# U.S. District Court
## Eastern District of Oklahoma (Muskogee)
## CIVIL DOCKET FOR CASE #: 6:09–cv–00105–JHP

Barrett v. USA

Assigned to: District Judge James H. Payne

Case in other court: 10th Circuit, 12–07086

ED/OK, 6:04–cr–115

Cause: 28:2255 Motion to Vacate / Correct Illegal Sentence

Date Filed: 03/16/2009
Date Terminated: 08/16/2012
Jury Demand: None
Nature of Suit: 535 Death Penalty – Habeas Corpus
Jurisdiction: U.S. Government Defendant

**Petitioner**

| | | |
|---|---|---|
| **Kenneth Eugene Barrett** | represented by | **David B. Autry** |

1021 NW 16th St
Oklahoma City, OK 73106
405–521–9600
Fax: 405–521–9669
Email: dbautry44@hotmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joan M. Fisher**
Federal Public Defender – Sacramento, CA
801 "I" St, Third Floor
Sacramento, CA 95814
916–498–6666
Fax: 916–498–5706
Email: joan.fisher@fd.org
*ATTORNEY TO BE NOTICED*

**Tivon Schardl**
Federal Public Defender – Sacramento, CA
801 "I" St, Third Floor
Sacramento, CA 95814
916–498–6666
Fax: 916–498–6656
Email: tim.schardl@fd.org
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

| | | |
|---|---|---|
| **USA** | represented by | **Christopher J. Wilson** |

US Attorney (OKED)
1200 W Okmulgee
Muskogee, OK 74401

918−684−5100
Fax: 918−684−5150
Email: Chris.Wilson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Kahan**
US Department of Justice – Capital Case
Unit
1331 F St NW
Rm 345
Washington, DC 20530
202−305−8910
Fax: 202−353−9779
Email: jeffrey.kahan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sheldon J. Sperling**
US Attorney (OKED)
1200 W Okmulgee
Muskogee, OK 74401
918−684−5100
Fax: 918−684−5150
*TERMINATED: 11/24/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/10/2009 | 4 | | MOTION to File Exhibits Under Seal and for a Protective Order by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 5 | | ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for a Protective Order (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 6 | | MOTION to Reconsider (Re: 5 Order Ruling on Motion to Seal Exhibits and for Protective Order) by Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 7 | | AMENDED ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for Protective Order (Re: 5 Order, 6 Motion to Reconsider) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 1 | | MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett; Responses due by 6/16/2009 (With attachments – **EXHIBITS 1−36; 59−60**)(EXHIBITS 37−58 NOT USED)(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 3 | | |

| | | | |
|---|---|---|---|
| | | | EXHIBITS IN SUPPORT OF MOTION **Nos. 61–70, 71–80, 81–99, 100–118** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 8 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134 and 135** (Re: 1 MOTION to Vacate and 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 9 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 10 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 11 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 12 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 13 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 137, 138, 139, 140, 141, 142 and 143** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 14 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 144A, 144B, 145 and 146** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 15 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 16 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 17 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 18 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 19 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 147B2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 20 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) |

| | | | |
|---|---|---|---|
| | | | (Entered: 03/18/2009) |
| 03/16/2009 | 21 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 22 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 23 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 24 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 25 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 26 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147F** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 27 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147G** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 28 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 148, 149, 150, 151, 152, 153, 154, 155, 156, 157 and 158** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 29 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 159, 160, 161, 162, 163, 164 and 165** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 30 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 166, 167, 168, 169, 170, 171, 172, 173, 174 and 175** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 31 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 32 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 33 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 34 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |

| 03/16/2009 | 35 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
|---|---|---|---|
| 03/16/2009 | 36 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 37 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 178, 179 and 180** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 38 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 39 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 40 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 41 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 42 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 182, 183, 184 and 185** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 43 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 186, 187, 188, 189, 190, 191, 192, 193, 194 and 195** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/17/2009 | 2 | | CORRECTED MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett (corrected to include verification) (Re: 1 Motion to Vacate); Responses due by 6/16/2009(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/18/2009 | 44 | | NOTICE to Government to Respond by **6/16/2009** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) Modified on 3/19/2009 to change response date to 6/16/09 (cjt, Deputy Clerk). (Entered: 03/18/2009) |
| 03/19/2009 | | | NOTICE of Docket Entry Modification; Error: Wrong date of 3/16/09 given in text; Correction: Correcting response date to 6/16/09 (Re: 44 Notice to Respond) (cjt, Deputy Clerk) (Entered: 03/19/2009) |
| 05/29/2009 | 45 | | MOTION to Disqualify Judge by Kenneth Eugene Barrett Responses due by 6/15/2009 Replies due by 6/24/2009.(Schardl, Tivon) (Entered: 05/29/2009) |
| 06/03/2009 | 46 | | ATTORNEY APPEARANCE by Christopher J. Wilson on behalf of USA (Wilson, Christopher) (Entered: 06/03/2009) |
| 06/11/2009 | 47 | | |

| | | | |
|---|---|---|---|
| | | | First MOTION for Extension of Time to Respond to Motion (Re: 45 MOTION to Disqualify Judge ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/11/2009 | 48 | | First MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment, 1 MOTION to Vacate Order/Judgment ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/12/2009 | 49 | | MINUTE ORDER by District Judge James H. Payne granting Application for Extension of Time to Respond to Petitioner's Motoin to Disqualify and Recuse United States District Judge James H. Payne from Further Participation in this Matter ( 47 Motion for Extension of Time to Respond to Motion). Accordingly, the respondent has until 7/15/09 within which to file its response to petitioner's motion (Re: 45 MOTION to Disqualify Judge ).(law, Deputy Clerk) (Entered: 06/12/2009) |
| 06/12/2009 | 50 | | MINUTE ORDER by District Judge James H. Payne granting in part and denying in part Application for Extension of Time to Respond to Petitioner's 28 U.S.C. Section 2255 Motion ( 48 Motion for Extension of Time to Respond to Motion ). Respondent has an additional 3 months or until 9/16/09 within which to file its response to petitioner's 28 U.S.C. Section 2255 Motion. (law, Deputy Clerk) (Entered: 06/12/2009) |
| 07/13/2009 | 51 | | RESPONSE in Opposition to Motion (Re: 45 MOTION to Disqualify Judge ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 07/13/2009) |
| 07/24/2009 | 52 | | First MOTION to unseal documents in cr–04–115 by USA Responses due by 8/10/2009 Replies due by 8/19/2009.(Wilson, Christopher) (Entered: 07/24/2009) |
| 08/14/2009 | 53 | | MOTION to File Response to Government's Motion to Unseal Out of Time by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/14/2009 | 54 | | MOTION to File Out of Time *PROPOSED ORDER* by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/17/2009 | 55 | | ORDER by District Judge James H. Payne: striking 54 Petitioner's Proposed Order which was filed in error (cjt, Deputy Clerk) (Entered: 08/17/2009) |
| 08/19/2009 | 56 | | MINUTE ORDER by District Judge James H. Payne: Directing Petitioner to supplement 53 MOTION to File Response to Government's Motion to Unseal Out of Time by 5:00 p.m. today, 8/19/09, to include a statement as to whether either Christopher J. Wilson or Jeffrey B. Kahan, counsel for respondent, USA objects to the motion. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 57 | | SUPPLEMENT (Re: 56 Minute Order,,, 53 MOTION to File Response to Government's Motion to Unseal Out of Time ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 08/19/2009) |
| 08/19/2009 | 58 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr–04–115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/19/2009) |

| | | | |
|---|---|---|---|
| 08/19/2009 | 59 | | MINUTE ORDER by District Judge James H. Payne: Striking 58 Petitioner's Response in Opposition to the Government's Motion to Unseal (Re: 52 Government's MOTION to Unseal Documents). (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 60 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's Motion to File a Response to Government's Motion to Unseal out of time (Doc. 53 ) is hereby granted. The Court notes that the Government's objection to Petitioner's request is based upon the impending deadline for the Government to respond to the Petitioner's § 2255 Motion (Doc. # 2) and that the Government's Motion to Unseal (Doc. # 52) indicates the pleadings sought are needed for the Government to be able to prepare its response to the Petitioner's § 2255 Motion. To the extent that any delay in ruling on the Government's Motion to Unseal is directly attributable to Petitioner's failure to timely respond to the Government's Motion to Unseal, this Court will consider that in the event the Government becomes unable to meet their current response deadlines on the § 2255 Motion. Accordingly, Petitioner shall be given until August 26, 2009 to file a Response to the Government's Motion (Doc. 52 ) and the Government shall be given until September 2, 2009, to Reply. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/26/2009 | 61 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr–04–115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/26/2009) |
| 08/28/2009 | 62 | | REPLY to Response to Motion (Re: 52 First MOTION to unseal documents in cr–04–115 ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 08/28/2009) |
| 09/04/2009 | 63 | | Second MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment ) by USA Responses due by 9/21/2009(Wilson, Christopher) (Entered: 09/04/2009) |
| 09/04/2009 | 64 | | MINUTE ORDER by District Judge James H. Payne: granting 63 Respondent's Motion for Extension of Time to Respond to Motion; Response due by 10/16/2009 (Re: 1 MOTION to Vacate Order/Judgment, 2 Corrected MOTION to Vacate Order/Judgment ) (cjt, Deputy Clerk) (Entered: 09/04/2009) |
| 09/04/2009 | 65 | | RESPONSE to Motion (Re: 63 Second MOTION for Extension to Respond to 2255 Motion) by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 9/8/2009 to change text and change link (dma, Deputy Clerk). (Entered: 09/04/2009) |
| 09/11/2009 | 66 | | ORDER by District Judge James H. Payne: denying 45 Petitioner's Motion to Disqualify and Recuse (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/11/2009 | 67 | | ORDER by District Judge James H. Payne: Granting in part, denying in part and taking under advisement in part 52 Government's MOTION to Unseal, or to Gain Full Access to Motions, Orders, Reports and Proceedings filed Cr–04–115 (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/22/2009 | 68 | | NOTICE of Intention Not to Abandon Claims and REQUEST for Protective Order (Re: 67 Order) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) Modified on 9/23/2009 change text (dma, |

| | | | |
|---|---|---|---|
| | | | Deputy Clerk). (Entered: 09/22/2009) |
| 09/23/2009 | 69 | | ORDER by District Judge James H. Payne (Re: 67 Order, 68 Petitioner's NOTICE of Intent Not to Abandon Claims and REQUEST for Protective Order) (cjt, Deputy Clerk) (Entered: 09/23/2009) |
| 09/25/2009 | 70 | | Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* by Kenneth Eugene Barrett Responses due by 10/13/2009 (With attachments – **EXHIBITS 1–10**)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 71 | | EXHIBIT(S) **11 through 50** (Re: 70 Amended MOTION to Vacate Order/Judgment *, Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 72 | | EXHIBIT(S) **51 through 118** (Re: 70 Amended MOTION to Vacate Order/Judgment *, Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/28/2009 | 73 | | OBJECTION to Petitioner's Proposed Protective Order (Re: 68 MOTION for Protective Order) by USA (Wilson, Christopher) Modified on 9/29/2009 to change text (dma, Deputy Clerk). (Entered: 09/28/2009) |
| 09/29/2009 | 74 | | ORDER by District Judge James H. Payne: Show Cause Hearing and Scheduling Conference are set for 10/6/2009 at 02:00 PM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne (Re: 70 Amended MOTION for Collateral Relief, to Vacate, Set Aside or Correct Sentence and for a New Trial) (cjt, Deputy Clerk) (Entered: 09/29/2009) |
| 09/30/2009 | 75 | | RESPONSE (Re: 69 Order, ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 09/30/2009) |
| 10/02/2009 | 76 | | MOTION to Vacate Order/Judgment *Order Filed September 29, 2009*, MOTION to Continue Hearing(s) *On Order to Show Cause* (Re: 74 Order,, Setting/Resetting Hearing(s), Setting/Resetting Hearing(s),, ) by Kenneth Eugene Barrett Responses due by 10/19/2009 (With attachments)(Schardl, Tivon) (Entered: 10/02/2009) |
| 10/02/2009 | 77 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's emergency motion (Dkt 76 ) to vacate show cause order is denied. The court hereby waives the presence of petitioner's counsel, Tivon Schardl, at the hearing scheduled October 6, 2009, at 2:00 p.m. Lead counsel, David Autry, is required to attend; however, arrangements will be made for lead counsel to speak with co–counsel Tivon Schardl via telephone, if necessary. In addition, the parties should be aware the court intends to conduct a status and scheduling conference to receive the parties' observations and comments as to the time frame necessary for disposition of this matter. (cjt, Deputy Clerk) (Entered: 10/02/2009) |
| 10/05/2009 | 78 | | MOTION to Continue Hearing(s), MOTION to Recuse, MOTION to Reconsider, MOTION for Leave to Appear *y* (Re: 77 Minute Order,,, Ruling on Motion to Vacate Order/Judgment,,, Ruling on Motion to Continue |

| | | | |
|---|---|---|---|
| | | | Hearing(s), Ruling on Motion to Continue Hearing(s), Ruling on Motion to Continue Hearing(s) ) by Kenneth Eugene Barrett Responses due by 10/20/2009(Schardl, Tivon) (Entered: 10/05/2009) |
| 10/05/2009 | 79 | | MINUTE ORDER by District Judge James H. Payne: denying 78 Petitioner's Motion to Reconsider; denying 78 Petitioner's Motion to Continue Hearing; finding as moot 78 Motion for Leave to Appear by Telephone pursuant to Minute Order 77 entered on 10/2/09. 78 Petioner's Motion to Recuse was previously denied by Order 66 entered on 9/11/09. (cjt, Deputy Clerk) (Entered: 10/05/2009) |
| 10/06/2009 | 80 | | MINUTES of Proceedings – held before District Judge James H. Payne: Show Cause/Scheduling Hearing held on 10/6/2009 (Court Reporter: K.Sidwell) (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 81 | | SCHEDULING ORDER by District Judge James H. Payne: Amended Motion to Vacate due 11/6/2009; Brief in Support due 1/5/2010; Response due 3/8/2010; Reply due 3/23/2010 (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 82 | | PROTECTIVE ORDER by District Judge James H. Payne: granting 68 Petitioner's Motion for Protective Order; granting 52 Government's Motion to Unseal Documents (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/08/2009 | 83 | | ***Remark: Pursuant to 82 Protective Order entered on 10/7/2009, copies of sealed Doc. Nos. 16, 23, 24, 25, 46, 50, 51, 57, 107, 113, 116, 118, 232, 274, 301 and the sealed letter dated 2/28/2005, all filed in Case No. CR–04–115–JHP, were personally delivered to Asst. United States Attorney Christopher Wilson on 10/8/2009. (cjt, Deputy Clerk) (Entered: 10/08/2009) |
| 10/09/2009 | 84 | | STATUS REPORT by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 10/09/2009) |
| 10/15/2009 | 85 | | TRANSCRIPT of Proceedings (Unredacted) of Show cause/Scheduling Hearing held on 10/6/09 before District Judge James H. Payne (Court Reporter: Ken Sidwell) (Pages: 1–42). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 80 Minutes of Scheduling Conference, Striking/Terminating Deadline(s)/Hearing(s) ) (kns, Court Reporter) (Entered: 10/15/2009) |
| 10/16/2009 | 86 | | MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* by Kenneth Eugene Barrett Responses due by 11/2/2009(Schardl, Tivon) (Entered: 10/16/2009) |
| 10/20/2009 | 87 | | ORDER by District Judge James H. Payne ; denying 86 Motion to Stay (lsa, Chambers) (Entered: 10/20/2009) |
| 10/28/2009 | 88 | | Unopposed MOTION to Extend Deadline(s) *Established by Order filed October 7, 2009* by Kenneth Eugene Barrett Responses due by 11/12/2009 (With attachments)(Schardl, Tivon) (Entered: 10/28/2009) |

| | | | |
|---|---|---|---|
| 11/02/2009 | 89 | | SUPPLEMENT to Unopposed Motion to Continue Filing Schedule 88 by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 11/3/2009 to edit text (cjt, Deputy Clerk). (Entered: 11/02/2009) |
| 11/03/2009 | 90 | | ORDER EXTENDING FILING SCHEDULE by District Judge James H. Payne: granting 88 Petitioner's Unopposed Motion to Continue Filing Schedule (cjt, Deputy Clerk) (Entered: 11/03/2009) |
| 11/04/2009 | 91 | | ORDER from Circuit Court (Re: 86 MOTION to Stay Proceedings Pending Disposition of Mandamus Action 87 Order Denying Motion to Stay) (cjt, Deputy Clerk) (Entered: 11/04/2009) |
| 12/03/2009 | 92 | | MINUTE ORDER by District Judge James H. Payne: Show Cause Hearing is set for 12/15/2009 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne for David Autry to show cause why he has failed to comply with this Court's prior orders regarding submission of CJA vouchers. Only David Autry's appearance is required at this hearing. (cjt, Deputy Clerk) (Entered: 12/03/2009) |
| 12/04/2009 | 93 | | ATTORNEY APPEARANCE by Joan Fisher on behalf of Kenneth Eugene Barrett (Fisher, Joan) Modified on 12/7/2009 to change text (dma, Deputy Clerk). (Entered: 12/04/2009) |
| 12/04/2009 | 94 | | NOTICE Petitioner's Notice Regarding Amended Petition by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 12/04/2009) |
| 12/04/2009 | 95 | | Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* by Kenneth Eugene Barrett Responses due by 12/18/2009(Fisher, Joan) (Entered: 12/04/2009) |
| 12/14/2009 | 96 | | ORDER from Circuit Court (Re: 87 Order, Ruling on Motion to Stay, 86 MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* ) (With attachments)(law, Deputy Clerk) (Entered: 12/14/2009) |
| 12/15/2009 | 97 | | SEALED MINUTES of Show Cause Hearing (cjt, Deputy Clerk) (Entered: 12/15/2009) |
| 01/08/2010 | 98 | | MOTION to Extend Deadline(s) *for submission of cja voucher* by Kenneth Eugene Barrett Responses due by 1/22/2010(Autry, David) (Entered: 01/08/2010) |
| 01/08/2010 | 99 | | MINUTE ORDER by District Judge James H. Payne: granting 98 Motion to Extend Time for Submittal of CJA Voucher by Petitioner's counsel, David Autry, until 1/11/2010. (cjt, Deputy Clerk) (Entered: 01/08/2010) |
| 01/11/2010 | 100 | | NOTICE of Submission of Matter for In Camera Review by USA (Wilson, Christopher) (Entered: 01/11/2010) |
| 01/11/2010 | 101 | | SEALED LETTER (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/12/2010 | 102 | | PROTECTIVE ORDER by District Judge James H. Payne (Re: 101 Sealed Letter) (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/13/2010 | 103 | | Unopposed MOTION to Extend Deadline(s) *to File Brief in Support of Amended Petition and Subsequent Briefing* by Kenneth Eugene Barrett Responses due by 1/27/2010 (With attachments)(Schardl, Tivon) (Entered: |

| | | | |
|---|---|---|---|
| | | | 01/13/2010) |
| 01/15/2010 | 104 | | MINUTE ORDER by District Judge James H. Payne: For good cause shown, 103 Petitioner's Motion for Extension of Time to File Brief in Support of Amended Motion to Vacate is granted. Petitioner shall be given until 2/18/2010 to file his brief. No further extensions of time shall be granted. Respondent's answer shall be due 4/19/2010 and Petitioner's reply will be due 5/4/2010. (Re: 95 Amended MOTION to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255) (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 01/15/2010 | 105 | | MINUTE ORDER by District Judge James H. Payne: It is hereby ordered that Petitioner Kenneth Eugene Barrett's CJA 30 DEATH PENALTY PROCEEDINGS: APPOINTMENT OF AND AUTHORITY TO PAY COURT–APPOINTED COUNSEL comes before the Court by David B. Autry. This matter is hereby REFERRED to Magistrate Judge Steven P. Shreder for a fee hearing and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate said original application and supporting documents. (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 02/02/2010 | 106 | | MINUTE ORDER by District Judge James H. Payne (Attachments: # 1 1/29/2010 E–Mail) (cjt, Deputy Clerk) (Entered: 02/02/2010) |
| 02/11/2010 | 107 | | Third MOTION to Extend Deadline(s) *Due to Newly Disclosed Evidence* by Kenneth Eugene Barrett Responses due by 2/25/2010 (With attachments)(Schardl, Tivon) (Entered: 02/11/2010) |
| 02/12/2010 | 108 | | MINUTE ORDER by District Judge James H. Payne: Motion Hearing and Status Conference are set for 3/1/2010 at 09:30 AM before District Judge James H. Payne (Re: 107 Petitioner's Third MOTION to Continue Briefing Schedule). Counsel are required to be present at this hearing. Petitioner does not need to be present. (cjt, Deputy Clerk) (Entered: 02/12/2010) |
| 02/18/2010 | 109 | | MOTION Leave to File Oversized Brief in Support of Amended Motion to Vacate, MOTION for Leave to File Brief in Support of Second Amended Motion to Vacate by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 110 | | Unopposed MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 3/4/2010(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 111 | | Amended MOTION for Leave to Exceed Page Limitation by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 112 | | MINUTE ORDER by District Judge James H. Payne: denying 111 Petitioner's Amended Motion for Leave to File Oversized Brief, with written order to follow (finding as moot 109 Petitioner's Motion for Leave to File Oversized Brief) (cjt, Deputy Clerk) (Entered: 02/18/2010) |
| 02/18/2010 | 113 | | MOTION to Reconsider *Order Denying Leave to File Oversized Brief* (Re: 112 Minute Order,, Ruling on Motion for Miscellaneous Relief,, Ruling on Motion for Leave to File Document(s), Ruling on Motion for Leave to File Document(s), Ruling on Motion to Exceed Page Limitation, ) by Kenneth |

| | | | |
|---|---|---|---|
| | | | Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 114 | | REDACTED EXHIBITS **119, 120, 121, 122** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 115 | | REDACTED EXHIBITS **125, 126, 128, 129, 130, 132, 133, 134, 137, 138** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 116 | | REDACTED EXHIBITS **148, 149, 150, 151, 152, 153, 154** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 117 | | REDACTED EXHIBITS **123, 124, 127, 131, 135** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 118 | | REDACTED EXHIBITS **155, 156** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 119 | | REDACTED EXHIBITS **157, 158** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 120 | | REDACTED EXHIBITS **163, 164** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 121 | | REDACTED EXHIBIT **161** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 122 | | REDACTED EXHIBIT **162** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 123 | | REDACTED EXHIBITS **165, 166** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 124 | | REDACTED EXHIBIT **159 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: |

| | | | |
|---|---|---|---|
| | | | 02/18/2010) |
| 02/18/2010 | 125 | | REDACTED EXHIBITS **167, 168, 169** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 126 | | REDACTED EXHIBIT **159 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 127 | | REDACTED EXHIBITS **170, 171** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 128 | | REDACTED EXHIBIT **160 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 129 | | REDACTED EXHIBIT **160 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 130 | | REDACTED EXHIBITS **172, 173** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 131 | 22 | REDACTED EXHIBIT **177 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 132 | 84 | REDACTED EXHIBITS **174, 175, 176, 178** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 133 | 166 | REDACTED EXHIBIT **177 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 134 | 227 | REDACTED EXHIBIT **177 Part c** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 135 | 265 | REDACTED EXHIBITS **179, 180, 181a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |

| 02/18/2010 | 136 | 366 | REDACTED EXHIBIT **181 Part B1** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
|---|---|---|---|
| 02/18/2010 | 137 | 454 | REDACTED EXHIBITS **182, 183** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 138 | 551 | REDACTED EXHIBIT **181 Part B2** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 139 | | REDACTED EXHIBIT **196 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 140 | | REDACTED EXHIBITS **184, 185, 186, 187, 188** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 141 | | REDACTED EXHIBIT **196 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 142 | | REDACTED EXHIBIT **196 Part c** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 143 | | REDACTED EXHIBIT **196 Part d** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 144 | | REDACTED EXHIBITS **189, 190, 191, 192, 193, 194, 195** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 145 | | REDACTED EXHIBITS **197, 198, 199, 200, 203, 204, and 205** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 02/18/2010) |
| 02/26/2010 | 146 | | ORDER by District Judge James H. Payne: granting 113 petitioner's Motion to Reconsider; Petitioner's brief due 3/1/10 at 4:30 p.m.; Status Conference RESET for 3/31/2010 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne; (granting in part 107 Motion to Continue Briefing Schedule; striking |

| | | | |
|---|---|---|---|
| | | | 1 Motion to Vacate Order/Judgment; striking 2 Corrected Motion to Vacate Order/Judgment; striking 70 Amended Motion to Vacate Order/Judgment) (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 02/26/2010 | 147 | | ORDER by District Judge James H. Payne: Re: 110 petitioner's Unopposed MOTION to File Exhibits Under Seal; Petitioner's response due 3/12/10 (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 03/01/2010 | 148 | | STIPULATION *and Order [Proposed] Modified Protective Order* by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 149 | | BRIEF in Support of Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 150 | | MOTION for Evidentiary Hearing (Re: 95 Amended MOTION to Vacate) by Kenneth Eugene Barrett; Responses due by 3/15/2010(Schardl, Tivon) Modified on 3/2/2010 to change text and link (dma, Deputy Clerk). (Entered: 03/01/2010) |
| 03/01/2010 | 151 | | MOTION Expand the Record (Re: 149 Brief in Support of Motion ) by Kenneth Eugene Barrett Responses due by 3/15/2010(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/03/2010 | 152 | | Joint MOTION to Modify Protective Order by all parties Responses due by 3/17/2010(Wilson, Christopher) (Entered: 03/03/2010) |
| 03/05/2010 | 153 | | RESPONSE in Opposition to Motion (Re: 150 MOTION for Hearing ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/05/2010 | 154 | | RESPONSE in Opposition to Motion (Re: 151 MOTION Expand the Record ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/12/2010 | 155 | | RESPONSE by Kenneth Eugene Barrett (Re: 147 Order) (Fisher, Joan) (Entered: 03/12/2010) |
| 03/25/2010 | 156 | | MINUTE ORDER by District Judge James H. Payne: **TIME CHANGE ONLY** – Status Conference RESET for 3/31/2010 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne. (cjt, Deputy Clerk) (Entered: 03/25/2010) |
| 03/29/2010 | 157 | | ORDER by District Judge James H. Payne: denying 150 Petitioner's Motion for Evidentiary Hearing (cjt, Deputy Clerk) (Entered: 03/29/2010) |
| 03/29/2010 | 158 | | MOTION to be Excused from the Status Conference set on March 31, 2010 by USA Responses due by 4/12/2010(Wilson, Christopher) (Entered: 03/29/2010) |
| 03/29/2010 | 159 | | MINUTE ORDER by District Judge James H. Payne: granting 158 Government's Motion to be Excused from Attendance of Status Conference. The Court further grants Government's request for substitute counsel, Douglas Horn, to appear in lieu of Christopher Wilson for this hearing only. (cjt, Deputy Clerk) (Entered: 03/29/2010) |

| | | | |
|---|---|---|---|
| 03/30/2010 | 160 | | MINUTE ORDER by District Judge James H. Payne: The Court directs that Courtroom 1, Room 230, be sealed on 3/31/2010 at 9:00 a.m. for the portion of the Status Hearing pertaining to the Protective Order. The Clerk is directed to post this Minute Order on the Court's bulletin board for public viewing located on the 2nd floor of the United States Courthouse. (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 161 | | ORDER (Re: Exhibits) by District Judge James H. Payne: granting 110 Petitioner's Motion to File Exhibits under Seal; granting 151 Petitioner's Motion to Expand the Record (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 162 | | SEALED EXHIBIT **201** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 163 | | SEALED EXHIBIT **202** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/31/2010 | 164 | | SEALED MINUTES of Proceedings – held before District Judge James H. Payne: Motion/Status Hearing held on 3/31/2010 (Re: 152 Joint MOTION to Modify Protective Order ) (Court Reporter: B.Neil) (cjt, Deputy Clerk) (cjt, Deputy Clerk). (Entered: 04/01/2010) |
| 03/31/2010 | 165 | | MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 03/31/2010 | 166 | | CORRECTED MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010, Reply due by 7/1/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 04/05/2010 | 167 | | SEALED REPORT TO COURT by USA (Re: 152 Joint Motion to Modify Protective Order) (cjt, Deputy Clerk) (Entered: 04/05/2010) |
| 04/08/2010 | 168 | | SEALED ORDER by Judge James H. Payne Re: 152 Joint Motion to Modify Protective Order (cjt, Deputy Clerk) (Entered: 04/08/2010) |
| 04/14/2010 | 169 | | SEALED STATUS REPORT by Kenneth Eugene Barrett (cjt, Deputy Clerk) Modified on 4/20/2010 to add corrected attachment (cjt, Deputy Clerk). (Entered: 04/15/2010) |
| 05/12/2010 | 170 | | Unopposed MOTION for Leave to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief by USA Responses due by 5/26/2010(Wilson, Christopher) (Entered: 05/12/2010) |
| 05/13/2010 | 171 | | ORDER by District Judge James H. Payne: granting 170 Respondent's Unopposed Motion to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief (cjt, Deputy Clerk) (Entered: 05/13/2010) |
| 05/14/2010 | 172 | | TRANSCRIPT of Proceedings (Unredacted) of Status Hearing held on 3–31–2010 before District Judge James H. Payne (Court Reporter: Brian P. Neil) (Pages: 1–46). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without |

| | | | |
|---|---|---|---|
| | | | redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s) ) (bpn, Court Reporter) (Entered: 05/14/2010) |
| 05/14/2010 | 173 | | TRANSCRIPT ORDER FORM for Status and Scheduling Conference conducted on 3/31/10 (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s), 172 Transcript of Proceedings – Unredacted) by Kenneth Eugene Barrett (law, Deputy Clerk) (Entered: 05/17/2010) |
| 05/17/2010 | 174 | | Redacted RESPONSE in Opposition to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 05/17/2010) |
| 05/17/2010 | 175 | | SEALED RESPONSE (Re: 174 RESPONSE to Motion; 95 Amended MOTION to Vacate, Set Aside or Correct a Sentence) by USA (dma, Deputy Clerk) (Entered: 05/17/2010) |
| 06/30/2010 | 176 | | Unopposed MOTION for Leave to Exceed Page Limitation *For Reply Brief* by Kenneth Eugene Barrett Responses due by 7/14/2010(Schardl, Tivon) (Entered: 06/30/2010) |
| 06/30/2010 | 177 | | MINUTE ORDER by District Judge James H. Payne: granting 176 Petitioner's Unopposed Motion for Leave to File Oversized Brief (cjt, Deputy Clerk) (Entered: 06/30/2010) |
| 07/01/2010 | 178 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 07/01/2010) |
| 07/23/2010 | 179 | | NOTICE of Filing of Signed Declaration of Toby Barrett (Re: 178 Reply to Response to Motion ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 07/23/2010) |
| 08/13/2010 | 180 | | REPORT AND RECOMMENDATION ON REQUEST FOR EXCESS COMPENSATION by Magistrate Judge Steven P. Shreder (Re: 105 Minute Order Referring CJA 30 Voucher) Objections to RRdue by 8/27/2010(eje, Deputy Clerk) (Entered: 08/13/2010) |
| 09/03/2010 | 181 | | SEALED ORDER by District Judge James H. Payne: Re: 180 Report and Recommendation) (cjt, Deputy Clerk) (Entered: 09/03/2010) |
| 09/03/2010 | | | CJA 30: Authorization to Pay David B. Autry on behalf of Kenneth Eugene Barrett. (JHP 9/3/10)(smg, Deputy Clerk) (Entered: 09/14/2010) |
| 02/07/2011 | 182 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 2/22/2011 (With attachments)(Fisher, Joan) (Entered: 02/07/2011) |
| 02/08/2011 | 183 | | MINUTE ORDER by District Judge James H. Payne: granting 182 Petitioner's Unopposed Motion to Seal. Petitioner is given leave to file the following documents under seal: Petitioners Motion to Vacate or Modify |

| | | | |
|---|---|---|---|
| | | | Protective Order and Request for Hearing; Brief in Support of Motion to Vacate or Modify Protective Order and Request for Hearing; Petitioners Motion for Leave to Conduct Discovery; and Petitioners Brief in Support of Motion to Conduct Discovery. (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 184 | | SEALED MOTION to Vacate or Modify Protective Orders and Request for Hearing by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 185 | | SEALED BRIEF in Support of 184 Petitioner's Sealed Motion to Vacate and/or Modify Protective Order and Request for Hearing (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 186 | | SEALED MOTION for Leave to Conduct Discovery by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 187 | | SEALED BRIEF in Support of 186 Sealed Motion to Conduct Discovery (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/17/2011 | 188 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 186 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 189 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 184 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 190 | | MINUTE ORDER by District Judge James H. Payne: granting 188 and 189 Government's Motions for Extension of Time to Respond to Motions; Responses due by 3/8/2011 Re: 184 Petitioner's SEALED MOTION to Vacate or Modify Protective Orders and 186 Petitioner's SEALED MOTION for Leave to Conduct Discovery (cjt, Deputy Clerk) (Entered: 02/17/2011) |
| 03/04/2011 | 191 | | Unopposed MOTION to Seal Document by USA Responses due by 3/18/2011(Kahan, Jeffrey) (Entered: 03/04/2011) |
| 03/04/2011 | 192 | | MINUTE ORDER by District Judge James H. Payne: granting 191 Respondent's Motion to File Sealed Oppositions to Sealed Motions (cjt, Deputy Clerk) (Entered: 03/04/2011) |
| 03/08/2011 | 193 | | SEALED RESPONSE in Opposition (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/08/2011 | 194 | | SEALED RESPONSE in Oposition (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/18/2011 | 195 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 4/1/2011 (With attachments)(Fisher, Joan) (Entered: 03/18/2011) |
| 03/18/2011 | 196 | | MINUTE ORDER by District Judge James H. Payne: granting 195 Petitioner's Motion to Seal Replies to documents 193 and 194 (cjt, Deputy Clerk) (Entered: 03/18/2011) |
| 03/21/2011 | 197 | | SEALED REPLY to Response (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by Petitioner (cjt, Deputy Clerk) (Entered: |

| | | | |
|---|---|---|---|
| | | | 03/22/2011) |
| 03/21/2011 | 198 | | SEALED REPLY to Response (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by Petitioner (cjt, Deputy Clerk) (Entered: 03/22/2011) |
| 03/16/2012 | 199 | | NOTICE of Filing of Declaration of Paul D. Gordon (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) Modified to reflect DVDs for Exhibits 2, 3 and 4 stored in file cabinet in vault on 2nd floor Court Clerk's Office (cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/16/2012 | 200 | | NOTICE of Filing of Declaration of Leonard Post (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 03/16/2012) |
| 03/16/2012 | 201 | | MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett Responses due by 3/30/2012 (With attachments)(Fisher, Joan) Modified to reflect CDs of Appendix A and Appendix B stored in file cabinet in vault on 2nd floor Court Clerk's Office(cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/19/2012 | 202 | | CERTIFICATE of Service (Re: 199 Notice (Other) ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/19/2012 | 203 | | CERTIFICATE of Service (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/29/2012 | 204 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 201 Motion to Supplement) by USA; Responses due by 4/12/2012 (With attachments)(Wilson, Christopher) Modified on 3/30/2012 (cjt, Deputy Clerk). (Entered: 03/29/2012) |
| 03/30/2012 | 205 | | MINUTE ORDER by District Judge James H. Payne: granting 204 Motion for Extension of Time to Respond to Motion; Response deadline extended to 4/30/2012 (Re: 201 MOTION to Supplement) (cjt, Deputy Clerk) (Entered: 03/30/2012) |
| 04/27/2012 | 206 | | RESPONSE in Opposition to Motion (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by USA ;(Wilson, Christopher) (Entered: 04/27/2012) |
| 05/07/2012 | 207 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255*, 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/07/2012) |
| 06/18/2012 | 208 | | MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY by Kenneth Eugene Barrett. Responses due by 7/2/2012(Fisher, Joan) (Entered: 06/18/2012) |

| 06/18/2012 | 209 | | BRIEF in Support of Motion (Re: 208 MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY ) by Kenneth Eugene Barrett ; (With attachments)(Fisher, Joan) (Entered: 06/18/2012) |
|---|---|---|---|
| 06/20/2012 | 210 | | ORDER by District Judge James H. Payne denying 201 Motion for Leave to Supplement Pending Motion to Vacate, Set Aside or Correct Judgment, Order and/or Sentence Under 28 U.S.C. Section 2255 (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/20/2012 | 211 | | MINUTE ORDER by District Judge James H. Payne denying 208 Motion to Preserve Testimony of Judge John Garrett, Retired, Without Further Delay (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/28/2012 | 212 | | MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* (Re: 210 Ruling on Motion to Supplement ) by Kenneth Eugene Barrett. Responses due by 7/12/2012(Fisher, Joan) (Entered: 06/28/2012) |
| 07/10/2012 | 213 | | RESPONSE in Opposition to Motion (Re: 212 MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* ) by USA ;(Wilson, Christopher) (Entered: 07/10/2012) |
| 08/16/2012 | 214 | | OPINION AND ORDER by District Judge James H. Payne: denying 95 Amended Motion to Vacate; denying 184 Sealed Motion; denying 186 Sealed Motion; denying 212 Motion to Reconsider (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 215 | | SEALED ORDER by District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 216 | | JUDGMENT by District Judge James H. Payne entering judgment in favor of USA against Kenneth Eugene Barrett (terminates case) (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 09/13/2012 | 217 | | MOTION to Alter Order/Judgment *and Brief in Support* (Re: 216 Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider ) by Kenneth Eugene Barrett. Responses due by 9/27/2012 (With attachments)(Fisher, Joan) (Entered: 09/13/2012) |
| 09/27/2012 | 218 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA. Responses due by 10/11/2012(Wilson, Christopher) (Entered: 09/27/2012) |
| 09/27/2012 | 219 | | ORDER by District Judge James H. Payne: granting 218 Motion for Extension of Time to Respond to Motion; Responses due by 10/29/2012 (Re: 217 MOTION to Alter or Amend Judgment) (cjt, Deputy Clerk) (Entered: 09/27/2012) |
| 10/29/2012 | 220 | | RESPONSE in Opposition to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 10/29/2012) |
| 10/30/2012 | 221 | | OPINION AND ORDER by District Judge James H. Payne: denying 217 Petitioner's Motion to Alter or Amend Judgment (cjt, Deputy Clerk) |

| | | | |
|---|---|---|---|
| | | | (Entered: 10/30/2012) |
| 12/26/2012 | 222 | | NOTICE OF APPEAL to Circuit Court (Re: 216 Judgment, 221 Ruling on Motion to Alter Order/Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider, 215 Sealed Order ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 12/26/2012) |
| 12/27/2012 | 223 | | Transmission of Notice of Appeal and Docket Sheet to Circuit Court with copy of 222 Notice of Appeal, 216 Judgment, 221 Ruling, 214 Ruling and 215 Sealed Order. Preliminary Record transmitted to 10th Circuit Court of Appeals electronically. (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/27/2012) |
| 12/27/2012 | 224 | | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 12–7086 (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/28/2012) |
| 01/10/2013 | 225 | | TRANSCRIPT ORDER FORM (Transcripts are not necessary or are already on file ) (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/10/2013) |
| 01/10/2013 | 226 | | DESIGNATION of Record on Appeal (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 01/10/2013) |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 177**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

22

**INFORMATION**

====================================================================

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA            )
        Plaintiff,        )
vs.                         )      No. CF-98-481
                       )
**AUBREY DALE JACOBS**        )
DOB:████/56 #████-1409 )
**JOSEPH DALE JACOBS**        )
DOB: ████76 #████-6130)
**JAMES WESLEY JACOBS**       )
DOB████/79 #████5912 )
**BRANDIE ZANE PRICE**        )
DOB:████78 #4████-5806)
        Defendant.      )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 15 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

# I N F O R M A T I O N

## IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:

Now comes DIANNE BARKER HARROLD, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that AUBREY DALE JACOBS, JOSEPH DALE JACOBS, JAMES WESLEY JACOBS and BRANDIE ZANE PRICE did, in Sequoyah County, and in the State of Oklahoma, on the 10TH DAY DECEMBER, in the year of our Lord, One Thousand, Nine Hundred and Ninety-Eight and before the presentment hereof, commit the crime of

COUNT I: POSSESSION OF CONTROLLED DRUG WITH INTENT TO DISTRIBUTE
(FELONY) 63 O.S. 2-401
On the day and year and in the county and state aforesaid, said AUBREY DALE JACOBS, JOSEPH DALE JACOBS, JAMES WESLEY JACOBS and BRANDIE ZANE PRICE, while acting in concert each with the other, did unlawfully, wilfully and feloniously have in their possession and under their control METHAMPHETAMINE with the felonious intent then and there to unlawfully deliver and distribute the same, said drug being classified as a controlled dangerous substance in Schedule II of the Uniform Controlled Dangerous Substances Act of this State,

COUNT II: UNLAWFUL POSSESSION OF PARAPHERNALIA-(MISD) 63 O.S. 2-405
On the day and year in the County and State aforesaid, said AUBREY DALE JACOBS, JOSEPH DALE JACOBS, JAMES WESLEY JACOBS and BRANDIE ZANE PRICE, while acting in concert each with the other, did unlawfully, wilfully and wrongfully have in their possession and under their control certain paraphernalia, to-wit: syringes, plastic baggies, scales and rolling papers, used to consume drugs classified as controlled dangerous substances under the Uniform Controlled Dangerous Substances Act of this State, and for the purpose and with the unlawful intent to administer such controlled dangerous substances without having any medical or other lawful need requiring possession of said paraphernalia,

COUNT III: UNLAWFUL POSSESSION OF MARIHUANA-(MISD) 63 O.S. 2-402
That on the day and year and in the county and state aforesaid, said AUBREY DALE JACOBS, JOSEPH DALE JACOBS, JAMES WESLEY JACOBS and BRANDIE ZANE PRICE, while acting in concert each with the other, did unlawfully, wilfully, knowingly, intentionally and wrongfully have in their possession and under their control MARIHUANA, said drug being classified as a controlled dangerous substance in Schedule I (C) of the Uniform Controlled Dangerous Substances Act of this State,

23

COUNT IV: FELONIOUSLY CARRYING FIREARM-21 O.S. 1283
AUBREY DALE JACOBS did unlawfully, wilfully, and feloniously have in his possession or within his immediate control a .12 gauge shotgun, after having been heretofore placed on DOC supervision in Case No. CF-98-58, for the crime of POSSESSION OF CONTROLLED DRUG WITH INTENT TO DISTRIUBTE, in Sequoyah County, State of Oklahoma,

COUNT V: POSSESSION OF FIREARM IN COMMISSION OF FELONY
21 O.S. 1287
That on the day and year, and in the County and State, aforesaid, AUBREY DALE JACOBS, JOSEPH DALE JACOBS, JAMES WESLEY JACOBS and BRANDIE ZANE PRICE, while acting in concert each with the other, did unlawfully, wilfully, and feloniously, while committing the felony of POSSESSION OF CONTROLLED DRUG WITH INTENT TO DISTRIBUTE, did then and there possess a firearm, to-wit: a .12 gauge shotgun, whether loaded or not, in such commission or attempt,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

By _____
Assistant District Attorney

STATE OF OKLAHOMA )
) ss.
COUNTY OF SEQUOYAH)
Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____
Assistant District Attorney

Subscribed and sworn to before me this 15th day of December, 1998.

My Commission Expires:
4/28/99

_____
NOTARY PUBLIC

WITNESSES:
Alan Spangler, Muldrow PD
David Haskins, Muldrow PD
David Taylor, Muldrow PD
Joe Cavillo, Muldrow PD
Phil Robertson, Muldrow PD
April Childers, Muldrow PD
Chemist, OSBI Lab, Tahlequah, OK

24

IN THE DISTRICT COURT OF SEQUOYAH COUNTY

STATE OF OKLAHOMA

PROBABLE CAUSE AFFIDAVIT

CF-98-481

Comes now the undersigned Affiant, and states upon Oath or Affirmation that the following information and facts are correct to the best of the Affiant's knowledge and belief.

NAME OF PERSON ARRESTED: Joseph Dale Jacobs
DATE OF BIRTH: ████ 76                          DATE OF ARREST 12-10-98
TIME OF ARREST (DETENTION) : 2345 _____ a.m./(p.m.)

STATE SPECIFIC FACTS UPON WHICH PROBABLE CAUSE FOR ARREST WAS BASED:

Search Warrant was executed at the Residence, were Subject named Above was AT. During Search Several Syringes were found, Several Plastic Baggies were found with White Powdery Substance inside. Green leafy Substance was also found. 12ga shotgun was found inside the Residence. Subject is Convicted Felon through Sebastian County on 3-15-98. Several Colored Small plastic Baggies were Discovered Along with Scales.

( Use reverse side or attach another page if necessary )

ANTICIPATED CHARGE (S) : Poss CDS w/ Intent, Poss Marijuana, Poss Drug Phara., Felon in Poss Firearm, Poss Firearm while Committing Felony, AFCF

_____
AFFIANT ( ARRESTING OFFICER )

SUBSCRIBED AND SWORN TO BEFORE ME, THE UNDERSIGNED, THIS 11th DAY OF December 199 8.
MY COMMISSION EXPIRES: 6/28/99                    _____
                                                 NOTARY PUBLIC / JUDGE / WITNESS

=============================================================================

PROBABLE CAUSE DETERMINATION

I, Dennis M. Sprouce : Judge of the District Court, revirwed this Probable Cause Affidavit on the 11 day of December ; 199 8 at 3:26 a.m / p.m.

___✓___ This Affidavit contains sufficient facts showing probable cause to detain the Arrestee to await further proceedings.

___✓___ The Court sets an Appearance Bond in the amount of $ 20,000.00

_____ The Court denies Bond at this time.

_____ This Affidavit contains insufficient facts to show there is probable cause to detain the Arrestee. The Arrestee is ORDERED RELEASED FROM CUSTODY FORTHWITH.

_____
JUDGE OF THE DISTRICT COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 15 1998

BERNELL EDWARDS, COURT CLERK
BY _____ Cw
_____ DEPUTY

IN THE DISTRICT COURT OF SEQUOYAH COUNTY

STATE OF OKLAHOMA

PROBABLE CAUSE AFFIDAVIT

CF-98-481

Comes now the undersigned Affiant, and states upon Oath or Affirmation that the following information and facts are correct to the best of the Affiant's knowledge and belief.

NAME OF PERSON ARRESTED: *James Wesley Jacobs*
DATE OF BIRTH: ███ 79     DATE OF ARREST *12-10-98*
TIME OF ARREST (DETENTION): *2345*     a.m./~p.m.~

STATE SPECIFIC FACTS UPON WHICH PROBABLE CAUSE FOR ARREST WAS BASED:

*Subject was at Residence were Search Warrant was excuted. During Search, Several Syringes were found, Several Plastic Baggies, and Scales. Asd. Plastic Baggies had white powdery Sbstance inside. Green leafy Sbstance was found, along with pipes. Two Syringes found was loaded with a liquid Sbstance. Also 12ga shotgun was found at the Residence.*

( Use reverse side or attach another page if necessary )

ANTCIPATED CHARGE (S) : *Poss CDS w/ Intent, Poss Marijuana, Poss Drug Para, Poss Firearm while commiting Felony*

AFFIANT / ARRESTING OFFICER

SUBSCRIBED AND SWORN TO BEFORE ME, THE UNDERSIGNED, THIS *11the* DAY OF *December* 199*8*.
MY COMMISSION EXPIRES: *6/28/99*

NOTARY PUBLIC / JUDGE / WITNESS

=====================================================================

PROBABLE CAUSE DETERMINATION

I, *Dennis M. Sprouse* : Judge of the District Court, revirwed this Probable Cause Affidavit on the *11* day of *December* ; 199*8* at *3:2r* ~a.m.~/ p.m.

___✓___ This Affidavit contains sufficient facts showing probable cause to detain the Arrestee to await further proceedings.

___✓___ The Court sets an Appearance Bond in the amount of $ *10,000.00*

_____ The Court denies Bond at this time.

_____ This Affidavit contains insufficient facts to show there is probable cause to detain the Arrestee. The Arrestee is ORDERED RELEASED FROM CUSTODY FORTHWITH.

JUDGE OF THE DISTRICT COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 15 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

26

IN THE DISTRICT COURT OF SEQUOYAH COUNTY

STATE OF OKLAHOMA

PROBABLE CAUSE AFFIDAVIT          CF-98-481

Comes now the undersigned Affiant, and states upon Oath or Affirmation that the following information and facts are correct to the best of the Affiant's knowledge and belief.

NAME OF PERSON ARRESTED: Brandie Jane Price
DATE OF BIRTH: ____ 78          DATE OF ARREST  12-10-98
TIME OF ARREST (DETENTION): 2345          a.m. / p.m.

STATE SPECIFIC FACTS UPON WHICH PROBABLE CAUSE FOR ARREST WAS BASED:

Subject was present at Residence while Search warrant was executed. Subjects Personal belongings were Also present at Residence. During Search Several Syringes were Found, Several Small plastic Baggies, Scales, and pipes. 2 Syringes were Found with liquid inside, Several plastic Baggies were found with powder Substance inside. 12ga Shotgun was found inside the Residence. Also green leafy Substance was found

( Use reverse side or attach another page if necessary )

ANTCIPATED CHARGE (S): Poss CDS w/ Intent, Poss Marijuana, Poss Para, Poss Firearm while Committing Felony

AFFIANT ( ARRESTING OFFICER )

SUBSCRIBED AND SWORN TO BEFORE ME, THE UNDERSIGNED, THIS 11the DAY OF December 1998.
MY COMMISSION EXPIRES: 6/28/99

NOTARY PUBLIC / JUDGE / WITNESS

========================================================================
PROBABLE CAUSE DETERMINATION

I, Dennis M. Sprouse : Judge of the District Court, revirwed this Probable Cause Affidavit on the 11 day of Dec. ; 1998 at 3:27 a.m. / p.m.

___ This Affidavit contains sufficient facts showing probable cause to detain the Arrestee to await further proceedings.

___ The Court sets an Appearance Bond in the amount of $ 15,000.00

___ The Court denies Bond at this time.

___ This Affidavit contains insufficient facts to show there is probable cause to detain the Arrestee. The Arrestee is ORDERED RELEASED FROM CUSTODY FORTHWITH.

JUDGE OF THE DISTRICT COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 1 5 1998

BERNELL EDWARDS COURT CLERK
BY _____ DEPUTY

IN .HE DISTRICT COURT OF SEQUOYAH C JTY

STATE OF OKLAHOMA

PROBABLE CAUSE AFFIDAVIT          CF-98-481

Comes now the undersigned Affiant, and states upon Oath or Affirmation that the following information and facts are correct to the best of the Affiant's knowledge and belief.

NAME OF PERSON ARRESTED: Aubrey Dale Jacobs
DATE OF BIRTH: _____ 56          DATE OF ARREST 12-10-98
TIME OF ARREST (DETENTION) : 2345 _____ a.m. (p.m.)

STATE SPECIFIC FACTS UPON WHICH PROBABLE CAUSE FOR ARREST WAS BASED:

Search Warrant was executed at the Residence of the person named above. During Search of the Residence Several Syringes were found, along with Scales, white powdery Substance believed to be Meth., Dreen leafy Substance believed to be Marijuana, 1 Set of Scales, Shotgun 12ga. Subject IS Convicted Felon. Subject Recieved 5 year Suspended Sentence in Sequoyah County on 12-7-98. (CF-98-58) Also Several Small Colored Plastic Baggies were Discovered.

( Use reverse side or attach another page if necessary )

ANTCIPATED CHARGE (S) : Poss CDS w/Intent, Poss Marijuana, Poss Phara., Poss Firearm while being Felon, Poss of Firearm while Commiting Felony, AFCF

AFFIANT (ARRESTING OFFICER)

SUBSCRIBED AND SWORN TO BEFORE ME, THE UNDERSIGNED, THIS 11th DAY OF
December 1998 .
MY COMMISSION EXPIRES: 6/8/99          NOTARY PUBLIC / JUDGE / WITNESS

==================================================================
PROBABLE CAUSE DETERMINATION

I, Dennis M. Sprouse : Judge of the District Court, revirwed this Probable Cause Affidavit on the 11th day of December ; 1998 at 3:25 a.m / (p.m.)

____ This Affidavit contains sufficient facts showing probable cause to detain the Arrestee to await further proceedings.

____ The Court sets an Appearance Bond in the amount of $ 35,000.00 ‑35,000.00

____ The Court denies Bond at this time.

____ This Affidavit contains insufficient facts to show there is probable cause to detain the Arrestee. The Arrestee is ORDERED RELEASED FROM CUSTODY FORTHWITH.

JUDGE OF THE DISTRICT COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 1 5 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

_St of Okla._

Plaintiff

**SEQUOYAH COUNTY, OKLAHOMA**
**FILED**
**IN DISTRICT COURT**

**DEC 22 1998**

**BERNELL EDWARDS, COURT CLERK**

BY _____ _au_ _____DEPUTY

vs. _Aubrey D. Jacob_

Defendant

CASE NO: _CRF 98/449_

APPLICATION FOR APPOINTED COUNSEL
AND
AFFIDAVIT OF FINANCIAL INABILITY TO EMPLOY COUNSEL

I swear and affirm that I am the party in the above entitled action. I want an attorney to represent me in this case. I am financially unable to obtain the services of an attorney without causing substantial hardship to myself or to my family. The following information is true and is given and intended to be relied upon by the court and other persons or agencies in determining my eligibility for legal services to be furnished to me at public expense.

PLEASE FILL IN ALL SPACES BELOW AND SIGN YOUR NAME UNDER OATH IN FRONT OF THE JUDGE, A NOTARY OR THE COURT CLERK. IF A QUESTION DOES NOT APPLY TO YOU, PLEASE WRITE IN THE BLANK "DOES NOT APPLY".

I. GENERAL INFORMATION                          DATE: _12-22-98_
NAME: _Dale Jacobs_
ADDRESS: ███████████████████
TELEPHONE: _____ MESSAGE NUMBER: _____
SOCIAL SECURITY NO: ████ _1409_   AGE: _42_   DOB: ████ _56_
SINGLE ( ✓ ) MARRIED ( ) SEPARATED ( )
SPOUSE'S NAME: _None_
ADDRESS: _None_
TELEPONE: _None_
HOW MANY PEOPLE ARE IN YOUR HOUSEHOLD? _0_
NAME AND AGES: _None_

ARE YOU CLAIMED AS A DEPENDENT BY A PARENT OR GUARDIAN? YES ( ) NO ( ✓ )

II FAMILY INCOME
YOUR MONTHLY TAKE HOME PAY: _None_ WEEKLY TAKE HOME PAY: _None_
YOUR EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY)
_None_
YOUR EMPLOYER'S PHONE NUMBER: _____
SPOUSE'S SALARY: _____
SPOUSE'S EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY
_____
SPOUSE'S EMPLOYER'S PHONE NUMBER: _____
IS ANY OTHER MEMBER OF YOUR HOUSEHOLD EMPLOYED? YES( ) NO( ✓ )
WHO? _None_
WHERE? _None_
SALARY? _None_
DEPENDENT'S EMPLOYER: _____
OTHER SOURCE OF INCOME OR BENEFITS (INCLUDE INTEREST, DIVIDENDS, ROYALTIES, ETC.) _None_
TOTAL FAMILY INCOME FOR PRECEDING MONTH WAS $ _None_

29

III FAMILY ASSETS (WHAT YOU OWN LESS WHAT YOU OWE ON IT)

MONEY:

IN JAIL: _2/cents_ AT HOME: _No_ CHECKING: _No_

SAVINGS: _No_ SAFE DEPOSIT BOX _No_ OTHER: _No_

HOME OR OTHER REAL ESTATE VALUE: _No_ JEWELRY VALUE: _No_

AUTOMOBILES: MAKE AND VALUE _None_ FURNITURE VALUE _No_

MOTORCYCLES:    MAKE    AND    VALUE_____ TOOLS/EQUIPMENT

VALUE _No_

NOTES, MORTGAGES AND TRUST DEEDS: _No_ ANY DEBTS OWED TO THE DEF____

OTHER ASSETS AND PROPERTY VALUE: _No_

ARE YOU PARTY TO A SUIT (PROBATE, WORKER'S COMPENSATION, PERSONAL INJURY)WHERE?_____ JUDGMENT MAY BE EXPECTED? YES( ) NO(✓)

NAME OF ATTORNEY?_____

IV EXPENSES AND DEBTS

RENT/HOUSE PAYMENT: _No_ CLOTHING _No_ FOOD _No_

DOCTOR/MEDICINE _No_ UTILITIES _No_ CAR PAYMENT _No_

INSURANCE: _No_ OTHER: _None_

TOTAL MONTHLY LIVING EXPENSES: _None_

MORTGAGE/LANDLORD'S NAME: _No_

MAJOR DEBTS: (list to whom and amount owed): _None_

_____

_____

LIST THE PERSONS WHO ARE DEPENDENT ON YOU FOR SUPPORT.   STATE YOUR RELATIONSHIP TO EACH PERSON AND HOW MUCH YOU CONTRIBUTE MONTHLY TO THEIR SUPPORT: _Nobody_

_____

_____

V. LAST EMPLOYMENT

WHEN DID YOU LAST WORK?: _19 94_

WHO WAS YOUR EMPLOYER?: _Pine Manufactured_

SALARY: _$400 weekly_ HOW LONG DID YOU WORK THERE?: _1 yr_

WHY DID YOU QUIT? _Went crazy_

_____

VI. THE FOLLOWING PEOPLE CAN VERIFY TO A LARGE EXTENT MY ABOVE MENTIONED FINANCIAL SITUATION.  GIVE NAME, ADDRESS AND PHONE NUMBER.

1. _Joey Jacobs_

2. _Myla Jacobs_

3. _James Jacobs_

_____

VII. CHARGE AND BOND

CHARGE(S): FELONY _✓_ MISDEMEANOR_____ JUVENILE_____

ARRESTING AGENCY:_____

CITY _Muldrow_ COUNTY _Sequoia_ STATE _OK_

HAS BOND BEEN POSTED? YES( ) NO(✓) DID YOU USE A BONDSMAN? YES( ) NO(✓)

WHO PAID THE BONDSMAN? _No_

AMOUNT OF BOND _$45,000_ PREMIUM PAID TO BONDING CO: _No_

IF YOU DID NOT USE A BONDSMAN, DID YOU POST A CASH _No_ OR P.R. _No_

LIST ANY DEFENDANTS CHARGES WITH YOU _____ *Don't Know* _____

VIII

1. HAVE YOU TRANSFERRED OR SOLD ANY ASSETS SINCE CHARGES WERE FILED IN THE CASE? YES ( )  NO ( ✓ ) IF SO, DESCRIBE THE BUYER AND THE AMOUNT RECEIVED.

_____

2. HAVE YOU RETAINED COUNSEL IN THE CASE OR IN ANY OTHER PENDING CRIMINAL CASE? YES ( ) NO ( ✓ ) IF SO, STATE THE CASE NUMBER, COURT ATTORNEY AND AMOUNT PAID TO ATTORNEY FOR SERVICES: _____ *none* _____

3. DO YOU HAVE ANY FRIENDS OR RELATIVES WHO ARE ABLE AND WILLING TO ASSIST YOU IN HIRING COUNSEL AND PAYING FOR TRANSCRIPTS? YES ( ) NO ( ✓ ) IF SO, HAVE THOSE PERSONS BEE ASKED TO HELP? YES ( ) NO ( ✓ )

4. IF ANY FRIEND OR RELATIVE HAS GIVEN PREVIOUS FINANCIAL ASSISTANCE IN THIS CASE, BUT IS NO LONGER ABLE OR WILLING TO DO SO, AN AFFIDAVIT TO THAT EFFECT FROM THAT PERSON SHOULD BE ATTACHED. IS THAT AFFIDAVIT ATTACHED YES( ) NO( )

IX. NAMES OF THREE ATTORNEY'S YOU CONTACTED:

1. NAME: _____ *Don George* _____
   WHEN DID YOU CONTACT THIS ATTORNEY? _____
   HOW DID YOU CONTACT THIS ATTORNEY? _____
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( ✓ )

2. NAME: _____ *Barney Long* _____
   WHEN DID YOU CONTACT THIS ATTORNEY? _____
   HOW DID YOU CONTACT THIS ATTORNEY? _____
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( ✓ )

3. NAME: _____ *Scott Heckman* _____
   WHEN DID YOU CONTACT THIS ATTORNEY? _____
   HOW DID YOU CONTACT THIS ATTORNEY? _____
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( ✓ )

X. I DECLARE UNDER PENALTY OF PERJURY THAT THE INFORMATION I HAVE PROVIDED IS TRUE AND CORRECT. I UNDERSTAND THAT I MAY BE PROSECUTED FOR PROVIDING FALSE INFORMATION IN THIS APPLICATION AND AFFIDAVIT. I UNDERSTAND THAT I MUST INFORM THE OKLAHOMA INDIGENT DEFENSE SYSTEM OF ANY CHANGE IN MY FINANCIAL SITUATION THAT MAY CHANGE THE INFORMATION I HAVE PROVIDED. I FURTHER DECLARE THAT I HAVE CONTACTED THREE ATTORNEYS, LICENSED TO PRACTICE LAW IN THIS STATE, AND I AM WITHOUT FUNDS TO PAY AN ATTORNEY TO REPRESENT ME OR TO PAY FOR TRANSCRIPTS AND COST ASSOCIATED WITH THIS CASE.

DATED THIS _12_ DAY OF _22_ 19 _98_

DEFENDANT _Aubrey D. Jacobs_
LEGAL GUARDIAN _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS _22nd_ DAY OF _December_ 19 _98_.

comm. exp. _____    _Bernell Edwards_
PUBLIC NOTARY OR CLERK OR JUDGE

I FIND THAT THE DEFENDANT IS UNABLE TO PAY THE APPLICATION FEE AND I HEREBY WAIVE THE FEE.

_____
JUDGE

APPOINTMENT OF INDIGENT DEFENSE COUNSEL

APPROVED _dmc_  DENIED_____

Hunter   12-23-98

## NOTICE

A copy of this APPLICATION AND AFFIDAVIT shall be sent to the prosecuting attorney or office of attorney general, whichever is applicable, for review and, upon request, the court shall hold a hearing to determine your eligibility for legal services to be furnished to you at public expense.

## IMPORTANT NOTICE

The court shall order you to pay the costs of your legal representation in total, or in installments. The court shall set the amount and due of each installment payment. The costs shall be paid to the court clerk in your county. The costs shall be a debt against you until paid and shall subject you to debt collection procedures as provided by law. The costs shall be deducted from any state income tax refund due you until the total costs are paid.

32

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

DEC 22 1998

STATE OF OKLAHOMA
_____
Plaintiff

BERNELL EDWARDS, COURT CLERK
BY _____, 
_____ DEPUTY

vs.  JOE JACOBS
_____
Defendant

CASE NO: CF-98-487A

APPLICATION FOR APPOINTED COUNSEL
AND
AFFIDAVIT OF FINANCIAL INABILITY TO EMPLOY COUNSEL

I swear and affirm that I am the party in the above entitled action. I want an attorney to represent me in this case. I am financially unable to obtain the services of an attorney without causing substantial hardship to myself or to my family. The following information is true and is given and intended to be relied upon by the court and other persons or agencies in determining my eligibility for legal services to be furnished to me at public expense.

PLEASE FILL IN ALL SPACES BELOW AND SIGN YOUR NAME UNDER OATH IN FRONT OF THE JUDGE, A NOTARY OR THE COURT CLERK. IF A QUESTION DOES NOT APPLY TO YOU, PLEASE WRITE IN THE BLANK "DOES NOT APPLY".

I. GENERAL INFORMATION          DATE: 12/13/98
NAME: JOE JACOBS
ADDRESS: ████████████ MULDROW
TELEPHONE: 775-2239          MESSAGE NUMBER: 775-2239
SOCIAL SECURITY NO: ███-██-6130     AGE: 22     DOB: ████████76
SINGLE (X) MARRIED ( ) SEPARATED ( )
SPOUSE'S NAME: NONE
ADDRESS: NONE
TELEPONE: NONE
HOW MANY PEOPLE ARE IN YOUR HOUSEHOLD? 3
NAME AND AGES: NYLA JACOBS, JAMES JACOBS, MATT JACOBS

ARE YOU CLAIMED AS A DEPENDENT BY A PARENT OR GUARDIAN? YES (X) NO ( )

II FAMILY INCOME
YOUR MONTHLY TAKE HOME PAY: N/A          WEEKLY TAKE HOME PAY: N/A
YOUR EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY)
N/A
YOUR EMPLOYER'S PHONE NUMBER: N/A
SPOUSE'S SALARY: N/A
SPOUSE'S EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY
N/A
SPOUSE'S EMPLOYER'S PHONE NUMBER: N/A
IS ANY OTHER MEMBER OF YOUR HOUSEHOLD EMPLOYED? YES( ) NO(X)
WHO? N/A
WHERE? N/A
SALARY? N/A
DEPENDENT'S EMPLOYER: N/A
OTHER SOURCE OF INCOME OR BENEFITS (INCLUDE INTEREST, DIVIDENDS, ROYALTIES, ETC.) N/A
TOTAL FAMILY INCOME FOR PRECEDING MONTH WAS $ N/A

33

III FAMILY ASSETS (WHAT YOU OWN LESS WHAT YOU OWE ON IT)
MONEY:
IN JAIL: NONE   AT HOME: NONE   CHECKING: NONE
SAVINGS: NONE   SAFE DEPOSIT BOX NONE   OTHER: NONE
HOME OR OTHER REAL ESTATE VALUE: NONE   JEWELRY VALUE: NONE
AUTOMOBILES: MAKE AND VALUE NONE   FURNITURE VALUE NONE
MOTORCYCLES:   MAKE   AND   VALUE NONE   TOOLS/EQUIPMENT
VALUE ___
NOTES, MORTGAGES AND TRUST DEEDS: NONE   ANY DEBTS OWED TO THE DEF ___
OTHER ASSETS AND PROPERTY VALUE: NONE
ARE YOU PARTY TO A SUIT (PROBATE, WORKER'S COMPENSATION, PERSONAL
INJURY)WHERE? NONE   JUDGMENT MAY BE EXPECTED? YES( ) NO(X)
NAME OF ATTORNEY? NONE

IV EXPENSES AND DEBTS
RENT/HOUSE PAYMENT: NONE   CLOTHING NONE   FOOD NONE
DOCTOR/MEDICINE NONE   UTILITIES NONE   CAR PAYMENT NONE
INSURANCE: NONE   OTHER:
TOTAL MONTHLY LIVING EXPENSES: NONE
MORTGAGE/LANDLORD'S NAME: NONE
MAJOR DEBTS: (list to whom and amount owed): NONE

LIST THE PERSONS WHO ARE DEPENDENT ON YOU FOR SUPPORT.   STATE YOUR
RELATIONSHIP TO EACH PERSON AND HOW MUCH YOU CONTRIBUTE MONTHLY TO THEIR
SUPPORT: N/A

V. LAST EMPLOYMENT
WHEN DID YOU LAST WORK?: N/A
WHO WAS YOUR EMPLOYER?: N/A
SALARY: NONE   HOW LONG DID YOU WORK THERE?: N/A
WHY DID YOU QUIT? N/A

VI. THE FOLLOWING PEOPLE CAN VERIFY TO A LARGE EXTENT MY ABOVE MENTIONED
FINANCIAL SITUATION.   GIVE NAME , ADDRESS AND PHONE NUMBER.
1. N/A
2. N/A
3. N/A

VII. CHARGE AND BOND
CHARGE(S): FELONY X   MISDEMEANOR X   JUVENILE
ARRESTING AGENCY: Muldrow Police Dept
CITY Muldrow   COUNTY Sequoyah   STATE Okla
HAS BOND BEEN POSTED? YES( ) NO(X) DID YOU USE A BONDSMAN? YES( ) NO(X)
WHO PAID THE BONDSMAN? N/A
AMOUNT OF BOND: NONE   PREMIUM PAID TO BONDING CO: NONE
IF YOU DID NOT USE A BONDSMAN, DID YOU POST A CASH N/A OR P.R. N/A

34

LIST ANY DEFENDANTS CHARGES WITH YOU _Dale Jacobs, James Jacobs, Brandie Price_
VIII

1. HAVE YOU TRANSFERRED OR SOLD ANY ASSETS SINCE CHARGES WERE FILED IN THE CASE? YES ( ) NO (X) IF SO, DESCRIBE THE BUYER AND THE AMOUNT RECEIVED.
_____
_____

2. HAVE YOU RETAINED COUNSEL IN THE CASE OR IN ANY OTHER PENDING CRIMINAL CASE? YES ( ) NO (X) IF SO, STATE THE CASE NUMBER, COURT ATTORNEY AND AMOUNT PAID TO ATTORNEY FOR SERVICES:_____

3. DO YOU HAVE ANY FRIENDS OR RELATIVES WHO ARE ABLE AND WILLING TO ASSIST YOU IN HIRING COUNSEL AND PAYING FOR TRANSCRIPTS? YES ( ) NO (X) IF SO, HAVE THOSE PERSONS BEE ASKED TO HELP? YES ( ) NO (X)

4. IF ANY FRIEND OR RELATIVE HAS GIVEN PREVIOUS FINANCIAL ASSISTANCE IN THIS CASE, BUT IS NO LONGER ABLE OR WILLING TO DO SO, AN AFFIDAVIT TO THAT EFFECT FROM THAT PERSON SHOULD BE ATTACHED. IS THAT AFFIDAVIT ATTACHED YES( ) NO (X)

IX. NAMES OF THREE ATTORNEY'S YOU CONTACTED:
1. NAME: _DAN GEORGE_____
   WHEN DID YOU CONTACT THIS ATTORNEY?_____
   HOW DID YOU CONTACT THIS ATTORNEY? _No collecto calls_
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO (X)
2. NAME: _HARRY Scoufos_____
   WHEN DID YOU CONTACT THIS ATTORNEY?_____
   HOW DID YOU CONTACT THIS ATTORNEY? _No collect call_
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO (X)
3. NAME: _Frank Sullivan_____
   WHEN DID YOU CONTACT THIS ATTORNEY? _No collect calls_
   HOW DID YOU CONTACT THIS ATTORNEY?_____
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO (X)

X. I DECLARE UNDER PENALTY OF PERJURY THAT THE INFORMATION I HAVE PROVIDED IS TRUE AND CORRECT. I UNDERSTAND THAT I MAY BE PROSECUTED FOR PROVIDING FALSE INFORMATION IN THIS APPLICATION AND AFFIDAVIT. I UNDERSTAND THAT I MUST INFORM THE OKLAHOMA INDIGENT DEFENSE SYSTEM OF ANY CHANGE IN MY FINANCIAL SITUATION THAT MAY CHANGE THE INFORMATION I HAVE PROVIDED. I FURTHER DECLARE THAT I HAVE CONTACTED THREE ATTORNEYS, LICENSED TO PRACTICE LAW IN THIS STATE, AND I AM WITHOUT FUNDS TO PAY AN ATTORNEY TO REPRESENT ME OR TO PAY FOR TRANSCRIPTS AND COST ASSOCIATED WITH THIS CASE.

DATED THIS _13_ DAY OF _DEC_____ 19_98_

DEFENDANT _Joe Jacobs  Joseph Jacobs_
LEGAL GUARDIAN _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS _22_ DAY OF _Dec_____ 19 _98_.

comm. exp._____       _Emma Muriel_____
                                 PUBLIC NOTARY OR CLERK OR JUDGE

35

I FIND THAT THE DEFENDANT IS UNABLE TO PAY THE APPLICATION FEE AND I HEREBY WAIVE THE FEE.

_____

JUDGE

APPOINTMENT OF INDIGENT DEFENSE COUNSEL

APPROVED _Cms_ DENIED _____

12-23-5y

NOTICE

A copy of this APPLICATION AND AFFIDAVIT shall be sent to the prosecuting attorney or office of attorney general, whichever is applicable, for review and, upon request, the court shall hold a hearing to determine your eligibility for legal services to be furnished to you at public expense.

IMPORTANT NOTICE

The court shall order you to pay the costs of your legal representation in total, or in installments. The court shall set the amount and due of each installment payment. The costs shall be paid to the court clerk in your county. The costs shall be a debt against you until paid and shall subject you to debt collection procedures as provided by law. The costs shall be deducted from any state income tax refund due you until the total costs are paid.

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

DEC 1 6 1998

_____
Plaintiff

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

vs. _Brandie Z. Price_____
Defendant

CASE NO: CF-98-481C

APPLICATION FOR APPOINTED COUNSEL
AND
AFFIDAVIT OF FINANCIAL INABILITY TO EMPLOY COUNSEL

I swear and affirm that I am the party in the above entitled action. I want an attorney to represent me in this case. I am financially unable to obtain the services of an attorney without causing substantial hardship to myself or to my family. The following information is true and is given and intended to be relied upon by the court and other persons or agencies in determining my eligibility for legal services to be furnished to me at public expense.

PLEASE FILL IN ALL SPACES BELOW AND SIGN YOUR NAME UNDER OATH IN FRONT OF THE JUDGE, A NOTARY OR THE COURT CLERK. IF A QUESTION DOES NOT APPLY TO YOU, PLEASE WRITE IN THE BLANK "DOES NOT APPLY".

I. GENERAL INFORMATION          DATE: 12/15/98
NAME: Brandie Zane Price
ADDRESS: ▮▮▮▮▮▮▮▮▮▮ Muldrow, OK 74948
TELEPHONE: 918-427-6259     MESSAGE NUMBER: _____
SOCIAL SECURITY NO.: ▮▮▮▮ 5806   AGE: 20   DOB: ▮▮▮/78
SINGLE ( ✓ ) MARRIED ( ) SEPARATED ( )
SPOUSE'S NAME: _____
ADDRESS: _____
TELEPONE: _____
HOW MANY PEOPLE ARE IN YOUR HOUSEHOLD? 2
NAME AND AGES: Myself - 20 yrs old    Grandmother - Louella
Stamps - 65
ARE YOU CLAIMED AS A DEPENDENT BY A PARENT OR GUARDIAN? YES ( · ) NO ( )

II FAMILY INCOME
YOUR MONTHLY TAKE HOME PAY: $0.00   WEEKLY TAKE HOME PAY: $0.00
YOUR EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY) —
none
YOUR EMPLOYER'S PHONE NUMBER: none
SPOUSE'S SALARY: none
SPOUSE'S EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY
none
SPOUSE'S EMPLOYER'S PHONE NUMBER: none
IS ANY OTHER MEMBER OF YOUR HOUSEHOLD EMPLOYED? YES( ) NO( ✓ )
WHO? NA
WHERE? NA
SALARY? NA
DEPENDENT'S EMPLOYER: NA
OTHER SOURCE OF INCOME OR BENEFITS (INCLUDE INTEREST, DIVIDENDS, ROYALTIES,
ETC.) SS Disability
TOTAL FAMILY INCOME FOR PRECEDING MONTH WAS $ 475.00

III FAMILY ASSETS (WHAT YOU OWN LESS WHAT YOU OWE ON IT)
MONEY:
IN JAIL: _None_ AT HOME: _None_ CHECKING: _None_
SAVINGS: _None_ SAFE DEPOSIT BOX _None_ OTHER: _None_
HOME OR OTHER REAL ESTATE VALUE: _None_ JEWELRY VALUE: _None_
AUTOMOBILES: MAKE AND VALUE _None_ FURNITURE VALUE _None_
MOTORCYCLES: MAKE AND VALUE _None_ TOOLS/EQUIPMENT
VALUE _None_
NOTES, MORTGAGES AND TRUST DEEDS: _None_ ANY DEBTS OWED TO THE DEF _____
OTHER ASSETS AND PROPERTY VALUE: _None_
ARE YOU PARTY TO A SUIT (PROBATE, WORKER'S COMPENSATION, PERSONAL
INJURY)WHERE? _Yes, Ark_ JUDGMENT MAY BE EXPECTED? YES( ) NO(✓)
NAME OF ATTORNEY? _Kise Ehronister_

IV EXPENSES AND DEBTS
RENT/HOUSE PAYMENT: _Unknown_ CLOTHING _Unknown_ FOOD _Unknown_
DOCTOR/MEDICINE _Unknown_ UTILITIES _Unknown_ CAR PAYMENT _none_
INSURANCE: _none_ OTHER: _Hen Unknown_
TOTAL MONTHLY LIVING EXPENSES: _Unknown_
MORTGAGE/LANDLORD'S NAME: _none_
MAJOR DEBTS: (list to whom and amount owed): _U.S. Government 1300.00_
_you School/College grant._

LIST THE PERSONS WHO ARE DEPENDENT ON YOU FOR SUPPORT. STATE YOUR
RELATIONSHIP TO EACH PERSON AND HOW MUCH YOU CONTRIBUTE MONTHLY TO THEIR
SUPPORT: _None_

_None_

V. LAST EMPLOYMENT
WHEN DID YOU LAST WORK?: _Aug. 98_
WHO WAS YOUR EMPLOYER?: _Father - Brad Price_
SALARY: _$5.90/hr._ HOW LONG DID YOU WORK THERE?: _2 yrs._
WHY DID YOU QUIT? _I didn't, father moved Co. to Chicago._

VI. THE FOLLOWING PEOPLE CAN VERIFY TO A LARGE EXTENT MY ABOVE MENTIONED
FINANCIAL SITUATION. GIVE NAME, ADDRESS AND PHONE NUMBER.
1. _Lenella Stamps_ ▮▮▮▮▮▮▮ _Muldrow OK 74948_
   _918-427-6259_
2. _Lauise Stamps, Price_ ▮▮▮▮▮▮▮ _Kibler, Ark._
   _501-632-3167_
3. _Brad Price Wheaton, IL 1-630-871-8771_

VII. CHARGE AND BOND: _Poss. of CDS w/ Intent_ _possesion of a firearm_
CHARGE(S): FELONY _" " Marijuana_ MISDEMEANOR _Drug paraphenelia_ JUVENILE _w/ in commission of a_ _felony_
ARRESTING AGENCY: _Muldrow Police Department_
CITY _Muldrow_ COUNTY _Seq._ STATE _OK_
HAS BOND BEEN POSTED? YES(✓) NO( ) DID YOU USE A BONDSMAN? YES( ) NO(✓)
WHO PAID THE BONDSMAN? _none_
AMOUNT OF BOND: _25,500_ PREMIUM PAID TO BONDING CO: _____
IF YOU DID NOT USE A BONDSMAN, DID YOU POST A CASH _____ OR P.R. _____

LIST ANY DEFENDANTS CHARGES WITH YOU _Joe Jacobs - Same, Dale Jacobs-Same_
VIII
1. HAVE YOU TRANSFERRED OR SOLD ANY ASSETS SINCE CHARGES WERE FILED IN THE CASE? YES ( ) NO ( ✓ ) IF SO, DESCRIBE THE BUYER AND THE AMOUNT RECEIVED.
_____ _none_ _____

2. HAVE YOU RETAINED COUNSEL IN THE CASE OR IN ANY OTHER PENDING CRIMINAL CASE? YES ( ) NO ( ✓ ) IF SO, STATE THE CASE NUMBER, COURT ATTORNEY AND AMOUNT PAID TO ATTORNEY FOR SERVICES: _none_ _____ .

3. DO YOU HAVE ANY FRIENDS OR RELATIVES WHO ARE ABLE AND WILLING TO ASSIST YOU IN HIRING COUNSEL AND PAYING FOR TRANSCRIPTS? YES ( ) NO ( ✓ ) IF SO, HAVE THOSE PERSONS BEE ASKED TO HELP? YES ( ) NO ( )
4. IF ANY FRIEND OR RELATIVE HAS GIVEN PREVIOUS FINANCIAL ASSISTANCE IN THIS CASE, BUT IS NO LONGER ABLE OR WILLING TO DO SO, AN AFFIDAVIT TO THAT EFFECT FROM THAT PERSON SHOULD BE ATTACHED. IS THAT AFFIDAVIT ATTACHED YES( ) NO( )

IX. NAMES OF THREE ATTORNEY'S YOU CONTACTED:
1. NAME: _Harry Scoufus_
   WHEN DID YOU CONTACT THIS ATTORNEY? _12/13/98_
   HOW DID YOU CONTACT THIS ATTORNEY? _mother_
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( ✓ )
2. NAME: _Tom Condren_
   WHEN DID YOU CONTACT THIS ATTORNEY? _12/13/98_
   HOW DID YOU CONTACT THIS ATTORNEY? _mother_
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( ✓ )
3. NAME: _none_
   WHEN DID YOU CONTACT THIS ATTORNEY? _none_
   HOW DID YOU CONTACT THIS ATTORNEY? _none_
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( )

X. I DECLARE UNDER PENALTY OF PERJURY THAT THE INFORMATION I HAVE PROVIDED IS TRUE AND CORRECT. I UNDERSTAND THAT I MAY BE PROSECUTED FOR PROVIDING FALSE INFORMATION IN THIS APPLICATION AND AFFIDAVIT. I UNDERSTAND THAT I MUST INFORM THE OKLAHOMA INDIGENT DEFENSE SYSTEM OF ANY CHANGE IN MY FINANCIAL SITUATION THAT MAY CHANGE THE INFORMATION I HAVE PROVIDED. I FURTHER DECLARE THAT I HAVE CONTACTED THREE ATTORNEYS, LICENSED TO PRACTICE LAW IN THIS STATE, AND I AM WITHOUT FUNDS TO PAY AN ATTORNEY TO REPRESENT ME OR TO PAY FOR TRANSCRIPTS AND COST ASSOCIATED WITH THIS CASE.

DATED THIS _15th_ DAY OF _December_ 19 _98_.

DEFENDANT _Brandie E. Price_   _Brandie E. Price_
LEGAL GUARDIAN _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS _16th_ DAY OF _Dec._ 19 _98_.

comm. exp._____   _Amanda Woody_
PUBLIC NOTARY OR CLERK OR JUDGE

I FIND THAT THE DEFENDANT IS UNABLE TO PAY THE APPLICATION FEE AND I HEREBY WAIVE THE FEE.

_____
                                                              JUDGE

APPOINTMENT OF INDIGENT DEFENSE COUNSEL
APPROVED _dms__   DENIED_____
Hunter = 12.28-98-

## NOTICE

A copy of this APPLICATION AND AFFIDAVIT shall be sent to the prosecuting attorney or office of attorney general, whichever is applicable, for review and, upon request, the court shall hold a hearing to determine your eligibility for legal services to be furnished to you at public expense.

## IMPORTANT NOTICE

The court shall order you to pay the costs of your legal representation in total, or in installments. The court shall set the amount and due of each installment payment. The costs shall be paid to the court clerk in your county. The costs shall be a debt against you until paid and shall subject you to debt collection procedures as provided by law. The costs shall be deducted from any state income tax refund due you until the total costs are paid.

SEQUOYAH COUNTY, OKLAHOMA
**FILED**
IN DISTRICT COURT

DEC 22 1998

**BERNELL EDWARDS, COURT CLERK**

BY_____DEPUTY

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

_St of Okl._
_____
Plaintiff

vs.

_James Wesley Jacobs_
_____
Defendant

CASE NO: _CJ-98-481B_

APPLICATION FOR APPOINTED COUNSEL
AND
AFFIDAVIT OF FINANCIAL INABILITY TO EMPLOY COUNSEL

I swear and affirm that I am the party in the above entitled action. I want an attorney to represent me in this case. I am financially unable to obtain the services of an attorney without causing substantial hardship to myself or to my family. The following information is true and is given and intended to be relied upon by the court and other persons or agencies in determining my eligibility for legal services to be furnished to me at public expense.

PLEASE FILL IN ALL SPACES BELOW AND SIGN YOUR NAME UNDER OATH IN FRONT OF THE JUDGE, A NOTARY OR THE COURT CLERK. IF A QUESTION DOES NOT APPLY TO YOU, PLEASE WRITE IN THE BLANK "DOES NOT APPLY".

I. GENERAL INFORMATION          DATE: _02-22-98_
NAME: _James Jacobs_
ADDRESS: ▮▮▮▮▮▮▮▮ _Gans OK 74936_
TELEPHONE: _776-0558_    MESSAGE NUMBER:_____
SOCIAL SECURITY NO: ▮▮▮_5912_  AGE: _19_  DOB: ▮▮▮_98_
SINGLE ( ✓ ) MARRIED ( ) SEPARATED ( )
SPOUSE'S NAME:_____
ADDRESS:_____
TELEPONE:_____
HOW MANY PEOPLE ARE IN YOUR HOUSEHOLD? _1_
NAME AND AGES: _James Jacobs_

ARE YOU CLAIMED AS A DEPENDENT BY A PARENT OR GUARDIAN? YES ( ) NO ( ✓ )

II FAMILY INCOME
YOUR MONTHLY TAKE HOME PAY:_____WEEKLY TAKE HOME PAY:_____
YOUR EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY)
_____
YOUR EMPLOYER'S PHONE NUMBER:_____
SPOUSE'S SALARY:_____
SPOUSE'S EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY
_____
SPOUSE'S EMPLOYER'S PHONE NUMBER:_____
IS ANY OTHER MEMBER OF YOUR HOUSEHOLD EMPLOYED? YES( ) NO( )_____
WHO?_____
WHERE?_____
SALARY?_____
DEPENDENT'S EMPLOYER:_____
OTHER SOURCE OF INCOME OR BENEFITS (INCLUDE INTEREST, DIVIDENDS, ROYALTIES, ETC.)_____
TOTAL FAMILY INCOME FOR PRECEDING MONTH WAS $_____

III FAMILY ASSETS (WHAT YOU OWN LESS WHAT YOU OWE ON IT)
MONEY:
IN JAIL:_____ AT HOME:_____ CHECKING:_____
SAVINGS:_____ SAFE DEPOSIT BOX_____ OTHER:_____
HOME OR OTHER REAL ESTATE VALUE:_____ JEWELRY VALUE:_____
AUTOMOBILES: MAKE AND VALUE Ma_____ 4700 FURNITURE VALUE_____
MOTORCYCLES:   MAKE   AND   VALUE_____ TOOLS/EQUIPMENT
VALUE_____
NOTES, MORTGAGES AND TRUST DEEDS:_____ ANY DEBTS OWED TO THE DEF_____
OTHER ASSETS AND PROPERTY VALUE:_____
ARE YOU PARTY TO A SUIT (PROBATE, WORKER'S COMPENSATION, PERSONAL
INJURY)WHERE?_____ JUDGMENT MAY BE EXPECTED? YES(  ) NO(  )
NAME OF ATTORNEY?_____

IV EXPENSES AND DEBTS
RENT/HOUSE PAYMENT:_____ CLOTHING_____ FOOD_____
DOCTOR/MEDICINE_____ UTILITIES $300.00 CAR PAYMENT_____
INSURANCE:_____ OTHER $1400.00 - Bail BoNdsMaN
TOTAL MONTHLY LIVING EXPENSES:_____
MORTGAGE/LANDLORD'S NAME:_____
MAJOR DEBTS: (list to whom and amount owed):_____
_____
_____

LIST THE PERSONS WHO ARE DEPENDENT ON YOU FOR SUPPORT.  STATE YOUR
RELATIONSHIP TO EACH PERSON AND HOW MUCH YOU CONTRIBUTE MONTHLY TO THEIR
SUPPORT:_____
_____
_____

V. LAST EMPLOYMENT
WHEN DID YOU LAST WORK?: 12-13-98
WHO WAS YOUR EMPLOYER?: NaTioN STaff
SALARY:_____ HOW LONG DID YOU WORK THERE?: 9-1-98 to 12-13-98
WHY DID YOU QUIT? I was fired cause I was iN Jail
_____

VI. THE FOLLOWING PEOPLE CAN VERIFY TO A LARGE EXTENT MY ABOVE MENTIONED
FINANCIAL SITUATION.  GIVE NAME , ADDRESS AND PHONE NUMBER.
1. _____
_____
2. _____
_____
3. _____
_____

VII. CHARGE AND BOND
CHARGE(S): FELONY_____ MISDEMEANOR_____ JUVENILE_____
ARRESTING AGENCY: Maldrow P.D
CITY Muldrow   COUNTY_____ STATE_____
HAS BOND BEEN POSTED? YES(  ) NO(  ) DID YOU USE A BONDSMAN? YES(  ) NO(  )
WHO PAID THE BONDSMAN?_____
AMOUNT OF BOND:_____ PREMIUM PAID TO BONDING CO:_____
IF YOU DID NOT USE A BONDSMAN, DID YOU POST  A  CASH_____ OR P.R._____

LIST ANY DEFENDANTS CHARGES WITH YOU ___Joe Jacobs___ ___Dale Jacobs___ Brandie Price

VIII

1. HAVE YOU TRANSFERRED OR SOLD ANY ASSETS SINCE CHARGES WERE FILED IN THE CASE? YES ( ) NO (✓) IF SO, DESCRIBE THE BUYER AND THE AMOUNT RECEIVED.

_____

2. HAVE YOU RETAINED COUNSEL IN THE CASE OR IN ANY OTHER PENDING CRIMINAL CASE? YES ( ) NO ( ✓ ) IF SO, STATE THE CASE NUMBER, COURT ATTORNEY AND AMOUNT PAID TO ATTORNEY FOR SERVICES: _____

_____

3. DO YOU HAVE ANY FRIENDS OR RELATIVES WHO ARE ABLE AND WILLING TO ASSIST YOU IN HIRING COUNSEL AND PAYING FOR TRANSCRIPTS? YES ( ) NO (✓) IF SO, HAVE THOSE PERSONS BEE ASKED TO HELP? YES ( ) NO ( )

4. IF ANY FRIEND OR RELATIVE HAS GIVEN PREVIOUS FINANCIAL ASSISTANCE IN THIS CASE, BUT IS NO LONGER ABLE OR WILLING TO DO SO, AN AFFIDAVIT TO THAT EFFECT FROM THAT PERSON SHOULD BE ATTACHED. IS THAT AFFIDAVIT ATTACHED YES( ) NO( )

IX. NAMES OF THREE ATTORNEYS YOU CONTACTED:

1. NAME: __Michael Daffin__
   WHEN DID YOU CONTACT THIS ATTORNEY? __12-22-98__
   HOW DID YOU CONTACT THIS ATTORNEY? __By Phone__
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( ✓ )
2. NAME: __Gerald Hunter__
   WHEN DID YOU CONTACT THIS ATTORNEY? __12-22-98__
   HOW DID YOU CONTACT THIS ATTORNEY? __By Phone__
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO (✓)
3. NAME: __Frank Sullivan Jr.__
   WHEN DID YOU CONTACT THIS ATTORNEY? __12-22-98__
   HOW DID YOU CONTACT THIS ATTORNEY? __By Phone__
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO (✓)

X. I DECLARE UNDER PENALTY OF PERJURY THAT THE INFORMATION I HAVE PROVIDED IS TRUE AND CORRECT. I UNDERSTAND THAT I MAY BE PROSECUTED FOR PROVIDING FALSE INFORMATION IN THIS APPLICATION AND AFFIDAVIT. I UNDERSTAND THAT I MUST INFORM THE OKLAHOMA INDIGENT DEFENSE SYSTEM OF ANY CHANGE IN MY FINANCIAL SITUATION THAT MAY CHANGE THE INFORMATION I HAVE PROVIDED. I FURTHER DECLARE THAT I HAVE CONTACTED THREE ATTORNEYS, LICENSED TO PRACTICE LAW IN THIS STATE, AND I AM WITHOUT FUNDS TO PAY AN ATTORNEY TO REPRESENT ME OR TO PAY FOR TRANSCRIPTS AND COST ASSOCIATED WITH THIS CASE.

DATED THIS __22nd__ DAY OF __December__ 19 __98__.

DEFENDANT __James Jacobs__   James Jacobs
LEGAL GUARDIAN _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS __22nd__ DAY OF __Dec-__ 19 __98__.

comm. exp._____   __Bernell Edwards__

PUBLIC NOTARY OR CLERK OR JUDGE

43

44

I FIND THAT THE DEFENDANT IS UNABLE TO PAY THE APPLICATION FEE AND I HEREBY WAIVE THE FEE.

_____

JUDGE

APPOINTMENT OF INDIGENT DEFENSE COUNSEL

APPROVED _dms_   DENIED_____

_Hunter_

NOTICE

A copy of this APPLICATION AND AFFIDAVIT shall be sent to the prosecuting attorney or office of attorney general, whichever is applicable, for review and, upon request, the court shall hold a hearing to determine your eligibility for legal services to be furnished to you at public expense.

IMPORTANT NOTICE

The court shall order you to pay the costs of your legal representation in total, or in installments. The court shall set the amount and due of each installment payment. The costs shall be paid to the court clerk in your county. The costs shall be a debt against you until paid and shall subject you to debt collection procedures as provided by law. The costs shall be deducted from any state income tax refund due you until the total costs are paid.

44

ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, first, middle, suffix(please print or type) (show alias)

Jacobs, James Wesley

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-98-481B | | Poss CDS w/int, Poss marj |
| | | Poss Para |
| | | Felony Poss of F/A |
| | $1,500.00 | Poss F/A comm Felony |
| | | |
| | | |
| | | |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the _12_ day of _Dec_ _____, 19 _98_.

*Kelly Tasper*

Signature

White Copy - Court
Yellow Copy - Sheriff's File

AUTHORIZED BY   _____

JUDGE OF THE DISTRICT COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 1 4 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

45

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

CF-98-481          JAN 0 5 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

I, Abrey Dale Jacobs, have been incarcareted, Since Dec, 10, 98, I have (ASTO), Ask, and Repeatedly, to see a doctor of a Nervous, problem, and condition thats presisting me, I can not get any attetion, and, attemted, three reqeust, and Filled out the Following reasons. Stated above, "Please Help in this matter".

"Respectfully"

*Dale Jacobs*

46

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN - 4 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

CF-98-481A

Date - Jan-4

Year -98

To whom, It may concern, On the 10th day of Dec, year of 98, I Joseph Dale Jacobs, Was in the Possion of C.D.S and a Shotgun, And Paraphanellia, Marijuana, and also, Was arrested, was James Wesley Jacobs, Aurby Dale Jacobs, and one Brandie Zane Price, Which had No Knowledge, Of Seize Prop. or Drugs I, Joseph Dale Jacobs, is writting this Statement willenfully, and state, that they had the above peaple, Listed, Had No Knowledge about the drugs or Shotgun, I pray that it takes the Burden off the above accused.

Respectfully

Joseph Dale Jacobs

Signed before me this 4th day of January 1999.

Bernell Edwards Court Clerk
By Maudeen Webster

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

# Charles Smith Bail Bonds

## APPEARANCE BOND

DEC 1 4 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

S.A.&I. 408 (1990)

IN THE DISTRICT COURT OF _____ Sequoyah _____ COUNTY, STATE OF OKLAHOMA
State of Oklahoma,                                    Plaintiff,

vs. Jamie Jacobs _____, Defendant        Case No. CF-98-481B

Know all men by these presents, that we the above named defendant, as principal, and the undersigned Martin E. Clapp D/B/A Charles E. Smith, Professional as surety(ies) personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of Eleven Thousand Five Hundred & 00/100 _____ Dollars ($ 11,500⁰⁰) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to the county jail of Sequoyah County, State of Oklahoma, shall personally be and appear before the District Court of said county on the 16th day of December , 19 98 , at 9:00 o'clock A M., of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of Poss. CDS W/Intent, Marij, Para, + Felon in Commr. of a Felony and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court without leave, then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hands and seals this 12th day of December , 19 98 .

Jamie Jacobs _____ Principal HC64 Box 535 Hans, OK 74936 Address

Charles E. Smith                    Surety        P.O. Box 824 Sallisaw, OK 74955        Address

Martin E. Clapp _____ Surety P.O. Box 824 Sallisaw, OK 74955 Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this 12th day of December , 19 98 .

_____ Court Clerk/Sheriff _____ Deputy

This undertaking approved this 12th day of December , 19 98 .

(SEAL)                                By: Kelly Moyer _____ Deputy/Clerk

---

## AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, Sequoyah County, SS:

The undersigned, being first duly sworn upon oath, says that he is a resident of Sequoyah County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as hereinafter specified under one or more of the following relevant statutory provisions, to-wit:

a) Consideration for this undertaking received or promised in the sum of $ 1755
b) Other security received or promised for making this undertaking, is as follows: Promissory Note + Indemnity Agreement
c) Such promise, security or consideration was received from:

Name Jamie Jacobs _____ Address HC64 Box 535 Hans, OK 74936

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as one commits perjury.

Martin E. Clapp _____ Address P.O. Box 824 Sallisaw, OK 74955
Affiant

Subscribed and sworn to before me this 12th day of December , 19 98 .

(SEAL)

_____
Court Clerk- Notary Public

My Commission Expires:                        _____ Deputy

48

POWER OF ATTORNEY                              Sallisaw, OK 74955

107 E. Creek                Charles E. Smith, Professional Bondsman
Sallisaw, OK 74955      $15,000.00 BOND POWER          ECS      №  16091

KNOW ALL MEN BY THESE PRESENTS:
   That I, Charles E. Smith, of Sallisaw, Sequoyah County, State of Oklahoma, have made and
constituted and appointed by these presents do make, constitute and appoint the below named
agent, my true and lawful attorney, for me and in my name, place and stead, and to my use
as my employee and agent to write professional bonds, to sign my name, by him, in the exec-
ution of any and all bonds made as my agent, giving my said attorney full power to do every
thing whatsoever requisite and necessary to be done in the premises as fully as I could do
if personally present, hereby ratifying and confirming all that my said attorney shall law-
fully do, or cause to be done, by virtue hereof.  All this provided this Power-Of-Attorney
is filed with the bond and retained as a part of the court records, the said Attorney-In-
Fact is hereby authorized to insert in this Power-Of Attorney the name of the person whose
behalf this bond was given.
   IN WITNESS THEREOF, Charles E. Smith, mas caused these presents to be signed by its duly
authorized officer, proper for the purpose this _12th_ day of _December_ 19 _98_ .

$15,000.00 BOND POWER

                                         Charles E. Smith, Professional Bondsman
                                         SMITH-RINGGOLD BAIL BONDS

Bond Amount $ _11,500.00_              Appearance Date _12-16-98 9:00 am._
Defendant _Jamie Jacobs_        Address ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Court _Sequoyah District_       City _Gans_          State _OK. 74936_
Offense _Poss of CDS W/Intent, Marij. Para, + Fka_  Case # _Ja_
Executing Agent _Martin E. Vaggs_

49

ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, first, middle, suffix(please print or type) (show alias)

*Jacobs Joseph*

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-98-481A | Hamilton Morgan 20'000.00 | Poss CDS w/int Poss Marij Poss Para Felon Poss F/A Poss F/A comm of felony |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the _23_ day of _1_ _____, 19_99_.

White Copy - Court
Yellow Copy - Sheriff's File

Signature

AUTHORIZED BY _____

JUDGE OF THE DISTRICT COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 25 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
# STATE OF OKLAHOMA

Case No: _CF-98-481_          Defendant: _Aubrey Jacobs_

## ACCUMULATIVE COURT COST FOR SEQUOYAH COUNTY

### VIOLENT COURT COST

**COURT FUND**

| | | |
|---|---|---|
| Court Fees | | $103.00 |
| Bail Bond Fee | $10.00 @ ____ | ____ |
| Jury Fee | $50.00 @ ____ | ____ |
| Fines | set by court | _1000.⁰⁰_ |
| Mailing fee | $7.00 @ ____ | ____ |
| Sub total Court Fund | | _1103.⁰⁰_ |

**SHERIFF FEES**

| | | |
|---|---|---|
| Sheriff Fees | | $5.00 |
| Arrest Warrant | $20.00 | ____ |
| Bench Warrnts | $20.00 @ ____ | ____ |
| Subpoenas | $20.00 @ ____ | ____ |
| Sub total Sheriff Fees | | _5.⁰⁰_ |

| | | |
|---|---|---|
| **LAW LIBRARY** | | $3.00 |
| **CLEET & FINGERPRINTING** | | $7.00 |
| VCA | $30.00 or set by court | _100.⁰⁰_ |
| OSBI LAB | set by court | _150.⁰⁰_ |
| D.A. DRUG FUND | set by court | _100.⁰⁰_ |
| REVOLVING FUND(appl fee-$40.00) | | _190.⁰⁰_ |
| IDF-ATTORNEY FEE | set by court | ____ |

TOTAL                    _1658.⁰⁰_

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 2 9 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

# In The District Court In And For Sequoyah County, State of Oklahoma

THE STATE OF OKLAHOMA,          **PLAINTIFF**

**VS.**          Case No. __CF-98-481__

Aubrey Dale Jacobs , DOB: ▮▮56 ,          **DEFENDANT**

## Judgment and Sentence

Now, on this ___29th___ day of ___January___, 19_99_, this matter comes on before the undersigned Judge, for sentencing and the defendant, __Aubrey Dale Jacobs__ appears personally and by Attorney __Gerald Hunter__, the State of Oklahoma represented by __Jeff Sheridan__, and the defendant, having previously:

(x) Entered a plea of guilty, with/without a plea agreement

( ) Entered a plea of Nolo Contendere, with/without a plea agreement

( ) Entered an <u>Alford</u> plea, with/without a plea agreement

( ) Found guilty by jury

( ) Found guilty by Judge after waiver of jury trial to/of the crime(s) of:

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 2 9 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

<u>Statutory Reference</u>

| Count | | | | |
|---|---|---|---|---|
| Count I : | UNLAWFUL POSSESSION OF CONTROLLED DRUG WITH INTENT | 63 | O.S. | 2-401 |
| Count III : | UNLAWFUL POSSESSION OF MARIHUANA | 63 | O.S. | 2-402 |
| Count IV : | FELONIOUSLY CARRYING FIREARM | 21 | O.S. | 1283 |
| V | POSSESSION OF FIREARM IN COMMISSION OF FELONY | 21 | | 1287 |

( ) The Court finds the defendant has _____ prior felony conviction(s) and this sentence has been enhanced in accordance with the provisions set forth in _____ O.S. _____, and,

It Is therefore Ordered, Adjudged, and Decreed by the Court that the Defendant, _____. __Aubrey Dale Jacobs__ , is guilty of the above described offenses and is sentenced as follows:

## — (Term Of Imprisonment)—

( ) Count _____ : Sentenced to a term of _____ imprisonment;

( ) Count _____ : Sentenced to a term of _____ imprisonment;

( ) Count _____ : Sentenced to a term of _____ imprisonment;

all under custody and control of: ( ) Oklahoma Department of Corrections, or ( ) the _____ County Sheriff. These terms to be served: ( ) concurrently, or ( ) consecutively: ( ) other: _____

## —Term Of Imprisonment With Part Suspended)—

( ) Count _____ : Sentenced to a term of _____ imprisonment;

( ) Count _____ : Sentenced to a term of _____ imprisonment;

( ) Count _____ : Sentenced to a term of _____ imprisonment;

with all except the first _____ suspended under the custody and control of: ( ) Oklahoma Department of Corrections, or ( ) the _____ County Sheriff, pursuant to the rules and conditions of probation entered by the court.

These terms to be served: ( ) concurrently, or ( ) consecutively.

52

IN THE DISTRICT COURT Or    )  Defendant _Aubry Dale Jacobs_
SEQUOYAH COUNTY             )
STATE OF OKLAHOMA           )  Case No. _CF-98-481_
                            )
                            )  Date _Jan 29, 1999_
                            )

## RULES AND CONDITIONS OF PROBATION

1. I will at the end of each month, until my final release (by the Court), make a written report. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general statement of my environment and progress.

2. I will not use or be in possession of intoxicants of any kind or alcoholic beverages, nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I understand that I am not to go into or loiter around beer taverns or pool halls.

3. I will not leave the county in which I reside or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.

4. I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.

5. I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.

6. I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.

7. I understand that it will be a violation of my Probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or a representative thereof.

8. I understand that I must support myself and all my dependants without public assistance so long as I am physically able to do so; failure to do my duty to my dependants shall constitute grounds for revocation of my Parole, Probation or Conditional Release.

9. I will refrain from violation of any City, State or Federal law.

10. I will abide by my curfew from 12 midnight until 5:00 a.m. daily unless I have written permission from my probation officer.

11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.

12. I will not refuse a breath-alcohol test if arrested for DUI, APC or an alcohol related offense.

13. I hereby waive my State and Federal constitutional rights of protection from unreasonable searches and seizures if my probation officer has a reasonable suspicion that I may be in control of contraband. That my probation officer may search me or my property if that suspicion exists in their mind.

14. I further understand that if I do not possess a high school diploma or a G.E.D. that I will acquire my G.E.D. within eighteen months or show proof of my inability to acquire the same to the Court, in writing, within that eighteen months.

15. SPECIAL CONDITIONS: The defendant is to pay probation fees of $20 per month as well as the total fees of: (Court Costs, Court Appointed Attorney fees, O.S.B.I. Lab Fees, fines or restitution) of $_____ within_____ months at a rate of not less than $_____ per month. Payments are to begin on the 5th day of_____, 19____ and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office.   *(Set out how the money is to be distributed).*

$1,000 fine  $100 VCA  $100 DA Drug fund + $150 lab fee

COUNTY, OKLAHOMA
FILED
TRICT COURT

JAN 2 9 1999

16. Defendant to report to DOC within 72 hours for intake. _DWARDS, COURT CLERK_

_____ DEPUT

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision. I further understand that these rules may not be terminated, modified or suspended by any probation officer, law enforcement officer or any other person without the written approval of the sentencing Judge and notice to the District Attorney's Office.

_____
Attorney for Defendant

_____
Probationer

Defendant's Mailing Address:

██████████████

_Muldrow, OK 74948_

_____
JUDGE OF THE DISTRICT COURT

**Sequoyah County Form CF-1**   **Uniform Plea of Guilty — Summary of Facts**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## THE STATE OF OKLAHOMA

STATE OF OKLAHOMA,                )
                                  )
                     Plaintiff    )
                                  )
vs.                               )          Case No. CF 98-481
                         JACOBS   )
Aubrey D Jack                     )          SEQUOYAH COUNTY, OKLAHOMA
                     Defendant    )          FILED
DOB _____ / 19 56      )          IN DISTRICT COURT
SS# _____ 1409         )
                                  )          JAN 2 9 1999
                                  )
                                  )          BERNELL EDWARDS, COURT CLERK
                                  )          BY _____ DEPUTY

### SUMMARY OF FACTS FOR THE PLEA OF GUILTY

Part A: Finding of Fact, Acceptance of Plea   *Waive Jurisdiction of SJ*   *Waive reading*      Circle

1. Is the name just read to you your true name?   **YES** NO
   If no, then what is your correct name? _____
   I have also been known by the name(s) _____
   _____

2. (A) Do you wish to have a record of these proceedings made by a Court Reporter ?   YES **NO**

   (B) Do you wish to waive your right to have a record of these proceedings made ?   **YES** NO

3. What is your age ? 42   What grade level in school have you completed ? 12

4. Can you read and understand this form ? [If no, Addendum A must be completed and attached]   **YES** NO

5. Are you currently taking any medications or substances which affect your ability to understand these proceedings ?   YES **NO**

6. Have you been prescribed any medication which you are not taking ?   YES **NO**
   If yes, what medication are you not taking? _____
   What is the purpose of the medication ? _____
   Why are you not taking the medication ? _____

7. Have you ever been treated by a doctor or health professional for mental illness or confined in a hospital for mental illness ?   YES **NO**
   If Yes, list doctor or health professional, place, and when treatment occurred:
   _____

8. Do you understand the purpose, the nature and the consequences of this proceeding ?   **YES** NO

9. Have you received a copy of the State's Information and read its allegations ?   **YES** NO

54

10.   A.  Do you understand you are charged with:
         Crime                    Statutory Reference

[1] _Poss of CD w/intent_        _63_ O.S. _2-401_   (YES)   NO
[2] _Poss of Para_               _63_ O.S. _2-405_   (YES)   NO
[3] _Poss of MARJ_               _63_ O.S. _2-402_   (YES)   NO
[4] _Felonious poss. of Firearm_ _21_ O.S. _1283_   (YES)   NO
[5] _Poss of firearm of in Commissi_ _21_ O.S. _1287_  (YES)   NO
                      _of Felony_

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

   B.  Are you charge after former conviction of a felony (AFCF) ?          YES   NO
   If yes, list the felony(ies) charged: _____

   _____

11.   Do you understand the range of punishment for the crime(s) is/are ?
         (List in the same order as in Number 10)

[1] Minimum of __5__ to a maximum of __Life__ and/or a fine of $__100000__  (YES)  NO
[2] Minimum of __0__ to a maximum of __12 Mo__ and/or a fine of $__100__   (YES)  NO
[3] Minimum of __0__ to a maximum of __12 Mo__ and/or a fine of $__550__   (YES)  NO
[4] Minimum of __1__ to a maximum of __10__ and/or a fine of $__1000__     (YES)  NO
[5] Minimum of __2__ to a maximum of __10__ and/or a fine of $__5000__     (YES)  NO

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

12.   Read the following statements:  You have the right to a speedy trial before a jury of your peers
      to determine whether you are guilty or not guilty and if you request, to determine the sentence.
      *If pleading to a capital murder,* advise of the procedure in 21 O.S. 701.10( B)
      **At the trial:**
      [1] You have the right to have an attorney represent you, either one you hire or *if you are indigent*
      a court appointed attorney.
      [2] You are presumed to be innocent of the charges.
      [3] You may remain silent or , if you chose, you may testify on your own behalf.
      [4] You have the right to see and hear all witnesses called to testify against you and the right to
      have those witnesses cross-examined.
      [5] You may have your witnesses ordered to appear in court to testify and present evidence of
      any defense you have to these charges.
      [6] The State is required to prove your guilt beyond a reasonable doubt.
      [7] The verdict of guilty or not guilty decided by a jury must be unanimous.  However, you can
      waive a jury trial and, if all parties agree, the case could be tried by a Judge alone who would
      decide if you were guilty or not guilty and if determined to be guilty, the appropriate punishment.

      Do you understand each of these rights ?                                 (YES)   NO

13.   Do you understand by entering a plea of guilty you give up these rights ?   (YES)   NO

14.   Do you understand that a conviction on a plea of guilty could increase punishment in any future   (YES)   NO
      case committed after this plea ?

15.   Is _Gerald Hunter_ your attorney ?                                         (YES)   NO

16.   Have you talked with your attorney about the charges, advised him/her regarding any defense   (YES)   NO
      you may have to the charges and received his/her advice ?

55

17. Do you believe your attorney has effectively assisted you in this case and are you satisfied with his/her representation ?     YES    NO

18. Do you wish to change your plea of not guilty to a plea of guilty and give up your right to a jury trial and all previously explained constitutional rights ?    YES    NO

19. Is there a plea agreement ?     YES    NO
    What is your understanding of the plea agreement ? _5 yrs Suspended_
    _$1000 fine UCF #100 DEF 100_
    _OSBI 150 OIDS 180 Costs_

20. Do you understand the Court is *not* bound by any agreement or recommendation and if the Court does not accept the plea agreement, you have the right to withdraw your plea of guilty ?    YES    NO

21. Do you understand that if there is no plea agreement the Court can sentence you within the range of punishment stated under question 11 ?    YES    NO   NA

22. Do you understand your plea of guilty to the charge(s) is subject to :    YES    NO
    (check one)
    [ ✓ ] no prior felony conviction    *not charged*
    [   ] one (1) prior felony conviction
    [   ] two (2) or more felony convictions    List prior felony convictions to which you are pleading:
    _____

23. What is/are your plea(s) to the each charge(s) ?
    [1] _GUILTY_ [2] _GUILTY_ [3] _GUILTY_ [4] _GUILTY_ [5] _GUILTY_

24. Did you commit the acts as charged in the information ?    YES    NO
    State a factual basis for your plea(s) (attach additional pages as needed, labeled as ADDENDUM C) :
    _I DID AS CHARGED IN INFO_
    _____

25. Have you been forced, abused, mistreated or promised anything by anyone to have you enter your plea(s) ?    YES    NO

26. Do you plead guilty of your own free will and without any coercion or compulsion of any kind ?    YES    NO

27. If you are entering a plea to a felony offense, you have a right to a Pre-sentencing investigation and Report which would contain the circumstances of the offense, any criminal record, social history and other background information about you. Do you request a Pre-sentence report ?    YES    NO

28. (A) Do you have any additional statements to make to the Court ?    YES    NO

     (B) Is there any legal reason as to why you should *not* sentence now ?    YES    NO

**HAVING BEEN SWORN, I, the Defendant whose signature appears below, make the following statements under oath:**

(1)     CHECK ONE:

      ___✓___ (A)    I have read, understood and completed this form.

      _____ (B)    My attorney completed this form and we (the attorney and I) have gone over the form and I understand its contents and agree with the answers. *Complete Addendum A and attach to this form.*

_____ (C)    The Court completed this form for me and inserted my answers to the questions in open court.

(2)    All answers are true and correct.

(3)    I understand that I may be prosecuted for perjury if I have made false statements to this Court.

Acknowledged this _____ Day of _____ JAN. 29 , 1999 .

_____
DEFENDANT

I, the undersigned attorney for the Defendant, believe the Defendant understands the nature, purpose, and consequence of this proceeding. (S)He Is able to assist me in formulating any defense to the charge(s). I am satisfied that the Defendant's waivers and plea(s) of guilty are voluntarily given and he/she had been informed of all legal and constitutional rights.

_____
ATTORNEY FOR DEFENDANT

The sentence recommendation in question 19 is correctly stated. I believe the recommendation is fair to the State of Oklahoma. Offer of Proof (nolo contendere plea) : _____
_____
_____
_____

_____
ASSISTANT DISTRICT ATTORNEY

**THE COURT FINDS AS FOLLOWS:**
A. The Defendant was sworn and responded to questions under oath.
B. The Defendant understands the purpose, nature and consequences of this proceeding.
C. The Defendant's plea(s) of ___Guilty___ is/are knowingly and voluntarily entered and accepted by the Court Reporter Present Court.
D. The Defendant is competent for the purpose of this hearing.
E. A factual basis exists for the plea(s) (and former conviction(s), if applicable).
F. The Defendant is guilty as charged: (check as appropriate)
   [  ] after no prior felony conviction.
   [  ] after one (1) prior felony conviction.
   [  ] after two (2) or more  prior felony convictions.
G. Sentencing or order deferring sentence shall be: [ 4 ] imposed instanter or [  ] continued until the ____
day of_____ , _____ at ____:_____ ___ . M . If the Pre-sentence investigation and Report is requested, it shall be provided to the Court by the ____ day of_____ , ___ .

DONE IN OPEN COURT this __27__ day of ____Jan____ , __99__ .

_____
JUDGE OF THE DISTRICT COURT

_____
NAME OF JUDGE TYPED OR PRINTED

_____
Court Reporter Present

_____
Deputy Court Clerk Present

## "NOTICE OF RIGHT TO APPEAL"

Sentence to Incarceration, Suspended or Deferred:

To appeal from this conviction, or order deferring sentence, on your plea of guilty, you must file in the Sequoyah County District Court Clerk's Office a written Application to Withdraw Plea of Guilty within ten (10) days from today's date. You must set forth in detail why you are requesting to withdraw your plea. The trial court must hold a hearing and rule upon your application within thirty (30) days from the date it is filed. If the trial court denies your application, you have a right to ask the Court of Criminal Appeals to review the District Court's denial by filing a Petition for Writ of Certiorari within ninety (90) days of the date of denial. Within ten (10) days from the date the application to withdraw plea of guilty is denied, notice of intent to appeal and designation or record must be filed pursuant to Oklahoma Court of Criminal Appeals Rule 4.2(D). If you are indigent, you have the right to be represented on appeal by a court appointed attorney.

Do you understand each of these rights to appeal ?                                                     YES   NO

Do you want to remain in the county jail ten (10) days before being taken to place of     YES   NO
confinement ?

Have you fully understood the questions that have been asked ?                               YES   NO

Have your answers been freely and voluntarily given ?                                              YES   NO

I ACKNOWLEDGE UNDERSTANDING OF RIGHTS AND SENTENCE IMPOSED.

_____
Defendant

I, the undersigned attorney, have advised the Defendant of his appellate rights.

_____
Attorney for the Defendant

DONE IN OPEN COURT, this _29_ day of _____Jun_____, _99_.

_____
Judge of the District Court

_____
Court Reporter Present                                                _____
                                                                                 Deputy Court Clerk Present

## ADDENDUM "A"

### CERTIFICATE OF DEFENSE COUNSEL

As the attorney for the defendant, _____ I certify that:

1. The Defendant has stated to me that he/she is [ able ] unable to read and understand the attached form, and I have [ ] determined the Defendant is able to understand the English language or [ ] determined the Defendant is unable to understand the English language and obtained _____ _____ to interpret to the Defendant in the _____ language.
2. I have read and fully explained to the Defendant the allegations contained in the Information in this case.
3. I have read and fully explained to the Defendant all of the questions in the Plea of Guilty/Summary of Facts and the answers to the questions set out in the Summary of Facts are the Defendant's answers.
4. To the best of my knowledge and belief the statement and declarations made by the Defendant are accurate and true and have been freely and voluntarily made.     Dated this _29_ day of _____Jou_____, _99_.

_____
Attorney for the Defendant

58

Sequoyah County Form CF-1 - b                    Uniform Plea of Guilty — Sentence on Plea

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Case Number CF- _____     State v. _____     Date: _____

**Part B:** Sentence **on Plea**    [NOTE ON USE: Part B is to be used with the Summary of Facts if contemporaneous with the entry of plea or may be formatted as a separate sentencing form if sentencing is continued to a future date.]

**THE COURT SENTENCES THE DEFENDANT AS FOLLOWS:**

DEFERRED SENTENCE

1. The sentencing date is deferred until _____ , _____ , _____ at __ : ___ _ M.

2. You [ ] will [ ] will not be under supervision by the Department of Corrections. The terms set forth in the Rules and Conditions of Probation in Addendum D shall be the rules you must follow during the period of deferment.

SUSPENDED SENTENCE or SUSPENDED AS TO PART

1. You are sentence t confinement under the supervision of the Department of Corrections for a term of years as follows:
[1]_____ [2]_____ [3]_____ [4]_____ [5]_____

TO BE SUSPENDED as follows:

    (A) ALL SUSPENDED [✓] Yes        [ ] No

    (B) suspended *except* as to the first _____ (months) (years) of the term(s) during which you are to be held in the custody of the Department of Corrections. The remaining term of the sentence(s) is to be suspended under the terms set forth in the Rules and Conditions of Probation in Addendum D.

2. The sentence(s) is/are to run [ ] concurrently [ ] consecutively with/to _____ _____ or NOT APPLICABLE.

TIME TO SERVE

1. You are sentence t confinement under the supervision of the Department of Corrections for a term of years as follows:
[1]_____ [2]_____ [3]_____ [4]_____ [5]_____

2. The sentence(s) is/are to run [ ] concurrently [ ] consecutively with/to _____ _____ or NOT APPLICABLE.

FINES AND COSTS

You are to pay in full any fine(s), costs , fees and restitution at the time of sentencing. In the alterative, you may request a stay of execution (SOE) from the Cost Administrator in the Sequoyah County District Court Clerk's Office. All information given to the Cost Administrator in requesting the SOE will be under oath and is considered as part of the summary of facts before the Court. *You will appear in person to make all payments as agreed.* Any payment *tendered other than in person will be accepted;* however, such acceptance does **not excuse** your appearance in the Clerk's Office.

59

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, First, Middle, suffix (please print or type) (show alias)

Price Brandie Zane                    5806                    78

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-98-481C | Sps dif per Nelson | Poss CDS/w/int Poss marj |
| | | Poss Drug Para Felon |
| | | Poss of F/A Poss F/A Comm of |
| | | felony |
| | | |
| | | |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB 01 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the 29 day of Jan , 19 99 .

_____
Signature

AUTHORIZED BY

per Nelson
JUDGE OF THE DISTRICT COURT

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said
defendant be released, if in your custody for no other cause, immediately upon receipt of this order.
Last Name, First, Middle, suffix (please print or type) (show alias)

Jacobs Aubrey Dale                     ████ 1409    ████ 56

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-98-481 | 5yrs Susp. | Poss CDS w/int. Poss Marij. Poss Drug Para. Felon poss of F/A Poss F/A Comm Felony AFCF |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB 01 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

In and for the District Court of Sequoyah County, State of Oklahoma,
witness my hand this the 29 day of Jan , 19 99 .

_____
Signature

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

AUTHORIZED BY

Per Nelson
JUDGE OF THE DISTRICT COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB - 1 1999

...DS, COURT CLERK
DEPUTY

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

Case No: _CF-98-481C_          Defendant: _Brandie Z. Price_

## ACCUMULATIVE COURT COST FOR SEQUOYAH COUNTY

### VIOLENT COURT COST

**COURT FUND**

| | | |
|---|---|---|
| Court Fees | | $103.00 |
| Bail Bond Fee | $10.00 @ _____ | _____ |
| Jury Fee | $50.00@ _____ | |
| Fines | set by court | _1000.00_ |
| Mailing fee | $7.00 @ _____ | |
| Sub total Court Fund | | _____ |

**SHERIFF FEES**

| | | |
|---|---|---|
| Sheriff Fees | | $5.00 |
| Arrest Warrant | $20.00 | _____ |
| Bench Warrnts | $20.00@ _____ | _____ |
| Subpoenas | $20.00@ _____ | |
| Sub total Sheriff Fees | | _5.00_ |

| | | |
|---|---|---|
| LAW LIBRARY | | $3.00 |
| CLEET & FINGERPRINTING | | $7.00 |

| | | |
|---|---|---|
| VCA | $30.00 or set by court | _100.00_ |
| OSBI LAB | set by court | _150.00_ |
| D.A. DRUG FUND | set by court | _100.00_ |
| REVOLVING FUND(appl fee-$40.00) | | _40.00_ |
| IDF-ATTORNEY FEE | set by court | |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

TOTAL                                        _$1508.00_

JAN 2 9 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**Sequoyah County Form CF-1**                                  Uniform Plea of Guilty — Summary of Facts

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
THE STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 29 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

STATE OF OKLAHOMA,      )
     )
     Plaintiff      )
     )
VS.      )   Case No. C 98-481
     )
Brandi Price,      )
     Defendant      )
DOB _____ / 19 98      )
SS# _____ - 5806      )

## SUMMARY OF FACTS FOR THE PLEA OF GUILTY

**Part A: Finding of Fact, Acceptance of Plea**    *Waive jurisdicto §55*    *waive reading*     Circle

1. Is the name just read to you your true name?     **YES**   NO
   If no, then what is your correct name? _____
   I have also been known by the name(s) _____
   _____

2. (A) Do you wish to have a record of these proceedings made by a Court Reporter ?     YES   **NO**

   (B) Do you wish to waive your right to have a record of these proceedings made ?     **YES**   NO

3. What is your age ? **20** What grade level in school have you completed ? **13/2**

4. Can you read and understand this form ? [If no, Addendum A must be completed and attached]     **YES**   NO

5. Are you currently taking any medications or substances which affect your ability to understand these proceedings ?     YES   **NO**

6. Have you been prescribed any medication which you are not taking ?     YES   **NO**
   If yes, what medication are you not taking? _____
   What is the purpose of the medication ? _____
   Why are you not taking the medication ? _____

7. Have you ever been treated by a doctor or health professional for mental illness or confined in a hospital for mental illness ?     YES   **NO**
   If Yes, list doctor or health professional, place, and when treatment occurred:
   _____

8. Do you understand the purpose, the nature and the consequences of this proceeding ?     **YES**   NO

9. Have you received a copy of the State's Information and read its allegations ?     **YES**   NO

10.   A.   Do you understand you are charged with:
          Crime          Statutory Reference

[1] *ct1 poss of CDS w/Intent*   63 o.s. 2-401   (YES) NO

*Misd* [2] *ct2 poss of para*   63 o.s. 2-405   (YES) NO

*Misd* [3] *ct3 poss of Mari*   63 o.s. 2-402   (YES) NO

[4] *ct4 felonitiong conv*   ___ o.s. ___   YES  NO

[5] *ct5 poss. of firearm in*   21 o.s. 1287   (YES) NO
              *commission of felony*

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

B.   Are you charge after former conviction of a felony (AFCF) ?          YES   NO
If yes, list the felony(ies) charged: _____

_____

11.   Do you understand the range of punishment for the crime(s) is/are ?
          (List in the same order as in Number 10)

[1]   Minimum of ___5___ to a maximum of ___Life___ and/or a fine of $___100,000___ (YES) NO

*Misd* [2]   Minimum of ___0___ to a maximum of ___12 mo___ and/or a fine of $___100___ (YES) NO

[3]   Minimum of ___0___ to a maximum of ___12 mo___ and/or a fine of $___500___ (YES) NO

[4]   Minimum of ___2___ to a maximum of _____ and/or a fine of $_____ YES  NO

[5]   Minimum of ___2___ to a maximum of ___10___ and/or a fine of $___500___ (YES) NO

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

12.   Read the following statements:   You have the right to a speedy trial before a jury of your peers to determine whether you are guilty or not guilty and if you request, to determine the sentence.
*If pleading to a capital murder,* advise of the procedure in 21 O.S. 701.10( B)
At the trial:
[1] You have the right to have an attorney represent you, either one you hire or *if you are indigent* a court appointed attorney.
[2] You are presumed to be innocent of the charges.
[3] You may remain silent or , if you chose, you may testify on your own behalf.
[4] You have the right to see and hear all witnesses called to testify against you and the right to have those witnesses cross-examined.
[5] You may have your witnesses ordered to appear in court to testify and present evidence of any defense you have to these charges.
[6] The State is required to prove your guilt beyond a reasonable doubt.
[7] The verdict of guilty or not guilty decided by a jury must be unanimous.  However, you can waive a jury trial and, if all parties agree, the case could be tried by a Judge alone who would decide if you were guilty or not guilty and if determined to be guilty, the appropriate punishment.

Do you understand each of these rights ?          (YES) NO

13.   Do you understand by entering a plea of guilty you give up these rights ?          (YES) NO

14.   Do you understand that a conviction on a plea of guilty could increase punishment in any future case committed after this plea ?          (YES) NO

15.   Is *Gerald Hunter* your attorney ?          (YES) NO

16.   Have you talked with your attorney about the charges, advised him/her regarding any defense you may have to the charges and received his/her advice ?          (YES) NO

64

17. Do you believe your attorney has effectively assisted you in this case and are you satisfied with his/her representation ?     (YES)   NO

18. Do you wish to change your plea of not guilty to a plea of guilty and give up your right to a jury trial and all previously explained constitutional rights ?     (YES)   NO

19. Is there a plea agreement ?     (YES)   NO
    What is your understanding of the plea agreement ? _5 yrs deferred_
    _$1000 fine, VCF $100   DEF $50_
    _OSBI 150  AIDS 180.  Costs_

20. Do you understand the Court is *not* bound by any agreement or recommendation and if the Court does not accept the plea agreement, you have the right to withdraw your plea of guilty ?     (YES)   NO

21. Do you understand that if there is no plea agreement the Court can sentence you within the range of punishment stated under question 11 ?     YES   NO   NA

22. Do you understand your plea of guilty to the charge(s) is subject to :     YES   (NO)
    (check one)
    [  ]  no prior felony conviction
    [  ]  one (1) prior felony conviction
    [  ]  two (2) or more felony convictions   List prior felony convictions to which you are pleading:

    _____

23. What is/are your plea(s) to the each charge(s) ?
    [1] _guilty_   [2] _guilty_   [3] _guilty_   [4] _guilty_   [5] _____

24. Did you commit the acts as charged in the information ?     (YES)   NO
    State a factual basis for your plea(s) (attach additional pages as needed, labeled as ADDENDUM C) :
    _I did as charged in the information_
    _____

25. Have you been forced, abused, mistreated or promised anything by anyone to have you enter your plea(s) ?     YES   (NO)

26. Do you plead guilty of your own free will and without any coercion or compulsion of any kind ?     (YES)   NO

27. If you are entering a plea to a felony offense, you have a right to a Pre-sentencing investigation and Report which would contain the circumstances of the offense, any criminal record, social history and other background information about you.  Do you request a Pre-sentence report ?     YES   (NO)

28. (A) Do you have any additional statements to make to the Court ?     YES   (NO)

    (B) Is there any legal reason as to why you should *not*  sentence now ?     YES   (NO)

HAVING BEEN SWORN, I , the Defendant whose signature appears below, make the following statements under oath:

(1)          CHECK ONE:

        _✓_ (A)     I have read, understood and completed this form.

        _____ (B)     My attorney completed this form and we (the attorney and I) have gone over the form and I understand its contents and agree with the answers. *Complete Addendum A and attach to this form.*

65

_____ (C)    The Court completed this form for me and inserted my answers to the questions in open court.

(2)    All answers are true and correct.

(3)    I understand that I may be prosecuted for perjury if I have made false statements to this Court.

Acknowledged this 29th Day of _January_____, _1999_.

_Brandie Zane Price_

DEFENDANT

I, the undersigned attorney for the Defendant, believe the Defendant understands the nature, purpose, and consequence of this proceeding.  (S)He is able to assist me in formulating any defense to the charge(s).  I am satisfied that the Defendant's waivers and plea(s) of guilty are voluntarily given and he/she had been informed of all legal and constitutional rights.

_____
ATTORNEY FOR DEFENDANT

The sentence recommendation in question 19 is correctly stated.  I believe the recommendation is fair to the State of Oklahoma.  Offer of Proof (nolo contendere plea) : _____

_____

_____

_____
ASSISTANT DISTRICT ATTORNEY

## THE COURT FINDS AS FOLLOWS:

A. The Defendant was sworn and responded to questions under oath.
B. The Defendant understands the purpose, nature and consequences of this proceeding.
C. The Defendant's plea(s) of _____ is/are knowingly and voluntarily entered and accepted by the Court. Court Reporter Present
D. The Defendant is competent for the purpose of this hearing.
E. A factual basis exists for the plea(s) (and former conviction(s), if applicable).
F. The Defendant is guilty as charged: (check as appropriate)
   [ ] after no prior felony conviction.
   [ ] after one (1) prior felony conviction.
   [ ] after two (2) or more  prior felony convictions
G. Sentencing or order deferring sentence shall be: [ ] imposed instanter or [✓] continued until the 29th day of _Jan_____ _2003_ at _7_ : _00_ _A_. M . If the Pre-sentence investigation and Report is requested, it shall be provided to the Court by the _____ day of _____, _____.

DONE IN OPEN COURT this _29_ day of _Jan_____, _99_.

_____
JUDGE OF THE DISTRICT COURT

_____
NAME OF JUDGE TYPED OR PRINTED

_Waived_
_____
Court Reporter Present

_____
Deputy Court Clerk Present

## "NOTICE OF RIGHT TO APPEAL"

Sentence to Incarceration, Suspended or Deferred:

To appeal from this conviction, or order deferring sentence, on your plea of guilty, you must file in the Sequoyah County District Court Clerk's Office a written Application to Withdraw Plea of Guilty within ten (10) days from today's date. You must set forth in detail why you are requesting to withdraw your plea. The trial court must hold a hearing and rule upon your application within thirty (30) days from the date it is filed. If the trial court denies your application, you have a right to ask the Court of Criminal Appeals to review the District Court's denial by filing a Petition for Writ of Certiorari within ninety (90) days of the date of denial. Within ten (10) days from the date the application to withdraw plea of guilty is denied, notice of intent to appeal and designation or record must be filed pursuant to Oklahoma Court of Criminal Appeals Rule 4.2(D). If you are indigent, you have the right to be represented on appeal by a court appointed attorney.

Do you understand each of these rights to appeal ? (YES) NO

Do you want to remain in the county jail ten (10) days before being taken to place of confinement ? YES (NO)

Have you fully understood the questions that have been asked ? (YES) NO

Have your answers been freely and voluntarily given ? (YES) NO

I ACKNOWLEDGE UNDERSTANDING OF RIGHTS AND SENTENCE IMPOSED.

_____
Defendant

I, the undersigned attorney, have advised the Defendant of his appellate rights.

_____
Attorney for the Defendant

DONE IN OPEN COURT, this _____ day of _____

_____
Judge of the District Court

_____
Court Reporter Present

_____
Deputy Court Clerk Present

## ADDENDUM "A"

### CERTIFICATE OF DEFENSE COUNSEL

As the attorney for the defendant, _____ , I certify that:

1. The Defendant has stated to me that he/she is [ ] able [ ] unable to read and understand the attached form, and I have [ ] determined the Defendant is able to understand the English language or [ ] determined the Defendant is unable to understand the English language and obtained _____ to interpret to the Defendant in the _____ language.

2. I have read and fully explained to the Defendant the allegations contained in the Information in this case.

3. I have read and fully explained to the Defendant all of the questions in the Plea of Guilty/Summary of Facts and the answers to the questions set out in the Summary of Facts are the Defendant's answers.

4. To the best of my knowledge and belief the statement and declarations made by the Defendant are accurate and true and have been freely and voluntarily made. Dated this _29_ day of _____ , 99__ .

_____
Attorney for the Defendant

67

**Sequoyah County Form CF-1 - b**                    **Uniform Plea of Guilty — Sentence on Plea**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Case Number CF- _____      State v. _____      Date: _____

**Part B:** Sentence **on Plea**      [NOTE ON USE: Part B is to be used with the Summary of Facts if contemporaneous with the entry of plea or may be formatted as a separate sentencing form if sentencing is continued to a future date.]

**THE COURT SENTENCES THE DEFENDANT AS FOLLOWS:**

DEFERRED SENTENCE

1. The sentencing date is deferred until ___*Jan*___ , *29* , *2003* at *9:00* A.M.

2. You [ ] will [ ] will not be under supervision by the Department of Corrections. The terms set forth in the Rules and Conditions of Probation in Addendum D shall be the rules you must follow during the period of deferment.

SUSPENDED SENTENCE or SUSPENDED AS TO PART

1. You are sentence t confinement under the supervision of the Department of Corrections for a term of years as follows:
[1]_____ [2]_____ [3]_____ [4]_____ [5]_____

TO BE SUSPENDED as follows:

   (A) ALL SUSPENDED   [ ] Yes          [ ] No

   (B) suspended *except* as to the first _____ (months) (years) of the term(s) during which you are to be held in the custody of the Department of Corrections. The remaining term of the sentence(s) is to be suspended under the terms set forth in the Rules and Conditions of Probation in Addendum D.

2. The sentence(s) is/are to run [ ] concurrently [ ] consecutively with/to _____
_____ or NOT APPLICABLE.

TIME TO SERVE

1. You are sentence t confinement under the supervision of the Department of Corrections for a term of years as follows:
[1]_____ [2]_____ [3]_____ [4]_____ [5]_____

2. The sentence(s) is/are to run [ ] concurrently [ ] consecutively with/to _____
_____ or NOT APPLICABLE.

FINES AND COSTS

You are to pay in full any fine(s), costs , fees and restitution at the time of sentencing. In the alterative, you may request a stay of execution (SOE) from the Cost Administrator in the Sequoyah County District Court Clerk's Office. All information given to the Cost Administrator in requesting the SOE will be under oath and is considered as part of the summary of facts before the Court. *You will appear in person to make all payments as agreed.* Any payment tendered other than in person will be accepted; however, such acceptance does **not** excuse your appearance in the Clerk's Office.

IN THE DISTRICT COURT OF )
SEQUOYAH COUNTY )
STATE OF OKLAHOMA )
)
)
)

Defendant _Brandie Zane Price_

Case No. _CF-98-481_

Date _Jan 29, 1999_

## RULES AND CONDITIONS OF PROBATION

1. I will at the end of each month, until my final release (by the Court), make a written report. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general statement of my environment and progress.

2. I will not use or be in possession of intoxicants of any kind or alcoholic beverages, nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I understand that I am not to go into or loiter around beer taverns or pool halls.

3. I will not leave the county in which I reside or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.

4. I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.

5. I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.

6. I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.

7. I understand that it will be a violation of my Probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or a representative thereof.

8. I understand that I must support myself and all my dependants without public assistance so long as I am physically able to do so; failure to do my duty to my dependants shall constitute grounds for revocation of my Parole, Probation or Conditional Release.

9. I will refrain from violation of any City, State or Federal law.

10. I will abide by my curfew from 12 midnight until 5:00 a.m. daily unless I have written permission from my probation officer.

11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.

12. I will not refuse a breath-alcohol test if arrested for DUI, APC or an alcohol related offense.

13. I hereby waive my State and Federal constitutional rights of protection from unreasonable searches and seizures if my probation officer has a reasonable suspicion that I may be in control of contraband. That my probation officer may search me or my property if that suspicion exists in their mind.

14. I further understand that if I do not possess a high school diploma or a G.E.D. that I will acquire my G.E.D. within eighteen months or show proof of my inability to acquire the same to the Court, in writing, within that eighteen months.

15. SPECIAL CONDITIONS: The defendant is to pay probation fees of $20 per month as well as the total fees of: (Court Costs, Court Appointed Attorney fees, O.S.B.I. Lab Fees, fines or restitution) of $_____ within_____ months at a rate of not less than $_____ per month. Payments are to begin on the 5th day of_____, 19____ and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office. *(Set out how the money is to be distributed).*

$1,000 fine   $100 VCA   $100 DA Drug Fund   $150 lab fee.

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

## JAN 2 9 1999

16. **Defendant to report to DOC within 72 hours for intake.**   BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision. I further understand that these rules may not be terminated, modified or suspended by any probation officer, law enforcement officer or any other person without the written approval of the sentencing Judge and notice to the District Attorney's Office.

_____
Attorney for Defendant

_Brandie Zane Price_
Probationer

_____
JUDGE OF THE DISTRICT COURT

Defendant's Mailing Address:
███████████████████████

_Muldrow_, OK _74948_

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 2 9 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA )
       Plaintiff, )
VS. )
       ) Case No. __CF-98-481__
       )
BRANDIE ZANE PRICE, DOB: ██████/78 )
      Defendant. )

## IMPOSITION JUDGMENT AND SENTENCE DEFERRED ON PLEA OF GUILTY

NOW, on this __29th__ day of __January__, 19_99_, the same being a judicial day of said court, and

the defendant, __Brandie Zane Price__, being personally present in open court, with his/her attorney

__Gerald Hunter__, and having been duly represented at all proceedings before the Court by such

attorney of record, and having been legally charged with the offense of
POSSESSION OF CONTROLLED DRUG WITH INTENT, 63 O.S. 2-401
POSSESSION OF MARIHUANA, 63 O.S. 2-402 (misd)
~~POSSESSION OF FIREARM IN~~ _____ and having been duly

informed of the nature of the charge, and of his/her constitutional rights and having been duly arraigned

thereon, and having duly and properly entered his/her plea of guilty to the crime of
POSSESSION OF CONTROLLED DRUG WITH INTENT TO DISTRIBUTE
and UNLAWFUL POSSESSION OF MARIHUANA (misd) _____ and having been advised

of his/her rights and the effect of such plea, and the defendant having been asked by the Court whether he/she

has any legal cause to show why the Court should not defer further proceedings and place him/her on

probation under supervision of the Department of Corrections upon the conditions of probation prescribed by

the Court, and the defendant consents to such procedure.

IT IS THEREFORE the decision and Order of the Court to defer the imposition of judgment and

sentence in this case for a period of __Five (5)__ years, and the defendant is placed on probation during
             and One (1) year

such period under the supervision of the Department of Corrections of the State of Oklahoma, such deferment

to continue during good behavior and pursuant to the Rules of the Department of Corrections of the State of

Oklahoma, as prescribed in the "Addition to Judgment and Sentence."

The defendant is further taxed costs of this prosecution in the amount of $_____ for which

judgment is hereby rendered.

Upon successful completion of the probationary term, the defendant shall be discharged without a court

judgment of guilt, and the verdict or plea of guilty shall be expunged from the record and said charge shall be

dismissed with prejudice to any further action. Upon violation of the conditions of probation, the court may

enter a judgment of guilt and proceed as provided in Section 1, Title 22-901a of the Oklahoma Statutes

Annotated, 1970. Said counts to run concurrent each with the other.

_____
JUDGE OF THE DISTRICT COURT

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,
      Plaintiff )
vs. )
BRANDIE ZANE PRICE )   Case No. CF-98-481C

███████████████ )

MULDROW, OK 74948 )
     Defendant )
  SS#: )
  DOB: ███████ 1978

*TEMP.*

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 29 1999

Date: 01/29/99
      State's Attorney: ROBBIE COWAN
      Defendant's Attorney:

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

RULE 8 HEARING
(Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____ $100.00 on or before 2-26-99 and then

_____ $100.00 per month on or before 02-26-1999

then _____ per month on or before the ___ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 2-26-99 _____

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: *Def to re-appear on Feb. 26th w/$100.00 and permanent Rule 8.*

TOTAL TO PAY $ 1508.00

X *Brandie Price*
      Defendant

_____
DENNIS M. SPROUSE
Judge of the District Court

*Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

# Hamilton - Morgan Bail Bonds
## Diane Hamilton
## APPEARANCE BOND

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 25 1999

BONNIE EDWARDS, COURT CLERK
BY _____ DEPUTY

IN THE DISTRICT COURT OF _____ *Seq* _____ COUNTY, STATE OF OKLAHOMA
State of Oklahoma,                    Plaintiff,

vs. Joseph Jacobs _____, Defendant        Case No. CF-98-481A

Know all men by these presents, that we the above named defendant, as principal, and the undersigned *Diane Hamilt. D.B.A.* Diane Hamilton, Professional as surety(ies) personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of *Twenty Thousand* _____ Dollars ($ 20,000.00 ) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to the county jail of _____ *Seq.* _____ County, State of Oklahoma, shall personally be and appear before the District Court of said county on the 22 day of *April* , 19 99 , at 9 o'clock a.m. of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of *Poss of CDS w/I / Poss of Mari / Poss drug Para / Felon poss of F/A Poss of F/A comm. of Felony AFCF* and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court without leave, then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hand and seals this 23 day of *Jan* , 19 99 .

*Diane Hamilt. D.B.A.* Principal [redacted] _____ Address
Hamilton - Morgan         Surety         113 North Oak  Sallisaw, Oklahoma 74955
Diane Hamilton
*Joseph D Jacob*  Surety [redacted] *Muldrow OK 74948* Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this 23 day of *Jan* , 19 99 .

_____ Court Clerk/Sheriff *Sally Henson* _____ Deputy

This undertaking approved this 23 day of *Jan* , 19 99 .

(SEAL)                       By: _____ Deputy/Clerk

=======================================================

## AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, _____ *Seq* _____ County, SS:

The undersigned, being first duly sworn upon oath, says that he is a resident of _____ *Seq* _____ County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as herinafter specified under one or more of the following relevant statutory provisions, to-wit:

a) Consideration for this undertaking received or promised in the sum of $ *3000.00*

b) Other security received or promised for making this undertaking, is as follows: *P.N.* *Penal. Agreement*

c) Such promise, security or consideration was received from:

*Joseph Jacobs  P 406 Main St Muldrow Ok 74948*
Name                                          Address

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as on commits perjury.

*Diane Hamilt. 113 N. Oak Sallisaw, Ok. 74955*
Affiant                              Address

Subscribed and sworn to before me this 23 day of *Jan* , 19 99 .
(SEAL)

_____
Court Clerk - Notary Public

My Commission Expires:          _____
                                Deputy

72

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,        )
     Plaintiff        )
                 )
vs.        )  Case No. CF-98-00481C
BRANDIE ZANE PRICE        )
109 N. FARGO        )
                 )
MULDROW, OK  74948        )
     Defendant        )
    SS#:
    DOB: ███ 1978

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB 2 6 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

Date: 02/26/99        State's Attorney: ROBBIE COWAN
                Defendant's Attorney:

RULE 8 HEARING
(Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

*30⁰⁰ pd on 2-26-99*

_____ $140.00 on or before 3-26-99 and then

_____ $140.00 per month on or before 04-26-1999

then *140⁰⁰* per month on or before the *26th* day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before ~~3-26-99~~

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

TOTAL TO PAY $ *1508⁰⁰*

*Brandie Zane Price*
    Defendant

DENNIS M. SPROUSE
Judge of the District Court

*Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

Case No: _CF-98-481_          Defendant: _Joseph Dale Jacobs_

## ACCUMULATIVE COURT COST FOR SEQUOYAH COUNTY

### NON-VIOLENT COURT COST

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**COURT FUND**

|  |  |  |
|---|---|---|
| Court Fees |  | $103.00 |
| Bail Bond Fee | $10.00 @ 1 | 10.00 |
| Jury Fee | $30.00@ |  |
| Fines | set by court | 1,000.00 |
| Mailing fee | $7.00 @ |  |
| Sub total Court Fund |  | 1113.00 |

APR 1 2 1999

BERNELL EDWARDS, COURT CLERK

BY _____ DEPUTY

**SHERIFF FEES**

|  |  |  |
|---|---|---|
| Sheriff Fees |  | $5.00 |
| Arrest Warrant | $20.00 |  |
| Bench Warrnts | $20.00@ |  |
| Subpoenas | $20.00@ |  |
| Sub total Sheriff Fees |  | 5.00 |

LAW LIBRARY                                    $3.00
CLEET & FINGERPRINTING                $7.00

| VCA | $25.00 or set by court | 100.00 |
|---|---|---|
| OSBI LAB | set by court | 150.00 |
| D.A. DRUG FUND | set by court | 100.00 |
| REVOLVING FUND(appl fee-$40.00) |  | 40.00 |
| IDF-ATTORNEY FEE | set by court | 150.00 |


TOTAL                                              $1668.00

# In the District Court in and for Sequoyah County
## State of Oklahoma

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 1 2 1999

GARNELL EDWARDS, COURT CLERK
BY _____ , DEPUTY

State of Oklahoma,  )
        )
        Plaintiff,  )
        )
vs.        )   Case No. CF- 98-481
        )
Joseph Jacobs        )
        )
        Defendant  )
        )

## WAIVER OF PRELIMINARY HEARING

Now on this ___12___ day of ___Apr___, 19_99_ the above styled case comes on for preliminary hearing. The defendant appears in person and represented by his attorney of record, __Gerald Hunter__, the State of Oklahoma appears by its Assistant District Attorney. Thereupon the defendant herein acknowledges having been advised of the right to a preliminary hearing. That in said hearing the State of Oklahoma must prove to the satisfaction of the Court that the crime as alleged in the information was, in fact, committed and there is probable cause to believe that the defendant committed said crime. That if said burden was not met then the case would be dismissed and the bond exonerated.

The defendant is further advised that at said hearing that he/she has the right to cross examine any of the State's witnesses and to call witnesses on his/her own behalf. And further, the defendant is advised of the right at the hearing to limited discovery of the State's case in chief.

Having these rights in mind, the defendant herein, waives all the above rights with respect to a preliminary hearing in this matter.

_____
Defendant

_____
Attorney for Defendant

## WAIVER OF JURISDICTION OF EXAMINING MAGISTRATE

The defendant is further advised that neither the examining magistrate nor the Special Judge has the jurisdiction to proceed further with the case unless affirmatively waived. Having these rights in mind, the defendant hereby waives his/her rights to object to any jurisdictional defects of the Court.

_____
Defendant

_____
Attorney for Defendant

## COURT MINUTE OF PRELIMINARY HEARING

The defendant in the above styled case having knowingly and intelligently waived his/her rights to the preliminary hearing and there being no objection by the State of Oklahoma, the Court accepts the defendant's waiver and hereby binds the defendant over to stand trial in the District Court of Sequoyah County, State of Oklahoma, on the charges as set out in the information as filed in this case.

_____
JUDGE OF THE DISTRICT COURT

75

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,       )
      Plaintiff       )
      )
vs.       )   Case No. CF-98-00481A
JOSEPH DALE JACOBS       )
306 N. MAIN       )
      )
MULDROW, OK  74948       )
      Defendant       )
  SS#:
  DOB: ████/1976

Date: 04/12/99       State's Attorney: ROBBIE COWAN
Defendant's Attorney: GERALD HUNTER

TEMP.

RULE 8 HEARING
(Summary)

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 1 2 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:


_____ $100.00 on or before 5-13-99  and then

~~_____ $100.00 per month on or before _____~~

then _____ per month on or before the ___ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 5-13-99 _____

OR; _____



IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _Defendant is ordered to re-appear on
the 13th day of May 1999._


TOTAL TO PAY $ 1668⁰⁰

_____
JOHN C. GARRETT
Judge of the District Court

_____
Defendant

*Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

**BENCH WARRANT--After Conviction**

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Sequoyah County, | ) | IN DISTRICT COURT |

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA | ) | |
| VS. | ) | No.CF-98-481 |
| JOSEPH DALE JACOBS | ) | |
| ▮▮▮▮▮MULDROW OK 74948 | ) | |
| 76▮▮▮▮6130 | ) | NO BOND |

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**JOSEPH DALE JACOBS** having been on the 12TH DAY OF APRIL, 1999, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :FAILURE TO APPEAR AND PAY MONIES DUE THE COURT IN THE AMOUNT OF $1,693.00

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **JOSEPH DALE JACOBS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 7TH DAY OF JUNE, 1999, By Order of the Court.

**BERNELL EDWARDS, COURT CLERK**

BY: _Maydee Webster_
DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

S H E R I F F ' S   R E T U R N

RECEIVED the within Writ on the _____ day of _____, 199____, at _____ o'clock ____ ____M., and executed on the _____ day of _____, 199____, at _____ _____ o'clock ____M. by _____
_____ _____

Dated this _____ day of _____ 199____.

_____
SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY:_____
DEPUTY

dms

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN - 8 1999

BERNELL EDWARDS COURT CLERK
BY _____ DEPUTY

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, First, Middle, suffix (please print or type) (show alias)

Jacks, Aubrey Dale

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-98-481 | New Rule 8 | FTA + pay |
| CF-98-58 | | |
| | | |
| | | |
| | | |
| | | |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the 8th day of May , 19 99

_Maudeen Webster_
Signature

**AUTHORIZED BY**

_Dennis M Sprouse_
JUDGE OF THE DISTRICT COURT

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

78

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 0 5 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

### IN THE DISTRICT COURT OF SEQUOYAH COUNTY
### STATE OF OKLAHOMA

STATE OF OKLAHOMA

vs.                                    Case No. ___CF-98-481___

JAMES WESLEY JACOBS

#### MOTION FOR CONTINUANCE

**COMES NOW** DIANNE BARKER HARROLD, District Attorney, in and for Sequoyah County, State of Oklahoma, and moves the Court to continue the above captioned matter now set for hearing on the __9th__ day of ___August___, 199_9_ . Movant would state that this Motion is not made for the purpose of delay but is based on the following grounds:

> States witness is out of State and cannot attend this hearing.
> His testimony is vital in this case

**WHEREFORE**, movant prays that this Honorable Court continue this matter to a new date certain.

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

BY: _____
~ ASSISTANT DISTRICT ATTORNEY

#### CERTIFICATE OF MAILING

I hereby certify that on the __5th__ day of ___August___, 199_9_ , I hand delivered a true and correct copy of the above and foregoing Motion to:

Gerald Hunter

attorney for the defendant herein with sufficient postage prepaid thereon.

_____

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA, )
      Plaintiff )
vs. )  Case No. CF-98-00481C
BRANDIE ZANE PRICE )        CF-99-00061
█████████████████ )
)
)
MULDROW, OK 74948 )
      Defendant )
  SS#:
  DOB: ████/1978

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 3 0 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

Date: 08/30/99     State's Attorney: ROBBIE COWAN

Defendant's Attorney:

RULE 8 HEARING

(Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

*100⁰⁰ pd on 8-30-99*

_____ $100.00 on or before _9-30-99_ and then

_____ $100.00 per month on or before _09-30-1999_

then *$100⁰⁰* per month on or before the _30th_ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before ~~9-30-99~~ _____

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _CF 98-481 = $918⁰⁰_

_CF 99-61 = $648⁰⁰_

TOTAL TO PAY $ _1566⁰⁰_

_Brandie Price_     _____
   Defendant        DENNIS M. SPROUSE
                  Judge of the District Court

*Defendant is further ordered to notify the Collections Adm. of

any change of address, telephone, employment, or income.

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA )
   Plaintiff, )
VS. )
)
JOSEPH DALE JACOBS, DOB: ███/76 )
   Defendant. )

Case No. ___CF-98-481___

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 1 2 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## IMPOSITION JUDGMENT AND SENTENCE DEFERRED ON PLEA OF GUILTY

NOW, on this ___12th___ day of ___April___, 19__99__, the same being a judicial day of said court, and the defendant, ___Joseph Dale Jacobs___, being personally present in open court, with his/her attorney ___Gerald Hunter___, and having been duly represented at all proceedings before the Court by such attorney of record, and having been legally charged with the offense of ___POSSESSION OF CONTROLLED DRUG WITH INTENT, 63 O.s. 2-401 POSSESSION OF MARIHUANA, 63 O.S. 2-402(misd)___ and having been duly informed of the nature of the charge, and of his/her constitutional rights and having been duly arraigned thereon, and having duly and properly entered his/her plea of guilty to the crime of ___POSSESSION OF CONTROLLED DRUG WITH INTENT and POSSESSION OF MARIHUANA___ and having been advised of his/her rights and the effect of such plea, and the defendant having been asked by the Court whether he/she has any legal cause to show why the Court should not defer further proceedings and place him/her on probation under supervision of the Department of Corrections upon the conditions of probation prescribed by the Court, and the defendant consents to such procedure.

IT IS THEREFORE the decision and Order of the Court to defer the imposition of judgment and sentence in this case for a period of ___Five (5) and One (1)___ years, and the defendant is placed on probation during such period under the supervision of the Department of Corrections of the State of Oklahoma, such deferment to continue during good behavior and pursuant to the Rules of the Department of Corrections of the State of Oklahoma, as prescribed in the "Addition to Judgment and Sentence."

The defendant is further taxed costs of this prosecution in the amount of $_____ for which judgment is hereby rendered.

Upon successful completion of the probationary term, the defendant shall be discharged without a court judgment of guilt, and the verdict or plea of guilty shall be expunged from the record and said charge shall be dismissed with prejudice to any further action. Upon violation of the conditions of probation, the court may enter a judgment of guilt and proceed as provided in Section 1, Title 22-901a of the Oklahoma Statutes Annotated, 1970. Said counts to run concurrent each with the other.

_____
JUDGE OF THE DISTRICT COURT

81

IN THE DISTRICT COURT OF )
SEQUOYAH COUNTY )
STATE OF OKLAHOMA )
)
)

Defendant ___JOSEPH DALE JACOBS___

Case No. ___CF-98-481___

Date___April 12, 1999___

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 12 1999

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUT

## RULES AND CONDITIONS OF PROBATION

1. I will at the end of each month, until my final release (by the Court), make a written report. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general statement of my environment and progress.

2. I will not use or be in possession of intoxicants of any kind or alcoholic beverages, nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I understand that I am not to go into or loiter around beer taverns or pool halls.

3. I will not leave the county in which I reside or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.

4. I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.

5. I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.

6. I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.

7. I understand that it will be a violation of my Probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or a representative thereof.

8. I understand that I must support myself and all my dependants without public assistance so long as I am physically able to do so; failure to do my duty to my dependants shall constitute grounds for revocation of my Parole, Probation or Conditional Release.

9. I will refrain from violation of any City, State or Federal law.

10. I will abide by my curfew from 12 midnight until 5:00 a.m. daily unless I have written permission from my probation officer.

11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.

12. I will not refuse a breath-alcohol test if arrested for DUI, APC or an alcohol related offense.

13. I hereby waive my State and Federal constitutional rights of protection from unreasonable searches and seizures if my probation officer has a reasonable suspicion that I may be in control of contraband. That my probation officer may search me or my property if that suspicion exists in their mind.

14. I further understand that if I do not possess a high school diploma or a G.E.D. that I will acquire my G.E.D. within eighteen months or show proof of my inability to acquire the same to the Court, in writing, within that eighteen months.

15. SPECIAL CONDITIONS: The defendant is to pay probation fees of $20 per month as well as the total fees of: (Court Costs, Court Appointed Attorney fees, O.S.B.I. Lab Fees, fines or restitution) of $_____ within_____ months at a rate of not less than $_____ per month. Payments are to begin on the 5th day of_____, 19____ and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office. *(Set out how the money is to be distributed)*.
    $1,000 fine $100 VCA $100 DA Drug Fund and $150 lab fee

17. Drug Rehab to be determined by DOC

16. Defendant to report to DOC within 72 hours for intake.

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision. I further understand that these rules may not be terminated, modified or suspended by any probation officer, law enforcement officer or any other person without the written approval of the sentencing Judge and notice to the District Attorney's Office.

_____
Attorney for Defendant

_____
JUDGE OF THE DISTRICT COURT

_____
Probationer

Defendant's Mailing Address:

306 N Main

Muldrow OK 74948

82

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

NOV 16 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

THE STATE OF OKLAHOMA, )
        Plaintiff, )
                  )
vs. )        No. CF-98-481
                  )
BRANDIE ZANE PRICE )
DOB: ▮▮▮/78 #▮▮▮▮-5806 )
        Defendant. )

## ORDER ACCELERATING DEFERRED SENTENCE

NOW, on this 16th day of November, 1999, the above styled case comes on for hearing on the State's Application to Impose Deferred Sentence. The State is present by Assistant District Attorney, Robbie Cowan, the defendant is present and represented by the attorney of record, Gerald Hunter.

The defendant, after being advised of her rights both by her attorney and by the Court, informs the Court that she wishes to stipulate to the Application to Impose Deferred Sentence and the State makes their recommendation of an accelerated sentence.

The Court finds that on the 29th day of January, 1999, the said defendant entered his plea of guilty to the crime of UNLAWFUL POSSESSION OF CONTROLLED DRUG WITH INTENT TO DISTRIBUTE and POSSESSION OF MARIHUANA; and that upon acceptance of said plea the Court ordered to defer the imposition of Judgment and Sentence in this cause for a term of Five (5) years in each case, pending the defendant's good behavior.

The Court finds that on the 1st day of November, 1999, the State filed an Application to Impose Deferred Sentence based on violations of the defendant's Rules and Conditions of Probation. The Court further finds the defendant did, in fact, violate the rules and conditions as alleged in the State's Application.

That the Court accepts the defendant's stipulation to the Application and thereby accepts her plea of guilty and accelerates the deferred sentence and finds the defendant guilty.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the defendant's deferred sentence is accelerated, the defendant is found guilty and is sentenced to a term of Ten (10) years with the Department of Corrections, Defendant to successfully complete the REGIMENTED TREATMENT PROGRAM (R.T.P.) with the balance suspended upon successful completion pursuant to Rules and Conditions of Probation. The Sheriff of Sequoyah County shall deliver said defendant to the Department of Corrections and leave therewith a copy of this Order of Judgment and Sentence to serve as a warrant and authority for the revocation of said defendant as provided herein. The second copy of the Order to be warrant and authority of said Sheriff for the transportation and imprisonment of said defendant as herein before provided. The Sheriff to make due return to the Clerk of this Court, with his procedure endorsed thereon. Said term to run concurrent with Sequoyah County Case No. CF-99-549 and consecutive with CF-99-61.

IT IS SO ORDERED.

_____
JUDGE OF THE DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**REDACTED EXHIBIT 174**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

84

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

     *Plaintiff,*

v.

JOSEPH ALONDO McADAMS,
a/k/a JOE McADAMS
a/k/a JOE MELENCON,
a/k/a JOE MALENCON,
MELISSA GAIL REESE,
BRANDIE ZANE PRICE,
LESLIE BERNARD JOHNSON
and CURRY ADOYLE DAWSON,

     *Defendants.*

Case No. CR 07-016-RAW

**FILED**

MAR 14 2007

William B. Guthrie
Clerk, U.S. District Court

By_____
        Deputy Clerk

## INDICTMENT

The Federal Grand Jury charges:

## COUNT ONE

**[21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A) – Conspiracy to Distribute Methamphetamine]**

A. <u>Objects of the Conspiracy.</u>

  Beginning prior to approximately May, 2006, the exact date being unknown to the Grand Jury, and continuing until on or about February 20, 2007, in the Eastern District of Oklahoma and elsewhere, **JOSEPH ALONDO McADAMS, a/k/a JOE McADAMS, a/k/a JOE MELENCON a/k/a JOE MALENCON (hereinafter "McADAMS"), MELISSA GAIL REESE(hereinafter "REESE"), BRANDIE ZANE PRICE (hereinafter "PRICE"), LESLIE BERNARD JOHNSON (hereinafter "JOHNSON"), and CURRY ADOYLE DAWSON (hereinafter**

1

85

# IN THE UNITED STATES DISTRICT COURT FOR THE

**FILED**

## EASTERN DISTRICT OF OKLAHOMA

APR 2 3 2007

WILLIAM B. GUTHRIE
Clerk, U.S. DISTRICT COURT

By_____
Deputy Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BRANDIE ZANE PRICE, | ) |
| | ) |
| Defendant. | ) |

Case No. CR-07-016-RAW

## PLEA AGREEMENT

PARTIES

1. The following plea agreement is entered into by and between the United States Attorney for the Eastern District of Oklahoma and the above-captioned defendant. Any reference to the plaintiff or the United States in this Agreement shall mean the office of the United States Attorney for the Eastern District of Oklahoma.

SENTENCING
GUIDELINE
APPLICATION

2. The defendant, and counsel for both parties, understand that the United States Sentencing Commission Guidelines which took effect on November 1, 1987, will provide advisory guidance to the sentencing Court, since Defendant's offense or offenses were completed after the effective date of the Guidelines implementation.

DEFENDANT'S
PLEA

3. The defendant agrees to waive indictment by a grand jury and plead guilty to a felony Information which will be filed against the defendant by the United States Attorney for the Eastern District of Oklahoma. That

86

Information will charge the defendant with a single count of violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(A), Possession with Intent to Distribute Methamphetamine a Schedule II Controlled Substance. The maximum penalty for such offense is imprisonment for a period of not less than ten (10) years nor more than life and a fine of up to $4,000,000.00, a term of supervised release to be determined by the Court, the costs of prosecution, imprisonment, probation, or supervised release, as well as a special assessment in the amount of $100.00. At the time the guilty plea is entered, the defendant shall admit to the Court that the defendant is, in fact, guilty of the offense charged in the Information.

SUPERVISED
RELEASE

4. The defendant also understands that the Court must impose at least a five-year term of supervised release in addition to any term of imprisonment, fine or assessment involving a violation of the Controlled Substances act.

PUNISHMENT

5. The defendant understands that the total, maximum possible sentence for all charges is the combination of penalties described above; that is not less than ten (10) years nor more than life in prison and fines totaling $4,000,000.00, a term of supervised release to be determined by the Court, the costs of prosecution, imprisonment, probation, or supervised release, and an assessment totaling $100.00.

-2-

SPECIAL
ASSESSMENT

6. When this plea agreement is returned to the U. S. Attorney's Office for review by the U. S. Attorney, the defendant will provide a check representing the full amount of the special assessment(s) set forth in paragraph 1 as required by Title 18, United States Code, Section 3013. This check will be made payable to the Clerk of the United States District Court and will be deposited with the Clerk immediately. If a special assessment is not ultimately imposed by the Court, the Clerk of the District Court will refund the amount tendered by the defendant after sentencing has been completed. The failure to have such check supported by sufficient funds will be treated as a breach of this plea agreement and may result in additional criminal charges being filed.

FINE

7. The defendant understands that the Court may impose a fine pursuant to the Sentencing Reform Act of 1984. The willful failure to pay any fine imposed by the Court, in full, may be considered a breach of this plea agreement. Further, the defendant acknowledges that willful failure to pay the fine may subject the defendant to additional criminal violations and civil penalties pursuant to Title 18, United States Code, Section 3611, et seq.

FINANCIAL
STATEMENT

8. The defendant agrees, as a part of this agreement, to submit to interviews by the United States Attorney Office's Financial Litigation Unit regarding the defendant's financial status, and to complete and submit a financial statement, under oath, not later than two weeks after the date of this plea agreement.

-3-

88

NO OTHER
CHARGES
(TAX CHARGES
EXCLUDED)

9. The United States Attorney's Office for the Eastern District of Oklahoma agrees that it will not bring any other criminal charges against the defendant arising out of the defendant's involvement in the offense(s) described above. However, nothing in this agreement will limit prosecution for criminal tax charges, if any, arising out of such offense(s).

SENTENCING
RECOMMENDATION

10. Counsel for the defendant has affirmatively indicated to the United States Attorney's Office that the defendant not only wishes to enter a plea of guilty, but clearly demonstrates a recognition and affirmative acceptance of responsibility as required by the sentencing guidelines. If the defendant can adequately demonstrate this recognition and affirmative acceptance of responsibility to the Court, the United States Attorney's Office will recommend that the defendant receive a three-point reduction in the defendant's offense level for acceptance of responsibility. The failure of the Court to find that the defendant is entitled to this three-point reduction shall not be a basis to void this plea agreement.

11. At the time of sentencing, the United States will make a recommendation that it considers appropriate based upon the nature and circumstances of the case and the defendant's participation in the offense, and specifically reserves the right to recommend a sentence up to and including the maximum sentence of imprisonment and/or a fine allowable, together with the cost of prosecution.

-4-

CONDITIONS OF
PROBATION

12. If probation or a term of supervised release is ordered, the United States will recommend the Court impose the following special conditions:

(a)  The defendant be prohibited from possessing a firearm or other dangerous weapon.

(b)  The defendant pay the fine in accordance with a specific schedule (to be determined by the Court).

(c)  The defendant be directed to provide the probation office and the United States Attorney access to any requested financial information.

(d)  The defendant be confined in a community treatment center, halfway house or similar facility.

(e)  The defendant be placed under house detention.

(f)  The defendant be directed to attend substance abuse counseling which may include testing to determine whether the defendant has reverted to drug or alcohol use.

(g)  The defendant be directed to attend psychiatric or psychological counseling and treatment in a program approved by the probation officer.

COOPERATION -
SUBSTANTIAL
ASSISTANCE

13. The defendant agrees to cooperate with the United States. Upon completion of such cooperation, if the United States believes the defendant has provided "substantial assistance" pursuant to Title 18, United States Code, Section 3553(e), the United States may in its discretion request the Court to depart below the guideline range when fixing a sentence for this defendant or may, within one year after sentencing herein, move the Court to order relief pursuant to Rule 35, Rules of Criminal Procedure.

(a)  At or before the time of sentencing, the United States will advise the Court of any assistance provided by defendant in the

-5-

ongoing investigation into illegal narcotics trafficking in eastern Oklahoma and western Arkansas and related criminal activity within the Eastern District of Oklahoma and elsewhere, or in the prosecution of another person who has committed a criminal offense. The United States may, but shall not be required to, make a motion requesting the Court to depart from the sentencing range called for by the guidelines in the event defendant provides "substantial assistance." This decision shall be in the sole discretion of the United States Attorney.

(b)    It is understood and agreed that a motion for departure shall not be made, under any circumstances, unless defendant's cooperation is deemed "substantial" by the United States Attorney. The United States has made no promise, implied or otherwise, that defendant will be granted a "departure" for "substantial assistance." Further, no promise has been made that a motion will be made for departure even if defendant complies with the terms of this agreement in all respects, but has been unable to provide "substantial assistance."

(c)    The United States agrees to consider the totality of the circumstances, including but not limited to the following factors, in determining whether, in the assessment of the U. S. Attorney, defendant has provided "substantial assistance" which would merit a government request for a downward departure from the applicable guideline sentencing range:

(1)    the United States' evaluation of the significance and usefulness of any assistance rendered by defendant;

(2)    the truthfulness, completeness, and reliability of any information or testimony provided by defendant;

(3)    the nature and extent of defendant's assistance;

(4)    any injuries suffered or any danger or risk of injury to defendant or defendant's family resulting from any assistance provided by defendant, and;

(5)    the timeliness of any assistance provided by defendant.

(d)    It is understood that even if a motion for departure is made by the United States, based upon defendant's perceived "substantial assistance," the final decision as to how much, if any,

reduction in sentence is warranted because of that assistance, rests solely with the District Court.

**PLACE OF CONFINEMENT**

14. At the time of sentencing, the United States will join with the defendant and urge the Court to recommend that the Bureau of Prisons designate the facility of the Defendant's choosing to be the place of service of this sentence. The defendant understands that the Bureau of Prisons is not bound by recommendations from the Court.

**INFORMATION TO PROBATION**

15. The defendant also understands that the United States will provide to the United States Probation Office all information in its possession which the United States deems relevant regarding the defendant's background, character, cooperation, if any, and involvement in this or other offenses.

**OBJECTION TO PRESENTENCE REPORT**

16. The defendant understands that both the United States and defendant must communicate to the probation officer, within eleven (11) days after disclosure of the Presentence Report, any objections they may have as to material information, base offense level, criminal history, sentencing guideline ranges and policy statements contained in or omitted from the report. The defendant agrees to meet with the United States at least five (5) days prior to sentencing in a good faith attempt to resolve any substantive differences. Any unresolved differences shall be communicated to the probation officer for inclusion in an addendum to the Presentence Report. The defendant understands that unresolved substantive objections will be

-7-

decided by the Court at the sentencing hearing where the standard of proof will be a preponderance of the evidence. Objections by the defendant to the Presentence Report or the Court's rulings thereon, shall not be grounds for withdrawal of defendant's plea(s) of guilty.

ALLOCUTION

17. At the sentencing, the United States may bring to the Court's attention, and the Court may consider, all relevant information with respect to the defendant's background, character and conduct including the conduct that is the subject of the charges which the United States has agreed to dismiss, and the nature and extent of the defendant's cooperation, if any. The United States may bring to the Court's attention and the Court may consider any failure by the defendant to fulfill any obligation under this agreement.

COURT NOT
BOUND

18. The defendant understands that the Court is not a party to and is not bound by this agreement nor any recommendations made by the parties. Thus, the Court is free to impose upon the defendant any sentence up to and including the maximum sentence of imprisonment for not less than ten (10) years not more than life in prison and a fine of up to $4,000,000.00, a term of supervised release, the costs of prosecution and special assessments totaling $100.00.

WITHDRAWAL
OF PLEA

19. The Court may depart upward or downward from the sentencing range calculation contained in the Presentence Report. The defendant agrees not to withdraw the plea or pleas of guilty herein if the Court contemplates departure or departs from the sentencing range calculation. If the Court

-8-

imposes a sentence with which the defendant is dissatisfied, the defendant will not be permitted to withdraw any guilty plea for that reason alone, nor will the defendant be permitted to withdraw any plea should the Court decline to follow any recommendations by any of the parties to this agreement. Both plaintiff and defendant specifically reserve the right to appeal any actual departure from the Presentence Report sentencing range found applicable by the Court after ruling on the objections, if any, by plaintiff and defendant to such sentencing range.

COOPERATION

20. The defendant agrees to cooperate fully with the United States. The defendant understands and agrees that complete and truthful cooperation is a material condition of this agreement. Cooperation shall include providing all information known to the defendant regarding any criminal activity, including but not limited to the offenses described in this agreement. Cooperation will also include complying with all reasonable instructions from the United States, submitting to interviews by investigators and attorneys at such reasonable times and places to be determined by counsel for the United States and to testify fully and truthfully before any grand juries, hearings, trials or any other proceedings where the defendant's testimony is deemed by the United States to be relevant. The defendant understands that such cooperation shall be provided to any state, local and federal law enforcement agencies designated by counsel for the United States. Further, it is understood and agreed that the defendant shall not directly, indirectly, or

-9-

intentionally disclose anything defendant knows or has done concerning the plaintiff's investigation to anyone other than defendant's attorney. Defendant agrees to take no steps directly or indirectly to "tip" or warn any subject of this investigation that defendant, subject or anyone else is being investigated. The United States agrees that any statements made by the defendant during the cooperation phase of this agreement shall not be used against the defendant in any subsequent prosecutions unless the defendant has breached this agreement. However, the United States will be free to use at sentencing in this case any of the statements and evidence provided by the defendant during the cooperation phase of the agreement.

21. THIS AGREEMENT IS NOT CONTINGENT IN ANY WAY UPON THE OUTCOME OF ANY INVESTIGATION, PROCEEDING OR SUBSEQUENT TRIAL. THUS, NONE OF THE RIGHTS AND OBLIGA-TIONS DESCRIBED ABOVE ARE IN ANY WAY DEPENDENT UPON A GRAND JURY RETURNING AN INDICTMENT, A JURY'S VERDICT AT ANY TRIAL, OR THE SUCCESS OF ANY PROSECUTION.

**SPEEDY TRIAL ACT WAIVER**

22. The defendant waives and agrees to waive any rights under the Speedy Trial Act and understands and agrees that sentencing may be delayed until the cooperation phase has been completed so that at sentencing the Court will have the benefit of all relevant information.

**BREACH OF AGREEMENT**

23. In the event the United States believes the defendant has failed to fulfill any obligations under this agreement, or has falsely implicated an

-10-

innocent person in the commission of a crime, then the United States shall, in its discretion, have the options of declaring any provision of this agreement null and void, in which event or events defendant shall not be entitled to withdraw the plea or pleas of guilty made in connection with this plea agreement. Whether or not the defendant has completely fulfilled all of the obligations under this agreement shall be determined by the Court in an appropriate proceeding at which any disclosures and documents provided by the defendant shall be admissible and at which the United States shall be required to establish any breach by a preponderance of the evidence. In order to establish any breach by the defendant, the United States is entitled to rely on statements and evidence given by the defendant during the cooperation phase of this agreement.

24. The defendant and the United States agree that in the event the Court concludes that the defendant has breached this agreement:

(a)     The defendant will not be permitted to withdraw any guilty plea(s) tendered under this agreement and agrees not to petition for withdrawal of any guilty plea(s);

(b)     The United States will be free to make any recommendations to the Court regarding sentencing in this case;

(c)     Any evidence or statements made by the defendant during the cooperation phase will be admissible at any trials or sentencings;

(d)     The United States will be free to bring any other charges it has against the defendant.

-11-

OTHER CRIMES
NOT COVERED

25. Nothing in this agreement shall protect the defendant in any way from prosecution for any offense committed after the date of this agreement, including but not limited to perjury, false declaration, or false statement, in violation of Title 18, United States Code, Sections 1621, 1623, or 1001, or obstruction of justice, in violation of Title 18, United States Code, Section 1503, 1505, or 1510, should the defendant commit any offense during the cooperation phase of this agreement. Should the defendant be charged with any offense alleged to have occurred after the date of this agreement, the information and documents disclosed to the United States during the course of the cooperation could be used against the defendant in any such prosecution.

WAIVER OF
CIVIL CLAIMS

26. The defendant agrees not to pursue or initiate any civil claims or suits against the United States of America, its agencies or employees, whether or not presently known to the defendant, arising out of the investigation, prosecution or cooperation covered by this agreement.

PROFESSIONAL
LICENSE

27. It is further understood and agreed that the status of any professional license held by the defendant is not protected by this agreement and is a matter solely within the discretion of the appropriate licensing authority. The United States may in its discretion provide to any such licensing authority any documents and information in its possession.

INFORMATION TO
OTHER AGENCIES

28. The defendant agrees to interpose no objection to the United States transferring evidence or providing information concerning the

-12-

defendant and/or this offense, to other state and federal agencies or other organizations, including, but not limited to the Internal Revenue Service, law enforcement agencies and licensing and regulatory agencies.

**IRS NOT BOUND**

29.   Nothing in this agreement shall limit the Internal Revenue Service in its collection of any taxes, interest or penalties due from the defendant arising out of or related in any way to the offenses identified in this agreement.

**IRS 6(e) ORDERS**

30.   The defendant agrees to interpose no objections to the entry of an order under Fed. R. Crim. P., Rule 6(e), authorizing transfer to the Examination Division of the Internal Revenue Service of the defendant's documents, or documents of third persons, in possession of the Grand Jury, the United States Attorney, or the Criminal Investigation Division of the Internal Revenue Service.

**POST-TRIAL MOTIONS**

31.   Nothing in this agreement shall restrict or limit the nature or content of the United States' motion or response to any motions filed on behalf of the defendant.

**WAIVER OF APPEAL AND POST CONVICTION RELIEF**

32.   Defendant expressly waives the right to appeal defendant's sentence on any ground, except to challenge an upward departure from the applicable guideline range as determined by the Court. Defendant specifically waives any appeal rights conferred by Title 18, United States Code, Section 3742, any post-conviction proceedings, and any habeas corpus proceedings. Defendant is aware that Title 18, United States Code, Section

-13-

3742 affords defendant the right to appeal the sentence imposed. Defendant is also aware that the sentence herein has not yet been determined by the Court. Defendant is aware that any estimate of the probable sentencing range that defendant may receive from his attorney, plaintiff, the probation office, or any agents of such parties, is not a promise, and is not binding on plaintiff, the probation office, or the Court. Realizing the uncertainty in estimating what sentence defendant will ultimately receive, defendant knowingly waives the right to appeal the sentence (except as to an upward departure) and agrees not to contest such sentence in any post conviction proceeding, including but not limited to writs of habeas corpus or coram nobis concerning any and all motions, defenses, probable cause determinations, and objections which defendant has asserted or could assert to this prosecution and to the court's entry of judgment against defendant and imposition of sentence, in exchange for the concessions made by the United States in this agreement and the execution of the agreement itself.

**REINSTITUTION OF PROSECUTION**

33. If defendant's guilty plea is rejected, withdrawn, vacated, or reversed at any time, the United States will be free to prosecute the defendant for all charges of which it then has knowledge, and any charges that have been dismissed will be automatically reinstated or may be represented to a grand jury with jurisdiction over the matter. In such event, defendant waives any objections, motions or defenses based upon The Statute of Limitations,

-14-

99

Speedy Trial Act, or constitutional restrictions as to the time of bringing such charges.

**OTHERS NOT BOUND**

34. Nothing in this agreement shall bind any other federal, state or local district, jurisdiction or law enforcement agency.

**EFFECT OF WAIVER OF TRIAL AND APPEAL OF SENTENCE**

35. The defendant understands that by pleading guilty, defendant will waive defendant's rights to be tried by a jury, to a presumption of innocence, to be assisted by an attorney at trial and to have an attorney appointed to assist defendant at trial, to confront and cross-examine witnesses against defendant and compel the attendance of witnesses for defendant, against self-incrimination, and to appeal the amount, terms, or condition of any punishment imposed by the Court, except for any upward departure from the sentencing guideline range found applicable by the Court.

36. Defendant agrees that if this matter were to proceed to trial, the United States could prove the following facts beyond a reasonable doubt, and that these facts accurately represent the defendant's provable offense conduct and specific offense characteristics: Between May, 2006, and February 20, 2007, in the Eastern District of Oklahoma, and elsewhere, Defendant possessed with intent to distribute in excess of 500 grams of a mixture or substance containing a detectable quantity of methamphetamine, a schedule II controlled substance. Defendant understands that defendant will have to swear under oath to the accuracy of this statement, and if defendant should be called upon to testify about this matter in the future, any

-15-

inconsistencies in such testimony may subject defendant to additional penalties of perjury which may be enforced by the United States under this agreement.

**REASONS FOR AGREEMENT**

37. The United States is entering into this plea agreement with the defendant because this disposition of the matter fairly and adequately addresses the gravity of the series of offenses from which the charges are drawn, as well as the defendant's role in such offenses; takes into account the public interest in a prompt and certain disposition of the case; adequately protects the public; and promotes respect for the law, thereby serving the ends of justice.

**COMPLETE AGREEMENT/ TERMS NOT SEVERABLE/ CONSTRUCTION**

38. The United States and the defendant will be bound by this plea agreement only if all conditions set forth herein are met. This plea agreement shall not be construed against either the United States or the defendant because both parties acknowledge responsibility for the plea agreement reached as a result of negotiation with respect hereto and as expressed herein. The subject headings herein are for convenience only and are not part of this plea agreement. This document states the complete and only plea agreement between the United States Attorney for the Eastern District of Oklahoma and the defendant in this case, and is binding only on the United States Attorney's Office for the Eastern District of Oklahoma and the defendant, supersedes all prior understandings, if any, whether written or oral, and cannot be modified other than by a writing that is signed by all parties or on the record in Court.

-16-

No other promises or inducements have been or will be made to the

defendant in connection with this case, nor have any predictions or threats

been made in connection with this plea.

SIGNATURE
REQUIREMENTS

40. None of the terms of this agreement shall be binding on the

Office of the United States Attorney for the Eastern District of Oklahoma

until this agreement is signed by the defendant, defense counsel and the

United States Attorney, or his authorized representative.

### ACKNOWLEDGMENTS

I have read this agreement and carefully reviewed every part of it with my attorney. I fully understand it and I voluntarily agree to it without reservation. No promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this plea agreement. I am satisfied with the legal services provided by my attorney in connection with this plea agreement and matters related to it. I do this of my own free will. No threats have been made to me, nor am I under the influence of anything that could impede my ability to fully understand this plea agreement.

_____          _____

Date                                                    BRANDIE ZANE PRICE
                                                           Defendant

I am the defendant's counsel. I have carefully reviewed every part of this agreement with the defendant. It accurately and completely sets forth the entire agreement between the United States and the defendant. The defendant's decision to enter into this agreement is an informed and voluntary one.

_____          _____

Date                                                    MR. ROB RIDENOUR, Esq.

-17-

On behalf of the Office of the United States Attorney for the Eastern District of Oklahoma, I accept this agreement of the defendant to plead guilty under the terms and conditions set forth herein.

SHELDON J. SPERLING
United States Attorney

_23 APR 2007_____
Date

ROB WALLACE
Assistant United States Attorney

1200 West Okmulgee
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

-18-

103

**"DAWSON")**, defendants herein, did willfully and knowingly combine, conspire, confederate, and agree together and with others, both known and unknown to the Grand Jury, to commit offenses against the United States in violation of Title 21, United States Code, Sections 846, and 841(a)(1), and Title 18, United States Code, Section 924( c ) as follows:

1. To knowingly and intentionally possess with intent to distribute methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1);

2. To knowingly and intentionally distribute methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1);

3. To obtain U.S. Currency in exchange for the methamphetamine that was being distributed by the co-conspirators; and

4. To use, carry, or possess firearms during and in relation to a drug trafficking crime, in violation of Title 18, United States Code, Section 924( c ).

B. <u>Means of the Conspiracy.</u>

The objects of the conspiracy were to be accomplished and were accomplished as follows:

1. **McADAMS** acquired large quantities of methamphetamine from sources of supply in Oklahoma City, Oklahoma, for distribution in and around Sequoyah County, Oklahoma, and Sebastian County, Arkansas.

2. **McADAMS**, enlisted the assistance of **REESE** to travel to Oklahoma City, Oklahoma, to acquire large quantities of methamphetamine for delivery and distribution in and around Sequoyah County, Oklahoma, and Sebastian County, Arkansas.

3. **McADAMS** delivered large quantities of methamphetamine to others, both known and unknown to the grand jury, in a process known as "fronting". "Fronting" is a method of distribution

2

of illegal narcotics wherein the narcotics are delivered to an individual for further marketing but no money is paid at the time of the delivery. Payment for the illegal narcotics occurs after the illegal narcotics are further marketed.

4. **REESE, JOHNSON,** and **PRICE,** along with others both known and unknown to the Grand Jury, received large quantities of methamphetamine from **McADAMS,** and distributed the methamphetamine to both end users and those engaged in further sale of the controlled substance.

5. **DAWSON** provided **McADAMS** with assistance in enforcing discipline among the co-conspirators and providing security for the illegal narcotics distribution operation by using firearms and physical intimidation.

C. Overt Acts of the Conspiracy

In furtherance of the conspiracy and to effect and accomplish its objectives, the defendants, and others known and unknown to the Grand Jury, committed the following overt acts, among others, in the Eastern District of Oklahoma, and elsewhere:

1. On or about May 18, 2006, Amy Osborne possessed approximately eight ounces of methamphetamine which she obtained from **McADAMS.**

2. On or about June 22, 2006, **PRICE** possessed approximately two ounces of methamphetamine. The methamphetamine was obtained from **McADAMS.**

3. Beginning around January 1, 2006, until on or about June 22, 2006, **PRICE** obtained methamphetamine from **McADAMS.** She received approximately one pound at each delivery and received at least one delivery and as many as three deliveries per week.

4. On or about June 23, 2006, **REESE** possessed approximately 9.2 grams of a mixture or substance containing a detectable quantity of methamphetamine.

3

5. On or about July 17, 2006, Teresa Casey and Johnny Paul Releford possessed approximately four ounces of methamphetamine, a Heritage Rough Rider, .22 caliber pistol, s/n HR88243 and $25,000 in U.S. Currency. The methamphetamine was received from **McADAMS**.

6. On or about July 31, 2006, Teresa Casey and Johnny Paul Releford possessed approximately one ounce of methamphetamine. The methamphetamine was received from **McADAMS**.

7. On or about August 8, 2006, **McADAMS** distributed, delivered and sold approximately eight ounces of methamphetamine in Sequoyah County, Oklahoma.

8. On or about August 19, 2006, **McADAMS** distributed, delivered and sold approximately six ounces of methamphetamine in Sequoyah County, Oklahoma and Sebastian County, Arkansas.

9. On or about August 22, 2006, Jack Ensey possessed approximately 182 grams of methamphetamine, $14,490 in U.S. Currency, digital scales and small zip lock bags. Ensey received the methamphetamine from **McADAMS**.

10. On or about August 23, 2006, **JOHNSON** possessed ammunition, firearms, methamphetamine, paraphernalia of methamphetamine trafficking, and a locked container with monies, and documents containing handwritten financial figures. **JOHNSON** obtained the methamphetamine from **REESE**.

11. On or about September 10, 2006, **McADAMS** possessed approximately four pounds and five ounces of methamphetamine in storage unit #259 located at ███████████ Fort Smith, Arkansas.

12. Sometime in September of 2006, Wesley McAfee and Connie Chambers took a large quantity of methamphetamine contained in a five gallon bucket located in a cellar at **McADAMS'**

4

mother's home in Sequoyah County, Oklahoma. The bucket contained eight pounds of methamphetamine packaged in one ounce bundles. Each ounce of methamphetamine was wrapped in a piece of plastic wrap which was then tied in a knot. McAfee provided three pounds to Chambers and took the remaining amount for use and sale.

13. Sometime in September, 2006, following the events described in paragraph 12, **REESE** lured McAfee to her residence just north of Roland, Sequoyah County, Oklahoma. At the **REESE** residence, McAfee was attacked by **McADAMS** and **DAWSON** for stealing the methamphetamine. McAfee was beaten, stripped naked, handcuffed, and his legs and feet were duct taped together. **McADAMS** and **DAWSON** threatened McAfee with handguns.

14. After the assault began, **McADAMS** and **REESE** traveled to McAfee's residence, kicked in the front door, and began ransacking the house searching for the stolen methamphetamine.

15. **DAWSON** and others, both known and unknown to the Grand Jury, remained with McAfee at the **REESE** residence. **DAWSON** continued the abuse of McAfee in an attempt to obtain the exact location of the stolen methamphetamine. **DAWSON** relayed answers given by McAfee to **REESE** and **McADAMS** via a cellular telephone. **REESE, McADAMS** and **DAWSON** later transported McAfee to his residence and left him in the garage of the residence naked, bound, and injured.

16. On or about September 27, 2006, **McADAMS** sold approximately six ounces of methamphetamine to an undercover federal agent. **REESE** and **DAWSON** were also present with **McADAMS. DAWSON** assisted in the drug transaction by stepping out of the vehicle driven by **McADAMS** and inspecting the vicinity ensuring no other individuals were present.

5

17. In or about December of 2006, on two separate occasions, **REESE** traveled to Oklahoma City, Oklahoma, and on each occasion, obtained six and one half pounds of methamphetamine. **REESE** transported the methamphetamine to Sequoyah County, Oklahoma, and Sebastian County, Arkansas, for distribution. Also on each occasion, **REESE** delivered approximately one pound of the methamphetamine to **JOHNSON** for further marketing.

18. On or about December 15, 2006, **REESE** possessed approximately three pounds and fifteen ounces of methamphetamine in storage unit #140 at Falcon Mini Storage located in Muldrow, Sequoyah County, Oklahoma.

19. On February 1, 2007, **McADAMS** possessed four pistols in his apartment at █████████ █████████ Oklahoma City, Oklahoma, the firearms are identified as follows:

- Ruger, model P95-DC, 9mm semi-automatic pistol, bearing serial number 312-19103
- Jimenez Arms, model JA Nine, 9mm semi-automatic pistol, serial number 009847
- Bryco Arms, model Jennings Nine, 9mm semi-automatic pistol, serial number 1301282
- Hi Point, model C, 9mm semi-automatic pistol serial number 829467

20. On Febraury 1, 2007, **JOHNSON** possessed methamphetamine and drug paraphernalia indicative of drug distribution at his residence at █████████████ Muldrow, Sequoyah County, Oklahoma.

**All in violation of Title 21, United States Code Sections, 846, 841(a)(1) and (b)(1)(A).**

<u>**COUNT TWO**</u>

**[Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(viii) — Possession of Methamphetamine with Intent to Distribute]**

On or about August 8, 2006, in Sequoyah County, Oklahoma, in the Eastern District of Oklahoma, **JOSEPH ALONDO McADAMS, a/k/a JOE McADAMS, a/k/a JOE MELENCON,**

6

a/k/a JOE MALENCON, defendant herein, knowingly and intentionally distributed, and possessed with the intent to distribute, a mixture or substance, in excess of 50 grams, which contained a detectable amount of methamphetamine.

**All in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(viii).**

## COUNT THREE

[Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(viii) – Possession of Methamphetamine with Intent to Distribute]

On or about August 19, 2006, in Sequoyah County, Oklahoma, in the Eastern District of Oklahoma, **JOSEPH ALONDO McADAMS, a/k/a JOE McADAMS, a/k/a JOE MELENCON, a/k/a JOE MALENCON**, defendant herein, knowingly and intentionally distributed, and possessed with the intent to distribute, a mixture or substance, in excess of 50 grams, which contained a detectable amount of methamphetamine.

**All in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(viii).**

## COUNT FOUR

[Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(viii) – Possession of Methamphetamine with Intent to Distribute]

On or about September 27, 2006, in Sequoyah County, Oklahoma, in the Eastern District of Oklahoma, **JOSEPH ALONDO McADAMS, a/k/a JOE McADAMS, a/k/a JOE MELENCON, a/k/a JOE MALENCON**, defendant herein, knowingly and intentionally distributed, and possessed with the intent to distribute, a mixture or substance, in excess of 50 grams, which contained a detectable amount of methamphetamine.

**All in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(viii).**

7

## COUNT FIVE

**[18 U.S.C. §§ 924 (c)(1)(A)(i) -- Possession of firearm in furtherance of a drug trafficking crime]**

In or about September, 2006, in Sequoyah County, Oklahoma, in the Eastern District of Oklahoma, **JOSEPH ALONDO McADAMS, a/k/a JOE McADAMS, a/k/a JOE MELENCON a/k/a JOE MALENCON** , defendant herein, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, to-wit: **Conspiracy to Distribute Methamphetamine**, in violation of Title 21, United States Code, Section 846, did knowingly use and carry in relation to, and did possess in furtherance of the aforementioned drug trafficking crime, a firearm, to wit: a hand gun or pistol of unknown manufacture and model.

**All in violation of Title 18, United States Code, Sections 924 (c)(1)(A)(i).**

## COUNT SIX

**[18 U.S.C. §§ 924 (c)(1)(A)(i) -- Possession of firearm in furtherance of a drug trafficking crime]**

In or about September, 2006, in Sequoyah County, Oklahoma, in the Eastern District of Oklahoma, **CURRY ADOYLE DAWSON**, defendant herein, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, to-wit: **Conspiracy to Distribute Methamphetamine**, in violation of Title 21, United States Code, Section 846, did knowingly use and carry in relation to, and did possess in furtherance of the aforementioned drug trafficking crime, a firearm, to wit: a hand gun or pistol of unknown manufacture and model.

**All in violation of Title 18, United States Code, Sections 924 (c)(1)(A)(i).**

## COUNT SEVEN

**[Title 21, United States Code, Section 853 --Criminal Forfeiture]**

On or about August 19, 2006, in Sequoyah County, Oklahoma, within the Eastern District of Oklahoma, the defendant, **JOSEPH ALONDO McADAMS, a/k/a JOE McADAMS, a/k/a JOE MELENCON, a/k/a JOE MALENCON,** did possess property to wit:  **A 2001 BMW, VIN: WBABN53451JU37233, OKLAHOMA TAG 066-XNR,** which was derived from the proceeds of an offense listed in Count One of the Indictment, which is incorporated herein by reference, and was used to facilitate the commission of the offenses listed in Counts One and Three of this Indictment.

**All pursuant to Title 21, United States Code, Section 853.**

## COUNT EIGHT

**[Title 21, United States Code, Section 853 --Criminal Forfeiture]**

On or about September 27, 2006,  in Sequoyah  County, Oklahoma, within the Eastern District of Oklahoma, and elsewhere, the defendant,**JOSEPH ALONDO McADAMS, a/k/a JOE McADAMS, a/k/a JOE MELENCON, a/k/a JOE MALENCON,** did possess property to wit:  **A 2002 LEXUS, MODEL G43, VIN: JT8BL69S020009371, OKLAHOMA TAG 110-XDO,** which was derived from the proceeds of an offense listed in Count One  of the Indictment, which is incorporated herein by reference, and was used to facilitate the commission of the offenses listed in Counts One and Four of this Indictment.

**All pursuant to Title 21, United States Code, Section 853.**

## COUNT NINE

[Title 21, United States Code, Section 853 --Criminal Forfeiture]

On or about February 1, 2007, in Oklahoma County, Oklahoma, within the Eastern District of Oklahoma, and elsewhere, the defendant, **JOSEPH ALONDO McADAMS, a/k/a JOE McADAMS, a/k/a JOE MELENCON, a/k/a JOE MALENCON,** did possess property to wit: **Two Thousand Nineteen and no/100s United States Dollars ($2,019.00) and One Thousand Mexican Pesos (1,000 Pesos),** which were the proceeds of the offense listed in Count One of the Indictment, which is incorporated herein by reference.

**All pursuant to Title 21, United States Code, Section 853.**

## COUNT TEN

[Title 21, United States Code, Section 853 --Criminal Forfeiture]

On or about December 15, 2006, in Sequoyah County, Oklahoma, within the Eastern District of Oklahoma, and elsewhere, the defendant, **MELISSA GAIL REESE,** did possess property to wit: **Ten Thousand Thirty Six and no/100s Dollars ($10,036.00),** which were the proceeds of the offense listed in Count One of the Indictment, which is incorporated herein by reference.

**All pursuant to Title 21, United States Code, Section 853.**

A TRUE BILL:

_____
FOREPERSON OF THE GRAND JURY

SHELDON J. SPERLING
United States Attorney

_____
ROB WALLACE, OBA#13130
Assistant United States Attorney

10

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

**FILED**
APR 20 2007
WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By _____
Deputy Clerk

UNITED STATES OF AMERICA,

        *Plaintiff,*

v.

BRANDIE ZANE PRICE,

        *Defendant.*

Case No. CR-07-16-RAW

## INFORMATION

**[Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(viii) – Possession of Methamphetamine with Intent to Distribute]**

From approximately May, 2006 to on or about February 20, 2007, in Sequoyah County, Oklahoma, in the Eastern District of Oklahoma, **BRANDIE ZANE PRICE**, defendant herein, knowingly and intentionally distributed, and possessed with the intent to distribute, a mixture or substance, in excess of 500 grams, which contained a detectable amount of methamphetamine.

**All in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(viii).**

SHELDON J. SPERLING
United States Attorney

ROB WALLACE, OBA # 13801
Assistant United States Attorney

113

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  CR-07-16-RAW |
| | ) | |
| BRANDI ZANE PRICE, | ) | **UNDER SEAL** |
| | ) | |
| Defendant. | ) | |

## MOTION TO SEAL

COMES NOW the defendant, Brandi Zane Price, by her attorney, Robert Ridenour and does hereby respectfully move this Court for leave of the Court to (1) allow the Defendant's Sentencing Memorandum to be filed under seal; and (2) order the sentencing hearing of the Defendant, scheduled for September 6, 2007, at 9 a.m., sealed.  Counsel is authorized to tell the Court that counsel for the government, Rob Wallace, does not object to the Court's ordering the Defendant's Sentencing Memorandum filed under seal, but - per office policy - does object to the sealing of the Defendant's Sentencing Hearing.

Counsel asks that the Sentencing Memorandum be sealed because it reveals personal matters of the Defendant, involving medical and other private information.  Further, it divulges information submitted for departure pursuant to federal sentencing guidelines that - for the Defendant's safety - ought not be in the public venue.  For the same reason, counsel asks for the sealing of the sentencing hearing, but only requests portions related to the government and the defendant's requests for a departure be sealed.

1

114

Therefore, premises considered, counsel prays for the requested relief.

Respectfully submitted this 29ᵗʰ day of August, 2007.

OFFICE OF THE FEDERAL PUBLIC DEFENDER
John V. Butcher, Federal Public Defender

By:     s/Robert Ridenour
        Robert Ridenour, OBA #16038
        Assistant Federal Public Defender
        One West Third St., Ste. 1225
        Tulsa, Oklahoma 74103
        (918) 581-7656

        Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on the 29ᵗʰ day of August, 2007, a true and correct copy of the foregoing

document was mailed via first class mail to the Office of the United States Attorney, attention Rob

Wallace, Counsel for Plaintiff.

        s/Robert Ridenour
        Robert Ridenour

2

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  CR-07-16-RAW |
| | ) | |
| BRANDI ZANE PRICE, | ) | **UNDER SEAL** |
| | ) | |
| Defendant. | ) | |

## MOTION TO SEAL

COMES NOW the defendant, Brandi Zane Price, by her attorney, Robert Ridenour and does hereby respectfully move this Court for leave of the Court to (1) allow the Defendant's Sentencing Memorandum to be filed under seal; and (2) order the sentencing hearing of the Defendant, scheduled for September 6, 2007, at 9 a.m., sealed.  Counsel is authorized to tell the Court that counsel for the government, Rob Wallace, does not object to the Court's ordering the Defendant's Sentencing Memorandum filed under seal, but - per office policy - does object to the sealing of the Defendant's Sentencing Hearing.

Counsel asks that the Sentencing Memorandum be sealed because it reveals personal matters of the Defendant, involving medical and other private information.  Further, it divulges information submitted for departure pursuant to federal sentencing guidelines that - for the Defendant's safety - ought not be in the public venue.  For the same reason, counsel asks for the sealing of the sentencing hearing, but only requests portions related to the government and the defendant's requests for a departure be sealed.

1

116

Therefore, premises considered, counsel prays for the requested relief.

Respectfully submitted this 29th day of August, 2007.

OFFICE OF THE FEDERAL PUBLIC DEFENDER
John V. Butcher, Federal Public Defender

By:      s/Robert Ridenour
         Robert Ridenour, OBA #16038
         Assistant Federal Public Defender
         One West Third St., Ste. 1225
         Tulsa, Oklahoma 74103
         (918) 581-7656

         Counsel for Defendant


## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of August, 2007, a true and correct copy of the foregoing

document was mailed via first class mail to the Office of the United States Attorney, attention Rob

Wallace, Counsel for Plaintiff.


                        s/Robert Ridenour
                        Robert Ridenour

2

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

**FILED**

**SEP 1 4 2007**

WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By _____
Deputy Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **Case No. CR-07-16-RAW** |
| | ) |
| BRANDIE ZANE PRICE, | ) |
| | ) |
| Defendant. | ) |

## NOTICE OF DISMISSAL

COMES NOW the plaintiff, United States of America, by and through United States Attorney Sheldon J. Sperling and Assistant United States Attorney Rob Wallace, and dismisses the Indictment returned on March 14, 2007, as to the defendant, pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure. The defendant has heretofore pled guilty to an information charging her with Possession with Intent to Distribute Methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(viii).

SHELDON J. SPERLING
United States Attorney

s/ ROB WALLACE
ROB WALLACE, OBA # 13130
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

LEAVE GRANTED FOR FILING:

RONALD A. WHITE
United States District Judge

118

✎AO 245B   (Rev. 06/05) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

| Eastern | District of | Oklahoma |
|---|---|---|

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|
| **V.** | |

| BRANDIE ZANE PRICE | Case Number: | CR-07-00016-003-RAW |
|---|---|---|
| | USM Number: | 04573-063 |

Robert Ridenour
Defendant's Attorney

## THE DEFENDANT:

■ pleaded guilty to count(s)   One of the Information

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section** | **Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|---|
| 21:841(a)(1) and (b)(1)(A)(viii) | Possession of Methamphetamine with Intent to Distribute | February 20, 2007 | 1 |

The defendant is sentenced as provided in pages 2 through ___6___ of this judgment. The sentence is imposed pursuant to Title 18, Section 3553(a) of the United States Criminal Code.

☐ The defendant has been found not guilty on count(s) _____

■ Count(s)   One of the Indictment   ■ is   ☐ are   dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

September 6, 2007
Date of Imposition of Judgment

Ronald A. White
United States District Judge
Eastern District of Oklahoma

E.O.D. 9/14/07
Date

AO 245B    (Rev. 06/05) Judgment in Criminal Case
           Sheet 2 — Imprisonment

Judgment — Page ___2___ of ____6____

DEFENDANT:          BRANDIE ZANE PRICE
CASE NUMBER:        CR-07-00016-003-RAW

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of:    60 months on Count One.

■  The court makes the following recommendations to the Bureau of Prisons:

That the Bureau of Prisons evaluate the defendant and determine if the defendant is a suitable candidate for the Intensive Drug Treatment Program. Should the defendant be allowed to participate in the program, it is further recommended that the defendant be afforded the benefits prescribed and set out in 18 U.S.C. § 3621(e) and according to Bureau of Prisons' policy.

That the defendant should be given credit for the time she served in the Muskogee County Jail in Muskogee, Oklahoma in connection with the charges in this case.

That the defendant be placed in the Bureau of Prisons facility at Carswell in Fort Worth, Texas to facilitate family contact.

The Court shall be informed in writing as soon as possible if the Bureau of Prisons is unable to follow the Court's recommendations, along with the reasons for not following such recommendations made by the Court.

■  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

☐  at _____  ☐ a.m.  ☐ p.m.   on _____ .

☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐  before 12:00 Noon on _____

☐  as notified by the United States Marshal.

☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a_____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
           Sheet 3 — Supervised Release

Judgment—Page ___3___ of ___6___

DEFENDANT:       BRANDIE ZANE PRICE
CASE NUMBER:     CR-07-00016-003-RAW

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :    36 months on Count One.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

■    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

■    The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)    the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)    the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)    the defendant shall support his or her dependents and meet other family responsibilities;

5)    the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)    the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)    the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)    the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement; and

14)   the defendant shall submit to urinalysis testing as directed by the Probation Office.

121

AO 245B   (Rev. 06/05) Judgment in a Criminal Case
          Sheet 3C — Supervised Release

Judgment—Page   4   of   6

DEFENDANT:        BRANDIE ZANE PRICE
CASE NUMBER:      CR-07-00016-003-RAW

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall participate in a program approved by the United States Probation Office for the treatment of narcotic addiction, drug dependency, or alcohol dependency, which will include testing to determine if she has reverted to the use of drugs or alcohol.  If it is determined by the Probation Officer that the defendant is in need of a residential drug/alcohol treatment program, she shall participate in such treatment as directed by the Probation Officer and remain in the treatment facility until discharged.

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
        Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___5___ of ___6___

DEFENDANT:          BRANDIE ZANE PRICE
CASE NUMBER:        CR-07-00016-003-RAW

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 0 | $ 0 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ 0 | $ 0 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B      (Rev. 06/05) Judgment in a Criminal Case
             Sheet 6 — Schedule of Payments

Judgment — Page ___6___ of ___6___

DEFENDANT:        BRANDIE ZANE PRICE
CASE NUMBER:      CR-07-00016-003-RAW

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A    ☐   Lump sum payment of $ _____ due immediately, balance due

         ☐   not later than _____ , or
         ☐   in accordance      ☐  C,   ☐  D,   ☐   E, or   ☐  F below; or

B    ■   Payment to begin immediately (may be combined with    ☐ C,      ☐ D, or    ■ F below); or

C    ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
         _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D    ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
         _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
         term of supervision; or

E    ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
         imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F    ■   Special instructions regarding the payment of criminal monetary penalties:

         Said special assessment of $100 shall be paid through the United States Court Clerk for the Eastern District of Oklahoma, P.O.
         Box 607, Muskogee, OK 74402, and is due immediately.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

—————————————————————

**REDACTED EXHIBIT 175**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

—————————————————————

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

125

**INFORMATION**

==============================================================================

### IN THE DISTRICT COURT OF SEQUOYAH COUNTY
### STATE OF OKLAHOMA

STATE OF OKLAHOMA        )
        Plaintiff,     )

vs.                    )     No. CF-97- 140
                    )

CHARLES EDMOND SANDERS  )
DOB: ███ 66         )
DL/SS# ███ 9539     )
        Defendant.    )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 2 9 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

### I N F O R M A T I O N
### IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:

Now comes DIANNE BARKER HARROLD, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that CHARLES EDMOND SANDERS did, in Sequoyah County, and in the State of Oklahoma, on the 25th day of April, in the year of our Lord, One Thousand, Nine Hundred and Ninety-Seven and before the presentment hereof, commit the crime of

**COUNT I: KNOWINGLY CONCEALING STOLEN PROPERTY-21 O.S. 1713**
That on the day and year, and in the County and State, aforesaid, CHARLES EDMOND SANDERS, did unlawfully, wilfully, knowingly, and feloniously conceal from Don Manning, certain personal property of value, to-wit: check in the amount of $50.00, that had prior thereto been stolen from the said Don Manning, the said defendant knowing or reasonably should have believed that said property was stolen did then and there unlawfully conceal and withhold said property from the owner thereof, with the felonious intent to deprive said owner thereof,

**COUNT II: UNLAWFUL POSSESSION OF CONTROLLED DRUG-63 O.S. 2-402 (B-1)**
That on the day and year, and in the County and State, aforesaid, CHARLES EDMOND SANDERS, did unlawfully, wilfully, knowingly, or intentionally and feloniously have in their possession and under their control METHAMPHETAMINE, said drug being classified as a controlled dangerous substance in Schedule II of the Uniform Controlled Dangerous Substances Act of this State,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

By _____
Assistant District Attorney

STATE OF OKLAHOMA )
               ) ss.
COUNTY OF SEQUOYAH)

Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____
Dennis Brewer

Subscribed and sworn to before me this 29th day of April, 1997.

My Commission Expires:
__6/28/99__

_____
NOTARY PUBLIC

WITNESSES:
Pat Sering          ███████  Muldrow, OK
Donald Manning     ███████ Sallisaw, OK
Joe Ellis         Blue Ribbon Downs, Sallisaw, OK
John Paul Johnson  Sallisaw Police Dept., Sallisaw, OK
Dennis Neff       Sallisaw Police Dept., Sallisaw, OK
Chemist           OSBI Lab, Tahlequah, OK

INFORMATION
Page 2

THE STATE OF OKLAHOMA,
    Plaintiff,

vs.

CHARLES EDMUND SANDERS,
    Defendant.

) IN THE DISTRICT COURT OF
) SEQUOYAH COUNTY, STATE
) OF OKLAHOMA
) CASE NO. CRF-97- 140
)
)
)
)

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 2 9 1997

DERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## FORMER CONVICTIONS

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES EDMOND SANDERS was heretofore on the 20TH day of JULY, 1992, in Case No. CRF-89-396, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UTTERING FORGED INSTRUMENT, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES EDMOND SANDERS was heretofore on the 20th day of JULY, 1992, in Case No. CRF-92-91, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UNLAWFUL POSSESSION OF CONTROLLED DRUG, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES EDMOND SANDERS was heretofore on the 20th day of JULY, 1992, in Case No. CRF-90-144, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of SEXUAL BATTERY, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

DIANNE BARKER HARROLD,
DISTRICT ATTORNEY

BY: _____
Assistant District Attorney

127

IN THE DISTRICT COURT OF SEQUO...H COUNTY

STATE OF OKLAHOMA
PROBABLE CAUSE AFFIDAVIT

CF-97-140

Comes now tne undersigned Affiant, and states upon Oath or Affirmation
tnat the following information and facts are correct to the best of the
Affiant's knowledge and belief.

NAME OF PERSON ARRESTED: _Sanders, Charles Edmond_

DATE OF BIRTH: ███ _66_   DATE OF ARREST: _4-25-97_

TIME OF ARREST (DETENTION) : _1425_ A.M./P.M.

STATE SPECIFIC FACTS UPON WHICH PROBABLE CAUSE FOR ARREST WAS BASED:

_Officer was disp. to Blue Ribbon Downs in reference to a stolen_
_check. When I arrived @ B.R.D I was met by Joe Ellis (B.R.D_
_security) Ellis told me that a man tried to cash a check @ one of_
_the pay out window, which had been cashed + stamped by a cashier approx. (over)_
(Use reverse side or attacn anotner page if necessary)

ANTICIPATED CHARGE (S): _Possession of stolen property, Possession of C.D.S_

_Dennis L. ___
AFFIANT       (ARRESTING OFFICER)

SUBSCRIBED AND SWORN TO BEFORE ME THE UNDERSIGNED, THIS _25 TH_ DAY
OF _April_, 199_7_.
MY COMMISSION EXPIRES : _9-26-2000_   -   _Berkeley R Smith JR_
NOTARY PUBLIC/JUDGE/WITNESS

=============================================================================
PROBABLE CAUSE DETERMINATION

I _Dennis M. Sprouse_, Judge of tne District Court, reviewed tnis
Probable Cause Affidavit on the _28ᶜ_ day of _April_, at _9:27_
A.M./P.M.

___✓___  Tnis Affidavit  contains sufficient facts snowing probable cause
to detain the Arrestee to await further proceedings.

___✓___  The court sets an appearance Bond in tne amount of $ _12,500.⁰⁰_ .

_____  The court denies Bond at tnis time.

_____  Tnis Affidavit contains insufficient facts to snow tnere is
probable cause to detain tne Arrestee. Tne Arrestee is ORDERED
RELEASED FROM CUSTODY FORTHWITH.

_____
JUDGE OF THE DISTRICT COURT

STATE OF OKLAHOMA
FILED
IN DISTRICT COURT

APR 2 9 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

1 hour earlier. The ℒ officer asked the suspect w... so he got the check he said ~~Bob~~ "Don" gave it to him. I located the man by the name of Don Manning. I asked him if he gave a check to the suspect to "Don" said no I don't know him, "suspect". The owner of the check said he cashed the check earlier @ B.R.D. Suspect was arrested for possession of stolen property. The checks value was $50.00

When the suspect was being booked into S.P.D. Jail a white powder was found on his person a test was made on the substance & was checked positive for meth @ that time suspect was charged with possession of C.D.S. A.F.C.F.

000808

# Charles Smith Bail Bonds

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

## APPEARANCE BOND

S.A.&I. 408 (1990)

APR 2 9 1997

IN THE DISTRICT COURT OF _____ Sequoyah _____ COUNTY, STATE OF OKLAHOMA
State of Oklahoma, _____ Plaintiff,     BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

vs. _____ Charles E. Sanders _____, Defendant     Case No. CF-97-140

Know all men by these presents, that we the above named defendant, as principal, and the undersigned Martin E. Clapp D/B/A Charles E. Smith, Professional as surety(ies) personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of _____ Twelve Thousand Five Hundred %00 _____ Dollars ($12,500.00) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to the county jail of _____ Sequoyah _____ County, State of Oklahoma, shall personally be and appear before the District Court of said county on the _____ 30 _____ day of _____ April _____, 19 97, at _____ 9:00 _____ o'clock A. M., of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of _____ Poss of CDS   KCSP   AFCF _____

and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court without leave, then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hands and seals this _____ 27 _____ day of _____ April _____, 19 97.

X _____ Charles Sanders _____ Principal   Rt 3 Box 55 Sallisaw Ok 74955 _____ Address

Charles E. Smith _____ Surety     P.O. Box 824 Sallisaw, OK 74955 _____ Address

Martin E. Clapp _____ Surety   PO Box 824 Sallisaw, Ok 74955 _____ Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this _____ 27 _____ day of _____ April _____, 19 97

_____ Court Clerk/Sheriff _____ Deputy

This undertaking approved this _____ 27 _____ day of _____ April _____, 19 97.

(SEAL)

By: _____ Deputy/Clerk

═══════════════════════════════════════

## AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, _____ Sequoyah _____ County, SS:

The undersigned, being first duly sworn upon oath, says that he is a resident of _____ Sequoyah _____ County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as hereinafter specified under one or more of the following relevant statutory provisions, to-wit:

a) Consideration for this undertaking received or promised in the sum of $ _____ 1900.00
b) Other security received or promised for making this undertaking, is as follows: _____ Promissory Note + Indemnity Agreement _____
c) Such promise, security or consideration was received from: _____

X _____ Charles Sanders _____      Sallisaw, Ok 74955
Name                                Address

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as one commits perjury.

X _____ Martin E. Clapp _____      Sallisaw, Ok, 74955
Affiant                            Address

Subscribed and sworn to before me this _____ 27 _____ day of _____ April _____, 19 97.

(SEAL)

_____
Court Clerk- Notary Public

My Commission Expires: _____

_____
Deputy

130

POWER OF ATTORNEY

107 E. Creek
Sallisaw, OK 74955

Cha    s E. Smith, Professional Bondsman

Sallisaw, OK 74955

$20,000.00 BOND POWER       SS

No 20581

KNOW ALL MEN BY THESE PRESENTS:

That I, Charles E. Smith, of Sallisaw, Sequoyah County, State of Oklahoma, have made and constituted and appointed by these presents do make, constitute and appoint the below named agent, my true and lawful attorney, for me and in my name, place and stead, and to my use as my employee and agent to write professional bonds, to sign my name, by him, in the execution of any and all bonds made as my agent, giving my said attorney full power to do every thing whatsoever requisite and necessary to be done in the premises as fully as I could do if personally present, hereby ratifying and confirming all that my said attorney shall lawfully do, or cause to be done, by virtue hereof. All this provided this Power-Of-Attorney is filed with the bond and retained as a part of the court records, the said Attorney-In-Fact is hereby authorized to insert in this Power-Of Attorney the name of the person whose behalf this bond was given.

IN WITNESS THEREOF, Charles E. Smith, mas caused these presents to be signed by its duly authorized officer, proper for the purpose this 27 day of April 19 97.

$20,000.00 BOND POWER

-66
5906

Charles E. Smith, Professional Bondsman
SMITH-RINGGOLD BAIL BONDS

Bond Amount $ 12,500 00

Appearance Date 4/30/97 9:00 AM.

Defendant Charles E. Sander   Address

Court Sequoyah District   City Sallisaw   State OK. 74955

Offense Poss of CDS KCSP AFCF   Case #

Executing Agent Martin E. Rapp

131

## IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA,          )
          Plaintiff,       )
                           )
vs.                    )    CF-97-140
                           )
CHARLES EDMOND SANDERS,    )
          Defendant.     )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUL 0 3 1997

BERNEL EDWARDS, COURT CLERK
BY _____ DEPUTY

### DEMURRER

COMES NOW Charles Edmond Sanders,, Defendant herein, and demurs to the information filed herein and moves the Court to dismiss this cause pending against said Defendant, and in support thereof, alleges and states:

I.

That this Court has no jurisdiction of the person of this Defendant or of the subject matter of this action;

II.

That the information herein is vague, indefinite and duplicitous and not substantially clear or in ordinary and concise language which could be in such a manner as to enable a person of common understanding to know what is intended;

III.

That the information wholly fails to state an offense, with such a degree of certainty, so as to enable the Court to pronounce judgment upon a conviction of the case;

IV.

That said information does not contain allegations of sufficient facts to constitute the basis of the crime charged or of any other criminal violation of the laws of the State of Oklahoma;

V.

That the facts stated in the information do not state facts sufficient to constitute a cause of action against said Defendant;

VI.

132

That said information does not substantially conform to the provisions of the laws and statutes of the State of Oklahoma;

WHEREFORE, said Defendant prays that his demurrer be sustained; that the information filed against said Defendant be dismissed and said Defendant be granted such other and further relief as to which the Defendant may be entitled and which the Court deems fair, just, equitable, proper and right.

AUTHORITY:

22 OS 401 et seq.
22 OS 493
22 OS 504 et seq.

CHARLES EDMOND SANDERS,
Defendant

William H. Dodson Sr.
Attorney at Law
P.O. Box 682
Sallisaw, Oklahoma  74955
(918) 775-3033

## CERTIFICATE OF DELIVERY

This is to certify that a true and correct copy of the above and forgoing Demurrer was hand delivered this 9  day of July, 1997 to:

Office of the District Attorney
Sequoyah County Courthouse
120 East Chickasaw
Sallisaw, Oklahoma  74955

133

## IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA,                )
      Plaintiff,                )
                                )

vs.                               )   CF-97-140
                                )

CHARLES EDMOND SANDERS,           )
      Defendant.                )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUL 0 3 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## MOTION TO SUPPRESS EVIDENCE

COMES NOW  Charles Edmond Sanders, Defendant herein, by and through his attorney, William H. Dodson Sr., and moves the Court to suppress the evidence had and obtained by the officers in this cause for the reason that no proper search warrant or affidavit for search warrant was issued and served for the premises and place where said evidence was found and seized, and such search and seizure was unreasonable and in violation of the constitutional and statutory rights, both state and federal, of said Defendant.

Further, said Defendant moves the Court to suppress the evidence had and obtained in this cause for the reason that said Defendant was not afforded those privileges against self incrimination as afforded by the Constitution of the State of Oklahoma and the United States of America.

AUTHORITY:
Constitution of the State of Oklahoma, Article II, Section 30
Constitution of the United States of America, Amendments No. 4, 5 and 14

CHARLES EDMOND SANDERS,
Defendant

William H. Dodson Sr.
Attorney at Law
P.O. Box 682
Sallisaw, Oklahoma  74955
(918) 775-3033

By: _____
William H. Dodson Sr.  O.B.A. 32397

134

## CERTIFICATE OF DELIVERY

This is to certify that a true and correct copy of the above and forgoing Motion to Suppress was hand delivered this _31_ day of July, 1997 to:

Office of the District Attorney
Sequoyah County Courthouse
120 East Chickasaw
Sallisaw, Oklahoma 74955

*Wm H Dodson Sr*

135

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,        )
                    Plaintiff,        )
                                  )
vs.                             )     CF-97-140
                                  )
CHARLES EDMOND SANDERS,        )
                    Defendant.        )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUL 0 3 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## MOTION TO PRODUCE EXCULPATORY EVIDENCE

      COMES NOW Charles Edmond Sanders, Defendant herein, by and through his attorney, William H. Dodson Sr. and hereby moves the Court to Order the District Attorney to produce all evidence favorable to Defendant in this case as mandated by the due process clause of the United States Constitution. Brady v Maryland, 373 U.S. 83 (1963).

     1.     The Defendant would respectfully submit that the specific items mentioned are material because they would be admissible and relevant to the issue of guilt or degree of punishment. Further, there exists a reasonable possibility that such disclosure could affect the result of this prosecution or punishment and cause it to be different in outcome. Further, failure to disclose the items requested will cause both Counsel to be mislead in the investigation and defense of this case. Defendant respectfully and specifically requests the following:

     2.     All statements by any witnesses that have been given to any law enforcement agency or District Attorney in this case. Further, all statements by possible witnesses who were, at any time, unable to positively identify the Defendant in any manner or at any time.

     3.     All reports, tests or opinions, including internal memoranda of any police department or law enforcement agency or the District Attorney's Office concerning tangible evidence that has been lost or destroyed while in the custody of any office, and that would have had relevance in the present prosecution.

     4.     All reports relating to any polygraph examination administered to any possible witness for the state.

Page One of Three

5.      All documents and reports regarding the physical or mental disease or disorder affecting any individual the State intends to call as a witness in the present case.

6.      All information that is arguably exculpatory through its use as impeachment of possible State witnesses, including, but not limited to, the prior criminal convictions of each witness, copies or summaries of any prior and arguable inconsistent statement of such witnesses concerning this prosecution, promises of leniency or reward by the State, and any other matter which would have relevance to the general credibility of such witnesses.

7.      All facts, information, written statements, tapes, videos and other recorded material, electronic or written, of questioning and interrogation of the Defendant from the State's initial contact with the Defendant until the conclusion of the interrogation or series of interrogation sessions.

8.      All material now known to the State, or which may become known, or which through due diligence may be learned from the investigating personnel or witnesses in this case, which is arguably exculpatory in nature or favorable to the accused, or may lead to arguably exculpatory material.  Further, if subsequent to compliance with these requirements or Orders pursuant thereto, the District Attorney or his agents discover additional material or information is discovered during the trial, the Court shall also be notified of the discovery of such evidence.

WHEREFORE, premises considered, the Defendant respectfully prays that the Court Order the State to disclose the items hereinabove set forth.

CHARLES EDMOND SANDERS,
Defendant.

by:      _____
William H. Dodson Sr    OBA #2397
Attorney at Law
P.O. Box 682
Sallisaw, Oklahoma  74955
(918) 775-3033

Page Two of Two

137

## CERTIFICATE OF DELIVERY

This is to certify that on the _31_ day of July, 1997 a true and correct copy of the above and forgoing document was hand delivered to:

The Office of the District Attorney
Sequoyah County Courthouse
120 East Chickasaw
Sallisaw, Oklahoma  74955

Page Three of Three

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,    )
       Plaintiff,    )
            )
vs.              )    CF-97-140
            )
CHARLES EDMOND SANDERS,    )
       Defendant.    )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**JUL 0 3 1997**

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

### MOTION FOR DISCOVERY

COMES NOW Charles Edmond Sanders, Defendant herein, by and through his Attorney, William H. Dodson Sr., and moves the Court to Order the State to disclose the following:

1.     The names and addresses of witnesses, together with their respective oral, written or recorded statement, or summaries of same. <u>Allen v District Court</u>, 803 P.2d 1164 (Okla. 1990).  22 OS Section 2001, et seq.

2.     All law enforcement reports made in connection with this case.  22 OS Section 2001, et seq.

3.     All sworn statements of persons having knowledge of the alleged criminal offense that have been obtained by the District Attorney's Office, any peace officer or any other entity privy to the District Attorney.  22 OS 749.

4.     Any reports or statements made by experts in connection with this particular case, including results of physical or mental examinations and of scientific tests, experiments or comparisons. <u>Allen v District Court</u>, supra.  22 OS Section 2001, et seq.

5.     Any written or recorded statements and the substance of any oral statements made by the accused. <u>Allen v District Court</u>, supra. 22 OS Section 2001 et seq.

6.     All tape recordings and stenographic transcriptions of any statements, or alleged admissions or confessions made by the Defendant. <u>Watts v State</u>, 487 P.2d 981 (Okla. 1971).

<u>Page One of Three</u>

7.    Any books, papers, documents, photographs, tangible objects, buildings, or places which the prosecuting attorney intends to use in the hearing or trial or which were obtained from or belong to the accused.  Allen v District Court, supra.  22 OS Section 2001 et seq.

8.    A detailed description of and access to all forms of tangible evidence in the custody of the District Attorney, State or private laboratories or police departments. Allen v District Court, supra.

9.    Any record of prior criminal convictions of the Defendant.  Allen v District Court, supra. 22 OS Section 2001, et seq.

10.    OSBI or FBI rap sheet/record check on any witnesses listed by the State or the Defense as possible witnesses who will testify at trial.  Allen v District Court, supra.

11.    Copies of any photographs to be used by the prosecution.  Stafford v District Court, 593 P.2d 797 (Okla. 1979); State, ex rel Fallis v Truesdell, 493 P.2d 1134 (Okla. 1972).

12.    Any and all written statement, oral statements or recordings of any other persons interviewed by the State or its agents which are inconsistent with an earlier statement or which are inconsistent with a statement made by any other person interviewed by the State or its witnesses.  U.S. v Rutkin, 212 F.2d 641 (3rd Cir. 1954).

13.    The nature, date and place of any criminal offense or acts of misconduct, other than those charged in the present information, which the State will offer for impeachement purposes and attempt to disprove good character or reputation of the Defendant.  Burks v State, 594 P.2d 771.

14.    Any and all consideration or promises of consideration given to any witness for the State or its attorney, referring to absolutely anything of value or use, including but not limited to immunity, witness fees, assistance to members of witnesses families or associates, assistants or favorable treatment with respect to any criminal action, and anything else which would create an interest or bias in a witness in favor of the State. King v United States, 419 U.S. 18 (1974).

15.    All diagrams, sketches and pictures which have been made by any witness or prospective witness in the case.

16.    A detailed description of, and access to, all physical items other than those specifically set out above which the District Attorney anticipates using as evidence in this proceeding.

<div align="center">Page Two of Three</div>

CHARLES EDMOND SANDERS,
Defendant.

By:  _William H. Dodson Sr.  OBA #2397_
Attorney at Law
P.O. Box 682
Sallisaw, Oklahoma  74955
(918) 775-3033

## CERTIFICATE OF DELIVERY

This is to certify that a true and correct copy of the above and forgoing instrument was was hand delivered this **3𝒟** day of July, 1997 to:

The Office of the District Attorney
Sequoyah County Courthouse
120 East Chickasaw
Sallisaw, Oklahoma  74955

Page Three of Three

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 176**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

142

# ORDER OF PROTECTION

District Court of Sequoyah County
State of Oklahoma
**PO-03-00390**
COURT PHONE NUMBER (918) 775-4411

____ AMENDED ORDER ____X____ EMERGENCY ORDER
____ CONTINUED ____ FINAL ____ ALIAS

| PETITIONER |
| --- |
| **MACKEY, GWENDLYN** |

and/or on behalf of minor family member(s):

Micheal Mackey, Kyle Wayne Hold, Sylus Real

-VS- **DEFENDANT(S)**
**CRAWFORD, CINDY**
Relationship to Petitioner: sister-in-law

Additional Petitioner Information

Name(s) and Age(s) or minor family members:
Gwendlyn Mackey, Michael Mackey, Kyle Wayne Hold, Sylus Real

| Defendant Identifiers | | | | |
| --- | --- | --- | --- | --- |
| SEX | RACE | DOB | HT | WT |
| F | W | | 5'2 | 110 |
| EYES | HAIR | DISTINGUISHING FEATURES: | | |
| Blue | Blonde | tatoo on ankle | | |
| DL# | | STATE: OK   EXPIRES: | | |
| OTHER: | | | | |

## CAUTION:

____ WEAPON INVOLVED-TYPE          ____ WEAPON PRESENT ON PROPERTY          ____ UNKNOWN IF WEAPON PRESENT

**THE COURT FINDS:** That it has jurisdiction over the parties and subject matter, and the Defendant has been or will be provided with reasonable notice and opportunity to be heard. Additional findings of this Order follow on succeeding pages.

**THE COURT ORDERS:** The above named Defendant to not commit further acts or threats of abuse. The Defendant and Petitioner must appear at the Sequoyah County District Court **6th day of January,2004, 2003 AT 1:30 P.M.** before Judge Payton. Additional terms of this Order follow on succeeding pages.
THE TERMS OF THIS ORDER SHALL BE EFFECTIVE UNTIL DATE AND TIME LISTED ABOVE.

**WARNING TO THE DEFENDANT:**

This Order shall be enforced, even without registration, by the courts of any state, the District of Columbia any U.S. Territory, and may be enforced on tribal lands (*18 U.S.C. ss2265*). Crossing state, territorial or tribal boundaries to violate this Order may result in federal imprisonment (*18 U.S.C. ss2262*).
Federal law provides penalties for possession, transporting, shipping or receiving any firearm or ammunition (*18 U.S.C. ss922(g)(8)*) with penalty up to $250, 000 fine and 10 years in prison.

## ONLY THE DISTRICT COURT CAN CHANGE THIS ORDER

EX PARTE  TEMPORARY EMERGENCY ORDER OF PROTECTION THE COURT FURTHER ORDERS as specifically marked in check boxes below:

_____ Defendant to have **no contact** with Petitioner, either in person or by telephone, at any time or place.
__X__ Defendant to not abuse, threaten, injure, assault, molest, stalk, harass or otherwise interfere with Petitioner.

_____ The Court assumes emergency jurisdiction under UCCJEA and order suspension of child visitation orders due to physical violence or threat of abuse by Defendant or a threat to violate a custody Order by Defendant
_____ Defendant to not stalk the Petitioner.
_____ Defendant to leave and remain away from the residence located at _____
on or before _____at _____AM/PM, and take no action to change utilities or telephone service.
_____ If this Order is served at the residence to be vacated, order Law Enforcement Officers to remain at the residence until Defendant removes necessary clothing and personal effects and leaves the premises.
_____ Order Defendant who is a minor, to leave the residence located at _____
by immediately placing Defendant in any type of care authorized for children taken into custody pursuant to 10 O.S. ll7303-1.1a.          Circle age of Minor Defendant   13  (14)  15  (16)   17
__X__ IT IS FURTHER ORDERED: A to pay Court cost.

**IF YOU FAIL TO APPEAR, THIS ORDER MAY BECOME A FINAL PROTECTIVE ORDER WITHOUT FURTHER NOTICE TO YOU AND OTHER RELIEF MY BE GRANTED.**

1. This Order is effective immediately.
2. At the hearing, the judge may assess court cost and attorneys fees for the prevailing party.
3. In addition to any other penalty specified, the Court may require Defendant to undergo treatment or participate in counseling services necessary to bring about the cessation of domestic abuse against Petitioner.
4. The filing or non-filing of criminal charges and the prosecution of the cases shall not be determined by a person who is protected by this Order, but shall be determined by the District Attorney.
5. No person, including a person who is protected by this Order, may give permission to anyone to ignore or violate any provision of this Order during the time in which this Order is valid. Every provision of this Order is in full force and effect unless a Court changes the Order.
6. this Order shall be in effect for up to three (3) years unless extended, modified, vacated or rescinded by the Court. This Order expires on the date shown on page 1.
7. A violation of this Order in Oklahoma is punishable by a fine of up to $1,000.00 or up to one year in the county jail, or by both such fine and imprisonment. A violation of this Order which causes injury shall be punishable by twenty (20) days to one (1) year in the county jail or a fine of up to $5,000.00 or by both such fine and imprisonment. Other penalties are provided in other states and for federal violations.
8. Possession of a firearm or ammunition by a defendant while this Order is in effect, may subject the Defendant to prosecution for a violation of federal law even if this order does not specifically prohibit the Defendant from possessing a firearm or ammunition.
9. This Order complies with the Violence Against Women Act's full faith and credit provision (*18 U.S.C. ss2265*) and this Order is enforceable throughout Oklahoma and in all 50 states, U.S. territories, tribal lands and the District of Columbia.

Dated this December 11, 2003

_____
JUDGE OF THE DISTRICT COURT

# Sheriff's Return

## State of Oklahoma, County of Sequoyah

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT
DEC H 5 2003
BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

Case # _PO-03-00390_

I certify that I received the foregoing summons on the _15th_ day of _December_ ,20_03_ , and that I delivered, or attempted delivery of the said summons as shown below to each party named for service request.

| Name of Person To be served | service address | served? yes or no | Date & Time of service or Attempt |
|---|---|---|---|
| Cindy Crawford | ███████ Sallisaw | Yes | 12/15/03 @ 10:30 am |
| | | | |
| | | | |
| | | | |

I certify that on _____ , I served_____
By leaving a copy of said summons with a copy of the petition attached at _____ which is his/her place of residence.

I certify that on_____ , I served_____ by leaving a copy of said summons with a copy of the petition attached at _____ with_____ , a member of his/her family over fifteen (15) years of age.

Dated on the _15th_ day of _December_ ,20_03_ .
J.W. Philpot, Sheriff of Sequoyah County

By_Pamela L Crutchfield_ Deputy Sheriff #853
Sequoyah County, Oklahoma

144

# ORDER OF PROTECTION

District Court of Sequoyah County
State of Oklahoma
**PO-03-00390**
COURT PHONE NUMBER (918) 775-4411

_____ AMENDED ORDER    X EMERGENCY ORDER
_____ CONTINUED _____ FINAL _____ ALIAS

| | |
|---|---|
| PETITIONER<br>**MACKEY, GWENDLYN**<br>and/or on behalf of minor family member(s):<br>Micheal Mackey, Kyle Wayne Hold, Sylus Real | Additional Petitioner Information<br>Name(s) and Age(s) or minor family members:<br>Gwendlyn Mackey,Michael Mackey,Kyle Wayne Hold,Sylus Real |

-VS-   DEFENDANT(S)
**CRAWFORD, CINDY**
Relationship to Petitioner: sister-in-law

Defendant Identifiers

| SEX | RACE | DOB | HT | WT |
|---|---|---|---|---|
| F | W | | 5'2 | 110 |

| EYES | HAIR | DISTINGUISHING FEATURES: |
|---|---|---|
| Blue | Blonde | tatoo on ankle |

DL# _____ STATE: OK   EXPIRES: _____
OTHER: _____

**CAUTION:**
_____ WEAPON INVOLVED-TYPE    _____ WEAPON PRESENT ON PROPERTY    _____ UNKNOWN IF WEAPON PRESENT

**THE COURT FINDS:** That it has jurisdiction over the parties and subject matter, and the Defendant has been or will be provided with reasonable notice and opportunity to be heard. Additional findings of this Order follow on succeeding pages.

**THE COURT ORDERS:** The above named Defendant to not commit further acts or threats of abuse. The Defendant and Petitioner must appear at the Sequoyah County District Court **6th day of January,2004, 2003 AT 1:30 P.M.** before Judge Payton. Additional terms of this Order follow on succeeding pages.
THE TERMS OF THIS ORDER SHALL BE EFFECTIVE UNTIL DATE AND TIME LISTED ABOVE.

**WARNING TO THE DEFENDANT:**
This Order shall be enforced, even without registration, by the courts of any state, the District of Columbia any U.S. Territory, and may be enforced on tribal lands (*18 U.S.C. ss2265*). Crossing state, territorial or tribal boundaries to violate this Order may result in federal imprisonment (*18 U.S.C. ss2262*).
Federal law provides penalties for possession, transporting, shipping or receiving any firearm or ammunition (*18 U.S.C. ss922(g)(8))* with penalty up to $250, 000 fine and 10 years in prison.

## ONLY THE DISTRICT COURT CAN CHANGE THIS ORDER

EX PARTE TEMPORARY EMERGENCY ORDER OF PROTECTION THE COURT FURTHER ORDERS as specifically marked in check boxes below:

_____ Defendant to have **no contact** with Petitioner, either in person or by telephone, at any time or place.

_____ Defendant to not abuse, threaten, injure, assault, molest, stalk, harass or otherwise interfere with Petitioner,

_____ The Court assumes emergency jurisdiction under UCCJEA and order suspension of child visitation orders due to physical violence or threat of abuse by Defendant or a threat to violate a custody Order by Defendant

_____ Defendant to not stalk the Petitioner.

_____ Defendant to leave and remain away from the residence located at _____
on or before _____ at _____ AM/PM, and take no action to change utilities or telephone service.

_____ If this Order is served at the residence to be vacated, order Law Enforcement Officers to remain at the residence until Defendant removes necessary clothing and personal effects and leaves the premises.

_____ Order Defendant who is a minor, to leave the residence located at _____
by immediately placing Defendant in any type of care authorized for children taken into custody pursuant to 10 O.S. ll7303-1.1a.     Circle age of Minor Defendant  13  (14)  15  (16)  17

_____ IT IS FURTHER ORDERED: A to pay Court cost.

**IF YOU FAIL TO APPEAR, THIS ORDER MAY BECOME A FINAL PROTECTIVE ORDER WITHOUT FURTHER NOTICE TO YOU AND OTHER RELIEF MY BE GRANTED.**

1. This Order is effective immediately.
2. At the hearing, the judge may assess court cost and attorneys fees for the prevailing party.
3. In addition to any other penalty specified, the Court may require Defendant to undergo treatment or participate in counseling services necessary to bring about the cessation of domestic abuse against Petitioner.
4. The filing or non-filing of criminal charges and the prosecution of the cases shall not be determined by a person who is protected by this Order, but shall be determined by the District Attorney.
5. No person, including a person who is protected by this Order, may give permission to anyone to ignore or violate any provision of this Order during the time in which this Order is valid. Every provision of this Order is in full force and effect unless a Court changes the Order.
6. this Order shall be in effect for up to three (3) years unless extended, modified, vacated or rescinded by the Court. This Order expires on the date shown on page 1.
7. A violation of this Order in Oklahoma is punishable by a fine of up to $1,000.00 or up to one year in the county jail, or by both such fine and imprisonment. A violation of this Order which causes injury shall be punishable by twenty (20) days to one (1) year in the county jail or a fine of up to $5,000.00 or by both such fine and imprisonment. Other penalties are provided in other states and for federal violations.
8. Possession of a firearm or ammunition by a defendant while this Order is in effect, may subject the Defendant to prosecution for a violation of federal law even if this order does not specifically prohibit the Defendant from possessing a firearm or ammunition.
9. This Order complies with the Violence Against Women Act's full faith and credit provision (*18 U.S.C. ss2265*) and this Order is enforceable throughout Oklahoma and in all 50 states, U.S. territories, tribal lands and the District of Columbia.

Dated this December 11, 2003

_____
JUDGE OF THE DISTRICT COURT

# SERVICE INFORMATION

Complete as detailed and as much information as is known.  This is to facilitate the officers in the efforts as to "SERVICE".

DEFENDANT'S NAME: Cindy Crawford

DATE OF BIRTH: _____ S.S. NO: _____

DEFANDANT'S CURRENT ADDRESS: Mission Run by Randy & Denise

IS THIS ADDRESS ___✓___ TEMPORARY OR _____ PERMANENT?

IF IT IS A TEMPORARY, DO YOU KNOW FOR HOW LONG AND/OR ANOTHER LOCATION WHERE HE/SHE MAY BE RESIDING? No

DEFENDANT'S CAR:  MAKE _____ MODEL _____ YEAR _____

COLOR _____ TAG NO. _____ STATE _____

PHYSICAL DESCRIPTION:  AGE 25? HEIGHT 5ft2 WEIGHT 110

HAIR COLOR Blond EYES Blue RACE C

ANY UNUSUAL CHARACTERISTICS: tatoo on Ankle

EMPLOYER: _____

EMPLOYER'S ADDRESS: _____ WORKING HRS: _____

USUAL OCCUPATION: _____

RELATIVE/FRIEND/OTHER CONTACT PERSON OF DEFENDANT:

NAME: _____

ADDRESS: _____ PHONE: _____

REMARKS: _____

146

ATTACHED TO EMERGENCY AND PERMANENT PROTECTIVE ORDER
APPLICATION

INFORMATION SHEET TO BE FILLED OUT AND
RETURNED TO SEQUOYAH COUNTY SHERIFF'S DISPATCH.

THIS INFORMATION WILL BE USED TO ENTER THE PROTECTIVE ORDER
INTO THE NATIONAL CRIME INDEXING COMPUTER.  TO ASSIST
IN THE PROTECTION OF THE PROTECTED PERSON.

CASE NUMBER: _____

PROTECTED PERSON'S NAME: Gwendolyn D. Mackey

PROTECTED PERSON'S DATE OF BIRTH: ████████-60

PROTECTED PERSON'S RACE AND SEX: C   Female

DEFENDANT'S FULL NAME IF KNOWN: Cindy   Crawford

DEFENDANT'S DATE OF BIRTH OR APPROXIMATE AGE: 25?

DEFENDANT'S RACE AND SEX: C   Female

DEFENDANT'S LAST KNOWN ADDRESS: Mission / Sallisaw

DEFENDANT'S SOCIAL SECURITY NUMBER IF KNOWN: _____

DEFENDANT'S DESCRIPTION: 5'2" Blonde Hair Glasses Blue Eyes

DEFENDANT'S TAG NUMBER AND STATE OF ISSUE IF KNOWN: _____

DEFENDANT'S CAR DESCRIPTION IF KNOWN: _____

147

IN THE _____ STRICT COURT OF ____SEQUOYAH____ ZOUNTY
STATE OF OKLAHOMA

_Gwendolyn Mackey + Jessica_
_Mackey, only_
_Kyle Wayne Hold_
vs. _Styles Real_                           )  Case No. PO- **03-390**
_Cindy Crawford_                            )                SEQUOYAH COUNTY, OKLAHOMA
_____           )                        FILED
Defendant(s).                               )                 IN DISTRICT COURT
                                            )
                                            )                    DEC 11 2003

PETITION FOR PROTECTIVE ORDER

BERNELL EDWARDS, COURT CLERK

BY_____ *HW* _____ DEPUTY

Petitioner, being sworn, states:

1.  (Check one or more)

☐  The Defendant has caused or attempted to cause serious physical harm to _____

☐  The Defendant has threatened _____

☑  The Defendant has harassed _me with false statements / breaking into my home + storage shed_

☐  The Defendant has stalked _14 yr old son + 16 yr old cousin_ (If parties are not related, or not in a previous or current dating relationship, a complaint must be filed with law enforcement and a copy must be attached.)

2.  The incident(s) which caused the filing of the petition occurred on or about _6-2003 - 12-11-03_
                                                                                      (Dates)

(Describe what happened)(Harassment requires a pattern of conduct.  Stalking requires repeated following.)

_House was broken into through front room window._
_Shed was torn apart, things stolen found at her residence._
_Knocking on doors all hours of the night._
_Attence taken during the night + cable wire cut._
_Cursing + screaming in front of minor children_  _threatened to cause problems with_
_children._  _on back_

(Attach additional sheet with more information, if necessary)

3.  Was a weapon used in the incident? _NO_ If "yes" what kind of weapon? _____

    Are there weapons on the premises? _____ If "yes" what kinds of weapons?_____

4.  The Petitioner and additional parties are related to the Defendant as follows: (check all that apply)

☐  Married                              ☐  Divorced
☐  Parent & Child                       ☐  Persons Related by Blood
☑  Persons Related by Marriage          ☐  Present Spouse of an Ex-Spouse
☐  Persons Living Same Household        ☐  Formerly Living Same Household
☐  Biological Parents Same Child        ☐  Persons in a Previous Dating Relationship
☐  Persons in a Dating Relationship     ☐  Not Related (Stalking requires filing police complaint, with copy attached.  No other relief is permitted by the Protection from Domestic Abuse Act for non-related parties.)

5.  (Check and Complete **A** or **B**)

☐  **A.** Petitioner does not request an Emergency Ex Parte Order but requests the relief checked below after notice and hearing.

☐  **B.** Petitioner is in immediate and present danger of abuse from the Defendant and an Emergency Ex Parte Order is necessary to protect the Petitioner from serious harm.  The Petitioner requests the following relief in the Ex Parte Order: (check one or more)

148

RELIEF REQUESTED

☑ Order Defendant to have no contact with Petitioner, either in person or by telephone, at any time or place.

☑ Order Defendant to not abuse, threaten, injure, assault, molest, stalk, harass, or otherwise interfere with Petitioner.

☐ Assume emergency jurisdiction under UCCJEA, and Order suspension of child visitation orders due to physical violence or threat of abuse by Defendant or a threat to violate a custody order by Defendant.

☐ Order Defendant to not stalk the Petitioner.

☐ Order Defendant to leave the residence located at _____ on or before _____, and take no action to change utilities or telephone service.

☐ Order Law Enforcement Officers to accompany Defendant to the residence to remove necessary clothing and personal effects, and remain in attendance until Defendant leaves the premises.

☐ Order Defendant who is a minor, to leave the residence located at _____ by immediately placing Defendant in any type of care authorized for children taken into custody pursuant to 10 O.S. §7303-1.1a                   Circle Age of Minor Defendant:  13   14   15   16   17

☐ Describe other relief Petitioner requests: _____

6.   ☑ Petitioner is a resident of the county wherein this Petition is filed.

     ☑ Defendant is a resident of the county wherein this Petition is filed

     ☑ The domestic abuse occurred in the county wherein this Petition is filed, but neither Petitioner nor Defendant are residents of this county.

7.   Petitioner requests that Defendant be ordered to pay all court costs, costs of service, photo evidence fees and attorneys' fees, if applicable.

8.   **WARNING:**  Whoever makes a statement or allegation in this Petition for Protective Order but does not believe that the statement or allegation is true, or knows that it is not true, or intends thereby to avoid or obstruct the ascertainment of the truth, may be found guilty of perjury.  Pursuant to Sections 500 and 504 of Title 21 of the Oklahoma Statutes, the penalty for perjury, or subornation of perjury, is a felony punishable by imprisonment for not more than five (5) years.

9.   Petitioner, being first duly sworn on oath states:  I have read the above and foregoing document, understand the meaning thereof, and declare, under penalty of perjury, that the facts and statements contained herein are believed to the best of my knowledge to be the truth and nothing but the truth.  **I understand that I am <u>required</u> by Court Order to appear at the Hearing on my Petition.**

_____
PETITIONER

Subscribed and sworn to before me this 11th day of _Dec._, 20 03.

_____
Deputy Court Clerk, Judge or Notary

Defendant's Address(es) for Service

_____

_____

If address is tribal land, which tribe?_____

Petitioner requests following law enforcement agencies receive copy of any protective Order entered herein:

_____

_____

_____

Official AOC Form (complies with Session Law Ch. 407, 49th Legislative Session effective 11/1/03)

2

Her male continued sexual advances to 14 + 16 year
old boys (our 14 year old & his 16 yr old cousin).
She has threatened us with involvement from DHS to have
our children taken for no reason.

150

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 178**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

151

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR SEQUOYAH COUNTY

THE STATE OF OKLAHOMA,
    Plaintiff,

vs.

TRAVIS DON CRAWFORD

ADDR: ████████████
        Sallisaw, OK  74955
SSN: ██████5635
DOB: █████64

        Defendant(s),

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 2 3 2008

MAUDEEN VANN, COURT CLERK
BY_____ DEPUTY

Case No.  CM-2008- 655

## INFORMATION

FOR:

COUNT 1:    POSSESSION OF CONTROLLED SUBSTANCE~ 63 O.S. § 2-402 a MISDEMEANOR
COUNT 2:    UNLAWFUL POSSESSION OF DRUG PARAPHERNALIA~ 63 O.S. § 2-405 a
            MISDEMEANOR

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH:

        I, **Jerry S. Moore**, the undersigned District Attorney of said County, in the name and by the authority, and on behalf of the State of Oklahoma, give information that in said County of Sequoyah and in the State of Oklahoma, **TRAVIS DON CRAWFORD**,  did then and there unlawfully, willfully, knowingly and wrongfully commit the crime(s) of:

**COUNT 1       POSSESSION OF CONTROLLED SUBSTANCE~  a MISDEMEANOR, on or about the 14th day of June, 2008, by knowingly and intentionally having in defendant's possession and under defendant's control Marijuana said drug being classified as a controlled dangerous substance in Schedule I (C) of the Uniform Controlled Dangerous Substances Act of Oklahoma**

**This crime is punishable by imprisonment up to 1 year and a fine of up to $1000.**

**COUNT 2       UNLAWFUL POSSESSION OF DRUG PARAPHERNALIA~  a MISDEMEANOR, on or about the 14th day of June, 2008, by possessing Rolling Papers which is used by abusers of drugs classified as Controlled Dangerous Substances and without having any medical or other lawful need requiring possession of said paraphernalia.**

**The crime is punishable by imprisonment for up to 1 year or, a fine of up to $1,000 or both.**

                                JERRY S. MOORE
                                DISTRICT ATTORNEY

                        By: _____
                            Kyle Waters
                            Assistant District Attorney

Subscribe and sworn to before me this  23rd  day of June, 2008.

KEB502892

_Helen Edwards_
NOTARY PUBLIC

My Commission expires:05-14-2009 #01006902

## WITNESSES ENDORSED FOR THE STATE OF OKLAHOMA

Herbert Hutchinson, Sallisaw Police Department, 101 W. Chickasaw, Sallisaw OK 74955
Bill Oliver, Sallisaw Police Department, 101 W. Chickasaw Sallisaw OK 74955
OSBI Chemist, OSBI 1995 AIRPORT PARKWAY, TAHLEQUAH OK 74464

KEB502893

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

CM-08-655

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

### Probable Cause Affidavit for Warrantless Arrest

Comes now the undersigned Affiant, and states upon Oath or Affirmation that the following information and facts are correct to the best of the Affiant's knowledge and belief:

JUN 2 3 2008

MAUDEEN VANN, COURT CLERK
_____ DEPUTY

Name of Person Arrested: Travis Don Crawford          Social Security Number: ████ 565█

Date of Birth: ████ 0/   Date of Arrest (Detention): 06 / 14 / 08   Time of Arrest: 1900   P .M.

State Specific Facts for Probable Cause for the Arrest and Detention:

On the 14th day of June 2008, at approximately 1840 hours, Myself and Officer Oliver traveled to the residence of Travis and Cindy Crawford located at 411 South Ash

#A in Sallisaw, Oklahoma to execute a search warrant for narcotics. Upon arrival at the residence I knocked on the front door several times, and after a short period a

white male subject identified as Travis Crawford answered the front door to the residence. I advised Crawford that we had a search warrant for his residence, and handed

him a valid search warrant signed by a judge. Upon entering the residence I could smell a strong odor of burnt marijuana. I began to search the residence a found a

partially burnt hand rolled cigarette, a green leafy substance, seeds and stems that field tested positive for the presence of marijuana.

[Use reverse side or attach another page if necessary]

Anticipated Charge(s): Possession of Marijuana, Possession of Paraphernalia

AFCF: No /Yes times (1) (2) or _____

_____ #901
Affiant (Arresting Officer)

Subscribed and sworn to before me the undersigned, this 17 Day of June 2008

My Commission Expires: 7-12-2010

Patsy Allen
Notary Public / Judge / Witness

### Probable Cause Determination

I, Dennis M. Sprouse, Judge of the District Court reviewed this Probable Cause Affidavit on the 18ᵗ day of June, 2008, at 11:36 A.M./PM.

dms    This Affidavit contains sufficient facts showing probable cause to detain the Arrestee to await further proceedings. The Sheriff for Sequoyah or Chief of Police of the arresting agency is hereby commanded to receive him/her into their custody and detain until he/she is legally discharged.

dms    The Court sets [___]an Appearance Bond in the amount of $_____.00 or [✓]as per Sequoyah County Bond Schedule.

_____    The Court denies Bond at this time.

_____    This Affidavit contains insufficient facts to show there exists probable cause to detain the Arrestee. **The Arrestee is Ordered Released From Custody Immediately.**

_____
Judge of the District Court

154

KEB502894

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

### Probable Cause Affidavit for Warrantless Arrest

Also while searching the residence I found documents with the name Cindy and Travis Crawford. At this time Crawford was placed under arrest and transported to the city jail. After checking Crawford's criminal history it showed that he had a previous conviction of marijuana. I then advised Crawford his Miranda Warning and he agreed to talk with me. Crawford advised me that all the marijuana found inside the residence was his and that Cindy Crawford had no knowledge of the marijuana being inside the residence.

KEB502895

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

State of Oklahoma,                    )
     Plantiff,                        )
                      )
                      )
     VS.                              )        CRM- 2008-655
                      )
TRAVIS Crawford                       )
                      )
                      )
_____              )
     Defendant

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 2 6 2008

MAUDEEN VANN, COURT CLERK
_____ DEPUTY

## ORDER TO APPEAR FOR DISPOSITION

You are hereby ordered to appear the __8th__ day of __Aug__ _____,
20 __08__ at _____9:30_____ __A__.M. You should report to the
Court Clerk's office on the second floor of the Sequoyah County Courthouse in Sallisaw.
You should report thirty minutes prior to your appearance time. **NO Further Notice
Will Be Given.**

Dated this __25__ day of __Jun__ _____ _2008_ .

_____
**Judge of the District Court**

✓ I understand I have been charged with a misdemeanor crime and must appear
for a dispositional docket for the Court's review of my case. The purpose of the
dispositional docket is to give me a chance to visit with an attorney from the District
Attorney's Office. After the visit, if a plea bargain is reached, I may enter a plea of guilty
in exchange for the state's recommendation. If no agreement is possible then I may
request a jury trial.

✓ <u>Most Importantly</u> I understand that my failure to appear at the date and time
given above will result in the issuance of a warrant for my arrest and that my present
bond will be forfeited.

X _____
**Defendant**

**X KEEP THIS FOR YOUR RECORDS AS NO FURTHER NOTICE WILL BE GIVEN**

KEB502896

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                        )
        Plaintiff                         )
vs.                                       )    Case No. CM-06-00784
TRAVIS CRAWFORD                           )    CM-08-00655
                                          )
                                          )         SEQUOYAH COUNTY, OKLAHOMA
                                          )              FILED
VIAN, OK  74962                           )         IN DISTRICT COURT
        Defendant                         )
    SS#: ▮▮▮▮5635                                    AUG 0 8 2008
    DOB: ▮▮▮▮1964
                                                    MAUDEEN VANN, COURT CLERK
                State's Attorney:              BY_____ DEPUTY
Date: 08/08/08   Defendant's Attorney: KYLE WATERS

RULE 8 HEARING
(Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____ $100.00 on or before 09-26-2008 and

then ___100___ per month on or before the 26 day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 09-26-20___ _____

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

_____

TOTAL TO PAY $ 601                        _____
                                                    DENNIS M. SPROUSE
X_____                Judge of the District Court
        Defendant
Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

KEB502897

# SEQUOYAH COUNTY DISTRICT COURT
## 120 E. Chickasaw, Sallisaw, OK 74955
## 918-775-4411

---

### *DEFENDANT'S FINANCIAL STATEMENT / SUPERVISION APPLICATION*
Thoroughly and legibly complete this Defendant's Financial Statement/Supervision Application
Do not leave any blanks. If an item does not pertain to you, fill in "N/A" for not applicable.

---

## DEFENDANT

| Name: (First, Middle, Last) | Nickname: Maiden Name: | Place of Birth: |
|---|---|---|
| TRAVIS D CRAWFORD | | Sallisaw OK |

| Social Security No: 5635 | Date of Birth: 64 | Age: 44 | Driver's License No.: | State: | Expiration Date: |
|---|---|---|---|---|---|

| Current Address: ☐ House ☐ Apt/Bldg # ☐ Mobile Home Lot # ☐ Other | How Long? |
|---|---|
| Gians OK 74962 | 30yn |

| Previous Address: | City | Zip | How Long? |
|---|---|---|---|
| | Sallisaw OK | | 2yn |

| Home Phone No: 918-790-2878 | Cell Phone No: | Message Phone No: 775-2509 |
|---|---|---|

| No. of Dependents: ☑ Spouse ☑ Children (ages): 4 ☐ Other (Relationship) | Total Dependents: 6 |
|---|---|

| Sex: M | Race: W | Hair: BR | Height: 5,7" | Weight: 200 lbs |
|---|---|---|---|---|

| Employer: (Name & Address): Jason Brooks | Supervisor's Name: Jason Brooks | Phone No: 315-0851 |
|---|---|---|

| How Long? Syn | Your Title: Concrete | Hours per Week: 20-40 | Hourly Rate: 10 /HR | Pay Schedule: ☑ Weekly ☐ Bi-weekly ☐ Other | Date of Next Check: |
|---|---|---|---|---|---|

---

## SPOUSE

| Name: (First, Middle, Last) Cynthia Crawford Elaine | Nickname; Maiden Name: |
|---|---|

| Social Security No: | Employer: (Name & Address) | Supervisor's Name: | Phone No: |
|---|---|---|---|

| How Long? | Title: | Hours per Week: | Hourly Rate: | Pay Schedule: ☐ Weekly ☐ Bi-weekly ☐ Other | Date of Next Check: |
|---|---|---|---|---|---|

---

### References - Someone who will always know how to contact you

| Full Name & Address of Nearest Relative Not Living With You | Relationship: | Phone No: |
|---|---|---|
| Roger Lee Crawford | Father | 775-2509 |
| Roger Dale Crawford | Brother | 775 552 |
| Dr Mack Dotson | Uncle | 775-6974 |
| Dr ann Dotson | aunt | 775-6974 |

Continued on other side.....

KEB502898

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

THE STATE OF OKLAHOMA　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
VS.　　　　　　　　　　　　　　　　　　　　)
_Travis Don Crawford_ )
　　　　　[Your Name]　　　　Defendant　　)

CM __08_____655__

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 0 8 2008

MAUDEEN VANN, COURT CLERK
BY _____ DEPUTY

### SUMMARY OF FACTS FOR THE MISDEMEANOR

of _____ Driving Under the Influence or _____ Actual Physical Control of Motor Vehicle while under the Influence; and/or __✔__ Possession of Marijuana; and/or _____ Domestic Abuse; and/or _____ Violation of Protective Order; and/or _____ Contributing to the Delinquency of a Minor

_____ PLEA OF GUILTY　　　　　　__✔__ PLEA OF NO CONTEST (Nolo Contendere)

**Waiver of Court Reporter:** I hereby waive the taking of this plea by a Certified Shorthand Reporter and the making of a shorthand record of these proceedings. I consent to the use of this "Summary of Facts" as the record of these proceedings.

_Travis Crawford_
Defendant's Signature [Your signature]

*All answers are given under an oath. Please put your initials beside each answer where indicated (Int.).*

1. What is your age? __44__　　　　　　　What grade did you complete in school / college? __12__ or GED

Your Social Security Number ▮▮▮▮▮ 5635 Your Date of Birth ▮▮▮▮▮ 19 64　　Int.____

2. Can you read and understand this form?　　　　　　　__✔__ Yes ___ No Int.___
   (If no, please give the name of who read and explained this form to you. _____)

3. Have you taken any medication, alcoholic beverages, drugs, inhalants or done anything that would affect your ability to understand these proceedings today?　　　　___ Yes __✔__ No Int.___
   (If yes, what have you taken and when did you take it? _____)

4. Have you ever been treated by a doctor or health professional for mental illness or confined in a hospital for mental illness?　　　　___ Yes __✔__ No Int.___
   (If Yes, list doctor or health professional, place, and when treatment occurred: _____)

5. Do you understand the purpose, the nature and the consequences of this proceeding?　　　　___ Yes __✔__ No Int.___

6. Have you received a copy of the information (or ticket) and do you understand that you are charged with the crime(s) of:
   Count 1 _Poss MJ_____
   Count 2 _Poss Para_____

-1-

KEB502899

Count 3_____
Count 4_____
Count 5_____
Count 6_____

_✓_ Yes    ___ No    Int.___

7. Do you understand the maximum punishment for each crime charged is :

Count 1 __1 yr__ days/months   and/or a fine of $_____.00 plus fees and Costs
Count 2 _____ days/months   and/or a fine of $_____.00 plus fees and Costs
Count 3 _____ days/months   and/or a fine of $_____.00 plus fees and Costs
Count 4 _____ days/months   and/or a fine of $_____.00 plus fees and Costs
Count 5 _____ days/months   and/or a fine of $_____.00 plus fees and Costs
Count 6 _____ days/months   and/or a fine of $_____.00 plus fees and Costs

_✓_ Yes    ___ No    Int.___

8. Do you understand that by entering a plea of guilty or no contest you may be sentenced to a term of imprisonment within these limits and/or fined within these limits?    _✓_ Yes    ___ No    Int.___

9. Read the following statements:  You have the right to a speedy trial before a jury of your peers to determine whether you are guilty or not guilty of each charge and if you request, to determine the sentence.

At the trial;
[1] You have the right to have an attorney represent you, either one you hire or, *if you are indigent,* a court-appointed attorney.
[2] You are presumed to be innocent of the charges.
[3] You may remain silent or, if you chose, you may testify on your own behalf.
[4] You have the right to see and hear all witnesses called to testify against you and the right to have those witnesses cross-examined.
[5] You may have your witnesses ordered to appear in court to testify and present evidence of any defense you have to these charges.
[6] The State is required to prove your guilt beyond a reasonable doubt.
[7] The verdict of guilty or not guilty decided by a jury must be unanimous.  However, you can waive a jury trial and, if all parties agree, the case could be tried by a Judge alone who would decide if you were guilty or not guilty and if determined to be guilty, the appropriate punishment.

    **Do you understand each of these rights?**    _✓_ Yes    ___ No    Int.___

10. Do you understand by entering a plea of guilty or no contest you give up these rights?    _✓_ Yes    ___ No    Int.___

11. Do you wish to appear without an attorney and represent yourself here today?    ___ Yes  _✓_ No    Int.___
    (If no, please give the name of attorney who is representing you: __WILLIAM OENDORF__ )

12. Do you understand that a conviction on a plea of guilty or no contest to the offense of Driving Under the Influence (D.U.I.) or Actual Physical Control of a Motor Vehicle while under the Influence (A.P.C.) will result in any later charge of D.U.I. or A.P.C. to be filed as a FELONY with the punishment enhancement upon conviction of a prison term of not less than one (1) year but not to exceed five (5) years and fine up to $2,500.00?    ___ Yes    ___ No    _✓_ Does not apply to me    Int.___

13. Do you understand that a conviction on the plea of guilty or no contest to the offense of Possession of Marijuana will result in any later charge of possession of marijuana being filed as a FELONY with the punishment enhancement upon conviction of a prison term of not less than two (2) year but not to exceed ten (10) years and fine up to $10,000.00?    _✓_ Yes    ___ No    ___ Does not apply to me    Int.___

14. Do you understand that a conviction on the plea of guilty or no contest to the offense of Possession of Marijuana will be a basis for the Department of Public Safety to suspend your driver's license for 180 days?    _✓_ Yes    ___ No    ___ Does not apply to me    Int.___

15. Do you understand that a conviction on the plea of guilty or plea of no contest to the offense of Domestic Abuse will result in any later charge of Domestic Abuse to be filed as a FELONY with the punishment enhancement upon conviction of a prison term of not two (2) years and fine up to $5,000.00?    ___ Yes    ___ No    _✓_ Does not apply to me    Int.___

16. Do you understand that a conviction on the plea of guilty or plea of no contest to the offense of Contributing to the Delinquency

-2-

KEB502900

of a Minor will result in any later charge of Contributing to the Delinquency of a Minor to be filed as a FELONY with the punishment enhancement upon conviction of a prison term of not three (3) years and fine up to $5,000.00?

_____ Yes   _X_ No   _✓_ Does **not** apply to me   Int._____

17. Do you wish to enter your plea and be sentenced now?      _✓_ Yes   _____ No   Int._____

18. What is your plea to:

| | | GUILTY | NOT GUILTY | NO CONTEST |
|---|---|---|---|---|
| Count 1 | | _____ | _____ | _✓_ |
| Count 2 | | _____ | _____ | _____ |
| Count 3 | | _____ | _____ | _____ |
| Count 4 | | _____ | _____ | _____ |
| Count 5 | | _____ | _____ | _____ |
| Count 6 | | _____ | _____ | _____ |

19. _____ Do you enter your plea of guilty of your own free will, without any coercion or compulsion of any kind and only for the sole reason that you are guilty and that you admit you did the acts as charged?

_____✓_____ Do you enter your plea of no contest of your own free will, without any coercion or compulsion of any kind even though you know the Court has the authority to find you guilty and assess punishment?

_✓_ Yes   _____ No   Int._____

20. Explain in detail what you did to commit the crime(s) *[In example, " I drank a six pack of beer while fishing. I drove my 1988 Ford pickup home. The police stopped me on Hwy. 59 for being left of center. Complete on the back if necessary.]*

_____

_____

_____

21. Have you been abused, mistreated, threatened, or promised anything by anyone to have you enter this plea?

_____ Yes   _✓_ No   Int._____

22. **Recommendation by the District Attorney's Office:**

| | | | | | |
|---|---|---|---|---|---|
| Count 1 _12_ days/month deferred / suspended / jail | and/or a fine of $_____ .00 | Fees_____ | Costs |
| Count 2 _12_ days/month deferred / suspended / jail | and/or a fine of $_____ .00 | Fees_____ | Costs |
| Count 3 _____ days/month deferred / suspended / jail | and/or a fine of $_____ .00 | Fees_____ | Costs |
| Count 4 _____ days/month deferred / suspended / jail | and/or a fine of $_____ .00 | Fees_____ | Costs |
| Count 5 _____ days/month deferred / suspended / jail | and/or a fine of $_____ .00 | Fees_____ | Costs |
| Count 6 _____ days/month deferred / suspended / jail | and/or a fine of $_____ .00 | Fees_____ | Costs |

Special Assessment of Fees: VCF $_____ .00   DADE $_____ .00   OSBI LAB $_____ .00

Restitution $_____ .00   *DA / ADA'S INITIALS* _____

## ALL FINES, COURT COST AND FEES ARE DUE AT THE TIME OF PLEA

3. Do you have anything more to say or do you know of a reason why you should not be sentenced at this time?

_____ Yes   _✓_ No   Int._____

4. **NOTICE OF RIGHT TO APPEAL** To appeal from this conviction, or order deferring sentence, on your plea of guilty, you *must file* in the Sequoyah County District Court Clerk's Office a written Application to Withdraw Plea of Guilty *within ten (10) days* from today's date. You must set forth in detail why you are requesting to withdraw your plea. The trial court must hold a hearing and rule upon your application within thirty (30) days from the date it is filed. If the trial court denies your application, you have a right to ask the Court of Criminal Appeals to review the District Court's denial by filing a Petition for Writ of Certiorari within ninety (90) days of the date of denial. Within ten (10) days from the date the application to withdraw plea of guilty is denied, notice of intent to appeal and designation or record must be filed pursuant to Oklahoma Court of Criminal Appeals Rule 4.2(D). If you are indigent, you have the right to be represented on appeal by a court-appointed attorney.

**Do you understand these rights of appeal?**      _____ Yes   _____ No   Int._____

-3-

KEB502901

25. The terms or your probation for either a deferred or suspended sentence(s) are:
    (1) You are not to violate any city, state or federal laws
    (2) You are to pay all fines, fees restitution and costs immediately.
    (3) You may be give time to pay if you meet the guidelines set by this Court following a Rule 8 hearing.
         *(You must appear and pay according to the Rule 8 Order.)*
    (4) You must complete the special rule(s):_____
    _____

    **Do you understand the terms of your probation?**      ✓ Yes     ___ No     Int.___

26. Have you fully understood all questions that have been asked in this form and are all the answers been freely and voluntarily given?      ✓ Yes     ___ No     Int.___

HAVING BEEN SWORN, I, the Defendant whose signature appears below, state that I have read or had read to me the "Summary of Facts" form and agree that it is a full and true statement of the questions asked me. All questions have been answered by me and are true and correct. I UNDERSTAND THAT I MAY BE PROSECUTED FOR PERJURY IF I HAVE MADE ANY FALSE STATEMENT TO THIS COURT.

_____
Defendant's signature [Your signature]

Approved as to form: _____        _____
District Attorney's Office                                    Attorney for Defendant

## THE COURT FINDS AS FOLLOWS:

    A.  The Defendant was sworn and responded to the questions under an oath.
    B.  The Defendant understands the purpose, nature and consequences of this proceeding.
    C.  The Defendant's plea(s) of ____ Guilty ✓ No Contest is / are knowingly and voluntary entered and accepted by the Court.
    D.  The Defendant is competent for the purpose of this hearing.
    E.  A factual basis exists for the plea(s)

## THE COURT SENTENCES THE DEFENDANT AS FOLLOWS:

DEFERRED SENTENCE
he sentencing date is deferred until ___Aug 8, 2009___ at 10:00 a.m.

-4-

162

KEB502902

## SUSPENDED SENTENCE (in full or in part)

You are sentenced to confinement under the supervision of the Sequoyah County Sheriff for a term as follows:

Count 1 _____ days/months to run c/c  c/s  with _____ and a fine of $_____.00 plus Costs and Fees
Count 2 _____ days/months to run c/c  c/s  with _____ and a fine of $_____.00 plus Costs and Fees
Count 3 _____ days/months to run c/c  c/s  with _____ and a fine of $_____.00 plus Costs and Fees
Count 4 _____ days/months to run c/c  c/s  with _____ and a fine of $_____.00 plus Costs and Fees
Count 5 _____ days/months to run c/c  c/s  with _____ and a fine of $_____.00 plus Costs and Fees
Count 6 _____ days/months to run c/c  c/s  with _____ and a fine of $_____.00 plus Costs and Fees

to be suspended as follows:      (A) _____    ALL SUSPENDED
                                 (B) _____    Suspended EXCEPT as to the first _____ Days/Months which
time you are to held in the custody of the Sequoyah County Jail.

## TIME TO SERVE IN COUNTY JAIL

You are sentenced to confinement under the supervision of the Sequoyah County Sheriff for a term as follows:
Count 1 _____ days/months to run c/c  c/s  with _____ and a fine of $_____.00 plus Costs and Fees
Count 2 _____ days/months to run c/c  c/s  with _____ and a fine of $_____.00 plus Costs and Fees
Count 3 _____ days/months to run c/c  c/s  with _____ and a fine of $_____.00 plus Costs and Fees
Count 4 _____ days/months to run c/c  c/s  with _____ and a fine of $_____.00 plus Costs and Fees
Count 5 _____ days/months to run c/c  c/s  with _____ and a fine of $_____.00 plus Costs and Fees
Count 6 _____ days/months to run c/c  c/s  with _____ and a fine of $_____.00 plus Costs and Fees

The Court further assess:

|   |   |   |
|---|---|---|
| (A) total fines for all Counts at | $_____ | .00 |
| (B) total costs for all Counts at | $_____ | .00 |
| (C) total VCF fees for all Counts at | $_____ | .00 |
| (D) total DADF fees for all Counts at | $_____ | .00 |
| (E) total OSBI Lab fees for all Counts at | $_____ | .00 |
| (F) total Restitution for all Counts at | $_____ | .00 |
| (G) total OIDS fees for all Counts at | $_____ | .00 |
| TOTAL AMOUNT DUE | $_____ | .00 |

_____ While the **full amount is due today**, the Court will allow the Defendant to pay $_____.00
t this time to the Sequoyah County Court Clerk's  and will approve the Defendant for the opportunity to
roceed with a Rule 8 asset hearing to determine what time, if any, should be allowed for complete payment.

Done in open Court, with all parties present, this 8ᴸ day of _Aug_ , _2008_ .

_____
JUDGE OF THE DISTRICT COURT

Co Form CM-1.0  8 / 13/ 99                                    Last Modified 8/13/99

-5-

163

KEB502903

# B B B
## Berglan Bail Bonds
### 235-0007

## APPEARANCE BOND

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT
JUN 1 6 2008
MAUDEAN VANN, COURT CLERK
BY_____ DEPUTY

LICENSE # _199856_    POWER NUMBER _32 75_
D.O.B. _____64

District Court, Case No. _CM-08-655_

STATE OF OKLAHOMA, SEQUOYAH COUNTY, ss:

BE IT REMEMBERED that on the _15_ day of _June_, _08_, _Travis Crawford_ as principal of SEQUOYAH County and State of OKLAHOMA, _Lance Berglan_ as securities residents of Sequoyah County and State aforesaid appeared personally before the undersigned authority **Sequoyah County Court Clerk** in and for Sequoyah County, and jointly and severally, acknowledged themselves to be indebted to the State of Oklahoma in the sum of _Fifteen Hundred_ DOLLARS ($ _1500_ ), to be made and levied on their respective goods, chattles, and lands, tenements, cash deposit and/or escrow deposit, to be void, however if the said _Travis Crawford_, Defendant, who has been committed to the county jail of Sequoyah County, State of Oklahoma, shall personally be and appear before the District Court of said County on the _18_ day of _June_, _08_ at _10_ o'clock _A_ .m., of said day and from term to term, and from day to day of each term, to answer a charge preferred against him/her for the offense of _Poss Mary. 2nd, Poss Para_

_____

and to do and receive what shall be enjoined by said Court upon him/her, and shall not depart the said court without leave.

WITNESS our hands and seals this _____ day of _____, _____.
Principal X_____ Address of Principal_____
**Berglan Bail Bonds** Surety, Address of Surety 112 N. Main, Sallisaw, OK 74955.

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this ___ day of _____, ____ Bernell Edwards, District Court Clerk, by Deputy X_Vicki Robison_. This undertaking approved this _____ day of _____, _____, Bernell Edwards, Court Clerk, _____, Judge.

## AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, SEQUOYAH COUNTY, ss:

_Lance Berglan_, being first duly sworn upon oath, says that he/she is a resident of Sequoyah County, State of Oklahoma, and that

(a)  Neither he/she nor anyone for his/her use has been promised or has received any surety or consideration. for making this undertaking

(b)  He/She has received the sum of $0 from_____ **DEFENDENT** and/or has been promised the sum of $_158_ from _Travis Crawford_ as consideration for making this undertaking.

(c)  He/She has received the following described property or instrument from _____ **DEFENDANT ET AL** as security for making this undertaking: **INDEMNITY AGREEMENT SIGNED BY DEFENDANT....**

(d)  _____ **DEFENDANT ET AL** has promised to secure him/her for making this undertaking.

Surety _____, Professsional_____ Judy Berglan _____

Subscribed and sworn to before me this _____ day of _____, _____.

**NOTARY PUBLIC**
(Sec. 1322, Title 59, O.S.A.)          **My Commission Expires**

164

KEB502904

# POWER OF ATTORNEY

Judy Berglan
Berglan Bail Bonds
112 N. Main St.
Sallisaw, OK 74955

CM-08-65

JB

3275

KNOW ALL MEN BY THESE PRESENTS: That Judy Berglan, Professional Bondsman licensed by the State of Oklahoma, does constitute and appoint the below named agent as my Attorney in Fact to execute Bail Bonds only in my name and on my behalf as Surety. *THIS POWER MUST BE ATTACHED TO AND FILED WITH BAIL BOND WRITTEN ON THE DEFENDANT NAMED BELOW AND IS VOID IF ALTERED OR ERASED*

Dated This ___15___ day of ___JUNE___, 20_08_

Defendant Name:

___TRAVIS___ ___Crawford___
(First)          (Middle)          (Last)

D.O.B. ____ ─64    Amt. of Bond: $__1500⁰⁰__    Premium: $__150⁰⁰__

Offense:__Poss Marj 2cnd, Poss Para__

Case Number:_____    Court:__District__

City:__Sallisan__    Court Date:__June 18 10A__    Posted For:__Berglan__

Rewrite of Power#:_____    Dated:_____    Amount: $_____

_____    _____Judy Berglan_____
Executing Agent's Signature          Professional Bondsman's Signature

KEB502905

**Sequoyah County Form CF-1**       'Uniform Plea of Guilty — Summary of Facts'

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
THE STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 1 2 1999

BERNICE EDWARDS, COURT CLERK
BY _____ DEPUTY

STATE OF OKLAHOMA,       )
              )
        Plaintiff    )
              )
vs.               )    Case No. CF-98-481
              )
Joseph D. Jocob,    )
        Defendant   )
DOB ____ / 19 76    )
SS# ____ - __ - 6130    )

## SUMMARY OF FACTS FOR THE PLEA OF GUILTY

### Part A: Finding of Fact, Acceptance of Plea

Circle

1. Is the name just read to you your true name?    **(YES)** NO
   If no, then what is your correct name? _____
   I have also been known by the name(s) _____
   _____

2. (A) Do you wish to have a record of these proceedings made by a Court Reporter?   **(YES)** NO

   (B) Do you wish to waive your right to have a record of these proceedings made?   YES **(NO)**

3. What is your age? 22  What grade level in school have you completed? GED

4. Can you read and understand this form? [If no, Addendum A must be completed and attached]   **(YES)** NO

5. Are you currently taking any medications or substances which affect your ability to understand these proceedings?   YES **(NO)**

6. Have you been prescribed any medication which you are not taking?   YES **(NO)**
   If yes, what medication are you not taking? _____
   What is the purpose of the medication? _____
   Why are you not taking the medication? _____

7. Have you ever been treated by a doctor or health professional for mental illness or confined in a hospital for mental illness?   YES **(NO)**
   If Yes, list doctor or health professional, place, and when treatment occurred:
   _____

8. Do you understand the purpose, the nature and the consequences of this proceeding?   **(YES)** NO

9. Have you received a copy of the State's Information and read its allegations?   YES **(NO)**

166

10.  A.  Do you understand you are charged with:

Crime Statutory Reference

MISD  [1] _Poss of CDS_ ____ 63 o.s. 2-401  (YES)  NO
MISD  [2] _Poss of Para_ ____ 63 o.s. 2-405  (YES)  NO
      [3] _Poss of Mari_ ____ ___ O.S. ___  YES  NO
      [4] _____ ___ O.S. ___  YES  NO
      [5] _____ ___ O.S. ___  YES  NO

*For additional charges:* List  additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

B.  Are you charge after former conviction of a felony (AFCF) ?               YES   NO
If yes, list the felony(ies) charged: _____

_____

11.  Do you understand the range of punishment for the crime(s) is/are ?
     (List in the same order as in Number 10)

[1]  Minimum of __2__ to a maximum of __10__ and/or a fine of $ _10,000_ (YES)  NO

[2]  Minimum of __0__ to a maximum of _12 Mo._ and/or a fine of $ _1000_ (YES)  NO

[3]  Minimum of __0__ to a maximum of _12 Mo._ and/or a fine of $ _500_ (YES)  NO

[4]  Minimum of _____ to a maximum of _____ and/or a fine of $_____  YES  NO

[5]  Minimum of _____ to a maximum of _____ and/or a fine of $_____  YES  NO

*For additional charges:* List  additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

12.  **Read the following statements:**   You have the right to a speedy trial before a jury of your peers to determine whether you are guilty or not guilty and if you request, to determine the sentence. *If pleading to a capital murder*, advise of the procedure in 21 O.S. 701.10( B)
**At the trial:**
[1] You have the right to have an attorney represent you, either one you hire or *if you are indigent* a court appointed attorney.
[2] You are presumed to be innocent of the charges.
[3] You may remain silent or , if you chose, you may testify on your own behalf.
[4] You have the right to see and hear all witnesses called to testify against you and the right to have those witnesses cross-examined.
[5] You may have your witnesses ordered to appear in court to testify and present evidence of any defense you have to these charges.
[6] The State is required to prove your guilt beyond a reasonable doubt.
[7] The verdict of guilty or not guilty decided by a jury must be unanimous.  However, you can waive a jury trial and, if all parties agree, the case could be tried by a Judge alone who would decide if you were guilty or not guilty and if determined to be guilty, the appropriate punishment.

Do you understand each of these rights ?                                      (YES)  NO

13.  Do you understand by entering a plea of guilty you give up these rights ?        (YES)  NO

14.  Do you understand that a conviction on a plea of guilty could increase punishment in any future  (YES)  NO
case committed after this plea ?

15.  Is _Mr. Hunter_ your attorney ?                                          (YES)  NO

16.  Have you talked with your attorney about the charges, advised him/her regarding any defense  (YES)  NO
you may have to the charges and received his/her advice ?

17.    Do you believe your attorney has effectively assisted you in this case and are you satisfied with his/her representation ?    (YES)   NO

18.    Do you wish to change your plea of not guilty to a plea of guilty and give up your right to a jury trial and all previously explained constitutional rights ?    (YES)   NO

19.    Is there a plea agreement ?    (YES)   NO
       What is your understanding of the plea agreement ? _5 deferred_
       _Fins cost assessment._
       _____
       _____

20.    Do you understand the Court is *not* bound by any agreement or recommendation and if the Court does not accept the plea agreement, you have the right to withdraw your plea of guilty ?    (YES)   NO

21.    Do you understand that if there is no plea agreement the Court can sentence you within the range of punishment stated under question 11 ?    (YES)   NO

22.    Do you understand your plea of guilty to the charge(s) is subject to :    YES   NO
       (check one)
       [X]   no prior felony conviction
       [ ]   one (1) prior felony conviction
       [ ]   two (2) or more felony convictions   List prior felony convictions to which you are pleading:
       _____

23.    What is/are your plea(s) to the each charge(s) ?
       [1] _Guilty_  [2] _Guilty_  [3] _Guilty_  [4] _____  [5] _____

24.    Did you commit the acts as charged in the information ?    YES   NO
       State a factual basis for your plea(s) (attach additional pages as needed, labeled as ADDENDUM C) :
       _I did as charged in information_
       _____

25.    Have you been forced, abused, mistreated or promised anything by anyone to have you enter your plea(s) ?    YES   (NO)

26.    Do you plead guilty of your own free will and without any coercion or compulsion of any kind ?    (YES)   NO

27.    If you are entering a plea to a felony offense, you have a right to a Pre-sentencing investigation and Report which would contain the circumstances of the offense, any criminal record, social history and other background information about you.  Do you request a Pre-sentence report ?    (YES)   NO

28.    (A) Do you have any additional statements to make to the Court ?    YES   (NO)

       (B) Is there any legal reason as to why you should *not*  sentence now ?    YES   (NO)

HAVING BEEN SWORN, I , the Defendant whose signature appears below, make the following statements under oath.

(1)        CHECK ONE:

           __✓____ (A)    I have read, understood and completed this form.

           _____ (B)    My attorney completed this form and we (the attorney and I) have gone over the form and I understand its contents and agree with the answers. *Complete Addendum A and attach to this form.*

_____ (C)    The Court completed this form for me and inserted my answers to the questions in open court.

(2)                          All answers are true and correct.

(3)                          I understand that I may be prosecuted for perjury if I have made false statements to this Court.

Acknowledged this __12__ Day of ___April___, __1999__.

_____ Joseph Jacobs
                              DEFENDANT

I, the undersigned attorney for the Defendant, believe the Defendant understands the nature, purpose, and consequence of this proceeding. (S)He is able to assist me in formulating any defense to the charge(s). I am satisfied that the Defendant's waivers and plea(s) of guilty are voluntarily given and he/she had been informed of all legal and constitutional rights.

_____
ATTORNEY FOR DEFENDANT

The sentence recommendation in question 19 is correctly stated. I believe the recommendation is fair to the State of Oklahoma. Offer of Proof (nolo contendere plea) : _____

_____

_____

_____
ASSISTANT DISTRICT ATTORNEY

## THE COURT FINDS AS FOLLOWS:

A. The Defendant was sworn and responded to questions under oath.

B. The Defendant understands the purpose, nature and consequences of this proceeding.

C. The Defendant's plea(s) of _____ is/are knowingly and voluntarily entered and accepted by the Court Reporter Present Court.

D. The Defendant is competent for the purpose of this hearing.

E. A factual basis exists for the plea(s) (and former conviction(s), if applicable).

F. The Defendant is guilty as charged: (check as appropriate)

    [ ] after no prior felony conviction.

    [ ] after one (1) prior felony conviction.

    [ ] after two (2) or more prior felony convictions

G. Sentencing or order deferring sentence shall be: [ ] imposed instanter or [ ] continued until the __12__ day of __April__, __2004__ at __9__ : __00__ __A__. M . If the Pre-sentence investigation and Report is requested, it shall be provided to the Court by the _____ day of _____, _____.

DONE IN OPEN COURT this __12__ day of __April__, __1999__.

_____
JUDGE OF THE DISTRICT COURT

_____
NAME OF JUDGE TYPED OR PRINTED

__Waived__
Court Reporter Present

_____
Deputy Court Clerk Present

## "NOTICE OF RIGHT TO APPEAL"

Sentence to Incarceration, Suspended or Deferred:

To appeal from this conviction, or order deferring sentence, on your plea of guilty, you must file in the Sequoyah County District Court Clerk's Office a written Application to Withdraw Plea of Guilty within ten (10) days from today's date. You must set forth in detail why you are requesting to withdraw your plea. The trial court must hold a hearing and rule upon your application within thirty (30) days from the date it is filed. If the trial court denies your application, you have a right to ask the Court of Criminal Appeals to review the District Court's denial by filing a Petition for Writ of Certiorari within ninety (90) days of the date of denial. Within ten (10) days from the date the application to withdraw plea of guilty is denied, notice of intent to appeal and designation or record must be filed pursuant to Oklahoma Court of Criminal Appeals Rule 4.2(D). If you are indigent, you have the right to be represented on appeal by a court appointed attorney.

Do you understand each of these rights to appeal ?   YES   NO

Do you want to remain in the county jail ten (10) days before being taken to place of confinement ?   YES   NO

Have you fully understood the questions that have been asked ?   YES   NO

Have your answers been freely and voluntarily given ?   YES   NO

I ACKNOWLEDGE UNDERSTANDING OF RIGHTS AND SENTENCE IMPOSED.

_____
Defendant

I, the undersigned attorney, have advised the Defendant of his appellate rights.

_____
Attorney for the Defendant

DONE IN OPEN COURT, this __12__ day of __April__, __1999__.

_____
Judge of the District Court

_____   _____
Court Reporter Present            Deputy Court Clerk Present

ADDENDUM "A"

### CERTIFICATE OF DEFENSE COUNSEL

As the attorney for the defendant, _____, I certify that:

1. The Defendant has stated to me that he/she is [ ] able [ ] unable to read and understand the attached form, and I have [ ] determined the Defendant is able to understand the English language or [ ] determined the Defendant is unable to understand the English language and obtained _____ _____ to interpret to the Defendant in the _____ language.
2. I have read and fully explained to the Defendant the allegations contained in the Information in this case.
3. I have read and fully explained to the Defendant all of the questions in the Plea of Guilty/Summary of Facts and the answers to the questions set out in the Summary of Facts are the Defendant's answers.
4. To the best of my knowledge and belief the statement and declarations made by the Defendant are accurate and true and have been freely and voluntarily made. Dated this __12__ day of __April__, __99__.

_____
Attorney for the Defendant

170

**Sequoyah County Form CF-1 - b**

**Uniform Plea of Guilty — Sentence on Plea**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Case Number CF- _____   State v. _____   Date: _____

**Part B:** Sentence on Plea   [NOTE ON USE: Part B is to be used with the Summary of Facts if contemporaneous with the entry of plea or may be formatted as a separate sentencing form if sentencing is continued to a future date.]

## THE COURT SENTENCES THE DEFENDANT AS FOLLOWS:

### DEFERRED SENTENCE

1. The sentencing date is deferred until _____ , ____ , _____ at __ : ___ _ M.

2. You [ ] will [ ] will not be under supervision by the Department of Corrections. The terms set forth in the Rules and Conditions of Probation in Addendum D shall be the rules you must follow during the period of deferment.

### SUSPENDED SENTENCE or SUSPENDED AS TO PART

1. You are sentence t confinement under the supervision of the Department of Corrections for a term of years as follows:

[1]_____ [2]_____ [3]_____ [4] _____ [5] _____

TO BE SUSPENDED as follows:

    (A) ALL SUSPENDED  [ ] Yes    [ ] No

    (B) suspended *except* as to the first _____ (months) (years) of the term(s) during which you are to be held in the custody of the Department of Corrections. The remaining term of the sentence(s) is to be suspended under the terms set forth in the Rules and Conditions of Probation in Addendum D.

2. The sentence(s) is/are to run [ ] concurrently [ ] consecutively with/to _____ _____ or NOT APPLICABLE.

### TIME TO SERVE

1. You are sentence t confinement under the supervision of the Department of Corrections for a term of years as follows:

[1]_____ [2]_____ [3] _____ [4] _____ [5] _____

2. The sentence(s) is/are to run [ ] concurrently [ ] consecutively with/to _____ _____ or NOT APPLICABLE.

### FINES AND COSTS

You are to pay in full any fine(s), costs , fees and restitution at the time of sentencing. In the alterative, you may request a stay of execution (SOE) from the Cost Administrator in the Sequoyah County District Court Clerk's Office. All information given to the Cost Administrator in requesting the SOE will be under oath and is considered as part of the summary of facts before the Court. *You will appear in person to make all payments as agreed.* Any payment *tendered other than in person will be accepted; however, such acceptance does not excuse your appearance in the Clerk's Office.*

171

## WARRANT CLEARANCE

WARRANT # CF-98-58A, CF-98-481

WARRANT NAME Jacobs, Aubrey Dale

DATE & TIME CLEARED 9-23-99    01:58

WARRANT CLEARED BY:

ARREST ✓    OFFICER SERVING Travis Gabbert

AGENCY SCSO

CANCEL _____    OFFICIAL DIRECTING WARRANT CANCELLATION

_____

WAS WARRANT PULLED FROM FILE?    (YES)    NO

IF NO, EXPLAIN WHY NOT_____

WAS WARRANT MARKED OFF BOOK?    (YES)    NO

IF NO, EXPLAIN WHY NOT_____

WAS WARRANT CANCELLED FROM NCIC?    YES    (NO)

IF YES, NCIC CANCELLATION NUMBER_____

IF NO, EXPLAIN WHY NOT  N/A

IF HOLD WAS PLACED, WAS WARRANT
REMOVED FROM HOLDS LIST?    YES    (NO)

IF NO, EXPLAIN WHY NOT N/A

SHERIFF'S OFFICE EMPLOYEE SIGNATURE _Troy L. Parker_

NOTE:  AFTER COMPLETION, ATTACH THIS FORM TO THE CANCELLED OR
SERVED WARRANT. BE SURE TO ATTACH THIS FORM BACK TO BACK
WITH THE WARRANT.

172

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 27 1999

IN DISTRICT COURT BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**BENCH WARRANT--After Conviction**

**STATE OF OKLAHOMA,**  )
**Sequoyah County,**  )

THE STATE OF OKLAHOMA  )
        VS.  )    No.CF-98-58A, CF-98-481
AUBREY DALE JACOBS  )
████████, MULDROW OK 74948  )
███-56 ████1409  )    **NO BOND**

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**AUBREY DALE JACOBS** having been on the 7TH DAY OF DECEMBER, 1998, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :FAILURE TO APPEAR AND PAY MONIES DUE THE COURT IN THE AMOUNT OF $2036.00

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **AUBREY DALE JACOBS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 20TH DAY OF SEPTEMBER, 1999, By Order of the Court.

**BERNELL EDWARDS, COURT CLERK**

BY: *Maudie Webster*
                        DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____, 199____, at _____ o'clock _____M., and executed on the _____ day of _____, 199____, at _____ o'clock _____M. by _____

Dated this _____ day of _____ 199____.

SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY: *Travis Gobbet (853)*
                        DEPUTY

dms

173

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order. Last Name, First, Middle, suffix (please print or type) (show alias)

Jacobs, Joseph Dale   DOB █████ 76   SS# █████ 6130

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-98-481A | New Rule 8 | FTA + pay |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the _6th_ day of _October_, 19_99_.

_Maureen Webster_
Signature

AUTHORIZED BY

_Dennis M Sprouse_
JUDGE OF THE DISTRICT COURT

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

OCT 06 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,               )
      Plaintiff                   )
vs.                                  )   Case No. CF-98-00481A
JOSEPH DALE JACOBS                   )
▆▆▆▆▆▆                               )
C/O JUNE TINNEY                      )
GANS, OK  74436                      )
      Defendant                   )
  SS#:

  DOB: ▆▆▆/1976

Date: 10/06/99      State's Attorney: ROBBIE COWAN
             Defendant's Attorney: GERALD HUNTER

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

OCT 06 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

RULE 8 HEARING
(Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:


_____ $200.00 on or before 10-7-99  and then

_____ $200.00 per month on or before _____

then _____ per month on or before the ___ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 10-7-99 _____

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: *Defendant agreed to continue Community Service at Co Barn*
*Given credit for jailtime & community service up to date.*

TOTAL TO PAY $ *bal 1263⁰⁰*

_____
JOHN C. GARRETT
Judge of the District Court

_____
Defendant

*Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

BENCH WARRANT—After Conviction

**ISSUED**

**10/13/99**

STATE OF OKLAHOMA, )
    Sequoyah County       )

IN......District......COURT

THE STATE OF OKLAHOMA

vs.

Aubrey Dale Jacobs

DOB: ███56

Defendant.

No. CF-98-481

Bond $20,000

THE STATE OF OKLAHOMA

To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma—Greeting:

Aubrey Dale Jacobs ................................................having been on the 29th day

of January A.D. 19 99, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of Unlawful possesstion of controlled drug, Application to revoke

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above-named Aubrey Dale Jacobs and bring him before said Court for judgment, or if the said Court has adjourned for the term, deliver him to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 13th day of October A.D. 19 99. By Order of the Court.

**Berneli Edwards**
Court Clerk

BY _Amanda Woody_
                                                        Deputy.

176

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OLKLAHOMA,                     )
        Plaintiff                      )
vs.                                     )   Case No. CF-98-00481A
JOSEPH DALE JACOBS                      )
▮▮▮▮▮▮▮                                 )
                                        )
C/O JUNE TINNEY                         )
GANS, OK  74936                         )
        Defendant                      )
    SS#:                                   SEQUOYAH COUNTY, OKLAHOMA
    DOB: ▮▮▮/1976                          FILED
                                        IN DISTRICT COURT

Date: 10/19/99        State's Attorney:   ROBBIE COWAN    **OCT 19 1999**
                      Defendant's Attorney: GERALD HUNTER

                                        BERNELL EDWARDS, COURT CLERK
                      RULE 8 HEARING     BY _____ DEPUTY
                        (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:


_____ $75.00 on or before 11-27-99 and then

_____ $75.00 per month on or before 12-27-1999

then $75⁰⁰ per month on or before the 27ᵗʰ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before ~~11-27-99~~ _____

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

_____

TOTAL TO PAY $ bal # 1063⁰⁰

_____          _____
        Defendant              JOHN C. GARRETT
                                   Judge of the District Court
*Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

177

BENCH WARRANT—After Conviction

STATE OF OKLAHOMA, )
    Sequoyah County        )                    IN....District......COURT

            THE STATE OF OKLAHOMA

                    vs.

....Brandie Zane Price.......................          No...CF-98-481 .  SEQUOYAH COUNTY, OKLAHOMA
                                                                                      FILED
....DOB:........78.................                   Bond                  IN DISTRICT COURT
    #......5806              Defendant.               $10,000               NOV 10 1999

THE STATE OF OKLAHOMA
To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma—Greeting: BERNELL EDWARDS, COURT CLERK
                                                                                      BY _____ DEPUTY
    Brandie Zane Price................................................having been on the....29th..day
of..January...........A.D. 19.99..., duly convicted in the....District........Court of Sequoyah County,
State of Oklahoma, of the crime of...Poss of controlled drug with intent to distribute .....
....Application to impose...............................................................

    YOU ARE THEREFORE COMMANDED Forthwith to arrest the above-named........................

....Brandie Zane Price...........................and bring him before said Court for judgment, or if the
said Court has adjourned for the term, deliver him to the Sheriff of the County of Sequoyah; there to be
detained by said Sheriff until the further order of the Court.

    WITNESS MY HAND And seal of said Court this 2nd........day of...November.......A.D. 19.99..
    By Order of the Court.

                                        **Bernell Edwards**
                                        **Court Clerk**

                                        BY _Erma Merrill_
                                                                Deputy

_Served by Pamela L. Crutchfield_

ISSUED
4-6-00

BENCH WARRANT—After Conviction

STATE OF OKLAHOMA, )
   Sequoyah County    )

IN__District__COURT

THE STATE OF OKLAHOMA

vs.

____Joseph D. Jacobs_____

____DOB;___█████-56_____
                                       Defendant.

No. CF-98-481

Bond $10,000

THE STATE OF OKLAHOMA.

To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma—Greeting:

   Joseph D. Jacobs_____having been on the__12th____day of__April_____A.D. 19_99___, duly convicted in the__District_____Court of Sequoyah County, State of Oklahoma, of the crime of____Poss of Controlled Drug With_Intent To Distribute/___ __Appl. to Impose_____

    YOU ARE THEREFORE COMMANDED Forthwith to arrest the above-named_____ ___Joseph D. Jacobs_____and bring him before said Court for judgment, or if the said Court has adjourned for the term, deliver him to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

    WITNESS MY HAND And seal of said Court this____5th_____day of__April_____A.D. X9.2000.   By Order of the Court.

Bernell Edwards
Court Clerk

BY *Amanda Wood*
                       Deputy

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA, )
                Plaintiff, )
vs. )                          No.  CF-98-481
BRANDIE ZANE PRICE )
DOB: ▮▮/78  #▮▮▮▮5806 )
                Defendant. )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 1 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## APPLICATION TO IMPOSE JUDGMENT AND SENTENCE

COMES NOW, Dianne Barker Harrold, the duly elected, qualified, and acting District Attorney of Sequoyah County, and states to the Court that on the 29th day of January, 1999, the said Defendant entered his/her plea of guilty in the above entitled case, in the District Court of Sequoyah County, Oklahoma, to the charge of: POSSESSION OF CONTROLLED DRUG WITH INTENT TO DISTRIBUTE and POSSESSION OF MARIHUANA, as set out in the Information on file in this cause and that upon acceptance of said plea the Court ordered to defer the imposition of Judgement and Sentence in this cause for Five (5) years with the said defendant placed on probation during such period under the Supervision of the Department of Correction and same to continue during the good behavior of the defendant, with the power of the Court to impose Judgement and Sentence for good cause shown at any time prior to the expiration of the probationary term.

That subsequent to the said Order of deferment of imposition of Judgment and Sentence, the defendant violated the rules and conditions of probation in the following manner:

**Rule #9:** by violating city, state or federal law, and being arrested on October 21, 1999, by Sallisaw Police and charged with UTTERING A FORGED INSTRUMENT and KNOWINGLY CONCEALING STOLEN PROPERTY, Sequoyah County Case No. CF-99-549.

That the commission of the said acts against the laws of violations of probation by the defendant is good cause for the Court to impose Judgement and Sentence immediately.

Further, that it is necessary for the State to secure the attendance of the defendant at the hearing and such attendance might not come about unless the said defendant is taken into custody, and that the Court should issue a Bench Warrant for the arrest of the defendant pending such hearing.

WHEREFORE, applicant prays that the Court set a date for hearing this application and that the deferring of Imposition of Judgement and Sentence be set aside and that Judgment be imposed immediately and that the Court direct the Court Clerk to issue a Bench Warrant for the arrest of the defendant.

Dated this 27th day of October, 1999.

DIANNE BARKER HARROLD, District Attorney

BY: _____
         Assistant District Attorney

WITNESSES:
Daniel Beats, c/o Probation & Parole, Sallisaw, OK
David Bethany, Sallisaw PD
Rick Nicholson, Sallisaw PD

## FINDING OF PROBABLE CAUSE

The Undersigned Judge of the District Court, upon the above application hereby determines there to be probable cause for the issuance of a Bench Warrant and so orders.

Dated this ___1___ day of ____Nov____, 1999.
Bond set at $ 10,000.00

_____
JUDGE OF THE DISTRICT COURT

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,           )
                    Plaintiff,   )
vs.                              )        No.  CF-98-481
JOSEPH D. JACOBS                 )
                    Defendant.   )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR '4 2000

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

### APPLICATION TO IMPOSE JUDGMENT AND SENTENCE

COMES NOW, Dianne Barker Harrold, the duly elected, qualified, and acting District Attorney of Sequoyah County, and states to the Court that on the 12TH DAY OF APRIL, 1999, the said Defendant entered his/her plea of guilty in the above entitled case, in the District Court of Sequoyah County, Oklahoma, to the charge of: POSSESSION OF CDS WITH INTENT TO DISTRIBUTE and UNLAWFUL POSSESSION OF MARIHUANA, as set out in the Information on file in this cause and that upon acceptance of said plea the Court ordered to defer the imposition of Judgement and Sentence in this cause for FIVE (5) years with the said defendant placed on probation during such period under the Supervision of the Department of Correction and same to continue during the good behavior of the defendant, with the power of the Court to impose Judgement and Sentence for good cause shown at any time prior to the expiration of the probationary term.

That subsequent to the said Order of deferment of imposition of Judgment and Sentence, the defendant violated the rules and conditions of probation in the following manner:

**Rule #1:** by failing to report for the months of May, June, July, August and December, 1999.
**Rule #5:** by failing to carry out instructions given by Probation and Parole officer.
**Rule #9:** by violating city, state or federal law, and being arrested on February 2, 2000, for BURGLARY SECOND DEGREE and DOMESTIC BATTERY, Sebastian County Case No. CR-99-6989.
**Rule #15:** by failing to pay probation fees and being in arrears $140.00.

That the commission of the said acts against the laws of violations of probation by the defendant is good cause for the Court to impose Judgement and Sentence immediately.

Further, that it is necessary for the State to secure the attendance of the defendant at the hearing and such attendance might not come about unless the said defendant is taken into custody, and that the Court should issue a Bench Warrant for the arrest of the defendant pending such hearing.

WHEREFORE, applicant prays that the Court set a date for hearing this application and that the deferring of Imposition of Judgement and Sentence be set aside and that Judgment be imposed immediately and that the Court direct the Court Clerk to issue a Bench Warrant for the arrest of the defendant.

Dated this _8th_ day of MARCH, 2000.

DIANNE BARKER HARROLD, District Attorney
BY: _____
        Assistant District Attorney

WITNESSES:
Jerry Sizemore, c/o Probation & Parole, Sallisaw, OK

### FINDING OF PROBABLE CAUSE

The Undersigned Judge of the District Court, upon the above application hereby determines there to be probable cause for the issuance of a Bench Warrant and so orders.

Dated this _3_ day of ___April___ 2000.
Bond set at $ _10,000_

_____
JUDGE OF THE DISTRICT COURT

DATE 2/7/00

## CASE REPORT

TO:

_____ District Supervisor
_____ Probation/Parole Officer
_____ Restitution & Accounting
 xx   District Attorney _____Cowan_____ County_____
 xx   District Judge _____Nelson_____ County___Sequoyah___
_____ Compact Administrator_____ State _____
 xx   File

*charger File Rec'd 4-3-00*

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 5 2000

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

Name_JACOBS, Joseph_____ DOC#_274672____Race/Sex_W/M_DOB ■76__
Case#_CF-98-481___ Date sentenced_4/12/99_____Date Released/Paroled_____
Crime_ Possession of CD w/Intent to Distribute; Possession of Marijuana_____
Sentence Length_ 5 years_____Type Case_Deferred____Date Discharge_4/11/2004__


TYPE OF REPORT                    VIOLATION REPORT


<u>Instant Offense/Violation of Rules and Conditions</u>: JACOBS has violated the following rules and conditions of his probation:

<u>Rule #1</u>: JACOBS failed to report for the months of May, June, July August, and December of 1999.

<u>Rule #5</u>: On 4/21/99 JACOBS was instructed by SPPO Daniels to return for another visit on 5/11/99. JACOBS failed to report as instructed. On 11/16/99, JACOBS was instructed by PPO Sizemore to report on 12/14/99, and again he failed to report. In October of 1999, JACOBS was given permission to travel to Ft. Smith, AR in search of employment only. On November 23, 1999 JACOBS traveled to Ft. Smith but did not search for employment. He broke into his ex-girlfriend's residence and assaulted her.

<u>Rule #9</u>: On November 23, 1999, JACOBS used a credit card or something similar to gain access into his ex-girlfriend's apartment, according to a Ft. Smith Police report. JACOBS started an argument with his ex-girlfriend and then became physical. She attempted to contact the police but JACOBS pulled the phone cord out of the wall. Then he blocked the doorway so she couldn't get out of the apartment. JACOBS also pushed his ex-girlfriend down. Some point during the scuffle, JACOBS' ex-girlfriend was cut with a broken beer bottle. JACOBS left the residence shortly after he noticed the cut to his ex-girlfriend's hand. An arrest warrant was issued for JACOBS shortly after the incident. The charges, Burglary 2nd and Domestic Battery, are filed under 99-6989 in the Sebastian County Court Clerk's office. JACOBS was arrest on that warrant on 2/2/00 and is free on $10,000 bond. His next court date is unknown.

182

JACOBS, Joseph
CF-98-481
Violation Report Continued

<u>Rule #15</u>: JACOBS is currently $140 arrears in probation fees.

<u>Summary/Recommendation</u>: JACOBS reports living with his grandmother at ████████ in Gars, OK. JACOBS reported sporadic employment since being placed under supervision. JACOBS is currently in arrears $140 in probation fees. He has improved in his reporting habits. He still is not trying as hard as he can to gain employment.

This officer respectfully recommends an Application to Impose be filed and a bench warrant issued for JACOBS' arrest.

*Melanie Carter*
for Linda Cheatham
Team Supervisor
DICC

Jerry Sizemore, PPO
Probation and Parole Officer
104 D South Oak
Sallisaw, OK 74960

LC:JS:aem
2/10/00

ISSUED
4-6-00

**BENCH WARRANT—After Conviction**

STATE OF OKLAHOMA, )
    Sequoyah County      )

IN .....District..... COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

THE STATE OF OKLAHOMA

vs.

Joseph D. Jacobs

DOB: 7-10-56 ▮▮▮▮▮ 76
w/m Ssn# ▮▮▮▮▮ 6130 Defendant.

No. CF-98-481    APR 2 4 2000

Bond $10,000

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

THE STATE OF OKLAHOMA

To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma—Greeting:

    Joseph D. Jacobs _____ having been on the 12th day

of April _____ A.D. 19 99 , duly convicted in the District _____ Court of Sequoyah County,

State of Oklahoma, of the crime of ____ Poss of Controlled Drug With Intent To Distribute/

Appl to Impose _____

    YOU ARE THEREFORE COMMANDED Forthwith to arrest the above-named _____

Joseph D. Jacobs _____ and bring him before said Court for judgment, or if the
said Court has adjourned for the term, deliver him to the Sheriff of the County of Sequoyah; there to be
detained by said Sheriff until the further order of the Court.

    WITNESS MY HAND And seal of said Court this 5th day of April _____ A.D. 19 2000.
By Order of the Court.

Bernell Edwards
Court Clerk

BY _Amanda Wood_
                    Deputy

No._____

In_____Court

THE STATE OF OKLAHOMA

vs.

_____

_____

Defendant

## BENCH WARRANT

(After Conviction)

FILED

This_____ day of _____A.D., 19\_\_\_\_

_____
District Clerk

By _____ Deputy.

SHERIFF'S RETURN

RECEIVED the within Writ on the_____day of_____19\_\_\_\_, at

_____o'clock \_\_\_\_\_M., and executed on the_____day of_____19\_\_\_\_,

at_____o'clock \_\_\_\_\_M., by_____

Dated this\_\_\_\_\_day of_____19\_\_\_\_

_____

Sheriff of_____County Oklahoma

By_____
Under Sheriff. Deputy.

ISSUED
4·6·00

BENCH WARRANT—After Conviction

STATE OF OKLAHOMA, )
   Sequoyah County    )

IN...............District...............COURT

        THE STATE OF OKLAHOMA

                vs.

_____Joseph D. Jacobs_____

_____DOB:_____ ﾠ

SSN #_____ 6150   Defendant.

No. CF-98-481

Bond $10,000

THE STATE OF OKLAHOMA

To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma—Greeting:

    Joseph D. Jacobs_____having been on the__12th____day

of__April_____A.D. 19_99__, duly convicted in the__District_____Court of Sequoyah County,

State of Oklahoma, of the crime of_____Poss. of Controlled Drug With__Intent To Distribute/___

__Appl. to Impose_____

    YOU ARE THEREFORE COMMANDED Forthwith to arrest the above-named_____

___Joseph D. Jacobs_____and bring him before said Court for judgment, or if the said Court has adjourned for the term, deliver him to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

    WITNESS MY HAND And seal of said Court this____5th_____day of__April_____A.D. X9 2000. By Order of the Court.

Bernell Edwards
Court Clerk

BY _Amanda Wood_____
                        Deputy

186

WARRANT CLEARANCE

WARRANT # _CF-98-481_

WARRANT NAME _Jacobs, Joseph D._

DATE & TIME CLEARED _4/22/00      00:45_

WARRANT CLEARED BY:

ARREST _X_      OFFICER SERVING _821 / Roy Coleman_

AGENCY _Sequoyah County S.O._

CANCEL_____      OFFICIAL DIRECTING WARRANT CANCELLATION

_____

WAS WARRANT PULLED FROM FILE?               (YES)      NO

IF NO, EXPLAIN WHY NOT _____

WAS WARRANT MARKED OFF BOOK?               (YES)      NO

IF NO, EXPLAIN WHY NOT _____

WAS WARRANT CANCELLED FROM NCIC?          (YES)      NO

IF NO, EXPLAIN WHY NOT _____

WAS WARRANT REMOVED FROM HOLDS BOOK?      YES      (NO)

IF NO, EXPLAIN WHY NOT _No hold placed_

SHERIFF'S OFFICE EMPLOYEE SIGNATURE _Barbara S. Keel_

NOTE:   AFTER COMPLETING THIS FORM, STAPLE THIS FORM BACK TO
BACK WITH THE WARRANT AND PLACE IN THE FOLDER MARKED
"SEND TO TERESA."

ISSUED
4-6-00

BENCH WARRANT—After Conviction

STATE OF OKLAHOMA, )
    Sequoyah County    )

IN ....District.... COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

THE STATE OF OKLAHOMA

vs.

____Joseph D. Jacobs_____

____DOB;___7-10-56____ ████████-76__

w/m  SSN# ████████ 6130  Defendant.

No. CF-98-481  .   APR 2 4 2000

Bond $10,000

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

THE STATE OF OKLAHOMA

To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma—Greeting:

___Joseph D. Jacobs_____having been on the__12th____day

of__April_____A.D. 19_99__, duly convicted in the__District_____Court of Sequoyah County,

State of Oklahoma, of the crime of____Poss-of-Controlled-Drug-With-Intent To Distribute/---

__Appl. to Impose_____

    YOU ARE THEREFORE COMMANDED Forthwith to arrest the above-named_____

___Joseph D. Jacobs_____and bring him before said Court for judgment, or if the
said Court has adjourned for the term, deliver him to the Sheriff of the County of Sequoyah; there to be
detained by said Sheriff until the further order of the Court.

    WITNESS MY HAND And seal of said Court this____5th_____day of__April_____A.D. X9 2000.
By Order of the Court.

**Bernell Edwards**
**Court Clerk**

BY _Amanda Wood_____
                      Deputy

No._____

In_____Court

THE STATE OF OKLAHOMA

vs.

_____

_____

Defendant

## BENCH WARRANT

(After Conviction)

FILED

This_____ day of _____A.D., 19____

_____
District Clerk

By _____ Deputy.

SHERIFF'S RETURN

RECEIVED the within Writ on the_____day of_____19____, at
_____o'clock ____.M, and executed on the_____day of_____
at_____o'clock _____M., by_____

Dated this_____day of_____19____

Sheriff of_____County Oklahoma

By_____Under Sheriff.

_____Deputy.

DEPARTMENT OF CORRECTIONS
DIVISION OF PROBATION AND PAROLE

Date: April 10, 2000

- CASE REPORT -

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAY 2 3 2000

BERNELL EDWARDS COURT CLERK
BY _____ _____ DEPUTY

TO:

| | | | |
|---|---|---|---|
| _____ | District Supervisor | | |
| _____ | Restitution and Accounting | | |
| X | District Attorney | Cowan | Sequoyah County |
| X | District Judge | Honorable David Nelson | Sequoyah County |
| _____ | Compact Administrator | | |
| X | File | | |

Name _____ Jacobs, Joseph _____   Race/Sex   W/M   DOB ▮ 76

Case & DOC # _____ SY-CF-98-481; 274672 _____   Crime _____ Pssn CD w/ Intent

Date of Sentencing _____ 4/12/99 _____   Date Released/Paroled _____

Sentence Length _____ 5 Years _____   Type Case _ Deferred _  Discharge Date _ 4/11/04

TYPE OF REPORT:          **SUPPLEMENTAL REPORT**

**REFERENCE:** Violation report completed 02/07/00.

**CASE STATUS:** JACOBS continues to violate the Rules and Conditions of his probation by:

Rule #2…By using illegal drugs…Jacobs tested positive for Marijuana and Methamphetamine on February 15, 2000. On that same date JACOBS was referred to Redbird Smith Health Clinic for a Substance Abuse Evaluation.

Rule #3…By changing address without first consulting the probation officer…On March 7, 2000, JACOBS reported his address as being with his grandmother at HC 64 Box 535 in Gans, Oklahoma. Attempted home visits on March 1, 6 and 29 of 2000 revealed JACOBS had not been seen in many weeks and furthermore his grandmother advised this officer he was not welcome at her residence.

Rule #5…By not allowing home visits…by not following instructions…JACOBS has not reported his correct address and therefore has not allowed this officer to conduct home visits. On March 7, 2000, JACOBS was instructed to complete a Substance Abuse Evaluation, to this date he has yet to comply.

Rule #7…By perpetuating falsehoods or deceptions…JACOBS reports his address as being with his grandmother at HC 64 Box 535 in Gans, Oklahoma. Attempted home visits on March 1, 6 and 29 of 2000 revealed JACOBS had not been seen in many weeks and furthermore his grandmother

JACOBS, JOSEPH
Page 2

advised this officer he was not welcome at her residence.

## RECOMMENDATION:

JACOBS general conduct is extremely poor as evidenced by his blatant disregard for his Rules and Conditions of Probation.  He refuses to tell the truth to his probation officer or follow instructions. His current address is unknown, as is his employment status.

This officer respectfully recommends an Amended Application to Impose be filed.  It is further recommended JACOBS be accelerated to incarceration.


Respectfully Submitted,

*Linda Cheatham*

Linda Cheatham, Team Supervisor
District I Community Corrections

Jerry Sizemore, PPO
District I Community Corrections
104 D S. Oak
Sallisaw, OK 74955

2

191

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

*Oklahoma*
Plaintiff

vs. *Joseph D Jacobs*
Defendant

CASE NO: *CF-98-481A*

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT
MAY 23 2000
BERNELL EDWARDS COURT CLERK
BY *Occi*
DEPUTY

APPLICATION FOR APPOINTED COUNSEL
AND
AFFIDAVIT OF FINANCIAL INABILITY TO EMPLOY COUNSEL

I swear and affirm that I am the party in the above entitled action. I want an attorney to represent me in this case. I am financially unable to obtain the services of an attorney without causing substantial hardship to myself or to my family. The following information is true and is given and intended to be relied upon by the court and other persons or agencies in determining my eligibility for legal services to be furnished to me at public expense.

PLEASE FILL IN ALL SPACES BELOW AND SIGN YOUR NAME UNDER OATH IN FRONT OF THE JUDGE, A NOTARY OR THE COURT CLERK. IF A QUESTION DOES NOT APPLY TO YOU, PLEASE WRITE IN THE BLANK "DOES NOT APPLY".

I. GENERAL INFORMATION          DATE: *5-09-00*
NAME: *Joseph Jacobs*
ADDRESS: ▮▮▮▮ *GANS OK,*
TELEPHONE: *776-0558*   MESSAGE NUMBER: *775-3316*
SOCIAL SECURITY NO: ▮▮▮ *6130* AGE: *24* DOB: ▮▮▮ *76*
SINGLE ( ✔ ) MARRIED ( ) SEPARATED ( )
SPOUSE'S NAME: *NA*
ADDRESS: *NA*
TELEPONE: *NA*
HOW MANY PEOPLE ARE IN YOUR HOUSEHOLD? *NA*
NAME AND AGES: *NA*

ARE YOU CLAIMED AS A DEPENDENT BY A PARENT OR GUARDIAN? YES ( ) NO ( X )

II FAMILY INCOME
YOUR MONTHLY TAKE HOME PAY: *0*    WEEKLY TAKE HOME PAY: *0*
YOUR EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY)
*Don't Have One*
YOUR EMPLOYER'S PHONE NUMBER: *Don't Have One*
SPOUSE'S SALARY: *NA*
SPOUSE'S EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY
*NA*
SPOUSE'S EMPLOYER'S PHONE NUMBER: *NA*
IS ANY OTHER MEMBER OF YOUR HOUSEHOLD EMPLOYED? YES( ) NO( X )
WHO? *None*
WHERE? *None*
SALARY? *None*
DEPENDENT'S EMPLOYER: *None*
OTHER SOURCE OF INCOME OR BENEFITS (INCLUDE INTEREST, DIVIDENDS, ROYALTIES, ETC.) *None*
TOTAL FAMILY INCOME FOR PRECEDING MONTH WAS $ *0.00*

192

JB

CM-08-65

3275

# POWER OF ATTORNEY

Judy Berglan
Berglan Bail Bonds
112 N. Main St.
Sallisaw, OK 74955

KNOW ALL MEN BY THESE PRESENTS:  That Judy Berglan, Professional Bondsman licensed by the State of Oklahoma, does constitute and appoint the below named agent as my Attorney in Fact to execute Bail Bonds only in my name and on my behalf as Surety. *THIS POWER MUST BE ATTACHED TO AND FILED WITH BAIL BOND WRITTEN ON THE DEFENDANT NAMED BELOW AND IS VOID IF ALTERED OR ERASED*

Dated This _____15_____ day of _____JUNE_____ , 20_08_

Defendant Name:

_____TRAVIS_____ _____CRAWFORD_____
(First)                              (Middle)                              (Last)

D.O.B. ____▉▉▉64____   Amt. of Bond: $___1500ᵉᵉ___   Premium: $___150ᵉᵉ___

Offense:___POSS MARJ 2ⁿᵈ, POSS PARA___

Case Number: _____   Court: ___DISTRICT___

City: ___SALLISAW___   Court Date: ___JUNE 18 10A___   Posted For: ___BERGLAN___

Rewrite of Power#:_____   Dated: _____   Amount: $ _____

_____
Executing Agent's Signature

_____Judy Berglan_____
Professional Bondsman's Signature

KEB502905

LIST ANY DEFENDANTS CHARGES WITH YOU ___None___

VIII

1. HAVE YOU TRANSFERRED OR SOLD ANY ASSETS SINCE CHARGES WERE FILED IN THE CASE? YES ( ) NO (✓) IF SO, DESCRIBE THE BUYER AND THE AMOUNT RECEIVED.

_____

2. HAVE YOU RETAINED COUNSEL IN THE CASE OR IN ANY OTHER PENDING CRIMINAL CASE? YES ( ) NO (✓) IF SO, STATE THE CASE NUMBER, COURT ATTORNEY AND AMOUNT PAID TO ATTORNEY FOR SERVICES: _____

3. DO YOU HAVE ANY FRIENDS OR RELATIVES WHO ARE ABLE AND WILLING TO ASSIST YOU IN HIRING COUNSEL AND PAYING FOR TRANSCRIPTS? YES ( ) NO (✓) IF SO, HAVE THOSE PERSONS BEE ASKED TO HELP? YES ( ) NO (✓)

4. IF ANY FRIEND OR RELATIVE HAS GIVEN PREVIOUS FINANCIAL ASSISTANCE IN THIS CASE, BUT IS NO LONGER ABLE OR WILLING TO DO SO, AN AFFIDAVIT TO THAT EFFECT FROM THAT PERSON SHOULD BE ATTACHED. IS THAT AFFIDAVIT ATTACHED YES( ) NO(✓)

IX. NAMES OF THREE ATTORNEY'S YOU CONTACTED:

1. NAME: _Bill oreudorff_
   WHEN DID YOU CONTACT THIS ATTORNEY? _5-8-00_
   HOW DID YOU CONTACT THIS ATTORNEY? _don't Take collect calls_
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO (✓)

2. NAME: _Mister Hunter_
   WHEN DID YOU CONTACT THIS ATTORNEY? _5-8-00_
   HOW DID YOU CONTACT THIS ATTORNEY? _don't Take collect calls_
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO (✓)

3. NAME: _Monte E. Johnson_
   WHEN DID YOU CONTACT THIS ATTORNEY? _5-8-00_
   HOW DID YOU CONTACT THIS ATTORNEY? _don't Take collect calls._
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO (✓)

X. I DECLARE UNDER PENALTY OF PERJURY THAT THE INFORMATION I HAVE PROVIDED IS TRUE AND CORRECT. I UNDERSTAND THAT I MAY BE PROSECUTED FOR PROVIDING FALSE INFORMATION IN THIS APPLICATION AND AFFIDAVIT. I UNDERSTAND THAT I MUST INFORM THE OKLAHOMA INDIGENT DEFENSE SYSTEM OF ANY CHANGE IN MY FINANCIAL SITUATION THAT MAY CHANGE THE INFORMATION I HAVE PROVIDED. I FURTHER DECLARE THAT I HAVE CONTACTED THREE ATTORNEYS, LICENSED TO PRACTICE LAW IN THIS STATE, AND I AM WITHOUT FUNDS TO PAY AN ATTORNEY TO REPRESENT ME OR TO PAY FOR TRANSCRIPTS AND COST ASSOCIATED WITH THIS CASE.

DATED THIS _05_ DAY OF _19_ _19 2000_

DEFENDANT _Joseph Jacob_
LEGAL GUARDIAN _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS _22_ DAY OF _May_ _2000_

comm. exp. _____

PUBLIC NOTARY OR CLERK OR JUDGE

I FIND THAT THE DEFENDANT IS UNABLE TO PAY THE APPLICATION FEE AND I HEREBY WAIVE THE FEE.

_____ JUDGE   5-22-00

APPOINTMENT OF INDIGENT DEFENSE COUNSEL
APPROVED _DW_   DENIED _____

## NOTICE

A copy of this APPLICATION AND AFFIDAVIT shall be sent to the prosecuting attorney or office of attorney general, whichever is applicable, for review and, upon request, the court shall hold a hearing to determine your eligibility for legal services to be furnished to you at public expense.

## IMPORTANT NOTICE

The court shall order you to pay the costs of your legal representation in total, or in installments. The court shall set the amount and due of each installment payment. The costs shall be paid to the court clerk in your county. The costs shall be a debt against you until paid and shall subject you to debt collection procedures as provided by law. The costs shall be deducted from any state income tax refund due you until the total costs are paid.

5/22/00



SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAY 16 2000

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said
defendant be released, if in your custody for no other cause, immediately upon receipt of this order.
Last Name, First, Middle, suffix (please print or type) (show alias)   ▮▮▮▮▮ 1409

Jacobs Aubrey Dale

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| | Bond lowered to $40,000.00 | Poss CDS w/int AFCF |
| ~~CF98-35A~~ | | FTA, FTP Appl to Revob |
| CR98-481 | No Hold for Crawford Co. | Appl to Revok. |
| | | |
| | | Hold for Crawford Co. |
| | | |

In and for the District Court of Sequoyah County, State of Oklahoma,
witness my hand this the _13_ day of _May_ ~~19~~ 2000.

Signature Jenny Manley

AUTHORIZED BY

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

_____
JUDGE OF THE DISTRICT COURT

196

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 1 9 2000

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order. Last Name, First, Middle, suffix (please print or type) (show alias)

Jacobs, Joseph Dale D.O.B. ▓▓▓▓ 76 S.S.N ▓▓▓▓ 6130

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-98-181A | Transported to D.O.C. by Tom Lowe Cecil Purty | Hold for D.O.C. |
| | | |
| | | |
| | | |
| | | |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the __16__ day of __June__ , 2000 .

_Jimie Faulkner_
Signature

AUTHORIZED BY

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

JUDGE OF THE DISTRICT COURT

197

**OKLAHOMA DEPARTMENT OF CORRECTIONS**
**RECEIPT FOR PRISONER/DOCUMENTS/DETAINER**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Name and Address of Other Agency:      Name and Address of Institution/CCC:   JUN 20 2000

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

*SEQUOYAH* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*   *LARC* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RE: *JOSEPH JACOBS*         JUDGMENT/WARRANT/ORDER: *98-481*

YOUR REF:                  OFFENSE:

OUR REF:                   TERM:

THE PARAGRAPH(S) CHECKED BELOW INDICATE(S) OUR DISPOSITION OF THE JUDGMENT/WARRANT/ORDER:

✓ RECEIVED ~~AS NEW RECEPTION~~/PAROLE VIOLATOR.

___ A DETAINER HAS BEEN FILED AGAINST HIM/HER IN YOUR FAVOR. THE PRISONER'S CURRENT RELEASE

DATE IS_____, AND HIS/HER PAROLE ELIGIBILITY DATE IS _____.

___ WE WILL NOTIFY YOU APPROXIMATELY 30 DAYS PRIOR TO RELEASE.

___ PRISONER WILL BE HELD FOR SERVICE ON THE ABOVE JUDGMENT AND SENTENCE.
___ FORM I OF THE AGREEMENT ON DETAINER IS BEING SERVED ON THE PRISONER.

___ WE ARE RETURNING THE WARRANT YOU FILED AS A DETAINER AGAINST THE ABOVE NAMED,

WHICH HAS BEEN WITHDRAWN IN COMPLIANCE WITH YOUR REQUEST OF _____.

___ OUT WITNESS PRISONER RELEASED/RECEIVED BY OKLAHOMA DEPARTMENT OF CORRECTIONS.

___ PRISONER RELEASED ON/RETURNED FROM APPEAL BOND.

___ OTHER _____

BY: _____   DATE AND TIME: *6-16-00*
     Signature and Title of Receiving Official

DISTRIBUTION:
   Original    Other Agency
   1st Copy    Inmate
   2nd Copy    Field File

DOC 060211B File in Section 1 (    )

I:\OPS\OPSSIG\OPSSIG06\OP060211.WPD

198

# District Court of the State of Oklahoma



**FIFTEENTH JUDICIAL DISTRICT**
**MUSKOGEE COUNTY COURT HOUSE**
**P.O. BOX 1350 - MUSKOGEE, OKLAHOMA 74402-1350**

**MIKE NORMAN**
**District Judge**

October 31, 2000

**PHONE**
**918/687-1950**

Brandie Price #274278
EWCC - RTP
P.O. Box 315
Taft, OK 74468-0315

Dear Ms. Price:

I am in receipt of your letter dated October 30, 2000, requested a judicial review in your three felony cases.

I have reviewed your letter, the enclosures, your felony files and spoken with the RTP director. I find it admirable that you wish to enroll in college. However, I find it equally as important to finish the RTP program as originally agreed. I believe it is necessary in life to follow through with what you start before you begin something new and that the RTP program has something invaluable for you to learn.

I hope upon completing the RTP program that you will continue with your college education.

Very truly yours,

Mike Norman
District Judge

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 0 2 2000

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

Judge Mike Norman,                                    October 30, 2000

Sir, my name is Brandie Price #274278. I am currently incarcerated at EWCC in the R.T.P program in Taft, OK. I was sentenced before you on November 16, 1999 on case #'s Crf 98-481, Crf 99-61, + Crf 99-549. I am writing you to request a judicial review so that I may be released this year in order to start college classes at Conners State College in the spring of 2001. Originally, I had planned to hire Mr. Harry Scanfus to file for a judicial review for me for November 2000. I sent Mr. Scanfus letters from Amy Aldridge, an instructer from CSC and NSU, and from Dr. Clint Davis, supervisor and director of education at EWCC, regarding my current status in college and my scholarship and enrollment at Conners State College for the spring of 2001. However, Mr. Scanfus wants $1500. up front before he will attempt to get me a court date. Unfortunately, I do not have the money. Mr. Scanfus has already pulled my file and talked to the D.A.'s office who said they would not oppose the motion but he will not file for the court date until I pay him the money, and, right now, I simply do not have it. I have been working very closely with Suzanne Edmondson and Dr. H. Clint Davis here at EWCC and the two have been a tremendous help in providing the opportunity for me to continue my college education. Dr. Davis said that if you have any questions or would like to talk to him about me, feel free to call him, he would be more than happy to talk to you. Sir, I am asking for the chance to do things right this time. I have worked very hard on myself in the 10½ months I have been in this program. I simply do not want this chance to slip away. Please set me a court date for judicial review on or before the 16th of November so that I may be released and can pre-enroll at Conners State College to attend the Spring semester in January of 2001. I have enclosed previous evaluations, a letter from B. Williams at CSC, a letter from Amy Aldridge at CSC/NSU, and a ~~recommendation~~ letter from Dr. H. Clint Davis. I have also enclosed my academic report from the Spring + ~~Fall~~ Summer semesters and currently I have a 4.0 gpa for the Fall semester. Please consider my

request for judicial review and reply to me at your earliest convieniance. Thank you so much.

Sincerly,

Brandie Price

P.S. I apologize for the letter being hand-written.

## EDDIE WARRIOR CORRECTIONAL CENTER

October 6, 2000

Harry Scoufus

**RE:     Brandy Price**

Brandy Price is currently one of my college students at Eddie Warrior Correctional Center. This is her third semester and she has always performed at the top of her class. She is extremely bright and demonstrates the capacity to excel in any chosen field of study. I have noticed a change in her attitude and her self-image. She is much more in control emotionally and exhibits increased maturity. Brandy is very personable and will be successful wherever she chooses to go to college. I have personally observed these changes and would recommend her acceptance to any college or university without any reservations. Brandy has had some personal reversals in her life, but she is a winner and I would not be surprised to see her introduced someday as Brandy Price, Ph. D.

Please note the attached letter from Amy Aldridge regarding a possible scholarship. I would like to lend my support to this. If you can find any way possible to help with this project it would be appreciated. I feel that a review of her High School transcript, CPT, and ACT would prove to you her potential.

Sincerely,

Dr. H. C. Davis
Supervisor of Education

September 25, 2000

Dear Mr. Scofus,

I'm writing in regards to a client of yours, Brandie Price. Miss Price was a student of mine in Speech 1113 at Dr. Eddie Warrior Correctional Center in the spring semester 2000. She was a model student, who excelled in communication performance and theory. Throughout the course, she continuously impressed me with her dedication, creativity and willingness to motivate others. In fact, I'm so impressed with Miss Price's intelligence and initiative that I have contacted the forensics director at Connors State College in Warner, Okla., to make arrangements for Miss Price to continue her education.

Kim Hayes, CSC forensics director, is making arrangements for Miss Price to join the speech and debate team upon her release from prison. Mrs. Hayes is also planning on offering Miss Price a scholarship of $400 a semester to compete for CSC. I have also made contact with Roger Thomason, CSC director of printing services, about offering Miss Price a job with the CSC Print Shop. He is considering the offer. After Miss Price graduates from CSC with an associate's degree, she will be welcomed onto the NSU speech and debate team. Dr. David Scott, NSU forensics director, has already agreed to this and will provide Miss Price a scholarship based upon the availability of funds at the time she begins NSU.

Miss Price expressed concern about getting involved with a 12-step program after release from EWCC. I have contacted Monarch Narcatics Anonymous, 501 Fredonia, Muskogee, Okla. about their 12-step program. They are in the process of sending me a meeting list. They have a program for Miss Price.

Miss Price has also expressed an interest in speaking to area youth about the dangers of alcohol and drugs. I have made some initial contact with area schools and many have expressed interest for Miss Price to visit their facilities.

On a personal note, I believe in Brandie Price. I come in contact with hundreds of college students a day. She is as dedicated and determined as anyone I have ever known. She will succeed in life after prison. I will be here to mentor and encourage her. She's got a bright future ahead of her. I'm thankful to be a part of it. If you have any questions, please do not hesitate to call me: 918.456.5511, Ext. 4790 or e-mail: aldridga@nsuok.edu.

Sincerely,

Amy N. Aldridge, Adjunct Instructor
Connors State College

203



**Connors State College**

*Warner/Muskogee*
Rt. 1 Box 1000
Warner, OK 74469-9700
918  463-2931

Advisement ar
Student Admission Servic

October 20, 2000

Dr. H. C. Davis
Supervisor of Education
Eddie Warrior Correctional Center
PO Box 315
Taft, OK 74463

Dear Dr. Davis:

Thank you for your letter referring Ms. Brandy Price to our institution. It is always exciting to hear the success stories from Eddie Warrior. It is equally exciting to know that Connors State College has been a part of that success and will continue to help in meeting educational goals.

Enclosed you will find an application for financial aid which Ms. Price should complete and mail as soon as possible. Please have her direct any questions about the application to the Financial Aid Office. She should be eligible for federal benefits after January. Although, we no longer have non-traditional fee waivers available for this academic school year, Ms. Hayes could award her with a departmental fee waiver from speech and debate. Once she registers for spring classes, Ms. Hayes can process her award.

Please encourage Brandy to pre-register for spring 2001 as soon as the schedules are available. I would be happy to help her with her class schedule if she would need assistance. My e-mail address is bgwilliams@connors.cc.ok.us.

We are looking forward to having Brandy on our campus. If you need additional information or assistance, please feel free to contact me at 918/463-2931, ex 6309.

Sincerely,

Billie Williams
Student Admissions and Advisement

cc: Dr. Jo Lynn Digranes

274278

RTP

## Unofficial Academic Record

PRICE, BRANDIE ZANE                                    ██████ 5806

### Unofficial CONNORS STATE COLLEGE

Secondary Schools:
   MULDROW SENIOR HIGH SCHOOL          Graduated   May 1997

Test Scores:
   06-07-00   PROF   AM H=1

Current Academic Program:
   Connors State College
      Associate of Arts
         Major:   General Studies

------------------------Spring 2000------------------------

Admitted Program:
   Connors State College
      Associate of Arts
         Major:   General Studies

----------------------------------------------------------------
HIST1493E01   HISTORY TO U.S. SN 1865      A    3.00   12.00
SPCH1113E01   INTRO TO ORAL COMMUNICATION  A    3.00   12.00
----------------------------------------------------------------

|              | AHRS | EHRS | QHRS | QPTS  | GPA   |
|--------------|------|------|------|-------|-------|
| Current      | 6.00 | 6.00 | 6.00 | 24.00 | 4.000 |
| Institution  | 6.00 | 6.00 | 6.00 | 24.00 | 4.000 |
| Cum Grad/Ret | 6.00 | 6.00 | 6.00 | 24.00 | 4.000 |

----------------------Summer 2000----------------------   Psyc
POLS1113E01   AMERICAN FED GOVERNMENT          (3.00)
SOCI1113E01   PRIN OF SOCIOLOGY                (3.00)        Soc
----------------------------------------------------------------

|              | AHRS  | EHRS | QHRS | QPTS  | GPA   |
|--------------|-------|------|------|-------|-------|
| Current      | 6.00  | 0.00 | 0.00 | 0.00  | 0.000 |
| Institution  | 12.00 | 6.00 | 6.00 | 24.00 | 4.000 |
| Cum Grad/Ret | 12.00 | 6.00 | 6.00 | 24.00 | 4.000 |
| Cumulative   | 12.00 | 6.00 | 6.00 | 24.00 | 4.000 |

--------------End of CONNORS STATE COLLEGE------------------

*Credits have been sent to
   case manager*

Date 06-07-00          Page  1 of  1          Time 04:38 PM

## MONTHLY INMATE EVALUATION TIME CREDIT REPORT

NAME _Price Brandie_          DOC# _274278_       FACILITY_____

EVALUATION PERIOD _May 2000_       ASSIGNMENT _College Student_____

PAY PERIOD_____          TASK_____

1. ATTENDANCE
   ___ 0 Absent more than 3 days
   ___ 2 Absent 2-3 days
   ___ 4 Absent 1 day
   _✓_ 6 No absences

2. OBSERVANCE OF SAFETY RULES
   ___ 0 Unacceptable
   ___ 1 Observes rules when watched
   ___ 2 Observes rules most of the time
   ___ 4 Observes rules at all times
   _✓_ 5 Helps promote safety

3. INITIATIVE AND SKILL DEVELOPMENT
   ___ 0 Unacceptable
   ___ 1 Marginal
   ___ 3 Fair
   ___ 5 Good--Upper 50%
   _✓_ 7 Seeks responsibility, self starter

4. QUALITY OF WORK
   ___ 0 Unacceptable
   ___ 1 Marginal
   ___ 3 Fair
   ___ 5 Good--Upper 50%
   _✓_ 8 Very low errors--Top 20%

5. CARE OF WORKING AREA
   ___ 0 Unacceptable
   ___ 1 Needs reminding
   ___ 2 Fair
   ___ 3 Average--Sustains acceptable level
   _✓_ 5 Maintains area neat and clean

6. CARE OF EQUIPMENT, MATERIALS, STOCK
   ___ 0 Unacceptable
   ___ 1 Marginal
   ___ 2 Fair
   ___ 3 Careful, minimal losses--Upper 50%
   _✓_ 5 No losses, keeps in proper condition

7. QUANTITY OF WORK
   ___ 0 Unacceptable
   ___ 2 Marginal
   ___ 4 Fair
   ___ 6 Good--Upper 50%
   _✓_ 8 Exceptional--Top 20%

8. ATTITUDE TOWARD PEERS AND SUPERVISOR
   ___ 0 Unacceptable
   ___ 1 Marginally cooperative
   ___ 3 Generally cooperative
   ___ 4 Usually cooperative
   _✓_ 6 Full cooperation, promotes harmony

TOTAL POINTS _50_ (See reverse side for interpretation)
COMMENTS_____

MONTH/YEAR COVERED_____ TOTAL CREDIT_____

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

_____
Signature of person preparing evaluation

_____
Signature of person reviewing evaluation          Inmate Signature

I:\DOCFORMS\060211M.WPD                              DOC 060211M (01S

## RT MONTHLY EVALUATION REPORT

NAME __PRICE  BRANDIE__     DOC# __274278__     FACILITY __EWCC/RTP__
EVALUATION PERIOD __1/1-31/00__     STAFF SIGNATURE_____

### TASK ASSIGNED DURING THIS PERIOD

1. OBSERVANCE OF RULES
_____0  UNACCEPTABLE OBSERVES RULES WHEN UNDER
           SUPERVISION
_____2  OBSERVES CARDINAL RULES AT ALL TIMES.
__✓__4  OBSERVES MAJOR RULES  MOST OF THE TIME
_____6  OBSERVES MAJOR AND CARDINAL RULES
           AND HELPS PROMOTE THE HEALTH OF THE
           COMMUNITY.

2. PERSONAL HYGIENE AND LIVING AREA
_____0  UNACCEPTABLE
_____2  MARGINAL, IMPROVEMENT NEEDED
_____4  GOOD DEVELOPING WELL
__✓__6  EXCELLENT METICULOUS IN APPEARANCE AND
           PAYS  CLOSE ATTENTION TO DETAILS REGARDING
           LIVING  AREA.

3. QUALITY OF WORK
_____0  MARGINAL
_____2  FAIR
_____4  GOOD UPPER 50%
__✓__6  EXCELLENT, VERY LOW  ERRORS--TOP 20%

4. PHYSICAL CONDITIONING
_____0  UNACCEPTABLE COMPLAINS AND DOES NOT
           PARTICIPATE AS EXPECTED.
_____2  MARGINAL PARTICIPATION UNRELATED TO
           MEDICAL CONDITION
__✓__4  GOOD PARTICIPATION SHOWS ENTHUSIASM.
           PHYSICAL CONDITIONING RECORD SHOWS
           MARKED IMPROVEMENT.
_____6  EXCELLENT PARTICIPATION SHOWS
           ENTHUSIASM, INTEREST AND COOPERATION.
           PHYSICAL CONDITIONING RECORD SHOWS
           MARKED IMPROVEMENT.

5. REGIMENTATION MILITARY DEMEANOR
_____0  UNACCEPTABLE OBSERVES MILITARY DEMEANOR
           WHEN REMINDED.
_____2  OBSERVES MILITARY DEMEANOR
           MOST OF THE TIME
_____4  OBSERVES MILITARY DEMEANOR
           AT ALL TIMES
__✓__6  OBSERVES MILITARY DEMEANOR
           AT ALL TIMES AND HELPS  OTHERS
           MAINTAINING THEIRS.

6. T.C.  PARTICIPATION AND ROLE MODELING
_____0  UNACCEPTABLE LEVEL OF
           PARTICIPATION. DISPLAYS NEGATIVE
           BEHAVIOR  AND  USES INAPPROPRIATE
           RESPONSES TO COMMUNITY.
_____2  MARGINAL PARTICIPATION AND USE OF
           THERAPEUTIC TECHNIQUES AND CONCEPTS.
           UTILIZES SOME COPING SKILLS BUT MAY BE
           IN A LEARNING STAGE OF ROLE MODELING.
__✓__4  GOOD PARTICIPATION IN T.C. UTILIZES
           CONCEPTS AND TECHNIQUES.  HAS GOOD
           COPING SKILLS AND USES CORRECT
           RESPONSES IN THE T.C. THE T.C
           RECOGNIZES GOOD QUALITIES TO ROLE
           MODEL.
_____7  EXCELLENT PARTICIPATION  IN T.C. SHOWS
           INITIATIVE WHILE USING  THERAPEUTIC
           TECHNIQUES AND CONCEPTS. DISPLAYS
           EXCELLENT COPING SKILLS . TAKES
           RESPONSIBILITY FOR HER BEHAVIOR AND
           EXHIBITS LEADERSHIP ABILITY.
           PROMOTES HARMONY AND IS ACCEPTED
           BY THE COMMUNITY AS A ROLE  MODEL.

7. ATTITUDE TOWARD STAFF AND PEERS
_____0  UNACCEPTABLE, DISPLAYS
           INAPPROPRIATE  BEHAVIOR AND
           RESPONSES TO OTHERS.
_____2  FAIR, SHOWS MARGINAL  COOPERATION
           AND  RESPECT FOR OTHERS.
_____4  GENERALLY COOPERATIVE AND
           RESPECTFUL.
__✓__6  FULLY COOPERATIVE, RESPECTFUL,
           PROMOTES  HARMONY.

8. PARTICIPATION IN ASSIGNED PROGRAMS
_____0  UNACCEPTABLE DOES NOT MEET
           EXPECTATIONS
_____2  MARGINAL PARTICIPATION  MUST BE
           REMINDED TO COMPLETE  ASSIGNMENTS.
__✓__4  SHOWS GOOD PARTICIPATION, INTEREST
           AND RESPONSIVENESS TO GROUP
           DISCUSSION AND COMPLETES WRITTEN
           ASSIGNMENTS.
_____6  SHOWS EXCELLENT PARTICIPATION,
           INTEREST AND RESPONSIVENESS TO GROUP
           DISCUSSION AND ACTIVITIES. COMPLETES
           WRITTEN  ASSIGNMENTS AS INSTRUCTED IN
           A TIMELY MANNER WITH VERY LOW
           ERRORS.
_____7  SHOWS EXCELLENT PARTICIPATION AND
           INTEREST TO PROGRAM LEADS GROUP  IN
           DISCUSSION AND ACTIVITIES. COMPLETES
           WRITTEN  ASSIGNMENTS IN A TIMELY
           MANNER WITH OUTSTANDING RESULTS.

EVALUATION SCORE __40__
TRAINEE SIGNATURE __Brandie Jane Price__

POOR_____  GOOD_____  EXCELLENT_____  OUTSTANDING __X__
COMMENTS _Excellent attitude, Good Worker, Good Role Model, very_
_knowledge able._

NAME  PRICE  BRANDIE          DOC#  274278          FACILITY  EWCC/RTP
EVALUATION PERIOD  2 - OO          STAFF SIGNATURE

## TASK ASSIGNED DURING THIS PERIOD

1. OBSERVANCE OF RULES
____ 0 UNACCEPTABLE OBSERVES RULES WHEN UNDER
        SUPERVISION
____ 2 OBSERVES CARDINAL RULES AT ALL TIMES.
_✓_ 4 OBSERVES MAJOR RULES MOST OF THE TIME
____ 6 OBSERVES MAJOR AND CARDINAL RULES
        AND HELPS PROMOTE THE HEALTH OF THE
        COMMUNITY.

2. PERSONAL HYGIENE AND LIVING AREA
____ 0 UNACCEPTABLE
____ 2 MARGINAL, IMPROVEMENT NEEDED
____ 4 GOOD DEVELOPING WELL
_✓_ 6 EXCELLENT METICULOUS IN APPEARANCE AND
        PAYS CLOSE ATTENTION TO DETAILS REGARDING
        LIVING AREA.

3. QUALITY OF WORK
____ 0 MARGINAL
____ 2 FAIR
____ 4 GOOD UPPER 50%
_✓_ 6 EXCELLENT, VERY LOW, ERRORS--TOP 20%

4. PHYSICAL CONDITIONING
____ 0 UNACCEPTABLE COMPLAINS AND DOES NOT
        PARTICIPATE AS EXPECTED.
____ 2 MARGINAL PARTICIPATION UNRELATED TO
        MEDICAL CONDITION
_✓_ 4 GOOD PARTICIPATION SHOWS ENTHUSIASM.
        PHYSICAL CONDITIONING RECORD SHOWS
        MARKED IMPROVEMENT.
____ 6 EXCELLENT PARTICIPATION SHOWS
        ENTHUSIASM, INTEREST AND COOPERATION.
        PHYSICAL CONDITIONING RECORD SHOWS
        MARKED IMPROVEMENT.

5. REGIMENTATION MILITARY DEMEANOR
____ 0 UNACCEPTABLE OBSERVES MILITARY DEMEANOR
        WHEN REMINDED.
____ 2 OBSERVES MILITARY DEMEANOR
        MOST OF THE TIME
____ 4 OBSERVES MILITARY DEMEANOR
        AT ALL TIMES
_✓_ 6 OBSERVES MILITARY DEMEANOR
        AT ALL TIMES AND HELPS OTHERS
        MAINTAINING THEIRS.

6. T.C. PARTICIPATION AND ROLE MODELING
____ 0 UNACCEPTABLE LEVEL OF
        PARTICIPATION. DISPLAYS NEGATIVE
        BEHAVIOR AND USES INAPPROPRIATE
        RESPONSES TO COMMUNITY.
_✓_ 2 MARGINAL PARTICIPATION AND USE OF
        THERAPEUTIC TECHNIQUES AND CONCEPTS
        UTILIZES SOME COPING SKILLS BUT MAY B
        IN A LEARNING STAGE OF ROLE MODELING
____ 4 GOOD PARTICIPATION IN T.C. UTILIZES
        CONCEPTS AND TECHNIQUES. HAS GOOD
        COPING SKILLS AND USES CORRECT
        RESPONSES IN THE T.C. THE T.C
        RECOGNIZES GOOD QUALITIES TO ROLE
        MODEL.
____ 7 EXCELLENT PARTICIPATION IN T.C. SHOWS
        INITIATIVE WHILE USING THERAPEUTIC
        TECHNIQUES AND CONCEPTS. DISPLAYS
        EXCELLENT COPING SKILLS. TAKES
        RESPONSIBILITY FOR HER BEHAVIOR AND
        EXHIBITS LEADERSHIP ABILITY.
        PROMOTES HARMONY AND IS ACCEPTED
        BY THE COMMUNITY AS A ROLE MODEL.

7. ATTITUDE TOWARD STAFF AND PEERS
____ 0 UNACCEPTABLE, DISPLAYS
        INAPPROPRIATE BEHAVIOR AND
        RESPONSES TO OTHERS.
____ 2 FAIR. SHOWS MARGINAL COOPERATION
        AND RESPECT FOR OTHERS.
____ 4 GENERALLY COOPERATIVE AND
        RESPECTFUL.
_✓_ 6 FULLY COOPERATIVE, RESPECTFUL,
        PROMOTES HARMONY.

8. PARTICIPATION IN ASSIGNED PROGRAMS
____ 0 UNACCEPTABLE DOES NOT MEET
        EXPECTATIONS
____ 2 MARGINAL PARTICIPATION MUST BE
        REMINDED TO COMPLETE ASSIGNMENTS.
____ 4 SHOWS GOOD PARTICIPATION, INTEREST
        AND RESPONSIVENESS TO GROUP
        DISCUSSION AND COMPLETES WRITTEN
        ASSIGNMENTS.
_✓_ 6 SHOWS EXCELLENT PARTICIPATION,
        INTEREST AND RESPONSIVENESS TO GROUP
        DISCUSSION AND ACTIVITIES. COMPLETES
        WRITTEN ASSIGNMENTS AS INSTRUCTED IN
        A TIMELY MANNER WITH VERY LOW
        ERRORS.
____ 7 SHOWS EXCELLENT PARTICIPATION AND
        INTEREST TO PROGRAM LEADS GROUP IN
        DISCUSSION AND ACTIVITIES. COMPLETES
        WRITTEN ASSIGNMENTS IN A TIMELY
        MANNER WITH OUTSTANDING RESULTS.

EVALUATION SCORE  40
TRAINEE SIGNATURE  Brandie Jane Price

POOR ____  GOOD ____  EXCELLENT ____  OUTSTANDING  X
COMMENTS  Good attitude, Hard worker, Needs to set goals to prepare herself

# RTP MONTHLY EVALUATION REPORT

NAME  PRICE  BRANDIE          DOC#  274278                FACILITY  EWCC/RTP

EVALUATION PERIOD   3-00                 STAFF SIGNATURE

## TASK ASSIGNED DURING THIS PERIOD

### 1. OBSERVANCE OF RULES

____0  UNACCEPTABLE OBSERVES RULES WHEN UNDER SUPERVISION

____2  OBSERVES CARDINAL RULES AT ALL TIMES.

____4  OBSERVES MAJOR RULES MOST OF THE TIME

✓ 6  OBSERVES MAJOR AND CARDINAL RULES AND HELPS PROMOTE THE HEALTH OF THE COMMUNITY.

### 2. PERSONAL HYGIENE AND LIVING AREA

____0  UNACCEPTABLE

____2  MARGINAL, IMPROVEMENT NEEDED

____4  GOOD DEVELOPING WELL

✓ 6  EXCELLENT METICULOUS IN APPEARANCE AND PAYS CLOSE ATTENTION TO DETAILS REGARDING LIVING AREA.

### 3. QUALITY OF WORK

____0  MARGINAL

____2  FAIR

____4  GOOD UPPER 50%

✓ 6  EXCELLENT, VERY LOW ERRORS--TOP 20%

### 4. PHYSICAL CONDITIONING

____0  UNACCEPTABLE COMPLAINS AND DOES NOT PARTICIPATE AS EXPECTED.

____2  MARGINAL PARTICIPATION UNRELATED TO MEDICAL CONDITION

✓ 4  GOOD PARTICIPATION SHOWS ENTHUSIASM. PHYSICAL CONDITIONING RECORD SHOWS MARKED IMPROVEMENT.

____6  EXCELLENT PARTICIPATION SHOWS ENTHUSIASM, INTEREST AND COOPERATION. PHYSICAL CONDITIONING RECORD SHOWS MARKED IMPROVEMENT.

### 5. REGIMENTATION MILITARY DEMEANOR

____0  UNACCEPTABLE OBSERVES MILITARY DEMEANOR WHEN REMINDED.

____2  OBSERVES MILITARY DEMEANOR MOST OF THE TIME

____4  OBSERVES MILITARY DEMEANOR AT ALL TIMES

✓ 6  OBSERVES MILITARY DEMEANOR AT ALL TIMES AND HELPS OTHERS MAINTAINING THEIRS.

### 6. T.C. PARTICIPATION AND ROLE MODELING

____0  UNACCEPTABLE LEVEL OF PARTICIPATION. DISPLAYS NEGATIVE BEHAVIOR AND USES INAPPROPRIATE RESPONSES TO COMMUNITY.

✓ 2  MARGINAL PARTICIPATION AND USE OF THERAPEUTIC TECHNIQUES AND CONCEPTS UTILIZES SOME COPING SKILLS BUT MAY BE IN A LEARNING STAGE OF ROLE MODELING.

____4  GOOD PARTICIPATION IN T.C. UTILIZES CONCEPTS AND TECHNIQUES. HAS GOOD COPING SKILLS AND USES CORRECT RESPONSES IN THE T.C. THE T.C RECOGNIZES GOOD QUALITIES TO ROLE MODEL.

____7  EXCELLENT PARTICIPATION IN T.C. SHOWS INITIATIVE WHILE USING THERAPEUTIC TECHNIQUES AND CONCEPTS. DISPLAYS EXCELLENT COPING SKILLS . TAKES RESPONSIBILITY FOR HER BEHAVIOR AND EXHIBITS LEADERSHIP ABILITY. PROMOTES HARMONY AND IS ACCEPTED BY THE COMMUNITY AS A ROLE MODEL.

### 7. ATTITUDE TOWARD STAFF AND PEERS

____0  UNACCEPTABLE, DISPLAYS INAPPROPRIATE BEHAVIOR AND RESPONSES TO OTHERS.

____2  FAIR, SHOWS MARGINAL COOPERATION AND RESPECT FOR OTHERS.

____4  GENERALLY COOPERATIVE AND RESPECTFUL.

✓ 6  FULLY COOPERATIVE, RESPECTFUL, PROMOTES HARMONY.

### 8. PARTICIPATION IN ASSIGNED PROGRAMS

____0  UNACCEPTABLE DOES NOT MEET EXPECTATIONS

____2  MARGINAL PARTICIPATION MUST BE REMINDED TO COMPLETE ASSIGNMENTS.

____4  SHOWS GOOD PARTICIPATION, INTEREST AND RESPONSIVENESS TO GROUP DISCUSSION AND COMPLETES WRITTEN ASSIGNMENTS.

✓ 6  SHOWS EXCELLENT PARTICIPATION, INTEREST AND RESPONSIVENESS TO GROUP DISCUSSION AND ACTIVITIES. COMPLETES WRITTEN ASSIGNMENTS AS INSTRUCTED IN A TIMELY MANNER WITH VERY LOW ERRORS.

____7  SHOWS EXCELLENT PARTICIPATION AND INTEREST TO PROGRAM LEADS GROUP IN DISCUSSION AND ACTIVITIES. COMPLETES WRITTEN ASSIGNMENTS IN A TIMELY MANNER WITH OUTSTANDING RESULTS.

EVALUATION SCORE____

TRAINEE SIGNATURE  Brandie Jane Price

POOR_____  GOOD_____  EXCELLENT_____  OUTSTANDING__✓__

COMMENTS _____

# RTP MONTHLY EVALUATION REPORT

NAME **PRICE BRANDIE** DOC# **274278** FACILITY **EWCC/RTP**

EVALUATION PERIOD **4-00** STAFF SIGNATURE

## TASK ASSIGNED DURING THIS PERIOD

**1. OBSERVANCE OF RULES**
- 0 UNACCEPTABLE OBSERVES RULES WHEN UNDER SUPERVISION
- 2 OBSERVES CARDINAL RULES AT ALL TIMES.
- ✓ 4 OBSERVES MAJOR RULES MOST OF THE TIME
- 6 OBSERVES MAJOR AND CARDINAL RULES AND HELPS PROMOTE THE HEALTH OF THE COMMUNITY.

**2. PERSONAL HYGIENE AND LIVING AREA**
- 0 UNACCEPTABLE
- 2 MARGINAL, IMPROVEMENT NEEDED
- 4 GOOD DEVELOPING WELL
- ✓ 6 EXCELLENT METICULOUS IN APPEARANCE AND PAYS CLOSE ATTENTION TO DETAILS REGARDING LIVING AREA.

**3. QUALITY OF WORK**
- 0 MARGINAL
- 2 FAIR
- ✓ 4 GOOD UPPER 50%
- 6 EXCELLENT, VERY LOW ERRORS--TOP 20%

**4. PHYSICAL CONDITIONING**
- 0 UNACCEPTABLE COMPLAINS AND DOES NOT PARTICIPATE AS EXPECTED.
- 2 MARGINAL PARTICIPATION UNRELATED TO MEDICAL CONDITION
- 4 GOOD PARTICIPATION SHOWS ENTHUSIASM. PHYSICAL CONDITIONING RECORD SHOWS MARKED IMPROVEMENT.
- ✓ 6 EXCELLENT PARTICIPATION SHOWS ENTHUSIASM, INTEREST AND COOPERATION. PHYSICAL CONDITIONING RECORD SHOWS MARKED IMPROVEMENT.

**5. REGIMENTATION MILITARY DEMEANOR**
- 0 UNACCEPTABLE OBSERVES MILITARY DEMEANOR WHEN REMINDED.
- 2 OBSERVES MILITARY DEMEANOR MOST OF THE TIME
- ✓ 4 OBSERVES MILITARY DEMEANOR AT ALL TIMES
- 6 OBSERVES MILITARY DEMEANOR AT ALL TIMES AND HELPS OTHERS MAINTAINING THEIRS.

**6. T.C. PARTICIPATION AND ROLE MODELING**
- 0 UNACCEPTABLE LEVEL OF PARTICIPATION. DISPLAYS NEGATIVE BEHAVIOR AND USES INAPPROPRIATE RESPONSES TO COMMUNITY.
- ✓ 2 MARGINAL PARTICIPATION AND USE OF THERAPEUTIC TECHNIQUES AND CONCEPTS. UTILIZES SOME COPING SKILLS BUT MAY BE IN A LEARNING STAGE OF ROLE MODELING.
- 4 GOOD PARTICIPATION IN T.C. UTILIZES CONCEPTS AND TECHNIQUES. HAS GOOD COPING SKILLS AND USES CORRECT RESPONSES IN THE T.C. THE T.C RECOGNIZES GOOD QUALITIES TO ROLE MODEL.
- 7 EXCELLENT PARTICIPATION IN T.C. SHOWS INITIATIVE WHILE USING THERAPEUTIC TECHNIQUES AND CONCEPTS. DISPLAYS EXCELLENT COPING SKILLS. TAKES RESPONSIBILITY FOR HER BEHAVIOR AND EXHIBITS LEADERSHIP ABILITY. PROMOTES HARMONY AND IS ACCEPTED BY THE COMMUNITY AS A ROLE MODEL.

**7. ATTITUDE TOWARD STAFF AND PEERS**
- 0 UNACCEPTABLE, DISPLAYS INAPPROPRIATE BEHAVIOR AND RESPONSES TO OTHERS.
- 2 FAIR, SHOWS MARGINAL COOPERATION AND RESPECT FOR OTHERS.
- ✓ 4 GENERALLY COOPERATIVE AND RESPECTFUL.
- 6 FULLY COOPERATIVE, RESPECTFUL, PROMOTES HARMONY.

**8. PARTICIPATION IN ASSIGNED PROGRAMS**
- 0 UNACCEPTABLE DOES NOT MEET EXPECTATIONS
- 2 MARGINAL PARTICIPATION MUST BE REMINDED TO COMPLETE ASSIGNMENTS.
- 4 SHOWS GOOD PARTICIPATION, INTEREST AND RESPONSIVENESS TO GROUP DISCUSSION AND COMPLETES WRITTEN ASSIGNMENTS.
- ✓ 6 SHOWS EXCELLENT PARTICIPATION, INTEREST AND RESPONSIVENESS TO GROUP DISCUSSION AND ACTIVITIES. COMPLETES WRITTEN ASSIGNMENTS AS INSTRUCTED IN A TIMELY MANNER WITH VERY LOW ERRORS.
- 7 SHOWS EXCELLENT PARTICIPATION AND INTEREST TO PROGRAM LEADS GROUP IN DISCUSSION AND ACTIVITIES. COMPLETES WRITTEN ASSIGNMENTS IN A TIMELY MANNER WITH OUTSTANDING RESULTS.

EVALUATION SCORE **36**

TRAINEE SIGNATURE **Brandie Price**

POOR_____ GOOD_____ EXCELLENT **X** OUTSTANDING_____

COMMENTS _____

# RTP MONTHLY EVALUATION REPORT

Case 6:09-cv-00105-JHP   Document 133   Filed 02/18/10   Page 46 of 61

NAME__PRICE  BRANDIE____ DOC#__274278___ FACILITY__EWCC/RTP
EVALUATION PERIOD___5-00_____ STAFF SIGNATURE___

## TASK ASSIGNED DURING THIS PERIOD

1. OBSERVANCE OF RULES
_____0 UNACCEPTABLE OBSERVES RULES WHEN UNDER SUPERVISION
_____2 OBSERVES CARDINAL RULES AT ALL TIMES.
__✓_4 OBSERVES MAJOR RULES  MOST OF THE TIME
_____6 OBSERVES MAJOR AND CARDINAL RULES AND HELPS PROMOTE THE HEALTH OF THE COMMUNITY.

2. PERSONAL HYGIENE AND LIVING AREA
_____0 UNACCEPTABLE
_____2 MARGINAL, IMPROVEMENT NEEDED
_____ GOOD DEVELOPING WELL
__✓_6 EXCELLENT METICULOUS IN APPEARANCE AND PAYS  CLOSE ATTENTION TO DETAILS REGARDING LIVING  AREA.

3. QUALITY OF WORK
_____0 MARGINAL
_____2 FAIR
_____4 GOOD UPPER 50%
__✓_6 EXCELLENT, VERY LOW  ERRORS--TOP 20%

4. PHYSICAL CONDITIONING
_____0 UNACCEPTABLE COMPLAINS AND DOES NOT PARTICIPATE AS EXPECTED.
_____2 MARGINAL PARTICIPATION UNRELATED TO MEDICAL CONDITION
_____4 GOOD PARTICIPATION SHOWS ENTHUSIASM. PHYSICAL CONDITIONING RECORD SHOWS MARKED IMPROVEMENT.
__✓_6 EXCELLENT PARTICIPATION SHOWS ENTHUSIASM, INTEREST AND COOPERATION. PHYSICAL CONDITIONING RECORD SHOWS MARKED IMPROVEMENT.

5. REGIMENTATION MILITARY DEMEANOR
_____0 UNACCEPTABLE OBSERVES MILITARY DEMEANOR WHEN REMINDED.
_____2 OBSERVES MILITARY DEMEANOR MOST OF THE TIME
__✓_4 OBSERVES MILITARY DEMEANOR AT ALL TIMES
_____6 OBSERVES MILITARY DEMEANOR AT ALL TIMES AND HELPS  OTHERS MAINTAINING THEIRS.

EVALUATION SCORE_____
TRAINEE SIGNATURE__Brandie Jane Price__

6. T.C.  PARTICIPATION AND ROLE MODELING
_____0 UNACCEPTABLE LEVEL OF PARTICIPATION. DISPLAYS NEGATIVE BEHAVIOR  AND  USES INAPPROPRIATE RESPONSES TO COMMUNITY.
_____2 MARGINAL PARTICIPATION AND USE OF THERAPEUTIC TECHNIQUES AND CONCEPTS. UTILIZES SOME COPING SKILLS BUT MAY BE IN A LEARNING STAGE OF ROLE MODELING.
__✓_4 GOOD PARTICIPATION IN T.C. UTILIZES CONCEPTS AND TECHNIQUES.  HAS GOOD COPING SKILLS AND USES CORRECT RESPONSES IN THE T.C. THE T.C RECOGNIZES GOOD QUALITIES TO ROLE MODEL.
_____7 EXCELLENT PARTICIPATION  IN T.C. SHOWS INITIATIVE WHILE USING  THERAPEUTIC TECHNIQUES AND CONCEPTS. DISPLAYS EXCELLENT  COPING SKILLS .  TAKES RESPONSIBILITY FOR HER BEHAVIOR AND EXHIBITS LEADERSHIP  ABILITY. PROMOTES  HARMONY AND IS ACCEPTED BY THE  COMMUNITY AS A ROLE  MODEL.

7. ATTITUDE TOWARD STAFF AND PEERS
_____0 UNACCEPTABLE, DISPLAYS INAPPROPRIATE  BEHAVIOR AND RESPONSES TO OTHERS.
_____2 FAIR, SHOWS MARGINAL  COOPERATION AND  RESPECT FOR OTHERS.
__✓_4 GENERALLY COOPERATIVE AND RESPECTFUL.
_____6 FULLY COOPERATIVE, RESPECTFUL, PROMOTES  HARMONY.

8. PARTICIPATION IN ASSIGNED PROGRAMS
_____0 UNACCEPTABLE DOES NOT MEET EXPECTATIONS
_____2 MARGINAL PARTICIPATION  MUST BE REMINDED TO COMPLETE  ASSIGNMENTS.
_____4 SHOWS GOOD PARTICIPATION, INTEREST AND RESPONSIVENESS TO GROUP DISCUSSION AND COMPLETES WRITTEN ASSIGNMENTS.
__✓_6 SHOWS EXCELLENT PARTICIPATION, INTEREST AND RESPONSIVENESS TO GROUP DISCUSSION AND ACTIVITIES.  COMPLETES WRITTEN  ASSIGNMENTS AS INSTRUCTED I A TIMELY MANNER WITH VERY LOW ERRORS.
_____7 SHOWS EXCELLENT PARTICIPATION AND INTEREST TO PROGRAM LEADS GROUP  IN DISCUSSION AND ACTIVITIES.  COMPLETES WRITTEN  ASSIGNMENTS IN A TIMELY MANNER WITH OUTSTANDING RESULTS.

POOR_____ GOOD_____ EXCELLENT_____ OUTSTANDING__X__
COMMENTS__Excellent attitude, Works hard, Very Intelligent, Tries Hard to do the right thing, Does extra work on the Educ. Crew__

# RTP MONTHLY EVALUATION REPORT

NAME PRICE BRANDIE  DOC# 274278  FACILITY EWCC/RTP

EVALUATION PERIOD 6-00  STAFF SIGNATURE T. Davis

## TASK ASSIGNED DURING THIS PERIOD

1. OBSERVANCE OF RULES

_____ 0 UNACCEPTABLE OBSERVES RULES WHEN UNDER SUPERVISION

_____ 2 OBSERVES CARDINAL RULES AT ALL TIMES.

✓ 4 OBSERVES MAJOR RULES MOST OF THE TIME

_____ 6 OBSERVES MAJOR AND CARDINAL RULES AND HELPS PROMOTE THE HEALTH OF THE COMMUNITY.

1 M.R.V

2. PERSONAL HYGIENE AND LIVING AREA

_____ 0 UNACCEPTABLE

_____ 2 MARGINAL, IMPROVEMENT NEEDED

_____ 4 GOOD DEVELOPING WELL

✓ 6 EXCELLENT METICULOUS IN APPEARANCE AND PAYS CLOSE ATTENTION TO DETAILS REGARDING LIVING AREA.

3. QUALITY OF WORK

_____ 0 MARGINAL

_____ 2 FAIR

_____ 4 GOOD UPPER 50%

✓ 6 EXCELLENT, VERY LOW ERRORS--TOP 20%

4. PHYSICAL CONDITIONING

_____ 0 UNACCEPTABLE COMPLAINS AND DOES NOT PARTICIPATE AS EXPECTED.

_____ 2 MARGINAL PARTICIPATION UNRELATED TO MEDICAL CONDITION

_____ 4 GOOD PARTICIPATION SHOWS ENTHUSIASM. PHYSICAL CONDITIONING RECORD SHOWS MARKED IMPROVEMENT.

✓ 6 EXCELLENT PARTICIPATION SHOWS ENTHUSIASM, INTEREST AND COOPERATION. PHYSICAL CONDITIONING RECORD SHOWS MARKED IMPROVEMENT.

5. REGIMENTATION MILITARY DEMEANOR

_____ 0 UNACCEPTABLE OBSERVES MILITARY DEMEANOR WHEN REMINDED.

_____ 2 OBSERVES MILITARY DEMEANOR MOST OF THE TIME

_____ 4 OBSERVES MILITARY DEMEANOR AT ALL TIMES

✓ 6 OBSERVES MILITARY DEMEANOR AT ALL TIMES AND HELPS OTHERS MAINTAINING THEIRS.

6. T.C. PARTICIPATION AND ROLE MODELING

_____ 0 UNACCEPTABLE LEVEL OF PARTICIPATION. DISPLAYS NEGATIVE BEHAVIOR AND USES INAPPROPRIATE RESPONSES TO COMMUNITY.

_____ 2 MARGINAL PARTICIPATION AND USE OF THERAPEUTIC TECHNIQUES AND CONCEPTS. UTILIZES SOME COPING SKILLS BUT MAY BE IN A LEARNING STAGE OF ROLE MODELING.

✓ 4 GOOD PARTICIPATION IN T.C. UTILIZES CONCEPTS AND TECHNIQUES. HAS GOOD COPING SKILLS AND USES CORRECT RESPONSES IN THE T.C. THE T.C RECOGNIZES GOOD QUALITIES TO ROLE MODEL.

_____ 7 EXCELLENT PARTICIPATION IN T.C. SHOWS INITIATIVE WHILE USING THERAPEUTIC TECHNIQUES AND CONCEPTS. DISPLAYS EXCELLENT COPING SKILLS. TAKES RESPONSIBILITY FOR HER BEHAVIOR AND EXHIBITS LEADERSHIP ABILITY. PROMOTES HARMONY AND IS ACCEPTED BY THE COMMUNITY AS A ROLE MODEL.

7. ATTITUDE TOWARD STAFF AND PEERS

_____ 0 UNACCEPTABLE, DISPLAYS INAPPROPRIATE BEHAVIOR AND RESPONSES TO OTHERS.

_____ 2 FAIR. SHOWS MARGINAL COOPERATION AND RESPECT FOR OTHERS.

_____ 4 GENERALLY COOPERATIVE AND RESPECTFUL.

✓ 6 FULLY COOPERATIVE, RESPECTFUL, PROMOTES HARMONY.

very helpful

8. PARTICIPATION IN ASSIGNED PROGRAMS

_____ 0 UNACCEPTABLE DOES NOT MEET EXPECTATIONS

_____ 2 MARGINAL PARTICIPATION MUST BE REMINDED TO COMPLETE ASSIGNMENTS.

_____ 4 SHOWS GOOD PARTICIPATION, INTEREST AND RESPONSIVENESS TO GROUP DISCUSSION AND COMPLETES WRITTEN ASSIGNMENTS.

✓ 6 SHOWS EXCELLENT PARTICIPATION, INTEREST AND RESPONSIVENESS TO GROUP DISCUSSION AND ACTIVITIES. COMPLETES WRITTEN ASSIGNMENTS AS INSTRUCTED I A TIMELY MANNER WITH VERY LOW ERRORS.

_____ 7 SHOWS EXCELLENT PARTICIPATION AND INTEREST TO PROGRAM LEADS GROUP IN DISCUSSION AND ACTIVITIES. COMPLETES WRITTEN ASSIGNMENTS IN A TIMELY MANNER WITH OUTSTANDING RESULTS.

EVALUATION SCORE 44

TRAINEE SIGNATURE Brandie Price

POOR _____ GOOD _____ EXCELLENT _____ OUTSTANDING X

COMMENTS Excellent attitude, works hard

NAME __PRICE  BRANDIE__ DOC# __274278__ __ FACILITY __EWCC/RTP__

EVALUATION PERIOD __9-00__ STAFF SIGNATURE __T. Davis__

## TASK ASSIGNED DURING THIS PERIOD

1. OBSERVANCE OF RULES

____0 UNACCEPTABLE OBSERVES RULES WHEN UNDER SUPERVISION

__✓__2 OBSERVES CARDINAL RULES AT ALL TIMES.

____4 OBSERVES MAJOR RULES MOST OF THE TIME

____6 OBSERVES MAJOR AND CARDINAL RULES AND HELPS PROMOTE THE HEALTH OF THE COMMUNITY.

*4 major rules*

2. PERSONAL HYGIENE AND LIVING AREA

____0 UNACCEPTABLE

____2 MARGINAL, IMPROVEMENT NEEDED

____4 GOOD DEVELOPING WELL

__✓__6 EXCELLENT METICULOUS IN APPEARANCE AND PAYS CLOSE ATTENTION TO DETAILS REGARDING LIVING AREA.

3. QUALITY OF WORK

____0 MARGINAL

____2 FAIR

____4 GOOD UPPER 50%

__✓__6 EXCELLENT, VERY LOW ERRORS--TOP 20%

4. PHYSICAL CONDITIONING

____0 UNACCEPTABLE COMPLAINS AND DOES NOT PARTICIPATE AS EXPECTED.

____2 MARGINAL PARTICIPATION UNRELATED TO MEDICAL CONDITION

__✓__4 GOOD PARTICIPATION SHOWS ENTHUSIASM. PHYSICAL CONDITIONING RECORD SHOWS MARKED IMPROVEMENT.

____6 EXCELLENT PARTICIPATION SHOWS ENTHUSIASM, INTEREST AND COOPERATION. PHYSICAL CONDITIONING RECORD SHOWS MARKED IMPROVEMENT.

5. REGIMENTATION MILITARY DEMEANOR

____0 UNACCEPTABLE OBSERVES MILITARY DEMEANOR WHEN REMINDED.

____2 OBSERVES MILITARY DEMEANOR MOST OF THE TIME

__✓__4 OBSERVES MILITARY DEMEANOR AT ALL TIMES

____6 OBSERVES MILITARY DEMEANOR AT ALL TIMES AND HELPS OTHERS MAINTAINING THEIRS.

6. T.C. PARTICIPATION AND ROLE MODELING

____0 UNACCEPTABLE LEVEL OF PARTICIPATION. DISPLAYS NEGATIVE BEHAVIOR AND USES INAPPROPRIATE RESPONSES TO COMMUNITY.

____2 MARGINAL PARTICIPATION AND USE OF THERAPEUTIC TECHNIQUES AND CONCEPT UTILIZES SOME COPING SKILLS BUT MAY B IN A LEARNING STAGE OF ROLE MODELING

__✓__4 GOOD PARTICIPATION IN T.C. UTILIZES CONCEPTS AND TECHNIQUES. HAS GOOD COPING SKILLS AND USES CORRECT RESPONSES IN THE T.C. THE T.C RECOGNIZES GOOD QUALITIES TO ROLE MODEL.

____7 EXCELLENT PARTICIPATION IN T.C. SHOW INITIATIVE WHILE USING THERAPEUTIC TECHNIQUES AND CONCEPTS. DISPLAYS EXCELLENT COPING SKILLS. TAKES RESPONSIBILITY FOR HER BEHAVIOR AND EXHIBITS LEADERSHIP ABILITY. PROMOTES HARMONY AND IS ACCEPTED BY THE COMMUNITY AS A ROLE MODEL.

7. ATTITUDE TOWARD STAFF AND PEERS

____0 UNACCEPTABLE, DISPLAYS INAPPROPRIATE BEHAVIOR AND RESPONSES TO OTHERS.

____2 FAIR, SHOWS MARGINAL COOPERATION AND RESPECT FOR OTHERS.

__✓__4 GENERALLY COOPERATIVE AND RESPECTFUL.

____6 FULLY COOPERATIVE, RESPECTFUL, PROMOTES HARMONY.

8. PARTICIPATION IN ASSIGNED PROGRAMS

____0 UNACCEPTABLE DOES NOT MEET EXPECTATIONS

____2 MARGINAL PARTICIPATION MUST BE REMINDED TO COMPLETE ASSIGNMENTS.

____4 SHOWS GOOD PARTICIPATION, INTEREST AND RESPONSIVENESS TO GROUP DISCUSSION AND COMPLETES WRITTEN ASSIGNMENTS.

__✓__6 SHOWS EXCELLENT PARTICIPATION, INTEREST AND RESPONSIVENESS TO GROU DISCUSSION AND ACTIVITIES. COMPLETES WRITTEN ASSIGNMENTS AS INSTRUCTED I A TIMELY MANNER WITH VERY LOW ERRORS.

____7 SHOWS EXCELLENT PARTICIPATION AND INTEREST TO PROGRAM LEADS GROUP IN DISCUSSION AND ACTIVITIES. COMPLETES WRITTEN ASSIGNMENTS IN A TIMELY MANNER WITH OUTSTANDING RESULTS.

EVALUATION SCORE __38__

TRAINEE SIGNATURE __Brandie Jane Price__

POOR____ GOOD____ EXCELLENT __X__ OUTSTANDING____

COMMENTS _____

NAME  PRICE BRANDIE          DOC#  274278          FACILITY  EWCC/RTP
EVALUATION PERIOD  Y-6-(0          STAFF SIGNATURE  Tea Davis

## TASK ASSIGNED DURING THIS PERIOD

1. OBSERVANCE OF RULES
___0 UNACCEPTABLE OBSERVES RULES WHEN UNDER SUPERVISION
___ OBSERVES CARDINAL RULES AT ALL TIMES.
✓4 OBSERVES MAJOR RULES MOST OF THE TIME
✓6 OBSERVES MAJOR AND CARDINAL RULES AND HELPS PROMOTE THE HEALTH OF THE COMMUNITY.

*1 House Rule*

2. PERSONAL HYGIENE AND LIVING AREA
___0 UNACCEPTABLE
___2 MARGINAL, IMPROVEMENT NEEDED
✓4 GOOD DEVELOPING WELL
___6 EXCELLENT METICULOUS IN APPEARANCE AND PAYS CLOSE ATTENTION TO DETAILS REGARDING LIVING AREA.

3. QUALITY OF WORK
___0 MARGINAL
___2 FAIR
___4 GOOD UPPER 50%
✓6 EXCELLENT, VERY LOW ERRORS--TOP 20%

4. PHYSICAL CONDITIONING
___0 UNACCEPTABLE COMPLAINS AND DOES NOT PARTICIPATE AS EXPECTED.
___2 MARGINAL PARTICIPATION UNRELATED TO MEDICAL CONDITION
___4 GOOD PARTICIPATION SHOWS ENTHUSIASM. PHYSICAL CONDITIONING RECORD SHOWS MARKED IMPROVEMENT.
✓6 EXCELLENT PARTICIPATION SHOWS ENTHUSIASM, INTEREST AND COOPERATION. PHYSICAL CONDITIONING RECORD SHOWS MARKED IMPROVEMENT.

5. REGIMENTATION MILITARY DEMEANOR
___0 UNACCEPTABLE OBSERVES MILITARY DEMEANOR WHEN REMINDED.
___2 OBSERVES MILITARY DEMEANOR MOST OF THE TIME
✓4 OBSERVES MILITARY DEMEANOR AT ALL TIMES
___6 OBSERVES MILITARY DEMEANOR AT ALL TIMES AND HELPS OTHERS MAINTAINING THEIRS.

EVALUATION SCORE___40
TRAINEE SIGNATURE Brandie Price

6. T.C. PARTICIPATION AND ROLE MODELING
___0 UNACCEPTABLE LEVEL OF PARTICIPATION. DISPLAYS NEGATIVE BEHAVIOR AND USES INAPPROPRIATE RESPONSES TO COMMUNITY.
___2 MARGINAL PARTICIPATION AND USE OF THERAPEUTIC TECHNIQUES AND CONCEPTS UTILIZES SOME COPING SKILLS BUT MAY B IN A LEARNING STAGE OF ROLE MODELING
___4 GOOD PARTICIPATION IN T.C. UTILIZES CONCEPTS AND TECHNIQUES. HAS GOOD COPING SKILLS AND USES CORRECT RESPONSES IN THE T.C. THE T.C RECOGNIZES GOOD QUALITIES TO ROLE MODEL.
✓7 EXCELLENT PARTICIPATION IN T.C. SHOWS INITIATIVE WHILE USING THERAPEUTIC TECHNIQUES AND CONCEPTS. DISPLAYS EXCELLENT COPING SKILLS. TAKES RESPONSIBILITY FOR HER BEHAVIOR AND EXHIBITS LEADERSHIP ABILITY. PROMOTES HARMONY AND IS ACCEPTED BY THE COMMUNITY AS A ROLE MODEL.

7. ATTITUDE TOWARD STAFF AND PEERS
___0 UNACCEPTABLE, DISPLAYS INAPPROPRIATE BEHAVIOR AND RESPONSES TO OTHERS.
___2 FAIR. SHOWS MARGINAL COOPERATION AND RESPECT FOR OTHERS.
✓4 GENERALLY COOPERATIVE AND RESPECTFUL.
___6 FULLY COOPERATIVE, RESPECTFUL, PROMOTES HARMONY.

8. PARTICIPATION IN ASSIGNED PROGRAMS
___0 UNACCEPTABLE DOES NOT MEET EXPECTATIONS
___2 MARGINAL PARTICIPATION MUST BE REMINDED TO COMPLETE ASSIGNMENTS.
✓4 SHOWS GOOD PARTICIPATION, INTEREST AND RESPONSIVENESS TO GROUP DISCUSSION AND COMPLETES WRITTEN ASSIGNMENTS.
___6 SHOWS EXCELLENT PARTICIPATION, INTEREST AND RESPONSIVENESS TO GROUP DISCUSSION AND ACTIVITIES. COMPLETES WRITTEN ASSIGNMENTS AS INSTRUCTED IN A TIMELY MANNER WITH VERY LOW ERRORS.
___7 SHOWS EXCELLENT PARTICIPATION AND INTEREST TO PROGRAM LEADS GROUP IN DISCUSSION AND ACTIVITIES. COMPLETES WRITTEN ASSIGNMENTS IN A TIMELY MANNER WITH OUTSTANDING RESULTS.

POOR___ GOOD___ EXCELLENT___ OUTSTANDING X
COMMENTS_____

# RTP MONTHLY EVALUATION REPORT

NAME __PRICE  BRANDIE__  DOC#__274278__  FACILITY __EWCC/RTP__

EVALUATION PERIOD __Sept 08__  STAFF SIGNATURE __T Davis__

## TASK ASSIGNED DURING THIS PERIOD

1. OBSERVANCE OF RULES
___0 UNACCEPTABLE OBSERVES RULES WHEN UNDER SUPERVISION
___2 OBSERVES CARDINAL RULES AT ALL TIMES.
___4 OBSERVES MAJOR RULES  MOST OF THE TIME
_✓_6 OBSERVES MAJOR AND CARDINAL RULES AND HELPS PROMOTE THE HEALTH OF THE COMMUNITY.

2. PERSONAL HYGIENE AND LIVING AREA
___0 UNACCEPTABLE
___2 MARGINAL,  IMPROVEMENT NEEDED
___4 GOOD DEVELOPING WELL
_✓_6 EXCELLENT METICULOUS IN APPEARANCE AND PAYS  CLOSE ATTENTION TO DETAILS REGARDING LIVING  AREA.

3. QUALITY OF WORK
___0 MARGINAL
___2 FAIR
___4 GOOD UPPER 50%
_✓_6 EXCELLENT, VERY LOW  ERRORS--TOP 20%

4. PHYSICAL CONDITIONING
___0 UNACCEPTABLE COMPLAINS AND DOES NOT PARTICIPATE AS EXPECTED.
___2 MARGINAL PARTICIPATION UNRELATED TO MEDICAL CONDITION
___4 GOOD PARTICIPATION SHOWS ENTHUSIASM. PHYSICAL CONDITIONING RECORD SHOWS MARKED IMPROVEMENT.
_✓_6 EXCELLENT PARTICIPATION SHOWS ENTHUSIASM, INTEREST AND COOPERATION. PHYSICAL CONDITIONING RECORD SHOWS MARKED IMPROVEMENT.

5. REGIMENTATION MILITARY DEMEANOR
___0 UNACCEPTABLE OBSERVES MILITARY DEMEANOR WHEN REMINDED.
___2 OBSERVES MILITARY DEMEANOR MOST OF THE TIME
___4 OBSERVES MILITARY DEMEANOR AT ALL TIMES
_✓_6 OBSERVES MILITARY DEMEANOR AT ALL TIMES AND HELPS  OTHERS MAINTAINING THEIRS.

6. T.C.  PARTICIPATION AND ROLE MODELING
___0 UNACCEPTABLE LEVEL OF PARTICIPATION. DISPLAYS NEGATIVE BEHAVIOR  AND  USES INAPPROPRIATE RESPONSES TO COMMUNITY.
___2 MARGINAL PARTICIPATION AND USE OF THERAPEUTIC TECHNIQUES AND CONCEPTS UTILIZES SOME COPING SKILLS BUT MAY B IN A LEARNING STAGE OF ROLE MODELING
___4 GOOD PARTICIPATION IN T.C. UTILIZES CONCEPTS AND TECHNIQUES.  HAS GOOD COPING SKILLS AND USES CORRECT RESPONSES IN THE T.C. THE T.C RECOGNIZES GOOD QUALITIES TO ROLE MODEL.
_✓_7 EXCELLENT  PARTICIPATION  IN T.C. SHOWS INITIATIVE WHILE USING  THERAPEUTIC TECHNIQUES AND CONCEPTS. DISPLAYS EXCELLENT  COPING SKILLS . TAKES RESPONSIBILITY FOR HER BEHAVIOR AND EXHIBITS LEADERSHIP  ABILITY. PROMOTES  HARMONY AND IS ACCEPTED BY THE  COMMUNITY AS A ROLE  MODEL.

7. ATTITUDE TOWARD STAFF AND PEERS
___0 UNACCEPTABLE,  DISPLAYS INAPPROPRIATE  BEHAVIOR AND RESPONSES TO OTHERS.
_✓_2 FAIR, SHOWS MARGINAL  COOPERATION AND  RESPECT FOR OTHERS.
___4 GENERALLY COOPERATIVE AND RESPECTFUL.
___6 FULLY COOPERATIVE, RESPECTFUL, PROMOTES  HARMONY.

8. PARTICIPATION IN ASSIGNED PROGRAMS
___0 UNACCEPTABLE DOES NOT MEET EXPECTATIONS
___2 MARGINAL PARTICIPATION  MUST BE REMINDED TO COMPLETE  ASSIGNMENTS.
___4 SHOWS GOOD PARTICIPATION, INTEREST AND RESPONSIVENESS TO GROUP DISCUSSION AND COMPLETES WRITTEN ASSIGNMENTS.
___6 SHOWS EXCELLENT PARTICIPATION, INTEREST AND RESPONSIVENESS TO GROU DISCUSSION AND ACTIVITIES.  COMPLETES WRITTEN  ASSIGNMENTS AS INSTRUCTED A TIMELY MANNER WITH VERY LOW ERRORS.
_✓_7. SHOWS EXCELLENT PARTICIPATION AND INTEREST TO PROGRAM LEADS GROUP IN DISCUSSION AND ACTIVITIES. COMPLETES WRITTEN  ASSIGNMENTS IN A TIMELY MANNER WITH OUTSTANDING RESULTS.

EVALUATION SCORE____

TRAINEE SIGNATURE __Brandie Price__

POOR____  GOOD____  EXCELLENT____  OUTSTANDING _X_

COMMENTS ____

Box susp completed

# ADJUSTMENT REVIEW

## NEW ARRIVAL/ADJUSTMENT REVIEW/EARNED CREDIT LEVEL

FACILITY _EWCC_   FACILITY ARRIVAL DATE _12.14.99_ TODAY'S DATE _8/30/00_  TOTAL DAYS REMAINING _3070_
LARC ARRIVAL DATE _12.01.99_  PAROLE DOCKET DATE _N/A_  PPCS DOCKET DATE _____
LAST REVIEW DATE _4/00_   CASE MANAGER _____

### INMATE IDENTIFICATION INFORMATION

Name: _Price Brandie_   Number: _224228_   Race: _W_   Sex: _F_
In case of emergency, contact: (Is this a change?) yes ___ no _X_
Name: _____
Address: _____   Relationship: _____   Phone:( ___ ) _____

### SECURITY FACTORS

Escape History: _NA_   Facility _____  Detainers _NA_   Additional _NA_
Check those which apply to:   Previous        Controlling/Current        Consecutive
Drug Distribution/Trafficking   _____        _____
Racketeering         _____        _Poss w/_
Robbery (3 after 1978)     _____        _Intent_
Sex Offense         _____        _10 yr_

### INMATE ADJUSTMENT

Job Skills _____    Assignment _RTP_    Effective Date _1.17.2000_

| Month/Year | Rating | Assignment |
|---|---|---|
| 2/00 | 38 Excellent | RTP |
| 6/00 | 44 Outs | " |
| 5/00 | 40 " | " |
| 4/00 | 36 Excell | " |

Performance Rating: Poor, Good, Excellent, Outstanding
Staff _Excellent_    Program Participation _Excellent_    Job _Outstanding_  REC ASST DIRECT.
Other Inmates _Excellent_   Personal Hygiene _Outstanding/SAT_   Living Area _Outstanding_
Assessment of Needs: _RTP_    _mRT_
Programs Assigned: _RTP_    _mRT - 8_
Refused _____  Waiting List _____  Participating _SAT_   Completed _AWOC,_
Comments: _____                     12 hrs college_

### MISCONDUCT RECORD

| Class | Code | Date Occurred | Expiration Date | |
|---|---|---|---|---|
| ___ | ___ | ___ | ___ | Misconduct Security Points ___ |
| ___ | ___ | ___ | ___ | Total Points _2_ |
| ___ | ___ | ___ | ___ | Assigned Security Level _min_ |

P = 1 - 2

### EARNED CREDIT CLASS DESIGNATION

Assigned level _3_ Effective Date _9.01.00_ Initial Review _____ Promotion _X_ Demotion _____ No Change _____

Committee Comments _____
                                    A on level II
Preparer Signature _____
Inmate Signature _Brandie Price_             Date _8/30/00_
Chairperson Comments _____            Date _____

Chair Signature _____             _8.30.00_
Date of Next Review _12/00_            Date _8-30-00_

ISSUED
6-5-00

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,              )
                    Plaintiff,      )
                                    )
vs.                                 )            No.  CF-98-481
                                    )
JOSEPH D. JACOBS                    )
                    Defendant.      )

## ORDER ACCELERATING DEFERRED SENTENCE

NOW, on this 5TH DAY OF JUNE, 2000, the above styled case comes on for hearing on the State's Application to Impose Deferred Sentence. The State is present by Assistant District Attorney, Lynn Anderson, the defendant is present and represented by the attorney of record, Monte Johnson.

The defendant, after being advised of his rights both by his attorney and by the Court, informs the Court that he wishes to stipulate to the Application to Impose Deferred Sentence and the State makes their recommendation of an accelerated sentence.

The Court finds that on the 12th day of April, 1999, the said defendant entered his plea of guilty to the crime of POSSESSION OF CDS WITH INTENT TO DISTRIBUTE and UNLAWFUL POSSESSION OF MARIHUANA and that upon acceptance of said plea the Court ordered to defer the imposition of Judgment and Sentence in this cause for a term of FIVE (5) years pending the defendant's good behavior.

The Court finds that on the 4th day of April, 2000, the State filed an Application to Impose Deferred Sentence based on violations of the defendant's Rules and Conditions of Probation. The Court further finds the defendant did, in fact, violate the rules and conditions as alleged in the State's Application.

That the Court accepts the defendant's stipulation to the Application and thereby accepts his plea of guilty and accelerates the deferred sentence and finds the defendant guilty.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the defendant's deferred sentence is accelerated, the defendant is found guilty and is sentenced to a term of Ten (10) years with the Department of Corrections, Defendant to successfully complete the REGIMENTED INMATE DISCIPLINARY PROGRAM (R.I.D) with the balance suspended upon completion, subject to Rules and Conditions of Probation previously entered. The Sheriff of Sequoyah County shall deliver said defendant to the Department of Corrections and leave therewith a copy of this Order of Judgment and Sentence to serve as a warrant and authority for the revocation of said defendant as provided herein. The second copy of the Order to be warrant and authority of said Sheriff for the transportation and imprisonment of said defendant as herein before provided. The Sheriff to make due return to the Clerk of this Court, with his procedure endorsed thereon.

IT IS SO ORDERED.

_____
JUDGE OF THE DISTRICT COURT

217

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA )
                Plaintiff )
)
VS. )
Joseph Jacobs )    CASE NUMBER: CF-98-481A
)                   TR-99-2109
)
)
D.O.B
DATE 10-27-00

FAYE TEAGUE
Assistant District Attorney
NONE           SEQUOYAH COUNTY, OKLAHOMA
FILED
Defendant's Attorney   IN DISTRICT COURT

RULE 8 HEARING           OCT 2 7 2000
(summary)

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES, IT IS HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

$ 100.00 ON OR BEFORE 12-1-00 BY 4:00 P.M. AND

$      ON OR BEFORE      BY   4:00 P.M. , THEN

$      PER MONTH ON OR BEFORE THE    DAY OF EACH MONTH WITH LIKE SUMS ON THE SAME DATE THEREAFTER UNTIL PAID IN FULL; OR THE BALANCE IN FULL ON OR BEFORE THE      DAY OF 199 BY    P.M. OR,
IT IS FURTHER ORDERED THAT DEFENDANT MAKE ALL PAYMENTS IN PERSON AT THE OFFICE OF THE COURT CLERK.
COMMENTS: Def to Re-appear on 12-1-00 with 100.00

TOTAL TO PAY $ 915.00 & proof of employment

_____
JUDGE OF THE DISTRICT COURT
John C Garrett

_____
DEFENDANT

* Defendant is further ordered to notify the Collections Adm. of any change of address, telephone, employment or income.

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                          )
      Plaintiff                          )
vs.                                         )   Case No. CF-98-00481A
JOSEPH DALE JACOBS ~~████~~ -GANS           )            TR-99-02109
                                           )
~~H¢O64UBOXT5NNEY~~                          )
GANS, OK  74936                             )
      Defendant                          )
    SS#:
    DOB: ████/1976

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 19 2000

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

Date: 12/19/00          State's Attorney:
                    Defendant's Attorney: ROBBIE COWAN
                                     GERALD HUNTER
                    RULE 8 HEARING
                      (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

           $75.00 on or before <u>01-31-20</u> and then

           $75.00 per month on or before <u>02-28-2001</u>

then <u>$75.⁰⁰</u> per month on or before the <u>28th</u> day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before <u>01-31-20</u>

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

TOTAL TO PAY $ <u>815.⁰⁰</u>

_____
JOHN C. GARRETT
Judge of the District Court

_____
      Defendant

*Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

**BENCH WARRANT--After Conviction**

ISSUED 3-13-01

| | | |
|---|---|---|
| **STATE OF OKLAHOMA,** | ) | |
| **Sequoyah County,** | ) | **IN DISTRICT COURT** |
| | | |
| THE STATE OF OKLAHOMA | ) | |
|             VS. | ) | No.CF-98-481 |
| AUBRE DALE JACOBS | ) | |
| ████████████████ | ) | |
| MULDROW OK 74948 | ) | |
| ██56 ████1409 | ) | BOND |

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**AUBRE DALE JACOBS** having been on the 29TH DAY JANUARY, 1999, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :FAILURE TO APPEAR

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **AUBRE DALE JACOBS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this  13TH DAY OF MARCH, 2001.  By Order of the Court.

BERNELL EDWARDS, COURT CLERK

BY: _Amanda Adams_
                                                              DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

S H E R I F F ' S   R E T U R N

RECEIVED the within Writ on the _____ day of _____, 199____, at _____o'clock _____M., and executed on the _____day of _____, 199____, at _____o'clock _____M. by _____

Dated this _____day of _____199____.

SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY:_____
                                                              DEPUTY

220

**BENCH WARRANT--After Conviction**

STATE OF OKLAHOMA,              )
Sequoyah County,                )              **IN DISTRICT COURT**

THE STATE OF OKLAHOMA      )
                    VS.                )              No.CF-98-481
AUBREY  JACOBS          )              *CF-98-58A*
█████████████             )
MULDROW, OK 74948          )
██72 █████-8322            )              BOND

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**AUBREY  JACOBS** having been on the 30TH DAY OF JUNE, 2000, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :FAILURE TO PAY MONIES DUE TO THE COURT IN THE AMOUNT OF $2033.00

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **AUBREY  JACOBS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah;  there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this  2ND DAY OF APRIL, 2001.  By Order of the Court.

**BERNELL EDWARDS, COURT CLERK**

BY: *Amanda Adams*
                                             DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

S H E R I F F ‘ S   R E T U R N

RECEIVED the within Writ on the _____ day of _____, 199____, at _____o'clock _____M., and executed on the _____day of _____, 199____, at _____o'clock _____M. by _____

Dated this_____ day of _____ 199____.

SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY:_____
                                             DEPUTY

*dms*

221

# DISTRICT COURT OF MUSKOGEE, WAGONER, CHEROKEE AND SEQUOYAH COUNTIES

### (FIFTEENTH JUDICIAL DISTRICT)

### (ORDER)



Date: April 17, 2001

Defendant: JACOBS, JOSEPH                          Case #: SY-CF-98-481

Charge: Possession of CD, Possession of M/J

Sentence Date: 06/05/00                    Expiration Date: 06/04/10

THE DEPARTMENT OF CORRECTIONS IS HEREBY RELIEVED FROM FURTHER ACTIVE SUPERVISION OF THIS DEFENDANT IN THIS PARTICULAR CASE.

_____
Honorable David Nelson
Judge of the District Court

_____
Lynn Anderson
Assistant District Attorney

222

# WARRANT CLEARANCE

WARRANT # ___CR. 98-481___

WARRANT NAME ___Jacobs, Aubre Dale___

DATE & TIME CLEARED ___4-22-01   2258___

WARRANT CLEARED BY:

    ARREST ___✗___ OFFICER SERVING ___Trp. Griffy___

                   AGENCY ___O.H.P___

    CANCEL _____ OFFICIAL DIRECTING WARRANT CANCELLATION

    _____

WAS WARRANT PULLED FROM FILE?    (YES)    NO

IF NO, EXPLAIN WHY NOT_____

WAS WARRANT MARKED OFF BOOK?    (YES)    NO

IF NO, EXPLAIN WHY NOT_____

WAS WARRANT CANCELLED FROM NCIC?    (YES)    NO

IF NO, EXPLAIN WHY NOT_____

WAS WARRANT REMOVED FROM HOLDS BOOK?    YES    ~~NO~~

IF NO, EXPLAIN WHY NOT ___No Holds___

SHERIFF'S OFFICE EMPLOYEE SIGNATURE ___J. Smith___

---

NOTE:   AFTER COMPLETING THIS FORM, STAPLE THIS FORM BACK TO BACK WITH THE WARRANT AND PLACE IN THE FOLDER MARKED "SEND TO COURT CLERK." ONLY USE THIS FORM TO CLEAR SEQUOYAH COUNTY WARRANTS.

       USE ONE FORM FOR EACH WARRANT CLEARED.

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT
APR 2 7 2001
BY _____
BERNELL EDWARDS, COURT CLERK
DEPUTY

**BENCH WARRANT--After Conviction**

ISSUED
3-13-01

| | | |
|---|---|---|
| **STATE OF OKLAHOMA,** | ) | |
| **Sequoyah County,** | ) | **IN DISTRICT COURT** |
| | | |
| THE STATE OF OKLAHOMA | ) | |
| VS. | ) | No.CF-98-481 SEQUOYAH COUNTY, OKLAHOMA |
| AUBRE DALE JACOBS | ) | FILED |
| ███████████ | ) | IN DISTRICT COURT |
| MULDROW OK 74948 | ) | APR 27 2001 |
| ███56 ████1409 | ) | BOND |

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**AUBRE DALE JACOBS** having been on the 29TH DAY JANUARY, 1999, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :FAILURE TO APPEAR

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **AUBRE DALE JACOBS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 13TH DAY OF MARCH, 2001. By Order of the Court.

BERNELL EDWARDS, COURT CLERK

BY: _Amanda Adams_
DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____, 199____, at _____ o'clock _____M., and executed on the _____ day of _____, 199____, at _____ o'clock _____M. by _____

_____

Dated this _____ day of _____ 199____.

SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY: _____
DEPUTY

# DISTRICT COURT OF MUSKOGEE, WAGONER, CHEROKEE AND SEQUOYAH COUNTIES

## (FIFTEENTH JUDICIAL DISTRICT)

### (ORDER)

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 1 4 2001

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

Date: June 13, 2001

Defendant: Joseph D. Jacobs          Case #: SY-CF-98-481

Charge: Possession of CDS w/ Intent To Deliver

Sentence Date: June 5, 2000          Expiration Date: June 4, 2010


THE DEPARTMENT OF CORRECTIONS IS HEREBY RELIEVED FROM FURTHER ACTIVE SUPERVISION OF THIS DEFENDANT IN THIS PARTICULAR CASE.


_____
Honorable John C. Garrett
Judge of the District Court

225

## BENCH WARRANT--After Conviction

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Sequoyah County, | ) | **IN DISTRICT COURT** |

THE STATE OF OKLAHOMA )
           VS. )     No.CF-98-481
AUBREY JACOBS )

)

MULDROW, OK 74948 )
▇6 ▇1409 )     NO BOND

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**AUBREY JACOBS** having been on the 2ND DAY OF APRIL, 1999, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :FAILURE TO PAY MONIES DUE TO THE COURT IN THE AMOUNT OF $1837.00

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **AUBREY JACOBS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 18TH DAY OF JUNE, 2001. By Order of the Court.

<div align="center">

**BERNELL EDWARDS, COURT CLERK**

BY *Amanda Adams*
                            DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

SHERIFF'S RETURN

</div>

RECEIVED the within Writ on the _____ day of _____, 199____, at _____o'clock _____M., and executed on the _____day of _____, 199____, at _____o'clock _____M. by _____ _____

Dated this _____day of _____199_____.

<div align="right">

_____
SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY:_____
                         DEPUTY

</div>

dms

**BENCH WARRANT--After Conviction**

| | |
|---|---|
| **STATE OF OKLAHOMA,** ) | |
| **Sequoyah County,** ) | **IN DISTRICT COURT** |
| | |
| THE STATE OF OKLAHOMA ) | |
| VS. ) | No. CF-98-481A |
| JOSEPH JACOBS ) | |
| ███████ C/O JUNE TINNEY | ) |
| GANS, OK 74936 ) | |
| ██76 ███-6130 ) | **NO BOND** |

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**JOSEPH JACOBS** having been on the 18TH DAY OF APRIL, 1999, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :FAILURE TO PAY MONIES DUE TO THE COURT IN THE AMOUNT OF $533.00

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **JOSEPH JACOBS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah;  there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 1ST DAY OF OCTOBER, 2001. By Order of the Court.

BERNELL EDWARDS, COURT CLERK

BY: _Amanda Adams_
DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____, 199___, at _____ o'clock _____M., and executed on the _____ day of _____, 199___, at _____ o'clock _____M. by _____

_____

Dated this _____ day of _____ 199___.

SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY: _____
DEPUTY

dms

227

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,

      Plaintiff        )

vs.                       )

BRANDIE ZANE PRICE     )   Case No. CF-98-00481C

                      )      CF-99-00061

MULDROW, OK  74948     )      CF-99-549

      Defendant      )      CM-00-900

SS#:                 )

DOB:    1978

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 16 2001

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

Date: 04/16/01     State's Attorney:

               Defendant's Attorney: LYNN R. ANDERSON

RULE 8 HEARING
(Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES, HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____ $50.00 on or before 05-16-20 and then

~~$50.00 per month on or before 06-16-2001~~

then _____ per month on or before the ___ day of each month with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 05-16-20

OR; _____

_____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: Def. ordered to reappear for Perm. Rule 8 on 5-16-01.

TAL TO PAY $ To be determined

_Brandie L. Price_     DENNIS M. SPROUSE
   Defendant       Judge of the District Court

endant is further ordered to notify the Collections Adm. of change of address, telephone, employment, or income.

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
       Plaintiff )
)
vs. )
BRANDIE ZANE PRICE )
)
)
MULDROW, OK  74948 )
       Defendant )
   SS#: )
   DOB: 1978

Case No. CF-98-00481C   410.00
CF-99-00061   683.00
CF-99-00549   1393.00
SEQUOYAH COUNTY, OKLAHOMA   141.00
FILED
IN DISTRICT COURT

MAY 16 2001

DARRELL EDWARDS, COURT CLERK
BY _____ DEPUTY

State's Attorney:
Defendant's Attorney:

Date: 05/16/01

RULE 8 HEARING LYNN R. ANDERSON
(Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

    $75.00 on or before 06-23-20 and then

    $75.00 per month on or before 07-23-2001

then 75.00 per month on or before the 23rd day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 06-23-20

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: $75 due 23rd ea mo. until 10-23-01

When pyt. increases to $100.00

TOTAL TO PAY $ 2976.00

Brandie J Price
    Defendant

MIKE NORMAN
Judge of the District Court

*Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

APPLICATION FOR STAY OF EXECUTION ON FINES/COSTS

CHECK ONE _____ I plan to pay before 3.30 pm today

_____ I plan to pay within 48 hours        /  I want extended time to pay

I understand that my assessed fine(s)/costs are due IMMEDIATELY unless otherwise ordered by the Court. I understand that I may be subject to penalties, including but not limited to imprisonment, if I fail to pay my assessed fine(s)/costs as ordered. I consent to an investigation into all information I provide on this application to verify its validity. I understand I may be held in CONTEMPT OF COURT for providing false and/or incomplete information on this application. I swear under PENALTY OF PERJURY that the below information is true and complete.

SIGNATURE_____  DATE  5-16-01

                                    DATE OF BIRTH ▉▉▉▉ 78

CASE #_____

SS# ▉▉▉▉▉ 5806                      FINE/COST_____

LAST NAME  Price                    FIRST  Brandie  MI  B

STREET ▉▉▉▉▉  CITY  Muldrow         PHONE_____

EMPLOYER  Rena Rd. Christian Daycare  HOW LONG  1 wk.   PHONE_____  824.00 mo.

EARNINGS  5.15  per  hr  #hrs/wk  40  paydates_____  before Toles

IF PAYING BEFORE 3:30 PM TODAY:  STOP HERE

MARITAL STATUS    SINGLE  ✓   MARRIED_____   DIVORCED_____
                  SEPERATED_____   WIDOW/ER_____   COMMON LAW_____

Names and Ages of Children_____
List others living in household   NAME        RELATIONSHIP   EMPLOYER   INCOME
Dad - Brad Price
Tammy Young - Dad's girlfriend
Kelsie + Justin Edwards - Tammy's Children

AMOUNT OF CASH WITH YOU $_____   Saving/Checking Accounts $_____

Property, Investments, Assets $_____

I AM SUPPORTED BY: Self                Do you receive housing assistance_____
    Alimony/Child Support_____   Monthly Expenses:
    Social Security_____         Rent  100. mo.
    Pension/Retirement_____      Food_____
    Welfare_____                 Utilities  54.50
    Food Stamps_____             Child Care_____
    Unemployment_____            Medical_____
    My Gross Monthly Earning_____  TOTALS_____    fines in Ark.
    Other Income Support_____ Source_____              50.00 mo.

DRIVERS LICENSE #_____ STATE_____ EXP.DATE_____
VEHICLES YOU OWN OR USE:  YEAR    MAKE/MODLE    MONTHLY PAYMENTS

230

WARRANT CLEARANCE

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUL 25 2002

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

WARRANT # _CF-98-481_

WARRANT NAME: _Jacobs, Aubrey_

DATE & TIME CLEARED: _07-23-02   14:30_

WARRANT CLEARED BY:

ARREST _✗_ OFFICER SERVING _____

AGENCY _____

CANCEL _X_ OFFICIAL DIRECTING WARRANT CANCELLATION

_Helen Edwards_

WAS WARRANT PULLED FROM FILE?          (YES)          NO

IF NO, EXPLAIN WHY _____

WAS WARRANT MARKED OFF BOOK?          (YES)          NO

IF NO, EXPLAIN WHY _____

WAS WARRANT CANCELLED FROM NCIC?   YES          (NO)

IF NO, EXPLAIN WHY _Not Entered_

WAS WARRANT REMOVED FROM HOLD BOOK?   YES          (NO)

IF NO, EXPLAIN WHY _No Hold_

SHERIFF'S OFFICE EMPLOYEE SIGNATURE _C.B._

NOTE: AFTER COMPLETING THIS FORM, STAPLE THIS FORM BACK TO BACK WITH THE WARRANT. AND PUT IN THE FOLDER MARKED " SEND TO COURT CLERK" ONLY USE THIS FORM TO CLEAR **SEQUOYAH COUNTY WARRANTS**. YOU MUST USE ONE FORM FOR EACH WARRANT CLEARED.

## BENCH WARRANT--After Conviction

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Sequoyah County, | ) | IN DISTRICT COURT |

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA | ) | |
| VS. | ) | No.CF-98-481 |
| AUBREY  JACOBS | ) | *CF-98-58A* |
| ▮▮▮▮▮▮▮▮ | ) | |
| MULDROW, OK 74948 | ) | |
| ▮▮72 ▮▮8322 | ) | BOND |

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**AUBREY  JACOBS** having been on the 30TH DAY OF JUNE, 2000, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :FAILURE TO PAY MONIES DUE TO THE COURT IN THE AMOUNT OF $2333.00

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **AUBREY  JACOBS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 2ND DAY OF APRIL, 2001. By Order of the Court.

BERNELL EDWARDS, COURT CLERK

BY: *Amanda Adams*
DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____, 199____, at _____ o'clock _____ M., and executed on the _____ day of _____, 199____, at _____ o'clock _____ M. by _____

Dated this _____ day of _____ 199____.

SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY: _____
DEPUTY

*dms*

**BENCH WARRANT--After Conviction**

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Sequoyah County, | ) | **IN DISTRICT COURT** |

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA | ) | |
| VS. | ) | No.CF-98-481 |
| AUBREY JACOBS | ) | |
| ██████████ | ) | |
| MULDROW, OK 74948 | ) | |
| ██56██1409 | ) | **NO  BOND** |

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**AUBREY JACOBS**  having been on the 2ND DAY OF APRIL, 1999, duly  convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :FAILURE TO PAY MONIES DUE TO THE COURT IN THE AMOUNT OF $1837.00

YOU  ARE  THEREFORE  COMMANDED  Forthwith to arrest the above - named. **AUBREY  JACOBS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah;  there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this  18TH DAY OF JUNE, 2001.  By Order of the Court.

<div align="right">

**BERNELL EDWARDS, COURT CLERK**

BY *Amanda Adams*

DEPUTY

</div>

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

S H E R I F F ' S   R E T U R N

RECEIVED the within Writ on the _____ day of _____, 199____, at _____ o'clock _____M., and executed on the _____ day of _____, 199____, at _____ o'clock _____M. by _____

_____

Dated this _____ day of _____ 199____.

<div align="right">

SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY:_____

DEPUTY

</div>

dms

233

## BENCH WARRANT--After Conviction

| | | |
|---|---|---|
| **STATE OF OKLAHOMA,** | ) | |
| **Sequoyah County,** | ) | **IN DISTRICT COURT** |
| | | |
| THE STATE OF OKLAHOMA | ) | |
| VS. | ) | No.CF-98-481 |
| AUBREY JACOBS          ) | | |
| ███████████ | ) | |
| MULDROW, OK 74948 | ) | |
| ██-56 ████-1409 | ) | NO  BOND |

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**AUBREY JACOBS**  having been on the 2ND DAY OF APRIL, 1999, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :FAILURE TO PAY MONIES DUE TO THE COURT IN THE AMOUNT OF $1837.00

YOU ARE THEREFORE COMMANDED  Forthwith to arrest the above - named
**AUBREY JACOBS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah;  there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this  18TH DAY OF JUNE, 2001.  By Order of the Court.

BERNELL EDWARDS, COURT CLERK

BY  *Amanda Adams*
DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

SHERIFF'S  RETURN

RECEIVED the within Writ on the _____ day of _____, 199___, at _____o'clock _____M., and executed on the _____ day of _____, 199___, at _____o'clock _____M. by _____

Dated this _____ day of _____ 199___.

SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY: _____
DEPUTY

dms

234

**BENCH WARRANT--After Conviction**

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Sequoyah County, | ) | IN DISTRICT COURT |
| | | |
| THE STATE OF OKLAHOMA | ) | |
| VS. | ) | No.CF-98-481 |
| AUBREY JACOBS | ) | *CF-98-58A* |
| ▮▮▮▮▮▮ | ) | |
| MULDROW, OK 74948 | ) | |
| ▮72 ▮▮-8322 | ) | BOND |

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**AUBREY JACOBS** having been on the 30TH DAY OF JUNE, 2000, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :FAILURE TO PAY MONIES DUE TO THE COURT IN THE AMOUNT OF $2333.00

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **AUBREY JACOBS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 2ND DAY OF APRIL, 2001. By Order of the Court.

BERNELL EDWARDS, COURT CLERK

BY: *Amanda Adams*
DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____, 199____, at _____ o'clock ____ M., and executed on the _____ day of _____, 199____, at _____ o'clock ____ M. by _____

_____

Dated this _____ day of _____ 199____.

SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY: _____
DEPUTY

*dms*

Hamilton Morgan Bail Bonds
P.O. Box 189 – 113 N. Oak
Sallisaw, Ok. 74955
918-775-7887

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB 1 2 2001

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

In the District Court of *Sequoyah County*
State of Oklahoma                        Plaintiff

vs                                       Case No.: *CF 98-481A*

*Dale Jacobs*  Defendant

Motion to Vacate and Exonerate Bond

Come now the Bondsman, this *12* day of *February*, 2001, by way Motion to Exonerate the Court's Order of Appearance Bond(s) on *Audrey Dale Jacobs*, and the reason to exonerate is: *30 days past Bench Warrant and Forfiture date of 11/6/2000.*

And the Bondsman, Diane Hamilton, DBA of Hamilton Morgan Bail Bonds appears, and the court being held fully advised in the premises hereby exonerate the order and judgment on this Appearance Bond.

*Diane Hamilton*
Movant

It Is Therefore Ordered, Adjudged, and Decreed by the court that the above mentioned Appearance Bond be exonerated.

SO ORDERED,

_____        _____
District Attorney                Judge of District Court

236

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUL 2 3 2002

___ EDWARDS, COURT CLERK

BY _____ DEPUTY

# Order To Withdraw Warrant

THE STATE OF OKLAHOMA, )        IN THE DISTRICT COURT

COUNTY OF SEQUOYAH,     )        Before _Dennis Sprouse_
                                                Judge

To:  The Sheriff of the County of Sequoyah:
        and                                         Case No. _CF-98-481_
The Court Clerk of the County of Sequoyah

An order having been made by the undersigned Judge to issue a Warrant for the arrest of the Defendant, _Aubrey Jacobs_ ____ , on the _18_ Day of _June_ , _2001_ .

This Court has determined that in the interest of justice said Warrant should be _withdrawn_ immediately.

IT IS ORDER, that the above mentioned _Warrant is withdrawn_ and all records are to immediately reflect that the Warrant is no longer outstanding for service.

Dated at Sallisaw, Oklahoma this _31st_ Day of _July_ ____ , _2002_ .

_____
Judge of the District Court

Δ in DOC.

237

# DISTRICT COURT OF MUSKOGEE, WAGONER, CHEROKEE AND SEQUOYAH COUNTIES

## (FIFTEENTH JUDICIAL DISTRICT)

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

## (ORDER)

OCT 0 2 2002

Case Number: CF-99-549, 98-481, 99-61

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

It is Ordered, Adjudged and Decreed that Brandie Z. Price have all past, present and future probation fees waived.

Honorable Judge Norman
Judge of the District Court

Brian Morton
Assistant District Attorney

238

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                          )
       Plaintiff                      )
vs.                                          )      Case No.  CF-98-00481C
BRANDIE ZANE PRICE                           )                CF-99-00061
                                             )                CF-99-00549
                                             )                CM-00-00900
MULDROW, OK  74948                           )
          Defendant             )
   SS#: ████5806                           )
   DOB: ███/1978                     *TEMP.*

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 19 2002

BERNELL EDWARDS, COURT CLERK
_____ DEPUTY

State's Attorney:
Defendant's Attorney:

Date: 11/19/02            RULE 8 HEARING JERRY S. MOORE
                              (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____ $40.00 on or before 01-10-20*03* and

then _____ per month on or before the ___ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 01-10-20 _____

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: *To appear January 10, 2003*

_____

TOTAL TO PAY $2309.00

_____           _____
     Defendant                      JOHN C. GARRETT
                                  Judge of the District Court

Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA | ) | |
| Plaintiff | ) | CASE NO. CF-98-481 |
| | ) | |
| VS | ) | **SEQUOYAH COUNTY, OKLAHOMA** |
| | ) | **FILED** |
| | ) | **IN DISTRICT COURT** |
| AUBREY D. JACOBS | ) | |
| Defendant | ) | **JUL 2 5 2002** |
| | ) | BERNELL EDWARDS, COURT CLERK |
| | | BY_____DEPUTY |

<u>MOTION TO DISMISS APPLICATION TO REVOKE SUSPENDED SENTENCE</u>

COMES NOW Lynn Anderson, the duly appointed, qualified and acting District Attorney, District Number 27, Sequoyah County, State of Oklahoma, and moves the Court to dismiss the above-entitled cause for the following reasons, to-wit:

Defendant pled to five years in D.O.C. in case #CF-98-58

DIANNE BARKER HARROLD
DISTRICT ATTORNEY
DISTRICT 27
STATE OF OKLAHOMA

BY_____
ASSISTANT DISTRICT ATTORNEY

<u>O R D E R</u>

NOW ON THIS 25th day of July, 2002 the above entitled cause comes on to be heard upon Motion to Dismiss state's Application To Revoke Suspended Sentence said cause and the Court being fully advised in the premises, finds that said Motion should be sustained; and it is therefore Ordered, Adjudged, and Decreed that said cause be, and the **Application To Revoke Suspended Sentence in the above styled case** is hereby dismissed for the reasons as set forth in said Motion.

_____
JUDGE OF THE DISTRICT COURT

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                    )
          Plaintiff                   )
vs.                                   )        Case No. CF-98-00481A  —785.ₒₒ
JOSEPH DALE JACOBS                    )                 SEQUOYAH COUNTY, OKLAHOMA
                                      )                 TR-99-02109 FILED        30.ₒₒ
                                      )                      IN DISTRICT COURT
GANS, OK  74936                       )
          Defendant                   )                 DEC 19 2000
     SS#:                             )
     DOB: ▮▮▮▮▮ 1976                                 BERNELL EDWARDS, COURT CLERK
                                                    BY _____ DEPUTY

                              State's Attorney:
Date: 12/19/00                Defendant's Attorney: ROBBIE COWAN
                                                    GERALD HUNTER
                              RULE 8 HEARING
                                (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____ $75.00 on or before 01-31-20 and then

_____ $75.00 per month on or before 02-28-2001

then $75.00 per month on or before the 28th day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 01-31-20 _____

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.    10-1-01 BW  533

                                            1-2-02 OTC

Comments: _____

_____

_____


TOTAL TO PAY $ 815.00

_____              _____
      Defendant                   JOHN C. GARRETT
                                  Judge of the District Court

*Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

241

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA )
                   Plaintiff )

VS. )

Joseph Jacobs )   CASE NUMBER: CF-98-481A
)                  TR-99-2109
)
D.O.B )
DATE 10-27-00 )

FAYE TEAGUE
Assistant District Attorney
NONE
Defendant's Attorney

*Temp*

RULE 8 HEARING
(summary)

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

OCT 2 7 2000

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES, IT IS HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

$ 100.00 ON OR BEFORE 12-1-00 BY 4:00 P.M. AND

$ ON OR BEFORE BY 4:00 P.M. , THEN

$ PER MONTH ON OR BEFORE THE DAY OF EACH MONTH WITH LIKE SUMS ON THE SAME DATE THEREAFTER UNTIL PAID IN FULL; OR THE BALANCE IN FULL ON OR BEFORE THE DAY OF 199 BY P.M. OR,

IT IS FURTHER ORDERED THAT DEFENDANT MAKE ALL PAYMENTS IN PERSON AT THE OFFICE OF THE COURT CLERK.

COMMENTS: Def to Re-appear on 12-1-00 with 100.00 & proof of employment

TOTAL TO PAY $ 915.00

S/John C Garrett
JUDGE OF THE DISTRICT COURT

_____
DEFENDANT

✓ Defendant is further ordered to notify the Collections Adm. of any change of address, telephone, employment or income.

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OLKLAHOMA,
        Plaintiff )
vs. )
~~JOSEPH DALE JACOBS~~ )
)
C/O JUNE TINNEY )
GANS, OK 74936 )
        Defendant )
SS#: )
DOB: ▮/1976 )

Case No. CF-98-00481A

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

Date: 10/19/99    State's Attorney:   ROBBIE COWAN
               Defendant's Attorney: GERALD HUNTER

OCT 19 1999

RULE 8 HEARING
(Summary)

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

        _____ $75.00 on or before 11-27-99 and then

        _____ $75.00 per month on or before 12-27-1999

then $75.⁰⁰ per month on or before the 27ᵗʰ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before ~~11-27-99~~

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____ 8-17-w pc to def 785.⁰⁰
_____ 6-5-200 -def w/DC

TOTAL TO PAY $ bal # 1063⁰⁰

_____
X _Joe Jacobs_
      Defendant

_____
JOHN C. GARRETT
Judge of the District Court

*Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

## APPLICATION FOR STAY OF EXECUTION ON FINES/COSTS

CHECK ONE _____ I plan to pay before 3:30 pm today

_____ I plan to pay within 48 hours    _____ I want extended time to pay

I understand that my assessed fine(s)/costs are due IMMEDIATELY unless otherwise ordered by the Court. I understand that I may be subject to penalties, including but not limited to imprisonment, if I fail to pay my assessed fine(s)/costs as ordered. I consent to an investigation into all information I provide on this application to verify its validity. I understand I may be held in CONTEMPT OF COURT for providing false and/or incomplete information on this application. I swear under PENALTY OF PERJURY that the below information is true and complete.

SIGNATURE _Joe Jacob_____    DATE_____

CASE #_____    DATE OF BIRTH ▓▓▓▓ 76

SS# ▓▓▓▓ 6/30_____    FINE/COST_____

LAST NAME JACOBS_____    FIRST Joseph MI D

STREET_____ CITY GANS____    PHONE 776-0558

EMPLOYER Carpet Barn HOW LONG N/A    PHONE 775-1668

EARNINGS_____ per_____ #hrs/wk_____ paydates_____

### IF PAYING BEFORE 3:30 PM TODAY: STOP HERE

MARITAL STATUS    SINGLE ✓    MARRIED____    DIVORCED____
SEPERATED____    WIDOW/ER____    COMMON LAW____

Names and Ages of Children_____
List others living in household    NAME    RELATIONSHIP    EMPLOYER    INCOME

_____
_____

AMOUNT OF CASH WITH YOU $_____ Saving/Checking Accounts $_____
Property, Investments, Assets $_____
I AM SUPPORTED BY:_____    Do you receive housing assistance____
   Alimony/Child Support_____    Monthly Expenses:
   Social Security_____    Rent_____
   Pension/Retirement_____    Food_____
   Welfare_____    Utilities_____
   Food Stamps_____    Child Care_____
   Unemployment_____    Medical_____
   My Gross Monthly Earning_____    TOTAL$_____
   Other Income Support_____ Source_____

DRIVERS LICENSE #_____ STATE_____ EXP.DATE_____
VEHICLES YOU OWN OR USE:   YEAR    MAKE/MODLE    MONTHLY PAYMENTS

_____
_____

244

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,                    )
        Plaintiff                          )
vs.                                        )   Case No. CF-98-00481A
JOSEPH DALE JACOBS                         )
▇▇▇▇▇▇▇                                    )
C/O JUNE TINNEY                            )
GANS, OK   74436                           )
        Defendant                          )
   SS#:                                          SEQUOYAH COUNTY, OKLAHOMA
   DOB: ▇▇▇▇/1976                                        FILED
                                                  IN DISTRICT COURT

Date: 10/06/99        State's Attorney: ROBBIE COWAN      OCT 06 1999
                   Defendant's Attorney: GERALD HUNTER

                        RULE 8 HEARING          BERNELL EDWARDS, COURT CLERK
                          (Summary)             BY _____ DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____ $200.00 on or before 10-7-99  and then _____

_____ ~~$200.00 per month on or before~~ _____

then _____ per month on or before the ___ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before ~~10-7-99~~ _____

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _Defendant agreed to continue Community Service at CoBurn_
_Given credit for jail time & Community service up to date._

_____

TOTAL TO PAY $ _bal 1263°°_

_____                    _____
Defendant                                 JOHN C. GARRETT
                                          Judge of the District Court

*Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

245

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,

      Plaintiff          )

vs.                  )

JOSEPH DALE JACOBS     )   Case No. CF-98-00481A

                  )

                  )

MULDROW, OK 74948    )

      Defendant     )

   SS#:

   DOB:    /1976

Date: 04/12/99

State's Attorney: ROBBIE COWAN

Defendant's Attorney: GERALD HUNTER

*TEMP.*

RULE 8 HEARING

(Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS
TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,
HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

    $100.00 on or before 5-13-99 and then

    ~~$100.00 per month on or before~~

then _____ per month on or before the ___ day of each month
with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 5-13-99

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN
PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _Defendant is ordered to re-appear on_
_the 13th day of May 1999._

TOTAL TO PAY $ _1668.00_

_____     _____
    Defendant               JOHN C. GARRETT
                    Judge of the District Court

Defendant is further ordered to notify the Collections Adm. of
change of address, telephone, employment, or income.

NE.

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**APR 12 1999**

BERNELL EDWARDS, COURT CLERK

BY _____
                  DEPUTY

*6-7-99 bw #222 In 25° fee 1693.w*

*- work crew 10-1-99 -*
*Jailed on 9-19-99*

# In the District Court in and for Sequoyah County
## State of Oklahoma

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB 1 9 2004

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

State of Oklahoma,                           )
                                             )
      Plaintiff,                           )
                                             )
vs.                                          )  Case No. CF- 9 8 - 481 (B)
                                             )
Jacobs, James W                              )
                                             )
      Defendant                            )

## WAIVER OF PRELIMINARY HEARING

Now on this _____17_____ day of Feb _____, 2004, the above styled case comes on for preliminary hearing. The defendant appears in person and represented by his attorney of record, __John M. Wh. Tack__, the State of Oklahoma appears by its Assistant District Attorney. Thereupon the defendant herein acknowledges having been advised of the right to a preliminary hearing. That in said hearing the State of Oklahoma must prove to the satisfaction of the Court that the crime as alleged in the information was, in fact, committed and there is probable cause to believe that the defendant committed said crime. That if said burden was not met then the case would be dismissed and the bond exonerated.

The defendant is further advised that at said hearing that he/she has the right to cross examine any of the State's witnesses and to call witnesses on his/her own behalf. And further, the defendant is advised of the right at the hearing to limited discovery of the State's case in chief.

Having these rights in mind, the defendant herein, waives all the above rights with respect to a preliminary hearing in this matter.

_____
                    Defendant

_____
                Attorney for Defendant

## WAIVER OF JURISDICTION OF EXAMINING MAGISTRATE

The defendant is further advised that neither the examining magistrate nor the Special Judge has the jurisdiction to proceed further with the case unless affirmatively waived. Having these rights in mind, the defendant hereby waives his/her rights to object to any jurisdictional defects of the Court.

_____
                    Defendant

_____
                Attorney for Defendant

## COURT MINUTE OF PRELIMINARY HEARING

The defendant in the above styled case having knowingly and intelligently waived his/her rights to the preliminary hearing and there being no objection by the State of Oklahoma, the Court accepts the defendant's waiver and hereby binds the defendant over to stand trial in the District Court of Sequoyah County, State of Oklahoma, on the charges as set out in the information as filed in this case.

DCA/Plea

March 18, 2003
@ 1:30pm

J. Garrett

_____
      JUDGE OF THE DISTRICT COURT

247

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                    )
        Plaintiff             )
vs.                                   )    Case No. CF-98-00481C
BRANDIE ZANE PRICE                    )             CF-99-00061
                                    )             CF-99-00549
                                    )             CM-00-00900
MULDROW, OK  74948                    )
▮▮▮▮▮▮▮▮Defendant                     )
  SS#: ▮▮▮▮5806
  DOB: ▮▮▮▮1978                       *TEMP.*

State's Attorney:

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

Defendant's Attorney:

NOV 1 9 2002

BERNELL EDWARDS, COURT CLERK

Date: 11/19/02              RULE 8 HEARING JERRY S. MOORE
                              (Summary)                    DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____ $40.00 on or before 01-10-20*03* and

then _____ per month on or before the ___ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 01-10-20 _____

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: *Do appear January 10, 2003*

_____


TOTAL TO PAY $ *2309.00*

*Brandie Price*
    Defendant

_____
    JOHN C. GARRETT
    Judge of the District Court

Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

APPLICATION FOR STAY OF EXECUTION ON FINES/COSTS

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

CHECK ONE        _____ I plan to pay before 3:30 pm today

NOV 19 2002

_____ I plan to pay within 48 hours     __X__ I want extended time to pay

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

I understand that my assessed fine(s)/costs are due IMMEDIATELY unless otherwise ordered by the Court. I understand that I may be subject to penalties, including but not limited to imprisonment, if I fail to pay my assessed fine(s)/costs as ordered. I consent to an investigation into all information I provide on this application to verify its validity. I understand I may be held in CONTEMPT OF COURT for providing false and/or incomplete information on this application. I swear under PENALTY OF PERJURY that the below information is true and complete.

SIGNATURE _Brandie Z. Price_        DATE _Nov. 19, 2002_

CASE # _98-481C_        DATE OF BIRTH _████ /78_

SS# _████ 5806_        FINE/COST _2309_

LAST NAME _Price_        FIRST _Brandie_  MI _Z_

STREET _████_        CITY _Muldrow_   PHONE _427-6259_

Dec. 15, 2002
work
release

EMPLOYER _NA_        HOW LONG _NA_   PHONE _NA_

EARNINGS _NA_ per _NA_ #hrs/wk _NA_ paydates _NA_

IF PAYING BEFORE 3:30 PM TODAY:  STOP HERE

MARITAL STATUS     SINGLE _✓_   MARRIED _____      DIVORCED _____
SEPERATED _____     WIDOW/ER _____      COMMON LAW _____

Names and Ages of Children _Zane - Morgan - Son_
List others living in household  NAME _Louella Stamps_   RELATIONSHIP _Grandmother_   EMPLOYER   INCOME

AMOUNT OF CASH WITH YOU $_____   Saving/Checking Accounts $_____
Property, Investments, Assets $_____
I AM SUPPORTED BY: _father_
    Alimony/Child Support _____       Do you receive housing assistance _no_
    Social Security _____        Monthly Expenses:
    Pension/Retirement _____        Rent _____
    Welfare _____        Food _____
    Food Stamps _____        Utilities _110.00_
    Unemployment _____        Child Care _____
    My Gross Monthly Earning _____       Medical _____
    Other Income Support _____   Source _____   TOTAL $_____

DRIVERS LICENSE # _444825806_ STATE _OK_ EXP. DATE _12/02_
VEHICLES YOU OWN OR USE:  YEAR _98_   MAKE/MODLE _Chev. Malibu_   MONTHLY PAYMENTS _266.44_
_50.00_

249

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
        Plaintiff        )
vs.                  )    Case No. CF-98-00481C  52.00
BRANDIE ZANE PRICE     )          CF-99-00061  2  583.00
                      )          CF-99-00549  3  1393.00
                      )          CM-00-00900  4  141.00
MULDROW, OK  74948     )
▓▓▓▓▓▓▓▓Defendant   )
  SS#: ▓▓▓▓5806
  DOB: ▓▓▓▓▓/1978

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 0 7 2003

BERNELL EDWARDS, COURT CLERK
BY
_____ DEPUTY

State's Attorney:
Defendant's Attorney:

Date: 01/07/03          RULE 8 HEARING JERRY S. MOORE
                        (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

        $40.00 on or before 02-07-20 03 and

then 40.00 per month on or before the 7th day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 02-07-20

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

TOTAL TO PAY $ 2269.00

_Brandie Price_____      JOHN C. GARRETT
     Defendant         Judge of the District Court

Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA, )
        Plaintiff )
vs. )   Case No. CF-98-00481C
BRANDIE ZANE PRICE )         CF-99-00061
)         CF-99-00549
)         CM-00-00900
MULDROW, OK 74948 )
           efendant )
      SS#: ▮▮▮5806
      DOB: ▮▮▮/1978

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 0 7 2003

BERNELL EDWARDS, COURT CLERK
_____DEPUTY

State's Attorney:
Defendant's Attorney:

Date: 01/07/03       RULE 8 HEARINGJERRY S. MOORE
               (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

          $40.00 on or before 02-07-20*03* and

then *40.00* per month on or before the 7th day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 02-07-20_____

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

TOTAL TO PAY $ *2269.00*

_____
Defendant

_____
JOHN C. GARRETT
Judge of the District Court

Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

251

IN THE DISTRICT COURT STATE OF OKLAHOMA SEQUOYAH COUNTY

# BENCH WARRANT
## FAILURE TO PAY

**STATE OF OKLAHOMA**

<div style="text-align:center">Plaintiff</div>

**VS.**

**AUBREY DALE JACOBS**

<div style="text-align:center">Defendant</div>

Case No:  CF-98-00058A

~~CF-98-481~~

CF-99-484

S.S.#: ████1409

D.O.B: ████56

THE STATE OF OKLAHOMA,

To any Sheriff or Policeman in this State GREETINGS:

The Defendant:

    Name:  AUBREY DALE JACOBS

    Address:  RT 5 BOX 550,  (SAME PLACE 403 N. MAIN)  (SAME PLACE 403 N. MAIN)  MULDROW, OK, 74948

    DL# & State: 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,      ; EXPIRATION DATE:

    Description:   RACE: C;   SEX: M

having been duly ordered to appear and pay fines and/or court costs in District Court of Sequoyah County, the State of Oklahoma, and having failed to do so.

YOU ARE THEREFORE COMMANDED FORTHWITH to arrest the above named defendant and bring said defendant before said Court for Judgment; or, if the Court has adjourned, that you deliver said defendant into the custody of the Sheriff of SEQUOYAH County, to be detained by said Sheriff until the further order of the Court;

    OR, UNTIL said defendant posts bail as authorized below;

**BOND SET AT     $4188.00  CASH ONLY ! ! ! ! !**

Tuesday, September 16, 2003

BY ORDER OF THE COURT:                 *Amanda Adams*

_____
Deputy Clerk

## OFFICER'S RETURN

I received this FAILURE TO PAY BENCH WARRANT on the ____ day of _____, 20___ , and executed the same on the ____ day of _____, 20 ____,

_____, SHERIFF

BY: _____, UNDERSHERIFF/DEPUTY

dms

252

SEQUOYAH COUNTY, OKLAHOMA
FILED
DISTRICT COURT

MAR 0 4 2004

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, First, Middle, suffix (please print or type)(show alias) ███ 56 -1409

Jacobs, Aubrey Dale

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF98 00058A | Release Per Judge Garrett | ~~Come back for the days~~ |
| CF98481 | | ~~For Re Ve~~ |
| CF99484 | | |
| | | FTA/FTP |
| | | |
| | | |
| | | |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the 1 day of march , 20 04 .

_R. McGee_
Signature

AUTHORIZED BY

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

_____
JUDGE OF THE DISTRICT COURT

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,           )
     Plaintiff             )
vs.                          )      Case No. CF-98-00058A
AUBREY DALE JACOBS           )               CF-98-00481
                       )               CF-99-00484
                       )
SABLABAWHEOK  74955          )
     Defendant             )
    SS#: ██████ 1409
    DOB: ██████ /1956

State's Attorney:

Date: 03/02/04

Defendant's Attorney:
                  LYNN R. ANDERSON
RULE 8 HEARING
(Summary)

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 0 2 2004

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS
TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,
HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____ $25.00 on or before 04-02-2004 and

then _____ per month on or before the ___ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 04-02-20 _____

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN
PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

TOTAL TO PAY $ 453.00

x Aubrey Jacobs
  Defendant

DENNIS M. SPROUSE
Judge of the District Court

Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,          )
          Plaintiff        )
vs.                         )    Case No. CF-98-00058A
AUBREY DALE JACOBS          )              CF-98-00481
                            )              CF-99-00484
                            )
SALLISAW, OK   74955        )
          Defendant         )
     SS#:  ████1409
     DOB:  ████/1956

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

State's Attorney:
Defendant's Attorney:                        APR - 6 2004

Date: 04/06/04                      JEFF SHERIDAN BERNELL EDWARDS, COURT CLERK
                    RULE 8 HEARING JOHN M. WHITWORTH
                        (Summary)              BY_____DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:


_____$50.00 on or before 05-30-2004 and

then ___50___ per month on or before the 30th day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 05-30-20_____

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: defendant to pay 50 for only four months.
May, June, July, Aug - Beginning September payments
increase to 100 each month.

TOTAL TO PAY $ need to see Judge.

_____
DENNIS M. SPROUSE
Judge of the District Court

X Aubrey Jacobs
          Defendant
Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

255

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,               )
           Plaintiff             )
vs.                              )    Case No. CF-98-00058A - 413.00
AUBREY DALE JACOBS               )             CF-98-00481 - 1837.00
                                 )             CF-99-00484 - 1878.00
                                 )
SABLABAWHEOK  74955              )
           Defendant             )
     SS#:        1409            )
     DOB:       /1956

                    State's Attorney:
                    Defendant's Attorney:

Date: 04/06/04                           JEFF SHERIDAN
                    RULE 8 HEARINGJOHN M. WHITWORTH
                         (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:


_____ $100.00 on or before 05-10-2004 and

then _____ per month on or before the ___ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 05-10-20 _____

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

_____

TOTAL TO PAY $ 2478.00

                                    DENNIS M. SPROUSE
_____            Judge of the District Court
          Defendant
Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

Credit approved per Garrett 4-12-04

BENCH WARRANT-AFTER CONVICTION

THE STATE OF OKLAHOMA,                          )
                                                )
vs.                                             )    Case No. CF-98-00481
AUBREY DALE JACOBS
108 APACHE                                           NO BOND
SALLISAW, OK  74955
██████ 1956    ██████ 1409

BENCH WARRANT

THE STATE OF OKLAHOMA,
     TO ANY SHERIFF, CONSTABLE, MARSHALL, OR POLICEMAN IN THIS STATE
GREETINGS:
AUBREY DALE JACOBS having been on April 06, 2004, duly convicted in the
District Court of Sequoyah County, State of Oklahoma, of the crime of:
FAILURE TO APPEAR AND PAY MONIES DUE THE COURT IN THE AMOUNT OF $3008.00.
POSSESSION OF CD W/INTENT TO DISTRIBUTE

     YOU ARE THEREFORE COMMANDED FORTHWITH to arrest the above named
defendant, AUBREY DALE JACOBS, and bring him/her before said Court for
judgement, or if said Court has adjourned for the term, deliver him/her to
the Sheriff of the County of Sequoyah; there to be detained by said Sheriff
until further order of the court;

     WITNESS my hand and seal of said Court this 10-05-2005.

                                   BERNELL EDWARDS
                                   COURT CLERK

                              By: _Amanda Adams_
                                   Deputy

            WILL ONLY EXTRIDATE FROM SURROUNDING STATES

                         SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____, 199__, at
_____o'clock __.m., and executed on the _____ day of _____, 199__, at
_____ o'clock __.m., by _____.

DATED this _____ day of _____, 1999.

                              JOHNNY PHILPOT,
                              SHERIFF, SEQUOYAH COUNTY

                              BY:_____
                                   Deputy

dms

257

# Sequoyah County Sheriff's Office
## Service of Warrant Return

Date: 11-5-05 Time: 02 : 51    Warrant #: CF-98-481A

Name of Arrestee: Joseph Jacobs

Location Of Arrest: Muldrow P. O.

I certify that on the above date and time, I served the following
Warrant on the above named person and transported said person
To the Sequoyah County Detention Center or served the warrant to
Said person while incarcerated in the county detention center.

Served by: Randy Do_____    Badge#: 847

Deputy Sheriff
Sequoyah County, Oklahoma

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 0 7 2005

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

258

**BENCH WARRANT--After Conviction**

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Sequoyah County, | ) | **IN DISTRICT COURT** |
| | | |
| THE STATE OF OKLAHOMA | ) | |
| VS. | ) | No. CF-98-481A |
| JOSEPH JACOBS | ) | |
| ▓▓▓▓▓▓▓▓O JUNE TINNEY | ) | |
| GANS, OK 74936 | ) | |
| ▓▓76  ▓▓▓▓6130 | ) | NO  BOND |

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**JOSEPH JACOBS**  having been on the 18TH DAY OF APRIL, 1999, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :FAILURE TO PAY MONIES DUE TO THE COURT IN THE AMOUNT OF $533.00

YOU  ARE  THEREFORE  COMMANDED  Forthwith to arrest the above - named **JOSEPH JACOBS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 1ST DAY OF OCTOBER, 2001. By Order of the Court.

BERNELL EDWARDS, COURT CLERK

BY: *Amanda Adams*
DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

SHERIFF'S  RETURN

RECEIVED the within Writ on the _____ day of _____, 199___, at _____ o'clock _____ M., and executed on the _____ day of _____, 199___, at _____ o'clock _____ M. by _____

Dated this _____ day of _____ 199___.

SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY: *Randy A____*        847        DEPUTY

dms

259

**BENCH WARRANT--After Conviction**

STATE OF OKLAHOMA,            )
Sequoyah County,             )            **IN DISTRICT COURT**

THE STATE OF OKLAHOMA        )
            VS.              )            No. CF-98-481A
JOSEPH JACOBS        )
▮▮▮▮▮ C/O JUNE TINNEY                     )
GANS, OK 74936       )
▮76 ▮▮-6130          )            NO  BOND

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**JOSEPH JACOBS** having been on the 18TH DAY OF APRIL, 1999, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :FAILURE TO PAY MONIES DUE TO THE COURT IN THE AMOUNT OF $533.00

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **JOSEPH JACOBS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 1ST DAY OF OCTOBER, 2001. By Order of the Court.

BERNELL EDWARDS, COURT CLERK

BY: _Amanda Adams_
                                        DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

S H E R I F F ' S   R E T U R N

RECEIVED the within Writ on the _____ day of _____, 199___, at _____o'clock _____M., and executed on the _____ day of _____, 199____, at _____o'clock _____M. by _____

Dated this _____ day of _____ 199____.

_____
SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY:_____
                                        DEPUTY

dms

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 29 2005

DARNELL EDWARDS, COURT CLERK

BY_____
_____ DEPUTY

# Order To Withdraw Warrant

THE STATE OF OKLAHOMA, )

COUNTY OF SEQUOYAH,     )

IN THE DISTRICT COURT

Before _Dennis Sprouse_
                        Judge

To: The Sheriff of the County of Sequoyah:
   and
The Court Clerk of the County of Sequoyah

Case No. _CF-98-481_

An order having been made by the undersigned Judge to issue a Warrant for the arrest of the Defendant, _Aubrey Jacobs_ _____ , on the __5__ Day of _October_ , _2005_ .

This Court has determined that in the interest of justice said Warrant should be *withdrawn* immediately.

IT IS ORDER, that the above mentioned *Warrant is withdrawn* and all records are to immediately reflect that the Warrant is no longer outstanding for service.

Dated at Sallisaw, Oklahoma this _1st_ Day of _December_ _____ , _2005_ .

_____
Judge of the District Court

261

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 29 2005

BERNELL EDWARDS, COURT CLERK
BY _____ *aa* _____ DEPUTY

Bernell Edwards
Sequoyah County Court Clerk
120 E. Chickasaw
Sallisaw, OK 74955
15th Judicial District

Ph. 918-775-4411
M. Vann, deputy
B. Lockhart, deputy
K. Victory, deputy
R. Terhune, deputy

Ph. 918-775-1223
E. Merrill, deputy
R. Hickman, deputy
A. Adams, deputy
S. Huff, deputy

DATE: 11/29/05

RE: CF-98-481

NAME: Aubrey Jacobs

This office requests you to withdraw the outstanding warrant on the above individual.
An order to withdraw signed by the appropriate Judge will follow.

Thank You,

A. Adams
Deputy

262

SEQUOYAH COUNTY DISTRICT COURT
BERNELL EDWARDS, COURT CLERK
SEQUOYAH COUNTY
SALLISAW, OK   74955

07-03-2006

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUBREY DALE JACOBS

SALLISAW, OK   74955

JUL 0 6 2006

In Re:CF-98-58A, CF-98-481, CF-99-484

BERNELL EDWARDS, COURT CLERK

Dear Aubrey Dale Jacobs,

BY_____Rtl_____DEPUTY

     Our records show that you are now delinquent on your fine and/or court costs in the amount of $500.00. The total amount due in your case(s) is $2648.00. If payment is not received within 10 days a warrant will be issued.  Additional court costs will be charged.  The  bond amount on the warrant will be $2648.00.(Cash bond only.)
     Please be advised that this is the ONLY OVERDUE NOTICE YOU WILL RECEIVE FROM THIS OFFICE.
     Any questions concerning this matter should be directed to the Sequoyah County Court Clerk, 120 East Chickasaw, Sallisaw, OK 74955, or by calling (918) 775-4411. Thank you for prompt attention to this matter.

                              Sincerely,

                              Bernell Edwards, Court Clerk

                              By Robin Hickman ,Deputy

On 04-06-2004, you were ordered and agreed to begin payments on 05-30-2004.  Payments were to be made in the amount of $50.00. The last payment received on this pay order was made on 05-18-2006.


There is a $10.00 charge for this notice, which is included in the total amount due.

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY**
**STATE OF OKLAHOMA**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

| | | |
|---|---|---|
| STATE OF OKLAHOMA | ) | |
| Plaintiff, | ) | SEP 1 6 2005 |
| | ) | BERNELL EDWARDS, COURT CLERK |
| vs. | ) | BY_____DEPUTY |
| | ) | Case No. CF-98-481(B) |
| JAMES. W. JACOBS, | ) | |
| Defendant. | ) | |

## MOTION TO DISMISS

**COMES NOW** RICHARD L. GRAY, District Attorney, in and for Sequoyah County, State of Oklahoma, and moves the Court to dismiss the above case of POSSESSION OF CDS WITH INTENT TO DISTRIBUTE; POSSESSION OF PARAPHERNALIA and POSSESSION OF MARIHUANA now pending against the above named defendant, JAMES W. JACOBS, pursuant to plea agreement in CF-01-693,

WHEREFORE, movant prays that this matter be dismissed for the above named reason.

RICHARD L. GRAY
DISTRICT ATTORNEY

BY: _____
ASSISTANT DISTRICT ATTORNEY

## ORDER

**NOW** on this ___16TH___ day of ___Sept___, 2005, this matter comes before the Court upon the Motion of the District Attorney, Richard L. Gray, and by his assistant moving the Court to dismiss the above pending case for the reason stated above.

IT IS THEREFORE ORDERED BY THE COURT that the above named cases against said defendant is hereby dismissed.

IT IS SO ORDERED.

_____
JUDGE OF THE DISTRICT COURT

264

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 179**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA
## CRIMINAL COVER SHEET

**CASE INFORMATION**

ASSIGNED JUDGE: _____     CF  2000- 668 _____

STATE                                          CM  2000- _____
                                               PREVIOUS CASE NUMBER: _____

VS.                                            PREVIOUS JUDGE: _____

RANDALL W. WEAVER

**DEFENDANT INFORMATION**
NAME:       RANDALL W. WEAVER _____
ADDRESS:    ▮▮▮▮▮▮ MULDROW, OK _____

ADDRESS TYPE: __H __W __O       TELEPHONE: ____     DATE OF BIRTH: ▮▮▮65 ____
DRIVERS LICENSE NUMBER:  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  SS# _____     DRIVERS LICENSE STATE: _____ OK
RACE: B   GENDER: M _____     LANGUAGE/DIALECT: _____
ADDITIONAL DEFENDANTS: ___Y ___N TOTAL NUMBER OF DEFENDANTS:  1 ____

**ATTORNEY INFORMATION**
(IF LICENSED IN OKLAHOMA, FILL IN ADDRESS INFORMATION ONLY IF IT IS NEW SINCE THEY WERE REGISTERED WITH THE OKLAHOMA BAR ASSOCIATION.)
(ATTACH ADDITIONAL COVER SHEETS FOR ADDITIONAL ATTORNEYS.)

LAST NAME: _____     FIRST NAME: _____
                                MIDDLE: _____
ADDRESS: _____
CITY: _____     STATE: _____ ZIP: _____
BAR NUMBER (REQUIRED): _____ TELEPHONE: _____
E-MAIL: _____

**OFFENSES:**

| COUNTS | OFFENSE CHARGED | O.S. CITATION | NCIC CODE |
|---|---|---|---|
| 1. | POCD - CHARGE 1 | | |
| 2. | FEL. IN POSS. FA - CHARGE 2 | | |
| 3. | POSS. FA IN COMM. - CHARGE 3 | | |
| 4. | KCSP - CHARGE 4 | | |
| 5. | PARA. - CHARGE 5 | | |

DATE: 11-13-00     Signature of (Assistant) District Attorney _____

KEB502906

INFORMATION

========================================================

### IN THE DISTRICT COURT OF SEQUOYAH COUNTY
### STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. CF-2000- 668 |
| | ) | |
| RANDALL W. WEAVER | ) | |
| DOB: ███-65 SSN# ███████2924 | ) | |
| Defendant. | ) | |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT
NOV 13 2000
BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## INFORMATION

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:

Now comes DIANNE BARKER HARROLD, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that RANDALL W. WEAVER did, in Sequoyah County, and in the State of Oklahoma, on the 8th day of November, in the year of our Lord, Two Thousand, and before the presentment hereof, commit the crime of

### Count I:
### UNLAWFUL POSSESSION OF CONTROLLED DRUG - 63 O.S. 2-402 (B-1)

That on the day and year, and in the County and State, aforesaid, RANDALL W. WEAVER, did unlawfully, wilfully, knowingly, or intentionally and feloniously have in his possession and under his control METHAMPHETAMINE, said drug being classified as a controlled dangerous substance in Schedule II of the Uniform Controlled Dangerous Substances Act of this State,

### Count II:
### FELON IN POSSESSION OF FIREARM-21 O.S. 1283

RANDALL W. WEAVER did unlawfully, wilfully, and feloniously have in his possession or within his immediate control two (2) guns to-wit: RUGER 22 CARBINE and a 12 GAUGE SHOTGUN, after having been heretofore convicted of a felony in Case No. CRF-91-4343, for the crime of POSSESSION OF CONTROLLED DRUG (COCAINE) WITH INTENT TO DELIVER, in Sebastian County, State of Oklahoma,

### Count III:
### POSSESSION OF FIREARM IN COMMISSION OF FELONY - 21 O.S. 1287

That on the day and year, and in the County and State, aforesaid, RANDALL W. WEAVER, did unlawfully, wilfully, and feloniously, while committing the felony of POSSESSION OF CDS, 63 O.S. 2-402, did then and there possess a firearm, to-wit: a RUGER 22 CARBINE and a 12 GAUGE SHOTGUN, whether loaded or not, in such commission or attempt,

### Count IV:
### KNOWINGLY CONCEALING STOLEN PROPERTY-21 O.S. 1713

That on the day and year, and in the County and State, aforesaid, RANDALL W. WEAVER, did unlawfully, wilfully, knowingly, and feloniously conceal from an individual in the state of Arkansas, Crawford County, certain personal property of value, to-wit: a Ruger 22 Carbine, that had prior thereto been stolen from the said individual, the said defendant knowing or reasonably should have believed that said property was stolen did then and there unlawfully conceal and withhold said property from the owner thereof, with the felonious intent to deprive said owner thereof,

### Count V:
UNLAWFUL POSSESSION OF PARAPHERNALIA (MISD) 63 O.S. 2-405

On the day and year in the County and State aforesaid, said RANDALL W. WEAVER did unlawfully, wilfully and wrongfully have in his possession and under his control certain paraphernalia, to-wit: BAGGIES, and ROLLING PAPERS, used to consume drugs classified as controlled dangerous substances under the Uniform Controlled Dangerous Substances Act of this State, and for the purpose and with the unlawful intent to administer such controlled dangerous substances without having any medical or other lawful need requiring possession of said paraphernalia,

KEB502907

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

By _____

Assistant District Attorney

STATE OF OKLAHOMA )
                           ) ss.
COUNTY OF SEQUOYAH )

Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____

Assistant District Attorney

Subscribed and sworn to before me this _13th_ day of November, 2000.

_____

NOTARY PUBLIC

My Commission Expires:

_10/4/04_

WITNESSES:

**Lisa Sapp, RPD**
**Ronnie Howard, RPD**

268

KEB502908

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 13 2000

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

CF-00-668

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,
    Plaintiff,

vs.

_RANDALL WILLIAM WEAVER__ ,
    Defendant.

### AFFIDAVIT

State of Oklahoma   )
County of Sequoyah  )  ss.

   __OFFICER LISA SAPP____ , of lawful age and being first duly sworn upon an oath, deposes and says: ON 11-08-2000 AT APPROXIMATELY 0128 I WAS SOUTHBOUND ON ROLAND ROAD WHEN I OBSERVED A GREEN FORD PICKUP IN FRONT OF ME CROSS THE CENTER LINE AT ROLAND ROAD AND I40 3 TIMES.

Based on this information, the undersigned prays that this Honorable Court issue a finding of fact that probable cause exists to believe that a crime has been committed and that there is probable cause to believe the defendant(s) above named committed that crime.

**FURTHER AFFIANT SAYETH NOT.**

_Officer Lisa Sapp_

Subscribed and sworn to before me this __8th__ day of __November__ , 2000.

MY COMMISSION EXPIRES: _5-14-2001_

_____
                                NOTARY PUBLIC

### FINDING OF PROBABLE CAUSE

   The undersigned Judge of this Court, upon sworn testimony and/or affidavit, hereby determines there to be probable cause to detain the defendant(s).
   DATED this ___8___ day of __November__ , 2000.

_____
JUDGE OF THE DISTRICT COURT

269

KEB502909

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, First, Middle, suffix (please print or type) (show alias) ██████████ 65

Weaver Randall William

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-00-668 | Bond 20,000.00 per Sprouse Charles Smith | Poss CDS Poss F/A left of center poss stolen F/A poss par AFCFX 1 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the ___7___ day of __Nov__ , 19 2000

_____
Signature

AUTHORIZED BY

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

_____
Sprouse
JUDGE OF THE DISTRICT COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 13 2000

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

KEB502910

INFORMATION - AMENDED
========================================================

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

| | | |
|---|---|---|
| **STATE OF OKLAHOMA** | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **No. CF-2000-668** |
| | ) | |
| **RANDALL W. WEAVER** | ) | |
| DOB: ███65 SSN#██████2924 | ) | |
| **Defendant.** | ) | |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 27 2000

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

*AMENDED*
## INFORMATION

### IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:

Now comes DIANNE BARKER HARROLD, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that RANDALL W. WEAVER did, in Sequoyah County, and in the State of Oklahoma, on the 8th day of November, in the year of our Lord, Two Thousand, and before the presentment hereof, commit the crime of

### Count I:
### UNLAWFUL POSSESSION OF CONTROLLED DRUG - 63 O.S. 2-402 (B-1)

That on the day and year, and in the County and State, aforesaid, RANDALL W. WEAVER, did unlawfully, wilfully, knowingly, or intentionally and feloniously have in his possession and under his control METHAMPHETAMINE, said drug being classified as a controlled dangerous substance in Schedule II of the Uniform Controlled Dangerous Substances Act of this State,

### Count II:
### FELON IN POSSESSION OF FIREARM - 21 O.S. 1283

RANDALL W. WEAVER did unlawfully, wilfully, and feloniously have in his possession or within his immediate control a TWO (2) guns to-wit: RUGER 22 CARBINE and a 12 GUAGE SHOTGUN, after having been heretofore convicted of a felony in Case No. CRF-91-99, for the crime of POSSESSION OF COCAINE WITH INTENT TO DISTRIBUTE, in Sebastian County, State of Arkansas,

### Count III:
### POSSESSION OF FIREARM IN COMMISSION OF FELONY - 21 O.S. 1287

That on the day and year, and in the County and State, aforesaid, RANDALL W. WEAVER, did unlawfully, wilfully, and feloniously, while committing the felony of POSSESSION OF CONTROLLED DRUG, did then and there possess a firearm, to-wit: a RUGER 22 CARBINE and a 12 GAUGE SHOTGUN, whether loaded or not, in such commission or attempt,

### Count IV:
### KNOWINGLY CONCEALING STOLEN PROPERTY-21 O.S. 1713

That on the day and year, and in the County and State, aforesaid, RANDALL W. WEAVER, did unlawfully, wilfully, knowingly, and feloniously conceal from an individual in the state of Arkansas, certain personal property of value, to-wit: a Ruger 22 Carbine, that had prior thereto been stolen from the said individual, the said defendant knowing or reasonably should have believed that said property was stolen did then and there unlawfully conceal and withhold said property from the owner thereof, with the felonious intent to deprive said owner thereof,

271

KEB502911

Count V:
## UNLAWFUL POSSESSION OF PARAPHERNALIA-(MISD) 63 O.S. 2-405

On the day and year in the County and State aforesaid, said RANDALL W. WEAVER did unlawfully, wilfully and wrongfully have in his possession and under his control certain paraphernalia, to-wit: BAGGIES and ROLLING PAPERS, used to consume drugs classified as controlled dangerous substances under the Uniform Controlled Dangerous Substances Act of this State, and for the purpose and with the unlawful intent to administer such controlled dangerous substances without having any medical or other lawful need requiring possession of said paraphernalia,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

> DIANNE BARKER-HARROLD
> DISTRICT ATTORNEY
>
> By _____
> Assistant District Attorney

STATE OF OKLAHOMA    )
                     ) ss.
COUNTY OF SEQUOYAH )

Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____
Assistant District Attorney

Subscribed and sworn to before me this 22 day of November, 2000.

_____
NOTARY PUBLIC

My Commission Expires:
10/4/04

WITNESSES:

**Lisa Sapp, RPD**
**Ronnie Howard, RPD**

KEB502912

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 2 7 2000

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

INFORMATION
Page 2

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | IN THE DISTRICT COURT OF |
| Plaintiff, | ) | SEQUOYAH COUNTY, STATE |
| | ) | OF OKLAHOMA |
| vs. | ) | CASE NO. CRF-2000-668 |
| | ) | |
| RANDALL W. WEAVER, | ) | |
| Defendant. | ) | |

## FORMER CONVICTIONS

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same RANDALL W. WEAVER was heretofore on the 18th day of April, 1991, in Case No. CRF-99-91, in the District Court of Sebastian County, State of Arkansas, a court of competent jurisdiction, convicted of the crime of POSSESSION OF COCAINE WITH INTENT TO DELIVER, said defendant being represented by counsel, and said conviction having become a final judgment in the case and therefore, this defendant is prosecuted as a second and subsequent offender.

DIANNE BARKER HARROLD,
DISTRICT ATTORNEY

BY:_____
Assistant District Attorney

273

KEB502913

# Charles Smith Bail Bonds
## APPEARANCE BOND

FILED
NOV 13 2000
BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

S.A.&I. 408 (1990)

IN THE DISTRICT COURT OF _____*Sequoyah*_____ COUNTY, STATE OF OKLAHOMA
State of Oklahoma,                                      Plaintiff,

vs.

_____*Randall Weaver*_____, Defendant        Case No. _CF-00-668_

Know all men by these presents, that, we the above named defendant, as principal, and the undersigned _Martin E. Dagg DBA_ Charles E. Smith, Professional as surety(ies) personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of _Twenty Thousand & 00/100_ Dollars ($ _20,000 00_ ) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to the county jail of _Sequoyah_ County, State of Oklahoma, shall personally be and appear before the District Court of said county on the _15th_ day of _November_, 2000, at _10:00_ o'clock _X_ M., of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of _Poss of CDS, Para, F/a in Comm. of a Felony, Stolen F/a, - Left of Center_ and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court without leave, _AFC_ then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hands and seals this _9th_ day of _November_, 2000.

_Randall Weaver_ _____ Principal ▉▉▉▉▉ _Muldrow, Ok_ _74948_ Address

Charles E. Smith _____ Surety ▉▉▉▉▉ OK 74955 Address

_Martin E. Dagg_ _____ Surety ▉▉▉▉▉ _Sallisaw, Ok_ _74955_ Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this _9th_ day of _November_, 2000.

_____ Court Clerk/Sheriff _____ Deputy

This undertaking approved this _9th_ day of _November_, 2000.

(SEAL)

By: _Michael Hendricks_ _____ Deputy/Clerk

## AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, _Sequoyah_ County, SS:

The undersigned, being first duly sworn upon oath, says that he is a resident of _Sequoyah_ County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as hereinafter specified under one or more of the following relevant statutory provisions, to-wit:

a) Consideration for this undertaking received or promised in the sum of $ _as quoted_

b) Other security received or promised for making this undertaking, is as follows: _Promissory Note + Indemnity Agreement_

c) Such promise, security or consideration was received from: ▉▉▉▉▉ _Muldrow, Ok 74948_

_Randall Weaver_ _____
Name                                      Address

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as one commits perjury. ▉▉▉▉▉ _Sallisaw, Ok 74955_

_Martin E. Dagg_ _____
Affiant                                      Address

Subscribed and sworn to before me this _____ _9th_ day of _November_, 2000.

(SEAL)

_____
Court Clerk- Notary Public

My Commission Expires:                    _____ Deputy

KEB502914

107 E. Creek
Sallisaw, OK 74955

POWER OF ATTORNEY
Charles E. Smith, Professional Bondsman
$25,000.00 BOND POWER                    TEC

Sallisaw, OK 74955

N⍛ 00491

KNOW ALL MEN BY THESE PRESENTS:

That I, Charles E. Smith, of Sallisaw, Sequoyah County, State of Oklahoma, have made and constituted and appointed by these presents do make, constitute and appoint the below named agent, my true and lawful attorney, for me and in my name, place and stead, and to my use as my employee and agent to write professional bonds, to sign my name, by him, in the execution of any and all bonds made as my agent, giving my said attorney full power to do everything whatsoever requisite and necessary to be done in the premises as fully as I could do if personally present, hereby ratifying and confirming all that my said attorney shall lawfully do, or cause to be done, by virtue hereof. All this provided this Power-Of-Attorney is filed with the bond and retained as a part of the court records, the said Attorney-In-Fact is hereby authorized to insert in this Power-Of-Attorney the name of the person whose behalf this bond was given.

IN WITNESS THEREOF, Charles E. Smith, has caused these presents to be signed by its duly authorized officer, proper for the purpose this _____ day of _November 2000_

$25,000.00 BOND POWER

_5-24-65_
_444789240_

_____
Charles E. Smith, Professional Bondsman
SMITH-RINGGOLD BAIL BONDS

Bond Amount $ _20,000_          Appearance Date _11/15/2000 10:00 Am_
Defendant _Randall Weaver_     Address _P.O. Box 1802_
Court _Sequoyah Dist._   City _Muldrow_   State _OK. 74948_
Offense _DUI Bond_          Case No. _____
Executing Agent _Martin E. Day_

KEB502915

276

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 180**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

276

# Larry and Brenda Shelly

████████ . • FORT SMITH, AR 72916 • (479) 648-8672|

June 17, 2003

The Honorable John Garrett
District Judge
District Court for Sequoyah County
120 E. Chickasaw
Sallisaw, OK  74955

RE:   Case No. JFP-03-458.
      Cindy Crawford, Plaintiff
      vs.
      Jeffrey Paul Mattox and
      Stacy Lynn Mattox, Husband and Wife and
      Larry Herbert Shelly and Brenda
      Jean Shelly, Husband and Wife, defendants

Dear Judge Garrett:

Larry and I received a Summons on June 11, 2003 and this response is for both
Larry and myself. I have known Cindy Crawford for almost eight years and we
have had many conversations about Halie Suzanne Mattox, their daughter.  If I
may indulge you, your Honor, I would like to give you some history on this
situation.  I will try to be brief as I know your time is valuable.

During the course of Jeff and Cindy's marriage a daughter, Trinity Faith
Mattox, was born.  Cindy had some problems with depression and Jeff stayed
home to take care of her and the baby. Cindy said to me that "she could do
something to the baby and get away with it because she had been in Harbor
View".  I quit my job the next day to help with Trinity. When Trinity was a
couple of weeks old she came to live with us.  When she was three and a half,
she went to live with Jeff full time in Sallisaw.  Jeff was an active
participant in her life all along, Cindy was not. Cindy stayed away for longer
and longer periods of time and, finally, Jeff divorced her.

In the early part of March 1998, Cindy called asking for Jeff.  She was very
excited and said she had something to tell him.  I asked if I could take a
message and she said no because she wanted to talk to him.  When he got home,
I asked him if he had been having sex with Cindy.  He said he had and I
congratulated him because he was going to be a father again.  When he talked
to Cindy, she told him the same thing.  Shortly after that, Cindy and I
talked.  She told me they had sex the day they were divorced and many times
during the following months.  She was upset because she wanted to get back
together but he told her it was just sex.  Still she held out hope.

Halie was born on November 23, 1998.  Cindy was living with her mother at the
time.  I started watching her in January 1999 for short visits.  When Cindy
moved to Sallisaw, the visits became longer and longer.  During this time,
Cindy was involved with drugs and that became all consuming to her.  On
November 18, 1999, we became Halie's guardians and Cindy was ordered to pay
$30.00 a week in Child support.  As of this writing, she has paid $127.00 and
owes $5,453.00.

As I have already stated, Cindy and I have had lengthy conversations about

The Honorable John Garrett
Page 2
June 17, 2003

Halie and Jeff. Cindy has always said that she does not want her children full time but she "wants to be a part of their lives", as she should be. She will go for long periods of time without a call or seeing them. Then one day she will call demanding to see them right now. You set a time and maybe she will show up and maybe she will not. Whenever she has had the girls, two days is her limit.

Another conversation we had was about the birth certificate. I asked why she did not put Jeff's name on it. She said because she did not want him to get custody of Halie like he did Trinity. I told her she was doing Halie a disservice by not having her father's name on the birth certificate.

Jeff became an active participant in Halie's life when she was two. He remarried shortly after that and there was an immediate problem between Cindy and Stacy. Both resented the other one. Cindy would call with an attitude and they would answer back with an attitude. Both sides were at fault. So instead of working together, they cause each other problems. If Cindy and her family make arraignments to get the kids from Jeff's, there is no guarantee they will get them. The plans change upon their arrival. I think some counseling probably would not hurt them all.

The oldest daughter, Trinity, had a terrible time with Halie living here and visiting there. She was not kind to her and nothing we did seemed to help. Jeff and Stacy had a son in February and Halie spent some time over there bonding with him and Trinity. It worked and now the relationship between the two sisters is a good one. Which brings us to the matter at hand.

In my humble opinion, I think the girls should be raised together with Jeff. Cindy should be allowed to have an active part in their lives. Cindy does not understand the emotional damage she will cause both girls if they are separated. Halie loves going over to Jeff and Stacy's house. She adores her sister and brother and to take that away from her would be sad.

As far as any financial responsibility on our part to pay for her court expenses, I feel she should be responsible for all expenses since she owes us $5,453.00.

Finally, should you find in Cindy's favor, your Honor, I pray you will give us reasonable visitation. Halie has been a part of our lives since she was an infant. It would do her great emotional harm to be separated from us.

According to the instructions in the summons, a copy of this letter has been sent to Michael A. Daffin, Cindy's attorney. A courtesy copy has also been sent to David Gean, III, Jeff and Stacy's attorney.

Thank you for considering this matter.

Sincerely,

Larry and Brenda Shelly

279

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**REDACTED EXHIBIT 181a**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255          *U.S. v. Barrett*, 6:09-cv-00105-JHP

279

1

IN THE DISTRICT COURT IN AND FOR CHEROKEE COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                    )
                                      )
                Plaintiff,            )
                                      )
vs.                                   )
                                      )   CASE NO. CF-2007-28
RICHARD LOY GRAY, JR.,                )
                                      )
                Defendant.            )

PARTIAL TRANSCRIPT OF JURY TRIAL HEARING

HAD ON THE 4TH DAY OF JUNE, 2008

BEFORE THE HONORABLE H. MICHAEL CLAVER

DISTRICT JUDGE OF THE DISTRICT COURT IN AND FOR

OKMULGEE COUNTY, OKLAHOMA

APPEARANCES:

On Behalf of the Plaintiff:     MS. JOEL-LYN McCORMICK
                                MR. CHARLES S. ROGERS
                                Assistant Attorney Generals
                                313 Northeast 21st Street
                                Oklahoma City, Oklahoma  73105

On Behalf of the Defendant:     MR. CLARK BREWSTER
                                MR. ROBERT R. NIGH, JR.
                                MR. MARVIN G. LIZAMA
                                Attorneys at Law
                                2617 East 21st
                                Tulsa, Oklahoma  74114

REPORTED BY:

RUSSELL E. SIMMONS, C.S.R.
Official Court Reporter
Oklahoma Number 01633
Okmulgee County Courthouse
Okmulgee, Oklahoma  74447
(918) 756-0673

COPY

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

i

I-N-D-E-X

Page No.

Proceedings commenced. ----------------------------------------------- 2

EVIDENCE PRESENTED ON BEHALF OF THE STATE:

CLINT JOHNSON testified:

Direct Examination by Ms. McCormick ------------------- 2
Cross-Examination by Mr. Brewster. ------------------- 25
Quiet bench conference. ----------------------------------------- 26
Continued Cross-Examination by Mr. Brewster. ------- 29
Voir Dire Examination by Ms. McCormick. ------------- 38
Continued Cross-Examination by Mr. Brewster. ------- 39
Quiet bench conference. ----------------------------------------- 49
Continued Cross-Examination by Mr. Brewster. ------- 50
Quiet bench conference. ----------------------------------------- 54
Open court. ------------------------------------------------------ 55
Continued Cross-Examination by Mr. Brewster. ------- 56
Quiet bench conference. ----------------------------------------- 57
Continued Cross-Examination by Mr. Brewster. ------- 58
Quiet bench conference. ----------------------------------------- 65
Continued Cross-Examination by Mr. Brewster. ------- 66
Quiet bench conference. ----------------------------------------- 73
Open court. ------------------------------------------------------ 75
Continued Cross-Examination by Mr. Brewster. ------- 76
Quiet bench conference. ----------------------------------------- 76
Open court. ------------------------------------------------------ 78
Redirect Examination by Ms. McCormick. ------------- 78

Partial transcript concluded. -------------------------- 84

Certificate of the Reporter. ---------------------------- 85

DEFENDANT'S EXHIBIT

| No. | Identified | Offered | Admitted |
| --- | --- | --- | --- |
| 2 | Pg. 38 (Safe Register) | Pg. 38 | Pg. 50 --- 86 |

DISTRICT COURT OF OKLAHOMA -- OFFICIAL TRANSCRIPT

2

(The following is a Partial Transcript of the proceedings that were had in the Okmulgee County Courthouse, Courtroom No. 1, on the 4th day of June, 2008, containing Clint Johnson's testimony:)

THE COURT:  We'll again reopen the record in CF-2007-28, STATE OF OKLAHOMA vs. RICHARD LOY GRAY, JR. Again acknowledge for the record the jury's returned to the jury box.  All parties are present.

And if the State would call their next witness, please.

MS. McCORMICK:  Thank you, Your Honor.  The State calls Clint Johnson.

THE COURT:  Mr. Johnson, if you'd raise your right hand, please.

CLINT JOHNSON,

called as a witness on behalf of the Plaintiff, having been first duly sworn upon his oath to testify the truth, testified as follows:

THE COURT:  Okay.  If you'd have a seat, please. And I'll ask you to state your name for the record.

THE WITNESS:  Clint Johnson.

THE COURT:  And you may proceed.

MS. McCORMICK:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. McCORMICK:

Q.  Sir, if you will, will you please start by giving the

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

3

jury an overview as to your law enforcement career?

A.    I started out with the Cherokee County Sheriff's Department as a reserve officer slash dispatcher, jailer.  I went to the street full-time as a full-time officer in, I believe, '95.  Worked there.  Worked with the Cherokee County Sheriff's office for, I think, around two years until I went to the District Attorney's office.

Q.    And when you refer to the District Attorney's office, are you referring to District 27?

A.    Yes, ma'am.

Q.    And, sir, when you began your employment with District 27, who was the District Attorney at that time?

A.    Dianne Barker-Harrold.

Q.    And how long were you with District 27?

A.    Approximately nine years.

Q.    Sir, I want to visit with you regarding your employment with District 27, in particular, and talk to you a little bit about some of your various assignments.  What were your various assignments when you were employed with District 27?

A.    I was a truancy officer to start with.  And then I began as a bogus check investigator arresting on bogus checks.  And then I went to the Drug Task Force.

Q.    How long were you a truancy officer?

A.    Approximately eight months, I'd say.

Q.    And then how long were you an investigator in the bogus

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

4

check division?

A.   Around the same time frame, eight months or so.

Q.   And then if I recall your outline, then you went on to be assigned to the Drug Task Force?

A.   Yes.

Q.   If you will, describe for the ladies and gentlemen of the jury what your duties and responsibilities were in reference to your assignment to the Drug Task Force?

A.   Investigation of narcotics cases.  Working methamphetamine labs.  Then I also later on became field supervisor of the Drug Task Force.

Q.   Now, as you previously explained, you began your employment with under the administration of Dianne Barker-Harrold.  Did that continue until a new administration?

A.   Yes, it did.

Q.   And who -- who -- what other district attorneys did you serve?

A.   Richard Gray.

Q.   Do you see Richard Gray present in the courtroom today?

A.   Yes, I do.

Q.   Will you --

MR. BREWSTER:   (Interposing)   Your Honor, we'd stipulate that he knows Mr. Gray.

MS. McCORMICK:   Thank you, Counsel.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

5

THE COURT:  Thank you, sir.

Q.    (By Ms. McCormick)  Sir, do you recall what year it was when the Defendant became District Attorney?

A.    2003.

Q.    And I'd like for you to explain for the ladies and gentlemen of the jury what was the makeup or the organization within the Drug Task Force unit at the time the Defendant became District Attorney?

A.    I was the Drug Task Force.

Q.    And who -- who -- who were the other members of the Drug Task Force?

A.    It was me for a short period.  And then Pam Stephens came on board as our secretary.  And then eventually James Carver was hired on.  And then Jerry Stephens.

Q.    Was there a director for the Drug Task Force?

A.    I'm sorry.  Yes.  Vyrl Keeter.

Q.    And how long was Mr. Keeter the director?

A.    Two and a half -- two years.  Somewhere through there, I'd say.

Q.    Were there other directors after Mr. Keeter?

A.    Yes, there were.

Q.    Who were they?

A.    Donovan Dobbs and Jeff Sheridan.

Q.    Well, you've described that at some point James Carver also became an agent and served on the Drug Task Force.  If

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

6

you will, describe how the two of you worked together.  Would you -- would you work in couple on your assignments, or would you work investigations independent of Agent Carver?

A.    Both.  We worked couples or independent investigations.

Q.    And given the nature of your work, how would you characterize the closeness between your work with Mr. Carver?  Did you usually know what he was doing and vice versa?

A.    For the most part, yes.  I mean, we knew what each other was doing.

Q.    Describe for the ladies and gentlemen of the jury what were the reporting habits with regard to your work in the field.  How did you report to the director?

A.    We'd see him in person.  Tell him what we were doing or call him on the phone, or -- or -- and let him know what we were doing.

Q.    And what level of contact did you have with the Defendant?

A.    A lot.

Q.    And while you may know what you mean by a lot, if you'll elaborate as to what you mean by a lot?

A.    There for a while I was calling him on almost a daily basis.

Q.    How did that come about?

A.    He wanted to know what we were doing.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

7

Q.   How did you become aware that the Defendant wanted to know what you were doing?

A.   He told us to call him.  He wanted to know.

Q.   At what point during his administration did that type of contact begin?

A.   I called him every -- I mean, since he took over, I'd call him.

Q.   Did you find anything out of the ordinary about that level of contact with the District Attorney?

A.   I did.

Q.   And, if you will, what was unusual about that?

A.   Working narcotics cases, the more -- the less people that know about a drug raid or a drug bust, the better off you are.  Whenever working narcotics cases and the level of involvement that somebody wants to get into it that is prosecuting the case, then I think it makes them more of a witness than it does being able to prosecute a case.  And plus I had questions about some of the people that I seen him dealing with.

Q.   Okay.  Well, if you -- you've -- you've touched upon the manner in which you must conduct those type -- the types of investigations you were assigned.  If you will, describe some of the tools that are necessary in your work as a narcotics investigator.  How do you go about investigating those types of crimes?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

8

A.    Using informants, buys, observations, trash pulls. There are several resources to use.

Q.    And it sounds like through these various sources, you collect information.  Once you collect information, is it also common for you to conduct search warrants?

A.    Yes.

Q.    I want to go back through your list.  You talk about informants.  And when you reference informants, explain or elaborate for the ladies and gentlemen of the jury how you go about using what you refer to as informants?

A.    Informants would be used.  Someone gets picked up on possession, and they want to talk or -- or gets picked up on a drug case or some kind of violation, and they want to talk about people selling drugs or using drugs or making meth. They would tell us about it.  And then you could use -- you could go out and make them a certified confidential informant.

The way you do that is you meet them someplace. You pat them down for money or dope or anything that they may have.  You know, make sure they don't have anything on their person.  You follow them to a residence that they said that they could buy narcotics from.  You do that on three occasions, and you could use them as a certified confidential informant, as long as you observe them that they can actually produce what they said they can produce.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

9

Q.    You also referenced what you call buys.  What do you mean by buys?

A.    Using Drug Task Force confidential informant funds to purchase drugs.

Q.    From the suppliers?

A.    From -- from the suppliers, yes.  I'm sorry.

Q.    Then you referenced trash pulls.  What do you mean by that?

A.    Anybody cooking methamphetamine, if they throw their trash out, we can show up to the residence.  And then if it's on the street curb, whatever, once it's picked up, then we can dig through it and see if they had a meth lab, chemicals, items used in meth labs or anything like that.  And then go back and write a search warrant on it.

Q.    Okay.  Sir, I'd like to turn your attention to a particular investigation or a particular case in which the Drug Task Force was involved in reference to Thomas Dayberry.  Are you familiar with that matter?

A.    Yes, I am.

Q.    And, if you will, explain for the ladies and gentlemen of the jury what, if any, involvement did you have in the Thomas Dayberry matter?

A.    I was called by the Adair County Sheriff's Department to assist in the execution of a search warrant, and I did.

Q.    How did you assist?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

10

A.    I drove to Adair County.  Went up and assisted them in security of the residence, and make sure the site was safe.

Q.    So did you -- were you at all involved in collecting or seizing any of the items thought to have evidentiary value at the scene?

A.    No.

Q.    Did you have any other involvement in -- in that matter?

A.    I did.  Not -- not on the search warrant part, no.

Q.    Okay.  After the search warrant?

A.    Yes.

Q.    What, if any, involvement did you have?

A.    I went to Adair County Sheriff's Department.  And Deputy Ralph Lucy that was an Adair County Deputy Sheriff, I guess case agent on the case, is the one who caught me there and asked me if he could turn over some money to me for the Drug Task Force.

Q.    And so who originally seized the funds that Officer Deputy Lucy contacted you about?

A.    I believe he did.

Q.    And so did you -- and what did you do after you received that request from Deputy Lucy?

A.    We went back to the deputy room.  And he had the funds laying there on his desk.  And I counted it.  And I believe I got more of a count than what he did.  And he counted it again.  And then we redid a receipt because I got more of a

11

count than he did. I -- then I remember putting it in a bag, and taping it, and signed it, and sealed it.

Q. Okay. Do you remember anything or can you describe for the ladies and gentlemen of the jury how the money was contained when you received it from -- from Deputy Lucy?

A. Just in the bank bag. When we were there, I remember a bank bag.

Q. And then you've described this process where there was a document or a receipt. Was this a pre-prepared document?

A. Yes.

Q. Who prepared it?

A. Ralph Lucy.

Q. What, if anything, did you do once the funds were counted to -- what did you do to further secure the -- the -- the -- the container the money was in?

A. I stuck it in the bag, and put -- put -- wrapped it in tape, and signed initials on it.

Q. What type of tape? Do you recall any type -- any -- any description of the tape?

A. Clear tape. Like the wrapping tape, that wide stuff, about two inches wide or so.

Q. And did -- did Deputy Lucy remain present throughout this process?

A. He was in the room, yes.

Q. What did you do with the funds after you took possession

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

12

of them?

A.    Took them, put them in my car, in my state-issued vehicle.

Q.    Where did you go after that?

A.    I couldn't tell you. I don't know. I mean, I probably went out to work. I don't know.

Q.    What did you do with the funds eventually?

A.    Took them to the Drug Task Force office.

Q.    Do you recall when it was you took them to the Drug Task Force office?

A.    I believe it was the next morning.

Q.    Did anyone, other than you, have access to your -- your county-issued vehicle during the time the funds were placed in your car?

A.    No.

Q.    If you will, explain or describe for the jury how you went about placing the funds or securing the funds inside the Drug Task Force office the next morning?

A.    Best I recall I went to the office. I walked in. I believe Pam Stephens was there. Told her I needed to place the funds in the vault. And went in there and placed them in.

Q.    Okay. And -- and what, if any, part did Ms. Stephens play in assisting you in placing the funds in the vault?

A.    She would have been standing there.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

13

Q.   Do you recall that specifically her standing there?

A.   I don't recall it specifically.  But I can tell you that I never went in there by myself into the vault.

Q.   And when you're referring to the vault, explain or -- to the ladies and gentlemen of the jury to what are you referring?

A.   We had the evidence room.  And then there was also a safe, a small safe, probably about that big in the evidence room.  And that's what I'm referring to the vault.

MS. McCORMICK:  Your Honor, may I approach the witness?

THE COURT:  Yes, ma'am.

Q.   (By Ms. McCormick)  Sir, I'm publishing State's Exhibit No. 16 previously admitted.  And I'd ask you if you recognize State's Exhibit 16?

A.   Yes.

Q.   What is State's Exhibit 16?

A.   That would have been the return that Ralph Lucy did. That's the receipt that I saw that morning.

Q.   I'm showing you the -- from the top to the bottom.  Sir, in your testimony you described that there was an exercise where you said you counted, or your count was higher, or you counted more.  Do you see any markings on State's Exhibit 16 that reflect any changes you made in the amount in reference to the amount?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

14

A. Yes, I do.

Q. And, sir, at the bottom of the page, if you will, describe the signatures that appear on the bottom of the page?

A. The affiant is Ralph Lucy, it appears. And then I signed as recipient.

Q. Sir, I'm also going to show you what's been previously admitted as Defendant's Exhibit 24. Do you recognize Defendant's Exhibit 24?

A. That appears to be the bank bag, yes.

Q. And, sir, in your testimony, you describe that you took an effort to further secure the bag. And that you used tape, and you indicated it was approximately two inches wide. Did you actually place that tape on the bank bag or on some other container the bank bag was placed in?

A. I believe on the bank bag.

Q. That -- that -- did officer or Deputy Lucy assist you in that effort?

A. I don't recall. He was in the room. I mean, I don't recall that when I taped it up.

Q. Once you placed the money -- once the monies were placed in the bank bag and further secured with tape, do you recall if the bank bag was placed in an envelope or any other container?

A. I don't recall that.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

15

Q.   Sir, if you will, describe the process you -- you carried out when you're placing the funds into what you refer to as the vault or the safe?

A.   Went in, took it into the evidence room, opened the safe, put the funds in it, and then signed a piece of paper that we had for the log.

Q.   And when you say a piece of paper, what type of piece of paper did you sign?

A.   It was a log sheet for the evidence vault.

Q.   What information is inscribed on -- on the register or the log next to the safe?

A.   The money seized, from whom, the time, date, I think location maybe.  I can't remember what all's on it.  Signed out by, signed in by.

Q.   After you placed the funds into the safe, what, if any, occasion did you have to see the funds anytime after that date?

A.   I didn't.

Q.   Sir, I'm going to publish to the jury what's been previously been offered as State's Exhibit 2 and Defendant's 1, and ask you if you recognize State's Exhibit 2?

A.   A Drug Task Force safe register.

Q.   Okay.  Is this the registry to which you've referred in your last response?

A.   Yes.  That's the log for the money seized.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

16

Q.   And, sir, do you recall the date on which you submitted the funds in reference to Thomas Dayberry to the -- the safe?

A.   I don't remember the exact date.  I can look at it here.  I can tell you.  I believe it was the 16th.

Q.   And, sir --

A.   (Interposing)  Of '03.

Q.   -- if I draw --

A.   (Interposing)  10.

Q.   -- the jury's attention to the second page, do you see the entry relevant to your placement of funds in reference to the Thomas Dayberry case?

A.   10-16 of '03.

Q.   And, sir, there appears to be some markings where that have been scribbled out.  Are you aware as to who made that marking?

A.   No, I -- I don't.

Q.   Do you recall that?

A.   I -- I probably scribbled it out if I messed up writing something.

Q.   And so as you previously described, the information that you document is the date on which you're logging the evidence in.  Then you indicated by whom.  And, if you will, explain what is placed in the block by whom?

A.   That's CJ, which is my initials.  And Delta 13 was my call number on the radio.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

17

Q.   And then you're describing the items or the purpose; is that correct?

A.   That's correct.

Q.   Sir, did you ever have a reason to access those funds after you placed them into the safe?

A.   No.

Q.   I'd like to turn your attention now to March of 2004. Were you still a member of the District 27 Drug Task Force at that time?

A.   Yes, I was.

Q.   And I'll ask you, sir, if you can describe, did anything unusual happen in reference to money kept in the Drug Task Force safe office in March of 2004?

A.   It was removed.

Q.   And how -- how did you learn about the removal of the money?

A.   I spoke to James Carver.  And he advised me that the Defendant was removing the money from the safe.

Q.   Where were you at the time?

A.   I was on vacation.

Q.   And what -- what did you do after you learned about the removal of the money?

A.   I went to the office.

Q.   And can you describe for the jury how much time lapse between the time you were contacted by Agent Carver and

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

18

actually arrived at the office?

A.    Maybe 15, 20 minutes.  Somewhere through there.

Q.    Who was present at the Drug Task Force office once you arrived?

A.    Pam Stephens, myself, Vyrl Keeter, I believe, Jeff Lancaster, the Defendant.  That -- I can't remember the other ones, I mean, if there was any more there.

Q.    Describe what was going on.  What did you observe once you entered the office?

A.    Laying on Pam Stephens' desk was some envelopes from the safe.  And then I observed the Defendant going back and forth into the evidence room.

Q.    And what, if any, interaction did -- did you have with the Defendant as he's going back and forth?

A.    None that I can recall.

Q.    Did the two of you speak?

A.    I think we said a few words to one another, but nothing I can recall.

Q.    Do you remember anything in particular about his demeanor?

A.    Smiling.

Q.    What did you observe after initially entering the office and seeing the activity?  Did you -- did you go further into the office or into the -- the -- the evidence room?

A.    No.  I never went in there.  I believe I walked out and

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

19

went to the bogus check office and got me something to drink and come back into the office.

Q.   Did you make contact with James Carver?

A.   I believe we spoke.

Q.   How long were you there before you went over to the bogus check division?

A.   I don't know.  A couple, two or three, four minutes, somewhere in there.

Q.   And after going to the bogus check division, what did you do?

A.   I came back to the Drug Task Force office.

Q.   And --

A.   And just stood around.

Q.   -- describe what was going on when you returned to the Drug Task Force office?

A.   They were still had the money laid out and everything, and the Defendant was gathering it all up.

Q.   And when you say had the money laid out, were -- were you actually seeing money laid out, or were there evidence envelopes?

A.   The evidence envelopes.

Q.   And -- and can you describe for the ladies and gentlemen of the jury the condition of the evidence envelopes?

A.   They were all sealed up.  I mean evidence envelopes laying on the desk that I observed.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

20

Q.   Did it appear, from your observation, that any of them had been disturbed in any way, unsealed or resealed?

A.   No.

Q.   How long did this process last?

A.   Maybe 20 minutes or so.

Q.   And what happened after that?

A.   The Defendant gathered it all up and left.

Q.   Do you know where he went?

A.   I know where he told me he went.  I don't know.

Q.   What did the Defendant say?

A.   That he was taking it to the safety deposit box.

Q.   Did he offer any further explanation?

A.   No.

Q.   Did you question him?

A.   No, I didn't.

Q.   Who left with him?

A.   I believe Jeff Lancaster.  And then I left right when he was leaving, I believe.

Q.   So you saw the two of them leave together?

A.   I can't -- I don't recall that.

Q.   After observing the evidence envelopes being removed and taken by this Defendant on the date in March of 2004, did you ever see those evidence envelopes again?

A.   One of them.

Q.   Describe the time you saw one of the evidence envelopes

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

21

again.

A.    Probably two or three months later in Adair County.

Q.    And what occasioned you to see the envelope again?

A.    The Defendant was at the Adair County Sheriff's -- or Courthouse.  And I was over there at the Adair County Courthouse.  The Defendant asked me to come to his truck.  We walked outside.  Went down to his truck.  He pulls a evidence envelope from his truck.  Asked me what I can tell him about it.  I looked at it.  I believe there was some bills in it or something.  And I think it was from the Dayberry -- or I'm sorry.  From the Scarborough case.  And I told him it looked like some money from Scarborough.  And he said that there was over $2,000.00 missing.  And I believe that's when I --

Q.    (Interposing)  What was your response?  What was your response?

A.    I said, well, if you believe something's missing, let's call the Oklahoma State Bureau of Investigation.  I even picked up my phone off my side.

Q.    And what did the Defendant -- what was the Defendant's reaction?

A.    He didn't want to do that.  It would be a black eye on his office.  And he said he'd make it up somehow.  And --

Q.    Was there any further discussion regarding these missing funds?

A.    Yes, there was.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

22

Q.    What else was said, and by whom?

A.    He took the evidence envelope back from me and threw it back in the truck. Said he shouldn't be talking to me about it anyway. That it was James Carver's case.

Q.    Describe this evidence envelope for the ladies and gentlemen of the jury.

A.    Probably I'd say somewhere around this wide, maybe that tall. You know, I don't recall exactly. But and had writing on it where you fill in the suspect, the time and date and everything on the front of it.

Q.    What type of material was it made of?

A.    Plastic. It was clear plastic.

Q.    Did you observe any openings on -- on the evidence envelope?

A.    Yes, I did.

Q.    And describe for the ladies and gentlemen of the jury any openings you saw.

A.    It looked like it had been like you tear plastic. It looks like it had been tore open on the top of the evidence envelope.

        MS. McCORMICK: Your Honor, may I approach?

        THE COURT: Yes, ma'am.

Q.    (By Ms. McCormick) Sir, I'm going to hand you what's been offered into evidence as Defendant's Exhibit No. 13. Do you recognize Defendant's Exhibit 13?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

23

A.   Evidence envelope.

Q.   And you described an evidence envelope that was shown to you back in late 2004 by the Defendant.  Is it the same evidence envelope that's marked as Defendant's Exhibit 13?

A.   No.

Q.   Have you seen Defendant's Exhibit 13 before?

A.   Yes, I have.

Q.   When was the first time you saw it?

A.   The preliminary hearing.

Q.   In this case?

A.   Yes.

Q.   Well, you've indicated that when the Defendant showed you the bag back in late 2004, you were able to see writing on the bag.  Is it your testimony that the tear was on the side where there was no writing, or was it on the side where you place information regarding the -- the case?

A.   The best I can recall, if you have an evidence bag about this size, it would have been up here.

Q.   What other conversations did you have with the Defendant regarding the evidence bag or the missing contents?

A.   That was it.

Q.   Did the Defendant ever approach you at any other time regarding any other monies?

A.   No.

Q.   And, sir, I'll ask you if before the evidence was

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

24

removed from the safe in March of 2004, did the Defendant approach you and question you about any missing monies at that time prior to that time?

A.    No.

MS. McCORMICK:  Your Honor, may I have a moment, please?

THE COURT:  Yes, ma'am.

MS. McCORMICK:  Your Honor, may I approach?

THE COURT:  Yes, ma'am.

Q.    (By Ms. McCormick)  Sir, just one last thing.  For the record, you indicated in reference to Defendant's 13 that there was a tear.  And I just want to describe for the record exactly where you believe where you observed the tear on the bag that was shown to you by the Defendant?

A.    It would have been up here on the top.

Q.    And --

A.    Right there.

Q.    And you're pointing, if you're facing the bag, you're pointing to the upper right-hand corner; is that correct?

A.    The bag would have been smaller, so it would have been maybe across it.

Q.    And -- and what type of tear was it?  Was it a straight tear, or as if it had been cut like Defendant's 13, or what type of tear was it?

A.    Like if you grab plastic and pull it, it breaks it and

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

25

tears it.

MS. McCORMICK: Your Honor, I pass the witness.

THE COURT: Thank you.

Mr. Brewster?

CROSS-EXAMINATION

BY MR. BREWSTER:

Q. Mr. Johnson, what are you doing now?

A. I'm worker's comp.

Q. You're on worker's comp?

A. Yes, sir.

Q. Okay. And is that all you're doing? I mean, you're not -- not able to work now?

A. I'm not working now, no, sir.

Q. But I understand you're running for office. I saw your truck out there, I think.

MS. McCORMICK: Objection. Relevance.

THE COURT: You can answer, Mr. Johnson.

A. (By the Witness) Yes, I am.

Q. (By Mr. Brewster) Running for sheriff, aren't you?

A. Yes, sir.

Q. Now, I'm puzzled because yesterday we had the benefit of listening to Officer Lucy who testified under oath that you were not present at the Dayberry search. You just testified that you were. Could you clarify that for me?

A. Yes, sir, I was.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

26

Q.   Well, Officer Lucy testified very directly.  I asked were you present?  He said no.  It's just you were there where he didn't see you, or --

A.   I was there.

MS. McCORMICK:  Objection.  Calls for speculation.  He -- he can't speak for Officer Lucy.

MR. BREWSTER:  Okay.  All right.

Q.   (By Mr. Brewster)  So you were there at the Dayberry search.  Now, who's the sheriff over there in Adair County then?

A.   When Mr. Lucy was there?

Q.   Yeah.

A.   Charles Hartshorn.

Q.   And do you have any relationship with that family at all?

MS. McCORMICK:  Objection.  Relevance.

MR. BREWSTER:  It's -- it's relevant.

MS. McCORMICK:  Your Honor, may we approach?

THE COURT:  Yes, ma'am.

(The following was a quiet bench conference:)

MS. McCORMICK:  Your Honor, I'm objecting regarding this Defendant -- this witness' relationship with the former -- the former sheriff of Adair County.  Counsel wants to go into it with regard to this witness having fathered a child by the sheriff's daughter.  That has absolutely no

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

27

relevance, and it is not proper for impeachment. It's not -- it's beyond the scope of direct examination. Has absolutely no place in this record.

MR. BREWSTER: It is relevant because I'm going to show that he and the sheriff had been dividing that money. I've got a couple of other accounts. I'm going to be able to show that at the forfeiture, that they never showed. I got the lawyer will testify he returned to the Defendant. Was in the last -- or returned to the Defendant in that case. I've got the case number. I've got the lawyer. It was the last in his hands that --

MS. McCORMICK: (Interposing) Well, he certainly hasn't given the State notice of that. And I'd ask that he be -- that he be excluded. He's not given the State any notice whatsoever regarding supposed funds that were divided between this witness and Sheriff Hartshorn. He's making it up as we go.

MR. BREWSTER: I'm not making it up. He was examined on cross-examination at preliminary hearing. And you have the transcript. There's an exhibit in the preliminary hearing that demonstrates that.

MS. McCORMICK: Your Honor, I'd ask --

THE COURT: (Interposing) Just a minute.

MS. McCORMICK: -- that Counsel -- he's putting on a show.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

28

MR. BREWSTER:  No, I'm not blurting it out.  I'm trying to be courteous to the reporter.

MS. McCORMICK:  He has a microphone.  He can hear.

THE COURT:  Folks, let's just make our record and go on.

MR. BREWSTER:  I simply am going to show that he had a very -- a relationship with Hartshorn's daughter.  He's essentially Hartshorn's, I guess, son-in-law by virtue of the fact that he fathered a child by Hartshorn's daughter.  And that just shows a connection.

MS. McCORMICK:  Your Honor --

THE COURT:  (Interposing)  Okay.  I've heard enough.  We'll allow -- we'll consider allowing you to do that in your case as far as his credibility in your case in chief.

MR. BREWSTER:  Judge --

THE COURT:  Let me finish.  We'll constrain it to the areas that we discussed in previous hearings.

MS. McCORMICK:  Your Honor, in the previous hearing, you were very clear that they had to have given us notice.

THE COURT:  Like I said, we'll consider that.  But I'm not telling you he can.  I said we'll consider it.

MS. McCORMICK:  But he cannot go into it now?

THE COURT:  No.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

29

MS. McCORMICK:  Thank you, Your Honor.

THE COURT:  Thank you, sir.

(The following was had in open court:)

Q.    (By Mr. Brewster)  Now, sir, I would like to ask you when did you meet up with Officer Lucy at the search?

A.    I believe it was while he was on the search warrant scene.

Q.    Okay.  And we saw some photographs, and not all of them.  There was a number of items seized out there at that search in the Dayberry/Rose search, right?

A.    I believe so, yes.

Q.    And were you assisting in that as well?

A.    Was I on the --

Q.    (Interposing)  Yes.

A.    -- Dayberry/Rose case?  Yeah.  That's the same case.

Q.    So you were assisting in that search?

A.    I assisted in the execution of the search warrant.

Q.    Okay.  And just what did you do?

A.    Arrived, assisted on securing the residence, and left. I observed a methamphetamine lab there, I believe.

Q.    Okay.  And then it was a number of days after that -- did you help count the money at the search?

A.    No, I didn't.

Q.    Okay.  When did you start counting the money?

A.    The day I went in, and Ralph Lucy caught me at the Adair

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

30

County Sheriff's Department.

Q. Okay. And do you know why Officer Lucy had contacted you about picking up the money?

A. I believe I walked into the Sheriff's office that morning.

Q. Okay. But why would you be the custodian of the money?

A. He has to turn it over to the Drug Task Force.

Q. Who suggested that to Officer Lucy?

MS. McCORMICK: Objection. Calls for hearsay, speculation.

MR. BREWSTER: If he knows. It might have been in his presence.

THE COURT: If you know, Mr. Johnson, you can answer.

Q. (By Mr. Brewster) Who suggested to Officer Lucy that you get the money?

A. I don't know.

Q. You don't know. And tell me now, I'd like to understand, you told these ladies and gentlemen of the jury that you secured the money with tape?

A. Yes, sir.

Q. How did you do that?

A. I wrapped tape around it.

Q. Around the bank bag?

A. That I recall, yes, sir.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

Q.   Was this adhesive tape?

A.   As far as I know, yes.

         MR. BREWSTER:  All right.  May I approach briefly?

         THE COURT:  Yes, sir.

Q.   (By Mr. Brewster)  Let me hand you what's been marked and received into evidence as Exhibit No. 24, Defense.  Show us where the tape is.

A.   I don't see any tape.

Q.   Okay.  How did you put the tape around that bag?

A.   Wrapped it around.

Q.   Is there any residue, any sticky stuff surface there?

A.   Not that I see any sticky stuff on it.

         MR. BREWSTER:  Okay.  May I publish that to the jury?

         THE COURT:  Yes, sir.

Q.   (By Mr. Brewster)  And how many -- how many wrappings of tape did you put around this, sir, to secure it?

A.   Don't know.

Q.   Okay.  And -- and you did that right in the presence of Officer Lucy, wrapped the tape around the bag; is that what you're telling us?

A.   Yes, sir.

Q.   Okay.  And then you kept the bag, what, for a day?

A.   Overnight, yes.

Q.   Okay.  And then after you -- then you went to the -- the

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

32

Drug Task Force safe that's in the evidence room there in Cherokee County?

A.   Yes, sir.

Q.   Now, was there a requirement that two people check the money in then?  And I'm talking about at this time.  This would have been roughly, I believe, in October 16th of 2003?

A.   That was my requirement, that I would go in there with two people.

Q.   And so you would always have another person initial that they were there with you?

A.   No, sir.

Q.   Okay.  But you would have something like the people that were in the Drug Task Force office document it somehow that they were there with you when you went into the safe?

A.   No, sir.

Q.   How would you accomplish that, that documentation, that there were two people going in the safe with you?

A.   I'd always go in there.  I'd say -- Pam there or Jerry -- James Carver or Jerry Stephens, I'd say, hey, go in there with me.

Q.   Well, I had asked James Carver if he ever entered by himself or do you ever enter by yourself --

MS. McCORMICK:   (Interposing)  Objection. Counsel's testifying.

MR. BREWSTER:  It's cross-examination.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

MS. McCORMICK:   In reference to other --

THE COURT:   He can finish his question, then I'll let you object.   So go ahead.

Q.   (By Mr. Brewster)   I asked Mr. Carver whether he accessed the safe by himself without anyone there.   He said yes.   I said did Clint Johnson access it?   Yes, by himself.

Are you telling me that that's not -- that he perjured himself when he said that?

MS. McCORMICK:   Objection.

THE COURT:   Overruled.

Q.   (By Mr. Brewster)   Do you know?

A.   I can't tell you what Mr. Carver testified to.   All I can tell you is what I can testify to.

Q.   Okay, sir.   Now, could we look at this log?   I believe it's first Defense Exhibit No. 1.

MR. BREWSTER:   Mr. Jarvi.

MR. JARVI:   Yes.   Number 1?

MR. NIGH:   Yes.

Q.   (By Mr. Brewster)   This is the log at least that was put in place at least by June 20th of '03; am I correct?

A.   Yes, sir.

Q.   Did the log before that time look like this?

A.   I don't know.

Q.   Well, you were there, weren't you?

A.   I didn't do anything before that date except up until

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

34

2003, and it was turned over to Sequoyah County when our other secretary was there.

Q.   No.  No.  No.  Sir, I'm asking were you in the Drug Task Force in the year of 2003?

A.   Yes, sir.

Q.   All right.  As a matter of fact, you were there under the previous administration -- previous administration, the one prior to Mr. Gray assuming office, right?

A.   Yes, sir.

Q.   And -- and then after Mr. Gray assumed office, you were gone for about three months on comp leave; am I right?

A.   After he assumed office?

Q.   Yes.  January, February, March?

A.   No, sir.

Q.   You were not on comp leave as documented by your hours?

A.   I was working in January of '03.

Q.   How about February and March?

A.   I believe I was working then, too.

Q.   Huh?

A.   I believe I was working then, also.

Q.   Did you turn hours in for those months, or did you turn comp time in?

A.   I would have turned in a time sheet.

Q.   Did you come to Mr. Gray and ask him to keep you employed because you needed the job?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

35

A.     Yes, I did.

Q.     Okay.  And what did he say?

A.     Okay.

Q.     And then was there a period of time where you were the only Drug Task Force officer?

A.     Yes.

Q.     All right.  Now, my question to you is on this log, was there a log similar to this prior to June 20th of '03?

A.     Not that I made.

Q.     So this was instituted after Mr. Gray assumed office?

A.     No.  This was after our security came on board, and I did this.

Q.     Prior to this, how did the log become maintained or record maintained as to who had access to the money in the safe?

A.     It was turned over to the secretary in Sallisaw.  So you'd have to ask her.

Q.     So at least by June 20th of '03, there's a safe, and we've heard this, but there's a safe within the evidence room, right?

A.     That's correct.

Q.     The safe has a combination?

A.     Correct.

Q.     You have the combination?

A.     Yes.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

36

Q. And Mr. Carver has the combination?

A. Correct.

Q. All right. And who logged money in on this particular log of the money that went in there?

A. Myself and James Carver.

Q. And what we have here is a log in by you here with no -- we don't know who it belongs to, do we?

A. No, sir.

Q. And then Mr. Carver follows suit. He puts no -- we don't know who it belongs to?

A. Correct.

Q. And then another one we don't know who it belongs to?

A. Another one with no name on it, yes, sir.

Q. Right. And then another one we don't know who it belongs to?

A. That's correct.

Q. And then we got an entry made by you down here just somebody. We don't even know how much money's involved, right? Redbird people's money?

A. Right.

Q. That's the log you were maintaining at this time period, right?

A. Yes, sir.

MR. BREWSTER: Can we turn to Page 2?

Q. (By Mr. Brewster) As a matter of fact, when you logged

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

in the Dayberry money here, you didn't even indicate who it belonged to, did you?

A.   Can't make out that last writing up there.

Q.   Yeah.  Because that's Mr. Gray's writing, isn't it?

A.   I don't know.

Q.   As a matter of fact, you put it in there with no entry as to who owned it, didn't you?

A.   I don't know.

Q.   Is that your handwriting?

A.   I can't see that.  It's blurry.

Q.   Okay.

        MR. BREWSTER:  May I approach briefly, Your Honor?

        THE COURT:  Yes, sir.

Q.   (By Mr. Brewster)  I believe you have a book.  But if -- if we've taken it back, I'll get you one.  Does he have a book?

        THE COURT:  Does he want to use mine?

        MR. BREWSTER:  Oh, Your Honor, I believe we have one here --

        THE COURT:  Okay.

        MR. BREWSTER:  -- for the witness.  May I approach briefly?

        THE COURT:  Yes, sir.

Q.   (By Mr. Brewster)  What I'm specifically referring to, sir, is this entry right here that has a bunch of scratch

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

38

out.  And then the entry there, that's Mr. Gray's handwriting, isn't it?

A.   I can't tell you whose handwriting that is.

Q.   Okay.  Let me direct your attention, if I can, to Exhibit No. 2 for identification purposes, Defense.  Can you tell me, sir, have you seen that document before?

A.   Yes, sir.

Q.   Is that a log that was maintained at the Drug Task Force called the safe register?

A.   Yes.

Q.   All right.

MR. BREWSTER:  I would move for the introduction of Defendant's Exhibit No. 2.

THE COURT:  Any objection, Ms. McCormick?

MS. McCORMICK:  One moment, please.  Your Honor, may I voir dire the witness?

THE COURT:  Yes, ma'am.

VOIR DIRE EXAMINATION

BY MS. McCORMICK:

Q.   Sir, I'd ask you if you'll compare Defendant's Exhibit No. 1 and Defendant's Exhibit No. 2.  There seems to be additional writing.  Will you take a moment to look at Defendant's Exhibit No. 2?

A.   Okay.

Q.   Sir, if you'll just compare the two exhibits and see the

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

39

places where additional writing has been placed.

A.   Yes, there has been.

Q.   Are you aware or do you know who was responsible for the additional writing?

A.   I don't.

Q.   Okay.

MS. McCORMICK:  Your Honor, I don't believe this witness is the proper witness to sponsor this Defendant's Exhibit No. 2.  We object.

THE COURT:  Mr. Brewster?

CONTINUED CROSS-EXAMINATION

BY MR. BREWSTER:

Q.   I direct your attention to Page 2 of that particular Exhibit No. 2.  Just a couple more questions.  Do you see entries made on 3-2 and 3-1 of '04, sir, at the bottom of that page?  March 2nd, '04, JC; March 1, '04, CJ?

A.   I don't see your -- you're talking about March of '04?

Q.   Right.

A.   I don't.

Q.   Exhibit No. 2?

A.   Oh, hold on.  I'm on Exhibit 1.  Sorry.  Yes.

Q.   As a matter of fact, that was the log that you started entering into after February 3rd, '04, isn't it?  You made those entries, or one entry anyway?

A.   One entry, yes.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

40

Q.    Tell me if it's not true, sir, that when Mr. Gray --

MR. BREWSTER:  Exhibit No. 1, please.  Display it.

Q.    (By Mr. Brewster)  When Mr. Gray saw the log, he started questioning you, and he said, Clint, we've got to know who owns this money, and this log needs to be updated, and we need to know where it is and who owns it, didn't he?

A.    No, sir.

Q.    And then after he did that, you then -- look at Exhibit No. 2 -- filled in some of the names on the money.  That's your handwriting, isn't it, sir?

A.    Which one are you talking about?

Q.    Exhibit No. 2.  Well, look at CJ, 7-24-03, 588, Mary Brewer.  That's your handwriting, isn't it, sir?

A.    That's not my handwriting, no.

Q.    The next one, Miguel Sanchez, that's your handwriting, isn't it, sir?

MS. McCORMICK:  Object to Counsel testifying regarding the exhibit which has not been offered.

MR. BREWSTER:  It's a leading question.

THE COURT:  He can ask about that, about it.  I think attempting to lay a foundation for its admission, he can certainly --

Q.    (By Mr. Brewster)  (Interposing)  Isn't that correct, sir?

THE COURT:  -- actually challenge him about that.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

41

MR. BREWSTER: I'm sorry, Your Honor.

Q. (By Mr. Brewster) Isn't that correct, sir?

A. Would you ask the question, again, please?

Q. Yes. Did you write in Miguel Sanchez?

A. I don't believe that's my handwriting, no.

Q. Okay. As a matter of fact, and I'm going to ask you directly now, after Mr. Gray saw this log and was asking questions about making sure this money was being safely kept, he demanded that you fill in data indicating who the owners of this money was, didn't he, sir?

A. No, sir.

Q. How do you suppose on Exhibit No. 2, for identification purposes, that information got put in there?

A. I don't know.

Q. And, as a matter of fact, even after Mr. Gray tried to get to pen you down as to what money and where the money belonged to, you still didn't indicate -- look at Page 2 of Exhibit No. 2 -- who the $6,534.00 belonged to, did you?

A. He didn't ask me about it.

Q. You never -- that never was put on Exhibit No. 2?

A. What?

Q. Any entry?

A. It shows $6,534.00 logged in the safe on 10-16 of '03.

Q. And, as a matter of fact, it was only after Mr. Gray got the envelopes out, tried to figure out who owned this money,

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

42

saw it on the envelope, and wrote it on the log was it ever determined who this money belonged to as far as the log goes; am I correct, sir?

A.    I can't tell you what Mr. Gray did.

Q.    Okay.  Now, this entry here, this Exhibit No. 2, did there come a time that Pam Stephens, the secretary, was asked to put it in her computer?

MS. McCORMICK:  Your Honor, I object to Defendant's Exhibit No. 2 being published to the jury.

MR. BREWSTER:  No.  No.

MS. McCORMICK:  It hasn't been offered.

MR. BREWSTER:  Exhibit No. 2 is not published to the jury.  Your Honor, we're on Exhibit No. 1.

MS. McCORMICK:  Well, look at --

MR. BREWSTER:  That's Exhibit No. 1.

MS. McCORMICK:  I apologize.

MR. ROGERS:  It's not marked, Your Honor.  That's probably the source of confusion.  Mr. Brewster obviously didn't mark this exhibit so that we can tell which one it was.

MR. BREWSTER:  It's State's Exhibit No. 2 at the preliminary hearing.  It's presently Defendant's Exhibit No. 1.

THE COURT:  Go ahead, sir.

MR. BREWSTER:  Sorry for the confusion, Your

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

43

Honor.  I -- I think I'm responsible for that.

Q.    (By Mr. Brewster)  Mr. Johnson, my question to you is were you aware that at some point in February or March, Pam Stephens was asked to put it in a computer so that money could be verified?

A.    I knew that she kept a log on the computer.

Q.    And did you ever see that log?

A.    Probably at some point.  I don't recall it.

Q.    Okay.  When you say at some point, you don't -- you don't recall ever seeing her computerized log?

A.    I don't recall.

Q.    Okay.  And directing your attention, if I could, to Exhibit No. 3 before you, sir, for identification purposes. Have you ever seen that computerized version of the log?

A.    Yes.  Yes.

Q.    Okay.  Now, is that -- is that supposed to be a -- the computer record of Exhibit No. 1, the one that's kept in the safe?

A.    Yes.

Q.    Okay.  Then tell me, if you would, how on 7-24-03, look at the entry of Exhibit No. 1, the $588.00, Ms. Stephens from the log would know who it belonged to unless Exhibit No. 2 was not updated by you at the request of Mr. Gray?

A.    I can tell you Mr. Gray never asked me to update anything.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

44

Q.   Okay, sir.  We talked a little bit about -- you did, I mean, in your direct examination about that day of March 25th of 2004 when James Carver called you and said Mr. Gray was at the evidence room removing the envelopes that contained the forfeiture money.  Remember that?

A.   Spoke to James Carver that day.

Q.   And it's your testimony that you were there?

A.   Yes.

Q.   Do you know of any person that saw you that --

A.   I was there.

Q.   Okay.  Do you know of any person that saw you?  Because I've examined them all, and I've not heard one say you were there.  And I'm just curious who did you speak with?

A.   The Defendant.

Q.   Okay.  So he would know you were there?

A.   Mr. Carver.

Q.   Mr. Carver denied you were there when I asked.

        MS. McCORMICK:  Objection.  Counsel's testifying.

        MR. BREWSTER:  Okay.  I asked --

        THE COURT:  (Interposing)  Sustained.

        MR. BREWSTER:  -- under oath.  Okay.  I'm sorry.

        THE COURT:  Thank you.

        MR. BREWSTER:  Okay.

Q.   (By Mr. Brewster)  So on that day, was it discovered that when Mr. Gray and Mr. Lancaster and Mr. Jones and Ms.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

45

Stephens were -- had the envelopes out on a table, was it discovered that notwithstanding this log, some of them were missing?

A.   No.  Not that I'm aware of.

Q.   I'm sorry?

A.   Not that I'm aware of until the prelim.

Q.   Okay.  Until the prelim.  Did you acknowledge in the prelim, as a matter of fact, that there were missing files that were logged in the log?

A.   There was.

Q.   Yeah.  Well, what -- what file -- what envelopes with money were logged in, but just weren't there?

A.   I don't recall the names.

Q.   How much did it total that was logged in the log, signed by you as logged in, but just not there when the inventory was made?

A.   I don't recall that either.

Q.   Over $10,000.00?

A.   I don't believe that much.  I don't recall.

Q.   Okay.  Let me ask you -- well, look at Exhibit No. 1 again.  And ask whether in fact Lisa Perez, who's not noted on here, but owned this money, that that was missing?  The --

A.   (Interposing)  Okay.

Q.   -- $1,636.00, that was not logged out, but it was gone?

A.   It wasn't gone.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

46

Q.   Where was it?

A.   Locked up in a filing cabinet.

Q.   Where was the filing cabinet?

A.   In the same Drug Task Force office.

Q.   Did -- when they -- when they got the folders that had this money, and this is only being one of them, they got them from the trunk of your car, didn't they, sir?

A.   No.

Q.   In addition to Ms. Perez's file, did you ever -- this particular entry here, this is James Carver's case, isn't it?  He logged it in; am I correct?

A.   My case.

Q.   Well, it says it's logged in by James Carver.

A.   He's the one who wrote it down.

Q.   Okay.  Not logged out by anybody, right?

A.   Right.

Q.   August of '03, right, logged in?

A.   Correct.

Q.   You have it in March of '04, right?

A.   Whatever date, yes.

Q.   You have it in your cabinet?

A.   Yes.

Q.   You never logged it out?

A.   No.

Q.   And just so do you know when this was ordered to be

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

forfeited, this money?

A.   No.

Q.   If the -- if the Cherokee County Court records reflect November 15th, '04, would you have any reason to dispute that?

A.   No.

Q.   Okay.  So it's forfeited a year and three months later, checked in by Mr. Carver, but taken out by you without any entry, and you have it, right?

A.   It's locked up, yes.

Q.   Why?

A.   Didn't go into the evidence room by myself or into the vault by myself, so it was probably tossed in my cabinet and locked up.

Q.   But Mr. Carver logged it in?

A.   That was a log for all the money that was seized.

Q.   Okay.  And so when he logged it in, he told us that he actually logged it in and placed on the envelope when he logged it in very careful to make sure.  Why would you take it out of there?  Are you saying that Mr. Carver didn't log it in?

A.   Mr. Carver logged it in, but that was money that was seized.  I can tell you it was my case.  And he's probably the one that logged it on the piece of paper because it was seized money.  But I can't tell you -- I mean, it was thrown

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

48

in my -- it was set in my filing cabinet with a padlock in the same Drug Task Force office and secured.

Q. Where did you document that, sir, that you logged this money out that's unnamed?

A. That is a money -- a log of all money seized.

Q. Okay. All right. Now, was -- were there other files missing?

A. Files?

Q. Yeah. The -- the envelopes. The evidence envelopes. We can call them envelopes if you choose that had money in them missing that were reflected on the log but just not there?

A. Nothing missing.

Q. Okay. Were they in the safe?

A. They were locked up in the filing cabinet.

Q. Okay. Were they in the safe as the log record reflects?

A. This is a log of seized money.

Q. Okay. Well, was Ms. Perez's money seized money and forfeited?

A. It was seized money.

Q. But it was not -- it is logged in, but then logged in by another person, not logged out, but you have it, right?

MS. McCORMICK: Objection. Asked and answered.

MR. BREWSTER: I think -- I think she's correct.

THE COURT: Thank you.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

Q.    (By Mr. Brewster)   Let's go on to the next one.   Look at did you involve logging in a seizure for Juan Ramirez of $4,348.00 on March 1st, '04 in the evidence log, sir?

A.    On March -- I'm sorry.   On March?

Q.    Look at Exhibit No. 2.

A.    Okay.

Q.    Because that's the continued one, Exhibit No. 2.

MR. BREWSTER:  We'd move for the introduction of Exhibit No. 2, subject to tying up further testimony as to who put the additional entries on it, Your Honor.   It's a --

MS. McCORMICK:  (Interposing)  Same --

MR. BREWSTER:  It's a document that two people wrote on, so, or maybe three.   But it's still a record that he recognizes.   And he did make the entries on -- this entry on March -- March 1st.   Move for the introduction of Exhibit No. 2.

MS. McCORMICK:  Same objection, Your Honor.   May we approach?

THE COURT:  Yes, ma'am.

(The following was a quiet bench conference:)

MR. BREWSTER:  Your Honor, there's no reason for an objection to this.   This is the log.   He enters it on this log.   The only difference is when Mr. Gray confronts him, he filled it in on the same day.   And that's his handwriting. We'll tie it up.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

50

MS. McCORMICK: But then when they tie it up, Your Honor, that would be the appropriate time for them to offer this unauthenticated document. We object.

MR. BREWSTER: It's authenticated.

THE COURT: I'm going to allow it. I think as between Mr. Carver and Mr. Johnson, it's sufficient. We'll allow it in.

MS. McCORMICK: And, Your Honor, with regard -- regarding writing that this witness can't identify, no one's identified, it's not been fully authenticated. We've had responses to questions that say they don't know who placed the writing on that document.

THE COURT: I've already ruled. Thank you.

(The following was had in open court:)

MR. BREWSTER: Your Honor, it's my understanding Exhibit No. 2 has now been received?

THE COURT: Yes, sir.

MR. BREWSTER: Mr. Jarvi, could you demonstrate Exhibit No. 2, Page 1?

Q. (By Mr. Brewster) After whatever happened, information was provided as to who the claimant was on these monies, right?

A. There's writing on it, yes.

Q. Yes, sir. And you're telling us under oath that's not your handwriting?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

51

A.    No, sir.

Q.    Okay.  You're not telling us under oath now?

A.    That's not my handwriting, yes, sir.

Q.    Okay.  All right.  Well, on your cases, who provided the information?  Clint Johnson.  I mean, did somebody talk to you about it?

A.    All I can tell you that's not my handwriting on that.

Q.    Whose is it?

THE COURT:  Mr. Johnson, that wasn't responsive to his question.  So please answer his question.

Q.    (By Mr. Brewster)  My question is if you didn't put it on there and it pertains to your cases, who do you suppose supplied the information?

MS. McCORMICK:  Objection.  Calls for speculation.

THE COURT:  If he knows, he can answer.

A.    (By the Witness)  No, I don't know.

MR. BREWSTER:  Turn to Page 2, please, Mr. Jarvi.

Q.    (By Mr. Brewster)  And I direct your attention to Page 2, please, Mr. Johnson.  You may choose to look at the screen or the one before you.  Second.  Same document.  We see now that it does not have an entry as to the 6,534 as to who owns it, right?

A.    Correct.

Q.    And, as a matter of fact, you -- you're making entries here, at least one 3-1-04, that same month, of $4,348.00,

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

52

right?

A.    It was logged on there, yes.

Q.    When the inventory and the -- the evidence envelopes are taken from the safe on March 25th, that one's missing, isn't it, from the safe?

A.    I believe that was one, yes.

Q.    Yeah, okay.

A.    It's not missing, though.

Q.    Okay.  Well, where did you log it out?

A.    It wasn't logged out.

Q.    You just logged it in and kept it?

A.    It was locked up in the filing cabinet with a padlock.

Q.    Yeah.  You logged it in and kept it, or did you log it in, later go take it back out?

A.    It was written down on here because that was money seized.

Q.    Well, this is the safe register, what goes in the safe, sir, doesn't it?

A.    That's also a paperwork showing what money was seized.

Q.    Okay.  Well, we see several days between the seizure on some of these than the actual logging in the safe.  But the log is not maintained until you put it in the safe; is that wrong?

A.    Yes.

Q.    Okay.  For you, in other words, you could log it in and

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

53

just keep it, right?

A.    I didn't keep it.  It was locked in the cabinet.

Q.    All right.  And was there another one, also, sir, and I direct your attention, if I could, that was missing 11-4-03, Kenny Miller, $3,782.00?  That wasn't in the safe either, was it?

A.    I don't recall that one.

Q.    Do you know where that went?

A.    Again, I don't recall that one.

Q.    So how many -- how much money do you recall having logged in the safe and it not being there when the inventory was taken?

MS. McCORMICK:  Objection.  Asked and answered.

MR. BREWSTER:  I don't think he's totalled it up.

THE COURT:  If you're able to answer, Mr. Johnson, please answer.

A.    (By the Witness)  I haven't totalled it up.

Q.    (By Mr. Brewster)  And you didn't know Mr. Gray was going there that day, did you?

A.    No.

Q.    And you didn't have the time to replenish the envelopes that you took money from, did you?

A.    I didn't take no money.

Q.    Did you ask Mr. Gray why he was taking this action?

A.    I believe he said he was going to the safety deposit box

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

54

with it.

Q.   Did you ask him why?  Don't you trust me?

A.   I don't think so.

Q.   Were you angry?

A.   No.

Q.   Did you tell Mr. Keeter that you were going to whip him?  Whip Mr. Gray?

A.   No.

Q.   Now, let's just concentrate, if we could, on a period of time from, let's say, oh, May of '03, or let's say May of '03 until November of '04.  How many insufficient checks do you think were returned on your accounts during that period of time in Tahlequah, Oklahoma?

MS. McCORMICK:  Objection, Your Honor.  May we approach?

THE COURT:  Yes, ma'am.

(The following was a quiet bench conference:)

MS. McCORMICK:  Your Honor, Counsel is once again getting beyond the scope of direct examination.  The pre- -- at the Court's previous ruling, you indicated the Defense wouldn't be able to put on their case at that time.  It's certainly not appropriate yet.  It's beyond the scope.  And the Court memorialized its ruling regarding how the guidelines, the boundaries that were going to be set for presentation of evidence.  And Counsel, who was not at the

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

55

hearing, is far afoul of that ruling. We'd ask that the Court direct him to stay within the boundaries by the Court and not go beyond the scope of direct.

MR. BREWSTER: I believe she is correct. I am beyond the scope of direct. I'd ask the Court's latitude. I'm going to put this on in our case. It would seem needless to bring him back. This is a case of persuasion at this point. And it would be seemingly a waste of time.

MS. McCORMICK: Please whisper.

MR. BREWSTER: If the Court -- I'm sorry. I wasn't quite finished yet. But if he's willing to come back. I'd ask in Your Honor's discretion. You have control of this interrogation. You can expand the scope in light of the fact it's going to be put on anyway. Or I can limit it.

THE COURT: Okay. I've set out some guidelines that I thought was fair to both sides. He can just stay or come back. So if you'll --

MR. BREWSTER: (Interposing) Well, I'll keep it within the scope.

THE COURT: Thank you, sir.

(The following was had in open court:)

MS. McCORMICK: Your Honor, may I offer the witness water?

THE COURT: I guess if he wants some water.

MS. McCORMICK: Do you want some?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

56

THE WITNESS: Please.

Q. (By Mr. Brewster) We'll reserve those questions until we meet again, okay, Mr. Johnson?

A. Okay.

Q. All right. Let me ask you this: I'm curious. If you were there on the 25th --

THE COURT: (Interposing) Mr. Brewster, is this a point where we could take just a short recess?

MR. BREWSTER: Yes, sir.

THE COURT: Is that okay with you?

MR. BREWSTER: Absolutely.

THE COURT: Folks, we'll take just a very brief recess. If you could be back in at 10:30, please. Again, same admonishments without me repeating those every one.

Folks, if you'd please rise while the jury steps out, please.

(The jury left the courtroom.)

THE COURT: And we're in recess. Thank you very much.

(A recess was taken.)

THE COURT: We'll again reopen the record in CF-2007-28, STATE OF OKLAHOMA vs. RICHARD LOY GRAY, JR. Again acknowledge for the record the jury's returned to the jury box. All parties are present. Mr. Johnson has returned to the witness stand.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

57

MS. McCORMICK: Your Honor, before Counsel resumes, may we approach?

THE COURT: Yes, ma'am.

(The following was a quiet bench conference:)

MS. McCORMICK: Your Honor, I'd just like to make the Court aware that during the beginning of the break, as Mr. Johnson was leaving the courtroom, Counsel made an unnecessary comment to him regarding any day, and gesturing. I'd just like it to be part of this record that Counsel's conduct is roguish and unprofessional. It's unnecessary that he interact with the witnesses that way. We'd ask that he be admonished.

MR. BREWSTER: Actually she's mistaken. I wasn't being roguish or unprofessional. I was being defensive of my own client. He came over there bolstering to Mr. Gray, puffing up. And I said, hey, anytime, step back. And then he came over towards you. And you misunderstood. Didn't see what happened. That's what happened. He was going to go over and confront Mr. Gray, bolster up to him. Mr. Gray, I had him step back. And told him anytime. All right.

THE COURT: Okay. So we all know what we need to do.

MR. BREWSTER: All right.

THE COURT: Thank you.

(The following was had in open court:)

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

58

THE COURT: Mr. Brewster?

MR. BREWSTER: Yes.

Q. (By Mr. Brewster) Mr. Johnson, you did -- when were you in bogus check division of the DA's office?

A. It would have been '96, I believe. '97, somewhere.

Q. And how long were you in that department of bogus checks?

A. Probably eight months.

Q. And -- and what is that? What's that department do? What does it handle?

A. Bogus checks.

Q. In other words, checks that are written for insufficient amounts to people that purchase things?

A. Yes.

Q. And then they're turned in for prosecution?

A. Yes.

Q. And what did you do in connection with that function?

A. I was the investigator that went out and arrested people.

Q. Okay. Now, getting back to this -- this day on March 25th, if I could briefly. You were there. Did you know what was going on? Mr. Carver tell you?

A. That the money was being removed from the safe.

Q. In other words, the evidence envelopes were being taken in the presence of others, right?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

59

A.   Correct.

Q.   All right.   And -- and they were going to put them in a safety deposit box?

A.   My understanding, yes.

Q.   Okay.   And did you come forward and say, hey, guys, there's some more that I have that are logged in that -- that you need to take?

A.   No, sir, I didn't.

Q.   Oh.

MR. BREWSTER:   If I could have Exhibit 2 placed on the board, Mr. Jarvi.

Q.   (By Mr. Brewster)   In addition to those ones we've talked about, Ms. Perez, Mr. Ramirez, the $4,348.00 which you say you had but not logged out; am I correct?

A.   Correct.   I didn't have it.   It was locked up.

Q.   Now, I'm also puzzled about these three.   That these are your cases, aren't they?   Bigby, Coldwell, and Frakes?

A.   Frakes is not mine, no, sir.

Q.   Okay.   But you -- you checked these out of here, didn't you?

A.   Yes, sir.

Q.   So Frakes isn't your case, and you just check it out?

A.   I'm the one who checked it out, yes, sir.

Q.   Okay.   And could you tell the ladies and gentlemen of the jury -- gentlemen of the jury why would you check out

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

339

60

this money on -- all on July 16th, '03?

A.   Would have been forfeited and turned over to the DA's office for deposit.

Q.   Well, if I represented to you as an officer of the Court that the records of Cherokee County reflect that this money was forfeited in February of -- February 9th, 2004, why would you have checked it out in July of '03? Proceedings weren't even close to being finished?

A.   Don't know. It was checked out for forfeiture proceedings, I guess.

Q.   How many months would that be? Five, seven months before the proceedings, the order is delivered, you check it out?

A.   Don't know.

Q.   Okay.

A.   And I can't tell you when the order was.

Q.   Well, why would you on one day pull all this money out of here, and including one that's not even your case you told us?

A.   I believe Frakes' was returned to him.

Q.   You believe that? Have you -- have you talked to Mr. Frakes?

A.   I believe Frakes' was returned.

Q.   To whom?

A.   It was turned over to -- I believe James Carver took it

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

61

back. He was ordered to give it back to Mr. Frakes is what I believe on the case.

Q. Okay. Well, this is checked out by Clint Johnson?

A. Correct.

Q. Do you know whether Mr. Frakes got his money?

A. You have to ask Mr. Frakes that.

Q. Okay. And all of this money, these -- these -- let's talk about this. Twenty-nine Kennedy half dollars, two Indian Head nickels, the $2.00 bills, why would you check this out on July 16th, and I'll tell you as an officer of the Court that it's not deposited until October of '04?

A. I don't know.

Q. A year and some months later?

A. I can just tell you it was deposited. I can't tell you anything else.

Q. And -- and then, sir, when it is deposited, the amounts are much different. There's no Kennedy half dollars or Indian Head nickels. What happened to those, sir?

A. I couldn't tell you.

Q. Well, how long were they in your possession before that money was forfeited?

A. I don't recall that.

Q. Well, if I tell you it was forfeited by Court order on October 8th of 2004, and you check it out July 16th, '03, well, why? Why?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

62

A.    I don't recall.  But I believe that those Indian Heads were sold at the -- at the public auction as a collector's edition.

Q.    Why do you check this out in July of '03 when it's not -- how much money are we talking about?  Sixty -- 6,324 in cash, right?

A.    Yeah.

Q.    $821.00 in cash.  So that's 7,100, right, roughly?  Am I correct?

A.    Okay.

Q.    And then some other denominations in -- in special currency, right?

A.    Okay.

Q.    Why do you check that out in July, sir, when it's not forfeited until the next year in October?

        MS. McCORMICK:  Objection.  Asked and answered.

        THE COURT:  I don't believe he's answered that.

        MR. BREWSTER:  I don't believe he has.

A.    (By the Witness)  I don't recall.

Q.    (By Mr. Brewster)  Okay.  Where did you put it?

A.    Been left at the DA's office.

Q.    Oh, so you checked this out in July, and leave it at the DA's office.  Who with?

A.    I don't recall.  I never took money home, and I never stole money.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

63

Q. What do you mean by steal?

A. I never took money.

Q. Yeah.

MR. BREWSTER: Scroll up, please, sir, Mr. Jarvi, on Exhibit 2.

Q. (By Mr. Brewster) Who are these people, and how much money is there supposed to be in the safe?

A. Redbird people's money is what it says.

Q. How much money, and who are they, if it's in the safe?

A. I can tell you what's on the paper, Redbird people's money.

Q. I know. But you checked it in, sir. And what I'm asking you simply is this: How would there be any accountability? Like if I make a deposit at the bank, they know it's me, and I put certain amount of money in it, and they keep it for me. This is a safe register. You're checking in something that has nobody's name and no amount.

A. Off a forfeiture sheet and the evidence return log from the search warrant.

Q. Did there come to be times when the people whose money that were seized were claiming more was seized than you were writing down?

A. No, sir.

Q. You never heard that?

A. I heard rumors once before. But it came through a

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

64

individual that was a -- certain investigations of narcotics in Adair County.

Q. Okay. So, in other words, when you seized the money and the money is being seized from alleged drug dealers, you can't trust them by saying that you took more than you really are accounting for; am I right? You can't trust them?

A. Anytime that we seized money, there was two officers that logged it.

Q. Well, who logged Redbird people's money, and how much is it?

A. I'd have to look at the search warrant returns to tell you.

Q. Well, who logged it?

A. Different officers.

Q. Who logged it on the safe register?

A. My name's on there for the safe.

Q. Why would you not put the amount? I don't mean to belabor this. I'm just puzzled by it.

A. I wasn't the case agent on all these search warrants done.

Q. But you're going to take some envelope, that you talk about how careful the chain of custody is, with the amount on the outside, and you're going to go into this register, this log that's going to verify the chain of custody and the amount, and you're going to put it in there and just not put

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

65

the names of the people or the amount on it?

A.    All I can tell you is Redbird people's money went in the safe.

Q.    Would it be to your benefit to be vague and indefinite so you could take the money when you needed it and use it like your own private ATM?

A.    No.

Q.    Okay.   In the years that we're talking about here, did you attempt to borrow money from several lawyers around town?

MS. McCORMICK:   Objection.   May we approach?

THE COURT:   Yes, ma'am.

(The following was a quiet bench conference:)

MS. McCORMICK:   He's doing it again, Your Honor. He's getting into areas that are clearly not relevant to and are beyond the scope of direct examination.   If he's going to put this type of evidence on, he should have given the State notice.   And he can do it in his case in chief.

MR. BREWSTER:   The State has notice.   Furthermore, bias is always an issue.   This guy was trying to borrow money.   I've got six lawyers at least that will tell us that he came to them trying to borrow money.   He borrowed money from three of them.   I have checks from two of them.   So what I'm saying is this is a complete credibility issue.   Two of them are people whose money that represent people that he has on his log.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

66

MS. McCORMICK:   Your Honor, it doesn't go to bias. It's certainly an area that they've raised and the subject of our conversation or our discussion on the record on Friday where the Court clearly set out boundaries for the presentation.

MR. BREWSTER:   I'm going to do it in our case in chief.  So I'll tie it to this log, and then we can move on and do it in our case in chief.

THE COURT:   If you can, you can try.

MR. BREWSTER:   All right.

THE COURT:   Thank you.

(The following was had in open court:)

Q.   (By Mr. Brewster)  We'll reserve that till the next time we meet as well, sir.

Let me ask this question of you:   Drawing your attention to Exhibit No. 2 before you.

MR. BREWSTER:   Page 2, Mr. Jarvi.

Q.   (By Mr. Brewster)  This one here.  It's Juan Pablo Ramirez on the bottom.

MR. BREWSTER:   Excellent job, Mr. Jarvi.

Q.   (By Mr. Brewster)  Do you see this one?

A.   Yes, sir.

Q.   What happened to that?

A.   I don't know.

Q.   Let me ask you did you report that it was returned to

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

67

Mr. Monte Strout, who's a lawyer in Tahlequah?

A. Not that I can recall.

Q. Did you in fact tell Pam Stephens that that money was given to Monte Strout?

A. No, not that I recall.

Q. After March 25th did you actually receive a check from Monte Strout for $1,800.00?

A. Probably.

Q. Okay. Why?

A. Worked for Mr. Strout.

Q. Mr. Strout's representing one of the people that you seized money from, right?

A. Correct.

Q. And then after it's released to Mr. Strout, you get a check from him that -- within a few months, right?

A. I worked for his base -- in his basement, yes.

Q. You worked in his basement?

A. Yes.

MR. BREWSTER: May I approach briefly, Your Honor, just to refresh memory on 2611?

THE COURT: Yes, sir.

Q. (By Mr. Brewster) Does that refresh your memory as to whether you received a check in '04 from Mr. Strout?

A. Okay.

Q. What is it for?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

68

THE COURT:  Does it refresh your memory?

THE WITNESS:  Oh.  It appears to be a check from him, yes.

THE COURT:  Does it refresh your memory?

THE WITNESS:  Yes.  Yes.

THE COURT:  Thank you.

MR. BREWSTER:  Thank you.

Q.   (By Mr. Brewster)  If I could, directing your attention to exhibit -- check my numbers here.  Exhibit No. 4 before you, marked for identification purposes only.  Directing your attention to the third page.

MR. BREWSTER:  And this is pursuant to 2611, Your Honor, for memory refresh.

Q.   (By Mr. Brewster)  On the entry Juan Ramirez, $4,338.00, does it refresh your memory as to where that money went?

MR. BREWSTER:  If I may approach briefly, I can assist?

A.   (By the Witness)  Show me, please.

THE COURT:  Yes, sir.

A.   (By the Witness)  Right here.  I'm sorry.  It says gave money to Monte Strout.

Q.   (By Mr. Brewster)  How much?

A.   It shows four -- well, in the safe it shows 43 or 4,348.

Q.   $4,348.00.  And that's one of the files or envelopes that were missing?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

69

A.    It wasn't missing.

Q.    Well, it wasn't in the safe, notwithstanding the fact that you logged it in?

A.    It was locked up.

Q.    And you had it?

A.    I didn't have it.  It was in the Drug Task Force office.

Q.    And, as a matter of fact, later -- it never got turned in.  You just said the money went to Monte Strout, right?

A.    Best I can recall, it was returned to Monte Strout.  That's what it says right here.

Q.    And how many months before you get a check from Mr. Strout?

A.    Whatever the date was.

Q.    Why would you give it to Monte Strout?

A.    Probably what the order said of the Court.

Q.    There's no order.

A.    Then I don't know.

Q.    Now, I'm trying to understand this meeting you had with Mr. Gray.  Did there come a time when these files that were locked up in your cabinet, you tell us, showed up for Mr. Gray?

A.    They were turned over to Mister -- or the Defendant, yes.

Q.    Did you tell him I put them in the backseat of your car?

A.    No.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

70

Q. Where did you give them to him?

A. At the Drug Task Force office.

Q. Where did you -- how did you hand them to him?

A. From my hand to his.

Q. Who was present?

A. I believe him and Jeff Lancaster was also there.

Q. How many days did it take for those files to get returned?

A. I don't recall.

Q. And some of them never did, including Mr. Ramirez's money, right?

A. All money was accounted for.

Q. Yeah. Never was returned to Mr. Gray or anyone else, Mr. Ramirez's money; am I correct?

A. I don't know.

Q. Well, it's your case. Why don't you know?

A. Because once I seize it and log it in, and then pick it back up and turn it over to the DA's office, I have nothing to do with it.

Q. In the years of 2003 and 2004, did you have a practice of going to the bank and buying cashier's checks with cash?

MS. McCORMICK: Objection. Your Honor, may we approach?

THE COURT: Yes, ma'am.

MR. BREWSTER: If it's your previous ruling covers

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

71

that subject, I'll reserve it till I get to examine him later.

MS. McCORMICK:  It is the same objection.

MR. BREWSTER:  Okay.  Okay.

Q.  (By Mr. Brewster)  We'll save it for our next meeting, sir.

Now, when you saw Mr. Gray in connection with the Scarborough case, remember that?

A.  Yes.

Q.  Mr. Gray -- you said Mr. Gray came to you and said, hey, what's going on about this money, right?

A.  He asked me to come to his truck, yes.

Q.  And that was in Adair County?

A.  Correct.

Q.  How many offices was Mr. Gray attempting to supervise in that at that time period?

A.  There was four in District 27.

Q.  Actually --

A.  (Interposing)  ADA's offices.

THE REPORTER:  I'm sorry?

Q.  (By Mr. Brewster)  Actually it's eight, wasn't there?  I mean, there was eight offices.  I mean, there was the Drug Task -- or, I mean, there was the DA's offices.  There was the Drug Task Force office.  There was the domestic offices for -- for child support enforcement.  He had eight separate

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

72

offices at that time, didn't he?

A.   I can't tell you how many offices.  I know there was four main offices.

Q.   Okay.  So when you meet with him in Adair County, did he call you over and say I want to meet with you?

A.   No.  We were at the courthouse together.  Or not together.  But, I mean, I was there, and he was also there.

Q.   And are you telling us that this is not the envelope he showed you?

A.   That's correct.

Q.   And I'm referring to Defendant's Exhibit No. 13?

A.   That's correct.

Q.   Okay.  But it had Scarborough on it?

A.   Correct.

Q.   Okay.  So what you're suggesting is Mr. Gray got another envelope, wrote Scarborough on it, and for some reason showed that one to you?

A.   All I can tell you is testify that the baggy he showed me wasn't that one.

Q.   Did he show you the receipt that was signed by Mr. Carver and Mr. Lancaster when the money was opened?

A.   No.

Q.   And you told him if you think I took it, call the OSBI?

A.   No.

Q.   Oh, I thought that's what you said.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

73

A.    No.   I said if you think there's money missing, call the OSBI.

Q.    Okay.   And you know the OSBI well.   You knew Vicky Lyons well.   She was the OSBI agent, wasn't she?

A.    Correct.

Q.    And you guys lived together for a while, didn't you?

A.    No.

MS. McCORMICK:   Objection, Your Honor.

Q.    (By Mr. Brewster)   Are you're denying that, Mr. Johnson?

MS. McCORMICK:   Objection.   Relevance.

THE COURT:   Do you want to approach?

MS. McCORMICK:   Yes, Your Honor.

(The following was a quiet bench conference:)

THE COURT:   Go ahead.

MS. McCORMICK:   Once again, Counsel is getting into areas that are far beyond the direct examination and have no place in cross-examination today.   He is totally ignoring and mocking the Court's ruling with regard to how His Honor expects this proceeding to be carried out.   This is probably our fifth or sixth time to come up here on the same objection.

MR. BREWSTER:   Now, this is within the scope, Ms. McCormick, because you're the --

MS. McCORMICK:   (Interposing)   It's not my scope.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

74

THE COURT: Go ahead, Mr. Brewster.

MR. BREWSTER: The scope of your direct because you elicited from him that he suggested to call the OSBI. My position is that he did so is because he knew what would happen if it was through them; although, it went up to the AG's office.

So my position simply is this: Through Mike Littlefield and your superiors, whoever that is, inquired of Mr. Nigh. And he was mute. And it turned out to be true. So my position right now is since you elicited from his investigation to call the OSBI, that was a complete false red herring on his part because he knew they'd do nothing. And he was correct.

MS. McCORMICK: And, Your Honor, for him to ask this witness if he lived with an OSBI agent --

MR. BREWSTER: (Interposing) He did.

MS. McCORMICK: -- is inappropriate.

MR. BREWSTER: Okay. He did. And we have witnesses that will show it. He lived with her. He drove her vehicle. He had her cell phone. When he was confronted about missing property, she's the one that brought it back. It'll all come in our case in chief.

MS. McCORMICK: Well, he just said the magic words. It will come in in his case in chief if it gets in. It's certainly not appropriate here.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

MR. BREWSTER:  It's appropriate because --

THE COURT:  (Interposing)  Okay.  For the purpose of their case, you can ask, and you've already asked him, and I think he's answered.  And we'll go on.

MR. BREWSTER:  We'll show it --

MR. ROGERS:  Your Honor, can I ask a question?

THE COURT:  Sure.

MR. ROGERS:  Mr. Brewster was permitted to elicit testimony concerning Monte Strout.  Apparently now we need to call Mr. Strout to deny that.  Is that -- should that be in our case, or in his case, or in rebuttal?

MR. BREWSTER:  You can call Mr. Strout if you like.  I have no objection.

MR. ROGERS:  He certainly was not part of our case.

THE COURT:  Well, I'm going to let y'all put on your case, and then they can put on their case.  And if y'all have rebuttal, you can do rebuttal.

MR. ROGERS:  Okay.  Thank you very much.

THE COURT:  Thank you.

(The following was had in open court:)

THE COURT:  Okay, Mr. Brewster.

MR. BREWSTER:  Should I not go there now or --

THE COURT:  You can ask that one.  That one question he can answer, and then we'll move on.

MR. BREWSTER:  Okay.  Okay.  And I can reserve this

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

until another time.  Okay.

Q.    (By Mr. Brewster)  Did you know -- were you the agent for a seizure involving a gentleman named Roy Brewer in Adair County, Case No. CF03-304?

A.    I don't recall.  I remember the name, but I don't recall the specifics of it.

Q.    Did there come a time in that case, to your recollection, that the Court ordered in that case that the money be returned to Mr. Brewer?  You were the last in possession of it, and but it was never returned?

A.    And, like I said, I don't recall the case.

Q.    Were you involved in a case involving the City of Tahlequah in a seizure involving a gentleman named Blake Keeley?

A.    What year?

Q.    Well, we'll get exactly the year here.  January of 2003?

MS. McCORMICK:  Objection as to the time frame, Your Honor.  May we approach?

THE COURT:  Yes, ma'am.

(The following was a quiet bench conference:)

MS. McCORMICK:  Your Honor, you set specific guidelines with reference to matters we'd be able -- we'd be allowed to question regarding a time frame.  I believe the time frame you set out was January of '03 to January of '06. And I believe Counsel's last reference was to a case out of

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

77

'02.

MR. BREWSTER:  Well, what happened was memos were sent to Mr. Johnson on this account.  He was the last to have received.  From the memos, the last -- it says the money's missing.  But he says I gave the money to Michelle.  I'm sorry.  It's Ms. Kinsey, I believe.  I'll give you the name. Misty Brinlee writes a memo to Jeff Sheridan in '05.

MS. McCORMICK:  (Inaudible.)

MR. BREWSTER:  Huh?  Jeff Sheridan.  Okay.  And as a result of that memo, the questions of Ms. Brinlee of course she didn't get it.  She's prepared to testify.  In the preliminary hearing I asked her about the same account covering the same time period that's missing.  He says -- he testified.  Donovan Dobbs will testify notwithstanding -- (Inaudible).  So it's just complete further lies from this witness.  You should be as interested as I in exposing this.

MS. McCORMICK:  Your Honor, can Counsel direct his argument to the Court as opposed to Counsel?  We're up here to consult with Your Honor.

THE COURT:  As long as both of you will do that, that's fine.  Go ahead.  Are y'all through?

MR. BREWSTER:  Yeah.

THE COURT:  I'd rather you bring that up in your case in chief.

MR. BREWSTER:  Very well, sir.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

78

THE COURT:   Thank you.

(The following was had in open court:)

MR. BREWSTER:   Your Honor, based upon the Court's ruling that I'll get to examine this gentleman in my case in chief further on other issues, I have no further questions at this time.

THE COURT:   Thank you.

Ms. McCormick?

MS. McCORMICK:   Yes, Your Honor, just briefly.

MR. BREWSTER:   Could he be recognized back, Your Honor?

THE COURT:   That was a yes if you missed that.

REDIRECT EXAMINATION

BY MS. McCORMICK:

Q.   Sir, at the beginning of Counsel's cross-examination, Defendant's Exhibit No. 24 was shown to you.  And you were asked regarding the -- the manner in which you secured that bank bag.  Counsel's question was with regard to tape residue.  Do you know where that Defense exhibit has been since you last placed it into the safe register or safe at the Drug Task Force office?

A.   No, I don't.

Q.   Okay.  So you wouldn't have had any access to it whatsoever; is that correct?

MR. BREWSTER:   Objection.  Leading.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

Q.    (By Ms. McCormick)   Would you have had any access to that bank bag?

A.    No.

Q.    So as far as its condition, what can you explain to the jury regarding why there is or is not tape residue?

A.    I can't.

Q.    There were a number of cases that were referenced during cross-examination.  Perez, Ramirez, Bigsby (sic), Coldwell, and -- and -- and there were others.  But have you ever been confronted regarding monies missing in those cases?

A.    No.

Q.    There was some quarreling with Counsel regarding whether they were in the safe or the file cabinet.  But have you ever been accused or questioned regarding those funds being missing?

A.    No.

Q.    As you sit here today, are you aware as to whether or not those funds are missing?

A.    No.

Q.    Sir, you referenced or Counsel referenced a case in which the Defendant was represented by a Monte Strout.  Who's Monte Strout?

A.    He's an attorney in Tahlequah.

Q.    Okay.  Was there a point in time when he actually worked for District 27?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

80

A.    Yes.

Q.    And what was his position?

A.    He was the First Assistant District Attorney.

Q.    Okay.  Was that during the Gray administration?

A.    Yes.

Q.    Sir, will you explain for this jury what work you were doing for Mr. Strout in his basement?

A.    Pouring concrete, redoing his basement for a workshop for him.

Q.    And is it your testimony that you were paid by Mr. Strout for doing that work?

A.    Yes.  I was paid by Mr. Strout for that.

Q.    How would you characterize your relationship with Mr. Strout?

A.    He's a friend.

Q.    There was some discussion regarding the combination and the access to the safe.  And you named a number of people who had access to the safe in the Drug Task Force office.  Do you know whether or not the Defendant had access?

A.    Yes, he did.

Q.    How do you know that?

A.    Because I gave him all the codes and a key.

Q.    You've referenced the log.  And Counsel questioned you extensively regarding information that's contained on the log, information that's left off of the log.  In addition to

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

81

the information you document on a log, do you also write reports with regard to your law enforcement work or your participation in an investigation?

A.    Yes.

Q.    And so with regard to the cases or each of the -- the cases that Counsel referenced, Ramirez, Perez, Miller, are there -- would there also be law enforcement reports that further detailed the handling of various evidence?

A.    Yes.

Q.    Sir, were there times where you were asked by different attorneys within the District Attorney's office to deliver evidence from -- from one place to another?

A.    Yes.

Q.    And who were some of those people who directed you to do so?

A.    Donovan Dobbs.  I believe Monte Strout asked me a couple of times.  And there would be other prosecutors that would ask me.

Q.    Did the Defendant ever ask you to make those types of transfers or deliveries?

A.    Not that I recall.

Q.    Was there anything unusual about you being -- that request being made of you, that type of request being made of you?

A.    No.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

82

Q.   Sir, when you described that you transferred a number of evidence envelopes to the Defendant at a point later in time than March 25th of 2004, explain or describe for the ladies and gentlemen of the jury how you did that.

A.   Went to the Drug Task Force office.  Removed the padlock from the filing cabinet.  Took it out.  The Defendant and I believe Mr. Lancaster arrived, and I handed it to them.

Q.   So this reference to having -- having -- you having placed the evidence envelopes in the Defendant's backseat or in his car, are you -- did -- was there ever an incident where that occurred?

A.   No.

Q.   In reference to the Dayberry case, Counsel questioned you regarding your involvement with the execution of the search warrant.  If you will, describe whether or not you were part of the team responsible for collecting evidence?

A.   I was not part of the team responsible for collecting any evidence.

Q.   And you described your role as being one of the people to secure the perimeter.  Explain for the ladies and gentlemen of the jury exactly what that means.

A.   Securing the outside of the residence, make sure no one comes upon us while we're inside or other officers while they're inside.  And just secure the area.

Q.   And so what level of interaction do you have with the

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

83

people who are actually searching?

A.    Just talking.  Observing.  Like a meth -- I know that there was a meth lab found there.  And I just looked at some of the chemicals.  And then I left.  Told them, yeah, it was a meth lab.

Q.    And in light of the number of officers who were involved in that search, did you have an occasion to see each and every officer, and each and every officer see you during the time you were at that scene?

A.    No.

Q.    With regard to the logs that have been offered as State's Exhibit No. 2, Defendant's Exhibit Nos. 1 and 2, are those logs that where information was added to on a regular basis and kind of a living/breathing document that changed constantly?

A.    Correct.

        MS. McCORMICK:  Your Honor, may I have a moment, please?

        THE COURT:  Yes, ma'am.

        MS. McCORMICK:  I have nothing further, Your Honor.

        THE COURT:  Thank you.

        Mr. Brewster?

        MR. BREWSTER:  I'll reserve mine.

        THE COURT:  Okay.  Mr. Johnson, you can step down.

        DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

84

And you'll need to remain in attendance, subject to recall.

THE WITNESS:   Thank you, sir.


(Partial transcript concluded.)

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

85

IN THE DISTRICT COURT IN AND FOR CHEROKEE COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                  )
                                    )
                   Plaintiff,       )
                                    )
vs.                                 )     CASE NO. CF-2007-28
                                    )
RICHARD LOY GRAY, JR.,              )
                                    )
                   Defendant.       )

I, RUSSELL E. SIMMONS, C.S.R., OFFICIAL COURT REPORTER in the above-entitled cause, do hereby certify that the foregoing transcript is a true and correct Partial Transcription of shorthand notes taken of Jury Trial Hearing Proceedings had in captioned cause on the 4th day of June, 2008, before the Honorable H. Michael Claver, District Judge in and for Okmulgee County, State of Oklahoma.

Dated this ___31st___ day of ___july___, 2008.

*Russell C. Simmons*

RUSSELL E. SIMMONS, C.S.R.
OFFICIAL COURT REPORTER
OKLAHOMA NO. 01633

Russell E. Simmons
Oklahoma Certified Shorthand Reporter
Certificate No. 1633
Exp. Date: December 31, 2008

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**REDACTED EXHIBIT 181b**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

366

05/23/2008 FRI 18:16   FAX 405 522 2795  OK ATTORNEY GENERAL                                    ☒029/☐/☐

District Attorney Richard Gray
From Agent Clint Johnson

**Monday :** did weekly reports, went to Adair County met with informant went to Tahlequah with informant and Fred Means did interview went back to Adair County dropped of informant.

**Tuesday :** Went to Adair County Attempted to meet informant went to Stilwell met with Jeff Lancaster and informant ref. Mexicans did drive by of residences of Mexicans.

**Wednesday :** went to Adair County did traffic interdiction of Doyle's trailer park were Mexicans hang out met with two different informants.

**Thursday :** off sick.

**Friday :** meeting with Donovan Dobbs took of sick rest of day at noon.

Agent Clint Johnson
10- 18 / 10-22



DEFENDANT'S EXHIBIT

001170

05/23/2008 FRI 18:16   FAX 405 522 2795 OK ATTORNEY GENERAL                                    ⊠030/⟨ɒ⟩0

District Attorney Richard Gray
From Agent Clint Johnson

Monday : Did weekly report, went to Muskogee County Federal Court and Grand Jury. Went back to Cherokee County met with Scott Craig met with informant.

Tuesday : Assisted at the Cherokee County Court House (security). Met with Scott Craig interviewed informant went to Adair County did drive by residence CI advised had lab. Worked on paperwork for reserve academy.

Wednesday : meeting with Donovan Dobbs worked on evidence room pulled out old case files took evidence to Cherokee County Sheriff's Department. Met with Scott Craig and attempted purchase.

Thursday : Assisted Cherokee Nation Marshal Service in execution of search warrant in Hulbert area.

Friday : went to office worked on paperwork for reserve academy. Met with Scott Craig attempted narcotics purchase with informant.

Agent Clint Johnson
11-08 / 11-12-04

001171

05/23/2008 FRI 18:16  FAX 405 522 2795 OK ATTORNEY GENERAL

District Attorney Richard Gray
From Agent  Clint Johnson

**Monday :** Did weekly report, went to Muskogee County Federal Court and Grand Jury. Went back to Cherokee County met with Scott Craig met with informant.

**Tuesday :** Assisted at the Cherokee County Court House (security). Met with Scott Craig interviewed informant went to Adair County did drive by residence CI advised had lab. Worked on paperwork for reserve academy.

**Wednesday :** meeting with Donovan Dobbs worked on evidence room pulled out old case files took evidence to Cherokee County Sheriff's Department. Met with Scott Craig and attempted purchase.

**Thursday :** Assisted Cherokee Nation Marshal Service in execution of search warrant in Hulbert area.

**Friday :** went to office worked on paperwork for reserve academy. Met with Scott Craig attempted narcotics purchase with informant.

Agent Clint Johnson
11-08 / 11-12-04

001172

05/23/2008 FRI 18:16   FAX 405 522 2795 OK ATTORNEY GENERAL                                   ☒032/☐☐

District Attorney Richard Gray
From Agent Clint Johnson

**Monday :** did weekly reports, went to Adair County met with informant went to Tahlequah met with two different informants finished paperwork.

**Tuesday :** Went to Adair County with informant and Jerry Stephens did mileage of residence typed search warrant met with judge went to Adair County did search warrant arrested one person.

**Wednesday :** did paperwork from search warrant logged all evidence into property room.

**Thursday :** off 4 hours holiday

**Friday :** Holiday

Agent Clint Johnson
12-20/12-24-04

001173

District Attorney Richard Gray
From Agent Clint Johnson

Monday : did weekly paperwork. Went to Adair County did drive by of two residences met with two different informants. Received information for search warrant executed search warrant arrested two persons seized meth lab.

Tuesday : assisted Cherokee County on a burglary in progress. Did paperwork on cases from one week previous.

Wednesday : met with two informants spoke to Mike Littlefield ref. Thursday going to Sequoyah County meeting with persons on Kenny Barrett case.

Thursday : went to Sequoyah County with Mike Littlefield and interviewed four persons regarding the Kenny Barrett case.

Friday : went to office worked on paperwork spoke to three different informants.

Agent Clint Johnson
12-08 / 12-10-04

001174

371

05/23/2008 FRI 13:15  FAX 405 522 2795 OK ATTORNEY GENERAL  @023/040

District Attorney Richard Gray
From Agent Clint Johnson

Monday: off sick

Tuesday : off sick

Wednesday : off vacation

Thursday : spoke to Glenn Reed with the Muskogee County Sheriff's Department spoke ref. to Mexican marijuana. Met with informant and Glenn Reed did two drive-by's of residence went back to Tahlequah met with informant later on in day did purchase of marijuana.

Friday : typed search warrant for residence did drive-by of residence waited on subject to show up executed traffic stop recovered approximately one-quarter pound marijuana typed two other search warrants executed two search warrants arrested four persons and recovered approximately 25 pounds of marijuana.

Agent Clint Johnson
01- 10 / 01-14-2005

001169

05/23/2008 FRI 13:16   FAX 405 522 2795 OK ATTORNEY GENERAL                                    ⓪027/⓪⓪

District Attorney Richard Gray
From Agent Clint Johnson

Monday: Did weekly report, court in Cherokee County, went to Adair County met with informant typed up to search warrants executed two search warrants in Adair County arrested three persons. Went to Siloam Springs Arkansas met with DEA ref. case of HIV man passing AIDS to juveniles.

Tuesday : worked on reports went to Adair County worked on case from Monday interviewed two informants.

Wednesday : went to federal court in Muskogee ref. Kenny Barrett.

Thursday : worked on paperwork in Tahlequah went to Muskogee interviewed informant with Dickie Huitt.

Friday : Assisted Clint on a search warrant in Tahlequah ( Super Mart )

Agent Clint Johnson
01-24 / 01-28-2005

001168

District Attorney Richard Gray
From Agent Clint Johnson

Monday: HOLIDAY

Tuesday : Did weekly report, worked on report and finished report from search warrant of 25 pounds of marijuana, went to Banc First with supoena gathered records.

Wednesday : met with two different informants in Adair County did drive-by of three different residences in Adair County for mileage of search warrants. Went to Tahlequah met with informant did drive-by of one residence in Cherokee County.

Thursday : Dropped car of at shop went to Westville P.D. in black dodge met with three different informants. Did drive-by of two different residences.

Friday : off sick

Agent Clint Johnson
01- 17 / 01-21-2005

001167

374

05/23/2008 FRI 18:16   FAX 405 522 2795 OK ATTORNEY GENERAL                    ☒025/☐☐

District Attorney Richard Gray
From Agent Clint Johnson

Monday: Did weekly report, went to OSBI dropped of evidence met with two informants.

Tuesday : Went to Adair County to resume dig at the well with OSBI.

Wednesday : Meeting with Donovan in Wagoner, went to Tahlequah typed pen register orders got signed.

Thursday : went to Westville met with two different informants had court in Adair County.

Friday : Off Sick

Agent Clint Johnson
02- 07 / 02-11-2005

001166

05/23/2008 FRI 18:15  FAX 405 522 2795 OK ATTORNEY GENERAL                    ☒034/□□

District Attorney Richard Gray
From Agent Clint Johnson

Monday :  did weekly reports, typed search warrant in Cherokee County, executed search warrant arrested two persons for cocaine.

Tuesday :  Went to Wagoner County worked in forfeiture room.

Wednesday :  went to Westville P.D. met with two informants attempted to get information for search warrant went to Tahlequah attempted knock and talk no answer.

Thursday :  did knock and talk in Tahlequah went to Adair County did knock and talk typed search warrant executed search warrant arrested two persons.

Friday :  off from working late money

Agent Clint Johnson
02-14/02-18-05

001175

05/23/2008 FRI 18:16  FAX 405 522 2795 OK ATTORNEY GENERAL                                    ☒035/〔☐〕☐

District Attorney Richard Gray
From Agent Clint Johnson

Monday : off holiday

Tuesday : did weekly paperwork met with informant typed search warrant executed search warrant arrested seven persons seized approximately $9000.00 cash went to Adair County worked lab.

Wednesday : did paperwork from search warrants met with two informants.

Thursday : did paperwork went to Adair County turned in paperwork attempted to do search warrant no one home warrant was not served.

Friday : met with Richard in meeting ref. search warrant from Tuesday.

Agent Clint Johnson
02-21/02-25-05

001176

05/23/2009 FRI 18:11   FAX 405 522 2795 OK ATTORNEY GENERAL                    ☒004/☐☐

## REPORT TO DONOVAN DOBBS
### 06-10-05—06-06-05

06-06-05 worked on weekly paperwork met with two different informants attempted to do controlled delivery.

06-07-05 met with two different informants again attempted to do controlled delivery did drive by of two different residences and provided surveillance.

06-08-05 attempting to do controlled buy assisted Cherokee Nation Marshal Service in the execution of search warrant. Two persons were arrested.

06-09-05 provided surveillance on residence. Stopped car arrested Antonio Parker/Andrea Hopkins seized 33 grams meth, appr. 300 grams marijuana and $2500.00 cash.

06-10-05 court in Tahlequah worked on paperwork.

Agent Clint Johnson

001145

05/23/2008 FRI 18:11   FAX 405 522 2795 OK ATTORNEY GENERAL                                    ☒005/[g/D]

## REPORT TO DONOVAN DOBBS
### 06-13-05—06-17-05

06-13-05 worked on weekly paperwork met with two different informants did knock and talk in Tahlequah.

06-14-05 went to the P.D. did interview of CI went with Jonathan Wells went to old City dump looked for marijuana plants.

06-15-05 met with Richard at office. Cleaned office went to airport met with Jonathan Wells flew for marijuana plants. Went to Chewey to check on possible lab arrested two persons.

06-16-05 executed search warrant on David Creech found zanax bars. Assisted U.S. Marshals in arresting Tim Holland.

06-17-05 off morning sick afternoon.

Agent Clint Johnson

001146



# United States Bankruptcy Court
# Eastern District Of Oklahoma
111 West 4th Street
Post Office Box 1347
Okmulgee, Oklahoma 74447

Judy_hares@okeb.uscourts.gov



**Judy K. Hares**
Deputy Clerk

TEL: 918.758.0126
FAX: 918.756.9248

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF OKLAHOMA

IN RE:                                    )
                                          )
    Clint Johnson                         )       Case No.      01-72501
                                          )       Chapter       7
    Tina Johnson                         )
                                          )
        Debtors          )

### CERTIFICATE

The undersigned does hereby certify that the following documents are true and correct copies of the proceedings in the above styled case.

Petition (34 pages)

Dated: April 28, 2008

_____
Judy Hares, Deputy Clerk



DEFENDANT'S
EXHIBIT

001022

(Official Form 1) (9/97)   Case: 01-72501   Doc #: 1   Filed: in USBC ED/OK on 07/25/2001   Page 1 of 14   **ORIGINAL**

| FORM B1 | **United States Bankruptcy Court**<br>**Eastern District of Oklahoma** | **Voluntary Petition** |
|---|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Johnson, Clint** | Name of Joint Debtor (Spouse)(Last, First, Middle):<br>**Johnson, Tina** |
|---|---|
| All Other Names used by the Debtor in the last 6 years<br>(include married, maiden, and trade names):<br>**N/A** | All Other Names used by the Joint Debtor in the last 6 years<br>(include married, maiden, and trade names):<br>**Tina Gourd** |
| Soc. Sec./Tax I.D. No. (if more than one, state all):<br>■■■■2820, N/A | Soc. Sec./Tax I.D. No. (if more than one, state all):<br>■■■■0303, N/A |
| Street Address of Debtor (No. & Street, City, State & Zip Code):<br>■■■■■■■■■<br>**Tahlequah, OK 74464** | Street Address of Joint Debtor (No. & Street, City, State & Zip Code):<br>■■■■■■■■■<br>**Tahlequah, OK 74464** |
| County of Residence or of the<br>Principal Place of Business:  **Cherokee** | County of Residence or of the<br>Principal Place of Business:  **Cherokee** |
| Mailing Address of Debtor (if different from street address):<br>■■■■■■■<br>**Tahlequah, OK 74464** | Mailing Address of Joint Debtor (if different from street address):<br>■■■■■■■<br>**Tahlequah, OK 74464** |
| Location of Principal Assets of Business Debtor<br>(if different from street address above): | |

| **Information Regarding the Debtor (Check the Applicable Boxes)** |
|---|

Venue (Check any applicable box)

☑ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.
☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

| Type of Debtor (Check all boxes that apply) | | Chapter or Section of Bankruptcy Code Under Which the Petition is Filed (Check one box) | | |
|---|---|---|---|---|
| ☑ Individual(s) | ☐ Railroad | ☑ Chapter 7 | ☐ Chapter 11 | ☐ Chapter 13 |
| ☐ Corporation | ☐ Stockbroker | ☐ Chapter 9 | ☐ Chapter 12 | |
| ☐ Partnership | ☐ Commodity Broker | ☐ Sec. 304 - Case ancillary to foreign proceeding | | |
| ☐ Other | | | | |

| Nature of Debts (Check one box) | | Filing Fee (Check one box) |
|---|---|---|
| ☑ Consumer/Non-Business | ☐ Business | ☑ Full Filing Fee Attached |

Chapter 11 Small Business (Check all boxes that apply)

☐ Debtor is a small business as defined in 11 U.S.C. § 101
☐ Debtor is and elects to be considered a small business under 11 U.S.C. § 1121(e) (Optional)

☐ Filing Fee to be paid in installments (Applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form No. 3.

Statistical/Administrative Information (Estimates only)

☐ Debtor estimates that funds will be available for distribution to unsecured creditors.
☑ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

| Estimated Number of Creditors | 1-15 | 16-49 |
|---|---|---|
| | ☑ | ☐ |

| Estimated Assets | | | |
|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million |
| ☐ | ☑ | ☐ | ☐ |

| Estimated Debts | | | |
|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million |
| ☐ | ☐ | ☑ | ☐ |

THIS SPACE IS FOR COURT USE ONLY

**UNITED STATES BANKRUPTCY COURT**
Eastern District of Oklahoma

Case # 01-72501   Chapter 7
Filed: 08:30 AM, 07/25/01   Okmulgee

Judge: Tom R. Cornish
Trustee: Gerald R. Miller
Debtor(s):
  Clint Johnson
  Tina Johnson

First Meeting of Creditors
02:30 PM, August 24, 2001
U S Courthouse Muskogee
U S Courthouse
101 N 5th St 3rd Fl
Muskogee OK 74401

RECEIPT

# 000042985 - SH
10:36 AM, July 25, 2001

| Code | Qty | Amount |
|---|---|---|
| CH7 | 1 | $200.00 |

**ORIGINAL**

TOTAL PAID: $200.00
From: H. Doak Willis
220 S Muskogee Ave
Tahlequah, OK 74464-0000

7

001023

(Official Form 1) (9/97)

| Voluntary Petition *(This page must be completed and filed in every case)* | Name of Debtor(s): Clint Johnson Tina Johnson | FORM B1, Page 2 |
|---|---|---|

| Prior Bankruptcy Case Filed Within Last 6 Years (If more than one, attach additional sheet) | | |
|---|---|---|
| Location Where Filed:    NONE | Case Number: | Date Filed: |

| Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor (If more than one, attach additional sheet) | | |
|---|---|---|
| Name of Debtor: NONE | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

## Signatures

| Signature(s) of Debtor(s) (Individual/Joint) | Signature of Debtor (Corporation/Partnership) |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct. [If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7. I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _____<br>Signature of Debtor<br><br>X _____<br>Signature of Joint Debtor<br><br>_____<br>Telephone Number (If not represented by attorney)<br><br>4-24-01<br>Date | I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.<br><br>The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X  Not Applicable<br>Signature of Authorized Individual<br><br>_____<br>Printed Name of Authorized Individual<br><br>_____<br>Title of Authorized Individual<br><br>_____<br>Date |
| **Signature of Attorney**<br><br>X _____<br>Signature of Attorney for Debtor(s)<br><br>Doak Willis, 9703<br>Printed Name of Attorney for Debtor(s) / Bar No.<br><br>Doak Willis<br>Firm Name<br><br>Attorney at Law  220 S. Muskogee Ave.<br>Address<br><br>Tahlequah, OK 74464<br><br>918-456-1304 ; (fax) 918-456-5031<br>Telephone Number<br><br>7-24-01<br>Date | **Signature of Non-Attorney Petition Preparer**<br>I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.<br><br>**Not Applicable**<br>Printed Name of Bankruptcy Petition Preparer<br><br>_____<br>Social Security Number<br><br>_____<br>Address<br><br>Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document: |
| **Exhibit A**<br>(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)<br>☐ Exhibit A is attached and made a part of this petition. | If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.<br><br>X  Not Applicable<br>Signature of Bankruptcy Petition Preparer |
| **Exhibit B**<br>(To be completed if debtor is an individual whose debts are primarily consumer debts)<br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.<br><br>X _____<br>Signature of Attorney for Debtor(s)        Date | _____<br>Date<br><br>A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156. |

001024

(Official Form 1) (9/97)

FORM 1. VOLUNTARY PETITION - Page 3

Name of Debtors: **Clint Johnson**
**Tina Johnson**

Case Number:

| NAME(S) OF ATTORNEY(S) DESIGNATED TO REPRESENT DEBTOR |
|---|

**Doak Willis** 9703

001025

384

## UNITED STATES BANKRUPTCY COURT
### Eastern District of Oklahoma

In re:     **Clint Johnson**                          **Tina Johnson**                    Case No. _____

             ████2820                          ████0303                    Chapter      7

## VERIFICATION OF CREDITOR MATRIX

The above named debtor(s), or debtor's attorney if applicable, do hereby certify under

penalty of perjury that the attached Master Mailing List of creditors, consisting of 3 sheet(s) is

complete, correct and consistent with the debtor's schedules pursuant to Local Bankruptcy

Rules and I/we assume all responsibility for errors and omissions.

Dated: _7-24-01_

Signed: _____            Signed: _____
           Doak Willis                                         Clint Johnson

Bar No.        9703                            Signed: _____
                                                         Tina Johnson

001026

385

**UNITED STATES BANKRUPTCY COURT**

**Eastern District of Oklahoma**

| | | | |
|---|---|---|---|
| In re: | Clint Johnson | Tina Johnson | Case No. _____ |
| | ▇▇▇-2820 | ▇▇▇0303 | Chapter   7 |
| Debtors | | | |

# DISCLOSURE OF COMPENSATION OF ATTORNEY
# FOR DEBTOR

1. Pursuant to 11 U.S.C. § 329(a) and Bankruptcy Rule 2016(b), I certify that I am the attorney for the above-named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

| | | |
|---|---|---|
| For legal services, I have agreed to accept | $ | 900.00 |
| Prior to the filing of this statement I have received | $ | 250.00 |
| Balance Due | $ | 650.00 |

2. The source of compensation paid to me was:

   ☑ Debtor          ☐ Other (specify)

3. The source of compensation to be paid to me is:

   ☑ Debtor          ☐ Other (specify)

4. ☑ I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm.

   ☐ I have agreed to share the above-disclosed compensation with a person or persons who are not members or associates of my law firm. A copy of the agreement, together with a list of the names of the people sharing in the compensation, is attached.

5. In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

   a) Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;

   b) Preparation and filing of any petition, schedules, statement of affairs, and plan which may be required;

   c) Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;

   d) Representation of the debtor in adversary proceedings and other contested bankruptcy matters;

   e) [Other provisions as needed]
   None

6. By agreement with the debtor(s) the above disclosed fee does not include the following services:
   None

---

**CERTIFICATION**

I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding.

Dated:  *7-24-01*

Doak Willis, Bar No. 9703

**Doak Willis**
Attorney for Debtor(s)

---

001027

Form B6
(6/90)

## United States Bankruptcy Court
## Eastern District of Oklahoma

In re   Clint Johnson          Tina Johnson          Case No.

Chapter   7

# SUMMARY OF SCHEDULES

AMOUNTS SCHEDULED

| NAME OF SCHEDULE | ATTACHED (YES/NO) | NO. OF SHEETS | ASSETS | LIABILITIES | OTHER |
|---|---|---|---|---|---|
| A – Real Property | YES | 1 | $ 83,500.00 | | |
| B – Personal Property | YES | 3 | $ 16,450.00 | | |
| C – Property Claimed as Exempt | YES | 1 | | | |
| D – Creditors Holding Secured Claims | YES | 1 | | $ 113,152.73 | |
| E – Creditors Holding Unsecured Priority Claims | YES | 2 | | $ 1,914.03 | |
| F – Creditors Holding Unsecured Nonpriority Claims | YES | 3 | | $ 11,508.22 | |
| G – Executory Contracts and Unexpired Leases | YES | 1 | | | |
| H – Codebtors | YES | 1 | | | |
| I – Current Income of Individual Debtor(s) | YES | 1 | | | $ 2,355.75 |
| J – Current Expenditures of Individual Debtor(s) | YES | 1 | | | $ 3,376.00 |
| Total Number of sheets in ALL Schedules ➤ | | 15 | | | |
| Total Assets ➤ | | | $ 99,950.00 | | |
| Total Liabilities ➤ | | | | $ 126,574.98 | |

001028

387

Case: 01-72501      Doc #: 1      Filed:  in USBC ED/OK on 07/25/2001  Page 7 of 34

FORM B6A
(6/90)

In re:  Clint Johnson                    Tina Johnson                    Case No.
                Debtor                                                              (If known)

## SCHEDULE A - REAL PROPERTY

| DESCRIPTION AND LOCATION OF PROPERTY | NATURE OF DEBTOR'S INTEREST IN PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION | AMOUNT OF SECURED CLAIM |
|---|---|---|---|---|
| LOT 1, BLOCK 2, SONGBIRD SUBDIVISION, A SUBDIVISION OF A PART OF THE N2 OF SW4 OF NW4 OF SECION 21, TOWNSHIP 17 NORTH, RANGE 22 EAST, ACCORDING TO THE RECORDED PLAT THEREOF, CHEROKEE COUNTY, OKLAHOMA | Fee Owner | J | $ 83,500.00 | $ 79,331.00 |
| | | Total  ➤ | $ 83,500.00 | |

(Report also on Summary of Schedules.)

001029

FORM B6B
(10/89)

In re  Clint Johnson                    Tina Johnson                    Case No.
                    Debtor                                                                    (If known)

# SCHEDULE B - PERSONAL PROPERTY

| TYPE OF PROPERTY | NONE | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY, WITH-OUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 1. Cash on hand | X | | | |
| 2. Checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | X | | | |
| 3. Security deposits with public utilities, telephone companies, landlords, and others. | X | | | |
| 4. Household goods and furnishings, including audio, video, and computer equipment. | | 2-Televisions; Microwave; Dishwasher; Washer/Dryer; 2-beds; Sofa; Recliner; Dinette Set | J | 1,500.00 |
| 5. Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles. | X | | | |
| 6. Wearing apparel. | | Personal Clothing | J | 300.00 |
| 7. Furs and jewelry. | | 2-Wedding Bands | J | 150.00 |
| 8. Firearms and sports, photographic, and other hobby equipment. | | 1994 Kawasaki Waverunner | J | 1,000.00 |
| | | 1997 Kawasaki 220 ATV | J | 3,000.00 |
| 9. Interests in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | X | | | |
| 10. Annuities. Itemize and name each issuer. | X | | | |
| 11. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Itemize. | X | | | |
| 12. Stock and interests in incorporated and unincorporated businesses. Itemize. | X | | | |
| 13. Interests in partnerships or joint ventures. Itemize. | X | | | |
| | | | | |

001030

FORM B6B
(10/89)

In re   Clint Johnson          Tina Johnson          Case No.
                    Debtor                                              (if known)

# SCHEDULE B - PERSONAL PROPERTY
(Continuation Sheet)

| TYPE OF PROPERTY | NONE | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY, WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 14. Government and corporate bonds and other negotiable and nonnegotiable instruments. | X | | | |
| 15. Accounts receivable. | X | | | |
| 16. Alimony, maintenance, support, and property settlements to which the debtor is or may be entitled. Give particulars. | X | | | |
| 17. Other liquidated debts owing debtor including tax refunds. Give particulars. | X | | | |
| 18. Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule of Real Property. | X | | | |
| 19. Contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | | |
| 20. Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims. Give estimated value of each. | X | | | |
| 21. Patents, copyrights, and other intellectual property. Give particulars. | X | | | |
| 22. Licenses, franchises, and other general intangibles. Give particulars. | X | | | |
| 23. Automobiles, trucks, trailers, and other vehicles and accessories. | | 1992 Ford Pick Up | J | 5,000.00 |
| | | 1995 Chevy Cavilar | J | 3,500.00 |
| 24. Boats, motors, and accessories. | | 1982 Charger Boat & Motor | J | 2,000.00 |
| 25. Aircraft and accessories. | X | | | |
| 26. Office equipment, furnishings, and supplies. | X | | | |
| 27. Machinery, fixtures, equipment and supplies used in business. | X | | | |

001031

FORM B6B
(10/89)

In re   Clint Johnson                    Tina Johnson                    Case No. _____
                    Debtor                                                              (if known)

## SCHEDULE B - PERSONAL PROPERTY
(Continuation Sheet)

| TYPE OF PROPERTY | NONE | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY, WITH- OUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 28. Inventory. | X | | | |
| 29. Animals. | X | | | |
| 30. Crops – growing or harvested.  Give particulars. | X | | | |
| 31. Farming equipment and implements. | X | | | |
| 32. Farm supplies, chemicals, and feed. | X | | | |
| 33. Other personal property of any kind not already listed.  Itemize. | X | | | |

_2_  continuation sheets attached                    Total  ➤        $ 16,450.00

(Include amounts from any continuation sheets attached. Report total also on Summary of Schedules.)

001032

Case: 01-72501     Doc #: 1     Filed: in USBC ED/OK on 07/25/2001   Page 11 of 34

FORM B6C
(6/90)

In re   Clint Johnson                    Tina Johnson                   , Case No. _____
                           Debtor.                                                    (If known)

# SCHEDULE C - PROPERTY CLAIMED AS EXEMPT

Debtor elects the exemption to which debtor is entitled under:

(Check one box)

☐ 11 U.S.C. § 522(b)(1)     Exemptions provided in 11 U.S.C. § 522(d).     Note:  These exemptions are available only in certain states.

☑ 11 U.S.C. § 522(b)(2)     Exemptions available under applicable nonbankruptcy federal laws, state or local law where the debtor's domicile
                            has been located for the 180 days immediately preceding the filing of the petition, or for a longer portion of the
                            180-day period than in any other place, and the debtor's interest as a tenant by the entirety or joint tenant to the
                            extent the interest is exempt from process under applicable nonbankruptcy law.

| DESCRIPTION OF PROPERTY | SPECIFY LAW PROVIDING EACH EXEMPTION | VALUE OF CLAIMED EXEMPTION | CURRENT MARKET VALUE OF PROPERTY, WITHOUT DEDUCTING EXEMPTIONS |
|---|---|---|---|
| 2-Televisions; Microwave; Dishwasher; Washer/Dryer; 2-beds; Sofa; Recliner; Dinette Set | 31 OSA § 1A3 | 0.00 | 1,500.00 |
| LOT 1, BLOCK 2, SONGBIRD SUBDIVISION, A SUBDIVISION OF A PART OF THE N2 OF SW4 OF NW4 OF SECION 21, TOWNSHIP 17 NORTH, RANGE 22 EAST, ACCORDING TO THE RECORDED PLAT THEREOF, CHEROKEE COUNTY, OKLAHOMA | 31 OSA §§ 1A1 | 0.00 | 83,500.00 |
| Personal Clothing | 31 OSA § 1A8 | 300.00 | 300.00 |

001033

FORM B6D
(6/90)

In re:   Clint Johnson                    Tina Johnson                         Case No.

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

☐   Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | CODEBTOR | HUSBAND, WIFE, JOINT OR COMMUNITY | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND MARKET VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| ACCOUNT NO. ▇▇▇▇<br>Armstrong Bank<br>1401 S. Muskogee<br>Tahlequah, OK 74464 | | J | 7/2000<br>Security Agreement<br>1995 Chevy Cavilar; 1982 Charger Boat & Motor; 1994 Kawasaki Waverunner<br><br>VALUE $7,000.00 | | | | 7,500.00 | 500.00 |
| ACCOUNT NO. ▇▇▇▇<br>Citifinancial<br>P.O. Box 2977<br>Broken Arrow, OK 74013 | | J | 10/2000<br>Second Lien on Residence<br>LOT 1, BLOCK 2, SONGBIRD SUBDIVISION, A SUBDIVISION OF A PART OF THE N2 OF SW4 OF NW4 OF SECION 21, TOWNSHIP 17 NORTH, RANGE 22 EAST, ACCORDING TO THE RECORDED PLAT THEREOF, CHEROKEE COUNTY, OKLAHOMA<br><br>VALUE $83,500.00 | | | | 9,658.73 | 0.00 |
| ACCOUNT NO. ▇▇▇▇<br>First State Bank<br>1111 S. Muskogee Ave.<br>Tahlequah, OK 74464 | | J | 12/2000<br>Security Agreement<br>1992 Ford Pick Up; 1997 Kawasaki ATV<br><br>VALUE $8,000.00 | | | | 16,663.00 | 8,663.00 |
| ACCOUNT NO. ▇▇▇▇<br>Homeside Lending, Inc.<br>7749 Bay Berry Rd., 1st Floor<br>Jacksonville, FL 32256<br><br>Shapiro, Marinos & Cejda, L.L.P.<br>Teresa W. Marianos<br>770 N.E. 63rd<br>Oklahoma City, OK 73105 | | J | 05/2000<br>First Lien on Residence<br>LOT 1, BLOCK 2, SONGBIRD SUBDIVISION, A SUBDIVISION OF A PART OF THE N2 OF SW4 OF NW4 OF SECION 21, TOWNSHIP 17 NORTH, RANGE 22 EAST, ACCORDING TO THE RECORDED PLAT THEREOF, CHEROKEE COUNTY, OKLAHOMA<br><br>VALUE $83,500.00 | | | | 79,331.00 | 0.00 |

0 Continuation sheets attached

|  |  |
|---|---|
| Subtotal<br>(Total of this page) | $113,152.73 |
| Total<br>(Use only on last page) | $113,152.73 |

(Report total also on Summary of Schedules)

001034

B6E
(Rev.4/98)

In re:   **Clint Johnson**                              **Tina Johnson**                        Case No. _____
_____
              Debtor                                                                                      (if known)

# SCHEDULE E – CREDITORS HOLDING UNSECURED PRIORITY CLAIMS

☐ Check this box if debtor has no creditors holding unsecured priority claims to report on this Schedule E.

**TYPES OF PRIORITY CLAIMS**    (Check the appropriate box(es) below if claims in that category are listed on the attached sheets)

☐ **Extensions of credit in an involuntary case**

Claims arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee or the order for relief. 11 U.S.C. § 507(a)(2).

☐ **Wages, salaries, and commissions**

Wages, salaries, and commissions, including vacation, severance, and sick leave pay owing to employees and commissions owing to qualifying independent sales representatives up to $4,650* per person earned within 90 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(3).

☐ **Contributions to employee benefit plans**

Money owed to employee benefit plans for services rendered within 180 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(4).

☐ **Certain farmers and fishermen**

Claims of certain farmers and fishermen, up to $4,650* per farmer or fisherman, against the debtor, as provided in 11 U.S.C. § 507(a)(5).

☐ **Deposits by individuals**

Claims of individuals up to $2,100* for deposits for the purchase, lease, or rental of property or services for personal, family, or household use, that were not delivered or provided. 11 U.S.C. § 507(a)(6).

☐ **Alimony, Maintenance, or Support**

Claims of a spouse, former spouse, or child of the debtor for alimony, maintenance, or support, to the extent provided in 11 U.S.C. § 507(a)(7).

☑ **Taxes and Certain Other Debts Owed to Governmental Units**

Taxes, customs duties, and penalties owing to federal, state, and local governmental units as set forth in 11 U.S.C. § 507(a)(8).

☐ **Commitments to Maintain the Capital of an Insured Depository Institution**

Claims based on commitments to the FDIC, RTC, Director of the Office of Thrift Supervision, Comptroller of the Currency, or Board of Governors of the Federal Reserve System, or their predecessors or successors, to maintain the capital of an insured depository institution. 11 U.S.C. § 507(a)(9).

☐ **Other Priority Debts**

* Amounts are subject to adjustment on April 1, 2004, and every three years thereafter with respect to cases commenced on or after the date of adjustment.

_1_ Continuation sheets attached

001035

FORM B6E - Cont
(10/89)

In re: **Clint Johnson**                    **Tina Johnson**                    Case No:
_____          _____                    _____
             Debtor                                                                        (If known)

## SCHEDULE E - CREDITORS HOLDING UNSECURED PRIORITY CLAIMS

### Type of Priority: Taxes and Certain Other Debts Owed to Governmental Units

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | CODEBTOR | HUSBAND, WIFE, JOINT OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM | CONTINGENT | UNLIQUIDATED | DISPUTED | TOTAL AMOUNT OF CLAIM | AMOUNT ENTITLED TO PRIORITY |
|---|---|---|---|---|---|---|---|---|
| ACCOUNT NO. ▮▮▮▮<br>Loan Servicing Center-FL<br>P.O. Box 7300<br>Wilkes Barre, PA 18773-7300<br><br>Oklahoma State Regents for Higher E.<br>P.O. Box 3000<br>Oklahoma City, OK 73101-3000 | | | 05/91<br>Student Loan | | | | 1,914.03 | 0.00 |

Sheet no. 1 of 1 sheets attached to Schedule of Creditors Holding Priority Claims

| | | |
|---|---|---|
| Subtotal<br>(Total of this page) | ➤ | $1,914.03 |
| Total<br>(Use only on last page of the completed Schedule E) | ➤ | $1,914.03 |

(Report total also on Summary of Schedules)

001036

FORM B6F (Official Form 6F) - (9/97)

In re: **Clint Johnson** **Tina Johnson** Case No. _____
            Debtor                                                                            (If known)

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

☐ Check this box if debtor has no creditors holding unsecured nonpriority claims to report on this Schedule F.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | CODEBTOR | HUSBAND, WIFE, JOINT OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. ▉▉▉▉▉<br>Capital One<br>P.O. Box 85617<br>Richmond, VA 23276 | | J | Miscellaneous Credit Card Purchases | | | | 1,272.34 |
| ACCOUNT NO. ▉▉▉▉▉<br>Dr. Erroll Allison<br>3070 S. Muskogee<br>Tahlequah, OK 74464 | | J | 6/01<br>Medical Services Rendered | | | | 2,267.50 |
| ACCOUNT NO. ▉▉▉▉▉<br>Gulf State Credit<br>P.O. Box 96070<br>Charlotte, NC 28296-0070<br><br>OSI<br>P.O. Box 8800<br>Jacksonville, FL 32239 | | J | Table & Chairs | | | | 894.91 |
| ACCOUNT NO. ▉▉▉▉▉<br>Hillcrest Hospital<br>P.O. Box 52039<br>Tulsa, OK 74152-0039<br><br>TAB Service<br>P.O. Box 52039<br>Tulsa, OK 74152-0039 | | J | 7/2000<br>Medical Services Rendered | | | | 1,712.42 |

**2** Continuation sheets attached

Subtotal ➤
Total ➤ | **$6,147.17** |

Case: 01-72501    Doc #: 1    Filed: in USBC ED/OK on 07/25/2001   Page 16 of 34

FORM B6F - Cont.
(10/89)

In re:  Clint Johnson                Tina Johnson                        Case No.: _____
                  Debtor                                                              (If known)

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

(Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. ▇▇▇<br>Speigel<br>First Consumer National Bank<br>P.O. Box 4080<br>Portland, OR 97208 | | J | 11/2000<br>Miscellaneous Credit Card Purchases | | | | 569.01 |
| ACCOUNT NO. ▇▇▇<br>St. Francis Home Medical Equip.<br>P.O. Box 700231<br>Tulsa, OK 74170 | | J | 7/2000<br>Medical Equipment | | | | 43.17 |
| ACCOUNT NO. ▇▇▇<br>Tahlequah City Hospital<br>P.O. Box 1008<br>Tahlequah, OK 74465<br><br>Collection Service Bureau<br>c/o J. Lance Hopkins<br>P.O. Box 1509<br>Tahlequah, OK 74464<br><br>J. Lance Hopkins<br>Attorney at Law<br>P.O. Box 1509<br>Tahlequah, OK 74464 | | J | 01/2001<br>Medical Services Rendered | | | | 2,352.97 |
| ACCOUNT NO. ▇▇▇<br>Tahlequah Lumber<br>1701 Park Hill Rd.<br>Tahlequah, OK 74464 | | J | 8/97<br>Miscellaneous Purchases Made on Credit Line | | | | 2,297.46 |

Sheet no. _1_ of _2_ continuation sheets attached to Schedule of Creditors Holding Unsecured Nonpriority Claims

| Subtotal (Total of this page) | ▸ | $5,262.61 |
|---|---|---|
| Total (Use only on last page of the completed Schedule F.) | ▸ | |

001038

FORM B6F - Cont.
(10/89)

In re:   **Clint Johnson**                     **Tina Johnson**                       Case No.
                        Debtor                                                                        (If known)

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

(Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | CODEBTOR | HUSBAND, WIFE, JOINT OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. ▉ | | J | 4/2000 | | | | 98.44 |
| Warren Billing 6600 South Yale, Ste 1500 Tulsa, OK 74136 | | | Medical Services Rendered | | | | |

Sheet no. 2 of 2 continuation sheets attached to Schedule of Creditors Holding Unsecured Nonpriority Claims

| | | |
|---|---|---|
| Subtotal (Total of this page) | ➤ | $98.44 |
| Total (Use only on last page of the completed Schedule F.) | ➤ | $11,508.22 |

(Report also on Summary of Schedules)

001039

Form B6G
(10/89)

In re:  Clint Johnson                    Tina Johnson                         Case No. _____
                              Debtor                                                      (If known)

# SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

☑  Check this box if debtor has no executory contracts or unexpired leases.

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT. | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY. STATE CONTRACT NUMBER OF ANY GOVERNMENT CONTRACT. |
|---|---|
|  |  |

001040

399

B6H
(6/90)

In re:  Clint Johnson                    Tina Johnson                    .     Case No. _____
         Debtor                                                                                                      (if known)

## SCHEDULE H - CODEBTORS

☑ Check this box if debtor has no codebtors.

| NAME AND ADDRESS OF CODEBTOR | NAME AND ADDRESS OF CREDITOR |
|---|---|
|  |  |

001041

In re   Clint Johnson                    Tina Johnson                      Case No.

# SCHEDULE I - CURRENT INCOME OF INDIVIDUAL DEBTOR(S)

| Debtor's Marital Status:   married | DEPENDENTS OF DEBTOR AND SPOUSE | | |
|---|---|---|---|
| Debtor's Age:        28<br>Spouse's Age:    22 | NAMES<br>Colton Nicolas Johnson | AGE<br>0 | RELATIONSHIP<br>Son |

| EMPLOYMENT: | DEBTOR | SPOUSE |
|---|---|---|
| Occupation | D.A. Investigator | Secretary |
| Name of Employer | State of Oklahoma | NE State University |
| How long employed | 5 years | 1 year 6 months |
| Address of Employer | 213 W. Delaware<br>Tahlequah, OK 74464 | 600 North Grand Ave<br>Tahlequah, OK 74464 |

| Income: (Estimate of average monthly income) | DEBTOR | SPOUSE |
|---|---|---|
| Current monthly gross wages, salary, and commissions (pro rate if not paid monthly.) | $ 2,159.13 | $ 1,040.72 |
| Estimated monthly overtime | $ 0.00 | $ 0.00 |
| SUBTOTAL | $ 2,159.13 | $ 1,040.72 |
| LESS PAYROLL DEDUCTIONS | | |
| a. Payroll taxes and social security | $ 473.58 | $ 190.23 |
| b. Insurance | $ 0.00 | $ 115.14 |
| c. Union dues | $ 0.00 | $ 0.00 |
| d. Other (Specify)          retirement | $ 65.15 | $ 0.00 |
| SUBTOTAL OF PAYROLL DEDUCTIONS | $ 538.73 | $ 305.37 |
| TOTAL NET MONTHLY TAKE HOME PAY | $ 1,620.40 | $ 735.35 |
| Regular income from operation of business or profession or farm (attach detailed statement) | $ 0.00 | $ 0.00 |
| Income from real property | $ 0.00 | $ 0.00 |
| Interest and dividends | $ 0.00 | $ 0.00 |
| Alimony, maintenance or support payments payable to the debtor for the debtor's use or that of dependents listed above. | $ 0.00 | $ 0.00 |
| Social security or other government assistance (Specify) | $ 0.00 | $ 0.00 |
| Pension or retirement income | $ 0.00 | $ 0.00 |
| Other monthly income<br>(Specify) | $ 0.00 | $ 0.00 |
| TOTAL MONTHLY INCOME | $ 1,620.40 | $ 735.35 |

TOTAL COMBINED MONTHLY INCOME          $ 2,355.75          (Report also on Summary of Schedules)

Describe any increase or decrease of more than 10% in any of the above categories anticipated to occur within the year following the filing of this document:                    NONE

001042

Form B6J
(6/90)

In re **Clint Johnson** **Tina Johnson** Case No.
Debtor (If known)

## SCHEDULE J - CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S)

☐ Check this box if a joint petition is filed and debtor's spouse maintains a separate household. Complete a separate schedule of expenditures labeled "Spouse".

| | | |
|---|---|---:|
| Rent or home mortgage payment (include lot rented for mobile home). | $ | 710.00 |
| Are real estate taxes included? Yes ✓ No | | |
| Is property insurance included? Yes ✓ No | | |
| Utilities. Electricity and heating fuel | $ | 200.00 |
| Water and sewer | $ | 30.00 |
| Telephone | $ | 70.00 |
| Other | $ | 0.00 |
| Home maintenance (repairs and upkeep). | $ | 50.00 |
| Food | $ | 400.00 |
| Clothing | $ | 150.00 |
| Laundry and dry cleaning | $ | 40.00 |
| Medical and dental expenses | $ | 100.00 |
| Transportation (not including car payments) | $ | 125.00 |
| Recreation, clubs and entertainment, newspapers, magazines, etc. | $ | 40.00 |
| Charitable contributions | $ | 0.00 |
| Insurance (not deducted from wages or included in home mortgage payments) | | |
| Homeowner's or renter's | $ | 0.00 |
| Life | $ | 0.00 |
| Health | $ | 0.00 |
| Auto | $ | 175.00 |
| Other | $ | 0.00 |
| Taxes (not deducted from wages or included in home mortgage payments) | | |
| (Specify) | $ | 0.00 |
| Installment payments: (In chapter 12 and 13 cases, do not list payments to be included in the plan) | | |
| Auto | $ | 289.00 |
| Other 2nd Auto | $ | 400.00 |
| 2nd Mortgage | $ | 289.00 |
| Alimony, maintenance or support paid to others | $ | 308.00 |
| Payments for support of additional dependents not living at your home | $ | 0.00 |
| Regular expenses from operation of business, profession, or farm (attach detailed statement) | $ | 0.00 |
| Other | $ | 0.00 |
| **TOTAL MONTHLY EXPENSES** (Report also on Summary of Schedules) | **$** | **3,376.00** |

[FOR CHAPTER 12 AND 13 DEBTORS ONLY]

Provide the information requested below, including whether plan payments are to be made bi-weekly, monthly, annually, or at some other regular interval.

| | | |
|---|---|---|
| A. Total projected monthly income | $ | |
| B. Total projected monthly expenses | $ | |
| C. Excess income (A minus B) | $ | |
| D. Total amount to be paid into plan each | $ | |

(Interval)

001043

In re:   Clint Johnson                          Tina Johnson                          Case No.
███████ -2820                        ███████ -0303

## DECLARATION CONCERNING DEBTOR'S SCHEDULES

### DECLARATION UNDER PENALTY OF PERJURY BY INDIVIDUAL DEBTOR

I declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of        15 sheets plus the summary page, and that they are true and correct to the best of my knowledge, information, and belief.

Date:   7-24-01                          Signature   _____
                                                      Clint Johnson

Date:   7-24-01                          Signature   _____
                                                      Tina Johnson

[If joint case, both spouses must sign]

### DECLARATION UNDER PENALTY OF PERJURY
### ON BEHALF OF CORPORATION OR PARTNERSHIP

(NOT APPLICABLE)

Penalty for making a false statement or concealing property. Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C §§ 152 and 3571.

001044

# UNITED STATES BANKRUPTCY COURT
## Eastern District of Oklahoma

| In re: | Clint Johnson | Tina Johnson | Case No. | |
|---|---|---|---|---|
| | ████ 2820 | ████ 0303 | Chapter | 7 |

## STATEMENT OF FINANCIAL AFFAIRS

### 1. Income from employment or operation of business

None ☐

State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the two years immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning and ending dates of the debtor's fiscal year.) If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| AMOUNT | SOURCE | FISCAL YEAR PERIOD |
|---|---|---|
| 34,639.00 | Employment | 1999 |
| 34,770.00 | Employment | 2000 |
| 7,285.04 | Employment | 2001 |

### 2. Income other than from employment or operation of business

None ☑

State the amount of income received by the debtor other than from employment, trade, profession, or operation of the debtor's business during the two years immediately preceding the commencement of this case. Give particulars. If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income for each spouse whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| AMOUNT | SOURCE | FISCAL YEAR PERIOD |
|---|---|---|

### 3. Payments to creditors

None ☑

a. List all payments on loans, installment purchases of goods or services, and other debts, aggregating more than $600 to any creditor, made within 90 days immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|

b. List all payments made within one year immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

None ☑

| NAME AND ADDRESS OF CREDITOR AND RELATIONSHIP TO DEBTOR | DATES OF PAYMENTS | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|

001045

## 4. Suits and administrative proceedings, executions, garnishments and attachments

None
☐

a. List all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| CAPTION OF SUIT AND CASE NUMBER | NATURE OF PROCEEDING | COURT OR AGENCY AND LOCATION | STATUS OR DISPOSITION |
|---|---|---|---|
| Credit Bureau Services Association d/b/a Collection Service Bureau Vs. Clint Johnson and Tina Johnson    CS-2001-283 | Civil Matter | District Court of Cherokee County State of Oklahoma | Pending |
| Homeside Lending, Inc., Vs. Clint Johnson and Tina Johnson, et al    CJ-2001-202 | Foreclosure | District Court Cherokee County State of Oklahoma | Pending |

b. Describe all property that has been attached, garnished or seized under any legal or equitable process within one year immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

None
☑

| NAME AND ADDRESS OF PERSON FOR WHOSE BENEFIT PROPERTY WAS SEIZED | DATE OF SEIZURE | DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|

## 5. Repossessions, foreclosures and returns

None
☑

List all property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure or returned to the seller, within one year immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR OR SELLER | DATE OF REPOSSESSION, FORECLOSURE SALE TRANSFER OR RETURN | DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|

## 6. Assignments and receiverships

None
☑

a. Describe any assignment of property for the benefit of creditors made within 120 days immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include any assignment by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF ASSIGNEE | DATE OF ASSIGNMENT | TERMS OF ASSIGNMENT OR SETTLEMENT |
|---|---|---|

001046

b.   List all property which has been in the hands of a custodian, receiver, or court-appointed official within one year immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

None ☑

| NAME AND ADDRESS OF CUSTODIAN | NAME AND ADDRESS OF COURT CASE TITLE & NUMBER | DATE OF ORDER | DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|---|

## 7.  Gifts

None ☑

List all gifts or charitable contributions made within one year immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient. (Married debtors filing under chapter 12 or chapter 13 must include gifts or contributions by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF PERSON OR ORGANIZATION | RELATIONSHIP TO DEBTOR, IF ANY | DATE OF GIFT | DESCRIPTION AND VALUE OF GIFT |
|---|---|---|---|

## 8.  Losses

None ☑

List all losses from fire, theft, other casualty or gambling within one year immediately preceding the commencement of this case or since the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include losses by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| DESCRIPTION AND VALUE OF PROPERTY | DESCRIPTION OF CIRCUMSTANCES AND, IF LOSS WAS COVERED IN WHOLE OR IN PART BY INSURANCE, GIVE PARTICULARS | DATE OF LOSS |
|---|---|---|

## 9.  Payments related to debt counseling or bankruptcy

None ☑

List all payments made or property transferred by or on behalf of the debtor to any persons, including attorneys, for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of a petition in bankruptcy within one year immediately preceding the commencement of this case.

| NAME AND ADDRESS OF PAYEE | DATE OF PAYMENT, NAME OF PAYOR IF OTHER THAN DEBTOR | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|

## 10.  Other transfers

None ☑

a.   List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

001047

| NAME AND ADDRESS OF TRANSFEREE, RELATIONSHIP TO DEBTOR | DATE: | DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED |
| --- | --- | --- |

---

## 11. Closed financial accounts

None
☑

List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within one year immediately preceding the commencement of this case. Include checking, savings, or other financial accounts, certificates of deposit, or other instruments; shares and share accounts held in banks, credit unions, pension funds, cooperatives, associations, brokerage houses and other financial institutions. (Married debtors filing under chapter 12 or chapter 13 must include information concerning accounts or instruments held by or for either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF INSTITUTION | TYPE AND NUMBER OF ACCOUNT AND AMOUNT OF FINAL BALANCE | AMOUNT AND DATE OF SALE OR CLOSING |
| --- | --- | --- |

## 12. Safe deposit boxes

None
☑

List each safe deposit or other box or depository in which the debtor has or had securities, cash, or other valuables within one year immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include boxes or depositories of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF BANK OR OTHER DEPOSITORY | NAMES AND ADDRESSES OF THOSE WITH ACCESS TO BOX OR DEPOSITORY | DESCRIPTION OF CONTENTS | DATE OF TRANSFER OR SURRENDER, IF ANY |
| --- | --- | --- | --- |

## 13. Setoffs

None
☑

List all setoffs made by any creditor, including a bank, against a debt or deposit of the debtor within 90 days preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATE OF SETOFF | AMOUNT OF SETOFF |
| --- | --- | --- |

## 14. Property held for another person

None
☑

List all property owned by another person that the debtor holds or controls.

| NAME AND ADDRESS OF OWNER | DESCRIPTION AND VALUE OF PROPERTY | LOCATION OF PROPERTY |
| --- | --- | --- |

## 15. Prior address of debtor

None
☑

001048

If the debtor has moved within the two years immediately preceding the commencement of this case, list all premises which the debtor occupied during that period and vacated prior to the commencement of this case. If a joint petition is filed, report also any separate address of either spouse.

| ADDRESS | NAME USED | DATES OF OCCUPANCY |
|---|---|---|

## 16. Spouses and Former Spouses

None ☑

If the debtor resides or resided in a community property state, commonwealth, or territory ( including Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, or Wisconsin) within the six-year period immediately preceding the commencement of the case, identify the name of the debtor 's spouse and of any former spouse who resides or resided with the debtor in the community property state.

NAME

## 17. Environmental Information.

For the purpose of this question, the following definitions apply:

"Environmental Law" means any federal, state or local statute or regulation regulating pollution, contamination, releases of hazardous or toxic substances, wastes or material into the air, land, soil, surface water, groundwater, or other medium, including, but not limited to, statutes or regulations regulating the cleanup of these substances, wastes, or material.

"Site" means any location, facility, or property as defined under any Environmental Law, whether or not presently or formerly owned or operated by the debtor, including, but not limited to, disposal sites.

"Hazardous Material" means anything defined as a hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, or contaminant or similar term under an Environmental Law.

a. List the name and address of every site for which the debtor has received notice in writing by a governmental unit that it may be liable or potentially liable under or in violation of an Environmental Law. Indicate the governmental unit, the date of the notice, and, if known, the Enivronmental Law.

None ☑

| SITE NAME AND ADDRESS | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DATE OF NOTICE | ENVIRONMENTAL LAW |
|---|---|---|---|

b. List the name and address of every site for which the debtor provided notice to a governmental unit of a release of Hazardous Material. Indicate the governmental unit to which the notice was sent and the date of the notice.

None ☑

| SITE NAME AND ADDRESS | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DATE OF NOTICE | ENVIRONMENTAL LAW |
|---|---|---|---|

c. List all judicial or administrative proceedings, including settlements or orders, under any Environmental Law with respect to which the debtor is or was a party. Indicate the name and address of the governmental unit that is or was a party to the proceeding, and the docket number.

None ☑

| NAME AND ADDRESS OF GOVERNMENTAL UNIT | DOCKET NUMBER | STATUS OR DISPOSITION |
|---|---|---|

## 18. Nature, location and name of business

001049

Case: 01-72501     Doc #: 1     Filed: In USBC ED/OK on 07/25/2001   Page 28 of 34

None
☑

a.     If the debtor is an individual, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partnership, sole proprietorship, or was a self-employed professional within the six years immediately preceeding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within the six years immediately preceding the commencement of this case.

If the debtor is a partnership, list the names, addresses, taxpayer identification numbers, nature of the business, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities within the six years immediately preceding the commencement of this case.

If the debtor is a corporation, list the names, addresses, taxpayer identification numbers, nature of the business, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities within the six years immediately preceding the commencement of this case.

| NAME | TAXPAYER I.D. NUMBER | ADDRESS | NATURE OF BUSINESS | BEGINNING AND ENDING DATES |
|------|------|------|------|------|
| | | | | |

b.     Identify any business listed in response to subdivision a., above, that is "single asset real estate" as defined in 11 U.S.C. § 101.

None
☑

| NAME | ADDRESS |
|------|------|
| | |

## 25. Pension Funds.

None
☑

If the debtor is not an individual, list the name and federal taxpayer identification number of any pension fund to which the debtor, as an employer, has been responsible for contributing at any time within the six-year period immediately preceeding the commencement of the case.

| NAME OF PENSION FUND | TAXPAYER IDENTIFICATION NUMBER |
|------|------|
| | |

*[if completed by an individaul or individual and spouse]*

I declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct.

Date   7-24-01          Signature of Debtor   Clint Johnson

Date   7-24-01          Signature of Joint Debtor   Tina Johnson

001050

## UNITED STATES BANKRUPTCY COURT
### Eastern District of Oklahoma

In re:   Clint Johnson               Tina Johnson                    Case No. _____
         ████2820               ████0303                      Chapter   7

## CHAPTER 7 INDIVIDUAL DEBTOR'S STATEMENT OF INTENTION

1. I have filed a schedule of assets and liabilities which includes consumer debts secured by property of the estate.

2. I intend to do the following with respect to the property of the estate which secures those consumer debts:

   a.  Property To Be Surrendered.

   Description of Property                          Creditor's Name

   1.   1992 Ford Pick Up; 1997 Kawasaki ATV       First State Bank

   b.  Property To Be Retained.                     [Check any applicable statement.]

| Description of Property | Creditor's Name | Property is claimed as exempt | Property will be redeemed pursuant to 11 U.S.C. § 722 | Debt will be reaffirmed pursuant to 11 U.S.C. §524(c) | Other |
|---|---|---|---|---|---|
| 1. 1995 Chevy Cavilar; 1982 Charger Boat & Motor; 1994 Kawasaki Waverunner | Armstrong Bank | | | X | |
| 2. LOT 1, BLOCK 2, SONGBIRD SUBDIVISION, A SUBDIVISION OF A PART OF THE N2 OF SW4 OF NW4 OF SECION 21, TOWNSHIP 17 NORTH, RANGE 22 EAST, ACCORDING TO THE RECORDED PLAT THEREOF, CHEROKEE COUNTY, OKLAHOMA | Citifinancial | | | X | |
| 3. LOT 1, BLOCK 2, SONGBIRD SUBDIVISION, A SUBDIVISION OF A PART OF THE N2 OF SW4 OF NW4 OF SECION 21, TOWNSHIP 17 NORTH, RANGE 22 EAST, ACCORDING TO THE RECORDED PLAT THEREOF, CHEROKEE COUNTY, OKLAHOMA | Homeside Lending, Inc. | | | X | |

Date:  7-24-01                                  _____
                                                Signature of Debtor

Date:  7-24-01                                  _____
                                                Signature of Joint Debtor

001051

# United States Bankruptcy Court
## Eastern District of Oklahoma
## NOTICE TO INDIVIDUAL CONSUMER DEBTOR

> The purpose of this notice is to acquaint you with the four chapters of the Federal Bankruptcy Code under which you may file a bankruptcy petition.  The bankruptcy law is complicated and not easily described.  Therefore, you should seek the advice of an attorney to learn of your rights and responsibilities under the law should you decide to file a petition with the court.  Court employees are prohibited from giving you legal advice.

**Chapter 7:  Liquidation ($155.00 filing fee plus $30.00 administrative fee plus $15.00 trustee surcharge)**

1. Chapter 7 is designed for debtors in financial difficulty who do not have the ability to pay their existing debts.

2. Under chapter 7 a trustee takes possession of all your property. You may claim certain of your property as exempt under governing law. The trustee then liquidates the property and uses the proceeds to pay your creditors according to priorities of the Bankruptcy Code.

3. The purpose of filing a chapter 7 case is to obtain a discharge of your existing debts.  If, however, you are found to have committed the certain kinds of improper conduct described in the Bankruptcy Code, your discharge may be denied by the court, and the purpose for which you filed bankruptcy petition will be defeated.

4. Even if you receive a discharge, there are some debts that are not discharged under the law.  Therefore, you may still be responsible for such debts as certain taxes and student loans, alimony and support payments, criminal restitution, and debts for death or personal injury caused by driving while intoxicated from alcohol or drugs.

5. Under certain circumstances you may keep property that you have purchased subject to a valid security interest.  Your attorney can explain the options that are available to you.

**Chapter 13:  Repayment of All or Part of the Debts of an Individual with Regular Income**
**($155.00 filing fee plus $30.00 administrative fee)**

1. Chapter 13 is designed for individuals with regular income who are temporarily unable to pay their debts but would like to pay them in installments over a period of time.  You are only eligible for chapter 13 if your debts do not exceed certain dollar amounts set forth in the Bankruptcy Code.

2. Under chapter 13 you must file a plan with the court to repay your creditors all or part of the money that you owe them, using your future earnings.  Usually, the period allowed by the court to repay your debts is three years, but no more than five years.  Your plan must be approved by the court before it can take effect.

3. Under chapter 13, unlike chapter 7, you may keep all your property, both exempt and non-exempt, as long as you continue to make payments under the plan.

4. After completion of payments under your plan, your debts are discharged except alimony and support payments, student loans, certain debts including criminal fines and restitution and debts for death or personal injury caused by driving while intoxicated from alcohol or drugs, and long term secured obligations.

**Chapter 11:  Reorganization ($800.00 filing fee)**

Chapter 11 is designed primarily for the reorganization of a business but is also available to consumer debtors.  Its provisions are quite complicated, and any decision by an individual to file a chapter 11 petition should be reviewed with an attorney.

**Chapter 12:  Family Farmer ($200.00 filing fee)**

Chapter 12 is designed to permit family farmers to repay their debts over a period of time from future earnings and is in many ways similar to a chapter 13.  The eligibility requirements are restrictive, limiting its use to those whose income arises primarily from a family owned farm.

I, the debtor, affirm that I have read this notice.

| | | |
|---|---|---|
| 7-24-01 | Clint Johnson, Debtor | |
| Date | | Case Number |
| 7-24-01 | Tina Johnson, Joint Debtor | |
| Date | | |

001052

Armstrong Bank
1401 S. Muskogee
Tahlequah, OK 74464


Capital One
P.O. Box 85617
Richmond, VA 23276


Citifinancial
P.O. Box 2977
Broken Arrow, OK 74013


Collection Service Bureau
c/o J. Lance Hopkins
P.O. Box 1509
Tahlequah, OK 74464


Dr. Erroll Allison
3070 S. Muskogee
Tahlequah, OK 74464


First State Bank
1111 S. Muskogee Ave.
Tahlequah, OK 74464


Gulf State Credit
P.O. Box 96070
Charlotte, NC 28296-0070


Homeside Lending, Inc.
7749 Bay Berry Rd., 1st Floor
Jacksonville, FL 32256


J. Lance Hopkins
Attorney at Law
P.O. Box 1509
Tahlequah, OK 74464


001053

Shapiro, Marinos & Cejda, L.L.P.
Teresa W. Marianos
770 N.E. 63rd
Oklahoma City, OK 73105


Loan Servicing Center-FL.
P.O. Box 7300
Wilkes Barre, PA 18773-7300


Oklahoma State Regents for Higher E
P.O. Box 3000
Oklahoma City, OK 73101-3000


OSI
P.O. Box 8800
Jacksonville, FL 32239


Speigel
First Consumer National Bank
P.O. Box 4080
Portland, OR 97208


St. Francis Home Medical Equip.
P.O. Box 700231
Tulsa, OK 74170


Hillcrest Hospital
P.O. Box 52039
Tulsa, OK 74152-0039


TAB Service
P.O. Box 52039
Tulsa, OK 74152-0039


Tahlequah City Hospital
P.O. Box 1008
Tahlequah, OK 74465

001054

413

Tahlequah Lumber
1701 Park Hill Rd.
Tahlequah, OK 74464


Warren Billing
6600 South Yale, Ste 1500
Tulsa, OK 74136

001055

```
AAAA_U.S.B.C.
NEWCASE LABEL MATRIX
for case 01-72501
parties / creditors
total     24
```

Clint  Johnson
[REDACTED]
Tahlequah OK    74464

Gerald  R.  Miller
POB 2667
Muskogee OK    74402 - 2667

H.  Doak  Willis
Baker & Willis
220 S Muskogee Ave
Tahlequah OK    74464

Tina  Johnson
[REDACTED]
Tahlequah OK    74464

Armstrong Bank
1401 S. Muskogee
Tahlequah, OK 74464

Capital One
P.O. Box 85617
Richmond, VA 23276

Citifinancial
P.O. Box 2977
Broken Arrow, OK 74013

Collection Service Bureau
c/o J. Lance Hopkins
P.O. Box 1509
Tahlequah, OK 74464

Dr. Erroll Allison
3070 S. Muskogee
Tahlequah, OK 74464

First State Bank
1111 S. Muskogee Ave.
Tahlequah, OK 74464

Gulf State Credit
P.O. Box 96070
Charlotte, NC 28296-0070

Hillcrest Hospital
P.O. Box 52039
Tulsa, OK 74152-0039

Homeside Lending, Inc.
7749 Bay Berry Rd., 1st Floor
Jacksonville, FL 32256

J. Lance Hopkins
Attorney at Law
P.O. Box 1509
Tahlequah, OK 74464

Loan Servicing Center-FL.
P.O. Box 7300
Wilkes Barre, PA 18773-7300

OSI
P.O. Box 8800
Jacksonville, FL 32239

Oklahoma State Regents for Higher E
P.O. Box 3000
Oklahoma City, OK 73101-3000

Shapiro, Marinos & Cejda, L.L.P.
Teresa W. Marinos
770 N.E. 63rd
Oklahoma City, OK 73105

Speigel
First Consumer National Bank
P.O. Box 4080
Portland, OR 97208

St. Francis Home Medical Equip.
P.O. Box 700231
Tulsa, OK 74170

TAB Service
P.O. Box 52039
Tulsa, OK 74152-0039

Tahlequah City Hospital
P.O. Box 1008
Tahlequah, OK 74465

Tahlequah Lumber
1701 Park Hill Rd.
Tahlequah, OK 74464

Warren Billing
6600 South Yale, Ste 1500
Tulsa, OK 74136

001056





# United States Bankruptcy Court
## Eastern District Of Oklahoma

111 West 4ᵗʰ Street
Post Office Box 1347
Okmulgee, Oklahoma 74447

Judy K. Hares
Deputy Clerk

judy_hares@okeb.uscourts.gov

TEL: 918.758.0126
FAX: 918.756.9248

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF OKLAHOMA

IN RE:                                    )
                                          )
    Clint Johnson                         )        Case No.      03-70360
                                          )        Chapter       13
    Tina Johnson                          )
                                          )
            Debtors  )

### CERTIFICATE

The undersigned does hereby certify that the following documents are true and correct copies of the proceedings in the above styled case.

**Petition (37 pages)**

Dated: April 28, 2008

_Judy K. Hares_
Judy Hares, Deputy Clerk



001057

Case: 03-70360     Doc #: 1     Filed: in USBC ED/OK on 02/05/2003   Page 1 of 37   ORIGINAL

(Official Form 1) (9/01)

| FORM B1 | United States Bankruptcy Court Eastern District of Oklahoma | Voluntary Petition |
|---|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>Johnson, Clint | Name of Joint Debtor (Spouse) (Last, First, Middle):<br>Johnson, Tina |
|---|---|
| All Other Names used by the Debtor in the last 6 years (include married, maiden, and trade names):<br>None | All Other Names used by the Joint Debtor in the last 6 years (include married, maiden, and trade names):<br>None |
| Soc. Sec./Tax I.D. No. (if more than one, state all):<br>▮▮▮▮-2820 | Soc. Sec./Tax I.D. No. (if more than one, state all):<br>▮▮▮▮-0303 |
| Street Address of Debtor (No. & Street, City, State & Zip Code):<br>▮▮▮▮▮▮▮▮▮▮<br>Tahlequah, OK. 74464 | Street Address of Joint Debtor (No. & Street, City, State & Zip Code):<br>▮▮▮▮▮▮▮▮▮▮<br>Tahlequah, OK. 74464 |
| County of Residence or of the Principal Place of Business: Cherokee | County of Residence or of the Principal Place of Business: Cherokee |
| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |
| Location of Principal Assets of Business Debtor (if different from street address above): | |

## Information Regarding the Debtor (Check the Applicable Boxes)

Venue (Check any applicable box)

☑ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

| Type of Debtor (Check all boxes that apply) | | Chapter or Section of Bankruptcy Code Under Which the Petition is Filed (Check one box) |
|---|---|---|
| ☑ Individual(s) | ☐ Railroad | ☐ Chapter 7   ☐ Chapter 11   ☑ Chapter 13 |
| ☐ Corporation | ☐ Stockbroker | ☐ Chapter 9   ☐ Chapter 12 |
| ☐ Partnership | ☐ Commodity Broker | ☐ Sec. 304 – Case ancillary to foreign proceeding |
| ☐ Other _____ | | |

**Nature of Debts (Check one box)**

☑ Consumer/Non-Business     ☐ Business

**Chapter 11 Small Business (Check all boxes that apply)**

☐ Debtor is a small business as defined in 11 U.S.C. § 101
☐ Debtor is and elects to be considered a small business 11 U.S.C. § 1121(e) (Optional)

**Filing Fee (Check one box)**

☑ Full Filing Fee attached

☐ Filing Fee to be paid in installments (Applicable to individuals only) Must attach signed application for the court's consideration

**Statistical/Administrative Information** (Estimates or

☑ Debtor estimates that funds will be available for dis
☐ Debtor estimates that, after any exempt property is be no funds available for distribution to unsecured.

| Estimated Number of Creditors | 1-15 | 16-49 |
|---|---|---|
| | ☐ | ☑ |

| Estimated Assets | | | | |
|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,0 $1( |
| ☐ | ☑ | ☐ | ☐ | |

| Estimated Debts | | | | |
|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1, $1( |
| ☐ | ☐ | ☑ | ☐ | |

UNITED STATES BANKRUPTCY COURT
Eastern District of Oklahoma          RECEIPT

Case # 03-70360     Chapter 13     # 000054703 - MP
Filed: 03:46 PM, 02/05/03   Okmulgee     03:50 PM, February 05, 2003

| Code | Qty | Amount |
|---|---|---|
| CH13 | 1 | $185.00 |

Judge: Tom R. Cornish
Trustee: William Mark Bonney
Debtor(s):
  Clint Johnson
  Tina Johnson

**First Meeting of Creditors**
11:00 AM, March 20, 2003
U S Courthouse Okmulgee Rm 306
U S Post Office & Courthouse
4th & Grand St Rm 306
Okmulgee OK 74447

ORIGINAL

**TOTAL PAID: $185.00**

From: Slaton J. Anthony
Potts Anthony Jones PC
1515 E Okmulgee
Muskogee, OK. 74403-0000

001058

7

(Official Form 1) (9/01)                                                                              FORM B1, Page 2

| **Voluntary Petition**<br>*(This page must be completed and filed in every case)* | Name of Debtor(s):<br>Clin Johnson & Tina Johnson |
|---|---|

**Prior Bankruptcy Case Filed Within Last 6 Years** (If more than one, attach additional sheet)

| Location<br>Where Filed: Eastern | Case Number:<br>01-72501 | Date Filed:<br>7-25-01 |
|---|---|---|

**Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor** (If more than one, attach additional sheet)

| Name of Debtor: NONE | Case Number: | Date Filed: |
|---|---|---|
| District: | Relationship: | Judge: |

## Signatures

| **Signature(s) of Debtor(s) (Individual/Joint)**<br>I declare under penalty of perjury that the information provided in this petition is true and correct.<br>[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.<br>I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _____<br>Signature of Debtor<br>X _____<br>Signature of Joint Debtor<br><br>Telephone Number (if not represented by attorney)<br><br>Date | **Exhibit A**<br>(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)<br><br>☐ Exhibit A is attached and made a part of this petition. |
|---|---|
| | **Exhibit B**<br>((To be completed if debtor is an individual whose debts are primarily consumer debts)<br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.<br><br>X _____  [□] 3 2003<br>Signature of Attorney for Debtor(s)          Date |
| **Signature of Attorney**<br>X _____<br>Signature of Attorney for Debtor(s)<br>JEFFERY B. POTTS 16561<br>Printed Name of Attorney for Debtor(s)<br>Slaton J. Anthony, OBA 16561<br>Firm Name<br>1515 East Okmulgee<br>Address<br>Muskogee, OK 74403<br><br>918-687-7755<br>Telephone Number<br><br>Date | **Exhibit C**<br>Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?<br><br>☐ Yes, and Exhibit C is attached and made a part of this petition.<br>☑ No |
| | **Signature of Non-Attorney Petition Preparer**<br>I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.<br><br>_____<br>Printed Name of Bankruptcy Petition Preparer<br>_____<br>Social Security Number<br>_____<br>Address |
| **Signature of Debtor (Corporation/Partnership)**<br>I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.<br>The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _____<br>Signature of Authorized Individual<br>_____<br>Printed Name of Authorized Individual<br>_____<br>Title of Authorized Individual<br>_____<br>Date | Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:<br><br>If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.<br><br>X _____<br>Signature of Bankruptcy Petition Preparer<br>_____<br>Date<br><br>A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. §110; 18 U.S.C. §156. |

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., ver. 3.4.0-562 - 30348

001059

FORM B4 - Cont.
(6/90)

# United States Bankruptcy Court
## Eastern District of Oklahoma

Clint Johnson & Tina Johnson

In re _____     Case No. _____
                     Debtor                                          (If known)

## SUMMARY OF SCHEDULES

Indicate as to each schedule whether that schedule is attached and state the number of pages in each.  Report the totals from Schedules A, B, D, E, F, I, and J in the boxes provided.  Add the amounts from Schedules A and B to determine the total amount of the debtor's assets.  Add the amounts from Schedules D, E, and F to determine the total amount of the debtor's liabilities.

| NAME OF SCHEDULE | ATTACHED (YES/NO) | NO. OF SHEETS | ASSETS | LIABILITIES | OTHER |
|---|---|---|---|---|---|
| A - Real Property | YES | 1 | $ 80,058.00 | | |
| B - Personal Property | YES | 4 | $ 9,820.00 | | |
| C - Property Claimed As Exempt | YES | 1 | | | |
| D - Creditors Holding Secured Claims | YES | 2 | | $ 129,113.71 | |
| E - Creditors Holding Unsecured Priority Claims | YES | 1 | | $ 0.00 | |
| F - Creditors Holding Unsecured Nonpriority Claims | YES | 2 | | $ 2,826.44 | |
| G - Executory Contracts and Unexpired Leases | YES | 1 | | | |
| H - Codebtors | YES | 1 | | | |
| I - Current Income of Individual Debtor(s) | YES | 1 | | | $ 1,858.81 |
| J - Current Expenditures of Individual Debtor(s) | YES | 1 | | | $ 880.00 |
| Total Number of Sheets in ALL Schedules ▶ | | 15 | | | |
| Total Assets ▶ | | | 39,878.00 | | |
| Total Liabilities ▶ | | | | 131,940.15 | |

001060

FORM B6A
(10/89)

In re  Clint Johnson & Tina Johnson
                    Debtor

Case No. _____
                    (if known)

# SCHEDULE A - REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a co-tenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit. If the debtor is married, state whether husband, wife, or both own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor holds no interest in real property, write "None" under "Description and Location of Property."

Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.

If an entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim. See Schedule D. If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim."

If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C - Property Claimed as Exempt.

| DESCRIPTION AND LOCATION OF PROPERTY | NATURE OF DEBTOR'S INTEREST IN PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION | AMOUNT OF SECURED CLAIM |
|---|---|---|---|---|
| Homestead ▓▓▓▓▓▓▓ Tahlequah, OK. 74464 | Fee Simple | H | 80,058.00 | 78,677.57 |
| | | Total ▶ | 80,058.00 | |

(Report also on Summary of Schedules)

Bankruptcy2002 © 1991-2002, New Hope Software, Inc., ver. 3.4.0-362 - 30048

FORM B6B
(10/89)

Clint Johnson & Tina Johnson

In re_____ Case No._____
                    Debtor                                                  (if known)

## SCHEDULE B - PERSONAL PROPERTY

Except as directed below, list all personal property of the debtor of whatever kind. If the debtor has no property in one or more of the categories, place an "X" in the appropriate position in the column labeled "None." If additional space is needed in any category, attach a separate sheet properly identified with the case name, case number, and the number of the category. If the debtor is married, state whether husband, wife, or both own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor is an individual or a joint petition is filed, state the amount of any exemptions claimed only in Schedule C - Property Claimed as Exempt.

Do not list interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.

If the property is being held for the debtor by someone else, state that person's name and address under "Description and Location of Property."

| TYPE OF PROPERTY | NONE | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 1. Cash on hand. | | cash<br>debtor in possession | J | 5.00 |
| 2. Checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | X | | | |
| 3. Security deposits with public utilities, telephone companies, landlords, and others. | X | | | |
| 4. Household goods and furnishings, including audio, video, and computer equipment. | | Household goods<br>debtor in possession | J | 3,000.00 |
| 5. Books. Pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles. | X | | | |
| 6. Wearing apparel. | | wearing apparel<br>debtor in possession | J | 800.00 |

Bankruptcy2003 ©1991-2002, New Hope Software, Inc., ver. 3.4.0.561 - 30348

001062

FORM B6B
(10/89)

Clint Johnson & Tina Johnson

In re _____          Case No. _____

Debtor                                                                              (if known)

## SCHEDULE B - PERSONAL PROPERTY
### (Continuation Sheet)

| TYPE OF PROPERTY | NONE | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY WITH-OUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 7. Furs and jewelry. | | wedding ring<br><br>debtor in possession | W | 400.00 |
| 8. Firearms and sports, photographic, and other hobby equipment. | | 9 mm Glock<br><br>debtor in possession | H | 300.00 |
| 9. Interests in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | X | | | |
| 10. Annuities. Itemize and name each issuer. | X | | | |
| 11. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Itemize. | X | | | |
| 12. Stock and interests in incorporated and unincorporated businesses. Itemize. | X | | | |
| 13. Interests in partnerships or joint ventures. Itemize. | X | | | |
| 14. Government and corporate bonds and other negotiable and non-negotiable instruments. | X | | | |
| 15. Accounts receivable. | X | | | |
| 16. Alimony, maintenance, support, and property settlement to which the debtor is or may be entitled. Give particulars. | X | | | |
| 17. Other liquidated debts owing debtor including tax refunds. Give particulars. | X | | | |
| 18. Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule of Real Property. | X | | | |

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., Ver. 3.4.0-552 - 30348

001063

FORM B6B
(10/89)

In re  Clint Johnson & Tina Johnson                                   Case No. _____
_____                                        (if known)
                    Debtor

## SCHEDULE B - PERSONAL PROPERTY
### (Continuation Sheet)

| TYPE OF PROPERTY | NONE | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 19. Contingent and noncontingent interests in estate or a decedent, death benefit plan, life insurance policy, or trust. | X | | | |
| 20. Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights of setoff claims. Give estimated value of each. | X | | | |
| 21. Patents, copyrights, and other intellectual property. Give particulars. | X | | | |
| 22. Licenses, franchises, and other general intangibles. Give particulars. | X | | | |
| 23. Automobiles, trucks, trailers, and other vehicles and accessories. | | 1999 Ford Ex-Cab F-150 Pickup<br>debtor in possession | H | 0.00 |
| | | 1976 Jeep<br>debtor in possession | H | 1,500.00 |
| | | 1992 Ford Pickup<br>debtor in possession | J | 3,010.00 |
| | | 1997 Kawasaki 4 Wheeler<br>debtor in possession | J | 800.00 |
| 24. Boats, motors, and accessories. | X | | | |
| 25. Aircraft and accessories. | X | | | |
| 26. Office equipment, furnishings, and supplies. | X | | | |
| 27. Machinery, fixtures, equipment, and supplies used in business. | X | | | |

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., ver. 3.4.0-562 - 30348

001064

Case: 03-70360     Doc #: 1     Filed: in USBC ED/OK on 02/05/2003  Page 8 of 37

FORM B6B
(10/89)     Clint Johnson & Tina Johnson
In re_____     Case No._____
                              Debtor                                              (if known)

## SCHEDULE B - PERSONAL PROPERTY
### (Continuation Sheet)

| TYPE OF PROPERTY | NONE | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 28. Inventory. | X | | | |
| 29. Animals. | | 2 dogs<br><br>debtor in possession | J | 5.00 |
| 30. Crops - growing or harvested. Give particulars. | X | | | |
| 31. Farming equipment and implements. | X | | | |
| 32. Farm supplies, chemicals, and feed. | X | | | |
| 33. Other personal property of any kind not already listed. | X | | | — |

0
_____continuation sheets attached     Total ▶ | $        9,820.00

(Include amounts from any continuation
sheets attached. Report total also on
Summary of Schedules)

001065

424

FORM B6C
(6/90)

In re Clint Johnson & Tina Johnson

_____
Debtor

Case No. _____
(if known)

## SCHEDULE C - PROPERTY CLAIMED AS EXEMPT

Debtor elects the exemption to which debtor is entitled under

(Check one box)

☐ 11 U.S.C. §522(b)(1) Exemptions provided in 11 U.S.C. §522(d). Note: These exemptions are available only in certain states.

☑ 11 U.S.C. §522(b)(2) Exemptions available under applicable nonbankruptcy federal laws, state or local law where the debtor's domicile has been located for the 180 days immediately preceding the filing of the petition, or for a longer portion of the 180-day period than in any other place, and the debtor's interest as a tenant by the entirety or joint tenant to the extent the interest is exempt from process under applicable nonbankruptcy law.

| DESCRIPTION OF PROPERTY | SPECIFY LAW PROVIDING EACH EXEMPTION | VALUE OF CLAIMED EXEMPTION | CURRENT MARKET VALUE OF PROPERTY WITHOUT DEDUCTING EXEMPTIONS |
|---|---|---|---|
| Homestead | (Husb)OS tit.31 §1(A(1) | 1,380.43 | 80,058.00 |
| cash | (Husb)OS tit.31 §1(A(18) | 5.00 | 5.00 |
| Household goods | (Husb)OS tit.31 §1(A(3) | 3,000.00 | 3,000.00 |
| wearing apparel | (Wife)OS tit.31 §1(A(3) | 800.00 | 800.00 |
| wedding ring | (Wife)OS tit.31 §1(A(8) | 400.00 | 400.00 |
| 9 mm Glock | (Husb)OS tit.31 §1(A(14) | 300.00 | 300.00 |
| 1976 Jeep | (Husb)OS tit.31 §1(A(13) | 1,500.00 | 1,500.00 |
| 1992 Ford Pickup | (Wife)OS tit.31 §1(A(13) | 3,010.00 | 3,010.00 |
| 1997 Kawasaki 4 Wheeler | (Husb)OS tit.31 §1(A(13) | 800.00 | 800.00 |
| 2 dogs | (Husb)OS tit.31 §1(A(16) | 5.00 | 5.00 |

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., ver. 3.4.0-562 - 30348

001066

Case: 03-70360    Doc #: 1    Filed: in USBC ED/OK on 02/05/2003 Page 10 of 37

FORM B6D
(6/90)    Clint Johnson & Tina Johnson

In re _____    Case No. _____
                        Debtor                                        (if known)

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and account number, if any, of all entities holding claims secured by property of the debtor as of the date of filing of the petition. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests. List creditors in alphabetical order to the extent practicable.   If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H", "W", "J", or "C" in the column labeled "Husband, Wife, Joint, or Community".

If the claim is contingent, place an "X" in the column labeled "Contingent". If the claim is unliquidated, place an "X" in the column labeled "Unliquidated". If the claim is disputed, place an "X" in the column labeled "Disputed". (You may need to place an "X" in more than one of these three columns).

Report total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules.

☐ Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | CODEBTOR | HUSBAND, WIFE, JOINT OR COMMUNITY | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND MARKET VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| ACCOUNT NO. ███<br>Armstrong Bank<br>3401 Chandler<br>Muskogee, OK. 74403 | | J | Incurred: 2001<br>Lien: Title Lien<br>Security: 1994 Wave Runner<br>monthly payment $ 175.00<br><br>Value $ 1,500.00 | | | | 1,397.00 | 0.00 |
| ACCOUNT NO. ███<br>Bancfirst<br>P.O. Box 1068<br>Tahlequah, OK. 74465 | | H | Incurred: 2001<br>Lien: Title lien<br>Security: 1976 Jeep<br><br>Value $ 1,200.00 | | | | 4,166.00 | 2,966.00 |
| ACCOUNT NO. ███<br>Bank Of Cherokee County<br>P.O. box 660<br>Park Hill, OK. 74451 | | H | Incurred: 12/02<br>Lien: personal loan<br>Security: 2 1/2 Acres Raw Land<br>montly payment $ 299.01<br>first payment to begin 1-6-03<br><br>Value $ 13,000.00 | | | | 13,000.00 | 0.00 |
| ACCOUNT NO. ███<br>Citifinancial Services Inc.<br>P.O. Box 1268<br>Muskogee, OK. 74402 | | J | Incurred: 10/02<br>Lien: Second Mortgage<br>Security: 118 Songbird Dr., Tahlequah, O.C. 74464<br>montly payment $100.00<br>current<br><br>Value $ 80,058.00 | | | | 8,582.20 | 0.00 |

1 _____ Continuation sheets attached

Subtotal ▶  $ 27,145.20
(Total of this page)

Total ▶  $
(Use only on last page)

(Report total also on Summary of Schedules)

001067

Case: 03-70360    Doc #: 1    Filed: in USBC ED/OK on 02/05/2003  Page 11 of 37

FORM B6D
(10/89)

In re Clint Johnson & Tina Johnson                          Case No. _____
                    Debtor                                                (if known)

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | CODEBTOR | HUSBAND, WIFE, JOINT OR COMMUNITY | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND MARKET VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| ACCOUNT NO. ▉<br>First State Bank<br>1111 S. Muskogee<br>Tahlequah, OK 74464 | | H | Incurred: 2001<br>Lien: Title Lien<br>Security: 1997 Kawasaki 4 Wheeler<br><br>Value $ 800.00 | | | | 800.00 | 0.00 |
| ACCOUNT NO. ▉<br>First State Bank<br>1111 S. Muskogee<br>Tahlequah, OK 74464 | | H | Incurred: 2001<br>Lien: Title Lien<br>Security: 1992 Stepside Pickup<br><br>Value $ 3,230.00 | | | | 5,000.00 | 1,770.00 |
| ACCOUNT NO. ▉<br>Homeside Lending<br>P.O. Box 44016<br>Jacksonville, FL 32231-9912 | | H | Incurred: 1999<br>Lien: First Mortgage<br>Security: 118 Songbird Dr., Tahlequah, OK. 74464<br>monthly payment $710.00<br>approx. 16 months behind<br><br>Value $ 30,058.00 | | | | 78,677.57 | 0.00 |
| ACCOUNT NO. ▉<br>Key Bank USA<br>P.O. Box 94981<br>Cleveland, OH 44101 | | J | Incurred: 3/02<br>Lien: auto loan<br>Security: 1999 Ford Pickup<br>montly payment $466.76<br>current<br><br>Value $ 11,135.00 | | | | 17,490.94 | 6,355.94 |
| ACCOUNT NO.<br><br> | | | <br><br>Value $ | | | | | |

Sheet no. 1 of 1 sheets attached to Schedule of Creditors

Subtotal ▶  $ 101,968.51
(Total of this page)

Total ▶  $ 129,113.71
(Use only on last page)

(Report total also on Summary of Schedules)

001068

B6E
(Rev. 4/01)

In re   Clint Johnson & Tina Johnson _____      Case No. _____
                        Debtor                                                              (if known)

# SCHEDULE E - CREDITORS HOLDING UNSECURED PRIORITY CLAIMS

A complete list of claims entitled to priority, listed separately by type of priority, is to be set forth on the sheets provided. Only holders of unsecured claims entitled to priority should be listed in this schedule. In the boxes provided on the attached sheets, state the name and mailing address, including zip code, and account number, if any, of all entities holding priority claims against the debtor or the property of the debtor, as of the date of the filing of this petition.

If any entity other than a spouse in a joint case may be liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H", "W", "J", or "C" in the column labeled "Husband, Wife, Joint, or Community".

If the claim is contingent, place an "X" in the column labeled "Contingent". If the claim is unliquidated, place an "X" in the column labeled "Unliquidated". If the claim is disputed, place an "X" in the column labeled "Disputed". (You may need to place an "X" in more than one of these three columns).

Report total of all claims listed on each sheet in the box labeled "Subtotal" on each sheet. Report the total of all claims listed on this Schedule E in the box labeled "Total" on the last sheet of the completed schedule. Repeat this total also on the Summary of Schedules.

☑ Check this box if debtor has no creditors holding unsecured priority claims to report on this Schedule E.

**TYPES OF PRIORITY CLAIMS** (Check the appropriate box(es) below if claims in that category are listed on the attached sheets)

☐ **Extensions of credit in an involuntary case**

Claims arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee or the order for relief. 11 U.S.C. § 507(a)(2).

☐ **Wages, salaries, and commissions**

Wages, salaries, and commissions, including vacation, severance, and sick leave pay owing to employees and commissions owing to qualifying independent sales representatives up to $4,650* per person earned within 90 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(3).

☐ **Contributions to employee benefit plans**

Money owed to employee benefit plans for services rendered within 180 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(4).

☐ **Certain farmers and fishermen**

Claims of farmers and fishermen, up to $4,650* per farmer or fisherman, against the debtor, as provided in 11 U.S.C. § 507(a)(5).

☐ **Deposits by individuals**

Claims of individuals up to $2,100* for deposits for the purchase, lease, or rental of property or services for personal, family, or household use, that were not delivered or provided. 11 U.S.C. § 507(a)(6).

☐ **Alimony, Maintenance, or Support**

Claims of a spouse, former spouse, or child of the debtor for alimony, maintenance, or support, to the extent provided in 11 U.S.C. § 507(a)(7).

☐ **Taxes and certain other debts owed to governmental units**

Taxes, customs duties, and penalties owing to federal, state, and local governmental units as set forth in 11 U.S.C. § 507(a)(8).

☐ **Commitments to maintain the capital of an Insured Depository Institution**

Claims based on commitments to the FDIC, RTC, Director of the Office of Thrift Supervision, Comptroller of the Currency, or Board of Governors of the Federal Reserve System, or their predecessors or successors, to maintain the capital of an insured depository institution. 11 U.S.C. § 507(a)(9).

*Amounts are subject to adjustment on April 1, 2004, and every three years thereafter with respect to cases commenced on or after the date of adjustment.

                                    0   continuation sheets attached

001069

FORM.B6F (Official Form 6F) (9/97)

In re Clint Johnson & Tina Johnson _____        Case No. _____
                    Debtor                                                                      (if known)

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

State the name, mailing address, including zip code, and account number, if any, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition. Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H", "W", "J", or "C" in the column labeled "Husband, Wife, Joint, or Community".

If the claim is contingent, place an "X" in the column labeled "Contingent". If the claim is unliquidated, place an "X" in the column labeled "Unliquidated". If the claim is disputed, place "X" in the column labeled "Disputed". (You may need to place an "X" in more than one of these three columns).

Report total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules.

☐ Check this box if debtor has no creditors holding unsecured nonpriority claims to report on this Schedule F.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | CODEBTOR | HUSBAND, WIFE, JOINT OR COMMUNITY | DATE CLAIM WAS INCURRED, AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. ▮▮▮▮▮<br>American Medical Collection Agency<br>2269 S. Saw Mill River Rd.<br>Bldg. 3<br>Elmsford, NY 10523 | | | Incurred: 2002<br>Consideration: Collections | | | | Notice Only |
| ACCOUNT NO. ▮▮▮<br>Americheck<br>5800 E. Skelly Dr. Suite 918<br>Tulsa, OK. 74135 | | W | Incurred: 2002<br>Consideration: Medical Services | | | | 125.00 |
| ACCOUNT NO. ▮▮▮▮<br>Bank of America<br>100 S. Muskogee Ave.<br>Tahlequah, OK. 74464 | | W | Incurred: 2002<br>Consideration: NSF checks | | | | 527.00 |
| ACCOUNT NO. ▮▮▮<br>H A chapman Institute<br>Dept. 1464<br>Tulsa, OK. 74182 | | W | Consideration: Medical Services | | | | Unknown |

1 ___ continuation sheets attached

Subtotal ▶ $                652.00

Total ▶ $

(Report total also on Summary of Schedules)

001070

Case: 03-70360    Doc #: 1    Filed: in USBC ED/OK on 02/05/2003  Page 14 of 37

FORM B6F (Official Form 6F) (9/97)

In re Clint Johnson & Tina Johnson
_____
Debtor

Case No. _____
(if known)

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | CODEBTOR | HUSBAND, WIFE, JOINT OR COMMUNITY | DATE CLAIM WAS INCURRED, AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. ▆<br>OBL Associates, Inc.<br>P.O. Box 54851<br>Tulsa, OK. 74155-0851 | | W | Incurred: 3/02<br>Consideration: Medical Services | | | | 90.43 |
| ACCOUNT NO ▆<br>Sallie Mae<br>P.O. Box 7400<br>Wilkes Barre, PA 18773-7400 | | H | Incurred: 1999<br>Consideration: student loan | | | | 2,006.31 |
| ACCOUNT NO ▆<br>Tahlequah City Hospital<br>P.O. Box 1008<br>Tahlequah, OK 74465 | | J | Incurred: 7/01<br>Consideration: Medical Services | | | | 77.70 |
| ACCOUNT NO ▆<br>Tahlequah Internal Med<br>1500 E. Downing #103<br>Tahlequah, OK 74464 | | | Incurred: 2001<br>Consideration: Professional Medical Services | | | | Unknown |
| ACCOUNT NO. ▆<br>Telecheck Services. Inc<br>P.O. Box 4451<br>Houston, Tx. 77210 | | W | Incurred: 2001<br>Consideration: NSF checks | | | | Unknown |

Sheet no. _1_ of _1_ sheets attached to Schedule of Creditors

Subtotal ► | $ | 2,174.44

Total ► | $ | 2,826.44

(Report total also on Summary of Schedules)

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., ver. 3.4.0-563 - 3048

001071

FORM B6G
(10/89)    Clint Johnson & Tina Johnson

In re _____          Case No. _____
                        Debtor                                    (if known)

# SCHEDULE G – EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property.  Include any timeshare interests.

State nature of debtor's interest in contract, i.e., "Purchaser," "Agent," etc.  State whether debtor is the lessor or lessee of a lease.

Provide the names and complete mailing addresses of all other parties to each lease or contract described.

NOTE:  A party listed on this schedule will not receive notice of the filing of this case unless the party is also scheduled in the appropriate schedule of creditors.

☑  Check this box if debtor has no executory contracts or unexpired leases.

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST. STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY.  STATE CONTRACT NUMBER OF ANY GOVERNMENT CONTRACT |
| --- | --- |
|  |  |

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., ver. 3.4.0-552 - 30348

001072

FORM B6H
(6/90)

In re ___Clint Johnson & Tina Johnson_____    Case No. _____
                              Debtor                                        (if known)

## SCHEDULE H - CODEBTORS

Provide the information requested concerning any person or entity, other than a spouse in a joint case, that is also liable on any debts listed by debtor in the schedules of creditors. Include all guarantors and co-signers. In community property states, a married debtor not filing a joint case should report the name and address of the nondebtor spouse on this schedule. Include all names used by the nondebtor spouse during the six years immediately preceding the commencement of this case.

☑   Check this box if debtor has no codebtors.

| NAME AND ADDRESS OF CODEBTOR | NAME AND ADDRESS OF CREDITOR |
|---|---|
|  |  |

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., ver. 3.4.0-562 - 30348

001073

FORM B6I
(6/90)

In re _Clint Johnson & Tina Johnson_____     Case No._____
                     Debtor                                      (if known)

## SCHEDULE I - CURRENT INCOME OF INDIVIDUAL DEBTOR(S)

The column labeled "Spouse" must be completed in all cases filed by joint debtors and by a married debtor in a chapter 12 or 13 case whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.

| Debtor's Marital Status: | DEPENDENTS OF DEBTOR AND SPOUSE | | |
|---|---|---|---|
| | NAMES | AGE | RELATIONSHIP |
| Married | Colton Johnson | 2 | son |
| | Jaselynn Johnson | 2 months | daughter |

| EMPLOYMENT: | DEBTOR | SPOUSE |
|---|---|---|
| Occupation | Investigator | unemployed |
| Name of Employer | District Attorney Office | |
| How long employed | 6 1/2 years | |
| Address of Employer | 213 W. Delaware Tahlequah, OK. 74464 | |

Income: (Estimate of average monthly income)

| | | DEBTOR | SPOUSE |
|---|---|---|---|
| Current monthly gross wages, salary, and commissions (pro rate if not paid monthly.) | $ | 2,896.48 | $ 0.00 |
| Estimated monthly overtime | $ | 0.00 | $ 0.00 |
| SUBTOTAL | $ | 2,896.48 | $ 0.00 |
| LESS PAYROLL DEDUCTIONS | | | |
| a. Payroll taxes and social security | $ | 638.71 | $ 0.00 |
| b. Insurance | $ | 0.00 | $ 0.00 |
| c. Union dues | $ | 0.00 | $ 0.00 |
| d. Other (Specify) (D)child support | $ | 398.96 | $ 0.00 |
| SUBTOTAL OF PAYROLL DEDUCTIONS | $ | 1,037.67 | $ 0.00 |
| TOTAL NET MONTHLY TAKE HOME PAY | $ | 1,858.81 | $ 0.00 |
| Regular income from operation of business or profession or farm (attach detailed statement) | $ | 0.00 | $ 0.00 |
| Income from real property | $ | 0.00 | $ 0.00 |
| Interest and dividends | $ | 0.00 | $ 0.00 |
| Alimony, maintenance or support payments payable to the debtor for the debtor's use or that of dependents listed above. | $ | 0.00 | $ 0.00 |
| Social security or other government assistance (Specify) _____ | $ | 0.00 | $ 0.00 |
| Pension or retirement income | $ | 0.00 | $ 0.00 |
| Other monthly income | $ | | $ |
| (Specify) _____ | $ | 0.00 | $ 0.00 |
| | $ | 0.00 | $ 0.00 |
| TOTAL MONTHLY INCOME | $ | 1,858.81 | $ 0.00 |

TOTAL COMBINED MONTHLY INCOME $_____ 1,858.81       (Report also on Summary of Schedules)

Describe any increase or decrease of more than 10% in any of the above categories anticipated to occur within the year following the filing of this document:

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., ver. 3.4.0-562 - 30348

001074

Case: 03-70360     Doc #: 1     Filed: in USBC ED/OK on 02/05/2003   Page 18 of 37

FORM B6J
(6/90)

In re Clint Johnson & Tina Johnson , Case No. _____
            Debtor                              (If known)

# SCHEDULE J - CURRENT EXPENDITURES OF INDIVIDUAL DEBTORS

Complete this schedule by estimating the average monthly expenses of the debtor and the debtor's family. Pro rate any payments made bi-weekly, quarterly, semi-annually, or annually to show monthly rate.

☐ Check this box if a joint petition is filed and debtor's spouse maintains a separate household. Complete a separate schedule of expenditures labeled "Spouse."

| | |
|---|---:|
| Rent or home mortgage payment (include lot rented for mobile home) | $ 0.00 |
| Are real estate taxes included?   Yes ____ No ✓ | |
| Is property insurance included?   Yes ____ No ✓ | |
| Utilities   Electricity and heating fuel | $ 100.00 |
|    Water and sewer | $ 25.00 |
|    Telephone | $ 100.00 |
|    Other ____ | $ 0.00 |
| Home maintenance (Repairs and upkeep) | $ 25.00 |
| Food | $ 250.00 |
| Clothing | $ 40.00 |
| Laundry and dry cleaning | $ 50.00 |
| Medical and dental expenses | $ 0.00 |
| Transportation (not including car payments) | $ 150.00 |
| Recreation, clubs and entertainment, newspapers, magazines, etc. | $ 40.00 |
| Charitable contributions | $ 0.00 |
| Insurance (not deducted from wages or included in home mortgage payments) | |
|    Homeowner's or renter's | $ 0.00 |
|    Life | $ 0.00 |
|    Health | $ 0.00 |
|    Auto | $ 100.00 |
|    Other ____ | $ 0.00 |
| Taxes (not deducted from wages or included in home mortgage payments) (Specify)____ | $ 0.00 |
| Installment payments (In chapter 12 and 13 cases, do not list payments to be included in the plan) | |
|    Auto | $ 0.00 |
|    Other ____ | $ 0.00 |
|    Other ____ | $ 0.00 |
| Alimony, maintenance, and support paid to others | $ 0.00 |
| Payments for support of additional dependents not living at your home | $ 0.00 |
| Regular expenses from operation of business, profession, or farm (attach detailed statement) | $ 0.00 |
| Other ____ | $ 0.00 |
| TOTAL MONTHLY EXPENSES (Report also on Summary of Schedules) | $ 880.00 |

(FOR CHAPTER 12 AND 13 DEBTORS ONLY)
Provide the information requested below, including whether plan payments are to be made bi-weekly, monthly, annually, or at some other regular interval.

| | |
|---|---:|
| A. Total projected monthly income | $ 1,858.81 |
| B. Total projected monthly expenses | $ 880.00 |
| C. Excess income (A minus B) | $ 978.81 |
| D. Total amount to be paid into plan each ____ monthly (interval) | $ 0.00 |

001075

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., ver. 3.4.0-562 - 30346

Form B6-Cont.
(12/94)

In re   Clint Johnson & Tina Johnson
_____,          Case No: _____
                        Debtor                                              (If known):

# DECLARATION CONCERNING DEBTOR'S SCHEDULES

### DECLARATION UNDER PENALTY OF PERJURY BY INDIVIDUAL DEBTOR

I declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of _____ 15
sheets and that they are true and correct to the best of my knowledge, information and belief.     (Total shown on summary page plus 1)

Date _____          Signature _____
                                                                                    Debtor

Date _____          Signature _____
                                                                        (Joint Debtor, if any)

                                                        (If joint case, both spouses must sign)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
**CERTIFICATION AND SIGNATURE OF NON-ATTORNEY BANKRUPTCY PETITION PREPARER (See 11 U.S.C. § 110)**

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. §110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____          _____
Printed or Typed Name of Bankruptcy Petition Preparer          Social Security No.

_____
Address

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional signed sheets conforming to the appropriate Official Form for each person.

X _____          _____
Signature of Bankruptcy Petition Preparer          Date

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. §156.*
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., ver. 3.4.0-551 - 30348

001076

Form 7
(9/00)

# FORM 7.  STATEMENT OF FINANCIAL AFFAIRS

## UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF OKLAHOMA

In Re   Clint Johnson & Tina Johnson                           Case No. _____   _____   _____
               (Name)                                                                    (if known)
                       Debtor

### STATEMENT OF FINANCIAL AFFAIRS

This statement is to be completed by every debtor. Spouses filing a joint petition may file a single statement on which the information for both spouses is combined. If the case is filed under chapter 12 or chapter 13, a married debtor must furnish information for both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. An individual debtor engaged in business as a sole proprietor, partner, family farmer, or self-employed professional, should provide the information requested on this statement concerning all such activities as well as the individual's personal affairs.

Questions 1 - 18 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 19 - 25. If the answer to an applicable question is "None," mark the box labeled "None." If additional space is needed for the answer to any question, use and attach a separate sheet properly identified with the case name, case number (if known), and the number of the question.

### DEFINITIONS

"In business." A debtor is "in business" for the purpose of this form if the debtor is a corporation or partnership. An individual debtor is "in business" for the purpose of this form if the debtor is or has been, within the six years immediately preceding the filing of this bankruptcy case, any of the following: an officer, director, managing executive, or owner of 5 percent or more of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or self-employed.

"Insider." The term "insider" includes but is not limited to: relatives of the debtor; general partners of the debtor and their relatives; corporations of which the debtor is an officer, director, or person in control; officers, directors, and any owner of 5 percent or more of the voting or equity securities of a corporate debtor and their relatives; affiliates of the debtor and insiders of such affiliates; any managing agent of the debtor. 11 U.S.C. § 101.

1.   Income from employment or operation of business

None
☐

State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the two years immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning and ending dates of the debtor's fiscal year) If a joint petition is filed, state income for each spouse separately.  (Married debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

AMOUNT                                    SOURCE (if more than one)

2003(H)        0.00      employment

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., ver. 3.4.0-562 - 30148

001077

AMOUNT                              SOURCE (if more than one)

2002(H)   34,757.76   employment

2001(H)   28,803.98   employment


AMOUNT                              SOURCE (if more than one)

2003(W)      0.00

2002(W)    5950.00   employment

2001(W)   10,217.45   employment

2. **Income other than from employment or operation of business**

None.
☒

State the amount of income received by the debtor other than from employment, trade, profession, or operation of the debtor's business during the two years immediately preceding the commencement of this case. Give particulars. If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income for each spouse whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

AMOUNT                              SOURCE

3. **Payments to Creditors**

None
☐

a.   List all payments on loans, installment purchases of goods or services, and other debts, aggregating more than $600 to any creditor, made within 90 days immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|
| Key Bank USA P.O. Box 94981 Cleveland, OH 44101 | 21/6/2002 | 1000.00 | 17,490.94 |
| Bargain Center Tahlequah, OK | 12/6/02 | $2476.00 | $0.00 |
| Action Loans Tahlequah, OK | 12/6/2002 | $1225.00 | $0.00 |

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., ver. 3.3.6-562 -30348

001078

None    b.    List all payments made within one year immediately preceding the commencement of this case to or for the benefit of creditors, who are or were insiders. (Married debtors filing under chapter 12 or chapter 13 must ☒   include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR AND RELATIONSHIP TO DEBTOR | DATES OF PAYMENTS | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|
| | | | |

**4. Suits and administrative proceedings, executions, garnishments and attachments**

None    a.    List all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case. (Married debtors filing under chapter 12 or chapter 13 ☐   must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| CAPTION OF SUIT AND CASE NUMBER | NATURE OF PROCEEDING | COURT OR AGENCY AND LOCATION | STATUS OR DISPOSITION |
|---|---|---|---|
| Homeside Lending vs CLint & Tina Johnson CI-2002-60 | Foreclosure | Cherokee County | Pending Sheriff Sale |

None    b.    Describe all property that has been attached, garnished or seized under any legal or equitable process within one year immediately preceding the commencement of this case. (Married debtors filing under chapter ☒   12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF PERSON FOR WHOSE BENEFIT PROPERTY WAS SEIZED | DATE OF SEIZURE | DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|
| | | |

**5. Repossessions, foreclosures and returns**

None    List all property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure or returned to the seller, within one year immediately preceding the commencement of this ☒   case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR OR SELLER | DATE OF REPOSESSION, FORECLOSURE SALE, TRANSFER OR RETURN | DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|
| | | |

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., ver. 3.4.0-562 - 30348

**6. Assignments and Receiverships**

None ☒ a.    Describe any assignment of property for the benefit of creditors made within 120 days immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include any assignment by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF ASSIGNEE | DATE OF ASSIGNMENT | TERMS OF ASSIGNMENT OR SETTLEMENT |
|---|---|---|

None ☒ b.    List all property which has been in the hands of a custodian, receiver, or court-appointed official within one year immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CUSTODIAN | NAME AND LOCATION OF COURT CASE TITLE & NUMBER | DATE OF ORDER | DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|---|

**7. Gifts**

None ☒ List all gifts or charitable contributions made within one year immediately preceding the commencement of this case, except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient. (Married debtors filing under chapter 12 or chapter 13 must include gifts or contributions by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF PERSON OR ORGANIZATION | RELATIONSHIP TO DEBTOR, IF ANY | DATE OF GIFT | DESCRIPTION AND VALUE OF GIFT |
|---|---|---|---|

**8. Losses**

None ☒ List all losses from fire, theft, other casualty or gambling within one year immediately preceding the commencement of this case or since the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include losses by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| DESCRIPTION AND VALUE OF PROPERTY | DESCRIPTION OF CIRCUMSTANCES, AND, IF LOSS WAS COVERED IN WHOLE OR IN PART BY INSURANCE, GIVE PARTICULARS | DATE OF LOSS |
|---|---|---|

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., ver. 3.4.0-552. - 30348

001080

9.   **Payments related to debt counseling or bankruptcy**

None

☐   List all payments made or property transferred by or on behalf of the debtor to any persons, including attorneys, for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of a petition in bankruptcy within one year immediately preceding the commencement of this case.

| NAME AND ADDRESS OF PAYEE | DATE OF PAYMENT, NAME OF PAYOR IF OTHER THAN DEBTOR | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|
| Potts, Anthony & Jones 1515 E. Okmulgee Muskogee, OK. 74403 | 12/11/02 | $300.00 filing fee & cost |

10.  **Other transfers**

None

☒   List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF TRANSFEREE, RELATIONSHIP TO DEBTOR | DATE | DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED |
|---|---|---|

11.  **Closed financial accounts**

None

☒   List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within one year immediately preceding the commencement of this case. Include checking, savings, or other financial accounts, certificates of deposit, or other instruments; shares and share accounts held in banks, credit unions, pension funds, cooperatives, associations, brokerage houses and other financial institutions. (Married debtors filing under chapter 12 or chapter 13 must include information concerning accounts or instruments held by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF INSTITUTION | TYPE AND NUMBER OF ACCOUNT AND AMOUNT OF FINAL BALANCE | AMOUNT AND DATE OF SALE OR CLOSING |
|---|---|---|

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., ver. 3.4.0-562 - 30348

001081

**12. Safe deposit boxes**

None ☒

List each safe deposit or other box or depository in which the debtor has or had securities, cash, or other valuables within one year immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include boxes or depositories of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF BANK OR OTHER DEPOSITORY | NAMES AND ADDRESSES OF THOSE WITH ACCESS TO BOX OR DEPOSITORY | DESCRIPTION OF CONTENTS | DATE OF TRANSFER OR SURRENDER, IF ANY |
|---|---|---|---|

**13. Setoffs**

None ☒

List all setoffs made by any creditor, including a bank, against a debt or deposit of the debtor within 90 days preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATE OF SETOFF | AMOUNT OF SETOFF |
|---|---|---|

**14. Property held for another person**

None ☒

List all property owned by another person that the debtor holds or controls.

| NAME AND ADDRESS OF OWNER | DESCRIPTION AND VALUE OF PROPERTY | LOCATION OF PROPERTY |
|---|---|---|

**15. Prior address of debtor**

None ☒

If the debtor has moved within the two years immediately preceding the commencement of this case, list all premises which the debtor occupied during that period and vacated prior to the commencement of this case. If a joint petition is filed, report also any separate address of either spouse.

| ADDRESS | NAME USED | DATES OF OCCUPANCY |
|---|---|---|

**16. Spouses and Former Spouses**

None ☒

If the debtor resides or resided in a community property state, commonwealth, or territory (including Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, or Wisconsin) within the six-year period immediately preceding the commencement of the case, identify the name of the debtor's spouse and of any former spouse who resides or resided with the debtor in the community property state.

NAME

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., ver. 3.4.0-562 - 30148

001082

**17. Environmental Sites**

For the purpose of this question, the following definitions apply:

"Environmental Law" means any federal, state, or local statute or regulation regulating pollution, contamination, releases of hazardous or toxic substances, wastes or material into the air, land, soil, surface water, groundwater, or other medium, including, but not limited to, statutes or regulations regulating the cleanup of these substances, wastes, or material.

"Site" means any location, facility, or property as defined under any Environmental Law, whether or not presently or formerly owned or operated by the debtor, including, but not limited to, disposal sites.

"Hazardous Material" means anything defined as a hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, or contaminant or similar term under an Environmental Law.

None ☒

a. List the name and address of every site for which the debtor has received notice in writing by a governmental unit that it may be liable or potentially liable under or in violation of an Environmental Law. Indicate the governmental unit, the date of the notice, and, if known, the Environmental Law:

| SITE NAME AND ADDRESS | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DATE OF NOTICE | ENVIRONMENTAL LAW |
|---|---|---|---|

b. List the name and address of every site for which the debtor provided notice to a governmental unit of a release of Hazardous Material. Indicate the governmental unit to which the notice was sent and the date of the notice.

None ☒

| SITE NAME AND ADDRESS | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DATE OF NOTICE | ENVIRONMENTAL LAW |
|---|---|---|---|

c. List all judicial or administrative proceedings, including settlements or orders, under any Environmental Law with respect to which the debtor is or was a party. Indicate the name and address of the governmental unit that is or was a party to the proceeding, and the docket number.

None ☒

| NAME AND ADDRESS OF GOVERNMENTAL UNIT | DOCKET NUMBER | STATUS OR DISPOSITION |
|---|---|---|

**18. Nature, location and name of business**

None ☒

a. If the debtor is an individual, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partnership, sole proprietorship, or was a self-employed professional within the six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within the six years immediately preceding the commencement of this case.

If the debtor is a partnership, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities, within the six years immediately preceding the commencement of this case.

If the debtor is a corporation, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities within the six years immediately preceding the commencement of this case.

| NAME | TAXPAYER I.D. NUMBER | ADDRESS | NATURE OF BUSINESS | BEGINNING AND ENDING DATES |
|---|---|---|---|---|

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., ver. 3.4.0-562 - 30348

001083

b. Identify any business listed in response to subdivision a., above, that is "single asset real estate" as defined in 11 U.S.C. § 101.

None
☒         NAME                                                           ADDRESS

The following questions are to be completed by every debtor that is a corporation or partnership and by any individual debtor who is or has been, within the six years immediately preceding the commencement of this case, any of the following: an officer, director, managing executive, or owner of more than 5 percent of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or otherwise self-employed.

*(An individual or joint debtor should complete this portion of the statement only if the debtor is or has been in business, as defined above, within the six years immediately preceding the commencement of this case. A debtor who has not been in business within those six years should go directly to the signature page.)*

19. Books, record and financial statements

None
☒    a.    List all bookkeepers and accountants who within the six years immediately preceding the filing of this bankruptcy case kept or supervised the keeping of books of account and records of the debtor.

NAME AND ADDRESS                                          DATES SERVICES RENDERED

None
☒    b.    List all firms or individuals who within the two years immediately preceding the filing of this bankruptcy case have audited the books of account and records, or prepared a financial statement of the debtor.

NAME                              ADDRESS              DATES SERVICES RENDERED

None
☒    c.    List all firms or individuals who at the time of the commencement of this case were in possession of the books of account and records of the debtor. If any of the books of account and records are not available, explain.

NAME                              ADDRESS

None ☒    d.  List all financial institutions, creditors and other parties, including mercantile and trade agencies, to whom a financial statement was issued within the two years immediately preceding the commencement of this case by the debtor.

NAME AND ADDRESS                                             DATE ISSUED

### 20. Inventories

None ☒    a.    List the dates of the last two inventories taken of your property, the name of the person who supervised the taking of each inventory, and the dollar amount and basis of each inventory.

DATE OF INVENTORY          INVENTORY SUPERVISOR          DOLLAR AMOUNT OF INVENTORY
                                                          (Specify cost, market or other basis)

None ☒    b.    List the name and address of the person having possession of the records of each of the two inventories reported in a., above.

DATE OF INVENTORY                              NAME AND ADDRESSES OF CUSTODIAN OF
                                              INVENTORY RECORDS

### 21. Current Partners, Officers, Directors and Shareholders

None ☒    a.    If the debtor is a partnership, list the nature and percentage of partnership interest of each member of the partnership.

NAME AND ADDRESS          NATURE OF INTEREST          PERCENTAGE OF INTEREST

None ☒    b.    If the debtor is a corporation, list all officers and directors of the corporation, and each stockholder who directly or indirectly owns, controls, or holds 5 percent or more of the voting or equity securities of the corporation.

NAME AND ADDRESS          TITLE          NATURE AND PERCENTAGE OF
                                        STOCK OWNERSHIP

### 22. Former partners, officers, directors and shareholders

None ☒    a.    If the debtor is a partnership, list each member who withdrew from the partnership within one year immediately preceding the commencement of this case.

NAME          ADDRESS          DATE OF WITHDRAWAL

Bankruptcy2002 ©1991-2002, New Hope Software, Inc., ver. 3.4.0-562 - 30348

001085

None   b.      If the debtor is a corporation, list all officers, and directors whose relationship with the corporation
☒      terminated within one year immediately preceding the commencement of this case.

| NAME AND ADDRESS | TITLE | DATE OF TERMINATION |
| --- | --- | --- |

**23.   Withdrawals from a partnership or distribution by a corporation**

None   If the debtor is a partnership or a corporation, list all withdrawals or distributions credited or given to an insider,
☒      including compensation in any form, bonuses, loans, stock redemptions, options exercised and any other
       perquisite during one year immediately preceding the commencement of this case.

| NAME & ADDRESS OF RECIPIENT, RELATIONSHIP TO DEBTOR | DATE AND PURPOSE OF WITHDRAWAL | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
| --- | --- | --- |

**24.   Tax Consolidation Group**

None   If the debtor is a corporation, list the name and federal taxpayer identification number of the parent corporation
☒      of any consolidated group for tax purposes of which the debtor has been a member at any time within the
       six-year period immediately preceding the commencement of the case.

| NAME OF PARENT CORPORATION | TAXPAYER IDENTIFICATION NUMBER |
| --- | --- |

**25.   Pension Funds**

None   If the debtor is not an individual, list the name and federal taxpayer identification number of any pension fund to
☒      which the debtor, as an employer, has been responsible for contributing at any time within the six-year period
       immediately preceding the commencement of the case.

| NAME OF PENSION FUND | TAXPAYER IDENTIFICATION NUMBER |
| --- | --- |

\* \* \* \* \* \*

Bankruptcy2002 © 1991-2002; New Hope Software, Inc., ver. 3.4.0-562 - 30348

001086

*[If completed by an individual or individual and spouse]*

I declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct.

Date _____ FEB 0 4 2003 _____   Signature of Debtor _____ CLINT JOHNSON _____

Date _____ FEB 0 4 2003 _____   Signature of Joint Debtor _____ TINA JOHNSON _____

---

**CERTIFICATION AND SIGNATURE OF NON-ATTORNEY BANKRUPTCY PETITION PREPARER (See 11 U.S.C. § 110)**

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C.§110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____        _____
Printed or Typed Name of Bankruptcy Petition Preparer            Social Security No.

_____
Address

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional signed sheets conforming to the appropriate Official Form for each person.

X_____        _____
Signature of Bankruptcy Petition Preparer                     Date

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. §156.*

---

_____0_____ continuation sheets attached

*Penalty for making a false statement: Fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §152 and 3571*

Bankruptcy2002 ±1991-2002, New Hope Software, Inc., ver. 3.4.0-562 - 30348

American Medical Collection Agency
Acct No: ▮▮▮▮▮▮▮
2269 S. Saw Mill River Rd.
Bldg. 3
Elmsford, NY 10523

Americheck
Acct No: ▮▮▮▮▮▮▮
5800 E. Skelly Dr. Suite 918
Tulsa, OK. 74135

Armstrong Bank
Acct No: ▮▮▮▮▮▮
3401 Chandler
Muskogee, OK. 74403

Bancfirst
Acct No: ▮▮▮▮▮▮
P.O. Box 1068
Tahlequah, OK. 74465

Bank of America
Acct No: ▮▮▮▮▮▮▮
100 S. Muskogee Ave.
Tahlequah, OK. 74464

Bank Of Cherokee County
Acct No: ▮▮▮▮▮▮
P.O. box 660
Park Hill, OK. 74451

Citifinancial Services Inc.
Acct No: ▮▮▮▮▮▮▮
P.O. Box 1268
Muskogee, OK. 74402

First State Bank
Acct No: ▮▮▮▮▮
1111 S. Muskogee
Tahlequah, OK 74464

First State Bank
Acct No: ▮▮▮▮▮
1111 S. Muskogee
Tahlequah, OK 74464

001088

H A chapman Institute
Acct No: ▮▮▮▮▮▮
Dept. 1464
Tulsa, OK. 74182

Homeside Lending
Acct No: ▮▮▮▮▮▮
P.O. Box 44016
Jacksonville, FL. 32231-9912

Key Bank USA
Acct No: ▮▮▮▮▮▮▮
P.O. Box 94981
Cleveland, OH 44101

OBL Associates, Inc.
Acct No: ▮▮▮▮
P.O. Box 54851
Tulsa, OK. 74155-0851

Sallie Mae
Acct No: ▮▮▮▮▮▮▮▮▮
P.O. Box 7400
Wilkes Barre, PA 18773-7400

Tahlequah City Hospital
Acct No: ▮▮▮▮▮▮
P.O. Box 1008
Tahlequah, OK 74465

Tahlequah Internal Med
Acct No: ▮▮▮▮▮▮
1500 E. Downing #103
Tahlequah, OK 74464

Telecheck Services. Inc
Acct No: ▮▮▮▮▮▮▮▮
P.O. Box 4451
Houston, Tx. 77210

001089

B 201 (12/99)

# UNITED STATES BANKRUPTCY COURT
## NOTICE TO INDIVIDUAL CONSUMER DEBTOR

The purpose of this notice is to acquaint you with the four chapters of the federal Bankruptcy Code under which you may file a bankruptcy petition. The bankruptcy law is complicated and not easily described. Therefore, you should seek the advice of an attorney to learn of your rights and responsibilities under the law should you decide to file a petition with the court. Court employees are prohibited from giving you legal advice.

## Chapter 7: Liquidation ($200 filing fee plus $30 administrative fee plus $15 trustee surcharge)

1. Chapter 7 is designed for debtors in financial difficulty who do not have the ability to pay their existing debts.

2. Under chapter 7 a trustee takes possession of all your property. You may claim certain of your property as exempt under governing law. The trustee then liquidates the property and uses the proceeds to pay your creditors according to priorities of the Bankruptcy Code.

3. The purpose of filing a chapter 7 case is to obtain a discharge of your existing debts. If, however, you are found to have committed certain acts of improper conduct described in the Bankruptcy Code, your discharge may be denied by the court, and the purpose for which you filed the bankruptcy petition will be defeated.

4. Even if you receive a discharge, there are some debts that are not discharged under the law. Therefore, you may still be responsible for such debts as certain taxes and student loans, alimony and support payments, criminal restitution, and debts for death or personal injury caused by driving while intoxicated from alcohol or drugs.

5. Under certain circumstances you may keep property that you have purchased subject to valid security interest. Your attorney can explain the options that are available to you.

## Chapter 13: Repayment of All or Part of the Debts of an Individual with Regular Income ($185 filing fee plus $30 administrative fee)

1. Chapter 13 is designed for individuals with regular income who are temporarily unable to pay their debts but would like to pay them in installments over a period of time. You are only eligible for chapter 13 if your debts do not exceed certain dollar amounts set forth in the Bankruptcy Code.

2. Under chapter 13 you must file a plan with the court to repay your creditors all or part of the money that you owe them, using your future earnings. Usually, the period allowed by the court to repay your debts is three years, but no more than five years. Your plan must be approved by the court before it can take effect.

3. Under chapter 13, unlike chapter 7, you may keep all your property, both exempt and non-exempt, as long as you continue to make payments under the plan.

4. After completion of payments under your plan, your debts are discharged except alimony and support payments, student loans, certain debts including criminal fines and restitution and debts for death or personal injury caused by driving while intoxicated from alcohol or drugs, and long term secured obligations.

## Chapter 11: Reorganization ($800 filing fee plus $30 administrative fee)

Chapter 11 is designed primarily for the reorganization of a business but is also available to consumer debtors. Its provisions are quite complicated, and any decision by an individual to file a chapter 11 petition should be reviewed with an attorney.

## Chapter 12: Family farmer ($200 filing fee plus $30 administrative fee)

Chapter 12 is designed to permit family farmers to repay their debts over a period of time from future earnings and is in many ways similar to chapter 13. The eligibility requirements are restrictive, limiting its use to those whose income arises primarily from a family-owned farm.

I, the debtor, affirm that I have read this notice.

| Date | Signature of Debtors | Case Number |
|---|---|---|

**WHITE-DEBTOR COPY**          **PINK-COURT COPY**

001090

# UNITED STATES BANKRUPTCY COURT
## Eastern District of Oklahoma

In re    Clint Johnson & Tina Johnson

Debtor

Case No.

Chapter    13

## DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR

1. Pursuant to 11 U.S.C. § 329(a) and Bankruptcy Rule 2016(b), I certify that I am the attorney for the above-named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

For legal services, I have agreed to accept                 $ 1,500.00 or $125.00 per hour
Prior to the filing of this statement I have received        $ 300.00
Balance Due                                                  $ unknown

2. The source of the compensation paid to me was:

   X    Debtor                    Other (specify)

3. The source of compensation to be paid to me is:

        Debtor            X    Other (specify) Chapter 13 Plan

4. X   I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm.

       I have agreed to share the above-disclosed compensation with a person or persons who are not members or associates of my law firm. A copy of the agreement, together with a list of the names of the people sharing in the compensation, is attached.

5. In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

a. Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
b. Preparation and filing of any petition, schedules, statement of affairs and plan which may be required;
c. Representation of the debtor at the meeting of creditors and hearing, and any adjourned hearings thereof;
d. abRepresentation in contested matter not initiated by Debtors; modification of confirmed plans or actions by trustee to obtain property to disburse to creditors

6. By agreement with the debtor(s), the above-disclosed fee does not include the following services: Representation of Debtor in adversarial matters;; Debtor shall additionally be charged $10.00 per letter sent certified to each creditor who attempts to collect a pre-petition debt by post petition acts.

### CERTIFICATION

I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding.

Date:

SLATON J. ANTHONY, OBA 16561

POTTS, ANTHONY & JONES

I or We, the debtor's herein, hereby state that we have reviewed and approved the rate of compensation paid and to be paid to Slaton J. Anthony, for the legal services rendered on my or our behalf in contemplation of or in connection with the bankruptcy case as specifically set forth in the DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR filed herein regardless of ultimate outcome of the bankruptcy and consent and assign any monies held by the trustee to be paid to Slaton J. Anthony to satisfy said compensation should a plan not be confirmed.

Date:

DEBTOR

001091

# UNITED STATES BANKRUPTCY COURT
## Eastern District of Oklahoma

In re   Clint Johnson & Tina Johnson

_____,
                        Debtor

Case No. _____

Chapter   13   _____

## CERTIFICATION BY ATTORNEY OF CREDITOR MATRIX

The below-named attorney hereby certifies that the disk submitted with the Petition of the above-named debtors contains all of the creditors for this case.

DATE:

Slaton J. Anthony, OBA# 16561
POTTS, ANTHONY & JONES
1515 E. Okmulgee
Muskogee, OK 74403
(918) 687-7755

.001092

# UNITED STATES BANKRUPTCY COURT
## Eastern District of Oklahoma

In re   Clint Johnson & Tina Johnson ,

                      Debtor

Case No.

Chapter    13

## VERIFICATION OF CREDITOR MATRIX

The above named Debtor(s) hereby verify that the attached list of Creditors is true and correct to the best of his/her or their knowledge.

DATE:

Clint Johnson

Tina Johnson

001093

Case: 03-70360      Doc #: 1      Filed: in USBC ED/OK on 02/05/2003  Page 37 of 37

AAAX_U.S.B.C.
NEWCASE LABEL MATRIX
for case 03-70360
parties / creditors
total       21

Clint   Johnson
████████████
Tahlequah OK    74464

Slaton  J.  Anthony
Potts Anthony Jones PC
1515 E Okmulgee
Muskogee OK    74403

Tina  Johnson
████████████
Tahlequah OK    74464

William  Mark  Bonney
Chapter 13 Trustee
Severs Bldg 215 State St Ste 408
PO Box 1548
Muskogee OK    74402 - 1548

American Medical Collection Agency
Acct No: ████████
2269 S. Saw Mill River Rd.
Bldg. 3
Elmsford, NY 10523

Americheck
Acct No: ████████
5800 E. Skelly Dr. Suite 918
Tulsa, OK. 74135

Armstrong Bank
Acct No: ████████
3401 Chandler
Muskogee, OK. 74403

Bancfirst
Acct No: ████████
P.O. Box 1068
Tahlequah, OK. 74465

Bank Of Cherokee County
Acct No: ████████
P.O. box 660
Park Hill, OK. 74451

Bank of America
Acct No: ████████
100 S. Muskogee Ave.
Tahlequah, OK. 74464

Citifinancial Services Inc.
Acct No: ████████
P.O. Box 1268
Muskogee, OK. 74402

First State Bank
Acct No: ████████
1111 S. Muskogee
Tahlequah, OK 74464

First State Bank
Acct No: ████████
1111 S. Muskogee
Tahlequah, OK 74464

H A chapman Institute
Acct No: ████████
Dept. 1464
Tulsa, OK. 74182

Homeside Lending
Acct No: ████████
P.O. Box 44016
Jacksonville, FL. 32231-9912

Key Bank USA
Acct No: ████████
P.O. Box 94981
Cleveland, OH 44101

OBL Associates, Inc.
Acct No: ████████
P.O. Box 54851
Tulsa, OK. 74155-0851

Sallie Mae
Acct No: ████████
P.O. Box 7400
Wilkes Barre, PA 18773-7400

Tahlequah City Hospital
Acct No: ████████
P.O. Box 1008
Tahlequah, OK 74465

Tahlequah Internal Med
Acct No: ████████
1500 E. Downing #103
Tahlequah, OK 74464

Telecheck Services. Inc
Acct No: ████████
P.O. Box 4451
Houston, Tx. 77210

001094

453

454

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 182**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

April 7, 1997

Received of Tracy Swearingen the sum of Three Thousand dollars ($3,000.00) as partial payment on attorney fee for Kenneth Barrett. Balance of Two Thousand ($2,000.00) due before Preliminary Hearing. An Additional sum of Twenty-Five Hundred ($2,500.00) due if case goes to Jury Trial.

Bill Ed Rogers
Attorney at Law

455

Kenneth Barrett    age 36                 DATE
                                        774-0845

① His house →

② Back to his house — No one there

③ Then went to his Mothers, went next door to Phylles, his Aunt, then went over to his grand-mother he Was in barn.

Arrested 3 weeks ago on warrant on case he Was paying on was Current

Frank Lloyd =

Last week in Feb - Frank Lloyd came to him wanted him to make buy - 3 buys then you go free =

PREPARED BY

PURCHASER'S COPY OF PERSONAL MONEY ORDER DRAWN ON OFFICE SHOWN HERE ON

71406

4-17 19 97

86-1234/1031

$ 825°°

FOR

NOT NEGOTIABLE

The customer procuring the Personal Money Order form, corresponding
in number and amount to that shown hereon, agrees to insert thereon in ink, the
date, payee, his/her signature and address and assumes responsibility for all
events made possible by his/her failure to do so.
SAVE THIS COPY FOR YOUR RECORD

L BANK OF SALLISAW
ESTABLISHED 1928
SAW, OKLAHOMA 74955

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY**
**STATE OF OKLAHOMA**

THE STATE OF OKLAHOMA,
                              Plaintiff,

vs.                                                    No. CF-97-86

BARRETT, KENNETH EUGENE          ,
                              Defendant.

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**A F F I D A V I T**

MAR 2 4 1997

State of Oklahoma   )
County of Sequoyah )  ss.

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

DET. LARRY BLOUNT          , of lawful age and being first duly sworn upon an oath, deposes and says:

On December 19, 1996 AT APPROXIMATELY 1310 HOURS, AN AGENT PURCHASED ONE-QUARTER (1/4) GRAM OF METHAMPHETAMINE FROM Kenneth EUGENE BARRETT OF MCKEY, SEQUOYAH COUNTY, OKLAHOMA. THIS AGENT USED TWENTY-FIVE DOLLARS ($25.00) OF OKLAHOMA STATE BUREAU OF NARCOTICS (OBN) OFFICIAL ADVANCED FUNDS DURING THE BUY.

SURVEILLANCE DURING THE BUY WAS MADE BY THIS OFFICER AND ANOTHER AGENT OF THE OBN.

Based on this information, the undersigned prays that this Honorable Court issue a finding of fact that probable cause exists to believe that a crime has been committed and that there is probable cause to believe the defendant(s) above named committed that crime.

FURTHER AFFIANT SAYETH NOT.

_____

Subscribed and sworn to before me this 18th day of March , 1997.

MY COMMISSION EXPIRES:
3·23·2000

_____
NOTARY PUBLIC

**FINDING OF PROBABLE CAUSE**

The undersigned Judge of this Court, upon sworn testimony and/or affidavit, hereby determines there to be probable cause to detain the defendant(s).
DATED this 24th day of March , 1997.

_____
JUDGE OF THE DISTRICT COURT

458

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA )
      Plaintiff, )
vs. )
       )
KENNETH EUGENE BARRETT )
DOB: ████ 61 )
DL/SS ████████ -9952 )
      Defendant. )

No. CF-97-86

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 2 4 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**I N F O R M A T I O N**

**IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:**

Now comes DIANNE BARKER HARROLD, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that KENNETH EUGENE BARRETT did, in Sequoyah County, and in the State of Oklahoma, on the 19th day of December, in the year of our Lord, One Thousand, Nine Hundred and Ninety-Six and before the presentment hereof, commit the crime of

UNLAWFUL DELIVERY OF A CONTROLLED DRUG -63 O.S. 2-401
On the day and year in the County and State aforesaid, said KENNETH EUGENE BARRETT did unlawfully, wilfully and feloniously deliver and distribute METHAMPHETAMINE to one Kevin Ottwell, said drug being classified as a controlled dangerous substance in Schedule II of the Uniform Controlled Dangerous substances Act of this State,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

By _____
Assistant District Attorney

STATE OF OKLAHOMA )
            ) ss.
COUNTY OF SEQUOYAH)
Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

Subscribed and sworn to before me this _____ day of March, 1997.

My Commission Expires:
_6/28/99_

_____
NOTARY PUBLIC

WITNESSES:
Kevin Ottwell ✓      OBN, 3313 W. 45th St., Tulsa, OK
Robert Jerome ✓    OBN, 3313 W. 45th St., Tulsa, OK
Chemist              OSBI Lab, Tahlequah, OK
Larry Blount        Sallisaw Police Dept., Sallisaw, OK

459

KENNETH EUGENE BARRETT

DB: 6/29/61 #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

AU: MALE

# WARRANT

STATE OF OKLAHOMA,
COUNTY OF SEQUOYAH—ss.

THE STATE OF OKLAHOMA, to any Sheriff, Constable, Marshal or Policeman in the above named County and State:

Information upon oath having been this day laid before me that the crime of __UNLAWFUL_DELIVERY__ OF A CONTROLLED DRUG _____ has been committed, and

accusing ___KENNETH_EUGENE_BARRETT_____ thereof.

You are therefore commanded forthwith to arrest the above named KENNETH_EUGENE_BARRETT_____

and bring him___ before me at __SALLISAW,_OK_____

or, in the case of my absence or inability to act, before the nearest or most accessible magistrate in this county.

Dated at _____, this _____24____ day of ___March_____, 19_77_.

The Defendant is to be admitted  _____
to bail in the amount of  ___
  *Judge of the District Court.*

*no Band to be set*
*Rev — DMS*
*4-3-97*

460

Prel 8-21-97 @ 1:30        Diesty (court Reporter)
Sprouse

Kevin Ottwell                           St. # hah
OBN                                     St #2 Report
7 years -

63 os  - Street Drug.
Undercover

Dec 19, 1996
      Tulsa — Sallisaw

Larry Blount — Frank Lloyd
meet a Corporative Individus — OIR —

went to McKey Community —>

Serger Story wood frome Cabin -
Was told he could meet Defendant
* Deft come out of house →
* overheard conversation (told us) Parts of it
Went to door went into room
on Right — obtained from ? was
divided up on top of Dresser ⟹
Paid the Defendant $25.⁰⁰ in Cash -
$20 bill and a five Dollar bill
Went back to Sallisaw Police Dept.

defid

KENNETH BARRETT
VIAN, OK
DOB: ███61
Caucasian:Male

Case No. CM-95-496

# WARRANT

STATE OF OKLAHOMA,
COUNTY OF SEQUOYAH—ss.

THE STATE OF OKLAHOMA, to any Sheriff, Constable, Marshal or Policeman in the above named County and State:

Information upon oath having been this day laid before me that the crime of _____

Violation of Protective Order _____ has been committed, and

accusing ___ Kenneth Barrett _____ thereof.

You are therefore commanded forthwith to arrest the above named _____ Kenneth Barrett

and bring h__im before me at _____ Sallisaw, OK

or, in the case of my absence or inability to act, before the nearest or most accessible magistrate in this county.

Dated at _____, this _____17th_____ day of __October__, 19 95.

The Defendant is to be admitted
to bail in the amount of $2000.²

_____
Judge of the District Court.

# APPLICATION FOR STAY OF EXECUTION ON FINES/COSTS

CHECK ONE _____ I plan to pay before 3:30 pm today

_____ I plan to pay within 48 hours _____ I want extended time to pay

I understand that my assessed fine(s)/costs are due IMMEDIATELY unless otherwise ordered by the Court. I understand that I may be subject to penalties, including but not limited to imprisonment, if I fail to pay my assessed fine(s)/costs as ordered. I consent to an investigation into all information I provide on this application to verify its validity. I understand I may be held in CONTEMPT OF COURT for providing false and/or incomplete information on this application. I swear under PENALTY OF PERJURY that the below information is true and complete.

SIGNATURE _____ DATE _____ 10-4-96

CASE # 96-64 / 96-258 / 95-496    DATE OF BIRTH ████████ 61

SS# ████████ 9956    FINE/COST $757.00

LAST NAME Barrett    FIRST _____ MI ____

STREET ████████ CITY Vian    PHONE 775-6969

EMPLOYER Freman Construction Ft. Smith    HOW LONG 1 yr    PHONE _____

EARNINGS Depents on Weather per $8.00    #hrs/wk 30 hrs    paydates Fridays

### IF PAYING BEFORE 3:30 PM TODAY: STOP HERE

MARITAL STATUS    SINGLE ✓    MARRIED ____    DIVORCED ____
SEPERATED ____    WIDOW/ER ____    COMMON LAW ____

Names and Ages of Children Toby Barrett Son

List others living in household    NAME    RELATIONSHIP    EMPLOYER    INCOME

AMOUNT OF CASH WITH YOU $ 300.00    Saving/Checking Accounts $ 0

Property, Investments, Assets $ Land - House - 30,000 to 40,000.00

I AM SUPPORTED BY: _____    Do you receive housing assistance NO

Monthly Expenses:

| | | |
|---|---|---|
| Alimony/Child Support | 0 | |
| Social Security | 0 | Rent 0 |
| Pension/Retirement | 0 | Food 150.00 |
| Welfare | 0 | Utilities 40.00 |
| Food Stamps | 0 | Child Care 0 |
| Unemployment | 0 | Medical 0 |
| My Gross Monthly Earning | 800.00 | TOTAL $ 190.00 |
| Other Income Support | 0    Source | |

DRIVERS LICENSE # 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 STATE OKLA EXP.DATE Suspened

VEHICLES YOU OWN OR USE:    YEAR    MAKE/MODLE    MONTHLY PAYMENTS

1973 - Dodge Truck  1968 - Truck  1965 - Ford Car
1969 - Chevy Truck  1965 - Chevy Truck  1962 - Chevy Truck

BENCH WARRANT ON INDICTMENT OR INFORMATION.

STATE OF OKLAHOMA,)                                    IN District COURT

Sequoyah County        )

THE STATE OF OKLAHOMA

vs.                                                              No. CM-96-64
                                                                 Bond $3000.00
Kenneth Barrett _____

_____ Vian, OK _____
                                Defendant.

THE STATE OF OKLAHOMA
To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma—Greeting:

Whereas an ____ information _____ having been __ filed __

on the ___ 20th __ day of __ February _____ A. D. 19 96 _ , in the District Court of

Sequoyah County, State of Oklahoma, charging ___ Kenneth Barrett _____

_____ with the crime of __ Attempting to elude, DUS III and __

_ Failure to appear. _____

You are therefore commanded forthwith to arrest the above named __ Kenneth Barrett _____

_____

and bring him before* ___ Judge of the District Court _____

_____

_____

_____

_____

_____ or if the said Court have adjourned for the

term that you deliver him into the custody of the Sheriff of Sequoyah County, Oklahoma.

Given under my hand with the seal of said Court affixed, this _____ 23rd _____ day of

_ February _____ A. D. 19 . 96                        _ Bernell Edwards _____
                                                                                  Court Clerk.
By order of the Court.                            By _Patty Lasiter_____
                                                                                  Deputy.

*See Sec. 5384, Wilson's Statutes.

STATE OF OKLAHOMA
OFFICE OF THE DISTRICT ATTORNEY
DISTRICT 27

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

SEQUOYAH COUNTY
120 EAST CHICKASAW
SALLISAW, OK 74955
(918) 775-9131

RE:   State v. _Barrett_____   CRM __96-64__
                                      _96-258_
      Preliminary Hearing Date _____ _95-496_

Dear

I have reviewed the above referenced file and, in order to streamline plea negotiations, convey the following recommendation:

1. Number of years: _____
2. Subject to PSI reserving right to object to a deferred or or suspended:  Yes _____   No _____
3. Fine: $_____
4. Victim of Crime Fund: $_____
5. Drug Enforcement Fund: $_____
6. Restitution: $_____
7. Hours of Community Service: _____
8. Other:

I reserve the right to change this recommendation until your client's acceptance.  Please contact me if you have additional information or questions.

Thank you for your consideration in this matter.

Sincerely,

_____
Assistant District Attorney

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA )
        Plaintiff )
            )
VS. )
_Kenneth Barrett_ ) CASE NUMBER: CM-96-64
            )        CM-96-258
            )        CM-96-496
D.O.B ████ /61 )
DATE 10-4-96

        FAYE TEAGUE
        Assistant District Attorney
        NONE
        Defendant's Attorney

RULE 8 HEARING
(summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES, IT IS HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

$ 50.⁰⁰ ON OR BEFORE 10-4-96 BY 4:00 P.M. AND

$ 150.⁰⁰ ON OR BEFORE 11-4-96 BY 4:00 P.M. , THEN

$ 150.⁰⁰ PER MONTH ON OR BEFORE THE 4th DAY OF EACH MONTH WITH LIKE SUMS ON THE SAME DATE THEREAFTER UNTIL PAID IN FULL; OR THE BALANCE IN FULL ON OR BEFORE THE _____ DAY OF 199___ BY _____ P.M. OR,

IT IS FURTHER ORDERED THAT DEFENDANT MAKE ALL PAYMENTS IN PERSON AT THE OFFICE OF THE COURT CLERK.
COMMENTS:

TOTAL TO PAY $ _____

_____
JUDGE OF THE DISTRICT COURT

_____
DEFENDANT

**\* Defendant is further ordered to notify the Collections Adm. of any change of address, telephone, employment or income.**

**BYRD'S WRECKER SERVICE**
618 Sequoyah
SALLISAW, OKLAHOMA 74955
Phone 775-3661 (24 Hours) or 775-4725
49119W

No. 49 0

Mike

| Name Kenny Prop TT | | Date of Order 3-16- |
|---|---|---|
| Address | | C,74 |
| City Sallisaw ok | Phone | Date Promised |
| Customer's Order No. | Order Written By Mike | |
| Year, Make, Model 4x4 62 Chev | Serial No. | License No. |
| | Motor No. | Speedometer |

| | | AMOUNT |
|---|---|---|
| TIME IN: Hold for Lic Reg | | |
| TIME OUT: Insurance / Proof of | | |

Paid OK
1012

| | Storage | 10 | 00 |
|---|---|---|---|
| | Total Labor | | |
| | Total Parts | | |
| | DPS Charge | 15 | 00 |
| | Hook Up | 31 | 15 |
| | Tow | | |
| | Mileage | 4 | 8 |
| | Tax | | |
| | TOTAL | 60 | 97 |

I hereby authorize the above repair work to be done along with the necessary materials. You and your employees may operate above vehicle for purposes of testing, inspection, or delivery at my risk. An express mechanics lien is acknowledged on above vehicle to secure the amount of repairs thereto. It is also understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control.

SIGNATURE Kenny Burk

State of Oklahoma

**COUNTY OF SEQUOYAH**

Jud. Dist. Court
Municipal

№ 000881

NAME:

## SUMMONS

The undersigned, being duly sworn upon his oath deposes and says that:

| on or about (date) | at (24 hour time) | at or near (location) |
|---|---|---|

| County Number | 68 | East Control-Int. | | | | North Location | | |
|---|---|---|---|---|---|---|---|---|

within the city, county and state aforesaid:

| Name (last, first, middle) | Phone number |
|---|---|

| Address |
|---|

| City | State | Zip Code |
|---|---|---|
| | OK | |

| Birthdate (mo., day, yr.) | Height | Weight | Race | Sex | Class | Endorsements |
|---|---|---|---|---|---|---|
| -61 | 5'10 | 15 | W | | Month/Year | State |

| Driver License Number |
|---|

| Employer | | Did Unlawfully | Operate ☐ | Park ☐ |
|---|---|---|---|---|

| Vehicle-Make | Year | Body Style-Color | Tag Number | Year | State |
|---|---|---|---|---|---|

| Commercial Motor Vehicle | Y | N | ☐ Haz. Mat. Placard | ACCIDENT: ☐ PD | ☑ PI | ☐ FATALITY |
|---|---|---|---|---|---|---|

and did then and there commit the following offense:

| | | | Pace | Radar | Plane | Other |
|---|---|---|---|---|---|---|
| SPEEDING | MPH in | MPH Zone | ☐ | ☐ | ☐ | ☐ |

Other Violation:

Contrary to Statute/Ordinance:

I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents thereof and that the facts supporting the criminal charge stated therein are true.

_____ _____ Badge No._____ Dist. _____
Signature of Officer                    Date

Sworn to and subscribed before me this ____ day of _____ 19____

_____
Name and Title

My Commission Expires _____

Court Appearance: ____ day of _____, 19 ___, at_____ M

(DPS USE)

Address of Court **120 E. CHICKASAW St. SALLISAW, OK**

NOTICE: Release upon personal recognizance based upon a signed written promise to appear for arraignment is conditional and failure to timely appear for arraignment shall result in suspension of the arrested person's driver license in Oklahoma, or in the nonresident's home state pursuant to the Nonresident Violator Compact.

WITHOUT ADMITTING GUILT, I promise to appear in said court at said time and place.

X SIGNATURE: _____
(CHECK ONLY ONE BOX)

| Signed Personal Recognizance ☐ | Bond Attached ☐ | ☐ Magistrate | ☒ Jail | ☐ Other |
|---|---|---|---|---|

| ☐ JUVENILE | Name of Parent or Guardian _____ Address _____ |
|---|---|

Officer's Remarks:

| AREA: | ☐ business | ☐ industrial | ☐ school | ☐ residential | ☒ rural |
|---|---|---|---|---|---|
| HIGHWAY TYPE: | ☐ 1 lane | ☒ 2 lane | ☐ 3 lane | 4 or more ☐ undivided | 4 or more ☐ divided | on/off ☐ ramp |

468

State of Oklahoma

**COUNTY OF SEQUOYAH**

) ss
Dist. Court
Municipal

No. 000880

OKLAHOMA DEPARTMENT OF PUBLIC SAFETY
OKLAHOMA UNIFORM VIOLATIONS COMPLAINT

## SUMMONS

The undersigned, being duly sworn, upon his oath deposes and says that:

| on or about (date) | at (24 hour time) | at or near (location) |
|---|---|---|

| County Number | 63 | East Control-Int. | | | North Location | | | |
|---|---|---|---|---|---|---|---|---|

within the city, county and state aforesaid:

Name (last, first, middle)　　　　Phone number

City　　　　State　　　Zip Code

| Birthdate (mo., day, yr.) | Height | Weight | Race | Sex | Class | Endorsements |
|---|---|---|---|---|---|---|
| | | | W | M | | |

License Number　　　　Month/Year　　State

Employer

| | Did Unlawfully | Operate | Park |
|---|---|---|---|
| | | ☒ | ☐ |

| Vehicle-Make | Year | Body Style-Color | Tag Number | Year | State |
|---|---|---|---|---|---|
| CHEV | | | | | |

| Commercial Motor Vehicle | Y | N | ☐ Haz. Mat. Placard | ACCIDENT: ☐ PD ☐ PI ☐ FATALITY |
|---|---|---|---|---|

and did then and there commit the following offense:

| | Pace | Radar | Plane | Other |
|---|---|---|---|---|
| SPEEDING ___ MPH in ___ MPH Zone | ☐ | ☐ | ☐ | ☐ |

Other Violation:

**Contrary to Statute/Ordinance:**

I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents hereof and that the facts supporting the criminal charge stated therein are true.

_____ Badge No. _____ Dist. _____
Signature of Officer　　Date

Sworn to and subscribed before me this ___ day of _____ 19 ___

_____ My Commission
Name and Title　　Expires _____

Court Appearance: ___ day of _____, 19 ___, at ___ M

(DPS USE)

Address of Court **120 E. CHICKASAW SALLISAW, OK**

NOTICE: Release upon personal recognizance based upon a signed written promise to appear for arraignment is conditional and failure to timely appear for arraignment shall result in suspension of the arrested person's driver license in Oklahoma, or in the nonresident's home state pursuant to the Nonresident Violator Compact.

WITHOUT ADMITTING GUILT, I promise to appear in said court at said time and place.

X SIGNATURE: _____

**(CHECK ONLY ONE BOX)**

| Signed Personal Recognizance ☐ | Bond Attached ☐ | ☐ Magistrate | ☐ Jail | ☐ Other |
|---|---|---|---|---|

☐ JUVENILE　Name of Parent or Guardian _____
Address _____

Officer's Remarks:

| AREA: HIGHWAY TYPE: | ☐ business | ☐ industrial | ☐ school | ☐ residential | ☒ rural |
|---|---|---|---|---|---|
| | ☐ 1 lane | ☒ 2 lane | | ☐ 4 or more sided / ☐ divided | ☐ on/off / ☐ ramp |

---

OKLAHOMA DEPARTMENT OF PUBLIC SAFETY
OKLAHOMA UNIFORM VIOLATIONS COMPLAINT

Case No. _____ Docket No. _____ Page No. _____

State of Oklahoma

County of _____ ) ss In The District Court

## SUMMONS

DPS 891258

The undersigned, being duly sworn, upon his oath deposes and says that:

| on or about (date) | at (24 hour time) | at or near (location) |
|---|---|---|

| County Number | | East Control-Int. | | | North Location | | | |
|---|---|---|---|---|---|---|---|---|

within the city, county and state aforesaid:

Name (last, first, middle)　　　　Phone Number

Address

City　　　　State　　　Zip Code

| Birthdate (mo., day, yr.) | Height | Weight | Race | Sex | Class | Endorsements |
|---|---|---|---|---|---|---|

Driver License Number　　　　Month/Year　　State

Employer

| | Did Unlawfully | Operate | Park |
|---|---|---|---|
| | | ☐ | ☐ |

| Vehicle-Make | Year | Body Style-Color | Tag Number | Year | State |
|---|---|---|---|---|---|

| Commercial Motor Vehicle | Y | N | ☐ Haz. Mat. Placard | ACCIDENT: ☐ PD ☐ PI ☐ FATALITY |
|---|---|---|---|---|

and did then and there commit the following offense:

| | Pace | Radar | Plane | Other |
|---|---|---|---|---|
| SPEEDING ___ MPH in ___ MPH Zone | ☐ | ☐ | ☐ | ☐ |

Other Violation:

**Contrary to Title _____ Section _____ Oklahoma Statutes**

I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents thereof and that the facts supporting the criminal charge stated therein are true.

_____ Badge No. _____ Troop _____
Signature of Officer　　Date

Sworn to and subscribed before me this ___ day of _____ 19 ___

_____ My Commission
Name and Title　　Expires _____

Court Appearance: ___ day of _____, 19 ___, at ___ M

(DPS USE)

Address of Court _____

NOTICE: Release upon personal recognizance based upon a signed written promise to appear for arraignment is conditional and failure to timely appear for arraignment shall result in suspension of the arrested person's driver license in Oklahoma, or in the nonresident's home state pursuant to the Nonresident Violator Compact.

WITHOUT ADMITTING GUILT, I promise to appear in said court at said time and place.

X Signature _____

**(CHECK ONLY ONE BOX)**

| Signed Personal Recognizance ☐ | Bond Attached ☐ | ☐ Magistrate | ☐ Jail | ☐ Other |
|---|---|---|---|---|

☐ Share the RD
☐ Juvenile　Name of Parent or Guardian _____
Address _____

Officer's Remarks:

| AREA: HIGHWAY TYPE: | ☐ business | ☐ industrial | ☐ school | ☐ residential | ☐ rural |
|---|---|---|---|---|---|
| | ☐ 1 lane | ☐ 2 lane | ☐ 3 lane | ☐ 4 or more undivided | ☐ 4 or more divided / ☐ on/off ramp |

## Left Form

OKLAHOMA UNIFORM VIOLATIO. OMPLAINT

State of Oklahoma    CM-96-64

COUNTY OF SEQUOYAH ) ss

Ct. I

Jud. Dist. Court
Municipal

№ J00881

**COMPLAINT - INFORMATION**
The undersigned, being duly sworn, upon his oath deposes and says that:

| on or about (date) | at (24 hour time) | at or near (location) |
| 2-17-96 | 17:07 | 2 Mi w of Coffmans Store |

County Number 68 | East Control-Int. | | | | | | North Location | |

within the city, county and state aforesaid:

Name (last, first, middle): Barrett Kenneth Eugue    Phone number 775-6969

Address: ▮▮▮▮▮▮▮▮▮▮

City: Vian    State: OK    Zip Code: 74962

Height 5'10 | Weight 180 | Race W | Sex M | Class | Endorsements

none    Month/Year    State

Employer:    Did Unlawfully ☐   Operate ☐   Park ☐

| Vehicle Make | Year | Body Style-Color | Tag Number | Year | State |
| Chev | 69 | Plu Blu | none | | |

Commercial Motor Vehicle Y ☐ N ☒   ☐ Haz. Mat. Placard   ACCIDENT: ☐ PD ☐ PI ☐ FATALITY

and did then and there commit the following offense:

SPEEDING ___ MPH in ___ MPH Zone    Pace ☐  Radar ☐  Plane ☐  Other ☐

Other Violation: Attempting To Elude a Police Officer

**Contrary to Statute/Ordinance:**

I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents thereof and that the facts supporting the criminal charge stated therein are true.

Terry Mathis   2-17-96   Badge No. 825   Dist. Seq

Signature of Officer    Date

Sworn to and subscribed before me this ____ day of ____ 19__

____ Name and Title    My Commission Expires

Court Appearance: 21 day of feb, 19 96, at 9:00 A M   (DPS USE)

Address of Court 120 E. CHICKASAW SALLISAW, OK

NOTICE: Release upon personal recognizance based upon a signed written promise to appear for arraignment is conditional and failure to timely appear for arraignment shall result in suspension of the arrested person's driver license in Oklahoma, or in the nonresident's home state pursuant to the Nonresident Violator Compact.

WITHOUT ADMITTING GUILT, I promise to appear in said court at said time and place.

X SIGNATURE: _Kenneth Barrett_
(CHECK ONLY ONE BOX)

| Signed Personal Recognizance ☐ | Bond Attached ☐ | | ☐ Magistrate | ☐ Jail | ☐ Other |

☐ JUVENILE    Name of Parent or Guardian ____    Address ____

Officer's Remarks: ____

| AREA: HIGHWAY TYPE: | ☐ business | ☐ industrial | ☐ school | ☐ residential | ☒ rural |
| | ☐ 1 lane | ☒ 2 lane | ☐ 3 lane | 4 or more ☐ undivided | 4 or more ☐ divided | ☐ on/off ramp |

## Right Form

AHOMA UNIFORM VIOLATIONS COMPLAINT

State of Oklahoma    CM-96-64

COUNTY OF SEQUOYAH ) ss

Ct. II

Jud. Dist. Court
Municipal

№ J0088

**COMPLAINT - INFORMATION**
The undersigned, being duly sworn, upon his oath deposes and says that:

| on or about (date) | at (24 hour time) | at or near (location) |
| 2-17-96 | 17:07 | 2 Mi w of Coffmans Sto |

County Number 68 | East Control-Int. | | | | | | North Location | |

within the city, county and state aforesaid:

Name (last, first, middle): Barrett Kenneth Eugue    Phone number

Address: ▮▮▮▮▮▮▮▮▮▮

Vian    State: OK    Zip Code: 74962

Birthdate -61 | Height 5'10 | Weight 180 | Race W | Sex M | Class | Endorsements

none    Month/Year    State

Employer:    Did Unlawfully ☒   Operate ☐   Park ☐

| Vehicle Make | Year | Body Style-Color | Tag Number | Year | State |
| Chev | 69 | Plu Blu | none | | |

Commercial Motor Vehicle Y ☐ N ☐   ☐ Haz. Mat. Placard   ACCIDENT: ☐ PD ☐ PI ☐ FATALITY

and did then and there commit the following offense:

SPEEDING ___ MPH in ___ MPH Zone    Pace ☐  Radar ☐  Plane ☐  Other ☐

Other Violation: D.U.S. III

**Contrary to Statute/Ordinance:**

I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents thereof and that the facts supporting the criminal charge stated therein are true.

Terry L. Mathis   2-17-96   Badge No. 825   Dist. Seq.

Signature of Officer    Date

Sworn to and subscribed before me this ____ day of ____ 19__

____ Name and Title    My Commission Expires

Court Appearance: 21 day of feb, 19 96, at 8:00 A M   (DPS USE)

Address of Court 120 E. CHICKASAW SALLISAW, OK

NOTICE: Release upon personal recognizance based upon a signed written promise to appear for arraignment is conditional and failure to timely appear for arraignment shall result in suspension of the arrested person's driver license in Oklahoma, or in the nonresident's home state pursuant to the Nonresident Violator Compact.

WITHOUT ADMITTING GUILT, I promise to appear in said court at said time and place.

X SIGNATURE: _Kenneth Barrett_
(CHECK ONLY ONE BOX)

| Signed Personal Recognizance ☐ | Bond Attached ☐ | | ☐ Magistrate | ☒ Jail | ☐ Other |

☐ JUVENILE    Name of Parent or Guardian ____    Address ____

Officer's Remarks: ____

| AREA: HIGHWAY TYPE: | ☐ business | ☐ ind | | | |
| | ☐ 1 lane | ☒ | | | |

PlAp The game And
that was the exact words
he use. They have
treated wrong I fill
I thout there Job
was to protect and
serere
have I got sereved
right.

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

State of Oklahoma, )
      Plaintiff, )
    )
VS. )  CRM- 96-258
    )
~~Kenneth Barrett~~ )
    )
    )
_____ )
      **Defendant**

## ORDER TO APPEAR FOR DISPOSITION

You are hereby ordered to appear the __16__ day of __August__, 199_6_ at _____9:30_____ A. M. You should report to the Court Clerk's office on the second floor of the Sequoyah County Courthouse in Sallisaw. You should report thirty minutes prior to your appearance time. **NO Further Notice Will Be Given.**

Dated this __19th__ day of _____July_____, 199_6_

_____
**Judge of the District Court**

I understand I have been charged with a misdemeanor crime and must appear for a dispositional docket for the Court's review of my case. The purpose of the dispositional docket is to give me a chance to visit with an attorney from the District Attorney's Office. After the visit, if a plea bargain is reached, I may enter a plea of guilty in exchange for the state's recommendation. If no agreement is possible then I may request a jury trial.

Most Importantly I understand that my failure to appear at the date and time given above will result in the issuance of a warrant for my arrest and that my present bond will be forfeited.

_____
**Defendant**

**KEEP THIS FOR YOUR RECORDS AS NO FURTHER NOTICE WILL BE GIVEN**

Gold - Defendant's Copy

472

# SUBPOENA - - - Criminal Action

STATE OF OKLAHOMA, } SS:   IN DISTRICT COURT   CASE No. CRM–_____

Sequoyah County,   CRF – 97-86

In the Name of the State of Oklahoma

To FRANK LLoyd

DIsl. ATTY'S OFFice

Sequoyah County Courthouse, Sallesow, OR _____, GREETING:

YOU ARE COMMANDED to appear before the District Court of the County of Sequoyah, at the Court House in Sallisaw, State of Oklahoma, on the ____27th____ day of ____August____, 1997 at the hour of __1.00__ o'clock in the __After__ noon of said day, and remain in attendance on call of said court from day to day and term to term until lawfully discharged, as a witness in a criminal action prosecuted by the State of Oklahoma, against Kenneth Barrett _____ on behalf of the ____Defendant____

Dated at Sallisaw, in said Sequoyah County, the __25th__ day of ____August____, 1997

Hereof fail not, under penalty of law.

B e r n e l l   E d w a r d s , Court Clerk

By _Patty Lasater_

Deputy

473

## SUBPOENA - - - Criminal Action

STATE OF OKLAHOMA,  } SS:          IN DISTRICT COURT          CASE No.   CRM–_____
Sequoyah County,                                                        CRF – 97-86

In the Name of the State of Oklahoma

To FRANK LLoyd _____
___ DisT. ATTY's OFFice _____
___ Sequoyah County CourtHouse, Sallesow, OR _____, GREETING:
YOU ARE COMMANDED to appear before the District Court of the County of Sequoyah, at the Court House in Sallisaw,
State of Oklahoma, on the ____27th____ day of __August__, 19_97_ at the hour of _1.00_ o'clock
in the __After__ noon of said day, and remain in attendance on call of said court from day to day and term to term
until lawfully discharged, as a witness in a criminal action prosecuted by the State of Oklahoma, against
_Kenneth Barrett_____ on behalf of the ___Defendant_____

Dated at Sallisaw, in said Sequoyah County, the __25th_ day of __August_____, 19_97_
Hereof fail not, under penalty of law.


Bernell Edwards, Court Clerk

By _Patty Lasiter_

                                                        Deputy

474

# SUBPOENA - - - Criminal Action

STATE OF OKLAHOMA,
Sequoyah County, } SS:     IN DISTRICT COURT     CASE No.  CRM–_____
CRF – 97-86

In the Name of the State of Oklahoma

To FRANK LLoyd _____
Dist. Atty's office
Sequoyah County Courthouse, Sallesow, OR _____, GREETING:

YOU ARE COMMANDED to appear before the District Court of the County of Sequoyah, at the Court House in Sallisaw, State of Oklahoma, on the ___27th___ day of ___August___, 19 97 at the hour of __1.00__ o'clock in the __After__ noon of said day, and remain in attendance on call of said court from day to day and term to term until lawfully discharged, as a witness in a criminal action prosecuted by the State of Oklahoma, against ___Kenneth Barrett___ on behalf of the ___Defendant___

Dated at Sallisaw, in said Sequoyah County, the __25th__ day of ___August___, 19 97
Hereof fail not, under penalty of law.

Bernell Edwards, Court Clerk

By _Patty Lasater_

Deputy

475



# OKLAHOMA STATE BUREAU OF INVESTIGATION
Tahlequah Regional Laboratory
P.O. Box 767
Tahlequah, OK 74465
(918) 456-0653

## CRIMINALISTICS EXAMINATION REPORT

| | | | |
|---|---|---|---|
| LAB NO.: | 97-1078 | Reported To: | OBNDD |
| | | Address: | 3313 W. 45th |
| | | | Tulsa, Oklahoma   74107 |
| Date Received: | 01-29-97 | | |
| Date Reported: | 04-30-97 | | |
| Classification of Case: | Drugs | Submitted By: | Kevin Ottwell, OBN |
| | | | By Cert. Mail Z 346 910 200 |

Suspect(s):  Kenny BARRETT,
WM

Victim(s):

Description of Evidence:
Sealed manilla envelope containing sealed evidence envelope with OBN seal
#28610 containing manilla envelope containing:

#T1     Small ziplock plastic bag containing cellophane wrapper containing
        off white powder, net weight: 0.15 gram.
#T2     Piece of notebook paper with writing.

Analysis of Evidence:

| ITEMS: | ANALYSIS: |
|---|---|
| #T1 | Methamphetamine, Schedule II. |
| #T2 | Not analyzed. |

DWR/cr

Dennis W. Reimer
Senior Criminalist

Pursuant to Title 22 O.S. Section 751,
I hereby certify that I am maker of
this document, and that it is a true and
correct report of the findings of the
Oklahoma State Bureau of Investigation
Criminalistics Laboratory.



*Aug 27, 1997 @ 1:00 p.m.*

**DIANNE BARKER HARROLD**
DISTRICT ATTORNEY

**STATE OF OKLAHOMA**
**OFFICE OF THE DISTRICT ATTORNEY**
DISTRICT 27

SEQUOYAH COUNTY
120 EAST CHICKASAW
SALLISAW, OK 74955
(918) 775-9131

RE:   State v. *Barrett*                    CF- *97-86*

~~Preliminary Hearing~~ Date   *7-2-97*

Dear

   I have reviewed the above referenced file and, in order to streamline plea negotiations, convey the following recommendation:

1. Number of years: *15 yr Susp. Sent*
2. Subject to PSI reserving right to object to a deferred or or suspended:   Yes _____   No _____
3. Fine: $ *1000*
4. Victim of Crime Fund: $ *250* .
5. Drug Enforcement Fund: $ *100*
6. Restitution: $ *$150 lab fee*
7. Hours of Community Service: _____
8. Other: *Court Costs*

   I reserve the right to change this recommendation until your client's acceptance.  Please contact me if you have additional information or questions.

   Thank you for your consideration in this matter.

*R+c prob.*
*w/ substance abuse Tx*

Sincerely,

*S. Kent Barnes*
Assistant District Attorney

477

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA      )
               Plaintiff,     )
                       )
vs.                    )    Case No CF-97-86
                       )
KENNETH EUGENE BARRETT )
               Defendant.   )

FILED IN DISTRICT COURT SEQUOYAH COUNTY, OKLAHOMA
SEP 11 1998
BY BERNELL EDWARDS, COURT CLERK DEPUTY

## MOTION TO WITHDRAW

COMES NOW Bill Ed Rogers, Attorney for the Defendant, and moves this Court for its Order allowing him to withdraw as the Attorney of Record for this Defendant, Kenneth Eugene Barrett and in support of said Motion would show to this Court that during the last telephonic conversation with this Defendant the Defendant stated that he had lost confidence in movant's ability to represent this Defendant. That due to the statements of Defendant this Attorney can no longer continue in his capacity as Attorney in this case.

WHEREFORE, movant request that he be allowed to withdraw from further representation of the Defendant in this matter.

BILL ED ROGERS, OBA #7713
Attorney for Defendant
1103 E. Cherokee
Sallisaw, Ok  74955
(918) 776-0430

478

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA )
          Plaintiff, )
          )
          )
vs. )     Case No CF-97-86
          )
KENNETH EUGENE BARRETT )
         Defendant. )

## MOTION TO WITHDRAW

COMES NOW Bill Ed Rogers, Attorney for the Defendant, and moves this Court for its Order allowing him to withdraw as the Attorney of Record for this Defendant, Kenneth Eugene Barrett and in support of said Motion would show to this Court that during the last telephonic conversation with this Defendant the Defendant stated that he had lost confidence in movant's ability to represent this Defendant. That due to the statements of Defendant this Attorney can no longer continue in his capacity as Attorney in this case.

WHEREFORE, movant request that he be allowed to withdraw from further representation of the Defendant in this matter.

BILL ED ROGERS, OBA #7713
Attorney for Defendant
1103 E. Cherokee
Sallisaw, Ok 74955
(918) 776-0430

# BILL ED ROGERS
## 1103 E. CHEROKEE
## SALLISAW, OK  74955
## 918-776-0430   FAX 918-775-559

May 4, 1998

Mr. Kenneth Barrett

██████████████

Vian, Ok   74962

Kenny:

Since I have not received a response to my letter of March 25, 1998,  I need for you to contact me concerning my representation of you in the pending case.

Respectfully,

Bill Ed Rogers
Attorney at Law
1103 E. Cherokee
Sallisaw, Ok   74955
(918) 776-0430

March  25, 1998

Mr. Kenneth Barrett

Vian, OK  74962

Kenny:

You need to contact me, my records show there is a balance of $2,000.00 owed on your attorney fees at this time.

Respectfully,

Bill Ed Rogers
Attorney at Law
1103 E. Cherokee
Sallisaw, OK 74955
918-776-0430

BER/car

481



SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 0 4 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

STATE OF OKLAHOMA
## OFFICE OF THE DISTRICT ATTORNEY
DISTRICT 27

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

SEQUOYAH COUNTY
120 EAST CHICKASAW
SALLISAW, OK 74955
(918) 775-9131

TO:   **BILL ED ROGERS**
Attorney for Defendant

CASE NO. CF-97-86
State vs.
KENNETH BARRETT

Pursuant to Title 22, Section 258 of Oklahoma State Statutes, please be informed that the criminal file relating to the above captioned case is available for your inspection at least five (5) working days prior to the scheduled preliminary hearing date.

Please feel free to come by the District Attorney's office to inspect the file and contents.

Thank you!

DIANNE BARKER HARROLD
District Attorney

BY: _____
Assistant District Attorney
Sequoyah County

### CERTIFICATE OF MAILING

I hereby certify that on the _4th_ day of **August,** 1997, the foregoing notice was mailed, postage thereon fully prepaid, to said attorney of record:

BILL ED ROGERS
Attorney at Law
303 Fryar Drive
Sallisaw, OK

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

STATE OF OKLAHOMA
                    Plaintiff,

vs.                                    Case No. CF-97-86          SEP 2 1998

KENNETH BARRETT,
                    Defendant.

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## MOTION TO PRODUCE

COMES NOW the State of Oklahoma and moves that the District Court order the Defendant to provide the State with notice of insanity defense, notice of alibi defense, the names and addresses of all defense witnesses to be called at trial and the production of all reports and exhibits to be offered into evidence.

The State requests that the Defendant produce and disclose the following material:

1.  Notice of the use of Insanity Defense to include the names and addresses of any experts and copies of all reports made or used in the examination of the defendant. The names, addresses and witness statements relating to any mental defects or conditions of the defendant that the defense plans on introducing into evidence. Further, that said notice be provided at least twenty days prior to trial. 22 O.S.A. Section 1176.

2.  Written notice of the full names and addresses of all alibi witnesses to include the date, time and place of the alleged alibi together with the witness statement or summaries to those facts. Further that said notice be given at least ten days prior to trial. See 22 O.S.A. Section 585.

3.  The names and addresses of all witnesses the defense will call at trial together with their written or recorded statements or summaries of the same at least ten days prior to trial.

4.  The production of all written exhibits, physical evidence, photographs, mental or physical examination reports and any other scientific report or statement that the defense intends to offer into evidence at least ten days prior to trial.

In support of the State's motion, the State would cite Allen v. District Court of Washington County, State of Oklahoma, 803 P.2d 1164 (Okl.Cr. 1990). The State further requests the Court exclude any evidence or witness' testimony that is offered by the defense not provided sooner than ten days prior to trial.

Respectfully submitted,

DIANNE BARKER HARROLD, DISTRICT ATTORNEY

BY: _____
    ASSISTANT DISTRICT ATTORNEY

CERTIFICATE OF MAILING

483

reports made or used in the examination of the defendant. The names, addresses and witness statements relating to any mental defects or conditions of the defendant that the defense plans on introducing into evidence. Further, that said notice be provided at least twenty days prior to trial. 22 O.S.A. Section 1176.

2. Written notice of the full names and addresses of all alibi witnesses to include the date, time and place of the alleged alibi together with the witness statement or summaries to those facts. Further that said notice be given at least ten days prior to trial. See 22 O.S.A. Section 585.

3. The names and addresses of all witnesses the defense will call at trial together with their written or recorded statements or summaries of the same at least ten days prior to trial.

4. The production of all written exhibits, physical evidence, photographs, mental or physical examination reports and any other scientific report or statement that the defense intends to offer into evidence at least ten days prior to trial.

In support of the State's motion, the State would cite <u>Allen v. District Court of Washington County, State of Oklahoma</u>, 803 P.2d 1164 (Okl.Cr. 1990). The State further requests the Court exclude any evidence or witness' testimony that is offered by the defense not provided sooner than ten days prior to trial.

Respectfully submitted,

DIANNE BARKER HARROLD, DISTRICT ATTORNEY

BY: _____
ASSISTANT DISTRICT ATTORNEY

## CERTIFICATE OF MAILING

I hereby certify that on the ___24___ day of ___September___, 1998, I mailed a true and correct copy of the above and foregoing Motion to:

Bill Ed Rogers
Attorney at Law
1103 E. Cherokee
Sallisaw, OK 74955

attorney for the defendant herein with sufficient postage prepaid thereon.

_____

484



DIANNE BARKER HARROLD
DISTRICT ATTORNEY
STATE OF OKLAHOMA
DISTRICT 27

OFFICE OF THE DISTRICT ATTORNEY

SEQUOYAH COUNTY
120 E. Chickasaw
Sallisaw, OK 74955
(918) 775-9131
FAX: (918) 775-1215

September 2, 1998

Bill Ed Rogers
Attorney at Law
1103 E. Cherokee
Sallisaw, OK 74955

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP  2 1998

RE:   STATE vs. Kenneth Barrett
      Case No. CF-97-86

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

Dear Bill Ed:

      The above captioned case has been scheduled by Judge Garrett
for the September Jury Docket.

      Please consider this letter an offering to allow you to pickup
at this office all discovery materials in the District Attorney's
possession so that discovery can be accomplished in a timely
manner.

      If you wish to discuss this case further please feel free to
call or come by and see me.

Sincerely,

S. STEPHEN BARNES
ASSISTANT DISTRICT ATTORNEY

SSB:gb

485

# BILL ED ROGERS
## 1103 E. CHEROKEE
## SALLISAW, OK   74955
## 918-776-0430   FAX 918-775-5591

September 14, 1998

Kenneth Barrett

Vian, Ok   74962

In Re: State v. Kenneth Barrett
       CRF-97-86
       Sequoyah County Case

Kenneth:

     Enclosed is a copy of my Motion to Withdraw, which was filed last Friday. It is my understanding that Judge Garrett has set this motion for hearing on September 24, 1998, at the hour of 9:00 a.m.. If you cannot get a new Attorney before that date you can either ask for more time or if you can't afford one you can ask the Court to appoint one for you.

     As a result of my withdrawing from your case the date of your trial will also have to be moved.

Respectfully,

Bill Ed Rogers
1103 E. Cherokee
Sallisaw, Ok  74955

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 183**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255      *U.S. v. Barrett*, 6:09-cv-00105-JHP


487

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR CHEROKEE COUNTY

THE STATE OF OKLAHOMA,  )
      Plaintiff,  )
        )
vs.  )
        )
CHARLES E. SANDERS  )
        )
ADDR: █████████  )
      Oologah, OK  )    Case No. CM-2008-1525
SSN: ████9539  )
DOB: ████/66  )
        )
      Defendant,  )

**INFORMATION**

**FOR:**

**COUNT 1:**    **PETIT LARCENY~ 21 O.S. § 1704 a MISDEMEANOR**

**STATE OF OKLAHOMA, COUNTY OF CHEROKEE:**

    I, **Jerry S. Moore**, the undersigned District Attorney of said County, in the name and by the authority, and on behalf of the State of Oklahoma, give information that in said County of Cherokee and in the State of Oklahoma, **CHARLES E. SANDERS**, did then and there unlawfully, willfully, knowingly and wrongfully commit the crime(s) of:

**COUNT 1**    **PETIT LARCENY~ a MISDEMEANOR, on or about the 21st day of October, 2008, by taking and concealing a belt, a cap and some watches with a value of less than $200 that belonged to Wal Mart without the consent of Wal Mart and with the intent to deprive Wal Mart permanently.**

**This crime is punishable by imprisonment for up to 6 months or a fine of $10-$500, or both.**

JERRY S. MOORE
DISTRICT ATTORNEY

By: _David Pierce_
David Pierce
Assistant District Attorney

**WITNESSES ENDORSED FOR THE STATE OF OKLAHOMA**

Jason H. Girdner, Tahlequah Police Department, 101 S Cherokee, Tahlequah OK 74464
Tyler O'Neal, Wal Mart, 2020 S Muskogee, Tahlequah OK 74464
Danny McClain, Wal-Mart, 2020 S. Muskogee, Tahlequah OK 74464

## IN THE DISTRICT COURT OF CHEROKEE COUNTY, STATE OF OKLAHOMA

**STATE OF OKLAHOMA**
**VS.**

*Charles Sanders*

CASE NO: *CF 98-111*

*Cm-08-1525*

Fine(s) _____    Cost(s) _____

DOB _____    D.L.# _____

sub-totals

TOTALS

Address _____

CITY _____ STATE _____ ZIP _____

DATE: *10/22/08*    MINUTE ORDER: *P.C. Hearing*

*Petit Larceny* *$1000*
*Possession of CDS* *$2000*

*CF 98-111* ~~No bond~~ *$250 Cash bond*

**DEFENDANT IS ORDERED BACK:** *Oct 24*, 200*8* @ *8:30*, *A*m.

Payments of fines, costs, fees, etc. shall be payable by money orders or cashier's checks (no personal checks or cash)
Include your name and case number - Payments shall be paid to the following entities:

| FINES AND COURT COSTS | RESTITUTION | DRUG FUND |
|---|---|---|
| Total of _____ | Total of _____ | Total of _____ |
| Payable in monthly payments of | Payable in monthly payments of | Payable in monthly payments of |
| _____ for _____ months | _____ for _____ months | _____ for _____ months |
| 1st payment due: _____ | 1st payment due: _____ | 1st payment due: _____ |
| **Payable to:** | **Payable to:** | **Payable to:** |
| Cherokee County Court Clerk<br>213 W. Delaware, room 302<br>Tahlequah, OK 74464 | Office of District Attorney<br>Cherokee County Courthouse<br>213 W. Delaware<br>Tahlequah, OK 74464 | Office of District Attorney<br>Cherokee County Courthouse<br>213 W. Delaware<br>Tahlequah, OK 74464 |

**I, THE DEFENDANT, UNDERSTAND THAT I MUST PAY AND COMPLETE ALL THE THINGS LISTED ABOVE AND MUST APPEAR BACK IN COURT ON THE DATE AND TIME SET FORTH ABOVE OR I WILL BE ARRESTED AND JAILED!!**

X _____
DEFENDANT

_____
DISTRICT COURT JUDGE

_____
DEFENDANT'S ATTORNEY

_____
ASSISTANT DISTRICT ATTORNEY

# APPEARANCE BOND

S.A. & I. 408 (1993)

FILED
STATE OF OKLAHOMA
CHEROKEE COUNTY

2008 OCT 28   AM 8: 51

SHIRLEY GLORY
COUNTY CLERK

IN THE DISTRICT COURT OF _Cherokee_ COUNTY, STATE OF OKLAHOMA

State of Oklahoma,
    Plaintiff,

                                                                      _____ D.C.

vs. _Charlie Edmond Sanders_         Case No. _CM-08-1525_
            Defendant

    Know all men by these presents, that we the above named defendant, as principal, and the undersigned _Renee Allcorn_ as surety(ies), personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of _One Thousand_ Dollars ($_1,000_) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

    The conditions of this bond are such that, if the above named ,defendant, who has been committed to the county jail of _Cherokee_ County, State of Oklahoma, shall personally appear before the _____ Court of said County on the _24_ day of _Oct_, _2008_, at _8:30_ o'clock _A_.M., of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of _Petit Larc_, _____ and shall not depart the said Court without leave and shall obey any order issued by said Court, then this bond shall be void; otherwise, this bond shall remain in full force and effect.

Witness our hands and seals this _22_ day of _Oct_ _____, _2008_.

_____ Principal _P.O. Box 663  Oklahoma OK_ Address
_Renee Allcorn_    Surety _8630 Hwy 10 Tah_ _74055_ Address
_____ Surety _____ Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this _22_ day of _Oct_, _2008_.

_____ Court Clerk _____ Sheriff
_Jequeta Kilpatrick_ Deputy _Jequeta Kilpatrick_ Deputy
This undertaking approved this _23_ day of _Oct_, _2008_

_S. Glory_
_____ Court Clerk
_C. Hall_
(SEAL)                                _____ Deputy

## AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, _Cherokee_ COUNTY, SS:

The undersigned, being first duly sworn upon oath, says that he is a resident of _Rogers_
County, State of Oklahoma, and that

490

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as one who commits perjury.

_Renee Allcox_     _8630 Hwy 10 Tahlequah OK_
Affiant                    Address

Subscribed and sworn to before me this _____ day of _____, _____

(SEAL)
My Commission Expires:

_____          _____
                                 Court Clerk - Notary Public

_____          _____
                                 Deputy

## QUALIFICATION OF SURETY
### 12 O.S. 1991,§62

STATE OF OKLAHOMA     )          Amount of Bond

### POWER OF ATTORNEY
# RENEE MORTON
No 12913
#### PROFESSIONAL BONDSPERSON
8630 Highway 10, Tahlequah, OK 74464 · Phone (918) 458-9188

**KNOW ALL MEN BY THESE PRESENTS:** that RENEE MORTON, a professional bondsperson licensed by the State of Oklahoma, does constitute and appoint the below agent as my attorney-in-fact to execute bail bonds only in my name and on my behalf as surety. This power must be attached to and filed with the bail bond written on the defendant below named.

## THIS POWER OF ATTORNEY IS VOID IF ALTERED OR ERASED.

Dated this _22_ day of _Oct._, 20_08_. Bond Amount _1,000—_ Premium $_100—_

Defendant (Name) _Charles Edmond Sanders_     D.O.B. _1-11-66_

Case No._____ Offense _Pet. Larc._

Appearance Date _10-24-08_ Court/County _Cherokee_ City _Tah_ , Oklahoma

Date of Discharge_____ SS# ███████-_9539_ If Rewrite - Original Power No._____

_Renee Allcox_

_____          **RENEE MORTON**, Professional Bondsperson
Executing Agent

That the assessed valuation of the above described property is $_____
     Assessed valuation on tax rolls      $_____
     Times 4 for total assessed valuation      _____
     Less encumbrances      _____
     Market value      _____

### WAIVER OF HOMESTEAD EXEMPTION

Comes now _____ and _____,owners of the real property described in this undertaking, and state(s) that __ he __ hereby waive(s) any homestead exemption __ he __ may hold in and to such property.

_____

_____

### AFFIDAVIT FOR CASH BOND

I am worth, over and above all exemptions, debts, and liabilities, the sum of _____ ($_____ ).

491

# IN THE DISTRICT COURT OF CHEROKEE COUNTY, STATE OF OKLAHOMA

**STATE OF OKLAHOMA**
**VS.**

*Charles Sanders*

|  | Fine(s) | Cost(s) |
|---|---|---|
| CASE NO: *CM 08-1525* | | |
| *CF 98-111* | | |
| | | |

DOB          D.L.#

sub-totals

TOTALS

Address

CITY      STATE          ZIP

DATE: *10/28/08*          MINUTE ORDER: *1pm IA*

*△ PNG   J. Ainsley   FSD*

FILED STATE OF OKLAHOMA CHEROKEE COUNTY 2008 OCT 28 PM 2: 20 SHIRLEY GLORY COUNTY CLERK BY _____ D.C.

**DEFENDANT IS ORDERED BACK:** *Nov 24* , 200 *8* @ *9:00*, *A* m.

Payments of fines, costs, fees, etc. shall be payable by money orders or cashier's checks (no personal checks or cash)
Include your name and case number - Payments shall be paid to the following entities:

| FINES AND COURT COSTS | RESTITUTION | DRUG FUND |
|---|---|---|
| Total of _____ | Total of _____ | Total of _____ |
| Payable in monthly payments of | Payable in monthly payments of | Payable in monthly payments of |
| _____ for _____ months | _____ for _____ months | _____ for _____ months |
| 1st payment due: _____ | 1st payment due: _____ | 1st payment due: _____ |
| **Payable to:** | **Payable to:** | **Payable to:** |
| Cherokee County Court Clerk | Office of District Attorney | Office of District Attorney |
| 213 W. Delaware, room 302 | Cherokee County Courthouse | Cherokee County Courthouse |
| Tahlequah, OK 74464 | 213 W. Delaware | 213 W. Delaware |
| | Tahlequah, OK 74464 | Tahlequah, OK 74464 |

**I, THE DEFENDANT, UNDERSTAND THAT I MUST PAY AND COMPLETE ALL THE THINGS LISTED ABOVE AND MUST APPEAR BACK IN COURT ON THE DATE AND TIME SET FORTH ABOVE OR I WILL BE ARRESTED AND JAILED!!**

X _____          _____
DEFENDANT                                         DISTRICT COURT JUDGE

_____          _____
DEFENDANT'S ATTORNEY                      ASSISTANT DISTRICT ATTORNEY

492

## IN THE DISTRICT COURT OF CHEROKEE COUNTY, STATE OF OKLAHOMA

**STATE OF OKLAHOMA**

**VS.**

Charles ~~Alexander~~ J Sanders

| | Fine(s) | Cost(s) |
|---|---|---|

CASE NO: ~~CF-98-111~~
CF-98-111
CM-08-1525

DOB          D.L.#

sub-totals _____

TOTALS _____

Address

CITY          STATE          ZIP

DATE: 11-24-08          MINUTE ORDER: BWUA

*R. Allcom*

As bondperson I called to inform Court that I had eye sx. and could not travel for 10 days. I ordered to appear w/ note from Dr. and sign this minute w/in 10 days of this minute.

FILED
STATE OF OKLAHOMA
CHEROKEE COUNTY
2008 NOV 25 AM 8:36
SHIRLEY GLORY
COUNTY CLERK
BY: _____

**DEFENDANT IS ORDERED BACK:** 12/22 , 200 8 @ 9:00 A.m.

Payments of fines, costs, fees, etc. shall be payable by money orders or cashier's checks (no personal checks or cash)
Include your name and case number - Payments shall be paid to the following entities:

**FINES AND COURT COSTS**

Total of _____

Payable in monthly payments of

_____ for _____ months

1st payment due: _____

**Payable to:**

Cherokee County Court Clerk
213 W. Delaware, room 302
Tahlequah, OK 74464

**RESTITUTION**

Total of _____

Payable in monthly payments of

_____ for _____ months

1st payment due: _____

**Payable to:**

Office of District Attorney
Cherokee County Courthouse
213 W. Delaware
Tahlequah, OK 74464

**DRUG FUND**

Total of _____

Payable in monthly payments of

_____ for _____ months

1st payment due: _____

**Payable to:**

Office of District Attorney
Cherokee County Courthouse
213 W. Delaware
Tahlequah, OK 74464

**I, THE DEFENDANT, UNDERSTAND THAT I MUST PAY AND COMPLETE ALL THE THINGS LISTED ABOVE AND MUST APPEAR BACK IN COURT ON THE DATE AND TIME SET FORTH ABOVE OR I WILL BE ARRESTED AND JAILED!!**

_____
DEFENDANT

_____
DEFENDANT'S ATTORNEY

_____
DISTRICT COURT JUDGE

_____
ASSISTANT DISTRICT ATTORNEY

493

## IN THE DISTRICT COURT OF CHEROKEE COUNTY, STATE OF OKLAHOMA

**STATE OF OKLAHOMA**

**VS.**

Charles Edmond Sanders

CASE NO: CF-98-111
CM-08-1525

Fine(s)        Cost(s)

sub-totals

TOTALS

2008 DEC 23 AM 7:17
SHIRLEY ELORY COUNTY CLERK

DOB        D.L.#

Address

CITY        STATE        ZIP

DATE: 12-22-08        MINUTE ORDER:

Δ pres w/out his attorney Rob Cowan. Case reset to FSD.

**DEFENDANT IS ORDERED BACK:** January 26, 2009 @ 9 A.m.

Payments of fines, costs, fees, etc. shall be payable by money orders or cashier's checks (no personal checks or cash)
Include your name and case number - Payments shall be paid to the following entities:

| FINES AND COURT COSTS | RESTITUTION | DRUG FUND |
|---|---|---|
| Total of _____ | Total of _____ | Total of _____ |
| Payable in monthly payments of | Payable in monthly payments of | Payable in monthly payments of |
| _____ for _____ months | _____ for _____ months | _____ for _____ months |
| 1st payment due: _____ | 1st payment due: _____ | 1st payment due: _____ |
| **Payable to:** | **Payable to:** | **Payable to:** |
| Cherokee County Court Clerk 213 W. Delaware, room 302 Tahlequah, OK 74464 | Office of District Attorney Cherokee County Courthouse 213 W. Delaware Tahlequah, OK 74464 | Office of District Attorney Cherokee County Courthouse 213 W. Delaware Tahlequah, OK 74464 |

**I, THE DEFENDANT, UNDERSTAND THAT I MUST PAY AND COMPLETE ALL THE THINGS LISTED ABOVE AND MUST APPEAR BACK IN COURT ON THE DATE AND TIME SET FORTH ABOVE OR I WILL BE ARRESTED AND JAILED!!**

DEFENDANT

DEFENDANT'S ATTORNEY

DISTRICT COURT JUDGE

ASSISTANT DISTRICT ATTORNEY

494

## IN THE DISTRICT COURT OF CHEROKEE COUNTY, STATE OF OKLAHOMA

**STATE OF OKLAHOMA**

**VS.**

*Charles Edmond Sanders*

CASE NO: *CF-98-111*

*CM-08-1525*

Fine(s)    Cost(s)

DOB          D.L.#

sub-totals

TOTALS

Address

CITY    STATE    ZIP

DATE: *1-26-09*    MINUTE ORDER:

*∆'s atty called and in jury trial*

*750*

**DEFENDANT IS ORDERED BACK:** *2/23* , 200*9* @ *9:00* A.m.

Payments of fines, costs, fees, etc. shall be payable by money orders or cashier's checks (no personal checks or cash) Include your name and case number - Payments shall be paid to the following entities:

| FINES AND COURT COSTS | RESTITUTION | DRUG FUND |
|---|---|---|
| Total of _____ | Total of _____ | Total of _____ |
| Payable in monthly payments of | Payable in monthly payments of | Payable in monthly payments of |
| _____ for _____ months | _____ for _____ months | _____ for _____ months |
| 1st payment due: _____ | 1st payment due: _____ | 1st payment due: _____ |
| **Payable to:** | **Payable to:** | **Payable to:** |
| Cherokee County Court Clerk 213 W. Delaware, room 302 Tahlequah, OK 74464 | Office of District Attorney Cherokee County Courthouse 213 W. Delaware Tahlequah, OK 74464 | Office of District Attorney Cherokee County Courthouse 213 W. Delaware Tahlequah, OK 74464 |

**I, THE DEFENDANT, UNDERSTAND THAT I MUST PAY AND COMPLETE ALL THE THINGS LISTED ABOVE AND MUST APPEAR BACK IN COURT ON THE DATE AND TIME SET FORTH ABOVE OR I WILL BE ARRESTED AND JAILED!!**

_____    _____
DEFENDANT                    DISTRICT COURT JUDGE

_____    _____
DEFENDANT'S ATTORNEY         ASSISTANT DISTRICT ATTORNEY

IN THE DISTRICT COURT OF THE 15TH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR CHEROKEE COUNTY

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| | ) | CF-1998-111 |
| vs. | ) | CM-2008-1525 |
| | ) | |
| CHARLES SANDERS, | ) | |
| Defendant. | ) | |

## MOTION FOR CONTINUANCE

COMES NOW, the Defendant, Charles Sanders, by and through his attorney, Rob Cowan, and moves this court to continue the Hearing in above entitled case. In support of this motion the defendant presents the statements in the attached affidavit. This motion is being presented in the interest of justice and not for purposes of delay.

WHEREFORE, PREMISES CONSIDERED, the Defendant, Charles Sanders, respectfully requests this court to grant a continuance in the above entitled cases.

Respectfully submitted,

Rob Cowan, OBA#16413
Attorney for Defendant
P.O. Box 41
Poteau, OK 74953
(918) 649-0675

## CERTIFICATE OF DELIVERY

I certify that on the 10th day of February, 2009, I delivered a true and correct copy of the above Entry of Appearance to: Office of District Attorney, Cherokee County Courthouse, 213 W. Delaware Tahlequah, OK 74464

Rob Cowan

## AFFIDAVIT

STATE OF OKLAHOMA )
) ss
COUNTY OF LEFLORE )

I, Rob Cowan, affiant, of lawful age, being first duly sworn upon my oath, state the following:

1) I am the attorney of record for Charles Sanders in the above entitled case;

2) The above entitled case is set for Hearing on February 23, 2009.

3) Attorney for Defendant will be in Haskell County in Trial

4) This motion is in good faith and not for purposes of unnecessary delay.

_____
Rob Cowan, Affiant

Subscribed and sworn to before me this 10th day of February, 2009.

Notary Public

IN THE DISTRICT COURT OF THE 15TH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR CHEROKEE COUNTY

| | | | |
|---|---|---|---|
| STATE OF OKLAHOMA, | ) | | |
| Plaintiff, | ) | | |
| | ) | CF-1998-111 | |
| vs. | ) | CM-2008-1525 | |
| | ) | | |
| CHARLES SANDERS, | ) | | |
| Defendant. | ) | | |

DATE: February 10, 2009                                          JUDGE: Pursley

## ORDER FOR CONTINUANCE

Now on this 10th day of February, 2009, this matter come before the Court on the Defendant's

Motion for Continuance. The Court finds that for good cause shown, the above entitled shall be

continued.

IT IS THEREFORE ORDERED, that the above entitled case are continued at the defendant's

request. This matter is set for Hearing on the **23, day of March, 2009 at 9:00 o'clock A.M.**

IT IS SO ORDERED

_____
Judge of the District Court

cc:     Office of the District Attorney
        Cherokee County Courthouse

        Rob Cowan
        Attorney for the Defendant



IN THE DISTRICT COURT IN AND FOR CHEROKEE COUNTY

STATE OF OKLAHOMA

| | |
|---|---|
| STATE OF OKLAHOMA, Plaintiff, | ) ) ) |
| vs. | ) Case No. CRM-87- 743 |
| CHARLES E. SANDERS | ) ) |
| Defendant. | ) |

INFORMATION FOR:
ASSAULT AND BATTERY

INFORMATION

| | | |
|---|---|---|
| STATE OF OKLAHOMA | ) | |
| | ) | ss |
| COUNTY OF CHEROKEE | ) | |

I, the  undersigned District Attorney of said County, in the name
by the authority, and on behalf of the State of Oklahoma, give
information, that on or about the 13th day of October, 1987, in  said
County of Cherokee  and  State of Oklahoma one, CHARLES E. SANDERS, did
then and there unlawfully, willfully,  and wrongfully commit an assault
and battery upon  the person of one TERESA TAYLOR, by  then  and  there
striking and beating her  about  the  head and body with his hands and
fists with force and violence and with  the  unlawful  intent to do her
corporal hurt and bodily injury,

21-644

contrary to the form and statute in such cases made  and  provided  and
against the peace and dignity of the state.

| | | |
|---|---|---|
| STATE OF OKLAHOMA | ) | |
| | ) | ss |
| COUNTY OF CHEROKEE | ) | |

I do  hereby  solemnly  swear  that  I  have  read  the above and
foregoing information, know  the   content   thereof,   and   that  the
statements therein contained are true.

_Teresa Taylor_

Subscribed and sworn to before me this 14th day of October, 1987.

_Connie L. Longley_
NOTARY PUBLIC

My Commission Expires:  11/7/89

I hereby  state  that  I  have  examined  the  facts  herein  and
recommend that a warrant issue.

GERALD HUNTER, DISTRICT ATTORNEY

BY: _____

WITNESSES FOR THE STATE OF OKLAHOMA
Keith Howell, P.O. Box 176, Ft. Gibson, Ok.
Teresa Taylor, Rt. 2 Box 115, Ft. Gibson, Ok.
Mike Stillwell, Rt.2 Box 115, Ft. Gibson, Ok.
Ernie Tiger, 213 W. Delaware, Tahlequah, Ok.

RECORDED 425
BOOK _____ PAGE 186

IN THE DISTRICT COURT IN AND FOR CHEROKEE COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,  )
      Plaintiff,  )
  )
vs.  )    Case No. CRM-87- 743
  )
  )
CHARLES E. SANDERS  )
  )
  )
      Defendant(s).  )

### AFFIDAVIT

The undersigned upon oath deposes and states as follows, to-wit:

That the above named defendant, CHARLES E. SANDERS, forcibly entered the home of Teresa Taylor and struck and beat her on the head and body with his fists.

Based on this information, the undersigned prays that this Honorable Court issue a finding of fact that probable cause exists to believe that a crime has been committed and that there is probable cause to believe the defendant(s) above named committed that crime.

_Teresa Taylor_
AFFIANT

SUBSCRIBED and sworn to before me this _____14th_____ day of
____October____ , 19_87_

_Connie L. Longley_
NOTARY PUBLIC

My Commission Expires:
____11/7/89____

### FINDING OF PROBABLE CAUSE

The undersigned Judge of this Court, upon sworn testimony and/or affidavit, herein determines there to be probable causes to detain the defendant(s).

DATED this _____14th_ day of _____October_____ 19_87_.

_____
ASSOCIATE DISTRICT JUDGE

500

WARRANT OF ARREST -- DISTRICT COURT--     DAY OR NIGHT                    NO.   CRM-87- _143_

STATE OF OKLAHOMA       } SS.
CHEROKEE COUNTY         }

TO THE SHERIFF OF THE COUNTY OF CHEROKEE: OR TO ANY SHERIFF, CONSTABLE, MARSHAL OR POLICEMAN

OF THIS STATE: COMPLAINT ON OATH HAVING BEEN THIS DAY LAID BEFORE ME, THAT THE CRIME OF

__ASSAULT AND BATTERY__ _500.00_ _____
  BOND:   $ _____

_____

_____

_____

_____

_5'5", 115 lbs._____
 w/m dob:  ████ /66    ████     Sallisaw, Ok. _____

HAS BEEN COMMITTED, AND ACCUSING   CHARLES E. SANDERS _____  THEREOF:

YOU ARE THEREFORE COMMANDED, FORTHWITH TO ARREST THE ABOVE NAMED _____

___CHARLES E. SANDERS_____ AND BRING HIM BEFORE ME AT MY OFFICE IN SAID COUNTY, TO
ANSWER SAID CHARGE.

DATED AT TAHLEQUAH, THIS _14th_ DAY OF ___October_____, 19_87_

WITNESS MY HAND AND OFFICAL SEAL.          _____
                                              JUDGE OF THE DISTRICT COURT


RETURN OF SERVICE

STATE OF OKLAHOMA, COUNTY OF CHEROKEE, SS.

    RECEIVED THIS WRIT THE _____ DAY OF _____ 19_____, AND EXECUTED IT BY

ARRESTING THE WITHIN NAMED _____ AND NOW HAVE HIS BODY BEFORE

THE COURT.

FEES-SERVICE AND RETURN OF WRIT      $_____
SERVICE ON FIRST PERSON              $_____
SERVICE-ADDITIONAL PERSONS           $_____
BRINGING PRISONER INTO COURT         $_____
ATTENDING EXAMINATION                $_____
MILEAGE _____ MILES

_____             $_____
_____             $_____
                                                        _____
                                                              SHERIFF

TOTAL ---------------------           $_____

501

IN THE DISTRICT COURT IN AND FOR CHEROKEE COUNTY
DIVISION, STATE OF OKLAHOMA

STATE OF OKLAHOMA )
)
_____ )
Plaintiff, )
) CASE NO.
·vs· )
) CRF-87-298
) ~~CRF-87-299~~
CHARLES E. SANDERS ) ~~CRF-87-300~~
) ~~CRM-87-743~~
EVELYN SANDERS )
Defendant. )

**COURT MINUTE**
**(Summary)**

WILLIAM H. BLISS _____JUDGE.

_____,REPORTER.

DATE: 10/16/87 _____ TIME: _____

1987 OCT 16 PH 3: 23

APPEARANCES: Plaintiff's attorney DOAK WILLIS _____

Defendant's attorney S. DAN GEORGE _____

Other _____

CAUSE COMES ON FOR: ARRAIGNMENT PLEA NOT GUILTY
AT REQUST MR. WILLIE

RULING/FINDING BY COURT: DEFENDANT'S BOND IS SET AT $3000.00 FOR EACH DEFENDANT ON

ALL CASE'S: CRF-87-298, CRF-87-299, CRF-87-300, CRM-87-743

PRELIMINARY HEARING DATE IS SET FOR NOVEMBER 23, 1987 @ 1:30 p.m,

BEFORE JUDGE LYNN BURRIS.

_____ ORDERED TO DRAW JOURNAL ENTRY

☒ Clerk ordered to send stamped, filed copy.

WILLIAM H. BLISS _____
DISTRICT JUDGE

**CERTIFICATE OF MAILING**

Copy of the above minute was mailed on this 16 day of Oct , 19 87,
to all attorneys of record as shown on the Civil Docket.

_____
Deputy Court Clerk

502

SUBPOENA IN CRIMINAL CASE  -- DISTRICT COURT        M-87-743

| STATE OF OKLAHOMA | ) | | THE STATE OF OKLAHOMA TO THE SHERIFF |
| | ) ss | | OF CHEROKEE COUNTY |
| CHEROKEE COUNTY | ) | | |

GREETINGS:

ORIGINAL

YOU ARE HEREBY COMMANDED to summons:

| Keith Howell, | ███ | Ft. Gibson, Ok. 478-2500 | 11-11-87 MH |
| Teresa Taylor, | | Ft. Gibson, Ok. | 11-11-87 MH |
| Mike Stillwell | | Ft. Gibson, Ok. 478-4310 | 11-11-87 MH |
| Ernie Tiger, | | Tahelquah, OK. | 11-10-87 MH |

to be and appear before the District Court of the County of Cherokee, at Tahlequah, in said County, on the __23__ day of __November__ A.D., 19__87__, at __1:30__ o'clock __P__ M., then and there to give testimony, and the truth to say, in a certain case, pending in said Court, wherein the State of Oklahoma prosecutes _____

____CHARLES E. SANDERS AND EVELYN SANDERS____

on behalf of the STATE OF OKLAHOMA

HEREOF FAIL NOT, under penalty of law, and have you then and there this writ.

Witness my hand and seal of this Court at Tahlequah, OK, this __10__ day of __November__, A.D., 19__87__.

Please call this office, 456-6173 before time for the hearing so we will be able to advise you at that time, if the case will definitely be heard.

COURT CLERK

DEPUTY

OFFICE OF THE DISTRICT ATTORNEY

| STATE OF OKLAHOMA | ) | |
| | ) ss | |
| CHEROKEE COUNTY | ) | |

This subpoena came into my hands this __10__ day of __Nov__ 19__87__, and I certify that I personally served the same on the within named persons by reading the same to _____All the above names____

_____

in this County and delivering _____

a copy except _____

who were not found.

11-11-87

SHERIFF BY: Mary H ottley                DEPUTY

IN THE DISTRICT COURT IN AND FOR CHEROKEE COUNTY

STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| PLAINTIFF | ) | |
| | ) | |
| VS. | ) | CRM 87-743 |
| | ) | |
| Charles Sanders | ) | |
| DEFENDANT | ) | |

## DISMISS ON COSTS

NOW, on this 23rd day of November , 1987 , the defendant appears ~~in person and by~~ their attorney of record, Dan George ____ at complaining witness' request, _____, and ~~on motion of the State~~, the case is hereby dismissed upon payment of court costs.

_Signature_

_____
ASSOCIATE DISTRICT JUDGE

```
                                        D.O.B. 01/11/66
                                        SS#    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
                                        DL#
```

BENCH WARRANT
===================================================================
                                        Case No. CRM-1987-00743

        IN THE DISTRICT COURT OF CHEROKEE COUNTY, STATE OF OKLAHOMA:

THE STATE OF OKLAHOMA, TO ANY SHERIFF, CONSTABLE, OR POLICEMAN IN THIS STATE:

                        CHARLES EDMOND SANDERS

having been, on 03/21/2001, duly charged in the District Court of Cherokee

County, State of Oklahoma, of the crime of

            BENCH WARRANT-FAILURE TO PAY FINE AND COST
                    (ASSAULT AND BATTERY)

you are hereby commanded forthwith to arrest the above named:

                        CHARLES EDMOND SANDERS

                                ,


and bring him/her before that Court for judgment, or if the Court has adjourned

for the term, you are to deliver him/her into the custody of the Sheriff of

Cherokee County, State of Oklahoma.

        Given under my hand, with the seal of said Court affixed on 03-22-2001

By order of the Court                M. MARGARET ROBBINS      , Court Clerk

_____
           Judge
     Cash
Bond Amount: $ 116.00                 By  C. Davis             , Deputy


===================================================================
                        OFFICER'S RETURN
    I RECEIVED THIS BENCH WARRANT ON THE _____ DAY OF _____, _____, AND

EXECUTED SAME ON THE _____ DAY OF _____, _____, BY _____

_____

                                _____SHERIFF

                        BY_____DEPUTY
```

IN THE DISTRICT COURT OF CHEROKEE COUNTY
STATE OF OKLAHOMA

WARRANT RECALL NOTICE

CASE NUMBER: *Crm 87- 743*

DEFENDANT(S): *Charles Edmond Sanders*

DATE WARRANT
ISSUED: *3-21-01*

TO:   COUNTY SHERIFF

YOU ARE HEREBY DIRECTED TO IMMEDIATELY RECALL THE WARRANT
IN THIS CASE WHICH WAS ISSUED ON THE ABOVE DATE.

M. MARGARET ROBBINS, COURT CLERK

BY: _S Glory_____DEPUTY

ORIGINAL FILED AND COPY TAKEN TO CHEROKEE COUNTY SHERIFF ON THIS

_15_ DAY OF _August_____, 20_01_.

506

Recalled 8-15-2001

D.O.B. 01/11/66
SS#    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
DL#

BENCH WARRANT
=============================================================

Case No. CRM-1987-00743

IN THE DISTRICT COURT OF CHEROKEE COUNTY, STATE OF OKLAHOMA:

THE STATE OF OKLAHOMA, TO ANY SHERIFF, CONSTABLE, OR POLICEMAN IN THIS STATE:

CHARLES EDMOND SANDERS

having been, on 03/21/2001, duly charged in the District Court of Cherokee

County, State of Oklahoma, of the crime of

BENCH WARRANT-FAILURE TO PAY FINE AND COST
(ASSAULT AND BATTERY)

you are hereby commanded forthwith to arrest the above named:

CHARLES EDMOND SANDERS

and bring him/her before that Court for judgment, or if the Court has adjourned

for the term, you are to deliver him/her into the custody of the Sheriff of

Cherokee County, State of Oklahoma.

Given under my hand, with the seal of said Court affixed on 03-22-2001

By order of the Court                    M. MARGARET ROBBINS          , Court Clerk

_____
                  Judge

Cash
Bond Amount: $ 116.00            By  C. Davis              , Deputy

=============================================================
OFFICER'S RETURN

I RECEIVED THIS BENCH WARRANT ON THE _____ DAY OF _____, _____, AND

EXECUTED SAME ON THE _____ DAY OF _____, _____, BY _____

_____

_____SHERIFF

BY_____DEPUTY

507

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR CHEROKEE COUNTY

STATE OF OKLAHOMA )
)
Plaintiff, )
)
vs. ) CASE NO. CF-98- 111
)
CHARLES EDMOND SANDERS, )
DOB: ███-66 )
SS#: ███-9539 )
)
Defendant. )

# INFORMATION

## IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:

DIANNE BARKER-HARROLD, the District Attorney for Cherokee County, Oklahoma, charges
**Charles Edmond Sanders** with:

## UTTERING A FORGED INSTRUMENT

On or about April 13, 1998, in Cherokee County, Oklahoma, **Charles Edmond Sanders while
acting in concert with Teresa Lynn Jordan,** committed the crime of Uttering a Forged Instrument,
a felony in violation of 21 O.S. 1592, by uttering as true to Food 4 Less Grocery Store of Tahlequah a
check purporting to have been issued by Billy Tackett that stated as follows:

Check No. 2039

Pay to the Order of Food For Less          $333.61
Three Hundred Thirty-Three and 61/100 Dollars

with the intent to defraud and knowing that the check was forged. This crime is punishable by
imprisonment for up to 7 years.

DIANNE BARKER-HARROLD,
DISTRICT ATTORNEY

By _____
FRANK M. MEDEARIS
ASSISTANT DISTRICT ATTORNEY

STATE OF OKLAHOMA )
) ss.
COUNTY OF CHEROKEE )

I, Dale L. Glory, being duly sworn, on oath state, that I have read the above and foregoing
information and know the contents thereof and that the facts stated therein are true.

_____

Subscribed and sworn to before me this 21ˢᵗ day of April, 1998.

_____
Notary Public

My Commission Expires:
May 28, 1999

TSIO-1384

**WITNESSES:**
Dale L. Glory, TPD, 101 S. Cherokee, Tahlequah, OK
Billy Dowling, TPD, 101 S. Cherokee, Tahlequah, OK
Billy Ivan Tackett, P.O. BOX 501, Collinsville, OK 74021
Kendra Porter, 503 W. Allen Rd., #3A, Tahlequah, OK
Misti White, 216 W. Chickasaw, Tahlequah, OK

IN THE DISTRICT COURT OF CHEROKEE COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                    )
    Plaintiff,                          )
                                        )
vs.                                   )   CASE NO. CF-98- 111
                                        )
CHARLES EDMOND SANDERS,               )
    Defendant.                          )

## AFFIDAVIT FOR PROBABLE CAUSE

The undersigned upon oath deposes and states as follows, to-wit:

This affiant hereby states that he is a detective with the Tahlequah City Police Department, Tahlequah, Cherokee County, Oklahoma. That on the 12th day of April, 1998, the Tahlequah City Police Department received a report from one Billy Tackett who stated that the drivers side window to his Dodge pickup truck had been broken and that someone had entered his truck and taken numerous personal items including a his check book. On April 15, 1998, check number 2039 on the account of Billy Tackett was uttered at Food 4 Less Grocery Store of Tahlequah, Cherokee County, Oklahoma. The cashier at the time requested identification from a gentleman, later identified as the defendant, Charles Edmond Sanders, who signed the check. Charles Edmond Sanders stated that he did not have any identification. The cashier then requested a check okay from management. The manager on duty requested identification from the female who was accompanying the defendant, later identified as Teresa Lynn Jordan.

On April 15, 1998, this affiant interviewed both Charles Sanders and Teresa Lynn Jordan and at that time they both confessed to uttering the forged check to Food 4 Less in the amount of $333.61.

Based on this information, the undersigned prays that this Honorable Court issue a finding of fact that probable cause exists to believe that a crime has been committed and that there is probable cause to believe the defendant above named committed that crime.

_____
AFFIANT

Subscribed and sworn to before me this 21st day of April, 1998.

_____
Notary Public

My Commission Expires:
  May 28, 1999

## FINDING OF PROBABLE CAUSE

The undersigned Judge of this Court, upon sworn testimony and/or affidavit, herein determines there to be probable cause to detain the defendant.

Dated this 22 day of _____April____, 1998.

_____
JUDGE OF THE DISTRICT COURT

IN THE DISTRICT COURT IN AND FOR CHEROKEE COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | Case No. CF-98-111 |
| v. | ) | |
| Charles E. Sanders, | ) | |
| Defendant. | ) | |

## PERSONAL RECOGNIZANCE

I hereby request the Court to order my release on this Personal Recognizance. I understand that I am being charged with certain crimes and that I must appear in court on the date listed below and each time thereafter that the Court orders me to appear. I understand that if I do not appear a bench warrant will be issued for my arrest.

I have been advised that anyone so released who willfully fails to surrender himself/herself after violation of this order, by failing to appear in court, can be charged with Bailjumping and shall upon conviction be guilty of a felony and may be fined up to $5,000.00 or imprisoned for not more than two (2) years, or both.

I further understand that by completing this form and promising to return to court each time, I will be released from jail.

I also understand that it is my duty to keep the Court advised of any change of address, and that my failure to do so will constitute no excuse for my absence and the resulting consequences.

I promise to appear in Court on the ___5th___ day of ___May___, 19 _98_ at ___1:50___ o'clock _P_.m.

_____Charles Sanders_____
Defendant

_____
Address

Approved and Release Ordered:

Dated: ___4/24/98___

_____
JUDGE OF THE DISTRICT COURT

**IN AND FOR THE DISTRICT COURT, CHEROKEE COUNTY
STATE OF OKLAHOMA**

STATE OF OKLAHOMA
                    PLAINTIFF,

VS.

*Charles Sanders*
                    DEFENDANT,

CASE NO. CF 98-141

DEFENDANT ENTERS A PLEA OF:
GUILTY: _____
NO CONTEST: _____
NOT GUILTY: _____

△ FTA
B/W
$10,000 Bond

**ORDER**

YOU HAVE BEEN ASSESSED THE COST AND/OR FINE IN THE ABOVE STYLED AND NUMBERED CASE IN

THE AMOUNT OF $ _____ .

YOU ARE HEREBY ORDERED TO PAY THE SUM OF $ _____ TO BE PAID IN _____ INSTALLMENTS

OF $ _____ , PAYABLE ON THE _____ DAY OF_____

_____ 19 _____ AND CONTINUING THEREAFTER._____ ,

_____ UNTIL PAID IN FULL.

DEFENDANT IS ORDERED BACK: _____ _____ 199 ____, AT _____ ____ . M.

YOUR WILLFUL FAILURE TO PAY AS ORDERED ABOVE, WILL RESULT IN A BENCH WARRANT BEING ISSUED
FOR YOUR ARREST AND WILL FURTHER SUBJECT YOU TO CONTEMPT OF COURT PROCEEDINGS AND
FURTHER JAIL SENTENCE.

1:00 P.M. ARRAIGNMENTS

DATED THIS __12TH__ DAY OF _____MAY_____ 19 __98__

I HAVE READ AND UNDERSTAND
THE ABOVE COURT ORDER.....        _____MARK L. DOBBINS_____
                                  JUDGE, CHEROKEE COUNTY, OKLAHOMA

_____
   DEFENDANT'S SIGNATURE

        MAKE MONEY ORDERS        M. MARGARET ROBBINS
            PAYABLE TO:          COURT CLERK

              MAIL TO:           213 W. DELAWARE, ROOM 302
                                 TAHLEQUAH, OK 74464

        SEND STAMPED SELF-ADDRESSED ENVELOPE FOR RETURN RECEIPT
              INCLUDE CASE NUMBERS ON ALL MONEY ORDERS
                  NO PERSONAL CHECKS ACCEPTED
WHITE COPY COURT              YELLOW COPY D.A.            PINK COPY DEFENDANT

IN THE DISTRICT COURT IN AND FOR CHEROKEE COUNTY
STATE OF OKLAHOMA

WARRANT RECALL NOTICE

CASE NUMBER: _CF-98-111_

DEFENDANT: _Charles Sanders_

DATE WARRENT ISSUED; _May 12, 1998_

TO: _Cherokee_ COUNTY SHERIFF

YOU ARE HEREBY DIRECTED TO IMMEDIATELY RECALL THE WARRENT
IN THIS CASE WHICH WAS ISSUED ON THE ABOVE DATE.

M. MARGARET ROBBINS,
COURT CLERK

BY; _____
Deputy

ORIGINAL FILED AND COPY TAKEN TO _Cherokee_ _____ COUNTY
SHERIFF THIS _22nd_ DAY OF _May_, 1998.

## IN AND FOR THE DISTRICT COURT, CHEROKEE COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA

PLAINTIFF,

VS.                                                            CASE NO. _CF-98-111_

_Charles Sanders_

DEFENDANT,

DEFENDANT ENTERS A PLEA OF:

GUILTY: _____

NO CONTEST: _____

NOT GUILTY: _____

**ORDER**

YOU HAVE BEEN ASSESSED THE COST AND/OR FINE IN THE ABOVE STYLED AND NUMBERED CASE IN

THE AMOUNT OF $ _____.

YOU ARE HEREBY ORDERED TO PAY THE SUM OF $ _____ TO BE PAID IN _____ INSTALLMENTS

OF $ _____, PAYABLE ON THE _____ DAY OF _____

_____ 19 _____ AND CONTINUING THEREAFTER _____,

_____ UNTIL PAID IN FULL.

DEFENDANT IS ORDERED BACK: _____ _June 1_ 199 _8_, AT _9:00_ _A_. M.

YOUR WILLFUL FAILURE TO PAY AS ORDERED ABOVE WILL RESULT IN A BENCH WARRANT BEING ISSUED FOR YOUR ARREST AND WILL FURTHER SUBJECT YOU TO CONTEMPT OF COURT PROCEEDINGS AND FURTHER JAIL SENTENCE.

DATED THIS _21_ DAY OF _May_ 19 _98_

I HAVE READ AND UNDERSTAND
THE ABOVE COURT ORDER.....

_____
JUDGE, CHEROKEE COUNTY, OKLAHOMA

_____
DEFENDANT'S SIGNATURE

MAKE MONEY ORDERS          M. MARGARET ROBBINS
PAYABLE TO:                COURT CLERK

MAIL TO:                   213 W. DELAWARE, ROOM 302
                           TAHLEQUAH, OK 74464

SEND STAMPED SELF-ADDRESSED ENVELOPE FOR RETURN RECEIPT
INCLUDE CASE NUMBERS ON ALL MONEY ORDERS
NO PERSONAL CHECKS ACCEPTED

WHITE COPY COURT          YELLOW COPY D.A.          PINK COPY DEFENDANT

*Recalled* 5/22/98 *by K. Spencer*

**ORIGINAL**

DAY OR NIGHT ARREST

COURT OF CHEROKEE COUNTY

BENCH WARRANT

STATE OF OKLAHOMA      )
                      ) SS.          NO. CF-98-111

COUNTY OF CHEROKEE    )

THE STATE OF OKLAHOMA

 TO THE SHERIFF OF CHEROKEE COUNTY, OKLAHOMA OR ANY SHERIFF OR
DEPUTY SHERIFF OR ANY OTHER OFFICER AUTHORIZED BY LAW TO SERVE
CRIMINAL PROCESS:

CHARLES SANDERS  with the crime of FAILURE TO APPEAR

ADDRESS:
PLACE OF EMPLOYMENT
DOB: ████66      SS#: ████-9539      SEX;
HGT:      WGT:      EYE:      RACE
TELEPHONE NUMBER:      BOND; $10,000.00

 YOU ARE THEREFORE COMMANDED forthwith to arrest the said    CHARLES
SANDERS  and bring him/her before the Court of Cherokee County, Oklahoma, or
if the Court be adjourned or be not in session that you retain him/her in
your custody in the County Jail in the County in which you arrest him /her or
that you deliver him/her into the custody of the Sheriff of Cherokee County,
Oklahoma, subject to the further order of this Court.

 WITNESS my hand and seal of the Court of Tahlequah, Cherokee County,
Oklahoma, this 12th day of May, 1998. A.D.

By Order of the Court
M. MARGARET ROBBINS, Court Clerk

By: _K. Spencer_____
Deputy

OFFICER'S RETURN

 Received within Bench Warrant on _____ day of _____, 19____
at _____ o'clock ____. M. and executed the same in _____
County on the _____ day of _____, 19____, at _____
o'clock ____. M. by _____
_____
_____

Dated this _____ day of _____, 19____.

FEES
Arrest _____  $_____      _____, Sheriff
_____ Miles _____  $_____
Into Court _____  $_____      By:_____, Deputy
_____  $_____

*Handed 5-27-98 by K. Horner*

# WARRANT OF ARREST ORIGINAL
### DAY OR NIGHT

CASE NO. CF-98- *11*

## IN THE DISTRICT COURT OF CHEROKEE COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA )
)ss.
CHEROKEE COUNTY )

TO THE SHERIFF OF THE COUNTY OF CHEROKEE, OR TO ANY SHERIFF, CONSTABLE, MARSHAL OR POLICEMAN OF THIS STATE: COMPLAINT ON OATH HAVING BEEN THIS DAY LAID BEFORE ME, THAT THE CRIME OF

UTTERING A FORGED INSTRUMENT

HAS BEEN COMMITTED, AND ACCUSING **CHARLES EDMOND SANDERS** THEREOF.

BOND:$ *500.00*

ADDRESS: ▮▮▮▮▮ SALLISAW, OKLAHOMA
DOB: ▮▮▮-66
SS#: ▮▮▮9539
RACE: White
SEX: Male
HEIGHT: 511
WEIGHT: 140
EYES: Brown
HAIR: Brown

YOU ARE THEREFORE COMMANDED, FORTHWITH TO ARREST THE ABOVE NAMED **CHARLES EDMOND SANDERS**, AND BRING THAT PERSON BEFORE ME AT MY OFFICE IN SAID COUNTY, TO ANSWER SAID CHARGE.

DATED IN TAHLEQUAH, CHEROKEE COUNTY, OKLAHOMA, THIS *22* DAY OF *April*, 19 *78*

WITNESS MY HAND AND OFFICIAL SEAL.

JUDGE OF THE DISTRICT COURT

## RETURN OF SERVICE

STATE OF OKLAHOMA )
) ss.
COUNTY OF CHEROKEE )

Received this Warrant on the ___ day of _____, 19__, and executed it by arresting the within named _____ and now have his body before the Court.

Fees-Service and Return of Warrant    $_____
Mileage                               $_____
Total                                 $

DELENA K. GOSS,
SHERIFF

By_____
   Deputy Sheriff

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR CHEROKEE COUNTY

STATE OF OKLAHOMA )
      Plaintiff, )
       )
       ) CASE NO. CF-98-111
vs. )
       )
CHARLES EDMOND SANDERS, )
DOB: ████66 )
SS#: ████9539 )
      Defendant. )

# AMENDED INFORMATION

## IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:

DIANNE BARKER-HARROLD, the District Attorney for Cherokee County, Oklahoma, charges **Charles Edmond Sanders** with:

## COUNT I: UTTERING A FORGED INSTRUMENT

On or about April 13, 1998, in Cherokee County, Oklahoma, **Charles Edmond Sanders while acting in concert with Teresa Lynn Jordan,** committed the crime of Uttering a Forged Instrument, a felony in violation of 21 O.S. 1592, by uttering as true to Food 4 Less Grocery Store of Tahlequah a check purporting to have been issued by Billy Tackett that stated as follows:

Check No. 2039

Pay to the Order of Food For Less     $333.61
Three Hundred Thirty-Three and 61/100 Dollars

with the intent to defraud and knowing that the check was forged. This crime is punishable by imprisonment for up to 7 years.

## COUNT II: UTTERING A FORGED INSTRUMENT

On or about April 12, 1998, in Cherokee County, Oklahoma, **Charles Edmond Sanders** committed the crime of Uttering a Forged Instrument, a felony in violation of 21 O.S. 1592, by uttering as true to Flintridge Grocery Store of Parkhill a check purporting to have been issued by Billy Tackett that stated as follows:

Check No. 2048

Pay to the Order of Flintridge Grocery Store    $79.64
Seventy-Nine and 64/100 Dollars

with the intent to defraud and knowing that the check was forged. This crime is punishable by imprisonment for up to 7 years.

## COUNT III: UTTERING A FORGED INSTRUMENT

On or about April 11, 1998, in Cherokee County, Oklahoma, **Charles Edmond Sanders** committed the crime of Uttering a Forged Instrument, a felony in violation of 21 O.S. 1592, by uttering as true to Oklahoma State Convenience Store of Parkhill a check purporting to have been issued by Billy Tackett that stated as follows:

Check No. 2024

Pay to the Order of Oklahoma Station    $141.32
One Hundred Forty-One and 32/100 Dollars

with the intent to defraud and knowing that the check was forged. This crime is punishable by imprisonment for up to 7 years.

## COUNT IV: UTTERING A FORGED INSTRUMENT

On or about April 12, 1998, in Cherokee County, Oklahoma, **Charles Edmond Sanders** committed the crime of Uttering a Forged Instrument, a felony in violation of 21 O.S. 1592, by uttering as true to Caney Ridge Best Stop Convenience Store of Welling a check purporting to have been issued by Billy Tackett that stated as follows:

Check No. 2046

Pay to the Order of Caney Ridge    $68.15
Sixty-Eight and 15/100 Dollars

with the intent to defraud and knowing that the check was forged. This crime is punishable by imprisonment for up to 7 years.

DIANNE BARKER-HARROLD,
DISTRICT ATTORNEY

By _____
FRANK M. MEDEARIS
ASSISTANT DISTRICT ATTORNEY

STATE OF OKLAHOMA )
                  ) ss.
COUNTY OF CHEROKEE )

I, Dale L. Glory, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____

Subscribed and sworn to before me this 29th day of May, 1998.

_____
Notary Public

My Commission Expires:
    May 28, 1999

WITNESSES:
Dale L. Glory, TPD, 101 S. Cherokee, Tahlequah, OK
Billy Dowling, TPD, 101 S. Cherokee, Tahlequah, OK
Billy Ivan Tackett, P.O. BOX 501, Collinsville, OK 74021
Kendra Porter, 503 W. Allen Rd., #3A, Tahlequah, OK
Misti White, 216 W. Chickasaw, Tahlequah, OK
Shannon Adney, Caney Ridge Best Stop, RT. 1, BOX 529, Welling, OK
John Mercell, Flintridge Grocery, HC 73, BOX 564, Parkhill, OK
Tandi Robertson, Oklahoma Station, HC 73, BOX 516, Parkhill, OK

518

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR CHEROKEE COUNTY

STATE OF OKLAHOMA, )
)
    Plaintiff, )
)
vs. )  CASE NO. CF-98-111
)
CHARLES EDMOND SANDERS, )
)
    Defendant. )

## SECOND PAGE INFORMATION

DIANNE BARKER-HARROLD, the District Attorney for Cherokee County, Oklahoma, further charges **Charles Sanders** with:

On or about July 2, 1992, Charles Edmond Sanders was convicted in CRF-92-91 in the District Court of Sequoyah County, Oklahoma, of the crime of Unlawful Possession of Controlled Drug, a felony, and sentenced to a term of ten (10) years with 1,095 days to be served and the balance being suspended.

On or about December 1, 1994, Charles Edmond Sanders was convicted in CRF-93-772 in the District Court of Muskogee County, Oklahoma, of the crime of Escape From Penal Institution, a felony, and sentenced to a term of three (3) years.

On or about December 1, 1994, Charles Edmond Sanders was convicted in CRF-93-131 in the District Court of Muskogee County, Oklahoma, of the crime of Possession of Contraband in Penal Institution, a felony, and sentenced to a term of three (3) years.

DIANNE BARKER-HARROLD,
DISTRICT ATTORNEY

By _____
Assistant District Attorney

WITNESSES:
Bernell Edwards, Court Clerk, 120 E. Chickasaw, Sallisaw, OK
Adaina Riley, Court Clerk, 220 State St., Muskogee, OK

## IN AND FOR THE DISTRICT COURT, CHEROKEE COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA
PLAINTIFF,

VS.

CASE NO. __CF-98-111__

CHARLES SANDERS
DEFENDANT,

*Felony Sounding Docket*

**DEFENDANT ENTERS A PLEA OF:**
GUILTY: _____
NO CONTEST: _____
NOT GUILTY: ___X___

*Gerald Hunter*

**ORDER**

YOU HAVE BEEN ASSESSED THE COST AND/OR FINE IN THE ABOVE STYLED AND NUMBERED CASE IN

THE AMOUNT OF $ _____ .

YOU ARE HEREBY ORDERED TO PAY THE SUM OF $ _____ TO BE PAID IN _____ INSTALLMENTS

OF $ _____ , PAYABLE ON THE _____ DAY OF_____

_____ 19 _____ AND CONTINUING THEREAFTER_____ ,

_____ UNTIL PAID IN FULL.

DEFENDANT IS ORDERED BACK: _____ *July 6* 199 *8*, AT *9:00 A.* M.

YOUR WILLFUL FAILURE TO PAY AS ORDERED ABOVE, WILL RESULT IN A BENCH WARRANT BEING ISSUED
FOR YOUR ARREST AND WILL FURTHER SUBJECT YOU TO CONTEMPT OF COURT PROCEEDINGS AND
FURTHER JAIL SENTENCE.

SOUNDING DOCKET

DATED THIS __1ST__ DAY OF _____JUNE_____ 19 __98__

I HAVE READ AND UNDERSTAND
THE ABOVE COURT ORDER.....

_____ MARK L. DOBBINS _____
JUDGE, CHEROKEE COUNTY, OKLAHOMA

**DEFENDANT'S SIGNATURE**

MAKE MONEY ORDERS          M. MARGARET ROBBINS
PAYABLE TO:               COURT CLERK

MAIL TO:          213 W. DELAWARE, ROOM 302
                  TAHLEQUAH, OK 74464

SEND STAMPED SELF-ADDRESSED ENVELOPE FOR RETURN RECEIPT
INCLUDE CASE NUMBERS ON ALL MONEY ORDERS
NO PERSONAL CHECKS ACCEPTED

WHITE COPY COURT          YELLOW COPY D.A.          PINK COPY DEFENDANT

## IN AND FOR THE DISTRICT COURT, CHEROKEE COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA
_____ PLAINTIFF,

VS.                                         CASE NO. ___CF-98-111___

                                            ATT: GERALD HUNTER
CHARLES SANDERS                             *Hr. Passed to aug. 3, 1998. at*
_____ DEFENDANT,
                                            *9:00 A.M. (Fast Pass)*
DEFENDANT ENTERS A PLEA OF:                 *B/w*
GUILTY: _____
NO CONTEST: _____                 *+5,000 bond*
NOT GUILTY: _____         ORDER

YOU HAVE BEEN ASSESSED THE COST AND/OR FINE IN THE ABOVE STYLED AND NUMBERED CASE IN

THE AMOUNT OF $ _____ .

YOU ARE HEREBY ORDERED TO PAY THE SUM OF $ _____ TO BE PAID IN _____ INSTALLMENTS

OF $ _____ , PAYABLE ON THE _____ DAY OF _____

_____ 19 _____ AND CONTINUING THEREAFTER _____ ,

_____ UNTIL PAID IN FULL.

DEFENDANT IS ORDERED BACK: _____*August 3*_____ 199_*8*_, AT _*9:00 A.*_ M.

YOUR WILLFUL FAILURE TO PAY AS ORDERED ABOVE, WILL RESULT IN A BENCH WARRANT BEING ISSUED
FOR YOUR ARREST AND WILL FURTHER SUBJECT YOU TO CONTEMPT OF COURT PROCEEDINGS AND
FURTHER JAIL SENTENCE.          SOUNDING DOCKET

                    DATED THIS ___6___ DAY OF _JULY___ 19 _98_

I HAVE READ AND UNDERSTAND      MARK DOBBINS
THE ABOVE COURT ORDER.....      _____
                                JUDGE, CHEROKEE COUNTY, OKLAHOMA
_____
DEFENDANT'S SIGNATURE

            MAKE MONEY ORDERS      M. MARGARET ROBBINS
                PAYABLE TO:        COURT CLERK

                    MAIL TO:       213 W. DELAWARE, ROOM 302
                                   TAHLEQUAH, OK 74464

            SEND STAMPED SELF-ADDRESSED ENVELOPE FOR RETURN RECEIPT
                INCLUDE CASE NUMBERS ON ALL MONEY ORDERS
                    NO PERSONAL CHECKS ACCEPTED
WHITE COPY COURT            YELLOW COPY D.A.          PINK COPY DEFENDANT

IN AND FOR THE DISTRICT COURT OF CHEROKEE COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
                                    Plaintiff,

vs.

*Charles Sanders*,
                                    Defendant.

CASE NO. _CF-98-111_

**Defendant enters a plea of:**
Guilty: _____
No Contest: _____
Not Guilty: _____

**ORDER**

YOU HAVE BEEN ASSESSED THE COSTS AND/OR FINE IN THE ABOVE STYLED AND NUMBERED CASE IN THE

AMOUNT OF $_____.

YOU ARE HEREBY ORDERED TO PAY THE SUM OF $ _____ COSTS AND $ _____

FINE FOR A TOTAL OF $ _____ , TO BE PAID IN _____ INSTALLMENTS OF

$_____ , PAYABLE ON THE _____ DAY OF _____ , 19 _____ AND

CONTINUING THEREAFTER _____ UNTIL PAID IN FULL.

*Hearing reset for Oct. 5, 1998, 9:00 A.M.*
*Sounding Dkt.*

DEFENDANT IS ORDERED BACK: _____ 199___ AT _____ , ____ .M.

YOUR WILLFUL FAILURE TO PAY AS ORDERED ABOVE WILL RESULT IN A BENCH WARRANT BEING ISSUED
FOR YOUR ARREST AND WILL FURTHER SUBJECT YOU TO CONTEMPT OF COURT PROCEEDINGS AND
FURTHER JAIL SENTENCE

I HAVE READ AND UNDERSTAND
THE ABOVE COURT ORDER.

DATED THIS _3_ DAY OF _August_ , 199 _8_

*Bondsman Infamed*.
Defendant's Signature

/S/ *Mark L. Dobbins*
JUDGE OF THE DISTRICT COURT

_____
Defendant's Attorney

_____
Assistant District Attorney

MAKE MONEY ORDERS PAYABLE TO:
M. MARGARET ROBBINS
COURT CLERK

MAIL TO:
213 W. DELAWARE, RM. 302
TAHLEQUAH, OK 74464

SEND STAMPED SELF-ADDRESSED ENVELOPE FOR RETURN RECEIPT
INCLUDE CASE NUMBERS ON ALL MONEY ORDERS; NO PERSONAL CHECKS ACCEPTED

WHITE COPY - COURT          YELLOW COPY - D.A.          PINK COPY - DEFENDANT

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR CHEROKEE COUNTY

STATE OF OKLAHOMA          )
      Plaintiff,          )
                         )
vs.          )          CASE NO. CF-98-111
                         )
CHARLES EDMOND SANDERS,          )
DOB: ▇▇▇-66          )
SS#: ▇▇▇9539          )
      Defendant.          )

# SECOND AMENDED  I N F O R M A T I O N

**IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:**

DIANNE BARKER-HARROLD, the District Attorney for Cherokee County, Oklahoma, charges **Charles Edmond Sanders** with:

## COUNT I: UTTERING A FORGED INSTRUMENT

On or about April 13, 1998, in Cherokee County, Oklahoma, **Charles Edmond Sanders while acting in concert with Teresa Lynn Jordan,** committed the crime of Uttering a Forged Instrument, a felony in violation of 21 O.S. 1592, by uttering as true to Food 4 Less Grocery Store of Tahlequah a check purporting to have been issued by Billy Tackett that stated as follows:

Check No. 2039

Pay to the Order of Food For Less          $333.61
Three Hundred Thirty-Three and 61/100 Dollars

with the intent to defraud and knowing that the check was forged. This crime is punishable by imprisonment for up to 7 years.

## COUNT II: UTTERING A FORGED INSTRUMENT

On or about April 12, 1998, in Cherokee County, Oklahoma, **Charles Edmond Sanders** committed the crime of Uttering a Forged Instrument, a felony in violation of 21 O.S. 1592, by uttering as true to Flintridge Grocery Store of Parkhill a check purporting to have been issued by Billy Tackett that stated as follows:

Check No. 2048

Pay to the Order of Flintridge Grocery Store          $79.64
Seventy-Nine and 64/100 Dollars

with the intent to defraud and knowing that the check was forged. This crime is punishable by imprisonment for up to 7 years.

## COUNT III: UTTERING A FORGED INSTRUMENT

On or about April 11, 1998, in Cherokee County, Oklahoma, **Charles Edmond Sanders** committed the crime of Uttering a Forged Instrument, a felony in violation of 21 O.S. 1592, by uttering as true to Oklahoma State Convenience Store of Parkhill a check purporting to have been issued by Billy Tackett that stated as follows:

Check No. 2024

Pay to the Order of Oklahoma Station          $141.32
One Hundred Forty-One and 32/100 Dollars

with the intent to defraud and knowing that the check was forged. This crime is punishable by imprisonment for up to 7 years.

TS73-1868

## COUNT IV: UTTERING A FORGED INSTRUMENT

On or about April 12, 1998, in Cherokee County, Oklahoma, **Charles Edmond Sanders** committed the crime of Uttering a Forged Instrument, a felony in violation of 21 O.S. 1592, by uttering as true to Caney Ridge Best Stop Convenience Store of Welling a check purporting to have been issued by Billy Tackett that stated as follows:

Check No. 2046

Pay to the Order of Caney Ridge          $68.15
Sixty-Eight and 15/100 Dollars

with the intent to defraud and knowing that the check was forged. This crime is punishable by imprisonment for up to 7 years.

## COUNT V: UTTERING A FORGED INSTRUMENT

On or about April 12, 1998, in Cherokee County, Oklahoma, **Charles Edmond Sanders** committed the crime of Uttering a Forged Instrument, a felony in violation of 21 O.S. 1592, by uttering as true to Wal-Mart Store #10 of Tahlequah a check purporting to have been issued by Billy Tackett that stated as follows:

Check No. 2038

Pay to the Order of Wal-Mart #10          $195.70
One Hundred Ninety-Five and 70/100 Dollars

with the intent to defraud and knowing that the check was forged. This crime is punishable by imprisonment for up to 7 years.

## COUNT VI: UTTERING A FORGED INSTRUMENT

On or about April 12, 1998, in Cherokee County, Oklahoma, **Charles Edmond Sanders** committed the crime of Uttering a Forged Instrument, a felony in violation of 21 O.S. 1592, by uttering as true to Wal-Mart Store #10 of Tahlequah a check purporting to have been issued by Billy Tackett that stated as follows:

Check No. 2049

Pay to the Order of Wal-Mart 10          $147.44
One Hundred Forty-Seven and 44/100 Dollars

with the intent to defraud and knowing that the check was forged. This crime is punishable by imprisonment for up to 7 years.

DIANNE BARKER-HARROLD,
DISTRICT ATTORNEY

By_____
FRANK M. MEDEARIS
ASSISTANT DISTRICT ATTORNEY

STATE OF OKLAHOMA      )
                      ) ss.
COUNTY OF CHEROKEE )

I, Dale L. Glory, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____

Subscribed and sworn to before me this 18th day of August, 1998.

_____
Notary Public

My Commission Expires:
May 28, 1999

**WITNESSES:**
Dale L. Glory, TPD, 101 S. Cherokee, Tahlequah, OK
Billy Dowling, TPD, 101 S. Cherokee, Tahlequah, OK
Billy Ivan Tackett, P.O. BOX 501, Collinsville, OK 74021
Kendra Porter, 503 W. Allen Rd., #3A, Tahlequah, OK
Misti White, 216 W. Chickasaw, Tahlequah, OK
Shannon Adney, Caney Ridge Best Stop, RT. 1, BOX 529, Welling, OK
John Mercell, Flintridge Grocery, HC 73, BOX 564, Parkhill, OK
Tandi Robertson, Oklahoma Station, HC 73, BOX 516, Parkhill, OK
Regina Hollman, Wal-Mart, 2020 S. Muskogee, Tahlequah, OK
Lottie Lenardo, Wal-Mart, 2020 S. Muskogee, Tahlequah, OK

IN AND FOR THE DISTRICT COURT OF CHEROKEE COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
                    Plaintiff,

vs.                                              CASE NO.    CF-98-111

_____CHARLES  SANDERS_____,
                    Defendant.

Defendant enters a plea of:
Guilty: _____
No Contest: _____            **ORDER**
Not Guilty: _____

YOU HAVE BEEN ASSESSED THE COSTS AND/OR FINE IN THE ABOVE STYLED AND NUMBERED CASE IN THE

AMOUNT OF $_____.

YOU ARE HEREBY ORDERED TO PAY THE SUM OF $ _____ COSTS AND $_____

FINE FOR A TOTAL OF $ _____ , TO BE PAID IN _____ INSTALLMENTS OF

$_____ , PAYABLE ON THE _____ DAY OF _____ , 19 _____ AND

CONTINUING THEREAFTER _____ UNTIL PAID IN FULL.

_____△ FTA    B/F    B/W    $15,000 bond._____

DEFENDANT IS ORDERED BACK: _____ 199___ AT _____ , _____.M.

YOUR WILLFUL FAILURE TO PAY AS ORDERED ABOVE WILL RESULT IN A BENCH WARRANT BEING ISSUED
FOR YOUR ARREST AND WILL FURTHER SUBJECT YOU TO CONTEMPT OF COURT PROCEEDINGS AND
FURTHER JAIL SENTENCE                          SOUNDING DOCKET

I HAVE READ AND UNDERSTAND         DATED THIS _5TH_ DAY OF_ OCTOBER , 199 8
THE ABOVE COURT ORDER.

_____         _____MARK L. ROBBINS_____
Defendant's Signature              JUDGE OF THE DISTRICT COURT

_____
Defendant's Attorney               MAKE MONEY ORDERS PAYABLE TO:
                                       M. MARGARET ROBBINS
                                       COURT CLERK
_____
Assistant District Attorney        MAIL TO:
                                       213 W. DELAWARE, RM. 302
                                       TAHLEQUAH, OK 74464

SEND STAMPED SELF-ADDRESSED ENVELOPE FOR RETURN RECEIPT
INCLUDE CASE NUMBERS ON ALL MONEY ORDERS; NO PERSONAL CHECKS ACCEPTED

WHITE COPY - COURT          YELLOW COPY - D.A.          PINK COPY - DEFENDANT

*ent.* NC IC 10/7/98 NIC W1084454I7

ORIGINAL

DAY OR NIGHT ARREST

BENCH WARRANT                                    COURT OF CHEROKEE COUNTY

STATE OF OKLAHOMA     )
                      ) SS.                    NO. CF-98-111
COUNTY OF CHEROKEE    )

THE STATE OF OKLAHOMA

    TO THE SHERIFF OF CHEROKEE COUNTY, OKLAHOMA OR ANY SHERIFF OR
DEPUTY SHERIFF OR ANY OTHER OFFICER AUTHORIZED BY LAW TO SERVE
CRIMINAL PROCESS:

CHARLES EDMOND SANDERS  with the crime of FAILURE TO APPEAR.

ADDRESS: RT. 3, BOX 55, SALLISAW, OK.
PLACE OF EMPLOYMENT
DOB: ███66          SS#: ███-9539              SEX: M
HGT: 5'11"          WGT: 140#          EYE:              RACE: W
TELEPHONE NUMBER:                     BOND: $15,000.00

    YOU ARE THEREFORE COMMANDED forthwith to arrest the said CHARLES EDMOND
SANDERS  and bring him/her before the Court of Cherokee County, Oklahoma, or
if the Court be adjourned or be not in session that you retain him/her in
your custody in the County Jail in the County in which you arrest him /her or
that you deliver him/her into the custody of the Sheriff of Cherokee County,
Oklahoma, subject to the further order of this Court.

    WITNESS my hand and seal of the Court of Tahlequah, Cherokee County,
Oklahoma, this 5th day of October, 1998. A.D.

               By Order of the Court
               M. MARGARET ROBBINS, Court Clerk

        By: *K. Spencer*
           Deputy

OFFICER'S RETURN

    Received within Bench Warrant on  5  day of *October* , 19 *98* ,
at *1600*  o'clock *P* . M. and executed the same in *Cherokee*
County on the  *1*  day of *Febuary* , 19 *99* , at *2326*
o'clock *PM*. M. by *ARREST*

    Dated this _____ day of _____, 19_____.

FEES
Arrest _____ $_____                  *D. Goss* , Sheriff
_____ Miles _____ $_____
Into Court _____ $_____          By: _____ , Deputy
_____ $_____

527

CHEROKEE COUNTY DISTRICT COURT, STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,
Plaintiff,

vs

Edmond
Charles Edward Sanders

Defendant.

CASE NO. CF-98-111

### ORDER OF RELEASE
### (DAYTIME)

The Sheriff of Cherokee County is hereby authorized and directed to release the above-identified defendant on the above listed case/s pursuant to an order of the court:

Defendant has:   __Pled   X Bonded   __Case Dismissed   __Other.

WITNESS MY HAND AND SEAL THIS 2nd DAY OF February, 19 99

CLERK - SEC/BAILIFF

BY _____ DEPUTY

STATE OF OKLAHOMA
CHEROKEE COUNTY
1999 FEB -2 P 2: 29
M MARGARET ROBBINS
COURT CLERK

528

## APPEARANCE BOND

S.A.&I. 408 (1993)

IN THE DISTRICT COURT OF _Cherokee_ COUNTY, STATE OF OKLAHOMA

State of Oklahoma,
             Plaintiff,

Case No. _CF - 98-111_

vs. _Charles Edward Sanders_
             Defendant.

Know all men by these presents, that we the above named defendant, as principal, and the undersigned _K. Kenii Allcorn_ as surety(ies), personally appeared before the undersigned authority and jointly and severally acknowledged, themselves, to be indebted to the State of Oklahoma in the sum of _Five Thousand_ Dollars ($ _5,000_ ) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named ,defendant, who has been committed to the county jail of _Cherokee_ County, State of Oklahoma, shall personally appear before the _____Court of said County on the _9_ day of _February_, 19_99_ at _1:00_ o'clock _p_ .M., of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of _FTA_ _____and shall not depart the said Court without leave and shall obey any order issued by said Court, then this bond shall be void; otherwise, this bond shall remain in full force and effect.

Witness our hands and seals this _2_ day of _February_, 19 _99_ .

_Charles Sanders_ Principal ▮▮▮▮ _Tahlequah_ Address
_K. Kenii Allcorn_ Surety ▮▮▮▮ _Tahlequah_ Address
_Lisa LeBoeuf_ Surety ▮▮▮▮ _OKC 73102_ Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this_____ day of_____, 19_____.

_M Margaret Robberson_ Court Clerk _____Sheriff
_Craig_ Deputy _____Deputy

This undertaking approved this _4_ day of _February_, 19 _99_ .

_M Margaret Robberson_ Court Clerk

(SEAL) _Craig_ Deputy

### AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, _Cherokee_ COUNTY, SS:

The undersigned, being first duly sworn upon oath, says that he is a resident of _Sequoyah_ County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as hereinafter specified under one or more of the following, to wit:

a)   Consideration for this undertaking received or promised in the sum of $ _750_ .

b)   Other security received or promised for making this undertaking, is as follows:
     _Note & Indemnity_

c)   Such promise, security or consideration was received from
     _Charles Sanders_                    _Rt 3 55 Tahlequah_
     Name                               Address

529

*I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as one who commits perjury.*

_K. Renee Allcon_
**Affiant**       ▮▮▮▮▮▮▮ **Address**      _Tahlequah OK_

Subscribed and sworn to before me this __2nd__ day of __February__ 19 __99__
(SEAL)
My Commission Expires: _____       **County Clerk / Notary Public**

**Deputy**

## QUALIFICATION OF SURETY
### 12 O.S. 1991, §62

STATE OF OKLAHOMA    )
              ) SS.
_____COUNTY )

**Amount of Bond**

$_____

*The undersigned surety(ies), being duly sworn upon oath state(s): That _he_ (is)(are) a citizen of the United States, is 21 years of age or over, and is a bona fide resident of the State of Oklahoma for the period of six months immediate last past.*

### AFFIDAVIT FOR PROPERTY BOND

*That _he_ (is)(are) the owner(s) of the following described real property situated in _____County, State of Oklahoma, which is pledged as security for said undertaking and that the legal title of record in the County Clerk's office is held by_____;*
*that there are liens or encumbrances against the said property in the following amount(s),*
_____
*held by the following persons:_____in the total amount of $_____.*

*I further swear that there are no delinquent taxes on said real property except for the years _____.*

*That the assessed valuation of the above described property is $_____.*
     Assessed valuation on tax rolls     $ _____
     Times 4 for total assessed valuation     _____
     Less encumbrances     _____
     Market value     _____

### WAIVER OF HOMESTEAD EXEMPTION

*Comes now _____and _____, owners of the real property described in this undertaking, and state(s) that _he_ hereby waive(s) any homestead exemption _he_ may hold in and to such property.*

_____

_____

### AFFIDAVIT FOR CASH BOND

*I am worth, over and above all exemptions, debts, and liabilities, the sum of _____ ($      ).*
*(Must be double the amount to be secured).*

_____
**Surety**

_____
**Surety/Bondsman**

*This Qualification of Surety subscribed and sworn to before me this _____day of_____, 19_____.*

_____
**Court Clerk/Judge**

_____
**Deputy Court Clerk**

530

**POWER OF ATTORNEY**
Gina LeBoeuf
A-1 and Able Bonding Companies
217 N. Harvey, Suite #103
Oklahoma City, Oklahoma 73102

№ 10223 GL

KNOW ALL MEN BY THESE PRESENTS: That, Gina LeBoeuf, Professional Bondsman licensed by the State of Oklahoma, does constitute and appoint the below named agent as my Attorney in Fact to execute Bail Bonds only in my name and on my behalf as Surety. *THIS POWER MUST BE ATTACHED TO AND FILED WITH THE BAIL BOND WRITTEN ON THE DEFENDANT NAMED BELOW AND IS VOID IF ALTERED OR ERASED.*

Dated this ___2___ day of ___February___, 19 _99_

Defendant Name:

___Charles___          ___Edward___          ___Sanders___
(First)                (Middle)               (Last)

D.O.B.:_____ Amt. of Bond: $_5,000_    Premium: $_750_

Offense: _FTA_

Case Number: _CF-98-111_                Court: _Cherokee_

City: _Tahlequah_   Court Date: _2-9-99_   Posted For:_____

Rewrite of Power #:_____   Dated:_____   Amount:_____

___K. Renee Allcorn___          ___Gina LeBoeuf___
Executing Agent's Signature       Professional Bondsman's Signature

531

IN AND FOR THE DISTRICT COURT OF CHEROKEE COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
                                         Plaintiff,

vs.

*Charles Sanders*
                                         Defendant,

CASE NO. _CF-99-___

Defendant enters a plea of:
Guilty: _____
No Contest: _____
Not Guilty: _____

**ORDER**

YOU HAVE BEEN ASSESSED THE COSTS AND/OR FINE IN THE ABOVE STYLED AND NUMBERED CASE IN THE

AMOUNT OF $_____.

YOU ARE HEREBY ORDERED TO PAY THE SUM OF $ _____ COSTS AND $ _____

FINE FOR A TOTAL OF $ _____ , TO BE PAID IN _____ INSTALLMENTS OF

$_____ , PAYABLE ON THE _____ DAY OF _____ , 19 _____ AND

CONTINUING THEREAFTER _____ UNTIL PAID IN FULL.

_____

*Court notes Bond reduced on defendants motion*

*State's objection*

DEFENDANT IS ORDERED BACK: _____ 199___ AT _____ , _____ .M.

YOUR WILLFUL FAILURE TO PAY AS ORDERED ABOVE WILL RESULT IN A BENCH WARRANT BEING ISSUED
FOR YOUR ARREST AND WILL FURTHER SUBJECT YOU TO CONTEMPT OF COURT PROCEEDINGS AND
FURTHER JAIL SENTENCE

I HAVE READ AND UNDERSTAND                    DATED THIS _2_ DAY OF _Feb_ , 199 _7_
THE ABOVE COURT ORDER.


_____            _____
Defendant's Signature                        JUDGE OF THE DISTRICT COURT

X_____
Defendant's Attorney                         MAKE MONEY ORDERS PAYABLE TO:
                                                  M. MARGARET ROBBINS
X_____                        COURT CLERK
Assistant District Attorney
*Under protest*                              MAIL TO:
                                                  213 W. DELAWARE, RM. 302
                                                  TAHLEQUAH, OK 74464

SEND STAMPED SELF-ADDRESSED ENVELOPE FOR RETURN RECEIPT
INCLUDE CASE NUMBERS ON ALL MONEY ORDERS; NO PERSONAL CHECKS ACCEPTED

WHITE COPY - COURT              YELLOW COPY - D.A.              PINK COPY - DEFENDANT

533

IN THE DISTRICT COURT IN AND FOR CHEROKEE COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA )
          Plaintiff )
 )
vs. )        CASE #  CF-98-111
 )
CHARLES EDMOND SANDERS )
          Defendant )

**NOTICE TO DEFENDANT, ATTORNEY OF RECORD
AND BONDSMAN OF RECORD**

YOU and each of you will take notice that a disposition docket has been set for the District Court of Cherokee County, Tahlequah, Oklahoma for _March 20, 2000 at 10:00 a.m._ The defendant above named is hereby ordered to appear, in person, and with counsel before the Court at that time for disposition of the above styled case.

THE BONDSMAN herein is hereby notified to have said defendant before the Court on the said 20th day of March, 2000 at 10:00 a.m.

Dated this the 25th day of February, 2000 in the Cherokee County Courthouse, in Tahlequah, Oklahoma.

G. BRUCE SEWELL
DISTRICT JUDGE

M. MARGARET ROBBINS
COURT CLERK CHEROKEE COUNTY

Copies to:
DEFENDANT

ATTORNEY OF RECORD

BONDSMAN OF RECORD     RENEE ALLCORN

IN THE DISTRICT COURT IN AND FOR CHEROKEE COUNTY, OKLAHOMA

STATE OF OKLAHOMA )
VS. : NO. CF-98-111
CHARLES EDMOND SANDERS )

### ORDER AND JUDGMENT OF FORFEITURE

ON THIS 20TH DAY OF MARCH, 2000, THE ABOVE CAUSE CAME ON FOR HEARING, ACCORDING TO REGULAR ASSIGNMENT OF THE DOCKET OF THIS COURT.

THE COURT FINDS THAT THE ABOVE NAMED DEFENDANT HAVING HERETOFORE BEEN CHARGED WITH THE CRIME OF UTTERING A FORGED INSTRUMENT, SIX COUNTS, AND HAVING BEEN COMMITTED TO BAIL IN THE AMOUNT OF $5,000.00 WAS RELEASED ON AN APPEARANCE BOND EXECUTED BY K. Renee Alcorn A LICENSED BONDSMAN, AND Gina LeBoeuf, IF APPLICABLE HIS INSURER; SAID BOND CONDITIONED AS PROVIDED BY LAW FOR THE APPEARANCE OF SAID DEFENDANT BEFORE THIS COURT AS REQUIRED, AND THE COURT HAVING SUBSEQUENTLY ORDERED SAID DEFENDANT TO APPEAR ON THE 20TH DAY OF MARCH, 2000, AND SAID DEFENDANT, BEING CALLED THREE TIMES IN OPEN COURT, WITHOUT SUFFICIENT EXCUSE, FAILED TO APPEAR BEFORE THE COURT AS ORDERED.

THE COURT FURTHER FINDS THAT SAID BONDSMAN HAD DUE AND LEGAL NOTICE AS PROVIDED BY LAW OF THE REQUIRED APPEARANCE OF SAID DEFENDANT.

THE COURT FURTHER FINDS THAT THE CONDITIONS OF SAID APPEARANCE BOND HAVE BEEN BROKEN BY BOTH THE DEFENDANT AND SAID BONDSMAN, AND THAT AN ORDER AND JUDGMENT OF FORFEITURE SHOULD BE ENTERED.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED BY THE COURT THAT THE APPEARANCE BOND OF SAID DEFENDANT BE, AND THE SAME IS HEREBY DECLARED AND IS ORDERED FORFEITED TO THE STATE OF OKLAHOMA, AND THE AMOUNT OF SAID BOND IS ORDERED PAID TO THE CLERK OF THE COURT.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED THAT THE COURT CLERK SHALL IMMEDIATELY MAIL A COPY OF THIS ORDER AND JUDGMENT OF FORFEITURE TO THE BONDSMAN AND, IF APPLICABLE, HIS INSURER. THE BONDSMAN IS HEREBY DIRECTED TO DEPOSIT WITH THE COURT CLERK, THE FACE AMOUNT OF THE SAID FORFEITED BOND, TO-WIT: $5,000.00. SUCH DEPOSIT TO BE MADE WITHIN 91 DAYS FROM RECEIPT OF THIS ORDER AND JUDGMENT OF FORFEITURE, OR THE MAILING OF THE NOTICE IF NO RECEIPT IS MADE.

_____
JUDGE OF THE DISTRICT COURT

CF-98-111

## CERTIFICATE OF MAILING

I certify that I mailed a true and correct copy of this instrument to the above named bondsman and, if applicable, his insurer to the last known address of each, by certified mail with return receipt requested this/2 day of April , 15 2000.

M. Margaret Robbins
COURT CLERK
BY C. Davis
Deputy

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Received by (Please Print Clearly) \| B. Date of Delivery<br>C. Signature  X [signature]   ☐ Agent  ☐ Addressee<br>D. Is delivery address different from item 1?  ☐ Yes   If YES, enter delivery address below:  ☐ No |
| 1. Article Addressed to:<br>RENEE' ALLCORN<br><br>TAHLEQUAH. OK 74464<br><br>CF-98-111   BY_____ | 3. Service Type<br>☑ Certified Mail  ☐ Express Mail<br>☐ Registered  ☐ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (Extra Fee)  ☐ Yes |
| 2. Article Number (Copy from service label)<br>Z-193 463 211 | |
| PS Form 3811, July 1999   Domestic Return Receipt | 102595-99-M-1789 |

536

| SENDER: *COMPLETE THIS SECTION* | *COMPLETE THIS SECTION ON DELIVERY* |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Received by *(Please Print Clearly)*   B. Date of Delivery<br><br>C. Signature<br>X _____ ☐ Agent ☐ Addressee |
| 1. Article Addressed to:<br>GINA LEBOEUF<br><br>OKLAHOMA CITY, OK 73102 | D. Is delivery address different from item 1?  ☐ Yes<br>If YES, enter delivery address below:  ☐ No |
|  | 3. Service Type<br>☑ Certified Mail   ☐ Express Mail<br>☐ Registered   ☐ Return Receipt for Merchandise<br>☐ Insured Mail   ☐ C.O.D.<br>4. Restricted Delivery? *(Extra Fee)*   ☐ Yes |

OF-98-111

2. Article Number *(Copy from service label)*
Z 193 463 204

PS Form 3811, July 1999          Domestic Return Receipt          102595-99-M-1789

IN AND FOR THE DISTRICT COURT OF CHEROKEE COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
_____,
Plaintiff,

vs.

Charles Edmond Sanders                    CASE NO. _CF-98-141_
Defendant.

Defendant enters a plea of:

Guilty: _____

No Contest: _____              **O R D E R**

Not Guilty: _____

YOU HAVE BEEN ASSESSED THE COSTS AND/OR FINE IN THE ABOVE STYLED AND NUMBERED CASE IN THE

AMOUNT OF $_____.

YOU ARE HEREBY ORDERED TO PAY THE SUM OF $ _____ COSTS AND $ _____

FINE FOR A TOTAL OF $ _____ , TO BE PAID IN _____ INSTALLMENTS OF

$_____ , PAYABLE ON THE _____ DAY OF _____ , 200____ AND

CONTINUING THEREAFTER _____ UNTIL PAID IN FULL.

_____Recall Bench Warrant_____

_____

DEFENDANT IS ORDERED BACK: _____ 8/8 _J.A._ , 200_0_ AT __1:00_ , _P_ .M.

YOUR WILLFUL FAILURE TO PAY AS ORDERED ABOVE WILL RESULT IN A BENCH WARRANT BEING ISSUED
FOR YOUR ARREST AND WILL FURTHER SUBJECT YOU TO CONTEMPT OF COURT PROCEEDINGS AND
FURTHER JAIL SENTENCE

I HAVE READ AND UNDERSTAND                DATED THIS _12th_ DAY OF _July_ , 200_0_
THE ABOVE COURT ORDER.

_____           _____
Defendant's Signature                     JUDGE OF THE DISTRICT COURT

_____
Defendant's Attorney                      MAKE MONEY ORDERS PAYABLE TO:
                                          M. MARGARET ROBBINS
                                          COURT CLERK
_____
Assistant District Attorney               MAIL TO:
                                          213 W. DELAWARE, RM. 302
                                          TAHLEQUAH, OK 74464

SEND STAMPED SELF-ADDRESSED ENVELOPE FOR RETURN RECEIPT
INCLUDE CASE NUMBERS ON ALL MONEY ORDERS; NO PERSONAL CHECKS ACCEPTED

WHITE COPY - COURT              YELLOW COPY - D.A.              PINK COPY - DEFENDANT

IN THE DISTRICT COURT OF CHEROKEE COUNTY
STATE OF OKLAHOMA

WARRANT RECALL NOTICE

CASE NUMBER: *CF-92-111*

DEFENDANT(S): *Charles E. Sanders*

DATE WARRANT
ISSUED: *3-31-00*

TO: COUNTY SHERIFF

YOU ARE HEREBY DIRECTED TO IMMEDIATELY RECALL THE WARRANT IN THIS CASE WHICH WAS ISSUED ON THE ABOVE DATE.

M. MARGARET ROBBINS, COURT CLERK

BY: _____DEPUTY

ORIGINAL FILED AND COPY TAKEN TO CHEROKEE COUNTY SHERIFF ON THIS
_13_ DAY OF _July_, 20_00_.

IN AND FOR THE DISTRICT COURT OF CHEROKEE COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA, _____,
Plaintiff,

vs.

_Charles Edmond Sanders_
Defendant.

CASE NO. _CF-98-111_

**Defendant enters a plea of:**
Guilty: _____
No Contest: _____
Not Guilty: _____

**ORDER**

YOU HAVE BEEN ASSESSED THE COSTS AND/OR FINE IN THE ABOVE STYLED AND NUMBERED CASE IN THE

AMOUNT OF $_____.

YOU ARE HEREBY ORDERED TO PAY THE SUM OF $_____ COSTS AND $_____

FINE FOR A TOTAL OF $_____, TO BE PAID IN _____ INSTALLMENTS OF

$_____, PAYABLE ON THE _____ DAY OF _____, 200_____ AND

CONTINUING THEREAFTER _____ UNTIL PAID IN FULL.

_____

_____

_____ _I.A.__ _____

DEFENDANT IS ORDERED BACK: _____8/29/00_____, 200___ AT _1:00_ , _P_ .M.

YOUR WILLFUL FAILURE TO PAY AS ORDERED ABOVE WILL RESULT IN A BENCH WARRANT BEING ISSUED
FOR YOUR ARREST AND WILL FURTHER SUBJECT YOU TO CONTEMPT OF COURT PROCEEDINGS AND
FURTHER JAIL SENTENCE                                    1:00 P.M. ARRAIGNMENTS

I HAVE READ AND UNDERSTAND          DATED THIS __15th_ DAY OF _AUGUST_____, 200_0_
THE ABOVE COURT ORDER.

_X_____
Defendant's Signature

_____MARK L. DOBBINS_____
JUDGE OF THE DISTRICT COURT

_____
Defendant's Attorney

_____
Assistant District Attorney

MAKE MONEY ORDERS PAYABLE TO:
M. MARGARET ROBBINS
COURT CLERK

MAIL TO:
213 W. DELAWARE, RM. 302
TAHLEQUAH, OK 74464

SEND STAMPED SELF-ADDRESSED ENVELOPE FOR RETURN RECEIPT
INCLUDE CASE NUMBERS ON ALL MONEY ORDERS; NO PERSONAL CHECKS ACCEPTED

WHITE COPY - COURT             YELLOW COPY - D.A.             PINK COPY - DEFENDANT

~~~. NCIC 6-8 00   NIC. W10165807

RECALLED 7-13-00

BY _____ Davis

BENCH WARRANT

D.O.B. 01/11/66
SS#    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
DL#

=================================================================

Case No. CF-98-00111

IN THE DISTRICT COURT OF CHEROKEE COUNTY, STATE OF OKLAHOMA:

THE STATE OF OKLAHOMA, TO ANY SHERIFF, CONSTABLE, OR POLICEMAN IN THIS STATE:

CHARLES EDMOND SANDERS

having been, on 03/31/00, duly charged in the District Court of Cherokee

County, State of Oklahoma, of the crime of

BENCH WARRANT: FAILURE TO APPEAR
(UTTERING A FORGED INSTRUMENT)

you are hereby commanded forthwith to arrest the above named:

CHARLES EDMOND SANDERS

and bring him/her before that Court for judgment, or if the Court has adjourned

for the term, you are to deliver him/her into the custody of the Sheriff of

Cherokee County, State of Oklahoma.

        Given under my hand, with the seal of said Court affixed on 03/31/00.

    By order of the Court          M. MARGARET ROBBINS _____, Court Clerk

_____ BRUCE SEWELL _____
        Judge

Bond Amount: _____          _____, Deputy

=================================================================

OFFICER'S RETURN

    I RECEIVED THIS BENCH WARRANT ON THE _____ DAY OF _____, 19___, AND

EXECUTED SAME ON THE _____ DAY OF _____, 19___, BY _____

_____

                                    _____ SHERIFF
                            BY _____ DEPUTY

IN THE DISTRICT COURT IN AND FOR  ADAIR     COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,
                    Plaintiff,

vs.                                    CASE NO.  CF-98-111

CHARLES E. SANDERS

           Defendant,


## O R D E R

### RELEASING BONDSMAN

NOW, On this the 3 day of MAY    , 2001, the bondsman,
RENEE Allcorn for the above-named defendant having produced the
defendant before the court, and having made oral application to
the court to be relieved and released from any further
responsibility in connection with the appearance bond heretofore
posted by said bondsman, and to have said bond discharged for the
reason that the defendant has not cooperated with said bondsman
by not having made contact as requested for the purpose of court
appearances, and the court, having examined the court file, the
statements of the bondsman and defendant, and having considered
all the facts and circumstances surrounding said case, and being
fully informed in the premises;

IT IS, THEREFORE, THE ORDER, JUDGMENT AND DECREE of the
Court that there is good and sufficient cause presented for the
appearances bond posted herein to be discharged and held for
naught, and the said bondsman exonerated from any further
responsibility in connection with said appearance bond, and the
defendant is remanded to the custody of the sheriff until a new
bond is made and approved.


                                _____
                                ASSOCIATE DISTRICT JUDGE

# IN THE DISTRICT COURT OF CHEROKEE COUNTY, STATE OF OKLAHOMA

**STATE OF OKLAHOMA**
**VS.**

*Charles Sanders*

| | Fine(s) | Cost(s) |
|---|---|---|
| CASE NO: *CF 98-111* | | |

DOB          D.L.#

Address

sub-totals

TOTALS

FILED
STATE OF OKLAHOMA
CHEROKEE COUNTY
2008 OCT 22 AM 9:40
SHIRLEY GLORY
COUNTY CLERK
BY
D.C.

CITY        STATE        ZIP

DATE: _10/22/08_           MINUTE ORDER: _P.C. Hearing_

_Petit Larceny_          $1600

_Possession of CDS_     $2000

_CF 98-111_   ~~No Bond~~  $250 Cash bond

**DEFENDANT IS ORDERED BACK:** _Oct 24_, 200_8_ @ _8:30_, **A.m.**

Payments of fines, costs, fees, etc. shall be payable by money orders or cashier's checks (no personal checks or cash)
Include your name and case number - Payments shall be paid to the following entities:

| FINES AND COURT COSTS | RESTITUTION | DRUG FUND |
|---|---|---|
| Total of _____ | Total of _____ | Total of _____ |
| Payable in monthly payments of | Payable in monthly payments of | Payable in monthly payments of |
| _____ for ____ months | _____ for ____ months | _____ for ____ months |
| 1st payment due: _____ | 1st payment due: _____ | 1st payment due: _____ |
| **Payable to:** | **Payable to:** | **Payable to:** |
| Cherokee County Court Clerk | Office of District Attorney | Office of District Attorney |
| 213 W. Delaware, room 302 | Cherokee County Courthouse | Cherokee County Courthouse |
| Tahlequah, OK 74464 | 213 W. Delaware | 213 W. Delaware |
| | Tahlequah, OK 74464 | Tahlequah, OK 74464 |

**I, THE DEFENDANT, UNDERSTAND THAT I MUST PAY AND COMPLETE ALL THE THINGS LISTED ABOVE AND MUST APPEAR BACK IN COURT ON THE DATE AND TIME SET FORTH ABOVE OR I WILL BE ARRESTED AND JAILED!!**

X _____          _____
DEFENDANT                                    DISTRICT COURT JUDGE

_____          _____
DEFENDANT'S ATTORNEY                    ASSISTANT DISTRICT ATTORNEY

543

## IN THE DISTRICT COURT OF CHEROKEE COUNTY, STATE OF OKLAHOMA

**STATE OF OKLAHOMA**
**VS.**

_Charles Sanders_

Fine(s)    Cost(s)

CASE NO: _CM 08-1525_

_CF 98-111_

DOB         D.L.#

sub-totals

TOTALS

Address

CITY        STATE        ZIP

DATE: _10/28/08_         MINUTE ORDER: _1pm IA_

_△ PNG    S. Qursley    FSD_

STATE OF OKLAHOMA CHEROKEE COUNTY FILED 2008 OCT 28 PM 2: 20 SHIRLEY GLORY COUNTY CLERK BY ___ D.C.

**DEFENDANT IS ORDERED BACK:** _Nov 24_ , 200 _8_ @ _9:00_ , _A_ m.

Payments of fines, costs, fees, etc. shall be payable by money orders or cashier's checks (no personal checks or cash)
Include your name and case number - Payments shall be paid to the following entities:

| FINES AND COURT COSTS | RESTITUTION | DRUG FUND |
|---|---|---|
| Total of _____ | Total of _____ | Total of _____ |
| Payable in monthly payments of | Payable in monthly payments of | Payable in monthly payments of |
| _____ for _____ months | _____ for _____ months | _____ for _____ months |
| 1st payment due: _____ | 1st payment due: _____ | 1st payment due: _____ |
| **Payable to:** | **Payable to:** | **Payable to:** |
| Cherokee County Court Clerk | Office of District Attorney | Office of District Attorney |
| 213 W. Delaware, room 302 | Cherokee County Courthouse | Cherokee County Courthouse |
| Tahlequah, OK 74464 | 213 W. Delaware | 213 W. Delaware |
|  | Tahlequah, OK 74464 | Tahlequah, OK 74464 |

**I, THE DEFENDANT, UNDERSTAND THAT I MUST PAY AND COMPLETE ALL THE THINGS LISTED ABOVE AND MUST APPEAR BACK IN COURT ON THE DATE AND TIME SET FORTH ABOVE OR I WILL BE ARRESTED AND JAILED!!**

X _____
DEFENDANT

_____
DEFENDANT'S ATTORNEY

_____
DISTRICT COURT JUDGE

_____
ASSISTANT DISTRICT ATTORNEY

## IN THE DISTRICT COURT OF CHEROKEE COUNTY, STATE OF OKLAHOMA

**STATE OF OKLAHOMA**

**VS.**

*Charles ~~J.~~ J Sanders*

Fine(s)        Cost(s)

CASE NO: ~~CF~~
CF-98-111
CM-08-1525

DOB        D.L.#

sub-totals _____

TOTALS _____

Address

CITY        STATE        ZIP

DATE: *11-24-08*        MINUTE ORDER: *BWUA*
R. Alcon

*As bondsperson called to inform Court that I had eye sx. and could not travel for 10 days. I ordered to appear w/ note from Dr. and sign this minute w/in 10 days of this minute.*

**DEFENDANT IS ORDERED BACK:** *12/22*, 200*8* @ *9:00* *A* m.

Payments of fines, costs, fees, etc. shall be payable by money orders or cashier's checks (no personal checks or cash)
Include your name and case number - Payments shall be paid to the following entities:

| FINES AND COURT COSTS | RESTITUTION | DRUG FUND |
|---|---|---|
| Total of _____ | Total of _____ | Total of _____ |
| Payable in monthly payments of | Payable in monthly payments of | Payable in monthly payments of |
| _____ for _____ months | _____ for _____ months | _____ for _____ months |
| 1st payment due: _____ | 1st payment due: _____ | 1st payment due: _____ |
| **Payable to:** | **Payable to:** | **Payable to:** |
| Cherokee County Court Clerk | Office of District Attorney | Office of District Attorney |
| 213 W. Delaware, room 302 | Cherokee County Courthouse | Cherokee County Courthouse |
| Tahlequah, OK 74464 | 213 W. Delaware | 213 W. Delaware |
| | Tahlequah, OK 74464 | Tahlequah, OK 74464 |

**I, THE DEFENDANT, UNDERSTAND THAT I MUST PAY AND COMPLETE ALL THE THINGS LISTED ABOVE AND MUST APPEAR BACK IN COURT ON THE DATE AND TIME SET FORTH ABOVE OR I WILL BE ARRESTED AND JAILED!!**

_____        _____
DEFENDANT        DISTRICT COURT JUDGE

_____        _____
DEFENDANT'S ATTORNEY        ASSISTANT DISTRICT ATTORNEY

## IN THE DISTRICT COURT OF CHEROKEE COUNTY, STATE OF OKLAHOMA

**STATE OF OKLAHOMA**

**VS.**

*Charles Edmond Sanders*

CASE NO: *CF-98-111*
*CM-08-1525*

Fine(s)    Cost(s)

DOB          D.L.#

sub-totals

TOTALS

*2008 DEC 23  AM 7:17  SHIRLEY GLORY COUNTY CLERK*

Address

CITY        STATE        ZIP

DATE: *12-22-08*        MINUTE ORDER:

*∆ pres w/out his attorney Rob Cowan. Case reset to FSD.*

**DEFENDANT IS ORDERED BACK:** *January 26*, 200 *9* @ *9*, *A* m.

Payments of fines, costs, fees, etc. shall be payable by money orders or cashier's checks (no personal checks or cash)
Include your name and case number - Payments shall be paid to the following entities:

| FINES AND COURT COSTS | RESTITUTION | DRUG FUND |
|---|---|---|
| Total of _____ | Total of _____ | Total of _____ |
| Payable in monthly payments of | Payable in monthly payments of | Payable in monthly payments of |
| _____ for _____months | _____ for _____months | _____ for _____months |
| 1st payment due: _____ | 1st payment due: _____ | 1st payment due: _____ |
| **Payable to:** | **Payable to:** | **Payable to:** |
| Cherokee County Court Clerk 213 W. Delaware, room 302 Tahlequah, OK 74464 | Office of District Attorney Cherokee County Courthouse 213 W. Delaware Tahlequah, OK 74464 | Office of District Attorney Cherokee County Courthouse 213 W. Delaware Tahlequah, OK 74464 |

**I, THE DEFENDANT, UNDERSTAND THAT I MUST PAY AND COMPLETE ALL THE THINGS LISTED ABOVE AND MUST APPEAR BACK IN COURT ON THE DATE AND TIME SET FORTH ABOVE OR I WILL BE ARRESTED AND JAILED!!**

DEFENDANT

DEFENDANT'S ATTORNEY

DISTRICT COURT JUDGE

ASSISTANT DISTRICT ATTORNEY

546

## IN THE DISTRICT COURT OF CHEROKEE COUNTY, STATE OF OKLAHOMA

**STATE OF OKLAHOMA**
**VS.**

*Charles Edmond*
*Sanders*

Fine(s)        Cost(s)

CASE NO: *CF-98-111*
*CM-08-1525*

DOB _____ D.L.# _____

sub-totals

TOTALS

Address _____

CITY      STATE      ZIP

DATE: *1-26-09* _____    MINUTE ORDER: _____

*△'s atty called and in jury trial*

*700*

**DEFENDANT IS ORDERED BACK:** *2/23* _____, 200*9* @ *9:00* A.m.

Payments of fines, costs, fees, etc. shall be payable by money orders or cashier's checks (no personal checks or cash)
Include your name and case number - Payments shall be paid to the following entities:

| FINES AND COURT COSTS | RESTITUTION | DRUG FUND |
|---|---|---|
| Total of _____ | Total of _____ | Total of _____ |
| Payable in monthly payments of | Payable in monthly payments of | Payable in monthly payments of |
| _____ for _____ months | _____ for _____ months | _____ for _____ months |
| 1st payment due: _____ | 1st payment due: _____ | 1st payment due: _____ |
| **Payable to:** | **Payable to:** | **Payable to:** |
| Cherokee County Court Clerk<br>213 W. Delaware, room 302<br>Tahlequah, OK 74464 | Office of District Attorney<br>Cherokee County Courthouse<br>213 W. Delaware<br>Tahlequah, OK 74464 | Office of District Attorney<br>Cherokee County Courthouse<br>213 W. Delaware<br>Tahlequah, OK 74464 |

**I, THE DEFENDANT, UNDERSTAND THAT I MUST PAY AND COMPLETE ALL THE THINGS LISTED ABOVE AND MUST APPEAR BACK IN COURT ON THE DATE AND TIME SET FORTH ABOVE OR I WILL BE ARRESTED AND JAILED!!**

_____        _____
DEFENDANT                       DISTRICT COURT JUDGE

_____        _____
DEFENDANT'S ATTORNEY            ASSISTANT DISTRICT ATTORNEY

IN THE DISTRICT COURT OF THE 15TH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR CHEROKEE COUNTY

STATE OF OKLAHOMA,                  )
       Plaintiff,               )
                           )
                           )       CF-1998-111
vs.                                 )       CM-2008-1525
                           )
CHARLES SANDERS,                    )
       Defendant.              )

## MOTION FOR CONTINUANCE

COMES NOW, the Defendant, Charles Sanders, by and through his attorney, Rob Cowan,
and moves this court to continue the Hearing in above entitled case. In support of this motion the
defendant presents the statements in the attached affidavit. This motion is being presented in the
interest of justice and not for purposes of delay.

WHEREFORE, PREMISES CONSIDERED, the Defendant, Charles Sanders, respectfully
requests this court to grant a continuance in the above entitled cases.

Respectfully submitted,

Rob Cowan, OBA#16413
Attorney for Defendant
P.O. Box 41
Poteau, OK 74953
(918) 649-0675

## CERTIFICATE OF DELIVERY

I certify that on the 10th day of February, 2009, I delivered a true and correct copy of the
above Entry of Appearance to: Office of District Attorney, Cherokee County Courthouse, 213 W.
Delaware Tahlequah, OK 74464

Rob Cowan

## AFFIDAVIT

STATE OF OKLAHOMA )
) ss
COUNTY OF LEFLORE )

I, Rob Cowan, affiant, of lawful age, being first duly sworn upon my oath, state the following:

1)   I am the attorney of record for Charles Sanders in the above entitled case;

2)   The above entitled case is set for Hearing on February 23, 2009.

3)   Attorney for Defendant will be in Haskell County in Trial

4)   This motion is in good faith and not for purposes of unnecessary delay.

_____
Rob Cowan, Affiant

Subscribed and sworn to before me this 10th day of February, 2009.

Notary Public in and for
State of Oklahoma
Leflore County

549

IN THE DISTRICT COURT OF THE 15TH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR CHEROKEE COUNTY

| | | |
|---|---|---|
| STATE OF OKLAHOMA, <br> Plaintiff, | ) <br> ) <br> ) | |
| vs. | ) <br> ) | CF-1998-111 <br> CM-2008-1525 |
| CHARLES SANDERS, <br> Defendant. | ) <br> ) <br> ) | |

DATE: February 10, 2009                                    JUDGE: Pursley

## ORDER FOR CONTINUANCE

Now on this 10th day of February, 2009, this matter come before the Court on the Defendant's

Motion for Continuance. The Court finds that for good cause shown, the above entitled shall be

continued.

IT IS THEREFORE ORDERED, that the above entitled case are continued at the defendant's

request. This matter is set for Hearing on the **23, day of March, 2009 at 9:00 o'clock A.M.**

IT IS SO ORDERED

_____
Judge of the District Court

cc:    Office of the District Attorney
       Cherokee County Courthouse

       Rob Cowan
       Attorney for the Defendant

## Sheridan, Jeff

**From:** Gray, Richard
**Sent:** Monday, November 28, 2005 6:13 PM
**To:** Sheridan, Jeff
**Subject:** RE: DRAFT

Thanks for the update.

-----Original Message-----
**From:** Sheridan, Jeff
**Sent:** Monday, November 28, 2005 5:10 PM
**To:** Gray, Richard
**Subject:** FW: DRAFT

-----Original Message-----
**From:** Jeff sheridan [mailto:t63s2415@yahoo.com]
**Sent:** Friday, November 25, 2005 12:13 PM
**To:** jeff.sheridan@dac.state.ok.us
**Subject:**

I talked with D. Champlain concerning allegations of inappropriate conduct by investigators, Tommy Morgan and Jeff Landcaster. I met with DC at his place of business in Tahlequah at approximately 10:30 on 112505. I identified myself and ask him if he would allow questions concerning one of the DTF investigators. I ask him if he perceived any inappropriate conduct or questions by Jeff Lancaster or Tommy Morgan concerning bad checks written by CJ. He advised that "This is getting blown way out of proportion. TM and JL apparently came into his store and requested any bad checks, as they always do. One of the employees mentioned bad checks written by CJ. TM and JL ask the clerks if they would like to give the checks to them and have them collect the checks. DC was contacted by his employee and said "No, he would hang on to them for a while, and eventually, the checks cleared. I ask DC if he felt any pressure to give the checks to TM or JL. He said no, "CJ had just written the checks and should have come by and picked the up and now he has his fit in the ringer." He indicated the TM and JL treated these checks like any other checks were received with insufficient funds.

Yahoo! Music Unlimited - Access over 1 million songs. Try it free.

11/29/2005


DEFENDANT'S EXHIBIT

695

11-7-05
CJ called at approximately 0400 to advise that he was going to assist Mike Littlefield until about 1830. I advised him to make up the time on the 8th.

11-8-05
CJ called at 19:59 last evening. Courtney is going to the doctor about his back this morning. CJ should be making up the time off today, approximately three (3) hours.

CJ called and advised he was out until 1:30. He received information concerning a hydroponics lab. Wanted to do warrant. Said OK, just stay in touch. Advised him not to exceed 43 hours of work. CJ indicated he would take off today and maybe a vacation day on Thursday.

11-9-05
Jim and Courtney have called in 10-8, not heard from CJ. Could be making up excess work hours for previous days. I need to check on $705 which CJ had in possession. Waiting on more details concerning the money.

11-14-05
Jim called in and advised he would be here today. Tomorrow in OKC.
CJ called and advised he was going to OKC @ 1400 and would be there tomorrow. CJ has not turned in the CI files as requested over one week ago. He should have had those returned by 11-10-05. Called CJ and advised need originals and he can keep copies.

11-16-05
Talked with CJ and again advised that I need Confidential Informant files. Advised I needed Originals. If there were any deactivated, still needed the files. Advised if they were prior to July, update the files with finger prints and photos and turn them in to me. Additionally advised that I needed his memo on activity for last week and fuel record. He advised he would come to Sallisaw with the documents. (did not receive files)

CJ called and advised that he was waiting on DEA concerning a teacher at Bunch School Ordering RP. I said, I will get with you tomorrow on the files and memo, and do not work over 43 hours.

CJ called while I was on my way home concerned about Mr. Mark Fox. He did not want to produce documentation concerning his activity with the DTF and was unsatisfied with Donovan's position of documenting. I called Donovan and he told me that Judge Sewell was mad that Mark Fox was not going to jail. The documentation would insure unsupervised probation, without he will get supervised.

11-17-05
Talked with DD about Mark Fox. He indicated that Judge Sewell will want to see documentation of activity prior to sentencing. Without documentation, Mark Fox would receive a suspended supervised sentence as opposed to unsupervised. CJ advised that he



DEFENDANT'S EXHIBIT

685

we do not comply with agreements with a CI, he will lose credibility. I told CJ of our conversation, he said he would talk with DD. CJ told me that DD had all confidential informant files. Called DD and he told me he had one file. I was under the distinct impression DD had several files.

CJ wanted $200.00 of funds for CI work. He filled out a CF-2 form and gave it to me. I called Chrissy and requested the money.

11-21-05
CJ TOLD ME THAT CI FILES PREVIOUS TO 2003 WENT WITH DIANE. HE ADVISED THAT $233 WAS GIVEN TO CI BY DONOVAN. ORIGINAL WAS SHOWN TO DONAVAN. WAS LOOKING FOR DOCUMENTATION OF $705. CJ IS STILL TO PROVIDE WITH DOCUMENTATION CI FILES USED IN 2003 IF CI WAS USED DURING THIS ADMINISTRATION. NEED TO SEND CONFRIMATION LETTER OF DISCUSSION. I NEED CALL DIANE FOR PRIOR TO 2003 FILES. CJ CALLED AND ADVISED HIS CHILD WAS SICK AND ASK OFF. I AUTHORIZED TIME OFF AND ADVISED HE NEEDED TO HAVE DOCUMENTATION BY WEDNESDAY ON CI FILES.

112205
CJ CALLED THIS AM AND ADVISED HE NEEDED MORE TIME TO REVIEW HIS CI FILES. I AGREED TO EXTEND THE TIME TO MONDAY. CJ ADDITIONALLY ADVISED HE WOULD BE WORKING WITH JUSTIN HUTCHISON AND A CI TODAY. CJ ASK IF I HAD TALKED WITH DD ABOUT CRUISE. I TOLD HIM I DID NOT KNOW THE NAME CRUISE. I ADVISED I HAD TOLD RICHARD ABOUT BRUSHY SCHOOL AND THE USE OF A COMPUTER TO ORDER PRECURSOR. CJ CALLED IN 22 MINUTES LATE. CJ TOLD ME THAT NO ONE WOULD WORK WITH HIM, NOT THE TPT, CCSO OR THE MARSHALS.

112305
CJ CALLED 20 MINUTES LATE TODAY. REMINDED HIM OF THE MEMO. FOR 8:00. CJ ADVISED THAT HE WAS SET UP IN WAGONER. JIM AND HIS WIFE HAD TRIED TO SET HIM UP. HE WAS RELUCTANT TO GO TO WAGONER AND WORK WITH JIM. HE ALSO ADVISED THAT JEFF LANCASETER AND TOMMY MORGAN WERE PRESISTENT IN GETTING HIS HOT CHECKS FROM THE CONVIENCE STORE. I TOLD CJ THAT IT WAS MY UNDERSTANDING THAT THE CLERK HAD BROUGHT THE CHECKS TO THEIR ATTENTION. CJ ADVISED THAT JEFF AND TOMMY HAD CALLED THE OWNER AND WANTED THE CHECKS HE SAID THAT THE ISSUE WOULD BE TAKEN TO THE GRAND JURY. I ADVISED THAT IT WOULD BE NECESSARY FOR HIM TO GO TO WAGONER. HE WANTED TO GET TOGETHER AND DISCUSS THINGS THAT I NEEDED TO KNOW. I ADVISED THAT I DID NOT KNOW ABOUT CONFLICTS WITH JIM AND THAT I DID NOT WANT TO KNOW ABOUT OTHER ISSUES CONCERNING THE GRAND JURY. HE INSISTED WE NEEDED TO GET TOGETHER. I TOLD CJ TO THINK ABOUT HOW HE WOULD FEEL CONFORTABLE WORKING WITH THE DTF. HE ADVISED IF HE HAD

686

SOMEONE WITH HIM TO WORK A CI TO SIGN THE CR-5. I ASSUME THAT HE MEANT FROM CHEROKEE OR ADAIR COUNTIES. I MADE MENTION OF THE CI FILES NEEDED TO BE COMPLETE AND HE SAID THEY ARE DONE.

I TALKED WITH CJ ABOUT THE USE OF THE CHEROKEE COUNTY OFFICE AND ADVISED THE DD DID NOT LIKE US USING THE OFFICE. APPARENTLY HIS CONCERN WAS OVER TAKING UP ATTORNEY SPACE. I CALLED RG AND ADVISED THAT WE WOULD NEED TO MEET IN WAGONER ON OCCASION, THERE SHOULD NOT BE A PROBLEM, JUST MAKE PLANS FOR SPACE. CJ ADVISED THAT HE HAD ASK FIRST BEFORE USING THE OFFICE. I ADVISED THAT I WAS DOCUMENTING FILES ON LATE CALLS.

CJ CALLED AND WAS GOING TO TAKE OFF. HE WOULD TRY TO DO THE BUST ON BRUSHY NEXT WEEK. THE FEDS WOULD BE INVOLVED IN THE PROSECUTION AND THE JIM WOULD HELP HIM. I TOLD CJ I WAS CONCERNED ABOUT HIS DISCOMFORFT IN WORKING WITH THE DTF AND NEEDED TO TALK WITH HIM. I ADVISED WE COULD TALK WHEN I RECEIVED THE FILES ON MONDAY.

112805
RECEIVED CI FILES FROM CJ AT THE CHEROKEE COUNTY SHERIFF'S OFFICE. . TALKED AT LENGTH ABOUT HIS DISCOMFORT WITH WORKING WITH THE INVESTIGATORS. HE INDICATED THAT HE WAS IN A HOSTILE WORKING ENVIROMENT. I ASK WHAT COULD BE DONE TO ASSIST HIM. HE INDICATED ASSIGNMENT TO FEDS.

112905
RECEIVED CI FILES FROM CJ ON MONDAY. DISCOVERED WE NEEDED CF-5 FORMS FOR FILES AS WELL. CJ WENT TO TAHLEQAH AND COPIED THE FILES TODAY. I PROVIDED HIM WITH $200 FOR CI AND RECEIVED PROPER FORM. WE DISCUSSED ASSIGNEMENT TO OBN OR THE FEDS. HE SAID HE WANTED TO MAKE TO TRASITION ON A TEMPORARY BASIS. HE FEELS THAT HE IS IN A HOSTILE WORKING ENVIOROMENT. CONTACTED TOM AT DAC AND ASK WHAT DOCUMENTATION WILL BE NEEDED. HE SAID COOPERATIVE AGREEMENT. ADVISED RG, WAITING ON DOCUMENTATION FROM OBN.

120505
I HAD AN OPPORTUNTIY TO REVIEW CF-5 FORMS ON THURSDAY AND FRIDAY OF LAST WEEK. THERE ARE TOO MANY CR-5 FORMS FOR THE FILES THAT WERE PRODUCED. THERE ARE ONLY ONE SIGNATURE ON SEVERAL OF THE FILES (13 OF 28 APPOXIMATELY) TALKED WITH TOM CUNNINGHAM ON FRIDAY, HE ADVISED THAT HE HAS SEEN DEFECTS ON CF-5 FORMS, LIKE 1 IN 100 FILES. WE ARE AT APPROXIMATELY 50% FAILURE. CJ CALLED THIS MORNING AND SAID HE TALKED WITH TOM CUNNINGHAM ON FRIDAY AND THE FILES DID NOT REALLY NEED TO BE

687.

UPDATED IF THEY WERE OLD FILES, OR FILES INITIATED WITH DBH. I WILL CALL TODAY AND TALK WITH CUNNIGNHAM.

121405

I HAVE ATTEMPTED TO OBTAIN ALL CI FILES FOR THE DTF FOR APPROXIMATELY ONE MONTH FROM CJ. THE ORIGINAL REQUEST WAS MADE ON AT THE MEETING WITH THE DTF WITH ALL PRESENT. THE PRODUCTION OF THE CI FILES WAS TO TAKE PLACE ON 111005. THAT DID NOT OCCUR FOR REASONS OF ILLNESS IN THE CJ FAMILY. THE DATE THEN WAS MOVED TO THE 111305 AND THEN 111505. AT THAT TIME PRODUCTION OF 12 FILES TOOK PLACE WITH PARTIAL INFORMATION PRODUCED AS TO A COUPLE OF OTHERS.

UPON FUTHER REVIEW OF THE FILES ON APPROXIMATELY 120305, I REALIZED THAT NONE OF THE FILES HAD CF-5 FORMS OR CRIMINAL BACKGROUND CHECKS. I REQUESTED ALL CF-5 FORMS FROM CJ AND RECIEVED APPROXIMATELY 28. APPROXIMATELY 50% OF THE FILES ONLY HAVE ONE SIGNATURE ON THE CF-5 FORM. I BROUGHT THAT TO THE ATTEMTION OF CJ AND HE ADVISED THAT I COULD SIGN THE FORM AS SUPERVISOR, THAT IS NOT THE CASE.

I CALLED ADN TALKED WITH TOM CUNNINGHAM CONCERNING THIS ISSUE. HE ADVISED THAT THERE HAVE BEEN OCCASSIONS WHERE AN OFFICER DID NOT OBTAIN THE SECOND SIGNATURE, BUT IT WAS "ONE IN ONE HUNDRED FILES. AGAIN, OUT OF THE TWENTY EIGHT CR-5 FORMS PRODUCED, THIRTEEN LACK A SECOND SIGNATURE. TOM CUNNINGHAM SAID THERE WERE WAYS OF ESTABLISHING THAT THE TRANSACTION TOOK PLACE, LIKE HAVE THE PURCHASED CDS. I HAVE NOT ATTEMPTED TO CONFIRM ANY OF THE FILES WITH ANOMILIES AT THIS POINT. I AM HESITANT TO SELF POLICE SUCH A SUBSTANTIAL DEVIATION IN POLICY.

TOM CUNNINGHAM CAME TO THE DTF OFFICE ON 120905 AND MET WITH ALL DTF MEMBERS TO REVIEW THE FILES AND TO PROVIDE INFORMATION CONCERNING CI FILES. TOM HAS TAKEN COPIES OF THE CF-5 FORMS AND COPIES OF CHECKS WERE WRITTEN FOR CONFIDENTIAL FUNDS. AT THIS POINT I HAVE NOT HEARD FORM TOM. HE DID INDICATE THAT WE MAY BE PLACED ON DRAW HOLD STATUS DUE TO OUR NON-COMPLIANCE. I ASK TOM HOW BAD THIS PROBLEM WAS COMPARITIVELY ON A SCALE FROM ONE TO TEN, HE SAID EIGHT.

IN THE HYPOTHETICAL, IF ONE WERE TO TAKE MONEY TO BE USED TO PURCHASE OF INFORMATION AND OR CDS AND MISAPPROPRIATE THOSE FUNDS, THE FOLLOWING COULD BE THE MANNER IT WOULD BE ACCOMPLISHED. BUY INFORMATION SO THAT THERE IS NO TANGIBLE EVIDENCE OF THE BUY OR ALLEGEDLY BUY CDS AND NOT LOG IT INTO EVIDENCE, SENT IT TO OSBI OR HAVE DOCUMENTATION CONCERING DESTRUCTION. THAT IS WHAT HAS HAPPENED HERE.

TOM ASK CJ IF HE HAD DOCUMENTATION AS TO DESTRUCTION. HE SAID NO. IT IS MY UNDERSTANDING THAT IN ORDER TO HAVE CDS DESTROYED; YOU MUST HAVE DOCUMENTATION PRESENTED TO OSBI.

688

WITHIN TWO HOURS OF OUR MEETING, CJ CALLED AND ADVISED HE HAD AFFIDAVITS FROM HIS CONFIDENTIAL INFORMANTS. I ASK HIM IF THE AFFIDAVITS WERE NOTORIZED. HE SAID NO. I ADVISED THAT ALL AFFIDAVITS MUST BE NOTORIZED WITH DATE AND AMOUNT OF PURCHASE. ADDITIONALLY, I REQUIRED A PRINT OF THE CI ON THE AFFIDAVIT. LATER IN THE SAME EVENING CJ TOLD ME THAT JAMES CARVER AND JERRY STEPHENS COULD SIGN ON MANY OF THE CF-5 FORMS. PREVIOUSLY HE HAD ADVISED THAT ONE REASON THAT THERE WAS NOT TWO SIGNATURES ON CF-5 FORMS IS THAT, " HE DID NOT TRUST SOME LAW ENFORCEMENT WITH HIS CONFIDENTIAL INFOMANTS". TODAY CJ CALLED ME AND TOLD ME THAT HE HAD TALKED WITH FRANK LOYD AND SAID THAT FRANK DID NOT BELIEVE THE TWO SIGNATURE ISSUE WAS "THAT BIG A DEAL". I TALKED WITH FRANK BEFORE LUNCH. HE ADVISED THAT THERE WAS A MEETING IN 2000 OR 2001 CONCERNING THE TWO SIGNATURE REQUIREMENT AND IT WAS AN ABSOLUTE REQUIREMENT. I ASK FRANK IF HE HAD TALKED WITH CJ LATELY CONCERNING CI FILES, HE SAID NOT IN A COUPLE OF YEARS.

AT THIS JUNCTURE, AS I REVIEW THE JAG GUIDELINES AND HAVE CONVERSATIONS WITH TOM CUNNINGHAM, I RECOGNIZE THAT THIS IS A SERIOUS ISSUE WITH FEDERAL REPROCUSSIONS. SINCE THERE IS AN INDICATION THAT NOT ALL FILES FOR THE PAST FIVE YEARS HAVE BEEN PRODUCED AND IN CONSIDERATION OF THE LACK OF A SECOND SIGNATURE ON SO MANY FILES, IAM FEEL I WOULD BE REMISS NOT TO REQUEST AN INDEPENDENT INVESTIGATION OF THE FILES. THEREFORE, I AM REQUESTING AN AUDIT OF THE CI FILES AND RECORDS RELEVANT TO THE USE OF THOSE FILES BY THE STATE AUDITORS OFFICE.

121405
I HAD LONG CONVERSATIONS WITH TOM CUNNINGHAM CONCERNING THE PROPER AVENUE TO SUPPLEMENT OUR DTF FILES. I CONVEYED MY CONCERN THAT SOMEONE OTHER THAT THE ONE THAT VIOLATED POLICY SHOULD ACTUALLY OBTAIN DOCUMENTATION. IT APPEARED TO ME THAT TOM WAS CONCERNED WITH DOCUMENTATION. I AM CONCERNED WITH VALID DOCUMENTATION. TOM SUGGESTED GETTING AN INDEPENDENT INVESTIGATOR TO SUPPLEMENT THE FILES, I AGREED. I ASSIGNED COURTNEY BATES TO THE TASK TO BE ASSISTED BY JIM JONES. CJ CAN BE PRESENT, BUT NOT PARTICIPATE IN THE PROCESS. ALL CONVERSATION IS CONTAINED IN MEMO TO DTF DATED ON THE 14TH.

121605
I TALKED TO CJ ON 121405, HE SAID HE WAS SICK AND TOOK OFF IN THE PM. ON THE 15TH HE SAID HE WAS SICK AND TOOK OFF ALL DAY. IN THE EVENING HE CALLED AND SAID HE WAS GOING TO DO A KNOCK AND TALK, I SAID OK, DO NOT GO OVER 43 HOURS. HE TOLD ME ON THE 16TH THAT HIS SISTER WAS GOING TO HAVE SURGERY (BRAIN) AND THAT HE WOULD BE OFF A COUPLE DAYS NEXT WEEK. I CALLED AND TOLD CJ

THAT WE NEEDED TO STAY FOCUSED ON GATHERING INFOMATION. HE SAID OK. CB CALLED AND ADVISED HE IS HAVING TROUBLE GETTING CJ'S CI'S. HE IS GOING TO CALL CJ AND HAVE HIM DELIVER THE CI'S TO THE DTF FOR INTERVIEW. CJ CALLED AND ADVISED HE WAS TREATED LIKE A CRIMINAL. TALKED WITH TOM, CLINT AND COURNEY. ALL SHOULD TRY TO WORK TOGETHER TO DOCUMENT FILES. CJ WANTS AN OSBI INVESTIGATION.

122305
I SPOKE WITH CJ ON 122005, HE ADVISED HE SISTER WAS SICK. HE HAD SEVERAL DAYS PREVIOUSLY INDICATED THE SAME. SHE WAS TO UNDERGO BRAIN SURGERY. IN THE MORNING, HE CALLED AND RELATED THAT HE HAD JUST BEEN CALLED TO COURT. I ADVISED THAT HE SHOULD HAVE BEEN SUBPOENAED. HE ADVISES HE WAS JUST CALLED. I ADVISED THAT HOPEFULLY IT WOULD NOT TAKE LONG. I DID NOT RELEASE HIM FROM HIS OBLIGATION. I WAS LATER CALLED BY JUDGE BROWN. SHE WAS UPSET THAT CJ WAS NOT AT COURT, AND HE HAD CALLED. SHE WANTED TO KNOW WHO TO TALK TO ABOUT CJ. I SAID TALK WITH ME. SHE SAID SHE HAD DECIDEC TO HAVE ONLY PERSONAL SERVICE ON CJ. I ASSURED HER HE WOULD BE IN COURT. CJ TOOK OFF THE 20TH-23RD.

CJ CALLED EARLIER IN THE WEEK, ADVISING THAT HE WANTED TO BE IN THE INTERVIEW WITH HIS CI. I TOLD HIM THAT I AM GOING TO LET COURTNEY CONDUCT THE INVESTIGATION AS HE SEES FIT. I WAS NOT TRYING TO KEEP HIS THE CI FROM HIM, HE WAS DRIVING THE CI TO THE INTERVIEW AND WITH THEM FOR 30 PRIOR AND AFTER THE INTERVIEW. CJ TOLD ME THAT COURTNEY WAS TREATING HIM LIKE A FUCKIING CRIMINAL. I ADVISED THAT WE WERE ONLY TRYING TO GATHER DOCUMENTATION. PERSONALITILES WERE JUST GETTING INVOLVED AND WE SHOULD ALL BE RESPECTFUL TO ON AND OTHER SO THAT WE CAN WORK ON THIS IN AN EXEDITIOUS MANNER.

122605
TALKED WITH FRED ELLIS OF MCGJ. ADVISED OF MY CONCERNS INVOLIVING THE DTF AND MISREPRESENTATION. CJ CALLED ON MY WAS BACK FROM MCGJ AND HE ADVISED HE HAD A LETTER FROM IS ATTORNEY. HE READ IT TO ME. I TALED WITH HIS ATTORNEY AND SHE ADVISED THAT SHE HAD NOT WRITTEN A LETTER, JUST GIVEN CJ AN ENVELOPE.

122805
I HAD A DISCUSSION WITH CJ IN THE DTF OFFICE. HE HANDED ME A LETTER FROM HIS ATTORNEY. I SPOKE WITH HIM ABOUT HIS CONCERNS. WE TALKED ABOUT JUDGE BROWN TELLING ME THAT SHE WAS GOING TO HAVE HIM PERSONALLY SERVED. HE SAID THAT HE DID NOT GET HIS SUBPOENA IN TIME. I WROTE A MEMO ASKING FOR ENUMERATION OF

EVENTS OF HARASSMENT, A LETTER FROM HIS DOCTOR. I ADVISED THAT WE HAD TO DOCUMENT THE FILES AND THEN WE COULD MOVE ON TO ASSIGNMENT WITH OBN OR DEA. HE TOLD ME THAT HE DID NOT BELIEVE I HAD IMPEADED HIS ASSIGNEMENT. HE SAID THAT HE HAD TOLD ME ON THE WEEK OF THE 12TH ABOUT MEETING ON THE 19TH WITH DEA. I TOLD HIM I HAD NOT HEARD ANYTHING ELSE FROM HIM ON THE MEETING. I ALSO ADVISED THAT HE NOW WANTS TO GO WITH OBN INSTEAD OF DEA.

I RECIEVED A CALL FROM MS. MEANS. SHE INDICATED THAT SHE WOULD FILE HER TORT CLAIM IN FEBRUARY. THAT SHE COULD NOT BELIEVE "HIS WITNESSES WERE TURNED OVER TO A LAYMAN." I ADVISED THE CI FILES WERE TURNED OVER TO INVESTIGATORS. I TOLD MS. MEANS THAT I WOULD DOCUMENT OUR CONVERSATION. SHE ADVISED THAT CJ NEEDED COUNSELING AND THAT OPERS COULD SUPPLY THAT COUNSELING.

123005
TALKED WITH CJ ABOUT THE CHAMPLAIN SITUATION.HE HAD INDICATED THAT HE HAD GONE BACK AND TALKED WITH HIM AGAIN. T HE HAD A WRITTEN STATEMENT FROM CHAMPLAIN. I CALLED CHAMPLAIN, HE SAID HE DID NOT WRITE A STATEMENT. CJ TOLD ME THAT MITTY MEANS HAD WRITTEN A LETTER TO ME. I ASK FOR CLARIFICATION AS TO WHO DRAFTED THE LETTER, CJ SAID MITTY MEANS. I TALKED WITH MITTY MEANS AND SHE SAID SHE DID NOT WRITE THE LETTER. I BELIEVE CJ IS LYING TO ME ABOUT CERTAIN THINGS. I CALLED TODAY AND TOLD HIM THAT PRIORITY IS OBN ASSIGNMENT ON TUESDAY AFTER THE HOLIDAY. I TALKED WITH FRED ELLIS AND ADVISED HIM OF THE MORE INCONSISTENCIES AND THAT I WOULD HAVE DIFFICULTY WORKING WITH CJ UNDER THESE CIRCUMSTANCES OF MISREPRESENTATION. CJ HAS NOT TURNED IN ANY REPORTS ON INVESTIGATIONS THAT HE WAS INVOLVED IN DURING NOVEMNBER AND DECEMBER OF 2005.

010306
I CALLED AND TALKED WITH LEE COHLMIA WITH DAC ABOUT CJ. SHE ADVISED THAT THERE ARE COUNSELING PROGRAMS THAT ARE OFFERED THROUGH THE STATE OF OKLAHOMA. THE EMPLOYEES BENIFIT COUNSEL PROVIDES FREE COUNSELING IN CONJUNCTION WITH EMPOYEES ASSISTANCE PROGRAM. I CALLED CJ AND ADVISED OF THE FREE SERVICE AND TOLD HIM IF HE NEEDED TIME OFF, TAKE ONE, TWO OR THREE WEEKS. HE SAID HE WOULD CALL MITTY AND LET ME KNOW.

TALKED TO LONNIE WRIGHT AT OBN. I ADVISED HIM THAT I HAD BEEN TOLD THAT CJ COULD BE ASSIGNED TO OBN. HE HAD NO IDEA WHAT I WAS TALKING ABOUT. HE WANTED TO KNOW IF I WANTED HIM TO DIRECT HIS MY DRUG TASK FORCE. I ADVISED I WAS NOT TRYING TO SHIRK MY RESPONSIBILITY, I WAS SIMPLY ATTEMPTING TO CONFIRM WHAT I HAD BEEN TOLD. WHAT CJ HAD TOLD ME WAS A COMPLETE LIE.

I CONACTED FRED ELLIS AND ADVISED THAT THE OBN OPTION WAS ALSO A MISREPRESENTATION.

1-5-06
CALLED FRED ELLIS AND ADVISED I MISSED HIS CALL, THAT I WAS IN WAGONER. I LEFT A MESSAGE THAT IT WOULD BE DIFFICULT TO WORK WITH CG. RECEIVED A MEMO FROM DD ABOUT JIM HINES CASE. THERE IS MISSING CDS IN THE CASE INVOLVING CJ.

December 27, 2005

Jeff Sheridan
Drug Task Force Director
120 E. Chickasaw
Sallisaw, OK 74955

Re: *Work Related Health Issues*

Dear Jeff,

Please allow this letter to serve as notification that due to continual, unwarranted harassments caused by the District Attorney's Office, I have developed a medical condition. My physician has advised me to consult with a counselor to deal with said working environment stress. It is the advise of my physician that due to my health issues being work related the cost could be at the expense of the District Attorney's Office. Please allow this letter to also serve as a formal request by myself for that expense to be provided to me.

I have a passion for my profession and the endorsement of many co-workers and agencies. I believe that there are no circumstances under which my employment with current administration will ever improve. While, I have made several suggestions to try to alleviate the tension with said administration, nothing has been resolved or attempted to be resolved.

Please provide me written correspondence as to the position the District Attorney's Office will take in regards to my proposed counseling services being paid for. Thank you in advance for your consideration and time. I look forward to a resolution to this matter.

Respectfully,

Clint Johnson

*[handwritten notes:]*
1.) Documentation for DA.
2.) Enumeration of acts construed as harassment.
3.) Suggestions

DEFENDANT'S EXHIBIT

742

560

MEMO

TO:    CLINT JOHNSON
FROM: JEFF SHERIDAN
RE: LETTER OF 122705

PLEASE PROVIDE DOCUMENTATION FROM YOU DOCTOR INDICATIONING ANY MEDICAL CONDITION THAT MAY BE EXISITING AT THIS TIME. ADDITIONALLY, PLEASE IDENTIFIY ANY INCIDENTS OF HARASSMENT WHICH MAY HAVE OCCURRED, TIME, PLACE AND INDIVIDUAL INVOLVED.
AS YOU KNOW, I REMAIN CONCERNED ABOUT DOCUMENTATION OF THE FILES. I BELIEVE AT THIS POINT, IT INVOLVES DOCUMENTATION FOR COMPLIANCE WITH THE JAG. ONCE THAT IS COMPLETE, WE MAY MOVE ON WITH OTHER OPTIONS.

743

Ms. Yahodhara Mohanty-Means,

This is a confirmation of our discussion of December 28, 2005, wherein you called me concerning Clint Johnson. You called with concerns of harassment being incurred by Clint Johnson. I requested from you as well as from Clint Johnson on this day that you identify the source of any perceived harassment so that, if any exists, it may be addressed. You advised me that advised that you would file your Tort Claim in February of this year. You then made vague reference to Richard and Vyrl.

I again ask for specific information concerning any alleged harassment. That type of activity will not be tolerated and will be stopped. I do need direction as to the individuals specifically involved. Please reconsider you position as to your refusal to identifying specific instances of alleged misconduct.

I the issue of counseling was discussed by yourself as well as Clint Johnson. I ask Clint Johnson to provide me with documentation from his doctor prescribing counseling sessions. I advised Clint Johnson that I believed that insurance would be his avenue to pay for such treatment. I will explore other alternatives that may exist to pay for such counseling.

Finally, you called me in a representative capacity. I found no indication from our discussion of your desire to limit communication between Clint Johnson and this office. Please clarify you position as soon as possible.

744

# MEMO

TO: CLINT JOHNSON
ROM: JEFF SHERIDAN

DATE:112105

Clint,

Please find below a list of items which we need to provide clarification. Review documents relevant to these items and provide copies, or a narrative concerning any information you may have concerning the items. You may fax the documents to me at the Sequoyah County Office, 918-775-1215.

1. CP-03-381 (Blake Keely) $705.00 was forfeited by our office. Records from the Tahlequah Police Department show that you received the money on 012803. There is no history of deposit of the sum in any account for District 27.

2. CP-05-449 (Wesley Hathcoat) The original receipt of the money received from Hathcoat needs to be provided for clarification purposes.

3. CV-03-140 (Alfredo Rivera) Any and all documentation in relation to $233.00. Our files do not reflect Rivera receiving the money.

Please attempt to provide the above ASAP, and direct your attention on these items exclusively so that sufficent documentation may be provided for our files.

Additionally, you are aware that the DTF must maintain files for five (5) years, pursuant to JAG requirements. There must be a central depository for all files and I, as Director, will secure the files in a fire proof cabinet. All deactivated files, and active files should be maintained in the depository. You should maintain you personal copy for purposes of checks and balances. Any time that an active file needs to be updated, you must update your copy, as well as the original, that I will maintain. I thought we were to exchange the files last week. You advised that Donavan had the files, and when I called, he had only one file. After reflecting on our conversations, I realized you believed that only files for this grant period need be produced. Any CI that is currently being used, regardless of when the CI was originally avtivated, must have have all the proper documents in their file as listed in the 2005 JAG Guidelines. All deactivated files need not be updated, but must be returned to the depository.

I am especially concerned about the files absent from a depository after several months into the present JAG. This must be addressed



immediately. The CI files must be produced by Wednesday. We can meet in Wagoner and place the files in the depository, as you know, I will have exclusive access.

MEMO

TO: RICHARD GRAY
FROM: JEFF SHERIDAN
RE: DRUG TASK FORCE

As you know, the DTF records maintained by the investigators were grossly inadequate. At the direction of Tom Cunningham, Courtney Bates has done an exemplary job of bringing us in to some symbolence of compliance with the JAG. The failure to keep proper records have resulted in two weeks of records searches, affidavit supplementation and attempts at corroboration, of various confidential funds records. After reviewing the information which was supplied, Tom Cunningham has requested additional information, which will take another week to accumulate, if possible. The prospect of our inability to properly document files is probable, and the request for repayment of some federal funds is possible.

When I first realized of the inadequacy of our records, I requested Clint Johnson to present me with confidential informant information. I then requested all of his CF-5 forms. After confirmation of the validity of my request with Tom Cunningham, Clint produced information. A substantial number of his CF-5 forms were lacking essential documentation to satisfy the JAG requirements. Late last week, two weeks after the initial production of the information, Tom Cunningham indicated that Clint had approximately eleven CF-5 forms missing. The purpose of those forms was to document the transfer of approximately one thousand dollars to confidential informants.

I have spoken with Clint on several occasions concerning the confidential informant files, as well as other aspects of the DTF. On several occasions he has provided me with information which was inaccurate, and without any factual basis. I perceive the representations to be intentionally misleading. It concerns me that I have encounter so many instances of misrepresentation from one individual over such a short period of time. I have no confidence in his ability to be truthful and forthright. I am not comfortable working with an individual with whom I have no trust, where investigators are working in a confidential capacity in undercover situations, where trust is essential.

One occasion of misrepresentation was when Clint Johnson had written insufficient fund checks to Champlain's Store in Tahlequah. Clint advised me that Jeff Lancaster and Tommy Morgan were out to get him. He advised they had learned of his checks after digging through the pouch of checks that were returned to the store. He advised they insisted on taking the checks. I contacted the owner and he advised that nothing inappropriate had occurred. It was simply that "He (Clint) had gotten his tit in a ringer, and he should have taken care of the checks. He has blown this all out of proportion." Later, Clint advised that he had talked with the owner, Dale Champlain and received different information, and advised he had a written statement of the owner. I again contacted Mr. Champlain and he advised, "he had written no statements".

Another situation involved the discussion of the importance of confidential fund records with Frank Loyd of Sequoyah County Sheriff's Department. Clint advised that he had talked to Frank and that "Frank did not think the CF-5 forms were any big deal either". I had an opportunity to talk with Frank about the CF-5 forms. He advised that in



the year 2000-2001 that he had attended a seminar on the forms and indicated that two signatures were important. I ask him when he last spoke to Clint concerning confidential fund records, he said, "I have not talked with Clint about CI records in two or three years".

When I was attempting to gather all of the confidential informant information Clint misrepresented the location of files. I had talked with Clint on two separate occasions about getting together to transfer the information he had in his notebook so that I may develop confidential informant files to be placed in a depository. I met with Clint in Tahlequah in the Sheriff's Office. Clint had his notebook with him, which is approximately two to three inches thick. I ask him if he had copies of the files for me, he told me that Donovan had copies of the files. I moved my hand toward his files and indicating with my hand I ask him, "Donovan has a copy of all of these files"? Clint said, "Yes". When I arrived back to my office, I called Donovan about the files. He indicated he had one file. Clint later gave me approximately twenty three separate individuals and some documentation for each file.

I decided to contact Ms. McCormick with the Multi County Grand Jury concerning my history with Clint. I spoke with Fred Ellis, an investigator with the Multi County Grand Jury. I advised as to the inadequate and missing CF-5 forms. I additionally advised him of instances which I perceived to be lying. I expressed my concern about the preception that any act to rectify the misrepresentations would be seen as retalilation. When I was on my way home from Oklahoma City Clint called me and told me he had a letter from his attorney, Mitty Means. I ask him what the letter concerned and he read it to me. Clint gave me a copy of the letter the next day. Soon thereafter, I spoke with Mrs. Means and inquired about the letter and ask her if she had written the letter his signature. She said she did not write the letter, only gave Clint an envelope. In an attempt at clarification, I again ask Clint if Ms. Means had drafted the letter, he said that "she wrote the letter". The envelope that he presented with the letter had a return address for Ms. Means, but her name was incorrectly spelled. The letter was addressed to me.

Finally, Clint had told me that he wanted to be assigned to OBN. I ask if he had it approved and everything was ready, and he agreed. He said that after the holidays, when everyone returned, all we needed to do was sign papers. I ask who the contact people were, and he advised, "Cindy Cunningham and Lonnie Wright". I called Lonnie Wright on the 3rd of January and addressed the situation. He advised that he was not aware of any such agreement and that he would be aware if one existed, because he would have to approve it". He went on to suggest that I wanted him to supervise my investigators. I assured him that was not the case, that I was not trying to shirk my responsibility and that I had received some incorrect information.

There is indeed an unfortunate pattern of inaccurate information. This list is not inclusive of all misrepresentations by Clint, hopefully it will suffice to show the basis for my concern. Based upon the foregoing, I would recommend the termination of Clint Johnson from his capacity as investigator for District Twenty Seven Drug Task Force.

642

MEMO

TO: RICHARD GRAY
FROM: JEFF SHERIDAN
RE: CONFIDENTIAL INFORMANT FILES

I HAVE ATTEMPTED TO OBTAIN ALL CI FILES FOR THE DTF FOR APPROXIMATELY ONE MONTH FROM CJ. THE ORIGINAL REQUEST WAS MADE ON AT THE MEETING WITH THE DTF WITH ALL PRESENT. THE PRODUCTION OF THE CI FILES WAS TO TAKE PLACE ON 111005. THAT DID NOT OCCUR FOR REASONS OF ILLNESS IN THE CJ FAMILY. THE DATE THEN WAS MOVED TO THE 111305 AND THEN 111505. AT THAT TIME PRODUCTION OF 12 FILES TOOK PLACE WITH PARTIAL INFORMATION PRODUCED AS TO A COUPLE OF OTHERS.

UPON FUTHER REVIEW OF THE FILES ON APPROXIMATELY 123005, I REALIZED THAT NONE OF THE FILES HAD CF-5 FORMS OR CRIMINAL BACKGROUND CHECKS. I REQUESTED ALL CF-5 FORMS FROM CJ AND RECIEVED APPROXIMATELY 28. APPROXIMATELY 50% OF THE FILES ONLY HAVE ONE SIGNATURE ON THE CF-5 FORM. I BROUGHT THAT TO THE ATTEMTION OF CJ AND HE ADVISED THAT I COULD SIGN THE FORM AS SUPERVISOR, THAT IS NOT THE CASE.

I CALLED ADN TALKED WITH TOM CUNNINGHAM CONCERNING THIS ISSUE. HE ADVISED THAT THERE HAVE BEEN OCCASSIONS WHERE AN OFFICER DID NOT OBTAIN THE SECOND SIGNATURE, BUT IT WAS "ONE IN ONE HUNDRED FILES. AGAIN, OUT OF THE TWENTY EIGHT CR-5 FORMS PRODUCED, THIRTEEN LACK A SECOND SIGNATURE. TOM CUNNINGHAM SAID THERE WERE WAYS OF ESTABLISHING THAT THE TRANSACTION TOOK PLACE, LIKE HAVE THE PURCHASED CDS. I HAVE NOT ATTEMPTED TO CONFIRM ANY OF THE FILES WITH ANOMILIES AT THIS POINT. I AM HESITANT TO SELF POLICE SUCH A SUBSTANTIAL DEVIATION IN POLICY.

TOM CUNNINGHAM CAME TO THE DTF OFFICE ON 120905 AND MET WITH ALL DTF MEMBERS TO REVIEW THE FILES AND TO PROVIDE INFORMATION CONCERNING CI FILES. TOM HAS TAKEN COPIES OF THE CF-5 FORMS AND COPIES OF CHECKS WERE WRITTEN FOR CONFIDENTIAL FUNDS. AT THIS POINT I HAVE NOT HEARD FORM TOM. HE DID INDICATE THAT WE MAY BE PLACED ON DRAW HOLD STATUS DUE TO OUR NON-COMPLIANCE. I ASK TOM HOW BAD THIS PROBLEM WAS COMPARITIVELY ON A SCALE FROM ONE TO TEN, HE SAID EIGHT.

IN THE HYPOTHETICAL, IF ONE WERE TO TAKE MONEY TO BE USED TO PURCHASE OF INFORMATION AND OR CDS AND MISAPPROPRIATE THOSE FUNDS, THE FOLLOWING COULD BE THE MANNER IT WOULD BE ACCOMPLISHED. BUY INFORMATION SO THAT THERE IS NO TANGIBLE EVIDENCE OF THE BUY OR ALLEGEDLY BUY CDS AND NOT LOG IT INTO EVIDENCE, SENT IT TO OSBI OR HAVE DOCUMENTATION CONCERING DESTRUCTION. THAT IS WHAT HAS HAPPENED HERE.


DEFENDANT'S EXHIBIT

676

TOM ASK CJ IF HE HAD DOCUMENTATION AS TO DESTRUCTION. HE SAID NO. IT IS MY UNDERSTANDING THAT IN ORDER TO HAVE CDS DESTROYED; YOU MUST HAVE DOCUMENTATION PRESENTED TO OSBI.

WITHIN TWO HOURS OF OUR MEETING, CJ CALLED AND ADVISED HE HAD AFFIDAVITS FROM HIS CONFIDENTIAL INFORMANTS. I ASK HIM IF THE AFFIDAVITS WERE NOTORIZED.HE SAID NO. I ADVISED THAT ALL AFFIDAVITS MUST BE NOTORIZED WITH DATE AND AMOUNT OF PURCHASE. ADDITIONALLY, I REQUIRED A PRINT OF THE CI ON THE AFFIDAVIT. LATER IN THE SAME EVENING CJ TOLD ME THAT JAMES CARVER AND JERRY STEPHENS COULD SIGN ON MANY OF THE CF-5 FORMS.  PREVIOUSLY HE HAD ADVISED THAT ONE REASON THAT THERE WAS NOT TWO SIGNATURES ON CF-5 FORMS IS THAT, " HE DID NOT TRUST SOME LAW ENFORCEMENT WITH HIS CONFIDENTIAL INFOMANTS". TODAY CJ CALLED ME AND TOLD ME THAT HE HAD TALKED WITH FRANK LOYD AND SAID THAT FRANK DID NOT BELIEVE THE TWO SIGNATURE ISSUE WAS "THAT BIG A DEAL". I TALKED WITH FRANK BEFORE LUNCH. HE ADVISED THAT THERE WAS A MEETING IN 2000 OR 2001 CONCERNING THE TWO SIGNATURE REQUIREMENT AND IT WAS AN ABSOLUTE REQUIREMENT. I ASK FRANK IF HE HAD TALKED WITH CJ LATELY CONCERNING CI FILES, HE SAID NOT IN A COUPLE OF YEARS.

AT THIS JUNCTURE, AS I REVIEW THE JAG GUIDELINES AND HAVE CONVERSATIONS WITH TOM CUNNINGHAM, I RECOGNIZE THAT THIS IS A SERIOUS ISSUE WITH FEDERAL REPROCUSSIONS.SINCE THERE IS AN INDICATION THAT NOT ALL FILES FOR THE PAST FIVE YEARS HAVE BEEN PRODUCED AND IN CONSIDERATION OF THE LACK OF A SECOND SIGNATURE ON SO MANY FILES, IAM FEEL I WOULD BE REMISS NOT TO REQUEST AN INDEPENDENT INVESTIGATION OF THE FILES. THEREFORE, I AM REQUESTING AN AUDIT OF THE CI FILES AND RECORDS RELEVANT TO THE USE OF THOSE FILES BY THE STATE AUDITORS OFFICE.

677

## Sheridan, Jeff

**From:** Dobbs, Donovan
**Sent:** Thursday, November 17, 2005 4:41 PM
**To:** Sheridan, Jeff
**Cc:** Gray, Richard
**Subject:** DTF seizures

Jeff,

Please get with Clint Johnson regarding the following cases:

1. CP-03-381- $705.00 was forfeited by our office. Records from the Tahlequah Police Department show that Johnson received the money on Jan. 28, 2003. There is no record that the money was deposited in any account in District 27. The defendant's name is Blake Keely

2. CP-05-449- Johnson produced a copy of a receipt that appeared to show that I received the money. The copy of the receipt does not appear to be in the proper form. Please look at the actual receipt and you make a copy of it. The defendant is The defendant's name is Wesley Hathcoat.

3. CV-03-140- It appears that Johnson and James Carver took $233.00 and were to return it to the defendant Alfredo Rivera. There is no record that the money was given to Mr... Rivera.

Let me know as soon as possible. Thank you.

Donovan

11/17/2005



654

## INTEROFFICE MEMORANDUM

TO:        JEFF SHERIDAN

FROM:      COURTNEY BATES

SUBJECT:   CF-5 INVESTIGATION

DATE:      12-19-05

CC:

Jeff,

I looked up more forms to send to Tom. I also finished getting the packet ready to send to Tom. Clint also brought by Mark Fox for me to question about the CF-5 forms that had his name on them I managed to clear some of those up. On the CF-5 form in question about Donovan and Clint giving Mr. Fox $60.00, Mr. Fox gave me a written statement stating the Donovan was the one who gave him the money. If I add up the numbers they go as follows.

1.  Total Checks found =          $12,320.00

2.  Total money from CF-2 =       $9,780.00

    a.  Checks I can place with CF-2 =  $7,650.00

    b.  Checks I can't place with CF-2 =$4,670.00

    c.  There are also several CF-2 forms that don't match checks.

3.  Total money on CF-5 =         $6,755.00

    a. Out of these $3,395.00 worth of forms do not meet the grant criteria.

4.  Total from Receipts =          $1,245.00

If you take the total checks that were written and subtract the amount from the CF-5 forms you get a total of $5,565.00. Then that total minus the receipts from were agents turned in money you get a total of $4,320.00 that is not accounted for in any way shape or form. If you notice that amount is only $350.00 different from the checks I can't place with any forms. If you take the total number of checks found and subtract it from the total number of CF-2 you get a difference of $2,540.00. Then take the amount of receipts from that you get $1,295.00 not accounted for. I don't know which is worse or what Tom will be looking at both number are very high. So in my opinion we are looking at anywhere from $1,295.00 to $4,320.00 that this office can not account for over the last three years. If I could find all the receipt books then I would have more of an explanation. Also I have been unable to get in touch with Edger so I have none of his CF-5 forms. Also the total from CF-5 forms should match the total from CF-2 but it does not. At this point I have no idea were the money is. As for the CF-5 Forms that don't meet grant criteria I think I have the sufficient explanations needed to confirm most of them with Tom at this time.

Respectfully,

*[signature: Courtney Bates]*

DEFENDANT'S EXHIBIT

733



### *Richard Loy Gray D.A.*
### *Twenty-Seventh Prosecutorial District Drug Task Force*
### *Report of Investigation*

Date: 01-05-06                                    Case number:  DTF-C06-001

Case Agent: Courtney Bates                                    Status: pending/initial
File title:

Defendants: D1)

Violations: D1)

Identification of evidence: (see attached evidence log)

Money list: N/A
Description of vehicle: N/A
List of witnesses:

Primary:      1.) Courtney Bates, Investigator, District 27 Drug Task Force
                  307 W. Cherokee St. Wagoner, OK 74467
                  Telephone: (918) 485-9447

              2.) Jim Jones, Investigator, District 27 Drug Task Force
                  307 W. Cherokee St. Wagoner, OK 74467
                  Telephone: (918) 485-9447


Secondary:    1.) OSBI Chemist, OSBI Laboratory
                  1995 Airport Parkway Tahlequah, Ok. 74464
                  Telephone: (918) 456-0653

Summary:  While in the performance of my duty's as a Drug Task Force Agent (DTF) District 27 on 1-05-06 I, (Courtney Bates) did an inventory on a DTF agents (Clint Johnson) vehicle. The reason the inventory was performed was because the agent's employment had been terminated and all of the property in the vehicle had to be inventoried to determent what items belong to DTF and what items were Agent Johnson's.



795

| Report of investigation | Case number |
|---|---|
| (Continued) | Page 2 |

**Details:** While performing the inventory of Agent Johnson's vehicle I found several items that were submitted by me for testing by the OSBI lab in Tahlequah. The tests showed that several of the items tested positive for Marijuana. Also some of the residue found on several of the items tested positive for Methamphetamine. Then one of the items that was located in a pill bottle that had the name David Creech on the bottle came back as Alprazolam. David Creech is a subject that Agent Johnson has served several search warrants against. Also located in the vehicle were 5 syringes. These items were sent to the OSBI lab, but were never tested. As for a complete list of the items found in Agent Johnsons vehicle see attached evidence log. There is no clear way to tale if these items were evidence that was seized in a search warrant, or if these items were Agent Johnsons. Finally if these items were evidence seized in a search warrant they were never submitted to the evidence officer, or the OSBI by Agent Johnson.

**List of attachments:**

1.) Photocopy of OSBI Criminalistics Examination Report
2.) Photocopy of Evidence Log

_____          1-5-06
Agent's Signature                              Date

**Dissemination:**

1.) Cherokee County District Attorney

796

**DISTRICT 27 DRUG TASK FORCE**

| 1. Date Booked | 2. Report No. |
|---|---|
| 01-05-06 | CN-05-066 |

| Type of Offense | 4. Location of Offense | 5. County |
|---|---|---|
| | | |

| 6. Defendant's Name    LAST    FIRST    MIDDLE | 7. Defendant's Address         City/Zip | 8. Ph # (Day) |
|---|---|---|
| | | |

## PROPERTY BOOKED

9. Type of Property    Items 1-16 found by Courtney Bates in vehicle issued to Clint Johnson

☐ Search Warrant No. _____

| 10. Item No. | 11. Quantity | 12. Article | 13. Brand | 14. Model # | 15. Serial # | 16. Descrip. (Color, Size, Style, Features, Caliber, etc.) | 17. Value | 18. Storage Location |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 | | | | | RED/BLK Box w/ Bullets, video tapes, film, photo, | | floor |
| | | | | | | Benzomatic torch | | |
| 2 | 1 | | | | | WHT Bucket (small) w/ items from alab | | floor |
| 3 | 1 | | | | | BRO Box - Sealed addressed to: Steve Allen | | floor |
| 4 | 1 | | | | | WHT Box - Sealed addressed to: Steve Allen | | floor |
| 5 | 1 | | | | | Bottle of Iodine | | floor |

## CHAIN OF CUSTODY

| 19. Item | 20. Relinquished By: | 21. Date | 22. Received By: | 23. Date |
|---|---|---|---|---|
| 1-16 | Clint Johnson | 1-5-6 | Courtney Bates | 1-5-6 |
| 1-16 | Courtney Bates | 1-5-6 | Evidence Room | 010506 |
| 2,7,8,9, 11,12 | Evidence Room | 010906 | Courtney Bates | 010906 |
| 7,8,9 14,11 r 12 | Courtny Bates | 1-9-06 | OSBI Lyg | 1-9-06 |

| 24. Reporting Officer | 25. Badge(s)    Delta  11 | 26. Page  1 of 2 |
|---|---|---|

797

# SUPPLEMENTAL PROPERTY SHEET

## PROPERTY BOOKED

Type of Property

☐ Evidence  ☐ Forfeited  ☐ Stolen          ☐ Search Warrant No.

| 10. Item No. | 11. Quantity | 12. Article | 13. Brand | 14. Model # | 15. Serial # | 16. Descrip. (Color, Size, Style, Features, Caliber, etc.) | 17. Value | 18. Storage Location |
|---|---|---|---|---|---|---|---|---|
| 6 | 1 | | | | | WHT Plastic Baby bottle Toy | | floor |
| 7 | 1 | | | | | Blue Zippered bag "Pepsi" w/ needles, spoon & plastic bag w/ white substance | | floor |
| 8 | 1 | | | | | WHT metal Box w/ needles, bullets spoon, plastic bag w/ WHT substance | | floor |
| 9 | 1 | | | | | BLUE Pill Bottle "David Creech" w/ 52 Xanax Bars & 3 Broken pcs | | floor |
| 10 | 1 | | | | | Clear plastic bottle — no lid | | floor |
| 11 | 1 | | | | | Pill Bottle "Peggie S. Johnson" w/ unknown plant mtl | | floor |
| 12 | 1 | | | | | Metal "crayola" Box w/ pipe, 4 red pills, 1 rolled cigarette, plastic bag w/ partially consumed rolled cigarette & green leaf substance, safe razor blade, "NIK" Methamphetamine field test kit (used) | | |
| 13 | 1 | | | | | Red plastic Hose | | floor |

| 24. Reporting Officer | 25. Badge(s) | 26. Page 2 of 3 |
|---|---|---|

798

# SUPPLEMENTAL PROPERTY SHEET

## PROPERTY BOOKED

Type of Property

☐ Evidence ☐ Forfeited ☐ Stolen   ☐ Search Warrant No. _____

| 10. Item No. | 11. Quantity | 12. Article | 13. Brand | 14. Model # | 15. Serial # | 16. Descrip. (Color, Size, Style, Features, Caliber, etc.) | 17. Value | 18. Storage Location |
|---|---|---|---|---|---|---|---|---|
| 14 | 1 | | | | | Bro Paper Bag w/ plastic Bag containing green leaf substance | | floor |
| 15 | 1 | | | | | Bro "Flambeau" Box w/ misc Ammunition ₹ .22 cal revolver ser ᵗᵉ 24767 | | floor |
| 16 | | | | | | Letter addressed i "Tony Dickeson" | | floor |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| 24. Reporting Officer | 25. Badge(s) | 26. Page 3 of 3 |
|---|---|---|

799

11/01/05

Memo to Richard Gray

At approx. 11:30 hours, investigators Tommy Morgan and Jeff Lancaster stopped at Chaplin's Truck Stop at 16294 S. Hwy 62 in Tahlequah, County of Cherokee. We asked the clerks (Kelly and Linda) if they had any bad checks to turn into the DA's office. They replied that they had checks on one S.O.B. who works for the DA's office. When the clerks were asked the employee's name, it was Clint Johnson. We asked if they wanted us to turn the checks in. At that time, they called the owner of the store (Doyle Champlin). He responded to hold the checks for a couple more days. Checks in question were written on dates 9/15, 9/17, and two on 9/18. Total of the four check $309.83

Tommy Morgan

Jeff Lancaster

701



# OKLAHOMA STATE BUREAU OF INVESTIGATION
### TAHLEQUAH REGIONAL LAB
1995 Airport Parkway
Tahlequah, Oklahoma 74464
(918) 456-0653

## CRIMINALISTICS EXAMINATION REPORT

| | | | |
|---|---|---|---|
| LAB NO.: | 06-405 | Reported To: | Courtney Bates |
| | | Address: | District 27 DTF |
| | | | 307 E. Cherokee Street |
| Date Received: | 01-09-06 | | Wagoner, OK. 74467 |
| Date Reported: | 01-26-06 | | |
| Classification of Case: | Drugs | Submitted By: | Courtney Bates, District 27 DTF |

Suspect(s):   UNKNOWN                     Victim(s):

Description of Evidence:

One (1) sealed brown paper sack containing one (1) white bucket containing:
- T1, T2    two (2) sample bottles [C-1, C-2] each containing approximately thirty (30) milliliters of a two layer liquid.
- T3, T4    two (2) sample bottles [C-3, C-4] each containing approximately thirty (30) milliliters of a clear liquid.
- T5        one (1) brown glass bottle with a white lid [C-5] containing approximately thirty (30) milliliters of a liquid.

One (1) sealed evidence envelope containing:
- T6, T7    two (2) syringe tubes each containing two (2) plastic syringes.
- T8, T9    two (2) syringe tubes each containing three (3) plastic syringes.

one (1) sealed evidence bag containing one (1) sealed evidence envelope containing:
one (1) evidence bag containing one (1) metal tin containing:
- T10       three (4) ziplock bags, one (1) plastic bag, one (1) plastic syringe holder, four (4) syringe plunger caps, one (1) red rubber item and pieces of fibrous material all with residues.
- T11       one (1) metal spoon with a residue.
- T12       one (1) ziplock bag containing a residue.

one (1) evidence bag containing one (1) zippered case "PEPSI" containing:
- T13       one (1) piece of cardboard, one (1) piece of a cigarette butt and one (1) metal spoon.
- T14       one (1) ziplock bag.
- T15       one (1) ziplock bag containing a fibrous material.

one (1) evidence bag containing:
- T16       one (1) prescription bottle "JOHNSON, PEGGIE" "DOXEPIN" containing what appears to be grass.
- T17       one (1) prescription bottle "DAVID CREECH" "PENICILL VK" containing fifty-three and one-half (53.5) white rectangular tablets "GG 249".

One (1) sealed evidence envelope containing:
one (1) evidence bag containing one (1) "Crayola" metal tin containing:
- T18       one (1) metal blade and one (1) metal pipe with a residue.
- T19       one (1) hand-rolled cigarette containing a green leafy substance, net weight: 0.37 gram.
- T20       one (1) cellophane wrapper containing three (3) red oblong tablets "5112 V".
- T21       one (1) ziplock bag containing:
    - T22       one (1) partially burned hand-rolled cigarette containing a green leafy substance, net weight: 0.11 gram.
    - T23       one (1) cellophane wrapper containing seeds and a green leafy residue, net weight: 0.48 gram.
one (1) brown paper sack "AUG 28, 2005 McNIEL BARN" containing:
- T24       one (1) clear plastic bag containing a green leafy substance, net weight: 0.57 gram.

Page 1 of 2 *المسلم*

800



LAB NO.:   06-405

DATE:   01-26-06

PAGE:   2

---

**Analysis of Evidence:**

| ITEMS: | ANALYSIS: |
|---|---|
| T1, T4 | No controlled dangerous substance identified. |
| T2, T3, T11, T12, T15 | Methamphetamine, Schedule II. |
| T5, T6 through T10, T13, T14, T18, T21 | Not analyzed. |
| T16 | Microscopic analysis was negative for Cannabis, no further testing performed. |
| T17 | Visual and literary analysis indicate Alprazolam, Schedule IV, not confirmed by instrumental analysis. |
| T19, T22, T23, T24 | Cannabis, (Marihuana containing tetrahydrocannabinol), Schedule I. |
| T20 | Visual and literary analysis indicate Propoxyphene, Schedule IV, not confirmed by instrumental analysis. |

*Pursuant to Title 22 O.S. Section 751, I hereby certify that I am maker of this document and that it is a true and correct report of findings of the Oklahoma State Bureau of Investigation Criminalistics Laboratory.*

Michael W. Childers
Criminalist

MWC/slb

801

## OKLAHOMA STATE BUREAU OF INVESTIGATION

TITLE OF
REPORT:    INTERVIEW OF CLINT JOHNSON                                Page 1 of 4

Information: CLINT JOHNSON, WM, DOB: ██/72, SSN ███-██-2820, ███ Stilwell, Oklahoma, 74960, 918/207-8400, provided the following

JOHNSON was currently employed as a Deputy Sheriff for the Adair County Sheriff's Department.   Prior to that, JOHNSON was a Drug Task Force Agent for the District 27 District Attorney's Office, Drug Task Force (DTF). JOHNSON worked at the Drug Task Force for about nine and one half years. JOHNSON had been an Oklahoma CLEET certified peace officer since 1996.

During 2005, JOHNSON encountered several problems with operational procedures at the Drug Task Force.  One of the Assistant District Attorney's (A. D. A.) for the District had stolen "Crank" from a house during one of JOHNSON'S search warrants.  The A.D.A. was JANET BICKEL (phonetic).   JOHNSON told the District Attorney, RICHARD GRAY what had happened. Nothing was done about the incident. There were also other problems within the District Attorney's Office and JOHNSON ended up having to testify before the Multi-County Grand Jury in Oklahoma City, Oklahoma.  JOHNSON told the truth to the Jury and several indictments were handed down against co-workers.

JOHNSON believed that by testifying before the Grand Jury that GRAY and other co-workers were out to get him and wanted him to be fired.  During late December 2005, JOHNSON took a medical leave from the District Attorney's Office, due to work related stress.   On January 5, 2006, two co-workers showed up at JOHNSON'S residence and said that they were getting his state-owned vehicle. The two co-workers present were DTF Agent COURTNEY BATES and A.D.A. JEFF SHERIDAN.   JOHNSON told them that was fine and went to where the car was. JOHNSON knew there were several drug related items in the car that needed to go to the OSBI Lab for destruction or to other Drug Enforcement Agencies.

JOHNSON knew that there were several things from different drug related investigations within the state car.   JOHNSON kept the items in the back hatch compartment of the two-door car. JOHNSON did not have a key to the evidence locker that was located in Wagoner. JOHNSON also customarily maintained custody of the

Investigation On: 2/23/06          At: TAHLEQUAH, OKLAHOMA          By: SHAWN WARD (SW)      File: CR06-1103
Offense: OFFICIAL MISCONDUCT              Victim: STATE OF OKLAHOMA
Office: NERO   Date Reported: 2/24/06    Approved by: [signature]                          Case Agent: WARD
                                                                                 Date Approved: 3-2-06  NO: 002

This document contains neither recommendations nor conclusions of the OSBI. It is the property of the OSBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



001103

CR 09-1009
INTERVIEW OF CLINT JOHNSON
PAGE 2

items that he knew were going to be sent to the OSBI Laboratory. JOHNSON would then take them to the OSBI Laboratory in Tahlequah for destruction.

END NOTE: During the interview of JOHNSON by OSBI Special Agent SHAWN WARD, JOHNSON was shown a list of items that had been made by COURTNEY BATES as a record of what items were within JOHNSON'S car on January 5, 2006. JOHNSON was also shown some of the actual items that had been submitted to the OSBI Laboratory in Tahlequah for drug and DNA analysis. DTF Agent COURTNEY BATES had submitted the items out of JOHNSON'S car to the OSBI Laboratory on January 9, 2006. BATES submitted the items to the lab before the OSBI was requested to conduct this investigation. (See Attached Copies of List of Items by BATES and O.S.B.I. Drug Analysis Report.)

JOHNSON gave OSBI Special Agent SHAWN WARD the following detailed recollection as to where most of the items had came from and why they were still within his car.

The following numbers are placed for reference to the same numbers utilized by BATES within his inventory.

Among the items within JOHNSON'S car:

ITEMS # 1, 2 and possibly 15 & 16: A lab bucket that contained some samples from a lab that JOHNSON and JERRY STEVENS had located in Adair County. The items were obtained from a house belonging to a male subject named "DIXON". DIXON was not home when they served the search warrant so they took the items and left. JOHNSON explained that the D.A.'S Office would not customarily file charges on drug related cases unless the subject was at the residence where the narcotics or lab was present. JOHNSON was going to take the items to the OSBI Lab for destruction. JOHNSON added that he believed items 15 and 16 were possibly from the DIXON search. JOHNSON told BATES that the items needed to be taken to the OSBI Lab for destruction on January 5, 2006.

ITEMS #3, 4, & 5: There was a bottle of Iodine and also a box that contained several new bottles of Iodine crystals. DEA intercepted the package. The box was being shipped to a subject named STEVE ALLEN. ALLEN'S name was on the shipping address. ALLEN had purchased the iodine on the Internet. ALLEN admitted he was going to deliver the Iodine to another guy so he could make drugs. JOHNSON was assisting the Drug Enforcement Agency out of Tulsa with the investigation. JOHNSON worked with an agent named "SHANNON" LNU. JOHNSON told BATES that he needed to take the iodine to the DEA Agent in Tulsa so they could finish working the controlled delivery to a guy named TODD CRUISE. BATES told JOHNSON to leave

001104

CR 08-1009
INTERVIEW OF CLINT JOHNSON
PAGE 3

the items within the car. JOHNSON saw BATES write the name SHANNON on his hand.

ITEM #7: A blue Pepsi case. JOHNSON remembered the blue case but did not recall whom he had obtained it from. JOHNSON believed that it was seized on a traffic stop.

ITEM #8: A white metal box with paraphernalia. JOHNSON believed that the box was seized on a consent to search of a residence in Cherokee County. JOHNSON was with Cherokee County Sheriff's Office Investigator JASON CHENNAULT and other deputies when the item was located. JOHNSON did not remember the name of the subject but recalled that a white female with an infant child was at the residence that was located by the Sewer Plant on the left hand side. The white female gave consent to search the house. The white metal box was taken as evidence. The male subject that lived within the residence worked at the Quick Lube 'n Tahlequah and went in and talked to CHENNAULT the next morning. No charges were going to be filed on the case. The male subject agreed to be a cooperating witness.

ITEM #9: Pill bottle with Pills. JOHNSON was with several other officers when they did a search warrant at CREECH'S residence. They did not find "crank" at the residence and took the pills to "hold over" CREECH'S head. CREECH agreed to be a cooperating witness and told JOHNSON that he would initiate a drug transaction by telephone with BOB LEPPKE. LEPPKE was a major drug dealer. The other officers present were JAMES CARVER, JERRY STEVENS, and SCOTT CRAIG. CRAIG worked for the Cherokee Marshal's Service. CARVER and STEVENS were with the Drug Task Force.

ITEM #12: Crayola Box with paraphernalia. JOHNSON did not remember getting the box. JOHNSON felt he would remember it if he had because of the picture upon the box. JOHNSON explained that sometimes other officers took drug related items and put them in his car when they were doing drug investigations. JOHNSON felt the items had to have been seized on a drug investigation obviously because it contained a "NIK" drug field test kit that was used.

ITEM # 14: Brown Paper sack words 'MCNEIL BARN': JOHNSON did not remember doing an investigation involving a MCNEIL BARN. The bag had the date August 28, 2005, on it. The writing was not JOHNSON'S handwriting. JOHNSON believed the handwriting was possibly JERRY STEVENS'.

Also during the inventory of the car on January 5, 2006, JOHNSON said that while getting the items out of the car he found a plastic baggy that contained a

CR 06-1005
INTERVIEW OF CLINT JOHNSON
PAGE 4

rolled marijuana cigarette and also a partially burned marijuana cigarette. JOHNSON believed the items were possibly taken off of someone during a traffic stop but no charges were going to be filed. JOHNSON got the items and handed them to BATES. JOHNSON told BATES that the items needed to go for destruction.

END OF DETAILED INFORMATION PROVIDED BY JOHNSON REFERENCE BATES' INVENTORY OF ITEMS WITHIN CAR.

According to a letter of request signed by District Attorney RICHARD GRAY, DNA analysis was requested upon the items within JOHNSON'S car. JOHNSON wanted to voluntarily provide his sample of DNA to be compared to the items within his car. JOHNSON believed that GRAY was insinuating that JOHNSON had actually used the drug paraphernalia.

CLINT JOHNSON'S DNA:

JOHNSON wanted to provide WARD two buccal swabs of JOHNSON'S DNA for analysis. WARD put on latex/rubber gloves and swabbed the inside of JOHNSON'S mouth with two swabs. WARD then placed the two swabs into an evidence envelope. WARD sealed and signed the envelope. On February 23, 2006, WARD entered the items into the OSBI Evidence Tracking System and then submitted the item to the OSBI Northeast Regional Laboratory for Analysis.

The DNA analysis was to be performed upon several syringes that were among the items within JOHNSON'S car. DTF Agent BATES had previously submitted the items. The items would then be compared to JOHNSON'S known DNA profile.

001106

582

05/23/2008 FRI 18:07   FAX 405 522 2795 OK ATTORNEY GENERAL

# OKLAHOMA STATE BUREAU OF INVESTIGATION

Page 1 of 2

**TITLE OF
REPORT:** SECOND INTERVIEW OF CLINT JOHNSON

CLINT JOHNSON, WM, DOB: ▓▓▓72, SSN: ▓▓▓-2820, ▓▓▓▓▓ Road, Stilwell, Oklahoma, 74960, 918/207-6400, provided the following information:

JOHNSON had recently taken a job with DYNCORP, INC. as a security agent. JOHNSON would be stationed in Iraq for one year. JOHNSON had been employed as a Deputy Sheriff for the Adair County Sheriff's Department. Prior to that, JOHNSON was a Drug Task Force Agent for the District 27 D.A.'S Office, Drug Task Force. JOHNSON worked at the Drug Task Force for about nine and one half years. JOHNSON had been an Oklahoma CLEET certified peace officer since 1996.

JOHNSON had kept several copies of Drug Task Force related documents for his own personal files. JOHNSON voluntarily provided the documents to OSBI Special Agents VICKI LYONS and SHAWN WARD. JOHNSON believed that there were several documents within the file that could possibly assist WARD with the investigation related to the District Attorney's Office Drug Task Force funds. (See Attached Copies of Documents.)

One of the forms indicated that EDGAR YIDI had given Drug Funds to JOHNSON for unknown drug buys. JOHNSON adamantly denied ever receiving any monies from YIDI and believed that YIDI was trying to "cover his own ass" because he was always screwing up. JOHNSON had only been on a few operations with YIDI and did not want to work with him because he was such a "screw up". YIDI had been in trouble for doing unethical things on drug buys. JOHNSON did not sign for any money from YIDI and would have definitely made an official document if he had received or given any Drug Funds to YIDI.

JOHNSON also had a weekly activity log that he had kept for several of the weeks that he worked at the Drug Task Force. Upon the weekly log of November 15, 2004, through November 19, 2004, JOHNSON had detailed that he had used a confidential informant to purchase methamphetamine and marijuana. JOHNSON used Drug Funds and there should have been a form to verify it but there was not one with his documents. Several other weekly logs showed where JOHNSON had met with informants and had paid them but there was not a form to verify it. JOHNSON had provided drug funds on a few occasions to the informants without doing a drug form

| Investigation On: | 05/30/06 | At: | TAHLEQUAH, OKLAHOMA | By: | SHAWN WARD (S.W.) | File: | CR06-1009 |

Offense: OFFICIAL MISCONDUCT          Victim: STATE OF OKLAHOMA          Case Agent: WARD

Office: NERO     Date Reported: 6/19/08     Approved by: _____     Date Approved: 7-26-06 IND: 008

This document contains neither recommendations nor conclusions of the OSBI. It is the property of the OSBI and is loaned to your agency; it and its content are not to be distributed outside your agency.



001132

CR 06-1009
SECOND INTERVIEW OF CLINT JOHNSON
PAGE 2

(CF-5).  JOHNSON did so because he would sometimes meet the informant at the courthouse and did not want to let anyone see him talking to the informant because it would jeopardize the informant's life or ability to work for the drug task force. JOHNSON usually had one of the other drug agents or police officers in the area witness the transactions to cover him.

JOHNSON used several hundred dollars for undercover buys that he had performed in the Redbird, Oklahoma, area. JOHNSON bought drugs with $500 dollars of drug funds on or about July of 2004 that was not detailed on a CF-5 form. JOHNSON did not utilize the CF-5 because he had been the one that made the purchases. JOHNSON also gave the informant $100 dollars that did the introduction for him to make the purchases.

JOHNSON had two original CF-5 forms in his possession that he had an informant sign and put his fingerprint.  One of the forms was for $80 dollars and two others were to the same informant but did not have the amount of money paid upon it.

001133



# RICHARD L. GRAY
### DISTRICT ATTORNEY

State of Oklahoma
27th District

Wagoner County
307 E. Cherokee
Wagoner, OK 74467
Telephone (918) 485-2119
Facsimile (918) 485-4220

January 5, 2006

Clint Johnson
Drug Task Force
27th Prosecutorial District

Dear Mr. Johnson:

Please be advised that your employment with the office of the District Attorney for the 27th Prosecutorial District is terminated as of this date.

Please turn in your December and January time sheets, all keys, cell phones, fire arms, and other related equipment. Any other access instruments to offices, safe keeping areas or safe deposit boxes must also be signed in along with your vehicle immediately. Jeff Sheridan will receive them on or before Friday, January 6, 2006 at 4:00 p.m.

I have taken the liberty of checking with DAC to ensure your insurance benefits will remain in effect until January 31, 2006; after which, you will have the option of continuing your benefits coverage at your own expense through COBRA. You will receive a separate notification regarding your COBRA options.

Please take your personal items with you immediately, as you will have no employee-status access to this office following today's date.

Sincerely,

Richard L. Gray, District Attorney
District 27

RLG\mb



644



TO:       Richard / File
FROM:    Misty
DATED:   November 13, 2006

During or about the time the DAs office was audited, I received a phone call from Clint Johnson. At that time, I was vaguely aware of a pending investigation, although not informed or knowledgeable of any details. Unfortunately, at this time, I cannot remember the exact date or even the exact month. It would have been between September 2005 and February 2006.

Clint called in reference to a specific amount of money. Again, at this date, I cannot recall the exact amount he referred to. Clint began the conversations with pleasantries, and then proceeded to ask me if I remembered a time where he had given me money from a drug bust or something and then proceeded to tell me what I had done with the money and other details of the incident (I do not remember what he said specifically in reference to that either).

I recall very distinctly my reaction to that phone call. I did tell you about him calling because I was so angry about it. Clint had asked me a lot of leading questions and I remember his recollection of the event and his recollection of the money and what was done with it, was entirely false. I remember it made me so angry because I felt suspicious that he would call me on the phone and ask me to recall a specific incident, regarding a specific amount of money, but be so wrong as to everything else. I strongly felt that he was trying to either record me or get me to admit to something that I did not agree with, or my memory did not support for someone else's benefit. I felt like he was trying to manipulate me.

I had been present on a similar occasion in 2003 when Clint came into my office and was trying to support something he had going on and telephoned the police in Adair County with them on speaker phone and fed the officer there a lot of leading questions about an incident so that I would believe him on something. I remember the officer corroborated some of Clint's story and then told him to come see him in person so they could get the story straight. That last part of his statement made me think that Clint might have stretched his version of the incident to some degree. (Unfortunately, I cannot recall the topic of that conversation either).

Anyway, Clint named a specific amount of money that he says he counted to me, and I wrote him a receipt and he 'misplaced' his receipt. I told him I didn't remember it at all and that if there had been a receipt written, I would have a carbon copy in one of the books.... I looked and there was not one. He got agitated and then said he could find his receipt and prove it to me. I suggested he do so. He was feeding me more specific information of which I absolutely had no recollection.

He did not call me back about the money, or produce his misplaced receipt.



EXHIBIT

001388



# RICHARD L. GRAY
DISTRICT ATTORNEY

State of Oklahoma
27th District

Wagoner County
307 E. Cherokee
Wagoner, OK 74467
Telephone (918) 485-2119
Facsimile (918) 485-4220

January 17, 2006

Chuck Jeffries
Oklahoma State Bureau of Investigation
Northeast Regional Office
125 W. 15th St., Ste 100
Tulsa, OK  74119

RE:    District 27 Drug Task Force

Dear Inspector Jeffries:

Due to inconsistencies, incomplete, missing and questionable confidential fund records associated with the District 27 Drug Task Force, I am hereby requesting that an investigation be initiated into District 27 Drug Task Force concerning potential misappropriation of federal funds.

The records have been reviewed by Tom Cunningham of the District Attorney's Council. At his direction, new members of the Drug Task Force have gone about the business of attempting to reconstruct and verify certain activities. We have not been successful in our attempt to document our files, and many files have no tangible explanation of missing funds

Therefore, I would ask for an investigation into the transactions of the Drug Task Force for District 27.

Sincerely,

Richard L. Gray
District Attorney

RLG/krb

DEFENDANT'S
EXHIBIT

790



# RICHARD L. GRAY
### DISTRICT ATTORNEY

State of Oklahoma
27th District

**Wagoner County**
307 E. Cherokee
Wagoner, OK 74467
Telephone (918) 485-2119
Facsimile (918) 485-4220

February 3, 2006

Chuck Jeffries
Oklahoma State Bureau of Investigation
Northeast Regional Office
125 W. 15th St., Ste 100
Tulsa, OK 74119

    RE:    District 27 Drug Task Force

Dear Inspector Jeffries:

This letter serves to supplement my previous letter of January, 17th, 2006, wherein I requested an investigation be initiated into the District 27 Drug Task Force, and setout the reasons therein.

Please find attached an Oklahoma Bureau of Investigation Report of various sundry items and an offense report submitted by Courtney Bates, one of my Drug Task Force agents. As you will note, the lab analysis confirms the presence of methamphetamine, marijuana and Alprazolam. The items listed were found in the vehicle being utilized by Clint Johnson in performance of his duties as a drug task force investigator. The items were not marked as evidence and were in various locations in the vehicle.

As you know, I requested an investigation of the District Twenty-Seven Drug Task force based on anomalies in confidential informant files and requisite documentation. One aspect of my concern in the confidential informant files was the fact that there were controlled substances purchased with federal funds with no record of those drugs ever being submitted for testing, logged into evidence or destroyed by the Oklahoma Bureau of Investigation. Now, there are drugs in the vehicle used by one of the agents involved with injection paraphernalia present.



807

Chuck Jeffries
February 3, 2006
Page 2 of 2

I have requested that the Oklahoma State Bureau of Investigation perform testing on syringes found in the vehicle driven by Clint Johnson. Additionally, I have requested DNA testing of the syringes and the partially smoked marijuana cigarette found in the vehicle.

I appreciate your prompt attention to this matter. If there is anything further I need to do to better facilitate this request, please let me know immediately. I appreciate your cooperation.

Sincerely,

Richard L. Gray,
District Attorney

RLG\mb
enclosures

808

589

918//51215          D.A
03:34:39 p.m.      02-03-2006        2/9



# DISTRICT 27

# DRUG TASK FORCE

# OFFENSE REPORT

**CASE AGENT: Courtney Bates**
**DATE OF OFFENSE: 01-05-06**
**TYPE OF OFFENSE: Unknown**

809

918/751215          D.A                                              03:34:44 p.m.    02-03-2006                3 /9



### Richard Loy Gray D.A.
### Twenty-Seventh Prosecutorial District Drug Task Force
### Report of Investigation

Date: 01-05-06                                                    Case number: DTF-C06-001

Case Agent: Courtney Bates                                                Status: pending/initial
File title:

Defendants: D1)

Violations: D1)

Identification of evidence: (see attached evidence log)

Money list: N/A
Description of vehicle: N/A
List of witnesses:

Primary:      1.) Courtney Bates, Investigator, District 27 Drug Task Force
              307 W. Cherokee St. Wagoner, OK 74467
              Telephone: (918) 485-9447

              2.) Jim Jones, Investigator, District 27 Drug Task Force
              307 W. Cherokee St. Wagoner, OK 74467
              Telephone: (918) 485-9447

Secondary:    1.) OSBI Chemist, OSBI Laboratory
              1995 Airport Parkway Tahlequah, Ok. 74464
              Telephone: (918) 456-0653

Summary: While in the performance of my duty's as a Drug Task Force Agent (DTF) District 27 on 1-05-06 I, (Courtney Bates) did an inventory on a DTF agents (Clint Johnson) vehicle. The reason the inventory was performed was because the agent's employment had been terminated and all of the property in the vehicle had to be inventoried to determent what items belong to DTF and what items were Agent Johnson's.

810

| Report of investigation | Case number |
|---|---|
| (Continued) | Page 2 |

**Details:** While performing the inventory of Agent Johnson's vehicle I found several items that were submitted by me for testing by the OSBI lab in Tahlequah. The tests showed that several of the items tested positive for Marijuana. Also some of the residue found on several of the items tested positive for Methamphetamine. Then one of the items that was located in a pill bottle that had the name David Creech on the bottle came back as Alprazolam. David Creech is a subject that Agent Johnson has served several search warrants against. Also located in the vehicle were 5 syringes. These items were sent to the OSBI lab, but were never tested. As for a complete list of the items found in Agent Johnsons vehicle see attached evidence log. There is no clear way to tale if these items were evidence that was seized in a search warrant, or if these items were Agent Johnsons. Finally if these items were evidence seized in a search warrant they were never submitted to the evidence officer, or the OSBI by Agent Johnson.

**List of attachments:**

1.) Photocopy of OSBI Criminalistics Examination Report
2.) Photocopy of Evidence Log

_____          _1- 5- 06_
Agent's Signature                                            Date

**Dissemination:**

1.) Cherokee County District Attorney

918/751215     D.A     03:35:06 p.m.     02-03-2006     5/9

## DI...RICT 27 DRUG TASK FORC...

| 1. Date Booked | 2. Report No. |
|---|---|
| 01-05-06 | CN-05-066 |

| 3. Type of Offense | 4. Location of Offense | | 5. County |
|---|---|---|---|
| 6. Defendant's Name      LAST     FIRST    MIDDLE | 7. Defendant's Address      City/Zip | 8. Ph # (Day) |

### PROPERTY BOOKED

9. Type of Property      Items 1-16 found by Courtney Bates in vehicle issued to Clint Johnson

☐ Search Warrant No.

| 10. Item No. | 11. Quantity | 12. Article | 13. Brand | 14. Model # | 15. Serial # | 16. Descrip. (Color, Size, Style, Features, Caliber, etc.) | 17. Value | 18. Storage Location |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 | | | | | RED/BLK Box w/ Bullets, video tapes, film, photo, | | floor |
| | | | | | | Benzomatic torch | | |
| 2 | 1 | | | | | WHT Bucket (small) w/ items from alab | | floor |
| 3 | 1 | | | | | BRO Box - Sealed addressed to: Steve Allen | | floor |
| 4 | 1 | | | | | WHT Box - Sealed addressed to: Steve Allen | | floor |
| 5 | 1 | | | | | Bottle of Iodine | | floor |

### CHAIN OF CUSTODY

| 19. Item | 20. Relinquished By: | 21. Date | 22. Received By: | 23. Date |
|---|---|---|---|---|
| 1-16 | Clint Johnson | 1-5-6 | Courtney Bates | 1-5-6 |
| 1-16 | Courtney Bates | 1-5-6 | Evidence Room | 010506 |
| 2,7,8,9,14,11,12 | Evidence Room | 010906 | Courtney Bates | 010906 |
| 2,7,8,9,11 r 12 | Courtney Bates | 1-9-06 | OSB I lug | 1-9-06 |

| 24. Reporting Officer | 25. Badge(s) Delta 11 | 26. Page 1 of 3 |
|---|---|---|

812

9187751215    D.A         03:35:21 p.m.    02-03-2006     6/9

# SUPPLEMENTAL PROPERTY SHEET

## PROPERTY BOOKED

9. Type of Property

☐ Evidence   ☐ Forfeited   ☐ Stolen      ☐ Search Warrant No.

| 10. Item No. | 11. Quantity | 12. Article | 13. Brand | 14. Model # | 15. Serial # | 16. Descrip. (Color, Size, Style, Features, Caliber, etc.) | 17. Value | 18. Storage Location |
|---|---|---|---|---|---|---|---|---|
| 6 | 1 | | | | | WHT Plastic Baby bottle Toy | | floor |
| 7 | 1 | | | | | Blue Zippered bag "Pepsi" w/ needles, spoon & plastic bag w/ white substance | | floor |
| 8 | 1 | | | | | WHT metal Box w/ needles, bullets spoon, plastic bag w/ WHT substance | | floor |
| 9 | 1 | | | | | Blue Pill Bottle "David Creech" w/ 52 xanax Bars & 3 Broken pc. | | floor |
| 10 | 1 | | | | | Clear plastic bottle - no lid | | floor |
| 11 | 1 | | | | | Pill Bottle "Peggie S. Johnson" w/ unknown plant mtl. | | floor |
| 12 | 1 | | | | | metal "Crayola" Box w/ pipe, 4 red pills, 1 rolled cigarette, plastic bag w/ partially consumed rolled cigarette & green leaf substance, sngle razor blade, "Pill" methamphetamine field test kit (USED) | | floor |
| 13 | 1 | | | | | Red plastic Rose | | floor |

| Reporting Officer | 25. Badge(s) | 26. Page 2 of 3 |
|---|---|---|

813

9187751215          D.A

03:35:34 p.m.     02-03-2006          7 /9

# SUPPLEMENTAL PROPERTY SHEET

## PROPERTY BOOKED

9. Type of Property

☐ Evidence  ☐ Forfeited  ☐ Stolen

☐ Search Warrant No.

| 10. Item No. | 11. Quantity | 12. Article | 13. Brand | 14. Model # | 15. Serial # | 16. Descrip. (Color, Size, Style, Features, Caliber, etc.) | 17. Value | 18. Storage Location |
|---|---|---|---|---|---|---|---|---|
| 14 | 1 | | | | | Bro Paper Bag w/ plastic Bag containing green leaf substance | | floor |
| | | | | | | | | |
| 15 | 1 | | | | | Bro "Flambeau" Box w/ misc Ammunition & .22 cal revolver ser # 24767 | | floor |
| 16 | | | | | | Letter addressed : "Tony Dickson" | | floor |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| Reporting Officer | 25. Badge(s) | 26. Page 3 of 3 |
|---|---|---|

814



# OKLAHOMA STATE BUREAU OF INVESTIGATION
## TAHLEQUAH REGIONAL LAB
1995 Airport Parkway
Tahlequah, Oklahoma 74464
(918) 456-0653

### CRIMINALISTICS EXAMINATION REPORT

| | | | |
|---|---|---|---|
| LAB NO.: | 06-405 | Reported To: | Courtney Bates |
| | | Address: | District 27 DTF |
| | | | 307 E. Cherokee Street |
| Date Received: | 01-09-06 | | Wagoner, OK 74467 |
| Date Reported: | 01-26-06 | | |
| Classification of Case: | Drugs | Submitted By: | Courtney Bates, District 27 DTF |

Suspect(s):  UNKNOWN                          Victim(s):

**Description of Evidence:**

One (1) sealed brown paper sack containing one (1) white bucket containing:

 T1, T2  two (2) sample bottles [C-1, C-2] each containing approximately thirty (30) milliliters of a two layer liquid.

 T3, T4  two (2) sample bottles [C-3, C-4] each containing approximately thirty (30) milliliters of a clear liquid.

 T5  one (1) brown glass bottle with a white lid [C-5] containing approximately thirty (30) milliliters of a liquid.

One (1) sealed evidence envelope containing:

 T6, T7  two (2) syringe tubes each containing two (2) plastic syringes.

 T8, T9  two (2) syringe tubes each containing three (3) plastic syringes.

one (1) sealed evidence bag containing one (1) sealed evidence envelope containing:

 one (1) evidence bag containing one (1) metal tin containing:

 T10  three (4) ziplock bags, one (1) plastic bag, one (1) plastic syringe holder, four (4) syringe plunger caps, one (1) red rubber item and pieces of fibrous material all with residues.

 T11  one (1) metal spoon with a residue.

 T12  one (1) ziplock bag containing a residue.

 one (1) evidence bag containing one (1) zippered case "PEPSI" containing:

 T13  one (1) piece of cardboard, one (1) piece of a cigarette butt and one (1) metal spoon.

 T14  one (1) ziplock bag.

 T15  one (1) ziplock bag containing a fibrous material.

 one (1) evidence bag containing:

 T16  one (1) prescription bottle "JOHNSON, PEGGIE" "DOXEPIN" containing what appears to be grass.

 T17  one (1) prescription bottle "DAVID CREECH" "PENICILL VK" containing fifty-three and one-half (53.5) white rectangular tablets "GG 249".

One (1) sealed evidence envelope containing:

 one (1) evidence bag containing one (1) "Crayola" metal tin containing:

 T18  one (1) metal blade and one (1) metal pipe with a residue.

 T19  one (1) hand-rolled cigarette containing a green leafy substance, net weight: 0.37 gram.

 T20  one (1) cellophane wrapper containing three (3) red oblong tablets "5112 V".

 T21  one (1) ziplock bag containing:

 T22  one (1) partially burned hand-rolled cigarette containing a green leafy substance, net weight: 0.11 gram.

 T23  one (1) cellophane wrapper containing seeds and a green leafy residue, net weight: 0.48 gram.

 one (1) brown paper sack "AUG 28, 2005 McNIEL BARN" containing:

 T24  one (1) clear plastic bag containing a green leafy substance, net weight: 0.57 gram.

Page 1 of 2

815



**LAB NO.:**    06-405

**DATE:**       01-26-06

**PAGE:**       2

Analysis of Evidence:

| ITEMS: | ANALYSIS: |
|---|---|
| T1, T4 | No controlled dangerous substance identified. |
| T2, T3, T11, T12, T15 | Methamphetamine, Schedule II. |
| T5, T6 through T10, T13, T14, T18, T21 | Not analyzed. |
| T16 | Microscopic analysis was negative for Cannabis, no further testing performed. |
| T17 | Visual and literary analysis indicate Alprazolam, Schedule IV, not confirmed by instrumental analysis. |
| T19, T22, T23, T24 | Cannabis, (Marihuana containing tetrahydrocannabinol), Schedule I. |
| T20 | Visual and literary analysis indicate Propoxyphene, Schedule IV, not confirmed by instrumental analysis. |

*Pursuant to Title 22 O.S. Section 751, I hereby certify that I am maker of this document and that it is a true and correct report of findings of the Oklahoma State Bureau of Investigation Criminalistics Laboratory.*

Michael W. Childers
Criminalist

MWC/slb

05/30/2005   29:38   OSBI NERO → NERL                                                     NO.388   P03



# RICHARD L. GRAY
### DISTRICT ATTORNEY

State of Oklahoma
27th District

Wagoner County
307 E. Cherokee
Wagoner, OK 74467
Telephone (918) 485-2119
Facsimile (918) 485-1250

February 22, 2006

Shawn Ward
Oklahoma State Bureau of Investigation
Northeast Regional Office
125 W. 15th St., Ste 100
Tulsa, OK 74119

Dear Special Agent Ward:

Pursuant to your discussion of February 22, 2006 with Jeff Sheridan, please consider this letter a supplemental request for investigation concerning seized funds which can not be located. There are two arrests and seizures money which are of concern, they are the following;

1. There was a seizure on January 28th, 2002 of $632.00 which was in the possession of Sandra Gable. The money was not logged into evidence, but is reflected on the return of search warrant. Charges were filed in Cherokee County, but were dismissed for lack of speedy trial. There was not a forfeiture filed. ........

2. On October 23, 2003, Roy Brewer was arrested and $634.00 was seized from his person. The money was mentioned in a report, but there is no further record to indicate the disposition of the money. A prosecution was initiated and plea entered, there is an indication that all property was to be returned to Roy Brewer. This is an Adair County case.

On both the cases, attorneys have been requesting the return of the money. Clint Johnson was the officer in both instances.



001099

05/30/2006  20:30  GSBI NEED → NERL                                     No.338  D04

Shawn Ward Letter
February 22, 2006
Page 2

Additionally, it is my understanding that you are aware that there were certain items of concern taken from the vehicle assigned to Clint Johnson. Pursuant to your conversation with Jeff Sheridan, there will be no further request for analysis of any of those items by this office. All requests will be deferred to you as you see fit, contingent on your investigation.

Sincerely,

Donovan Dobbs
First Assistant District Attorney

DDD/rb

001100

599

To Jeff Sheridan

This is per our conversation as you wanted me to write up a statement:

I received your memo regarding certain cases in Cherokee and Adair County forfeiture cases. Reference to the $233.00 dollars this money was given back to the individual after consulting with Richard Gray due to this agent and agent Carver receiving information from this subject. Agent Carver is a witness that the money was returned back to the subject.

The original receipt for the $131.00 I have in my possession I took it up and presented it to Donovan Dobbs the original receipt is still in my possession.

The $751.00 that was taken in January of 2003 was taken to Misty Brinley which was shortly after Richard Gray took over office and they had me gathering up items for sale and forfeited items. We called Richard Gray approximately three times to find out where to put the money. This agent turned the money over to Misty Brinley.

If you have any questions please do not hesitate to contact me.

Thank You
Clint Johnson



935

APPEAL,LC−3,PROTO,R/R

# U.S. District Court
# Eastern District of Oklahoma (Muskogee)
# CIVIL DOCKET FOR CASE #: 6:09−cv−00105−JHP

Barrett v. USA
Assigned to: District Judge James H. Payne
Case in other court:  10th Circuit, 12−07086
                ED/OK, 6:04−cr−115
Cause: 28:2255 Motion to Vacate / Correct Illegal Sentence

Date Filed: 03/16/2009
Date Terminated: 08/16/2012
Jury Demand: None
Nature of Suit: 535 Death Penalty –
Habeas Corpus
Jurisdiction: U.S. Government Defendant

**Petitioner**

**Kenneth Eugene Barrett**　　　　　　represented by　**David B. Autry**
1021 NW 16th St
Oklahoma City, OK 73106
405−521−9600
Fax: 405−521−9669
Email: dbautry44@hotmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joan M. Fisher**
Federal Public Defender – Sacramento,
CA
801 "I" St, Third Floor
Sacramento, CA 95814
916−498−6666
Fax: 916−498−5706
Email: joan.fisher@fd.org
*ATTORNEY TO BE NOTICED*

**Tivon Schardl**
Federal Public Defender – Sacramento,
CA
801 "I" St, Third Floor
Sacramento, CA 95814
916−498−6666
Fax: 916−498−6656
Email: tim.schardl@fd.org
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**USA**　　　　　　　　　　　　represented by　**Christopher J. Wilson**
US Attorney (OKED)
1200 W Okmulgee
Muskogee, OK 74401

1

918−684−5100
Fax: 918−684−5150
Email: Chris.Wilson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Kahan**
US Department of Justice – Capital Case
Unit
1331 F St NW
Rm 345
Washington, DC 20530
202−305−8910
Fax: 202−353−9779
Email: jeffrey.kahan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sheldon J. Sperling**
US Attorney (OKED)
1200 W Okmulgee
Muskogee, OK 74401
918−684−5100
Fax: 918−684−5150
*TERMINATED: 11/24/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/10/2009 | 4 | | MOTION to File Exhibits Under Seal and for a Protective Order by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 5 | | ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for a Protective Order (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 6 | | MOTION to Reconsider (Re: 5 Order Ruling on Motion to Seal Exhibits and for Protective Order) by Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 7 | | AMENDED ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for Protective Order (Re: 5 Order, 6 Motion to Reconsider) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 1 | | MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett; Responses due by 6/16/2009 (With attachments – **EXHIBITS 1–36; 59–60**)(EXHIBITS 37–58 NOT USED)(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 3 | | |

2

| | | | |
|---|---|---|---|
| | | | EXHIBITS IN SUPPORT OF MOTION **Nos. 61–70, 71–80, 81–99, 100–118** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 8 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134 and 135** (Re: 1 MOTION to Vacate and 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 9 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 10 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 11 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 12 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 13 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 137, 138, 139, 140, 141, 142 and 143** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 14 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 144A, 144B, 145 and 146** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 15 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 16 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 17 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 18 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 19 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 147B2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 20 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) |

| | | | |
|---|---|---|---|
| | | | (Entered: 03/18/2009) |
| 03/16/2009 | 21 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 22 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 23 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 24 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 25 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 26 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147F** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 27 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147G** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 28 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 148, 149, 150, 151, 152, 153, 154, 155, 156, 157 and 158** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 29 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 159, 160, 161, 162, 163, 164 and 165** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 30 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 166, 167, 168, 169, 170, 171, 172, 173, 174 and 175** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 31 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 32 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 33 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 34 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |

| | | | |
|---|---|---|---|
| 03/16/2009 | 35 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 36 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 37 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 178, 179 and 180** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 38 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 39 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 40 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 41 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 42 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 182, 183, 184 and 185** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 43 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 186, 187, 188, 189, 190, 191, 192, 193, 194 and 195** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/17/2009 | 2 | | CORRECTED MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett (corrected to include verification) (Re: 1 Motion to Vacate); Responses due by 6/16/2009(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/18/2009 | 44 | | NOTICE to Government to Respond by **6/16/2009** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) Modified on 3/19/2009 to change response date to 6/16/09 (cjt, Deputy Clerk). (Entered: 03/18/2009) |
| 03/19/2009 | | | NOTICE of Docket Entry Modification; Error: Wrong date of 3/16/09 given in text; Correction: Correcting response date to 6/16/09 (Re: 44 Notice to Respond) (cjt, Deputy Clerk) (Entered: 03/19/2009) |
| 05/29/2009 | 45 | | MOTION to Disqualify Judge by Kenneth Eugene Barrett Responses due by 6/15/2009 Replies due by 6/24/2009.(Schardl, Tivon) (Entered: 05/29/2009) |
| 06/03/2009 | 46 | | ATTORNEY APPEARANCE by Christopher J. Wilson on behalf of USA (Wilson, Christopher) (Entered: 06/03/2009) |
| 06/11/2009 | 47 | | |

| | | | |
|---|---|---|---|
| | | | First MOTION for Extension of Time to Respond to Motion (Re: 45 MOTION to Disqualify Judge ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/11/2009 | 48 | | First MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment, 1 MOTION to Vacate Order/Judgment ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/12/2009 | 49 | | MINUTE ORDER by District Judge James H. Payne granting Application for Extension of Time to Respond to Petitioner's Motoin to Disqualify and Recuse United States District Judge James H. Payne from Further Participation in this Matter ( 47 Motion for Extension of Time to Respond to Motion). Accordingly, the respondent has until 7/15/09 within which to file its response to petitioner's motion (Re: 45 MOTION to Disqualify Judge ).(law, Deputy Clerk) (Entered: 06/12/2009) |
| 06/12/2009 | 50 | | MINUTE ORDER by District Judge James H. Payne granting in part and denying in part Application for Extension of Time to Respond to Petitioner's 28 U.S.C. Section 2255 Motion ( 48 Motion for Extension of Time to Respond to Motion ). Respondent has an additional 3 months or until 9/16/09 within which to file its response to petitioner's 28 U.S.C. Section 2255 Motion. (law, Deputy Clerk) (Entered: 06/12/2009) |
| 07/13/2009 | 51 | | RESPONSE in Opposition to Motion (Re: 45 MOTION to Disqualify Judge ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 07/13/2009) |
| 07/24/2009 | 52 | | First MOTION to unseal documents in cr−04−115 by USA Responses due by 8/10/2009 Replies due by 8/19/2009.(Wilson, Christopher) (Entered: 07/24/2009) |
| 08/14/2009 | 53 | | MOTION to File Response to Government's Motion to Unseal Out of Time by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/14/2009 | 54 | | MOTION to File Out of Time *PROPOSED ORDER* by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/17/2009 | 55 | | ORDER by District Judge James H. Payne: striking 54 Petitioner's Proposed Order which was filed in error (cjt, Deputy Clerk) (Entered: 08/17/2009) |
| 08/19/2009 | 56 | | MINUTE ORDER by District Judge James H. Payne: Directing Petitioner to supplement 53 MOTION to File Response to Government's Motion to Unseal Out of Time by 5:00 p.m. today, 8/19/09, to include a statement as to whether either Christopher J. Wilson or Jeffrey B. Kahan, counsel for respondent, USA objects to the motion. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 57 | | SUPPLEMENT (Re: 56 Minute Order,,, 53 MOTION to File Response to Government's Motion to Unseal Out of Time ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 08/19/2009) |
| 08/19/2009 | 58 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/19/2009) |

| | | | |
|---|---|---|---|
| 08/19/2009 | 59 | | MINUTE ORDER by District Judge James H. Payne: Striking 58 Petitioner's Response in Opposition to the Government's Motion to Unseal (Re: 52 Government's MOTION to Unseal Documents). (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 60 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's Motion to File a Response to Government's Motion to Unseal out of time (Doc. 53 ) is hereby granted. The Court notes that the Government's objection to Petitioner's request is based upon the impending deadline for the Government to respond to the Petitioner's § 2255 Motion (Doc. # 2) and that the Government's Motion to Unseal (Doc. # 52) indicates the pleadings sought are needed for the Government to be able to prepare its response to the Petitioner's § 2255 Motion. To the extent that any delay in ruling on the Government's Motion to Unseal is directly attributable to Petitioner's failure to timely respond to the Government's Motion to Unseal, this Court will consider that in the event the Government becomes unable to meet their current response deadlines on the § 2255 Motion. Accordingly, Petitioner shall be given until August 26, 2009 to file a Response to the Government's Motion (Doc. 52 ) and the Government shall be given until September 2, 2009, to Reply. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/26/2009 | 61 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr–04–115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/26/2009) |
| 08/28/2009 | 62 | | REPLY to Response to Motion (Re: 52 First MOTION to unseal documents in cr–04–115 ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 08/28/2009) |
| 09/04/2009 | 63 | | Second MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment ) by USA Responses due by 9/21/2009(Wilson, Christopher) (Entered: 09/04/2009) |
| 09/04/2009 | 64 | | MINUTE ORDER by District Judge James H. Payne: granting 63 Respondent's Motion for Extension of Time to Respond to Motion; Response due by 10/16/2009 (Re: 1 MOTION to Vacate Order/Judgment, 2 Corrected MOTION to Vacate Order/Judgment ) (cjt, Deputy Clerk) (Entered: 09/04/2009) |
| 09/04/2009 | 65 | | RESPONSE to Motion (Re: 63 Second MOTION for Extension to Respond to 2255 Motion) by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 9/8/2009 to change text and change link (dma, Deputy Clerk). (Entered: 09/04/2009) |
| 09/11/2009 | 66 | | ORDER by District Judge James H. Payne: denying 45 Petitioner's Motion to Disqualify and Recuse (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/11/2009 | 67 | | ORDER by District Judge James H. Payne: Granting in part, denying in part and taking under advisement in part 52 Government's MOTION to Unseal, or to Gain Full Access to Motions, Orders, Reports and Proceedings filed Cr–04–115 (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/22/2009 | 68 | | NOTICE of Intention Not to Abandon Claims and REQUEST for Protective Order (Re: 67 Order) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) Modified on 9/23/2009 change text (dma, |

| | | | |
|---|---|---|---|
| | | | Deputy Clerk). (Entered: 09/22/2009) |
| 09/23/2009 | 69 | | ORDER by District Judge James H. Payne (Re: 67 Order, 68 Petitioner's NOTICE of Intent Not to Abandon Claims and REQUEST for Protective Order) (cjt, Deputy Clerk) (Entered: 09/23/2009) |
| 09/25/2009 | 70 | | Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* by Kenneth Eugene Barrett Responses due by 10/13/2009 (With attachments – **EXHIBITS 1–10**)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 71 | | EXHIBIT(S) **11 through 50** (Re: 70 Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 72 | | EXHIBIT(S) **51 through 118** (Re: 70 Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/28/2009 | 73 | | OBJECTION to Petitioner's Proposed Protective Order (Re: 68 MOTION for Protective Order) by USA (Wilson, Christopher) Modified on 9/29/2009 to change text (dma, Deputy Clerk). (Entered: 09/28/2009) |
| 09/29/2009 | 74 | | ORDER by District Judge James H. Payne: Show Cause Hearing and Scheduling Conference are set for 10/6/2009 at 02:00 PM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne (Re: 70 Amended MOTION for Collateral Relief, to Vacate, Set Aside or Correct Sentence and for a New Trial) (cjt, Deputy Clerk) (Entered: 09/29/2009) |
| 09/30/2009 | 75 | | RESPONSE (Re: 69 Order, ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 09/30/2009) |
| 10/02/2009 | 76 | | MOTION to Vacate Order/Judgment *Order Filed September 29, 2009*, MOTION to Continue Hearing(s) *On Order to Show Cause* (Re: 74 Order,, Setting/Resetting Hearing(s), Setting/Resetting Hearing(s),, ) by Kenneth Eugene Barrett Responses due by 10/19/2009 (With attachments)(Schardl, Tivon) (Entered: 10/02/2009) |
| 10/02/2009 | 77 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's emergency motion (Dkt 76 ) to vacate show cause order is denied. The court hereby waives the presence of petitioner's counsel, Tivon Schardl, at the hearing scheduled October 6, 2009, at 2:00 p.m. Lead counsel, David Autry, is required to attend; however, arrangements will be made for lead counsel to speak with co–counsel Tivon Schardl via telephone, if necessary. In addition, the parties should be aware the court intends to conduct a status and scheduling conference to receive the parties' observations and comments as to the time frame necessary for disposition of this matter. (cjt, Deputy Clerk) (Entered: 10/02/2009) |
| 10/05/2009 | 78 | | MOTION to Continue Hearing(s), MOTION to Recuse, MOTION to Reconsider, MOTION for Leave to Appear *y* (Re: 77 Minute Order,,, Ruling on Motion to Vacate Order/Judgment,,, Ruling on Motion to Continue |

| | | | |
|---|---|---|---|
| | | | Hearing(s), Ruling on Motion to Continue Hearing(s), Ruling on Motion to Continue Hearing(s) ) by Kenneth Eugene Barrett Responses due by 10/20/2009(Schardl, Tivon) (Entered: 10/05/2009) |
| 10/05/2009 | 79 | | MINUTE ORDER by District Judge James H. Payne: denying 78 Petitioner's Motion to Reconsider; denying 78 Petitioner's Motion to Continue Hearing; finding as moot 78 Motion for Leave to Appear by Telephone pursuant to Minute Order 77 entered on 10/2/09. 78 Petioner's Motion to Recuse was previously denied by Order 66 entered on 9/11/09. (cjt, Deputy Clerk) (Entered: 10/05/2009) |
| 10/06/2009 | 80 | | MINUTES of Proceedings – held before District Judge James H. Payne: Show Cause/Scheduling Hearing held on 10/6/2009 (Court Reporter: K.Sidwell) (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 81 | | SCHEDULING ORDER by District Judge James H. Payne: Amended Motion to Vacate due 11/6/2009; Brief in Support due 1/5/2010; Response due 3/8/2010; Reply due 3/23/2010 (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 82 | | PROTECTIVE ORDER by District Judge James H. Payne: granting 68 Petitioner's Motion for Protective Order; granting 52 Government's Motion to Unseal Documents (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/08/2009 | 83 | | ***Remark: Pursuant to 82 Protective Order entered on 10/7/2009, copies of sealed Doc. Nos. 16, 23, 24, 25, 46, 50, 51, 57, 107, 113, 116, 118, 232, 274, 301 and the sealed letter dated 2/28/2005, all filed in Case No. CR–04–115–JHP, were personally delivered to Asst. United States Attorney Christopher Wilson on 10/8/2009. (cjt, Deputy Clerk) (Entered: 10/08/2009) |
| 10/09/2009 | 84 | | STATUS REPORT by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 10/09/2009) |
| 10/15/2009 | 85 | | TRANSCRIPT of Proceedings (Unredacted) of Show cause/Scheduling Hearing held on 10/6/09 before District Judge James H. Payne (Court Reporter: Ken Sidwell) (Pages: 1–42). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 80 Minutes of Scheduling Conference, Striking/Terminating Deadline(s)/Hearing(s) ) (kns, Court Reporter) (Entered: 10/15/2009) |
| 10/16/2009 | 86 | | MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* by Kenneth Eugene Barrett Responses due by 11/2/2009(Schardl, Tivon) (Entered: 10/16/2009) |
| 10/20/2009 | 87 | | ORDER by District Judge James H. Payne ; denying 86 Motion to Stay (lsa, Chambers) (Entered: 10/20/2009) |
| 10/28/2009 | 88 | | Unopposed MOTION to Extend Deadline(s) *Established by Order filed October 7, 2009* by Kenneth Eugene Barrett Responses due by 11/12/2009 (With attachments)(Schardl, Tivon) (Entered: 10/28/2009) |

| | | | |
|---|---|---|---|
| 11/02/2009 | 89 | | SUPPLEMENT to Unopposed Motion to Continue Filing Schedule 88 by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 11/3/2009 to edit text (cjt, Deputy Clerk). (Entered: 11/02/2009) |
| 11/03/2009 | 90 | | ORDER EXTENDING FILING SCHEDULE by District Judge James H. Payne: granting 88 Petitioner's Unopposed Motion to Continue Filing Schedule (cjt, Deputy Clerk) (Entered: 11/03/2009) |
| 11/04/2009 | 91 | | ORDER from Circuit Court (Re: 86 MOTION to Stay Proceedings Pending Disposition of Mandamus Action 87 Order Denying Motion to Stay) (cjt, Deputy Clerk) (Entered: 11/04/2009) |
| 12/03/2009 | 92 | | MINUTE ORDER by District Judge James H. Payne: Show Cause Hearing is set for 12/15/2009 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne for David Autry to show cause why he has failed to comply with this Court's prior orders regarding submission of CJA vouchers. Only David Autry's appearance is required at this hearing. (cjt, Deputy Clerk) (Entered: 12/03/2009) |
| 12/04/2009 | 93 | | ATTORNEY APPEARANCE by Joan Fisher on behalf of Kenneth Eugene Barrett (Fisher, Joan) Modified on 12/7/2009 to change text (dma, Deputy Clerk). (Entered: 12/04/2009) |
| 12/04/2009 | 94 | | NOTICE Petitioner's Notice Regarding Amended Petition by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 12/04/2009) |
| 12/04/2009 | 95 | | Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* by Kenneth Eugene Barrett Responses due by 12/18/2009(Fisher, Joan) (Entered: 12/04/2009) |
| 12/14/2009 | 96 | | ORDER from Circuit Court (Re: 87 Order, Ruling on Motion to Stay, 86 MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* ) (With attachments)(law, Deputy Clerk) (Entered: 12/14/2009) |
| 12/15/2009 | 97 | | SEALED MINUTES of Show Cause Hearing (cjt, Deputy Clerk) (Entered: 12/15/2009) |
| 01/08/2010 | 98 | | MOTION to Extend Deadline(s) *for submission of cja voucher* by Kenneth Eugene Barrett Responses due by 1/22/2010(Autry, David) (Entered: 01/08/2010) |
| 01/08/2010 | 99 | | MINUTE ORDER by District Judge James H. Payne: granting 98 Motion to Extend Time for Submittal of CJA Voucher by Petitioner's counsel, David Autry, until 1/11/2010. (cjt, Deputy Clerk) (Entered: 01/08/2010) |
| 01/11/2010 | 100 | | NOTICE of Submission of Matter for In Camera Review by USA (Wilson, Christopher) (Entered: 01/11/2010) |
| 01/11/2010 | 101 | | SEALED LETTER (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/12/2010 | 102 | | PROTECTIVE ORDER by District Judge James H. Payne (Re: 101 Sealed Letter) (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/13/2010 | 103 | | Unopposed MOTION to Extend Deadline(s) *to File Brief in Support of Amended Petition and Subsequent Briefing* by Kenneth Eugene Barrett Responses due by 1/27/2010 (With attachments)(Schardl, Tivon) (Entered: |

| | | | |
|---|---|---|---|
| | | | 01/13/2010) |
| 01/15/2010 | 104 | | MINUTE ORDER by District Judge James H. Payne: For good cause shown, 103 Petitioner's Motion for Extension of Time to File Brief in Support of Amended Motion to Vacate is granted. Petitioner shall be given until 2/18/2010 to file his brief. No further extensions of time shall be granted. Respondent's answer shall be due 4/19/2010 and Petitioner's reply will be due 5/4/2010. (Re: 95 Amended MOTION to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255) (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 01/15/2010 | 105 | | MINUTE ORDER by District Judge James H. Payne: It is hereby ordered that Petitioner Kenneth Eugene Barrett's CJA 30 DEATH PENALTY PROCEEDINGS: APPOINTMENT OF AND AUTHORITY TO PAY COURT–APPOINTED COUNSEL comes before the Court by David B. Autry. This matter is hereby REFERRED to Magistrate Judge Steven P. Shreder for a fee hearing and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate said original application and supporting documents. (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 02/02/2010 | 106 | | MINUTE ORDER by District Judge James H. Payne (Attachments: # 1 1/29/2010 E–Mail) (cjt, Deputy Clerk) (Entered: 02/02/2010) |
| 02/11/2010 | 107 | | Third MOTION to Extend Deadline(s) *Due to Newly Disclosed Evidence* by Kenneth Eugene Barrett Responses due by 2/25/2010 (With attachments)(Schardl, Tivon) (Entered: 02/11/2010) |
| 02/12/2010 | 108 | | MINUTE ORDER by District Judge James H. Payne: Motion Hearing and Status Conference are set for 3/1/2010 at 09:30 AM before District Judge James H. Payne (Re: 107 Petitioner's Third MOTION to Continue Briefing Schedule). Counsel are required to be present at this hearing. Petitioner does not need to be present. (cjt, Deputy Clerk) (Entered: 02/12/2010) |
| 02/18/2010 | 109 | | MOTION Leave to File Oversized Brief in Support of Amended Motion to Vacate, MOTION for Leave to File Brief in Support of Second Amended Motion to Vacate by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 110 | | Unopposed MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 3/4/2010(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 111 | | Amended MOTION for Leave to Exceed Page Limitation by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 112 | | MINUTE ORDER by District Judge James H. Payne: denying 111 Petitioner's Amended Motion for Leave to File Oversized Brief, with written order to follow (finding as moot 109 Petitioner's Motion for Leave to File Oversized Brief) (cjt, Deputy Clerk) (Entered: 02/18/2010) |
| 02/18/2010 | 113 | | MOTION to Reconsider *Order Denying Leave to File Oversized Brief* (Re: 112 Minute Order,, Ruling on Motion for Miscellaneous Relief,, Ruling on Motion for Leave to File Document(s), Ruling on Motion for Leave to File Document(s), Ruling on Motion to Exceed Page Limitation, ) by Kenneth |

| | | | |
|---|---|---|---|
| | | | Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 114 | | REDACTED EXHIBITS **119, 120, 121, 122** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 115 | | REDACTED EXHIBITS **125, 126, 128, 129, 130, 132, 133, 134, 137, 138** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 116 | | REDACTED EXHIBITS **148, 149, 150, 151, 152, 153, 154** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 117 | | REDACTED EXHIBITS **123, 124, 127, 131, 135** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 118 | | REDACTED EXHIBITS **155, 156** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 119 | | REDACTED EXHIBITS **157, 158** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 120 | | REDACTED EXHIBITS **163, 164** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 121 | | REDACTED EXHIBIT **161** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 122 | | REDACTED EXHIBIT **162** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 123 | | REDACTED EXHIBITS **165, 166** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 124 | | REDACTED EXHIBIT **159 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: |

| | | | |
|---|---|---|---|
| | | | 02/18/2010) |
| 02/18/2010 | <u>125</u> | | REDACTED EXHIBITS **167, 168, 169** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>126</u> | | REDACTED EXHIBIT **159 Part b** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>127</u> | | REDACTED EXHIBITS **170, 171** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>128</u> | | REDACTED EXHIBIT **160 Part a** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>129</u> | | REDACTED EXHIBIT **160 Part b** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>130</u> | | REDACTED EXHIBITS **172, 173** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>131</u> | | REDACTED EXHIBIT **177 Part a** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>132</u> | | REDACTED EXHIBITS **174, 175, 176, 178** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>133</u> | | REDACTED EXHIBIT **177 Part b** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>134</u> | | REDACTED EXHIBIT **177 Part c** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>135</u> | | REDACTED EXHIBITS **179, 180, 181a** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |

| 02/18/2010 | 136 | | REDACTED EXHIBIT **181 Part B1** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
|---|---|---|---|
| 02/18/2010 | 137 | | REDACTED EXHIBITS **182, 183** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 138 | | REDACTED EXHIBIT **181 Part B2** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 139 | 22 | REDACTED EXHIBIT **196 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 140 | 83 | REDACTED EXHIBITS **184, 185, 186, 187, 188** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 141 | 174 | REDACTED EXHIBIT **196 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 142 | 217 | REDACTED EXHIBIT **196 Part c** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 143 | 263 | REDACTED EXHIBIT **196 Part d** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 144 | 289 | REDACTED EXHIBITS **189, 190, 191, 192, 193, 194, 195** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 145 | 417 | REDACTED EXHIBITS **197, 198, 199, 200, 203, 204, and 205** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 02/18/2010) |
| 02/26/2010 | 146 | 461 | ORDER by District Judge James H. Payne: granting 113 petitioner's Motion to Reconsider; Petitioner's brief due 3/1/10 at 4:30 p.m.; Status Conference RESET for 3/31/2010 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne; (granting in part 107 Motion to Continue Briefing Schedule; striking |

| | | | |
|---|---|---|---|
| | | | 1 Motion to Vacate Order/Judgment; striking 2 Corrected Motion to Vacate Order/Judgment; striking 70 Amended Motion to Vacate Order/Judgment) (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 02/26/2010 | 147 | 468 | ORDER by District Judge James H. Payne: Re: 110 petitioner's Unopposed MOTION to File Exhibits Under Seal; Petitioner's response due 3/12/10 (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 03/01/2010 | 148 | 470 | STIPULATION *and Order [Proposed] Modified Protective Order* by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 149 | 475 | BRIEF in Support of Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 150 | 766 | MOTION for Evidentiary Hearing (Re: 95 Amended MOTION to Vacate) by Kenneth Eugene Barrett; Responses due by 3/15/2010(Schardl, Tivon) Modified on 3/2/2010 to change text and link (dma, Deputy Clerk). (Entered: 03/01/2010) |
| 03/01/2010 | 151 | 770 | MOTION Expand the Record (Re: 149 Brief in Support of Motion ) by Kenneth Eugene Barrett Responses due by 3/15/2010(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/03/2010 | 152 | 775 | Joint MOTION to Modify Protective Order by all parties Responses due by 3/17/2010(Wilson, Christopher) (Entered: 03/03/2010) |
| 03/05/2010 | 153 | 778 | RESPONSE in Opposition to Motion (Re: 150 MOTION for Hearing ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/05/2010 | 154 | 782 | RESPONSE in Opposition to Motion (Re: 151 MOTION Expand the Record ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/12/2010 | 155 | 786 | RESPONSE by Kenneth Eugene Barrett (Re: 147 Order) (Fisher, Joan) (Entered: 03/12/2010) |
| 03/25/2010 | 156 | | MINUTE ORDER by District Judge James H. Payne: **TIME CHANGE ONLY** – Status Conference RESET for 3/31/2010 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne. (cjt, Deputy Clerk) (Entered: 03/25/2010) |
| 03/29/2010 | 157 | 808 | ORDER by District Judge James H. Payne: denying 150 Petitioner's Motion for Evidentiary Hearing (cjt, Deputy Clerk) (Entered: 03/29/2010) |
| 03/29/2010 | 158 | | MOTION to be Excused from the Status Conference set on March 31, 2010 by USA Responses due by 4/12/2010(Wilson, Christopher) (Entered: 03/29/2010) |
| 03/29/2010 | 159 | | MINUTE ORDER by District Judge James H. Payne: granting 158 Government's Motion to be Excused from Attendance of Status Conference. The Court further grants Government's request for substitute counsel, Douglas Horn, to appear in lieu of Christopher Wilson for this hearing only. (cjt, Deputy Clerk) (Entered: 03/29/2010) |

| 03/30/2010 | 160 | | MINUTE ORDER by District Judge James H. Payne: The Court directs that Courtroom 1, Room 230, be sealed on 3/31/2010 at 9:00 a.m. for the portion of the Status Hearing pertaining to the Protective Order. The Clerk is directed to post this Minute Order on the Court's bulletin board for public viewing located on the 2nd floor of the United States Courthouse. (cjt, Deputy Clerk) (Entered: 03/30/2010) |
|---|---|---|---|
| 03/30/2010 | 161 | 809 | ORDER (Re: Exhibits) by District Judge James H. Payne: granting 110 Petitioner's Motion to File Exhibits under Seal; granting 151 Petitioner's Motion to Expand the Record (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 162 | | SEALED EXHIBIT **201** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 163 | | SEALED EXHIBIT **202** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/31/2010 | 164 | | SEALED MINUTES of Proceedings – held before District Judge James H. Payne: Motion/Status Hearing held on 3/31/2010 (Re: 152 Joint MOTION to Modify Protective Order ) (Court Reporter: B.Neil) (cjt, Deputy Clerk) (cjt, Deputy Clerk). (Entered: 04/01/2010) |
| 03/31/2010 | 165 | | MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 03/31/2010 | 166 | | CORRECTED MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010, Reply due by 7/1/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 04/05/2010 | 167 | | SEALED REPORT TO COURT by USA (Re: 152 Joint Motion to Modify Protective Order) (cjt, Deputy Clerk) (Entered: 04/05/2010) |
| 04/08/2010 | 168 | | SEALED ORDER by Judge James H. Payne Re: 152 Joint Motion to Modify Protective Order (cjt, Deputy Clerk) (Entered: 04/08/2010) |
| 04/14/2010 | 169 | | SEALED STATUS REPORT by Kenneth Eugene Barrett (cjt, Deputy Clerk) Modified on 4/20/2010 to add corrected attachment (cjt, Deputy Clerk). (Entered: 04/15/2010) |
| 05/12/2010 | 170 | 811 | Unopposed MOTION for Leave to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief by USA Responses due by 5/26/2010(Wilson, Christopher) (Entered: 05/12/2010) |
| 05/13/2010 | 171 | 814 | ORDER by District Judge James H. Payne: granting 170 Respondent's Unopposed Motion to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief (cjt, Deputy Clerk) (Entered: 05/13/2010) |
| 05/14/2010 | 172 | | TRANSCRIPT of Proceedings (Unredacted) of Status Hearing held on 3–31–2010 before District Judge James H. Payne (Court Reporter: Brian P. Neil) (Pages: 1–46). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without |

| | | | |
|---|---|---|---|
| | | | redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s) ) (bpn, Court Reporter) (Entered: 05/14/2010) |
| 05/14/2010 | 173 | | TRANSCRIPT ORDER FORM for Status and Scheduling Conference conducted on 3/31/10 (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s), 172 Transcript of Proceedings – Unredacted) by Kenneth Eugene Barrett (law, Deputy Clerk) (Entered: 05/17/2010) |
| 05/17/2010 | 174 | | Redacted RESPONSE in Opposition to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 05/17/2010) |
| 05/17/2010 | 175 | | SEALED RESPONSE (Re: 174 RESPONSE to Motion; 95 Amended MOTION to Vacate, Set Aside or Correct a Sentence) by USA (dma, Deputy Clerk) (Entered: 05/17/2010) |
| 06/30/2010 | 176 | | Unopposed MOTION for Leave to Exceed Page Limitation *For Reply Brief* by Kenneth Eugene Barrett Responses due by 7/14/2010(Schardl, Tivon) (Entered: 06/30/2010) |
| 06/30/2010 | 177 | | MINUTE ORDER by District Judge James H. Payne: granting 176 Petitioner's Unopposed Motion for Leave to File Oversized Brief (cjt, Deputy Clerk) (Entered: 06/30/2010) |
| 07/01/2010 | 178 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 07/01/2010) |
| 07/23/2010 | 179 | | NOTICE of Filing of Signed Declaration of Toby Barrett (Re: 178 Reply to Response to Motion ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 07/23/2010) |
| 08/13/2010 | 180 | | REPORT AND RECOMMENDATION ON REQUEST FOR EXCESS COMPENSATION by Magistrate Judge Steven P. Shreder (Re: 105 Minute Order Referring CJA 30 Voucher) Objections to RRdue by 8/27/2010(eje, Deputy Clerk) (Entered: 08/13/2010) |
| 09/03/2010 | 181 | | SEALED ORDER by District Judge James H. Payne: Re: 180 Report and Recommendation) (cjt, Deputy Clerk) (Entered: 09/03/2010) |
| 09/03/2010 | | | CJA 30: Authorization to Pay David B. Autry on behalf of Kenneth Eugene Barrett. (JHP 9/3/10)(smg, Deputy Clerk) (Entered: 09/14/2010) |
| 02/07/2011 | 182 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 2/22/2011 (With attachments)(Fisher, Joan) (Entered: 02/07/2011) |
| 02/08/2011 | 183 | | MINUTE ORDER by District Judge James H. Payne: granting 182 Petitioner's Unopposed Motion to Seal. Petitioner is given leave to file the following documents under seal: Petitioners Motion to Vacate or Modify |

| | | | |
|---|---|---|---|
| | | | Protective Order and Request for Hearing; Brief in Support of Motion to Vacate or Modify Protective Order and Request for Hearing; Petitioners Motion for Leave to Conduct Discovery; and Petitioners Brief in Support of Motion to Conduct Discovery. (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 184 | | SEALED MOTION to Vacate or Modify Protective Orders and Request for Hearing by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 185 | | SEALED BRIEF in Support of 184 Petitioner's Sealed Motion to Vacate and/or Modify Protective Order and Request for Hearing (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 186 | | SEALED MOTION for Leave to Conduct Discovery by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 187 | | SEALED BRIEF in Support of 186 Sealed Motion to Conduct Discovery (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/17/2011 | 188 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 186 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 189 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 184 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 190 | | MINUTE ORDER by District Judge James H. Payne: granting 188 and 189 Government's Motions for Extension of Time to Respond to Motions; Responses due by 3/8/2011 Re: 184 Petitioner's SEALED MOTION to Vacate or Modify Protective Orders and 186 Petitioner's SEALED MOTION for Leave to Conduct Discovery (cjt, Deputy Clerk) (Entered: 02/17/2011) |
| 03/04/2011 | 191 | | Unopposed MOTION to Seal Document by USA Responses due by 3/18/2011(Kahan, Jeffrey) (Entered: 03/04/2011) |
| 03/04/2011 | 192 | | MINUTE ORDER by District Judge James H. Payne: granting 191 Respondent's Motion to File Sealed Oppositions to Sealed Motions (cjt, Deputy Clerk) (Entered: 03/04/2011) |
| 03/08/2011 | 193 | | SEALED RESPONSE in Opposition (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/08/2011 | 194 | | SEALED RESPONSE in Oposition (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/18/2011 | 195 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 4/1/2011 (With attachments)(Fisher, Joan) (Entered: 03/18/2011) |
| 03/18/2011 | 196 | | MINUTE ORDER by District Judge James H. Payne: granting 195 Petitioner's Motion to Seal Replies to documents 193 and 194 (cjt, Deputy Clerk) (Entered: 03/18/2011) |
| 03/21/2011 | 197 | | SEALED REPLY to Response (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by Petitioner (cjt, Deputy Clerk) (Entered: |

| | | | |
|---|---|---|---|
| | | | 03/22/2011) |
| 03/21/2011 | 198 | | SEALED REPLY to Response (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by Petitioner (cjt, Deputy Clerk) (Entered: 03/22/2011) |
| 03/16/2012 | 199 | | NOTICE of Filing of Declaration of Paul D. Gordon (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) Modified to reflect DVDs for Exhibits 2, 3 and 4 stored in file cabinet in vault on 2nd floor Court Clerk's Office (cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/16/2012 | 200 | | NOTICE of Filing of Declaration of Leonard Post (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 03/16/2012) |
| 03/16/2012 | 201 | | MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett Responses due by 3/30/2012 (With attachments)(Fisher, Joan) Modified to reflect CDs of Appendix A and Appendix B stored in file cabinet in vault on 2nd floor Court Clerk's Office(cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/19/2012 | 202 | | CERTIFICATE of Service (Re: 199 Notice (Other) ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/19/2012 | 203 | | CERTIFICATE of Service (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/29/2012 | 204 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 201 Motion to Supplement) by USA; Responses due by 4/12/2012 (With attachments)(Wilson, Christopher) Modified on 3/30/2012 (cjt, Deputy Clerk). (Entered: 03/29/2012) |
| 03/30/2012 | 205 | | MINUTE ORDER by District Judge James H. Payne: granting 204 Motion for Extension of Time to Respond to Motion; Response deadline extended to 4/30/2012 (Re: 201 MOTION to Supplement) (cjt, Deputy Clerk) (Entered: 03/30/2012) |
| 04/27/2012 | 206 | | RESPONSE in Opposition to Motion (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by USA ;(Wilson, Christopher) (Entered: 04/27/2012) |
| 05/07/2012 | 207 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255*, 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/07/2012) |
| 06/18/2012 | 208 | | MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY by Kenneth Eugene Barrett. Responses due by 7/2/2012(Fisher, Joan) (Entered: 06/18/2012) |

| | | | |
|---|---|---|---|
| 06/18/2012 | 209 | | BRIEF in Support of Motion (Re: 208 MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY ) by Kenneth Eugene Barrett ; (With attachments)(Fisher, Joan) (Entered: 06/18/2012) |
| 06/20/2012 | 210 | | ORDER by District Judge James H. Payne denying 201 Motion for Leave to Supplement Pending Motion to Vacate, Set Aside or Correct Judgment, Order and/or Sentence Under 28 U.S.C. Section 2255 (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/20/2012 | 211 | | MINUTE ORDER by District Judge James H. Payne denying 208 Motion to Preserve Testimony of Judge John Garrett, Retired, Without Further Delay (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/28/2012 | 212 | | MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* (Re: 210 Ruling on Motion to Supplement ) by Kenneth Eugene Barrett. Responses due by 7/12/2012(Fisher, Joan) (Entered: 06/28/2012) |
| 07/10/2012 | 213 | | RESPONSE in Opposition to Motion (Re: 212 MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* ) by USA ;(Wilson, Christopher) (Entered: 07/10/2012) |
| 08/16/2012 | 214 | | OPINION AND ORDER by District Judge James H. Payne: denying 95 Amended Motion to Vacate; denying 184 Sealed Motion; denying 186 Sealed Motion; denying 212 Motion to Reconsider (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 215 | | SEALED ORDER by District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 216 | | JUDGMENT by District Judge James H. Payne entering judgment in favor of USA against Kenneth Eugene Barrett (terminates case) (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 09/13/2012 | 217 | | MOTION to Alter Order/Judgment *and Brief in Support* (Re: 216 Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider ) by Kenneth Eugene Barrett. Responses due by 9/27/2012 (With attachments)(Fisher, Joan) (Entered: 09/13/2012) |
| 09/27/2012 | 218 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA. Responses due by 10/11/2012(Wilson, Christopher) (Entered: 09/27/2012) |
| 09/27/2012 | 219 | | ORDER by District Judge James H. Payne: granting 218 Motion for Extension of Time to Respond to Motion; Responses due by 10/29/2012 (Re: 217 MOTION to Alter or Amend Judgment) (cjt, Deputy Clerk) (Entered: 09/27/2012) |
| 10/29/2012 | 220 | | RESPONSE in Opposition to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 10/29/2012) |
| 10/30/2012 | 221 | | OPINION AND ORDER by District Judge James H. Payne: denying 217 Petitioner's Motion to Alter or Amend Judgment (cjt, Deputy Clerk) |

| | | | |
|---|---|---|---|
| | | | (Entered: 10/30/2012) |
| 12/26/2012 | 222 | | NOTICE OF APPEAL to Circuit Court (Re: 216 Judgment, 221 Ruling on Motion to Alter Order/Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider, 215 Sealed Order ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 12/26/2012) |
| 12/27/2012 | 223 | | Transmission of Notice of Appeal and Docket Sheet to Circuit Court with copy of 222 Notice of Appeal, 216 Judgment, 221 Ruling, 214 Ruling and 215 Sealed Order. Preliminary Record transmitted to 10th Circuit Court of Appeals electronically. (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/27/2012) |
| 12/27/2012 | 224 | | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 12–7086 (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/28/2012) |
| 01/10/2013 | 225 | | TRANSCRIPT ORDER FORM (Transcripts are not necessary or are already on file ) (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/10/2013) |
| 01/10/2013 | 226 | | DESIGNATION of Record on Appeal (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 01/10/2013) |

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 196**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255          *U.S. v. Barrett*, 6:09-cv-00105-JHP

22

CAUTION: NOT TO BE USED FOR IDENTIFICATION PURPOSES

THIS IS AN IMPORTANT RECORD SAFEGUARD IT

ANY ALTERATIONS IN SHADED AREAS RENDER FORM VOID

| DD FORM 214 1 JUL 79 | PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE | CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY |
|---|---|---|

| 1. NAME (Last, first, middle) | 2. DEPARTMENT, COMPONENT AND BRANCH | 3. SOCIAL SECURITY NO. |
|---|---|---|
| CRAWFORD TRAVIS DON | ARMY/RA | ███ 5635 |

| 4a. GRADE, RATE OR RANK | 4b. PAY GRADE | 5. DATE OF BIRTH | 6. PLACE OF ENTRY INTO ACTIVE DUTY |
|---|---|---|---|
| PV1 | E-1 | 640120 | LITTLE ROCK AR |

| 7. LAST DUTY ASSIGNMENT AND MAJOR COMMAND | 8. STATION WHERE SEPARATED |
|---|---|
| PCF USAFACFS    TRADOC TC | FORT SILL OK |

| 9. COMMAND TO WHICH TRANSFERRED | 10. SGLI COVERAGE |
|---|---|
| NA | AMOUNT $  35,000   ☐ NONE |

| 11. PRIMARY SPECIALTY NUMBER, TITLE AND YEARS AND MONTHS IN SPECIALTY (Additional specialty numbers and titles involving periods of one or more years) | 12. RECORD OF SERVICE | YEAR(s) | MON(s) | DAY(s) |
|---|---|---|---|---|
| 12B10 COMBAT ENGINEER, 1 YEAR AND 7 MONTHS// NOTHING FOLLOWS | a. Date Entered AD This Period | 83 | 03 | 24 |
| | b. Separation Date This Period | 85 | 01 | 23 |
| | c. Net Active Service This Period | 01 | 04 | 22 |
| | d. Total Prior Active Service | 00 | 00 | 00 |
| | e. Total Prior Inactive Service | 00 | 00 | 13 |
| | f. Foreign Service | 00 | 00 | 00 |
| | g. Sea Service | 00 | 00 | 00 |
| | h. Effective Date of Pay Grade | 83 | 11 | 16 |
| | i. Reserve Oblig. Term. Date | 00 | 00 | 00 |

13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service)

ARMY SERVICE RIBBON//SHARPSHOOTER (RIFLE M16)//EXPERT (HAND GRENADE)//NOTHING FOLLOWS

14. MILITARY EDUCATION (Course Title, number weeks, and month and year completed)

NONE//NOTHING FOLLOWS

| 15. MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERANS' EDUCATIONAL ASSISTANCE PROGRAM   ☐ YES  ☒ NO | 16. HIGH SCHOOL GRADUATE OR EQUIVALENT   ☒ YES  ☐ NO | 17. DAYS ACCRUED LEAVE PAID   NONE |
|---|---|---|

18. REMARKS

DENTAL CARE WAS NOT PROVIDED WITHIN 90 DAYS PRIOR TO SEPARATION// NOTHING FOLLOWS

| 19. MAILING ADDRESS AFTER SEPARATION | 20. MEMBER REQUESTS COPY 6 BE |
|---|---|
| ███  VIAN OK 74962 | SENT TO  OK   DIR. OF VET AFFAIRS  ☒ YES  ☐ NO |

| 21. SIGNATURE OF MEMBER BEING SEPARATED | 22. TYPED NAME/GRADE, TITLE AND SIGNATURE OF OFFICIAL AUTHORIZED TO SIGN |
|---|---|
| SM NOT AVAILABLE FOR SIGNATURE | L. D. BRUNK, SGM, USA, C, TRANSFER POINT |

SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only)

| 23. TYPE OF SEPARATION | 24. CHARACTER OF SERVICE (Includes upgrades) |
|---|---|
| DISCHARGE | UNDER OTHER THAN HONORABLE CONDITIONS |

| 25. SEPARATION AUTHORITY | 26. SEPARATION CODE | 27. REENLISTMENT CODE |
|---|---|---|
| AR 635-200, CHAPTER 10 | KFS | RE-3b |

28. NARRATIVE REASON FOR SEPARATION

FOR THE GOOD OF THE SERVICE-IN LIEU OF COURT-MARTIAL

| 29. DATES OF TIME LOST DURING THIS PERIOD   840729-841209  ✓ 831005-831008/831021-831101/840625-840625/840706-840718 | 30. MEMBER REQUESTS COPY 23 INITIALS |
|---|---|

CAUTION: NOT TO BE USED FOR
IDENTIFICATION PURPOSES

ANY ALTERATIONS IN SHADED AREAS
RENDER FORM VOID

| 1. NAME (Last, first, middle) CRAWFORD TRAVIS DON | 2. DEPARTMENT, COMPONENT AND BRANCH ARMY RA | 3. SOCIAL SECURITY NO. (Also, Service Number if applicable) |
|---|---|---|
| 4. MAILING ADDRESS (Include ZIP Code) ██████████ VIAN OKLAHOMA   74962 | | ██████████ 5635 |

5. ORIGINAL DD FORM 214 IS CORRECTED AS INDICATED BELOW

| ITEM NO. | CORRECTED TO READ |
|---|---|
| | SEPARATION DATE ON DD FORM 214 BEING CORRECTED - **85 01 23** |
| 12C | 01 04 16/NOTHING FOLLOWS |

| 6. DATE | 7. TYPED NAME, GRADE, TITLE AND SIGNATURE OF OFFICIAL AUTHORIZED TO SIGN |
|---|---|
| 13JUL88 | ELIZABETH B. TATUM, GS-8, C, ADRB SEC, ARPERCEN |

**DD** FORM 1 JUL 79 **215**

S/N 0102-LF-000-2150

PREVIOUS EDITIONS
OF THIS FORM ARE
OBSOLETE.

**CORRECTION TO DD FORM 214, CERTIFICATE OF RELEASE OR
DISCHARGE FROM ACTIVE DUTY**

SERVICE - 2

# ENLISTMENT / REENLISTMENT DOCUMENT - ARMED FORCES OF THE UNITED STATES

| A. | IDENTIFICATION DATA | | |
|---|---|---|---|

| 1. NAME (Last-First-Middle-Jr-Sr-etc.) | 2. SSN | 3. DATE OF ENL / REENL | 4. GRADE |
|---|---|---|---|
| CRAWFORD  TRAVIS DON | ███-5635 | 11 MAR 1983 | PV-1 |

| 5. HOME OF RECORD (City, State, ZIP Code) | 6. PLACE OF ENLISTMENT / REENLISTMENT | | | |
|---|---|---|---|---|
| SALLISAW, OK   74955 | MEPS LITTLE ROCK, AR | | | |

| 7. DATE OF BIRTH | 8. SELECTIVE SERVICE NO. | 9. PREV MIL SVC UPON ENL / REENL | YEARS | MONTHS | DAYS |
|---|---|---|---|---|---|
| ███ 1964 | ☐ NOT REGISTERED | a. Total Active Military Service | 00 | 00 | 00 |
| | | b. Total Inactive Military Service | 00 | 00 | 00 |

| B. | AGREEMENTS |
|---|---|

10. I am enlisting/reenlisting in the United States _____ ARMY RESERVE _____

this date for _____ 6 _____ years beginning in pay grade _____ E-1 _____. The additional details of my enlistment/reenlistment are in Section C and Annex(es) _____ A _____.

a. **FOR ENLISTMENT IN A DELAYED ENTRY/ENLISTMENT PROGRAM (DEP)**, I understand that I will be ordered to active duty as a Reservist unless I report to the place shown in item 6 above by _____ 0630 _____

_____ 24 MARCH 1983 _____ for enlistment in the Regular Component of the United States
(time and date)

_____ ARMY _____ for not less than _____ 3 _____ years. My enlistment in the DEP is in a nonpay status. I understand my period of time in the DEP is creditable for pay purposes upon enlistment on active duty. I also understand that this time is NOT counted toward fulfillment of my military service obligation or commitment. I must maintain my current qualifications, and keep my recruiter informed of any changes in my physical or dependency status, moral qualifications, or mailing address.

b. Remarks: (If none, so state.)

NONE

c. The agreements in this section and the attached annex(es) are all the promises made to me by the Government. **ANYTHING ELSE ANYONE HAS PROMISED ME IS NOT VALID AND WILL NOT BE HONORED.** _____ T.DC _____
(Initials of Enlistee/Reenlistee)

| C. | PARTIAL STATEMENT OF EXISTING UNITED STATES LAWS |
|---|---|

11. **FOR ALL ENLISTEES OR REENLISTEES:** Many laws, regulations, and military customs will govern my conduct and require me to do things a civilian does not have to do. The following statements are not promises or guarantees of any kind. They explain some of the present laws affecting the Armed Forces which I cannot change but which Congress can change at any time.

a. My enlistment is more than an employment agreement. As a member of the Armed Forces of the United States, I will be:

(1)   Required to obey all lawful orders and perform all assigned duties.

(2)   Subject to separation during or at the end of my enlistment. If my behavior fails to meet acceptable military standards, I may be discharged and given a certificate for less than honorable service, which may hurt my future job opportunities and my claim for veteran's benefits.

(3)   Subject to the military justice system; which means, among other things, that I may be tried by military courts-martial.

(4)   Required upon order to serve in combat or other hazardous situations.

(Continued on page 2, reverse side)

DD Form 82 FEB 4/1    THIS FORM, TOGETHER WITH DD FORMS 4/2 AND 4/3, FEB 82, REPLACES DD FORMS 4/1 THRU 4/5, JUN 78, WHICH WILL BE USED UNTIL EXHAUSTED. *(This edition may not be used after 28 February 1983.)*    25 Page

| C. | PARTIAL STATEMENT OF EXISTING UNITED STATES LAWS *(Continued from page 1)* |
|---|---|

*(5)* Entitled to receive pay, allowances, and other benefits as provided by law and regulation.

*b.* Laws and regulations that govern military personnel may change without notice to me. Such changes may affect my status, pay, allowances, benefits, and responsibility as a member of the Armed Forces **REGARDLESS** of the provisions of this enlistment/reenlistment document.

*c.* In the event of war, my enlistment in the Armed Forces continues until 6 months after the war ends, unless my enlistment is ended sooner by the President of the United States.

12. Military Service Obligation. *(FOR ALL MEMBERS OF THE ACTIVE AND RESERVE COMPONENTS, INCLUDING THE NATIONAL GUARD.)*

*a.* **FOR ALL ENLISTEES:** I must serve a total of 6 years. Any part of that service not served on active duty must be served in a Reserve Component unless I am sooner discharged.

*b.* If I am a member of a Reserve Component of an Armed Force at the beginning of a period of war or national emergency declared by Congress, or if I become a member during that period, my military service may be extended without my consent until 6 months after the end of that period.

*c.* As a member of a Reserve Component, in time of war or national emergency declared by the Congress, I may be required to serve on active duty *(other than for training)* for the entire period of the war or emergency and for 6 months after its end.

*d.* As a member of the Ready Reserve I may be required to perform active duty or active duty for training without my consent *(other than as provided in paragraph 10 of this document)* as follows:

*(1)* In time of national emergency declared by the President of the United States, I may be ordered to active duty *(other than for training)* for not more than 24 consecutive months.

*(2)* I may be ordered to active duty for 24 months, and my enlistment may be extended so I can complete 24 months of active duty, if:

*(a)* I am not assigned to or participating satisfactorily in a unit of the Ready Reserve; and

*(b)* I have not met my Reserve obligation; and

*(c)* I have not served on active duty for a total of 24 months.

*(3)* I may be ordered to perform additional active duty training for not more than 45 days if I have not fulfilled my military service obligation and fail in any year to perform the required training duty satisfactorily. If the failure occurs during the last year of my required membership in the Ready Reserve, my enlistment may be extended until I perform that additional duty, but not for more than 6 months.

*(4)* When determined by the President that it is necessary to support any operational mission, I may be ordered to active duty for not more than 90 days if I am a member of the Selected Reserve.

13. **IF ENLISTING IN THE NAVY OR MARINE CORPS:** I understand that if I am serving on a naval vessel in foreign waters, and my enlistment expires, I will be returned to the United States for discharge as soon as possible consistent with my desires. However, if essential to the public interest, I understand that I may be retained on active duty until the vessel returns to the United States. If I am retained under these circumstances, I understand I will be discharged not later than 30 days after my return to the United States; and, that except in time of war, I will be entitled to an increase in basic pay of 25 percent from the date my enlistment expires to the date of my discharge.

| D. | CERTIFICATION AND ACCEPTANCE |
|---|---|

14. My acceptance for enlistment is based on the information I have given in my application for enlistment. If any of that information is false or incorrect, this enlistment may be voided or terminated administratively by the Government or I may be tried by a Federal, civilian, or military court and, if found guilty, may be punished.

I CERTIFY THAT I HAVE CAREFULLY READ THIS DOCUMENT. Any questions I had were explained to my satisfaction. I fully understand that **ONLY THOSE AGREEMENTS IN SECTION B OF THIS DOCUMENT OR RECORDED ON THE ATTACHED ANNEX(ES) WILL BE HONORED. ANY OTHER PROMISES OR**

*(Continued on page 3 (DD Form 4/2) attached)*

**D.**         **CERTIFICATION AND ACCEPTANCE** *(Continued from page 2)*

## GUARANTEES MADE TO ME BY ANYONE ARE WRITTEN BELOW:
*(If none, check "NONE" and initial.)*

                         ☒NONE _T.D.C_
                                   *(Initials)*

| 14a. TYPED NAME / SSN OF APPLICANT / REENLISTEE | 14b. SIGNATURE OF APPLICANT / REENLISTEE |
|---|---|
| TRAVIS DON CRAWFORD ███████ 5635 | *Travis Don Crawford* |

15. On behalf of the United States _____ ARMY _____ , I accept this applicant for enlistment. I have witnessed the signature in item 14b to this document. I certify that I have explained that only those agreements in Section B of this form and in the attached Annex(es) will be honored, and any other promises made by any person are not effective and will not be honored

| 15a. NAME GRADE, SSN, AND ORGANIZATION OF SERVICE REPRESENTATIVE *(Type or Print)* | 15b. SIGNATURE OF SERVICE REPRESENTATIVE | 15c. DATE SIGNED |
|---|---|---|
| GARY I FREET SFC(P) ███████ USA DRC LITTLE ROCK AR | *Gary I. Freet* | 11 MAR 1983 |

**E.**         **CONFIRMATION OF ENLISTMENT OR REENLISTMENT**

### 16a. FOR SERVICE IN THE ARMED FORCES <u>EXCEPT</u> THE NATIONAL GUARD *(ARMY OR AIR)*:

I, ___ TRAVIS DON CRAWFORD ___ , do solemnly swear *(or affirm)* that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I will obey the orders of the President of the United States and the orders of the officers appointed over me, according to regulations and the Uniform Code of Military Justice. So help me God.

### 16b. FOR ENLISTMENT OR REENLISTMENT IN THE NATIONAL GUARD *(ARMY OR AIR)*:

I, _____ , do solemnly swear *(or affirm)* that I will support and

defend the Constitution of the United States and the State of _____ against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I will obey the orders of the President of

the United States and the Governor of _____ and the orders of the officers appointed over me, according to law and regulations. So help me God.

| 16c. I acknowledge that the oath above, as filled in, has been administered to me and that I have sworn *(or affirmed)* to the same. | 16d. SIGNATURE OF ENLISTEE / REENLISTEE |
|---|---|
| | *Travis Don Crawford* |

16e. The above oath was administered, subscribed, and duly sworn to *(or affirmed)* before me this date.

| 16f. NAME, GRADE, AND ORGANIZATION OF ENLISTING OFFICER *(Type or Print)* | 16g. SIGNATURE OF ENLISTING OFFICER | 16h. DATE SIGNED |
|---|---|---|
| JAMES F AVARY LTJG MEPS LITTLE ROCK AR | *James F Avary* | 11 MAR 1983 |

### 16i. FOR ENLISTMENT OR REENLISTMENT IN THE NATIONAL GUARD *(ARMY OR AIR)*:

I do hereby acknowledge to have voluntarily enlisted *(reenlisted)* this _____ day of _____ 19 _____ in the _____

National Guard of the State of _____ and as a Reserve of the United States

_____ with membership in the _____ National Guard of the United States for a period of _____
                                                                *(years)*

_____ _____ under the conditions prescribed by law, unless sooner discharged by proper authority.
*(months)*     *(days)*

16j. SIGNATURE OF ENLISTEE / REENLISTEE

| DD | Form 82 FEB | 4/2 | THIS FORM, TOGETHER WITH DD FORMS 4/1 AND 4/3, FEB 82, REPLACES DD FORMS 4/1 THRU 4/5, JUN 78, WHICH WILL BE USED UNTIL EXHAUSTED. | Page 3 |

27

| 17. NAME | 18. SSN |
|---|---|
| CRAWFORD | ███-5635 |

**F.**            **DISCHARGE FROM DELAYED ENTRY / ENLISTMENT PROGRAM**

19. I request to be discharged from the Delayed Entry/Enlistment Program and enlisted in the Regular Component of the United States

    ARMY                          for a period of     THREE     years.

No changes have been made to my enlistment options **OR** if changes were made they are recorded on Annex(es) 

        B                  which replace(s) Annex(es)     A

| 19a. DATE | 19b. SIGNATURE OF DEP ENLISTEE |
|---|---|
| 24 MAR 1983 | *Travis Don Crawford* |

**G.**            **APPROVAL AND ACCEPTANCE BY SERVICE REPRESENTATIVE**

20. This enlistee is discharged from the Reserve Component shown in item 10 and is accepted for enlistment in the Regular Component of the

United States   ARMY                        in pay grade E-   1   .

Applicant served   00   years,   00   months, and   13   days in the DEP. **AGREEMENTS IN ITEM 10**

**AND ATTACHED ANNEX(ES), OR AS MODIFIED IN ITEM 19, REMAIN IN EFFECT.**

| 20a. NAME, GRADE, SSN, AND ORGANIZATION OF SERVICE REPRESENTATIVE *(Type or print)* | 20b. SIGNATURE OF SERVICE REPRESENTATIVE |
|---|---|
| WILLIE F SNELL SFC ██████<br>USA DRC LITTLE ROCK AR | *Willie F Snell* |

**H.**          **CONFIRMATION OF ENLISTMENT OR REENLISTMENT**

21. **FOR SERVICE IN A REGULAR COMPONENT OF THE ARMED FORCES:**

I,     TRAVIS DON CRAWFORD       , do solemnly swear *(or affirm)* that I will support

and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the

same; and that I will obey the orders of the President of the United States and the orders of the officers appointed over me, according to

regulations and the Uniform Code of Military Justice. So help me God.

| 21a. I acknowledge that the oath above has been administered to me and that I have sworn *(or affirmed)* to the same, | 21b. SIGNATURE OF ENLISTEE / REENLISTEE |
|---|---|
| | *Travis Don Crawford* |

21c. The above oath of enlistment was administered, subscribed, and duly sworn to *(or affirmed)* before me

on   24 MARCH   , 19  83  .

| 21d. NAME, GRADE, AND ORGANIZATION OF ENLISTING OFFICER *(Type or print)* | 21e. SIGNATURE OF ENLISTING OFFICER |
|---|---|
| JAMES F AVARY LTJG USNR<br>MEPS LITTLE ROCK AR | *James F Avary* |

**DD** Form 82 FEB **4/3**   THIS FORM, TOGETHER WITH DD FORMS 4/1 AND 4/2, FEB 82, REPLACES DD FORMS 4/1 THRU 4/5, JUN 78, WHICH WILL BE USED UNTIL EXHAUSTED.   Page

*Clerk 139 #1344 22 Feb 1984*

13 DAYS

## APPLICATION FOR ENLISTMENT - ARMED FORCES OF THE UNITED STATES

Form Approved
OMB-22-R-0311

### DATA REQUIRED BY THE PRIVACY ACT OF 1974

**AUTHORITY** Title 10, United States Code, Sections 504, 505, 508, and 510, and Executive Order 9397

**PRINCIPAL PURPOSE** To determine your eligibility for enlistment.

**ROUTINE USES** If you are enlisted, this form becomes the principal source document for, and a part of, your military personnel records which are used to make decisions related to your training, promotion, reassignment, and other personnel management actions.

**DISCLOSURE** Voluntary, failure to answer all questions on this form except 12, 26, 32, and 35 may result in denial of your enlistment.

### WARNING

Information provided by you on this form is FOR OFFICIAL USE ONLY and will be maintained and used in strict compliance with Federal law and regulation. The information provided by you becomes the property of the United States Government and it may be consulted throughout your military service career, particularly whenever either favorable or adverse administrative or disciplinary actions related to you are involved.

YOU CAN BE PUNISHED BY FINE, IMPRISONMENT OR BOTH
IF YOU ARE FOUND GUILTY OF MAKING A KNOWING AND WILLFUL FALSE STATEMENT ON THIS APPLICATION.

### INSTRUCTIONS (Read carefully BEFORE filling out this form)

1. Type or print LEGIBLY all answers, if the answer is "None" or "Not Applicable," so state.
2. Questions 12, 26, and 32 are optional and may be left blank. Question 35 may be answered orally.
3. If additional space is needed for any answer, continue it in Item 37, "REMARKS."

### SECTION I - PERSONAL DATA

SERVICE  D  A R       NPS   PS

SOCIAL SECURITY ACCOUNT NUMBER  5635  NAME CRAWFORD TRAVIS DON

SALLISAW 46135 74955

(SEQUOYAH) OKLAHOMA 74955

SALLISAW SEQUOYAH OKLAHOMA 74955 40735

CITIZENSHIP  U.S. (BIRTH)  SEX M  POPULATION GROUP  CA  WHITE

ETHNIC GROUP NONE  MARITAL STATUS SINGLE  NO. OF DEPENDENTS 0  DATE OF BIRTH 640120  RELIGIOUS PREFERENCE NO-Pref.  EDUC 122

SELECTIVE SERVICE INFORMATION  NOT REGISTERED

FOREIGN LANGUAGE NONE

DRIVERS LICENSE INFORMATION  STATE OK  NUMBER 003257285  EXPIRES JAN 31 1984

### SECTION II - EXAMINATION AND ENLISTMENT DATA PROCESSING CODES (FOR OFFICE USE ONLY)

91 24 ASVAB 14 17 11 08 46 66 14 34 03 08

MEDICAL RESULTS 1 1 1 1 1 0 7 18 142 088 BROWN GREEN 24

DATE OF ENLISTMENT 830311  PROJ ACTIVE DUTY DATE 830324 3  RECRUITER IDENTIFICATION 5HABM126

DATE OF ENLISTMENT 830324  ACTIVE DUTY SVC DATE 830324  PAY ENTRY DATE 830311  GRADE E4  DATE OF RANK 830324  HIGHEST GRADE 122

5HABM12B10123B00 YYOTYFT LNWD

00 1 A E P V 1 1 0 0 0 0 8 0 0
8 4 0 8 8 1 0 2 0 8 7 0 9 9 0 9 6 0
9 6 0 8 2 0 7 5 0 0 0 0 4 H 3 H N 0
0 0 0 0 0 0 0 0 H F 0 0

DD FORM 1966/1 OCT 80
EDITION OF 1 SEP 79 IS OBSOLETE

| LAST NAME | SSAN |
|---|---|
| CRAWFORD | ▓▓▓▓-5635 |

## SECTION III — VERIFICATION OF PERSONAL DATA

**22.** EDUCATION (List all high schools and colleges attended; if none attended, show last school attended.)

| a. MONTH & YEAR | | b. NAME AND LOCATION OF SCHOOL | c. GRADUATE | | d. DEGREE RECEIVED |
|---|---|---|---|---|---|
| FROM | TO | | NO | YES | |
| AUG 1978 | MAY 1982 | SALLISAW HIGH SCHOOL SALLISAW, OKLAHOMA | | X | HIGH SCHOOL DIPLOMA |
| | | | | | |
| | | | | | |

**23.** CITIZENSHIP (You must provide your recruiter with the necessary documents to confirm your answers.)

| a. PLACE OF BIRTH (City County, State, & Country) | b. CERTIFICATE ISSUED BY (County & State) |
|---|---|
| SALLISAW (SEQUOYAH) OKLAHOMA USA | (SEQUOYAH) OKLAHOMA |

| c. BIRTH CERTIFICATE FILE NO. | d. NATURALIZATION CERTIFICATE NO. | e. IF CITIZENSHIP IS DERIVED, GIVE PARENTS' CERTIFICATE NO(S), DATE, PLACE, & COURT |
|---|---|---|
| HIGH SCHOOL DIPLOMA | N/A | |

| f. IF AN ALIEN, GIVE ALIEN REGISTRATION NO. | g. NATIVE COUNTRY | |
|---|---|---|
| N/A | N/A | N/A |

| h. DATE AND PORT OF ENTRY INTO THE U.S.A. | i. DATE AND PLACE LAST REGISTERED |
|---|---|
| N/A | N/A |

**24.** MILITARY SERVICE

a. ARE YOU NOW OR HAVE YOU EVER BEEN IN ANY REGULAR OR RESERVE BRANCH OF THE ARMED FORCES OR IN THE ARMY NATIONAL GUARD OR IN THE AIR NATIONAL GUARD?   ☒ NO (Go on to question 26)

☐ YES (Complete the following and give your recruiter the appropriate DD Form 214 or DD Form 215 for his review.)

| b. PAY GRADE | c. SERVICE NUMBER | d. SERVICE COMPONENT | e. DATE OF ENTRY | f. DATE OF DISCH/REL | g. TYPE OF DISCH/REL CERTIFICATE | h. DAYS LOST (If any) |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

i. IF YOU ARE NOW A MEMBER OF ANY RESERVE OR NATIONAL GUARD UNIT, GIVE THE UNIT NAME, ITS ADDRESS, AND TELEPHONE NUMBER:

N/A

*DO NOT WRITE IN THIS BLOCK — COMPLETED BY RECRUITER*

| 25. VERIFICATION OF SERVICE | a. | YRS | MOS | DAYS | b. PEBD | c. ADSD | d. LAST RE-CODE | e. SPN/SPD |
|---|---|---|---|---|---|---|---|---|
| | TOT ACT MIL SVC | 00 | 00 | 00 | 830311 | 830314 | N/A | N/A |
| | TOT INACT MIL SVC | 00 | 00 | 13 | | | | |

## SECTION IV — OTHER BACKGROUND DATA

**26.** COMMERCIAL LIFE INSURANCE POLICIES (OPTIONAL ENTRY)

(Information, if provided, is used to assist your survivors in filing claims should you die while on active duty.)

| a. NAME OF COMPANY ISSUING POLICY | b. POLICY NUMBER |
|---|---|
| N/A | N/A |

**27.** EMPLOYMENT (Show all periods of employment and unemployment.)

| a. MONTH & YEAR | | b. NAME AND ADDRESS OF COMPANY | c. JOB TITLE | d. NAME OF SUPERVISOR |
|---|---|---|---|---|
| FROM | TO | | | |
| DEC 1982 | Present | UNEMPLOYED | | |
| JULY 1982 | DEC 1982 | NORTON MANUFACTURING FT. SMITH, ARKANSAS | Laborer | ROBERT MAXWELL |
| APR 82 | JULY 1982 | JOHN LANDER LANDSCAPING SALLISAW, OKLAHOMA | Laborer | JOHN LANDER |

**DD** FORM 1966/2
1 SEP 78

DD FORMS 1966/1 THRU 8, 1 SEP 78 REPLACE THE PREVIOUS EDITION OF THIS SERIES (1 AUG 75) WHICH IS OBSOLETE.

PAGE

30

| LAST NAME | | | | SSAN | |
|---|---|---|---|---|---|
| CRAWFORD | | | | | 5635 |

## SECTION IV – OTHER BACKGROUND DATA (Continued from page 2)

**28.  RESIDENCES** (List all for the last five years or 13th birthday whichever is shorter.)

| a. MONTH & YEAR | | b. STREET ADDRESS | c. CITY | d. STATE | e. ZIP CODE |
|---|---|---|---|---|---|
| FROM | TO | | | | |
| JAN 1981 | Present | | SALLISAW | OKLAHOMA | 74955 |
| MAY 1978 | JAN 1981 | | SALLISAW | OKLAHOMA | 74955 |

**29. MARITAL STATUS AND DEPENDENCY**

| | | NO | YES |
|---|---|---|---|
| a. | Are you now, or have you ever been, married? | TDC | |
| b. | If you have been married, are you now living with your spouse? | TDC | |
| c. | Have you ever been divorced or legally separated? (If "yes", enter date, place and court which granted the divorce or legal separation in item 37, "REMARKS".) | TDC | |
| d. | Is any court order or judgment in effect that directs you to provide support for children or alimony? (If "yes", enter date, place and court which granted alimony or support, including orders resulting from paternity suits, in item 37, "REMARKS".) | TDC | |
| e. | Is any person dependent on you for their support? (If "yes", list them in item 30 below and check "DEPN/YES" block.) | TDC | |

**30. RELATIVES**

| a. NAME (Last - First - Middle) | b. DEPN NO | b. DEPN YES | c. DATE OF BIRTH | d. PLACE OF BIRTH | e. PRESENT ADDRESS | f. CITIZENSHIP |
|---|---|---|---|---|---|---|
| FATHER | | | | | | |
| CRAWFORD ROGER LEE | X | | | | | USA |
| MOTHER (Maiden Name) | | | | | | |
| DATSON PHYLIS G FAN | X | | | | | USA |
| SPOUSE (Maiden Name) | | | | | | |
| NONE | | | | | | |
| CHILDREN | | | | | | |
| NONE | | | | | | |
| (CRAWFORD GWEN) | | | | | | |
| OTHERS (Brothers, Sisters, In-laws, etc.) | | | | | | |
| CRAWFORD GWEN DENISE | X | | | | | USA |
| CRAWFORD ROGER DALE | X | | | | | USA |

**31. RELATIVES AND FRIENDS LIVING IN FOREIGN COUNTRIES**
(List anyone with whom you had or have a close relationship who lives in a foreign country.)

| a. NAME | b. RELSHIP | c. AGE | d. OCCUPATION | e. ADDRESS | f. CITIZENSHIP |
|---|---|---|---|---|---|
| NONE | | | | | |

**DD FORM 1966/3  1 SEP 78**  DD FORMS 1966/1 THRU 8, 1 SEP 78, REPLACE THE PREVIOUS EDITION OF THIS SERIES (1 AUG 75), WHICH IS OBSOLETE.  PAGE

31

| LAST NAME | SSAN |
|---|---|
| *CRAWFORD* | ███████-5635 |

## SECTION IV — OTHER BACKGROUND DATA *(Continued from page 3)*

| 32. MEMBERSHIP IN YOUTH PROGRAMS | NO | YES |
|---|---|---|
| Have you ever been enrolled in an ROTC, Junior ROTC, or Sea Cadet Program, or have you been a member of the Civil Air Patrol? *(Optional entry - you may be entitled to a higher enlistment grade based on such membership and participation. If "yes", enter organization and its address in item 37.)* | TDX | |

| 33. DECLARATIONS *(Answer by placing your initials in the appropriate block; explain "yes" answers in item 37, "REMARKS".)* | NO | YES |
|---|---|---|
| a. Have you ever been rejected for enlistment, reenlistment, or induction by any branch of the Armed Forces of the United States? | TDX | |
| b. Are you now, or have you ever been, a deserter from any branch of the Armed Forces of the United States? | TDX | |
| c. Are you now drawing, or do you have an application pending, or approval for: Retired pay, disability allowance, severance pay, or a pension from the Government of the United States? | TDX | |
| d. Are you a conscientious objector? That is, do you now have, or have you ever had, a firm, fixed, and sincere objection to participation in war in any form or to the bearing of arms because of religious training or belief? | TDX | |
| e. Are you the only living child of your parents? | TDX | |
| f. Have you been a draft evader or participated in an amnesty program? | TDX | |
| g. Do you now have, or have you had within the past ten years, knowing membership with the specific intent of furthering the aims of, or adherence to, and active participation in any foreign or domestic organization or association or movement or group or combination of persons which unlawfully advocates or practices the commission of acts of force or violence to prevent others from exercising their rights under the Constitution or the Laws of the United States, or of any State, or which seeks to overthrow the Government of the United States or subdivision thereof by unlawful means? *(If "yes", give the name(s) of the organization(s) and inclusive dates of your membership in item 37.)* | TDX | |
| h. Have you ever visited a foreign country except as a member of the United States Armed Forces performing official duties? *(If "yes", give year and month, countries visited, and purpose of travel in item 37.)* | TDX | |
| i. Have you ever worked for a foreign government? *(If "yes", give dates of employment, name of the government you worked for, and description and location of your duties in item 37.)* | TDX | |

| 34. UNDERSTANDINGS | INITIALS |
|---|---|
| a. I UNDERSTAND THAT IF I AM REJECTED FOR ENLISTMENT BECAUSE OF A DISQUALIFICATION THAT I HAVE CONCEALED, I MAY NOT BE PROVIDED RETURN TRANSPORTATION FROM THE PLACE OF EXAMINATION TO MY HOME. *TDC* | TDC |
| b. I UNDERSTAND ~~THAT IF I HAVE NOT REACHED MY 26TH BIRTHDA~~Y, AN ORIGINAL ENLISTMENT OBLIGATES ME TO SERVE IN THE ARMED FORCES FOR A PERIOD OF SIX *(6)* YEARS *(ACTIVE AND RESERVE)* UNLESS SOONER DISCHARGED. | TDC |

### 35. CHARACTER AND SOCIAL ADJUSTMENT
*(Read and consider the following instructions carefully BEFORE answering questions a through f on top of page 5.)*

1. If your answer to every question is truthfully "NO", initial in the appropriate space.

2. You are not required to answer or explain your responses to these questions in writing if your answer is "YES" or you have reservations about answering questions of this nature. Instead, you may request a personal interview in which you may provide the required information for each question orally.

a. If you choose the personal interview, the information you give may be investigated; however, any written record of the interview itself will not be retained more than six months after your entry on active duty and will not become

a part of your permanent military personnel service record.

b. This information may be requested from you again at some future date if you enlist and may become a part of your security investigative file at that time. This could occur as a result of your being considered for duties involving access to classified information or other types of duty requiring a personnel security investigation.

3. A "YES" answer will not necessarily disqualify you for enlistment; it will depend on the circumstances surrounding the situation involved.

INITIAL HERE IF YOU PREFER A PERSONAL INTERVIEW: _____

---

*DO NOT WRITE IN THIS BLOCK — TO BE COMPLETED BY INTERVIEWER*

APPLICANT HAS BEEN INTERVIEWED AND IS

☐ ELIGIBLE FOR ENLISTMENT ☐ INELIGIBLE FOR ENLISTMENT

| DATE OF INTERVIEW | GRADE, NAME, ORG & TITLE OF INTERVIEWER | SIGNATURE OF INTERVIEWER |
|---|---|---|
| | | |

**DD** FORM 1 SEP 78 **1966/4** DD FORMS 1966/1 THRU 8; 1 SEP 78, REPLACE THE PREVIOUS EDITION OF THIS SERIES (1 AUG 75), WHICH IS OBSOLETE. PAGE 4

| LAST NAME | | SSAN |
|---|---|---|
| *CRAWFORD* | | ████ -3635 |

| SECTION IV – OTHER BACKGROUND DATA *(Continued from page 4)* | NO | YES |
|---|---|---|
| a. Have you ever taken any narcotic substance, sedative, stimulant, or tranquillizer drugs, except as prescribed by a licensed physician? | | *TDC* |
| b. Have you ever intentionally sniffed glue, paint, hairspray, or other chemical fumes? | *TDC* | |
| c. Have you ever been involved in the use, purchase, possession, or ~~sale of marijuana~~, LSD, or any other harmful or habit-forming drugs and/or chemicals, except as prescribed by a licensed physician? *Sale of marijuana or other drugs* | ~~TDC~~ | ~~TDC~~ |
| d. Has your use of alcoholic beverages *(such as liquor, beer, wine)* ever resulted in the loss of a job, arrest by police, or treatment for alcoholism? *(or Drug abuse)* | *TDC* | |
| e. Have you ever been a patient *(whether or not formally committed)* in any institution primarily devoted to the treatment of mental, nervous, emotional, psychological, or personality disorders? | *TDC* | |
| f. Have you ever engaged in homosexual activity *(sexual relations with another person of the same sex)*? | *TDC* | |

36.                                           INVOLVEMENT WITH POLICE OR JUDICIAL AUTHORITIES

YOUR ANSWERS TO THE FOLLOWING QUESTIONS WILL BE VERIFIED WITH THE FEDERAL BUREAU OF INVESTIGATION *(FBI)* AND OTHER AGENCIES TO DETERMINE ANY PREVIOUS RECORDS OF ARREST OR CONVICTIONS OR JUVENILE COURT ADJUDICATIONS. IF YOU CONCEAL SUCH RECORDS AT THIS TIME, YOU MAY, UPON ENLISTMENT, BE SUBJECT TO DISCIPLINARY ACTION AND/OR DISCHARGE/SEPARATION FROM THE MILITARY SERVICE WITH OTHER THAN AN HONORABLE DISCHARGE.

*(Answer by placing your initials in the appropriate block.)*

| | NO | YES |
|---|---|---|
| a. Have you ever been arrested, charged, cited *(including traffic violations)* or held by any law-enforcement or juvenile authorities in the United States or in a foreign country regardless of whether the citation or charge was dropped or dismissed or you were found not guilty? | | *TDC* |
| b. As a result of being arrested, charged, cited, or held by law-enforcement or juvenile authorities, have you ever been convicted, fined, or forfeited bond, or adjudicated a youthful offender or juvenile delinquent *(regardless of whether the record in your case has been "sealed", expunged, or otherwise stricken from the court record)*? | | *TDC* |
| c. Have you ever been detained, held in, or served time in, any jail or prison or reform or industrial school or any juvenile facility or correctional institution in the United States or in a foreign country? | *TDC* | |
| d. Have you been released from parole, probation, juvenile supervision, or given a suspended sentence or relieved of charges pending on condition that you apply for or enlist in the United States Armed Forces? | *TDC* | |
| e. Are you now involved in, or a party to, or connected with, any court action or civil suit? *(Explain a "yes" answer in item 37.)* | *TDC* | |

f. Explain below "yes" answers given in "a" through "d" above. *(Include all incidents with law-enforcement authorities even if the citation or charge was dropped or dismissed or you were found not guilty or you have been told by recruiting personnel or anyone else that the incident was not important enough to list.)*

| OFFENSE (1) | DATE (2) | PLACE (3) | AGE (4) | DISPOSITION (5) | COURT (6) |
|---|---|---|---|---|---|
| RECKLESS DRIVING | DECEMBER 1982 | SALLISAW OKLAHOMA | 18 | $45.00 fine (PAID) | TRAFFIC COURT |
| 67 in 55 MPH zone Speeding | AUGUST 1981 | SALLISAW OKLAHOMA | 17 | $47.00 fine (PAID) | TRAFFIC COURT |
| | | | | | |
| | | | | | |
| | | | | | |

DD FORM 1966/5
1 SEP 78

DD FORMS 1966/1 THRU 8, 1 SEP 78, REPLACE THE PREVIOUS EDITION OF THIS SERIES (1 AUG 75), WHICH IS OBSOLETE.

PAGE

| LAST NAME | SSAN |
|---|---|
| CRAWFORD | ▓▓▓ ▓▓-5635 |

**SECTION IV — OTHER BACKGROUND DATA** *(Continued from page 5)*

**37. REMARKS** *(Enter item(s) being continued)*

The Army's commitment to me in the DEP is contingent upon my entering and completingmy senior year in high school.

appl. signature ___N/A___

REF ITEM 30 DD 1966-3

| Bro & sisters | DEPN | DOB | POB | Present ADD | USA |
|---|---|---|---|---|---|
| CRAWFORD MONTY DWAYNE | NO | � | ▀ | ▀ | USA |

REF ITEM 35 - Section IV - A&C

Individual experminted with marijuana twice around May 1982 at a party - no other drugs were involved haven't smoked it since — Travis ___ Crawford

REF ITEM 27 - Employment - DD 1966-2

| Month Year From / To | Name & address of company | Job title | Name of supervisor |
|---|---|---|---|
| JUNE 1979 / AUGUST 1979 | altos air force Base altos, OKLAHOMA | Yard Care | Major Price |

Per BRIDGE call From SWRR ⊂ I-IV GRAD male CAN ENLIST
HRAP - Ø                              IN MAR 83  11MAR83

CCN 807 90 565

**38. I AM INTERESTED IN THE FOLLOWING MILITARY SKILLS; I FULLY UNDERSTAND THAT I WILL NOT BE GUARANTEED ANY SPECIFIC MILITARY SKILL OR ASSIGNMENT TO A GEOGRAPHICAL AREA UNLESS IT IS INCLUDED IN SECTION VI OF THIS FORM AND IN MY DD FORM 4 AND ATTACHED ANNEXES OR IF MY RECRUITER LISTED IT IN ITEM 37 ABOVE.**

**DD** FORM 1 SEP 78 **1966/6** DD FORMS 1966/1 THRU 8, 1 SEP 78, REPLACE THE PREVIOUS EDITION OF THIS SERIES (1 AUG 76), WHICH IS OBSOLETE.

LAST NAME

*CRAWFORD*

ISSAN ▮▮▮▮ 5635

## SECTION V — CERTIFICATIONS

39. I CERTIFY THAT THE INFORMATION GIVEN BY ME IN THIS DOCUMENT IS TRUE, COMPLETE, AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF. I UNDERSTAND THAT I AM BEING ACCEPTED FOR ENLISTMENT BASED ON THE INFORMATION PROVIDED BY ME IN THIS DOCUMENT; THAT IF ANY OF THE INFORMATION IS KNOWINGLY FALSE OR INCORRECT, I COULD BE TRIED IN A CIVILIAN OR MILITARY COURT AND COULD RECEIVE A LESS THAN HONORABLE DISCHARGE WHICH COULD AFFECT MY FUTURE EMPLOYMENT OPPORTUNITIES.

*(Your signature in this block must be witnessed by your recruiter.)*

| a. DATE SIGNED | b. NAME OF APPLICANT (Type or print) | c. SIGNATURE OF APPLICANT |
|---|---|---|
| March 4, 1983 | Travis Don Crawford | Travis Don Crawford |

40. DATA VERIFICATION BY RECRUITER *(Enter a description of the actual document used to verify items below.)*

| a. NAME | | b. AGE | c. CITIZENSHIP |
|---|---|---|---|
| BIRTH CERTIFICATE | | B/C | B/C |
| d. EDUCATION | | e. SOCIAL SECURITY ACCOUNT NUMBER | |
| HIGH SCHOOL DIPLOMA | | SSAN Card # ▮▮▮▮ 5635 | |
| f. PRIOR MILITARY SERVICE | | g. OTHER (Specify) | |
| N/A | | N/A | |

41. I CERTIFY THAT I HAVE WITNESSED APPLICANT'S SIGNATURE ABOVE AND THAT I HAVE VERIFIED THE DATA IN SECTIONS I, III, AND IV OF THIS DOCUMENT AND THE DOCUMENTS LISTED ABOVE AS PRESCRIBED BY MY DIRECTIVES. I FURTHER CERTIFY THAT I HAVE NOT MADE ANY PROMISES OR GUARANTEES OTHER THAN THOSE LISTED AND SIGNED BY ME IN ITEM 37. I UNDERSTAND MY LIABILITY TO TRIAL BY COURTS-MARTIAL UNDER THE UNIFORM CODE OF MILITARY JUSTICE SHOULD I EFFECT OR CAUSE TO BE EFFECTED THE ENLISTMENT OF ANYONE KNOWN BY ME TO BE INELIGIBLE FOR ENLISTMENT.

| a. DATE SIGNED | b. NAME & GRADE, SSAN, OR RECRUITER ID NO. OR ORGANIZATION (Type or print) | c. SIGNATURE OF RECRUITER |
|---|---|---|
| 4 March 1983 | E-5 SGT John L. Chandler ▮▮▮▮ | Sgt John L. Chandler |

## SECTION VI — ENLISTMENT OPTIONS ACCEPTED
*(COMPLETED BY GUIDANCE COUNSELLOR, AFEES LIAISON NCO, ETC., AS SPECIFIED BY SPONSORING SERVICE)*

| 42a. ENL COMP | b. GRADE/RATE | c. DATE OF RANK | d. TERM ENL |
|---|---|---|---|
| RA | E-1 | 24 MAR 83 | 3 |
| e. T-E MOS/AFS | f. PMOS/AFS | g. WAIVER CODE | h. OPT ANAL | i. PROG ENL FOR |
| 12B10 | 12B00 | NONE | N/A | N/A |

j. SPECIFIC OPTION/PROGRAM ENLISTED FOR *(Write in clear text English)* IAW AR 601-210

TABLE 9-3 US ARMY AIRBORNE ENLISTMENT OPTION 18AC

k. I CERTIFY THAT I HAVE REVIEWED ALL INFORMATION CONTAINED IN THIS DOCUMENT AND, TO THE BEST OF MY JUDGMENT AND BELIEF, APPLICANT FULFILLS ALL LEGAL AND POLICY REQUIREMENTS FOR ENLISTMENT. I ACCEPT HIM/HER FOR ENLISTMENT ON BEHALF OF THE UNITED STATES _____ARMY_____, AND CERTIFY THAT I HAVE NOT MADE ANY PROMISES OR GUARANTEES EXCEPT AS LISTED IN ITEM 42j ABOVE. I FURTHER CERTIFY THAT SERVICE REGULATIONS GOVERNING SUCH ENLISTMENT HAVE BEEN STRICTLY COMPLIED WITH AND ANY WAIVERS REQUIRED TO EFFECT APPLICANT'S ENLISTMENT HAVE BEEN SECURED AND ARE ATTACHED TO THIS DOCUMENT.

| l. DATE SIGNED | m. NAME & GRADE, SSAN, OR RECRUITER ID NO. OR ORGANIZATION (Type or print) | n. SIGNATURE OF ACCEPTOR |
|---|---|---|
| 11 MAR 83 | Dennis L. Chappell ▮▮▮▮ E-7 | Dennis L. Chappell |

## SECTION VII — ENTNAC/NAC PROCESSING
*(COMPLETED BY AFEES ENTNAC INTERVIEWER)*

43a. ENTNAC/NAC INTERVIEW COMPLETED ON ___11 MAR 83___. ADDITIONAL INFORMATION

[X] WAS NOT DISCLOSED. [ ] WAS DISCLOSED AND REPORTED TO THE SPONSORING SERVICE REPRESENTATIVE.

| b. DATE SIGNED | c. GRADE, NAME & ORGANIZATION OF INTERVIEWER (Type or print) | d. SIGNATURE OF INTERVIEWER |
|---|---|---|
| 11 MAR 83 | | |

**DD** FORM **1966/7**
1 SEP 78

DD FORMS 1966/1 THRU 8, 1 SEP 78, REPLACE THE PREVIOUS EDITION OF THIS SERIES (1 AUG 75), WHICH IS OBSOLETE.

PAGE

LAST NAME
*CRAWFORD*

SSAN 5635

## SECTION VIII — RECERTIFICATION BY APPLICANT AND CORRECTION OF DATA AT THE TIME OF ACTIVE DUTY ENTRY

44.   I HAVE REVIEWED ALL INFORMATION CONTAINED IN THIS DOCUMENT THIS DATE; THAT INFORMATION IS STILL CORRECT AND TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF. IF CHANGES WERE REQUIRED, THE ORIGINAL ENTRY HAS BEEN MARKED "SEE VIII" AND THE CORRECT INFORMATION IS PROVIDED BELOW.

| a.   QUESTION | b.   CHANGE REQUIRED |
|---|---|
| | *None T.D.C* |
| | |
| | |

c.   GRADE, NAME, & SSAN OF WITNESS (Type or print)
*E-7 Willie F. Snell*

d.   SIGNATURE OF APPLICANT
*Travis Don Crawford*

e.   DATE
*Mar. (24) 83*

f.   SIGNATURE OF WITNESS
*Willie Snell*

## SECTION IX — PARENTAL/GUARDIAN CONSENT FOR ENLISTMENT

45.
a.   I/WE CERTIFY THAT_____HAS NO OTHER LEGAL GUARDIAN OTHER THAN ME/US AND I/WE CONSENT TO HIS/HER ENLISTMENT IN THE UNITED STATES_____. I/WE CERTIFY THAT _NO PROMISES OF ANY KIND_ HAVE BEEN MADE TO ME/US CONCERNING ASSIGNMENT TO DUTY, TRAINING OR PROMOTION DURING HIS/HER ENLISTMENT _AS AN INDUCEMENT_ TO ME/US TO SIGN THIS CONSENT. I/WE HEREBY AUTHORIZE THE ARMED FORCES REPRESENTATIVES CONCERNED TO PERFORM MEDICAL EXAMINATIONS, OTHER EXAMINATIONS REQUIRED, AND TO CONDUCT RECORDS CHECKS TO DETERMINE HIS/HER ELIGIBILITY. I/WE RELINQUISH ALL CLAIM TO HIS/HER SERVICE AND TO ANY WAGE OR COMPENSATION FOR SUCH SERVICE.

b.   _FOR ENLISTMENT IN A RESERVE COMPONENT:_   I/WE UNDERSTAND THAT, AS A MEMBER OF A RESERVE COMPONENT, HE/SHE MUST SERVE MINIMUM PERIODS OF ACTIVE DUTY FOR TRAINING UNLESS EXCUSED BY COMPETENT AUTHORITY. IN THE EVENT HE/SHE FAILS TO FULFILL THE OBLIGATIONS OF HIS/HER RESERVE ENLISTMENT, HE/SHE MAY BE RECALLED TO ACTIVE DUTY AS PRESCRIBED BY LAW. I/WE FURTHER UNDERSTAND THAT WHILE HE/SHE IS IN THE READY RESERVE, HE/SHE MAY BE ORDERED TO EXTENDED ACTIVE DUTY IN TIME OF WAR OR NATIONAL EMERGENCY DECLARED BY THE CONGRESS OR THE PRESIDENT OR WHEN OTHERWISE AUTHORIZED BY LAW.

c.   I/WE CERTIFY THAT HIS/HER BIRTHDAY IS:_____

| 46a.   NAME OF WITNESS (Type or print) | b.   NAME OF PARENT (Type or print) | c.   DATE |
|---|---|---|
| d.   SIGNATURE OF WITNESS | e.   SIGNATURE OF PARENT | |
| f.   NAME OF WITNESS (Type or print) | g.   NAME OF PARENT (Type or print) | h.   DATE |
| i.   SIGNATURE OF WITNESS | j.   SIGNATURE OF PARENT | |

47.   VERIFICATION OF SINGLE SIGNATURE CONSENT

## SECTION X — STATEMENT OF NAME FOR OFFICIAL MILITARY RECORDS

48.
IF THE PREFERRED ENLISTMENT NAME (name given in block 2) IS NOT THE SAME AS ON YOUR BIRTH CERTIFICATE AND IT HAS NOT BEEN CHANGED BY LEGAL PROCEDURE PRESCRIBED BY STATE LAW, COMPLETE THE FOLLOWING:

a.   *N/A*
(Enter name as shown on your Birth Certificate)

b.   I HEREBY STATE THAT I HAVE NOT CHANGED MY NAME THROUGH ANY COURT OR OTHER LEGAL PROCEDURE, THAT I PREFER TO USE THE NAME OF *N/A* BY WHICH I AM KNOWN IN THE COMMUNITY AS A MATTER OF CONVENIENCE AND WITH NO CRIMINAL INTENT. I FURTHER STATE THAT I AM THE SAME PERSON AS THE PERSON WHOSE NAME IS SHOWN IN BLOCK 2.

c.   MY SOCIAL SECURITY ACCOUNT NUMBER REFLECTS THE NAME:_*N/A*_

| d.   GRADE & NAME OF WITNESS (Type or print) | e.   SIGNATURE OF APPLICANT | f.   DATE |
|---|---|---|
| g.   SIGNATURE OF WITNESS | | |

**DD** FORM 1 SEP 78   **1966/8**   DD FORMS 1966/1 THRU 8, 1 SEP 78, REPLACE THE PREVIOUS EDITION OF THIS SERIES (1 AUG 75), WHICH IS OBSOLETE.   PAGE

**STATEMENTS FOR ENLISTMENT**
**US ARMY AIRBORNE ENLISTMENT OPTION**
FOR USE OF THIS FORM, SEE AR 601-210; THE PROPONENT AGENCY IS THE OFFICE OF THE DEPUTY CHIEF OF STAFF FOR PERSONNEL.

*TO BE COMPLETED BY ALL APPLICANTS ENLISTING FOR THIS ENLISTMENT OPTION*

1. ACKNOWLEDGEMENT: In connection with my enlistment in the Regular Army for the United States Army Airborne Enlistment Option, I hereby acknowledge that:

a. I am volunteering to perform frequent aircraft flights and parachute jumps and to participate in realistic combat training while receiving airborne training or performing airborne duty.

b. Upon completion of training in MOS *12B10 Combat Engineer*, I will be assigned to _____
(MOS & title)

_____ *IPAC* _____
(Unit selected for initial assignment)

c. Should I fail to qualify for airborne training subsequent to my enlistment, or fail to retain these qualifications, I will not be offered another assignment choice, but will be reassigned in accordance with the needs of the Army. Examples of specific causes for disqualification for airborne training include:

(1) Failure to complete basic training satisfactorily.

(2) Failure to complete advanced individual training, or the equivalent of such training satisfactorily.

(3) Failure to attain required standards, as prescribed by AR 614-200, on the Advanced Physical Fitness Test.

(4) Failure to complete airborne (parachute) training, if required.

(5) The existence of a medical disqualification.

(6) Failure to maintain all qualifications for airborne training.

d. In the event my enlistment commitment cannot be fulfilled, the alternatives available to me will be as provided in Chapter 5, AR 635-200, as of the date of my claim of unfulfilled enlistment commitment or, erroneous enlistment is submitted. I understand that I will have a period of thirty (30) days to elect an alternative or to request other training from the date I am advised that my selected option cannot be fulfilled, or where not formally advised, from the date I discover or should have discovered the grounds for submitting a claim. This period may be extended by the general courts-martial convening authority when necessary to determine the availability of my selected alternative. If I make no election within that period, my claim will be deemed to have been waived. I may withdraw any request for training or reassignment prior to approval and elect another alternative, but not thereafter.

e. In the event the unit for which I enlisted or to which I am assigned under the provisions of this option is deployed, relocated, inactivated, disbanded, discontinued, or redesignated, I will remain assigned to the unit or activity, or be reassigned in accordance with my preferences. However, if the foregoing is not possible or does not fulfill Army world-wide personnel requirements, the needs of the Army will determine whether I will remain assigned to the unit or activity or be reassigned.

f. I understand that I am guaranteed initial assignment to the unit indicated above, and that such assignment is not for any minimum period. After initial assignment, I am subject to reassignment in accordance with the needs of the Army and established assignment policies.

g. My term of enlistment is for *3* years (specify).

*TO BE COMPLETED BY ALL APPLICANTS ENLISTING FOR A SPECIAL FORCES UNIT*

2. ACKNOWLEDGEMENT: In connection with my enlistment in the Regular Army for the US Army Airborne Enlistment Option, I hereby acknowledge that:

a. If I am not already airborne qualified, I will be required to qualify for and successfully complete such training before receiving Special Forces training.

b. By my enlistment for this option, I am volunteering to perform frequent aircraft flights and parachute jumps and to participate in realistic combat training while engaged in airborne and Special Forces training and duty.

c. I understand that Special Forces units in time of war are engaged on a sustained basis in operations within and behind enemy lines for military purposes.

d. I am aware that all Special Forces personnel are required to undergo language training either mission type or as a student, at an appropriate language facility.

e. Should I fail to qualify for Special Forces training/duty subsequent to my enlistment, I will not be offered another assignment choice, but will be reassigned in accordance with the needs of the Army. Examples of specific causes for disqualification for Special Forces training duty include:

37

(1) Failure to complete basic training and advanced individual training, i. equired.

(2) Failure to attain required standards, as prescribed in AR 614-200, on the Advanced Physical Fitness Test.

(3) Failure to complete satisfactorily airborne (parachute) training, if required.

(4) Failure to qualify for SECRET security clearance.

(5) Loss of medical and professional qualifications required for airborne or Special Forces duty.

(6) A determination by the appropriate Special Forces commander that, I am unsuitable for further Special Forces training and duty.

---

### TO BE COMPLETED BY ALL APPLICANTS ENLISTING FOR A RANGER UNIT

3. ACKNOWLEDGMENT: In connection with my enlistment in the Regular Army for the US Army Airborne Enlistment Option, I hereby acknowledge that:

a. If I am not already airborne qualified, I will be required to qualify for and successfully complete such training before assignment to the 75th Infantry. I volunteer to attend the ranger course.

b. By my enlistment for this option, I am volunteering to perform frequent aircraft flights and parachute jumps and to participate in realistic combat training while engaged in airborne/ranger training and duty.

c. I understand that ranger units in time of war are engaged on a sustained basis in operations within and behind enemy lines for military purposes.

d. Should I fail to qualify for ranger training/duty subsequent to my enlistment, I will not be offered another assignment choice, but will be reassigned in accordance with the needs of the Army. Examples of specific causes for disqualification for ranger training/duty include:

(1) Failure to complete basic training and advanced individual training, if required.

(2) Failure to attain required standards, as prescribed in AR 614-200, on the Advanced Physical Fitness Test.

(3) Failure to complete satisfactorily airborne (parachute) training, if required.

(4) Failure to qualify for security clearance.

(5) Loss of physical, medical, or professional qualifications required for airborne and Ranger duty.

e. I am aware that the battalion commander has the authority to relieve summarily from duty and move from the battalion individuals he determines are unsuited for continued assignment to the ranger battalion. Whether I will be reassigned to another Ranger unit will be at the option of the Army, but if I am summarily relieved, such action will not constitute a breach of my enlistment commitment regardless of whether I am so reassigned.

---

4. UNDERSTANDING: I understand that in the event the Secretary of the Army determines that military necessity of a national scope requires that service members be available for immediate assignment/reassignment, any guarantees contained in this agreement may be terminated. Under these conditions I may be assigned or reassigned according to the needs of the Army.

I have read and understand each of the statements above and in the DD Form 1966 series, signed by me, and understand that these statements are intended to constitute all promises whatsoever concerning my enlistment. Any other promise or representation of commitments made to me in connection with my enlistment is written below in my own handwriting, or is hereby waived. (If none, write "NONE").

NONE  T.DC

---

### AUTHENTICATION

| SIGNATURE OF GUIDANCE COUNSELOR | SIGNATURE OF APPLICANT | DATE |
|---|---|---|
| | | 24 MARCH 83 |
| **TYPED NAME, GRADE AND SSN OF WITNESSING OFFICIAL** | **SIGNATURE OF WITNESSING OFFICIAL** | DATE |
| Willie F Snell E-7 | | 24 march 83 |

38

**STATEMENTS FOR ENLISTMENT**
**DELAYED ENTRY PROGRAM**
FOR USE OF THIS FORM, SEE AR 601-210; THE PROPONENT AGENCY IS THE OFFICE OF THE DEPUTY CHIEF OF STAFF FOR PERSONNEL.

*TO BE COMPLETED BY ALL APPLICANTS ENLISTING FOR THIS ENLISTMENT OPTION*

1. ACKNOWLEDGEMENT: In connection with my enlistment in the United States Army Reserve, I hereby acknowledge that:

   a. My enlistment in the US Army Reserve obligates me to a total of 6 years service in the Armed Forces of the United States, including service in the Reserve components, unless sooner discharged by proper authority. Fulfillment of the obligation begins on the date I enter on active duty.

   b. I will be assigned to the US Army Reserve Control Group (Delayed Entry), during which time I will be in a nonpay status, and will not be authorized to participate in any Reserve training.

   c. My time served in the Reserve will be creditable for pay purposes when I enlist in the Regular Army or enter on active duty.

   d. I volunteer to serve on active duty for __3__ years in any job assignment specified by the Army, such period to begin within __13__ days (specify) unless I enlist in the Regular Army, or I am granted further delay by proper authority.

   e. In lieu of performing the active duty specified in e above, I may enlist in the Regular Army for not less than 2 years with the following understanding.

      (1) Upon enlistment in the Regular Army, I will be enlisted under the provisions of AR 601-210.

TABLE 8-3 US ARMY AIRBORNE ENLISTMENT OPTION __18AC__
(Enter the appropriate table number and title of the enlistment option(s) for which enlisting)

      (2) If enlisting for an Army school course, I am assured of attending school course,
__COMBAT ENGINEER__    __12B10__
      (Enter school course title and course number)

      (3) In the event the enlistment option, school course, or training for which I am enlisting is not available before I enlist in the Regular Army through no fault of my own, I will select one of the following alternatives:

      (a) I will enlist for another option, school course, or training of my choice for which I am qualified and for which there is a vacancy.

      (b) I will be discharged from the Delayed Entry Program.

      (c) The date of my enlistment in the Regular Army is scheduled for __24 MAR 83__ .
                                                                    (Day, Month, Year)

      (d) Should I disqualify myself before I enlist in the Regular Army, initiate action designed to obtain my release from the Delayed Entry Program, fail to enlist in the Regular Army, or willfully fail to report for active duty on the date specified in my enlistment orders, I forfeit my entitlement to this enlistment option and may be required to serve on active duty for __2__ years in my Reserve status.

   f. Upon completion of my active duty, I will serve in the Ready Reserve in accordance with laws and regulations then in effect or thereafter put into effect.

DA FORM 3286-40, 1 Mar 80          EDITION OF 1 JUL 75 IS OBSOLETE.
ANNEX

g.   In the event I willfully fail to report on the date specified in my active duty orders to the Armed Forces Examining and Entrance Station designated therein, I will be in an absent without leave (AWOL) status and subject to apprehension and disciplinary action under Article 85 (Desertion) or Article 86 (AWOL) of the Uniform Code of Military Justice (Title 10, US Code, Sections 885 and 886).

2.   UNDERSTANDING:  I understand that in the event the Secretary of the Army determines that military necessity of a national scope requires that service members be available for immediate assignment/reassignment, any guarantees contained in this agreement may be terminated.  Under these conditions I may be assigned or reassigned according to the needs of the Army. *TDC*

I have read and understand each of the statements above and in the DD Form 1966 series, signed by me, and understand that these statements are intended to constitute all promises whatsoever concerning my enlistment. Any other promise or representation of commitments made to me in connection with my enlistment is written below in my own handwriting, or is hereby waived.  (If none, write "NONE"): *NoNE*

## AUTHENTICATION

| SIGNATURE OF GUIDANCE COUNSELOR | SIGNATURE OF APPLICANT | DATE |
|---|---|---|
| *Dennis F Chappell* | *Shawn Don Crawford* | 24 MAR 83 |

| TYPED NAME, GRADE AND SSN OF WITNESSING OFFICIAL | SIGNATURE OF WITNESSING OFFICIAL | DATE |
|---|---|---|
| *Dennis C. Chappell* | *Dennis F Chappell* | 24 MAR 80 |

☆ U.S.GPO:1981-0-765-042/1148

SECTION II – CLASSIFICATION AND ASSIGNMENT DATA (Continued)

| 1. NAME | 2. SSN | | |
|---|---|---|---|
| CRAWFORD TRAVIS DON | | 5635 | |

SECTION II – CLASSIFICATION AND ASSIGNMENT DATA

| 6. | MILITARY OCCUPATIONAL SPECIALTIES | | ☐ CONT |
|---|---|---|---|
| MOSC | TITLE | | DATE |
| (P) 12B10 | COMBAT ENGR | | 830630 |

**③ MOS EVALUATION SCORES** ☐ CONT

| MOSC | YR & MO | SCORE | YR & MO | SCORE | YR & MO | SCORE |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

**4. ASSIGNMENT CONSIDERATIONS** ☐ CONT

USAR PRIOR AR601-210 TAB66-9-3 12B 18AC
FT BENNING AIRBORNE WHV&P 830527
ENL COMMITMENT TERM-FAILURE TO MEET QUAL

**7. AVIATION ASI & GUNNERY QUALIFICATION** ☐ CONT

| AIRCRAFT | | INSTR PILOT | | GUNNERY SYSTEM | |
|---|---|---|---|---|---|
| F/W | R/W | F/W | R/W | TNG | INSTR |
| | | | | | |

**⑧ APTITUDE AREA SCORES** ☐ CONT

| AREA | SCORE | AREA | SCORE |
|---|---|---|---|
| GT | 80 | | |
| GM | 84 | | |
| EL | 88 | | |
| CL | 102 | | |
| MM | 87 | | |
| SC | 99 | | |
| CO | 96 | | |
| FA | 96 | | |
| OF | 82 | | |
| ST | 75 | | |

| DATE | 830303 |
|---|---|
| PLACE | LITTLE ROCK, AR |

**5. OVERSEA SERVICE** ☐ CONT

| FROM | THRU | AREA AND COUNTRY | MO | TYPE | NTC | DEPN ARR OS |
|---|---|---|---|---|---|---|
| | | | | | | |

**9. AWARDS, DECORATIONS & CAMPAIGNS** ☐ CONT

RIFLE M-16 SHS QUAL BAD 830122
HAND GREN EXP QUAL BAD 830503
ARMY SERVICE RIBBON 830630

**10. OTHER TESTS** ☐ CONT

| TEST | SCORE | DATE |
|---|---|---|
| MDB-X | | |
| OCT | | |
| DLAT | | |
| OQI-1 | | |
| FAST-OB | | |
| WOCB | Y-1 | |

**11. AMERICAN BOARD CERTIFICATION & LICENSES OR CERTIFICATES HELD** ☐ CONT

**12. LANGUAGE PROFICIENCY**

| DA FORM 330 SUBMITTED | DATE |
|---|---|
| | |

DA FORM 2-1 1 JAN 73

41

PERSONNEL QUALIFICATION RECORD – PART III

| SECTION II – CLASSIFICATION AND ASSIGNMENT DATA (Continued) | | | | | SECTION III – SERVICE, TRAINING AND OTHER DATES | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **13** PILOT RATINGS | | | | | **18. APPOINTMENTS AND REDUCTIONS** ☐ CONT | | | | **19. SPECIALIZED TRAINING** ☐ CONT | |
| ORIGINAL | DATE | CURRENT | | DATE | GRADE | COMP | EFFECTIVE DATE | DATE OF ~~ELIG~~/RANK | SUBJECT | DATE |
| | | | | | | | | | ATP 21-114 (BCT) | |
| **14** FLYING STATUS ☐ CONT | | | | | PV1 | | | 830324 | Geneva-Hague Conventions | 830411 |
| | | | | | PV2 | | | 830924 | | |
| | | | | | PV2 | | | 830928 | Military Justice | |
| INSTRUMENT CERTIFICATION | | | | | PV1 | | | 831025 | Benefits of Honorable Discharge | 830325 |
| **15** INTERNSHIPS, RESIDENCIES AND FELLOWSHIPS ☐ CONT | | | | | PV1 | | | 831102 | | |
| HOSPITAL | | TYPE OR SERVICE | MONTHS | YEAR | PV1 | | | A831116 | RACE REL-1 | 830401 |
| | | | | | | | | | OSUT | 830630 |

| **16** HOSPITAL/TEACHING APPOINTMENTS AND PRIVATE PRACTICE ☐ CONT | | | | | **20 BASIC ENLISTED SERVICE DATE (BESD)** | | | 83 0327 | | |
| FROM | THRU | INSTITUTION/LOCATION | TYPE | DURAT | | | | | | |
| | | | | | **21 TIME LOST (Sec 972, Title 10, USC)** | | | | | ☐ CONT |
| | | | | | FROM | THRU | DAYS | REASON | | |
| | | | | | 831005 | 831008 | 4 | AWOL | | |
| | | | | | 831021 | 831101 | 12 | IMPRT | | |
| | | | | | 840625 | 840625 | 1 | AWOL | | |
| | | | | | 840706 | 840718 | 13 | AWOL | | |
| | | | | | 840729 | 841109 | | AWOL (TO DSTN SEC 1 TC M53) | | |

| **17. CIVILIAN EDUCATION AND MILITARY SCHOOLS** ☐ CONT | | | | | | **SECTION IV – PERSONAL AND FAMILY DATA** | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| SCHOOL | MAJOR/COURSE/MOSC | DURAT | COMP | YEAR | | **22. PHYSICAL STATUS** | | | **23. PLACE OF BIRTH AND CITIZENSHIP** | |
| SALLISAW HS | GEN | 4 YRS | YES | 82 | | HEIGHT | WEIGHT | GLASSES | SELF OKLAHOMA | |
| USATC | CBT ENGR (12B10) | 13 WKS | YES | 83 | | 67 | 181 | ☐ YES ☒ NO | SPOUSE | |
| | | | | | | DATE OF EXAM 830311 | | | CITIZENSHIP OF SPOUSE | |
| | | | | | | **24. NUMBER OF DEPENDENTS** | | | **25. HOME OF RECORD/ADDRESS** | |
| | | | | | | ADULT | CHILDREN | | SALLISAW, OK | |
| | | | | | | 0 | 0 | | B 7th ENGR BN, FT. 1814 LA 71158 | |
| | | | | | | **26. CIVILIAN OCCUPATION** | | | | |
| | | | | | | JOB TITLE: N/A | | | | |
| | | | | | | DOT CODE | CRITICAL OCCUPATION ☐ YES ☐ NO | | NO. MONTHS EMPLOYED | MOSC |
| | | | | | | DUTIES PERFORMED | | | | |
| | | | | | | EMPLOYER | | | | |

42

Case 6:09-cv-00105-JHP Document 139 Filed 02/18/10 Page 22 of 61

## SECTION V — MISCELLANEOUS

| 27. REMARKS | 28 | ITEM CONTINUATION |
|---|---|---|
| | ITEM NO. | DATA |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

### SECTION IX — RESERVE COMPONENT DATA

32a. READY RESERVE OBLIGATION EXPIRATION DATE:

b. DA FORM 3726 OR 3726-1 AGREEMENT EXPIRATION DATE:

29. DATE DA FORM 20B PREPARED  831002

c. SERVICE OBLIGATION EXPIRATION DATE:

30. DATE DUPLICATE DA FORM 2-1 SUBMITTED:

d. MANDATORY REMOVAL FROM ACTIVE STATUS:

31. REPORT OF CHANGES

e. RETIREMENT YEAR ENDING DATE:

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 |
| 47 | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 63 | 64 | 65 | 66 | 67 | 68 | 69 |
| 70 | 71 | 72 | 73 | 74 | 75 | 76 | 77 | 78 | 79 | 80 | 81 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 89 | 90 | 91 | 92 |

| 33. DATE | | 34. SIGNATURE |
|---|---|---|
| PREPARED | REVIEWED | |
| 58 Mar 3 | 830711 | Travis Don Crawford |

SECTION VII CURRENT AND PREVIOUS ASSIGNMENTS

| 35. | | | RECORD OF ASSIGNMENTS | | NON-DUTY DAYS | NON-RATED DAYS | ☐ CONT |
|---|---|---|---|---|---|---|---|
| EFFECTIVE DATE | DUTY MOSC | PRINCIPAL DUTY | ORGANIZATION AND STATION OR OVERSEA COUNTRY | | BP YR/MO | EP YR/MO | TYPE REPORT |
| | | (RES) 830311 - 830323 | NO PAD | | | | |
| 830324 | | ENLISTMENT | USARECSTA F/W MO | | — | — | NONE |
| 830330 | 12B00 | OSUT | Co D/ Bn 2d Tng Bde (OSUT) USATCEWMo | | — | — | NONE |
| 830630 | — — | CASUAL | ENROUTE TO FT POLK LA | | — | — | NONE |
| 830712 | | | HHC 7TH ENGR BN FT POLK, LA | | | | |
| 830712 | 12B10 | TOOLROOM KEEPER | Co B 7th Engr Bn Ft. Polk, LA. | | — | — | NONE |
| 830905 | | AWOL | | | — | — | NONE |
| 830909 | 12B10 | TOOLROOM KEEPER | B 7th ENGR BN FT POLK LA | | — | — | NONE |
| 831021 | | CONFINED | | | — | — | NONE |
| 031162 | 12B10 | TOOLROOM KEEPER | B 7TH ENGR BN FT POLK LA | | — | — | NONE |
| 840625 | — — | AWOL | | | — | — | NONE |
| 840626 | 12B10 | TOOLROOM KEEPER | Co B 7TH ENGR BN FT POLK LA | | — | — | NONE |
| 840706 | — — | AWOL | | | — | — | NONE |
| 840719 | 12B10 | TOOLROOM KEEPER | Co B 7TH ENGR BN FT POLK LA | | — | — | NONE |
| 840729 | — — | AWOL | | | — | — | NONE |
| 840827 | — — | DROPPED FROM ROLLS — DESERTION | | | | | |
| 841210 | | RMC | Ft Chaffee, AR | | | | |
| 841210 | | CASUAL | PCF, USAFACES, Ft Sill, OK | | | | |
| 850123 | | Disch(Under Other Than Honorable Conditions) | | | | | |

44

CRAWFORD, TRAVIS D.  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

NAME (Last, first, middle initial) AND SOCIAL SECURITY NUMBER

**INSERT SHEET TO DA FORM 2-1**

**RECORD OF COURT-MARTIAL CONVICTION**

For use of this form, see AR 640-2-1; the proponent agency is the office of TJAG.

| 1. TYPE OF COURT-MARTIAL | a. NUMBER | b. HEADQUARTERS | c. ARTICLE |
|---|---|---|---|
| SUMMARY | 52 | 2d Bde, 5th Inf Div (M) & Ft Polk, La  71459 | 86 |

2. SYNOPSIS OF SPECIFICATION AND DATE OF OFFENSE. ~~07A 5 Oct 83,~~ AWOL from 5 Oct 83 until 8 Oct 83.

| 3a. SENTENCE AS APPROVED, INCLUDING DATE ADJUDGED AND DATE APPROVED (after insertion, complete certification) | 3b. I CERTIFY THAT THE FOREGOING IS CORRECT (Signature and typed name, grade, and organization) |
|---|---|
| Red PV1, Forf $200.00 for 1 mos, CHL for 15 days. <br> ADJ:  21 Oct 83            APP:   25 Oct 83 | BARRY L. ICENHOWER, 1LT, AGC <br> HQ 5th Inf Div (M) & Ft Polk, La  71459 |

| 4a. ACTION ON SUPERVISORY OR APPELLATE REVIEW, INCLUDING HEADQUARTERS AND DATE (after insertion complete certification) | 4b. I CERTIFY THAT THE FOREGOING IS CORRECT (Signature and typed name, grade, and organization) |
|---|---|
| Supr Review Compl App:  28 Oct 83, HQ 5th Inf Div (M) & Ft Polk, La <br> 71459 | BARRY L. ICENHOWER, 1LT, AGC <br> HQ 5th Inf Div (M) & Ft Polk, La  71459 |

| 5a. MODIFICATION, SUSPENSION, OR SETTING ASIDE OF TRIAL RESULTS (insert action taken, headquarters and date) (after insertion, complete certification) | 5b. I CERTIFY THAT THE FOREGOING IS CORRECT (Signature and typed name, grade, and organization) |
|---|---|
| | |

| 6a. SUSPENDED SENTENCE VACATED (insert headquarters and date) (after insertion, complete certification) | 6b. I CERTIFY THAT THE FOREGOING IS CORRECT (Signature and typed name, grade, and organization) |
|---|---|
| | |

| 1. TYPE OF COURT-MARTIAL | a. NUMBER | b. HEADQUARTERS | c. ARTICLE |
|---|---|---|---|
| | | | |

2. SYNOPSIS OF SPECIFICATION AND DATE OF OFFENSE

| 3a. SENTENCE AS APPROVED, INCLUDING DATE ADJUDGED AND DATE APPROVED (after insertion, complete certification) | 3b. I CERTIFY THAT THE FOREGOING IS CORRECT (Signature and typed name, grade, and organization) |
|---|---|
| | |

| 4a. ACTION ON SUPERVISORY OR APPELLATE REVIEW, INCLUDING HEADQUARTERS AND DATE (after insertion complete certification) | 4b. I CERTIFY THAT THE FOREGOING IS CORRECT (Signature and typed name, grade, and organization) |
|---|---|
| | |

| 5a. MODIFICATION, SUSPENSION, OR SETTING ASIDE OF TRIAL RESULTS (insert action taken, headquarters and date) (after insertion, complete certification) | 5b. I CERTIFY THAT THE FOREGOING IS CORRECT (Signature and typed name, grade, and organization) |
|---|---|
| | |

| 6a. SUSPENDED SENTENCE VACATED (insert headquarters and date) (after insertion, complete certification) | 6b. I CERTIFY THAT THE FOREGOING IS CORRECT (Signature and typed name, grade, and organization) |
|---|---|
| | |

45

DA FORM 2-2  REPLACES DA FORM 20B, 1 JAN 65, WHICH IS OBSOLETE.

## INSERT SHEET TO DA FORM 2-1

### RECORD OF COURT-MARTIAL CONVICTION

For use of this form, see AR 640-2-1; the proponent agency is the office of TJAG.

NAME *(Last, first, middle initial)* AND SOCIAL SECURITY NUMBER

| 1. TYPE OF COURT-MARTIAL | a. NUMBER | b. HEADQUARTERS | c. ARTICLE |
|---|---|---|---|
| | | | |

2. SYNOPSIS OF SPECIFICATION AND DATE OF OFFENSE

| 3a. SENTENCE AS APPROVED, INCLUDING DATE ADJUDGED AND DATE APPROVED *(after insertion, complete certification)* | 3b. I CERTIFY THAT THE FOREGOING IS CORRECT *(Signature and typed name, grade, and organization)* |
|---|---|
| 4a. ACTION ON SUPERVISORY OR APPELLATE REVIEW, INCLUDING HEADQUARTERS AND DATE *(after insertion complete certification)* | 4b. I CERTIFY THAT THE FOREGOING IS CORRECT *(Signature and typed name, grade, and organization)* |
| 5a. MODIFICATION, SUSPENSION, OR SETTING ASIDE OF TRIAL RESULTS *(insert action taken, headquarters and date) (after insertion, complete certification)* | 5b. I CERTIFY THAT THE FOREGOING IS CORRECT *(Signature and typed name, grade, and organization)* |
| 6a. SUSPENDED SENTENCE VACATED *(insert headquarters and date) (after insertion, complete certification)* | 6b. I CERTIFY THAT THE FOREGOING IS CORRECT *(Signature and typed name, grade, and organization)* |

| 1. TYPE OF COURT-MARTIAL | a. NUMBER | b. HEADQUARTERS | c. ARTICLE |
|---|---|---|---|
| | | | |

2. SYNOPSIS OF SPECIFICATION AND DATE OF OFFENSE

| 3a. SENTENCE AS APPROVED, INCLUDING DATE ADJUDGED AND DATE APPROVED *(after insertion, complete certification)* | 3b. I CERTIFY THAT THE FOREGOING IS CORRECT *(Signature and typed name, grade, and organization)* |
|---|---|
| 4a. ACTION ON SUPERVISORY OR APPELLATE REVIEW, INCLUDING HEADQUARTERS AND DATE *(after insertion complete certification)* | 4b. I CERTIFY THAT THE FOREGOING IS CORRECT *(Signature and typed name, grade, and organization)* |
| 5a. MODIFICATION, SUSPENSION, OR SETTING ASIDE OF TRIAL RESULTS *(insert action taken, headquarters and date) (after insertion, complete certification)* | 5b. I CERTIFY THAT THE FOREGOING IS CORRECT *(Signature and typed name, grade, and organization)* |
| 6a. SUSPENDED SENTENCE VACATED *(insert headquarters and date) (after insertion, complete certification)* | 6b. I CERTIFY THAT THE FOREGOING IS CORRECT *(Signature and typed name, grade, and organization)* |

46

PREPARED 84 MAY 15   PCN: ALC-P75                    PERSONNEL QUALI?
PPX RL    TYPE RECORD PERSONNEL-INGY

FORM NO 6413

|   |   |   |   | SECTION |
|---|---|---|---|---|
| 1 | NAME | CRAWFORD TRAVIS DON | 6 | RACE/CODE |
| 2 | SSN | ███████-5635 | 7 | DATE OF B |
| 3 | VSSSN CODE | V | 8 | NUMBER DE |
| 4 | MPC/CODE | ENLISTED   E | 9 | NO ACMP C |
| 5 | SEX/CODE | MALE   M | 10 | NO ACMP N |

|   |   |   |   | SECTION |
|---|---|---|---|---|
| 1 | GRADE/CODE | PV11 16 | 15 | PROMOTION |
| 2 | DATE OF RANK | 8311 2 | 16 | DUAL SVC |
| 3 | SVC COMP/CODE | REG   R | 17 | DUAL SVC |
| 4 | PMOS/ASI | 12B10 60 | 18 | SMOS/ASI |
| 5 | LANG-1/CODE |  | 19 | DUTY MOS/ |
| 6 | LANG-2/CODE |  | 20 | BONUS MOS |
| 7 | SCTY STS CODE | P | 21 | PROM/PROG |
| 8 | SCTY CLNC/CODE | NONE   U | 22 | PROPAY/CO |
| 9 | PERHES | 111111 | 23 | SPAY1/SPA |
| 10 | PHYS CAT CODE | A | 24 | IPAY1/IPA |
| 11 | GT SCORE | 96 | 25 | SQT MOS |
| 12 | OJT COMP DATE |  | 26 | SQT DATE- |
| 13 | MIL EDUC/CODE | NONE   7 | 27 | SQT DATE- |
| 14 | CIV EDUC/CODE | HS GRAD   E | 28 | SQT PERCE |

|   |   |   |   | SECTION |
|---|---|---|---|---|
| 1 | UPC | ANUB | 4 | ARRIVAL D |
| 2 | UNIT NAME | 0607 EN BN   CO B | 5 | DEPART DA |
| 3 | REPORT DATE | 831712 | 6 | GAINING U |

|   |   |   |   | SECTION |
|---|---|---|---|---|
| 1 | PEBD | 408  830327 | 11 | DATE ELIG |
| 2 | BASD | 830408 21 | 12 | FHA ELIG |
| 3 | ETS | 840327 860408 20 | 13 | DLOS |
| 4 | CURR TERM SVC/CODE | 3 YR   3 | 14 | DROS/DERO |
| 5 | DELAY IN SEP/CODE |  | 15 | REA/TERM |
| 6 | DATE LAST PCS | 8306 | 16 | LAST CBT |
| 7 | DATE OF LAST EN |  | 17 | CURR/LAST |
| 8 | EER DATE VERIF |  | 18 | TRAVEL ST |
| 9 | DATE OF LAST PHOTO |  | 19 | OVERSEAS |
| 10 | DATE ELIG AFRM |  | 20 | CONUS PRE |

|   |   |   |   | SECTION |
|---|---|---|---|---|
| 1 | POSITION NO | 0041 | 3 | AUTH MOS/ |
| 2 | POSITION TITLE | CBT CONSTRUCTION SP | 4 | AUTH GRAD |

SECTION

DA FORM 2A (1 JUN 82)

ATION RECORD, PART I CD 84 MAY 16 SCN EG
VOUCHER NO MLSZ

- PERSONAL DATA
MH-CAU C          11 ETH GRP/CODE    OTHER          X
H        649120    12 CITZSHP/CODE    NATIVE-BORN 1
DENTS    90        13 MRTL STS/CODE SINGLE          S
P PCS             14 REL PREF/CODE NO-REL-PREF              01
EP PCS

- QUALIFICATION DATA
D                 29 SGT RATING/CODE   NO PREV SCORE
DE/CODE           30 SGT SCORE
P/CODE            31 PROM PTS-C/DATE
        00000 0   32 PROM PTS-P/DATE
        12810 00  33 REEN ELIG/INELIG   INELIG-AWOL/LT   9A
F DATE
S
        NONE


        8404

GE       %

- UNIT DATA
        830712            7 LOSING UPC
                          8 REGT AFFIL
                          9 REGT HOMEBASE

- SERVICE DATA
M       8603


        N/A
E       L 8497
R/DATE  NONE           Z
T/CODE  NO PRIOR CS SVC  Z
S
F/CODES 1 HAWAII        15 2 EUROPE         62 3 FAR-EAST-PAC   63
ODE     FT BRAGG NC             NB

- POSITION DATA
        12810 00       5
ODE     PFC3           6 AUTH LANG/CODE INVALID CODE           00

- LOCAL DATA

DEPARTMENT OF THE ARMY
Headquarters, 2d Brigade, 5th Infantry Division (Mechanized)
Fort Polk, Louisiana 71459

SUMMARY COURT-MARTIAL ORDER
NUMBER                52                                              25 October 1983

Before a summary court-martial which convened at Fort Polk, Louisiana, pursuant to Court-Martial Convening Order Number 45, this headquarters, dated 12 August 1983, was arraigned and tried:

Private E-2 Travis D. Crawford, ████-5635, US Army, Company B, 7th Engineer Battalion (Combat), Fort Polk, Louisiana 71459

Charge:  Violation of the Uniform Code of Military Justice, Article 86

Specification:  In that Private E2 Travis D. Crawford, US Army, Company B, 7th Engineer Battalion (Combat), 5th Infantry Division (Mechanized), did, on or about 5 October 1983, without authority, absent himself from his unit, to wit:  Company B, 7th Engineer Battalion (Combat), 5th Infantry Division (Mechanized), located at Fort Polk, Louisiana, a military installation, and did remain so absent until on or about 9 October 1983.

PLEAS

To the Specification and the Charge:  Guilty

FINDINGS

Of the Specification and the Charge:  Guilty

SENTENCE

To be reduced to the grade of E1, To forfeit $200.00 for one month, and to be confined at hard labor for 15 days.  (No previous convictions considered).

The sentence was adjudged on 21 October 1983.

ACTION
DEPARTMENT OF THE ARMY
Headquarters, 2d Brigade, 5th Infantry Division (Mechanized)
Fort Polk, Louisiana 71459

25 October 1983

Approved and ordered executed.  The accused will be confined in the Fort Polk Installation Detention Facility, and the confinement will be served therein or elsewhere as competent authority may direct.

/s/ F. J. Walters
/t/ F. J. WALTERS
Colonel, Infantry
Commanding

49

SCMO No. 52, DA, HQ, 2d Bde, 5th Inf Div (M), Ft Polk, LA 71459, dtd 25 Oct 83, continued:

BY ORDER OF COLONEL WALTERS:

GAYLE D. SAMS
CPT, IN
Adjutant

DISTRIBUTION:
1-Accused
1-Cdr, Co B, 7th Engr Bn
1-Cdr, 7th Engr Bn
1-Cdr, 2d Bde
1-Cdr, USAERC-PASC, Ft Harrison, IN 46249
4-AFZX-AG-R, Ft Polk, LA
1-CID, Ft Polk, LA
1-Legislative Actions, Ft Polk, LA
1-F&AO, ATTN:  SGM, Ft Polk, LA
8-ROT
1-Rec/Ref Set

HQ 5TH INF DIV (MECH) & FT POLK
Office of SJA
This record of trial has been examined and the findings and sentence, as approved by convening authority, are correct in law and fact.

28 OCT 83
(DATE)
(JAGC)

R. DANA ASHFORD
CPT, JAGC

Prior to consenting to trial by summary court-martial, the accused in this case consulted with a qualified attorney and was duly advised of all his procedural and substantive rights under Para 79, MCM (1969 rev) and Art. 20, UCMJ.

28 OCT 83
(DATE)

R. DANA ASHFORD
CPT, JAGC

R. DANA ASHFORD, CPT, JAGC

# PERSONNEL ACTION

For use of this form, see DA PAM 600-8 and AR 680-1; the proponent agency is MILPERCEN.

## DATA REQUIRED BY THE PRIVACY ACT

Authority: Title 5, section 3012; Title 10, U.S.C. E.O. 9397. Principal Purpose: Use by service member in accordance with DA Pamphlet 600-8 when requesting a personnel action on his/her own behalf (Section III). Routine Uses: To initiate the processing of a personnel action being requested by the service member. Disclosure: Voluntary. Failure to provide Social Security Number may result in a delay or error in processing of the request for personnel action.

| THRU: (Include ZIP Code) | TO: (Include ZIP Code) | FROM: (Include ZIP Code) |
|---|---|---|
| | MILPO USAPCF FORT SILL, OK 73503 | COMMANDER PCF USAFACFS FORT SILL, OK 73503 |

## SECTION I - PERSONAL IDENTIFICATION

| NAME (Last, first, MI) | GRADE OF RANK/PMOS (Enl only) | SOCIAL SECURITY NUMBER |
|---|---|---|
| CRAWFORD, TRAVIS D. | PV1/E-1          12B | ▮▮▮-5635 |

## SECTION II - DUTY STATUS CHANGE (Proc 9-1, DA Pam 600-8)

The above member's duty status is changed from __Dropped from Unit Rolls__

to Attached, Return to Military Control

effective __0001__ hours, __10 December__ 19 __84__

## SECTION III - REQUEST FOR PERSONNEL ACTION

I request the following action:

| TYPE OF ACTION | Procedure | TYPE OF ACTION | Procedure |
|---|---|---|---|
| Service School (Enl only) | | Reassignment Married Army Couples | |
| ROTC or Reserve Component Duty | | Reclassification | |
| Volunteering For Oversea Service | | Officer Candidate School | |
| Ranger Training | | Asgmt of Pers with Exceptional Family Members | |
| Reasgmt Extreme Family Problems | | Identification Card | |
| Exchange Reassignment (Enl only) | | Identification Tags | |
| Airborne Training | | Separate Rations | |
| Special Forces Training/Assignment | | Leave - Excess/Advance/Outside CONUS | |
| On-the-Job Training (Enl only) | | Change of Name/SSN/DOB | |
| Retesting in Army Personnel Tests | | Other (Specify) | |

| SIGNATURE OF MEMBER (When required) | DATE |
|---|---|
| | |

## SECTION IV - REMARKS (Applies to Sections II, III, and V) (Continue on separate sheet)

Fr AWOL/DFR (Surr mil auth 10 Dec 84, Ft. Chaffee, AR rtn mil con 10 Dec 84, Ft. Chaffee, AR) RNA this sta

(SM AWOL since 29 July 84 Fm Co B, 7th Eng Bn, Ft. Polk, LA)

## SECTION V - CERTIFICATION/APPROVAL/DISAPPROVAL

I certify that the duty status change (Section II) or that the request for personnel action (Section III) contained herein -

☒ HAS BEEN VERIFIED          ☐ RECOMMEND APPROVAL          ☐ RECOMMEND DISAPPROVAL
          ☐ IS APPROVED                              ☐ IS DISAPPROVED

| COMMANDER/AUTHORIZED REPRESENTATIVE | SIGNATURE | DATE |
|---|---|---|
| DIANA J. MOSMAN, SSG, USA, PERS SGT | *[signature]* | 11 December 1984 |

51

## PERSONNEL ACTION

For use of this form, see DA PAM 600-8 and AR 680-1; the proponent agency is MILPERCEN.

### DATA REQUIRED BY THE PRIVACY ACT

Authority: Title 5, section 3012; Title 10, U.S.C. E.O. 9397. Principal Purpose: Use by service member in accordance with DA Pamphlet 600-8 when requesting a personnel action on his/her own behalf (Section III). Routine Uses: To initiate the processing of a personnel action being requested by the service member. Disclosure: Voluntary. Failure to provide Social Security Number may result in a delay or error in processing of the request for personnel action.

| THRU: (Include ZIP Code) | TO: (Include ZIP Code) | FROM: (Include ZIP Code) |
|---|---|---|
| | MILPO USAPCF FORT SILL, OK 73503 | COMMANDER PCF USAFACFS FORT SILL, OK 73503 |

### SECTION I - PERSONAL IDENTIFICATION

| NAME (Last, first, MI) | GRADE OF RANK/PMOS (Enl only) | SOCIAL SECURITY NUMBER |
|---|---|---|
| CRAWFORD, TRAVIS D. | PV1/E-1          12B | ███-5635 |

### SECTION II - DUTY STATUS CHANGE (Proc 9-1, DA Pam 600-8)

The above member's duty status is changed from __Dropped from Unit Rolls__

to __Attached, Return to Military Control__

effective ___0001___ hours, __10 December__ 19 __84__

### SECTION III - REQUEST FOR PERSONNEL ACTION

I request the following action:

| TYPE OF ACTION | Procedure | | TYPE OF ACTION | Procedure |
|---|---|---|---|---|
| Service School (Enl only) | | | Reassignment Married Army Couples | |
| ROTC or Reserve Component Duty | | | Reclassification | |
| Volunteering For Oversea Service | | | Officer Candidate School | |
| Ranger Training | | | Asgmt of Pers with Exceptional Family Members | |
| Reasgmt Extreme Family Problems | | | Identification Card | |
| Exchange Reassignment (Enl only) | | | Identification Tags | |
| Airborne Training | | | Separate Rations | |
| Special Forces Training/Assignment | | | Leave - Excess/Advance/Outside CONUS | |
| On-the-Job Training (Enl only) | | | Change of Name/SSN/DOB | |
| Retesting in Army Personnel Tests | | | Other (Specify) | |

| SIGNATURE OF MEMBER (When required) | DATE |
|---|---|
| | |

### SECTION IV - REMARKS (Applies to Sections II, III, and V) (Continue on separate sheet)

Fr AWOL/DFR (Surr mil auth 10 Dec 84, Ft. Chaffee, AR rtn mil con 10 Dec 84, Ft. Chaffee, AR) RNA this sta

(SM AWOL since 29 July 84 Fm Co B, 7th Eng Bn, Ft. Polk, LA)

### SECTION V - CERTIFICATION/APPROVAL/DISAPPROVAL

I certify that the duty status change (Section II) or that the request for personnel action (Section III) contained herein -

☒ HAS BEEN VERIFIED
☐ IS APPROVED    ☐ RECOMMEND APPROVAL    ☐ RECOMMEND DISAPPROVAL
☐ IS DISAPPROVED

| COMMANDER/AUTHORIZED REPRESENTATIVE | SIGNATURE | DATE |
|---|---|---|
| DIANA J. MOSMAN, SSG, USA, PERS SGT | *[signature]* | 11 December 1984 |

52

# PERSONNEL ACTION

For use of this form, see DA PAM 600-8 and AR 680-1; the proponent agency is MILPERCEN

## DATA REQUIRED BY THE PRIVACY ACT

Authority: Title 5, section 3012; Title 10, U.S.C. E.O. 9397. Principal Purpose: Use by service member in accordance with DA Pamphlet 600-8 when requesting a personnel action on his/her own behalf (Section III). Routine Uses: To initiate the processing of a personnel action being requested by the service member. Disclosure: Voluntary. Failure to provide Social Security Number may result in a delay or error in processing of the request for personnel action.

| THRU: (Include ZIP Code) | TO: (Include ZIP Code) | FROM: (Include ZIP Code) |
|---|---|---|
| | MILPO USAPCF FORT SILL, OK  73503 | COMMANDER PCF USAFACFS FORT SILL, OK 73503 |

## SECTION I - PERSONAL IDENTIFICATION

| NAME (Last, first, MI) | GRADE OF RANK/PMOS (Enl only) | | SOCIAL SECURITY NUMBER |
|---|---|---|---|
| CRAWFORD, TRAVIS D. | PV1/E-1 | 12B | 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 |

## SECTION II - DUTY STATUS CHANGE (Proc 9-1, DA Pam 600-8)

The above member's duty status is changed from __Dropped from Unit Rolls__

to __Attached, Return to Military Control__

effective __0001__ hours, __10 December__ 19 __84__

## SECTION III - REQUEST FOR PERSONNEL ACTION

I request the following action:

| TYPE OF ACTION | Procedure | TYPE OF ACTION | Procedure |
|---|---|---|---|
| Service School (Enl only) | | Reassignment Married Army Couples | |
| ROTC or Reserve Component Duty | | Reclassification | |
| Volunteering For Oversea Service | | Officer Candidate School | |
| Ranger Training | | Asgmt of Pers with Exceptional Family Members | |
| Reasgmt Extreme Family Problems | | Identification Card | |
| Exchange Reassignment (Enl only) | | Identification Tags | |
| Airborne Training | | Separate Rations | |
| Special Forces Training/Assignment | | Leave - Excess/Advance/Outside CONUS | |
| On-the-Job Training (Enl only) | | Change of Name/SSN/DOB | |
| Retesting in Army Personnel Tests | | Other (Specify) | |

| SIGNATURE OF MEMBER (When required) | DATE |
|---|---|
| | |

## SECTION IV - REMARKS (Applies to Sections II, III, and V) (Continue on separate sheet)

Fr AWOL/DFR (Surr mil auth 10 Dec 84, Ft. Chaffee, AR rtn mil con 10 Dec 84, Ft. Chaffee, AR) RNA this sta

(SM AWOL since 29 July 84 Fm Co B, 7th Eng Bn, Ft. Polk, LA)

## SECTION V - CERTIFICATION/APPROVAL/DISAPPROVAL

I certify that the duty status change (Section II) or that the request for personnel action (Section III) contained herein -

☒ HAS BEEN VERIFIED     ☐ RECOMMEND APPROVAL     ☐ RECOMMEND DISAPPROVAL
☐ IS APPROVED     ☐ IS DISAPPROVED

| COMMANDER/AUTHORIZED REPRESENTATIVE | SIGNATURE | DATE |
|---|---|---|
| DIANA J. MOSMAN, SSG, USA, PERS SGT | | 11 December 1984 |

53

# PERSONNEL ACTION

For use of this form, see AR 680-1; the proponent agency is MILPERCEN.

## DATA REQUIRED BY THE PRIVACY ACT

Authority: Title 5, section 3012; Title 10, U.S.C. E.O. 9397. Principal Purpose: Use by service member in accordance with DA Pamphlet 600-8 when requesting a personnel action on his/her own behalf (Section III). Routine Uses: To initiate the processing of a personnel action being requested by the service member. Disclosure: Voluntary. Failure to provide Social Security Number may result in a delay or error in processing of the request for personnel action.

| THRU: (Include ZIP Code) | TO: (Include ZIP Code) | FROM: (Include ZIP Code) |
|---|---|---|
| COMMANDER<br>7TH ENGINEER BATTALION<br>FORT POLK, LOUISIANA  71459 | COMMANDER<br>5TH INFANTRY DIVISION (M)<br>ATTN:  MILPO<br>FORT POLK, LOUISIANA  71459 | COMMANDER<br>B CO, 7TH ENGINEER BATTALION (C)<br>FORT POLK, LOUISIANA  71459 |

## SECTION I - PERSONAL IDENTIFICATION

| NAME (Last, first, MI) | GRADE OF RANK/PMOS (Enl only) | SOCIAL SECURITY NUMBER |
|---|---|---|
| CRAWFORD, TRAVIS D. | PV1/12B10 | ███████5635 |

## SECTION II - DUTY STATUS CHANGE (Proc 9-1, DA Pam 600-8)

The above member's duty status is changed from __ABSENT WITHOUT LEAVE__

to __DROPPED FROM THE ROLLS__

effective __0001__ hours, __27 August__ __1984__

## SECTION III - REQUEST FOR PERSONNEL ACTION (DA Pam 600-8)

I request the following action:

| TYPE OF ACTION | Procedure | TYPE OF ACTION | Procedure |
|---|---|---|---|
| Service School (Enl only) | 3-10 | Reassignment Married Army Couples | 3-32 |
| ROTC or Reserve Component Duty | 3-12 | Reclassification | 3-46 |
| Volunteering For Oversea Service | 3-14 | Leave - Excess/Advance/Outside CONUS | 4-8 |
| Ranger Training | 3-15 | Officer Candidate School | 4-10 |
| Reasgmt Extreme Family Problems | 3-16 | Change of Name/SSN/DOB | 4-11 |
| Exchange Reassignment (Enl only) | 3-18 | Identification Card | 4-23 |
| Airborne Training | 3-19 | Identification Tags | 4-24 |
| Special Forces Training/Assignment | 3-22 | Asgmt of Pers with Handicapped Dependents | 4-28 |
| On-the-Job Training (Enl only) | 3-23 | Separate Rations | 9-1 |
| Retesting in Army Personnel Tests | 3-25 | Other (Specify) | |

| SIGNATURE OF MEMBER (When required) | DATE |
|---|---|
| | |

## SECTION IV - REMARKS (Applies to Sections II, III, and V) (Continue on separate sheet)

30 AUG 1984

## SECTION V - CERTIFICATION/APPROVAL/DISAPPROVAL

I certify that the duty status change (Section II) or that the request for personnel action (Section III) contained herein -

☒ HAS BEEN VERIFIED          ☐ RECOMMEND APPROVAL          ☐ RECOMMEND DISAPPROVAL

☐ IS APPROVED          ☐ IS DISAPPROVED

| COMMANDER/AUTHORIZED REPRESENTATIVE | SIGNATURE | DATE |
|---|---|---|
| ROBERT M. SPEAR, 1LT, CE, ADJUTANT | | 28 August 1984 |

DA FORM 4187   EDITION OF 1 MAY 74 WILL BE USED UNTIL EXHAUSTED. DA FORM 4187-R

## PERSONNEL ACTION

For use of this form, see AR 680-1; the proponent agency is MILPERCEN.

### DATA REQUIRED BY THE PRIVACY ACT

Authority: Title 5, section 3012; Title 10, U.S.C. E.O. 9397. Principal Purpose: Use by service member in accordance with DA Pamphlet 600-8 when requesting a personnel action on his/her own behalf (Section III). Routine Uses: To initiate the processing of a personnel action being requested by the service member. Disclosure: Voluntary. Failure to provide Social Security Number may result in a delay or error in processing of the request for personnel action.

| THRU: (Include ZIP Code) | TO: (Include ZIP Code) | FROM: (Include ZIP Code) |
|---|---|---|
| COMMANDER<br>7TH ENGINEER BATTALION (C)<br>FORT POLK, LOUISIANA  71459 | COMMANDER<br>5TH INFANTRY DIVISION (M)<br>ATTN:  MILPO<br>FORT POLK, LOUISIANA  71459 | COMMANDER<br>B CO, 7TH ENGINEER BATTALION (C)<br>FORT POLK, LOUISIANA  71459 |

### SECTION I - PERSONAL IDENTIFICATION

| NAME (Last, first, MI) | GRADE OF RANK/PMOS (Enl only) | SOCIAL SECURITY NUMBER |
|---|---|---|
| CRAWFORD, TRAVIS D. | PV1/12B10 | ███-5635 |

### SECTION II - DUTY STATUS CHANGE (Proc 9-1, DA Pam 600-8)

The above member's duty status is changed from ___PRESENT FOR DUTY___

to ___ABSENT WITHOUT LEAVE___

effective ___0900___ hours, __29 July__ 19_84_

### SECTION III - REQUEST FOR PERSONNEL ACTION (DA Pam 600-8)

I request the following action:

| TYPE OF ACTION | Procedure | TYPE OF ACTION | Procedure |
|---|---|---|---|
| Service School (Enl only) | 3-10 | Reassignment Married Army Couples | 3-32 |
| ROTC or Reserve Component Duty | 3-12 | Reclassification | 3-46 |
| Volunteering For Oversea Service | 3-14 | Leave - Excess/Advance/Outside CONUS | 4-8 |
| Ranger Training | 3-15 | Officer Candidate School | 4-10 |
| Reasgmt Extreme Family Problems | 3-16 | Change of Name/SSN/DOB | 4-11 |
| Exchange Reassignment (Enl only) | 3-18 | Identification Card | 4-23 |
| Airborne Training | 3-19 | Identification Tags | 4-24 |
| Special Forces Training/Assignment | 3-22 | Asgmt of Pers with Handicapped Dependents | 4-28 |
| On-the-Job Training (Enl only) | 3-23 | Separate Rations | 9-1 |
| Retesting in Army Personnel Tests | 3-25 | Other (Specify) | |

| SIGNATURE OF MEMBER (When required) | DATE |
|---|---|
| | |

### SECTION IV - REMARKS (Applies to Sections II, III, and V) (Continue on separate sheet)

03 AUG 1984

### SECTION V - CERTIFICATION/APPROVAL/DISAPPROVAL

I certify that the duty status change (Section II) or that the request for personnel action (Section III) contained herein -

☒ HAS BEEN VERIFIED     ☐ RECOMMEND APPROVAL     ☐ RECOMMEND DISAPPROVAL
☐ IS APPROVED     ☐ IS DISAPPROVED

| COMMANDER/AUTHORIZED REPRESENTATIVE | SIGNATURE | DATE |
|---|---|---|
| ROBERT M. SPEAR, 1LT, CE, ADJUTANT | | 30 July 1984 |

DA FORM 4187   EDITION OF 1 MAY 74 WILL BE USED UNTIL EXHAUSTED. DA FORM 4187-R

# PERSONNEL ACTION

For use of this form, see DA PAM 600-8 and AR 680-1; the proponent agency is MILPERCEN.

## DATA REQUIRED BY THE PRIVACY ACT

Authority: Title 5, section 3012; Title 10, U.S.C. E.O. 9397. Principal Purpose: Use by service member in accordance with DA Pamphlet 600-8 when requesting a personnel action on his/her own behalf (Section III). Routine Uses: To initiate the processing of a personnel action being requested by the service member. Disclosure: Voluntary. Failure to provide Social Security Number may result in a delay or error in processing of the request for personnel action.

| THRU: (Include ZIP Code) | TO: (Include ZIP Code) | FROM: (Include ZIP Code) |
|---|---|---|
| Commander<br>7th Engineer Battalion<br>Fort Polk, Louisiana  71459 | Commander<br>5th Infantry Division (M)<br>ATTN:  AFZX-AG-PA<br>Fort Polk, LA  71459 | COMMANDER<br>B Co, 7th Engr Bn (C)<br>Fort Polk, LA  71459 |

## SECTION I - PERSONAL IDENTIFICATION

| NAME (Last, first, MI) | GRADE OF RANK/PMOS (Enl only) | SOCIAL SECURITY NUMBER |
|---|---|---|
| CRAWFORD, Travis D. | PV1/12B10 | ███-5635 |

## SECTION II - DUTY STATUS CHANGE (Proc 9-1, DA Pam 600-8)

The above member's duty status is changed from _____ ABSENT WITHOUT LEAVE _____

to _____ PRESENT FOR DUTY _____

effective _____ 1730 _____ hours, _____ 19 July _____ 19 84

## SECTION III - REQUEST FOR PERSONNEL ACTION

I request the following action:

| TYPE OF ACTION | Procedure | TYPE OF ACTION | Procedure |
|---|---|---|---|
| Service School (Enl only) | | Reassignment Married Army Couples | |
| ROTC or Reserve Component Duty | | Reclassification | |
| Volunteering For Oversea Service | | Officer Candidate School | |
| Ranger Training | | Asgmt of Pers with Exceptional Family Members | |
| Reasgmt Extreme Family Problems | | Identification Card | |
| Exchange Reassignment (Enl only) | | Identification Tags | |
| Airborne Training | | Separate Rations | |
| Special Forces Training/Assignment | | Leave - Excess/Advance/Outside CONUS | |
| On-the-Job Training (Enl only) | | Change of Name/SSN/DOB | |
| Retesting in Army Personnel Tests | | Other (Specify) | |

| SIGNATURE OF MEMBER (When required) | DATE |
|---|---|
| | |

## SECTION IV - REMARKS (Applies to Sections II, III, and V) (Continue on separate sheet)

2 4 JUL 1984

## SECTION V - CERTIFICATION/APPROVAL/DISAPPROVAL

I certify that the duty status change (Section II) or that the request for personnel action (Section III) contained herein

☒ HAS BEEN VERIFIED          ☐ RECOMMEND APPROVAL          ☐ RECOMMEND DISAPPROVAL
          ☐ IS APPROVED                              ☐ IS DISAPPROVED

| COMMANDER/AUTHORIZED REPRESENTATIVE | SIGNATURE | DATE |
|---|---|---|
| ROBERT M. SPEAR, 1LT | | 20 July 1984 |

## PERSONNEL ACTION
For use of this form, see AR 680-1; the proponent agency is MILPERCEN.

### DATA REQUIRED BY THE PRIVACY ACT

Authority: Title 5, section 3012; Title 10, U.S.C. E.O. 9397. Principal Purpose: Use by service member in accordance with DA Pamphlet 600-8 when requesting a personnel action on his/her own behalf (Section III). Routine Uses: To initiate the processing of a personnel action being requested by the service member. Disclosure: Voluntary. Failure to provide Social Security Number may result in a delay or error in processing of the request for personnel action.

| THRU: (Include ZIP Code) | TO: (Include ZIP Code) | FROM: (Include ZIP Code) |
|---|---|---|
| COMMANDER<br>7TH ENGINEER BATTALION (C)<br>FORT POLK, LOUISIANA 71459 | COMMANDER<br>5TH INFANTRY DIVISION (M)<br>ATTN: MILPO<br>FORT POLK, LOUISIANA 71459 | COMMANDER<br>B CO, 7TH ENIGNEER BATTALION (C)<br>FORT POLK, LOUISIANA 71459 |

### SECTION I - PERSONAL IDENTIFICATION

| NAME (Last, first, MI) | GRADE OF RANK/PMOS (Enl only) | SOCIAL SECURITY NUMBER |
|---|---|---|
| CRAWFORD, TRAVIS D. | PV1/12B10 | ████5635 |

### SECTION II - DUTY STATUS CHANGE (Proc 9-1, DA Pam 600-8)

The above member's duty status is changed from ___PRESENT FOR DUTY___

to ___ABSENT WITHOUT LEAVE___

effective ___0630___ hours, ___6 July___ 19 84

### SECTION III - REQUEST FOR PERSONNEL ACTION (DA Pam 600-8)

I request the following action:

| TYPE OF ACTION | Procedure | TYPE OF ACTION | Procedure |
|---|---|---|---|
| Service School (Enl only) | 3-10 | Reassignment Married Army Couples | 3-32 |
| ROTC or Reserve Component Duty | 3-12 | Reclassification | 3-46 |
| Volunteering For Oversea Service | 3-14 | Leave - Excess/Advance/Outside CONUS | 4-8 |
| Ranger Training | 3-15 | Officer Candidate School | 4-10 |
| Reasgmt Extreme Family Problems | 3-16 | Change of Name/SSN/DOB | 4-11 |
| Exchange Reassignment (Enl only) | 3-18 | Identification Card | 4-23 |
| Airborne Training | 3-19 | Identification Tags | 4-24 |
| Special Forces Training/Assignment | 3-22 | Asgmt of Pers with Handicapped Dependents | 4-28 |
| On-the-Job Training (Enl only) | 3-23 | Separate Rations | 9-1 |
| Retesting in Army Personnel Tests | 3-25 | Other (Specify) | |

| SIGNATURE OF MEMBER (When required) | DATE |
|---|---|
| | |

### SECTION IV - REMARKS (Applies to Sections II, III, and V) (Continue on separate sheet)

JP

1 2 JUL 1984

### SECTION V - CERTIFICATION/APPROVAL/DISAPPROVAL

I certify that the duty status change (Section II) or that the request for personnel action (Section III) contained herein -

☒ HAS BEEN VERIFIED          ☐ RECOMMEND APPROVAL          ☐ RECOMMEND DISAPPROVAL
☐ IS APPROVED                ☐ IS DISAPPROVED

| COMMANDER/AUTHORIZED REPRESENTATIVE | SIGNATURE | DATE |
|---|---|---|
| ROBERT M. SPEAR, 1LT, CE, ADJUTANT | RMS | 9 July 1984 |

57

# PERSONNEL ACTION

For use of this form, see AR 680-1; the proponent agency is MILPERCEN.

## DATA REQUIRED BY THE PRIVACY ACT

Authority: Title 5, section 3012; Title 10, U.S.C. E.O. 9397. Principal Purpose: Use by service member in accordance with DA Pamphlet 600-8 when requesting a personnel action on his/her own behalf (Section III). Routine Uses: To initiate the processing of a personnel action being requested by the service member. Disclosure: Voluntary. Failure to provide Social Security Number may result in a delay or error in processing of the request for personnel action.

| THRU: (Include ZIP Code) | TO: (Include ZIP Code) | FROM: (Include ZIP Code) |
|---|---|---|
| | Commander 5th INF DIV ATTN: DIV FINANCE FORT POLK, LA 71459 | COMMANDER, BCO 7th ENGR FORT POLK, LA 71459 |

## SECTION I - PERSONAL IDENTIFICATION

| NAME (Last, first, MI) | GRADE OF RANK/PMOS (Enl only) | SOCIAL SECURITY NUMBER |
|---|---|---|
| CRAWFORD, TRAVIS D. | PV1 / 12B10 | ▮▮▮-5635 |

## SECTION II - DUTY STATUS CHANGE (Proc 9-1, DA Pam 600-8)

The above member's duty status is changed from __Absent Without Leave__

to __Present for Duty__

effective __2254__ hours, __26 JUNE__ 19 __84__

## SECTION III - REQUEST FOR PERSONNEL ACTION (DA Pam 600-8)

I request the following action:

| TYPE OF ACTION | Procedure | TYPE OF ACTION | Procedure |
|---|---|---|---|
| Service School (Enl only) | 3-10 | Reassignment Married Army Couples | 3-32 |
| ROTC or Reserve Component Duty | 3-12 | Reclassification | 3-46 |
| Volunteering For Oversea Service | 3-14 | Leave - Excess/Advance/Outside CONUS | 4-8 |
| Ranger Training | 3-15 | Officer Candidate School | 4-10 |
| Reasgmt Extreme Family Problems | 3-16 | Change of Name/SSN/DOB | 4-11 |
| Exchange Reassignment (Enl only) | 3-18 | Identification Card | 4-23 |
| Airborne Training | 3-19 | Identification Tags | 4-24 |
| Special Forces Training/Assignment | 3-22 | Asgmt of Pers with Handicapped Dependents | 4-28 |
| On-the-Job Training (Enl only) | 3-23 | Separate Rations | 9-1 |
| Retesting in Army Personnel Tests | 3-25 | Other (Specify) | |

| SIGNATURE OF MEMBER (When required) | DATE |
|---|---|
| | |

## SECTION IV - REMARKS (Applies to Sections II, III, and V) (Continue on separate sheet)

12 JUL 1984

## SECTION V - CERTIFICATION/APPROVAL/DISAPPROVAL

I certify that the duty status change (Section II) or that the request for personnel action (Section III) contained herein -

| ☒ HAS BEEN VERIFIED | ☐ RECOMMEND APPROVAL | ☐ RECOMMEND DISAPPROVAL |
|---|---|---|
| ☐ IS APPROVED | ☐ IS DISAPPROVED | |

| COMMANDER/AUTHORIZED REPRESENTATIVE | SIGNATURE | DATE |
|---|---|---|
| ROBERT M. SPEAR 1LT, CE ADJ | | |

58

# PERSONNEL ACTION

For use of this form, see AR 680-1; the proponent agency is MILPERCEN.

## DATA REQUIRED BY THE PRIVACY ACT

Authority: Title 5, section 3012; Title 10, U.S.C. E.O. 9397. Principal Purpose: Use by service member in accordance with DA Pamphlet 600-8 when requesting a personnel action on his/her own behalf (Section III). Routine Uses: To initiate the processing of a personnel action being requested by the service member. Disclosure: Voluntary. Failure to provide Social Security Number may result in a delay or error in processing of the request for personnel action.

| THRU: (Include ZIP Code) | TO: (Include ZIP Code) | FROM: (Include ZIP Code) |
|---|---|---|
| | Cdr, 5TH INF DIV ATTN: DIV FIN FORT POLK, LA 71459 | COMMANDER, B CO 7th ENGR FORT POLK, LA 71459 |

## SECTION I - PERSONAL IDENTIFICATION

| NAME (Last, first, MI) | GRADE OF RANK/PMOS (Enl only) | SOCIAL SECURITY NUMBER |
|---|---|---|
| CRAWFORD, TRAVIS D. | PVL / 12B10 | ▉▉▉ 5635 |

## SECTION II - DUTY STATUS CHANGE (Proc 9-1, DA Pam 600-8)

The above member's duty status is changed from **PRESENT FOR DUTY**

to **ABSENT WITHOUT LEAVE**

effective **0630** hours, **25 JUNE** 19 **84**

## SECTION III - REQUEST FOR PERSONNEL ACTION (DA Pam 600-8)

I request the following action:

| TYPE OF ACTION | Procedure | TYPE OF ACTION | Procedure |
|---|---|---|---|
| Service School (Enl only) | 3-10 | Reassignment Married Army Couples | 3-32 |
| ROTC or Reserve Component Duty | 3-12 | Reclassification | 3-46 |
| Volunteering For Oversea Service | 3-14 | Leave - Excess/Advance/Outside CONUS | 4-8 |
| Ranger Training | 3-15 | Officer Candidate School | 4-10 |
| Reasgmt Extreme Family Problems | 3-16 | Change of Name/SSN/DOB | 4-11 |
| Exchange Reassignment (Enl only) | 3-18 | Identification Card | 4-23 |
| Airborne Training | 3-19 | Identification Tags | 4-24 |
| Special Forces Training/Assignment | 3-22 | Asgmt of Pers with Handicapped Dependents | 4-28 |
| On-the-Job Training (Enl only) | 3-23 | Separate Rations | 9-1 |
| Retesting in Army Personnel Tests | 3-25 | Other (Specify) | |

| SIGNATURE OF MEMBER (When required) | DATE |
|---|---|
| | |

## SECTION IV - REMARKS (Applies to Sections II, III, and V) (Continue on separate sheet)

12 JUL 1984

## SECTION V - CERTIFICATION/APPROVAL/DISAPPROVAL

I certify that the duty status change (Section II) or that the request for personnel action (Section III) contained herein -

☒ HAS BEEN VERIFIED     ☐ RECOMMEND APPROVAL     ☐ RECOMMEND DISAPPROVAL
☐ IS APPROVED     ☐ IS DISAPPROVED

| COMMANDER/AUTHORIZED REPRESENTATIVE | SIGNATURE | DATE |
|---|---|---|
| ROBERT M. SPEAR 1LT, CE ADJ | | |

59

# PERSONNEL ACTION

For use of this form, see AR 680-1; the proponent agency is MILPERCEN.

## DATA REQUIRED BY THE PRIVACY ACT

Authority: Title 5, section 3012; Title 10, U.S.C. E.O. 9397. Principal Purpose: Use by service member in accordance with DA Pamphlet 600-8 when requesting a personnel action on his/her own behalf *(Section III)*. Routine Uses: To initiate the processing of a personnel action being requested by the service member. Disclosure: Voluntary. Failure to provide Social Security Number may result in a delay or error in processing of the request for personnel action.

| THRU: *(Include ZIP Code)* | TO: *(Include ZIP Code)* | FROM: *(Include ZIP Code)* |
|---|---|---|
| COMMANDER<br>7TH ENGINEER BATTALION (C)<br>FORT POLK, LOUISIANA  71459 | MILPO<br>5TH INFANTRY DIVISION (M)<br>FORT POLK, LOUISIANA  71459 | COMMANDER<br>B CO, 7TH ENGINEER BATTALION (C)<br>FORT POLK, LOUISIANA  71459 |

## SECTION I - PERSONAL IDENTIFICATION

| NAME *(Last, first, MI)* | GRADE OF RANK/PMOS *(Enl only)* | SOCIAL SECURITY NUMBER |
|---|---|---|
| CRAWFORD, TRAVIS D. | PV1/12B10 | ████-5635 |

## SECTION II - DUTY STATUS CHANGE *(Proc 9-1, DA Pam 600-8)*

The above member's duty status is changed from  CONFINED MILITARY AUTHORITIES

to  PRESENT FOR DUTY

effective  0656  hours,  2 November  19 83

## SECTION III - REQUEST FOR PERSONNEL ACTION *(DA Pam 600-8)*

I request the following action:

| TYPE OF ACTION | Procedure | TYPE OF ACTION | Procedure |
|---|---|---|---|
| Service School *(Enl only)* | 3-10 | Reassignment Married Army Couples | 3-32 |
| ROTC or Reserve Component Duty | 3-12 | Reclassification | 3-46 |
| Volunteering For Oversea Service | 3-14 | Leave - Excess/Advance/Outside CONUS | 4-8 |
| Ranger Training | 3-15 | Officer Candidate School | 4-10 |
| Reasgmt Extreme Family Problems | 3-16 | Change of Name/SSN/DOB | 4-11 |
| Exchange Reassignment *(Enl only)* | 3-18 | Identification Card | 4-23 |
| Airborne Training | 3-19 | Identification Tags | 4-24 |
| Special Forces Training/Assignment | 3-22 | Asgmt of Pers with Handicapped Dependents | 4-28 |
| On-the-Job Training *(Enl only)* | 3-23 | Separate Rations | 9-1 |
| Retesting in Army Personnel Tests | 3-25 | Other *(Specify)* | |

| SIGNATURE OF MEMBER *(When required)* | DATE |
|---|---|
| | |

## SECTION IV - REMARKS *(Applies to Sections II, III, and V) (Continue on separate sheet)*

16 May 1983

## SECTION V - CERTIFICATION/APPROVAL/DISAPPROVAL

I certify that the duty status change *(Section II)* or that the request for personnel action *(Section III)* contained herein -

☒ HAS BEEN VERIFIED    ☐ RECOMMEND APPROVAL    ☐ RECOMMEND DISAPPROVAL
☐ IS APPROVED    ☐ IS DISAPPROVED

| COMMANDER/AUTHORIZED REPRESENTATIVE | SIGNATURE | DATE |
|---|---|---|
| CHARLES E. HERRMANN, CPT, CE, ADJ | *[signature]* | 2 November 1983 |

# PERSONNEL ACTION

For use of this form, see AR 680-1; the proponent agency is MILPERCEN.

## DATA REQUIRED BY THE PRIVACY ACT

Authority: Title 5, section 3012; Title 10, U.S.C. E.O. 9397. Principal Purpose: Use by service member in accordance with DA Pamphlet 600-8 when requesting a personnel action on his/her own behalf *(Section III)*. Routine Uses: To initiate the processing of a personnel action being requested by the service member. Disclosure: Voluntary. Failure to provide Social Security Number may result in a delay or error in processing of the request for personnel action.

| THRU: *(Include ZIP Code)* | TO: *(Include ZIP Code)* | FROM: *(Include ZIP Code)* |
|---|---|---|
| COMMANDER<br>7TH ENGINEER BATTALION   (C)<br>FORT POLK, LOUISIANA   71459 | XXXXXXXXX MILPO<br>5TH INFANTRY DIVISION   (M)<br>FORT POLK, LOUISIANA   71459 | COMMANDER<br>B CO, 7TH ENGINEER BATTALION  (C)<br>FORT POLK, LOUISIANA   71459 |

## SECTION I - PERSONAL IDENTIFICATION

| NAME *(Last, first, MI)* | GRADE OF RANK/PMOS *(Enl only)* | SOCIAL SECURITY NUMBER |
|---|---|---|
| CRAWFORD, TRAVIS D. | PV1/ 12B10 | ███–5635 |

## SECTION II - DUTY STATUS CHANGE *(Proc 9-1, DA Pam 600-8)*

The above member's duty status is changed from   PRESENT FOR DUTY

to   CONFINED MILITARY AUTHORITIES

effective   1700   hours,   21 October   19 83

## SECTION III - REQUEST FOR PERSONNEL ACTION *(DA Pam 600-8)*

I request the following action:

| TYPE OF ACTION | Procedure | TYPE OF ACTION | Procedure |
|---|---|---|---|
| Service School *(Enl only)* | 3-10 | Reassignment Married Army Couples | 3-32 |
| ROTC or Reserve Component Duty | 3-12 | Reclassification | 3-46 |
| Volunteering For Oversea Service | 3-14 | Leave - Excess/Advance/Outside CONUS | 4-8 |
| Ranger Training | 3-15 | Officer Candidate School | 4-10 |
| Reasgmt Extreme Family Problems | 3-16 | Change of Name/SSN/DOB | 4-11 |
| Exchange Reassignment *(Enl only)* | 3-18 | Identification Card | 4-23 |
| Airborne Training | 3-19 | Identification Tags | 4-24 |
| Special Forces Training/Assignment | 3-22 | Asgmt of Pers with Handicapped Dependents | 4-28 |
| On-the-Job Training *(Enl only)* | 3-23 | Separate Rations | 9-1 |
| Retesting in Army Personnel Tests | 3-25 | Other *(Specify)* | |

| SIGNATURE OF MEMBER *(When required)* | DATE |
|---|---|
| | |

## SECTION IV - REMARKS *(Applies to Sections II, III, and V) (Continue on separate sheet)*

25 OCT 1983

## SECTION V - CERTIFICATION/APPROVAL/DISAPPROVAL

I certify that the duty status change *(Section II)* or that the request for personnel action *(Section III)* contained herein -

☒ HAS BEEN VERIFIED          ☐ RECOMMEND APPROVAL          ☐ RECOMMEND DISAPPROVAL

☐ IS APPROVED          ☐ IS DISAPPROVED

| COMMANDER/AUTHORIZED REPRESENTATIVE | SIGNATURE | DATE |
|---|---|---|
| CHARLES E. HERRMANN, CPT, CE, ADJ | *Charles E. Herrmann* | 24 Oct 83 |

## PERSONNEL ACTION
For use of this form, see DA PAM 600-8 and AR 680-1; the proponent agency is MILPERCEN.

### DATA REQUIRED BY THE PRIVACY ACT
Authority: Title 5, section 3012; Title 10, U.S.C. E.O. 9397. Principal Purpose: Use by service member in accordance with DA Pamphlet 600-8 when requesting a personnel action on his/her own behalf (Section III). Routine Uses: To initiate the processing of a personnel action being requested by the service member. Disclosure: Voluntary. Failure to provide Social Security Number may result in a delay or error in processing of the request for personnel action.

| THRU: (Include ZIP Code) | TO: (Include ZIP Code) | FROM: (Include ZIP Code) |
|---|---|---|
| COMMANDER 7TH ENGINEER BATTALION FORT POLK, LOUISIANA 71459 | MILPO 5TH INFANTRY DIVISION FORT POLK, LOUISIANA 71459 | COMMANDER B CO, 7TH ENGINEER BATTALION FORT POLK, LOUISIANA 71459 |

### SECTION I - PERSONAL IDENTIFICATION

| NAME (Last, first, MI) | GRADE OF RANK/PMOS (Enl only) | SOCIAL SECURITY NUMBER |
|---|---|---|
| CRAWFORD, TRAVIS D. | PV1/12B10 | █████5635 |

### SECTION II - DUTY STATUS CHANGE (Proc 9-1, DA Pam 600-8)

The above member's duty status is changed from ~~PRESENT FOR DUTY~~ ABSENT WITHOUT LEAVE

to PRESENT FOR DUTY

effective 1300 hours, 9 Oct 1983

### SECTION III - REQUEST FOR PERSONNEL ACTION

I request the following action:

| TYPE OF ACTION | Procedure | TYPE OF ACTION | Procedure |
|---|---|---|---|
| Service School (Enl only) | | Reassignment Married Army Couples | |
| ROTC or Reserve Component Duty | | Reclassification | |
| Volunteering For Oversea Service | | Officer Candidate School | |
| Ranger Training | | Asgmt of Pers with Exceptional Family Members | |
| Reasgmt Extreme Family Problems | | Identification Card | |
| Exchange Reassignment (Enl only) | | Identification Tags | |
| Airborne Training | | Separate Rations | |
| Special Forces Training/Assignment | | Leave - Excess/Advance/Outside CONUS | |
| On-the-Job Training (Enl only) | | Change of Name/SSN/DOB | |
| Retesting in Army Personnel Tests | | Other (Specify) | |

| SIGNATURE OF MEMBER (When required) | DATE |
|---|---|
| | |

### SECTION IV - REMARKS (Applies to Sections II, III, and V) (Continue on separate sheet)

14 OCT 1983

### SECTION V - CERTIFICATION/APPROVAL/DISAPPROVAL

I certify that the duty status change (Section II) or that the request for personnel action (Section III) contained herein -

[X] HAS BEEN VERIFIED   [ ] RECOMMEND APPROVAL   [ ] RECOMMEND DISAPPROVAL
[ ] IS APPROVED   [ ] IS DISAPPROVED

| COMMANDER/AUTHORIZED REPRESENTATIVE | SIGNATURE | DATE |
|---|---|---|
| CHARLES E. HERRMANN, CPT, CE, ADJ | | 11 Oct 83 |

62

# PERSONNEL ACTION

For use of this form, see AR 680-1; the proponent agency is MILPERCEN.

## DATA REQUIRED BY THE PRIVACY ACT

Authority: Title 5, section 3012; Title 10, U.S.C. E.O. 9397. Principal Purpose: Use by service member in accordance with DA Pamphlet 600-8 when requesting a personnel action on his/her own behalf *(Section III)*. Routine Uses: To initiate the processing of a personnel action being requested by the service member. Disclosure: Voluntary. Failure to provide Social Security Number may result in a delay or error in processing of the request for personnel action.

| THRU: *(Include ZIP Code)* | TO: *(Include ZIP Code)* | FROM: *(Include ZIP Code)* |
|---|---|---|
| Commander<br>7th Engr Bn (C)<br>Fort Polk, LA 71459 | MILPO<br>5th Inf Div<br>Fort Polk, LA 71459 | COMMANDER<br>Co B, 7th Engr Bn (C)<br>Fort Polk, LA 71459 |

## SECTION I - PERSONAL IDENTIFICATION

| NAME *(Last, first, MI)* | GRADE OF RANK/PMOS *(Enl only)* | SOCIAL SECURITY NUMBER |
|---|---|---|
| CRAWFORD, TRAVIS D. | PV1  12B10 | ████5635 |

## SECTION II - DUTY STATUS CHANGE *(Proc 9-1, DA Pam 600-8)*

The above member's duty status is changed from ___ Present for duty

to ___ Absent without leave

effective ___ 0615 hours, 5 October ___ 19 83

## SECTION III - REQUEST FOR PERSONNEL ACTION *(DA Pam 600-8)*

I request the following action:

| TYPE OF ACTION | Procedure | TYPE OF ACTION | Procedure |
|---|---|---|---|
| Service School *(Enl only)* | 3-10 | Reassignment Married Army Couples | 3-32 |
| ROTC or Reserve Component Duty | 3-12 | Reclassification | 3-46 |
| Volunteering For Oversea Service | 3-14 | Leave - Excess/Advance/Outside CONUS | 4-8 |
| Ranger Training | 3-15 | Officer Candidate School | 4-10 |
| Reasgmt Extreme Family Problems | 3-16 | Change of Name/SSN/DOB | 4-11 |
| Exchange Reassignment *(Enl only)* | 3-18 | Identification Card | 4-23 |
| Airborne Training | 3-19 | Identification Tags | 4-24 |
| Special Forces Training/Assignment | 3-22 | Asgmt of Pers with Handicapped Dependents | 4-28 |
| On-the-Job Training *(Enl only)* | 3-23 | Separate Rations | 9-1 |
| Retesting in Army Personnel Tests | 3-25 | Other *(Specify)* | |

| SIGNATURE OF MEMBER *(When required)* | DATE |
|---|---|
| | |

## SECTION IV - REMARKS *(Applies to Sections II, III, and V) (Continue on separate sheet)*



07 OCT 1983

## SECTION V - CERTIFICATION/APPROVAL/DISAPPROVAL

I certify that the duty status change *(Section II)* or that the request for personnel action *(Section III)* contained herein ·

☒ HAS BEEN VERIFIED  ☐ IS APPROVED  ☐ RECOMMEND APPROVAL  ☐ IS DISAPPROVED  ☐ RECOMMEND DISAPPROVAL

| COMMANDER/AUTHORIZED REPRESENTATIVE | SIGNATURE | DATE |
|---|---|---|
| CHARLES E. HERRMANN, CPT, CE, ADJ | *Charles E Herrmann* | 5 Oct 83 |

663

# NOTICE OF UNAUTHORIZED ABSENCE FROM UNITED STATES ARMY

For use of this form, see Appendix D, 19–9; the proponent agency is the Office of The Provost Marshal General

| | 1. DATE COMPLETED |
|---|---|
| | 27 August 1984 |

To all law enforcement agencies: This form not valid for apprehension unless active US Army NCIC Wanted Person Record is on file in NCIC. When the NCIC record does not agree with data on this form or if individual claims he is not absent without leave or a deserter and does not have the papers to prove his claim, the apprehending person or agency representative should communicate direct by the most rapid means available, to the US Army Deserter Information Point, Ft. Benjamin Harrison, IN., to ascertain the individual's correct status.  Phone: AUTOVON Extensions 699-3355/3356 or 3357.  Commercial (317) 542-3355/3356 or 3357.

PHOTOGRAPH
(If Available)

| 2. THRU: | 3. FOR USADIP USE ONLY |
|---|---|
| | 3a. VERIFIED BY DIP-AG (Date and Initials) |
| TO: UNITED STATES ARMY DESERTER INFORMATION POINT AGPERSCEN ATTN: AGPE-D FT. BENJAMIN HARRISON, IN. 46249 | 3b. DIP-MP CONTROL NO.     3c. NIC NO. |

| 5. NAME OF DESERTER (Last, First, Middle) | 6. GRADE OR RATING | 7. SEX |
|---|---|---|
| CRAWFORD, Travis D. | Private E1 | Male |

| 8. RACE | 9. PLACE OF BIRTH | 10. DATE OF BIRTH | 11. HEIGHT | 12. WEIGHT | 13. HAIR (Color) | 14. EYES (Color) |
|---|---|---|---|---|---|---|
| White | Fort Smith, Arkansas | ████ 1964 | 66in | 150 | Brown | Brown |

| 15. SERVICE AND SERVICE NO. | 16. CITIZENSHIP | 17. SOCIAL SECURITY NO. | 18. OPERATOR'S LICENSE NO. | 19. OPERATOR'S STATE |
|---|---|---|---|---|
| | US | ████-5635 | | |

| 20. YEAR OPERATOR'S LICENSE EXPIRES | 21. DATE/HOUR OF ABSENCE | 22. DATE DROPPED FROM ROLLS |
|---|---|---|
| | 29 July 1984/0630 hours | 27 August 1984 |

23. ORGANIZATION OR ACTIVITY AND PLACE FROM WHICH ABSENT (If AWOL/UA in transit, list old and new unit in item 31, REMARKS)

Company B, 7th Engineer Battalion (Combat), Fort Polk, Louisiana  71459

24. MEMBER'S PERMANENT RESIDENCE ADDRESS (Include ZIP Code)

701 East Chickasaw, Sallisaw, Oklahoma  74955

| 25. LICENSE PLATE NO. | 25a. STATE | 25b. YEAR EXPIRES | 25c. LICENSE PLATE TYPE |
|---|---|---|---|
| 25d. VEHICLE IDENTIFICATION NO. | 25e. YEAR | 25f. MAKE | 25g. MODEL | 25h. STYLE | 25i. COLOR |

| 26. CIVILIAN OCCUPATION | 27. MILITARY OCCUPATION |
|---|---|
| | 12B10  Combat Engineer |

28. NAME AND ADDRESS OF NEAREST RELATIVE (Include ZIP Code)

Phyllis Crawford ████████████████  ████████████████ (Mother)

29. OTHER RELATIVES AND/OR PERSONS KNOWN BY DESERTER

Name and Relationship          Address (Include ZIP Code)

Unk

32. RECOMMENDED DISTRIBUTION (Include ZIP Codes, use reverse, if necessary.)

| 30. ESCAPE OF SENTENCED PRISONER ☐ YES ☒ NO | 30b. CONVICTED FOR (Offense): |
|---|---|
| a. DISCHARGE STATUS: DISCHARGED ☐ YES ☒ NO ☐ EXECUTED ☐ SUSPENDED | |

31. REMARKS (List peculiar habits and traits of character, unusual mannerisms and speech; peculiarities in appearance, clothing worn; aliases; marks and scars; tatoos; facial characteristics; complexion, posture, build, other SSN's used by individual or other data that may assist in identification.  List known facts, e.g., Armed and dangerous, drug user, suicidal tendencies, guards are needed, etc.  List data on DA Form 19-51 that will assist in apprehension.)

None

33. I certify that a Morning Report entry was made on 27 August 1984 reflecting the appropriate data in items 5, 6, 17, 21, 22, and 23 above.
(Date)

| 33a. ORGANIZATION AND STATION | 33b. TYPED NAME, GRADE, AND TITLE | 33c. SIGNATURE (Sign All Copies) |
|---|---|---|
| HQ, 7th Engineer Battalion Fort Polk, Louisiana  71459 | ROBERT M. SPEAR, 1LT Adjutant 7th Engr Bn (C) | R.M.S. |

| 34. PROVOST MARSHAL (Organization and Station) | 34a. TYPED NAME, GRADE, AND TITLE | 34b. SIGNATURE (Sign All Copies) |
|---|---|---|
| | | |

| 35. UNITED STATES ARMY DESERTER INFORMATION POINT AGPERSCEN ATTN: AGPE-D FT. BENJAMIN HARRISON, IN. 46249 | 35a. TYPED NAME, GRADE, AND TITLE | 35b. SIGNATURE (Sign All Copies) |
|---|---|---|
| | | |

DA FORM 3835
1 FEB 72

REPLACES DA FORM 3545 (TEST), 1 APR 70 (Ped and Offset Master) WHICH IS OBSOLETE.



DEPARTMENT OF THE ARMY
Headquarters, 7th Engineer Battalion (Combat)
Fort Polk, Louisiana  71459

August 27, 1984

Battalion Office

Mrs Phyllis Crawford

Dear Mrs Crawford:

I regret to inform you that your son, Private Travis D. Crawford, ███████ 5635, who had previously been absent without official leave since 29 July 1984, has not returned to this organization. He has now been dropped from the rolls of this organization which means that he has been administratively classified as a deserter. Civilian and military law enforcement agencies have been notified of his status and requested to apprehend him.

Soldiers classifed as deserters and their dependents are not eligible for post exchange, commissary, medical care and other military privileges to include pay and allowances.

If you know where he is, please urge him to return to military control without delay.

Sincerely,

Robert M. Spear
First Lieutenant, Corps of Engineers
Adjutant

DEPARTMENT OF THE ARMY
Headquarters, 7th Engineer Battalion (Combat)
Fort Polk, Louisiana  71459

Battalion Office                                    7 August 1984

Mrs Phyllis Crawford

███████████████
███████████ ████

     I regret to inform you that Travis D. Crawford has been absent without leave from this unit since 29 July 1984.  Your son's absence could result in a trial by court-martial with loss of pay and allowances which could mean that his dependents would lose all rights to receive allotments, medical care, commissary and post exchange privileges and other military benefits.  Continued absence could also result in confinement or dismissal with dishonorable or bad conduct discharge.

     If you know where he is, please urge him to return immediately to military control at the nearest Army installation in order to avoid serious consecquences of prolonged unauthorized absence.

     Rest assured that your son will be given a fair hearing and the opportunity to present any information on his behalf.

Sincerely,

Robert M. Spear
First Lieutenant, Corps of Engineers
Adjutant

## COMMANDER'S REPORT OF INQUIRY/UNAUTHORIZED ABSENCE
For use of this form, see AR 630-10; the proponent agency is MILPERCEN.

| 1. NAME (Last, first, middle) | | 2. RANK | 3. SSN |
|---|---|---|---|
| CRAWFORD, Travis D. | | PV1 | ▮▮▮-5635 |

| 4. ORGANIZATION | 5. INITIAL DATE OF UNAUTHORIZED ABSENCE |
|---|---|
| B Co, 7th Engr Bn (C) | 29 July 1984 |

### 6. PHYSICAL DESCRIPTION

| a. HEIGHT | b. WEIGHT | c. AGE | d. COLOR HAIR | e. COLOR EYES | f. GLASSES |
|---|---|---|---|---|---|
| 66 in | 150 | 20 | Brown | Brown | ☐ YES ☒ NO |

g. SCARS, IDENTIFYING MARKS, ETC.
Unknown

7. DRIVER'S LICENSE NO. & VEHICLE ID

### 8. RELATIVES

| NAME | ADDRESS | RELATIONSHIP |
|---|---|---|
| PHYLLIS CRAWFORD | ▮▮▮▮▮▮▮▮ | MOTHER |
| | | |
| | | |
| | | |

### 9. COMPETENT WITNESSES AND CLOSE FRIENDS (Indicate summary testimony, if given, in item 13)

| NAME | ADDRESS | SSN | GRADE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

### 10. POSSIBLE CONTRIBUTING FACTORS CAUSING AWOL

☐ MARITAL STRIFE    ☐ INDEBTEDNESS    ☐ TROUBLE WITH SUPERIORS    ☐ UNKNOWN
☒ OTHER (Specify)    Pending Court-Martial for previous AWOL.

### 11. RECORD OF ANY EVIDENCE OF THE FOLLOWING
☐ MENTAL INSTABILITY    ☐ INABILITY TO ADJUST TO MILITARY LIFE
☐ FOUL PLAY    ☐ ALCOHOL    ☐ DRUG USE    ☐ INTENT NOT TO RETURN
☐ EVIDENCE OF SHIRKING IMPORTANT/HAZARDOUS DUTY    ☐ DISSENT FROM FOREIGN POLICIES OF THE US
☐ OTHER (Specify)    None

### 12. PERTINENT EVIDENCE FOUND IN PERSONAL EFFECTS (If none, so state)

None

### 13. CONTINUATION/REMARKS (If additional space is necessary, continue on reverse, specifying item no.)

```
DOB:  ▮▮▮▮▮▮ 1964
POB:  Fort Smith, Arkansas
HOR:  Sallisaw, Oklahoma
ETS:  27 March 1986
RACE: White
MOS:  12 B10
```

*(stamp: PROVOST MARSHAL OFFICIAL FORT POLK, LA. 71459)*

### 14. AUTHENTICATION (Signature, title, organization, and date)
ROBERT M. SPEAR, 1LT, Adjutant 7th Engr Bn (C)

DA FORM 4384, 1 OCT 79    REPLACES DA FORM 4384-R, 1 JUL 75, WHICH IS OBSOLETE.    UNIT FILE

67

DEPARTMENT OF THE ARMY
Headquarters US Army Field Artillery Center and Fort Sill
Fort Sill, Oklahoma   73503-5000

ORDER 010-33                                                    10 January 1985

CRAWFORD, TRAVIS D. ████████-5635 PV1 Personnel Control Facility, United States
Army Field Artillery Center and Fort Sill (WOVGPR) Fort Sill, Oklahoma   73503-5010

You are reassigned to the US Army separation transfer point shown for separation
processing,  after processing, you are discharged from the component shown.  If
you are delayed in reporting to the separation transfer point, you still must
report to the separation transfer point as soon as possible or as authorized to
recieve a new effective date of discharge.

Assigned to:  US Army Separation Transfer Point (WOVG1A) Fort Sill, Oklahoma
    73503-5100
Reporting date:  23 January 1985
Component:  RA
Discharge date:  23 January 1985
Additional instructions:  You are not authorized movement of your household goods or
    dependents at Government expense.

FOR ARMY USE
Auth: AR 635-200
HOR: VIAN, OK
P1 EAD or OAD:  LITTLE ROCK, OK          PEBD:  NA
MDC:  NZE5
Format:  501

FOR THE COMMANDER:


DISTRIBUTION                             BLAINE H. SMITH JR.
D                                        LTC, AGC
PCF Records/Files                        Adjutant General

DEPARTMENT OF THE ARMY
Headquarters US Army Field Artillery Center and Fort Sill
Fort Sill, Oklahoma  73503-5000

ORDER   347-26                                                12 December 1984

1.  BERNHARD, THEODORE JR. ████████████  PV1

You are assigned as indicated.

Assigned to:  Personnel Control Facility, US Army Field Artillery Center and
   Fort Sill (WOVGPR) Fort Sill, Oklahoma  73503-5010
Effective date:  10 December 1984
Additional instructions:  NONE

FOR ARMY USE
DFR of:  SVC BTRY, 6th BN, 80th FA, Fort Ord, CA
Component:  RA
Pl and date return to mil con:  Fort Sam Houston, TX 10 December 1984
MDC:  NZE5
Format:  426

2.  BOWIE, ARNOLD EUGENE ████████████  PV2

You are assigned as indicated.

Assigned to:  Personnel Control Facility, US Army Field Artillery Center and
   Fort Sill (WOVGPR) Fort Sill, Oklahoma  73503-5010
Effective date:  7 December 1984
Additional instructions:  NONE

FOR ARMY USE
DFR of: B Co, 193rd BN, 22d FA, APO MIAMI 34004
Component: RA
Pl and date return to mil con:  Fort Sam Houston, TX  6 December 1984
MDC:  NZE5
Format:  426

3.  BURK, JERRY LEE ████████████  PFC

You are assigned as indicated.

Assigned to:  Personnel Control Facility, US Army Field Artillery Center and
   Fort Sill (WOVGPR) Fort Sill, Oklahoma  73503-5010
Effective date:  10 December 1984
Additional instructions:  NONE

FOR ARMY USE
DFR of:  HHC, 2d BN, 508th INF, Fort Bragg, NC
Component:  RA
Pl and date return to mil con: Van Alstyne, TX  8 December 1984
MDC:  NZE5
Format:  426

ORDER 347-26                                                12 December 1984

4. CRAWFORD, TRAVIS DON ██████ -5635    PV1

You are assigned as indicated.

Assigned to: Personnel Control Facility, US Army Field Artillery Center and
    Fort Sill (WOVGPR) Fort Sill, Oklahoma  73503-5010
Effective date:   10 December 1984
Additional instructions:  NONE

FOR ARMY USE
DFR of:  Co B, 7th ENG BN, Fort Polk, LA
Component:  RA
Pl and date return to mil con:  Fort Chaffee, AR 10 December 1984
MDC:  NZE5
Format:  426

5. CRAWFORD, ROGER DALE ████████████    PV2

You are assigned as indicated.

Assigned to:  Personnel Control Facility, US Army Field Artillery Center and
    Fort Sill (WOVGPR) Fort Sill, Oklahoma  73503-5010
Effective date:  10 December 1984
Additional instructions:  NONE

FOR ARMY USE
DFR of:  528th Maint&Sup Co.,Fort Clayton, Panama
Component:  RA
Pl and date return to mil con: Fort Chaffee, AR 10 December 1984
MDC:  NZE5
Format:  426

FOR THE COMMANDER:


DISTRIBUTION                             BLAINE H. SMITH JR.
D                                        LTC, AGC
PCF Records/Files                        Adjutant General

70

DEPARTMENT OF THE ARMY
HEADQUARTERS 5TH INFANTRY DIVISION (MECHANIZED) AND FORT POLK
Fort Polk, Louisiana  71459

ORDERS  133-31                                        11 JULY 1983

CRAWFORD, TRAVIS D. ████5635 PV1           5TH AG Repl Det (WHN3AA)
Fort Polk, Louisiana  71459

You are reassigned as indicated below.  No travel involved.

Assigned to: HHC 7TH ENGR BN (WANUTOA)
    Fort Polk, Louisiana  71459
Reporting date: 12 JULY 1983
Movement designator code:  NZE3
Additional instructions:  (a)  You are assigned primary duty as  12B100000
    Position number 9992
    (b)  Unit assignment will submit Position Number indicated with arrival
    transaction to Standard Installation/Division Personnel System.

Format:  420

FOR THE COMMANDER:

OFFICIAL:                                    E. F. DONNAN JR.
                                             LTC, AGC
                                             Adjutant General

MALCOLM C. WEAVER
MAJ, AGC
Asst AG

DISTRIBUTION:
Record Set (1)
Consolidated Order (4)
AFZX-AG-PE (1)
AFZX-AG-PM (1)
AFZX-AG-PS (1)
AFZX-EHH-FH (1)
Cdr,  5TH REPL DET FT POLK, LA  71459(1)
Cdr,  HHC 7TH ENGR BN FT POLK, LA  71459(1)
Cdr,

71

DEPARTMENT OF THE ARMY
HEADQUARTERS
US ARMY TRAINING CENTER ENGINEER AND FORT LEONARD WOOD
FORT LEONARD WOOD, MISSOURI  65473

ORDERS 172-211                                              21 JUNE 1983

CRAWFORD TRAVIS D ▮▮▮▮▮ 5635 PV1 CO D 1ST BN 2ND TNG BDE (OSUT) USATC ENGR (W1MP1R)
FT LEONARD WOOD MO 65473

YOU WILL PROCEED ON PERMANENT CHANGE OF STATION AS INDICATED.

ASSIGNED TO:   5TH ADJUTANT GENERAL COMPANY (WANRAA) FORT POLK, LOUISIANA 71459
REPORTING DATE:   10 JULY 1983
ADDITIONAL INSTRUCTIONS:   (A) YOU ARE REQUIRED TO REPORT TO THE FAMILY HOUSING/HOUSING
  REFERRAL OFFICE SERVING YOUR NEW DUTY STATION BEFORE YOU MAKE HOUSING ARRANGEMENTS
  FOR RENTING, LEASING, OR PURCHASING ANY OFF-POST HOUSING. (B) YOU ARE AUTHORIZED
  SHIPMENT OF HOUSEHOLD GOODS. (C) YOU WILL NOT DEPART THIS STATION PRIOR TO
  30 JUNE 1983.

FOR ARMY USE
AUTH:   NA
ASGD TO MGT DSG:   12B100000                    CONTROL SPECIALTY:   NA
PERS CON NO:   ZAGR076                          PMOS/PSSI:   12B100000
MDC:   1XE3                                     ENL/REENLB INDIC:   NA
PEBD:   NA                                      PPD:   NA
FORMAT:   410                                   PROJ SPECIALTY:    NA

FOR THE COMMANDER:

```
* * * * * * * * * * * * * *
*      HQ. USATC ENGR      *
*   AND FT. LEONARD WOOD,MO *
*       OFFICIAL SEAL       *
* * * * * * * * * * * * * *
```
J. R. PATTERSON
LTC, AGC
ADJUTANT GENERAL

DISTRIBUTION:
EA INDIV INDIC (3)
ATZT-AGT (32)
CDR CO D 1ST BN 2ND TNG BDE
FT LEONARD WOOD (1)
PAC 1ST BN 2ND TNG BDE
FT LEONARD WOOD (2)
ATZT-AGAM (1)
ATZT-AGA-S (1)
ATZT-DI-TM (3)
CDR, 5TH AG CO FT POLK LA 71459 (3)
ATZT-DRM-FPM (9)
MPRJ (ATZT-AGTR) (2)

I ACKNOWLEDGE THAT AN ORIENTATION LECTURE FROM AR 19-201 WAS GIVEN AT THE UNITED STATES ARMY TRAINING CEN-TER, ENGINEER, AG OUTPROCESSING TEAM. I WAS ADVISED THAT SHOULD NOT HAVE THE FOLLOWING ACCOMPANY ME TO MY ADVANCED INDIVIDUAL TRAINING ASSIGNMENT:

PRIVATELY OWNED VEHICLE      B. DEPENDENTS
HOUSEHOLD GOODS

DELIBERATE DISREGARD OF THE FOREGOING INSTRUCTIONS WILL CAUSE ME FINANCIAL EMBARRASSMENT AND WORK A SEVERE HARDSHIP UPON MY DEPENDENTS.

29 June 83
DATE

SIGNATURE

247-4

DEPARTMENT OF DEFENSE
Military Entrance Processing Station
211 West Third Street
Little Rock, Arkansas 72203

ENLISTMENT TRAVEL ORDER NO.   60-1                           24 MARCH 1983

AUTHORITY: AR 601-210

1. Having enlisted this date in the U. S. Army under the authority shown above, you are hereby assigned to active duty. Comply with the instructions contained in paragraph 3 below and if applicable, other supplemental instructions attached to these orders.

2. Government transportation is authorized in connection with these orders and chargeable to PCS MDC 1AE3. Movement of dependents and shipment of household goods in connection with these orders is not authorized. Use of transportation requests and meal tickets is directed.

3. Enlistees concerned are transferred to U. S. Army Reception Stations at locations shown below effective this date. You will proceed from this MEPS and report to proper station not later than 2400 hours on date indicated.

| NAME SOCIAL SECURITY NO. | LOCATION REPORT BY | REMARKS SPECIAL INSTRUCTIONS |
|---|---|---|
| OSBURN, BENTLEY E. ████████ | FT LEONARD WOOD, MO 24 MAR 83 | DISCH USAR 23MAR83 ████████ BCT DATE: 28 MAR 83 |
| CRAWFORD, TRAVIS D. ██-5635 | FT LEONARD WOOD, MO 24 MAR 83 | DISCH USAR 23MAR83 UPAR 135-178 BCT DATE: 28 MAR 83 |
| ROACH, BRAD A. ████████ | FT SILL, OK 24 MAR 83 | DISCH USAR 23MAR83 ████████ BCT DATE: 28 MAR 83 |

FOR THE COMMANDER:

LEORA V. GRAY
CPT, AGC
Assistant Adjutant

DISTRIBUTION:
Indiv (3) USA DRC LR AR (3)
EA SVC REC (5)   MEPS LR AR (4)
USAREC... FT L/WOOD MO (7)   USAREC...

DISTRIBUTION:
Indiv (3) USA DRC LR AR (3)
EA SVC REC (5)   MEPS LR AR (4)

74

# DISPOSITION FORM

For use of this form, see AR 340-15; the proponent agency is TAGO.

| REFERENCE OR OFFICE SYMBOL | SUBJECT | | |
|---|---|---|---|
| SFMR-RBB | Appointment of Members to the Army Council of Review Boards | | |

| TO | FROM | DATE | CMT 1 |
|---|---|---|---|
| OSA, Mil Pers Ofc<br>Rm 1D614, Pentagon | OASA(M&RA), ACRB<br>Rm 200, CM #4 | 1 January 1988 | |

1. These orders supersede orders dated 2 November 1987. Effective this date, individuals listed below are designated as Presiding Officers, Hearing Examiners, or Board Members, and will serve as directed by the Director for the following boards: Army Discharge Review, Army Disability Rating Review, Army Physical Disability Appeal, Ad Hoc Review, Army Security Review, Army Board for Review of Eliminations, and Army Grade Determination:

ROWE, James W., ——————, COL, AR (President, ADRB & Director, ACRB)
ALLEN, Richard H., ——————, COL, AG, w/Primary Duty: Senior Projects Officer
DeCHRISTOPHER, Edward P., ——————, COL, IN
LAWTON, JOHN P., ——————, COL, IN
NICKENS, Joseph E., ——————, COL, FA
SYMONS, John W., ——————, COL, FA
BERRY, Kenneth S., ——————, LTC, AG
DAVIS, Constance M., ——————, LTC, AG
DUNIGAN, Theodore, ——————, LTC, AV
GILLEN, James, ——————, LTC, AG
HAMMER, Martin A., ——————, LTC, IN
JEFFERDS, Fred, ——————, LTC FA
RIVERA, Ruben E., ——————, LTC, EN
STOCKSTILL, John D., ——————, LTC, FA
WOLKOWICH, Walter E., ——————, LTC, AD
ZEAMER, Aaron C., ——————, LTC, QM
LASKI, Karen M., ——————, MAJ(P), AG, w/ Primary Duty: Special Projects Officer

2. Effective this date, the following individuals will serve as members of the above boards as directed by the Director and serve as special consultant as indicated:

GAINES, Lelia T., ——————, LTC, MC — Medical Consultant
TIEDEMANN, John J., ——————, COL, JA — Legal Consultant
ASKEW, Donald C., ——————, COL, USAR — Ad Hoc Reserve Officer
JOHNSON, David H., ——————, LTC, USAR — Ad Hoc Reserve Officer

3. Effective this date, the individuals listed below will serve as alternate members of the above boards as directed by the Director with principal duty as listed below:

CZVORNYEK, Gary, ——————, MAJ, AG — Chief, Sec Rec Branch
HARVELL, Herbert, ——————, CPT, AG — Secretary Recorder
LIPSCOMB, Regina, ——————, CPT, AG — Secretary Recorder
RAINEY, Patricia D., ——————, CPT(P), AG — Secretary Recorder
STRONG, Violeta A., ——————, CPT, AG — Secretary Recorder

*James W. Rowe*

JAMES W. ROWE
COL, AR
Director

75

DEPARTMENT OF THE ARMY
HEADQUARTERS
US ARMY TRAINING CENTER ENGINEER AND FORT LEONARD WOOD
FORT LEONARD WOOD, MISSOURI  65473

ORDERS 159-196                                                    8 JUNE 1983

1. NAME                     SSN           GR  MOS
KENNEDY GARY L                            PV1 12C100000
LOCKE RICHARD K                           PV1 12C100000
NAUMAN RONALD B                           PFC 12C100000
SEAY JACKSON A                            PFC 12C100000

THE FOLLOWING MOS (SPECIALTY SKILL IDENTIFIER)/SPECIAL QUALIFICATIONS IDENTIFIER ACTION CONCERNING
YOU IS DIRECTED.

UNIT OF ASSIGNMENT:  CO D 1ST BN 2ND TNG BDE (OSUT) USATC ENGR (W1MP1R)
    FT LEONARD WOOD MO 65473
AWARDED:                          12C100000
HOW ACQUIRED:                     A
WITHDRAWN:                        NOT APPLICABLE
EFFECTIVE DATE:                   30 JUNE 1983
RECLASSIFICATION CONTROL NUMBER:  NOT APPLICABLE
ADDITIONAL INSTRUCTIONS:  AWARD OF ABOVE PRIMARY MILITARY OCCUPATIONAL SPECIALTY IS CONTINGENT UPON
    SUCCESSFUL COMPLETION OF TRAINING AND GRADUATION.
FORMAT:  310

2. NAME                     SSN           GR  MOS
BERNIER CHRISTIAN                         PFC 12B100000
BOOM FRANKLIN M A                         PV1 12B100000
COOK HOWARD F                             PV1 12B100000
CRAWFORD TRAVIS D           447 76 5635   PV1 12B100000
DAURELIO DANIEL L                         PFC 12B100000
DICKINSON LARRY A                         PV1 12B100000
ELIZONDO ABRAHAM                          PV1 12B100000
GEARHEART RICHARD                         PV1 12B100000
GIRARDOT CHRISTOPHER                      PV1 12B100000
GREEN BARRETT D                           PV1 12B100000
JANI JOSEPH J                             PV1 12B100000
KINDLE RODNEY J                           PV1 12B100000
MANSIR MARTIN J                           PFC 12B100000
NIXON TIMOTHY B                           PFC 12B100000
OSBURN BENTLEY E                          PV1 12B100000
ROSENELLA MICHAEL                         PFC 12B100000
SALERA JAMES                              PV1 12B100000
SHANDS PIERRE D                           PV1 12B100000
SHIVER SCOTT                              PV1 12B100000
SIMMONS DEXTER J                          PV1 12B100000
SPARKS RICKI L                            PV2 12B100000
WHALEN BARNEY W                           PV1 12B100000

THE FOLLOWING MOS (SPECIALTY SKILL IDENTIFIER)/SPECIAL QUALIFICATIONS IDENTIFIER ACTION CONCERNING
YOU IS DIRECTED.

UNIT OF ASSIGNMENT:  CO D 1ST BN 2ND TNG BDE (OSUT) USATC ENGR (W1MP1R)
    FT LEONARD WOOD MO 65473
AWARDED:                          12B100000
HOW ACQUIRED:                     A
WITHDRAWN:                        NOT APPLICABLE
EFFECTIVE DATE:                   30 JUNE 1983
RECLASSIFICATION CONTROL NUMBER:  NOT APPLICABLE
ADDITIONAL INSTRUCTIONS:  AWARD OF ABOVE PRIMARY MILITARY OCCUPATIONAL SPECIALTY IS CONTINGENT UPON
    SUCCESSFUL COMPLETION OF TRAINING AND GRADUATION.
FORMAT:  310

3. NAME                     SSN           GR  MOS
BEDRIN JAMES P                            PV1 12B100000
BLAIR DONALD JR                           PV2 12B100000
CHAFFIN HOWARD L                          PV1 12B100000
COLLINS DWAYNE C                          PV1 12B100000
HANNIBAL RICHARD                          PV1 12B100000
HUNTER ROBERT J                           PFC 12B100000
LITTLE MICHAEL Q                          PV1 12B100000
NELSON RONALD W                           PV1 12B100000
PANIZZI RANDOLPH                          PFC 12B100000



76

ORDERS 159-196 HQ USATC ENGR AND FORT LEONARD WOOD 8JUN83

SAUNDERS KENT E                          PV1 12B100000
SCHOOLFIELD RANDY                        PV1 12B100000
WHIPKEY STEVEN R                  PV1 12B100000
WHITT CRAIG A                            PFC 12B100000
WILLIAMS STEPHEN                         PV1 12B100000

THE FOLLOWING MOS (SPECIALTY SKILL IDENTIFIER)/SPECIAL QUALIFICATIONS IDENTIFIER ACTION CONCERNING
YOU IS DIRECTED.

UNIT OF ASSIGNMENT:  CO D 1ST BN 2ND TNG BDE (OSUT) USATC ENGR (W1MP1R)
    FT LEONARD WOOD MO 65473
AWARDED:                        12B100000
HOW ACQUIRED:                   A
WITHDRAWN:                      NOT APPLICABLE
EFFECTIVE DATE:                 30 JUNE 1983
RECLASSIFICATION CONTROL NUMBER:  NOT APPLICABLE
ADDITIONAL INSTRUCTIONS:  AWARD OF ABOVE PRIMARY MILITARY OCCUPATIONAL SPECIALTY IS CONTINGENT UPON
    SUCCESSFUL COMPLETION OF TRAINING AND GRADUATION. ENLISTMENT FO UNITED STATES ARMY CASH BONUS
    ENLISTMENT OPTION TABLE H-17 AR 601-210.
FORMAT:  310

FOR THE COMMANDER:

                                      * * * * * * * * * * * * * *
                                      *     HQ. USATC ENGR      *
                                      *  AND FT. LEONARD WOOD, MO *
                                      *      OFFICIAL SEAL       *
                                      * * * * * * * * * * * * * *
                                           J. R. PATTERSON
DISTRIBUTION:                              LTC, AGC
EA INDIV INDIC (1)                         ADJUTANT GENERAL
ATZT-AGT (23)
CDR CO D 1ST BN 2ND TNG BDE
FT LEONARD WOOD (1)
PAC 1ST BN 2ND TNG BDE
FT LEONARD WOOD (1)
ATZT-AGA-S (1)
ATZT-DRM-FPM (28)
MPRJ (ATZT-AGTR) (40)

77

ATZR-JAMJ   (12 Dec 84)   CRAWFORD, Travis D.   PV1
SUBJECT:  Request for Discharge for the Good of the Service.

TO  Cdr, PCF          FROM Cdr, USAFACFS          DATE   **4 JAN 1985**   CMT

1.  The request for discharge for the good of the service under the provisions of chapter 10, AR 635-200, is approved.

2.  DD Form 794A (Other than Honorable Conditions Discharge Certificate) will be furnished.  Enlisted member will be issued a letter barring him/her from this post.

3.  EM will be processed for separation.

RAPHAEL J. HALLADA
Brigadier General, USA
Acting Commander

FS FL 25
(SJA) 1 Nov 80

ATZR-HP   Crawford, Travis D.   PV1
SSN ████5635   (12 Dec 84)
SUBJECT:   Request for Discharge for the Good of the Service
    18 DEC 1984    Concur. w/discharge under other than honorable conditions

THRU  Cdr, HQ COMD, COMD   FROM Cdr, PCF, USAFACFS   DATE   DEC 1 7 1984   CMT2

TO   Cdr, USAFACFS, ATTN:  ATZR-JAMJ

1.  Request is administratively correct and meets the requirements for discharge under the provisions of Chapter 10, AR 635-200.

2.  FACTUAL DATA:  SM is charged with an AWOL of 134 days, surrendered to military authorities.  Records NVAL this station.

3.  STATEMENT AND INTERVIEW EXTRACT:  Enlisted:  23 Mar 83; Total Creditable Service:  1 year, 4 months and 5 days; Education Level:  12 years; Age:  20; Marital Status:  Married; Dependents:  Two; Court-Martials:  One; Article 15's:  None; Reason for AWOL:  Personal reasons.

4.  SM has become disillusioned with the military.  Rehabilitation efforts considered futile.

5.  Recommend approval and issuance of a discharge Under Other Than Honorable Conditions (DD Form 794a).

3 Encls
1.  Transmittal of Charges
     w/1 Encl  (DD Form 458)
2.  DA Form 4187
3.  Orders

WILLIAM L. BOWMAN
1LT,ADA
Commanding

79

# DISPOSITION FORM

For use of this form, see AR 340-15, the proponent agency is TAGCEN.

| REFERENCE OR OFFICE SYMBOL | SUBJECT |
|---|---|
| | Request for Discharge for the Good of the Service |

| TO | FROM Crawford Travis D | DATE 12 DEC 1984 | CMT 1 |
|---|---|---|---|

Cdr, USAFACFS

1. I, Travis Don Crawford                    SSN ████ 5635, hereby voluntarily request discharge for the good of the Service under the provisions of Chapter 10, AR 635-200. I understand that I may request discharge for the good of the Service because of the following charge(s) which has (have) been preferred against me under the Uniform Code of Military Justice, each of which authorizes the imposition of a bad-conduct or dishonorable discharge. TDC AWOL
840729- 841210

2. I am making this request of my own free will and have not been subjected to any coercion whatsoever by any person. I have been advised of the implications that are attached to it. By submitting this request for discharge, I acknowledge that I understand the elements of the offense(s) charged and that I am guilty of the charge(s) against me or of (a) lesser included offense(s) therein contained which also authorize(s) the imposition of a bad-conduct or dishonorable discharge. Moreover, I hereby state that under no circumstances do I desire further rehabilitation, for I have no desire to perform further military service.

3. /Prior/to/completing/this/form,/I/have/been/afforded/the/opportunity/to/consult /with/appointed/counsel/for/consultation/(*in/addition,/I/have/consulted/with /military/counsel/of/my/own/choice/who/was/reasonably/available)/(civilian/counsel /retained/at/no/expense/to/the/Government))//(**Although/I/have/received/a/lawful /order/to/see/consulting/counsel,/I/persist/willfully/in/my/refusal/to/see/him/) (***I have consulted with counsel for consultation who has fully advised me of the nature of my rights under the Uniform Code of Military Justice, (the elements of the offense(s) with which I am charged, any relevant less included offense(s) thereto, and the facts which must be established by competent evidence beyond a reasonable doubt to sustain a finding of guilty; the possible defenses which appear to be available at this time; and the maximum permissible punishment if found guilty) /(and/of/the/legal/effect/and/significance/of/my/suspended/discharge)/ (Although he has furnished me legal advice, this decision is my own.))

4. I understand that, if my request for discharge is accepted, I may be discharged under conditions other than honorable and furnished an Under Other Than Honorable Discharge Certificate. I have been advised and understand the possible effect of an Under Other Than Honorable Discharge and that, as a result of the issuance of such a discharge, I will be deprived of many or all Army benefits, that I may be ineligible for many or all benefits administered by the Veterans Administration, and that I may be deprived of my rights and benefits as a veteran under both Federal and State law. I also understand that I may expect to encounter substantial prejudice in civilian life because of an Under Other Than Honorable Discharge. I further understand that there is no automatic upgrading nor review by any government agency of a less than honorable discharge and that I must apply to the Army Discharge Review Board or the Army Board for Correction of Military Records if I wish review of my discharge. I realize that the act of consideration by either board does not imply that my discharge will be upgraded.

FS OP 396a (SJA) - 1 Oct 84

DA FORM 2496   REPLACES DD FORM 96, WHICH IS OBSOLETE.   ☆ U.S. GOVERNMENT PRINTING OFFICE: 1980-671-207

SUBJECT:   Request for Discharge for the Good of the Service

5.   I understand that, once my request for discharge is submitted, it may be withdrawn only with consent of the commander exercising court-martial authority, or without that commander's consent, in the event trial results in an acquittal or the sentence does not include a punitive discharge even though one could have been adjudged by the court.   Further, I understand that if I depart absent without leave, this request may be processed and I may be discharged even though I am absent.

6.   I have been advised that I may submit any statements I desire in my own behalf, which will accompany my request for discharge.   Statements in my own behalf (are) (are not) submitted with this request.

7.   I hereby acknowledge receipt of a copy of this request for discharge and of all enclosures submitted herewith.

8.   I (do) (do not) desire a physical evaluation prior to separation.

_____
(Signature of respondent)

*To be used when appropriate.   Such counseling is not to be used in lieu of consultation with consulting counsel.
**To be used only when a member under military control refuses to obey an order to see consulting counsel.   (See paragraph 10-2c.)
***To be used in all cases when a member had consulted with consulting counsel.

## STATEMENT

Having been advised by me of (the basis for his contemplated trial by court-martial and the maximum permissible punishment authorized under the Uniform Code of Military Justice) ~~the significance of his or her suspended sentence to a bad conduct or dishonorable discharge;~~ the possible effects of an Other Than Honorable Discharge, if this request is approved; and of the procedures and rights available to him or her, _Travis D Crawford_ personally made the choice indicated in the foregoing request for the good of the Service.

_____
CPT, JAGC                    MARK D. ERICKSON
Defense Counsel              CPT, JAGC
                             Defense Counsel

Data Required by the Privacy Act of 1974
(5 U.S.C. 552a)

AUTHORITY:   Section 301, Title 5, U.S.C. and Section 3012, Title 10, U.S.C.

PURPOSE:   To be used by the commander exercising general court-martial jurisdiction over you to determine approval or disapproval of your request.

2

SUBJECT:   Request for Discharge for the Good of the Service

ROUTINE USES:   Request with appropriate documentation including the decision of the discharge authority will be filed in the MPRJ as permanent material and disposed of in accordance with AR 640-10, and may be used by other appropriate Federal agencies and State and local governmental activities where use of the information is compatible with the purpose for which the information was collected.

Submission of a request for discharge is voluntary. Failure to provide all or a portion of the requested information may result in your request being disapproved.

L 4897 Army-Fort Sill, Okla.

3

82

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**REDACTED EXHIBIT 184**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

83

# TULSA COUNTY DISTRICT ATTORNEY'S OFFICE
## INSPECTION NOTIFICATION
## PURSUANT TO 22 O.S. § 258

DEFENDANT _Sanders Charles_

CASE NO. _CF -94-1503_

DISTRICT COURT
F I L E D
SEP 0 5 2001
SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

You are hereby notified that law enforcement reports pertaining to the above entitled case are available for inspection at least 5 days prior to the date of the preliminary hearing. To inspect the law enforcement reports make a <u>written</u> request to the Tulsa County District Attorney's Office and deliver or mail such request to:

**TULSA COUNTY DISTRICT ATTORNEY'S OFFICE
406 TULSA COUNTY COURTHOUSE
500 SOUTH DENVER AVENUE
TULSA, OKLA. 74103-3832**

The request must be received at least one day in advance of the date of inspection. Each request must include the case name, case number, assigned judge, date of preliminary hearing and date of requested inspection. Inspection may be made on any business day between the hours of 1:30 p.m. and 3:00 p.m. in the Tulsa County District Attorney's Office.

I acknowledge receipt of this notice informing the defendant in the above captioned case of the opportunity to inspect law enforcement reports pursuant to 22 O.S. § 258.

_____     _9/5/01_
Defendant or Defense Counsel          Date

_____     _9-5-01_
Representative of D.A.'s Office        Date

**SHERIFF'S RETURN**

DISTRICT COURT
**FILED**

STATE OF OKLAHOMA,    )

TULSA COUNTY    )  ss.

*Sanders, Charles C.*

*CF 94-1503*

OCT 1 2 2001

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

Received this writ on the __29__ day of __August__, __2001__, and executed the same by delivering the within named defendant into the custody of the

__TCSO - DLM CJC__

at __Tulsa__ Oklahoma, on the __29__ day of __August__, __2001__

I Hereby Certify the above to be times and manner of executing the within and foregoing writ.

Dated and returned this __8__ day of __October__, __2001__

**COSTS:**

OTHER _____   $ _____

_____   $ _____

Mileage __197__ Miles   $ __67.97__

_____   $ _____

Total   $ __67.97__

**STANLEY GLANZ,** SHERIFF

Tulsa County, Oklahoma

By _Cyndi Johnston_

Deputy Sheriff.

Form 915 (Rev. 1-89)

85

# ORDER OF RELEASE FROM CUSTODY

*Rof*

TO THE SHERIFF OF TULSA COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order:

Last name, first, middle, suffix (please print) (show alias')

Sanders, Charles Edmond

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE/CLARIFICATION OF COUNTS |
|---|---|---|
| CF94-1503 | dismissed | uttering forged |
| | | |
| | | DISTRICT COURT |
| | | **F I L E D** |
| | | SEP 2 1 2001 |
| | | SALLY HOWE SMITH, COURT CLERK |
| | | STATE OF OKLA. TULSA COUNTY |

DAVID L. MOSS CJC
TULSA COUNTY, OKLAHOMA

AGENT

SEP 1 9 2001

❑ **ELECTRONIC MONITOR REQUIRED BEFORE RELEASE**

In and for the District Court of Tulsa County, State of Oklahoma, witness my hand this the _____ 18 _____ day of _____ Sept _____, 20 01.

SALLY HOWE SMITH, DISTRICT COURT CLERK
TULSA COUNTY, OKLAHOMA

Division/Court _____

Received by: _____

Deputy Sheriff

By: _____
Deputy Court Clerk
(Court Seal)

Form 4647 (3-01)

  

IN THE DISTRICT COURT WITHIN AND FOR TULSA COUNTY, OKLAHOMA
WARRANT OF ARREST          TPD  Offense No. 506477

STATE OF OKLAHOMA    ) ss.
COUNTY OF TULSA      )                          Case No. CF 94 1503
                                                              Felony

THE STATE OF OKLAHOMA,                    SEP 0 4 2001
     TO ANY SHERIFF OR PEACE OFFICER WITHIN THE STATE OF OKLAHOMA:

     Probable cause, upon oath, having been shown before the undersigned Judge of the District Court of Tulsa County, Oklahoma, that the crime(s) of UTTERING A FORGED INSTRUMENT AFCF  has been committed and that there is reason to believe that CHARLES EDMOND SANDERS has committed said crime(s);

     You are therefore commanded forthwith to arrest the said defendant and bring him/her before me, or some other magistrate of said court, at the Tulsa County Courthouse, Tulsa County, Oklahoma.

     The defendant is to be admitted to bail in the sum of $ 5,000 in lieu of holding the above named defendant and, in the event bail is taken, the above named defendant is hereby ordered to appear before me, or before one of the other magistrates of said Court, on the next regularly scheduled day of Court following the defendant's release on said bail.

     Dated at Tulsa, Oklahoma, this 24 day of March, 19 94.

                                        _____
                                              Judge of the District Court

Description of Defendant    N 851286
NAME: SANDERS, CHARLES EDMOND          DOB:       66  AGE: 28-28
ADDR:                                  SSN:         39   BRADFORD GRIFFITH
DESC: IN  M, 5 09, 170#, HAIR=BRO, EYES=BRO  DL:           TPD/PID:

==================================================================
FEES:                          RETURN OF OFFICER        DISTRICT COURT
Service and return of writ....$_____                  F I L E D
Service on defendant.........$_____    I received this writ the_____ day of
                                         and executed it by arresting the within named  SEP 2 8 2001  19____
Bringing prisoner to Court....$_____
                                                        SALLY HOWE SMITH, COURT CLERK
Attending examination........$_____    and now have him/her before the Court  STATE OF OKLA. TULSA COUNTY

Mileage____miles @____/mile.$_____
                                         DAVID L. MOSS CJC
Other_____$_____            TULSA COUNTY, OKLAHOMA            Deputy Sheriff

          TOTAL  $_____                  _____
==================================================================  AGENT
                               COMMITMENT ORDER
The within named defendant having been brought before me pursuant to the warrant of arrest shown above, and having failed to give bail for his/her appearance, he/she is hereby committed to the custody of the Sheriff of

_____ County to await examination, set for the_____ day of_____, 19_____

at_____ o'clock____.M.                   _____
                                                  Judge of the District Court

ORIGINAL
                                           DATA ENTERED
                                           DATE 3-25-94

IN THE DISTRICT COURT OF TULSA COUNTY, OKLAHOMA

STATE OF OKLAHOMA, ) ss.
COUNTY OF TULSA, )

THE STATE OF OKLAHOMA

vs.

CHARLES EDMOND SANDERS

SALLY HOWE SMITH CF 94 1593

INFORMATION

21-1592

MAR 25 1994

BE IT REMEMBERED:
   That DAVID MOSS, the duly qualified and acting DISTRICT ATTORNEY FOR TULSA COUNTY, OKLAHOMA, who prosecutes in the name and by the authority of the STATE OF OKLAHOMA, comes now into the District Court of Tulsa County, State of Oklahoma, and gives the Court to understand and be informed that:

CHARLES EDMOND SANDERS, on or about 11-24-94, in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did commit the crime of UTTERING A FORGED INSTRUMENT, a felony, by unlawfully, feloniously, willfully, knowingly and fraudulently, with intent to defraud, utter and publish as true to one T. ROY BARNES PHARMACY a certain instrument, to-wit: a check which is in words and figures as follows:

REALTY MANAGEMENT CORPORATION                                          1520
   6900 LONDON WAY
 OKLAHOMA CITY, OK 73132                         CHECK NO.

                                         CHECK DATE 11-24-93
PAY      BARNES PHARMACY                 AMOUNT      80.06
         EIGHTY DOLLARS & 06/100
TO THE
ORDER
OF

                                                CITYBANK
                                                WILSHIRE
                                                7901 N MACARTHER
                                                PO BOX 1116
                                       OKLAHOMA CITY, OK 73123-0316
                                       \s\ J. RANDLE CARTER

that said defendant then and there knowing at the time that said written instrument was forged and counterfeited, and that the signature of J. RANDLE CARTER to said instrument was forged and counterfeited, but said defendant did then and there unlawfully, willfully, fraudulently and feloniously, utter and publish same with the felonious intent then and there on the part of said defendant to beat, cheat and defraud in violation of 21 OSA 1592,

contrary to the form of the Statutes in such cases made and provided, and against the peace and dignity of the State.

                         DAVID MOSS, District Attorney

                         BY _____
                                                      Assistant

STATE OF OKLAHOMA, ) ss.
COUNTY OF TULSA, )

   I, J.R. GOODENOUGH, being duly sworn on oath, say that the statements set forth in the above information are true.

                         _____

Subscribed and sworn to me this ____ day of _____, 19____.
                         SALLY HOWE SMITH, Court Clerk

                         By _____
                                                      Deputy

NAMES OF WITNESSES

PAUL MCMAHAN           TULSA POLICE DEPT.
                       600 CIVIC CENTER          TULSA      OK 74103
ETHYL KINSFATHER       ████████████████          TULSA      OK 74110

88

NAMES OF WITNESSES (CONTINUED)

| | | | |
|---|---|---|---|
| PAT MAULDIN | █████████████ | OKLA CITY | OK 73102 |
| CLAY THOMAS | | FT SMITH | AR 72901 |
| HAROLD COBB | TULSA POLICE DEPT. | | |
| | 600 CIVIC CENTER | TULSA | OK 74103 |
| JAMES SPOON | ████████████ | TULSA | OK 74135 |
| LEO FREY | WILSHIRE APARTMENTS | | |
| | ███████████████ | OKLA CITY | OK 73132 |
| PATTIE FREY | WILSHIRE APARTMENTS | | |
| | █████████████ | OKLA CITY | OK 73132 |
| SANDY FULKERSON | WILSHIRE APARTMENTS | | |
| | █████████████ | OKLA CITY | OK 73132 |
| LYNN MORRIS | WILSHIRE APARTMENTS | | |
| | █████████████ | OKLA CITY | OK 73132 |
| DEBBIE BRATCHER | WILSHIRE APARTMENTS | | |
| | █████████████ | OKLA CITY | OK 73132 |

THE STATE OF OKLAHOMA

                              Plaintiff,)

           vs.                       )

                                     )          No._____

CHARLES EDMOND SANDERS          )

                         Defendant.)

THE STATE FURTHER ALLEGES:

That the said CHARLES EDMOND SANDERS was heretofore on 08-08-96, in Case No. CRF-89-00396, in the District court of Sequoyah County, State of Oklahoma, convicted of a felony, to-wit: the crime of **UTTERING A FORGED INSTRUMENT** and sentenced to a term of three (3) years. Said crime being an offense punishable under the laws of the state of Oklahoma by imprisonment in the penitentiary. Said defendant being represented by counsel at the time, and said conviction being a final judgment in the case.

That the said CHARLES EDMOND SANDERS was heretofore on 08-08-90, in Case No. CRF-90-00144, in the District court of Sequoyah County, State of Oklahoma, convicted of a felony, to-wit: the crime of **SEXUAL BATTERY** and sentenced to a term of three (3) years. Said crime being an offense punishable under the laws of the state of Oklahoma by imprisonment in the penitentiary. Said defendant being represented by counsel at the time, and said conviction being a final judgment in the case.

That the said CHARLES EDMOND SANDERS was heretofore on 07-21-92, in Case No. CRF-92-00091, in the District court of Sequoyah County, State of Oklahoma, convicted of a felony, to-wit: the crime of **UNLAWFUL POSSESSION OF CONTROLLED SUBSTANCE** and sentenced to a term of ten (10) years. Said crime being an offense punishable under the laws of the state of Oklahoma by imprisonment in the penitentiary. Said defendant being represented by counsel at the time, and said conviction being a final judgment in the case.

Contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the state.

                              DAVID MOSS, District Attorney

                              BY *Gary R Edwards*

                                                     Assistant

NAMES OF WITNESSES

| | | | |
|---|---|---|---|
| DISTRICT COURT CLERK | TULSA CO. COURTHOUSE | TULSA | OK |
| BOB YERTON | TULSA POLICE DEPARTMENT | TULSA | OK |
| RECORDS CUSTODIAN | TULSA CO. SHERIFFS OFFICE | TULSA | OK |
| RECORDS CUSTODIAN | PROBATION/PAROLE | SALLISAW | OK |
| PROBATION OFFICER | PROBATION/PAROLE | SALLISAW | OK |

90

```
ATTORNEY: GPN/    /                              Case No._____
SECRETARY: KRB                                   DA Temp. No.C F-94-CY032

DESCRIPTION OF DEFENDANT(S)

NAME: SANDERS, CHARLES EDMOND                    DOB: ███████66  AGE: 28-28
ADDR:                                            SSN: ███████-9539
DESC: IN  M, 5 09, 170#, HAIR=BRO, EYES=BRO      DL: ███████
REMARK:                                          DA HISTORY NO: 062062
```

91

STATE OF OKLAHOMA,                          )
                                            )
                          Plaintiff,        )          CF 94 1503
vs.                                         )   Case No. _____
                                            )
                                            )
CHARLES EDMOND SANDERS                      )
                                            )
                          Defendant(s).     )

                          AFFIDAVIT

STATE OF OKLAHOMA   )
                    )ss.
COUNTY OF TULSA     )

The undersigned, of lawful age, being first duly sworn, upon oath deposes and states as follows:

1. He is a Police Officer, Tulsa Police Department.

2. He has read certain official investigative reports and statements of witnesses regarding the above named Defendant(s) and, from these statements and reports it appears as follows:

3. On 11-24-93, a white male subject went to the T. Roy Barnes Pharmacy, 3404 South Yale Avenue, City of Tulsa, Tulsa County Oklahoma, and purchased drugs. The subject identified himself as J. Randle Carter and wrote check number 1520, account number ▉▉▉▉▉ drawn on City Bank, Wilshire, 7901 North MacArthur, Oklahoma City, Oklahoma. The maker of the check was Reality Management Corporation, ▉▉▉▉▉ Oklahoma City, Oklahoma. The check was in the amount of $80.06 and was signed with the name J. Randle Carter. The pharmacy employee that accepted the check was Et Butcher.

4. T. Roy Barnes Pharmacy deposited the check and it was latter returned stamped "Unauthorized Signature". On 12-25-94, T. Roy Barnes employee James Spoon made a police report and turned the check to police.

5. On 02-23-94, I contacted Detective Pat Maulden, Oklahoma City Police Department and he informed me that the above described check had been stolen in a burglary from the Reality Management Corporation office in Oklahoma City in October and that several of the stolen/forged checks (Con't)

WHEREFORE, affiant prays this Honorable Court to issue a warrant for the arrest of the within named Defendant(s), that he/she/they may be brought before a magistrate and held to answer for the offense(s) of **UTTERING A FORGED INSTRUMENT AFCF** _____

_____

**AFFIANT-Detective Paul McMahan**

Subscribed and sworn to before me this _22_ day of _March_, 19_94_.

My commission expires _December 22, 1996_     _Kathy S. Ottinger_
                                              Notary Public

                    FINDING OF PROBABLE CAUSE

On this _24_ day of _March_ 19_94_ the above styled and numbered cause came on for hearing before me, the undersigned Judge of the District Court of Tulsa County, Oklahoma, upon the Affidavit of **Detective Paul McMahan** requesting that a warrant of arrest be issued for the within named Defendant(s), that he/she/they might be arrested and held to answer for the offense(s) of **UTTERING A FORGED INSTRUMENT AFCF** _____

Based upon said Affidavit I am satisfied and do hereby find that the offense(s) of **UTTERING A FORGED INSTRUMENT AFCF** _____

has/have been committed and that there is probable cause to believe the within named Defendant(s) has/have committed said offense(s) and that a warrant of arrest should issue.

Dated this _24_ day of _March_ 19_94_.

_____
**JUDGE OF THE DISTRICT COURT**

**BRADFORD GRIFFITH**

Page 2.

have been passed in the Oklahoma City area and that one his prime suspects was Charles Edmond Sanders, who is an escapee from Jess Dunn Correctional Institution. Mauldin sent me a copy of the Oklahoma City Police Department reports of the burglary and forgeries. The report list five persons as authorized to sign on the above described bank account, and they are Leo Frey, Pattie Frey, Sandy Fulkerson, lynn Morris, and Debbie Bratcher. The name of J. Randle Carter is not a authorized signer.

6. I also found that Detective Clay Thomas, Ft. Smith, Arkansas Police Department was also working a case in which Sanders was a suspect. I contacted Detective Thomas and he sent me the photo line up he was using for identification of Sanders.

7. On 02-25-94, I presented the six photo line up that contained a photo of Charles Sanders to T. Roy Barnes employee Ethyl Kinsfather and she identified the photo of Charles Sanders as the person presenting check number 1520 described previously.

8. From Oklahoma Department of Corrections records, Charles Edmond Sanders has several felony convictions including Illegal Possession of Controlled Substances from Sequoyah County, Ok., CRF-92-0091.

9. Charles Edmond Sanders is described as follows:

Indian Male, 5'9", 170 pounds, medium build, brown hair and eyes, date of birth ████66, Soc. Sec. ████9539. address unknown.

94

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 185**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

94

CJH

IN THE DISTRICT COURT WITHIN TULSA COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA, )
)
Plaintiff,)
VS. ) Case No. CM-03-6603
)
CHARLES EDMOND SANDERS
Defendant.)

**DISTRICT COURT**
**FILED**

APR 1 4 2004

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

APPLICATION TO REVOKE SUSPENDED SENTENCE

**Comes Now** TIM HARRIS, the duly elected and qualified District Attorney of Tulsa County, Oklahoma, and shows to the court that heretofore the above named defendant was charged by Information(s) filed in the District Court of Tulsa County with the crime(s) of **OBTAINING MERCHANDISE BY FALSE PRETENSE** and thereafter on 02-05-04 entered his plea of **GUILTY** to the said charge(s) of **OBTAINING MERCHANDISE BY FALSE PRETENSE** before the Honorable **DARLENE CRUTCHFIELD**, Judge of the District Court of Tulsa County. Thereafter, on 02-05-04 the Court found the defendant guilty and suspended the sentence for a term of **12 MONTHS**. Subsequently, the defendant was released from custody and placed under the supervision of the State Department of Corrections, Probation Division, subject to certain written Rules and Conditions of Probation with the defendant's deferred sentence being conditioned upon the defendant abiding by said Rules and Conditions of Probation.

The District Attorney has been informed and alleges and states that the defendant has subsequently failed to comply with the Rules and Conditions of Probation entered in the above entitled and numbered cause(s) in that:

**On or about 02-15-04, in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did commit the crime of UNLAWFUL POSSESSION OF CONTROLLED DRUG, a misdemeanor, by unlawfully, knowingly and intentionally, have in his possession and under his control Lortab said drug being classified as controlled dangerous substance in Schedule I of the Uniform Controlled Dangerous Substances Act of this State, as alleged in Case Number CM-04-1187.**

**On or about 02-15-04, in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did commit the crime of UNLAWFUL POSSESSION OF PARAPHERNALIA, a misdemeanor, by unlawfully, willfully and wrongfully have in his possession and under his immediate control certain paraphernalia, to-wit: a syringe and a pipe used by abusers of drugs classified as controlled dangerous substances under the Uniform Controlled Dangerous Substances Act of this State, and for the purpose and with the unlawful intent to administer such controlled dangerous substances without having any medical or other lawful need requiring possession of said paraphernalia, as alleged in Case Number CM-04-1187.**

**Wherefore,** the State of Oklahoma requests that the suspended sentence entered in the above entitled and numbered cause(s) be revoked. The State further requests that a bench warrant be issued for the defendant's apprehension and that a detention hearing be ordered set within a reasonable time after the defendant's apprehension, and further, that the court order subpoenas issued for the following persons to attend said hearing and testify on behalf of the State of Oklahoma.

TIM HARRIS, District Attorney

By _____
Assistant District Attorney

NAMES OF WITNESSES:
**PAUL SCHROEDER S1199, TULSA POLICE DEPT, 600 CIVIC CENTER, TULSA OK 74103**
**DAVID DERBY D8807, TULSA POLICE DEPT, 600 CIVIC CENTER, TULSA OK 74103**
**PHIL CERVANTES, TULSA CO SHERIFFS OFF, 500 S DENVER, TULSA OK 74103**

L HILL, TULSA CO SHERIFFS OFF, 500 S DENVER, TULSA OK 74103
MATT FLEENOR, TULSA CO SHERIFFS OFF, 500 S DENVER, TULSA OK 74103

IN THE DISTRICT COURT WITHIN TULSA COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,           )
                            )
                   Plaintiff,)
VS.                         )          Case No. **CM-03-6603**
                            )
**CHARLES EDMOND SANDERS**
                   Defendant.)

DISTRICT COURT
**FILED**

APR 1 4 2004

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

### ORDER RE APPLICATION TO REVOKE SUSPENDED SENTENCE

On this ___8___ day of ___April '04___, 20____, the State of Oklahoma, by and through TIM HARRIS, the District Attorney of Tulsa County, appeared before me, the undersigned Judge of the District Court, and presented its Application to Revoke Suspended Sentence alleging that the defendant, **CHARLES EDMOND SANDERS**, violated the rules and conditions of probation imposed upon him under the terms of the suspended sentence entered in the above entitled and numbered cause(s), and requested that said sentence be revoked, that a bench warrant be issued for the defendant's apprehension, that a detention hearing be ordered set upon the defendant's apprehension, and that subpoenas be issued for the attendance of witnesses at said hearing.

The Court, having examined the State's Application to Revoke Suspended Sentence and the allegations set forth therein, and being fully advised in the premises, finds that good cause has been shown for the issuance of a bench warrant for the defendant's apprehension, that a detention hearing should be set upon the defendant's apprehension, and that subpoenas should be issued on behalf of the State and the defendant for the attendance of witnesses at said detention hearing.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** that a bench warrant issue for the apprehension of the above named defendant, **CHARLES EDMOND SANDERS**, that a detention hearing be set upon the defendant's apprehension, and that subpoenas be issued on behalf of the State and the defendant for witnesses to attend and testify on the date set for the detention hearing.

Dated this ___8___ day of ___April '04___, 20____

_____
Judge of the District Court

97



DISTRICT COURT

F I L E D

DEC 1 6 2005

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA, TULSA COUNTY

DEC 1 2 2005

## ORDER OF RELEASE FROM CUSTODY

TO THE SHERIFF OF TULSA COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order:

Last name, first, middle, suffix (please print) (show alias')

Sanders, Charles Edmond

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE/CLARIFICATION OF COUNTS |
|---|---|---|
| cm.04.1187 | Suspended | fta/poss cd sched I II |
| cm.04.1187 | Suspended | fta/poss drug paraphernali |
| cm.03.6603 | ~~suspended~~ Dismissed | Application to revoke |
|  |  |  |
|  |  |  |
|  |  |  |

☐ ELECTRONIC MONITOR REQUIRED BEFORE RELEASE

. In and for the District Court of Tulsa County, State of Oklahoma, witness my hand this the ____9th____ day of __Dec__, 20 __05__.

SALLY HOWE SMITH, DISTRICT COURT CLERK
TULSA COUNTY, OKLAHOMA

By: _Darryl S. Vannay_
Deputy Court Clerk
(Court Seal)

Division/Court __Otey__

Received by: _Brill. K-8_
Deputy Sheriff

Received by: _____
C.C.A.

Form 4647 (Rev. 6-01)

98

# ORDER OF THE COURT - RULE 8 HEARING
[prepare separate Rule 8 for each case]

**DEFENDANT'S NAME:** *Charles Edmond Sanders*   **CASE NO.:** *CM-03-6603*

☒ **The Court has sentenced you to the custody of the Department of Corrections or the Tulsa County Jail** and you are therefore ordered to report to the Cost Administrator on the 2nd floor of this building within two weeks of your release from the Department of Corrections, **or** immediately after your release from the Tulsa County Jail, to make payment arrangements on the costs and fines assessed to you today.

☐ **The Court finds you are able to pay and you agree to pay by installment** payment the fines and costs assessed in this case. You are ordered to report immediately to the Cost Administrator on the 2nd floor of this building to make arrangements for installment payments of the costs and fines assessed in this case as shown below.

☐ **The Court orders you to perform** _____ **hours of community service in lieu of the fines and costs or in lieu of** _____ assessed in this case as shown below. You are **first** ordered to report immediately to the Misdemeanant Work Program located in the basement of this building, Room B3 in the Court Services Office and **secondly** you are ordered to report to the Office of the Cost Administrator on the 2nd floor of this building. A review of your community service is set before this Court on: _____

☐ **The Court has found you to be indigent and unable to pay** the costs and fines assessed in this case and said monies are hereby ordered suspended. You are ordered to take this form immediately to the Cost Administrator on the 2nd floor of this building.

☐ **The Court finds you are able and agree to pay the fines and costs assessed in this case immediately** and you are ordered to **report immediately to the Criminal/Traffic Division** on the 2nd floor of this building and to pay all costs and fines assessed in this case as shown below.

*APPLICATION DISMISSED COST TO △*

**COUNT 1** : (circle one) **D.U.I.    Felony    (Misdemeanor)    Traffic    Charge amended to:** _____
Deferred (date) _____ D.U.I. Program (date)_____ Suspended (_____ yrs) Dismissed cost to: State/(Deft) (circle 1)
Fine $_____    Victim's Compensation $_____    Court Fund $_____    Deferred Fee $_____
Drug Fund Fee $_____    Lab Fee $_____    D.A. Drug Fund $_____    P.S.I. Fee $_____
DNA Fee $_____ Incarceration Fee $_____ Restitution $_____ Other _____ $_____

**COUNT 2** : (circle one) **D.U.I.    Felony    Misdemeanor    Traffic    Charge amended to:** _____
Deferred (date) _____ D.U.I. Program (date)_____ Suspended (_____ yrs) Dismissed cost to: State/Deft. (circle 1)
Fine $_____    Victim's Compensation $_____    Court Fund $_____    Deferred Fee $_____
Drug Fund Fee $_____    Lab Fee $_____    D.A. Drug Fund $_____    P.S.I. Fee $_____
DNA Fee $_____ Incarceration Fee $_____ Restitution $_____ Other _____ $_____

**COUNT 3** : (circle one) **D.U.I.    Felony    Misdemeanor    Traffic    Charge amended to:** _____
Deferred (date) _____ D.U.I. Program (date)_____ Suspended (_____ yrs) Dismissed cost to: State/Deft. (circle 1)
Fine $_____    Victim's Compensation $_____    Court Fund $_____    Deferred Fee $_____
Drug Fund Fee $_____    Lab Fee $_____    D.A. Drug Fund $_____    P.S.I. Fee $_____
DNA Fee $_____ Incarceration Fee $_____ Restitution $_____ Other _____ $_____

**COUNT 4** : (circle one) **D.U.I.    Felony    Misdemeanor    Traffic    Charge amended to:** _____
Deferred (date) _____ D.U.I. Program (date)_____ Suspended (_____ yrs) Dismissed cost to: State/Deft. (circle 1)
Fine $_____    Victim's Compensation $_____    Court Fund $_____    Deferred Fee $_____
Drug Fund Fee $_____    Lab Fee $_____    D.A. Drug Fund $_____    P.S.I. Fee $_____
DNA Fee $_____ Incarceration Fee $_____ Restitution $_____ Other _____ $_____

**IF YOU FAIL TO PAY, APPEAR, OR REPORT AS ORDERED, A WARRANT WILL BE ISSUED FOR YOUR ARREST AND YOU MAY BE CONFINED IN THE TULSA COUNTY JAIL UNTIL THE BALANCE IS PAID IN FULL**

Dated this __13th__ day of __December__ , __05__ .    _____
                                                              Judge of the District Court of Tulsa County

I HAVE READ AND UNDERSTAND THIS ORDER:

_____          _____
Defendant's Signature                        Attorney's Signature

Form 3913 (Rev. 3-01)

99

DISTRICT COURT FILED

DEC 13 2005

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

100

Case 6:09-cv-00105-JHP   Document 140-2   Filed 02/18/10   Page 7 of 30

TO THE SHERIFF OF TULSA COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order:

Last name, first, middle, suffix (please print) (show alias')

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE/CLARIFICATION OF COUNTS |
|---|---|---|
| CM 03-6603 | *Cpt Rev.* | F. T. P. |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐ **ELECTRONIC MONITOR REQUIRED BEFORE RELEASE**

In and for the District Court of Tulsa County, State of Oklahoma, witness my hand this the ___ day of ___ , 20 __

ANN THOMPSON, MUNICIPAL COURT CLERK FOR
SALLY HOWE SMITH, DISTRICT COURT CLERK
TULSA COUNTY, OKLAHOMA

By: _____
Deputy Court Clerk
(Court Seal)

Division/Court _____

Received by: _____
Deputy Sheriff

Received by: _____
C.C.A.

Form 4679 (Rev. 9-01)

**JAIL CREDIT**

DISTRICT COURT
# F I L E D

NOV 9 2005

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

**TULSA COUNTY**
**STATE OF OKLAHOMA**
   **v.s.:**

**THE SHERIFF'S OFFICE**
**TULSA COUNTY, OKLAHOMA**

SANDERS, CHARLES EDMOND          Case Numbers: CM03-6603  FTP
   **A.K.A.:**
   DLM#: 1105965

| | | | |
|---|---|---|---|
| Intake Date: 9/19/05 | Sentencing Date: 10/6/05 | Credit Time Served: ☐ |
| Sentence Days: 36 | Sentence Dollars: $15.00 | Estimated Release Date |
| Trusty Credit Days: 0 | Trusty Tanked Days: 0 | 10-Nov-05 |

| Month | Days | | Dollar Rate | | Extended Amount | | Day Rate | | Extended Days |
|---|---|---|---|---|---|---|---|---|---|
| Oct | 26 | x | $15.00 | = | $390.00 | x | 0.00 | = | 0.00 |
| Nov | 10 | x | $15.00 | = | $150.00 | x | 0.00 | = | 0.00 |
| Total: | 36 | | | | $540.00 | | | | 0.00 |

To the District Court clerk, Tulsa, Oklahoma

For your information, the above name defendant in my custody, having been sentenced to a term of confinement in Tulsa County Jail, Tulsa, Oklahoma, has completed his jail sentence.

Witness my hand this _____10_____ day of _____NOVEmbER_____, 2005

Stanley Glanz, Sheriff
Tulsa County, Oklahoma

By: _____
   Records Clerk

ORDER OF COMMITMENT OR PUNISHMENT - COURT COST

COUNTY OF TULSA,
THE STATE OF OKLAHOMA

TO THE SHERIFF, OR, THE LAWFUL CUSTODIAN OF INMATES HOUSED IN TULSA COUNTY, OKLAHOMA:

Last Name, First, Middle, Suffix (please print) (show aliases)  Marcus Charles Edmond

| CASE NUMBER | SENTENCE/DAYS | RATE PER DAY | DESCRIPTION OF CHARGES |
|---|---|---|---|
| CM-02-4443 | 36 | $5.00 | *Failure to Appear and/or Pay* |
|  |  | $5.00 | *Failure to Appear and/or Pay* |
|  |  | $5.00 | *Failure to Appear and/or Pay* |
|  |  | $5.00 | *Failure to Appear and/or Pay* |
|  |  | $5.00 | *Failure to Appear and/or Pay* |
|  |  | $5.00 | *Failure to Appear and/or Pay* |
|  |  | $5.00 | *Failure to Appear and/or Pay* |

THE COURT FINDS THAT THE DEFENDANT, having presented no exigent circumstances for his failure to comply as previously ordered, IS GUILTY OF:

☐ Willful failure to appear before the Court or the Cost Administrator on _____ pursuant to the order on file in the above styled and numbered case(s).

☐ Willful failure to pay costs and/or fines on _____ pursuant to the order on file in the above styled and numbered case(s).

YOU, OR ANY OTHER AGENT AUTHORIZED BY LAW ARE COMMANDED to receive the defendant into your custody and confine him in the Tulsa County Jail on the above stated case(s), at the statutory rate of $5.00 per day, for a total of __36__ days until the total amount of $ __563.00__ has been satisfied with any balance due (after even rates applied) to be suspended, or, until any remaining balance due is paid in full. You will make due return of this writ with your doings endorsed thereon.

☐ The defendant is to receive credit for time served.      An Incarceration Review Hearing is set _____

☑ As a special consideration by this Court, the defendant may be released from incarceration, at any time, upon a total (partial) payment of $ __271.00__ and be ordered to report immediately to the Cost Administrator to receive credit toward costs and fines for the time served and to make arrangements on the remaining balance due.

☐ As a special consideration by this Court, the defendant may be released from incarceration, at any time, upon payment of 1/2 of the total cost due, after credit is applied, and be ordered to report immediately to the Cost Administrator to receive credit toward costs and fines for the time served and to make arrangements on the remaining balance due.

ATTESTATION: 
SALLY HOWE SMITH
DISTRICT COURT CLERK

Dated this the __10th__ day of __October__, __2005__

By: _____
Deputy Court Clerk
(Court Seal)

_____
Judge, Tulsa County District Court

Received by: _____
T.C.S.O.

Received by: _____
C.C.A.

Form 1735 (Rev. 5-99)

**Date:** 10/12/2005
**Time:** 2:32 PM

## David L. Moss Criminal Justice Center
### Booking Sheet

**Page:** 1 of 1
**Person Id:** 1105965
**Booking Id:** 1111884

## Booking Sheet



| | | | | |
|---|---|---|---|---|
| **Full Name:** | SANDERS, CHARLES EDMOND | **Street:** ▮▮▮▮▮ | | **Arrest Date:** 9/19/05 |
| **First Name:** | CHARLES | **City:** SALLISAW | | **Arrest Time:** 11:00 |
| **Middle Name:** | EDMOND | **State:** OK | **SSN #:** ▮▮-9539 | **Arrest By:** MURROW |
| **Last Name:** | SANDERS | **Zip:** | **Lic State:** | **Book Date:** 9/19/05 |
| **AKA Name:** | | **Phone:** (918) 775-309 | **Lic #:** | **BookTime:** 13:14 |
| **Next of Kin:** | EVELYN SANDERS | **N of K #:** (918) 775-309 | **Agency:** USM | **Book By:** LAURA BUIRRE |
| **Birth Place:** | | | | **Rate:** $10.00 |

| | | | |
|---|---|---|---|
| **Birth Date** ▮▮ 1966 | **Location:** J14-R-2 | **Custody:** 4 | |
| **Age:** 39 | **FBI #:** | **TPD #:** | |
| **Race:** W | **OSBI #:** | **OTN #:** | |
| **Marital Sts** | **Sched Date:** 11/10/05 | **Sched Time:** | |
| **Gender:** M | **Actual Date:** | **Actual Time:** | |
| **Height:** 5 ft 09 in | | | |
| **Weight:** 170 lbs | | **Profile** | **Frontview** |
| **Hair Color:** BRO | | | |
| **Facial Hair:** | | | |
| **Eye Color:** BRO | | | |
| **Build:** | | | |
| **Complexion:** | **Weekend Server** ☐ | | |
| **Docket Id:** 119884 | | | |

## Offenses:

| Case # | Offense Type | Offense Description | Bond | Status | | Date | Time |
|---|---|---|---|---|---|---|---|
| | FEDERAL | USM FORM-41/ U.S MARSHAL | | | HUS - Hold US Ma | | |
| CM04-1187 | MISDEMEANOR | FTA/ POSS CD SCHED I II 1ST OFFENSE | $15,000 | JTSD | A - Arraignment | 10/13/05 | 13:30 |
| CM04-1187 | MISDEMEANOR | FTA/ POSS DRUG PARAPHERNALIA | $15,000 | JTSD | A - Arraignment | 10/13/05 | 13:30 |
| CM03-6603 | MISDEMEANOR | APPLICATION TO REVOKE | $1,000 | JTSD | A - Arraignment | 10/13/05 | 13:30 |
| CM03-6603 | MISDEMEANOR | FTP/ COURT COST | $277 | FTP | SNT - Sentence to | | |
| X/O CASH | | | | | | | |

# ORDER OF RELEASE FROM CUSTODY

NOV 1 4 2005

TO THE SHERIFF OF TULSA COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order:

Last name, first, middle, suffix (please print) (show alias')

Sanders Charles Edmond

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE/CLARIFICATION OF COUNTS |
|---|---|---|
| CM03-6003 | Sent Served | FTP |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐ ELECTRONIC MONITOR REQUIRED BEFORE RELEASE

In and for the District Court of Tulsa County, State of Oklahoma, witness my hand this the _____ day of _____, 20 ___.

Division/Court _____

ANN THOMPSON, MUNICIPAL COURT CLERK FOR
SALLY HOWE SMITH, DISTRICT COURT CLERK
TULSA COUNTY, OKLAHOMA

By: _____
Deputy Court Clerk
(Court Seal)

Received by: _____
Deputy Sheriff

Received by: _____
C.C.A.

Form 4679 (Rev. 9-01)

Case 6:09-cv-00105-JHP Document 140-2 Filed 02/18/10 Page 11 of 30

STATE OF OKLAHOMA,

OCT 0 2005

**ORDER OF COMMITMENT FOR PUNISHMENT - COURT COST**

COUNTY OF TULSA,
THE STATE OF OKLAHOMA

§

TULSA COUNTY SHERIFF

TO THE SHERIFF, OR, THE LAWFUL CUSTODIAN OF INMATES HOUSED IN TULSA COUNTY, OKLAHOMA:

Last Name, First, Middle, Suffix (please print) (show aliases) Sanders, Charles Edmond

| CASE NUMBER | SENTENCE/DAYS | RATE PER DAY | DESCRIPTION OF CHARGES |
|---|---|---|---|
| CM-03-6663 | 36 | $5.00 | *Failure to Appear and/or Pay* |
| | | $5.00 | *Failure to Appear and/or Pay* |
| | | $5.00 | *Failure to Appear and/or Pay* |
| | | $5.00 | *Failure to Appear and/or Pay* |
| | | $5.00 | *Failure to Appear and/or Pay* |
| | | $5.00 | *Failure to Appear and/or Pay* |
| | | $5.00 | *Failure to Appear and/or Pay* |

THE COURT FINDS THAT THE DEFENDANT, having presented no exigent circumstances for his failure to comply as previously ordered, IS GUILTY OF:

☐ Willful failure to appear before the Court or the Cost Administrator on _____ pursuant to the order on file in the above styled and numbered case(s).

☐ Willful failure to pay costs and/or fines on _____ pursuant to the order on file in the above styled and numbered case(s).

YOU, OR ANY OTHER AGENT AUTHORIZED BY LAW ARE COMMANDED to receive the defendant into your custody and confine him in the Tulsa County Jail on the above stated case(s), at the statutory rate of $5.00 per day, for a total of _36_ days until the total amount of $ _553.00_ has been satisfied with any balance due (after even rates applied) to be suspended, or, until any remaining balance due is paid in full. You will make due return of this writ with your doings endorsed thereon.

☐ The defendant is to receive credit for time served.     An Incarceration Review Hearing is set _____

☒ As a special consideration by this Court, the defendant may be released from incarceration, at any time, upon (total) (partial) payment of $ _277.00_ and be ordered to report immediately to the Cost Administrator to receive credit toward costs and fines for the time served and to make arrangements on the remaining balance due.

☐ As a special consideration by this Court, the defendant may be released from incarceration, at any time, upon payment of 1/2 of the total cost due, after credit is applied, and be ordered to report immediately to the Cost Administrator to receive credit toward costs and fines for the time served and to make arrangements on the remaining balance due.

Dated this the _16th_ day of _October_ _2005_.

**ATTESTATION:**
SALLY HOWE SMITH
DISTRICT COURT CLERK

By: _____
    Deputy Court Clerk
    (Court Seal)

_____
Judge, Tulsa County District Court

DAVID L. MOSS CJC
TULSA COUNTY OKLAHOMA

AGENT

Received by: _____
              T.C.S.O.

Received by: _____
              C.C.A.

Form 1735 (Rev. 5-99)

105

DONE

STATE OF OKLAHOMA,

SEP 2 8 2005

**ORDER OF COMMITMENT**

COUNTY OF TULSA,
THE STATE OF OKLAHOMA

§

TULSA COUNTY SHERIFF

05 SEP 27 PM 4:05

TO THE SHERIFF, OR, THE LAWFUL CUSTODIAN OF INMATES HOUSED IN TULSA COUNTY, OKLAHOMA:

Last Name, First, Middle, Suffix (please print) (show aliases)

Sanders, Charles Edmond                    JB

An order having been made this day by the Judge of the District Court of Tulsa County, Oklahoma, that the above named defendant be held for appearance in court on the ___ day of ___ October ___ 2005 in Rm. 173 @ 830 AM/PM

for ☐ arraignment   ☐ preliminary hearing   ☐ district court arraignment   ☐ jury trial   ☐ non-jury trial

☐ disposition ☐ sentencing upon a charge and bond of: Cost Court

| CASE NUMBER | CHARGE | BOND | ELECTRONIC MONITOR REQUIRED |
|---|---|---|---|
| CMFD3-6603 | FTP | x/o Cash $277.00 | |
| | | | |
| | | | |

DAVID L. MOSS SO
TULSA COUNTY, OKLAHOMA

You, or any other agent authorized by law are commanded to receive into your custody and detain said Defendant until he or she is legally discharged.

Dated at Tulsa, Oklahoma, this ___ 27th ___ day of ___ September ___ 2005.

COURT/JUDGE ___ FTP ___

SALLY HOWE SMITH, DISTRICT COURT CLERK

Deputy Court Clerk                    (Court Seal)

Received by: ___ JK-28 ___
T.C.S.O.

Received by: ___
C.C.A.

Form 4646 (Rev. 3-01)

106

SEP 2 7 2005

# IN THE DISTRICT COURT OF TULSA COUNTY, OKLAHOMA
## BENCH WARRANT (REVOCATION PROCEEDING)

STATE OF OKLAHOMA,        ) SS.
COUNTY OF TULSA          )     No. CM-03-6603 ( Misdemeanor )
                            )

STATE OF OKLAHOMA,        )
            Plaintiff,)        **ORIGINAL**
VS.                        )
      C193059        )
CHARLES EDMOND SANDERS
           Defendant.)

TO THE SHERIFF OF TULSA COUNTY, OKLAHOMA OR ANY OTHER OFFICER
AUTHORIZED BY LAW TO SERVE PROCESS IN THE STATE OF OKLAHOMA:

An Application to Revoke Suspended Sentence has been filed against the above named
defendant **CHARLES EDMOND SANDERS**. You are therefore commanded forthwith to arrest
the above named defendant and bring **CHARLES EDMOND SANDERS** before said Court or if
the court be adjourned or not in session that you retain him in your custody in the County Jail of
Tulsa County, Oklahoma, subject to the further order of this court.

Defendant is to be arraigned before the Judge in Room number 173 of the Tulsa County **DISTRICT COURT**
Courthouse. The defendant is admitted to bail in the sum of $ 1000 . **FILED**

## BY ORDER OF THE COURT

SEP 2 8 2005

Given under my hand and the seal of said Court affixed       SALLY HOWE SMITH, COURT CLERK
this **12th** day of **April**, 20**04**             STATE OF OKLA. TULSA COUNTY
                                 SALLY HOWE-SMITH, Court Clerk
                                 By **Cherri D. Jackson**
                                   Deputy

Description of Defendant
**NAME: CHARLES EDMOND SANDERS  DOB:** ███ -66
**ADDR:** ██████ **MARBLE CITY, OK 74945 SSN:** ███ -9539 **DL:**
**DESC: IN M, 5' 09" 170#, HAIR=BRO, EYES=BRO** ✓
**REMARKS:  OC - OBTAINING MERCHANDISE BY FALSE PRETENSE**

=========================================================================

### RETURN OF OFFICER
I received this bench warrant on the 26 day of 09 , 20 05 , and executed the same
in TULSA County on the 26 day of 09 ,20 05 , at 1800 o'clock M.,
By

Dated this ___ day of ___, 20 ___.

FEES:                   By C. R. Haywood TPD /0162 Deputy OFFICER
Arrest.................................$_____
_____miles @ _____/mile.....$_____
Into Court ...............................$_____      DAVID L. MOSS CJC  4/20/04
Other_____              $_____       TULSA COUNTY, OKLAHOMA
                                 TOTAL $_____
                                   AGENT

107

R-2
9/28

# IN THE DISTRICT COURT OF TULSA COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA, Plaintiff,

-vs-

Sanders, Charles, Defendant.

Charge(s): _____

Bond(s) Set:_____

**DISTRICT COURT**
# F I L E D

**SEP 2 8 2005**

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

Case No. _CM04-1187_
_CM03-6603_

In Custody _____
Out on: Bond _____
   Pretrial Release _____
   Other _____

## PAUPER'S AFFIDAVIT

I, (Name) _Sanders, Charles_  (Soc. Sec. #) [REDACTED] _9539_  Phone # _775-3093_

(Address) [REDACTED] _Sallisaw, OK_ , upon oath,

do depose and state:

**I.** I talked to the following 3 lawyers about this case:

1. ____None____      Cost to represent me $_____
2. _____      Cost to represent me $_____
3. _____      Cost to represent me $_____

## II. PERSONS IN HOUSEHOLD

|  |  | Is Person a Dependent |
|---|---|---|
| Spouse: | _____ | Yes ( ) No ( ) |
| Children: | _____ | Yes ( ) No ( ) |
|  | _____ | Yes ( ) No ( ) |
| Others: | _____ | Yes ( ) No ( ) |
|  | _None_ | |

Are you claimed as a dependent by parent or guardian?    Yes ( )   No (✓)

   If so, explain _____

## III. FINANCIAL STATUS—ASSETS (Defendant or person(s) responsible for defendant's support):

A.    1. Cash on Hand: $ _None_

2. Bank Accounts:

| Bank Name & Address | Account # | Checking/Savings | $ Amount |
|---|---|---|---|
| _None_ | | | |

3. Bonds & Securities:

| Description | Value |
|---|---|
| _None_ | |

4. All Other Possessions of Value: (including tax refunds, notes, accts. receivable, etc.)

| Description | Value |
|---|---|
| _None_ | |

B.    1. Current Employment: _None_

2. Earnings: _____

3. If not currently employed, last employment:
   (Place & Date) _BRB Construction / 2002_

4. Supplemental Income: (V.A., Soc. Security, Disability, Child Support, etc.) _None_

5. Spouse's Current Employment: _None_

6. Spouse's Monthly Earnings: $ _____

108

Form 3719 (Rev. 1-01) Front

SEP 2 7 2005

## IN THE DISTRICT COURT OF TULSA COUNTY, STATE OF OKLAHOMA

| | |
|---|---|
| State Of Oklahoma, | |
| Plaintiff, | Case No. CM-2003-6603A **ORIGINAL** |
| -vs- | Misdemeanor |
| CHARLES EDMOND SANDERS , | C 192059 |
| Defendant,, | |

### BENCH WARRANT ISSUED FAILED TO PAY
### BY ORDER OF THE HONORABLE COST ADMIN. JUDGE (GENERAL)

THE STATE OF OKLAHOMA, TO ANY SHERIFF OR PEACE OFFICER WITHIN THE STATE OF OKLAHOMA:
You are commanded forthwith to arrest: **CHARLES EDMOND SANDERS , Defendant**

SS.# ████9539, DL# NONE, DOB ████1966
Sex: Male   Race: American Indian or Alaskan
Native   Hair: Brown   Eyes: Brown   Weight:
170   Height: 509

**MARBLE CITY, OK     74445**

**DISTRICT COURT
F I L E D**

Counts:
**OBTAINING MERCHANDISE BY FALSE PRETENSE**

**Total Bond Amount: $553.00**

SEP 2 8 2005

**Comment: ATTENTION CCA BOOKING: DEFT MAY BE RELEASED UPON
***CASH*** PAYMENT IN FULL...OR...SET FOR COST DOCKET.**

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

and bring him/her before the court or if the court is adjourned or is not in session that you retain him/her in your custody or deliver him/her to the lawful custodian inmates of the **Tulsa County** Jail subject to the further order of this court.

Given under my hand and the seal of said court affixed this the ___20___ day of ___May___, 20_04_.

By Order of the Court:                    SALLY HOWE SMITH, Clerk of Court

By: _____           By: _____
Judge of the District Court              Deputy Court Clerk

#### OFFICER'S RETURN OF SERVICE

Received this writ this ___26___day of ___09___, ___05___, at __15CC__o'clock ___.M. and served the same by taking the above named person into custody on the ___26___ day of ___09___, ___05___ _____, and delivering the person to the judge named.

| | | |
|---|---|---|
| Serving Warrant | $_____ | _____, Sheriff |
| Copy | $_____ | _____ County, Oklahoma |
| Mileage | $_____ | |
| (____ Miles @____ per mile) | | By: _C. HAYWOOD  TPD  ᴄ1612_ |
| Total | $_____ | Deputy  OFFICER |

WARRANT NUMBER: TU-<..warrantid..>

DAVID L. MOSS CJC
TULSA COUNTY, OKLAHOMA

AGENT                ISS 5/25/04

dhtmled11:(http://ocisapp//applications/documentmanagement/documentdelivery.asp?page...  5/20/2004



# TULSA COUNTY DIVISION OF COURT SERVICES
## COMMUNITY SERVICE PROGRAM
TULSA COUNTY ADMINISTRATION BLDG.
500 SOUTH DENVER, ROOM B5
TULSA, OKLAHOMA 74103-3832
### OFFICE: 918-596-5749 / FAX: 918-596-5792

## REPORT OF PROGRAM

KEVIN C. FRANCIS/DIRECTOR

| COMPLETION | NON COMPLETION | REVOKED | FAILED TO REPORT | JUVENILE | FINES & COST |
|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |

NAME SANDERS, Charles EDMOND    CASE NO(S) CM03-6603

HOURS ASSIGNED:                    JUDGE

                                    CHARGE

COUNTY:                            PROBATION: DISTRICT COURT

                                    INTAKE: **FILED**

COMMENTS:                          JUN 0 8 2004

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

This is to certify the undersigned volunteer completed a total of _____ 0 _____ hours of community service in the TULSA COUNTY COMMUNITY SERVICE PROGRAM:

Dated this ___7th___ day of ___June___, 2004

By _____
COMMUNITY SERVICE OFFICER/STAFF

Form 2299 (Rev. 2-04)    Copy 1-White-Court    Copy 2-Canary-Community Service Program    Copy 3-Pink-Volunteer



**SALLY HOWE SMITH**
**C O U R T  C L E R K**

Tulsa County Courthouse
Tulsa, Oklahoma 74103-3844

500 South Denver, Rm. 200
(918) 596-5000

March 24, 2004
CM-03-6603
Charles E. Sanders

Maple City, OK  74445

**Failure To Report – Cost Administration**

DISTRICT COURT
F I L E D

MAR 2 4 2004

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. • TULSA COUNTY

****WARNING****

Court Records indicate that when you were sentenced in the District Court of Tulsa County the Judge ordered you to pay court costs or report to Cost Administration immediately, or upon your release. Further, that you have failed to report as ordered and that the costs assessed to you in the above numbered case have not been paid in full.

You **must pay** your delinquent court cost in the amount of **$538** immediately - **OR** - you **must appear** in person before the Cost Administrator **within five (5) working days of the date of this letter**. Office hours are 8:30 A.M. to 5:00 P.M. Monday through Friday (see address below).

**If you fail to pay in full or appear within five (5) days any or all of the following actions may be taken against you:**

- A WARRANT 'WILL' BE ISSUED FOR YOUR ARREST AND YOU MAY BE CONFINED IN THE TULSA COUNTY JAIL BY A FURTHER ORDER OF THE COURT UNTIL ALL COSTS ARE SATISFIED.
- $35 'WILL' BE ADDED TO THE COURT COST YOU ALREADY OWE ($10 has already been added to your cost due for mailing of this letter).
- YOUR OKLAHOMA TAX REFUND MAY BE SEIZED.
- YOUR DRIVER'S LICENSE MAY BE SUSPENDED.

*Before* a bench warrant is issued for your arrest you may pay by cash, check, money order, cashiers check
(Insufficient checks will be prosecuted to the fullest extent)

*After* a warrant is issued checks will not be accepted

For your protection -- **Do Not** send cash through the mail

MAKE AND MAIL
PAYMENT TO:

klpm

SALLY HOWE SMITH, TULSA COUNTY COURT CLERK
Criminal/Traffic Division
Tulsa County Courthouse, 2nd Floor
500 South Denver
Tulsa, Oklahoma 74103-3844

Form 872 (Rev. 1-93)

# ORDER OF THE COURT - RULE 8 HEARING
[prepare separate Rule 8 for each case]

DEFENDANT'S NAME: Charles Edmond Sanders    CASE NO.: CM-2003-6903

☐    **The Court has sentenced you to the custody of the Department of Corrections or the Tulsa County Jail and you are** therefore ordered to report to the Cost Administrator on the 2nd floor of this building within two weeks of your release from the Department of Corrections, or immediately after your release from the Tulsa County Jail, to make payment arrangements on the costs and fines assessed to you today.

FEB 2 5 2004

☐    **The Court finds you are able to pay and you agree to pay by installment** payment the fines and costs assessed in this case. You are ordered to report immediately to the Cost Administrator on the 2nd floor of this building to make installment payments of the costs and fines assessed in this case as shown below.

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. - TULSA COUNTY

☐    **The Court orders you to perform** _____ **hours of community service in lieu of the fines and costs or in lieu of** _____ assessed in this case as shown below. You are first ordered to report immediately to the Misdemeanant Work Program located in the basement of this building, Room B3 in the Court Services Office and secondly you are ordered to report to the Office of the Cost Administrator on the 2nd floor of this building. A review of your community service is set before this Court on: _____.

☐    **The Court has found you to be indigent and unable to pay** the costs and fines assessed in this case and said monies are hereby ordered suspended. You are ordered to take this form immediately to the Cost Administrator on the 2nd floor of this building.

☐    The Court finds you are able and agree to pay the fines and costs assessed in this case immediately and you are ordered to **report immediately to the Criminal/Traffic Division** on the 2nd floor of this building and to pay all costs and fines assessed in this case as shown below.

**COUNT 1** : (circle one) **D.U.I.    Felony    (Misdemeanor)    Traffic    Charge amended to:**_____
Deferred (date) _____ D.U.I. Program (date)_____ Suspended (1 yrs) Dismissed cost to: State/Deft. (circle 1)
Fine $250.00    Victim's Compensation $125.00    Court Fund $10    Deferred Fee $_____
Drug Fund Fee $_____    Lab Fee $_____    D.A. Drug Fund $_____    P.S.I. Fee $_____
DNA Fee $_____ Incarceration Fee $_____ Restitution $_____ Other _____ $_____

**COUNT 2** : (circle one) **D.U.I.    Felony    Misdemeanor    Traffic    Charge amended to:**_____
Deferred (date) _____ D.U.I. Program (date)_____ Suspended (_____ yrs) Dismissed cost to: State/Deft. (circle 1)
Fine $_____    Victim's Compensation $_____    Court Fund $_____    Deferred Fee $_____
Drug Fund Fee $_____    Lab Fee $_____    D.A. Drug Fund $_____    P.S.I. Fee $_____
DNA Fee $_____ Incarceration Fee $_____ Restitution $_____ Other _____ $_____

**COUNT 3** : (circle one) **D.U.I.    Felony    Misdemeanor    Traffic    Charge amended to:**_____
Deferred (date) _____ D.U.I. Program (date)_____ Suspended (_____ yrs) Dismissed cost to: State/Deft. (circle 1)
Fine $_____    Victim's Compensation $_____    Court Fund $_____    Deferred Fee $_____
Drug Fund Fee $_____    Lab Fee $_____    D.A. Drug Fund $_____    P.S.I. Fee $_____
DNA Fee $_____ Incarceration Fee $_____ Restitution $_____ Other _____ $_____

**COUNT 4** : (circle one) **D.U.I.    Felony    Misdemeanor    Traffic    Charge amended to:**_____
Deferred (date) _____ D.U.I. Program (date)_____ Suspended (_____ yrs) Dismissed cost to: State/Deft. (circle 1)
Fine $_____    Victim's Compensation $_____    Court Fund $_____    Deferred Fee $_____
Drug Fund Fee $_____    Lab Fee $_____    D.A. Drug Fund $_____    P.S.I. Fee $_____
DNA Fee $_____ Incarceration Fee $_____ Restitution $_____ Other _____ $_____

**IF YOU FAIL TO PAY, APPEAR, OR REPORT AS ORDERED, A WARRANT WILL BE ISSUED FOR YOUR ARREST AND YOU MAY BE CONFINED IN THE TULSA COUNTY JAIL UNTIL THE BALANCE IS PAID IN FULL**

Dated this 5th day of February, 2004.    _____
Judge of the District Court of Tulsa County

I HAVE READ AND UNDERSTAND THIS ORDER:

_____    _____    112
Defendant's Signature    Attorney's Signature

Form 3913 (Rev. 3-01)

IN THE DISTRICT COURT OF TULSA COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,

Plaintiff,

vs.

CR/M.-7003.6603

_Charles Edmund Sanders_ ,
Defendant.

DOB: ██████ -66

**DISTRICT COURT**

**F I L E D**

FEB 1 9 2004

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLAHOMA, TULSA COUNTY

### RECORD OF PLEA

I am the defendant in this case and I have signed my name at the end of this statement. My lawyer has also signed at the end of this statement. I have received and read a copy of the written charge against me which my lawyer now has. My lawyer and I have talked about this charge. I have told my lawyer what I did and what I know about the crime I am accused of. My lawyer has told me what he has learned about the witnesses and evidence against me. I have talked to my lawyer as much as I want to and we both agree it would be best that I plead _Guilty_ to the charge of _Obtaining Merchandise By False Pretense_

I believe that the witnesses and evidence against me can prove this charge and establish facts to support my plea.

My lawyer has told me what the minimum and maximum punishment is for this crime and has also told me the District Attorney recommends that the court give me the following sentence:
_1 year Suspended, $250.00 fine, 250.00 VCF, 40 TCW?, Court costs_

(D.A.'S INITIALS) 2-5-04

I understand the court does not have to follow this recommendation.

I understand I can appeal any sentence the court gives me on this plea by filing a notice of appeal within 10 days.

I know that by pleading to this charge I give up my right to have a fair, speedy and public trial and all the other rights that go with a trial. I now give up my rights and plead by signing this Record of Plea. I also understand I waive any motions or defects in the proceedings to date.

I want the court's record to show that my lawyer has explained to me my rights and that I understand my rights. I know that the purpose of a trial is to decide whether I am guilty or innocent of the crime I am accused of. I know that I have the right to choose whether I want a jury of _6_ citizens to hear my case and make this decision, or to have a judge without a jury hear my case and make this decision. I know that I do not have to prove either to the judge or the jury that I am innocent, because the law gives me the right to remain silent and the law presumes I am innocent. I also know the District Attorney must prove that I am guilty beyond a reasonable doubt. I know that before I can be found guilty at trial, the witness against me must appear in court and testify under oath before the judge and the jury. I also know I can be in court at all times during the trial, that my lawyer can be there with me, and that my lawyer and I can participate in selecting the jury. I know my lawyer and I can see and hear the witnesses and evidence against me, that we can object to certain evidence, and cross examine the witnesses against me. I know I can call witnesses who can testify for me and the court will order witnesses to attend court on my behalf. I also know that if I want to give up the right to remain silent I can tell the judge and the jury my side of this case, and that myself and my lawyer can make arguments to the judge and the jury. I understand *all* jurors must agree I am guilty beyond a reasonable doubt before I can be found guilty.

I fully understand these rights and I make a free choice at this time to give up these rights and plead. I was not promised anything, or threatened or forced against my will to give up these rights and plead. I am fully competent and am not under the influence of any drugs, medication or alcohol.

_Charles Sanders_
Defendant

DATE: _February 5, 2004_

_M. J. Boyce_
Attorney for Defendant

DATE: _February 5, 2004_

Court's Minute

_Donna Crutchfield_

ORIGINAL

# IN THE DISTRICT COURT IN AND FOR TULSA COUNTY, OKLAHOMA

| | |
|---|---|
| State of Oklahoma,<br>-vs-<br>**CHARLES EDMOND SANDERS**<br>SS# ████-9839<br>DOB ██████-**1966** | Case No. **CM-2003-6603**<br>Count No. **1** |

**DISTRICT COURT**
**F I L E D**

**JUDGMENT AND SENTENCE**
**All Time Suspended**
**Misdemeanor**

FEB 1 8 2004

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

Now, this **5th day of February, 2004** this matter comes on before the Court for sentencing and the defendant appears personally and by his or her Attorney of record, **SHERRY BOYCE** and the State of Oklahoma is represented by **GRANT FITZ**. The Court Reporter is not present.

The defendant has entered a plea of **GUILTY** and has been found guilty by the Court of the crime of **OBTAINING MERCHANDISE BY FALSE PRETENSE**.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED by the Court that the defendant, is guilty of this offense and is sentenced to **one (1) year** all under the custody and control of the **Tulsa County Jail**, further, all of said term is suspended **and the defendant is not to be under any formal supervision.** The rules and conditions signed by the defendant acknowledging his or her understanding are incorporated as Exhibit A.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT that in addition to the preceding terms, and the general cost of this case, the defendant is also sentenced to a **fine in the amount of $250.00; Victim's Compensation Assessment in the amount of $125.00; Court Fund in the amount of $10.00. THE DEFENDANT IS FURTHER ORDERED TO COMPLETE 40 HOURS WITH THE TULSA COUNTY WORK PROGRAM WITHIN 120 DAYS.**

IT IS FURTHER ORDERED BY THIS COURT THAT JUDGMENT IS HEREBY ENTERED against the defendant for all costs, fees, fines, and assessments ordered in this action and he or she is ordered to report immediately upon conclusion of this sentencing hearing, or discharge from custody if the

114

defendant is currently incarcerated, to the Tulsa County Court Clerk to pay all costs, fines, fees, and assessments ordered in this action - or - to the Tulsa County Court Cost Administrator to make arrangements to pay the costs, fines, fees, and assessments as ordered pursuant to the Rule 8 Hearing held this day.

The Court further advised the defendant of his or her right to appeal to the Court of Criminal Appeals of the State of Oklahoma and of the necessary steps to be taken by him or her to perfect such appeal, and that if he or she desired to appeal and was unable to afford counsel and a transcript of the proceedings, that the same would be furnished by the State, subject to reimbursement in accordance with 22 § O. S. 1355.14, 20 § O. S. 106.4 (b), and, ADC-72-33.

Witness my hand this **5th day of February, 2004**

**JUDGE DARLENE CRUTCHFIELD**

ATTESTATION:

SALLY HOWE SMITH
District Court Clerk of Tulsa County

By:_____
Vela LaCasse, Deputy

### COURT CLERK'S CERTIFICATION

I, Sally Howe Smith, District Court Clerk for Tulsa, Oklahoma, hereby certify that the foregoing is a true, correct and full copy of the instrument herewith set out as appears on record in the Court Clerks Office of Tulsa, Oklahoma.

Dated this the _____ day of _____, _____.

SALLY HOWE SMITH, DISTRICT COURT CLERK, TULSA COUNTY, OKLAHOMA

By: _____, Deputy

# IN THE DISTRICT COURT IN AND FOR TULSA COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA,

                    Plaintiff,

    vs.

Charles Edmond Sanders

                    Defendant,

Case No(s) CM- 2003-6603

Judge Critchfield

District Attorney _____

Term of Probation 1 year

Hours of Service 40

**FILED**

**DISTRICT COURT**

FEB 0 9 2004

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

---

## TULSA COUNTY DIVISION OF COURT SERVICES
## COMMUNITY SERVICE PROGRAM
(AN ALTERNATIVE TO INCARCERATION)
## RULES AND CONDITIONS OF PROBATION

On the 5th day of February, 20 04, the Court, upon the Defendant's plea of

( ✓ ) guilty               ( ) withheld a finding of guilty, and deferred sentencing

( ) nolo contendere     ( ) found the Defendant guilty and suspended the sentence

for a term of 12 months upon certain Rules and Conditions of Probation and upon the Defendant's request that he/she be allowed to participate in the Community Service Program as an alternative to incarceration. Therefore, the Court hereby places the Defendant under the following Rules and Conditions of Probation and subject to the supervision of the Community Service Program, to-wit:

1. The Defendant will not violate any laws or ordinances of any State or Municipality or violate any rules, regulations or laws of the United States;

2. You must complete your obligations of 40 hours within 120 days;

3. When the defendant is scheduled to work, he/she must be there on time and ready to work. The Defendant will perform those duties assigned to him/her by his/her Community Service Program supervisor; and, the Defendant understands that it will be grounds for revocation of his/her probation if the Defendant fails or refuses to perform said duties to the satisfaction of and in accordance with the requests of his/her supervisor;

4. The defendent will need to check in with the office at 596-5749 within one week of completing his or her work hours to verify hours were completed.

5. After the Defendant has been scheduled, no more than ONE emergency cancellation will be allowed. You must call and inform our office if and when the cancellation is used. We **DO NOT consider a lack of transportation to be an emergency cancellation;**

6. **It is the Defendant's responsibility** to see to it that they sign in and out on the time sheet each of the days worked. Failure to do so will result in a forfeiture of credit for the hours in question;

The Defendant hereby certifies that he/she has read the above and foregoing Rules and Conditions of Probation and understands the terms and conditions therefore and hereby agrees to abide by said terms and conditions during the period of probation. The Defendant hereby agrees to contact the COMMUNITY SERVICE PROGRAM AT 596-5797 and 596-5798, between the hours of 8:00 a.m. to 5:00 p.m. Monday - Friday, to receive completion for his/her participation in said program. The Defendant understands that ANY VIOLATION OF THE RULES AND CONDITIONS OF PROBATION will result in an Application for revocation of probation being filed and a Warrant for Arrest being issued for the Defendant.

Dated this 5th day of February, 20 04

X _____
Defendant

_____
JUDGE OF THE DISTRICT COURT

WITNESSED:

_____
Attorney For Defendant

Copy 1—White—Court File     Copy 2—Canary—Court Services     Copy 3—Pink—Dist. Attorney     Copy 4—Gold—Defendant

Form 2181 (Rev. 2-03)     116

# IN THE DISTRICT COURT IN AND FOR TULSA COUNTY
## STATE OF OKLAHOMA

DISTRICT COURT
**FILED**

STATE OF OKLAHOMA,

FEB 09 2004

Plaintiff,

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

vs.

Charles Edmund Sanders

Defendant,

Case No(s) CM-2003-6603

Judge Critchfield

Term of Probation 1 year

Offense Obtaining Merchandise By False Pretense

Hours of Service 40

### TULSA COUNTY DIVISION OF COURT SERVICES
### COMMUNITY SERVICE PROGRAM
### (An Alternative to Incarceration)
### APPLICATION AND INFORMATION

| ADDRESS | | CITY Sapulpa | STATE OK | ZIP 74955 |
|---|---|---|---|---|
| HOME PHONE 918-305-3095 | WORK PHONE 918-776-7814 | MOTHER'S ADDRESS & PHONE 2030 75 Inverb | FATHER'S ADDRESS & PHONE | |
| EMPLOYER & TITLE Heavy Equipment Operator | | SPOUSE'S NAME & PLACE OF EMPLOYMENT N/A | | PHONE N/A |

| RACE I | HEIGHT 5 9 | WEIGHT 170 | HAIR R | EYES BR | SEX male | SOCIAL SECURITY NO. 989 | AGE 38 | DATE OF BIRTH 66 |
|---|---|---|---|---|---|---|---|---|
| FRIEND OR REFERENCE NUMBER | | | | | | | | |

### COMMUNITY SERVICE PROGRAM COUNSELOR ONLY

| CC | | PP | PSI | SENT | | FINES |
|---|---|---|---|---|---|---|
| LENGTH OF PROBATION | | | | JOB SKILL # | | |
| COMPLETION DATE | | | | | | |

DO YOU HAVE ANY PHYSICAL LIMITATIONS? IF YES, WHAT IS THE NATURE OF THE LIMITATION?
☐ YES  ☐ NO

HAVE YOU EVER BEEN A PLAINTIFF IN A PERSONAL INJURY SUIT? IF YES, EXPLAIN.
☐ YES  ☐ NO

ARE YOU NOW UNDER MEDICAL CARE?
☐ YES  ☐ NO

HAVE YOU HAD ANY INJURIES, OPERATIONS OR SERIOUS ILLNESS IN THE PAST FIVE YEARS?

HAVE YOU EVER BEEN FOUND GUILTY OF A FELONY? IF YES, FOR WHAT OFFENSE?       PLACE AND DISPOSITION
☐ YES  ☐ NO

I hereby certify that the foregoing information is, to the best of my knowledge, true and correct, and agree not to operate any type of motorized vehicle while performing community service in this program if my license is presently suspended or revoked for any reason.

I further agree, as a condition to my participation in the program, to execute this release of liability. I hereby release the Board of County Commissioners of Tulsa County, its agents, servants, and employees for any and all liability for any injuries which I may sustain as a result of my participation in the program so long as such injuries are not a result of the acts or omissions of any employee of Tulsa County as are described in the Oklahoma Political Subdivisions Tort Claims Act, 51 O.S. §151 et seq. I specifically release the Board of County Commissioners of Tulsa County for any injuries which I may sustain as may be occasioned by those persons not affiliated with the said Board of County Commissioners.

Dated this 5th day of February, 20 04.

Comments:

X _Charles Sanders_
Defendant

_[signature]_
JUDGE OF THE DISTRICT COURT

WITNESSED:

_[signature]_
Attorney for Defendant

117

Form 2182 (Rev. 2-03)    Copy 1 – White – Court File    Copy 2 – Canary – Court Services    Copy 3 – Pink – District Attorney    Copy 4 – Gold – Defendant

# ORDER OF RELEASE FROM CUSTODY

DEC 2 2 2003

CM-03-6603

TO THE SHERIFF OF TULSA COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order:

Last name, first, middle, suffix (please print) (show alias')

SANDERS, CHARLES E

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE/CLARIFICATION OF COUNTS |
|---|---|---|
| NF | BOND | Obtain Merch by False Pre Mou tha #500 |
| | | 2003 DEC 20 14:05 |
| | | |
| | | |
| | | |

DISTRICT COURT
FILED

JAN 2 2 2004

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA TULSA COUNTY

☐ ELECTRONIC MONITOR REQUIRED BEFORE RELEASE

In and for the District Court of Tulsa County, State of Oklahoma, witness my hand this the 20 day of 12 , 20 03 .

ANN THOMPSON, MUNICIPAL COURT CLERK FOR
SALLY HOWE SMITH, DISTRICT COURT CLERK
TULSA COUNTY, OKLAHOMA

By: _____
Deputy Court Clerk
(Court Seal)

Division/Court _____

Received by: _____
Deputy Sheriff

Received by: _____
C.C.A.

Form 4679 (Rev. 9-01)

Case 6:09-cv-00105-JHP  Document 140-2  Filed 02/18/10  Page 25 of 30

# TRACIS

TULSA REGIONAL AUTOMATED CRIMINAL INFORMATION SYSTEM
STANDARDIZED REPORTING FORMAT TUL-1849L

**TULSA POLICE DEPARTMENT**
**ARREST AND BOOKING DATA**

INCIDENT NUMBER
003-090941

Medical Pre-Screen Receive

☑ CHECKED

| PAGE | OF |

**MUG & PRINT**

☐ PARTIAL  ☐ COMPLETE   PHOTO TO _____   TCSO NUMBER _____   COURT DATE _____   DIVISION _____

☐ FEDERAL DISTRICT  ☑ TULSA DISTRICT  ☐ OSAGE DISTRICT  ☐ MUNICIPAL  ☐ HOLD FOR _____   ☐ JUV  ☐ R.O.P.

CM-03-0603

LOCATION OF ARREST: 2019 E. 81ST ST   LOCATION OF OCCURRENCE: SAME

| | MO | DATE | YR | DAY | TIME | | MO | DATE | YR | DAY | TIME | | MO | DATE | YR | DAY | TIME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCURRED | 12 | 19 | 03 | FRI | 1830 | ARRESTED | 12 | 19 | 03 | FRI | 1910 | BOOKED | 12 | 19 | 03 | FRI | 2110 |

| PID | SUSPECT NAME (LAST, FIRST, MIDDLE) | AKA | HGT | WGT | HAIR | EYES | SKIN | RACE | SEX |
|---|---|---|---|---|---|---|---|---|---|
| 851286 | SANDERS, CHARLES EDMOND | | 509 | 170 | BRO | BRO | M | W | M |

STREET ADDRESS, CITY, STATE: ▓▓▓ SALLISAW, OK   ZIP CODE: 74945   AGE: 37   DOB: ▓▓66▓▓   SOCIAL SECURITY NUMBER: ▓▓9539

EMPLOYER/SCHOOL: SMITH CONSTRUCTION   HOME PHONE: 918-774-0143   DRIVER'S LICENSE NUM: SAME   ST: OK   CLASS: D   END:

EMPLOYER ADDRESS: SALLISAW, OK   BUSINESS PHONE: 918-775-8581   OSBI NUMBER:   FBI NUMBER:

NEXT OF KIN: SHELLY JACKSON   ADDRESS:   PHONE: 918-775-2135   RELATIONSHIP: FRIEND

PERSONAL ODDITIES: MUSTACHE & GOATEE, NN SHAVEN, LEFT EYE DAMAGED   TATTOOS: RIGHT SHOULDER - RABBIT

CLOTHING: RED SHIRT, BLU JEANS, COWBOY BOOTS BROWN   WARNING INDICATORS:

**VEHICLE**

| DISPOSITION/HOLD | VIN | TAG YR | TAG STATE | TAG NUMBER |
|---|---|---|---|---|
| | | | | |

| VEH YR | VEH MAKE | VEH MODEL | VEH STYLE | COLOR TOP/BOTTOM | MISC IDENTIFIERS |
|---|---|---|---|---|---|
| | | | | | |

ARRESTING OFFICER: G.L. WATSON   ID NUM: W9282   DIV: WDSW   AGENCY: TPD   BACKING OFFICER:   ID NUM   DIV   AGENCY   INTAKE: BOWER   ID NUM

| FED STA MUN | FEL MISD | CRIME DESCRIPTION | TITLE | SECT | PARA | DATE OF OFFENSE | WARRANT NUMBER | ORI | BOND | O.R. | UCR |
|---|---|---|---|---|---|---|---|---|---|---|---|
| S | F | OBT. MERCH. BY FALSE PRETENSE | 21 | 1542 | A | 121903 | — | TPD | | | 2K |

# 1105965

DISTRICT COURT
**F I L E D**

JAN 0 9 2004

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

| WILL SIGN CITY INFORMATION | LAY WITNESS LIST FOR MUNICIPAL CHARGES | | |
|---|---|---|---|
| ☐ OFFICER | WITNESS NAME | ADDRESS / ZIP | TELEPHONE |
| ☐ CITIZEN | 1 ANDREW PAUL MACKENZIE | 2019 E. 81ST ST TULSA OK 74136 | 488 8791 |
| | 2 | | |
| | 3 | | |
| | 4 | | |
| | 5 | | |

| BREATHALYZER OPERATOR/ID NUM/AGENCY | BREATHALYZER SUPERVISOR/ID NUM/AGENCY | TEST RESULTS |
|---|---|---|
| | | 0. % |

MEDICAL PROBLEMS

| PROPERTY RECEIPT | VCR TAPE | PHOTO NUM | LATENT NUM |
|---|---|---|---|
| | | | |

RIGHT INDEX

ARREST NUMBER 060369

119

## APPEARANCE BOND — DISTRICT COURT

IN THE DISTRICT COURT, TULSA COUNTY, OKLAHOMA

STATE OF OKLAHOMA,

Plaintiff,

**DISTRICT COURT**
**F I L E D**

**DEC 2 2 2003**

No. NF 03-4999

vs.

Charles Edmond Sanders Defendant,

**SALLY HOWE SMITH, COURT CLERK**
**STATE OF OKLA. TULSA COUNTY**

KNOW ALL MEN BY THESE PRESENTS, That we, the above named defendant, as principal, and the undersigned bondsman, corporation and other signers as sureties, jointly and severally acknowledge ourselves to owe and be indebted to the State of Oklahoma in the sum of Two Thousand _____ Dollars ($ 2,000.00 ) to be levied on our property, real and personal, cash deposits and escrow deposits, wherever found, to the use of the State of Oklahoma.

THE CONDITION OF THIS BOND IS SUCH that if the above named defendant, now charged in the District Court of Tulsa County, with the crime of Obtaining Merchandise by False Pretense - More than $500.00 and admitted to bail in the above stated sum, shall personally be and appear before the said Court, in the division to which said case is assigned, on the 9 day of January, 2004 9:30 am as ordered for arraignment, preliminary hearing, trial or judgment, and from day to day and term to term thereafter as ordered, or on the first day of the next jury term of said Court, if so ordered, and from day to day and term to term thereafter as ordered by said Court, and not depart therefrom without leave, and shall do and receive what shall be enjoined upon him by said Court, until this cause is finally determined, then this bond to be void, otherwise to be in full force and effect.

74955

Principal (Defendant) x Charles Sanders   Address x ▮▮▮▮▮▮ Sallisaw, Okla 74985

Surety _____   Address _____

Surety _____   Address _____

Surety-Licensed Bondsman Karen B. Ringgold   Office Address 105 N. Denver, Tulsa, OK 74103
#804192

Dated, filed and approved this

Corporate Surety _____   20 day of 12 , 03

By _____   By _____
Attorney-in-Fact   Deputy Court Clerk

### AFFIDAVIT AS TO UNDERTAKING AND QUALIFICATIONS OF SURETY

(Required of all licensed bondsmen, under penalty of perjury, 59 O.S., § 1322; 12 O.S., § 61; 12 O.S., § 62)

STATE OF OKLAHOMA, COUNTY OF TULSA, SS

The undersigned licensed bondsman, being duly sworn, on oath states:

JAN 0 7 2004

That neither he or she, not anyone for his or her use, has been promised or has received any security or consideration for his or her undertaking, except as stated herein.

**MICROFILMED**

Consideration received or promised $ 200.00 .

Security received or promised: (List deeds or mortgages and describe personal property.)
Signed indemnity agreement and promissory note. No other collateral.

Such promise, security or consideration was received from:

Evelyn Sanders   P.O. Box 75, Marble City, OK 74945
Name   Address

That he or she is presently duly licensed, registered, and in all respects authorized by law to become surety in this undertaking, 59 O.S., § 1301 et seq.; 22 O.S., § 1101 et seq.; 12 O.S., § 61 et seq.; 22 O.S., § 1320.

That he or she is worth double the sum to be secured, over and above all exemptions, debts and liabilities, 12 O.S., § 1301 et seq.; 22 O.S., § 1101 et seq.; 12 O.S., § 61 et seq.

That he or she has not signed or countersigned this bond in blank, nor has he or she given a power of attorney to, or otherwise authorized, any person to countersign his or her name to this bond unless that person is a licensed bondsman directly employed by a bondsman giving such power of attorney, 59 O.S., § 1316.

That he or she has attached hereto all receipts for collateral accepted by him or her, fully described in detail, 59 O.S., § 1314; 59 O.S., §1322.

That he or she is authorized, and legally capable, in all respects, to enter into this undertaking, both personally and on behalf of the corporate surety above-named; and that this undertaking is within, and does not exceed, the limitations and conditions of the power of attorney granted him or her by said corporate surety, all pursuant to 59 O.S., § 1320.

That he or she is familiar with the provisions of Oklahoma Statute regarding the effects of defects, omissions and irregularities in such undertakings, 59 O.S., § 1326.

That all legal requirements of licensing, registration and certification have been met by this bondsman, 59 O.S., § 1320.

That the bondsman fully understands that willful misstatement of any material fact herein may subject him or her to prosecution for perjury, and/or to proceedings seeking denial, suspension or revocation of the bondsman's license, 59 O.S., § 1310.

That he or she is a resident of the County of Tulsa , State of Oklahoma.

Karen B. Ringgold
Licensed Bondsman

Before me, the undersigned, on this 20 day of December , 2003 , personally appeared Karen Ringgold , known to me to be the identical person who executed the within and foregoing instrument, and acknowledged to me that he executed same as his free and voluntary act and deed. Given under my sign and seal of office on the day and year above written.

ANN THOMPSON, MUNICIPAL COURT CLERK

_____
Deputy Court Clerk

120

Form 29 (Rev. 3-00) Front

IN THE DISTRICT COURT OF TULSA COUNTY
STATE OF OKLAHOMA

Case No. **CM 2003 6603**

Misdemeanor Information

THE STATE OF OKLAHOMA,

    Plaintiff,

    Vs.

**CHARLES EDMOND SANDERS**

    Defendant(s).

**DISTRICT COURT**
**FILED**

DEC 3 0 2003

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA: TULSA COUNTY

**BE IT REMEMBERED:**

That **TIM HARRIS**, the duly elected and qualified **District Attorney for Tulsa County, Oklahoma,** who prosecutes in the name and by the authority of **The State of Oklahoma,** comes now into the District Court of Tulsa County, State of Oklahoma, and gives the Court to understand and be informed that:

(Count 01)
21-1541-0001

**CHARLES EDMOND SANDERS**, on or about 12-19-03, in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did commit the crime of **OBTAINING MERCHANDISE BY FALSE PRETENSE**, a misdemeanor, by unlawfully, wrongfully, willfully, and fraudulently, obtain merchandise of a value less than $500.00, belonging to one WALMART by means of deception and fraudulent representations, pretense, scheme or device, made and used by said defendant to gain the confidence of the said WALMART and to induce them to part with their said merchandise in manner and means as follows:  exchanged a stolen laser level for other merchandise in the amount of $74.83.
That the said WALMART relied on the aforesaid statements, representations and scheme made and used by said defendant and delivered possession and title of the aforesaid merchandise to said defendant.  That all of said representations and statements, pretense, scheme and device were false and untrue and were knowingly made and used by said defendant with the unlawful, willful, wrongful, and fraudulent intent then and there to deceive the said WALMART and to swindle, beat, cheat and defraud them out of said merchandise,

contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State.  I have examined the facts in this case and recommend that a warrant do issue.

**TIM HARRIS**, District Attorney

By _____

                                       Assistant

STATE OF OKLAHOMA, ss.
COUNTY OF TULSA,

121

I, _____, being duly sworn on oath, say that the statements set forth in the above information are true.

_____

Subscribed and sworn to me this _____ day of _____, 20_____

**SALLY HOWE SMITH,** Court Clerk

By_____
                                        Deputy

## NAMES OF WITNESS(ES):

ANDREW MACKENZIE          ██████████████          TULSA          OK 74136
G L WATSON W9282          TULSA POLICE DEPT.          TULSA          OK 74103
                          600 CIVIC CENTER

123

Attorney: TLP/ /                                    Case No. _____
Secretary: ZWP                                     DA Temp. No.<u>CRM-03-MY021</u>

Description of Defendant(s)

NAME: CHARLES EDMOND SANDERS
ADDR:
DESC: IN  M, 5 09, 170#, HAIR=BRO, EYES=BRO     DOB ███ -66
DA HISTORY NO: 062062     SSN: ███ 9539     DL:
REMARK:

124

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Case No. 6:09-cv-00105-JHP |
| ) | |
| KENNETH EUGENE BARRETT, ) | |
| ) | |
| *Defendant.* ) | |

---

**REDACTED EXHIBIT 186**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

124

**IN AND FOR THE DISTRICT COURT OF TULSA COUNTY**
**STATE OF OKLAHOMA**

STATE OF OKLAHOMA,
                          Plaintiff,                    CASE NUMBER CM-04-1187

vs

_Charles Edmond Snokes_
                          Defendant,



DISTRICT COURT
**F I L E D**

DEC 2 0 2005

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

# FINDINGS OF FACT - ACCEPTANCE OF PLEA

The trial judge shall ensure the Defendant is sworn either prior to completing the
Findings of Fact - Acceptance of Plea or prior to inquiry by the Court on the plea

1. Is the name under which you have been charged and referred to
   in court your true name?                                               **YES**   NO

   If No, what is your correct name? _____
   I have also been known by the name(s) _____

2. (a) Do you wish to have a record made of these proceedings
       by a Court Reporter?                                               YES   **NO**
   (b) Do you wish to waive this right?                                   **YES**   NO

3. Age: __39__          Grade completed in school: _2 yrs Ark. St._ .

4. Can you read and understand this form?                                 **YES**   NO
   (If the answer above is no, ADDENDUM A is to be completed and attached)

5. Are you currently taking any medications or substances which affect your
   ability to understand these proceedings?                               YES   **NO**

6. Have you been prescribed any medication that you should be taking, but
   you are not taking?                                                    YES   **NO**

   If so, what kind and for what purpose? _____
   _____
   _____
   _____

7. Have you ever been treated by a doctor or health professional for mental
   illness or confined in a hospital for mental illness?                  YES   **NO**

   If yes, list the doctor or health professional, place and when occurred:
   _____
   _____
   _____

8. Do you understand the nature and consequences of this proceeding?      **YES**   NO

9. Have you received a copy of the Information and read its allegations?   **YES**   NO

10. A. Do you understand you are charged with:

| | Crime | Statutory Reference | | |
|---|---|---|---|---|
| (1) | Unlawful Poss of CD | 63 O.S. 2-402 | **YES** | NO |
| (2) | Unlawful Poss of Prnaph | 63 O.S. 2-405 | **YES** | NO |
| (3) | | O.S. | YES | NO |
| (4) | | O.S. | YES | NO |
| (5) | | O.S. | YES | NO |

(List additional charges on a separate sheet and label ADDENDUM B)

   B. Are you charged after former conviction of a felony?                YES   **NO**
   If yes, list the felony(ies) charged: _____
   _____
   _____

_(handwritten margin note)_ Competency Hearing

Form 4058 (Rev. 6-00) Page 1

22. Do you understand your plea of guilty to the charge(s) is after:

☒ no prior felony convictions

☐ one (1) prior felony conviction

☐ two or more prior felony convictions
List prior felony convictions to which you are pleading: _____

_____

_____

23. What (is) (are) your plea(s) to the charge(s) (and to each one of them)? _GUILTY_

24. Did you commit the acts as charged in the Information?          (YES)   NO

State the factual basis for your plea(s) (attach additional page as needed, labeled as ADDENDUM C):

ON 2-15-04 IN TULSA COUNTY, I UNLAWFULLY POSSESSED CORTAD & PARAPHERNALIA.

_____

25. Have you been forced, abused, mistreated, or promised anything
by anyone to have you enter your plea(s)?          YES   (NO)

26. Do you plead guilty of your own free will and without any coercion
or compulsion of any kind?          (YES)   NO

27. If you are entering a plea to a felony offense, you have a right to a Pre-
Sentence Investigation and Report which would contain the circumstances
of the offense, any criminal record, social history and other background
information about you. Do you want to have the report?          YES   (NO)

28. (A) Do you have any additional statements to make to the court?          YES   (NO)

(B) Is there any legal reason you should not be sentenced now?          YES   (NO)

HAVING BEEN SWORN, I, the Defendant whose signature appears below, make the following statements under oath:

(1) ☐ I have read, understood and completed this form, and

☒ My attorney completed this form and we have gone over the form and
I understand its contents and agree with the answers. See ADDENDUM A.

☐ The Trial Judge completed this form for me and inserted my answers to the questions.

(2) The answers are true and correct.

(3) I understand that I may be prosecuted for perjury if I have made false statements to the court.

X _____
_____ Defendant

Soc. Sec. No. _____ 9539 D.O.B. _____ 66

SALLISAW, OK 74945

_____
Address

Acknowledged this __9TH__ day of __DECEMBER__, 20 05.

_____
JUDGE OF THE DISTRICT COURT

126

# SENTENCE ON PLEA

### THE COURT SENTENCES THE DEFENDANT AS FOLLOWS:

#### TIME TO SERVE

You are sentenced to confinement under the supervision of the Department of Corrections for a term of years as follows: (List in same order as in question No. 10, Part A)

The sentence(s) to run ☐ Concurrently ☐ Consecutively ☐ Not applicable

#### SUSPENDED SENTENCE or SUSPENDED AS TO PART

You are sentenced to confinement under the supervision of the Department of Corrections for a term of years as follows: (List in same order as in question No. 10, Part A)

① 1 PR ³/₅ 100 F 125 CF SOKT + COSTS

③ 1 PR ³/₅ 100 F 50 CF 50 UCF 1 COSTS

CC W/ CT 1

_____ to be suspended as follows:

☐ ALL SUSPENDED      ☐ ALL SUSPENDED <u>EXCEPT</u> as to the first _____ year(s) _____ month(s) of the term(s) during which time you are to be held in the custody of the Department of Corrections. The remainder of the sentence(s) to be suspended.

You ☐ will ☐ will not be under supervision of the Department of Corrections as set forth in the Rules and Conditions of Probation Addendum.

The sentence(s) to run ☐ Concurrently ☐ Consecutively ☐ Not applicable

#### DEFERRED SENTENCE

The sentencing date is deferred until _____, 20____ at _____ ___.M. as follows: (List in same order as in question No. 10, Part A)

You ☐ will be under supervision of the Department of Corrections. The terms set forth in the Rules and Conditions of Probation Addendum shall be the rules you must follow during the period of deferment.

You ☐ will not be under supervision of the Department of Corrections.

The sentence(s) to run ☐ Concurrently ☐ Consecutively ☐ Not applicable

127

Form 4058 (Rev. 6-00) Page 5

# ADDENDUM "A"
# CERTIFICATE OF DEFENSE COUNSEL

As the attorney for the Defendant,   CHARLES EDMOND SANDERS   , I certify that:

1. The Defendant has stated to me that he/she is ☒ able   ☐ unable   to read and understand the attached form, and I have:

    ☒ determined the Defendant is able to understand the English language.

    ☐ determined the Defendant is unable to understand the English language and obtained _____ to interpret.

2. I have read and fully explained to the Defendant the allegations contained in the Information in this case.

3. I have read and fully explained to the Defendant all of the questions. The answers to the questions are the Defendant's answers and:

    ☐ the Defendant completed the form in his/her own handwriting, and

    ☒ I completed the form for the Defendant and inserted the Defendant's answers to the questions in my own handwriting.

4. To the best of my knowledge and belief the statements and declaration made by the Defendant are accurate and true and have been freely and voluntarily made.

Dated this the ___9th___ day of ____DECEMBER____, 20_05

_____
Attorney for the Defendant

Form 4058 (Rev. 6-00) Page 7

ORIGINAL

# IN THE DISTRICT COURT IN AND FOR TULSA COUNTY, OKLAHOMA

| State of Oklahoma, | |
| --- | --- |
| -vs- | |
| **CHARLES EDWARD SANDERS** | Case No.   CM-2004-1187 |
| SS#         9539 | Count No.   1 |
| DOB       /66 | |



**JUDGMENT AND SENTENCE**
**All Time Suspended**
**MISDEMEANOR**

**DISTRICT COURT**
**F I L E D**

DEC 1 9 2005

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

Now, this **9TH day of DECEMBER , 2005,** this matter comes on before the Court for sentencing and the defendant appears personally and by his or her Attorney of record, **ASHLEY WEBB** and the State of Oklahoma is represented by **COURTNEY SMITH** . The Court Reporter IS WAIVED.

The defendant has entered a plea of **GUILTY** and has been found guilty by the Court of the crime of **POSSESSION OF CONTROLLED DRUGS** .

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED by the Court that the defendant, is guilty of this offense and is sentenced to **1 YEAR** all under the custody and control of the **TULSA COUNTY JAIL**, further, all of said term is suspended, and the the defendant is **NOT TO BE UNDER ANY FORMAL SUPERVISION.** The rules and conditions signed by the defendant acknowledging his or her understanding are incorporated as Exhibit A.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT that in addition to the preceding terms, and the general miscellaneous costs of this action, the defendant is also sentenced to: **Fine** in the amount of **$100.00**; **Court Fund Assessment** in the amount of **$125.00**; **Victim's Compensation Assessment** in the amount of **$50.00** ;

IT IS FURTHER ORDERED BY THIS COURT THAT JUDGMENT IS HEREBY ENTERED against the defendant for all costs, fees, fines, and assessments ordered in this action and he or she is ordered to report immediately upon conclusion of this sentencing hearing, or discharge from custody if the defendant is currently incarcerated, to the Tulsa County Court Clerk to pay all costs, fines, fees, and assessments ordered in this action - or - to the Tulsa County

129

Court Cost Administrator to make arrangements to pay the costs, fines, fees, and assessments as ordered pursuant to the Rule 8 Hearing held this day.

The Court further advised the defendant of his or her right to appeal to the Court of Criminal Appeals of the State of Oklahoma and of the necessary steps to be taken by him or her to perfect such appeal, and that if he or she desired to appeal and was unable to afford counsel and a transcript of the proceedings, that the same would be furnished by the State, subject to reimbursement in accordance with 22 § O. S. 1355.14, 20 § O. S. 106.4 (b), and, ADC-72-33.

Witness my hand this 9TH day of DECEMBER , 2005

Judge **MILLIE OTEY**

ATTESTATION:

SALLY HOWE SMITH
District Court Clerk Tulsa County

By: JANICE MAGGRD, Deputy

## COURT CLERK'S CERTIFICATION

I, Sally Howe Smith, District Court Clerk for Tulsa, Oklahoma, hereby certify that the foregoing is a true, correct and full copy of the instrument herewith set out as appears on record in the Court Clerks Office of Tulsa, Oklahoma.

Dated this the _____ day of _____, _____.

SALLY HOWE SMITH, DISTRICT COURT CLERK, TULSA COUNTY, OKLAHOMA

By: _____, Deputy

130

**ORIGINAL**

## IN THE DISTRICT COURT IN AND FOR TULSA COUNTY, OKLAHOMA

| | |
|---|---|
| State of Oklahoma,<br>-vs-<br>**CHARLES EDWARD SANDERS**<br>SS# ████ 9539<br>DOB ████ /66 | Case No.   CM-2004-1187<br>Count No.   2 |

**DISTRICT COURT**
**F I L E D**
**DEC 1 9 2005**

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

**JUDGMENT AND SENTENCE**
**All Time Suspended**
**MISDEMEANOR**

Now, this **9TH day of DECEMBER , 2005,** this matter comes on before the Court for sentencing and the defendant appears personally and by his or her Attorney of record, **ASHLEY WEBB** and the State of Oklahoma is represented by **COURTNEY SMITH** . The Court Reporter IS WAIVED.

The defendant has entered a plea of **GUILTY** and has been found guilty by the Court of the crime of **POSSESSION OF PARAPHERNALIA .**

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED by the Court that the defendant, is guilty of this offense and is sentenced to **1 YEAR** all under the custody and control of the **TULSA COUNTY JAIL**, further, all of said term is suspended, and the the defendant is **NOT TO BE UNDER ANY FORMAL SUPERVISION.** The rules and conditions signed by the defendant acknowledging his or her understanding are incorporated as Exhibit A. **CC WITH CT 1**.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT that in addition to the preceding terms, and the general miscellaneous costs of this action, the defendant is also sentenced to: **Fine** in the amount of **$100.00; Court Fund Assessment** in the amount of **$50.00; Victim's Compensation Assessment** in the amount of **$50.00** ;

IT IS FURTHER ORDERED BY THIS COURT THAT JUDGMENT IS HEREBY ENTERED against the defendant for all costs, fees, fines, and assessments ordered in this action and he or she is ordered to report immediately upon conclusion of this sentencing hearing, or discharge from custody if the defendant is currently incarcerated, to the Tulsa County Court Clerk to pay all

131

costs, fines, fees, and assessments ordered in this action - or - to the Tulsa County Court Cost Administrator to make arrangements to pay the costs, fines, fees, and assessments as ordered pursuant to the Rule 8 Hearing held this day.

The Court further advised the defendant of his or her right to appeal to the Court of Criminal Appeals of the State of Oklahoma and of the necessary steps to be taken by him or her to perfect such appeal, and that if he or she desired to appeal and was unable to afford counsel and a transcript of the proceedings, that the same would be furnished by the State, subject to reimbursement in accordance with 22 § O. S. 1355.14, 20 § O. S. 106.4 (b), and, ADC-72-33.

Witness my hand this 9TH day of DECEMBER , 2005

_____
Judge **MILLIE OTEY**

ATTESTATION:

SALLY HOWE SMITH
District Court Clerk Tulsa County

By: _____
**JANICE MAGGRD,**Deputy

### COURT CLERK'S CERTIFICATION

I, Sally Howe Smith, District Court Clerk for Tulsa, Oklahoma, hereby certify that the foregoing is a true, correct and full copy of the instrument herewith set out as appears on record in the Court Clerks Office of Tulsa, Oklahoma.

Dated this the _____ day of _____, _____.

SALLY HOWE SMITH, DISTRICT COURT CLERK, TULSA COUNTY, OKLAHOMA

By: _____, Deputy

# ORDER OF RELEASE FROM CUSTODY

133

TO THE SHERIFF OF TULSA COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order:

Last name, first, middle, suffix (please print) (show alias')

Sanders, Charles Edmond

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE/CLARIFICATION OF COUNTS |
|---|---|---|
| Cm.04-1187 | Suspended | fta/poss cd sched I II |
| Cm.04-1187 | Suspended | fta/poss drug paraphernalia |
| Cm.03-6603 | ~~Suspended~~ Dismissed | Application to revoke |
|  |  |  |
|  |  |  |
|  |  |  |

☐ **ELECTRONIC MONITOR REQUIRED BEFORE RELEASE**

In and for the District Court of Tulsa County, State of Oklahoma, witness my hand this the ___9th___ day of ___Dec___, 20 __05__.

SALLY HOWE SMITH, DISTRICT COURT CLERK
TULSA COUNTY, OKLAHOMA

Division/Court __Otey__

By: __Darryl D. Vannoy__
Deputy Court Clerk
(Court Seal)

Received by: __B. W.__
Deputy Sheriff

Received by: _____
C.C.A.

Form 4647 (Rev. 6-01)

# PAYMENT PLAN AGREEMENT

## TULSA COUNTY COURT COST ADMINISTRATION

**DISTRICT COURT**
**F I L E D**

DEC 1 6 2005

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

NAME: _Charles E Sanders_

SOCIAL SECURITY NO. ████████████9539

ADDRESS: ████████████
_Sand Springs, OK 74055_

TELEPHONE: _918-775-3093_

EMPLOYER: _____

TELEPHONE: _____

CASE NO. _CM-04-1187_  $ _842.00_

_CF-03-_____  $ _____

_____  $ _____

_____  $ _____

_____  $ _____

$ _____

GRAND TOTAL  $ _842.00_

$ _____ is to be paid on or before _____

D.U.I program cases: be prepared to pay $ _____ after court on _____.

The first payment of $ _15.00_ is due on _2-16-06_ then _5_ payments of $ _15.00_ are to be paid on or before the _16th_ day of each month with the final payment of $ _342.00_ being due on _7-16-06_

You are to return to Cost Administration for review on _7-16-06_.

Work hours were assigned in lieu of costs and fine. Completion date: _____.

➤ All payments are made in the Criminal/Traffic Division located on the second floor of the County Courthouse in the Court Clerk's Office. Office hours are 8:30 a.m. to 5:00 p.m. **If paying in person bring this payment plan with you.**

➤ If paying by mail, enclose a stamped self addressed envelope if you want your receipt mailed back to you. **Put your case number on your check or money order. Write** *court cost* **on your payment.** Make payable to, and mail to: Sally Howe Smith, Court Clerk, Criminal/Traffic Division, Tulsa County Courthouse, 500 South Denver, Tulsa, Oklahoma 74103-3844. Allow 7 days for delivery.

➤ Payments can be made by cash, check, money order, or cashier's check.
   • Do **not** send cash through the mail
   • Bad checks will be prosecuted to the fullest extent of the law

➤ All payments must be received in the Office of the Court Clerk on or before the due date to avoid penalties. If you cannot make your payment on time you must appear *in person* before the Cost Administrator on your due date.

I have read and have agreed to the foregoing payment schedule. I understand I am under an order of the Court to comply and that if I fail to do so, I will face additional penalties and possible imprisonment.

Defendant's signature: _Charles Sanders_    Date: _12-16-05_

**✱ WARNING ✱ IF YOU DO NOT MAKE YOUR SCHEDULED PAYMENTS ON TIME, THE TOTAL AMOUNT THAT YOU OWE WILL BECOME DUE AND A WARRANT SHALL BE ISSUED FOR YOUR ARREST FOR THE FULL AMOUNT OF COST CHARGED IN YOUR CASE(S), PLUS PENALTY FEES.**

134

Form 3907 (Rev. 9-04)

## ORDER OF THE COURT - RULE 8 HEARING
[prepare separate Rule 8 for each case]

DEFENDANT'S NAME: _Charles Edmond Sanders_   CASE NO.: _CM-04-1187_

☒   **The Court has sentenced you to the custody of the Department of Corrections or the Tulsa County Jail** and you are therefore ordered to report to the Cost Administrator on the 2nd floor of this building within two weeks of your release from the Department of Corrections, <u>or immediately after your release</u> from the Tulsa County Jail, to make payment arrangements on the costs and fines assessed to you today.

☐   **The Court finds you are able to pay and you agree to pay by installment** payment the fines and costs assessed in this case. You are ordered to <u>report immediately to the Cost Administrator</u> on the 2nd floor of this building to make arrangements for installment payments of the costs and fines assessed in this case as shown below.

☐   **The Court orders you to perform** _____ hours of community service in lieu of the fines and costs or in lieu of _____ assessed in this case as shown below. You are <u>first</u> ordered to <u>report immediately to the Misdemeanant Work Program</u> located in the basement of this building, Room B3 in the Court Services Office and <u>secondly</u> you are ordered to <u>report to the Office of the Cost Administrator</u> on the 2nd floor of this building. A review of your community service is set before this Court on: _____.

☐   **The Court has found you to be indigent and unable to pay** the costs and fines assessed in this case and said monies are hereby ordered suspended. You are ordered to <u>take this form immediately to the Cost Administrator</u> on the 2nd floor of this building.

☐   **The Court finds you are able and agree to pay the fines and costs** assessed in this case immediately and you are ordered to **report immediately to the Criminal/Traffic Division** on the 2nd floor of this building and to pay all costs and fines assessed in this case as shown below.

**COUNT 1 :** (circle one) **D.U.I.   Felony   (Misdemeanor)   Traffic**   Charge amended to:_____
Deferred (date) _____ D.U.I. Program (date)_____ Suspended (_____ yrs) Dismissed cost to: State/Deft. (circle 1)
Fine $ _100_   Victim's Compensation $ _50_   Court Fund $ _125_   Deferred Fee $_____
Drug Fund Fee $_____   Lab Fee $_____   D.A. Drug Fund $_____   P.S.I. Fee $_____
DNA Fee $_____ Incarceration Fee $_____ Restitution $_____ Other _____ $_____

**COUNT 2 :** (circle one) **D.U.I.   Felony   (Misdemeanor)   Traffic**   Charge amended to:_____
Deferred (date) _____ D.U.I. Program (date)_____ Suspended (_____ yrs) Dismissed cost to: State/Deft. (circle 1)
Fine $ _100_   Victim's Compensation $ _50_   Court Fund $ _50_   Deferred Fee $_____
Drug Fund Fee $_____   Lab Fee $_____   D.A. Drug Fund $_____   P.S.I. Fee $_____
DNA Fee $_____ Incarceration Fee $_____ Restitution $_____ Other _____ $_____

**COUNT 3 :** (circle one) **D.U.I.   Felony   Misdemeanor   Traffic**   Charge amended to:_____
Deferred (date) _____ D.U.I. Program (date)_____ Suspended (_____ yrs) Dismissed cost to: State/Deft. (circle 1)
Fine $_____   Victim's Compensation $_____   Court Fund $_____   Deferred Fee $_____
Drug Fund Fee $_____   Lab Fee $_____   D.A. Drug Fund $_____   P.S.I. Fee $_____
DNA Fee $_____ Incarceration Fee $_____ Restitution $_____ Other _____ $_____

**COUNT 4 :** (circle one) **D.U.I.   Felony   Misdemeanor   Traffic**   Charge amended to:_____
Deferred (date) _____ D.U.I. Program (date)_____ Suspended (_____ yrs) Dismissed cost to: State/Deft. (circle 1)
Fine $_____   Victim's Compensation $_____   Court Fund $_____   Deferred Fee $_____
Drug Fund Fee $_____   Lab Fee $_____   D.A. Drug Fund $_____   P.S.I. Fee $_____
DNA Fee $_____ Incarceration Fee $_____ Restitution $_____ Other _____ $_____

**IF YOU FAIL TO PAY, APPEAR, OR REPORT AS ORDERED, A WARRANT WILL BE ISSUED FOR YOUR ARREST AND YOU MAY BE CONFINED IN THE TULSA COUNTY JAIL UNTIL THE BALANCE IS PAID IN FULL**

Dated this _9TH_ day of _DECEMBER_, _2005_.   _____
                                                Judge of the District Court of Tulsa County

I HAVE READ AND UNDERSTAND THIS ORDER:

X_____   _____
        Defendant's Signature                    Attorney's Signature

Form 3913 (Rev. 3-01)

135

J-17
R-2
9/28

# IN THE DISTRICT COURT OF TULSA COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA, Plaintiff,

-vs-

Sanders, Charles, Defendant.

**DISTRICT COURT**
**FILED**
SEP 2 8 2005

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

Case No. CM04-1187
CM03-6603

Charge(s): _____

Bond(s) Set:_____

In Custody _____

Out on: Bond _____

Pretrial Release _____

Other _____

## PAUPER'S AFFIDAVIT

I, (Name) Sanders, Charles   (Soc. Sec. #) ▮▮▮▮ 9539   Phone # 775-3093

(Address) ▮▮▮▮▮▮▮▮▮   Sallisaw, OK , upon oath,

do depose and state:

**I. I talked to the following 3 lawyers about this case:**

1. _____ None _____   Cost to represent me $_____
2. _____   Cost to represent me $_____
3. _____   Cost to represent me $_____

## II. PERSONS IN HOUSEHOLD

Is Person a Dependent

Spouse: _____   Yes ( ) No ( )

Children: _____   Yes ( ) No ( )

_____   Yes ( ) No ( )

Others: _____   Yes ( ) No ( )

_____ None _____

Are you claimed as a dependent by parent or guardian?   Yes ( ) No (✓)

If so, explain _____

## III. FINANCIAL STATUS—ASSETS (Defendant or person(s) responsible for defendant's support):

A.   1. Cash on Hand: $ None

2. Bank Accounts:

| Bank Name & Address | Account # | Checking/Savings | $ Amount |
|---|---|---|---|
| None | | | |

3. Bonds & Securities:

| Description | Value |
|---|---|
| None | |

4. All Other Possessions of Value: (including tax refunds, notes, accts. receivable, etc.)

| Description | Value |
|---|---|
| None | |

B.   1. Current Employment: None

2. Earnings: _____

3. If not currently employed, last employment:
(Place & Date) BRB Construction / 2002

4. Supplemental Income: (V.A., Soc. Security, Disability, Child Support, etc.) None

5. Spouse's Current Employment: None

6. Spouse's Monthly Earnings: $ _____

Form 3719 (Rev. 1-01) Front

136

C.  Home and Other Real Estate

Real Property                                  Value                          Balance Owed

*None*

D.  Vehicle(s):
Description                                     Value                          Balance Owed

*None*

E.  Personal Property: (furniture, appliances, tools, equipment, etc.)
Items                                          Market Value                   Balance Owed

*None*

F.  Litigation you or your spouse have pending for recovery of money:
Case No.                                       County

*None*

IV.  **FINANCIAL STATUS—LIABILITIES**

A.  Charge or Open Accounts:
Description                                     Balance

*None*

B.  Housepayment or Rent:
Mortgagee/Landlord                             Monthly Payment

*DOC Custody*

If own, balance: _____

C.  Child Support Obligations
Monthly Payment: ___*None*___

D.  Other Debts:
Creditor                                       Balance

*None*

V.  **OTHER**

A.  Have you transferred or sold any assets since charges were filed in this case?     Yes ( )  No (✓)
If so, describe the buyer and the amount received:
_____

B.  Have you retained counsel in this case or in any other pending criminal case?     Yes ( )  No (✓)
If so, state the case number, court, attorney and amount paid to attorney for services:
_____

C.  Amount of bond posted $ *6600.00*_____. It was a: *Original Bond*
_____ Cash bond, where the entire bond amount was posted in cash.
___✓___ Surety bond, where a bondsperson posted the bond for me.
_____ Property bond, where someone put up their property.
If you have posted a cash or surety bond, who provided the funds for the bond? *Myself*
If you have posted a surety bond, how much was the bondsperson paid? $ *600.00*

D.  Do you have any friends or relatives who are able and willing to assist you in hiring counsel and paying for transcripts? Yes ( ) No (✓)
If so, have those persons been asked to help? Yes ( ) No ( )

E.  If a friend or relative has given previous financial assistance in this case, including the posting of bond, but is no longer able or willing to do so, an affidavit to that effect from that person shall be attached, stating why such help is no longer available.

**I further swear and affirm that I am without funds or other sources of income to pay an attorney or to pay for transcripts and costs associated with this case. I understand I am under a continuing obligation to keep this Court informed of any changes in my financial status and this Court may conduct another hearing to determine my indigent status at any time.**

_____
Applicant's Signature

Subscribed and sworn to before me this ___*28*___ day of ___*Sept*___ 20 *05*.

State of Oklahoma
County of ___*Tulsa*___  OR

_____*A.W. Hope*_____
Notary Public

My Commission Expires _*10-8-07*_

COURT CLERK

By: _____
   Deputy

_____
Judge of The District Court

Form 3719 (Rev. 1-01 Back)



SEP 2 7 2005   **ORIGINAL**

## IN THE DISTRICT COURT OF TULSA COUNTY, STATE OF OKLAHOMA

| | |
|---|---|
| State Of Oklahoma,<br><br>Plaintiff,<br><br>-vs-<br><br>*C192059*<br>CHARLES EDMOND SANDERS ,<br><br>Defendant,, | Case No. CM-2004-1187<br><br>Misdemeanor |

**DISTRICT COURT**
**F I L E D**

SEP 2 8 2005

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA, TULSA COUNTY

### BENCH WARRANT ISSUED FAILED TO APPEAR
### BY ORDER OF THE HONORABLE MARK BARCUS

THE STATE OF OKLAHOMA, TO ANY SHERIFF OR PEACE OFFICER WITHIN THE STATE OF OKLAHOMA:

> You are commanded forthwith to arrest: **CHARLES EDMOND SANDERS , Defendant**

██████████ ✓
MARBLE CITY, OK   74945

SS.# 441709539, DL# NONE, DOB
01/11/1966
Sex: Male   Race: American Indian or
Alaskan Native   Hair: Brown   Eyes:
Brown   Weight: 170   Height: 509

**Counts:**
POSSESSION OF CONTROLLED DRUG            $15,000.00
POSSESSION OF PARAPHERNALIA              $15,000.00

**Comment: BRING DEFENDANT TO ARRAIGNMENT, ROOM 173,
9:30 AM.**

and bring him/her before the court or if the court is adjourned or is not in session that you retain him/her in your custody or deliver him/her to the lawful custodian inmates of the **Tulsa County** Jail subject to the further order of this court.

Given under my hand and the seal of said court affixed this the ___5___ day of
___April___ , 20 _04_ .

SALLY HOWE SMITH , Clerk of Court

By: _____
Deputy Court Clerk

### OFFICER'S RETURN OF SERVICE

Received this writ this _26_ day of ___09___ , _05_ , at _1500_ o'clock ___.M. and
served the same by taking the above named person into custody on the _26_ day of
___09___ , _05_ , and delivering the person to the judge named.

| | | |
|---|---|---|
| Serving Warrant | $_____ | _____ , Sheriff |
| Copy | $_____ | _____ County, Oklahoma |
| Mileage | | |
| (___ Miles @ ___ per mile) | $_____ | By: _C. R. HAYWOOD TPD 01612_ |
| Total | | Deputy OFFICER |

DAVID L. MOSS CJC    4/8/04
TULSA COUNTY, OKLAHOMA

AGENT

138

CASE No. CM-2004-1187
misdemnor

Your Honor;

DISTRICT COURT 6-17-04
FILED Thursday
JUL 1 5 2004

Jodge, BARCUS

I'm writing you on Behalf

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

of That I Recived from Your courts
on CASE; NO CM-2004-1187 A Bench
Warrant; Which I was Supposed
to Appear before you on April 5-2004
which I fail to do, I was and
Still Are Detained IN The Sequohah
Co. Jail, and I'm Praying that I GET
out within the Next 2 weeks, So
your; Honor I Hope + Pray that you
will Lift the Warrant, and I Give
you my word That I will Report to
you within 24 Hours After my Release
Thank you for Taking the Time out
of your Busy Schabule, to Read This

Respectfully

Charles E. Sanders

SeO Co. Jail
119 S B. Oak St
Salisaw, Okla

DISTRICT COURT
**F I L E D**

IN AND FOR THE DISTRICT COURT OF TULSA COUNTY MAY 1 1 2004
STATE OF OKLAHOMA

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

State Of Oklahoma,

                Plaintiff,

-vs-                                   Case No. _CM-2004-1187_

Charles E Sauders ,                       2 Counts

                Defendant,

## BONDSMAN'S NOTICE[1]

**DEFENDANT RETURNED TO TULSA COUNTY CUSTODY PRIOR TO BREACH OF UNDERTAKING** - Comes now the undersigned bondsman, surety, or agent thereof, and respectfully represents to the Court that the defendant in the above styled and numbered case(s) was surrendered to custody of the Tulsa County Jail on the _____ day of _____, _____ , for the following reason(s):_____

_____
_____I hereby request the Court Clerk to enter a minute to the case exonerating the bond pursuant to Title 59 § 1327 (A).

**DEFENDANT RETURNED TO CUSTODY AFTER FORFEITURE** - Comes now the undersigned bondsman, surety, or agent thereof, and respectfully represents to the Court that the defendant in the above styled and numbered case(s) was returned to the custody of _Sequoyah_ County, OK. on the _28th_ day of _April_ ,_2004_ , within the 90 day statutory time period. A Tulsa County hold _X_ has _____has not  been placed on the defendant for this case.  I hereby request the Court Clerk to enter a minute to the case vacating the forfeiture and exonerating the bond pursuant to Title 59 § 1332 (C).

See Attached Hold

Dated this the _11th_ day of _____May_____,_2004_ .

_____ 583-8000
Bondsman/Surety/Agent (signature and **phone number**)

### (ADVISORY TO SURETY)

If a defendant is in custody of a county - <u>other than Tulsa County</u> - only a Judge can exonerate the bond <u>prior to breach</u>.  You may request the Court to issue a bench warrant for cause to be used as a 'hold' against the defendant in the custodial county. You should also advise the District Attorney.

<u>After forfeiture</u> if a defendant is returned to custody <u>outside the State of Oklahoma</u>, only a Judge can authorize a minute or order vacating the forfeiture. Although Judges' requirements will vary, most require a Motion to Vacate the Bond Forfeiture, verification that a Tulsa County hold has been placed, proof that transportation costs have been paid, and approval from the Office of the District Attorney.

---

[1] Please attach a copy of the body slip, the jail's verification of recommitment or return to custody, or hold confirmation.

SALS

MSG NR: 00022963     ORI: OK0720501     DATE: 20040428

TO:  SEQUOYAH CO

REF: SANDERS, CHARLES EDMOND 19660111

PLEASE PLACE A HOLD ON THIS SUBJECT WARR CM04-1187 FOR POSS CD AND
PARA. WE WILL EXTRADITE. PLEASE CONFIRM HOLD IN RETURN TTY.
ALL HELP APPRECIATEDF

AUTH: TAPPER
FROM: TCSO     OPR: WHEELER     11:51

MESSAGE ACCEPTED - TCAD 00100 AT 11:52   04/28/2004
056750

141

IN THE DISTRICT COURT OF TULSA COUNTY
STATE OF OKLAHOMA

Case No. C M-04-01187
AMENDED
Misdemeanor Information

THE STATE OF OKLAHOMA,

    Plaintiff,

Vs.

CHARLES EDMOND SANDERS
A/K/A DOTSON, WALTER TIMOTHY
A/K/A MORK, CHARLES E
A/K/A SANDERS, MONK
A/K/A SANDERS, MORK
A/K/A SANDERS, CHARLES ROBERT
A/K/A SANDERS, CHARLES MONK

    Defendant(s).

FILED

APR 0 7 2004

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA.

**BE IT REMEMBERED:**

That **TIM HARRIS**, the duly elected and qualified **District Attorney for Tulsa County, Oklahoma,** who prosecutes in the name and by the authority of **The State of Oklahoma**, comes now into the District Court of Tulsa County, State of Oklahoma, and gives the Court to understand and be informed that:

**(Count 01)**
**63-0002-0402 (B2)**

**CHARLES EDMOND SANDERS**, on or about 02-15-04, in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did commit the crime of **UNLAWFUL POSSESSION OF CONTROLLED DRUG**, a misdemeanor, by unlawfully, knowingly and intentionally, have in his possession and under his control Loritab said drug being classified as controlled dangerous substance in Schedule I of the Uniform Controlled Dangerous Substances Act of this State,

**(Count 02)**
**63-0002-0405 (0B)**

**CHARLES EDMOND SANDERS**, on or about 02-15-04, in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did commit the crime of **UNLAWFUL POSSESSION OF PARAPHERNALIA**, a misdemeanor, by unlawfully, willfully and wrongfully have in his possession and under his immediate control certain paraphernalia, to-wit: a syringe and a pipe used by abusers of drugs classified as controlled dangerous substances under the Uniform Controlled Dangerous Substances Act of this State, and for the purpose and with the unlawful intent to administer such controlled dangerous substances without having any medical or other lawful need requiring possession of said paraphernalia,

contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State. I have examined the facts in this case and recommend that a warrant do issue.



142

**TIM HARRIS**, District Attorney

By_____

Assistant

STATE OF OKLAHOMA, ss.
COUNTY OF TULSA,

I, _____ being duly sworn on oath, say that the statements set forth in the above information are true.

_____

Subscribed and sworn to me this _____ day of _April_____, 20 _04_

**SALLY HOWE SMITH,** Court Clerk

By_____

Deputy

**NAMES OF WITNESS(ES):**

| | | | |
|---|---|---|---|
| PAUL SCHROEDER S1199 | TULSA POLICE DEPT. 600 CIVIC CENTER | TULSA | OK 74103 |
| DAVID DERBY D8807 | TULSA POLICE DEPT. 600 CIVIC CENTER | TULSA | OK 74103 |
| PHIL CERVANTES | TULSA CO. SHERIFFS OFF. 500 S. DENVER | TULSA | OK 74103 |
| L HILL | TULSA CO. SHERIFFS OFF. 500 S. DENVER | TULSA | OK 74103 |
| MATT FLEENOR | TULSA CO. SHERIFFS OFF. 500 S. DENVER | TULSA | OK 74103 |

ORIGINAL

144

Attorney: TP / /                                    Case No. <u>C M-04-01187</u>
Secretary: NCF

Description of Defendant(s)

NAME: <u>CHARLES EDMOND SANDERS</u>
ADDR[REDACTED]      MARBLE CITY, OK  74945
DESC: IN  M, 5 09, 170#, HAIR=BRO, EYES=BRO     DOB: [REDACTED]-66
DA HISTORY NO: 062062    SSN:[REDACTED]9539   DL:
REMARK: 441709530
A/K/A DOTSON, WALTER TIMOTHY, MORK, CHARLES E, SANDERS, MONK, SANDERS, MORK, SANDERS, CHARLES ROBERT, SANDERS, CHARLES MONK

ORIGINAL

IN THE DISTRICT COURT OF TULSA COUNTY
STATE OF OKLAHOMA

Case No. **CM 2004 1187**

Misdemeanor Information

THE STATE OF OKLAHOMA,

Plaintiff,

Vs.

**DISTRICT COURT**
**FILED**

CHARLES EDMOND SANDERS
A/K/A DOTSON, WALTER TIMOTHY    FEB 2 6 2004
A/K/A MORK, CHARLES E
A/K/A SANDERS, MONK             SALLY HOWE SMITH, COURT CLERK
A/K/A SANDERS, MORK             STATE OF OKLA. TULSA COUNTY
A/K/A SANDERS, CHARLES ROBERT
A/K/A SANDERS, CHARLES MONK

Defendant(s).

**BE IT REMEMBERED:**

That **TIM HARRIS**, the duly elected and qualified **District Attorney for Tulsa County, Oklahoma,** who prosecutes in the name and by the authority of **The State of Oklahoma**, comes now into the District Court of Tulsa County, State of Oklahoma, and gives the Court to understand and be informed that:

**(Count 01)**
**63-0002-0402 (B2)**

CHARLES EDMOND SANDERS, on or about 02-15-04, in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did commit the crime of **UNLAWFUL POSSESSION OF CONTROLLED DRUG**, a misdemeanor, by unlawfully, knowingly and intentionally, have in his possession and under his control Loritab said drug being classified as controlled dangerous substance in Schedule III of the Uniform Controlled Dangerous Substances Act of this State,

**(Count 02)**
**63-0002-0405 (0B)**

CHARLES EDMOND SANDERS, on or about 02-15-04, in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did commit the crime of **UNLAWFUL POSSESSION OF PARAPHERNALIA**, a misdemeanor, by unlawfully, willfully and wrongfully have in his possession and under his immediate control certain paraphernalia, to-wit: a syringe and a pipe used by abusers of drugs classified as controlled dangerous substances under the Uniform Controlled Dangerous Substances Act of this State, and for the purpose and with the unlawful intent to administer such controlled dangerous substances without having any medical or other lawful need requiring possession of said paraphernalia,

contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State. I have examined the facts in this case and recommend that a warrant do issue.

145

**TIM HARRIS,** District Attorney

By_____

Assistant

STATE OF OKLAHOMA, ss.
COUNTY OF TULSA,

I, _____, being duly sworn on oath, say that the statements set forth in the above information are true.

_____

Subscribed and sworn to me this _____ day of _____, 20_____

**SALLY HOWE SMITH,** Court Clerk

By_____

Deputy

## NAMES OF WITNESS(ES):

| | | | |
|---|---|---|---|
| PAUL SCHROEDER S1199 | TULSA POLICE DEPT. 600 CIVIC CENTER | TULSA | OK 74103 |
| DAVID DERBY D8807 | TULSA POLICE DEPT. 600 CIVIC CENTER | TULSA | OK 74103 |
| PHIL CERVANTES | TULSA CO. SHERIFFS OFF. 500 S. DENVER | TULSA | OK 74103 |
| L HILL | TULSA CO. SHERIFFS OFF. 500 S. DENVER | TULSA | OK 74103 |
| MATT FLEENOR | TULSA CO. SHERIFFS OFF. 500 S. DENVER | TULSA | OK 74103 |

Attorney: TP /  /                                 Case No. _____
Secretary: NCF                                    DA Temp. No.CRM-04-BZ059

Description of Defendant(s)

NAME: CHARLES EDMOND SANDERS
ADDR: ███████████ MARBLE CITY, OK  74945
DESC: IN  M, 5 09, 170#, HAIR=BRO, EYES=BRO     DOB: ███-66
DA HISTORY NO: 062062     SSN: ███-9539     DL:
REMARK: 441709530
A/K/A DOTSON, WALTER TIMOTHY, MORK, CHARLES E, SANDERS, MONK, SANDERS, MORK, SANDERS, CHARLES ROBERT, SANDERS, CHARLES MONK



## ORIGINAL

IN THE DISTRICT COURT IN AND FOR TULSA COUNTY, OKLAHOMA



| | |
|---|---|
| State of Oklahoma, | |
| vs. | Case No. CM-04-1187<br>Count No. 1,2 |
| Sanders, Charles Edmond | |

**F I L E D**
APR 0 6 2004
SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

## ORDER AND JUDGMENT OF FORFEITURE

On **APRIL 5, 2004** the above cause came on for hearing, according to the regular assignment of the docket of this Court. The Court finds that the above named defendant having heretofore been charged with the crime of: **CT. 1 POSS OF CONTROLLED DRUG; CT 2.POSS. PARAPH** having been committed to bail in the amount shown below and released on an appearance bond executed by the bondsman, and if applicable his insurer, as shown below:

Ct-1 $5,000.00 @ michelle Beavers, Karen Ringgold  11575
Ct-2 $250.00   "   "   11576

Said bond conditioned as provided by law for the appearance of the defendant before this Court as required, and the Court having ordered the defendant to appear on **APRL 5, , 2004** and the defendant, being called three times in open court - without sufficient excuse - failed to appear before the Court as ordered - or - departed there from without leave from the Court. The Court further finds that said bondsman had due and legal notice as provided by law of the required appearance of said defendant. The court further finds that the conditions of said appearance bond have been broken by both the defendant and the bondsman, and that an Order and Judgment of Forfeiture should be entered.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that the appearance bond of said defendant be, and the same is hereby declared and is ordered forfeited to the State of Oklahoma, and the amount of said bond is ordered paid to the Clerk of the Court.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Court Clerk shall immediately mail a copy of this Order and Judgment of Forfeiture to the bondsman, and, if applicable, his or her insurer. The bondsman is hereby directed to deposit with the Court Clerk, the face amount of the forfeited bond, as shown above. Such deposit to be made within ninety-one (91) days from receipt of this Order and Judgment of Forfeiture or from the mailing of this notice if no receipt is made.

Witness my hand this **5TH** day of **April, 2004.**

**JUDGE MARK BARCUS**

## CERTIFICATE OF MAILING

I, Sally Howe Smith, District Court Clerk, for Tulsa County, Oklahoma, do certify that I mailed a true and correct copy of this Order and Judgment of Forfeiture to the above named bondsman and, if applicable, his or her insurer to the last known address of each, by certified mail with return receipt requested this ___6___ day of ___April___, 2004.

SALLY HOWE SMITH, Tulsa County District Court Clerk

By: _____

148

CW 2/13/72

**PAYMENT PLAN AGREEMENT**

**TULSA COUNTY COURT COST ADMINISTRATION**

DISTRICT COURT
F I L E D
APR 0 5 2004
SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

NAME: Bryan Patrick Thurman

SOCIAL SECURITY NO.: ████████ 1217

ADDRESS: ████████████

Tulsa, 74127

TELEPHONE: 282 0775

EMPLOYER: BA Lawn/Landscape

TELEPHONE: 625 1539

CASE NO. CF 02 78       $ 303.50

☆ TR03 21344      $ 70.00

CM 04 181      $ 532.00

TR04 4057      $ 238.00

TR04 4052      $ 158.00

$ _____

GRAND TOTAL   $ 1301.50

---

$ _____ is to be paid on or before _____

---

D.U.I program cases: be prepared to pay $ _____ after court on _____.

---

The first payment of $ 100.00 is due on 4/31/04, then 5 payments of $ 100.00 are to be paid on or before the 31st day of each month with the final payment of $ 701.50 being due on 9/31/04.

---

You are to return to Cost Administration for review on 9/31/04.

---

Work hours were assigned in lieu of costs and fine. Completion date: _____.

---

➤ All payments are made in the Criminal/Traffic Division located on the second floor of the County Courthouse in the Court Clerk's Office. Office hours are 8:30 a.m. to 5:00 p.m. **If paying in person bring this payment plan with you.**

➤ If paying by mail, enclose a stamped self addressed envelope if you want your receipt mailed back to you. **Put your case number on your check or money order.** Write *court cost* on your payment. Make payable to, and mail to: Sally Howe Smith, Court Clerk, Criminal/Traffic Division, Tulsa County Courthouse, 500 South Denver, Tulsa, Oklahoma 74103-3844. Allow 7 days for delivery.

➤ Payments can be made by cash, check, money order, or cashier's check.
  • Do **not** send cash through the mail
  • Bad checks will be prosecuted to the fullest extent of the law

➤ All payments must be received in the Office of the Court Clerk on or before the due date to avoid penalties. If you cannot make your payment on time you must appear *in person* before the Cost Administrator on your due date.

I have read and have agreed to the foregoing payment schedule. I understand I am under an order of the Court to comply and that if I fail to do so, I will face additional penalties and possible imprisonment.

Defendant's signature: _____   Date: 3/31/04

**✱ WARNING ✱ IF YOU DO NOT MAKE YOUR SCHEDULED PAYMENTS ON TIME, THE TOTAL AMOUNT THAT YOU OWE WILL BECOME DUE AND A WARRANT CAN BE ISSUED FOR YOUR ARREST FOR THE FULL AMOUNT OF COST CHARGED IN YOUR CASE(S), PLUS PENALTY FEES.**

Form 3907 (Rev. 4-97)

149

# ORDER OF RELEASE FROM CUSTODY



FEB 17 2004

150

TO THE SHERIFF OF TULSA COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order:

Last name, first, middle, suffix (please print) (show alias')

Sanders      Charles    E.      CM-04-1187

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE/CLARIFICATION OF COUNTS |
|---|---|---|
| NS | Bond | Poss para |
|  |  | Obst / interfere w Police off |
|  |  | Poss CD AFCF |
|  |  |  |
|  |  |  |

DISTRICT COURT **FILED** MAR 2 5 2004 SALLY HOWE SMITH, COURT CLERK STATE OF OKLA. TULSA COUNTY

❏ **ELECTRONIC MONITOR REQUIRED BEFORE RELEASE**

In and for the District Court of Tulsa County, State of Oklahoma, witness my hand this the ___16___ day of ___2___, 20 _04_.

ANN THOMPSON, MUNICIPAL COURT CLERK FOR
SALLY HOWE SMITH, DISTRICT COURT CLERK
TULSA COUNTY, OKLAHOMA

Division/Court _____

By: _____
Deputy Court Clerk
(Court Seal)

Received by: _____
Deputy Sheriff

Received by: _____
C.C.A.

Form 4679 (Rev. 9-01)

# TRACIS
TULSA REGIONAL AUTOMATED CRIMINAL INFORMATION SYSTEM
STANDARDIZED REPORTING FORMAT

**TULSA COUNTY SHERIFF**
**ARREST AND BOOKING DATA**

INCIDENT NUMBER

CM041187

PAGE ___ OF ___

**MUG & PRINT**
- ☐ PARTIAL   ☐ COMPLETE   PHOTO TO _____   TCSO NUMBER _____   COURT DATE _____   DIVISION _____
- ☐ FEDERAL DISTRICT   ☑ TULSA DISTRICT   ☐ NCIC CHECKED   ☐ MUNICIPAL   ☐ HOLD FOR _____   ☐ JUV   ☐ R.O.P.

**LOCATION OF ARREST** [redacted]

**LOCATION OF OCCURRENCE** [redacted]

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OCCURRED** MO 2 DATE 15 YR 04 DAY SUN TIME 1915 | **ARRESTED** MO 2 DATE 15 YR 04 DAY SUN TIME 1930 | **BOOKED** MO 02 DATE 15 YR 04 DAY SUN TIME 2101 |

TPD/PID

**SUSPECT NAME (LAST, FIRST, MIDDLE)** SANDERS, Charles   AKA

HGT 59   WGT 170   HAIR Bro   EYES Bro   SKIN M   RACE W   SEX M

**STREET ADDRESS, CITY, STATE** [redacted]   ZIP CODE 74945   AGE 38   DOB [redacted]-66   SOCIAL SECURITY NUMBER [redacted] 9153

**EMPLOYER/SCHOOL** [redacted]   HOME PHONE 918 775 3092   DRIVER'S LICENSE NUM   ST   CLASS   END

**EMPLOYER ADDRESS**   BUSINESS PHONE   OSBI NUMBER   FBI NUMBER

**NEXT OF KIN** Evelyn Sanders   **ADDRESS** Same   **PHONE** Same   **RELATIONSHIP** mom

**PERSONAL ODDITIES**

**CLOTHING** Stripe Shirt   Jeans cap   **TATTOOS** R. chest   **WARNING INDICATORS** meth user

**DISPOSITION/HOLD**   VIN   TAG YR   TAG STATE   TAG NUMBER

VEHICLE   VEH YR   VEH MAKE   VEH MODEL   VEH STYLE   COLOR TOP/BOTTOM   MISC IDENTIFIERS

**ARRESTING OFFICER** R. Hunter (3356)   **ID NUM  DIV  AGENCY** TCSO   **BACKING OFFICER**   **ID NUM  DIV  AGENCY**   **JAIL INTAKE** Nichols   **ID NUM**

| FED STA MUN | FEL MISD | CRIME DESCRIPTION | TITLE | SECT | PARA | DATE OF OFFENSE | WARRANT NUMBER | ORI | BOND | O.R. | UCR |
|---|---|---|---|---|---|---|---|---|---|---|---|
| S | M | Poss Drug Paraphnilia | | | | 2-15-04 | | | $250.00 | | |
| S | M | Obstructing | | | | 2-15-04 | | | $500.00 | | |
| | | All AECF | | | | | | | | | |
| S | F | Poss, controlled Drug | 63 | 4201 | | | | | $5,000.00 | | |

1105965

**DISTRICT COURT**
**FILED**
MAR 16 2004

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

**FORCE** LEVEL: ☐ NONE   ☐ MINIMAL   ☐ DEFENSIVE   ☐ DEADLY   INJURED: ☐
DOCUMENT:

| BREATHALYZER OPERATOR/ID NUM/AGENCY | BREATHALYZER SUPERVISOR/ID NUM/AGENCY | TEST RESULTS 0.    % |
|---|---|---|

MEDICAL PROBLEMS

PROPERTY RECEIPT   VCR TAPE   PHOTO NUM   LATENT NUM

CONNECTED:   SUSPECTS   VICTIM   ASSOCIATES   WILL SIGN CITY INFORMATION

RIGHT INDEX

065857   ARREST DOCKET NUMBER 2004

Form 3771 (Rev. 8-99) Front

No Expiration Date
Amount — (Unlimited)

# POWER OF ATTORNEY
## Karen B. Ringgold

N⁰ 11575

### KNOW ALL MEN BY THESE PRESENTS:

That I, Karen B. Ringgold, of Tulsa, Tulsa County, State of Oklahoma, have made and constituted and appointed by these presents do make, constitute and appoint the below named agent, my true and lawful attorney, for me and in my name, place and stead, and to my use, as my employee and agent to write professional bonds, to sign my name, by him, in the execution of any and all bonds made as my agent, giving my said attorney full power to do everything whatsoever requisite and necessary to be done in the premises as fully as I could do if personally present, hereby ratifying and confirming all that my said attorney shall lawfully do, or cause to be done, by virtue hereof. All this provided this Power-Of-Attorney is filed with the bond and retained as part of the court records, that said Attorney-In-Fact is hereby authorized to insert in this Power-Of-Attorney the name of the person on whose behalf this bond is given.

IN WITNESS THEREOF, Karen B. Ringgold has caused these presents to be signed by its duly authorized officer, proper for the purpose this _____ 16 _____ day of _____ February _____, 20 04 _____.

_____ Karen B. Ringgold _____
Karen B. Ringgold
Professional Bondsman

Bond Amount $ 5,000.⁰⁰ _____ Appearance Date 3-8-04 9:30 Am. 173 _____

Defendant Charles Edmond Sanders _____

Court District _____ City Tulsa _____ State OK _____

Offense Poss. C/O AFCF _____ Case # NF _____

Executing Agent _____ (signature) _____

_____
Attach rider if needed for land description.

| | | |
|---|---|---|
| Less encumbrances | $ | _____ |
| Market value | $ | _____ |

I further swear that there are no delinquent taxes on said real property, except years: _____

_____ Total $ _____

and that said property is not scheduled on any other bond except _____

_____ Amount $ _____

This instrument is sworn to and acknowledged for the purpose of the approval of the bond to which it is attached, and for the purpose of impressing a lien on the above described property, (59 OS 1321-1324)

_____
Surety

_____
Surety-Bondsman

### WAIVER OF HOMESTEAD EXEMPTION

_____ and _____ husband and wife,

do hereby waive our homestead exemption in and to the real property described in the within and foregoing instrument.

_____

_____

### ACKNOWLEDGEMENT

STATE OF OKLAHOMA, COUNTY OF TULSA, SS

Before me, a deputy district court clerk, in and for said county and state, on this day personally appeared each of the above named, to me known to be the identical persons who executed the within and foregoing instrument, and acknowledged to me that he/they executed the same as his/their free and voluntary act and deed for the uses and purposes therein set forth. The said bondsman surety subscribed this instrument and swore to his qualifications before me the day last written, and in consideration thereof I have approved the bond to which this acknowledgement is attached.

Dated at Tulsa, Oklahoma, this _____ day of _____, _____.

ANN THOMPSON, MUNICIPAL COURT CLERK

By _____

Form 29 (Rev. 3-00) Back

Deputy Court Clerk

152

No Expiration Date

Amount — (Unlimited)

**POWER OF ATTORNEY**

**Karen B. Ringgold**

N<u>o</u> 11576

**KNOW ALL MEN BY THESE PRESENTS:**

That I, Karen B. Ringgold, of Tulsa, Tulsa County, State of Oklahoma, have made and constituted and appointed by these presents do make, constitute and appoint the below named agent, my true and lawful attorney, for me and in my name, place and stead, and to my use, as my employee and agent to write professional bonds, to sign my name, by him, in the execution of any and all bonds made as my agent, giving my said attorney full power to do everything whatsoever requisite and necessary to be done in the premises as fully as I could do if personally present, hereby ratifying and confirming all that my said attorney shall lawfully do, or cause to be done, by virtue hereof. All this provided this Power-Of-Attorney is filed with the bond and retained as part of the court records, that said Attorney-In-Fact is hereby authorized to insert in this Power-Of-Attorney the name of the person on whose behalf this bond is given.

**IN WITNESS THEREOF,** Karen B. Ringgold has caused these presents to be signed by its duly authorized officer, proper for the purpose this _____16_____ day of ___February___, 20_04___.

_Karen B. Ringgold_

Karen B. Ringgold

Professional Bondsman

Bond Amount $ _250.00_  Appearance Date _3·8·04  9:30 RM·173_

Defendant _Charles Edmond Saunders_

Court _District_  City _Tulsa_  State _OIC_

Offense _Possession Paraphernalia_  Case # _NF_

Executing Agent _[signature]_

Attach rider if needed for land description.

Less encumbrances $ _____

Market value $ _____

I further swear that there are no delinquent taxes on said real property, except years: _____

Total $ _____

and that said property is not scheduled on any other bond except _____

Amount $ _____

This instrument is sworn to and acknowledged for the purpose of the approval of the bond to which it is attached, and for the purpose of impressing a lien on the above described property, (59 OS 1321-1324)

_____

Surety

_____

Surety-Bondsman

**WAIVER OF HOMESTEAD EXEMPTION**

_____ and _____ husband and wife,

do hereby waive our homestead exemption in and to the real property described in the within and foregoing instrument.

_____

_____

**ACKNOWLEDGEMENT**

STATE OF OKLAHOMA, COUNTY OF TULSA, SS

Before me, a deputy district court clerk, in and for said county and state, on this day personally appeared each of the above named, to me known to be the identical persons who executed the within and foregoing instrument, and acknowledged to me that he/they executed the same as his/their free and voluntary act and deed for the uses and purposes therein set forth. The said bondsman surety subscribed this instrument and swore to his qualifications before me the day last written, and in consideration thereof I have approved the bond to which this acknowledgement is attached.

Dated at Tulsa, Oklahoma, this _____ day of _____, _____.

ANN THOMPSON, MUNICIPAL COURT CLERK

By _____

Form 29 (Rev. 3-00) Back

Deputy Court Clerk

153

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 187**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

154

## Form 1 (left)

CM-00-389

**OKLAHOMA DEPARTMENT OF PUBLIC SAFETY**
**OKLAHOMA UNIFORM VIOLATIONS COMPLAINT**   Ct. III

Case No. _____ Docket No. _____ Page No. _____
State of Oklahoma
County of **SEQUOYAH** } ss   In The District Court

**COMPLAINT-INFORMATION**   DPS **C834879**

The undersigned, being duly sworn, upon his oath deposes and says that:

on or about (date) **05-20-00**  at (24 hour time) **1140**   at or near (location) **CIR 1/2 S BRUSHY ART RD**
County Number **6 8**   East   North / Location
within the city, county and state aforesaid:

Name (last, first, middle) **SANDERS CHARLES EDMOND**   Phone Number **NONE**
Address ████████████
City **SALLISAW**   State **OK**   Zip Code **74955**
Birthdate (mo., day, yr.) **66**  Height **510**  Weight **170**  Race **W**  Sex **M**  Class **D**  Endorsements
Driver License Number **441 709539**   Month/Year **1100**   State **OK**
Employer **NONE**
Did Unlawfully   Operate ☑ Park ☐
Vehicle-Make **FORD**  Year **80**  Body Style-Color **PU BIK**  Tag Number **MNK 9551**  Year **00**  State **NC**
Commercial Motor Vehicle Y ☐ N ☑  Haz. Mat. Placard  ACCIDENT: ☐ PD ☐ PI ☐ FATALITY
and did then and there commit the following offense:

SPEEDING ___ MPH in ___ MPH Zone   Pace ☐ Radar ☐ Plane ☐ Other ☐
Other Violation: **RESISTING ARREST**

Contrary to Title **21** Section **268**   Oklahoma Statutes

I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents thereof and that the facts supporting the criminal charge stated therein are true.

Signature of Officer _____ Date **05-24-00**   Badge No. **356** Troop **C**

Sworn to and subscribed before me this ___ day of _____, 19___

Name and Title   My Commission Expires _____
(DPS USE) **MSO**

Court Appearance: ___ day of _____, 19___, at ___ M
Address of Court _____

**NOTICE:** Release upon personal recognizance based upon a signed written promise to appear for arraignment is conditional and failure to timely appear for arraignment shall result in suspension of the arrested person's driver license in Oklahoma, or in the nonresident's home state pursuant to the Nonresident Violator Compact.

**WITHOUT ADMITTING GUILT,** I promise to appear in said court at said time and place.

X Signature: **JAIL**
(CHECK ONLY ONE BOX)
☐ Signed Personal Recognizance  Bond Attached ☐  ☐ Magistrate  ☑ Jail  ☐ Other
☐ Share the RD   Name of Parent or Guardian _____
☐ Juvenile   Address _____
Officer's Remarks:

DPS C834879

## Form 2 (center)

CM-00-389

**OKLAHOMA DEPARTMENT OF PUBLIC SAFETY**
**OKLAHOMA UNIFORM VIOLATIONS COMPLAINT**   Ct. I

Case No. _____ Docket No. _____ Page No. _____
State of Oklahoma
County of **SEQUOYAH** } ss   In The District Court

**COMPLAINT-INFORMATION**   DPS **C834878**

The undersigned, being duly sworn, upon his oath deposes and says that:

on or about (date) **05-20-00**  at (24 hour time) **1140**   at or near (location) **CIR 1/2 S BRUSHY ART RD**
County Number **6 8**   East   North / Location
within the city, county and state aforesaid:

Name (last, first, middle) **SANDERS CHARLES EDMOND**   Phone Number **NONE**
Address ████████████
City **SALLISAW**   State **OK**   Zip Code **74955**
Birthdate (mo., day, yr.) **66**  Height **510**  Weight **170**  Race **W**  Sex **M**  Class **D**  Endorsements
Driver License Number **441 709539**   Month/Year **1100**   State **OK**
Employer **NONE**
Did Unlawfully   Operate ☑ Park ☐
Vehicle-Make **FORD**  Year **80**  Body Style-Color **PU BIK**  Tag Number **MNK 9551**  Year **00**  State **NC**
Commercial Motor Vehicle Y ☐ N ☑  Haz. Mat. Placard  ACCIDENT: ☐ PD ☐ PI ☐ FATALITY
and did then and there commit the following offense:

SPEEDING ___ MPH in ___ MPH Zone   Pace ☐ Radar ☐ Plane ☐ Other ☐
Other Violation: **ATTEMPTING TO ELUDE AN OFFICER**

Contrary to Title **21** Section **540 A**   Oklahoma Statutes

I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents thereof and that the facts supporting the criminal charge stated therein are true.

Signature of Officer _____ Date **05-24-00**   Badge No. **356** Troop **C**

Sworn to and subscribed before me this ___ day of _____, 19___

Name and Title   My Commission Expires _____
(DPS USE)

Court Appearance: ___ day of _____, 19___, at ___ M
Address of Court _____

**NOTICE:** Release upon personal recognizance based upon a signed written promise to appear for arraignment is conditional and failure to timely appear for arraignment shall result in suspension of the arrested person's driver license in Oklahoma, or in the nonresident's home state pursuant to the Nonresident Violator Compact.

**WITHOUT ADMITTING GUILT,** I promise to appear in said court at said time and place.

X Signature: **JAIL**
(CHECK ONLY ONE BOX)
☐ Signed Personal Recognizance  Bond Attached ☐  ☐ Magistrate  ☑ Jail  ☐ Other
☐ Share the RD   Name of Parent or Guardian _____
☐ Juvenile   Address _____
Officer's Remarks:

155

DPS C834878

## Form 3 (right)

CM-00-389

**OKLAHOMA DEPARTMENT OF PUBLIC SAFETY**
**OKLAHOMA UNIFORM VIOLATIONS COMPLAINT**   Ct. II

Case No. _____ Docket No. _____ Page No. _____
State of Oklahoma
County of **SEQUOYAH** } ss   In The District Court

**COMPLAINT-INFORMATION**   DPS **C834880**

The undersigned, being duly sworn, upon his oath deposes and says that:

on or about (date) **05-20-00**  at (24 hour time) **1140**   at or near (location) **CIR 1/2 S BRUSHY ART RD**
County Number **6 8**   East   North / Location
within the city, county and state aforesaid:

Name (last, first, middle) **SANDERS CHARLES EDMOND**   Phone Number **NONE**
Address ████████████
City **SALLISAW**   State **OK**   Zip Code **74955**
Birthdate (mo., day, yr.) **66**  Height **510**  Weight **170**  Race **W**  Sex **M**  Class **D**  Endorsements
Driver License Number **441 709539**   Month/Year **1100**   State **OK**
Employer **NONE**
Did Unlawfully   Operate ☑ Park ☐
Vehicle-Make **FORD**  Year **80**  Body Style-Color **PU BLK**  Tag Number **MNK 9551**  Year **00**  State **NC**
Commercial Motor Vehicle Y ☐ N ☑  Haz. Mat. Placard  ACCIDENT: ☐ PD ☐ PI ☐ FATALITY
and did then and there commit the following offense:

SPEEDING ___ MPH in ___ MPH Zone   Pace ☐ Radar ☐ Plane ☐ Other ☐
Other Violation: **AFFIX UNAUTHORIZED LICENSE PLATE TO VEHICLE**

Contrary to Title **47** Section **4-107 D**   Oklahoma Statutes

I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents thereof and that the facts supporting the criminal charge stated therein are true.

Signature of Officer _____ Date **052400**   Badge No. **356** Troop **C**

Sworn to and subscribed before me this ___ day of _____, 19___

Name and Title   My Commission Expires _____
(DPS USE) **LP4**

Court Appearance: ___ day of _____, 19___, at ___ M
Address of Court _____

**NOTICE:** Release upon personal recognizance based upon a signed written promise to appear for arraignment is conditional and failure to timely appear for arraignment shall result in suspension of the arrested person's driver license in Oklahoma, or in the nonresident's home state pursuant to the Nonresident Violator Compact.

**WITHOUT ADMITTING GUILT,** I promise to appear in said court at said time and place.

X Signature: **JAIL**
(CHECK ONLY ONE BOX)
☐ Signed Personal Recognizance  Bond Attached ☐  ☐ Magistrate  ☑ Jail  ☐ Other
☐ Share the RD   Name of Parent or Guardian _____
☐ Juvenile   Address _____
Officer's Remarks: **MNK 9551 NC REGISTERS**

DPS C834880

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 01 2000

BERNELL EDWARDS COURT CLERK
BY _____ DEPUTY

| | |
|---|---|
| State of Oklahoma, ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | CRM- 2000 -389 |
| ) | |
| *Charles Sanders* ) | |
| ) | |
| ) | |
| _____ ) | |
| **Defendant** | |

## ORDER TO APPEAR FOR DISPOSITION

You are hereby ordered to appear the ___30___ day of ___June___, __2000__ at ___9:30___ _A_ M. You should report to the Court Clerk's office on the second floor of the Sequoyah County Courthouse in Sallisaw. You should report thirty minutes prior to your appearance time. **NO Further Notice Will Be Given.**

Dated this _31st_ day of _MAY_ _2000_.

_____
**Judge of the District Court**

I understand I have been charged with a misdemeanor crime and must appear for a dispositional docket for the Court's review of my case. The purpose of the dispositional docket is to give me a chance to visit with an attorney from the District Attorney's Office. After the visit, if a plea bargain is reached, I may enter a plea of guilty in exchange for the state's recommendation. If no agreement is possible then I may request a jury trial.

Most Importantly I understand that my failure to appear at the date and time given above will result in the issuance of a warrant for my arrest and that my present bond will be forfeited.

_____
**Defendant**

KEEP THIS FOR YOUR RECORDS AS NO FURTHER NOTICE WILL BE GIVEN

**BENCH WARRANT ON INDICTMENT OR INFORMATION**

ISSUED
6-5-00

STATE OF OKLAHOMA,)
SEQUOYAH COUNTY,   )                    IN THE DISTRICT COURT

THE STATE OF OKLAHOMA        )
            VS.              )
                             )       CASE NO: CM-00-389
    Charles Edmond Sanders         )
                             )
_____      )
                             )
DOB: ███/66            ·     )
SS/DL NO: ███-9539           )

## THE STATE OF OKLAHOMA
To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma-Greeting:

Whereas an Information having been filed on the 26th  day of ___May_____
19_00_, in the District Court of Sequoyah County, State of Oklahoma, charging
_Charles Edmond Sanders_____with the crime of __Attempting to elude, Etc_.
_____
_____

YOU ARE THEREFORE COMMANDED FORTHWITH TO ARREST THE ABOVE
NAMED: _Charles Edmond Sanders_____
and bring him before* A.J. Henshaw_____
or if the said Court have adjourned for the term that you deliver him into the custody of
the Sheriff of Sequoyah County, Oklahoma.

Given under my hand and the seal of said Court affixed, this 6th  day of __June____
2000___. By order of the Court.

                         BERNELL EDWARDS, COURT CLERK
                    by: _Amanda Whaley_____
                         **Deputy Court Clerk**

### SHERIFF'S RETURN

     Received the Writ on the _____ day of _____19___, at _____o'clock
_____M., and executed on the _____ day of _____ 19___, at _____o'clock
by:_____

DATED THIS _____ DAY OF _____19____.

                         _____
                         **SHERIFF OF SEQUOYAH COUNTY, OK.**

                         _____
                         **DEPUTY**

·*see sec. 5384, Wilson's Statutes

157

## BENCH WARRANT ON INDICTMENT OR INFORMATION

ISSUED
6-5-00

STATE OF OKLAHOMA,)
SEQUOYAH COUNTY,  )                     IN THE DISTRICT COURT

THE STATE OF OKLAHOMA        )
VS.                          )          SEQUOYAH COUNTY, OKLAHOMA
                             )                    FILED
Charles Edmond Sanders       )          CASE NO: CM-00-389       IN DISTRICT COURT
                             )
_____      )          JUN 0 9 2000
                             )
DOB: ████/66            )               BERNELL EDWARDS, COURT CLERK
SS/DL NO: ███████-9539        )          BY _____ DEPUTY

## THE STATE OF OKLAHOMA

To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma-Greeting:

  Whereas an Information having been filed on the 26th day of   May
19 00 , in the District Court of Sequoyah County, State of Oklahoma, charging
 Charles Edmond Sanders          with the crime of   Attempting to elude, Etc.
_____
_____

YOU ARE THEREFORE COMMANDED FORTHWITH TO ARREST THE ABOVE
NAMED:  Charles Edmond Sanders
and bring him before* A.J. Henshaw
or if the said Court have adjourned for the term that you deliver him into the custody of
the Sheriff of Sequoyah County, Oklahoma.

Given under my hand and the seal of said Court affixed, this 6th day of   June
2000  . By order of the Court.

                          BERNELL EDWARDS, COURT CLERK

                          by: Amanda Wooly
                              Deputy Court Clerk

### SHERIFF'S RETURN

   Received the Writ on the _____ day of _____ 19___, at _____ o'clock
_____ M., and executed on the _____ day of _____ 19___, at _____ o'clock
by: _____

DATED THIS _____ DAY OF _____ 19___.

                              SHERIFF OF SEQUOYAH COUNTY, OK.

                              _____
                              DEPUTY

*see sec. 5384, Wilson's Statutes

158

## WARRANT CLEARANCE

WARRANT # _CM00-389_

WARRANT NAME _Charles Edmond Sanders_

DATE & TIME CLEARED _6/7/00   1816_

WARRANT CLEARED BY:

ARREST ___✓___ OFFICER SERVING _Leilani Letcher_

AGENCY _SCSO_

CANCEL _____ OFFICIAL DIRECTING WARRANT CANCELLATION

_____

WAS WARRANT PULLED FROM FILE?   (YES)   NO

IF NO, EXPLAIN WHY NOT _____

WAS WARRANT MARKED OFF BOOK?   YES   (NO)

IF NO, EXPLAIN WHY NOT _Not written in warrant book_

WAS WARRANT CANCELLED FROM NCIC?   YES   (NO)

IF NO, EXPLAIN WHY NOT _Not entered_

WAS WARRANT REMOVED FROM HOLDS BOOK?   YES   (NO)

IF NO, EXPLAIN WHY NOT _No hold_

SHERIFF'S OFFICE EMPLOYEE SIGNATURE _Amy T. Nelson_

NOTE:   AFTER COMPLETING THIS FORM, STAPLE THIS FORM BACK TO
BACK WITH THE WARRANT AND PLACE IN THE FOLDER MARKED
"SEND TO COURT CLERK." ONLY USE THIS FORM TO CLEAR
SEQUOYAH COUNTY WARRANTS.

USE ONE FORM FOR EACH WARRANT CLEARED.

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

Case No: *CM-10-389*          Defendant: *Charles Sanders*

### ACCUMULATIVE COURT COST FOR SEQUOYAH COUNTY

<u>MISDEMEANOR COURT COST</u>

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**COURT FUND**

| | | |
|---|---|---|
| Court Fees | | $83.00 |
| Bail Bond Fee | $10.00 @ | |
| Jury Fee | $30.00@ | |
| Fines | set by court | 300.00 |
| Mailing fee | $7.00 @ | |
| Sub total Court Fund | | 383.00 |

JUN 3 0 2000

BERNEL... SANDERS, COURT CLERK
BY _____ DEPUTY

**SHERIFF FEES**

| | | |
|---|---|---|
| Sheriff Fees | | 5.00 |
| Arrest Warrant | $30.00 | |
| Bench Warrant | $30.00@ | 1 | 30.00 RV |
| Revolving Fund | $5.00 | |
| Subpoenas | $30.00@ | |
| Sub total Sheriff Fees | | 35.00 |

LAW LIBRARY                                        $3.00
CLEET & FINGERPRINTING                             $7.00

| | | |
|---|---|---|
| VCA | $10.00 or set by court | 10.00 |
| OSBI LAB | set by court | |
| D.A. DRUG FUND | set by court | |
| REVOLVING FUND(appl fee-$40.00) | | 5.00 |
| IDF-ATTORNEY FEE | set by court | |

TOTAL                                              $ 443.00



**STATE OF OKLAHOMA**
## OFFICE OF THE DISTRICT ATTORNEY
DISTRICT 27

**DIANNE BARKER HARROLD**
DISTRICT ATTORNEY

SEQUOYAH COUNTY
120 EAST CHICKASAW
SALLISAW, OK 74955
(918) 775-9131

RE:  State v. _CHARLES SANDERS_  CRA _00-389_

~~Preliminary~~ _PS_ Hearing Date  _6-30-00_

Dear: _MR. SANDERS_

I have reviewed the above referenced file and, in order to streamline plea negotiations, convey the following recommendation:

CT 1
ATT.
ELUDE /

Dismiss

1. Number of years: _____
2. Subject to PSI reserving right to object to a deferred or or suspended: Yes _____ No _____
3. Fine: $_____
4. Victim of Crime Fund: $_____
5. Drug Enforcement Fund: $_____
6. Restitution: $_____
7. Hours of Community Service: _____
8. Other:

I reserve the right to change this recommendation until your client's acceptance. Please contact me if you have additional information or questions.

Thank you for your consideration in this matter.

CT2
Improper
GC plate
20+C

Sincerely,

_____
Assistant District Attorney

CT3

~~Poss~~ Resisting Arrest
1 YR Susp
250+C

161

2S

## IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA,           )
      Plaintiff           )
vs.           )   Case No. ~~CF-98-00316~~
CHARLES EDMOND SANDERS           )   CM-00-00389
            )
█████████████           )
            )
SALLISAW, OK   74955           )
    Defendant           )
  SS#: ████-9539
  DOB: ████1966

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

Date: 06/30/00    State's Attorney:
           Defendant's Attorney: ROBBIE COWAN

JUN 3 0 2000

### RULE 8 HEARING
(Summary)

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

      $100.00 on or before 08-05-20 and then

      $100.00 per month on or before 09-05-2000

then $100ᵒᵒ per month on or before the 5th day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before ~~08-05-20~~

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

_____

TOTAL TO PAY $443ᵒᵒ

                        DENNIS M. SPROUSE
X _____      Judge of the District Court
    Defendant

*Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

## BENCH WARRANT--After Conviction

| | | |
|---|---|---|
| **STATE OF OKLAHOMA,** | ) | |
| **Sequoyah County,** | ) | **IN DISTRICT COURT** |
| | | |
| THE STATE OF OKLAHOMA | ) | |
|      VS. | ) | No.CM-00-389 |
| CHARLES EDMOND SANDERS | ) | |
| ███████████ | ) | |
| SALLISAW OK 74955 | ) | |
| 66 ██-9539 | ) | NO BOND |

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**CHARLES EDMOND SANDERS** having been on the 30TH DAY OF JUNE, 2000, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :FAILURE TO APPEAR AND PAY MONIES DUE THE COURT IN THE AMOUNT OF $385.00

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **CHARLES EDMOND SANDERS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 2ND DAY OF NOVEMBER, 2000. By Order of the Court.

**BERNELL EDWARDS, COURT CLERK**

BY: _____
                                    DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

### SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____, 199____, at _____o'clock _____M., and executed on the _____ day of _____, 199____, at _____o'clock _____M. by _____

Dated this _____day of _____ 199____.

                            _____
                            SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

                            BY:_____
                                      DEPUTY

163

## WARRANT CLEARANCE

WARRANT # _____ CM 00-389_____

WARRANT NAME __Charles   Edmond   Sanders_____

DATE & TIME CLEARED ____3-4-01_____

WARRANT CLEARED BY:

   ARREST __X__  OFFICER SERVING __TRP    Jenkins_____

                    AGENCY ____O.H.P._____

   CANCEL_____  OFFICIAL DIRECTING WARRANT CANCELLATION

          _____

WAS WARRANT PULLED FROM FILE?          (YES)     NO

IF NO, EXPLAIN WHY NOT_____

WAS WARRANT MARKED OFF BOOK?          (YES)     NO

IF NO, EXPLAIN WHY NOT_____

WAS WARRANT CANCELLED FROM NCIC?       YES      (NO)

IF NO, EXPLAIN WHY NOT____Not   Entered_____

WAS WARRANT REMOVED FROM HOLDS BOOK?   YES      (NO)

IF NO, EXPLAIN WHY NOT____No Holds_____

SHERIFF'S OFFICE EMPLOYEE SIGNATURE __J. Smith  878__

NOTE:   AFTER COMPLETING THIS FORM, STAPLE THIS FORM BACK TO
      BACK WITH THE WARRANT AND PLACE IN THE FOLDER MARKED
      "SEND TO COURT CLERK." ONLY USE THIS FORM TO CLEAR
      SEQUOYAH COUNTY WARRANTS.

      USE ONE FORM FOR EACH WARRANT CLEARED.

## BENCH WARRANT--After Conviction

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Sequoyah County, | ) | **IN DISTRICT COURT** |

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA | ) | |
| VS. | ) | No.CM-00-389 |
| CHARLES EDMOND SANDERS | ) | |
| ███████████ | ) | |
| SALLISAW OK 74955 | ) | |
| ███-66 ███-9539 | ) | NO BOND |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 0 7 2001

BERNELL EDWARDS, COURT CLERK
BY_____
_____DEPUTY

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**CHARLES EDMOND SANDERS**   having been on the 30TH DAY OF JUNE, 2000, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :FAILURE TO APPEAR AND PAY MONIES DUE THE COURT IN THE AMOUNT OF $385.00

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **CHARLES EDMOND SANDERS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah;  there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this  2ND DAY OF NOVEMBER, 2000.  By Order of the Court.

BERNELL EDWARDS, COURT CLERK

BY: _____
DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____, 199____, at _____o'clock _____M., and executed on the _____day of _____, 199____, at _____o'clock _____M. by _____

Dated this _____day of _____199____.

_____
SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA
BY: _____ #334
DEPUTY

165

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 0 7 2001

DARNELL EDWARDS, COURT CLERK

BY_____DEPUTY

# Order To Withdraw Warrant

THE STATE OF OKLAHOMA, )

COUNTY OF SEQUOYAH,     )

IN THE DISTRICT COURT

Before *Mike Norman*

Judge

To:  The Sheriff of the County of Sequoyah:
       and
The Court Clerk of the County of Sequoyah

Case No. *CM-00-369*

An order having been made by the undersigned Judge to issue a Warrant for the arrest of the Defendant, *Charles Sanders*
_____ , on the *2nd* Day of *Nov* , *2000* .

This Court has determined that in the interest of justice said Warrant should be *withdrawn* immediately.

IT IS ORDER, that the above mentioned *Warrant is withdrawn* and all records are to immediately reflect that the Warrant is no longer outstanding for service.

Dated at Sallisaw, Oklahoma this *6th* Day of *March*
_____ , *2000* .

_____
Judge of the District Court

166

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, First, Middle, suffix (please print or type)(show alias)

Sanders Charles Edmond "monk"

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| cm-00-389 | Paid Fine in full | FTA - FTP |
|  | Hamilton/morgan | Obstruct p.o. |
|  |  | Poss of marij |
|  |  | T.O.C |
|  |  | Poss of para |
|  |  |  |
|  |  |  |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the 06 day of March , 20 01 .

Jenny Manley
Signature

AUTHORIZED BY

Warrant Schedule
JUDGE OF THE DISTRICT COURT

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

167

# Hamilton - Morgan Bail Bonds
## Diane Hamilton
## APPEARANCE BOND   SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 0 8 2001

IN THE DISTRICT COURT OF _____ Seq _____ COUNTY, STATE OF OKLAHOMA
State of Oklahoma,                          Plaintiff,        BERNELL EDWARDS, COURT CLERK
                                                             BY _____ DEPUTY

vs. _Charles Sanders_____, Defendant        Case No. CM-00-389

Know all men by these presents, that we the above named defendant, as principal, and the undersigned _Diane Hamilton_ Diane Hamilton, Professional as surety(ies) personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of _Four Thousand_____ Dollars ($ 4000 ⁰⁰ ) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to the county jail of _Seq_____ County, State of Oklahoma, shall personally be and appear before the District Court of said county on the _7_ day of _March_, 20_01_, at _10_ o'clock A.m, of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of_Obstructing a police officer - Poss. of Marij - pass. of para - TDC._ and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court without leave, then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hand and seals this _7_ day of _March_, 20 _01_.

_____ Principal _____ _____ Address
Hamilton - Morgan
Diane Hamilton                        Surety
_Diane Hamilton_ Surety _PO Box 189 Sallisaw_ Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this _6_ day of _March_, 20 _01_.

_____ Court Clerk/Sheriff _Jenny Manley_ Deputy

This undertaking approved this _6_ day of _March_, 20 _01_.

(SEAL)                    By: _____ Deputy/Clerk

## AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, _Seq_____ County, SS:

The undersigned, being first duly sworn upon oath, says that he is a resident of _Seq_____ County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as herinafter specified under one or more of the following relevant statutory provisions, to-wit:

a) Consideration for this undertaking received or promised in the sum of $ _600_ ⁰⁰

b) Other security received or promised for making this undertaking, is as follows: _P/N_

c) Such promise, security or consideration was received from: _____ _Sullivan Jes_
Name _____s

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as on commits perjury.
_Diane Hamilton_ _P.O. 189 Sallisaw, Oki 74955_
Affiant                    Address

Subscribed and sworn to before me this _____ day of _____, 20 _____.
(SEAL)

_____
Court Clerk - Notary Public

My Commission Expires:        _____
                              Deputy

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 188**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

169

**OKLAHOMA HIGHWAY PATROL**
**OKLAHOMA UNIFORM VIOLATIONS COMPLAINT**

Case No. _R-02-4186_ Docket No. _____ Page No. _____

State of Oklahoma
County of _Wagoner_ } ss    In The District Court

**COMPLAINT-INFORMATION**    DPS **D283972**

The undersigned, being duly sworn, upon his oath deposes and says that:

on or about (date) _10/6/02_ at (24 hour time) _1525_    at or near (location) _MTP MW 25 NB_

County Number _73_   East Control-Int. _0495_   North Location _01 2.15_

within the city, county and state aforesaid:

Name (last, first, middle) _LITTLEFIELD DAWN M_   Phone Number

Address _____

City _COOKSON_   State _OK_   Zip Code _74427_

Birthdate (mo. day yr.) _5_   Height _5-7_   Weight _160_   Race _W_   Sex _M_   Class _D_   Endorsements

Driver License Number _081 042 857_   Month/Year _3-06_   State _OK_

Employer _____   Did Operate ☒   Park ☐   Unlawfully

Vehicle-Make _TOY_   Year _99_   Body Style-Color _4DR SIL_   Tag Number _CSO-M6W_   Year _02_   State _OK_

Commercial Motor Vehicle Y ☐ N ☒   ☐ Haz. Mat. Placard   ACCIDENT: ☐ PD ☐ PI ☐ FATALITY

and did then and there commit the following offense:

SPEEDING   MPH in _____   MPH Zone _____   Pace ☐ Radar ☐ Plane ☐ Other ☐

Other Violation: _FAIL TO CARRY VALID SECURITY VERIFICATION_

Contrary to Title _47_ Section _7-602.1_   Oklahoma Statutes

I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents thereof and that the facts supporting the criminal charge listed therein are true.

_____ Signature of Officer   Date _10/6/02_   Badge No. _212_ Troop _XB_

Sworn to and subscribed before me this _____ day of _____, 20____

Name and Title _____   My Commission Expires _____

Court Appearance: _7_ day of _Nov_, 20_02_, at _9:_ M   (DPS USE) _Feb_

Address of Court _Courthouse Wagoner_

NOTICE: Release upon personal recognizance based upon a signed written promise to appear for arraignment is conditional and failure to timely appear for arraignment shall result in suspension of the arrested person's driver license in Oklahoma, or in the nonresident's home state pursuant to the Nonresident Violator Compact.

WITHOUT ADMITTING GUILT, I promise to appear in said court at said time and place.

X Signature _Dawn Littlefull_

(CHECK ONLY ONE BOX)

☐ Signed Personal Recognizance
☐ Bond Attached _____
☐ Magistrate ☐ Jail ☐ Other

☐ Share the RD
☐ Juvenile

Name of Parent or Guardian _____
Address _____

Officer's Remarks: _____

AREA: ☐ business ☐ industrial ☐ school ☐ residential ☒ rural

HIGHWAY TYPE: ☐ 1 lane ☐ 2 lane ☐ 3 lane ☐ 4 or more undivided ☒ 4 or more divided ☐ on/off ramp

FILED
WAGONER COUNTY, OKLAHOMA
IN DISTRICT COURT
OCT 15 2002
SUE WELLS, COURT CLERK

D283972

**NOTICE OF FAILURE TO COMPLY WITH TERMS OF CITATION**

| CITATION NUMBER | DATE OF VIOLATION | COURT DOCKET NUMBER |
|---|---|---|
| D283972 | 10/06/02 | TR-2002-04186 |

LOCATION OF VIOLATION
MTP MM 25 NB

DESCRIPTION OF VIOLATION
FAILURE TO CARRY VALID INS. VERIFICATION

| FINE AND COST | SCH. APP. DATE | COUNTY CODE | CITY CODE |
|---|---|---|---|
| $124.00 | 11-07-02 | 73 | |

| DRIVER LICENSE NUMBER | EXP. DATE | STATE | DATE OF BIRTH | RACE | SEX |
|---|---|---|---|---|---|
| 081042857 | 06 | OK | ▮50 | W | M |

NAME:   LAST   FIRST   MIDDLE
LITTLEFIELD, DAVID M

STREET ADDRESS
▮

| CITY | STATE | ZIP CODE |
|---|---|---|
| COOKSON | OK | 74427 |

| VEHICLE TAG NUMBER | STATE | YEAR | MAKE | MODEL |
|---|---|---|---|---|
| 080MGW | OK | 99 | TOYO | 4DR |

## COURT INFORMATION

NAME OF COURT
WAGONER COUNTY COURT CLERK

MAILING ADDRESS
PO BOX 249

| CITY | STATE | ZIP CODE |
|---|---|---|
| WAGONER | OK | 74477 |

TELEPHONE
AREA CODE (918)   NUMBER 485-4508

JUDGE/CLERK SIGNATURE  _K. Weise_

DATE OF NOTICE  01/21/03

DPS: DI0787-01 1 Rev: 1088

**DEFENDANT'S NOTICE**

**STATE OF**



**OKLAHOMA**

NONRESIDENT
VIOLATOR COMPACT

You failed to timely honor your signed agreement to appear in court on the citation described in this notice or otherwise failed to satisfy the charge as provided by law.

You have **15** days from the date shown in the lower right corner of this notice to appear or present the fine and cost to the court. If you fail to comply, the licensing authority in your state will be notified and your driver license will be suspended.

NO PERSONAL CHECKS

171

DATE OF CITATION _____

NAME OF DEFENDANT David M. Littlefield

CITATION # TR-62-4186

D.A. RECOMMENDATION Dismiss- 0

Showed proof of Ins.

AMOUNT DUE 0

D.A. SIGNATURE _____

DATE OF ORDER 1/27/03

172

## ABSTRACT OF COURT RECORD

### FORWARD TO ACCIDENT RECORDS, DEPARTMENT OF PUBLIC SAFETY
P.O. Box 11415, Oklahoma City, OK 73136-0415

Case No. _____ Docket No. _____ Page No. _____

Arraignment Continued to: _____

### ENTRY OF APPEARANCE AND PLEA

I, the undersigned, do hereby enter my appearance on the complaint of the offense charged on the other side of this summons. I have been informed of my right to trial as provided by law.

☐ I do hereby waive my rights to a hearing by court or jury and PLEAD GUILTY to said offense as charged. I further agree to pay the penalty prescribed for my offense.

☐ I do hereby waive my rights to a hearing by court or jury and PLEAD NOLO CONTENDERE (No Contest) to said offense as charged. I further agree to pay the penalty prescribed for my offense.

☐ I do hereby PLEAD NOT GUILTY to said offense as charged, posting amount designated below as my bond for appearance in court on: _____

Signature of Defendant: _____

Amount: $ _____ Date: _____

### PROSECUTOR'S ENDORSEMENT

The within complaint has been examined and there is probable cause for filing the same. Complaint filed:

Signature Prosecuting Attorney (D.A. / A.D.A.)    Date: 10-15-02

### COURT ORDERS

On (Date): _____

☐ Charge Amended to _____

Non Conviction Based Upon:

☐ Court (Jury) Acquittal          ☒ Court Dismissal *No Fine/Costs*

☐ Deferred to Date _____      ☐ Court Dismissal *With Fine/Costs*

Date of Order _1-27-03_            *Valid insurance shown*

Conviction Based Upon:

☐ Bond Forfeiture                 ☐ Plea of Guilty

☐ Plea of Nolo Contendere         ☐ Court (Jury) Conviction

Conviction Date _____

The Court, therefore, enters the following order:

Fines $ _____   Costs: $ _____

Jailed _____ days in _____

School _____ days; Probation _____ days; Defendant notified of his rights _____

Appeal Bond of $ _____ filed _____

Appeal to _____ Court

I Certify This To Be A True And Correct Abstract Of Court Record.

Signature of:
☐ Judge    ☐ Clerk    ☒ Deputy Clerk

# DISPOSITION FORM

For use of this form, see AR 340-15, the proponent agency is TAGCEN.

| REFERENCE OR OFFICE SYMBOL | SUBJECT |
|---|---|
| | Request for Discharge for the Good of the Service |

| TO | FROM Crawford Travis D | DATE 12 DEC 1984 | CMT 1 |
|---|---|---|---|
| Cdr, USAFACFS | | | |

1. I, _Travis D Crawford_ SSN ████ _5635_, hereby voluntarily request discharge for the good of the Service under the provisions of Chapter 10, AR 635-200. I understand that I may request discharge for the good of the Service because of the following charge(s) which has (have) been preferred against me under the Uniform Code of Military Justice, each of which authorizes the imposition of a bad-conduct or dishonorable discharge. _TDC AWOL 840729 841210_

2. I am making this request of my own free will and have not been subjected to any coercion whatsoever by any person. I have been advised of the implications that are attached to it. By submitting this request for discharge, I acknowledge that I understand the elements of the offense(s) charged and that I am guilty of the charge(s) against me or of (a) lesser included offense(s) therein contained which also authorize(s) the imposition of a bad-conduct or dishonorable discharge. Moreover, I hereby state that under no circumstances do I desire further rehabilitation, for I have no desire to perform further military service.

3. ~~Prior to completing this form, I have been afforded the opportunity to consult with appointed counsel for consultation (*in addition, I have consulted with military counsel of my own choice who was reasonably available) (civilian counsel retained at no expense to the Government)) (**Although I have received a lawful order to see consulting counsel, I persist willfully in my refusal to see him.)~~ (***I have consulted with counsel for consultation who has fully advised me of the nature of my rights under the Uniform Code of Military Justice, (the elements of the offense(s) with which I am charged, any relevant less included offense(s) thereto, and the facts which must be established by competent evidence beyond a reasonable doubt to sustain a finding of guilty; the possible defenses which appear to be available at this time; and the maximum permissible punishment if found guilty) ~~(and of the legal effect and significance of my suspended discharge)~~ (Although he has furnished me legal advice, this decision is my own.))

4. I understand that, if my request for discharge is accepted, I may be discharged under conditions other than honorable and furnished an Under Other Than Honorable Discharge Certificate. I have been advised and understand the possible effect of an Under Other Than Honorable Discharge and that, as a result of the issuance of such a discharge, I will be deprived of many or all Army benefits, that I may be ineligible for many or all benefits administered by the Veterans Administration, and that I may be deprived of my rights and benefits as a veteran under both Federal and State law. I also understand that I may expect to encounter substantial prejudice in civilian life because of an Under Other Than Honorable Discharge. I further understand that there is no automatic upgrading nor review by any government agency of a less than honorable discharge and that I must apply to the Army Discharge Review Board or the Army Board for Correction of Military Records if I wish review of my discharge. I realize that the act of consideration by either board does not imply that my discharge will be upgraded.

FS OP 396a (SJA) - 1 Oct 84

DA FORM 2496
1 FEB 62     REPLACES DD FORM 96, WHICH IS OBSOLETE.

☆ U. S. GOVERNMENT PRINTING OFFICE: 1980-671-207

SUBJECT:   Request for Discharge for the Good of the Service

5.   I understand that, once my request for discharge is submitted, it may be withdrawn only with consent of the commander exercising court-martial authority, or without that commander's consent, in the event trial results in an acquittal or the sentence does not include a punitive discharge even though one could have been adjudged by the court.   Further, I understand that if I depart absent without leave, this request may be processed and I may be discharged even though I am absent.

6.   I have been advised that I may submit any statements I desire in my own behalf, which will accompany my request for discharge.   Statements in my own behalf (are) (are not) submitted with this request.

7.   I hereby acknowledge receipt of a copy of this request for discharge and of all enclosures submitted herewith.

8.   I (do) (do not) desire a physical evaluation prior to separation.

_____
(Signature of respondent)

*To be used when appropriate.   Such counseling is not to be used in lieu of consultation with consulting counsel.
**To be used only when a member under military control refuses to obey an order to see consulting counsel.   (See paragraph 10-2c.)
***To be used in all cases when a member had consulted with consulting counsel.

### STATEMENT

Having been advised by me of (the basis for his contemplated trial by court-martial and the maximum permissible punishment authorized under the Uniform Code of Military Justice) ~~the sending if cause of his or her suspended sentence to a bad conduct or dishonorable discharge)~~ the possible effects of an Other Than Honorable Discharge, if this request is approved; and of the procedures and rights available to him or her, _____Travis O Crawford O_____ personally made the choice indicated in the foregoing request for the good of the Service.

_____
CPT, JAGC          MARK D. ERICKSON
Defense Counsel    CPT, JAGC
                   Defense Counsel

Data Required by the Privacy Act of 1974
(5 U.S.C. 552a)

AUTHORITY:   Section 301, Title 5, U.S.C. and Section 3012, Title 10, U.S.C.

PURPOSE:   To be used by the commander exercising general court-martial jurisdiction over you to determine approval or disapproval of your request.

2

SUBJECT:   Request for Discharge for the Good of the Service

ROUTINE USES:   Request with appropriate documentation including the decision of the discharge authority will be filed in the MPRJ as permanent material and disposed of in accordance with AR 640-10, and may be used by other appropriate Federal agencies and State and local governmental activities where use of the information is compatible with the purpose for which the information was collected.

Submission of a request for discharge is voluntary.  Failure to provide all or a portion of the requested information may result in your request being disapproved.

L 4897 Army-Fort Sill, Okla.

3

DEPARTMENT OF THE ARMY
Personnel Control Facility
US Army Field Artillery Center and Fort Sill
Fort Sill, Oklahoma 73503-5010

ATZR-HP

SUBJECT: Transmittal of Charges

Commander
Headquarters Commandant Command
US Army Field Artillery Center and Fort Sill
Fort Sill, Oklahoma 73503-5010

1. Transmitted are the charges against Private E-1 Travis D. Crawford, SSN ███-5635.

2. Disposition instructions were requested and received 10 December 1984. Service records and allied papers NVAL this station.

3. I recommend Trial by SPECIAL Court-Martial.

3 Encls
1. DD Form 458
2. DA Form 4187
3. Orders

WILLIAM L. BOWMAN
1LT, ADA
Commanding

177

# CHARGE SHEET

## I. PERSONAL DATA

| 1. NAME OF ACCUSED (Last, First, MI) | 2. SSN | | 3. GRADE OR RANK | 4. PAY GRADE |
|---|---|---|---|---|
| CRAWFORD, TRAVIS D. | ▮▮▮▮ 5635 | | PV1 | E-1 |

| 5. UNIT OR ORGANIZATION | 6. CURRENT SERVICE | |
|---|---|---|
| | a. INITIAL DATE | b. TERM |
| PCF, USAFACFS, FT. SILL, OK   73503-5010 | 23 March 1983 | 3 Years |

| 7. PAY PER MONTH | | | 8. NATURE OF RESTRAINT OF ACCUSED* | 9. DATE(S) IMPOSED |
|---|---|---|---|---|
| a. BASIC | b. SEA/FOREIGN DUTY | c. TOTAL | | |
| $596.40 | NA | $596.40 | Restriction | 10 December 1984 |

## II. CHARGES AND SPECIFICATIONS

**10. CHARGE:**   VIOLATION OF THE UCMJ, ARTICLE 86

SPECIFICATION:   In that Private E-1 Travis D. Crawford, US Army, Personnel Control Facility, US Army Field Artillery Center and Fort Sill, did, on or about 29 July 1984, without authority, absent himself from his organization, to wit:   Company B, 7th Engineer Battalion, located at Fort Polk, Louisiana, and did remain so absent until on or about 10 December 1984.

## III. PREFERRAL

| 11a. NAME OF ACCUSER (Last, First, MI) | b. GRADE | c. ORGANIZATION OF ACCUSER |
|---|---|---|
| BOWMAN, WILLIAM L. | 1LT | PCF, USAFACFS, FT. SILL, OK   73503-5010 |

| d. SIGNATURE OF ACCUSER | e. DATE |
|---|---|
| *William L Bowman* | 11 Dec 84 |

AFFIDAVIT: Before me, the undersigned, authorized by law to administer oaths in cases of this character, personally appeared the above named accuser this _11th_ day of ___December___, 19 _84_, and signed the foregoing charges and specifications under oath that he/she is a person subject to the Uniform Code of Military Justice and that he/she either has personal knowledge of or has investigated the matters set forth therein and that the same are true to the best of his/her knowledge and belief.

| JANET E. LAURITZEN | HQ COMDT CMD, USAFACFS |
|---|---|
| *Typed Name of Officer* | *Organization of Officer* |
| 1LT | Adjutant |
| *Grade* | *Official Capacity to Administer Oath (See R.C.M. 307(b)—must be commissioned officer)* |
| *Janet E Lauritzen* | |
| *Signature* | 178 |

12.

On _____ *Li Dec* _____, 19 *84*, the accused was informed of the charges against him/her and of the name(s) of the accuser(s) known to me *(See R.C.M. 308 (a)). (See R.C.M. 308 if notification cannot be made.)*

WILLIAM L. BOWMAN                          PCF, USAFACFS, FT. SILL, OK  73503-5010
_____            _____
Typed Name of Immediate Commander          Organization of Immediate Commander

1LT
_____ Grade
*William L. Bowman*
_____
Signature

## IV. RECEIPT BY SUMMARY COURT-MARTIAL CONVENING AUTHORITY

13.

The sworn charges were received at _____ hours, _____ 19 _____ at _____
                                                                              Designation of Command or

_____
Officer Exercising Summary Court-Martial Jurisdiction (See R.C.M. 403)

                                    FOR THE[1] _____

_____            _____
Typed Name of Officer                       Official Capacity of Officer Signing

_____
Grade

_____
Signature

## V. REFERRAL; SERVICE OF CHARGES

| 14a. DESIGNATION OF COMMAND OF CONVENING AUTHORITY | b. PLACE | c. DATE |
|---|---|---|

Referred for trial to the _____ court-martial convened by _____

_____, _____ 19 _____, subject to the following instructions:[2] _____

_____ By _____ of _____
                     Command or Order

_____            _____
Typed Name of Officer                       Official Capacity of Officer Signing

_____
Grade

_____
Signature

15.

On _____, 19 _____, I (caused to be) served a copy hereof on (each of) the above named accused.

_____            _____
Typed Name of Trial Counsel                 Grade or Rank of Trial Counsel

_____            _____
Signature                                   Signature

FOOTNOTES:  1 — When an appropriate commander signs personally, inapplicable words are stricken.
            2 — See R.C.M. 601(e) concerning instructions. If none, so state.

☆ U.S. G.P.O. 1984-421-186/17048

ATZR-HP   Crawford, Travis D.   PV1
SSN  ████-5635  (12 Dec 84)
SUBJECT:   Request for Discharge for the Good of the Service

THRU  Cdr, HQ COMDT COMD      FROM  Cdr, PCF, USAFACFS      DATE   DEC 17 1984      CMT2

TO    Cdr, USAFACFS, ATTN:  ATZR-JAMJ

1.   Request is administratively correct and meets the requirements for discharge under the provisions of Chapter 10, AR 635-200.

2.   FACTUAL DATA:  SM is charged with an AWOL of 134 days, surrendered to military authorities.  Records NVAL this station.

3.   STATEMENT AND INTERVIEW EXTRACT:  Enlisted:  23 Mar 83; Total Creditable Service:  1 year, 4 months and 5 days; Education Level:  12 years; Age:  20; Marital Status:  Married; Dependents:  Two; Court-Martials:  One; Article 15's:  None; Reason for AWOL:  Personal reasons.

4.   SM has become disillusioned with the military.  Rehabilitation efforts considered futile.

5.   Recommend approval and issuance of a discharge Under Other Than Honorable Conditions (DD Form 794a).

3 Encls
1.  Transmittal of Charges
    w/1 Encl  (DD Form 458)
2.  DA Form 4187
3.  Orders

WILLIAM L. BOWMAN
1LT,ADA
Commanding

180

# DISPOSITION FORM

For use of this form, see AR 340-15, the proponent agency is TAGCEN.

| REFERENCE OR OFFICE SYMBOL | SUBJECT |
|---|---|
| | Request for Discharge for the Good of the Service |

| TO | FROM Crawford Travis O | DATE 12 DEC 1984 | CMT 1 |
|---|---|---|---|
| Cdr, USAFACFS | | | |

1.  I, Travis O Crawford                          SSN ███ 5635, hereby
voluntarily request discharge for the good of the Service under the provisions of
Chapter 10, AR 635-200.  I understand that I may request discharge for the good of
the Service because of the following charge(s) which has (have) been preferred
against me under the Uniform Code of Military Justice, each of which authorizes the
imposition of a bad-conduct or dishonorable discharge. TOC AWOL
840729- 841210

2.  I am making this request of my own free will and have not been subjected to any
coercion whatsoever by any person.  I have been advised of the implications that
are attached to it.  By submitting this request for discharge, I acknowledge that I
understand the elements of the offense(s) charged and that I am guilty of the
charge(s) against me or of (a) lesser included offense(s) therein contained which
also authorize(s) the imposition of a bad-conduct or dishonorable discharge.
Moreover, I hereby state that under no circumstances do I desire further
rehabilitation, for I have no desire to perform further military service.

3.  ~~Prior to completing this form, I have been afforded the opportunity to consult
with appointed counsel for consultation (*in addition, I have consulted with
military counsel of my own choice who was reasonably available) (civilian counsel
retained at no expense to the Government)   (**Although I have received a lawful
order to see consulting counsel, I persist willfully in my refusal to see him.)~~
(***I have consulted with counsel for consultation who has fully advised me of the
nature of my rights under the Uniform Code of Military Justice, (the elements of
the offense(s) with which I am charged, any relevant less included offense(s)
thereto, and the facts which must be established by competent evidence beyond a
reasonable doubt to sustain a finding of guilty; the possible defenses which appear
to be available at this time; and the maximum permissible punishment if found
guilty) ~~(and of the legal effect and significance of my suspended discharge.)~~
(Although he has furnished me legal advice, this decision is my own.))

4.  I understand that, if my request for discharge is accepted, I may be discharged
under conditions other than honorable and furnished an Under Other Than Honorable
Discharge Certificate.  I have been advised and understand the possible effect of
an Under Other Than Honorable Discharge and that, as a result of the issuance of
such a discharge, I will be deprived of many or all Army benefits, that I may be
ineligible for many or all benefits administered by the Veterans Administration,
and that I may be deprived of my rights and benefits as a veteran under both
Federal and State law.  I also understand that I may expect to encounter
substantial prejudice in civilian life because of an Under Other Than Honorable
Discharge.  I further understand that there is no automatic upgrading nor review by
any government agency of a less than honorable discharge and that I must apply to
the Army Discharge Review Board or the Army Board for Correction of Military
Records if I wish review of my discharge.  I realize that the act of consideration
by either board does not imply that my discharge will be upgraded.

FS OP 396a (SJA) - 1 Oct 84

DA FORM 2496   REPLACES DD FORM 96, WHICH IS OBSOLETE.   ☆ U.S. GOVERNMENT PRINTING OFFICE: 1980-671-207
1 FEB 62

SUBJECT: Request for Discharge for the Good of the Service

5. I understand that, once my request for discharge is submitted, it may be withdrawn only with consent of the commander exercising court-martial authority, or without that commander's consent, in the event trial results in an acquittal or the sentence does not include a punitive discharge even though one could have been adjudged by the court. Further, I understand that if I depart absent without leave, this request may be processed and I may be discharged even though I am absent.

6. I have been advised that I may submit any statements I desire in my own behalf, which will accompany my request for discharge. Statements in my own behalf (are) (are not) submitted with this request.

7. I hereby acknowledge receipt of a copy of this request for discharge and of all enclosures submitted herewith.

8. I (do) (do not) desire a physical evaluation prior to separation.

_____
(Signature of respondent)

*To be used when appropriate. Such counseling is not to be used in lieu of consultation with consulting counsel.
**To be used only when a member under military control refuses to obey an order to see consulting counsel. (See paragraph 10-2c.)
***To be used in all cases when a member had consulted with consulting counsel.

## STATEMENT

Having been advised by me of (the basis for his contemplated trial by court-martial and the maximum permissible punishment authorized under the Uniform Code of Military Justice) (the student cadence of his or her suspended sentence to a bad conduct or dishonorable discharge) the possible effects of an Other Than Honorable Discharge, if this request is approved; and of the procedures and rights available to him or her, _Travis D Crawford_ personally made the choice indicated in the foregoing request for the good of the Service.

_____
CPT, JAGC
Defense Counsel

MARK D. ERICKSON
CPT, JAGC
Defense Counsel

Data Required by the Privacy Act of 1974
(5 U.S.C. 552a)

AUTHORITY: Section 301, Title 5, U.S.C. and Section 3012, Title 10, U.S.C.

PURPOSE: To be used by the commander exercising general court-martial jurisdiction over you to determine approval or disapproval of your request.

2

182

SUBJECT:   Request for Discharge for the Good of the Service

ROUTINE USES:   Request with appropriate documentation including the decision of the discharge authority will be filed in the MPRJ as permanent material and disposed of in accordance with AR 640-10, and may be used by other appropriate Federal agencies and State and local governmental activities where use of the information is compatible with the purpose for which the information was collected.

Submission of a request for discharge is voluntary. Failure to provide all or a portion of the requested information may result in your request being disapproved.

L 4897 Army-Fort Sill, Okla.

3

183

DEPARTMENT OF THE ARMY
Personnel Control Facility
US Army Field Artillery Center and Fort Sill
Fort Sill, Oklahoma   73503-5010


ATZR-HP

SUBJECT:   Transmittal of Charges


Commander
Headquarters Commandant Command
US Army Field Artillery Center and Fort Sill
Fort Sill, Oklahoma   73503-5010


1.   Transmitted are the charges against Private E-1 Travis D. Crawford,
SSN ████-5635.

2.   Disposition instructions were requested and received 10 December 1984.
Service records and allied papers NVAL this station.

3.   I recommend Trial by SPECIAL Court-Martial.


3 Encls
1.  DD Form 458                              WILLIAM L. BOWMAN
2.  DA Form 4187                             1LT, ADA
3.  Orders                                   Commanding

184

# CHARGE SHEET

## I. PERSONAL DATA

| 1. NAME OF ACCUSED *(Last, First, MI)* | 2. SSN | 3. GRADE OR RANK | 4. PAY GRADE |
|---|---|---|---|
| CRAWFORD, TRAVIS D. | ▮▮▮▮-5635 | PV1 | E-1 |

| UNIT OR ORGANIZATION | 6. CURRENT SERVICE | |
|---|---|---|
| | a. INITIAL DATE | b. TERM |
| PCF, USAFACFS, FT. SILL, OK 73503-5010 | 23 March 1983 | 3 Years |

| PAY PER MONTH | | | 3. NATURE OF RESTRAINT OF ACCUSED | 9. DATE(S) IMPOSED |
|---|---|---|---|---|
| a. BASIC | b. SEA/FOREIGN DUTY | c. TOTAL | | |
| $596.40 | NA | $596.40 | Restriction | 10 December 1984 |

## II. CHARGES AND SPECIFICATIONS

). CHARGE:     VIOLATION OF THE UCMJ, ARTICLE 86

SPECIFICATION:   In that Private E-1 Travis D. Crawford, US Army, Personnel Control Facility, US Army Field Artillery Center and Fort Sill, did, on or about 29 July 1984, without authority, absent himself from his organization, to wit:  Company B, 7th Engineer Battalion, located at Fort Polk, Louisiana, and did remain so absent until on or about 10 December 1984.

## III. PREFERRAL

| la. NAME OF ACCUSER *(Last, First, MI)* | b. GRADE | c. ORGANIZATION OF ACCUSER |
|---|---|---|
| BOWMAN, WILLIAM L. | 1LT | PCF,USAFACFS, FT. SILL, OK 73503-5010 |

| SIGNATURE OF ACCUSER | e. DATE |
|---|---|
| *William L. Bowman* | 11 Dec 84 |

AFFIDAVIT: Before me, the undersigned, authorized by law to administer oaths in cases of this character, personally appeared the above named accuser this *11th* day of *December*, 19 *84*, and signed the foregoing charges and specifications under oath that he/she is a person subject to the Uniform Code of Military Justice and that he/she either has personal knowledge of or has investigated the matters set forth therein and that the same are true to the best of his/her knowledge and belief.

| JANET E. LAURITZEN | HQ COMDT CMD, USAFACFS |
|---|---|
| Typed Name of Officer | Organization of Officer |
| 1LT | Adjutant |
| Grade | Official Capacity to Administer Oath *(See R.C.M. 307(b)—must be commissioned officer)* |
| *Janet E. Lauritzen* | *Janet E. Lauritzen* |
| Signature | |

185

12.

On _____ 4 Dec _____, 19 84, the accused was informed of the charges against him/her and of the name(s) of the accuser(s) known to me *(See R.C.M. 308 (a)). (See R.C.M. 308 if notification cannot be made.)*

WILLIAM L. BOWMAN
*Typed Name of Immediate Commander*

PCF, USAFACFS, FT. SILL, OK 73503-5010
*Organization of Immediate Commander,*

1LT
*Grade*

William L. Bowman
*Signature*

### IV. RECEIPT BY SUMMARY COURT-MARTIAL CONVENING AUTHORITY

13.

The sworn charges were received at _____ hours, _____ 19 ___ at _____

*Designation of Command or*

*Officer Exercising Summary Court-Martial Jurisdiction (See R.C.M. 403)*

FOR THE[1] _____

_____
*Typed Name of Officer*

_____
*Official Capacity of Officer Signing*

_____
*Grade*

_____
*Signature*

### V. REFERRAL; SERVICE OF CHARGES

| 14a. DESIGNATION OF COMMAND OF CONVENING AUTHORITY | b. PLACE | c. DATE |
|---|---|---|
| | | |

Referred for trial to the _____ court-martial convened by _____

_____

_____ , _____ 19 ___ , subject to the following instructions:[2] _____

_____

_____ By _____ of _____
*Command or Order*

_____
*Typed Name of Officer*

_____
*Official Capacity of Officer Signing*

_____
*Grade*

_____
*Signature*

15.

On _____ , 19 ___ , I (caused to be) served a copy hereof on (each of) the above named accused.

_____
*Typed Name of Trial Counsel*

_____
*Grade or Rank of Trial Counsel*

_____
*Signature*

FOOTNOTES: 1 — When an appropriate commander signs personally, inapplicable words are stricken.
2 — See R.C.M. 601(e) concerning instructions. If none, so state.

☆U.S. G.P.O. 1984—421—646/17048

186

24TI-40 · RM

| 1. LAST NAME - FIRST NAME - MIDDLE NAME *(Print or type)* | | TO BE FILLED IN BY ISSUING AUTHORITY | | |
|---|---|---|---|---|
| CRAWFORD Travis Don | | DATE OF ISSUE<br>28 Mar 83 | EXPIRATION DATE<br>23 Mar 86 | CARD SERIAL NUMBER<br>G 987981 |
| 2. ADDRESS *(Preferably Military Installation)* | | 3. HOME PHONE | 4. OFFICE PHONE | 5. DATE OF APPLICATION<br>28 Mar 83 |

| | DESIRED | 7. | CHECK REASON FOR REQUESTING CARD | |
|---|---|---|---|---|
| | | ✓ INITIAL ISSUE | CHANGE OF IDENTIFICATION OR GRADE | |
| | | REPLACE LOST CARD | TRANSFER TO RESERVE COMPONENTS | |
| | | REPLACE MUTILATED CARD | RETIREMENT *(Specify type)* | |
| | | EXPIRATION | | |
| | | REENLISTMENT | OTHER *(Specify)* | |
| CRAWFORD<br>TRAVIS D | | CORRECT AN ERROR | IF REPLACING LOST CARD, STATE CIRCUMSTANCES UNDER WHICH CARD WAS LOST *(Continue in "Remarks")* | |
| OTHER *(Specify)* | | ENTRY ON ACTIVE DUTY FOR MORE THAN 30 DAYS | | |

| 8. GRADE *(See reverse)*<br>E-1 | 9. SOCIAL SECURITY NO.<br>▓▓▓ 5635 | 10. DATE OF BIRTH<br>▓▓▓ 64 | 11. WEIGHT<br>179 | 12. HEIGHT<br>5'6" | 13. GENEVA CONVENTION CATEGORY<br>2 |
|---|---|---|---|---|---|
| 14. COLOR OF HAIR<br>Brown | 15. COLOR OF EYES<br>Brown | 16. BLOOD TYPE<br>O+ | 17. EXPIRATION TERM OF SERVICE OR OBLIGATION<br>23 Mar 86 | | |

FOR CARDS OTHER THAN DD FORM 2A, DD FORM 2A *(Res)* AND DD FORM 2A *(Ret)*

| 18. SOCIAL SECURITY NUMBER *(DA Form 1602 only)* | 19. STATUS *(DA Form 1602 only)* | 20. SEX *(DA Form 1602 only)* | 21. CAPACITY *(DD Form 1934)* | 22. RELIGION *(DD Form 489 and DD Form 1934)* |
|---|---|---|---|---|
| 23. EQUIVALENT RANK *(DD Form 489 and DD Form 1934)* | 24. POSITION TITLE *(DD Form 489 and DA Form 1095)* | 25. UNIT, SECTION, BRANCH OR ACTIVITY/COMMAND OR SERVICE *(DD Form 489, DA Form 1602 and DA Form 1095 only)* | | |

| SIGNATURE OF APPROVING AUTHORITY | SIGNATURE OF APPLICANT<br>Travis D. Crawford |
|---|---|
| RECEIPT OF CARD IS ACKNOWLEDGED *(Signature)*<br>Travis D. Crawford | DATE ACKNOWLEDGED<br>28 Mar 83 |

**DA** FORM **428** 1 OCT 78 — REPLACES EDITION JUN 75, & DA FORM 428-R, PRIVACY ACT STATEMENT SEP 75, WHICH ARE OBSOLETE. **APPLICATION FOR IDENTIFICATION CARD**

*For use of this form, see AR 606-5; the OTHER (Specify)*

187



DEER'S I.D. PREPARED 12 SEPT 1300

## APPLICATION FOR UNIFORMED SERVICES IDENTIFICATION AND PRIVILEGE CARD

FORM APPROVED
OMB No. 0704-0020.

### DATA REQUIRED BY THE PRIVACY ACT OF 1974

**AUTHORITY:** 10 U.S.C. 133 Executive Order 9397, 22 November 1943 (Social Security Number).

**PRINCIPAL PURPOSE(S):** Is used by applicant to apply for a DD Form 1173, "Uniformed Services Identification and Privilege Card."

**ROUTINE USE(S):** Is used by appropriate authority to evaluate an applicant's eligibility to be issued a DD Form 1173, "Uniformed Services Identification and Privilege Card." The DOD Enrollment/Eligibility System will be a routine user of information provided on this application.

**DISCLOSURE:** Mandatory for Active Duty military personnel. Failure to complete the form may result in disciplinary or administrative action. Voluntary for all other persons. However, failure to furnish all information, including SSN, could delay or prevent the issuance of an ID Card to persons otherwise eligible.

### SECTION I — IDENTIFICATION OF PERSON UPON WHOM ELIGIBILITY FOR DD FORM 1173 IS BASED

| 1. NAME (Last - First - Middle Initial) | 2. SSN | 3. GRADE | 4. HOME PHONE | 5. OFFICE PHONE |
|---|---|---|---|---|
| CRAWFORD TRAVIS D. | ████ 6635 | E-1 | N/A | 535-6828 |

| 6. ADDRESS (Include ZIP Code) | 7. BRANCH OF SVC | 8. STATUS |
|---|---|---|
| B, 7TH ENGR BN (CBT) FT POLK LA 71459 | ARMY | X ACTIVE DUTY ☐ RETIRED ☐ 100% DAV  ☐ DECEASED AD ☐ DECEASED RETIRED ☐ OTHER (Specify, Item 60) |

| 9. DATE OF EXPIRATION OF SERVICE OR CONTRACT (or date) 860325 | 10. REASON FOR APPLICATION ☐ ORIGINAL CARD(S) ☐ OTHER (Specify, Item 59) |
|---|---|

### SECTION II — PERSONS FOR WHOM IDENTIFICATION CARDS ARE REQUESTED (INCLUDE YOURSELF WHEN APPLICABLE)
(List dependents claimed who will not be issued ID Cards in Section V, Item 60.)

|  | | FOR USE OF VERIFYING OFFICER | FOR USE OF ISSUING OFFICER |
|---|---|---|---|

| 11. NAME (Last - First - Middle Initial) - SSN (If applicable) | 12. RELATIONSHIP | 13. DATE OF BIRTH (Yr., Mo., Day) | 14. PRIVILEGE AUTH 1/ | 15. CARD NO. ISSUED |
|---|---|---|---|---|
| TERESE LOCKHART | WIFE | ████ | EUCTMCMS | |

| 16. ADDRESS (Include ZIP Code) | 17. EYES | 18. HAIR | 19. MC EFFECTIVE DATE (Yr., Mo., Day) | 20. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| ████ | BR | BR | 83-Jul-27 | |
|  | 21. HEIGHT 5'5 | 22. WEIGHT 100lbs | 23. EXPIRATION DATE (Yr., Mo., Day) 84-MAR-24 | |

| 24. NAME (Last - First - Middle Initial) - SSN (If applicable) | 25. RELATIONSHIP last none | 26. DATE OF BIRTH (Yr., Mo., Day) | 27. PRIVILEGE AUTH 1/ | 28. CARD NO. ISSUED |
|---|---|---|---|---|
| | | | | |

| 29. ADDRESS (Include ZIP Code) | 30. EYES | 31. HAIR | 32. MC EFFECTIVE DATE (Yr., Mo., Day) | 33. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| | 34. HEIGHT | 35. WEIGHT | 36. EXPIRATION DATE (Yr., Mo., Day) | |

| 37. NAME (Last - First - Middle Initial) - SSN (If applicable) | 38. RELATIONSHIP | 39. DATE OF BIRTH (Yr., Mo., Day) | 40. PRIVILEGE AUTH 1/ | 41. CARD NO. ISSUED |
|---|---|---|---|---|
| | | | | |

| 42. ADDRESS (Include ZIP Code) | 43. EYES | 44. HAIR | 45. MC EFFECTIVE DATE (Yr., Mo., Day) | 46. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| | 47. HEIGHT | 48. WEIGHT | 49. EXPIRATION DATE (Yr., Mo., Day) | |

1/ Abbreviated Privileges, i.e.: C—Commissary; Exchange, EL—Limited, EU—Unlimited; T—Theater; MC—Medical Care in Civilian Facilities; MS—Medical Care in Uniformed Services Facilities.

### SECTION III — VERIFICATION BY PERSONNEL OFFICER OR OTHER RESPONSIBLE OFFICIAL OF SPONSOR'S SERVICE

The status of the persons named in Section II has been verified, issue of DD Form 1173 by any U.S. Uniformed Service Activity is authorized, benefits and privileges to which entitled, effective and expiration date of eligibility for each named person are verified, issuing agency is requested to (A) issue DD Form 1173 upon presentation of this application, (B) enter in the appropriate column of Section II the card number issued with the date issued, (C) if dependents are claimed who will not be issued ID Cards in Section V, Item 60, send a copy of this application to DOD Enrollment/Eligibility Processing Center, OSD/HA, Rm. 3E173, Pentagon, Washington, D.C. 20301, (D) complete Section IV of this application form and return it to the organization designated in Item 50.

| 50. ORGANIZATION AND MAILING ADDRESS OF VERIFYING OFFICER | 51. TYPED NAME, GRADE, AND TITLE | 52. SIGNATURE |
|---|---|---|
| | | |

### SECTION IV — AUTHENTICATION BY ISSUING AGENCY

**53.** ISSUING OFFICE — Ensure Items 61 and 62 are completed and signed. A notation of the receipt and destruction or complete accounting of the previously issued card must be made in Item 59. Upon issue, forward one copy to the activity holding the service record of the sponsor or to the verifying activity.

| 54. ORGANIZATION OF ISSUING OFFICER (Include UIC) | 55. TYPED NAME, GRADE, AND TITLE | 56. SIGNATURE |
|---|---|---|
| | | |

| 57. ☐ RECEIPT OF CARD(S) IS ACKNOWLEDGED | a. DATE ACKNOWLEDGED | b. SIGNATURE OF CARD RECIPIENT |
|---|---|---|
| | | |

**DD FORM 1172** 1 JAN 79

PREVIOUS EDITION IS OBSOLETE. ALSO RESCINDS DD FORM 1172 PRIVACY ACT STATEMENT AUG 75.

## SECTION V — STATEMENT OF UNIFORMED SERVICES OR CIVILIAN SPONSOR; OTHERWISE THE APPLICANT

**58. STATE MARITAL STATUS** *(Check appropriate box(es) and complete entries as applicable.)*

☒ MARRIED  ☐ SEPARATED  ☐ DIVORCED/ANNULLED  ☐ ANNULLED AB-INITIO  ☐ UNMARRIED *(surviving)* SPOUSE  ☐ UNREMARRIED *(surviving)* SPOUSE

### DEFINITION

UNMARRIED *(surviving)* SPOUSE — A spouse who has married subsequent to the death of the sponsor and has had that marriage terminated by death, decree of divorce or decree of annulment.

UNREMARRIED *(surviving)* SPOUSE — A spouse who has never remarried or never legally remarried as in the case of an "AB INITIO" annulment. Spouses in this category would not lose their benefits.

a. ☒ Lawful marriage to the spouse named took place at _____MCDONALD COUNTY MISSOURI_____ on __83 *(Year)* July. 27 *(Day)*__

b. ☐ I am the unmarried *(surviving)* spouse of the sponsor named in Section I, whose subsequent marriage terminated in divorce, annulment or death. I understand that I may not be entitled to medical care as administered by the Department of Defense. In the event of annulment, a special finding authorizing medical care must be made by the Parent service of the sponsor.

c. ☐ Child(ren) listed in Section II is (are) unmarried and legitimate child(ren), illegitimate child(ren) of a male sponsor whose paternity has been judicially determined, illegitimate child(ren) of record of a female sponsor who has been judicially directed to support the child(ren), adopted child(ren), or stepchild(ren), who is (are) legitimate child(ren) of the spouse of the active duty, retired, or deceased member listed in Section I; and (1) the child(ren) named is (are) less than 21 years of age; or (2) 21 years of age and over and (a) is incapable of self-support because of a mental or physical incapacity that existed prior to his or her reaching the age of 21, the incapacity has been continuous and the child(ren) is (are), in fact, dependent upon the sponsor for over fifty (50) percentum of his or her support (or who was so dependent on sponsor at the time of death); or (b) has not passed his or her twenty-third birthday, is pursuing a fulltime course of education in an institution of higher learning approved by the Secretary of Defense or the Secretary of Health, Education and Welfare (as appropriate) or by a state agency under Title 38, U.S.C., Chapter 34, Veteran's Educational Assistance, and Chapter 35, War Orphans' and Widows' Educational Assistance, of Title 38 U.S.C., is carrying a course load of a minimum of twelve (12) semester credit hours or equivalent hours and is (or was at the time of the member's death) dependent upon the member for over fifty (50) percentum of his or her support.

d. ☐ Child(ren) listed in Section II is (are) unmarried and illegitimate child(ren) of a male sponsor whose paternity has not been judicially determined, illegitimate child(ren) of record of a female sponsor or illegitimate child(ren) of the spouse of a sponsor (i.e., the sponsor's stepchild(ren), or stepchild(ren) of a deceased member or retiree at time of death) who resides with or in a home provided by the sponsor, or which was being provided by the deceased member or retiree at the time of death, and who is and continues to be dependent upon the sponsor for over fifty (50) percentum of his or her support or who was dependent on the deceased member or retiree at the time of death; that the child(ren) named is (are) less than 21 years of age or is (are) 21 years of age and over and is (1) incapable of self-support because of a mental or physical incapacity that existed prior to his or her reaching the age of 21, and the incapacity has been continuous and who continues to be dependent upon the sponsor or (2) has not passed his or her twenty-third birthday, is pursuing a fulltime course of education in an institution of higher learning approved by the Secretary of Defense or the Secretary of Health, Education and Welfare (as appropriate) or by a state agency under Title 38, U.S.C., Chapter 34, Veteran's Educational Assistance, and Chapter 35, War Orphans' and Widows' Educational Assistance, of Title 38, U.S.C., is carrying a course load of a minimum of twelve (12) semester hours or equivalent hours and is (or was at the time of the member's death) dependent upon the member for over fifty (50) percentum of his or her support.

NOTE: Section II — In those special circumstances which permit children over 21 entitlement to medical care, indicate after date of birth, (INCT) for a temporarily incapacitated child, (INCP) for a permanently incapacitated child or (SCH) for attendance at approved school. Enter under Item 60, REMARKS, the name of the institution of higher learning and expected date of graduation.

e. ☐ I am the parent, adoptive parent, parent-in-law, or adoptive parent-in-law of the sponsor named in Section I and at the time of his or her death, I, and all other parents, adoptive parents, parents-in-law, or adoptive parents-in-law named herein resided in the household of (or, for medical care purposes, in a dwelling place provided or maintained by) said sponsor, and were in fact dependent upon him or her for over one-half of our support. I understand that I am not entitled to CHAMPUS.

f. ☐ I am the legal guardian of the dependent or dependents of the sponsor named in Section I, and further certify that the named dependents meet the criteria for eligibility as indicated by blocks checked above.

g. ☐ All parents, adoptive parents, parents-in-law, or adoptive parents-in-law named are in fact dependent upon me for over one-half of their support and actually reside in my household or in a dwelling provided or maintained by me and, therefore, are eligible for benefits such as commissary stores, exchange and medical care. I understand my parents, adoptive parents, parents-in-law, or adoptive parents-in-law are not entitled to CHAMPUS.

h. ☐ I am entitled to retired, retirement, or retainer pay or equivalent pay as a result of service in a uniformed service.

**59. DISPOSITION OF PREVIOUSLY ISSUED CARDS**

☐ CARD NO. _____ RETURNED AND DESTROYED   ☐ PREVIOUSLY ISSUED CARD LOST *(Cite circumstances in Item 60, REMARKS.)*

☐ PREVIOUSLY ISSUED CARD STOLEN *(Cite circumstances in Item 60, REMARKS.)*

**60. REMARKS** *(List dependents claimed who will not be issued an ID Card. For each dependent provide name, date of birth, relationship to sponsor, SSN if applicable, and address if different from sponsor or applicant.)*

LEGAL DOCUMENTATION WAS PRESENTED TO VERIFY ELIGIBILITY AND DEPENDENCY ON 83-SEP-12

DEERS ENROLLMENT

## SECTION VI — CONDITIONS APPLICABLE TO SPONSOR

I understand that the actions of the recipient(s) of DD Form 1173, Uniformed Services Identification and Privilege Card, issued as a result of this application are my responsibility insofar as proper use of the card for the benefits and privileges, i.e., medical care, exchange, commissary and theater, authorized. I will cause the recipient to surrender the card immediately upon call to do so or when appropriate under applicable regulations and will notify an agency designated to grant authorizations for privileges and facilities in event of any change in status affecting a recipient's eligibility therefor.

I am aware that medical care furnished in uniformed services facilities is subject to availability of space, facilities and the capabilities of the medical staff to provide such care. Determinations made by the medical officer or contract surgeon, or his designee, as to availability of space, facilities and the capabilities of the medical staff shall be conclusive. Reimbursement shall be required for any unauthorized medical care furnished at Government expense. PENALTY FOR PRESENTING FALSE CLAIMS OR MAKING FALSE STATEMENTS IN CONNECTION WITH CLAIMS: FINE OF NOT MORE THAN $10,000 OR IMPRISONMENT FOR NOT MORE THAN FIVE YEARS OR BOTH. (Act 25, June 1948, 18 U.S.C. 281, 1001.)

| 61. DATE OF APPLICATION | 62. SIGNATURE OF SERVICE SPONSOR OR APPLICANT |
|---|---|
| 12 Sep 83 | *[signature]* |

REVERSE OF DD FORM 1172

**APPLICATION FOR UNIFORMED SERVICES IDENTIFICATION AND PRIVILEGE CARD**

*FORM APPROVED*
*OMB No. 0704-0020*

**DEERS ENROLLMENT**

### DATA REQUIRED BY THE PRIVACY ACT OF 1974

| | |
|---|---|
| AUTHORITY: | 10 U.S.C. 133 Executive Order 9397, 22 November 1943 (Social Security Number). |
| PRINCIPAL PURPOSE(S): | Is used by applicant to apply for a DD Form 1173, "Uniformed Services Identification and Privilege Card." |
| ROUTINE USE(S): | Is used by appropriate authority to evaluate an applicant's eligibility to be issued a DD Form 1173, "Uniformed Services Identification and Privilege Card." The DOD Enrollment/Eligibility System will be a routine user of information provided on this application. |
| DISCLOSURE: | Mandatory for Active Duty military personnel. Failure to complete the form may result in disciplinary or administrative action. Voluntary for all other persons. However, failure to furnish all information, including SSN, could delay or prevent the issuance of an ID Card to persons otherwise eligible. |

### SECTION I — IDENTIFICATION OF PERSON UPON WHOM ELIGIBILITY FOR DD FORM 1173 IS BASED

| 1. NAME (Last - First - Middle Initial) | 2. SSN | 3. GRADE | 4. HOME PHONE | 5. OFFICE PHONE |
|---|---|---|---|---|
| CRAWFORD, Travis D. | ▮▮▮-5635 | E-1 | 5-6828/A | 5-6828 |

| 6. ADDRESS (Include ZIP Code) | 7. BRANCH OF SVC | 8. STATUS |
|---|---|---|
| B Co. 7th Engr Bn<br>Ft. Polk, LA 71459 | ARMY | ☒ ACTIVE DUTY ☐ RETIRED ☐ 100% DAV<br>☐ DECEASED AD ☐ DECEASED RETIRED ☐ OTHER (Specify, Item 60) |

| 9. DATE OF EXPIRATION OF SERVICE OR CONTRACT (or death) | 10. REASON FOR APPLICATION |
|---|---|
| 23 Mar 86 | ☐ ORIGINAL CARD(S)<br>☐ OTHER (Specify, Item 59) |

### SECTION II — PERSONS FOR WHOM IDENTIFICATION CARDS ARE REQUESTED (INCLUDE YOURSELF WHEN APPLICABLE)
(List dependents claimed who will not be issued ID Cards in Section V, Item 60.)

| | FOR USE OF VERIFYING OFFICER | FOR USE OF ISSUING OFFICER |
|---|---|---|
| | | |

| 11. NAME (Last - First - Middle Initial) - SSN (If applicable) | 12. RELATIONSHIP | 13. DATE OF BIRTH (Yr., Mo., Day) | 14. PRIVILEGE AUTH 1/ | 15. CARD NO. ISSUED |
|---|---|---|---|---|
| CRAWFORD, Teresa S. | WIFE | ▮▮▮ | | N/A |

| 16. ADDRESS (Include ZIP Code) | 17. EYES | 18. HAIR | 19. MC EFFECTIVE DATE (Yr., Mo., Day) | 20. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| ▮▮▮ | BROWN | BROWN | | |

| | 21. HEIGHT | 22. WEIGHT | 23. EXPIRATION DATE (Yr., Mo., Day) | |
|---|---|---|---|---|
| | 5'5" | 126 | | |

| 24. NAME (Last - First - Middle Initial) - SSN (If applicable) | 25. RELATIONSHIP | 26. DATE OF BIRTH (Yr., Mo., Day) | 27. PRIVILEGE AUTH 1/ | 28. CARD NO. ISSUED |
|---|---|---|---|---|
| | | | | |

| 29. ADDRESS (Include ZIP Code) | 30. EYES | 31. HAIR | 32. MC EFFECTIVE DATE (Yr., Mo., Day) | 33. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| | | | | |

| | 34. HEIGHT | 35. WEIGHT | 36. EXPIRATION DATE (Yr., Mo., Day) | |
|---|---|---|---|---|
| | | | | |

| 37. NAME (Last - First - Middle Initial) - SSN (If applicable) | 38. RELATIONSHIP | 39. DATE OF BIRTH (Yr., Mo., Day) | 40. PRIVILEGE AUTH 1/ | 41. CARD NO. ISSUED |
|---|---|---|---|---|
| | | | | |

| 42. ADDRESS (Include ZIP Code) | 43. EYES | 44. HAIR | 45. MC EFFECTIVE DATE (Yr., Mo., Day) | 46. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| | | | | |

| | 47. HEIGHT | 48. WEIGHT | 49. EXPIRATION DATE (Yr., Mo., Day) | |
|---|---|---|---|---|
| | | | | |

1/ *Abbreviated Privileges, i.e.: C—Commissary; Exchange. EL—Limited, EU—Unlimited; T—Theater; MC—Medical Care in Civilian Facilities; MS—Medical Care in Uniformed Services Facilities.*

### SECTION III — VERIFICATION BY PERSONNEL OFFICER OR OTHER RESPONSIBLE OFFICIAL OF SPONSOR'S SERVICE

The status of the persons named in Section II has been verified, issue of DD Form 1173 by any U.S. Uniformed Service Activity is authorized, benefits and privileges to which entitled, effective and expiration date of eligibility for each named person are verified, issuing agency is requested to (A) issue DD Form 1173 upon presentation of this application, (B) enter in the appropriate column of Section II the card number issued with the date issued, (C) if dependents are claimed who will not be issued ID Cards in Section V, Item 60, send a copy of this application to DOD Enrollment/Eligibility Processing Center, OSD/HA, Rm. 3E173, Pentagon, Washington, D.C. 20301, (D) complete Section IV of this application form and return it to the organization designated in Item 50.

| 50. ORGANIZATION AND MAILING ADDRESS OF VERIFYING OFFICER | 51. TYPED NAME, GRADE, AND TITLE | 52. SIGNATURE |
|---|---|---|
| ▮▮▮ Inf Div (M) & FP<br>ATTN: AFZX-AGC<br>Ft Polk, LA 71459 | BARRY L. ICENHOWER<br>1LT, AGC<br>Chief, Enl Pers | *[signature]* |

### SECTION IV — AUTHENTICATION BY ISSUING AGENCY

53. ISSUING OFFICE — Ensure Items 61 and 62 are completed and signed. A notation of the receipt and destruction or complete accounting of the previously issued card must be made in Item 59. Upon issue, forward one copy to the activity holding the service record of the sponsor or to the verifying activity.

| 54. ORGANIZATION OF ISSUING OFFICER (Include UIC) | 55. TYPED NAME, GRADE, AND TITLE | 56. SIGNATURE |
|---|---|---|
| | | |

| 57. ☐ RECEIPT OF CARD(S) IS ACKNOWLEDGED | a. DATE ACKNOWLEDGED | b. SIGNATURE OF CARD RECIPIENT | |
|---|---|---|---|
| | | | |

**DEERS ENROLLMENT**

**DD FORM 1172** *1 JAN 79*

PREVIOUS EDITION IS OBSOLETE
ALSO RESCINDS DD FORM 1172 PRIVACY ACT STATEMENT AUG 75.

190

**SECTION V — STATEMENT OF UNIFORMED SERVICES OR CIVILIAN SPONSOR; OTHERWISE THE APPLICANT**

58. STATE MARITAL STATUS *(Check appropriate box(es) and complete entries as applicable.)*

[X] MARRIED    [ ] SEPARATED    [ ] DIVORCED/ANNULLED    [ ] ANNULLED AB INITIO    [ ] UNMARRIED *(surviving)* SPOUSE    [ ] UNREMARRIED *(surviving)* SPOUSE

DEFINITION

UNMARRIED *(surviving)* SPOUSE — A spouse who has married subsequent to the death of the sponsor and has had that marriage terminated by death, decree of divorce or decree of annulment.

UNREMARRIED *(surviving)* SPOUSE — A spouse who has never remarried or never legally remarried as in the case of an "AB INITIO" annulment. Spouses in this category would not lose their benefits.

a. [X] Lawful marriage to the spouse named took place at **McDonald County, MO** *(Place)* on **83/07/26** *(Date: Yr., Mo., Day)*

b. [ ] I am the unmarried *(surviving)* spouse of the sponsor named in Section I, whose subsequent marriage terminated in divorce, annulment or death. I understand that I may not be entitled to medical care as administered by the Department of Defense. In the event of annulment, a special finding authorizing medical care must be made by the Parent service of the sponsor.

c. [ ] Child(ren) listed in Section II is (are) unmarried and legitimate child(ren), illegitimate child(ren) of a male sponsor whose paternity has been judicially determined, illegitimate child(ren) of record of a female sponsor who has been judicially directed to support the child(ren), adopted child(ren), or stepchild(ren), who is (are) legitimate child(ren) of the spouse of the active duty, retired, or deceased member listed in Section I; and (1) the child(ren) named is (are) less than 21 years of age; or (2) 21 years of age and over and (a) is incapable of self-support because of a mental or physical incapacity that existed prior to his or her reaching the age of 21, the incapacity has been continuous and the child(ren) is (are), in fact, dependent upon the sponsor for over fifty (50) percentum of his or her support *(or who was so dependent on sponsor at the time of death)*; or (b) has not passed his or her twenty-third birthday, is pursuing a fulltime course of education in an institution of higher learning approved by the Secretary of Defense or the Secretary of Health, Education and Welfare *(as appropriate)* or by a state agency under Title 38, U.S.C., Chapter 34, Veteran's Educational Assistance, and Chapter 35, War Orphans' and Widows' Educational Assistance, of Title 38 U.S.C., is carrying a course load of a minimum of twelve (12) semester credit hours or equivalent hours and is *(or was at the time of the member's death)* dependent upon the member for over fifty (50) percentum of his or her support.

d. [ ] Child(ren) listed in Section II is (are) unmarried and illegitimate child(ren) of a male sponsor whose paternity has not been judicially determined, illegitimate child(ren) of record of a female sponsor or illegitimate child(ren) of the spouse of a sponsor *(i.e., the sponsor's stepchild(ren), or stepchild(ren) of a deceased member or retiree at time of death)* who resides with or in a home provided by the sponsor, or which was being provided by the deceased member or retiree at the time of death, and who is and continues to be dependent upon the sponsor for over fifty (50) percentum of his or her support or who was dependent on the deceased member or retiree at the time of death; that the child(ren) named is (are) less than 21 years of age or is (are) 21 years of age and over and is (1) incapable of self-support because of a mental or physical incapacity that existed prior to his or her reaching the age of 21, and the incapacity has been continuous and who continues to be dependent upon the sponsor or (2) has not passed his or her twenty-third birthday, is pursuing a full-time course of education in an institution of higher learning approved by the Secretary of Defense or the Secretary of Health, Education and Welfare *(as appropriate)* or by a state agency under Title 38, U.S.C., Chapter 34, Veteran's Educational Assistance, and Chapter 35, War Orphans' and Widows' Educational Assistance, of Title 38, U.S.C., is carrying a course load of a minimum of twelve (12) semester hours or equivalent hours and is *(or was at the time of the member's death)* dependent upon the member for over fifty (50) percentum of his or her support.

NOTE: Section II — In those special circumstances which permit children over 21 entitlement to medical care, indicate after date of birth, (INCT) for a temporarily incapacitated child, (INCP) for a permanently incapacitated child or (SCH) for attendance at approved school. Enter under Item 60, REMARKS, the name of the institution of higher learning and expected date of graduation.

e. [ ] I am the parent, adoptive parent, parent-in-law, or adoptive parent-in-law of the sponsor named in Section I and at the time of his or her death, I, and all other parents, adoptive parents, parents-in-law, or adoptive parents-in-law named herein resided in the household of *(or, for medical care purposes, in a dwelling place provided or maintained by)* said sponsor, and were in fact dependent upon him or her for over one-half of our support. I understand that I am not entitled to CHAMPUS.

f. [ ] I am the legal guardian of the dependent or dependents of the sponsor named in Section I, and further certify that the named dependents meet the criteria for eligibility as indicated by blocks checked above.

g. [ ] All parents, adoptive parents, parents-in-law, or adoptive parents-in-law named are in fact dependent upon me for over one-half of their support and actually reside in my household or in a dwelling provided or maintained by me and, therefore, are eligible for benefits such as commissary stores, exchange and medical care. I understand my parents, adoptive parents, parents-in-law, or adoptive parents-in-law are not entitled to CHAMPUS.

h. [ ] I am entitled to retired, retirement, or retainer pay or equivalent pay as a result of service in a uniformed service.

59. DISPOSITION OF PREVIOUSLY ISSUED CARDS

[ ] CARD NO. _____    [ ] RETURNED AND DESTROYED    [X] PREVIOUSLY ISSUED CARD LOST *(Cite circumstances in Item 60, REMARKS.)*    [ ] PREVIOUSLY ISSUED CARD STOLEN *(Cite circumstances in Item 60, REMARKS.)*

60. REMARKS *(List dependents claimed who will not be issued an ID Card. For each dependent provide name, date of birth, relationship to sponsor, SSN if applicable, and address if different from sponsor or applicant.)*

LEGAL INFORMATION WAS PRESENTED TO VERIFY ELIGIBILITY AND DEPENDENCE ON

*1983 oct 20*

**SECTION VI — CONDITIONS APPLICABLE TO SPONSOR**

I understand that the actions of the recipient(s) of DD Form 1173, Uniformed Services Identification and Privilege Card, issued as a result of this application are my responsibility insofar as proper use of the card for the benefits and privileges, i.e., medical care, exchange, commissary and theater, authorized. I will cause the recipient to surrender the card immediately upon call to do so or when appropriate under applicable regulations and will notify an agency designated to grant authorizations for privileges and facilities in event of any change in status affecting a recipient's eligibility therefor.

I am aware that medical care furnished in uniformed services facilities is subject to availability of space, facilities and the capabilities of the medical staff to provide such care. Determinations made by the medical officer or contract surgeon, or his designee, as to availability of space, facilities and the capabilities of the medical staff shall be conclusive. Reimbursement shall be required for any unauthorized medical care furnished at Government expense. PENALTY FOR PRESENTING FALSE CLAIMS OR MAKING FALSE STATEMENTS IN CONNECTION WITH CLAIMS: FINE OF NOT MORE THAN $10,000 OR IMPRISONMENT FOR NOT MORE THAN FIVE YEARS OR BOTH. *(Act 25, June 1948, 18 U.S.C. 287, 1001.)*

61. DATE OF APPLICATION    *1983 Oct 20*

62. SIGNATURE OF SERVICE SPONSOR OR APPLICANT *(signature)*

REVERSE OF DD FORM 1172    U.S. GOVERNMENT PRINTING OFFICE: 1982-361-646:8590

191

**SECTION V — STATEMENT OF UNIFORMED SERVICES OR CIVILIAN SPONSOR: OTHERWISE THE APPLICANT**

**58. STATE MARITAL STATUS** (Check appropriate box(es) and complete entries as applicable.)

[x] MARRIED   [ ] SEPARATED   [ ] DIVORCED/ANNULLED   [ ] ANNULLED AB-INITIO   [ ] UNMARRIED (surviving) SPOUSE   [ ] UNREMARRIED (surviving) SPOUSE

**DEFINITION**

UNMARRIED (surviving) SPOUSE — A spouse who has married subsequent to the death of the sponsor and has had that marriage terminated by death, decree of divorce or decree of annulment.

UNREMARRIED (surviving) SPOUSE — A spouse who has never remarried or never legally remarried as in the case of an "AB INITIO" annulment. Spouses in this category would not lose their benefits.

a. [x] Lawful marriage to the spouse named took place at __McDonald County , MO__ (Place) on __83/07/26__ (Date: Yr.-Mo.-Day)

b. [ ] I am the unmarried (surviving) spouse of the sponsor named in Section I, whose subsequent marriage terminated in divorce, annulment or death. I understand that I may not be entitled to medical care as administered by the Department of Defense. In the event of annulment, a special finding authorizing medical care must be made by the Parent service of the sponsor.

c. [ ] Child(ren) listed in Section II is (are) unmarried and legitimate child(ren), illegitimate child(ren) of a male sponsor whose paternity has been judicially determined, illegitimate child(ren) of record of a female sponsor who has been judicially directed to support the child(ren), adopted child(ren), or stepchild(ren), who is (are) legitimate child(ren) of the spouse of the active duty, retired, or deceased member listed in Section I; and: (1) the child(ren) named is (are) less than 21 years of age; or (2) 21 years of age and over and (a) is incapable of self-support because of a mental or physical incapacity that existed prior to his or her reaching the age of 21, the incapacity has been continuous and the child(ren) is (are), in fact, dependent upon the sponsor for over fifty (50) percentum of his or her support (or who was so dependent on sponsor at the time of death); or (b) has not passed his or her twenty-third birthday, is pursuing a fulltime course of education in an institution of higher learning approved by the Secretary of Defense or the Secretary of Health, Education and Welfare (as appropriate) or by a state agency under Title 38, U.S.C., Chapter 34, Veteran's Educational Assistance, and Chapter 35, War Orphans' and Widows' Educational Assistance, of Title 38 U.S.C., is carrying a course load of a minimum of twelve (12) semester credit hours or equivalent hours and is (or was at the time of the member's death) dependent upon the member for over fifty (50) percentum of his or her support.

d. [ ] Child(ren) listed in Section II is (are) unmarried and illegitimate child(ren) of a male sponsor whose paternity has not been judicially determined, illegitimate child(ren) of record of a female sponsor or illegitimate child(ren) of the spouse of a sponsor (i.e., the sponsor's stepchild(ren), or stepchild(ren) of a deceased member or retiree at time of death) who resides with or in a home provided by the sponsor, or which was being provided by the deceased member or retiree at the time of death, and who is and continues to be dependent upon the sponsor for over fifty (50) percentum of his or her support or who was dependent on the deceased member or retiree at the time of death; that the child(ren) named is (are) less than 21 years of age or is (are) 21 years of age and over and is (1) incapable of self-support because of a mental or physical incapacity that existed prior to his or her reaching the age of 21, and the incapacity has been continuous and who continues to be dependent upon the sponsor or (2) has not passed his or her twenty-third birthday, is pursuing a full-time course of education in an institution of higher learning approved by the Secretary of Defense or the Secretary of Health, Education and Welfare (as appropriate) or by a state agency under Title 38, U.S.C., Chapter 34, Veteran's Educational Assistance, and Chapter 35, War Orphans' and Widows' Educational Assistance, of Title 38, U.S.C., is carrying a course load of a minimum of twelve (12) semester hours or equivalent hours and is (or was at the time of the member's death) dependent upon the member for over fifty (50) percentum of his or her support.

NOTE: Section II — In those special circumstances which permit children over 21 entitlement to medical care, indicate after date of birth, (INCT) for a temporarily incapacitated child, (INCP) for a permanently incapacitated child or (SCH) for attendance at approved school. Enter under Item 60, REMARKS, the name of the institution of higher learning and expected date of graduation.

e. [ ] I am the parent, adoptive parent, parent-in-law, or adoptive parent-in-law of the sponsor named in Section I and at the time of his or her death, I, and all other parents, adoptive parents, parents-in-law, or adoptive parents-in-law named herein resided in the household of (or, for medical care purposes, in a dwelling place provided or maintained by) said sponsor, and were in fact dependent upon him or her for over one-half of our support. I understand that I am not entitled to CHAMPUS.

f. [ ] I am the legal guardian of the dependent or dependents of the sponsor named in Section I, and further certify that the named dependents meet the criteria for eligibility as indicated by blocks checked above.

g. [ ] All parents, adoptive parents, parents-in-law, or adoptive parents-in-law named are in fact dependent upon me for over one-half of their support and actually reside in my household or in a dwelling provided or maintained by me and, therefore, are eligible for benefits such as commissary stores, exchange and medical care. I understand my parents, adoptive parents, parents-in-law, or adoptive parents-in-law are not entitled to CHAMPUS.

h. [ ] I am entitled to retired, retirement, or retainer pay or equivalent pay as a result of service in a uniformed service.

**59. DISPOSITION OF PREVIOUSLY ISSUED CARDS**

[ ] CARD NO. _____ RETURNED AND DESTROYED   [x] PREVIOUSLY ISSUED CARD LOST (Cite circumstances in Item 60, REMARKS.)

[ ] PREVIOUSLY ISSUED CARD STOLEN (Cite circumstances in Item 60, REMARKS.)

**60. REMARKS** (List dependents claimed who will not be issued an ID Card. For each dependent provide name, date of birth, relationship to sponsor, SSN if applicable, and address if different from sponsor or applicant.)

*(stamp)* THIS DOCUMENTATION WAS PRESENTED TO VERIFY ELIGIBILITY AND DEPENDENCE ON

*1983 oct 20*

**SECTION VI — CONDITIONS APPLICABLE TO SPONSOR**

I understand that the actions of the recipient(s) of DD Form 1173, Uniformed Services Identification and Privilege Card, issued as a result of this application are my responsibility insofar as proper use of the card for the benefits and privileges, i.e., medical care, exchange, commissary and theater, authorized. I will cause the recipient to surrender the card immediately upon call to do so or when appropriate under applicable regulations and will notify an agency designated to grant authorizations for privileges and facilities in event of any change in status affecting a recipient's eligibility therefor.

I am aware that medical care furnished in uniformed services facilities is subject to availability of space, facilities and the capabilities of the medical staff to provide such care. Determinations made by the medical officer or contract surgeon, or his designee, as to availability of space, facilities and the capabilities of the medical staff shall be conclusive. Reimbursement shall be required for any unauthorized medical care furnished at Government expense. PENALTY FOR PRESENTING FALSE CLAIMS OR MAKING FALSE STATEMENTS IN CONNECTION WITH CLAIMS: FINE OF NOT MORE THAN $10,000 OR IMPRISONMENT FOR NOT MORE THAN FIVE YEARS OR BOTH. (Act 25, June 1948, 18 U.S.C. 287, 1001.)

**61. DATE OF APPLICATION** _1983 oct 20_   **62. SIGNATURE OF SERVICE SPONSOR OR APPLICANT** _Travis D. Crawford_

REVERSE OF DD FORM 1172

☆U.S. GOVERNMENT PRINTING OFFICE: 1982-361-646:8590

| APPLICATION FOR UNIFORMED SERVICES IDENTIFICATION AND PRIVILEGE CARD | FORM APPROVED OMB No. 0704-0020. |
|---|---|

DATA REQUIRED BY THE PRIVACY ACT OF 1974

AUTHORITY: 10 U.S.C. 133 Executive Order 9397, 22 November 1943 (Social Security Number).

PRINCIPAL PURPOSE(S): Is used by applicant to apply for a DD Form 1173, "Uniformed Services Identification and Privilege Card."

ROUTINE USE(S): Is used by appropriate authority to evaluate an applicant's eligibility to be issued a DD Form 1173, "Uniformed Services Identification and Privilege Card." The DOD Enrollment/Eligibility System will be a routine user of information provided on this application.

DISCLOSURE: Mandatory for Active Duty military personnel. Failure to complete the form may result in disciplinary or administrative action. Voluntary for all other persons. However, failure to furnish all information, including SSN, could delay or prevent the issuance of an ID Card to persons otherwise eligible.

**SECTION I — IDENTIFICATION OF PERSON UPON WHOM ELIGIBILITY FOR DD FORM 1173 IS BASED**

| 1. NAME (Last - First - Middle Initial) | 2. SSN | 3. GRADE | 4. HOME PHONE | 5. OFFICE PHONE |
|---|---|---|---|---|
| CRAWFORD TRAVIS D. | ▮▮-5635 | E-1 | N/A | 535-6828 |

| 6. ADDRESS (Include ZIP Code) | 7. BRANCH OF SVC | 8. STATUS |
|---|---|---|
| B, 7TH ENGR BN (CBT) FT POLK LA 71459 | ARMY | ☒ ACTIVE DUTY ☐ RETIRED ☐ 100% DAV ☐ DECEASED AD ☐ DECEASED RETIRED ☐ OTHER (Specify, Item 60) |

| 9. DATE OF EXPIRATION OF SERVICE OR CONTRACT (or death) | 10. REASON FOR APPLICATION |
|---|---|
| XX 860325 | ☐ ORIGINAL CARD(S) ☒ OTHER (Specify, Item 59) |

**SECTION II — PERSONS FOR WHOM IDENTIFICATION CARDS ARE REQUESTED** (INCLUDE YOURSELF WHEN APPLICABLE)
(List dependents claimed who will not be issued ID Cards in Section V, Item 60.)

| | FOR USE OF VERIFYING OFFICER | FOR USE OF ISSUING OFFICER |
|---|---|---|

| 11. NAME (Last - First - Middle Initial) - SSN (If applicable) | 12. RELATIONSHIP | 13. DATE OF BIRTH (Yr., Mo., Day) | 14. PRIVILEGE AUTH 1/ | 15. CARD NO. ISSUED |
|---|---|---|---|---|
| TERESE S. CRAWFORD | WIFE | ▮▮▮▮ | EUCTMCNS | MX00,201A |

| 16. ADDRESS (Include ZIP Code) | 17. EYES | 18. HAIR | 19. MC EFFECTIVE DATE (Yr., Mo., Day) | 20. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| ▮▮▮▮▮ | BR | BR | 83-Jul-27 | 13 OCT 1983 |

| 21. HEIGHT | 22. WEIGHT | 23. EXPIRATION DATE (Yr., Mo., Day) | |
|---|---|---|---|
| 5'5 | 100lbs | 86-Mar-27 | |

| 24. NAME (Last - First - Middle Initial) - SSN (If applicable) | 25. RELATIONSHIP | 26. DATE OF BIRTH (Yr., Mo., Day) | 27. PRIVILEGE AUTH 1/ | 28. CARD NO. ISSUED |
|---|---|---|---|---|
| | | | | |

| 29. ADDRESS (Include ZIP Code) | 30. EYES | 31. HAIR | 32. MC EFFECTIVE DATE (Yr., Mo., Day) | 33. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| | | | | |

| | 34. HEIGHT | 35. WEIGHT | 36. EXPIRATION DATE (Yr., Mo., Day) | |
|---|---|---|---|---|
| | | | | |

| 37. NAME (Last - First - Middle Initial) - SSN (If applicable) | 38. RELATIONSHIP | 39. DATE OF BIRTH (Yr., Mo., Day) | 40. PRIVILEGE AUTH 1/ | 41. CARD NO. ISSUED |
|---|---|---|---|---|
| | | | | |

| 42. ADDRESS (Include ZIP Code) | 43. EYES | 44. HAIR | 45. MC EFFECTIVE DATE (Yr., Mo., Day) | 46. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| | | | | |

| | 47. HEIGHT | 48. WEIGHT | 49. EXPIRATION DATE (Yr., Mo., Day) | |
|---|---|---|---|---|
| | | | | |

1/ Abbreviated Privileges, i.e.: C—Commissary; Exchange, EL—Limited, EU—Unlimited; T—Theater; MC—Medical Care in Civilian Facilities; MS—Medical Care in Uniformed Services Facilities.

**SECTION III — VERIFICATION BY PERSONNEL OFFICER OR OTHER RESPONSIBLE OFFICIAL OF SPONSOR'S SERVICE**

The status of the persons named in Section II has been verified, issue of DD Form 1173 by any U.S. Uniformed Service Activity is authorized, benefits and privileges to which entitled, effective and expiration date of eligibility for each named person are verified, issuing agency is requested to (A) issue DD Form 1173 upon presentation of this application, (B) enter in the appropriate column of Section II the card number issued with the date issued, (C) if dependents are claimed who will not be issued ID Cards in Section V, Item 60, send a copy of this application to DOD Enrollment/Eligibility Processing Center, OSD/HA, Rm. 3E173, Pentagon, Washington, D.C. 20301, (D) complete Section IV of this application form and return it to the office/official designated in Item 50.

| 50. ORGANIZATION AND MAILING ADDRESS OF VERIFYING OFFICER | 51. TYPED NAME, GRADE, AND TITLE | 52. SIGNATURE |
|---|---|---|
| HQ Inf DIV (M) & FT ATTN: AFZX-AGC Ft Polk, LA 71459 | BARRY L. ICENHOUR ALT, AGC Assistant Adjutant General | (signature) |

**SECTION IV — AUTHENTICATION BY ISSUING AGENCY**

53. ISSUING OFFICE — Ensure Items 61 and 62 are completed and signed. A notation of the receipt and destruction or complete accounting of the previously issued card must be made in Item 59. Upon issue, forward one copy to the activity holding the service record of the sponsor or to the verifying activity.

| 54. ORGANIZATION OF ISSUING OFFICER (Include UIC) | 55. TYPED NAME, GRADE, AND TITLE | 56. SIGNATURE |
|---|---|---|
| HQ, USAG FT. CHAFFEE, AR 72905 | JERRY B. RIEDEL, GS-3, DAC | Jerry B Riedel |

| ☒ RECEIPT OF CARD(S) IS ACKNOWLEDGED | a. DATE ACKNOWLEDGED 13 OCT 1983 | b. SIGNATURE OF CARD RECIPIENT Teresa Crawford |
|---|---|---|

DD FORM 1172
1 JAN 79

PREVIOUS EDITION IS OBSOLETE
ALSO RESCENDS DD FORM 1172 PRIVACY ACT STATEMENT AUG 75.

193

**SECTION V — STATEMENT OF UNIFORMED SERVICES OR CIVILIAN SPONSOR; OTHERWISE THE APPLICANT.**

8. STATE MARITAL STATUS (Check appropriate box(es) and complete entries as applicable.)

| [X] MARRIED | [ ] SEPARATED | [ ] DIVORCED/ANNULLED | [ ] ANNULLED AB·INITIO | [ ] UNMARRIED (surviving) SPOUSE | [ ] UNREMARRIED (surviving) SPOUSE |

**DEFINITION**

UNMARRIED (surviving) SPOUSE — A spouse who has married subsequent to the death of the sponsor and has had that marriage terminated by death, decree of divorce or decree of annulment.

UNREMARRIED (surviving) SPOUSE — A spouse who has never remarried or never legally remarried as in the case of an "AB INITIO" annulment. Spouses in this category would not lose their benefits.

a. [X] Lawful marriage to the spouse named took place at ___MCDONALD COUNTY MISSOURI___ on _83 July 27_
(Place)                                    (Date: Yr., Mo., Day)

b. [ ] I am the unmarried (surviving) spouse of the sponsor named in Section I, whose subsequent marriage terminated in divorce, annulment or death. I understand that I may not be entitled to medical care as administered by the Department of Defense. In the event of annulment, a special finding authorizing medical care must be made by the Parent service of the sponsor.

c. [ ] Child(ren) listed in Section II is (are) unmarried and legitimate child(ren), illegitimate child(ren) of a male sponsor whose paternity has been judicially determined, illegitimate child(ren) of record of a female sponsor who has been judicially directed to support the child(ren), adopted child(ren), or stepchild(ren), who is (are) legitimate child(ren) of the spouse of the active duty, retired, or deceased member listed in Section I; and (1) the child(ren) named is (are) less than 21 years of age; or (2) 21 years of age and over and (a) is incapable of self-support because of a mental or physical incapacity that existed prior to his or her reaching the age of 21, the incapacity has been continuous and the child(ren) is (are), in fact, dependent upon the sponsor for over fifty (50) percentum of his or her support (or who was so dependent on sponsor at the time of death); or (b) has not passed his or her twenty-third birthday, is pursuing a fulltime course of education in an institution of higher learning approved by the Secretary of Defense or the Secretary of Health, Education and Welfare (as appropriate) or by a state agency under Title 38, U.S.C., Chapter 34, Veteran's Educational Assistance, and Chapter 35, War Orphans' and Widows' Educational Assistance, of Title 38 U.S.C., is carrying a course load of a minimum of twelve (12) semester credit hours or equivalent hours and is (or was at the time of the member's death) dependent upon the member for over fifty (50) percentum of his or her support.

d. [ ] Child(ren) listed in Section II is (are) unmarried and illegitimate child(ren) of a male sponsor whose paternity has not been judicially determined, illegitimate child(ren) of record of a female sponsor or illegitimate child(ren) of the spouse of a sponsor (i.e., the sponsor's stepchild(ren), or stepchild(ren) of a deceased member or retiree at time of death) who resides with or in a home provided by the sponsor, or which was being provided by the deceased member or retiree at the time of death, and who is and continues to be dependent upon the sponsor for over fifty (50) percentum of his or her support or who was dependent on the deceased member or retiree at the time of death; that the child(ren) named is (are) less than 21 years of age or is (are) 21 years of age and over and is (1) incapable of self-support because of a mental or physical incapacity that existed prior to his or her reaching the age of 21, and the incapacity has been continuous and who continues to be dependent upon the sponsor or (2) has not passed his or her twenty-third birthday, is pursuing a full-time course of education in an institution of higher learning approved by the Secretary of Defense or the Secretary of Health, Education and Welfare (as appropriate) or by a state agency under Title 38, U.S.C., Chapter 34, Veteran's Educational Assistance, and Chapter 35, War Orphans' and Widows' Educational Assistance, of Title 38, U.S.C., is carrying a course load of a minimum of twelve (12) semester hours or equivalent hours and is (or was at the time of the member's death) dependent upon the member for over fifty (50) percentum of his or her support.

NOTE: Section II — In those special circumstances which permit children over 21 entitlement to medical care, indicate after date of birth, (INCT) for a temporarily incapacitated child, (INCP) for a permanently incapacitated child or (SCH) for attendance at approved school. Enter under Item 60, REMARKS, the name of the institution of higher learning and expected date of graduation.

e. [ ] I am the parent, adoptive parent, parent-in-law, or adoptive parent-in-law of the sponsor named in Section I and at the time of his or her death, I, and all other parents, adoptive parents, parents-in-law, or adoptive parents-in-law named herein resided in the household of (or, for medical care purposes, in a dwelling place provided or maintained by) said sponsor, and were in fact dependent upon him or her for over one-half of our support. I understand that I am not entitled to CHAMPUS.

f. [ ] I am the legal guardian of the dependent or dependents of the sponsor named in Section I, and further certify that the named dependents meet the criteria for eligibility as indicated by blocks checked above.

g. [ ] All parents, adoptive parents, parents-in-law, or adoptive parents-in-law named are in fact dependent upon me for over one-half of their support and actually reside in my household or in a dwelling provided or maintained by me and, therefore, are eligible for benefits such as commissary stores, exchange and medical care. I understand my parents, adoptive parents, parents-in-law, or adoptive parents-in-law are not entitled to CHAMPUS.

h. [ ] I am entitled to retired, retirement, or retainer pay or equivalent pay as a result of service in a uniformed service.

59. DISPOSITION OF PREVIOUSLY ISSUED CARDS

[ ] CARD NO. _____  RETURNED AND DESTROYED    [ ] PREVIOUSLY ISSUED CARD LOST (Cite circumstances in Item 60, REMARKS.)

[ ] PREVIOUSLY ISSUED CARD STOLEN (Cite circumstances in Item 60, REMARKS.)

60. REMARKS (List dependents claimed who will not be issued an ID Card. For each dependent provide name, date of birth, relationship to sponsor, SSN if applicable, and address if different from sponsor or applicant.)

DEERS ENROLLMENT

LEGAL DOCUMENTATION WAS PRESENTED
TO VERIFY ELIGIBILITY AND DEPENDENCE
ON   83-Sep-12

**SECTION VI — CONDITIONS APPLICABLE TO SPONSOR**

I understand that the actions of the recipient(s) of DD Form 1173, Uniformed Services Identification and Privilege Card, issued as a result of this application are my responsibility insofar as proper use of the card for the benefits and privileges, i.e., medical care, exchange, commissary and theater, authorized. I will cause the recipient to surrender the card immediately upon call to do so or when appropriate under applicable regulations and will notify an agency designated to grant authorizations for privileges and facilities in event of any change in status affecting a recipient's eligibility therefor.

I am aware that medical care furnished in uniformed services facilities is subject to availability of space, facilities and the capabilities of the medical staff to provide such care. Determinations made by the medical officer or contract surgeon, or his designee, as to availability of space, facilities and the capabilities of the medical staff shall be conclusive. Reimbursement shall be required for any unauthorized medical care furnished at Government expense. PENALTY FOR PRESENTING FALSE CLAIMS OR MAKING FALSE STATEMENTS IN CONNECTION WITH CLAIMS: FINE OF NOT MORE THAN $10,000 OR IMPRISONMENT FOR NOT MORE THAN FIVE YEARS OR BOTH. (Act 25, June 1948, 18 U.S.C. 287, 1001.)

| 61. DATE OF APPLICATION | 62. SIGNATURE OF SERVICE SPONSOR OR APPLICANT |
| 12 Sep 85 | |

GOVERNMENT PRINTING OFFICE: 1982-361-646:859C

| DO NOT FOLD, STAPLE, OR MUTILATE | 1. Name (Last, First, Middle) CRAWFORD TRAVIS DON | | 2a. SSN 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 | 2b. Initial (To incl.) date valid SSN) TA | 3a. SVC A | 3b. REPORTING UNIT CODE OU STATION NA |
|---|---|---|---|---|---|---|
| 4. Spouse's Name/Address | TERESA SUE (LOCKHART) ▓▓▓▓▓ | | | | | |
| 5. Children's Name/Relationship/ DOB/Address | KRISTINE M (D) 831124 | | | | | |
| | | | | | | |
| | | | | | | |
| 6. Father's Name/Address | ROGER CRAWFORD ▓▓▓▓▓ | | | | | |
| 7. Mother's Name/Address | PHYLLIS (DOTSON) CRAWFORD SEE ITEM 6 | | | | | |
| 8. Do Not Notify Due To Ill Health | a. NA | | b. NOTIFY INSTEAD | | NA | |
| 9. Beneficiary(ies) For OG If No Surviving Spouse Or Child/Address/Percentage | PHYLLIS CRAWFORD (M) SEE ITEM 6 100% | | | | | |
| 10. Beneficiary(ies) For Unpaid Pay And Allowances Address/Percentage | KRISTINE MARIE CRAWFORD (D) SEE ITEM 4 100% | | | | | |
| 11. Allotment Designee/Percentage If Missing Subject To Secretarial Determination | TERESA SUE CRAWFORD (W) SEE ITEM 4 100% | | | | | |
| 12. Insurance (SGLI and other Insurance Companies/Policy No's) | a. SGLI (Optional Service Use) ☒ Maximum ☐ Other (Amount) _____ ☐ No | | b. Insurance Companies/Policy Numbers NONE | | | |
| 13. CONTINUATION/REMARKS | | | | | | |

| 14. SIGNATURE OF SERVICE MEMBER (Include Rank/Rate/Grade) | 15. SIGNATURE OF WITNESS (Include Rank/Rate/Grade) | 16. DATE SIGNED |
|---|---|---|
| *Travis D Crawford E-1* | *John E. Casper E-4* | 84/12/1 |

## INSTRUCTIONS TO SERVICEMEMBER

This extremely important form is to be used by you to show the names and addresses of your spouse, children, parents, and any other person(s) you would like notified if you become a casualty, and, to designate beneficiaries for certain benefits if you die. IT IS YOUR RESPONSIBILITY to keep your Record of Emergency Data up to date to show your desires as to beneficiaries to receive certain death payments, and to show changes in your family or other dependents listed; for example, as a result of marriage, civil court action, death, or address change. Regarding your designation in item 11, allotment if missing (if used by your Service), please read the following statement carefully, and sign on the line provided:

I fully understand that, if I am captured, missing, or interned, my designation of allotments to dependents from my pay and allowances serves only as a guide to the Secretary of my Service. The Secretary may alter my designated allotment in the best interests of myself, my dependents, or the United States Government.

*Travis D Crawford*
SIGNED

195

*(PLEASE READ INSTRUCTIONS ON THE REVERSE SIDE BEFORE COMPLETING AND SUBMITTING THIS FORM)*

## SERVICEMEN'S GROUP LIFE INSURANCE ELECTION

IMPORTANT.— This form is for use by ACTIVE DUTY AND RESERVE MEMBERS. This form does not apply to and cannot be used for any other Government Life Insurance.

| USE THIS FORM FOR ▶ | 1. REDUCING OR REFUSING INSURANCE | 2. STATING TO WHOM AND HOW INSURANCE SHOULD BE PAID |
|---|---|---|

*(Do not make erasures, corrections or changes. Complete a new form)*

| LAST NAME – FIRST NAME – MIDDLE NAME | RANK, TITLE OR GRADE | SERVICE OR SOCIAL SECURITY NO. |
|---|---|---|
| CRAWFORD Travis Don | PVI / E-1 | ████ 5635 |

| BRANCH OF SERVICE (Do not abbreviate) | CURRENT DUTY LOCATION |
|---|---|
| ARMY | PCF USAFaces FTS, // ok 73503-5010 |

### 1. REDUCING OR REFUSING INSURANCE

By law you are automatically insured for $20,000. If you do not want $20,000 insurance write below in your own handwriting "I want only $15,000, $10,000, or $5,000 insurance," or "I want no insurance" as you prefer. Reduced or refused insurance can be restored only by written request with proof of good health and compliance with other requirements.

▶ _____

> BE SURE TO COMPLETE PART 2 ⬇

### 2. BENEFICIARY(IES) AND PAYMENT TO BENEFICIARY(IES) *(Read instructions C and D on reverse)*

IMPORTANT – You must write in the spaces below
(1) "By Law" in your own handwriting if you wish the law to apply (as explained on reverse) or,
(2) The names and other information for persons you want to receive your insurance.
Insurance is paid in a lump sum or 36 equal monthly installments at the option of the beneficiary(ies). If you insert "36" under "Payments to Beneficiary," payment will be made only in 36 equal monthly installments.

**I DESIGNATE THE FOLLOWING BENEFICIARIES TO RECEIVE PAYMENT OF MY INSURANCE PROCEEDS AS SHOWN BELOW:**

| COMPLETE NAME AND ADDRESS OF EACH BENEFICIARY (If married woman, *give her own first and middle names* and husband's last name) | RELATIONSHIP TO INSURED | SHARES TO BE PAID TO EACH BENEFICIARY (Use fractions such as 1/2, 2/3 or 3/4) | PAYMENTS TO BENEFICIARY (Insert "36" if only monthly payments desired. See D on reverse) |
|---|---|---|---|
| PRINCIPAL (First) By Law | | | |
| | | | |
| CONTINGENT (Second - If principal beneficiary dies before me or before completion of installment payments to the principal beneficiary) By Law | | | |
| | | | |
| | | | |

NOTE: If more than one principal beneficiary is named, the share of any such beneficiary who dies before me shall be distributed equally among the surviving principal beneficiaries. If there is no surviving principal beneficiary the proceeds shall be distributed equally to the surviving contingent beneficiaries. This Designation of Beneficiary shall be void if none of the designated beneficiaries is living at my death. If after completion of this form my insurance is increased, this beneficiary designation shall apply to the full amount in force unless a new designation is made.

I UNDERSTAND that this form cancels any prior beneficiary or payment instructions and that unless I have named the beneficiary(ies) above, my insurance will be paid under the "Provisions of the Law" as explained on the reverse of this form.

| SIGN HERE IN INK ▶ *Travis D Crawford* (Signature of member) (Do not print) | DATE COMPLETED *11 Dec 84* |
|---|---|

| WITNESSED AND RECEIVED BY: | RANK, TITLE OR GRADE SP4 / E-4 | ORGANIZATION PCF USAFACF5 | DATE RECEIVED 84/2/11 |
|---|---|---|---|

VA FORM JUL 1974 **29-8286**   SUPERSEDES VA FORM 29-8286, SEP 1970. WHICH WILL NOT BE USED.   MEMBER'S OFFICIAL PERSONNEL FILE

196

| DIS REPORT OF NAC/ENTNAC | | DATE 83/04/13 | | 83077-5079 |
|---|---|---|---|---|
| CODE D0600 | CONTROL | STATUS CLOSED | | COPY TO |

**DISTRIBUTION**

TO ADDRESSEE INDICATED BY REQUESTER
ON ACCOMPANYING DD FORM 1584

**MADE BY**

DIS, PC BOX 1083, BALTIMORE, MD 21203

| SEX | SOCIAL SECURITY NO | FORMER MIL. SV. NO. | BIRTH (DATE) (GPC) (PLACE) |
|---|---|---|---|
| M | ▉ 5635 | | 64 ▉ 40 |

**NI TITLE**

CRAWFORD TRAVIS DON

ENTNAC CONDUCTED, INCLUDING DCII CHECK. THE FOLLOWING AGENCIES WERE
CHECKED WITH FAVORABLE RESULTS.

   FBI - HEADQUARTERS.
   FBI - IDENT. DIV. NAME CHECK ONLY.

THOMAS E. EWALD
DIRECTOR, PERSONNEL INVESTIGATIONS CENTER

THIS DOCUMENT INCORPORATES RESULTS OF CHECKS OF NATIONAL AGENCIES,
CONDUCTED IN ACCORDANCE WITH DOD DIRECTIVE 5200.2-R. IT DOES NOT
CONSTITUTE A GRANTING OR DENIAL OF A CLEARANCE. ON COMPLETION OF
CLEARANCE ACTION, THIS FORM, ACCOMPANYING DOCUMENTS, IF ANY, AND AL
REPRODUCTIONS SHOULD BE DESTROYED

| CLASSIFICATION | | WARNING |
|---|---|---|
| PAGE | | THIS DOCUMENT IS THE PROPERTY OF THE DEFENSE INVESTIGA SERVICE. CONTENTS... OFFICIAL DUTIES REQUIRE ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED... |
| RON | 1 LAST | |



DEPARTMENT OF THE ARMY
Headquarters US Army Field Artillery Center and Fort Sill
Fort Sill, Oklahoma  73503-5000

ORDER 010-33                                                    10 January 1985

CRAWFORD, TRAVIS D. ████ 5635 PV1 Personnel Control Facility, United States
Army Field Artillery Center and Fort Sill (WOVGPR) Fort Sill, Oklahoma  73503-5010

You are reassigned to the US Army separation transfer point shown for separation
processing, after processing, you are discharged from the component shown. If
you are delayed in reporting to the separation transfer point, you still must
report to the separation transfer point as soon as possible or as authorized to
recieve a new effective date of discharge.

Assigned to:  US Army Separation Transfer Point (WOVG1A) Fort Sill, Oklahoma
   73503-5100
Reporting date:  23 January 1985
Component:  RA
Discharge date:  23 January 1985
Additional instructions:  You are not authorized movement of your household goods or
   dependents at Government expense.

FOR ARMY USE
Auth: AR 635-200
HOR: VIAN, OK
P1 EAD or OAD:  LITTLE ROCK, OK          PEBD:  NA
MDC:  NZE5
Format:  501

FOR THE COMMANDER:

DISTRIBUTION                             BLAINE H. SMITH JR.
D                                        LTC, AGC
PCF Records/Files                        Adjutant General

7

# DISPOSITION FORM

For use of this form, see AR 340-15, the proponent agency is TAGCEN.

REFERENCE OR OFFICE SYMBOL | SUBJECT

Waiver of Enlistment Commitment

TO Cdr, USATC Engr & FLW          FROM D-1-2          DATE 27 MAY 83   CMT 1
ATTN: ATZT-AGTM

Having been counseled regarding the affect of a waiver of my enlistment commitment made at the time of my enlistment (and of the procedure for submitting a claim of unfulfilled enlistment commitment), I knowingly and voluntarily waive all my enlistment commitment entitlements. I realize and fully understand that, as a result of doing so, I will be assigned in accordance with the needs of the service and required to complete the term of service for which I enlisted. I further understand that this waiver can only be withdrawn upon the express consent of an approving authority or his designee.

HBN TNg
181st ABN Bragg

*Travis D Crawford*
(Signed)

I have witnessed the voluntary signature of *TRAVIS D CRAWFORD 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* and have ascertained the individual has received the required counseling. Distribution of this waiver will be in accordance with AR 601-210.

*(Signed)*

FLW O/P 167 (Rev 1 Mar 84) Previous Edition Obsolete

DA FORM 2496 (1 FEB 62)    REPLACES DD FORM 96, WHICH IS OBSOLETE.

199

ROUTINE

PT 00228   129/1705Z                                    PAGE 01

ACTION/PRIM INT   --INFO--        RI----- 050821

DPC CS G1 G2 G3/DPT G4 DDC DIO LAO AG CM ACC MED SJA DEH AMO

DPCA PAO DIVARTY DISCOM DPDO HQCOMD LEC/PM CIO CE TSA DMMC

CPO DRC IG 5AV 507 902 45EOD 5SIG ICS 105 TCC OTHERS-

RCTUADFN RUCLEJB8560 1231347-UUUU--RUCLDGA.
ZNR UUUUU
R0202342 MAY 84
FM CDR TNGSPTCEN FT EUSTIS VA //ATIC-SMD-FS//
INFO CDR HHC 5TH INF DIV FT POLK LA//AFZX-DPT-TSO 230//
BT
UNCLAS

                  UNCLASSIFIED/TRAINING INFORMATION

              *** INDIVIDUAL SOLDIER'S REPORT ***

TO:   COMMANDER                  TSO:   230        TESTED:   25 APR 84
      CO B 7TH EN BN                                SCORED:   02 MAY 84
      FT POLK           LA   71459                     SQT:   12B1 1840 0

REPORT ON:   E2 CRAWFORD  TRAVI                           SCORE:    54
             SSN:   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
             MOSC:   12B1   COMBAT ENGINEER

                           ****

THE S Q T INDICATES POTENTIAL TRAINING WEAKNESS ON TASK(S):

    0511921001       INSTL/REM M14 MINE
    0511921002       M16A1 MINE
    0511921006       INSTL M15 MINE
    0511921008       M21 ANTITANK MINE
    0511921022       LOC MINES BY PROBING
    0511921023       LOC MINES W/ANPRS-11
    0511921024       LOC MINES W/ANPRS-7
    0511931004       CONST ELEC DET ASSY
    0511931011       DUAL FIRING SYSTEMS
    0511951001       INSTALL PICKETS
    0511971004       ASY DBL SGL BAILY BR
    0511971022       ASY DBL-STORY MGB
    0511981009       ASSY M4T6 SDL ASSY
    0511981010       ASSIST ASSEMBLY LTR

THE SOLDIER ALSO MISSED QUESTIONS ON TASK(S):

    0511921014       INST/REM ANTIHAND DV
    0511931002       NONELECTRIC ASSEMBLY
    0511931009       DETONATIONG CORD
    0511981007       ASY 4-FLOAT RAFT
    0511981008       OP PNEU ASSAULT BOAT
    0512001001       TIE KNOTS/LASHINGS

BT 8560
NNNN

ROUTINE

200

**APPLICATION FOR UNIFORMED SERVICES IDENTIFICATION AND PRIVILEGE CARD**

FORM APPROVED
OMB No. 0704-0020

DATA REQUIRED BY THE PRIVACY ACT OF 1974

AUTHORITY: 10 U.S.C. 133 Executive Order 9397, 22 November 1943 (Social Security Number).

PRINCIPAL PURPOSE(S): Is used by applicant to apply for a DD Form 1173, "Uniformed Services Identification and Privilege Card."

ROUTINE USE(S): Is used by appropriate authority to evaluate an applicant's eligibility to be issued a DD Form 1173, "Uniformed Services Identification and Privilege Card." The DOD Enrollment/Eligibility System will be a routine user of information provided on this application.

DISCLOSURE: Mandatory for Active Duty military personnel. Failure to complete the form may result in disciplinary or administrative action. Voluntary for all other persons. However, failure to furnish all information, including SSN, could delay or prevent the issuance of an ID Card to persons otherwise eligible.

### SECTION I — IDENTIFICATION OF PERSON UPON WHOM ELIGIBILITY FOR DD FORM 1173 IS BASED

| 1. NAME (Last - First - Middle Initial) | 2. SSN | 3. GRADE | 4. HOME PHONE | 5. OFFICE PHONE |
|---|---|---|---|---|
| Crawford Travis D | -5635 | E-1 | | 1-1261 |

| 6. ADDRESS (Include ZIP Code) | 7. BRANCH OF SVC | 8. STATUS |
|---|---|---|
| Vian OK 74962 | Army | ☐ ACTIVE DUTY  ☐ DECEASED AD  ☐ RETIRED  ☐ DECEASED RETIRED  ☐ 100% DAV  ☒ OTHER (Specify, Item 60) |

| 9. DATE OF EXPIRATION OF SERVICE OR CONTRACT (or death) | 10. REASON FOR APPLICATION |
|---|---|
| | ☐ ORIGINAL CARD(S)  ☒ OTHER (Specify, Item 69) |

### SECTION II — PERSONS FOR WHOM IDENTIFICATION CARDS ARE REQUESTED (INCLUDE YOURSELF WHEN APPLICABLE)
(List dependents claimed who will not be issued ID Cards in Section V, Item 60.)

FOR USE OF VERIFYING OFFICER — FOR USE OF ISSUING OFFICER

| 11. NAME (Last - First - Middle Initial) - SSN (If applicable) | 12. RELATIONSHIP | 13. DATE OF BIRTH (Yr., Mo., Day) | 14. PRIVILEGE AUTH 1/ | 15. CARD NO. ISSUED |
|---|---|---|---|---|
| Crawford Teresa S | Wife | | | |

| 16. ADDRESS (Include ZIP Code) | 17. EYES | 18. HAIR | 19. MC EFFECTIVE DATE (Yr., Mo., Day) | 20. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| | 21. HEIGHT | 22. WEIGHT | 23. EXPIRATION DATE (Yr., Mo., Day) | |

| 24. NAME (Last - First - Middle Initial) - SSN (If applicable) | 25. RELATIONSHIP | 26. DATE OF BIRTH (Yr., Mo., Day) | 27. PRIVILEGE AUTH 1/ | 28. CARD NO. ISSUED |
|---|---|---|---|---|
| Crawford Kristine M | Daughter | | | |

| 29. ADDRESS (Include ZIP Code) | 30. EYES | 31. HAIR | 32. MC EFFECTIVE DATE (Yr., Mo., Day) | 33. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| | 34. HEIGHT | 35. WEIGHT | 36. EXPIRATION DATE (Yr., Mo., Day) | |

| 37. NAME (Last - First - Middle Initial) - SSN (If applicable) | 38. RELATIONSHIP | 39. DATE OF BIRTH (Yr., Mo., Day) | 40. PRIVILEGE AUTH 1/ | 41. CARD NO. ISSUED |
|---|---|---|---|---|
| | | | | |

| 42. ADDRESS (Include ZIP Code) | 43. EYES | 44. HAIR | 45. MC EFFECTIVE DATE (Yr., Mo., Day) | 46. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| | 47. HEIGHT | 48. WEIGHT | 49. EXPIRATION DATE (Yr., Mo., Day) | |

1/ Abbreviated Privileges, i.e.: C—Commissary; Exchange, EL—Limited, EU—Unlimited; T—Theater; MC—Medical Care in Civilian Facilities; MS—Medical Care in Uniformed Services Facilities.

### SECTION III — VERIFICATION BY PERSONNEL OFFICER OR OTHER RESPONSIBLE OFFICIAL OF SPONSOR'S SERVICE

The status of the persons named in Section II has been verified, issue of DD Form 1173 by any U.S. Uniformed Service Activity is authorized, benefits and privileges to which entitled, effective and expiration date of eligibility for each named person are verified; issuing agency is requested to (A) issue DD Form 1173 upon presentation of this application, (B) enter in the appropriate column of Section II the card number issued with the date issued, (C) if dependents are claimed who will not be issued ID Cards in Section V, Item 60, send a copy of this application to DOD Enrollment/Eligibility Processing Center, OSD/HA, Rm. 3E173, Pentagon, Washington, D.C. 20301, (D) complete Section IV of this application form and return it to the organization designated in Item 50.

| 50. ORGANIZATION AND MAILING ADDRESS OF VERIFYING OFFICER | 51. TYPED NAME, GRADE, AND TITLE | 52. SIGNATURE |
|---|---|---|
| Personnel Control Facility  USAFACFS | Diane J.  Mosman  SSG, Asst Pers SGT | |

### SECTION IV — AUTHENTICATION BY ISSUING AGENCY

53. ISSUING OFFICE — Ensure Items 61 and 62 are completed and signed. A notation of the receipt and destruction or complete accounting of the previously issued card must be made in Item 59. Upon issue, forward one copy to the activity holding the service record of the sponsor or to the verifying activity.

| 54. ORGANIZATION OF ISSUING OFFICER (Include UIC) | 55. TYPED NAME, GRADE, AND TITLE | 56. SIGNATURE |
|---|---|---|
| | | |

| 57. | a. DATE ACKNOWLEDGED | b. SIGNATURE OF CARD RECIPIENT |
|---|---|---|
| ☐ RECEIPT OF CARD(S) IS ACKNOWLEDGED | | |

**DD** FORM 1172  1 JAN 79   PREVIOUS EDITION IS OBSOLETE. ALSO RESCINDS DD FORM 1172 PRIVACY ACT STATEMENT AUG 75.

## SECTION V — STATEMENT OF UNIFORMED SERVICES OR CIVILIAN SPONSOR; OTHERWISE THE APPLICANT

**58. STATE MARITAL STATUS** *(Check appropriate box(es) and complete entries as applicable.)*

☐ MARRIED ☐ SEPARATED ☐ DIVORCED/ANNULLED ☐ ANNULLED AB INITIO ☐ UNMARRIED *(surviving)* SPOUSE ☐ UNREMARRIED *(surviving)* SPOUSE

### DEFINITION

UNMARRIED *(surviving)* SPOUSE — A spouse who has married subsequent to the death of the sponsor and has had that marriage terminated by death, decree of divorce or decree of annulment.

UNREMARRIED *(surviving)* SPOUSE — A spouse who has never remarried or never legally remarried as in the case of an "AB INITIO" annulment. Spouses in this category would not lose their benefits.

a. ☐ Lawful marriage to the spouse named took place at _____ *(Place)* on _____ *(Date: Yr., Mo., Day)*

b. ☐ I am the unmarried *(surviving)* spouse of the sponsor named in Section I, whose subsequent marriage terminated in divorce, annulment or death. I understand that I may not be entitled to medical care as administered by the Department of Defense. In the event of annulment, a special finding authorizing medical care must be made by the Parent service of the sponsor.

c. ☐ Child(ren) listed in Section II is (are) unmarried and legitimate child(ren), illegitimate child(ren) of a male sponsor whose paternity has been judicially determined, illegitimate child(ren) of record of a female sponsor who has been judicially directed to support the child(ren), adopted child(ren), or stepchild(ren), who is (are) legitimate child(ren) of the spouse of the active duty, retired, or deceased member listed in Section I; and (1) the child(ren) named is (are) less than 21 years of age; or (2) 21 years of age and over and (a) is incapable of self-support because of a mental or physical incapacity that existed prior to his or her reaching the age of 21, the incapacity has been continuous and the child(ren) is (are) in fact, dependent upon the sponsor for over fifty (50) percentum of his or her support (or who was so dependent on sponsor at the time of death); or (b) has not passed his or her twenty-third birthday, is pursuing a fulltime course of education in an institution of higher learning approved by the Secretary of Defense or the Secretary of Health, Education and Welfare (as appropriate) or by a state agency under Title 38, U.S.C., Chapter 34, Veteran's Educational Assistance, and Chapter 35, War Orphans' and Widows' Educational Assistance, of Title 38 U.S.C., is carrying a course load of a minimum of twelve (12) semester credit hours or equivalent hours and is (or was at the time of the member's death) dependent upon the member for over fifty (50) percentum of his or her support.

d. ☐ Child(ren) listed in Section II is (are) unmarried and illegitimate child(ren) of a male sponsor whose paternity has not been judicially determined, illegitimate child(ren) of record of a female sponsor or illegitimate child(ren) of the spouse of a sponsor (i.e., the sponsor's stepchild(ren), or stepchild(ren) of a deceased member or retiree at time of death) who resides with or in a home provided by the sponsor, or which was being provided by the deceased member or retiree at the time of death, and who is and continues to be dependent upon the sponsor for over fifty (50) percentum of his or her support or who was dependent on the deceased member or retiree at the time of death; that the child(ren) named is (are) less than 21 years of age or is (are) 21 years of age and over and is (1) incapable of self-support because of a mental or physical incapacity that existed prior to his or her reaching the age of 21, and the incapacity has been continuous and who continues to be dependent upon the sponsor or (2) has not passed his or her twenty-third birthday, is pursuing a full-time course of education in an institution of higher learning approved by the Secretary of Defense or the Secretary of Health, Education and Welfare (as appropriate) or by a state agency under Title 38, U.S.C., Chapter 34, Veteran's Educational Assistance, and Chapter 35, War Orphans' and Widows' Educational Assistance, of Title 38, U.S.C., is carrying a course load of a minimum of twelve (12) semester hours or equivalent hours and is (or was at the time of the member's death) dependent upon the member for over fifty (50) percentum of his or her support.

NOTE: Section II — In those special circumstances which permit children over 21 entitlement to medical care, indicate after date of birth, (INCT) for a temporarily incapacitated child, (INCP) for a permanently incapacitated child or (SCH) for attendance at approved school. Enter under Item 60, REMARKS, the name of the institution of higher learning and expected date of graduation.

e. ☐ I am the parent, adoptive parent, parent-in-law, or adoptive parent-in-law of the sponsor named in Section I and at the time of his or her death, I, and all other parents, adoptive parents, parents-in-law, or adoptive parents-in-law named herein resided in the household of (or, for medical care purposes, in a dwelling place provided or maintained by) said sponsor, and were in fact dependent upon him or her for over one-half of our support. I understand that I am not entitled to CHAMPUS.

f. ☐ I am the legal guardian of the dependent or dependents of the sponsor named in Section I, and further certify that the named dependents meet the criteria for eligibility as indicated by blocks checked above.

g. ☐ All parents, adoptive parents, parents-in-law, or adoptive parents-in-law named are in fact dependent upon me for over one-half of their support and actually reside in my household or in a dwelling provided or maintained by me and, therefore, are eligible for benefits such as commissary stores, exchange and medical care. I understand my parents, adoptive parents, parents-in-law, or adoptive parents-in-law are not entitled to CHAMPUS.

h. ☐ I am entitled to retired, retirement, or retainer pay or equivalent pay as a result of service in a uniformed service.

**59. DISPOSITION OF PREVIOUSLY ISSUED CARDS**

CARD NO. _____ ☐ RETURNED AND DESTROYED ☐ PREVIOUSLY ISSUED CARD LOST *(Cite circumstances in Item 60, REMARKS.)* ☐ PREVIOUSLY ISSUED CARD STOLEN *(Cite circumstances in Item 60, REMARKS.)*

**60. REMARKS** *(List dependents claimed who will not be issued an ID Card. For each dependent provide name, date of birth, relationship to sponsor, SSN if applicable, and address if different from sponsor or applicant.)*

Request SM be withdrawn from DEERS.
SM Discharge UP Chapter 10, AR 635-200 effective

## SECTION VI — CONDITIONS APPLICABLE TO SPONSOR

I understand that the actions of the recipient(s) of DD Form 1173, Uniformed Services Identification and Privilege Card, issued as a result of this application are my responsibility insofar as proper use of the card for the benefits and privileges, i.e., medical care, exchange, commissary and theater, authorized. I will cause the recipient to surrender the card immediately upon call to do so or when appropriate under applicable regulations and will notify an agency designated to grant authorizations for privileges and facilities in event of any change in status affecting a recipient's eligibility therefor.

I am aware that medical care furnished in uniformed services facilities is subject to availability of space, facilities and the capabilities of the medical staff to provide such care. Determinations made by the medical officer or contract surgeon, or his designee, as to availability of space, facilities and the capabilities of the medical staff shall be conclusive. Reimbursement shall be required for any unauthorized medical care furnished at Government expense. PENALTY FOR PRESENTING FALSE CLAIMS OR MAKING FALSE STATEMENTS IN CONNECTION WITH CLAIMS: FINE OF NOT MORE THAN $10,000 OR IMPRISONMENT FOR NOT MORE THAN FIVE YEARS OR BOTH. *(Act 25, June 1948, 18 U.S.C. 287, 1001.)*

**61. DATE OF APPLICATION**
84 Dec 12

**62. SIGNATURE OF SERVICE SPONSOR OR APPLICANT**

202

**APPLICATION FOR UNIFORMED SERVICES IDENTIFICATION AND PRIVILEGE CARD**

*FORM APPROVED OMB No. 0704-0020*

## DATA REQUIRED BY THE PRIVACY ACT OF 1974

**AUTHORITY:** 10 U.S.C. 133 Executive Order 9397, 22 November 1943 (Social Security Number).

**PRINCIPAL PURPOSE(S):** Is used by applicant to apply for a DD Form 1173, "Uniformed Services Identification and Privilege Card."

**ROUTINE USE(S):** Is used by appropriate authority to evaluate an applicant's eligibility to be issued a DD Form 1173, "Uniformed Services Identification and Privilege Card." The DOD Enrollment/Eligibility System will be a routine user of information provided on this application.

**DISCLOSURE:** Mandatory for Active Duty military personnel. Failure to complete the form may result in disciplinary or administrative action. Voluntary for all other persons. However, failure to furnish all information, including SSN, could delay or prevent the issuance of an ID Card to persons otherwise eligible.

### SECTION I — IDENTIFICATION OF PERSON UPON WHOM ELIGIBILITY FOR DD FORM 1173 IS BASED

| 1. NAME (Last - First - Middle Initial) | 2. SSN | 3. GRADE | 4. HOME PHONE | 5. OFFICE PHONE |
|---|---|---|---|---|
| Crawford Travis D | 5635 | E-1 | | 1-1261 |

| 6. ADDRESS (Include ZIP Code) | 8. STATUS |
|---|---|
| ▓▓▓▓ Vian OK 74962 | Army  ☐ ACTIVE DUTY  ☐ RETIRED  ☐ 100% DAV  ☐ DECEASED AD  ☐ DECEASED RETIRED  ☒ OTHER (Specify, Item 60) |

| 9. DATE OF EXPIRATION OF SERVICE OR CONTRACT (or death) | 10. REASON FOR APPLICATION |
|---|---|
| | ☐ ORIGINAL CARD(S)  ☒ OTHER (Specify, Item 59) |

### SECTION II — PERSONS FOR WHOM IDENTIFICATION CARDS ARE REQUESTED (INCLUDE YOURSELF WHEN APPLICABLE)
(List dependents claimed who will not be issued ID Cards in Section V, Item 60.)

| | FOR USE OF VERIFYING OFFICER | FOR USE OF ISSUING OFFICER |
|---|---|---|

| 11. NAME (Last - First - Middle Initial) - SSN (If applicable) | 12. RELATIONSHIP | 13. DATE OF BIRTH (Yr., Mo., Day) | 14. PRIVILEGE AUTH 1/ | 15. CARD NO. ISSUED |
|---|---|---|---|---|
| Crawford Teresa S | Wife | ▓▓▓ | | |

| 16. ADDRESS (Include ZIP Code) | 17. EYES | 18. HAIR | 19. MC EFFECTIVE DATE (Yr., Mo., Day) | 20. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| | 21. HEIGHT | 22. WEIGHT | 23. EXPIRATION DATE (Yr., Mo., Day) | |

| 24. NAME (Last - First - Middle Initial) - SSN (If applicable) | 25. RELATIONSHIP | 26. DATE OF BIRTH (Yr., Mo., Day) | 27. PRIVILEGE AUTH 1/ | 28. CARD NO. ISSUED |
|---|---|---|---|---|
| Crawford Kristine M | Daughter | ▓▓▓ | | |

| 29. ADDRESS (Include ZIP Code) | 30. EYES | 31. HAIR | 32. MC EFFECTIVE DATE (Yr., Mo., Day) | 33. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| | 34. HEIGHT | 35. WEIGHT | 36. EXPIRATION DATE (Yr., Mo., Day) | |

| 37. NAME (Last - First - Middle Initial) - SSN (If applicable) | 38. RELATIONSHIP | 39. DATE OF BIRTH (Yr., Mo., Day) | 40. PRIVILEGE AUTH 1/ | 41. CARD NO. ISSUED |
|---|---|---|---|---|
| | | | | |

| 42. ADDRESS (Include ZIP Code) | 43. EYES | 44. HAIR | 45. MC EFFECTIVE DATE (Yr., Mo., Day) | 46. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| | 47. HEIGHT | 48. WEIGHT | 49. EXPIRATION DATE (Yr., Mo., Day) | |

1/ Abbreviated Privileges, i.e.: C—Commissary; Exchange, EL—Limited, EU—Unlimited; T—Theater; MC—Medical Care in Civilian Facilities; MS—Medical Care in Uniformed Services Facilities.

### SECTION III — VERIFICATION BY PERSONNEL OFFICER OR OTHER RESPONSIBLE OFFICIAL OF SPONSOR'S SERVICE

The status of the persons named in Section II has been verified, issue of DD Form 1173 by any U.S. Uniformed Service Activity is authorized, benefits and privileges to which entitled, effective and expiration date of eligibility for each named person are verified, issuing agency is requested to (A) issue DD Form 1173 upon presentation of this application, (B) enter in the appropriate column of Section II the card number issued with the date issued, (C) if dependents are claimed who will not be issued ID Cards in Section V, Item 60, send a copy of this application to DOD Enrollment/Eligibility Processing Center, OSD/HA, Rm. 3E173, Pentagon, Washington, D.C. 20301, (D) complete Section IV of this application form and return it to the organization designated in Item 50.

| 50. ORGANIZATION AND MAILING ADDRESS OF VERIFYING OFFICER | 51. TYPED NAME, GRADE, AND TITLE | 52. SIGNATURE |
|---|---|---|
| Personnel Control Facility USAFACFS | Diane J. Mosman SSG, Asst Pers SGT | |

### SECTION IV — AUTHENTICATION BY ISSUING AGENCY

53. ISSUING OFFICE — Ensure Items 61 and 62 are completed and signed. A notation of the receipt and destruction or complete accounting of the previously issued card must be made in Item 59. Upon issue, forward one copy to the activity holding the service record of the sponsor or to the verifying activity.

| 54. ORGANIZATION OF ISSUING OFFICER (Include UIC) | 55. TYPED NAME, GRADE, AND TITLE | 56. SIGNATURE |
|---|---|---|
| | | |

| 57. ☐ RECEIPT OF CARD(S) IS ACKNOWLEDGED | a. DATE ACKNOWLEDGED | b. SIGNATURE OF CARD RECIPIENT |
|---|---|---|
| | | |

**DD** FORM 1172, 1 JAN 79   PREVIOUS EDITION IS OBSOLETE. ALSO RESCINDS DD FORM 1172 PRIVACY ACT STATEMENT AUG 75.

203

**SECTION V — STATEMENT OF UNIFORMED SERVICES OR CIVILIAN SPONSOR; OTHERWISE THE APPLICANT**

**58. STATE MARITAL STATUS** (Check appropriate box(es) and complete entries as applicable.)

☐ MARRIED ☐ SEPARATED ☐ DIVORCED/ ANNULLED ☐ ANNULLED AB INITIO ☐ UNMARRIED (surviving) SPOUSE ☐ UNREMARRIED (surviving) SPOUSE

**DEFINITION**

UNMARRIED (surviving) SPOUSE — A spouse who has married subsequent to the death of the sponsor and has had that marriage terminated by death, decree of divorce or decree of annulment.

UNREMARRIED (surviving) SPOUSE — A spouse who has never remarried or never legally remarried as in the case of an "AB INITIO" annulment. Spouses in this category would not lose their benefits.

a. ☐ Lawful marriage to the spouse named took place at _____ (Place) on _____ (Date: Yr., Mo., Day)

b. ☐ I am the unmarried (surviving) spouse of the sponsor named in Section I, whose subsequent marriage terminated in divorce, annulment or death. I understand that I may not be entitled to medical care as administered by the Department of Defense. In the event of annulment, a special finding authorizing medical care must be made by the Parent service of the sponsor.

c. ☐ Child(ren) listed in Section II is (are) unmarried and legitimate child(ren), illegitimate child(ren) of a male sponsor whose paternity has been judicially determined, illegitimate child(ren) of record of a female sponsor who has been judicially directed to support the child(ren), adopted child(ren), or stepchild(ren), who is (are) legitimate child(ren) of the spouse of the active duty, retired, or deceased member listed in Section I; and (1) the child(ren) named is (are) less than 21 years of age; or (2) 21 years of age and over and (a) is incapable of self-support because of a mental or physical incapacity that existed prior to his or her reaching the age of 21, the incapacity has been continuous and the child(ren) is (are) in fact, dependent upon the sponsor for over fifty (50) percentum of his or her support (or who was so dependent on sponsor at the time of death); or (b) has not passed his or her twenty-third birthday, is pursuing a fulltime course of education in an institution of higher learning approved by the Secretary of Defense or the Secretary of Health, Education and Welfare (as appropriate) or by a state agency under Title 38, U.S.C., Chapter 34, Veteran's Educational Assistance, and Chapter 35, War Orphans' and Widows' Educational Assistance, of Title 38 U.S.C., is carrying a course load of a minimum of twelve (12) semester credit hours or equivalent hours and is (or was at the time of the member's death) dependent upon the member for over fifty (50) percentum of his or her support.

d. ☐ Child(ren) listed in Section II is (are) unmarried and illegitimate child(ren) of a male sponsor whose paternity has not been judicially determined, illegitimate child(ren) of record of a female sponsor or illegitimate child(ren) of the spouse of a sponsor (i.e., the sponsor's stepchild(ren), or stepchild(ren) of a deceased member or retiree at time of death) who resides with or in a home provided by the sponsor, or which was being provided by the deceased member or retiree at the time of death, and who is and continues to be dependent upon the sponsor for over fifty (50) percentum of his or her support, or who was dependent on the deceased member or retiree at the time of death; that the child(ren) named is (are) less than 21 years of age or is (are) 21 years of age and over and is (1) incapable of self-support because of a mental or physical incapacity that existed prior to his or her reaching the age of 21, and the incapacity has been continuous and who continues to be dependent upon the sponsor or (2) has not passed his or her twenty-third birthday, is pursuing a full-time course of education in an institution of higher learning approved by the Secretary of Defense or the Secretary of Health, Education and Welfare (as appropriate) or by a state agency under Title 38, U.S.C., Chapter 34, Veteran's Educational Assistance, and Chapter 35, War Orphans' and Widows' Educational Assistance, of Title 38, U.S.C., is carrying a course load of a minimum of twelve (12) semester hours or equivalent hours and is (or was at the time of the member's death) dependent upon the member for over fifty (50) percentum of his or her support.

NOTE: Section II — In those special circumstances which permit children over 21 entitlement to medical care, indicate after date of birth, (INCT) for a temporarily incapacitated child, (INCP) for a permanently incapacitated child or (SCH) for attendance at approved school. Enter under Item 60, REMARKS, the name of the institution of higher learning and expected date of graduation.

e. ☐ I am the parent, adoptive parent, parent-in-law, or adoptive parent-in-law of the sponsor named in Section I and at the time of his or her death, I, and all other parents, adoptive parents, parents-in-law, or adoptive parents-in-law named herein resided in the household of (or, for medical care purposes, in a dwelling place provided or maintained by) said sponsor, and were in fact dependent upon him or her for over one-half of our support. I understand that I am not entitled to CHAMPUS.

f. ☐ I am the legal guardian of the dependent or dependents of the sponsor named in Section I, and further certify that the named dependents meet the criteria for eligibility as indicated by blocks checked above.

g. ☐ All parents, adoptive parents, parents-in-law, or adoptive parents-in-law named are in fact dependent upon me for over one-half of their support and actually reside in my household or in a dwelling provided or maintained by me and, therefore, are eligible for benefits such as commissary stores, exchange and medical care. I understand my parents, adoptive parents, parents-in-law, or adoptive parents-in-law are not entitled to CHAMPUS.

h. ☐ I am entitled to retired, retirement, or retainer pay or equivalent pay as a result of service in a uniformed service.

**59. DISPOSITION OF PREVIOUSLY ISSUED CARDS**

☐ CARD NO. ___ ☐ RETURNED AND DESTROYED ☐ PREVIOUSLY ISSUED CARD LOST (Cite circumstances in Item 60, REMARKS.) ☐ PREVIOUSLY ISSUED CARD STOLEN (Cite circumstances in Item 60, REMARKS.)

**60. REMARKS** (List dependents claimed who will not be issued an ID Card. For each dependent provide name, date of birth, relationship to sponsor, SSN if applicable, and address if different from sponsor or applicant.)

Request SM be withdrawn from DEERS.
SM Discharge UP Chapter 10, AR 635-200 effective

**SECTION VI — CONDITIONS APPLICABLE TO SPONSOR**

I understand that the actions of the recipient(s) of DD Form 1173, Uniformed Services Identification and Privilege Card, issued as a result of this application are my responsibility insofar as proper use of the card for the benefits and privileges, i.e., medical care, exchange, commissary and theater, authorized. I will cause the recipient to surrender the card immediately upon call to do so or when appropriate under applicable regulations and will notify an agency designated to grant authorizations for privileges and facilities in event of any change in status affecting a recipient's eligibility therefor.

I am aware that medical care furnished in uniformed services facilities is subject to availability of space, facilities and the capabilities of the medical staff to provide such care. Determinations made by the medical officer or contract surgeon, or his designee, as to availability of space, facilities and the capabilities of the medical staff shall be conclusive. Reimbursement shall be required for any unauthorized medical care furnished at Government expense. PENALTY FOR PRESENTING FALSE CLAIMS OR MAKING FALSE STATEMENTS IN CONNECTION WITH CLAIMS: FINE OF NOT MORE THAN $10,000 OR IMPRISONMENT FOR NOT MORE THAN FIVE YEARS OR BOTH. (Act 25, June 1948, 18 U.S.C. 287, 1001.)

**61. DATE OF APPLICATION** 84 Dec 12

**62. SIGNATURE OF SERVICE SPONSOR OR APPLICANT**

REVERSE OF DD FORM 1172

204

| APPLICATION FOR UNIFORMED SERVICES IDENTIFICATION AND PRIVILEGE CARD | FORM APPROVED OMB No. 0704-0020. |
|---|---|

**DATA REQUIRED BY THE PRIVACY ACT OF 1974**

**AUTHORITY:** 10 U.S.C. 133 Executive Order 9397, 22 November 1943 (Social Security Number).

**PRINCIPAL PURPOSE(S):** Is used by applicant to apply for a DD Form 1173, "Uniformed Services Identification and Privilege Card."

**ROUTINE USE(S):** Is used by appropriate authority to evaluate an applicant's eligibility to be issued a DD Form 1173, "Uniformed Services Identification and Privilege Card." The DOD Enrollment/Eligibility System will be a routine user of information provided on this application.

**DISCLOSURE:** Mandatory for Active Duty military personnel. Failure to complete the form may result in disciplinary or administrative action. Voluntary for all other persons. However, failure to furnish all information, including SSN, could delay or prevent the issuance of an ID Card to persons otherwise eligible.

### SECTION I – IDENTIFICATION OF PERSON UPON WHOM ELIGIBILITY FOR DD FORM 1173 IS BASED

| 1. NAME (Last - First - Middle Initial) | 2. SSN | 3. GRADE | 4. HOME PHONE | 5. OFFICE PHONE |
|---|---|---|---|---|
| Crawford Travis D | ▮▮▮▮ 5635 | E-1 | | 1-1261 |

| 6. ADDRESS (Include ZIP Code) | 7. BRANCH OF SVC | 8. STATUS |
|---|---|---|
| ▮▮▮▮▮ Vian OK 74962 | Army | ☐ ACTIVE DUTY  ☐ RETIRED  ☐ 100% DAV  ☐ DECEASED AD  ☐ DECEASED RETIRED  ☑ OTHER (Specify, Item 60) |

| 9. DATE OF EXPIRATION OF SERVICE OR CONTRACT (or death) | 10. REASON FOR APPLICATION  ☐ ORIGINAL CARD(S)  ☑ OTHER (Specify, Item 59) |
|---|---|

### SECTION II – PERSONS FOR WHOM IDENTIFICATION CARDS ARE REQUESTED (INCLUDE YOURSELF WHEN APPLICABLE)
(List dependents claimed who will not be issued ID Cards in Section V, Item 60.)

| | FOR USE OF VERIFYING OFFICER | FOR USE OF ISSUING OFFICER |
|---|---|---|

| 11. NAME (Last - First - Middle Initial) - SSN (If applicable) | 12. RELATIONSHIP | 13. DATE OF BIRTH (Yr., Mo., Day) | 14. PRIVILEGE AUTH 1/ | 15. CARD NO. ISSUED |
|---|---|---|---|---|
| Crawford Teresa S | Wife | ▮▮▮▮ | | |

| 16. ADDRESS (Include ZIP Code) | 17. EYES | 18. HAIR | 19. MC EFFECTIVE DATE (Yr., Mo., Day) | 20. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| | 21. HEIGHT | 22. WEIGHT | 23. EXPIRATION DATE (Yr., Mo., Day) | |

| 24. NAME (Last - First - Middle Initial) - SSN (If applicable) | 25. RELATIONSHIP | 26. DATE OF BIRTH (Yr., Mo., Day) | 27. PRIVILEGE AUTH 1/ | 28. CARD NO. ISSUED |
|---|---|---|---|---|
| Crawford Kristine M | Daughter | ▮▮▮▮ | | |

| 29. ADDRESS (Include ZIP Code) | 30. EYES | 31. HAIR | 32. MC EFFECTIVE DATE (Yr., Mo., Day) | 33. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| | 34. HEIGHT | 35. WEIGHT | 36. EXPIRATION DATE (Yr., Mo., Day) | |

| 37. NAME (Last - First - Middle Initial) - SSN (If applicable) | 38. RELATIONSHIP | 39. DATE OF BIRTH (Yr., Mo., Day) | 40. PRIVILEGE AUTH 1/ | 41. CARD NO. ISSUED |
|---|---|---|---|---|
| | | | | |

| 42. ADDRESS (Include ZIP Code) | 43. EYES | 44. HAIR | 45. MC EFFECTIVE DATE (Yr., Mo., Day) | 46. DATE ISSUED (Yr., Mo., Day) |
|---|---|---|---|---|
| | 47. HEIGHT | 48. WEIGHT | 49. EXPIRATION DATE (Yr., Mo., Day) | |

1/ Abbreviated Privileges, i.e.: C—Commissary; Exchange, EL—Limited; EU—Unlimited; T—Theater; MC—Medical Care in Civilian Facilities; MS—Medical Care in Uniformed Services Facilities.

### SECTION III – VERIFICATION BY PERSONNEL OFFICER OR OTHER RESPONSIBLE OFFICIAL OF SPONSOR'S SERVICE

The status of the persons named in Section II has been verified, issue of DD Form 1173 by any U.S. Uniformed Service Activity is authorized, benefits and privileges to which entitled, effective and expiration date of eligibility for each named person are verified, issuing agency is requested to (A) issue DD Form 1173 upon presentation of this application, (B) enter in the appropriate column of Section II the card number issued with the date issued, (C) if dependents are claimed who will not be issued ID Cards in Section V, Item 60, send a copy of this application to DOD Enrollment/Eligibility Processing Center, OSD/HA, Rm. 3E173, Pentagon, Washington, D.C. 20301, (D) complete Section IV of this application form and return it to the organization designated in Item 50.

| 50. ORGANIZATION AND MAILING ADDRESS OF VERIFYING OFFICER | 51. TYPED NAME, GRADE, AND TITLE | 52. SIGNATURE |
|---|---|---|
| Personnel Control Facility, USAFACFS | Diane J. Mosman SSG, Asst Pers SGT | |

### SECTION IV – AUTHENTICATION BY ISSUING AGENCY

53. ISSUING OFFICE — Ensure Items 61 and 62 are completed and signed. A notation of the receipt and destruction or complete accounting of the previously issued card must be made in Item 59. Upon issue, forward one copy to the activity holding the service record of the sponsor or to the verifying activity.

| 54. ORGANIZATION OF ISSUING OFFICER (Include UIC) | 55. TYPED NAME, GRADE, AND TITLE | 56. SIGNATURE |
|---|---|---|
| | | |

| 57. | a. DATE ACKNOWLEDGED | b. SIGNATURE OF CARD RECIPIENT |
|---|---|---|
| ☐ RECEIPT OF CARD(S) IS ACKNOWLEDGED | | |

DD FORM 1172  1 JAN 79   PREVIOUS EDITION IS OBSOLETE. ALSO RESCINDS DD FORM 1172 PRIVACY ACT STATEMENT AUG 75.

205

# APPLICATION FOR UNIFORMED SERVICES IDENTIFICATION AND PRIVILEGE CARD

FORM APPROVED OMB No. 0704-0020

**AUTHORITY:** Title 10 USC, Executive Order 9397

**PRINCIPAL PURPOSE(S):** Is used by applicant to apply for a DD Form 1173, "Uniformed Services Identification and Privilege Card."

**ROUTINE USE(S):** Is used by appropriate authority to evaluate an applicant's eligibility to be issued a DD Form 1173.

**DISCLOSURE:** Mandatory for Active Duty military personnel ... Voluntary for all other persons. However, failure to furnish all information, including SSN, could delay or prevent the issuance of an ID Card to persons otherwise eligible.

## SECTION I — IDENTIFICATION OF PERSON UPON WHOM ELIGIBILITY FOR DD FORM 1173 IS BASED

| 1. NAME (Last - First - Middle Initial) | 2. SSN | 3. GRADE | 4. HOME PHONE | 5. OFFICE PHONE |
|---|---|---|---|---|
| Bernhard Theadore Jr | [redacted]9209 | E-1 | | 1-1261 |

| 6. ADDRESS (Include ZIP Code) | 7. BRANCH OF SVC | 8. STATUS |
|---|---|---|
| [redacted] Humble TX 77338 | Army | ☐ ACTIVE DUTY ☐ RETIRED ☐ 100% DAV ☐ DECEASED AD ☐ DECEASED RETIRED ☒ OTHER (Specify, Item 60) |

9. SERVICE OR CONTRACT (or death) / 10. REASON FOR APPLICATION: ☐ ORIGINAL CARD(S) ☒ OTHER (Specify, Item 59)

SM-Discharged IAW AR 635-200 Chap 10. Request SM be withdrawn from DEERS.

## SECTION II — PERSONS FOR WHOM IDENTIFICATION CARDS ARE REQUESTED (INCLUDE YOURSELF WHEN APPLICABLE)

(List dependents claimed who will not be issued ID Cards in Section V, Item 60.)

FOR USE OF VERIFYING OFFICER / FOR USE OF ISSUING OFFICER

| 11. NAME (Last - First - Middle Initial) - SSN (If applicable) | 12. RELATIONSHIP | 13. DATE OF BIRTH | 14. PRIVILEGE AUTH 1/ | 15. CARD NO. ISSUED |
|---|---|---|---|---|
| Bernhard Debra A | Wife | [redacted] | | |

16. ADDRESS (Include ZIP Code) — 19. MC EFFECTIVE DATE (Yr., Mo., Day) — 20. DATE ISSUED (Yr., Mo., Day)

21. HEIGHT — 22. WEIGHT — 23. EXPIRATION DATE

| 24. NAME (Last - First - Middle Initial) - SSN (If applicable) | 25. RELATIONSHIP | 26. DATE OF BIRTH | 27. PRIVILEGE AUTH 1/ | 28. CARD NO. ISSUED |
|---|---|---|---|---|
| Bernhard Alysha A | Daughter | [redacted] | | |

29. ADDRESS (Include ZIP Code) — 30. EYES — 31. HAIR — 32. MC EFFECTIVE DATE (Yr., Mo., Day) — 33. DATE ISSUED (Yr., Mo., Day)

34. HEIGHT — 35. WEIGHT — 36. EXPIRATION DATE

37. NAME (Last - First - Middle Initial) - SSN (If applicable) — 38. RELATIONSHIP — 39. DATE OF BIRTH — 40. PRIVILEGE AUTH 1/ — 41. CARD NO. ISSUED

42. ADDRESS (Include ZIP Code) — 43. EYES — 44. HAIR — 45. MC EFFECTIVE DATE — 46. DATE ISSUED

1/ Abbreviated Privileges, i.e., CE – Commissary, Exchange; EL – Limited; EU – Unlimited; T – Theater; MC – Medical Care in Civilian Facilities; MS – Medical Care in Uniformed Services Facilities.

## SECTION III — VERIFICATION BY PERSONNEL OFFICER OR OTHER RESPONSIBLE OFFICIAL OF SPONSOR'S SERVICE

The status of the persons named in Section I has been verified. Issue of DD Form 1173 by the activity of any Uniformed Service activity is authorized, including privileges to which entitled, effective and expiration date of eligibility for each named person, as verified in the personnel records, upon presentation of this application. (Eligibility of dependents of DOD civilian employees who are residing abroad may be verified ... DOD Eligibility Processing Center, ... Washington, D.C. 20310.)

| 50. ORGANIZATION OF VERIFYING OFFICER | 51. TYPED NAME, GRADE, AND TITLE | 52. SIGNATURE |
|---|---|---|
| Personnel Control Facility USAFACFS | Diane J. Mosman SSG, Asst Exec SGT | |

## SECTION IV — AUTHENTICATION BY ISSUING AGENCY

ISSUING OFFICE — Ensure Items 61 and 62 are completed and signed. A notation of the receipt and destruction or complete accounting of the previously issued card must be made in Item 59. Upon issue, forward one copy to the activity holding the service record of the sponsor or to the verifying activity.

64. ORGANIZATION OF ISSUING OFFICER (Include UIC) — 65. TYPED NAME, GRADE, AND TITLE — 66. SIGNATURE

67. ☐ RECEIPT OF CARD(S) IS ACKNOWLEDGED — SIGNATURE OF CARDHOLDER

## SECTION V — STATEMENT OF UNIFORMED SERVICES OR CIVILIAN SPONSOR; OTHERWISE THE APPLICANT

DD FORM 1 JAN 79 1172 — PREVIOUS EDITION IS OBSOLETE. ALSO RESCENDS DD FORM 1172, PRIVACY ACT STATEMENT, AUG 75.

APPLICANT

LEAVE BLANK

LAST NAME **NAM**     FIRST NAME     MIDDLE NAME

Crawford Travis Don

SIGNATURE OF PERSON FINGERPRINTED

*Travis D Crawford*

ALIASES **AKA**

ORI

DATE OF BIRTH **DOB**
Month   Day   Year
64

RESIDENCE OF PERSON FINGERPRINTED

Vian, OK. 74962

CITIZENSHIP **CTZ**    US

| SEX | RACE | HGT. | WGT. | EYES | HAIR | PLACE OF BIRTH **POB** |
|---|---|---|---|---|---|---|
| M | Cau | 5'7" | 183 | BRN | BRN | Sallisaw Ok |

DATE    SIGNATURE OF OFFICIAL TAKING FINGERPRINTS

12 Dec 89   *Jones*

YOUR NO. **OCA**

LEAVE BLANK

EMPLOYER AND ADDRESS

PCF USA Faces
FT Sill OK/A. 73503-5010

FBI NO. **FBI**

ARMED FORCES NO. **MNU**

CLASS

REF.

REASON FINGERPRINTED

Excess Leave/Discharge

SOCIAL SECURITY NO. **SOC**
5635

MISCELLANEOUS NO. **MNU**

| 1. R. THUMB | 2. R. INDEX | 3. R. MIDDLE | 4. R. RING | 5. R. LITTLE |
|---|---|---|---|---|

| 6. L. THUMB | 7. L. INDEX | 8. L. MIDDLE | 9. L. RING | 10. L. LITTLE |
|---|---|---|---|---|

LEFT FOUR FINGERS TAKEN SIMULTANEOUSLY    L. THUMB    R. THUMB    RIGHT FOUR FINGERS TAKEN SIMULTANEOUSLY

207

LEAVE BLANK

**APPLICANT**

| | LAST NAME NAM | FIRST NAME | MIDDLE NAME |
|---|---|---|---|
| | Crawford | Travis | Don |

SIGNATURE OF PERSON FINGERPRINTED
*Travis D Crawford*

RESIDENCE OF PERSON FINGERPRINTED
Vian, Ok 74962

ALIASES AKA

ORI

DATE OF BIRTH DOB — 6_

CITIZENSHIP CTZ — US

| SEX | RACE | HGT. | WGT. | EYES | HAIR | PLACE OF BIRTH POB |
|---|---|---|---|---|---|---|
| M | Cau | 5'7" | 185 | BRN | BRN | Sallisaw, Ok |

DATE — BR25Y

SIGNATURE OF OFFICIAL TAKING FINGERPRINTS

YOUR NO. OCA

LEAVE BLANK

EMPLOYER AND ADDRESS
PCF USAFACFS
FT Sill OKLA. 73503-5010

FBI NO. FBI

ARMED FORCES NO. MNU

CLASS

REF.

REASON FINGERPRINTED
Excess Leave/Discharge

SOCIAL SECURITY NO. SOC — 563

MISCELLANEOUS NO. MNU

| 1. R. THUMB | 2. R. INDEX | 3. R. MIDDLE | 4. R. RING | 5. R. LITTLE |
|---|---|---|---|---|
| 6. L. THUMB | 7. L. INDEX | 8. L. MIDDLE | 9. L. RING | 10. L. LITTLE |

LEFT FOUR FINGERS TAKEN SIMULTANEOUSLY | L. THUMB | R. THUMB | RIGHT FOUR FINGERS TAKEN SIMULTANEOUSLY

AEZR-HP ... Request ... Initial Pay and Allow...

TO Cdr, PCF, USAFACFS
Fort Sill, OK 73503

FROM E-2 Travis D. Crawford
(GR) (FIRST, MI, LAST NAME)

(SSN) ████ 5635

1. UP paragraph 5-5, AR 630-5, request I be placed in an indefinite period leave pending completion of administrative discharge proceedings (Chap 10, ...

2. IAW paragraph 5-2h, AR 630-5, I understand that (INITIAL EACH ONE):

TDC a. All periods of excess leave are without pay and allowances.

TDC b. No leave accrues to members during periods of excess leave.

TDC c. There is no entitlement to physical disability retired pay ... member incur a physical disability while in an excess leave status.

TDC d. Members who have been granted excess leave while awaiting discharge will be charged with ordinary leave until accrued leave is exhaust...

3. In addition, I understand that (INITIAL EACH ONE):

TDC a. If granted excess leave, I will be completely processed for ... from the Army and, if elected, receive my separation physical examination ... parture on excess leave.

TDC b. If my administrative discharge is approved, discharge paper... mailed to me at the following leave address:

NAME: Travis Don Crawford    SSN: ████ 5635    PAY G...

LEAVE ADDRESS: ████████ Wian OK 74962    TEL No. 918...

TDC c. If granted excess leave, I am required to leave instruction... above leave address as to my whereabouts at all times or furnish a new add... Commander, US Army Personnel Control Facility, USAFACFS, Fort Sill, OK 73... receipt of my discharge papers.

SIGNATURE _Travis D. Crawford_

DATE

TO Service Member    FROM ...

Your request for excess leave has been approved as shown by DA Form 31. ... Comdt Comd, USAFACFS, was delegated authority on 4 Dec 83 by the CG, USAF... prove indefinite excess leave per para 5-5, AR 630-5.

DA ... 2496

| SERVICE MEMBER'S STATEMENT CONCERNING COMPENSATION FROM THE VETERANS ADMINISTRATION | DATE |
|---|---|
| For use of this form, see AR 635-10; the proponent agency is MILPERCEN. | |

**1. PLACE OF SEPARATION** *(Hospital or other separation activity)*

**2.**

### INSTRUCTIONS FOR PERSONNEL BEING SEPARATED

a. Each member being processed for separation from active military service for any reason who has undergone prolonged hospitalization, or suffered from wounds, injury or disease while in service, is advised to apply for compensation from the Veterans Administration by completing VA Form 21-526e. Each member who had a physical defect when entering the service which the member feels was aggravated by military service should file VA Form 21-526e. You are further advised that, if you do not apply for compensation from the Veterans Administration by completing VA Form 21-526e at the time of separation, you may do so at any time thereafter, that, if you do intend to file, it is advisable to do so before you leave the service as at that time your medical records are more easily obtainable and action by the Veterans Administration on your claim will be expedited thereby: and that filing VA Form 21-526e will in no way delay your separation.

b. Each member being discharged or released from active duty who has served at least 180 days and who was not provided a complete dental examination and all appropriate dental services and treatment within 90 days prior to discharge or release may apply for Veterans Outpatient Dental Treatment. Application must be made within 90 days of discharge or release from active duty.

c. When you have read the above paragraphs, check the items in 3.a. and 3.b. below, then complete items 4 and 5.

**3.**

I am being processed for separation from the Army and have been advised that:

a. I am entitled to file an application for compensation from the Veterans Administration.

I ☐ HAVE ☐ HAVE NOT FILED APPLICATION FOR SUCH COMPENSATION ON VA FORM 21-526e.
☐ I UNDERSTAND THAT I MAY FILE AFTER I SEPARATE FROM THE ARMY.

b. ☐ IF ELIGIBLE UNDER 2B ABOVE, I MAY MAKE APPLICATION TO THE VA FOR VETERANS OUTPATIENT DENTAL TREATMENT. THIS APPLICATION MUST BE MADE WITHIN 90 DAYS OF DISCHARGE OR RELEASE FROM ACTIVE DUTY.

**4. NAME, GRADE, AND SSN** *(Addressograph plate may be used)*

Crawford Travis Don    E-2    ██████-5635

**5. SIGNATURE OF MEMBER BEING SEPARATED**

*Travis D Crawford*

*NOTE: When application is filed for compensation on VA Form 21-526e, check documents listed below that have been sent to the Veterans Administration. Appropriate VA Office and address will be shown.*

**TO:**

☐ VA FORM 21-526e *(Application for Compensation or Pension from VA)*

☐ A REPRODUCED COPY NO. 3 DD FORM 214 *(Certificate of release or discharge from active duty)*

HEALTH RECORDS INCLUDING THE FOLLOWING:

☐ SF 88 *(Report of Medical Examination)* — ☐ AT ENTRY      ☐ AT SEPARATION
☐ SF 93 *(Report of Medical History)* — ☐ AT ENTRY
☐ SF 600 *(Health Record—Chronological Record of Medical Care)*
☐ SF 603 *(Health Record—Dental)*

☐ Other *(Specify)*

ACTION HAS BEEN TAKEN TO TRACE THE MISSING RECORDS NOT CHECKED ABOVE — ☐ YES      ☐ NO
*(State reason if action has not been taken)*

### PREPARATION AND DISTRIBUTION

Prepare in ORIGINAL only if a claim is not filed and place ORIGINAL in DA Form 20.
Prepare in DUPLICATE when a claim is filed or in all cases of physical disability separation.
Forward DUPLICATE copy with Health Records.

210

**DA FORM 664**   EDITION OF 1 JUL 79 IS OBSOLETE.   ☆ U.S. GOVERNMENT PRINTING OFFICE: 1984-421-646/8093

PERSONNEL DATA - SIDPERS

For use of this form, see AR 680-1; the proponent agency is MILPERCEN

## DATA REQUIRED BY THE PRIVACY ACT

AUTHORITY: Title 5, United States Code, Section 301.

PRINCIPAL PURPOSE(S):
a. Permanent historical and legal document pertaining to the individual shown thereon during the period of assignment/attachment with a specific unit.
b. Is the replacement document for the Morning Report (DA Form 1) for unit supported by the Standard Installation Division Personnel System (SIDPERS).

ROUTINE USES:
a. Provide unit/PAC clerk with personnel information which, in conjunction with appropriate source documents enable the unit/PAC clerk to prepare SIDPERS change reports to update field and HQDA data bases.
b. Recording of this change data on the reverse side Part II to provide an audit trail of incidents/occurrences.
c. Reconcile assigned/attached strength of the unit against rosters, unit manning reports and other strength related documents.
d. Recording of other personnel management data not otherwise shown elsewhere; e.g. local address, phone number for emergency and alert purposes.
e. May be used as a substitute for the Personnel Action, DA Form 4187 as an evidentiary document in courts-martial proceedings.

DISCLOSURE: Mandatory disclosure of local address, telephone number, and name and address of next-of-kin is required for emergency notification. Failure to disclose these data could result in delayed notification of emergency to the soldier and/or next-of-kin.

## PART I

ORGANIZATION (UPC)
ANYBd

UNIT/STATION
B CO 7TH ENGINEER BATTALION FORT POLK LOUISIANA 71459

| 1. NAME (Last, first, middle) CRAWFORD, TRAVIS D | | 2. SSN ████ 5635 | 3. GRADE & PAY GRADE PVI E-1 | 4. BLOOD TYPE O POS |
|---|---|---|---|---|
| 5. DUTY ASSIGNMENT COMBAT CONSTRUCTION SPECIALIST | 6. DUTY PHONE NUMBER 535-7064 | 7. LOCAL ADDRESS (Include ZIP Code) BLDG 2044 RM FT POLK LA 71459 | | 8. LOCAL PHONE NO. 535-6900 |
| 9. NEXT OF KIN (Name and address) (Include ZIP Code) PHYLIS CRAWFORD (MOTHER) ██████████ | | | 10. HOME OF RECORD SALLISAW, OK | |
| 11. PLACE OF BIRTH FORT SMITH ARKANSAS | | 12. HIGHEST AWARD(S) NONE | | |
| 13a. SQT PRIMARY (Score and date) 12K NOT TESTED | | 13b. SQT SECONDARY (Score and date) NONE | | |
| 14. | 15. | 16. | 17. | |

REMARKS

## COMMANDER'S OR AUTHORIZED REPRESENTATIVE'S GRADE, NAME AND INITIALS

| GRADE | NAME | INITIALS | GRADE | NAME | INITIALS |
|---|---|---|---|---|---|
| 1LT | PHILLIP H MAY | | 1LT | Robert M. SPEAR | |
| SSG | DAVID M BAKER | | | | |
| CPT | Charles E Herrmann | | | | |
| SFC | James B. STEEN | | | | |

CERTIFICATE

I certify that the initials appearing above opposite the name and on the reverse side of this form are those of myself as Commander/ designated Bn PAC representative or my authorized representatives. I further certify that the entry on the reverse side as initialed is a true statement as pertains to the individual indicated hereon for the reporting period.

| COMMANDER | TENURE DATES | COMMANDER | TENURE DATES |
|---|---|---|---|
| COMMANDER | TENURE DATES | COMMANDER | TENURE DATES |
| COMMANDER | TENURE DATES | COMMANDER | TENURE DATES |

DA FORM 2475-2
1 OCT 77

EDITION OF 1 JAN 74 AND DA FORM 2475-2R, PRIVACY ACT STATEMENT, 26 SEP 75 ARE OBSOLETE

211

| NAME | | | SSN | | | | | |
|------|---|---|-----|---|---|---|---|---|
| CRAWFORD TRAVIS D | | | | 5635 | | | | |

**PART II**

| DATE REPORTED | ACTION REPORTED | EFFECTIVE DATE | INITIALS | CYCLE/DATE | P | U | REMARKS |
|---|---|---|---|---|---|---|---|
| 830712 | ARR - 830712 / HN3AA / ANUBØ / 111 AB25. | 830712 | DUB | ED/830915 | X | | |
| 831006 | DYST - PDY / AWL / 0645 / ANUBØ | 831005 | DUB | JA/831007 | X | | |
| 831011 | DYST - AWL / PDY / 1300 / ANUBØ | 831009 | DUB | JC/831012 | X | | |
| 831024 | DYST - PDY / CMA / 1700 / ANUBØ | 831021 | DUB | JJ/831027 | X | | |
| 831024 | GRCH - PVL / C / 831021. | 831021 | DUB | JJ/831027 | X | | |
| 821103 | DYST - CMA / PDY / 0656 / ANUBØ. | 831102 | DUB | KA/831108 | X | | |
| 840202 | POSN - CDQL / ANUBØ. | 840201 | DUB | BA/840206 | X | | |
| 840626 | DYST - PDY / AWL / 0630 / ANUBØ. | 840625 | | FO 840628 | X | | |
| 840627 | DYST - AWL / PDY / 2254 / ANUBØ. | 840626 | | FB 840628 | X | | |
| 840709 | DYST PDY / AWL / 0630 / ANUBØ. | 840706 | | C/840710 | X | | |
| 840720 | DYST - AWL / PDY / 1730 / ANUBØ | 840719 | | GL/840723 | X | | |
| 840730 | DYST - PDY / AWL / 0900 / ANUBØ. | 840729 | | GK/840731 | X | | |
| 840828 | AFR - 941 / ANUBØ. | 840827 | | HN/840829 | X | | |

THIS IS ORIGINAL COPY

ROBERT M. SPHAR
1LT, CE
Adjutant

# DISPOSITION FORM

For use of this form, see AR 340-15; the proponent agency is TAGO.

| REFERENCE OR OFFICE SYMBOL | SUBJECT |
|---|---|
| AFZX-U-CO | Revocation of Security Clearance |

| TO S2/Security Manager | FROM Cdr, 7th Engr Bn (C) | DATE 27 August 1984 | CMT 1 |
|---|---|---|---|

1. Request that the appropriate security clearance on the following named service member be revoked:

NAME:   CRAWFORD, Travis   PV1

SSAN:   ███ 5636

2. Service member was dropped from the rolls of this organization on 27 Augsut 1984 for being AWOL for more than 30 days.

FOR THE COMMANDER:

ROBERT M. SPEAR
1LT, CE
Adjutant

213

**DA FORM 2496**   PREVIOUS EDITIONS WILL BE USED   ☆ U.S. Government Printing Office: 1983—405

ENLISTED MANAGEMENT
Inprocessing Records Screen

1.   NAME: CRAWFORD TRAVIS DON

2.   GRADE: E-2            3.   PMOS: 12B            4.   SSN: ████ 5635
5.   PULHES: 111111        6.   SMOS: ___            7.   ASI: ___
8.   BONUS MOS: ___        9.   ART 15/CM ___       10.   BAR TO REENL: ___

---

## PROMOTIONS

11.   Is promotion packet present?  (DA3355, Board Proceedings, Standing List, Sequence Number)  YES___ NO___

12.   Is promotion order present?  YES___ NO___

13.   Is SM eligible for automatic promotion to E2/3?  YES___ NO___

---

## RECLASS/SPECIAL ACTIONS

14.   Is SM a CSM, SGM or ISG?  YES___ NO___

15.   Is SM an E5(P), E6 or E7?  YES___ NO___  SMOS?___

16.   Does MOS skill level match SM grade?  YES___ NO___

17.   Does SM have a PULHES that conflicts with AR 611-201?  YES___ NO___

18.   Does SM have a reclass action pending from previous unit?  YES___ NO___

19.   Was SM previously reclassified?  YES___ NO___

---

## EER E5-9

20.   What date is entered in item 62, DA Form 2?___

21.   What is the period of report last entered in item 35, DA Form 2-1?___

22.   Is ending period of report the same as date of last PCS?  YES___ NO___

---

23.   Remarks:

24.   Records screened by___ Date___

Distribution
1 cy CP
1 cy EM

FP Form 567 1 Nov 82

Standard Form 88
Revised 10/75
General Services Administration
Interagency Comm. on Medical Records
FPMR 101-11.806-8

# REPORT OF MEDICAL EXAMINATION

| 1. LAST NAME—FIRST NAME—MIDDLE NAME | 2. GRADE AND COMPONENT OR POSITION | 3. IDENTIFICATION NO. |
|---|---|---|
| CRAWFORD TRAVIS DON | | 563 |

| 4. HOME ADDRESS (Number, street or RFD, city or town, State and ZIP Code) | 5. PURPOSE OF EXAMINATION | 6. DATE OF EXAMINATION |
|---|---|---|
| Sallisaw, Oklahoma 74955 | ENLISTMENT (RA) AF OTHER / COMMISSION USAR USN ROTC / RETENTION ARNG USMC RESERVE | 11 MAR 1983 |

| 7. SEX MALE / FEMALE | 8. RACE HISP CAU NEG IND-AMER | 9. TOTAL YEARS GOVERNMENT SERVICE MILITARY NONE  CIVILIAN NONE | 10. AGENCY | 11. ORGANIZATION UNIT |

| 12. DATE OF BIRTH 64 (19) | 13. PLACE OF BIRTH CITY Sallisaw STATE Oklahoma 74955 | 14. NAME, RELATIONSHIP, AND ADDRESS OF NEXT OF KIN (mother) Phyllis Crawford 701 E. Chickasaw Sallisaw Oklahoma ZIP 74955 |

15. EXAMINING FACILITY OR EXAMINER, AND ADDRESS

MEPS, P.O. BOX 989, AR 72203

16. OTHER INFORMATION

17. RATING OR SPECIALTY | TIME IN THIS CAPACITY (Total) | LAST SIX MONTHS

## CLINICAL EVALUATION

NOTES. (Describe every abnormality in detail. Enter pertinent item number before each comment. Continue in item 73 and use additional sheets if necessary.)

(Check each item in appropriate column; enter "NE" if not evaluated.) — NORMAL / ABNORMAL

| Item | NORMAL | ABNORMAL |
|---|---|---|
| 18. HEAD, FACE, NECK AND SCALP | ✓ | |
| 19. NOSE | ✓ | |
| 20. SINUSES | ✓ | |
| 21. MOUTH AND THROAT | ✓ | |
| 22. EARS—GENERAL (Int & ext. canals) (Auditory acuity under items 70 and 71) | ✓ | |
| 23. DRUMS (Perforation) | ✓ | |
| 24. EYES—GENERAL (Visual acuity and refraction under items 59, 60 and 67) | ✓ | |
| 25. OPHTHALMOSCOPIC | ✓ | |
| 26. PUPILS (Equality and reaction) | ✓ | |
| 27. OCULAR MOTILITY (Associated parallel movements, nystagmus) | ✓ | |
| 28. LUNGS AND CHEST (Include breasts) | ✓ | |
| 29. HEART (Thrust, size, rhythm, sounds) | ✓ | |
| 30. VASCULAR SYSTEM (Varicosities, etc.) | ✓ | |
| 31. ABDOMEN AND VISCERA (Include hernia) | ✓ | |
| 32. ANUS AND RECTUM (Hemorrhoids, fistulae) (Prostate, if indicated) | ✓ | |
| 33. ENDOCRINE SYSTEM | ✓ | |
| 34. G-U SYSTEM | ✓ | |
| 35. UPPER EXTREMITIES (Strength, range of motion) | ✓ | |
| 36. FEET | ✓ | |
| 37. LOWER EXTREMITIES (Except feet) (Strength, range of motion) | ✓ | |
| 38. SPINE, OTHER MUSCULOSKELETAL | ✓ | |
| 39. IDENTIFYING BODY MARKS, SCARS, TATTOOS | | ✓ |
| 40. SKIN, LYMPHATICS | ✓ | |
| 41. NEUROLOGIC (Equilibrium tests under item 72) | ✓ | |
| 42. PSYCHIATRIC (Specify any personality deviation) | ✓ | |
| 43. PELVIC (Females only) (Check how done) ☐ VAGINAL ☐ RECTAL | | |

24 T - 40

#39. Scar, above left Breast

(Continue in item 73)

## 44. DENTAL (Place appropriate symbols, shown in examples, above or below number of upper and lower teeth.)

Restorable teeth / Non-restorable teeth / Missing teeth / Replaced by dentures / Fixed Partial dentures

| R I G H T | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | L E F T |
| | 32 | 31 | 30 | 29 | 28 | 27 | 26 | 25 | 24 | 23 | 22 | 21 | 20 | 19 | 18 | 17 | |

REMARKS AND ADDITIONAL DENTAL DEFECTS AND DISEASES

ACCEPTABLE NO / YES

Partial @ top

URINE # 23

LABORATORY FINDINGS MEPS, LITTLE ROCK AR 72203

| 45. URINALYSIS: A. SPECIFIC GRAVITY | | 46. CHEST X-RAY (Place, date, film number and result) |
|---|---|---|
| B. ALBUMIN N-MULTI-STIX NEG | D. MICROSCOPIC | FILM # 20 5635  RESULTS WM |
| C. SUGAR N-MULTI-STIX NEG | | 14 X 17 Chest  DATE 11 MAR 1983 |
| 47. SEROLOGY (Specify test used and result) RPR # 1  REACTIVE / NON REACTIVE | 48. EKG | 49. BLOOD TYPE AND RH FACTOR | 50. OTHER TESTS sickle test neg  12 MAY 19 |

88-118

## MEASUREMENTS AND OTHER FINDINGS
5635 11   MAR 1983

| 51. HEIGHT | 52. WEIGHT | 53. COLOR HAIR | 54. COLOR EYES | 55. BUILD: | 56. TEMPERATURE |
|---|---|---|---|---|---|
| 66 -3/4 | 181 | BROWN | BROWN | ☐ SLENDER  ☑ MEDIUM  ☐ HEAVY  ☐ OBESE | |

### 57. BLOOD PRESSURE (Arm at heart level) / 58. PULSE (Arm at heart level)

| | A. SITTING | B. RECUMBENT | C. STANDING (5 min.) | A. SITTING | B. AFTER EXERCISE | C. 2 MIN. AFTER | D. RECUMBENT | E. AFTER STANDING 3 MIN. |
|---|---|---|---|---|---|---|---|---|
| SYS. | 142 | | | 64 | | | | |
| DIAS. | 80 | | | | | | | |

### 59. DISTANT VISION / 60. REFRACTION / 61. NEAR VISION

| | DISTANT VISION | | | REFRACTION | | | NEAR VISION | |
|---|---|---|---|---|---|---|---|---|
| RIGHT 20/ | 20 | CORR. TO 20/ | BY | S. | CX | 91 | CORR. TO | BY |
| LEFT 20/ | 20 | CORR. TO 20/ | BY | S. | CX | | CORR. TO | BY |

**62. HETEROPHORIA (Specify distance)**

| ESº | EXº | R. H. | L. H. | PRISM DIV. | PRISM CONV. CT | PC | PD |
|---|---|---|---|---|---|---|---|

| 63. ACCOMMODATION | | 64. COLOR VISION (Test used and result) | 65. DEPTH PERCEPTION (Test used and score) | |
|---|---|---|---|---|
| RIGHT | LEFT | AFVT RED & GREEN   PASS   FAIL   PASS | VERHOEFF   FAIL   PASS | UNCORRECTED |
| | | 714 | | CORRECTED |

| 66. FIELD OF VISION | 67. NIGHT VISION (Test used and score) | 68. RED LENS TEST | 69. INTRAOCULAR TENSION |
|---|---|---|---|

| 70. HEARING | | | 71. AUDIOMETER | | | | | | | | 72. PSYCHOLOGICAL AND PSYCHOMOTOR (Tests used and score) |
|---|---|---|---|---|---|---|---|---|---|---|---|

| | | | | | 250 256 | 500 512 | 1000 1024 | 2000 2048 | 3000 2896 | 4000 4096 | 6000 6144 | 8000 8192 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RIGHT WV | /15 SV | /15 | RIGHT | | 15 | 15 | 5 | 5 | | 5 | 5 | |
| LEFT WV | /15 SV | /15 | LEFT | | 5 | 5 | 5 | 5 | | 5 | 5 | |

**FOR MEPS USE ONLY**

| WK | ST | DATE | INITIAL |
|---|---|---|---|
| 6 | b | 830311 | |
| 6 | b | 830324 | |

**73. NOTES (Continued) AND SIGNIFICANT OR INTERVAL HISTORY**

PHYSICAL INSPECTION CONDUCTED AND NO COMMUNICABLE DISEASES WERE NOTED THIS DATE

FALANT   PASS   FAIL

| DATE | HT | WT | QUAL | DISQ | DOCTOR |
|---|---|---|---|---|---|
| 24 MAR 1983 | 66 | 179 | ✓ | | W. J. KILBURY, M.D. CHIEF MEDICAL OFFICER |
| | | | | | |
| | | | | | |

Applicant ☑ is ☐ is not qualified for Airborne, Ranger, & Special Forces Training in accordance with Chapter 2 & Chapter 7, para 7-3, AR 40-501 Based on medical findings recorded on this medical examination.   12 MAY 1983

*(Use additional sheets if necessary)*

**74. SUMMARY OF DEFECTS AND DIAGNOSES (List diagnoses with item numbers)**

**75. RECOMMENDATIONS—FURTHER SPECIALIST EXAMINATIONS INDICATED (Specify)**

**76. A. PHYSICAL PROFILE**

| P | U | L | H | E | S | X |
|---|---|---|---|---|---|---|
| 1 | 1 | 1 | 1 | 1 | 1 | |

**77. EXAMINEE (Check)**

ENLISTMENT   CHAP 3, AR 40-501
RETENTION
APPOINTMENT
AIRBORNE QUALIFIED

A. ☑ IS QUALIFIED FOR
B. ☐ IS NOT QUALIFIED FOR

**B. PHYSICAL CATEGORY**

| A | B | C | E |
|---|---|---|---|
| ✓ | | | |

**78. IF NOT QUALIFIED, LIST DISQUALIFYING DEFECTS BY ITEM NUMBER**

| 79. TYPED OR PRINTED NAME OF PHYSICIAN | SIGNATURE |
|---|---|
| 80. TYPED OR PRINTED NAME OF PHYSICIAN | SIGNATURE |
| 81. TYPED OR PRINTED NAME OF DENTIST OR PHYSICIAN (Indicate which) | SIGNATURE |
| 82. TYPED OR PRINTED NAME OF REVIEWING OFFICER OR APPROVING AUTHORITY | SIGNATURE | NUMBER OF ATTACHED SHEETS |

W. J. KILBURY, M.D. CHIEF MEDICAL OFFICER

☆ U.S. GOVERNMENT PRINTING OFFICE : 1977—O-241-530 #3375

216

STANDARD FORM 93
REV. OCTOBER 1974   Exception to SF 93
GSA FPMR 101—11.8   approved by NARS May 79

APPROVED
OFFICE OF MANAGEMENT AND BUDGET No. 29–R0191

# REPORT OF MEDICAL HISTORY

**(THIS INFORMATION IS FOR OFFICIAL AND MEDICALLY-CONFIDENTIAL USE ONLY AND WILL NOT BE RELEASED TO UNAUTHORIZED PERSONS)**

| 1. LAST NAME—FIRST NAME—MIDDLE NAME | 2. SOCIAL SECURITY OR IDENTIFICATION NO. |
|---|---|
| CRAWFORD Travis Don | ▮▮▮▮▮ 5635 |

| 3. HOME ADDRESS (No. street or RFD, city or town, State, and ZIP CODE) | 4. POSITION (title, grade, component) |
|---|---|
| Sallisaw Oklahoma 74955 | Civilian |

| 5. PURPOSE OF EXAMINATION | 6. DATE OF EXAMINATION | 7. EXAMINING FACILITY OR EXAMINER, AND ADDRESS |
|---|---|---|
| R4 ENLST | 11 MAR 1983 | MILITARY ENTRANCE PROCESSING STATION 211 WEST THIRD STREET POST OFFICE BOX 929 LITTLE ROCK, AR |

**8. STATEMENT OF EXAMINEE'S PRESENT HEALTH AND MEDICATIONS CURRENTLY USED (Follow by description of past history, if complaint exists)**

Good Health
I am taking no medications

ALLERGIES
NO KNOWN ALLERGIES

**9. HAVE YOU EVER (Please check each item)**

| YES | NO | (Check each item) |
|---|---|---|
| | TDK | Lived with anyone who had tuberculosis |
| | TDK | Coughed up blood |
| | TDK | Bled excessively after injury or tooth extraction |
| | TDK | Attempted suicide |
| | TDK | Been a sleepwalker |

**10. DO YOU (Please check each item)**

| YES | NO | (Check each item) |
|---|---|---|
| | TDK | Wear glasses or contact lenses |
| ✓ | | Have vision in both eyes |
| | TDK | Wear a hearing aid |
| | TDK | Stutter or stammer habitually |
| | TDK | Wear a brace or back support |

**11. HAVE YOU EVER HAD OR HAVE YOU NOW (Please check at left of each item)**

| YES | NO | DON'T KNOW | (Check each item) | YES | NO | DON'T KNOW | (Check each item) | YES | NO | DON'T KNOW | (Check each item) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ✓ | | TDK | Scarlet fever, erysipelas | | ✓ | | Cramps in your legs | | ✓ | | "Trick" or locked knee |
| | ✓ | | Rheumatic fever | | ✓ | | Frequent indigestion | | | | Foot trouble |
| | ✓ | | Swollen or painful joints | | ✓ | | Stomach, liver, or intestinal trouble | | ✓ | | Neuritis |
| | ✓ | | Frequent or severe headache | | ✓ | | Gall bladder trouble or gallstones | | ✓ | | Paralysis (include infantile) |
| | ✓ | | Dizziness or fainting spells | | ✓ | | Jaundice or hepatitis | | ✓ | | Epilepsy or fits |
| | ✓ | | Eye trouble | | ✓ | | Adverse reaction to serum, drug, or medicine | | ✓ | | Car, train, sea or air sickness |
| | ✓ | | Ear, nose, or throat trouble | | ✓ | | | | ✓ | | Frequent trouble sleeping |
| | ✓ | | Hearing loss | ✓ | | | Broken bones | | ✓ | | Depression or excessive worry |
| | ✓ | | Chronic or frequent colds | | ✓ | | Tumor, growth, cyst, cancer | | ✓ | | Loss of memory or amnesia |
| ✓ | | TDK | Severe tooth or gum trouble | | ✓ | | Rupture/hernia | | ✓ | | Nervous trouble of any sort |
| | ✓ | | Sinusitis | | ✓ | | Piles or rectal disease | | ✓ | | Periods of unconsciousness |
| | ✓ | | Hay Fever | | ✓ | | Frequent or painful urination | | | | |
| | ✓ | | Head injury | | ✓ | | Bed wetting since age 12 | | | | |
| | ✓ | | Skin diseases | | ✓ | | Kidney stone or blood in urine | | | | |
| | ✓ | | Thyroid trouble | | ✓ | | Sugar or albumin in urine | | | | |
| | ✓ | | Tuberculosis | | ✓ | | VD—Syphilis, gonorrhea, etc. | | | | |
| | ✓ | | Asthma | | ✓ | | Recent gain or loss of weight | | | | |
| | ✓ | | Shortness of breath | | ✓ | | Arthritis, Rheumatism, or Bursitis | | | | |
| | ✓ | | Pain or pressure in chest | | ✓ | | Bone, joint or other deformity | | | | |
| | ✓ | | Chronic cough | | ✓ | | Lameness | | | | |
| | ✓ | | Palpitation or pounding heart | | ✓ | | Loss of finger or toe | **12. FEMALES ONLY: HAVE YOU EVER** | | | |
| | ✓ | | Heart trouble | | ✓ | | Painful or "trick" shoulder or elbow | | | | Been treated for a female disorder |
| | ✓ | | High or low blood pressure | | ✓ | | Recurrent back pain | | | | Had a change in menstrual pattern |

LMP
G— P— O— ABO—
INITIALS

| 13. WHAT IS YOUR USUAL OCCUPATION? | 14. ARE YOU (Check one) |
|---|---|
| Manual Labor DROVE Fork truck | ✓ Right handed    ☐ Left handed |

93–102–01

| YES | NO | CHECK EACH ITEM YES OR NO. EVERY ITEM CHECKED YES MUST BE FULLY EXPLAINED IN BLANK SPACE ON RIGHT |
|---|---|---|
| | ✓ | 15. Have you been refused employment or been unable to hold a job or stay in school because of: A. Sensitivity to chemicals, dust, sunlight, etc. |
| | ✓ | B. Inability to perform certain motions. |
| | ✓ | C. Inability to assume certain positions. |
| | ✓ | D. Other medical reasons (If yes, give reasons.) |
| | ✓ | 16. Have you ever been treated for a mental condition? (If yes, specify when, where, and give details). |
| | ✓ | 17. Have you ever been denied life insurance? (If yes, state reason and give details.) |
| | ✓ | 18. Have you had, or have you been advised to have, any operations? (If yes, describe and give age at which occurred.) |
| ✓ | | 19. Have you ever been a patient in any type of hospitals? (If yes, specify when, where, why, and name of doctor and complete address of hospital.) |
| | ✓ | 20. Have you ever had any illness or injury other than those already noted? (If yes, specify when, where, and give details.) |
| | ✓ | 21. Have you consulted or been treated by clinics, physicians, healers, or other practitioners within the past 5 years for other than minor illnesses? (If yes, give complete address of doctor, hospital, clinic, and details.) |
| | ✓ | 22. Have you ever been rejected for military service because of physical, mental, or other reasons? (If yes, give date and reason for rejection.) |
| | ✓ | 23. Have you ever been discharged from military service because of physical, mental, or other reasons? (If yes, give date, reason, and type of discharge: whether honorable, other than honorable, for unfitness or unsuitability.) |
| | ✓ | 24. Have you ever received, is there pending, or have you applied for pension or compensation for existing disability? (If yes, specify what kind, granted by whom, and what amount, when, why.) |

I certify that I have reviewed the foregoing information supplied by me and that it is true and complete to the best of my knowledge.
I authorize any of the doctors, hospitals, or clinics mentioned above to furnish the Government a complete transcript of my medical record for purposes of processing my application for this employment or service.

| TYPED OR PRINTED NAME OF EXAMINEE | SIGNATURE |
|---|---|
| Travis Don Crawford | Travis Don Crawford |

NOTE: HAND TO THE DOCTOR OR NURSE, OR IF MAILED MARK ENVELOPE "TO BE OPENED BY MEDICAL OFFICER ONLY."
25. Physician's summary and elaboration of all pertinent data (Physician shall comment on all positive answers in items 9 through 24. Physician may develop by interview any additional medical history he deems important, and record any significant findings here.)

Fx Left forearm age 6. —

NJ 4x — 6 mo

EXAMINEE DENIES HISTORY OF DRUG AND ALCOHOL ABUSE AND HOMOSEXUALITY

| TYPED OR PRINTED NAME OF PHYSICIAN OR EXAMINER M. J. KILBURY, M.D. CHIEF MEDICAL OFFICER | DATE 11 MAR 1986 | SIGNATURE M. J. Kilbury | NUMBER OF ATTACHED SHEETS |
|---|---|---|---|

REVERSE OF STANDARD FORM 93

☆ GPO : 1980 O — 318–137

Standard Form 600
General Services Administration and
Interagency Committee on Medical Records
FPMR 101-11.806-8    Exception Approved by NARS
October 1975        1 Aug 79

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION (*Sign each entry*) |

**27 JUL 1984**

Bn Aid Station
7th Cbt Engr
Ft. Polk, LA 71459

S- 20 y/o WM Ē c/o Insect Bite to (L) foot 2nd
Toe x 3 days Erythmia, Edema, Ecchynosis
present Ē Drainage on site some Necrosis
of Tissue noted

O- Insect Bite to 2nd toe of (L) foot Ē
complication

P- Refer to TMC #1 CW2 Workman for
Assetment                PECIATT             1830   90

Infected toe
Plan - ① crutches
       ② QTS x 24 h - ↑ foot
       ③ Betadine scrub/ointment + dressing
       ④ Tegopen 250 mg QID x 10 d.
       ⑤ RTC to E.R. tomorrow for re-eval.
       ⑥ Culture.

| PATIENT'S IDENTIFICATION (*Use this Space for Mechanical Imprint*) | PATIENT'S NAME (*Last, First, Middle initial*) | | SEX |
|---|---|---|---|
| | Crawford  Travis | | M |
| | YEAR OF BIRTH | RELATIONSHIP TO SPONSOR | COMPONENT/STATUS | DEPART/SERVICE |
| | 1963 | —— | AD | RA |
| | SPONSOR'S NAME | | RANK/GRADE |
| | | | E-1 |
| | SSAN OR IDENTIFICATION NO. | ORGANIZATION |
| | | B co 7th Eng Bn |

CHRONOLOGICAL RECORD OF MEDICAL CARE
Standard Form 600
600-106-01

Standard Form 600
General Services Administration and
Interagency Committee on Medical Records
FPMR 101-11.806-8    Exception Approved by NARS
October 1975        1 Aug 79

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION (*Sign each entry*) |

**2 5 JUL 1984** — Bn Aid Station
7th Cbt Engr Bn
Ft. Polk, LA 71459

T-97°
P-64
R-18
B/P-124/48

S- 20 y-o- ♂ c̄ c/o PAIN TO ① 2ND TOE. Pt. STATES HE HAD "BLACK SPOT" ON TOE X 3 DAYS. THEN YESTERDAY "SPOT" WAS REPLACED BY "PUS POCKET" TODAY IS PAINFUL + SWOLLEN. ² 0 MEDS NKDA.

O- SWELLING, REDNESS. POINT TENDERNESS DISTAL TOE JUST BEHIND TOENAIL.

**2 5 JUL 1984** — TMC # 1
Ft Polk, LA

0265

A - Prob ingrown toenail.

Plan ① Warm soaks QID
② No running x 3 days.

_[signature]_
JAMES J. WORKMAN
GW2  PA

| PATIENT'S IDENTIFICATION (*Use this Space for Mechanical Imprint*) | PATIENT'S NAME (*Last, First, Middle initial*) Crawford  Travis | | | SEX m |
|---|---|---|---|---|
| | YEAR OF BIRTH 1964 | RELATIONSHIP TO SPONSOR | COMPONENT/STATUS AD | DEPART/SERVICE RA |
| | SPONSOR'S NAME | | | RANK/GRADE E-1 |
| | SSAN OR IDENTIFICATION NO. 5635 | | ORGANIZATION Bro 7th Engi Bn | |

CHRONOLOGICAL RECORD OF MEDICAL CARE
Standard Form 600
600-106-01

TMC 1

REPORT
INITIAL GRAM STAIN REPORT *cdy*

NAME Crawford

SSN 5635          LOCATION

SPECIMEN foot

EPTH. CELLS _____ few
WBC'S moderate
RBC'S many

GRAM POS. COCCI
IN CHAINS

GRAM POS. COCCI IN CLUSTERS many

GRAM NEG. COCCI

GRAM NEG RODS

OTHER

DATE 7-28-84     TECH SP

WOUND # 8886

7 ENG

221

## SCREENING NOTE OF ACUTE MEDICAL CARE

For use of this form, see HQDA Ltr 40-83-2, the proponent agency is TSG.

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | SCREENER LOCATION | | |
|---|---|---|---|
| | TIME PATIENT ARRIVES 0600 | TIME ENCOUNTER BEGINS 0650 | TIME PATIENT LEAVES 0705 |

| DATE 23-July-84 | SCREENER LOCATION 7th Cbt Engr Bn Ft. Polk, LA 71459 | CHIEF COMPLAINT Throat | DURATION x 1 day |
|---|---|---|---|

| PATIENT RESIDENCE ☑ BARRACKS ☐ OFF POST ☐ POST HOUSING ☐ TRANSIENT | VITAL SIGNS TEMPERATURE 968  ALLERGIES NKDA  PULSE 58  BP 120/90  RESP 18 |
|---|---|

FIRST VISIT FOR THIS COMPLAINT ☑ YES ☐ NO  IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ☐ YES ☐ NO

### SPECIAL INSTRUCTIONS

Algorithm/code — Using information provided by the patient in regards to his/her chief complaint, enter the algorithm to be utilized and the algorithm code in parenthesis following the algorithm title. EXAMPLE: Headache (B-13). If two chief complaints are presented that appear to be related, the more serious of the two must be determined and associated algorithm utilized. If two complaints appear to be unrelated or if the aidman is unable to determine the more serious of the two, each complaint will be screened separately utilizing both spaces.

Algorithm Summary - Following the flowchart for the selected algorithm, the aidman must summarize the question and enter the reply for each box number until an endpoint is reached. In certain instances (EXAMPLE: Cough pg E-7) the logic may involve skipping one or more boxes. If this is the case, DO NOT enter a response for any boxes skipped.

Final Disposition — For patient disposition check the health care provider level indicated by the endpoint number. If self-care protocol is called for the aidman MUST enter the protocol number and the prescribed medications in the spaces indicated. If two algorithms are utilized, each endpoint directing the patient to different levels of the health care provider, the aidman will enter the higher level called for.

The Screening Note of Acute Medical Care will be completed in duplicate. The original will accompany patient to the next level of Health Care Provider or remain in the Aid Station, depending on the endpoint and disposition reached. In either case, the original is filed in the Health Record upon completion of the evaluation. The copy is retained by the Aidman. At the end of sick call, all copies will be turned into the supervisor for audit purposes.

Duty Job Moto Pool

| ALGORITHM/CODE Sore Throat (TD-15) | ALGORITHM/CODE |
|---|---|
| ALGORITHM SUMMARY | ALGORITHM SUMMARY |
| 1. YES - Pt. can touch chin to Chest. 3. NO - No exudate, No swelling Temp. < 101. 5. YES - Pt. can clear both Ears. | 20 Y/O ♂ c/o sore throat X 1 day. Pt. states that he was running and fell into a pole. Coughed up some blood & difficulty Swallowing |
| ENDPOINT NUMBER TD-15-E | ENDPOINT NUMBER |

| PATIENT'S IDENTIFICATION (Use mechanical imprint if available, for typed or written entries give: Name, SSN, Unit, Sex, Birthdate, and Duty Phone) | FINAL DISPOSITION |
|---|---|
| Crawford Travis E-1 ████ 5635 Male ████ - 64 B Co 7th Engr. Bn 6838 | ☐ I – PHYSICIAN STAT  ☐ IV – SELF CARE PROTOCOL ☐ II – PA STAT  ☐ V – HOSP CLINIC REFERRAL ☑ III – PA TODAY SELF CARE PROTOCOL MEDICATIONS GIVEN _____ _____ _____ _____ _____ |

| AIDMAN'S SIGNATURE & CODE | AUDITOR'S INITIALS & DATE |
|---|---|

DA FORM 5181-R (TEST), FEB 83

# RECORD OF ACUTE MEDICAL CARE

(Entries on this record should be restricted to further evaluation and treatment of complaint(s) screened)

| DATE | 2ND CARE LOCATION | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVES |
|------|-------------------|----------------------|------------------------|----------------------|
|      |                   |                      |                        |                      |

## HISTORY OF PRESENT ILLNESS

ONSET (Time, Date, Abrupt/Gradual) *20 810 w 0 c/o sore throat x one day. Fell yesterday*

SYMPTOMS (Character/Quality, Severity, Location, Radiation, Duration, Frequency, Brought on by, Made worse by, Relieved by) *while running. Hit (R) chin + anterior neck on a pole.*

ASSOCIATED SYMPTOMS COURSE (Better/Worse/Same, Extent of Disability, Preventive Evaluation and Therapy)

PAST MEDICAL HISTORY (Condition under Evaluation/Therapy, Prescribed Medications, Allergies, Last Tetanus)

PHYSICAL EXAMINATION *HEENT - clear*

Blood Pressure ___ Pulse ___ Respiration ___ Temperature ___ Weight ___

*Neck - superficial abrasion (R) chin + anterior neck,*
*Chest - CTA,*

ASSESSMENT

*Ix - superficial abrasions*
*Plan - Betadine scrub*
*RTD, RTC prn*

| PLAN | DIAGNOSTIC TESTS | RESULTS | THERAPEUTIC |
|------|------------------|---------|-------------|
|      |                  |         |             |

DISPOSITION

☐ ADMITTED   DISCHARGED WITH: ☐ NO FOLLOWUP REQUIRED
☐ FOLLOWUP REQUIRED (give location & state)

FOLLOWUP AS:
☐ EMERGENCY
☐ ASAP
☐ ROUTINE

ACTIVITY LEVEL
☐ NO LIMITATIONS – FULL DUTY/ACTIVITY       ☐ BEDREST (List hours/days) ___
☐ LIMITED (give description & duration) ___

| SIGNATURE OF HEALTH CARE PROVIDER | SIGNATURE OF MEDICAL SUPERVISOR | AUDITOR'S INITIALS AND DAT |
|-----------------------------------|----------------------------------|----------------------------|
| JAMES J. WORKMAN                  |                                  |                            |
| CW2  PA                           |                                  |                            |

## SPECIAL INSTRUCTIONS

The Record of Acute Medical Care is to be utilized in lieu of the SF 600 (Health Record – Chronological Record of Medical Care) at the Troop Medical Clinic level and above.   Use of this form for further evaluation and treatment at the screener location is prohibited unl the Aidmen are additionally qualified to make such assessments under supervision of a Physician Assistant.

# SCREENING NOTE OF ACUTE MEDICAL CARE

For use of this form, see HQDA Ltr 40-83-2, the proponent agency is TSG.

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | SCREENER LOCATION | | |
|---|---|---|---|
| | TIME PATIENT ARRIVES 0635 | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVES |
| DATE 28 Jun 84 | SCREENER LOCATION Bn Aid Station 7th Cbt Engr Bn Ft. Polk, LA 71459 | CHIEF COMPLAINT① Leg Boil Dental | DURATION X 1 wk |
| PATIENT RESIDENCE ☒ BARRACKS ☐ OFF POST ☐ POST HOUSING ☐ TRANSIENT | | VITAL SIGNS TEMPERATURE 9b.6 PULSE 64 BP 1/00 | ALLERGIES NKDA RESP 20 |

FIRST VISIT FOR THIS COMPLAINT ☒ YES ☐ NO   IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ☐ YES ☐ NO

## SPECIAL INSTRUCTIONS

Algorithm/code — Using information provided by the patient in regards to his/her chief complaint, enter the algorithm to be utilized and the algorithm code in parenthesis following the algorithm title.  EXAMPLE: Headache (B-13).  If two chief complaints are presented that appear to be related, the more serious of the two must be determined and associated algorithm utilized.  If two complaints appear to be un-related or if the aidman is unable to determine the more serious of the two, each complaint will be screened separately utilizing both spaces.

Algorithm Summary - Following the flowchart for the selected algorithm, the aidman must summarize the question and enter the reply for each box number until an endpoint is reached.  In certain instances (EXAMPLE: Cough pg E-7) the logic may involve skipping one or more boxes.  If this is the case, DO NOT enter a response for any boxes skipped.

Final Disposition — For patient disposition check the health care provider level indicated by the endpoint number.  If self-care protocol is called for the aidman MUST enter the protocol number and the prescribed medications in the spaces indicated.  If two algorithms are utilized, each endpoint directing the patient to different levels of the health care provider, the aidman will enter the higher level called for.

The Screening Note of Acute Medical Care will be completed in duplicate.  The original will accompany patient to the next level of Health Care Provider or remain in the Aid Station, depending on the endpoint and disposition reached.  In either case, the original is filed in the Health Record upon completion of the evaluation.  The copy is retained by the Aidman.  At the end of sick call, all copies will be turned into the supervisor for audit purposes.

*Duty Pvt — Motor Pool*

| ALGORITHM/CODE Complaint Not onled (TK-17) | ALGORITHM/CODE |
|---|---|
| ALGORITHM SUMMARY 21 y/o w/ a% Boil to ① leg. Pt has been on sick call numerous times before for this same type complaint | ALGORITHM SUMMARY Recurrent furuncles — Plan ① CBC, UA, SMA-20 ② Keflex 250 mg QTD x10 days ③ Routine Derm consu JAMES I. WORKMAN CW2  PA |
| ENDPOINT NUMBER TK-17-A | ENDPOINT NUMBER |

| PATIENT'S IDENTIFICATION (Use mechanical imprint if available, for typed or written entries give: Name, SSN, Unit, Sex, Birthdate, and Duty Phone) | FINAL DISPOSITION | |
|---|---|---|
| CRAWFORD, TRAVIS  E-2 ▓▓▓▓  5635 Male - ▓▓▓ 64 Bco 7th Engr Bn  (68281) | ☐ I – PHYSICIAN STAT ☐ II – PA STAT ☒ III – PA Today SELF CARE PROTOCOL MEDICATIONS GIVEN _____ | ☐ IV – SELF CARE PROTOCOL ☐ V – HOSP CLINIC REFERRAL |
| | AIDMAN'S SIGNATURE & CODE Pfc Lloyd C Wynn 477 | AUDITOR'S INITIALS & DATE |

DA FORM 5181-R (TEST), FEB 83

## RECORD OF ACUTE MEDICAL CARE
*(Entries on this record should be restricted to further evaluation and treatment of complaint(s) screened)*

| DATE | 2ND CARE LOCATION | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVES |
|------|-------------------|----------------------|-----------------------|---------------------|
| Dec 1 | | | | |

### HISTORY OF PRESENT ILLNESS

ONSET *(Time, Date, Abrupt/Gradual)*

SYMPTOMS *(Character/Quality, Severity, Location, Radiation, Duration, Frequency, Brought on by, Made worse by, Relieved by)*

ASSOCIATED SYMPTOMS COURSE *(Better/Worse/Same, Extent of Disability, Preventive Evaluation and Therapy)*

PAST MEDICAL HISTORY *(Condition under Evaluation/Therapy, Prescribed Medications, Allergies, Last Tetanus)*

### PHYSICAL EXAMINATION

Blood Pressure _____   Pulse _____   Respiration _____   Temperature _____   Weight _____

### ASSESSMENT

### PLAN

| DIAGNOSTIC TESTS | RESULTS | THERAPEUTIC |
|------------------|---------|-------------|
| | | |

### DISPOSITION

☐ ADMITTED   DISCHARGED WITH: ☐ NO FOLLOWUP REQUIRED   FOLLOWUP AS:
☐ FOLLOWUP REQUIRED   ☐ EMERGENCY
*(give location & state)*   ☐ ASAP
☐ ROUTINE

### ACTIVITY LEVEL

☐ NO LIMITATIONS – FULL DUTY/ACTIVITY   ☐ BEDREST *(List hours/days)* _____
☐ LIMITED *(give description & duration)* _____

| NATURE OF HEALTH CARE PROVIDER | SIGNATURE OF MEDICAL SUPERVISOR | AUDITOR'S INITIALS AND DATE |
|--------------------------------|----------------------------------|------------------------------|
| | | |

### SPECIAL INSTRUCTIONS

Record of Acute Medical Care is to be utilized in lieu of the SF 600 (Health Record – Chronological Record of Medical Care) at the Top Medical Clinic level and above. Use of this form for further evaluation and treatment at the screener location is prohibited unless. Aidmen are additionally qualified to make such assessments under supervision of a Physician Assistant.

REVERSE OF DA FORM 5181-R (TEST), FEB

## SCREENING NOTE OF ACUTE MEDICAL CARE

For use of this form, see HQDA Ltr 40-83-2, the proponent agency is TSG.

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | SCREENER LOCATION | | |
|---|---|---|---|
| | TIME PATIENT ARRIVES 0730 | TIME ENCOUNTER BEGINS 0733 | TIME PATIENT LEAVES 0738 |

| DATE 3-May-84 | SCREENER LOCATION Bn Aid Station 7th Cbt Engr Bn Ft Polk, LA 71459 | CHIEF COMPLAINT F/U Boil on (R) knee x 2 wks | DURATION |
|---|---|---|---|
| PATIENT RESIDENCE ☒ BARRACKS ☐ OFF POST | ☐ HOUSING ☐ TRANSIENT | VITAL SIGNS TEMPERATURE 97.6 PULSE 60 | ALLERGIES NKDA BP 120/86 RESP 16 |

FIRST VISIT FOR THIS COMPLAINT ☐ YES ☒ NO  IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ☒ YES ☐ NO

### SPECIAL INSTRUCTIONS

Algorithm/code — Using information provided by the patient in regards to his/her chief complaint, enter the algorithm to be utilized and the algorithm code in parenthesis following the algorithm title. EXAMPLE: Headache (B-13). If two chief complaints are presented that appear to be related, the more serious of the two must be determined and associated algorithm utilized. If two complaints appear to be unrelated or if the aidman is unable to determine the more serious of the two, each complaint will be screened separately utilizing both spaces.

Algorithm Summary - Following the flowchart for the selected algorithm, the aidman must summarize the question and enter the reply for each box number until an endpoint is reached. In certain instances (EXAMPLE: Cough pg E-7) the logic may involve skipping one or more boxes. If this is the case, DO NOT enter a response for any boxes skipped.

Final Disposition — For patient disposition check the health care provider level indicated by the endpoint number. If self-care protocol is called for the aidman MUST enter the protocol number and the prescribed medications in the spaces indicated. If two algorithms are utilized, each endpoint directing the patient to different levels of the health care provider, the aidman will enter the higher level called for.

The Screening Note of Acute Medical Care will be completed in duplicate. The original will accompany patient to the next level of Health Care Provider or remain in the Aid Station, depending on the endpoint and disposition reached. In either case, the original is filed in the Health Record upon completion of the evaluation. The copy is retained by the Aidman. At the end of sick call, all copies will be turned into the supervisor for audit purposes.

Duty Job- Motor Pool

| ALGORITHM/CODE J-11-J- (Boils) | ALGORITHM/CODE |
|---|---|
| ALGORITHM SUMMARY F/U on Boils. | ALGORITHM SUMMARY |
| ENDPOINT NUMBER J-11-A PA Today | ENDPOINT NUMBER |

| PATIENT'S IDENTIFICATION (Use mechanical imprint if available, for typed or written entries give: Name, SSN, Unit, Sex, Birthdate, and Duty Phone) | FINAL DISPOSITION |
|---|---|
| Crawford Travis        E-2 ▓▓▓▓▓ 5635 Male        ▓▓▓-64 Co 7th Engr BN        6828 | ☐ I – PHYSICIAN STAT        ☐ IV – SELF CARE PROTOCOL ☐ II – PA STAT        ☐ V – HOSP CLINIC REFERRAL ☒ III – PA Today SELF CARE PROTOCOL MEDICATIONS GIVEN _____ |

| | AIDMAN'S SIGNATURE & CODE Lloyd C Wynn   Ch 21 | AUDITOR'S INITIALS & DATE |
|---|---|---|

DA FORM 5181-R (TEST), FEB 83

## RECORD OF ACUTE MEDICAL CARE

*(Entries on this record should be restricted to further evaluation and treatment of complaint(s) screened)*

| DATE 3 MAY 1984 | 2ND CARE LOCATION Ft Polk, LA | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVES |
|---|---|---|---|---|

### HISTORY OF PRESENT ILLNESS

ONSET *(Time, Date, Abrupt/Gradual)*

SYMPTOMS *(Character/Quality, Severity, Location, Radiation, Duration, Frequency, Brought on by, Made worse by, Relieved by)*

F/u care

ASSOCIATED SYMPTOMS COURSE *(Better/Worse/Same, Extent of Disability, Preventive Evaluation and Therapy)*

Much better today.

PAST MEDICAL HISTORY *(Condition under Evaluation/Therapy, Prescribed Medications, Allergies, Last Tetanus)*

PHYSICAL EXAMINATION

Blood Pressure 120/86   Pulse 60   Respiration _____   Temperature 97⁶   Weight _____

ASSESSMENT

Resolving abscess (R) Knee area.

PLAN

| DIAGNOSTIC TESTS | RESULTS | THERAPEUTIC |
|---|---|---|
| | RTC tomorrow | Irrigated c̄ H₂O₂ & NaCl Povadine dsd Report to McGauzel |

DISPOSITION

☐ ADMITTED   DISCHARGED WITH: ☐ NO FOLLOWUP REQUIRED   ☐ FOLLOWUP REQUIRED *(give location & state)*

FOLLOWUP AS: ☐ EMERGENCY  ☐ ASAP  ☐ ROUTINE

ACTIVITY LEVEL

☐ NO LIMITATIONS — FULL DUTY/ACTIVITY   ☐ BEDREST *(List hours/days)* _____
☐ LIMITED *(give description & duration)* _____

| SIGNATURE OF HEALTH CARE PROVIDER | SIGNATURE OF MEDICAL SUPERVISOR | AUDITOR'S INITIALS AND DATE |
|---|---|---|

### SPECIAL INSTRUCTIONS

The Record of Acute Medical Care is to be utilized in lieu of the SF 600 (Health Record — Chronological Record of Medical Care) at the Troop Medical Clinic level and above.   Use of this form for further evaluation and treatment at the screener location is prohibited unless the Aidmen are additionally qualified to ma[  ] uch assessments under supervision of a Physi  Assistant.

# SCREENING NOTE OF ACUTE MEDICAL CARE

For use of this form, see HQDA Ltr 40-63-2, the proponent agency is TSG.

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | SCREENER LOCATION | | |
|---|---|---|---|
| | TIME PATIENT ARRIVES 0725 | TIME ENCOUNTER BEGINS 0748 | TIME PATIENT LEAVES 0752 |

| DATE 2-May-84 | SCREENER LOCATION Bn Aid Station 7th Cbt Engr Bn | CHIEF COMPLAINT Infected ® Knee x 4 days | DURATION |

| PATIENT RESIDENCE | Ft. Polk, LA 71459 | VITAL SIGNS | |
|---|---|---|---|
| ☒ BARRACKS   ☐ POST HOUSING | | TEMPERATURE 98.4   ALLERGIES NKDA | |
| ☐ OFF POST   ☐ TRANSIENT | | PULSE 72   BP 124/80   RESP 17 | |

FIRST VISIT FOR THIS COMPLAINT ☐ YES ☒ NO   IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ☒ YES ☐ NO

## SPECIAL INSTRUCTIONS

Algorithm/code — Using information provided by the patient in regards to his/her chief complaint, enter the algorithm to be utilized and the algorithm code in parenthesis following the algorithm title. EXAMPLE: Headache (B-13). If two chief complaints are presented that appear to be related, the more serious of the two must be determined and associated algorithm utilized. If two complaints appear to be un-related or if the aidman is unable to determine the more serious of the two, each complaint will be screened separately utilizing both spaces.

Algorithm Summary - Following the flowchart for the selected algorithm, the aidman must summarize the question and enter the reply for each box number until an endpoint is reached. In certain instances (EXAMPLE: Cough pg E-7) the logic may involve skipping one or more boxes. If this is the case, DO NOT enter a response for any boxes skipped.

Final Disposition — For patient disposition check the health care provider level indicated by the endpoint number. If self-care protocol is called for the aidman MUST enter the protocol number and the prescribed medications in the spaces indicated. If two algorithms are utilized, each endpoint directing the patient to different levels of the health care provider, the aidman will enter the higher level called for.

The Screening Note of Acute Medical Care will be completed in duplicate. The original will accompany patient to the next level of Health Care Provider or remain in the Aid Station, depending on the endpoint and disposition reached. In either case, the original is filed in the Health Record upon completion of the evaluation. The copy is retained by the Aidman. At the end of sick call, all copies will be turned into the supervisor for audit purposes.

Duty Job - 9 Motor Pool

| ALGORITHM/CODE TJ-11-1 ( Boils ) | ALGORITHM/CODE |
|---|---|
| ALGORITHM SUMMARY | ALGORITHM SUMMARY |
| Boils followup | |

| ENDPOINT NUMBER TJ-11-A PA today | ENDPOINT NUMBER |
|---|---|

| PATIENT'S IDENTIFICATION (Use mechanical imprint if available, for typed or written entries give: Name, SSN, Unit, Sex, Birthdate, and Duty Phone) | FINAL DISPOSITION |
|---|---|
| Crawford Travis  E-2  5635  Male ████ 64  Bco 7th Eng BN   6828 | ☐ I – PHYSICIAN STAT        ☐ IV – SELF CARE PROTOCOL<br>☐ II – PA STAT                    ☐ V – HOSP CLINIC REFERRAL<br>☒ III – PA today<br>SELF CARE PROTOCOL MEDICATIONS GIVEN ____ |

| AIDMAN'S SIGNATURE & CODE   Walter K. Cull  615 | AUDITOR'S INITIALS & DATE |
|---|---|

DA FORM 5181-R (TEST), FEB 83

# RECORD OF ACUTE MEDICAL CARE

*(Entries on this record should be restricted to further evaluation and treatment of complaint(s) screened)*

| DATE 2 MAY 1984 | 2ND CARE LOCATION Ft Polk, LA | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVES |
|---|---|---|---|---|

## HISTORY OF PRESENT ILLNESS

ONSET *(Time, Date, Abrupt/Gradual)* (R) knee - inflammation external

SYMPTOMS *(Character/Quality, Severity, Location, Radiation, Duration, Frequency, Brought on by, Made worse by, Relieved by)* still painful -

ASSOCIATED SYMPTOMS COURSE *(Better/Worse/Same, Extent of Disability, Preventive Evaluation and Therapy)*

PAST MEDICAL HISTORY *(Condition under Evaluation/Therapy, Prescribed Medications, Allergies, Last Tetanus)*

PHYSICAL EXAMINATION  erythema - full knee ROM -
lesion still exuding purulent material -
erythema from knee to mid lower leg

Blood Pressure _____ Pulse _____ Respiration _____ Temperature _____ Weight _____

ASSESSMENT  soft infection (R) knee - cellulitis

## PLAN

| DIAGNOSTIC TESTS | RESULTS | THERAPEUTIC |
|---|---|---|
| Cont. Keflex 500mg qid <br> IPD - pack. <br> RTC tomorrow - | | |

## DISPOSITION

☐ ADMITTED

DISCHARGED WITH: ☐ NO FOLLOWUP REQUIRED
☐ FOLLOWUP REQUIRED *(give location & state)*

FOLLOWUP AS:
☐ EMERGENCY
☐ ASAP
☐ ROUTINE

ACTIVITY LEVEL

☐ NO LIMITATIONS – FULL DUTY/ACTIVITY   ☒ BEDREST *(List hours/days)* until 0600 3may84

☐ LIMITED *(give description & duration)* _____

| SIGNATURE OF HEALTH CARE PROVIDER | SIGNATURE OF MEDICAL SUPERVISOR Whitehead, Michael WO | AUDITOR'S INITIALS AND DATE |
|---|---|---|

## SPECIAL INSTRUCTIONS

The Record of Acute Medical Care is to be utilized in lieu of the SF 600 (Health Record – Chronological Record of Medical Care) the Troop Medical Clinic level and above. Use of this form for further evaluation and treatment at the screener location is prohibited unless the Aidmen are additionally qualified to make such assessments under supervision of a Physician Assistant.

# SCREENING NOTE OF ACUTE MEDICAL CARE

MINGUSSO, INCUSSI, MD

For use of this form, see HQDA Ltr 40-83-2, the proponent agency is TSG.

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | SCREENER LOCATION | | |
|---|---|---|---|
| | TIME PATIENT ARRIVES 0600 | TIME ENCOUNTER BEGINS 0712 | TIME PATIENT LEAVES 0715 |
| DATE 1-May-81 | SCREENER LOCATION Bn Aid Station 7th Cbt Engr Bn | CHIEF COMPLAINT Leg Bottom Knee  ✗  1 ½ wks | DURATION |
| PATIENT RESIDENCE ☒ BARRACKS ☐ OFF POST | ☐ POST HOUSING Ft. Polk LA 71459 ☐ TRANSIENT | VITAL SIGNS TEMPERATURE 99.4   ALLERGIES NKDA PULSE 82   BP 117/60   RESP 18 | |

FIRST VISIT FOR THIS COMPLAINT ☐ YES ☒ NO   IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ☐ YES ☒ NO

## SPECIAL INSTRUCTIONS

Algorithm/code — Using information provided by the patient in regards to his/her chief complaint, enter the algorithm to be utilized and the algorithm code in parenthesis following the algorithm title.   EXAMPLE: Headache (B-13).   If two chief complaints are presented that appear to be related, the more serious of the two must be determined and associated algorithm utilized.   If two complaints appear to be unrelated or if the aidman is unable to determine the more serious of the two, each complaint will be screened separately utilizing both spaces.

Algorithm Summary - Following the flowchart for the selected algorithm, the aidman must summarize the question and enter the reply for each box number until an endpoint is reached.   In certain instances (EXAMPLE: Cough pg E-7) the logic may involve skipping one or more boxes.   If this is the case, DO NOT enter a response for any boxes skipped.

Final Disposition — For patient disposition check the health care provider level indicated by the endpoint number.   If self-care protocol is called for the aidman MUST enter the protocol number and the prescribed medications in the spaces indicated.   If two algorithms are utilized, each endpoint directing the patient to different levels of the health care provider, the aidman will enter the higher level called for.

The Screening Note of Acute Medical Care will be completed in duplicate.   The original will accompany patient to the next level of Health Care Provider or remain in the Aid Station, depending on the endpoint and disposition reached.   In either case, the original is filed in the Health Record upon completion of the evaluation.   The copy is retained by the Aidman.   At the end of sick call, all copies will be turned into the supervisor for audit purposes.

Duty Job - Motorpool

| ALGORITHM/CODE   Boils   TJ-11-1 | ALGORITHM/CODE |
|---|---|
| ALGORITHM SUMMARY | ALGORITHM SUMMARY |
| | |
| ENDPOINT NUMBER   TJ-11-A | ENDPOINT NUMBER |

| PATIENT'S IDENTIFICATION (Use mechanical imprint if available, for typed or written entries give: Name, SSN, Unit, Sex, Birthdate, and Duty Phone) | FINAL DISPOSITION |
|---|---|
| Crawford  Travis  ▉▉▉  5b35  Male ▉▉▉-64  Bco 7th Engr Bn   (6828)   E-2 | ☐ I – PHYSICIAN STAT       ☐ IV – SELF CARE PROTOCOL ☐ II – PA STAT             ☐ V – HOSP CLINIC REFERRAL ☒ III – PA SELF CARE PROTOCOL MEDICATIONS GIVEN _____ |
| | AIDMAN'S SIGNATURE & CODE   PFC M.McItts  95     AUDITOR'S INITIALS & DATE |

D.A. FORM 5181-R  (TEST),  FEB  83

# RECORD OF ACUTE MEDICAL CARE

(Entries on this record should be restricted to further evaluation and treatment of complaint(s) screened)

| DATE 1   MAY 1984 | 2ND CMO LOCATION Ft Polk, LA | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVES |
|---|---|---|---|---|

## HISTORY OF PRESENT ILLNESS

ONSET (Time, Date, Abrupt/Gradual)

2-3 days

SYMPTOMS (Character, Quality, Severity, Location, Radiation, Duration, Frequency, Brought on by, Made worse by, Relieved by)

pain and swelling of area just inferior to R knee

ASSOCIATED SYMPTOMS COURSE (Better/Worse/Same, Extent of Disability, Preventive Evaluation and Therapy)

was expressing pustular exudate 2 days ago.
bo

PAST MEDICAL HISTORY (Condition under Evaluation/Therapy, Prescribed Medications, Allergies, Last Tetanus)

has problems c large follicular infections - has had many

PHYSICAL EXAMINATION  inferior-anterior knee R - large vesicular lesion 5 mm

| Blood Pressure | Pulse | Respiration | Temperature | Weight |
|---|---|---|---|---|
| large erythematous | | # tender | | |

leg tender surrounding lesion - distal pulses strong - neuro intact

ASSESSMENT

for T infection -
early cellulitis

PLAN

| DIAGNOSTIC TESTS | RESULTS | THERAPEUTIC |
|---|---|---|

① bedrest - elevation
② Keflex 500 mg qid x 7 d
③ heat -

DISPOSITION

☐ ADMITTED   DISCHARGED WITH: ☐ NO FOLLOWUP REQUIRED
☑ FOLLOWUP REQUIRED
(give location & state)

FMSy - TMC #7

FOLLOWUP AS:
☐ EMERGENCY
☐ ASAP
☐ ROUTINE

ACTIVITY LEVEL
☐ NO LIMITATIONS — FULL DUTY/ACTIVITY
☐ LIMITED (give description & duration)
☑ BEDREST (List hours/days) until 0700

| SIGNATURE OF HEALTH CARE PROVIDER | SIGNATURE OF MEDICAL SUPERVISOR Whitehead, Michael, WO PA | AUDITOR'S INITIALS AND DATE |
|---|---|---|

## SPECIAL INSTRUCTIONS

The Record of Acute Medical Care is to be utilized in lieu of the SF 600 (Health Record — Chronological Record of Medical Care) at the Troop Medical Clinic level and above.   Use of this form for further evaluation and treatment at the screener location is prohibited unless the Aidmen are additionally qualified to make such assessments under supervision of a Physician/assistant.

231

## SCREENING NOTE OF ACUTE MEDICAL CARE

For use of this form, see HQDA Ltr 40-83-2, the proponent agency is TSG.

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | | SCREENER LOCATION | | |
|---|---|---|---|---|
| | TIME PATIENT ARRIVES 0610 0735 | TIME ENCOUNTER BEGINS 0730 | TIME PATIENT LEAVES 0735 | |
| DATE 28 MAR 84 | SCREENER LOCATION Bn Aid Station 7th Cbt Engr Bn | CHIEF COMPLAINT F/U Boil | DURATION x 4 days | |
| PATIENT RESIDENCE ☒ BARRACKS ☐ OFF POST | ☐ POST HOUSING ☐ TRANSIENT Ft. Polk, LA 71459 | VITAL SIGNS TEMPERATURE 94.4 PULSE 70 BP 110/70 | ALLERGIES NKDA RESP 15 | |

FIRST VISIT FOR THIS COMPLAINT ☐ YES ☒ NO   IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ☒ YES ☐ NO

### SPECIAL INSTRUCTIONS

Algorithm/code — Using information provided by the patient in regards to his/her chief complaint, enter the algorithm to be utilized and the algorithm code in parenthesis following the algorithm title.  EXAMPLE: Headache (B-13).  If two chief complaints are presented that appear to be related, the more serious of the two must be determined and associated algorithm utilized.  If two complaints appear to be unrelated or if the aidman is unable to determine the more serious of the two, each complaint will be screened separately utilizing both spaces.

Algorithm Summary - Following the flowchart for the selected algorithm, the aidman must summarize the question and enter the reply for each box number until an endpoint is reached.  In certain instances (EXAMPLE: Cough pg E-7) the logic may involve skipping one or more boxes.  If this is the case, DO NOT enter a response for any boxes skipped.

Final Disposition — For patient disposition check the health care provider level indicated by the endpoint number.  If self-care protocol is called for the aidman MUST enter the protocol number and the prescribed medications in the spaces indicated.  If two algorithms are utilized, each endpoint directing the patient to different levels of the health care provider, the aidman will enter the higher level called for.

The Screening Note of Acute Medical Care will be completed in duplicate.  The original will accompany patient to the next level of Health Care Provider or remain in the Aid Station, depending on the endpoint and disposition reached.  In either case, the original is filed in the Health Record upon completion of the evaluation.  The copy is retained by the Aidman.  At the end of sick call, all copies will be turned into the supervisor for audit purposes.

Duty Cat - Motor Pool

| ALGORITHM/CODE TLS (Return Requested w/ date) | ALGORITHM/CODE |
|---|---|
| ALGORITHM SUMMARY follow up. | ALGORITHM SUMMARY |
| ENDPOINT NUMBER E1-5-A | ENDPOINT NUMBER |

| PATIENT'S IDENTIFICATION (Use mechanical imprint if available, for typed or written entries give: Name, SSN, Unit, Sex, Birthdate, and Duty Phone) | FINAL DISPOSITION |
|---|---|
| CRAWFORD, TRAVIS E-2 ▓▓▓ 5635 MALE - ▓▓▓64 Bco 7th Engr Bn (6828) | ☐ I — PHYSICIAN STAT    ☐ IV — SELF CARE PROTOCOL ☐ II — PA STAT today    ☐ V — HOSP CLINIC REFERRAL ☒ III — PA SELF CARE PROTOCOL MEDICATIONS GIVEN _____ _____ _____ _____ |
| | AIDMAN'S SIGNATURE & CODE CLS    AUDITOR'S INITIALS & DATE Walter H. Callet |

DA FORM 5181-R (TEST), FEB 83

## RECORD OF ACUTE MEDICAL CARE
*(Entries on this record should be restricted to further evaluation and treatment of complaint(s) screened)*

| DATE | 2ND CARE LOCATION | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVES |
|---|---|---|---|---|
| | | | | |

### HISTORY OF PRESENT ILLNESS

**ONSET** *(Time, Date, Abrupt/Gradual)*

X 2 days

**SYMPTOMS** *(Character/Quality, Severity, Location, Radiation, Duration, Frequency, Brought on by, Made worse by, Relieved by)*

20 y/o of for left Boil

**ASSOCIATED SYMPTOMS COURSE** *(Better/Worse/Same, Extent of Disability, Preventive Evaluation and Therapy)*

look better

**PAST MEDICAL HISTORY** *(Condition under Evaluation/Therapy, Prescribed Medications, Allergies, Last Tetanus)*

Taking FLH
NKDA

**PHYSICAL EXAMINATION**

Blood Pressure _____ Pulse _____ Respiration _____ Temperature _____ Weight _____

Boil look better no signs of bad infection

**ASSESSMENT**

Resolving Boil

**PLAN**

| DIAGNOSTIC TESTS | RESULTS | THERAPEUTIC |
|---|---|---|
| | | irrigated c̄ sterile water + Hydrogen Peroxide. packed c̄ ¼ Gauges + dressed |

**DISPOSITION**

☐ ADMITTED   DISCHARGED WITH: ☐ NO FOLLOWUP REQUIRED

☑ FOLLOWUP REQUIRED *(give location & state)*

TMC #1 29 Mar 84

FOLLOWUP AS:
☐ EMERGENCY
☐ ASAP
☐ ROUTINE

**ACTIVITY LEVEL**

☐ NO LIMITATIONS — FULL DUTY/ACTIVITY   ☑ BEDREST *(List hours/days)* 48 hrs.
☐ LIMITED *(give description & duration)* _____

| SIGNATURE OF HEALTH CARE PROVIDER  J. WORKMAN | SIGNATURE OF MEDICAL SUPERVISOR | AUDITOR'S INITIALS AND DATE |
|---|---|---|
| CW2  PA | | |

### SPECIAL INSTRUCTIONS

The Record of Acute Medical Care is to be utilized in lieu of the SF 600 (Health Record — Chronological Record of Medical Care) at the Troop Medical Clinic level and above.   Use of this form for further evaluation and treatment at the screener location is prohibited unless the Aidmen are additionally qualified to make such assessments under supervision of a Physician Assistant.

233

## SCREENING NOTE OF ACUTE MEDICAL CARE

For use of this form, see HQDA Ltr 40-83-2, the proponent agency is TSG.

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | SCREENER LOCATION | | |
|---|---|---|---|
| | TIME PATIENT ARRIVES Ø545 | TIME ENCOUNTER BEGINS O6OO | TIME PATIENT LEAVES O6O7 |
| DATE 26 MM 84 | SCREENER LOCATION **Aid Station** 7th Cbt Engr Bn Ft. Polk, LA 71459 | CHIEF COMPLAINT PAINful Boils | DURATION X 1 day |
| PATIENT RESIDENCE ☐ BARRACKS ☒ OFF POST ☐ POST HOUSING ☐ TRANSIENT | | VITAL SIGNS TEMPERATURE 98 6. ALLERGIES UKDA PULSE 78 BP 122/86 RESP 16 | |

FIRST VISIT FOR THIS COMPLAINT ☐ YES ☒ NO   IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ☒ YES ☐ NO

### SPECIAL INSTRUCTIONS

Algorithm/code — Using information provided by the patient in regards to his/her chief complaint, enter the algorithm to be utilized and the algorithm code in parenthesis following the algorithm title.  EXAMPLE: Headache (B-13).  If two chief complaints are presented that appear to be related, the more serious of the two must be determined and associated algorithm utilized.  If two complaints appear to be unrelated or if the aidman is unable to determine the more serious of the two, each complaint will be screened separately utilizing both spaces.

Algorithm Summary - Following the flowchart for the selected algorithm, the aidman must summarize the question and enter the reply for each box number until an endpoint is reached.  In certain instances (EXAMPLE: Cough pg E-7) the logic may involve skipping one or more boxes.  If this is the case, DO NOT enter a response for any boxes skipped.

Final Disposition — For patient disposition check the health care provider level indicated by the endpoint number.  If self-care protocol is called for the aidman MUST enter the protocol number and the prescribed medications in the spaces indicated.  If two algorithms are utilized, each endpoint directing the patient to different levels of the health care provider, the aidman will enter the higher level called for.

The Screening Note of Acute Medical Care will be completed in duplicate.  The original will accompany patient to the next level of Health Care Provider or remain in the Aid Station, depending on the endpoint and disposition reached.  In either case, the original is filed in the Health Record upon completion of the evaluation.  The copy is retained by the Aidman.  At the end of sick call, all copies will be turned into the supervisor for audit purposes.

Duty Job - Motor Pool

| ALGORITHM/CODE (TJ-11-1) Boils | ALGORITHM/CODE |
|---|---|
| ALGORITHM SUMMARY | ALGORITHM SUMMARY |

TJ-11-1 Tgt P.A

| ENDPOINT NUMBER TJ-11-A | ENDPOINT NUMBER |
|---|---|

| PATIENT'S IDENTIFICATION (Use mechanical imprint if available, for typed or written entries give: Name, SSN, Unit, Sex, Birthdate, and Duty Phone) | FINAL DISPOSITION |
|---|---|
| CRAWford, TRAVIS D. ███ 5635 ███ 64 E-2 | ☐ I – PHYSICIAN STAT     ☐ IV – SELF CARE PROTOCOL ☐ II – PA STAT          ☐ V – HOSP CLINIC REFERRAL ☒ III – PA SELF CARE PROTOCOL MEDICATIONS GIVEN _____ |
| Co. 7th Engr Bn    DP#6828 | AIDMAN'S SIGNATURE & CODE   Kenneth G. Cal.   ALU   AUDITOR'S INITIALS & DATE |

DA FORM 5181-R (TEST) FEB 83

# RECORD OF ACUTE MEDICAL CARE

*(Entries on this record should be restricted to further evaluation and treatment of complaint(s) screened)*

| DATE 2 6 MAR 1984 | 2ND CARE LOCATION TMC ☐ T Ft Polk, LA | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVES |
|---|---|---|---|---|

## HISTORY OF PRESENT ILLNESS

ONSET *(Time, Date, Abrupt/Gradual)*

SYMPTOMS *(Character/Quality, Severity, Location, Radiation, Duration, Frequency, Brought on by, Made worse by, Relieved by)*

c/o foot or toes

ASSOCIATED SYMPTOMS COURSE *(Better/Worse/Same, Extent of Disability, Preventive Evaluation and Therapy)*

PAST MEDICAL HISTORY *(Condition under Evaluation/Therapy, Prescribed Medications, Allergies, Last Tetanus)*

PHYSICAL EXAMINATION

Blood Pressure _____  Pulse _____  Respiration _____  Temperature _____  Weight _____

ASSESSMENT

PLAN

| DIAGNOSTIC TESTS | RESULTS | THERAPEUTIC |
|---|---|---|

DISPOSITION

☐ ADMITTED   DISCHARGED WITH: ☐ NO FOLLOWUP REQUIRED   ☑ FOLLOWUP REQUIRED *(give location & state)*

FOLLOWUP AS:
☐ EMERGENCY
☐ ASAP
☐ ROUTINE

ACTIVITY LEVEL
☐ NO LIMITATIONS — FULL DUTY/ACTIVITY   ☑ BEDREST *(List hours/days)*
☐ LIMITED *(give description & duration)*

TERRY G. DAVIS

| SIGNATURE OF HEALTH CARE PROVIDER Physician Assistant | SIGNATURE OF MEDICAL SUPERVISOR | AUDITOR'S INITIALS AND DATE |
|---|---|---|

## SPECIAL INSTRUCTIONS

The Record of Acute Medical Care is to be utilized in lieu of the SF 600 (Health Record — Chronological Record of Medical Care) at the Troop Medical Clinic level and above.   Use of this form for further evaluation and treatment at the screener location is prohibited unless the Aidmen are additionally qualified to make such assessments under supervision of a Physician Assistant.

## SCREENING NOTE OF ACUTE MEDICAL CARE

For use of this form, see HQDA Ltr 40-83-2, the proponent agency is TSG.

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | SCREENER LOCATION | | |
|---|---|---|---|
| | TIME PATIENT ARRIVES — 0915 | TIME ENCOUNTER BEGINS 0917 | TIME PATIENT LEAVES |
| DATE 14 MAR 1984 | SCREENER LOCATION TMC - 1 Ft Polk, LA. | CHIEF COMPLAINT Boils | DURATION X / wk. |

**PATIENT RESIDENCE**
☒ BARRACKS  ☐ POST HOUSING  ☐ OFF POST  ☐ TRANSIENT

**VITAL SIGNS**
TEMPERATURE 97.9  ALLERGIES NKDA
PULSE 70  BP 112/70  RESP 14

FIRST VISIT FOR THIS COMPLAINT ☒ YES ☐ NO   IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ☐ YES ☐ NO

### SPECIAL INSTRUCTIONS

Algorithm/code — Using information provided by the patient in regards to his/her chief complaint, enter the algorithm to be utilized and the algorithm code in parenthesis following the algorithm title.  EXAMPLE: Headache (B-13).  If two chief complaints are presented that appear to be related, the more serious of the two must be determined and associated algorithm utilized.  If two complaints appear to be un-related or if the aidman is unable to determine the more serious of the two, each complaint will be screened separately utilizing both spaces.

Algorithm Summary - Following the flowchart for the selected algorithm, the aidman must summarize the question and enter the reply for each box number until an endpoint is reached.  In certain instances (EXAMPLE: Cough pg E-7) the logic may involve skipping one or more boxes.  If this is the case, DO NOT enter a response for any boxes skipped.

Final Disposition — For patient disposition check the health care provider level indicated by the endpoint number.  If self-care protocol is called for the aidman MUST enter the protocol number and the prescribed medications in the spaces indicated.  If two algorithms are utilized, each endpoint directing the patient to different levels of the health care provider, the aidman will enter the higher level called for.

The Screening Note of Acute Medical Care will be completed in duplicate.  The original will accompany patient to the next level of Health Care Provider or remain in the Aid Station, depending on the endpoint and disposition reached.  In either case, the original is filed in the Health Record upon completion of the evaluation.  The copy is retained by the Aidmen.  At the end of sick call, all copies will be turned into the supervisor for audit purposes.

| ALGORITHM/CODE   TS-11-1 | ALGORITHM/CODE |
|---|---|
| ALGORITHM SUMMARY | ALGORITHM SUMMARY |
| | |

| ENDPOINT NUMBER   TS-11-A | ENDPOINT NUMBER |
|---|---|

**PATIENT'S IDENTIFICATION** (Use mechanical imprint if available, for typed or written entries give: Name, SSN, Unit, Sex, Birthdate, and Duty Phone)

CRAWFord, Travis
- 5635
B co. 7th ENGR

DP # 6828

**FINAL DISPOSITION**
☐ I – PHYSICIAN STAT
☐ II – PA STAT
☒ III – PA
☐ IV – SELF CARE PROTOCOL
☐ V – HOSP CLINIC REFERRAL

SELF CARE PROTOCOL MEDICATIONS GIVEN _____

| AIDMAN'S SIGNATURE & CODE   AC 14 | AUDITOR'S INITIALS & DATE |
|---|---|

DA FORM 5181-R (TEST), FEB 83

# RECORD OF ACUTE MEDICAL CARE

*(Entries on this record should be restricted to further evaluation and treatment of complaint(s) screened)*

| DATE 1 4 MAR 1984 | 2ND CATMEDGATION Ft Polk, LA | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVE |
|---|---|---|---|---|

## HISTORY OF PRESENT ILLNESS

**ONSET** *(Time, Date, Abrupt/Gradual)*

X 1 week

**SYMPTOMS** *(Character/Quality, Severity, Location, Radiation, Duration, Frequency, Brought on by, Made worse by, Relieved by)*

20 yo OT Complains of boils on legs and buttocks X 1 week

F/U from

**ASSOCIATED SYMPTOMS COURSE** *(Better/Worse/Same, Extent of Disability, Preventive Evaluation and Therapy)*

**PAST MEDICAL HISTORY** *(Condition under Evaluation/Therapy, Prescribed Medications, Allergies, Last Tetanus)*

Antibiotic (?)

**PHYSICAL EXAMINATION** — Multiple inflammatory lesions c 2° infections on lower extremities.

Blood Pressure _____ Pulse _____ Respiration _____ Temperature _____ Weight _____

**ASSESSMENT**

**PLAN**

| DIAGNOSTIC TESTS | RESULTS | THERAPEUTIC |
|---|---|---|

Probable folliculitis c̄ 2° infection

Plan — ① Tegopen 250 mg #80 ī 00 QID

② Betadine scrubs

③ Boutheon ont.

**DISPOSITION**

☐ ADMITTED

DISCHARGED WITH: ☐ NO FOLLOWUP REQUIRED ☒ FOLLOWUP REQUIRED *(give location & state)* one week

FOLLOWUP AS: ☐ EMERGENCY ☐ ASAP ☐ ROUTINE

**ACTIVITY LEVEL**

☒ NO LIMITATIONS — FULL DUTY/ACTIVITY ☐ BEDREST *(List hours/days)* _____

☐ LIMITED *(give description & duration)* _____

| SIGNATURE OF HEALTH CARE PROVIDER | SIGNATURE OF MEDICAL SUPERVISOR | AUDITOR'S INITIALS AND DATE |
|---|---|---|

**SPECIAL INSTRUCTIONS**

The Record of Acute Medical Care is to be utilized in lieu of the SF 600 (Health Record — Chronological Record of Medical Care) at the Troop Medical Clinic level and above. Use of this form for further evaluation and treatment at the screener location is prohibited unless the Aidmen are additionally qualified to make such assessments under supervision of a Physician Assistant.

558-102

(See Instructions on Back of this Sheet)

NSN 7540-01-075-3786

## EMERGENCY CARE AND TREATMENT
(Medical Record)

EMERGENCY ROOM
TREATMENT FACILITY (Signp)
USACH FT. POLK, LA 71459

LOG NUMBER
35

### ARRIVAL

| DATE | | | TIME |
|---|---|---|---|
| DAY | MONTH | YR. | |
| | | FEB 1 | |

TRANSPORTATION TO HOSPITAL
(Attach care enroute sheet)
[X] PRIVATE VEHICLE   [ ] AMBULANCE
[ ] OTHER (Specify)

CURRENT MEDS. (tetanus immunization and other data)
*none*

HISTORY OBTAINED FROM
[X] PATIENT   [ ] OTHER (Specify)

ALLERGIES
NKDA

PATIENT'S HOME ADDRESS OR DUTY STATION (City, State and ZIP Code)
BKS 2044

HOME TELE. NO. (Inc. area code)
0

CHIEF COMPLAINT(S) (Include symptom(s), duration)
Painful Swollen (R) groin area x 2 days

SEX: M   AGE: 20

POSSIBLE THIRD PARTY PAYER?
[ ] YES   [X] NO

TIME SEEN BY PROVIDER
2000

### VITAL SIGNS

| TIME | 1953 | |
|---|---|---|
| BP | 124/78 | |
| PULSE | 74 | |
| RESP. | 16 | |
| TEMP. | 99.1 | |
| WT. (Child) | 179 | |

DESCRIBE (1) Subjective data (Pertinent History); (2) Objective data (Examination - include results of tests and x-rays); (3) Assessment (Diagnosis); (4) Plan (Treatment/Procedures - include medication given and follow-up)

Flight Status Yes/No
PRP Program Yes/No

S- 20 y/o W ♂ c/o sores prox (R) thigh, lat (R) thigh + post (R) thigh, initially noticed Mon. Several had a head which he popped yesterday.

O- Lesions are warm, erythematous, firm + tender; post & medial prox lesions oozing blood.

### CATEGORY (See reverse)

| EMERGENT | |
|---|---|
| URGENT | |
| NON-URGENT | |

### ORDERS

| ORDERS | INITS. | TIME |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

ASSESSMENT/DIAGNOSIS
Folliculitis vs Insect Bites (Infected)

### DISPOSITION (Check all that apply)

| HOME | | FULL DUTY | |
|---|---|---|---|

QUARTERS

| [X] 24 Hrs. | 48 Hrs. | 72 Hrs. |
|---|---|---|

MODIFIED DUTY UNTIL:

| DAY | MONTH | YEAR |
|---|---|---|

REFERRED TO (Indicate clinic)
TMC #1

| EMERGENCY | | TODAY | |
|---|---|---|---|
| 72 HOURS | | ROUTINE | |

ADMIT. TO HOSP. UNIT/SERVICE

### CONDITION UPON RELEASE

| IMPROVED | [X] UNCHANGED |
|---|---|
| DETERIORATED | |

TIME OF RELEASE: 2015

(CONTINUE ON SF 507, IF NEEDED)

PATIENT'S IDENTIFICATION (Mechanical imprint) FOR WRITTEN ENTRIES GIVE: Name - last, first, middle; SSN; DOB, service status, name and relation of sponsor or next of kin (IMPORTANT - LIST FACILITY HOLDING TREAT-MENT RECORD)

15 5635 123113
CRAWFORD TRAVIS DON
1964   AD USA   PVT   BJ ACH

B 7 Eng
2466828
E 2 A/D

SIGNATURE OF PROVIDER AND ID STAMP
Jeffrey T. Green Jr.
Physician Assistant

INSTRUCTIONS TO PATIENT (Include medications ordered, any limitations and follow-up plans)
1. Trizopen Caps 250mg II PO QID
2. Moist heat

025588

238

EMERGENCY CARE AND TREATMENT

STANDARD FORM 558 (REV. 6-82)

# SCREENING NOTE OF ACUTE MEDICAL CARE

For use of this form, see HQDA Ltr 40-83-2, the proponent agency is TSG.

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | SCREENER LOCATION | | |
|---|---|---|---|
| | TIME PATIENT ARRIVES 0620 | TIME ENCOUNTER BEGINS 0614 | TIME PATIENT LEAVES 0626 |

| DATE 15 FEB 84 | SCREENER LOCATION **Bn Aid Station** 7th Cbr Engr Bn Ft Polk LA 71459 | CHIEF COMPLAINT Sore throat Headache Runny Nose X 3 days | DURATION |
|---|---|---|---|

PATIENT RESIDENCE: ☒ BARRACKS ☐ OFF POST     POST HOUSING: ☐ POST ☐ TRANSIENT

VITAL SIGNS — TEMPERATURE 96.4   ALLERGIES NKA (MEDS)   PULSE 74   BP 110/60   RESP 17

FIRST VISIT FOR THIS COMPLAINT ☒ YES ☐ NO   IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ☐ YES ☐ NO

## SPECIAL INSTRUCTIONS

Algorithm/code — Using information provided by the patient in regards to his/her chief complaint, enter the algorithm to be utilized and the algorithm code in parenthesis following the algorithm title. EXAMPLE: Headache (E-13). If two chief complaints are presented that appear to be related, the more serious of the two must be determined and associated algorithm utilized. If two complaints appear to be unrelated or if the aidman is unable to determine the more serious of the two, each complaint will be screened separately utilizing both spaces.

Algorithm Summary - Following the flowchart for the selected algorithm, the aidman must summarize the question and enter the reply for each box number until an endpoint is reached. In certain instances (EXAMPLE: Cough pg E-7) the logic may involve skipping one or more boxes. If this is the case, DO NOT enter a response for any boxes skipped.

Final Disposition — For patient disposition check the health care provider level indicated by the endpoint number. If self-care protocol is called for the aidman MUST enter the protocol number and the prescribed medications in the spaces indicated. If two algorithms are utilized, each endpoint directing the patient to different levels of the health care provider, the aidman will enter the higher level called for.

The Screening Note of Acute Medical Care will be completed in duplicate. The original will accompany patient to the next level of Health Care Provider or remain in the Aid Station, depending on the endpoint and disposition reached. In either case, the original is filed in the Health Record upon completion of the evaluation. The copy is retained by the Aidman. At the end of sick call, all copies will be turned into the supervisor for audit purposes.

Duty JOB: MOTOR POOL

| ALGORITHM/CODE TD-21 (Cold) | ALGORITHM/CODE TD-15 (Sore throat) |
|---|---|
| ALGORITHM SUMMARY | ALGORITHM SUMMARY |
| 1. Yes PT has stuffy nose. SM states that his throat is the worse of all. Screened as sore throat | 1. yes PT can touch chin to chest 3. no Temp + no exudate or swollen tonsils 5. No PT states he can't clear his ears. |

| ENDPOINT NUMBER TD-21-A | ENDPOINT NUMBER TD-15-D |
|---|---|
| PATIENT'S IDENTIFICATION (Use mechanical imprint if available, for typed or written entries give: Name, SSN, Unit, Sex, Birthdate, and Duty Phone) Crawford Travis 5435 B Co. 7th ENG Bn DP# 6828 | FINAL DISPOSITION ☐ I – PHYSICIAN STAT ☐ II – PA STAT ☒ III – PA today ☐ IV – SELF CARE PROTOCOL ☐ V – HOSP CLINIC REFERRAL  SELF CARE PROTOCOL MEDICATIONS GIVEN _____ |
| | AIDMAN'S SIGNATURE & CODE Cb07 Walter McCallahan   AUDITOR'S INITIALS & DATE |

DA FORM 5181-R (TEST), FEB 83

## RECORD OF ACUTE MEDICAL CARE
*(Entries on this record should be restricted to further evaluation and treatment of complaint(s) screened)*

| DATE | 2ND CARE LOCATION | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVES |
|---|---|---|---|---|
| 15 FEB 1984 | Ft Polk, LA | 0946 | 0810 | 0820 |

### HISTORY OF PRESENT ILLNESS

ONSET *(Time, Date, Abrupt/Gradual)*
+3 day

SYMPTOMS *(Character/Quality, Severity, Location, Radiation, Duration, Frequency, Brought on by, Made worse by, Relieved by)*
20 year old male c/o - sore throat, headache, runny nose.

Prod. cough

ASSOCIATED SYMPTOMS COURSE *(Better/Worse/Same, Extent of Disability, Preventive Evaluation and Therapy)*
Pt states not doing any better

PAST MEDICAL HISTORY *(Condition under Evaluation/Therapy, Prescribed Medications, Allergies, Last Tetanus)*
no allergies to meds
no meds

PHYSICAL EXAMINATION    Alert, oriented , Throat injected c̄ purulent

Blood Pressure ___ Pulse ___ Respiration ___ Temperature ___ Weight ___
Post nasal drip     Neck supple     No sinus tenderness
Chest CTA

ASSESSMENT

Pharyngitis / URI

### PLAN

| DIAGNOSTIC TESTS | RESULTS | THERAPEUTIC |
|---|---|---|

TC     Tylenol / Cepacol / Robitussin / Actifed tab i tid
RTC if ↑ temp., pain etc. #20

DISPOSITION

☐ ADMITTED    DISCHARGED WITH: ☒ NO FOLLOWUP REQUIRED    FOLLOWUP AS:
CW2, PA    ☐ FOLLOWUP REQUIRED    ☐ EMERGENCY
ANNE W. ENGELDORF    *(give location & state)*    ☐ ASAP
☒ ROUTINE

ACTIVITY LEVEL    ☐ NO LIMITATIONS – FULL DUTY/ACTIVITY    ☐ BEDREST *(List hours/days)* ___
☒ LIMITED *(give description & duration)*    NO running X3 d1

| SIGNATURE OF HEALTH CARE PROVIDER | SIGNATURE OF MEDICAL SUPERVISOR | AUDITOR'S INITIALS AND DATE |
|---|---|---|
| | Anne W. Holday CW2 QAC | |

### SPECIAL INSTRUCTIONS

The Record of Acute Medical Care is to be utilized in lieu of the SF 600 (Health Record — Chronological Record of Medical Care) at the Troop Medical Clinic level and above. Use of this form for further evaluation and treatment at the screener location is prohibited unless the Aidmen are additionally qualified to make such assessments under supervision of a Physician Assistant.

240

REVERSE OF DA FORM 5181-R (TEST) 1 83

## SCREENING NOTE OF ACUTE MEDICAL CARE

For use of this form, see HQDA Ltr 40-83-2, the proponent agency is TSG.

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | SCREENER LOCATION | | |
|---|---|---|---|
| | TIME PATIENT ARRIVES 8935 | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVES |
| DATE 3 FEB 1984 | SCREENER LOCATION Bn Aid Station 7th Cbt Engr Bn | CHIEF COMPLAINT Throwing up, sick, Stomach Aches | DURATION X 1 day |
| PATIENT RESIDENCE ☒ BARRACKS ☐ OFF POST | ☐ POST HOUSING Ft. Polk, LA 71459 ☐ TRANSIENT | VITAL SIGNS TEMPERATURE 97.0  ALLERGIES NKDA PULSE 76  BP 110/78  RESP 20 | |

FIRST VISIT FOR THIS COMPLAINT ☒ YES ☐ NO   IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ☐ YES ☐ NO

### SPECIAL INSTRUCTIONS

Algorithm/code -- Using information provided by the patient in regards to his/her chief complaint, enter the algorithm to be utilized and the algorithm code in parenthesis following the algorithm title.  EXAMPLE: Headache (B-13).  If two chief complaints are presented that appear to be related, the more serious of the two must be determined and associated algorithm utilized.  If two complaints appear to be unrelated or if the aidman is unable to determine the more serious of the two, each complaint will be screened separately utilizing both spaces.

Algorithm Summary - Following the flowchart for the selected algorithm, the aidman must summarize the question and enter the reply for each box number until an endpoint is reached.  In certain instances (EXAMPLE: Cough pg E-7) the logic may involve skipping one or more boxes.  If this is the case, DO NOT enter a response for any boxes skipped.

Final Disposition -- For patient disposition check the health care provider level indicated by the endpoint number.  If self-care protocol is called for the aidman MUST enter the protocol number and the prescribed medications in the spaces indicated.  If two algorithms are utilized, each endpoint directing the patient to different levels of the health care provider, the aidman will enter the higher level called for.

The Screening Note of Acute Medical Care will be completed in duplicate.  The original will accompany patient to the next level of Health Care Provider or remain in the Aid Station, depending on the endpoint and disposition reached.  In either case, the original is filed in the Health Record upon completion of the evaluation.  The copy is retained by the Aidman.  At the end of sick call, all copies will be turned into the supervisor for audit purposes.

Duty Job - Motor Pool

| ALGORITHM/CODE ( E-3) Nausea, vomiting | ALGORITHM/CODE |
|---|---|
| ALGORITHM SUMMARY 1. No Trauma 2. No severe pain 3. No bloody stools or vomitus 4. Not pregnant 5. Not over 1 wk 8 No Temp. | ALGORITHM SUMMARY _(illegible handwriting)_ |

| ENDPOINT NUMBER | ENDPOINT NUMBER |
|---|---|
| PATIENT'S IDENTIFICATION (Use mechanical imprint if available, for typed or written entries give: Name, SSN, Unit, Sex, Birthdate, and Duty Phone) Crawford TRAVIS E-2 ████-5635 Male - 20 Jan 64 Bcot Engr (6828) | FINAL DISPOSITION ☐ I -- PHYSICIAN STAT ☐ IV -- SELF CARE PROTOCOL ☐ II -- PA STAT ☐ V -- HOSP CLINIC REFERRAL ☐ III -- PA SELF CARE PROTOCOL MEDICATIONS GIVEN _____ |
| | AIDMAN'S SIGNATURE & CODE   AUDITOR'S INITIALS & DATE |

DA FORM 5181-R (TEST), FEB 83

# RECORD OF ACUTE MEDICAL CARE

*(Entries on this record should be restricted to further evaluation and treatment of complaint(s) screened)*

| DATE 3 FEB 1984 | 2ND CAMC LOCATION Ft Polk, LA | TIME PATIENT ARRIVES 0945 | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVE |
|---|---|---|---|---|

## HISTORY OF PRESENT ILLNESS

ONSET *(Time, Date, Abrupt/Gradual)*

SYMPTOMS *(Character/Quality, Severity, Location, Radiation, Duration, Frequency, Brought on by, Made worse by, Relieved by)*

ASSOCIATED SYMPTOMS COURSE *(Better/Worse/Same, Extent of Disability, Preventive Evaluation and Therapy)*

PAST MEDICAL HISTORY *(Condition under Evaluation/Therapy, Prescribed Medications, Allergies, Last Tetanus)*

PHYSICAL EXAMINATION

Blood Pressure _____ Pulse _____ Respiration _____ Temperature _____ Weight _____

ASSESSMENT

PLAN

| DIAGNOSTIC TESTS | RESULTS | THERAPEUTIC |
|---|---|---|

DISPOSITION

☐ ADMITTED

DISCHARGED WITH: ☐ NO FOLLOWUP REQUIRED
☐ FOLLOWUP REQUIRED *(give location & state)*

FOLLOWUP AS:
☐ EMERGENCY
☐ ASAP
☐ ROUTINE

ACTIVITY LEVEL

☐ NO LIMITATIONS — FULL DUTY/ACTIVITY
☐ LIMITED *(give description & duration)* _____
☐ BEDREST *(List hours/days)* _____

| SIGNATURE OF HEALTH CARE PROVIDER | SIGNATURE OF MEDICAL SUPERVISOR | AUDITOR'S INITIALS AND DATE |
|---|---|---|

## SPECIAL INSTRUCTIONS

The Record of Acute Medical Care is to be utilized in lieu of the SF 600 (Health Record — Chronological Record of Medical Care) at the Troop Medical Clinic level and above. Use of this form for further evaluation and treatment at the screener location is prohibited unless the Aidmen are additionally qualified to make such assessments under supervision of a Physician Assistant.

REVERSE OF DA FORM 5181-R (TEST), F. 83

242

## SCREENING NOTE OF ACUTE MEDICAL CARE

For use of this form, see HQDA Ltr 40-83-2, the proponent agency is TSG.

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | SCREENER LOCATION | | |
|---|---|---|---|
| | TIME PATIENT ARRIVES 0600 | TIME ENCOUNTER BEGINS 0655 | TIME PATIENT LEAVES |
| DATE 27 JAN 1984 | SCREENER LOCATION Bn Aid Station 7th Cbt Engr Bn | CHIEF COMPLAINT Chest Pains | DURATION X 1 day |
| PATIENT RESIDENCE ☒ BARRACKS ☐ OFF POST | ☐ POST HOUSING Ft. Polk, LA 71459 ☐ TRANSIENT | VITAL SIGNS TEMPERATURE 98.4  ALLERGIES NKDA PULSE 72  BP 122/80  RESP | |

FIRST VISIT FOR THIS COMPLAINT ☒ YES ☐ NO   IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ☐ YES ☐ NO

### SPECIAL INSTRUCTIONS

Algorithm/code — Using information provided by the patient in regards to his/her chief complaint, enter the algorithm to be utilized and the algorithm code in parenthesis following the algorithm title.  EXAMPLE: Headache (B-13).  If two chief complaints are presented that appear to be related, the more serious of the two must be determined and associated algorithm utilized.  If two complaints appear to be un-related or if the aidman is unable to determine the more serious of the two, each complaint will be screened separately utilizing both spaces.

Algorithm Summary - Following the flowchart for the selected algorithm, the aidman must summarize the question and enter the reply for each box number until an endpoint is reached.  In certain instances (EXAMPLE: Cough pg E-7) the logic may involve skipping one or more boxes.  If this is the case, DO NOT enter a response for any boxes skipped.

Final Disposition — For patient disposition check the health care provider level indicated by the endpoint number.  If self-care protocol is called for the aidman MUST enter the protocol number and the prescribed medications in the spaces indicated.  If two algorithms are utilized, each endpoint directing the patient to different levels of the health care provider, the aidman will enter the higher level called for.

The Screening Note of Acute Medical Care will be completed in duplicate.  The original will accompany patient to the next level of Health Care Provider or remain in the Aid Station, depending on the endpoint and disposition reached.  In either case, the original is filed in the Health Record upon completion of the evaluation.  The copy is retained by the Aidman.  At the end of sick call, all copies will be turned into the supervisor for audit purposes.

Duty Job — Motor Pool

| ALGORITHM/CODE TE-5 | ALGORITHM/CODE |
|---|---|
| ALGORITHM SUMMARY | ALGORITHM SUMMARY |
| 1) no. pt is < 40 y/o  Pain is (1) anterior short  2) no - Pulse is not irregular  3) no - Pt seems to be in no distress  4) yes - Pain is made worse by Deep breath | |
| ENDPOINT NUMBER TE-5-D | ENDPOINT NUMBER |

| PATIENT'S IDENTIFICATION (Use mechanical imprint if available, for typed or written entries give: Name, SSN, Unit, Sex, Birthdate, and Duty Phone) | FINAL DISPOSITION |
|---|---|
| CRAWFORD, TRAVIS  E-2 ▮▮▮▮ 5635 MALE - ▮▮▮▮ 64 Bco 7th Engr Bn | ☐ I – PHYSICIAN STAT      ☐ IV – SELF CARE PROTOCOL ☐ II – PA STAT            ☐ V – HOSP CLINIC REFERRAL ☒ III – PA SELF CARE PROTOCOL MEDICATIONS GIVEN _____ |
| | AIDMAN'S SIGNATURE & CODE ___  AUDITOR'S INITIALS & DATE |

DA FORM 5181-R (TEST), FEB 83

## RECORD OF ACUTE MEDICAL CARE

*(Entries on this record should be restricted to further evaluation and treatment of complaint(s) screened)*

| DATE | 2ND CARE LOCATION | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVES |
|------|-------------------|----------------------|------------------------|----------------------|
| 27 JAN 1984 | Ft Polk | 0815 | | |

### HISTORY OF PRESENT ILLNESS

**ONSET** *(Time, Date, Abrupt/Gradual)*

1 day

**SYMPTOMS** *(Character/Quality, Severity, Location, Radiation, Duration, Frequency, Brought on by, Made worse by, Relieved by)*

20 yr old male c/o chest pain and hurt when breathing.

① Side not related under —
SOB —    hurts in deep breaths —

**ASSOCIATED SYMPTOMS COURSE** *(Better/Worse/Same, Extent of Disability, Preventive Evaluation and Therapy)*

Pt state not doing any better

Sharp — intermittent
on respiration goes away
of radiation

**PAST MEDICAL HISTORY** *(Condition under Evaluation/Therapy, Prescribed Medications, Allergies, Last Tetanus)*

no allergies/meds —
no meds —
yes ht- high blood pressure — in family — not Sm

**PHYSICAL EXAMINATION**

VS Stble afebrile (no ♦)

Blood Pressure _____ Pulse _____ Respiration _____ Temperature _____ Weight _____

∅ SOB — lungs clear ∅ cyl
neck supple ∅ nodes
radial pulse equal bilat
∅ veins neck disten
lung CTA —
heart RRR S₁ S₂ distinct ∅ (m) n rub

**ASSESSMENT**

Mild costrochondritis

**PLAN**

DIAGNOSTIC TESTS          RESULTS          THERAPEUTIC

Disalcid 500 ii tbs PO TID —          if RTD under 10 days - Do Salicylate level
NO alc/work x 3 days          ? Naval exam - malingering

**DISPOSITION**

☐ ADMITTED   DISCHARGED WITH: ☐ NO FOLLOWUP REQUIRED   FOLLOWUP AS:
☐ FOLLOWUP REQUIRED   ☐ EMERGENCY
*(give location & state)*   ☐ ASAP
☐ ROUTINE

**ACTIVITY LEVEL**

☐ NO LIMITATIONS — FULL DUTY/ACTIVITY   ☐ BEDREST *(List hours/days)* _____
☐ LIMITED *(give description & duration)* _____

| SIGNATURE OF HEALTH CARE PROVIDER | SIGNATURE OF MEDICAL SUPERVISOR | AUDITOR'S INITIALS AND DATE |
|---|---|---|
| | Puckett Jr. Physicians' Assistant | A. ROY II, MD CPT MC |

### SPECIAL INSTRUCTIONS

The Record of Acute Medical Care is to be utilized in lieu of the SF 600 (Health Record — Chronological Record of Medical Care) at the Troop Medical Clinic level and above. Use of this form for further evaluation and treatment at the screener location is prohibited unless the Airmen are additionally qualified to make such assessments under supervision of a Physician's Assistant.

Standard Form 600
General Services Administration and
Interagency Committee on Medical Records
FPMR 101-11.806-8   Exception Approved by NARS
October 1975        1 Aug 79

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION (*Sign each entry*) |

**13 DEC 1983**

TMC-1
FT. POLK, LA 71459

~ Flup HA's

has been treated X 3 for HA's

US- č Midrin/Cafergot c/o relief

located frontal / temporal areas-
Throbbing - č N/V

~ pmh hx EPTS - tx with rest/sleep-

seen yesterday tx č Cafergot - c/o relief

PE) US- 98.5   68   142/98-

in NAD - WD PWN Wσ

PERLA

Cr nn II-XII grossly intact -

alert X 3

A) vascular HA

P) To FRC TMC DEM - further evaluation

physician not in area- no other stronger meds available-

LOUIS E. PUCKETT, JR.
CW2, PA

PATIENT'S IDENTIFICATION (*Use this Space for Mechanical Imprint*)

PATIENT'S NAME (*Last, First, Middle initial*)   SEX

YEAR OF BIRTH   RELATIONSHIP TO SPONSOR   COMPONENT/STATUS   A1D   DEPART/SERVICE   Army

SPONSOR'S NAME   RANK/GRADE

SSAN OR IDENTIFICATION NO.   5635   ORGANIZATION

CHRONOLOGICAL RECORD OF MEDICAL CARE
Standard Form 600
600-106-01

| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION *(Sign each entry)* |
|------|-------------------------------------------------------------------------|
|      |                                                                         |

7 Feb 84

VOID

MR7

☆ U.S. GOVERNMENT PRINTING OFFICE : 1981 O - 348-714

# RECORD OF ACUTE MEDICAL CARE

*(Entries on this record should be restricted to further evaluation and treatment of complaint(s) screened)*

| DATE 1 2 DEC 1983 | 2ND CARE LOCATION TMC = 1 Ft Polk, LA | TIME PATIENT ARRIVES 1600 | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVE |
|---|---|---|---|---|

## HISTORY OF PRESENT ILLNESS

**ONSET** *(Time, Date, Abrupt/Gradual)*

**SYMPTOMS** *(Character/Quality, Severity, Location, Radiation, Duration, Frequency, Brought on by, Made worse by, Relieved by)*

19 y/o ♂ in for f/u. Seen 9 Dec 82 for c/o temporal HA @ interval precipitated by "spots" c̄ n/v.

**ASSOCIATED SYMPTOMS COURSE** *(Better/Worse/Same, Extent of Disability, Preventive Evaluation and Therapy)*

Location — frontal occipital — HA — throbbing — constant
prev hx of similar HAs —
(EPTS)

**PAST MEDICAL HISTORY** *(Condition under Evaluation/Therapy, Prescribed Medications, Allergies, Last Tetanus)*   NKA

Pt on meds?: NKDA
Eye exam — Mar 83 & use of glasses.
meds — Midrin
Tylan   OS stable — afebrile   Family hx

**PHYSICAL EXAMINATION**

Blood Pressure _____   Pulse _____   Respiration _____   Temperature _____   Weight _____

In NAD —
PERRLA — EOMs intact
alert x3 -

**ASSESSMENT**

Cn nr II - XII grossly intact.

No migraine HAs

**PLAN**

| DIAGNOSTIC TESTS | RESULTS | THERAPEUTIC |
|---|---|---|

Cafergot 1 tab, ii tabs now, then 1 tab PO q ½ hr x 4
until relief max 6 tabs x 24 hr
Qrts — RTW & takes in am — c̄ HA's

recheck prn/ref to TMC

**DISPOSITION**

☐ ADMITTED   DISCHARGED WITH: ☐ NO FOLLOWUP REQUIRED   FOLLOWUP AS:
☐ FOLLOWUP REQUIRED   ☐ EMERGENCY
*(give location & state)*   ☐ ASAP
☐ ROUTINE

**ACTIVITY LEVEL**

☐ NO LIMITATIONS – FULL DUTY/ACTIVITY   ☐ BEDREST *(List hours/days)* _____
☐ LIMITED *(give description & duration)* _____

LOUIS E. PUCKETT, JR.
CW2, PA

| SIGNATURE OF HEALTH CARE PROVIDER | SIGNATURE OF MEDICAL SUPERVISOR | AUDITOR'S INITIALS AND DATE |
|---|---|---|

## SPECIAL INSTRUCTIONS

The Record of Acute Medical Care is to be utilized in lieu of the SF 600 (Health Record — Chronological Record of Medical Care) at the Troop Medical Clinic level and above. Use of this form for further evaluation and treatment at the screener location is prohibited unless the Aidmen are additionally qualified to m̶ such assessments under supervision of a Physician Assistant.

REVERSE OF DA FORM 5181-R (TEST), FEB 83

## SCREENING NOTE OF ACUTE MEDICAL CARE

For use of this form, see HQDA Ltr 40-83-2, the proponent agency is TSG.

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | SCREENER LOCATION | | |
|---|---|---|---|
| | TIME PATIENT ARRIVES 1000 | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVES |
| DATE 12 DEC 1983 | SCREENER LOCATION Ft Polk, LA | CHIEF COMPLAINT | DURATION |

| PATIENT RESIDENCE | VITAL SIGNS | |
|---|---|---|
| ☐ BARRACKS  ☐ POST HOUSING | TEMPERATURE 97.4. | ALLERGIES NKA |
| ☐ OFF POST  ☐ TRANSIENT | PULSE 76  BP 122/40  RESP. | |

FIRST VISIT FOR THIS COMPLAINT ☐ YES ☐ NO   IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ☐ YES ☐ NO

### SPECIAL INSTRUCTIONS

Algorithm/code — Using information provided by the patient in regards to his/her chief complaint, enter the algorithm to be utilized and the algorithm code in parenthesis following the algorithm title. EXAMPLE: Headache (B-13). If two chief complaints are presented that appear to be related, the more serious of the two must be determined and associated algorithm utilized. If two complaints appear to be unrelated or if the aidman is unable to determine the more serious of the two, each complaint will be screened separately utilizing both spaces.

Algorithm Summary - Following the flowchart for the selected algorithm, the aidman must summarize the question and enter the reply for each box number until an endpoint is reached. In certain instances (EXAMPLE: Cough pg E-7) the logic may involve skipping one or more boxes. If this is the case, DO NOT enter a response for any boxes skipped.

Final Disposition — For patient disposition check the health care provider level indicated by the endpoint number. If self-care protocol is called for the aidman MUST enter the protocol number and the prescribed medications in the spaces indicated. If two algorithms are utilized, each endpoint directing the patient to different levels of the health care provider, the aidman will enter the higher level called for.

The Screening Note of Acute Medical Care will be completed in duplicate. The original will accompany patient to the next level of Health Care Provider or remain in the Aid Station, depending on the endpoint and disposition reached. In either case, the original is filed in the Health Record upon completion of the evaluation. The copy is retained by the Aidman. At the end of sick call, all copies will be turned into the supervisor for audit purposes.

| ALGORITHM/CODE | ALGORITHM/CODE |
|---|---|
| ALGORITHM SUMMARY | ALGORITHM SUMMARY |
| | |
| ENDPOINT NUMBER | ENDPOINT NUMBER |

| PATIENT'S IDENTIFICATION (Use mechanical imprint if available, for typed or written entries give: Name, SSN, Unit, Sex, Birthdate, and Duty Phone) | FINAL DISPOSITION |
|---|---|
| Crawford, Travis 5635  7+1 Engr | ☐ I – PHYSICIAN STAT  ☐ IV – SELF CARE PROTOCOL ☐ II – PA STAT  ☐ V – HOSP CLINIC REFERRAL ☐ III – PA SELF CARE PROTOCOL MEDICATIONS GIVEN _____ |
| | AIDMAN'S SIGNATURE & CODE | AUDITOR'S INITIALS & DATE |

DA FORM 5181-R (TEST), FEB 83

## SCREENING NOTE OF ACUTE MEDICAL CARE

For use of this form, see HQDA Ltr 40-83-2, the proponent agency is TSG.

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | SCREENER LOCATION | | |
|---|---|---|---|
| | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVES |
| DATE 0 9 DEC 1983 | SCREENER LOCATION TMC - 1 Ft Polk, LA. | CHIEF COMPLAINT | DURATION |

| PATIENT RESIDENCE | | VITAL SIGNS |
|---|---|---|
| ☐ BARRACKS   ☐ POST HOUSING | | TEMPERATURE 98   ALLERGIES O Allergies |
| ☐ OFF POST   ☐ TRANSIENT | | PULSE 76   BP 138/92   RESP 18 |

FIRST VISIT FOR THIS COMPLAINT ☐ YES ☐ NO   IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ☐ YES ☐ NO

### SPECIAL INSTRUCTIONS

Algorithm/code — Using information provided by the patient in regards to his/her chief complaint, enter the algorithm to be utilized and the algorithm code in parenthesis following the algorithm title.  EXAMPLE: Headache (B-13).  If two chief complaints are presented that appear to be related, the more serious of the two must be determined and associated algorithm utilized.  If two complaints appear to be unrelated or if the aidman is unable to determine the more serious of the two, each complaint will be screened separately utilizing both spaces.

Algorithm Summary - Following the flowchart for the selected algorithm, the aidman must summarize the question and enter the reply for each box number until an endpoint is reached.  In certain instances (EXAMPLE: Cough pg E-7) the logic may involve skipping one or more boxes.  If this is the case, DO NOT enter a response for any boxes skipped.

Final Disposition — For patient disposition check the health care provider level indicated by the endpoint number.  If self-care protocol is called for the aidman MUST enter the protocol number and the prescribed medications in the spaces indicated.  If two algorithms are utilized, each endpoint directing the patient to different levels of the health care provider, the aidman will enter the higher level called for.

The Screening Note of Acute Medical Care will be completed in duplicate.  The original will accompany patient to the next level of Health Care Provider or remain in the Aid Station, depending on the endpoint and disposition reached.  In either case, the original is filed in the Health Record upon completion of the evaluation.  The copy is retained by the Aidman.  At the end of sick call, all copies will be turned into the supervisor for audit purposes.

| ALGORITHM/CODE | ALGORITHM/CODE |
|---|---|
| ALGORITHM SUMMARY | ALGORITHM SUMMARY |
| | |
| ENDPOINT NUMBER | ENDPOINT NUMBER |

| PATIENT'S IDENTIFICATION (Use mechanical imprint if available, for typed or written entries give: Name, SSN, Unit, Sex, Birthdate, and Duty Phone) | FINAL DISPOSITION |
|---|---|
| CRAWford, Travis ███████ 5635 7th Engr BN D/P 6828 | ☐ I – PHYSICIAN STAT      ☐ IV – SELF CARE PROTOCOL |
| | ☐ II – PA STAT           ☐ V – HOSP CLINIC REFERRAL |
| | ☐ III – PA |
| | SELF CARE PROTOCOL MEDICATIONS GIVEN _____ |
| | AIDMAN'S SIGNATURE & CODE      AUDITOR'S INITIALS & DATE |

DA FORM 5181-R (TEST), FEB 83

# RECORD OF ACUTE MEDICAL CARE
*(Entries on this record should be restricted to further evaluation and treatment of complaint(s) screened)*

| DATE 09 DEC 1983 | 2ND CARE LOCATION TMC - 1 Ft. Polk, LA | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVE |
|---|---|---|---|---|

## HISTORY OF PRESENT ILLNESS

**ONSET** *(Time, Date, Abrupt/Gradual)*

**SYMPTOMS** *(Character/Quality, Severity, Location, Radiation, Duration, Frequency, Brought on by, Made worse by, Relieved by)*

19 yo ♂ Complains of severe headache behind eyes. Seeing spots before eyes, blurred vision. duration 25 min. pt shaking. Bilateral ~~front~~ temporal & orbital HA c̄ N/V. Aura of "spots" ā HA begins.

**ASSOCIATED SYMPTOMS COURSE** *(Better/Worse/Same, Extent of Disability, Preventive Evaluation and Therapy)*

**PAST MEDICAL HISTORY** *(Condition under Evaluation/Therapy, Prescribed Medications, Allergies, Last Tetanus)*

∅ meds          ⊖ hx trauma c̄ LOC.
⊕ fam. hx. Migraines
⊖ "  " Seizures

**PHYSICAL EXAMINATION**

Neuro nl for CN, Fundoscopic, DTRs, cerebellar function. No carotid bruits.

Blood Pressure 138/82   Pulse 76   Respiration ___   Temperature 98   Weight ___

Alert, oriented in obvious discomfort.

**ASSESSMENT**

Migraine HA

**PLAN**

| DIAGNOSTIC TESTS | RESULTS | THERAPEUTIC |
|---|---|---|

Phenergan supps ī now, then repeat
Midrin ī now repeat ī q h x3 (up to 5 pills/12 hrs)
Qhs x 24h

**DISPOSITION**

☐ ADMITTED   DISCHARGED WITH: ☐ NO FOLLOWUP REQUIRED   FOLLOWUP AS:
☐ FOLLOWUP REQUIRED   *(give location & state)*   ☐ EMERGENCY
☐ ASAP
☐ ROUTINE

**ACTIVITY LEVEL**

☐ NO LIMITATIONS – FULL DUTY/ACTIVITY   ☑ BEDREST *(List hours/days)* 24h
☐ LIMITED *(give description & duration)*

| SIGNATURE OF HEALTH CARE PROVIDER | SIGNATURE OF MEDICAL SUPERVISOR ANNE M. E. ROADORF CW2 PA | AUDITOR'S INITIALS AND DATE |
|---|---|---|

SPECIAL INSTRUCTIONS

The Record of Acute Medical Care is to be utilized in lieu of the SF 600 (Health Record — Chronological Record of Medical Care) at the Troop Medical Clinic level and above.   Use of this form for further evaluation and treatment at the screener location is prohibited unless the Aidmen are additionally qualified to make such assessments under supervision of a Physician assistant.

250

## SCREENING NOTE OF ACUTE MEDICAL CARE

For use of this form, see HQDA Ltr 40-83-2, the proponent agency is TSG.

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | SCREENER LOCATION | | |
|---|---|---|---|
| | TIME PATIENT ARRIVES 0945 | TIME ENCOUNTER BEGINS 1010 | TIME PATIENT LEAVES |
| DATE 09 DEC 1983 | SCREENER LOCATION Bn Aid Station 7th Cbt Engr Bn | CHIEF COMPLAINT Head Ache | DURATION 15 mins |
| PATIENT RESIDENCE ☒BARRACKS ☐OFF POST | ☐POST ☐TRANSIENT Fort Polk LA 71459 | VITAL SIGNS TEMPERATURE 98.4   PULSE _____ BP _____ | ALLERGIES NKDA RESP 17 |

FIRST VISIT FOR THIS COMPLAINT ☒YES ☐NO   IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ☐YES ☐NO

### SPECIAL INSTRUCTIONS

Algorithm/code — Using information provided by the patient in regards to his/her chief complaint, enter the algorithm to be utilized and the algorithm code in parenthesis following the algorithm title. EXAMPLE: Headache (B-13). If two chief complaints are presented that appear to be related, the more serious of the two must be determined and associated algorithm utilized. If two complaints appear to be unrelated or if the aidman is unable to determine the more serious of the two, each complaint will be screened separately utilizing both spaces.

Algorithm Summary - Following the flowchart for the selected algorithm, the aidman must summarize the question and enter the reply for each box number until an endpoint is reached. In certain instances (EXAMPLE: Cough pg E-7) the logic may involve skipping one or more boxes. If this is the case, DO NOT enter a response for any boxes skipped.

Final Disposition — For patient disposition check the health care provider level indicated by the endpoint number. If self-care protocol is called for the aidman MUST enter the protocol number and the prescribed medications in the spaces indicated. If two algorithms are utilized, each endpoint directing the patient to different levels of the health care provider, the aidman will enter the higher level called for.

The Screening Note of Acute Medical Care will be completed in duplicate. The original will accompany patient to the next level of Health Care Provider or remain in the Aid Station, depending on the endpoint and disposition reached. In either case, the original is filed in the Health Record upon completion of the evaluation. The copy is retained by the Aidman. At the end of sick call, all copies will be turned into the supervisor for audit purposes.

Duty Job - Motor Pool

| ALGORITHM/CODE   TB-13 | ALGORITHM/CODE |
|---|---|
| ALGORITHM SUMMARY | ALGORITHM SUMMARY |
| 1. Can PT touch chin to chest? No | couple of days but futh last |
| 2. Temp. 100°↑ NO | month he hadn't had a headache |
| 3. PT obviously too drowsy or confused to answer questions accurately NO | until today. PT states when his headaches begins he sees |
| 4. Visual problems yes | dots in front of his eyes. The pain is just behind his eyes. |
| 19 yo ē c/o severe headache x 15 min. PT states before he use to get headaches every | |

| ENDPOINT NUMBER | ENDPOINT NUMBER |
|---|---|
| PATIENT'S IDENTIFICATION (Use mechanical imprint if available, for typed or written entries give: Name, SSN, Unit, Sex, Birthdate, and Duty Phone)  CRAWFORD TRAVIS E-1  ████ 5635  male - ████ 64  Bn 7th Engr Bn (6825) | FINAL DISPOSITION ☐I – PHYSICIAN STAT  ☐IV – SELF CARE PROTOCOL ☒II – PA STAT   ☐V – HOSP CLINIC REFERRAL ☒III – PA SELF CARE PROTOCOL MEDICATIONS GIVEN _____ _____ _____ |
| | AIDMAN'S SIGNATURE & CODE   AL07  Walter H. Callahan | AUDITOR'S INITIALS & DATE  ARH9Dec83 |

DA FORM 5181-R (TEST), FEB 83

# RECORD OF ACUTE MEDICAL CARE

*(Entries on this record should be restricted to further evaluation and treatment of complaint(s) screened)*

| DATE | 2ND CARE LOCATION | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVE |
|------|-------------------|----------------------|-----------------------|---------------------|
| | | | | |

## HISTORY OF PRESENT ILLNESS

ONSET *(Time, Date, Abrupt/Gradual)*

SYMPTOMS *(Character/Quality, Severity, Location, Radiation, Duration, Frequency, Brought on by, Made worse by, Relieved by)*

ASSOCIATED SYMPTOMS COURSE *(Better/Worse/Same, Extent of Disability, Preventive Evaluation and Therapy)*

PAST MEDICAL HISTORY *(Condition under Evaluation/Therapy, Prescribed Medications, Allergies, Last Tetanus)*

PHYSICAL EXAMINATION

Blood Pressure _____    Pulse _____    Respiration _____    Temperature _____    Weight _____

ASSESSMENT

PLAN

| DIAGNOSTIC TESTS | RESULTS | THERAPEUTIC |
|------------------|---------|-------------|
| | | |

DISPOSITION

☐ ADMITTED

DISCHARGED WITH:  ☐ NO FOLLOWUP REQUIRED
☐ FOLLOWUP REQUIRED *(give location & state)*

FOLLOWUP AS:
☐ EMERGENCY
☐ ASAP
☐ ROUTINE

ACTIVITY LEVEL

☐ NO LIMITATIONS – FULL DUTY/ACTIVITY

☐ LIMITED *(give description & duration)* _____

☐ BEDREST *(List hours/days)* _____

| SIGNATURE OF HEALTH CARE PROVIDER | SIGNATURE OF MEDICAL SUPERVISOR | AUDITOR'S INITIALS AND DATE |
|------------------------------------|----------------------------------|------------------------------|
| | | |

## SPECIAL INSTRUCTIONS

The Record of Acute Medical Care is to be utilized in lieu of the SF 600 (Health Record — Chronological Record of Medical Care) at the Troop Medical Clinic level and above.   Use of this form for further evaluation and treatment at the screener location is prohibited unless the Aidmen are additionally qualified to make such assessments under supervision of a Physician Assistant.

REVERSE OF DA FORM 5181-R (TEST)   83 84

252

Standard Form 600
General Services Administration and
Interagency Committee on Medical Records
FPMR 101-11.806-8   Exception Approved by NARS
October 1975        1 Aug 79

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION (*Sign each entry*) |

1 NOV 83 — S infected Spider bite x 1 week.

O- 19 yo B WD WN ♂ absen due to spider bite
A Cellulitis č lymphangitis
P- Scrub č betadine- 1 ml. Lidocaine
I & D. Culture obtained. Hot moist
Sacks 4 a 5 times a day.
Return to TMC 1 2 Nov 83

ANNE W. E. HOLDORF
CW2, PA

09 DEC 1983

VOID

MKy

| PATIENT'S IDENTIFICATION (*Use this Space for Mechanical Imprint*) | PATIENT'S NAME (*Last, First, Middle initial*) Crawford, Travis | | | SEX M |
|---|---|---|---|---|
| | YEAR OF BIRTH | RELATIONSHIP TO SPONSOR | COMPONENT/STATUS | DEPART/SERVICE |
| | SPONSOR'S NAME | | | RANK/GRADE E-1 |
| | SSAN OR IDENTIFICATION NO. -5635 | | ORGANIZATION C 7th Eng (IDF) | |

CHRONOLOGICAL RECORD OF MEDICAL CARE

Standard Form 600
600-106-01

| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION *(Sign each entry)* |
|------|--------------------------------------------------------------------------|

09 DEC 1983

VOID

MK*

☆ U.S. GOVERNMENT PRINTING OFFICE : 1981 O - 348-714

Standard Form 600
General Services Administration and
Interagency Committee on Medical Records
FPMR 101-11.806-8     Exception Approved by NARS
October 1975          1 Aug 79

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION (*Sign each entry*) |

**1 NOV 1983**

TMC-1
FT. POLK, LA 71459

Abscess B © region rt Thgh x 5 days.

Ø meds

— I & D done   culture taken ·      small femoral/inguinal

pack c̄ iodoform gauze          not inflamed

local xid         dsg —

abscess        Ø meds given

profile — No R/M/PT x 5 days

RTN daily TMC1 for tx.

*[signature]*

LOUIS E. PUCKETT, JR.
CW2, PA

09 DEC 1983

VOID

MRF

| PATIENT'S IDENTIFICATION (*Use this Space for Mechanical Imprint*) | PATIENT'S NAME (*Last, First, Middle initial*) CRAWFORD, TRAVIS | SEX M |
|---|---|---|
| | YEAR OF BIRTH | RELATIONSHIP TO SPONSOR | COMPONENT/STATUS A/D | DEPART/SERVICE Army |
| | SPONSOR'S NAME | | RANK/GRADE |
| | SSAN OR IDENTIFICATION NO. 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 | ORGANIZATION |

CHRONOLOGICAL RECORD OF MEDICAL CARE
Standard Form 600
600-106-01

255

| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION *(Sign each entry)* |
|------|---------------------------------------------------------------------------|
|      |                                                                           |

09 DEC 1983

VOID
MK 7

☆ U.S. GOVERNMENT PRINTING OFFICE : 1981 0 – 34⸍ ⸍4

## RECORD OF ACUTE MEDICAL CARE
*(Entries on this record should be restricted to further evaluation & treatment of complaint(s) screened)*

| DATE | 2ND CARE LOCATION | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS | TIME PATIENT LEAV |
|---|---|---|---|---|
| 12 OCT 83 | TMC #1 | 0736 | | |

### HISTORY OF PRESENT ILLNESS

ONSET *(Time, Date, Abrupt/Gradual)*

x1 day

SYMPTOMS *(Character/Quality, Severity, Location, Radiation, Duration, Frequency, Brought on by, Made worse by, Relieved by)*

19 year old male c/o back & headache; Pt state when bent over his back hurt worse.

ASSOCIATED SYMPTOMS COURSE *(Better/Worse/Same, Extent of Disability, Preventive Evaluation and Therapy)*

Pt states doing any better.    Many lifting — Ø radiates    NO HA    Ø bladder/bowel problem

PAST MEDICAL HISTORY *(Condition under Evaluation/Therapy, Prescribed Medications, Allergies, Last Tetanus)*

NKDA

no hx of back pain -
no allergic to meds
no meds ✓

hx of hematuria c
2 low IVP
did not keep Phys 28 T c RBC

### PHYSICAL EXAMINATION

Blood Pressure _____ Pulse _____ Respiration _____ Temperature _____ Weight _____

In NAD —    US stable

good oit/stool motion
normal gait

LS gen FROM —
good heel/toe walk
SLR 80 w/o pain passive
DTR's +2 +4 bilat knee/ankle

### ASSESSMENT

muscle strain

UA — was Ø RBC's

### PLAN

| DIAGNOSTIC TESTS | RESULTS | THERAPEUTIC |
|---|---|---|
| Norgesic Forte QID — Duty rest no lift > 25 lbs x5 days | | schedule appt for RBC |

### DISPOSITION

☐ ADMITTED    DISCHARGED WITH: ☐ NO FOLLOWUP REQUIRED    FOLLOWUP AS: ☐ EMERGENCY
☐ FOLLOWUP REQUIRED    ☐ ASAP
*(give location & state)*    ☐ ROUTINE

### ACTIVITY LEVEL

☐ NO LIMITATIONS — FULL DUTY/ACTIVITY    ☐ BEDREST
☐ LIMITED *(give description & duration)*    LOUIS E. PUCKETT JR
CW2, PA

SIGNATURE OF HEALTH CARE PROVIDER    SIGNATURE OF MEDICAL SUPERVISOR    AUDITOR INITIALS AND DATE

### SPECIAL INSTRUCTIONS

The Record of Acute Medical Care is to be utilized in lieu of the SF 600 (Health Record — Chronological Record of Medical Care) at the Troop Medical Clinic level and above. Use of this form for further evaluation and treatment at the screener location is prohibited unless the Aidmen are additionally qualified to ma   ich assessments under supervision of a Physi   Assistant.

## SCREENING NOTE OF ACUTE MEDICAL CARE

For use of this form, see HQDA Ltr 40-83-2, the proponent agency is TSG.

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | SCREENER LOCATION | | |
|---|---|---|---|
| | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVES |

| DATE 12 OCT 1981 | SCREENER Aid Station 7th Cbt Engr Bn Ft. Polk, LA 71459 | CHIEF COMPLAINT Back + Headache | DURATION X 10 DAY |
|---|---|---|---|

PATIENT RESIDENCE
☐ BARRACKS  ☐ POST HOUSING
☐ OFF POST  ☐ TRANSIENT

VITAL SIGNS
TEMPERATURE 96.8°  ALLERGIES NKA (MED.)
PULSE 68  BP 120/78  RESP.

FIRST VISIT FOR THIS COMPLAINT ☐ YES ☐ NO   IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ☐ YES ☐ NO

### SPECIAL INSTRUCTIONS

Algorithm/code — Using information provided by the patient in regards to his/her chief complaint, enter the algorithm to be utilized and the algorithm code in parenthesis following the algorithm title. EXAMPLE: Headache (B-13). If two chief complaints are presented that appear to be related, the more serious of the two must be determined and associated algorithm utilized. If two complaints appear to be un-related or if the aidman is unable to determine the more serious of the two, each complaint will be screened separately utilizing both spaces.

Algorithm Summary - Following the flowchart for the selected algorithm, the aidman must summarize the question and enter the reply for each box number until an endpoint is reached. In certain instances (EXAMPLE: Cough pg E-7) the logic may involve skipping one or more boxes. If this is the case, DO NOT enter a response for any boxes skipped.

Final Disposition — For patient disposition check the health care provider level indicated by the endpoint number. If self-care protocol is called for the aidman MUST enter the protocol number and the prescribed medications in the spaces indicated. If two algorithms are utilized, each endpoint directing the patient to different levels of the health care provider, the aidman will enter the higher level called for.

The Screening Note of Acute Medical Care will be completed in duplicate. The original will accompany patient to the next level of Health Care Provider or remain in the Aid Station, depending on the endpoint and disposition reached. In either case, the original is filed in the Health Record upon completion of the evaluation. The copy is retained by the Aidman. At the end of sick call, all copies will be turned into the supervisor for audit purposes.

| ALGORITHM/CODE BACK PAIN (R-3) | ALGORITHM/CODE |
|---|---|
| ALGORITHM SUMMARY | ALGORITHM SUMMARY |

① ⊖ NOT ASSOCIATED c̄ DYSURIA/FREQUENCY OF URINATION.

② ⊖ NOT ASSOCIATED c̄ NAUSEA/VOMITING/ DIARRHEA OR ABDOMINAL PAIN.

③ ~~Fever~~ ⊖ fever present.

④ ⊖ PAIN DOESN'T RADIATE into leg or legs below KNEE.

⑤ Yes - history of ↑ back trauma in past 72 hrs.

| ENDPOINT NUMBER R-3-E | ENDPOINT NUMBER |
|---|---|

PATIENT'S IDENTIFICATION (Use mechanical imprint if available, for typed or written entries give: Name, SSN, Unit, Sex, Birthdate, and Duty Phone)

CRAWFORD, TRAVIS, D

5635

B. co. 7th Engr Bn
M          DPF6828

FINAL DISPOSITION
☐ I — PHYSICIAN STAT    ☐ IV — SELF CARE PROTOCOL
☐ II — PA STAT           ☒ V — HOSP CLINIC REFERRAL
☐ III — PA
SELF CARE PROTOCOL MEDICATIONS GIVEN @ Refer to TMC #2

| AIDMAN'S SIGNATURE & CODE | AUDITOR'S INITIALS & DATE |
|---|---|

DA FORM 5181-R (TEST), FEB 83

## SCREENING NOTE OF ACUTE MEDICAL CARE

For use of this form, see HQDA Ltr 40-83-2, the proponent agency is TSG.

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | SCREENER LOCATION | | |
|---|---|---|---|
| | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS *1445* | TIME PATIENT LEAVES |
| DATE *07 SEP 1983* *06 SEP 1983* | SCREENER LOCATION TMC = 1 Ft Polk, LA. | CHIEF COMPLAINT *urinating blood* | DURATION *X 1 Days* |

| PATIENT RESIDENCE | | VITAL SIGNS | |
|---|---|---|---|
| ☐BARRACKS | ☐POST HOUSING | TEMPERATURE *97.4* | ALLERGIES *NKA* |
| ☐OFF POST | ☐TRANSIENT | PULSE *72*   BP *120/80* RESP *17* | |

FIRST VISIT FOR THIS COMPLAINT ☑YES ☐NO   IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ☐YES ☐NO

### SPECIAL INSTRUCTIONS

Algorithm/code — Using information provided by the patient in regards to his/her chief complaint, enter the algorithm to be utilized and the algorithm code in parenthesis following the algorithm title.  EXAMPLE: Headache (B-13).  If two chief complaints are presented that appear to be related, the more serious of the two must be determined and associated algorithm utilized.  If two complaints appear to be unrelated or if the aidman is unable to determine the more serious of the two, each complaint will be screened separately utilizing both spaces.

Algorithm Summary - Following the flowchart for the selected algorithm, the aidman must summarize the question and enter the reply for each box number until an endpoint is reached.  In certain instances (EXAMPLE: Cough pg E-7) the logic may involve skipping one or more boxes.  If this is the case, DO NOT enter a response for any boxes skipped.

Final Disposition — For patient disposition check the health care provider level indicated by the endpoint number.  If self-care protocol is called for the aidman MUST enter the protocol number and the prescribed medications in the spaces indicated.  If two algorithms are utilized, each endpoint directing the patient to different levels of the health care provider, the aidman will enter the higher level called for.

The Screening Note of Acute Medical Care will be completed in duplicate.  The original will accompany patient to the next level of Health Care Provider or remain in the Aid Station, depending on the endpoint and disposition reached.  In either case, the original is filed in the Health Record upon completion of the evaluation.  The copy is retained by the Aidman.  At the end of sick call, all copies will be turned into the supervisor for audit purposes.

| ALGORITHM/CODE *K-12* | ALGORITHM/CODE |
|---|---|
| ALGORITHM SUMMARY | ALGORITHM SUMMARY |

1) SM, states he has stomach Ache + low
   1a) Quader pain.
2) SM. states he had trauma to
   Abdomen area 3 week ago.

| ENDPOINT NUMBER *K-12A* | ENDPOINT NUMBER |
|---|---|
| PATIENT'S IDENTIFICATION (Use mechanical imprint if available, for typed or written entries give: Name, SSN, Unit, Sex, Birthdate, and Duty Phone) | FINAL DISPOSITION |

PATIENT IDENTIFICATION:
Crawford Travis D.
█████ 5635
E/ Bco. 7 Eng. BN

FINAL DISPOSITION
☐ I — PHYSICIAN STAT
☑ II — PA STAT
☐ III — PA
☐ IV — SELF CARE PROTOCOL
☐ V — HOSP CLINIC REFERRAL

SELF CARE PROTOCOL MEDICATIONS GIVEN _____

| AIDMAN'S SIGNATURE & CODE *Bobby R. Miller 9B10* | AUDITOR'S INITIALS & DATE |
|---|---|

DA FORM 5181-R (TEST), FEB 83

## RECORD OF ACUTE MEDICAL CARE
(Entries on this record should be restricted to further evaluation and treatment of complaint(s) screened)

| DATE 07 SEP 1983 | 2ND CARE LOCATION TMC #1 Ft Polk, LA | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS | TIME PATIENT LE |
|---|---|---|---|---|

### HISTORY OF PRESENT ILLNESS

ONSET (Time, Date, Abrupt/Gradual)

SYMPTOMS (Character/Quality, Severity, Location, Radiation, Duration, Frequency, Brought on by, Made worse by, Relieved by)

19 y/o w 0 has c/o urinating blood X 1 day, S.M. states he has stomach pain off & on & lower abdomen pain. S.M. states had trauma to Abodmen 3 week Ago.

ASSOCIATED SYMPTOMS COURSE (Better/Worse/Same, Extent of Disability, Preventive Evaluation and Therapy)

Med 0

PAST MEDICAL HISTORY (Condition under Evaluation/Therapy, Prescribed Medications, Allergies, Last Tetanus)

Allergies 0

### PHYSICAL EXAMINATION

Blood Pressure 120 Pulse 72 Respiration 17 Temperature 97.9 Weight ___

Abd-flat BS wnc non ___ tederness & suprapubic tederness. Testes ↓↓ non ___ & eden Penis non ___

ASSESSMENT

Senating R/o stone.

### PLAN

DIAGNOSTIC TESTS
Urinalysis

RESULTS
Color cloudy brown
SG 1.030
___
Bili ___ 44
ph / Neg
RBC / ___ (crystals) O2 Calo xAlate
Bacteria heavy

THERAPEUTIC
↑ fluids

DISPOSITION

☐ ADMITTED

DISCHARGED WITH: ☐ NO FOLLOWUP REQUIRED
☑ FOLLOWUP REQUIRED
(give location & state)
___ @ Aid station

FOLLOWUP AS:
☐ EMERGENCY
☐ ASAP
☐ ROUTINE

ACTIVITY LEVEL

☐ NO LIMITATIONS – FULL DUTY/ACTIVITY
☐ LIMITED (give description & duration)___
☒ BEDREST (List hours/days) 15 hs

| SIGNATURE OF HEALTH CARE PROVIDER | SIGNATURE OF MEDICAL SUPERVISOR | AUDITOR'S INITIALS AND DATE |
|---|---|---|

SPECIAL INSTRUCTIONS

The Record of Acute Medical Care is to be utilized in lieu of the SF 600 (Health Record – Chronological Record of Medical Care) at the Troop Medical Clinic level and above. Use of this form for further evaluation and treatment at the screener location is prohibited unless the Aidmen are additionally qualified to make such assessments under supervision of a Ph___

260

Standard Form 600
General Services Administration and
Interagency Committee on Medical Records
FPMR 101-11.806-8    Exception Approved by NARS
October 1975          1 Aug 79

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION (Sign each entry) |

1 1 JUL     RECORDS SCREENED
IAW AR 40-66

FORT POLK, LA. 71459

PATIENT'S IDENTIFICATION (Use this Space for Mechanical Imprint)

PATIENT'S NAME (Last, First, Middle initial)
CRAWFORD, TRAVIS

SEX
M

YEAR OF BIRTH      RELATIONSHIP TO SPONSOR      COMPONENT/STATUS      DEPART/SERVICE
A1D          USA

SPONSOR'S NAME

RANK/GRADE
E-1

SSAN OR IDENTIFICATION NO.
5635

ORGANIZATION
HHC 7th Eng

CHRONOLOGICAL RECORD OF MEDICAL CARE
Standard Form 600
600–106–01

261

| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION *(Sign each entry)* |
|------|--------------------------------------------------------------------------|
|      |                                                                          |
|      |                                                                          |
|      |                                                                          |
|      |                                                                          |
|      |                                                                          |
|      |                                                                          |
|      |                                                                          |
|      |                                                                          |
|      |                                                                          |
|      |                                                                          |
|      |                                                                          |
|      |                                                                          |
|      |                                                                          |
|      |                                                                          |
|      |                                                                          |
|      |                                                                          |
|      |                                                                          |
|      |                                                                          |
|      |                                                                          |

9 NOV 1983

VOID

Standard Form 600
General Services Administration and
Interagency Committee on Medical Records
FPMR 101-11.806-8 Exception Approved by NARS
October 1975 1 Aug 79

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE | |
|---|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION (Sign each entry) | |

**28 MAR 1983**

OPTOMETRY CLINIC USARECSTA FLW MO 65473

PLATOON LINE NO:

241-1-40

(RA) NG ER

UNAIDED VISUAL OD 20/ 20
ACUITY OS 20/ 20

PRESENT RX: VA WITH RX

OD 20/

OS 20/

SCREENER: Bwn

FRAME MEASUREMENTS: PD EYE SIZE DBL TEMP

HISTORY:

OPHTHALMOSCOPY:

PUPILS:

MUSCLE BALANCE:

PRESCRIBED: OD 20/

OS 20/

☐ CONSIDERED IN PROFILE E-2: Code U:

Diagnosis:

☐ MEB APPOINTMENT MADE: Date:

Time:

COMMENTS:

EXAMINER:

PATIENT'S IDENTIFICATION (Use this Space for Mechanical Imprint)

CRAWFORD TRAVIS D
████ -5635

| PATIENT'S NAME (Last, First, Middle initial) | | SEX |
|---|---|---|
| YEAR OF BIRTH | RELATIONSHIP TO SPONSOR | COMPONENT/STATUS | DEPART/SERVICE |
| SPONSOR'S NAME | | RANK/GRADE |
| SSAN OR IDENTIFICATION NO. | ORGANIZATION | |

CHRONOLOGICAL RECORD OF MEDICAL CARE
Standard Form 600
600-106-01

FLW O/P 305 (Rev 1 Apr 81) Previous Edition Obsolete

| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION *(Sign each entry)* |
|------|------|

AUDIOLOGY CLINIC USARECSTA FLW MO   65473

EAR PLUGS/SOUND PROTECTION DEVICE FITTING

(Check One)

| | EX SMALL | SMALL | MEDIUM | LARGE | EX LARGE |
|------|------|------|------|------|------|
| RT | | | | | |
| LT | | | | | |

☐ TRIPLE FLANGE

☑ SINGLE FLANGE

ISSUED TWO FITTED EARPLUGS WITH ONE CASE.

MEDICAL RECORDS HAVE BEEN SCREENED AND INDIVIDUAL (IS/IS NOT) REFERRED TO THE AUDIOLOGY CLINIC AT THE HOSPITAL FOR EVALUATION.

APPT: Date:

Time:

EXAMINER:

1 NOV 1983

| MEDICAL RECORD | CONSULTATION SHEET |
|---|---|

**REQUEST**

TO: *Dermotology*

FROM: *(Requesting physician or activity)* TMC 1

DATE OF REQUEST 28 June 88

REASON FOR REQUEST *(Complaints and findings)*

20 y/o u ♂ c̄ recurrent furuncles x 6 months. Lab: UA, CBC, SMA-20 done today. Started on Keflex 250 mg QID for large lesion on medial ℞ upper leg. Please eval

PROVISIONAL DIAGNOSIS

DOCTOR'S SIGNATURE
JAMES J. WORKMAN
03 JUL 1988   CW2   PA

APPROVED

PLACE OF CONSULTATION
☐ BEDSIDE   ☐ ON CALL

☒ ROUTINE   ☐ TODAY
☐ 72 HOURS   ☐ EMERGENCY

**CONSULTATION REPORT**

DERMATOLOGY CLINIC   1445

S.   Hx as above —

O.   Culture not done — No lesions since above Rx

A.   Most skin infections are Staph or Strep bacteria and Keflex is good for both.

P.   if lesions recur please get cultures.
R+C MR1

Earl Pearson MD

*(Continued on reverse side)*

| SIGNATURE AND TITLE | DATE |
|---|---|

| IDENTIFICATION NO. | ORGANIZATION | REGISTER NO. | WARD NO. |
|---|---|---|---|

PATIENT'S IDENTIFICATION *(For typed or written entries give: name—last, first, middle; grade; rank; rate; hospital or medical facility)*

Crawford, Travis

5635

☆GPO 1979: 311-158

CONSULTATION SHEET
STANDARD FORM 513 (Rev. 9-77)
Prescribed by GSA/ICMR
FPMR 101-11 (806-8
513-107

(1430 hrs)

| MEDICAL RECORD | CONSULTATION SHEET |

**REQUEST**

TO: FPC (Dominguez) — FROM: *(Requesting physician or activity)* TMC 1 —   DATE OF REQUEST: 13 Dec 83

REASON FOR REQUEST *(Complaints and findings)*

19 y/o WO♂ c/o HA x 5 dep-tx c̄ Midrin / Cafergot worse. States prior hx of "migraine HA" EPTS. Has N/V visual aura "spots before eyes", No hx of head trauma / seizures, family hx of seizures. PE) US stable BP ↑ in mild distress WDWNWO♂ - PEARLA a nn _____ grossly intact — would appreciate your evaluation for neuro ____

Thank you

PROVISIONAL DIAGNOSIS

vascular HA

DOCTOR'S SIGNATURE: LOUIS E. PUCKETT, JR. CW2, PA

APPROVED

PLACE OF CONSULTATION: ☐ BEDSIDE  ☐ ON CALL

☐ ROUTINE  ☒ TODAY   ☐ 72 HOURS  ☐ EMERGENCY

**CONSULTATION REPORT**

FAMILY PRACTICE DEPT.
B.J.A.C.H.
FT POLK, LA 71459
DATE: DEC 1 3 1983
DOCTOR: Dominguez
APP. TIME: 1430
TIME IN: 1415   WT.

WT 180 lbs. w/c
T. 98.5
P/P 120/60

Allergies NKDA
Pt. refers to pain
failed work like
vacations

Pt. ⊘ 19 y/o WO A) PFC, s/p AWOL x 4a apparent known hx Migraine HA + Free Bleeder since childhood; apparent c/o bursting Ⓡ eye retroorbital pain HA then radiate across forehead + bilateral TMJ-Temporal region. Denies photosensitivity, noise diff., N/C, dizzy, LOC, trauma, SOB, DOE, diaphoresis, no visual diff. F Hx Ⓐ all Migraine HA + Seizures; Mom times verbalized wants to quit the Army, disagree discipline – searching all way out; on witnessed (Dr. Quezada 91 B). Admit ETOH – no ____ no smoking / no coffee; 8 hr sleep; Meals x 3. Lungs – CTA ⊘ Heart – RRR, SEM 2/6 4th ____ ____ axilla ____ GU all – essentially ____ ____ ____ Neuro – grossly intact II-XII, no deficit

A) Ⓡ Tension HA + Stress

P) Ⓐ MHC
Ⓑ ACS
③ Xanax 0.25 mg tabs p.o. bid # ____
④ CBC – ESR, U/A, SMA-6
⑤ Quarters x 1 day
⑥ ____ to TMC #1, Rest, Relax, ↑ Exercise
⑦ RTC prn by CKS only, to 1° au
Call 1st SGT about case

SIGNATURE AND TITLE   DATE

IDENTIFICATION NO.   ORGANIZATION   REGISTER NO.   WARD NO.

PATIENT'S IDENTIFICATION *(For typed or written entries give Name—last, first, middle; grade; rank; rate; hospital or medical facility)*

Crawford, Travis –

Dominguez, Francisco J.
CPT, MC

CONSULTATION SHEET
STANDARD FORM 513 (Rev. 9-77)
Prescribed by GSA/ICMR
FPMR 101-11.806-8

266

| MEDICAL RECORD | CONSULTATION SHEET |
|---|---|

**REQUEST**

TO: F.P.  Dr. Simon

FROM: *(Requesting physician or activity)* TMC #1  Dr. Roy

DATE OF REQUEST 12 Sept 1983

REASON FOR REQUEST *(Complaints and findings)*

19 y/o o¹ c̄ hematuria and ® flank pain - discussed c̄ you on Thursday. Now c̄ ↓ hematuria & pain. IVP show suggestion of post obstructive dilitation - on ®. Please evaluate

PROVISIONAL DIAGNOSIS

Ureteral Colic on ®

DOCTOR'S SIGNATURE  Clyde R Roy MD CPT mc

APPROVED

PLACE OF CONSULTATION
☐ BEDSIDE   ☐ ON CALL

☒ ROUTINE   ☐ 72 HOURS
☒ TODAY   ☐ EMERGENCY

**CONSULTATION REPORT**

*(Continued on reverse side)*

SIGNATURE AND TITLE

DATE

IDENTIFICATION NO.   ORGANIZATION

REGISTER NO.   WARD NO.

PATIENT'S IDENTIFICATION *(For typed or written entries give: Name—last, first, middle; grade; rank; rate; hospital or medical facility)*

CRAWFORD, TRAVIS
██████ -5635
B co 7ᵗʰ Engr Bn

☆GPO 1979. 311-158

CONSULTATION SHEET
STANDARD FORM 513 (Rev. 9-77)
Prescribed by GSA/ICMR
FPMR 101-11.806-8
513-107

267

# REFERENCE AUDIOGRAM

| | ZIP CODE/APO |
|---|---|
| | 71459 |

**DOD COMPONENT** [X]
- A—ARMY
- N—NAVY
- F—AIR FORCE
- M—MARINE CORPS
- 1—OTHER DOD ACTIVITY

**SERVICE COMPONENT** [X]
- R—REGULAR
- V—RESERVE
- G—NATIONAL GUARD
- 1—OTHER

## PERSONAL DATA

**SSN** X ▓▓▓▓ 5 6 3 5

**LAST NAME—FIRST NAME—MIDDLE INITIAL** Crawford Travis D

**SEX** [X] M—MALE / F—FEMALE

**DATE OF BIRTH** year 6 4 | month ▓ | day ▓

**PAY GRADE, UNIFORMED SERVICES** E02

**GRADE, CIVILIAN**

**SERVICE DUTY OCCUPATION CODE** 12B10

**MAILING ADDRESS OF ASSIGNMENT** B Co 7th ENG AF2X-DCS 71459

**LOCATION—PLACE OF WORK** Ft Polk LA motor pool Bldg 2044

**MAJOR COMMAND** FORSCOM

**DUTY PHONE** 6828

## AUDIOMETRY

[X]
1. REFERENCE ESTABLISHED PRIOR TO INITIAL DUTY IN HAZARDOUS NOISE AREAS
2. REFERENCE ESTABLISHED FOLLOWING EXPOSURE IN NOISE DUTIES
3. REFERENCE RE—ESTABLISHED AFTER FOLLOWUP PROGRAM

### HEARING THRESHOLD LEVELS OF TEST FREQUENCIES RE: ANSI S3.6

| | | LEFT EAR | | | | | | RIGHT EAR | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 500 | 1000 | 2000 | 3000 | 4000 | 6000 | 500 | 1000 | 2000 | 3000 | 4000 | 6000 |
| 10 | 5 | 0 | 10 | 15 | 30 | 20 | 15 | 0 | 5 | 10 | 30 |

**DATE OF AUDIOGRAM** year 84 | month 01 | day 30

**DAY OF WEEK** [2]
- 1-SUN
- 2-MON
- 3-TUES
- 4-WED
- 5-THURS
- 6-FRI
- 7-SAT

**MIL-TIME-DAY** 0915

**HOURS SINCE LAST NOISE EXPOSURE** 24

**ENT PROBLEM AT TIME OF TEST** [X]
- 1—NO
- 2—YES
- 3—UNKNOWN

## EXAMINER

**LAST NAME—FIRST NAME—MIDDLE INITIAL** Murphie + A Robert P.

**TRAINING CERT NO.** 045 **SSN** ▓▓▓▓

**SERVICE DUTY OCCUPATION CODE** 91B10

**OFFICE SYMBOL** HSXV PMS-O

## AUDIOMETER

**TYPE** [3]
- 1-MANUAL
- 2-SELF-RECORDING (automatic)
- 3-MICROPROCESSOR

**MODEL** GRS-1A

**MANUFACTURER** Autotech

**SERIAL NUMBER** 389

**LAST ELECTROACOUSTIC CALIB DATE** year 83 | month 04 | day 25

## PERSONAL HEARING PROTECTION

**TYPE USED** [2]
- 1-SINGLE FLANGE (V51R)
- 2-TRIPLE FLANGE
- 3-HAND FORMED EARPLUGS
- 4-EAR CANAL CAPS
- 5-NOISE MUFFS
- 6-OTHER

**EARPLUGS ISSUED** [3]
- 1-NO
- 2-YES
- 3-PREVIOUSLY ISSUED

**SIZE EARPLUGS** R: S L: M
- 1-XS
- 2-S
- 3-M
- 4-L

**DOUBLE PROTECTION USED** [7]
- 1-NO
- 2-YES

**GLASSES WORN** (including goggles) [7]
- 1-NO
- 2-YES

**FREQUENCY GLASSES WORN** [X]
- 1-ALWAYS

S/S # 447765635
UNIT # 422
TECH (signature)
CERT # 045
DATE: 01/30/84
DATE LAST CALIBRATED: 04/27/83
AUTOTECH MODEL GRS-1A
SERIAL NO. 389
CAL: ANSI S3.6-1969

FREQ(HZ) DB(HTL)
LT     RT
500   10    20
1000  5*    15*
2000  0     0
3000  10    5
4000  15    10
6000  30    30

*INDICATES RETEST
*HEARING LOSS CODE:
STD. #8
SEQ. #14
H.L.

## CONTENTS REVIEWED AND VALIDATED BY

**NAME OF REVIEWER** (Signature) Emma S Hansen

**SERVICE DUTY OCCUPATION CODE** 610

**AUTOVON** 863 6131

**SSN** ▓▓▓▓

**OFFICE SYMBOL** HSXV PMS-O

**DD FORM 2215** 1 SEP 79



BAYNE-JONES ARMY COMMUNITY HOSPITAL
DEPARTMENT OF PATHOLOGY
FT. POLK, LOUISIANA 71459

NAME:   CRAWFORD, TRAVIS D. (20)
S. S. N. #   20-5631
SPONSER'S UNIT: B CO 7TH ENGR
PHYSICIAN: WORKMAN

REQUISITION NO.   336-532

AGE: A/        SEX: MALE                    ROOM NO. TMC 1

RAW TIME: 14:44                            OPERATOR CODE: JD

RAW DATE: TEST 06/28/84    NORMAL RANGE      CURRENT DATE:   06/29/84    UNITS

KDA 20 PROFILE

| | NORMAL RANGE | RESULTS | |
|---|---|---|---|
| GLUCOSE | 64.0-114. MG/DL | 66 | |
| BUN | 7.00-23.0 MG/DL | 10 | |
| CREAT | 0.60-1.20 MG/DL | 0.9 | |
| URIC ACID | 2.70-7.70 MG/DL | 8.0 | H |
| SODIUM | 135.-146. MEQ/L | 140 | |
| POTASSIUM | 3.80-5.20 MEQ/L | 4.1 | |
| CHLORIDE | 100.-112. MEQ/L | 102.4 | |
| PHOS | 2.30-4.10 MG/DL | 4.4 | H |
| CALCIUM | 8.40-11.0 MG/DL | 8.9 | |
| PROTEIN | 6.40-8.40 G/DL | 7.4 | |
| ALBUMIN | 4.00-5.20 G/DL | 4.5 | |
| ALK PHOS | 86.0-275. U/L | 373 | H |
| SGOT/AST | 4.00-37.0 U/L | 37 | |
| SGPT/ALT | 4.00-29.0 U/L | 16 | |
| LDH/LD610 | 89.0-166. U/L | 129 | |
| CPK/CK | 0.00-271. U/L | 120 | |
| TOT BILI | 0.00-1.00 MG/DL | 0.1 | |
| CHOL ST | 114.-299. MG/DL | 141 | |
| TRIGLY | 26.0-314. MG/DL | 99 | |
| GLOBULIN | 2.00-3.60 G/DL | 2.9 | |
| A/G RATIO | 1.00-2.40 | 1.5 | |

TECHNOLOGIST REVIEW

# HEALTH RECORD

## IMMUNIZATION RECORD

*All entries in ink to be made in block letters*

### VACCINATION AGAINST SMALLPOX *(Number of previous vaccination scars)*

| | DATE | ORIGIN | BATCH NUMBER | REACTION | STATION | PHYSICIAN'S NAME |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |

### YELLOW FEVER VACCINE

| | DATE | ORIGIN | BATCH NUMBER | STATION | PHYSICIAN'S NAME |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |

### TYPHOID VACCINE

| | DATE | DOSE | PHYSICIAN'S NAME | | DATE | DOSE | PHYSICIAN'S NAME |
|---|---|---|---|---|---|---|---|
| 1 | | | | 4 | | | |
| 2 | | | | 5 | | | |
| 3 | | | | 6 | | | |

### TETANUS-DIPHTHERIA TOXOIDS

| | DATE | DOSE | PHYSICIAN'S NAME | | DATE | DOSE | PHYSICIAN'S NAME |
|---|---|---|---|---|---|---|---|
| 1 | | | | 4 | | | |
| 2 | | | | 5 | | | |
| 3 | | | | 6 | | | |

### CHOLERA VACCINE

| | DATE | PHYSICIAN'S NAME | | DATE | PHYSICIAN'S NAME | | DATE | PHYSICIAN'S NAME |
|---|---|---|---|---|---|---|---|---|
| 1 | | | 4 | | | 7 | | |
| 2 | | | 5 | | | 8 | | |
| 3 | | | 6 | | | 9 | | |

**PATIENT'S IDENTIFICATION** *(Mechanically Imprint, Type or Print)*:

Crawford, Travis

▬▬▬ - 5635

◀ Patient's Name—last, first, middle initial; Sex; Age or Year of Birth; Relationship to Sponsor; Component/Status; Department/Service.

◀ Sponsor's Name—last, first, middle initial; Rank/Grade; SSN or Identification Number; Organization.

601-104

**IMMUNIZATION RECORD**
Standard Form 601— October 1975
General Services Administration and
Interagency Committee on Medical Records
FPMR 101-11.806-8

271

## ORAL POLIOVIRUS VACCINE

| | DATE | DOSE | PHYSICIAN'S NAME | | DATE | DOSE | PHYSICIAN'S NAME |
|---|------|------|------------------|---|------|------|------------------|
| 1 | | | | 3 | | | |
| 2 | | | | 4 | | | |

## INFLUENZA VACCINE

| | DATE | DOSE | PHYSICIAN'S NAME | | DATE | DOSE | PHYSICIAN'S NAME |
|---|------|------|------------------|---|------|------|------------------|
| 1 | | | | 3 | | | |
| 2 | | | | 4 | | | |

## OTHER IMMUNIZATIONS

| | DATE | TYPE | DOSE | PHYSICIAN'S NAME | | DATE | TYPE | DOSE | PHYSICIAN'S NAME |
|---|------|------|------|------------------|---|------|------|------|------------------|
| 1 | | | | | 5 | | | | |
| 2 | | | | | 6 | | | | |
| 3 | | | | | 7 | | | | |
| 4 | | | | | 8 | | | | |

## SENSITIVITY TESTS (Tuberculin, etc.)

| | DATE | TYPE | DOSE | ROUTE | RESULTS | PHYSICIAN'S NAME |
|---|------|------|------|-------|---------|------------------|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |

**REMARKS:**

THIS RECORD IS ISSUED IN ACCORDANCE WITH ARTICLE 99, WHO SANITARY REGULATION NO. 2.

| MEDICAL RECORD | | RADIOGRAPHIC REPORTS |
|---|---|---|

ATTACH 3D REPORT ALONG HERE ↑ AND SUCCEEDING ONES ON ABOVE LINES

ATTACH 2D REPORT WITH TOP AT THIS LINE ↑

SEP 8  2 06TH OJ

| PATIENT'S IDENTIFICATION (For typed or written entries give: Name—last, first, middle; medical facility) | AGE 19 | SEX ♂ | REGISTER NO. | WARD NO. TMC#1 | FILM NO. N-83 |
|---|---|---|---|---|---|

Crawford  Travis
~~███~~ - 5635
B-Co. 7th  Eng Bn

EXAMINATION REQUESTED: IVP   Last Read if Abn Call Dr. Sirvin F.P.

REQUESTED BY: Roy MD

DATE OF REQUEST: 8 Sept 1983

PERTINENT CLINICAL HISTORY, OPERATIONS, PHYSICAL FINDINGS, AND PROVISIONAL DIAGNOSIS

36 hr Hx passing blood in urine. Closed abd injury 3 wks ago

DATE OF EXAMINATION (include year): 8 Sept 83

DATE OF REPORT:

DATE TRANSCRIBED: 9 Sep 83

**RADIOGRAPHIC REPORT**

IVP:  Initial film of the abdomen reveals scattered gas and fecal shadows throughout the colon and rectum.  Following injection of contrast prompt nephrogram effect was obtained bilaterally.  The renal outline is normal.  The right calices are very mildly blunted and the entire right ureter is visualized with no evidence of obstruction.  The mild blunting of the calices could have been due to post obstructive changes.  The left pelvicaliceal system and ureters are normal.
IMPRESSION:  Suggestion of post obstructive changes in the right kidney.  Excretory urogram is otherwise normal.
DANIEL A. MANUAT, JR, MAJ, MC/eb

SIGNATURE: (Specify location of X-ray facility if not part of requesting facility)

NOTE: For additional space use SF-507, Continuation Sheet

RADIOGRAPHIC REPORT
STANDARD FORM 519-A (REV. 9-77)
Prescribed by GSA-ICMR
FPMR 101-11.806-8
519-213

☆ U.S. Government Printing Office: 1980—311-158/26

273



Crawford TJavis
5635
Rec'd 7th Eng By

TMC#1
BHAA

Enter in above space   PATIENT IDENTIFICATION—TREATING FACILITY—WARD NO.—DATE

**MICRO-BIOLOGY 1**

SPECIMEN LAB RPT NO

PATIENT STATUS
☐ BED
AMB ☑
☐ OUTPT
DOM ☐
☐ NP

INFECTION
☐ ADMITTED WITH
☑ HOSPITAL ACQUIRED ☐
☐ PRE OPERATIVE
POST OPERATIVE ☐
☐ NON SURG
POSTPARTUM ☐
☐ NEWBORN
OTHER (Specify) ☐

LAB ID NO   JUL 27

REQUESTING PHYSICIAN'S SIGNATURE    Roy

REPORTED BY

MD   DATE
TECH

CLINICAL INFORMATION (Including specimen source)    Wound Cult foot

ANTIBACTERIAL THERAPY

WO 8886

**MICROBIOLOGY 1**
STANDARD FORM 553 (Rev. 3-77)
General Services Administration and Interagency
Committee on Medical Records FPMR 101-11 806-8

SPECIMEN TAKEN
DATE 26 Ju   TIME

EXAMINATION REQUESTED
☑ CULTURE
☐ COLONY COUNT
☐ SMEAR
☑ SENSITIVITY
REPORT

S. aureus

---

Crawford, Travis
— 5635
B 7 Engr

Enter in above space   PATIENT IDENTIFICATION—TREATING FACILITY—WARD NO.—DATE

BHAA
TMCA

**MISC**
SPECIMEN/LAB RPT. NO.

URGENCY
☑ ROUTINE
TODAY ☐
☐ PRE-OP
STAT ☐

PATIENT STATUS
☐ BED      ☐ AMB
OUTPATIENT ☑
☐ NP       ☐ DOM

SPECIMEN SOURCE (Specify)
TC

LAB ID NO

REQUESTING PHYSICIAN'S SIGNATURE    Anderfie PAC

REPORTED BY

MD  DATE
TECH

TH 7495

REMARKS    TC

TEST(S)
SPECIMEN TAKEN
DATE 15 Feb 81   TIME
REQUESTED    CHS
RESULTS

BETA STREPTOCOCCUS
GROUP A BY BACITRACIN
A PRATS, MD
CHIEF PATHOLOGY SVC

USACH, FORT

**MISCELLANEOUS**
STANDARD FORM 557 (Rev. 3-77)
General Services Administration and Interagency
Committee on Medical Records FPMR 101-11 806-8

**First form (top):**

20 447 76 5635    123173    *TMC#*
CRAWFORD TRAVIS DON                *BHA 1*
1964    AD  USA  PVT    GLWACH
0-1-2                  *REPORT* 360-2222
*7 Bngrs*

Enter in above space    PATIENT IDENTIFICATION—TREATING FACILITY—WARD NO.—DATE
REQUESTING PHYSICIAN'S SIGNATURE          REPORTED BY

*Roy*    RECEIVED BY    CPT MC    E89060
*Hinote*    TO    8 Sept 85    MD DATE

| | SPECIMEN/LAB RPT. NO. |
|---|---|
| HEMATOLOGY | 29 |

| URGENCY | PATIENT STATUS | |
|---|---|---|
| ☐ ROUTINE | ☐ BED | ☐ AMB |
| | OUTPATIENT ☑ | |
| TODAY ☐ | ☐ NP | ☐ DOM |
| ☐ PRE-OP | SPECIMEN SOURCE | |
| STAT ☐ | ☑ VEIN | ☐ CAP |
| | ☐ OTHER (Specify) | |
| | LAB. ID. NO. | |

PATIENTS MED. RECORD    549-105

| TEST(S) | SPECIMEN TAKEN | TIME | A.M. P.M. [X] | REQUESTED | RBC COUNT | HEMOGLOBIN | HEMATOCRIT | MCV | MCH | MCHC | WBC COUNT | IMMATURE | NEUTRO-BANDS | NEUTRO | LYMPHS | EOSINOPHILS | BASOPHILS | MONOCYTES | PLATELETS | RBC | SED. RATE | PLATELET COUNT | RETICULOCYTE COUNT | CLOTTING TIME | BLEEDING TIME | P CONTROL T | PATIENT T | CONTROL | PATIENT | % ACTIVITY | RATIO | SICKLING TEST | LE PREP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | DATE | | X | | | | | | | | | | | | WBC DIFF AND BLOOD CELL MORPH | | | | | | | | | | | | | | | | | | |
| | RESULTS | 6.65 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

USACH, FORT POLK

**Second form (bottom):**

20 447 76 5635    123173    *TMC#1*
CRAWFORD TRAVIS DON        *BHA 1*
1964    AD  USA  PVT    GLWACH
0-1-2              REPORT CALLED  0-2222

Enter in above space    PATIENT IDENTIFICATION—TREATING FACILITY—WARD NO.—DATE
REQUESTING PHYSICIAN'S SIGNATURE          REPORTED BY

*Roy*    RECEIVED BY    E89060    8 Sept

NORMAL RANGE PT 10.0 TO 12.5 SEC
PTT 29.0 TO 40.5 SEC

| | SPECIMEN/LAB RPT. NO. |
|---|---|
| HEMATOLOGY | |

| URGENCY | PATIENT STATUS | |
|---|---|---|
| ☐ ROUTINE | ☐ BED | ☐ AMB |
| | OUTPATIENT ☑ | |
| TODAY ☐ | ☐ NP | ☐ DOM |
| ☐ PRE-OP | SPECIMEN SOURCE | |
| STAT ☑ | ☑ VEIN | ☐ CAP |
| | ☐ OTHER (Specify) | |
| | LAB. ID. NO. | |

PATIENTS MED. RECORD    549-105

| TEST(S) | SPECIMEN TAKEN | TIME | A.M. P.M. [X] | REQUESTED | RBC COUNT | HEMOGLOBIN | HEMATOCRIT | MCV | MCH | MCHC | WBC COUNT | IMMATURE | NEUTRO-BANDS | NEUTRO | LYMPHS | EOSINOPHILS | BASOPHILS | MONOCYTES | PLATELETS | RBC | SED. RATE | PLATELET COUNT | RETICULOCYTE COUNT | CLOTTING TIME | BLEEDING TIME | P CONTROL T | PATIENT T | CONTROL | PATIENT | % ACTIVITY | RATIO | SICKLING TEST | LE PREP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | DATE | | | | | | | | | | | | | | WBC DIFF AND BLOOD CELL MORPH | | | | | | | | | X | X | | | | | | | |
| | RESULTS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

USACH, FORT POLK    E89060

Crawford, Travis
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

LABORATORY REPORT DISPLAY

Crawford, Travis
-5635

7TH. ENb.

**URINALYSIS**

URGENCY — ☑ ROUTINE — TODAY ☐ — PRE-OP ☐ — STAT ☐

PATIENT STATUS — ☐ BED — ☐ AMB — OUTPATIENT ☐ — ☐ NP — ☐ DOM

SPECIMEN SOURCE — ☐ ROUTINE — ☐ OTHER (Specify)

SPECIMEN/LAB RPT NO.

PATIENTS MED. RECORD

Enter in above space    PATIENT IDENTIFICATION—TREATING FACILITY—WARD NO.—DATE

REQUESTING PHYSICIAN'S SIGNATURE | REPORTED BY | MD | DATE
LAB. ID NO.

REMARKS

TECH

| TEST(S) | | | COLOR | SPECIFIC GRAVITY | UROBILINOGEN | OCCULT BLOOD | BILE | KETONES | GLUCOSE | PROTEIN | pH | MICROSCOPIC | WBC | RBC | EPITH CELLS | C A S T S — WBC | RBC | HYALINE | GRANULAR | BACTERIA | CRYSTALS | MUCUS | NITRITE | BENCE-JONES PROTEIN | HEMOSIDERIN | HCG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SPECIMEN TAKEN | | | Clear | | | | | | | | | | | | | | | | | | | | | | | |

**URINALYSIS**

**LABORATORY REPORT DISPLAY**

INSTRUCTIONS: This form may be used to display laboratory reports as a flow sheet to be read as a progressive table. If so, a separate sheet should be used for each type of report form. When assorted report forms are mounted on the display sheet, both test names and results should always be visible.

ENTER IN SPACE BELOW: PATIENT IDENTIFICATION—TREATING FACILITY—WARD NO.—DATE

ALIGN ALL LABORATORY REPORTS ALONG THIS BASE LINE

FORMS DISPLAYED ON THIS SHEET ARE (Check one)

MOUNTED ON STRIPS 1 THROUGH 7 / MOUNTED ON STRIPS 1, 3, 5, AND 7 / MOUNTED ON STRIPS 1, 4, AND 7

☐ CHEMISTRY I (SF 546)
☐ CHEMISTRY II (SF 547)
☐ CHEMISTRY III (SF 548)
☐ HEMATOLOGY (SF 549)
☐ URINALYSIS (SF 550)
☐ SEROLOGY (SF 551)
☐ SPINAL FLUID (SF 555)
☐ PARASITOLOGY (SF 552)
☐ IMMUNOHEMATOLOGY (SF 556)
☐ ASSORTED FORMS
☐ OTHER (Specify)
☐ MICROBIOLOGY I (SF 553)
☐ MICROBIOLOGY II (SF 554)
☐ MISCELLANEOUS (SF 557)
☐ ASSORTED FORMS

STANDARD FORM 545
545-106-01

CHEMISTRY I
546-106

| TEST(S) | SPECIMEN TAKEN | | REQUESTED | RESULTS | DATE |
|---|---|---|---|---|---|
| DATE | | | | | |
| TIME | A.M. / P.M. | | | | |
| GLUCOSE | | (X) | | 96 | |
| UREA-N | | X | | 15 | |
| CREATININE | | | | | |
| URIC ACID | | | | | |
| SODIUM | | | | | |
| POTASSIUM | | X | | 3.6 | |
| CHLORIDE | | | | | |
| CO₂ | | | | | |
| PHOSPHATE | | | | | |
| CALCIUM | | X | | 10.1 | |
| TOTAL PROTEIN | | | | | |
| ALBUMIN | | | | | |
| GLOBULIN | | | | | |
| ALKALINE PHOSPHATASE | | X | | 287 | |
| ACID PHOSPHATASE | | | | | |
| SGOT | | X | | 19 | |
| LDH | | | | | |
| CPK | | | | | |
| BILIRUBIN (TOTAL) | | | | | |
| BILIRUBIN (DIRECT) | | | | | |
| CHOLESTEROL | | | | | |
| TRIGLYCERIDES | | | | | |
| AMYLASE | | | | | |
| LIPASE | | | | | |
| PROFILE (Specify) | | | | | |

CHEM 1

URGENCY — ☐ ROUTINE — ☐ TODAY — ☐ PRE-OP — ☐ STAT

PATIENT STATUS — ☐ BED — ☐ AMB — OUTPATIENT ☐ — ☐ NP — ☐ DOM

SPECIMEN SOURCE — ☐ BLOOD — ☐ OTHER (Specify)

LAB. ID. NO.

REMARKS

RECEIVED

PATIENT IDENTIFICATION—TREATING FACILITY—WARD NO.—DATE
REPORTED BY
DATE BY

REQUESTING PHYSICIAN'S SIGNATURE

Enter in above space

CRAWFORD TRAVIS DON
1964 AD USA
20 447 76 5635   121713

277



CRAWFORD, TRAVIS D
5635
B 7ᵗʰ Engr Bn

TMC 1,

**URINALYSIS**

| SPECIMEN/LAB RPT NO |
|---|

| URGENCY | PATIENT STATUS |
|---|---|
| ☐ ROUTINE | ☐ BED  ☐ AMB |
| TODAY ☐ | OUTPATIENT ☐ |
| ☐ PRE-OP | ☐ NP  ☐ DOM |
| STAT ☐ | SPECIMEN SOURCE |
| | ☐ ROUTINE |
| | ☐ OTHER (Specify) |

PATIENT'S MED. RECORD

Enter in above space
PATIENT IDENTIFICATION—TREATING FACILITY—WARD NO.—DATE
REQUESTING PHYSICIAN'S SIGNATURE                REPORTED BY

MD DATE  120183

REMARKS        prev hematuria

LAB. ID NO.

550-105

URINALYSIS

Standard Form 550 (Rev. 4-77)
General Services Administration and Interagency
Committee on Medical Records FPMR 101-11 806-8

Crawford Travis D
5635

Bro 7ᵗʰ Engr

TMC 3
BHA

**MICRO-BIOLOGY 1**

| SPECIMEN LAB RPT NO |
|---|

| PATIENT STATUS | INFECTION |
|---|---|
| ☐ BED | ☐ ADMITTED WITH HOSPITAL ACQUIRED ☐ |
| AMB ☒ | ☐ PRE OPERATIVE POST OPERATIVE ☐ |
| ☐ OUTPT | ☐ NON SURGICAL |
| DOM ☐ | POSTPARTUM ☐ |
| NP | ☐ NEWBORN |
| | OTHER (Specify) ☐ |

PATIENTS MED. RECORD

Enter in above space
PATIENT IDENTIFICATION—TREATING FACILIT
REQUESTING PHYSICIAN'S SIGNATURE                REPORTED BY

UA    0367

LAB ID NO

CLINICAL INFORMATION (including specimen source)

090683

RECEIVED

TECH
ANTIBACTERIAL THERAPY

553-106

MICROBIOLOGY 1

STANDARD FORM 553 (Rev. 3-77)
General Services Administration and Interagency
Committee on Medical Records FPMR 101-11 806-8

SEP 7  3 18 PM '83

NO GROWTH

BRAGG, FORT POLK
CH. DEPT. OF PATHOLOGY

Crawford John

B co 7th Engr Bn

SPECIMEN/LAB RPT NO.

**URINALYSIS**

| URGENCY | PATIENT STATUS |
| --- | --- |
| ☐ ROUTINE | ☐ BED ☐ AMB |
| | OUTPATIENT ☐ |
| ☐ TODAY | ☐ NP ☐ DOM |
| ☐ PRE-OP | SPECIMEN SOURCE |
| STAT ☐ | ☐ ROUTINE |
| | ☐ OTHER (Specify) |

PATIENTS. MED. RECORD

Enter in above space    PATIENT IDENTIFICATION—TREATING FACILITY—WARD NO.—DATE

REQUESTING PHYSICIAN'S SIGNATURE | REPORTED BY | MD | DATE | LAB. ID NO.

TECH

REMARKS

**URINALYSIS**
550-105
Standard Form 550 (Rev. 4-77)
General Services Administration and Interagency
Committee on Medical Records FPMR 101-11 806-B

---

Crawford Travis D
5635
B co 7th Engr

TMC - 1
Ft Polk, LA.

B HA 1

SPECIMEN/LAB RPT NO

**BHA-1**

**URINALYSIS**

| URGENCY | PATIENT STATUS |
| --- | --- |
| ☒ ROUTINE | ☐ BED ☒ AMB |
| | OUTPATIENT ☐ |
| ☒ TODAY | ☐ NP ☐ DOM |
| ☐ PRE-OP | SPECIMEN SOURCE |
| STAT ☐ | ☒ ROUTINE |
| | ☐ OTHER (Specify) |

PATIENTS. MED. RECORD

Enter in above space    PATIENT IDENTIFICATION—TREATING FACILITY—WARD NO.—DATE

REQUESTING PHYSICIAN'S SIGNATURE | REPORTED BY | MD | DATE | LAB. ID NO.

TECH

REMARKS

**URINALYSIS**
550-106
Standard Form 550 (Rev. 4-77)
General Services Administration and Interagency
Committee on Medical Records FPMR 101-11 806-B

280

# LABORATORY REPORT DISPLAY

Case 6:09-cv-00105-JHP   Document 143   Filed 02/18/10   Page 19 of 26

| TEST(S) | | | |
|---|---|---|---|
| SPECIMEN TAKEN | | | |
| DATE | TIME | | A.M.<br>P.M. |
| RESULTS | REQUESTED | | [X] |
| | RBC COUNT | | |
| | HEMOGLOBIN | | |
| | HEMATOCRIT | | |
| | MCV | | |
| | MCH | | |
| | MCHC | | |
| | WBC COUNT | | |
| | | IMMATURE | |
| | | NEUTRO-BANDS | |
| | | NEUTROSEGS | |
| | | LYMPHS | |
| | | EOSINOPHILS | |
| | | BASOPHILS | |
| | | MONOCYTES | |
| | | PLATELETS | |
| | | RBC | |
| | SED RATE | | |
| | PLATELET COUNT | | |
| | RETICULOCYTE COUNT | | |
| | CLOTTING TIME | | |
| | BLEEDING TIME | | |
| | P T T | CONTROL | |
| | | PATIENT | |
| | | CONTROL | |
| | | PATIENT | |
| | | % ACTIVITY | |
| | | RATIO | |
| | SICKLING TEST | | X |
| | LE PREP | | |

NEGATIVE

HEMATOLOGY        549-106
STANDARD FORM 549 (Rev. 7-78)
General Services Administration and Interagency
Committee on Medical Records FPMR 101-11 806-8

REMARKS

Enter in above space:
REQUESTING PHYSICIAN'S SIGNATURE
PATIENT IDENTIFICATION—TREATING FACILITY—WARD-NO—DATE
REPORTED BY

Crawford, Travis D
D-1-2
76 5635

REMOVE PROTECTIVE STRIP—PLACE TOP OF 2D REPORT ON THIS LINE—RIGHT MARGIN
ON BASE LINE

REMOVE PROTECTIVE STRIP—PLACE TOP OF 3D REPORT HERE AND SUCCEEDING ONES
ON LINES TO THE RIGHT

PATIENTS MED. RECORD

② ③ ④ ⑤ ⑥ ⑦

ALIGN ALL LABORATORY REPORTS ALONG THIS BASE LINE

**INSTRUCTIONS:** This form may be used to display laboratory reports as a flow sheet to be read as a progressive table. If so, a separate sheet should be used for each type of report form. When assorted report forms are mounted on the display sheet, both test names and results should always be visible.

ENTER IN SPACE BELOW: PATIENT IDENTIFICATION—TREATING FACILITY—WARD NO.—DATE

CRAWFORD TRAVIS D
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

| FORMS DISPLAYED ON THIS SHEET ARE (Check one) | |
|---|---|
| MOUNTED ON STRIPS 1 THROUGH 7 | MOUNTED ON STRIPS 1, 3, 5, AND 7 |
| ☐ CHEMISTRY I (SF 546) | ☐ PARASITOLOGY (SF 552) |
| ☐ CHEMISTRY II (SF 547) | ☐ IMMUNOHEMATOLOGY (SF 556) |
| | ☐ ASSORTED FORMS |
| ☐ CHEMISTRY III (SF 548) | ☐ OTHER (Specify) |
| ☐ HEMATOLOGY (SF 549) | MOUNTED ON STRIPS 1, 4, AND 7 |
| ☐ URINALYSIS (SF 550) | ☐ MICROBIOLOGY I (SF 553) |
| | ☐ MICROBIOLOGY II (SF 554) |
| ☐ SEROLOGY (SF 551) | ☐ MISCELLANEOUS (SF 557) |
| ☐ SPINAL FLUID (SF 555) | ☐ ASSORTED FORMS |

General Services Administration and
Interagency Committee on Medical Records
FPMR 101-11.806-8
October 1975

**LABORATORY REPORT DISPLAY**

☆ GPO : 1981 0 - 354-368

Clerk 139 #1344 - Feb 1984

...... complete basic training and advanced individual training, if required.

(2) Failure to attain required standards, as prescribed in AR 614-200, on the Advanced Physical Fitness Test.

(3) Failure to complete satisfactorily airborne (parachute) training, if required.

(4) Failure to qualify for SECRET security clearance.

(5) Loss of medical and professional qualifications required for airborne or Special Forces duty.

(6) A determination by the appropriate Special Forces commander that I am unsuitable for further Special Forces training and duty.

────────────────── TO BE COMPLETED BY ALL APPLICANTS ENLISTING FOR A RANGER UNIT ──────────────────

3. ACKNOWLEDGMENT   In connection with my enlistment in the Regular Army for the US Army Airborne Enlistment Option, I hereby acknowledge that:

a. If I am not already airborne qualified, I will be required to qualify for and successfully complete such training before assignment to the 75th Infantry. I volunteer to attend the ranger course.

b. By my enlistment for this option, I am volunteering to perform frequent aircraft flights and parachute jumps and to participate in realistic combat training while engaged in airborne/ranger training and duty.

c. I understand that ranger units in time of war are engaged on a sustained basis in operations within and behind enemy lines for military purposes.

d. Should I fail to qualify for ranger training/duty subsequent to my enlistment, I will not be offered another assignment choice, but will be reassigned in accordance with the needs of the Army. Examples of specific causes for disqualification for ranger training/duty include

(1) Failure to complete basic training and advanced individual training, if required.

(2) Failure to attain required standards, as prescribed in AR 614-200, on the Advanced Physical Fitness Test.

(3) Failure to complete satisfactorily airborne (parachute) training, if required.

(4) Failure to qualify for security clearance.

(5) Loss of physical, medical, or professional qualifications required for airborne and Ranger duty.

e. I am aware that the battalion commander has the authority to relieve summarily from duty and move from the battalion individuals he determines are unsuited for continued assignment to the ranger battalion. Whether I will be reassigned to another Ranger unit will be at the option of the Army, but if I am summarily relieved, such action will not constitute a breach of my enlistment commitment regardless of whether I am so reassigned.

4. UNDERSTANDING: I understand that in the event the Secretary of the Army determines that military necessity of a national scope requires that service members be available for immediate assignment/reassignment, any guarantees contained in this agreement may be terminated. Under these conditions I may be assigned or reassigned according to the needs of the Army

I have read and understand each of the statements above and in the DD Form 1966 series, signed by me, and understand that these statements are intended to constitute all promises whatsoever concerning my enlistment. Any other promise or representation of commitments made to me in connection with my enlistment is written below in my own handwriting, or is hereby waived. (If none, write "NONE").

NONE . T.DC .

**AUTHENTICATION**

| SIGNATURE OF GUIDANCE COUNSELOR | SIGNATURE OF APPL'CANT. | DATE 24 MARCH 83 |
|---|---|---|
| TYPED NAME, GRADE AND SSN OF WITNESSING OFFICIAL Willie F SNELLE? | SIGNATURE OF WITNESSING OFFICIAL | DATE 24 march 83 |

☆U.S. Government Printing Office: 1981—341-646/5284

282

*Clerk 139 #1344 22 Feb 1984*

## STATEMENTS FOR ENLISTMENT
### DELAYED ENTRY PROGRAM
FOR USE OF THIS FORM, SEE AR 601-210. THE PROPONENT AGENCY IS THE OFFICE OF THE DEPUTY CHIEF OF STAFF FOR PERSONNEL

*TO BE COMPLETED BY ALL APPLICANTS ENLISTING FOR THIS ENLISTMENT OPTION*

1.  ACKNOWLEDGMENT    In connection with my enlistment in the United States Army Reserve, I hereby acknowledge that:

    a.  My enlistment in the US Army Reserve obligates me to a total of 6 years service in the Armed Forces of the United States, including service in the Reserve components, unless sooner discharged by proper authority. Fulfillment of the obligation begins on the date I enter on active duty.

    b.  I will be assigned to the US Army Reserve Control Group (Delayed Entry), during which time I will be in a nonpay status, and will not be authorized to participate in any Reserve training.

    c.  My time served in the Reserve will be creditable for pay purposes when I enlist in the Regular Army or enter on active duty.

    d.  I volunteer to serve on active duty for __3__ years in any job assignment specified by the Army, such period to begin within __13__ days (specify) unless I enlist in the Regular Army, or I am granted further delay by proper authority.

    e.  In lieu of performing the active duty specified in e above, I may enlist in the Regular Army for not less than 2 years with the following understanding.

    (1)  Upon enlistment in the Regular Army, I will be enlisted under the provisions of AR 601-210.

TABLE 9-3 US ARMY AIRBORNE ENLISTMENT OPTION __18AC__
(Enter the appropriate table number and title of the enlistment option(s) for which enlisting)

    (2)  If enlisting for an Army school course, I am assured of attending school course,

__COMBAT ENGINEER__         __12B10__
(Enter school course title and course number)

    (3)  In the event the enlistment option, school course, or training for which I am enlisting is not available before I enlist in the Regular Army through no fault of my own, I will select one of the following alternatives:

    (a)  I will enlist for another option, school course, or training of my choice for which I am qualified and for which there is a vacancy.

    (b)  I will be discharged from the Delayed Entry Program.

    (c)  The date of my enlistment in the Regular Army is scheduled for __24 MAR 83__ .
                                                                    (Day, Month, Year)

    (d)  Should I disqualify myself before I enlist in the Regular Army, initiate action designed to obtain my release from the Delayed Entry Program, fail to enlist in the Regular Army; or willfully fail to report for active duty on the date specified in my enlistment orders, I forfeit my entitlement to this enlistment option and may be required to serve on active duty for __2__ years in my Reserve status.

    f.  Upon completion of my active duty, I will serve in the Ready Reserve in accordance with laws and regulations then in effect or thereafter put into effect.

DA FORM 3286-40, 1 Mar 80              EDITION OF 1 JUL 75 IS OBSOLETE.

*Clerk 139 #1344 22 Feb 1984*

f. In the event I willfully fail to report on the date specified in my active duty orders to the Armed Forces Examining and Entrance Station designated therein, I will be in an absent without leave (AWOL) status and subject to apprehension and disciplinary action under Article 85 (Desertion) or Article 86 (AWOL) of the Uniform Code of Military Justice (Title 10, US Code, Sections 885 and 886).

2. UNDERSTANDING: I understand that in the event the Secretary of the Army determines that military necessity of a national scope requires that service members be available for immediate assignment/reassignment, any guarantees contained in this agreement may be terminated. Under these conditions I may be assigned or reassigned according to the needs of the Army. *TDC*

I have read and understand each of the statements above and in the DD Form 1966 series, signed by me, and understand that these statements are intended to constitute all promises whatsoever concerning my enlistment. Any other promise or representation of commitments made to me in connection with my enlistment is written below in my own handwriting, or is hereby waived. (If none, write "NONE"). *NONE*

## AUTHENTICATION

| SIGNATURE OF GUIDANCE COUNSELOR | SIGNATURE OF APPLICANT | DATE |
|---|---|---|
| | | 24 MAR 83 |
| TYPED NAME, GRADE AND SSN OF WITNESSING OFFICIAL *DENNIS L. CHAPPELL E-7* | SIGNATURE OF WITNESSING OFFICIAL | DATE |
| | | 24 MAR 83 |

☆U.S.GPO:1981-0-765-042/1146

Clerk 139  #1344  Feb 1984



Clerk 139  #1344 - Feb 1984

City Police & County Sheriff
Sequoyah County.
Sallisaw, Oklahoma.

Form approved.
OMB No. 0704 0001

Date  8 march  83.

Dear Sir:

Travis. Don Crawford.  who claims to have resided at ██████████

Sallisaw  OK  74955  from             to             and whose fingerprints and personal

description are recorded hereon is an applicant for enlistment in the United States
It is requested that the following information be furnished from your files. A return envelope is inclosed for
your convenience.  S.... ... 2 74.. my
                          DoB  5 Jun 1963.

Very truly yours,

1 Inclosure
Return Envelope

Recruiting Officer

---

| POLICE RECORD CHECK | CITY AND STATE | | DATE |
|---|---|---|---|

HAS APPLICANT A POLICE OR JUVENILE RECORD? (other than minor traffic violation)
☐ YES  ☒ NO  IF  YES, WHAT WAS THE OFFENSE OR CHARGE, DISPOSITION, AND SENTENCE?

IS APPLICANT NOW UNDERGOING COURT ACTION OF ANY KIND?  ☐ YES  ☒ NO  IF "YES," GIVE DETAILS

DOES CIVIL CUSTODY EXIST?  ☐ YES  ☒ NO  IF "YES," SPECIFY
IS APPLICANT  ☐ MARRIED  ☐ SEPARATED  ☐ DIVORCED  ☐ WIDOWED  ☐ SINGLE  ☐ MARITAL STATUS UNKNOWN
REMARKS

TITLE  Deputy Court Clerk

SIGNATURE  Maudeen Winn

DD FORM 369
1 MAR 84

REPLACES EDITION OF 1 AUG 80
WHICH MAY BE USED

286

*Clerk 139 #1344 - Feb 1984*

Form approved.
OMB No. 0704-000

CITY POLICE
COUNTY SHERIFF
SEQUOYAH COUNTY
SALLISAW, OKLAHOMA

Date 7 Mar 1983

Dear Sir :

TRAVIS DON CRAWFORD who claims to have resided at ▮▮▮▮▮▮▮▮
SALLISAW SEQUOYAH OK from _____ to present and whose fingerprints and personal description are recorded hereon is an applicant for enlistment in the United States ARMY. It is requested that the following information be furnished from your files. A return envelope is inclosed for your convenience.

SSAN ▮▮▮▮▮▮ 5635
DOB ▮▮▮▮▮▮ 1964

Very truly yours.

Sgt John L Chandler
Recruiting Officer

1 Inclosure
Return Envelope       W/M

---

**POLICE RECORD CHECK**          CITY AND STATE

HAS APPLICANT A POLICE OR JUVENILE RECORD other than minor traffic violations
☐ YES ☐ NO IF YES : WHAT WAS THE OFFENSE OR CHARGE, DISPOSITION, AND SENTENCE?

IS APPLICANT NOW UNDERGOING COURT ACTION OF ANY KIND ☐ YES ☐ NO IF YES. GIVE DETAILS

DOES CIVIL CUSTODY EXIST? ☐ YES ☐ NO IF YES. SPECIFY
IS APPLICANT ☐ MARRIED ☐ SEPARATED ☐ DIVORCED ☐ WIDOWED ☐ SINGLE ☐ MARITAL STATUS UNKNOWN

REMARKS

No record

TITLE Deputy Sheriff

SIGNATURE

DD FORM 369
1 MAR 64

REPLACES EDITION OF 1 AUG 50
WHICH MAY BE USED

☆U.S. GPO: 1982-361-448/9485

287

Clerk 139 #1344 - Feb 1984

Form approved.
OMB No. 0704-0007

OKLAHOMA STATE POLICE
SALLISAW, OKLAHOMA

Date 7 Mar 1983

Dear Sir:

TRAVIS DON CRAWFORD who claims to have resided at ███████

SALLISAW from to present and whose fingerprints and personal

description are recorded hereon is an applicant for enlistment in the United States ARMY
It is requested that the following information be furnished from your files. A return envelope is inclosed for
your convenience.

SSAN ███████ 5635     Very truly yours,
DOB ███████ 1964

1 Inclosure
Return Envelope
                    W/M                Sgt John L Chandle
                                       Recruiting Officer

| POLICE RECORD CHECK | CITY AND STATE | | DATE |
|---|---|---|---|

HAS APPLICANT A POLICE OR JUVENILE RECORD? or of those minor traffic violation
☐ YES ☐ NO  IF  YES.  WHAT WAS THE OFFENSE OR CHARGE, DISPOSITION, AND SENTENCE?

IS APPLICANT NOW UNDERGOING COURT ACTION OF ANY KIND? ☐ YES ☐ NO  IF YES.  GIVE DETAILS

DOES CIVIL CUSTODY EXIST? ☐ YES ☐ NO  IF  YES.  SPECIFY

IS APPLICANT ☐ MARRIED ☐ SEPARATED ☐ DIVORCED ☐ WIDOWED ☐ SINGLE ☐ MARITAL STATUS UNKNOWN

REMARKS

no record

| TITLE  Deputy Sheriff | SIGNATURE |
|---|---|

DD FORM 369
1 MAR 84

REPLACES EDITION OF 1 AUG 80
WHICH MAY BE USED

☆U.S. GPO: 1982—361-444/8445

288

289

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

———————————————

**REDACTED EXHIBIT 189**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

———————————————

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255          *U.S. v. Barrett*, 6:09-cv-00105-JHP

289

SW·07·34

# AFFIDAVIT FOR SEARCH WARRANT

**STATE OF OKLAHOMA** )

**COUNTY OF MUSKOGEE** )

PAULA SEXTON COURT CLERK

2007 APR 23 AM 11:48

STATE OF OKLAHOMA COUNTY OF MUSKOGEE FILED

(1) I, Jan Ray, Affiant, being first duly sworn on oath depose and says that the following constitutes of commission of crime:  Child Abuse

(2) We are searching for any evidence of child abuse (Dell computers, digital cameras, digital memory cards, and photographs reflecting/depicting evidence of child abuse involving bruising.

(3) And that the above mentioned records are located as follows: At the residence of Dawn Littlefield who resides at ███████ Oktaha, Oklahoma in Muskogee County.   From Peak Boulevard take 69 highway south approximately 8.8 miles turn west on Wainwright road approximately 4.3 miles.   Residence is a brown stone structure with white trim with silver/white shingles that sits on the north side of the road.

(4) Based upon the following facts: I, Jan Ray have been a deputy for the Muskogee County Sheriff's Department for five years and have participated in over one hundred investigations involving child abuse and/or child exploitation.  Affiant has received over one hundred hours of training involving child abuse and forensic interview techniques. Affiant has been involved in or conducted over two hundred forensic interviews of children who were alleged to be victims of child abuse and/or exploitation.  Affiant is currently assigned to the Investigations Division of the Muskogee County Sheriff's Department.  Affiant has been conducting an investigation concerning the physical abuse of two minors, L.L. a 17 year old female and C.L. a 10 year old male, the son and daughter of Dawn and Mike Littlefield. Affiant was advised by L.L. that Mike Littlefield has physically abused her for approximately seven to eight years.  The abuse involved the striking of L.L. by Mike Littlefield with his hands and fists about the head and body of L.L. resulting in bruising.  Affiant was also advised by L.L. that her brother C.L. was additionally physically abused my Mike Littlefield for a period of seven to eight years.  The abuse involved the striking of C.L. by Mike Littlefield with his hands and fists about the head and body of C.L. resulting in bruising. Affiant was advised by L.L. that she had a discussion with her mother, Dawn Littlefield concerning the physical abuse of C.L. by Mike Littlefield.   Affiant was advised by L.L. that Dawn Littlefield told her that she, Dawn Littlefield had taken photographs with a digital camera of C.L. after Mike Littlefield had physically abused C.L. while L.L. was away from the home during the months of July through October of 2006, and transferred those photographs to a Dell desktop computer in the home of Dawn Littlefield as proof of the physical abuse.  Affiant was advised by L.L. that the transfer of the digital images from

291

the digital camera to the Dell desktop computer is accomplished by taking the memory card from the camera and inserting the memory card into the Dell desktop computer and saving the pictures. Affiant was advised by L.L. that she did not see the pictures of abuse until she viewed them in the Dell desktop computer in December of 2006. Affiant was advised by L.L. that the photographs depicted bruising about the arms, legs, and back of C.L. The affiant was advised that the Dell computer was located in the home of Dawn Littlefield on March 22nd 2007. Affiant was advised y L.L. that the Dell computer has been in the home of Dawn Littlefield consistently for three years and the last time that L.L. saw the photographs depicting abuse involving C.L. as described above was March 20th 2007. Affiant was additionally advised by L.L. that there were several cassette tapes recordings in the home of Dawn Littlefield and that those cassette tapes contained the voice of Mike Littlefield during a period when he was having "temper fits" in the home of Dawn Littlefield. Affiant advised that L.L. and C.L. were residents of the home of Dawn Littlefield for a period exceeding ten years. Affiant was advised by L.L. that she had listened to the tapes and the tapes were located in a drawer in the dresser of Dawn Littlefield's bedroom.

Based on the above information, affiant prays that a search warrant be granted.

AFFIANT

Subscribed and sworn to before me this 13th day of April, 2007.

JUDGE OF THE DISTRICT COURT
Muskogee County, Oklahoma

10:30 on 4-13-07

Time

$\mathcal{SW}\cdot 07\cdot 34$

# SEARCH WARRANT RETURN

State of Oklahoma
County of Muskogee:

The following described property was seized under this warrant on April 13, 2007

2007 APR 23 AM 11:48
PAUL SEXTON
COURT CLERK

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE
FILED

1)  1 Sony Handy cam    SN#341925
2)  1 Fuji Film Digital camera    SN#OH14371
3)  1 Dell Tower  BJWCZ71  Dimension 9100
4)  64 cd/dvd's
5)  1 Fuji film memory card
6)  1 Dell Tower  #GPNR211  Dimension 2100
7)  1 Kodak memory card
8)  1 Canon digital camera ZR20  #2989
9)  1 Logitech camera
10) 1 PC 100 Floppy disc
11) 2 Kodak flash cameras
12) 1 gateway computer tower GT4010
13) 4 floppy disc
14) 1 san memory card
15) 1 Fuji film memory disc

I, Jan Ray the officer by whom this warrant was executed on the 13th day April 2007 do hereby swear that the above inventory contains a true and detailed account of all property taken by the Muskogee county Sheriff's deputies on the warrant subscribed and sworn by me this 13th day of April, 2007.

_____
Affiant

For the search of the following location, ▮▮▮▮▮▮, Oktaha, OK. From Peak blvd take 69 highway south approximately 8.8 miles turn west on Wainwright road approximately 4.3 miles. Residence is a brown stone structure with white trim with silver/white shingles that sits on the north side of the road.

_____
Judge of the District Court

292

SW.07·34

# SEARCH WARRANT

## IN THE NAME OF THE STATE OF OKLAHOMA
## TO: ANY PEACE OFFICER OF THIS STATE

(1)   The above affidavit having been sworn to by the affiant, Jan Ray, before me this day, based upon the following facts stated herein, probable cause having been found, I command you anytime of the day to search for the following described evidence and make a return according to law.

(2)   We are searching for any evidence Dell computers, digital cameras, digital memory cards, cassette tapes, photographs reflecting/depicting evidence of child abuse involving bruising

(3)   That the said search be conducted at the following location: ███████, Oktaha, Oklahoma in Muskogee County.  From Peak Blvd take 69 highway south approximately 8.8 miles turn west on Wainwright road approximately 4.3 miles.  Residence is a brown stone structure with white trim with silver/white shingles that sits on the north side of the road.

Issued under my hand this _/3_ day of _APRIL_ , 2007

JUDGE OF THE DISTRICT COURT
MUSKOGEE COUNTY, OKLAHOMA

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR MUSKOGEE COUNTY

THE STATE OF OKLAHOMA,
      Plaintiff,

vs.

DAWN LITTLEFIELD

ADDR: ██████████████
      OKTAHA, OK 74450
SSN: ██████0275
DOB: ████/68

      Defendant(s),

Case No. CF-2007-369

## INFORMATION

FOR:

COUNT 1: DOMESTIC ABUSE - ASSAULT AND BATTERY 2nd & SUBSEQUENT~ 21 O.S. § 644(C) a FELONY

STATE OF OKLAHOMA, COUNTY OF MUSKOGEE:

I, **Larry D. Moore**, the undersigned District Attorney of said County, in the name and by the authority, and on behalf of the State of Oklahoma, give information that in said County of Muskogee and in the State of Oklahoma, **DAWN LITTLEFIELD**, did then and there unlawfully, willfully, knowingly and wrongfully commit the crime(s) of:

COUNT 1    DOMESTIC ABUSE - ASSAULT AND BATTERY 2nd & SUBSEQUENT~ a FELONY, **on or about the 19th day of March, 2007, by willfully and unlawfully striking L.L., her daughter by then and there dragging L.L., 17 years old, out of the back seat of a car, throwing her into the front seat, and began to beat her about her face, arms, and body leaving serious bruising about her body.**

This crime is punishable by imprisonment up to 4 years or a fine of $5,000.

LARRY D. MOORE
DISTRICT ATTORNEY

By: _____
    Assistant District Attorney

I have examined the facts in this case and recommend that a warrant do issue.

By: _____
    Assistant District Attorney

295

Subscribed and sworn to before me this _26_ day of April, 2007.

*Melody Hazelwood*
NOTARY PUBLIC

My Commission expires:

| NOTARY PUBLIC IN AND FOR STATE OF OKLAHOMA | Melody Hazelwood Muskogee County Comm. Exp. 11-01-09 #05010119 |
|---|---|

**WITNESSES ENDORSED FOR THE STATE OF OKLAHOMA**

Jan Ray,  MUSKOGEE COUNTY SHERIFF'S OFFICE, 220 State Street , Muskogee OK
L.D.L., C/O DHS, P.O. Box 608, Muskogee OK  74401
C.L., C/O DHS, P.O. Box 608 Muskogee, OK 74401
Kory  McCorkle, 9801 S. Sheridan, Tulsa OK  74133
Doris  Branscum, C/O Jan Ray, Muskogee County Sheriff's Office, 220 State St., Muskogee OK  74401
Marc  Barnette, 308 S. Tyler, Muskogee OK  74401

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR MUSKOGEE COUNTY

THE STATE OF OKLAHOMA,           )
                                 )
        Plaintiff,               )
                                 )
vs.                              )        Case No.  CF-2007-369
                                 )
DAWN LITTLEFIELD                 )
SSN:        -0275                )
DOB:      /68                    )
                                 )
        Defendant,               )

## SUPPLEMENTAL INFORMATION FOR

I, **Larry D. Moore**, the undersigned District Attorney of said County, in the name and by the authority of the State of Oklahoma, and in addition to the original information filed herein, further inform the Court as follows:

THAT the said defendant was heretofore on June 29, 2006, represented by an attorney in case number CF-2006-244, in the District Court of County, Oklahoma, convicted of the crime of: DOMESTIC ASSAULT & BATTERY, a MISDEMEANOR and sentenced to 1 year suspended, which was a final conviction;

LARRY D. MOORE
DISTRICT ATTORNEY

By: _____
Assistant District Attorney

IN THE DISTRICT COURT IN AND FOR MUSKOGEE COUNTY
STATE OF OKLAHOMA

The State of Oklahoma

Plaintiff:

-vs-

Dawn Littlefield

Defendant(s)

Case Number: 2803230

## Affidavit

The undersigned upon oath deposes and states as follows, to wit:

Affiant advises that on the | 23nd | day of | March |, 2007___ at approximately | 10:00 | Hours, the following incidents occurred at | Oktaha, Oklahoma |

Muskogee, Muskogee County, Oklahoma.

> On Thursday, March 22, 2007 I deputy Jan Ray went to the residence of Dawn and Mike Littlefield on a possible abuse case involving their daughter Lacy Littlefield age 17. While at the residence DHS worker Melissa Todd and myself observed bruises on Lacy Littlefield's upper arms, wrist and shoulder. Lacy Littlefield stated to us that her Mother Dawn Littlefield and hit her several times 4 days ago. Lacy states that her Mother Dawn Littlefield caught Lacy talking to her boyfriend on the phone and Dawn Littlefield became angry.

Based on this information, the undersigned prays that this Honorable Court issue a finding of fact that probable cause exist to believe that a crime has been committed and that there is probable cause to believe the defendant(s) above named committed that crime.

_____
Affiant Signature

SUBSCRIBED AND SWORN TO ME on this | 20th | day of | Apr |, 20 | 07 |

My Commission number

NOTARY PUBLIC IN AND FOR STATE OF OKLAHOMA

Carrie L. Thornton
Muskogee County
Comm. Exp. 08-09-10
#00007785

My Commission expires

_____
Notary Public

297

IN THE DISTRICT COURT IN AND FOR MUSKOGEE COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,
                    PLAINTIFF,

-VS-                                                    CASE NO. CF-2007-369

DAWN LITTLEFIELD
                    DEFENDANT(S),

## FINDING OF PROBABLE CAUSE

The undersigned Judge of this Court, upon sworn testimony and/or affidavit, hereby determines there to be probable cause to detain the defendant(s).

Dated this ___26___ day of April, 2007.

_____
JUDGE OF THE DISTRICT COURT
MUSKOGEE COUNTY, OKLAHOMA

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR MUSKOGEE COUNTY

THE STATE OF OKLAHOMA,
     Plaintiff,              )
                                 )

vs.                            )     Case No. CF-2007-369

DAWN LITTLEFIELD
ADDR: █████████████
     OKTAHA, OK  74450
SSN: ████████0275
DOB: ██████68
     Defendant(s),

**FELONY WARRANT**

STATE OF OKLAHOMA, COUNTY OF MUSKOGEE, TO ANY LAW ENFORCEMENT OFFICER:

YOU ARE HEREBY COMMANDED to forthwith arrest and take said **DAWN LITTLEFIELD** into custody for the offense(s) of:

COUNT 1:    DOMESTIC ABUSE - ASSAULT AND BATTERY 2nd & SUBSEQUENT~
               21 O.S. § 644(C) a **FELONY**

and bring her before me or some other Magistrate having cognizance of the case, to be dealt with according to law. You are further directed to execute this writ or warrant either in daytime or nighttime.

Bond for the release of the above named defendant, to guarantee said defendant's appearance in all the Court's proceedings herein, be and the same is hereby fixed in the sum of $ 1500.00 until the further Order of the Court.

Dated this 26th day of April, 2007.

_____
Judge of the District Court

Presenting Agency:    MUSKOGEE COUNTY SHERIFF'S OFFICE    Agency Case Number:

EXTRADITE / ENTER NCIC:    YES    NO

Circle ONE:    LOCAL ONLY    ALL STATES    SURROUNDING STATES

Identifiers:    Gender:  Female             Race:     White
             Height:   5' 6"             Eye Color:  GREEN
             Weight:  130 lbs.          Hair Color:
             DL #:
             Markings:

## OFFICER'S REPORT

STATE OF OKLAHOMA, COUNTY OF MUSKOGEE

Received the within writ on the _____ day of April, 2007 and executed the same by taking into custody **DAWN LITTLEFIELD** and presenting her before the court this_____day of April, 2007

**Fees:** Arresting _____ persons at $ _____ each $_____

_____ miles at $_____ per mile $_____

TOTAL $_____

By: _____
Law Enforcement Officer

## FELONY & MISDEMEANOR MINUTES

CASE NO. **CF-07-369**

CASE NO. _____

CASE NO. _____

CASE NO. _____

CASE NO. _____

DATE: **April 26**, 2007

DEFT: **Dawn Littlefield**

ATTY: **Donn Baker**

PLED NOT GUILTY SET DISPOSITION DOCKET

_____

_____

### STATE:

LARRY MOORE_____ JAMES WALTERS_____
JEFF SHERIDAN_____ JIM CARNAGEY_____
NIKKI BAKER-DOTSON **X**
OTHER_____

ST REQUESTED BOND:$_____

_____

_____

_____

_____

*SOUNDING /* (*PRELIMINARY:*)

**5-30-07 @ 9:00 - TA**

_____

BOND SET:$ **1,500 -**

_____

_____

_____

*ACCELERATION / REVOCATION:*

_____

_____

_____

CASH BOND REDUCED TO $_____
TO PAY $_____ MO. BEGINS 30 DAYS.
IF NOT POSTED SET CONTEMPT.

PRIOR BOND EXONERATED:_____

*DCA / PLEA / REVIEW / CONTEMPT:*

_____

_____

(*OTHER:*)

**Judge Adair recuses**

_____

_____

_____

_____

_____

_____

_____

COURT APPOINTED ATTY:_____
DEFT NOTIFIED IF BOND IS MADE *HE/SHE*
MUST RETAIN OWN ATTY.

✓DEFT ADMONISHED FROM ALL
COMMUNICATION WITH ANY
WITNESS/VICTIM:_____ **X**_____

DEFT NOTIFIED OF RIGHT TO CALL
EMBASSY_____.

NEED _____ INTERPRETER.

*JUDGE:*
ADAIR_____ ROBINSON **X**_____
ALFORD_____ NORMAN_____
THYGESEN_____ OTHER_____

DEFENDANT FAILED TO APPEAR ISSUE:
BENCH WARRANT:____ BOND FORFEITURE:____

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE
FILED

2007 APR 30  AM 8: 32

PAULA SEXTON
COURT CLERK

IN THE DISTRICT COURT OF MUSKOGEE COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,      )
                       )
    Plaintiff          )
Vs.                    )   Case No. CF-2007-369
                       )
Dawn Michelle Littlefield,   )
                       )
    Defendant.         )

# **MOTION FOR DISCOVERY**

COMES NOW Dawn Michelle Littlefield, by and through her attorney of record, Donn F. Baker, and moves this Court for a Discovery Order.

Movant request that the State disclose and provide the following materials and information within that party's possession or control;

1.  The names and addresses of any witness the State plans to call at trial, together with their relevant oral, written or recorded statement, or summaries of the same;

2.  Any written or recorded statements and the substance of any oral statements made by any party in this case;

3.  Any reports or statements made by experts in connection with the instant case, including results of physical or mental examination and of scientific tests, experiments or comparisons;

4.  Any books, papers, documents, photographs, tangible objects, buildings or places which the State intends to use in the trial.

5.  Any record of prior criminal conviction of the parties involved in this case.

6.  The OSBI or FBI rap sheet/record checks on any witness listed by the State or Defense as a possible witness who will testify at trial.

WHEREFORE, PREMISES CONSIDERED the movant prays that this Honorable Court order the State to comply with this Motion for Discovery and set forth a time for inspection and delivery prior to trial.

Respectfully Submitted,

By: _____

Donn F. Baker, OBA#443
Attorney at Law
319 West Delaware
Tahlequah, OK 74464
918-456-1233

## CERTIFICATE OF MAILING

I hereby certify that on the 27th day of April, 2007, I mailed a true, correct, and complete copy of the above and foregoing to: District Attorney, Muskogee County Courthouse, 220 State Street, Muskogee, OK 74401 with proper postage thereon.

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE
IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR MUSKOGEE COUNTY

2007 APR 30  AM 6:47

THE STATE OF OKLAHOMA,                    )
    Plaintiff,        PAULA SEXTON        )
            COURT CLERK        )
vs.                                        )        Case No. CF-2007-369
                        )
                        )
DAWN LITTLEFIELD                           )
ADDR: ███████████                          )
    OKTAHA, OK  74450                     )
SSN: ████0275                              )
DOB: ████/68                               )
    Defendant(s),                         )

## FELONY WARRANT

STATE OF OKLAHOMA, COUNTY OF MUSKOGEE, TO ANY LAW ENFORCEMENT OFFICER:

YOU ARE HEREBY COMMANDED to forthwith arrest and take said **DAWN LITTLEFIELD** into custody for the offense(s) of:

    COUNT 1:    DOMESTIC ABUSE - ASSAULT AND BATTERY 2nd & SUBSEQUENT-
                  21 O.S. § 644(C) a **FELONY**

and bring her before me or some other Magistrate having cognizance of the case, to be dealt with according to law.  You are further directed to execute this writ or warrant either in daytime or nighttime.

Bond for the release of the above named defendant, to guarantee said defendant's appearance in all the Court's proceedings herein, be and the same is hereby fixed in the sum of $ 1500.00 until the further Order of the Court.

Dated this 26th day of April, 2007.

                                            Judge of the District Court

**Presenting Agency:**    MUSKOGEE COUNTY SHERIFF'S OFFICE    Agency Case Number:

**EXTRADITE / ENTER NCIC:**    YES    NO

**Circle ONE:**    LOCAL ONLY    ALL STATES    SURROUNDING STATES

**Identifiers:**    Gender:  Female               Race:    White
              Height:  5' 6"                Eye Color:  GREEN
              Weight:  130 lbs.          Hair Color:
              DL #:
              Markings:

304

## OFFICER'S REPORT

STATE OF OKLAHOMA, COUNTY OF MUSKOGEE

Received the within writ on the _____ day of April, 2007 and executed the same by taking into custody **DAWN LITTLEFIELD** and presenting her before the court this____ day of April, 2007

**Fees:** Arresting _____ persons at $ _____ each $_____

_____ miles at $_____ per mile $_____

**TOTAL** $_____

By: _Terry Freeman · MCoID_____
Law Enforcement Officer

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR MUSKOGEE COUNTY

THE STATE OF OKLAHOMA,            )
    Plaintiff,                    )
                            )
vs.                               )      Case No.  CF-2007-369
                            )
DAWN LITTLEFIELD                  )
    Defendant(s),                 )

## SUBPOENA

STATE OF OKLAHOMA, COUNTY OF MUSKOGEE:

TO:    Kory Mccorkle, ██████████ Tulsa, OK  74133

You are hereby commanded to appear before the District Court of Muskogee County in the City of Muskogee on the **30th day of May, 2007, at 9:00 AM.**

then and there to testify on behalf of the State of Oklahoma as a witness in the above entitled case wherein the State of Oklahoma prosecutes the said **DAWN LITTLEFIELD** and you will remain in attendance and on call of said court from day to day and term to term until lawfully discharged.

*THIS YOU SHALL IN NO WAY OMIT UNDER PENALTY OF LAW*

Witness my hand and seal this __4__ day of May, 2007.

Paula Sexton, Court Clerk               LARRY D. MOORE, District Attorney

_____, Deputy   or   By: _____

## INSTRUCTIONS

- The Muskogee County Courthouse is located at **220 State Street, Muskogee.**
- **Report to the office of the District Attorney 30 minutes prior to the scheduled time.**
- **Do not go into the courtroom.**
- **Dress Appropriately.  Shorts are not permitted in the Courtroom**
- **If you are traveling from out of county or state, receipts for food and lodging MUST be retained for possible reimbursement by the District Attorney's Office.**

This case is presently set for **Preliminary Hearing.**  Please check beforehand to see if your attendance is still required at the above printed time and date. During the week, between the hours of 8:00 AM and 5:00 PM, you may call the Muskogee County District Attorney's Office at (918)682-9400. If your case is rescheduled, a *new subpoena* will be issued notifying you of your new appearance time and date.

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE
{00} MAY 18 AM 11: 37
PAULA SEXTON
COURT CLERK

**IN AND FOR THE EAST CENTRAL JUDICIAL ADMINISTRATIVE DISTRICT**
**STATE OF OKLAHOMA**

**ORDER OF ASSIGNMENT**
**ECJA -7**

Pursuant to the Rule on Administration of Courts, 20 O.S., Ch.1, App. 2, Rule 2, proper request and showing of good cause, the undersigned ORDERS and DIRECTS the assignment of:

**DARRELL G. SHEPHERD ASSOCIATE DISTRICT JUDGE**

to the District Court of Muskogee County, Oklahoma to take required Judicial action in the case of:

STATE OF OKLAHOMA

VS.                                    Case No. CF-2007-369

DAWN MICHELLE LITTLEFIELD

This assignment is effective today and until final disposition of the Preliminary Hearing. The attorneys are directed to contact Judge Darrell G. Shepherd for hearing date and time.

Dated:

_____
THOMAS H. ALFORD, Presiding Judge
East Central Judicial Administrative District

COPIES:

COURT ADMINISTRATOR: Mike Evans, Administrative Director of the Courts, 1915 N. Stiles, Suite 305, Oklahoma City, OK 73105

ASSIGNED JUDGE: Darrell G. Shepherd, Wagoner County Courthouse , 307 East Cherokee Street Wagoner, OK 74467

COURT CLERK: Paula Sexton

ATTORNEY FOR DEFENDANT: Donn F. Baker, 319 West Delaware Street, Tahlequah, OK 74401

**IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF THE STATE OF OKLAHOMA SITTING IN AND FOR MUSKOGEE COUNTY**

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CF-2007-369 |
| | ) | |
| DAWN LITTLEFIELD, | ) | |
| Defendant. | ) | |

## ORDER SETTING HEARING

Plaintiff's Motion to Allow Child Witness Testimony by Alternative Method having been filed herein;

IT IS HEREBY ORDERED that the same is scheduled for hearing before the Honorable Darrell Shepherd on the 22nd day of June, 2007 at 9:00 a.m.

_____
JUDGE OF THE DISTRICT COURT

## CERTIFICATE OF DELIVERY

I do hereby certify that on the 11th day of June, 2007, I faxed a true and correct copy of the above and foregoing motion to Donn Baker, Attorney for Defendant at 918-456-7515.

_____

**IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF THE STATE OF OKLAHOMA SITTING IN AND FOR MUSKOGEE COUNTY**

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE

2007 JUN 11 PM 6: 20

PAULA SEXTON
COURT CLERK

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | Case No. CF-2007-369 |
| | ) | |
| DAWN LITTLEFIELD, | ) | |
| Defendant. | ) | |

### MOTION TO ALLOW CHILD WITNESS TESTIMONY BY ALTERNATIVE METHOD

Comes now the State of Oklahoma, hereinafter "the State", by and through Larry D. Moore, District Attorney for the Fifteenth Prosecutorial District, and in accordance with Title 12, O.S. § 2611.3, et seq., respectfully moves the Court to grant this Motion to Allow Child Witness Testimony by Alternative Method. In support thereof, the State would show the Court as follows:

1.) The above-named Defendant has been charged by Information with one count of Domestic Abuse-Assault and Battery.

2.) Said count is for a charge regarding alleged abuse as to the Defendant's minor daughter, L.L., who is seventeen (17) years old and as witnessed by the Defendant's minor son, C.L., who is ten (10) years old.

3.) Requiring the minor child, C.L., to testify in open Court and to be confronted face-to-face by the Defendant would likely result in serious emotional trauma that would substantially impair the child's ability to communicate with the findings of fact.

Wherefore, based upon the foregoing, the State prays that the Court grant its Motion herein.

Respectfully submitted,

Larry D. Moore, District Attorney

By: _Larry D. Moore_ _____

309

## CERTIFICATE OF DELIVERY

I do hereby certify that on the 11th day of June, 2007, I faxed a true and correct copy of the above and foregoing motion to Donn Baker, Attorney for Defendant at 918-456-7515.

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE
FILED

**IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF**
**THE STATE OF OKLAHOMA SITTING IN AND FOR MUSKOGEE COUNTY** 2007 JUN 11 PM 6:20

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | PAULA SEXTON |
| Plaintiff, | ) | COURT CLERK |
| | ) | |
| vs. | ) | Case No. CF-2007-369 |
| | ) | |
| DAWN LITTLEFIELD, | ) | |
| Defendant. | ) | |

## MOTION TO APPOINT ADVOCATE FOR CHILD WITNESS

Comes now the State of Oklahoma, hereinafter "the State", by and through Larry D. Moore, District Attorney for the Fifteenth Prosecutorial District, and in accordance with Title 12 O.S. § 2611.7(b), respectfully moves the Court to grant this Motion to Appoint Advocate for Child Witness. In support thereof, the State would show the Court as follows:

1.) Title 12 O.S. § 2611.7(b) allows the Court to appoint an advocate to monitor the potential for emotional trauma.

2.) The case at bar involves the alleged abuse by Defendant of her 17 year old daughter as witnessed by her 10 year old son.

3.) The child witness, the Defendant's 10 year old son, is likely to suffer severe emotional trauma when called to testify.

4.) 12 O.S. § 2611.7(b) requires that such an advocate be a Court Appointed Special Advocate ("CASA"), a registered professional social worker, a psychologist or a psychiatrist.

5.) The Court should appoint such an advocate, *sui asponte* and without need of hearing.

Wherefore, based upon the foregoing, the State prays that the Court grant its Motion herein.

Respectfully submitted,

Larry D. Moore, District Attorney

By: _____

311

## CERTIFICATE OF DELIVERY

I do hereby certify that on the 11th day of June, 2007, I faxed a true and correct copy of the above and foregoing motion to Donn Baker, Attorney for Defendant at 918-456-7515.

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR MUSKOGEE COUNTY

|                        |   |                         |
|------------------------|---|-------------------------|
| THE STATE OF OKLAHOMA, | ) |                         |
|                        | ) |                         |
| Plaintiff,             | ) |                         |
|                        | ) |                         |
| vs.                    | ) | Case No. CF-2007-369    |
|                        | ) |                         |
| DAWN LITTLEFIELD,      | ) |                         |
|                        | ) |                         |
| Defendant(s),          | ) |                         |
|                        | ) |                         |

## MOTION TO DISMISS

I, **Larry D. Moore**, the undersigned District Attorney of said County, in the name and by the authority of the State of Oklahoma, moves the Court to dismiss the above entitled cause without prejudice for the following reason, to wit:

In the best interest of justice.

WHEREFORE, Larry D. Moore, District Attorney, moves the court to dismiss the above entitled cause without prejudice.

DATED this __3rd__ day of August, 2007.

LARRY D. MOORE,
DISTRICT ATTORNEY

James E. Walters
Assistant District Attorney

## ORDER

NOW, on this __3rd__ day of August, 2007, this case comes on to be heard before me, the undersigned Judge in and for Muskogee County, State of Oklahoma, and the Court being fully advised in the premises FINDS that said case should be dismissed without prejudice, and the same is HEREBY DISMISSED at the costs to the Defendant ordered waived and said Defendant is discharged and the bondsman is released from any liability herein.

Judge of the District Court

313

314

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 190**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP


314

OKLAHOMA HIGHWAY PATROL
OKLAHOMA UNIFORM VIOLATIONS COMPLAINT

Case No. _____ Docket No. _____ Page No. _____

State of Oklahoma

County of _Muskogee_ } -ss-

In The District Court

COMPLAINT-INFORMATION   DPS E611925

The undersigned, being duly sworn, upon his oath deposes and says that:

| on or about (date) | at (24 hour time) | at or near (location) |
|---|---|---|
| 01-07-08 | 0612 | Wainwright Rd Toll Rd 69 Hwy |

| County Number | 51 | East Control-Int. | 0 5 3 3 | North Location | 0 4 8 0 |

within the city, county and state aforesaid:

Name (last, first, middle) _Littlefield, Dawn M_   Phone Number _478-3647_

Address ███████████████████████

City _OKtaha_   State _OK_   Zip Code _74450_

| Birthdate (mo., day, yr) | Height | Weight | Race | Sex | Class | Endorsements |
|---|---|---|---|---|---|---|
| ██ 68 | 505 | 145 | W | F | D | — |

Driver License Number _F-0828 69786_   Withdrawal ☐Y ☑N   Month/Year _____   State _OK_

Employer _____   Did Unlawfully   Operate ☑   Park ☐

| Vehicle-Make | Year | Body Style-Color | Tag Number | Year | State |
|---|---|---|---|---|---|
| TOYO | 98 | 4D RED | 960 CZT | 08 | OK |

Commercial Motor Vehicle ☐Y ☑N   ☐Haz. Mat. Placard   ACCIDENT: ☑PD ☐PI ☐FATALITY

and did then and there commit the following offense:

| SPEEDING | MPH in | MPH Zone | Pace ☐ | Radar ☐ | Plane ☐ | Other ☐ |
|---|---|---|---|---|---|---|

Other Violation: _Fail to Stop at stop Sign_

Contrary to Title _47_ Section _11-403 B_   Oklahoma Statutes

I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents thereof and that the facts supporting the criminal charge stated therein are true.

_____ Signature of Officer   _01-07-08_ Date   Badge No. _812_ Troop _C_

Sworn to and subscribed before me this _____ day of _____ .20 _____

_____ Name and Title   My Commission Expires _____

Court Appearance: _15_ day of _MAY_ .20 _08_ at _1:00_ M   (DPS USE)

Address of Court _220 State St. Muskogee_

NOTICE: Release upon personal recognizance based upon a signed written promise to appear for arraignment is conditional and failure to timely appear for arraignment shall result in suspension of the arrested person's driver license in Oklahoma, or in the nonresident's home state pursuant to the Nonresident Violator Compact.

WITHOUT ADMITTING GUILT, I promise to appear in said court at said time and place.

X Signature: _____

(CHECK ONE BOX ONLY)

| ☐ Signed Personal Recognizance | ☐ Bond Attached | ☐ Magistrate | ☐ Jail | ☑ Other |
|---|---|---|---|---|

☐ Juvenile   Name of Parent or Guardian _____   Address _____

Officer's Remarks: _____

AREA: ☐ business  ☐ industrial  ☐ school  ☐ residential  ☑ rural

HIGHWAY TYPE: ☐ 1 lane  ☑ 2 lane  ☐ 3 lane  ☐ 4 or more undivided  ☐ 4 or more divided  ☐ on/off ramp

E611925

NAME   Last   First   Middle   DPS

Dawn
Settlefun
tich
Ben

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

REDACTED EXHIBIT 191

TO KENNETH EUGENE BARRETT'S

SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255             *U.S. v. Barrett*, 6:09-cv-00105-JHP


317

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE
FILED

**In the District Court In and For Muskogee County**
**State of Oklahoma**

2007 JUN 12 AM 9: 44

PAULA SEXTON
COURT CLERK

| | | |
|---|---|---|
| State of Oklahoma, | ) | |
| | ) | |
| Plaintiff, | ) | |
| Vs. | ) | Case No. CF-2006-244 |
| | ) | |
| Dawn Littlefield, | ) | |
| | ) | |
| Defendant. | ) | |

## WAIVER OF 20 DAY RULE

COMES NOW the Defendant, Dawn Littlefield, by and through her attorney, Donn F. Baker and informs the Court that she hereby waives the 20 day rule wherein she must have a revocation hearing within 20 days. That the Defendant, Defendant's counsel and State's attorney, James Walters, have agreed that the application to revoke will trail the disposition of felony case number CF-2007-369.

Respectfully submitted,

DAWN MICHELLE LITTLEFIELD
Defendant

Donn F. Baker, OBA#443
Attorney at Law
319 West Delaware
Tahlequah, OK 74464
(918) 456-1233

ATTORNEY FOR DEFENDANT

## CERTIFICATE OF MAILING

I, Donn F. Baker, hereby certify that on the 24 day of May, 2007, mailed a true and correct copy of the foregoing to: James Walter, Assistant District Attorney, Muskogee County Courthouse, 220 State Street, Muskogee, OK  74401; Judge Darrell Shepherd, Wagoner County Courthouse, 307 E. Cherokee St., Wagoner, OK 74467 with proper postage affixed thereon.

# IN THE DISTRICT COURT OF Muskogee COUNTY, STATE OF OKLAHOMA
## BENCH WARRANT:FAILURE TO PAY

STATE OF OKLAHOMA
       Plaintiff.

VS.

DAWN MICHELLE LITTLEFIELD
D.O.B.: ████68    Defendant.
SS #: ████0275

2007 DEC 21   AM 8:50

COURT CLERK

CASE NO:    CF-06-00244

THE STATE OF OKLAHOMA,
To any Sheriff, Constable, Marshal or Policeman in this State:

GREETINGS:  WHEREAS, an INFORMATION having been filed in the District Court of Muskogee County,
State of Oklahoma, charging:

**DAWN MICHELLE LITTLEFIELD**
████████████████

**OKTAHA, OK  74450**

**474-7647**
**OK DL #: 082408411          EXP DATE: 5-07**
**5FT 6IN 135 LBS EYES-GREEN HAIR-RED**

### BENCH WARRANT:FAILURE TO PAY

You are therefore commanded forthwith to arrest the above named defendant and bring said defendant before the
the District Court of Muskogee County to answer said Charge, or if the Court has adjourned for the term, that you
deliver said defendant into the custody of the Sheriff of Muskogee County, to be detained by said Sheriff until the
further order of the Court, or until bond is posted as listed below.

Bond Amount: $ _400.00 Cash_

       GIVEN UNDER MY HAND AND SEAL of said Court, this 20th day of _Dec_, 20 07
       BY ORDER OF THE COURT:

_____
                Judge

### OFFICER'S RETURN

I received this FAILURE TO APPEAR BENCH WARRANT on the _____ day of _____, 20 ____, and
EXECUTED THE SAME on the _31st_ day of _December_, 20 _07_.

BY: _Recalled By Judge Adair_

                CHARLES PEARSON
                Sheriff, Muskogee County          SHERIFF

BY _____ DEPUTY/UNDERSHERIFF

321

# IN THE DISTRICT COURT OF Muskogee COUNTY, STATE OF OKLAHOMA
## BENCH WARRANT:FAILURE TO PAY

STATE OF OKLAHOMA
        Plaintiff.

VS.

2007 DEC 21   AM 8:50

PAULA SEXTON
COURT CLERK

CASE NO:    CF-06-00244

DAWN MICHELLE LITTLEFIELD
D.O.B.: ████68  Defendant.
SS #: ████0275

THE STATE OF OKLAHOMA,
To any Sheriff, Constable, Marshal or Policeman in this State:

GREETINGS: WHEREAS, an INFORMATION having been filed in the District Court of Muskogee County, State of Oklahoma, charging:

**DAWN MICHELLE LITTLEFIELD**
████████████

**OKTAHA, OK  74450**

**474-7647**
**OK DL #: 082408411          EXP DATE: 5-07**
**5FT 6IN 135 LBS EYES-GREEN HAIR-RED**

### BENCH WARRANT:FAILURE TO PAY

You are therefore commanded forthwith to arrest the above named defendant and bring said defendant before the the District Court of Muskogee County to answer said Charge, or if the Court has adjourned for the term, that you deliver said defendant into the custody of the Sheriff of Muskogee County, to be detained by said Sheriff until the further order of the Court, or until bond is posted as listed below.

Bond Amount: $ 400.00 Cash

GIVEN UNDER MY HAND AND SEAL of said Court, this 20th day of Dec , 2007
BY ORDER OF THE COURT:

_____
Judge

### OFFICER'S RETURN

I received this FAILURE TO APPEAR BENCH WARRANT on the _____ day of _____, 20 ____, and EXECUTED THE SAME on the _____ day of _____, 20 _____.

BY:_____

_____SHERIFF

BY_____DEPUTY/UNDERSHERIFF

321

**RETURN**

Received the within writ on the _____ day of _____ , _____ at _____A.M./P.M

and executed on the _____ day of _____ , _____ at _____A.M./P.M

BY:   _____   Mailing in the U.S. mail, postage prepaid thereon

_____   Personal service by sheriff

_____   Personal service by District Attorney's Office

**CHARLES PEARSON**

**Sheriff, Muskogee County**

Dated this  _21st_  day of  _May_ , _2007_

_Cecilia Collins_

I hereby certify that the within to be a
true copy of the original subpoena

| | | |
|---|---|---|
| Serving first paper | $ _____ | |
| Additional person | $ _____ | |
| Copies | $ _____ | |
| Mileage | $ _____ | |
| Total | $ _____ | |

_Probation + parole_
_Served to P+P bar_
_at MSO 5p-/07_

IN THE DISTRICT COURT IN AND FOR ~~WAGONER~~ Muskogee COUNTY
DIVISION, STATE OF OKLAHOMA

_State of Oklahoma_ )
)
)
_____ )
Plaintiff, )
vs. )
) CASE NO. _CF-06-244_
_____ )
_Dawn Michelle Littlefield_ )
) COURT MINUTE
) (SUMMARY)
_____ )
Defendant. )

_Darrell Shepherd_____ Judge.

_____ Reporter.

Date: __5-22-07____   Time: _____

Plaintiff's Attorney   _ADA James Walters_

Defendant's Attorney   _Donn Baker_

Other   _____

CAUSE COMES ON FOR: _____

RULING/FINDING BY COURT: _Rev. hrg. re-set for 6/22/07_
_@ 9:00 A.M.  Defendant will waive 20 day rule_
_per phone call from undersigned to Donn Baker._

_____

_____

☐ Clerk ordered to send stamped, filed copy.

ORDERED TO DRAW JOURNAL ENTRY

JUDGE OR COURT CLERK

CERTIFICATE OF MAILING

Copy of the above minute was mailed on this _____ day of _____,
20____, to all attorneys of record as shown on the Civil Docket.

\JudithSkeen\FORMS\Court Minute.summary.doc

**In the District Court In and For Muskogee County**
**State of Oklahoma**

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE
FILED

2007 MAY 24  AM 12: 12

| | |
|---|---|
| State of Oklahoma,  )  | PAULA SEXTON |
| )  | COURT CLERK |

State of Oklahoma,                )
                                  )
        Plaintiff,                )
Vs.                               ). Case No. CF-2006-244
                                  )
Dawn Littlefield,                 )
                                  )
        Defendant.                )

### WAIVER OF 20 DAY RULE

COMES NOW the Defendant, Dawn Littlefield, by and through her attorney,

Donn F. Baker and informs the Court that she hereby waives the 20 day rule wherein she

must have a revocation hearing within 20 days.  That the Defendant, Defendant's counsel

and State's attorney, James Walters, have agreed that the application to revoke will trail

the disposition of felony case number CF-2007-369.

Respectfully submitted,

DAWN MICHELLE LITTLEFIELD
Defendant

Donn F. Baker, OBA#443
Attorney at Law
319 West Delaware
Tahlequah, OK  74464
(918) 456-1233

ATTORNEY FOR DEFENDANT

324

## CERTIFICATE OF MAILING

    I, Donn F. Baker, hereby certify that on the *24* day of *May*, 2007, mailed a true and correct copy of the foregoing to: James Walter, Assistant District Attorney, Muskogee County Courthouse, 220 State Street, Muskogee, OK 74401; Judge Darrell Shepherd, Wagoner County Courthouse, 307 E. Cherokee St., Wagoner, OK 74467 with proper postage affixed thereon.

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR MUSKOGEE COUNTY

THE STATE OF OKLAHOMA,                    )
    Plaintiff,                            )
                                          )
vs.                                       )       Case No.  CF-2007-369 &
                                          )                 CF-2006-244
DAWN LITTLEFIELD                          )
    Defendant(s),                         )

### SUBPOENA

STATE OF OKLAHOMA, COUNTY OF MUSKOGEE:

TO:    Jan Ray, MUSKOGEE COUNTY SHERIFF'S OFFICE, 220 State Street , Muskogee, OK
        L.D.L., c/o DHS, 32nd Street, Muskogee, OK
        C.L., c/o DHS, 32nd Street, Muskogee, OK
        Doris Branscum, c/o Jan Ray, MSO, 220 State St., Muskogee, OK
        Marc Barnette, ▮▮▮▮▮▮ Wagoner, OK
        Probation & Parole, 3105 Azalea Park Drive, Muskogee, OK

You are hereby commanded to appear before the District Court of Muskogee County in the City of Muskogee on the **22nd day of June, 2007, at 9:00 AM.**

then and there to testify on behalf of the State of Oklahoma as a witness in the above entitled case wherein the State of Oklahoma prosecutes the said **DAWN LITTLEFIELD** and you will remain in attendance and on call of said court from day to day and term to term until lawfully discharged.

***THIS YOU SHALL IN NO WAY OMIT UNDER PENALTY OF LAW***

Witness my hand and seal this 24th day of May, 2007.

Paula Sexton, Court Clerk                        LARRY D. MOORE, District Attorney

_____, Deputy      or      By: _____

### INSTRUCTIONS

* **The Muskogee** County Courthouse is located at **220 State Street, Muskogee.**
* **Report to the office of the District Attorney 30 minutes prior to the scheduled time.**
* **Do not go into the courtroom.**
* **Dress Appropriately.  Shorts are not permitted in the Courtroom**
* **If you are traveling from out of county or state, receipts for food and lodging MUST be retained for possible reimbursement by the District Attorney's Office.**

This case is presently set for **Preliminary Hearing/Revocation Hearing.**  Please check beforehand to see if your attendance is still required at the above printed time and date. During the week, between the hours of 8:00 AM and 5:00 PM, you may call the Muskogee County District Attorney's Office at (918)682-9400. If your case is rescheduled, a *new subpoena* will be issued notifying you of your new appearance time and date.

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE
FILED
**IN THE DISTRICT COURT OF MUSKOGEE COUNTY**
**THE STATE OF OKLAHOMA**
2007 FEB 21  PM 4: 01

PAULA SEXTON
COURT CLERK

| | |
|---|---|
| **THE STATE OF OKLAHOMA,**<br>        **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Case No.   CF-2006-244** |
| | ) |
| **DAWN MICHELLE LITTLEFIELD** | ) |
| SSN: ███████0275 | ) |
| DOB: ██████/68 | ) |
|         **Defendant,** | ) |

## JUDGMENT AND SENTENCE

Now, on this 29th day of June, 2006, this matter comes on before the undersigned Judge for sentencing and the Defendant, **DAWN MICHELLE LITTLEFIELD**, appears personally and by her attorney, Chad Richardson, the State of Oklahoma represented by David Pierce, and the Defendant, having previously Count 1: PLED GUILTY OF OTHER
to/of the crime(s) of:

Count 1:  ASSAULT AND BATTERY DOMESTIC, a MISDEMEANOR,
         committed on or about the 10th day of March, 2006

(X)     **IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** by the Court that the Defendant, **DAWN MICHELLE LITTLEFIELD**, is guilty of the above described offenses and is sentenced as follows:

### TERM OF IMPRISONMENT WITH EXECUTION OF SENTENCE SUSPENDED

(Attach additional sheet(s) to clarify, if necessary)

Count 1 Sentenced to a term of 1 year in the Oklahoma Department of Corrections.

All of said term(s) of imprisonment suspended pursuant to the rules and conditions of probation entered by the court.

 Under the custody and control of:

        **IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT** that in addition to the preceding terms, the Defendant is also sentenced to:

### COSTS, VCA AND RESTITUTION

Fine: $200.00

VCA:$100

Court costs as accrued.

### SPECIAL RULES AND CONDITIONS OF PROBATION

**IT IS FURTHER ORDERED** that judgment is hereby entered against the Defendant as to the fines, costs, and assessments set forth above.

The Court further advised the Defendant of her rights and procedure to appeal to the Court of Criminal Appeals of the State of Oklahoma, and of the necessary steps to be taken by her to perfect such appeal, and that if she desired to appeal and was unable to afford counsel and a transcript of the proceedings, that the same would be furnished by the State subject to reimbursement of the cost or representation in accordance with Sec. 1335.14 of Title 22.

In the event the above sentence is for incarceration in the Department of Corrections, the Sheriff of Muskogee County, Oklahoma is ordered and directed to deliver the Defendant to the Lexington Assessment and Reception Center at Lexington, Oklahoma, and leave therewith a copy of this Judgment and Sentence to serve as warrant authority of the Sheriff for the transportation and the imprisonment of the Defendant as herein before provided.  The Sheriff to make due return to the clerk of this Court, with his proceedings endorsed thereon.

**WITNESS** my hand the day and year first above mentioned.

_____
Judge of the District Court

(SEAL)

ATTEST:  Paula Sexton, Court Clerk

_____
Deputy Clerk

## CLERK'S CERTIFICATION OF COPIES

I, Paula Sexton, Clerk of the District Court of Muskogee County, State of Oklahoma, do hereby certify the foregoing to be true, correct, full and complete copy of the original Judgment and Sentence in the case of Oklahoma v. **DAWN MICHELLE LITTLEFIELD** as the same appears of record in my office.

WITNESS my hand and official seal this _____ day of February, 2007.

(SEAL)

Paula Sexton, Court Clerk

By:  _____
Deputy Clerk

## SHERIFF'S RETURN

I received this Judgment and Sentence the _____ day of February, 2007, and executed it by delivering the Defendant to the Lexington Assessment and Reception Center at Lexington, Oklahoma, on the _____ day of February, 2007.

I also certify the above prisoner has served _____ days in the County Jail on the present charge or charges.

Charles Pearson, Sheriff

_____
Deputy Sheriff

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR MUSKOGEE COUNTY

THE STATE OF OKLAHOMA,
     Plaintiff,             )
                               )
vs.                            )     Case No.   CF-2006-244

DAWN MICHELLE LITTLEFIELD

ADDR:  █████████
       Wainwright, OK  74468
SSN:    █████0275
DOB:    ████1968

       Defendant(s),

## APPLICATION TO REVOKE SUSPENDED SENTENCE

    I, **Larry D. Moore**, the undersigned District Attorney of said County, in the name and by the authority of the State of Oklahoma, show that the above-named Defendant **DAWN MICHELLE LITTLEFIELD**, on the 29th day of June, 2006 previously:

COUNT 1      PLED GUILTY OF OTHER

to/of the crime(s) of:

COUNT 1      DOMESTIC ASSAULT & BATTERY ~ 21 O.S. § 644(C) a MISDEMEANOR

    **FURTHER, THAT** on the 29th day of June, 20067, the Court sentenced the above-named Defendant to:

       (X)  Count 1    Sentenced to a term of 1 year suspended, under the custody and control of the pursuant to the rules and conditions of probation entered by the court under statutory and/or Court-imposed rules of probation.

    **FURTHER, THAT** the said Defendant is in violation of the terms and conditions of probation of said Judgment and Sentence, to-wit:

    Dawn Littlefield drug her 17 year old child out of the backseat of a car, throwing her into the front seat, and began to beat her about her face, body, and arms leaving serious bruising about her body.

    That the aforesaid acts violated the conditions and is good cause for the Court to revoke said suspended sentence.

    **WHEREFORE, THE STATE OF OKLAHOMA** requests that the Court set a date for hearing this Petition and that the suspension clause in said Judgment and Sentence be set aside and revoked, and that the sentence be carried out in full, according to its terms.

    DATED THIS ⁴ᵗʰ day of May, 2007.

                         LARRY D. MOORE
                         DISTRICT ATTORNEY

                         By:_____
                         Assistant District Attorney

# IN THE DISTRICT COURT OF Muskogee COUNTY, STATE OF OKLAHOMA
## BENCH WARRANT:APPL TO REVOKE

STATE OF OKLAHOMA
      Plaintiff.

VS.

DAWN MICHELLE LITTLEFIELD
D.O.B.: ███ /68   Defendant.
SS #: ███ 0275

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE

2007 MAY 08 AM 10: 46
4

PAULA SEXTON
COURT CLERK    CASE NO:   CF-06-00244

THE STATE OF OKLAHOMA,
To any Sheriff, Constable, Marshal or Policeman in this State:

GREETINGS: WHEREAS, an INFORMATION having been filed in the District Court of Muskogee County, State of Oklahoma, charging:

**DAWN MICHELLE LITTLEFIELD**

████████

**OKTAHA, OK 74450**

**474-7647**
**OK DL #: 082408411       EXP DATE: 5-07**
**5FT 6IN 135 LBS EYES-GREEN HAIR-RED**

### BENCH WARRANT:APPL TO REVOKE

You are therefore commanded forthwith to arrest the above named defendant and bring said defendant before the the District Court of Muskogee County to answer said Charge, or if the Court has adjourned for the term, that you deliver said defendant into the custody of the Sheriff of Muskogee County, to be detained by said Sheriff until the further order of the Court, or until bond is posted as listed below.

Bond Amount: $ _____

GIVEN UNDER MY HAND AND SEAL of said Court, this 4 day of May , 2007.
    BY ORDER OF THE COURT:

_____
              Judge

### OFFICER'S RETURN

I received this FAILURE TO APPEAR BENCH WARRANT on the _____ day of _____, 20 ____ , and EXECUTED THE SAME on the _____ day of _____, 20 _____ .

BY: _____

_____ SHERIFF

BY _____ DEPUTY/UNDERSHERIFF

330

# COMMITMENT/RELEASE

THE STATE OF OKLAHOMA
MUSKOGEE COUNTY

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE
)ss            FILED
2007 MAY 18 AM 6: 51
PAULA SEXTON
COURT CLERK

IN THE DISTRICT COURT
BEFORE _____JUDGE

To the Sheriff of the County of Muskogee:

An order having been this day made by me, that _____ Dawn Littlefield _____ be held to answer upon charge(s) of:

| CHARGES | CASE # | BOND REQUIRED $ |
|---|---|---|
| Amp to Rev. | CF-06-244 | Recog - to Don Baker |
|  |  |  |
|  |  |  |
|  |  |  |

FINES _____ COSTS _____

SENTENCE _____

INCARCERATE: DOC____COUNTY JAIL____WEEKENDS____DOC IN CO. JAIL____ (Bondsman_____)

Waives 10 days:     YES_____     NO_____

You are commanded to:

_____ release him/her from your custody in the above cases

_____ receive him/her into your custody and detain until legally discharged.

Dated at Muskogee, this _____17th_____ day of _____May_____, 20 07

THE STATE OF OKLAHOMA
MUSKOGEE COUNTY

_____
JUDGE

331

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE
FILED

2007 MAY 18 AM 6: 52

# IN THE DISTRICT COURT IN AND FOR MUSKOGEE COUNTY SEXTON
## STATE OF OKLAHOMA
COURT CLERK

<u>State of Oklahoma</u>        )        Case Number: *CF-06-244*
    Plaintiff       )

Vs.

*DAWN Littlefield*
Defendant

## RECOGNIZANCE RELEASE

The undersigned attorney herewith requests that the above named defendant be released from the Muskogee County/City Detention Facility on his/her recognizance and in my custody to appear for all necessary court appearances in the district court before a District Judge on __30__day of __MAY__, 200 7 at _____.
                                           (time)

The undersigned agrees that if the defendant should fail to appear at said time and place, he/she, the attorney, will immediately cause his/her appearance or cause an appearance bond to be posted for and on the behalf of the defendant in such sum as the court shall require, and in the event of the failure of said defendant to appear or bond posted, said attorneys recognizance privilege will be removed by the court.

Date: __17__ day of __MAY__, 200 7

_____
Signature of Attorney for Defendant

_____
Name of Attorney (Printed)

_____
Signature of Defendant

332

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE

## IN AND FOR THE EAST CENTRAL JUDICIAL ADMINISTRATIVE DISTRICT
### STATE OF OKLAHOMA
2007 MAY 18  AH 11: 37

### ORDER OF ASSIGNMENT
### ECJA -8

PAULA SEXTON
COURT CLERK

Pursuant to the Rule on Administration of Courts, 20 O.S., Ch.1, App. 2, Rule 2, proper request and showing of good cause, the undersigned ORDERS and DIRECTS the assignment of:

**DARRELL G. SHEPHERD ASSOCIATE DISTRICT JUDGE**

to the District Court of Muskogee County, Oklahoma to take required Judicial action in the case of:

STATE OF OKLAHOMA

VS.                           Case No. CF-2006-244

DAWN MICHELLE LITTLEFIELD

This assignment is effective today and until final disposition of the case.  The attorneys are directed to contact Judge Darrell G. Shepherd for hearing date and time.

Dated: 5·18·07

_____
THOMAS H. ALFORD, Presiding Judge
East Central Judicial Administrative District

COPIES:
> COURT ADMINISTRATOR: Mike Evans, Administrative Director of the Courts, 1915 N. Stiles, Suite 305, Oklahoma City, OK  73105
> ASSIGNED JUDGE: Darrell G. Shepherd, Wagoner County Courthouse , 307 East Cherokee Street Wagoner, OK 74467
> COURT CLERK: Paula Sexton
> ATTORNEY FOR DEFENDANT: Donn F. Baker, 319 West Dela ware Street, Tahlequah, OK 74401

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR MUSKOGEE COUNTY

THE STATE OF OKLAHOMA,  )
      Plaintiff,  )
  )
vs.  )    Case No. CF-2006-244
  )
DAWN MICHELLE LITTLEFIELD  )
      Defendant(s),  )

## SUBPOENA

STATE OF OKLAHOMA, COUNTY OF MUSKOGEE:

TO:    Probation & Parole, 3105 Azalea Park Drive , Muskogee, OK 74401

You are hereby commanded to appear before the District Court of Muskogee County in the City of Muskogee on the **30th day of May, 2007, at 9:00 AM.**

then and there to testify on behalf of the State of Oklahoma as a witness in the above entitled case wherein the State of Oklahoma prosecutes the said **DAWN MICHELLE LITTLEFIELD** and you will remain in attendance and on call of said court from day to day and term to term until lawfully discharged.

*THIS YOU SHALL IN NO WAY OMIT UNDER PENALTY OF LAW*

Witness my hand and seal this _18th_ day of May, 2007.

Paula Sexton, Court Clerk           LARRY D. MOORE, District Attorney

_____, Deputy    or    By: _____

### INSTRUCTIONS

- The **Muskogee** County Courthouse is located at **220 State Street, Muskogee.**
- **Report to the office of the District Attorney 30 minutes prior to the scheduled time.**
- **Do not go into the courtroom.**
- **Dress Appropriately. Shorts are not permitted in the Courtroom**
- **If you are traveling from out of county or state, receipts for food and lodging MUST be retained for possible reimbursement by the District Attorney's Office.**

This case is presently set for **Revocation Hearing.** Please check beforehand to see if your attendance is still required at the above printed time and date. During the week, between the hours of 8:00 AM and 5:00 PM, you may call the Muskogee County District Attorney's Office at (918)682-9400. If your case is rescheduled, a *new subpoena* will be issued notifying you of your new appearance time and date.

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE
FILED

IN THE DISTRICT COURT IN AND FOR MUSKOGEE COUNTY
STATE OF OKLAHOMA 2007 MAY 22 AM 8:52

PAULA SEXTON
COURT CLERK

State of Oklahoma,            )
                             )
        Plaintiff,           )
Vs.                          )   Case No. CF-2006-244
                             )
Dawn Littlefield,            )
                             )
        Defendant.           )

## ENTRY OF APPEARANCE

COMES NOW Donn F. Baker and hereby enters his appearance as counsel of record for

the Defendant, Dawn Littlefield.

All future notices or correspondence should be forwarded to counsel at the address below.

_____
DONN F. BAKER, OBA#443
ATTORNEY AT LAW
319 West Delaware
TAHLEQUAH, OK  74464
(918) 456-1233

## CERTIFICATE OF MAILING

I, Donn F. Baker, hereby certify that on the 18th day of May, 2007, mailed a true and
correct copy of the foregoing Entry of Appearance to: District Attorney, Muskogee County
Courthouse, 220 State Street, Muskogee, OK  74401  with postage prepaid thereon.

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE
FILED

2007 MAY 22  AM 6: 16

PAULA SEXTON
COURT CLERK

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR MUSKOGEE COUNTY

THE STATE OF OKLAHOMA,           )
         Plaintiff,              )
                                 )
vs.                              )          Case No.  CF-2006-244
                                 )
DAWN MICHELLE LITTLEFIELD        )
         Defendant(s),           )

## SUBPOENA

STATE OF OKLAHOMA, COUNTY OF MUSKOGEE:

TO:    Probation & Parole, 3105 Azalea Park Drive , Muskogee, OK   74401

You are hereby commanded to appear before the District Court of Muskogee County in the City of Muskogee on the **30th day of May, 2007, at 9:00 AM.**

then and there to testify on behalf of the State of Oklahoma as a witness in the above entitled case wherein the State of Oklahoma prosecutes the said **DAWN MICHELLE LITTLEFIELD** and you will remain in attendance and on call of said court from day to day and term to term until lawfully discharged.

*THIS YOU SHALL IN NO WAY OMIT UNDER PENALTY OF LAW*

Witness my hand and seal this _18th_ day of May, 2007.

Paula Sexton, Court Clerk                 LARRY D. MOORE, District Attorney

_____, Deputy     or     By:_____

## INSTRUCTIONS

- **The Muskogee** County Courthouse is located at **220 State Street, Muskogee.**
- **Report to the office of the District Attorney 30 minutes prior to the scheduled time.**
- **Do not go into the courtroom.**
- **Dress Appropriately.  Shorts are not permitted in the Courtroom**
- **If you are traveling from out of county or state, receipts for food and lodging MUST be retained for possible reimbursement by the District Attorney's Office.**

This case is presently set for **Revocation Hearing.**  Please check beforehand to see if your attendance is still required at the above printed time and date.  During the week, between the hours of 8:00 AM and 5:00 PM, you may call the Muskogee County District Attorney's Office at (918)682-9400.  If your case is rescheduled, a *new subpoena* will be issued notifying you of your new appearance time and date.

336

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR MUSKOGEE COUNTY

2006 MAR 16 PM 1:59

PAULA S[...]
COURT CL[...]

THE STATE OF OKLAHOMA,
     Plaintiff,          )
)
vs.                     )
)
DAWN MICHELLE LITTLEFIELD    )
)
ADDR:   ████████████     )
      Oktaha, OK  74450     )     Case No.  CF-2006-244
SSN:  ████0275        )
DOB:  ███68          )
)
     Defendant(s),       )

## INFORMATION

FOR:

COUNT 1:     CHILD ABUSE BY INJURY~ 10 O.S. § 7115(A) a FELONY

STATE OF OKLAHOMA, COUNTY OF MUSKOGEE:

     I, **John David Luton**, the undersigned District Attorney of said County, in the name and by the authority, and on behalf of the State of Oklahoma, give information that in said County of Muskogee and in the State of Oklahoma **DAWN MICHELLE LITTLEFIELD** did then and there unlawfully, willfully, knowingly and wrongfully commit the crime(s) of:

**COUNT 1**    **CHILD ABUSE BY INJURY~ a FELONY, on or about the 10th day of March, 2006, by willfully and maliciously causing physical and mental injury to L.D.L., age 16, by throwing L.D.L. into the bathroom, striking her repeatedly with a stick on her back, legs and arms, and calling her a bitch.**

This crime is punishable by a fine of $500-$5,000 or imprisonment from 1 year - Life, or both.

JOHN DAVID LUTON
DISTRICT ATTORNEY

By: _____
    Assistant District Attorney

Subscribed and sworn to before me this 16th day of March, 2006.

_____
NOTARY PUBLIC    05008386

My Commission expires: 9/8/2009

## WITNESSES ENDORSED FOR THE STATE OF OKLAHOMA

Jim Williams,  MUSKOGEE COUNTY SHERIFF'S OFFICE, 220 State Street , Muskogee OK
Charles Fowler, P.O. Box 167, Oktaha OK  74450
L.D.L., Rt. 1 Box 1939, Oktaha OK  74450

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR MUSKOGEE COUNTY

2006 MAR 16 PM 1:59

PAULA
COURT C

| | |
|---|---|
| THE STATE OF OKLAHOMA,<br>Plaintiff,<br><br>vs.<br><br>DAWN MICHELLE LITTLEFIELD<br>ADDR: ████████<br>Oktaha, OK 74450<br>SSN: ████0275<br>DOB: ███68<br>Defendant(s), | )<br>)<br>)<br>)<br>) Case No. CF-2006-244<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## FELONY WARRANT

STATE OF OKLAHOMA, COUNTY OF MUSKOGEE, TO ANY LAW ENFORCEMENT OFFICER:

YOU ARE HEREBY COMMANDED to forthwith arrest and take said **DAWN MICHELLE LITTLEFIELD** into custody for the offense(s) of:

COUNT 1:     CHILD ABUSE BY INJURY~ 10 O.S. § 7115(A) a **FELONY**

and bring her before me or some other Magistrate having cognizance of the case, to be dealt with according to law. You are further directed to execute this writ or warrant either in daytime or nighttime.

Bond for the release of the above named defendant, to guarantee said defendant's appearance in all the Court's proceedings herein, be and the same is hereby fixed in the sum of $_____, until the further Order of the Court.

Dated this _____ day of March, 2006.

_____
Judge of the District Court

Presenting Agency:     MUSKOGEE COUNTY SHERIFF'S OFFICE     Agency Case Number:

EXTRADITE / ENTER NCIC:          YES     NO

Circle ONE:     LOCAL ONLY          ALL STATES          SURROUNDING STATES

| Identifiers: | Gender: | Female | | Race: | White |
|---|---|---|---|---|---|
| | Height: | 5' 6" | | Eye Color: | GREEN |
| | Weight: | 125 lbs. | | Hair Color: | BLONDE |
| | DL #: | | | | |
| | Markings: | | | | |

## OFFICER'S REPORT

STATE OF OKLAHOMA, COUNTY OF MUSKOGEE

Received the within writ on the _____ day of March, 2006 and executed the same by taking into custody **DAWN MICHELLE LITTLEFIELD** and presenting her before the court this_____day of March, 2006

**Fees:**  Arresting  _____ persons at $ _____ each  $_____

_____ miles at $_____ per mile  $_____

TOTAL $_____

By: _____

Law Enforcement Officer

## APPEARANCE BOND

S.A.&I. 408 (1993)

## IN THE DISTRICT COURT OF MUSKOGEE COUNTY, STATE OF OKLAHOMA

State of Oklahoma,

Plaintiff,

vs.

_Dawn Littlefield_ Case No._____

Lo8  W/F  Defendant.

Know all men by these presents, that we the above named defendant, as principal, and the undersigned **KIM PITMAN**, agent for International Fidelity Insurance Company, as surety(ies), personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the state of Oklahoma in the sum of ____Two Thousand____ Dollars($ _2000_ ) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant who has been committed to the county jail of **Muskogee** County, State of Oklahoma, shall personally appear before the ___District___ Court of said County on the ___10___ day of ___March___, 20_06_, at _9:00_ o'clock _A_.M., of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of _OTB In Muna_

and shall not depart the said Court with out leave and shall obey any order issued by said Court, then this bond shall be void; otherwise, this bond shall remain in full force and effect.

Witness our hands and seals this __12__ day of __March__, 20_06_

_____ Principal _Htl Box 535 Oktaha OK 74459_ Address

_____ Surety P.O. Box 1269, Muskogee OK 74402-1269_____ Address

International Fidelity Insurance Company__Surety One Newark Center, 20th Floor, Newark NJ 07102_____Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this _____ day of _____,20_____.

Paula Sexton, Court Clerk _____ Sheriff

_____ Deputy _____ Deputy

This undertaking approved this _13_ day of _MARCH_____, 20_06_.

Paula Sexton, Court Clerk

_____ Deputy

(Seal)

### AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, MUSKOGEE COUNTY, SS:

The undersigned, being fully sworn upon oath, says that he is a resident of **Muskogee** County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as hereinafter specified under one or more of the following, to wit:

a) Consideration for this undertaking received or promised in the sum of $ _200 w/_
b) Other security received or promised for making this undertaking, is as follows: _Note Taken, Signed by Written Agreement_
c) Such promise, security or consideration was received from:

_Dawn Littlefield_
Name                                    Address

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as one who commits perjury.

_____
Affiant                                  P.O. Box 1269, Muskogee OK 74402-1269
                                         Address

Subscribed and sworn to before me this _____ day of _____, 20____.
(Seal)

_____
Court Clerk - Notary Public

My Commission Expires:

_____
_____ Deputy

**POWER OF ATTORNEY**
**INTERNATIONAL FIDELITY INSURANCE COMPANY**   Power No. IB- 932596

Bond Department - 1-800-935-2245
P.O. Box 9810, Calabasas, CA 91372-9810

THIS POWER OF ATTORNEY NULL AND VOID
UNLESS USED BEFORE 12/31/06

It is unlawful to print this form without written consent of home office.

KNOW ALL MEN BY THESE PRESENTS, that INTERNATIONAL FIDELITY INSURANCE COMPANY, a corporation duly organized and existing under the laws of the State of New Jersey has constituted and appointed, and does hereby constitute and appoint,

its true and lawful attorney-in-fact, with full power and authority to sign the company's name and affix its corporate seal to, and deliver on its behalf as surety, any and all obligations as herein provided, and the execution of such obligations in pursuance of these presents shall be as binding upon the company as fully and to all intents and purposes as if done by the regularly elected officers of said company at its home office in their own proper person; and the said company hereby ratifies and confirms all and whatsoever its said attorney-in-fact may lawfully do and perform in the premises by virtue of these presents.

THIS POWER OF ATTORNEY IS VOID IF ALTERED OR ERASED, THE OBLIGATION OF THE COMPANY SHALL NOT EXCEED THE SUM OF THREE THOUSAND DOLLARS ($3,000.00)

AND MAY BE EXECUTED FOR RECOGNIZANCE ON CRIMINAL BAIL BONDS ONLY.

NOT VALID FOR IMMIGRATION BONDS

Bond Amt $ _____   Case # _____
Defendant _____
Appearance Date _____   DIV _____
Court City _____
Court County _____   State _____
Offense _____
Date Filed _____
Atty in fact _____
SIGNATURE / If applicable, add your COURT assigned Agent #

FORM IB (Rev. 6/05)

**\*NOTICE\***
STACKING
OF POWER
IS STRICTLY
PROHIBITED!
No more than
one power
from this
Surety may
be used to
execute any
one bond.

IN WITNESS WHEREOF, said INTERNATIONAL FIDELITY INSURANCE COMPANY, by virtue of authority conferred by its Board of Directors, has caused these presents to be sealed with its corporate seal, signed by its President and attested by its Secretary, this 1st day of August, 2003.

Francis Mitterhoff, Chairman of the Board

Norman Konvitz, Secretary

INTERNATIONAL FIDELITY INSURANCE CO.
1904

1. A separate Power of Attorney must be attached to each bond executed.
2. Powers of Attorney must not be returned to attorney-in-fact, but should remain a permanent part of court records.
3. The authority of such attorney-in-fact is limited to appearance bonds and cannot be construed to guarantee for failure to provide payments, back alimony payments, fines or wage law claims.

**ENTER SURETY-ASSIGNED EXECUTING AGENT CODE # HERE:**

## FELONY & MISDEMEANOR MINUTES

CASE NO. CF-06-244

CASE NO._____

CASE NO._____

CASE NO._____

CASE NO._____

DATE: March 16 ____, 2006

DEFT: Dawn Littlefield

ATTY: Chad Richardson

PLED NOT GUILTY SET DISPOSITION DOCKET

_____

_____

### STATE:

DAVID PIERCE_____   TIM KING_____
JOHN DAVID LUTON_____   JOHN WRIGHT X
KRISTEN LITTLEFIELD_____   OTHER_____

### SOUNDING PRELIMINARY:

3-30-06 @ 10:00 AA

_____

_____

ST REQUESTED BOND:$_____

_____

_____

BOND SET:$ Same

_____

_____

CASH BOND:$_____

_____

_____

### ACCELERATION / REVOCATION:

_____

_____

_____

### REVIEW / CONTEMPT:

_____

_____

_____

CASH BOND REDUCED TO $_____
TO PAY $_____ MO. BEGINS 30 DAYS.
IF NOT POSTED SET CONTEMPT.

PRIOR BOND EXONERATED:_____

COURT APPOINTED ATTY:_____
DEFT NOTIFIED IF BOND IS MADE *HE/SHE*
MUST RETAIN OWN ATTY.

✓DEFT ADMONISHED FROM ALL
COMMUNICATION WITH ANY
WITNESS/VICTIM: X

DEFT NOTIFIED OF RIGHT TO CALL
EMBASSY_____.

### OTHER:

_____

_____

_____

_____

NEED _____ INTERPRETER.

### JUDGE:

ADAIR_____   ROBINSON_____
ALFORD_____   NORMAN_____
THYGESEN X   OTHER_____

BENCH WARRANT:_____

BOND FORFEITURE:_____

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR MUSKOGEE COUNTY

THE STATE OF OKLAHOMA,
Plaintiff,

vs.                                                                Case No. CF-2006-244

DAWN MICHELLE LITTLEFIELD
ADDR: ████████
    Oktaha, OK  74450
SSN: ████████0275
DOB: ████████/68
    Defendant(s),

)
)
)
)
)
)
)
)
)
)
)
)

**FELONY WARRANT**

STATE OF OKLAHOMA, COUNTY OF MUSKOGEE, TO ANY LAW ENFORCEMENT OFFICER:

YOU ARE HEREBY COMMANDED to forthwith arrest and take said **DAWN MICHELLE LITTLEFIELD** into custody for the offense(s) of:

COUNT 1:    CHILD ABUSE BY INJURY~ 10 O.S. § 7115(A) a **FELONY**

and bring her before me or some other Magistrate having cognizance of the case, to be dealt with according to law. You are further directed to execute this writ or warrant either in daytime or nighttime.

Bond for the release of the above named defendant, to guarantee said defendant's appearance in all the Court's proceedings herein, be and the same is hereby fixed in the sum of $_____, until the further Order of the Court.

Dated this _____ day of March, 2006.

Judge of the District Court

Presenting Agency:    MUSKOGEE COUNTY SHERIFF'S OFFICE    Agency Case Number:

EXTRADITE / ENTER NCIC:    YES    NO

Circle ONE:    LOCAL ONLY    ALL STATES    SURROUNDING STATES

Identifiers:    Gender:  Female        Race:    White
            Height:  5' 6"        Eye Color:  GREEN
            Weight:  125 lbs.      Hair Color:  BLONDE
            DL #:
            Markings:



344

345

## OFFICER'S REPORT

STATE OF OKLAHOMA, COUNTY OF MUSKOGEE

Received the within writ on the _____ day of March, 2006 and executed the same by taking into custody **DAWN MICHELLE LITTLEFIELD** and presenting her before the court this _10_ day of March, 2006

Fees:  Arresting _____ persons at $ _____ each  $_____

_____ miles at $_____ per mile  $_____

TOTAL $_____

3/12/06. Release.
$2000. Jordan

By: _Jimmie Williams, mco EW_
    Law Enforcement Officer

## IN THE DISTRICT COURT OF MUSKOGEE COUNTY
## STATE OF OKLAHOMA

**STATE OF OKLAHOMA**
<div align="center">Plaintiff</div>

VS.

_Dawn Michelle Littlefield_
<div align="center">Defendant</div>

CASE NO. _CM-01-497_

_set by Judge RA_

<div align="center">

## ORDER

</div>

YOU HAVE BEEN ASSESSED THE COST AND/OR FINE IN THE ABOVE STYLED CASE IN THE AMOUNT OF $_____ PAYABLE AT $ _100.00_ PER MONTH. PAYABLE ON THE ____29____ DAY OF ____August____, 2006 AND CONTINUING THEREAFTER UNTIL PAID IN FULL.

YOUR WILLFUL FAILURE TO PAY AS ORDERED WILL RESULT IN A BENCH WARRANT BEING ISSUED FOR YOUR ARREST AND WILL FURTHER SUBJECT YOU TO CONTEMPT OF COURT PROCEEDINGS AND FURTHER JAIL SENTENCE.

DATED THIS ____18____ DAY OF ____August____, 2006.

_Pd 100.00 today for July_

_____
DISTRICT JUDGE

I HAVE READ AND UNDERSTAND THE ABOVE COURT ORDER.

_Carol McKee_

_____
COST ADMINISTRATOR

_____
DEFENDANT'S SIGNATURE

---

<div align="center">

MAKE CHECK OR MONEY ORDER PAYABLE TO:
PAULA SEXTON, DISTRICT COURT CLERK
P. O. BOX 1350   MUSKOGEE, OK  74402-1350
*Send Self Addressed Stamped Envelope for Return Receipt & Include Your Case Number on ALL Payments.

</div>

## MUSKOGEE COUNTY

## APPLICATION FOR STAY OF EXECUTION OF FINES/COSTS

I understand that my assessed fine(s)/costs are due IMMEDIATELY unless otherwise ordered by the Court. I understand that I may be subject to penalties. Including but not limited to imprisonment, if I fail to pay my assessed fine(s)/costs as ordered. I consent to an investigation into all information I provide on this application to verify its validity. I understand I may be held in CONTEMPT OF COURT for providing false and/or incomplete information on this application. I swear under PENALTY OF PERJURY that the information below is true and complete.

DATED _6-17 2007_

SIGNATURE _Dan Litt_                          FINE/COST $ _____

CASE# _CM-01-497_

SS#. ███ _0275_      DL# _632 408 4/6_      STATE _of_   EXPIRES _5/31/10_

PROBATION OFFICER _____      PHONE NUMBER _____

LAST NAME _Littlefield_      FIRST _Dean_      MI _m._

PHYSICAL ADDRESS ███████      CITY _Oktaha_      ST/ZIP _74450_

MAILING ADDRESS _SAA_      CITY _____      ST/ZIP _____

PHYSICAL DESC: HGT. _5'6_ WGHT. _135_ EYES _Green_ HAIR _Red_ D.O.B. ███ _ZP_

RACE _AI_      MALE __   FEMALE X

HOME PHONE _474-7647_      CELL# _____ CONTACT# _____

EMPLOYER _Self_      HOW LONG _11 yrs_ PHONE _474-7647_

EARNINGS _50,000_      PER _yr_   #HRS/WK _varies_      PAYDATES _varies_

MARITAL STATUS: SINGLE ____      MARRIED X      DIVORCED ____      SEPERATED ____

WIDOW/ER ____      COMMON LAW ____

Names and Ages of Children _Lacy (16), Clay (9)_

List others living in household  Name _____ Relationship _____ Employer _____ Income _____

_____

_____

AMOUNT OF CASH WITH YOU $ _100_      SAVINGS/CHECKING ACCOUNTS $ _____

Property, Investments, Assets $ _____

VEHICLES YOU OWN OR USE: YEAR _____ MAKE/MODEL _____

348

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

———————————————

**REDACTED EXHIBIT 192**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

———————————————

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

348

IN THE DISTRICT COURT IN AND FOR MUSKOGEE COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA
COUNTY OF MUSKOGEE
FILED
2005 APR 25 PM 2:0

PAULA SEXTON
COURT CLERK

PAM LITTLEFIELD,                )
                                )
              Plaintiff,         )
                                )   Case No. CS- OS- 572
v.                              )
                                )
MIKE LITTLEFIELD,               )
                                )
              Defendant.         )

## PETITION

COMES now the Plaintiff, Pam Littlefield, for her cause of action against the Defendant, and states as follows:

1.     The Plaintiff is an individual and resides in Muskogee County, Oklahoma.

2.     The Defendant is an individual and resides in Muskogee County, Oklahoma.

3.     The Plaintiff and Defendant were previously married and divorced in case number FD-95-115 in the District Court of Muskogee County, Oklahoma. That, as a part of the Divorce Decree, the parties entered into a written Property Settlement Agreement.

4.     Under the terms of the Property Settlement Agreement, the Defendant was required to pay certain monies for educational expenses for the children of the parties.

5.     The Defendant has breached the agreement by failure to pay the educational expenses required by the agreement. The Plaintiff has made demand on the Defendant for performance, pursuant to the agreement, but the Defendant has failed, refused and neglected to comply with the contract.

6.     The Plaintiff has been damaged to date as a result of the Defendant's breach of contract in the amount of $26,917.23.

Wherefore, premises considered, Plaintiff prays judgment against the Defendant for breach of contract in the amount of $26,917.23; for reasonable attorney fees and costs; and for such other and further relief as the court deems just.

D. D. Hayes    OBA #4002
HAYES & ERICSON
222 North 4th Street
P.O. Box 1389
Muskogee, Oklahoma 74402
Telephone (918) 681-0529
Fax (918) 681-0533
Attorney for Plaintiff

IN THE DISTRICT COURT OF MUSKOGEE COUNTY
STATE OF OKLAHOMA

PAM LITTLEFIELD,                        )
                                        )
              Plaintiff,                )
                                        )
vs.                                     )      Case No. CJ-05-572
                                        )
MIKE LITTLEFIELD,                       )
                                        )
              Defendant.                )

### ENTRY OF APPEARANCE

COMES NOW Mark Green to enter his appearance as attorney of record for the Defendant

herein and respectfully request an additional twenty days in which to answer or otherwise plead.

*Mark Green*

MARK GREEN, OBA #3570
P. O. Box 2362
Muskogee, OK 74402
(918) 683-0309 Telephone
(918) 687-5964 Telecopier

### CERTIFICATE OF SERVICE

I, Mark Green, hereby certify that on the ___11___ day of ___May___, 2005, a true and
correct copy of the foregoing was served in the following manner and on the following:

_____ U.S. Mail          __X__ Facsimile          _____ Hand-delivery

D. D. Hayes
P. O. Box 1389
Muskogee, OK 74402

*Mark Green*

MARK GREEN

351

IN THE DISTRICT COURT OF MUSKOGEE COUNTY
STATE OF OKLAHOMA

PAM LITTLEFIELD,                    )
                                    )
            Plaintiff,              )
                                    )
vs.                                 )        Case No. CJ-05-572
                                    )
MIKE LITTLEFIELD,                   )
                                    )
            Defendant.              )

## ANSWER

COMES NOW Mike Littlefield and for his answer to Plaintiff's Petition, alleges and states:

1.    That Defendant admits the allegations contained in paragraph 1 of the petition.

2.    That Defendant admits the allegations contained in paragraph 2 of the petition.

3.    That Defendant admits the allegations contained in paragraph 3 of the petition.

4.    That Defendant admits the allegations contained in paragraph 4 of the petition and

specifically:

> "3.    Pamela Jeanne Littlefield and David Michael Littlefield agree that the parties have acquired during the marriage the sum of $11,353.00 in savings and investments. It is agreed that neither party will be awarded these funds. The funds shall be placed with Pamela Jeanne Littlefield as Trustee, and shall be used to pay the expenses of the college education of the minor children.
>
> 4.    Pamela Jeanne Littlefield and David Michael Littlefield hereby agree, with respect to the college education of the minor children, as follows: After any applicable scholarships and after savings designated for education are exhausted, both Pamela Jeanne Littlefield and David Michael Littlefield shall contribute 50% each to the cost of each child's college education expenses for tuition, books, room, board, transportation, and clothing. The college or university attended shall be a State supported institution located within the State

of Oklahoma. The child shall maintain at least twelve credits per semester. This obligation shall cease after four years of college for each child."

5. That Defendant denies the allegations contained in paragraph 5 of the petition.

6. That Defendant denies the allegations contained in paragraph 6 of the petition.

7. That Defendant affirmatively states that, consistent with the terms set forth in paragraph 4 above, he was to pay for certain educational expenses. That he has done so in the past and the parties have been in negotiation but are unable to agree on an amount for current expenses because of the Plaintiff's insistence on including expenses that Defendant has no duty to pay.

8. That Plaintiff should furnish to Defendant a full accounting of the expenses she alleges total $26,917.23 together with a full explanation as to how these expenses were incurred.

9. That Plaintiff has within her control certain deposits of monies intended to be used for education expenses for which she should furnish a full and complete accounting. That same should be credited against the expenses she alleges.

WHEREFORE, Defendant prays this Court deny the relief requested by Plaintiff, grant Defendant the relief he requests, award Defendant costs and attorney fees for defense of this action and all other relief to which he may be entitled.

MARK GREEN, OBA #3570
P. O. Box 2362
Muskogee, OK 74402
(918) 683-0309 Telephone
(918) 687-5964 Telecopier

354

## CERTIFICATE OF SERVICE

I, Mark Green, hereby certify that on the 21st day of June , 2005, a true and correct copy of the foregoing was served in the following manner and on the following:

_____ U.S. Mail          _X_ Facsimile          _____ Hand-delivery

D. D. Hayes

Muskogee, OK 74402

MARK GREEN

**IN THE DISTRICT COURT OF MUSKOGEE COUNTY, STATE OF OKLAHOMA**

Case No.   CJ-2005-00572

PAM LITTLEFIELD                                        D.D. HAYES
                     Plaintiff(s)                  Attorney(s) for Plaintiff(s)


                   --vs--

MIKE LITTLEFIELD                                       MARK GREEN
                     Defendant(s)                  Attorney(s) for Defendant(s)



                              Judge:          A. CARL ROBINSON

06/26/2006   CT MIN: ON RECORD W/CSR, ELISE CRUCHON. PLT APPEARED
             W/ATTY, D D HAYES; DEFT APPEARED W/ATTY, MARK GREEN.
             SWORN TESTIMONY TAKEN & EXHIBITS ENTERED. RECESSED @
             12:05-BACK IN SECESSION @ 2:25. ADDITIONAL TESTIMONY &
             EXHIBITS. RECESSED @ 4:32; TO BE CONT'D TO MUTUALLY
             AGREEABLE DATE. ACR

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 193**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255          *U.S. v. Barrett*, 6:09-cv-00105-JHP

356

IN THE DISTRICT COURT IN AND FOR MUSKOGEE COUNTY
STATE OF OKLAHOMA

| | |
|---|---|
| BANK OF OKLAHOMA, NA | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. CJ-03-988 |
| | ) |
| JENNIFER LITTLEFIELD, | ) |
| | ) |
| DAVID LITTLEFIELD | ) |
| | ) |
| Defendants. | ) |

## PETITION

**COMES NOW** the Plaintiff, Bank of Oklahoma, NA , and for its cause of action against the Defendants, Jennifer and David Littlefield, would allege and state as follows:

1. Plaintiff, Bank of Oklahoma, NA, is a duly organized corporation licensed to do business in the State of Oklahoma.

2. Defendants, Jennifer and David Littlefield, are individuals residing in Muskogee County, State of Oklahoma.

3. The claim alleged herein arose out of a contractual agreement between Bank of Oklahoma, NA and the Defendants, wherein Bank of Oklahoma, NA loaned money to the Defendants.

## COUNT I

### BREACH OF CONTRACT

4. Paragraphs 1-3 are incorporated by reference as if fully set forth herein.

1

5. On April 30, 2002, the Defendants signed a promissory note as maker wherein they borrowed Three Thousand Five Hundred Dollars and 00/100ths ($3,500.00) from Bank of Oklahoma, NA. (Attached hereto as Exhibit "A" is a true and correct copy of the note.)

6. According to the terms of the note, the Defendants were to pay $127.38 on the 14th of each month beginning June 14, 2002 and ending on May 14, 2005.

7. Defendants have failed to make timely payments pursuant to the terms of the naote and are therefore in default under the terms of the note.

8. According to the terms of the note the Defendants are in default and Bank of Oklahoma, NA is filing this action for breach of contract to recover the unpaid balance of $2,848.73 with accrued interest in the amount of $96.93, plus interest thereon at the rate of 17.25% per annum from January 30, 2003, costs and fees provided for by the terms of the note.

9. In accordance with the Fair Debt Collection Practices Act, Title 15 U.S.C.A. § 1692(g), if applicable, unless the person or entity responsible for the payment of the above debt, within thirty days after receipt of this notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid; and if said person or entity notifies the undersigned attorney for Plaintiff in writing within said thirty day period that the debt, or any portion thereof, is disputed, said attorney will obtain verification of the debt and a copy of such verification will be mailed to said person or entity by the undersigned attorney for Plaintiff; and upon written request by you within the thirty day period, the undersigned attorney for Plaintiff will provide the name and address of the original creditor, if different from the current creditor. Federal law requires us to inform you that this is an attempt to collect a debt and any information obtained will be used for that purpose.

2

10. Wherefore premises considered, Bank of Oklahoma, NA demands judgment against the Defendants for the remaining $2,848.73 with accrued interest in the amount of $96.93, plus interest thereon at the rate of 17.25% per annum from May 1, 2003, costs and attorneys fees provided for by the terms of the note and any other relief this court deems just and proper.

Respectfully submitted,

*Richard Cha*

Scott F. Lehman, OBA # 15908
Marcus N. Ratcliff, OBA # 19201
Richard A. Chapman, OBA # 17849
Latham, Stall, Wagner, Steele & Lehman, P.C.
1437 South Boulder, Suite 820
Tulsa, Oklahoma 74119
(918) 382-7523

Attorney for Bank of Oklahoma, NA

3

CONSUMER PROMISSORY NOTE - SIMPLE/VARIABLE

ORIGINAL

**MAKER(S) NAME & ADDRESS** (Last Name First)

Littlefield, Jennifer S.
Littlefield, David M.

Muskogee, OK  74403

**LENDER/SECURED PARTY**

Bank of Oklahoma, N.A.
P.O. Box 2864
Tulsa, OK   74101-2864

**SECURITY AGREEMENT**

The undersigned grants to Lender a security interest in Collateral described hereon to secure the payment of the Promissory Note executed herewith and such other obligations and on such terms as set out on Page 2 hereof.

X _David M. Littlefield_
X _Jennifer S. Littlefield_
X _____

| NOTE NUMBER | DATE OF NOTE | DATE FINANCE CHARGE BEGINS | OFFICERS INITIALS |
|---|---|---|---|
| 2018525 | 04/30/02 | 04/30/02 | 453 |

| PRINCIPAL AMOUNT | [X] FIXED INTEREST RATE | [ ] VARIABLE INTEREST RATE |
|---|---|---|
| $3,535.00 | 17.250 % | % over Index. Initial Index Rate is _____ % |

**PURPOSE STATEMENT**

The purpose of loan is:
a

Social Security Numbers:          Phone Numbers:
___-__-2761    Home: 918-682-8479
___-__-3795    Work: 918-457-3141

**DISCLOSURES**

| 1. ANNUAL PERCENTAGE RATE The cost of the credit as a yearly rate. | 2. FINANCE CHARGE The dollar amount the credit will cost. | 3. AMOUNT FINANCED The amount of credit provided to Maker or on his behalf as itemized below. | 4. TOTAL OF PAYMENTS (Add boxes 2 and 3) The amount Maker will have paid after Maker has made all payments as scheduled. |
|---|---|---|---|
| 17.978 % | $ 1,085.68 | $ 3,500.00 | $ 4,585.68 |

Boxes checked apply to this transaction:
- [ ] This obligation is payable on Demand. All disclosures are based on an assumed maturity of one year.
- [ ] This obligation has a Demand Feature.
- [ ] The Annual Percentage Rate does not take into account any required deposit of Maker.

**PAYMENT SCHEDULE WILL BE:**

| NUMBER OF REGULAR PAYMENTS | AMOUNT OF PAYMENTS | |
|---|---|---|
| | Regular | Plus a Final Payment |
| 36 | $ 127.38 | $ n/a |

| FREQUENCY OF PAYMENTS | DUE DATE OF PAYMENTS | | |
|---|---|---|---|
| [X] Monthly | First Payment | OTHER PAYMENTS DUE SAME DAY OF EACH PERIOD | Final Payment |
| [ ] | 06/14/02 | | 05/14/05 |

- [ ] The Annual Percentage Rate may increase during the term of this loan if the _____ (Index) _____ increases.

Any increase will take the form of:
- [ ] higher payment amounts.  [ ] more payments of the same amount.  [ ] a larger amount due at maturity.
- [ ] The Interest Rate will not increase more often than once a _____
- [ ] The Interest Rate will not increase by more than _____ % each time.
- [ ] The Interest Rate will not increase above _____ %. [ ] The Interest Rate will not decrease below _____ %.
- If the Interest Rate increases by _____ % in _____ (time period)
- [ ] Maker's regular payments will increase to $_____
- [ ] Maker will have to make _____ additional payments.
- [ ] Maker's Final Payment will increase to $_____

Prepayment: You may be charged a Minimum Finance Charge.

See Promissory Note, Security Agreement and related contract documents for additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

**SECURITY / COLLATERAL**

Boxes checked apply to this transaction:
- [ ] The signers of the Security Agreement are giving a security interest in the following property:

- [X] This loan is secured by all money, deposit accounts, and other property owned by Maker and in the possession or control of Lender and all deposits, including deposit accounts, of Maker with Lender.
- [X] Collateral securing other loans of Maker with Lender also secures this loan.
- [ ] Assumption Policy: Someone buying Maker's house:
  - [ ] may, subject to certain conditions, be allowed to assume the remainder of the mortgage on the original terms.
  - [ ] cannot assume the remainder of the mortgage.

Fees Paid in Cash by Maker: Filing Fees $_____    Non-Filing Insurance $ n/a

**PREVIOUS OBLIGATIONS BEING CONSOLIDATED AND REFINANCED**

| No. _____ | No. _____ | Obligations Being Consolidated |
| $_____ | 1 _____ | Unpaid Balances Before Refunds |
| $_____ | 2 _____ | Credit Life Insurance Refund |
| $_____ | 3 _____ | Disability Insurance Refund |
| $_____ | 4 _____ | Total Refunds (Add 2 and 3) |
| $_____ | 5 _____ | Net Balance Refinanced (1 minus 4) |

**ITEMIZATION OF AMOUNT FINANCED**

| $ _____ | 6 | Amount Refinanced and Paid on Account of Maker (Add line 5 Totals) |
| $ 3,500.00 | 7 | Amount Given and Disbursed to Maker Directly |
| | | Amounts Paid to Others on Behalf of Maker: |
| $_____ | 8 | Credit Life Insurance Premium to _____ |
| $_____ | 9 | Disability Insurance Premium to _____ |
| $_____ | 10 | Other Insurance Premium to _____ |
| $_____ | 11 | Filing and Releasing Fees to Public officials |
| $_____ | 12 | License, Title and Registration to _____ |
| $_____ | 13 | To _____ |
| $ 35.00 | 14 | To Loan Documentation Fee |
| $ 35.00 | 15 | Total Amount Paid to Others on Behalf of Maker (Add lines 8 thru 14) |
| $ 3,535.00 | 16 | Total Amount Paid to or on Behalf of Maker (Add Lines 6, 7 and 15) |
| $ 35.00 | 17 | Less - Prepaid Finance Charge |
| $ 3,500.00 | 18 | Amount Financed (Subtract line 17 from line 16) |

Form DOK784 (07/01/01)

**INSURANCE STATEMENT**

CREDIT LIFE AND DISABILITY INSURANCE are not required to obtain this loan. Such insurance for unpaid interest and principal of loan and for term of loan will only be provided if available and if Maker requests Lender to obtain such insurance by indicating insurance desired and signing below.

- [ ] Life Insurance on      [ ] Maker  [ ] Co-Maker
  - Cost for One Person.......................$_____
  - Cost for Two Persons......................$_____
- [ ] Disability Insurance on   [ ] Maker  [ ] Co-Maker
  - Cost for One Person.......................$_____

VENDOR'S SINGLE INTEREST AND/OR OTHER INSURANCE may be obtained by Maker through any person of his choice. If obtained through Lender, the cost for term of loan will be:
- [ ] Other Insurance.................................$_____
- [ ] Vendor's Single Interest Insurance.........$_____
  (The issuer issuing this policy waives its rights to subrogation against Maker)
- [ ] Maker desires the insurance checked above.
- [X] Maker does not desire insurance.

X _Jennifer S. Littlefield_   Date
X _David M. Littlefield_      4/30/02

**PROMISSORY NOTE**

FOR VALUE RECEIVED, the undersigned Maker(s) and all other parties liable hereunder, herein sometimes referred to collectively as Maker, promise to pay in order of named Lender (a) the Principal Amount as shown on page one; (b) with interest at the Interest Rate (as adjusted if applicable) on the balance thereof at any time remaining unpaid, and (c) any other accrued and unpaid part of the Finance Charge. All payments received by Lender are to be applied first to accrued and unpaid interest and Finance Charge to date of payment and then toward payment of the unpaid balance of the Principal Amount. All Prepaid Finance Charges are earned when paid and are not subject to rebate on early prepayment.

VARIABLE RATE. If the "Variable Interest Rate" box is checked, the Interest Rate shall vary with the Index set forth and shall be the number of percentage points above such Index as shown hereon as the "Rate Over Index". Increases or decreases in the Index will be reflected at set forth hereon. If the Index is a Prime or Base rate, that term shall mean the rate of interest announced from time to time as its Base or Prime Rate. In no event shall the Interest rate exceed the rate permitted by law. There shall be no restrictions on the change in the Index or Interest Rate unless specifically set out on page one.

ALL PARTIES DEEMED PRINCIPALS. All parties liable for payment hereunder shall each be regarded as a principal and each party may from any party with approval of holder and without notice to any other party may from time to time renew this Note or consent to one or more extensions or deferrals of any payment due for any term or terms, and all parties shall be liable in same manner as on original note. All parties liable for payment hereunder waive presentment, notice of dishonor and protest, and consent to partial payments, any substitutions or release of collateral and to addition or release of any party or guarantor.

PREPAYMENT. Maker shall have the right to prepay the Amount financed without penalty in full or in part at any time, provided, however, that prior to or contemporaneously with any such prepayment, Maker shall have paid to Lender the Finance Charge accrued to date of such prepayment and, provided, however, that holder may collect or retain a minimum Finance Charge of $5.00 where Amount Financed is $75.00 or less and $7.50 where Amount Financed is more than $75.00. Upon prepayment in full, the Maker will be granted a rebate of any unearned portion of the Finance Charge. Partial prepayments, at option of Lender, shall be applied first to accrued and unpaid Finance Charge and then to principal payments in inverse order of maturity.

ACCELERATION. At option of holder, the unpaid balance of Note and all other obligations and indebtedness of any party herein to holder, whether direct or indirect, absolute or contingent, now existing or hereafter arising, shall become immediately due and payable without notice or demand upon occurrence or existence of any Event of Default as described on reverse side hereof. Any amount not paid when due, shall continue to bear Finance Charge at the Interest Rate provided in this Note.

COLLECTION COSTS. The Lender may charge and collect from the Maker a ten-dollar fee for each return by a Bank or other depository institution of a dishonored check, negotiable order of withdrawal or share draft issued by the Maker in connection with the loan. This fee shall be in addition to all other loan finance charges, fees and additional charges which the Lender may charge and collect from the Maker and shall not be subject to refund or rebate. Maker agrees to pay reasonable cost of enforcing the security interest; and, in any reasonable attorney fees, not to exceed 15% of the unpaid debt after default, provided, however, that this agreement as to attorney fees shall not apply if prohibited by law at the time this Note is signed.

**MAKER(S) SIGNATURES**

I/We agree to terms of this Promissory Note, the Security Agreement, Disclosure Statement, and Payment Schedule, including Additional Provisions printed on Page 2 hereof. I/We have received a completed copy of this form as of Date of Note indicated above.

X _Jennifer S. Littlefield_
Jennifer S. Littlefield
X _David M. Littlefield_
David M. Littlefield
X _____

Furnished by American Bank Systems, Inc.

EXHIBIT A

# ADDITIONAL PROVISIONS

## MAKER EXPRESSLY WARRANTS, COVENANTS AND AGREES:

### WARRANTIES AND COVENANTS

**1. Grant of Security Interest.** All signers of the Security Agreement on the front hereof, together with all Makers hereof, are herein collectively referred to as Maker. Maker grants to Lender a security interest in Collateral described hereon to secure the payment of Indebtedness evidenced by a PROMISSORY NOTE executed herewith, and except for collateral which is the consumer's principal dwelling, to secure (1) all future advances by Lender to Maker, (2) all other liabilities to Lender (primary, secondary, direct or indirect, absolute or contingent, sole, joint, or several) due to or to become due however evidenced or acquired, and (3) the performance of all agreements, covenants, and warranties of Maker to Lender. Collateral consists of (1) all property specifically described hereon, (2) all personal property installed in, or affixed to, such described property, including additions, accessions, and accessories, (3) all money, deposit accounts, and other property owned by Maker and in the possession or control of Lender and all deposits, including deposit accounts, of Maker with Lender, (4) proceeds, and (5) all other property similar to that previously described which are hereafter acquired by Maker, except as limited by law in the case of consumer goods acquired more than ten days after the date Lender gives value hereunder. Collateral does not include "household goods", as defined in 12CFR Sec. 227.12(d), unless purchased with the proceeds hereof.

**2. Financial Information.** All loan applications, balance sheets, earnings statements, other financial information and other representations which have been, or may hereafter be, furnished Lender/Secured Party to induce it to enter into or continue a financial transaction with Maker fairly represent the financial condition of Maker as of the date and for the period shown therein, and all other information, reports, documents, papers and data furnished to Lender/Secured Party are or shall be, at the time furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to give Lender/Secured Party a true and accurate knowledge of the subject matter. There has been no material change in the financial condition of Maker since the effective date of the last furnished financial information which has not been reported to Lender/Secured Party in writing.

**3. Ownership Free of Encumbrances.** Except for the security interest hereby granted or a security interest previously disclosed in writing to Lender/Secured Party, Maker now owns, or will use the proceeds of the advances hereunder to become the owner of, the Collateral free from any prior liens, all claims and demands of persons claiming any interest therein adverse to the Lender/Secured Party. Maker will not permit any lien or security interests other than the Lender/Secured Party's security interest to attach to any of the Collateral, will not permit the Collateral to be levied upon, garnished or attached under any legal process, or permit any other thing to be done that may impair the value of the Collateral or the security interest afforded hereby.

**4. Financing Statement.** No Financing Statement covering Collateral is on file in any public office. Maker agrees to join with Lender/Secured Party in executing one or more Financing Statements in form satisfactory to Lender/Secured Party and provide such other documents as may be required from time to time, in order to perfect, or to continue perfection of, the security interest herein granted. A carbon, photographic or other reproduction of this Agreement or of any Financing Statement is sufficient as a Financing Statement.

**5. Residence, Use and Location.** Statements made herein or otherwise as to Maker's address and as to location, possession and use of the Collateral are true. Maker agrees to immediately notify Lender/Secured Party in writing of any proposed change in Maker's address and to provide such notification prior to the proposed effective date thereof. Maker will not permit any of the Collateral to be removed from the location specified herein without the written consent of Lender/Secured Party.

**6. Sale, Lease or Disposition of Collateral Prohibited.** Maker shall not sell, transfer, exchange, lease or otherwise dispose of the Collateral or any part thereof or the Maker's rights therein without first obtaining the prior written consent of Lender/Secured Party. The consent of Lender/Secured Party may be conditioned upon any requirements (including, but not limited to, the application of proceeds to obligations secured hereby) which requirements the Lender/Secured Party deems to be for the protection of its security interest; and, it is understood and agreed that such consent will not be deemed to be effective unless and until such requirements and conditions have been fulfilled.

The grant hereunder by Maker of a security interest in the proceeds of the Collateral shall not be construed to mean that Lender/Secured Party consents to sale or any other disposition of the Collateral.

**7. Maintenance and Inspection.** Maker at own expense shall keep the Collateral in good condition and repair, shall not permit it to be misused or abused or wasted or allowed to deteriorate except for the ordinary wear and tear of its intended primary use, shall prudently protect the Collateral from the elements, shall use the Collateral lawfully and not permit its illegal use or its use in a manner not permitted by the written insurance coverage, and shall permit and facilitate Lender/Secured Party to examine and inspect the Collateral at any time and wherever located.

**8. Taxes.** Maker shall promptly pay any and all taxes, assessments and license fees with respect to the Collateral or the use of the Collateral.

**9. Affixing to Real or Personal Property Prohibited.** Maker shall not permit any of the Collateral to become an accession or affixed to other personal property or to become attached or affixed to real property without first obtaining prior written consent of Lender. The consent of Lender may be conditional upon any requirements (including, but not limited to, the subrogation of other interest owners in and to such other personal or real property to the rights and interest of Lender) which requirements Lender deems to be for protection of its security interest; and, it is understood and agreed that such consent will not be deemed to be effective until such conditions and requirements have been fulfilled.

**10. Adequate Insurance.** Maker at own expense shall insure Collateral with companies acceptable to Lender/Secured Party against such casualties and in such amounts as prudent and adequate to protect Lender/Secured Party or as Lender/Secured Party shall require. All insurance policies shall be written for benefit of Maker and Lender/Secured Party as their interests appear and such policies or certified copies thereof evidencing same shall be furnished to Lender/Secured Party within ten days of date of this Agreement. All policies of insurance shall provide for at least ten days prior written notice of cancellation to Lender/Secured Party. Lender/Secured Party may act as attorney for Maker in the procuring of insurance, in making, adjusting, and settling claims under or canceling such insurance and in endorsing Maker's name on any drafts or checks drawn by insurers of Collateral.

**11. Expenditures of Lender.** At its option and after any written notice to Maker required by law, which notice Maker and Lender/Secured Party hereby agree is sufficient if mailed, postage prepaid, to the address of Maker provided for herein at least ten days before the commencement of the performance of the duties specified therein, it is agreed Lender/Secured Party may discharge taxes, liens, security interests or other encumbrances on the Collateral and may pay for the repair of any damage to the Collateral, for the maintenance and preservation thereof, and for insurance thereon. Maker shall be liable for and agrees to pay Lender/Secured Party for all expenditures of Lender/Secured Party for taxes on the Collateral, for the discharge of liens, security interest or other encumbrances on the Collateral, for the repair of any damage to the Collateral, and for all costs, attorney's fees and other disbursements of Lender/Secured Party in connection with the foregoing. Maker agrees promptly to reimburse Lender/Secured Party for all such expenditures and until such reimbursement the amounts of such expenditures shall be considered a liability of Maker to Lender/Secured Party which is secured by this Security Agreement and shall be subject to a FINANCE CHARGE at a rate not exceeding the INTEREST RATE provided herein. In addition, Maker shall be liable for and agrees to pay Lender/Secured Party for all costs, attorney fees and other disbursements of Lender/Secured Party as allowed by law or provided for herein in the enforcement or collection of any note, warranty, or liability of Maker to Lender/Secured Party, or in the realization upon or the enforcement or collection of any account, contract right, promissory note, chattel paper, instrument, document, deposit accounts, investment property, letter-of-credit rights, supporting obligations, or other Collateral in which Lender/Secured Party has a security interest. Maker agrees promptly to reimburse Lender/Secured Party for all such expenditures and until such reimbursement the amount of such expenditures shall be considered a liability of Maker to Lender/Secured Party which is secured by this Security Agreement.

**12. Right of Offset.** Any property, tangible or intangible, of Maker in possession of Lender/Secured Party at any time during the term hereof, or any indebtedness due from Lender/Secured Party to Maker, or any of the foregoing of any party hereto, is pledged to secure payment hereof and may at any time while the whole or any part of Maker's indebtedness to Lender/Secured Party remains unpaid, whether before or after maturity thereof, be appropriated, held or applied toward the payment of this or any obligation of Maker to Lender/Secured Party.

**13. Cooperation of Maker.** If the Collateral includes livestock, Maker, upon demand of Lender/Secured Party and with an appropriate credit for the value thereof, to the extent Lender/Secured Party deems it necessary to preserve the Collateral will make available to Lender/Secured Party all feed, both hay and grain, and all equipment used in the feeding and handling of the livestock, owned by Maker, and will cooperate with Lender/Secured Party and use his best efforts to accord Lender/Secured Party use of all the Maker's right, title and interest in or to all water privileges, and other equipment used in the feeding and handling of the livestock, and all contracts and leases covering lands for pasture and grazing. If the Collateral includes crops which are growing or planted on leased land, the Maker, in accordance with the above, will cooperate with Lender/Secured Party and use his best efforts to accord Lender/Secured Party use of all of the Maker's right, title and interest in or to all contracts or leases covering such leased real property. If the Collateral includes investment property, stocks or bonds, Maker will deliver immediately to Lender/Secured Party all proceeds of the Collateral regardless of kind, character or form, any stock rights, rights to subscribe, dividends regardless of kind, interest, any investment property, securities, or any other property which Maker may receive by reason of such Collateral to be held by Lender/Secured Party in the same manner as the property originally deposited as Collateral; provided, however, that Lender/Secured Party at its option may permit such property to be received and retained by Maker but, provided further, that Lender/Secured Party may at any time terminate such permission. Without limitation by reason of the foregoing specific agreements, Maker shall do all acts which Lender/Secured Party deems reasonable or necessary to preserve or protect the Collateral.

### EVENTS OF DEFAULT

Maker shall be in default under this Agreement upon the happening of any one or more of the following events or conditions, herein called "Events of Default":

**1.** Any warranty, covenant, agreement, representation, financial information or statement made or furnished to Lender/Secured Party by or in behalf of Maker to induce Lender/Secured Party to enter into this Agreement, or in conjunction therewith, is violated or proves to have been false in any material respect when made or furnished.

**2.** Any payment required hereunder or under any other note or obligation of Maker to this Lender/Secured Party or to others is not made when due or in accordance with terms of the applicable contract.

**3.** Maker defaults in the performance of any covenant, obligation, warranty, or provision contained in any Loan Agreement or in any other note or obligation of Maker to Lender/Secured Party or to others.

**4.** The occurrence of any event or condition which results in acceleration of the maturity of any obligation of Maker to Lender/Secured Party or to others under any note, indenture, agreement, or undertaking.

**5.** The making of any levy against or seizure, garnishment or attachment of any Collateral, the consensual encumbrance thereof by Maker, or the sale, lease or other disposition of Collateral by Maker without the prior written consent of Lender/Secured Party as required elsewhere in this Agreement.

**6.** Loss, theft, substantial damage or destruction of Collateral.

**7.** When in the judgment of Lender/Secured Party, the Collateral becomes unsatisfactory or insufficient in character or value, and upon request Maker fails to provide additional Collateral as required by Lender/Secured Party.

**8.** Any time Lender/Secured Party in its sole discretion believes the prospect of payment or performance of any liability, covenant, warranty or obligation secured hereby is impaired.

**9.** The death, dissolution, termination of existence or insolvency of Maker, the appointment of a receiver over any part of Maker's property or any part of the Collateral, an assignment for the benefit of creditors, or the commencement of any proceeding under any bankruptcy or insolvency law by or against Maker or any guarantor or surety for Maker.

### REMEDIES

Upon the occurrence of an Event of Default, and at any time thereafter, Lender/Secured Party may, at its option and without notice or demand to Maker except as otherwise provided by law, exercise any and all rights and remedies provided by the Uniform Commercial Code of the state in which Lender/Secured Party is located, as well as all other rights and remedies possessed by Lender/Secured Party, including but not limited to:

**1.** Declare all liabilities secured hereby immediately due and payable, and/or proceed to enforce payment and performance of all liabilities secured hereby, provided that, upon any prepayment in full of the unpaid balance of such liabilities, the Maker shall be entitled to a rebate of any unearned portion of any finance or other charge in accordance with law.

**2.** Require Maker to assemble Collateral or evidence thereof and make it available to Lender/Secured Party at place designated by Lender/Secured Party which is reasonably convenient to both parties.

**3.** Repossess the Collateral, and for this purpose Lender/Secured Party is hereby granted authority to enter into and upon any premises on which the Collateral or any part may be situated, and to remove it.

**4.** Possess all books and records evidencing or pertaining to the Collateral, and for this purpose Lender/Secured Party is hereby given authority to enter into and upon any premises at which such books and records or any part of them may be situated, and to remove them.

**5.** Apply that portion of the Collateral consisting of cash or cash equivalent items such as checks, drafts or deposited funds against any liabilities of Maker selected by Lender/Secured Party, and for this purpose Maker agrees that cash or equivalents will be considered identical to cash proceeds. Lender/Secured Party shall have the right immediately and without further action by it to set off against the liabilities secured hereby all money owed by Lender/Secured Party to Maker, whether due or not due, and Lender/Secured Party shall be deemed to have exercised such right to set off and to have made a charge against such money at the time of any acceleration upon default even though such charges made are entered on the Lender/Secured Party's books subsequent thereto.

**6.** Transfer any of the Collateral or evidence thereof into its own name or that of a nominee and receive the proceeds therefrom and hold the same as security for the liabilities of Maker to Lender or apply it on or against any such liability. Lender may also demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, release or realize upon Collateral, in its own name or in the name of the Maker as Lender may determine.

**7.** Sell or otherwise dispose of the Collateral. Unless Collateral in whole or part is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Maker reasonable notice of the time and place of any public sale, or of the time after which any private sale or other disposition is to be made. Any requirement of notice shall be met if notice is mailed, postage prepaid, to the address of Maker provided for herein at least ten days before sale or other disposition or action. Lender shall be entitled to, and Maker shall be liable for, all reasonable costs and expenditures of realizing on its security interest, including without limitation, court costs, fees for replevin bonds, storage, repossession costs, repair and preparation costs for sale, selling costs, and reasonable attorney fees as set forth in the PROMISSORY NOTE. All such costs are secured by the security interest in the Collateral covered herein.

**8.** Lender shall not be liable for the failure to collect any account, enforce any contract right, or for any other act or omission on the part of Lender, its officers, agents or employees, except as the same constitutes a lack of good faith or failure to act in a commercially reasonable manner. Lender shall have acted in a commercially reasonable manner if its action or non-action is consistent with general banking usage in the area of Lender's location, but this standard shall not constitute disapproval of any procedures which may be otherwise reasonable under the circumstances nor require Lender to take necessary steps to preserve rights against prior parties in an instrument or chattel paper.

### GENERAL

**1. Waivers.** No act, delay, or omission, including Lender/Secured Party's waiver of remedy because of any default hereunder, shall constitute a waiver of any of Lender/Secured Party's rights and remedies under this Agreement or any other agreement between the parties. All rights and remedies of Lender/Secured Party are cumulative and may be exercised singularly or concurrently, and the exercise of any one or more remedy will not be a waiver of any other. No waiver, change, modification, or discharge of any of Lender/Secured Party's rights or of Maker's duties as so specified or allowed will be effective unless in writing and signed by a duly authorized officer of Lender/Secured Party; and, any such waiver will not be a bar to the exercise of any right or remedy on any subsequent default. No officer or employee of Lender/Secured Party has authority to waive or modify the provisions of this paragraph. Maker waives all suretyship defenses and all rights of setoff, to the full extent permitted by law.

**2. Applicable Law.** Any cause of action for a breach of enforcement of, or a declaratory judgment respecting this agreement or any agreement related to the execution and delivery of this agreement shall be commenced and maintained only in the United States District Court for the Northern District of Oklahoma or the applicable Oklahoma state trial court sitting in Tulsa, Oklahoma and having subject matter jurisdiction; provided, however, any action to foreclose any deed of trust or real estate mortgage securing finance or repayment shall be brought in any county having mandatory venue thereof pursuant to the venue statutes of the State of Oklahoma.

**3. Agreement Binding on Assigns.** This Agreement shall inure to the benefit of the successors and assigns of Lender/Secured Party and shall be binding upon the heirs, executors, administrators, successors and assigns of Maker.

**4. Rights of Lender Assignable.** Lender at any time and at its option may pledge, transfer or assign its rights under this Agreement in whole or in part, and any transferee or assignee shall have all the rights of Lender as to the rights or parts thereof so pledged, transferred, or assigned.

**5. Joint and Several Responsibility of Maker.** If more than one Maker executes this Agreement, their responsibility hereunder shall be joint and several and the reference to Maker herein shall be deemed to refer to each Maker.

**6. Separability of Provisions.** If any provisions of this Agreement shall for any reason be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions hereof, and this Agreement shall be construed as if such invalid or unenforceable provisions had never been contained herein.

Page 2

361

**FOR INTERNAL USE ONLY**

THIS SHEET WILL NOT BECOME PART OF THE PUBLIC RECORD, AND WILL BE USED FOR INTERNAL CASE TRACKING PURPOSES.

**CIVIL COVER SHEET**

IN THE DISTRICT COURT OF _Muskogee_ COUNTY
STATE OF OKLAHOMA

PLAINTIFF _Bank of Oklahoma, N.A._
v.
DEFENDANT _Jennifer + David Littlefield_

☐ CJ
☐ CS
☐ CV
☐ SC
☐ SD

CASE NO. _CJ-03-988_

## PARTY INFORMATION

THE INFORMATION BELOW IS REQUIRED OF EACH PARTY IN THE CASE.

PARTY TYPE: ☒ PLAINTIFF   ☐ DEFENDANT   ☐ OTHER

| COMPANY OR LAST NAME | FIRST NAME | MIDDLE NAME | PREFIX (MR., ETC.) | SUFFIX (SR., ETC.) |
|---|---|---|---|---|
| Bank of Oklahoma, N.A. | | | | |

STREET ADDRESS
P.O. Box 472

ADDRESS TYPE ☐ HOME   ☐ WORK ☐
OTHER
DRIVERS LICENSE # (FEDERAL TAX ID FOR CORPORATE OR ENTITY PARTIES)

| CITY | STATE | ZIP | TELEPHONE | DATE OF BIRTH | DRIVERS LICENSE STATE |
|---|---|---|---|---|---|
| Tulsa | OK | 74103 | | | |

## ATTORNEY INFORMATION

IF LICENSED IN OKLAHOMA, FILL IN ADDRESS INFORMATION ONLY IF IT NEW SINCE THEY WERE REGISTERED WITH THE OKLAHOMA BAR ASSOCIATION. ATTACH ADDITIONAL COVER SHEETS FOR ADDITIONAL ATTORNEYS. ALL ATTORNEYS SHOULD BE LISTED. NOTE: ADDRESS CHANGES ARE EFFECTIVE IN ALL OCIS COUNTIES.

| COMPANY OR LAST NAME | FIRST NAME | MIDDLE NAME | PREFIX (MR., ETC.) | SUFFIX (SR., ETC.) |
|---|---|---|---|---|
| Lehman | Scott | Fowler | | |

STREET ADDRESS
1437 S. Boulder
Suite 820

ADDRESS TYPE ☐ HOME   ☐ WORK ☐
OTHER
EMAIL ADDRESS

| CITY | STATE | ZIP | TELEPHONE | BAR NUMBER AND STATE |
|---|---|---|---|---|
| Tulsa | OK | 74119 | 382-7623 | |

## SUMMONS INFORMATION

NUMBER OF SUMMONS TO BE ISSUED __2__

PETITION TO BE SERVED BY: ☐ SHERIFF OF _____ COUNTY
☐ PROCESS SERVER   ☐ PUBLICATION   ☐ BY HAND
☐ REGISTERED MAIL   ☐ GIVEN TO THE ATTORNEY OF RECORD   ☐ OTHER

## CLAIMS OF RELIEF REQUESTED (CIRCLE PRIMARY RELIEF, CHECK ALL OTHERS)

| | | |
|---|---|---|
| ☐ ABANDONED PROPERTY | ☐ DECLARATORY JUDGMENT | ☐ INTENTIONAL INFLICTION EMOTIONAL |
| ☐ ABSTRACT OF JUDGMENT/ FOREIGN JUDGMENT | ☐ DISCRIMINATION | DISTRESS |
| ☐ APPLICATION TO RELEASE LIEN | ☐ FORCIBLE ENTRY & DETAINER | ☐ INTERPLEADER |
| ☐ APPLICATION RE: REVOCATION OF DRIVER'S LICENSE | ☐ FORECLOSURE | ☐ LEGAL NEGLIGENCE |
| | ☐ FORFEITURE (AUTO) | ☐ LIBEL / SLANDER |
| ☐ APPEAL / CITY | ☐ STRICT LIABILITY | ☐ LOSS OF CONSORTIUM |
| ☐ APPEAL / ADMINISTRATIVE | ☐ TORTIOUS INTERFERENCE CONTRACT | ☐ MAJORITY RIGHTS |
| ☐ ARBITRATION | ☐ TRANSFER CASE / COUNTER CLAIM | ☐ MANDAMUS |
| ☐ ASSAULT & BATTERY | ☐ TRANSFER CASE / SMALL CLAIMS TO CIVIL | ☐ MALICIOUS PROSECUTION |
| ☐ AUTO NEGLIGENCE | ☐ TRUST | ☐ MEDICAL NEGLIGENCE |
| ☐ BAD FAITH INSURER LIABILITY | ☐ WAIVER OF PENALTY TAX | ☐ PARTITION |
| ☒ BREACH AGREEMENT / CONTRACT | ☐ WRONGFUL DEATH | ☐ PREMISES LIABILITY |
| ☐ BREACH OF FIDUCIARY DUTY | ☐ WRONGFUL TERMINATION | ☐ PROFESSIONAL NEGLIGENCE |
| ☐ CANCELLATION OF LEASE | ☐ FORFEITURE (CONTRABAND) | ☐ PRODUCT LIABILITY |
| ☐ CHANGE OF NAME | ☐ FRAUD | ☐ PROMISSORY NOTE |
| ☐ CLASS ACTION | ☐ FRIENDLY SUIT | ☐ QUIET TITLE |
| ☐ CONDEMNATION | ☐ INDEBTEDNESS | ☐ REFORMATION OF DEED / INSTRUMENT |
| | ☐ INJUNCTION / RESTRAINING ORDER | ☐ REPLEVIN |
| | | ☐ SPECIFIC PERFORMANCE |
| | | ☐ OTHER _____ |
| | | ☐ OTHER _____ |

THIS COVER SHEET IS REQUIRED TO BE SUBMITTED BY ALL PARTIES WITH THEIR INITIAL FILING. THIS DOCUMENT IS REQUIRED BY SUPREME COURT ADMINISTRATIVE DIRECTIVE SCAD-1999-87.

Promulgated by the Oklahoma Administrative Office of the Courts

**REVISION 5-16-2000**

362

IN THE DISTRICT COURT IN AND FOR MUSKOGEE COUNTY
STATE OF OKLAHOMA

BANK OF OKLAHOMA N.A. )
)
     Plaintiff, )
)
v. )     *CJ-03-988*
)
JENNIFER & DAVID LITTLEFIELD, )
)
     Defendant(s). )

## SUMMONS

To the above-named Defendant: Jennifer Littlefield, SSN: 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

| Home Address | Work Address |
|---|---|
| ▆▆▆▆▆▆▆▆ Muskogee, Ok 74403 (918)457-3141 | |

You have been sued by the above-named Plaintiff, and you are directed to file a written answer to the attached Petition in the Court at the above address within **thirty (30) days** after service of this summons upon you, exclusive of the day of service. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the Plaintiff. Unless you answer the Petition within the time stated, judgment will be rendered against you with costs of the action.

IMPORTANT NOTICE: THE FOLLOWING NOTICE IS PROVIDED PURSUANT TO TITLE 15 U.S.C.A. § 1692(g), FAIR DEBT COLLECTION PRACTICES ACT: THE AMOUNT OF THE DEBT IS AS SET FORTH IN THE ATTACHED PETITION. THE CREDITOR TO WHOM THE DEBT IS OWED IS THE PLAINTIFF NAMED ABOVE. UNLESS THE CONSUMER (THE PERSON OBLIGATED OR ALLEGEDLY OBLIGATED FOR THE PAYMENT OF THE ABOVE DEBT), WITHIN THIRTY DAYS AFTER RECEIPT OF THE NOTICE, DISPUTES THE VALIDITY OF THE DEBT, OR ANY PORTION THEREOF, THE DEBT WILL BE ASSUMED TO BE VALID BY PLAINTIFF'S ATTORNEY. IF SAID CONSUMER NOTIFIES THE UNDERSIGNED ATTORNEY FOR PLAINTIFF IN WRITING WITHIN SAID THIRTY DAY-PERIOD THAT THE DEBT, OR ANY PORTION THEREOF IS DISPUTED, SAID ATTORNEY WILL OBTAIN VERIFICATION OF THE DEBT AND A COPY OF SUCH VERIFICATION WILL BE MAILED TO THE SAID CONSUMER WITHIN THE THIRTY-DAY PERIOD, THE UNDERSIGNED ATTORNEY FOR THE PLAINTIFF WILL PROVIDE THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR, IF DIFFERENT FROM THE CURRENT CREDITOR.

EVEN THOUGH YOUR ANSWER TO THE PETITION IS TO BE FILED WITHIN THIRTY (30) DAYS AS STATED ABOVE, YOU MAY OBTAIN AN EXTENSION OF THAT TIME. FURTHERMORE, NO REQUEST WILL BE MADE TO THE COURT FOR A JUDGMENT UNTIL THE EXPIRATION OF THIRTY (30) DAYS AFTER YOUR RECEIPT OF THIS SUMMONS AND PETITION. HOWEVER IF YOU REQUEST PROOF OF THE DEBT OR THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR WITHIN THE THIRTY (30) DAY PERIOD THAT BEGINS WITH YOUR RECEIPT OF THIS SUMMONS AND PETITION, THE LAW REQUIRES THAT OUR EFFORTS TO COLLECT THIS DEBT (THROUGH LITIGATION OR OTHERWISE) TO CEASE UNTIL THE REQUESTED INFORMATION IS MAILED TO YOU. YOU SHOULD CONSULT AN ATTORNEY FOR ADVICE CONCERNING YOUR RIGHTS AND OBLIGATIONS IN THIS SUIT.

     Issued this _25th_ day of _June_, 2003.

(SEAL)

                                              Court Clerk

                                            By: _____
                                                   Deputy Court Clerk

Scott F. Lehman, OBA #15908
Marcus N. Ratcliff, OBA #19201
Richard A. Chapman, OBA #17849
Latham, Stall, Wagner, Steele & Lehman
1437 South Boulder, Suite 820
Tulsa, OK 74119
Phone: (918)858-9040
Fax:   (918)382-7541

                                                Lee Belmonte
                                              Appointed to serve. PSL#_____

                                              Authorized by

     **THIS SUMMONS** was served on _____ (date of service).

                              _____
                             (Signature of person serving summons)

THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.



IN THE DISTRICT COURT IN AND FOR MUSKOGEE COUNTY
STATE OF OKLAHOMA

BANK OF OKLAHOMA N.A.     )

       Plaintiff,     )

v.     )      **CJ-03-928**

JENNIFER & DAVID LITTLEFIELD,     )

       Defendant(s).     )

## SUMMONS

To the above-named Defendant: David Littlefield, SSN: 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

| Home Address | Work Address |
|---|---|
| ████████████ Muskogee, Ok 74403 (918)457-3141 | US Govt, 1200 W Okmulgee, Muskogee, OK (918)684-5700 |

You have been sued by the above-named Plaintiff, and you are directed to file a written answer to the attached Petition in the Court at the above address within **thirty (30) days** after service of this summons upon you, exclusive of the day of service. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the Plaintiff. Unless you answer the Petition within the time stated, judgment will be rendered against you with costs of the action.

IMPORTANT NOTICE: THE FOLLOWING NOTICE IS PROVIDED PURSUANT TO TITLE 15 U.S.C.A. § 1692(g), FAIR DEBT COLLECTION PRACTICES ACT: THE AMOUNT OF THE DEBT IS AS SET FORTH IN THE ATTACHED PETITION. THE CREDITOR TO WHOM THE DEBT IS OWED IS THE PLAINTIFF NAMED ABOVE. UNLESS THE CONSUMER (THE PERSON OBLIGATED OR ALLEGEDLY OBLIGATED FOR THE PAYMENT OF THE ABOVE DEBT), WITHIN THIRTY DAYS AFTER RECEIPT OF THE NOTICE, DISPUTES THE VALIDITY OF THE DEBT, OR ANY PORTION THEREOF, THE DEBT WILL BE ASSUMED TO BE VALID BY PLAINTIFF'S ATTORNEY. IF SAID CONSUMER NOTIFIES THE UNDERSIGNED ATTORNEY FOR PLAINTIFF IN WRITING WITHIN SAID THIRTY DAY-PERIOD THAT THE DEBT, OR ANY PORTION THEREOF IS DISPUTED, SAID ATTORNEY WILL OBTAIN VERIFICATION OF THE DEBT AND A COPY OF SUCH VERIFICATION WILL BE MAILED TO THE SAID CONSUMER WITHIN THE THIRTY-DAY PERIOD, THE UNDERSIGNED ATTORNEY FOR THE PLAINTIFF WILL PROVIDE THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR, IF DIFFERENT FROM THE CURRENT CREDITOR.

EVEN THOUGH YOUR ANSWER TO THE PETITION IS TO BE FILED WITHIN THIRTY (30) DAYS AS STATED ABOVE, YOU MAY OBTAIN AN EXTENSION OF THAT TIME. FURTHERMORE, NO REQUEST WILL BE MADE TO THE COURT FOR A JUDGMENT UNTIL THE EXPIRATION OF THIRTY (30) DAYS AFTER YOUR RECEIPT OF THIS SUMMONS AND PETITION. HOWEVER IF YOU REQUEST PROOF OF THE DEBT OR THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR WITHIN THE THIRTY (30) DAY PERIOD THAT BEGINS WITH YOUR RECEIPT OF THIS SUMMONS AND PETITION, THE LAW REQUIRES THAT OUR EFFORTS TO COLLECT THIS DEBT (THROUGH LITIGATION OR OTHERWISE) TO CEASE UNTIL THE REQUESTED INFORMATION IS MAILED TO YOU. YOU SHOULD CONSULT AN ATTORNEY FOR ADVICE CONCERNING YOUR RIGHTS AND OBLIGATIONS IN THIS SUIT.

Issued this 25th day of June, 2003.

(SEAL)

Court Clerk

By: _____
     Deputy Court Clerk

Scott F. Lehman, OBA #15908
Marcus N. Ratcliff, OBA #19201
Richard A. Chapman, OBA #17849
Latham, Stall, Wagner, Steele & Lehman
1437 South Boulder, Suite 820
Tulsa, OK 74119
Phone: (918)858-9040
Fax:   (918)382-7541

Lee Belmonte
Appointed to serve. PSL#_____

_____
Authorized by

THIS SUMMONS was served on _____ (date of service).

_____
**(Signature of person serving summons)**

THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.

IN THE DISTRICT COURT IN AND FOR MUSKOGEE COUNTY
STATE OF STATE OF OKLAHOMA

**BANK OF OKLAHOMA N.A.**

Plaintiff,

v.

**JENNIFER & DAVID LITTLEFIELD,**

Defendant(s).

CT-01-9ee

2003 JUL 22 AM 8:53

PAULA SEXTON
COURT CLERK

ORIGINAL

**SUMMONS**

To the above-named Defendant: David Littlefield, SSN: 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

| Home Address | Work Address |
|---|---|
| ▮▮▮▮▮ Muskogee, Ok 74403 (918)457-3141 | US Govt, 1200 W Okmulgee, Muskogee, OK |
| 774 3290 | (918)684-5700 DISC |

You have been sued by the above-named Plaintiff, and you are directed to file a written answer to the attached Petition in the Court at the above address within thirty (30) days after service of this summons upon you, exclusive of the day of service. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the Plaintiff. Unless you answer the Petition within the time stated, judgment will be rendered against you with costs of the action.

IMPORTANT NOTICE: THE FOLLOWING NOTICE IS PROVIDED PURSUANT TO TITLE 15 U.S.C.A. § 1692(g), FAIR DEBT COLLECTION PRACTICES ACT: THE AMOUNT OF THE DEBT IS AS SET FORTH IN THE ATTACHED PETITION. THE CREDITOR TO WHOM THE DEBT IS OWED IS THE PLAINTIFF NAMED ABOVE. UNLESS THE CONSUMER (THE PERSON OBLIGATED OR ALLEGEDLY OBLIGATED FOR THE PAYMENT OF THE ABOVE DEBT), WITHIN THIRTY DAYS AFTER RECEIPT OF THE NOTICE, DISPUTES THE VALIDITY OF THE DEBT, OR ANY PORTION THEREOF, THE DEBT WILL BE ASSUMED TO BE VALID BY PLAINTIFF'S ATTORNEY. IF SAID CONSUMER NOTIFIES THE UNDERSIGNED ATTORNEY FOR PLAINTIFF IN WRITING WITHIN SAID THIRTY DAY-PERIOD THAT THE DEBT, OR ANY PORTION THEREOF IS DISPUTED, SAID ATTORNEY WILL OBTAIN VERIFICATION OF THE DEBT AND A COPY OF SUCH VERIFICATION WILL BE MAILED TO THE SAID CONSUMER WITHIN THE THIRTY-DAY PERIOD, THE UNDERSIGNED ATTORNEY FOR THE PLAINTIFF WILL PROVIDE THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR, IF DIFFERENT FROM THE CURRENT CREDITOR.

EVEN THOUGH YOUR ANSWER TO THE PETITION IS TO BE FILED WITHIN THIRTY (30) DAYS AS STATED ABOVE, YOU MAY OBTAIN AN EXTENSION OF THAT TIME. FURTHERMORE, NO REQUEST WILL BE MADE TO THE COURT FOR A JUDGMENT UNTIL THE EXPIRATION OF THIRTY (30) DAYS AFTER YOUR RECEIPT OF THIS SUMMONS AND PETITION. HOWEVER IF YOU REQUEST PROOF OF THE DEBT OR THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR WITHIN THE THIRTY (30) DAY PERIOD THAT BEGINS WITH YOUR RECEIPT OF THIS SUMMONS AND PETITION, THE LAW REQUIRES THAT OUR EFFORTS TO COLLECT THIS DEBT (THROUGH LITIGATION OR OTHERWISE) TO CEASE UNTIL THE REQUESTED INFORMATION IS MAILED TO YOU. YOU SHOULD CONSULT AN ATTORNEY FOR ADVICE CONCERNING YOUR RIGHTS AND OBLIGATIONS IN THIS SUIT.

Issued this 25th day of June, 2003.

(SEAL)

Scott F. Lehman, OBA #15908
Marcus N. Ratcliff, OBA #19201
Richard A. Chapman, OBA #17849
Latham, Stall, Wagner, Steele & Lehman
1437 South Boulder, Suite 820
Tulsa, OK 74119
Phone: (918)858-9040
Fax: (918)382-7541

Paula Sexton
Court Clerk

By: _____
Deputy Court Clerk

ART HIGLEY
Appointed to serve. PSL# 2003-7

Richard Chap
Authorized by

THIS SUMMONS was served on 7-8-03 (date of service).

ART HIGLEY
(Signature of person serving summons)

THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.

*Muskogee*
*C.J-03- 7*

## Lee Belmonté — B.P.I.

P. O. Box 470124 • Tulsa, OK 74147 • (918) 665-4817 • 800-324-2048
*Serving all of Oklahoma*

### PROOF OF SERVICE

Documents Served: I, being duly sworn, certify that I received the foregoing, to wit:

X Summons w/Petition
___ Summons
___ Temporary Order
___ Temporary Restraining Order
___ Notice: _____
___ Motion: _____
___ Order: _____
___ Interrogatories
___ Other: _____

___ Request for Production
___ Request for Admissions

___ Affidavit
___ FE&D
___ HOA
___ Citation
___ Subpoena w/Fees
___ Subpoena Duces Tecum
___ Garnishment

**METHOD OF SERVICE:** Answered the same according to law in the following manner, to wit:

**PERSONAL SERVICE**
X by delivering a true copy of said process personally to *David Littlefield*
at *1200 W. Okmulgee Muskokee* Date: *7-8-03* Time: _____
☐ by delivering a true copy of said process personally to _____
at _____ Date: _____ Time: _____

**USUAL PLACE OF RESIDENCE**
☐ by leaving a copy of said process for _____ with _____
a resident/family member, fifteen years of age or older, at _____
which is his/her usual place of residence. Date: _____ Time: _____

**CORPORATION/PARTNERSHIP, ETC.**
☐ by delivering a true copy of said process to _____ he/she/it,
being the service agent, agent in charge, an officer or partner of said entity, to wit: _____
_____ at _____ Date: _____ Time: _____

**POSTED SERVICE**
☐ by affixing a true copy of said process to the premises located at _____
which is in the possession of the defendant to wit: _____ Date _____

**SERVICE BY MAIL**
☐ by mailing a true copy of said process to _____ by certified mail,
restricted delivery, return receipt requested, at _____ Date: _____
Receipted on Date: _____. Copy attached.

**NOT FOUND**
☐ Said process WAS NOT SERVED on the following named for reasons stated: _____
_____

**OTHER INFORMATION**
☐ _____

Subscribed and sworn before me this *14* day of
_____
*Annette*
Notary Public
(SEAL)

ANNETTE L. KEY
Tulsa County
Notary Public in and for
State of Oklahoma
Comm # 02007291  Exp. May 01 2006
Commission Exp.

Undersigned declares under penalty of perjury that the foregoing is true and correct.

*Arthur Higby*
Name of Server

License Number: *2003-7*

IN THE DISTRICT COURT IN AND FOR MUSKOGEE COUNTY
STATE OF OKLAHOMA

BANK OF OKLAHOMA N.A.

      Plaintiff,

v.

JENNIFER & DAVID LITTLEFIELD,

      Defendant(s).

2003 JUL 22 AM 8: 53

COURT CLERK ON   CT-03-985

**SUMMONS**

To the above-named Defendant: Jennifer Littlefield, SSN: 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

| Home Address | Work Address |
|---|---|
| Muskogee, Ok 74403 (918)457-3141 | |

3800 E HARRIS RD

You have been sued by the above-named Plaintiff, and you are directed to file a written answer to the attached Petition in the Court at the above address within thirty (30) days after service of this summons upon you, exclusive of the day of service. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the Plaintiff. Unless you answer the Petition within the time stated, judgment will be rendered against you with costs of the action.

IMPORTANT NOTICE: THE FOLLOWING NOTICE IS PROVIDED PURSUANT TO TITLE 15 U.S.C.A. § 1692(g), FAIR DEBT COLLECTION PRACTICES ACT: THE AMOUNT OF THE DEBT IS AS SET FORTH IN THE ATTACHED PETITION. THE CREDITOR TO WHOM THE DEBT IS OWED IS THE PLAINTIFF NAMED ABOVE. UNLESS THE CONSUMER (THE PERSON OBLIGATED OR ALLEGEDLY OBLIGATED FOR THE PAYMENT OF THE ABOVE DEBT), WITHIN THIRTY DAYS AFTER RECEIPT OF THE NOTICE, DISPUTES THE VALIDITY OF THE DEBT, OR ANY PORTION THEREOF, THE DEBT WILL BE ASSUMED TO BE VALID BY PLAINTIFF'S ATTORNEY. IF SAID CONSUMER NOTIFIES THE UNDERSIGNED ATTORNEY FOR PLAINTIFF IN WRITING WITHIN SAID THIRTY DAY-PERIOD THAT THE DEBT, OR ANY PORTION THEREOF IS DISPUTED, SAID ATTORNEY WILL OBTAIN VERIFICATION OF THE DEBT AND A COPY OF SUCH VERIFICATION WILL BE MAILED TO THE SAID CONSUMER WITHIN THE THIRTY-DAY PERIOD, THE UNDERSIGNED ATTORNEY FOR THE PLAINTIFF WILL PROVIDE THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR, IF DIFFERENT FROM THE CURRENT CREDITOR.

EVEN THOUGH YOUR ANSWER TO THE PETITION IS TO BE FILED WITHIN THIRTY (30) DAYS AS STATED ABOVE, YOU MAY OBTAIN AN EXTENSION OF THAT TIME. FURTHERMORE, NO REQUEST WILL BE MADE TO THE COURT FOR A JUDGMENT UNTIL THE EXPIRATION OF THIRTY (30) DAYS AFTER YOUR RECEIPT OF THIS SUMMONS AND PETITION. HOWEVER IF YOU REQUEST PROOF OF THE DEBT OR THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR WITHIN THE THIRTY (30) DAY PERIOD THAT BEGINS WITH YOUR RECEIPT OF THIS SUMMONS AND PETITION, THE LAW REQUIRES THAT OUR EFFORTS TO COLLECT THIS DEBT (THROUGH LITIGATION OR OTHERWISE) TO CEASE UNTIL THE REQUESTED INFORMATION IS MAILED TO YOU. YOU SHOULD CONSULT AN ATTORNEY FOR ADVICE CONCERNING YOUR RIGHTS AND OBLIGATIONS IN THIS SUIT.

Issued this 25th day of June, 2003.

(SEAL)

Court Clerk

By: _____
Deputy Court Clerk

Scott F. Lehman, OBA #15908
Marcus N. Ratcliff, OBA #19201
Richard A. Chapman, OBA #17849
Latham, Stall, Wagner, Steele & Lehman
1437 South Boulder, Suite 820
Tulsa, OK 74119
Phone: (918)858-9040
Fax:   (918)382-7541

Appointed to serve. PSL# 2003 84

Authorized by

THIS SUMMONS was served on _____ 7-16-03 _____

(Signature of person serving summons)

THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.

*Mushogee*
*J-03-988*

## Lee Belmonté — B.P.I.

P.O. Box 470124 • Tulsa, OK 74147 • (918) 665-4817 • 800-324-2048
*Serving all of Oklahoma*

## PROOF OF SERVICE

Documents Served: I, being duly sworn, certify that I received the foregoing, to wit:

- X Summons w/Petition
- Summons
- Temporary Order
- Temporary Restraining Order
- Notice: _____
- Motion: _____
- Order: _____
- Interrogatories
- Other: _____

- _____ Request for Production
- _____ Request for Admissions

- _____ Affidavit
- _____ FE&D
- _____ HOA
- _____ Citation
- _____ Subpoena w/Fees
- _____ Subpoena Duces Tecum
- _____ Garnishment

**METHOD OF SERVICE:** Answered the same according to law in the following manner, to wit:

**PERSONAL SERVICE**
- ☐ by delivering a true copy of said process personally to _____
  at _____ Date: _____ Time: _____
- ☐ by delivering a true copy of said process personally to _____
  at _____ Date: _____ Time: _____

**USUAL PLACE OF RESIDENCE**
- ☒ by leaving a copy of said process for *Jennifer Littlefield* with *M. Littlefield - Home*
  a resident/family member, fifteen years of age or older, at *3007 River Oaks Dr. Muskogee*
  which is his/her usual place of residence. Date: *7-16-03* Time: _____

**CORPORATION/PARTNERSHIP, ETC.**
- ☐ by delivering a true copy of said process to _____ he/she/it,
  being the service agent, agent in charge, an officer or partner of said entity, to wit: _____
  _____ at _____ Date: _____ Time: _____

**POSTED SERVICE**
- ☐ by affixing a true copy of said process to the premises located at _____
  which is in the possession of the defendant to wit: _____ Date _____

**SERVICE BY MAIL**
- ☐ by mailing a true copy of said process to _____ by certified mail,
  restricted delivery, return receipt requested, at _____ Date: _____
  Receipted on Date: _____. Copy attached.

**NOT FOUND**
- ☐ Said process WAS NOT SERVED on the following named for reasons stated: _____

OTHER INFORMATION *Avoiding Service, Would not give Name! First!*

Subscribed and sworn before me this *20* day of _____ 20 *03*.

ANNETTE L. KEY
Tulsa County
Notary Public in and for
State of Oklahoma
#02027293 Exp. May 01 Commission Exp. *5-1-06*

*Annette L. Key*
Notary Public
(SEAL)

Undersigned declares under penalty of perjury
that the foregoing is true & correct.

_____
Name of Server

License Number: *2003-7*

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

REDACTED EXHIBIT 194

TO KENNETH EUGENE BARRETT'S

SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255          *U.S. v. Barrett*, 6:09-cv-00105-JHP

372

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

IN THE MATTER OF SEARCH WARRANT    )
FOR THE RESIDENCE OF KENNY BARRETT  )
LOCATED IN SEQUOYAH COUNTY      )        CASE NO. _____
STATE OF OKLAHOMA             )

### AFFIDAVIT FOR SEARCH WARRANT

I, Clint Johnson, being of lawful age, first being duly sworn, state as follows:

I am an Investigator with the office of the District Attorney for the, Twenty-seventh (27th) Prosecutorial District Drug Task Force for the State of Oklahoma and have been so employed for the past two (2) years. During my employment as an Investigator I have been involved in numerous drug investigations and have attended schools in the investigation and recognition of drugs and drug paraphenalia, as defined in Title 63 of the Oklahoma Statutes.

I have probable cause to believe that the following property constitutes evidence of a crime as defined under Oklahoma Statutes in Title 63, to-wit: Unlawful possession, distribution and/or manufacturing of controlled dangerous substances.

Methamphetamine and/or other controlled dangerous substances, a more Particular description this affiant cannot give, and personal property Consisting of that paraphenalia ordinarily used in manufacturing, Administering, utilizing or consuming said drugs together with books, Records, receipts, telephone records, video-taped transactions, audio-taped Transactions, plastic baggies, and equipment, chemicals, formulas, notes, and Similar documents and materials and money used in the sale and distribution Of said drugs, Letters, utility bills and other documents showing proof of Residency for the occupants of the residence.

I further state that the above described property may be found and is now being kept, possessed and/or concealed in the following described location, or upon or within certain vehicles, and/or house, building or premises, the curtilage thereof and appurtenances thereof belonging in, **SEQUOYAH** County, Oklahoma, described as follows:

The residence of Kenny Barrett, which may be located by beginning at the intersection of ▓▓▓▓▓▓▓▓▓▓

*102*

KEB502161

located in the City of Sallisaw, Sequoyah County, Oklahoma. At this intersection travel west on United States Highway Sixty-four (U.S. 64) for approximately five and five-tenths (5.5) miles to the intersection of United States Highway Sixty-four (U.S. 64) and an unmarked paved county road (also known as Dwight Mission Road.) at this intersection turn right (north) onto the unmarked paved county road and travel approximately three (3.0) miles to a three way intersection. At this intersection turn right (east) onto an unmarked paved county road and travel approximately one- (1.0) mile and the unmarked paved county road will curve to the north and intersect with a dirt/gravel county road. At this intersection continue on the dirt/gravel road for approximately one hundred (100) yards to the intersection of the dirt/gravel county road and the second drive on the left (north) side of the road which leads to the residence to be searched. There is a galvanized gate at the entrance of the driveway and there are cow skulls hanging on the gatepost, one on either side of the gate.

The residence to be searched is described as being two-story wood frame structure with the main portion of the residence unpainted. The residence has a brown composition shingled roof with the front door facing south. To the west of the residence is a smaller wood and metal building. Adjacent to the building is several vehicles of assorted make and models.

As probable cause for believing that said property may be found at the location aforesaid, I allege and state as follows

On September 18, 1999 this affiant was contacted by a confidential informant (CI) who advised that, within the past seventy-two (72) hours, they were in the above described residence and observed a male that is known to the CI as Kenny Barrett present a quantity of a white powder substance and represent it as being "methamphetamine".

The CI went on to state that while in the above described residence they observed Kenny Barrett divide and exchange a portion of the white powder substance for a quantity of money. The CI stated that they had been in the above-described residence on previous occasions and observed Kenny Barrett make "drug transactions".

The CI further stated that while in the above described residence they overheard Kenny Barrett state "if the cops try to raid me they will regret it because I'm going to kill the first cop through the door." The CI also stated that while in the residence they observed several pistols lying around the residence and also Kenny Barrett had a pistol on his person.

This affiant is familiar with Kenny Barrett due to a pending investigation for the past six (6) months and is familiar that Kenny Barrett has an outstanding felony arrest warrant out of Sequoyah County, Oklahoma for failure to appear for a jury trial and unlawful delivery of CDS case number CF-97-86.

KEB502162

This affiant has learned from the CI that Kenny Barrett is maintaining his "drug transactions" in the night time hours due to the cover of darkness and that law enforcement personnel are less frequent at night.

The CI further stated that Kenny Barrett, due to Kenny Barrett's belief that law enforcement personnel cannot execute search warrants during the night, sell's controlled dangerous substances at nighttime and keeps large quantities of methamphetamine in his residence at nighttime in order to be undetected by law enforcement personnel.

This affiant asks that this search warrant be directed for day or night service due to the facts stated herein.

This affiant received information from the informant on at least five (5) occasions. Each time that this informant has provided information, the information proved to be true and accurate and resulted in the confiscation of illegal substances

Based upon my knowledge, experience and training I know that persons engaged in the sale of controlled substances, especially methamphetamine, commonly utilize various tools and articles, which are commonly referred to as "paraphenalia" to prepare, divide, weigh and package their drugs for distribution; further, it is my experience that said dealers routinely keep records of their various drug transactions in the form of handwritten notes and electronic recordings, so that misunderstandings do not occur with their customers.

WHEREFORE, Affiant ask that a search warrant be issued according to law, directed to the Sheriff of SEQUOYAH County, Oklahoma, or any of his duly appointed and authorized deputies, or to any constable or policeman of Sequoyah County, or peace officer of the State of Oklahoma, including any Drug Task Force Officer/Investigator with the 27th Prosecutorial District, Trooper of the Oklahoma Highway Patrol, Agent of the Oklahoma State Bureau of Narcotics and Dangerous Drugs, Agent of the Oklahoma State Bureau of Investigation, or Special Agents and Task Force Officers of the Drug Enforcement Administration, Special Agent with the Bureau of Alcohol, Tobacco and Firearms, or any other state or federal peace officer.

AFFIANT FURTHUR REQUEST that officers be directed to execute this warrant without the normally required knocking and announcing of law enforcement personnel's presence, due to the violent and unstable nature of KENNY BARRETT and the danger posed to law enforcement personnel by KENNY BARRETT and/or other unknown persons who may be present.

164

KEB502163

**FURTHER AFFIANT SAYETH NOT.**

_____
AFFIANT

SUBSCRIBED AND SWORN to before me this 20ᵗʰ day of September, 1999

_____
JUDGE OF THE DISTRICT COURT

165

376

KEB502164

377

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY**
**STATE OF OKLAHOMA**

IN THE MATTER OF SEARCH WARRANT    )
FOR THE RESIDENCE OF KENNY BARRETT  )
LOCATED IN SEQUOYAH COUNTY        )        CASE NO. _____
STATE OF OKLAHOMA               )


**SEARCH WARRANT**


To the Sheriff of **SEQUOYAH** County, Oklahoma, or any of his duly appointed and authorized deputies, or to any constable or policeman of Sequoyah County, or peace officer of the State of Oklahoma, including any Drug Task Force Officer/Investigator with the 27th Prosecutorial District, Trooper of the Oklahoma Highway Patrol, Agent of the Oklahoma State Bureau of Narcotics and Dangerous Drugs, Agent of the Oklahoma State Bureau of Investigation, or Special Agents and Task Force Officers of the Drug Enforcement Administration, Special Agent with the Bureau of Alcohol, Tobacco and Firearms, or any other state or federal peace officer.

Probable cause having been shown on this date before me by Clint Johnson, an Investigator with the office of the District Attorney's Drug Task Force for the, Twenty-Seventh (27th) Prosecutorial District for the State of Oklahoma.

The following property constitutes evidence of a crime as defined under Oklahoma Statutes in Title 63 to-wit: Unlawful possession, distribution and/or manufacturing of controlled dangerous substances.

Methamphetamine and/or other controlled dangerous substances, a more Particular description this affiant cannot give, and personal property Consisting of that paraphenalia ordinarily used in manufacturing, Administering, utilizing or consuming said drugs together with books, Records, receipts, telephone records, video-taped transactions, audio-taped Transactions, plastic baggies, and equipment, chemicals, formulas, notes, and Similar documents and materials and money used in the sale and distribution Of said drugs, Letters, utility bills and other documents showing proof of Residency for the occupants of the residence.

Which is currently being kept, possessed and/or concealed in the following described location, or upon or within certain vehicles, and/or house, building or premises, the curtilage thereof and appurtenances thereof belonging, in **SEQUOYAH** County, Oklahoma, described as follows:

166

KEB502165

The residence of Kenny Barrett, which may be located by beginning at the intersection of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ located in the City of Sallisaw, Sequoyah County, Oklahoma. At this intersection travel west on United States Highway Sixty-four (U.S. 64) for approximately five and five-tenths (5.5) miles to the intersection of United States Highway Sixty-four (U.S. 64) and an unmarked paved county road (also known as Dwight Mission Road.) at this intersection turn right (north) onto the unmarked paved county road and travel approximately three (3.0) miles to a three way intersection. At this intersection turn right (east) onto an unmarked paved county road and travel approximately one- (1.0) mile and the unmarked paved county road will curve to the north and intersect with a dirt/gravel county road. At this intersection continue on the dirt/gravel road for approximately one hundred (100) yards to the intersection of the dirt/gravel county road and the second drive on the left (north) side of the road which leads to the residence to be searched. There is a galvanized gate at the entrance of the driveway and there are cow skulls hanging on the gatepost, one on either side of the gate.

The residence to be searched is described as being two-story wood frame structure with the main portion of the residence unpainted. The residence has a brown composition shingled roof with the front door facing south. To the west of the residence is a smaller wood and metal building. Adjacent to the building is several vehicles of assorted make and models.

**YOU ARE THEREFORE COMMANDED**, at any time of the **day and/or night** to make a search of said residence, vehicles, and/or buildings and premises, the curtilage thereof and appurtenances thereto belonging to the described property, for said property, and if found to seize the same, and make a return hereof pursuant to Title 22 O.S. 1991 s.s. 1233.

**YOU ARE FURTHUR COMMANDED** to execute this warrant without the normally required knocking and announcing of law enforcement personnel's presence, due to the violent and unstable nature of **KENNY BARRETT** and the danger posed to law enforcement personnel by **KENNY BARRETT** and/or other unknown persons who may be present.

WARRANT ISSUED at _11:38_ o'clock, _A_.m. on this _20th_ day of _Sept_, 1999

_____
**JUDGE OF THE DISTRICT COURT**

167

378

KEB502166

379

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**REDACTED EXHIBIT 195**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255          *U.S. v. Barrett*, 6:09-cv-00105-JHP

379

INFORMATION

DISTRICT COURT OKLAHOMA
FILED
SEP 1 0 2002
BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA  )
         Plaintiff,  )
vs.  )  No. CF-02- 477
  )
RANDY OWEN TURMAN  )
DOB: ▇▇-61 SS# ▇▇-3638  )
         Defendant.  )

### INFORMATION

### IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:

Now comes DIANNE BARKER HARROLD, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that Randy Owen Turman did, in Sequoyah County, and in the State of Oklahoma, on the 30th day of August, in the year of our Lord, Two Thousand Two and before the presentment hereof, commit the crime of

### COUNT I
### MANUFACTURE OF C.D.S. (Felony) 63 O.S. 2-401
Randy Owen Turman did unlawfully, knowingly and feloniously manufacture at Route 1 Box 189-B Vian, Oklahoma, known as the Randy Turman residence, in Sequoyah County, State of Oklahoma, METHAMPHETAMINE, classified as a controlled dangerous substance in Schedule II of the Uniform Controlled Dangerous Substances Act of this State,

### COUNT II
### POSSESSION OF CONTROLLED DRUG WITH INTENT TO DISTRIBUTE
### 63 O.S. 2-401
On the day and year and in the county and state aforesaid, said Randy Owen Turman did unlawfully, wilfully and feloniously have in his possession and under his control METHAMPHETAMINE with the felonious intent then and there to unlawfully deliver and distribute the same, said drug being classified as a controlled dangerous substance in Schedule II of the Uniform Controlled Dangerous Substances Act of this State,

### COUNT III
### POSSESSION OF PRECURSOR MATERIAL- (FELONY) 63 O.S. 2-322
That on the day and year, and in the County and State, aforesaid, Randy Owen Turman, did unlawfully, wilfully and feloniously possess RED PHOSPHORUS, a precursor substance without first having a permit or license issued by the Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control,

### COUNT IV
### POSSESSION OF PRECURSOR MATERIAL- (FELONY) 63 O.S. 2-322
That on the day and year, and in the County and State, aforesaid, Randy Owen Turman did unlawfully, wilfully and feloniously possess EPHEDRINE, a precursor substance without first having a permit or license issued by the Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control,

### COUNT V
### POSSESSION OF FIREARM IN COMMISSION OF FELONY
### 21 O.S. 1287
That on the day and year, and in the County and State, aforesaid, Randy Owen Turman, did unlawfully, wilfully, and feloniously, while committing the felony of Manufacture of CDS , did then and there possess a firearm, to-wit: a Remington Model 522 Viper .22 Rifle, whether loaded or not, in such commission or attempt,

380

COUNT VI

POSSESSION OF FIREARM WITH ALTERED SERIAL NUMBER 21- O.S. 1550

That on the day and year, and in the County and State, aforesaid, Randy Owen Turman, did have in his possession and under his control a firearm described as a Norinco SKS 7.69x32 of which the factory serial number or identification number had been removed, defaced altered, obliterated or mutilated,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

By _____
Assistant District Attorney

STATE OF OKLAHOMA )
) ss.
COUNTY OF SEQUOYAH)

Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____
Assistant District Attorney

Subscribed and sworn to before me this ___ day of September, 2002.

My Commission Expires:
6/23/04  #00010626

_____
NOTARY PUBLIC

WITNESSES:
Agent Frank Loyd c/o D.A. Office
Officer Bob Young Vian P.D.
Deputy Kelly Karnes SCSO
Deputy Travis Gabbert SCSO
Chemist, OSBI Lab, Tahlequah, Ok

381

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

CF-02-417

### Probable Cause Affidavit for Warrantless Arrest

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 1 0 2002

PERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

Comes now the undersigned Affiant, and states upon Oath or Affirmation that the following information and facts are correct to the best of the Affiant's knowledge and belief:

Name of Person Arrested: RANDY OWEN TURMAN          Social Security Number: 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

Date of Birth: ████ / 61   Date of Arrest (Detention): 08 / 30 / 02   Time of Arrest: _____ .M.

State Specific Facts for Probable Cause for the Arrest and Detention:

ON AUGUST 30, 2002 AT APPROXIMATELY 8:50 AM A SEARCH WARRANT WAS EXECUTED ON THE RESIDENCE OF

RANDY TURMAN WHEN ENTRY WAS MADE THERE WAS A WHITE FEMALE AND A WHITE MALE JUVENILE

LAYING IN THE LIVINGROOM AND A WHITE MALE LAYING IN THE BED IN THE EAST BEDROOM. WHILE

CHECKING MR TURMAN FOR WEAPONS A PLASTIC BAGGIE CONTAINING A WHITE POWDER SUBSTANCE ( WHICH

FIELD TESTED POSITIVE FOR TRACES OF METH) WAS FOUND IN THE LEFT FRONT POCKET OF THE PANTS MR

[Use reverse side or attach another page if necessary]

Anticipated Charge(s): SEE ATTACHED LIST

AFCF: No / Yes times (1) (2) or _____     KELLY KARNES   *Kelly Karnes*

                                            Affiant (Arresting Officer)

Subscribed and sworn to before me the undersigned, this 4th Day of September 2002

My Commission Expires: 5-14-2005
#01006702

*Helen Edwards*
Notary Public / Judge / Witness

## Probable Cause Determination

I, Dennis M. Sprouse, Judge of the District Court reviewed this Probable Cause Affidavit on the 4th day of September, 2002, at 2:12 A.M./P.M.

___✓___ This Affidavit contains sufficient facts showing probable cause to detain the Arrestee to await further proceedings. The Sheriff for Sequoyah or Chief of Police of the arresting agency is hereby commanded to receive him/her into their custody and detain until he/she is legally discharged.

___✓___ The Court sets [  ] an Appearance Bond in the amount of $_____ .00 or [ ✓ ] as per Sequoyah County Bond Schedule.

_____ The Court denies Bond at this time.

_____ This Affidavit contains insufficient facts to show there exists probable cause to detain the Arrestee. **The Arrestee is Ordered Released From Custody Immediately.**

_____
Judge of the District Court

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

### Probable Cause Affidavit for Warrantless Arrest

TURMAN WAS WEARING. WILL SEARCHING THE WEST BEDROOM NUMEROUS GLASS WARE, AND A SET OF OHAUS DIAGRAM SCALES WAS FOUND ON A SHELVE. WHILE SEARCHING THE EAST BEDROOM A METAL BOX CONTAINING MISC. AMMUNTION WAS FOUND ON THE TABLE, A GLASS JAR CONTAINING A LIQUID WITH A WHITE SEDIMENT APPROXIMATELY FULL WHICH IS BELIEVED TO BE EPHEDRINE WAS FOUNDON THE TABLE,A MIRROR WITH WHITE POWDER (WHICH FIELD TESTED POSITIVE FOR TRACES OF METH) AND A PLASTIC SNORTING STRAW WAS FOUND ON THE TABLE, A 18OZ PLASTIC BOTTLE MARKED RED DEVIL LYE APPROXIMATELY 1/2 FULL WAS FOUND ON THE GUN RACK, A QUART GLASS JAR CONTAINING A GOLD LIQUID APPROXIMATELY 1/3 FULL WAS FOUND ON THE TABLE, ONE POUND BOX MARKED SALT WAS FOUND ON THE TABLE.TWO 25ML TYMEX FLASKS WAS FOUND IN COAT POCKETS, PLASTIC BAGGIE CONTAINING MULTIPLE RUBBER GLOVES WAS FOUND ON THE TABLE,MULTIPLE COFFEE FILTER PAPERS WITH A WHITE POWDER SUBSTANCE BELIVED TO BE METH WAS FOUND ON SHELVE UNDER TABLE TOP BESIDE THE BED, A PLASTIC BAGGIE CONTAINING A RED POWDER SUBSTANCE BELIEVED TO BE RED PHOSPHORUS. TWO PLASTIC BOTTLES MARKED HEET WITH A CLEAR LIQUID WAS FOUND ON SHELVE ABOVE TABLE BESIDE OF BED, A BROWN BOTTLE CONTAINING MISC. PILLS WAS FOUND ON TABLE TOP BESIDE OF BED. A PARTIAL ROLL OF BLACK TAPE WAS FOUND ON FLOOR, TWO BOXES OF 22 SHELLS WAS FOUND ON SHELVE. A REMINGTON MODEL 522 VIPER 22 SEMI-AUTO WAEVER SCOPE SERIAL NUMBER 3050180 LOADED WITH 10 ROUNDS WAS FOUND ON FLOOR, WHILE LOGGING THE WEAPONS THE NORINCO SKS 7.69X32 APPEARRED THAT THE SERIAL NUMBERS HAD BEEN FILED ON, A STAR 22 SEMI-AUTO SERIAL NUMBER F386268 LOADED WITH ONE IN BARREL AND SIX IN MAG WAS FOUND ON TABLE, THERE WAS ALSO SEVERAL OTHER FIREARMS FOUND IN THE RESIDENCE. MR TURMAN HAS A PRIOR FELONY CONVICTION FOR POSS OF CDS, ALONG WITH OTHER CHARGES.

383

ANTICIPATED CHARGES ON
RANDY TURMAN
August 30, 2002

1. MANUFACTORING CDS
2. POSS CDS WITH INTENT
3. POSS OF FIREARM COMM OF FELONY
4. FELON IN POSS OF FIREARM
5. POSS OF PRECURSOR RED P AND EPHEDRINE
6. POSS OF CDS IN PRESENCE OF MINOR CHILD
7. POSS FIREARM WITH ALTERED OR REMOVED SERIAL
   NUMBER

384

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT
SEP 2 0 2002
BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

# Hamilton - Morgan Bail Bonds
## Diane Hamilton
## APPEARANCE BOND

IN THE DISTRICT COURT OF _____ Seq _____ COUNTY, STATE OF OKLAHOMA
State of Oklahoma, _____ Plaintiff,

vs. Randy Turman , Defendant      Case No. CF-02-477

Know all men by these presents, that we the above named defendant, as principal, and the undersigned . _Diane, Pratt_____ Diane Hamilton, Professional as surety(ies) personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of _One hundred thousand_____ Dollars ($ 100,000.00 ) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to the county jail of_ Seq _____County, State of Oklahoma, shall personally be and appear before the District Court of said county on the 25 day of September, 2002, at 10 o'clock AM, of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of Cons-To deliver /Manu/ Possess CDS/ P.of para./ P.of CDS w/t /P.of CDS in presence of minor under 12-/P.of F/A in comm/felon in pass of F/A /A.of Precusor X2 Altering Serial # on F/A and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court without leave, then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hand and seals this _18_ day of __Sept_____, 20 02.

_____ Principal _[redacted]_____ Address
Hamilton - Morgan         Surety
Diane Hamilton
_____ Surety _[redacted]__ Sallisaw, Ok _____ Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this _____ day of _____, 20 _____.

_____ Court Clerk/Sheriff ____ APH (806)_____Deputy

This undertaking approved this _____ day of _____, 20 _____.

(SEAL)                    By: _____ Deputy/Clerk

## AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, ____ Seq _____ County, SS:

The undersigned, being first duly sworn upon oath, says that he is a resident of __Seq____ County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as herinafter specified under one or more of the following relevant statutory provisions, to-wit:

a) Consideration for this undertaking received or promised in the sum of $_12,000.00_____

b) Other security received or promised for making this undertaking, is as follows: P.N. _Bond Agreement_____

c) Such promise, security or consideration was received from: _____
_Randy Turman_____ _[redacted]_____
Name

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as on commits perjury.

_Diane Pratt__ _[redacted]__ _Sallisaw, OK. 74955_
Affiant                    Address

Subscribed and sworn to before me this _____ day of _____, 20 _____.

(SEAL)

_____
Court Clerk - Notary Public

My Commission Expires:        _____
                             Deputy

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEP 1 9 2002

BERNELL EDWARDS, COURT CLERK

BY_____ DEPUTY

_____
Plaintiff

vs.

CASE NO: CF-02-472

_____
Defendant

APPLICATION FOR APPOINTED COUNSEL
AND
AFFIDAVIT OF FINANCIAL INABILITY TO EMPLOY COUNSEL

I swear and affirm that I am the party in the above entitled action. I want an attorney to represent me in this case. I am financially unable to obtain the services of an attorney without causing substantial hardship to myself or to my family. The following information is true and is given and intended to be relied upon by the court and other persons or agencies in determining my eligibility for legal services to be furnished to me at public expense.

PLEASE FILL IN ALL SPACES BELOW AND SIGN YOUR NAME UNDER OATH IN FRONT OF THE JUDGE, A NOTARY OR THE COURT CLERK. IF A QUESTION DOES NOT APPLY TO YOU, PLEASE WRITE IN THE BLANK "DOES NOT APPLY".

I. GENERAL INFORMATION DATE: 9-15-02
NAME: Randall Owen Turman
ADDRESS: ███████████
TELEPHONE: 773 8606 MESSAGE NUMBER: Same
SOCIAL SECURITY NO: ████ 3638 AGE: 42 DOB: ███ 61
SINGLE ( ) MARRIED (✓) SEPARATED ( )
SPOUSE'S NAME: Nina Turman
ADDRESS: Rt 1 Box 105 B
TELEPONE: 918 773 8606
HOW MANY PEOPLE ARE IN YOUR HOUSEHOLD? 6
NAME AND AGES: Natalie Turman 15 Dillion Turman 8
Cheyenn Turman 6 Randi Turman 2
ARE YOU CLAIMED AS A DEPENDENT BY A PARENT OR GUARDIAN? YES ( ) NO (✓)

II FAMILY INCOME
YOUR MONTHLY TAKE HOME PAY: Veryis WEEKLY TAKE HOME PAY: Veryis
YOUR EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY)
Self Employed
YOUR EMPLOYER'S PHONE NUMBER: -0-
SPOUSE'S SALARY: -0-
SPOUSE'S EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY
-0-
SPOUSE'S EMPLOYER'S PHONE NUMBER: -0-
IS ANY OTHER MEMBER OF YOUR HOUSEHOLD EMPLOYED? YES( ) NO(✓)
WHO? -0-
WHERE? -0-
SALARY? -0-
DEPENDENT'S EMPLOYER: -0-

OTHER SOURCE OF INCOME OR BENEFITS (INCLUDE INTEREST, DIVIDENDS, ROYALTIES, ETC.) -0-
TOTAL FAMILY INCOME FOR PRECEDING MONTH WAS $ -0-

386

AMOUNT OF BOND:_____ PREMIUM PAID TO BONDING CO:_____
IF YOU DID NOT USE A BONDSMAN, DID YOU POST A CASH___ OR P.R.___
LIST ANY DEFENDANTS CHARGES WITH YOU _____

VIII

1. HAVE YOU TRANSFERRED OR SOLD ANY ASSETS SINCE CHARGES WERE FILED IN THE CASE? YES ( ) NO ( ✓ ) IF SO, DESCRIBE THE BUYER AND THE AMOUNT RECEIVED.
_____

2. HAVE YOU RETAINED COUNSEL IN THE CASE OR IN ANY OTHER PENDING CRIMINAL CASE? YES ( ✓ ) NO ( ) IF SO, STATE THE CASE NUMBER, COURT ATTORNEY AND AMOUNT PAID TO ATTORNEY FOR SERVICES: _____

3. DO YOU HAVE ANY FRIENDS OR RELATIVES WHO ARE ABLE AND WILLING TO ASSIST YOU IN HIRING COUNSEL AND PAYING FOR TRANSCRIPTS? YES ( ) NO ( ✓ ) IF SO, HAVE THOSE PERSONS BEE ASKED TO HELP? YES ( ) NO ( )

4. IF ANY FRIEND OR RELATIVE HAS GIVEN PREVIOUS FINANCIAL ASSISTANCE IN THIS CASE, BUT IS NO LONGER ABLE OR WILLING TO DO SO, AN AFFIDAVIT TO THAT EFFECT FROM THAT PERSON SHOULD BE ATTACHED. IS THAT AFFIDAVIT ATTACHED YES( ) NO( )

IX. NAMES OF THREE ATTORNEY'S YOU CONTACTED:
1. NAME:_____
   WHEN DID YOU CONTACT THIS ATTORNEY?_____
   HOW DID YOU CONTACT THIS ATTORNEY?_____
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( ✓ )
2. NAME:_____
   WHEN DID YOU CONTACT THIS ATTORNEY?_____
   HOW DID YOU CONTACT THIS ATTORNEY?_____
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( ✓ )
3. NAME:_____
   WHEN DID YOU CONTACT THIS ATTORNEY?_____
   HOW DID YOU CONTACT THIS ATTORNEY?_____
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( ✓ )

X. I DECLARE UNDER PENALTY OF PERJURY THAT THE INFORMATION I HAVE PROVIDED IS TRUE AND CORRECT. I UNDERSTAND THAT I MAY BE PROSECUTED FOR PROVIDING FALSE INFORMATION IN THIS APPLICATION AND AFFIDAVIT. I UNDERSTAND THAT I MUST INFORM THE OKLAHOMA INDIGENT DEFENSE SYSTEM OF ANY CHANGE IN MY FINANCIAL SITUATION THAT MAY CHANGE THE INFORMATION I HAVE PROVIDED. I FURTHER DECLARE THAT I HAVE CONTACTED THREE ATTORNEYS, LICENSED TO PRACTICE LAW IN THIS STATE, AND I AM WITHOUT FUNDS TO PAY AN ATTORNEY TO REPRESENT ME OR TO PAY FOR TRANSCRIPTS AND COST ASSOCIATED WITH THIS CASE.

DATED THIS _9_ DAY OF ___15 - 02___

          DEFENDANT _____

          LEGAL GUARDIAN _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____, _____

comm. exp. _____
           _____
           PUBLIC NOTARY OR CLERK OR JUDGE

A&I 1-4030 (1985)                          RECEIVING REPORT                          No.

REC. ON BLANKET P.O.                _Sequoyah_ COUNTY, OKLAHOMA

VENDOR _Cliff's Pharmacy_                                DATE _August 28, 20__

F.O.B. CARRIER _____                REC. DEPT./PROJECT NO. _34_

DELIVERY TICKET NO. _70942_     REQUISITION NO X _____    PURCHASE ORDER NO. _674_
                                        (For Blanket P.O.)

| QTY. ORD. | QTY. REC. | BACK-ORD. | UNIT | DESCRIPTION (INCLUDE CONDITION OF GOODS) | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|---|
| 5 | 15 | | | Dynatus AF for Phillis Marin | 1.73 | 26.00 |
| | | | | | | |
| | | | | SEQUOYAH COUNTY, OKLAHOMA FILED IN DISTRICT COURT NOV - 8 2002 BERNELL EDWARDS, COURT CLERK BY _____ DEPUTY CF-9-218 | | |
| | | | | | TOTAL | 26.00 |

REMARKS _____

RECEIVED BY _Pamela L. Crutchfield_      DELIVERED BY _Clifford Meux_

STRIKE THROUGH ANY UNUSED LINES    Copy 1-White-County Clerk    Copy 2-Canary-Send to Inventory Officer with Copy 2 of P.O.
                                   Copy 3-Pink-Receiving Officer    Copy 4-Goldenrod-Send to Purchasing Agent with Orig. P.O.

---

A&I 1-4030 (1985)                          RECEIVING REPORT                          No.

REC. ON BLANKET P.O.                _Sequoyah_ COUNTY, OKLAHOMA

VENDOR _Cliff's Pharmacy_                                DATE _September 2, 20 02_

F.O.B. CARRIER _____                REC. DEPT./PROJECT NO. _34_

DELIVERY TICKET NO. _70946_     REQUISITION NO X _____    PURCHASE ORDER NO. _674_
                                        (For Blanket P.O.)

| QTY. ORD. | QTY. REC. | BACK-ORD. | UNIT | DESCRIPTION (INCLUDE CONDITION OF GOODS) | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|---|
| 30 | 30 | | | Ultram 50 mg for Randy Turman | 1.14 | 34.10 |
| | | | | | | |
| | | | | | | |
| | | | | CF-02-477 | | |
| | | | | | | |
| | | | | | | |
| | | | | | TOTAL | 34.10 |

REMARKS _____

RECEIVED BY _Pamela L. Crutchfield_      DELIVERED BY _Clifford Meux_

STRIKE THROUGH ANY UNUSED LINES    Copy 1-White-County Clerk    Copy 2-Canary-Send to Inventory Officer with Copy 2 of P.O.
                                   Copy 3-Pink-Receiving Officer    Copy 4-Goldenrod-Send to Purchasing Agent with Orig. P.O.

**SHERIFF'S RETURN**
State of Oklahoma, County of Sequoyah

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 1 0 2003

BERNELL EDWARDS, COURT CLERK

BY_____ DEPUTY

Case # CF-02-477

I certify that I received the foregoing summons on the ___10___ day of

____April____, 20_03_, and that I delivered, or attempted delivery of the said

summons as shown below to each party named for service request.

| Name of person to be served | Service address | Served? Yes or No | Date & Time of service or attempt |
|---|---|---|---|
| Kelly Karnes | SCSO | Yes | 04.10-03 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

I certify that on _____, I served _____
by leaving a copy of said summons with a copy of the petition attached at

_____

which is his/her usual place of residence.

I certify that on _____, I served_____
by leaving a copy of said summons with a copy of the petition attached at

_____

with _____, a member of his family over fifteen (15) years
of age.

Dated on the __10__ day of ___April___, 20_03_.

J.W. Philpot, Sheriff of Sequoyah County

By: _____, Deputy Sheriff

Sequoyah County, Oklahoma

389

SUBPOENA

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA,
      Plaintiff,

vs.                                No. CF-02-477

RANDY TURMAN
      Defendant.

TO: DEPUTY KELLY KARNES S.C.S.O.
    DEPUTY TRAVIS GABBERT S.C.S.O.

       GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the 17TH   day of APRIL, 2003, at the hour of 10:00: o'clock A. M. to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and RANDY TURMAN, is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

      HEREOF FAIL NOT, under penalty of law.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the District Court of said County, this 10TH  day of APRIL, 2003.

                       BERNELL EDWARDS, COURT CLERK

                       By _Robin Mitchell_
                            Deputy

=====================================================================

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE AND PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

=====================================================================

SHERIFF'S RETURN

     Received this Writ this_____day of_____, 20____,_____
o'clock_____M.,_____, 20_____, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the ____ day of _____, 19____,; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____
_____By_____
_____20_____, I cannot find the within named_____
_____in my county.

                    JOHNNY PHILPOT, SHERIFF

                    By_____
                        Deputy

                    Mileage_____miles

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 1 0 2003

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

STATE OF OKLAHOMA )
      PLAINTIFF, )
                  )
VS )
                  )      CASE NO. CF-02-477
                  )
RANDY OWEN TURMAN )
      DEFENDANT, )

## MOTION FOR CONTINUANCE

COMES NOW the State of Oklahoma, by and through Assistant District Attorney, Ralph Keen II moves this Honorable Court to continue the above captioned matter now set for hearing on the 17th day of April, 2003. Movant would state that this Motion is not made for the purpose of delay but is based on the following grounds:

That Deputy Kelly Karnes, the State's witness in this case, is scheduled for oral surgery on April 14, 2003, therefore will be unable to attend said hearing. Defense attorney Donn Baker's office has been contacted and they have advised that he has no objections to a continuance.

Wherefore, movant prays that this Honorable Court continue this matter to a new date certain.

_____
ASSISTANT DISTRICT ATTORNEY

## CERTIFICATE OF DELIVERY

1, the undersigned, do hereby certify that on the 10th day of April, 2003, I mailed a true and correct copy of the above foregoing Motion and Order for Continuance to:

Donn Baker
Attorney at Law
432 West Keetoowah
Tahlequah, Ok 74464

with sufficient postage prepaid thereon.

_____
Affiant

391

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 1 0 2003

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

| | | |
|---|---|---|
| STATE OF OKLAHOMA | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS· | ) | CASE NO. CF-02-477 |
| | ) | |
| | ) | |
| RANDY OWEN TURMAN | ) | |
| DEFENDANT. | | |

ORDER FOR CONTINUANCE

COMES NOW the undersigned Judge of the District Court and hereby grants the above and foregoing Motion For Continuance.

DATED this _10th_ day of April, 2003.

_____
JUDGE OF THE DISTRICT COURT

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED BY THE COURT that the Preliminary Hearing is rescheduled for the _12_ day of ____June___, 2003, at _9_ o'clock _A_.M.

_____
JUDGE OF THE DISTRICT COURT

392

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 1 7 2003

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,          )
                            )
        Plaintiff,          )
Vs.                         ) CASE NO. CF-2002-477
                            )
RANDY OWEN THURMAN,         )
                            )
        Defendant.          )

## MOTION FOR DISCOVERY

COMES NOW, Randy Owen Thurman, by and through his attorney of record, Donn F. Baker, and moves this Court for a Discovery Order. Defendant requests that the State discloses and provides the following materials and information:

1.    Any written or recorded statements and the substance of any oral statement made by the State, its agents, employees or representatives, or the defendant;

2.    The names and addresses of any witness the State plans to call at trial, together with their relevant oral, written or recorded statement, and summaries of the same;

3.    Any record of prior criminal conviction of the parties involved in this case;

4.    The OSBI or FBI rap sheet/record checks on any witness listed by the State or Defense as a possible witness who will testify at trial;

5.    Any book, paper, document, photograph, and other tangible objects or portions thereof, which are (1) within the possession, custody and control of the State and (2)(a) which are material to the preparation of the defense; or (b) are intended for use by the State as evidence at trial, or (c) were obtained from or belonged to the defendant.

6.    Any and all photographs, film, audio tapes and video tapes and any written transcripts

thereof that related to any of the offenses charges in the information.

7.  The names, addresses and phone numbers of persons with knowledge of the facts of the case or have been interviewed by the State or its agents in connection with this case.

8.  Written statements of all persons in paragraph 4 whom the State does not plan to call as witness.

9.  Any and all fingerprint impressions, tests, handwriting exemplars, or other physical evidence, or test results obtained by the State relating to this case and any and all comparisons or written reports of tests, analysis or other examinations conducted regarding the foregoing by the State or any of its agents or under its direction.

10. Any and all material known to the State or which may become known, or which through due diligence may be learned from investigating officers or witnesses or persons having personal knowledge of this case, which is exculpatory in nature or favorable to the accused, or which may lead to exculpatory or favorable material or which might serve to mitigate punishment, including any evidence impeaching or contraction testimony of State witnesses or the instructions to State witnesses not to speak with or discuss the facts of this case with defense counsel.

11. All search and arrest warrants and supporting affidavits issued for or regarding the Defendant in this cause and in regard to any evidence or property seized or searched in regard to the investigation.

In support of this motion, the Defendant would show the Court as follows:

1.  The items requested are in the exclusive possession, custody and control of the State

by and through its agents, law enforcement officers or prosecuting attorney's office, the existence of which is known or may become known with diligence, and the Defendant has no other means of ascertaining the disclosures requested.

2.    The items requested are not privileged.

3.    The items and information are material to this cause on the issues of guilt or innocence and punishment to be determined.

4.    The Defendant cannot safely go to trial without such information and inspection, nor can the Defendant adequately prepare the defense to the charges against him.

5.    That absent such discovery, the Defendant's rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution will be violated and cause irreparable injury.

WHEREFORE, PREMISES CONSIDERED, that said Defendant respectfully prays that this Honorable Court will order the State to comply with this Motion for Discovery and set forth a time for inspection and delivery prior to trial.

Respectfully submitted,

BY: _____
DONN F. BAKER OBA # 443
Attorney for Defendant
239 West Keetoowah
Tahlequah, Oklahoma 74464
(918) 456-1233
(918) 456-7515

## CERTIFICATE OF MAILING

The undersigned hereby certifies that a true and correct copy of the above and foregoing was caused to be mailed by first class mail in the United States Mail on the ___9th___ day of April ___, 2003, to:

District Attorney's Office
Sequoyah County Courthouse
120 East Chickasaw Street
Sallisaw, OK  74955

Donn F. Baker

396

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 1 7 2003

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

STATE OF OKLAHOMA,                      )
                                        )
                  PLAINTIFF,            )
VS.                                     ) CASE NO. CF-2002-477
                                        )
RANDY OWEN THURMAN,                     )
                                        )
                  DEFENDANT.            )

### Entry of Appearance

COMES NOW Donn F. Baker, for the defendant, Randy Owen Thruman, and hereby enters his appearance as counsel of record for the defendant.

All future notices or correspondence should be forwarded to counsel at the address below.

DONN F. BAKER  OBA#443
Attorney at Law
239 W. Keetoowah
Tahlequah, OK  74464
(918) 456-1233

### CERTIFICATE OF MAILING

I, Donn F. Baker, hereby certify that on the 9th day of April, 2003, mailed a true and correct copy of the foregoing Entry of Appearance to: District Attorney, c/o Sequoyah County Courthouse, 120 East Chickasaw Street, Sallisaw, OK  74955 with proper postage.

397

**SUBPOENA**

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA,
                Plaintiff,

vs.

                                                    No. CF-02-477

RANDY OWEN TURMAN
                Defendant.

TO: DEPUTY KELLY KARNES S.C.S.O.
    DEPUTY TRAVIS GABBERT S.C.S.O.


        GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the 12TH day of JUNE, 2003, at the hour of 9:00: o'clock A. M. to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and RANDY OWEN TURMAN, is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

        HEREOF FAIL NOT, under penalty of law.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the District Court of said County, this 16TH day of APRIL, 2003.


                                    BERNELL EDWARDS, COURT CLERK
                                    By _Amanda Adams_
                                                Deputy

===================================================================

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE AND PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.


===================================================================

                            SHERIFF'S RETURN

        Received   this   Writ   this____day   of_____,
20____,____
o'clock____M.,_____, 20_____, served   the   same   by
delivering a copy thereof, with the endorsements thereon, duly
certified to the within named on the ____ day of _____
19____,; served the same by leaving a copy thereof with the
endorsements thereon, duly certified at the usual place of
residence of the within named witness:_____
_____By_____
find the within named_____20_____, I cannot
_____in my county.


                            JOHNNY PHILPOT, SHERIFF

                            By_____
                                        Deputy

                            Mileage_____miles

SUBPOENA

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA,
                    Plaintiff,

vs.                                              No. CF-02-477

RANDY OWEN TURMAN
                    Defendant.

TO: DEPUTY KELLY KARNES S.C.S.O.
    DEPUTY TRAVIS GABBERT S.C.S.O.


        GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the 12TH day of JUNE, 2003, at the hour of 9:00: o'clock A. M. to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and RANDY OWEN TURMAN, is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

        HEREOF FAIL NOT, under penalty of law.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the District Court of said County, this 16TH day of APRIL, 2003.

                                BERNELL EDWARDS, COURT CLERK

                                By Amanda Adams
                                    Deputy
=================================================================

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE AND PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.


=================================================================

                            SHERIFF'S RETURN

        Received    this    Writ    this_____day    of_____,
20_____,_____ o'clock_____M.,_____, 20_____, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____ day of _____, 19_____,; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____By_____
_____20_____, I cannot find the within named_____ _____in my county.

                                JOHNNY PHILPOT, SHERIFF

                                By_____
                                      Deputy

                                Mileage_____miles

FILED
IN DISTRICT COURT
OKLAHOMA

**SHERIFF'S RETURN**

State of Oklahoma, County of Sequoyah

APR 1 7 2003

BERNELL EDWARDS, COURT CLERK
BY_____
_____DEPUTY

Case # CF-02-477

I certify that I received the foregoing summons on the _16th_ day of

_April_, 20_03_, and that I delivered, or attempted delivery of the said

summons as shown below to each party named for service request.

| Name of person to be served | Service address | Served? Yes or No | Date & Time of service or attempt |
|---|---|---|---|
| Kelly Karnes | ████████, Sallisaw | Yes | 4-16-03 @ 4pm |
| Travis Gabbert | ████████ Sallisaw | Yes | 4-16-03 @ 4pm |
| | | | |
| | | | |
| | | | |
| | | | |

I certify that on _____, I served _____
by leaving a copy of said summons with a copy of the petition attached at

_____

which is his/her usual place of residence.

I certify that on _____, I served _____
by leaving a copy of said summons with a copy of the petition attached at

_____

with _____
of age. _____, a member of his family over fifteen (15) years

Dated on the _16th_ day of _April_, 20_03_.

J.W. Philpot, Sheriff of Sequoyah County

By _Pamela L. Crutchfield_ Deputy Sheriff #853

Sequoyah County, Oklahoma

400

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 0 5 2003

BERNELL EDWARDS, COURT CLERK

BY_____ DEPUTY

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY**
**STATE OF OKLAHOMA**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 0 4 2002

BERNELL EDWARDS, COURT CLERK

BY_____ DEPUTY

IN THE MATTER OF SEARCH WARRANT )
OF THE RESIDENCE OF RANDY TURMAN )
LOCATED IN SEQUOYAH COUNTY ) CASE NO. SW-02-75
STATE OF OKLAHOMA )

## SEARCH WARRANT

To the Sheriff of SEQUOYAH County, Oklahoma, or any of his duly appointed and authorized deputies, or to any constable or policeman of SEQUOYAH County, or peace officer of the state of Oklahoma, including any Drug Task Force Officer/Investigator with the 27th Prosecutorial District, Trooper of Oklahoma Highway Patrol, Agent of the Oklahoma State Bureau of Narcotics and Dangerous Drugs, Agent of the Oklahoma State Bureau of Investigations, or Special Agents and Task Force Officers of the Drug Enforcement Administration, Special Agent of the Bureau of Alcohol, Tobacco and Firearms, or any other state or federal peace officer.

Probable cause having been shown on this date before me by Kelly Karnes, a Deputy with the Sequoyah County Sheriffs Department for the, State of Oklahoma, the following property constitutes evidence of a crime as defined by Oklahoma Statutes in Title 63, to-wit: unlawful possession, distribution and/or manufacturing of the controlled substance

Methamphetamine and/or other controlled dangerous substance, a more particular description this affiant cannot give, and personal property consisting of that paraphernalia ordinary used in manufacturing, utilizing, administering or consuming said drugs together with books, records, receipts, telephone records, video-taped transactions, audio-taped transactions, plastic baggies, and equipment, chemicals, formulas, notes, and similar documents and materials and money used in the sale and distribution of said drugs and letters, utility bills and other documents showing proof of residency for the occupants of the residence.

Which is currently being kept, possessed and/or concealed in the following described location, or upon or within certain vehicles, and/or house, building or premises, the curtilage thereof and appurtenances thereof belonging, in SEQUOYAH County, Oklahoma, described as follows:

The residence of Randy Turman which may be located by beginning at the intersection of State Highway 82 and State Highway 100 north of Vian, Sequoyah County, Oklahoma. From this intersection, proceed north on State Highway 82 for approximately six-tenths (0.6) mile; to where State Highway makes a curve to the north and intersects with an unmarked county road (known as Evening Shade Road) that continues on to the east. At this intersection travel east on the unmarked paved county road for approximately two and two-tenths mile (2.2) to the intersection of unmarked paved county road (known as Evening Shade Road) and gravel private driveway. At this

intersection, turn south (right) onto gravel driveway. Which leads to the residence to be searched.

The residence to be searched is described as being brown wood single story structure, with a wood porch attached to the residence, The residence sits in a east-west direction with the front door facing

YOU ARE THEREFORE COMMANDED, in the daytime to make an immediate search of the said residence, vehicles, and/or buildings and premises, the curtilage thereof and appurtenances thereto belonging to the described property, for said property, and if found to seize the same, and make a return hereof within ten (10) days.

WARRANT ISSUED at _4:00_ o'clock _p_ m on this _23rd_ day of _AUGUST_, 200_2_

_____
JUDGE OF DISTRICT COURT

I, Bernell Edwards, Court Clerk, for Sequoyah County Oklahoma, hereby certify that the foregoing is a true, correct, and full copy of the instrument herewith set out as appears of record in the Court Clerk's office of Sequoyah County, Oklahoma, and said instrument is now in full force and effect.
Dated this ____ day of _Sept._ 20__.
Bernell Edwards, Court Clerk
By _____
Deputy

402

SHERIFF'S RETURN

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT
SEP 0 4 2002
BERNELL EDWARDS, COURT CLERK
BY_____
DEPUTY

I received the Search Warrant herein on this 23 day of August 200 5, and executed same on the 30 day of August 200 2, by searching within the described premises and the search resulted in the seizure of:

"SEE ATTACHED LIST"

I, KELLY Karnes , by whom this warrant was executed, do swear that the above inventory contains a true and detailed account of all the property taken by me on the search warrant.

Kelly Karnes

Subscribed and sworn to before me this 4th day of September 200 2.

JUDGE OF THE DISTRICT COURT

I, Bernell Edwards, Court Clerk, for Sequoyah County, Oklahoma, hereby certify that the foregoing is a true, correct, and full copy of the instrument herewith set out as appears of record in the Court Clerk's office of Sequoyah County, Oklahoma, and said instrument is now in full force and effect.
Dated this _____ day of _____
20___
Bernell Edwards, Court Clerk
By _____
Deputy

## _Sequoyah County Sheriffs Department_
### SEARCH WARRANT LOG

NAME: RANDY TURMAN
CASE #825-020143

ADDRESS: RT 1 BOX 189-B VIAN OK
DATE: August 30, 2002

| ITEM # | AREA | DESCRIPTION | LOCATION | FOUND BY |
|---|---|---|---|---|
| 1 | ON PERSON OF RANDY TURMAN | ONE PLASTIC BAGGIE CONTAINING A WHITE POWDER SUBSTANCE | LEFT FRNT JEAN POCKET | TRAVIS GABBERT (TG) |
| 2 | ON PERSON OF RANDY TURMAN | 227 DOLLARS | BLACK WALLET | TG |
| 3 | WEST BEDROOM | NUMEROUS GLASS WARE | ON SHELVE | KELLY KARNES (KK) |
| 4 | WEST BEDROOM | ONE SET OF OHAUS DIAGRAM SCALES | ON SHELVE | KK |
| 5 | EAST BEDROOM | ONE METAL BOX CONTAINING AMMUNTION | ON SHELVE | KK |
| 6 | EAST BEDROOM | ONE GLASS JAR CONTAINING LIQUID WITH WHITE SEDIMENT APPROXIMATELY FULL | ON FLOOR | KK |
| 7 | EAST BEDROOM | ONE MIRROR WITH A WHITE LINE AND A PLASTIC SNORTING STRAW | ON TABLE | KK |
| 8 | EAST BEDOOM | ONE 18OZ PLASTIC BOTTLE MARKED RED DEVIL LYE APPROXIMATELY ½ FULL | ON GUN CABINET | KK |
| 9 | EAST BEDROOM | ONE UART JAR CONTAINING A GOLD LIQUID APPROXIMATELY 1/3 FULL | ON TABLE | KK |
| 10 | EAST BEDROOM | ONE-ONE POUND BOX MARKED SALT | ON TABLE | KK |
| 11 | EAST BEDROOM | ONE 25 ML TYMEX FLASK | IN BROWN COAT POCKET | KK |
| 12 | EAST BEDROOM | ONE 25ML TYMEX FLASK | IN BLUE COAT POCKET | KK |
| 13 | EAST BEDROOM | ONE PLASTIC BAGGIE CONTAINING MULTIPLE RUBBER GLOVES | ON TABLE BESIDE BED | KK |
| 14 | EAST BEDROOM | ONE METAL BOX CONTAINING LIQUID RESIDUE | ON FLOOR | KK |
| 15 | EAST BEDROOM | NUMEROUS COFFEE FILTER PAPERS | ON TABLE | KK |
| 16 | EAST BEDROOM | ONE PLASTIC BAGGIE WITH A RED POWDER RESIDIUE | ON SHELVE UNDER TABLE | KK |
| 17 | EAST BEDROOM | THREE DOCUMENTS WITH NAME RENDY TUMAN | ON SHELVE UNDER TABLE | KK |

## Sequoyah County Sheriffs Department
### SEARCH WARRANT LOG

| | | | | |
|---|---|---|---|---|
| 18 | EAST BEDROOM | MULTIPLE COFFEE FILTER PAPERS WITH A WHITE POWDER SUBSTANCE | ON SHELVE UNDER TABLE | KK |
| 19 | EAST BEDROOM | ONE GLASS SMOKING DEVICE WITH BURNT RESIDUE | ON SHELVE UNDER TABLE | KK |
| 20 | EAST BEDROOM | ONE PLASTIC BOTTLE WITH A WHITE POWDER RESIDUE | ON SHELVE UNDER TABLE | KK |
| 21 | EAST BEDROOM | TWO 12OZ PLASTIC BOTTLE MARKED HEET WITH A CLEAR LIQUID | ON SHELVE ABOVE TABLE | KK |
| 22 | EAST BEDROOM | ONE GLASS BOTTLE CONTAINING MISC. PILLS | ON TABLE | KK |
| 23 | EAST BEDRQOM | ONE PARCIAL ROLL OF BLACK TAPE | ON FLOOR | KK |
| 24 | EAST BEDROOM | ONE CARB BOARD BOX CONTAINING 22 SHELS | ON SHELVE | KK |
| 25 | EAST BEDROOM | ONE BOX OF WINCHESTER 22 SHELLS | ON SHELVE | KK |
| 26 | EAST BEDROOM | ONE REMINGTON MODEL 522 VIPER 22 SEMI-AUTO WITH BLACK SYNTHETIC STOCK SERIAL NUMBER 3050180 WITH WEAVER SCOPE LOADED WITH 10 ROUNDS | ON FLOOR | KK |
| 27 | EAST BEDROOM | ONE SAVAGE MODEL 110 30-06 BOLT ACTION WITH YELLOW,RED, AND BLACK STOCK SERIAL NUMBER F346257 WITH RED FIELD SCOPE | ON FLOOR | KK |
| 28 | EAST BEDROOM | ONE NORINCO SKS 7.62X39 SEMI-AUTO WITH BROWN STOCK WITH RED SLING AND BAYONET SERIAL NUMBER 1409953 | ON FLOOR | KK |
| 29 | EAST BEDROOM | TWO MOTOROLA RADUIS SP 50 SERIAL NUMBERS 777FAU8156 AND 777FA03033 WITH TWO CHARGERS | ON SHELVE | KK |
| 30 | EAST BEDROOM | ONE REMINGTON MODEL 12 22 SHORT-LONG PUMP SERIAL NUMBER 718808 | ON FLOOR | KK |
| 31 | EAST BEDROOM | ONE RUGER 10/22 CARBINE WITH BROWN STOCK SERIAL NUMBER 124-74261 | ON FLOOR | KK |
| 32 | EAST BEDROOM | ONE AGWAN MODEL M-68M 22 MAG LEVER ACTION WITH LIGHT BROWN STOCK WITH GRAY CENAL SERIAL NUMBER 11890 | ON FLOOR | KK |
| 33 | EAST BEDROOM | ONE FAB 7MM BOLT ACTION WITH BROWN STOCK SERIAL NUMBER 018252 | ON FLLOR | KK |
| 34 | EAST BEDROOM | ONE MARLIN 22 BOLT ACTION LONG RIFLE WITH BROWN STOCK AND STAINLESS BARREL SERIAL NUMBER 05460166 WITH EMPTY CASING IN CHAMBER AND TWO ROUNDS IN TUBE | ON FLOOR | KK |
| 35 | EAST BEDROOM | ONE STAR 22 SEMI-AUTO PISTOL SERIAL NUMBER F386268 LOADED WITH ONE IN BARREL AND TWO IN TUBE | ON TABLE | KK |

## Sequoyah County Sheriffs Department
### SEARCH WARRANT LOG

| 36 | EAST BEDROOM | ONE BROWN LEATHER SHOULDER HOLSTER FITTING THE 22 CAL PISTOL | ON FLOOR | KK |
| 37 | EAST BEDROOM | ONE MOTOROLA SP50 RADIO SERIAL NUMBER 777FYJ0682 | ON TABLE | KK |
| 38 | EAST BEDROOM | ONE BROWN PLASTIC GUN CASE  MARKED 2 | ON FLOOR | KK |
| 39 | EAST BEDROOM | ONE BROWN PLASTIC GUN CASE | ON FLOOR | KK |
| 40 | EAST BEDROOM | ONE BLACK PLASTIC GUN CASE | ON FLOOR | KK |
| 41 | EAST BEDROOM | ONE CAMO COLORED NYLON GUN CASE | ON FLOOR | KK |
| 42 | EAST BEDROOM | ONE BROWN COLORED NYLON CASE | ON FLOOR | KK |

ITEMIZED DESCRIPTION OF EVIDENCE  (CONTINUED)

PLASTIC BAG CONTANING RED POWDER RESIDUE MARKED 16

PLASTIC BAG CONTAINING MULTIPLE COFFEE FILTER PAPERS WITH WHITE POWDER MARKED 18

BROWN GLASS BOTTLE CONTAINING MISC. PILLS

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOM.
FILED
IN DISTRICT COURT

SEP 0 4 2002

BERNELL EDWARDS, COURT CLERK
BY_____
_____DEPUTY

IN THE MATTER OF SEARCH WARRANT of )
THE RESIDENCE OF RANDY TURMAN    )
LOCATED IN SEQUOYAH              )
COUNTY, OKLAHOMA                 )

CASE NO SW-02-75

## AFFIDAVIT FOR SEARCH WARRANT

I, Kelly Karnes, being of lawful age, first being duly sworn, state as follows:

I am a Deputy with the Sequoyah County Sheriff's Department for the State of Oklahoma, and have been employed with the Sheriffs Department for the past seven years During my employment as deputy, I have been involved in investigations of illegal possession, distribution and manufacturing of controlled dangerous substance as defined in title 63 of Oklahoma statutes.

I have probable cause to believe that the following property constitutes evidence of a crime as defined under Oklahoma statutes in title 63, to-wit: unlawful possession, distribution and/or manufacturing of controlled dangerous substance.

Methamphetamine and/or other controlled dangerous substance, a more particular description this affiant cannot give, and personal property consisting of that paraphernalia ordinary used in manufacturing, utilizing, administering or consuming said drugs together with books, records, receipts, telephone records, video-taped transactions, audio-taped transactions, plastic baggies, and equipment, chemicals, formulas, notes, and similar documents and materials and money used in the sale and distribution of said drugs and letters, utility bills and other documents showing proof of residency for the occupants of the residence.

I further state that the above described property may be found and is now being kept, possessed and/or concealed in the following described location, or upon or within certain vehicles, and/or house, building or premises, the curtilage thereof and appurtenances thereof belonging, in SEQUOYAH County, Oklahoma, described as follows:

The residence of Randy Turman which may be located by beginning at the intersection of State Highway 82 and State Highway 100 north of Vian, Sequoyah County, Oklahoma. From this intersection, proceed north on State Highway 82 for approximately six-tenths (0.6) mile; to where State Highway makes a curve to the north and intersects with an unmarked county road (known as Evening Shade Road) that continues on to the east. At this intersection travel east on the unmarked paved county road for approximately two and two-tenths mile (2.2) to the intersection of unmarked paved county road (known as Evening Shade Road) and gravel private driveway. At this

intersection, turn south (right) onto gravel driveway. Which leads to the residence to be searched.

The residence to be searched is described as being brown wood single story structure, with a wood porch attached to the residence, The residence sits in a east-west direction with the front door facing west.

As probable cause for believing that said property may be found at the location aforesaid, I allege and state as follows:

This affiant had a conversation with confidential informant (CI). The CI advised the following events have occurred within the last 72 hours;

1. The CI has been to the above mentioned residence, While at the above mentioned residence,
2. The CI observed a white powdery substance presented to the CI by a occupant of the residence as methamphetamine .
3. The CI observed a red powder known to the CI as red phosphorous
4. The CI observed a white powder substance presented to the CI by occupant of the residence to be ephederine

This affiant that he has received information from this informant on more than three occasions. Each time that this informant has provided information, the information proved to be true and accurate and resulted in confiscation of illegal substance.

Due to this affiant's experience and training red phosphorous and ephederine is commonly used in the manufacturing methamphetamine

I further state that I have been involved in numerous drug investigations and have attended schools in investigations and recognition of drugs and drug paraphernalia. Based on my knowledge, experience and training in investigations of dealers of drugs, especially methamphetamine, they commonly utilize various tools and articles, which are commonly referred to as "paraphernalia" to prepare, divide, weigh, and package their drugs for distribution and use vehicles for distribution; further, it is my experience that said dealers routinely keep records of their various drug transactions in the form of handwritten notes and electronic recordings, so that misunderstanding do not occur with their customers.

Wherefore, affiant asks that a search warrant issue according to law, directed to the Sheriff of SEQUOYAH County, Oklahoma, or any of his duly appointed and authorized deputies, or to any constable or policeman of SEQUOYAH County, or peace officer of the state of Oklahoma, including any Drug Task Force Officer/Investigator with the 27th Prosecutorial District, Trooper of Oklahoma Highway Patrol, Agent of the Oklahoma

409

State Bureau of Narcotics and Dangerous Drugs, Agent of the Oklahoma State Bureau of Investigations, or Special Agents and Task Force Officers of the Drug Enforcement Administration, Special Agent of the Bureau of Alcohol, Tobacco and Firearms, or any other state or federal peace officer, commanding that he search the residence described herein, vehicles, buildings, or premises the curtilage thereof and appurtenances thereto and to take possession of the property hereinbefore described and detain the same as provided by law, and make a written return thereof according to law.

FURTHER AFFIANT SAYETH NOT.

_Kelly Karner_
AFFIANT

SUBSCRIBED AND SWORN to before me this 23ʳᵈ day of August, 200 2

JUDGE OF THE DISTRICT COURT

, Bernell Edwards, Court Clerk, for Sequoyah County Oklahoma, hereby certify that the foregoing is a true, correct, and full copy of the instrument herewith set out as appears of record in the Court Clerk's office of Sequoyah County, Oklahoma, and said instrument is now in full force and effect.
Dated this _____ day of _____
20____
Bernell Edwards Court Clerk
Deputy

410

**SHERIFF'S RETURN**

State of Oklahoma, County of Sequoyah

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 0 6 2003

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

Case # CF-02-477

I certify that I received the foregoing summons on the _5th_ day of _September_, 20_03_, and that I delivered, or attempted delivery of the said summons as shown below to each party named for service request.

| Name of person to be served | Service address | Served? Yes or No | Date & Time of service or attempt |
|---|---|---|---|
| Travis Gabbert | 120 E. Chickasaw Sallisaw, OK | Yes | 9/5/03 @ 13:30 hrs. |
| | | | |
| | | | |
| | | | |
| | | | |

I certify that on _____, I served _____ by leaving a copy of said summons with a copy of the petition attached at

_____

which is his/her usual place of residence.

I certify that on _____, I served_____ by leaving a copy of said summons with a copy of the petition attached at

_____

with _____, a member of his family over fifteen (15) years of age.

Dated on the _5th_ day of _September_, 20_03_

J.W. Philpot, Sheriff of Sequoyah County

By _Pamela L. Crutchfield_, Deputy Sheriff

Sequoyah County, Oklahoma

411

SUBPOENA

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA
STATE OF OKLAHOMA,
         Plaintiff,

vs.

No. CF-02-477

RANDY OWEN TURMAN
         Defendant.
**TO: DEPUTY TRAVIS GABBERT S.C.S.O.**
~~KELLY KARNES C/O ARKOMA P.D.~~

         GREETINGS: You are hereby commanded to appear before the
District Court of Sequoyah County, at the Courthouse therein on the
**11ᵀᴴ day of SEPTEMBER, 2003, at the hour of 9:00 o'clock A. M.** to
testify as a witness in a certain action pending in said Court
wherein the State of Oklahoma is Plaintiff, and **RANDY OWEN TURMAN,**
is defendant; on the part of the State of Oklahoma and not depart
without leave of the Court.
         HEREOF FAIL NOT, under penalty of law.
         IN WITNESS WHEREOF, I have hereunto set my hand and affixed
the seal of the District Court of said County, this 4ᵀᴴ day of
SEPTEMBER, 2003.

                              BERNELL EDWARDS,  COURT CLERK

                              By _Robin Hickman_
                                 Deputy

===========================================================================

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS
PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN
PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE AND PLEASE LEAVE A PHONE
NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR
APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU
CALL.

===========================================================================

                         SHERIFF'S RETURN

         Received   this   Writ   this_____day   of_____,
20____,_____
o'clock_____M.,_____, 20_____, served   the   same   by
delivering a copy thereof, with the endorsements thereon, duly
certified to the within named on the ____ day of _____,
19____,; served the same by leaving a copy thereof with the
endorsements thereon, duly certified at the usual place of
residence of the within named witness:_____

_____By_____

find the within named_____20_____, I cannot
_____in my county.

                         JOHNNY PHILPOT, SHERIFF

                         By_____
                              Deputy

                         Mileage_____miles

412

**SUBPOENA**
IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
   Plaintiff,

VS.                No. CF-02-477

RANDY OWEN TURMAN,
   Defendant,

TO: TROOPER CODY HYDE, C/O OHP HEADQUARTERS, OKLA. CITY, OK; KEVIN STOUT, SEQ. COUNTY JAIL, SALLISAW, OK; KENNETH WILSON, S. C. S. O., SALLISAW, OK; DR. MICHAEL CALLERY, 1109 E. CHEROKEE, SALLISAW, OK ;

   GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **3rd day of November, 2003, at the hour of 9:00 o'clock A. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **DALE SUMMERLIN,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

   HEREOF FAIL NOT, under penalty of law.

   IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 27TH day of October, 2003.

           BERNELL EDWARDS, COURT CLERK

           By _Robin Hickman_
               Deputy

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE **AND** PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

SHERIFF'S RETURN

   Received this Writ this _____ day of _____, 20___, _____ o'clock ____.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____ day of _____, 20___; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____By_____

_____ 20_____ . I cannot find the within named _____ in my county.

          JOHNNY PHILPOT, SHERIFF

         By_____
             Deputy

       Mileage_____miles

413

## SUBPOENA

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
    Plaintiff,

VS.
    :
             No. CF-02-477

RANDY OWEN TURMAN,
    Defendant,

TO:  KELLY KARNES, VIAN, OK; DEP. TRAVIS GABBERT, S. C. S. O., SALLISAW, OK;

GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **3rd day of November, 2003, at the hour of 9:00 o'clock A. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **RANDY OWEN TURMAN,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

HEREOF FAIL NOT, under penalty of law.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 28TH day of October, 2003.

BERNELL EDWARDS, COURT CLERK

By_____
           Deputy

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE **AND** PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

### SHERIFF'S RETURN

Received this Writ this _____ day of _____, 20___, _____ o'clock ___.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____ day of _____, 20___; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____By_____

named _____20_____. I cannot find the within _____in my county.

JOHNNY PHILPOT, SHERIFF

By_____
           Deputy

Mileage_____miles

414

# In the District Court in and for Sequoyah County
## State of Oklahoma

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 0 4 2003

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

State of Oklahoma,                          )
                                            )
    Plaintiff,                       )
                                            )
vs.                                         )   Case No. CF- 02 477
                                            )
Randy Owen Turman                           )
                                            )
    Defendant                        )
                                            )

## WAIVER OF PRELIMINARY HEARING

Now on this ___3___ day of _November, 2003_, the above styled case comes on for preliminary hearing. The defendant appears in person and represented by his attorney of record, _Donn Baber by TKB_ , the State of Oklahoma appears by its Assistant District Attorney. Thereupon the defendant herein acknowledges having been advised of the right to a preliminary hearing. That in said hearing the State of Oklahoma must prove to the satisfaction of the Court that the crime as alleged in the information was, in fact, committed and there is probable cause to believe that the defendant committed said crime. That if said burden was not met then the case would be dismissed and the bond exonerated.

The defendant is further advised that at said hearing that he/she has the right to cross examine any of the State's witnesses and to call witnesses on his/her own behalf. And further, the defendant is advised of the right at the hearing to limited discovery of the State's case in chief.

Having these rights in mind, the defendant herein, waives all the above rights with respect to a preliminary hearing in this matter.

_____
Defendant

_____
Attorney for Defendant

## WAIVER OF JURISDICTION OF EXAMINING MAGISTRATE

The defendant is further advised that neither the examining magistrate nor the Special Judge has the jurisdiction to proceed further with the case unless affirmatively waived. Having these rights in mind, the defendant hereby waives his/her rights to object to any jurisdictional defects of the Court.

_____
Defendant

_____
Attorney for Defendant

## COURT MINUTE OF PRELIMINARY HEARING

The defendant in the above styled case having knowingly and intelligently waived his/her rights to the preliminary hearing and there being no objection by the State of Oklahoma, the Court accepts the defendant's waiver and hereby binds the defendant over to stand trial in the District Court of Sequoyah County, State of Oklahoma, on the charges as set out in the information as filed in this case.

DCH/Plea

Dec 18, 2003
@ 1:30 p
J. Garrett

_____
JUDGE OF THE DISTRICT COURT

415

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA**

STATE OF OKLAHOMA )
             Plaintiff, )
              )
vs. )      Case No.  CF-02-477
              )
RANDY OWEN TURMAN )
             Defendant. )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**MAY 0 9 2007**

MAUDEEN VANN, COURT CLERK
BY _____ DEPUTY

**MOTION TO DISMISS**

**COMES NOW** JERRY S. MOORE, District Attorney, in and for Sequoyah County, State of Oklahoma, and moves the Court to dismiss above styled case  now pending against the above named defendant,  in the best interest of justice ,

WHEREFORE, movant prays that this matter be dismissed for the above named reason.

                                 **JERRY S. MOORE
                                 DISTRICT ATTORNEY**

BY: _____
                      ASSISTANT DISTRICT ATTORNEY

**ORDER**

**NOW** on this ___9th___ day of   May, 2007, this matter comes before the Court upon the Motion of the District Attorney, Jerry S. Moore, and by his assistant moving the Court to dismiss the  above pending case for the reason stated above.

IT IS THEREFORE ORDERED BY THE COURT that the above styled case against said defendant is hereby dismissed .

IT IS SO ORDERED.

                                 _____
                           **JUDGE OF THE DISTRICT COURT**

416

417

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---
---

# REDACTED EXHIBIT 197

# TO KENNETH EUGENE BARRETT'S

# SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

---
---

EDUCATION, IMMUNIZATION
SANITATION IS HEALTH
CONSERVATION

Commissioner
G. F. MATHEWS, M. D.

## State Department of Health
### State of Oklahoma
3400 NORTH EASTERN
OKLAHOMA CITY 5, OKLAHOMA

DEPARTMENT OF COMMERCE
Bureau of the Census

**STANDARD CERTIFICATE OF LIVE BIRTH** State File No.
State of Oklahoma 28656 Registrar's No. 157

1. PLACE OF BIRTH:
(a) County Sequoyah
(b) City or town Rural Vian
IF OUTSIDE OF CITY OR TOWN LIMITS PUT RURAL
(c) Name of hospital or institution:
IF NOT IN HOSP. OR INST. GIVE ST. NO. AND LOCATION
(d) Mother's stay before delivery:
In hospital or institution ___ In this community 21 year
SPECIFY WHETHER YRS. MO. OR DAYS

2. USUAL RESIDENCE OF MOTHER
(a) State Oklahoma
(b) County Sequoyah
(c) City or town Rural
IF OUTSIDE CITY LIMITS, WRITE RURAL
(d) Street No.
IF RURAL, GIVE LOCATION

3. Full name of child Phyllis Jean Dotson
4. Date of birth [redacted] 42
MO. DA. YR.

5. Sex Female
6. Twin or triplet ___ If so-born 1st ___ 2nd, or 3rd
7. No. months of pregnancy 9
8. Is mother married? yes

FATHER OF CHILD
9. Full name Hugh Virgil Dotson
10. Color or Race White
11. Age at time of this birth 24 yrs.
12. Birthplace Sequoyah Co. Okla.
CITY, TOWN, COUNTY, ST. OR FOREIGN COUNTRY
13. Usual occupation Farming
14. Industry or business

MOTHER OF CHILD
15. Full maiden name Hattie Gertrude Real
16. Color or race White
17. Age at time of this birth 21 yrs.
18. Birthplace Sequoyah Co. Okla.
CITY, TOWN, COUNTY, ST. OR FOREIGN COUNTRY
19. Usual occupation Housewife
20. Industry or business

21.
(a) How many other children of this mother now living? One
(b) How many other children born alive but now dead? none
(c) How many children were born dead? none

22. Mother's mailing address for registration notice:
Mrs. H. V. Dotson
Vian, Oklahoma
[redacted]

23. (a) Was a solution of Silver Nitrate used in eyes? yes
(b) Was Blood test for syphilis made? no

DO NOT GIVE RESULT OF TEST
24. I hereby certify that I attended the birth of this child who was born alive at the hour of 6:45 a.m. on the date above stated and stillborn
that the information given was furnished by Mr. Dotson
this child as ___ related to Father

25. Date received by local registrar
26. Registrar's own signature Jas. M. ___
27. Date given name added ___ by ___ REGISTRAR

Attendant's own signature M.K. Newbu
M.D. midwife or other M.D. Date signed 7-26-42
Address Sallisaw, Oklahoma

I do hereby certify the foregoing to be a true and correct copy, original of which is on file in this office.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and caused the official seal to be affixed, at Oklahoma City, Oklahoma, this ___ day of OCTOBER 1948

M. F. Shackelford
STATE REGISTRAR

KEB505519

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,       )
                                )
                  *Plaintiff,*  )
                                )
v.                              )       Case No. 6:09-cv-00105-JHP
                                )
KENNETH EUGENE BARRETT,         )
                                )
                  *Defendant.*  )

REDACTED EXHIBIT 198

TO KENNETH EUGENE BARRETT'S

SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

# CERTIFICATE OF LIVE BIRTH

State of Oklahoma - Department of Health

STATE FILE NO. 135 -64-002446

LOCAL REG. NO. 94

**1. PLACE OF BIRTH**
a. COUNTY Sequoyah
b. CITY, TOWN, OR LOCATION Sallisaw, Oklahoma
c. NAME OF (If not in hospital, give street address) HOSPITAL OR INSTITUTION Sequoyah Memorial
d. IS PLACE OF BIRTH INSIDE CITY LIMITS? Yes ☑ No ☐

**2. USUAL RESIDENCE OF MOTHER (Where does mother live?)**
a. STATE Okla. b. COUNTY Sequoyah
c. CITY, TOWN, OR LOCATION Vian, Okla.
d. STREET ADDRESS ▮▮▮▮▮▮
e. IS RESIDENCE INSIDE CITY LIMITS? YES ☐ NO ☑
f. IS RESIDENCE ON A FARM YES ☑ NO ☐

**CHILD**

3. CHILD'S NAME (Type or print) First Travis Middle Don Last Crawford

4. SEX Male
5a. THIS BIRTH SINGLE ☑ TWIN ☐ TRIPLET ☐
5b. IF TWIN OR TRIPLET, WAS CHILD BORN 1st ☐ 2d ☐ 3d ☐
6. DATE OF BIRTH Month ▮▮ Day ▮▮ Year 64

**FATHER**

7. FATHER'S NAME First Roger Middle Lee Last Crawford
8. COLOR OR RACE White
9. AGE (At time of this birth) 27 YEARS
10. BIRTHPLACE (State or foreign country) Illinois
11a. USUAL OCCUPATION Norge Plant
11b. KIND OF BUSINESS OR INDUSTRY

**MOTHER**

12. MOTHER'S MAIDEN NAME First Phyllis Middle Jean Last Dotson
13. COLOR OR RACE White
14. AGE (At time of this birth) 21 YEARS
15. BIRTHPLACE (State or foreign country) Oklahoma
16. PREVIOUS DELIVERIES TO MOTHER (Do NOT include this birth)
a. How many OTHER children are now living? 1
b. How many OTHER children were born alive but are now dead? 0
c. How many fetal deaths (fetuses born dead at ANY time after conception)? 0

17. INFORMANT Mrs. Roger L. Crawford
18. MOTHER'S MAILING ADDRESS ▮▮▮▮▮ Vian, Oklahoma

19a. LENGTH OF PREGNANCY COMPLETED WEEKS Term
19b. WEIGHT OF CHILD AT BIRTH 6 LB. 12 OZ.
20. WAS PROPHYLACTIC DRUG USED IN BABY'S EYES? YES ☑ NO ☐

21a. WAS BLOOD OF THIS CHILD'S MOTHER TESTED FOR SYPHILIS? YES ☑ NO ☐
21b. DATE TEST MADE Aug 1963
21c. IF NO TEST, STATE REASON THEREFOR:

I hereby certify that this child was born alive on the date stated above.
22a. SIGNATURE Samuel S. Kirkland M.D.
22c. ADDRESS Sallisaw, Okla
22b. ATTENDANT AT BIRTH M.D. ☑ D.O. ☐ D.C. ☐ MIDWIFE ☐ OTHER (Specify)
22d. DATE SIGNED 1-20-64

23a. DATE REC'D. BY LOCAL REG. 2-4-64
23b. REGISTRAR'S SIGNATURE Elsie King
24. DATE RECEIVED BY STATE REGISTRAR FEB 5 1964

THIS LINE FOR USE OF STATE REGISTRAR | DATE CORRECTIONS MADE | ITEMS CORRECTED | AUTHORITY | CLERK

VS 152   12-55

**June 30, 2008**

420

KEB505536



B00409769

This is true and correct copy of the official record on file in the Office of Vital Statistics, Oklahoma City, Oklahoma, certified on the date stamped.

*James M. Crutcher MD*

James M. Crutcher
Commissioner of Health
Office of Vital Statistics
Department of Health



It is in violation of Oklahoma Statutes, Title 63, Section 1-324.1, to "prepare or issue any certificate which purports to be original, certified copy or copy of a certificate of birth, death or stillbirth, except as authorized in this act or rules and regulations adopted under this act."

**CERTIFIED COPIES WILL BE PRODUCED ON MULTI-COLOR SECURITY PAPER.**

**VERIFY PRESENCE OF WATERMARK    HOLD TO LIGHT TO VIEW**

**WARNING:** THIS DOCUMENT IS PRINTED ON SECURITY WATERMARKED PAPER AND CONTAINS SECURITY FIBERS. DO NOT ACCEPT WITHOUT VERIFYING THE PRESENCE OF THE WATERMARK.

THE DOCUMENT FACE CONTAINS A SECURITY BACKGROUND, EMBOSSED SEAL AND THERMOCHROMIC INK. THE BACK CONTAINS SPECIAL LINES WITH TEXT.

421

KEB505537

422

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 199**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---



# STATE OF ILLINOIS

### DEPARTMENT OF PUBLIC HEALTH - DIVISION OF VITAL RECORDS

STATE OF ILLINOIS

## CERTIFICATE OF LIVE BIRTH

MATCHING IDC

CHILD'S BIRTH NUMBER 112- 69 006462

REGISTRATION DISTRICT NO. 99.0

REGISTERED NUMBER 300

CHILD—NAME
1. FIRST: Stephen  MIDDLE: Wayne  LAST: Barrett
2a. DATE OF BIRTH (MONTH, DAY, YEAR): 1969  2b. HOUR: 3:17 A. M.

SEX
3. male
4a. THIS BIRTH—SINGLE, TWIN, TRIPLET, ETC. (SPECIFY): single
4b. IF NOT SINGLE BIRTH—BORN FIRST, SECOND, THIRD, ETC. (SPECIFY):
5a. PLACE OF BIRTH COUNTY: Will

5b. CITY, TOWN, TWP. OR ROAD DISTRICT NO.: Joliet
5c. INSIDE CITY (YES/NO): yes
5d. HOSPITAL—NAME: St. Joseph (IF NOT IN HOSPITAL, GIVE STREET AND NUMBER)

MOTHER—MAIDEN NAME
6a. FIRST: Sylvia  MIDDLE: G.  LAST: Dotson
6b. AGE (AT TIME OF THIS BIRTH): 28
6c. BIRTHPLACE (STATE OR FOREIGN COUNTRY): Oklahoma

RESIDENCE
7a. STATE: Illinois
7b. COUNTY: Will
7c. CITY, TOWN, TWP. OR ROAD DISTRICT NO.: Wheatland
7d. INSIDE CITY (YES/NO): no
7e. STREET AND NUMBER: Scotch Church Road

MOTHER'S COMPLETE MAILING ADDRESS
7f. STREET AND NUMBER OR R.F.D.: | CITY OR TOWN: Plainfield | STATE: Illinois | ZIP: 60544

FATHER—NAME
8a. FIRST: Ernest  MIDDLE: E.  LAST: Barrett
8b. AGE (AT TIME OF THIS BIRTH): 30
8c. BIRTHPLACE (STATE OR FOREIGN COUNTRY): Oklahoma

INFORMANT'S SIGNATURE
9a. ▶ *Sylvia G. Barrett*
9b. RELATION TO CHILD: mother

I CERTIFY THAT THE ABOVE NAMED CHILD WAS BORN ALIVE AT THE PLACE AND TIME AND ON THE DATE STATED ABOVE.
10b. DATE SIGNED (MONTH, DAY, YEAR): Jan. 29, 1969
10c. ATTENDANT—M.D., D.O., MIDWIFE, OTHER (SPECIFY): M.D.

SIGNATURE
10a. ▶ *T. C. Chuticasan M.D.*
10d. ILLINOIS LICENSE NUMBER: 37809

CERTIFIER'S COMPLETE MAILING ADDRESS
10e. STREET AND NUMBER OR R.F.D.: 25 N. Ottawa Street | CITY OR TOWN: Joliet | STATE: Illinois | ZIP: 60431

LOCAL REGISTRAR'S SIGNATURE
11a. ▶ *Herbert S Walley M.D.*
11b. DATE REC'D BY LOCAL REGISTRAR (MONTH, DAY, YEAR): February 3, 1969

VS. 100 — (1968)  ILLINOIS DEPARTMENT OF PUBLIC HEALTH — BUREAU OF STATISTICS  (BASED ON 1968 U.S. STANDARD CERTIFICATE)

783593

This is to certify that this is a true and correct copy of the official record filed with the Illinois Department of Public Health.

DATE ISSUED

FEB 27 2009

*Damon T. Arnold, M.D., M.P.H.*
DAMON T. ARNOLD, M.D., M.P.H.
STATE REGISTRAR

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

American Bank Note Company

KEB505272

424

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

———————————————————

**REDACTED EXHIBIT 200**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

———————————————————

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255          *U.S. v. Barrett*, 6:09-cv-00105-JHP

424

# RECORD OF PUPILS ENROLLED

RECORD AGE AT BIRTHDAY NEAREST TO SEPTEMBER 1, 19 69

| NAMES OF BOYS GIRLS (CROSS OUT ONE) | GRADE | DATE OF BIRTH | | | AGE | RESIDENT DISTRICT | TUITION | CODE REF. | TRANSFERRED TO OR FROM | DA R |
|---|---|---|---|---|---|---|---|---|---|---|
| | | YR. | MO | DAY | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| Amendola, Salvatore | 2 | | | | | Stanhope | | | | |
| Bell, Michael | 2 | | | | | 5030 | | | | |
| Coulter, Miguel | 2 | | | | | | | | | |
| Curran, Timothy | 2 | | | | | | | | | |
| DeAngelis, Francisco | 2 | | | | | | | | | |
| Edwards, William | 2 | | | | | | | | | |
| Fossati, Mark | 2 | | | | | | | | | |
| Irwin, Gary | 2 | | | | | | | | | |
| Sobussman, Kurt | 2 | | | | | | | | | |
| Stephens, Jonathan | 2 | | | | | | | | | |
| Stephens, Seth | 2 | | | | | | | | | |
| Stritch, Jody | 2 | | | | | | | | | |
| Urodzinski, David | 2 | | | | | | | | | |
| Zoll, Gregory | 2 | | | | | | | | | |
| Dash, Peter | 2 | | | | | | | | ent. 10-13 Staten Island | |
| | | | | | | | | | | |
| Barrett, Kenneth | 3 | | | | 8 | | | | 74 To Oklahoma. | 3 |
| Craig, Peter | 3 | | | | 8 | | | | | |
| Desimone, John | 3 | | | | 9 | | | | | |
| Donahue, John | 3 | | | | 8 | | | | | |
| Ehehalt, Robert | 3 | | | | 8 | | | | | |
| Fugger, John | 3 | | | | 8 | | | | | |
| Hargreaves, Kevin | 3 | | | | 8 | | | | | |
| Howell, William | 3 | | | | 9 | | | | | |
| Jimenez, Scott | 3 | | | | 8 | | | | | |
| Jozowski, Joe | 3 | | | | 10 | | | | | |
| Monachello, Vincent | 3 | | | | 8 | | | | | |
| Murdock, David | 3 | | | | 8 | | | | | |
| Quinn, John | 3 | | | | 9 | | | | | |
| Smith, Brian | 3 | | | | 9 | | | | | |
| Sofia, Carl | 3 | | | | 8 | | | | | |
| Wink, John | 3 | | | | 8 | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

KEB505534

| NAME OF PARENT OR GUARDIAN | ADDRESS | | TIMES TARDY (PER SESSION) | ADDITIONAL SPACES FO TRANSFERRED TO OR FR |
|---|---|---|---|---|
| Thomas Amendola | | Stanhope | | |
| Charles Bell | | Stanhope | 0 | |
| John Coulter | | Stanhope | 0 | |
| Arthur Curran | | Stanhope | 0 | |
| Dominick DeAngelis | | Stanhope | 0 | |
| Jacques, Edwards | | Stanhope | 0 | |
| Manlio Fossati | | Stanhope | 0 | |
| Thomas Irwin | | Stanhope | 0 | |
| Joseph Schussmann | | Stanhope | 0 | |
| Theodore Stephens | | Stanhope | 0 | |
| Theodore Stephens | | Stanhope | | |
| Joseph Stritch | | Stanhope | | |
| Joseph Urodzinski | | Stanhope | 1 | |
| Murray Zoll | | Stanhope | | |
| David Dash | | Stanhope | | |
| | | | | |
| Ernest Barrett | | Stanhope | | |
| Thomas Craig | | Lafayette | | |
| John Desimone | | Stanhope | | |
| Patrick Donahue | | Stanhope | | |
| Robert Ehehalt | | Stanhope | | |
| Charles Fugger | | Stanhope | | |
| Raymond Hargreaves | | Stanhope | | |
| William Howell | | Stanhope | | |
| Adolpho Jimenez | | Stanhope | | |
| Joseph Jozowski | | Stanhope | | |
| Vincent Monachello | | Stanhope | | |
| David Murdock | | Stanhope | | |
| Clyde Quinn | | Stanhope | | |
| Ernest Smith | | Stanhope | | |
| Joseph Sofia | | Stanhope | | |
| Sarah Wink | | Stanhope | | |

TOTAL DAYS ABSENT

426

KEB505535

# OFFICIAL TRANSCRIPT
## SALLISAW HIGH SCHOOL
## SALLISAW, OKLAHOMA

| Barrett | Kenneth | | |
|---|---|---|---|
| LAST NAME | FIRST | Middle | |

ENTERED:   DATE ____8-22-77____   GRADE _____10_____

____61

DATE OF BIRTH          PLACE OF BIRTH          FROM: Jay County High School, Indiana

SEX __M____   RACE __W____   MAILING ADDRESS _____   PHONE NUMBER _____

FATHER _____ OCCUPATION _____ MOTHER Gelene Barrett _____ OCCUPATION _____

| 9th Year 76 — 77 | Sem. Marks | | 10th Year 77 — 78 | Sem. Marks | | 11th Year — — | Sem. Marks | | 12th Year — — | Sem. Marks | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SUBJECTS | 1st | 2nd | SUBJECTS | 1st | 2nd | SUBJECTS | 1st | 2nd | SUBJECTS | 1st | 2nd |
| English I | | | English II | | | English III | | | English IV | | |
| Civics | | | Biology | | | American History | | | | | |
| Oklahoma History | | | | | | | | | | | |
| Math | *A | *B | | | | | | | | | |
| LIFE General Science | *B | *C | | | | | | | | | |
| Comm. Arts | *C | *D | | | | | | | | | |
| I.E.S. | *B | *B | | | | | | | | | |

*Grades from Jay County High School, Indiana

## RECORD OF TEST DATA

| CREDITS SENT TO: | |
|---|---|
| School | Date |
| School | Date |
| | Date |
| Passing Marks   A B C D | |
| Rank in Class _____ | |
| Periods Per Week _____ | |
| Length of Periods _____ | |

Graduated___X____   Dropped_____   Withdrew_____

Date of Graduation____May 10_____ 19____

Course: College Prep. _____   General_____

_____ Principal

Transcript Certified _____ Registrar
Sandra Hoover 1-9-09

Number in Class: Boys_____ Girls_____ Total_____

KEB505605

NAME 3A____ _____ _____ 1961

| | | | MONTH | DAY | YEAR |

ADDRESS ████████████████████████  Lake Hopatcong

FATHER *Ernest*    MOTHER *Sylvia*    TELEPHONE 663-1302

FAMILY PHYSICIAN *Dr Alinte*    TELEPHONE 366-0773

| DISEASE HISTORY | YEAR | | YEAR | | YEAR | OPERATIONS OR INJURIES | YE |
|---|---|---|---|---|---|---|---|
| GERMAN MEASLES | | STREP. INFECTION | | ALLERGIES | | | |
| MEASLES | 1967 | POLIOMYELITIS | | ASTHMA | | | |
| MUMPS | | RHEUMATIC FEVER | | DIABETES | | | |
| OTITIS MEDIA | | WHOOPING COUGH | | CONVULSIVE DISORDER | | | |
| c. pox | 1966 | | | EMOTIONAL | | | |

| TEST AND IMMUNIZATIONS: | DATE | RESULT | DATE | RESULT | DATE | RESULT | DATE | RESULT | DATE | RESULT |
|---|---|---|---|---|---|---|---|---|---|---|
| SMALL POX VACCINATION | 8/22/66 | Sun | | | | | | | | |
| D. P. T. | 1961 | — | 62 | — | B 8/22/66 | | B 1969 | | | |
| TETANUS | | | | | | | | | | |
| POLIO | Sabin | 1964 | | 1964 | | 1964 | | B 8/22/66 | | |
| MEASLES | | | | | | | | | | |
| OTHER | | | | | | | | | | |
| TBC. TEST & TYPE | Tine | 9/69 | Neg. | 1/71 | neg | | | | | |
| CHEST X-RAY | | | | | | | | | | |
| SCHOOL | Stan. | ETB | ETB | M.S. | | | | | | |
| GRADE | 3 | 4 | 5 | 6 | 7 | 8 | | | | |
| AGE | 8 | 9 | 10 | 11 | 12 | 13 | | | | |
| YEAR | 69/70 | 70/71 | 71/72 | 72/73 | 73/74 | 74/75 | | | | |
| HEIGHT | 50 | 51" | 54 | 54 | | | | | | |
| WEIGHT | 54 | 55 | 63 | 64 | | | | | | |

## HEALTH APPRAISAL
Code:   R — See Reverse Side      N — Normal

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE OF EXAMINATION | 69/70 | 6-72 | | | | | | | | | |
| GENERAL APPEARANCE | Ave. | ✓ | | | | | | | | | |
| BEHAVIOR | ave. | ✓ | | | | | | | | | |
| GROOMING | ave. | ✓ | | | | | | | | | |
| NUTRITION | ave. | ✓ | | | | | | | | | |
| DEVELOPMENT | N. | ✓ | | | | | | | | | |
| SPEECH | N. | ✓ | | | | | | | | | |
| PHYSICAL FINDINGS | | | | | | | | | | | |
| DISABILITIES | | | | | | | | | | | |
| SCHOOL PHYSICIAN | | w.T. | | | | | | | | | |
| FAMILY PHYSICIAN | | | | | | | | | | | |
| DENTAL EXAM | | | | | | | | | | | |
| SCHOOL DENTIST | | | | | | | | | | | |
| FAMILY DENTIST | | | | | | | | | ✓ | | |
| VISION    R | 20/25 | N | | | | | | | | | |
| L | /25 | | | | | | | | | | |
| HEARING   R | N | N | | | | | | | | | |
| L | N | | | | | | | | | | |

A-45

KEB505711



JOLIET PUBLIC SCHOOLS
# ANNUAL RECORD
Grades Kdg., One, Two, Three, Four, Five, and Six

Record of pupil's age, attendance and scholarship for _1966_1967_ year.

Grade _Kdg_ Date _6-9-67_ Teacher _Ardis Corp_ School _Culbertson_

Arrange names alphabetically, last name first. Number consecutively. Write numbers inside margin. Mark habits, Satisfactory or Unsatisfactory.

| PUPIL'S NAME STREET & NUMBER | BIRTH DATE | Days Present | Days Absent | Conduct | Effort | Reading | Lang. & Comm. | Spelling | Writing | Listening | Mathematics | Social Studies | Science | Art | Physical Education | Music | Foreign Language | Health & Safety Rules | Accepts Resp. | Has Sch. Material | Neatness | Promotion (Yes or No) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5. Barrett, Kenneth ██████ | ██ 61 | 54.5 | 33.5 | S | S | | | | | S | | | | | | | | | S | S | S | S | Yes |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 203**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP


430



# SOCIAL SECURITY ADMINISTRATION
Baltimore, Maryland 21290-0300

## CERTIFICATION OF EXTRACT FROM RECORDS

Pursuant to the provisions of Title 42, United States Code, Section 904, and the authority vested in me by 42 United States Code 902. I hereby certify that I have legal custody of certain records, documents, and other information established and maintained by the Social Security Administration, pursuant to Title 42, United States Code, Section 405, and that the annexed is a true extract from such records in my custody as aforesaid.

I further certify that all signatures of Social Security Administration annexed document(s) are genuine and made to the signers' official capacity.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the Social Security Administration to be affixed this *25th* day of *February* , 2009

Kathryn E. Fox
Division Director
Division of Earnings Record Operations
Office of Central Operations

Form **SSA-473** (3-96)
Destroy Prior Edition

431

KEB505258

```
SSA-1826                    ITEMIZED STATEMENT OF EARNINGS            JOB:
VERSION 1984.002 * * *      FOR SSN  ████ 5635        * * *


FROM:    SOCIAL SECURITY ADMINISTRATION
         OFFICE OF CENTRAL OPERATIONS
         300 N. GREENE STREET
         BALTIMORE, MARYLAND   21290-0300

CCA                                      NUMBER HOLDER NAME:
                                         TRAVIS D CRAWFORD
1116 POWHATTEN AVE


SAN FRANCISCO            CA  94110

PERIOD REQUESTED   JANUARY 1978  THRU  DECEMBER 2007

YEAR  JAN - MARCH  APRIL -JUNE  JULY - SEPT    OCT - DEC      TOTAL

EMPLOYER NUMBER:  87-0212664
U S BUREAU OF RECLAMATION
PO BOX 11568
SALT LAKECITY UT 84147-0000

1980      -              -             -             -        $      582.66

EMPLOYER NUMBER:  34-1680390
FRANCES J NAGY
33325 ROCKFORD DR
SOLON   OH 44139-1934

1981      -              -             -             -        $    2,487.26

EMPLOYER NUMBER:  04-1680390
SAINT-GOBAIN ABRASIVES INC
2770 W WASHINGTON ST
STEPHENVILLE   TX 76401-3702

1982      -              -             -             -        $    4,412.25

                              PAGE 001
```

432

KEB505259

```
SSA-1826                    ITEMIZED STATEMENT OF EARNINGS            JOB:
VERSION 1984.002 * * *       FOR SSN ████5635          * * *
```

```
YEAR  JAN - MARCH  APRIL -JUNE  JULY - SEPT    OCT - DEC      TOTAL
```

```
EMPLOYER NUMBER:  35-9990000
DEPT OF THE ARMY SRD AC RC
ATTN DFAS ADIMB LAURA WICKS
% DFAS ATTN DFASIN ADIMB
8899 E 56TH ST
INDIANAPOLIS   IN 46249-0002

1983      -            -            -            -       $    5,434.59
1984      -            -            -            -       $    4,624.72
1985      -            -            -            -       $      100.76

EMPLOYER NUMBER:  73-1205422
JAMES STROUP & J L DEEN PTRS
LAWN CARE PROFESSIONALS
 JAMES STROUP GEN PTR
520 N HICKORY
SALLISAW   OK 74955-0000

1984      -            -            -            -       $       88.00

EMPLOYER NUMBER:  43-1251798
TRACKER OIL RECOVERY SERVICES INC &
 SUBS
% JOHN R BARSANTI JR
ONE METROPOLITAN SQUARE SUITE 2600
ST LOUIS MO 63102-2740

1985      -            -            -            -       $      693.75
1986      -            -            -            -       $    1,482.51

EMPLOYER NUMBER:  71-0520797
TEC THE EMPLOYMENT COMPANY
1825 N A ST
FORT SMITH AR 72901-3337

1985      -            -            -            -       $       15.75
1989      -            -            -            -       $      191.52
1990      -            -            -            -       $       88.88
1991      -            -            -            -       $      740.00
```

PAGE 002

433

KEB505260

```
SSA-1826                  ITEMIZED STATEMENT OF EARNINGS          JOB:
VERSION 1984.002 * * *      FOR SSN  ████  5635        * * *
```

```
YEAR   JAN - MARCH  APRIL -JUNE  JULY - SEPT    OCT - DEC      TOTAL
```

```
EMPLOYER NUMBER:  73-1097674
RACE HORSES INC
BLUE RIBBON DOWNS
500 ONEOK PLZA 100 W FIFTH ST
TULSA  OK 74103-0000

1986      -            -            -            -        $      205.63

EMPLOYER NUMBER:  73-1268160
J L DEEN
LAWNCARE PROFESSIONALS
RT 2 BOX 148C
SALLISAW  OK 74955-9643

1986      -            -            -            -        $      726.25
1987      -            -            -            -        $    1,115.50
1988      -            -            -            -        $       77.50
1990      -            -            -            -        $       27.50

EMPLOYER NUMBER:  43-0308250
HAMMOND SHEET METAL CO
BARRINGTON MANUFACTURING CO
PO BOX 220910
SAINT LOUIS MO 63122-0910

1987      -            -            -            -        $    3,620.41
1988      -            -            -            -        $    8,148.14
1991      -            -            -            -        $    1,024.50

EMPLOYER NUMBER:  71-0515657
HOLLAND & NOWOTNY INC
H & N FOODS
PO DRAWER V
VAN BUREN AR 72956-1943

1987      -            -            -            -        $    1,472.22
```

PAGE 003

434

KEB505261

```
SSA-1826                    ITEMIZED STATEMENT OF EARNINGS            JOB:
VERSION 1984.002 * * *      FOR SSN  ████  5635         * * *
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | | TOTAL |
|------|-------------|-------------|-------------|-----------|---|-------|

```
EMPLOYER NUMBER:  84-0909680
EXPRESS SERVICES INC
8516 NW EXPRESSWAY
OKLAHOMA CITY OK 73162-6010
```

| 1987 | - | - | - | - | $ | 135.00 |
|------|---|---|---|---|---|--------|
| 1994 | - | - | - | - | $ | 406.00 |

```
EMPLOYER NUMBER:  71-0636933
CLARK INTERIORS INC
1635 HIGHWAY 282
VAN BUREN AR 72956-7516
```

| 1989 | - | - | - | - | $ | 180.00 |
|------|---|---|---|---|---|--------|

```
EMPLOYER NUMBER:  73-1112277
ROLAND LUMBER & HARDWARE LLC
GARY M PEARSON & RICKY L RIGGS PTR
PO BOX 326
ROLAND  OK 74954-0326
```

| 1989 | - | - | - | - | $ | 1,786.25 |
|------|---|---|---|---|---|----------|

```
EMPLOYER NUMBER:  74-2152396
KCI USA INC
KCI
% MICHAEL PARKMAN TAX DEPT
PO BOX 659508
SAN ANTONIO TX 78265-9508
```

| 1989 | - | - | - | - | $ | 7,974.46 |
|------|---|---|---|---|---|----------|
| 1990 | - | - | - | - | $ | 5,193.56 |

```
EMPLOYER NUMBER:  71-0675099
PROFESSIONAL TEMPORARY SERVICES INC
1115 S WALDRON RD 204
FORT SMITH AR 72903-2588
```

| 1990 | - | - | - | - | $ | 2,056.26 |
|------|---|---|---|---|---|----------|

<center>PAGE 004</center>

435

KEB505262

```
SSA-1826                    ITEMIZED STATEMENT OF EARNINGS          JOB:
VERSION 1984.002 * * *        FOR SSN ████-5635         * * *
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | | TOTAL |
|------|-------------|-------------|-------------|-----------|---|-------|
| 1991 | - | - | - | - | $ | 997.07 |

EMPLOYER NUMBER:  73-0657570
MID-AMERICA CHEMICAL INC
PO BOX 25882
OKLAHOMA CITY OK 73125-0000

| | | | | | | |
|------|-------------|-------------|-------------|-----------|---|-------|
| 1990 | - | - | - | - | $ | 269.25 |

EMPLOYER NUMBER:  73-1092582
A A PERSONNEL INC
2709 NW 39TH EXPY
OKLAHOMA CITY OK 73112-3702

| | | | | | | |
|------|-------------|-------------|-------------|-----------|---|-------|
| 1990 | - | - | - | - | $ | 32.00 |

EMPLOYER NUMBER:  71-0309661
O K FOODS INC
PO BOX 1787
FORT SMITH AR 72902-1787

| | | | | | | |
|------|-------------|-------------|-------------|-----------|---|-------|
| 1991 | - | - | - | - | $ | 140.25 |
| 1992 | - | - | - | - | $ | 1,452.58 |

EMPLOYER NUMBER:  73-1343198
BEST VALUE MOBILE HOMES INC
DONS MOBILE HOMES
3020 WEST CHEROKEE
SALLISAW  OK 74955-2543

| | | | | | | |
|------|-------------|-------------|-------------|-----------|---|-------|
| 1991 | - | - | - | - | $ | 175.68 |

EMPLOYER NUMBER:  71-0649173
EMPLOYMENT CONNECTION INC
9300 JENNY LIND RD
FORT SMITH AR 72908-9145

| | | | | | | |
|------|-------------|-------------|-------------|-----------|---|-------|
| 1992 | - | - | - | - | $ | 823.73 |

PAGE 005

436

KEB505263

```
SSA-1826                    ITEMIZED STATEMENT OF EARNINGS              JOB:
VERSION 1984.002 * * *        FOR SSN   ████  -5635        * * *
```

```
YEAR   JAN - MARCH   APRIL -JUNE   JULY - SEPT    OCT - DEC     TOTAL
```

```
EMPLOYER NUMBER:  71-0668937
C & N ELECTRIC POWER CONTRACTORS
 INC
106 S 2ND ST
OZARK   AR 72949-3226

1992      -           -             -             -        $    1,916.75

EMPLOYER NUMBER:  73-0934497
JONESBORO ADVERTISING CORPORATION
PO BOX 428
WICHITA   KS 67201-0428

1992      -           -             -             -        $       21.99

EMPLOYER NUMBER:  71-0415188
WAL-MART STORES INC
702 SW 8TH ST DEPT 8686 0555
BENTONVILLE   AR 72716-6209

1993      -           -             -             -        $      169.97

EMPLOYER NUMBER:  71-0726285
CFSI TEMPORARY SERVICES INC
522 S 22ND ST
FORT SMITH AR 72901-3916

1993      -           -             -             -        $    7,056.80

EMPLOYER NUMBER:  71-0445587
FORT SMITH AVIONICS INC
522 S 22ND ST
FORT SMITH AR 72901-3916

1994      -           -             -             -        $      941.50
```

PAGE 006

437

KEB505264

```
SSA-1826                  ITEMIZED STATEMENT OF EARNINGS          JOB:
VERSION 1984.002 * * *        FOR SSN ███5635        * * *
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | | TOTAL |
|------|-------------|-------------|-------------|-----------|---|-------|

```
EMPLOYER NUMBER:  71-0504534
AIR SYSTEMS INC
PO BOX 10953
FORT SMITH AR 72917-0953
```

| 1994 | - | - | - | - | $ | 2,181.75 |
| 1995 | - | - | - | - | $ | 4,515.97 |

```
EMPLOYER NUMBER:  73-0797029
IDEAL INC
1401 BEACON ST
MUSKOGEE  OK 74403-2147
```

| 1996 | - | - | - | - | $ | 1,275.00 |

```
EMPLOYER NUMBER:  83-0317231
ROD A KNOWLTON
KNOWLTON CONSTRUCTION
3800 HAWTHORNE AVE
CASPER  WY 82604-4919
```

| 1996 | - | - | - | - | $ | 680.00 |

```
EMPLOYER NUMBER:  87-0325362
BROWN-FOUTZ COMPANY
PO BOX 71055
SALT LAKECTY UT 84171-0055
```

| 1996 | - | - | - | - | $ | 422.50 |

```
EMPLOYER NUMBER:  04-2810774
NORTON PROPPANTS INC
1 NEW BOND ST
WORCESTER  MA 01606-2614
```

| 2002 | - | - | - | - | $ | 331.65 |

438

KEB505265

SSA-1826                    ITEMIZED STATEMENT OF EARNINGS           JOB:
VERSION 1984.002 * * *        FOR SSN ████5635        * * *

YEAR   JAN - MARCH  APRIL -JUNE  JULY - SEPT    OCT - DEC       TOTAL


THERE ARE NO OTHER EARNINGS RECORDED UNDER THIS SOCIAL SECURITY
NUMBER FOR THE PERIOD(S) REQUESTED.

EARNINGS FOR THE YEARS AFTER   2007 MAY NOT BE SHOWN, OR ONLY
PARTIALLY SHOWN, BECAUSE THEY MAY NOT YET BE ON OUR RECORDS.

PAGE 008 END

KEB505266

440

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,     )
                                          )

                   *Plaintiff,*     )

                                          )

v.                                     )       Case No. 6:09-cv-00105-JHP

                                          )

KENNETH EUGENE BARRETT,     )

                                          )

                   *Defendant.*     )

---

# REDACTED EXHIBIT 204

# TO KENNETH EUGENE BARRETT'S

# SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                     *U.S. v. Barrett*, 6:09-cv-00105-JHP

440

Sequoyah County
Warrant Clearance

Warrant Name: **MATTOX, CiNdy LUCAS**

Warrant Number: **CF 99-00645**

Date & Time Cleared: **04-13-06 16:13**

Warrant Cleared By:

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

Arrest _____ Serving Officer _____ · _____ Badge #: **APR 20 2006**

BERNELL EDWARDS, COURT CLERK

Agency: _____ BY_____ DEPUTY

Cancel: ✓ Authority: *Recall Robin Hickman*

Was Warrant Pulled from file?          (Yes)          No

If no Explain: _____

Was Warrant Marked Off Warrant Book and Data Base?     (Yes)     No

If no Explain: _____

Was Warrant Canceled from NCIC?        (Yes)        Not Entered

Was Warrant Removed From Holds Book?      Yes      (No Hold Placed)

Sheriff's Office Employee Signature: _____

Note: After completing this form, staple it to the back of cleared warrant and put it in the folder marked Court Clerk. Use this form only to clear Sequoyah County Warrants. Every warrant must be cleared on a separate form.

KEB502875

BENCH WARRANT-AFTER CONVICTION

THE STATE OF OKLAHOMA,                    )
                                          )
vs.                                       )   Case No. CF-99-00645
CINDY LUCAS MATTOX
█████████████████                             NO BOND
SALLISAW, OK  74955
████/1976    ████2026

BENCH WARRANT

THE STATE OF OKLAHOMA,
        TO ANY SHERIFF, CONSTABLE, MARSHALL, OR POLICEMAN IN THIS STATE
GREETINGS:
CINDY LUCAS MATTOX having been on March 07, 2002, duly convicted in the
District Court of Sequoyah County, State of Oklahoma, of the crime of:
FAILURE TO APPEAR AND PAY MONIES DUE THE COURT IN THE AMOUNT OF $2651.30.
UNLAWFUL POSSESSION OF CONTROLLED DRUG

      YOU ARE THEREFORE COMMANDED FORTHWITH to arrest the above named
defendant, CINDY LUCAS MATTOX, and bring him/her before said Court for
judgement, or if said Court has adjourned for the term, deliver him/her to
the Sheriff of the County of Sequoyah; there to be detained by said Sheriff
until further order of the court;

      WITNESS my hand and seal of said Court this 12-27-2005.


                                    BERNELL EDWARDS
                                    COURT CLERK

                                    By: _Amanda Adams_
                                              Deputy

            WILL ONLY EXTRIDATE FROM SURROUNDING STATES

                          SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____, 20___, at
_____ o'clock ___.m., and executed on the _____ day of _____, 20___, at
_____ o'clock ___.m., by _____.

DATED this _____ day of _____, 20___.


                                    JOHNNY PHILPOT,
                                    SHERIFF, SEQUOYAH COUNTY

                                    BY: _____
                                              Deputy

dms

KEB502876

BENCH WARRANT-AFTER CONVICTION

THE STATE OF OKLAHOMA,                          )
                                                )
vs.                                             )   Case No. CF-99-00645
CINDY LUCAS MATTOX                              
██████████████████                                  NO BOND
SALLISAW, OK  74955
████████/1976  ████████2026

BENCH WARRANT

THE STATE OF OKLAHOMA,
         TO ANY SHERIFF, CONSTABLE, MARSHALL, OR POLICEMAN IN THIS STATE
GREETINGS:
CINDY LUCAS MATTOX having been on March 07, 2002, duly convicted in the
District Court of Sequoyah County, State of Oklahoma, of the crime of:
FAILURE TO APPEAR AND PAY MONIES DUE THE COURT IN THE AMOUNT OF $2651.30.
UNLAWFUL POSSESSION OF CONTROLLED DRUG

     YOU ARE THEREFORE COMMANDED FORTHWITH to arrest the above named
defendant, CINDY LUCAS MATTOX, and bring him/her before said Court for
judgement, or if said Court has adjourned for the term, deliver him/her to
the Sheriff of the County of Sequoyah; there to be detained by said Sheriff
until further order of the court;

     WITNESS my hand and seal of said Court this 12-27-2005.


                                        BERNELL EDWARDS
                                        COURT CLERK
                                        By: _Amanda Adams_
                                             Deputy

          WILL ONLY EXTRIDATE FROM SURROUNDING STATES

                         SHERIFF'S RETURN


RECEIVED the within Writ on the _____ day of _____, 20___, at
_____o'clock ___.m., and executed on the _____ day of _____, 20___, at
_____o'clock ___.m., by _____.

DATED this _____ day of _____, 20___.


                                   JOHNNY PHILPOT,
                                   SHERIFF, SEQUOYAH COUNTY

                                   BY:_____
                                                Deputy


dms

443

KEB502877

*Bernell Edwards*
*Sequoyah County Court Clerk*
*120 East Chickasaw*
*Sallisaw, OK 74955*
*15th Judicial District*

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 13 2006

BERNELL EDWARDS, COURT CLERK

BY _____ DEPUTY

*Ph. 918-775-4444*

*M. Vann, deputy*
*B. Lockhart, deputy*
*K. Victory, deputy*
*R. Terhune, deputy*

*Ph. 918-775-1223*

*E. Merrill, deputy*
*R. Mitchell, deputy*
*A. Adams, deputy*
*S. Huff, deputy*

Date: 4-13-06

Re: CF-99-645

Name: Cindy Lucas Mattox

This office requests you to withdraw the outstanding warrant on the above individual. An order to withdraw will follow signed by the judge.

Thank You,

Robin Hickman
Deputy

444

KEB502878

# Order To Withdraw Warrant

THE STATE OF OKLAHOMA, )          IN THE DISTRICT COURT

COUNTY OF SEQUOYAH,      )    Before _Sprouse_
                                                    Judge

To: The Sheriff of the County of Sequoyah:
      and                                    Case No. _CF-99-645_
The Court Clerk of the County of Sequoyah

      An order having been made by the undersigned Judge to issue a Warrant for the arrest of the Defendant, _Cindy Lucas Mattox_ _____ , on the _27th_ Day of _December_ , _2005_.

      This Court has determined that in the interest of justice said Warrant should be _withdrawn_ immediately.

      IT IS ORDER, that the above mentioned _Warrant is withdrawn_ and all records are to immediately reflect that the Warrant is no longer outstanding for service.

Dated at Sallisaw, Oklahoma this _13_ Day of _April_ _____ , _200 6_ .

_____
Judge of the District Court

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 1 3 2006

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

445

KEB502879

446

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 205**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAY 2 9 2003

BERNELL EDWARDS, COURT CLERK

BY_____ DEPUTY

Case No. JFP-03- 458

|  |  |  |
|---|---|---|
| CINDY CRAWFORD, | ) | |
|  Plaintiff, | ) | |
|  | ) | |
| vs. | ) | |
|  | ) | |
|  | ) | |
| JEFFREY PAUL MATTOX and STACY | ) | |
| LYNN MATTOX, Husband and Wife, and | ) | |
| LARRY HERBERT SHELLY and BRENDA | ) | |
| JEAN SHELLY, Husband and Wife, | ) | |
|  Defendants. | ) | |

## PETITION

Plaintiff, Cindy Crawford, for her cause of action states as follows:

1.    Plaintiff is a resident of Sequoyah County, Oklahoma.

2.    The Defendants, Jeffrey Paul Mattox and Stacy Lynn Mattox, reside in Sequoyah County, Oklahoma.  Defendants, Larry Herbert Shelly and Brenda Jean Shelly, reside in Fort Smith, Sebastian County, Arkansas.

3.    The subject matter of this action is ██████████████, whose date of birth is ████████ 998, born in the City of Poteau, LeFlore County, State of Oklahoma.

4.    This court has jurisdiction over the parties and subject matter of this action pursuant to the applicable provisions of the Uniform Child Custody Jurisdiction and Enforcement Act, Parental Kidnapping Prevention Act, and the Uniform Interstate Family Support Act, and 10 O.S. § 89(C).

The Law Office of
Michael A. Daffin, Inc.
OBA #2128
131 E. Chickasaw
P.O. Box 1461
Sallisaw, OK 74955
(918) 775-7722
Fax (918) 775-7725

1

447

5.      Venue is proper with the court.

6.      The federal and state Indian Child Welfare Acts do not apply with the proceeding. Further, this court has the sole and exclusive jurisdiction in this matter pursuant to the Uniform Child Custody Jurisdiction Act for the following reasons:

A.      This court has exercised jurisdiction of the Minor Child pursuant to an Order Appointing Guardian in Sequoyah County Case No. PG-99-102.

B.      The Minor Child, ███████████ is in the legal and physical custody of Larry Herbert Shelly and Brenda Jean Shelly pursuant to an Order Appointing Co-Guardians in Sequoyah County Case No. PG-99-102.  Said Minor Child has resided with Larry Herbert Shelly and Brenda Jean Shelly for a period of time in excess of six (6) months next preceding the filing of this Petition.

C.      Plaintiff has participated in previous litigation in Sequoyah County Case No. PG-99-102 and this Court has continuing jurisdiction of said Minor Child.

D.      Other than Sequoyah County Case No. PG-99-102, Plaintiff has no knowledge of any custody proceedings concerning the Minor Child pending in a court of this or any other state and she knows of no person who is not a party to these proceedings who claims custodial or visitation rights with respect to said Minor Child.

7.      On ██████ 1998, Plaintiff gave birth to the Minor Child.  Defendant, Jeffrey Paul Mattox, has claimed to be the biological father of said Minor Child, however, Plaintiff does not believe said Defendant to be the biological father.  Plaintiff requests that Defendant, Jeffrey Paul Mattox's paternity or non-paternity be judicially determined.  If Jeffrey Paul Mattox is the biological father of the Minor Child, Plaintiff prays for all ancillary relief associated with this determination including but not limited to, custody of the Minor Child and child support with the Defendant, Jeffrey Paul Mattox, having rights of visitation.

2

448

8.     Plaintiff moves the court to enter it's Order requiring Plaintiff and Defendant, Jeffrey Paul Mattox, and the Minor Child to appear for paternity testing.

9.     Defendants, Larry Herbert Shelly and Brenda Jean Shelly, are named as Defendants in this matter because they claim some custodial or visitation rights with said Minor Child and are the appointed co-guardians in Sequoyah County Case No. PG-99-102. Defendant, Stacy Lynn Mattox, is named as a Defendant in this action because there is pending in PG-99-102 an application to transfer guardianship to Jeffrey Paul Mattox and Stacy Lynn Mattox and therefore said Defendant may claim some custodial or visitation interest with said Minor Child.

**WHEREFORE,** Plaintiff prays this court determine whether Defendant, Jeffrey Paul Mattox, is the biological father of the Minor Child, Halie Suzanne Mattox, and for such other and further relief which this Court deems just and proper.

Respectfully submitted,
CINDY CRAWFORD, Plaintiff


*The Law Office of*
*MICHAEL A. DAFFIN, INC.*

By: _____
MICHAEL A. DAFFIN   (OBA #2128)
Attorney at Law
131 East Chickasaw
P.O. Box 1461
Sallisaw, OK  74955
(918) 775-7722
FAX: (918) 775-7725

3

450

## VERIFICATION

STATE OF OKLAHOMA    )
                            ) ss.
COUNTY OF SEQUOYAH   )

CINDY CRAWFORD, being of lawful age and being first duly sworn upon oath, deposes and states:

That she is the Plaintiff in the above and foregoing instrument; that she has read the contents contained therein, and further states that the same are true and correct as she verily believes.

_____
CINDY CRAWFORD

SUBSCRIBED AND SWORN to before me this 28th day of __May__, 2003.

{SEAL}

_____
NOTARY PUBLIC, Commission No. 00006715

4

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

| | | |
|---|---|---|
| CINDY CRAWFORD, | ) | |
| Plaintiff, | ) | |
| VS. | ) | Case No. JFP-03-458 |
| | ) | |
| JEFFREY PAUL MATTOX and STACY | ) | |
| LYNN MATTOX, Husband and Wife, and | ) | |
| LARRY HERBERT SHELLY and BRENDA | ) | |
| JEAN SHELLY, Husband and Wife, | ) | |
| Defendants. | ) | |

## RETURN OF PERSONAL SERVICE

I, the undersigned, hereby certify that I received the foregoing Summons and Petition on the 10th day of June, 2003 and that I delivered a copy of said instrument(s) to the following at the address and on the date and time set forth opposite their name, to-wit:

| NAME/ADDRESS | DATE SERVED: | TIME: |
|---|---|---|
| **BRENDA JEAN SHELLY** | 6-11-03 | 11:25 am |
| F. Smith | | |

### AFFIDAVIT

| | |
|---|---|
| STATE OF OKLAHOMA | ) |
| | ) ss. |
| COUNTY OF SEQUOYAH | ) |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 1 2 2003

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

I, the undersigned, do under oath, say that I personally served the aforementioned instrument(s) to the person above named and made the Return thereon, according to law and that I am now and was at the time of this a duly authorized Process Server licensed to make this Affidavit, so help me God.

_____
TERRY FRANKLIN  PS #0301

SUBSCRIBED AND SWORN to before me this 11th day of June, 2003

{S E A L}

BETTY JO McCOY
NOTARY PUBLIC
COMMISSION NO. 00006715
COMM. EXP. MAY 10, 2004
IN AND FOR
STATE OF
OKLAHOMA
SEQUOYAH COUNTY

_____
NOTARY PUBLIC
Betty Jo McCoy

*Terry Franklin*
PS #0301
P.O. Box 1086
Sallisaw, OK 74955
(918) 775-0067

451

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

| | |
|---|---|
| CINDY CRAWFORD, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. JFP-03-458 |
| | ) |
| JEFFREY PAUL MATTOX and STACY | ) |
| LYNN MATTOX, Husband and Wife, and | ) |
| LARRY HERBERT SHELLY and BRENDA | ) |
| JEAN SHELLY, Husband and Wife, | ) |
| Defendants. | ) |

## RETURN OF PERSONAL SERVICE

I, the undersigned, hereby certify that I received the foregoing Summons and Petition on the 10th day of June, 2003 and that I delivered a copy of said instrument(s) to the following at the address and on the date and time set forth opposite their name, to-wit:

| NAME/ADDRESS | DATE SERVED: | TIME: |
|---|---|---|
| LARRY HERBERT SHELLY | 6-11-03 | 11:25 Am |
| Ft. Smith Ar. | | |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 1 2 2003

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

**AFFIDAVIT**

STATE OF OKLAHOMA )
) ss.
COUNTY OF SEQUOYAH )

I, the undersigned, do under oath, say that I personally served the aforementioned instrument(s) to the person above named and made the Return thereon, according to law and that I am now and was at the time of this a duly authorized Process Server licensed to make this Affidavit, so help me God.

_____
TERRY FRANKLIN PS #0301

SUBSCRIBED AND SWORN to before me this 11th day of June, 2003

{SEAL}

BETTY JO McCOY
NOTARY PUBLIC
COMMISSION NO.
00006715
COMM. EXP. MAY 10, 2004
IN AND FOR
STATE OF
OKLAHOMA
SEQUOYAH COUNTY

_____
NOTARY PUBLIC

Terry Franklin
PS #0301
P.O. Box 1086
Sallisaw, OK 74955
(918) 775-0067

452

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

CINDY CRAWFORD, )
               Plaintiff, )

vs. )                 Case No. JFP-03-458

)
JEFFREY PAUL MATTOX and STACY )
LYNN MATTOX, Husband and Wife, and )
LARRY HERBERT SHELLY and BRENDA )
JEAN SHELLY, Husband and Wife, )
               Defendants. )

## RETURN OF PERSONAL SERVICE

I, the undersigned, hereby certify that I received the foregoing Summons and Petition on the 10th day of June, 2003 and that I delivered a copy of said instrument(s) to the following at the address and on the date and time set forth opposite their name, to-wit:

| NAME/ADDRESS | DATE SERVED: | TIME: |
|---|---|---|
| **JEFFREY PAUL MATTOX** <br> ▬▬▬▬▬▬ <br> *Sallisaw Ok 74955* | *6-11-03* | *12:15pm* |

**AFFIDAVIT**

STATE OF OKLAHOMA )
                  ) ss.
COUNTY OF SEQUOYAH )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 1 2 2003

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

I, the undersigned, do under oath, say that I personally served the aforementioned instrument(s) to the person above named and made the Return thereon, according to law and that I am now and was at the time of this a duly authorized Process Server licensed to make this Affidavit, so help me God.

TERRY FRANKLIN  PS #0301

SUBSCRIBED AND SWORN to before me this 11th day of June, 2003

{SEAL}

NOTARY PUBLIC

*Terry Franklin*
PS #0301
P.O. Box 1086
Sallisaw, OK 74955
(918) 775-0067

453

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

| | | |
|---|---|---|
| CINDY CRAWFORD, | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. JFP-03-458 |
| | ) | |
| JEFFREY PAUL MATTOX and STACY | ) | |
| LYNN MATTOX, Husband and Wife, and | ) | |
| LARRY HERBERT SHELLY and BRENDA | ) | |
| JEAN SHELLY, Husband and Wife, | ) | |
| Defendants. | ) | |

## RETURN OF PERSONAL SERVICE

I, the undersigned, hereby certify that I received the foregoing Summons and Petition on the 10th day of June, 2003 and that I delivered a copy of said instrument(s) to the following at the address and on the date and time set forth opposite their name, to-wit:

**NAME/ADDRESS**          **DATE SERVED:**          **TIME:**

**STACY LYNN MATTOX**          *6-11-03*          *12:05pm*

██████████████

*Sallisaw Ok*

**AFFIDAVIT**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

STATE OF OKLAHOMA )
) ss.
COUNTY OF SEQUOYAH )

JUN 1 2 2003

BERNELL EDWARDS, COURT CLERK

BY_____
DEPUTY

I, the undersigned, do under oath, say that I personally served the aforementioned instrument(s) to the person above named and made the Return thereon, according to law and that I am now and was at the time of this a duly authorized Process Server licensed to make this Affidavit, so help me God.

_____
TERRY FRANKLIN  PS #0301

SUBSCRIBED AND SWORN to before me this 11th day of June, 2003

{SEAL}

*Betty Jo McCoy*
NOTARY PUBLIC

{SEAL: BETTY JO McCOY NOTARY PUBLIC COMMISSION NO. 00006715 COMM. EXP. MAY 10, 2004 IN AND FOR STATE OF SEQUOYAH COUNTY STATE OF OKLAHOMA}

*Terry Franklin*
PS #0301
P.O. Box 1086
Sallisaw, OK 74955
(918) 775-0067

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

CINDY CRAWFORD,                           )
             Plaintiff,          )
                          )
vs.                                       )       Case No. JFP-03-458
                          )
                          )
JEFFREY PAUL MATTOX and STACY             )
LYNN MATTOX, Husband and Wife, and        )
LARRY HERBERT SHELLY and BRENDA           )
JEAN SHELLY, Husband and Wife,            )
                   Defendants.     )

## DISMISSAL

**COMES NOW** Cindy Crawford, Plaintiff herein, and hereby dismisses the above entitled and numbered cause.

<div align="center">

*Cindy Crawford*
_____
CINDY CRAWFORD, Plaintiff

</div>

w Office of
:hael A. Daffin,
  Inc.
JBA #2128
 E. Chickasaw
 P.O. Box 1461
saw, OK 74955
'18) 775-7722
(918) 775-7725

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**AUG 1 7 2005**

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

CINDY CRAWFORD, )
          Plaintiff, )
vs. )    Case No. JFP-03-458
)
JEFFREY PAUL MATTOX AND STACY )
LYNN MATTOX, HUSBAND AND WIFE )
AND LARRY HERBERT SHELLY AND )
JEAN SHELLY, HUSBAND AND WIFE, )
          Defendants. )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**AUG 2 5 2005**

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

## ORDER OF DISMISSAL

**THIS CAUSE** comes on for hearing on the Court's regularly scheduled dispositional docket of August 18, 2005, regarding inactive cases. The Court hereby finds that no activity has occurred in this cause for more than one (1) year and therefore this cause is hereby dismissed with prejudice. The Court further finds that the Plaintiff, Cindy Crawford, filed her Dismissal in this cause on August 17, 2005, by and through her attorney, Michael A. Daffin.

**IT IS ORDERED, ADJUDGED, AND DECREED BY THE COURT** that this cause numbered JFP-03-458 wherein Cindy Crawford is Plaintiff and Jeffrey Paul Mattox and Stacy Lynn Mattox, husband and wife, and Larry Herbert Shelly and Brenda Jean Shelly, husband and wife, are Defendants is hereby dismissed with prejudice.

_____
JUDGE OF THE DISTRICT COURT

456

# Larry and Brenda Shelly

3705 SOUTHRIDGE EST. • FORT SMITH, AR 72916 • (479) 648-8672|

June 17, 2003

The Honorable John Garrett
District Judge
District Court for Sequoyah County
120 E. Chickasaw
Sallisaw, OK 74955

RE:   Case No. JFP-03-458.
      Cindy Crawford, Plainti
      vs.
      Jeffrey Paul Mattox and
      Stacy Lynn Mattox, Hus
      Larry Herbert Shelly a
      Jean Shelly, Husband a

*Place in File*
*gch*

Dear Judge Garrett:

Larry and I received a Sum                              se is for both
Larry and myself. I have k                             years and we
have had many conversation                             aughter. If I
may indulge you, your Hono                             ory on this
situation. I will try to                               ble.

During the course of Jeff                              nity Faith
Mattox, was born. Cindy                                  Jeff stayed
home to take care of her a                             she could do
something to the baby and get away with it             n in Harbor
View". I quit my job the next day to help with Trinity. When Trinity was a
couple of weeks old she came to live with us. When she was three and a half,
she went to live with Jeff full time in Sallisaw. Jeff was an active
participant in her life all along, Cindy was not. Cindy stayed away for longer
and longer periods of time and, finally, Jeff divorced her.

In the early part of March 1998, Cindy called asking for Jeff. She was very
excited and said she had something to tell him. I asked if I could take a
message and she said no because she wanted to talk to him. When he got home,
I asked him if he had been having sex with Cindy. He said he had and I
congratulated him because he was going to be a father again. When he talked
to Cindy, she told him the same thing. Shortly after that, Cindy and I
talked. She told me they had sex the day they were divorced and many times
during the following months. She was upset because she wanted to get back
together but he told her it was just sex. Still she held out hope.

██████ was born on ████████████ 1998. Cindy was living with her mother at the
time. I started watching her in January 1999 for short visits. When Cindy
moved to Sallisaw, the visits became longer and longer. During this time,
Cindy was involved with drugs and that became all consuming to her. On
November 18, 1999, we became ██████ guardians and Cindy was ordered to pay
$30.00 a week in Child support. As of this writing, she has paid $127.00 and
owes $5,453.00.

As I have already stated, Cindy and I have had lengthy conversations about

457

The Honorable John Garrett
Page 2
June 17, 2003

███ and Jeff.  Cindy has always said that she does not want her children full time but she "wants to be a part of their lives", as she should be.  She will go for long periods of time without a call or seeing them.  Then one day she will call demanding to see them right now.  You set a time and maybe she will show up and maybe she will not.  Whenever she has had the girls, two days is her limit.

Another conversation we had was about the birth certificate.  I asked why she did not put Jeff's name on it.  She said because she did not want him to get custody of ███ like he did Trinity.  I told her she was doing Halie a disservice by not having her father's name on the birth certificate.

Jeff became an active participant in ███ life when she was two.  He remarried shortly after that and there was an immediate problem between Cindy and Stacy.  Both resented the other one.  Cindy would call with an attitude and they would answer back with an attitude.  Both sides were at fault.  So instead of working together, they cause each other problems.  If Cindy and her family make arraignments to get the kids from Jeff's, there is no guarantee they will get them.  The plans change upon their arrival.  I think some counseling probably would not hurt them all.

The oldest daughter, Trinity, had a terrible time with Halie living here and visiting there.  She was not kind to her and nothing we did seemed to help. Jeff and Stacy had a son in February and ███ spent some time over there bonding with him and Trinity.  It worked and now the relationship between the two sisters is a good one.  Which brings us to the matter at hand.

In my humble opinion, I think the girls should be raised together with Jeff. Cindy should be allowed to have an active part in their lives.  Cindy does not understand the emotional damage she will cause both girls if they are separated.  ███ loves going over to Jeff and Stacy's house.  She adores her sister and brother and to take that away from her would be sad.

As far as any financial responsibility on our part to pay for her court expenses, I feel she should be responsible for all expenses since she owes us $5,453.00.

Finally, should you find in Cindy's favor, your Honor, I pray you will give us reasonable visitation.  Halie has been a part of our lives since she was an infant.  It would do her great emotional harm to be separated from us.

According to the instructions in the summons, a copy of this letter has been sent to Michael A. Daffin, Cindy's attorney.  A courtesy copy has also been sent to David Gean, III, Jeff and Stacy's attorney.

Thank you for considering this matter.

Sincerely,

*Brenda Shelly*

Larry and Brenda Shelly



Larry H. Shelly

Fort Smith, AR 72916



The Honorable John Garrett
District Judge
District Court for Sequoyah County
120 E. Chickasaw
Sallisaw, OK  74955

612

460

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )
                                   )
                     Petitioner,   )
                                   )
vs.                                )          Case No. 09-CIV-105-JHP
                                   )
UNITED STATES OF AMERICA,          )
                                   )
                     Respondent.   )

## ORDER

On February 12, 2010, this Court set this matter for hearing on Petitioner's Motion to Continue Briefing Schedule (Doc. 107) and for Status Conference. Thereafter, on February 18, 2010, Petitioner filed a Motion for Leave to File Oversized Brief (Doc. 109) of approximately 200 pages. Later that day, Petitioner filed an Amended Motion for Leave to File Oversized Brief (Doc. 111) which indicated, as required by local court rule, that the Government objects to this request. Thereafter, on the same day this Court entered a minute order denying Petitioner's request to file an oversized brief (Doc. 112). Before the Court had time to prepare a written order, at 8:23 p.m., central standard time, Petitioner filed a Motion to Reconsider Order denying Leave to File Oversized Brief (Doc. 113), which motion is now before the Court.

In an effort to explain the Court's original reasoning for denying Petitioner's Motion to file an Oversized Brief, a history of this case is appropriate. On October 6, 2009, this Court held a Show Cause/Scheduling Hearing in this matter. In an attempt to clarify and/or

simplify the issues in this matter and because Petitioner's counsel did not comply with numerous local court rules,[1] this Court ordered Petitioner to file a Second Amended Motion utilizing the form appended to the Rules Governing Section 2255 Proceedings and a new scheduling order was entered.  Since the Amended Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial, was 453 pages long, the Court assumed if counsel used the form provided for in the rules, that the Motion would concisely set forth the issues and facts relied upon therein.  The Court gave Petitioner until November 6, 2009 to file the Amended Motion and an additional sixty (60) days in which to brief the issues.

On October 16, 2009, Petitioner's counsel requested this Court to stay the proceedings pending disposition of a mandamus action pending in the Tenth Circuit Court of Appeals. When that request was denied, Petitioner sought an extension of thirty (30) days for filing his Amended Motion and asked that all filing deadlines be extended.  The Court granted the requested extension giving Petitioner until December 6, 2009 to file his amendment and until February 4, 2010 to file a brief in support.  The Amended Motion was filed on December 4, 2009.  Instead of simplifying and/or clarifying the issues, Petitioner's Amended Motion consisted of 403 pages.  Thereafter, on January 13, 2010, Petitioner requested a second extension of time to file his brief which this Court granted thus giving Petitioner until

---

[1]Since the Court set forth the history of filings in the case prior to October 6, 2009, at the Show Cause/Scheduling Hearing, the Court will not repeat that history any more than necessary to understand this Order.  *See*, Doc. 85, Transcript of proceedings held on October 6, 2009.

February 18, 2010 to file a brief in support of his Amended Motion.[2]  On the due date of the brief, counsel requested leave to file an oversized brief of "approximately 200 pages," (Docs. 109 and 111) as well as filing a Motion to File Documents under Seal (Doc. 110).[3]  To support this request, Petitioner's counsel indicates the issues are extremely complex.  While the Court understands that "death is different,"[4] the issues in this particular case are not significantly more complex than any other criminal case tried in this district.  Whether crafted by design or due to counsel's lack of understanding that this Court's rules are designed to make the system fair for all litigants regardless of the sentence imposed, it has become obvious to this Court that Petitioner's counsel is taking every opportunity to delay this Court's efforts to efficiently and fairly determine the issues before the Court.  Petitioner's counsel have repeatedly disregarded this Court's rules and orders.  Their continued excuse for their failure to comply is that Petitioner is facing a sentence of death and that this Court routinely permits "similarly situated capital habeas corpus petitioners"[5] to do things differently.  Perhaps counsel do not realize that this case does not involve a "habeas corpus petitioner."  *See*, 28 U.S.C. § 2254.  Rather, this case deals with the issue of whether or not this Court should vacate its own judgment because "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without

---

[2]At the scheduling hearing previously mentioned, the Court advised Petitioner's counsel that the Court expected counsel to follow the Local Court rules.  Additionally, the Court advised Petitioner's counsel that any Motion to Seal exhibits should be filed at least 20 days prior to the due date of the brief.  Doc. 85, at p. 12.

[3]A separate order is being entered this date regarding the Motion to File Documents under Seal.

[4]*Baze v. Rees*, 128 S.Ct. 1520, 1550 (2008).

[5]*See*, Doc. 111 at ¶ 2.

jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, . . . ."[6]

To the extent that Petitioner's counsel was originally able to file their factual allegations and legal authorities in under 400 pages, this Court does not understand why the Amended Motion is longer than the original and counsel now seek to increase the Petitioner's filings in this case by more than 250 pages.[7]  Counsel contend in their Motion to Reconsider that denial of the right to file the oversized brief, "is an abuse of discretion, and an intrusion on counsel's ability to comply with their oaths to defend the Constitution and zealously advocate for their client."[8]

While Petitioner's counsel who, prior to their appointment herein, have never before practiced or appeared before this Court apparently believe, based on pure speculation concerning this Court's state of mind and/or reasons for how this case was handled prior to trial by the Court,[9] that this Court would intentionally attempt to deprive any party appearing before it of their constitutional rights to due process, counsel are mistaken.  Basic due process requires that all parties comply with the court rules.  This Court's ability to enforce its orders and court rules are critical to the Court's obligation to move this case to a final resolution in

---

[6] 28 U.S.C. § 2255.

[7] It should be noted that after this Court denied leave to file an oversized brief, counsel attached to the motion to reconsider a brief consisting of 277 pages.  *See*, Doc. 113-2.  It should also be pointed out that this oversized brief no longer contains ten (10) pages which was included in the original and Amended Motion to Vacate.  Docs. 1 and 70, Appendix B, Index to Exhibits.  *See also*, Doc. 113-4, Motion to Expand Record to include Appendix B, pages 418 through 427.

[8] Doc. 113, at ¶ 16.

[9] *See*, Exhibits 34, 54, and 67.

4

a just and efficient manner.[10]  If counsel, which this Court appointed based solely upon the recommendation of the Federal Public Defender of the Northern/Eastern District of Oklahoma, have questions about application of the local rules or Federal rules of procedure, then counsel should seek clarification by filing a motion with the Court.  However, counsel should anticipate the need for clarification and/or direction well in advance of due dates which this Court has previously established to expedite disposition of this matter.

If counsel are so busy that they do not have time to adequately devote to this matter,[11] they should advise the Court in order that the Court can find counsel who are able to appropriately and timely deal with the issues.  Perhaps on reflection this Court was overly optimistic that the issues in this case could be clarified and/or simplified if Petitioner's counsel filed an Amended Motion on the form prescribed by Rule 5 of the Rules Governing Section 2255 Proceedings for the United States District Courts and then filed a brief in support thereof.  Unfortunately, it appears this Court's good intentions accomplished nothing.

While this Court's review of the Amended Motion to Vacate (Doc. 95) convinces this Court that Petitioner could easily brief the issues raised within the twenty-five (25) page limit contained in the local court rules, this Court has reconsidered its decision.  The Court is aware that the Western District of Oklahoma has recently imposed page limitations in capital

---

[10]*See*, F.R.Cv.P. 1 which indicates the purpose of the Federal Rules is to "secure the just, speedy, and inexpensive determination of every action and proceeding."

[11]The record in this matter is replete with excuses by counsel as to why they were not able to complete their motion to vacate  within the statute of limitations as well as orders from this Court regarding filing deadlines.  Most of these excuses have dealt with counsel's extensive caseload.  The Court shouldn't have to remind counsel that it is the duty of an attorney to obey all lawful orders of this Court.

habeas corpus cases. *See*, General Order 10-1 filed on January 10, 2010 in the Western District of Oklahoma. However, as this Court has pointed out herein, this case is substantially different from a state capital habeas corpus case. Specifically, petitioners in a § 2254 proceeding should already have had a Court review all of the issues raised in their petition including ineffective assistance of counsel, *Brady* violations and all issues dealing with newly discovered evidence. Whereas, in a § 2255 proceeding, other than the appellate court on direct appeal, no court may have ever reviewed the post-conviction issues raised by the petitioner. As a result, this Court hereby grants Petitioner leave to file the brief tendered to this Court on February 18, 2010. The Court is aware that a tendered appendix to said brief contains a Motion to Expand the Record (Doc. 113-4) to include an index of the exhibits submitted herein. The Court would direct, prior to the actual filing of said brief, that Petitioner include as an additional Appendix to the Brief, the index of the exhibits.

Further, counsel are hereby advised that this Court is striking all previous motions to vacate filed herein and in light of the substantial length of the Amended Motion and Brief in Support thereof the Court will not refer to those matters unless an issue arises regarding whether a specific claim is barred by the statute of limitations. *See*, LCvR 9.2(c).

Based upon the Court's reconsideration of its prior order, the hearing and status conference previously scheduled for March 1, 2010 is hereby rescheduled for March 31 at 10:00 a.m. at which time the Court shall hold a status conference in an attempt to move this case forward. Since the Court has once again given Petitioner additional time to comply with this Court's orders, all counsel shall be prepared to advise the Court how much time, if any,

6

is required before this Court will have the matter properly briefed in order that the Court can ascertain whether any of the grounds raised in the Amended Motion are deserving of an evidentiary hearing. A new scheduling order shall be entered at said status conference and the Court will expect counsel to comply with that order. Further, counsel are advised that this Court expects compliance with its orders and all court rules in the future and that further attempts to disregard this Court's rules and/or orders will not be tolerated simply because "death is different." Finally, all counsel are required to be present.

It is therefore, the Order of this Court that:

1. The Petitioner shall be given until 4:30 p.m., central standard time, on March 1, 2010 to file the brief submitted as an Appendix to the Motion to Reconsider (Doc. 113-2), which brief shall have an appendix that includes a list of the exhibits filed and/or sought to be filed under seal herein. Petitioner is not required to submit an additional courtesy copy of the brief to the Court. To the extent petitioner is adding as an Appendix to the brief a list of the exhibits, petitioner shall submit a courtesy copy of that Appendix to the Court.

2. The hearing on the motion for extension of time and status conference set for March 1, 2010 is hereby stricken.

3. A status conference shall be held on March 31, 2010 at 10:00 a.m. and a further scheduling order shall be entered at that time.

4. All counsel are required to be present at the status conference on March 31, 2010.

It is so ordered on this 26th day of February, 2010.

7

James H. Payne
United States District Judge
Eastern District of Oklahoma

467

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 09-CIV-105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**ORDER re: MOTION TO SEAL**

On February 18, 2010, Petitioner filed an Unopposed Motion to File Exhibits under Seal (Doc. 110). The basis for this motion is that the records Petitioner wishes to file are medical records. The Court has carefully reviewed the exhibits which counsel requests to be filed under seal. The records Petitioner seeks to seal consist of approximately 1,274 pages not including the cover pages which have been attached to several of these records. The Court recognizes that all of these exhibits are medical records. However, approximately 132 pages of these exhibits contain medical records which were created after the Petitioner's trial. Others appear to have no relevance to the issues for which they are cited (*i.e.*, ineffective assistance of counsel for failing to obtain these records), for instance, medical records dealing with mammogram screenings, medical record releases, back pain, knee pain, hurt shoulder, x-ray results, ear aches, etc. As a result, this Court would question how these records would be relevant to any of the issues in this case. Due to the length of the medical records relating to Kenneth Barrett, this Court did not review every page of those records. If, however, any

468

portion of Mr. Barrett's records were created after the trial herein or relate to issues other than his mental health, this Court would question whether those records are relevant to the matters raised herein. While counsel for Petitioner may have obtained certain records during the course of their investigation herein, it is up to counsel to review those records and ensure that items sought to be filed with this Court are relevant to the issues raised in the pleadings. Counsel for Petitioner shall have fourteen (14) days from the date of this order, or until March 12, 2010, to advise this Court as to each page of the exhibits which they wish to file under seal how the medical record is relevant to the issues contained within the motion to vacate.

It is therefore the Order of this Court that Petitioner shall have until March 12, 2010 to advise this Court, as to each page of the exhibits which they wish to file under seal, how the medical record is relevant to the issues contained within the motion to vacate.

It is so ordered on this 26th day of February, 2010.

James H. Payne
United States District Judge
Eastern District of Oklahoma

2

469

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 6:09-civ-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## STIPULATION AND ORDER

Petitioner and Respondent by and through their respective counsel stipulate and agree to entry of the Order set forth herein below as resolution of Petitioner's request to modify the protective order previously entered [Doc 102].

## [PROPOSED] MODIFIED PROTECTIVE ORDER

NOW on this ___ day of March, 2010, Petitioner and Respondent stipulated and agreed that the Protective Order entered *ex parte* on January 12, 2010, should be modified to provide the following:

1. The letter dated and submitted January 11, 2010 for *in camera* review (SEALED LETTER [Doc 101]) shall remain under seal. However subject to the provisions of this Order, the sealed letter [Doc 101] and any documents filed therewith shall be disclosed to counsel for Petitioner's counsel.

2.  None of the information contained in the sealed letter shall be revealed to the Petitioner, or to any person other than counsel of record for the Petitioner and/or persons working for counsel for the Petitioner in connection with these § 2255 proceedings without prior approval and order from this Court.

3.  Upon request by Petitioner's counsel and stipulation and consent by Respondent's counsel, Petitioner's counsel and/or persons working for counsel for Petitioner in connection with these § 2255 proceedings, may disclose the contents of the SEALED LETTER [Doc 101] to the following persons:  (a) the person who is the subject of that letter, (b) former counsel and investigators for Petitioner including John Echols, Roger Hilfiger, Brett Smith, (c) former Assistant United States Attorney Michael Littlefield, (d) former District 27 Drug Task Force Agent Clint Johnson, (e) current District 27 Drug Task Force personnel including Larry Lane.

4.  Any person with whom Petitioner's counsel or person working with counsel for Petitioner discloses any matter related to the SEALED LETTER, [Doc 101], shall be served with and advised that the information disclosed is subject to this Protective Order.

5.  In future pleadings, motions, and other filings, the person who is the subject of the SEALED LETTER will be referred to as Witness A whenever reference to that person would reveal to an informed person the information.

DATED:  March ___, 2010.

472

Respectfully submitted,

SHELDON J. SPERLING
United States Attorney
Eastern District of Oklahoma

/s/ Christopher J Wilson
CHRISTOPHER J. WILSON, OBA #13810
Assistant United States Attorney
United States Attorney's Office
1200 West Okmulgee
Muskogee, OK          74401


/s/ Jeffrey B. Kahn
JEFFREY B. KAHN, PA Bar #93199
Trial Attorney
U.S. Department of Justice
1331 F Street, N.W., Rm. 345
Washington, D.C.
Tel:(202) 305-8910

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
21 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

/s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

/s/ Joan M. Fisher
JOAN M. FISHER, ID Bar No. 2854
Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666


Attorneys for Plaintiff/Respondent          Attorneys for Defendant/Petitioner
UNITED STATES OF AMERICA                   KENNETH EUGENE BARRETT

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 6:09-civ-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**ORDER**

NOW on this ___ day of March, 2010, Petitioner and Respondent having stipulated and agreed that the Protective Order entered *ex parte* on January 12, 2010, should be modified to provide the following and the Court being fully apprised in the premises, good cause appearing,

IT IS HEREBY ORDERED:

1.  The letter dated and submitted January 11, 2010 for *in camera* review (SEALED LETTER [Doc 101]) shall remain under seal.  However subject to the provisions of this Order, the sealed letter [Doc 101] and any documents filed therewith shall be disclosed to counsel for Petitioner's counsel.

2.  None of the information contained in the sealed letter shall be revealed to the Petitioner, or to any person other than counsel of record for the Petitioner and/or persons working for counsel for the Petitioner in connection with these § 2255 proceedings

ORDER

Barrett v. USA
Case # 6:09-cv-00105-JHP

1

473

474

without prior approval and order from this Court.

3.  Upon request by Petitioner's counsel and stipulation and consent by Respondent's counsel, Petitioner's counsel and/or persons working for counsel for Petitioner in connection with these § 2255 proceedings, may disclose the contents of the SEALED LETTER [Doc 101] to the following persons:  (a) the person who is the subject of that letter, (b) former counsel and investigators for Petitioner including John Echols, Roger Hilfiger, Brett Smith, (c) former Assistant United States Attorney Michael Littlefield, (d) former District 27 Drug Task Force Agent Clint Johnson, (e) current District 27 Drug Task Force personnel, including Larry Lane.

4.      Any person with whom Petitioner's counsel or person working with counsel for Petitioner discloses any matter related to the SEALED LETTER, [Doc 101], shall be served with and advised that the information disclosed is subject to this Protective Order.

5.      In future pleadings, motions, and other filings, the person who is the subject of the SEALED LETTER will be referred to as Witness A whenever reference to that person would reveal to an informed person the information.

DATED:   March ___, 2010.

_____
James H. Payne
United States District Judge
Eastern District of Oklahoma

474

# IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,      ) | |
|      ) | |
| *Petitioner/Defendant*,      ) | |
|      ) | |
| **v.**      ) | **Case No. 6:09-cv-00105-JHP** |
|      ) | |
| UNITED STATES OF AMERICA,      ) | |
|      ) | |
| *Respondent/Plaintiff.*      ) | |

---

**PETITIONER'S BRIEF IN SUPPORT OF
SECOND AMENDED § 2255 MOTION
AND IN SUPPORT OF
PETITIONER'S MOTION FOR EVIDENTIARY HEARING
AND MOTION FOR RECORD EXPANSION**

---

DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: 405-521-9600

DANIEL J. BRODERICK
Federal Defender
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Counsel
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: 916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

**TABLE OF CONTENTS**

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Statement Regarding Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.    Events Leading Up to the Raid on the Barrett Home . . . . . . . . . . . . . . . . . . . . . 9

        1.    Mr. Barrett's "Failure to Appear" and the Resulting Bench Warrant . . . . 9

        2.    The Search Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        3.    September 24, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.    Three Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1.    State Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        2.    Federal Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.  Points and Authorities Supporting Mr. Barrett's Grounds for Relief . . . . . . . . . . . . . . . 18

    Ground 1    Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and his Right to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel. . . . . . . . . . . . . . . . . . . . . . . . 18

Judicial Interference with Defense Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Lack of Judicial Impartiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    Ground 2.    Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. §§ 3005 & 3006A and the Sixth Amendment to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        1.    The Test for Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        2.    The Test for Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        3.    The Need for an Evidentiary Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Ground 2, Part A(1).   Defense Counsel's Unreasonable Omissions in Reurging Franks
                       Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Ground 2, Part A(2).   Trial counsel unreasonably failed to investigate and introduce
                       evidence of eyewitnesses as well as mental impairment and illness
                       that would have rebutted the prosecution's theory of the case,
                       supported the defense theory, and formed the basis for conviction
                       of a lesser offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Ground 2, Part A(3):   Defense Counsel's Unreasonable Failure to Investigate and Present
                       Evidence Showing Mr. Barrett was Incompetent to Stand Trial . 53
     1.       Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
     2.       Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Ground 2, Part A(4).   But for trial counsel's unreasonable omissions it is reasonably
                       probable that the jury would have rejected the testimony of the
                       Government's eleventh hour "snitch" witnesses and, like the two
                       juries before them, refused to convict Mr. Barrett of
                        premeditated murder.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Ground 2, Part A (5).  Trial counsel were ineffective in failing to make appropriate and
                       timely objections to improper hearsay evidence of other
                        bad acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Ground 2, Parts A(6) and (10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

     1.       Defense Counsel's Failure to Obtain Expert Assistance . . . . . . . . . . . . . 77

Ground 2, Part A (11).         Trial counsel unreasonably failed to contest the admission
                               of lengthy "expert" testimony which served no legitimate
                               purpose, but merely excused the inaccuracies and
                               inconsistencies in the fact witnesses' testimony.  Counsel
                               also unreasonably failed to seek an adequate remedy for
                               this improper testimony.  . . . . . . . . . . . . . . . . . . . . . . . . 92

Ground 2, Part A (12).         The verdicts reached at both stages of trial are unreliable
                               due to trial counsel's unreasonable failure to seek
                               appropriate instructions . . . . . . . . . . . . . . . . . . . . . . . . . 97

Ground 2, Part A (13).         The outcomes of the trial and appeal are unreliable due to
                               trial counsel's unreasonable failure to preserve a record of
                               error, resulting in numerous meritorious claims on direct
                               appeal being evaluated under the onerous plain
                               error standard.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Ground 2, Part A (14).     Trial counsel unreasonably failed to object to numerous instances of prosecutorial misconduct in closing argument in the penalty phase of trial. . . . . . . . . . . . . . . . . . . . . . . 101

Ground 2, Part B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

1.     Deficient Performance:  Mr. Barrett's defense counsel failed to fulfill duties to conduct a thorough background investigation, consult with experts, and prepare a two-stage strategy based on readily available information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

2.     Prejudice:  The readily available mitigation evidence regarding Mr. Barrett's background, the circumstances of the offense, impeachment of the Government's intent witnesses, and Mr. Barrett's mental problems would have changed the jury's assessment of his culpability. . . . . . . . . 115

Ground 3.     Mr. Barrett was Denied his Rights to Due Process and Equal Protection of the Laws, and his Right to Transcripts, Expert and Investigative Assistance under 18 U.S.C. §§ 3005 & 3006A . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

1.     The Withholding of Funds for Transcripts. . . . . . . . . . . . . . . . . . . . . . . 127

2.     Mental Health Assistance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

3.     Mitigation Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

4.     Fact Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

5.     Crime Scene Reconstruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

6.     Expert on Police Standards and Procedure. . . . . . . . . . . . . . . . . . . . . . . 138

7.     Cumulative Effect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

Ground 4.     Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Were Violated by the Use of False Information in Obtaining the No-Knock Warrant for his Arrest. The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was Invalid under Franks v. Delaware, 438 U.S. 154 (1978).  Appellate Counsel Were Ineffective for Failing to Raise the Issue on Direct Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

Ground 5.      Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his Sixth Amendment Rights to Counsel and Confrontation, and his Eighth Amendment Right to a Fair and Reliable Capital Sentencing Process Due to the Government's Suppression of Exculpatory Evidence, Knowing use of Perjured Testimony, and Failures to Correct False Testimony; Mr. Barrett is Entitled to Relief from his Convictions and Sentences Based on Newly Discovered Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

1.      The Government Suppressed Material Evidence Favorable to the Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

     a.      The law relating to suppression of exculpatory evidence 149

         1.      What is "favorable to the accused" . . . . . . . . . . 149

         2.      What is "suppression . . . . . . . . . . . . . . . . . . . . 151

         3.      What is "material" . . . . . . . . . . . . . . . . . . . . . . . 152

     b.      Exculpatory Evidence Suppressed by the Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

         1.      Charles Sanders . . . . . . . . . . . . . . . . . . . . . . . . 153

         2.      Travis Crawford 3.. . . . . . . . . . . . . . . . . . . . . . 155

         3.      Cindy Crawford. . . . . . . . . . . . . . . . . . . . . . . . 155

         4.      Brandie Zane Price . . . . . . . . . . . . . . . . . . . . . 156

         5.      Karen Real . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

         6.      Randy Turman . . . . . . . . . . . . . . . . . . . . . . . . . 157

2.      The prosecution's reliance upon false testimony . . . . . . . . . . . 159

3.      Newly Discovered Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . 161

4.      The Need for an Evidentiary Hearing . . . . . . . . . . . . . . . . . . . 164

5.      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Ground 5, Part C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

Ground 5, Part D.     Mr. Barrett is Entitled to a New Trial Due to the Prosecution's
                      Improper Questioning of Witnesses . . . . . . . . . . . . . . . . . . . . . . 168

Ground 6.     Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to
              the United States Constitution were Violated Due to the Court's
              Restrictions on the Use of his Statements  . . . . . . . . . . . . . . . . . . . . . . . 175

Ground 7.     Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were
              Violated when the Trial Court Permitted the Marshals to Restrain him
              Without Justification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Ground 8.     Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth,
              and Eighth Amendments to the United States Constitution.  . . . . . . . . . 187

Ground 9.     Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the
              United States Constitution were Violated When the Trial Court Failed to
              Instruct on a Lesser Included Homicide Offense.  Direct Appeal Counsel
              Were Ineffective for Failing to Raise this Issue.  . . . . . . . . . . . . . . . . . . 192

Ground 10.    Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the
              United States Constitution were Violated Due to the Trial Court's Refusal
              to Instruct the Jury that they Could Consider Residual Doubts as a
              Mitigation Factor.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

Ground 11.    Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated
              When the Trial Court Excused for Cause a Juror Who, While  Personally
              Opposed to the Death Penalty, Could Nonetheless Consider it as a
              Punishment Option.  Appellate Counsel Were Ineffective for Failing to
              Raise this Issue on Direct Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

Ground 12.    The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights
              under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the
              Jury was Not Required to Find that Death was an Appropriate Punishment
              Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were
              Violated by Appellate Counsel's Unreasonable Failure to Raise
              this Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

Ground 13.    Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth
              Amendments were Violated Due to the Effects of Drugs he was Given in
              Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial
              Court's Removal of Mr. Barrett from the Courtroom in the Presence of the
              Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical
              Stages of the Proceedings without Valid Waiver; To the Extent Appellate
              Counsel Failed to Raise the Issue on Appeal, Counsel were
              Ineffective. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

Ground 14.  Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact. . . . . . . . . . . . . . . . . . . . . . . . 221

Ground 15.  Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

Ground 16.  Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

Ground 17.  Due to Mr. Barrett's Chronic and Severe Mental Illness and Organic Brain Impairments, His Execution Would Violate the Eighth Amendment . . 228

Ground 18.  The Failure of Counsel to Raise or Effectively Argue on Appeal Grounds Which Are of Record Violated Mr. Barrett's Due Process Right to Effective Assistance of Appellate Counsel. . . . . . . . . . . . . . . . . . . . . . . . 232

    A.    Appellate Counsel's Failure to Raise Specific Issues Constituted Ineffective Assistance of Counsel. . . . . . . . . . . . . . . . . . . . . . . . 234

        1.    Appellate Counsel Unreasonably Failed to Recognize the Due Process Violations Resulting from the Court's Partiality and Ex Parte Communications with the Government. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

        2.    Appellate Counsel Unreasonably Failed to Raise in Direct Appeal Issues that Arose under Franks v. Delaware, 438 U.S. 154 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

        3.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Government's Inappropriate Use of Hearsay Evidence used to Show Propensity or Character. . . . . . . . . . . . . . 236

        4.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Jury's Exposure to Phony Expert Jim Horn. . . . . . . 237

        6.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Restrictions on the Use of Mr. Barrett's Statements. . . . . . . . . . . . . . . . . . . . . . . . 238

7.     Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Use of a Shock Belt on Mr. Barrett during Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239

8.     Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Denial of a Jury Instruction on Lesser Included Offenses . . . . . . . . . . . 240

9.     Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Refusal to Give an Instruction Permitting Jurors to Weigh Residual Doubts about the Way the Shooting Occurred . . . . . . . . . . . . . . 240

10.    Appellate Counsel Unreasonably Failed to Raise on Direct Appeal the Trial Court's Unconstitutional Dismissal of Juror 62. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

11.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Failure to Require Proof Beyond a Reasonable Doubt as to the Weighing Factor Necessary to Impose a Death Sentence . . . . . . . . . . . . . 241

12.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Removal of Mr. Barrett from the Courtroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

13.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Racial Bias in the Administration of the Federal Death Penalty. . . . . . . . . . . . . . . . . . . . . . . 242

14.    Appellate Counsel Unreasonably Failed to Raise on Appeal Unconstitutional Deficiencies in the Indictment. . . . . . . 243

B.     A New Trial is Reasonably Probable Based upon the Cumulative Effect of the Errors Appellate Counsel Unreasonably Failed to Raise. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

Ground 19.   Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case. . . . . . . . . . . . 245

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

## TABLE OF AUTHORITIES

### FEDERAL CASES

Adams v. Bertrand, 453 F.3d 428 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Adams v. Texas, 448 U.S. 38 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Ake v. Oklahoma, 470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Akwal v. Mitchell, 559 F.3d 456 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Alcorta v. Texas, 355 U.S. 28 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

Allen v. Woodford, 395 F.3d 979 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Anderson v. Sirmons, 476 F.3d 1131 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Apprendi v. New Jersey, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . 207, 208, 209, 241

Atkins v. Virginia, 536 U.S. 304 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 229, 230, 231, 232

Balfour v. Haws, 892 F.2d 556 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Banks v. Dretke, 540 U.S. 668 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149, 152

Banks v. Reynolds, 54 F.3d 1508 (10th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

Bates v. Bell, 402 F.3d 635 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Beck v. Alabama, 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192, 193, 196

Bell v. Evatt, 72 F.3d 421 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

Benn v. Lambert, 283 F.3d 1040 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Berryman v. Morton, 100 F.3d 1089 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Bishawi v. United States, 292 F. Supp. 2d 1122 (S.D.N.Y. 2003)
     aff'd, 109 Fed. Appx. 813 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

Bland v. Sirmons, 459 F.3d 999 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Bouchillon v. Collins, 907 F.2d 589 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . 54, 106, 189

Bowen v. Maynard, 799 F.3d 593 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

Bracy v. Gramley, 520 U.S. 899 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 32

Bracy v. Schomig, 286 F.3d 406 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Brady v. Maryland, 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Brecht v. Abramson, 507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Brewer v. Aiken, 935 F.2d 850 (7th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Britt v. North Carolina, 404 U.S. 226 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125, 127

Brooks v. Tennessee, 406 U.S. 605 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Brown v. Sternes, 304 F.3d 677 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 109

Bryan v. Mullin, 335 F.3d 1207 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 230

Bundy v. Dugger, 816 F.2d 564 (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Bush v. Gore, 531 U.S. 98 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Buttrum v. Black, 721 F. Supp. 1268 (N.D. Ga. 1989),
    aff'd, 908 F.2d 695 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

California v. Brown, 479 U.S. 538 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

California v. Trombetta, 467 U.S. 479 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125, 175

Carey v. Duckworth, 738 F.2d 875 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Carter v. Bowersox, 265 F.3d 705 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Chambers v. Mississippi, 410 U.S. 284 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 179

Clark v. Crist, 335 F.3d 1303 (11th Cir. 2003),
    cert. denied, 540 U.S. 1155 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Clay v. Bowersox, 367 F.3d 993 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Combs v. Coyle, 205 F.3d 269 (6th Cir.2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Cone v. Bell, ___ U.S. ___, 129 S. Ct. 1769 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

Cooks v. Ward, 165 F.3d 1283 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Cooper v, Oklahoma, 517 U.S. 348 (1996), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 188, 189

Correll v. Ryan, 539 F.3d 938 (9th Cir. 2008),
    cert. denied, 129 S. Ct. 903 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Crane v. Kentucky, 476 U.S. 683 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 179

Crivens v. Roth, 172 F.3d 991 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 153, 155, 156, 157

Cross v. United States, 325 F.2d 629 (D.C. Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

Crowe v. Sanders, 864 F.2d 430 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 97

Cunningham, 549 U.S., at 281, 127 S. Ct. 856 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

Darden v. Wainwright, 477 U.S. 168 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168, 174

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) . . . . . . . . . . . 79, 93, 95, 137

Davis v. Alaska, 415 U.S. 308 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176, 179

Deck v. Missouri, 544 U.S. 622 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182, 183

Delaware v. Van Arsdale, 475 U.S. 673 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 179

Dennis v. United States, 384 U.S. 855 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

Donnelly v. DeChristoforo, 416 U.S. 637 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . 149, 168, 174

Douglas v. Workman, 560 F.3d 1156 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . 150, 154, 156, 157

Draughton v. Dretke, 427 F.3d 286 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 90

Driscoll v Delo, 71 F.3d 701 (8th Cir. 1995),
    cert. denied, 519 U.S. 910 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 82

Drope v. Missouri, 420 U.S. 162 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Drope v. Missouri, 383 U.S. 375 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Duckett v. Mullin, 306 F.3d 982 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171, 246

Ducky v. United States, 362 U.S. 402 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 188, 191

Duhamel v. Collins, 955 F.2d 962 (5th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

Duvall v. Reynolds, 139 F.3d 768 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Dzurgiot v. Luther, 897 F.2d 1222 (1st Cir 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Eagle v. Linahan, 279 F.3d 1283 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Eddings v. Oklahoma, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 104, 150, 175, 238

Eddmonds v. Peters, 93 F.3d 1307 (7th Cir. 1996),
    cert. denied, 520 U.S. 1172 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Estelle v. McGuire, 502 U.S. 62 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Estelle v. Williams, 425 U.S. 501 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182, 183

Estock v. Lane, 842 F.2d 184 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Evittts v. Lucey, 469 U.S. 387 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Felde v. Butler, 817 F.2d 281 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Felder v. Johnson, 180 F.3d 206 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Ferguson v. Georgia, 365 U.S. 570 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fero v. Kerby, 39 F.3d 1462 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Ferrara v. United States, 456 F.3d 278 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 162

Fisher v. Gibson, 282 F.3d 1283 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37

Franks v. Delaware, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Freeman v. Class, 95 F.3d 639 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 97

Gardner v. Florida, 430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 97, 174

Geders v. United States, 425 U.S. 80 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

Giglio v. United States, 405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Gilbert v. Mullen, 302 F.3d 1166 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Giles v. Maryland, 386 U.S. 66 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

Girts v. Yanai, 501 F.3d 743 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Godinez v. Moran, 509 U.S. 389 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

Gonzales v. McKune, 247 F.3d 1066 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Gonzalez v. Pliler, 341 F.3d 897 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Goodman v. Bertrand, 467 F.3d 1022 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Gravely v. Mills, 87 F.3d 779 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100, 102

Gray v. Mississippi, 481 U.S. 648 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

Green v. United States, 972 F. Supp. 917 (E.D. Pa. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 241

Greer v. Miller, 483 U.S. 756 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Gregory v. United States, 369 F.2d 185 (D.C. Cir. 1966),
    cert. denied, 396 U.S. 865 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . 148, 165, 166, 167

Griffin v. Warden, Maryland Correctional Adjustment Center,
    970 F.2d 1355 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 109

Hadley v. Groose, 97 F.3d 1131 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Haliym v. Mitchell, 492 F.3d 680 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Hall v. Washington, 106 F.3d 742 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 112

Halliday v. United States, 380 F.2d 270 (1st Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Hamilton v. Alabama, 368 U.S. 52 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Hardwick v. Crosby, 320 F.3d 1127 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

Harris v. Reed, 894 F.2d 871 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 109

Harris v. United States, 536 U.S. 545 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

Harris v. Wood, 64 F.3d 1432 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 38

Hawkins v. Camparet-Cassini, 251 F.3d 1230 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 186

Hays v. Farwell, 482 F. Supp. 2d 1180 (D. Nev. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236, 238

Heath v. Alabama, 474 U.S. 82 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

Heath v. Jones, 941 F.2d 1126 (11th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

Herring v. New York, 422 U.S. 853 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21, 97

High v. Head, 209 F.3d 1257 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Hill v. Mitchell, 400 F.3d 308 (6th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

Hodge v. Hurley, 426 F.3d 368 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Hogan v. Gibson, 197 F.3d 1297 (10th Cir. 2000),
    cert. denied, 121 S.Ct. 332 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192, 197

Holbrook v. Flynn, 475 U.S. 560 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Holmes v. South Carolina, 547 U.S. 319 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

Hooper v. Mullin, 314 F.3d 1162 (10th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Hull v. Kyler, 190 F.3d 88 (3rd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 57

Illinois v. Allen, 397 U.S. 337 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182, 215

Illinois v. Gates, 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

Imbler v. Pachtman, 424 U.S. 409 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

In re Murchison, 349 U.S. 133 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Irvin v. Dowd, 366 U.S. 717 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

Jaffee v. Redmond, 518 U.S. 1 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

James v. Gibson, 211 F.3d 543 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002),
    cert. denied, 539 U.S. 958 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 51

Jermyn v. Horn, 266 F.3d 257 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Johnson v. Bagley, 544 F.3d 592 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Johnson v. Bagley, 544 F.3d 592 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 87, 107, 111, 115

Johnson v. Zerbst, 304 U.S. 458 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

Jones v. Polk, 401 F.3d 257 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177, 178

Jones v. United States, 526 U.S. 227 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207, 225

Keeble v. United States, 412 U.S. 205 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

Kimmelman v. Morrison, 477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Kubat v. Thieret, 867 F.2d 351 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . 79, 93

Kyles v. Whitley, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Lafferty v. Cook, 949 F.2d 1546 (10th Cir. 1991),
        cert. denied, 504 U.S. 911 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Lambright v. Schriro, 490 F.3d 1103 (9th Cir. 2007),
        cert. denied, 128 S. Ct. 882 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Lankford v. Idaho, 500 U.S. 110 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Le v. Mullin, 311 F.3d 1002 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

Leonard v. Michigan, 256 F. Supp. 2d 723 (W.D. Mich. 2003) . . . . . . . . . . . . . . . . . . . 84, 85

Lindstadt v. Keane, 239 F.3d 191 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Lockett v. Ohio, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Lockhart v. Fretwell, 506 U.S. 364 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Lockhart v. McCree, 476 U.S. 162 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200, 204

Mak v. Blodgett, 970 F.2d 614 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Malicoat v. Mullin, 426 F.3d 1241 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

Marshall v. Hendricks, 307 F.3d 36 (3rd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Martin v. Grosshans, 424 F.3d 588 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . 75, 81, 97, 100

Mason v. Hanks, 97 F.3d 887 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Mason v. Mitchell, 543 F.3d 766 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Massaro v. United States, 538 U.S. 500 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Mattox v. United States, 146 U.S. 140 (1892) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227, 228

Mayfield v. Woodford, 270 F.3d 915 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

McCleskey v. Kemp, 482 U.S. 920 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

McCracken v. Gibson, 268 F.3d 970 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

In re McDonald, 514 F.3d 539 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548 (1984) . . . . . . . . . . . . . . . 227

McGregor v. Gibson, 248 F.3d 946 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 187

Media v. California, 505 U.S. 437 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

Mejia v. City of New York, 119 F. Supp. 2d 232 (EDNY 2000) . . . . . . . . . . . . . . . . . . . . . . . 147

Mickens v. Taylor, 535 U.S. 162 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Miles v. Stainer, 108 F.3d 1109 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 551109

Miller v. Anderson, 255 F.3d 455 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 84, 85, 86

Miller v. Anderson, 268 F.3d 485 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Miller v. Senkowsky, 268 F. Supp. 2d 296 (E.D. N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . 84, 85, 86

Mitchell v. Gibson, 262 F.3d 1036 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Mooney v. Holohan, 294 U.S. 103 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

Moore v. Illinois, 408 U.S. 786 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Moore v. Johnson, 194 F.3d 586 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 38, 109

Moore v. United States, 432 F.2d 730 (CA3 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Morgan v. Illinois, 504 U.S. 719 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

Petitioner's Merits Brief                                       xv                              *Barrett v. U.S.*, 09-cv-105-JHP

Mullaney v. Wilbur, 421 U.S. 684 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 197

Murray v. Carrier, 477 U.S. 478 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

Napue v. Illinois, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . 148, 159, 164, 246

Norhrup v. Trippett, 265 F.3d 372 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Nuckols v. Gibson, 233 F.3d 1261 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

O'Bryan v. Estelle, 714 F.2d 365 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

O'Neal, 513 U.S. at 437. [,O'Neal v. McAninch, 513 U.S. 432 (1995).] . . . . . . . . . . . . . . . . . 131

Odle v. Woodford, 238 F.3d 1084 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Outten v. Kearney, 464 F.3d 401 (3rd Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110, 111

Owens v. United States, 387 F.3d 607 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Parker v. Dugger, 498 U.S. 308 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

Patton v. Mullin, 425 F.3d 788 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Pavel v. Hollins, 261 F.3d 210 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 86, 106

Paxton v. Ward, 199 F.3d 1197 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170, 173

Peltier v. Booker, 348 F.3d 888 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162, 163

Pennsylvania v. Ritchie, 480 U.S. 39 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Penry v. Johnson, 532 U.S. 782 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

Penry v. Lynaugh, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 173, 199

Phaneuf v. Fraiken, 448 F.3d 591 (2nd Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 143

Phillips v. Woodford, 267 F.2d 966 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Polk County v. Dodson, 454 U.S. 312 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Porter v. McCollum, ___ U.S. ___, 130 S. Ct. 447 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 104

Powell v. Alabama, 287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Powell v. Collins, 332 F.3d 376 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128, 130, 131

Profitt v. Waldron, 831 F.2d 1245 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Ramonez v. Berghuis, 490 F.3d 482 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Remmer v. United States, 347 U.S. 227 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

Reynolds v. Bagley, 498 F.3d 549 (6th Cir.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Reynolds v. Norris, 86 F.3d 796 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Reynoso v. Giurbino, 462 F.3d 1099 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Richards v. Quarterman, 566 F.3d 553 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Richey v. Bradshaw, 498 F.3d 344 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Riggins v. Nevada, 504 U.S. 127 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177, 214, 219

Ring v. Arizona, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207, 208, 210, 225

Roche v. Davis, 291 F.3d 473 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185, 239

Rock v. Arkansas, 483 U.S. 44 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

Rodriguez v. Hoke, 928 F.2d 534 (2d Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Roe v. Flores-Ortega, 528 U.S. 470 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

Rojem v. Gibson, 245 F.3d 1130 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

Romano v. Gibson, 239 F.3d 1156 (10th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Rompilla v. Beard, 545 U.S. 374 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Roper v. Simmons, 543 U.S. 304 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229, 231, 232

Sallahdin v. Gibson, 275 F.3d 1211 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 200

Sassounian v. Roe, 230 F.3d 1097 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

Schmuck v. United States, 489 U.S. 705 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

Scott v. Mullin, 303 F.3d 1222 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 76

Sechrest v. Ignacio, 549 F.3d 789 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Seidel v. Merkle, 146 F.3d 750 (9th Cir. 1998),
    cert. denied, 525 U.S. 1093 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Silva v. Woodford, 279 F.3d 825 (9th Cir.),
    cert. denied, 537 U.S. 942 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Singh v. Prunty, 142 F.3d 1157 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

Skaggs v. Parker, 235 F.3d 261 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Skipper v. South Carolina, 476 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 238

Smith v. Gibson, 197 F.3d 454 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Smith v. Phillips, 455 U.S. 209 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

Smith v. Roberts, 115 F.3d 818 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Snowden v. Singleterry, 135 F.3d 732 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 82, 97

Spears v. Mullin, 343 F.3d 1215 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

Steidl v. Fermon, 494 F.3d 623 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Steinkuhler v. Meschner, 176 F.3d 441 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Stewart v. Wolfenbarger, 468 F.3d 338 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . 51, 61, 69, 90

Stouffer v. Reynolds, 214 F.3d 1231 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Strickler v. Greene, 527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149, 151, 160

Sullivan v. Louisiana, 508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

Tanberg v. Sholtis, 401 F.3d 1151 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Taylor v. Kentucky, 436 U.S. 478 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

Taylor v. Workman, 554 F.3d 879 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 192, 196

Tennard v. Dretke, 524 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

Tennard v. Dretke, 542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104, 150

Thomas v. Goldsmith, 979 F.2d 746 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Thompson v. Wainwright, 787 F.2d 1447 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Thornburg v. Mullin, 422 F.3d 1113 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 173, 246

Tumey v. Ohio, 273 U.S. 510 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

Turner v. Duncan, 158 F.3d 449 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Turrentine v. Mullin, 390 F.3d 1181 (10th Cir. 2004),
    cert. denied, 545 U.S. 1106 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192, 197

United States v. Abeyta, 27 F.3d 470 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

United States v. Agurs, 427 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 159

United States v. Antone, 603 F.3d 566 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

United States v. Bagley, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151, 152

United States v. Baker, 432 F.3d 1189 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

United States v. Barrett, 469 F.3d 1079 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

United States v. Barrett, 496 F.3d 1079 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 177, 243

United States v. Beeks, 224 F.3d 741 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Benally, 146 F.3d 1232 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

United States v. Bernal-Obeso, 989 F.2d 331 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 41

United States v. Biswell, 700 F.2d 1310 (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

United States v. Blakely, 14 F.3d 1557 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Bridwell, 583 F.2d 1135 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

United States v. Brooks, 161 F.3d 1240 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

United States v. Broomfield, 201 F.3d 1270 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Bruce, 458 F.3d 1157 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

United States v. Burbage, 365 F.3d 1174 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 238

United States v. Burrows, 872  F.2d 915 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . 34, 35, 109

United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 194, 205

United States v. Cherry, 433 F.3d 698 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

United States v. Cheska, 202 F.3d 947 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Cook, 45 F.3d 388 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 233, 234

United States v. Correas, 419 F.3d 151 (2nd Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

United States v. Cronic, 466 U.S. 648 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 53

United States v. Davenport, 753 F.3d 1460 (9th 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Davis, 132 F. Supp. 2d 455 (E.D. La. Feb. 2, 2001) . . . . . . . . . . . . . . . . . . . . 199

United States v. Davis, 766 F.2d 1452 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

United States v. Davis, 960 F.3d 820 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

United States v. Dawkins, 17 F.3d 399 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 41, 143

United States v. Durham, 287 F.3d 1297 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . 182, 186

United States v. Ferra, 900 F.2d 1057 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

United States v. Foree, 43 F.3d 1572 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 143

United States v. Fulcher, 250 F.3d 244 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

United States v. Fuller, 938 F. Supp. 731 (D. Kan. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

United  States v. Garcia-Guizer, 160 F.3d 511 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Ghane, 490 F.3d 1036 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

United States v. Giovanelli, 945 F.2d 479 (2nd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

United States v. Hall, 113 F.3d 157 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 144

United States v. Haney, 318 F.3d 1161 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

United States v. Henandez, 975 F.2d 1035 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

United States v. Hernandez, 94 F.3d 606 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

United States v. Hernandez-Rodriguez, 443 F.3d 138 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . . 163

United States v. Hill, 799 F. Supp. 86 (D. Kan. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Hogue, 827 F.2d 660 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

United States v. Honken, 378 F. Supp. 2d 1040 (N.D. Iowa 2004) . . . . . . . . . . . . . . . . . . . . . 199

United States v. Humphrey, 208 F.3d 1190 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 98, 193

United States v. Joe, 8 F.3d 1488 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

United States v. Johnson, 520 U.S. 461 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

United States v. Jones, 336 F.3d 245 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

United States v. Kauffman, 109 F.3d 186 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

United States v. Kennedy, 64 F.3d 1465 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 126, 133

United States v. Kennedy, 131 F.3d 1371 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

United States v. Kojayan, 8 F.3d 1315 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

United States v. Kreutzer, 61 M.J. 293 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132, 134

United States v. Libby, 429 F. Supp. 2d 1 (D. D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

United States v. Lofton, 776 F.2d 918 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 197

United States v. Manning, 23 F.3d 570 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Martinez-Medina, 279 F.3d 105 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Miller, 753 F.2d 1475 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 143

United States v. Morales-Quinones, 812 F.2d 604 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . 71

United States v. Novaton, 271 F.3d 968 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

United States v. Olano, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

United States v. Osorio, 929 F.2d 753 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

United States v. Pinto, 755 F.2d 150 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

United States v. Quintanilla, 193 F.3d 1139 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 152, 162

United States v. Ramsey, 323 F. Supp. 2d 27 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 97

United States v. Reddick, 90 F.3d 1276 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 143

United States v. Resko, , 3 F.3d 684 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 226, 228

United States v. Rich, 580 F.2d 929 (9th Cir.),
       cert. denied, 439 U.S. 935 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166, 167

United States v. Rivera, 900 F.2d 1462 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

United States v. Rosales-Rodriguez, 289 F.3d 1106 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 219

United States v. Sands, 899 F.2d 912 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

United States v. Scafe, 822 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 195

United States v. Scheer, 168 F.3d 445 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 155, 156

United States v. Serawop, 410 F.3d 656 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

United States v. Siddiqi, 959 F.2d 1167 (2nd Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

United States v. Sinclair, 109 F.3d 1527 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

United States v. Sorrells, 714 F.2d 1522 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

United States v. Soundingsides, 820 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . 50, 195

United States v. Temple, 862 F.2d 821 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 74

United States v. Thomas, No. CCB-03-0150,
       2006 U.S. Dist. LEXIS 3266 (D.Md. January 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . 95

United States v. Toles, 297 F.3d 959 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 243, 246

United States v. Torres, 569 F.3d 1277 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Velarde, 485 F.3d 553 (10th Cir. 2007)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

United States v. Vigeant, 176 F.3d 565 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 144

United States v. Visinaiz, 428 F.3d 1300 (10th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

United States v. Wardell, 591 F.3d 1279 (10th Cir. 2009)  . . . . . . . . . . . . . . . 182, 183, 184, 186

United States v. Warner, 23 F.3d 287 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

United States v. Wood, 207 F.3d 1222 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

United States v. Young, 470 U.S. 1 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

Viereck v. United States, 318 U.S. 236 (1943)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

Village of Willowbrook v. Olech, 528 U.S. 562 (2000)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Wackerly v. Workman, 580 F.3d 1171 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Wainwright v. Witt, 469 U.S. 412 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

Walton v. Arizona, 497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

Ward v. Village of Monroe, 409 U.S. 57 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Washington v. Hofbrauer, 228 F.3d 689 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Watts v. Singletary, 87 F.3d 1282 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Wiggins v. Smith, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Williams v. Calderon, 52 F.3d 1465 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

Williams v. Quarterman, 551 F.3d 352 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Williams v. Taylor, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Williamson v. Reynolds, 904 F. Supp. 1529 (E.D. Okl. 1995) . . . . . . . . . . . . . . . . . . . . . . passim

Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Witherspoon v. Illinois, 391 U.S. 510 (1968)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199, 200, 204

Wood v. Georgia, 450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 141

Woodson v. North Carolina, 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . 104, 199, 200, 210

**STATE CASES**

Anderson v. State, 992 P.2d 409 (Ok. Crim. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 112, 115

Burnside v. State, 858 N.E.2d 232 (Ind. App. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

Commonwealth v. Alvarez, 740 N.E.2d 610 (Mass. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Davis v. Polk, 2007 WL 2898711 (W.D.N.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Dunkle v. State, 139 P.3d 228 (Okl. Cr. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Gordon v. Kelly, 2000 WL 145144 (6th Cir. Feb. 1, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 172

Horton v. Massie, 2000 WL 107386 (10th Cir. Jan.31, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 69

Jennings v. State, 744 P.2d 212 (Okl. Cr. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Mitchell v. State, 379 S.E.2d 123 (S.C.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

Patton v. State, 784 So. 2d 380 (Fla. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 109

State v. Garner, 36 P.3d 346 (Mont. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

State v. Saunders, 958 P.2d 364 (Wash. Ct. App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

State v. Talley, 702 P.2d 353 (N.M. Ct. App. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

United States v. Bodkins, 2005 WL 1118158 (W.D. Va. May 11, 2005) . . . . . . . . . . . . . . . . . 199

United States v. Rodham, 2007 WL 2031705 (4th Cir. Jul. 11, 2007) . . . . . . . . . . . . . . . . . . . 56

Williams v. State, 669 N.E.2d 1372 (Ind. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 133

Wood v. Endell, 702 P.2d 248 (Alaska App. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Wrinkles v. State, 749 N.E.2d 1179 (Ind. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

**DOCKETED CASES**

Boyd v. Allen, __F.3d__, No. 07-14908 (11th Cir. Jan. 8, 2010) . . . . . . . . . . . . . . . . . . . . . . . 176

Stun-Technology, Inc. v. RACC Industries, Inc., Case No. 95-268 . . . . . . . . . . . . . . . . . . . . 184

United States v. Kenneth Eugene Barrett, Case No. 6:04-CR-00115-JHP-SPS . . . . . . . . . . . . . 3

**FEDERAL STATUTES**

18 U.S.C.
      § 1112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193
      § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 33, 125
      § 3006A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 33
      § 3432 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 166
      § 3591 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207
      § 3592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207
      § 3592(a)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150, 151
      § 3593(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150, 208, 225
      § 3599 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
      § 4241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

21 U.S.C. § 848(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207, 208

28 U.S.C. § 2255(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Federal Rules of Civil Procedure 26(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Federal Rules of Criminal Procedure
      16 ( c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152
      31( c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193
      33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

Federal Rules of Evidence
      403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 74
      404(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
      608(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 63, 64
      615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
      702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93, 137
      803(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

## MISCELLANEOUS

ABA Guideline 10.8 and Commentary, 31 Hofstra L. Rev. 913, 1028
    (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

ABA Standards for Criminal Justice 4-1.2(c) (3d ed. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Barlow, David H. , Clinical Handbook of Psychological Disorders, Third Edition: A Step-by-
    Step Treatment Manual, 71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Blume John H. & Johnson, Sheri Lynn , Competent Capital Representation: the Necessity
    of Knowing and Heeding what Capital Jurors Tell us about Mitigation, 36 Hofstra L.
    Rev.1035 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

Garvey, Stephen P., Aggravation and Mitigation in Capital Cases: What Do Jurors Think?,
    98 Colum. L. Rev. 1538, 1563 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

Goodpaster, Gary The Trial for Life: Effective Assistance of Counsel in Death Penalty
    Cases, 58 N.Y.U. L. Rev. 299 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

The ABA Model Code of Professional Responsibility EC 5-23 (1980),
    quoted in Wood, 450 U.S. at 270 n . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,      )
                             )
         Petitioner/Defendant, )
                             )
v.                           )      Case No. 6:09-cv-00105-JHP
                             )
UNITED STATES OF AMERICA,     )
                             )
         Respondent/Plaintiff. )

---

PETITIONER'S BRIEF IN SUPPORT OF
SECOND AMENDED § 2255 MOTION
AND IN SUPPORT OF
PETITIONER'S MOTION FOR EVIDENTIARY HEARING
AND MOTION FOR RECORD EXPANSION

---

## I.      Introduction

### A.      Statement Regarding Form

This brief is being filed pursuant to the Court's order filed October 7, 2009 (Doc. 81).  In keeping with the Court's description of the reasons for requiring Mr. Barrett to file a second amended petition on the form created for petitioners filing *pro se* this brief provides the legal support for the grounds set forth in that amended petition.  As stated in Mr. Barrett's prior filing (Doc. 94), pursuant to the Court's statements at the hearing held October 6, 2009, Mr. Barrett's First Amended § 2255 Motion is a valid pleading.  (Doc. 70.)  Mr. Barrett does not waive or abandon any basis for relief set forth in his First Amended § 2255 Motion.  However, as the Court has indicated it may not look further at the First Amended § 2255 Motion, Mr. Barrett repeats in this brief the introductory summary of argument from that pleading.  In other respects,

Petitioner's Merits Brief                    1                    *Barrett v. U.S.*, 09-cv-105-JHP

this brief supplements the legal grounds for relief set forth in the Second Amended § 2255 Motion. (Doc. 95.)

As shown in Mr. Barrett's previous objections (Doc. 94), the procedure being used in this case is not the norm for cases in the Eastern District or elsewhere. Mr. Barrett and his counsel have made every effort to ensure this brief meets the Court's expectations and requirements. However, those requirements and expectations remain unclear. In preparing this brief based on the October 7 Order and the hearing transcript, counsel understand that the Court intends for them to rely upon the facts set forth in the Second Amended § 2255 Motion (Doc. 95), upon the unsealed exhibits filed with the First Amended § 2255 Motion, and upon the redacted exhibits being filed contemporaneously with this brief. Therefore, this brief assumes the reader is familiar with those facts, and the record and exhibits documenting them, and the absence of a fact or reference to a fact from this brief should not be construed as a waiver or forfeiture of any previously asserted basis for relief.

The arguments set forth in this brief are incomplete. On January 12, 2010, the Court issued an order that enjoins Mr. Barrett's counsel from speaking publicly about certain evidence that supports Mr. Barrett's claims. That evidence was disclosed, in whole or in part, to Mr. Barrett's counsel on January 28, 2010. On February 11, 2010, Mr. Barrett filed a motion seeking to continue the briefing schedule so that he could seek relief from that injunction, investigate the newly discovered evidence, and amend his claims accordingly. The Court has set the motion for hearing on a date after this brief is due. The outcome of that hearing will affect the supplemental and additional merits briefing to be filed in support of Petitioner's claims.

In addition, Mr. Barrett respectfully submits this brief in support of his motion for an evidentiary hearing pursuant to 28 U.S.C. § 2255(b) and to expand the record pursuant to Rule 7 of the Rules Governing § 2255 Proceedings.

References to prior proceedings are as follows:

- References to the consecutively paginated trial transcripts:  R. *xxx*;

- References to hearing transcripts not consecutively paginated with the trial transcripts:  Tr. [date] Hr'g at *xxx*;

- References to documents filed with the court such as pleadings, motions, and orders cite the docket number for *United States v. Kenneth Eugene Barrett*, Case No. 6:04-CR-00115-JHP-SPS:  Doc. *xxx*

- References to the two state trials:  1st St. Tr. Tx at *xxx*, and 2nd St. Tr. Tx at *xxx*;

- References to the exhibits to the First Amended § 2255 Motion:  Exhibit *xx* (an index to the exhibits appears in Appendix B to that Motion);

- All other references are self-explanatory or based on the Blue Book.

**B.    Summary of Argument**

Kenneth Eugene Barrett would not and did not intentionally kill Trooper David "Rocky" Eales.  Mr. Barrett defended himself from an unannounced attack on his home and his teenage son by individuals who failed to announce that they were law enforcement officers.  In recognition of these facts – although without the benefit of the evidence presented through this Petition – a jury of Oklahoma citizens acquitted Mr. Barrett of the murder for which he now sits on death row.  This Petition shows the Government succeeded in overturning that result through an unfair trial in this Court, a trial characterized by judicial misconduct, ineffective defense

representation (a product both of a failure to perform according to prevailing professional norms and judicial interference), the withholding of truthful information that would have impeached the Government's key witnesses, and other forms of misconduct by prosecutors and law enforcement officers. Mr. Barrett is a mentally ill, traumatized man under sentence of death for a death that, though tragic, was not murder.

In order to improve their chances of obtaining the desired result, the Government loaded the dice with seven drug-addict informants who were nowhere to be found during the five years Mr. Barrett's state case was pending, but who materialized at the last minute to provide the prosecution with much needed and inadmissible "evidence" of intent. A number of these noxious characters dutifully marched to the witness stand to recite "statements" from Mr. Barrett that he threatened to kill any law enforcement officer who stepped on his property. Some of these witnesses also sought to portray Mr. Barrett as a drug manufacturer, even though no drug lab was found on his property when it was searched after Trooper Eales was tragically killed.

In handling these witnesses, the Government used a carrot and stick approach. To get them to toe the mark, the Government employed intimidation and threats with at least two of them, Travis and Cindy Crawford. This strong-arm tactic was headed up by disgraced former Assistant United States Attorney David Michael Littlefield, who was charged in 2007 with beating his children, and whose has been reprimanded by the Oklahoma Supreme Court as a result of his child abuse case.

The carrot was undisclosed deals only vaguely hinted at during trial, or concealed altogether, and only consummated at or after the conclusion of Mr. Barrett's trial. The big winner in the snitch sweepstakes was Charles "Monk" Sanders, an eighteen-time (at least) convicted felon who was the alleged "C.I." for corrupt Drug Task Force officer Clint Johnson's

search warrant for Mr. Barrett's residence, which set this entire tragedy in train. Sanders, who was permitted by Seqouyah County officials to run riot despite an almost unending series of convictions, saw any future jail time evaporate, had "split sentences" he never should have received in numerous felony cases reduced to straight *unsupervised* probation, and was even excused from paying any costs or fines in his cases, all courtesy of the Government and state prosecutors after he testified at Mr. Barrett's trial.

Others were also rewarded for their testimony. Karen Real, who, at the time of her testimony was serving a fourteen-year federal sentence in a drug manufacturing and firearms case, saw her sentence reduced to time served on the Government's Rule 35 motion shortly after Mr. Barrett was convicted and sentenced to death. Brandie Zane Price, a convicted felon who was depicted as having been delivered from her drug addiction at the time she testified against Mr. Barrett, was later charged in the Eastern District with being a member of a wide-ranging drug conspiracy. In the indictment filed against her and others, Price was charged with having started her participation in the drug conspiracy just a few short weeks after Mr. Barrett was formally sentenced. Randy Turman, a methamphetamine manufacturer who had a pending six-count drug case hanging over his head at the time he testified against Mr. Barrett, falsely testified on cross-examination that his case had "done been taken care of," when, in fact, it had not. The Government surely knew Turman was lying, but sat silently and allowed him to perjure himself, in derogation of its duty to correct false testimony. In 2007, after being inactive for years, Turman's case was dismissed by Sequoyah County prosecutors "in the interests of justice."

The Government knew it still had a shaky edifice on its hands. With sufficient time and a competent defense investigation, it would take but a few prods for the whole ramshackle thing to come crashing down. In order to prevent or forestall any effective investigation by the defense,

the Government contrived to keep the identity of these witnesses secret for as long as possible. As the general jury qualification process in Mr. Barrett's trial began, the Government filed a spurious sealed motion to delay identifying the names and addresses of the snitch witnesses. An improper *ex parte* hearing was conducted by the Court on the motion. As the court quickly realized, the Government had zero evidence for its request; none of these witnesses were in the least bit of danger. Outside the presence of defense counsel, their Government adversaries were allowed to speak for them on the question of whether the trial had already begun, thus precluding the informants from testifying under the applicable notice statute, and what steps the Government proposed so the defense would eventually have "access" to these witnesses. The Cout recognized a lengthy continuance would likely be necessary to permit proper time for defense preparation. In passing, AUSA Littlefield revealed to the Court, but not defense counsel, that he was aware of a witness who would contradict Charles Sanders.

When the hearing was eventually unsealed and defense counsel were allowed to "participate," neither the Court nor the Government informed the defense of what had gone on behind closed doors. What had occurred was misrepresented to defense counsel. There was no reason to keep what had transpired at the hearing secret, since there was no basis for the Government's motion to begin with. Defense counsel were led down the primrose path, hastily agreeing to an arrangement whereby they would be allowed, under Government supervision, to interview the informant witnesses. However, except in one instance, these witnesses refused to speak to the defense. Having agreed to what the Government presented as a *fait accompli*, the ability of defense counsel to investigate and impeach these witnesses and to marshal independent evidence contradicting them went up in smoke. Mr. Barrett shows by his motion and this brief

Petitioner's Merits Brief                        6                        *Barrett v. U.S.*, 09-cv-105-JHP

that with a competent investigation, the credibility of the Government's key witnesses would have been destroyed.

The Government's tactics of secrecy, obfuscation and misdirection, exemplified by what occurred at the *ex parte* hearing, typified the prosecutors' conduct of the entire case.  Mr. Barrett shows in this motion that the Government routinely violated its duties to disclose exculpatory evidence, and sponsored or knowingly allowed materially false testimony.

Well before the *ex parte* hearing, Mr. Barrett found the sledding rough in his efforts to receive what every criminal defendant in this country is entitled to as a matter of fundamental constitutional right: a fair trial.  Mr. Barrett had to contend not only with prosecutors who were determined to press every fair and unfair advantage at their disposal, but the Cout as well.

From the inception of the case, the Cout demonstrated concerns with and an interest in matters inconsistent with providing Mr. Barrett competent representation.  Tulsa attorney John Echols successfully represented Mr. Barrett in state court.  He was obviously the best choice to defend Mr. Barrett against the late-coming federal charges.  The Cout only appointed Mr. Echols as a means of saving money, and rejected the Federal Defenders' recommendations of qualified co-counsel in order to give less-qualified local counsel experience needed to form the basis for a local panel of capital attorneys.  The Cout's furtherance of these interests virtually forced Mr. Echols off the case, including by withholding compensation for the budgeting investigation the Cout required Echols to undertake.

After Mr. Echols threw up his hands in frustration and withdrew from the case, more compliant counsel saw it to its predictable end.  Mr. Barrett demonstrates in his motion and this brief that trial counsel, due to a combination of interference from the Cout and their own unprofessional errors and omissions, rendered ineffective assistance at the guilt/innocence stage

of trial.  Counsel failed to consult any experts, or even question the purported "expertise" of Government witnesses, whose qualifications and methods the Cout recognized as lacking.

Trial counsel, in part deceived by the Cout and Government following *ex parte* communications, failed to seek a continuance to investigate the seven secret informants.  Mr. Barrett shows here that even moderate investigation would have shown these witnesses were unworthy of belief.

Counsel's ineffectiveness, again for the same combination of reasons, continued into the penalty phase.  Because counsel were underfunded and failed to properly prepare, the prosecution was able to portray Mr. Barrett as nothing more than a mean, common criminal from an ordinary, unremarkable background, who had simply decided to embark on the path that led him to the courtroom.  Defense counsel did virtually nothing to counter the prosecution's depiction of their client, putting on a superficial and misleading mitigation case that both played right into the Government's hands and failed utterly to reveal Mr. Barrett's true character, history and background.

Mr. Barrett was and is nothing like the prosecution argued.  A competent mitigation investigation would have shown the truth about him.  Severe mental illness has plagued Mr. Barrett's family for generations.  As shown in his motion and this brief, Kenneth Barrett has struggled with severe organic, psychiatric, psychological and intellectual impairments his whole life.  This evidence would have been relevant not only in the penalty phase, but in the first stage of trial as well.

Far from being a "bad person" who came from an ordinary background and simply chose to walk a twisted road, Kenneth Barrett is the product of a woefully dysfunctional marriage, a union that was rife with alcohol and other substance abuse, mental dysfunction, chaos, emotional

and, at times, physical abuse, and infidelity. Kenneth Barrett's upbringing was anything but normal. As he struggled from birth with his genetic inheritance, he was forced to grow up in the maelstrom of chaos and neglect created by his parents. The psychological and emotional abuse his parents visited on each other as their doomed-from-the-start marriage unraveled was, from the beginning of his life, visited on him.

The numerous constitutional errors that marred Mr. Barrett's trial require that he be granted relief from his convictions and sentences.

## II.   Statement of the Case

### A.   Events Leading Up to the Raid on the Barrett Home

#### 1.   Mr. Barrett's "Failure to Appear" and the Resulting Bench Warrant

In March, 1997, Mr. Barrett was charged with unlawful delivery of a controlled substance arising from the alleged sale of $25 of methamphetamine to an undercover agent. In the court proceedings for that case, Attorney Bill Ed Rogers represented Mr. Barrett until September 11, 1998, when Mr. Rogers filed a motion to withdraw from the case. There is no record of a ruling on Mr. Rogers' motion. The court docket reflects that Mr. Barrett asked the Court for an appointed attorney on December 14, 1998; however, there is no indication that the Court ever did so. There was no other activity in the case until January 19, 1999, when the docket states that "subp's issued."

The court docket indicates that on January 28, 1999, a bench warrant was issued for Mr. Barrett for "failing to appear for jury trial" on January 27, 1999. This was the only notation in the criminal docket regarding the trial for which Mr. Barrett allegedly failed to appear. The only other information about this alleged trial date was elicited at the hearing on Mr. Barrett's Motion to Suppress Evidence on January 26, 2005, prior to his federal trial. At that hearing, Sequoyah

County Court Clerk Bernell Edwards testified that Mr. Barrett's state trial for the drug case had been scheduled for January 25, 1999. However, juror records examined by Sequoyah County Court Clerk Vickie Beaty show that no citizens were summoned for jury duty on January 25, 1999 or, indeed, for the entire month of January, 1999. Accordingly, the bench warrant issued for Mr. Barrett's arrest arose from his failure to appear for a trial for which no jurors had ever been summoned.

There was never any evidence that Mr. Barrett was aware of the bench warrant. Mr. Barrett's bail bondsmen, Martin Daggs, testified that he eventually became aware of the bench warrant but never saw a need to notify Mr. Barrett about the warrant. Mr. Daggs stated that he knew where Mr. Barrett lived and he could find him if he wanted to.

### 2.   *The Search Warrant.*

Eight months after the issuance of the bench warrant, Clint Johnson, the supervising agent and field supervisor for the District Twenty-Seven Drug Task Force (Task Force) prepared an affidavit for a search warrant for Mr. Barrett's residence. The affidavit asserted that a confidential informant had seen Mr. Barrett sell drugs on one occasion between September 15 and 18, 1999; that he had seen Mr. Barrett engage in other drug transactions at his house; that he had overheard Mr. Barrett say "'if the cops try to raid me they will regret it because I'm going to kill the first cop through the door'"; that Mr. Barrett had guns in his house; and, that Mr. Barrett sold drugs at night because he believed search warrants could not be served at night. (At the federal trial in 2005, law enforcement for the first time identified the confidential informant as Charles "Monk" Sanders. Sanders testified and on cross-examination denied having seen, heard, done, and said the specific things attributed to him in Johnson's affidavit.)

On September 20, 1999, a District Court Judge signed the requested search warrant which authorized law enforcement officers to conduct the search at any time of the day or night and to enter Mr. Barrett's residence without the normally required knocking and announcing their presence. Inexplicably, there did not appear to have been any discussion about simply paying a visit to Mr. Barrett, despite the fact that law enforcement had visited Mr. Barrett in the recent past and even inspected his weapons without any violence.

In any event, Johnson considered the search warrant to be "high risk" in nature and contacted the Oklahoma Highway Patrol's Tactical Team (Tact Team) for assistance in serving the warrant. Johnson met with Tact Team members to discuss the execution of the warrant. It was determined that the Tact Team would enter and secure the area first, and that the Task Force and would then perform the actual search of Barrett's residence. The Tact Team and Task Force were accompanied by an entourage of local dignitaries. The Tact Team allegedly decided that, because the front gate to Barrett's property was locked, three of the Tact Team vehicles, two Ford Broncos that were unmarked and had extra antennae removed and a marked highway patrol unit, would enter Barrett's property by first driving north on a private driveway that lay to the east of Barrett's property, and then driving west across the land and through a ditch onto Barrett's property.

### 3.    *September 24, 1999*.

Until late in the night of September 23 and after midnight on the September 24, Mr. Barrett and his son Toby had worked in their garage on a Camaro which Mr. Barrett had promised to Toby if he returned to high school. After they finished up around 12:30 A.M., Toby cleaned up the garage and was walking to his trailer. At that time, the five Tact Team vehicles

headed towards Mr. Barrett's residence.  What happened next was the subject of conflicting accounts by the law enforcement officers involved.

The lead Tact Team vehicle, a white Ford Bronco, drove eastward on the gravel road that passed in front of Mr. Barrett's residence.  The driver, Trooper John "Buddy" Hamilton, observed Toby as he entered the private drive to the east of Barrett's residence, but continued with the execution of the no-knock warrant.  Hamilton then turned his vehicle westward towards Mr. Barrett's house and entered a deep ditch that lay between Mr. Barrett's cabin and the property to the east, and drove straight towards the house.

Toby screamed, "Dad," as the unmarked Bronco continued toward the porch.

Mr. Barrett was eating a bowl of cereal when he heard Toby yell.  He went to the doorway and saw the high-beam bright headlights coming towards his cabin from the ditch on the side of his house.  Mr. Barrett ran inside, grabbed a gun and shoved it in his waistband and went to the window.  As Mr. Barrett approached the window, he was shot in the lower portion of his body.  Mr. Barrett grabbed his Colt Sporter rifle, to which were attached two full and one partially full magazines of ammunition, and started firing out the doorway.

The lead Bronco hit the porch of the cabin.  As it had been approaching, the second and third vehicles entered the property.  They stopped slightly behind Hamilton's vehicle.  Meanwhile, Troopers Gene Hise and Robert Darst, who arrived at the scene in the fourth Tact Team vehicle, climbed over the locked front gate, entered the yard in front of Mr. Barrett's house, and yelled at Toby to get on the ground.  Trooper Darst eventually took custody of Toby Barrett and determined he was unarmed.

The shooting lasted less than thirty seconds.  At some point, Hamilton's passenger, Trooper David "Rocky" Eales, opened the front passenger door, got out of the vehicle, and began

moving towards the rear of the vehicle. Before he arrived at the rear of the vehicle, Trooper Eales was struck by three bullets or bullet fragments.

Meanwhile, Hamilton threw a diversionary device out of the driver's side window of his vehicle, causing a noticeable flash and loud bang. The flash and bang created a stoppage of gunfire, during which Hamilton got out of the driver's side of his vehicle. Hamilton then moved towards the rear of his vehicle. As he did so, he was struck by a bullet in the back of the left shoulder. When he reached the back of the vehicle, Hamilton observed Eales face down on the ground with Trooper Ricky Manion attempting to assist him.

At some point in the melee, Manion shot Mr. Barrett in the lower body. Hamilton approached and entered the house, told Mr. Barrett to get up, and Mr. Barrett responded that he could not because he had been shot. Hamilton, with the assistance of Troopers Manion and Steve Hash, dragged Mr. Barrett out of the house and into the front yard and beat him. Mr. Barrett had been shot at least four times.

After unsuccessfully attempting to provide first aid to Trooper Eales, Tact Team members transported him to a local hospital, where he was pronounced dead. A search of Mr. Barrett's property, including his house and outbuildings, failed to yield methamphetamine. The government seized items that it contended were related to the production and use of methamphetamine, including coffee filters, pseudoephedrine, ephedrine tablets, red phosphorus, and iodine.

### B. Three Trials

#### 1. State Trials.

Mr. Barrett was tried in Oklahoma state court, twice, as set out more fully in the Procedural History (Appendix A hereto). In the first state trial, the jury was deadlocked and

could not reach a verdict. The second state court jury rejected the first-degree murder charge and instead found Mr. Barrett guilty of the lesser-included crime of first-degree manslaughter. The jury also rejected the shooting with intent to kill charge and instead found Mr. Barrett guilty of the lesser-included offense of assault and battery with a dangerous weapon. The jury acquitted Mr. Barrett on the two counts of discharge of a firearm with intent to kill. Mr. Barrett did not appeal his convictions or sentences.

### 2. Federal Trial.

Mr. Barrett's federal trial was markedly different from his state trials. In the first phase the most notable difference was the testimony of seven informants, who did not testify in either of the state trials. The identity of these snitches was not made known to the defense until after the beginning of jury selection. These snitches came forward with statements that Mr. Barrett allegedly made about "going down in a blaze of glory" and the like.

At the sentencing phase of Mr. Barrett's trial, the government presented testimony with respect to victim impact and future dangerousness. In the category of future dangerousness, the government presented the following witnesses:

1.      Stanley Philpot, a Sequoyah County reserve deputy sheriff, who testified about an incident in which he stopped Mr. Barrett in his truck and informed him of the outstanding felony warrant for his arrest. Stanley followed Mr. Barrett home, at which time Mr. Barrett allegedly stood on the porch holding a gun. Stanley called for back up but neither Mr. Barrett nor the gun could be found.

2.      Johnny Philpot, former Sequoyah County Sheriff, who testified that he was called as back up for the above incident.

3.      Cindy Crawford, who testified that Mr. Barrett allegedly held a gun to her leg because she refused to sleep with him and said that he would "fucking kill her" if she came back to his place.

4.      Charles "Monk" Sanders testified that he was present when a female friend of Mr. Barrett's received a telephone call from Mr. Barrett while he was in jail. According to Sanders's second-stage testimony, he overheard Mr. Barrett, whose voice he recognized, tell the female friend they needed to find the person who got him arrested so they could "kill that son of a bitch."

5.      Larry Lane, a Sequoyah County Sheriff's Deputy, who stated that Mr. Barrett ran a police check point and he pursued him until he ran off the road and ran away on foot.

6.      Shannon Smith, a former Sequoyah County Sheriff's Deputy, who was present at the checkpoint. Smith testified that Mr. Barrett pulled off so fast that two police officers had to jump out of the way. Smith also testified that on a different occasion he saw Mr. Barrett slapping his wife. Smith said that he told Mr. Barrett to stop and Mr. Barrett allegedly told Smith "he was going to get his gun and kill him."

With respect to victim impact, the government presented the following witnesses:

1.      William DeWeese, Rocky Eales' best friend from the Marine Corps, who testified that Trooper Eales was an outstanding person, an outstanding marine and like a brother to him.

2.      Nancy Eales Stalcup, Rocky Eales' sister, who testified that Trooper Eales was a wonderful person and a wonderful brother. Ms. Stalcup stated that Trooper

Eales' death had a deteriorating effect on her health for which she had to receive medical care.

3.      Bobbie Eales, Rocky Eales' mother, who testified about her son and read a five-page written statement into the record that described her loss and pain.

4.      Gene Hise, an Oklahoma State Highway Patrolman and good friend of Rocky Eales, who testified about informing Kelli Eales of Rocky's death and his loss and Post-Traumatic Stress Disorder since Trooper Eales' death.

5.      Kelli Eales, Trooper Eales' wife, who testified about her husband's death and the loss she has suffered.  Mrs. Eales also read into the record statements her children had written about the loss of their father.

The mitigation stage of the sentencing hearing lasted less than three days.  There was no testimony regarding Mr. Barrett's mental health.

Mr. Barrett's counsel presented the following witnesses in mitigation:

1.      Maudeen Vann, First Deputy Court Clerk, Sequoyah County, Oklahoma, who testified as to the verdict in the state trial, the 30-year sentence Mr. Barrett received and was serving and the fact that he had no prior felony record.

2.      Kathy Trotter, Mr. Barrett's cousin, who briefly testified that everyone in the family grew up with guns and used guns. She also testified that she was a process server and familiar with the legal community and had no knowledge of Mr. Barrett's involvement in violent activities other than some instances of domestic violence.

3.      Jimmy Wilson, a case manager at the Oklahoma Department of Corrections, who testified as to the actual time Mr. Barrett would serve on his

state sentence, the type of facility in which he would serve his sentence, his restrictions and his possibility of parole.

4.    Abby Stites, Mr. Barrett's former wife, who testified about their troubled marriage and that it was not all Mr. Barrett's fault; she was equally to blame.

5.    Craig Edgmon, Mr. Barrett's neighbor, who testified that Mr. Barrett was a good mechanic and worked on his car, truck and farm equipment.

6.    Clyde Edgmon, Mr. Barrett's neighbor and Craig Edgmon's father, who also testified that Mr. Barrett was a good mechanic who charged a fair price and sometimes did work for no charge.  Mr. Edgmon also testified that law enforcement (John Owens and Sandy Gerdner) came by his house when Mr. Barrett was working on Mr. Edgmon's truck and talked to Mr. Barrett for some time.  This was a very friendly exchange that took place three to six months before the raid.

7.    Robert Gude, a former jailer at the Sequoyah County Jail, who testified about the conditions at the Sequoyah County Jail and Mr. Barrett's behavior at the jail.

8.    Courtney Burke, an assistant administrator at the Sequoyah County Jail, who testified regarding Mr. Barrett's behavior while housed at the jail.

9.    Martin Daggs, a bail bondsman in Sequoyah County who had bonded Mr. Barrett out of jail on the 1997 drug case.  Daggs testified that he was aware of the bench warrant but never did anything to make Mr. Barrett aware of the bench warrant because a judgment of forfeiture had never been ordered.

10.   Steve Barrett, Mr. Barrett's brother, who testified superficially about his

and Mr. Barrett's childhood.

11.　　Roger Crawford, Mr. Barrett's uncle and neighbor, who testified that Mr.

Barrett was a good father, a good son, a good neighbor and good mechanic.

12.　　Gelene Dotson, Mr. Barrett's mother, who testified superficially about Mr.

Barrett's childhood, his marriage and his adult life.

13.　　Ernest Barrett, Mr. Barrett's father, who testified superficially about Mr. Barrett's

youth.

14.　　Doris Barrett, Mr. Barrett's stepmother, who testified that Mr. Barrett was

like a son to her.

**III.　Points and Authorities Supporting Mr. Barrett's Grounds for Relief**

> **Ground 1　Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and his Right to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel**.

In Ground 1of the Amended § 2255 Motions, Mr. Barrett describes the factual bases for

this Court to vacate his conviction or death sentence for violations of several constitutional and

statutory rules.  The facts presented therein show actions of the trial court denied Mr. Barrett a

fair trial under conditions required or routinely provided to similarly situated defendants pursuant

to 18 U.S.C. §§ 3005, 3006A, and 3599, the Judicial Conference's Guidelines for

implementation of the Criminal Justice Act, prevailing professional norms of criminal defense

practice, and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution. As he will throughout this Brief, Mr. Barrett relies upon the factual averments of

the Amended § 2255 Motions and the exhibits thereto.

At the outset, Mr. Barrett reiterates his multiple objections to the Honorable James H. Payne deciding this claim. First, Ground 1 alleges on-the-record and off-the-record actions by Judge Payne. It is improper for a trial judge to decide a claim where he is at least a potential witness to extra-record matters. Judge Payne has made himself a witness by disputing on the basis of his personal knowledge the accounts of other witnesses. Resp. Pet. Mandamus by Hon. James H. Payne, Tenth Cir. Case No. 09-7096. Second, Ground 1 contains more than mere allegations of legal error; it presents evidence on which an impartial tribunal could find interference with defense counsel and the withholding of a ruling so that the prosecution could gain a strategic advantage. These actions were undisputed in the mandamus proceedings before the Court of Appeals. Even if these actions were taken in the well-intentioned, but mistaken belief that they were proper, the Due Process Clause recognizes that judges, like all other human beings, are susceptible to cognitive biases that render unreliable decisions reflecting on their own interests.

### Judicial Interference with Defense Counsel

Judicial interference with defense counsel carrying out their constitutional function as opponents of the Government violates the Sixth Amendment. *Geders v. United States*, 425 U.S. 80, 91(1976) (trial court's order prohibiting defense counsel from consulting with defendant during recess between direct and cross-examination); *Herring v. New York*, 422 U.S. 853, 863, 865 (1975) (order barring defense counsel from summing up in bench trial); *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972) (rule requiring defendant to testify before any other witnesses denied defendant benefit of counsel's advice and guidance); *Hamilton v. Alabama*, 368 U.S. 52, 55 (1961) (denial of counsel at arraignment where defenses had to be raised); *Ferguson v. Georgia*, 365 U.S. 570, 596 (1961) (where state rule made defendant incompetent to give sworn testimony,

Constitution required that counsel be permitted to guide unsworn statement).  Where such interference is shown, the "[Supreme] Court has uniformly found constitutional error without any showing of prejudice . . . ."  *United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984).[1]

The facts set out in Ground 1 show the trial court acting in contravention of guidelines for the administration of the Criminal Justice Act.  Those guidelines were developed by judges and personnel from the Administrative Office of the United States Court for the purpose of implementing the statutory requirements of the Criminal Justice Act while preserving the independence of criminal defense counsel that is protected by the Fifth and Sixth Amendments.

The Supreme Court granted certiorari in *Geders v. United States* in order to resolve a split in the circuits regarding whether a defendant had to show prejudice in order to prevail on a claim that the trial court interfered with his Sixth Amendment right to counsel by preventing counsel from conferring with the defendant during a recess that coincided with the defendant's testimony. 425 U.S. at 86. The Supreme Court in *Geders* recognized the broad powers of a trial judge to control the proceedings and make discretionary rulings in the course of a trial.  425 U.S. at 86. The Court held that where these important tools of the trial court conflict with a defendant's rights, "the conflict must, under the Sixth Amendment, be resolved in favor of the right to the assistance and guidance of counsel.  *Brooks v. Tennessee*,  406 U.S. 605 (1972)."  425 U.S. at 91. The Court in *Geders* distinguished the common practice of sequestering disinterested witnesses, which the Court described with approval, from the special case of keeping a defendant from speaking with his attorney.  425 U.S. at 87.  The difference, the Court emphasized, is that an attorney must be able to gather information from the defendant and discuss the trial with him

---

[1]  Although Mr. Barrett need not show prejudice before the Court would be required to vacate his conviction based on Ground 1, Mr. Barrett can show prejudice and does so through the facts and law addressed here, and in Grounds 2, 3, and 4.

Petitioner's Merits Brief                                    20                        *Barrett v. U.S.*, 09-cv-105-JHP

because, during even a time as brief as the seventeen hours at issue, there are "tactical decisions to be made and strategies to be reviewed." 425 U.S. at 88. The key issue is whether the trial court's action denies the defendant, even temporarily, the "'guiding hand of counsel at every step in the proceedings'" that is at the core of the Sixth Amendment right. 425 U.S. at 89, quoting *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932).

In *Herring v. New York*, the Supreme Court considered a state law giving the trial judge discretion to dispense with closing arguments in bench trials. *Herring*, 422 U.S. at 853-54. In holding that this grant of judicial discretion violated the Sixth Amendment, the Court referred to two factors. First, was the historical role of closing argument in criminal cases. 422 U.S. at 860-61. Second, the Court focused on the core function of counsel for the defense:

> The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free. In a criminal trial, which is in the end basically a factfinding process, no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment.

*Id.*, 422 U.S. at 862. In the present case, the trial court's discretionary, administrative rulings infringed upon the core defense functions of marshaling evidence and making informed strategic and tactical decisions.

The trial court here communicated to defense counsel (a) that counsel had been selected to represent Mr. Barrett over more qualified alternatives so that he could be appointed to future capital cases; (b) that the Court disapproved of investigative expenditures such as the use of experts to assist the defense in preparing various parts of the defense, even where those resources were routinely provided to other capital defendants; (c) that the Court would involve itself in defense decision-making to an unprecedented extent by requiring the defense to justify all investigative expenditures and proposing to allow prosecutors to challenge defense experts at the

point where they were first requested; (d) that the Court preferred Mr. Hilfiger to Mr. Echols, and that the Court would show that preference by compensating Mr. Hilfiger at a higher rate. Mr. Hilfiger demonstrated through words and deeds that he recognized the trial court's displeasure with defense expenditures, and responded by refusing to join Mr. Echols' efforts to obtain resources for Mr. Barrett's defense. After Mr. Hilfiger was elevated to lead counsel, he acknowledged that he had not been familiar with the work done in preparation for the prior trials. Mr. Hilfiger also decided to forego use of expert and investigative resources the trial court had authorized, resources of which Mr. Hilfiger thought the trial court disapproved. The consequence of these circumstances was that Mr. Barrett's defense counsel failed to employ resources that would have supported his defense and the marshaling of mitigation evidence, and that defense counsel made innumerable tactical moves in ignorance.

The trial court's stated interest in reducing costs, in using Mr. Barrett's representation to found a panel for appointments in future capital cases, and its communications with counsel created a conflict between the Court's interests, counsel's interests and Mr. Barrett's interest in a vigorous, independent defense. *See Wood v. Georgia*, 450 U.S. 261 (1981).

In *Wood*, the solicitor for the State of Georgia brought to the attention of the trial court and Supreme Court that the attorney for the petitioners was burdened by a conflict between his own interests and the interests of his clients. The conflict stemmed from the attorney's fee arrangement. He was being paid by the former employer of the petitioners. When the petitioners had been employed by the lawyer's principal, they were arrested for distributing indecent materials. The petitioners were convicted and ordered to pay fines. They were ordered as a condition of their probation to make installment payments, and when they failed to make those payments, there was a parole revocation hearing. The attorney retained by the former employer

Petitioner's Merits Brief                 22              *Barrett v. U.S.*, 09-cv-105-JHP

represented the petitioners at that hearing. The petitioners told the judge they were unable to pay and had been lead to believe their former employer, their attorney's principal, would pay the fines. Rather than advocate that the petitioners should not be jailed, or that the conditions of their parole should be modified, the attorney challenged the constitutionality of the fines. *Wood*, 450 U.S. at 266-67.

In *Wood* the Supreme Court acknowledged that it was unclear whether the arrangement between the petitioners' attorney and their former employer created an actual conflict. The Court did not need to find that the former employer was withholding payment of the petitioners' fines in order to create a test case. It was sufficient for the incentive to create such a test case to exist. at 267-68. Similarly, in the present case, it is not necessary for Mr. Barrett to establish that the trial court was withholding funds from the defense for any particular purpose, or that Mr. Hilfiger refused to use the few funds that were available because the trial judge disapproved and Mr. Hilfiger's appointment was to be the first of many in capital cases. The incentive structure was clear and, as discussed more *infra*, it had an actual, negative impact on Mr. Barrett's defense.

The Supreme Court in *Wood* found that the attorney's loyalty to his employer created an incentive for the attorney not to seek all remedies available from the trial court including leniency. *Id.* at 268 n.14 In addition, the Court found "a danger that petitioners' lawyer was influenced in his strategic decisions by . . . improper considerations" stemming from the attorney's employment. The Court noted the widespread condemnation of payment arrangements for defense counsel where "the party paying the fees may have had a long-range interest in establishing a legal precedent and could do so only if the interests of the defendants themselves were sacrificed." Id. at 270.

Here, Judge Payne had a long-range plan that included establishing a panel of local attorneys to handle capital cases, and establishing precedent, or not permitting capital-case considerations to override precedent, for lower rates of compensation. Judge Payne expressed in his orders and letter to counsel that he wanted to limit compensation in this capital case to rates paid for non-capital cases, despite clear authority in statute and the CJA Guidelines as well as a national practice of paying higher rates in cases where the Government seeks the defendant's execution. Mr. Hilfiger was aware that he was personally selected for appointment to this case due to Judge Payne's first long-range plan. His communications with co-counsel Echols reflect he also was aware of Judge Payne's long-range plan to keep costs low, and not to establish a precedent for the future panel of the higher costs established by precedent in other capital cases.

Judge Payne illustrated the benefits of furthering his long-range agenda. At the point where disagreements between Mr. Echols and Judge Payne came to a head, that is when Judge Payne denied funds for investigative and expert assistance that had been granted to all other similarly situated capital defendants, Mr. Hilfiger refused to join his co-counsel in advocating for resources. Mr. Echols withdrew from the case over the denial of what he considered necessary resources. Shortly before this dispute, Judge Payne had refused to compensate Mr. Echols at the highest rate offered lead counsel in a capital trial. Immediately after Mr. Hilfiger refused to support Mr. Echols' request for funds and Mr. Echols withdrew, Judge Payne increased Mr. Hilfiger's compensation to the highest rate.

Federal Death Penalty Resource Counsel, Richard Burr had provided evidence that the funds sought for Mr. Barrett's defense were well within the range of funding for other federal death penalty cases. After he was made lead counsel, Mr. Hilfiger refused to communicate with Mr. Burr. As the trial date drew near, Mr. Hilfiger requested advice from Assistant Federal

Defender Julia O'Connell about a mitigation specialist. This was one of the investigative resources Mr. Echols sought in a request with which Mr. Hilfiger had refused to join. When Ms. O'Connell advised Mr. Hilfiger to contact Resource Counsel, Mr. Hilfiger did not follow through. The record of hearings in August and September, and the recollection of Jeanne Russell shows Mr. Hilfiger's reluctance to retain a mitigation specialist was not based on knowledge of the facts. Dr. Russell relates that co-counsel Bret Smith was philosophical about her inability to serve as a mitigation specialist, saying the trial court would not fund a thorough investigation anyway. Despite invitations from the trial court, defense counsel never sought to amend the budget. These circumstances show Mr. Barrett's counsel were not exercising independent professional judgment on what was in their client's interests.

> As the ABA has long recognized,

> Since a lawyer must always be free to exercise his professional judgment without regard to the interests or motives of a third person, the lawyer who is employed by one to represent another must constantly guard against erosion of his professional freedom.

The ABA Model Code of Professional Responsibility EC 5-23 (1980), quoted in *Wood*, 450 U.S. at 270 n.17. The Supreme Court has explicitly applied this principal to the work of publicly funded criminal defense counsel:

> [A] public defender is not amenable to administrative direction in the same sense as other employees of the State. Administrative and legislative decisions undoubtedly influence the way a public defender does his work. State decisions may determine the quality of his law library or the size of his caseload. But a defense lawyer is not, and by the nature of his function cannot be, the servant of an administrative superior. Held to the same standards of competence and integrity as a private lawyer, see *Moore v. United States*, 432 F.2d 730 (CA3 1970), a public defender works under canons of professional responsibility that mandate his exercise of independent judgment on behalf of the client. "A lawyer shall not permit a person who recommends, employs, or pays him to render legal

services for another to direct or regulate his professional judgment in rendering such legal services." DR 5-107(B), ABA Code of Professional Responsibility (1976).

*Polk County v. Dodson*, 454 U.S. 312, 321 (1981).

This is not merely a matter of professional ethics.  The administrative actions of the trial court in this case, however well-intentioned they may have been, created incentives and disincentives that, according to participants in the defense, influenced the actions of defense counsel in ways that harmed Mr. Barrett's ability to marshal a defense based on a reasonable investigation and expert assistance.  These unique circumstances violated "the constitutional obligation of the [trial court] to respect the professional independence of the public defenders whom it engages."  *Polk County*, 454 U.S.at 321-22.  "Implicit in the concept of a 'guiding hand' is the assumption that counsel will be free of state control.  There can be no fair trial unless the accused receives the services of an effective and independent advocate."  *Id.*, 454 U.S. at 322.  Due to the administrative actions of the trial court, and the disincentives it created, defense counsel in this case were not informed, for example, of available grounds for cross-examination of prosecution "expert" Iris Dalley, of grounds for presenting a mental-state defense, of evidence that Mr. Barrett was incompetent to stand trial, and of a wealth of lay and expert mitigation evidence.

The trial court's express limitations on investigation, including the requirement, contrary to CJA Guidelines, that all investigative expenditures be justified after the fact, interfered with the defense's exercise of independent professional judgment by influencing the factual bases upon which defense counsel could make judgments.  The Supreme Court and Tenth Circuit have repeatedly recognized that counsel cannot make reasonable, independent judgments in the absence of information that can only be obtained through inquiry and investigation.  *Rompilla v. Beard*, 545 U.S. 374, 390 (2004) (counsel could not have made reasonable decision regarding

Petitioner's Merits Brief                26                *Barrett v. U.S.*, 09-cv-105-JHP

penalty phase having failed to examine record of prior conviction); *Wiggins v. Smith*, 539 U.S. 510, 532-33 (2003) (counsel could not have made reasonable decision regarding mitigation after having failed to investigate evidence of sexual abuse); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (counsel could not have made reasonable decision about penalty phase closing argument after having failed to investigate defendant's background); *Kimmelman v. Morrison*, 477 U.S. 365, 387 (1986) (counsel could not have made reasonable decision regarding suppression after failing to inquire into prosecutor's duty to produce evidence absent a discovery motion); *Strickland v. Washington*, 466 U.S. 668, 691 (1984) (choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").

The evidence shows Judge Payne expressed deep skepticism about the need for any additional investigation after the two state-court trials. Exh. 65. The disagreement between Mr. Echols and Judge Payne over the need for further investigation was one ground on which Mr. Echols withdrew. Mr. Hilfiger stated in his fee budget prior to Mr. Echols's withdrawal, and in his motion for a continuance after the withdrawal, that he was unfamiliar with the prior record and with the extent of the investigation that had been done during the state court proceedings. The record and extra-record evidence also shows that Mr. Hilfiger and Mr. Smith did not even attempt to review whatever mitigation evidence had been developed for the state trials until the federal trial was underway.

Mr. Barrett does not rely solely upon the *potential* impact on defense counsel's actions from the trial court's incentive and disincentive structure. *See Mickens v. Taylor*, 535 U.S. 162 (2002). Defense counsel's actions (including the conversation with Dr. Russell) show counsel was conscious of the limitations imposed by the budget, but that counsel proceeded without

seeking additional funds even to the extent that counsel presented a witness who had promised to damage Mr. Barrett's case if he could rather than consult an court-funded expert. Regardless of the trial court's intentions, the message communicated to defense counsel was that the court would look favorably on less spending, and this message had an actual impact on counsel's performance. For example, although the trial court authorized defense counsel to retain George Kirkham, Ph.D., an expert in police procedures, based on prior counsel's explanation that former FBI agent Chuck Choney, a friend of the victim, was hostile to the defense, trial counsel never contacted Dr. Kirkham. See Exh. 44. During a hearing in October 2005, defense counsel dismissed the court's questions about the budget by stating that he had not used the funds authorized for Kirkham and other experts, and said he would rely upon Choney, instead. As he had indicated, Choney reversed his prior position on aspects of the raid and provided more evidence favorable to the prosecution than it was favorable to Mr. Barrett. It is difficult to imagine a more concrete adverse impact than presenting a witness who had an announced bias against the defendant rather than spend CJA funds on an independent expert.[2]

The evidence presented in the Amended § 2255 Motions demonstrates that the trial court's denial of attorney time and other resources for Mr. Barrett's defense was arbitrary and capricious, and denied Mr. Barrett resources provided to other defendants in federal death penalty cases. The trial court's actions violated Mr. Barrett's rights to due process and equal protection by treating him as "a 'class of one,' . . . intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). *See also*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

---

[2] Mr. Barrett's defense counsel never contacted Dr. Kirklham. Therefore the decision to rely upon the biased Choney could not have been based on an informed judgment about their relative strengths or weaknesses.

Imposition of the death penalty through such an arbitrarily skewed process violates the Eighth Amendment's prohibition on cruel and unusual punishment.

<div align="center">**Lack of Judicial Impartiality**</div>

The fair trial guarantees of the Due Process Clause of the Fifth Amendment encompass a litigant's right to have "a neutral and detached judge" preside over judicial proceedings. *Ward v. Village of Monroe,* 409 U.S. 57, 62 (1972). This right includes a factfinder without either actual bias or the appearance of bias. *In re Murchison,* 349 U.S. 133, 136 (1959). This constitutional guarantee is sufficiently important that its denial is not subject to the harmless error rule. *See, e.g., Tumey v. Ohio,* 273 U.S. 510 (1927); *Bracy v. Schomig,* 286 F.3d 406, 414 (7th Cir. 2002).

The trial court took actions and withheld action in violation of the Code of Judicial Conduct and that demonstrated the judge was not impartial. "No matter what the evidence against (a defendant), he had the right to have an impartial judge." *Tumey v. Ohio*, 273 U.S. 510, 535 (1927). Partiality on the part of a judge in a civil appeal violates due process. *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813 (1985). The Supreme Court has "emphasized the special importance of fair procedure" in death penalty cases, including giving adequate notice to the defense of the judge's plans. *Lankford v. Idaho*, 500 U.S. 110, 125 (1991), quoting and citing, *Gardner v. Florida*, 430 U.S. 349, 357 (1977). The trial judge's conduct violated Mr. Barrett's rights under the Fifth and Fourteenth Amendments.

In order to establish a due process violation based on judicial bias, Mr. Barrett must show the trial judge took actions adverse to his interest that were not based on legitimate concerns. *See Bracy v. Gramley*, 520 U.S. 899 (1997). In *Bracy*, the judge who presided over the petitioner's trial was convicted of taking bribes to fix the trials of other criminal defendants. Bracy alleged that the judge's misconduct on behalf of those defendants who did bribe him "induced a sort of

compensatory bias" against those who did not so the authorities would not suspect the judge of being soft on all defendants. *Bracy*, 520 U.S. 905. This compensatory bias was manifest in numerous discretionary rulings the judge made. *Ibid.* The Supreme Court found, "difficulties of proof aside, there is no question that, if it could be proved, such compensatory, camouflaging bias on [the judge's] part in petitioner's own case would violate the Due Process Clause of the Fourteenth Amendment." *Ibid.*

In *Tumey v. Ohio*, 273 U.S. 510 (1927), the Supreme Court invalidated the judgment rendered against a man convicted of violating a prohibition law. *Tumey* is generally cited for the proposition that due process is violated when the judge presiding over a cause has a personal pecuniary interest in the outcome. However, the Supreme Court held "the pecuniary interest of the mayor in the result of his judgment is not the only reason for holding that due process of law is denied to the defendant here." *Tumey*, 273 U.S. at 532. The Court held Tumey's due process rights also were violated due to the mayor's fiduciary interest in protecting and providing for the *public* fisc by convicting defendants. *Id.* at 532-33.

In Mr. Barrett's case, the facts show at least two ways in which the trial court demonstrated a lack of impartiality and made administrative or discretionary rulings, or withheld such rulings to Mr. Barrett's disadvantage and without a legitimate legal basis. As shown in the Amended § 2255 Motions, the trial court ignored, knowingly violated, or threatened to ignore numerous aspects of the Criminal Justice Act ("CJA"), the Judicial Council's Guidelines for administering the CJA, federal judicial practice in administering the CJA, and 18 U.S.C. § 3599. Mr. Echols, the local Federal Defender, and trial counsel Smith all have commented upon the extraordinary extent to which the trial judge's concern over the public fisc impeded the defense.

The CJA and CJA Guidelines were constructed to prevent concern over the fisc from crossing the line into interference with the defense's ability to function as the prosecution's adversary.

As argued *supra*, the trial judge's deviations from the CJA Guidelines and standard practice in federal death penalty cases also communicated to defense counsel that resources were not available and that the court would show favor towards defense counsel if he did not use those resources that were made available. But the trial judge manifested a lack of impartiality in other, more direct ways.

The record shows the trial judge participated in an *ex parte* hearing with prosecutors then misrepresented to defense counsel what occurred during the hearing. Thereafter, the trial judge took actions, and withheld judicial action in ways that the judge knew inured to the benefit of the prosecution and to the disadvantage of Mr. Barrett's dissent. Although the trial judge, during the *ex parte* hearing found the government presented insufficient grounds for delaying the release of witness names as required by 18 U.S.C. § 3432, the judge withheld judgment on the government's motion for a protective order while prosecutor's secured concessions from the defense. Although the judge stated during the *ex parte* hearing that the defense would have cause for a continuance based on the number of witnesses and their importance to the prosecution's case, the judge never communicated that information to the defense. In the post-conviction process, defense counsel has stated that he believed the trial judge would not grant a continuance. Additionally, although the trial judge recognized in the government's *ex parte* proffer that the withheld witnesses would testify to alleged prior bad acts of the defendant, the judge (a) permitted the prosecutor to make *ex parte* arguments against disclosure of that testimony, (b) misrepresented the content of the hearing by omitting reference to that discussion, and (c) stood

by while the prosecution delayed disclosures and the defense failed to object at trial to the testimony.

The trial judge's withholding from defense counsel of all the matters discussed in the *ex parte* hearing violated clearly established norms of judicial conduct.  Similar to the American Bar Association's Model Code of Judicial Conduct ("Model Rules"), the Code of Conduct for United States Judges ("Code of Conduct") provides:

> A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law.  Except as set out below, a judge should not initiate, permit, or consider ex parte communications, or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers.  If a judge receives an unauthorized ex parte communication on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested.  A judge may:
>
> (a) initiate, permit, or consider ex parte communications as authorized by law;
>
> (b) when circumstances require it, permit ex parte communication for scheduling, administrative or emergency purposes, but only if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication;

Canon 3 Rule 4(a)(b);  *Cf.* Model Rules, Canon 2, Rule 2.9.[3]  The trial judge's failure to disclose all the matters discussed in the September 13, 2005 *ex parte* hearing violated  this rule.

As in *Bracy*, there can be no question that the trial judge's withholding of rulings and statements required by the Code of Judicial Conduct violated Mr. Barrett's right to due process of law.  This case is distinguishable, however, in that there is abundant evidence of the violation. At a minimum, the files and records do not conclusively demonstrate that Mr. Barrett is entitled

---

[3]  Petitioner cited this Rule in his Motion to Disqualify and it is this Rule that Judge Payne addressed in his opinion.  For purposes of Judge Payne's disqualification, the Code of Conduct controls but is in all relevant ways effectively the same as the Model Rules.

to no relief.  Therefore, this Court should order an evidentiary hearing on sufficient notice so that

Mr. Barrett's counsel may make use of discovery and subpoenas to marshal all available

evidence.  R. Gov. § 2255 Proc. 8(c).  The trial judge should recuse himself from that hearing.

*Dzurgiot v. Luther*, 897 F. 2d 1222, 1227 (1st Cir 1990) (judge who presided at trial may

determine if evidentiary hearing is necessary but different judge should conduct evidentiary

hearing); *Halliday v. United States*, 380 F. 2d 270, 274 (1st Cir. 1967) (pre-section 2255 Rules

decision mandating assignment of section 2255 motion to judge other than trial judge, except

when difficult to do so because, for example, there is only one judge in district).  Following the

hearing, this Court should vacate the judgment against Mr. Barrett and order a new trial before a

different judge.

**Ground 2.**  **Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. §§ 3005 & 3006A and the Sixth Amendment to the United States Constitution.**

Review of Ground 2 is governed by the familiar two-part standard set forth in *Strickland*

*v. Washington*, 466 U.S. 668 (1984), and its progeny: deficient performance and prejudice.

***1.***     ***The Test for Deficient Performance.***

"The Sixth Amendment . . . envisions counsel's playing a role that is critical to the ability

of the adversarial system to produce just results.  An accused is entitled to be assisted by an

attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is

fair." *Strickland*, 466 U.S. at 685.  In general terms the Supreme Court has said that "[t]o

establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell

below an objective standard of reasonableness.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003),

quoting *Strickland*, 466 U.S. at 688.  Defense counsel may fail to perform according to Sixth

Amendment standards when they "undermine[] the proper functioning of the adversarial process." *Strickland*, at 686.

Beyond these general terms the Supreme Court has consistently relied upon codified and judicially recognized duties of counsel as guides to judging the reasonableness of attorneys' performance "'under prevailing professional norms.'" *Wiggins*, 539 U.S. at 521, quoting *Strickland*, 466 U.S. at 688. The evidence proffered with Mr. Barrett's petitions shows that the attorneys who represented him at trial failed to follow these norms in numerous ways. At a minimum, an evidentiary hearing is required because the proffered evidence and the files and records of the case do not conclusively show that Mr. Barrett is entitled to no relief under *Strickland*'s standards.

*Strickland* requires that "a court deciding and actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Courts, including the Supreme Court, have repeatedly recognized that *Strickland*'s focus means that "[j]ust as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer." *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990), citing *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986).[4]

---

[4] The Supreme Court has rejected efforts to portray a trial attorney's conduct as the product of a strategic decision because, when considered in light of the surrounding circumstances, the alleged strategy "resemble[d] more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations." *Wiggins v. Smith*, 539 U.S. 510, 526-527 (2003). Other courts have long been in accord. *See*, *e.g.*, *United States v. Burrows*, 872

Petitioner's Merits Brief                    34                    *Barrett v. U.S.*, 09-cv-105-JHP

Because the focus of the Sixth Amendment claim is on the functioning of the adversarial process, *Strickland*, 466 U.S. at 686, reviewing courts should make "every effort to view the facts as a *defense* lawyer would have at the time." *Rompilla v. Beard*, 545 U.S. 374, 386 (2005) (emphasis added).

The Supreme Court has explained that a reviewing court generally should "assess counsel's overall performance throughout the case in order to determine whether the identified acts or omissions overcome the presumption that a counsel rendered reasonable professional assistance." *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1985) (internal quotations from, and citations to, *Strickland* omitted). This includes an examination of counsel's performance both "before and at trial." *Ibid.* It is not necessary for Mr. Barrett to show that his counsel completely failed to act as the prosecution's adversary; even a single objectively unreasonable act or omission may establish grounds for relief. *Fisher v. Gibson*, 282 F.3d 1283, 1306-07 (10th Cir. 2002).

The Supreme Court has cautioned against any "checklist" or "detailed rules for counsel's conduct" because they would "interfere with the constitutionally protected independence of counsel," and "distract counsel from the overarching mission of vigorous advocacy of the defendant's cause." *Strickland*, 466 U.S. at 688-689. At the same time, the Supreme Court has

F.2d 915, 918 (9th Cir. 1989) (holding district court committed reversible error by assuming trial counsel made a strategic decision although there was no evidentiary support for the assumption); *Brown v. Sternes*, 304 F.3d 677, 691 (7th Cir. 2002) ("it is not the role of a reviewing court to engage in a *post hoc* rationalization for an attorney's actions . . . or engage in Monday morning quarterbacking"); *Moore v. Johnson*, 194 F.3d 586, 604  (5th Cir. 1999) ("Court is . . . not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all"); *Griffin v. Warden, Maryland Correctional Adjustment Center*, 970 F.2d 1355, 1358 (4th Cir. 1992) (citing *Strickland* and *Kimmelman* for proposition that "courts should not conjure up tactical decisions an attorney could have made, but plainly did not"); *Patton v. State*, 784 So.2d 380, 387 (Fla. 2000) (same as *Burrows*).

identified certain basic duties that must be met in every case.  First is "the duty of loyalty,

perhaps the most basic of counsel's duties," *id.* at 692, which includes "a duty to avoid conflicts

of interest."  *Id.* at 688.  Additionally, counsel have

> ...the more particular duties to consult with the defendant on important
> decisions and to keep the defendant informed of important developments
> in the course of the prosecution.  Counsel also has a duty to bring to bear
> such skill and knowledge as will render the trial a reliable adversarial
> testing process.

*Id.* at 688.  Criminal defense counsel have a "duty to investigate," *id.* at 690, and capital defense

counsel have an "'obligation to conduct a thorough investigation of the defendant's

background.'" *Wiggins*, 539 U.S. at 523, quoting *(Terry) Williams*, 529 U.S. at 396.  This

investigation must precede and inform counsel's actions, and "strategic choices made after less

than complete investigation are reasonable precisely to the extent that reasonable professional

judgment supports limitations on investigation."  *Strickland*, 466 U.S. at 690-91.  Included in the

duty to investigate is the common-sense "notion that defense counsel must obtain information

that the [prosecution] has and will use against the defendant," and investigate that information.

*Rompilla v. Beard*, 545 U.S. 374, 387 (2005).

### 2.       The test for prejudice.

Mr. Barrett "must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466

U.S. at 694.  A reasonable probability is less than a preponderance.  *Strickland*'s standard does

not require to Mr. Barrett to "show that counsel's deficient conduct more likely than not altered

the outcome in the case."  *Id.* at 693.  Claims such as Mr. Barrett's do not implicate the prejudice

standard of *Lockhart v. Fretwell*, 506 U.S. 364, 369-370 (1993).  *(Terry) Williams*, 529 U.S. at

393.

> The question is not whether counsel's ineffectiveness must be demonstrated by showing the trial would have resulted in a defense verdict, but whether the omitted evidence "creates a reasonable doubt that did not otherwise exist." *See United States v. Agurs*, 427 U.S. 97, 112 (1976). Upon such a showing, constitutional error has been committed. *Id.* In this case, it cannot be fairly said that the omissions and failures of trial counsel, while argumentatively explainable, do not raise a reasonable doubt in the guilty verdict.

*Stouffer v. Reynolds*, 214 F.3d 1231, 1234-35 (10th Cir. 2000) (parallel citations and footnote omitted). *See also Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001) ("we think the chance of an acquittal would still have been significantly less than 50 percent; but it would not have been a negligible chance, and that is enough to require us to conclude that the lawyer's errors of representation were, in the aggregate, prejudicial") (citing *Strickland*, 466 U.S. at 694, and other authorities).

*Strickland*'s prejudice test requires the Court to consider the effects of all of trial counsels' unprofessional errors in light of "the totality of the evidence" adduced at trial and in post-conviction proceedings. *Strickland*, 466 U.S. at 695; *Wiggins*, 539 U.S. at 536; *(Terry) Williams*, 529 U.S. at 397. This Court must consider that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Strickland*, at 695-696.

Determinations of prejudice require a cumulative assessment of counsels' errors: "Taking the unaffected findings as given, and taking due account of the effect of the errors on the remaining findings, a court making a prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 696; *Fisher v. Gibson*, 282 F.3d 1283, 1307-11 (10th Cir. 2002).[5]

---

[5] Accord *Wackerly v. Workman*, 580 F.3d 1171, 1176 (10th Cir. 2009); *Sallahdin v. Gibson*, 275 F.3d 1211, 1235 (10th Cir. 2002).; *Silva v. Woodford*, 279 F.3d 825, 834 (9th Cir.), *cert. denied*, 537 U.S. 942 (2002); *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001); *Lindstadt*

Petitioner's Merits Brief                    37                    *Barrett v. U.S.*, 09-cv-105-JHP

In making that determination, the Supreme Court looks not only at the evidence trial counsel failed to uncover, but what further effort by reasonable attorneys in their role as advocates would have produced with the evidence. *Rompilla*, 545 U.S. at 391-92 (describing chain of evidence a defense lawyer at the time could have developed following reasonable investigation). *See also Kyles v. Whitley*, 514 U.S. 419, 438, 441 (1995) (reasonable-probability standard looks at cumulative effect of "disclosure of suppressed evidence to competent counsel").[6]

Lastly, the Court must "proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision" whether to convict of a particular offense, or impose a sentence of death. *Id.* at 695.

### 3.    *The Need for an Evidentiary Hearing*.

This Court is required to conduct an evidentiary hearing on Mr. Barrett's claims "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." 28 U.S.C. § 2255(b).  Because the record of the trial will rarely contain sufficient information for the Court to make a determination under the *Strickland* standard, it is generally necessary to consider extra-record evidence. *Massaro v. United States*, 538 U.S. 500, 05 (2003). "The evidence introduced at trial . . . will be devoted to issues of guilt or innocence, and the

v. Keane, 239 F.3d 191, 199 (2d Cir. 2001); *Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999); *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998); *Berryman v. Morton*, 100 F.3d 1089, 1101-02 (3d Cir. 1996); *Harris v. Wood*, 64 F.3d 1432, 1438-39 (9th Cir. 1995); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992); *Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir.1991).

[6]The same prejudice test is applied in ineffective-assistance cases and cases of suppressed evidence. *Stouffer*, *supra*, 214 F.3d at 1235 n.4 ("In a constitutional context, we see no principled distinction between whether that omission results from the acts of the prosecution or an ill-prepared defense counsel.").

Petitioner's Merits Brief                38                *Barrett v. U.S.*, 09-cv-105-JHP

resulting record in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis." *Ibid.* "Particularly where, as here, it is the pretrial . . . performance of counsel as well as the performance during trial that is specifically alleged to have been inadequate, it is not sufficient that the trial judge found counsel's performance as observed in the course of trial to be adequate." *Wood v. Endell*, 702 P.2d 248, 249 (Alaska App. 1985).[7]  At a minimum, the record of the trial cannot be said to conclusively refute the evidence proffered with the Amended § 2255 Motion and the argument presented herein.  Accordingly, this Court should enter an order providing Mr. Barrett adequate notice of a hearing so that his counsel may marshal all available evidence including through the use of discovery and this Court's subpoena power. R. Gov. § 2255 Proc. 8(c).

**Ground 2, Part A(1).**     **Defense Counsel's Unreasonable Omissions in Reurging *Franks* Issue**

Trial counsel were professionally unreasonable for failing to adequately re-urge the motion to suppress under *Franks v. Delaware,* 438 U.S. 154 (1978) following the first stage testimony of Charles "Monk" Sanders.  Counsel's failure in this respect undermines confidence in the jury's first stage verdicts.  Because it was shown during Sanders's cross-examination that the material averments made in the search warrant affidavit to secure a night-time, no knock

---

[7] *See also Clark v. Crist*, 335 F.3d 1303, 1311-1312 (11th Cir. 2003), *cert. denied*, 540 U.S. 1155 (2004) (where petitioner raised two distinct appellate ineffective-assistance claims, and state court held hearing on the second claim but not the first, it was improper for district court to rely on counsel's testimony regarding the second claim as a basis for finding reasonable performance on the first claim); *Marshall v. Hendricks*, 307 F.3d 36, 109-10 (3rd Cir. 2002) (resolution of *Strickland* claim unreasonable because based on "generalized assumptions" from trial record); *Bryan v. Mullin*, 335 F.3d 1207, 1216 n.7 (10th Cir. 2003) (no deference due state-court rejection of *Strickland* claim where state court refused to determine facts through evidentiary hearing).

warrant[8] were false, or were made in reckless disregard for the truth, and for other reasons, all evidence seized in the search of Mr. Barrett's cabin and property was subject to suppression. *See* Ground IV. The failure to competently argue the *Franks* motion obviously undermines confidence in the outcome of the first stage of trial. Because the search warrant was defective under *Franks,* the drug-related and firearms evidence which formed the basis for each of the three counts of conviction would have evaporated, leaving nothing upon which the jury could have returned guilty verdicts.

On cross-examination, Charles Sanders, the alleged "C.I." who supplied information to secure the search warrant, repudiated virtually all the claims attributed to him by District 27 Task Force Officer Clint Johnson in the warrant affidavit. ( R. 2518-21, 2596-2601, 2608-10, 2618-23, 2625-28) Sanders's wildly conflicting testimony, the content of which seemed to depend on which lawyer happened to be questioning him at the time ( R. 2531-38), not only served to disavow the "facts" supporting probable cause, let alone probable cause for a nighttime, no-knock warrant, but showed Sanders, due to his criminal record, including criminal acts of dishonesty (or that portion of his vast criminal record was revealed at trial, *see* Ground II A (4)(c)), the deals he had received in the past (to the extent that was explored incompletely and incompetently at trial, *see* Ground II A (4)(c)), his ongoing drug use even while working as an informant, and his reputation for honesty in the community (*See* Ground II A (4)(c)) made him so thoroughly disreputable that no police officer, in good conscience, could have relied on him to secure a search warrant of any kind, against anybody. In dealing with Sanders, Clint Johnson, who himself was thoroughly corrupt (*See* Ground V B (1)), either sponsored false information or acted in reckless disregard of the truth.

---

[8] Exhibit 194.

The usefulness of an informant witness such as Sanders depends "in large measure on the degree to which he both is and can be presented to the fact-finder as a reliable person." *United States v. Bernal-Obeso,* 989 F.2d 331, 335-36 (9th Cir. 1993). But for counsel's failings, Sanders could have presented as thoroughly untrustworthy, thus collapsing the foundation for the search warrant. There was nothing in the search warrant affidavit to show that Johnson, or anyone else, had corroborated the information purportedly received from the C.I. (Sanders). *United States v. Dawkins,* 17 F.3d 399, 404 (D.C. Cir. 1994) (where an informant's tips are concerned, the task turns in large part on the independent police work corroborating – or failing to corroborate – the details of the informant's claims). For all that was revealed by the search warrant affidavit, Sanders simply could have been making the information up. *Phaneuf v. Fraiken,* 448 F.3d 591, 597-99 (2nd Cir. 2006).

Instead of arguing the vast array of reasons provided by Sanders's testimony, his background and history (which were not disclosed in the search warrant affidavit), and the circumstances surrounding his supposed involvement in the case as grounds to suppress the fruits of the search under *Franks,* the defense, as the Government was quick to point out, argued only one discrepancy in his testimony, involving Sanders's alleged sighting of a white powder he believed to be methamphetamine during one of his "visits" to Mr. Barrett's cabin. (Doc. 231.) With the argument in this posture, the trial court was quick to deny the renewed motion to suppress without a *Franks* hearing, holding not only that the ground urged by the defense was inadequate, but improperly also relying upon the testimony of the other snitch witnesses, who only surfaced years after the warrant was executed, to "corroborate" Sanders. (Doc. 235.)

Had defense counsel urged all of the many grounds for suppressing the fruits of the search warrant under *Franks*, there is no question that Mr. Barrett would have been entitled to an

Petitioner's Merits Brief 41 *Barrett v. U.S.*, 09-cv-105-JHP

evidentiary hearing. *United States v. Ferra,* 900 F.2d 1057, 1058-59 (7th Cir. 1990) (where testimony of one officer at trial appeared to contradict the essential testimony of another officer as to when the search warrant was obtained, trial court should have conducted an evidentiary hearing on a renewed motion to suppress). Here, had counsel advanced all the reasons the search warrant was defective under *Franks,* the court would have been compelled to hold a hearing, which was avoided because of counsel's unprofessional re-urging the motion to suppress.

It is also abundantly clear that had defense counsel properly argued all the grounds for suppression under *Franks,* stemming not only from Sanders's contradictory testimony, but from the facts that had been omitted from the search warrant affidavit about Sanders's criminal history, deals, and ongoing drug use[9], which Clint Johnson deliberately blinded himself to, a

---

[9] The courts have held that search warrants are ripe for a *Franks* attack where, as here, the affiant omits crucial information bearing on an informant's credibility, leaving the magistrate in the dark in appropriately evaluating the information upon which a search warrant affidavit relies. *E.g., United States v. Vigeant,* 176 F.3d 565, 573 (1st Cir. 1999) ("First, and most important, Botehlo [the affiant] neglected to mention the confidential informant's long criminal history, his numerous aliases, his recent plea agreement, and other indicia of his unreliability."); *United States v. Hall,* 113 F.3d 157, 159 (9th Cir. 1997) (in context of *Franks* challenge, police withheld information on the confidential informant's prior convictions, as well as the fact the informant had previously falsely reported a crime); *United States v. Sorrells,* 714 F.2d 1522, 1528 (11th Cir. 1983) ("We do not however recommend or endorse omissions in the affidavit of the confidential informant's credibility or reliability."). Likewise, just as counsel failed to mount a *Franks* attack on the warrant based on Sanders's extensive criminal history, acts of dishonesty, and the numerous deals he had received due to his work as an informant, counsel failed to challenge the unadorned statement in the search warrant affidavit that Sanders had provided "reliable" information on "at least" five prior occasions, a bald statement that is entitled to little if any weight in evaluating the sufficiency of the probable cause showing. *United States v. Reddick,* 90 F.3d 1276, 1280-81 (7th Cir. 1996) (magistrate judge correctly concluded officer's statement that the informant had provided reliable information in the past is an unsupported conclusion which does not support a probable cause finding); *United States v. Foree,* 43 F.3d 1572, 1575-76 (11th Cir. 1995) (allegation that C.I. had provided reliable information in the past entitled to little weight); *United States v. Miller,* 753 F.2d 1475, 1480 (9th Cir. 1985) (assertion that C.I. had provided reliable information in the past was entitled to only "slight weight," since such a statement is both unclear and conclusory; there, as here, there was no showing that any information provided by the informant in the past had led to any search, arrest, or conviction, nor whether the past information was vital or merely incidental to one or more police investigations).

*Franks* challenge would have been sustained. No legitimate strategy excuses counsel's failure in this regard. As noted, Mr. Barrett was grievously prejudiced by counsel's omissions. Had the evidence obtained from the search warrant been suppressed, as it should have been upon a proper, competently argued renewed motion to suppress under *Franks*, the Government would have been left with virtually no case. *Kimmelman v. Morrison,* 477 U.S. 365, 383-91 (1985) (counsel was professionally unreasonable for failing to litigate valid Fourth Amendment claim, which may be raised under the rubric of ineffective assistance of counsel in collateral proceedings, and remand was ordered to determine prejudice); *Owens v. United States,* 387 F.3d 607, 609-11 (7th Cir. 2004) (failure to make a proper Fourth Amendment objection to the admission of evidence can support later challenge to counsel's effectiveness); *Norhrup v. Trippett,* 265 F.3d 372, 382-85 (6th Cir. 2001) (counsel ineffective for failing to pursue meritorious motion to suppress). Here, the prejudice from counsel's failures is clear. Counsel was ineffective for failing to professionally and thoroughly re-urge a motion to suppress based on Sanders's trial testimony and other factors bearing on his credibility.

The *Franks* issue, and counsels' failure to effectively argue it, were at least partially framed by the record. The issue was not raised on direct appeal. Because the issue was obviously meritorious, even with the record that was made, there could be no reasonable strategic basis for omitting it. The failure to raise this issue was professionally unreasonable and prejudicial. *See* Ground 18.

**Ground 2, Part A(2).**     **Trial counsel unreasonably failed to investigate and introduce evidence of eyewitnesses as well as mental impairment and illness that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense.**

> Where, as here, a defendant claiming lack of criminal responsibility has a significant medical history that appears to have contributed to the underlying mental disease or defect, competent counsel would certainly investigate the full extent of that contributing medical history. The possibility that a defendant's mental illness could be explained and confirmed by reference to some demonstrable physical illness or injury would be of such obvious value to the defense that one would expect counsel to explore it both promptly and thoroughly. The opportunity to present the jury with a medical explanation for the defendant's mental illness, an explanation that could both corroborate the existence of the mental disease and portray the defendant's mental illness in a sympathetic light, should not have been squandered.

*Commonwealth v. Alvarez*, 740 N.E.2d 610, 616 (Mass. 2000).

Mr. Barrett's defense counsel were on notice of at least three things that triggered a duty to investigate his mental health prior to trial. First, based on the prior trials and discovery, defense counsel knew the Government's theory of the case would be that Mr. Barrett anticipated a police raid, prepared for it, and intended to use deadly force if the police came to his property. Count 3 of the superseding indictment put defense counsel on notice that the Government would attempt to prove Mr. Barrett intentionally killed a state law enforcement officer in the performance of his official duties. (Doc. 52.) Conviction on Count 3 could, and did result in Mr. Barrett being sentenced to death. Docs. 258, 285. Jury instructions on Count 3 would require findings that Mr. Barrett intentionally killed the victim, knowing or having reason to know that the victim was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties. Doc. 240; R. 4262-64, 4266-67.

Second, medical records, statements from Mr. Barrett's family and ex-wife, and prior mental health examinations available to defense counsel from the time of their appointment

showed Mr. Barrett had a history of mental health problems. Mr. Barrett's family and friends informed prior counsel that he had attempted suicide by shooting himself in the chest, and had progressively become more paranoid and isolated in the years prior to the raid. Medical records corroborated the account, showed Mr. Barrett had been diagnosed at different times with Major Depression and Bipolar Disorder, and showed he had been involuntarily medicated with antipsychotic drugs, and was prescribed them for the future. A prior forensic examination had found him to be the most paranoid criminal defendant the examiner had ever seen. That expert also reported that Mr. Barrett showed signs of organic brain damage that should be investigated by a specialist. Accordingly, counsel sought funds for a neuropsychological evaluation. Doc. 50 at 8. Defense counsel had information from various sources, including the affidavit supporting the no-knock warrant, records from Mr. Barrett's incarceration, and witness accounts, that Mr. Barrett had been a long-time drug user, including the use of methamphetamine.[10]

Third, long established case law and professional norms of criminal practice, particularly in capital cases, informed Mr. Barrett's attorneys that they should investigate these matters and secure expert assistance. ABA Guidelines 10.7, 10.10.1, and 10.11. Defense counsel actually informed the trial court prior to trial expert testimony on "the psychology of individual responses to sudden life or death situations * * * is essential to Mr. Barrett's capital defense, which hinges on an understanding the human mind's response * * * [and] will negate the government's allegations of premeditation and malice aforethought relating to capital punishment." Doc. 46 at 5. *See also* Doc. 50 at 5-6, 8.

---

[10] The evidentiary hearing support for these facts is documented in the Amended § 2255 Motions and the exhibits thereto. As he has elsewhere in this Brief, Mr. Barrett relies upon and incorporates by specific reference those averments and exhibits.

Despite the recognition that mental health evidence could aid the defense at both stages of trial, defense counsel failed to retain any mental health expert to review Mr. Barrett's history or examine him prior to trial.  Counsel's failures to have Mr. Barrett evaluated in connection with first-stage intent or mental state issues, in light of the defense arguments made at trial respecting how the shooting occurred, constitute deficient performance.  In *Wiggins v. Smith*, 539 U.S. 510 (2003), for example, the Supreme Court found constitutional error where defense counsel's statements prior to and during trial reflected a contemporaneous intention to present evidence of sexual abuse, but counsel failed to investigate available documents showing the defendant had been a victim of such abuse.  *Wiggins*, 539 U.S. at 526-27.

Similarly, in *Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002), *cert. denied*, 539 U.S. 958 (2003), the court held the result of the trial was unreliable due to defense counsel's failure to investigate and present evidence that would have established a mental state defense.  *Jennings*, 290 F.3d at 1014-19.  Defense counsel's failure to investigate and explore expert advice regarding a mental state defense was found to be objectively unreasonable under *Strickland* where counsel knew the defendant had been a long-time methamphetamine user, the defendant's ex-wife would have reported prior diagnoses of mental illness, the defendant had been sent for a psychiatric examination by a court, and had exhibited other mental impairments.  *Id.*, 290 at 1014.

The duty of capital defense counsel to conduct a prompt and thorough investigation of the defendant's background, to provide relevant personal history records to mental health experts, and to have the defendant evaluated by mental health experts is discussed more fully in the section of this brief addressing Part B of Ground 2, *infra*.

In assessing the prejudice from counsel's deficient performance, this Court must consider

the cumulative effect of all acts and omissions of counsel found to be deficient, and the favorable evidence presented at trial. *Rompilla*, 545 U.S. at 391-92; *Stouffer v. Reynolds*, 214 F.3d at 1235 & n.4. The results of an accurate and reliable mental health evaluation – summarized in the Amended § 2255 Motions and cited exhibits – demonstrate that trial counsel's failings were prejudicial. A reasonable investigation would have revealed the following:

- Mr. Barrett's mental functioning was impaired at the time of the offense by psychiatric illness and significant brain damage, which prevented him from knowing or deliberating on the nature of his responses to the police incursion before he acted;

- at the time of the charged offenses, Mr. Barrett suffered from several major brain disorders including Bipolar Disorder, Post Traumatic Stress Disorder and damage to his brain in the areas that are necessary to exercise judgment and reasoning;

- significant functional effects of Mr. Barrett's disorders are a heightened state of fear of imminent annihilation coupled with an inability to understand or regulate his reactions – including overreactions – to perceived threats (*see generally* Exh. 117 at ¶¶ 66-78);

- Mr. Barrett's organic impairments would negatively impact his abilities to "organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment," and these disabilities are exacerbated under "conditions of complexity and/or highly stressful situations" (Exh. 89 at 24);

- Mr. Barrett has difficulty processing visual information and is abnormally subject to feelings of fear and paranoia, with consequent tendencies to impulsiveness and aggressive outbursts (Exh. 89 at 13.)

- family witnesses would have described an individual who had been mentally and emotionally troubled from childhood on; who was subject to inexplicable and wild mood swings; who was paranoid, suspicious and overly vigilant; who had suffered from deep and prolonged episodes of depression; who reacted without thinking or correctly perceiving what was going on around him; who handled stress poorly and who reacted under stress; and who retreated to a safe place when he felt threatened. (*See, e.g.*, Exhibit 103; Exhibit 96; Exhibit 97; Exhibit 98; Exhibit 93; Exhibit 86; Exhibit 81; Exhibit 99; Exhibit 74; 101; Exhibit 79.)

Had Mr. Barrett's defense counsel retained and provided background information to the mental health professionals they recognized a need for, jurors would have heard a psychiatrist testify that

> Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer. It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.
>
> [¶]    My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment. The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats,

neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

Exh. 117 at ¶¶ 76-78.

This evidence – particularly when viewed in conjunction with the available evidence impeaching the prosecution's informant witnesses, the expert evidence impeaching the prosecution's "reconstruction" of events, eyewitness accounts, and expert evidence of the raid's fatal flaws – would have supported the first stage defense of lack of intent, and the arguments that Mr. Barrett was unaware that the police were on his property and was simply reacting in the moment in a fearful and panicked state to a perceived threat by criminal trespassers would have been strengthened immeasurably. Due to Mr. Barrett's inability to correctly process information, especially visual information, it could have been argued that even if, as the police witnesses claimed, some of the automobiles which converged on Mr. Barrett's property had their emergency lights engaged, Mr. Barrett did not recognize this and instead simply reacted by firing on the vehicle which all witnesses agreed looked like an ordinary automobile. At a minimum, this evidence would have been critical in contesting the intent element of Count 3 which, as noted, required Mr. Barrett to have a specific intent to kill someone who was known to him to be a law enforcement officer engaged in official duties.

The available evidence would have created reasonable doubt as to the intent element of Count 3, and would have established the basis for a defense of not guilty by reason of insanity, as well as an instruction on lesser included offenses, at least with respect to Count 3.[11]

---

[11]    As argued in Claim 9, Mr. Barrett was denied his due process rights under the Fifth Amendment when the court failed to give a defense theory instruction, and denied requests from both the government and the defense for a manslaughter instruction.

Petitioner's Merits Brief                              49                    *Barrett v. U.S.*, 09-cv-105-JHP

. Tenth Circuit Pattern Instruction 2.54 outlines the elements of voluntary manslaughter under 18 U.S.C. section 1112(a), § 2.  Voluntary manslaughter is murder without malice, upon a sudden quarrel (which does not apply here) or heat of passion.  Homicide is voluntary manslaughter where a defendant, in a sudden heat of passion and without malice, intentionally kills the victim, or acts recklessly with extreme disregard for human life.  Heat of passion is defined as passion, fear or rage in which the defendant loses normal self-control, as a result of a circumstance or circumstances that provoke such a passion in an ordinary person, but which do not justify the use of deadly force.  *United States v. Scafe*, 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides*, 820 F.2d 1232, 1242 (10th Cir. 1987).

The mental state required for voluntary manslaughter would apply to all three of the counts charged against Mr. Barrett, because it negates malice altogether.  E.g., *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975); *United States v. Lofton*, 776 F.2d 918, 920 (10th Cir. 1985) ("a defendant in a federal murder case who has sufficiently raised a heat of passion defense [is] entitled to instructions informing the jury of the theory of defense and the Government's duty to prove beyond a reasonable doubt the absence of a heat of passion in order to obtain a murder conviction."); *United States v. Serawop*, 410 F.3d 656. 660-70 (10th Cir. 2005) (citing *Lofton*'s holding that in order to establish malice, the prosecution must prove the absence of a heat of passion beyond a reasonable doubt when it is an issue in the case).

Expert and lay testimony would have raised the issue that Mr. Barrett, even if he had been able to know the difference between right and wrong (which he could not) when confronted with a strange vehicle barreling onto his property and striking his porch, would not have been aware of a police presence, but simply reacted out of a passion, fear or rage in which whatever self-control

552

he possessed was lost, due to the circumstance of the middle-of-the-night intrusion onto his property of automobiles he could not discern as police vehicles.

As in *Jennings v. Woodford, supra*, Mr. Barrett was prejudiced by his counsel's failure to conduct a reasonable investigation and preparation of a defense that counsel themselves viewed as viable. 290 F.3d at 1015-19 (concluding undiscovered evidence would have aided defense that accused lacked the capacity to form the intent to commit first degree murder; defendant was a long-term methamphetamine addict, had previously attempted suicide and was committed to a mental hospital, otherwise had a history of self-injury, and had been diagnosed as a schizophrenic); *Seidel v. Merkle,* 146 F.3d 750, 756-57 (9th Cir. 1998), *cert. denied,* 525 U.S. 1093 (1999) (counsel ineffective for failing to investigate and produce evidence of defendant's mental problems, including PTSD, which would have served to negate malice and support self-defense claim); *Williamson v. Ward,* 110 F.3d 1508, 1518-21 (10th Cir. 1997) (counsel ineffective for failing to investigate and present evidence of defendant's extensive mental health problems, which would have assisted a claim of incompetency to stand trial and aided in a first stage mental health defense); *Stewart v. Wolfenbarger,* 468 F.3d 338, 357, 361 (6th Cir. 2006) (counsel ineffective for failing to call witnesses in support of defense theory (alibi)).

Mr. Barrett shows below that trial counsel was professionally unreasonable for failing to investigate, prepare and introduce testimony from eyewitnesses Toby Barrett and Alvin Hahn that would have rebutted the Government's theory as to how the shooting occurred, and whether the police made their official presence known by the use of emergency lighting. Mr. Barrett also shows that the actions of the Tact Team fell outside professional standards for law enforcement and that one aspect of the team's recklessness was the use of unprofessional procedures that minimized the chances of being recognized as law enforcement. (Exhibit 44.) In addition to

these failings, a proper mental health investigation by a qualified expert, and testimony from readily available lay witnesses who could have testified to Mr. Barrett's mental and emotional state, would have revealed that the Government's portrait of Mr. Barrett was wholly inaccurate. Rather than the intentional and remorseless killer who deliberately *acted* according to a plan to "take out" any law enforcement officer who stepped onto his property, as depicted by the Government, Mr. Barrett is in fact a severely mentally ill individual whose cognitive deficits and mental impairments caused him to *react*, without reflection or deliberation, to what he reasonably perceived was a life-threatening attack by unknown criminals.  The testimony that could have been developed and offered, but was not, would have refuted the Government's theory of the case at both stages of trial regarding intent, and supported defense theory instructions and instructions on lesser included offenses.

Defense counsel's consultation with a mental health professional in preparation for Mr. Barrett's trial was limited to retaining Dr. Jeanne Russell of Tulsa, Oklahoma, to reprise the risk assessment she had done in preparation for a second stage proceeding in state court, and to conduct research on memory loss stemming from traumatic events.  Due to counsel's failure to conduct a proper investigation, counsel never had Mr. Barrett evaluated with the full range of psychiatric and neuropsychological testing that would have shown him to be the antithesis of the Government's picture.[12]

---

[12]     Claims 1 and 3 show that Mr. Barrett had constitutional and statutory rights to expert assistance to refute the testimony of Government witnesses.

**Ground 2, Part A(3):**         **Defense Counsel's Unreasonable Failure to Investigate and Present Evidence Showing Mr. Barrett was Incompetent to Stand Trial**

In Part A(3) of Ground 1, Mr. Barrett pleaded the factual basis for finding that his trial counsel unreasonably failed to investigate and present evidence establishing a bona fide doubt as to his competence to stand trial.  Such omissions lead to circumstances in which no attorney could be expected to perform competently.[13]  The failure to ensure competence presents a structural defect in the trial process because an incompetent defendant is unable to assist in his own defense.  As the Supreme Court has said,

> [c]ompetence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's behalf or to remain silent without penalty for doing so.[[14]]

Thus, the failure of Mr. Barrett's trial counsel to gather and present evidence that he experienced neuropsychological dysfunction that impaired his ability to track the proceedings exacerbated by Bipolar mania, paranoia, and the effects of Post Traumatic Stress Disorder violated Mr. Barrett's rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.

       *1.*     *Deficient Performance*.

One of defense counsel's unreasonable omissions prior to trial, was the failure to use funds the trial court had authorized for a background investigation and mental health evaluation. The duty of capital defense counsel to conduct a thorough investigation of the defendant's background, and to do so well in advance of trial, is well established in law and codified norms of capital defense practice, and is described in detail in the argument supporting Ground 2, Part

---

[13] *See United States v. Cronic*, 466 U.S. 648 (1984).

[14] *Cooper v, Oklahoma*, 517 U.S. 348, 354 (1996), *quoting Riggins v. Nevada*, 504 U.S. 127, 139-140 (1992) (Kennedy, J., concurring in judgment).

B, of this brief, *infra*.[15]  It is equally well-established that capital defense counsel should, in every case, consider having the defendant evaluated by a qualified mental health professional.[16]  In Mr. Barrett's case the duties triggered by these conventions were also triggered by the information available to, or known by, defense counsel.

Exhibits submitted with Mr.Barrett's initial and amended § 2255 motions show defense counsel had, or should have had in their possession documents establishing that Mr. Barrett was paranoid and unstable, that he was prone to deep depression, had attempted suicide, was diagnosed with the major mental illness, Bipolar Disorder, and was prescribed antipsychotic medication.[17]  "It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has notice of the client's history of mental problems."[18]  Mr. Barrett's defense counsel were aware that he had been evaluated in state court by Dr. Bill Sharp. Had counsel contacted Dr. Sharp they would have known that he found Mr. Barrett the most

---

[15]  The Supreme Court found defense counsel ineffective for omissions related to their background investigation in *Rompilla v. Beard*, 545 U.S. 374, 388-89 (2005) (failure to review file of defendant's prior conviction that prosecution intended to introduce in aggravation and which contained evidence of mental health problems); *Wiggins v. Smith*, 539 U.S. 510, 531-32 (2002) (defense counsel ineffective for failing to pursue evidence defendant had been victim of sexual abuse); *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) (defense counsel ineffective for failing to undertake numerous tasks associated with background investigation).  The prevailing norm in capital defense practice at the time of Mr. Barrett's trial was to gather background information in the form of family history, school records, medical records, and employment records, *Anderson v. Sirmons*, 476 F.3d 1131, 1142 (10th Cir. 2007) (citing ABA Guideline 10.7 commentary), and to do so early so that the information could be supplied to mental health experts, and used to devise a consistent strategy for both phases of trial.  *Id.*, 476 F.3d at 1143.

[16]  *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997).  *See also Anderson*, 476 F.3d at 1143 (noting "vital importance" of investigating possible mental health evidence for penalty phase); ABA Guidelines 10.7, 10.10.1, and 10.11.

[17]  See Exhs. 147 and 55.

[18]  *Williamson v. Ward*, 110 F.3d 1508, 1518-19 (10th Cir. 1997) (quoting *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990)).

Petitioner's Merits Brief                    54                    *Barrett v. U.S.*, 09-cv-105-JHP

paranoid criminal defendant he had ever evaluated.[19]  Defense counsel also knew, or should have

known, that Mr. Barrett had been involuntarily committed for psychiatric treatment, once

following a suicide attempt.[20]  Records of such a hospitalization would have been obtained by

any reasonably diligent attorney.[21]  Those records show Mr. Barrett was diagnosed with Bipolar

Disorder and that he was prescribed antipsychotic medication.[22]  A history of paranoia,

psychiatric hospitalization, and a need for psychotropic medication provides more than what an

objectively reasonable attorney would need before employing the already-authorized services of a

mental health expert to evaluate the defendant.  "'An attorney has expanded duties when

representing a client whose condition prevents him from exercising proper judgment.'"[23]

Numerous courts have recognized that a defendant's need for medication is relevant to

whether he is competent.[24]  The defendants in *Pate v. Robinson* and *Drope v. Missouri*,[25] and like

Mr. Barrett, had attempted suicide, and that was one factor the Supreme Court considered in

---

[19]  Exh. 55 at ¶ 33.

[20]  Exh. 34 (Decl of John Echols) at p. 13.

[21]  ABA Guideline 10.7 Commentary; *Anderson*, *supra*, 476 F.3d at 1142.

[22]  Exh. 147.

[23]  *Williamson*, *supra*, 110 F.3d at 1518 (quoting *Thompson v. Wainwright*, 787 F.2d 1447, 1451-52 (11th Cir. 1986)).  *See also Hull v. Kyler*, 190 F.3d 88, 112 (3rd Cir. 1999) ("Defense counsel's special role arises not only from the typical attorney-client relationship, but from the very fact that the defendant may be unable to appreciate the proceedings or to assist his attorney (or to make an intelligent decision on challenging his competency)").

[24]  See *Williamson*, *supra*, 110 F.3d at 1515-16 (defendant had been diagnosed with severe bipolar disorder and medicated, perhaps to excess); *McGregor v. Gibson*, 248 F.3d 946, 956 (10th Cir. 2001) (defendant could only maintain competence when medicated); *Miles v. Stainer*, *supra*, 108 F.3d at 1112; *State v. Garner*, 36 P.3d 346, 352 (Mont. 2001) (collecting cases); *United States v. Jones*, 336 F.3d 245, 260 (3d Cir. 2003); *Watts v. Singletary*, 87 F.3d 1282, 1287-1288 (11th Cir. 1996) ("The fact that a defendant is taking drugs (whether proscribed or prescribed) during trial should alert the court to a potential competency issue, but need not, in itself, necessitate a competency hearing.").

[25]  383 U.S. 375 (1966); 420 U.S. 162 (1975).

finding sufficient cause to question their competence.[26]  Due to the requirement that the

defendant have the present ability to work with counsel in a rational manner,[27] paranoia,

particularly when directed toward defense counsel, can be a sign of incompetence.[28]

Despite these duties, defense counsel advised the trial court in September and October

2005 that they had not consulted any mental health professionals, or had Mr. Barrett evaluated by

a psychologist or psychiatrist.  Due to defense counsel's failure to undertake these rudimentary

investigative tasks, counsel lacked information necessary to make informed decisions about Mr.

Barrett's mental condition.

The relevant ABA Standards clearly required defense counsel to secure an independent

assessment of Mr. Barrett's competence from the first time they had reason to doubt it.[29]

Because, in part, "judges must depend to some extent on counsel to bring [competence] issues

into focus,"[30] prevailing professional norms require that defense counsel bring evidence

suggesting incompetence to the attention of the court.[31]

---

[26]  *Pate*, 383 U.S. at 381; *Drope*, 420 U.S. at 170.

[27]  *Ducky v. United States*, 362 U.S. 402 (1960); *Drope v. Missouri*, 420 U.S. at 172.

[28]  *See, e.g.*, *Jones*, *supra*, 336 F.3d at 258; *United States v. Rodham*, 2007 WL 2031705 (4th Cir. Jul. 11, 2007) (unpublished) (finding of incompetence upheld despite defendant's ability to understand proceedings where paranoid delusions and bipolar symptoms rendered defendant incompetent to assist in own defense); *Williamson*, *op. cit.*; *Lafferty v. Cook*, 949 F.2d 1546, 1552 (10th Cir. 1991), *cert. denied*, 504 U.S. 911 (1992) ("while Lafferty physically knew the nature of the proceedings against him, and their possible consequences, he was unable as a result of his paranoid delusional system to interpret them in a realistic way"); *Estock v. Lane*, 842 F.2d 184 (7th Cir. 1988) (per curiam) (defendant incompetent at time of trial due in part to paranoia, attempt to kill himself shortly before trial).

[29]  ABA Criminal Justice Standards, ? 4-3.6 and commentary; ABA Standards, Mental Health, Standard 7-4.2 ("Defense counsel should move for evaluation of the defendant's competence to stand trial whenever the defense counsel has a good faith doubt as to the defendant's competence").

[30]  *Drope v. Missouri*, 420 U.S. 162, 176-77 (1975).

[31]  *Williamson v. Ward*, 110 F.3d 1508, 1517 (10th Cir. 1997).

### 2.    *Prejudice.*

To establish the prejudice of counsel's failure to seek a timely competency hearing, Mr. Barrett must show only a reasonable probability that he was incompetent at the time of his trial.[32] In making that determination, the Court must consider in aggregate all the information available. This is a requirement both of *Strickland*,[33] and the substantive standards governing competence to stand trial.[34]

"[T]he evidence of Mr. [Barrett's] mental state which we have recited at length throughout this [petition] establishes a reasonable probability that he was not competent to stand trial."[35]  As he understands the Court's instructions, Mr. Barrett relies upon the detailed description of the facts in, and the exhibits appended to, the initial and amended § 2255 motions to apprise the Court of the facts.  He summarizes some of the relevant facts here for the purpose of relating them to the case law previously cited.

- A reasonable investigation of Mr. Barrett's family history would have shown extensive evidence of Bipolar Disorder in his family;

- Interviews with witnesses known to defense counsel, such as Gelene Dotson (defendant's mother) and Abby Stites (defendant's ex-wife) would have produced

---

[32]  *Williamson*, *supra,* 110 F.3d at 1519; *Hull v. Kyler*, 190 F.3d 88, 105 (3d Cir. 1999) (citing *Eddmonds v. Peters*, 93 F.3d 1307, 1317 (7th Cir. 1996), *cert. denied*, 520 U.S. 1172 (1997); and *Felde v. Butler*, 817 F.2d 281, 282 (5th Cir. 1987)).

[33]  *Williams v. Taylor*, *supra*, 529 U.S. at 497.

[34]  *See Drope*, *supra*, 420 U.S. at 179-80 ("in considering the indicia of petitioner's incompetence separately, the state courts gave insufficient attention to the aggregate of those indicia"); *Jermyn v. Horn*, 266 F.3d 257, 292 (3d Cir. 2001) (*Drope* requires reviewing court to consider probative force of "indicia of incompetence . . . in the aggregate"); *Balfour v. Haws*, 892 F.2d 556, 560-61 (1989) (analyzing under *Drope* the "cumulative information in the record"); *Bundy v. Dugger*, 816 F.2d 564, 567 (11th Cir. 1987).

[35]  *Williamson*, *supra*, 110 F.3d,  at 1519.

Petitioner's Merits Brief                          57                          *Barrett v. U.S.*, 09-cv-105-JHP

extensive reports of his elevated (manic) episodes and depressive episodes including how they interfered with his daily functioning;

• Had defense counsel gathered the medical records normally obtained in capital cases, they would have found diagnoses of paranoia and Bipolar Disorder, and prescriptions for antipsychotic medications, and known that Mr. Barrett was unmedicated;

• Mr. Barrett showed marked distrust of his lead counsel, Roger Hilfiger, such that the Court had to encourage Mr. Barrett to communicate with counsel;

• Mr.Barrett had been attacked by the Government's case agent, was fearful of law enforcement, and was fearful of being electrocuted by law enforcement officers who controlled an electric shock belt strapped to his back or side throughout the trial;

• A qualified psychiatrist, duly advised of Mr. Barrett's performance on neuropsychological tests, would have advised defense counsel and the court of the following:

> • That Mr. Barrett showed functional impairments associated with the neurologically damaged areas of Mr. Barrett's brain were consistent with impairment of the domains necessary for trial competence, such as executive functioning; and that Mr. Barrett would not be able to track, focus or concentrate on the trial proceedings, or be able to integrate and evaluate new information to the degree minimally necessary to appreciate and exercise his legal rights;

> • That Mr. Barrett was impaired by the cognitive effects of his paranoia and Bipolar Disorder;

- That Mr. Barrett was further impaired by the effects of Post Traumatic Stress Disorder;

- That PTSD and paranoia exacerbated the interference with Mr. Barrett's participation in his defense caused by the electric shock device and the fear it was designed to induce.[36]

At a minimum, the files and records of the case do not conclusively refute the evidence that Mr. Barrett's defense counsel unreasonably failed to investigate his mental health prior to trial. Therefore, this Court either should find that this "lack of investigation created a substantial risk that [their] client's due process rights were violated by standing trial while incompetent, and therefore undermines . . . confidence in the reliability of the adversarial testing process,"[37] or vacate the conviction and order a new trial.[38] If the Court deems an evidentiary hearing necessary, it should schedule the hearing at a time when Mr Barrett will have had sufficient notice to conduct discovery and subpoena witnesses, R. Gov. § 2255 Proc. 8(c), and thereafter vacate the judgment of conviction and sentence of death.

**Ground 2, Part A(4).** **But for trial counsel's unreasonable omissions it is reasonably probable that the jury would have rejected the testimony of the Government's eleventh hour "snitch" witnesses and, like the two juries before them, refused to convict Mr. Barrett of premeditated murder.**

The Government's case for the intent element of Count 3 and for the penalty phase "gateway" intent factors overwhelmingly rested on the shoulders of the seven informant witnesses. The same could also be said for the drug charges underlying Counts 1 and 2, in light

---

[36] *See* Exh. 117 (Decl. George W. Woods, M.D.) at ¶¶ 80-81

[37] *Williamson v. Ward*, 110 F.3d, at 1519.

[38] *Ibid.*

of the paucity of drug evidence found in the search of Mr. Barrett's cabin and property after Trooper Eales was shot and killed.

These witnesses were absent from the two state trials. It was crucial to the defense case that they be impeached and discredited. However, through a combination of 1) the machinations attending the improper *ex parte* conference, where the court recognized that a lengthy continuance would be necessary for the defense to prepare adequately for these witnesses, particularly in light of the fact that the Government's motion for a protective order was baseless (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 20, 22-23, 27) (*See* Ground I); 2) deliberate obfuscation and delay on the part of the Government in revealing the identity of these witnesses and the substance of their testimony; 3) defense counsel's acquiescence in an arrangement (and the consequent time constraints) that doomed any effective investigation into these witnesses; and 4) the failure of the defense to move for the continuance the court itself recognized would be appropriate in light of the Government's conduct[39], the informant witnesses escaped the type of withering impeachment they would have faced had counsel conducted – or been allowed sufficient time to conduct – a professionally reasonable investigation into these witnesses and their stories.[40]

Counsels' failure to secure the time needed to competently investigate these witnesses, or to mount an investigation in the time permitted, was professionally unreasonable. This is especially true due to the centrality of these witnesses to the Government's case in both stages of

---

[39] Direct appeal attorney Mark Henricksen, who was assisted by lead trial counsel Roger Hilfiger on the direct appeal, questioned Mr. Hilfiger about why he did not seek a continuance. Mr. Hilfiger did not dismiss the merits of moving for a continuance, but instead stated that he simply did not think one would be granted, even though he recognized the importance of the seven snitches to the Government's case. (Exhibit 29.) Of course, as noted, the court's comments at the improper *ex parte* hearing, of which Mr. Hilfiger was never made aware during trial, indicate otherwise.

[40] Any defense efforts to effectively attack the informant witnesses were also blunted by the Government's *Brady* violations, which are discussed in Ground V.

Petitioner's Merits Brief        60        *Barrett v. U.S.*, 09-cv-105-JHP

trial. *Rompilla v. Beard,* 545 U.S. 374, 387 (2005) (as noted in the introduction to this ground for relief, defense counsel are obligated to obtain the evidence the prosecution is going to use and to investigate it); *Strickland v. Washington,* 466 U.S. 668, 690 (1984) (counsel's overarching duty is to conduct a competent, reasonable investigation, and where such is not undertaken and no strategy exists for foregoing it, counsel's conduct is professionally unreasonable); *Stewart v. Wolfenbarger,* 468 F.3d 338, 357, 361 (6th Cir. 2006) (counsel was professionally unreasonable for failing to investigate and produce witnesses who would have supported the accused's defense); *Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003).

In his previous filings, Mr. Barrett has shown that abundant evidence which would have rendered these witnesses incredible could have been produced with a professionally reasonable investigation. In summary, this evidence consists of the following:

1.     Because Charles Sanders's criminal history was not adequately investigated, the defense omitted to bring out numerous other convictions suffered by Sanders, as well as a litany of dismissed charges and sweetheart deals. Put in context, this information showed not only that Sanders's criminal history, including acts of dishonesty, was far more extensive than revealed at trial, but that local law enforcement was complicit in simply allowing him to commit crime after crime with little consequence, so long as he was getting other people in trouble by informing on them. Had all of this information been imparted to the jury, not only Sanders's credibility, but that of his cynical sponsors in law enforcement, would have all but vanished. (*E.g.,* Exhibits 57, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 168, 183, 185, 186, 187.)

Likewise, counsel failed to investigate and produce evidence of a laundry list of bad and dishonest acts Sanders could have been confronted with on cross-examination. *United States v. Torres,* 569 F.3d 1277, 1282-83 (10th Cir. 2009); *United States v. Velarde,* 485 F.3d 553, 563

(10th Cir. 2007); Fed.R.Evid. 608(b).  Defense counsel failed to present witnesses, including one of Sanders's own relatives, who could have attested to Sanders's total lack of believability, both to them personally and in the wider community.  Fed.R.Evid. 404(a).  (Exhibit 13, Decl. of Janesse Thomas; Exhibit 76, Decl. of Billy Poindexter; Exhibit 90, Decl. of Rick Lunsford; Exhibit 94, Decl. of Sally Davis Johnson; Exhibit 95, Decl. of Sean Hill.)  Witnesses were also available to contest Sanders's seeming claim – latched onto by the Government in closing argument (R. 4299.) – that Sanders had been at Mr. Barrett's residence on the afternoon of September 23, 1999.  (Exhibit 37, Decl. of Robert Thompson; Exhibit 77, Decl. of Brandy Hill; Decl. 90, Decl. of Rick Lunsford.)  A witness was available to contradict specific portions of Sanders's testimony regarding his alleged drug-related visits to Mr. Barrett's property in the summer and early fall of 1999.[41]  (Exhibit 13, Decl. of Janesse Thomas.)

Not only would all this overlooked information, testimony, and evidence have impeached Sanders's trial testimony, it would have aided immeasurably in a competent *Franks* attack on the search warrant.  (*See* Ground II A (1).)

2.     The absence of a professionally reasonable investigation and preparation resulted in the omission of numerous impeaching facts and witnesses to discredit Travis Crawford.[42]  Among the informant witnesses, only Mr. Crawford testified to an alleged contemporaneous statement by Mr. Barrett threatening law enforcement.  There were readily available witnesses who could have contradicted Crawford's account of the events on the afternoon and early evening of September 23, 1999, but the lack of a competent investigation, and/or the time to

---

[41]  The court and the Government are aware of other information reflecting adversely on Sanders's credibility from this particular witness.  (Docs. 100-02.)

[42]  As discussed in Ground V A (1)(b), Travis Crawford has recanted his testimony. (Exhibit 31, Decl. of Leonard Post; Exhibit 45, Decl. of Travis Crawford.)

Petitioner's Merits Brief                    62                    *Barrett v. U.S.*, 09-cv-105-JHP

perform one, meant that the jury never heard them.  (Exhibit 77, Decl. of Brandy Hill; Exhibit 90, Decl. of Rick Lunsford.)

The jury never heard evidence regarding Mr. Crawford's history as an informant and an informant witness.  (Exhibit 45, Decl. of Travis Crawfod; Exhibit 92, Decl. of Roger Crawford; Exhibit 90, Decl. of Rick Lunsford.)  Crawford's mental health history and his criminal record in the military were not explored.  (Exhibit 45, Decl. of Travis Crawford; Exhibit 143, sealed medical records of Travis Crawford; Exhibit 196, sealed military records of Travis Crawford.)  Crawford could have been cross-examined at some length about past acts of dishonesty and other bad acts relevant to his overall credibility, but, because a reasonable investigation was not or could not be undertaken, he was able to skirt scrutiny in these areas.  *United States v. Torres, supra*; *United States v. Valarde, supra.*; Fed.R.Evid. 608(b).  (Exhibit 78, Decl. of Carolyn Joseph; Exhibit 90, Decl. of Rick Lunsford.)  Omitted also were witnesses who could have testified that in their personal opinions, and in the community at large, Crawford was known for his self-serving dishonesty. Fed.R.Evid. 404(a).  (Exhibit 78, Decl. of Carolyn Joseph; Exhibit 90, Decl. of Rick Lunsford.)  The jury also never heard from available witnesses that, contrary to his testimony, Crawford's drug problems were ongoing at the time of his testimony against Mr. Barrett.  (Exhibit 77, Decl. of Brandy Hill; Exhibit 78, Decl. of Carolyn Joseph.)  It should also be noted that since the time of his testimony, Mr. Crawford has stated that he was rewarded for appearing as a witness against Mr. Barrett.  (Exhibit 77, Decl. of Brandy Hill.)

3.      Much the same is true of Travis Crawford's wife, Cindy Crawford.[43]  Failure to competently and reasonably investigate her criminal record led to her not being impeached, for example, with the fact that she could have been charged with felonies instead of misdemeanors in her previous criminal cases and that she was, at the time of her testimony against Mr. Barrett, in violation of the terms of her Sequoyah County deferred sentence, which gave her a motive to tailor her testimony to the Government's liking.  (Exhibits 170, 204.)

Although, as if by accident, Cindy Crawford's mental health history was alluded to briefly in the penalty phase, where she made a return appearance to the witness stand, it was not brought up at all in the guilt phase, when the need to employ every means to discredit her was especially acute.  (Exhibit 144, sealed medical records of Cindy Crawford.)

As with Sanders and Travis Crawford, counsel, due to a lack of investigation, not only failed to cross-examine Ms. Crawford on numerous bad and dishonest acts that would have chipped away at her credibility, *United States v. Torres, supra*; *United States v. Valarde, supra,* Fed.R.Evid. 608(b), but failed to investigate and present a host of witnesses who could have testified to her history as an informant and her bad reputation for honesty in the community, as well as her continued drug use at the time of Mr. Barrett's trial.  Fed.R.Evid. 404(a).  (File in Sequoyah County Case No. P-03-458; Exhibit 176; Exhibit 77, Decl. of Brandy Hill; Exhibit 78, Decl. of Carolyn Joseph; Exhibit 83, Decl. of Gwendolyn Crawford; Exhibit 88, Decl. of Mike Mackey; Exhibit 92, Decl. of Roger Crawford; Exhibit 95, Decl. of Sean Hill.)  Likewise,

---

[43]  Like her husband Travis, Cindy Crawford recanted her testimony to defense investigators.  Unlike Travis, she refused to sign a declaration attesting to her recantation.  *See* Ground V A (1)( c).  *See also,* Exhibit 14, Decl. of Dale Anderson; Exhibit 31, Decl. of Leonard Post.

Petitioner's Merits Brief                   64                   *Barrett v. U.S.*, 09-cv-105-JHP

counsel neglected to develop a witness who could have completely discredited Ms. Crawford's second stage testimony. (Exhibit 104, Decl.of Richie Barrett.)

4.     Randy Turman was not only a key Government witness in connection with supposed threats Mr. Barrett hurled at law enforcement, but was the most important of the informant witnesses on the alleged drug crimes which underlay Counts 1 and 2. Turman testified that Mr. Barrett had manufactured methamphetamine.

Turman was allowed, without correction by the Government, to perjure himself about his 6-count Sequoyah County drug case, which he falsely informed the jury had "done been taken care of." In fact, it was still pending, and was to languish in the system for two more years before being dismissed by the Sequoyah County District Attorney's Office "in the interests of justice." With nothing apparently hanging over his head, Turman testified that he had nothing to fear from the Government, and had not worked as an informant. (Exhibit 195.)

Because defense counsel neglected to check Turman's court records in Sequoyah County, they were unable to expose his perjury about his then-pending felony case, the fact that little or no action had been taken on it in years, which strongly suggested he had been working as an informant, and that with these serious pending charges, he had a powerful motive to please the Government with his testimony in the hopes that he would be rewarded – as he ultimately was – with a favorable resolution of his case. Had Turman's perjury and his motives for testifying been revealed, his credibility as a whole would have been brought into serious question by any reasonable trier of fact. Moreover, Sean Hill was available as a witness who could and would have testified to Turman's poor reputation in the community for honesty, but he was not developed as a witness. (Exhibit 95, Decl. of Sean Hill.)

5.      As with the failure to impeach the other informant witnesses through cross-examination, independent evidence, or both, defense counsel failed to effectively attack the testimonies of Karen Real and Brandy Price.

Again due to the failure to investigate the relevant court records, counsel failed to confront Real with the fact that a number of state drug cases against her had been dismissed. Real had a motive to please the Government in order to maintain the status quo on her dismissed state drug charges.  (Exhibits 47, 48, 49, 50, 51, 52.)

Counsel failed to delve beyond a surface level into what Real wanted and expected to receive by way of benefit on her 14 year federal sentence, allowing Real to escape into expressing vague and ethereal hopes for a break she really did not expect to materialize.  Nothing beyond her statement that the prosecutor would "talk to" the sentencing judge in her case was testified to.  In fact, Real later received, pursuant to a Rule 35 motion filed by the Government, a sentence reduction to time served as the direct result of her testimony against Mr. Barrett.[44]

Defense counsel, due to the failure to take reasonable investigative steps, also omitted to call witnesses who could have testified to Real's poor reputation in the community for honesty. Fed.R.Evid. 404(a).  (Exhibit 95, Decl. of Sean Hill.)

The last statement is true also of Brandie Zane Price.  Fed.R.Evid. 404(a).  (Exhibit 95, Decl. of Sean Hill.)  In addition, counsel failed to call independent witnesses who could have testified that Price's automobile could not have navigated the terrain east of Mr. Barrett's cabin,

---

[44]  *See* Ground V A (e).

as she claimed she did when she allegedly drove out to visit Mr. Barrett.[45]  (Exhibit 77, Decl. of

Brandy Hill; Exhibit 95, Decl. of Sean Hill.)

6.      Due to the omission of a professionally reasonable investigation, trial counsel

failed to convert Randy Weaver into a defense witness, which could have been done with one

question.  Weaver was the only one of the informant witnesses to have consented to an interview

with the defense (albeit in the presence of Government agents, per the ill-fated "arrangement"

with defense counsel).  Had he been asked, Weaver would have testified that Mr. Barrett never

threatened to harm law enforcement if they came to his property in response to is pending drug

delivery case, and that such comments would have been completely out of character for Mr.

Barrett.  (Exhibit 38, Decl. of Randy Weaver.)

The failure to explore this subject with Mr. Weaver was mirrored in defense counsels'

failure to launch a professionally reasonable investigation to discover other readily available

witnesses who could and would have testified, in complete contrast to six of the seven informant

witnesses, that Mr. Barrett never threatened law enforcement, in relation to his pending drug case

or under any other circumstances, and that, in fact, law enforcement patrols were a regular

occurrence in his neighborhood, with no acts of violence from Mr. Barrett.  (Exhibit 37, Decl. of

Robert Thompson; Exhibit 77, Decl. of Brandie Hill; Exhibit 90, Decl. of Rick Lunsford; Exhibit

96, Decl. of Toby Barrett.)

Just as there can be no question that defense counsel were professionally unreasonable for

failing to investigate and introduce all of the impeachment evidence outlined above, and

explicated in detail in Mr. Barrett's previous filings (in part, but not exclusively, because a

---

[45]  As with Karen Real, Price later received a huge break from the Government in a
federal drug case in which she was charged shortly after Mr. Barrett's trial concluded.  *See*
Ground V A (d).

reasonable and necessary continuance was not sought), it is crystal clear that counsel's failings, for which no strategic basis existed, were prejudicial to the outcome of both stages of trial.

It cannot be over-emphasized that the sole difference between the state prosecution against Mr. Barrett, in which he was acquitted of murder, and the federal case, in which he was sentenced to death, was the presence of the late-coming informant witnesses. Effective investigation, cross-examination, and independent evidence would have neutralized them completely. Despite the obvious importance of these witnesses to the Government's case for intent in both stages of trial, and to establishing the underlying drug charges, counsel failed to move for a continuance, and took virtually no steps to investigate and impeach these witnesses. *United States v. Fuller,* 938 F.Supp. 731, 733-34 (D. Kan. 1996) (counsel ineffective for, among other reasons, failing to insist on adequate time to prepare for trial).

In Mr. Barrett's case, counsel in effect agreed to a trial by ambush with respect to the seven critical informant witnesses. Because of the crucial importance of these witnesses, whose credibility could have been devastated had proper investigative steps been taken, the failures of trial counsel were unquestionably prejudicial. There is a reasonable probability, sufficient to undermine confidence in the outcome of trial, that but for counsels' indefensible errors and omissions, the result of the guilt stage of trial would have been different. At a minimum, these failings also had a prejudicial effect on the punishment stage. *Rompilla v. Beard,* 545 U.S. 374 (2005); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Strickland v. Washington,* 466 U.S. 668 (1984).

Mr. Barrett's case is analogous to *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002), where, in the context of a *Brady* claim, a capital conviction was vacated because exculpatory evidence which could have been used to impeach witnesses was not disclosed. The evidence, there and in Mr. Barrett's case, would have shown that the witnesses had a motive to fabricate

and had colluded in their stories.  *See also, Stewart v. Wolfenbarger,* 468 F.3d at 357, 361

(failure to investigate and develop witnesses who would have contradicted prosecution case and

supported the defense theory of alibi); *Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003)

(counsel ineffective in part for failing to impeach immunized witness, and for failing to call

available witnesses to contradict testimony of prosecution witnesses and prosecution's theory as

to how the homicides occurred); *Steinkuhler v. Meschner,* 176 F.3d 441, 445 (8th Cir. 1999)

(counsel ineffective for failing to use available evidence to impeach witnesses).

In Mr. Barrett's case, among other failings addressed here and in Mr. Barrett's previous

filings, counsel failed to adequately investigate the criminal histories of the informant witnesses,

particularly Sanders and Turman, and failed to research their court files, which would have

produced devastating impeachment and demonstrated that they had motives to lie.  *See also, e.g.,*

*Reynoso v. Giurbino,* 462 F.3d 1099, 1114, 1120 (9th Cir. 2006) and *Driscoll v Delo,* 71 F.3d

701, 708 (8th Cir. 1995), *cert. denied,* 519 U.S. 910 (1996) (counsel ineffective for failing to

impeach); *Horton v. Massie,* 2000 WL 107386 (10th Cir. Jan.31, 2000) (unpublished) (counsel

ineffective for failing to call defendant's young daughter in murder case to support claim that

while defendant was present, she did not participate in the offense; the prosecution's witnesses

told inconsistent stories, and the prosecutor emphasized that defendant's version of events was

uncorroborated; counsel was also ineffective for failing to investigate and present evidence that

the state's chief witnesses were collaborating with each other and had motives to fabricate);

*Hadley v. Groose,* 97 F.3d 1131 (8th Cir. 1996) (counsel's handling of police witness's testimony,

which conflicted with his police report, constituted ineffective assistance; here, there was not just

a single failure to impeach with a single document, but a wholesale failure to reasonably

investigate and effectively confront a number of crucial prosecution witnesses).

571

**Ground 2, Part A (5).**  **Trial counsel were ineffective in failing to make appropriate and timely objections to improper hearsay evidence of other bad acts.**

Fed.R.Evid. 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the  prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

"The Federal Rules of Evidence generally preclude the use of evidence of crimes or wrongs unrelated to the conduct at issue if that evidence is offered to prove a propensity to behave in a particular manner." *Tanberg v. Sholtis,* 401 F.3d 1151, 1168 (10th Cir. 2005).  For evidence of other crimes or bad acts to be admissible under Rule 404(b), four factors must be satisfied: (1) the evidence is offered for a proper purpose; (2) the evidence is relevant; (3) the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice; and (4) upon request, the district court provides an appropriate limiting instruction. *United States v. Cherry,* 433 F.3d 698, 700-02 (10th Cir. 2005).  *See also*, *United States v. Brooks,* 161 F.3d 1240, 1243 (10th Cir. 1998), *citing Huddleston v. United States*, 485 U.S. 681, 691-92 (1988).  In offering 404(b) evidence, the Government carries the burden of showing how the proffered evidence is relevant to one or more issues in the case; it must specifically articulate the evidentiary hypotheses by which a fact of consequence may be inferred from the other acts evidence.  *United States v. Biswell,* 700 F.2d 1310, 1317 (10th Cir. 1983).  There must be a clear and logical connection between the alleged earlier offense or misconduct and the case being tried.  *Id.* at 1317-18.

Before prior bad acts evidence is admissible, the trial court must find the evidence: (1) tends to establish intent, knowledge, motive, identity or absence of mistake or accident; (2) is related to the charge in that it serves to establish intent, knowledge, motive, identity or absence of mistake or accident; (3) has real probative value, not just possible worth; and (4) is close in time to the crime charged.  If the trial court determines that the prior acts are admissible under 404(b), it must still conduct a separate balancing of the probative value of the evidence and its prejudicial impact under Fed.R.Evid. 403.  *United States v. Temple,* 862 F.2d 821, 823-24 (10th Cir. 1988), *relying on United States v. Morales-Quinones,* 812 F.2d 604, 612 (10th Cir. 1987); *United States v. Hogue,* 827 F.2d 660, 663 (10th Cir. 1987).

On September 22, 2005, after the start of the trial, the Government filed a Notice of Intent to Offer Evidence of Other Crimes.  (Doc. 206.)  Aside from evidence regarding narcotics activity at Mr. Barrett's residence preceding the shooting of Trooper Eales, the Government stated it intended to offer testimony from the majority of its informant witnesses (Charles Sanders, Randy Turman, Cindy Crawford, Travis Crawford and Brandie Price) that in the weeks and months preceding the shooting of Trooper Eales, Mr. Barrett had made statements to the effect that if law enforcement came on his property, he would shoot them.[46]  The Government argued these alleged statements were relevant to show Mr. Barrett's intent.  (Doc. 206 at 1-3.)  The Government's filing failed to give notice that informant witness Karen Real would offer similar evidence of supposed statements made by Mr. Barrett.  Before Mr. Barrett could respond, the Government's filing said, "The defendant has not complained of lack of notice."  (Doc. 206 at 4.)

---

[46]  Mr. Barrett's argument concerns only the testimony offered by the informant witnesses regarding his alleged statements or actions related to those statements.

The Government's Notice was filed nine days after the trial court, during an *ex parte* hearing, advised the prosecutors that the testimony they intended to present from informants included evidence covered by Rule 404(b).  (Tr. 8/13/05 Hr'g at 22-23.)  The court permitted the prosecutors to argue outside the presence of Mr. Barrett and his counsel that the testimony was not within the scope of the rule.  *Ibid.*  Following the conclusion of that discussion, when defense counsel were present, the trial court described the content of the *ex parte* discussion without revealing that it included the court stating that the testimony described *in camera* included 404(b) evidence.  *Id.* at 25-27.

On September 27, 2005, trial counsel for Mr. Barrett filed a response to the Government's 404(b) Notice, contesting specifically the evidence of Mr. Barrett's alleged statements, and arguing that the proposed testimony from the informant witnesses was irrelevant propensity evidence; any marginal relevance or probative value it might possess was outweighed by the danger of unfair prejudice.  (Doc. 215.)

On the same day counsel for Mr. Barrett filed their response to the 404(b) Notice, the court stated it would rule on admissibility as the evidence developed, and directed the Government to approach the bench immediately before it intended to offer such evidence. Defense counsel were directed to submit an appropriate limiting instruction, should they desire to do so.  (R. 174.)  Defense counsel filed a proposed limiting instruction on September 28.  (Doc. 218.)

With virtually no objections or requests for appropriate limiting instructions, the informant witnesses (aside from Travis Crawford ( R. 462-66), who later recanted his testimony) were permitted to testify to alleged stale threats by Mr. Barrett to law enforcement, as well as evidence of drug activities that were not contemporaneous to the offenses charged in the

superseding indictment. ( R. 412-15, 422-23, testimony of Randy Turman; R. 2515, 2612, 2614, testimony of Charles Sanders; R. 3068, 3070, 30732-73, testimony of Cindy Crawford; R. 3485-86, 3492-93, 3507, 3509, testimony of Brandie Zane Price; R. 3082-83, 3118-20, 3090, 3106, 3135-36, testimony of Karen Real.)

Evidence of Mr. Barrett's alleged statements to these witnesses, excluding Travis Crawford, was inadmissible, and wrongly argued and considered by the jury as propensity evidence in violation of Rule 404(b). Trial counsel unreasonably failed (a) to seek reasonable pretrial disclosure of these statements, (b) to make appropriate objections to the Government's delay and to the admissibility of the statements, and (c) to seek an appropriate order limiting the jury's consideration of the evidence to Mr. Barrett's alleged state of mind at the time the statements were made. *See Kimmelman v. Morrison*, 477 U.S. 365, 385 (1985) (counsel's failure to seek suppression of evidence unreasonable where counsel also failed to seek pretrial discovery).

Trial counsel were on notice by September 12, 2005, at the latest, that the Government intended to use informant witnesses, but made no request for notice under Rule 404(b). To the extent earlier requests for discovery included requests for 404(b) notice, trial counsel unreasonably failed to assert that the Government had staged an ambush (as the trial judge himself thought likely, Tr. 9/13/05 Hr'g at 7, 10-12), failed to seek a continuance to investigate, and failed to object that the Government had not shown good cause for the late disclosures, as required by Rule 404(b).

The statements were hearsay, and pursuant to Fed.R.Evid. 803(3) were admissible only to show the declarant's state of mind at the time the statements allegedly were made. The alleged statements made weeks, several months, or many months before the offense could not reliably or

relevantly evince Mr. Barrett's intent on the night Trooper Eales was fatally shot; they were injected into the trial simply to unfairly prejudice Mr. Barrett. *United States v. Temple, supra*; *United States v. Henandez,* 975 F.2d 1035, 1040 (4th Cir. 1992) (other crimes testimony that defendant told witness about special recipe for cooking crack, that the defendant used crack and used to sell it was inadmissible to show intent in conspiracy case; the testimony was not relevant to the defendant's conduct or mental state during the course and at the time of the alleged conspiracy).

Moreover, any time frame placed on these alleged statements by the informant witnesses was completely unreliable. Their memories were vague in the extreme due not only to the passage of time, but because of their own repeated use of mind-altering drugs. The alleged statements attributed to Mr. Barrett by Turman, Sanders, Cindy Crawford, Brandie Price and Karen Real *were not* close in time to the offense itself, and had only "possible worth," not real probative value. *Temple,* 862 F.2d at 823-24. Any slight probative value this evidence could arguably be said to possess was clearly outweighed by the danger of unfair prejudice. Fed.R.Evid. 403.

Even assuming for the sake of argument that Mr. Barrett made these statements (which he did not), they could not relate to any specific intent to do harm to law enforcement when the Highway Patrol Tact Team invaded his property unannounced in the middle of the night, with the lead vehicle having all the appearance of a civilian automobile. This evidence simply covered Mr. Barrett in a veil of unwarranted suspicion. With respect to Karen Real, no notice was given by the Government in its 404(b) filing that she would attribute any threatening statements to Mr. Barrett. *United States v. Temple, supra* (defendant was prejudiced by improper admission of other crimes or bad act evidence which did not show a common scheme or plan and was

otherwise inadmissible, and commenting that care should be taken to protect the accused as far as possible from being convicted simply because of past conduct rather than the crime for which he is being tried).

Although defense counsel filed a response the Government's 404(b) Notice objecting to the admission of Mr. Barrett's statements to these witnesses, and made, as outlined above, sporadic objections during the testimony of Randy Turman and Karen Real, the remainder of the evidence complained of here passed without a contemporaneous objection, and a contemporaneous request for a limiting instruction. *United States v. Davis,* 766 F.2d 1452, 1458 (10th Cir. 1985) (failure to lodge contemporaneous objections fatal to claim raised on appeal). Because the evidence addressed here was clearly inadmissible, and trial counsel recognized its inadmissibility in their response to the Government's 404(b) Notice, counsel were professionally unreasonable for failing to make adequate, contemporaneous objections. Since the testimony of the informant witnesses regarding Mr. Barrett's supposed statements was the centerpiece of the Government's case for intent, the failure to adequately object affected the trial outcome. *Strickland v. Washington,* 466 U.S. 668, 688, 694 (1984); *Martin v. Grosshans,* 424 F.3d 588, 591-92 (7th Cir. 2005); *Freeman v. Class,* 95 F.3d 639 (8th Cir. 1996); *Crowe v. Sanders,* 864 F.2d 430 (6th Cir. 1989) (counsel deemed ineffective for failing to properly object or seek proper curative measures, including moving for a mistrial).

Defense counsel were also professionally unreasonable, to Mr. Barrett's prejudice, for failing to object to Karen Real's other crimes or bad act testimony because no pretrial notice was given as required by Rule 404(b), and for failing to object to the prosecution's 404(b) Notice because it was filed untimely. Rule 404(b) states that upon request, reasonable notice in advance of trial of other crimes or bad act evidence must be given, absent good cause indicating notice

should be excused. The prosecution did not file its 404(b) Notice until individual jury selection in the case was underway.

To the extent trial counsel did object to the other bad acts evidence addressed here, direct appeal counsel were ineffective for failing to raise a substantive 404(b) issue. *See* Ground 18, *infra*.

**Ground 2, Parts A(6) and (10)**

In Parts A(6) through (10) of Ground 2, Mr. Barrett sets forth the factual basis for finding that the judgment of conviction is unreliable due to the defense attorneys' failure to pursue mutually reinforcing evidence undermining the prosecution's theory of intent. As these omissions are related, and must be considered cumulatively, *see Scott v. Mullin*, 303 F.3d 1222, 1230-31 (10th Cir. 2002); *Strouffer v. Reynolds*, 214 F.3d 1231, 1235 n.4 (10th Cir. 2000), they will be addressed together here.

In Ground 2, Parts A(6) and (7), Mr. Barrett describes the evidence showing that his trial counsel failed to consult with or present evidence from expert witnesses Edward Hueske and George Kirkham, whom this Court had found were reasonably necessary to the defense. In Part A(8) of Ground 2, Mr. Barrett shows that his defense counsel unreasonably failed to show the jury that Tact Team members had made numerous inconsistent statements that called into question their account of the raid, especially the signs that they were law enforcement. In Part A(9) of Ground 2, Mr. Barrett describes the eyewitness evidence that was available to dispute the accounts of law enforcement officers regarding the visibility of signs that the attack on Mr. Barrett's cabin came from law enforcement officers. In Part A(10), Mr. Barrett sets out the evidence contradicting the theory that he was on notice that he faced arrest. Together, these errors gave the jury an unchallenged and unreliable record upon which to decide the crucial

question whether the evidence showed beyond a reasonable doubt that Mr. Barrett had sufficient knowledge that he was under assault from law enforcement officers that the jury could infer he had an intent to kill.

### 1.    Defense Counsel's Failure to Obtain Expert Assistance

"A lawyer cannot be deemed effective where he hires an expert consultant and then either willfully or negligently keeps himself in the dark about what that expert is doing, and what the basis for the expert's opinion is." *Richey v. Bradshaw*, 498 F.3d 344, 362-63 (6th Cir. 2007).  In *Richey*, the court held that the outcome of the trial was unreliable because defense counsel failed to make use of an expert to challenge gaps in the prosecution's theory of how the crime (arson) occurred.  498 F.3d at 363.   In *Adams v. Bertrand*, 453 F.3d 428 (7th Cir. 2006), the court held the state court had unreasonably applied *Strickland* by finding no deficient performance although the defense attorney "committed to a predetermined strategy without a reasonable investigation that could have produced a pivotal witness."  453 F.3d at 437.  The same occurred in Mr. Barrett's case, where defense counsel committed to strategy at trial without consulting two experts who could have undermined key aspects of the prosecution's case.

Iris Dalley's crime scene reconstruction testimony, complete with animations and a power point presentation, was the key component of the prosecution's claim that the physical evidence demonstrated Mr. Barrett was not only firing from a vantage point that made it supposedly apparent that he was shooting at law enforcement officers, but that Trooper Eales had stepped out of the Bronco driven by Trooper Hamilton at the time Eales was shot.  The inference was that, based on the way Trooper Eales was dressed, Mr. Barrett would have recognized him as a law enforcement officer.  Thus, Dalley's testimony was important to the Government's case for the

intent factors in Counts 1 and 2, the specific intent requirement of Count 3, as well as the intent "gateway" factors in the sentencing stage.

Perhaps lulled into inaction by the trial court's earlier comment, in limiting the funding for a defense crime scene expert, that the court had never permitted crime scene reconstruction evidence in previous trials, counsel failed to utilize what resources had been made available to engage the services of their own crime scene analyst to critique and counter Dalley's testimony and presentation. Instead of seeking expert assistance to rebut Dalley's findings, counsel relied exclusively on cross-examination, which did virtually nothing to dent Dalley's testimony.[47]

Due to the importance of Dalley's testimony to the Government's case in both stages of trial, counsel were professionally unreasonable for failing to retain Mr. Hueske, who had previously worked on the case at the state level and had been contacted by Mr. Echols to assist in Mr. Barrett's defense in federal court. Trial counsels' unreasonable omission was prejudicial. Had counsel engaged the services of the independent expert authorized for Mr. Barrett's defense,

---

[47] The manner in which trial counsel handled expert witnesses as a whole raises troubling questions indicative of deficient performance and resulting prejudice. Although Dalley's testimony was ripe for attack by another, far more qualified expert in Mr. Hueske, such an attack was never mounted. The one expert the defense did call – Chuck Choney – was, as shown here, an ill-advised move from the beginning. Choney could only hurt the defense, and he did. Defense counsel were on notice that Choney would be a hostile witness.

Yet again symptomatic of counsel's deficient performance with expert witnesses was counsel's failure to object at the outset to the plainly inadmissible testimony of James Horn, which the court ultimately struck *sua sponte*, although not until the damage was done, taking measures inadequate to excise the prejudice flowing from Horn's testimony. Ground 2, Part A (11).

The one expert the defense retained for the second stage, Dr. Jeanne Russell, who has a PhD. in education, was approached on the eve of trial, in part to serve as a mitigation specialist, even though she was unqualified to undertake this task and had no time to work up a professionally reasonable mitigation case, even if she were qualified to do so. (Exhibit 56)

Finally, despite a wealth of evidence indicating that Mr. Barrett had serious psychological and psychiatric impairments, counsel failed altogether to secure the assistance of *appropriate* mental health professionals, whose testimony would have been critical in both stages of trial. Grounds 2, Part A (2)(3), Part B (1)(2), Ground 8.

it could have been shown that Dalley's analysis was amateurish, unscientific, seriously flawed, and did not comport with the necessary protocols for conducting a legitimate and reliable reconstruction. In connection with the current proceedings, counsel asked Mr. Hueske to review Ms. Dalley's testimony, the exhibits introduced in the case, her Power Point presentation, her animations, and other materials upon which she relied. Mr. Hueske, a nationally known expert whose credentials, training and experience far outstrip Dalley's meager qualifications, has concluded that Dalley's testimony was not worthy of belief. (Exhibits 109, 110.)

Had trial counsel obtained the services of a qualified forensic examiner, they could have challenged the admissibility of Dalley's testimony under Rule 702 of the Federal Rules of Evidence and under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993) and *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999). Dalley failed to adhere to the standard, recognized protocol in the particular discipline for conducting a crime scene reconstruction. She failed to take many steps that should have been taken, and failed to utilize the appropriate methodology. Due to these numerous failures, her conclusions, aimed at strengthening the Government's case, were scientifically unreliable. At a minimum, the jury would have heard evidence that Dalley's analysis, and her subsequent testimony based on that analysis, was outside the parameters of a proper, legitimate crime scene reconstruction and trajectory analysis. Had defense counsel hired an independent expert to advise them, a powerful motion to exclude Dalley's testimony altogether could have been presented. Dalley's testimony and analysis was little better, if at all, than the "expert" testimony of James Horn, which the court found so bereft of reliability and relevance that it was stricken because it failed to comply with *Daubert* and *Kumho Tire.*

It is not just Mr. Barrett's current lawyers who say Ms. Dalley is far from being an objective scientific witness, but is a partisan advocate who dresses up her personal opinions in the guise of "science." The Oklahoma Court of Criminal Appeals has chastised Ms. Dalley, reversing a first degree murder conviction due to Dalley's unreliable, unscientific testimony, including the improper use of computer-generated animations. *Dunkle v. State,* 139 P.3d 228, 249-51 (Okl. Cr. 2006). In that case, the defendant's murder conviction was reversed in large part because Iris Dalley's conclusions and computerized animations were not based on objective scientific findings, but simply restated the prosecution's theory of the case under a "scientific" gloss. Based on Mr. Hueske's report, Dalley did the same thing in Mr. Barrett's case. She used improper methodologies and techniques to "package" evidence already heard by the jury, offering conclusions based on an incompetent and unscientific evaluation of the evidence.[48]

Because Dalley's analysis was an important part of the Government's case, it was inexcusable for counsel to fail to hire an independent expert such as Mr. Hueske to evaluate her methods and conclusions and to testify for the defense. Had all the flaws in Dalley's testimony been exposed by independent evidence, there would be little if any "physical evidence" to support the prosecution's theory as to how the shooting occurred and the position of Mr. Barrett when he fired the .233 rifle. If an independent expert such as Mr. Hueske had been retained to critique Dalley's work, the defense would have been placed in a much stronger position to argue, as it did, that Mr. Barrett was inside his house rather than outside when he fired the weapon, and

---

[48] In addition to trial counsel's other failings with respect to Dalley's testimony, counsel were professionally unreasonable for failing to investigate Dalley's track record of giving scientifically groundless testimony. Although the *Dunkle* case was decided in 2006, after Mr. Barrett's trial concluded in 2005, it was tried some years before, the appellate briefs had been filed at the time of Mr. Barrett's trial, and Dalley's reputation was well known in the criminal defense community.

was thus unaware that the vehicle coming directly at his house was a police vehicle, especially due to the fact the Ford Bronco driven by Trooper Hamilton had no emergency lights engaged.

All of this is especially critical on the issue of intent with respect to Count 3 of the superseding indictment, the intent elements of Counts 1 and 2, and the intent elements in the penalty phase. Even if the trial court had received Dalley's testimony, there is at least a reasonable probability that the outcome of the trial would have been different. If jurors had been shown the chasm between what counts as a scientifically reliable claim and Dalley's testimony, they would have reached any of several conclusions adverse to the prosecution, from finding that Dalley just made things up in an effort to assist the prosecution, to finding that her conclusions were entitled to little credence or weight.

To obtain a conviction on Count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed a law enforcement officer in the performance of his official duties, that he knew or had reason to know he was shooting at a law enforcement officer, and that the shooting was precipitated by that knowledge. Absent Dalley's testimony, all the Government had to rely on were the often conflicting accounts and compromised memories of the Tact Team members who testified.

Thus, the prejudice under *Strickland* flowing from counsels' failure to effectively contest Dalley's testimony with expert assistance is readily apparent. The failure to prepare a reliable reconstruction of the crime scene, or to challenge an unreliable reconstruction, is ineffective assistance where the reconstruction is an important issue at trial. *See Draughton v. Dretke,* 427 F.3d 286 (5th Cir. 2005)(trial counsel ineffective for failing to present evidence on how fatal shooting occurred, which would have supported defense claims); *Martin v. Grosshans,* 424 F.3d 588, 590-92 (7th Cir. 2005)(counsel ineffective in part for failing to object to the inadmissible

testimony of two key prosecution witnesses); *Snowden v. Singleterry,* 135 F.3d 732, 738 (11th Cir. 1998)(counsel unreasonable and ineffective for failing to object to improper expert testimony); *Driscoll v. Delo,* 71 F.3d 701, 708 (8th Cir. 1995)(counsel professionally unreasonable and ineffective for failing to impeach serology evidence); *Jennings v. State,* 744 P.2d 212 (Okl. Cr. 1987)(counsel ineffective for failing to secure opinion from accident reconstruction expert who would have corroborated eyewitness testimony that defendant was not driving the vehicle involved in a fatal accident).  As in *Jennings,* defense counsels' unreasonable omission here lay in part in the failure to retain an expert, and in part in the failure to make use of lay testimony.  As set forth in Part A(9) of Ground 2, defense counsel failed to call Toby Barrett and Alvin Hahn, the only two percipient witnesses to the scene other than the law enforcement officers whose conduct was under review.

Defense counsel had requested authorization to retain the assistance of Dr. George Kirkham, a criminologist, sworn police officer, and expert in SWAT standards, methods, and procedures.  (Doc. 50.)  Counsel explained to the trial court in March 2005 that a former FBI agent, Chuck Choney, had given testimony favorable to Mr. Barrett during the second state trial, but had made it clear that he had been a friend of Trooper Eales and would not testify favorably for the defense.  *See* Tr. 3/22/05 Hr'g at 14-15.  Mr. Choney confirmed this in September and October 2005 by not returning calls from defense counsel and telling them he was, at best, reluctant to testify.  Tr. 10/3/05 Hr'g at 6-7.  Defense counsel did not speak with Dr. Kirkham before the trial started, and had only minimal contact with Mr. Choney.

In the prevailing professional norms of capital defense practice, counsel do not simply assume the accuracy of the prosecution's expert's findings, or rely upon their lay knowledge of a subject to get them through cross-examination.  Counsel acting in that manner fails to provide the

defendant with the "ample opportunity to meet the case of the prosecution" to which he is entitled, and undermines "the reliability of the adversarial testing process." *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (internal quotation marks and citations omitted). Rather, "[w]ith the assistance of appropriate experts, counsel should . . . aggressively re-examine all of the government's forensic evidence, and conduct appropriate analyses of all other available forensic evidence." ABA Guideline 10.7 Commentary. *See also* ABA Standard 4-4.1 Commentary ("resources of scientific laboratories may be required to evaluate certain kinds of evidence . . . Neglect of any of these steps may preclude the presentation of an effective defense"). Thus, the Supreme Court in *Kimmelman* found defense counsel's performance constitutionally deficient where counsel failed to conduct discovery and perform scientific testing on a bed sheet. *Kimmelman*, *supra*, 477 U.S. at 385-86.

Similarly, in *Stouffer v. Reynolds*, 214 F.3d 1231 (10th Cir. 2000), the court upheld the district court's grant of habeas corpus relief based, in part, on the district court's finding that defense counsel performed deficiently because they failed to consult with forensic experts prior to cross-examining the prosecution's experts. Defense counsel had "failed to file an application for funds to hire experts to examine the opinions of the State's expert witnesses. The district court found the result was an inability to 'develop the defense theory through cross-examination of the State's witnesses [which] was not strategic, but [a] total lack of preparation.'" *Id.*, 214 F.3d at 1234. As noted, the same could be said for Mr. Barrett's defense counsel's failure to have Mr. Hueske review Iris Dalley's prior testimony.

In *Miller v. Anderson*, 255 F.3d 455 (7th Cir. 2001),[49] the court held the Indiana Supreme Court had unreasonably rejected the petitioner's ineffective-assistance claim where defense counsel had failed to retain experts to challenge key aspects of the prosecution's case. Judge Posner wrote that "it was irresponsible of the [defense] lawyer not to consult experts" in a case where so much turned on the prosecution's experts' testimony and there was little trial counsel could do to substantiate the defense without experts. 255 F.3d at 459. As in this case, experts in different fields were available to substantiate the defense. In *Miller*, the defense was that the defendant was not present at the crime scene, and a DNA expert, as well as a treadmark and footprint expert, would have testified there was no objective evidence he had been present. *Ibid.*

In this case, there was no objective evidence that Mr. Barrett could have seen lights or other signs that the people attacking him were law enforcement officers. Iris Dalley's testimony about the relative positions of the lead Bronco and Mr. Barrett were the product of unreliable methods and exaggeration. Testimony from Dr. Kirkham would have informed the jury that the methods used by the Tact Team were so far outside the norms of safe police methods that they seemed calculated to make it impossible for Mr. Barrett to recognize them as law enforcement officers until the last possible moment. Testimony from Mr. Hueske, and an informed cross-examination of Ms. Dalley, would have exposed her opinions as mere speculation.

In *Leonard v. Michigan*, 256 F.Supp. 2d 723 (W.D. Mich. 2003), defense counsel's performance was held ineffective where the case turned largely on weight to be given the prosecution's DNA evidence. Defense counsel failed to secure the services of an expert prior to a suppression hearing, and the expert would have revealed many flaws in the testimony of the

---

[49] The order granting habeas corpus relief, but not the opinion itself, was withdrawn after the parties settled the case. *Miller v. Anderson*, 268 F.3d 485 (7th Cir. 2001).

prosecution expert.  There, as here, the failure to retain an expert prior to the suppression hearing, then conceding admissibility of the prosecution expert's testimony without the information the defense expert could have provided to bring that testimony into doubt, was unreasonable because the decision was based on incomplete investigation.  256 F. Supp. 2d at 731.

The *Leonard* court also found trial counsel acted unreasonably by failing to secure an expert to assist with cross-examination during the testimony of the prosecution's expert.  *Id.* at 733.  "How defense counsel could have proceeded to trial, knowing the critical piece of evidence against his client was DNA evidence, without first reviewing the experts' reports, protocol, and analysis is almost incomprehensible and certainly unreasonable."  *Ibid.*  One could say the same here.  Although Mr. Barrett's defense counsel had reviewed Ms. Dalley's prior testimony, they simply threw away the opportunity to have their cross-examination informed by an expert in the field.

In other cases where defense counsel failed to make use of expert assistance the courts made available, their performance was found to be deficient.  The court in *Miller* raised *sua sponte* the question whether trial counsel could have found the experts offered by post-conviction counsel, and the question whether the trial court would have provided funds for those experts.  255 F.3d at 457.  Here, the record answers those questions.  Defense counsel knew about Mr. Hueske and Dr. Kirkham, and the court authorized them to assist the defense.  Similarly, in *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) (*en banc*), the court found it significant that defense counsel "spent less than half the defense investigation budget authorized" to prepare for trial.  270 F.3d at 927.  This was one factor reflecting counsel's lack of preparation.

Defense counsel's conduct in this case is similar to that of counsel in *Miller v. Senkowsky*, 268 F. Supp. 2d 296 (E.D. N.Y. 2003).  There as here, defense counsel signaled that

Petitioner's Merits Brief                    85                    *Barrett v. U.S.*, 09-cv-105-JHP

he was aware there was a strategic need to retain the services of experts to challenge the prosecution's theory of liability.  There as here, the trial court authorized counsel to retain experts to assist the defense, but defense counsel failed to retain the experts.  268 F. Supp. 2d at 311.  There as here, defense counsel cross-examined the prosecution's expert about questionable matters in the expert's testimony.  *Ibid.*  But, there as here, defense counsel's failure to retain available experts denied the defense the opportunity to present the jury with an independent expert's opinion that contradicted that of the prosecution.  *Id.* at 311-12.  Relying on *Pavel v. Hollins*, 261 F.3d 210 (2nd Cir. 2001), and earlier decisions from the Seventh Circuit, the court concluded it was unreasonable for defense counsel not to seek an independent expert's opinion. *Id.* at 312.

Another theme echoed by courts in other cases is that defense counsel is professionally unreasonable for calling expert witnesses they know or should know will be hostile to the defense position and/or will give damaging testimony.  This was certainly the case with Mr. Choney.  In *Miller*, for example the Seventh Circuit found defense counsel had made a tactical decision to call a psychologist to testify that Miller "was incapable of the kind of violence that had been perpetrated against the victim."  255 F.3d at 458.  There was no "coherent reason" for the tactic "given the inevitability of the destruction of the psychologist and of Miller himself if the jury was told about the prior convictions," which occurred during cross-examination.  *Ibid.* This Court should similarly find there was no coherent reason for Mr. Barrett's defense counsel to call Chuck Choney to the stand given the inevitability that he would change his testimony to harm the defense.  Whatever counsel hoped to accomplish, the risk to Mr. Barrett was too great given that it was entirely avoidable, and an independent expert who could have offered favorable testimony had already been approved by the court.

Similarly in *Skaggs v. Parker*, 235 F.3d 261 (6th Cir. 2000), the court found defense counsel acted unreasonably when he decided to recall a mental health expert at a second trial after the expert's testimony at the first trial had been "rambling, confusing, and, at times, incoherent to the point of being comical." 235 F.3d at 264. The court found defense counsel acted unreasonably in part because, like Mr. Barrett's counsel, they waited until "the eleventh hour" to prepare for the second penalty trial. *Id.* at 270. The court continued, "Counsel's decision to call [the expert] at the retrial of the penalty phase, despite their belief that [his] testimony could realistically be more harmful than helpful, simply because counsel believed it would not be worth their time to request additional money from the court, cannot be deemed to have been a reasonable exercise of professional judgment." *Id.* at 270. In Mr. Barrett's case, the issue is not the competence of the witness *per se* but the witness's telling defense counsel that he would, if he could, harm the defense case. Here, defense counsel lacked even the unreasonable excuse proffered in *Skaggs,* because the trial court had authorized counsel to retain another expert. *See also Sechrest v. Ignacio*, 549 F.3d 789 (9th Cir. 2008) (ineffective assistance found for allowing pro-prosecution witness to testify where a defense witness was standing by).

> Defense attorneys, we recognize, are not obligated to shop for "the 'best' experts" who will testify in the most advantageous way possible. *Reynolds v. Bagley*, 498 F.3d 549, 557 (6th Cir.2007). But it is unreasonable, after an incomplete investigation, to put an expert on the stand who will "directly contradict[ ] the sole defense theory" and "render worthless" other helpful testimony. *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir.2000).

*Johnson v. Bagley*, 544 F.3d 592, 605 (6th Cir. 2008). *See also, Akwal v. Mitchell,* 559 F.3d 456, 464-68 (6th Cir. 2009)(where accused's defense was insanity, counsel ineffective for calling expert who testified defendant was sane at the time of the commission of the offense); *id.* at 466 ("presenting an expert witness whose testimony plainly contradicts and utterly destroys an individual's sole defense constitutes deficient performance by counsel"); *Combs v. Coyle,* 205

F.3d 269, 288 (6th Cir. 2000)(counsel ineffective for relying on expert witness who undermined defense).

### 2.      *The Failure to Impeach and Present Percipient Witness Testimony*

The failure to secure expert testimony to contradict the Government's theory was compounded by trial counsel's failure to impeach the version of events given by Government witnesses with the prior state trial testimonies of the Government witnesses and the testimony of reliable eyewitnesses whose testimony rebutting the Government's recent version of events was readily available. *See* Claims 2A.9 (Doc 95 at 143-149); 2A.10 (Doc 95 at 149-154). The extensive record details of the factual bases for the claims is incorporated as if fully set forth herein. In general, prior to the federal trial, there had been two state trials in which witnesses had testified. Government witnesses had testified significantly differently at the state trials on the critical issues of (1) Mr. Barrett's knowledge that the onslaught of aggressive activity in the middle of the night was a police action and (2) who actually initiated the gunfire. Had trial counsel insisted on securing the prior transcripts and compared the testimonies of the Government witnesses, including Trooper Poe, Greninger and Hamilton and most importantly Clint Johnson, the Government's version of events would have been shown to be what it was – a concoction fabricated to avoid the same result as the state court trial.

Even more inexplicably, trial counsel did not call two eyewitnesses, Toby Barrett and Alvin Hahn, to rebut the law enforcement accounts of the raid. *See* Doc. 95 at 149-154. Toby Barrett, a witness relied upon by the State, raised reasonable doubts at the state court trial about the Government's version of events regarding the raid, including the prosecutor's argument that Mr. Barrett had an opportunity to observe the scene, see police lights and form the intent to kill before the shooting started. (R. 4299-4302.) Similarly, counsel failed to call Mr. Barrett's

neighbor, Alvin Hahn, to support the defense theory that the police assault occurred without indication that they were law enforcement, giving Mr. Barrett reason to believe he was being attacked by unknown trespassers. (Exhibit 75.)

Trial counsel's omissions of these known witnesses were unreasonable and prejudicial. In *Ramonez v. Berghuis*, 490 F.3d 482 (6th Cir. 2007), the court held the result of the trial was unreliable because the defense attorneys had failed to interview and present testimony from percipient witnesses who would have corroborated the defendant's account of events and supported acquittal.

In *Goodman v. Bertrand*, 467 F.3d 1022 (6th Cir. 2006), the court vacated the petitioner's conviction based on the cumulative effect of a few deficiencies in counsel's performance. Of significance here, defense counsel failed to call as a witness an individual who had testified in a previous trial on the same charge. In the prior trial, the witness failed to identify the defendant as the perpetrator. That trial ended in a hung jury. 467 F.3d at 1024. The court found it was unreasonable for the defense not to call the witness, although defense counsel defended the decision not to subpoena her because he believed the government would call her. Similarly here, the prosecution had called Toby Barrett and Alvin Hahn in the state trials. "There is little tactical wisdom in counsel resting on his hands and assuming the government would help make the defense case for him." 467 F.3d at 1029.

The testimony of Toby Barrett and Alvin Hahn would have conflicted sharply with the accounts of the Government's witnesses, and provided jurors with evidence that Mr. Barrett did not know, in the few seconds he had to act, that the people attacking his cabin in the middle of the night were law enforcement officers. Viewed individually, and especially collectively, with all the evidence defense counsel failed to prepare and produce in the first stage of trial to counter

the Government's case, there is a reasonable likelihood of a different result had Toby Barrett and

Alvin Hahn been called as witnesses. *Strickland v. Washington,* 466 U.S. 668 (1984); *Stewart v.*

*Wolfenbarger,* 468 F.3d 338, 357, 361 (6th Cir. 2006)(counsel ineffective for failing to call

available witnesses who would have supported defense claim, specifically, in that case, an alibi

defense); *Draughton v. Dretke,* 427 F.3d 286 (5th Cir. 2005)(counsel ineffective for failing to

produce evidence supporting defense theory and in contrast to prosecution testimony on how

shooting occurred); *Cargle v. Mullin,* 317 F.3d 1196, 1120-22 (10th Cir. 2003)(counsel found

ineffective, among other reasons, for failing to call available witnesses to contradict testimony of

prosecution witnesses, and prosecution's theory as to how homicides were committed).

### 3.   The Failure to Attack the Inference that Mr. Barrett was Aware of a Warrant

In Part A(11) of Ground 2, Mr. Barrett describes the abundant evidence defense counsel

could have presented showing that he lacked knowledge of a bench warrant for failing to appear

for trial. Defense counsel's presentation of the bail bondsman at the penalty phase demonstrates

that counsel were aware that doubts could be raised about the issue of notice. Their failure to

investigate is materially indistinguishable from the circumstances of *Rompilla v. Beard*, *supra*.

The Court found one "obvious reason that the failure to examine Rompilla's prior conviction file

fell below the level of reasonable performance" was that counsel was aware the prior would be

used in aggravation. 545 U.S. at 383. "It [was] also undisputed that the prior conviction file was

a public document" available at the local courthouse. *Id.* at 384.

> With every effort to view the facts as a defense lawyer would have done at the
> time, it is difficult to see how counsel could have failed to realize that without
> examining the readily available file they were seriously compromising their
> opportunity to respond to a case for aggravation.

*Id.* at 385.

In Mr. Barrett's case the obviousness of the need to investigate was even greater.  The alleged failure to appear was the *sine qua non* of the entire case.  Yet defense counsel (a) failed to review the court records for January 25, 1999, the day of the supposed trial, and (b) failed to recognize that the warrant had been "issued" by a deputy clerk in violation of state law.

The available evidence defense counsel unreasonably failed to investigate shows the following, *inter alia*:

- Court records showed reason to believe Mr. Barrett had no reason to go to court in January 25 because the trial was not scheduled to occur, no jurors were summoned, and he was without counsel;

- The state court had found the District Attorney had not sought an arrest warrant, and the warrant had "issued" illegally under state law for that reason and because it was signed only by a deputy clerk;

- That Mr. Barrett's counsel on the charge had obtained an offer for him to plead guilty and receive no jail time;

- There was no official evidence of notice of the failure to appear and no record, such as a certified mail receipt, that notice had been received;

- That Mr. Barrett's attorney in that case had been upset with him and had cut off communication.

*See generally* Exhs. 31 and 182, and transcripts cited on pages 155-58 of the Second Amended § 2255 Motion.

In addition, defense counsel failed call a neighbor of Mr. Barrett's who would have testified that approximately three weeks before the raid, law enforcement officers visited Mr. Barrett's cabin, inspected his weapon, and left without either arresting him or mentioning a

warrant. ( Exh. 85.)  Sheriff Phipot also has told Mr. Barrett's investigator that he was present in late 1998 for a similar incident on the property.  (Exh. 108.)  Had defense counsel interviewed Mr. Barrett's family they would have testified, consistent with Dr. Kirkham, that the raid was foolish and unnecessary as Mr. Barrett could have been arrested without confrontation or violence.  (Exhs. 91, 93, 97.)

Cumulatively or individually, the evidence available but unpresented would have given jurors at least reasonable doubt about the Government's circumstantial theory, of notice and intent.  Defense counsel's failure to subject that theory to the available means of adversarial testing was a failure to function as counsel guaranteed by the Sixth Amendment.

At a minimum, the files and records do not conclusively show that Mr. Barrett is entitled to no relief.  Other jurors, presented with impeachment of the Government's theory acquitted Mr. Barrett of intentional murder.  This Court must either vacate the judgments of conviction and sentence, or schedule an evidentiary hearing at such time that counsel may complete their investigation.  R. Gov. § 2255 Proc. 8(c).

**Ground 2, Part A (11).** **Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony.  Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.**

Mr. Barrett's trial counsel unreasonably failed to challenge the Government's use of irrelevant and prejudicial testimony of James H. Horn, a so-called expert in the area of "traumatic stress."  (R. 849.)  Trial counsel allowed the jury to hear Horn's testimony over a period of two days, failed to timely move to strike that testimony, and when the court did finally strike the testimony, failed to obtain an adequate curative instruction, or to move for a mistrial.  The facts

supporting the claim are set out extensively in the Amended Petition and fully incorporated herein.  (Doc. 95 at 163-176.)

Horn testified extensively before the jury without challenge from defense counsel, who elicited details of how law enforcement officers should be treated after a traumatic incident, and permitted Horn to establish that his work was not "interested in critiquing and facts, but in helping [officers] resolve their emotional response to these incidents."  Though the Court eventually struck the testimony (R. 1636), and instructed the jury not to consider the extensive testimony (R. 1740), it was too little too late.  Trial counsel's failure to aggressively seek an affirmative order striking the testimony and/or a mistrial was constitutionally indefensible.  Absent this error Petitioner probably would not have been convicted or, at a minimum, sentenced to death.

Horn's testimony was inadmissible under Fed. R. Evid. 702.  The fact was equally clear on the basis of the two state trial transcripts.   The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), charged trial judges with the "gatekeeper" function of excluding unreliable expert testimony and ensuring that the proposed testimony will assist the trier of fact in understanding or determining a fact in issue. To do so, first, the trial court must ensure that the evidence is reliable.  *Id.* at 592.  Second, the court must ensure that the evidence will assist the trier of fact and is thus relevant.  *Id.  Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999) further held that the principles enunciated in *Daubert* applied to all expert testimony, not merely scientific evidence.

Counsel were also ineffective for failing initially to challenge Horn's qualifications and the admissibility of his testimony despite ample opportunity to prepare for a challenge to Mr. Horn.  Defense counsel were also ineffective for failing to challenge Horn's testimony because it

was not helpful to the trier of fact.  The unopposed admission of his testimony, and counsel's

eventual need to have it stricken were "the result of inattention, not reasoned strategic judgment."

*Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005) (internal citation omitted) (counsel ineffective

for failure to review readily available court file concerning previous conviction).  Defense

counsel appear to have had no real strategy concerning Horn's testimony.  They conceded

admissibility, and reconsidered only when the court ruled the testimony inadmissible and

suggested moving to strike it.

Defense counsel's apparent acceptance without question of a privileged relationship

between Horn and the officers he was debriefing was insupportable.  While the federal courts are

authorized to define new privileges, and the "recognition of a privilege based on a confidential

relationship should be determined on a case-by-case basis," *Jaffee v. Redmond*, 518 U.S. 1, 5-7

(1996) (recognizing privilege in communications with licensed social worker), no "traumatic

stress debriefing" privilege has yet emerged, and counsel did not raise or argue Mr. Barrett's

right to effective representation through full discovery and cross-examination informed by

knowledge of what was said at the debriefings.[50]  Thus, counsel's ineffective performance in

accepting at face value Horn's claim of confidentiality spilled over into their cross-examination

of the tactical team officers.

Not only did counsel lack information from the debriefings with which to cross-examine,

but they also overlooked the critical fact that the group sessions were, in effect, a pre-emptive

---

[50]Strong policy arguments would militate against allowing law enforcement to conceal such debriefings on privilege grounds.  To do so would create the temptation to hold debriefings in every controversial case in order to chill defense counsel's ability to cross-examine effectively about the possibility of contamination of witnesses.  Moreover, since the officers in this case effectively waived any privilege by testifying as to the facts of the incident, shielding them from inquiry into earlier and possibly inconsistent statements would be decidedly unfair.

Petitioner's Merits Brief                    94                    *Barrett v. U.S.*, 09-cv-105-JHP

violation of Fed. R. Evid. 615:  an untrammeled opportunity for the officers to learn in advance what other officers would say and, consciously or unconsciously, adopt other officers' perspectives on the incident.  Defense counsel also did not question the narrative technique adopted by some of the officers, of speaking in the present tense - a recognized therapeutic technique in trauma counseling - when describing what they said had taken place.[51]  This not only suggested an unusual degree of synchronicity in the officer's testimony, but rendered it more powerful than a normal past-tense narrative.

Regardless of the court's instruction, Horn's testimony should not have been admitted and was highly prejudicial.  It was the court that recognized Horn had nothing legitimate to offer, hence the fact that his testimony was stricken.  This testimony must have had a tremendous impact on the jury, and the court's instruction to disregard it was an exercise in futility.

Horn's connection with the FBI alone would have been perceived by the jury as lending weight to what he said.  Another court, in holding that the testimony of a member of the FBI's Behavioral Analysis Unit failed to satisfy *Daubert*, noted: "In light of ... the considerable authority and even mystique in which these experts are cloaked due to their status within the FBI, it is essential to establish the reliability of such expert testimony."  *United States v. Thomas*, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266 at * 90-94 (D.Md. January 13, 2006) (criticizing unreliability, lack of proven methodology and circular reasoning of agent's testimony).

This was not a case where an isolated and fleeting reference to an improper matter would have been easily cured.  It is normally presumed "that a jury will follow an instruction to disregard inadmissible evidence *unless* there is an overwhelming probability that the jury will be

---

[51]  *See* David H. Barlow, *Clinical Handbook of Psychological Disorders, Third Edition: A Step-by-Step Treatment Manual*, 71, Guilford Press (2001).

Petitioner's Merits Brief                     95                     *Barrett v. U.S.*, 09-cv-105-JHP

unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n. 8 (1987) (internal quotation marks and citations omitted) (emphasis added); *Patton v. Mullin*, 425 F.3d 788, 800 (10th Cir. 2005) (single reference to defendant as an "ex-con" cured by instruction to disregard). The probability that the court's instruction prevented the jury from considering Horn's testimony in the ways stated herein is overwhelmingly small. Horn's testimony stretched out over two days, and the supposedly curative instruction given by the court was late in coming.

Horn's testimony concluded on October 4, 2005, but the jury was not instructed to disregard it until three days later, on October 7, 2005. This delay can only have allowed the evidence to sink into the jury's consciousness. By contrast, in *United States v. Joe*, 8 F.3d 1488, 1498 (10th Cir. 1993), an erroneous reference to the defendant's prior incarceration was a "single isolated occurrence in the context of a larger explanation and the trial judge gave an immediate curative instruction." Consequently, reversal was not required. In this case, the nonchalant instruction downplayed its own importance and cannot be said to have effectively admonished the jury.

Notably, this was a case where the prosecution evidence had previously failed to convince two state court juries to convict Mr. Barrett of either first or second degree murder. It can therefore be readily concluded that the evidence was otherwise "not overwhelming" and that the impact of Horn's testimony on the jury requires a new trial. *See United States v. Sands*, 899 F.2d 912 (10th Cir. 1990) (new trial warranted where it cannot be said with reasonable certainty that the improper reference "had but very slight effect on the verdict of the jury").

As alleged in the Amended Petition, Doc. 95 at 176, there was no disadvantage to requesting mistrial and therefore no strategic reasons for failing to make the motion. Counsel's

Petitioner's Merits Brief 96 *Barrett v. U.S.*, 09-cv-105-JHP

failure to move for a mistrial clearly demonstrated deficient performance.  In a similar situation, where counsel only realized during the testimony of a government witness that his client's statement had been given after he had already invoked his rights, a trial court suppressed the statement.  However, only a cautionary instruction was given and counsel did not move for a mistrial.  *United States v. Ramsey*, 323 F.Supp.2d 27, 33  (D.D.C.  2004).  Counsel's performance was held to be deficient in the circumstances of that case, where "any reasonable defense lawyer would have jumped at the chance to start the trial afresh."  *Id*. at 37.  Given Mr. Barrett's counsel's lack of preparedness, their failure to even attempt to obtain a mistrial defies explanation.  *See also Martin v. Grosshans*, 424 F.3d 588, 591-92 (7th Cir. 2005) (trial counsel ineffective for failing to move for mistrial after prosecutor's inflammatory closing argument); *Freeman v. Class*, 95 F.3d 639 (8th Cir. 1996) (counsel ineffective for failing to move for mistrial after repeated references to defendant's exercise of right to remain silent); *Crowe v. Sanders*, 864 F.2d 430 (6th Cir. 1989) (counsel ineffective for failing to seek mistrial after court gave improper parole instructions); *Snowden v. Singleterry,* 135 F.3d 732, 738 (11th Cir. 1998) (counsel ineffective for failing to object to bogus "expert" testimony).

      **Ground 2, Part A (12).**      **The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions**.

Trial counsel's task in representing a criminal defendant is to giveg the jury a way to find reasonable doubt.  In this respect, closing argument is an indispensable aspect of the defense function.  *Herring v. New York*, 422 U.S. 853 (1975); *Gardner v. Florida*, 430 U.S. 349, 360 (1977).  However, the defense lawyer also must request jury instructions that frame the issues and enable the jury to give effect to the defense's theories.  Absent such instruction, defense evidence may not be given appropriate effect.

Mr. Barrett's trial counsel unreasonably failed to seek instructions that would have given the jury a way to give effect to the defense evidence and argument. The instructions trial counsel unreasonably failed to seek include an instruction on informant witness credibility, an instruction on drug-addict witness credibility, an instruction on self-defense, instructions on the theory of the defense, and instructions on lesser-included offenses.

The prosecution relied heavily on the testimony of seven informant witnesses. These witnesses, as the prosecutor has conceded, were critical to distinguishing the prosecution in this case from the two previous state-court prosecutions. Some of these witnesses acknowledged at trial, or have acknowledged since the trial, that they were involved in illegal activities before, during, and after their testimony or the events about which they testified. These activities included illegal drug possession, use, and/or distribution, various civil violations, making false statements, weapons violations, and violations of court orders.

An attorney has a duty to conduct legal research, and be informed about, and seek from the trial court, such orders as may be available to assist in the presentation of the defense.

Courts have long given instructions that inform the jury that the testimony of an informant "'must be examined and weighed by the jury with greater care than the testimony of a witness who is not so motivated.'" *See*, *e.g.*, *United States v. Humphrey*, 208 F.3d 1190, 1206 (10th Cir. 2000). *See also United States v. Bridwell*, 583 F.2d 1135, 1142 n.6 (10th Cir. 1978). Although trial counsel argued to the jury that the informant witnesses' testimony should not be credited, counsel unreasonably failed to seek a jury instruction to the same effect.

The informant witnesses also confessed to being drug addicts, either at the time of their testimony, or at the time they allegedly perceived the "events" they described in their testimony.

Karen Real, Randy Turman, Randy Weaver, Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, and Brandie Price were all drug addicts at relevant times.

Courts have long instructed juries that the testimony of someone who is shown to have used addictive drugs during the period of time about which the witness testified must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses. One such instruction reads:

> "You should never convict any defendant upon the unsupported testimony of such
> a witness unless you believe that testimony beyond a reasonable doubt."

(Fifth Circuit Pattern Jury Instr. 1.16 (2001).)

"Criminal defendants are entitled to jury instructions upon their theory of defense provided there is evidentiary and legal support." *United States v. Visinaiz*, 428 F.3d 1300, 1308 (10th Cir.2005) (citations omitted). The defense theories were (a) that at the point in time when Mr. Barrett fired his weapon he had no indication that the vehicle speeding toward him contained law enforcement officer (R 4314), and (b) that Mr. Barrett was not engaged in drug manufacturing or distribution when the raid took place. As evidenced by the state-court verdicts, the inconsistent testimony of the law enforcement percipient witnesses in federal court, and the jury's verdict in this case, there was evidence and legal support for a theory-of-defense instruction. *Richards v. Quarterman,* 566 F.3d 553, 568-70 (5th Cir. 2009) (defense counsel was ineffective not only for failing to introduce available exculpatory evidence, but also failing to request appropriate instructions, specifically on lesser included offenses.

**Ground 2, Part A (13).**     **The outcomes of the trial and appeal are unreliable due to trial counsel's unreasonable failure to preserve a record of error, resulting in numerous meritorious claims on direct appeal being evaluated under the onerous plain error standard.**

In Ground 2, Part A(13), Mr. Barrett sets forth the factual basis for finding his defense counsel were professionally unreasonable for failing to make proper objections in order to preserve the record for appeal in violation of his Fifth Amendment due process rights, his rights to effectively confront witnesses and to the effective assistance of counsel under the Sixth Amendment, and his right to a reliable sentencing determination under the Eighth Amendment. Trial counsel's failure to timely preserve complete objections are fully set out in the Amended § 2255 Motions and in the direct appeal decision in this case *United States v. Barrett,* 469 F.3d 1079 (10th Cir. 2007).

Trial counsel's failure to make full and timely objections to each of these errors constituted ineffective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668 (1984); *Cf. Martin v. Grosshans,* 424 F.3d 588, 590-92 (7th Cir. 2005); *Cargle v. Mullin,* 317 F.3d 1196, 1220-22 (10th Cir. 2003); *Gravely v. Mills,* 87 F.3d 779, 785 (6th Cir. 1996). Analogously, in these cases, counsel were found ineffective, in whole or in part, for simply failing to object to prosecutorial misconduct. In Mr. Barrett's case, trial counsel's failures to lodge appropriate objections and to adequately preserve the record for appeal were numerous, were not a function of legitimate trial strategy, and prejudiced Mr. Barrett because the onerous "plain error" standard was applied to judging myriad meritorious issues.   Under prevailing professional norms, trial counsel had a duty to "consider all legal claims potentially available" and "thoroughly investigate the basis for each potential claim." ABA Guideline 10.8 and Commentary, 31 *Hofstra L.Rev.* 913, 1028 (2003). Trial counsel must bear in mind "the importance of protecting the client's

rights against later contentions by the government that the claim has been waived, defaulted, not exhausted or otherwise forfeited." *Id.* Once counsel has made a decision that a clam should be made, counsel has the duty to "present the claim as forcefully as possible" and "ensure that a full record is made of all legal proceedings in connection with the claim." *Id.* at 1028-29.

Each of the claims that trial counsel failed to preserve had merit. Mr. Barrett would have suffered no adverse consequences had trial counsel made timely and complete objections. Had counsel made appropriate objections, Mr. Barrett would have obtained relief from his convictions and sentence of death based on each of these errors under the appropriate de novo standard of review. Accordingly, trial counsel's failure to preserve Mr. Barrett's objections on each of these grounds fell far below the standards expected of competent counsel in capital cases.

The constitutional violations set forth above warrant the granting of § 2255 relief without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abramson,* 507 U.S. 619, 638 n. 9 (1993). Furthermore, these constitutional violations, individually or cumulatively, so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the jury's determinations of guilt and punishment, rendering them fundamentally unfair and resulting in a miscarriage of justice.

**Ground 2, Part A (14).** **Trial counsel unreasonably failed to object to numerous instances of prosecutorial misconduct in closing argument in the penalty phase of trial.**

Ground V, section C, details repeated instances of prosecutorial misconduct in questioning witnesses and in closing arguments in both the guilt/innocence and the sentencing phase. The specific instances will not be repeated but are incorporated herein by specific reference. Faced with arguments that could in no sense be termed appropriate, counsel failed

altogether to object.  The failure to object to clear prosecutorial misconduct can never be termed

a reasonable strategy.  Especially in light of the numerous, serious constitutional errors which

plagued Mr. Barrett's trial, this omission by counsel was prejudicial.  In this case, the prosecution

basically did whatever it pleased.  That abuse of the process continued unabated in second stage

closing arguments, to Mr. Barrett's clear detriment.  *E.g., Girts v. Yanai,* 501 F.3d 743, 755-58

(6th Cir. 2007); *Hodge v. Hurley,* 426 F.3d 368, 386-89 (6th Cir. 2005); *Washington v.*

*Hofbrauer,* 228 F.3d 689, 703, 709 (6th Cir. 2000); *Gravely v. Mills,* 87 F.3d 779, 785 (6th Cir.

1996) (finding counsel ineffective for failing to object to misconduct in closing arguments).

**Ground 2, Part B**

> **1.    *Deficient Performance:  Mr. Barrett's defense counsel failed to
> fulfill duties to conduct a thorough background investigation,
> consult with experts, and prepare a two-stage strategy based on
> readily available information.***

In general, the standard for evaluating an ineffective-assistance claim related to the

penalty phase of a capital trial is the same as that applied to the liability phase.[52]  However,

reviewing courts

> are particularly vigilant in guarding this right when the defendant faces a sentence
>
> of death. See *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir.1997) ("In
>
> assessing counsel's conduct, we are mindful of the Supreme Court's observation
>
> that '[o]ur duty to search for constitutional error with painstaking care is never
>
> more exacting than it is in a capital case.'") (quoting *Burger v. Kemp*, 483 U.S.
>
> 776, 785 (1987)).[53]

---

[52]  *Strickland*, 466 U.S. at 695; *Smith v. Mullin*, 379 F.3d 919, 938 (10th Cir. 2004).

[53]  *Smith*, 379 F.3d at 938-39 (parallel citations omitted).

Petitioner's Merits Brief                                     102                          *Barrett v. U.S.*, 09-cv-105-JHP

The differences between first and second-stage claims relate to the different tasks trial counsel must perform in a capital case, and the law related to a capital sentencing decision.[54] Of course, the tasks counsel must perform in order to prepare for a capital trial are, in large part, driven by the rules governing these unique proceedings. The Court of Appeals for the Tenth Circuit has summarized these duties:

> "The sentencing stage is the most critical phase of a death penalty case. Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence." *Romano v. Gibson*, 239 F.3d 1156, 1180 (10th Cir.2001). To perform adequately in a capital case, trial counsel must undertake "'to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.' " *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989) [hereinafter 1989 Guidelines] ); *see also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.7(A) (2003) [hereinafter 2003 Guidelines]. Counsel should consider, inter alia, medical history, educational history, social and family history, religious and cultural influences, and employment. *See* 2003 Guidelines 10.7, Commentary.[55]

---

[54] *Strickland*, 466 U.S. at 694-95 (determination of prejudice must be based on assumption that jurors will follow the law applicable to decision); *Smith*, at 939 (citing ABA Standards for Criminal Justice 4-1.2(c) (3d ed. 1993) ("Since the death penalty differs from other criminal penalties in its finality, defense counsel in a capital case should respond to this difference by making extraordinary efforts on behalf of the accused.")).

[55] *Anderson v. Sirmons*, 476 F.3d 1131, 1142 (10th Cir. 2007).

Mr. Barrett had a constitutionally protected right to have his trial counsel investigate, develop and present, and have the jury give effect to, mitigation evidence related to his background and character and the circumstances of the offense.[56] In order to guarantee enforcement of that right, trial counsel were expected to perform in a manner consistent with prevailing professional norms of capital defense practice, such as the norms codified in the ABA Criminal Justice Standards ("ABA Standards") and the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines").[57]

Eighth Amendment law has long recognized that mitigation evidence exists in many forms. The Supreme Court has "spoken in the most expansive terms" when describing the scope of mitigation evidence.[58] "[M]itigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value."[59] In order to identify evidence from the defendant's background or the circumstances of the crime that a juror could find has mitigating value, trial counsel have an "'obligation to conduct a thorough investigation of the defendant's background.'"[60]

---

[56] *Williams v. Taylor*, 529 U.S. 362, 393 (2000); *Eddings v. Oklahoma*, 455 U.S. 104, 113-15 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion).

[57] *Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Williams*, 529 U.S. at 396; *Smith*, 379 F.3d at 942. References to the 2003 Revised Edition of the ABA Guidelines are to 31 Hofstra L. Rev. 913 (2003) and are referenced as "ABA Guidelines" unless the 1989 Guidelines are intended.

[58] *Tennard v. Dretke*, 542 U.S. 274, 284 (2004).

[59] *Ibid.* (internal quotation marks omitted). *See also Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (decision whether to impose death sentence must be informed by "compassionate or mitigating factors stemming from the diverse frailties of humankind").

[60] *Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447, 452-53 (2009), quoting *Williams*, 529 U.S. at 396; *Wiggins*, 539 U.S. at 522 (same). *See also* ABA Guideline 10.7 (Investigation); ABA Guidelines, 31 Hofstra L. Rev. at 925 ("providing quality representation in capital cases requires counsel to undertake correspondingly broad investigation and preparation").

Petitioner's Merits Brief      104      *Barrett v. U.S.*, 09-cv-105-JHP

A central goal for this investigation is finding evidence that humanizes the defendant and provides an explanation for the crime.[61]  Both court decisions and codified norms of capital defense practice recognize the need for defense counsel to begin the mitigation investigation early.[62]  The ABA Guidelines, for example, recognize the importance of gaining sufficient trust with the defendant and his family that they will understand and cooperate with an investigation that presupposes the possibility of a conviction, and that is likely to involve highly personal and painful parts of the family's history.[63]

Prevailing professional norms called upon Mr. Barrett's defense counsel to speak with

> [w]itnesses familiar with [and obtain] evidence relating to the client's life and development from conception to the time of sentencing, that would be explanatory of the offense . . ., would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death.[64]

Because the entire process of investigation will take time, codified norms of capital defense practice have long recognized the need for counsel to start early and be persistent.[65]

Strategic concerns also recommend prompt investigation due to the need for counsel to have sufficient information far enough in advance of trial to develop a consistent strategy for the

---

[61] *Smith*, 379 F.3d at 943.

[62] *Anderson, supra*, 476 F.3d at 1143 (defense counsel's performance deficient where "penalty phase investigator[] spent only twenty-three hours in substantive investigation, all of which was undertaken in the month before trial"; citing ABA Guideline 10.7 and commentary); *Allen v. Woodford*, 395 F.3d 979, 1001-02 (9th Cir. 2005) (finding deficient performance based on defense counsel's delay in investigating potential mitigation until after guilt phase and finding "legal experts agree that preparation for the sentencing phase of a capital case should begin early and even inform preparation for a trial's guilt phase"); ABA Guidelines, 31 Hofstra L. Rev. at 925.

[63]  ABA Guideline 10.7, Commentary, 31 Hofstra L. Rev. at 1024 ("Counsel should bear in mind that much of the information that must be elicited for the sentencing phase investigation is very personal and may be extremely difficult for the client to discuss.").

[64]  ABA Guideline 10.11(F)(1).

[65]  *Ibid.*; *id.*, 31 Hofstra L. Rev. at 925-26.

first and second stages.[66]  In order to complete a thorough background investigation it is routine for defense counsel to retain a mitigation specialist, an investigator with knowledge of the types of information considered mitigating and with the training or experience needed to gather this sometimes difficult information.[67]  The team, including the mitigation specialist, should be assembled "[a]s soon as possible."[68]

In Mr. Barrett's case, the observations of witnesses and even the trial record shows trial defense counsel unreasonably delayed an investigation of Mr. Barrett's background, never conducted a thorough investigation, and never learned enough about the available mitigation evidence to have made reasonable decisions about strategy.[69]  The evidence proffered with the Amended Motions shows the following with regard to counsel's duty to conduct a prompt and thorough background investigation:

---

[66]  ABA Guideline 10.10.1 ("Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies."); 31 Hofstra L. Rev. at 926; Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L.Rev. 299, 320, 324 (1983).

[67]  ABA Guidelines 4.1(A)(2) and 10.7.

[68]  ABA Guideline 10.4(C).

[69]  It is well-established that defense counsel cannot make reasonable strategic decisions without first conducting an investigation into strategic alternatives.  *Wiggins*, 539 U.S. at 523 (where alleged deficiency relates to investigation court will "focus on whether the investigation . . . *was itself reasonable*") (emphasis in original); *see also*, *Strickland*, 466 U.S. at 691; *Anderson*, 476 F. 3d at 1145-46 (citing  *Hooper v. Mullin*, 314 F.3d 1162, 1170-71 (10th Cir.2002) (failure to pursue reasonable avenues of investigation without any idea of what the investigation might reveal was not an informed strategic decision and required relief from sentence of death); *Pavel v. Hollins*, 261 F.3d 210, 218 n. 11 (2d Cir. 2001) (collecting cases and discussing how decisions made in ignorance of relevant facts and law cannot be characterized as strategic under *Strickland*); *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990) ("Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum."); *Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987) (noting that the "usual deference to tactical decisions is not relevant" when the decisions are based on "information that was faulty because of ... ineffective investigatory steps")).

- According to computer records and a motion to continue the trial, during the time lead trial counsel Roger Hilfiger was co-counsel with John Echols, he did not access the records of the state court trials or the files of the defense investigation of those files (Exh. 34 at p. 3);

- In court filings in February 2005, Mr. Echols advised that a prior effort to develop mitigation evidence was cut short after being conducted by a novice mitigation investigator who refused to prepare a report, and that the materials gathered by the investigator were in the possession of Steve Leedy (Exh. 64 at p. 2, 4; Doc. 113);

- In March 2005 the trial court found the services of a mitigation specialist were reasonably necessary to the defense and authorized trial counsel to use the services of Inquisitor, Inc. (Doc. 97);

- In late May 2005, after being made lead counsel, trial counsel informed the court that he was unfamiliar with the records accumulated by prior counsel during the state-court proceedings, and that he was obtaining them;

- By the end of June 2005 with the trial approximately six weeks away, trial counsel was only searching for a mitigation specialist (Exh. 67 at p. 3);

- In mid-August 2005 trial counsel asked Dr. Jeanne Russell to serve as a mitigation investigator, but she declined in part due to the lateness of the request (Exh. 56 at p. 2-3,);

- On September 9, 2005, trial counsel advised the court that they had contacted Mr. Barrett's prior counsel because they had been able to find "very little mitigation" in the materials they had received from state-court counsel (Tr. 9/9/05 Hr'g at 43,);[70]

---

[70] In *Johnson v. Bagley*, 544 F.3d at 600, the Sixth Circuit found trial counsel had been ineffective in part because they, like counsel here, had relied exclusively on inexperienced mitigation investigators who did an incomplete job.

- Trial counsel never retrieved the files of the mitigation investigator that were in the possession of Steve Leedy (Exh. 111 at p. 2), and did not confer with the attorney who had responsibility for presenting any second-stage evidence at the second state court trial (Exh. 82.);

- Trial counsel never contacted Inquisitor, Inc., the mitigation specialist the court authorized him to retain (Exh. 66.);

- Although trial counsel were aware that many family members and friends of Mr. Barrett lived nearby, no one from the defense interviewed them regarding Mr. Barrett's background or other mitigating factors (*see*, *e.g.*, Exhs. 37, 77, 78, 80, 81, 83, 84, 85, 86, 90, 95, and 96.)

It is not simply that a lawyer should conduct a mitigation investigation because prevailing professional norms say he should, or because the Supreme Court had reiterated this requirement three times shortly before Mr. Barrett's trial.[71] Nor is it merely that the Supreme Court, for nearly two decades before this trial, had reminded defense counsel that mitigation is important due to the "'belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse.'"[72] Nor was it necessary for Mr. Barrett's counsel to conduct a thorough background investigation solely because empirical evidence available to counsel and broadly cited and relied upon by courts and practitioners put trial counsel on notice that evidence of family dysfunction and mental illness were cited by jurors in

---

[71] *Rompilla*, *supra* (June 2005); *Wiggins*, *supra* (2002); *Williams*, *supra* (2000).

[72] *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring).

studies as reasons to vote for a sentence less than death.[73]  While the presence of each of these

factors is sufficient to compel a finding of deficient performance in this case, the evidence shows

trial counsel were aware that mitigation evidence was obtainable upon reasonable investigation,

and that the trial court found such an investigation was reasonably necessary.

This Court must "reconstruct the circumstances of counsel's challenged conduct, and . . .

evaluate the conduct from counsel's perspective at the time."[74]  The trial record reflects counsel

saw that mitigation evidence from Mr. Barrett's family would be valuable.[75]  The records and

reports of prior investigators available to trial counsel showed that Mr. Barrett came from a

broken home, that he had attempted suicide, that he had been diagnosed with and involuntarily

treated for Bipolar Disorder, that a prior forensic evaluation and statements of witnesses cited

evidence of paranoia and a mood disorder, Attention Deficit/Hyperactivity Disorder ("ADHD"),

---

[73] *See Smith*, *supra*, 379 F.3d at 942; *Brewer v. Aiken*, 935 F.2d 850, 862 (7th Cir.1991) (Easterbrook, J., concurring).

[74] *Strickland*, 466 U.S. at 689.  This requirement means both that the Court may not impose unreasonable expectations based on hindsight, *ibid.*, and that it is inappropriate to consider post-hoc rationalizations for counsel's challenged conduct.  *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990), citing *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986).  *See Wiggins*, *supra*, 539 U.S. at 526-27 (rejecting theory proffered by government because it "resembles more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing"); *United States v. Burrows*, 872 F.2d 915, 918 (9th Cir. 1989) (holding district court committed reversible error by assuming trial counsel made a strategic decision although there was no evidentiary support for the assumption); *Brown v. Sternes*, 304 F.3d 677, 691 (7th Cir. 2002) ("it is not the role of a reviewing court to engage in a *post hoc* rationalization for an attorney's actions . . . or engage in Monday morning quarterbacking"); *Moore v. Johnson*, 194 F.3d 586, 604  (5th Cir. 1999) ("Court is . . . not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all"); *Griffin v. Warden, Maryland Correctional Adjustment Center*, 970 F.2d 1355, 1358 (4th Cir. 1992) (citing *Strickland* and *Kimmelman* for proposition that "courts should not conjure up tactical decisions an attorney could have made, but plainly did not"); *Patton v. State*, 784 So.2d 380, 387 (Fla. 2000) (same as *Burrows*).

[75]  Trial counsel's opening statement at the penalty phase promised the jury "some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999."  Vol. 24 at 4704.

Petitioner's Merits Brief                          109                    *Barrett v. U.S.*, 09-cv-105-JHP

and other mental health problems affecting information processing and impulse control, especially under stress.  Yet, as shown in the evidence summarized *supra*, defense counsel delayed for approximately nine months any investigation, then only made half-hearted efforts to obtain records of a previous investigation that they were on notice was incomplete.  When defense counsel realized their predicament, they indicated to an Assistant Federal Defender and a psychologist that they wanted to conduct a mitigation investigation, only to learn it was too late. It was unreasonable for Mr. Barrett's defense counsel not to follow the leads that were available to them.[76]

A simple comparison between the personal history of Mr. Barrett presented at trial and that presented through records and witness declarations in the Amended Petition, plus the witnesses' statements that they were not contacted by trial counsel, or were only superficially interviewed, shows trial counsel's preparation for the penalty phase was objectively unreasonable.[77]  Trial counsel presented testimony from  seven members of Mr. Barrett's family: Kathy Trotter (cousin), Abby Stites (ex-wife), Steven Barrett (brother), Roger Crawford (uncle by marriage), Gelene Dotson (mother), Ernest Barrett (father), and Doris Barrett (step mother).

---

[76] *See Wiggins*, 539 U.S. at 526-27 (finding trial counsel unreasonably failed to follow lead related to defendant suffering childhood sexual abuse despite extent of other mitigation investigation); *Johnson v. Bagley*, 544 F.3d 592,605-606 (6th Cir. 2008) (trial counsel failed to conduct reasonable family background investigation despite interviewing and presenting at least one family member); *Mason v. Mitchell*, 543 F.3d 766, 768 (6th Cir. 2008) (trial counsel ineffective where conducted only limited background investigation).

[77] *See Outten v. Kearney*, 464 F.3d 401, 415-416, 418-419 (3rd Cir. 2006) (defense counsel ineffective for conducting superficial investigation and presenting six family members and friends to testify defendant was a good guy). *Compare*, *e.g.*, Vol. 24 at 4783-93 (testimony of Kathy Trotter) *with* Exh. 86; Vol. 24 at 4878-93 (direct examination of Abby Stites) *with* Exh. 103; Vol. 25 at 5030-51 (testimony of Steven Barrett) *with* Exh. 99; Vol. 25 at 5052-70 (testimony of Roger Crawford) *with* Exh. 92 at 1-2; Vol. 25 at 5071-5104 (testimony of Gelene Dotson) *with* Exh. 97); Vol. 25 at 5105-18 (testimony of Ernest Barrett) *with* Exh. 81; Vol. 25 at 5119-25 (testimony of Doris Barrett) *with* Exh. 80.

Ms. Trotter, Steve Barrett, Gelene Dotson, Ernest Barrett, and Doris Barrett report that the only work trial counsel did with them regarding the penalty phase was to speak with them for a few minutes shortly before they were called to testify.  Exh. 86 at 3; Exh. 99 at 7; Exh. 97 at 16-17; Exh. 81 at 10; Exh. 80 at 1-2.  Trial counsel did not even give Ernie Barrett or his wife a preview of the questions they would ask.  Exh. 81 at 10; Exh. 80 at 2.  Ms. Dotson and Ms. Barrett attended the trial and were available to be interviewed on many occasions.[78]  Exh. 97 at 16-17; Exh. 80 at 1.  Trial counsel on only one occasion visited Ms. Dotson's home, but failed to interview her about Kenny Barrett's background.  Exh. 97 at 16-17.  Ms. Stites reports that trial counsel did not interview her about Mr. Barrett's family history or mental health problems.  Exh. 103 at 4.  Mr. Crawford notes that although trial counsel questioned him on the witness stand about his daughter-in-law, Cindy Crawford, counsel never asked about Ms. Crawford's honesty or her troubles with the law.  Exh. 92 at 1-2.  Steven Barrett predicted that there would be questions about how he turned out different than Kenny, and even attempted to talk with trial counsel about the reasons for these differences, but trial counsel would only say they would ask him some questions.[79]  Exh. 99 at 7.

The difference the commonplace of witness interviews would have made is set forth in the section of the Amended Petition and this brief addressing the prejudice prong of *Strickland*.

---

[78]  It is objectively unreasonable for capital defense counsel to fail to interview the defendant's mother regarding potential mitigation when she is available and has information to disclose.  *See Johnson v. Bagley*, 544 F.3d 592, 600 (6th Cir. 2008) (finding "[n]o reasonable professional judgment could have supported a decision not to interview [defendant's mother]") (internal quotations and citation omitted).

[79]  The prosecution exploited trial counsel's unreasonable omission at great length, thereby furthering the misleading and incomplete image of Mr. Barrett that trial counsel presented to the jury.  *See* Vol. 25 at 5042-51.  Where defense counsel's failure to prepare witnesses for penalty phase leaves prosecution open to undermine mitigation, there is deficient performance.  *See Outten*, *supra*, 464 F.3d at 421-423 (defense counsel's failure to interview mitigation witnesses lead to prosecutor eliciting statements about defendant assaulting them).

But there is much more to trial counsel's lack of preparation.  Reasonable defense counsel would have known that a thorough investigation of the capital defendant's background, including collecting records regarding his education, medical treatment, psychiatric treatment, work history, and any criminal history is necessary for a competent assessment of mitigation by mental health experts.[80]

"Where it is apparent from evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance."[81]  With regard to defense counsel's lack of investigation into mental health issues the evidence from record and extra-record sources shows the following:

- Prior counsel and a psychologist had identified potential areas of mental health mitigation including Mr. Barrett's prior diagnoses of paranoia, a mood disorder, ADHD,

---

[80]  The failure to pursue obvious, readily available leads regarding aggravating and mitigating evidence has often been found to constitute deficient performance.  *See*, *e.g.*, *Rompilla*, 545 U.S. at 383-84 (failure to investigate file on prior conviction that was maintained in courthouse was deficient); *Williams*, 529 U.S. at 396 (deficient performance found in part because "[c]ounsel failed even to return the phone call" of a potential mitigation witness"); *Anderson*, 476 F.3d at 1143 (defense counsel's performance deficient in part for failing to gather documents related to defendant's social history, citing ABA Guideline 10.7 and commentary).

[81]  *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997).  *See also Anderson*, 476 F.3d at 1143 (noting "vital importance" of investigating possible mental health evidence for penalty phase).

The trial under review in *Hall* occurred in the mid-1980's, *Hall*, 106 F.3d at 744 (citing direct appeal opinion decided in 1986), and the trial in *Anderson* occurred in 1997, *see Anderson v. State*, 992 P.2d 409, 412 (Ok. Crim. App. 1999).  All of the trials under review in cases cited in this section of the present brief occurred long before Mr. Barrett's trial.  While it is true that the purpose of Sixth Amendment review is not to improve the standards of defense counsel, *see Strickland*, 466 U.S. at 688, it is a reflection of how far below prevailing professional norms trial counsel's performance was that they failed to undertake the most rudimentary tasks decades after their importance was so well established in practice and in law.

and organic brain impairments, and trial counsel were on notice of those results (*see*, *e.g.*, Exh. 55);

• Trial counsel were aware that evidence of brain impairment could be helpful in both stages of trial due to the circumstances of the raid, and that Mr. Barrett had "used drugs and suffered significant head injuries during his life" (Doc. 50);

• In March 2005 the trial court found the services of a psychiatrist or psychologist were reasonably necessary to the preparation of a defense (Doc. 97), but trial counsel never retained a mental health expert to evaluate Mr. Barrett;

• In mid-August 2005 trial counsel contacted Dr. Jeanne Russell, who had performed a "risk assessment" of Mr. Barrett in 2003 (Exh. 56);

• Trial counsel obtained the report of Dr. Bill Sharp, but did not speak with him (Exh. 55);

• On September 9, 2005, with the start of jury selection less than one week away, the court described the defense's preparation as "still [a] work in progress" (Tr. 9/9/05 Hr'g at 42.);

Trial counsel's failure to have Mr. Barrett evaluated by a mental health expert fell below prevailing professional norms. As the United States Attorney himself observed at the time, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation (Tr. 9/9/05 Hr'g at 38). The facts of the case, and additional information about Mr. Barrett's background were the bases for defense counsel's request to retain mental health experts to prepare for trial. Trial counsel knew, or should have known, that Mr. Barrett had come from a dysfunctional family, had sustained head injuries, used drugs known to have a negative impact on brain functions, was considered

paranoid, had attempted suicide by shooting himself in the chest with a shotgun, was involuntarily hospitalized and treated with antipsychotic medicine, was diagnosed with Bipolar Disorder and ADHD, and that the shooting occurred during a surprise attack on Mr. Barrett's property in the middle of the night with his teenage son present.  Like the United States Attorney, courts viewing less compelling cases have found deficient performance where trial counsel failed to obtain a thorough mental health assessment.[82]

Defense counsel's last-minute attempt to make use of Dr. Russell's prior assessment was unreasonable.  Defense counsel themselves maintained that Dr. Russell's risk assessment was not a mental health examination, and Dr. Russell confirms that she did not see Mr. Barrett in connection with the federal trial.  Exh. 56 at 4.  Dr. Russell did not evaluate Mr. Barrett's neuropsychological functioning or explore the presence of other psychological conditions.  *Id.* at 1-2.  Merely contacting a doctor of education, or even having an examination performed, may not be reasonable where evidence suggests more work will produce more persuasive mitigation.[83]

> **2.      *Prejudice:  The readily available mitigation evidence regarding Mr. Barrett's background, the circumstances of the offense, impeachment of the Government's intent witnesses, and Mr.***

---

[82]  *See*, *e.g.*, *Correll v. Ryan*, 539 F.3d 938, 945 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 903 (2009) (defense counsel's performance deficient where counsel knew defendant "came from a dysfunctional family, sustained a serious head injury, was committed to various psychiatric facilities, and that he was addicted to drugs; yet defense counsel did not obtain the records nor did he interview witnesses concerning these matters"); *Haliym v. Mitchell*, 492 F.3d 680, 716 (6th Cir. 2007) (defense counsel's knowledge that defendant attempted suicide by shooting himself in the temple "should have strongly suggested the need to investigate whether Petitioner had a mental defect"); *Lambright v. Schriro*, 490 F.3d 1103, 713 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 882 (2008) (finding deficient performance where defense counsel failed to conduct mental health investigation despite knowing that defendant had twice attempted suicide, been hospitalized, traumatized in Vietnam War, and used drugs).

[83]  *See*, *e.g. Rompilla*, 545 U.S. at 391 (defense counsel ineffective despite initial unhelpful assessment from mental health experts because reasonable investigation would have revealed mental health problems); *Haliym*, *supra*, 492 F.3d at 715 (trial counsel acted unreasonably by allowing only for one and one half hour evaluation of defendant by psychiatrist).

616

*Barrett's mental problems would have changed the jury's assessment of his culpability*.

Acts and omissions of counsel require a new trial when there is a reasonable probability that the outcome of the proceeding would have been more favorable to the defendant. In a capital case, this standard is met if "there is a reasonable probability that at least one juror would have struck a different balance" between aggravating and mitigating evidence at the second stage of trial.[84] Prejudice is established where "[c]ompetent counsel could have put on evidence that 'differ[ed] in a substantial way - in strength and subject matter - from the evidence actually presented at sentencing.'"[85] Stated differently, the Sixth Amendment is violated in a capital sentencing proceeding where defense counsel fails to take necessary steps to provide the jury with information that can help them understand the defendant's "unique personal circumstances"[86] and offer an explanation for his conduct.[87]

The test is not whether "a jury could have heard it all and still have decided on the death penalty." *Rompilla*, 545 U.S. at 393. It is whether the totality of the mitigation evidence "might well have influenced the jury's appraisal of [the defendant's] culpability." *Williams*, 529 U.S. at 398.

As the Tenth Circuit stated in *Anderson*, *supra*, defense counsel are expected to recognize the importance of the penalty phase, and prepare accordingly. The verdict from the second state court trial – which specifically rejected a finding that Mr. Barrett had an intent to kill – put Mr. Barrett's counsel on notice that rebutting evidence of intent was possible. As shown in the

---

[84]   *Wiggins*, 539 U.S. at 537.

[85]   *Johnson v. Bagley*, 544 F.3d at 603 (quoting *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir.2005)) .

[86]   *Williams*, 529 U.S. at 415-416.

[87]   *Smith v. Mullin*, 379 F.3d at 929, 943.

Petitioner's Merits Brief                              115                              *Barrett v. U.S.*, 09-cv-105-JHP

preceding sections of this Brief, Mr. Barrett's defense counsel unreasonably failed to investigate and present readily available evidence to rebut the Government's theory of intent in the following ways:

•       Court records and witness statements showing the seven key witnesses the government relied upon to establish intent could have been impeached because they (a) were liars; (b) were career criminals; (c) were testifying in exchange for implied or explicit promises of compensation or threats of retaliation; (d) were actively using narcotics either at the time they allegedly perceived the events described in their testimony, or at the time of their testimony, or both; (e) testified falsely, and/or (f) were discouraged from communicating with Mr. Barrett's counsel, or refused to be questioned before their testimony;[88]

•       Expert testimony and cross-examination would have shown that the government's "expert" reconstructionist used unreliable methods and could not have provided any reliable opinion regarding Mr. Barrett's view of events;[89]

•       Expert testimony and cross-examination of government witnesses showing that the raiding team used unorthodox methods and failed to follow standard practices in ways that made it extremely unlikely Mr. Barrett would recognize his attackers as law enforcement officers;[90]

---

[88] *See* evidence described in Ground 2, Part A(4) and the exhibits thereto.

[89] *See* evidence described in Ground 2, Part A(6) and the exhibits thereto, especially Exhibit 109, the report of Edward E. Heuske who, like other experts was found to be reasonably necessary to the defense, but was not retained until post-conviction.

[90] *See* evidence described in Ground 2, Part A(7) and the exhibits thereto, especially Exhibit 44, the report of George Kirkham, Ph.D., another expert the court found was reasonably necessary to the defense, but who was not retained until post-conviction.

- The prior inconsistent statements of members of the raiding team showing further reason to doubt that Mr. Barrett recognized his attackers were law enforcement officers;[91]

- Testimony of percipient witnesses Toby Barrett, Bubba Thompson, and Alvin Hahn who would have testified (a) that the sign on Mr. Barrett's gate had nothing to do with law enforcement; (b) that Trooper Hamilton's claim about the condition of the gate at the time of the drive-by was false; (c) that there were no police lights visible at the start of the shooting; (d) that Toby's cry of alarm was the first indication Mr. Barrett had of the raid; (e) that Mr. Barrett only had a split second view of the scene before he went inside; (f) and that there was only one car with its lights on visible within 15 seconds of the shooting;[92]

- Court records, the files of Mr. Barrett's attorney on the state drugs charge, and witness statements were available to show (a) that there was no trial scheduled for the day Mr. Barrett supposedly failed to appear, (b) that there is neither an official record nor any evidence in counsel's file that Mr. Barrett either knew of the court date or the warrant, (c) that Mr. Barrett had been offered a plea settlement that would have given him no rational reason to avoid court, (d) and that law enforcement officers had recently been to Mr. Barrett's home to inspect his weapons and left without incident.[93]

That the jury rejected the "future dangerousness" aggravating circumstance when the government offered the evidence impeached in the foregoing points demonstrates that even with

---

[91] *See* evidence described in Ground 2, Part A(8).

[92] *See* evidence described in Ground 2, Part A(9), and the exhibits thereto including the declarations of Toby Barrett (Exh. 96), Robert Thompson (Exh. 37), and Alvin Hahn (Exh. 75).

[93] *See* evidence described in Ground 2, Part A(10), and the exhibits thereto including Exhs. 39, 31, and 182. The record shows defense counsel believed it was important to present evidence that Mr. Barrett at least lacked notice of the trial and warrant as they presented witnesses on this issue.

Petitioner's Merits Brief                    117                    *Barrett v. U.S.*, 09-cv-105-JHP

the seven snitches, the question of intent was a close call.  It is at least reasonably probable that if defense counsel had marshaled this readily available evidence the jury would have had sufficient doubts about Mr. Barrett's intentions to vote for a sentence less than death.[94]

If Mr. Barrett's defense counsel had conducted the "requisite, diligent investigation into his client's troubling background and unique personal circumstances,"[95] the jury would have heard extensive mitigation evidence that, at a minimum, creates a reasonable probability of changing the balance for at least one juror.  The available evidence, described in detail on pages 195 through 230 of the Second Amended § 2255 Motion, and the exhibits cited therein, shows the following:

- Mr. Barrett lived, and was attacked on, land given him by his grandfather;

- The land was precious to the family as it represented the greatest wealth they had in the world;

- Mr. Barrett's family presents an extraordinary history of and hereditary predisposition for Bipolar Disorder extending over multiple generations, in addition to other relatives with severe mental illness;

- Mr. Barrett is a descendant of Cherokees; his grandfather, who gave him the property, acquired it after a life of hard work he began after leaving an Indian orphanage to which he was sent when his own father was killed in a gunfight;

- Mr. Barrett's mother Gelene grew up in poverty, and worked hard in the fields as a child; she sometimes missed out on school, but eventually graduated high school;

---

[94] *See Anderson*, *supra*, 476 F.3d at 1146 (finding ineffective-assistance where aggravating evidence included that defendant said he wanted to "take care of" prosecution witnesses).

[95] *Williams*, 529 U.S. at 415 (O'Connor, J. concurring).

- Mr. Barrett's paternal grandfather was mentally ill and an alcoholic; he and Mr. Barrett's grandmother also lived a hard-working life in extreme poverty;

- One of Mr. Barrett's father's earliest memories is of being taken out of school to work in the fields;

- Ernie Barrett feared his father and the erratic, angry outbursts his mental illness brought on;

- Ernie, Mr. Barrett's father, responded to these feelings of powerlessness by becoming emotionally numb, and as a boy he got into many fights, even treating his younger siblings cruelly;

- Ernie once attempted to prevent his father from beating his mother and himself sustained a large scar from a blow with a metal file;

- Ernie joined the Marines, but dealt with his memories of home by drinking to excess;

- Ernie and Gelene had a stormy marriage characterized by Ernie's emotional and physical absence, excessive drinking ("a fifth at a time"), and incessant philandering;

- Mr. Barrett's mother Gelene was miserable and suffered from alcoholism;

- From the time she was pregnant with Mr. Barrett, Gelene was humiliated and embarrassed by her circumstances and dealt with it by drinking "from the moment she woke up until she went to bed";

- Unsurprisingly, Mr. Barrett's early childhood development was marked by some significant delays including attending to someone speaking or observing their hands, playing peek-a-boo, and making associations between objects and events;

- He had trouble learning to walk, drink from a cup and play pat-a-cake;

- He exhibited early signs that he might develop Bipolar Disorder, including appearing "hyperactive," crying easily, and being "emotional about things that did not matter";

- Ernie and Gelene beat Mr. Barrett with a belt and Gelene in particular verbally abused him with habitually cruel or degrading speech;

- Mr. Barrett struggled in school and attended special education classes some of the time;

- Mr. Barrett's parents separated and got back together many times, at one point separating for three years;

- On at least one occasion, Ernie assaulted Gelene;

- Ernie "[h]ardly had anything to do with [Kenny] after the divorce" and Mr. Barrett suffered tremendously from the separation from the father he idolized;

- Mr. Barrett moved from Joliet, Illinois, to New Jersey, to Oklahoma and Indiana before settling in the Sallisaw area as a teenager;

- At age 14 Kenny Barrett lost his beloved grandmother, one of the few adults who visited nothing by love on him;

- At age 17, Mr. Barrett was assaulted by Sheriff John Philpot who broke his jaw;

- By this time, family and friends noticed Mr. Barrett's paranoia and "terrible mood swings" including periods of depression that lasted for days;

- His mother taught him to self-medicate with drugs and alcohol;

- Still, he earned the affection of his co-workers and neighbors, and the love of Abby, his wife;

- Abby and Kenny's marriage was stormy and involved violence on both sides and, like his parents' marriage, involved frequent separations and reconciliations;

- During the marriage, Ernie, Abby and Mr. Barrett's cousin Brandy observed Mr. Barrett's bouts of depression and sudden changes to being "manic, always on the go and upbeat," he would work all the time;

- Abby tried to get Mr. Barrett to seek psychiatric treatment;

- Abby felt that Mr. Barrett was unable to take care of himself;

- Then Mr. Barrett tried to kill himself by shooting himself in the chest with a shotgun;

- After the suicide attempt, he saw a psychiatrist who prescribed Elavil and Ascendin, but his mood swings continued;

- In October 1986 Mr. Barrett was involuntarily committed to Eastern State Hospital "as a result of mental disorder or impairment by chronic alcoholism or drug abuse" that created an immediate risk of harm to himself or others;

- After his release from the hospital nine days later Mr. Barrett was observed to be paranoid;

- In addition to the shotgun blast to the chest, Mr. Barrett experienced numerous head injuries;

- In January 1995 Mr. Barrett was again hospitalized, and this time he was diagnosed with Bipolar Disorder and placed on Haldol; hospital staff described him as "extremely agitated," and showing a "lack of concentration" and "rapid though process" characteristic of the disorder;

- His son Toby observed that Mr. Barrett was very paranoid and scared and "could be in the best of moods one minute, then the worst";

- Gelene hoped that if Mr. Barrett lived close to her "and just worked on his cars and fixed things for people, he might be able to make it";

- But Mr. Barrett became more paranoid and more dependent on his family;

- Still, as the jury heard somewhat at trial, Mr. Barrett was a beloved family member and neighbor, known for his mechanical skills and generosity, and who never caused anyone to fear him.

If this history had been given to mental health experts, as was expected practice under prevailing professional norms, they would have identified numerous risk factors for the development of mental illness and impairment in Mr. Barrett's life.  These include multi-generational neurological impairments and affective mood disorders, as well a patterns of substance abuse, parental neglect, lack of appropriate boundaries, domestic discord, and inter-parental violence and abuse.  (Exh. 117 at ¶ 22.)  In addition to family members' moving descriptions of Mr. Barrett's struggles, experts would have explained that "neglect of the type suffered by Mr. Barrett has been found to constitute as significant a risk factor for childhood trauma as physical abuse, and one which has some of the longest term and most pernicious effects of all such early traumatic experiences."  *Id.* at ¶ 33.

As the state-court expert, Dr. Sharp had observed, Mr. Barrett shows symptoms of organic impairments due to his mother's alcohol abuse during pregnancy.  (Exh. 55; Exh. 89 at ¶ 23; Exh. 117 at ¶ 37, ¶ 44.)  From these early insults to his developing brain, Mr. Barrett moved on to head injuries at age eight or nine, being punched hard enough to break his jaw, a motorcycle accident in his early twenties, and the trauma of the shotgun blast to his chest.

Petitioner's Merits Brief         122         *Barrett v. U.S.*, 09-cv-105-JHP

This history, when considered by a competent mental health professional with appropriate testing and clinical evaluation, shows Mr. Barrett was, in September 1999, severely impaired by a combination of functional problems diagnostically described as Dysexecutive Syndrome, Bipolar Disorder, and Post Traumatic Stress Disorder. Taking into account these clinical assessments, the psychologist originally retained for the second state trial would have found that

> one could conclude that Mr. Barrett's response to the raid on his property was impulsive and not thought-out. I liken the situation to a person being surprised in the night by an unexpected phone call or alarm clock. In general, someone in those circumstances will experience some disorientation and difficulty understanding events. For someone with Mr. Barrett's mental impairments those experiences would be magnified many times over. For a normally functioning person to understand how Mr. Barrett would have experienced the assault on his property, he would have to think about his own sense of surprise or disorientation and think of that experience multiplied one thousand times over.

Exh. 55 at ¶ 24.

In making its prejudice determination, this Court also must consider the ways in which the prosecution was able to exploit defense counsel's lack of preparation for the penalty phase. As set forth in pages 243 through 247 of the Second Amended § 2255 Motion, defense counsel's inattention to developing a second stage case permitted the prosecution to portray Mr. Barrett in a false light. Now disgraced prosecutor Michael Littlefield mocked Mr. Barrett's parents for not seeing him enough and not knowing the difference between him being "hyper" and "hyped up." He exploited the fact that Mr. Barrett's son had not even testified regarding the impact an execution would have on him. He made much of the differences between Steven and Kenny Barrett, because defense counsel failed to heed Steven's concern about explaining the differences in their childhoods.

The Court also must consider the effect the undiscovered mitigation evidence would have had on the aggravating evidence. The jury rejected the idea that Mr. Barrett would present a

625

continuing threat to society.  The aggravating circumstances they found all related to the

circumstances of the offense.  The evidence discussed from Part A of Ground 2 would have

created serious doubts about the Government's portrayal of those circumstances.  And the mental

health evidence, summarized here by Dr. Woods, would have negated the aggravating

circumstances:

> Mr. Barrett's chronic PTSD had . . . become acute, faced with a new stressor.
> Acute symptoms of increased startle response, hyperreactivity, fight or flight,
> impaired judgment, and ruminative thinking, and affective dysregulation all came
> into play; and were compounded by his psychiatric disorder.
>
> [¶]      Mr. Barrett's bipolar disorder was, at this point in his life, at its most
> extreme.  He was profoundly depressed, and had been in a particularly steep
> downward spiral since his divorce.  Mr. Barrett had become increasingly
> withdrawn, by everyone's account.  He reported to me that the years from his
> divorce and the raid on his home were the darkest of his life.  He was self
> medicating more heavily than ever before.
>
> [¶]      Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid
> ideation augmented his affective dysregulation, hyperreactivity, and exaggerated
> startle response, setting the stage for his brain, with little executive functioning
> ability, to misprocess everything that was going on, to limit his ability to
> understand the input from each of these symptoms, and, eventually, to be shot
> himself multiple times and kill an officer.  It is my professional belief that Mr.
> Barrett, as a function of a mental disorder, believed his actions were right at the
> time of the police action on his property.  This distorted belief was further
> augmented by the symptoms of his bipolar disorder, his profound depression,
> isolation, impaired judgment, irritable mood, and paranoid ideation.  His belief
> that he was also doing the right thing was shaped by his hyperreactivity, a known
> stressor that was life threatening but unidentified, an exaggerated startle response
> and, again, extreme paranoia.

Exh. 117 at ¶¶ 75-77.

In sum, the mitigation evidence readily available to Mr. Barrett's defense counsel is of the

type and quantity that courts in the cases cited *supra* have consistently found to establish a

reasonable probability of jurors making a different decision at the second stage of trial.  At a

minimum, "the undiscovered mitigating evidence, taken as a whole, might well have influenced

the jury's appraisal of [this defendant's] culpability, and the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla*, 545 U.S. at 393 (internal quotation marks and citations omitted).

**Ground 3.     Mr. Barrett was Denied his Rights to Due Process and Equal Protection of the Laws, and his Right to Transcripts, Expert and Investigative Assistance under 18 U.S.C. §§ 3005 & 3006A**

In Ground 3 of his initial and Amended § 2255 Motions, Mr. Barrett seeks a new trial based on the failure of the trial court to provide him expert assistance necessary to his defense at both phases of trial.  As set forth more fully in the amended petition, the record evidence shows the trial court denied in full, delayed, or denied to such a great part as to make use ineffectual, transcripts, investigative assistance, and expert assistance that are routinely provided to defendants in federal death penalty cases.  Although the trial court found these resources were reasonably necessary to Mr. Barrett's defense, the court withheld funds necessary to make those resources useful to preparing the defense.

Due process guarantees a criminal defendant "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984); *see also Holmes v. South Carolina*, 547 U.S. 319 (2006).  Where the government proceeds against an indigent defendant, due process requires that a defendant be provided "the raw materials integral to the building of an effective defense." *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985); *see also Britt v. North Carolina*, 404 U.S. 226, 227 (1971).  As the Supreme Court noted in *Ake*, Congress attempted to guarantee to due process to defendants in federal criminal cases through "subsection (e) of the Criminal Justice Act, 18 U.S.C. § 3006A," which "provide[s] that indigent defendants shall receive the assistance of all experts 'necessary for an adequate defense.'" *Ake*, 470 U.S. at 79-80.  Reflecting the higher due process requirements of capital cases, Congress provided in 18 U.S.C.

§ 3005 that a capital "defendant shall be allowed, in his defense to make any proof that he can produce by lawful witnesses," and in § 3599 for funds for "investigative, expert, or other services [that] are reasonably necessary for the representation of the defendant."

In deciding whether the denial of investigative or expert assistance violated due process, the Court of Appeals for the Tenth Circuit follows the three-part test the Supreme Court applied in *Ake*: (1) the effect on Mr. Barrett's private interest in the accuracy of the trial if the requested service is not provided; (2) the burden on the government's interest if the service is provided; and (3) the probable value of the additional service and the risk of error in the proceeding if such assistance is not offered. *United States v. Kennedy*, 64 F.3d 1465, 1473 (10th Cir. 1995).

In the sections that follow, we will address the second and third of these factors as to each deprivation with the exception of the transcripts which the Supreme Court has held are presumptively necessary to preparing a defense, particularly where prosecution witnesses' prior testimony will be offered. As to each deprivation, however, the private interest at stake is the same. As the Supreme Court said in *Ake* itself, "The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling." 470 U.S. at 78. Mr. Barrett's interest in the outcome of the trial – his very life – "is obvious and weighs heavily in our analysis." *Ibid. See also Williamson v. Reynolds*, 904 F. Supp. 1529, 1561-62 (E.D. Okl. 1995), *aff'd on other grounds by*, *Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997).

As to the third factor – the probable value to the defense of the expert assistance – this Court should conduct a cumulative assessment of the error. This case presents unique circumstances because the trial court did not simply deny Mr. Barrett the assistance of an investigator or expert. It cut funding for each and every type of assistance counsel identified as

necessary to the development of the defense, including all funds for travel that would have permitted an investigator, or in some instances an expert, to interview witnesses, observe the crime scene, meet with counsel, testify, or observe the government's experts in order to assist with cross-examination. This across-the-board restriction was devastating to the defense and allowed key aspects of the prosecution's case to go unchallenged. The effect of these restrictions under the third part of the *Ake* test must be considered cumulatively. However, each individual denial will be discussed separately.

### 1.   *The Withholding of Funds for Transcripts.*

By the time of *Britt v. North Carolina*, 404 U.S. 226 (1971), the Supreme Court's cases left "no doubt that the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal." *Britt*, 404 U.S. at 227. *Britt* itself involved a retrial after the initial three-day trial ended in a mistrial. *Ibid.* The Court majority agreed with the dissent that the Court's

> cases have consistently recognized the value to a defendant of a transcript of prior proceedings, *without requiring a showing of need tailored to the facts of the particular case*. [E]ven in the absence of specific allegations it can ordinarily be assumed that a transcript of a prior mistrial would be valuable to the defendant in at least two ways: as a discovery device in preparation for trial, and as a tool at the trial itself for the impeachment of prosecution witnesses.

*Id.*, 404 U.S. at 228 (emphasis added). Thus, the majority "agree[d] with the dissenters that there would be serious doubts about the decision below if it rested on petitioner's failure to specify how the transcript might have been useful to him."[96] *Ibid.*

---

[96] The Supreme Court found no due process violation in *Britt* because the state court had *not* required a showing of need, but had instead rested its denial of a transcript "on the second factor in the determination of need, that is, the availability of adequate alternatives to a transcript. The second trial was before the same judge, with the same counsel and the same court reporter, and the two trials were only a month apart. In these circumstances, the court suggested that petitioner's memory and that of his counsel should have furnished an adequate substitute for a transcript." *Britt*, 404 U.S. at 228.

Despite this precedent, the trial court initially denied Mr. Barrett and his counsel access to transcripts of pretrial hearings, including hearings in which witnesses testified who would later testify at trial, because they could not make a showing of special need sufficient to satisfy the court. Order filed 3/18/05 (Doc. 97) at 6-7. Although the trial court ultimately relented and allowed Mr. Barrett's counsel access to transcripts of the second state-court trial, the delay was prejudicial. Lead trial counsel had explained to the court in February that he would need 160 hours to assemble and review the files and records of the case. Doc. 51 at 4. After Mr. Hilfiger was elevated to lead counsel, he reported to the court that he had not yet reviewed those transcripts. As weeks and months went by, the lack of progress in obtaining the transcripts was a frequent topic of conversation between defense counsel and the court. As shown in Ground 1 and Ground 2 section A(8), defense counsel failed to obtain and use the transcripts in a timely or effective manner.

### 2. *Mental Health Assistance*.

As stated *infra*, Mr. Barrett's interest in confronting the government's case was the most compelling imaginable – his life was at stake. The importance of mental health testimony in a capital trial was stated in *Ake*, 470 U.S. at 80-82. As to the third factor in the *Ake* analysis, the importance of mental health testimony, particularly in the penalty phase of a capital trial, is too well established in law and empirical research to be in dispute. Numerous cases discussing the importance of mental health testimony in a capital sentencing proceeding are discussed in the part of this brief on Ground 2, *supra*. *See also Powell v. Collins*, 332 F.3d 376, 395-96 (6th Cir. 2003).

Nevertheless, as to the third factor in the *Ake* analysis, defense counsel presented the court with sufficient grounds to find mental health assistance was reasonably necessary to the

defense.  Doc. 97 at 3.  The trial record reflects that the principal matter in dispute was Mr. Barrett's mental state at the time his home was attacked.  Trial counsel requested the assistance of a mental health expert in part based on the need to explain to the jury how his mind reacted to the sudden assault.  Doc. 50.  Trial counsel also informed the court that Mr. Barrett had "used drugs and suffered significant head injuries during his life," and that this history indicated a need for an "expert in diagnosing organic brain disorders."  *Ibid.*  Trial counsel stated that the "defense need[ed] to engage an expert capable of assessing the likelihood that Mr. Barrett suffers from any identifiable psychological or physiological deficits, including possible organic brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting."  *Ibid.*

In addition to these statements, as documented in the exhibits cited in support of Grounds 2 and 3, trial counsel had available evidence that Mr. Barrett had attempted suicide, was diagnosed with Bipolar Disorder, and had been involuntarily treated with psychotropic medications.  *See* Doc. 208, Exhs. 118 & 147.  As to the penalty phase at least, it is undisputed that Mr. Barrett's "mental condition [was] relevant to his criminal culpability and to the punishment he might suffer."  *Ake*, 470 U.S. at 80.  The United States Attorney said at the time of trial, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation.  (Tr. 9/9/05 Hr'g at 38.)  It should be undisputed, therefore, that "the assistance of a psychiatrist may well [have been] crucial to the defendant's ability to marshal his defense."  *Ake*, 470 U.S. at 80.  The declarations of Dr. Myla Young (Exh. 89), Dr. George Woods (Exh. 117), and Dr. Bill Sharp (Exh. 55) show that with adequate funding -- both for a background investigation and for proper testing and clinical evaluation -- the defense could have developed both a mental state defense to Count 3 and extensive mitigation evidence.

Petitioner's Merits Brief                     129                     *Barrett v. U.S.*, 09-cv-105-JHP

However, the trial court would not permit this evidence to be developed.  First, the court denied most of the funds needed to conduct a routine background investigation, and denied all travel expenses.  In that defense counsel had identified a mitigation specialist from Tennessee to perform that work, the denial of travel expenses effectively negated the utility of the reduced amount available for hourly work.  Second, although Dr. Sharp had specifically recommended neuropsychological testing, which is performed by a psychologist, and defense counsel demonstrated a need for a medical doctor based on Mr. Barrett's prior treatment with antipsychotic medications, the trial court would permit counsel to retain "either a psychiatrist or a psychologist" but not both.  Doc. 97 at 3.  *Ake* requires the court, "at a minimum, assure the defendant access to a *competent* psychiatrist who will conduct an *appropriate* examination and assist in evaluation, preparation and presentation of the defense." *Ake*, 470 U.S. at 83 (emphasis added).  *See also Bell v. Evatt*, 72 F.3d 421 (4th Cir. 1995); *Buttrum v. Black*, 721 F.Supp. 1268, 1312 (N.D. Ga. 1989), *aff'd*, 908 F.2d 695 (11th Cir. 1990) (expert "failed to provide the scope of psychiatric assistance contemplated by *Ake*").  As a psychiatrist was not competent to do the testing Dr. Sharp identified as important, and a psychologist was not competent to assist the defense in presenting the significance of Mr. Barrett's medication, the court's provision for only one expert failed to satisfy due process.

Similarly, in *Powell*, *supra*, the court held the petitioner was entitled to a new capital sentencing trial due to the trial court's refusal to appoint an expert the defense needed to diagnose the petitioner's organic brain impairments.  Upon consideration of the evidence proffered from Drs. Young, Woods, and Sharp, this Court should reach the same conclusion *mutatis mutandis* as the Sixth Circuit said in *Powell*:

> the testimony of an independent psychiatrist – particularly one who was qualified
> to conduct the appropriate testing of which Dr. [Sharp] spoke – may have

Petitioner's Merits Brief                              130                    *Barrett v. U.S.*, 09-cv-105-JHP

632

provided facts and information for the jury to consider at mitigation, which may have led to a different recommendation by the jury at sentencing. We therefore believe that the lack of the expert assistance which Petitioner sought, and [to] which he was entitled under *Ake*, "had a substantial and injurious effect or influence in determining the jury's" decision at sentencing, *see Brecht*, 507 U.S. at 637,[97] such that we are left in "grave doubt" as to the harmlessness of this error, thereby requiring that relief be granted to Petitioner on this issue. *See O'Neal*, 513 U.S. at 437.[98]

332 F.3d at 395-96.

As to the second *Ake* factor – the burden on the Government of providing the services – this case is unique in showing that the cost to the Government of providing the assistance counsel requested was wholly in line with costs the Government absorbed in other capital cases. Of course, *Ake* itself held that the burden of providing appropriate, competent mental health assistance in a capital case is minimal compared to the risks of an erroneous outcome. But defense counsel also presented the court with declarations of Federal Death Penalty Resource Counsel, Richard Burr, who was able to place the funding in a national context. Mr. Burr advised the trial court that Congress had allocated funds specifically for the purpose of defense preparation such as that sought for Mr. Barrett's defense, and that the "standard practice in federal capital trials is to provide the services of more than one mental health expert." Exh. C to Doc. 107. Mr. Burr also advised the trial court that the rates it was willing to pay were far below those authorized in other cases. *Id.*

The record and extra-record evidence demonstrates that Mr. Barrett was denied due process due to the trial court's unique limitation on his counsel's access to expert assistance. At a minimum, the files and records do not conclusively show that Mr. Barrett is entitled to no relief. Whether considered alone, or together with the other deprivations, this Court either

---

[97]     *Brecht v. Abrahamson*, 507 U.S. 619 (1993).
[98]     *O'Neal v. McAninch*, 513 U.S. 432 (1995).

Petitioner's Merits Brief                    131                    *Barrett v. U.S.*, 09-cv-105-JHP

should vacate Mr. Barrett's conviction and sentence, or set this matter for an evidentiary hearing after affording counsel time to complete their investigation.  R. Gov. § 2255 Proc. 8(c).

### 3.      *Mitigation Investigation.*

As set forth more fully in relation to Part B of Ground 2, *supra*, the Supreme Court's capital sentencing jurisprudence, empirical evidence of what jurors value in mitigation, and the standards of capital defense practice make the assistance of a skilled mitigation investigator essential to developing a strategy for the penalty phase.  *See generally* ABA Guideline 10.4, § C(2), and Guideline 1.1 Commentary, 31 Hofstra L. Rev. at 925.  The ABA Guidelines' emphasis on mitigation investigation, and that of the Supreme Court in *Rompilla*, *Wiggins*, and *Williams*, *supra*, amply demonstrate that the first and third *Ake* factors weigh heavily in Mr. Barrett's favor.  Thus, the Court of Appeals for the Armed Forces has held, relying in part on *Wiggins*, that the denial of a mitigation specialist for the defense in a capital case violates due process and the defendant's right to compulsory process as secured by the Sixth Amendment. *United States v. Kreutzer*, 61 M.J. 293, 298 & n.7 (2004).

As to the second factor, again, the record shows the cost to the Government was minimal compared to the importance of conducting the "requisite, diligent investigation into [the defendant's] troubling background and unique personal circumstances."  *Williams*, 529 U.S. at 415 (O'Connor, J., concurring).  Defense counsel consulted with Inquisitor, Inc., a firm in Tennessee that could provide specialized mitigation investigative services.  Per Judicial Council Guidelines, Inquisitor's services were recommended by an experienced Assistant Federal Public Defender who had used the firm in another case in the Eastern District of Oklahoma.  Doc. 50 at 4.  Defense counsel also consulted with Resource Counsel Burr about the different needs of federal versus state trials.  Defense counsel also planned to rely upon the incomplete, preliminary

investigation that had been done years earlier, prior to the first state court trial. Doc. 50 at 5 n.3. Based on this work, defense counsel requested 300 hours of time, and $5,000.00 for travel.

Resource counsel advised the trial court that the time sought was well below the average of 600 hours worked by mitigation specialists in federal death penalty cases. Exh. C to Doc. 107 at 4. Nevertheless, the trial court would authorize only 100 hours, less than three weeks' work. Doc. 97 at 3. That was approximately one tenth the funds provided in other federal death penalty cases. Exh. C to Doc. 107 at 4. However, as indicated *supra*, even this insufficient amount was at best a symbolic gesture because the court denied all funds for travel. Under those circumstances, the mitigation investigator could not even be compensated for mileage driving to various family members' homes. *See Williams v. State*, 669 N.E.2d 1372 (Ind. 1996) (trial court's limitation of mitigation expert services to 25 hours per week was arbitrary and an abuse of discretion; however, error was harmless because sufficient mitigating evidence was presented at sentencing and jury deadlocked on punishment).

This case must be contrasted with *United States v. Kennedy*, 64 F.3d 1465 (10th Cir. 1995), in which the court found no abuse of discretion under the CJA where the trial court authorized the defense expert to fly from California to Denver in order to inspect documents there and prepare for trial. 64 F.3d at 1471-72. In this case, the denial of similar travel expenses prevented Mr. Barrett's counsel from bringing to court the mitigation specialist who would assist with the witnesses, if not testify to the social history she gathered.

Assuming *arguendo* the denial of a mitigation investigator is subject to a harmless-error analysis, the personal, medical, and social history available to be developed, and its consequences for an accurate mental health diagnosis, as set forth in pages 195 through 242 of the Second Amended § 2255 Motion, had a substantial and injurious effect on the verdict. The

record and declarations of Mr. Barrett's family members show defense counsel failed to conduct any interviews aimed at developing mitigation evidence.  In cases cited in the argument supporting Ground 2, *supra*, courts have often found similar social history evidence to satisfy the more burdensome reasonable-probability standard of *Strickland*.

This case is analogous to *United States v. Kreutzer*, 61 M.J. 293, 298 (2005), in which the Court of Appeals held that the trial court's denial of funds for a mitigation specialist was not harmless in light of the abundant mitigation evidence that was available, but that went undiscovered due to the absence of a qualified investigator.

At a minimum, the files and records of this case do not conclusively demonstrate that Mr. Barrett is entitled to no relief based on the trial court's unique withholding of essential resources from the defense.  This Court should either vacate the death sentence imposed on Mr. Barrett or set this case for evidentiary hearing at such a time when his counsel will be adequately prepared. R. Gov. § 2255 Proc. 8(c).

### 4.   *Fact Investigation*.

As the Supreme Court had repeatedly iterated in the years preceding Mr. Barrett's trial, *see cases cited supra*, fact investigation is the foundation for reasonable professional decision-making.  The centrality of investigation to defense preparation also is reflected in ABA Criminal Justice Standard 4-4.1 and ABA Guidelines 1.1 and 10.7.

Mr. Barrett's counsel sought 300 hours of investigative assistance at a rate of $50.00 per hour, which was the rate quoted for capital trial investigation.  Resource Counsel advised the Court that the "average number of hours approved for fact investigation in [death-penalty] authorized cases is closer to 500 hours." Exh. C to Doc. 107 at 3.  The trial court authorized only 100 hours at $30.00 per hour, the rate paid to state-subsidized investigators working with the

Petitioner's Merits Brief                    134                    *Barrett v. U.S.*, 09-cv-105-JHP

Oklahoma Indigent Defense System (Doc. 128 at 3 & n.1), although those investigators were prohibited from working on a federal death penalty case.  Exh. 111.

Moreover, the trial court announced that it would not follow Judicial Conference Guidelines and pay for previously authorized labor, but would condition payment on *ex post* "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial."  Doc. 97 at 2 n.2.  This meant any investigation that did not produce significant admissible evidence would be uncompensated.  The Court's refusal to pay market rates, provision for 20 percent of the investigative time common to capital cases, and threat not to compensate the investigator for any work later deemed insignificant or inadmissible, created unprecedented disincentives for defense counsel to explore potential defenses and ways to test the prosecution's evidence.

The prejudice from the trial court's restrictions was compounded by defense counsel's decision, stated at the October 3, 2005 hearing, to forego the use of experts and instead rely upon a lay investigator.  This decision was likely influenced by the trial court's expressed desire to have the defense spend minimal amounts on expert assistance.

The prejudice from the trial court's withholding of investigative resources is seen most starkly in Parts A(4), A(6), and A(10) to Ground 2 of the Amended § 2255 Motions.  The evidence proffered there shows the failure to investigate had a substantial injurious effect on the trial in that nearly all key prosecution witnesses necessary to convict Mr. Barrett of first-degree murder could have been either excluded or impeached.

At a minimum, the files and records do not demonstrate that Mr. Barrett is entitled to no relief.  Therefore, this Court must either vacate his conviction or schedule an evidentiary hearing

Petitioner's Merits Brief                               135                               *Barrett v. U.S.*, 09-cv-105-JHP

after permitting counsel sufficient time to complete their investigation.  R. Gov. § 2255 Proc.

8(c).

### 5.  *Crime Scene Reconstruction.*

As this Court has previously held,

> when forensic evidence and expert testimony are critical parts of the criminal prosecution of an indigent defendant, due process requires the State to provide an expert who is not beholden to the prosecution.  The fact that forensic evidence and expert testimony are crucial to the prosecution is in and of itself a sufficient showing of the need for expert assistance and that the defendant would be prejudiced without it.

*Williamson v. Reynolds*, 904 F. Supp. 1529, 1562 (E.D. Okl. 1995), *aff'd on other grounds by*,

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997).  At trial, as the State had in the prior trials,

the Government relied upon purported "expert" Iris Dalley's "reconstruction" of events as

evidence that Mr. Barrett would have been aware that his attackers were law enforcement

officers.

Mr. Barrett's defense counsel requested authorization to retain Edward E. Hueske to assist

counsel in preparing to submit Dalley's testimony to the adversarial testing that due process and

the Sixth Amendment require.  The defense sought 80 hours of labor from Mr. Hueske and

$1,000.00 in travel expenses.  Doc. 50 at 7.  While Dalley had years to prepare and refine her

testimony, and unlimited resources to view the crime scene and the vehicles, the trial court

authorized for Mr. Barrett's defense 20 hours work and no travel expenses.  Doc. 97 at 3.

As this Court said *Williamson* was no different than *Ake*, so too Mr. Barrett's case is no

different.

> "The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling." *Ake*, 470 U.S. at 78.  The State's interest in the financial burden of providing expert assistance for Petitioner and its interest in prevailing at trial are clearly outweighed by the

interest of the "fair and accurate adjudication of criminal cases." *Ake*, 470 U.S. at 79.

*Williamson*, 904 F. Supp. at 1561.

Also as this Court said in *Williamson*,

Unless the defendant's attorney is learned in the expert's field, cross-examination will hardly suffice. Expert witnesses can stray outside the boundaries of their expertise, but a defendant's attorney may not be able to recognize misrepresentations or errors in methodology. Only the defendant's own expert can assure the indigent accused an adequate defense in cases where expert testimony plays a key role in the prosecution.

904 F. Supp. at 1562 (footnotes omitted). Due to the prohibition on travel, Mr. Barrett could not rely upon Mr. Hueske at trial when Dalley's testimony showed, *inter alia*,

• that she failed in many ways to follow accepted methods for conducting a reconstruction such that her testimony was inadmissible under Fed. R. Evid. 702 and *Daubert*, *supra*;

• that she falsely testified to having been unable to determine the caliber of bullets that struck the lead Bronco;

• that she exceeded the bounds of accepted methodology when testifying that the trajectories she described were "accurate";

• that she misrepresented both science and the evidence when she claimed there was "no means of sequencing any of the shots";

• that she exaggerated her ability to estimate the distance of a firearm from the cabin;

- that her conclusion regarding the location of Trooper Eales' arm when it was struck was unreliable due to her failure to examine the surrounding area for tissue or blood.

(Exh. 109.)

In short, Dalley's testimony was wholly unreliable, but, due to the defense's lack of access to an expert, the jury was permitted to consider it as the only forensic "science" to support a finding of intent. Due to this failure of the adversarial testing process, the jury was permitted to reach an unwarranted conclusion. The prosecution demonstrated at trial – through its use of Dalley and Horn and the seven informants – that it had serious doubts about its ability to obtain a conviction for murder based on the conflicting and unreliable accounts of the Tact Team members. The results of the two state trials show those fears were justified as the case against Mr. Barrett for intentional murder was weak at best.

Assuming *arguendo* that the impact of the denial of expert assistance on the adversarial testing process in violation of due process could be subject to harmless-error analysis, the report of Mr. Hueske appended to Mr. Barrett's Motion as Exhibit 109 demonstrates his absence from the trial had a substantial injurious effect on the verdict. At a minimum, the files and records of this case do not conclusively demonstrate that Mr. Barrett is entitled to no relief based on the trial court's unique withholding of essential resources from the defense. This Court should either vacate the death sentence imposed on Mr. Barrett or set this case for evidentiary hearing at such a time when his counsel will be adequately prepared. R. Gov. § 2255 Proc. 8(c).

### 6. *Expert on Police Standards and Procedure*.

Based on success in the state trial that could not be repeated with the same witness, Mr. Barrett's defense counsel sought authorization to retain Dr. George Kirkham, a criminologist,

sworn law enforcement officer, and expert in police tactics. Doc. 50 at 5. Counsel informed the court that Dr. Kirkham charged a flat rate for pretrial review and preparation, and that he would need to travel from his residence in Florida. *Ibid.* The trial court, without explanation, refused to authorize Dr. Kirkham's rate, arbitrarily limited the defense to 40 hours of services at $100.00 per hour, and denied funds for Dr. Kirkham to travel. Doc. 97 at 3.

It was clearly error for the trial court tacitly to determine that saving the United States Government a few thousand dollars outweighed both Mr. Barrett's interest and society's interest in avoiding an erroneous assessment of the Tact Team's methods, including whether they afforded Mr. Barrett an opportunity to identify law enforcement officers. *See Williamson*, 904 F. Supp. at 1561, quoting *Ake*, 470 U.S. at 78, 79. Count 3, and the statutory aggravating factors found by the jury, required the jury to find, contrary to the state-court jury, that Mr. Barrett intended to kill law enforcement officers.

If the trial court had permitted Dr. Kirkham to testify, rather than excluding him through the use of purse strings, the jury would have learned, *inter alia*,

- that the raid was contrary to law enforcement standards and procedures in that it relied first and foremost on force and aggression, provoking force and aggression in return without attempting a peaceful resolution;

- that the Tact Team violated standards of law enforcement practice that are designed to protect officers by minimizing opportunities for Mr. Barrett to identify them as law enforcement officers; and

- that the Tact Team recklessly and unnecessarily exposed Troopers Hamilton and Eales to gunfire both from the cabin and fellow officers.

Exh. 44.  Dr. Kirkham would have explained that everything about the information the Tact Team had made the raid exactly the wrong thing to do, and that the standards the team ignored were based on extensive experience of mistakes that lead to shootings that otherwise would not have occurred.

Assuming *arguendo* the denial of an adversarial testing through defense evidence attacking intent can be subject to harmless-error analysis, the withholding of funds for Dr. Kirkham's review of law enforcement officers' testimony and his own testimony had a substantial injurious effect on the verdict.  Jurors informed of the facts would have rejected a finding of intent.  At a minimum, they would have had sufficient doubts in the penalty phase to find Mr. Barrett was insufficiently culpable to be sentenced to death.

The files and records do not conclusively show that Dr. Kirkham's testimony would have had no effect.  Therefore, if this Court does not vacate the judgments of conviction and sentence based on the extant or an expanded record, it should order an evidentiary hearing following an opportunity for further investigation and discovery.  R. Gov. § 2255 Proc. 8(c).

### 7.    *Cumulative Effect.*

As discussed herein and in relation to Ground 1 and Ground 2 of the Amended § 2255 Motions, the verdict in the criminal case was not the product of the adversarial testing process contemplated by the Fifth, Sixth, Eighth and Fourteenth Amendments.  The trial court's refusal to authorize defense resources such as transcripts and time and travel for mitigation and other fact investigation – resources long deemed minimally necessary by Supreme Court precedent and routinely granted similarly situated defendants – undercut the adversarial testing process in at least two ways.  First, the Court's demonstrated preference for minimal spending by the defense and its demonstrated willingness to provide future appointments and higher compensation to

counsel who worked within those limitations, and to dismiss counsel unwilling to work within them, created a conflict between Mr. Barrett's interests and counsel's interests. *See* discussion *supra* of *Wood v. Georgia*, 450 U.S. 261 (1981). From defense counsel's defeatist statement to Jeanne Russell only a few weeks before the trial started – that it was alright that it was too late to conduct a mitigation investigation because the Court would not fund it anyway (Exh. 56 at 2-3) – it is clear that counsel acutely felt the impact of these impediments.

Second, and independent of the disincentives created by the trial court's preferences, the Court imposed unprecedented limitations on defense resources that prevented Mr. Barrett from bringing witnesses to court, unless he subpoenaed various professionals and compelled them to appear for free. As a result, Mr. Barrett's defense were unable fully to challenge, *inter alia*, the testimony of law enforcement officers regarding the conduct of the raid, the testimony of seven informant witnesses about whom vast amounts of impeachment evidence was either suppressed or undiscovered by the defense, and the only forensic "science" evidence adduced to demonstrate intent. In addition, the defense was prevented from conducting the mitigation investigation, and mental health investigation the Supreme Court and Courts of Appeals have consistently held is essential to a fair and reliable capital sentencing proceeding. The across-the-board impact of the trial court's denial of routine expenses cannot be said to have been harmless under any standard.

643

**Ground 4.      Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Were Violated by the Use of False Information in Obtaining the No-Knock Warrant for his Arrest. The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was Invalid under *Franks v. Delaware,* 438 U.S. 154 (1978). Appellate Counsel Were Ineffective for Failing to Raise the Issue on Direct Appeal.**

As shown in Ground II, *supra*, in connection with the claim that trial counsel were ineffective for failing to argue all available evidence supporting the renewed motion to suppress, the trial record itself established the Clint Johnson warrant was invalid under *Franks v. Delaware,* 438 U.S. 154 (1978). Suppressed *Brady* material and other evidence gathered in support of Mr. Barrett's §2255 petition which relates back to the credibility of the informant at the relevant time makes this conclusion even stronger.

Since the warrant was based solely on the word of the confidential informant, Charles Sanders, his reliability was the linchpin of probable cause. There was no other information from any other source, and no other circumstances cited in the affidavit, that provided probable cause to search Mr. Barrett's residence and property. The "totality of the circumstances" in this case *was* Sanders. *Illinois v. Gates,* 462 U.S. 213 (1983) (totality of the circumstances test used to judge validity of search warrants; an informant's veracity, reliability, and basis of knowledge are all important considerations in determining whether information as a whole is sufficient to supply probable cause). If Sanders is unreliable, his information is *per se* unreliable. Because Sanders is the antithesis of a reliable source, Clint Johnson, at the very least, acted with reckless disregard for the truth in utilizing him as a source, and in omitting information from the search warrant affidavit that would have given an accurate picture of Sanders's credibility.

The unsupported statement in the search warrant affidavit that Sanders had given "reliable" information in the past, without more, does not establish the credibility of the

643

information contained in the affidavit and does not assist in establishing probable cause, since there is nothing in the affidavit to show that any of this information was corroborated by anyone else, let alone an independent law enforcement investigation. *United States v. Reddick,* 90 F.3d 1276, 1280-81 (7th Cir. 1996) (magistrate judge correctly concluded officer's statement that the informant had provided reliable information in the past is an unsupported conclusion which does not support a probable cause finding); *United States v. Foree,* 43 F.3d 1572, 1575-76 (11th Cir. 1995) (allegation in affidavit that informant had provided reliable information in the past is to be accorded little weight in the probable cause calculus); *United States v. Miller,* 753 F.2d 1475, 1480 (9th Cir. 1985) (statement in affidavit that C.I. had provided reliable information previously was entitled to only "slight weight"; such a statement is both unclear and conclusory; there, as here, there was no showing that any information provided by the informant in the past had led to any search, arrest, or conviction, nor whether the past information was vital or merely incidental to other law enforcement investigations). The total absence of any corroborating facts for the C.I.'s claims indicates that Sanders, with Clint Johnson's approval, could simply be fabricating the information. *Phaneuf v. Fraiken,* 448 F.3d 591, 597-99 (2nd Cir. 2006); *United States v. Dawkins,* 17 F.3d 399, 404 (D.C. Cir. 1994) (in evaluating whether an informant's tip furnishes probable cause for a warrant, magistrate must look to whether independent investigation has corroborated or failed to corroborate the informant's claims).

Sanders could not be relied upon to provide reliable information. No reasonable person could put stock in anything he says. Sanders is a professional criminal, who had racked up at least eighteen felony convictions at the time he testified against Mr. Barrett, and had surpassed double digits by 1999. Numerous other felony charges against him were dismissed because of his work as a snitch. He always had a motive to lie against others to get out of his own scrapes

645

with the law, and has largely been successful, continuing to land on his feet with probationary sentences so he could commit still more crimes in the community, when any sane system of justice would have flushed him ages ago. His convictions for crimes of dishonesty are legion: repeated instances of forgery, burglary, concealing stolen property, larceny of merchandise from a retailer, and other forms of fraud and theft, not to mention an extensive list of other felonies. He has a history of promising to appear in court and then failing to appear. He has a history of promising to adhere to terms of probation and then breaking them by committing still more crimes, after which he is given still more probation. He is a long term drug addict. Sanders could not give a straight and consistent answer to save his life at Mr. Barrett's trial, which reflects his almost congenital inability to tell the truth. Yet he was rewarded for his testimony, as he has always been rewarded for informing on others, despite his wretched history of dishonesty, and despite the fact that he continued to victimize the community as a virtual one man crime wave. All this was known about Sanders in 1999, and it has only gotten worse. Johnson's affidavit was deliberately and egregiously misleading because all this information bearing directly on Sanders's credibility was omitted from the search warrant affidavit. *United States v. Vigeant,* 176 F.3d 565, 573 (1st Cir. 1999) ("First, and most important, Botehlo [the affiant] neglected to mention the confidential informant's long criminal history, his numerous aliases, his recent plea agreement, and other indicia of his unreliability."); *United States v. Hall,* 113 F.3d 157, 159 (9th Cir. 1997) (police withheld information on the confidential informant's prior convictions and the fact that the informant had previously falsely reported a crime).

At the time he signed the affidavit, Clint Johnson was aware of Sanders's lack of reliability, and Johnson himself intentionally ignored evidence of Sanders's then-current drug usage, crimes of dishonesty, and Sanders's inability to see evidence of drug activity at Mr.

Barrett's residence during the critical time. Yet Johnson still relied on this miscreant as a "reliable confidential informant."

In connection with the claim of ineffective assistance of trial counsel for failing to produce witnesses to attack Sanders's honesty, Mr. Barrett has provided declarations from several people in the community, including one of Sanders's uncles, who say without reservation and in the strongest terms possible that Sanders is totally dishonest and unbelievable, and that this is the opinion by acclamation in the community as a whole. (Exhibit 90; Exhibit 70; Exhibit 94; Exhibit 76; Exhibit 13; Exhibit 95.) Sanders claimed that he and Janesse Thomas bought drugs at Mr. Barrett's a few days before the shooting incident. Ms. Thomas says this is absolutely false. (Exhibit 13.)

Is it to be believed that the community as a whole regards Sanders as thoroughly dishonest and untrustworthy, but that Clint Johnson could realistically think he was a reliable informant, about whom nothing had to be revealed to a reviewing magistrate? It simply does not wash. Johnson acted with reckless disregard for the truth, at a minimum, in relying on Sanders for information about Mr. Barrett or anyone else, let alone presenting that information in a search warrant affidavit.

The prosecution suppressed exculpatory evidence regarding Sanders's dishonesty. As stated in Grounds I and II, Mike Littlefield informed the court of a witness who failed to corroborate Sanders. This would have assisted in establishing a *Franks* claim, and in generally impeaching Sanders, but the evidence was never revealed to the defense. The transcript of this hearing was, however, available to direct appeal counsel.

Then there is Clint Johnson himself. The Government suppressed *Brady* evidence that before, during and after Mr. Barrett's trial, Johnson was caught in a web of his own bad acts,

deceit and corruption,  including abuse of his position of trust; passing hot checks; failing to control his informants and neglecting to properly supervise and document their activities; failure to account for funds and evidence; theft of drug fund money; kickback schemes; dishonesty with his superiors; and likely drug use, as he tooled around in his drug task force car with drug paraphernalia, marijuana and methamphetamine, none of it properly packaged and marked as evidence.  Johnson was fired from the District Attorney's Office a little over two weeks after Mr. Barrett was formally sentenced.  In sum, Johnson and Sanders were birds of a feather:  both liars, both drug addicts, both trading lies for favorable treatment from law enforcement.

With respect to Johnson's request for a no-knock, nighttime warrant, which was predicated on information from the " C.I".  that Mr. Barrett had threatened law officers, Johnson acted with reckless disregard for the truth by omitting mention of the fact that local law enforcement, including Sheriff John Philpot, had been to Mr. Barrett's residence less than a month before, and encountered no resistance.  (Exhibit 6.)

A search warrant must be voided and the fruits suppressed when 1) it is found the affiant knowingly or recklessly included false statements *or omitted material information from the affidavit in support of a search warrant,* and 2) it is concluded that after excising such false statements and considering such material omissions, the corrected affidavit does not supply probable cause to search.  *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978); *United States v. Correas,* 419 F.3d 151, 152, 155 (2nd Cir. 2005) (two federal courts, after conducting *Franks* hearings, found affiant made numerous assertions that were knowingly and recklessly false; after setting aside the false statements, probable cause was not established); *United States v. Kennedy,* 131 F.3d 1371, 1376 (10th Cir. 1997).

Here, at a minimum, when the omitted material information about the reliability of the informant is considered, probable cause could not have been found, because Sanders's history, character, actions and reputation would show him and his word to be totally unreliable.  Johnson called Sanders "reliable," a deliberately false or reckless statement in itself, and omitted an avalanche of information, detailed above and elsewhere in this motion, that would have proved the exact opposite to any reasonable magistrate.  Had Johnson given a true picture of his C.I.'s numerous crimes of dishonesty; his motivation to accuse others of wrongdoing in order to escape punishment for his own acts, for which he received deal after deal instead of the hard prison time he deserved, after which he continued to commit crimes; his violations of the terms of probation; his bond forfeitures and failures to appear; the number of arrests; the number of convictions; his chronic drug use; and his bottom-of-the-barrel reputation in the community for anything even remotely approaching honesty and trustworthiness, no neutral, detached magistrate would find probable cause.  *Mejia v. City of New York,* 119 F.Supp.2d 232, 273, n. 38 (EDNY 2000) (like a prosecutor's knowing use of false evidence to obtain a tainted conviction, the use of false or reckless information in a search warrant affidavit works an "unacceptable corruption" of the truth seeking function).

Johnson's failure to mention that less than a month before securing the warrant, Sheriff Philpot and other officers had been to Mr. Barrett's without incident, was material to the request for a no-knock, nighttime search warrant.  In failing to mention this crucial fact, Johnson acted with reckless disregard for the truth.  Had the magistrate been informed of this, the averment in the affidavit that Mr. Barrett, according to the "reliable" C.I., had "threatened" law enforcement would have been rendered meaningless, and no cause for a no-knock, nighttime warrant would have been established, even aside from the question whether any warrant should issue at all.

Although defense counsel raised a *Franks* issue, however incompletely, at trial, and there were certainly indications of Sanders's deplorable criminal record and rampant dishonesty in the ever-shifting sands of his testimony, appellate counsel failed to raise the issue on direct appeal, either as a freestanding argument under *Franks*, or one coupled with an ineffective assistance of trial counsel argument.  (Exhibit 29.)  *See* Ground XVIII, *infra*.  Mr. Barrett is of course requesting an evidentiary hearing on each factual issue raised in his §2255 motion, and specifically requests a *Franks*  hearing, or its equivalent.  He has made more than the requisite showing.

> **Ground 5.** **Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his Sixth Amendment Rights to Counsel and Confrontation, and his Eighth Amendment Right to a Fair and Reliable Capital Sentencing Process Due to the Government's Suppression of Exculpatory Evidence, Knowing use of Perjured Testimony, and Failures to Correct False Testimony; Mr. Barrett is Entitled to Relief from his Convictions and Sentences Based on Newly Discovered Evidence.**

### Introduction

Ground 5 of the Amended § 2255 Motion describes evidence of constitutional and statutory violations  under a variety of rules.  In Parts A and B, Mr. Barrett describes evidence establishing violations of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, and *Mooney v. Holohan*, 294 U.S. 103 (1935), and its progeny, including *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972).  Parts A and B of Ground 5 also describe newly discovered evidence of criminal and other misconduct committed by the three law enforcement officials who were chiefly responsible for the investigation and prosecution of this case.  In Part C, Mr. Barrett describes evidence demonstrating a violation of due process under *Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966) (Wright, J.), *cert. denied*, 396 U.S. 865

(1969).  In Part D, Mr. Barrett sets forth the bases for finding prosecutorial misconduct rendered the trial unfair under the standard of *Donnelly v. DeChristoforo*, 416 U.S. 1974).

As he has throughout this brief, Mr. Barett relies upon the facts set out in the Amended Motion and the exhibits thereto.

### 1.   The Government Suppressed Material Evidence Favorable to the Defense.

#### a.   The law relating to suppression of exculpatory evidence.

"There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

#### 1.   What is "favorable to the accused".

The scope of favorable evidence includes everything that is "material either to guilt or to punishment."  *Brady v. Maryland*, 373 U.S. 83, 87 (1967).  *Brady*, 373 U.S. at 87.  Evidence must be disclosed if it is favorable to the defense, *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995), and evidence is favorable "either because it is exculpatory, or because it is impeaching." *Strickler*, 527 U.S. at 281-82; *Bowen v. Maynard,* 799 F.3d 593, 610 (10th Cir. 1986) (*Brady* obligations extend to impeachment evidence); *Carey v. Duckworth,* 738 F.2d 875, 878 (7th Cir. 1984); *United States v. Osorio,* 929 F.2d 753, 761 (1st Cir. 1991); *United States v. Libby,* 429 F. Supp.2d 1, 10-11 (D. D.C. 2006).

The case at bar presents an extraordinary amount of impeachment material of the type that has been found to be subject to disclosure requirements.  For example, in *Banks v. Dretke*, 540 U.S. 668 (2004), the Court held the petitioner was entitled to a new capital sentencing trial because the prosecution withheld information showing that a key witness presented to show the

defendant would be a future danger was an informant. *See also United States v. Torres*, 569 F.3d 1277 (10th Cir 2009) (vacating conviction where government disclosed some but not all impeachment evidence related to informant witness). In particular, the Government was required to disclose any and all deals either the prosecutor or any of the law enforcement officers working on the case had made with a witness whether "explicit or tacit." *Douglas v. Workman*, 560 F.3d 1156, 1186 (10th Cir. 2009).

The scope of what could be considered favorable evidence for the defense is a function of the law applicable to the two potential phases of trial, liability and punishment. As to the issue of punishment, *Brady* requires the disclosure of evidence that could be used by the defense as mitigation evidence to be weighed against a possible death sentence. Indeed, *Brady* itself was a death penalty case in which the suppressed evidence related to Brady's relative culpability, not his liability for the murder. *Id.* at 88-89. *See also Cone v. Bell*, ___ U.S. ___, 129 S. Ct. 1769, 1786 (2009) (remanding capital habeas case to district court for hearing on suppression of evidence favorable to capital defendant at sentencing). When the Supreme Court has "addressed directly the relevance standard applicable to mitigating evidence in capital cases . . . [the Court] spoke in the most expansive terms." *Tennard v. Dretke*, 542 U.S. 274, 284 (2004). *See, e.g., Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982) ("virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances"). Congress codified this conception of mitigation evidence in 18 U.S.C. §§ 3592(a)(8) and 3593©). A "defendant may present any information relevant to a mitigating factor . . . regardless of its admissibility under the rules governing admission of evidence at criminal trials . . . ." 18 U.S.C. § 3593(c). Mitigating factors are broadly defined to include any "factors in the

defendant's background, record, or character or any other circumstances of the offense that mitigate against imposition of the death sentence." 18 U.S.C. § 3592(a)(8).

## 2. What is "suppression"

Suppression is defined as the failure to produce favorable evidence. Prosecutors have an "affirmative duty to disclose evidence favorable to the defense." *Kyles*, 514 U.S. at 432. The prosecutor's "constitutional duty is triggered by the potential impact of favorable but undisclosed evidence . . . ." *Kyles*, 514 U.S. at 434. Because it is the prosecutor's affirmative duty to seek out *Brady* material and produce it to the defense, the failure to produce evidence constitutes "suppression" "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. When the government possesses favorable evidence that is "material," the evidence must be produced to the defense. Evidence is material when, "considered cumulatively, not item by item," *Kyles*, 514 U.S. at 436, it would create a "reasonable probability" of a favorable result for the defendant. *Id.*, 514 U.S. at 434, quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985).

Because knowledge of all evidence in the possession of the government, and any state agency working with the prosecution, is attributed to the prosecutor, *United States v. Giglio*, 405 U.S. 150, 154 (1972), "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437. Thus, "the rule encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Strickler*, 527 U.S. at 280-81 (quoting *Kyles*, 514 U.S. at 438). *See also United States v. Antone,* 603 F.3d 566, 569 (5th Cir. 1979) (facts known to state law enforcement personnel imputed to federal prosecutors when "the two governments ... pooled their investigative energies to a considerable extent.").

This duty extended beyond the point in time when any individual witness testified, and has continued to the present day. *Smith v. Roberts,* 115 F.3d 818, 820 (10th Cir. 1997); *United States v. Quintanilla,* 193 F.3d 1139, 1146-49 (10th Cir. 1999) (citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 60 (1987)); *Steidl v. Fermon,* 494 F.3d 623, 630 (7th Cir. 2007) ("For evidence known to the state at the time of trial, the duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings"); *High v. Head,* 209 F.3d 1257, 1265 n.8 (11th Cir. 2000). *See also, Banks,* 540 U.S. at 696; *Giglio,* 405 U.S. at 155; *United States v. Kojayan,* 8 F.3d 1315, 1320, 1323-25 (9th Cir. 1993); *Thomas v. Goldsmith,* 979 F.2d 746, 749-50 (9th Cir. 1992) (prosecution has an obligation to turn over exculpatory evidence relevant to habeas proceedings, even if it was not discovered prior to the close of trial); Fed.R.Crim.P. 16 ( c); Fed.R.Civ.P. 26(g)(1). *Cf. Imbler v. Pachtman,* 424 U.S. 409, 427, n. 25 (1976) (under ABA Criminal Justice Standard 3-3.11, commentary, "A prosecutor may not properly refrain from investigation in order to avoid coming into possession of evidence that may weaken the prosecution's case ... The duty of the prosecutor is to acquire all the relevant evidence ...").

### 3.     What is "material"

Evidence is "material" if there is a reasonable probability that, had the evidence been disclosed, the outcome of trial or sentencing would have been different. *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994), citing *United States v. Bagley,* 473 U.S. 667, 682 (1985). To prevail, a Movant need not show that it is more "probable than not" that had the evidence been disclosed, the outcome would have been different. *Kyles,* 514 U.S. at 435-36. Rather, the question is whether, considering the cumulative effect of the suppressed evidence, *Kyles,* 514 U.S. at 436, "disclosure of the suppressed evidence to competent counsel would have made a

different result reasonably probable." *Id.*, at 441. That is, the court must consider the evidence "not item by item," *Kyles*, 514 U.S. at 436, and not in the abstract or based on the evidence's own inherent value, but "the cumulative impact of the withheld evidence; its utility to the defense as well as its potentially damaging impact on the prosecution's case." *Banks v. Reynolds*, 54 F.3d 1508, 1518 (10th Cir.1995).

In establishing a *Brady* violation, Mr. Barrett need not refute every piece of evidence in the prosecution's case. "*Bagley* materiality . . . is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, at 434-35. Mr. Barrett is entitled to relief if he can show that in the hands of competent defense counsel the suppressed "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

### b. **Exculpatory Evidence Suppressed by the Government.**

### 1. *Charles Sanders.*

The Government suppressed a wealth of exculpatory evidence which would have impeached Charles Sanders. This evidence includes:

• Evidence of Sanders's complete criminal history, including his many felony convictions, arrests, and dismissed charges. On direct examination, the Government permitted Sanders to testify falsely that he had only four prior felony convictions, when, in fact, he has at least eighteen. Sanders also had numerous charges dismissed in exchange for his work as an informant. This was not revealed to the defense. *Crivens v. Roth,* 172 F.3d 991, 995-96 (7th Cir. 1999) (prosecution's failure to provide defendant with criminal records of its witnesses violated *Brady*); *United States v. Hill,* 799 F.Supp. 86, 89-90 (D. Kan. 1992) (for purposes of

impeachment, a defendant is entitled to discovery of the adult criminal records of Government witnesses; in addition, the Government is required to disclose all promises or consideration given to a witness, and any threats made to a witness).

    • Evidence of the breadth of Sanders's work as an informant, including the many favorable deals he received over his lengthy criminal career, all of which was relevant to his overall credibility and his motives for testifying against Mr. Barrett. *E.g., Singh v. Prunty,* 142 F.3d 1157 (9th Cir. 1998); *Crivins v. Roth, supra*; *United States v. Hill, supra.*

    • Evidence of the nature of the deals Sanders's would receive directly as a result of his testimony against Mr. Barrett. The prosecution misled the jury by getting Sanders to agree that the prosecution would simply "talk to" state authorities in Sequoyah County in the several cases on which he was currently doing time, and would "talk to" authorities in Tulsa County in connection with a pending case Sanders had there. At and shortly after the conclusion of Mr. Barrett's trial, the sentences in Sanders's Sequoyah County cases were converted to straight suspended sentences with no supervision by the Oklahoma Department of Corrections. All this was done pursuant to a "plea agreement with feds." Later, Sanders's obligation to pay costs and fines in these cases was lifted. Sanders received straight probation on his Tulsa County case, despite his appalling criminal history. Sanders had another pending case in Cherokee County for which he later received favorable treatment. *Giglio v. United States,* 405 U.S. 150, 154 (1972); *Douglas v. Workman,* 560 F.3d at 1186; and the other cases cited above.

    • Based on what was revealed by AUSA Littlefield at the improper *ex parte* conference with the court on September 13, 2005, the Government was aware of a witness, whose identity has still not been disclosed, who would impeach Sanders's second stage testimony. *See generally, Kyles v. Whitley,* 514 U.S. at 433-34; *Brady v. Maryland,* 373 U.S. at 87.

Petitioner's Merits Brief          154          *Barrett v. U.S.*, 09-cv-105-JHP

### 2.     *Travis Crawford*

The Government suppressed the following exculpatory evidence with respect to Travis Crawford:

• The Government knew or should have known that, contrary to his trial testimony, Crawford was still an active drug user and was under the influence of drugs when he testified.

• Evidence of Crawford's criminal record in the military.  *Crivens v. Roth, supra*; *United States v. Hill, supra.*

• Evidence that AUSA threatened Crawford and coached or suggested what his testimony would be in connection with supposed threats Mr. Barrett had made to law enforcement on the afternoon before the shooting.  *United States v. Scheer,* 168 F.3d 445, 451 (11th Cir. 1999) (reversal required due to Government's failure to reveal prosecution's intimidation of a key witness); *United States v. Hill, supra* (among other exculpatory evidence required to be disclosed to the defense is any threats to witnesses by the Government or its agents).                    • Evidence of Crawford's history as an informant and an informant witness, which was relevant to Crawford's overall credibility and his motives for testifying against Mr. Barrett.

### 3.  *Cindy Crawford.*

The Government suppressed the following exculpatory evidence with respect to Cindy Crawford:

• That she had been threatened when interviewed by AUSA Mike Littlefield before trial, that the interview was otherwise conducted in an intimidating atmosphere, and that she had been coached to make Mr. Barrett appear more violent than he actually was.  Cindy Crawford was also threatened between her first and second stage testimony, because the prosecution was displeased that she had not provided evidence on alleged drug manufacturing by Mr. Barrett in her first

stage testimony.  The prosecution also discouraged her from talking to the defense.  *United States v. Scheer, supra*; *United States v. Hill, supra.*

• That, contrary to her trial testimony, Ms. Crawford was still an active drug user and was either high or "coming down" from a high when she was interviewed by the Government and testified against Mr. Barrett.

• That Ms. Crawford suffered from mental impairments which affected her ability to accurately recall and relate past occurrences, and which caused her to embellish and exaggerate.

• That Ms. Crawford  had regularly worked as an informant in the past, and had received a break on a Sequoyah County drug case in which she could have been charged with a felony; that, at the time of her testimony against Mr. Barrett, she was in violation of her Sequoyah County five year deferred sentence, which gave her a motive to please the Government with her testimony; and that the probation violation was resolved favorably to her after her testimony against Mr. Barrett.  *Giglio v. United States, supra*; *Douglas v. Workman, supra.*

### 4.  *Brandie Zane Price*

• In light of the fact that shortly after Mr. Barrett's trial, Brandie Price was charged in a federal drug conspiracy, the Government suppressed evidence it knew or should have known respecting Price's drug-related activities, including drug usage, at the time of her testimony at Mr. Barrett's trial.  Much was made during Price's direct testimony that she had rehabilitated herself and was "clean" of drugs.

### 5.  *Karen Real*

• The Government suppressed evidence of Real's complete criminal record, including the dismissal of numerous state drug charges in Sequoyah and Cherokee Counties.  *Crivens v. Roth,*

*supra*; *United States v. Hill, supra*.  Evidence regarding the dismissed state charges was relevant to Real's overall credibility and her motives for testifying.

• As with Charles Sanders, the Government soft-peddled the deal it had in the works for Real's testimony.  It was suggested at trial that the prosecutor would simply "talk to" her sentencing judge, and Real testified that while she may be hopeful for a break on her fourteen year federal sentence, she really was not expecting one.  Shortly after Mr. Barrett's trial, Real, courtesy of a Rule 35 motion filed by the Government, was rewarded for her testimony with credit for time served and immediate release from prison.  *Giglio v. United States, supra*; *Douglas v. Workman, supra*.

### 6.     Randy Turman

• The Government suppressed evidence regarding Turman's six-count Sequoyah County felony drug case which, contrary to Turman's trial testimony that the case had "done been taken care of," was still an open case, and had been pending resolution for some years.  With this case hanging over his head, Turman had a powerful motive to tailor his testimony to the Government's liking.  This evidence flatly contradicted Turman's testimony that he had nothing to fear from the authorities.  *Crivens v. Roth, supra*; *United States v. Hill, supra*.

### 7.     Law Enforcement Witnesses

The Government suppressed material exculpatory evidence with respect to law enforcement witnesses Clint Johnson, Vicki Lyons and Sequoyah County Sheriff John Philpot. These witnesses – and the Government's theory of the case – could have been impeached into oblivion but for the suppression of this evidence.

Clint Johnson, with his financial irresponsibility, hot check writing, kickbacks to select defense counsel, theft of drugs and drug money, likely drug use, mishandling of informants, and

Petitioner's Merits Brief                    157                    *Barrett v. U.S.*, 09-cv-105-JHP

overall abuse and misuse of his office, was the quintessential dirty cop.  This information was obviously known to the Government and its agents at the time of Mr. Barrett's trial, and defense counsel was entitled to it.  *Cf. United States v. Henthorn,* 931 F.2d 29, 30-31 (9ᵗʰ Cir. 1991). Shortly after Mr. Barrett's trial concluded, Johnson was fired from his law enforcement job. Johnson's corrupt and criminal behavior not only thoroughly discredited him, but, by clear implication, discredited Charles Sanders as well as the validity of the search warrant.  Johnson's recklessness, incompetence and corruption set this entire tragedy in motion.

OSBI Agent Vicki Lyons, Johnson's girlfriend, used her position of authority to help shield him from scrutiny of his illegal activities.  The Government knew or should have known this.  Had this evidence been placed before the jury, Lyons credibility would have been severely damaged, perhaps beyond repair.

Sequoyah County Sheriff John Philpot – and the Government – concealed the fact that approximately one month before the raid on Mr. Barrett's cabin, he had been to Mr. Barrett's property and encountered no problems.  Philpot's recent admission of this fact corroborates the accounts of other witnesses who were available to testify on this point, but were not called by the defense.  This fact alone fatally undercuts the Government's intent case against Mr. Barrett, not to mention the necessity for a no-knock, nighttime search warrant.

Consistent with the authority cited herein, there can be no doubt that the Government wilfully suppressed exculpatory evidence and that, but for the suppression of this evidence, there is a reasonable probability that the outcome of trial would have been different.  As the Government itself has acknowledged, the sole difference between the state proceedings, in which Mr. Barrett was acquitted of murder and convicted of manslaughter, was the late-coming appearance of the seven informant witnesses.  Their credibility, and the Government's case for

intent in both stages of trial, as well as its case for the underlying drug charges, would have been destroyed absent the Government's illegal conduct in shielding these witnesses from effective impeachment. The integrity of the investigation and the Government's theory of the case would have been shown to be entirely lacking had exculpatory evidence relating to Clint Johnson, Vicki Lyons, and John Philpot been revealed. The exculpatory evidence suppressed by the prosecution also would have shown that the search warrant was invalid and that all evidence seized in its execution should have been suppressed.

### 2. The prosecution's reliance upon false testimony

> Prosecutors may not knowingly present perjured testimony. Thus, it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment . . . . The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

*Napue*, 360 U.S. at 269 (internal citations omitted).

As in other classes of cases, the law imputes to the individual prosecutor knowledge of the falsity of the witnesses' statements. In *Giglio*, the Court imputed to one Assistant United States Attorney knowledge of a promise offered to a witness by another Assistant United States Attorney, even though the trial prosecutor denied knowledge of the promise. *Giglio*, 405 U.S. at 154. Thus, prosecutors in the perjured-testimony context have the same duty to learn information showing the falsity of a witness's testimony that they have to discover exculpatory or impeachment evidence.

However, when, as here, the prosecution relied upon perjured testimony, the prejudice standard is different than for a *Brady* claim. In such cases, a "new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Giglio*, 405 U.S. at 154, quoting *Napue*, 360 U.S. at 271; *see also United States v. Agurs*, 427

Petitioner's Merits Brief                      159                      *Barrett v. U.S.*, 09-cv-105-JHP

U.S. 97, 103 (1976). The Supreme Court has "treated 'reasonable likelihood' as synonymous with 'reasonable possibility' and thus ha[s] equated materiality in the perjured-testimony cases with a showing that suppression of the evidence was not harmless beyond a reasonable doubt." *Strickler*, 527 U.S. at 299 (Souter, J., dissenting) (collecting cases).

Some of these falsehoods the prosecution presented at trial were substantive. Others went to the witnesses' credibility. Either way, the prosecutors violated Mr. Barrett's right to due process of law:

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

*Ibid.*

Some of the *Brady* evidence discussed above, and the newly discovered evidence addressed below, is also relevant to Mr. Barrett's argument that the Government knowingly sponsored false evidence. The false evidence foisted on the jury by the Government includes: 1) failing to correct Charles Sanders's testimony on direct examination that he only had four felony convictions, *Giles v. Maryland,* 386 U.S. 66 (1966); *Alcorta v. Texas,* 355 U.S. 28 (1957); 2) failing to correct Charles Sanders's testimony that he only received a few favors from Clint Johnson and others in law enforcement over the course of his criminal career; 3) failing to correct Randy Turman's perjury that his six-count Sequoyah County drug case had "done been taken care of"; 4) sponsoring Charles Sanders as a second stage witness, even though the Government was aware of a witness who said Sanders's claims were false; 5) eliciting testimony from Sanders that he had been to Mr. Barrett's cabin on the afternoon preceding the shooting, and three days before the shooting to consummate a drug deal; 6) eliciting or failing to correct testimony from

Clint Johnson at the pretrial suppression hearing which falsely portrayed the confidential

informant's (Sanders's) drug activities and prior record; 7) fostering the false impression that the

Government would simply "talk to" state authorities about Sanders's cooperation, and would

"talk to" Karen Real's sentencing judge on her behalf, while leaving the false impression that

these witnesses may well receive nothing in consideration of their testimony; 8) sponsoring false

testimony from the Crawfords and Brandie Price regarding their ongoing drug use; and 9) giving

an overall false picture of the informant witnesses' records and motives for testifying.

Consistent with the authority cited here, and especially when the Government's knowing

use of false testimony is considered in the aggregate with the suppression of exculpatory

evidence and newly discovered evidence, there can be no serious debate that Mr. Barrett was

prejudiced and that relief is required.  Had the jury been given an accurate picture of the

prosecution's witnesses, the Government's case would have been on shaky ground indeed.

### 3.      *Newly Discovered Evidence*

Newly discovered evidence, *i.e.,* evidence which could not have been discovered by the

exercise of due diligence before or during trial, may also form the basis for relief under § 2255.

*E.g., United States v. Hernandez,* 94 F.3d 606 (10th Cir. 1996) (rejecting newly discovered

evidence claim raised in initial 2255 petition, which was filed during pendency of direct appeal,

on the merits); (Fed. R. Crim. P. 33.)  To warrant relief on a claim of newly discovered evidence,

it must be shown: 1) that the evidence was discovered after the trial; 2) that failure to learn of the

evidence was not caused by a lack of diligence; 3) the evidence is not merely impeaching in

character; 4) the evidence is material to the principal issues involved; and 5) the evidence is of

such a nature that, had it been disclosed to the jury, there is a reasonable probability of a different

outcome, *i.e.,* acquittal or a lesser sentence. *Peltier v. Booker,* 348 F.3d 888, 890 (10th Cir. 2003); *United States v. Sinclair,* 109 F.3d 1527, 1531 (10th Cir. 1997).

A *Brady* claim may be a subspecies of a newly discovered evidence claim. *United States v. Quintinella,* 193 F.3d 1139, 1148 n. 9 (10th Cir. 1999). Whether the claims made below constitute *Brady* violations, newly discovered evidence, or both, Mr. Barrett is entitled to relief from his convictions and sentences.

Travis Crawford's recantation is newly discovered evidence, and could not have been uncovered prior to or during trial with the exercise of due diligence, because the Government sprung Crawford as a witness at the eleventh hour to forestall any effective investigation, and Crawford refused to speak with trial counsel about his testimony. Because he was the only witness to claim Mr. Barrett threatened law enforcement roughly contemporaneously to the shooting of Trooper Eales, his testimony was critical to the Government's intent case. Much the same is true of Cindy Crawford's revelation of improper Government conduct in connection with her testimony and the numerous impeaching facts she related to investigators currently working for Mr. Barrett. Crawford has also all but recanted her second stage testimony against Mr. Barrett. The newly discovered evidence respecting the Crawfords, either alone or in combination with the other newly discovered evidence addressed here, warrants relief under the standard of *Peltier v. Booker, supra. E.g., In re McDonald,* 514 F.3d 539, 542-47 (6th Cir. 2008) (post-trial recantation of key witness's trial testimony could not have been discovered previously with the exercise of due diligence and, if recantation was credible, defendant's constitutional rights would have been violated; defendant was permitted to file a second habeas challenge to his conviction); *Ferrara v. United States,* 456 F.3d 278, 290-98 (1st Cir. 2006) (defendant allowed to withdraw

plea ten years after the fact because informant witness recanted, and government concealed evidence of the recantation).

Other *Brady* evidence already discussed here also constitutes newly discovered evidence under the standards outlined above.  This evidence includes: 1) Charles Sanders's deals in exchange for his testimony against Mr. Barrett, which had to have been in the works all along but were only consummated at or shortly after the conclusion of Mr. Barrett's trial; 2) the deals, in state and federal court, respectively, accorded to Karen Real, Brandie Price, Randy Turman, and Cindy Crawford; and 3) Clint Johnson's firing shortly after Mr. Barrett's trial, and the revelations further damaging Johnson's credibility that surfaced at the trial of former Sequoyah County District Attorney Richard Gray, wherein Mr. Gray was acquitted on a directed verdict following Johnson's appearance as a prosecution witness.

Newly discovered evidence corroborating Travis and Cindy Crawford's claims that they were threatened and intimidated by then-AUSA Mike Littlefield has come to light with Littlefield's *Alford* plea to child abuse charges and the Oklahoma Supreme Court's private reprimand of his criminal conduct.  A child-abusing bully would hardly be above threatening witnesses, or engaging in the suppression of exculpatory evidence and the other forms of prosecutorial misconduct addressed throughout Mr. Barrett's pleadings.

All of this newly discovered evidence meets the *Peltier* factors and raises the reasonable probability of a different trial outcome had it been presented to the jury.  *United States v. Hernandez-Rodriguez,* 443 F.3d 138, 144-48 (1st Cir. 2006) (new trial ordered before a different judge where trial court abused its discretion in failing to assess the full impact of newly discovered evidence on the trial outcome; in Mr. Barrett's case, the combined effect of the newly discovered evidence, as well as the *Brady* violations and other related prosecutorial misconduct,

plainly mandates relief); *United States v. Fulcher,* 250 F.3d 244, 249-93 (4th Cir. 2001) To the extent that some – but most assuredly not all – of this newly discovered evidence could be called impeaching in character, it should be remembered that in some situations, such as in Mr. Barrett's case, newly discovered impeachment evidence could be so powerful that it renders the trial testimony of one or more witnesses incredible. *United States v. Davis,* 960 F.3d 820, 835 (9th Cir. 1992).

### 4.     *The Need for an Evidentiary Hearing*

As argued regarding Ground 2, *supra*, the governing law regarding *Brady*, *Giglio*, and *Napue* claims generally requires the Court to evaluate the cumulative effect of extra-record evidence. For that reason, hearings are generally required, and the prerequisite for denying such claims without a hearing, 28 U.S.C. § 2255(b), is less likely to exist. *United States v. Siddiqi,* 959 F.2d 1167, 1172-74 (2nd Cir. 1992) (remand to determine if defendant's submission of new evidence entitled him to a new trial).

### 5.     *Conclusion*

Considered together, the Government's wholesale suppression of exculpatory evidence, its knowing reliance on false evidence, and the new evidence Mr. Barrett has been able to discover during the course of these collateral proceedings demonstrates without question that Mr. Barrett's constitutional rights were violated and that he received a fatally flawed trial before this court. *United States v. Torres,* 569 F.3d 1277 (10th Cir. 2009: *Douglas v. Workman,* 560 F.3d 1156, 1186 (10th Cir. 2009); *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002) (habeas relief granted in §2254 case where exculpatory evidence, even if it could only be used for impeachment purposes, was suppressed); *Mitchell v. Gibson,* 262 F.3d 1036, 1059-60, 1062-63, 1065 (10th Cir. 2001) (vacating state death sentence for failure to reveal exculpatory results of testing of physical

evidence); *Nuckols v. Gibson,* 233 F.3d 1261 (10th Cir. 2000) (habeas relief granted where prosecution failed to disclose material evidence impeaching key prosecution witness). This evidence was relevant not only to the guilt-innocence determination, but to punishment as well, because it reveals mitigating facts about the circumstances of the homicide.

**Ground 5, Part C**

"In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact. Exceptions to this are justifiable only by the clearest and most compelling considerations." *Dennis v. United States,* 384 U.S. 855, 873 (1966) (footnote omitted). "'No right of a defendant is violated when a potential witness freely chooses not to talk....' *Kines v. Butterworth*, 669 F.2d 6, 9 (1st Cir. 1981), *cert. denied*, 456 U.S. 980 (1982). However, the prosecution may not interfere with the free choice of a witness to speak with the defense absent justification 'by the clearest and most compelling considerations.' *Id.*" *United States v. Pinto*, 755 F.2d 150, 152 (10th Cir. 1985). "[W]hen the free choice of a potential witness to talk to defense counsel is constrained by the prosecution without justification, this constitutes improper interference with a defendant's right of access to the witness. Justification on the part of the prosecution to interfere with that right can be shown only by the clearest and most compelling considerations." *Kines*, 669 F.2d at 9.

In *United States v. Gregory*, 369 F.2d 185 (D.C. Cir. 1966), *cert. denied*, 396 U.S. 865 (1969), the court, per Judge Skelly Wright, found the defendant's due process rights were violated when the "prosecutor embarrassed and confounded the accused in the preparation of his defense by advising the witnesses . . . not to speak to anyone unless he were present." 369 F.2d at 187. The prosecutor said he had "instructed all the witnesses that they were free to speak to anyone they like. However, it was my advice that they not speak to anyone about the case unless I

was present." *Ibid.* The statements of the court in *Gregory* apply to this case, although the

misconduct here was more serious:

> The purpose of 18 U.S.C. § 3432 requiring that in capital cases the defendant be furnished a list of the names and addresses of the witnesses to be called by the Government is to assist defense counsel in preparing the defense by interviewing the witnesses. Witnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them. Here the defendant was denied that opportunity which, not only the statute, but elemental fairness and due process required that he have. It is true that the prosecutor stated he did not instruct the witnesses not to talk to defense counsel. He did admit that he advised the witnesses not to talk to anyone unless he, the prosecutor, were present.

*Gregory*, 369 F.2d at 187-88.

The *Gregory* court noted that the then-current canons of professional conduct provided

that each party should have equal access to witnesses. *Id.* at 188. Today, professional standards

provide that it is unprofessional conduct for prosecutors to impede defense counsel's access to

prosecution witnesses. ABA Standard 3-3.1(c). "It is imperative that prosecutors and other

officials maintain a posture of strict neutrality when advising witnesses of their duties and

rights." *United States v. Rich*, 580 F.2d 929, 934 (9th Cir.), *cert. denied*, 439 U.S. 935 (1978).

Courts cannot tolerate "any governmental conduct that has the purpose or effect of discouraging

witnesses from cooperating with the counsel of an accused." *Ibid.* Thus, "counsel may not make

his or her presence a condition of the interview" between the defense lawyer and a witness. ABA

Standard 3-3.1(c) Commentary.

The court in *Gregory* held the prosecutor's conduct was as pernicious as the suppression

of evidence in violation of *Brady*. The court observed that there was not

> any direct suppression of evidence. But there was unquestionably a suppression of the means by which the defense could obtain evidence. The defense could not know what the eye witnesses to the events in suit were to testify to or how firm they were in their testimony unless defense counsel was provided a fair

Petitioner's Merits Brief                    166                    *Barrett v. U.S.*, 09-cv-105-JHP

opportunity for interview. In our judgment the prosecutor's advice to these eye
witnesses frustrated that effort and denied appellant a fair trial.

*Id.* at 189.

In this case, the Government first sought through an *ex parte* motion for a protective

order to prevent the defense from receiving the identifying information required by § 3432.

During the *ex parte* hearing on that motion, the trial court made it clear that the Government

failed to present anything close to the clearest and most compelling circumstances necessary to

forestall compliance with the statute.  (Tr. 9/13/05 Hr'g at 4-5, 9, 19.)  Nevertheless, the Court

withheld adjudication of the motion for a protective order.  This enabled the prosecutors to rely

upon the possibility of the protective order being granted when "negotiating" an "arrangement"

with the defense.  In the end, the prosecutors would secure, with the Court's tacit assistance, an

arrangement more detrimental to the search for truth than the one the court condemned in

*Gregory*, i.e., some witnesses would be interviewed but only after a delay and only in the

presence of the prosecutor.

There were also more egregious violations of the defense's right to investigate.

Prosecutors, through statements and/or actions, communicated to witnesses that they should not

speak with defense personnel outside the presence of the prosecutor. ( Exh. 92; Exh. 31.)  Karen

Real has told Mr. Barrett's investigator that she was told not to speak with him. ( Exh. 43.)

As stated in the Amended § 2255 Motions, the performance of Mr. Barrett's defense

counsel in relation to these witnesses also fell below prevailing professional norms.  To the

extent they acquiesced in the limitations on their access to information about the witnesses based

on ignorance of *Gregory* and cases following it, their conduct was unprofessional.  *Williams*, 529

U.S. at 395 (defense counsel's failure to obtain social service records on defendant based on

erroneous belief state law made them unavailable was constitutionally deficient); *Kimmelman*,

Petitioner's Merits Brief                                         167                                    *Barrett v. U.S.*, 09-cv-105-JHP

477 U.S. at 385 (counsel's failure to move to suppress was constitutionally deficient because it was based "on counsel's mistaken beliefs that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense").  The evidence described in Ground 2, Part A(4) and in Ground 5, Part A, shows that if defense counsel had sought a continuance and investigated the informants, and if the prosecution had complied with its duty to disclose impeachment evidence, the informant witnesses' credibility would have been totally undermined.

At a minimum, in light of the evidence presented in the Amended Motion, and the legal arguments presented here, the files and records do not conclusively show Mr. Barrett is entitled to no relief.  This Court should order an evidentiary hearing on sufficient notice for Mr. Barrett to obtain discovery and make use of this Court's subpoena power to marshal the abundant evidence. Thereafter, this Court should vacate the conviction.

**Ground 5, Part D.    Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses and Closing Argument.**

Throughout the guilt and penalty phases of Mr. Barrett's trial the prosecutors repeatedly and in various ways violated rules of professional conduct regarding the questioning of witnesses.  (*See* ABA Standard 3-5.6.)  These improper questions, together with the prosecutors' "comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

As shown in Mr. Barrett's previous filings, the Government engaged in the following forms of improper questioning of witnesses: 1) asking questions for which there was no good faith basis, or which were beyond the personal knowledge of the witness; 2) implying, through such questioning, that the prosecutor personally had knowledge of facts not testified to by the witness, making the prosecutor, in effect, a testifying witness; 3) commenting on Mr. Barrett's

670

exercise of his trial rights, as if he were somehow doing something wrong by demanding his

constitutional right to a trial; 4) asking witnesses whether other witnesses had made false

statements, when, again, such would be beyond the knowledge of the witness being examined; 5)

utilizing questions as a form of closing argument by repeating, over and over, the testimony of

the informant and other witnesses, thus in effect vouching for the testimony of the witnesses.

Each of these categories of questioning was improper. *United States v. Beeks,* 224 F.3d

741, 746 (8th Cir. 2000)(analyzing in detail and condemning repeated questioning by prosecutor

for which no good faith basis existed); *United States v. Davenport,* 753 F.3d 1460, 1462 (9th

1985)(improper to make commentary or ask questions for which no good faith basis exists to

"waft an unwarranted innuendo into the jury box"),  Just as it is improper to engage in

commentary in closing argument that is outside the record evidence, *e.g., United States v.*

*Cheska,* 202 F.3d 947 (7th Cir. 2000); *United States v. Manning,* 23 F.3d 570 (1st Cir. 1994);

*United States v. Blakely,* 14 F.3d 1557 (11th Cir. 1994), it is likewise improper, through the

questioning of witnesses, to imply the existence of certain facts or evidence the witness has not

testified to.  In effect vouching for the testimony of witnesses, or treating their testimony as

established fact in commentary or questioning of other witnesses, is equally beyond the pale.

*United States v. Young,* 470 U.S. 1, 18-19 (1985)(vouching for witnesses vests them with the

imprimatur of the government, and may induce the jury to trust the government's judgment rather

than its own view of the evidence); *United States v. Martinez-Medina,* 279 F.3d 105 (1st Cir.

2002)(improper vouching for credibility of informant witness by implying that if informant were

lying to curry favor with the government, he would have come up with more powerful

testimony); *United States v. Broomfield,* 201 F.3d 1270, 1276 (10th Cir. 2000)(court condemned

increased willingness of prosecutors to "push the envelope" with improper vouching); *United*

*States v. Garcia-Guizer,* 160 F.3d 511, 520 (9ᵗʰ Cir. 1998)(noting that the court had frequently observed that the government may not vouch for the credibility of its witnesses, either through putting the prosecutor's own prestige behind the witness's testimony, or indicating that extrinsic information not presented in court supports the witness's testimony).

The Government's conduct in the penalty phase closing arguments was even more egregious. In his portion of the penalty phase closing argument, AUSA Littlefield, taking unfair advantage of the court's erroneous ruling excluding Mr. Barrett's statements expressing his genuine remorse for Trooper Eales's death by wishing he had been killed rather than Mr. Eales, fastened on an ambiguous statement that had been allowed in evidence: that Mr. Barrett wished things had turned out differently. Knowing full well this isolated statement did not tell the whole story, Littlefield sarcastically told the jury that by this, Mr. Barrett simply meant he was sorry he got caught; what he regretted was that he would not have an opportunity to "kill more of the bastards." (R. 5356-57.) The Tenth Circuit has condemned similar tactics. *Paxton v. Ward,* 199 F.3d 1197, 1217 (10th Cir. 1999) (prosecutorial misconduct justified sentencing relief where, in connection with unadjudicated homicide introduced in the penalty phase, prosecution objection prevented defendant from showing the charge had been dismissed because he passed a polygraph test, and prosecutor took advantage of the ruling to argue "we don't know why" the case was dismissed, implying dismissal could have stemmed from a technicality).

United States Attorney Sperling strayed from the record and appealed to societal alarm, stating at one point the "hand of God" prevented Mr. Barrett from being a multiple murderer. This was "way over the capital murder line." (R. 5402-03.) Similarly, Sperling later asked, "Why wasn't this a double murder or a triple murder or a quadruple murder?" (R. 5412.) Denigrating Mr. Barrett's fundamental right to a fair trial, Sperling, in the form of a rhetorical

question, told the jury Mr. Barrett not only had no right to leniency, but really had no right to "fairness." (R. 5408.)

Trotting out a variation on the old Bob Macy[99] "three hots and a cot" argument, which the Tenth Circuit has condemned on more than one occasion, Sperling repeatedly – and falsely – characterized life without the possibility of release as Mr. Barrett simply being "sent to his room." (R. 5412, 5423.) Continuing in the same improper vein, Sperling told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation. (R. 5412.) Speculating outside the record simply to prejudice the jury, Sperling said that if given life, Mr. Barrett would be a "hero" to his fellow inmates. (R. 5412.) *Duckett v. Mullin,* 306 F.3d 982, 992 (10th Cir. 2002); *Le v. Mullin,* 311 F.3d 1002, 1014-15 (10th Cir. 2002). In the next breath, he engaged in improper name calling, referring to Mr. Barrett as the "executioner of the innocent." (R. 5412.)

Attempting to create resentment among the jurors, as if Mr. Barrett, and not the jury, was in control of his fate, and again denigrating Mr. Barrett's right to a fair trial, Sperling falsely told the jury Mr. Barrett wanted to "choose his sentence." Asking rhetorically, "How unjust is that?" the United States Attorney closed the circle on the "three hots and a cot" theme and appealed to lynch law by inquiring "What opportunity did he give Rocky Eales to live?" The prosecutor again went outside the record when he stated Mr. Barrett wanted "the thrill of the kill." (R. 5412-13.)

---

[99] Mr. Macy is the former long-time District Attorney in Oklahoma County, who was well known, and often criticized by the courts, for his misconduct in death penalty cases.

Fueling alarm that Mr. Barrett was a threat to witnesses, when there was absolutely no evidence in the record to support such a claim[100], and misleading the jury all at once, the prosecutor commented that the state case was "grossly under-evidenced," because "no small effort was involved" in getting the drug-addicted, criminal, deal-swinging snitches "brave enough," to testify. (R. 5414-15.) *Gordon v. Kelly,* 2000 WL 145144 (6th Cir. Feb. 1, 2000) (unpublished) (pervasive efforts by prosecutor to portray defendant as being feared by witnesses required habeas relief).

Left unsaid, of course, was that these individuals, who supposedly knew so much, and were never once threatened by Mr. Barrett to keep them "quiet," were nowhere to be found in 1999 when the shooting occurred, or in 2002 and 2004 when the case was tried in state court. They only crawled out of the woodwork when the federal government put the arm on them. To say, as the prosecutor did, that the state juries got only a "small glimpse" of the whole case falsely implied the seven Johnny and Janie Come Latelys were ready, willing and able to testify back when, but were somehow prevented from doing so by the state prosecutors, or out of "fear."

The prosecutor grossly misled the jury when he referred to the victim impact witnesses and stated "[t]hey didn't testify in state court," as if this explained the state court outcome. (R. 5415.) This falsely implied the victim impact witnesses did not testify in the state trials only because the incompetent, "under-evidenced" state prosecutors did not have sense enough to put them on the stand. Sperling was well aware they *could not have testified by law* because the case never got past the first stage. Shielded by the court's erroneous ruling excluding Mr. Barrett's

---

[100] This was a knowing false statement on the prosecutor's part. As discussed in Ground 1, the Government failed to produce *any* evidence at the *ex parte* hearing on its motion to delay disclosing the identity of the informant witnesses that the witnesses had ever been threatened in any manner by Mr. Barrett. "Monk" Sanders testified in the second stage that Mr. Barrett wanted the snitch who landed him in jail harmed, but anything this pathetic witness had to offer was scarcely worthy of belief.

statements of remorse, and picking up where Mike Littlefield left off, the prosecutor ridiculed the "wish it had been different" statement, remarking this sentiment was "big of him [Mr. Barrett]." (R. 5419.) The prosecutor stated there was no evidence Mr. Barrett had "lost one wink of sleep" over what he did.  Mr. Barrett killed "remorselessly" and "selfishly," with no sympathy or empathy for anyone.  Mr. Barrett was so unfeeling and callous, it was almost as if he had done "nothing."  The "wrong choice" comment was likened to a meaningless mistake, nothing more than an "oops."  (R. 5420-21.)  There were additional comments on Mr. Barrett's supposed lack of remorse.  (R. 5419-20, 5421-22.)  *Paxton v. Ward,* 199 F.3d at 1217.

The United States Attorney improperly denigrated Mr. Barrett's right to put on mitigating evidence by stating he was using his family as "props," in contrast to Trooper Eales, who did not receive a similar chance to plead for his life.  (R. 5420.)  *Cf. Penry v. Lynaugh,* 492 U.S. 302, 319 (1989); *Lockett v. Ohio,* 438 U.S. 586 (1978).

Sperling aligned himself with the jurors as if he and they were on the same team, stating that "we" must not refuse to do "our" duty just because the victim's family and the community could not be made whole again.  (R. 5421-22.)  Remarks of this nature have always been deemed improper. *Viereck v. United States,* 318 U.S. 236, 247-48 (1943); *Cargle v. Mullin,* 317 F.3d 1196, 1223 (10th Cir. 2003).

It is simply improper for a prosecutor to suggest that a jury has a civic duty to convict or to return a certain punishment. *Thornburg v. Mullin,* 422 F.3d 1113, 1134 (10th Cir. 2005); *Malicoat v. Mullin,* 426 F.3d 1241, 1256 (10th Cir. 2005); *Spears v. Mullin,* 343 F.3d 1215, 1247 (10th Cir. 2003).

Continuing with the civic duty theme, the prosecutor talked of Mr. Barrett having "slaughtered an innocent soldier of the law," warning the jury they would make him a "hero" in

prison if they returned a life sentence, or "sent him back to his room" and merely gave him "more time." (R. 5423.) This was little better than telling the jury that if they spared Mr. Barrett's life, they would be accomplices to any future crimes he might commit. *Bates v. Bell,* 402 F.3d 635, 642 (6th Cir. 2005).

The misconduct in second stage closing arguments was so pervasive that Mr. Barrett's fundamental due process rights to a fair sentencing proceeding were violated, notwithstanding the lack of objections. *See* Ground II. *Darden v. Wainwright,* 477 U.S. 168 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974). The error stemming from prosecutorial misconduct cannot be termed harmless, even under the strict due process test of *Darden* and *Donnelly.* This was not a runaway case for the death penalty. The jury rejected death on counts 1 and 2, and also rejected the non-statutory aggravating circumstance that Mr. Barrett would pose a continuing threat.

"It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. 349, 358 (1977)(plurality opinion); *Bland v. Sirmons,* 459 F.3d 999, 1028 (10th Cir. 2006). The repeated misconduct of the prosecutors prevented the jury from evaluating the second stage evidence fairly, leading to a death verdict based on emotion rather than reason. *Bland,* 459 F.3d at 1024.

Prosecutorial misconduct was not raised on direct appeal. Because the misconduct of the prosecutors in both stages of trial was so glaring, no reasonable strategy excused the failure to raise the claim. Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different. *Evittts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984). *See* Ground XVIII, *infra.*

Petitioner's Merits Brief                    174                    *Barrett v. U.S.*, 09-cv-105-JHP

**Ground 6.**  **Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements and Other Evidence.**

Mr. Barrett's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, to due process, to effective assistance of counsel, to a reliable sentence, to present defense evidence, and to rebut the evidence introduced against him were violated when the trial court unduly restricted defense counsel's opportunity to present significant, relevant and admissible *defense* evidence and facts to the jury, including various statements by Mr. Barrett around the time of his arrest that showed deep remorse for the death of Trooper David Eales.  The trial court also improperly restricted evidence regarding the previous state court trials and verdict.

The court's exclusion Mr. Barrett's statements expressing remorse for Trooper Eales's death during penalty phase proceedings violated Mr. Barrett's right to jury consideration, as a mitigating factor, of important evidence of Mr. Barrett's character, in violation of *Tennard v. Dretke,* 524 U.S. 274, 285 (2004); *Penry v. Johnson,* 532 U.S. 782, 797 (2001); *Skipper v. South Carolina*, 476 U.S. 1 (1976); *Eddings v. Oklahoma,* 455 U.S. 104 (1982); and *Lockett v. Ohio*, 438 U.S. 586 (1978).   The exclusion of this evidence also violated Mr. Barrett's Sixth Amendment right to offer evidence in support of his case.  *Rock v. Arkansas*, 483 U.S. 44 (1987); *Chambers v. Mississippi,* 410 U.S. 284, 294 (1973).  The exclusion of this evidence deprived Mr. Barrett "of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986); *California v. Trombetta,* 467 U.S. 479, 485 (1984).  These restrictions also denied Mr. Barrett the opportunity to conduct an effective cross-examination of prosecution witnesses, in violation of Mr. Barrett's rights under the Confrontation Clause of the Sixth Amendment.  *Delaware v. Van Arsdale*, 475

U.S. 673, 678 (1986); *Davis v. Alaska,* 415 U.S. 308, 318 (1974).  Finally, the trial court's

rulings fatally infected the proceedings and violated Mr. Barrett's due process rights.  *Estelle v.*

*McGuire*, 502 U.S. 62, 70 (1991); *Moore v. Illinois*, 408 U.S. 786, 800 (1972).

During the course of Mr. Barrett's trial, counsel sought to admit a number of statements

made by Mr. Barrett shortly after his arrest that showed his deep remorse for the death of Trooper

Eales.  For example, Mr. Barrett's counsel sought to admit the written statement of Trooper Glen

Smithson, who recorded that on September 29, 1999, Mr. Barrett told him, "The wrong person

got killed.  I wished it had been me."  (Exhibit 107.)

However, the prosecutor objected to these statements, and the court incorrectly excluded

them.  It goes without saying that remorse is a proper mitigating factor, and that any evidence

bearing on it, particularly in light of the relaxed standards for the admissibility of evidence in a

federal capital trial, is admissible under the Eighth Amendment.  The courts routinely note that

evidence of remorse, whether testified to by a defendant himself, or a defendant's expressions of

remorse to third parties, are appropriate considerations for a jury in a death penalty case.  *Boyd v.*

*Allen,* ___F.3d___, No. 07-14908 (11ᵗʰ Cir. Jan. 8, 2010) (noting that a witness testified in the

penalty phase that the defendant had expressed remorse to her and told her that he never "meant

for it to happen"); *Smith v. Mullin,* 379 F.3d 919, 936 (10ᵗʰ Cir. 2004); *James v. Gibson,* 211 F.3d

543, 549 (10ᵗʰ Cir. 2000); *Cooks v. Ward,* 165 F.3d 1283, 1294 (10ᵗʰ Cir. 1998) (jury instructed

that, as a mitigating factor, defendant had repeatedly expressed remorse and shame for his

offense); *Duvall v. Reynolds,* 139 F.3d 768, 779 (10ᵗʰ Cir. 1998) (rejecting ineffective assistance

argument for failure to introduce evidence of remorse, when evidence of defendant's remorse

was in the trial record, including defendant crying during his statement to the police).  Here, the

court instructed the jury on remorse as a mitigating factor, but excluded the evidence supporting

a finding of remorse.  With evidence of remorse improperly excluded, the jury was left to believe that the opposite was true: that Mr. Barrett had no remorse for his crimes, and that this was a reason to sentence him to death.  *United States v. Barrett,* 496 F.3d 1079, 1088 n. 4 (10th Cir. 2007) (noting that while all or some of the jurors found a number of mitigating factors, the jury *unanimously* rejected remorse as a mitigating factor).

The Government cynically exploited the court's ruling in closing argument, mocking the notion Mr. Barrett had any remorse at all.  The prosecutor fastened on Mr. Barrett's statement to his mother that he wished things had turned out differently, which AUSA Littlefield  stated meant Mr. Barrett had wished he had not gotten caught so he could "kill more of the bastards." (R. 5356.)  During closing argument, Mr. Barrett's counsel argued, as a factor in mitigation, that Mr. Barrett expressed remorse.  With Mr. Barrett's expressions of remorse excluded, the United States Attorney was able, without fear of contradiction, to call him a "common, cold-blooded murderer."  (R. 5423.)

By refusing Mr. Barrett's attempts to present evidence of his contemporaneous expressions of remorse, the Court prevented Mr. Barrett from proving the existence of this factor in mitigation.  In fact, Mr. Barrett's expressions of remorse were highly relevant and admissible. Remorse is "an important mitigating factor." *Jones v. Polk*, 401 F.3d 257, 264 (4th Cir. 2005). *See also Riggins v. Nevada*, 504 U.S. 127, 144 (1992) (Kennedy, J., concurring) ("In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps be determinative of whether the offender lives or dies.")  This is particularly true when, as in this case, the Government "emphasized the lack of remorse in closing argument." *Jones v. Polk*, 401 F.3d at 264.

"Short of a defendant taking the stand, often the only way to present evidence of remorse is through the hearsay statements of others." *Davis v. Polk*, 2007 WL 2898711, at *18 (W.D.N.C. 2007).   Accordingly, the use of hearsay rules to prevent the admission of expressions of remorse violates the *Lockett* line of cases, which hold:

> that 'a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could not be part of the sentencing decision at all."

*Jones v. Polk*, 401 F.3d at 263 *quoting Johnson v. Texas*, 509 U.S. 350, 362 (1993) (court erred in excluding as hearsay at penalty phase letter in which capital defendant expressed remorse).

The court's error in excluding this evidence prejudiced Mr. Barrett.  Had Mr. Barrett been allowed to present this evidence, there is a reasonable probability that he would not have been sentenced to death.  The court clearly erred in excluding this evidence, because the rules of evidence, with respect to the introduction of both mitigating and aggravating evidence, do not apply in the sentencing stage of a capital case.  Title 21 U.S.C. §848(j), in effect at the time of Mr. Barrett's trial, states that any other information a party may want to submit is not constrained by the rules of evidence, unless its probative value is substantially outweighed by the danger of unfair prejudice.  Because a defendant must be allowed under the Eighth Amendment to introduce any relevant mitigating evidence, it beggars the imagination to believe that expressions of remorse are more prejudicial than probative.  The court excluded highly relevant mitigating evidence of remorse, which opened the door for the Government to prejudicially deride Mr. Barrett as a cold blooded killer who wanted to take out more cops.

All of the constitutional violations alleged above warrant the granting of relief without any determination of whether these violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional

Petitioner's Merits Brief                                    178                            *Barrett v. U.S.*, 09-cv-105-JHP

violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on Mr. Barrett's conviction and death sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

The trial court also violated Mr. Barrett's Fifth Amendment due process rights to a fair trial, and his Sixth Amendment rights to present a defense and to confront witnesses against him by excluding altogether, in the *first stage* of trial, evidence of the prior state court trials and verdict. *Crane v. Kentucky,* 476 U.S. at 690; *Delaware v. Van Arsdall,* 475 U.S. at 678-79; *Davis v. Alaska,* 415 U.S. at 318; *Chambers v. Mississippi,* 410 U.S. at 294. Although counsel did cross-examine some of the informant witnesses about why they only came forward shortly before the federal trial, the cross-examination lacked proper context. The credibility of these witnesses would have been severely damaged, and their motives for coming forward only years after the fact would have been exposed, had counsel been able to point out in cross-examination that Mr. Barrett had actually been tried for Trooper Eales's death not once, but twice in state court in 2002 and 2004, and that these "important" witnesses were nowhere to be found, even though they were in the community and the same state law enforcement officers (most particularly, Clint Johnson and Sheriff Philpot) who were assisting in the federal case had worked the state case. Evidence that these witnesses were totally silent at the time of the two previous state court trials also would have put the lie to Clint Johnson's testimony, elicited on cross-examination, that several individuals had reported threats from Mr. Barrett to law enforcement, and that this "fact" made execution of the warrant "high risk." (*See also,* Ground II A (8))

In *United States v. Giovanelli,* 945 F.2d 479, 486-490 (2nd Cir. 1991), the defendants were charged in a racketeering case.  Some of the predicate acts for the racketeering charge were an attempted murder and two murders for which some of the accused had either been acquitted or which had resulted in hung juries in state court.  Just as the trial court did here in the guilt phase, the trial judge in *Giovanelli* excluded all previous mention of the fact that there had been previous trials, and the outcome of those trials.

On appeal, the defendants argued that the information regarding the prior state trials was vital to the ability to cross-examine and impeach witnesses with the fact that their testimony had evolved since the state court prosecutions.  It was held that while evidence regarding the outcome of the previous state prosecutions could perhaps have been excluded as being more prejudicial (to the Government's case) than probative, the defendant's rights to put on a defense and confront witnesses was violated by the trial court's ruling that any mention of the previous state court prosecutions was *verboten*.  The appellate court held that before evidence of the state proceedings was introduced, the trial court could have and should have instructed the jury that under the dual sovereign doctrine, *Heath v. Alabama,* 474 U.S. 82 (1985), it was permissible for the Federal government to charge an individual for the same offense that had previously been prosecuted at the state level, and that the jury would hear references to testimony given in the prior state trials.  Defense counsel should have been permitted to refer to the previous trials, but not their outcome.  Because the trial court did not follow this course, the jury's findings of the predicate acts relating to the previous state prosecutions were vacated.

At the very least, counsel for Mr. Barrett should have been able to bring out, on cross-examination of the informants, that there had been previous state court trials and that these witnesses were suspiciously absent from them, raising the inference that their testimony had been

tailored and fabricated for the late-coming federal prosecution in order to "fill the gap" in the Government's proof. Counsel also should have been permitted to refer to the previous state court trials in cross-examination of the law enforcement witnesses to raise the inference that their testimony had evolved after two jury trials. As noted, information regarding the state court trials also would have been invaluable in impeaching Clint Johnson's false testimony that execution of the warrant was "high risk" because several individuals had reported threats by Mr. Barrett to law enforcement. If that were the case, where were these witnesses in state court?

Mr. Barrett submits that not only the fact of the state court trials, but their outcome, should have been permitted in the guilt stage. Evidence that one jury had deadlocked on the state murder charge, and that a second jury had acquitted Mr. Barrett of murder, convicting him instead of manslaughter, was highly probative to his defense at the federal trial, and would have exposed the impure motives of the Government for bringing a federal case simply because it did not like the outcome of the state prosecution. The only "prejudice" the Government would have suffered had the result of the state court proceedings been placed before the jury was the exposure of its cynicism and the unfairness in launching a federal prosecution to begin with.

Appellate counsel were ineffective for failing to raise the issues addressed here, which were clearly framed by the record.. There could be no reasonable strategy for neglecting to raise these claims on direct appeal. There is a reasonable probability that had the issues been raised, the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984). *See* Ground XVIII, *infra*.

**Ground 7.**    **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were Violated when the Trial Court Permitted the Marshals to Restrain him Without Justification.**

In Ground 7 of the Amended § 2255 Motion, Mr. Barrett sets out the evidence demonstrating that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court permitted the U.S. Marshal to place on Mr. Barrett a bulging electric shock apparatus and required him to wear the shock device during the trial without a finding that Mr. Barrett was or would be a security risk. Throughout the trial Mr. Barrett was forced to wear a "stun belt" around his waist. The belt left an unusual bulge that was visible through Mr. Barrett's clothing. The marshals' ability to send an electric shock through the belt intimidated Mr. Barrett and posed a danger to him that impaired his ability fully to observe and participate in the trial, including communicating with his attorneys.

The Supreme Court has long held that the use of visible or fear-inducing restraints on a defendant without a particularized finding of necessity violates due process and can impair a defendant's Sixth Amendment right to effective assistance of counsel, to a presumption of innocence, and to a fair and reliable capital sentencing proceeding as guaranteed by the Eighth Amendment. *Deck v. Missouri*, 544 U.S. 622, 632 (2005); *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Estelle v. Williams*, 425 U.S. 501 (1976); and *Illinois v. Allen*, 397 U.S. 337 (1970). "'The use of stun belts, depending somewhat on their method of deployment, raises all of the traditional concerns about the imposition of physical restraints.'" *United States v. Wardell*, 591 F.3d 1279, 1294 (10th Cir. 2009), quoting *Gonzalez v. Pliler*, 341 F.3d 897, 900 (9th Cir. 2003), and citing *United States v. Durham*, 287 F.3d 1297, 1306 (11th Cir. 2002) (applying Supreme Court's restrictions to "stun belts").

The Tenth Circuit has "recognized the district court's legal obligation to consider *individualized* factors in determining whether to deviate from the general rule prohibiting physical restraints." *Wardell*, 591 F.3d at 1293 (emphasis added). *See also Deck*, at 633 ("determination must be case specific; that is to say, it should reflect particular concerns , say special security needs or escape risks, related to the defendant on trial"). In order to place Mr. Barrett in the electric shock device the trial court had to find it "serve[d] an 'essential' interest 'specific' to [the] particular case. Security needs or escape risks 'related to the defendant on trial' constitute such an interest." *Ibid.*, quoting *Deck*, 544 U.S. at 628, 633. The record shows there was no basis for finding Mr. Barrett posed any risk of escape, and the trial court made no such individualized finding. On the contrary, the trial judge stated that the decision to place Mr. Barrett in the electric shock device was *not* based on defendant-specific concern that he would pose a danger in court, but on generalized security concerns. Tr. 9/13/05 ex parte Hr'g at 13. *Cf. United States v. Baker*, 432 F.3d 1189, 1244 (11th Cir. 2005) ("the decision to use shackles to restrain a defendant at trial should rarely be employed as a security device"). "[B]ecause of the various constitutional concerns that flow from such a decision, it triggers 'close judicial scrutiny.'" *Wardell*, at 1293, quoting *Estelle*, 425 U.S. at 504. Here, during the September 9, 2005 hearing on the use of the device, the trial court failed to apply the required scrutiny when it expressly deferred to the judgment of the marshals.

Prejudice is presumed from the use of a shock restraint unless two conditions are met: "(1) the court makes a defendant-specific determination of necessity resulting from security concerns; and (2) it minimizes the risk of prejudice by, for instance, concealing the stun belt from the jury." *Wardell*, at 1294. As already shown, the trial court did not make any defendant-

Petitioner's Merits Brief                           183                           *Barrett v. U.S.*, 09-cv-105-JHP

specific finding and there was no basis in the record for one.  Thus, prejudice is to be presumed.

But there is evidence that the second precondition to requiring a prejudice showing also fails.

The electric shock device created a visible bulge in Mr. Barrett's clothing that was observable by the jury.  Exh. 80.  Indeed, the manufacturer of the device has distinguished its product from others because it is an "obvious" restraint.  Pet. Writ Cert. in *Stun-Tech, Inc. v. RACC Industries, Inc.*, Case No. 95-268, available at 1995 WL 17048059.

In addition, this is not the "ordinary" case posited in *Wardell*.  As the jury found, Mr. Barrett was known by the Government and trial court to be a victim of violent abuse by Sheriff Johnny Philpot and his deputy.  The Government and trial court also were aware that Mr. Barrett had been beaten, denied medical treatment, and threatened by law enforcement officers for his role in the death of David Eales.  Under the circumstances it was reasonable for Mr. Barrett to fear that he would be shocked by the marshals on the slightest perceived provocation, and as this issue was raised by defense counsel, the trial court was aware that the shock device would inhibit Mr. Barrett's movements and communications with counsel in court.  Since the trial, defense counsel have confirmed that Mr. Barrett felt intimidated wearing the stun belt throughout the trial.  (Exh. 29.)

> That experience is hardly surprising given what was known about the use of this device: Two nine-volt batteries connected to prongs that are attached to the wearer over the left kidney region power the belt. The belt may be activated from as far away as 300 feet and once activated it delivers an eight-second, 50,000 volt shock that cannot be stopped. This high-pulsed electrical current travels through the body along blood channels and nerve pathways. The belt's electrical emission knocks down most of its victims, causing them to shake uncontrollably and remain incapacitated for up to forty-five minutes. Activation may also cause immediate and uncontrollable defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal. Activation may cause some wearers to suffer heartbeat irregularities or seizures.

> *Manufacturers of the stun belt emphasize that the belt relies on the continuous fear of what might happen if the belt is activated for its effectiveness.*

*Wrinkles v. State*, 749 N.E.2d 1179, 1193-94 (Ind. 2001) (emphasis added).

Defense counsel's performance fell below prevailing professional norms when they failed to bring these issues to the attention of the trial court during the trial. Defense counsel have a duty to develop a relationship of trust with the defendant and to take affirmative steps "at all stages of the case [to] engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case." ABA Guideline 10.5.C. In order to facilitate communication during trial, and to avoid impediments to Mr. Barrett's ability rationally to assist in his own defense, and to preserve the record, defense counsel were obligated to bring to the trial court's attention the bulge in Mr. Barrett's clothing, and the discomfort and fear it produced. ABA Guideline 10.8.A. Counsel's omissions constitute deficient performance.

In *Roche v. Davis*, 291 F.3d 473 (7th Cir. 2002), the court held the outcome of the capital sentencing proceedings was unreliable due to defense counsel's failure to object to the petitioner's shackling and the failure to ensure that the jury could not see the shackles. The state court decision was unreasonable because the court only considered counsel's efforts to reveal the shackles during his testimony but not when seated at the defense table when the record revealed the shackles were visible to the jurors. The court held there was prejudice – even though the final determination about the appropriate sentence rested with the trial judge – because there was considerable mitigation available and the jury deliberated for eight hours and was unable to recommend the death penalty. In the present case, this Court must consider the abundant mitigation evidence presented in Part B of Ground 2. Upon such consideration, defense

counsel's failure in this case to prevent Mr. Barrett from being restrained with an obvious and terrifying device undermines confidence in the verdict.

To the extent this Court finds the claim should have been raised on direct appeal, Mr. Barrett suffered prejudice from counsel's errors. Appellate counsel states that he did not believe the issue was preserved. Exh. 29. Mr. Barrett was prejudiced from prior counsel's omissions in that if the facts had been presented, prejudice would have been presumed, and Mr. Barrett would been entitled to a new trial.

As with the obviousness of the device, the element of fear cannot be denied as "the psychological toll exacted by such constant fear is one of the selling points made by the manufacturer of the belt." *Hawkins v. Camparet-Cassini*, 251 F.3d 1230, 1239 (9th Cir. 2001) (referring to Stun-Tech literature promoting "'total psychological supremacy [over] troublesome prisoners'"). Mr. Barrett's defense counsel informed the court that Mr. Barrett feared the device because he was at special risk from electrocution due to conductive steel wire in his chest and abdomen area. Tr. 9/9/05 Hr'g at 27. As courts have observed

> "[t]he fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely chills a defendant's inclination to make any movements during trial-including those movements necessary for effective communication with counsel.
>
> "... Wearing a stun belt is [also] a considerable impediment to a defendant's ability to follow the proceedings and take an active interest in the presentation of his case. It is reasonable to assume that much of a defendant's focus and attention when wearing one of these devices is occupied by anxiety over the possible triggering of the belt."

*Wardell*, at 1296-97, quoting *Durham*, 287 F.3d at 1305-06.

The use of an obvious, fear-inducing device that gave marshals psychological dominance over Mr. Barrett during the trial requires that the conviction be vacated and a new trial held. At a minimum, the files and records do not conclusively show that Mr. Barrett is entitled to no relief.

Petitioner's Merits Brief              186              *Barrett v. U.S.*, 09-cv-105-JHP

Accordingly this Court should give adequate notice of an evidentiary hearing so that Mr. Barrett may use discovery and this Court's subpoena power to prove either the denial of due process, the denial of effective assistance of counsel, or both.  28 U.S.C. § 2255(b); R. Gov. § 2255 Proc. 8(c).  Thereafter, the conviction should be vacated and a new trial should be ordered.

**Ground 8.     Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution**.

In Ground 8 of the Amended § 2255 Motions, Mr. Barrett sets out the factual basis for the Court to find that the judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, and to a jury trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Mr. Barrett was tried, convicted and sentenced to death when he was in fact mentally incompetent to stand trial.  The facts supporting the claim are set out in the Amended Motion and will not be repeated here.

It is "well-settled that the 'criminal trial of an incompetent defendant violates due process.'"  *McGregor v. Gibson*, 248 F.3d 946, 951 (10th Cir. 2001) (en banc), quoting *Media v. California*, 505 U.S. 437, 453 (1992).  The Fifth and Fourteenth Amendment right not to be tried while incompetent includes the right to be present and rationally to participate in the proceedings. *Medina v. California*, 505 U.S. at 453; *Drope v. Missouri*, 420 U.S. 162, 172-173 (1975); *Pate v. Robinson*, 383 U.S. 375, 386 (1966).

Due process requires that when a trial court is aware of evidence sufficient to create a bona fide doubt about the defendant's competence, a hearing is necessary.  *Drope v. Missouri*, 420 U.S. 162, 172-73 (1975).  Because competence can wax and wan over the course of the

Petitioner's Merits Brief                         187                    *Barrett v. U.S.*, 09-cv-105-JHP

proceedings, "a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope*, 420 U.S. at 181; *see also United States v. Ghane*, 490 F.3d 1036, 1041 (8th Cir. 2007) ("competency finding is not static"). Thus the Court reversed in *Drope* because "the record reveal[ed] a failure [on the part of the trial court] to give proper weight to the information suggesting incompetence which came to light during trial." *Drope*, 420 U.S. at 179.

> Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's behalf or to remain silent without penalty for doing so.

*Cooper*, *supra*, 517 U.S. at 354, *quoting Riggins v. Nevada*, 504 U.S. 127, 139-140 (1992) (Kennedy, J., concurring in judgment).

In *Dusky v. United States*, 362 U.S. 402 (1960), the Supreme Court ruled that the test for determining whether a criminal defendant is competent to stand trial is "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him." In *Drope v. Missouri*, 420 U.S. 162 (1975), the Court further explained that a "person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." 420 U.S. at 171.

*Drope* and *Dusky* establish a two-part test. "The first prong of the competency test requires the district court to determine if the defendant has 'a rational as well as factual understanding of the proceedings against him.'" *Ghane*, 490 F.3d at 1040, quoting *Dusky*, *supra*. This first prong also has two components, and unless each is satisfied, the trial cannot proceed.

If the defendant has a factual understanding but lacks a rational understanding, for example, due to irrational beliefs about to personnel involved, he is not competent to stand trial. *Ibid.* (finding defendant was incompetent due to paranoid conspiracy beliefs although he had a factual understanding of the proceedings).

"The second prong of the competency test requires the district court to determine whether the defendant is able to assist properly in his defense." *Ibid.* If the defendant understands the proceedings, but, due to a mental disease or defect, cannot properly assist in his defense, the trial cannot proceed. 18 U.S.C. § 4241.

Where a preponderance of the evidence shows that a defendant lacks the requisite understanding or ability to participate in the proceedings, the defendant may not be tried or admitted to punishment. *Cooper v. Oklahoma*, 517 U.S. 348 (1996); *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990).

The substantive due process violation that resulted from requiring Mr. Barrett to stand trial while he was mentally incompetent may be established by any relevant evidence, including both the evidence available at the time of trial, as well as any evidence developed since then. *Odle v. Woodford*, 238 F.3d 1084, 1090 (9th Cir. 2001) (determination whether defendant was incompetent in fact required consideration of "old" evidence of mental state evidence at trial and "new" evidence of post-conviction psychiatric evaluations); *Reynolds v. Norris*, 86 F.3d 796, 802 (8th Cir. 1996); see, also, *Gilbert v. Mullen*, 302 F.3d 1166, 1178 (10th Cir. 2002) (discussing different burdens of proof for substantive and procedural competency claims).

The factual allegations set forth in more detail in Grounds 2, 7, and 13, and incorporated by this reference as though fully set fort, and the supporting documentary and record evidence submitted with and/or incorporated by reference into this petition, irrefutably demonstrates that

691

Mr. Barrett was incompetent as a matter of clinical and medical fact at all stages of the trial proceedings.  At the time of his trial, Mr. Barrett had a documented psychiatric history, including medical diagnosis of Bipolar Disorder, a serious mental illness known to produce "bizarre behavior," impair judgment and distort perceptions.  *Williamson v. Ward*, 110 F.3d 1508, 1519 (10th Cir. 1997).

The evidence submitted with the Amended § 2255 Motions, in summary, establishes the following:

- Mr. Barrett was involuntarily committed to psychiatric hospitals on two occasions and forcibly treated with antipsychotic medication;

- in the months before his arrest, Mr. Barrett's disordered thinking became increasingly paranoid and delusional as he became preoccupied with the distorted belief that he was being monitored by some form of unknown aircraft;

- Mr. Barrett experiences brain dysfunction due to organic brain damage, particularly in the areas that are necessary to reason, exercise sound judgment and inhibit overreaction to stress situations.

- damage to Mr. Barrett's brain compromises his ability to engage in purposeful, organized, strategic, self-regulated, goal-directed behavior; screen out interference and sustain attention; inhibit reflexive responses and return to ongoing activity; efficiently integrate multiple outputs; oversee the selection of verbal and non-verbal processing mechanisms; regulate emotional control; direct motor output; and adequately process and make use of new information (Exhibit 89 at ¶¶ 36-38;  Exhibit 117 at ¶¶ 57-58);

- Mr. Barrett was suffering the effects of Bipolar Disorder and Post Traumatic Stress Disorder (PTSD) (Exh. 117 at ¶ 81);

692

- Mr. Barrett's ability to rationally perceive and attend to legal proceedings was significantly compromised by the racing thoughts indicative of the disabling "manic form" of Bipolar Disorder (*cf. Williamson v. Ward*, 110 F.3d, at 1519; Exh. 117 at ¶ 80);

- these conditions were synergistically increased by the effect of his brain damage to produce a "ruminative" thought process, which caused Mr. Barrett to be "unable to get unstuck" (Exh. 117, at ¶ 80), which caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings (*id.* at ¶¶ 59, 80).

The record reflects times when Mr. Barrett could not regulate his verbal output or emotional control after he became agitated by some aspect of the prosecutor's closing argument. His involuntary remarks were heard by persons in the courtroom, and his reflexive motoric reaction of attempting to stand prompted intervention by the courtroom marshals. Once contained and redirected, Mr. Barrett was escorted from the courtroom without further incident. Mr. Barrett's uncontrolled behaviors, however, disrupted the proceedings and likely had a deleterious effect on the jury's deliberations. Mr. Barrett's reflexive, self-harming comments and actions occurred without regard to social context or the damage they threatened to inflict on his case, and demonstrate that he was unable rationally to assist with his defense. Because such behaviors were the product of Mr. Barrett's mental diseases and defects, he was incompetent to stand trial.

The trial and sentencing of Mr. Barrett while he was actually mentally incompetent constitutes a deprivation of due process necessitating the granting of habeas corpus relief without a further showing of prejudice. *Pate v. Robinson*, 383 U.S., at 386-387; *Dusky v. United States*,

362 U.S. 402 (1960). The error deprived Mr. Barrett of a fair and reliable determination of guilt and penalty. *Pate v. Robinson*, 383 U.S., at 386.

At a minimum, the files and records do not conclusively refute Mr. Barrett's grounds for relief. Therefore, this Court must schedule an evidentiary hearing after permitting sufficient time for his counsel to complete their investigation, including through the use of discovery. 28 U.S.C. § 2255(b); R. Gov. § 2255 Proc. 8(c). Thereafter, this Court should vacate the judgments of conviction and sentence and order that a new trial be held.

**Ground 9.** **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense. Direct Appeal Counsel Were Ineffective for Failing to Raise this Issue.**

In a capital case, where the evidence supports it, a court must instruct the jury on a lesser- included homicide offense. This "third option" between first degree murder and acquittal helps ensure the reliability of any death verdict if the defendant is convicted of first degree murder. *Beck v. Alabama,* 447 U.S. 625 (1980). As the Supreme Court explained in *Beck*:

> [W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense – but leaves some doubt with respect to an element that would justify conviction of a capital offense – the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.
>
> Such a risk cannot be tolerated in a case in which the defendant's life is at stake.

*Beck,* 447 U.S. at 637. *See also, Taylor v. Workman,* 554 F.3d 879, 885-894 (10th Cir. 2009); *Turrentine v. Mullin,* 390 F.3d 1181, 1192-94 (10th Cir. 2004), *cert. denied*, 545 U.S. 1106 (2005); *Hogan v. Gibson,* 197 F.3d 1297, 1305 (10th Cir. 2000), *cert. denied,* 121 S.Ct. 332 (2000) (in *Turrentine* and *Hogan*, the Tenth Circuit found *Beck* error for failing to instruct on lesser forms of homicide that were supported by some evidence; in *Taylor*, *Beck* was not satisfied

694

because the second degree murder instructions that were given were flawed and prevented the jury from accurately assessing whether the defendant was guilty of second degree rather than first degree murder).

In more general terms, a defendant is entitled to instructions on his theory of defense where the law and some evidence support them. *United States v. Haney,* 318 F.3d 1161, 1163 (10ᵗʰ Cir. 2003); *United States v. Benally,* 146 F.3d 1232, 1235-36 (10ᵗʰ Cir. 1998) (error for failing to instruct on involuntary manslaughter as a lesser-included offense of voluntary manslaughter). In *United States v. Bruce,* 458 F.3d 1157, 1162-66 (10ᵗʰ Cir. 2006), the Court noted that Fed.R.Crim.P. 31( c) provides "[a] defendant may be found guilty of ... an offense necessarily included in the offense charged[,]" and that this rule is mandatory "in the sense that if there is evidence to support a lesser included offense and the defendant requests such a charge, the court has no discretion to refuse such an instruction." *See also, United States v. Humphrey,* 208 F.3d 1190, 1206-07 (10ᵗʰ Cir. 2000).

Here, both the prosecution and the defense requested the trial court instruct on voluntary manslaughter. (R. 4212, 4213, 4215, 4218-19. 18 U.S.C. §1112.) The United States Attorney conceded there was evidence in the record that raised this lesser offense, because testimony indicated that before shots were fired, Trooper Hamilton's unmarked Bronco swerved toward Toby Barrett, and Mr. Barrett's actions in firing on the vehicle could be seen as an imperfect form of self-defense or defense of another, reducing the crime to voluntary manslaughter. Consistent with the reasoning behind *Beck v. Alabama, supra* the prosecutor stated that because this was a capital case, caution dictated a lesser-included offense instruction be given. The United States Attorney distinguished count 3 from counts 1 and 2 (which in essence charged felony murder), because count 3 had a specific knowledge and intent element. To be guilty of

count 3, Mr. Barrett had to have more than the intent required to commit an underlying felony, which alone would supply the necessary intent for first degree murder in the usual felony murder case. As suggested by the Government, and as the court ultimately instructed the jury, to be guilty of count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed Trooper Eales, knowing or having reason to know he was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties. (R. 4215-19, *See also,* Doc. 240, first stage jury instructions; R. 4262-63, elements of count 3.) The court declined to instruct on voluntary manslaughter, ruling the case came down to "murder one or nothing." (R. 4211, 4222.)

The court's ruling violated Mr. Barrett's Fifth Amendment due process rights and his Eighth Amendment rights to a reliable sentencing determination, as well as his rights under federal law to be instructed on his theory of defense.

This circuit applies a four-part test to determine whether an instruction on a lesser-included offense is warranted: 1) there must be a proper request; 2) the lesser offense consists of some, but not all, of the elements of the greater offense; 3) the element or elements distinguishing the greater and lesser offense are in dispute; and 4) based on the evidence, the jury could rationally convict the defendant of the lesser offense and acquit him of the greater offense. *United States v. Chanthadara,* 230 F.3d 1237, 1257 (10th Cir. 2000); *United States v. Abeyta,* 27 F.3d 470, 473 (10th Cir. 1994). "In the federal courts, it has long been beyond dispute" that a defendant is entitled to an instruction on a lesser offense if the evidence would permit a rational jury to find him guilty of the lesser offense and acquit him of the greater. *Keeble v. United States,* 412 U.S. 205, 208 (1974).

All four requirements for an instruction on voluntary manslaughter were met in Mr. Barrett's case.

There was a proper request, not only by Mr. Barrett, but from the Government as well.

The lesser offense consists of some, but not all, of the elements of the greater offense. The elements of voluntary manslaughter are: 1) the defendant killed the victim; 2) the defendant acted unlawfully; 3) while in a sudden quarrel or a heat of passion, and therefore without malice, the defendant either a) intentionally killed the victim, or b) intended to cause serious bodily injury, or c) acted recklessly with extreme disregard for human life.  "Intentionally killed" means either 1) a specific purpose to take the life of another human being, or 2) a willingness to act knowing that the death of another human being is practically certain to follow from that conduct. "Heat of passion" is a passion, fear or rage in which the defendant loses normal self-control, as a result of circumstances that provoke such a passion in an ordinary person, but which did not justify the use of deadly force.  Voluntary heat of passion manslaughter is "murder without malice."  (Tenth Circuit Pattern Jury Instruction 2.54.)  *See also, e.g., United States v. Scafe,* 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides,* 820 F.2d 1232, 1242 (10th Cir. 1987).

The pertinent elements of count 3 of the superseding indictment, which distinguish it from a "straight" felony murder because a specific intent in connection with the homicide is required (as opposed to simply the intent to commit an underlying felony) are the intentional killing of a state law enforcement officer, whom the defendant knew or had reason to know was a law enforcement officer, and who was killed while engaging in *and on account of* the performance of his official duties.  (Doc. 240; R. 4262-63.)

The distinction between the elements of count 3 and voluntary manslaughter is intent. The elements of voluntary manslaughter are a subset of the greater offense, since it would be impossible to commit the greater offense without first committing the lesser offense, *i.e.,* the intentional killing of another human being. The lesser offense of voluntary manslaughter contains no element not required for the greater offense charged in count 3; again, the distinction lies in the level and nature of intent. *Schmuck v. United States,* 489 U.S. 705, 716 (1989).

In Mr. Barrett's case, the element or elements distinguishing the greater and lesser offenses were in dispute. The crux of the case was knowledge and intent. The Government contended Mr. Barrett intentionally killed Trooper Eales knowing or having reason to know he was a law enforcement officer engaged in the performance of his official duties, and on account of the performance of those duties. The defense theory was that when Mr. Barrett saw an ordinary, unmarked vehicle he had no idea contained police officers speed toward his house and his son, Toby, he reacted out of fear and fired. This circumstance, while perhaps not justifying the use of deadly force, would have aroused a "heat of passion" in any ordinary individual.

Finally, based on the evidence, a rational jury could convict Mr. Barrett of the lesser-included offense and acquit him of the greater offense. *This is exactly what happened in state court, where Mr. Barrett was convicted of heat of passion manslaughter based on the same defense theory that was advanced in the federal trial.*

Because all four of the elements for determining when a lesser-included offense instruction must be given were met in Mr. Barrett's case, the court committed constitutional error, at least with respect to count 3, in failing to charge the jury on the offense of voluntary manslaughter. *Beck v. Alabama,* 447 U.S. at 637 (1980); *Taylor v. Workman,* 554 F.3d at 885-

894; *Turrentine v. Mullin,* 390 F.3d at 1192-94; *Hogan v. Gibson,* 197 F.3d at 1305. The court also committed error, under the federal criminal cases cited above and under Fed.R.Crim.P. 31 (c), in refusing to instruct on this lesser offense, consistent with the evidence and Mr. Barrett's theory of defense.

Mr. Barrett also contends, as was discussed in Ground II, that a voluntary manslaughter instruction was appropriate as a lesser-included offense for counts 1 and 2. Although these were "straight" felony murder counts, heat of passion negates the element of malice, however it is defined. When one kills in a heat of passion, that act and the mental state underlying it removes the act from being committed in the course or in furtherance of the commission of a felony, which supplies the intent or malice element for felony murder. *Mullaney v. Wilbur,* 421 U.S. 421 U.S. 684, 704 (1975); *United States v. Lofton,* 776 F.2d 918, 920 (10th Cir. 1985).

As set forth in Ground 18, *infra,* appellate counsel were ineffective for failing to raise this issue on appeal, particularly because as the error was conceded by the Government at trial, appellate counsel were well aware that Mr. Barrett had been convicted of manslaughter in state court, and the factual basis for Mr. Barrett's federal court defense was the same as it was in state court. (Exhibit 29.) Had this issue been raised, there is at least a reasonable probability that the outcome of the appeal, particularly (but not exclusively) as to count 3, would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

> **Ground 10.** **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor.**

In Ground 10 of the Amended § 2255 Motion, Mr. Barrett describes the record and extra-record factual basis for concluding he was denied effective assistance of counsel, due process, and a reliable capital sentencing proceeding because his defense counsel failed to present, and the

trial court failed to give an instruction on, evidence casting a doubt on the manner in which the death of Trooper Eales occurred.

On September 26, 2005, the court entered an order that Mr. Barrett could not rely upon the prior proceedings in mitigation because they were not relevant to the circumstances of the offense, (Tr. 9/26/05 Hr'g at 10-11), and could not rely upon residual doubt as a mitigating circumstance. *Id.* at 11. This ruling compounded the trial court's prior rulings impairing the defense's ability to cross-examine prosecution witnesses with testimony given in the second state-court trial.

During the penalty phase conference on jury instructions, the court asked whether either party objected to leaving out a residual doubt instruction. (R. 5288.) Mr. Hilfiger stated that he did not object. (R. 5289.) This failure to object was professionally unreasonable.

Evidence from studying how jurors decide whether to impose a death sentence has shown that residual doubts about the defendant's conduct can be powerful factors in deciding to vote for life. Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1563 (1998); John H. Blume & Sheri Lynn Johnson, *Competent Capital Representation: the Necessity of Knowing and Heeding what Capital Jurors Tell us about Mitigation*, 36 Hofstra L. Rev. 1035, 1044 & n. 35 (2008). Defense counsel's failure to seek a residual doubt instruction at the penalty phase denied Mr. Barrett his constitutional right to have the jury consider in its sentencing deliberations the doubt that first-stage cross-examination had cast upon the informants' testimony.

Mr. Barrett had a constitutionally protected right to introduce evidence, and have the jury give mitigating effect to evidence, that tended to cast doubt on the Government's theory of the manner in which the crime occurred. The trial ruling excluding such evidence treated the issue

as one of guilt or innocence.  Professionally diligent counsel would have pointed out that the evidence of the prior conviction showed that a prior jury was convinced that the death of Trooper Eales was not brought about in the manner which the Government claimed in the federal proceedings.

Capital sentencing instructions must "provide [the jury] with a vehicle for expressing its 'reasoned moral response'" to the defendant's background and character, and the circumstances of the crime.  *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).  That response is supposed to express the "conscience of the community." *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968).  *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976), prohibited mandatory death penalty statutes on grounds that they prevented the jury from making, and denied the defendant the right to,an individualized sentencing determination.  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), held that a jury instruction that fails to require the jury to give consideration to the circumstances of the offense violates the Eighth Amendment.  "*Woodson* and *Lockett* meant to ensure that the sentencing jury would function as a 'link between contemporary community values and the penal system.'" *Morgan v. Illinois*, 504 U.S. 719, 745 (1992) (Scalia, J. dissenting), quoting *Witherspoon*, 391 U.S. at 519 n. 15.  Knowledge that two prior juries had been unconvinced that the crime was committed in a manner consistent with capital murder would have been important to the federal jury's ability to perform this function.

District courts in other federal death penalty cases permitted the use of "residual doubt" evidence in mitigation.  *United States v. Davis*, 132 F. Supp. 2d 455 (E.D. La. Feb. 2, 2001); *United States v. Honken*, 378 F. Supp. 2d 1040 (N.D. Iowa 2004); *United States v. Bodkins*, 2005 WL 1118158 (W.D. Va. May 11, 2005).  Mr. Barrett's defense counsel knew, or should have

known, about these cases. Their existence was discoverable without the need of independent research. Federal Death Penalty Resource Counsel knew of them and would have informed Mr. Barrett's trial counsel about them.

The Tenth Circuit has recognized repeatedly that residual doubt may be an appropriate strategy in the penalty phase of a capital case. *Sallahdin v. Gibson,* 275 F.3d 1211, 1240 n. 10 (10th Cir. 2002) (reasonable strategy for counsel, having argued defendant's innocence in the first stage, to a adopt a "residual doubt" approach in the penalty phase); *McCracken v. Gibson,* 268 F.3d 970, 979 (10th Cir. 2001) (counsel not ineffective in penalty phase; he tried to develop some mitigating evidence and also reasonably relied on a residual doubt argument); *Smith v. Gibson,* 197 F.3d 454, 462 (10th Cir. 1999) (citing *Lockhart v. McCree,* 476 U.S. 162, 181 (1986), and recognizing that residual doubt strategy can be extremely effective in a capital case).

The trial court's preclusion of evidence and argument that would have cast doubt upon the Government's contention that Mr. Barrett acted out of a pre-established intention to shoot at law enforcement officers, and the court's refusal to instruct that jury that residual doubts about these circumstances could be considered in mitigation, was contrary to *Woodson*, *Lockett*, and *Witherspoon*, was contrary to the law observed in other federal death penalty cases, and was contrary to the law of the Tenth Circuit. The error was compounded by the bizarre instruction telling the jury residual or lingering doubt about Mr. Barrett's guilt was not a mitigating factor, that it was bound by its first stage verdict, that it could not speculate on the reasons for the verdict in Sequoyah County, and that the sentence in that case could only be considered for any mitigating effect it might have on the sentence in the federal proceedings. (Doc. 257, Instruction No. 19, R. 5320-21.)

Due to these errors, the Government was permitted to rely upon, and the jury was instructed to give effect to, the prosecution evidence adduced through the seven informant witnesses, while Mr. Barrett was prohibited from relying upon evidence presented in the first stage or trial that cast doubt upon that evidence, and from showing that in the absence of these eleventh-hour prosecutorial saviors, two previous juries declined to convict Mr. Barrett of murder.

For similar reasons, it was unreasonable for appellate counsel to fail to raise the trial court's denial of a residual doubt instruction on appeal. ABA Guideline 10.15.1. It is at least reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would have followed its own precedent. *See* Ground 20.

The trial court's refusal to permit Mr. Barrett to rely upon mitigation that other similarly situated defendants were permitted to present was arbitrary and capricious, and violated Mr. Barrett's rights to due process, equal protection of the laws, and to be free from the cruel and unusual imposition of capital punishment. The death sentence should be vacated. At a minimum, the files and records do not conclusively show that Mr. Barrett is entitled to no relief. Therefore, this Court must conduct an evidentiary hearing on trial counsel's unreasonable failure to seek a residual-doubt instruction and appellate counsel's failure to raise the issue on appeal. 28 U.S.C. § 2255(b). That hearing should be scheduled for a time after Mr. Barrett's counsel have had an opportunity complete their investigation through discovery and other means. R. Gov. § 2255 Proc. 8(c). Thereafter, this Court should vacate the death sentence.

**Ground 11.   Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While  Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option.  Appellate Counsel Were Ineffective for Failing to Raise this Issue on Direct Appeal.**

In Ground 11 of the Amended § 2255 Motion, Mr. Barrett sets forth evidence in the record to establish that his constitutional rights were violated when the trial court excused Juror 62 for cause because she was personally opposed to the death penalty, rather than because she would be prevented or substantially impaired from considering it.

When initially questioned by the Government, Juror 62 answered, "Yes, I do[]" when asked whether she had such objections that would "prevent [her] from considering the imposition of a death sentence[.]" (R. Individual jury selection, 819-21.)  Upon further questioning by the Court, however, Juror 62 answered as follows:

Q.   ...If I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions about the death penalty so strong that you would not be able to follow my instructions?

A.   If you told me I had to, I would do it, because that's my duty, but I would probably live with it for the rest of my life. But if you told me I had to do it, and I thought that he actually -- the crime was so heinous that he should have the death penalty, because I was instructed to do it, and I thought it was, I could do it. I would do it. But I do not -- I would live --

Q.   So you understand, I realize that no one, probably, if they were asked, wants to serve on the jury where that's a possibility.

A.   I understand that.

Q.   And -- but if you were selected -- otherwise selected as a juror, would you be willing to put your, what I know are strong, personal beliefs aside, and fairly consider the imposition of the death penalty?

A.   I would consider it, yes.

Q.   And, of course, when you say "consider it," couched in the -- history of how you've answered these questions, it prompts me to say:  Would you consider it fairly? I mean, in this case, the first thing that would have to happen before we got to even a sentencing stage, is there would have to be a finding --

A.   Right.

Q.   --that justified-- I wouldn't turn the case over to you for sentencing until there had been a conviction for murder that, under the law, justified either death or imprisonment for life without the possibility of release. So, under these circumstances, the Government would have to follow through with their obligation and put on aggravating factors. And aggravating factors are those factors that would suggest that death is the appropriate punishment. Then the defendant would have the opportunity to put on what's called mitigating factors. And, as a juror, you'd be obligated to not exactly balance them, but give them serious consideration to whether or not the Government had put on sufficient aggravation, when compared to the mitigation, for you to arrive at a death penalty. So, do you think you could do that?

A.   I think I could. It would be very hard for me to do that, but if it was my duty.

Q.   Well, I think when you say it would be -- it encourages me, because you say it would be very hard. I agree. I don't disagree with that. It will be very hard. I mean,

the people who end up sitting as jurors in any case, but particularly in this case,

it's going to be very hard.

A.     Un-huh.

Q.     And it should be very hard.

(R. individual jury selection 826-28).

After further questioning by the Government defense counsel and the court, the

Government moved to excuse Juror 62 for cause stating that she only answered "three or four

questions in the right direction, under significant pressure." (R. individual jury selection 838).

The court granted the Government's motion over objection by defense counsel, finding that Juror

62 was "substantially impaired." (R. individual jury selection 838-40).

The *Witherspoon* doctrine limits a trial court's power to dismiss prospective jurors based

on their views about capital punishment. *Witherspoon v. Illinois*, 391 U.S.510, 519 (1968).

"[T]hose who firmly believe that the death penalty is unjust may nevertheless serve as jurors in

capital cases so long as they state clearly that they are willing to temporarily set aside their own

beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986). Unless a

potential juror's opposition to capital punishment is so deeply entrenched that it "would prevent

or substantially impair the performance of his duties as a juror in accordance with his instructions

and oath," the prospective juror is qualified. *Wainwright v. Witt*, 469 U.S. 412, 420-21 (1985)

(quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). A prospective juror's views "prevent or

substantially impair the performance of duties" when they "create an obstacle" to impartial

consideration of law or facts. *See Witt*, 469 U.S. at 434. The crucial inquiry is whether the

venireman could follow the court's instructions and obey his oath, notwithstanding his views on

capital punishment." *Dutton v. Brown,* 788 F.2d 669, 675 (10th Cir. 1986). "Where the court

Petitioner's Merits Brief                          204                    *Barrett v. U.S.*, 09-cv-105-JHP

finds that even one juror was improperly excluded, the defendant is entitled to a new sentencing, because the right to an impartial adjudication is 'so basic to a fair trial that [its] infraction can never be treated as harmless error.' " *Fuller v. Johnson*, 114 F.3d 491, 500 (5th Cir.1997) (quoting *Gray v. Mississippi*, 481 U.S. 648, 668 (1987)).

In *United States v. Chanthadara,* 230 F.3d 1237 (10th Cir. 2000), the 10th Circuit overturned a death sentence when it found that a district court erred by removing a juror for cause based on her questionnaire answers.[101] *See id.* at 1271. The potential juror indicated, "I believe the death penalty is proper in some cases although I don't think I would be able to vote for the death penalty in a case." *Id.* She clarified that this was because she didn't feel she would "ever be 100% sure that [death] was the proper verdict." *Id.* The juror also stated, "I feel the death penalty is proper in some cases but I don't feel I could ever think there was enough evidence to come to that conclusion even though I might feel the person has been proven guilty." *Id.* The 10th Circuit found that the juror's answers were ambiguous but not sufficient to determine that she should be removed for cause; thus, she was not substantially impaired. *Id.* The court noted that perhaps upon questioning it would have been determined that she was not fit to be a death penalty juror, but the court failed to make any such determination. *See id.* at 1272.

Similar to the prospective juror in *Chanthadara,* Juror 62 in Mr. Barrett's case was only ambiguous in her answers. She was improperly excused for cause solely because of her moral

---

[101]     It should be noted that the *Chanthadara* court did not base its holding on the fact that the juror's answers were on a questionnaire without an opportunity for voir dire. ("[W]e reserve for another day the question of whether a trial court has an obligation to voir dire prospective jurors before removing them for cause based on their views on the death penalty.  . . . even if we assume the district court was not required to conduct voir dire before removing her, [the juror's] answers on the questionnaire do not support removing her for cause under the [*Witherspoon*] standard[.]" *Chanthadara,* 230 F. 3d at 1269.) Because there was no voir dire, however, the *Chanthadara* court used a de novo standard of review rather than abuse of discretion, based on the fact that the trial court did not make any credibility determinations with respect to this juror.

objections to the death penalty, not because she would be prevented or substantially impaired from considering it, even though it might be difficult or harmful to her conscience.  This wrongful dismissal for cause violated Mr. Barrett's rights under the Fifth, Sixth and Fourteenth Amendments. *Gray v. Mississippi,* 481 U.S. 648, 668 (1987).

Based on this error, Mr. Barrett's death sentence must be reversed. *See Gray,* 481 U.S. at 668 (holding that the erroneous removal of potential juror based on her views on the death penalty was reversible constitutional error); *see also O'Bryan v. Estelle,* 714 F. 2d 365, 371 (5th Cir. 1983) ("The courts have required a death sentence to be set aside even if only one potential juror has been excluded for opposing the death penalty on grounds broader than those set forth in *Witherspoon.*") (citing *Davis v. Georgia,* 429 U.S. 122 (1976)).

It was unreasonable of appellate counsel to fail to raise this issue on appeal. Had this issue been raised, there is a reasonable probability that the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

> **Ground 12.   The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue**.

Mr. Barrett's death sentence and confinement are unlawful and were obtained in violation of his rights under the Impartial Jury Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment, and the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment because the jury was not instructed that the reasonable doubt standard governed the

ultimate penalty determination in this case. *Ring v. Arizona*, 536 U.S. 584, 600 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are set out in the Amended Motion to Vacate filed pursuant to court order on December 4, 2009. Doc 95 at 354-355. Simply put, Mr. Barrett's jury was not instructed to find and did not find beyond a reasonable doubt whether the aggravating factors sufficiently outweigh the mitigating factors – a fact necessary to elevate the punishment available from life to death.

In *Ring v. Arizona*, the Supreme Court held that the fundamental constitutional principle it had made clear three years earlier, in *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999), applies to capital cases like all others. *Ring*, 536 U.S. at 600. That constitutional principle is this: "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id., quoting Jones* 527 U.S. at 243 n.6. The Government may not impose a sentence greater than that authorized by the jury's simple verdict of guilt, unless the facts supporting an increased sentence (other than a prior conviction) are also submitted to the jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 455. The *Apprendi* principle applies to fact findings necessary to put a capital defendant to death. *Ring*, 536 U.S. at 609.

Under federal statutes, neither a judge nor a jury may sentence a defendant to death based solely on the jury's findings at the guilt phase. 18 U.S.C. §§ 3591, *et seq.;* 21 U.S.C. § 848(g) (repealed). In order to impose the increased punishment of death, the jury must make additional *factual* findings at the penalty phase. 18 U.S.C.§ 3591-3592; 3593; 21 U.S.C. § 848 (i),(j), (k),

(n).    These findings include a finding that the aggravating factors sufficiently outweigh any mitigating factors to justify the imposition of a sentence of death.  18 U.S.C. § 3593(e); 21 U.S.C. § 848(k).

Because additional factual findings are absolutely required in order to impose an increased punishment, under *Apprendi,* the additional facts must be proven beyond a reasonable doubt.  530 U.S. at 478.  In *Oregon v. Ice,* __U.S.__, 129 S.Ct. 711, 717 (2009), the Supreme Court clarified its application of *Apprendi* to particular situations as follows:

> Our application of *Apprendi*'s rule must honor the "longstanding common-law practice" in which the rule is rooted. *Cunningham,* 549 U.S., at 281, 127 S.Ct. 856. The rule's animating principle is the preservation of the jury's historic role as a bulwark between the State and the accused at the trial for an alleged offense. See *Apprendi,* 530 U.S., at 477, 120 S.Ct. 2348. Guided by that principle, our opinions make clear that the Sixth Amendment does not countenance legislative encroachment on the jury's traditional domain. See *id.,* at 497, 120 S.Ct. 2348. We accordingly considered whether the finding of a particular fact was understood as within "the domain of the jury ... by those who framed the Bill of Rights." *Harris v. United States,* 536 U.S. 545, 557, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (plurality opinion).

*Id.*  The Sixth Amendment principle of a "jury's role in finding facts that would determine a homicide defendant's eligibility for capital punishment was particularly well-established," by the time the Bill of Rights was established.  *Ring,* 536 U.S. at 599 (quoting *Walton v. Arizona*, 497 U.S. 639. 710 (1990) (Stephens, J., dissenting).  Under the *Apprendi* rationale, then, Mr. Barrett was entitled to a jury instruction that before a death verdict could be returned, the jury was required to find beyond a reasonable doubt that the aggravating  factors sufficiently outweighed the mitigating factors to justify a sentence of death.  *See* 18 U.S.C. §3593(e). [102]

Just as the finding of an aggravating circumstance is a "fact" that must be proved beyond a reasonable doubt under *Ring, supra*, the finding that one or more aggravating circumstances

---

[102] Or if no mitigating factors are found, that the aggravating factors are sufficient to justify a death sentence.  18 U.S.C. § 3593(e).

outweigh mitigating circumstances is a factual one. Indeed, under the federal death penalty statutes applicable to Mr. Barrett's trial, the weighing process leads to the *ultimate* factual finding without which the death penalty may not be imposed. Therefore, the "fact" that the aggravating factors outweigh the evidence in mitigation is *the indispensable factual finding* that "increases the penalty for a crime beyond the prescribed statutory maximum." *Apprendi*, 530 U.S. at 490. In other words, while the finding of one or more aggravating circumstances is a necessary precondition to the imposition of the death penalty, it is not sufficient for the death penalty to be imposed. Before a death sentence can be returned, the jury must find, as a matter of fact, that the aggravating circumstances outweigh the mitigating circumstances. Because the weighing instruction given by the trial court failed to impose the "beyond a reasonable doubt" standard to this factual finding, the weighing process in Mr. Barrett's case was constitutionally invalid.

This conclusion is supported by the Tenth Circuit's holding in *Rojem v. Gibson,* 245 F.3d 1130, 1135-38 (10th Cir. 2001), where the Court vacated an Oklahoma death row inmate's capital sentence because the trial court failed to give a weighing instruction altogether. If the weighing process is simply "icing on the cake" and does not require both a *necessary and sufficient* factual finding before a death sentence can be rendered, then the absence of a weighing instruction would be of little significance. If, as in *Rojem*, it is constitutional error to forgo a weighing instruction altogether, then the flawed weighing instruction given in Mr. Barrett's case, which did not properly allocate the burden of proof, is equally erroneous.

By not requiring a standard for the certainty necessary to impose a death verdict, a defendant might be sentenced to death by jurors who believe it is simply more likely than not the defendant should be sentenced to death, rather than by a unanimous finding that death is

appropriate beyond a reasonable doubt.  Put another way, the trial court's weighing instruction permitted the jury to make the ultimate factual finding without which a death sentence cannot be returned by a preponderance of the evidence only.  This plainly violates the Supreme Court's *Apprendi* line of cases.

Moreover, because a death penalty is qualitatively different from any other criminal punishment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."  *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).  The requirement of heightened reliability compels the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances before the death penalty may be imposed.

This Court's failure to instruct the jury to find the necessary fact of sufficient weight beyond a reasonable doubt renders Mr. Barrett's death sentence unconstitutional.  To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.  Ring, *supra*; Jones, *supra*.  The failure to properly instruct on the burden of proof is a structural error "without which [the penalty trial] cannot serve its function."  *Sullivan v. Louisiana,* 508 U.S. 275, 281 (1993).  It is, therefore, reversible per se.  *Id.* at 281-82.

To the extent that defense counsel failed to request an appropriate instruction on this issue, they rendered constitutionally ineffective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668. 686 (1984).  Their performance fell far below the standards expected of competent counsel in capital cases.  Moreover, had counsel requested an appropriate instruction on this issue, there is a substantial probability that Mr. Barrett would not have been sentenced to death.

Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been granted a new penalty trial. *See* Claim 18, *infra*.

These constitutional violations warrant the granting of this Petition without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. These constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair and resulting in a miscarriage of justice.

> **Ground 13.  Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective.**

In Ground 13, Mr. Barrett sets forth evidence in support of his claim that his removal from the courtroom without hearing, warning or just cause violated his constitutional rights. The trial court further violated Mr. Barrett's rights by failing to determine whether he was competent to knowingly and willingly waive his constitutional right to be present at trial and instruct him about that right. Mr. Barrett sets forth evidence of further constitutional violations arising from the effects of the medication regime he was subjected to in jail, including the administration of contraindicated drugs and the discontinuation of necessary medication, all of which substantially exacerbated his neurological impairments and affected his judgment, self-control and behavior in front of the jury. Mr. Barrett's trial counsel's actions and omissions in response to these events were unreasonable and caused unfair prejudice to Mr. Barrett.

During the Government's penalty phase closing argument in the jury's presence, Mr. Barrett impulsively made audible remarks and began to rise from his chair so that he could leave the courtroom. This behavior was arguably due to the fact that Mr. Barrett was not being given medication for his psychological conditions and he was suffering from the effects of steroids. The marshals restrained him and asked the judge whether Mr. Barrett should be removed from the courtroom. The judge said yes. (R. 5421). After the Government finished its closing argument, the court held a hearing without Mr. Barrett present regarding whether the jury should be instructed regarding Mr. Barrett's removal. (R. 5430). Defense counsel requested no instruction and stated, "I don't really care one way or the other. I don't object, I don't approve," in response to the court's proposed instruction. (R. 5434-35). Trial counsel did not confer privately with Mr. Barrett about this matter; instead, they spoke to him in the presence of a deputy marshal. (R. 5437.)

The court ordered Mr. Barrett placed in "minimum restraints." (R. 5438.) The court asserted that an unidentified deputy marshal "brought to my attention that the Defendant has said if you force me to come to the court, I can give you some problems." (R. 5438.)

Thereafter, Mr. Barrett's counsel requested to speak with him. (R. 5438.) Mr. Barrett was brought into the courtroom, and the following took place:

> Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings. I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?
>
> Mr. Barrett:    Yes, Your Honor.
>
> The Court:    Do you have any questions of the Court about that?
>
> Mr. Barrett:    No, sir. I'll ask the marshal to return – (Interrupted)
>
> The Court:    One more. Does that include the verdict?

Petitioner's Merits Brief                          212                          *Barrett v. U.S.*, 09-cv-105-JHP

714

Mr. Barrett:     Yes, Your Honor.

The Court:     Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.

Mr. Barrett:     Yes, sir.

(R. 5439).

Mr. Barrett was escorted out, and the jury escorted in. (R. 5439.)

The court then read the following instruction to the jury:

Members of the jury, you are instructed that neither the Defendant's conduct nor his statements during closing arguments are evidence in this case and you should not consider them in rendering your verdict.

(R. 5440).

 As a result of these events, the trial court violated Mr. Barrett's constitutional rights by (a) removing him from the courtroom without just cause, warning or hearing; (b) forcing Mr. Barrett to unnecessarily wear additional restraints;  (c) failing to advise Mr. Barrett of his constitutional right to be present at trial; (d) failing to determine whether Mr. Barrett was competent to knowingly and voluntarily waive his constitutional right to be present at trial; (d) failing to determine whether Mr. Barrett had in fact  knowingly and voluntarily waived that right; and (e) failing to give the jury a curative instruction. Mr. Barrett's trial counsel acted unreasonably (a) by failing to consult mental health or other medical experts regarding Mr. Barrett's condition, including his competence to make a valid waiver; (b) by failing to raise a doubt about Mr. Barrett's competence; (c) by failing to seek a hearing on his competence and/or the effects of his not taking medication for depression or bipolar disorder and the affects of the steroids; (d) by failing to object to the additional restraints; (e) by failing to object to the choice the court gave Mr. Barrett (be present in unlawful restraints or absent); (f) by failing to advise

Petitioner's Merits Brief                     213                     *Barrett v. U.S.*, 09-cv-105-JHP

him about the risks of being absent immediately before the jury began to deliberate whether he would live or die; and (g) by failing to seek an appropriate instruction regarding the actions of the marshals, the court, and Mr. Barrett's absence.

Among the most prejudicial inferences likely affecting the jury's penalty determination, Mr. Barrett's apparent voluntary withdrawal from the proceedings likely conveyed a misleading sense of indifference to the outcome of the trial, callous disregard for the seriousness of the questions facing the jury, and even lack of remorse. The defendant's courtroom demeanor is always a relevant and important issue - fair game for either side. In *Riggins v. Nevada,* 504 U.S. 127 (1992), Justice Kennedy in his concurring opinion noted:

> It is a fundamental assumption of the adversary system that the trier of fact observes the accused throughout the trial, while the accused is either on the stand or sitting at the defense table. This assumption derives from the right to be present at trial, which in turn derives from the right to testify and rights under the Confrontation Clause.

*Id.* at 142.

At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial. *See Riggins,* 504 U.S. at 142*; see also Williams v. Calderon,* 52 F.3d 1465, 1483 (9th Cir. 1995) ("Williams' trial demeanor was evidence the jury and judge could both consider."); *Kubat v. Thieret,* 867 F.2d 351, 373, n. 19 (7th Cir. 1989) ("We note again that mitigating factors are not necessarily limited to those adduced from specific evidence offered at the sentencing hearing . . . such as character testimony . . . . A juror might be disposed to grant mercy based on other factors, such as a humane perception of the defendant developed during trial.").

The Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment guaranteed Mr. Barrett the right to be present during all critical stages of the case. *Illinois v. Allen,* 397 U.S. 337 (1970). Under controlling law,

> a defendant can lose his right to be present at trial if, *after he has been warned* by the judge that he will be removed if he continues the disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom.

*Id.* (emphasis added). The trial court's order that the marshals remove Mr. Barrett without warning did not comport with the requirements of law. (R. 5430, 5433-34). The trial court plainly ignored the requirement the requirement that "courts must indulge every reasonable presumption against the loss of constitutional rights[,] *Allen,* 397 U.S. at 343, when it (a) ordered that Mr. Barrett be placed in additional restraints beside the electric shock device he already wore on his belt, and (b) permitted him to be absent without informing him that his presence was a constitutional right and of the risks of giving up that right. Moreover, Mr. Barrett did not knowingly and intelligently waive his right to be present.

First, Mr. Barrett was not overly disruptive such that his removal was necessary. Any jurors who had been focused on the prosecutor before observing the marshals restraining and removing Mr. Barrett may have concluded prejudicially that the marshals perhaps acted in response to some threatening behavior of Mr. Barrett toward someone in the courtroom or an attempt to escape. This prejudice was only exacerbated by the court's order of the placement of additional restraints on Mr. Barrett.

Second, the court did not fulfill its duty to instruct Mr. Barrett that he was foregoing a constitutional right by being absent from the courtroom, and it did not assure that Mr. Barrett made a knowing and voluntary waiver of that right. Although the court asked Mr. Barrett whether he wanted to be present, it did not instruct him that he was waiving a constitutional

right. Further, it made no inquiry of his mental status or competency to make that decision. *See Pate v. Robinson*, 383 U.S. 375 (1966); *Godinez v. Moran*, 509 U.S. 389 (1993).

Federal Rule of Criminal Procedure 43(a)(2) requires the presence of the defendant at "every trial stage, including . . . the return of the verdict." Although this requirement can be waived, "'[i]t has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' * * * This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused.'" *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938), quoted in *Carnley v. Cochran,* 369 U.S. 506, 514-515 (1962). This means that when the defendant is available, "the serious and weighty responsibility of determining whether he wants to waive a constitutional right requires that he be brought before the court, advised of that right, and then permitted to make 'an intelligent and competent waiver.'" *Cross v. United States,* 325 F.2d 629, 631 (D.C. Cir. 1963). The trial court did not carry out its "serious and weighty" responsibility in this case.

Mr. Barrett's trial counsel was wholly inadequate in this entire matter and acted unreasonably in two fundamental ways:  first, by failing to accurately assess Mr. Barrett's mental health and medication needs; and second, by failing to adequately advise their client, object to the trial court's actions including the ordering of additional restraints, and seek a proper curative instruction.

Mr. Barrett's trial counsel unreasonably failed to conduct a thorough investigation of his background, including his mental health problems. *See* Ground 2, *supra*. Nevertheless, Mr. Barrett's counsel knew, or reasonably should have known, (a) that Mr. Barrett had attempted suicide in the past; (b) that Mr. Barrett had been diagnosed with depression and bipolar disorder;

(c) that Mr. Barrett had been prescribed medications for these conditions; (d) that Mr. Barrett was not being given medication at the time of trial; (e) that Mr. Barrett was suffering the effects of steroids. Reasonably diligent counsel, informed about their client's condition, would have taken steps to obtain a competent mental health evaluation and judicial determination of the medical necessity for the drug regimen Mr. Barrett was being administered; the medical appropriateness of discontinuing his psychotropic medications; whether Mr. Barrett had psychiatrically decompensated since the termination of the medications; and the nature and severity of the functional impact of discontinuing and/or administering any medication on his ability to communicate and cooperate with counsel and on his affect and appearance before the jury.

In the face of a judicial determination that the drug regimen to which Mr. Barrett was subjected was justified by medical necessity, reasonably diligent counsel would have sought a further medical and legal determination of the degree to which the effects of such a regimen interfered with Mr. Barrett's ability to participate in trial proceedings, including any distortion or alteration of his demeanor, affect and presentation in front of the jury; his attitude toward participating in the proceedings; his ability to endure the disclosure and/or discussion of sensitive information; his capacity to understand his rights and make informed decisions regarding the exercise or waiver of such rights; and his ability and willingness to communicate and cooperate with counsel.

In the event the trial court made a judicial determination that Mr. Barrett's medication regimen was justified and that he was competent to proceed with trial, reasonably diligent counsel would have taken all steps necessary to prevent any untoward scenes in front of the jury, for example, by seeking appropriate medications and counseling Mr. Barrett regarding the prosecutor's likely arguments and preparing him for them. If Mr. Barrett nonetheless acted

inappropriately to his potential detriment in front of the jury, reasonably diligent counsel would have renewed the request for a medical evaluation and determination of the necessity for and functional impact of the medication regimen, as well as an assessment of Mr. Barrett's adjudicatory competency.

Trial counsel acted unreasonable in their failure to properly advise or convey to Mr. Barrett the repercussions of his absence from critical stages of his trial. Prevailing professional norms of criminal defense practice advise counsel to maintain close contact with the defendant in order to develop trust, (1 ABA Standards for Criminal Justice, Criminal Defense Function 4-3.1 and commentary (2nd ed. 1986)), and to "advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome." *(Id.*, Standard 4-5.1.) One reason for this professional norm is "to keep the client from making suicidal choices about the case." (ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.2, commentary (Feb. 1989 ed.)). Mr. Barrett's counsel failed to follow these fundamental practices and, as a result, the jury was given a false impression of Mr. Barrett, and Mr. Barrett was denied his right to be present during trial.

Trial counsel's performance was ineffective because they willingly allowed Mr. Barrett to be absent from the courtroom during critical stages of the trial -- closing argument, jury instructions and the reading of the penalty phase verdict. They did so without ensuring that Mr. Barrett was making a knowing, informed decision.

The error in allowing Mr. Barrett's absence was not harmless. In his absence, factual matters were discussed, namely what he purportedly said and did that caused the marshals to remove him. His presence would have contributed to the fairness of the proceeding because Mr. Barrett could have advised his counsel about the facts. In the context of jury instructions,

720

prejudice has been found wherever a defendant and his lawyer were absent when the court instructed the jury, because counsel could have objected to the instruction or suggested an alternate instruction. *See, e.g. United States v. Rosales-Rodriguez,* 289 F.3d 1106, 1110 (9th Cir. 2002). Here, defense counsel was present, but refused to take a position on the court's proposed jury instruction. ("I really don't care one way or the other." (R. 5435.) Had Mr. Barrett been present, he could have consulted with counsel about the proposed jury instruction.

> The fact that Mr. Barrett's counsel was present did not remedy the situation:

> Although the presence of counsel is certainly a relevant factor to be considered in determining whether a defendant's absence was harmless, the right to be present at trial - grounded in the Confrontation Clause and the Due Process Clause - is not a gossamer right inevitably swept away simply because a defendant is represented, in his absence, by counsel. The right to be present is distinct from the right to be represented by counsel. The right to be present would be hollow indeed if it was dependent upon the lack of representation by counsel. Furthermore, such a rule would ignore the fact that a client's active assistance at trial may be key to an attorney's effective representation of his interests.

*United States v. Novaton*, 271 F.3d 968, 1000 (11th Cir. 2001). Similarly, Mr. Barrett need not demonstrate any particular issue that his counsel failed to raise in his absence. Forcing Mr. Barrett to make such a showing in order to demonstrate prejudicial error from his absence devalues the constitutional right to be present, and ignores the assistance that a defendant can provide to his counsel during trial. If we were to require that a defendant show with specificity how his presence might have changed the course or outcome of a trial, then the right to be present would cease to exist in many cases in which the evidence of guilt is strong. The right to be present at one's own trial is not that weak. *See Riggins,* 504 U.S., at 137. "Efforts to prove or disprove actual prejudice from the record before us would be futile, and guesses whether the outcome of the trial might have been different [in the absence of drugging] would be purely speculative." *United States v. Novaton*, 271 F.3d. at 1000.

Trial counsel also acted unreasonably by failing to seek an instruction necessary to avoid harm to the jury's deliberations. Trial counsel stated that he could not think of an instruction to give the jury.  Unable to decide, he said, "I don't really care one way or the other." (R. 5434).

Upon due consideration, trial counsel would have recognized that the court's instruction failed to address the problem. In fact, the instruction given constituted prejudicial error. It was as if the court instructed everyone to ignore the elephant in the room -- the defendant's absence from the proceedings. Nonetheless, the court's instruction permitted the jury to consider the actions of the marshals in restraining Mr. Barrett and removing him from the courtroom, presumably, from the jury's perspective, upon the court's orders or with the court's blessing. Although trial counsel was adamant that Mr. Barrett had not made an aggressive move toward anyone, he permitted the jury to consider that marshals and the court were justified in removing Mr. Barrett. It is beyond reason that trial counsel failed to seek a modification of the instruction that would have communicated truthful information about Mr. Barrett not having made any aggressive moves, Mr. Barrett suffering the effects of poor or absent medical treatment, or an instruction that directed the jury not to consider or draw any inference from Mr. Barrett's absence from the courtroom.

Any of these individual factors would warrant reversal of Mr. Barrett's death sentence; the cumulative effect of this error substantially influenced the jury's verdict and, as a result, this Court should vacate the sentence of death imposed on Mr. Barrett in violation of the Constitution and laws of the United States.

To the extent the facts supporting this claim were apparent on the appellate record, appellate counsel unreasonably failed to raise this issue on appeal. Had counsel raised the issues

presented in this claim it is reasonably probable that the court would have found the numerous violations of federal law were not harmless beyond a reasonable doubt, or constituted plain error.

**Ground 14.**   **Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.**

In Ground 14 of the Amended Petition, Mr. Barrett challenges the constitutionality of the federal death penalty, as administered, because it is disproportionately applied according to the race of the victim. Some twenty years ago, the federal death penalty was reintroduced; since then it has been used as a tool of federal law enforcement with escalating frequency. Statistics maintained by the Federal Death Penalty Resource Counsel as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the victim's race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment.

A significantly higher percentage of cases involving white victims are authorized for death than cases involving non-white victims. As Professor David Baldus reported in 2001 to Sen. Russell D. Feingold of the Senate Judiciary Committee, "Between January 27, 1995 and July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases—a 16 percentage point difference that is statistically significant at the .001 level." (Exhibit 115.) Continuing the pattern, during the administration of Attorney General Ashcroft, 32% of cases involving white victims

which were presented for authorization were authorized for death, while only 19% of cases involving non-white victims were so authorized. During the administration of Attorney General Gonzales, the difference was even more striking: 41% of cases involving white victims were authorized, while only 16% of cases involving non-white victims were authorized.[103]  (Exhibit 116.)

Moreover, when those cases involving white victims go to trial, there is a much greater likelihood of a death sentence. According to Professor Baldus's 2001 review of DOJ figures, "The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases. Nationwide, the rates were .05 (10/198) for the white victim cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death sentences were actually imposed, the rate in the white victim cases was .17 (10/59) versus .08 (10/119) in the minority victim cases - a nine percentage-point difference." (Exhibit 115.)

More recently, Lauren Cohen Bell, Ph.D., has conducted a comprehensive statistical analysis of the relationship between victim race and sentencing outcomes in federal capital cases. This analysis was based on data maintained by the Federal Death Penalty Resource Counsel Project regarding the 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008. (Exhibit 113.) Dr. Bell excluded from her analysis only the one non-homicide case and the five mass victim (terrorist attack) cases among the 403.  She determined that a federal defendant charged with killing a white victim is *three times more likely* to be sentenced to death than a defendant who kills a non-white victim. Dr. Bell concluded that the race of the victim is "highly statistically significant" and that the likelihood that the discrepancy occurs by chance is "essentially zero." (Exhibit 112.)

---

[103]     Overall authorization rates were roughly equal: 22% for Attorney General Ashcroft and 20% for Attorney General Gonzales.

Given these statistics regarding the application of the federal death penalty, it is no longer possible to dismiss this claim on the basis that the "small" number of cases renders statistical disparities inconsequential. The Supreme Court has held that a court may not infer from broad statistical studies involving different decision-makers (*i.e.*, prosecutors, judges, or juries across an entire state) that the decision to seek or impose the death penalty in a particular case was based on a racially discriminatory motive. *McCleskey v. Kemp,* 482 U.S. 920 (1987). However, *McCleskey* can be distinguished from the situation presented here. A single decision-maker - the Attorney General of the United States - is responsible for each and every decision to seek the death penalty in a court of the United States. This distinction alone renders the numbers revealed by the attached statistics all the more probative of discrimination. The Court should grant relief from Mr. Barrett's death sentence because the government's charging and plea practices are influenced by the race homicide victims, in violation of the Fifth, Eighth, and Fourteenth Amendments.

Although a portion of the statistics cited above are based in part on periods after Mr. Barrett's trial, evidence of the developing pattern was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial; that office has maintained this data since 1992. Trial counsel's failure to obtain the information and pursue a pre-trial challenge to the Government's racially discriminatory actions was deficient performance.[104] Had counsel

---

[104]    Defendant's Motion To Declare The Federal Death Penalty Statute Unconstitutional, (Doc. 78), does not address the disparate application of the statute according to race of the victim. Appellate counsel did not raise the issue on appeal. *See* Defendant/Appellant's Brief, C.A. No. 06-7005, Proposition VI. To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused," (Doc. 78 at 3), appellate counsel were ineffective in failing to pursue and develop the issue. *See* Ground 18, *infra*.

performed effectively, it is reasonably likely that the Government would have been precluded from seeking death.

Alternatively, the statistics regarding the application of the federal death penalty since Mr. Barrett's trial constitute new evidence that warrants review of this ground for relief. Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions.

Mr. Barrett has proffered evidence that shows that the racial discrepancy present in the administration of the Federal Death Penalty Act is the work of a single decision maker, i.e. the DOJ. This fact renders the above statistics all the more probative of discrimination. The Court should grant relief from Mr. Barrett's death sentence because the Government's charging and plea practices, as well as the sentencing patterns, are influenced by the race of the victims, in violation of the Fifth and Eighth Amendments.

**Ground 15.** **Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made in the Court-ordered Amended Petition [Doc 95 at 373-75] and the exhibits filed herewith.

Mr. Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial by a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because the indictment in his case made no

mention of the federal death penalty or any of the additional non-statutory aggravating factors relied upon by the Government during the penalty phase.

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

The indictment (and the death penalty statute) under which petitioner was tried and sentenced denied petitioner his right to notice in the charging document of the aggravating circumstances which would make him eligible to be sentenced to death.   United States Constitution, Fifth, Sixth, and Fourteenth Amendments; 18 U.S.C. §3593 (compelling Notice only a reasonable time before trial or acceptance of a guilty plea rather than in the indictment), *Ring v. Arizona, supra;  Jones v. United States*, 526 U.S. 227 (1999).

As the Supreme Court has made clear in a line of cases:

> [U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.

*Ring v. Arizona*, 536 U.S. 584, 600 (2002) *quoting Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999).  In direct contravention of these principles, the Government failed to allege in the indictment  any non-statutory aggravating factors which the Government relied upon to urge death or that the aggravating circumstances proved were sufficient to justify a sentence of death. *See* 18 U.S.C. §3593.  By the Government's failure to allege that death was justified and identify non-statutory aggravating factors which the Government alleged were sufficient to justify a sentence of death, the jury was not appropriately instructed on the facts necessary before a death sentence could be imposed.  *See generally*, Claim 12, *infra*.  This structural defect in Mr. Barrett's capital proceedings requires that his death sentence be vacated.

727

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the death sentence, rendering it fundamentally unfair and resulting in a miscarriage of justice.

**Ground 16.    Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

In Ground 16, Mr. Barrett sets forth claims that various forms of juror misconduct violated his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

As set forth in the Amended § 2255 Motion, the juror misconduct that took place in Mr. Barrett's trial included improper consideration of matters extraneous to trial; improper exposure to publicity and community sentiment; improper exposure to witnesses and others who claimed to have knowledge about Mr. Barrett and the case; false or misleading responses of jurors on voir dire; improper biases which infected jury deliberations; improper exposure to the prejudicial opinions of third parties; improper communications with third parties and/or the trial judge; and improperly prejudging the guilt/innocence and penalty phases of Mr. Barrett's trial. In addition, the jury in this case was not sequestered in such a way as to avoid contact with prejudicial publicity.

The most serious cases of juror misconduct involve extraneous influences on the jury, such as jurors becoming privy to prejudicial information not introduced into evidence or having improper contacts with parties, witnesses, or third parties. *See United States v. Resko*,

727

3 F.3d 684, 690 (3d Cir. 1993) (finding improper intra-jury misconduct warranted new trial in this instance). The Sixth Amendment includes an impartial jury clause, such that "[p]rivate communications, possibly prejudicial, between jurors and third persons, ... are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox v. United States,* 146 U.S. 140, 150 (1892). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd,* 366 U.S. 717, 722 (1961) (internal quotation marks omitted). This rule resulted in what is colloquially called the *Remmer I* presumption:

> [A]ny private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Remmer v. United States,* 347 U.S. 227, 229 (1954).

The Sixth and Fourteenth Amendments to the United States Constitution require that a defendant be tried by an impartial jury that is free from any extraneous influences that could subvert the fact finding process. The Supreme Court has defined "an impartial trier of fact" as "a jury capable and willing to decide the case solely on the evidence before it." *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (citing *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). When jurors consult information that was not introduced during the course of the trial or that conflicts with the trial judge's instructions, the jurors become unsworn witnesses against the defendant in violation of the Sixth Amendment. *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000). "It is vital in capital cases that the jury should pass upon the case free from

external causes tending to disturb the exercise of deliberate and unbiased judgment." *Mattox*, *supra*, 146 U.S. at 149. Mr. Barrett had no opportunity to confront the extraneous information to which the jurors were exposed, denying Mr. Barrett his rights to a fair trial and due process.

The introduction of extraneous materials or evidence has consistently been held to mandate a new trial. *See, e.g., Resko,* 3 F.3d at 690. Mr. Barrett should be granted a new trial which can be conducted free of extraneous and prejudicial influences.

Counsel provided ineffective assistance in failing to litigate this issue in the trial court and by failing to raise it on direct appeal, to Mr. Barrett's prejudice. Defense and appellate counsel had a duty to preserve Mr. Barrett's rights by asserting and preserving the record as to all potentially viable bases for relief. ABA Guideline 10.8. Due to the low standard for reversal in cases of extra-judicial influence on jurors, there can be no valid reason for prior counsel not to have raised this issue except to the extent it relies upon extra-record evidence not previously available. Counsel's ineffective assistance resulted in the deprivation of Mr. Barrett's rights under the Sixth, Eighth and Fourteenth Amendments. Relief is appropriate.

At a minimum, the files and records do not conclusively demonstrate that Mr. Barrett is entitled to no relief. Accordingly, this Court should set this matter for hearing after affording his counsel adequate time to engage in discovery and other investigation, and to use this Court's subpoena power to marshal all available evidence. R. Gov. § 2255 Proc. 8(c).

### Ground 17. Due to Mr. Barrett's Chronic and Severe Mental Illness and Organic Brain Impairments, His Execution Would Violate the Eighth Amendment

In Ground 17, Mr. Barrett argues that the Eighth Amendment's prohibition of the execution of the mentally retarded and underage offenders should be expanded to preclude the execution of severely mentally ill individuals such as Mr. Barrett. Similar to people with mental

retardation and juveniles, the execution of the mentally ill serves no retributive or deterrent function and offends "evolving standards of decency."

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution of individuals with mental retardation. The Court reasoned that a person with mental retardation is both less culpable and less able to be deterred because of his "diminished capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318.

In *Roper v. Simmons*, 543 U.S. 304 (2005), the Court held that the execution of juveniles who commit crimes while under age eighteen also violates the Eighth Amendment. Analogous to *Atkins*, the Court reasoned, "[r]etribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity. . . . [T]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." *Id.* at 571-72 (internal quotations omitted).

Although neither *Atkins* nor *Roper* explicitly addresses a categorical exception for persons who are severely mentally ill, the reasoning of the decisions makes necessary an expansion of Eighth Amendment protection to the mentally ill. *Atkins*' and *Roper*'s bar on the death penalty for the mentally retarded and underage offenders was levied to remedy those very wrongs inherent in the execution of the mentally ill.

People with mental illness, like Mr. Barrett, share the characteristics that make the execution of mentally retarded and underage individuals inconsistent with the retributive and

deterrence functions of the death penalty, such as a diminished capacity for understanding, impulse control, and ability to engage in meaningful cost-benefit analysis. ABA, *Special Feature: Recommendation and Report on the Death Penalty and Persons with Mental Disabilities*, 30 Mental & Physical Disability Law Rpt'r 668, 670 (2006).

This was specifically recognized by Judge Robert Henry of the 10th Circuit, who cited to the *Atkins* ruling and concluded that the imposition of the death penalty against a mentally ill individual likewise "contributes nothing" to the goals of retribution and deterrence and "also is not constitutional." *See Bryan v. Mullin,* 335 F.3d 1207, 1228 (10th Cir. 2003) (Henry, J., dissenting). In his dissent, which was joined by three other judges, Judge Henry stated:

> The Supreme Court has held that the deficiencies borne by the mentally retarded "do not warrant an exemption from criminal sanctions, but diminish their personal culpability." *Atkins,* 536 U.S. at 320, 122 S.Ct. 2242. The Court's logic applies no less to those in Mr. Bryan's shoes who suffer from severe mental deficiencies. *See Hardwick v. Crosby,* 320 F.3d at 1164 (2003) ("One can be competent to stand trial and yet suffer from mental health problems that the sentencing jury and judge should have had an opportunity to consider.") (internal quotation marks omitted).

*Id.* at 1237.

Moreover, the execution of the mentally ill offends the "evolving standards of decency" protected by the Eighth Amendment. That amendment's analysis is "informed by objective factors," such as the views of professional "organizations with germane expertise." *Atkins*, 536 U.S. at 312, 316 n.21. Here, the leading legal professional organization in the country, the American Bar Association, unequivocally express the view that "[d]efendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences, or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law." American Bar Resolution 122A,

unanimously passed on August 8, 2006; ABA, 30 MENTAL & PHYSICAL DISABILITY LAW RPT'R at 668. In addition, nearly every major mental health association in the United States has published a policy statement addressing the issue of the execution of mentally ill offenders, and all of those organizations advocate either an outright ban on executing *all* mentally ill offenders, or a moratorium until a more comprehensive evaluation system can be implemented.[105] Moreover, just as in *Atkins* and *Roper*, where international law and opinion weighed against the execution of persons with mental retardation, international law and opinion weigh against the execution of the mentally ill.[106]

Mr. Barrett does not have, and never has had, an intact brain. (*See* Ground 2, § B.2.b., *supra*; Exhibit 117; Exhibit 89.) He suffers from severe mental illness in the form of Bipolar

---

[105] *See* American Psychiatric Association, *Moratorium on Capital Punishment in the United States* (approved October 2000), APA Document Reference No. 200006; American Psychological Association, *Resolution on the Death Penalty in the United States*, National Alliance for the Mentally Ill, *The Criminalization of People with Mental Illness*; National Mental Health Association, *Death Penalty and People with Mental Illness* (approved March 10, 2001). Specifically, the National Mental Health Association (NMHA) found that the fact-finding portion of capital trials "fails to identify who among those convicted and sentenced to death actually has a mental illness." NMHA, *Death Penalty and People with Mental Illness.* Similarly, the American Psychological Association (APA) argued that too many "[p]rocedural problems, such as assessing competency," render capital punishment unfair to the mentally ill. APA, *Resolution on the Death Penalty in the United States.* Such procedural inadequacies fall far short of the "basic requirements of due process," according to the American Psychiatric Association (AMPA). AMPA, *Moratorium on Capital Punishment in the United States.* Thus, the NMHA, APA, and AMPA believe that the criminal justice system routinely executes many mentally ill individuals without realizing that any illness existed and, therefore, without considering that illness as a mitigating factor. The National Alliance for the Mentally Ill (NAMI) advocates an outright ban on death sentences for individuals with any type of brain disorder. NAMI, *The Criminalization of People with Mental Illness*.

[106] The International Covenant on Civil and Political Rights (ICCPR) specifically forbids the use of the death penalty in an arbitrary manner, International Covenant on Civil and Political Rights, 999 U.N.T.S. 171 (1966), art. 6, and the Human Rights Committee of the United Nations has interpreted the treaty to forbid the execution of persons with severe mental illness. *See* William Schabas, *International Norms on Execution of the Insane and the Mentally Retarded*, 4 Criminal Law Forum 95, 100 (1993). Although the United States issued a reservation to article six, the Human Rights Committee has concluded that the reservation is invalid. Moreover, customary international law also prohibits the execution of Mr. Barrett. *Id.*

Petitioner's Merits Brief                    231                    *Barrett v. U.S.*, 09-cv-105-JHP

Disorder, Post Traumatic Stress Disorder and Dysexecutive Syndrome, and his brain is organically damaged. Experts who have examined Mr. Barrett have opined that Mr. Barrett's functioning is compromised by multiple neurological and neuropsychiatric symptoms such that he mis-processes information and cannot understand the difference between right and wrong. (Exhibit 117.) Simply put, Mr. Barrett cannot think the way that other people think; he cannot experience and interact with the world the way other people do; and he cannot act in his own best interest in a rational manner. In light of these circumstances, *Atkins* compels that Mr. Barrett's sentence violates the Eighth Amendment.

Because of both his organic brain disease and severe mental illness, there is no meaningful way to distinguish Mr. Barrett from the people protected by *Atkins*. His execution would violate the Eighth Amendment. The holdings of *Atkins* and *Roper* should be extended to protect Mr. Barrett and those like him from a penalty disproportionate to his culpability.

As with mental retardation, Mr. Barrett's status as a person with significant mental illness is non-waivable and should preclude his execution without regard to waiver.

> **Ground 18.   The Failure of Counsel to Raise or Effectively Argue on Appeal Grounds Which Are of Record Violated Mr. Barrett's Due Process Right to Effective Assistance of Appellate Counsel.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made in the Amended § 2255 Motions and the exhibits thereto and filed herewith.

As noted throughout there are numerous constitutional claims alleged in the Amended § 2255 Motions which were not raised on appeal that arguably could have been briefed and argued on the trial record.  To the extent a claim raised herein could have been and should have been raised on appeal, the failure of appellate counsel, one of whom was trial counsel as well (Mr. Hilfiger) to raise significant, substantive claims which probably would have resulted in a reversal

and remand on appeal violated Mr. Barrett's right to the effective assistance of counsel on appeal as guaranteed by the Due Process Clause of the Fifth Amendment.

The Due Process Clause of the Fifth Amendment guarantees to a defendant in a criminal case the effective assistance of counsel on appeal. *Evitts v. Lucey,* 469 U.S. 387, 396 (1985); *United States v. Cook*, 45 F. 3d 388, 392 (10th Cir. 1995). Where a petitioner challenges the outcome of his appeal, the question whether the result should be upheld is resolved based upon the familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984). *Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000). To make out this claim, Mr. Barrett must and can demonstrate that appellate counsel's performance fell below an objective standard of reasonableness and but for counsel's actions, the omitted issue would have a reasonable probability of success on appeal. *Duhamel v. Collins,* 955 F.2d 962, 967 (5th Cir.1992); *Heath v. Jones,* 941 F.2d 1126, 1132 (11th Cir.1991).

Here, Petitioner's counsel's performance on appeal fell below prevailing professional norms in that counsel either failed to recognize meritorious issues, failed to consult with Mr. Barrett regarding whether to raise meritorious issues or not, or both. The outcome of the appeal is unreliable; the issues appellate counsel could have raised, either individually or cumulatively, create a reasonable probability that the judgment or sentence would not have been affirmed.

Imposition of a death sentence without meaningful appellate review violates the Eighth Amendment. *Parker v. Dugger*, 498 U.S. 308, 321 (1991). As demonstrated *infra*, the record of this case presented numerous grounds for reversal, and for distinguishing this case from others in which a death sentence was imposed, and likening this case to cases in which a sentence less than death was imposed. To the extent the Court of Appeals prevented appellate counsel from

briefing those issues, there was a failure of meaningful appellate review in violation of Mr. Barrett's rights to due process and to be free from arbitrary imposition of the death penalty.

While an action under 28 U.S.C. § 2255 is not intended as a second direct appeal, and issues framed by the trial record are ordinarily considered waived if not raised on direct appeal, *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994), cause for excusing a procedural bar exists where appellate counsel provides ineffective assistance. *Murray v. Carrier*, 477 U.S. 478 (1986). Mr. Barrett can establish cause for any alleged failure to present a previously framed issue on appeal. Appellate counsel in this case unreasonably failed to recognize meritorious issues for appeal. (Exhibit 29.)

For the reasons briefed here in support of Ground 1; Ground 2, Parts A.1, A.5, A.11; Ground 3; Ground 4; Ground 5, Part D; Ground 6; Ground 7; Ground 9; Ground 10; Ground 11; Ground 12; Ground 13; Ground 14; Ground 15; and Ground 19, there is at least a reasonable probability that the conviction or sentence would have been reversed on appeal if these issues had been raised. The allegations related to these claims in the Amended § 2255 Motions, as well as the legal arguments in this Brief offered in support of the claims, are incorporated herein by specific reference.

### A. Appellate Counsel's Failure to Raise Specific Issues Constituted Ineffective Assistance of Counsel.

#### 1. Appellate Counsel Unreasonably Failed to Recognize the Due Process Violations Resulting from the Court's Partiality and Ex Parte Communications with the Government.

To the extent the matters raised in Ground 1 could have been raised on direct appeal, appellate counsel were ineffective which resulted in a violation of Mr. Barrett's right to Due Process under the Fifth and Fourteenth Amendments. *See Evitts,* 469 U.S. at 396; *Cook*, 45 F.3d

at 392.  As set out in the Amended § 2255 Motions Judge Payne's disparate treatment of original lead counsel, John Echols, who had successfully defended Mr. Barrett in two state trials and Mr. Hilfiger, like Judge Payne, a former U.S. Attorney, which resulted in the ultimate withdrawal of Mr. Echols, was a matter of record which could reasonably have been presented on appeal.  *See* Doc. 95 at 382-83.  Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter.  His client did not.  Despite the clear issues of partiality and issues surrounding the same, Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal.  As a result, Mr. Hilfiger suffered from a conflict of interest.

Appointed counsel Henricksen believed that the issues related to the court's treatment of counsel required consideration of extra-record evidence.  Exhibit 29.  To the extent Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work.  ABA Guidelines, *supra*, Guideline 10.15.1.  If counsel Henricksen is incorrect in his analysis that the issue can be later raised, his failure to raise it is not strategic but constitutionally defective.  *See generally, Bishawi v. United States*, 292 F. Supp. 2d 1122, 1127 (S.D.N.Y. 2003) *aff'd*, 109 Fed. Appx. 813 (7th Cir. 2004) (holding failure to file a consolidated appeal raising all issues after denial of a Motion for New Trial was not a strategic decision because counsel incorrectly believed petitioner could later challenge his conviction and sentence on direct appeal.)

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal.  Exhibit 29.  However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal.  *Id.*  Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below

prevailing standards. *See Hays v. Farwell,* 482 F. Supp 2d 1180, 1200 (D. Nev. 2007)(Failure to raise meritorious prosecutorial misconduct including improper argument was ineffective assistance of counsel on appeal.)  At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised in Ground 1 had been raised on appeal.

> **2.      Appellate Counsel Unreasonably Failed to Raise in Direct Appeal Issues that Arose under *Franks v. Delaware*, 438 U.S. 154 (1978).**

For the reasons stated in Ground 2, Part A.1, and Ground 4, *supra*, Mr. Barrett had at the time of appeal, a claim based on *Franks v. Delaware*, that was at least partially framed by the record.  Appellate counsel did not raise the issue because he felt trial counsel had failed to make an adequate record.  (Exhibit 29.)  The *Franks* issue, in conjunction with a claim of ineffective assistance of trial counsel for failing to competently argue it, would have made a difference in the outcome of the appeal, Mr. Barrett was prejudiced.  Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.  *Evitts, supra*; *Eagle v. Linahan,* 279 F.3d 1283, 1301-06, 1308 (11th Cir. 2002) (counsel ineffective on appeal for failing to raise error apparent on the record); *Carter v. Bowersox,* 265 F.3d 705, 709-10, 716 (8th Cir. 2001) (direct appeal counsel ineffective for failing to raise issue apparent on the record, even though not preserved or adequately preserved, under plain error standard); *Mason v. Hanks,* 97 F.3d 887, 897 (7th Cir. 1996)(direct appeal counsel ineffective for failing to raise issue apparent from the record).

> **3.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Government's Inappropriate Use of Hearsay Evidence used to Show Propensity or Character.**

In Ground 2, Part A.5, Mr. Barrett argued that improper "propensity" evidence concerning alleged statements made by him to various informant witnesses threatening violence

to the police if they showed up on his property was wrongly admitted, and that trial counsel were ineffective for failing to lodge appropriate, timely objections to this evidence. To the extent trial counsel did preserve this issue by filing a response to the Government's 404(b) Notice (Docs. 206, 215), and by at least lodging some objections to part of this testimony, direct appeal counsel were ineffective for failing to raise a substantive 404(b) issue. *See Argument under Ground 2(A)(5), hereinabove.*

Because the 404(b) issue was meritorious, even based on the record that was made, no reasonable strategic basis for excluding it from the appeal exists. *See, e.g., State v. Saunders*, 958 P.2d 364, 366-67 (Wash. Ct. App. 1998); *Mitchell v. State*, 379 S.E.2d 123, 125 (S.C.1989). The failure to raise the issue was professionally unreasonable. For the reasons briefed in relation to the substantive issues *supra*, had the issue been raised, a reasonable probability exists that the outcome of the appeal would have been different.

**4.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Jury's Exposure to Phony Expert Jim Horn.**

In Ground 2, Part A.11, Mr. Barrett showed that the testimony of Government "expert" Jim Horn was erroneously and prejudicially heard by the jury. The fact that trial counsel failed to preserve error initially by moving to exclude the testimony of Mr. Horn, and only asked for his testimony to be stricken after the court's *sua sponte* expressions of concern, did not necessarily waive for appeal the issues of mistrial and a meaningful jury instruction to cure the error in permitting Horn to testify. Appellate counsel could and should have raised the issue as falling under the plain error doctrine, since trial counsel had failed to raise them in a timely fashion. *United States v. Johnson*, 520 U.S. 461, 467 (1997); *United States v. Olano*, 507 U.S. 725, 732 (1993). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial

rights, and which (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Burbage,* 365 F.3d 1174, 1180 (10th Cir. 2004).

The trial court itself had identified the existence of error, but had not remedied it with a more appropriate instruction or a mistrial. Mr. Barrett's right to a fair trial and, ultimately, a fair sentencing proceeding were thus affected and, particularly given the highly questionable nature of Mr. Horn's testimony, the integrity of these proceedings was unquestionably tainted.

### 5. Appellate Counsel Unreasonably Failed to Raise on Appeal the Prosecutors' Use of Improper, Inflammatory Argument in Violation of Mr. Barrett's Due Process Rights

Prosecutorial misconduct through questions and argument as described Ground 5, Part D was not raised on direct appeal. The misconduct of the prosecutors in both stages of trial was glaring *See Hays v. Farwell*, 482 F. Supp. 2d at 1200-1201. No reasonable strategy excused the failure to raise the claim. Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

### 6. Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Restrictions on the Use of Mr. Barrett's Statements.

As set forth in Ground 6, *supra*, the trial court placed unconstitutional restrictions on the introduction and use of Mr. Barrett's statements. This issue was clearly framed by the record. Appellate counsel acted unreasonably in failing to present this issue to the Court of Appeals. Because of the overriding importance of mitigating evidence in capital cases, the Supreme Court has been extremely vigilant in vacating death sentences where, as here, relevant mitigating evidence is excluded. *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Eddings v. Oklahoma*, 455

Petitioner's Merits Brief                          238                     *Barrett v. U.S.*, 09-cv-105-JHP

U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978).  There could be no reasonable strategy for neglecting to raise this issue.  There is a reasonable probability that had it been raised, the outcome of the appeal would have been different.

Without considering the mitigating impact Mr. Barrett's statements would have had, the Court of Appeals could not conduct meaningful review of the death sentence.  The appellate court's view of the balance of aggravating and mitigating evidence was skewed, as was the jury's, in favor of death.

> **7.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Use of a Shock Belt on Mr. Barrett during Trial.**

As set forth in Ground 7, *supra*, the trial court, admittedly without constitutionally required justification, ordered Mr. Barrett to be fitted with an electric-shock belt during trial. The shock pack created a large bulge under Mr. Barrett's clothes, induced fear in Mr. Barrett, distracted him from the trial, and prevented him from sitting normally or concentrating on the proceedings.

The trial court's lack of justification for the use of this restraint was apparent on the record, as were some of its affects on the trial.  To the extent the shock belt was used without sufficient justification, the constitutional violation was preserved for appeal, and the failure of appellate counsel to raise the issue constitutes deficient performance.  Appellate counsel believed the issue required extra-record development. Exhibit 29.  The unjustified use of visible restraints requires reversal absent the Government showing the error was harmless beyond a reasonable doubt.  *Roche v. Davis*, 291 F. 3d 473 (7th Cir. 2002).   In this case, where the issue of Mr. Barrett's alleged hostility to law enforcement was a central issue at trial, the Government could

not and cannot establish harmlessness.  Therefore, there is a reasonable probability that Mr.

Barrett would have been granted a new trial if the issue had been raised on direct appeal.

> **8. Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Denial of a Jury Instruction on Lesser Included Offenses**.

As set forth in Ground 9, *supra*, the trial court unconstitutionally failed to instruct the jury

on the lesser included offense of voluntary manslaughter.  The failure to argue on appeal that the

trial court had a responsibility to include an instruction on lesser included offense was ineffective

assistance of counsel.  *See e.g., Burnside v. State*, 858 N.E.2d 232, 238 (Ind. App. 2006).  In light

of the very clear circumstances set out in the Amended § 2255 Motions [Doc 70 at 350-54; Doc

95 at 387] and under Ground 9 above, *no* reasonable strategy excuses the failure to raise this

issue.  Had this issue been raised, there is at the very least a reasonable probability that the

outcome of the appeal, particularly (but not exclusively) as to Count 3, would have been

different.

> **9. Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Refusal to Give an Instruction Permitting Jurors to Weigh Residual Doubts about the Way the Shooting Occurred**.

As set forth in Ground 10, *supra*, the trial court violated Mr. Barrett's rights under the

Fifth, Sixth, and Eighth Amendments by failing to instruct jurors that they could consider in the

second stage doubts regarding the raid.  It was unreasonable for appellate counsel to fail to raise

the trial court's denial of a residual doubt instruction on appeal.  ABA Guideline 10.15.1.  It is at

least reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would

have followed its own precedent and reversed the death judgment.

> **10. Appellate Counsel Unreasonably Failed to Raise on Direct Appeal the Trial Court's Unconstitutional Dismissal of Juror 62**.

Petitioner's Merits Brief                240                *Barrett v. U.S.*, 09-cv-105-JHP

741

The dismissal of Juror 62, as set out in detail in Ground 11, *supra*, was not raised on direct appeal, even though the error was plainly apparent from the record.  Because the petitioner's claim of the trial court's unconstitutional dismissal of Juror 62 was plainly apparent on the trial record, had a high probability of success, and was not foregone on the basis of a tactical decision, the failure to raise it on appeal fell below the objective standards of reasonableness required under *Strickland. See, e.g., United States v. Kauffman,* 109 F.3d 186, 190 (3d Cir. 1997); *see also*, *Green v. United States*, 972 F. Supp. 917, 919 (E.D. Pa. 1997) (defense compelled to use strike on juror who should have been removed for cause).  There was no reasonable strategic ground for omitting this argument.  Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.

> **11.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Failure to Require Proof Beyond a Reasonable Doubt as to the Weighing Factor Necessary to Impose a Death Sentence**.

As set forth in Ground 12, *supra*,  the Court's failure to provide an instruction to the jury regarding the Government's burden to prove beyond a reasonable doubt that the aggravating circumstances outweigh mitigating circumstances renders Mr. Barrett's death sentence unconstitutional.  To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.  The "fact" that the aggravating factors outweigh the evidence in mitigation is *the indispensable factual finding* that "increases the penalty for a crime beyond the prescribed statutory maximum." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).  Because the weighing instruction given by the trial court failed to impose the "beyond a reasonable doubt" standard to this factual finding, the weighing process in Mr. Barrett's case was

743

constitutionally invalid. Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been granted a new penalty trial.

### 12. Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Removal of Mr. Barrett from the Courtroom.

As set forth in Ground 13, *supra*, Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated due to the effects of drugs he was given in jail, trial counsel's failure to inquire about the drugs' effects, the trial court's removal of Mr. Barrett from the Courtroom in the presence of the jury without cause or inquiry, and Mr. Barrett's subsequent absence from critical stages of the proceedings without a valid waiver.  To the extent the matters surrounding the forceful removal and denial of presence at all critical proceedings are a matter of record, it was unreasonable for appellate counsel not to raise these issues on appeal.  It is at least reasonably probable that the conviction or sentence would have been reversed and new proceedings ordered if these multiple violations of the Constitution were presented on appeal.

### 13. Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Racial Bias in the Administration of the Federal Death Penalty.

As set forth in Ground 14, *supra*, trial counsel filed a Motion To Declare The Federal Death Penalty Statute Unconstitutional (Doc. 78), which addressed the disparate application of the statute but did not argue disparity based on the race of the victim.  Appellate counsel did not raise on appeal the issue of the unconstitutionality of the federal death penalty on the basis of arbitrary and capricious disparities in application of the penalty based on the race of the victim on appeal.  To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused" (Doc. 78 at 3), appellate counsel acted unreasonably in failing to raise the issue.

There is a reasonable probability that the death sentence would have been vacated had the issue been raised.

To the extent the Court of Appeals prevented appellate counsel from raising this issue, the court's review of the death sentence imposed on Mr. Barrett was constitutionally inadequate. The Court of Appeals failed to consider the disproportionate use of the federal death penalty based on the race of the victim.

**14.  Appellate Counsel Unreasonably Failed to Raise on Appeal Unconstitutional Deficiencies in the Indictment.**

As set forth in Ground 15, *supra*, Mr. Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial by a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because the indictment in his case did not charge either the non-statutory aggravating factors relied upon by the government during the penalty phase or the allegation that the aggravating factors outweighed the mitigating factors.  Appellate counsel unreasonably failed to raise this issue on direct appeal. There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

**B.  A New Trial is Reasonably Probable Based upon the Cumulative Effect of the Errors Appellate Counsel Unreasonably Failed to Raise.**

The Court of Appeals reviewed the errors in this case cumulatively.  *United States v. Barrett, supra*, 496 F.3d at 1121.  "'A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'"  *Ibid.*, quoting, *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002).  The review conducted on appeal was deficient due to

Petitioner's Merits Brief                                   243                        *Barrett v. U.S.*, 09-cv-105-JHP

the unreasonable omissions of appellate counsel, the Court of Appeals' limitations on counsel, or both.

There is a reasonable probability that any two or more of the errors identified herein *supra*, if they had been considered cumulatively on appeal, would have resulted in reversal. Several of the errors appellate counsel unreasonably failed to raise, or did raise on appeal, complement each other such that the risk of harm is increased. For example, the harm from the trial court's withholding from trial counsel the contents of the *ex parte* hearing complements the continuance issue raised on appeal. As appellate counsel states, without knowing that Judge Payne had said he believed a continuance was likely, defense trial counsel failed to seek a continuance because he believed the court would deny the request. (Exhibit 29.) Issues related to the seven snitches would have been enhanced if trial and appellate counsel had argued the Government's violation of Fed. R. Evid. 404(b), particularly with regard to failure to disclose that Karen Real would testify to prior bad acts.

Multiple errors in the second stage had greater cumulative impact than their already prejudicial independent impact. The jury in this case, after being denied the opportunity to convict on manslaughter, were denied consideration of Mr. Barrett's statements, doubts about the raid, and were inflamed by improper argument and seeing Mr. Barrett in an electric shock belt. These errors, in and of themselves, or combined with the unconstitutional circumstances that removed Mr. Barrett from the courtroom, had a prejudicial influence on the penalty deliberations. While the errors alleged may not have been prejudicial, standing alone, they must be considered cumulatively, each of which "was one more thread with which to tie the knot of ineffective assistance of counsel." *State v. Talley*, 702 P.2d 353, 358 (N.M. Ct. App. 1985).

Prejudice at the very least is present when considering the "cumulative effect" of the errors.

Whether considered individually or cumulatively, appellate counsel's unreasonable failure to raise issues on appeal, and/or the Court of Appeals' failure to consider them, violated Mr. Barrett's rights under the Fifth, Eighth, and Fourteenth Amendments.  The judgments of conviction and sentence should be set aside.

At a minimum, the files and records of the case do not conclusively demonstrate that Mr. Barrett is entitled to no relief.  Therefore, this Court either should vacate the judgments or schedule an evidentiary hearing after providing sufficient notice and time for Mr. Barrett's counsel to complete their investigation and marshal all available evidence.  R. Gov. § 2255 Proc. 8(c).

**Ground 19.   Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case.**

Mr. Barrett's convictions and sentences were unlawfully and unconstitutionally imposed, in violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Barrett's guilt and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness.  *E.g., Taylor v. Kentucky,* 436 U.S. 478, 487, and n.15 (1978) ("[T]he cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness.")

Mr. Barrett has amply demonstrated that numerous prejudicial errors of constitutional dimension, or otherwise, require vacation of his convictions and sentences.

However, should it be deemed that, individually, none of the errors asserted require relief, their combined impact clearly necessitates a new trial or, at a minimum, a new sentencing trial.

A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of trial is such that, collectively, they can no longer be determined to be harmless. *United States v. Toles,* 297 F.3d 959, 972 (10th Cir. 2002); *United States v. Rivera,* 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc). Put a slightly different way, cumulative error is present when the "cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *Duckett v. Mullin,* 306 F.3d 982, 992 (10th Cir. 2002), *quoting Rivera*, 900 F.3d at 1469. In the Tenth Circuit, a cumulative-error analysis is applied to review the impact of legally diverse claims. *E.g., Cargle v. Mullin,* 317 F.3d 1196, 1207 (10th Cir. 2003); *United States v. Wood,* 207 F.3d 1222, 1237-38 (10th Cir. 2000) (conviction reversed due to cumulative effect of mid-trial denial of acquittal on first and second degree murder and evidentiary error). In death penalty cases, the courts review whether the errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process, or rendered the sentencing fundamentally unfair in light of the heightened degree of reliability demanded in a capital case[,]" *Thornburg v. Mullin,* 422 F.3d 1113, 1137 (10th Cir. 2005), unless the errors involve violations of specific constitutional rights, in which case "the principles governing those rights control." *Cargle,* 317 F.3d at 1207.

Mr. Barrett has demonstrated that, due to numerous errors and omissions, he was denied his rights to effective assistance of counsel in both stages of trial, and that the prosecution violated its *Brady, Giglio* and *Napue* obligations virtually wholesale. Prosecutorial misconduct was rampant in this case. These significant constitutional errors were aided and abetted by

judicial misconduct which permitted the Government to lay behind the log and conduct a trial by ambush. The "materiality" standards of the tests for ineffective assistance of counsel and *Brady* violations are identical: to prevail, a defendant must show that but for counsel's errors or omissions, or but for the suppression of evidence and similar misconduct, there is a reasonable probability that the outcome of trial would have been different, *i.e.,* that confidence in the outcome of trial is undermined. *Strickland v. Washington,* 466 U.S. 668, 694 (1984); *Kyles v. Whitley,* 514 U.S. 419, 435 (1995). *E.g., Felder v. Johnson,* 180 F.3d 206, 214 (5th Cir. 1999); *Benn v. Lambert,* 283 F.3d 1040, 1053 (9th Cir. 2002); *Clay v. Bowersox,* 367 F.3d 993, 1000 (8th Cir. 2004).

Thus, in a cumulative-error analysis of *Strickland* and *Brady* violations, a court must first analyze the *Strickland* violations collectively to determine if the errors are "material." If the claimed errors of trial counsel are not in combination found to meet the materiality standard of reasonable probability of a different outcome, the court must combine all *Strickland* and *Brady* violations collectively to determine whether the combination of errors meets the "reasonable probability" standard. *Williams v. Quarterman,* 551 F.3d 352 (5th Cir. 2008) (remanding to district court for *de novo* consideration of *Strickland* claim and of the cumulative prejudice of *Strickland* and *Brady* claims); *Gonzales v. McKune,* 247 F.3d 1066, 1078 (10th Cir. 2001) (court found that the outcome of trial "would likely have changed in light of a combination of *Strickland* and *Brady* errors, even though neither test would individually support a petitioner's claim for habeas relief."); *Phillips v. Woodford,* 267 F.2d 966, 975-76 (9th Cir. 2001)(court cumulated prejudice as a result of ineffective assistance of counsel with the materiality resulting from *Napue* violation where prosecution allowed its witness to falsely testify that he had no deals).

There can be no serious question that, even if the ineffective assistance claim and the *Brady* and similar errors which infected Mr. Barrett's trial are not judged individually to warrant relief, their combined effect warrants relief. This is particularly true because, as noted, judicial misconduct contributed to both constitutional errors. Moreover, additional constitutional and other serious errors marred Mr. Barrett's trial, as reflected in this brief and Movant's previous filings. The combined effect of all errors, if not determined to warrant relief individually, compels the granting of relief when viewed in the aggregate.

## CONCLUSION

For the foregoing reasons, as well as those stated in the Amended § 2255 Motions and all exhibits thereto, this Court should grant the following relief:

1.  Recuse himself and have all proceedings regarding Mr. Barrett's application for post-conviction relief randomly reassigned to another judge;

2.  Require Respondent to file an Answer to the Petition in the form prescribed by Rule 5 of the Rules Governing § 2255 Proceedings, identifying all proceedings conducted in Petitioner's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

3.  Permit Mr. Barrett to file a traverse to the Respondent's answer, at such time as to provide an adequate opportunity to respond to any affirmative defenses raised by the Answer;

4.  Permit Mr. Barrett to amend his motion with recently discovered evidence and any further evidence or grounds for relief that may arise through investigation of that evidence, discovery, or an evidentiary hearing;

5.      Grant Mr. Barrett's motion to expand the record;

6.      Grant Mr. Barrett's motion for evidentiary hearing to resolve any factual disputes

raised by the Respondent's Answer to this Petition, or by Petitioner's Reply to any

affirmative defenses raised by the Respondent;

7.      Permit oral argument as appropriate and required;

8.      Vacate Petitioner's convictions and sentences and order that appropriate retrial

and/or sentencing hearings be conducted; and

9.      Grant such further and additional relief as may be just.


DATED:   March 1, 2010

Respectfully submitted,
/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

/s/ Joan M. Fisher
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender

/s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

751

**Certificate of Electronic Filing and Service**

I hereby certify that on this 1st day of March 2010 I caused the foregoing Petitioner's Brief in Support of Second Amended § 2255 Motion and in Support of Petitioner's Motion for Evidentiary Hearing and Motion for Record Expansion to be filed with the Clerk of the Court using the ECF System for filing. A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and Jeffrey B. Kahan, U.S. Dept. of Justice, 1331 F Street, NW, Washington, DC 20530.


/s/ Tivon Schardl

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Petitioner/Defendant,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Respondent/Plaintiff.* | ) | |

---

## APPENDIX A
### TO PETITIONER'S BRIEF IN SUPPORT OF
### SECOND AMENDED § 2255 MOTION
### AND IN SUPPORT OF
### PETITIONER'S MOTION FOR EVIDENTIARY HEARING
### AND MOTION FOR RECORD EXPANSION

---

DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Counsel
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

**INDEX**

**NON-SEALED EXHIBITS**
**PREVIOUSLY SUBMITTED IN SUPPORT OF**
**(FIRST) AMENDED MOTION TO VACATE, DOCKET NUMBER 70**

**VOLUME I**

Exhibit 1          Marriage Certificate for A.J. and Ada Barrett

Exhibit 2          Marriage Certificate for Abe and Minnie Dotson

Exhibit 3          Marriage Certificate for Allen and Ida Real

Exhibit 4          Marriage Certificate for David and Carolyn Joseph

Exhibit 5          Marriage Certificate for Ernest and Sylvia Gelene
                   Barrett

Exhibit 6          Declaration of Rodney Floyd

Exhibit 7          Marriage Certificate for Kenneth and Abigail Barrett

Exhibit 8          Marriage Certificate for Hugh and Hattie Dotson

Exhibit  9         Marriage Certificate for Sam and Ida Hatter

Exhibit 10         Marriage Certificate for Sam and Bessie Hatter

Exhibit 11         Marriage Certificate for Paul and Sylvia Gelene Dudley

Exhibit 12         Divorce File for Ernest and Sylvia Gelene Barrett

Exhibit 13         Declaration of Janesse Thomas

Exhibit 14         Declaration of Dale Anderson

Exhibit 15         Divorce File for Isaac and Marilyn Barrett

Exhibit 16         *State of Oklahoma vs. Abe Dotson*, dated December 14, 1917 and
                   December 15, 1917 (Commitment to Penitentiary)

Exhibit 17         *State of Oklahoma vs. Abe Dotson*, Record of Informations, dated
                   November 12, 1915 (Assault with the Intent to Kill)

Exhibit 18          *State of Oklahoma vs. Abe Dotson*, Criminal Docket, dated 1915 (Assault with the Intent to Kill)

Exhibit 19          *State of Oklahoma vs. Abe Dotson,* Criminal Docket (Carrying Weapon)

Exhibit 20          *State of Oklahoma vs. Abe Dotson*, Criminal Trial Docket (Drunk in a Public Place)

Exhibit 21          *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Drunk in a Public Place)

Exhibit 22          *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Larcenry)

Exhibit 23          *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Obtaining Money Under False Pretense)

Exhibit 24          Declaration of David Autry

Exhibit 25          *State of Oklahoma vs. Billy Dean Maxwell*, Case Number 1715 (Burglary)

Exhibit 26          *In the Matter of Mental Illness of Billy Dean Maxwell*, Case Number MH-82-12, Record of Mental Health Proceeding, dated May 5, 1982

Exhibit 27          *In the Matter of the Sanity of A.J. Barrett*, Case Number 141, Lunacy Record, dated August 12, 1918

Exhibit 28          *In the Matter of the Sanity of A.J. Barrett*, Case Number 709, Mental Health Record and Petition for Order of Admission to State Hospital

Exhibit 29          Declaration of Mark Henricksen

Exhibit 30          *Ada Blount vs. Kathleen Blake*, Case Number 13026

Exhibit 31          Declaration of Leonard Post

Exhibit 32          *In the Matter of the Sanity of Wallace Dotson*, Lunacy Record, Case Number 366, dated May 4, 1948

Exhibit 33          *In the Matter of Mental Illness of Kenneth Barrett*, Case Number 481, Record of Mental Health Proceeding

Exhibit 34          Declaration of John Echols

Exhibit 35          Excerpts from Kenneth Barrett's Baby Book

Exhibit 36          Letter from Kenneth Barrett

Appendix A to Petitioner's Merits Brief          ii          *Barrett v. U.S.*, 09-cv-105-JHP

Exhibit 37          Declaration of Robert Thompson

Exhibit 38          Declaration of Randy Weaver

Exhibit 39          Declaration of Vickie Beaty

Exhibit 40          Declaration of Amanda Grizzle

Exhibit 41          Declaration of Ellen Stovall

Exhibit 42          Declaration of Christine Calbert

Exhibit 43          Supplemental Declaration of Leonard Post

Exhibit 44          Report of George Kirkham, Ph.D.

Exhibit 45          Declaration of Travis Crawford

Exhibit 46          *Diana Barrett vs. Ernest Barrett*, Case No. JFD-79-3274

Exhibit 47          *State of Oklahoma vs. Karen Real*, Case No. CF-99-00018, Docket Sheet

Exhibit 48          *State of Oklahoma vs. Karen Real*, Case No. CM-99-00040, Docket Sheet

Exhibit 49          *State of Oklahoma vs. Karen Real*, Case No. CF-99-00250A, Docket Sheet

Exhibit 50          *State of Oklahoma vs. Karen Real*, Case No. CF-99-00251, Docket Sheet

Exhibit 51          *State of Oklahoma vs. Karen Real*, Case No. CF-98-00264A, Docket Sheet

Exhibit 52          *State of Oklahoma vs. Karen Real*, Case No. CF-97-00445A, Docket Sheet

Exhibit 53          *State of Oklahoma vs. David Littlefield*, Case No. OBAD No. 1729 and SCBD No. 5338, Order dated September 14, 2009

Exhibit 54          Declaration of Susan Otto

Exhibit 55          Declaration of Bill Sharp, Ph.D.

Exhibit 56          Declaration of Jeanne Russell, Ed.D.

Exhibits 57         *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-111, Docket Sheet

Exhibit  58         Intentionally Left Blank, No Exhibit.

Appendix A to Petitioner's Merits Brief                    iii                    *Barrett v. U.S.*, 09-cv-105-JHP

Exhibit 59          *State of Oklahoma vs. Henry Edwards* (Manslaughter)

Exhibit 60          *State of Oklahoma vs. Marilyn Crawford*, Case Number 3005, Criminal Docket (Cultivation of Mari)

Exhibit 61          *State of Oklahoma vs. Kenneth Barrett*, Docket Sheet, Case Number CF-97-00086

Exhibit 62          *State of Oklahoma vs. Tom Dotson*, Case Number 3005, Criminal Docket (Disposing of Mortgaged Property)

Exhibit 63          *State of Oklahoma vs. Tom Dotson*, Case Number 2763, Criminal Docket (Manslaughter in the First Degree)

Exhibit 64          Letter from John Echols to Honorable James H. Payne, dated February 28, 2005

Exhibit 65          Letter from Honorable James H. Payne to John Echols, dated February 22, 2005

Exhibit 66          Letter from Ronald Lax to Tivon Schardl, dated September 24, 2008

Exhibit 67          Declaration of Julia O'Connell

Exhibit 68          *United States of America vs. Karen Real*, Case Number, Case Number CR-00-21-FHS

Exhibit 69          *Barrett Death Sentence Upheld*, Tahlequah Daily Press, dated July 27, 2007

Exhibit 70          *Drug Offender Receives Break*, Times Record

Exhibit 71          Letter to the Editor, *She Questions Sheriff's Department*, dated October 17, 1999

Exhibit 72          *State of Oklahoma vs. Charles Sanders*, Case Number CF-1998-00022

Exhibit 73          Photographs of Kenneth Barrett's shack

Exhibit 74          Declaration of Ada Blout

Exhibit 75          Declaration of Alvin Hahn

Exhibit 76          Declaration of Billy Poindexter

Appendix A to Petitioner's Merits Brief          iv          *Barrett v. U.S.*, 09-cv-105-JHP

Exhibit 77            Declaration of Brandie Hill

Exhibit 78            Declaration of Carolyn Joseph

Exhibit 79            Declaration of Dewey Padgett

Exhibit 80            Declaration of Doris Barrett, dated February 10, 2009

Exhibit 81            Declaration of Ernest Barrett

Exhibit 82            Declaration of Frank Gordon

Exhibit 83            Declaration of Gwendolyn Crawford

Exhibit 84            Declaration of Issac Barrett

Exhibit 85            Declaration of Janice Sanders

Exhibit 86            Declaration of Kathy Trotter

Exhibit 87            Declaration of Linda Riley


**VOLUME II**

Exhibit 88            Declaration of Mike Mackey

Exhibit 89            Declaration of Dr. Myla Young

Exhibit 90            Declaration of Paul Rickie Lunsford

Exhibit 91            Declaration of Phyllis Crawford

Exhibit 92            Declaration of Roger Crawford

Exhibit 93            Declaration of Ruth Harris

Exhibit 94            Declaration of Sally Davis Johnson

Exhibit 95            Declaration of Shawn Hill

Exhibit 96            Declaration of Toby Barrett (resubmitted)

Exhibit 97            Declaration of Sylvia Gelene Dotson

Exhibit 98            Declaration of Mark Dotson

Appendix A to Petitioner's Merits Brief            v            *Barrett v. U.S.*, 09-cv-105-JHP

Exhibit 99          Declaration of Steve Barrett (resubmitted)

Exhibit 100         Declaration of Warren Barrett (resubmitted)

Exhibit 101         Declaration of Nona Reich (resubmitted)

Exhibit 102         Declaration of Carl Cook

Exhibit 103         Declaration of Abby Stites

Exhibit 104         Declaration of Richard Barrett

Exhibit 105         Declaration of Doris Barrett, March 5, 2009

Exhibit 106         New Articles from Vian American and Sequoyah County Democrat
                    Regarding Abe Dotson

Exhibit 107         Description Narrative, Written by Trooper Glen Smithson, dated
                    September 29, 1999

Exhibit 108         Excerpt from the Deposition of John Philpot

Exhibit 109         Report by Edward E. Hueske

Exhibit 110         Curriculum Vitae of Edward E. Hueske

Exhibit 111         Declaration of Steve Leedy

Exhibit 112         Declaration of Lauren Cohen Bell

Exhibit 113         2008 Declaration of Kevin McNally

Exhibit 114         Declaration of Rodney Floyd

Exhibit 115         Memo Regarding DOJ Report on the Federal Death Penalty System, dated
                    June 11, 2001

Exhibit 116         2007 Declaration of Kevin McNally

Exhibit 117         Declaration of Dr. George Woods

Exhibit 118         Declaration of Richard H. Burr

Appendix A to Petitioner's Merits Brief            vi            *Barrett v. U.S.*, 09-cv-105-JHP

INDEX

REDACTED EXHIBITS
IN SUPPORT OF PETITIONER'S
(SECOND) AMENDED MOTION TO VACATE SET ASIDE,
OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY
(MOTION UNDER 28 U.S.C. § 2255), DOCKET NUMBER 95
FILED AT DOCKET NUMBERS 114 THROUGH 145

**VOLUME I**

Exhibit 119          Birth Certificate of Kenneth Barrett

Exhibit 120          Birth Certificate of Sylvia Gelene Dotson

Exhibit 121          Birth Certificate of Richard Barrett

Exhibit 122          Birth Certificate of Toby Barrett

Exhibit 123          Birth Certificate of Stephen Barrett

Exhibit 124          Death Certificates of Allen M. Real and Allen
                     Cleveland Real

Exhibit 125          Death Certificate of A.J. Barrett

Exhibit 126          Death Certificate of Ada Melton Barrett

Exhibit 127          Death Certificate of Albert Maxwell

Exhibit 128          Death Certificate of Billy Maxwell

Exhibit 129          Death Certificate of Hattie Dotson

Exhibit 130          Death Certificate of Hugh Dotson

Exhibit 131          Death Certificate of Ida Melton

Exhibit 132          Death Certificate of Isaac Barrett

Exhibit 133          Death Certificate of Mary Barrett

Exhibit 134          Death Certificate of Minnie Andrews

Exhibit 135          Brandon Smith Social Security Records, Itemized Statement of Earnings

Appendix A to Petitioner's Merits Brief          vii          *Barrett v. U.S.*, 09-cv-105-JHP

Exhibit 136          Educational Records for Kenneth Barrett

Exhibit 137          Educational Records for Gwendolyn Barrett

Exhibit 138          Educational Records for Ernest Barrett

Exhibit 148          Report of Interview with Kenneth Barrett by the Oklahoma State Bureau of Investigation, dated October 11, 1999

Exhibit 149          Marriage Certificate for Ernest and Diana Barrett

Exhibit 150          Divorce File for Eugene and Sylvia Gelene Dudley

Exhibit 151          Divorce File for Kenneth and Abigail Barrett

Exhibit 152          *Kimberly Pulice vs. Richard Barrett*, Case Number JFP-2004-17

Exhibit 153          *In the Matter of Guardianship of Brandon Leroy Smith*, Case Number PG

Exhibit 154          *In re: Sale of Inherited Lands of Lewis Dotson*, Case Number 481

Exhibit 155          Sylvia Gelene Dotson's Genealogy Memorandum

Exhibit 156          *State of Oklahoma vs. David Littlefield*, Case Number SCBD-5338


**VOLUME II**

Exhibit 157          *State of Oklahoma vs. Charles Sanders,* Case Number CF-97-9

Exhibit 158          *State of Oklahoma vs. Charles Sanders*, Case Number CF-97-75

Exhibit 159          *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-128

Exhibit 160          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-346

**VOLUME III**

Exhibit 161          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-363

Exhibit 162          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-99-562

Exhibit 163          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2001-314

Exhibit 164          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2003-124

Exhibit 165          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2004-19

Exhibit 166          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-03-365

Exhibit 167          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-96-0444


**VOLUME IV**

Exhibit 168          *State of Oklahoma vs. Charles Sanders*, Case Number  CRF-92-91

Exhibit 169          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-08-224

Exhibit 170          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-2004-613

Exhibit 171          *State of Oklahoma vs. Cindy Crawford Mattox*, Case Number
                     CM-2001-885

Exhibit 172          *State Oklahoma vs. Brandie Price*, Case Number  CF-99-549

Exhibit 173          *State Oklahoma vs. Brandie Price*, Case Number  CM-00-900

Exhibit 174          *United States of America vs. Brandie Price*, Case Number
                     CR-07-16-RAW

Exhibit 175          *State Oklahoma vs. Charles Sanders*, Case Number  CF-97-140

Exhibit 176          *Michael Mackey vs. Cindy Crawford*, Case Number  PO-03-390

**VOLUME V**

Exhibit 177         *State Oklahoma vs. Aubrey Jacobs, Joseph Jacobs, James Jacobs, Brandie Price*, Case Number CF-98-481

Exhibit 178         *State of Oklahoma vs. Travis Crawford*, Case Number  CM-08-655

Exhibit 179         *State of Oklahoma vs. Randy Weaver*, Case Number  CF-00-668

Exhibit 180         Letter from Larry and Brenda Sell to Honorable John Garrett


**VOLUME VI**

Exhibit 181 A       Background Materials on Clint Johnson:  Testimony of Clint Johnson in *State of Oklahoma vs. Richard Loy Gray* and Exhibits

Exhibit 181 B       Background Materials on Clint Johnson:  Testimony of Clint Johnson in *State of Oklahoma vs. Richard Loy Gray* and Exhibits (Continuation of Exhibit 181A)

**VOLUME VII**

Exhibit 182         Bill Ed Rogers's File

Exhibit 183         *State of Oklahoma vs. Charles Sanders*, Case Numbers CM-08-1525 and CF-98-111

Exhibit 184         *State of Oklahoma vs. Charles Sanders*, Case Number CF-94-1503

Exhibit 185         *State of Oklahoma vs. Charles Sanders*, Case Number CM-03-6603

Exhibit 186         *State of Oklahoma vs. Charles Sanders*, Case Number CM-04- 1187

Appendix A to Petitioner's Merits Brief            x                *Barrett v. U.S.*, 09-cv-105-JHP

**VOLUME VIII**

Exhibit 187          *State of Oklahoma vs. Charles Sanders*, Case Number CM-00-389

Exhibit 188          *State of Oklahoma vs. David Littlefield*, Case Number TRC-02-04186

Exhibit 189          *State of Oklahoma vs. David Littlefield*, Case Number CF-2007-369

Exhibit 190          *State of Oklahoma vs. Dawn Littlefield*, Case Number TRC-08-00774

Exhibit 191          *State of Oklahoma vs. Dawn Littlefield*, Case Number CF-2006-244

Exhibit 192          *Pam Littlefield vs. Mike Littlefield*, Case Number CJ-05-572

Exhibit 193          *Bank of Oklahoma vs. Jennifer and David Littlefield*, Case Number CJ-03-988

Exhibit 194          Affidavit for Search Warrant signed by Clint Johnson and Search Warrant, dated September 20, 1999

Exhibit 195          *State of Oklahoma vs. Randy Turman*, Case Number CF-02-477


**VOLUME IX**

Exhibit 196          Military Records for Travis Crawford


**VOLUME X**

Exhibit 197          Birth Certificate of Phyllis Dotson

Exhibit 198          Birth Certificate of Travis Crawford

Exhibit 199          Birth Certificate of Stephen Barrett

Exhibit 200          Educational Records for Kenneth Barrett

Exhibit 203          Social Security Records for Travis Crawford

Exhibit 204          *State of Oklahoma vs. Cindy Crawford*, Case Number CF-99-645

Exhibit 205          *Cindy Crawford v. Jeffrey and Stacy Mattox, and Larry and Brenda Shelly*, Case Number JFP-09-458

**INDEX**

**UNREDACTED VERSION PURSUANT TO LOCAL RULE: FILE UNDER SEAL**

**SEALED EXHIBITS
IN SUPPORT OF PETITIONER'S
(SECOND) AMENDED MOTION TO VACATE,  DOCKET NUMBER 95
AND RELATED TO PETITIONER'S UNOPPOSED
MOTION TO FILE EXHIBITS UNDER SEAL, DOCKET NUMBER 110
LODGED WITH THE COURT ON FEBRUARY 18, 2010**

**VOLUME I**

Exhibit 139          Medical Records for Carolyn Joseph

Exhibit 140          Medical Records for Kathy Trotter

Exhibit 141          Medical Records for Brandie Hill

Exhibit 142          Medical Records for Toby Barrett

Exhibit 143          Medical Records for Travis Crawford


**VOLUME II**

Exhibit 144A          Medical Records for Cynthia Crawford

Exhibit 144B          Medical Records for Cynthia Crawford

Exhibit 145          Medical Records for Linda Riley

Exhibit 146          Medical Records for A.J. Barrett


**VOLUME III**

Exhibit 147 A          Medical Records for Kenneth Barrett

Exhibit 147 B          Medical Records for Kenneth Barrett (Continuation)

Exhibit 147 C          Medical Records for Kenneth Barrett (Continuation)

**VOLUME IV**

Exhibit 147 D          Medical Records for Kenneth Barrett (Continuation)

Exhibit 147 E          Medical Records for Kenneth Barrett (Continuation)

Exhibit 147 F          Medical Records for Kenneth Barrett (Continuation)


**VOLUME V**

Exhibit 147 G          Medical Records for Kenneth Barrett (Continuation)

Exhibit 201            Medical Records for Gwen Crawford

Exhibit 202            Medical Records for Carolyn Joseph

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Petitioner/Defendant,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Respondent/Plaintiff.* | ) | |

## MOTION FOR EVIDENTIARY HEARING

Petitioner, Kenneth Eugene Barrett, by and through counsel, pursuant to 28 U.S.C. § 2255(b) and Rule 8 of the Rules Governing § 2255 Proceedings, moves this Court for an order granting an evidentiary hearing to resolve any factual disputes presented by the First and Second Amended § 2255 Motions (Docs. 70 and 95), the Answer, and any reply or traverse. This motion is supported by the merits brief filed March 1, 2010, by the files and records in this case and in *United States v. Barrett*, Case No. CR-04-115, and by the following:

1.      Section 2255(b) of the Judicial Code provides (with emphasis added):

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court *shall* cause notice thereof to be served upon the United States attorney, *grant a prompt hearing thereon*, determine the issues and make findings of fact and conclusions of law with respect thereto.

Rule 8(a) of the Rules Governing § 2255 Proceedings provides:

> If the motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted.

The use of mandatory language indicates this Court is required, on its own motion, to order an evidentiary hearing unless there is conclusive evidence Mr. Barrett is entitled to no relief. For

the reasons stated in the First Amended § 2255 Motion, the Second Amended § 2255 Motion, and the Brief filed March 1, 2010, the motion, files and records do not conclusively refute Mr. Barrett's claims, and an evidentiary hearing is required.

2.    Mr. Barrett requested an evidentiary hearing in his § 2255 Motion and in his First Amended § 2255 Motion.  However, the Court has expressed disapproval of Mr. Barrett requesting any form of relief other than the vacating of his conviction and sentence, and has required Mr. Barrett to refile his grounds for relief on a form that does not include a place to request an evidentiary hearing.  Therefore, Mr. Barrett is filing this motion in an abundance of caution in order to ensure he is not deemed to have forfeited his right to a hearing by complying with the Court's order and amending his motion to conform to the form.

Mr. Barrett requests that this Court "conduct the hearing as soon as practicable *after* giving the attorneys adequate time to investigate and prepare." R. Gov. § 2255 Proc. 8(c) (emphasis added).  Depending upon what matters the Government does and does not dispute, Mr. Barrett intends to move for discovery pursuant to R. Gov. § 2255 Proc. 6.  As stated in the brief filed March 1, 2010, Mr. Barrett's attorneys are unable to complete their investigation in this case in part because the prosecutors continue to suppress exculpatory and impeachment evidence, and in part because the Court has imposed a gag order preventing counsel from disclosing newly discovered evidence that supports several claims.

3.    Motions for evidentiary hearings in habeas corpus cases are treated as dispositive in the Rules Governing § 2254 Cases.  Advisory Committee notes to § 2254 Rule 8(b) are explicit on this point:  "Subdivision (b) provides that a magistrate [judge], when so empowered by rule of the district court, may *recommend* to the district judge that an evidentiary hearing be held . . ., provided he gives the district judge a sufficiently detailed description of the facts so that

Pet. Mot. Evid. Hr'g                              2                    *Barrett v. U.S.*, 09-cv-105-JHP

767

the judge may *decide whether or not to hold an evidentiary hearing*." (emphasis added).

Therefore, Mr. Barrett submits LCvR 7.1 does not apply. Nevertheless, the undersigned have conferred with counsel for the Government by telephone and e-mail. Counsel did not confer in person because they are more than 30 miles apart and to do so would have been impractical and fiscally irresponsible. In the last communication the undersigned received from counsel for the Government, opposing counsel advised that if the undersigned "could provide more guidance as to the substance of each of these motions" they would notify the undersigned of the Government's position. That communication was received February 18, 2010, the same day petitioner lodged his motions as attachments to his Motion for Reconsideration. As of this time of filing the Government has not stated whether it will oppose this motion.

For the reasons stated herein, and those set forth in the merits brief filed March 1, 2010, Mr. Barrett respectfully requests this Court grant him an evidentiary hearing.

DATED:   March 1, 2010

Respectfully submitted,
 /s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: 405-521-9600

DANIEL J. BRODERICK
Federal Defender
 /s/ Joan M. Fisher
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender
 /s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: 916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

Pet. Mot. Evid. Hr'g          3          *Barrett v. U.S.*, 09-cv-105-JHP

768

**Certificate of Electronic Filing and Service**

I hereby certify that on this 18th day of February 2010 I caused the foregoing Motion for Extension of Time to be filed with the Clerk of the Court using the ECF System for filing.  A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and Jeffrey B. Kahan, U.S. Dept. of Justice, 1331 F Street, NW, Washington, DC 20530.

/s/ Joan Fisher

Pet. Mot. Evid. Hr'g          4          *Barrett v. U.S.*, 09-cv-105-JHP

769

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Petitioner/Defendant,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Respondent/Plaintiff.* | ) | |

## MOTION TO EXPAND THE RECORD

Petitioner, Kenneth Eugene Barrett, by and through counsel, pursuant to 28 U.S.C. § 2255(b) and Rule 7 of the Rules Governing § 2255 Proceedings, moves this Court for an order expanding the record to include the exhibits listed in Appendix B, pages 418 through 427, of the First Amended § 2255 Motion (Doc. 70). This motion is supported by the merits brief being filed March 1, 2010 by the files and records in this case and in *United States v. Barrett*, Case No. CR-04-115, and by the following:

1.      Rule 7 of the Rules Governing § 2255 Proceedings provides that if the motion is not dismissed, this Court "may direct the parties to expand the record by submitting additional materials relating to the motion." R. Gov. § 2255 Proc. 7(a).

> The materials that may be required include letters predating the filing of the motion, documents, exhibits, and answers under oath to written interrogatories propounded by the judge. Affidavits also may be submitted and considered as part of the record.

R. Gov. § 2255 Proc. 7(b). Rule 7's only constraint on the Court's discretion to expand the record with the listed documents is that the Court "give the party against whom the additional materials are offered an opportunity to admit or deny their correctness." R. Gov. § 2255 Proc. 7(c).

Mr. Barrett has submitted 204 exhibits with his First and Second Amended § 2255 Motions.  Each of those items is either a letter predating the filing of the motion, a document relevant to a cognizable claim for relief, an exhibit relevant to a cognizable claim for relief, or a declaration under penalty of perjury which is admissible to the same extent as an affidavit (*see* 28 U.S.C. § 1746).  Those exhibits are listed in Appendix B to the First Amended § 2255 Motion (Doc. 70 at 418-27).

The Court has already determined not to summarily dismiss the Motion and has given the Government a total or more than one year to prepare an Answer.  The Government has possessed all exhibits referenced in this motion since September 9, 2009.  The current schedule for the Answer provides more than adequate time for the Government to admit or deny the correctness of the exhibits.

2.      Section 2255(b) of the Judicial Code provides (with emphasis added):

Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court *shall* cause notice thereof to be served upon the United States attorney, *grant a prompt hearing thereon*, determine the issues and make findings of fact and conclusions of law with respect thereto.

Rule 8(a) of the Rules Governing § 2255 Proceedings provides:

If the motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted.

The use of mandatory language indicates this Court is required, on its own motion, to order an evidentiary hearing unless there is conclusive evidence Mr. Barrett is entitled to no relief.  For the reasons stated in the First Amended § 2255 Motion, the Second Amended § 2255 Motion, and the Brief filed March 1, 2010, the motion, files and records do not conclusively refute Mr. Barrett's claims, and an evidentiary hearing is required.

3.      Mr. Barrett requested an evidentiary hearing in his § 2255 Motion and in his First Amended § 2255 Motion.  However, the Court has expressed disapproval of Mr. Barrett requesting any form of relief other than the vacating of his conviction and sentence, and has required Mr. Barrett to refile his grounds for relief on a form that does not include a place to request an evidentiary hearing.  Therefore, Mr. Barrett is filing this motion in an abundance of caution in order to ensure he is not deemed to have forfeited his right to develop the factual record by complying with the Court's order and amending his motion to conform to the form.

As stated in the brief filed March 1, 2010, Mr. Barrett's attorneys are unable to complete their investigation in this case in part because the prosecutors continue to suppress exculpatory and impeachment evidence, and in part because the Court has imposed a gag order preventing counsel from disclosing newly discovered evidence that supports several claims.

4.      Motions for evidentiary hearings in habeas corpus cases are treated as dispositive in the Rules Governing § 2254 Cases.  Advisory Committee notes to § 2254 Rule 8(b) are explicit on this point:  "Subdivision (b) provides that a magistrate [judge], when so empowered by rule of the district court, may *recommend* to the district judge that an evidentiary hearing be held . . ., provided he gives the district judge a sufficiently detailed description of the facts so that the judge may *decide whether or not to hold an evidentiary hearing*."  (emphasis added).  Record expansion is considered an expeditious method of developing the necessary factual record for adjudicating habeas corpus claims "without the time and expense required for an evidentiary hearing."  R. Gov. § 2254 Cases 7, Advisory Committee Notes on Adoption.  Therefore, Mr. Barrett submits LCvR 7.1 does not apply.  Nevertheless, the undersigned have attempted to confer with the Government by telephone and e-mail in order to apprise the Court of the Government's position on this motion.  Counsel did not confer in person because they are more than 30 miles apart and to do so would have been impractical and fiscally irresponsible. In the

last communication the undersigned received from counsel for the Government, opposing counsel advised that if the undersigned "could provide more guidance as to the substance of each of these motions" they would notify the undersigned of the Government's position.  That communication was received February 18, 2010, the same day petitioner lodged his motions as attachments to his Motion for Reconsideration  As of this time of filing, opposing counsel has not stated whether they oppose this motion.

5.      Should this Motion fall within LCvR 7.1, Mr. Barrett submits granting this motion would have the effect of expediting resolution of the merits insofar as some factual matters could be resolved without an evidentiary hearing.

For the foregoing reasons, and those set forth in the merits brief filed March 1, 2010, Petitioner respectfully moves this Court expand the record with the exhibits submitted with his Amended § Motions.

DATED:   March 1, 2010

Respectfully submitted,
 /s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender
 /s/ Joan M. Fisher
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender
 /s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

**Certificate of Electronic Filing and Service**

I hereby certify that on this 1st day of March 2010 I caused the foregoing Motion to Expand the Record to be filed with the Clerk of the Court using the ECF System for filing. A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and Jeffrey B. Kahan, U.S. Dept. of Justice, 1331 F Street, NW, Washington, DC 20530.

/s/ Joan Fisher

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,   )
                          )
              Petitioner, )
                          )
v.                        )        Case No. 6:09-civ-00105-JHP
                          )
UNITED STATES OF AMERICA, )
                          )
              Respondent. )

## JOINT MOTION TO MODIFY PROTECTIVE ORDER

**COME NOW**, Petitioner and Respondent, by and through their respective counsel, and jointly move to modify the Protective Order [Doc. 102] previously entered on January 12, 2010. In support of this motion, the parties stipulate and agree that a modification of the Protective Order is warranted and proper. The parties further jointly request the Protective Order be modified as follows:

## [PROPOSED] MODIFIED PROTECTIVE ORDER

NOW on this ___ day of March, 2010, Petitioner and Respondent having jointly moved that the Protective Order entered *ex parte* on January 12, 2010, should be modified to provide the following:

1. The letter dated and submitted January 11, 2010 for *in camera* review (SEALED LETTER [Doc 101]) shall remain under seal. However subject to the provisions of this Order, the sealed letter [Doc 101] and any documents filed therewith shall be disclosed to counsel for Petitioner's counsel.

JOINT MOTION AND [PROPOSED] ORDER                       Barrett v. USA
                                    1                   Case # 06:09-cv-00105-JHP

2.  None of the information contained in the sealed letter shall be revealed to the Petitioner, or to any person other than counsel of record for the Petitioner and/or persons working for counsel for the Petitioner in connection with these § 2255 proceedings without prior approval and order from this Court.

3.  Upon request by Petitioner's counsel and stipulation and consent by Respondent's counsel, Petitioner's counsel and/or persons working for counsel for Petitioner in connection with these § 2255 proceedings, may disclose the contents of the SEALED LETTER [Doc 101] to the following persons:  (a) the person who is the subject of that letter, (b) former counsel and investigators for Petitioner including John Echols, Roger Hilfiger, Brett Smith, (c) former Assistant United States Attorney Michael Littlefield, (d) former District 27 Drug Task Force Agent Clint Johnson, (e) current District 27 Drug Task Force personnel including Larry Lane.

4.  Any person with whom Petitioner's counsel or person working with counsel for Petitioner discloses any matter related to the SEALED LETTER, [Doc 101], shall be served with and advised that the information disclosed is subject to this Protective Order.

5.  In future pleadings, motions, and other filings, the person who is the subject of the SEALED LETTER will be referred to as Witness A whenever reference to that person would reveal to an informed person the information.

A proposed Order consistent with that set forth above will be submitted the Court.

**WHEREFORE**, the Petitioner and Respondent jointly respectfully request the

Protective Order [Doc. 102] be modified and for all other relief which the Court deems

proper.

Respectfully submitted,

SHELDON J. SPERLING
United States Attorney
Eastern District of Oklahoma

/s/ Christopher J Wilson
CHRISTOPHER J. WILSON, OBA #13810
Assistant United States Attorney
United States Attorney's Office
1200 West Okmulgee
Muskogee, OK          74401

/s/ Jeffrey B. Kahn
JEFFREY B. KAHN, PA Bar #93199
Trial Attorney
U.S. Department of Justice
1331 F Street, N.W., Rm. 345
Washington, D.C.
Tel:(202) 305-8910

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
21 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

/s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

/s/ Joan M. Fisher
JOAN M. FISHER, ID Bar No. 2854
Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Plaintiff/Respondent
UNITED STATES OF AMERICA

Attorneys for Defendant/Petitioner
KENNETH EUGENE BARRETT

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT     )

         Movant,             )

                         )

v.                         )     Case No. 09-CV-00105-JHP

                         )

UNITED STATES OF AMERICA     )

                         )

         Respondent.     )

## RESPONSE TO PETITIONER'S MOTION FOR EVIDENTIARY HEARING

Now comes the United States of America and files this response in opposition to Barrett's Motion for Evidentiary Hearing.

## PROCEDURAL HISTORY

On March 16, 2009, Barrett filed a 377-page Motion for Collateral Relief, asserting 17 claims for relief. (Doc. 1.) The next day, before an answer was ordered, Barrett filed a 379-page Corrected Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence and for New Trial, again asserting 17 claims for relief. (Doc. 2.) An Answer to the Motion was due on October 16, 2009. (Doc. 50.) But on September 25, 2009, Barrett filed a 430-page Amended Motion for Collateral relief, asserting 19 claims for relief. (Doc. 70.) Rather than ordering an Answer to the Amended Motion, the Court directed Barrett to file a Second Amended Motion that complied with the Rules Governing § 2255 Proceedings. (Doc. 81.) On December 5, 2009, Barrett filed a 403-page Second Amended Motion to Vacate, Set Aside, or Correct a Sentence, asserting 19 claims for relief. (Doc. 95.) And on March 1, 2010, Barrett filed a 277-page Brief in Support of Second Amended § 2255 Motion and in Support of Petitioner's Motion for Evidentiary Hearing and Motion for Record Expansion. (Doc. 149.) The Answer to the Second Amended Motion and Brief in Support is currently due on April 19, 2010. (*See* Doc. 104.)

1

On March 1, 2010, Barrett filed the instant Motion for Evidentiary Hearing (Doc. 150, hereinafter "Mot."). This Opposition follows.

## BARRETT'S REQUEST FOR AN EVIDENTIARY HEARING IS MOOT, PREMATURE AND REDUNDANT

Barrett requests that this Court order an evidentiary hearing to resolve any factual disputes presented by the First[1] and Second Amended § 2255 Motions (Docs. 70 and 95), the Answer, and any reply or traverse. He complains that he has been compelled to file this Motion because the court-approved form upon which he was required to file his Second Amended Motion did not include space for him to request an evidentiary hearing. (Mot. at 1-2.) This Court should deny Barrett's request as premature and wholly unnecessary.

The Rules following § 2255 place an affirmative duty upon this Court to "review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Rule 8(a), Rules Governing Section 2255 Proceedings in the United States District Courts; *see* Mot. at 1. The rule creates a duty that arises after the government's responsive pleading is filed. *See Green v. United States*, 65 F.3d 546, 548 (6th Cir. 1995); *see also United States v. Lopez*, 100 F.3d 113, 119 (10th Cir. 1996) (noting court's obligation to exercise discretion).

Given that the Court is already obliged by the rules to consider the propriety of an evidentiary hearing, Barrett's Motion is a moot gesture – a request to make a determination the Court will have to make, if and when the question becomes ripe. The Motion is not merely extraneous, it is also premature, because the Court's duty to determine the need for an evidentiary hearing does not arise until the government has had an opportunity to answer the Second Amended Motion to Vacate. The Court cannot now determine if the answer, which has

---

[1]On February 26, 2010, this Court struck the First Amended Motion, obviating the need to consider whether it conflicts with the government's, as-yet unfiled, answer. (Doc. 147 at 6.)

2

not been filed, creates any factual conflicts that will require resolution through evidentiary development. Furthermore, the government has not had an opportunity to show that relief should not be granted even if Barrett can prove his factual allegations. *See United States v. Kennedy*, 225 F.3d 1187, 1193 (10th Cir. 2000).

Even if this Court did not have an independent obligation to discharge its duties under Rule 8– and Barrett was therefore required to request an evidentiary hearing – the current Motion would still be unnecessary. Barrett's Motion merely reiterates his myriad requests for an evidentiary hearing in his Second Amended Motion to Vacate, Set Aside, or Correct a Sentence (Doc. 95 at 268, 354, 357, 371, 401.) and Brief in Support of the Motion of Second Amended § 2255 Motion and in Support of Petitioner's Motion for Evidentiary Hearing and Motion for Record Expansion[2] (Doc. 149 at 3, 33, 34, 38, 59, 92, 132, 134, 135, 138, 140, 148, 164, 168, 187, 192, 201, 207, 224, 225, 245, 248, 249 ).

This Court should therefore deny Barrett's Motion as redundant, premature and preempted by an existing sua sponte duty.

### CONCLUSION

Based on the foregoing reasoning and authority, the government respectfully urges the Court to deny Barrett's Motion for Evidentiary Hearing.

Dated: March 5, 2010.

Respectfully submitted,

SHELDON J. SPERLING
United States Attorney
Eastern District of Oklahoma

---

[2]Though prohibited by local rule, Barrett submitted his Brief in Support as to three Motions, his Second Amended Motion to Vacate (Doc. 95), his Motion to Expand the Record (Doc. 151), and the instant Motion for Evidentiary Hearing (Doc. 150). *Cf.* LCvR 7.1(c) (requiring separate motions and briefs in support).

781

s/ Christopher J. Wilson
  CHRISTOPHER J. WILSON, OBA # 13801
  Assistant United States Attorney
  Eastern District of Oklahoma

s/ Jeffrey B. Kahan

  JEFFREY B. KAHAN, Pa. BAR #93199
  Trial Attorney
  U.S. Department of Justice
  1331 F Street, N.W.; Rm. 345
  Washington, D.C. 20530
  Tel: (202) 305-8910

4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT  )
           )
  Movant,      )
           )
v.           )  Case No. 09-CV-00105-JHP
           )
UNITED STATES OF AMERICA  )
           )
  Respondent.     )

## RESPONSE TO PETITIONER'S MOTION TO EXPAND THE RECORD

Now comes the United States of America and files this response in opposition to Barrett's

Motion to Expand the Record.

## PROCEDURAL HISTORY

On March 16, 2009, Barrett filed a 377-page Motion for Collateral Relief, asserting 17

claims for relief. (Doc. 1.) The next day, Barrett filed a 379-page Corrected Motion for Collateral

Relief, to Vacate, Set Aside, or Correct Sentence and for New Trial, again asserting 17 claims for

relief. (Doc. 2.) In support of the Motion and Corrected Motion, Barrett submitted 135 exhibits.

(Docs. 1, 2, 3, 8.) On September 25, 2009, Barrett filed a 430-page Amended Motion for Collateral

relief, asserting 19 claims for relief. (Doc. 70.) In support of the Amended Motion, he appended

204 exhibits. (Docs. 70-72.) The Court subsequently directed Barrett to file a Second Amended

Motion that complied with the Rules Governing § 2255 Proceedings. (Doc. 81.) The Court also

provided Barrett with additional time to file a Brief in Support of his Motion. (*Id*.) On December

5, 2009, Barrett filed a 403-page Second Amended Motion to Vacate, Set Aside, or Correct a

Sentence, asserting 19 claims for relief. (Doc. 95.) On March 1, he filed a Brief in Support of the

Second Amended Motion to Vacate. (Doc. 149.) In support of the Motion and Brief, he purports

to rely on 118 unsealed exhibits previously filed with his First Amended Motion (*see* Doc. 149 at

2) and exhibits 119 through 205, which he filed on February 18, 2010.  (Docs. 110, 114-45; *see* Doc. 149 at 2.)  On February 26, 2010, this Court struck the First Amended Motion.  (Doc. 147 at 6.)

On March 1, 2010, Barrett filed the instant Motion to Expand the Record to include the 204 exhibits referenced in Appendix B to the First Amended Motion.[1]  (Doc. 151, hereinafter "Mot").  This Opposition follows.

## THIS COURT SHOULD DENY BARRETT'S MOTION TO EXPAND THE RECORD AS A PREMATURE AND UNNECESSARY

Barrett requests that this Court expand the record to include the exhibits referenced in Appendix B of his stricken First Amended Motion to Vacate.  He argues that the Court has the authority to direct the parties to augment the record and contends that the government has had ample time to refute his exhibits.  Barrett argues that he is entitled to an evidentiary hearing and that record expansion provides a practical alternative to such a proceeding. (Mot. at 1-4.)  This Court should deny Barrett's request as premature and extraneous.

Litigants in federal court may append exhibits to motions.  *See* Fed. R. Civ. Proc., rules 7(b)(2) & 10(c).  Indeed, the rules of court anticipate that defendants seeking collateral relief under 28 U.S.C. § 2255 will append exhibits to their motions.  *See* Rule 4(b), Rules Governing § 2255 Proceedings in the United States District Courts.  Exhibits appended to briefs are not deemed part of the record unless permitted by the court.  LCvR. 7.1(l).  The Court has the authority to sua sponte order the expansion of the record in lieu of an evidentiary hearing.  *See Miller v. United States*, 564 F.2d 103, 105-06 (1st Cir. 1977); Rule 7, Rules Governing § 2255 Proceedings in the United States District Courts.  But the Court's duty to decide whether an evidentiary hearing is necessary does not arise until the government has filed an answer.  *See Green v. United States*, 65 F.3d 546, 548 (6th Cir. 1995); *see also United States v. Lopez*, 100 F.3d 113, 119 (10th Cir. 1996) (noting court's obligation to exercise discretion).

---

[1]On February 26, 2010, this Court struck the First Amended Motion.  (Doc. 147 at 6.)

The Court cannot now determine if the answer, which has not been filed, creates any factual conflicts that will require resolution through evidentiary development. Furthermore, the government has not had an opportunity through its answer to show that relief should not be granted even if Barrett can prove his factual allegations. *See United States v. Kennedy*, 225 F.3d 1187, 1193 (10th Cir. 2000). As such, any request to expand the record – by hearing or otherwise – is premature. A decision to expand the record at this juncture would risk placing in evidence an enormous volume of irrelevant and unauthenticated documents, and this Court should not make such a ruling on the basis of Barrett's conclusory assertion that his Motion to Vacate demonstrates the need for evidentiary development. Indeed, this Court has openly questioned the relevance of at least some of Barrett's exhibits (Doc. 147), and should not place any of them in evidence without permitting the government to show, through its answer, that none of the documents is necessary to the resolution of this matter.

Barrett is particularly unpersuasive in asserting that the government has had ample time to determine the correctness of his exhibits. First, the government did not know what documents Barrett would ultimately rely upon until he filed his Second Amended Motion and Brief in Support. Second, the government has never been ordered by this Court under Rule 7 to determine the correctness of the exhibits, and it has never independently considered the issue, because it is focused on demonstrating that Barrett's claims do not merit relief regardless of the self-serving and unauthenticated documents he appended to his pleadings. The Court should not order the government to undertake such an analysis now, as time spent doing so would simply distract from the task of answering the Motion to Vacate in a manner that should obviate the need for evidentiary development.

Barrett's Motion to Expand the Record is thus a premature request for this Court to discharge an existing duty that will not arise until it is in a position to determine whether this case is in need of evidentiary development.

**CONCLUSION**

Based on the foregoing reasoning and authority, the government respectfully urges the

Court to deny Barrett's Motion to Expand the Record.

Dated: March 5, 2010.

Respectfully submitted,

SHELDON J. SPERLING
United States Attorney
Eastern District of Oklahoma

s/    Christopher J. Wilson
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
Eastern District of Oklahoma

s/    Jeffrey B. Kahan

JEFFREY B. KAHAN, Pa. BAR #93199
Trial Attorney
U.S. Department of Justice
1331 F Street, N.W.; Rm. 345
Washington, D.C. 20530
Tel: (202) 305-8910

785

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Petitioner/Defendant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent/Plaintiff.* | ) | |

**PETITIONER'S RESPONSE TO THE ORDER
FILED FEBRUARY 26, 2010 (DOC. 147)**

## TABLE OF CONTENTS

I.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   General Bases For Finding Pages Relevant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   Specific Bases for Finding Pages Relevant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Exhibit 139          Medical Records for Carolyn Joseph . . . . . . . . . . . . . . . . . . . . 6

    Exhibit 140          Medical Records for Kathy Trotter . . . . . . . . . . . . . . . . . . . . . 6

    Exhibit 141          Medical Records for Brandie Hill . . . . . . . . . . . . . . . . . . . . . . 7

    Exhibit 142          Medical Records for Toby Barrett . . . . . . . . . . . . . . . . . . . . . . 8

    Exhibit 143          Medical Records for Travis Crawford . . . . . . . . . . . . . . . . . . . 8

    Exhibit 144          Medical Records of Cynthia Crawford . . . . . . . . . . . . . . . . . . 10

    Exhibit 145          Medical Record of Linda Riley . . . . . . . . . . . . . . . . . . . . . . . . 12

    Exhibit 146          Mental Health Records of A.J. Barrett . . . . . . . . . . . . . . . . . . . 12

    Exhibit 147          Medical Records of Kenneth Eugene Barrett . . . . . . . . . . . . . . 12

    Exhibit 201          Medical Records of Gwendolyn Crawford . . . . . . . . . . . . . . . 17

    Exhibit 202          Medical Records of Carolyn Joseph . . . . . . . . . . . . . . . . . . . . 17

IV.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Banks v. Dretke*, 540 U.S. 668 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Brady v. Maryland*, 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Rompilla v. Beard*, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Strickler v. Greene*, 527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Quintinella*, 193 F.3d 1139 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 11

*Wiggins v. Smith*, 539 U.S. 510 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5

*Williams v. Taylor*, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5

### FEDERAL STATUTES

18 U.S.C. § 3592(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 U.S.C. § 2255(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Fed. R. Evid. 104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Evid. 106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Evid. 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12

Fed. R. Evid. 803(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fed. R. Evid. 901(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fed. R. Evid. 902(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fed. R. Evid. 1101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Evid. 1101(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Evid. 1101(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Evid. 1101(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,     )
                            )
        *Petitioner/Defendant,*     )
                            )
v.                          )          **Case No. 6:09-cv-00105-JHP**
                            )
UNITED STATES OF AMERICA,   )
                            )
        *Respondent/Plaintiff.*     )

**PETITIONER'S RESPONSE TO THE ORDER
FILED FEBRUARY 26, 2010 (DOC. 147)**

Comes now, Movant/Defendant KENNETH BARRETT, by and through his undersigned

counsel, and makes the following showing in response to the Court's order (Doc. 147) filed

February 26, 2010.

## I.   Introduction

This Court's order requires Mr. Barrett "to advise this Court, as to each page of the

exhibits which they wish to file under seal, how the medical record is relevant to the issues

contained within the motion to vacate." Order (Doc. 147) at 2. This Court's order provides that

Mr. Barrett's counsel were required to review the records submitted with his motion to vacate

"and ensure that items sought to be filed with this Court are relevant to the issues raised in the

pleadings." *Ibid*.

Prior to filing the initial Motion to Vacate (Doc. 1), Mr. Barrett's counsel reviewed all the

records that were submitted as exhibits and determined that all were relevant. Counsel

determined that the exhibits at issue here were relevant in the specific ways described *infra*.

However, counsel are unaware of any requirement to ensure that each *page* of each exhibit

proffered at the pleading stage met the evidentiary standard of relevance.

Through the sealed and other exhibits, Mr. Barrett's counsel sought first, to demonstrate Mr. Barrett's ability to prove his allegations with documentary evidence, *see* R. Gov. § 2255 Proc. 3(b); second, to give the Government an opportunity to review the sources upon which the allegations of the Motion were based, *see* R. Gov. § 2255 Proc. 7(c); third, to enable the Court to make a fully informed decision regarding an evidentiary hearing, 28 U.S.C. § 2255(b); R. Gov. § 2255 Proc. 8(a); and fourth, to streamline the proceedings without burdening anyone with unnecessary documents.

## II.   General Bases For Finding Pages Relevant

Mr. Barrett's filings were done with the understanding that exhibits to a pleading such as a § 2255 motion are in the nature of an offer of proof, *see* Fed. R. Evid. 104 – a demonstration of the *bona fides* of the averments in the motion – and that the pleading stage of a case is not evidentiary in nature.  This understanding is based in part upon Rule 4(b) of the Rules Governing § 2255 Proceedings, which calls upon the judge to make a preliminary review of the motion and "any attached exhibits" before deciding whether to order an answer, and in part upon Fed. R. Evid. 1101(e), which provides that the Rules of Evidence apply to § 2255 proceedings "to the extent that matters of evidence are not provided for in the statutes which govern procedure therein or in other rules prescribed by the Supreme Court," and in part upon common practice in similar cases.  As an offer of proof akin to those made pursuant to Fed. R. Evid. 104, the rules of admissibility do not apply.  Fed. R. Evid. 1101(d)(1) & (3).  Pursuant to Fed. R. Evid. 1101, Mr. Barrett's counsel assessed the relevance of the proffered exhibits as to both the procedural stage at which they were proffered, and the substantive issues to which they relate.

One procedural issue as to which all exhibits are relevant relates to Rule 7 of the Rules

Governing § 2255 Proceedings.  Mr. Barrett's counsel were attempting to make review of the claims more efficient, and to that end anticipated filing a motion for the record to be expanded with the pleading exhibits, as he ultimately did.  Counsel ensured that the exhibits were substantively relevant and sufficiently complete as to afford the Government "an opportunity to admit or deny their correctness," R. Gov. § 2255 Proc. 7(c), and to decide whether to seek to have the entire writing made part of the record pursuant to Fed. R. Evid. 106.  Pursuant to Fed. R. Evid. 1101(d)(3) and 1101(e), Mr. Barrett submits the rules governing admissibility do not apply to each page of a document proffered for review under Rule 7(c).  Of course, the existence *vel non* of extra-record evidence is relevant to this Court's decision whether the files and records conclusively refute Mr. Barrett's claims.  28 U.S.C. § 2255(b); R. Gov. § 2255 Proc. 8(a).

Relevance is defined as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  In the detailed discussion of the exhibits *infra*, Mr. Barrett addresses specific facts of consequence to the determination of his claims and how pages of the exhibits make them more or less probable.  In addition to these specifics, the exhibits Mr. Barrett seeks to file under seal are relevant to several general issues of consequence.

First, these exhibits were proffered in support of claims of ineffective assistance and either the suppression of exculpatory evidence, or the new discovered exculpatory evidence.  Rulings on such claims frequently include determinations whether the evidence was available at the time of trial or is newly discovered.[1]  That even hostile witnesses such as Cindy and Travis

---

[1]  *See*, *e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 383-84 (2005) (defense counsel acted unreasonably by failing to review readily available evidence); *Wiggins v. Smith*, 539 U.S. 510, 532-33 (2002) (same); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (same); *Banks v. Dretke*, 540 U.S. 668 (2004) (due process violated where prosecution failed to disclose exculpatory evidence available at time of trial); *Strickler v. Greene*, 527 U.S. 263, 282-83 (1999) (finding

Crawford made their medical records available to Mr. Barrett shows that absent government pressure such records could have been obtained by defense counsel, and that the Government's claim at the time of trial that such witnesses had an *endogenous* preference not to speak to the defense is less probably true. As to the issue of availability then there are instances where an entire file is relevant.

Second, the proffered medical records are relevant as facts and data relied upon by experts whose opinions Mr. Barrett's counsel also proffered with his Motion. *See* Fed. R. Evid. 703. Mr. Barrett's medical records and those of family members that were available at the time of trial were considered by Dr. George Woods. Exh. 117 at ¶ 14; *see also id.* at ¶¶ 23-34. To the extent Dr. Woods considered post-trial information from medical records, that they were confirming of the findings based on pre-trial information makes it more probable that this Court will find he reached the correct conclusion. Dr. Myla Young also reviewed Mr. Barrett's past medical history for risk factors, *see* Exh. 89 at ¶¶ 20, 21, 24, and his medical condition at the time of testing, in order to ensure she obtained objectively valid results, *id.* at ¶¶ 32-33.

Third, Mr. Barrett's counsel are making an offer of proof at the time of pleading. They therefore had to rely upon experience in similar cases to anticipate procedural or substantive arguments the Government might raise, and assemble exhibits based on those speculative judgments. Some records were excised more than others based on these judgments. In some exhibits extraneous parts of records and/or those containing inconsequential diagnoses that might be embarrassing to a witness were included because the document in its entirety is relevant even

---

cause for procedural default due to prosecution's failure to disclose impeachment evidence in state post-conviction proceedings).

if individual pages do not contain direct evidence of a fact at issue.[2]  For example, pages that do not contain information independently supportive of a fact at issue were sometimes included to place other pages in context or to establish that a record is what it purports to be, Fed. R. Evid. 901(a), or that it is part of a regularly prepared record, Fed. R. Evid. 902(11), or that it was not requested at the time of trial.[3]  As evidence related to Mr. Barrett's background, the records of Mr. Barrett and his family members are relevant under 18 U.S.C. § 3592(a)(1) and (a)(8).

Fourth, to the extent this Court is considering striking exhibits unless every page of the exhibit is deemed relevant, Mr. Barrett objects that such a ruling would be erroneous.  Federal Rules of Evidence 104(a), 104(b), 1101(d)(1) and 1101(d)(3) preclude striking exhibits submitted as an offer of proof.  Mr. Barrett submits it would be a violation of the rules of evidence and his due process rights for this Court to strike exhibits before preliminary questions can be resolved such as whether the Government disputes an averment and the nature of the dispute, and whether Mr. Barrett could establish relevance by fulfilling a condition of fact that, due to the nature of collateral litigation, can only occur after the issues are joined through an answer and reply.  The imposition of a page-by-page relevance requirement as to Mr. Barrett's offer of proof is arbitrary and invidious and consistent with a pattern of this Court invoking or applying rules to Mr. Barrett in an arbitrary or invidious manner, or as a pretext for finding fault with his counsel.  *See* Ground 1 to 2nd Amend. § 2255 Mot.; Objections filed 12/4/10 (Doc.

---

[2]  Mr. Barrett acknowledged in his initial motion for leave to file many of these same records under seal that he sought "to protect the witnesses from breaches of their privacy unrelated to the litigation in this case."  That motion was granted.

[3]  *See Wiggins v. Smith*, 539 U.S. 510, 533-34 (2002) (holding death judgment unreliable due to defense counsel's unreasonable failure to obtain records related to defendant's background); *Williams v. Taylor*, 529 U.S. 362, 395-98 (2000) (holding death judgment unreliable due in part to defense counsel's unreasonable failure to obtain records related to defendant's background).

139).

### III.   Specific Bases for Finding Pages Relevant

**Exhibit 139**              **Medical Records for Carolyn Joseph**

Exhibit 139 consists in two pages excerpted from a larger medical file on Mr. Barrett's maternal aunt, Carolyn Joseph.  The exhibit is relevant to Ground 2, in which Mr. Barrett alleges his trial attorneys were ineffective for failing to conduct the thorough investigation of their client's background that the Supreme Court repeatedly has held is required in capital cases.  As part of his showing of prejudice, Mr. Barrett presents the opinion of Dr. George Woods who finds that Mr. Barrett's background includes extensive evidence of a family history of mental health problems, including bipolar disorder.  Exh. 117 at ¶¶ 23-32.  Dr. Woods's diagnosis of Bipolar Disorder in Mr. Barrett is based in part on that family history.  Whether there is a family history of bipolar disease or related illnesses is a matter of consequence to the determination of the action.  Both pages of Exhibit 139, which are dated before the trial, document that Ms. Joseph was being medicated for bipolar disorder.  Therefore Exhibit 139 tends to make it more probable that if trial counsel had investigated Mr. Barrett's family history they would have discovered evidence showing he suffered from bipolar disorder at the time of the offense and trial.

**Exhibit 140**              **Medical Records for Kathy Trotter**

Exhibit 140 is another medical record of a family member who, as shown on the first five pages of the exhibit, was diagnosed with major depression.  Exhibit 140 was proffered with Exhibit 86, a declaration, and was considered by Dr. Woods.  See 1st Amend. Pet. at 220-21. The entire record relates to the family member's hospitalization during a bout with major depression.  Each page describes the circumstances that lead the family member to seek medical

treatment, see, e.g., Exh. 140 at p. 49, the manner in which doctors reached a diagnosis, and how the family member responded to treatment, including treatment with antidepressant and anti-anxiety medication.  Exh. 140 at p. 42-43.  The complete record shows the witness's condition was serious enough that she was hospitalized for approximate eight days.  Exh. 140 at p. 8.  Nearly all the pages are dated before the trial and therefore make it more probable that this Court will find there were medical records available to Mr. Barrett's counsel which could have been used to support a diagnosis or background information related to defenses or mitigation.  Pages 55 through 59 of Exhibit are dated after the trial.  However, they show continuing treatment for depression and anxiety.  Their proffer is consistent with the rule of completeness, and are relevant in that they make it more probable that a mental health expert considering evidence of major depression in Mr. Barrett's family is correct to find a significant problem.

**Exhibit 141          Medical Records for Brandie Hill**

Exhibit 141 was proffered to show further evidence that Mr. Barrett's family members recognized the existence and impact of depression and bipolar disorder in the family.  1st Amend. Pet. at 218.  It corroborates statements made in the Declaration of Brandy Hill (Exh. 77), Mr. Barrett's cousin, and was proffered for that purpose.  *Ibid.* and *id.* at 242.  Although this record is dated after the trial, Ms. Hill is quoted on the third page of the document to state that the problem had been ongoing for several years.  Consideration of this document will make it more probable that this Court will find (a) that family members, at the time of trial, had recognized there was a family history of bipolar disorder, and (b) that the symptoms of the disease have been serious enough to impact family members' lives.  As with other similar medical records, this record was relied upon by Dr. Woods to confirm that a doctor at the time of trial would have made a reliable diagnosis of major mental illness in Mr. Barrett and his family.

**Exhibit 142**          **Medical Records for Toby Barrett**

Exhibit 142 is another set of family member medical records proffered to show Dr. Woods is correct to find a persistent family pattern of mental illness.  On the second through eighth, the eleventh through eighteenth, and twentieth through twenty-third pages of Exhibit 142, physicians document Mr. Barrett's son Toby experiencing symptoms of depression, mania, and Attention Deficit Hyperactivity Disorder.  On the fifteenth page, which is dated in 2007, Toby Barrett relates a past diagnosis for depression.  These pages, while dated after Mr. Barrett's trial, tend to make it more probable that Dr. Woods is correct in identifying a family history of bipolar disease or symptoms, and more probable that Dr. Woods is correct to diagnose Mr. Barrett with bipolar disease.

**Exhibit 143**          **Medical Records for Travis Crawford**

Exhibit 143 consists in records from various occasions on which key prosecution witness Travis Crawford sought medical treatment Mr. Barrett proffered Exhibit 143 for the purpose of showing that Travis Crawford was an unreliable witness, and to corroborate things said about Mr. Crawford by his father in the father's declaration – for example that his son has for some time been under medical treatment for neurological problems (migraine) and mental health problems.  See also KEB302350[4] (reporting history of anxiety in September 2008); KEB302364 (reporting medication for anxiety and depression in January 2008); KEB502376-379 (seeking treatment for migraine and reporting in August 2007 a history of depression and current medications for anxiety and depression); KEB502383-384 (January 2007 reporting then current need for medication for anxiety).  Pages KEB502405-414 are dated before the trial.  They show

---

[4] Longer documents were electronically "Bates" stamped to facilitate easy reference. These numbers appear in the bottom right corner of the electronic (PDF) image of the exhibit. Due to margin limitations, these numbers may not print on all printers.

Travis Crawford seeking treatment for a repeated bout of kidney stones.  Methamphetamine use is reported to cause kidney stones in some people.  Pages numbered KEB502419, 421 and 423 document a history of kidney stones prior to January 2002, which corroborates that Travis Crawford was a heavy methamphetamine user long before he testified.  Pages numbered KEB502390-393 document some of the effects of the long-term methamphetamine use reported in Travis Crawford's declaration and that of his father.  They show that in March 2006, approximately six months after his testimony, Travis Crawford reported he was a methamphetamine user and that he had last used the drug two months earlier.  In April 2006, the records show, he had five teeth extracted (tooth loss being a known consequence of chronic meth abuse), and went to the emergency room seeking pain medication but stormed out before he could be examined.  These records make it more probable this Court will find that Travis Crawford was an unreliable witness who was, like all drug addicts, under constant risk of arrest and loss of access to drugs on which he was dependent.  Not every page of these records contains independent evidence.  For example, the first page is a cover sheet for a particular hospital visit.  It is relevant, however, because it places in context the next page, on which Mr. Crawford reports a prior diagnosis for, and drug treatment for, anxiety.

As the records show, they are a complete set of records from one hospital.  The set was proffered because the pages that are not independently relevant to a material fact are interspersed with pages which are relevant to such an extent that integrity of the exhibit might appear compromised if certain pages were removed.  However, if the Government and this Court have no objection, Mr. Barrett could withdraw pages numbered KEB502343-346, KEB502352-354, KEB302360-363, KEB302365-68, KEB502424, KEB502370-375; KEB502380-382; KEB502386-89; KEB502415-18.

Pages numbered KEB502394-404 show Mr. Crawford going to the emergency room for a variety of complaints in a brief period all that involved seeking either muscle relaxants or pain killers or both, and Mr. Barrett submits these pages are relevant to this Court's determination whether Travis Crawford would have been willing to give false testimony to please law enforcement if doing so would have left him free on the streets to continue to use drugs.

**Exhibit 144          Medical Records of Cynthia Crawford**

Exhibit 144 was proffered in support of Ground 2 in order to demonstrate Mr. Barrett's ability to prove that a reasonable investigation of prosecution witness Cindy Crawford would have uncovered evidence that she had an impaired mental condition, which, along with her drug use, could have impeached her credibility, her ability accurately to recall and relate, and showed her to be unstable and amenable to pressure or influence from law enforcement.  1st Amend. Pet. at 90-91.  Parts of Exhibit 144 that were created prior to Ms. Crawford's trial testimony[5] show she had a history of opiate abuse and drug rehabilitation although she denied drug use (KEB503547, dated October 18, 2005), and that she had a history of emotional instability and being medicated for anxiety (KEB503546, 550, 554, 565, 568, 570, 573), depression (KEB503566, 569, 577), and Post Traumatic Stress Disorder (KEB503577, 578).

Exhibit 144 also was proffered in support of Ground 5 as newly discovered evidence and as corroboration of the declarations of Mr. Barrett's post-conviction investigators which aver (a) that absent influence from the prosecution, Ms. Crawford executed a release for defense counsel to obtain her medical records, *id.* 302 and n.55, (b) that she had long suffered from mental health problems that would lead her to misperceive events and embellish them.  *Ibid.*   In that Ms. Crawford was a key prosecution witness who testified at both stages of trial, the availability of

_____

[5]  Ms. Crawford testified on October 24 and November 9, 2005.

evidence that would have impeached her credibility is a fact of consequence to the determination of Grounds 2 and 5.

Because Ms. Crawford first agreed to be interviewed and provide records to the defense then refused to review a declaration memorializing her statements, her mental condition both prior to, during, and since the time of trial may be a fact of consequence to the determination of this action.  Records dated after the time of trial show reports of PTSD (KEB503414, 423, 449-56, 457-462, 501-507, 508-511, 514, 518), and show her receiving medications for panic disorder, major depression, and antipsychotic medications.  KEB503402, 403, 407, 412, 414, 421, 429-32 (report of overdose of panic medication at KEB503430), 450, 452, 454-456, 458, 501-504, 518-520, 524-528).  Post-conviction evidence is relevant to Mr. Barrett's claims predicated upon *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  *United States v. Quintinella,* 193 F.3d 1139, 1148 n. 9 (10th Cir. 1999).  These medical records make it more probable this Court will find Ms. Crawford felt pressured to testify favorable for the prosecution, and that she was under pressure not to cooperate with the defense, and they will make it less probable this Court will find Ms. Crawford's testimony was truthful, or that, considered cumulatively with other evidence the verdicts based in part on her testimony are worthy of confidence.

Viewed together, these records from one hospital show a pattern beginning in January 2005 in which Ms. Crawford seeks emergency treatment either for the mental health conditions mentioned *supra*, or for a variety of complaints for which she is often seeking pain medication despite x-ray and other examinations that show no injury, and reports of her opiate abuse and an addiction to pain pills (KEB503512).  This entire history is relevant to an assessment of her credibility and vulnerability to law enforcement, and her decisions first to cooperate with Mr.

Barrett's post-conviction investigation then not to participate.

If the Government does not dispute the correctness of the records, and this Court wishes to minimize the size of the exhibit the following fourteen pages could be withdrawn and the exhibit re-submitted: KEB503521-523; KEB503542-545; KEB503581-584; KEB503594-596.

**Exhibit 145       Medical Record of Linda Riley**

Exhibit 145 was proffered as further documentary proof that members of Mr. Barrett's family, in this case his paternal aunt, have been diagnosed with and treated for severe anxiety and depression. 1st Amend. Pet. at 221. This one-page excerpt from a larger record was available at the time of trial and makes it more probable that this Court will find Dr. Woods was correct to identify a family history of mental illness that could have been documented at the time of trial. *See* Exh. 117 at ¶ 26.

**Exhibit 146       Mental Health Records of A.J. Barrett**

Exhibit 146 documents the court-ordered commitment of Mr. Barrett's grandfather to a mental health facility in 1966. It was proffered as one of many records documenting a history of mental illness and domestic violence in Mr. Barrett's family, as well as the family's educational, financial, social, and work background. The entire document makes it more probable that this Court will find records related to violence, mental illness, alcoholism, low educational attainment, poverty, and family dysfunction in Mr. Barrett's background were available to defense counsel and mental health experts, but were not sought, obtained, or considered in a manner consistent with prevailing professional norms, and that these documents would have served independently or through experts as the basis for mitigation evidence. *See*, *e.g.*, Exh. 117 at ¶ 27.

**Exhibit 147       Medical Records of Kenneth Eugene Barrett**

As mentioned *supra*, Mr. Barrett's medical records are relevant in part because they were relied upon by Dr. Woods and Dr. Young both to assess Mr. Barrett's condition at the time of their evaluations, and to form opinions that could be based solely upon records available at the time of trial.  *See* Fed. R. Evid. 703.  In other words, to the extent Dr. Woods and Dr. Young relied on the entirety of Mr. Barrett's medical records in aid of reaching their conclusions and diagnoses, the records are directly relevant to their findings, and offer documentary support for them.  The experts' reliance on the entirety of Mr. Barrett's medical records – both psychiatric and non-psychiatric – shows that they did not "cherry pick" the documentary record of Mr. Barrett's medical history, but took into account the entire record to inform their conclusions, as they were professionally obligated to do.  *See infra*.  Dr. Woods' and Dr. Young's reports indicate both their reliance on the records and how the records assisted in their overall evaluations of Mr. Barrett.

The Court specifically directed Mr. Barrett's counsel to address the relevance of his medical records that do not mention mental illness,[6] and that post-date the trial.  Order (Doc. 147) at 1-2.  A complete medical history is a component of a mental health assessment.  Dr. Woods mentioned in his declaration that he was applying the diagnostic criteria of the American Medical Psychiatric Association's *Diagnostic and Statistical Manual – IV – TR* ("DSM-IV-TR").  Exh. 117 at ¶¶ 61, 66, 67.  The DSM-IV-TR, like previous versions of the DSM uses a diagnostic

---

[6] E.g., Exh. Vol. 2, Exh. 147, pp. 1-7, 11, 13-18, 21-40, 43-60; Exh. Vol. III, Exh. 147, pp. 148-153, 183-237, 239, 303; Exh. Vol. IV, Exh. 147, pp. 83-146, 177-315.  These materials consist of records from Sequoyah Memorial Hospital, St. Francis Medical Center in Tulsa, where Mr. Barrett was taken after Trooper Eales was killed and Mr. Barrett was himself shot, and medical records from the period of time Mr. Barrett was in state, and then later federal custody.  Any duplicate records among these materials stems from the fact that various sources from which Mr. Barrett obtained the records themselves had records from other facilities.  Duplicate records from the several sources of records were included not to burden the court with repetition, but to demonstrate how easily counsel could have acquired and reviewed the records.

method called "multiaxial assessment."

> A multiaxial system involves an assessment on several axes, each of which refers to a different domain of information that may help the clinician plan treatment and predict outcome.  There are five axes included in the DSM-IV multiaxial classification:
>
> | | |
> |---|---|
> | Axis I | Clinical Disorders |
> | | Other Conditions That May Be a |
> | | a Focus of Clinical Attention |
> | Axis II | Personality Disorders |
> | | Mental Retardation |
> | Axis III | General Medical Condition |
> | Axis IV | Psychosocial and Environmental Problems |
> | Axis V | Global Assessment of Functioning |
>
> The use of the multiaxial system facilitates comprehensive and systematic evaluation with attention to the various mental disorders and *general medical conditions,* psychological and environmental problems, and level of functioning that might be overlooked if the focus were on assessing a single presenting problem.

DSM-IV-TR at 27. (Emphasis added) This approach is particularly relevant in the context of a capital case because 'the multiaxial system promotes the application of the biopsychosocial model" which tracks the consideration given in capital sentencing proceedings to the medical, educational, and psychosocial background of the defendant.

"General medical conditions can be related to mental disorders in a variety of ways.  In some cases it is clear that the general medical condition is directly etiological to the development or worsening of mental systems and that the mechanism for this effect is psychological." *Id.* at 29.  "There are other situations in which general medical conditions are recorded on Axis III because of their importance to the overall understanding or treatment of the individual with the mental disorder." *Id.* at 30.  In addition, the DSM-IV-TR uses a process of "differential diagnosis" to distinguish conditions.  In order to rule a diagnostic label in or out of consideration, the examiner must consider all five axes.

In a post-conviction forensic setting such as this, it is sometimes important for mental health examiners to review medical information from the period before trial and the period after trial in order to form an opinion regarding the onset of the individual's symptoms. If, for example, Dr. Young found evidence of head trauma or other medical reasons for loss of consciousness before the offense or trial, but none in the time since, that would support an opinion that the etiology of brain dysfunction lies in the pre-offense trauma. An example of this was Mr. Barrett's suicide attempt in 1986 when he shot himself in the chest with a shotgun. This incident, and the records reflecting it, are clearly relevant to an assessment of his mental condition; the suicide attempt resulted in Mr. Barrett's commitment to Eastern State Hospital.

Both pretrial and post-trial medical records are relevant to a competent examination of a defendant by psychiatric or psychological experts for a number of reasons. The records assist the examiner in determining whether the person being evaluated is on medications that could affect his response to the examination, and/or whether he is suffering from a physical condition which impairs his concentration or produces "noise" in his presentation that has to be distinguished from the signals the examiner is picking up during the evaluation. Post-trial medical records are relevant because they indicate to an examiner whether the subject has experienced trauma or other illness since the trial that could affect the person's responses.

Beyond all this, Mr. Barrett's psychiatric[7] and other medical records (*see* fn. 6) are

---

[7] *See, e.g,* Exh. Vol. II, Exh. 147, pp. 8-10, 20, 57-100 (Eastern State records); Exh. Vol. III, 1-23, 27-147 (Eastern State records; partial duplicate); Exh. Vol. III, Exh. 147, pp. 240-270, records of Wagoner Community Hospital and Bill Willis Mental Health facility, pp. 271-288 (partial duplicate of these records); Exh. Vol. III, Exh. 147, p. 289 (Social Security Disability appeal form); Exh. Vol. III, Exh. 147, pp. 290-302 (Eastern State records, partial duplication), Exh. Vol. IV, Exh. 147, p. 176 (denial of disability by Social Security Administration). The duplicate copies of various records that appear in Exhibit 147 apparently stem from the fact that various sources from which Mr. Barrett acquired the records had records from other facilities. As noted in fn. 6, duplicate copies of records were included in Mr. Barrett's submission to

directly relevant to his arguments that: 1) trial counsel were ineffective for failing to utilize appropriate expert assistance to show that Mr. Barrett was incompetent to stand trial (Ground 2, Part A(3), Ground 8); 2) trial counsel were ineffective for failing to utilize expert (and lay) witnesses to argue that, due to his severe mental illnesses and the manner in which he processes information and reacts in stressful situations, Mr. Barrett was either simply incapable of forming the required intent, particularly, but not exclusively, with respect to Count 3, or, at the worst, that his mental and emotional state made him liable for only a lesser offense or offenses which evidence also would have generally aided in rebutting the Government's theory of the case (Ground 2, Part A(2), Ground 9); 3) trial counsel were ineffective for failing to fulfill their duties to conduct a thorough and competent mitigation investigation, consult with appropriate experts, and prepare effective and complementary defenses in both the first and second stages of trial which focused on Mr. Barrett's and his family's lengthy history of mental illness (Ground 2, Part B (1)(2)); 4) that the trial court denied Mr. Barrett's rights to due process and equal protection, and his right to expert assistance under the applicable federal statutes (Ground 3 (2)(3)); 5) Mr. Barrett's physical health problems, as well as his mental illnesses, are relevant to his claim that he was improperly restrained with a stun belt during trial (Ground 7); 6) that Mr. Barrett's constitutional rights were violated due to the effects of drugs he was given, and trial counsel's failure to inquire about the effects of the drug regimen Mr. Barrett was on during trial, which contributed to the incident in which Mr. Barrett was removed from the courtroom during the penalty phase without a proper inquiry or waiver (Ground 13; Ground 18 (A)(12); and, 7) that due to Mr. Barrett's organic brain impairments and chronic and severe mental illnesses, his

---

demonstrate the ease with which trial counsel either could have acquired or reviewed the pertinent medical records.

execution would violate the Eighth Amendment (Ground 17).  The relevance of Mr. Barrett's medical records to these grounds for relief were explained in Mr. Barrett's § 2255 motion and supporting brief, and based on the Court's familiarity with those documents are not be repeated here.

**Exhibit 201**　　　　　　**Medical Records of Gwendolyn Crawford**

Exhibit 201 contains medical records of Mr. Barrett's maternal first cousin, Gwendolyn Crawford.  This five-page exhibit was proffered in support of Ground 2 in order to document the prevalence of mental illness in Mr. Barrett's family. 1st Amend. Pet. at 218.  The first page of the exhibit is offered for the purpose of authentication.  The remaining pages document Mr. Barrett's cousin being treated over a period of years for tension headaches, migraine, and "nerve difficulties" that are also described as "anxiety-depression."  *See* Exh. 117 at ¶ 24.

**Exhibit 202**　　　　　　**Medical Records of Carolyn Joseph**

Exhibit 202 are medical records related to the same witness as Exhibit 139 which was addressed *supra*.  Records created after the trial confirm the longstanding nature of this family member's bipolar disease either directly or based on medications.  *See* pages Bates numbered KEB505285, 292, 298, 303, and 309.  These records make it more probable this Court will find Dr. Woods' conclusions are correct and well founded.  Records created years before the trial show medications for depressive symptoms.  KEB505364, 369, and 413.  These records are relevant to Dr. Woods' diagnosis and to show that the same diagnosis could have been made at the time of trial.

Unlike Exhibit 139, Mr. Barrett's counsel proffered this hospital's records in their entirety because as a whole the record makes it more probable this Court will find that defense counsel did not seek medical records related to Mr. Barrett's family, despite the family's

willingness to notify counsel in interviews that there is a history of bipolar and other neurological disorders.  This hospital included in its records all prior releases, authorizations, and requests for records.  Bates pages KEB505355-363 reflect the request made by Mr. Barrett's post-conviction counsel.  The entire file is relevant under Fed. R. Evid. 803(7) because it shows that the hospital had the post-conviction records request, and a form prepared in response, but no request dating from the time of trial.

## IV.   Conclusion

For the foregoing reasons, and those stated in Mr. Barrett's Amended Motion to Vacate, and in his unopposed motion to file under seal, Mr. Barrett respectfully requests this Court grant the motion and file the exhibits.

DATED:   March 12, 2010

Respectfully submitted,

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender
/s/ Joan M. Fisher
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender
/s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

**Certificate of Electronic Filing and Service**

I hereby certify that on this 12th day of March 2010 I caused the foregoing Motion to Expand the Record to be filed with the Clerk of the Court using the ECF System for filing.  A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and Jeffrey B. Kahan, U.S. Dept. of Justice, 1331 F Street, NW, Washington, DC 20530.

/s/ Joan Fisher

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Petitioner,　　)
　　　　　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　　　　)　　　Case No. 09-CIV-105-JHP
　　　　　　　　　　　　　　　　　　)
UNITED STATES OF AMERICA,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Respondent.　)

## ORDER

This matter comes on for consideration of Petitioner's Motion for Evidentiary Hearing (Doc. 150).  The Government filed a Response objecting to Petitioner's request (Doc. 153).

Rule 8 of the Rules Governing Section 2255 Proceedings for the United States District Court governs evidentiary hearings.  Prior to granting an evidentiary hearing, this Court ". . . .must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." *Id.*  Since an answer has not been filed, Petitioner's Motion is premature.  Further, if after reviewing the records herein, this Court determines an evidentiary hearing is warranted on any of the issues raised herein, the Court will enter an appropriate order.

It is therefore, the Order of this Court that Petitioner's Motion for Evidentiary Hearing (Doc. 150) is hereby denied.

DATED this 29th day of March, 2010.

James H. Payne
United States District Judge
Eastern District of Oklahoma

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,      )
                                      )
                    Petitioner,   )
                                        )
vs.                                    )      Case No. 09-CIV-105-JHP
                                        )
UNITED STATES OF AMERICA,      )
                                      )
                    Respondent.  )

**<u>ORDER</u>**
**(Re: Exhibits to Second Amended Motion to Vacate)**

This matter comes on for consideration of Petitioner's Motion to Expand the Record (Doc. 151) and Motion to File Exhibits under Seal (Doc. 110).  After consideration of said motions, as well as the Government's response, the Court finds Petitioner's Motion to Expand the Record (Doc. 151) is hereby granted as follows:

Exhibits 1 thru 57 and 59 thru 118 (filed as part of Doc. Nos. 70, 71 and 72) will be considered by this Court in support of the Second Amended Motion to Vacate (Doc. 96) even though this Court has stricken the First Amended Motion (Doc. 70).

Petitioner's Unopposed Motion to File Exhibits under Seal (Doc. 110) is granted despite Petitioner's failure to comply with the Court's Order (Doc. 147) entered on February 26, 2010.  On March 16, 2009, the following exhibits were filed under seal:

Exhibits 139-143 (part of Doc. 13); Exhibits 144A, 144B, 145-146 (Doc. 14);

Exhibit 147A (Doc. 15, 16, and 17); Exhibit 147B (Doc. 18, 19, and 20); Exhibit 147C (Doc. 21 and 22); Exhibit 147D (Doc. 23); Exhibit 147E (Doc. 24 and 25) Exhibit 147F (Doc. 26); Exhibit 147G (Doc. 27). The Court will consider said exhibits in support of the Second Amended Motion to Vacate (Doc. 96) without refiling of the same.

Further, the Court Clerk is hereby ordered to file Exhibits 201 and 202, which have not been previously filed herein, under seal. It should be noted for the record herein that Appendix A to Petitioner's Brief in Support of the Second Amended Motion to Vacate (Doc. 149-2) contains an Index of **ALL** of the Exhibits filed in support of the Second Amended Motion to Vacate (Doc. 95), including the Redacted Exhibit Nos. 119 - 205 which are filed as Doc. Nos. 114 - 145 herein.

It is so ordered on this _30th_ day of March, 2010.

James H. Payne
United States District Judge
Eastern District of Oklahoma

810

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **KENNETH EUGENE BARRETT** | ) |
| | ) |
| *Petitioner*, | ) |
| | ) |
| **v.** | )   **Case No. CV-09-00105-JHP** |
| | ) |
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| *Respondent.* | ) |

**UNOPPOSED MOTION TO FILE REDACTED ANSWER TO**
**PETITIONER'S SECOND AMENDED MOTION FOR COLLATERAL RELIEF**

**COMES NOW**, Respondent, United States of America, by and through undersigned counsel, and respectfully requests permission to file a Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief.  In support, Respondent would submit the following:

1)   On December 5, 2009, Petitioner filed a 403-page Second Amended Motion, asserting 19 enumerated claims for relief.  In support of his Motion, Petitioner references a number of exhibits which were filed under seal.  In addition, Petitioner's Motion also references a number of additional documents which were previously filed under seal in the underlying criminal case, *United States v. Kenneth Eugene Barrett*, CR-04-115, and which are subject to a Protective Order issued October 7, 2009 (Doc. 82 herein).  The Protective Order states in relevant part:

> None of the documents identified in Paragraph 1, and *no information contained therein or derived therefrom*, shall be revealed to any person other than counsel of record for the United States and/or persons working for the United States Department of Justice in connection with these Section 2255 proceedings without an order from this Court.

(emphasis added).

2)      In order to fully respond to all of the Petitioner's claims for relief, the Respondent

must reference certain sealed documents, matters contained within sealed documents, and/or

information derived from certain sealed documents, some of which are the subject of the above-

referenced Protective Order.

3)      Consequently, as a matter of necessity, Respondent must seek authorization to file

a redacted version of the Answer and authority to file a complete version under seal.

4)      On May 11-12, 2010, undersigned counsel consulted with Tivon Schardl, one of the

attorneys representing Petitioner, via e-mail.  Mr. Schardl advised that Petitioner has no objection

to the Court granting this Motion allowing Respondent to file a redacted Answer and a complete

Answer under seal.

**WHEREFORE,** premises considered, the Respondent prays the Court grant the

Respondent's motion to file a redacted Answer and a complete Answer under seal.

Respectfully submitted,

SHELDON J. SPERLING
United States Attorney

s/      Christopher J. Wilson
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
United States Attorney's Office
1200 West Okmulgee
Muskogee, OK 74401
(918) 684-5100
Fax (918) 684-5150

## CERTIFICATE OF SERVICE

I, hereby certify that on 12th day of May, 2010, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry, Attorney for Petitioner
Tivon Schardl, Attorney for Petitioner
Joan Fisher, Attorney for Petitioner

s/      Christopher  J. Wilson
        Assistant United States Attorney

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | **Case No. CV-09-00105-JHP** |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *Respondent.* | ) | |

## ORDER GRANTING UNOPPOSED MOTION TO FILE REDACTED ANSWER TO PETITIONER'S SECOND AMENDED MOTION FOR COLLATERAL RELIEF

**NOW** on this 13th day of May, 2010, Respondent's Unopposed Motion to file a Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief comes on for hearing. The Court, having been fully advised of the premises, hereby ORDERS as follows:

1)   The Respondent's Unopposed Motion File a Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief should be and is hereby GRANTED.

2)   The Respondent is ordered to file a redacted version of the Answer to Petitioner's Second Amended Motion for Collateral Relief.

3)   The Respondent is furthered ordered to submit a complete, un-redacted version of the Answer to Petitioner's Second Amended Motion for Collateral Relief to the Clerk of the Court for filing under seal and to counsel for the Petitioner.

IT IS SO ORDERED.

James H. Payne
United States District Judge
Eastern District of Oklahoma

# U.S. District Court
## Eastern District of Oklahoma (Muskogee)
## CIVIL DOCKET FOR CASE #: 6:09–cv–00105–JHP

Barrett v. USA

Assigned to: District Judge James H. Payne

Case in other court:  10th Circuit, 12–07086

ED/OK, 6:04–cr–115

Cause: 28:2255 Motion to Vacate / Correct Illegal Sentence

Date Filed: 03/16/2009

Date Terminated: 08/16/2012

Jury Demand: None

Nature of Suit: 535 Death Penalty – Habeas Corpus

Jurisdiction: U.S. Government Defendant

**Petitioner**

**Kenneth Eugene Barrett**     represented by     **David B. Autry**
1021 NW 16th St
Oklahoma City, OK 73106
405–521–9600
Fax: 405–521–9669
Email: dbautry44@hotmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joan M. Fisher**
Federal Public Defender – Sacramento, CA
801 "I" St, Third Floor
Sacramento, CA 95814
916–498–6666
Fax: 916–498–5706
Email: joan.fisher@fd.org
*ATTORNEY TO BE NOTICED*

**Tivon Schardl**
Federal Public Defender – Sacramento, CA
801 "I" St, Third Floor
Sacramento, CA 95814
916–498–6666
Fax: 916–498–6656
Email: tim.schardl@fd.org
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**USA**     represented by     **Christopher J. Wilson**
US Attorney (OKED)
1200 W Okmulgee
Muskogee, OK 74401

1

918−684−5100
Fax: 918−684−5150
Email: Chris.Wilson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Kahan**
US Department of Justice – Capital Case
Unit
1331 F St NW
Rm 345
Washington, DC 20530
202−305−8910
Fax: 202−353−9779
Email: jeffrey.kahan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sheldon J. Sperling**
US Attorney (OKED)
1200 W Okmulgee
Muskogee, OK 74401
918−684−5100
Fax: 918−684−5150
*TERMINATED: 11/24/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/10/2009 | 4 | | MOTION to File Exhibits Under Seal and for a Protective Order by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 5 | | ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for a Protective Order (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 6 | | MOTION to Reconsider (Re: 5 Order Ruling on Motion to Seal Exhibits and for Protective Order) by Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 7 | | AMENDED ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for Protective Order (Re: 5 Order, 6 Motion to Reconsider) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 1 | | MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett; Responses due by 6/16/2009 (With attachments – **EXHIBITS 1−36; 59−60**)(EXHIBITS 37−58 NOT USED)(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 3 | | |

| | | | |
|---|---|---|---|
| | | | EXHIBITS IN SUPPORT OF MOTION **Nos. 61–70, 71–80, 81–99, 100–118** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 8 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134 and 135** (Re: 1 MOTION to Vacate and 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 9 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 10 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 11 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 12 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 13 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 137, 138, 139, 140, 141, 142 and 143** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 14 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 144A, 144B, 145 and 146** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 15 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 16 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 17 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 18 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 19 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 147B2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 20 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) |

| | | | |
|---|---|---|---|
| | | | (Entered: 03/18/2009) |
| 03/16/2009 | 21 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 22 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 23 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 24 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 25 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 26 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147F** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 27 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147G** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 28 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 148, 149, 150, 151, 152, 153, 154, 155, 156, 157 and 158** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 29 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 159, 160, 161, 162, 163, 164 and 165** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 30 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 166, 167, 168, 169, 170, 171, 172, 173, 174 and 175** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 31 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 32 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 33 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 34 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |

| | | | |
|---|---|---|---|
| 03/16/2009 | 35 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 36 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 37 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 178, 179 and 180** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 38 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 39 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 40 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 41 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 42 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 182, 183, 184 and 185** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 43 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 186, 187, 188, 189, 190, 191, 192, 193, 194 and 195** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/17/2009 | 2 | | CORRECTED MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett (corrected to include verification) (Re: 1 Motion to Vacate); Responses due by 6/16/2009(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/18/2009 | 44 | | NOTICE to Government to Respond by **6/16/2009** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) Modified on 3/19/2009 to change response date to 6/16/09 (cjt, Deputy Clerk). (Entered: 03/18/2009) |
| 03/19/2009 | | | NOTICE of Docket Entry Modification; Error: Wrong date of 3/16/09 given in text; Correction: Correcting response date to 6/16/09 (Re: 44 Notice to Respond) (cjt, Deputy Clerk) (Entered: 03/19/2009) |
| 05/29/2009 | 45 | | MOTION to Disqualify Judge by Kenneth Eugene Barrett Responses due by 6/15/2009 Replies due by 6/24/2009.(Schardl, Tivon) (Entered: 05/29/2009) |
| 06/03/2009 | 46 | | ATTORNEY APPEARANCE by Christopher J. Wilson on behalf of USA (Wilson, Christopher) (Entered: 06/03/2009) |
| 06/11/2009 | 47 | | |

| | | | |
|---|---|---|---|
| | | | First MOTION for Extension of Time to Respond to Motion (Re: 45 MOTION to Disqualify Judge ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/11/2009 | 48 | | First MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment, 1 MOTION to Vacate Order/Judgment ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/12/2009 | 49 | | MINUTE ORDER by District Judge James H. Payne granting Application for Extension of Time to Respond to Petitioner's Motoin to Disqualify and Recuse United States District Judge James H. Payne from Further Participation in this Matter ( 47 Motion for Extension of Time to Respond to Motion). Accordingly, the respondent has until 7/15/09 within which to file its response to petitioner's motion (Re: 45 MOTION to Disqualify Judge ).(law, Deputy Clerk) (Entered: 06/12/2009) |
| 06/12/2009 | 50 | | MINUTE ORDER by District Judge James H. Payne granting in part and denying in part Application for Extension of Time to Respond to Petitioner's 28 U.S.C. Section 2255 Motion ( 48 Motion for Extension of Time to Respond to Motion ). Respondent has an additional 3 months or until 9/16/09 within which to file its response to petitioner's 28 U.S.C. Section 2255 Motion. (law, Deputy Clerk) (Entered: 06/12/2009) |
| 07/13/2009 | 51 | | RESPONSE in Opposition to Motion (Re: 45 MOTION to Disqualify Judge ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 07/13/2009) |
| 07/24/2009 | 52 | | First MOTION to unseal documents in cr–04–115 by USA Responses due by 8/10/2009 Replies due by 8/19/2009.(Wilson, Christopher) (Entered: 07/24/2009) |
| 08/14/2009 | 53 | | MOTION to File Response to Government's Motion to Unseal Out of Time by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/14/2009 | 54 | | MOTION to File Out of Time *PROPOSED ORDER* by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/17/2009 | 55 | | ORDER by District Judge James H. Payne: striking 54 Petitioner's Proposed Order which was filed in error (cjt, Deputy Clerk) (Entered: 08/17/2009) |
| 08/19/2009 | 56 | | MINUTE ORDER by District Judge James H. Payne: Directing Petitioner to supplement 53 MOTION to File Response to Government's Motion to Unseal Out of Time by 5:00 p.m. today, 8/19/09, to include a statement as to whether either Christopher J. Wilson or Jeffrey B. Kahan, counsel for respondent, USA objects to the motion. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 57 | | SUPPLEMENT (Re: 56 Minute Order,,, 53 MOTION to File Response to Government's Motion to Unseal Out of Time ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 08/19/2009) |
| 08/19/2009 | 58 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr–04–115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/19/2009) |

| | | | |
|---|---|---|---|
| 08/19/2009 | 59 | | MINUTE ORDER by District Judge James H. Payne: Striking 58 Petitioner's Response in Opposition to the Government's Motion to Unseal (Re: 52 Government's MOTION to Unseal Documents). (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 60 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's Motion to File a Response to Government's Motion to Unseal out of time (Doc. 53 ) is hereby granted. The Court notes that the Government's objection to Petitioner's request is based upon the impending deadline for the Government to respond to the Petitioner's § 2255 Motion (Doc. # 2) and that the Government's Motion to Unseal (Doc. # 52) indicates the pleadings sought are needed for the Government to be able to prepare its response to the Petitioner's § 2255 Motion. To the extent that any delay in ruling on the Government's Motion to Unseal is directly attributable to Petitioner's failure to timely respond to the Government's Motion to Unseal, this Court will consider that in the event the Government becomes unable to meet their current response deadlines on the § 2255 Motion. Accordingly, Petitioner shall be given until August 26, 2009 to file a Response to the Government's Motion (Doc. 52 ) and the Government shall be given until September 2, 2009, to Reply. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/26/2009 | 61 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr–04–115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/26/2009) |
| 08/28/2009 | 62 | | REPLY to Response to Motion (Re: 52 First MOTION to unseal documents in cr–04–115 ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 08/28/2009) |
| 09/04/2009 | 63 | | Second MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment ) by USA Responses due by 9/21/2009(Wilson, Christopher) (Entered: 09/04/2009) |
| 09/04/2009 | 64 | | MINUTE ORDER by District Judge James H. Payne: granting 63 Respondent's Motion for Extension of Time to Respond to Motion; Response due by 10/16/2009 (Re: 1 MOTION to Vacate Order/Judgment, 2 Corrected MOTION to Vacate Order/Judgment ) (cjt, Deputy Clerk) (Entered: 09/04/2009) |
| 09/04/2009 | 65 | | RESPONSE to Motion (Re: 63 Second MOTION for Extension to Respond to 2255 Motion) by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 9/8/2009 to change text and change link (dma, Deputy Clerk). (Entered: 09/04/2009) |
| 09/11/2009 | 66 | | ORDER by District Judge James H. Payne: denying 45 Petitioner's Motion to Disqualify and Recuse (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/11/2009 | 67 | | ORDER by District Judge James H. Payne: Granting in part, denying in part and taking under advisement in part 52 Government's MOTION to Unseal, or to Gain Full Access to Motions, Orders, Reports and Proceedings filed Cr–04–115 (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/22/2009 | 68 | | NOTICE of Intention Not to Abandon Claims and REQUEST for Protective Order (Re: 67 Order) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) Modified on 9/23/2009 change text (dma, |

| | | | |
|---|---|---|---|
| | | | Deputy Clerk). (Entered: 09/22/2009) |
| 09/23/2009 | 69 | | ORDER by District Judge James H. Payne (Re: 67 Order, 68 Petitioner's NOTICE of Intent Not to Abandon Claims and REQUEST for Protective Order) (cjt, Deputy Clerk) (Entered: 09/23/2009) |
| 09/25/2009 | 70 | | Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* by Kenneth Eugene Barrett Responses due by 10/13/2009 (With attachments – **EXHIBITS 1–10**)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 71 | | EXHIBIT(S) **11 through 50** (Re: 70 Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 72 | | EXHIBIT(S) **51 through 118** (Re: 70 Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/28/2009 | 73 | | OBJECTION to Petitioner's Proposed Protective Order (Re: 68 MOTION for Protective Order) by USA (Wilson, Christopher) Modified on 9/29/2009 to change text (dma, Deputy Clerk). (Entered: 09/28/2009) |
| 09/29/2009 | 74 | | ORDER by District Judge James H. Payne: Show Cause Hearing and Scheduling Conference are set for 10/6/2009 at 02:00 PM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne (Re: 70 Amended MOTION for Collateral Relief, to Vacate, Set Aside or Correct Sentence and for a New Trial) (cjt, Deputy Clerk) (Entered: 09/29/2009) |
| 09/30/2009 | 75 | | RESPONSE (Re: 69 Order, ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 09/30/2009) |
| 10/02/2009 | 76 | | MOTION to Vacate Order/Judgment *Order Filed September 29, 2009*, MOTION to Continue Hearing(s) *On Order to Show Cause* (Re: 74 Order,, Setting/Resetting Hearing(s), Setting/Resetting Hearing(s),, ) by Kenneth Eugene Barrett Responses due by 10/19/2009 (With attachments)(Schardl, Tivon) (Entered: 10/02/2009) |
| 10/02/2009 | 77 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's emergency motion (Dkt 76 ) to vacate show cause order is denied. The court hereby waives the presence of petitioner's counsel, Tivon Schardl, at the hearing scheduled October 6, 2009, at 2:00 p.m. Lead counsel, David Autry, is required to attend; however, arrangements will be made for lead counsel to speak with co–counsel Tivon Schardl via telephone, if necessary. In addition, the parties should be aware the court intends to conduct a status and scheduling conference to receive the parties' observations and comments as to the time frame necessary for disposition of this matter. (cjt, Deputy Clerk) (Entered: 10/02/2009) |
| 10/05/2009 | 78 | | MOTION to Continue Hearing(s), MOTION to Recuse, MOTION to Reconsider, MOTION for Leave to Appear *y* (Re: 77 Minute Order,,, Ruling on Motion to Vacate Order/Judgment,,, Ruling on Motion to Continue |

| | | | |
|---|---|---|---|
| | | | Hearing(s), Ruling on Motion to Continue Hearing(s), Ruling on Motion to Continue Hearing(s) ) by Kenneth Eugene Barrett Responses due by 10/20/2009(Schardl, Tivon) (Entered: 10/05/2009) |
| 10/05/2009 | 79 | | MINUTE ORDER by District Judge James H. Payne: denying 78 Petitioner's Motion to Reconsider; denying 78 Petitioner's Motion to Continue Hearing; finding as moot 78 Motion for Leave to Appear by Telephone pursuant to Minute Order 77 entered on 10/2/09. 78 Petioner's Motion to Recuse was previously denied by Order 66 entered on 9/11/09. (cjt, Deputy Clerk) (Entered: 10/05/2009) |
| 10/06/2009 | 80 | | MINUTES of Proceedings – held before District Judge James H. Payne: Show Cause/Scheduling Hearing held on 10/6/2009 (Court Reporter: K.Sidwell) (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 81 | | SCHEDULING ORDER by District Judge James H. Payne: Amended Motion to Vacate due 11/6/2009; Brief in Support due 1/5/2010; Response due 3/8/2010; Reply due 3/23/2010 (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 82 | | PROTECTIVE ORDER by District Judge James H. Payne: granting 68 Petitioner's Motion for Protective Order; granting 52 Government's Motion to Unseal Documents (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/08/2009 | 83 | | ***Remark: Pursuant to 82 Protective Order entered on 10/7/2009, copies of sealed Doc. Nos. 16, 23, 24, 25, 46, 50, 51, 57, 107, 113, 116, 118, 232, 274, 301 and the sealed letter dated 2/28/2005, all filed in Case No. CR–04–115–JHP, were personally delivered to Asst. United States Attorney Christopher Wilson on 10/8/2009. (cjt, Deputy Clerk) (Entered: 10/08/2009) |
| 10/09/2009 | 84 | | STATUS REPORT by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 10/09/2009) |
| 10/15/2009 | 85 | | TRANSCRIPT of Proceedings (Unredacted) of Show cause/Scheduling Hearing held on 10/6/09 before District Judge James H. Payne (Court Reporter: Ken Sidwell) (Pages: 1–42). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 80 Minutes of Scheduling Conference, Striking/Terminating Deadline(s)/Hearing(s) ) (kns, Court Reporter) (Entered: 10/15/2009) |
| 10/16/2009 | 86 | | MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* by Kenneth Eugene Barrett Responses due by 11/2/2009(Schardl, Tivon) (Entered: 10/16/2009) |
| 10/20/2009 | 87 | | ORDER by District Judge James H. Payne ; denying 86 Motion to Stay (lsa, Chambers) (Entered: 10/20/2009) |
| 10/28/2009 | 88 | | Unopposed MOTION to Extend Deadline(s) *Established by Order filed October 7, 2009* by Kenneth Eugene Barrett Responses due by 11/12/2009 (With attachments)(Schardl, Tivon) (Entered: 10/28/2009) |

| 11/02/2009 | 89 | | SUPPLEMENT to Unopposed Motion to Continue Filing Schedule 88 by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 11/3/2009 to edit text (cjt, Deputy Clerk). (Entered: 11/02/2009) |
|---|---|---|---|
| 11/03/2009 | 90 | | ORDER EXTENDING FILING SCHEDULE by District Judge James H. Payne: granting 88 Petitioner's Unopposed Motion to Continue Filing Schedule (cjt, Deputy Clerk) (Entered: 11/03/2009) |
| 11/04/2009 | 91 | | ORDER from Circuit Court (Re: 86 MOTION to Stay Proceedings Pending Disposition of Mandamus Action 87 Order Denying Motion to Stay) (cjt, Deputy Clerk) (Entered: 11/04/2009) |
| 12/03/2009 | 92 | | MINUTE ORDER by District Judge James H. Payne: Show Cause Hearing is set for 12/15/2009 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne for David Autry to show cause why he has failed to comply with this Court's prior orders regarding submission of CJA vouchers. Only David Autry's appearance is required at this hearing. (cjt, Deputy Clerk) (Entered: 12/03/2009) |
| 12/04/2009 | 93 | | ATTORNEY APPEARANCE by Joan Fisher on behalf of Kenneth Eugene Barrett (Fisher, Joan) Modified on 12/7/2009 to change text (dma, Deputy Clerk). (Entered: 12/04/2009) |
| 12/04/2009 | 94 | | NOTICE Petitioner's Notice Regarding Amended Petition by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 12/04/2009) |
| 12/04/2009 | 95 | | Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* by Kenneth Eugene Barrett Responses due by 12/18/2009(Fisher, Joan) (Entered: 12/04/2009) |
| 12/14/2009 | 96 | | ORDER from Circuit Court (Re: 87 Order, Ruling on Motion to Stay, 86 MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* ) (With attachments)(law, Deputy Clerk) (Entered: 12/14/2009) |
| 12/15/2009 | 97 | | SEALED MINUTES of Show Cause Hearing (cjt, Deputy Clerk) (Entered: 12/15/2009) |
| 01/08/2010 | 98 | | MOTION to Extend Deadline(s) *for submission of cja voucher* by Kenneth Eugene Barrett Responses due by 1/22/2010(Autry, David) (Entered: 01/08/2010) |
| 01/08/2010 | 99 | | MINUTE ORDER by District Judge James H. Payne: granting 98 Motion to Extend Time for Submittal of CJA Voucher by Petitioner's counsel, David Autry, until 1/11/2010. (cjt, Deputy Clerk) (Entered: 01/08/2010) |
| 01/11/2010 | 100 | | NOTICE of Submission of Matter for In Camera Review by USA (Wilson, Christopher) (Entered: 01/11/2010) |
| 01/11/2010 | 101 | | SEALED LETTER (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/12/2010 | 102 | | PROTECTIVE ORDER by District Judge James H. Payne (Re: 101 Sealed Letter) (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/13/2010 | 103 | | Unopposed MOTION to Extend Deadline(s) *to File Brief in Support of Amended Petition and Subsequent Briefing* by Kenneth Eugene Barrett Responses due by 1/27/2010 (With attachments)(Schardl, Tivon) (Entered: |

| | | | |
|---|---|---|---|
| | | | 01/13/2010) |
| 01/15/2010 | 104 | | MINUTE ORDER by District Judge James H. Payne: For good cause shown, 103 Petitioner's Motion for Extension of Time to File Brief in Support of Amended Motion to Vacate is granted. Petitioner shall be given until 2/18/2010 to file his brief. No further extensions of time shall be granted. Respondent's answer shall be due 4/19/2010 and Petitioner's reply will be due 5/4/2010. (Re: 95 Amended MOTION to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255) (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 01/15/2010 | 105 | | MINUTE ORDER by District Judge James H. Payne: It is hereby ordered that Petitioner Kenneth Eugene Barrett's CJA 30 DEATH PENALTY PROCEEDINGS: APPOINTMENT OF AND AUTHORITY TO PAY COURT–APPOINTED COUNSEL comes before the Court by David B. Autry. This matter is hereby REFERRED to Magistrate Judge Steven P. Shreder for a fee hearing and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate said original application and supporting documents. (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 02/02/2010 | 106 | | MINUTE ORDER by District Judge James H. Payne (Attachments: # 1 1/29/2010 E–Mail) (cjt, Deputy Clerk) (Entered: 02/02/2010) |
| 02/11/2010 | 107 | | Third MOTION to Extend Deadline(s) *Due to Newly Disclosed Evidence* by Kenneth Eugene Barrett Responses due by 2/25/2010 (With attachments)(Schardl, Tivon) (Entered: 02/11/2010) |
| 02/12/2010 | 108 | | MINUTE ORDER by District Judge James H. Payne: Motion Hearing and Status Conference are set for 3/1/2010 at 09:30 AM before District Judge James H. Payne (Re: 107 Petitioner's Third MOTION to Continue Briefing Schedule). Counsel are required to be present at this hearing. Petitioner does not need to be present. (cjt, Deputy Clerk) (Entered: 02/12/2010) |
| 02/18/2010 | 109 | | MOTION Leave to File Oversized Brief in Support of Amended Motion to Vacate, MOTION for Leave to File Brief in Support of Second Amended Motion to Vacate by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 110 | | Unopposed MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 3/4/2010(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 111 | | Amended MOTION for Leave to Exceed Page Limitation by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 112 | | MINUTE ORDER by District Judge James H. Payne: denying 111 Petitioner's Amended Motion for Leave to File Oversized Brief, with written order to follow (finding as moot 109 Petitioner's Motion for Leave to File Oversized Brief) (cjt, Deputy Clerk) (Entered: 02/18/2010) |
| 02/18/2010 | 113 | | MOTION to Reconsider *Order Denying Leave to File Oversized Brief* (Re: 112 Minute Order,, Ruling on Motion for Miscellaneous Relief,, Ruling on Motion for Leave to File Document(s), Ruling on Motion for Leave to File Document(s), Ruling on Motion to Exceed Page Limitation, ) by Kenneth |

| | | | |
|---|---|---|---|
| | | | Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 114 | | REDACTED EXHIBITS **119, 120, 121, 122** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 115 | | REDACTED EXHIBITS **125, 126, 128, 129, 130, 132, 133, 134, 137, 138** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 116 | | REDACTED EXHIBITS **148, 149, 150, 151, 152, 153, 154** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 117 | | REDACTED EXHIBITS **123, 124, 127, 131, 135** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 118 | | REDACTED EXHIBITS **155, 156** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 119 | | REDACTED EXHIBITS **157, 158** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 120 | | REDACTED EXHIBITS **163, 164** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 121 | | REDACTED EXHIBIT **161** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 122 | | REDACTED EXHIBIT **162** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 123 | | REDACTED EXHIBITS **165, 166** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 124 | | REDACTED EXHIBIT **159 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: |

| | | | |
|---|---|---|---|
| | | | 02/18/2010) |
| 02/18/2010 | 125 | | REDACTED EXHIBITS **167, 168, 169** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 126 | | REDACTED EXHIBIT **159 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 127 | | REDACTED EXHIBITS **170, 171** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 128 | | REDACTED EXHIBIT **160 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 129 | | REDACTED EXHIBIT **160 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 130 | | REDACTED EXHIBITS **172, 173** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 131 | | REDACTED EXHIBIT **177 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 132 | | REDACTED EXHIBITS **174, 175, 176, 178** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 133 | | REDACTED EXHIBIT **177 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 134 | | REDACTED EXHIBIT **177 Part c** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 135 | | REDACTED EXHIBITS **179, 180, 181a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |

| 02/18/2010 | 136 | | REDACTED EXHIBIT **181 Part B1** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
|---|---|---|---|
| 02/18/2010 | 137 | | REDACTED EXHIBITS **182, 183** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 138 | | REDACTED EXHIBIT **181 Part B2** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 139 | | REDACTED EXHIBIT **196 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 140 | | REDACTED EXHIBITS **184, 185, 186, 187, 188** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 141 | | REDACTED EXHIBIT **196 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 142 | | REDACTED EXHIBIT **196 Part c** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 143 | | REDACTED EXHIBIT **196 Part d** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 144 | | REDACTED EXHIBITS **189, 190, 191, 192, 193, 194, 195** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 145 | | REDACTED EXHIBITS **197, 198, 199, 200, 203, 204, and 205** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 02/18/2010) |
| 02/26/2010 | 146 | | ORDER by District Judge James H. Payne: granting 113 petitioner's Motion to Reconsider; Petitioner's brief due 3/1/10 at 4:30 p.m.; Status Conference RESET for 3/31/2010 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne; (granting in part 107 Motion to Continue Briefing Schedule; striking |

| | | | |
|---|---|---|---|
| | | | 1 Motion to Vacate Order/Judgment; striking 2 Corrected Motion to Vacate Order/Judgment; striking 70 Amended Motion to Vacate Order/Judgment) (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 02/26/2010 | 147 | | ORDER by District Judge James H. Payne: Re: 110 petitioner's Unopposed MOTION to File Exhibits Under Seal; Petitioner's response due 3/12/10 (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 03/01/2010 | 148 | | STIPULATION *and Order [Proposed] Modified Protective Order* by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 149 | | BRIEF in Support of Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 150 | | MOTION for Evidentiary Hearing (Re: 95 Amended MOTION to Vacate) by Kenneth Eugene Barrett; Responses due by 3/15/2010(Schardl, Tivon) Modified on 3/2/2010 to change text and link (dma, Deputy Clerk). (Entered: 03/01/2010) |
| 03/01/2010 | 151 | | MOTION Expand the Record (Re: 149 Brief in Support of Motion ) by Kenneth Eugene Barrett Responses due by 3/15/2010(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/03/2010 | 152 | | Joint MOTION to Modify Protective Order by all parties Responses due by 3/17/2010(Wilson, Christopher) (Entered: 03/03/2010) |
| 03/05/2010 | 153 | | RESPONSE in Opposition to Motion (Re: 150 MOTION for Hearing ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/05/2010 | 154 | | RESPONSE in Opposition to Motion (Re: 151 MOTION Expand the Record ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/12/2010 | 155 | | RESPONSE by Kenneth Eugene Barrett (Re: 147 Order) (Fisher, Joan) (Entered: 03/12/2010) |
| 03/25/2010 | 156 | | MINUTE ORDER by District Judge James H. Payne: **TIME CHANGE ONLY** – Status Conference RESET for 3/31/2010 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne. (cjt, Deputy Clerk) (Entered: 03/25/2010) |
| 03/29/2010 | 157 | | ORDER by District Judge James H. Payne: denying 150 Petitioner's Motion for Evidentiary Hearing (cjt, Deputy Clerk) (Entered: 03/29/2010) |
| 03/29/2010 | 158 | | MOTION to be Excused from the Status Conference set on March 31, 2010 by USA Responses due by 4/12/2010(Wilson, Christopher) (Entered: 03/29/2010) |
| 03/29/2010 | 159 | | MINUTE ORDER by District Judge James H. Payne: granting 158 Government's Motion to be Excused from Attendance of Status Conference. The Court further grants Government's request for substitute counsel, Douglas Horn, to appear in lieu of Christopher Wilson for this hearing only. (cjt, Deputy Clerk) (Entered: 03/29/2010) |

| | | | |
|---|---|---|---|
| 03/30/2010 | 160 | | MINUTE ORDER by District Judge James H. Payne: The Court directs that Courtroom 1, Room 230, be sealed on 3/31/2010 at 9:00 a.m. for the portion of the Status Hearing pertaining to the Protective Order. The Clerk is directed to post this Minute Order on the Court's bulletin board for public viewing located on the 2nd floor of the United States Courthouse. (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 161 | | ORDER (Re: Exhibits) by District Judge James H. Payne: granting 110 Petitioner's Motion to File Exhibits under Seal; granting 151 Petitioner's Motion to Expand the Record (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 162 | | SEALED EXHIBIT **201** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 163 | | SEALED EXHIBIT **202** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/31/2010 | 164 | | SEALED MINUTES of Proceedings – held before District Judge James H. Payne: Motion/Status Hearing held on 3/31/2010 (Re: 152 Joint MOTION to Modify Protective Order ) (Court Reporter: B.Neil) (cjt, Deputy Clerk) (cjt, Deputy Clerk). (Entered: 04/01/2010) |
| 03/31/2010 | 165 | | MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 03/31/2010 | 166 | | CORRECTED MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010, Reply due by 7/1/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 04/05/2010 | 167 | | SEALED REPORT TO COURT by USA (Re: 152 Joint Motion to Modify Protective Order) (cjt, Deputy Clerk) (Entered: 04/05/2010) |
| 04/08/2010 | 168 | | SEALED ORDER by Judge James H. Payne Re: 152 Joint Motion to Modify Protective Order (cjt, Deputy Clerk) (Entered: 04/08/2010) |
| 04/14/2010 | 169 | | SEALED STATUS REPORT by Kenneth Eugene Barrett (cjt, Deputy Clerk) Modified on 4/20/2010 to add corrected attachment (cjt, Deputy Clerk). (Entered: 04/15/2010) |
| 05/12/2010 | 170 | | Unopposed MOTION for Leave to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief by USA Responses due by 5/26/2010(Wilson, Christopher) (Entered: 05/12/2010) |
| 05/13/2010 | 171 | | ORDER by District Judge James H. Payne: granting 170 Respondent's Unopposed Motion to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief (cjt, Deputy Clerk) (Entered: 05/13/2010) |
| 05/14/2010 | 172 | | TRANSCRIPT of Proceedings (Unredacted) of Status Hearing held on 3–31–2010 before District Judge James H. Payne (Court Reporter: Brian P. Neil) (Pages: 1–46). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without |

| | | | |
|---|---|---|---|
| | | | redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s) ) (bpn, Court Reporter) (Entered: 05/14/2010) |
| 05/14/2010 | 173 | | TRANSCRIPT ORDER FORM for Status and Scheduling Conference conducted on 3/31/10 (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s), 172 Transcript of Proceedings – Unredacted) by Kenneth Eugene Barrett (law, Deputy Clerk) (Entered: 05/17/2010) |
| 05/17/2010 | 174 | 22 | Redacted RESPONSE in Opposition to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 05/17/2010) |
| 05/17/2010 | 175 | | SEALED RESPONSE (Re: 174 RESPONSE to Motion; 95 Amended MOTION to Vacate, Set Aside or Correct a Sentence) by USA (dma, Deputy Clerk) (Entered: 05/17/2010) |
| 06/30/2010 | 176 | | Unopposed MOTION for Leave to Exceed Page Limitation *For Reply Brief* by Kenneth Eugene Barrett Responses due by 7/14/2010(Schardl, Tivon) (Entered: 06/30/2010) |
| 06/30/2010 | 177 | | MINUTE ORDER by District Judge James H. Payne: granting 176 Petitioner's Unopposed Motion for Leave to File Oversized Brief (cjt, Deputy Clerk) (Entered: 06/30/2010) |
| 07/01/2010 | 178 | 417 | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 07/01/2010) |
| 07/23/2010 | 179 | 689 | NOTICE of Filing of Signed Declaration of Toby Barrett (Re: 178 Reply to Response to Motion ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 07/23/2010) |
| 08/13/2010 | 180 | | REPORT AND RECOMMENDATION ON REQUEST FOR EXCESS COMPENSATION by Magistrate Judge Steven P. Shreder (Re: 105 Minute Order Referring CJA 30 Voucher) Objections to RRdue by 8/27/2010(eje, Deputy Clerk) (Entered: 08/13/2010) |
| 09/03/2010 | 181 | | SEALED ORDER by District Judge James H. Payne: Re: 180 Report and Recommendation) (cjt, Deputy Clerk) (Entered: 09/03/2010) |
| 09/03/2010 | | | CJA 30: Authorization to Pay David B. Autry on behalf of Kenneth Eugene Barrett. (JHP 9/3/10)(smg, Deputy Clerk) (Entered: 09/14/2010) |
| 02/07/2011 | 182 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 2/22/2011 (With attachments)(Fisher, Joan) (Entered: 02/07/2011) |
| 02/08/2011 | 183 | | MINUTE ORDER by District Judge James H. Payne: granting 182 Petitioner's Unopposed Motion to Seal. Petitioner is given leave to file the following documents under seal: Petitioners Motion to Vacate or Modify |

| | | | |
|---|---|---|---|
| | | | Protective Order and Request for Hearing; Brief in Support of Motion to Vacate or Modify Protective Order and Request for Hearing; Petitioners Motion for Leave to Conduct Discovery; and Petitioners Brief in Support of Motion to Conduct Discovery. (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 184 | | SEALED MOTION to Vacate or Modify Protective Orders and Request for Hearing by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 185 | | SEALED BRIEF in Support of 184 Petitioner's Sealed Motion to Vacate and/or Modify Protective Order and Request for Hearing (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 186 | | SEALED MOTION for Leave to Conduct Discovery by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 187 | | SEALED BRIEF in Support of 186 Sealed Motion to Conduct Discovery (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/17/2011 | 188 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 186 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 189 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 184 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 190 | | MINUTE ORDER by District Judge James H. Payne: granting 188 and 189 Government's Motions for Extension of Time to Respond to Motions; Responses due by 3/8/2011 Re: 184 Petitioner's SEALED MOTION to Vacate or Modify Protective Orders and 186 Petitioner's SEALED MOTION for Leave to Conduct Discovery (cjt, Deputy Clerk) (Entered: 02/17/2011) |
| 03/04/2011 | 191 | | Unopposed MOTION to Seal Document by USA Responses due by 3/18/2011(Kahan, Jeffrey) (Entered: 03/04/2011) |
| 03/04/2011 | 192 | | MINUTE ORDER by District Judge James H. Payne: granting 191 Respondent's Motion to File Sealed Oppositions to Sealed Motions (cjt, Deputy Clerk) (Entered: 03/04/2011) |
| 03/08/2011 | 193 | | SEALED RESPONSE in Opposition (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/08/2011 | 194 | | SEALED RESPONSE in Oposition (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/18/2011 | 195 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 4/1/2011 (With attachments)(Fisher, Joan) (Entered: 03/18/2011) |
| 03/18/2011 | 196 | | MINUTE ORDER by District Judge James H. Payne: granting 195 Petitioner's Motion to Seal Replies to documents 193 and 194 (cjt, Deputy Clerk) (Entered: 03/18/2011) |
| 03/21/2011 | 197 | | |

| | | | |
|---|---|---|---|
| | | | SEALED REPLY to Response (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by Petitioner (cjt, Deputy Clerk) (Entered: 03/22/2011) |
| 03/21/2011 | 198 | | SEALED REPLY to Response (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by Petitioner (cjt, Deputy Clerk) (Entered: 03/22/2011) |
| 03/16/2012 | 199 | 694 | NOTICE of Filing of Declaration of Paul D. Gordon (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) Modified to reflect DVDs for Exhibits 2, 3 and 4 stored in file cabinet in vault on 2nd floor Court Clerk's Office (cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/16/2012 | 200 | 958 | NOTICE of Filing of Declaration of Leonard Post (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 03/16/2012) |
| 03/16/2012 | 201 | 964 | MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett Responses due by 3/30/2012 (With attachments)(Fisher, Joan) Modified to reflect CDs of Appendix A and Appendix B stored in file cabinet in vault on 2nd floor Court Clerk's Office(cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/19/2012 | 202 | | CERTIFICATE of Service (Re: 199 Notice (Other) ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/19/2012 | 203 | | CERTIFICATE of Service (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/29/2012 | 204 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 201 Motion to Supplement) by USA; Responses due by 4/12/2012 (With attachments)(Wilson, Christopher) Modified on 3/30/2012 (cjt, Deputy Clerk). (Entered: 03/29/2012) |
| 03/30/2012 | 205 | | MINUTE ORDER by District Judge James H. Payne: granting 204 Motion for Extension of Time to Respond to Motion; Response deadline extended to 4/30/2012 (Re: 201 MOTION to Supplement) (cjt, Deputy Clerk) (Entered: 03/30/2012) |
| 04/27/2012 | 206 | 1020 | RESPONSE in Opposition to Motion (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by USA ;(Wilson, Christopher) (Entered: 04/27/2012) |
| 05/07/2012 | 207 | 1027 | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255,* 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/07/2012) |
| 06/18/2012 | 208 | 1038 | |

| | | | |
|---|---|---|---|
| | | | MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY by Kenneth Eugene Barrett. Responses due by 7/2/2012(Fisher, Joan) (Entered: 06/18/2012) |
| 06/18/2012 | 209 | 1041 | BRIEF in Support of Motion (Re: 208 MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY ) by Kenneth Eugene Barrett ; (With attachments)(Fisher, Joan) (Entered: 06/18/2012) |
| 06/20/2012 | 210 | 1052 | ORDER by District Judge James H. Payne denying 201 Motion for Leave to Supplement Pending Motion to Vacate, Set Aside or Correct Judgment, Order and/or Sentence Under 28 U.S.C. Section 2255 (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/20/2012 | 211 | | MINUTE ORDER by District Judge James H. Payne denying 208 Motion to Preserve Testimony of Judge John Garrett, Retired, Without Further Delay (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/28/2012 | 212 | 1055 | MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* (Re: 210 Ruling on Motion to Supplement ) by Kenneth Eugene Barrett. Responses due by 7/12/2012(Fisher, Joan) (Entered: 06/28/2012) |
| 07/10/2012 | 213 | 1061 | RESPONSE in Opposition to Motion (Re: 212 MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* ) by USA ;(Wilson, Christopher) (Entered: 07/10/2012) |
| 08/16/2012 | 214 | 1072 | OPINION AND ORDER by District Judge James H. Payne: denying 95 Amended Motion to Vacate; denying 184 Sealed Motion; denying 186 Sealed Motion; denying 212 Motion to Reconsider (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 215 | | SEALED ORDER by District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 216 | 1263 | JUDGMENT by District Judge James H. Payne entering judgment in favor of USA against Kenneth Eugene Barrett (terminates case) (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 09/13/2012 | 217 | 1264 | MOTION to Alter Order/Judgment *and Brief in Support* (Re: 216 Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider ) by Kenneth Eugene Barrett. Responses due by 9/27/2012 (With attachments)(Fisher, Joan) (Entered: 09/13/2012) |
| 09/27/2012 | 218 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA. Responses due by 10/11/2012(Wilson, Christopher) (Entered: 09/27/2012) |
| 09/27/2012 | 219 | | ORDER by District Judge James H. Payne: granting 218 Motion for Extension of Time to Respond to Motion; Responses due by 10/29/2012 (Re: 217 MOTION to Alter or Amend Judgment) (cjt, Deputy Clerk) (Entered: 09/27/2012) |
| 10/29/2012 | 220 | 1352 | RESPONSE in Opposition to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA ; (With |

| | | | |
|---|---|---|---|
| | | | attachments)(Wilson, Christopher) (Entered: 10/29/2012) |
| 10/30/2012 | 221 | 1450 | OPINION AND ORDER by District Judge James H. Payne: denying 217 Petitioner's Motion to Alter or Amend Judgment (cjt, Deputy Clerk) (Entered: 10/30/2012) |
| 12/26/2012 | 222 | 1452 | NOTICE OF APPEAL to Circuit Court (Re: 216 Judgment, 221 Ruling on Motion to Alter Order/Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider, 215 Sealed Order ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 12/26/2012) |
| 12/27/2012 | 223 | | Transmission of Notice of Appeal and Docket Sheet to Circuit Court with copy of 222 Notice of Appeal, 216 Judgment, 221 Ruling, 214 Ruling and 215 Sealed Order. Preliminary Record transmitted to 10th Circuit Court of Appeals electronically. (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/27/2012) |
| 12/27/2012 | 224 | | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 12–7086 (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/28/2012) |
| 01/10/2013 | 225 | | TRANSCRIPT ORDER FORM (Transcripts are not necessary or are already on file ) (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/10/2013) |
| 01/10/2013 | 226 | | DESIGNATION of Record on Appeal (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 01/10/2013) |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT )
 )
  *Petitioner*, )
 )
v. )        **Case No. CV-09-00105-JHP**
 )         **Criminal Case No. CR-04-00115-JHP**
UNITED STATES OF AMERICA )
 )
  *Respondent.* )

## GOVERNMENT'S ANSWER IN OPPOSITION TO SECOND AMENDED MOTION TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY

### (Answer Under 28 U.S.C. § 2255)

SHELDON J. SPERLING
United States Attorney
Eastern District of Oklahoma


CHRISTOPHER J. WILSON, OBA #13801
Assistant United States Attorney
Eastern District of Oklahoma
1200 West Okmulgee
Muskogee, OK 74401-6848
Tel: (918) 684-5100

JEFFREY B. KAHAN, PA Bar No. 93199
Trial Attorney
U.S. Department of Justice
1331 F Street, N.W.; Rm. 345
Washington, D.C. 20530
Tel: (202) 305-8910

# TABLE OF CONTENTS

PROCEDURAL HISTORY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

BARRETT'S CONTENTIONS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

FEDERAL COLLATERAL REVIEW OF PRESUMPTIVELY FINAL CRIMINAL
     JUDGMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
     A.  Cognizable Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
     B.  Time Barred Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
     C.  Procedurally Defaulted Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
     D.  Claims Previously Adjudicated on Direct Appeal.. . . . . . . . . . . . . . . . 14
     E.  New Rule of Criminal Procedure.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
     F.  Harmless Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

THE GOVERNMENT'S ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
     I. THIS COURT PROPERLY ADMINISTERED THE CRIMINAL JUSTICE ACT AND
         FAIRLY DISCHARGED ITS JUDICIAL DUTIES. . . . . . . . . . . . . . . . . . . 16
         1.  CJA Funding Decisions are not Subject to Review by Themselves, and the
            Funding Determinations in this Case did not Deprive Barrett of any
            Cognizable Right. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
         2.  The Court Engaged in Appropriate and Fully Disclosed Ex Parte Contact with
            the Government. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
            A.  Procedural Default.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
            B.  The Court Properly Met with the Government and Disclosed the
               Communication. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
     II. BARRETT RECEIVED THE ASSISTANCE OF CONSTITUTIONALLY
        ADEQUATE TRIAL COUNSEL
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
         1.  Counsel Provided Unconflicted Representation.. . . . . . . . . . . . . . . . . . 25
         2.  Counsel Effectively Re-Urged the Suppression of Evidence. . . . . . . . . . . 27
            A.  Trial Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
            B.  Appellate Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
         3.  Trial Counsel Had No Duty to Investigate Barrett's Alleged Diminished
            Capacity to Form Intent
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
         4.  Trial Counsel Had No Duty to Challenge Barrett's Competence.. . . . . . . . 37
         5.  Trial Counsel Adequately Investigated the Civilian Witnesses. . . . . . . . . . 40
            A.  Absence of Continuance Motion.. . . . . . . . . . . . . . . . . . . . . . . . . 40
            B.  Character Witnesses.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
            C.  Individual Impeachment of Witnesses.. . . . . . . . . . . . . . . . . . . . . 45

i.  Travis Crawford. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
ii.  Cindy Crawford. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
iii.  Charles Sanders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
iv.  Randy Weaver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
v.  Brandie Price. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
vi.  Karen Real. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
vii.  Randy Turman. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
6.  Counsel Made Appropriate Evidentiary Objections and Arguments. . . . . . . 64
    A.  Time Barred Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
    B.  The Absence of Futile Objections did not Constitute Ineffectiveness
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
    C.  Appellate Counsel Provided Adequate Assistance. . . . . . . . . . . . . . 70
7.  Trial Counsel Properly Investigated the Crime Scene Reconstruction. . . . . . 70
8.  Trial Counsel Properly Investigated and Presented Evidence Concerning Police
    Tactics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
9.  Trial Counsel Reasonably Cross-Examined Law Enforcement Witnesses. . . . 78
    A.  Allegedly Forgone Impeachment. . . . . . . . . . . . . . . . . . . . . . . . . . 79
    B.  Allegedly Forgone Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . 83
    C.  Eliciting Supposedly Damaging Evidence. . . . . . . . . . . . . . . . . . . 85
10.  Trial Counsel Reasonably Omitted the Unpersuasive Testimony of Barrett's
     Son and Neighbor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
    A.  Toby Barrett. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
    B.  Alvin Hahn. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
11.  Trial Counsel Reasonably Omitted Unpersuasive Evidence Concerning
     Barrett's Knowledge of the Arrest Warrant. . . . . . . . . . . . . . . . . . . 91
    A.  Issuance of the Bench Warrant. . . . . . . . . . . . . . . . . . . . . . . . . 92
    B.  Knowledge of the Bench Warrant and Wisdom of Seeking a No-Knock
        Search Warrant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
    C.  Barrett's Supposed Cooperation with the Police. . . . . . . . . . . . . . . 96
12.  Trial Counsel Reasonably Sought and Received an Order Striking the
     Testimony of a Government Expert Witness; No Further Response Was
     Prudent or Necessary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101
13.  Trial Counsel did not Omit any Valid Requests for Guilt-Phase Jury
     Instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
14.  Trial Counsel's Failure to Make Futile Objections did not Constitute
     Ineffective Assistance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
15.  Trial Counsel did not Ineffectively Omit Objections to Prejudicial
     Misconduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115
16.  Trial Counsel Presented Appropriate Mitigation Evidence in View of their
     Client's Wishes and the Available Facts. . . . . . . . . . . . . . . . . . . . . 115
    A.  The Defense Evidence and Jury Verdict. . . . . . . . . . . . . . . . . . . 116
    B.  Counsel Validly Elected a Mitigation Strategy, and Any Forgone
        Evidence Would have Been Counterproductive. . . . . . . . . . . . 119

ii

24

III.  THE COURT PROPERLY PROVIDED NECESSARY ASSISTANCE TO THE DEFENSE
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
    1.  Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
    2.  Mental Health Experts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
    3.  Crime Scene Reconstruction Expert. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133
    4.  Miscellaneous Experts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141
    5.  Pre-Trial Hearing Transcripts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
IV.  THE SEARCH WARRANT IN THIS CASE WAS VALID, AND BARRETT
    CANNOT CHALLENGE IT ON COLLATERAL REVIEW. . . . . . . . . . . . . . . . 146
    1.  Search and Seizure Claims are not Reviewable Under § 2255. . . . . . . . . . . 146
    2.  Barrett's Attacks on the Warrant do not Justify Relief Under *Franks*. . . . . 148
    3.  Appellate Counsel Provided Adequate Assistance. . . . . . . . . . . . . . . . . . . . 151
V.  THE PROSECUTION HONORED ITS OBLIGATIONS TO DISCLOSE
    EXCULPATORY MATERIAL TO THE DEFENSE AND TO AFFORD
    BARRETT A FAIR TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152
    1.  The Government did not Violate Any Duty of Disclosure. . . . . . . . . . . . . . . 152
        A.  The Standard of Review for Newly Discovered Evidence.. . . . . . . . . 152
        B.  The Government Disclosed All Necessary Evidence about Civilian
            Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153
            i.  Charles Sanders .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154
            ii.  Travis Crawford. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159
            iii.  Cindy Crawford. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164
            iv.  Brandie Zane Price. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168
            v.  Karen Real. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169
            vi.  Randy Turman. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173
        C.  The Government Possessed no Knowledge of a Witness who Would
            Contradict Charles Sanders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174
        D.  The Government Disclosed All Necessary Evidence Concerning Law
            Enforcement Personnel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175
            i.  Clint Johnson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175
            ii.  Michael Littlefield. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180
            iii.  Johnny Philpot. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183
    2.  The Prosecution did not Interfere with Defense Counsel's Investigation. . . . 185
        A.  The Government Complied with the Law Regarding the Disclosure of
            Witnesses, and Barrett Cannot Raise that Issue in this Proceeding,
            Having Unsuccessfully Raised it on Appeal. . . . . . . . . . . . . . . . 185
        B.  The Prosecution did not Interfere with Defense Counsel's Access to
            Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187
    3.  The Prosecutors Committed no Prejudicial Misconduct During the Trial. . . 189
        A.  Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189
        B.  The Prosecutors Properly Questioned the Witnesses and Argued for
            Death. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190
            i.  The Prosecutors did not Ask Questions Designed to Imply

                Personal Knowledge
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190
        ii. The Prosecutor did not Improperly Comment on the
            Defendant's Exercise of his Right to Trial.. . . . . . . . . . . 197
        iii. The Prosecutor did not Improperly Engage in Cross-
            Examination Outside the Scope of Direct Exam. . . . . . . 198
      C. The Prosecutors Properly Argued that the Jury Should Impose a Death
            Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201
        i. The Prosecutors Properly Relied on this Court's Rulings. . . . 201
        ii. The Prosecutors Properly Characterized the Record. . . . . . 203
        iii. The Prosecutors Used Fair and Appropriate Rhetoric. . . . . 208
        iv. The Prosecutor did not Commit Prejudicial Misconduct in his
            Use of the First Person During Argument. . . . . . . . . . . 213
        v. The Prosecutor Properly Argued that Prison Was Insufficient
            Punishment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215
VI. BARRETT HAS FAILED TO STATE A TIMELY, UNDERSTANDABLE OR
      COGNIZABLE CLAIM THAT THIS COURT ERRONEOUSLY EXCLUDED
      EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216
VII. THIS COURT PROPERLY PERMITTED THE MARSHALS SERVICE TO USE
      AN ELECTRONIC RESTRAINT ON BARRETT. . . . . . . . . . . . . . . . . . . 219
    1. Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219
    2. Barrett Fails to Identify the Pertinent Order or Demonstrate Any Error.. . . 220
VIII. BARRETT WAS COMPETENT TO STAND TRIAL. . . . . . . . . . . . . . . . . . . . 224
IX. THE TRIAL COURT PROPERLY REFUSED TO INSTRUCT THE JURY ON
      VOLUNTARY MANSLAUGHTER.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227
    1. Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227
    2. Voluntary Manslaughter Was Not Available as a Lesser Included Offense in
        this Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 228
X. THIS COURT PROPERLY INSTRUCTED THE JURY THAT RESIDUAL DOUBT
      DID NOT CONSTITUTE A MITIGATING FACTOR. . . . . . . . . . . . . . . . . . 233
    1. Barrett has Procedurally Defaulted his Claim that this Court Instructed
        Improperly. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233
    2. The Law Provides no Right to a Residual Doubt Theory of Mitigation. . . . . 234
    3. Counsel Performed Competently. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237
XI. THIS COURT PROPERLY EXCUSED A MEMBER OF THE VENIRE FOR
      CAUSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238
    1. Barrett Procedurally Defaulted this Claim. . . . . . . . . . . . . . . . . . . . . 238
    2. The Excused Venire Member was Substantially Impaired as a Potential Capital
        Case Juror and Properly Excused
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239
    3. Appellate Counsel Reasonably Omitted any Challenge to the Removal of Juror
        62. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242
XII. BARRETT CANNOT RELITIGATE HIS ARGUMENT THAT THE

CONSTITUTION REQUIRES CAPITAL JURIES TO APPLY A
REASONABLE DOUBT BURDEN OF PROOF TO THE PENALTY PHASE
WEIGHING PROCESS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242
XIII.  BARRETT WAS PROPERLY REMOVED FROM THE COURTROOM AT HIS
OWN REQUEST THEN VALIDLY WAIVED HIS RIGHT TO RETURN. . . 243
    1.  Barrett has Failed to State Cognizable or Meritorious Claims Regarding the
        Court's Decision to Permit Him to Absent Himself. . . . . . . . . . . . . . . . 244
        A.  Barrett Procedurally Defaulted these Claims.. . . . . . . . . . . . . . . . . 244
        B.  Time Barred Sub-Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245
        C.  The Trial Court Properly Responded to Barrett's Demand to Leave the
            Courtroom. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246
        D.  The Court Properly Ordered Barrett Held in Minimal Restraints During
            a Hearing Outside the Presence of the Jury. . . . . . . . . . . . . . . . . 250
    2.  Counsel Properly Represented Barrett's Interests with Regard to His Request
        to Waive his Presence at Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251
        A.  Counsel Bore no Duty to Respond to the Order that Barrett Appear in a
            Minimum Physical Restraint. . . . . . . . . . . . . . . . . . . . . . . . . . . . 251
        B.  Counsel Bore no Duty to Investigate or Raise a Doubt About Barrett's
            Competence Following his Request to Absent Himself from the
            Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 252
        C.  Counsel Advised Barrett not to Waive his Presence at Trial. . . . . . 256
        D.  Counsel Discharged their Obligation to Seek an Instruction Regarding
            Barrett's Absence from the Courtroom. . . . . . . . . . . . . . . . . . . . 258
XIV.  THE FEDERAL DEATH PENALTY IS NOT SOUGHT ON A RACIALLY
DISCRIMINATORY BASIS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260
XV.  BARRETT WAS PROPERLY CHARGED BY SUPERSEDING INDICTMENT
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 263
    1.  Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264
    2.  The Superseding Indictment Adequately Alleged the Factors that Rendered
        Barrett Eligible for the Death Penalty. . . . . . . . . . . . . . . . . . . . . . . . 264
        A.  The Superseding Indictment Alleged all Necessary Eligibility Factors
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265
        B.  The Superseding Indictment Omitted Superfluous Information. . . . 267
        C.  Collateral Relief Cannot Lie on the Theory Advanced by Barrett. . . 268
XVI.  BARRETT HAS NOT IDENTIFIED ANY JUROR MISCONDUCT, NOR HAS
HE DEMONSTRATED THAT THIS COURT SHOULD HAVE
SEQUESTERED THE JURY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 268
    1.  Justiciability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270
    2.  Timeliness.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271
    3.  New Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271
XVIII.  BARRETT RECEIVED THE ASSISTANCE OF CONSTITUTIONALLY
ADEQUATE APPELLATE COUNSEL.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272
XIX.  THERE ARE NO ERRORS TO ACCUMULATE.. . . . . . . . . . . . . . . . . . . . 274

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 276

vi

28

# TABLE OF AUTHORITIES

### A.  <u>Federal Cases</u>

*Aguilar v. Dretke*, 428 F.3d 526 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

*Ake v. Oklahoma*, 470 U.S. 68 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126, 127

*Alba v. Quarterman*, 621 F. Supp. 2d 396 (E.D. Tex. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . 210

*Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . 33, 38, 47, 52, 120

*Allen v. Mullin*, 368 F.3d 1220 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Apprendi v. New Jersey*,  530 U.S. 466 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265

*Arizona v. Evans*, 514 U.S. 1 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Atkins v. Virginia*, 536 U.S. 304 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272

*Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769 (10th Cir. 2009). . . . . . . . . . . . . . 261

*Bacon v. Lee*, 224 F.3d 470 (4th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Battle v. United States*, 419 F.3d 1292 (11th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . 13, 225

*Beard v. Banks*, 542 U.S. 406 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 272

*Beck v. Alabama*, 447 U.S. 625 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231, 232

*Bell v. Bell*, 512 F.3d 223 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

*Bergman v. McCaughtry*, 65 F.3d 1372 (7th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . 80, 87

*Blockburger v. United States*, 284 U.S. 299 (1932). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

*Bobby v. Van Hook*, 130 S. Ct. 13 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261

*Bousley v. United States*, 523 U.S. 614 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Boyle v. McKune*, 544 F.3d 1132 (10th Cir. 2008). . . 49, 53, 58, 62, 64, 74, 75, 87, 89-91, 96, 99

*Brady v. Maryland*, 373 U.S. 83 (1963). . . 148, 149, 152-154, 156, 159-162, 166, 168, 175, 176, 178-180

*Bragg v. Galaza*, 242 F.3d 1082 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

*Branzburg v. Hayes*, 408 U.S. 665 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

*Brecht v. Abrahamson*, 507 U.S. 619 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 132, 237

*Brewer v. Reynolds*, 51 F.3d 1519 (10th Cir.1995). . . . . . . . . . . . 17, 132, 138, 140-142, 144, 145

*Bullock v. Carver*, 297 F.3d 1036 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 259

*Burger v. Kemp*, 483 U.S. 776 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 119

*Butler v. McKellar*, 494 U.S. 407 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272

*Caldwell v. Mississippi*, 472 U.S. 320 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Campbell v. Reed*, 594 F.2d 4 (4th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

*Cannon v. Gibson*, 259 F.3d 1253 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

*Castro v. Oklahoma*, 71 F.3d 1502 (10th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

*Castro v. Ward*, 138 F.3d 810 (10th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000). . . . . . . . . . . . . . . . . . . . . 33, 37, 71

*Christian v. United States*, 398 F.2d 517 (10th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998). . . . . . . . . . . . . . . . . . 154, 166, 167, 171, 174, 183

*Coe v. Bell*, 209 F.3d 815 (6th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271

*Coleman v. Brown*, 802 F.2d 1227 (10th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

*Cristini v. McKee*, 526 F.3d 888 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

viii

*Crosetto v. State Bar of Wisconsin*, 12 F.3d 1396 (7th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . 270

*Cunningham v. Zant*, 928 F.2d 1006 (11th Cir. 1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

*Daniels v. United States*, 254 F.3d 1180 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . 14, 21, 127, 245

*Darden v. Wainwright*, 477 U.S. 168 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190, 208

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). . . . . . . . . . . . . . . . . . . . . . . 101

*Davis v. Exec. Dir., Dept. Of Corrections*, 100 F.3d 750 (10th Cir. 1996). . . . . . . . . . . . . . . . 240

*Deck v. Missouri*, 544 U.S. 622 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250

*Dever v. Kan. State Penitentiary*, 36 F.3d 1531 (10th Cir.1994).. . . . . . . . . . . . . . . . . . . . . . . 31

*Dist. Atty's Office v. Osborne*, 129 S. Ct. 2308 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). . . . . . . . . 190, 197, 198, 201, 203, 205-213, 216

*Duckett v. Godinez*, 67 F.3d 734 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985) . . . . . . . . . . . . . . . . 179

*Duvall v. Reynolds*, 139 F.3d 768 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

*Earhart v. Johnson*, 132 F.3d 1062 (5th Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Flast v. Cohen*, 392 U.S. 83, 96-97 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

*Ford v. Wainwright*, 477 U.S. 399 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272

*Foster v. Dugger*, 823 F.2d 402 (11th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Foster v. Ward*, 182 F.3d 1177 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 253

*Fox v. Ward*, 200 F.3d 1286 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Franklin v. Lynaugh*, 487 U.S. 164 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234, 235

*Franks v. Delaware*, 438 U.S. 154 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 146, 147

*Fuller v. Johnson*, 114 F.3d 491 (5th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

ix

*Gamble v. Oklahoma*, 583 F.2d 1161 (10th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147, 148

*Gardner v. Galetka*, 568 F.3d 862 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Geders v. United States*, 422 U.S. 853 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Giglio v. United States*, 405 U.S. 150 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153, 155, 156

*Green v. United States*, 262 F.3d 715 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hagner v. United States*, 285 U.S. 427 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . 26, 115, 218

*Hall v. Luebbers*, 296 F.3d 685 (8th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Hamling v. United States*, 418 U.S. 87 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

*Hawkins v. Comparet-Cassini*, 251 F.3d 1230 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . 222

*Hawkins v. Hannigan*, 185 F.3d 1146 (10th Cir. 1999). . . . 30, 103, 107, 110, 115, 151, 228, 237, 252, 255, 263

*Hedrick v. True*, 443 F.3d 342 (4th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Henderson v. Norris*, 118 F.3d 1283 (8th Cir. 1997). . . . . . . . . . . . . . . 37, 45, 49, 53, 58, 64, 98

*Herrera v. Collins*, 506 U.S. 390 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153, 165, 187

*Hogan v. Gibson*, 197 F.3d 1297 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

*Hooks v. Ward*, 184 F.3d 1206 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

*Hopkins v. Reeves*, 524 U.S. 88 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 228, 230, 231

*Horne v. Trickey*, 895 F.2d 497 (8th Cir.1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 263

*Illinois v. Allen*, 397 U.S. 337 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220, 247, 250

*In re Charge of Judicial Misconduct*, 91 F.3d 1416 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . 22

*In re United States*, 397 F.3d 274 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261

x

*James v. Borg*, 24 F.3d 20 (9th Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*Juan H. v. Allen*, 408 F.3d 1262 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Kennedy v. Block*, 784 F.2d 1220 (4th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

*Knowles v. Mirzayance*, 129 S. Ct. 1411 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 253

*Koch v. Puckett*, 907 F.2d 524 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Le v. Mullin*, 311 F.3d 1002 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Leeper v. United States*, 446 F.2d 281 (10th Cir. 1971). . . . . . . . . . . 191, 193, 194, 196, 199, 200

*Liles v. Saffle*, 945 F.2d 333 (10th Cir.1991).. . . . . . . . . . . . . . . . . . . . . . . 128, 132, 134, 139

*Lowry v. Barnhart*, 329 F.3d 1019 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Luce v. United States*, 469 U.S. 38 (1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

*Massaro v. United States*, 538 U.S. 500 (2003).. . . . . . . . . . . . . . . . . . . . . . . . 72, 127, 245, 269

*McCleskey v. Kemp*, 481 U.S. 279 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261, 262

*McCleskey v. Zant*, 499 U.S. 467 (1991). . . . 21, 127, 189, 218, 219, 228, 234, 238, 245, 264, 269

*McDowell v. Calderon*, 107 F.3d 1351 (9th Cir. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

*McElvain v. Lewis*, 283 F. Supp. 2d 1104 (C.D. Cal. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . 102

*McGee v. Higgins*, 568 F.3d 832 (10th Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 109

*McPartlin v. Comm'r*, 653 F.2d 1185 (7th Cir.1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Mills v. Singletary*, 63 F.3d 999 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . 42, 59, 60, 62, 63

*Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126, 142

*Moore v. Marr*, 254 F.3d 1235 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80-85

*Moya v. United States*, 35 F.3d 501 (10th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Murray v. Carrier*, 477 U.S. 478 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Murtishaw v. Woodford*, 255 F.3d 926 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

*Neder v. United States*, 527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 231

*Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495 (10th Cir.1995). . . . . . . . . . . . . 270

*Nooner v. Norris*, 499 F.3d 831 (8th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

*Oregon v. Guzek*, 546 U.S. 517 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

*O'Dell v. Netherland*, 521 U.S. 151 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Palmer v. City of Monticello*, 31 F.3d 1499 (10th Cir.1994). . . . . . . . . . . . . . . . . . . . . . . 45, 64

*Parker v. Scott*, 394 F.3d 1302 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Patel v. United States*, 19 F.3d 1231 (7th Cir.1994). . . . . . . . . . . . . . 83, 87, 92, 93, 95, 99, 101

*Paxton v. Ward*, 199 F.3d 1197 (10th Cir.1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202, 203

*Penry v. Johnson*, 532 U.S. 782 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

*Perillo v. Johnson*, 79 F.3d 441 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

*Pierce v. Blaine*, 467 F.3d 362 (3d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

*Pulley v. Harris*, 465 U.S. 37 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*Renne v. Geary*, 501 U.S. 312 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

*Rhoades v. Arave*, 2007 WL 1550441 (D. Id. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

*Riggins v. Nevada*, 504 U.S. 127 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

*Ring v. Arizona*, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265

*Rojem v. Gibson*, 245 F.3d 1130 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . 17, 19, 126, 128, 129

*Romano v. Gibson*, 239 F.3d 1156 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

xii

*Roper v. Simmons*, 543 U.S. 304 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272

*Saffle v. Parks*, 494 U.S. 484 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272

*Sallahdin v. Gibson*, 275 F.3d 1211 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

*Sandoval v. Calderon*, 241 F.3d 765 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

*Schad v. Arizona*, 501 U.S. 624 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

*Schriro v. Summerlin*, 542 U.S. 348 (2004).. . . . . . . . . . . . . . . 14, 15, 20, 262, 263, 268, 271, 272

*Scott v. Romero*,  2005 WL 2865173 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Shabazz v. Artuz*, 336 F.3d 154 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . 156, 158, 168, 169, 171

*Smith v. Black*, 904 F.2d 950 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

*Smith v. Murray*, 477 U.S. 527 (1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Smith v. Workman*, 550 F.3d 1258 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . 95, 97, 253, 255

*Spaziano v. Florida*, 468 U.S. 447, 455(1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

*Steffel v. Thompson*, 415 U.S. 452 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

*Stewart v. Gramley*, 74 F.3d 132 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

*Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271

*Strickland v. Washington*, 466 U.S. 668 (1984).. . . . . 25, 32, 37, 72, 73, 98, 99, 111, 120, 132, 252

*Stringer v. Black*, 503 U.S. 222 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

*Tarver v. Hopper*, 169 F.3d 710 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*Teague v. Lane,* 489 U.S. 288 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 15, 237, 272

*Thomas v. Gilmore*, 144 F.3d 513 (7th Cir. 1998).. . . . . . . . . . . . . . . . . . . . . 33, 75, 111, 119

*Toles v. Gibson*, 269 F.3d 1167 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

*Tompkins v. Moore*, 193 F.3d 1327 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

xiii

35

*Tucker v. Ozmint*, 350 F.3d 433 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*United States v. Horey*, 333 F.3d 1185 (10th Cir. 2003). . . . . . . . . . 189, 218, 219, 234, 239, 264

*United States v. Allen*, 16 F.3d 377 (10th Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Alvarez*, 137 F.3d 1249 (10th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Apodaca*, 843 F.2d 421 (10th Cir. 1988).. . . . . . . . . . . . . . . . . . . . . . . . 220, 250

*United States v. Armstrong*, 517 U.S. 456 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261, 262

*United States v. Ashley*, 2008 WL 1766868 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . 156

*United States v. Ballard*, 586 F.2d 1060 (5th Cir.1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

*United States v. Banks*, 405 F.3d 559 (7th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . 190, 192

*United States v. Barajas-Diaz*, 313 F.3d 1242 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007). . . . 3, 4, 22, 23, 41, 108, 112-115, 147, 186, 188, 199, 243, 264

*United States v. Basham*, 561 F.3d 302 (8th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

*United States v. Baskes*, 649 F.2d 471 (7th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

*United States v. Beckford*, 966 F. Supp. 1415, 1417-18 (E.D. Va. 1997). . . . . . . . . . . . . . 230, 232

*United States v. Beers*, 189 F.3d 1297 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . 160, 176, 177, 180

*United States v. Begay*, 144 F.3d 1336 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

*United States v. Bender*, 304 F.3d 161 (1st Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . 154, 160, 161

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

*United States v. Bin Laden*, 126 F. Supp. 2d 256 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . 262

*United States v. Bishop*, 890 F.2d 212 (10th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*United States v. Blackwell*, 127 F.3d 947 (10th Cir. 1997) . . . . . . . . . . . . . . . 12, 17, 23, 86, 269

xiv

*United States v. Blount*, 502 F.3d 674 (7th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Bolden*, 355 F.2d 453 (7th Cir.1966).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

*United States v. Booker*, 981 F.2d 289 (7th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 133

*United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . 266

*United States v. Bowen*, 946 F.2d 734 (10th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

*United States v. Brown*, 326 F.3d 1143 (10th Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . 266

*United States v. Browning*, 390 F.2d 511 (4th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

*United States v. Caballero*, 277 F.3d 1235 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . 102, 103

*United States v. Caldwell*, 543 F.2d 1333 (D.C. Cir. 1974). . . . . . . . . . . . . . 135, 139, 141, 143

*United States v. Caldwell*, 560 F.3d 1202 (10th Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . 68

*United States v. Cameron*, 907 F.2d 1051 (11th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Carr*, 80 F.3d 413 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Challoner*,  583 F.3d 745 (10th Cir. 2009). . . . . . . 31, 32, 70, 106, 151, 242, 273

*United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000). . . . . . 36, 228, 229, 231, 239, 242

*United States v. Chemical Foundation, Inc.*, 272 U.S. 1 (1926). . . . . . . . . . . . . . . . . . . . . . . . 261

*United States v. Chirinos*, 112 F.3d 1089 (11th Cir. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . 202

*United States v. Clingman*, 288 F.3d 1183 (10th Cir. 2002). . . . . . . . . . . . . . 25, 26, 218, 258, 268

*United States v. Connolly*, 504 F.3d 206 (1st Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*United States v. Cook*, 45 F.3d 388 (10th Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Cook*, 608 F.2d 1175 (9th Cir.1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*United States v. Cook*, 997 F.2d 1312 (10th Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . 146, 148

xv

*United States v. Cornejo-Sandoval*, 564 F.3d 1225 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . 249

*United States v. Cousins*, 455 F.3d 1116 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Craycraft*, 167 F.3d 451 (8th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 92

*United States v. Crockett*, 435 F.3d 1305 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*United States v. Dago*, 441 F.3d 1238 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*United States v. Davis*, 953 F.2d 1482 (10th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*United States v. Dazey*, 403 F.3d 1147 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . 204, 207, 208, 212

*United States v. DeFusco*, 949 F.2d 114 (4th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . 127, 245

*United States v. Duran-Moreno*, 616 F. Supp. 2d 1162 (D.N.M. 2009). . . . . . . . . . . . . . . . . . . 181

*United States v. Erickson*, 561 F.3d 1150 (10th Cir. 2009). . . .  154, 155, 160-162, 166, 167, 169, 172, 175, 179, 180, 184

*United States v. Espinoza-Saenz*, 235 F.3d 501 (10th Cir. 2000). . . . .  13, 65, 172, 217, 246, 271, 273

*United States v. Evans*, 224 F.3d 670 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . 153, 160, 165

*United States v. Fell*, 360 F.3d 135 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*United States v. Fisher*, 38 F.3d 1144 (10th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . 25, 30, 32, 79

*United States v. Floyd*, 81 F.3d 1517 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 269

*United States v. Frady*, 456 U.S. 152 (1982). . . . .  13, 21, 186, 189, 218, 219, 227, 233, 234, 238, 264

*United States v. Fulks*, 454 F.3d 410 (4th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*United States v. Gabaldon*, 522 F.3d 1121 (10th Cir. 2008). . . 13, 66, 92, 172, 217, 246, 271, 273

*United States v. Galloway*, 56 F.3d 1239 (10th Cir.1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Garcia*, 625 F.2d 162 (7th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*United States v. Gonzales*, 164 F.3d 1285 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*United States v. Gordon*, 172 F.3d 753 (10th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Guerrero*, 488 F.3d 1313 (10th Cir. 2007). . . . . . . . . . . . . . . 13, 65, 92, 171, 246

*United States v. Hack*, 782 F.2d 862 (10th Cir. 1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

*United States v. Haddock*, 12 F.3d 950 (10th Cir. 1993).. . . 25, 135, 138, 140-142, 144, 145, 258

*United States v. Harden*, 846 F.2d 1229 (8th Cir. 1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Hardwell*, 80 F.3d 1471 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . 151, 181

*United States v. Harris*, 408 F.3d 186 (5th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . 93, 95

*United States v. Haynes*, 269 F. Supp. 2d 970 (W.D. Tenn. 2003). . . . . . . . . . . . . . . . . . . . . 267

*United States v. Hemsley*, 2008 WL 2725857 (10th Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . 111

*United States v. Henderson*, 461 F. Supp. 2d 133 (S.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . 266

*United States v. Henderson*, 485 F.  Supp. 2d 831 (S.D. Ohio 2007). . . . . . . . . . . . . . . . . . . . . 266

*United States v. Henderson*, 584 F. Supp. 1037 (W.D. Pa. 1984).. . . . . . . . . . . . . . . . . . . 63, 158

*United States v. Herbst*, 565 F.2d 638 (10th Cir.1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

*United States v. Higgs,* 353 F.3d 281 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . 216, 232, 266

*United States v. Hollis*, 971 F.2d 1441 (10th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

*United States v. Infante*, 404 F.3d 376 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

*United States v. Isaac-Sigala*, 448 F.3d 1206 (10th Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Ivy*, 83 F.3d 1266 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

*United States v. Jackson*, 549 F.3d 963 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

*United States v. Jones*, 399 F.3d 640 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

*United States v. Jones*, 468 F.3d 704 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

xvii

*United States v. Kelly*, 35 F.3d 929 (4th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

*United States v. Kennedy*, 225 F.3d 1187 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . 25, 51, 57, 257

*United States v. Khan*, 835 F.2d 749 (10th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Lafayette*, 983 F.2d 1102 (D.C. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . 149

*United States v. Laymon*, 621 F.2d 1051 (10th Cir.1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*United States v. Le*, 327 F. Supp. 2d 601 (E.D. Va. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 266

*United States v. Lee*, 374 F.3d 637 (8th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*United States v. Lipp*, 54 F. Supp. 2d 1025 (D. Kan. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*United States v. Lujan*, 530 F. Supp. 2d 1224 (D.N.M. 2008). . . . . . . . . . . . . . . . . . . . . . . . . 179

*United States v. Maden*, 114 F.3d 155 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*United States v. Mahasin*, 442 F.3d 687 (8th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

*United States v. Marashi*, 913 F.2d 724 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

*United States v. Mathis*, 357 F.3d 1200 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. McCullough*, 457 F.3d 1087 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . 114

*United States v. McKissick*, 204 F.3d 1282 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . 220, 223

*United States v. McNally*, 485 F.2d 398 (8th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

*United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . 231, 232

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*United States v. Meridyth*, 364 F.3d 1181 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*United States v. Miguel*, 338 F.3d 995 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

*United States v. Miller*, 907 F.2d 994 (10th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 97

*United States v. Moore*, 108 F.3d 270 (10th Cir.1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

*United States v. Murray,* 751 F.2d 1528 (9th Cir.1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*United States v. Napue*, 834 F.2d 1311 (7th Cir. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Natson*, 444 F. Supp. 2d 1296 (M.D. Ga. 2006). . . . . . . . . . . . . . . . . . . . . . . 267

*United States v. Nguyen*, 155 F.3d 1219 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

*United States v. Nguyen*, 413 F.3d 1170 (10th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . 74, 259

*United States v. Nicholson*, 983 F.2d 983 (10th Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . 107, 108

*United States v. Nolan*, 571 F.2d 528 (10th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Novaton*, 271 F.3d 968 (11th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

*United States v. Olano*, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 258, 260

*United States v. O'Brien*, 131 F.3d 1428 (10th Cir.1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*United States v. Paden*, 908 F.2d 1229 (5th Cir. 1990).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

*United States v. Parker*, 553 F.3d 1309 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*United States v. Pearson*, 159 F.3d 480 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

*United States v. Pearson*, 203 F.3d 1243 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . 159, 165

*United States v. Peveto*, 881 F.2d 844 (10th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*United States v. Pinto*, 755 F.3d 150 (10th Cir. 1985).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*United States v. Preciado*, 336 F.3d 739 (8th Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Prescott*, 221 F.3d 686 (4th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

*United States v. Prichard*, 875 F.2d 789 (10th Cir. 1989).. . . . . . . . . . . . . . . . . . . 14, 186, 243

*United States v. Prince*, 938 F.2d 1092 (10th Cir.1991). . . . . . . . . . . . . . . . . . . . . . . . . . 39, 253

*United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 266

*United States v. Pursley*, 577 F.3d 1204 (10th Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . . . 40, 41

xix

*United States v. Rivas*, 862 F. Supp. 208 (N.D. Ill. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Rivera*, 347 F.3d 850 (10th Cir. 2003).. . . . . . . . . . . . . . . . . 15, 24, 188, 233, 251

*United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990).. . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 266

*United States v. Robinson*, 530 F.2d 1076 (D.C. Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . 182

*United States v. Rodriguez*, 833 F.2d 1536 (11th Cir. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Rodriguez-Felix*, 450 F.3d 1117 (10th Cir. 2006). . . . 17, 18, 104, 126, 129, 136, 142, 143

*United States v. Rogers*, 556 F.3d 1130 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

*United States v. Runnels*, 93 F.3d 390 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Salazar*, 323 F.3d 852 (10th Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Sapp*, 989 F. Supp. 1093 (D. Kan. 1997).. . . . . . . . . . . . . . . . . . . . . . 83, 87, 92

*United States v. Scalf*, 725 F.2d 1272 (10th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*United States v. Sealander*, 91 F.3d 160, *15 (Table) (10th Cir. 1996). . . . . . . . . . . . . . . . . . 248

*United States v. Serawop*, 410 F.3d 656 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

*United States v. Shaffer*, 472 F.3d 1219 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States v. Simpson*, 152 F.3d 1241 (10th Cir.1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Smith*, 692 F.2d 658 (10th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . 107, 108

*United States v. Soderstrand*, 412 F.3d 1146 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Solomon*, 513 F. Supp. 2d 520 (W.D. Pa. 2007). . . . . . . . . . . . . . . . . . . . . . . 266

*United States v. Sullivan*, 919 F.2d 1403 (10th Cir.1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

*United States v. Tanner*, 941 F.2d 574 (7th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . 90, 97, 100

xx

*United States v. Tisdale*, 248 F.3d 964 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . 28, 149

*United States v. Torres*, 569 F.3d 1277 (10th Cir. 2009).. 154, 159, 164, 167, 171, 177-179, 183, 185

*United States v. Torrez-Ortega*, 184 F.3d 1128 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . 178

*United States v. Vasquez*, 985 F.2d 491 (10th Cir.1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . 151

*United States v. Viefhaus*, 168 F.3d 392 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*United States v. Walton (In re Baker)*, 693 F.2d 925 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . 18

*United States v. Wardell*, 591 F.3d 1279 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . 220, 222

*United States v. Warner*, 23 F.3d 287 (10th Cir.1994). . . . . . . . . . . . . . . . . . . . . . 14, 186, 243

*United States v. Watson*, 409 F.3d 458 (D.C. Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Webster*, 162 F.3d 308 (5th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*United States v. Weiss*, 930 F.2d 185 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

*United States v. Weller*, 238 F.3d 1215 (10th Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*United States v. Willis*, 202 F.3d 1279 (10th Cir. 2000). . . 12, 13, 65, 92, 171, 217, 245, 271, 273

*United States v. Wilson*, 493 F. Supp. 2d 364 (E.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . . . 266

*United States v. Wiseman*, 297 F.3d 975 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*United States v. Wolny*, 133 F.3d 758 (10th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

*United States v. Young*, 470 U.S. 1 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208, 209, 211

*United States v. Young*, 952 F.2d 1252 (10th Cir. 1991).. . . . . . . . . . . . . . . . . . . . . . . . 163, 177

*United States v. Zuno-Arce*, 25 F. Supp. 2d 1087 (C.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . 262

*Uttecht v. Brown*, 551 U.S. 1 (2007) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239, 240

*Wainwright v. Witt*, 469 U.S. 412 (1985).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239, 242

xxi

*Walker v. Gibson*, 228 F.3d 1217 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . 39, 40, 224-227, 256

*Wallace v. Ward*, 191 F.3d 1235 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

*Waters v. Thomas*, 46 F.3d 1506 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 120

*Whalen v. United States*, 445 U.S. 684 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

*Wiggins v. Smith*, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Williams v. Allen*, 458 F.3d 1233 (11th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 98, 100

*Williams v. Bowersox*, 340 F.3d 667 (8th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Willis v. United States*, 87 F.3d 1004 (8th Cir.1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . 205, 208, 210

*Yarborough v. Gentry*, 540 U.S. 1 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

## B. Underline{State Cases}

*Hale v. State*, 750 P.2d 130 (Okla. Crim. App. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Malone v. State*, 168 P.3d 185 (Okla. Crim. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . 216

*Powell v. State*, 995 P.2d 510 (Okla. Crim. App. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . 216

## C. Underline{Constitutions}

U.S. Const. art. III, § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

## D. Underline{Federal Statutes}

18 U.S.C. § 1111. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

18 U.S.C. § 3282. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

18 U.S.C. § 3432. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 186

18 U.S.C. § 3591. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265

18 U.S.C. § 3592. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235, 265, 266

18 U.S.C. § 3593. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

18 U.S.C. § 924. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 227, 228, 230

21 U.S.C. § 848. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 36, 165, 227, 230, 231, 235, 265, 266

28 U.S.C. § 2255 . . . 12, 14, 15, 17, 22, 65, 92, 146, 153, 160, 165, 171, 186, 217, 225, 244, 245, 262, 270, 271, 273

**E.  State Statutes**

21 Okl. St. Ann. § 11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

**F.  Rules**

Fed. R. Crim. P. 33. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152, 153

Fed. R. Crim. P. 35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

Fed. R. Crim. P. 41. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

Fed. R. Crim. P. 43. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

Fed. R. Evid. 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 69, 113, 182

Fed. R. Evid. 404. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66-70, 181, 182

Fed. R. Evid. 602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

Fed. R. Evid. 608. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 64, 177, 178

Fed. R. Evid. 609. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163, 172, 177, 178

Fed. R. Evid. 611. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

Fed. R. Evid. 704. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Fed. R. Evid. 801. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Rule 2, Rules Gov'g § 2255 Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 218, 268

## G.  Other Authorities

Tenth Circuit Pattern Jury Instructions (Criminal) § 1.08 (2005) .. . . . . . . . . . . . . . . . . . . . . . 104

Third Circuit Pattern Jury Instructions (Criminal) § 3.04 (2008). . . . . . . . . . . . . . . . . . . . . . . 104

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT    )
    )
        *Petitioner*,    )
    )
v.    )    **Case No. CV-09-00105-JHP**
    )    **Criminal Case No. CR-04-00115-JHP**
UNITED STATES OF AMERICA    )
    )
        *Respondent.*    )

GOVERNMENT'S ANSWER IN OPPOSITION TO SECOND AMENDED MOTION TO
VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL
CUSTODY

(Answer Under 28 U.S.C. § 2255)

PROCEDURAL HISTORY

On November 9, 2004, a federal grand jury for the Eastern District of Oklahoma returned

an indictment that charged Kenneth Eugene Barrett with using and carrying a firearm during and

in relation to drug trafficking crimes (18 U.S.C. § 924(c)(1)(A) & (j)); carrying a firearm in

relation to a crime of violence (18 U.S.C. § 924(c)(1)(A) & (j)); and intentionally killing, during

the commission of a drug trafficking crime, a state law enforcement officer engaged in the

performance of his official duties (21 U.S.C. § 848(e)(1)(B)).  (Trl. Doc. 9.)[1]  On February 9,

2005, the grand jury returned a superseding indictment containing the same three counts as the

original indictment.  (Trl. Doc. 52.)  On February 15, 2005, the government filed notice of its

intent to seek the death penalty with respect to all three counts.  (Trl. Doc. 60.)

---

[1]Throughout its Answer, the government refers to the documents in case no. 04-CR-115-JHP by docket number or date of entry and prefaces the citations with "Trl."  Citations to documents filed on the instant docket, case no. 09-105-JHP, have no preface.

1

On September 26, 2005, a jury trial commenced.  On November 4, 2005, the jury convicted Barrett of all three charged offenses.  (Trl. Doc. 241.)  On November 17, 2005, at the conclusion of the penalty phase hearing, the jury found that Barrett was at least 18 years old at the time of the offenses and that he intentionally killed the victim.  (Trl. Doc. 257.)  As statutory aggravating factors, the jury found, with respect to Counts 1 and 2, that Barrett killed or attempted to kill more than one person in a single criminal episode, and committed the offenses after substantial planning and premeditation to cause the death of a person.  (*Id.*)  As to Count 3, the jury found that Barrett knowingly created a grave risk of death to one or more persons in addition to the victim, and that Barrett committed the offense after substantial planning and premeditation.  (*Id.*)  As a non-statutory aggravating factor applicable to all three counts, the jury found that Barrett caused injury, harm, and loss to the victim's family.  (*Id.*)  Twelve mitigating factors were found true by at least one juror.  (*Id.*)  After weighing the aggravating and mitigating factors, the jury recommended a sentence of death as to Count 3 and sentences of life imprisonment without the possibility of release as to Counts 1 and 2.  (*Id.*)  On December 19, 2005, this Court imposed the recommended  sentences.

Barrett appealed his conviction and sentence to the United States Court of Appeals for the Tenth Circuit, raising the following claims of error:

1.  The trial court erroneously denied a motion to suppress evidence seized pursuant to a search warrant.

2.  The indictment was insufficient, it improperly charged multiple crimes and improperly joined offenses.

3.  The trial court admitted improper victim impact evidence.

2

4.  Juror misconduct violated Barrett's constitutional rights.

5.  The trial court erroneously permitted the government to exercise a race-based peremptory challenge during jury selection.

6.  The trial court erroneously failed to declare the statutory basis of the federal death penalty unconstitutional.

7.  The jury was improperly permitted to weigh a threshold intent factor when selecting the appropriate punishment.

8.  Insufficient evidence supported the jury's finding of intent to kill and, thus, Barrett's conviction.

9.  The government failed to timely disclose the names and addresses of seven witnesses.

10.  The trial court erroneously refused to dismiss the indictment based on double jeopardy, collateral estoppel and the statute of limitations.

11.  The trial court erroneously refused to dismiss the indictment based on the government's alleged failure to adhere to its own *Petite* policy.

12.  Cumulative error required reversal.

In a published opinion, the Tenth Circuit affirmed the conviction and sentence in full. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007).

On March 16, 2009 (364 days after the Supreme Court denied a petition for writ of certiorari from the Tenth Circuit's judgment), Barrett filed a 377-page Motion for Collateral Relief, asserting 17 enumerated claims of error.  (Doc. 1.)  On March 17, 2009, he filed a 379-page Corrected Motion for Collateral Relief, again asserting 17 enumerated claims.  (Doc. 2.) On September 25, 2009, Barrett filed a 430-page Amended Motion for Collateral relief, asserting

19 enumerated claims for relief. (Doc. 70.) This Court subsequently ordered Barrett to file a second-amended motion that complied with the Rules Governing § 2255 Proceedings. (Doc. 81.) The order also permitted Barrett to file a brief in support of his motion. (*Id.*) On December 5, 2009, Barrett filed a 403-page Second Amended Motion, asserting 19 enumerated claims for relief (Doc. 95, hereinafter referred to as "Mot."), and on March 1, 2010, he filed a 277-page Brief in Support of his Motion (Doc. 149, hereinafter referred to as "BIS"). The Government now files this Answer.

<div align="center">

**STATEMENT OF FACTS[2]**

</div>

On January 28, 1999, the District Court of Sequoyah County, Oklahoma, issued a warrant for Barrett's arrest on charges of unlawful delivery of a controlled drug and failure to appear for jury trial. Although Barrett managed to avoid arrest during the ensuing months, state law enforcement officials were aware of his presence and continued to investigate his activities. In September of 1999, Clint Johnson, the supervising agent and field supervisor for the District Twenty-Seven Drug Task Force (Task Force), which encompassed Cherokee, Wagoner, Adair and Sequoyah Counties in Oklahoma, received information from a confidential informant (CI) that Barrett was manufacturing and distributing methamphetamine at his residence. Johnson, using the information provided by the CI, prepared an affidavit for a search warrant. On September 20, 1999, the District Court of Sequoyah County issued the requested search warrant for Barrett's residence. The warrant authorized law enforcement officers to conduct the search "at any time of the day and/or night," and to enter Barrett's residence "without the normally

---

[2]The Statement of Facts is drawn from the Tenth Circuit's opinion in this case. *Barrett*, 496 F.3d at 1082-85 (record citations omitted).

<div align="center">4</div>

required knocking and announcing ... due to the violent and unstable nature of ... BARRETT and the danger posed to law enforcement personnel by ... BARRETT and/or other unknown persons who may be present." The items to be seized included methamphetamine or other controlled dangerous substances, paraphernalia, drug manufacturing equipment and supplies, and written records and documents pertaining to drug manufacturing and distribution.

Johnson considered the search warrant to be "high risk" in nature. In particular, Johnson was aware that Barrett routinely carried firearms and had threatened to kill law enforcement officers if they "showed up at his residence." Further, Johnson was aware that Barrett's residence was accessible only by a dead-end road, that several of Barrett's relatives lived in residences nearby, and that there was little cover around the residence from which the search team could perform surveillance. Accordingly, Johnson contacted the Oklahoma Highway Patrol's Tactical Team (Tact Team) for assistance in serving the warrant. The Tact Team was "highly trained and specialized in [serving] ... high risk search warrants...." Johnson and another Task Force leader met with Tact Team members to discuss the execution of the warrant. It was determined that the Tact Team would enter and secure the area first, and that the Task Force would then perform the actual search of Barrett's residence.

The Tact Team met during the daylight hours of September 23, 1999, and developed a plan for entering and securing Barrett's residence. As part of this planning process, three members of the Tact Team drove by Barrett's residence in an unmarked Ford Bronco during the early evening hours. Travis Crawford, Barrett's cousin, was in the vicinity at the time of the drive-by and observed Barrett walk to the area of the front gate after the Bronco drove by his residence. Crawford spoke to Barrett and Barrett indicated he had seen the Bronco and knew it

<div align="center">5</div>

belonged to law enforcement officers.  When Crawford told Barrett that the law enforcement officers would likely return to serve the warrant, Barrett responded by saying "D.G.F.," which, according to Crawford, meant "Don't give a fuck."  Further, Barrett told Crawford that "he was going out in a blaze of glory."

Using the information they observed during the drive-by, together with information provided by the Task Force, the Tact Team decided to execute the search warrant during the night with the hope that Barrett and any other occupants of the residence would be asleep.  The Tact Team further decided that, because the front gate to Barrett's property was locked, three of the Tact Team vehicles, two Ford Broncos and a marked highway patrol unit, would enter Barrett's property by first driving north on a private driveway that lay to the east of Barrett's property, and then driving west across the land and through a ditch onto Barrett's property.  The occupants of those three vehicles, six Tact Team members in total, would then get out of their vehicles, walk on foot to the house, and enter through the front door.  The Tact Team decided that a fourth unit, a marked highway patrol car, would stop at the locked front gate of the property and that one of the occupants of that vehicle would remain in that position to provide cover for the other team members, while the second and third occupants of that vehicle would climb over the gate, enter the property on foot, and watch the west side of Barrett's house to prevent him from escaping to his mother's residence, which was located adjacent to Barrett's house.  Finally, the Tact Team decided that a fifth unit, a white Ford Bronco, would enter the driveway of Barrett's mother's home.

At approximately 12:30 a.m. on the morning of September 24, 1999, the Tact Team met members of the Task Force at a highway intersection near Barrett's residence.  From there, the

6

five Tact Team vehicles headed towards Barrett's residence.  The Task Force vehicles waited approximately two minutes before heading towards Barrett's residence in order to give the Tact Team a chance to secure the area.

As the lead Tact Team vehicle, a white Ford Bronco, drove eastward on the gravel road that passed in front of Barrett's residence, the driver, Trooper John Hamilton, observed a white male standing in the front yard of Barrett's residence.  Hamilton continued to observe the man, who was later determined to be Barrett's son Toby, as he drove past Barrett's residence and entered the private driveway to the east of Barrett's residence.  Hamilton then turned his vehicle westward towards Barrett's house and entered a deep ditch that lay between Barrett's residence and the property to the east, and approximately twenty to twenty-five yards away from Barrett's residence.

Meanwhile, Troopers Gene Hise and Robert Darst, who arrived at the scene in the fourth Tact Team vehicle, climbed over the locked front gate, entered the yard in front of Barrett's house, and yelled at Toby Barrett to get on the ground.  Toby Barrett initially failed to comply, but ultimately got on the ground.  Trooper Darst then took custody of Toby Barrett and determined he was unarmed.  While Toby Barrett was on the ground being handcuffed, he turned his head towards the house and screamed "Dad!"

As Hamilton's vehicle exited the ditch and headed towards Barrett's house, it began to receive gunfire that hit the middle of the windshield, at approximately "head level" of Hamilton and his passenger, Trooper David Eales.[3]  The gunfire intensified as Hamilton drove closer to

_____

[3]According to the record, Toby Barrett did not begin yelling "Dad" until after the gunfire began.

7

53

Barrett's residence, and Hamilton was hit in the face with some object, either bullet fragments or flying glass from the windshield. As a result of the continuous gunfire, neither Hamilton nor Eales were able to turn on the vehicle's emergency lights, as the Tact Team had originally planned for them to do.

The second Tact Team vehicle, a Ford Bronco occupied by Troopers Raymond Greninger and Ricky Manion, was less than a car length behind the first Tact Team vehicle. Unlike the first vehicle, the second vehicle had its emergency lights on, including a flashing strobe-type light on the sun visor and wig-wag headlights. The third Tact Team vehicle, a marked highway patrol unit driven by Trooper Hash, also had its emergency lights on, including a full light bar on top. The lights from the light bar were bright enough to light up the entire area of Barrett's residence. This third vehicle was traveling less than a car length behind the second vehicle.

Hamilton's vehicle ultimately came to a stop at or near the southeast corner of Barrett's residence, and the second and third vehicles stopped slightly behind Hamilton's vehicle. Hamilton fell between the front seats of his vehicle in an attempt to avoid the gunfire. Hamilton's passenger, Eales, opened the front passenger door, got out of the vehicle, and began moving towards the rear of the vehicle. At some point before he arrived at the rear of the vehicle, Eales was struck by three gunshots.

Meanwhile, Hamilton threw a diversionary device out of the driver's side window of his vehicle, causing a noticeable flash and loud bang. The flash and bang created a stoppage of gunfire, during which Hamilton got out of the driver's side of his vehicle. Hamilton then moved towards the rear of his vehicle. As he did so, he was shot in the back of the left shoulder. When he reached the back of the vehicle, Hamilton observed Eales face down on the ground, with

8

Manion attempting to assist him.

From the rear of the vehicle, both Hamilton and Manion were able to observe a man, later identified as Barrett, standing in the interior doorway of the residence holding a rifle.  Hamilton fired two rounds at Barrett, but did not hit him.  Manion moved from the rear of Hamilton's vehicle to the east side of Barrett's house.  From a position behind a parked truck, Manion fired two short bursts of gunfire through the east window of Barrett's home.  Some of the shots fired by Manion struck Barrett in the lower body.  Hamilton observed Barrett fall face down through the front doorway and drop his rifle.  Hamilton approached and entered the house, told Barrett to get up, and Barrett responded that he could not because he had been shot.  Hamilton, with the assistance of Troopers Manion and Hash, dragged Barrett out of the house and into the front yard.  As the three troopers were dragging Barrett, another trooper, Danny Oliver, yelled at them that Barrett had a pistol tucked in the front of his waistband.  Manion pulled Barrett's arms out from underneath him, handcuffed him, and performed a quick pat-down.  During the pat-down, Manion found the pistol that Barrett had tucked into the right side of his waistband.  Hamilton, Manion and Greninger entered the house and confirmed there were no other persons inside.

After unsuccessfully attempting to provide first aid to Eales, Tact Team members transported him to a local hospital, where he was pronounced dead.  An autopsy indicated that Eales suffered gunshot wounds to his chest, his left flank, and his right arm, all of which appeared to have occurred while Eales was facing away from Barrett.  The gunshot wound to the chest entered the left side of Eales' upper back, broke four of Eales' ribs, perforated the left upper lung lobe, and ultimately struck Eales' aorta, causing a quarter-inch hole.  The injury to Eales' aorta was determined to be irreparable and the cause of Eales' death.

9

Investigation of the crime scene by law enforcement officers determined that Barrett fired approximately nineteen shots at law enforcement officers using a Colt Sporter .223 rifle. The rifle, which had a lethal range of approximately 541 to 595 yards, was equipped with three magazines that Barrett had taped together, giving him a total of ninety-one rounds available for use at the time the shooting incident began. A search of Barrett's property, including his house and outbuildings, produced a variety of other firearms, including a fully loaded 12 gauge shotgun and a fully loaded .22 caliber pistol. The search also resulted in the seizure of a variety of materials related to the production and use of methamphetamine (e.g., coffee filters, hypodermic needles, digital scales, pseudoephedrine, ephedrine tablets, iodine, plastic tubing, toluene). A search of Barrett's person produced a plastic baggie containing red phosphorous, a lighter, and approximately $2100 in cash.

### BARRETT'S CONTENTIONS

1. The Court's administration of the Criminal Justice Act and its ex parte meeting with prosecutors demonstrates bias that requires relief without a showing of prejudice.

2. Barrett received ineffective assistance of counsel at trial.

3. The Court deprived Barrett of funding necessary to employ experts and purchase pre-trial hearing transcripts.

4. Newly discovered evidence requires this Court to grant a hearing to determine whether the police acted in good faith when they obtained a search warrant for Barrett's house.

5. The prosecutors committed misconduct, by suppressing evidence favorable to the defense, interfering with the defense, improperly examining witnesses, and unfairly arguing for a death sentence.

6.  The Court erroneously excluded evidence of Barrett's remorse.

7.  The Court improperly ordered Barrett to wear an electronic stun belt during the trial.

8.  The Court permitted Barrett to stand trial while he was mentally incompetent.

9.  The Court erroneously failed to instruct the jury on voluntary manslaughter as a lesser included offense to the three charged crimes.

10.  The Court improperly failed to instruct the jury that it could consider residual doubt as a factor in mitigation during its penalty deliberations.

11.  The Court improperly excused a juror based on her opinions about the death penalty.

12.  The penalty phase instructions unconstitutionally relieved the jury of employing the reasonable doubt standard when it weighed the aggravating and mitigating factors.

13.  Following Barrett's disruption of the trial, the Court and counsel improperly responded to the defendant's request to absent himself from the proceedings.

14.  Statistical information demonstrates that the federal government disproportionately seeks the death penalty in cases involving White, rather than minority, victims.

15.  The indictment in this case that did not refer to the death penalty and did not allege the aggravating factors upon which the prosecution relied at trial.

16.  The Court failed to sequester the jury and, as a result, the jurors committed misconduct by consulting information outside the record.

17.  Barrett is not competent to be executed.

18.  Barrett received ineffective assistance of appellate counsel.

19.  Cumulative error requires reversal.

11

57

**FEDERAL COLLATERAL REVIEW OF PRESUMPTIVELY FINAL CRIMINAL JUDGMENTS**

Collateral relief under 28 U.S.C. § 2255 is strictly circumscribed. The grounds for relief under § 2255 are narrower than those for relief on direct appeal. With very limited exceptions, relief may not be based on (1) an error that is not of jurisdictional or constitutional dimension, (2) a procedurally defaulted ground, (3) a claim previously raised and rejected on direct appeal, (4) a "new rule" as defined by *Teague v. Lane,* 489 U.S. 288 (1989), or (5) an error that did not have a substantial and injurious effect or influence in determining the jury's verdict.

A. Cognizable Claims

While § 2255 provides a "comprehensive remedy, 'it does not encompass all claimed errors in conviction and sentencing.'" *United States v. Khan*, 835 F.2d 749, 753 (10th Cir. 1987). Once a defendant has appealed his conviction, the court is "entitled to presume he stands fairly and finally convicted. . . . Our trial and appellate procedures are not so unreliable that we may not afford their completed operation any binding effect beyond the next in a series of endless postconviction collateral attacks." *Khan*, 835 F.2d at 753 (emphasis omitted). Errors of law or fact do not provide a basis for § 2255 relief unless they involve "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Blackwell*, 127 F.3d 947, 954 (10th Cir. 1997) (internal quotes omitted).

B. Time Barred Claims

Statutory law imposes a one-year period of limitations in which federal prisoners may file motions to vacate, set aside or correct his sentence. 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d 1279, 1280 (10th Cir. 2000). The limitation period begins on the date the Supreme Court denies a defendant's petition for writ of certiorari from direct appeal, regardless of whether

12

58

the defendant seeks rehearing. *Willis*, 202 F.3d at 1280-81. The period of limitations bars untimely amendments that add new claims to a defendant's initial § 2255 motion. *United States v. Guerrero*, 488 F.3d 1313, 1316 (10th Cir. 2007). While § 2255 movants may file untimely amendments that clarify, amplify or expand the facts in their timely-filed motions, they may not use such pleadings to add new claims. *United States v. Espinoza-Saenz*, 235 F.3d 501, 504-05 (10th Cir. 2000). Section 2255 movants may, though, justify untimely pleadings by showing a need for equitable tolling, which is reserved for extraordinary circumstances beyond the defendant's control. *United States v. Gabaldon*, 522 F.3d 1121, 1124 (10th Cir. 2008).

C. <u>Procedurally Defaulted Claims</u>

A collateral attack is more limited than an appeal, and the doctrine of procedural default generally bars consideration of any claim that the movant omitted to appropriately raise on appeal. *United States v. Frady*, 456 U.S. 152, 165 (1982); *United States v. Dago*, 441 F.3d 1238 (10th Cir. 2008). This doctrine applies even in death penalty cases. *See Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005). An exception lies for claims of ineffective assistance of counsel, which should be raised in a collateral attack rather than a direct appeal. *See United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir.1995).

Apart from claims of ineffective assistance, courts may consider otherwise procedurally-defaulted claims in two instances. First , they may consider defaulted claims when a movant demonstrates "that the constitutional error 'has probably resulted in the conviction of one who is actually innocent.'" *United States v. Wiseman*, 297 F.3d 975, 979 (10th Cir. 2002) (quoting *Bousley v. United States*, 523 U.S. 614, 623-24 (1998)). Second, courts may consider defaulted claims if the petitioner establishes cause and prejudice. *United States v. Allen*, 16 F.3d 377, 378

13

(10th Cir. 1994).  "Cause" exists only in those cases in which a factor external to the defense prevented counsel from raising a claim at the appropriate juncture.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  A movant can show cause by demonstrating that a claim was "so novel that its legal basis [was] not reasonably available to counsel."  *United States v. Barajas-Diaz*, 313 F.3d 1242, 1248 (10th Cir. 2002).  A movant can also establish cause by showing that defense counsel provided constitutionally ineffective assistance.  *Wiseman*, 297 F.3d at 979.  To establish prejudice, a petitioner must show that the claimed errors "worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimension."  *Daniels v. United States*, 254 F.3d 1180, 1191 (10th Cir. 2001) (emphasis original, internal quotations omitted).

D.  Claims Previously Adjudicated on Direct Appeal

Generally, a claim raised and rejected on direct appeal cannot be relitigated in a § 2255 motion.  *United States v. Warner*, 23 F.3d 287, 291 (10th Cir.1994).  Relitigation of an appellate issue during § 2255 proceedings "may be proper when there has been an intervening change in the law of a circuit."  *United States v. Prichard*, 875 F.2d 789, 790-91 (10th Cir. 1989); *United States v. Nolan*, 571 F.2d 528, 530 (10th Cir. 1978).

E.  New Rule of Criminal Procedure

Collateral relief is further limited to claims based on established law.  *Teague v. Lane*, 489 U.S. at 310.  When the Supreme Court announces a new rule of law, it "applies to all criminal cases still pending on direct review.  As to convictions that are already final, however, the rule applies only in limited circumstances."  *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (citation omitted).  Generally, new procedural rules do not apply retroactively, while new

substantive doctrines – those that alter the range of punishable conduct or the class of punishable people – do. *Id.* at 351-52. A court employs a three-step analysis to ascertain whether a rule of criminal procedure applies. *Beard v. Banks*, 542 U.S. 406, 411 (2004). First, it determines when the judgment became final. *Id.* Second, it decides whether the pertinent rule of law was "new" at the time of finality by deciding whether a "court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution." *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (internal quotations omitted). Third, the court considers if a new rule is of "watershed" magnitude, and therefore applicable under an exception to *Teague*. *United States v. Cousins*, 455 F.3d 1116, 1126 n.6 (10th Cir. 2006).

F.  <u>Harmless Error</u>

Even assuming a § 2255 motion demonstrates legal error, "[i]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." *United States v. Dago*, 441 F.3d at 1245. Thus, absent a showing that the case involves one of a rare group of structural errors that affect the framework of the trial and require reversal without a showing of prejudice, a § 2255 movant cannot obtain relief without establishing that an identified legal error "had substantial and injurious effect or influence in determining the jury's verdict." *United States v. Rivera*, 347 F.3d 850, 852 (10th Cir. 2003) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *see Green v. United States*, 262 F.3d 715, 717-18 (8th Cir. 2001) (applying structural error analysis in a § 2255 case); *see also Neder v. United States*, 527 U.S. 1, 8 (1999) (collecting structural error cases).

62

**THE GOVERNMENT'S ARGUMENT**

## I. THIS COURT PROPERLY ADMINISTERED THE CRIMINAL JUSTICE ACT AND FAIRLY DISCHARGED ITS JUDICIAL DUTIES

Barrett claims that this Court's administration of the Criminal Justice Act ("CJA") was improper and requires relief without any showing of prejudice. Barrett's claim largely concerns what he perceives as the Court's disparate treatment of attorney John Echols, who withdrew from the case, and attorney Roger Hilfiger, who tried it with co-counsel, Bret Smith. Barrett characterizes the Court's actions as misconduct. He builds upon that theme to argue that the Court improperly engaged in an ex parte hearing with prosecutors, and the combined effect of the Court's actions requires recusal. (Mot. 7-32; BIS 18-33.) Barrett's theory that alleged errors under the CJA amount to structural error lacks any legal basis. Moreover, he has defaulted his claim that the Court improperly engaged in ex parte contact with the government and failed to establish that the contention has any merit.

1. CJA Funding Decisions are not Subject to Review by Themselves, and the Funding Determinations in this Case did not Deprive Barrett of any Cognizable Right

Barrett claims that this Court committed structural error, requiring automatic relief, when it placed unfair demands on counsel to account for their budgets and in making CJA funding decisions on the basis of improper criteria. Barrett's novel argument is legally and factually unsupportable. Barrett unsuccessfully analogizes this case to matters in which courts actively interfered in the relationship between defendant and defense counsel, requiring reversal without a showing of prejudice. (*See, e.g.,* BIS 19-21 (citing, inter alia, *Geders v. United States*, 422 U.S. 853 (1975).) But the claim of structural error under the CJA fails in view of the fact that the Tenth Circuit has held that the outright denial of defense services does not require per se relief.

16

*Brewer v. Reynolds*, 51 F.3d 1519, 1529 (10th Cir.1995).  At most, Barrett might hope to show

that the Court's CJA rulings resulted in a deprivation of necessary resources.  *See generally*

*United States v. Rodriguez-Felix*, 450 F.3d 1117, 1127 (10th Cir. 2006).  But he only attempts to

make such a showing in Claim Three.[4]

Even if he succeeded in showing he was deprived of a requested service, he bears the

burden of establishing, inter alia, the "probable value of the additional service and the risk of

error in the proceeding if such assistance is not offered."  *Id.* at 1128.  Indeed, he would also have

to demonstrate that any actual error "caused him substantial prejudice."  *See Rojem v. Gibson*,

245 F.3d 1130, 1139 (10th Cir. 2001); *see also Christian v. United States*, 398 F.2d 517, 519

(10th Cir. 1968) (holding that a defendant claiming denial of resources under the CJA must

demonstrate actual prejudice by clear and convincing error).  Thus, Barrett's theory of structural

error is wholly without basis in the law.

In the present claim, Barrett simply challenges the process by which his trial attorneys

were chosen and compensated.  Such an argument does not state a claim amenable to relief under

§ 2255.  As noted above, "Not every violation of federal law can be remedied under § 2255. . . .

Only if the violation constitutes 'a fundamental defect which inherently results in a complete

miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair

procedure; can § 2255 provide relief."  *United States v. Gordon*, 172 F.3d 753, 755 (10th Cir.

1999) (citation omitted); *see United States v. Blackwell*, 127 F.3d at 954.  Fee determinations

under the CJA are administrative decisions that are not subject to review, even on appeal.  *United*

---

[4]The government refutes Barrett's claims that he was deprived of necessary resources in Argument III, *infra*.

17

*States v. Davis*, 953 F.2d 1482, 1497 n.21 (10th Cir. 1992); *see also United States v. Rodriguez*, 833 F.2d 1536, 1538 (11th Cir. 1987); *United States v. Walton (In re Baker)*, 693 F.2d 925 (9th Cir. 1982).

Barrett, in his attack on the Court's administrative CJA rulings, makes no attempt to show he was deprived of resources necessary to the defense.  He therefore fails to show a fundamental defect resulting in a miscarriage of justice.  Instead, Barrett begins with a discussion of the selection of appointed counsel and intimates that this Court considered inappropriate criteria in choosing his attorneys.  (Mot. 8-9.)  Barrett also attacks the procedures the Court employed for counsel to submit and it to review budget proposals, and complains that attorney Echols was unfairly required to submit onerous and uncompensated accountings while co-counsel Hilfiger was not.  (Mot. 10-25.)  Again raising concerns about favoritism, Barrett observes that the Court paid Hilfiger more than Echols and permitted Hilfiger to hire a jury consultant after disallowing one to Echols.  (Mot. 24-25.)  On their face, none of these allegations even attempts to show that Barrett's defense was deprived of a necessary resource.  Accordingly, none of these arguments states a valid claim.  *See Davis*, 953 F.2d at 1497 n.21.

Barrett fares no better in complaining about the content of the Court's decisions concerning funds available to the defense.  For instance, Barrett claims that the Court calculated the defense investigator's fees on the basis of an inappropriate scale and that it drafted an order that misled counsel as to the necessity of retaining a crime scene reconstruction expert.  (Mot. 14-15)  Barrett's complaint about the investigator's pay scale is of no moment, because he makes no allegation – much less any showing – that the investigator refused to perform any necessary work.  *Cf. Rodriguez-Felix*, 450 F.3d at 1128.  Similarly, Barrett fails to show that the defense

18

detrimentally relied on the Court's statement, in dicta, that it had not previously permitted the testimony of a crime scene reconstruction expert. Barrett would be hard pressed to complain about the persuasiveness of that remark, given that the underlying order provided the defense with $4,000 for forensic trajectory analysis. (*See* Doc. 97 at 3.)

Barrett additionally argues that the Court ignored prevailing professional norms when it ruled on requests for a "mitigation specialist," an additional mental health expert and a jury consultant. (Mot. 15-16.) His argument that the Court deviated from supposed "norms" does not demonstrate error under the CJA, much less does it properly allege that he was prejudicially deprived of any necessary resource. There exists no authority for the notion that capital defendants are entitled to multiple mental health experts or to CJA rulings identical to other death penalty defendants.

Barrett also complains that the Court unduly delayed authorization for the purchase of transcripts from Barrett's second state court trial. (Mot. 16-17.) Barrett's claim that the Court issued an untimely order for the purchase of prior trial transcripts fails to show how the alleged delay substantially hampered the impeachment of witnesses. Furthermore the Court initially denied the requested funds on March 18, 2005 (Trl. Doc. 97), but granted them four days later on reconsideration (Trl. Dckt. entry Mar. 22, 2005). Barrett fails to show that the four-day delay had any impact on his defense.

In short, the Court's alleged errors in administering the CJA simply do not demonstrate that the defense was denied any necessary resource that substantially prejudiced the case. As such, these arguments fail to state a valid basis for relief. *Cf. Rojem v. Gibson*, 245 F.3d at 1139. Moreover, Barrett lacks any factual basis in alleging that the Court unfairly administered CJA

funds. As this Court has already found,

> Petitioner fails to acknowledge . . . that after Mr. Echols was allowed to withdraw at his request, this Court repeatedly encouraged defense counsel to submit supplemental budget requests if they felt they needed additional funding. The budget was not carved in stone but as the definition implies was an estimate of what might reasonably be required. Additionally, the record is clear that the Court encouraged defense counsel on numerous occasions to file amended budget requests and/or to advise the Court if it needed to amend its budget as the case proceeded.

(Doc. 66 at 18-19.)

Barrett has not attempted to assert a valid claim concerning the deprivation of defense funding. Instead, he has relied on a novel extension of inapposite case law to assert that the court committed per se reversible error in ruling under the CJA. His claim is therefore not merely meritless: because it lacks a basis in existing law, any relief would necessarily require the legally impossible – a retroactive application of a new rule of law. *Schriro v. Summerlin*, 542 U.S. at 351. Relief under Barrett's theory would require this Court to retroactively apply a new rule of Constitutional import, something it may not do. *Id.*

For the foregoing reasons, Barrett's attack on the Court's CJA rulings must fail.

2. The Court Engaged in Appropriate and Fully Disclosed Ex Parte Contact with the Government

As part of an overarching theme that this Court treated him unfairly, Barrett claims it improperly engaged in ex parte communications with the government and failed to fully disclose the matters discussed to the defense. (Mot. 25-32.) Barrett defaulted this contention by failing to raise it on appeal and cannot show that it has any merit at this juncture.

A. Procedural Default

In his contention that the Court engaged in improper ex parte communications with the

<div align="center">20</div>

government, Barrett relies on facts within the four corners of the record – the transcript of the very hearing he claims as the basis of the error. Barrett made no claim about the Court's conduct of the hearing on appeal and thereby defaulted the issue. *See United States v. Frady*, 456 U.S. at 165. Barrett attempts to explain his default by claiming as cause for it that appellate counsel was ineffective. (Mot. 31, 382-83.) Because the claim lacks legal merit, as shown below, appellate counsel had no obligation to raise it, and Barrett cannot establish cause for his default. *See McCleskey v. Zant*, 499 U.S. 467, 493 (1991). Even if he could show cause, Barrett cannot establish prejudice to excuse his default. In other words, he cannot show that the ex parte hearing worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimension. *Daniels*, 254 F.3d at 1191. Barrett makes no attempt to excuse his default through a showing of factual innocence. Thus, he cannot obtain collateral relief here. He has defaulted, without excuse, his claim that the Court engaged in improper ex parte contact with the government.

B. The Court Properly Met with the Government and Disclosed the Communication

As in his unsuccessful Motion to Disqualify and Recuse (Doc. 45), Barrett relies on non-binding guidelines to advance his claim that this Court improperly engaged in ex parte communications with the government and failed to make necessary disclosures to the defense. Specifically, Barrett complains that this Court's conduct during and after a September 13, 2005 ex parte hearing "violated" the American Bar Association's Model Code of Judicial Conduct Canon 2, Rule 2.9, because it involved matters of substance and did not result in full disclosure to the defense. Barrett further argues that the lack of disclosure placed him at an unfair disadvantage in obtaining witness information, but ignores the fact that the Tenth Circuit already

21

found that he timely received the requisite disclosures.  *See United States v. Barrett*, 496 F.3d at 1116-17.

In rejecting Barrett's recusal motion, the Court has already found that it properly held an ex parte hearing with the prosecution to consider allegations that the defendant had threatened witnesses:

> Based solely upon the government's allegations that Petitioner/Defendant had suggested that the informant on the search warrant needed "to be taken care of," the Court was obligated to hold an *ex parte* hearing to ascertain the basis for the government's safety concerns and to determine whether the government could prove "by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person.". . . Although *ex parte* hearings should be avoided whenever possible, *id.*, one must question how a court would ever be able to consider a government claim that disclosure of a witness's identity would jeopardize that witness's life without holding an *ex parte* hearing.

(Doc. 66 at 8.)  The Court's finding in rejecting the recusal motion should also apply with equal force to the § 2255 Motion.

Assuming, arguendo, that the Court revisits the decision to hold the ex parte hearing, Barrett's arguments fare no better here than in his Motion to Disqualify.  Barrett fails to demonstrate that the Court was bound by the ABA's rule 2.9.  The ABA's Model Code created no "legally enforceable duties."  *Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003).  Indeed, the Judicial Conference's own Code of Conduct for United States Judges is merely "aspirational."  *In re Charge of Judicial Misconduct*, 91 F.3d 1416, 1417-18 (10th Cir. 1996).  "The fact that a judge's conduct violates the [Judicial Conference's] Canons . . . does not necessarily mean that it constitutes judicial misconduct."  *Id.* at 1418.  Violations of aspirational and unenforceable guidelines cannot provide a basis for § 2255, and certainly will not establish

"a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Blackwell*, 127 F.3d at 954.

Moreover, Barrett cannot show that this Court's ex parte hearing violated any legal principal, given that it concerned discussions about potential threats to witnesses whose identities were to be disclosed under 18 U.S.C. § 3432. "[W]here the government fears that disclosing a list of its witnesses would pose a threat to their safety, ex parte communications between the court and the government may be appropriate in determining whether or not the list should be provided." *United States v. Napue*, 834 F.2d 1311, 1318 (7th Cir. 1987); *see* Doc. 66 at 8.

Barrett also fails in arguing that this Court's alleged failure to disclose information about the ex parte hearing led the defense to forgo a meritorious continuance request under § 3432. Section 3432, requiring disclosure of witnesses at least three days ahead of a death penalty trial, was unquestionably honored in this case, as this Court has previously noted. *United States v. Barrett*, 496 F.3d at1116-17; Doc. 66 at 16 & n.10. Accordingly, Barrett's argument that the Court somehow misled him into relinquishing a continuance amounts to a complaint that he was deprived of a basis for seeking an unfair advantage and a needless delay.

The record, moreover, undermines Barrett's fundamental factual claims that during the ex parte hearing the Court indicated it would deny a government motion to seal witness identities and that it impliedly betrayed a belief that the government's duty to disclose witnesses had already attached under § 3432. In fact, the Court began the hearing by noting it had reached no conclusion about the commencement of trial for § 3432 purposes and ended it with an extended discussion about the safety of witnesses and a statement that it would take under advisement the question of record sealing. (Tr. Hr'g on Gov't's Mot., Sept. 13, 2005: 4-5, 20-23; Doc. 66 at 11,

23

13.)  "[B]efore the Court could issue a formal ruling on the government's motion, the parties announced to the Court that they had reached an agreement regarding these witnesses."  (Doc. 66 at 13.)  "Once an announcement was made that counsel had discussed those issues and had reached an agreed resolution, there was nothing left for the Court to decide."  (*Id*. at 16.)

Even if Barrett had shown that the Court improperly discussed the matter ex parte or failed to properly disclose the substance of the hearing, he cannot establish prejudice.  As noted above, Barrett essentially argues that had he heard the details of the Court's comments he would have been alerted to the possibility that he could seek additional time to obtain witness disclosure from the government.  The government, however, timely disclosed the witness information to Barrett, foreclosing any possibility that defense counsel's absence from the meeting "had substantial and injurious effect or influence in determining the jury's verdict."  *United States v. Rivera*, 347 F.3d at 852.  Furthermore, nothing prevented the defense from moving for a continuance if they believed one was necessary to investigate the government's witnesses.  As discussed below, however, Barrett cannot show a reasonable probability that additional time to investigate the witnesses would have resulted in a more favorable verdict.  *See, infra*, Arg. II, 5.

Because the Court properly engaged in a brief ex parte meeting with the government and did not hide any fact or finding from the defense, much less deny the defense any right under the law, Barrett cannot establish any basis for relief.

## II. BARRETT RECEIVED THE ASSISTANCE OF CONSTITUTIONALLY ADEQUATE TRIAL COUNSEL

Barrett makes a multi-pronged attack on defense counsel, raising 15 enumerated claims about the supposed failings of his attorneys.  Fourteen of those claims arise primarily in the context of the guilt phase of trial and one concerns the penalty phase.  (Mot. 33-249; BIS 33-

24

125.) As detailed below, none of Barrett's allegations have any merit under the prevailing standards for constitutional competency of counsel.

To demonstrate ineffective assistance of counsel, Barrett must show his attorneys' performance was deficient and that the deficient performance was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). He bears the burden of demonstrating that counsel's performance fell below prevailing professional norms. *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009); *United States v. Salazar*, 323 F.3d 852, 857 (10th Cir. 2003). In so doing, he must overcome a strong presumption that counsel did provide effective assistance. *United States v. Kennedy*, 225 F.3d 1187, 1197 (10th Cir. 2000) (citation omitted). Any conclusory assertions will be insufficient to the task. *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994); *see also United States v. Clingman*, 288 F.3d 1183, 1186 (10th Cir. 2002) (petitioner must show-beyond mere allegations-that counsel's deficient performance "affected the outcome of the plea process") (citation and internal quotation marks omitted)). The prejudice prong is heavier than the harmless error test applied on direct appeal. *United States v. Haddock*, 12 F.3d 950, 958 (10th Cir. 1993). Under that standard, the defendant must show that, absent his attorney's error, a reasonable probability exists that he would have received a more favorable verdict. *See id.*

Contrary to Barrett's assertions, the record demonstrates that his attorneys provided wholly adequate representation, and that none of their supposed errors likely altered the outcome of the trial. The government responds to the enumerated contentions in turn.

1. Counsel Provided Unconflicted Representation

In summary fashion, Barrett complains that the Court's management of defense funding created an actual conflict for trial counsel, which induced them to forgo necessary efforts on the

25

defendant's behalf.  (Mot. 34.)  Barrett's assertion is insufficiently pled and without merit.

In a collateral attack on a criminal judgment, the defendant must allege some factual basis for relief sought.  Rule 2(b)(2), Rules Gov'g § 2255 Proceedings; *see United States v. Clingman*, 288 F.3d at 1187; *see also Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (holding that "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based" (citations omitted)).  Barrett's Motion simply asserts that the Court's desire to minimize costs and appoint local counsel created a conflict for trial counsel.  Barrett makes no effort to establish a nexus between the Court's asserted goal of cost saving and his attorneys' decisions.  Beyond that failing, Barrett does not identify any decisions that counsel supposedly made, as a result of the alleged conflict, and does not show how his attorneys' actions prejudiced him.  Barrett's wholly conclusory claim fails on its face.

More fundamentally, Barrett's claim lacks merit because it does not establish a conflict.  An actual conflict of interest exists "if counsel was forced to make choices advancing other interests to the detriment of his client.  Without a showing of inconsistent interests, any alleged conflict remains hypothetical, and does not constitute ineffective assistance."  *United States v. Alvarez*, 137 F.3d 1249, 1252 (10th Cir.1998) (citations omitted).  Barrett, however, makes no effort to demonstrate how the Court's supposedly erroneous funding choices forced counsel to make choices detrimental to the defendant.  Whatever limitations the Court may have placed on funding, it did not create any incentives for counsel to save money on its behalf – for instance, by promising a bonus if the attorneys chose to forgo reliance on court-funded expert witnesses.  Quite the opposite, the Court expressly invited counsel to seek supplemental funding as needed.  (*See* Doc. 66 at 18-19; Trl. Doc. 128 at 6, 133 at 2.)

26

Because Barrett has failed to identify the basis of any arguable conflict, much less to properly detail his contention, the claim should fail.

## 2. Counsel Effectively Re-Urged the Suppression of Evidence

Charles Sanders admitted during his trial testimony that he was the confidential informant whose observations formed the basis of the original search warrant served at Barrett's home. (Tr. 11: 2521.) Based on Sanders's testimony, Barrett's attorneys moved to suppress the drug evidence recovered at the crime scene, arguing that the warrant affidavit was not truthful. (Trl. Doc. 228.) Barrett claims, however, that his attorneys were ineffective in drafting that motion. Specifically, he argues that the motion should have explored, in greater detail, alleged inconsistencies within Sanders's trial testimony and between his testimony and averments in the search warrant affidavit. Barrett contends that such argument would have demonstrated that the warrant's affiant, Clint Johnson, was deliberately untruthful or recklessly indifferent to the truth. Barrett also claims that appellate counsel should have raised the issue on appeal. (Mot. 34-47; BIS 39-43.) Barrett's claim fails because this Court properly denied the motion to suppress in view of Johnson's good faith reliance on Sanders, rather than on the basis of Sanders's credibility. The Court specifically, and properly, rejected the argument that Sanders's truthfulness was a relevant consideration in its ruling on the motion.

### A. Trial Counsel

Barrett's trial attorneys relied on *Franks v. Delaware*, 438 U.S. 154 (1978), to argue that aspects of Sanders's testimony demonstrated that the search warrant that was being served at the time of the murder was based on false statements that Clint Johnson knowingly or recklessly included. (Tr. 12: 2677-80; Trl. Doc. 228.) The effort was unsuccessful – not because counsel

27

failed to identify any particular flaws in the warrant affidavit or inconsistencies in Sanders's

testimony – but because *Franks* commands an evaluation of the affiant's truthfulness, not the

informant's.

To satisfy *Franks*, a defendant must establish by a preponderance of the evidence that the

affiant offered false information intentionally or with a reckless disregard for the truth.  *United*

*States v. Tisdale*, 248 F.3d 964, 973 (10th Cir. 2001).  In view of that rule, this Court denied

Barrett's *Franks* motion, specifically observing as follows:

> "It is important to emphasize that 'truthful' does not mean that 'every fact recited in the warrant affidavit is necessarily correct.' . . . since the information contained within an affidavit for a search warrant is based upon hearsay and information received from informants, the affidavit must be truthful 'in the sense that the information put forth is believed or appropriately accepted by the affiant as true.'"

(Trl. Doc 253 at 6 (quoting *Franks*, 438 U.S. at 165).)  The Court rejected the motion based on

its finding that Johnson acted appropriately: "because the affiant accepted as true what he was

told by Sanders, and had found him to be reliable in the past, the Court finds the affidavit was

properly supported."  (Doc 253 at 7.)  In a subsequent non-dispositive finding, the Court noted

that Barrett had not shown Sanders's information to have been untrue.  (*Id*.)

Even if Sanders's veracity had been a central issue in deciding the *Franks* motion, Barrett

provides no reason for believing the arguments he now identifies would have altered this Court's

ruling.  For instance, Barrett contends that his attorneys should have attacked the affidavit's

assertion that the defendant possessed large quantities of drugs at home by noting Sanders's

testimony that he had never observed drug manufacturing at the house and did not observe drug

activity there in July 1999.  (Mot. 37, pts. a & b.)  Neither of Sanders's statements contradict the

assertion that Barrett possessed large quantities of drugs.  Sanders need not have seen Barrett

manufacture drugs or possess them at any particular point in time to have observed him, as asserted in the affidavit, in possession at some other juncture.  Moreover, the affidavit does not state that Sanders observed the large quantity of drugs, and implies that the informant merely repeated Barrett's own claim of nighttime possession.  (*See* Trl. Doc. 253 Ex. A.)  *See generally United States v. Mathis*, 357 F.3d 1200, 1205 (10th Cir. 2004) (holding that hearsay received through confidential informants may properly support a search warrant).

Barrett also claims his attorneys should have argued, on the basis of Sanders's testimony, that the affidavit was untruthful in reporting that the informant had seen the defendant with methamphetamine between September 15 and September 18, 1999.  (Mot. 37-39, pts. c-f.)  Sanders's cross-examination did reveal that – more than six years after providing information to Johnson – Sanders was unclear on the details and chronology of his observations.  But given the passage of time, those inconsistencies were far less revealing than they might have been in 1999, when the informant spoke to Johnson.  In fact, Sanders candidly admitted he could not recall precisely when he had observed Barrett selling methamphetamine.  (Tr. 12: 2632.)  Sanders did, however, remember that he provided Johnson with contemporaneous reports of Barrett's drug activity, when those observations were no doubt far fresher in his mind.  (*See* Tr. 12: 2635-37.)  Sanders's inability to recall, in 2005, the specific details of 1999 drug transactions did not show that he was untruthful in contemporaneously reporting his actions and observations to Clint Johnson.  More importantly, Sanders's imperfect memory in 2005 did not demonstrate that, in 1999, Johnson had any reason to doubt his informant's reports.

Sanders's confusion about dates and events, no matter how pronounced six years after the fact, had no bearing on Clint Johnson's truthfulness at the time he prepared the search warrant

<div align="center">29</div>

affidavit.  Sanders's inconsistencies at trial could not, and did not, undermine Johnson's basis for believing the informant– the accuracy and reliability of information Sanders had previously provided.  (Trl. Doc 253 at 7.)  Johnson's good faith reliance on Sanders precluded a *Franks* violation, and trial counsel's failure to further attempt to impeach Sanders's veracity with irrelevant observations about the witness's understandably faded memory could not have amounted to deficient performance.  *See Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir. 1999) (finding the failure to raise a futile issue does not constitute ineffectiveness); *United States v. Booker*, 981 F.2d 289, 294 (7th Cir. 1992) (holding that failure to fully research a motion does not constitute ineffectiveness if even "a brilliant analysis" would have failed).

Barrett also briefly argues that trial counsel, had they engaged in more significant investigation, could have prevented this Court from relying on witnesses to "buttress" the credibility of Sanders and Johnson.  (Mot. 46.)  Barrett's argument fails because it misconstrues the Court's ruling.  The Court denied the *Franks* motion because Johnson's prior reliance upon Sanders provided him with a basis for believing the informant in seeking the instant search warrant.  (Trl. Doc. 253 at 7.)  To the extent this Court referred to other witnesses in finding that Sanders was apparently truthful, the statements were mere dicta.  Barrett's attack on this Court's non-dispositive statement does not demonstrate error.  Moreover, his conclusory speculation that trial counsel might have forestalled the Court from making a statement in dicta falls far short of demonstrating prejudicial ineffectiveness.  *See United States v. Fisher*, 38 F.3d at 1147; *Booker*, 981 F.2d at 294.

B.  Appellate Counsel

In a perfunctory argument, Barrett claims that appellate counsel was ineffective for failing

<center>30</center>

to raise the *Franks* issue before the Tenth Circuit.  Barrett states that the issue "was at least partially framed by the record."  (Mot. 47, 383; BIS 236.)

The omission of a merely "viable" appellate issue does not in amount to ineffective assistance of counsel.  *United States v. Challoner*,  583 F.3d 745, 749 (10th Cir. 2009).  "Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Dever v. Kan. State Penitentiary*, 36 F.3d 1531, 1537 (10th Cir.1994).  "[The] process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986).  Only the omission of a "dead-bang winner" by counsel is deficient performance that prejudices the defendant.  *Challoner*, at 749 (citing *United States v. Cook*, 45 F.3d 388, 395 (10th Cir. 1995)).  A "dead-bang winner" is "an issue which was obvious from the trial record and one which would have resulted in a reversal on appeal."  *Id.*

In this case, Barrett has not demonstrated any error under *Franks*.  Furthermore, Barrett provides no hint as to what part of the issue was or was not framed by the record, and does not explain how appellate counsel could have demonstrated error under *Franks*, given this Court's factual finding that Johnson relied in good faith on Sanders.  Certainly, the Tenth Circuit would have viewed the evidence in the light most favorable to the Government and accepted the factual findings unless they were clearly erroneous.  *See United States v. Soderstrand*, 412 F.3d 1146, 1151 (10th Cir. 2005).  Barrett has not identified any evidence that appellate counsel might have relied upon to show that this Court clearly erred in finding that Johnson acted in good faith.  As such, he cannot establish any likelihood of success on appeal, much less show that the forgone

31

issue was a "dead-bang winner."  In short, Barrett cannot demonstrate through his perfunctory argument, that appellate counsel's performance fell below an objective standard of reasonableness or prejudiced this case.  *See United States v. Challoner*, 583 F.3d at 749 ; *see also United States v. Fisher*, 38 F.3d at 1147 (holding conclusory allegations of ineffectiveness legally insufficient).

3.  Trial Counsel Had No Duty to Investigate Barrett's Alleged Diminished Capacity to Form Intent

Barrett claims that his trial attorneys provided constitutionally ineffective assistance of counsel because they failed to fully investigate and present evidence that the defendant suffered from mental illnesses that would have allegedly negated the government's showing of intent. Barrett theorizes that he would have been convicted of nothing more serious than manslaughter had his attorneys investigated and adduced the allegedly forgone evidence. (Mot. 47-58; BIS 44-52.)  Barrett has located witnesses who appear prepared to offer evidence concerning his mental state.  However, he has not shown that trial counsel was alerted, by facts reasonably known to them, to investigate this information.  Regardless of counsel's cognizance of their client's supposed mental health issues, the relevance of this information hinges on Barrett's specious theory that he could have been convicted of manslaughter, which was not a lesser included offense of any charged crime.  Counsel did not provide prejudicial ineffective assistance by omitting to investigate or present irrelevant mental health evidence.

Counsel, of course, had a duty to conduct a reasonable investigation.  *Strickland*, 466 U.S. at 691.  "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Id.* at 691.  A showing that counsel could have conducted a more

<center>32</center>

thorough investigation that might have borne fruit does not establish ineffectiveness. *See Burger v. Kemp*, 483 U.S. 776, 794 (1987). "A reasonable investigation is not . . . the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct." *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998) (citing *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995)). The duty to investigate depends upon the facts known to the attorney. *Wiggins v. Smith*, 539 U.S. 510, 527 (2003); *see Hedrick v. True*, 443 F.3d 342, 350 (4th Cir. 2006). The reasonableness of the investigation is determined by the information conveyed to counsel by his client, as well as other information in his possession, recognizing "the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Chandler v. United States*, 218 F.3d 1305, 1318 & n.22 (11th Cir. 2000) (internal quotation omitted). Where counsel did not know of facts that would alert him to the need to conduct a particular investigation, a failure to investigate does not amount to deficient performance. *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003); *see Bacon v. Lee*, 224 F.3d 470, 481 (4th Cir. 2000).

In this case, Barrett has not shown that trial counsel had any basis in fact or reason for concluding that the diagnoses proffered in the § 2255 Motion might have been available. Barrett cites a series of declarations from lay witnesses who make unschooled observations about the defendant's mental health. (Mot. 56 (citing Mot. Exs. 74, 78, 81, 86, 93, 96-99, 101, 103).) According to Barrett, his attorneys should have presented these witnesses to prove his diminished capacity. However, the declarations overwhelmingly speak to Barrett's childhood and early adulthood, without even a vague reference to his mental condition at the time of the murder. None of the declarants attempts to provide evidence that Barrett lacked the ability to form

33

specific intent at the time of the offense.  Indeed, the only eyewitness to the murder, Toby Barrett, avers that "Even though [the defendant] was scared, he was not dangerous and I was not afraid of him.  Dad did the best he could." (Mot. Ex. 96 at 2.)  Similarly, Carolyn Joseph makes a vague assertion that Barrett hallucinated, apparently under the influence of illegal drugs, but states, "I have never known Kenny to hurt anybody.  He gets emotional, but as far as hurting anybody, he is not a dangerous person." (Mot. Ex. 78 at 4.)  The declarations may describe a man who led a troubled life, and exacerbated his own difficulties with intoxicants, but they do not provide any relevant evidence about Barrett's capacity to form intent on the night he murdered David Eales.  At most, the declarations provide a basis for a finding that defense counsel should have investigated Barrett's mental health, something they unquestionably did.

Indeed, trial counsel consulted with a psychologist, Dr. Jeanne Russell, who "reprise[d] . . . the risk assessment she had done in preparation for a second stage proceeding in state court." (Mot. 48-49.)  Barrett provides no indication that Dr. Russell reported anything that might have led counsel to conclude that there might exist evidence of neurological and psychiatric impairments so profound that they could vitiate the government's evidence of intent.  Russell herself makes no such claim in the declaration she provided to Barrett.  (*See* Mot. Ex. 56.)  Russell does imply that she limited her assessment to data from Barrett's state trial.  (*See id.* at 3-4.)  Her declaration in this regard appears inaccurate, as jail visitation records demonstrate that Dr. Russell and another psychologist met with Barrett on October 12, 2005, well before the conclusion of the guilt phase trial.  Barrett provides no indication that Dr. Russell suggested, or that the defense in either of his prior state trials, involved evidence of diminished capacity.

Certainly, Barrett's current reports, while identifying symptoms of supposed mental

<div align="center">34</div>

illness, include no basis for concluding that lay counsel should reasonably have recognized the likelihood of the profound defects alleged here. For instance, Barrett's current psychiatric expert observed, "There was no evidence of perceptual disorders, hallucinations, or delusions," though he finds that the defendant was delusional at the time of the crime. (*Compare* Mot. Ex. 117 at 6 *with* Mot. Ex. 117 at 26.) Significantly, the expert recognized that Barrett attempted to hide his supposed mental health issues: "Mr. Barrett is invested in appearing to be a high functioning individual, without significant past or present impairment, and who is in control of his life." (Mot. Ex. 117 at 7.) Barrett's expert describes a defendant who would not have provided any outward appearance of mental illness that would have suggested he lacked the capacity to form intent. On the facts apparently known or reasonably knowable to trial counsel, Barrett cannot show that a failure to investigate evidence of diminished capacity was objectively unreasonable.

Ultimately fatal to his claim, Barrett cannot establish that an investigation of his mental health could have led to the production of admissible evidence, precluding him from showing deficient performance or prejudice. Evidence of mental illness is admissible to negate specific intent, but only if the "defendant clearly demonstrates how such evidence would negate intent rather than 'merely present a dangerously confusing theory of defense more akin to justification and excuse.'" *United States v. Brown*, 326 F.3d 1143, 1147 (10th Cir. 2003) (quoting *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990)). Courts carefully scrutinize such evidence to determine if it rests upon a legally acceptable theory for negating intent to avoid confusing the jury with improper justification theories. *Brown*, 326 F.3d at 1147. Significantly, the *Brown* court upheld the exclusion of mental health evidence intended to show that the defendant's could not form requisite intent because the proffer lacked a causal nexus:

35

> Brown relied on Dr. Lindberg's conclusion that Brown did not have the capacity to conform his conduct to the requirements of the law.  Specifically, Brown sought to rely upon testimony that he was unable to make "correct choices" because of his mental condition. . . . Dr. Lindberg's testimony did not address Brown's intent, or lack thereof, for conspiracy to possess with the intent to distribute and distribution of methamphetamine.  Dr. Lindberg did not opine on how Brown's post-traumatic stress disorder, coupled with chemical dependency, was either related to or tended to negate the requisite specific intent element.  Thus, Brown fails to connect his mental condition with any legally acceptable theory that he lacked specific intent.

*Id.* at 1148.

In view of *Brown*, Barrett cannot show a reasonable likelihood that his trial attorneys could have successfully obtained admission of the mental health evidence proffered in the § 2255 Motion.  Like the defendant in *Brown*, Barrett appears to have identified evidence that at the time of the crime he suffered from supposed mental health issues, including hallucinations, prefrontal lobe dysfunction, bipolar syndrome, post-traumatic stress disorder, perceptual disorders, paranoid ideation, hyperreactivity, and affective dysregulation. (*See, e.g.*, Mot. Exs. 78 at 4, 117 at 26, 27.)  But Barrett has not established the causal link between his supposed mental health issues and the mens rea required for conviction of the charged offenses.

To prove the § 848 offense that gave rise to the death penalty, the government had to establish, in pertinent part, that "Kenneth Eugene Barrett, intentionally killed . . . David Eales; . . . . [and] That the defendant, Kenneth Eugene Barrett, knew or *had reason to know* David Eales was a law enforcement officer." (Doc. 240, Inst. 15.)  As to the § 924 homicide offenses, counts 1 and 2, Barrett concedes that those offenses were "'straight' felony murder counts." (*See* Doc. 240, Inst. 7; Mot. 337.)  Thus, to establish malice aforethought for each of those crimes, the government relied on proof that Barrett committed the homicide during the perpetration of a felony.  *See United States v. Chanthadara*, 230 F.3d 1237, 1259 (10th Cir. 2000); *see also, infra*,

36

Arg. IX, 2 (discussing the Tenth Circuit's felony murder doctrine).

As such, proof of the charged offenses did not rest, in any way, on Barrett's recognition of Trooper Eales as a police officer or his understanding that his actions were wrongful. At most, the jury had to find that Barrett *had reason to know* Eales was a police officer and killed him intentionally. Barrett could not have negated the mens rea of the charged crimes with a heat-of-passion theory, as he did in state court, because voluntary manslaughter is not a lesser included offense of any count of the indictment, as fully explored, *infra*, in Argument IX. Accordingly, the putative mental health evidence was irrelevant and inadmissible under *Brown*. The failure to investigate such pointless information did not constitute ineffective assistance. *See Tompkins v. Moore*, 193 F.3d 1327, 1334 (11th Cir. 1999); *Henderson v. Norris*, 118 F.3d 1283, 1288 (8th Cir. 1997). Furthermore, no reasonable probability exists that Barrett would have received a more favorable verdict had his attorneys explored, and presented, information about his mental health. *Strickland*, 466 U.S. at 691.

4. Trial Counsel Had No Duty to Challenge Barrett's Competence

Barrett claims that his trial attorneys provided ineffective assistance of counsel in failing to investigate and challenge his competency to stand trial. (Mot. 58-61; BIS 53-59.) The observations of trial counsel demonstrate that the lawyers were never alerted to facts that would have induced a reasonable attorney to investigate or challenge Barrett's competence. Moreover, counsel's recollections demonstrate that there is no reasonable probability a challenge to Barrett's competence would have resulted in a different outcome at trial.

As noted above, the reasonableness of counsel's actions are judged with regard to the information known to the lawyer. *See Chandler*, 218 F.3d at 1318 & n.22. Counsel's ignorance

37

of facts that would have pointed to the need for investigation of some matter, explains the

absence of such an inquiry. *Alcala v. Woodford*, 334 F.3d at 893.  By extension, no finding of

ineffectiveness will lie for failing to challenge a defendant's competence, if the record does not

show that a reasonable attorney would have been on notice of a need to assess competence. *See*

*Foster v. Ward*, 182 F.3d 1177, 1186 (10th Cir. 1999); *United States v. Rivas*, 862 F. Supp. 208,

212 (N.D. Ill. 1994).

Furthermore, as more fully discussed below, the evidence available at the time of trial precludes Barrett from establishing that he was prejudiced by his attorneys' omission of a challenge to his competence.  (*See, infra*, Arg. VIII.)  Given Barrett's demeanor and ability to effectively assist his lawyers with such matters as composing examination and choosing witnesses, he cannot show that he "was unable to consult with trial counsel with a reasonable degree of rational understanding or that he lacked a rational and factual comprehension of the proceedings."  *Walker v. Gibson*, 228 F.3d 1217, 1231 (10th Cir. 2000) (internal quotes omitted), *abrogated on other grounds in Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001).  Because Barrett cannot show any reasonable likelihood that the outcome of his trial was affected

39

by his attorneys' omission of any challenge to his competence, he cannot show prejudicial ineffectiveness. *Id.*

5. Trial Counsel Adequately Investigated the Civilian Witnesses

Barrett claims that his trial attorneys provided ineffective assistance by dint of their allegedly inadequate investigation of the government's civilian witnesses. Barrett argues that, upon learning the identifies of these witnesses, his counsel should have moved for a trial continuance. Further, he contends that trial counsel should have identified and presented evidence to contradict the civilian witnesses and demonstrate they had poor reputations for truthfulness. (Mot. 61-120; BIS 59-69.) Barrett has wholly failed to show that his attorneys' conduct was unreasonable or prejudicial.

A. Absence of Continuance Motion

Barrett argues that his attorneys were ineffective for failing to move for a trial continuance after they received timely disclosure of the government's civilian witnesses. (Mot. 62-63.) In this case, Barrett was satisfied with the provision of names, and agreed to the government's method of providing the names as well as with the opportunity the government provided for the defense to interview the witnesses. Barrett's retrospective claim, that he would have fared better at trial had counsel filed more or different motions, requires evidence of resulting prejudice. *United States v. Miller*, 907 F.2d 994, 1000 (10th Cir. 1990); *United States v. Rivera*, 900 F.2d 1462, 1472-74. (10th Cir. 1990) (en banc).

Here, Barrett cannot show that his attorney could have made a meritorious continuance motion. The decision to grant a continuance is within the sound discretion of the trial court. *United States v. Pursley*, 577 F.3d 1204, 1229 (10th Cir. 2009). The denial of a continuance

constitutes error only when it materially prejudices the defense.  *Id.* at 1229 (citing *United States v. Simpson*, 152 F.3d 1241, 1251-52 (10th Cir.1998)).  In other words, a continuance is only legally necessary if its denial would prevent the development of "substantial favorable evidence."  *United States v. Rivera*, 900 F.2d at 1476.  In this case, the government's disclosure of civilian witness names was unquestionably timely.  *Barrett*, 496 F.3d at 1116-17.  The timing of the disclosures, as a legal matter, could not have given rise to a meritorious continuance motion.

Moreover, Barrett cannot show that the timing of the disclosures, as a logistical matter, prevented him from developing substantial favorable evidence.  The government's civilian witnesses were all friends and relatives of the defendant.  Barrett was necessarily familiar with the people and the incidents about which they testified.  In fact, the witnesses testified to extremely limited events or aspects of their relationships with Barrett.  During the course of the prosecution's case-in-chief, Barrett could have easily directed trial counsel to the witnesses he now claims would have contradicted or impeached the government's evidence.  (*See, infra*, Arg. II, 2, B & C.)  Given Barrett's ties to the government's witnesses, he presumably would have been able to point his attorneys to potential character witnesses, to the extent his friends and relatives had reputations for dishonesty.  (*Id.*)  In view of the investigation required of the defense, and the defendant's intimate knowledge of the things to be investigated, Barrett could not have shown at the time of a trial that a continuance was necessary for him to develop substantial favorable evidence.  Therefore, Barrett cannot show that he could have established, at the time of trial, a need for a continuance.

As explored below, Barrett fails to show that the evidence he has developed to this point is substantially favorable to the defense.  (*See, infra*, Arg. II, 5, B & C.)  Because Barrett cannot

show that the allegedly forgone evidence would have resulted in a reasonable likelihood of acquittal, he cannot show that the omission of a continuance to develop that evidence was prejudicial ineffectiveness.

### B. Character Witnesses

Barrett complains repeatedly that his attorneys were ineffective for failing to identify and present character witnesses with which to attack the reputations of several of the government's civilian witnesses.  (Mot. 69, 71 (Travis Crawford); 77-80 (Cindy Crawford); 103-04, 107 (Charles Sanders); 110 (Brandie Price).)

Counsel  was not required to "pursue every path until it [bore] fruit or until all available hope whither[ed]." *Mills v. Singletary*, 63 F.3d 999, 1021 (11th Cir. 1995) (quoting *Foster v. Dugger*, 823 F.2d 402, 405 (11th Cir. 1987)) (internal quotes omitted); *see United States v. Carr*, 80 F.3d 413, 418 (10th Cir. 1996).   Failure to present evidence demonstrating witnesses' reputation for dishonesty does not constitute ineffectiveness if the attorney tried to impeach the witness by other means, and the forgone reputation witnesses would presumably have a bias for the defendant.  *See Kubat v. Thieret*, 867 F.2d 351, 364 (7th Cir. 1989).

Furthermore, the omission of the character witnesses identified by Barrett could not have caused a reasonable likelihood of prejudice to the defense.  The defense elicited concessions

from each of the witnesses that were potentially very damaging to their credibility. The witnesses had extensive criminal records or long-time involvement with drugs. (*See, e.g.*, Tr. 3: 456-57 (T. Crawford's drug use), 467-68 (T. Crawford's prior arrest, false testimony on direct exam, and drug-dulled memory), 472 (impact of drugs on T. Crawford's perception and recollection); 11: 2524-34 (Sanders's extensive criminal record), 12: 2581-82, 2586-87 (Sanders's drug use in spite of informant and probation status); 13: 3070-75 (C. Crawford's substance abuse and its deleterious impact on her memory and perception); 15: 3498-3502 (Price's extensive criminal record and prison sentence for crimes of moral turpitude), 3504, 3507 (Price's bad memory).)

The character flaws and questionable memories of the civilian witnesses was more than apparent from the cross-examination, requiring no further explication through putative character witnesses, virtually all of whom had a connection to the defendant that would have established their own biases. (*See* Mot. Exs. 77 (declaration of Barrett's second cousin, B. Hill, as to C. Crawford's character), 95 (declaration of Barrett's cousin's spouse, S. Hill, as to Price and C. Crawford's character),78 (declaration of Barrett's aunt, C. Joseph, as to T. Crawford's character), 90 (declaration of Barrett's friend and drug associate, P. Lunsford as to Sanders's character), 92 (declaration of Barrett's uncle, R. Crawford as to C. Crawford's character).) One remaining putative witness to Cindy Crawford's character, Mike Mackey, was engaged in litigation with Ms. Crawford and therefore would have had his own personal interest in coloring his testimony. (*See* Mot. Ex. 176.) Given the questionable credibility of the putative character witnesses, counsel would have acted quite reasonably to reject them.

In any event, character testimony would not have carried the day for the defense, because

43

the government's case did not rely on the individual credibility of its civilian witnesses. The jury likely credited the civilian witnesses' accounts of Barrett's drug use and hostility toward the police because the witnesses had no apparent opportunity to harmonize their observations of similar events occurring at different points in time. For instance, three of the civilian witnesses testified to Barrett's involvement in using and distributing drugs.[5] (Tr. 3: 366, 374-75, 8: 1838, 13: 3087.) Five of the government's witnesses offered cross-reenforcing testimony about Barrett's hostility to the police and willingness to resist them with force. (Tr. 3: 400-01, 466, 11: 2514-15, 13: 3068-69, 15: 3491-93.)

Beyond the cross-corroboration of the witnesses, Barrett's own conduct lent a high degree of plausibility to reports that he had made fatalistic and anti-authority statements: he had a home filled with property that demonstrated he was making, using and selling methamphetamine (*see, e.g.,* Tr. 10: 2131-32, 12: 2675, 2690-95, 2740-42, 2792-93, 2803-2807, 2817-18, 13: 2967-70, 2958-62, 3012-13, 3040-45), he failed to appear for a court hearing resulting in the issuance of an arrest warrant (Tr. 3: 323), he had a hostile relationship with the county sheriff (Tr. 8: 1809), he locked the gate to his isolated land (Tr. 3: 518), he kept dangerous dogs (Tr. 3: 517), he posted a threatening sign (Tr. 3: 399), and he kept an arsenal of weapons that he sometimes fired to the annoyance of his neighbors (*see* Tr. 8: 1812, 9: 1894-1901), he persisted in his attempt to attack the police with a firearm even as they attempted to handcuff him (Tr. 5: 1112-13). Counsel could

---

[5]Some of the putative character witnesses would have corroborated Barrett's heavy involvement in illegal drugs, lending strength to the government's theory that the defendant was manufacturing and selling methamphetamine. (*See* Mot. Ex. 90 at 2 (noting that the declarant spent 33 continuous hours with Barrett under the influence of drugs, curing which time Mot. Ex. 77 declarant Brandy Hill was present and apparently using drugs), 78 at 4 (noting declarant's assertions that she asked the police place Barrett in drug treatment).)

not brush aside these facts, which so clearly suggested that Barrett was a person who would indicate a willingness to die in a fight with the police. Barrett's conduct lent significant believability to the government's witnesses.

Of course, to the extent that Barrett claims that the so called "character" witnesses could have testified to specific acts of misconduct by the government's witnesses, including drug use and acts of dishonesty, such collateral evidence was inadmissible. *See* Fed. R. Evid. 608(b); *Palmer v. City of Monticello*, 31 F.3d 1499, 1507 n. 11. (10th Cir.1994) ("'Like the general rule barring the use of extrinsic evidence to impeach a witness on a collateral matter through contradiction, the purpose of Rule 608(b)'s prohibition of extrinsic evidence is to avoid holding mini-trials on irrelevant or collateral matters'"). Trial counsel was not ineffective for omitting to proffer inadmissible evidence. *Henderson v. Norris*, 118 F.3d at 1288 (holding defense counsel are not ineffective in failing to elicit inadmissible evidence); *see Parker v. Scott*, 394 F.3d 1302, 1326 (10th Cir. 2005).

In sum, on this record, no reasonable likelihood exists that Barrett would have received a more favorable verdict had his attorneys presented evidence that the government's witnesses had poor reputations for honesty, as other means of impeachment apparently failed in the face of a strong prosecution case. The decision to forgo unhelpful evidence was not prejudicial ineffectiveness.

C. Individual Impeachment of Witnesses

Apart from the alleged failure to adduce evidence of the civilian witnesses' poor reputation for truthfulness, Barrett also complains that his attorneys were ineffective for failing to adduce specific evidence to contradict or impeach them. As previously discussed, the individual

45

credibility of the witnesses was not critical to the persuasiveness of the government's case; rather, the corroboration provided by the witnesses and other evidence, as a whole, lent believability to the prosecution case. (*See, infra*, Arg. II, 5, B.) Putting that aside, Barrett has not shown that the evidence he has identified was reasonably known to counsel or helpful to the defense, especially given that the civilian witnesses were likely believed because they corroborated one another and offered testimony consistent with Barrett's other known conduct.

### i. Travis Crawford

Barrett complains that his trial attorneys were ineffective in confronting the testimony of Travis Crawford. Specifically, Barrett argues that his attorneys should have elicited from Crawford the fact that he had acted as an informant in the past. Further, Barrett claims that counsel should have called Rick Lunsford, Brandy Hill, Toby Barrett and Robert Thompson to contradict Crawford's account of his conversation with the defendant. (Mot. 64-72.)

Crawford is Barrett's cousin and testified that on the evening of September 23, 1999, he observed a white SUV traveling west on the county road immediately south of Barrett's house. (Tr. 3: 463-64.) Crawford went to speak to Barrett. (Tr. 3: 465-66.) Barrett opined that the Bronco might contain police, and Crawford agreed. Barrett stated that they might return, prompting Crawford's further agreement. One of the pair mentioned Barrett's outstanding warrant, and Barrett stated, "Don't give a fuck," and that if they came back, "all hell would break loose." (Tr. 3: 466). Defense counsel elicited Crawford's admissions that the witness had passed bad checks, that he was $11,000 in arrears on his child support payments, that he used methamphetamine for 15 years, and that he had suffered from a failing memory and distorted perceptions as a result of drug use. (Tr. 3: 467-68, 471-72.) In fact, counsel elicited Crawford's

concession that he had misidentified the make and model of the vehicle he saw on the road. (Tr. 3: 472.)

Barrett has failed to show that his attorneys acted ineffectively for failing to discover and present any supposed impeachment evidence, because he has not shown that the lawyers had reason to know of it. Indeed, Barrett elsewhere complains that the government failed to apprise the defense of Crawford's prior cooperation with another law enforcement agency.[6] (*See* Mot. 278-83.) Likewise, Barrett gives no indication that he ever told his attorneys about any witnesses to his conversation with Crawford. Counsel were not ineffective in their presentation of evidence to the extent they were not provided with the information necessary to investigate and identify it. *Alcala v. Woodford*, 334 F.3d at 893.

Barrett also fails to show how the absence of the identified evidence actually prejudiced him. The failure to adduce evidence that Crawford had cooperated with unrelated law enforcement officials, at some prior point in time, concerning unrelated drug transactions provides no basis in reason for questioning his credibility in this case.

As to the eyewitnesses to Barrett's conversation with Crawford, they were unlikely to have meaningfully assisted the defense. Rick Lunsford apparently would have testified he had spent the 33 hours preceding the conversation with Barrett using methamphetamine. (Mot. Ex. 90 at 2.) Furthermore, he would have testified that he and that everyone present (apparently including the defendant's son) was in possession of drugs. (*Id.*) In fact, he states that Brandy Hill left the property after the police drove by because she possessed drugs. (*See id.*) For all the

---

[6]As discussed below, Barrett has failed to show that the government, itself, had reason to know of Crawford's prior informant activity. (*See, infra,* Arg. V, 1, C, ii.)

47

94

damage such testimony would have likely done, it does not appear that Lunsford would have provided much assistance.  He, like Hill, could have testified that Barrett never told Crawford that he was "going down in a blaze of glory," but they do not appear to otherwise contradict Crawford's account of the conversation.  (*See id*. at 3; Mot. ex. 77 at 1-2.)  Hill avers that Crawford and Barrett did not discuss killing the police or "going down in a blaze of glory" (Mot. Ex. 77 at 2), but she does not specifically mention Barrett's elliptical remarks about not caring whether the Bronco held police officers or about "all hell breaking loose," if they returned. Whatever minimal assistance Hill and Lunsford might have provided, counsel had an obvious tactical reason for avoiding witnesses who would have testified to the defendant's drug activity, in a case where the government premised jurisdiction on precisely that issue.

Unlike Hill and Lunsford, Toby Barrett has not indicated that Crawford's testimony was false.  (*See* Mot. Ex. 96.)  Likewise, Toby Barrett's friend, Robert Thompson, concedes that he does not even know Travis Crawford.  In fact, Thompson could not have observed Crawford's critical conversation with Barrett, which occurred after Tact Team members drove past the defendant's property.  Thompson left Barrett's home around 3:00 or 3:30 p.m. (Mot. Ex. 37 at 2), but the Tact Team vehicle did not drive by Barrett's property until 5:30 p.m.  (Tr. 3: 516.) Thompson's recollection of the remainder of his visit to the defendant's house was irrelevant and inadmissible as to Crawford's credibility.

Barrett fares no better with his complaints that his attorneys were ineffective for failing to call potential character witnesses.  As explored above, Barrett fails to show that his attorneys had a duty to call such witnesses, much less that those identified in the § 2255 Motion could have created a reasonable likelihood of acquittal.  (*See, supra,* Arg. II, 5, B.)  Accordingly, counsel did

<div align="center">48</div>

not act unreasonably or prejudicially in omitting such evidence.

Trial counsel's omission of the body of information identified here in no way constituted prejudicial ineffective assistance. Barrett has not shown that they had reason to know of the evidence or valid reasons not to forgo it upon discovery. Most significantly, he cannot demonstrate a reasonable probability that he would have been acquitted had his attorneys attempted to adduce the putative impeachment of Travis Crawford. *See Boyle v. McKune*, 544 F.3d 1132, 1138 (10th Cir. 2008); *Henderson v. Norris*, 118 F.3d at 1288. Thus, his claim of ineffective assistance should fail.

### ii. Cindy Crawford

Though the jury apparently rejected Cindy Crawford's penalty phase testimony, and she endured a substantial credibility attack during both trial phases, Barrett complains that his attorneys were ineffective for failing to adequately confront her. Specifically, he claims his attorneys should have cross-examined Crawford regarding her mental health, her supposed motivations to please the prosecution, and several acts of misconduct. He also claims his attorneys should have adduced evidence of Crawford's poor reputation for truthfulness. Finally, Barrett claims his attorneys should have called Richard Barrett to contradict the assertion that the defendant assaulted Crawford with a shotgun. (Mot. 72-81.) Despite the number of his contentions regarding Crawford, Barrett does not show that his attorneys were prejudicially ineffective in responding to her testimony.

During the guilt phase, Cindy Crawford testified that she was a former user of marijuana, methamphetamine and alcohol with a criminal conviction for marijuana possession. (Tr. 13: 3061.) She reported that she had received drugs while at Barrett's home, but could not recall

49

from whom.  (Tr. 13: 3063.)  She identified Barrett's AR-15 and stated that he usually kept it in a gun case or by his desk.  (Tr. 13: 3065-66.)  Finally, she stated that around the time of the murder Barrett kept "protection" because he knew the police might come to his house and that he said he intended to "go out in a blaze of glory."  (Tr. 13: 3068-69.)

On cross-examination, Crawford admitted she had used methamphetamine for nine years and was heavily involved with the drug at the time of the murder.  (Tr. 13: 3070-71.)  She specifically stated that Barrett had not provided her with drugs.  (Tr. 13: 3072.)  But she admitted that as a result of her drug use she lost her sense of time, that events were "pretty much a blur" because some things she could "remember clearly" and others she could not."  As she elaborated, the drug took "a toll on [her] mind.  It plays tricks on your mind."  (Tr. 13: 3073.)

During the penalty phase, Crawford testified that around two weeks before the murder she visited Barrett's home and he made sexual overtures to her, which she rebuffed.  (Tr. 22: 4576-77.)  Reversing herself from her guilt phase testimony, Crawford stated that on this occasion she received drugs from the defendant.  (Tr. 22: 4577.)  Crawford said she left the house, under a ruse, in a car driven by Barrett's brother.  Before the car pulled away, Barrett opened the vehicle's door, pointed a shotgun at Crawford's leg and told her never to return.  (Tr. 22: 4578.)  During cross-examination, Crawford was confronted with the contradiction between her guilt and penalty phase testimonies and stated, by way of explanation, that she had post-traumatic stress disorder.  (Tr. 22: 4580-81.)  Crawford then denied that she had falsely accused several people of wrong doing.  (Tr. 22: 4582-83.)  But she admitted that she never made a police report concerning Barrett's confrontation of her.  (Tr. 22: 4585.)

Ultimately, the jury appears to have refused to rely on Crawford's penalty phase

50

testimony. The jury demonstrated its lack of reliance on Crawford by rejecting the future dangerousness aggravator allegation, which was premised on Barrett's other acts of threatened and real violence, including his armed assault on the witness. (Trl. Doc. 257 at 13-17.) Crawford did not testify about any other aspect of Barrett's life during the penalty phase.

Given that the jury appears to have rejected Crawford's penalty phase testimony about the shotgun assault, there is no reasonable probability that Barrett would have received a more favorable verdict had his attorneys made more efforts to impeach her during the second stage of trial. *United States v. Kennedy*, 225 F.3d at 1197 (noting a claim of ineffectiveness "may be resolved on either performance or prejudice grounds alone"). Despite the patent effectiveness of trial counsel's penalty phase strategy, Barrett nonetheless faults the attorneys for failing to call his brother, Richard Barrett, to contradict Crawford as to the incident in which the defendant threatened the witness with a rifle. But Richard Barrett was a twice-convicted felon with an obvious bias based on his relationship to the defendant. (Resp. Ex 7.) At the time of trial, Richard Barrett had a 1999 conviction for burglary and two counts of assault with a dangerous weapon, and a 2001 conviction for possession of a controlled substance, possession/furnishing a precursor substance, and using an offensive weapon in a felony. (Resp. Ex. 7.) Counsel did not act unreasonably or prejudicially in failing to call such an easily impeached witness. *See United States v. Harden*, 846 F.2d 1229, 1232 (8th Cir. 1988).

Barrett's complaints about counsel's response to Cindy Crawford's guilt phase testimony are no more meritorious. As to the absence of mental health evidence concerning Crawford, Barrett fails to identify facts that would have alerted his attorneys to that issue before the witness revealed in the penalty phase that she had a diagnosed mental condition. Thus, he fails to show

51

that they acted ineffectively as a matter of law. *See Alcala v. Woodford*, 334 F.3d at 893.

Moreover, Barrett fails to show how additional evidence of alleged mental illness would have

been anything other than cumulative to the other impeachment, given that Crawford conceded

that drug use degraded her memory and impacted her perception of events (Tr. 13: 3070-74).

*See, e.g., Hall v. Luebbers*, 296 F.3d 685, 694 (8th Cir. 2002).

Barrett's complaint that his attorneys should have confronted Crawford with evidence

that she had received favorable treatment in her state case, and therefore might feel beholden to

the government, lacks any substance. Barrett simply speculates as to Crawford's motivations and

produces no evidence that she was promised any benefit from the federal government in

exchange for her testimony. In fact, Barrett fails to explain what information should have alerted

counsel to the assertion that Crawford had previously provided assistance to another law

enforcement agency. *Alcala v. Woodford*, 334 F.3d at 893. Likewise, Barrett cannot succeed in

contending that Crawford should have been asked if she knew her misdemeanor marijuana case

could have been filed as a felony as there is no nexus between that issue and her testimony in this

case. Indeed, Crawford did not testify that her conviction was a misdemeanor: she merely stated

that she had received a deferred sentence for a marijuana charge. (Tr. 13: 3061.)

Barrett also cannot succeed in complaining that his attorneys were ineffective for failing

to call potential character witnesses Roger Crawford, Mike Mackey, Brandy Hill, Sean Hill,

Carolyn Joseph, and Gwendolyn Crawford or to confront the Crawford with prior bad acts.

Barrett fails to show what information would have led counsel to any of the witnesses except for

Mackey. As previously discussed, Barrett does not overcome the strategic reason for omitting

such witnesses and does not show that such evidence would have led to a reasonable likelihood

52

of acquittal. (*See, supra,* Arg. II, 5, B.)  Thus, he has not demonstrated that counsel acted unreasonably or prejudicially in omitting the evidence.

Finally, Barrett complains that his attorney should have adduced the testimony of several associates of the defendant.  Barrett claims these putative witnesses would have testified that they never heard him make threats directed at the police, supposedly contradicting Cindy Crawford's testimony.  (*See* Mot. 80-81 (citing Mot. Exs. 37, 38, 77, 90, 96).)  However, none of those supposed witnesses actually impeach Crawford.  At most, they observe that they never heard Barrett utter a statement like that attributed to him by Crawford and conjecture that he would not make threats about the police.  The assertions that Barrett would not make such a statement are inadmissible speculation, and the declarants offer nothing to factually contradict Cindy Crawford's account of her interaction with Barrett.  *See United States v. Isaac-Sigala*, 448 F.3d 1206, 1210 (10th Cir. 2006) ("[A] jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility.") (internal quotations and alterations omitted).  Barrett simply cannot establish a reasonable probability that he would have been acquitted had his attorneys presented irrelevant and inadmissible information about the likelihood he made a reported statement.  *See Boyle v. McKune*, 544 F.3d at 1138; *Henderson v. Norris*, 118 F.3d at 1288.

### iii.  Charles Sanders

Trial counsel elicited evidence of Sanders's lengthy criminal record, his history of assistance to law enforcement, and the favorable treatment he had received from prosecutors in the past.  Barrett, however, claims his attorneys were ineffective for failing to adduce still more

evidence of the witness's misconduct and prior relationship with law enforcement.   As previously noted, he also argues that counsel should have presented character witnesses to attack Sander's reputation for honesty and percipient witnesses to contradict his recollections.  (Mot. 81-108.)  The absence of cumulative evidence of Sanders's criminal history was entirely beside the point: if the admission that the witness had sustained 10 felony convictions did not give the jury cause to disregard Sanders's testimony, the elicitation of his misdemeanor convictions or a recitation of the 18 counts underlying the 10 felony judgments would not have carried the day. Similarly, the failure to present the testimony of the biased character witnesses identified by Barrett did not prejudice the defense, nor did the omission of testimony from percipient witnesses who would have provided more assistance to the prosecution than to Barrett.

<center>(A) <u>Prior Criminal Activity and Character</u></center>

Charles Sanders, the confidential informant described in the state search warrant affidavit, testified that Barrett often had methamphetamine at his residence and that he had observed Barrett sell methamphetamine from his residence.  (Tr. 11: 2511, 2515, 2520-22, 12: 2631-33.) Sanders further testified that Barrett knew of the warrant for his arrest, kept firearms, and had threatened to kill law enforcement officers if they attempted to serve the warrant.  According to Sanders, Barrett said that he hoped the first people through his door were either Sheriff Philpot or Drug Task Force Agent Frank Lloyd.  (Tr. 11: 2515).  On cross-examination, defense counsel elicited Sanders's 10 criminal convictions and the favorable treatment he had received from prosecutors.  (Tr.  11: 2524-34.)  Counsel then elicited Sanders's concession that he had informed on approximately a half dozen people and had received assistance from Clint Johnson. (Tr.11: 2534-37.)  Counsel adduced the fact that Sanders was using drugs during his association

<center>54</center>

with Clint Johnson. (Tr. 12: 2582.)

During the cross-examination, the trial court held an extended hearing outside the presence of the jury regarding the propriety of questions aimed at uncovering the targets of Sanders's informant activity. During that hearing, the Court agreed that there was no relevance to the identity of targets uninvolved with this case. (Tr. 11: 2549.)

To the extent that Sanders received lenient treatment in other cases, Barrett simply speculates that the judgments reflected consideration for the witness's cooperation. The omission of any examination about those sentences could not have amounted to unreasonable or prejudicial representation, given the lack of basis for believing they represented evidence of some benefit from law enforcement. Indeed, when counsel attempted to draw such a blind inference from the cold record of Sanders's criminal history, he met with great resistance:

> Q. But Clint Johnson was aware that you had in 1998 that you had possession of CDS, that you were charged in 1998 with possession of CDS. You didn't get convicted on that charge until August of 2001?
> A. That's right.
> Q. And so, during this period of time, Clint Johnson was aware that you had this charge hanging over your head, wasn't he?
> A. Clint Johnson couldn't do nothing about that.
> Q. Except make recommendations to the DA?
> A. I don't know if he could do that either.
> Q. But you weren't sentenced until after – (Interrupted)
> A. I hired an attorney to fight them cases for me. It wasn't like Clint Johnson sat there and represented me during them cases.
> Q. Well, I mean, you had 98 -- CF 98-346, CF 98-363, and CF 99-562. Those three cases, which are possession of CDS, uttering forged instruments and knowingly concealing stolen property, so on one hand you're out here doing your deal, doing whatever criminal acts you're doing, but on the other hand, you're helping Clint Johnson, aren't you?
> A. Well, no.
> Q. You aren't?
> A. That's wrong again. No. Them charges happened just because they happened. It was -- the forgery charges is on my girlfriend. The fraud charge was on my girlfriend. It wasn't like I was just committing crimes so I can see how

<div align="center">55</div>

much trouble Clint Johnson could get me out of.

Q, He sure got you out a lot of it, didn't he?

A. No, sir, he didn't.

(Tr. 11: 2535-37.)  Barrett fails to show what effort his counsel spared to elicit further concessions by Sanders.

Putting aside counsel's attempts to impeach Sanders as a long time informant, the extent to which the witness may have provided assistance to the police in exchange for consideration in other matters was a largely secondary point.  The pertinent question was what benefit he might stand to gain from his cooperation in this case.  And Sanders's direct testimony provided no doubt that the government stood poised to intervene in his existing case if satisfied by his cooperation.  (*See* Tr. 11: 2494.)  Thus, the most salient basis of potential impeachment was before the jury.  Not only did the defense enjoy a substantial record upon which to attack Sanders's credibility, counsel did so during argument.  During the guilt phase summation, counsel noted that Sanders was committing crimes while providing information to Clint Johnson: "Kind of gives you a pretty smooth cover for whatever it is that you want to do, doesn't it?"  (Tr. 20: 4345.)  Counsel also noted that Sanders had trifled over the question of whether he had 10 or 11 convictions, and further observed that the witness expected to serve only 18 months on a 20-year sentence.  (*Id.*)  The omission of any cumulative impeachment evidence was not a prejudicial breach of counsel's duties under the Sixth Amendment.

Still, Barrett goes on to complain that his attorneys failed to adduce several specific instances of Sanders's criminal misconduct as impeachment evidence at the penalty phase trial.  Sanders, like Cindy Crawford, provided very brief penalty phase testimony that went to the sole issue of future dangerousness.  (*See* Tr. 22: 4596-87.)  As noted with regard to Ms. Crawford,

that non-statutory aggravator was rejected by the jury (Trl. Doc. 257 at 13-17), obviating any argument that omissions by defense counsel in any way prejudiced Barrett. Because the jury appears to have rejected Sanders's penalty phase testimony, there is no reasonable probability that Barrett would have received a more favorable verdict had his attorneys made further efforts to impeach him. *United States v. Kennedy*, 225 F.3d at 1197.

As to the omission of character witnesses to attack Sanders's reputation for credibility in the community, Barrett has failed to show that counsel's strategies for attacking the witness were insufficient. As fully explored above, Barrett has not shown that the omission of character testimony adduced from the defendant's friends and relatives was unreasonable or prejudicial. (*See, supra*, Arg. II, 5, B.)

(B)  Contradictory Witnesses

Barrett also complains that his attorneys did not contact Rick Lunsford, Brandy Hill, Janesse Thomas, and Robert Thompson to contradict Sanders's testimony that he visited the defendant's home on the day of the murder. As was true with regard to Travis Crawford, Barrett again gives no indication that he informed his attorneys about the existence of any witnesses to his encounter with Sanders, thereby excusing any failure to discover such potential evidence. In any event, Lunsford, Hill and Thompson were at Barrett's home the day before the murder, but Sanders was not nearly so specific as to the last time he bought drugs from the defendant. (*See, e.g.*, Tr. 11: 2519 ("a week, three, four days maybe"),12: 2631 (stating he went to the house three or four days before the shooting).) Furthermore, counsel had a valid tactical reason for avoiding Lunsford and Hill, who could have testified to significant drug activity at Barrett's home on the day of the murder. (*See* Mot. Ex. 90 at 2; *supra*, Arg. II, 5, C, I.)

57

Similarly, Barrett now contends that another witness, Janesse Thomas, was available to contradict Sanders's account of his visit to the defendant's home on the day of the murder. In this instance, Sanders himself testified that he went to Barrett's home in Thomas's company, presumably placing them on notice about her existence. But Thomas would have been toxic to the defense, as she would have testified that she personally obtained methamphetamine from Barrett on several occasions. (*See* Resp. Ex. 3.) While she would have contradicted Sanders's assertion that she accompanied him to Barrett's house to purchase drugs in September 1999, she would have testified that she saw the witness there on other occasions, apparently buying drugs from the defendant. (*See id.*) Whatever benefit Thomas's contradiction of Sanders might have provided, the overall impact of her testimony would have served to corroborate the witnesses who testified that the defendant sold drugs. Moreover, given the use of drugs by Sanders and Thomas, Sanders's error concerning these non-critical facts could have been plausibly explained by confusion rather than purposeful falsity.

As to all of these witnesses, Barrett has failed to show that counsel acted unreasonably or that a reasonable likelihood exists that the jury would have returned a different verdict had they been called. *See Boyle v. McKune*, 544 F.3d at 1138; *Henderson v. Norris*, 118 F.3d at 1288.

iv. Randy Weaver

Barrett also fails to demonstrate ineffective assistance of counsel based on his attorneys' response to Randy Weaver. Weaver testified that Barrett had sold him drugs and that the defendant was aware of his outstanding arrest warrant. However, Weaver never testified that the defendant had expressed any desire to act violently toward the police or anyone else. (Tr. 8: 1834-40.) Barrett now claims that his attorneys were ineffective for failing to adduce from

58

Weaver the fact that Barrett had never made a "blaze of glory" comment to him or otherwise threatened the police in his presence. (Mot. 108-09 (citing Mot. Exs. 24).)

Counsel acted reasonably in omitting this line of questioning. The defense effectively neutralized Weaver by eliciting his testimony that he had only visited Barrett's home on three or four occasions and never after May 1999. (*See* Tr. 8: 1841, 1844.) Given the minimal contact between Barrett and Weaver, the witness's failure to recollect a violent or threatening statement by the defendant would have had almost no probity. Instead, the defense elicited Weaver's testimony, which was illustrative of Barrett's sociability and peacefulness. Under questioning by the defense, Weaver testified that he always found the defendant's gate open and was never threatened when entering the property. (Tr. 8: 1845.) Defense counsel's strategy was reasonable and effective.

The alleged failure to elicit from Weaver an assertion that he never heard the defendant make a threatening statement about the police, when it appears they never discussed the subject in their very short relationship, was not unreasonable or prejudicial. *See Mills v. Singletary*, 63 F.3d at 1021.

### v. Brandie Price

Barrett fails to demonstrate that trial counsel provided ineffective assistance of counsel in their response to Brandie Price. (Mot. 109-11.) Price, who admitted to nine felony convictions, testified that she had visited Barrett's house on four to six occasions. (Tr. 15: 3486-88.) On most of her trips to Barrett's home, she went through the open gate, but once had to go through the ditch to the east of his house when the gate was locked. (Tr. 15: 3489-90.) Price was at Barrett's home seven to ten days before the murder and heard the defendant state that the police

59

had a warrant for him and that if they came, "we would grab a gun and hit the floor." (Tr. 15: 3491-92.) Barrett said he would "take as many of them bastards with him as he could." (Tr. 15: 3493.)

On cross-examination, Price stated that she had traveled through the ditch to the east of Barrett's house with Ronnie Baldwin, who drove a Mazda very slowly through the area. (Tr. 15: 3504, 3506.) During the defense case in chief, counsel presented Baldwin, a felon with multiple convictions, who had no specific recollection of going to Barrett's house with Price. (Tr. 18: 4117, 4124-26.) Baldwin flatly denied ever driving through the ditch to the east of Barrett's house and said he was incarcerated seven to ten days before the murder. (Tr. 18: 4119, 4129-30.) Baldwin did admit to using methamphetamine with Barrett. (Tr. 18: 4135-36.)

Though counsel effectively contradicted much of Price's testimony, Barrett complains that they did not do enough because they did not present Shawn and Brandy Hill to testify that a car like the one described by Blair could not have traversed the ditch no matter how slowly it went. Barrett fails to show what information would have alerted his attorneys to the Hills, or why his counsel would not have reasonably rejected the putative testimony of an incarcerated felon like Shawn Hill. (*See* Resp. Ex. 8.) He also fails to show why counsel would have considered such testimony necessary after presenting a witness who denied going through the ditch in the first instance. The failure to adduce the ancillary testimony of the Hills was entirely reasonable, as counsel had no duty to exhaust every possible avenue of attack. *See Mills v. Singletary*, 63 F.3d at 1021. Regardless, given the substantial attacks the defense made upon Blair, no reasonable likelihood exists that Barrett would have received a more favorable verdict if counsel had called the Hills.

vi. <u>Karen Real</u>

Barrett also fails to show that his attorney's ineffectively attempted to impeach Karen Real. Real, was serving a 14-year sentence for conspiracy to manufacture, maintaining a house and a gun charge. (Tr. 13: 3079-80.) She was the ex-wife of Barrett's cousin. After her marriage ended, she occasionally visited Barrett's house over a two year period, ending nine to 10 months before the murder. During her visits, she consumed methamphetamine supplied by Barrett. She also saw him sell drugs to other people. (Tr. 13: 3081-83, 3087, 3091, 14: 3102, 3110-11.) Real frequently observed Barrett carrying a handgun in his waistband, and reaching for his rifle when people approached his property. (Tr. 13: 3086, 14: 3106.) During her acquaintance with Barrett, Real heard him consistently making hostile statements about law enforcement. (Tr. 13: 3089-90, 14: 3106.) Despite the fact that the government elicited Real's federal felony conviction at the outset of her testimony, a subject the defense returned to, Barrett argues that his attorneys were ineffective for failing to inquire of the witness whether she had cooperated with the government and provided information against her codefendants in exchange for leniency. (Mot. 123-24.) Barrett's speculative argument has no merit.

Barrett has not shown that the putative evidence about Real's conduct in her own case has even a grain of substance, nor does he show that it would have had any impeachment value. Barrett fails to provide any evidence that Real actually did cooperate with the government against her codefendants, instead relying on the baseless declaration of someone named Sean Hill, who is not employed by the Department of Justice. Mr. Hill is, as previously noted, a repeatedly convicted felon, whose inadmissable testimony defense counsel would have reasonably forgone. (*See* Resp. Ex. 8.) Indeed, he was incarcerated by the State of Oklahoma at the time of Barrett's

trial.  (*See id.*)  Certainly, no reasonable probability exists that his presence on the witness stand, concerning matters outside his knowledge, would have led to a more favorable verdict. Furthermore, given the fact that Real admitted that she stood to benefit from her testimony in the present case, no reasonable probability exists that Barrett would have received an acquittal had the defense presented less-than-credible evidence that she had cooperated in an earlier one.  *See Boyle v. McKune*, 544 F.3d at 1138;  *Mills v. Singletary*, 63 F.3d at 1021.

Likewise, as explored above, Barrett's complaints that his attorneys omitted evidence about Real's reputation for honesty is without merit.  (*See, supra*, Arg. II, 5, B.)

Barrett also raises an untimely and meritless contention regarding his attorneys' omission of evidence about state prosecutions that had been dismissed prior to this trial.  He claims that evidence of the dismissed cases could have formed the basis of a tenuous argument about bias, premised on the factually-deficient notion that the cases could have been reinstituted by state or federal prosecutors.  Barrett theorizes that Real had a motive to testify favorably for the government because she would have been concerned that the State of Oklahoma could have revived her dismissed cases if she displeased the federal prosecutor.  Barrett argues his analysis is unaffected by the possibility that the state cases may have been dismissed in light of Real's federal prison sentence, as the doctrine of dual sovereignty would have permitted the State of Oklahoma to separately punish the witness.

Barrett is wrong – the State of Oklahoma bars double punishment as a statutory matter, and there is no showing here that Real's federal prison sentence would not have precluded further punishment in state court.  21 Okl. St. Ann. § 11; *cf. Hale v. State*, 750 P.2d 130, 139 (Okla. Crim. App. 1988) (noting propriety of punishment for state crimes defined differently than those

at issue in a prior federal prosecution).  More fundamentally, Barrett has not and cannot show that the federal government had any authority to order a local prosecution, a necessary premise to demonstrating the relevance of the dismissed state cases.  *See United States v. Henderson*, 584 F. Supp. 1037, 1038 (W.D. Pa. 1984) (noting independence of local and federal prosecutors). Moreover, the federal government could not have prosecuted the offenses itself, because they were all alleged to have occurred before or during 1999 (*see* Mot. 112-14), well outside the five-year statute of limitations applicable to non-capital offenses.  18 U.S.C. § 3282.

The omission of irrelevant and inadmissible evidence concerning dismissed state cases, about which Barrett has shown no viable chance of revival in any court, did not constitute ineffective assistance of counsel.  *See Mills v. Singletary*, 63 F.3d at 1021.

### vii.  Randy Turman

As he does with in regard to the other civilian witnesses, Barrett fails in his claim that trial counsel ineffectively failed to impeach Randy Turman.  (Mot. 115-20.)  Turman testified that Barrett intended to kill the police if they entered his property. (Tr. 3: 400-01, 412-15.)  On cross-examination, Turman conceded that had been arrested but said that the case had ended.  (Tr. 3: 435.)  Barrett's counsel clearly knew that Turman's case remained active and asked the witness about the case records, "I've got them right here.  I've looked at them.  You want to look at them?"  But Turman stated he probably could not understand the records, leading counsel to assert, "It's not over with."  (Tr. 3: 435-36.)  Barrett claims counsel was ineffective for failing to demonstrate the falsity of Turman's testimony and the fact that he would supposedly benefit from his cooperation with the government through the dismissal of the state charges.  (Mot. 124-27.) Barrett is wrong.

<center>63</center>

Counsel was foreclosed from proving by extrinsic evidence what Turman would not admit – the collateral question of the witness's case status. *See* Fed. R. Evid. 608(b); *Palmer*, 31 F.3d at 1507 n.11.  As to the allegation that counsel should have adduced evidence that Turman had entered a cooperation agreement with the government, the underlying allegation has no substance.  Barrett has not shown that Turman had any agreement with the government regarding the dismissal of charges.  Counsel had no obligation to elicit what was not true and did not perform ineffectively by failing to do the impossible.  Further, as previously noted, Barrett also cannot succeed in his complaints that his attorneys were ineffective for failing to call putative character witnesses to attack Turman's credibility.  (*See, supra,* Arg. II, 5, B.)

Reprising an argument he made with regard to Cindy Crawford, Barrett complains that his attorneys should have adduced evidence that some of his friends never heard him make threats directed at the police.  According to Barrett, this information would have impeached Turman's recollection of such a remark.  (*See* Mot. 119 (citing Mot. Exs. 37, 77, 90, 96).)  However, none of Barrett's friends mention, much less contradict, Turman.  They do observe that they never heard Barrett utter a statement like those attributed to him by Turman and speculate that he would not make threats about peace officers.  Speculation of that stripe is inadmissible, and the declarants offer nothing to actually impeach Turman's testimony.  Barrett simply cannot establish a reasonable probability that he would have been acquitted had his attorneys presented the inadmissible and irrelevant information identified here.  *See Boyle v. McKune*, 544 F.3d at 1138; *Henderson v. Norris*, 118 F.3d at 1288.

6.  Counsel Made Appropriate Evidentiary Objections and Arguments

Barrett claims that his trial counsel ineffectively omitted objections to evidence of his

statements that evinced enmity toward the police and desire to engage them in violence.  He

argues that the testimony was susceptible to objection under the rules governing hearsay, prior

bad acts evidence, and the balancing of probity and prejudice.  Finally, Barrett complains that to

the extent his trial attorneys did interpose objections under Federal Rule of Evidence 404(b), his

appellate attorneys were ineffective for failing to pursue the matter.  (Mot. 120-27, 384; BIS 70-

76.)  Barrett failed to timely raise these arguments, which this Court should therefore disregard.

In any event, he fails to show that the underlying testimony was inadmissible and, thus, that his

lawyers provided prejudicially ineffective assistance in their response to it.

A.  Time Barred Claim

Barrett first raised his present claim, that trial and appellate counsel did not properly

challenge the evidence of his prior statements, in the Amended § 2255 Motion, filed September

25, 2009.  (Doc. 70 at 135-43.)  The Amended Motion was filed well after the expiration of the

one-year period of limitations applicable to his Motion to Vacate.  *See* 28 U.S.C. § 2255(f);

*United States v. Willis*, 202 F.3d at 1280; *cf.* Docs 1 & 2.  The limitations period began to run on

the date the Supreme Court denied Barrett's petition for writ of certiorari, March 17, 2008.

*Willis*, 202 F.3d at 1280-81.  The year expired on March 17, 2009.  Because over six months

elapsed before Barrett filed the amendment, his new claim is barred.  *See United States v.*

*Guerrero*, 488 F.3d at 1316.  The claim is based on an entirely novel premise, and does not

merely clarify, amplify or expand any timely-filed contention.  *Cf. United States v. Espinoza-*

*Saenz*, 235 F.3d at 505.  In short, the claim arises from different facts than those ineffective

assistance of counsel claims set forth in the Corrected Motion (Doc. 2) and therefore does not

relate back to that pleading.  *See United States v. Craycraft*, 167 F.3d 451, 457 (8th Cir. 1999).

Furthermore, Barrett has made no attempt to show that extraordinary circumstances beyond his control prevented him from raising the contention. *United States v. Gabaldon*, 522 F.3d at 1124. Of course, he cannot do so, as the claim is premised on the information available within the record. Thus, this Court should strike and disregard Barrett's untimely claim that trial counsel failed to properly respond to the prosecution's evidence concerning his remarks.

B. The Absence of Futile Objections did not Constitute Ineffectiveness

Prior to trial, the government filed a notice that it intended to adduce evidence that Barrett had made statements, prior to the murder, of his intent to attack police officers if they entered his land. The government argued that the proposed testimony was not prior bad act evidence subject to Federal Rule of Evidence 404(b) but information intrinsic to Barrett's crimes. (*See* Trl. Doc. 206.) Barrett filed a response, arguing that the evidence should be excluded under Rule 404(b). (Trl. Doc. 215.) The Court stated that it would decide the admissibility of the proposed evidence on an as-needed basis during trial. (Tr. 174.) Barrett now claims his attorneys failed to interpose timely objections on the grounds that it was inadmissible hearsay, prior bad acts evidence, and inordinately prejudicial information. *See* Fed. Rules Evidence 403, 404(b) and 802.

However, none of the forgone objections had any merit, and trial counsel had no obligation to raise a futile objection. *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990); *see Scott v. Romero*, No. 04-2262, 2005 WL 2865173, at **2 (10th Cir. Nov. 2, 2005) ("Counsel is not ineffective for failing to advance a futile argument.").[7]

Barrett's statements to various witnesses, as adduced by the prosecution, did not

---

[7]The government has attached to this Answer copies of all cited unpublished opinions.

66

constitute hearsay as a matter of law.  Federal Rule of Evidence 801(d)(2)(A) provides that a statement is not hearsay if it "is offered against a party and is the party's own statement."  *See United States v. Maden*, 114 F.3d 155, 157 (10th Cir. 1997).  Because Barrett's extrajudicial remarks, as proffered by the government, were not hearsay, trial counsel's failure to interpose futile objections could not have constituted ineffective assistance.

Barrett fares no better in complaining that his lawyers should have objected to the testimony as under Federal Rule of Evidence 404(b), because that provision would not have provided any bar to the evidence.  Rule 404(b) does not apply to . . . evidence that is intrinsic to the crime charged."  *United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009) (quotation and alteration omitted).  "Generally speaking, intrinsic evidence is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury.  Extrinsic evidence, on the other hand, is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense."  *Id.* (quotation and alteration omitted).  For instance, in a case involving a conviction for using a telephone to transmit racially-motivated bomb threats, the defendant's possession of racially inflammatory materials was deemed intrinsic to the crime and relevant to rebut a defense that the threats were not "true threats."  *United States v. Viefhaus*, 168 F.3d 392, 398 (10th Cir. 1999).  There, the Tenth Circuit held that "the need to demonstrate the context in which Viefhaus uttered his remarks rendered much of the evidence of Viefhaus' racial hostility intrinsic to the crime charged in the indictment."  *Id.* (citing *United States v. O'Brien*, 131 F.3d 1428, 1432 (10th Cir.1997)).

In this case, the defense announced from the outset of the trial that it would challenge the prosecution's proof of intent: "Kenneth Barrett's actions were a reaction to an unknown force in

67

self-defense of his son, himself, and the protection of his property.  And all of his actions in firing at the Ford Bronco were without malice aforethought, intention, or premeditation. This was not murder." (Tr. 237.)  The government met its burden of proof by presenting evidence of Barrett's express intent.  The government's evidence included Barrett's statements to Randy Turman and Karen Real that he would shoot at police if they entered his property (Tr. 3: 412, 14: 3106), his statement to Charles Sanders that he would shoot the first police officer who attempted to serve an arrest warrant on him (Tr. 11: 2515), and his statement to Cindy Crawford that he would "go out in a blaze of glory" if the police attempted to arrest him (Tr. 13: 3068-69).

Barrett's statements of intent were just as intrinsic to his crime, and relevant to the government's case, as were the racist statements that Viefhaus impliedly adopted through mere possession.  Thus, as argued prior to trial (*see* Trl. Doc. 206 at 4-6.), the statements attributed to Barrett were not subject to the limitations of Rule 404(b), and trial counsel's omission of meritless objections to them on such a ground was not ineffective assistance.  The statements attributed to Barrett were apparently made after he failed to appear for his state trial, resulting in the issuance of a warrant for his arrest.  As such, the statements reflected his pugnacious refusal to submit to authority and were highly probative of his thought process when the police did, in fact, come to arrest him.

Even if the statements were analyzed under Rule 404(b), their admissibility would be patent, despite Barrett's claim that some of them were attenuated by time from the murder.  Rule Evidence is admissible under Rule 404(b) if it is offered for a proper purpose, relevant, and not unduly prejudicial.  *United States v. Caldwell*, 560 F.3d 1202, 1212 (10th Cir. 2009).  The evidence at issue here was unquestionably offered for a proper purpose.  It involved Barrett's

express desire to engage peace officers in violence if they entered his land or tried to arrest him and was therefore patently relevant to his intent when the police did, in fact, attempt to execute an arrest warrant at his home.

Barrett complains that the statements were prejudicial because they were estimated to have occurred between a few hours and 10 months prior to the murder and were therefore attenuated from the crime. Barrett is wrong: evidence of the fact that he harbored the intent to commit this crime over a long period is not prejudicial and would not have require exclusion of the evidence. *See United States v. Runnels*, 93 F.3d 390, 393-94 (7th Cir. 1996) (finding six-year-old threat admissible because it was "part and parcel" of an ongoing relationship between the defendant and victim). Barrett fares no better in arguing that his lawyers should have objected that they received late notice of the evidence under Rule 404(b). The notice (Trl. Doc. 206) was, however, timely filed four days before the September 26, 1999 commencement of trial. *See United States v. Blount*, 502 F.3d 674, 678 (7th Cir. 2007) (holding one week sufficient); *United States v. Watson*, 409 F.3d 458, 465-66 (D.C. Cir. 2005) (48 hours sufficient); *United States v. Preciado*, 336 F.3d 739, 745 (8th Cir. 2003) (several days sufficient). The absence of futile objections on these grounds was not ineffective assistance.

Finally, Barrett cannot demonstrate ineffectiveness based on the omission of objections under Federal Rule of Evidence 403. Barrett posits that the Court would have stricken the testimony under Rule 403 because the witnesses were not credible. However, exclusion of evidence is not permitted on ground that judge does not find it credible. *Gardner v. Galetka*, 568 F.3d 862, 876 (10th Cir. 2009). Once again, the omission of patently futile objections did not constitute prejudicial ineffectiveness.

C.  Appellate Counsel Provided Adequate Assistance

Barrett claims, in a perfunctory manner, that his appellate attorneys provided ineffective assistance in failing to challenge some of his prior statements under Federal Rule of Evidence 404(b).  Barrett, as demonstrated above, has failed to show any evidentiary error in the admission of his statements, and thus any basis upon which the appellate court might have granted relief. Counsel's failure to raise a futile issue on appeal does not constitute deficient performance or prejudicial ineffectiveness.  *See United States v. Challoner*, 583 F.3d at 749.

7.  Trial Counsel Properly Investigated the Crime Scene Reconstruction

Barrett claims his attorneys provided ineffective assistance in failing to retain a crime-scene reconstruction expert to counter the evidence adduced by the government through Iris Dalley.  According to Barrett, Dalley was a key government witness who testified that the defendant had fired on the police from his porch and therefore could have seen the emergency lights on the police cars behind the Bronco that carried Trooper Eales.  Barrett also contends that if trial counsel had consulted with Edward Hueske they could have challenged the admissibility of Dalley's testimony, as Hueske would have allegedly demonstrated flaws in her methodology. (Mot. 127-39; BIS 77-88.)  Barrett's argument ignores counsel's entirely reasonable strategy for turning Dalley's testimony to the advantage of the defense.  The argument also grossly misstates the content and significance of Dalley's testimony, and therefore fails to demonstrate prejudice.

During questioning by the prosecution, Dalley provided limited opinions, corroborating existing evidence or drawing conclusions the jury would have naturally drawn from existing testimony.  Contrary to Barrett's assertion here, she never testified that Barrett fired on Eales from the porch.  Indeed, she conceded early in her direct testimony that she could not determine

the exact position of the shooter or the victim's vehicle:

> Q. Can you place exactly where the shooter was or where the Bronco was in relation to this location, for any of these trajectories, ma'am?
> A. No. My analysis does not tell me the exact position of either or both.

(Tr. 14: 3175.) Though the foregoing testimony leaves no doubt that Dalley did not place the defendant on the porch, the prosecutor returned to the subject:

> Q. Okay. Are there any shots that would cause you problems in regards to the trajectories considering the path that we discussed and a shooter being located in or around the front door which would put him in potentially just outside the door on the porch to moving inside of the house?
> A. It would be possible for a shooter to be either on the porch or in the doorway if the Bronco is moving in the described path, could put the Bronco in the various positions that could account for the trajectories.
> Q. Okay. You can't say where the shooter was for any one of those given shots?
> A No, I cannot.

(Tr. 14: 3226.) In view of these colloquies, Barrett's principal claim about Dalley – that she placed him on the porch – is an utter fiction. Dalley drew only two significant conclusions about Barrett and his victim: the defendant could not have fired all the shots from a prone position inside his house and Eales's flank and elbow wounds were sustained after he exited the Bronco. (Tr. 14: 3228-29, 3247, 3254, 3259.)

Not only had defense counsel prepared to meet Dalley's limited testimony, they effectively elicited her concession that she could not exclude the possibility that Barrett had fired every shot from inside his home, thus confirming the viability of the defense theory. As noted, the reasonableness of counsel's investigation is measured against information possessed by them. *Chandler*, 218 F.3d at 1318 & n.22. In this case, it appears clear that defense counsel knew, on the basis of Dalley's prior testimony, that they could elicit her concession that Barrett may well have fired every shot from inside his house. (*See* Tr. 14: 3264, 3280-91; *see also* Tr. March 22,

71

2005 at 17-18 (noting that counsel had elicited damaging admissions from Dalley).) Defense

counsel adduced, in summary, a concise crystallization of that important point:

> Q. Okay. So, with the car at that location and the shooter inside the house,
> you know, moving in the house as long as the doorway's open, shooting out the
> doorway, would that be consistent with the -- and how you drove the car up to the
> porch, would that be consistent with all 18 trajectories into the car?
> A. It is possible to have a path starting at this point and coming up to the
> porch in which you could have relative positions that could create all of those
> trajectories.

(Tr. 15: 3349-51.) Presenting this favorable evidence, rather than attacking the admissibility of

Dalley's testimony with the assistance of Hueske, was an entirely reasonable strategic decision

on counsel's part. *See Massaro v. United States*, 538 U.S. 500, 504 (2003) (observing that

*Strickland* requires defendants claiming ineffective assistance of counsel to show that their

attorneys' actions "were not supported by a reasonable strategy"). The decision to adduce

evidence helpful to the defense through Dalley, who's credibility the government would not

attack, was a valid tactical decision akin to counsel's reliance on Cloyce Choney as an expert in

police practices, discussed below. (*See, infra*, Arg. II, 8)

Even if Barrett could show that counsel had not made an entirely reasonable decision to

exploit Dalley, rather than to challenge the admissibility of her testimony, he cannot demonstrate

prejudice. Given the limited reach of her testimony, Barrett cannot show a reasonable likelihood

that he would have received a more favorable verdict, even if he had effectively challenged its

reliability or admissibility with the assistance of Edward Hueske. While she had an extended

stay on the witness stand, Dalley provided only two conclusions from her analysis. She opined

only that Barrett could not have fired all the shots from a prone position inside his cabin (a

conclusion that did not inculpate Barrett by itself or contradict any defense theory) and she found

that Trooper Eales's fatal left flank wound was not consistent with the trajectories of the shots into the Bronco. (Tr. 14: 3228-29, 3247, 3254, 3259.)

Of Dalley's two conclusions, only the latter one was incriminating, in that it demonstrated that the defendant fired on a fleeing man, but the evidence presented to the jury would not have permitted any other conclusion. The driver of the Bronco, Trooper Hamilton, testified that the shots fired at the vehicle struck the windshield traveling from the right. (Tr. 3: 554, 605.) When the Bronco stopped, Trooper Eales exited and moved to the rear. (Tr. 5: 989-97, 996-98, 1033, 1096-1101, 1158-60, 1165-66.) In so doing, Eales exposed his left side to Barrett's fire. (Tr. 5: 997-98, 1101-02.) According to the medical examiner, Eales was shot twice in his left side by bullets that passed through some intervening objects. (Tr. 7: 1599, 1605-07, 1610-15.) The fatal bullet entered "on the left side of the upper back" and traveling "slightly back to front and slightly downward." (Tr. 7: 1611, 1614-15, 1619.) Given the path of that bullet through Eales's body, the jury could have only inferred that, at the moment he was shot, the victim was turning from Barrett, not sitting in vehicle receiving fire from the right. Dalley may have reached this conclusion based on her analysis of other evidence, but it merely corroborated an obvious fact about the shooting. There was absolutely no evidence upon which the defense, even with the assistance of another expert, could have suggested that Eales had managed to expose his left side to a bullet wound while he was seated the Bronco. (*See, e.g.*, Tr. 3: 541-43, 612-13 (explaining that Eales had a 20 pound ballistic shield between his legs that interfered with easy movement).)

Accordingly, even if counsel had successfully relied upon Edward Hueske to substantially impeach, or even foreclose, the testimony of Iris Dalley, no reasonable probability exists that Barrett would have received a more favorable verdict. *See Strickland*, 466 U.S. at 691.

8. Trial Counsel Properly Investigated and Presented Evidence Concerning Police Tactics

Barrett claims that his trial attorneys provided ineffective assistance when they relied on the testimony of Cloyce Choney in an effort to criticize the tactics of the Oklahoma Highway Patrol Tact Team. According to Barrett, trial counsel should have retained expert witness George Kirkham, who would have identified supposed flaws in the Tact Team's planning and execution of the arrest warrant. (Mot. 139-43; BIS 77-88.) Barrett fails to demonstrate that his counsel's choice of witness was in any way deficient, as Choney had previously criticized the Tact Team's operation. Moreover, Barrett cannot show that Kirkham's testimony would have altered the outcome of the trial. While Kirkham is apparently more critical of the Tact Team than Choney, his opinion ultimately fails to reveal any relevant point. He opines, with the advantage of hindsight, that the Tact Team should have used less confrontational techniques, but he fails to show that those the choice of tactics had any bearing on Barrett's intent or that alternative tactics were reasonably available to the police.

"[T]he decision of which witnesses to call is quintessentially a matter of strategy." *Boyle v. McKune*, 544 F.3d at 1139. Because such decisions are matters of strategy, counsel's choices are accorded a strong presumption of reasonableness. *Williams v. Bowersox*, 340 F.3d 667, 669-71 (8th Cir. 2003); *see also United States v. Nguyen*, 413 F.3d 1170, 1181 (10th Cir. 2005) (holding that adequately informed strategic choices are "virtually unchallengeable"). To establish that a strategic decision constituted ineffectiveness, the defendant must show that it was completely unreasonable, such that it bore no relationship to any possible defense strategy. *See Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000). Assuming the defendant can meet that onerous burden, he must still establish prejudice by demonstrating a reasonable probability that

74

the forgone witness's testimony would have resulted in acquittal.  *See Boyle v. McKune*, 544 F.3d at 1138; *see also Earhart v. Johnson*, 132 F.3d 1062, 1067-68 (5th Cir. 1998); *United States v. Murray,* 751 F.2d 1528, 1535 (9th Cir.1985).

Barrett cannot show that trial counsel's decision to call Cloyce Choney was unreasonable. Barrett concedes that counsel had a valid strategic reason for calling Choney: the witness had testified for the prosecution in state court but provided testimony favorable to the defense during cross-examination.  (Mot. 142.)  While Barrett now complains that his attorneys called a reluctant, government-friendly, witness, his argument appears premised on the "inestimable benefit of hindsight."  *Thomas v. Gilmore*, 144 F.3d at 515.  Apart from the fact that Choney had previously provided evidence helpful to the defense, the defense stood to gain greatly by calling him – rather than a retained expert – because his testimony could not be impeached on the basis of his associations with, or payment by, the defense.  Choney's reluctance to testify for the defense, and his association with the victim, were the hallmarks of his credibility for the defense, something the defense recognized long before trial.  (*See* Tr. March 22, 2005 at 15 (defense counsel describes Choney as "an eX-FBI agent, and he'd rather be drawn and quartered than appear in court as a defense witness in Mr. Barrett's case.  He was extremely credible.  If you get the Government to call him, we can save money on ours.").)  In fact, when called by the defense Choney provided several criticisms of the Tact Team's conduct, observing that no-knock warrant services were disfavored and inherently dangerous (Tr. 17: 3906-07, 3919), that the team's plan should have included a contingency for compromised stealth (Tr. 17: 3907), that the team's plan should have included a contingency for an injured officer (Tr. 17: 3908-09), that containment was preferable to forced entry (Tr. 17: 3905-06), and that the lead vehicle should have had

75

illuminated emergency lights (Tr. 17: 3974-75).  Trial counsel's decision to elicit this evidence through Choney was reasonable and cannot form the basis of a successful ineffectiveness claim.

Assuming, arguendo, that Barrett could show that his attorneys had a Sixth Amendment duty to call Kirkham, rather than Choney, he cannot show a reasonable probability that the paid witness's testimony would have led to acquittal.  Most significantly, the relative professionalism of the Tact Team, the completeness of its tactical plan, and the ability of its leaders to predict the dangers of the operation had no bearing on Barrett's culpability.  The government had no burden to prove that Barrett even recognized the victims as police – it merely had to show that he had reason to know that they were peace officers.  *See, supra*, Arg. II, 2; *infra*, Arg. IX, 2; Trl. Doc. 240 Inst. 15.  The absence of a defense-friendly expert to testify to irrelevant criticisms of the Tact Team's operation in no way reduced the likelihood of acquittal in this case.

Furthermore, Kirkham's analysis appears to exist in a vacuum that denudes it of any meaning.  After setting forth empty platitudes about a preference for non-confrontational police practices, Kirkham concludes that the Tact Team should have initiated contact "from sufficient distance and cover to afford participating officers a reasonable degree of safety."  (Mot. Ex. 44 at 3.)  Kirkham provides no indication how the Tact Team could have practically accomplished his theoretical operation.  Indeed, he appears to have formed his opinion in ignorance of circumstances that essentially forced the Tact Team to plan for direct confrontation.  Barrett's home stood behind a substantial gate.  (Tr. 7: 1479.)  The surrounding land lacked concealment or good observation points.[8]  (Tr. 3: 516.)  Feral dogs roamed the area and could give away

---

[8]This simple fact wholly undermines Kirkham's naive supposition that the police should have used a bullhorn "from a position of cover to announce that officers were there . . . and to order [Barrett] to exit the cabin with his hands empty and in view."  (Mot. Ex. 44 at 3.)

76

police positions.  (Tr. 3: 516-017, 7: 1404, 1479.)   Barrett was apt to shoot at the police and was armed with, what even Kirkham refers to, as a "formidable long range weapon."  (Tr. 7: 1473-74; Mot. Ex. 44 at 2.)  Barrett could have easily fled to his mother's nearby trailer.  (Tr. 7: 1433, 1473.)  And, in fact, Barrett's neighbors on three sides were related to him, sympathetic to his anti-authority views and potentially willing to use force against the arrest team.  (Tr. 4: 684-85, 839-40.)

Given these facts, the Tact Team's plan represented a regrettable compromise with the reality at hand, rather than an ideal scheme based on wishful thinking.  Unsurprisingly, several of Barrett's criticisms of the warrant service were undisputed at trial, such as the fact that the team lost the element of surprise (Tr. 3: 644, 676-77), the fact that the lead vehicle advanced from a tactically disadvantageous position (Tr. 3: 683), the fact that the lead Bronco was unmarked (Tr. 7: 1532, 1535-36), the fact that the lead Bronco would lack the coverage of surveillance team (Tr. 7: 1404-05) and the fact that the police provided no audible warning of their presence (Tr. 4: 837-38, 7: 1535).  Barrett fails to explain how a paid defense expert's repetition of this evidence, which was conceded by the very officers who planned and executed the operation, would have placed him in better stead.

Kirkham does not improve Barrett's attempt to demonstrate error by offering an opinion about the defendant's mental state at the time of the shooting.  In open court, Kirkham could not as he offers to do, testify that the tactics employed by the police rendered "unanswerable" whether the defendant realized he was firing on police (Mot. Ex. 44 at 1).  The expert was not permitted to opine about Barrett's mental state.  *Cf.* Fed. R. Evid. 704; *United States v. Shaffer*, 472 F.3d 1219, 1225 (10th Cir. 2007) (holding that district court appropriately excluded opinion

<center>77</center>

<center>123</center>

of computer expert that defendant did not necessarily intend to download illegal child pornography).  Putting aside the bar on improper expert opinions, a police tactics expert like Kirkham would have had no basis for opining about Barrett's intent, apart from the defendant's own assertions.  Barrett could not, however, utilize an expert as a conduit for the admission of inadmissible hearsay.  *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008).

Finally, Barrett argues that Kirkham could have testified that the manner in which the Tact Team approached the house minimized the likelihood that he recognized the troopers as police.  But such testimony was unnecessary, as the evidence as summarized above was more than sufficient to support that argument as presented in summation by Mr. Hilfiger.  (*See* Tr. 20: 4329-32.)  Barrett cannot show that the addition of cumulative evidence from a retained expert, susceptible to impeachment on the basis of bias, would have led to a reasonable probability of acquittal.  As such, he cannot show that his attorneys' decision to rely on Choney, rather than Kirkham, amounted to prejudicial ineffective assistance of counsel.

9.  Trial Counsel Reasonably Cross-Examined Law Enforcement Witnesses

Barrett claims his trial attorneys provided ineffective assistance of counsel by failing to adequately impeach the testimony of Tact Team members regarding the circumstances of the shooting.  He also complains that counsel failed to adduce exculpatory evidence.  In a tenuously related argument, Barrett also claims ineffective assistance based on an instance of cross-examination that led to supposedly damaging evidence from Clint Johnson.  (Mot. 143-49.)  Barrett's claims fail because counsel effectively cross-examined the witnesses despite the fact that they did not have complete transcripts of the defendant's second state trial, which supposedly would have formed the basis of the forgone impeachment.  Barrett cannot show a

78

reasonable likelihood that the supposedly forgone or mistaken questions he identifies had any impact on the outcome of this lengthy and complex trial.

A.   Allegedly Forgone Impeachment

As of October 3, 2005, it appears that trial counsel had not received a complete transcript of Barrett's second state trial.  (*See* Tr. 4: 670.)  Significantly, Barrett has not shown that his attorneys had access to the evidence with which he claims they should have attempted to impeach various government witnesses.  In fact, Barrett argues – in apparent contradiction of his ineffectiveness claim – that counsel did not receive the transcript in time to prepare.  (Mot. 143.) Barrett cannot show that his attorneys acted unreasonably in omitting questions based on transcripts they did not have.  Having failed at this foundational level to show that his attorneys were objectively deficient in their performances, he cannot show ineffective assistance, as conclusory assertions are insufficient to establish ineffective assistance of counsel.[9]  *United States v. Fisher*, 38 F.3d at 1147.

Regardless of Barrett's access to the transcript, the supposedly forgone cross-examination about the circumstances of the crime had no impact upon the outcome of this trial, a fact that defeats his attempt to show that the omission of the questions was unreasonable or prejudicial. Indeed, "In hindsight, there are few, if any, cross-examinations that could not be improved upon. If that were the standard of constitutional effectiveness, few would be the counsel whose performance would pass muster." *Willis v. United States*, 87 F.3d 1004, 1006 (8th Cir.1996). The omission of impeachment evidence of negligible value does not prejudice the defense or, by

_____

[9]Barrett elsewhere claims this Court failed to properly fund his request for the transcript. (*See, infra*, Arg. III.)  Because, as shown below, the transcript was of negligible value, any delay in receiving the document should not form a basis of relief.

79

extension, amount to ineffective assistance. *See Moore v. Marr*, 254 F.3d 1235, 1241 (10th Cir. 2001). The reasonableness of counsel's conduct in cross-examining a witness depends upon the importance of the witness to the government's case. *Tucker v. Ozmint*, 350 F.3d 433, 444 (4th Cir. 2003). Furthermore, the omission of impeachment on a collateral matter does not constitute ineffectiveness. *United States v. Lipp*, 54 F. Supp. 2d 1025, 1036-37 (D. Kan. 1999); *see Bergman v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995).

As explored below, the supposedly forgone impeachment centered on details about the activation of emergency lights on various vehicles. Such facts were of great significance to Barrett's trial defense. However, the same facts were understandably less important to, and therefore more easily forgotten by, the members of the Tact Team. Defense counsel could have hardly expected to alter the outcome of the trial by showing that police officers who witnessed the murder of a colleague could not recall with crystal clarity, six years after the crime, who activated overhead lights and when they did so. While Barrett argues that the activation of the lights was an important point of dispute for him at trial, he ignores the fact that it was an unlikely focus of attention for the police, as they found themselves caught in a hail of gunfire moments after entering the defendant's property. Any minor flaws in the officers' recollections would have been unsurprising under the circumstances in which they were perceived. Not only was the omission of the supposed impeachment non-prejudicial, Barrett cannot show that any decisions to forgo such meaningless evidence was unreasonable, especially given that he premises most of his claims on misinterpretations of the pertinent records.

Barrett first complains that his attorneys failed to challenge Trooper Poe's testimony that he initially observed emergency lights when he saw the first Bronco come into view from the east

80

(Tr. 7: 1412) with prior testimony that the witness saw the lights after shots erupted (Mot. 145 (citing 2nd St. Trial Tr. at 747).) However, there is no meaningful contradiction between Poe's testimony at the two trials. Poe explained on cross-examination that he did not recall seeing emergency lights from the time he left his car until he reached his assigned position by the fence. (Tr. 7: 1444.) From that vantage, however, Poe observed the Bronco come into view and saw emergency lights sparkling off the glass that was being shot from the vehicle. (See Tr. 7: 1412-13, 1444.) As such, his testimony in the two trials was not inconsistent and no meaningful impeachment was available. *See Moore v. Marr*, 254 F.3d at 1241.

Barrett next observes that Trooper Geringer testified in this trial that as he turned from the road to the driveway adjacent to the defendant's property, his partner, Trooper Manion, activated the emergency lights in their vehicle. (Tr. 4: 732-33.) Barrett claims his attorneys should have contradicted this statement with Greninger's prior testimony that he turned the lights on after turning to approach the defendant's home. (Mot. 145 (citing 2nd St. Trial Tr. at 448, 461).) The inconsistencies between these statements are minor, as they do not fundamentally impeach the evidence that the emergency lights on Geringer's vehicle were activated shortly after the car turned from the road in front of Barrett's home. In fact, defense counsel elicited from Geringer an admission that he did not recall precisely where he was when the emergency lights came on: "I don't know exactly. [The lights were activated] somewhere in there prior to entering the property." (Tr. 4: 771.) By adducing Geringer's admission that his memory was unclear, defense counsel obviated the need to demonstrate as much by relying on evidence of a slightly inconsistent statement as to who in the vehicle activated the lights. The omission of that evidence was neither unreasonable nor prejudicial. *See Moore v. Marr*, 254 F.3d at 1241.

81

Barrett also notes that Geringer testified in this trial that he recalled Hash's emergency lights were activated (Tr. 4: 760), but was unsure if Hise's lights were activated and did not recall if Pettingill's lights were activated (Tr. 4: 772-73).  According to Barrett, counsel should have impeached that testimony with Geringer's prior statement that he recalled seeing Hise's emergency lights on.  (Mot. 145 (citing 2nd St. Trial Tr. at 448, 461).)  Of course, that statement was not inconsistent with Greninger's testimony about Hash and Pettingill's vehicles, and might have only served to refresh the witness's recollection about a fact that was ultimately damaging to the defense.  *See Moore v. Marr*, 254 F.3d at 1241.  The defense certainly could not have anticipated much value in the potential impeachment, as Greninger readily admitted that his memory of the events was imperfect.  (See Tr. 4: 736 ("I still have a blocked memory"), 741 (recalling a flashbang, but not when he heard it), 792 ("That's the best of my memory today."), 806 (failing to recall when he heard a pause in the shooting).)

Barrett also errs in asserting that trial counsel should have impeached Clint Johnson's testimony that he saw emergency lights by eliciting evidence of the witness's initial statement to Investigator Jones.  (*See* Mot. 145-46 "counsel was caught flat-footed").)  In fact, counsel examined Johnson about his statement to Jones, adducing his admission that he might not have told her about observing emergency lights because of the stress he was under.  (Tr. 2: 361-62.)

Barrett similarly misreads the record when he claims that trial counsel failed to impeach Trooper Hamilton's testimony that he began receiving gunfire as he entered the ditch to the east of the defendant's home.  (*See* Mot. 146-47.)  Hamilton unambiguously testified during the federal trial his vehicle was initially hit by gunfire "[s]hortly *after* we came out of the ditch." (Tr. 3: 537 (emphasis added).)  Barrett was not prejudiced by the failure to elicit a prior

82

consistent statement in this regard.  *See Moore v. Marr*, 254 F.3d at 1241.  Because Hamilton's

recollection supported the defense theory that Barrett did not fire until the lead vehicle was

relatively close to the house, and Hamilton was in the best position to know where he was when

the shooting began, there was no need to further explore the issue with Trooper Greninger, as

Barrett nonetheless complains.  (*See* Mot. 146, 147; *see also, infra*, Arg. II, 9, B .)

Barrett again errs when he claims that defense counsel failed to contrast Trooper Poe and

Trooper Greninger's testimony about guns in the defendant's house with the fact that neither man

testified about such observations in a prior trial.  (Mot. 147.)  Given that Barrett does not

demonstrate that the witnesses were previously asked about the guns, much less denied seeing

them, he has not shown that the prior testimony was inconsistent with that offered here.

On this record, Barrett has failed to carry his burden of demonstrating that counsel

unreasonably and prejudicially failed to elicit evidence with any impeachment value whatsoever.

B.  Allegedly Forgone Evidence

Apart from complaining about his attorneys' supposed failure to impeach government

witnesses, Barrett also contends that counsel did not effectively elicit potentially exculpatory

testimony during cross-examination.  But Barrett cannot show that the absence of the testimony

created a reasonable likelihood of prejudice, and therefore cannot establish ineffective assistance.

*See Patel v. United States*, 19 F.3d 1231, 1237 (7th Cir.1994); *United States v. Sapp*, 989 F.

Supp. 1093, 1099-1100 (D. Kan. 1997).  Because the forgone evidence would not have assisted

the defense, Barrett cannot show that the omissions demonstrate unreasonable performance.

Specifically, Barrett cannot demonstrate any prejudice based on his claim that defense

counsel should have relied on a transcript of a prior trial to elicit evidence that Trooper Poe had

83

an unobstructed view of the defendant's house but still could not determine who had opened fire first, the police or the defendant.  (Mot. 146.)  Poe testified on direct examination that immediately after exiting his vehicle he heard shots and turned his attention, wholly and solely, to seeking cover behind a post:

> A.  As soon as I got out of the car and started towards the post, I started hearing gunfire.
> Q.  Okay. What did you do at that point?
> A.  At that time I thought they were shooting at Gene, Doc and I because we were on the ground.
> Q.  Okay.
> A.  So I took cover behind the post.
> Q.  Okay. What, at that point, did you see, if anything?
> A.  Not really anything at that point. I just took cover.

(Tr. 7: 1410.)  Because Poe explained that his focus was on his own safety, rather than the source of gunfire, the defense could not have relied on him to suggest who instigated the violence.  As such, Barrett cannot establish any prejudice from the supposed omission.  *See Moore v. Marr*, 254 F.3d at 1241.

Barrett similarly fails in arguing that trial counsel should have confronted Trooper Greninger with a prior statement that he "recalled hearing gunfire as Hamilton's vehicle approach the front of the house."  (Mot. 146.)  According to Barrett, the prior statement was inconsistent with Greninger's inability to recall the location of the lead Bronco during his testimony and implied that the witness observed gunfire only when Hamilton's Bronco "was almost literally in front of his house, with its headlights obstructing [the defendant's] view."  (*Id*.)  Barrett's interpretation of the ambiguous prior statement amounts to nothing more than wishful thinking.  The prior statement gave no more indication as to Hamilton's location than did Greninger's trial testimony.  The omission of such an imprecise statement from evidence could

<p style="text-align:center">84</p>

not have created a reasonable probability of prejudice or constituted prejudicial ineffectiveness.

*See Moore v. Marr*, 254 F.3d at 1241.

    C.  Eliciting Supposedly Damaging Evidence

Barrett also claims his trial attorneys provided ineffective assistance of counsel when they

elicited Clint Johnson's reasons for asserting that the service of the warrants was "high risk."

Though Barrett does not identify any of the allegedly offending examination, it appears that he

likely intended to fault his attorneys for a pair colloquies:

> Q. Okay. What advice did you give them to tell them that this was high risk?
> A. That we received information about Mr. Barrett and his threats to law enforcement, and him carrying firearms, and that he was going to kill law enforcement officers when they showed up at his residence.

(Tr. 2: 333.)

> Q What other information did you have that he's high risk?
> A That he was going to kill law enforcement officers, that he was making methamphetamine at the residence, which also makes it a substantial risk to law enforcement personnel due to explosive hazards when you're dealing with methamphetamine labs, and just all the information we received about him going to kill law enforcement officers. That makes it high risk.
> Q. Okay. And did you receive this information from more than the confidential informant?
> A. Yes.
> Q. How many more?
> A. I received it from Agent Loyd.
> Q. Who had received it from the confidential informant?
> A. No, sir. I believe that there were several people that came into the sheriff's office, reporting to the sheriff that Mr. Barrett was shooting across the road all the time, and they was wanting something done about it. And we received several tips that Mr. Barrett was going to kill law enforcement, from several -- several different people advised us of that.

(Tr. 2: 334-35.)

Barrett fails to show that the decision to elicit this testimony was unreasonable.

<center>85</center>

Certainly, it appears that counsel believed that Johnson had relied solely on his confidential informant in characterizing the warrant service as high risk. Barrett's counsel could not exploit that theory, and argue that Johnson was unreasonable in his reliance (essentially the same argument that Barrett makes in his Motion in Claims 2, sub. 2 and 5), without establishing the validity of its underlying premise. When he attempted to do so, Johnson apparently surprised him by citing other sources of information, but Barrett fails to show that trial counsel was on notice that Johnson might respond in this way. Barrett cannot show the inadequacy of counsel's actions using "the benefits of 20/20 hindsight." *United States v. Blackwell*, 127 F.3d at 955.

Furthermore, Barrett cannot show that Johnson's testimony, whether anticipated or not, prejudiced the defense. Indeed, he makes no effort to show that in the absence of these isolated comments it is reasonably likely that he would have been acquitted. He is foreclosed from doing so by the record, as the government substantiated the accusations mentioned by Johnson, using live witnesses. (*See, e.g.*, Tr. 3: 412 (establishing one of Barrett's threats against law enforcement), 1812 (noting complaints to the police about Barrett's use of firearms), 11: 2488-2524 (establishing the confidential informant's observations of Barrett), 12: 2653-95 (establishing the existence of a methamphetamine lab in Barrett's home), 13: 3075 (noting one of Barrett's threat to shoot the police), 14: 3106 (noting another Barrett's threats against the police).) Because all the assertions made by Johnson with regard to the warrant were eventually proved by extant evidence, Barrett's ineffective assistance claim should fail for lack of any possible prejudice.

Counsel's conduct of the cross-examination was neither unreasonable nor harmful to the defense, and any attempt to premise a Sixth Amendment violation on it should fail.

10.  Trial Counsel Reasonably Omitted the Unpersuasive Testimony of Barrett's Son and Neighbor

Barrett claims his attorneys provided ineffective assistance in failing to call as defense witnesses his son, Toby Barrett, and his neighbor, Alvin Hahn.  According to Barrett, those two witnesses could have undermined government evidence that, before he began shooting, the defendant could have seen illuminated emergency lights on some of the Tact Team vehicles. (Mot. 149-54; BIS 88-90.)  Neither Hahn nor Toby Barrett would have meaningfully undermined the prosecution's case, and counsel's omission of their testimony was not prejudicial ineffectiveness.

As noted above, "[T]he decision of which witnesses to call is quintessentially a matter of strategy."  *Boyle v. McKune*, 544 F.3d at 1139.  Absent a showing that a forgone witness's testimony would have created a reasonable likelihood of adquittal, Barrett cannot establish ineffective assistance.  *See Patel v. United States*, 19 F.3d at 1237; *United States v. Sapp*, 989 F. Supp. at 1099-1100.

A.  Toby Barrett

Of the two putative witnesses identified in the Motion, the defendant's son was the only one who actually observed the police enter Barrett's land.  As a matter of trial strategy, counsel could well have determined not to call the defendant's son as a witness because he was so obviously susceptible to impeachment for bias.  *See Bergmann v. McCaughtry*, 65 F.3d at 1380. But more significantly, the defendant's son had nothing exculpatory to offer.  Indeed, Toby Barrett concedes he had limited recall of what he found to be a brief and confusing encounter: "I yelled 'Dad.'  I don't recall how many times I yelled it.  It all happened so fast."  (Mot. Ex. 96 at 3.)  He also admits that he does not know when the shooting began: "There may well have been

87

133

shots before [a police officer tackled me] – again it happened so fast and I was so scared, but my dad wasn't on the porch and I know for sure that nothing hit the Bronco before it came to a stop." (*Id.*)

What Toby Barrett does recall would not have assisted the defense. Toby notes that he looked toward his great grandmother's driveway and saw "an SUV and a Crown Vic . . . . I thought I saw my dad come onto the porch for just a second . . . . I looked at the porch again and my dad was already gone." (Mot. Ex. 96 at 3.) If Toby could identify the second vehicle as a Crown Victoria, it seems unlikely that his father could not have. The Crown Victoria must have been Trooper Hash's marked patrol car, which followed directly behind Trooper Greninger's Bronco. (*See* Tr. 5: 984.) Trooper Hash activated his emergency lights before turning onto the driveway (Tr. 5: 987) and Trooper Manion illuminated the emergency lights in Greninger's vehicle as the Bronco pulled on the defendant's property (Tr. 4: 732). The overall effect should have left little question in Barrett's mind that the police were entering his land. Assuming, arguendo, that neither vehicle illuminated emergency lights, it begs credulity to suggest that Toby Barrett was able to identify the make and model of Hash's vehicle, but his father did not notice the profoundly distinctive silhouette of emergency lights mounted on the roof of a marked police car. (*See* Tr. 5: 1021 (Hash testifies, "I have a patrol car . . . with the overhead lights.").)

Hash and Greninger's testimony regarding the activation of emergency lights is impliedly contradicted by Toby Barrett, who claims in his declaration, "The first police lights I seen [sic] was on the police car that crashed through the gate when the shooting was over." (Mot. Ex. 96 at 3.) However, that assertion would have had little persuasive value, given the fact that Toby was – by his own admission – confused by the fast-moving events and also pushed to the ground soon

88

after the police arrived.  Simply put, his admission that he has difficulty recalling the pertinent events undermines the reliability of his putative testimony, especially when combined with his relationship to the defendant.

Toby Barrett supposedly would have also testified that the defendant did not fire into the lead Bronco until the vehicle had come to a stop in front of the house and Kenneth Barrett had vacated the porch.  (*See* Mot. Ex. 96 at 3.)  Presumably, such testimony would have tied to a theory that the defendant did not begin shooting until the Bronco posed a clear threat to his own safety inside the house.  But that assertion is blunted by Toby Barrett's concession that he did not know when the shooting actually began: "There may well have been shots before [the Bronco stopped] – again it happened so fast and I was so scared, but my dad wasn't on the porch."  (*Id.*)  Whether or not the Bronco was hit, Toby's forgone testimony would have allowed for the conclusion that his father began shooting before the vehicle stopped.  Furthermore, Toby's evident confusion and divided attention provides no basis for crediting his representation that his father "wasn't on the porch," particularly given the fact that he cannot say when the shooting began.  Given the obvious limitations on Toby Barrett's recollection, as well as his clear exposure to impeachment based on bias, trial counsel could have reasonably omitted calling him to the witness stand and did not prejudice defendant in doing so.  *See Boyle v. McKune*, 544 F.3d at 1139.

Barrett also argues, in conclusory fashion, that Toby Barrett could have contradicted the prosecution's inference that the defendant posted a threatening sign that reflected his intent.  (*See* (Mot. 152 (citing Tr. 20: 4297, 4305).)  According to Barrett, his son offered a sanitized synopsis of the sign during a state court proceeding, but did not opine as to the intent behind the posting.

(*See* Mot. 151.)  Apart from inadmissible hearsay or speculation, contradicted by the contents of the sign itself, one cannot imagine what testimony Toby Barrett might have offered to undermine the government's rather intuitive position that Barrett meant exactly what he had written about shooting trespassers regardless of identity.  *See United States v. Tanner*, 941 F.2d 574, 585 (7th Cir. 1991) (affirming exclusion of defense witnesses with no personal knowledge of pertinent events).  Certainly, Toby Barrett's declaration makes no reference to the sign.  (*Cf.* Mot. Ex. 96.)

The omission of Toby Barrett, whose putative testimony would not have created a reasonable likelihood of acquittal, did not constitute prejudicial ineffective assistance of counsel. *See Boyle v. McKune*, 544 F.3d at 1138.

B.  Alvin Hahn

The putative testimony of Barrett's neighbor, Alvin Hahn, would have had even less value than that of the defendant's son.  According to Barrett, Hahn would have corroborated Toby's claim that only one police car had activated its emergency lights.  Hahn, though, offers no such information.  He states that he was awakened by gunfire, looked out his window 15 seconds after it stopped, and saw "*at least one* vehicle with its police lights on."  (Mot. Ex. 75 at 1 (emphasis added).)  Thus, he could have offered no evidence as to the visibility of emergency lights when Barrett began firing.

Apart from that fundamental flaw, Hahn's declaration clearly allows for the possibility that multiple vehicles had engaged their emergency lights.  And Hahn gives no indication that he had an unobstructed view of Barrett's land, or that his vantage allowed him to see all possible emergency lights.  The emergency lights on Trooper Geringer vehicles were not visible from the rear and Trooper Hash did not recall whether he had activated his rear-facing emergency lights,

90

potentially explaining any limitations in Hahn's perception. (Tr. 1021-22.)  Given the fact that Hahn could not provide any exculpatory testimony, trial counsel reasonably omitted him from the witness stand and did not prejudice defendant in doing so.  *See Boyle*, 544 F.3d at 1138.

11.  Trial Counsel Reasonably Omitted Unpersuasive Evidence Concerning Barrett's Knowledge of the Arrest Warrant

Barrett claims his attorneys provided ineffective assistance in failing to present evidence that he was unaware that the state court had issued a warrant for his arrest.  He argues that counsel should have adduced evidence that his state trial could not have occurred on the day he failed to appear and that the state court clerk mailed the warrant to him but did not request a return receipt from the post office.  He also claims that counsel should have called bail bondsman Martin Daggs during the guilt phase.  Supposedly, Daggs would have testified that he never notified the defendant about the warrant.  Finally, Barrett complains that his attorneys should have called some of his relatives to testify that the police had visited the defendant's home without incident and that they could have convinced him to surrender.[10]  (Mot. 154-63; BIS 90-92.)

Barrett's arguments all fail, as he cannot show that any of this evidence would have assisted him or that the failure to adduce it was objectively unreasonable.  As previously noted, absent a showing that a forgone witness's testimony would have created a reasonable likelihood

---

[10]Barrett notes in passing that his former attorney's widow, Mary Rogers, has reviewed her late husband's file and found no record of a warrant.  The widow also reportedly assured Barrett's present counsel that her husband, Bill Ed Rogers, would not have informed the defendant of a warrant, had he received notice, because he was angered at having been fired. (Mot. 158.)  Barrett does not fault his federal trial lawyers for failing to adduce any of this material, nor could he.  Barrett's attorneys could not seriously have proffered a hearsay report of Mary Rogers's hearsay interpretation of her husband's privileged file, which she presumably could not have authenticated.

91

137

of prejudice, Barrett cannot establish ineffective assistance.  *See Patel v. United States*, 19 F.3d

at 1237; *United States v. Sapp*, 989 F. Supp. at 1099-1100.

    A.  <u>Issuance of the Bench Warrant</u>

Barrett argues that his attorneys should have introduced evidence that the Sequoyah

County court had not summoned a venire for the date he failed to appear for a scheduled jury

trial.  He argues that proof of that fact would have implied some invalidity in the subsequently

issued warrant, because it was premised on his failure to appear for a jury trial.  Barrett goes on

to observe that the warrant was issued by an unauthorized deputy clerk without a  motion from

the prosecution.  (Mot. 155-57.)  Barrett's argument is untimely and without any merit, as the

police acted in good faith on the basis of a facially-valid warrant.

Barrett first raised the argument about counsel's failure to attack the validity of the

warrant in his Amended § 2255 Motion, filed September 25, 2009.  (Doc. 70 at 173-74.)  The

Amended Motion was filed well after the expiration of the one-year period of limitations

applicable to his Motion to Vacate.  *See* 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d

at1280; *cf.* Docs 1 & 2.  The limitations period began to run on the date the Supreme Court

denied Barrett's petition for writ of certiorari, March 17, 2008.  *Willis*, 202 F.3d at 1280-81.  The

year expired on March 17, 2009.  Because over six months elapsed before Barrett filed the

amendment, his new claim is barred.  *See United States v. Guerrero*, 488 F.3d at 1316.  The

claim arises from different facts than those alleged in support of Barrett's Corrected Motion

(Doc. 2) and therefore does not relate back to that pleading.  *See Craycraft*, 167 F.3d at 457.

Barrett has made no attempt to show that extraordinary circumstances beyond his control

prevented him from raising the contention.  *United States v. Gabaldon*, 522 F.3d at 1124.  Of

<div align="center">92</div>

course, he cannot do so, as the claim is premised on the information available within the record.

Thus, this Court should strike and disregard Barrett's untimely claim that trial counsel failed to

adduce evidence concerning the validity of Sequoyah County's bench warrant.

Even if this Court found this claim cognizable, it still would lack any merit. As this

Court has already found, the police were authorized to enter Barrett's property by a search

warrant, wholly independent of the bench warrant. (Trl. Docs. 105 at 5 & 124; Tr. 7: 1471

(Trooper Pettingill notes the existence of two warrants.) Accordingly, any flaw in the arrest

warrant would have in no way called into question the propriety of the Tact Team's entry to

Barrett's property. But even if Barrett could show that the Tact Team relied on the bench

warrant to enter the property, any flaw in its issuance still would not have invalidated the entry

because the police were acting in good faith. The Supreme Court applies a good-faith exception

to the Fourth Amendment suppression rule, and will not exclude evidence if police officers relied

on a mistake made by a judicial employee in the issuance of a warrant. *See Arizona v. Evans*,

514 U.S. 1, 15 (1995). Indeed, this Court has already recognized that legal basis for denying

suppression in this case. (*See* Trl. Doc. 105 at 5-6 (citing, inter alia, *United States v. Bishop*, 890

F.2d 212, 216 (10th Cir. 1989)).)

Trial counsel's omission of irrelevant evidence about the validity of the bench warrant

was not ineffective assistance. *United States v. Harris*, 408 F.3d 186, 191 (5th Cir. 2005); *see*

*Patel v. United States*, 19 F.3d at 1237.

B. Knowledge of the Bench Warrant and Wisdom of Seeking a No-Knock Search
   Warrant

Barrett makes three unrelated arguments that his attorneys failed to present circumstantial

evidence about his knowledge of the state court bench warrant and the necessity of seeking a no-

93

knock search warrant. (Mot. 157-59.) The government responds to these meritless points in order of presentation.

Barrett claims his attorneys acted ineffectively in failing to adduce evidence from a state court file that bench warrant was mailed to him without a return receipt requested. (*See* Mot. 157-58; Tr. Hr'g Jan. 26, 2005, at 29-30, 39-42.) Barrett's claim fails from the outset because the record of the mailing was subject to a legal presumption of delivery in the absence of any evidence to the contrary. *See Moya v. United States*, 35 F.3d 501, 504 (10th Cir. 1994); *McPartlin v. Comm'r*, 653 F.2d 1185, 1191 (7th Cir.1981) (noting presumption of receipt of properly addressed mail); *see also Hagner v. United States*, 285 U.S. 427, 430 (1932) ("The rule is well-settled that proof that a letter properly directed was placed in a post office creates a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed."). Indeed, when presented with the issue, this Court did not presume that the mailing provided insufficiently reliable notice:

> While the Defendant focuses primarily on the fact that he may not have received notice of the need to appear, the evidence presented at the hearing indicated that the Sequoyah County Court Clerk followed the usual procedures employed to effect such notice, *i.e.*, that notice was mailed to the Defendant's last known address, and that the underlying file fully documented these procedures. . . . it thus cannot be said that false information was intentionally or recklessly provided to the judge (e.g., that the Defendant was afforded notice when in fact he was not).

(Trl. Doc. 105 at 7-8.) Accordingly, production of the state court file would have simply served to provide further evidence that Barrett was aware of the warrant and the failure to elicit such harmful evidence was neither unreasonable nor prejudicial.

Barrett also complains that his attorneys should have presented information, which he located in his former attorney's file, to demonstrate that the state had offered to allow him to

<div align="center">94</div>

plead guilty in exchange for a no-custody sentence in his drug case.[11]  According to Barrett, this information would have shown that the police later acted unreasonably in seeking a no-knock warrant.  Of course, the fact that a prosecutor offered a favorable disposition in Barrett's 1997 drug case has absolutely no bearing on how the police interpreted information obtained in 1999 about the defendant's subsequent conduct and attitude toward law enforcement.  Moreover, the necessity of seeking a no-knock warrant had no bearing on the document's validity or the Tact Team's reliance on it to properly enter Barrett's property.  Assuming that, in spite of the patent irrelevance of the plea offer, trial counsel still might have concluded that the matter was worth exploring, Barrett fails to show that his attorneys had any reason to investigate the issue.  In particular, he fails to aver that he advised them of the existence of the plea offer.  *Cf. Smith v. Workman*, 550 F.3d 1258, 1272 (10th Cir. 2008) (noting that counsel are not expected to be clairvoyant).  Trial counsel did not act ineffectively in omitting to present irrelevant evidence about a plea offer, in another case, about which they had no reason to have any knowledge.  *United States v. Harris*, 408 F.3d at 191; *see Patel v. United States*, 19 F.3d at 1237.

Barrett is similarly unpersuasive in complaining that his attorneys ineffectively omitted the testimony of bail bondsman Martin Daggs from the guilt phase.  (Mot. 159.)  As Barrett notes, Daggs testified in the penalty phase that he did not detain the defendant or otherwise provide him notice about the bench warrant following the failure to appear.  (Tr. 25: 5008-29.)  The fact that Daggs had not informed Barrett of the warrant in no way foreclosed the possibility that the defendant learned of it from some other source.  Here the government presented evidence

---

[11]For the sake of argument, the government assumes that Barrett does not fault his attorneys for failing to adduce the hearsay documents in his former attorney's file and, instead, believes that trial counsel should have sought admissible evidence of the plea offer.

95

that Barrett made statements acknowledging the existence of the warrant or the likelihood the police would enter his property (*see e.g.,* Tr. 3: 400-01, 466, 13: 3068, 15: 3492), and Daggs's inaction does nothing to contradict that testimony because he was not the only possible source of information about the warrant.  Notably, Daggs's penalty phase testimony about his actions failed to persuade the jury that Barrett was unaware of the warrant, as it found true the substantial planning and premeditation factor.  That finding implied the jury's reliance on testimony that Barrett intended to kill police officers when they served a warrant that he had frequently discussed.  (*See, e.g.*, Tr. 3: 400-01, 466.)  Thus, there is no reasonable probability that Daggs's absence from the witness stand during the guilt phase in any way prejudiced the verdict.  The omission of his minimally probative testimony from the guilt phase was neither unreasonable nor prejudicial ineffectiveness.  *See Boyle*, 544 F.3d at 1138.

C. Barrett's Supposed Cooperation with the Police

Barrett also fails to demonstrate that his attorneys erred in omitting to call witnesses who would have testified that Sheriff Johnny Philpot had visited the defendant's home less than a month before the murder.  According to Barrett such evidence would have undermined the government's proof that the defendant was hostile to law enforcement.  Barrett's claim that Philpot was on his porch less than a month before the killing is based on the recollection of his cousin and neighbor, Janice Sanders, whose call to the police supposedly led the police to respond.[12]  (Mot. Ex. 85 at 1-2.)  Philpot testified at trial to a single instance in which he and

---

[12]Barrett's mother also alludes to the incident in a declaration (Mot. Ex. 97 at 16), but she does not state that she actually observed it and is not simply repeating Sanders's representations. Barrett also proffers a hearsay report that Philpot recently told a defense investigator that the incident occurred less than a month before the murder, but that inadmissible evidence should not long detain this Court.  (*See* Mot. Ex. 114.)

96

other deputies had gone to Barrett's home and inspected the defendant's weapons:

> Q. Sheriff Philpot, there has been reference to an incident in which
> Kenneth Barrett allowed officers to look at his firearms. Are you familiar with
> that incident?
> A. Yes, I am.
> Q. And when did that happen?
> A. It was in July, I think the 29th of 1998.

(Tr. 1789, *see also* Tr. 1809-10.)  Philpot has clarified that the July 1998 incident was the only one in which he visited Barrett's home and inspected a weapon.  (See Resp. Ex. 1.)

Significantly, defense counsel did not challenge Philpot on the date of the incident, though Barrett was present and clearly could have informed his lawyers whether the meeting had occurred just a month before the murder.  The fact that Philpot was not challenged indicates that Barrett said nothing because the sheriff's memory was accurate.  More to the point, Barrett's apparent silence on this subject deprives his ineffectiveness claim of any merit.  If Barrett did not inform his attorneys that he had met with Philpot shortly before the murder, he can hardly fault them for failing to investigate the subject or learn of it from some other source.  As noted above, "[C]ounsel cannot be faulted for failing to raise claims as to which the client has neglected to supply the essential underlying facts . . . [because] clairvoyance is not required of effective trial counsel." *Smith v. Workman*, 550 F.3d at 1272 (quoting *United States v. Miller*, 907 F.2d at 999 (internal quotations omitted)).

Barrett further fails in claiming his attorney should have adduced the testimony of his relatives that he would have willingly surrendered had the police had solicited his family for cooperation.  (Mot. 161-62.)  At best, such testimony would have amounted to inadmissible hearsay accounts of the defendant's statements.  At worst, it would have consisted of inadmissible speculation about the defendant's intent.  *See United States v. Tanner*, 941 F.2d at

97

585. Trial counsel did not act unreasonably, nor did they prejudice Barrett, by omitting to proffer patently inadmissible evidence. *See Williams v. Allen*, 458 F.3d 1233, 1250 (11th Cir. 2006); *Henderson v. Norris*, 118 F.3d at 1288.

Barrett also fails to demonstrate ineffectiveness when he faults his attorneys for omitting to adduce evidence that, some unspecified number years before the murder, his aunt had once convinced him to surrender to pursuing police officers. (See Mot. 162 (citing Mot. Ex. 91).) The incident was entirely irrelevant to Barrett's state of mind at the time of the murder, and cumulative of more concrete evidence that a little more than a year before the murder, the defendant had permitted Sheriff Philpot and several deputies onto his porch. Again, trial counsel did not act ineffectively or prejudicially by forgoing such unpersuasive and irrelevant evidence. *See Strickland v. Washington*, 466 U.S. at 687; *Williams v. Allen*, 458 F.3d at 1250.

On a related note, Barrett cannot demonstrate ineffectiveness by alleging his attorneys should have adduced, at the guilt phase, the penalty phase testimony of Clyde Edgmon. (*See* Mot. 162-63.) Edgmon testified that Barrett came to his house an indeterminate period of time prior to the murder to perform some mechanical work on a vehicle. During Barrett's visit, two police officers accosted the defendant, but Edgmon did not listen to the conversation. (Tr. 24: 4929-39.) Edgmon's recollections, devoid of any time frame, demonstrate nothing about the entirely distinguishable facts of this case, which turned on Barrett's intent toward police officers entering his land to arrest him. Indeed, Edgmon's testimony clearly failed to raise a reasonable doubt during the penalty phase that Barrett had substantially planned and premeditated the murder. (*See* Trl. Doc. 258.) As such, Barrett cannot show a reasonable probability that Edgmon's involvement in the guilt phase would have led to acquittal, when the government had

98

no burden to prove premeditation.  (*See* Trl. Doc. 240 at Inst. 7.)  The omission of Edgmon's

patently unhelpful testimony was not ineffective assistance of counsel.  *See Strickland v.*

*Washington*, 466 U.S. at 687; *Boyle v. McKune*, 544 F.3d at 1138.

Barrett also cannot establish ineffectiveness based on the omission of testimony that he

did not typically react to the presence of police officers when he observed them on the public

road outside his house.  (*Cf*. Mot. 162 (citing Mot. Exs. 77 & 95).)  According to Barrett, the

putative testimony would have established that, consistent with his indifference to the police, he

did not respond when told by Travis Crawford that officers had driven by his house in an

unmarked vehicle.  Such a strategy would have, however, lent credence to Crawford's testimony

that he made the report to Barrett in the first instance.  Presumably, Crawford would not have

thought to inform Barrett of the police presence unless he believed it constituted some sort of

threat to the defendant.  Putting that aside, evidence that Barrett was not hostile to the presence of

the police on public highways was irrelevant; the issue at trial was his intent toward them when

they entered his property to arrest him.  The omission of irrelevant evidence about Barrett's

response to the public presence of the police was neither unreasonable performance nor

prejudicial to the defense.  *See Strickland*, 466 U.S. at 687; *Patel v. United States*, 19 F.3d at

1237.

Barrett also fails to establish ineffective assistance based on a claim that his attorneys

should have adduced evidence that he hung a threatening sign on his gate shortly before the

murder in response to trespassers, not in anticipation of the police.  (Mot. 162 (citing Mot. Ex.

95).)  As evidence of this, Barrett points to Shawn Hill's assertion that "The sign on Kenny's

gate was put there on the 9/22/99 because meth fiends had climbed across his fence the night

before and awakened him. It had nothing to do with the police." (*Id*.)  Hill's averment lacks any apparent foundation and appears, at best, to repeat the defendant's hearsay statements.  *See Tanner*, 941 F.2d at 585.  The failure to adduce inadmissible evidence is neither objectively unreasonable nor prejudicial.  *See Williams v. Allen*, 458 F.3d at 1250.  Moreover, counsel could have validly concluded that any attempt to minimize the significance of the sign through Hill's testimony would have simply drawn further attention to the government's evidence and allowed the prosecution to explore it with a defense witness.  *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (noting strong presumption that counsel makes decisions for tactical reasons, rather than out of neglect).

Assuming, arguendo, that counsel had no valid reason for omitting the putative defense evidence, the forgone evidence would have had little impact, as the prosecution did not rely on any fact that Hill's supposed testimony appears designed to contradict.  (*See, e.g.*, Tr. 3: 398, 13: 3085.)  The prosecution certainly presented evidence of the sign, but it spoke for itself, expressing Barrett's universally profane and hostile sentiment, "Keep Out. I don't give a shit who you are, if you cross my gate or come on my property, I'll shoot."  The sign was not, however, the object of enormous scrutiny or concern at trial.  The government adduced evidence about it from a handful of witnesses (Tr. 3: 398, 4: 726, 11: 2344-45 & 13: 3085) and mentioned it during argument (Tr. 20: 4297, 4381, 4382, 4396), never once claiming that Barrett had intended it specifically for the police or that he had hung it a particularly long time before the murder.  The sign was but one part of the proof of the defendant's intent, and the prosecution presented a constellation of evidence to establish mens rea.  (*See, e.g.*, Tr. 20: 4296-99 (argument about intent that relied on, in addition to the sign, the defendant's statements, his constant possession of

100

a handgun, and his decision to arm himself with a rifle when a man entered his property and said he was being pursued by the police), 4305-07 (premising intent on the defendant's locked gate, his easy access to a rifle, his shot pattern, his preparation of a spotting scope to view the natural point of entry to his land, and his attempt to reach his pistol after being taken into custody).)  As such, Barrett cannot show a reasonable probability that he would have been acquitted had his attorneys adduced Hill's putative testimony about the sign.  *Patel v. United States*, 19 F.3d at 1237.  Accordingly, Barrett cannot sustain his claim of ineffective assistance of counsel.  *Id.*

12.  Trial Counsel Reasonably Sought and Received an Order Striking the Testimony of a Government Expert Witness; No Further Response Was Prudent or Necessary

Barrett claims his trial attorneys were ineffective for failing to prepare for the government's expert witness, James Horn, and for failing to interpose a *Daubert* challenge to his testimony.[13]  Barrett further argues his trial attorneys were ineffective for omitting to seek a mistrial after they successfully moved to strike Horn's testimony.  In a related vein, he contends that his appellate attorneys were ineffective for failing to argue that the jury's exposure to Horn constituted plain error.  (Mot. 163-76, 384-85; BIS 92-97, 237-38.)  Trial counsel's successful motion to strike Horn's testimony moots his various complaints about counsel's alleged failures to prepare for the witness.  Regardless, the jury's exposure to Horn would not have supported a valid mistrial motion or an appellate claim of plain error.

As Barrett concedes, this Court granted a defense motion to strike Horn's testimony, holding that it was not based upon assertions that tested "in such a manner to make the evidence reliable under *Daubert*."  (Tr. 8: 1634-35.)  In fact, the Court commented that it could not

---

[13]*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

101

determine what methods Horn had employed or what conclusions he had reached.  The Court

commented that it did not believe that Horn had reached any opinions based on the facts of the

case.  (Tr. 8: 1635-36.)  It also noted counsel's strategic decision to challenge the witness before

the jury and observed, "Defense counsel did an admirable job in his cross examination of Mr.

Horn."  (Tr. 8: 1635.)  Later that day, the Court informed the jury that it had struck Horn's

testimony and instructed the jurors to disregard it in its entirety:

> As a matter of law, I have determined that the testimony which you heard on
> Monday afternoon and Tuesday morning of James Horn should not have been
> admitted into this trial. You should not speculate about the reasons for my ruling
> on this issue it is based solely on my interpretation of the law applicable in this
> case. Therefore, I instruct you that you should disregard Mr. Horn's testimony in
> its entirety and not consider it for any purpose in making your decision when
> reaching a verdict in this case.

(Tr. 8: 1739-40.)  The Court's ruling rendered Horn's testimony a nullity; the Court's findings

underscore the fact that Horn had not prejudiced the defense.

Federal courts "presume that jurors will follow clear instructions to disregard evidence

unless there is an overwhelming probability that the jury will be unable to follow the court's

instructions, and a strong likelihood that the effect of the evidence would be devastating to the

defendant." *United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002) (internal quotation

marks omitted); *see also Penry v. Johnson*, 532 U.S. 782, 799-800 (2001) (noting general

presumption that juries follow instructions applies in habeas proceedings).  Accordingly,

Barrett's complaints that his attorneys failed to properly prepare for, and preemptively challenge,

Horn's testimony are moot, as that testimony was presumably disregarded by the jury under the

Court's instruction.  *See Caballero*, 277 F.3d at 1243; see *generally McElvain v. Lewis*, 283 F.

Supp. 2d 1104, 1127 (C.D. Cal. 2003) (finding no ineffectiveness where counsel did make an

allegedly omitted objection).

Barrett similarly fails in attempting to show that trial counsel should have sought a mistrial based on the jury's exposure to Horn's testimony. A motion for mistrial would have been futile, and therefore could not amount to ineffective assistance. *See Hawkins v. Hannigan*, 185 F.3d at 1152; *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994). Courts of this circuit may only grant a mistrial "when a defendant's right to a fair and impartial trial has been impaired." *United States v. Caballero*, 277 F.3d at 1242. "'Whether a motion for mistrial should be granted is within the discretion of the trial judge because he is in the best position to evaluate the effect of the offending evidence on the jury.'" *United States v. Meridyth*, 364 F.3d 1181, 1183 (10th Cir. 2004) (quoting *United States v. Laymon*, 621 F.2d 1051, 1053 (10th Cir.1980)). In this regard, a motion for mistrial requires "an examination of the prejudicial impact of an error or errors when viewed in the context of an entire case." *Meridyth*, 364 F.3d at 1183. "Where evidence is later ruled inadmissible, a cautionary instruction is ordinarily sufficient to cure any alleged prejudice to the defendant and declaring a mistrial is only appropriate where a cautionary instruction is unlikely to cure the prejudicial effect of an error." *United States v. Peveto*, 881 F.2d 844, 859 (10th Cir. 1989).

Barrett cannot show that the jury's exposure to Horn's testimony impaired his right to a fair trial. Horn's testimony on direct examination was confined to intuitive and anecdotal observations about the nature of human memory. He made innocuous and non-controversial assertions – that memory is affected by emotion, that witnesses to stressful events require time to compose their emotions before reliably recounting events, and that the quality of a witness's perception and memory degrade in relation to the stress of the event to be recalled. (Tr. 4: 850-

103

51, 856-58, 860-61.)  These common-sense observations were not prejudicial to Barrett and required little creativity to turn to the defense's advantage in a prosecution built on the testimony of participants in a gun battle.  Indeed, similar evidence has frequently been proffered by defendants seeking to undermine eyewitness identifications.  *See generally United States v. Rodriguez-Felix*, 450 F.3d at 1123-25 (noting the refusal of most federal courts to create a per se rule of exclusion for experts in eyewitness identification who testify about, inter alia, the effects of stress on memory).

Horn made other statements about memory that are not subject to reasonable debate.  He testified that "triggers" can assist witnesses in recalling otherwise forgotten details.  (Tr. 4: 852, 854-55, 859.)  That observation was not only non-prejudicial, it is entirely consistent with the well-worn legal precept that litigants can refresh recollection with extrinsic evidence.  *See United States v. Weller*, 238 F.3d 1215, 1221 (10th Cir. 2001) (noting general rule that almost anything can be used to refresh a witness's recollection).  Horn also stated that inconsistencies are normal among witnesses to a stressful event.  (Tr. 4: 860.)  Again, his assertion reflects a widely-accepted concept in the courts, as the pattern jury instructions of this circuit and others effectively inform jurors of the same thing.  *See, e.g.*, Tenth Circuit Pattern Jury Instructions (Criminal) § 1.08 (2005) ("When weighing conflicting testimony . . . . you should keep in mind that innocent misrecollection – like failure of recollection – is not uncommon."); *see also* Third Circuit Pattern Jury Instructions (Criminal) § 3.04 (2008) ("Inconsistencies or discrepancies in a witness' testimony or between the testimony of different witnesses may or may not cause you to disbelieve a witness' testimony. Two or more persons witnessing an event may simply see or hear it differently. Mistaken recollection, like failure to recall, is a common human experience").

104

On cross-examination, defense counsel led Horn into a series of statements that tended to undermine the reliability of the government's witnesses, who were testifying six years after the shooting.  For instance, Horn stated that the jury had to understand the "impact that trauma has on memory" because it was necessarily relying on recollections of traumatic events.  (Tr. 4: 885.) Horn also conceded that memory degraded over time (Tr. 4: 911), that grief stemming from the death of a colleague could affect memory (Tr. 5: 955), and that a workshop he held for the Tact Team possibly led to cross-contamination of memory (Tr. 4: 906).  He also reiterated that memory was distorted by trauma.  (Tr. 5: 955.)  Far from prejudicial to the defense, this testimony provided grist for a bevy of potential reasonable-doubt arguments.

Unable to demonstrate the existence of any prejudice resulting from the substance of Horn's testimony, Barrett instead attacks its tone, arguing that the witness's connection to the FBI and his references to the fraternal bond among police officers lent credibility to the government's witnesses.  (Mot. 174.)  Trial counsel apparently took a longer view, appreciating that the witness's connection to law enforcement lent credibility to statements the defense could use to attack the reliability of the government's witnesses.  In fact, Horn's testimony about the familial bonds among police officers was also beneficial to the defense, because it referred to a stressor that might diminish the reliability of an officer's recollections of events like this shooting:

> A. . . . in critical incidents, it's very akin to the relationship I still have to this day with the Marines with whom I served in Vietnam because there is a bond when you face life-threatening situations that is formed, that is probably like no other bond.  You become instant friends and you probably just stay that way the rest of your life because of that experience.
> Q.  In that regard, if an officer shooting relates to a member of a tactical team, is that going to increase the difficulties of -- that we are talking about today or is that going to minimize it or what impact, if any impact, is it going to have?

105

151

A. I have never seen it where it didn't increase the impact that it had on the participants when it's a colleague.

(Tr. 4: 862.)

Horn's testimony was potentially very helpful to it and provided no basis for a mistrial. In fact, Horn's testimony provided so many potential benefits to the defense, that counsel had an obvious tactical reason not to challenge it in the first instance and had no colorable basis for a mistrial motion after the order striking the evidence. Certainly, trial counsel's omission of a futile motion for a mistrial was neither unreasonable nor prejudicial. Similarly, appellate counsel wisely chose to omit a claim of plain error based on the jury's exposure to plainly non-prejudicial evidence. *See United States v. Challoner*, 583 F.3d at 745 (noting that only the failure to raise a "dead-bang winner" amounts to effectiveness on appeal).

13. Trial Counsel did not Omit any Valid Requests for Guilt-Phase Jury Instructions

Barrett claims that his trial attorneys rendered ineffective assistance when they omitted to request jury instructions on informant credibility, drug-user credibility, self defense, two defense theories, and unidentified lesser-included offenses. (Mot. 176-78; BIS 97-99.) Barrett's claims all fail because adequate instructions were given, because counsel did make the supposedly forgone request, or because the omitted instructions were contrary to the law and evidence.

Barrett misreads the record when he complains that his attorneys did not request an instruction on informant witness credibility. The Court duly instructed the jury as follows:

> The testimony of a witness who provides evidence against the defendant for some advantage that it may give to them or in contemplation of immunity or reduction from punishment or any other inducement, must be examined and weighed with greater care or greater scrutiny than the testimony of an ordinary witness. You must determine whether the witness's testimony has been affected as to its credibility by any interest they have in any special treatment they receive or any interest they have in the outcome of the trial or any prejudice they have against the

106

152

defendant.

(Trl. Doc. 240, Inst. 27.)  Barrett does not identify this instruction, nor does he make any attempt to show how it failed to properly educate the jury about the credibility of informants.  Barrett's attorneys could not have been ineffective for failing to request an instruction that was given by the court.  *See Hawkins v. Hannigan*, 185 F.3d at 1152.

Barrett claims that his attorneys erred in failing to request an instruction on drug addict credibility.  He is correct that such an instruction should be given upon request, when supported by the record.  *United States v. Smith*, 692 F.2d 658, 660–61 (10th Cir. 1982).  However, the absence of such a charge is not necessarily prejudicial.  *See id.*; *see also United States v. Nicholson*, 983 F.2d 983, 991 (10th Cir. 1993).  In *Smith*, the Tenth Circuit held harmless the omission of an addict instruction because the trial court had provided a general credibility instruction in addition to charges on accomplice, informant, and felon testimony.  The court found those instructions "sufficient to alert the jury to consider with special care and weigh with caution the testimony of" the drug-addict witness and observed that the issue was extensively explored during testimony.  *Smith*, 692 F.2d at 661; *see Nicholson*, 983 F.2d at 991 (similar result).

In this case, the Court instructed the jury on credibility, impeachment, impeachment by prior conviction, and informant testimony.  (*See* Trl. Doc. 240.)  Additionally, counsel for both parties elicited testimony about the prosecution witnesses' involvement with drugs.  (*See, e.g*, Tr. 3: 428-31 (Randy Turman); 3: 468 & 471-72 (Travis Crawford); 8: 1836 & 1843 (Randy Weaver); 11: 2511, 2515-24, 12: 2581-82 & 2604-05 (Charles Sanders), 13: 3061 & 3070-75 (Cindy Crawford); 13: 3081, 14: 3100 & 3117 (Karen Real); 14: 3486-88 (Brandie Price).)  On

107

this record, as in *Smith* and *Nicholson*, the jury charge and evidence as a whole preclude a finding of prejudice stemming from the absence of a addict-witness instruction. As such, Barrett's cannot demonstrate that his attorneys provided ineffective assistance in omitting to request such an instruction. *McGee v. Higgins*, 568 F.3d 832, 839 (10th Cir. 2009) (disposing of ineffectiveness claims on prejudice grounds alone "[b]ecause it is easier").

Barrett cannot show that his trial attorneys were ineffective in failing to request a self-defense instruction because he cannot demonstrate that the record supported the giving of such a charge. A defendant is entitled to an instruction on his theory of the case if such a charge is "a correct statement of the law, and if he [had] offered sufficient evidence for the jury to find in his favor." *United States v. Crockett*, 435 F.3d 1305, 1314 (10th Cir. 2006). The record here would not support a legally complete self-defense instruction. Such a charge would have informed the jury that Barrett is not entitled to use any greater force than he had reasonable ground to believe was necessary under the circumstances to save his life or avert serious bodily harm. *See United States v. Scalf*, 725 F.2d 1272, 1273-74 (10th Cir. 1984).

Here, as the Tenth Circuit noted, the evidence indicated that Barrett shot Eales three times as the victim sought cover behind a vehicle and was facing away from the defendant. *Barrett*, 496 F.3d at 1085; *see* Tr. 7: 1605-07, 1610-15. Even if the appearance of Eales and his fellow Tact Team members had arguably placed Barrett in a reasonable apprehension of his safety, the defendant had clearly become the aggressor when he shot a fleeing man three times in the back and could not have demonstrated that he was using reasonable force under the circumstances. *See Le v. Mullin*, 311 F.3d 1002, 1026-27 (10th Cir. 2002) (holding counsel was not ineffective for failing to request a self defense instruction because defendant was the initial aggressor); *see*

108

*also United States v. Garcia*, 625 F.2d 162, 170 (7th Cir. 1980) (finding self-defense claim unavailable to defendants who, following an altercation, chased victim, held him down and stabbed him 47 times). Because self-defense was not a viable theory under the facts, counsel did not act unreasonably in omitting to request an instruction on the doctrine.

Furthermore, to convict Barrett of Counts 2 and 3, the jury had to find that the defendant had reason to know that the victim was a police officer. (*See* Trl. Doct. 240 at Insts. 7 & 15.) That finding precludes the possibility that the jury could have also found that Barrett, in these circumstances, used no greater force than he had reasonable grounds to believe was necessary. By extension, the finding obviates the possibility that a self-defense instruction, even if requested and given, would have led to a reasonable probability of a more favorable verdict. Accordingly, Barrett cannot establish prejudicial ineffectiveness based on the decision not to request an unnecessary instruction. *See McGee v. Higgins*, 568 F.3d at 839 (10th Cir. 2009).

Barrett is no more successful in his conclusory argument that counsel should have requested instructions in support of two defense theories – first, that the defendant had no indication that the lead Bronco contained police officers and, second, that he was not engaged in drug manufacture or distribution when the Tact Team entered his land. Barrett provides no hint what form the unrequested instructions might have taken. At most, though, counsel might have requested instructions that admonished jurors to acquit Barrett if they harbored a reasonable doubt about facts that formed a necessary prerequisite to proof of the charged offenses. Such an instruction was entirely unnecessary, because the charge adequately informed the jury that it must acquit on the basis of reasonable doubt as to any element of any charged crime, including whether Barrett had reason to know he was firing on police and whether he was involved in drug

109

offenses.  (*See* Trl. Doc. 240, Insts. 3, 4, 7, 8, 9, 10, 11, 12, 13, 15 & 16.)  The Court was not required to give a theory of the defense instruction "if it would simply give the jury a clearer understanding of the issues."  *United States v. Wolny*, 133 F.3d 758, 765 (10th Cir.1998).  In view of that rule, defense counsel could not have provided ineffective assistance by failing to make a futile motion for a pointless instruction.  *See Hawkins*, 185 F.3d at 1152.

Finally, Barrett's contention that his attorneys were ineffective for failing to request lesser-included-offense instructions fails as a matter of law and fact.  Barrett's trial lawyers did ask for lesser offense instructions, as Barrett concedes later in his § 2255 Motion:

> MR. HILFIGER: Okay. Well, I just – I still feel it should be separated, murder first, murder second.  Also we're asking that voluntary manslaughter because it  doesn't come under heat of passion as defined in theTenth Circuit.

(Tr. 19: 4212.)  In fact, Barrett elsewhere claims error based on this Court's denial of the request.  (*See* Mot. 336 ("the defense requested the trial court instruct on voluntary manslaughter").)  Even if defense counsel had not requested the instructions, the government did.  (*See* Tr. 19: 4213-21.)

The actions of all counsel notwithstanding, there was no lesser-offense instruction available as to the charged crimes as a matter of law.  *See, infra*, Arg. IX.  Furthermore, this Court found that the record would not support a lesser-offense instruction as to any of the charged crimes.  RT 4222-24; *cf. United States v. Moore*, 108 F.3d 270, 272 (10th Cir.1997) (requiring lesser-included-offense instructions only if, inter alia, "a jury could rationally convict the defendant of the lesser offense and acquit him of the greater offense.").  Thus, Barrett could not even show, hypothetically, that the alleged absence of the request would have been anything but futile and non-prejudicial.

14. Trial Counsel's Failure to Make Futile Objections did not Constitute Ineffective Assistance

110

Barrett claims his trial attorneys were ineffective for omitting objections that resulted in the "plain error" review of various appellate claims.  (Mot. 178-79; BIS 100-01.)  Barrett's argument fails as a matter of law, as the Tenth Circuit does not recognize the stated theory as asserting a valid claim of ineffectiveness.  Even if Barrett had stated a legally valid claim, he cannot demonstrate prejudice in view of the Tenth Circuit's opinion, which states or implies that all the claims denied under the plain error standard of review would have similarly failed if considered de novo.

To demonstrate the existence of prejudicial ineffectiveness, Barrett must establish "a reasonable probability that but for" his counsel's failure to object, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687.  He cannot properly premise a claim of ineffective assistance of counsel on an argument that the lack of an objection resulted in plain error review.  *See United States v. Hemsley*, No. 07-4222, 2008 WL 2725857, at **1(10th Cir. July 11, 2008) (holding that *Strickland* analyses of omitted objections focuses on the impact at trial).  The Tenth Circuit's refusal to contemplate such claims accords with the notion that courts strive to avoid analysis of counsel's conduct with the "benefit of hindsight." *Thomas v. Gilmore*, 144 F.3d at 515.  Arguments that trial counsel's omission of an objection precluded reversal on appeal ignores the fact that a timely objection would likely have resulted in a remedy that foreclosed a subsequent appeal.  Because any attempt to show that a timely objection would not have had such an effect is entirely speculative, the claimant can never show a reasonable likelihood of prejudice.  *Strickland*, 466 U.S. at 687.  Accordingly, this Court should simply reject his contention for failure to state a viable claim.

To the extent that the Court should review, in the alternative, the impact of plain error

111

157

review on the outcome of this case, the Tenth Circuit's opinion permits no showing that the standard of review had any prejudicial effect. Indeed, in rejecting a claim about the search warrant's failure to meet certain state law requirements, the court expressly concluded "there was no error on the part of the district court, let alone plain error." *Barrett*, 496 F.3d at 1089. While the court did not make a similar statement in rejecting challenges to the search warrant based on its execution by federal agents, its reasoning in no way demonstrates that it would have reached a different result had it applied de novo review. *See id.* at 1090-91. The Tenth Circuit rejected the argument that federal agents could not validly serve a state warrant by observing that Oklahoma state law specifically permitted such service. *Id.* at 1090. It rejected a claim that the warrant did not meet the requirements of Federal Rule of Criminal Procedure 41, based on a finding that the rule did not apply. *Id.* at 1091.

Barrett also fails in his complaints that the Tenth Circuit reviewed his challenges to the indictment under an unfavorable standard. In fact, the Tenth Circuit's rejection of his sufficiency claims was not dependent upon the plain error standard. While the court noted it would apply the standard, it ultimately found no error at all, obviating the concern that the standard applied was of any moment. *See, e.g., Barrett*, 496 F.3d at 1093 ("Counts 1 and 2 of the superseding indictment clearly gave Barrett fair notice of the charges he had to defend against, and likewise were sufficient to enable him to assert a double jeopardy defense "); *id.* at 1094 ("As for Barrett's second sufficiency-related argument, it is unnecessary for a criminal defendant charged with a § 924(c) offense to be separately charged with and convicted of the underlying offense."); *id.* at 1094-95 (rejecting a claim regarding the application of a Supreme Court decision because it did not apply to Barrett's indictment). The Tenth Circuit's rejection of Barrett's multiplicity claim

112

likewise noted the lack of objection below, but applied the same test to the indictment that it would have utilized under de novo review. *Barrett*, 496 F.3d at 1095 (quoting by reference to another case the test established in *Blockburger v. United States*, 284 U.S. 299, 302 (1932)). The Tenth Circuit rejected Barrett's misjoinder argument as "wholly lacking merit," leaving little doubt that the standard of review had any impact on the disposition of the claim. *Barrett*, 496 F.3d at 1097.

The court used similar language in rejecting claims about the admission of victim impact evidence. It rejected Barrett's legal interpretation of such evidence out of hand: "To the extent that Barrett is suggesting that all second-stage evidence must focus on the "characteristics" of the capital defendant, he is clearly wrong. " *Barrett*, 496 F.3d 1098. It left absolutely no doubt that admission of almost all the challenged evidence did not constitute error of any stripe: "we conclude there was no error, let alone plain error, arising from the admission of this victim impact testimony." *Id.* at 1099. With regard to this Court's decision to allow descriptions of a picture drawn by the victim's son and an essay written by the victim's daughter, the Tenth Circuit found that the legal bases for Barrett's challenges were inapplicable, that Barrett had fallen "far short" of establishing plain error, and that the evidence was not prejudicial under the Federal Rule of Evidence 403. *Id.* at 1099-1100. The Tenth Circuit rejected the final challenge to victim impact evidence, four photographs of Trooper Eales, by noting it was "not persuaded that the district court committed any error, let alone plain error. *Id.* at 1101. Given the Tenth Circuit's reasoning, no reasonable probability exists that Barrett would have received a more appelate outcome had his trial attorneys interposed more futile objections to the victim impact evidence.

The Tenth Circuit also would have rejected Barrett's *Batson* claim regardless of the

standard of review employed.  It declined to adopt a rule applying plain error to the review of a

*Batson* claim based on the lack of a contemporaneous challenge to the prosecutor's race-neutral

explanation and stated, "even applying the standard of review more favorable to Barrett, his

*Batson* claim fails.  *Barrett*, 496 F.3d at 1105 n.1.

The Tenth Circuit's rejection of Barrett's challenges to the federal death penalty statutes

referred to the plain error standard, but in no way depended upon it for the rejection of the

defendant's claims.  The court denied Barrett's challenge to non-statutory aggravators by

reference to a binding precedent from a case decided on de novo review.  *Barrett*, 496 F.3d at

1108 (citing *United States v. McCullough*, 457 F.3d 1087, 1106 (10th Cir. 2006)).  Similar

reasoning formed the basis of the court's rejection of claims regarding proportionality review

(496 F.3d at 1109 (citing *Pulley v. Harris*, 465 U.S. 37, 43 (1984)), and the "relaxed" evidentiary

standard (*id*. at 1109 (citing *United States v. Fulks*, 454 F.3d 410, 437-38 (4th Cir. 2006); *United*

*States v. Lee*, 374 F.3d 637, 648-49 (8th Cir. 2004); *United States v. Fell*, 360 F.3d 135, 143-46

(2d Cir. 2004); and *United States v. Webster*, 162 F.3d 308, 354 (5th Cir.1998)).  While the court

referred to plain error in rejecting Barrett's challenge to allegedly vague aggravating factors, it

made clear that Barrett had wholly failed to make out any claim of error, whatsoever: "§ 848's

general allowance of non-statutory aggravating factors is constitutionally permissible. . . . Barrett

has failed to explain how this alleged deficiency in § 848's scheme prejudiced him."  496 F.3d at

1110.  The court's reasoning makes clear that the standard of review did not affect the resolution

of Barrett's challenges to the federal death penalty statutes.

Plain error review also played no substantive part in the denial of a claim concerning the

supposed "double counting" of intent to kill.  Again, the Tenth Circuit again explained in certain

114

terms that plain error played no part in its decision: "Barrett has failed to establish any error, let alone plain error, resulting from the manner in which the jury was instructed to utilize the mental culpability aggravating factor in determining the appropriate sentence with respect to Count 3." *Barrett*, 496 F.3d at 1111.

Barrett's claim that the government provided late disclosure of evidence was decided with reference to the plain error standard, but failed on the basis of the Tenth Circuit's concrete finding that voir dire, rather than jury qualification, marked the commencement of trial for purposes of determining timeliness. 496 F.3d at 1116. As such, there is no basis in reason for concluding that the court would have reached different decision if it had invoked de novo review.

In short, Barrett wholly fails to demonstrate that the Tenth Circuit's references to the plain error standard had any impact on the outcome of the appeal, much less do they indicate that trial counsel were ineffective.

15. Trial Counsel did not Ineffectively Omit Objections to Prejudicial Misconduct

Petitioner claims that his attorneys provided ineffective assistance in that they failed to timely object to instances of prosecutorial misconduct during argument. (Mot. 180; BIS 101-02.) Petitioner's failure to set forth, with any specificity, the factual basis of his argument deprives it of any merit. *See Hall v. Bellmon*, 935 F.2d at 1110 ("conclusory allegations without supporting factual averments are insufficient to state a claim"). But regardless of the flaws in Barrett's pleading, the prosecutors did not commit prejudicial misconduct during argument – as fully explored below – and the omission of futile objections could not have amounted to ineffective assistance. *See, infra*, Arg. V; *Hawkins*, 185 F.3d at 1152.

16. Trial Counsel Presented Appropriate Mitigation Evidence in View of their Client's Wishes and the Available Facts

115

Barrett claims that his attorneys acted ineffectively in failing to present mitigating evidence that he had a dysfunctional childhood and suffered from bipolar syndrome and organic brain damage. (Mot. 185-248; BIS 102-25.) Defense counsel wisely presented internally consistent evidence meant to demonstrate that Barrett was a valuable member of his family and community who had been treated unfairly by the government. Barrett has failed to show that his attorneys were aware, or should have been aware of any evidence that he was mentally ill. Moreover, the putative evidence of Barrett's chaotic upbringing and mental illness would have undermined the defense strategy and violated the defendant's desire not to have the jury decide this case on the basis of sympathy.

A. The Defense Evidence and Jury Verdict

Given Barrett's outburst in response to the prosecution's penalty phase argument about his mother, discussed at in Argument XIII, it appears that counsel wisely chose to heed the defendant's wishes. Additionally, counsel had not discovered a factual premise for presenting substantial mental health evidence and wished to avoid premising the mitigation case on Barrett's drug abuse, as they thought such a theory was apt to be poorly received by the jury.

In view of the circumstances confronting defense counsel, they elected to present evidence from several of Barrett's friends and relatives, describing him as a good, generally non-violent, person who regretted Trooper Eales's homicide. Barrett's cousin, Kathy Trotter, who had many connections to the local community, was unaware of the defendant engaging in acts of violence but had heard rumors that he had engaged in mutual combat with his ex-wife. (Tr. 24:

116

162

4783-93.)  The defendant's brother, Steven Barrett, testified that Barrett was not a violent person but was a loner.  Steven knew that Barrett smoked marijuana, but did not have personal knowledge that the defendant used any other drug.  (Tr. 25: 5030-51.)  Roger Crawford, an uncle and neighbor, testified that Barrett was non-violent, a good nephew, a good father, and a hardworking mechanic.  Crawford suspected Barrett might have used drugs, but had no personal knowledge.  (Tr. 25: 5052-70.)  Like Barrett's other relatives, his neighbors, Craig and Clyde Edgmon, described the defendant as non-violent and a good car mechanic.  (Tr. 24: 4920-25, 4929-34.)

Barrett's mother and next-door neighbor, Gelene Dotson, described the defendant as an average, but hyper child, who quit high school after a disagreement with the superintendent over the need to get a hair cut.  Dotson noted that her son went to work, first taking care of horses then laboring on oil facilities and performing carpentry and mechanical work.  Dotson recalled that Barrett married at 18 and had a stormy relationship with his wife, marked by verbal – not physical – disputes.  She said that she had never observed Barrett use drugs and could not tell with certainty whether he ever had.  While Dotson and Barrett had disagreements, she never feared he would act violently.  She described Barrett as "more settled down" since his arrest, something she attributed to his lack of activity.  She also related Barrett's statements that he wished he had reacted differently when the Tact Team entered his property.  (Tr. 25: 5071-5105.)

Abby Stites was married to Barrett for 14 years, and conceded that the pair did engage in mutual physical combat during their relationship.  However, weapons were never used.  (Tr. 24: 4877-81.)  While Stites had observed Barrett boasting of a willingness to use violence outside their relationship, she had never seen him act on those threats.  (Tr. 24: 4883-84.)  Stites touched

117

163

on the fact that she had participated in an effort to have Barrett committed to a hospital in 1986, because she felt he had undefined "mental problems."[14]   Though Barrett discontinued the medications he received at the hospital, Stites agreed to share custody of their son with the defendant following their 1995 divorce.  (Tr. 24: 4893.)

Ernest Barrett, the defendant's father, conceded that he did not have a close relationship with his son after divorcing his mother.  But characterized the defendant as non-violent and said Barrett was sorry about the killing of Trooper Eales.  (Tr. 25: 5105-09.)  Barrett's step-mother, Doris Barrett, reported that after the defendant's arrest, she had developed a close relationship with him that she intended to maintain.  ( Tr. 25: 5119-25.)

The defense presented a separate body of evidence that demonstrated Barrett had been tried and convicted of manslaughter in Sequoyah County Court for the killing of Trooper Eales. He was serving his sentence in the state's only maximum security facility, though he appeared under Department of Corrections regulations, to merit incarceration in only a minimum security facility.  (Tr. 24: 4823-27.)  Moreover, he had not engaged in any act of misconduct in prison and was considered moderately likely to succeed if provided with substance abuse treatment.  (Tr. 24: 4828, 4840-4843.)

The defense presentation was clearly persuasive, even if it was not ultimately successful. The jury unanimously found in mitigation that Barrett was a father, a loved son and stepson, a person whose death would impact his child, family and friends, and a person with no prior felony convictions.  (Trl. Doc. 257.)  A majority of jurors also found that Barrett was a good neighbor

---

[14]During previous testimony, the hospital was characterized as a substance abuse treatment facility.  (*See* Tr. 24: 4830-31.)

118

and friend.  (*Id*.)  Additionally, five jurors found that Barrett had accepted responsibility for Eales's death from his prior conviction and that he had been punished and convicted for that death.  (*Id*.)  Finally, the jury not only rejected the prosecution's allegations that Barrett constituted a future danger, but two jurors found in mitigation that the defendant did not constitute a future danger to society.  (*Id*.)

B.  Counsel Validly Elected a Mitigation Strategy, and Any Forgone Evidence Would have Been Counterproductive

Barrett should not succeed in faulting his attorneys for failing to investigate and present evidence of his supposed mental illnesses, which allegedly include bipolar disorder and organic damage to the prefrontal lobe of his brain.  Nor should Barrett prevail by alleging that his attorneys failed to present proof that he was the progeny of a dysfunctional family.  Barrett had no interest in presenting such evidence.  Moreover, the records he relies upon to establish his alleged mental illness would have depicted him as a violent and inveterate drug addict, who repeatedly spurned the efforts of relatives and medical professionals to help him, in favor of a slavish abuse of marijuana and methamphetamine.

As previously noted, a showing that counsel could have conducted a more thorough investigation that might have borne fruit does not establish ineffectiveness.  *See Burger v. Kemp*, 483 U.S. at 794.  Investigations are not evaluated in light of ideal conditions with the benefit of hindsight.  *Thomas v. Gilmore*, 144 F.3d at 515; *see Tarver v. Hopper*, 169 F.3d 710, 715 (11th Cir. 1999) (noting that counsel is not "required to investigate and present all available mitigating evidence to be reasonable").  A showing that additional evidence could have been adduced by trial counsel "usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction

119

counsel will inevitably identify shortcomings in the performance of prior counsel. . . . [B]ut perfection is not the standard of effective assistance. *Waters v. Thomas*, 46 F.3d at 1514.

In particularly, where counsel did not know of facts that would alert him to the need to conduct a particular investigation, a failure to investigate does not amount to deficient performance. *Alcala v. Woodford*, 334 F.3d at 893. "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland*, 466 U.S. at 691. Thus, notwithstanding a defense attorney's duty to investigate and present mitigating evidence, "counsel also has to be responsive to the wishes of his client." *Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) (citing *Wallace v. Ward*, 191 F.3d 1235, 1247-48 (10th Cir. 1999) for the proposition that counsel's performance during a capital sentencing was sufficient, though counsel acquiesced in his client's wish to forgo mitigating evidence or challenge the state's evidence).

120

166

Sharp claims to have informed prior counsel of his opinion that Barrett's mental health merited investigation and to have faxed a report of unknown content to an unidentified person at some unreported date in 2005. (Mot. Ex. 55 at 3-4.) Nonetheless, Barrett fails to present any evidence that any specific information was ever provided to Messrs. Smith or Hilfiger that suggested the need for further investigation. Furthermore, counsel apparently arranged for Jeanne Russell and another psychologist to meet with Barrett, as demonstrated by the defendant's jailhouse visitation log. (*See* Resp. Ex. 5.) Russell omits this fact from her declaration, and Barrett has not shown that the results of her contemporaneous evaluation merited further

121

exploration.

Assuming, arguendo, that Barrett could show that his attorneys unreasonably failed to investigate evidence that he was mentally ill and came from a dysfunctional background, he cannot establish a reasonable likelihood that the testimony would have led to a more favorable verdict.  Barrett claims his attorney should have presented evidence of the dysfunction in his upbringing, as a precursor to evidence that he was severely mentally ill.  Doing so would have utterly negated the jury's view that he was a loved son and stepson, a person whose death would impact his child, family and friends, and a good neighbor and friend.  (Trl. Doc. 257.)  As such, Barrett can only establish that defense counsel could have had to have presented a different mitigation case than they did, not one that was necessarily more successful.

[15]  Barrett currently relies on diagnoses of bipolar syndrome, post-traumatic stress disorder and organic brain damage, which he received in 2009, but claims were indicative of his mental condition in 1999.  (*See* Mot. Exs. 89 & 117.)  The government does not concede that any of these diagnoses is presently

---

[15]Respondent's Exhibits 13 to 20 are excerpted from Petitioner's Exhibit 147.  Given the volume of material in Exhibit 147, which is not paginated, the government elected to copy the pertinent pages rather than attempt to identify them in their original form by description.

accurate, but that is not the issue.  Rather, Barrett must establish a reasonable likelihood that he would have been spared a death sentence had he presented this evidence.  He cannot do so because his own medical records demonstrate that medical professionals who diagnosed Barrett far closer in time to the murder than his current experts did not perceive a neurological illness, bipolar syndrome or post-traumatic stress disorder.  Rather, they observed a dangerous and assaultive drug addict.  Those records substantially undercut the accuracy of Barrett's current diagnoses and would have shattered the counsel's attempt to characterize their client as a decent, hardworking member of his family and community.

123

169

124

170

Similarly, evidence that Barrett had experienced a dysfunctional upbringing at the hands of mentally ill relatives would have undermined the jury's finding that the defendant was valued by his family.[16]  Barrett cannot show that he was prejudiced by the omission of evidence that would have sabotaged his attorneys' efforts to characterize him as useful and loved member of his family and society.  *See Cannon v. Gibson*, 259 F.3d 1253, 1277-78 (10th Cir. 2001) (holding that omitted evidence "would have negated much of the mitigation evidence actually adduced by trial counsel and could have strengthened the prosecution's argument that Cannon represented a continuing threat to society.").

Had counsel taken the path identified in the § 2255 Motion, Barrett could argue that they were ineffective for failing to humanize him and blunt the allegation of future dangerousness. Because the forgone evidence could have only been presented as an alternative to the case Barrett's lawyers actually developed, the attack on counsel's strategy relies entirely on the

---

[16]Barrett goes to pains to demonstrate that many of his relatives, some quite distant, experienced hardships or the effects of mental illness. (*See, e.g.*, Mot. 196-209.)  Apart from asserting his genetic link to mental illness, Barrett fails to establish a nexus between the suffering of his relatives and any viable theory of mitigation.  *See Rhoades v. Arave*, No. CV 93-0155-S-EJL, 2007 WL 1550441, at * 37 (D. Id. May 24, 2007) ("Petitioner is attempting to show a complete family history, going back several generations, but he has not explained how the rumored behavior of distant relatives has a causal or direct bearing on him.").

125

172

benefits of hindsight and should be rejected.

## III.  THE COURT PROPERLY PROVIDED NECESSARY ASSISTANCE TO THE DEFENSE

Barrett argues that this Court violated his due process rights when it improperly deprived him of necessary funding to employ various experts and purchase pre-trial hearing transcripts. Specifically, Barrett faults the Court for refusing to pay the complete or partial costs of three mental health experts, a "mitigation" specialist, a ballistics expert, and independent fact investigator, an independent SWAT expert, a metallurgist, a drug expert, a crime scene reconstruction expert, and a jury consultant.  (Mot. 249-62; BIS 125-41.)  Barrett has defaulted these arguments by failing to raise them on appeal.  But beyond that, he has failed to demonstrate that the Court's funding decisions were erroneous or prejudicial.

1.  <u>Procedural Default</u>

The Constitution guarantees criminal defendants the assistance of necessary experts. Under *Ake v. Oklahoma*, when a defendant demonstrates that his mental capacity "is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985).  *Ake* is construed broadly to guarantee other services, so long as the defendant shows that they are basic tools necessary to an adequate defense.  *United States v. Rodriguez-Felix*, 450 F.3d at 1127; *see, e.g., Rojem v. Gibson*, 245 F.3d at 1139 (finding defendant failed to make a sufficient showing to appoint an investigator); *see also Moore v. Johnson*, 225 F.3d 495, 503 (5th Cir. 2000) (finding the defendant failed to make a sufficient showing to appoint either a jury-selection expert or a mitigation expert).

126

Because *Ake* and its progeny require the defense to justify to the trial court the need for any government-funded services, Barrett's claim requires him to show that he presented this Court with valid reasons to purchase the services of which he now claims he was deprived. Thus, he cannot obtain relief without identifying facts that he could have included in the appellate record had he so chosen. Barrett, however, did not challenge the Court's funding of defense services on appeal. *See Massaro v. United States*, 538 U.S. at 504 (noting general rule that claims omitted from appeal may not be raised on collateral review); *United States v. DeFusco*, 949 F.2d 114, 120 (4th Cir. 1991) (noting § 2255 provides the appropriate vehicle for adjudicating a claim if the defendant has failed to create an adequate record for appeal).

Barrett attributes his default of the CJA claims to the supposed ineffectiveness of appellate counsel. (*See* Mot. 261.) That argument is inconsistent with the fact that Barrett resisted any scrutiny of his funding requests, and only allowed government scrutiny of his CJA motions on pain of forfeiting his claim entirely. (*See* Docs. 58, 61, 65, 67) Putting aside the fact that Barrett maintained a desire to protect the privacy of his funding requests long after his appeal was decided, he cannot demonstrate that he was entitled to any more services than he received. As a result, appellate counsel had no obligation to raise futile funding challenges, and Barrett cannot establish ineffective assistance of appellate counsel or, by extension, cause for his default. *See McCleskey v. Zant*, 499 U.S. at 493. Furthermore, Barrett has not shown the other element necessary for relief from his default – prejudice. In short, he fails to demonstrate he is actually innocent or that this Court's denial of services worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimension. *Daniels*, 254 F.3d at 1191. Thus, he has defaulted any claim of error concerning the deprivation of defense services.

<center>127</center>

2. <u>Mental Health Experts</u>

Barrett claims that this Court erroneously denied him fair access to the services of a psychologist, a psychiatrist and a neuropsychologist. He claims, in the alternative, that if the Court did not err, his attorneys were ineffective in failing to adequately request assistance. Barrett's claims fail because he never made the specific requests for assistance he identifies at this juncture, nor did he properly justify the requests he did make. Given that Barrett bore the burden of justifying any CJA expenditures, he cannot demonstrate that the Court's refusal to grant him assistance he did not ask for amounted to error. His claim of ineffective assistance of counsel is equally unavailing, as Barrett fails to show that his attorneys possessed information upon which to premise more compelling requests for the funding of mental health professionals.

As previously noted, the onus rests squarely with the defense to show the need for government-funded assistance, and defendants must offer "more than undeveloped assertions that the requested assistance would be beneficial." *Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1 (1985). "General allegations supporting a request for court appointment of [an] . . . expert, without substantive supporting facts, and undeveloped assertions that . . . assistance would be beneficial to the defendant will not suffice to require the appointment of [an expert] to aid in the preparation of a criminal defense." *Liles v. Saffle*, 945 F.2d 333, 336 (10th Cir.1991); *see Allen v. Mullin*, 368 F.3d 1220, 1236 (10th Cir. 2004); *Rojem*, 245 F.3d at 1139; *Castro v. Ward*, 138 F.3d 810, 826-27 (10th Cir.1998) (finding defendant failed to make a sufficient showing – one "with particularity" – to appoint an investigator). In assessing the necessity of a requested resource, the court considers three criteria:

> (1) the effect on [the defendant's] private interest in the accuracy of the trial if the
> requested service is not provided; (2) the burden on the government's interest if

128

175

the service is provided; and (3) the probable value of the additional service and the risk of error in the proceeding if such assistance is not offered.

*Rodriguez-Felix*, 450 F.3d at 1128 (quoting *Rojem*, 245 F.3d at 1139).

In this case, the Court made it eminently clear that it would require detailed showings to justify the appointment of defense experts. Indeed, the Court issued an Order in response to Barrett's request for pre-authorization of the defense budget (Trl. Doc. 24) that left little room for doubt as to the precise showing necessary for the funding of defense experts:

> The proposed litigation budget shall set forth separately and with specificity any expert witness counsel seeks to hire. A request shall: (i) identify the proposed expert and describe his credentials and experience; (ii) describe the subject matter to be covered by the expert; (iii) address why the expert is need [*sic*], i.e., explain both the facts indicating that further analysis is justified and the reason an expert witness is needed to interpret those facts; (iv) discuss the stage of the proceedings at which the expert is needed; and, (v) provide a specific time budget identifying the expert's billing rate and amount of time the expert anticipates spending on each portion of the investigation or analysis.

(Trl. Doc. 38 at 2.) Barrett made another attempt to submit a pre-authorization budget request, prompting this Court to issue an Order that directed counsel to "submit a proposed defense budget that *strictly complies* with it previous Order." (Trl. Doc. 47 at 1 (citing Trl. Doc. 38).)

Despite Barrett's reliance on wholly undeveloped requests for a mental health experts, the Court granted him between $4,000 and $6,000 to engage a psychiatrist or psychologist. (Trl. Doc. 97 at 3.)

---

In rejecting Barrett's renewed request, the Court observed that counsel had, despite repeated reminders, failed to comply with orders regarding the submission of a proposed budget. (Trl. Doc. 128 at 2-3.)  Specifically, the Court found that counsel had neglected to answer its five questions regarding potential experts.  (*Id*. at 2.)  The Court made clear that it sought this information to avoid a duplication of prior efforts: "[I]n light of the fact the basic underlying sequence of events involved in this particular case have been tried in courts of the State of Oklahoma twice before, the order sought detailed information from counsel regarding what factual issues *remained* to be investigated."  (*Id*. (emphasis added).)  While the Court explained that it would not expend funds simply because the case involved the potential imposition of the death penalty, it made clear that it would revisit the budget if Barrett submitted appropriately detailed requests.  (*Id*. at 3 & 6; *see also* Tr. March 22, 2005 at 31-32 ("I'll give you leave to respond to the budget at your leisure.").)  In a subsequent pre-trial Order, the court acknowledged the defense's asserted difficulties in retaining experts and it invited renewed requests that complied with previously-stated requirements.  (Doc. 133 at 2.)

As shown above, those requests were non-specific and inconsistent with the specifications mandated by the Court.  Barrett never attempted to correct or amend his prior

131

budget requests, and cannot fault this court for refusing to appoint experts on the basis of "general allegations" devoid of "substantive supporting facts." *Liles v. Saffle*, 945 F.2d at 336.

Even if Barrett could show that the Court or defense counsel had erred, he cannot demonstrate prejudice. As previously noted, the erroneous denial assistance to the defense is trial error subject to harmless error analysis under *Brecht*. *Brewer v. Reynolds*, 51 F.3d at 1529; *see, supra*, Arg. I. To merit relief Barrett must therefore show that any improper denial of funding for mental health experts "had substantial and injurious effect or influence in determining the jury's verdict." *Brewer*, 51 F.3d at 1529; *see also Toles v. Gibson*, 269 F.3d 1167, 1176-77 (10th Cir. 2001). Or, alternatively, he must show that absent counsel's allegedly inadequate budget requests, a reasonable probability exists that he would have received a more favorable verdict. *Strickland*, 466 U.S. at 687. Barrett cannot make either of these showings.

Barrett relies on a mistaken assumption in claiming that the allegedly erroneous denial of mental health evidence affected the guilt-phase verdict because it prevented him from rebutting the government's evidence of malice aforethought. As fully explored below, the malice element of counts 1 and 2 was satisfied by proof that Barrett committed the homicide during the course of a felony, and common law malice was not an element of count 3. (*See, infra*, Arg. IX, 2.) Accordingly, the absence of mental health evidence had no impact on the guilt phase verdict. As for the omission of any possible mental health evidence during the penalty phase, Barrett had no right to the psychiatrist of his choosing and has failed to show any reasonable likelihood that the funds he did receive were inadequate to develop any putative mitigating evidence. Certainly, Barrett has not shown that had he received more funding for financial assistance to hire mental health experts a reasonable probability exists the he would have received a more favorable

132

penalty phase verdict.

Barrett is equally unsuccessful in advancing his alternative, an entirely perfunctory, argument that counsel ineffectively failed to properly request mental health experts. (*See* Mot. 252.) Despite any failings in counsel's budget requests, the documents were persuasive enough to secure $4,000 to $6,000 to hire a mental health expert. (Trl. Doc. 97 at 3.) Barrett has not attempted to show, much less has he established, a reasonable probability that he would have received a more favorable verdict had counsel been provided with more money.

Barrett should be foreclosed from showing that counsel's initial failure to persuade this Court to provide more money for investigation the discovery of that evidence was prejudicial ineffectiveness. *See United States v. Booker*, 981 F.2d 289, 294 (7th Cir. 1992) (holding that a defendant cannot establish ineffectiveness based on the flaws in a futile motion).

3. Crime Scene Reconstruction Expert

Barrett alleges that the Court limited funding for the defense to hire Edward Hueske, an expert in ballistics and crime scene reconstruction with whom the defense could have challenged the government's witness, Iris Dalley. Barrett also complains that the funding order misled the defense because it observed that the Court had never previously permitted crime scene reconstruction testimony. (Mot. 256-59.) Regardless of the content of the order or the quantity of the funding, Barrett did receive $4,000 to retain the same ballistics and crime scene

133

reconstruction expert he relies upon now, Edward Hueske.  (*See* Trl. Doc. 97 at 3.)  The order provided these funds despite the fact that Barrett's request for the monies wholly failed to comply with the requirements for such motions.  While the order suggested that the Court would not likely admit crime scene reconstruction evidence, Barrett does not demonstrate that it misled his attorneys or that the funds provided by the court actually deprived him of necessary services. Simply stated, he does not show that Hueske's input was necessary to the defense, much less that the expert could not have provided useful guidance at the level of funding provided.

Barrett cannot fault this Court for refusing to provide Hueske with an arbitrary sum of           on the basis of "general allegations" devoid of "substantive supporting facts."  *Liles v. Saffle*, 945 F.2d at 336.

134

Case 6:09-cv-00105-JHP   Document 174   Filed 05/17/10   Page 160 of 301

To the extent Barrett argues that the Court's funding order misled counsel into believing ballistics and crime scene experts were unnecessary, he fails to state a cognizable claim that the defense was deprived of a necessary tool.  (*See, supra*, Arg. I.)  Beyond the fact that inferences drawn from a funding order do not entail a fundamental defect in the trial amenable to collateral relief, the conclusion that the order placed the defense at some disadvantage is unfair.  Barrett makes no effort to show that the Court ever refused a supplemental budget request after deciding to permit Dalley to testify.

*see also* Tr. March 22, 2005 at 17-18 (counsel refers to Dalley's prior testimony as "kind of embarrassing for [the state prosecution]").)  Accordingly, counsel was not misled by the Court's order, nor did they act unreasonably in forgoing consultation with Hueske.

Putting aside the Court's valid reasons for rejecting the funding request, Barrett fails to show that the monies provided were inadequate for Hueske to have reviewed Dalley's findings and to have identified most, if not all, the flaws alleged here.  (*See* Mot. 258-60.)  Barrett makes no attempt to demonstrate what specific, outcome-determinative, assistance Hueske might have provided had counsel received all the requested funding,          , rather than the amount initially provided by the Court.  Moreover, Barrett has made no effort to show that the funds provided were inadequate for an expert to engage in an analysis necessary for the defense or, at least, to justify supplemental CJA funding.  Without such a showing, he cannot establish that this Court erred or that his attorneys were ineffective in requesting money to hire a crime scene expert.  *See Haddock*, 12 F.3d at 958; *United States v. Caldwell*, 543 F.2d 1333, 1351 (D.C. Cir.

<center>135</center>

1974); *United States v. McNally*, 485 F.2d 398, 406 (8th Cir. 1973).

Barrett would have been unable to demonstrate that additional funding for a crime scene expert was necessary to his defense under *Rodriguez-Felix*, 450 F.3d at 1128. Apart from the fact that the defense had money to retain Hueske, Barrett wholly overstates Dalley's significance to the case. Dalley provided limited opinions, largely corroborative of existing evidence or conclusions the jury would have naturally drawn from it. Even on direct she conceded, with regard to the critical issue of Barrett's vantage, that she could not determine the exact position of the shooter or the victim's vehicle. (Tr. 14: 3175, 3226.) Ultimately, she opined only that Barrett could not have fired all the shots from a prone position inside the cabin and that Eales's flank and elbow wounds were not consistent with the trajectories of the shots into the Bronco when it was in motion. (Tr. 14: 3228-29, 3247, 3254, 3259.) Given the limited nature of this evidence, Barrett fails to demonstrate how he could have shown the necessity of expending more funds than he had received to impeach this witness. Certainly, the possibility exists that the defense might have relied on its own expert to identify otherwise unexplored flaws the crime scene reconstruction testimony, but Barrett cannot show any likelihood that such evidence would have affected the verdict, as the government did not require Dalley to prove any aspect of its case.

The government presented eyewitness testimony that the shots Barrett fired at Trooper Eales's Bronco, struck the windshield at around eye level, traveling from the victim's right. (Tr. 3: 554, 605.) When the Bronco stopped, Trooper Eales stumbled to the rear of his vehicle as a gunman fired through the front door of the Barrett home while simultaneously retreating inside. (Tr. 5: 989-97, 996-98, 1033, 1096-1101, 1158-60, 1165-66.) Eales exposed the left side of his

136

body to gunfire when he exited the Bronco.  (Tr. 5: 997-98, 1101-02.)  According to a pathologist, Eales received two wounds on his left side, both of which contained multiple fragments that indicated the bullets had passed through intervening objects.  (Tr. 7: 1599, 1605-07, 1610-15.)  One of the wounds to Eales's left side, which the medical examiner described as entering "on the left side of the upper back" and traveling "slightly back to front and slightly downward" was fatal.  (Tr. 7: 1611, 1614-15, 1619.)

Given the path of the fatal bullet through Eales's body – left to right, slightly back to front, and slightly downward – the jury could have only inferred that the victim was turning from Barrett when he was shot and not sitting in a four-wheel drive vehicle that was receiving fire from the right.  The testimony of other witnesses established facts that Dalley merely corroborated – that Eales was fatally shot as he fled from the Bronco.  Thus, the evidence provided by Dalley may have assisted the prosecution in highlighting certain facts, but the jury did not require her testimony to deduce the circumstances of Barrett's lethal shot.

Putting aside the limited impact of Dalley's direct examination, Barrett fails to acknowledge the length and depth of the defense's cross-examination of her.  Most significantly, trial counsel elicited Dalley's concession that the defendant could have fired every shot from inside his house, thereby using the government's own witness to support a defense hypothesis. (*See* Tr. 15: 3264, 3280-91, 3349-51.)  Given that the defense so effectively exploited the government's retained expert, it had no need to expend further funds on an expert like Hueske. *Cf. Aguilar v. Dretke*, 428 F.3d 526, 534 (5th Cir. 2005) (finding no due process violation for failure to appoint a ballistics expert since the evidence was neither critical to the conviction nor subject to varying expert opinion).  Thus, Barrett cannot show that the Court's funding level for

137

Hueske had a substantial and injurious effect on the verdict, much less can he show a reasonable probability that he would have received a more favorable verdict if his counsel had persuaded this Court to provide more money to hire the expert. *Brewer*, 51 F.3d at 1529; *Haddock*, 12 F.3d at 958.  Accordingly, both his alternative attacks on the court's funding and his trial attorneys' efforts on his behalf should fail.

4.  SWAT Practices Expert

Barrett complains that the Court did not adequately fund his request for his chosen expert on SWAT tactics, George Kirkham.  While Barrett requested          to hire Kirkham, the Court authorized an expenditure of $4,000.  According to Barrett, the refusal to grant the requested sum prevented him from adducing evidence that the Tact Team's warrant-service procedure violated established police practices, minimized the chance that he could identify the victims as police officers, was likely to provoke a violent response and unnecessarily exposed team members to gunfire.  (Mot. 260-61.)  Once again, Barrett received public funds despite a failure to properly justify the level of funding he did receive, much less that which he requested.  Barrett does not show that the amount of money the Court granted was inadequate to his needs or, at least, to justify further expenditures.  Beyond the funding he received, or could have received, Barrett cannot show that any of the forgone testimony he hoped to elicit about the Tact Team's procedures would have altered the outcome of the case.

185

Barrett cannot fault this Court for refusing to provide          on the basis of his general

allegations. *Liles v. Saffle*, 945 F.2d at 336. Moreover, he has made no effort to show that the

$4,000 grant he did receive was inadequate to hire an adequate expert or, at a minimum, to

develop a more substantial showing in support of his desire for Kirkham. Certainly, Barrett has

not shown that another expert could not have provided the putative testimony for the amount

allotted, and he cannot show that he had a right to the appointment of Kirkham over some other

expert. *See United States v. Caldwell*, 543 F.2d at 1351.

Most significantly, Barrett fails to show how evidence of failings in the Tact Team's

operation was in any way exculpatory or mitigating. As discussed elsewhere, the government

bore no burden to prove during the guilt phase that Barrett actually recognized the victims as

139

police officers, and only had to show that he had reason to know. *See, supra*, Arg. II, 2; *infra*, Arg. IX, 2. Evidence that the Tact Team might have taken steps to better identify itself was therefore irrelevant. But assuming that such evidence did have some bearing on the trial, defense counsel adduced testimony critical of the Tact Team through an unpaid witness, Cloyce Choney. Choney observed, inter alia, that the Tact Team should have planned compromised stealth (Tr. 17: 3907), that containment was preferable to forced entry (Tr. 17: 3905-06), and that Hamilton's Bronco should have had illuminated emergency lights (Tr. 17: 3974-75). In sum, Barrett cannot show, under any relevant standard, that the Court's funding decision had a prejudicial effect on the trial. *Brewer*, 51 F.3d at 1529; *Haddock*, 12 F.3d at 958. Thus, his alternative attacks on the court's decisions and his trial attorneys' efforts on his behalf should fail.

Indeed, during the penalty phase, the jury found that Barrett acted with substantial planning and premeditation. (*See* Trl. Doc. 258 at 9-11.) Thus, the jury must have found that Barrett recognized the Tact Team as police and shot at them in keeping with his repeated statements about killing peace officers who entered his land. Of course, Barrett made clear his desire to kill police officers, whom he must have recognized as such, when he reached for a pistol in his waistband as three uniformed troopers dragged him from his home. (Tr. 3: 548-50, 5: 1112-13.) Any putative testimony from a paid witness that the Tact Team might have better identified itself, or acted with greater circumspection, would not have had any mitigating effect. The fact that Barrett knowingly shot at the police reflected poorly on his character, regardless of whether the Tact Team could or should have planned the operation to further minimize the risk of confrontation. By no means has Barrett shown that the Court's provision of $4,000 for a SWAT expert had a prejudicial effect on outcome of this trial. *Brewer*, 51 F.3d at 1529

140

4. Miscellaneous Experts

Barrett complains, without any supporting argument, that the Court improperly deprived him of a mitigation specialist, an independent fact investigator, a metallurgist, a drug analyst, and a jury consultant. (Mot. 249-50.)

Furthermore, he has made no effort to demonstrate that the Court's drug analyst funding of $3,125 – which Barrett ultimately rejected, outright – had a prejudicial effect on the verdict that would support his alternative claims of judicial error and ineffective assistance of counsel. *Brewer*, 51 F.3d at 1529; *Haddock*, 12 F.3d at 958.

In this claim, Barrett also suggests the he did not have a jury consultant, but elsewhere concedes that he did receive the assistance of such an expert despite the Court's initial resistance

141

to the expense.  (*See* Mot. 24-25.)  Barrett gives no hint how the Court's initial reluctance to fund a jury consultant could have prejudiced him in light of the fact that he received the desired assistance.  Regardless, Barrett could not show that he was entitled to such an expert under *Ake*, or that the Court would have erred if it had refused the expense.  *See Moore v. Johnson*, 225 F.3d at 503 ("jury selection is not a mysterious process to be undertaken by those learned in the law only with the assistance of outside professionals").  Certainly, Barrett has failed to show that the level of public funding he received to hire a jury consultant had a prejudicial effect.  *Brewer*, 51 F.3d at 1529; *Haddock*, 12 F.3d at 958.

Finally, Barrett claims that this Court failed to provide adequate funding for his investigator and mitigation specialist.  Barrett asserts that in requesting funds for these investigators, he relied upon typical practices in capital cases, apparently providing some preemptive deduction of needed resources in view of work done in anticipation of the prior state trials.  However, Barrett does not establish that he ever demonstrated to this Court the likely value of the resources he requested or the risk of error if such assistance was not offered.  *Rodriguez-Felix*, 450 F.3d at 1128.   Indeed, he does not acknowledge that the Court informed him, prior to trial, that his requests for investigative funding were wholly inadequate.  (Trl. Doc. 128 at 2-3.)

Rather than attempting to show that the Court erroneously refused a satisfactory demonstration of need, Barrett falls back on arguments that the Court's supposed parsimony deprived him of a factual investigation approaching the "average number of hours approved in similar cases."  (Mot. 256.)  However, he makes no attempt to show what information he actually would have obtained through the investment of greater investigative resources or how that

142

information might have changed the verdict.  Moreover, Barrett does not explain the significance of the "average" number of hours.

Barrett now vaguely argues the funding level prevented his attorneys from obtaining evidence about his "personal, medical, and social history."  (*See* BIS 133, citing Claim 2, B.)

However, Barrett has not shown what information was actually obtained by the defense, and what was forgone as a result of the funds provided.  *Cf. United States v. Caldwell*, 543 F.2d at 1351.  As to information of some arguable mitigating value – such as the impact of the defendant's drug use, his divorce or his supposedly dysfunctional family – Barrett does not

143

explain why he would have required substantial investigative resources to discover what he himself should have known.  *See Bobby v. Van Hook*, 130 S. Ct. 13, 18 (2009) (noting the presentation of effective mitigation concerning the defendant's dysfunctional upbringing and early adulthood); *see also* Tr. March 22, 2005 at 43-45 (in which the Court expressed the view that mitigation was an area in which defense counsel had substantial expertise and could have concomitant involvement in the investigation).  Furthermore, he makes no effort to show what information had been collected in anticipation of his state trials and how the provided funds prevented him from effectively enhancing the existing store of potential mitigation evidence.  Thus, he has not shown that the money he received was inadequate or prejudiced the outcome of this case.  *Brewer*, 51 F.3d at 1529; *Haddock*, 12 F.3d at 958.

Any complaint that funding for the mitigation specialist impacted the investigation into Barrett's mental health should fail on its face, as the Court provided funds to hire a psychologist or psychiatrist, the expert presumably qualified to offer such evidence.  *See Castro v. Oklahoma*, 71 F.3d 1502, 1515 (10th Cir. 1995) (noting the limitations of expertise).  Barrett's implied claim that his attorneys could not assemble information about distant relatives – his so-called "social history" – should likewise fail.  Evidence about distant and long-dead relations was irrelevant to Barrett's character, history or the circumstances of the offense.  At best, it could have provided highly attenuated mitigation of de minimis weight.  *See Stewart v. Gramley*, 74 F.3d 132, 137 (7th Cir. 1996) ("The report of the mitigation specialist adds colorful details possibly relevant under a *tout comprendre* defense if one existed, but not calculated to make a judge or jury think Stewart less deserving of the death penalty."); *see also Bobby v. Van Hook*, 130 S. Ct. at 19 (finding in view of what was known about the defendant, "it was not unreasonable for his

144

counsel not to identify and interview every other living family member or every therapist who once treated his parents."). Even assuming that Barrett could now show that enhanced funding for a mitigation specialist would have led to the accumulation of additional evidence, he has not shown that it would have impacted the outcome of the case. *Brewer*, 51 F.3d at 1529; *Haddock*, 12 F.3d at 958. Moreover, he cannot make such a showing in view of the fact that he instructed his attorneys not to present evidence concerning his family and background. (Resp. Exs. 11 & 12.)

5. Pre-Trial Hearing Transcripts

Barrett complains that the Court denied him transcripts of pre-trial hearings, including those of his state-court trials. He contends that as a result of the funding decision, he was denied access to the September 13, 2005 ex parte hearing between the Court and prosecution. (Mot. 250; BIS 127-28.) Barrett's claim lacks any meaningful basis in fact.

As discussed above, and as Barrett concedes, the Court granted funds for a transcript of the second state-court trial. (*See, supra*, Arg. I.) Barrett asked for permission to purchase the transcript, which was denied on March 18, 2005 (Trl. Doc. 97), but granted on reconsideration, four days later, March 22, 2005 (Trl. Dckt. entry Mar. 22, 2005).

Barrett cannot show that he was denied funding for the very thing he, in fact, received. Indeed, as shown above, the fact that the transcript was delivered late despite the funds to purchase it had no impact on the outcome of this trial. (*See, supra*, Arg. II, 9, A.) As a result, he cannot demonstrate any prejudice concerning the level of funding.

<div align="center">145</div>

On March 18, 2005, the Court also denied a request for a transcript of a pre-trial hearing, but not the ex parte hearing held six months later, on September 13, 2005.  Rather the Court denied a request for a transcript of a hearing that was held on January 26, 2005.  (*See* Trl. Doc. 97 (denying Eighth Ex Parte Motion – Trl. Doc. 57).)  The Court never denied a transcript for the September 13th hearing, because Barrett never asked for one, and certainly was in no position to do so six months before it occurred.  Barrett cannot show that the Court erred in refusing to grant something he never requested.

Because Barrett has not shown error or prejudice, his claim should fail.

### IV.  THE SEARCH WARRANT IN THIS CASE WAS VALID, AND BARRETT CANNOT CHALLENGE IT ON COLLATERAL REVIEW

Barrett claims that newly-discovered information about the credibility of Charles Sanders and Clint Johnson requires this Court to grant an evidentiary hearing to determine whether the original search warrant in this case was sought in good faith under *Franks v. Delaware*.  Barrett also complains that his appellate attorneys were ineffective for failing to raise the *Franks* issue on appeal.  (Mot. 264-70; BIS 142-48.)  The thrust of Barrett's claim, that his Fourth Amendment rights were violated, is not subject to a determination on collateral review.  His derivative claim of ineffectiveness is patently without merit, as appellate counsel had no obligation to raise issues premised on extra-record evidence.

1.  <u>Search and Seizure Claims are not Reviewable Under § 2255</u>

Barrett cannot raise his Fourth Amendment search and seizure claim on collateral review, having litigated it at trial.  Courts considering motions for collateral review under § 2255 may not review Fourth Amendment violations when the defendant had a full and fair opportunity to litigate the claim at trial and present the issue on direct appeal.  *United States v. Cook*, 997 F.2d

<div align="center">146</div>

1312, 1317 (10th Cir. 1993).  A full and fair opportunity to litigate the claim includes "the procedural opportunity to raise or otherwise present a Fourth Amendment claim.  It also includes the full and fair evidentiary hearing . . . . [and] it contemplates recognition and at least colorable application of the correct Fourth Amendment constitutional standards."  *Gamble v. Oklahoma*, 583 F.2d 1161, 1165 (10th Cir. 1978).

In this case, Barrett unquestionably received a full and fair opportunity to challenge the search warrant under *Franks*, 438 U.S. 154.  On January 26, 2005, a magistrate judge held an evidentiary hearing at which Clint Johnson testified that he had drafted the search warrant application based on information from a confidential informant.  (*See* Trl. Doc. 253 at 2.) Johnson further testified that he had, on at least five other occasions, relied on the same informant and found his information accurate.  (*Id.*)  Johnson stated that the warrant application accurately reflected the informant's statements about Barrett and Barrett's illicit activities.  (*Id.*) In conformity with the magistrate's report and recommendation, this Court denied Barrett's motion to suppress.  (*Id.*)

Shortly after Barrett's trial began, Charles Sanders admitted from the witness stand that he was Johnson's confidential informant.  Barrett's attorneys relied on Sanders's trial testimony to challenge the search warrant under *Franks*.  (*See* Trl. Doc. 253 at 2-5.)  This Court denied the motion, because it was premised on the irrelevant question of Sanders's truthfulness, rather than on Johnson's.  (*See* Trl. Docs. 184 & 253 at 5-6; *see also, supra*, Arg. II, 2)  On appeal, Barrett presented several Fourth Amendment challenges to the warrant, though not the precise one raised here.  *See Barrett*, 496 F.3d at 1088-91.

On this record, Barrett cannot dispute the fact that he received an opportunity to fully

147

litigate a *Franks* challenge to the search warrant.  He filed written briefing supported by an exhibit (Trl. Doc. 184), he premised his claims on evidentiary proceedings (*id*.; *see generally* Tr. 11: 2488 to Tr. 12: 2652), and he received correct application of pertinent Fourth Amendment doctrine (Trl. Doc. 253).  *See Gamble*, 583 F.2d at 1165.  Further, he challenged the warrant under the Fourth Amendment on appeal.  *See Cook*, 997 F.2d at 1312 (noting that the litigation of any Fourth Amendment claim on appeal indicates an opportunity to fully and fairly litigate all such claims).  Accordingly, Barrett may not revisit his *Franks* claim in this proceeding.

Barrett may argue that he was not provided with the opportunity to raise the precise claims he has stated here because the government allegedly suppressed the information necessary to recognize and assert the contentions.  Certainly, had the government suppressed material evidence favorable to the defense, Barrett could arguably avoid the bar on collateral litigation of his Fourth Amendment claims.  *See Smith v. Black*, 904 F.2d 950, 965 (5th Cir. 1990), *abrogated on other grounds in Stringer v. Black*, 503 U.S. 222, 227 (1992).  But such a claim should sound in *Brady*,[18] not under the Fourth Amendment.  *See id.*  Of course, none of that matters, as Barrett has not shown that the government improperly suppressed any material evidence in this case, particularly with regard to Sanders and Johnson.  (*See, infra*, Arg. V, 1.)  Accordingly, this Court should disregard Barrett's renewed attempt to litigate the *Franks* claim on collateral review.

2.  Barrett's Attacks on the Warrant do not Justify Relief Under *Franks*

Assuming, arguendo, that this Court determines that it should review the *Franks* claim in this § 2255 proceeding, Barrett should not succeed.  To justify a *Franks* hearing, as previously noted, Barrett must establish by a *preponderance of the evidence* that Johnson intentionally or

---

[18]*Brady v. Maryland*, 373 U.S. 83, 87 (1963).

recklessly included false information in, or omitted material information from, the warrant affidavit. *Tisdale*, 248 F.3d at 973 (emphasis added); *see, supra,* Arg. II, 1. Barrett has made no attempt to satisfy either of these conditions, much less has he established by anything approaching a preponderance of the evidence that they are true.

Barrett initially tries to show that evidence concerning Sanders's credibility should lead to suppression under *Franks*. But Sanders's credibility, as this Court has already found, is irrelevant. The fact that Barrett can elaborate on his previously-stated but meritless argument that Sanders was unreliable does not, as a matter of law, enhance the defendant's claim. Accordingly, this Court should disregard any allegations that Barrett possesses evidence with which to impeach Sanders's credibility. *See Tisdale*, 248 F.3d at 973.

Next, Barrett turns his attention to Johnson, claiming that the government failed to disclose the detective's alleged malfeasance – conduct that occurred largely after the trial. First, the government had no duty to disclose any information about Johnson because he and his agency did not fall within the ambit of the prosecution team for purposes of *Brady* discovery. (*See, infra*, Arg. V, 1, D, i.) Assuming Barrett could establish his allegations that Johnson was a thief and likely drug user, this Court should not rely on Johnson's post-trial conduct to revisit its *Franks* ruling. *See United States v. Lafayette*, 983 F.2d 1102, 1105 (D.C. Cir. 1993) (holding newly discovered evidence refers to evidence that existed at the time of the trial proceeding); *United States v. Bolden*, 355 F.2d 453, 461 (7th Cir.1966). Regardless of any legal bars to relying on Barrett's allegations about Johnson, the defendant's indictment of the detective, as fully explored below, falls flat. (*See, infra*, Arg. V, 1, D, i.) Johnson may have been a poor administrator and financial manager, but no one has shown him to have been corrupt. Johnson's

149

poor skills as a manager of money and evidence simply do not establish by a preponderance of the evidence that he intentionally or recklessly included false information in the warrant affidavit.

In a final flawed attempt to attack the warrant, Barrett returns to his allegation that Sheriff Johnny Philpot visited the defendant's house mere weeks before the murder, supposedly undermining Johnson's sworn affidavit concerning the defendant's threats to law enforcement. Barrett himself does not appear to recall Philpot's putative visit to the cabin. He relies instead on his cousin and neighbor, Janice Sanders, whose call for help supposedly led the police to respond.[19] (Mot. Ex. 85 at 1-2.) As previously noted, counsel did not challenge Philpot on the date of his visit to the defendant's home, though Barrett clearly heard the sheriff's testimony and could have informed his lawyers of any inaccuracy in the witness's recollection. (*See, supra*, Arg. II, 11, C.) Of course, Barrett said nothing, because the sheriff was not at his home a few weeks before this killing. Philpot has clarified that the July 1998 incident about which he testified was the only occasion on which he visited Barrett's home and inspected a weapon. (*See* Resp. Ex. 1.)

But assuming, arguendo, that Philpot visited the defendant's home just three weeks before the murder, Barrett fails to show that the sheriff shared that information with Johnson prior to the preparation of the warrant affidavit. As such, he cannot show that Johnson was intentionally or recklessly untruthful in the warrant application. Even if Philpot did tell Johnson about such a contemporaneous incident, it does not appear that he would have mollified Johnson's view of the situation. Quite the opposite, Philpot testified that he initially resisted

---

[19]Barrett's mother also alludes to the incident in a declaration (Mot. Ex. 97 at 16), but she does not state that she actually observed it.

150

Johnson's plan for Tact Team involvement in the warrant service.   But after speaking to Johnson, Philpot became convinced of the need for tactical assistance.  (Tr. 8: 1793, 1808-09.) Thus, whatever information Philpot shared with Johnson, Johnson was not only sincerely convinced himself that the warrant service was a dangerous undertaking, but was capable of converting others who believed differently.

Accordingly, the baseless contention that Sheriff Philpot visited Barrett's home a few weeks before the murder does not establish by a preponderance of the evidence that Agent Johnson intentionally or recklessly included false information in the search warrant affidavit.

3.  <u>Appellate Counsel Provided Adequate Assistance</u>

Barrett claims that his appellate attorneys provided ineffective assistance in failing to raise the *Franks* claim on direct appeal to the Tenth Circuit.  Barrett, however, fails to show any way in which this Court erred, and thus any basis upon which the appellate court might have granted relief.  Counsel's failure to raise a futile issue on appeal does not constitute deficient performance or prejudicial ineffectiveness.  *See Hawkins v. Hannigan*, 185 F.3d at 1152. Certainly, to the extent Barrett complains that his attorneys failed to raise the precise claims raised here, which is largely premised on allegations and information that came to light after trial, he necessarily fails.  He cannot show that his attorneys had an obligation to raise a claim based on facts outside the record.  The appellate court could only consider issues "for which the record provides a factual basis." *United States v. Hardwell*, 80 F.3d 1471, 1485 (10th Cir. 1996) (citing *United States v. Vasquez*, 985 F.2d 491, 494-95 (10th Cir.1993)).  Barrett cannot show that counsel provided deficient performance by omitting to raise a facially non-cognizable claim on appeal. *See United States v. Challoner*, 583 F.3d at 745.

<div align="center">151</div>

## V.  THE PROSECUTION HONORED ITS OBLIGATIONS TO DISCLOSE EXCULPATORY MATERIAL TO THE DEFENSE AND TO AFFORD BARRETT A FAIR TRIAL

Barrett makes a multi-pronged attack on the government, claiming that it suppressed exculpatory evidence concerning six civilian witness, two law enforcement witnesses, and one trial prosecutor.  Barrett also accuses the prosecutors of interfering with the defense and with improperly questioning witnesses and improperly arguing for a death sentence.  (Mot. 270-322; BIS 148-74.)  As detailed below, Barrett fails to demonstrate that any aspect of the prosecution's actions amounted to prejudicial misconduct.

### 1.  The Government did not Violate Any Duty of Disclosure

Barrett begins his attack on the prosecution with a two-part claim of non-disclosure. First, he asserts that the government failed to turn over impeachment evidence concerning six civilian witnesses, Charles Sanders, Travis Crawford, Cindy Crawford, Brandie Zane Price, Karen Real and Randy Turman,  (Mot. 272-95; BIS 153-57.)  Second, he argues that the prosecution suppressed information about three law enforcement officials, Clint Johnson, Michael Littlefield and John Philpot.  (Mot. 296-310; BIS 157-59.)  Not only does Barrett claim that the government violated the familiar *Brady* standard, he also argues that the supposedly newly-discovered evidence he presents here will give rise to relief pursuant to Federal Rule of Criminal Procedure 33.  (BIS 161-64.)  Barrett is wrong on all counts.  The appropriate standard for analyzing his claims is that of *Brady* and its progeny.  Under that jurisprudence, Barrett cannot show that the government failed to disclose any material evidence favorable to his defense.

### A.  The Standard of Review for Newly Discovered Evidence

In addition to invoking the due process jurisprudence of *Brady*, Barrett argues that this

152

198

Court should construe his suppression claims as contentions involving newly discovered evidence under Federal Rule of Criminal Procedure 33.  However, Rule 33 permits new trial motions based on newly discovered evidence for only three years after the jury returns its verdict. In this case, Barrett was convicted by jury verdict on November 4, 2005.  He did not file the initial iteration of his § 2255 Motion, raising the Rule 33 claims, until March 16, 2009, four-and-a-half months after the deadline had expired for seeking a new trial under Rule 33.  Accordingly, any attempt to invoke Rule 33 is untimely.

Moreover, the standard applicable to a new trial motion under Rule 33 has no place in this action.  Rule 33 is meant to correct "factual injustice" rather than legal errors.  *United States v. Evans*, 224 F.3d 670, 674 (7th Cir. 2000).  Accordingly, Rule 33 allows for relief under a liberal "interests of justice" standard.  *United States v. Prescott*, 221 F.3d 686, 688 (4th Cir. 2000).  In contrast, § 2255 requires a demonstration of legal error, because collateral relief will not lie based solely on a showing of actual innocence.  *Herrera v. Collins*, 506 U.S. 390 (1993); *Evans*, 224 F.3d at 674 ("A bona fide motion for a new trial on the basis of newly discovered evidence falls outside § 2255 ¶ 1 because it does not contend that the conviction or sentence violates the Constitution or any statute.").  Thus, Barrett should not succeed in his attempt to invoke Rule 33 in this proceeding.

B.  The Government Disclosed All Necessary Evidence about Civilian Witnesses

Properly analyzed under § 2255, Barrett cannot succeed in his attempts to demonstrate that the prosecution violated its *Brady* obligation in regard to its civilian witnesses.  Prosecutors must disclose all substantial material evidence favorable to the defense, whether it relates to guilt, punishment, or the credibility of witnesses.  *Giglio v. United States*, 405 U.S. 150, 154

153

(1972); *Brady v. Maryland*, 373 U.S. at 87.  To establish a *Brady* violation, a defendant must show that "the prosecution suppressed evidence, the evidence was favorable to the defense, and the evidence was material." *United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Torres*, 569 F.3d 1277, 1282 (10th Cir. 2009).

Prosecutors bear no obligation to volunteer information they do not possess.  *United States v. Erickson*, 561 F.3d at 1163.  Likewise, prosecutors need not compile or seek evidence favorable to the defense.  *United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002); *United States v. Marashi*, 913 F.2d 724, 734 (9th Cir. 1990).  Thus, a successful *Brady* claim requires a showing that any allegedly suppressed evidence actually existed.  *Erickson*, 561 F.3d at 1163. *Brady* does not compel disclosure if the defendant knew or should have known the essential facts permitting him to take advantage of the exculpatory evidence.  *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998); *United States v. Kelly*, 35 F.3d 929, 937 (4th Cir. 1994); *see also Erickson*, 561 F.3d at 1163 (citing with approval *Coe*, 161 F.3d at 344).

Notwithstanding his substantial burdens in demonstrating error under *Brady*, Barrett presents claims that are a conglomeration of speculation, unreliable hearsay and flawed logic. Ultimately, he fails to show that the government suppressed any material evidence in its actual or constructive possession.

        i.  Charles Sanders

Barrett claims the government failed to disclose Sanders's prior convictions.  Barrett also

<center>154</center>

claims that Charles Sanders received undisclosed consideration in exchange for his trial testimony.  Specifically, Barrett alleges that after Sanders's testimony, a prison sentence that the witness was serving at the time of trial was suspended.  Barrett further claims that a state court entered an order after the trial, marked "per plea agreement with feds," which relieved Sanders of any correctional supervision for the duration of his suspended sentence.  Still later, Sanders was relieved of any fines or costs associated with the convictions.  Sanders, according to Barrett, also received a trial delay in a misdemeanor case, in which he also received a suspended sentence.  (Mot. 259-64; BIS 153-54.)  Barrett's claim of undisclosed prior convictions is contradicted by the record.  His theory of undisclosed benefits is built entirely on speculation that the government had formed an agreement with Sanders that it had some obligation to disclose.

The record demonstrates the falsity of Barrett's claim that the government failed to disclose all of Sanders's known prior convictions.  Defense counsel confronted Sanders with all of his convictions, to date, identifying almost all of them by case number.  (*Compare* Tr. 11: 2524-34; *with* Resp. Ex. 6 (Sanders's Oklahoma DOC records).)  Furthermore, defense counsel noted that he had obtained Sanders's criminal record from the Oklahoma Department of Corrections.  (Tr. 11: 2524.)  To the extent the government did not make the disclosure to counsel, it bore no obligation to provide the defense with publicly-available information.  *See United States v. Erickson*, 561 F.3d at 1163.

Not only does Barrett fail to show that the government failed to disclose information concerning Sanders's criminal record, he also cannot show that the prosecution suppressed information concerning consideration promised to the witness.  Prosecutors must disclose benefits promised to a government informants in exchange for testimony.  *See, e.g.*, *Giglio*, 405

155

U.S. at 150.  To show suppression of such evidence, a defendant must clearly establish  an undisclosed agreement between the government and the witness that existed prior to the testimony.  *See id.* at 152-53; *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008); *Campbell v. Reed*, 594 F.2d 4, 7 (4th Cir. 1979).  A mere showing that a witness hoped to benefit from his testimony will not suffice to demonstrate a due process violation.  *United States v. Baskes*, 649 F.2d 471, 477 (7th Cir. 1980); *see United States v. Ashley*, No. 06-2258, 2008 WL 1766868, at **3 (10th Cir. April 18, 2008) (declining to rely on speculation to infer the existence of *Brady* material).  Evidence that a prosecution witness ultimately received favorable treatment does not, by itself, demonstrate that the prosecution failed to disclose an agreement.  *See Shabazz v. Artuz*, 336 F.3d 154, 164-65 (2d Cir. 2003).  As the Sixth Circuit has observed,

> "The government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the witnesses prior to their testimony."  *Shabazz v. Artuz*, [citation] (emphasis in original). To conclude otherwise would place prosecutors in the untenable position of being obligated to disclose information prior to trial that may not be available to them or to forgo the award of favorable treatment to a participating witness for fear that they will be accused of withholding evidence of an agreement.

*Bell v. Bell*, 512 F.3d 223, 234 (6th Cir. 2008).

Barrett fails to show that any benefits that Sanders may have received subsequent to trial were the product of a pre-existing bargain with the prosecutors in this case.  The fact that state prosecutors provided leniency does not demonstrate the existence of a bargain with federal officials that was subject to disclosure.  *Shabazz*, 336 F.3d at164-65.  Sanders, had a long criminal record.  (*See, e.g.*, Tr. 11: 2524-30.)  Sanders testified that the Assistant U.S. Attorney would speak, or had spoken, to pertinent local officials about his cooperation:

> Q.  And I advised you of any assistance that I would provide to yourself in

156

relation – for your cooperation, testimony in this case, haven't I?

A. Yes, sir.

Q. What did I tell you I would do in your behalf?

A. You tell – you didn't make me no promises. You told me that you would talk to the prosecution upon completion. That – no, you haven't guaranteed me nothing.

Q. In relation to talking to the prosecutors, the conviction you're serving now is in Sequoyah County; is that correct?

A. Yes, sir.

Q. Did I advise you that I talked to the prosecutors in Sequoyah County and tell them of your cooperation?

A. Yes, sir.

Q. And since then you also had an application to revoke a misdemeanor sentence in Tulsa County, didn't you?

A. Yes, sir.

Q. And in fact, I called the District Attorney's Office in Tulsa County and advised them that you were cooperating in this case as well, didn't I?

A. Yes, sir.

Q. Beyond doing that, contacting the D.A.'s Office in Sequoyah County and the D.A. 's Office in Tulsa County and advising them that I anticipate you're going to cooperate, have I told you any promises in regards to what would happen to any sentence that you may be facing or any time you may be serving?

A. Have you advised me of what now?

Q. Have I told you anything about what would happen to any sentence you have?

A. No.

(Tr. 11: 2494-95.) Any benefit that Sanders may have subsequently received in the state cases was entirely consistent with the facts disclosed to the jury and does not demonstrate the existence of another, more attractive, agreement subject to disclosure.

Barrett attempts to bootstrap the evidence of subsequently-conferred benefits into a showing of a prior agreement between Sanders and the government by noting entries in state court orders that refer to a "plea agreement with feds." (*See* Mot. 259-62.) Barrett's blatant reliance on that unadorned hearsay will not carry the day for him. The term "plea agreement" clearly was not used in its ordinary meaning, as the federal government could not have entered into an agreement with Sanders that bound the terms of a state court judgment. *See United States*

157

*v. Henderson*, 584 F. Supp. at 1038. Certainly, the "agreement" could refer in shorthand fashion to the fully-disclosed request for leniency made by the government on Sanders's behalf. Regardless of how the phrase was intended, it makes no specific reference to this case, much less does it show that an agreement existed at the time of Sanders's testimony, beyond that described at trial. Accordingly, Barrett is left to speculate about an agreement that he has not shown existed at the time of trial, forestalling his effort to obtain relief.

Barrett's only other attempt to show that the government failed to disclose a promised benefit to Sanders comes in the form of obviously unreliable multiple hearsay. Barrett has submitted a declaration from an investigator who claims to have spoken to Sanders's mother, Evelyn Sanders, who reportedly stated that the government failed to make good on "things" promised to her son in exchange for his testimony. (Mot. Ex. 14 at 5-6.) The investigator's declaration provides no foundation for Ms. Sanders's claim of knowledge about the case. Presumably, her source of information was her son, whose credibility Barrett otherwise takes pains to attack. But assuming Sanders made such a statement to his mother, who repeated it to the investigator, who reported it in the declaration, the house of hearsay cards still falls because there is no indication that the alleged promises were extended before Sanders testified. Because Barrett's claim rests entirely on speculation, hearsay and conclusory allegations, it fails to state a case for relief. *See Shabazz v. Artuz*, 336 F.3d at 164-65.

Assuming Barrett had identified competent evidence of undisclosed promises made to Sanders, he fails to show that any of it was material. Sanders testified to his extensive criminal record and the benefits he unquestionably did receive in exchange for his testimony. Sanders also admitted his lengthy record of drug use. (*See, e.g.*, Tr. 11: 2511, 2535, 2581.) Thus,

158

substantial evidence was adduced upon which the jury could have elected to discredit Sanders.

Any evidence of further promises to him, about which Barrett now speculates, would have

merely been cumulative to the testimony adduced.  The absence of such evidence does not

undermine confidence in this verdict, as Barrett fails to show a reasonable likelihood that further

efforts to impeach Sanders – by simply reenforcing existing evidence about him – would have

led to a different verdict.  *See Torres*, 569 F.3d at 1282.

ii.  Travis Crawford

In the guise of a *Brady* claim, Barrett claims that Travis Crawford was coached by a

prosecutor and has recanted certain aspects of his trial testimony.  Barrett also alleges that the

government knew that Crawford had a criminal record in the military, had previously cooperated

with local law enforcement officials, and knew or "had reason to know" that Crawford was under

the influence of drugs during his testimony and  pre-trial interview.  (Mot. 278-83 (citing Mot.

Exs. 31, 45, 91, 92); BIS 155.)  Barrett has failed to state a claim under *Brady*, as he has not

demonstrated that the government possessed any material evidence that it had a duty to disclose.

Barrett's claim relies, in large part, on hearsay accounts of Crawford's alleged unsworn

statements.  (*See* Mot. Exs. 31, 91, 92.)  All that evidence is facially insufficient to demonstrate

error.  Hearsay accounts of supposed recantation do not demonstrate that a witness has forsworn

his testimony.  *See United States v. Pearson*, 203 F.3d 1243, 1275 (10th Cir. 2000) ("Sworn trial

testimony is generally not refuted by unsworn repudiation of that testimony."); *see also United

States v. Connolly*, 504 F.3d 206, 213 (1st Cir. 2007) ("[n]o inference of government knowledge

of perjury arises from the mere fact of a convict's hearsay report that a material witness recanted

testimony.").  Crawford, himself, only recants hearing Barrett say he would go out in a "blaze of

159

glory" (see Mot. Ex. 45), but otherwise appears to maintain that he heard the defendant make fatalistic comments about the likelihood that the police might return to his after they surveilled it on the afternoon before the shooting (Tr. 3: 463-66).

Putting aside the source of the allegations, and the fact that Crawford has not materially changed his recollection of the pertinent events, Barrett has failed to establish that the prosecutors knew, or should have known, of any supposed falsity in Crawford's testimony, a fact fatal to any claim under *Brady*.[20]  *See Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th Cir. 2001). If Crawford, in interviews with government officials, attributed certain remarks to the defendant, Barrett has not shown why the prosecutors should have disbelieved him, much less had reason to disclose their skepticism. *United States v. Erickson*, 561 F.3d at 1163; *United States v. Bender*, 304 F.3d at 164.

Apart from his direct attack on Crawford's testimony, Barrett asserts that the witness had spent two months in a military brig and had once cooperated with local law enforcement. Neither assertion demonstrates that the U.S. Attorney's Office knew of the activity and therefore had a duty to disclose it. *Brady* requires the disclosure of only that evidence within the actual or constructive possession of the prosecution and its investigative team. *United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999).  The investigative team consisted of only the United States Drug Enforcement Agency, and Barrett provides no reason for believing the DEA or the U.S. Attorney was aware of local law enforcement's alleged involvement with Crawford.  (*See* Resp.

---

[20]Apparently cognizant of the weakness of his *Brady* claim, Barrett argues that the reports of recantation require relief as newly discovered evidence.  As discussed above, Barrett cannot rely on evidence of recantation alone, absent a showing of legal error, to obtain relief under § 2255.  *Evans*, 224 F.3d at 674.

160

Ex. 4.)  Likewise, Barrett provides no reason for the prosecution team to have learned the immaterial fact that Crawford was supposedly incarcerated in a military brig approximately 20 years before this trial for an unidentified offense that may or may not have reflected on his credibility.  *See United States v. Bender*, 304 F.3d at 164 (noting prosecution has no burden to seek out impeaching information).

Barrett also fails to show that the government should have known that Crawford may have testified falsely about his drug use.  Crawford testified that he had stopped using drugs nine months before taking the stand.  (Tr. 3: 457.)  According to a hearsay account, Crawford has since stated that "he and the other snitches were . . . high on drugs when the prosecutor . . . interviewed them . . . [and] that anybody who had been around drug addicts would have know that."  (Mot. Ex. 31 at 3; *but see* Mot Ex. 45 (making no such assertion).)  If Crawford admitted he was intoxicated when he met with a prosecutor, Barrett has failed to show that the interview occurred within nine months of trial and that the government therefore would have borne a burden of disclosure regarding false testimony.  More fundamentally, Barrett errs in speculating that the prosecutor had the skills and experience to recognize Crawford's supposed intoxication.  If Crawford's behavior during the alleged interview was merely suspect, the government was under no obligation to further investigate his drug use.  *United States v. Bender*, 304 F.3d at 164.  Barrett's speculation that the prosecutor knew or could have known of Crawford's alleged intoxication will not support a *Brady* claim.  *See United States v. Erickson*, 561 F.3d at 1163.

An exploration of the related claim that Crawford now claims he and the other civilian witnesses were intoxicated at the time of trial underscores the speciousness of Barrett's *Brady* arguments regarding drug use.  Crawford reports that he and other witnesses were under the

161

influence of drugs during their trial testimony.  (Mot. Ex. 45 at 2.)  Without conceding that

Crawford has any basis in knowledge for discussing the condition of other witnesses, the

government observes that Barrett's *Brady* claim fails as a matter of law, because the condition of

the witnesses was either obvious or it was not.  If the witnesses' intoxication was obvious, the

government had no obligation to disclose it, because the defense would or should have known

anyway.  *See Erickson*, 561 F.3d at 1163.  If the witnesses' intoxication was not obvious, the

prosecutors had no obligation to disclose what they did not know.  *Id.*

Barrett also fails in his claim that the government should have disclosed supposed threats

to Crawford, who reports that the prosecutor told him "all the bad things that would happen to

[him] if [he] 'lied.'"  (Mot. Ex. 45 at 2.)  The fact that the prosecutor encouraged Crawford, in

the strongest possible terms, to speak truthfully is not evidence that was favorable to the defense.

*See United States v. Paden*, 908 F.2d 1229, 1235 (5th Cir. 1990) ("Encouraging a defendant to

tell the truth . . . does not render a statement involuntary.  [Citation.]  Neither does a recitation of

the potential sentence a defendant might receive render a statement involuntary."); *United States

v. Ballard*, 586 F.2d 1060, 1063 (5th Cir.1978) ("[T]elling the [defendant] in a noncoercive

manner of the realistically expected penalties and encouraging her to tell the truth is no more than

affording her the chance to make an informed decision with respect to her cooperation with the

government.").

Assuming, arguendo, that Barrett had shown that the government flouted its duty of

disclosure, he has not identified any forgone information about Travis Crawford that would have

had a material effect on the verdict.  Crawford made substantial admissions on the witness stand

to potentially impeaching facts.  He admitted his lengthy use of methamphetamine (Tr. 3: 457),

162

he admitted his arrests for child support violations and check fraud (Tr. 3: 467-68), and he admitted that drug use had affected his memory and perception of events (Tr. 3: 471-72), and he admitted that six years had passed between the murder and his testimony in which he had never provided a written statement to law enforcement (Tr. 3: 481-82).  Any further evidence designed to impeach Crawford as a general matter, such as with his record of decades-old military transgressions, would have been cumulative to that already adduced.

Indeed, any information about Crawford's military history is irrelevant.  Crawford joined the military because he had "problems" in school.  (Mot. Ex. 45 at 1.)  He entered the army in 1983, and was discharged on January 23, 1985, more than 20 years before Barrett's trial.  Barrett cannot demonstrate that any offense for which Crawford was sent to the brig occurred within 10 years of trial and could therefore have been the basis of impeachment evidence.  Fed. R. Evid. 609(b); *see United States v. Begay*, 144 F.3d 1336, 1338 (10th Cir. 1998).  By no means has Barrett made any effort to show that the military infraction was the sort of offense that this Court would find sufficiently probative of the witness's credibility to overcome an objection to its apparent age.

Barrett fares no better in claiming that the prosecutor withheld information about Crawford's prior intoxication.  Had the prosecutor disclosed an opinion that Crawford was under the influence of drugs while testifying or within nine months of trial, Barrett cannot show the information would have led to admissible impeachment evidence.  Presumably defense counsel could have cross-examined Crawford as to his state of sobriety while meeting with the prosecutor, but the attorneys were not free to adduce evidence about such a collateral matter had Crawford denied his supposed drug use.  *See United States v. Young*, 952 F.2d 1252, 1259 (10th

163

Cir. 1991). Certainly, Crawford has not indicated he would have admitted he was under the influence of drugs, and Barrett fails to identify any extant evidence he could have developed on the basis of a "disclosure" about the condition of the witness before or during trial. Barrett has not shown that anyone who observed Crawford on the stand, or before, could have provided an informed and admissible opinion about Crawford's drug use.

Moreover, Barrett cannot show any likelihood that he would have received a more favorable verdict had the defense adduced evidence that the prosecutor told Crawford he would get in trouble if he was dishonest. Also, the supposedly undisclosed evidence of Crawford's cooperation with local law enforcement would have had de minimis impeachment value. Such information might have shown, generally, that Crawford was willing to help the police to escape criminal liability, but there was no indication he did so in the present case. Crawford is alleged to have previously testified about controlled drug buys though the police had initially told him he would not have to. (Mot. 281.) That evidence appears to enhance Crawford's credibility, because it shows he honored his commitments when he had no obligation to do so.

Barrett cannot show a reasonable likelihood that any of the supposedly suppressed evidence about Crawford would have led to a more favorable verdict, especially given that far more powerful evidence of impeachment did not lead to acquittal. *See United States v. Torres*, 569 F.3d at 1282. Accordingly, he has failed to demonstrate that the prosecution violated any duty of disclosure.

### iii. Cindy Crawford

Barrett relies exclusively on hearsay to argue that Cindy Crawford has recanted her trial testimony, that she was coached and threatened by law enforcement to provide false testimony,

164

and that she was "coming down off a two day meth high" when she testified at trial and provided an interview to the prosecutor. (*See* Mot. Exs. 14, 31.) Barrett also complains that the government suppressed information that Ms. Crawford suffered from post-traumatic stress disorder and that she was widely-reputed to have cooperated with other law enforcement agencies. Barrett also claims that Ms. Crawford received undisclosed benefits in exchange for her testimony. (Mot. 283-89; BIS 155-56.) Barrett's contention is without any substance and fails to state any meritorious claim that the prosecution was aware of evidence favorable to the defense that it failed to disclose.

The hearsay reports of Ms. Crawford's supposed recantation and claims of prosecutorial mistreatment are not sufficient to obtain relief or further review of this claim. *See Pearson*, 203 F.3d at 1275; *see also Herrera v. Collins*, 506 U.S. at 416 (noting that affidavits in a habeas action were "particularly suspect" because they were based on hearsay). The declarations of witnesses attesting to Ms. Crawford's alleged statements do not amount to cognizable evidence of recantation and this Court should disregard them.[21]

Barrett likewise cannot succeed with his speculative assertions that the prosecution withheld evidence that Ms. Crawford was mentally ill and an active user of methamphetamine at the time of trial. He fails to show that the government knew Ms. Crawford had been diagnosed with post-traumatic stress disorder, though she claimed to have received such a diagnosis during her penalty phase testimony (Tr. 22: 4580). He also fails to show that the government had any

---

[21]As in his claim regarding Travis Crawford, *supra*, Barrett argues that the reports of Cindy Crawford's recantation require relief as newly discovered evidence. Here again, Barrett cannot rely upon such a theory to obtain relief under § 2255 – he must demonstrate a legal error in addition to a factual one. *Evans*, 224 F.3d at 674.

165

knowledge that the witness was using drugs around the time of trial.[22] Barrett's speculation that the government knew of Ms. Crawford's mental condition and drug abuse does not state a meritorious *Brady* claim. *See United States v. Erickson*, 561 F.3d at 1163.

Regardless of the government's alleged failure to disclose, Ms. Crawford referred to her supposed post-traumatic stress disorder during the penalty phase, undermining any argument that Barrett did not learn of that fact in time to take advantage of it. *See Coe*, 161 F.3d at 344. The information was, after all, potentially relevant only to Ms. Crawford's penalty-phase testimony. During the penalty phase, she testified about a situation she would have found understandably stressful – the defendant's attempt to coax her into sex and his subsequent assault on her with a firearm. (Tr. 22: 4576-79.) Because she asserted that her disorder prevented her from "handl[ing] stress very well" (Tr. 22: 4580), the condition arguably affected her perception and recollection of the events she described. But during the guilt phase, Ms. Crawford did not describe any stressful event. Instead, she testified that she had received drugs at Barrett's house (Tr. 13: 3064), had once encountered a difficult situation with the defendant (Tr. 13: 3064-65), had observed one of Barrett's guns (Tr. 13: 3067-68), and had heard Barrett express an awareness that the police might come to his home and an intention to "go out in a blaze of glory." (Tr. 13: 3068-69.) Thus, Barrett cannot show that he did not learn of the witness's alleged mental condition in time to make use of it. By extension, he cannot show that the witness's supposed disorder was probative of her credibility during the guilt phase or that a reasonable likelihood exists that he would have been acquitted had the evidence come to light

---

[22]As with Travis Crawford, if Ms. Crawford was manifestly intoxicated during trial, the government would have had no duty to disclose her condition. *See Erickson*, 561 F.3d at 1163.

<div align="center">166</div>

during the first portion of the trial.  *See United States v. Torres*, 569 F.3d at 1282.

Barrett's claim that the prosecution had a duty to disclose the fact that Ms. Crawford was "well known" as a "snitch" is both self-defeating and without substance.  If Ms. Crawford's reputation was "well-known," as suggested by various declarants (*see, e.g.*, Mot. Exs. 83 at 2 ("It is common knowledge in the community that Cindy Crawford has worked as a 'snitch' for local law enforcement"), 88 ("It is common knowledge in the community that Cindy Crawford has worked as an informant for the police"), 92 ("I am aware that Cindy has worked as an informant for the local police")), the government bore no duty to disclose that fact, as defense counsel knew or should have learned of it, independently.  *See Coe*, 161 F.3d at 344.  Ms. Crawford's reputation aside, Barrett fails to show that the witness had – prior to her testimony – actually provided documented assistance to law enforcement in exchange for favorable treatment, much less that anyone in the prosecution team was aware of such facts.  The reported rumors about Ms. Crawford do not demonstrate that any supposed cooperation with law enforcement predated this trial, much less that the investigative team possessed information it should have disclosed.  Absent proof that the prosecution suppressed information, Barrett's speculative claim fails.  *See United States v. Erickson*, 561 F.3d at 1163.  Of course, Barrett cannot show that the failure to disclose the vague rumors he reports here were in any way material to the outcome of the trial.

Finally, Barrett's accusations that Ms. Crawford received undisclosed benefits in exchange for her testimony lack any merit.  Barrett identifies what he perceives as lenient treatment provided in state court to Ms. Crawford.  Without attempting to show that her treatment was in any way influenced by federal prosecutors, Barrett speculates that she benefitted from some undisclosed bargain for her testimony.  Indeed, he goes so far as to claim that the

167

federal government influenced sentencing in a prosecution that the State of Oklahoma commenced almost three years after Ms. Crawford testified in this case. Even if Barrett could show that the federal prosecutor exercised some influence over the course of the state proceedings, he would still fall far short of demonstrating a *Brady* violation, as he has not shown the existence of an agreement with the witness at the time of trial. *Shabazz*, 336 F.3d at164-65. Barrett's speculative accusations are legally insufficient to show error. *Id.*

### iv.  Brandie Zane Price

Barrett claims that Brandie Price received undisclosed benefits for her testimony. He premises the assertion on evidence that she received leniency in the prosecution of crimes she committed after this trial. Barrett further claims that the government knew or should have known that Price was involved in that criminal activity when she testified. (Mot. 289-92; BIS 156.) Once again, Barrett's speculative claims lack merit.

As with Barrett's previous attempts to elevate evidence of subsequently-conferred benefits into the basis of a *Brady* violation, this present collection of conjecture should fail. Barrett relies on a news report that indicates that in 2007, the government treated Price leniently when it prosecuted her for crimes committed in 2006. (Mot. 271.) According to Barrett's source, the basis of that treatment was Price's testimony at Barrett's 2005 trial. Barrett has not, however, shown that there existed an agreement for such leniency at the time of the witness's testimony. *Shabazz*, 336 F.3d at164-65. Indeed, Barrett provides no theory as to how the government might have induced Price's cooperation by promising leniency in a prosecution it had not undertaken for a crime the witness had not yet committed. Absent proof of some actual assurance to induce Ms. Price's testimony, Barrett fails as a matter of law to state a valid claim

168

214

that the government suppressed evidence. *Id.*

Barrett also fails in asserting the contention that the government failed to disclose evidence that Ms. Price was, in 2005, trafficking in drugs. Barrett speculates that the government's 2007 indictment, which charges crimes committed in 2006, somehow indicates that the U.S. Attorney knew of the activity in 2005. Quite the contrary, the charges suggest that even in 2007, the government lacked evidence that Price was trafficking in drugs at the time of Barrett's trial. Barrett has not shown that Price actually engaged in any unlawful conduct in 2005, much less has he shown that the government was aware of such activity. Absent such proof, Barrett's speculative claim should not succeed. *See United States v. Erickson*, 561 F.3d at 1163.

v. Karen Real

Karen Real, a convicted felon, acknowledged on the witness stand that the prosecutor had agreed to inform her sentencing court about her cooperation in this case, a fact Barrett does not dispute. After Barrett's trial, the prosecutor filed a motion on Real's behalf for a reduction of sentence. That motion, according to Barrett, was an undisclosed benefit to the witness. Barrett also adds, by way of summary allegation, that the government suppressed information regarding Real's criminal record, including the dismissal of numerous state drug charges. (Mot. 292-94; BIS 156-57.) Barrett fails to show that the benefit received by Real was not the one described by the witness in open court. Barrett's claim regarding the suppression of Real's criminal record is untimely and without merit, as the defendant fails to show that the government possessed any material information about Real's state prosecutions.

169

Real testified that she began using methamphetamine regularly in 1994 or 1995, and continued doing so until her arrest in 2000. (Tr. 13: 3081.) She admitted that she had been convicted in federal court of three offenses, including "conspiracy to manufacture," and was sentenced to 14 years in state prison. (Tr. 13: 3079-80.) Real explained the assurances she had received from the prosecution in exchange for her testimony:

> Q. And did I indicate anything that I would do for you or attempt to do for you in relation to your cooperating with the Government in this case?
> A. No, sir.
> Q. Did I talk about anything I'd say to the Court?
> A. Well, you just mentioned that, you know, you could tell the Judge, you know, what I did. And then it would be up to the Judge.
> Q Okay. Any relief from your sentence -- you're aware it's not going to come from me, its got to come for the court?
> A Yes. The court.

(Tr. 13: 3080-81.) Ultimately, the government moved to modify Real's sentence under Federal Rule of Criminal Procedure 35 without proposing any particular reduction. The government informed the court that Real "was the first [civilian witness] and cooperated willingly and courageously. Her assistance was substantial and created an environment in which others could cooperate as well. She is clearly deserving of a reduction in her sentence in consideration of her efforts." (Resp. Ex. 9.) The court subsequently reduced the sentence to time served. (Resp. Ex. 10.)

Barrett fails to demonstrate that the benefit Real expressly anticipated was not precisely the one she received. Following her testimony, the prosecution moved to reduce her sentence by the only procedural means available – a Rule 35(b) motion – leaving the ultimate disposition entirely in the court's discretion. Barrett fails to identify a benefit received by Real that went undisclosed to the jury, much less the defense. Indeed, Barrett appears only to complain that

170

Real's testimony was insufficiently precise to accurately elucidate the agreement for the benefit of the jury, not that the government failed to disclose a benefit it promised to the witness. But Real's testimony provided the defense with the essential facts necessary to further explore the precise nature of the witness's agreement and thereby take any possible advantage of the evidence. *See Coe*, 161 F.3d at 344.

To the extent the benefit conferred was any greater than that described by the witness – because it involved a request to reduce Real's sentence rather than a mere notification to the court of her cooperation – Barrett has not shown that the witness was assured before she testified that the government would make such a motion. Any claim to the contrary is speculative and legally insufficient to establish that the government knowingly suppressed evidence. *See Shabazz*, 336 F.3d at164-65. Regardless, Barrett has not, and cannot, show a reasonable likelihood that he would have been acquitted had the government specifically and expressly disclosed an intent to file a Rule 35 motion rather than simply "tell the judge" what Real did. *See United States v. Torres*, 569 F.3d at 1282. No reasonable probability exists that the jury's credibility determination, much less its verdict, would have changed had it learned in greater technical detail what procedural steps the prosecutor would take to satisfy its end of the bargain with Real. *See id.*

Barrett also claims that the prosecution suppressed information about Real's criminal record. He first raised that claim that in his Brief in Support (BIS 156-57), which was filed March 1, 2010, well after the expiration of the one-year period of limitations applicable to his Motion to Vacate. *See* 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d at1280; *cf.* Docs 1, 2, 70, 81. His claim should be disregarded as untimely. *See United States v. Guerrero*, 488 F.3d

171

at 1316. The claim is based on an entirely novel premise, and does not merely clarify, amplify or expand any timely-filed contention. *Cf. United States v. Espinoza-Saenz*, 235 F.3d at 505. Furthermore, Barrett has made no attempt to show that extraordinary circumstances beyond his control prevented him from raising the contention. *United States v. Gabaldon*, 522 F.3d at 1124. Thus, this Court should strike and disregard Barrett's untimely claim that the government failed to disclose evidence regarding Karen Real's criminal record.

Even if Barrett had timely raised his claim that the government suppressed information about Real's criminal history, he fails to show that the prosecution team ever possessed the data or that it was material. According to Barrett, the undisclosed portions of Real's criminal history involve dismissed cases in Sequoyah and Cherokee Counties. Barrett fails to provide any basis for his speculation that the government had knowledge of these inchoate prosecutions. *See United States v. Erickson*, 561 F.3d at 1163. Not only does Barrett fail to show that the government had such information, he fails to explain how it would have resulted in admissible, material evidence. The prosecutions to which Barrett alludes apparently did not result in conviction, and therefore were not admissible as impeachment evidence, even assuming they involved felony prosecutions undertaken within 10 years of this trial. *Cf.* Fed. R. Evid. 609. Barrett also fails to explain why evidence of dismissed state prosecutions would have resulted in a reasonable likelihood of acquittal, given that Real admitted that she was presently incarcerated for a federal felony conviction and stood to benefit through her cooperation. *Erickson*, 561 F.3d at 1163.

In short, this Court should disregard Barrett's claims of non-disclosure, which are speculative, untimely and premised on a misinterpretation of the record.

172

vi. <u>Randy Turman</u>

Barrett claims that the prosecution failed to disclose the fact that Randy Turman was a defendant in a pending Sequoyah County prosecution and that the government "sponsored" the witness's false testimony that the case had "done been taken care of." (Mot. 294-95; BIS 157.) Barrett's claim has no merit.

The government did not adduce the testimony that Barrett complains of – Barrett's own lawyers did, and they clearly knew the status of Turman's case, as the cross-examination of the witness demonstrates:

> Q. And on that case, you're currently out on bond on another $100,000; aren't you?
>
> A. No, 120,000.
> Q. And the status of that case is what?
> A. There's – there's nothing, no status. I've done been to court, and it's done been taken care of.
> Q. It's over with?
> A. As far as I know.
> Q. Have you looked at the records?
> A. No, sir.
> Q. Do you want to look at them?
> A. I don't know what good it would do me.
> Q. <u>I've got them right here.  I've looked at them.</u>  You want to look at them?
> A. I probably wouldn't understand them.
> Q. It's not over with --
> A. The last time I went to court on that was two years ago, and I have never been made another court date.  That was when Kelly Karnes was fired from the sheriff's department. He brought in bogus charges on me  –

(Tr. 3: 435-36 (emphasis added).)

Barrett cannot establish a failure to disclose, for an instance in which his attorney announced in open court that he possessed the relevant records to refute Turman's testimony.  In short, no relief can lie, because the defense was armed with the essential facts permitting it to

173

take advantage of the potentially impeaching evidence. *Coe*, 161 F.3d at 344.

> C. The Government Possessed no Knowledge of a Witness who Would Contradict Charles Sanders

Barrett claims that the prosecution, during the course of an ex parte hearing, stated that it had knowledge of a witness who could contradict Charles Sanders's report that he had heard the defendant utter threats directed at Clint Johnson's confidential informant. According to Barrett, the government never disclosed that witness to the defense. (Mot. 295-96; BIS 154.) Barrett's contention lacks any merit, as the prosecutor never stated that he had spoken to a witness who could or did contradict Sanders.

The statement to which Barrett appears to allude was not part of any discussion about Sanders's report of a threat to the confidential informant. Rather, the colloquy between the Court and prosecutors concerned the existence of witnesses to events that occurred *prior* to the murder, who could "testify that Mr. Barrett knew there was an arrest warrant outstanding, . . . expected law enforcement to come to his residence at some point in time and advised that – words to the effect of I'm going to shoot when they come." (Tr. Hr'g on Gov't's Mot., Sept. 13, 2005, at 10.) The Court asked whether disclosure of the anticipated testimony would alert the defendant to the identity of the witnesses, prompting Assistant U.S. Attorney Littlefield to respond as follows:

> If – Your Honor asks about does that notice them, the defense, as to who it is and my response would be yes and no. Yes, because the defense could go back through his recollection of who he might have said that to and have an access to the names. No, because it is my belief that the defendant said that to many, many more people than those that we have found. I have learned of one person, for example, who through witnesses, who would have been a participant in a conversation with Mr. Barrett in which statements of this nature would have been made. I talked to that person. That person refused to acknowledge it, I think in large measure because of the fear.

(*Id*. at 11-12.)

<div align="center">174</div>

The subject matter of the hearing subsequently changed, when Assistant U.S. Attorney Littlefield began to discuss a threat Barrett had made *after* committing the murder with regard to Sanders.  (Tr. Hr'g on Gov't's Mot., Sept. 13, 2005, at 14.)  Littlefield explained that "sometime after the defendant's arrest, [Sanders] was at the residence of a female associate of Barrett's when Barrett called and that's when Barrett advised the female that they needed to identify the informant and, quote, 'take care of him.'" (*Id*. at 17.)  Thus, the record fails to demonstrate that any witness – in particular the aforementioned witness who was too scared to admit that Barrett had made *pre-offense* statements to her about the police – was in any position to contradict Sanders about a threat to his safety made *after* the murder.

Barrett's claim that the prosecution suppressed the identity of a witness is baseless.  He has not shown the government suppressed the identity of any witness who could have contradicted any trial testimony, and his attempt to mount a *Brady* claim on this empty record must fail.  *See United States v. Erickson*, 561 F.3d at 1163.  The government violated no right of Barrett's by omitting to disclose evidence it did not possess.  *Id.*

D.  The Government Disclosed All Necessary Evidence Concerning Law Enforcement Personnel

Barrett claims that the government suppressed evidence favorable to the defense about three law enforcement officials involved in the case – Agent Clint Johnson, Assistant U.S. Attorney Michael Littlefield, and Sheriff Johnny Philpot.  (Mot. 296-310.)  Barrett's contention regarding Johnson involves baseless allegations of largely post-trial misconduct of which the government had no knowledge.  Barrett's contention regarding Littlefield involves irrelevant post-trial conduct.  And his contention regarding Philpot is simply without a basis in fact or law.

i.  Clint Johnson

175

Barrett claims that the prosecution improperly suppressed evidence that Drug Task Force Agent Clint Johnson engaged in several acts of supposed misconduct, involving alleged check fraud and a misuse of office that included the failure to log drug evidence.  Barrett contends that this conduct began prior to this trial, was discovered during the trial, and led to Johnson's firing shortly after the trial.  Barrett also claims that Johnson mismanaged his personal finances, declared bankruptcy, and gave materially false testimony regarding his knowledge of Charles Sanders's criminal activity before September 24, 1999.  (Mot. 297-303.)  The government had no knowledge of this alleged misconduct, none of which has any substance.

As previously noted, *Brady* requires only the disclosure of evidence within the government's actual or constructive possession.  *United States v. Beers*, 189 F.3d at 1304.  The courts do not impute to the federal government exculpatory information in the possession of state agencies, when the two each separately investigate a crime.  *Id.* at 1303-04.  In this case, the government had no *Brady* obligation to disclose information concerning Johnson's activity because the witness and his employer were not a part of the prosecution team.

The U.S. Attorney, while it had contact with other police agencies during the course of this prosecution, relied on only one institution as its investigator – the DEA.  Indeed, counsel was informed well before trial that the United States Attorney had no access to, or knowledge of, the personnel files in the possession of local police agencies.  (*See* Resp. Ex. 4.)  The U.S. Attorney had no association with Clint Johnson or the Drug Task Force that would have given rise to knowledge of the personnel matters alleged here.  Given that the Task Force was not a part of the prosecution team during the course of this investigation or trial, this Court should not impute to the government any knowledge that the Task Force may have had regarding the witness's

176

supposed misconduct.  *Beers*, 189 F.3d at 1304.

Even assuming that the government had some institutional connection to the Task Force, the available evidence was immaterial.  Of the supposed misconduct attributed to Johnson, the only incident that allegedly occurred prior to sentencing in this case involved the passing of bad checks in September 2005, which the District Attorney apparently discovered on November 1, 2005.  The report did not constitute the conviction of any crime.  At most, defense counsel could have confronted Johnson with the allegation on cross-examination, but had the witness denied scienter, counsel could not have proved the misconduct through extrinsic evidence.  *See* Fed. R. Evid. 608 & 609; *United States v. Weiss*, 930 F.2d 185, 199 (2d Cir. 1991); *see also United States v. Young*, 952 F.2d at 1259.

Johnson apparently would have stood on firm ground in denying fraudulent intent, as the matter has never been shown to reflect criminal wrongdoing.  The Oklahoma Attorney General investigated the matter and determined that Johnson's accuser, District Attorney Richard Gray,[23] exaggerated or fabricated Johnson's supposed misconduct.  The Attorney General determined that the recipient of the Johnson's checks did not perceive any fraudulent intent and had no desire to report the matter until Gray's investigator forced the issue.  (*See* Resp. Ex. 2.)  No reasonable probability exists that Barrett would have received a more favorable verdict had the defense elicited evidence that Johnson inadvertently wrote an overdraft on his checking account.  *See United States v. Torres*, 569 F.3d at 1282.

Johnson, according to Barrett, also misused his position as a police officer, though the

---

[23]It appears that District Attorney, Richard Gray, commenced an investigation of Johnson based on suspicions that the subordinate had reported to state officials his concerns that the elected official was embezzling money.

177

underlying allegations lack substance and were not discovered in time to constitute *Brady*

material. Barrett concedes that Johnson's employer did not discover any errors in the logging of

drug evidence until January 5, 2006, roughly three weeks after the December 19, 2005 sentencing

in this matter. (*Compare* Mot. 297-98; *with* Trl. Dckt. Dec. 19, 2005.) The remaining

allegations concerning misuse of office did not come to light until 2008, during the State of

Oklahoma's prosecution of Richard Gray. (*See* Mot. 300-01.) The government had no

continuing duty to disclose any of the post-trial information. *See Dist. Atty's Office v. Osborne*,

129 S. Ct. 2308, 2319-20 (2009); *see also United States v. Jones*, 399 F.3d 640, 646-47 (6th Cir.

2005) (holding that evidence that did not exist at the time of trial was not *Brady* material). Even

if Johnson's actions had come to light during this trial, no reasonable likelihood exists that

Barrett would have received a more favorable verdict: the Attorney General performed an audit

of Johnson's use of official funds and, despite discovering sloppy bookkeeping, did not find any

misuse of monies (*See* Resp. Ex. 2). *See United States v. Torres*, 569 F.3d at 1282.

Apparently aware of the fact that he does not identify any concrete allegation that anyone,

in any government agency, could show that Johnson was misusing his office during this trial,

Barrett claims that the witness's employer had suspicions as early as November 9, 2005. (*See*

Mot. 284-85.) *Brady* does not, however, require the disclosure of subjective suspicions. *United*

*States v. Torrez-Ortega*, 184 F.3d 1128, 1137 (10th Cir. 1999). As a result, Barrett fails to state a

meritorious claims with his sundry allegations that the Task Force had an unsubstantiated

"concern" about Johnson's financial accountings or truthfulness. Mere suspicions of misconduct

would not have constituted admissible impeachment evidence. *See* Fed. R. Evid. 608 & 609.

Thus, Barrett cannot show a reasonable likelihood that he would have received a more favorable

verdict had the hunches of Johnson's employer come to light.  *United States v. Torres*, 569 F.3d at 1282.

Barrett likewise fails in his assertion that Johnson's 2001 bankruptcy was *Brady* material. Assuming the defense could have used the bankruptcy to impeach Johnson, it was a public record available to Barrett through another source.  *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 789 (1985) ("federal law . . . makes the fact of the bankruptcy a matter of public record."); *see United States v. Infante*, 404 F.3d 376, 386-87 (5th Cir. 2005) (finding no duty under *Brady* to disclose public records); *United States v. Lujan*, 530 F. Supp. 2d 1224, 1258 (D.N.M. 2008).  Regardless of the availability of the bankruptcy records, no reasonable probability exists that irrelevant evidence of Johnson's personal financial problems, which occurred four years before this trial, would have resulted in a more favorable verdict.  *See United States v. Torres*, 569 F.3d at 1282.

Finally, Barrett speculates that Johnson testified falsely when he stated that he did not know whether the confidential informant sold or manufactured drugs.  Johnson did, however, testify that Sanders had participated in drug dealing prior to September 24, 1999.  (Tr. Jan. 26, 2005 at 92.)  The statement was completely consistent with Johnson's apparent knowledge of Sanders's conviction for delivery of cocaine and amphetamines.  Barrett, however, claims that Johnson must have known that Sanders was selling drugs, though he denied such knowledge during the hearing.  (*See id.* at 93.)   Barrett fails to support his supposition with any evidence of Johnson's actual knowledge, and therefore cannot demonstrate any failure of disclosure. Because Barrett merely speculates that Johnson knew of Sanders's narcotics activity, he lacks a basis in fact and fails to state a valid *Brady* claim.  *See United States v. Erickson*, 561 F.3d at

1163.  Johnson was, in any event, a mere witness, not a part of the investigative team.  Thus, his knowledge of Sanders's activity cannot be imputed to the government as the basis of a *Brady* claim.  *See Beers*, 189 F.3d at 1304.

### ii.  Michael Littlefield

Barrett claims that the prosecution suppressed evidence that Michael Littlefield was abusing his children around the time of trial.  According to Barrett, evidence of this conduct would have demonstrated that the prosecutor intimidated witnesses.  He also argues that the prosecutor used improper rhetoric during cross-examination to "expiate his own sins."  (Mot. 303-07.)  Barrett's claim lacks factual support or legal substance.  He has failed to demonstrate that there was evidence of child abuse to disclose at the time of trial, or that the putative evidence was admissible and, therefore, material.

Barrett has provided no competent evidence that Littlefield abused his children prior to or during this trial.  Instead, he relies on a search warrant affidavit to assert that Littlefield's conduct, which was punished two years after this trial, extended back to any time relevant to this case.  (*See* Mot. 304-05 (citing Mot. Ex. 189).)  Of course, the affidavit is nothing more than the basis of a probable cause determination, and not proof of a crime.  In the absence of any reliable evidence that the claimed misconduct actually fell within the time frame of this case, Barrett has fallen far short of demonstrating that there was any evidence for the government to have disclosed.  *See United States v. Erickson*, 561 F.3d at 1163.

Assuming, arguendo, that Barrett had shown that Littlefield abused his children during the investigation or trial of this case, he still could not establish materiality.  Littlefield was not a witness to any aspect of this case.  His alleged misconduct, first identified two years after trial

and eight years after the murder, is entirely irrelevant to the evidence adduced against Barrett.

Nonetheless, Barrett argues that he could have proven that Littlefield intimidated witnesses based on evidence of child abuse.  Barrett's theory cannot survive scrutiny under Federal Rule of Evidence 404(b), which generally prohibits proof of prior misconduct to prove conduct in conformity at some later time.  Admittedly, Barrett, as a criminal defendant, would have enjoyed greater latitude than the government in offering prior bad acts evidence, but he still could not have met the relevant four-part test for admissibility, which would have required him to show,

> (i) whether the evidence is introduced for a proper purpose; (ii) whether the evidence is relevant; (iii) whether the evidence has probative value that is not substantially outweighed by the potential for unfair prejudice; and (iv) whether the party introducing the evidence has precisely articulated the purpose for which the evidence is offered.

*United States v. Duran-Moreno*, 616 F. Supp. 2d 1162, 1172 (D.N.M. 2009) (citing *United States v. Hardwell*, 80 F.3d at 1488).

The putative child abuse evidence lacked any relevance and therefore could not have been offered for proper purpose, as Barrett cannot show that the prosecutor intimidated witnesses or that his trial attorneys had a basis for alleging that Littlefield had done so.  To show Littlefield's supposed misconduct, Barrett simply refers to "Travis Crawford's and Cindy Crawford's claims they were threatened by Littlefield."  (Mot. 306.)  Barrett ignores the fact that Travis and Cindy Crawford have made no such accusations – indeed, Cindy has not even offered a declaration. (*See* Mot. Exs. 14, 31.)  Moreover, only Cindy Crawford is reported to have accused Littlefield of intimidation (see Mot. Ex. 14 at 2-3), while according to Travis Crawford, Littlefield told him that "bad things" would happen if he lied.  (Mot. Ex. 31 at 3.)  The only arguably competent

181

evidence presented by Barrett with regard to Littlefield's allegedly threatening behavior toward witnesses comes from Janice Sanders, who claims that the prosecutor "got angry with" her when she expressed an opinion that Barrett's state sentence was adequate and the federal prosecution was un-American.  (Mot. 306 (citing Mot. Ex. 85 at 3).)  Strikingly absent from the declaration, however, is any indication that Littlefield – despite any supposed anger – attempted to intimidate Sanders.

Barrett has not only failed to identify any basis upon which his trial attorneys could have accused Littlefield of intimidating witnesses, he has also failed to demonstrate a nexus between witness intimidation and child abuse.  Assuming, arguendo, that Littlefield physically abused his wife's children, that conduct would not provide any proof of his motive, opportunity, intent, preparation, plan, knowledge, identity, or lack of mistake in intimidating witnesses.  Fed. R. Evid. 404(b).  Simply stated, Littlefield's domestic misconduct might have been pertinent to a claim that he was assaultive, but provides no basis in reason for concluding that he improperly influenced evidence, and thus cannot survive scrutiny under Rule 404(b).

Not only would evidence of Littlefield's misconduct have lacked probity, it would have been highly prejudicial, requiring testimony on an inflammatory, highly personal, yet entirely collateral matter.  Such evidence would have tended to unfairly reflect on the government's case though it involved Littlefield's personal conduct.  Given these flaws, any evidence of Littlefield's conduct at or around the time of trial would not have survived scrutiny under Federal Rule of Evidence 403.  *See generally United States v. Robinson*, 530 F.2d 1076, 1078-79 (D.C. Cir. 1976) (discussing prejudicial effect of child battery evidence to prove identification).

By the same token, Barrett cannot show that he could have relied on allegations of child

182

abuse as the basis for an objection to Littlefield's cross-examination of Abby Stites, though the defendant now offers a pseudo-Freudian theory about the supposedly cathartic nature of the prosecutor's questions. In point of fact, Barrett has not demonstrated that the prosecutor's examination was improper, much less has he shown that it was motivated by some inappropriate need to purge subconscious guilt.

Given the clear inadmissibility and irrelevance of the putative child abuse evidence, Barrett cannot show that the government failed to disclose a material fact, as there is no reasonable likelihood that he would have received a more favorable verdict had the defense possessed irrelevant information, to the extent it existed, about Littlefield's behavior. *See United States v. Torres*, 569 F.3d at 1282.

### iii. Johnny Philpot

Barrett claims that the prosecution suppressed evidence that Johnny Philpot had visited his home, and inspected his weapons just a few weeks before the murder. According to Barrett, evidence of this alleged incident would have undermined the government's proof that the defendant intended to kill peace officers who entered his land. (Mot. 307-10.) The government bore no duty to disclose the supposed encounter.

The Constitution does not compel the disclosure of information that was available to the defense from another source. *Coe*, 161 F.3d at 344. Obviously, information about a meeting between Johnny Philpot and Barrett was available to the defense from the defendant. For that reason, the government had no duty to disclose evidence of the alleged encounter.

In point of fact, the government did not disclose any evidence of this alleged incident for the simple reason that it did not occur. Philpot has clarified that he visited Barrett's home and

183

inspected rifles there, on a single occasion – July 29, 1998, over a year before Barrett murdered Trooper Eales. (*See* Resp. Ex. 1.) Not only was that incident disclosed to the defense, it was fully explored before the jury. (Tr. 8: 1789, *see also* Tr. 8: 1809-10.) The government bore no duty to disclose evidence of an meeting inaccurately recalled by witnesses long after the fact. *See Erickson*, 561 F.3d at 1163.

As proof of the supposed encounter, Barrett relies on the declaration of Rodney Floyd (Mot. Ex. 6), in which the declarant asserts that Philpot told him about responding to the defendant's home with other deputies in 1999. This incompetent hearsay is not reliable evidence of anything, much less of a constitutional violation sufficient to overturn Barrett's murder conviction, and this Court should disregard it. Elsewhere in his § 2255 Motion, Barrett claims that Philpot's supposed 1999 visit to Barrett's home was witnessed by Janice Sanders. (*See* Mot. 160-61 (citing Mot. Ex. 85).) According to her declaration, Sanders called the police after Barrett fired a bullet that nearly missed her mother. Sanders asserts, "That call to the sheriff brought five law enforcement vehicles to Kenny's place and resulted in John Philpot inspecting Kenny's rifle to see if it was legal. I watched them there from across the road." (Mot. Ex. 85 at 1.) Ms. Sanders's recollection is, as shown above, mistaken.

But even if the incident described by Sanders had occurred, and should have been disclosed, Barrett has not demonstrated its materiality. As noted, Sanders claims that five police vehicles responded to her complaint that Barrett had nearly shot her mother. Crediting Sanders's account, it would appear that a few weeks before the murder, Barrett had demonstrated a gross disregard for the safety of his own relatives in the handling of his weapons. Sanders's recollection of a heavy police response, indeed on that may well have involved every active duty

184

sheriff's deputy in rural Sequoyah County, would have shown that local law enforcement considered Barrett dangerous, if not hostile.  Thus, the circumstances described by Sanders fall far short of proving that Barrett did not intend harm to police officers if he observed them entering his land to serve an arrest warrant.  Certainly, no reasonable likelihood exists that Barrett would have received a more favorable verdict had the government disclosed evidence of the 1999 incident recalled by Sanders.  *See United States v. Torres*, 569 F.3d at 1282.

2.  The Prosecution did not Interfere with Defense Counsel's Investigation

Barrett claims that the prosecution interfered with defense counsel's investigation by delaying disclosure of government witnesses and by advising witnesses not to communicate with the defense in the absence of a government representative.  (Mot. 310-14; BIS 165-68.)  Barrett's contention that the government unduly delayed disclosure of witness identities was already rejected on appeal, and there is no basis for revisiting it now.  His argument that the government actively interfered with witnesses has no basis in fact.

A.  The Government Complied with the Law Regarding the Disclosure of Witnesses, and Barrett Cannot Raise that Issue in this Proceeding, Having Unsuccessfully Raised it on Appeal

In the guise of an argument that the prosecution interfered with defense counsel's investigation, Barrett argues that the government did not timely disclose the identities of its civilian witnesses.  Barrett also revisits arguments he made in claims I and II, asserting that the actions of the Court and prosecutors, combined with the omissions of his own lawyers, deprived him of a deserved trial continuance.  (Mot. 310-14.)  Barrett unsuccessfully challenged the timing of the disclosure on appeal, and cannot revisit the issue in this proceeding.

On appeal, Barrett unsuccessfully argued "the government's 'failure' to timely provide

185

231

him the names of those witnesses 'amounted to an ambush, thereby denying [him] the

opportunity to investigate and prepare cross-examination, as well as present a defense.'" *Barrett*,

496 F.3d at 1115.  In rejecting that contention, the Tenth Circuit Court of Appeals held that trial

began with voir dire on September 26, 2005, and that disclosure was timely made one week

beforehand, on September 19, 2005.  *Id.* at 1116-17 (finding disclosure timely under 18 U.S.C. §

3432).  Additionally, the Tenth Circuit held that even if Barrett had demonstrated error, he had

not shown substantial prejudice: "Barrett has fallen far short of establishing that he was

substantially prejudiced . . . . [D]efense counsel expressly acquiesced in the disclosure schedule .

. . and at no time thereafter complained about the timing of the disclosure, requested additional

time to question the seven witnesses, or objected to the testimony of these witnesses . . .[under] §

3432."  *Id.* at 1117.  The Tenth Circuit's disposition of this issue precludes further review under

§ 2255.

As noted above, a defendant may not relitigate, under § 2255, any issues considered and

rejected on direct appeal.  *United States v. Warner*, 23 F.3d at 291.  Relitigation of an appellate

issue under § 2255 "may be proper when there has been an intervening change in the law of a

circuit."  *United States v. Prichard*, 875 F.2d at 790-91.  In this case, Barrett has not

demonstrated any intervening change of law that might permit this Court to revisit the claim that

the government unduly delayed disclosure of its witnesses.[24]  Even if Barrett could raise the

claim anew, it would fail for the very reasons set forth in the Tenth Circuit's opinion.

As discussed above, Barrett had no legal right to a delay in trial and cannot show that his

---

[24]To the extent Barrett may argue that this claim depends on aspects of the record he did not cite in support of his appellate claim, he has defaulted any new argument by failing to raise it before the Tenth Circuit. *See United States v. Frady*, 456 U.S. at 165.

186

exclusion from an ex parte hearing deprived him of any entitlement. (*See, supra*, Arg. I, B.) Moreover, he cannot show that his attorneys' failure to move for an undeserved continuance upon learning the identities of the government's witnesses amounted to prejudicial ineffective assistance of counsel. (*See, supra*, Arg. II, 4, A.) This Court should disregard Barrett's attempts to revive these arguments in this context.

B. The Prosecution did not Interfere with Defense Counsel's Access to Witnesses

The other portion of Barrett's argument concerning alleged prosecutorial interference with the defense concerns allegations that the prosecutor improperly advised witnesses not to speak with members of the defense camp in the absence of a government attorney. (Mot. 310-11 (citing Mot. Exs. 31 & 92).) In asserting this claim, Barrett relies exclusively on incompetent multiple hearsay. His arguments lack any basis in fact or law.

Barrett's claim relies entirely on the declarations of Roger Crawford and Leonard Post, which report statements by Travis and Cindy Crawford, who supposedly related the remarks of a prosecutor. Such multiple hearsay should not inspire the confidence of, much less any relief from, this Court. *See Herrera v. Collins*, 506 U.S. at 416 (noting that affidavits submitted in a habeas action were "particularly suspect" because they were based on hearsay).

Even if this Court is inclined to rely on the multiple hearsay proffered by Barrett, it still should not find that the claim has any merit. Significantly, neither Roger nor Phyllis Crawford, report any mention of efforts by the prosecution to deter witnesses from speaking to defense attorneys or investigators. (Mot. Exs. 91 & 92.) The only possible basis for the claim of interference is found in the declarations of the investigators who interviewed Cindy Crawford. They report as follows:

187

> Cindy stated that Mr. Littlefield, and later John Philpot, told her that she did not have to talk to or be interviewed by Mr. Barrett's lawyers or anyone working with them if she did not want to. Cindy stated that it was implied she should not speak to the defense.

(Mot. Ex. 31 at 7; *see also* Mot. Ex. 14 at 3 (reporting virtually identical observation).)

That allegation does not, however, demonstrate prosecutorial interference with the defense. Certainly, the government was not permitted to interfere in Cindy Crawford's decision to engage in an interview with the defense. *United States v. Gonzales*, 164 F.3d 1285, 1292 (10th Cir. 1999). But witnesses have a right to refuse interviews with the defense, and the prosecution may advise them of that right. *See United States v. Pinto*, 755 F.3d 150, 152 (10th Cir. 1985). Here, Barrett has not shown that the prosecution exceeded its authority to advise Ms. Crawford that she did not have to speak with the defense. Her subjective interpretation of that neutral advice, as interpreted by hearsay witnesses a half a decade after the pertinent events is in no way an appropriate basis for determining that the government committed misconduct.

Even assuming that the prosecution's actions in this case were misinterpreted by Ms. Crawford as a command, Barrett could not show any prejudice. Ms. Crawford, as reported in the declarations of Barrett's investigators, gave no indication that she would have spoken to defense counsel in the absence of the prosecutor's admonition. Furthermore, although the prosecution agreed to make Ms. Crawford available to the defense, she apparently declined to be interviewed. (Trl. Dckt. entry Sept. 14, 2005; *see Barrett*, 496 F.3d at 1115.) Furthermore, Barrett makes no effort to demonstrate a reasonable likelihood that, absent the remarks attributed to Littlefield and Philpot, he would have received a more favorable verdict. *United States v. Rivera*, 347 F.3d 850, 852; *see also United States v. Cook*, 608 F.2d 1175, 1182 (9th Cir.1979) (holding prosecutorial violations of due process are not subject to reversal absent a showing of prejudice), *overruled on*

188

234

*other grounds by Luce v. United States*, 469 U.S. 38 (1984).  Simply put, Barrett fails to show that any forgone interview with Cindy Crawford would have likely led to his acquittal.  As such, his claim should fail.

3.  The Prosecutors Committed no Prejudicial Misconduct During the Trial

Barrett claims that during the penalty phase of trial, the prosecutors interposed a series of improper questions designed to imply falsehoods or to bolster the credibility of the case.  He further contends that the prosecutors made improper comments during argument.  (Mot. 315-20; BIS 168-74.)  Barrett procedurally defaulted his claim of misconduct by failing to raise it on appeal.  Beyond that, the prosecutor committed no misconduct.

A.  Procedural Default

Because Barrett's claim of prosecutorial misconduct at trial relies on facts wholly within the ambit of the record, he was required to raise the issue on direct appeal, and his failure to do so resulted in a procedural default.  *See United States v. Frady*, 456 U.S.  at 167-68.  To the extent Barrett attempts to explain his default by claiming appellate counsel were ineffective for failing to raise the issue (Mot. 385), the claims lack any legal merit, and the attorneys had no obligation to raise them.  (*See, infra*, Arg. V, 3, B & C.)  Because these claims would have been futile if raised on appeal, Barrett cannot establish constitutionally-cognizable ineffectiveness or, by extension, cause and prejudice to excuse the default.  *See McCleskey v. Zant*, 499 U.S. at 493; *cf. United States v.  Horey*, 333 F.3d 1185, 1187-88 (10th Cir. 2003).  Apart from the fact that he has not shown cause and prejudice, Barrett makes no attempt to demonstrate actual innocence to excuse his default.  Accordingly, Barrett cannot obtain collateral relief based on the alleged

189

prosecutorial misconduct at trial.

B.  The Prosecutors Properly Questioned the Witnesses and Argued for Death

Assuming that Barrett had not defaulted his claim, he could not succeed because he has not shown that the prosecutors asked any improper questions in this case.

i.  The Prosecutors did not Ask Questions Designed to Imply Personal Knowledge

In an utterly conclusory fashion, founded on a string citation, Barrett claims that the prosecutor engaged in improper cross-examination of defense witnesses.  He claims the prosecutors, in an effort to imply their own knowledge, asked questions for which they lacked a good faith basis or for which they knew the witnesses lacked personal knowledge.   (Mot. 315.) As shown below, the prosecutors did not engage in improper questioning of witnesses.  While they occasionally elicited negative answers from witnesses, the prosecutors either clarified the record or could not have intended to imply their personal knowledge based on the context or content of the examination.  As such, they did not commit misconduct.

This Court analyzes claims of prosecutorial misconduct to determine whether the alleged malfeasance violated due process.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Thus, it examines the entire proceeding to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Prosecutors may not ask a question that implies a factual predicate which they know they cannot support or for which they have no reason to believe there is foundation of truth.  *United States v. Banks*, 405 F.3d 559, 566 (7th Cir. 2005). Cross-examination may properly embrace any matter germane to direct examination, qualifying or destroying it, or tending to elucidate, modify, explain, contradict or rebut testimony given by

190

the witness. *Leeper v. United States*, 446 F.2d 281, 288 (10th Cir. 1971).

In this case, the prosecutors did not ask questions designed to imply personal knowledge of facts that they were unprepared to prove, and the government addresses Barrett's allegations to the contrary in turn.

The prosecutor asked Deputy Court Clerk Maudeen Vann if records of Barrett's 1986 criminal case were available. (Tr. 24: 4743.) The question did not imply any special knowledge on the prosecutor's part. Instead, the innocuous inquiry was merely designed to explain the absence from evidence of a protective order filed against Barrett in the 1986 matter. (*See* Tr. 24: 4743-44.) The question was part of a larger effort by the prosecution to show the limits of the information concerning Barrett's criminal records (*see* Tr. 24: 4740-41). *See Leeper*, 446 F.2d at 288.

The prosecutor also asked Vann if, in her experience, it was uncommon for someone who received a 20-year Oklahoma state prison sentence to return to the community in two to four years. (Tr. 24: 4765.) The question did not imply personal knowledge on the prosecutor's part. Instead, it sought Vann's knowledge on the basis of her professional experience.[25] Moreover, the examination of Vann was a mere prelude to specific evidence adduced through Jimmy Wilson, an employee of the state Department of Corrections:

---

[25]Barrett elsewhere complains that the prosecutor elicited evidence outside Vann's personal knowledge when he asked her whether an inmate sentenced to 20 years imprisonment "will" be released earlier. (Mot. 300.) Contrary to Barrett's claim, the prosecutor established Vann's familiarity with the state Department of Corrections from her work as a court clerk, then elicited her agreement that "it's not uncommon for somebody to have a 20 year sentence and yet be back in Sequoyah County within a matter of two, three or four years, is it, ma'am?" (Tr. 4765-66.) The witness did not lack foundation for her answer, and the prosecutor engaged in no impropriety.

191

Q.  All right. By the way, in DOC custody, 20 years doesn't mean 20 years, does it?

A.  No, sir.

Q.  Twenty years could mean lots less than that, correct?

A.  Less than ten.

Q.  And in fact, you have testified about the various rate at which the Defendant was accumulating credits at OSP, McAlester, correct?

A.  Correct.

(Tr. 24: 4851.)  Thus, the examination of Vann implied nothing the prosecutor was unprepared to adduce through another witness.  *Cf. Banks*, 405 F.3d at 566.

The prosecutor asked Vann if she knew who actually received custody of Toby Barrett, given that the defendant's divorce decree indicated that he had received joint custody of his son. (Tr. 24: 4781.)  Barrett argues that this question implied that he was denied custody of his son. On its face, the question could not have implied knowledge of such a ruling, since it posited that he received joint custody.  At most, the question implied that despite a joint custody decree, the defendant did not take physical custody of his child.  As such, the question properly clarified for the lay jury that a joint-custody decree did not necessarily mean that both parents had custody and cared for the child.  Furthermore, the prosecutor was not only fully prepared to show who cared for the defendant's son, he did so by eliciting from the defendant's ex-wife that she had almost exclusive custody of Toby until the murder (Tr. 24: 4908-09).  *Cf. Banks*, 405 F.3d at 566.

The prosecutor asked process server Kathy Trotter a series of questions, testing her knowledge of Barrett and his associates.  (Tr. 24: 4788-92.)  These questions were not designed to imply any personal knowledge on the part of the prosecutor.  Rather, they were clearly designed to challenge Trotter's hyperbolic testimony, "It's a small community. I'm very aware of pretty much what goes on all the time."  (Tr. 24: 4785.)  Trotter's lack of personal knowledge about the topics of inquiry undermined the credibility of this assertion and did not imply any

192

238

particular knowledge on the part of the prosecutor.  *See Leeper*, 446 F.2d at 288.

The prosecutor asked Jimmy Wilson about an Oklahoma Department of Corrections document, which indicated that if Barrett escaped or was released from state prison, "notification is supposed to be given to the victim, that is, to Kelli Eales."  (Tr. 24: 4850.)  Subsequently, the prosecutor asked Wilson if the form provided for any right other than notification, such as "funding for a move."  (*Id*.)  Wilson answered that the form did not, but in response to a follow-up question regarding the form, the witness volunteered, "I really don't know what the victims' services do for them.  All I know is we handle, through the victim services and they notify the victims."  (*Id*.)  While the unrequested information clearly concerned a matter outside the witness's personal knowledge, the prosecutor did not attempt to elicit the response and could not have committed misconduct by eliciting an unexpected answer.

The prosecutor also asked Wilson whether an Oklahoma state prison inmate became technically eligible for parole on the first day of state custody.  Wilson said he did not know, and the prosecutor apologized for asking questions outside the witness's professional capacity.  (Tr. 24: 4852-53.)  The question was clearly designed to elicit a response within the witness's personal knowledge, but failed to do so.  But rather than leaving an ambiguous implication before the jury, the prosecutor later clarified that Wilson believed that Barrett became parole eligible in May 2006.  (Tr. 24: 4876.)  As such, the prosecution made its point that Barrett was eligible for parole after a very brief period of incarceration, denuding the prior inquiry of any possible prejudicial effect.

The prosecutor adduced from Wilson the fact that local jails did not necessarily report a prisoner's misconduct to the Department of Corrections when the inmate was sent to state

custody.  (Tr. 24: 4859.)  The questions were apparently intended to neutralize the impression that Barrett had not been assaultive while in jail.  (*See* Tr. 24: 4813.)  As such, the queries referred to a proper subject for cross-examination.  *See Leeper*, 446 F.2d at 288.  While the questions alluded to Barrett's misconduct in the county jail, the prosecution later adduced specific evidence of Barrett's assaultive and threatening misconduct in that facility.  (*See, e.g.*, Tr. 26: 5220, 5233, 5252, 5264-65.)  Accordingly, the prosecutor's question to Wilson clearly was not designed to elicit any fact the government was unprepared to prove.

The prosecutor subsequently attempted to identify inaccuracies in Defendant's Exhibit 247 (Tr. 24: 4862), a Department of Corrections screening form that the defense had introduced through Wilson's direct testimony.  (*See* Tr. 24: 4727-28.)  The prosecutor attacked the document by asking a series of questions designed to show omissions from the form concerning the facts of Trooper Eales's murder.  (Tr. 24: 4861-62.)  As such, the prosecutor properly attempted to elucidate the reach of a defense exhibit on cross-examination.  *See Leeper*, 446 F.2d at 288.  Furthermore, the government had already presented evidence of the murder to the jury, and it would be absurd to suggest that the prosecutor's examination was designed to imply personal knowledge of facts he was unprepared to prove.

The prosecutor also asked Wilson if he knew of Barrett's secret or illegal behavior and whether inmates committed undetected acts of misconduct in prison.  (Tr. 24: 4866.)  By their nature, these questions could not have implied personal knowledge, as there was no basis in reason for believing that anyone was aware of "secret" misconduct.  The questions were properly intended to rebut the inference created by the defense that Barrett was a model inmate because his prison records did not reflect misconduct (*see* Tr. 24: 4828).  *See Leeper*, 446 F.2d at 288.

<div align="center">194</div>

The questions were also a preface to a broader exploration of the fallibility of prison security. (Tr. 24: 4866-68.)  The prosecutor asked a series of questions regarding the possibility that an inmate could put his best foot forward in order to lull officials into complacency.  (Tr. 24: 4869.)  By their nature, these questions could not have implied personal knowledge.  The prosecutor could not have implied personal knowledge by addressing the unknown.  Indeed, he pointed out that jailers could not "read the minds of prisoners."  (*Id.*)  The colloquy properly established that no one could truly know the intentions of prisoners, even those with good records of conduct.

The prosecutor asked Barrett's former wife, Abby Stites, a series of questions concerning her reports of an incident in which Barrett assaulted her.  The prosecutor asked Ms. Stites about specific statements she had made to Lynn Morris and Donna Hines.  (Tr. 24: 4911, 4913.)  These were not questions designed to imply information within the personal knowledge of the prosecutor, but queries designed to impeach Stites with prior inconsistent statements.  *See* Fed. R. Evid., rule 613.  While Stites denied some of the details of the incident, as the prosecutor understood them, her testimony as a whole demonstrated that she and Barrett had engaged in mutual physical combat and that he was an abusive spouse.  (*See, e.g.*, Tr. 4880-81, 4898, 4909-10.)  There is no basis for concluding that the prosecutor examined Stites in bad faith, as Barrett makes no effort to show that the prosecutor lacked a basis for the questions he asked of the witness.

The prosecutor asked Craig Edgmon whether he could speak to the character of Karen Real.  Edgmon said he could not.  (Tr. 24: 4925.)  The question was one in a series of inquiries about Edgmon's knowledge of the defendant's associates.  The entire line of inquiry was properly designed to show that the witness, who testified that the defendant was non-violent (Tr.

195

4924), had only a passing acquaintance with him. *See Leeper*, 446 F.2d at 288. To the extent that the question could have inadvertently resulted in testimony that bolstered another witness, it did not, as Edgmon had no real knowledge of Real.

The prosecutor asked jail employee Courtney Burk whether she knew if Barrett had any communicable disease:

> Q. And I'm not suggesting you necessarily know with regard to Mr. Barrett whether or not he has any transmittable disease like that, do you know?
> A. I have no idea.
> Q. Given the fact that there are 260 inmates at any given point in time, would you expect that Shirley Shores would have absolute recall as to who has what in terms of communicable diseases?
> A. No, she wouldn't know at all times.

(Tr. 25: 5006.) This evidence was relevant to demonstrate the fear and uncertainty Barrett would have instilled in Shirley Shores when he spit at her. (*See* Tr. 25: 5005.) The prosecutor did not imply any knowledge of Barrett's physical condition. Quite the opposite, he suggested that, in a confrontation with the defendant, a jail worker would not know Barrett's health status. As such, the cross-examination properly elucidated the seriousness of Barrett's misconduct, which the defense had attempted to minimize in importance (see Tr. 25: 4991-93). *See Leeper*, 446 F.2d at 288.

The prosecutor engaged in the following colloquy with Doris Barrett:

> Q. And so, if somebody's come in and talked about seeing guns around the house, his father having guns, that couldn't have been in the Sallisaw area, could it?
> A That was when we lived in Illinois and we lived in New Jersey and then when he (Interrupted)
> Q Could not have been around Sallisaw, could it?
> A No. But when he did go to his dad's, though his dad collects guns. There have always been guns.

(Tr. 25: 5092.) The evidence clarified and corrected the testimony of Kathy Trotter, who had

196

created the impression that Barrett's father kept guns while living in Sallisaw.  (*See* Tr. 24: 4786-87.)  As such, the testimony adduced from Doris Barrett did not imply the personal knowledge of the prosecutor, but related to previously adduced evidence.

All of these lines of inquiry, whether judged separately or apart, were entirely proper.  Moreover, the vast majority of the examination challenged by Barrett concerned the allegations of his future dangerousness, which the jury rejected.  (Doc. 257.)  As such, Barrett cannot hope to show that the questions at issue here infected his trial with unfairness.[26]  *See Donnelly v. DeChristoforo*, 416 U.S. at 643.

> ii.  The Prosecutor did not Improperly Comment on the Defendant's Exercise of his Right to Trial

Barrett claims that the prosecutor improperly commented on his exercise of his right to trial during cross-examination of Maudeen Vann.  (Mot. 315.)  However, the prosecutor did not make any improper comment, or even mention Barrett's election to go to trial in this case.

A prosecutor's remarks on a defendant's exercise of the right to trial amount to misconduct if they imply that the accused is more likely to be culpable if he pleaded not guilty.  *See United States v. Hollis*, 971 F.2d 1441, 1454 (10th Cir. 1992).  Prosecutors likewise commit misconduct if they imply that the defendant had an ulterior motive for electing to go to trial.  *Id.*; *see Cunningham v. Zant*, 928 F.2d 1006, 1019 (11th Cir. 1991).  Neither of the aforementioned transgressions occurred here.

In this case, the prosecutor and Vann engaged in the following colloquy:

---

[26]Barrett also suggests that the prosecutor improperly implied knowledge at Tr. 25: 4980, but he is mistaken.  The prosecutor, at that juncture, examined Robert Gude about the accuracy of Defense Exhibit 244.  Gude never claimed a lack of knowledge about any asserted subject, and the prosecutor implied nothing.

Q. (By Mr. Littlefield) In regards to the felony information about which you've testified for the homicide of David Eales, Mr. Barrett didn't plead guilty, did he, ma'am?

A. No, sir.

Q. Put the government to the task of proving its case, didn't he?

A. Yes, sir.

Q. And ultimately Mr. Barrett was convicted of manslaughter and given a year sentence in that case?

A. Yes, sir.

(Tr. 24: 4765.) The prosecutor made no improper comment about Barrett's exercise of his right to trial. By simply pointing out that Barrett had gone to trial in state court, he did not imply that the defendant was more likely guilty in that case or this one. Rather, the prosecutor underscored the fact that the state had presented evidence in its prosecution of Barrett. That fact tied to a later colloquy in which the prosecutor established that Barrett's state court manslaughter conviction was based on different evidence than that presented by the government in this case. (Tr. 24: 4767.) For the government, this was an important point, as it forestalled the possibility that the jury might conclude from the state manslaughter verdict that a death sentence was unwarranted.

Because the prosecutor implied nothing untoward about Barrett's exercise of his right to trial, the defendant cannot show that the brief and isolated inquiries about that topic deprived him of a fair trial, especially given the fact that defense counsel had also elicited testimony that the state verdict was delivered by a jury (Tr. 24: 4737). *See DeChristoforo*, 416 U.S. at 643.

iii.   The Prosecutor did not Improperly Engage in Cross-Examination Outside the Scope of Direct Exam

Barrett complains that during the penalty phase, the prosecutors improperly engaged in cross-examination outside the scope of direct. He also complains that the prosecutors asked questions on cross-examination about which the witnesses lacked personal knowledge. (Mot. 315.) The prosecutors violated no applicable rule, and created no unfairness through their

198

actions.

Barrett's contentions rely upon Federal Rules of Evidence 602 (regarding the personal knowledge of witnesses) and 611(b) (regarding the scope of cross-examination).  Neither of those rules, however, applied to the penalty phase trial.  18 U.S.C. § 3593(c); *see United States v. Basham*, 561 F.3d 302, 334 (8th Cir. 2009); *Barrett*, 496 F.3d at 1100.  Accordingly, the prosecutor did not violate any applicable legal doctrine.  Regardless of the applicability of the Rules of Evidence, the prosecution did not interpose any question that infected the trial with unfairness.  As previously noted, cross-examination may properly seek to limit, explain or contradict any topic explored on direct.  *Leeper*, 446 F.2d at 288.

All of the instances of supposed misconduct identified by Barrett involved questions designed to qualify the reach of the evidence adduced by the defense.  As such, the queries properly demonstrated what the witnesses did not know.  (*See* Mot. 315-16 (citing Tr. 24: 4767, 4788-92, 4925, 4926; 25: 5024-26, 5045, 5069, 5116).)  None of the questions implied knowledge solely and wholly within the reach of the government.  Instead, they blunted the impact of Barrett's witnesses by showing the limits of their knowledge.  For instance, the prosecution elicited Maudeen Vann's concession that she did not know whether the state had relied on the same evidence in Barrett's prior trials that the federal government had in this one. (Tr. 24: 4767.)  As noted above, that testimony clarified the fact that the state conviction records adduced by the defense (*see* Tr. 24: 4722-26) were not necessarily based on the same evidence presented in this trial.  (*See, supra*, Arg. V, 3, B, ii.)

The prosecutor questioned Craig Edgmon about his knowledge of Barrett's associates (Tr. 24: 4925-26), to properly demonstrate the witness's lack of familiarity with the defendant

<div align="center">199</div>

<div align="right">245</div>

and, by extension, to undermine his characterization of Barrett as a non-violent person (*see* Tr. 24: 4924-25). *Leeper*, 446 F.2d at 288; *see, supra*, Arg. V, 3, B, i. Similarly, the prosecution adduced Steven Barrett's concession that he had limited knowledge of the defendant's failed marriage. (Tr. 25: 5045.) That testimony properly undermined the foundation for Steven Barrett's characterization of the relationship as involving "[m]ainly verbal disagreements" and only "one instance" he could recall of a physical altercation. (*See* Tr. 25: 5033.)

The prosecution cross-examined two witnesses about their limited knowledge of the defendant's prior criminal activity (Tr. 25: 5024, 5069) in response to direct testimony that Barrett was not threatening (Tr. 25: 5059), was a good person (Tr. 25: 5062), was a good son (*id*.), and was not known to have committed a violent offense against anyone but his ex-wife (Tr. 25: 5012). The government demonstrated Ernest Barrett's ignorance of the defendant's conduct during the two years preceding the murder (Tr. 25: 5116), to clarify his testimony that he saw the defendant "periodically" and that for "[a] couple of years before this incident[,] I hadn't saw much of him." (*See* Tr. 25: 5111, 5112.) And, as noted, the prosecution cross-examined Kathy Trotter about her ignorance of Barrett's associates and criminal record (Tr. 24: 4788-92) to undermine her claim of knowledge concerning the community (see Tr. 24: 4785). (*See, supra*, Arg. V, 3, B, i.)

All the examination disputed by Barrett was entirely appropriate and meant to test relevant portions of direct examination. *See Leeper*, 446 F.2d at 288. But notwithstanding any questions designed to show that the defense witnesses lacked substantial relationships with Barrett, the jury unanimously found that the defendant was a father, a loved son and stepson, a person whose death would impact his child, family and friends, and a person with no prior felony

200

convictions. (Trl. Doc. 257.) A majority of jurors also found that Barrett was a good neighbor and friend. (*Id*.) Furthermore, in spite of any question designed to show that the state prosecution involved different evidence than this trial, five jurors found in mitigation that Barrett had accepted responsibility for Trooper Eales's death and had been convicted and punished for it. (*Id*.) Thus, Barrett cannot show that he was in any way prejudiced, much less that the government's cross-exam infected his trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

    C.   The Prosecutors Properly Argued that the Jury Should Impose a Death Sentence

Identifying isolated fragments of argument, divorced from the context of the case, Barrett argues that the prosecutors committed repeated misconduct during their penalty phase summation and rebuttal. He argues that they took unfair advantage of court rulings, argued outside the record and used improper rhetoric. (Mot. 316-22; BIS 168-74.) As demonstrated below, the prosecutors relied properly on this Court's rulings, used appropriate verbiage, and drew reasonable inferences from the record.

    i.   The Prosecutors Properly Relied on this Court's Rulings

Barrett claims that the prosecution improperly took advantage of a supposed evidentiary ruling, in which the Court excluded Barrett's statement that he wished he had been killed instead of Trooper Eales. Barrett argues that, in view of the ruling, the prosecutor had no right to argue as follows: "[The defendant] expressed remorse. How? When? Well, he told his mom he wished it could have been different. Yeah, like not get caught. Yeah, like kill more of the bastards like I intended to." (Mot. 316 (citing Tr. 27: 5356).) Barrett likewise complains that the prosecution should not have attacked his other reported statements of regret as the follows: "[Barrett's mother] says Defendant knows he made a wrong decision as to how to react that

<div align="center">201</div>

night. If he could do it different, he would. Now, that's big of him," and "There is no proof that this Defendant lost one wink of sleep over what he did. It's almost as if he had done nothing, like nothing happened. . . . His mother quoted him as saying he made a wrong decision and would do it differently. You know, it's almost an oops." (Mot. 319 (citing Tr. 27: 5419).)

Barrett's claim fails for want of any support in the record. Barrett has not identified the supposed evidentiary ruling that he claims should have acted as a bar to the prosecution's assertions during argument. The putative ruling also appears to form the basis of Claim 6 of the § 2255 Motion, but, there again, Barrett has failed to specify the decision about which he complains. (*See, infra*, Arg. VI.) Accordingly, Barrett has not shown that this Court excluded evidence of his remorse on the government's motion, though he premises his argument on precisely that assertion.

Regardless of Barrett's failure to identify a pertinent ruling, or even a government motion to exclude evidence of his remorse, he still could not gain relief on the basis of this claim. Prosecutors "may rely in good faith on evidentiary rulings made . . . and make arguments in reliance on those rulings." *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008) (citing *United States v. Chirinos*, 112 F.3d 1089, 1098 (11th Cir. 1997)). As such, the prosecutors in this case did not commit misconduct by failing to acknowledge excluded evidence.

Barrett, however, argues that a finding of misconduct should lie based on supposed similarities between this case and *Paxton v. Ward*, 199 F.3d 1197 (10th Cir.1999). But his attempted analogy does not succeed. *Paxton* arose as a federal habeas attack on a state court death penalty judgment. The state had sought to prove in aggravation that the defendant had committed a prior murder. The prosecution of the prior case had been dismissed in light of the

202

248

defendant's performance on a polygraph test. The dismissal was a stipulated fact at trial, but the court prohibited the parties from referring to the polygraph as a matter of state evidentiary law. During argument, however, the prosecutor asserted that the defendant

> had the same opportunity to put evidence on that witness stand about that [earlier] killing that we did. Everything – if he had any evidence – if the defense had any evidence to show that that crime didn't happen exactly the way that our witnesses told you it did he could have put a witness on the witness stand. You didn't hear from anybody . . . . And there could be a lot of reasons as to why [the earlier prosecution was dismissed] . . . who knows. We don't know why it was dismissed.

*Id.* at 1212-13. The Tenth Circuit found that the prosecutor committed misconduct because he "deliberately made two critical misrepresentations to the jury: he told the jury that Mr. Paxton had been given the opportunity to present any evidence showing that he had not killed his wife, and he told the jury that the reason for the dismissal was unknown." *Id.* at 1213.

The facts of this case bear no resemblance to those of *Paxton*. By expressly relying on Paxton's failure to present evidence, the prosecutor alluded to the very subject the court had forbidden the parties from mentioning. In this case, though, the prosecutors attacked evidence that Barrett did adduce – his statements of apparent remorse to his parents. (*See* Tr. 27: 5356-57, 5419-22; *see also* Tr. 25: 5089 (Gelene Dotson's testimony about her son's regrets), 5115 (Ernest Barrett's testimony about his son's regrets).) The prosecutors made no reference, however elliptical, to supposedly excluded evidence, plainly distinguishing this case from *Paxton*. Having failed to show that the prosecutors offended *Paxton* or flouted this Court's evidentiary rulings, Barrett cannot show that the their actions infected his trial with unfairness and therefore constitute prejudicial misconduct. *See DeChristoforo*, 416 U.S. at 643.

ii. The Prosecutors Properly Characterized the Record

203

Barrett argues that the government's attorneys made assertions unsupported by the record. (Mot. 316, 317.)  As shown below, the prosecutors made entirely appropriate inferences from the evidence, even if those inferences were unfavorable to Barrett.

A prosecutor's summation must rely on facts adduced in the record.  *See United States v. Ivy*, 83 F.3d 1266, 1288 (10th Cir. 1996); *United States v. Sullivan*, 919 F.2d 1403, 1425-26 (10th Cir.1991).  Prosecutors may, however, argue that the jury should draw reasonable inferences from the evidence in support the government's theory of the case.  *United States v. Dazey*, 403 F.3d 1147, 1170 (10th Cir. 2005).

Barrett unsuccessfully contends that the prosecution unfairly strayed from the record and appealed to societal alarm with an argument that the defendant intended to murder multiple police officers.  (Mot. 316 (citing Tr. 27: 5402-03, 5412).)  The record showed that Barrett had stated his intent to kill as many police officers as he could and to "go out in a blaze of glory." (*See, e.g.*, Tr. 400-01, 412-15, 463-66, 2514-15, 3068-69, 3491-93.)  When the Tact Team entered Barrett's land, he fired at least 18 rounds from an AR-15, wounding one trooper and killing a second.  (*See* Tr. 318-20, 539, 544, 56-57, 3168, 3236.)  Apart from the AR-15, Barrett carried a loaded pistol in his waistband, and was apparently reaching for the weapon just before troopers handcuffed him.  (Tr. 548-50, 1112-13.)  On this evidentiary record, the prosecutors were well within bounds in arguing that this incident very nearly resulted in multiple murders:

> I want to ask you two preliminary questions.  The first is this: What kept the Defendant from being a multiple murderer in this case?  Some may say the hand of God, Providence, fate, dumb luck.  The Defendant in this case intended to be a multiple murderer.  We'll examine the facts. But the second question I want to ask you is this: If 19 rounds . . . from this firearm . . . . 19 shots at highway patrolman, at officers of the law, at soldiers of the law, if 19 shots from this gun at point blank range, but extending farther out to begin, if that's not over the capital line, what is?  Must it have been 30 or 60 or the 91 that he had at the ready?

<div align="center">204</div>

(Tr. 27: 5402.)

The prosecutor's presentation was free of any inappropriate and unprofessional epithets to describe Barrett. *Cf. Wilson v. Sirmons*, 536 F.3d 1064, 1118 (10th Cir. 2008) (finding the terms "animal" and "unadulterated evil" were "pejorative[], unprofessional, inappropriate, and unworthy of an officer of the court"). And while it made a passing reference to "God," the argument did not improperly invoke a higher power as a justification for seeking the death penalty. *Cf. Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2000) (finding misconduct in argument that included "You are not playing God. You are doing what God says."). In fact, the prosecutor's argument was particularly apt here, given that the government alleged and proved a multiple-murder aggravator as to counts one and two (Trl. Doc. 257 at 8, 10). *See Coleman v. Brown*, 802 F.2d 1227, 1239 (10th Cir. 1986) (finding penalty phase argument appropriate when relevant to factors before the jury). The finding was fully supported by the evidence of Barrett's express intent and his use of semi-automatic high-powered rifle to fire into a group of occupied police vehicles. Barrett cannot show that the prosecutor's argument amounted to anything but a fair inference from this record. In no way, has he shown that the summation unfairly infected his trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

Barrett also claims that the prosecutor improperly speculated outside the record when he argued as follows: "Don't let this Defendant – the evidence may reasonably infer and you may reasonably conclude – be a hero to his fellow inmates, to his fellow incarcerated criminals." (Mot. 317 (citing Tr. 27: 5412-13).) The statement was couched as a mere invitation to infer a fact supported by the record. By its very nature, the statement does not imply improper reliance on facts outside of evidence.

205

Indeed, the government adduced substantial evidence upon which the jurors could have made the inferential leap suggested by the prosecutor.  The record demonstrated that Barrett exerted control over other inmates while incarcerated in jail.  (Tr. 26: 5235.)  The evidence further showed that Barrett had threatened a guard in front of other inmates.  (*See* Tr. 26: 5249, 5251-52.)  And the evidence showed, as a general matter, that prisoners harbored great animosity for inmates who cooperated with law enforcement.  (*See* Tr. 24: 4866-67.)  Given this testimony, the jury could have fairly inferred that prison inmates would look with favor upon someone who murdered a police officer.  The record aside, the prosecutor could have properly urged this point as a matter of common knowledge, as the jurors could be expected to understand prisoners' tendency to identify, as incarcerated felons, against a common social adversary, law enforcement. *See United States v. Browning*, 390 F.2d 511 (4th Cir. 1968) (observing that counsel may argue matters of common knowledge).  Accordingly, Barrett has failed to show that the prosecutor's argument amounted to misconduct, much less that the statement infected his trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

According to Barrett, the prosecutor also argued outside the record when he stated, "The Defendant didn't need to commit this murder.  He wanted the thrill of the kill."  (Mot. 302 (citing Tr. 27: 5412-13).)  The prosecution had, though, adduced evidence that Barrett planned the murder as a suicidal gesture, stating he would "go out in a blaze of glory."  (Tr. 3: 463-66; 13: 3068-69.)  The government also adduced evidence that Barrett hoped in particular to kill people with whom he had an adversarial history.  (Tr. 11: 2515.)  Clearly, the evidence permitted a fair inference that Barrett looked forward to a confrontation with the police as a form of catharsis. The prosecutor's contention that Barrett wanted the "thrill of the kill" was a fair deduction from

the evidence and in no way infected the trial with unfairness. *See DeChristoforo*, 416 U.S. at 643; *Dazey*, 403 F.3d at 1170.

Barrett also argues unsuccessfully that the prosecution created a false impression that its civilian witnesses feared the defendant. (Mot. 318.) Barrett is wrong. The prosecutor made an utterly rational inference from the evidence in arguing as follows:

> You heard witnesses testify here that in the state proceeding they didn't – they were really grossly under-evidenced. Randy Turman didn't testify, nor did Travis Crawford, nor Charles Sanders nor Karen Real nor Brandie Price, Cindy Crawford, Randall Weaver. No small effort was involved in getting them brave enough to hit the stand. They didn't want to testify. We required their testimony.

(Tr. 27: 5414-15.) The prosecutor's assertion once again represented an appropriate inference from the record. All the witnesses conceded battles with addictive drugs, and all but two of them mentioned involvement in the criminal justice system. (*See, e.g.*, Tr. 2: 365-66; 3: 457; 8: 1835-36; 11: 2491-95; 13: 3061-62, 3079-81; 15: 3486-87.) Two of the witnesses, Karen Real and Charles Sanders, were incarcerated at the time of their testimony. (Tr. 11: 2491; 13: 3079.) As noted above, a defense witness explained that prisoners tended to look with homicidal intent on other inmates who cooperated with law enforcement. (*See* Tr. 24: 4866-67.) Consistent with that testimony, Charles Sanders testified that he overheard Barrett, while the pair were incarcerated, express a desire to seek vengeance against the confidential informant. (Tr. 22: 4587-88.) On that record, the prosecutor could appropriately infer that the witnesses had reasons to avoid the witness stand. Indeed, at least two of them – Travis Crawford and Brandie Price – specifically admitted their lack of enthusiasm for testifying. (*See, e.g.*, Tr. 3: 470; 15: 3497.) Given the evidence adduced at trial, and the fact that the prosecutor never stated or implied that the civilian witnesses all harbored a specific fear of Barrett, the comment did not infect the trial

207

with unfairness.  *See DeChristoforo*, 416 U.S. at 643.

### iii.  The Prosecutors Used Fair and Appropriate Rhetoric

Barrett makes a series of claims about the fairness of the prosecutors' use of terminology to characterize the evidence and the defendant's rights.  (Mot. 316-20.)  Once again, his claims are baseless – either entirely lacking in factual support or legal merit.  The government used persuasive, but entirely appropriate language in arguing for a death sentence in this case, particularly in rebuttal to the defense argument.

As noted, prosecutors may urge reasonable inferences from the evidence.  *Dazey*, 403 F.3d at 1170.  They may not, however, utilize disparaging terms to make personal attacks on the defendant.  *See, e.g.*, *Darden*, 477 U.S. at 180-81 (describing the prosecutor's use of the term "animal" as improper); *Wilson v. Sirmons*, 536 F.3d at 1118.  But when supported by the record, the use of emotionally-freighted terms does not constitute misconduct.  *See Wilson*, at 1118 (upholding use of the term "psychopath" in view of expert testimony that the defendant met some criteria for the diagnosis).  Furthermore, courts analyze the prosecution's rebuttal in the context of the defense argument that preceded it.  *See United States v. Young*, 470 U.S. 1, 12-13 (1985).

Barrett, putting words in the mouth of the prosecutor that were never spoken, claims that the government's attorney argued that Barrett had no right to "fairness."  (Mot. 302 (citing Tr. 27: 5408).  Barrett's contention relies upon a fabrication.  The government, in point of fact, argued against leniency and the defense's assertion that a death verdict would be unfair:

> He was a fully conscious adult who substantially planned, who premeditated in a number of ways in the weeks and months prior to this murder. He expected, he watched, he surveilled and he slaughtered an absolutely innocent man who had done nothing to him.  And they ask for increased leniency or fairness?

<center>208</center>

> This was game day for the murderer.  He clearly tried to murder at least two human beings, shots at the Bronco, the intentional killing of the passenger.  But he wasn't finished.  He saw the driver, Buddy Hamilton, getting out of the vehicle, didn't he?  Buddy was wounded.  He fired at him, too.  Buddy was wounded in the front, the face, in the front and back, and back, and back, of his shoulder.  *And they claim unfairness*.

(Tr. 5408 (emphasis added).)  As the prosecutor implied, the defense had argued – indeed, had argued passionately and at length – that a death verdict would be "unfair."  (Tr. 27: 5367-75, 5383 ("You've always learned that there will not be twice you'll be subject to jeopardy for the same offense.  And that's exactly what the Government is asking you to do here today.  They're asking you to be an instrument of death for the Government.  That, ladies and gentlemen, is fundamentally unfair.").)  In response to that argument, the prosecution properly asserted that a death sentence was eminently fair, but never implied or stated that Barrett had anything less than a right to a scrupulously fair trial on that question.  *See United States v. Young*, 470 U.S. at 12-13.  Accordingly Barrett has failed to identify any remark that was objectionable, much less that infected his trial with unfairness.  *See DeChristoforo*, 416 U.S. at 643.

Citing a different passage in the summation, Barrett again claims that the government argued he was not entitled to fairness, adding allegations that the prosecutor appealed to "lynch law" and falsely claimed the defendant was in control of his fate.  According to Barrett, these errors all occurred in the following passage: "The Defendant wants to choose his sentence.  He now wants to live.  And how unjust is that?  What opportunity did he give Rocky Eales to live?  How unjust is that?"  (See Mot. 317 (citing Tr. 27: 5413).)  As with the previous passage, this argument responded to the defense's oft-repeated assertion that a death sentence would be unfair.  (*See, e.g.*, Tr. 27: 5367-75, 5383.)  To the extent the prosecutor noted that the defendant wanted to choose his sentence, it responded to the defense request that the jury impose a term of

<div align="center">209</div>

imprisonment. (*See* Tr. 27: 5382.) At no time did the prosecutor suggest or state that the jury should deny the defendant a fair trial, nor did he allude to the applicability of any extra-legal standard. Once again, his remarks did not infect the trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

Barrett further complains that the prosecutor engaged in improper name calling when he referred to him as "the executioner of the innocent." (Mot. 317 (citing Tr. 27: 5413).) Barrett's characterization of the record is inaccurate. The prosecutor did not label Barrett with an epithet, he attacked Barrett's conduct when he said, "All with a civilized core must have revulsion at what the Defendant did to have acted as the executioner of the innocent." (Tr. 27: 5413.) Assuming, arguendo, that the prosecutor relied upon an epithet, it was not the type of personal and pejorative labeling that amounts to a due process violation. *See Alba v. Quarterman*, 621 F. Supp. 2d 396, 425-26 (E.D. Tex. 2008) (holding defense counsel did not provide ineffective assistance in omitting to object to government argument, including characterization of defendant as "executioner"). Given the nature of the murder, in which Barrett repeatedly shot Trooper Eales as the victim attempted to flee from the confrontation, the nature of the murder was akin to an execution of a man who had done nothing other than his duty. The prosecutor's terminology, while connoting disdain for the defendant's actions, was appropriate on this evidence. *Wilson*, 536 F.3d at 1118.

Barrett claims that the prosecutor "grossly misled" the jury when he asserted that the victim-impact witnesses did not testify in the defendant's state court trials. According to Barrett, the argument implied that the witnesses had not testified due to the incompetence of the state prosecutors. (Mot. 318.) Certainly, the argument represented a fair inference from the record, as

Barrett's own attorneys adduced the fact that the victim's wife had never had a previous opportunity to testify.  (*See* Tr. 23: 4692; *see also* Tr. 25: 5122-25 (Doris Barrett testifies to differences between the state and federal trials).)  Furthermore, the prosecution's argument responded to the defense contention that the existing state court sentence was ample punishment for this murder.  (*See* Tr. 27: 5367-75, 5383.)  The prosecutor properly reacted to that view by observing that this trial contemplated different evidence than its predecessor, distinguishing for the jury why a harsher sentence might not be unfair in light of the evidence.  *See Young*, 470 U.S. at 12-13.  In no way did this isolated and relatively insignificant statement infect the entire trial with unfairness.  *See DeChristoforo*, 416 U.S. at 643.

The defendant further complains that the prosecutor improperly referred to Barrett's relatives as "props" and denigrated his right to present mitigating evidence by contrasting the defense case with Trooper Eales's death.  (Mot. 319 (citing Tr. 27: 5420.)

> The Defendant had sporadic contact, pretty much unwanted, particularly with his mother, until he committed murder and got arrested.  They didn't visit him at his house.  They hadn't seen the inside of his house by and large.  And remember this, hear [*sic*] in court, the Defendant victimizes his own family by making them serve as props, as witnesses on his behalf.  Remember, Rocky didn't get this similar chance to plead for his life.

(Tr. 27: 5420.)  The prosecutor's statement in no way denigrated Barrett's right to present evidence of any stripe.  Rather, it accurately characterized the mitigation presentation as a somewhat hollow gesture, given that Barrett's relatives had demonstrated lack of familiarity with and affection for him.  For instance, Steven Barrett conceded he and the defendant had different social circles and had had infrequent contact in the preceding 16 years.  (Tr. 25: 5041, 5044.)  Likewise, Barrett's mother, who lived next door to him, admitted she never visited his cabin and did not deliver phone messages to him because she "wasn't running a message service" on his

211

behalf. (Tr. 25: 5082.)  The defendant's father stated he hadn't see Barrett for approximately two years prior to the murder and had never entered his home.  (Tr. 25: 5116-17.)  On this record, the prosecutor accurately and appropriately characterized Barrett's testifying relatives as "props."  *United States v. Dazey*, 403 F.3d at 1170.  Despite the evidence and argument, the jury found that Barrett was a loved son and stepson and a person whose death would impact his relatives.  (Trl. Doc. 257.)  As such, the defendant simply cannot show that the prosecutor's argument was especially persuasive or that it infected his trial with unfairness.  *See DeChristoforo*, 416 U.S. at 643.

To the extent the prosecutor urged the jury to disregard the testimony of Barrett's relatives in view of Trooper Eales's violent death, he did not commit misconduct.  In remarkably similar circumstances, the Ninth Circuit found that a prosecutor committed no misconduct when he argued that the defendant "had the right to present his mother's plea for his life," but added that the defendant had not permitted any one to plead for the victim's life.  *McDowell v. Calderon*, 107 F.3d 1351, 1365 (9th Cir.), *opinion superseded and amended on other grounds at* 116 F.3d 364, *and judgment vacated in part on other grounds at* 130 F.3d 833 (1997).  The Ninth Circuit reasoned, "the prosecutor did not state that the jury could not consider the mother's plea.  The prosecutor simply asked the jury not to overlook the victim and not to make its sentencing decision based solely on sympathy for McDowell."  *Id.*  The same analysis should apply here, and this Court should find that the prosecutor's comparison of the victim's death with the circumstances of the defendant's trial did not infect the proceeding with unfairness.  *See DeChristoforo*, 416 U.S. at 643.

Barrett also contends that the prosecutor essentially argued that the jury would be

212

accomplices in any of the defendant's future crimes if they sentenced him to a prison term. (Mot. 319.) Barrett's characterization of the government's argument finds no support in the record. The argument about which he complains is as follows:

> The defense lawyer says that the Defendant is not a future danger. Ask yourselves, would any of us want to be in a prison cell next to a man who is capable of coldly attacking law enforcement officers? So he's a good prisoner, to those he can't manipulate or selectively attack.
>
> You did hear an emotional appeal from his lawyers. We predicted they asked for fairness. We ask, ladies and gentlemen in this venue, for justice. If we merely send this Defendant back to his room, you may reasonably infer that this cop killer will be a hero to many in the prison population he enters. He will have committed cold blooded murder, yet will have escaped the capital noose. This Defendant will have slaughtered an innocent soldier of the law and merely be given more time. Don't make him a hero.

(Tr. 27: 5423.) The prosecutor did not intimate that the jury might bear responsibility for any crime Barrett might commit in the future. In light of an aggravating factor allegation, he properly argued that Barrett was a future danger. (*See* Doc. 257 at Inst. 13.) The prosecutor then changed tacks and properly argued that any sentence short of death was insufficient in light of the crime and would actually enhance the defendant's status in prison. (*See, supra*, Arg. V, C, ii.) At no time did the prosecutor urge, expressly or impliedly, that the jurors should condemn Barrett to obviate any concern that they might somehow share culpability for his future crimes. As such it did not constitute misconduct or infect the trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

### iv. The Prosecutor did not Commit Prejudicial Misconduct in his Use of the First Person During Argument

Barrett claims that the prosecutor improperly aligned himself with the jury in his use of first-person pronouns during argument. (Mot. 319.) Specifically, the prosecutor argued as

213

259

follows:

> Remember the real victims.  It is not our job here to forgive.  We are not the victims of the Defendant's brutality.  It's not our job to feel guilty.  The murderer who mercilessly killed in this case as a matter of conscious, premeditation and planning ought to feel guilt and remorse, but he doesn't.  He is the one who put us all here.  What a sense of power he must feel, the narcissistic, selfish collection of reality that he is.  He's the one that put us all here. [¶]  But we must not refuse to do our duty just because we can't make the victim's family or friends or community whole.

(Tr. 27: 5421-22.)  While the prosecutor's use of the first-person was ill-advised, the argument did not confuse the jury about its role and therefore did not amount to prejudicial misconduct.

In *Cargle v. Mullin*, the Tenth Circuit held that prosecutors commit misconduct when they confuse the jury about its role and suggest that the panel is part of the law enforcement "team" rather than impartial arbiters.  317 F.3d 1196, 1223 (10th Cir. 2003).  The *Cargle* court found that the prosecutor had likely committed reversible misconduct in arguing

> [Y]ou the jury, [assistant district attorney] Mrs. Smith and me, and the police, all fulfilled their roles in this case because that's our duty . . . . [T]his defendant ... committed a crime so vile, so vicious, so despicable, so unnecessary that the death penalty is the only answer.  Sure your job is hard, but you can do it.  Only you can do it.  The police department has done all that it can do. When I sit down, Mrs. Smith and I will have done all that we can do.  Only the 12 of you can finish the job by going up in that jury room and bringing back a verdict of death.  Unless you do that, the efforts of the police department and my office have all been in vain.

*Id.* at 1222-23.

The argument at issue in *Cargle* bears nothing more than the most superficial resemblance to statement at issue here, and Barrett misplaces his reliance on the use of first-person pronouns as a basis for analogizing the two cases.  The argument in *Cargle* offended the defendant's rights because it urged the jury to return a death verdict to avoid rendering moot the efforts of the police and prosecution.  As such, it implied that the jury bore some duty, or at least

214

260

allegiance to the government.

The prosecutor in this case made no similar argument.  In fact, he made no attempt to directly tie the role of jury to that of law enforcement, apart from the use of the words "us" and "our."  Those isolated uses of the first person did not prejudice the defendant.  *See United States v. Jones*, 468 F.3d 704, 708 (10th Cir. 2006).  In the context of the government's lengthy argument, the very occasional use of the first person was nothing more than an ill-chosen mannerism that the jury would have understood as such.  *See id.*  In fact, the prosecutor concluded his argument by observing that the jury's task involved a weighing under the law, rather than the performance of the government's wishes: "Under the standards of the law and the instructions by the Court, the Defendant should be as it were, weighed in the balance and found wanting."  (Tr. 27: 5426.)  Given the overall thrust of the argument, the brief resort to first-person pronouns did not serve to confuse the jury about its role, especially given that the Court instructed the jury on its role before and after counsels' presentations.  (*See, e.g.* 27: 5296-97, 5440-43.)

<div align="center">v.  The Prosecutor Properly Argued that Prison Was Insufficient Punishment</div>

Barrett claims that the prosecutors improperly argued that a prison sentence was insubstantial punishment for his crime.  According to Barrett, the prosecutor's comments amounted to a variation of, what he terms a "three hots and cot," argument – an apparent reference to the coinage and doctrine of the Oklahoma Court of Criminal Appeals.  (Mot. 316-17 (citing Tr. 27: 5412, 5423).)  In fact, the prosecutor's argument was entirely appropriate under federal law, and would not have constituted a violation of the Oklahoma's "three hots" doctrine.

The prosecutor in this case argued that this crime merited greater punishment than a mere

<div align="center">215</div>

prison sentence:

> You've heard the defense attorneys ask you to do something other than to render a capital sentence. The Defendant wants to be sentenced to his room as punishment. Justice cannot be served in the case by allowing the Defendant to live in prison. If he's allowed to live in prison, he will have perks like workouts and visitors and phone calls and mail, TV and recreation.

(Tr. 27: 5412.) Later, the prosecutor returned to the "room" metaphor, arguing "We ask . . . for justice. If we merely send this Defendant back to his room, you may reasonably infer that this cop killer will be a hero to many in the prison population he enters." (Tr. 27: 5423.)

Prosecutors do not commit misconduct in arguing that incarceration is an inadequate, and arguably indulgent, form of punishment for the crime charged in a capital case. *See United States v. Higgs,* 353 F.3d 281, 332 (4th Cir. 2003) (summarily rejecting a claim that the government improperly argued that imprisonment would be "soft" in view of the privileges available to the defendant as an inmate). As in *Higgs*, in which the defense had argued that the defendant would face high security imprisonment, the prosecutor's argument in this case was an especially apt rebuttal to the defense contention that Barrett was already the subject of close confinement. *See id.*; *see also* Tr. 27: 5368-69. Moreover, the comments at issue would not offend Oklahoma's "three cots" doctrine, which defines as misconduct arguments that compare the relative comforts of prison with the fate of the dead victim. *See Malone v. State*, 168 P.3d 185, 232 (Okla. Crim. App. 2007); *Powell v. State*, 995 P.2d 510, 539 (Okla. Crim. App. 2000). The prosecutor in this case made no such inflammatory appeal, and certainly made no statement that infected the trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

### VI. BARRETT HAS FAILED TO STATE A TIMELY, UNDERSTANDABLE OR COGNIZABLE CLAIM THAT THIS COURT ERRONEOUSLY EXCLUDED EVIDENCE

Barrett claims that this Court erroneously excluded evidence of his remorse about the

216

murder of Trooper Eales.  (Mot. 322-26.)  Barrett reiterates that claim in his Brief in Support and also adds a new contention – that the Court improperly excluded guilt phase evidence that the defendant had been previously tried for Trooper Eales's homicide.  (BIS 175-81.)  Barrett's novel claim about the exclusion of evidence concerning his prior state trials is time-barred.  Moreover, Barrett offers no record citations for any supposedly erroneous ruling.  In fact, he gives no hint as to when or under what circumstances trial counsel supposedly sought the introduction of any evidence of remorse or of prior trials.  Given Barrett's failure to identify the facts that supposedly give rise to relief, his contention must fail.

A.  Time Barred Claim

Barrett first raised his claim that this Court improperly excluded evidence of his prior state trial in his Brief in Support (BIS 179-81), which was filed March 1, 2010, well after the expiration of the one-year period of limitations applicable to his Motion to Vacate.  *See* 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d at1280; *cf.* Docs 1, 2, 70, 81.  The claim is based on an entirely novel premise, and does not merely clarify, amplify or expand any timely-filed contention.  *Cf. United States v. Espinoza-Saenz*, 235 F.3d at 505.  Barrett has made no attempt to show that extraordinary circumstances beyond his control prevented him from raising the time-barred claim.  *United States v. Gabaldon*, 522 F.3d at 1124.  Thus, this Court should strike and disregard Barrett's untimely claim that this Court erroneously excluded evidence of his state court trials during the guilt phase of this federal proceeding.

B.  Inadequately-Pled Claims

Regardless of the application of the time bar, Barrett's claims concerning the exclusion of evidence are inadequately pled and, therefore, not amenable to consideration.  In a collateral

217

attack on a criminal judgment, the defendant must allege some factual basis for relief sought.

Rule 2(b)(2), Rules Gov'g § 2255 Proceedings; *see United States v. Clingman*, 288 F.3d at 1187;

*see also Hall v. Bellmon*, 935 F.2d at 1110 ("conclusory allegations without supporting factual

averments are insufficient to state a claim on which relief can be based" (citations omitted)).

Barrett's Motion identifies only one piece of allegedly excluded evidence, the report of

Oklahoma State Trooper Glen Smithson that he heard the defendant state, "The wrong person got

killed.  I wished it had been me."  (*See* Mot. 322 (citing Mot. Ex. 107).)  While Barrett quotes the

alleged statement, he does not identify the ruling that excluded it, much less show that the ruling

was legally flawed in view of the facts and circumstances known to the Court.  From the facts

alleged, the government cannot identify any disputed ruling.  Barrett's failure to cite a single

instance in which the Court excluded evidence of remorse, much less erred, requires the denial of

this facially deficient claims.

C.  Procedural Bar

Because Barrett's claims that this Court erroneously excluded evidence would, to the

extent they have any factual basis, rely on facts wholly within the ambit of the record, he was

required to raise the issues on appeal.  His failure to do so resulted in procedural defaults.  *See*

*United States v. Frady*, 456 U.S.  at 167-68.  Barrett attempts to explain his defaults by claiming

that appellate counsel was ineffective.  (Mot. 385-86.)  Given that the claims lack any specificity,

Barrett cannot establish constitutionally-cognizable ineffectiveness or, by extension, legal cause

and prejudice to excuse his default.  *See McCleskey v. Zant*, 499 U.S. at 493; *cf. United States v.*

*Horey*, 333 F.3d at 1187-88.  Apart from the fact that he has not shown cause and prejudice,

Barrett makes no attempt to demonstrate actual innocence to excuse his default.  Having failed to

raise the issue on appeal, Barrett cannot obtain collateral relief based on the Court's supposed

decision to exclude evidence of remorse or of prior state court trials.

### VII.  THIS COURT PROPERLY PERMITTED THE MARSHALS SERVICE TO USE AN ELECTRONIC RESTRAINT ON BARRETT

Barrett claims that this Court improperly issued an order that permitted the Marshals

Service to place him in an electronic stun belt during the trial.  He argues that the Court

inappropriately premised the decision to permit use of the belt solely because he faced the death

penalty.  According to Barrett, the belt was visible to the jury and interfered with his ability to

communicate with defense counsel.  (Mot. 326-35; BIS 182-87.)  Barrett defaulted this

contention by failing to raise it on appeal.  Regardless, he cannot show that the Court ruled on the

asserted basis, much less can he demonstrate error.

### 1.  Procedural Default

Because Barrett's claim that this Court erroneously ordered him to wear a stun belt relies

on facts wholly within the ambit of the record, he was required to raise the issue on direct appeal,

and his failure to do so resulted in a procedural default.  *See United States v. Frady*, 456 U.S.  at

167-68.  Barrett attempts to explain his default by claiming that trial and appellate counsel were

ineffective for failing to preserve or raise it.  (Mot. 386-87.)  Given that the claim lacks any legal

merit, Barrett's attorneys had no obligation to raise it.  (*See, infra*, Arg. VII, 2.)  Because an

appeal of this claim would have been futile, Barrett cannot establish constitutionally-cognizable

ineffectiveness or, by extension, cause and prejudice to excuse the default.  *See McCleskey v.*

*Zant*, 499 U.S. at 493; *cf. United States v.  Horey*, 333 F.3d at 1187-88.  Apart from the fact that

he has not shown cause and prejudice, Barrett makes no attempt to demonstrate actual innocence

to excuse his default.  Having failed to raise the issue on appeal, Barrett cannot obtain collateral

219

relief based on the Court's decision that he would wear a stun belt during trial.

2.  Barrett Fails to Identify the Pertinent Order or Demonstrate Any Error

Barrett has failed to identify any portion of the record that substantiates his claim that this Court ordered him to wear a stun belt simply because he was facing the death penalty. Nonetheless, he baldly claims that this Court erroneously subjected him to the device based solely on his status as a capital defendant.  Barrett's claim is contradicted by the record, which demonstrates that the Court properly determined to employ an unobtrusive means of restraint in view of evidence that the defendant presented a security risk.

Criminal defendants do not have an unqualified right to appear before the jury without restraints.  *United States v. Hack*, 782 F.2d 862, 867 (10th Cir. 1986) (citing *Illinois v. Allen*, 397 U.S. 337 (1970)).  If compelling reasons exist to justify the use of restraints, the general presumption against shackling "must necessarily yield to the competing interests of courtroom participants for the safe conduct and orderly progress of the trial."  *Hack*, 782 F.2d at 867.  The decision to impose appropriate restraints lies within the informed discretion of the trial court. *Id.*; *see United States v. Wardell*, 591 F.3d 1279, 1293 (10th Cir. 2009).  The decision to employ restraints is made on an individualized, case-by-case, basis in consideration of such factors as the defendant's record, charged crime and physical condition.  *Wardell*, 591 F.3d at 1293 (citing *Hack*, 782 F.2d at 868).

The unobtrusiveness of a particular restraint informs the reasonableness of its use.  *United States v. Apodaca*, 843 F.2d 421, 431 (10th Cir. 1988).  Thus, the Tenth Circuit does not presume prejudice from the use of a stun belt, absent evidence that a juror actually observed the device. *United States v. McKissick*, 204 F.3d 1282, 1299 (10th Cir. 2000).  The Tenth Circuit's approach

220

appears similar to that of the Eighth Circuit: "We review the district court's security decisions for an abuse of discretion to determine whether the . . . reasons for the extra security justified the potential for prejudice that the restraints impose." *United States v. Mahasin*, 442 F.3d 687, 691 (8th Cir. 2006).

In this case, the decision to employ the stun belt was an appropriate exercise of discretion supported by substantial evidence that Barrett presented a security risk. The Court conducted an extensive hearing in which it heard evidence that the Marshals Service considered Barrett a potential escape risk. During the hearing, Deputy U.S. Marshal Louisia Murrow described seeing Barrett attempting to tamper with his handcuffs by twisting and pulling on them. He unsuccessfully attempted to conceal his efforts by turning away from a surveillance camera in his holding cell. (Tr. Sealed Hr'g, Aug. 31, 2005, at 10-11.) Murrow, who had nearly 10 years of experience transporting prisoners, described this behavior as "very extraordinary." (*Id*. at 6, 14.) Murrow reported that other experienced Deputy U.S. Marshals had expressed concerns about securing Barrett, because their observations led them to believe he was studying potential avenues of escape. (*Id*. at 14-15, 50-52.) Murrow's testimony aside, the Court noted that the government had submitted three declarations in support of its brief. (*Id*. at 73-74.)

At the conclusion of the hearing, the Court stated that it would take the matter under submission. (Tr. Sealed Hr'g, Aug. 31, 2005, at 114.) One week later, the Court issued a 19-page order authorizing the use of the stun belt. (Trl. Doc. 178.) In its order, the Court noted the evidence that Barrett constituted an escape risk. For instance, the order recounted the fact that "deputy marshals assigned to transport the defendant to court have reported observing the defendant giving his restraining devices undue attention as well as noting entrances and exits."

221

(*Id*. at 6-7.)  The order also noted Deputy Marshal Murrow's observations that Barrett had attempted to tamper with his handcuffs. (*Id*. at 11.)  After extensively reviewing the pertinent law on the use of stun belts (*Id*. at 12-15), the order analyzed 10 individualized factors to determine the propriety of the stun belt in this case (*Id*. at 15-18).  Given that the belt was employed to thwart a potential security risk, rather than the threat of mere disruptions, its use reflects an entirely appropriate exercise of the court's discretion.  *See United States v. Wardell*, 591 F.3d at 1294 (refusing to presume prejudice where belt was appropriately used to ensure security and court made efforts to minimize prejudice); *cf. Hawkins v. Comparet-Cassini*, 251 F.3d 1230, 1242-43 (9th Cir. 2001) (vacating a preliminary injunction against the use of stun belts for security purposes, and noting that alternative restraints are potentially more prejudicial).

Barrett's claim that the Court relied solely on the nature of the charges to permit use of the stun belt ignores the Court's reasoning as articulated in the Order.  (*See* Mot. 326-27; BIS 183.)  Barrett attempts to demonstrate that the Court relied on an improper rationale because it made a non-dispositive statement *after* issuing its ruling.  One week after filing the order, the Court stated in passing that it would likely have employed a stun belt in any capital case.  (Tr. Hr'g on Gov't's Mot., Sept. 13, 2005, at 13.)  The statement does not demonstrate that the Court relied on mere sentence exposure to utilize the restraint in this case.  Quite the opposite, the statement clearly implies that the Court relied on additional grounds in restraining Barrett, as fully demonstrated by its detailed order.

Barrett also argues, without any evidentiary support, that use of the restraint impeded his movement and communication with counsel, because he felt especially susceptible to its use in light of metal implanted in his torso and prior violent encounters he had had with police.  Barrett

222

268

failed to raise either point during the hearing on the use of the belt, and therefore cannot show the Court improperly failed to take that information into account. (*See* Tr. Sealed Hr'g, Aug. 31, 2005, at 1-114.) In fact, Barrett aired only one of those allegations – that he had a metal implant in his body – in open court. He did so, not by way of objection, but with a post-ruling question. At the conclusion of a hearing held three days after the Court authorized the belt, defense counsel asked if the implant would enhance the effects of the device. (Tr. Status Hr'g, Sept. 9, 2005, at 27.) The Court said that it would have the Marshals Service address this concern with the defense. (*Id*. at 27-28.) Barrett has never shown the implant would have amplified the belt's impact, nor has he provided any evidence that his prior encounters with local law enforcement agencies made him especially fearful of the belt in the hands of the federal Marshals Service.

In a failed attempt to demonstrate prejudice from the belt, Barrett relies on the declaration of gallery spectator Doris Barrett to assert that the device created a visible bulge. (Mot. 327; BIS 184.) Ms. Barrett's declaration, however, does not assert that she saw a bulge resulting from the belt. (Mot. Ex. 80.) Even if Barrett had presented evidence that a gallery spectator saw a bulge, he would not have shown that any juror actually observed it, undermining his effort to demonstrate prejudice. *See McKissick*, 204 F.3d at 1299. Evidence that a bulge was visible in the gallery would not undercut this Court's finding that jurors were unlikely to see the belt's protrusion, as it received testimony that no panel member had reported seeing the belt in other cases in which it was used and ordered that Barrett would enter and exit the courtroom outside the presence of the panel. (Trl. Doc. 178 at 16-17; Tr. Sealed Hr'g, Aug. 31, 2005, at 34.) Barrett also argues that the device was visible based on a description of "obvious" stun belts that appears in a petition for writ of certiorari filed 10 years prior to his trial. (BIS 184.) The request

223

for certiorari is entirely irrelevant, as Barrett makes no effort to show that he wore a belt similar to the one placed on the litigants in the earlier case.

This Court's multi-prong analysis of the request to utilize the stun belt was a reasonable balancing of interests, including the seriousness of the charges, the defendant's past conduct, the Marshals' view of the need for additional security, the potential prejudice to the defendant, and the availability of other means for securing the courtroom. (Trl. Doc. 178 at 15-18.) The Court's analysis was full, fair and in keeping with the Tenth Circuit's approach to in-court restraints. As such, Barrett has failed to demonstrate that the Court erred in issuing its decision to allow use of the stun belt.

## VIII.  BARRETT WAS COMPETENT TO STAND TRIAL

Barrett claims that this Court permitted him to stand trial while he was mentally incompetent, in violation of his substantive due process rights. As support for his argument, Barrett relies almost exclusively on the reports of two experts who evaluated him more than three years after the trial. (Mot. 331-35; BIS 187-92.) The speculative, retrospective, evidence presented by Barrett does not satisfy the heavy burden for obtaining relief on a substantive claim of incompetence.

A defendant is competent if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding [and if] he has a rational as well as factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402, 402 (1960). On collateral review, defendants may allege they were tried while incompetent in violation of their substantive due process rights. *Walker v. Gibson*, 228 F.3d at 1229. Such claims may not

224

be procedurally barred.  *Id.*  To prevail on such a claim, the defendant "must demonstrate by clear and convincing evidence a real, substantial, and legitimate doubt regarding his competence to stand trial."  *Id.*; *see Battle v. United States*, 419 F.3d at 1298-99 (11th Cir. 2005) (applying clear and convincing standard under § 2255).  "This standard of proof is high; and the facts must positively, unequivocally, and clearly generate the legitimate doubt."  *Battle*, 419 F.3d at 1298-99.  The Tenth Circuit has held that speculative opinions of mental health experts, based on post-trial evaluations of a defendant, do not constitute clear and convincing evidence of incompetence.  *Walker*, 228 F.3d at 1230.

In this case, Barrett offers little to show incompetence beyond the opinions of two retained experts, who performed post-trial evaluations of him.  (Mot. Exs. 89, 117.)  The first expert, neuropsychologist Myla Young, confines her conclusions to Barrett's organic brain function.  Only the second expert, psychiatrist George Woods, reaches a conclusion that would call into question Barrett's competence at the time of trial.  Woods states, "Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial."  (Mot. Ex. 117 at 28.)  Woods's conclusion represents an extrapolation of his own 2009 evaluation of Barrett and the evaluation performed by Young.  Woods also claims to have considered mental health evaluations of the defendant in 1986 and 1995, respectively 19 and 10 years before trial.  (*Id*. at 17-18.)

Significantly, Woods appears to have ignored the fact that those historic reports repeatedly found that Barrett was oriented in all three spheres.  Furthermore, Woods did not consider evidence from any percipient source but Barrett in concluding that the defendant's alleged mental health issues affected his competence.  (*See id.* at 28.)  In other words, he did not

225

consult with former counsel, anyone present in the courtroom, or the psychologist who evaluated Barrett at the time of trial, to corroborate his hypothesis that the defendant was unable to meaningfully assist defense counsel.  The declarations of the Barrett's retained witnesses – premised as they are on incomplete information – do not constitute clear and convincing evidence.  *Walker*, 228 F.3d at 1230.

Even in his outburst, Barrett expressed a lucid outrage at the prosecutor's reliance on the testimony of the defendant's relatives, and one consistent with his desire to avoid scrutiny of his family and with his manifest understanding of the proceedings.  (*See* Tr. 27: 5421.)  Barrett's outburst provides no evidence that he did not understand the proceedings or lacked the capacity to assist his attorneys.  Indeed, Barrett cannot point to any instance in which an attorney raised a doubt about his competence in a prior trial.  The absence of prior concern about Barrett's competence is consistent with the historic record of mental health evaluations that found Barrett was a violent drug addict, but an otherwise lucid individual.

Even if his argument was not contradicted by counsel's observations and the historic record, Barrett could not succeed here.  He cannot identify anything in the record, such as the opinion of this Court or any witness, that anyone harbored a "real, substantial, and legitimate doubt " about his competence.  On this record, Barrett has fallen far short of meeting his "high" burden of proof.  The supposition of his retained expert – based on evidence gathered years after

226

the trial, and largely from the self-interested defendant – does not overcome the observations of

the prior mental health expert or the defense lawyers with whom Barrett so effectively interacted.

In short, Barrett has failed to establish a bona fide doubt regarding his competency at the time of

trial. *Walker*, 228 F.3d at 1228.

<div align="center">

IX.  THE TRIAL COURT PROPERLY REFUSED TO INSTRUCT THE JURY ON
VOLUNTARY MANSLAUGHTER

</div>

Barrett claims that this Court erred in failing to instruct the jury on voluntary

manslaughter as a lesser included offense to the three charged counts.  According to Barrett, he

could have relied on a heat-of-passion theory to negate the malice element of count 3,

intentionally killing a police officer during the commission of a drug trafficking crime (21 U.S.C.

§ 848(e)(1)(B)), and of counts 1 and 2, firearm murder during and in relation to drug trafficking

crime and in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A) & (j)).  (Mot. 336-39; BIS

192-97.)  Barrett defaulted this claim by failing to raise it on appeal.  Regardless of the default,

the contention has no merit as voluntary manslaughter is not a lesser offense of killing a police

officer during a drug trafficking crime (count 3 of the indictment), and heat of passion will not

act to negate the malice element of felony murder, the theory that supported the intent element of

counts 1 and 2 of the indictment.

1.  Procedural Default

Barrett's claim that this Court erroneously omitted voluntary manslaughter instructions

relies on facts wholly within the ambit of the record.  As such, he was required to raise the issue

on direct appeal, and his failure to do so resulted in a procedural default.  *See United States v.

Frady*, 456 U.S.  at 167-68.  Barrett attempts to explain his default by claiming that appellate

counsel was ineffective.  (Mot. 387.)  Given that the claim lacks any legal merit, Barrett's

<div align="center">227</div>

attorneys had no obligation to raise it.  (*See, infra*, Arg. IX, 2.)  Because an appeal of this claim would have been futile, Barrett cannot establish constitutionally-cognizable ineffectiveness or, by extension, cause and prejudice to excuse the default.  *See McCleskey v. Zant*, 499 U.S. at 493; *Hawkins v. Hannigan*, 185 F.3d at 1152.  Apart from the fact that he has not shown cause and prejudice, Barrett makes no attempt to demonstrate actual innocence to excuse his default. Having failed to raise the issue on appeal, Barrett cannot obtain collateral relief based on the absence of a lesser-included offense instruction.

2.  <u>Voluntary Manslaughter Was Not Available as a Lesser Included Offense in this Case</u>

The Court could not have instructed the jury on voluntary manslaughter as a lesser included offense of any of the charged capital offenses.  Courts must instruct on lesser included offenses when "(1) there is a proper request for one; (2) the lesser included offense consists of some, but not all, the elements of the offense charged; (3) proof of the element or elements differentiating the lesser and greater offenses is a matter in dispute; and (4) a jury could rationally convict on the lesser offense and acquit on the greater offense."  *United States v. Chanthadara*, 230 F.3d at 1257.  But courts need not instruct on lesser non-included offenses in capital cases when such instructions would be impermissible in noncapital cases.  *Hopkins v. Reeves*, 524 U.S. 88, 95-96 (1998).

While Barrett and the prosecution both requested lesser included offense instructions, the Court could not give them because voluntary manslaughter did not properly consist of some, but not all, of the elements of the charged offenses.  Barrett was charged in count 1 with a firearm murder during and in relation to drug trafficking, and in count 2 with a firearm murder during and in relation to a crime of violence.  18 U.S.C. § 924(j).  As Barrett states, both of those

228

charges relied on a felony murder theory to provide the requisite malice.  (*See* Trl. Doc. 240, Inst. 7; Mot. 321 ("these were 'straight' felony murder counts).)  In other words, the offenses relied on proof that the defendant committed the homicide during the course of a felony to establish malice aforethought.  *See Chanthadara*, 230 F.3d at 1259 (citing *Whalen v. United States*, 445 U.S. 684, 693 n.7 (1980)); *see also United States v. Nguyen*, 155 F.3d 1219, 1229 (10th Cir. 1998) (holding that a felony murder charge based on a killing during a robbery did not entitle the defendant to an instruction requiring additional or independent proof of state of mind).  The felonies Barrett committed during the perpetration of the § 924 offenses would not have provided a legal basis for a conviction of first degree murder.  *See* 18 U.S.C. § 1111.  However, as Barrett apparently recognizes, the fact that he committed the homicide offenses during the perpetration of other felonies did satisfy the malice element for purposes of establishing second degree murder. *United States v. Pearson*, 159 F.3d 480, 486 (10th Cir. 1998) ("second degree murder's malice aforethought element is satisfied by: . . . commission of a felony when the felony in question is not one of those specified in the first degree murder paragraph of § 1111(a).").

Because "the malice aforethought required for second-degree murder is different in kind, as opposed to degree, than the malice required for [first degree] felony murder," the Tenth Circuit has concluded that second degree murder is not a lesser included offense of first degree felony murder.  *Chanthadara*, 230 F.3d at 1258.  Expressly relying and expanding upon that reasoning, the Ninth Circuit held that voluntary manslaughter is, likewise, not a lesser included offense of felony murder.  *United States v. Miguel*, 338 F.3d 995, 1005 (9th Cir. 2003).  As the Ninth Circuit noted, voluntary manslaughter requires an element that felony murder does not – the intent to inflict injury.  *Id.*  The Tenth Circuit impliedly extended that rule to second degree

<div align="center">229</div>

felony murders, holding that the offense of voluntary manslaughter requires proof of heat of passion "with a mental state that would otherwise constitute second degree murder – either a general intent to kill, intent to do serious bodily injury, or with depraved heart recklessness." *United States v. Serawop*, 410 F.3d 656, 666 (10th Cir. 2005).

Consistent with the foregoing doctrine, this Court did not instruct the jury that it had to find such an intent to inflict injury as to counts 1 and 2. (*See* Doc. 240, Inst. 7.) By extension, the Court correctly refused to instruct on voluntary manslaughter as a lesser-included offense of the § 924(j) crimes charged in counts 1 and 2. *See Hopkins v. Reeves*, 524 U.S. at 95-96.

The Court likewise refused to instruct on manslaughter as a lesser included offense of the final charge in the indictment, count 3. Barrett was charged in count 3 with the murder of a police officer during a drug trafficking crime, a homicide offense that contains no lesser included offenses as defined by 21 U.S.C. § 848(e). *See United States v. Beckford*, 966 F. Supp. 1415, 1417-18 (E.D. Va. 1997). In enacting § 848(e), Congress elected to omit any gradations of the homicide offense the statute defined, and this Court had no power to imply a lesser charge:

> The text of Section 848(e) confirms . . . that the statute neither substantively defines, nor contains penalties for, grades of homicide lesser than intentional killing which may be committed in furtherance of a CCE or a drug crime, as defined by the statute. . . . [O]ther, federal homicide statutes, such as voluntary manslaughter and second degree murder, 18 U.S.C. §§ 1111, 1112, cannot serve as lesser included offenses because offenses such as those must be committed within the maritime or territorial jurisdiction of the United States in order to be federally prosecuted. By way of contrast, a Section 848(e)(1)(A) killing need not occur within federal territorial jurisdiction. . . . [¶] Finally, the courts cannot imply lesser included homicide offenses to Section 848(e)(1)(A) because there are no common law federal crimes.

*Beckford*, at 1418.

Barrett would stand on different footing had Congress chosen to define § 848 homicide

using a common law term like "malice aforethought," which is traditionally viewed as admitting

to a theory of heat of passion. *See Neder v. United States*, 527 U.S. at 21 ( "[W]here Congress

uses terms that have accumulated settled meaning under the common law, a court must infer,

unless the statute otherwise dictates, that Congress means to incorporate the established meaning

of these terms" (internal quotations and modifications omitted)). Given the statutory definition

of the charged offense, the Court could not find that heat of passion would negate the intent

requirement. In short, the Court could not have found that voluntary manslaughter consisted of

some, but not all, the elements of a § 848 homicide. *Cf. Chanthadara*, 230 F.3d at 1257. The

Court was, thus, precluded from instructing on voluntary manslaughter as a lesser offense of §

848 and properly refused the charge as to count 3. *See Hopkins v. Reeves*, 524 U.S. at 95-96.

3. Any Error Should Be Considered Harmless

The Constitution prohibits the imposition of a death sentence if the jury did not have the

opportunity to consider a properly requested lesser included offense instruction. *Beck v.

Alabama*, 447 U.S. 625, 627 (1980). Such errors are never harmless. *See Hogan v. Gibson*, 197

F.3d 1297, 1312 n.13 (10th Cir. 1999). Thus, if this Court had erroneously rejected the requested

voluntary manslaughter instructions, Barrett would have no burden to demonstrate prejudice,

absent an intervening change of law. *See Hooks v. Ward*, 184 F.3d 1206, 1227 (10th Cir. 1999)

(disapproving dicta suggesting that rule of per se reversibility would not apply to convictions

under the Federal Death Penalty Act and similar procedures). The government observes,

however, that valid reasons exist for questioning *Beck's* application to federal death penalty

cases. *See generally United States v. McVeigh*, 153 F.3d 1166, 1197 (10th Cir. 1998),

*disapproved of in Hooks*, 184 F.3d at 1227. The government sets forth its theory of harmless

error to preserve it for potential appellate presentation, or in case the Tenth Circuit revisits its application of the *Beck* doctrine before this Court decides this case.

*Beck* should not apply to this case, given the procedural hurdles required to obtain the death verdict under federal law. *Beck's* "fundamental concern . . . was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all." *Schad v. Arizona*, 501 U.S. 624, 646 (1991); *see Spaziano v. Florida*, 468 U.S. 447, 455(1984) ("The absence of a lesser included offense instruction increases the risk that the jury will convict . . . simply to avoid setting the defendant free). In this case, the jury was never faced with such a choice, and *Beck* should not apply to preclude a harmless error analysis. Under the procedures utilized here, Barrett was not convicted of a "capital" crime until the jury had found at least one threshold intent factor and one statutory aggravator. *See Beckford*, 966 F. Supp. at 1428; *see also United States v. Higgs,* 353 F.3d at 298 (noting a defendant is not eligible for the death penalty without such findings). As a result, the concerns that animate *Beck* do not apply, nor should the per se rule of reversibility. *See Beckford*, 966 F. Supp. at 1428-30; *see also McVeigh*, 153 F.3d at 1197.

If legally applicable to this case, harmless error analysis would defeat any argument in favor of relief. In this case, the penalty phase jury found that Barrett had committed the three charged offenses with substantial planning and premeditation. (*See* Doc. 257.) In finding premeditation, the jury presumably relied on the guilt-phase evidence of Barrett's stated intent to kill police officers , as the government presented no additional evidence about the circumstances of the crime during the penalty phase. (*See, e.g.*, Tr. 465-66, 3068-69, 3491-93.) The jury's

232

finding of premeditation forestalls any effort by Barrett to demonstrate that the jury would have convicted him of voluntary manslaughter on a heat of passion theory, if given the choice. *See United States v. Frady*, 456 U.S. at172-74 (1982) (discussing the inconsistency of a jury finding premeditation and heat of passion). Simply put, Barrett could not show a reasonable likelihood that the same jury that found he killed "only after thinking the matter over and deliberating whether to act," would have found on the basis of the same evidence that he acted in a heat of passion. (*See* Trl. Doc. 257, Inst. 12 (defining substantial planning and premeditation).)

Accordingly, if required to show it, Barrett could not establish that the absence of the manslaughter instructions had a substantial and injurious effect or influence on the jury's verdict. *United States v. Rivera*, 347 F.3d at 852.

## X. THIS COURT PROPERLY INSTRUCTED THE JURY THAT RESIDUAL DOUBT DID NOT CONSTITUTE A MITIGATING FACTOR

Barrett claims that this Court improperly ruled, at the outset of the trial, that the defense could not rely upon residual doubt as a mitigating circumstance. He also complains that his trial attorneys provided ineffective assistance in failing to challenge the Court's ruling and in failing to adduce evidence to support a residual doubt theory. He further argues that his appellate attorneys were ineffective for failing to challenge the jury charge because it instructed the jury that it could not consider residual doubt as a circumstance in mitigation. (Mot. 340-344; BIS 197-201.) Barrett defaulted the claim of instructional error. Because he cannot show that this Court bore any legal duty to instruct on residual doubt, Barrett cannot establish a flaw in the jury charge. Likewise, he cannot demonstrate that his attorneys provided ineffective assistance in omitting to request the charge or to present evidence in support of this flawed legal theory.

1. Barrett has Procedurally Defaulted his Claim that this Court Instructed Improperly

233

Because Barrett's claim that this Court erroneously omitted a residual doubt instruction relies on facts wholly within the ambit of the record, he was required to raise the issue on appeal, and his failure to do so resulted in a procedural default.  *See United States v. Frady*, 456 U.S.  at 167-68.  Barrett attempts to explain his default by claiming appellate counsel was ineffective. (Mot. 387.)  Given that the claim lacks any legal merit, Barrett's attorneys had no obligation to raise it.  (*See, infra*, Arg. X, 2.)  Because an appeal of this claim would have been futile, Barrett cannot establish constitutionally-cognizable ineffectiveness or, by extension, cause and prejudice to excuse the default.  *See McCleskey v. Zant*, 499 U.S. at 493; *cf. United States v. Horey*, 333 F.3d at 1187-88.  Apart from the fact that he has not shown cause and prejudice, Barrett makes no attempt to demonstrate actual innocence to excuse his default.  Having failed to raise the issue on appeal, Barrett cannot obtain collateral relief based on the absence of a residual doubt instruction.

2.  The Law Provides no Right to a Residual Doubt Theory of Mitigation

Barrett cannot show that he had any entitlement to an instruction on residual doubt.  In 1988, a plurality of the Supreme Court held that "[t]his Court's prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor."  *Franklin v. Lynaugh*, 487 U.S. 164, 174 (1988).  The Court reaffirmed the *Franklin* plurality in *Oregon v. Guzek*, 546 U.S. 517 (2006).  The Court observed that it had never found an Eighth Amendment right to present residual doubt evidence at a capital sentencing hearing, and rejected the notion that the exclusion of residual doubt evidence violated the Eighth Amendment.  *See also United States v. Jackson*, 549 F.3d 963, 981 & n.24 (5th Cir. 2008) (noting that the Supreme Court has never found a right to an instruction on residual doubt).  In

234

view of *Franklin* and *Guzek*, this Court did not err under the Constitution in omitting any instruction on residual doubt.

Like the Constitution, the relevant death penalty statutes also fail to support Barrett's claim that he had a right to a residual doubt instruction. Residual doubt is not among the enumerated mitigators listed in the statutes under which Barrett was tried. *See* 18 U.S.C. § 3592(a); 21 U.S.C. § 848(n). The provisions for non-statutory mitigators do not assist Barrett either. Section 3592(a)(8) provides for the consideration of "[o]ther factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence." Similarly, section 848(m) allowed consideration of "other factors in the defendant's background or character." But that language does not contemplate residual doubt, given that the *Franklin* plurality stated, "[s]uch lingering doubts are not over any aspect of petitioner's character, record, or a circumstance of the offense." *Franklin*, 487 U.S. at 174 (internal quotations omitted). Thus, residual doubt is not a permissible non-statutory mitigator in the federal system, and Barrett cannot identify any basis in law upon which to premise a right to an instruction or the introduction of evidence to support such a theory.

Given the dearth of legal support for his claim, Barrett relies on a small selection of inapposite cases arising from state court judgments in which the Tenth Circuit has found that reliance on residual doubt was a reasonable defense strategy. (BIS 200 (citing, inter alia, *Sallahdin v. Gibson*, 275 F.3d 1211, 1240 n.10 (10th Cir. 2002).) The fact that reliance on residual doubt may be reasonable in other jurisdictions, where the theory is apparently available, did not require the Court to instruct on such a theory in this case.

Assuming, arguendo, the law vested Barrett with some right to a residual doubt

instruction, he has failed to show that the absence of one had any impact on his sentence. The circumstances of the offense, in which Barrett fired 18 rounds at a police vehicle left no doubt that he shot Eales to death, as the victim was attempting to serve a valid arrest warrant on the defendant for a prior felony drug offense. (*See, e.g.,* Tr. 20: 4330-31 (defense argument that Barrett fired on the police).) Indeed, Barrett argues only that a residual doubt instruction would have permitted him to attack the intent element of the charged crimes, which he erroneously identifies as the "pre-established intention to shoot at law enforcement officers." (*See* BIS 200.) In fact, the government bore only the duty to prove that Barrett "knew or had reason to know David Eales was a law enforcement officer." (Trl. Doc. 240 No. 15.)

The government proved mens rea through a combination of circumstantial evidence and the testimony of the defendant's associates, and did so despite the fact that the defense had amply, but unsuccessfully, identified reasons to disbelieve Barrett's friends. (*See* Tr. 20: 4339-47 (defense argument regarding the credibility of the civilian witnesses.) Barrett fails to note that the witnesses were believable, as discussed above, not because they were above impeachment, but because their testimony was cross-corroborating and consistent with evidence about Barrett's life. (*See, supra*, Arg. II, 4, B; *see also* Tr. 20: 4381-83 (prosecution argument conceding civilian witness character flaws but noting cross-corroboration and supporting circumstantial evidence).) Indeed, the mens rea evidence also supported the substantial planning and premeditation aggravating factor, which the jury found unanimously and beyond a reasonable doubt during the penalty phase. (Trl. Doc. 257 at 9-11.)

Barrett cannot show a reasonable likelihood that the same jury that found during the penalty phase that he killed with premeditation ("only after thinking the matter over and

<p style="text-align:center">236</p>

deliberating whether to act") would have harbored residual doubts about the guilt phase evidence that meaningfully undermined its confidence in the conviction. (*Compare* Trl. Doc. 257, Inst. 12 (defining substantial planning and premeditation); *with* Trl. Doc. 240 No. 15 (defining Count 3.) Any supposed residual doubt in this case was therefore entirely illusory. Given the jury's apparent confidence in the evidence, and the heinousness of this crime, Barrett cannot demonstrate a reasonable likelihood that he would have received a more favorable penalty verdict had this Court permitted an appeal to residual doubt. *Brecht v. Abrahamson*, 507 U.S. at 638.

Because Barrett's claim that the Court erred in omitting a residual doubt instruction lacks any basis in existing law, any relief would necessarily require the retroactive application of a new rule of law, in derogation of Supreme Court authority. *Teague v. Lane*, 489 U.S. at 310. Given the existing legal landscape, no rational jurist could now or have ever concluded that this Court violated the law by failing to recognize residual doubt as a viable mitigation theory. Thus, relief in this matter would require this Court to retroactively apply a new rule of Constitutional import, something it may not do. *Id.*

3. Counsel Performed Competently

Trial and appellate counsel did not provide ineffective assistance by omitting to challenge the Court's jury instruction not to rely on residual doubt or by declining to proffer inadmissable evidence to support an improper lingering-doubt theory. The attorneys who represented Barrett at trial and on appeal had no obligation to raise futile arguments in favor of a mitigation theory that finds no favor in federal law. *See Hawkins*, 185 F.3d at 1152. Furthermore, trial counsel were obligated to limit the presentation of evidence and requested instructions based on this

237

Court's valid order precluding reliance on residual doubt.  Even if the failure to pursue residual doubt amounted to error, Barrett still could not show a reasonable likelihood that he would have received a more favorable verdict had counsel made the omitted arguments, as this Court simply had no obligation to permit the jury to consider the theory.

## XI. THIS COURT PROPERLY EXCUSED A MEMBER OF THE VENIRE FOR CAUSE

Barrett contends that this Court violated his constitutional rights when it excused Juror 62 based on her expressed scruples against voting to impose a death verdict.  Barrett also complains that his appellate attorneys failed to challenge the exclusion of Juror 62.  (Mot. 354-57; BIS 202-06.)  As reflected by his argument that counsel failed to address the dismissal of the juror on appeal, Barrett has defaulted his claim by failing to raise the issue on direct appeal.  Because no reasonable likelihood exists that the Court of Appeals would have granted relief on the issue, Barrett cannot show that his appellate attorneys were ineffective for failing to raise it, and therefore cannot establish cause to excuse the default.  Regardless, Barrett has not demonstrated that this Court erred in the first instance.

1. Barrett Procedurally Defaulted this Claim

Because Barrett's challenge to the exclusion of Juror 62 relies on facts wholly within the four corners of the record, he was required to raise the claim on direct appeal and his failure to do so resulted in a procedural default.  *See United States v. Frady*, 456 U.S. at 165.  Barrett attempts to explain his default by claiming that appellate counsel was ineffective.  (Mot. 388.)  Given that the claim lacks any legal merit, Barrett's attorneys had no obligation to raise it.  (*See, infra*, Arg. XI, 2.)  Thus, Barrett cannot establish constitutionally-cognizable ineffectiveness or, by extension, cause and prejudice to excuse the default.  *See McCleskey v. Zant*, 499 U.S. at 493; *cf.*

<p style="text-align:center">238</p>

*United States v. Horey*, 333 F.3d at 1187-88.  Furthermore, Barrett  makes no claim of actual innocence that might excuse his default.  Having failed to raise the issue on appeal, and having failed to demonstrate any basis for overlooking that default, Barrett cannot obtain collateral relief based on the striking of the juror.

2.  <u>The Excused Venire Member was Substantially Impaired as a Potential Capital Case Juror and Properly Excused</u>

The lengthy questioning of the excused venire member, Juror 62, established that she was substantially impaired in her ability to act as a panel member in a capital case.  A court may exclude a member of the venire for cause if that person's "views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *United States v. Fields*, 516 F.3d 923, 936 -937 (10th Cir. 2008).  "The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment."  *United States v. Chanthadara*, 230 F.3d at 1270.  A district court's determination of a venire member's bias receives particular deference because it "is based almost exclusively on the trial judge's unique ability to observe demeanor and assess credibility."  *Id.* at 1269-70.

Appellate courts recognize that, "when there is ambiguity in the prospective juror's statements, the trial court, aided as it undoubtedly [is] by its assessment of [the juror's] demeanor, [is] entitled to resolve it in favor of the State."  *Uttecht v. Brown*, 551 U.S. 1, 7 (2007) (internal quotation marks omitted).  Thus, a trial court may properly strike a venire member even "in the absence of clear statements . . . that he or she is impaired."  *Id.*  Indeed, even "assurances that [the venire member] would consider imposing the death penalty and would follow the law . . . d[o] not require the trial court to deny the [prosecution's] motion to excuse," *id.* at 18, if "these

239

responses were interspersed with more equivocal statements," *id.* at 15.  In fact, prospective jurors are properly excused if they could consider the death penalty in only limited circumstances not involved in the case at bar.  *See e.,g., United States v. Bernard*, 299 F.3d 467, 474-75 (5th Cir. 2002) (juror could impose death under "limited circumstances," although not "sure about this"); *Fuller v. Johnson*, 114 F.3d 491, 500 (5th Cir. 1997) (juror could consider death penalty only for multiple murders); *Davis v. Exec. Dir., Dept. Of Corrections*, 100 F.3d 750, 778 (10th Cir. 1996) (juror would not consider death penalty for alcohol-related murder).

In this case, it was not an abuse of the Court's discretion to conclude that Juror 62 was substantially impaired in her ability to impose a death sentence.  The venire member began her examination by informing the court, "I don't – I could not do it.  I could not say anybody to be sentenced to death."  (Tr. of Ind. Juror Qual., Sept. 14, 2005, at 820.)  When asked to elaborate, the venire member continued, "I couldn't even say that they deserve it, no.  I don't believe in it." (*Id*.)  Later, she answered affirmatively when asked by the Court if she had "moral, religious, philosophical, or personal opinions which would prevent [her] from considering the imposition of a death sentence."  (*Id*. at 821.)

During voir dire by defense counsel, Juror 62 stated that she had opposed the death penalty on religious grounds her entire adult life.  (Tr. of Ind. Juror Qual., Sept. 14, 2005, at 822-23.)  Juror 62 reiterated for counsel that she "could not say" that the defendant "needs the death penalty."  (*Id*. at 824.)  Finally, she told the defense attorney she could not imagine a circumstance so heinous that she could vote to impose the death penalty.  (*Id*. at 825.)  In the course of a follow-up examination by the prosecution, Juror 62 stated flatly that she could not sign a document that required the death penalty for the defendant.  (*Id*. at 826.)

<p style="text-align:center">240</p>

On further questioning by the Court, Juror 62 equivocally allowed that, as a matter of duty, she thought she could consider the death penalty, but that it would be very difficult. (Tr. of Ind. Juror Qual., Sept. 14, 2005, at 828.) Juror 62 offered an ambiguous explanation of her position to the prosecutor, "If the judge told me that that was my options, either the death or – the death penalty and – I would do that, yes. That would be my duty. I'm here, and that would be what I'm here for. But I couldn't live with it, but I would do that, yes," then conceded, "I don't know whether I could or not." (*Id*. at 830.) The most Juror 62 ever allowed about her possible involvement in the imposition of a death verdict was that "I possibly could do that." (*Id*. at 832.) Asked to explain that possibility, Juror 62 responded with reference to very limited circumstances not involved in this case, saying the crime would have to involve extremely heinous facts, perhaps "torture" or "something very bad to a child." (*Id*. at 832.) Juror 62 concluded her questioning by again equivocally stating she thought she "probably could sign the death penalty" if instructed that it was her duty. (*Id*. at 835-36.)

On this record of no more than ambiguous answers by Juror 62, and several specific denials concerning her ability to meaningfully participate in a death penalty case like this one, the Court did not abuse its discretion in finding her substantially impaired. *See Uttecht*, 551 U.S. at 7-8; *Fields*, 516 F.3d at 937-38. Indeed, the Court's consideration of Juror 62's in-court behavior, in addition to her remarks, demonstrates the propriety of its decison-making:

> Well, the time the Court has taken with this juror, I think it reflects the concern on both parties. I took into consideration her demeanor. I asked those questions twice, to try to study her. I agree with counsel for the Government. I think she is substantially impaired, and I find that she is not qualified.

(*See* T. of Ind. Juror Qual., Sept. 14, 2005, at 839-40.) The finding of substantial impairment on the stated basis was a completely appropriate: the stricken venire member was simply unable to

241

convince this Court by word or deed that she could meaningfully participate in a death penalty decision.  As such, her excusal should not form the basis of relief.

3.  <u>Appellate Counsel Reasonably Omitted any Challenge to the Removal of Juror 62</u>

While a record existed upon which appellate counsel could have challenged the excusal of Juror 62, Barrett cannot show that the failure to raise the issue amounted to ineffective assistance of counsel.  As noted above, the Tenth Circuit would have reviewed a challenge to the strike of Juror 62 for abuse of discretion alone.  *Chanthadara*, 230 F.3d at 1269-70.  In its review, the appellate court would have deferred to this Court's discretion in such matters, and considered in support of the challenged ruling a record of "extensive individualized inquiry" conducted by the bench, "the presence of ambiguities within" the trial court's  province to resolve, the court's "express reliance on its first-hand assessment of credibility."  *United States v. Fields*, 516 F.3d at 938; *see also Wainwright*, 469 U.S. at 425-26 (recognizing "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law," and deference should be afforded the court's opinion).

Given the deferential review owed to this Court's decision, and the strong record to support it, no demonstrable likelihood exists that Barrett might have prevailed on appeal by challenging the removal of Juror 62.  Appellate counsel wisely chose to omit such an obviously meritless contention from the appeal.  *See United States v. Challoner*, 583 F.3d at 745 (noting that only the failure to raise a "dead-bang winner" amounts to effectiveness on appeal).

XII.  BARRETT CANNOT RELITIGATE HIS ARGUMENT THAT THE CONSTITUTION REQUIRES CAPITAL JURIES TO APPLY A REASONABLE DOUBT BURDEN OF PROOF TO THE PENALTY PHASE WEIGHING PROCESS

In its instructions to the jury during the penalty phase, this Court did not require application of the reasonable doubt standard to the weighing of aggravating and mitigating factors.  According to Barrett, this omission violated the Constitution.  (Mot. 354-56; BIS 206-11.)  On appeal, Barrett made essentially the same claim, which the Tenth Circuit rejected on the merits.  Barrett cannot raise the contention again.

During the direct appeal in this case, the Tenth Circuit rejected Barrett's claim that the Constitution required application of the reasonable doubt standard to the jury's weighing of aggravating and mitigating factors during penalty selection.  *Barrett*, 496 F.3d at 1107-08.  Barrett may not revisit the claim during it this proceeding without demonstrating some intervening change in the circuit's law.  *United States v. Warner*, 23 F.3d at 291; *United States v. Prichard*, 875 F.2d at 790-91.  There has been no such change of law.  Quite the opposite, the Tenth Circuit recently reaffirmed its rejection of Barrett's argument about the application of reasonable doubt to the death penalty selection process, rejecting precisely the claim that Barrett attempts to raise in this § 2255 litigation.  *United States v. Fields*, 516 F.3d at 950.  Even if this Court could consider the claim, the Tenth Circuit's opinions in *Barrett* and *Fields* would compel rejection of it.  The non-cognizable argument must therefore fail.

To the extent that Barrett claims his appellate attorneys provided ineffective assistance for failing to raise this claim (Mot. 388-89), he is mistaken.

## XIII.  BARRETT WAS PROPERLY REMOVED FROM THE COURTROOM AT HIS OWN REQUEST THEN VALIDLY WAIVED HIS RIGHT TO RETURN

During the prosecution's penalty phase rebuttal argument, Barrett stood, directed a complaint at the prosecutor, then asked to leave the courtroom.  With the Court's assent, the Marshals Service escorted Barrett from the room.  (Tr. 27: 5421.)  After the argument, the Court

recessed to permit defense counsel to consult with Barrett, who expressed his desire not to return. (Tr. 27: 5432.)  Barrett also warned a deputy marshal that he could disrupt proceedings if forced back to the trial.  (Tr. 27: 5438.)  At the Court's direction, Barrett was returned to the courtroom outside the presence of the jury, but in minimal restraints.  During a brief hearing, he waived his right to be present at trial.  (Tr. 27: 5438-39.)  The Court subsequently instructed the jury it could not consider Barrett's conduct or statements during its deliberations.  (*See* Tr. 5440.)

Barrett claims that the Court erred in permitting him to leave the courtroom without advising him of his right to stay.  He also claims as error the Court's order to return him in restraints, his counsel's failure to consult an expert on competence, his counsel's failure to ensure he received appropriate medications, his counsel's failure to advise him of the risks of absence, and his counsel's failure to seek an appropriate instruction about his absence.  (Mot. 357-403.) The government responds to these contentions in turn.

1.  Barrett has Failed to State Cognizable or Meritorious Claims Regarding the Court's Decision to Permit Him to Absent Himself

Barrett defaulted his claims regarding any alleged error in permitting him to leave the courtroom and in returning him, outside the jury's presence, in minimal restraints.  Barrett also failed to timely raise two of his sub-claims.  Putting aside Barrett's failure to properly raise his contentions on appeal or under § 2255, none of his arguments has merit, as this Court properly balanced the defendant's rights against its duty to ensure orderly proceedings.

A.  Barrett Procedurally Defaulted these Claims

Barrett defaulted his claims that this Court improperly responded to his demand to leave the courtroom and subsequently had him restrained for a hearing outside the presence of the jury. Both contentions rely entirely on facts found in the record.  Because Barrett previously omitted to

244

raise them on appeal, they are defaulted. *See Massaro v. United States*, 538 U.S. at 504; *United States v. DeFusco*, 949 F.2d at 120. Barrett attempts to explain his default by claiming that appellate counsel was ineffective for failing to raise the issues. (*See* Mot. 389.) Given that the claims lack legal merit, as fully explored below, Barrett's appellate attorneys had no obligation to raise them. (*See, infra*, Arg. XIII, B & C.) Thus, Barrett cannot establish constitutionally-cognizable ineffectiveness or, by extension, legal cause for his default. *See McCleskey v. Zant*, 499 U.S. at 493. Even if he could show cause, Barrett cannot establish actual prejudice to excuse his default – he cannot show that the Court's orders infected his entire trial with errors of constitutional dimension. *Daniels*, 254 F.3d at 1191. Having failed to raise the issue on appeal, or excused the omission here, Barrett cannot obtain collateral relief based on the Court's orders following his request to leave the courtroom.

B.  Time Barred Sub-Claims

Barrett first raised his sub-claim that this Court failed to determine whether he was competent to waive his right to presence and failed to give a curative instruction[27] regarding his absence in his Brief in Support (*see* BIS 213), which was filed March 1, 2010, well after the expiration of the one-year period of limitations applicable to his Motion to Vacate. *See* 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d at 1280; *cf.* Docs 1, 2, 70, 81. The limitations period began to run on the date the Supreme Court denied Barrett's petition for writ of certiorari, March 17, 2008. *Willis*, 202 F.3d at 1280-81. Because nearly two years elapsed before Barrett

---

[27]Barrett elsewhere recognizes that this Court did provide a curative instruction. (BIS 220.) Indeed, he premises a claim of ineffective assistance of trial counsel on an argument that his lawyers failed to seek a better admonition. (*Id*.) As discussed below, the Court gave a perfectly acceptable and effective instruction. (*See, infra*, Arg. XIII, 2, D.)

filed the brief, his claims are barred.  *See United States v. Guerrero*, 488 F.3d at 1316.  The

claims are unrelated to the arguments raised in his prior pleadings because they attempt to blame

the Court for what Barrett previously blamed his attorneys (*see* Doc. 2 at 336-51), and do not

merely clarify, amplify or expand any timely-filed contention.  *Cf. United States v. Espinoza-*

*Saenz*, 235 F.3d at 505.  Furthermore, Barrett has made no attempt to show that extraordinary

circumstances beyond his control prevented him from raising the time-barred sub-claims.  *United*

*States v. Gabaldon*, 522 F.3d at 1124.  Thus, this Court should strike and disregard Barrett's

untimely claims that this Court failed to determine his competency and failed to give a curative

instruction.

      C.  <u>The Trial Court Properly Responded to Barrett's Demand to Leave the Courtroom</u>

      Barrett fails in claiming that the Court violated his rights by permitting him to leave the

courtroom without first warning him of his right to remain and of the dangers of absenting

himself.  (Mot. 364.)  During the government's final penalty phase argument, the prosecutor

urged the jury to reject, as unpersuasive, statements of remorse attributed to the defendant by his

parents.  (Tr. 27: 5420-21.)  Barrett rose from his chair and stated as follows:

> Get off my family, Sperling.  This is about murder, not my family.  You didn't
> mention the fact that I made two statements to OSBI Internal Affairs that you
> wouldn't let this jury hear, would you?  I've heard enough of him talking about
> my family.  Take me out of the courtroom.  Take me out.

(Tr. 27: 5421.)  With the Court's permission, deputy U.S. Marshals removed an unresisting

Barrett from the courtroom, and the prosecutor concluded his argument.  (*See* Tr. 27: 5421,

5430.)

      In asserting that the Court should have warned him of his right to remain in the room

before permitting him to leave, Barrett relies on inapposite authority concerning disruptive

<div align="center">246</div>

defendants – not defendants, like him, who voluntarily absented themselves from their trials.

Barrett had no right to any admonishment from the bench before he left the courtroom of his own

accord.

In *Illinois v. Allen*, Barrett's principal authority, the Supreme Court held that a defendant

can forfeit his right to presence in the courtroom if, "after he has been warned by the judge that

he will be removed if he continues his disruptive behavior," he insists on disrupting the

proceedings. 397 U.S. 337, 343 (1970); *see* BIS 215. *Allen* involved a pro se defendant who

argued with the court, threatened harm to the judge, and promised to disrupt his trial, but never

expressed a desire to leave the courtroom. *See id.* at 339-41. *Allen* does not require trial courts

to warn obstreperous defendants of their right to presence – and makes no mention whatsoever of

a warning about the potential pitfalls of voluntary absence. *See United States v. Romero*, 491

F.3d 1173, 1177 (10th Cir. 2007) (holding that cases are not authority for propositions not

considered). *Allen* simply holds that no constitutional violation occurs when a disruptive

defendant is removed following a warning, but does not and could not consider the effect of a

failure to issue one. *See Allen*, at 340.

In fact, rather than setting bright line requirements for responding to disruptive

defendants, *Allen* stated that trial courts should exercise appropriate discretion:

> We believe trial judges confronted with disruptive, contumacious, stubbornly
> defiant defendants must be given sufficient discretion to meet the circumstances
> of each case. No one formula for maintaining the appropriate courtroom
> atmosphere will be best in all situations. We think there are at least three
> constitutionally permissible ways for a trial judge to handle an obstreperous
> defendant like Allen: (1) bind and gag him, thereby keeping him present; (2) cite
> him for contempt; (3) take him out of the courtroom until he promises to conduct
> himself properly.

*Allen*, 397 U.S. at 343-44. In view of that broad discretion, the Eighth Circuit has held that the

failure to warn a disruptive defendant of an impending removal from the courtroom does not necessarily constitute constitutional error. *United States v. Shepherd*, 284 F.3d 965, 967 (8th Cir. 2002).

However, neither *Allen* nor *Shepherd* controls here, because they concern the response to a defendant who is merely disruptive, rather than one who voluntarily leaves his trial. The Tenth Circuit, in an unpublished case, recognized precisely that distinction, and rejected a claim that the trial court had an obligation to warn the defendant of his right to remain before honoring his request to leave. *United States v. Sealander*, 91 F.3d 160, *15 (Table) (10th Cir. 1996). The accused may unquestionably absent himself from trial, and the Supreme Court has never held that trial courts must admonish defendants before permitting them to exercise that right. Indeed, in confronting an argument for such a duty from a defendant who was convicted in absentia after failing to return from a mid-trial lunch break, the Supreme Court held,

> It is wholly incredible to suggest that petitioner, who was at liberty on bail, had attended the opening session of his trial, and had a duty to be present at the trial, [citation], entertained any doubts about his right to be present at every stage of his trial. It seems equally incredible to us, as it did to the Court of Appeals, that a defendant who flees from a courtroom in the midst of a trial-where judge, jury, witnesses and lawyers are present and ready to continue-would not know that as a consequence the trial could continue in his absence.

*Taylor v. United States*, 414 U.S. 17, 20 (1973) (*per curiam*) (internal quotations omitted); *see also United States v. Newman*, 733 F.2d 1395, 1401 (10th Cir. 1984) (holding a trial may continue in a defendant's absence). Consistent with that jurisprudence, the applicable court rule permits a defendant to absent himself without any warning from the Court. Fed. R. Crim. P. 43(c)(1)(A); *cf. United States v. Mitchell*, 502 F.3d 931, 987-88 (9th Cir. 2007) (holding that portion of Rule 43 prohibiting absence from capital sentencing applies to the sentencing hearing,

not the penalty phase trial).

Barrett, like the defendant in *Taylor*, strains credulity in suggesting that he could demand to leave the courtroom while the prosecutor was arguing to the jury but not recognize that, as a consequence, the trial would continue without him.  Given that Barrett said he wished to leave the courtroom in response to a prosecution argument he found distasteful, it appears that, not only did he understand that the trial would continue his absence, he hoped that it would.  (*See* Tr. 4521 ("I've heard enough of him talking about my family.  Take me out of the courtroom.").)

Moreover, Barrett's statement demonstrated that he had a rational and factual understanding – in fact, a fairly sophisticated understanding – of the proceedings.  Barrett's obvious grasp of his circumstances defeats, rather than supports, any argument that his actions should have provided reasonable cause to believe that he was suffering from a mental disease or defect that rendered him incompetent.  *See United States v. Cornejo-Sandoval*, 564 F.3d 1225, 1233 (10th Cir. 2009).  The fact that Barrett's decision to absent himself may have reflected anger and frustration does not assist him in demonstrating some doubt about his competence, given the coherence of his remarks.  *See id.* at 1236 ("Defendant's tirades reflect anger and frustration, but they are not incoherent.")

Under these circumstances, the Court had no obligation to admonish Barrett of his right to remain, as the defendant was expressly forfeiting precisely that right and obviously realized he could remain in court if he desired.  Barrett's further contention, that the Court owed him a warning about the dangers of leaving his own trial finds no support in the law, whatsoever.

Accordingly, this Court should reject Barrett's argument that it improperly permitted him to absent himself from trial at his own insistence.

249

D.  The Court Properly Ordered Barrett Held in Minimal Restraints During a Hearing Outside the Presence of the Jury

Following his outburst, Barrett consulted with his attorneys and expressed his desire to remain absent from the trial.  (Tr. 27: 5432.)  He also apparently informed a deputy U.S. Marshal that he might become more disruptive if forced to return to the courtroom.  (Tr. 27: 5438.)  In view of these facts, the Court ordered Barrett produced in "minimum restraints" for a hearing outside the presence of the jury in which he personally confirmed his desire to remain absent from the proceedings.  (Tr. 27: 5438-39.)  Barrett argues that his appearance in court, while shackled, violated his rights.

Barrett is wrong.  He had a constitutional right to appear before the jury without visible restraints.  *Deck v. Missouri*, 544 U.S. 622, 629 (2005).  However, he can point to no analogous right for his appearances outside the presence of the jury.  Even if Barrett could identify such a right, he could not show that the decision to restrain him was improper in this instance.  Under certain circumstances, "shackling . . . may be appropriate because of the public's competing interest in courtroom security and the just administration of law."  *See Allen*, 397 U.S. at 344.  In this case, the defendant had disrupted his own death penalty trial and demanded removal from the proceedings, then issued a threat to disrupt the courtroom again if returned to the courtroom. In that context, the Court acted well within its discretion to maintain courtroom order and decorum when it ordered that Barrett wear a "minimum restraint" for his brief appearance to waive the right to remain present.  *See United States v. Apodeca*, 843 F.2d at 431.

Even if the Court had erred in deciding to restrain Barrett, the error was harmless.  Barrett has presented no basis for finding that the application of a "minimum restraint" during the brief hearing, in which he did nothing more than waive his presence, could have conceivably

250

prejudiced him.  Indeed, Barrett presents no evidence that the restraint in any way discomforted him, much less interfered with his right to communicate with counsel.  Neither has he shown that any member of the jury might have observed him in the restraint.  He has not submitted a declaration of his own or one from counsel that provides even the slightest hint that the unidentified restraint in any way impacted his right to a fair trial.  On this record, Barrett cannot establish that the order for him to wear the restraint had a substantial and injurious effect or influence on the verdict.  *United States v. Rivera*, 347 F.3d at 852; *see Duckett v. Godinez*, 67 F.3d 734, 749 (9th Cir. 1995) (claim of unconstitutional shackling subject to harmless-error analysis).

2.  Counsel Properly Represented Barrett's Interests with Regard to His Request to Waive his Presence at Trial

Barrett makes a series of claims about the quality of his representation as it impacted the waiver of his presence at trial.  He alleges that his attorneys were ineffective in responding to his appearance in restraints, in failing to challenge his competence, in failing to fully advise him of the risks of his absence, and in failing to seek an instruction concerning his absence from the proceedings.  (Mot. 348-49.)  As shown below, he has failed to demonstrate that his attorneys provided prejudicially ineffective assistance.

A.  Counsel Bore no Duty to Respond to the Order that Barrett Appear in a Minimum Physical Restraint

Barrett claims that his attorney provided ineffective assistance because they failed to object to the order that he wear a minimum restraint during a brief return to the courtroom outside the presence of the jury.  Barrett further contends that counsel should have objected to the shackling order because it presented him with a choice of appearing in a restraint or not at all.

251

(Mot. 348.)  Barrett's arguments cannot succeed because he has not shown that this Court erred by ordering shackling, in the first instance, much less can he demonstrate prejudice.

As discussed above, Barrett has not identified any right to appear, outside the presence of the jury, without some form of restraint.  Even if he had such a right, his initial disruption of the trial and his threat to create more "trouble," justified the application of a minimal restraint before returning him to the courtroom.  (*See, supra*, Arg. XIII, 1, C.)  Given the legality and manifest necessity of the Court's order, counsel were not objectively deficient in failing to make futile objections to it.  *See Hawkins*, 185 F.3d at 1152.  By extension, of course, Barrett cannot show that counsel's alleged omission prejudiced him, because he cannot establish "a reasonable probability that but for" his counsel's failure to object, "the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 687.

> B.  Counsel Bore no Duty to Investigate or Raise a Doubt About Barrett's Competence Following his Request to Absent Himself from the Trial

Barrett claims that his attorneys provided ineffective assistance when they failed to investigate or challenge his competence.  Ignoring his earlier claim that counsel acted ineffectively in failing to challenge his competence (*see* Mot. 72-76) , Barrett tries a new tack, asserting that his lawyers failed to properly investigate an allegation that the jailers deprived him of medications necessary to treat his supposed mental health issues while simultaneously providing him with steroids that exacerbated his presently-identified disorders.  Barrett also adds an argument that his attorneys should have consulted with medical or mental health experts to determine whether he was competent to waive his presence before the jury.  (Mot. 348-49.)

As discussed above (*see, supra*, Arg. II, A, 3), no finding of ineffectiveness will lie for failing to challenge a defendant's competence if the record does not show that a reasonable

<p style="text-align:center">252</p>

attorney would have been on notice of a need to do so.  *See Foster v. Ward*, 182 F.3d at 1186.

Even Barrett's outburst manifested an understanding of the proceedings.  (*See* Tr. 27: 5421.)  Barrett's outburst provides no evidence that he did not understand the proceedings or lacked the capacity to assist his attorneys.  Indeed, Barrett cannot point to any instance in which an attorney raised a doubt about his competence in this trial or any prior proceeding.  Barrett's demeanor in and out of court provided substantial evidence of his competence and undermines the notion that counsel was alerted to any reasonable basis for questioning it.  *See Prince*, 938 F.2d at 1094.

Given the facts confronting counsel, Barrett cannot show that they were on notice to investigate his medical treatment or consult with experts as regarded the question of competence.  Simply put, Barrett's obvious cogence forestalls any argument that his attorneys fell below prevailing professional norms in omitting to pursue a competence challenge, before or after the defendant absented himself from trial.  *See Knowles v. Mirzayance*, 129 S. Ct. at 1420.  Nonetheless, Barrett argues that reasonably diligent counsel would have investigated the drugs their client was receiving to determine whether he had psychiatrically decompensated and whether the drugs impacted his ability to cooperate with counsel.  (Mot. 343-44, 349.)  Barrett's argument places the cart before the horse – suggesting that counsel had a duty to investigate a potential source of incompetence when they did not question their client's competence to begin with.  The law simply does not require such limitless investigation.  *See Smith v. Workman*, 550

253

F.3d at 1270 (noting attorneys are "not required to investigate all leads as long as the decision not to pursue a particular lead . . . is reasonable under the circumstances."); *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir.), *amended by* 253 F.3d 1150 (9th Cir. 2001) (observing that the duty to prepare a defense "is not limitless").  Because counsel had no duty to investigate a speculative theory of drug-induced incompetence, they had no concomitant obligation to challenge Barrett's competence on the basis of this undiscovered hypothesis.

Indeed, Barrett's lucidity also undermines his secondary argument that his attorneys' alleged ineffectiveness resulted in a violation of his rights under *Riggins v. Nevada*, 504 U.S. 127 (1992).  The *Riggins* decision arose from a trial in which the defendant was forcibly medicated, over his express objection, with psychotropic drugs that unquestionably affected his behavior. But in this case, counsel had no indication from Barrett's conduct that some underlying medical treatment might be affecting their client's psyche.  But beyond the fact that counsel had no basis for suspecting the impact of medication on the defendant's behavior, and therefore were not ineffective for failing to object, *Riggins* is wholly inapposite.  The case stands for the "narrow[]" proposition that the state cannot forcibly medicate a defendant, over his objection, absent a necessity to "accomplish an essential state policy."  *Id.* at 133, 138.  Such facts simply do not exist in this case, in which Barrett can identify no evidence that he was forced to take or refrain from any drug, much less that any mediation he did take actually affected his behavior at trial.

Barrett fares no better with his argument that his lawyers should have consulted with experts to determine whether he was competent to waive his presence at trial.  (Mot. 348-49.)  As previously and repeatedly stated, counsel had no notice of any fact giving rise to a concern about Barrett's competence, and no duty to investigate the mere possibility that Barrett was

254

incompetent.  Barrett, without any apparent warning to his lawyers, disrupted the prosecutor's argument and asked to be removed from the courtroom.  Counsel were in no position to have predicted that Barrett would voluntarily absent himself from the proceedings, and could not reasonably be expected to have consulted experts in anticipation of the possibility that their client might surprise them with a request to leave the court.  *See Smith v. Workman*, 550 F.3d at1272 (holding trial counsel have no duty of clairvoyance).  Barrett also fails to identify any information that might have come to his attorneys' attention when they consulted with him after his initial outburst that might have led them to question his competence.

Indeed, to the extent that Barrett may argue that, by itself, his decision to absent himself from court should have put counsel on notice of a basis to investigate or challenge his competence, he cannot prevail.  Competence requires only an ability to consult with counsel "with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings." *Dusky*, 362 U.S. at 402.  Barrett's brief outburst and request to absent himself from an argument he found distasteful do nothing to suggest he lacked a rational understanding of the proceedings or an impaired ability to communicate with his attorneys.  In fact, Barrett's outburst demonstrated a cogent understanding of the prosecutor's argument, upon which the defendant commented in detail.  (Tr. 27: 5421.)  On the basis of their client's remarks, which obviously manifested a rational understanding of the proceedings, trial counsel could not have fallen below prevailing professional norms by omitting to make a futile argument about their client's competence. *See Hawkins*, 185 F.3d at 1152.

By extension, the record simply does not provide a basis for finding a reasonable likelihood of prejudice based on the omission of a competence challenge. (*See, infra*, Arg. VIII.)

255

Barrett's demeanor and ability to effectively assist his lawyers in all phases of the trial preclude any showing that he "was unable to consult with trial counsel with a reasonable degree of rational understanding or that he lacked a rational and factual comprehension of the proceedings." *Walker v. Gibson*, 228 F.3d at 1231. Because Barrett cannot show any reasonable likelihood that the Court might have found him incompetent, he cannot possibly show that his attorneys' omission of a challenge to his competence affected the outcome of his trial. As such, he cannot establish the prejudice necessary for a successful claim of ineffective assistance of counsel. *Id.*

C. Counsel Advised Barrett not to Waive his Presence at Trial

Barrett claims, without any basis in the record, that his attorneys failed to appropriately advise him of the risks of waiving his presence in the courtroom for the court's final instructions to the jury. Presumably, this allegation concerns counsel's consultation with Barrett after his sudden decision to leave the courtroom. (Mot. 349.) Barrett's claim is unsupported by the record and fails to establish prejudice that might give rise to relief.

The trial transcript strongly suggests that counsel did, indeed, attempt to advise their client that he should appear at his trial. After Barrett left the courtroom, counsel spoke to him, and advised the court,

> Yes, we have talked to Mr. Barrett after this incident and he said he just – he didn't want anything further. We talked about having instructions and he said he did not desire – didn't want to have any instructions and he didn't want to participate in the court proceeding now. How much longer that will be I don't know, but I mean, his indication was he didn't want to be in the courtroom.

(Tr. 27: 5432.) Co-counsel later added, "Like I say, some time may go by and he might have a change of heart. I think we ought to re-address that, Mr. Hilfiger and I ought to re-address that, with him at the appropriate time." (Tr. 27: 5436.) The clear implication of the attorneys'

256

statements was that they believed Barrett should attend his trial, had advised him to do so and planned to advise him to do so again. In the face of this record, Barrett has made no effort to show that his attorneys' conduct fell below an objective standard of reasonableness.

Barrett has presented no affirmative evidence that his attorneys failed to warn him of the risks of refusing to appear in court. Barrett has not submitted a declaration of his own attesting to such an omission, nor has he submitted one from his lawyers claiming that they failed to provide adequate counsel as to the hazards of fleeing one's own trial. For want of any factual basis, Barrett's claim should fail. *See Kennedy*, 225 F.3d at 1197 (noting the defendant's burden to overcome the strong presumption that counsel provided adequate assistance).

Moreover, Barrett has made no effort to show that he would have heeded counsel's advice had he received any particular warning about the drawbacks of absenting himself from trial, much less has he shown a reasonable probability that he would have received a more favorable verdict had his lawyers given him different advice. Barrett attempts to sidestep the question of prejudice by arguing, in essence, that the Court should treat the issue as one involving structural error because any attempt to demonstrate prejudice would require speculation. (Mot. 348 (citing *United States v. Novaton*, 271 F.3d 968, 1000 (11th Cir. 2001).) Barrett's argument does not avail him, as his own cited authority holds that a court applies a constitutional standard of harmless error analysis when confronted on appeal with a violation of a defendant's right to presence at trial. *Novaton*, 271 F.3d at 1000.

Barrett, of course, is not seeking appellate reversal on the basis of his absence from the courtroom. He is seeking collateral relief base on a claim of ineffective assistance of counsel. To succeed with that argument he must show a reasonable probability that but for counsel's

257

alleged error the outcome of the trial would have been different. *See United States v. Clingman*, 288 F.3d at 1186. Barrett can show nothing of the sort. The proceeding that he refused to attend after his initial outburst was brief and relatively perfunctory. The jury received final instructions from the court and was sworn before deliberations. (Tr. 27: 5440-44.) Indeed, the jury received a specific instruction that it could not consider Barrett's conduct during the prosecution's argument – a charge that impliedly encompassed his decision to absent himself from trial. (*See* Tr. 27: 5440.) The jury had previously received an instruction that "[e]ven if you believe that the evidence reveals other aggravating factors, you may not consider them." (Tr. 27: 5306-07.) The jury is presumed to have followed these instructions, which precluded it from considering Barrett's voluntary absence against him. *See United States v. Olano*, 507 U.S. 725, 740 (1993) ("'[It is] the almost invariable assumption of the law that jurors follow their instructions.'").

Given the contents of the jury charge and the brevity of the defendant's absence, Barrett cannot show that his decision to absent himself had any impact on the verdict. By extension, he falls far short of his burden of demonstrating that, had he received different advice from his attorneys, a reasonable likelihood exists that he would have attended the final minutes of his trial, and the jury would have returned a different verdict. *See Haddock*, 12 F.3d at 958.

D. Counsel Discharged their Obligation to Seek an Instruction Regarding Barrett's Absence from the Courtroom

Barrett claims that his attorneys provided ineffective assistance in failing to specifically request that the court admonish the jury that it could not consider Barrett's absence from the courtroom or the actions of the Court and Marshal's Service in response to the defendant's outburst. (Mot. 349.) Counsel's actions, in declining to request a specific instruction, were the product of a valid strategic choice and therefore cannot constitute ineffective assistance.

Regardless, the absence of any further instruction on Barrett's absence did not prejudice the defense.

When an attorney's decision stems from an adequately-informed strategic choice, the presumption that the decision was objectively reasonable becomes "virtually unchallengeable." *Bullock v. Carver*, 297 F.3d 1036, 1044 (10th Cir. 2002). Specifically, an attorney may validly choose to forgo an instruction based on a concern that it will unduly highlight some aspect of the case. *See United States v. Nguyen*, 413 F.3d at 1181.

In this case, the Court proposed an instruction that would warn the jury it could not consider Barrett's statement or conduct in deliberations. (Tr. 27: 5435.) Speaking for both counsel, defense attorney Hilfiger responded, "I think I share the same opinion. Mr. Smith is sort of ambivalent to the instruction. It highlights it to an extent, but then it also, you know, cautions the jury. I don't really care one way or the other. I don't object, I don't approve." (*Id.*) Clearly, counsel had a valid tactical concern that it should not draw undue attention to Barrett's absence. Counsel also implied their satisfaction with the Court's proposed instruction, which walked a satisfactory middle ground – drawing minimal attention to the defendant's actions and providing ample protection against consideration of the defendant's absence. Counsel's decision not to seek a stronger or more comprehensive charge is wholly appropriate when viewed through the lens of reasonable strategic concerns.

Even if counsel had erred, Barrett cannot establish prejudice. As previously noted, the Court sua sponte instructed the jury that it could not consider Barrett's conduct during the argument. (Tr. 27: 5440.) Barrett's "conduct" necessarily encompassed his ongoing absence from the courtroom. But even if the jury had not received that instruction, the Court had already

259

limited its ability to consider only the aggravating factors alleged by the government. (Tr. 27: 5306-07.) Not only did the jury presumably follow its instructions, but its verdict bears out the fact that it did not improperly consider any aspect of Barrett's absence from the court. *See United States v. Olano*, 507 U.S. at 740 (regarding the presumption that juries follow their instructions). The jury found several alleged aggravating factors, but rejected the allegation that Barrett was a future danger to others – the one allegation that his flight from the courtroom, an obviously impulsive act of defiance to authority, might have supported had the jury improperly considered it. (*See* Doc. 257 at 14-17.) Because the charge provided by the court amply protected Barrett against consideration of his absence from court, and the verdict provides no basis for believing the jury considered Barrett's conduct, no reasonable likelihood exists that a more comprehensive instruction would have resulted in a different verdict.

## XIV. THE FEDERAL DEATH PENALTY IS NOT SOUGHT ON A RACIALLY DISCRIMINATORY BASIS

Barrett, citing statistical studies, claims that the federal death penalty is disproportionately sought in cases involving White, rather than minority, victims. To the extent the statistics proffered by Barrett do not warrant relief, he argues that they merit discovery and an evidentiary hearing. He also makes a conclusory claim that his trial and appellate attorneys were ineffective for failing to raise this issue. (Mot . 368-73, 389-90; BIS 221-24.) Barrett cannot obtain relief on his claim of racial bias, having premised it on bare statistical data of questionable reliability. Likewise, he has shown no entitlement to evidentiary proceedings on this meritless contention, and cannot premise claims of ineffective assistance of counsel on the failure to raise futile arguments.

If a prosecutor has probable cause to believe a defendant has committed a crime, "the

260

decision, whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his [or her] discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *In re United States*, 397 F.3d 274, 284 (5th Cir. 2005).  That discretion is, though, guided by the Equal Protection Clause.  *In re United States*, 397 F.3d at 284.  The law presumes that prosecutors exercise their discretion in good faith and constitutional compliance.  *See United States v. Armstrong*, 517 U.S. 456, 465-66 (1996).  Only proof of discriminatory effect and purpose will overcome this presumption of regularity.  *Id.* at 465 (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)).  To establish a discriminatory effect, Barrett must show that similarly situated individuals of a different race were not prosecuted." *United States v. Armstrong*, 517 U.S. at 465 (internal quotations and citations omitted).

Far from addressing similarly-situated defendants, the data presented by Barrett to support his argument lacks the barest indication of admissibility.  Barrett relies on statistics generated by David Baldus and Lauren Cohen Bell.  Barrett has not provided any foundation for these calculations.  Neither has he demonstrated that the calculations have been tested, subjected to peer review, and published.  He gives no indication that he is even aware of the known error rate of the studies he cites.  In short he has not shown the reliability of the papers he proffered.  *See Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009).  On that basis alone, Barrett's claim should fail.

Assuming Barrett had shown the reliability of his data, the numbers he cites still would not carry the day.  Statistics reflecting the application of the death penalty to different races cannot, without more, support a finding of discriminatory intent sufficient to strike down a death penalty system on equal protection grounds.  *See McCleskey v. Kemp*, 481 U.S. 279, 292-97

<p style="text-align:center">261</p>

(1987); *see also United States v. Bin Laden*, 126 F. Supp. 2d 256, 261 (S.D.N.Y. 2000) ("At its core . . . *McCleskey* stands for the notion that, by themselves, systemic statistics cannot prove racially discriminatory intent in support of an equal protection claim by a particular capital defendant."). *McCleskey* controls here and requires denial of this claim, as Barrett has not offered any evidence of discriminatory effect or intent. *McCleskey*, at 292-93. In short, Barrett has made no effort to show that similarly situated defendants have received different treatment. *See Armstrong*, 517 U.S. at 465; *see* Mot. Exs. 115 & 116. Instead, he has merely alluded to reports that address the administration of the federal death penalty generally. Under *McCleskey*, Barrett's data does not demonstrate that the Government pursued the death penalty for racially discriminatory reasons.

Barrett's bald assertion, premised on a selective review of federal death penalty cases, that a constitutional violation has occurred is insufficient to state a claim under § 2255, and will not support his pendant request for discovery. The Rules Governing § 2255 do not authorize "fishing expeditions," and "conclusory allegations unsupported by specifics . . . will not entitle one to discovery or a hearing." *United States v. Zuno-Arce*, 25 F. Supp. 2d 1087, 1118 (C.D. Cal. 1998) (quoting *Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir. 1996)).

Assuming, for the sake of argument, that Barrett's claim did not fail for the reasons stated, this Court still could not grant relief because it would require the application of a new rule of law. Barrett's claim that statistical data will suffice to show a violation of the Equal Protection Clause lacks any basis in existing law. As such, any relief would necessarily require the retroactive application of a new rule of law – something this Court may not do. *Schriro v. Summerlin*, 542 U.S. at 351. Given the prevailing legal landscape, no rational jurist could now

262

or have ever concluded that Barrett's statistics demonstrate a constitutional flaw in the federal death penalty system.  Accordingly, relief in this matter is forbidden.  *Id.*

Moreover, the omission of this claim from the briefs and arguments of Barrett's trial and appellate counsel does not constitute ineffectiveness.  Barrett cannot show that the absence of this futile claim, at trial or on appeal, constituted a deprivation of his Sixth Amendment right to the effective assistance of counsel.  *See Hawkins v. Hannigan*, 185 F.3d at 1152.  Given that Barrett concedes he has premised his current arguments on information and arguments never presented to the trial court (Mot. 371 n.49), his ineffective assistance of appellate claim is especially poorly taken.  *See Horne v. Trickey*, 895 F.2d 497, 499-500 (8th Cir.1990) (rejecting ineffective assistance claim where appellate counsel considered the forgone issue but omitted it because the record did not contain sufficient support).

For all the foregoing reasons, this Court should reject Barrett's claim of racial discrimination in the federal government's administration of the death penalty, as well as the related claim of ineffective assistance of counsel and the alternative request for discovery and an evidentiary hearing to explore the legally baseless contention.

## XV.  BARRETT WAS PROPERLY CHARGED BY SUPERSEDING INDICTMENT

Barrett claims that the government violated his constitutional rights by filing an indictment in this case that did not reference the death penalty and did not allege the aggravating factors – statutory and non-statutory – upon which the prosecution relied at trial.  (Mot. 373-75; BIS 224-26.)[28]  Barrett has not only defaulted this claim, but he is wrong – the government's

---

[28]Barrett's Motion claims that the government failed to allege "any of the aggravating factors," but his Brief in Support only addresses the failure to allege non-statutory aggravators. The government addresses the issue as articulated in the Motion.

263

superseding indictment properly alleged the statutory aggravating factors as required by law.

1.  Procedural Default

Barrett has defaulted his attack on the indictment in this case by filing to properly raise it in this Court or on appeal.  *United States v. Frady*, 456 U.S. at 165.  Barrett has not previously claimed the indictment in this case was infirm.  *See generally Barrett*, 496 F.3d 1079.  He attempts to explain his default by claiming that appellate counsel was ineffective.  (Mot. 390.) Given that the claim lacks any legal merit or factual basis, Barrett's attorneys had no obligation to raise it.  As such Barrett cannot establish constitutionally-cognizable ineffectiveness or, by extension, cause and prejudice to excuse the default.  *See McCleskey v. Zant*, 499 U.S. at 493; *cf. United States v. Horey*, 333 F.3d at 1187-88.  Additionally, Barrett makes no claim of actual innocence that might excuse his default.  As a result, Barrett cannot obtain collateral relief based on the asserted flaw in the indictment.

2.  The Superseding Indictment Adequately Alleged the Factors that Rendered Barrett Eligible for the Death Penalty

Assuming, arguendo, that Barrett had not defaulted his complaint that the indictment was deficient, he still could not obtain relief.  Barrett's claim is factually baseless, as it ignores the superseding indictment under which he was tried.  A superseding indictment may generally be sought any time before trial on the merits of an earlier indictment.  *See United States v. Herbst*, 565 F.2d 638, 643 (10th Cir.1977).  If two indictments are pending simultaneously against the same defendant, the government may select which one to bring to trial.  *United States v. Bowen*, 946 F.2d 734, 736 (10th Cir. 1991).

In this case, the government filed a superseding indictment on February 9, 2005, approximately eight months before trial.  (Trl. Doc. 52.)  The superseding indictment included

two Notices of Special Findings by the grand jury that alleged the defendant's age at the time of the crime, all threshold intent factors applicable to the charges (18 U.S.C. § 3591(a)(2) (counts 1 & 2) and 21 U.S.C. § 848(n)(1) (count 3)), and statutory aggravating factors applicable to the charges (18 U.S.C. § 3592(c)(5), (9), (16) (counts 1 & 2) and 21 U.S.C. § 848(n)(5), (8) (count 3)).  The superseding indictment was, in pertinent part, attached to the guilt phase jury charge and was liberally quoted in the penalty phase charge, leaving no doubt that the government elected to try Barrett under that pleading.  (*See* Trl. Docs. 240, 241, 257 & 258.)  Consistent with prevailing Supreme Court authority, the superseding indictment alleged all necessary factors to render Barrett eligible for the death penalty, but did not include allegations of non-statutory aggravating factors or any advice to the grand jury that the special factors would expose Barrett to the death penalty.

A.   The Superseding Indictment Alleged all Necessary Eligibility Factors

The Supreme Court has held that the facts necessary to render a defendant eligible for a death sentence "operate[] as 'the functional equivalent of an element of a greater offense.'"  *Ring v. Arizona*, 536 U.S. 584, 609 (2002) (quoting *Apprendi v. New Jersey*,  530 U.S. 466, 494 (2000)).  Such eligibility-defining factors are subject to the Sixth Amendment's jury trial clause and must be proved to a jury beyond a reasonable doubt.  *See Ring*, 536 U.S. at 602 ("[i]f a State makes an increase in punishment contingent on the finding of a fact, that fact - no matter how the State labels it - must be found by a jury beyond a reasonable doubt").

Although the Supreme Court has not extended *Ring* to require grand jury findings of eligibility factors pursuant to the Indictment Clause, lower courts have consistently held that the eligibility factors – at least one threshold intent factor under § 3591(a)(2) or § 848(n)(1) and at

265

least one statutory aggravating factor under § 3592(c) or § 848(2) to (12) - must be charged in the indictment and found by the grand jury. *See, e.g., United States v. Higgs,* 353 F.3d at 298; *United States v. Robinson*, 367 F.3d 278, 284 (5th Cir.), *cert. denied*, 543 U.S. 1005 (2004); *United States v. Purkey*, 428 F.3d 738, 749 (8th Cir. 2005), *cert. denied*, 127 U.S. 433 (2006). Assuming that *Ring* requires a grand jury finding as to eligibility factors, the indictment in this case was fully compliant with that constitutional mandate.

The Indictment Clause does not require the government to allege any non-statutory aggravating factors because they do not render defendants, like Barrett, eligible for the death penalty. Non-statutory aggravators must be proven beyond a reasonable doubt, but are not the functional equivalent of elements of the offense because they do not affect eligibility for punishment. *See United States v. Fields*, 516 F.3d at 944 ("non-statutory aggravators play no role in the eligibility determination under the FDPA, but are relevant only in the weighing process at the ensuing sentence-selection stage."). Given that non-statutory aggravators only impact the selection of punishment, they need not be presented to the grand jury. *See Higgs*, 353 F.3d at 298; *United States v. Brown*, 441 F.3d 1330, 1368 (11th Cir. 2006); *Purkey*, 428 F.3d at 749-50; *United States v. Bourgeois*, 423 F.3d 501, 507-08 (5th Cir. 2005); *United States v. Solomon*, 513 F. Supp. 2d 520, 530 (W.D. Pa. 2007); *United States v. Henderson*, 485 F. Supp. 2d 831, 869 (S.D. Ohio 2007); *United States v. Wilson*, 493 F. Supp. 2d 364, 387 (E.D.N.Y. 2006); *United States v. Henderson*, 461 F. Supp. 2d 133, 135 (S.D.N.Y. 2006); *United States v. Le*, 327 F. Supp. 2d 601, 614-15 (E.D. Va. 2004). In keeping with this authority, the government alleged, and the grand jury found, that Barrett committed the substantive death-eligible offenses, and that the threshold intent and statutory aggravating factors applied. The Indictment Clause

required nothing more.

> B.  The Superseding Indictment Omitted Superfluous Information

The superseding indictment properly omitted any reference to the death penalty.  The Indictment Clause has two purposes.  It acts as a check on prosecutorial power.  *See generally Branzburg v. Hayes*, 408 U.S. 665, 686-87 (1972) (explaining that "the ancient role of the grand jury ... [is a] dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions).  Additionally, it guarantees notice of the charges against which the defendant must defend.  *See Hamling v. United States*, 418 U.S. 87, 117 (1974).  "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished."  *Id*.

Here, the superseding indictment set forth the elements and their functional equivalents charged against Barrett.  Specifically, it provided Barrett with notice of the mental state and statutory aggravating factors that the government relied upon at the penalty phase.  Such an indictment was entirely sufficient, as it charged "the elements necessary to constitute the offense . . . not . . . the ultimate punishment sought for the offense committed."  *United States v. Haynes*, 269 F. Supp. 2d 970, 980-81 (W.D. Tenn. 2003) (citing *Hamling*, 418 U.S. at 117); *see also United States v. Natson*, 444 F. Supp. 2d 1296,1305 (M.D. Ga. 2006).

Because the superseding indictment alleged all necessary elements or eligibility factors, while omitting any unnecessary reference to the punishment sought in this case, it wholly complied with applicable constitutional mandates and formed a proper basis for the judgment in

this case.

### C. Collateral Relief Cannot Lie on the Theory Advanced by Barrett

Putting aside the factual flaw in Barrett's claim, he advances an argument without any foundation in existing law – that a proper indictment in a capital case must include reference to the death penalty and allegations of the non-statutory aggravating factors. Because Barrett's claim lacks any basis in existing law, relief would necessarily require the retroactive application of a new rule of constitutional law. *Cf. Schriro v. Summerlin*, 542 U.S. at 351. Given the prevailing legal landscape, no rational jurist could now or have ever concluded that the superseding indictment in this case was in any way deficient. Because relief on this claim would require the retroactive application of a novel rule of constitutional law, this Court must reject the argument. *Id.*

For all the foregoing reasons, this Court should reject Barrett's deficient and defaulted attack on the indictment.

### XVI. BARRETT HAS NOT IDENTIFIED ANY JUROR MISCONDUCT, NOR HAS HE DEMONSTRATED THAT THIS COURT SHOULD HAVE SEQUESTERED THE JURY

Barrett claims – in an entirely conclusory fashion – that this Court failed to sequester the jury and, as a result, the jurors committed misconduct by consulting information outside the record. Barrett offers no record citations for any supposedly erroneous ruling, nor does he specify any act of misconduct. (Mot. 376-77; BIS 226-28.) Barrett's failure to provide a basis for finding any error is fatal to his claim.

As previously noted, Barrett is obligated to allege some factual basis for the relief sought. Rule 2(b)(2), Rules Gov'g § 2255 Proceedings; *see United States v. Clingman*, 288 F.3d at 1187. Barrett's Motion identifies no erroneous ruling by the Court or any misconduct by a juror, and

268

the government is unaware of any request for jury sequestration in this case.  Barrett therefore cannot show that this Court abused its discretion in refusing to sequester the jury.  *See United States v. Floyd*, 81 F.3d 1517, 1528 (10th Cir. 1996).  He falls far short of demonstrating "a fundamental defect" that resulted in "a complete miscarriage of justice."  *United States v. Blackwell*, 127 F.3d at 954.  His failure to cite a single instance of error or misconduct requires the denial of this facially deficient claim.

To the extent Barrett claims this Court erroneously failed to place adequate strictures on the jury, his claim presumably relies on facts wholly within the record.  Having failed to raise on appeal any sequestration issue, Barrett has defaulted such contentions.  *See Massaro v. United States*, 538 U.S. at 504.  Barrett does not attempt to explain his default, but notes in passing claiming that appellate counsel was supposedly ineffective for failing to raise it.  Given that the underlying claim lacks any specificity, as does the contention of ineffectiveness, Barrett cannot establish constitutionally-cognizable error on the part of his lawyer, much less can he show legal cause for his default.  *See McCleskey v. Zant*, 499 U.S. at 493.  Furthermore, Barrett has made no attempt to show prejudice that would excuse his default.  Accordingly, he cannot obtain collateral relief based on any alleged error concerning sequestration.

## XVII.  BARRETT HAS FAILED TO STATE A TIMELY OR COGNIZABLE CLAIM THAT EXECUTING HIM WOULD BE CRUEL AND UNUSUAL PUNISHMENT IN VIEW OF HIS ALLEGED MENTAL HEALTH ISSUES

Barrett claims, without asserting he is incompetent, that given his alleged mental health issues, it would be cruel and unusual to execute him.  (Mot. 379-80; BIS 228-32.)  Barrett's claim is not ripe.  To the extent it is properly considered at this juncture, the argument is untimely, as Barrett did not raise it until September 2010.  Moreover, Barrett's novel argument is

not amenable to relief under § 2255.

1. <u>Justiciability</u>

Barrett cannot challenge his prospective execution because the issue is not yet ripe. Article III of the Constitution extends the judicial power of the United States only to real cases or controversies. U.S. Const. art. III, § 1; *see Kennedy v. Block*, 784 F.2d 1220, 1222 (4th Cir. 1986). Thus, federal courts cannot give advisory opinions in hypothetical cases. *Flast v. Cohen*, 392 U.S. 83, 96-97 (1968). Among other issues, the question of ripeness bears on a federal court's subject matter jurisdiction under Article III. *See New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1498-99 (10th Cir.1995). Before a plaintiff may obtain an injunction against future enforcement of a law he must show some substantial hardship-the enforcement must be certain and the only impediment to the case's ripeness is delay before eventual prosecution. *Steffel v. Thompson*, 415 U.S. 452, 462 (1974) (allowing an injunction against police when the plaintiff or his friends had twice before been arrested for distributing the same handbills at the same shopping center); *Crosetto v. State Bar of Wisconsin*, 12 F.3d 1396, 1403 (7th Cir. 1993). The plaintiff bears the burden to allege facts sufficient to demonstrate the appropriateness of a judicial resolution. *See Renne v. Geary*, 501 U.S. 312, 316 (1991).

In this case, Barrett has made no effort to demonstrate ripeness of his complaints about his mental health, nor could he. While Barrett does not claim he is incompetent, his argument that he is too mentally ill to be executed under the Constitution is otherwise indistinguishable from a contention that he lacks the capacity to be executed. The courts have universally found that claims of incompetence to be executed are not ripe until the execution is imminent. *See, e.g., Nooner v. Norris*, 499 F.3d 831, 834 (8th Cir. 2007); *Pierce v. Blaine*, 467 F.3d 362, 367 n.2

(3d Cir. 2006); *Coe v. Bell*, 209 F.3d 815, 823 (6th Cir. 2000); *see also Stewart v. Martinez-Villareal*, 523 U.S. 637, 643 (1998) (recognizing that a defendant's claim of incompetence to be executed was "unquestionably ripe" after the state issued a warrant for the execution).

Barrett's execution is not imminent and his claim is therefore not ripe.

2. Timeliness

Assuming, arguendo, that this Court found Barrett's claim that he is too mentally ill to be executed under the Eighth Amendment was justiciable, the argument is time barred. Not until he filed his Amended § 2255 Motion did Barrett first set forth the instant Eighth Amendment claim. (Doc. 70 at 390-94.) The Amended Motion was filed well after the expiration of the expiration of the one-year period of limitations applicable to this case. *See* 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d at1280; *cf.* Docs 1 & 2. The claim is based on an entirely novel premise, and does not merely clarify, amplify or expand any timely-filed contention. *Cf. United States v. Espinoza-Saenz*, 235 F.3d at 505. Furthermore, Barrett has made no attempt to show that extraordinary circumstances beyond his control prevented him from raising the contention. *United States v. Gabaldon*, 522 F.3d at 1124. Of course, he cannot do so, given that he premises the argument on information he set forth in his original Motion. (*See* Doc. 2 Exs. 89, 117.) Thus, even if the Court finds this issue justiciable, it should disregard it as untimely.

3. New Rule

Barrett's claim is not merely non-justiciable and time barred. Because it lacks a basis in existing law, any relief would necessarily require the legally impossible – a retroactive application of a new rule of law. *Schriro v. Summerlin*, 542 U.S. 348. Barrett has conceded that

271

317

his Eighth Amendment claim is not an attempt to rely on the well-recognized rule that a defendant must be mentally competent to be executed. *See generally Ford v. Wainwright*, 477 U.S. 399 (1986). Instead, he seeks to derive his claim from other Eighth Amendment jurisprudence, specifically the bars on execution of retarded or juvenile offenders. (*See* BIS 229 (citing *Roper v. Simmons*, 543 U.S. 304 (2005) and *Atkins v. Virginia*, 536 U.S. 304 (2002).) Barrett's attempt to draw these parallels to precedent will not carry the day for him. Even if the result a defendant seeks is within the "logical compass" of Supreme Court authority or he can show that Supreme Court decisions "inform, or even control or govern, the analysis" of his contention, his claim still relies on a new rule unless the result is dictated by pre-existing precedent. *See Saffle v. Parks*, 494 U.S. 484, 491 (1990); *Butler v. McKellar*, 494 U.S. 407, 415 (1990); *see also Beard v. Banks*, 542 U.S. at 416 (holding that prior precedent may support a particular result, but if it does not mandate the outcome it is not an existing rule for *Teague* purposes). Because Barrett necessarily calls upon this Court to extend tenuously-related precedent in order to grant relief, his theory requires an impermissible application of a new rule of constitutional import. *Schriro v. Summerlin*, 542 U.S. 348.

Accordingly, if this Court finds that it can review Barrett's claim, it still should deny relief.

## XVIII.  BARRETT RECEIVED THE ASSISTANCE OF CONSTITUTIONALLY ADEQUATE APPELLATE COUNSEL

In a separately enumerated ground, Barrett restates, from pertinent points in his Motion, a series of claims that his appellate counsel provided constitutionally deficient assistance for failing to raise a series of individual claims. (Mot. 382-90.) Because the government has responded to those claims elsewhere in its Answer, it declines to repeat its arguments here.

Barrett also claims that his appellate attorney provided ineffective assistance for failing to raise the cumulative effect of the forgone claims that he previously identified. (Mot. 391-92.) Barrett's claim is untimely and without merit.

Not until he filed his Amended § 2255 Motion did Barrett first premise a claim of ineffective assistance of appellate counsel on the omission of a cumulative error argument. (Doc. 70 at 405-06.) The Amended Motion was filed well after the expiration of the March 17, 2009 expiration of the one-year period of limitations applicable to this case. *See* 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d at 1280; *cf.* Docs 1 & 2. The claim is based on an entirely novel premise, and does not merely clarify, amplify or expand any timely-filed contention. *Cf. United States v. Espinoza-Saenz*, 235 F.3d at 505. Furthermore, Barrett has made no attempt to show that extraordinary circumstances beyond his control prevented him from raising the contention. *United States v. Gabaldon*, 522 F.3d at 1124. Of course, he cannot do so, and simultaneously maintain that the claim is premised on information available within the record that might have supported an appeal. Thus, this Court should strike and disregard Barrett's untimely claim that appellate counsel was ineffective for failing to seek relief based on the cumulative impact of other forgone issues.

Even if the Court found the issue timely, it still should not grant relief. As discussed throughout this brief, the claims allegedly omitted by appellate counsel were either futile, unsupported by the record or raised and rejected. Accordingly, there would have been no prejudice to accumulate by the Court of Appeals had counsel raised the cumulative error argument Barrett now identifies. The omission of a futile argument, derived from other meritless arguments, did not constitute ineffective assistance. *United States v. Challoner*, 583 F.3d at 749.

273

## XIX.  THERE ARE NO ERRORS TO ACCUMULATE

Barrett argues that even if no single alleged error requires relief, the cumulative effect of the supposed errors does require the Court to grant his Motion.  (Mot. 357-58.)  As the Government has demonstrated, none of Barrett's contentions have merit, and many are procedurally defective.  Moreover, Barrett has failed to establish prejudice as to any of the claims he raises.  Accordingly, his contention of cumulative error should be rejected.  *See United States v. Rogers*, 556 F.3d 1130, 1144 (10th Cir. 2009).

## CONCLUSION

Based on the foregoing reasoning and authority, the government respectfully urges this

Court to deny the Second Amended Motion to Vacate, Set Aside, or Correct a Sentence by a

Person in Federal Custody.

Respectfully submitted,

Dated: May 17, 2010

SHELDON J. SPERLING
United States Attorney
Eastern District of Oklahoma


/s/   Christopher J. Wilson
CHRISTOPHER J. WILSON, OBA #13801
Assistant United States Attorney
Eastern District of Oklahoma
1200 West Okmulgee
Muskogee, OK 74401-6848
Tel: (918) 684-5100


/s/   Jeffrey B. Kahan
JEFFREY B. KAHAN, PA Bar No. 93199
Trial Attorney
U.S. Department of Justice
1331 F Street, N.W.; Rm. 345
Washington, D.C. 20530
Tel: (202) 305-8910

## CERTIFICATE OF SERVICE

I, hereby certify that on 17th day of May, 2010, I electronically transmitted the attached REDACTED Answer and Attachments to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry, Attorney for Petitioner
Tivon Schardl, Attorney for Petitioner
Joan Fisher, Attorney for Petitioner

I, hereby further certify that on 17th day of May, 2010, I electronically transmitted a complete, unredacted Answer and Attachments to the following:

David B. Autry, Attorney for Petitioner
Tivon Schardl, Attorney for Petitioner
Joan Fisher, Attorney for Petitioner

s/      Christopher  J. Wilson
        Assistant United States Attorney

## DECLARATION OF JOHNNY PHILPOT

I, Johnny Philpot, declare the following:

1.   I was the Sheriff of Sequoyah County, Oklahoma from November 12, 1996 to December 31, 2008.

2.   On July 29, 1998, I responded with some of my deputies, Shelton Fair (#826), Larry Lane (#824) and Walter Ross, Undersheriff (#821), to the home of Kenneth Eugene Barrett. On that occasion, I spoke with Mr. Barrett, and some of my deputies inspected some rifles of Mr. Barrett's. Though Mr. Barrett had an outstanding Sequoyah County misdemeanor warrant at that time, I did not arrest him or cause him to be arrested.

3.   Prior to Mr. Barrett's arrest in connection with the shooting death of David "Rocky" Eales, the July 29, 1998 incident described in paragraph 2, above, was the last occasion on which I visited Mr. Barrett's home in Mr. Barrett's presence.

4.   In preparation of this declaration, I reviewed a Sequoyah County Sheriff's Department Radio Log dated July 29, 1998, which is attached as exhibit A. This radio log accurately reflects the date and activities of the event discussed in paragraph 2, above.

I have read this declaration carefully and it accurately reflects the matters discussed therein.

I declare under penalty of perjury that the above and foregoing 1 page declaration is true and correct to the best of my knowledge and belief.

Executed by me this 5-26 day of August, 2009, in Sequoyah County, Oklahoma.

Johnny Philpot

EXHIBIT 1

323

## DECLARATION OF JOEL-LYN MCCORMICK

I, Joel-lyn McCormick, hereby declare under penalty of perjury, pursuant to the laws of the State of Oklahoma and the United States of America, that the following is true and correct:

1.    I am currently employed as an Assistant U.S. Attorney for the Northern District of Oklahoma.

2.    Prior to my employment in the U.S. Attorney's office, I was employed in the Oklahoma Office of the Attorney General, where I served as the chief of the Multicounty Grand Jury Unit.

3.    During the course of my duties in the Multicounty Grand Jury Unit, I presented Clint Johnson as a witness in the 2008 case against former District 27 District Attorney Richard Gray.

4.    During my preparations for the trial in Mr. Gray's case, I investigated allegations of misconduct leveled against Mr. Johnson.

5.    Specifically, I directed Attorney General Investigator Fred Ellis to verify an allegation that Mr. Johnson had written checks to a merchant on insufficient funds in September 2005. As I understood the situation, the merchant had not perceived any fraudulent intent on Johnson's part. However, I recall that an investigator from the District 27 District Attorney's Office contacted the merchant and urged him to turn the checks over to the DA's office for prosecution.

6.    Investigator Fred Ellis made me aware of an audit of confidential informant funds used by Clint Johnson's former employer, the District 27 Drug Task Force. The auditor concluded there were deficiencies in the records. The auditor described the deficiencies as poor record keeping by multiple members of the Drug Task Force, including Johnson, and to poor management by the Task Force's administrators. The audit did not find Clint Johnson had misappropriated confidential informant funds.

Executed on this _12_ th day of May, 2010, at Tulsa, Oklahoma:

Joel-lyn McCormick

1

EXHIBIT 2

324

## Declaration of Janesse Lynelle Thomas

I, **Janesse Lynelle Thomas**, do hereby declare under penalty of perjury under the laws of Oklahoma and the United States of America that the following is true and correct:

1. I began using methamphetamine in the early 1990s, but discontinued my use in February 1998 when I found out I was pregnant. I began using methamphetamine again some time in 2001.

2. From 2001 onward, I was a daily methamphetamine user.

3. I have a son, Nathanial Dean Thomas, who was born on September 1, 1998.

4. Until October 2009, I publicly maintained that Steven London was Nathanial Thomas's father. In October 2009, I stated that Charles "Monk" Sanders was Nathanial Thomas's actual father and had impregnated me during non-consensual intercourse. I had never previously informed anyone other than Steven London that Charles "Monk" Sanders was Nathanial Thomas's biological father.

5. I was introduced to Kenneth Eugene Barrett by my former boyfriend, Donald Teague, in the mid-1990s.

6. I am aware that Kenneth Barrett was convicted in the homicide of an Oklahoma State Trooper.

7. I have used methamphetamine in Kenneth Barrett's company – I snorted it and observed Barrett injecting it.

8. Kenneth Barrett was a known distributor of methamphetamine in the 1990s.

9. While I have never purchased methamphetamine from Kenneth Barrett, I received the drug from him without charge.

10. On about five occasions, I visited Kenneth Barrett's property. I also socialized with Kenneth Barrett in Donald Teague's home, and in the trailer belonging to Barrett's mother. I last entered Barrett's home in early 1998.

11. I last saw Kenneth Barrett in late 1998. I parked in his mother's driveway. Barrett came out of his house and walked over to where I was parked. Barrett sat with me in my mom's pickup and we talked for about 10-15 minutes.

12. I never visited Kenneth Barrett's property in the company of Charles "Monk" Sanders. However, during two of my visits to Barrett's land in 1997, I saw Sanders there. On both those occasions, I believe Sanders purchased methamphetamine from Barrett. I have not seen nor had any communication with Charles "Monk" Sanders since the incident when he had non-consensual intercourse with me.

EXHIBIT 3

13.   I am currently serving a 10-year prison sentence for Burglary II, Larceny From House, Knowingly Concealing Stolen Property, Conspiracy, Burglary II, and Larceny From House following my conviction by plea in Sequoyah County District Court case no. CF-2009-346. This sentence is running concurrent with Sequoyah County District Court case nos. CF-2008-324 (Identity Theft) and CF-2008-530 (Possession of Controlled Drug With Intent to Distribute).

Executed at Taft, Oklahoma, this 26 day of March, 2010:

Janesse Lynelle Thomas

EXHIBIT 3



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of Oklahoma*

---

*1200 West Okmulgee*                                              *(918) 684-5100*
*Muskogee, Oklahoma 74401*                               *Main Fax (918) 684-5130*
                                                                    *Criminal Fax (918) 684-5150*

February 16, 2005

*Via US Mail and E-mail to defender@pianosa.com*

John Echols
Bank of America Building
Suite 2112
PO Box 701196
Tulsa, OK 74170-1196

       RE:    *United States v. Kenneth Barrett*
                Case No.  CR-04-115-P

Dear Mr. Echols:

In response to your correspondence requesting discovery, please consider the following:

1.     **Confidential Informant.**  It is not our intention to identify the confidential informant.  That situation would change should we determine to utilize this individual as a witness.

2.     **Chip Teague.**  As I previously orally advised you, we do not anticipate Chip Teague will be a witness in this matter.  There is no relevant discovery related to Teague in this case.  The reference to Teague, Doss Gann and Toby Barrett as "members of this organization" by Special Agent Craig Nixon is merely hearsay and "street intelligence."  The undersigned prosecuted both Chip Teague and Doss Gann.  At no time in either prosecution did the government possess reliable, credible, relevant or admissible information associating Kenneth Barrett with the above-named individuals in a legitimate, criminal conspiracy.

3.     **Tara Barrett.**  Ms. Barrett is not a witness in the instant matter.

4.     **Stephen Carl Smith**.  The government has no intention nor expectation of calling Mr. Smith as a witness in the instant matter.

EXHIBIT 4

327

Mr. Echols
February 9, 2005
Page 2

5. **Drug Task Force Agents.** The only involvement of DEA Drug Task Force Agents in the instant matter is in regards to the service and execution of the warrant of September 24, 1999. Those matters have previously been provided in discovery. The warrants executed on September 24, 1999, were not DEA search warrants. DEA agents did not participate in either seeking or obtaining the warrants.

6. **Gilbert Green.** The government is unaware of any involvement of Gilbert Green in the instant matter.

7. **Personnel Files.** Said materials are not discoverable. The government has no control of personnel files of state agents and is under no obligation nor has authority to require a search of same. As to federal personnel files, the government has requested a "*Giglio*" search of personnel files of all known federal witnesses. We have been advised that no "*Giglio*" materials exist in regards to any identified federal agent.

8. **Forensic Testing.** The agency/laboratory, identity and curriculum vitae, and results of examinations which you requested, have previously been provided. The government is currently in the process of obtaining testing methods and protocols followed and anticipates providing a response as soon as we are in receipt of such information.

9. **Any and All Search and Arrest Warrants Relevant to this Case.** Other search and arrest warrants, to the extent they exist, are not relevant to the instant charges. You would have the same access we have through state district court clerks.

10. **Records and Documents Concerning Barrett Prior to September 24, 1999.** The government has been advised by the DEA that no investigation regarding Barrett was ongoing prior to September 24, 1999. As such, there are no reports concerning Mr. Barrett to be discovered.

11. **Documents, Records and Reports Subsequent to September 24, 1999.** Those materials have already been discovered.

12. **No Knock Policies of the FBI and DEA.** Neither the FBI nor DEA were involved in the obtaining or entry in the service of this warrant. The policies of these agencies are irrelevant.

13. **Deadly Force Policies.** Neither the FBI nor DEA were involved in the entry in the execution of the warrants in the instant case. Their deadly force policies are not relevant.

328

Mr. Echols
February 9, 2005
Page 3

14. **Grand Jury Federal.** Grand Jury testimony will be provided when it is obtained.

15. **Grand Jury Testimony State.** The government does not have possession of any Grand Jury testimony from any state proceedings.

16. **Drug Task Forces.** This operation was not a DEA search warrant. The entry was not conducted by nor under the auspicious of the Drug Enforcement Administration. The fact that the DEA ultimately conducted the search as a courtesy to District 27 District Attorney's Office Drug Task Force as a consequence of the murder of David Eales by Kenneth Barrett does not make the internal policies of the DEA regarding the funding and operation of their Drug Task Force officers a discoverable item.

17. **Page 34 of Disc "Barrett 01DEA.pdf."** A hard copy has been provided.

18. **Letter dated August 25, 2004.** The letter is attached. As you can see, the letter only references a delay in the destruction of evidence. Its relevance to the instant matters escapes the undersigned.

19. **The reference to Toby Barrett, Chip Teague and Doss Gann's as "members of this organization."** This has previously been addressed in paragraph 2 of this response.

I hope this letter satisfies your concerns.

Sincerely,

SHELDON J. SPERLING
United States Attorney

D. MICHAEL LITTLEFIELD
Assistant United States Attorney

DML:ljh:dlo



**U. S. Department of Justice**
Drug Enforcemei . Administration
McAlester Resident Office
McAlester, Oklahoma

_www.dea.gov_                                      August 25, 2004

Sheldon Sperling
United States Attorney
Eastern District Of Oklahoma
Muskogee, Oklahoma

Mr. Sperling,

I was in error when I said that I had received a letter or memo from Mr. Gray, I have not.

I sent Mr. Gray a registered letter on March 24, 2004 requesting Mr. Gray or a authorized representative to contact me in reference to the destruction or transfer of all evidence in this pending matter. As you can see, Mr. Gray signed for the registered letter on March 25, 2004.

As of today's date, the DEA McAlester Resident Office or myself, has not been contacted by Mr. Gray or an authorized representative of his office as requested in the letter dated, March 24, 2004 to Mr. Gray.

On April 6, 2004 the requests for the destruction of all evidence in this pending matter were sent to the DEA South Central Regional Laboratory, Dallas, Texas and the DEA Non-Drug Evidence Custodian, McAlester, Oklahoma.

On April 15, 2004, Captain Mike Grimes, Oklahoma Highway Patrol faxed me a letter requesting for a 120 day delay in the destruction of the evidence in DEA custody, the destruction was delayed and the requests were returned back to our office.

On June 29, 2004, we spoke via "e" mail, I gave you my thoughts on this matter and we left this matter there. At this point my thoughts are, Mr. Gray or his authorized representative did not contact the DEA McAlester Resident Office or myself, this tells me, Mr.Gray has, and or had no intention of pursuing any further state charges against Kenneth Barrett.

Mr. Gray may be waiting for the destruction of the evidence, and then stating, the evidence has been destroyed and he can no longer pursue state charges against Kenneth Barrett because there is no evidence.

Juan A. Beal

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)**

I, _Ida Tompkins_, attest under penalties of perjury

(or criminal punishment for false statement or false attestation) that I am employed by

_Muskogee County Sheriff's Office_ (business), and that my

official title is _Administrator_. I am a custodian of records for such

business entity. I state that each of the records attached hereto is the original record or a true

duplicate of the original record in the custody of _Muskogee County Sheriffs Office/ Detention Center_

(name of business from which documents are produced), and that I am the custodian of the

attached records consisting of ___1___ page(s).

I further state that:

A.     all records attached to this certificate were made at or near the time of the

occurrence of the matters set forth, by, or from information transmitted by, a person with

knowledge of those matters;

B.     such records were kept in the course of a regularly conducted business activity of

_Muskogee County S.O./ D.C_ (business); and

C.     such records were made by _Ida Tompkins_ (business) as a

regular practice.

I further state that this certification  is intended to satisfy Rule 902(11), Federal Rule of

Evidence.

_4/30/2010_
Date

_Ida [signature]_
Signature

EXHIBIT 5

331

Case 6:09-cv-00105-JHP   Document 174-6   Filed 05/17/10   Page 2 of 2

| DATE | TIME | ATTORNEY and/or BONDSMAN | SIGNATURE OF INMATE |
|---|---|---|---|
| 10/11 | 0920 | Dodd, Kiann | atty |
| 10/11 | 0930 | Jack Manley | Minister |
| 10/11 | 1205 | Larry Bowles | att |
| 10/11 | 1400 | Vera Hooper | Housing Auth. |
| 10/11 | 1400 | Kathryn Christie | Housing Auth. |
| 10/12 | 0935 | Anita Kissell / Norene Gay | psychologist |
| 10/12 | 1400 | Rick Salley | minister |
| 10/12 | 1400 | Janice Purcell | atty |
| 10/12 | 1445 | Gina Cowley | atty |
| 10/12 | 1445 | Gina Cowley | atty |
| 10/12 | 1445 | Gina Cowley | atty |
| 10/12 | 1600 | Roger Hilfiger | atty |
| 10/12 | 1600 | Roger Hilfiger | atty |
| 10/13 | 12:35 | Albert Matthews | Atty |
| 10/13 | 1315 | Ryan Neighbors | McCoys |
| 10/13 | 1330 | Jeff Winters | Minister |
| 10/13 | 1630 | Warren Gotcher | Warren Gotcher |
| 10-14 | 9:20 | Jeff Winters | minister |
| 10/14 | 0950 | Randall Price | Psychologist |
| 10/14 | 1045 | Thomas Fitch | minister |
| 10/15 | 1437 | Stewart Ericson | Att. |
| 10/16 | 1925 | Frank Baccellos / Scott Copley / Steve Smith | Minister |
| 10/17 | 1030 | Jeff Winters | minister |

Kenneth Barrett

Kenneth Barrett

Kenneth Barrett



# OKLAHOMA DEPARTMENT OF CORRECTIONS

Back to Previous Search   New Search

## Name

CHARLES E SANDERS
ODOC# 191483



image 1 of 11 >

7 Sep 2005

## Alias

Walter T Dotson
Monk
Charles E Mork
Charles E Sanders
Charles Sanders
Monk Sanders
Mork Sanders

## IDs

**ODOC#:** 191483

**Birth Date:** 01/11/1966

## Appearance

American Indian Male; 5 ft. 10 in. tall; 200 pounds; Brown hair; Brown eyes;

## Body Marks

BAK: TAT L UPP NO FEAR VG

CHE: SCAR L LOW 10"

CHE: TAT R UPP MUSKOGEE // PLAY BOY BUNNY // PLAY BOY

WRIST: SCAR L 6"

## Sentence

| CRF# | County | Offense | Conviction | Term | Term Code | Start | End |
|---|---|---|---|---|---|---|---|
| 86-604 | ARJR | Illegal Dist Of Controlled Substances | 04/13/1988 | 6Y 0M 0D | Int. Prob. In | 04/13/1988 | 05/27/1994 |
| 89-396 | SEQU | Uttering A Forged Instrument | 08/08/1990 | 1Y 0M 0D | Incarceration | 10/29/1992 | 12/12/1993 |
| 89-396 | SEQU | Uttering A Forged Instrument | 08/08/1990 | 2Y 0M 0D | Probation | 08/08/1990 | 08/07/1993 |
| 89-396 | SEQU | Uttering Forged Instruments | 08/08/1990 | 3Y 0M 0D | Probation | 04/13/1988 | 11/25/1996 |
| 90-144 | SEQU | Unlawful Poss Of Cds (Cocaine)Afcf | 08/08/1990 | 3Y 0M 0D | Incarceration | 10/29/1992 | 07/04/1995 |
| 90-144 | SEQU | Unlawful Poss Of Cds (Cocaine)Afcf | 08/08/1990 | 7Y 0M 0D | Probation | 08/08/1990 | 08/07/2000 |
| 90-144 | SEQU | Sexual Battery | 08/08/1990 | 3Y 0M 0D | Probation | 04/13/1988 | 11/25/1996 |
| 92-91 | SEQU | Unlawful Possession Of Cds (Cocaine) Afcf | 07/20/1992 | 3Y 0M 0D | Incarceration | 10/29/1992 | 07/04/1995 |
| 92-91 | SEQU | Unlawful Possession Of Cds (Cocaine) Afcf | 07/20/1992 | 7Y 0M 0D | Probation | 07/20/1992 | 07/19/2002 |
| 93-131 | MUSK | Carrying Weapon/Drugs/Alcohol Into Jail | 12/01/1994 | 3Y 0M 0D | Incarceration | 08/22/1995 | 07/28/1996 |
| 93-772 | MUSK | Escape From State Penitentiary | 12/01/1994 | 3Y 0M 0D | Incarceration | 12/01/1994 | 11/16/1995 |
| 95-486 | ARJR | Rec/Poss/Conc Stolen Property | 07/06/1995 | 3Y 0M 0D | Incarceration | 07/06/1995 | 05/25/1996 |
| 95-486 | ARJR | Forgery 2nd-Notes,Checks,Bills,Drafts | 07/06/1995 | 3Y 0M 0D | Incarceration | 07/06/1995 | 05/25/1996 |
| 98-346 | SEQU | Poss Of Controlled Drug (Rss) Bal Susp Upon Successful Comp Last Stop | 08/23/2001 | 0Y 0M 676D | Incarceration | 10/09/2001 | 03/09/2002 |
| 98-346 | SEQU | Poss Of Controlled Drug (Rss) Bal Susp Upon Successful Comp Last Stop | 08/23/2001 | 6556D | Probation | 08/23/2001 | 06/10/2021 |
| 98-363 | SEQU | Uttering A Forged Instrument (Rss) Bal Susp Upon Successful Comp Last Stop | 08/23/2001 | 0Y 0M 676D | Incarceration | 10/09/2001 | 03/09/2002 |
| 98-363 | SEQU | Uttering A Forged Instrument (Rss) Bal | 08/23/2001 | 6556D | Probation | 08/23/2001 | 06/10/2021 |

## EXHIBIT 6

| Case | Court | Offense | Offense Date | Term | Type | Start | End |
|---|---|---|---|---|---|---|---|
| | | Susp Upon Successful Comp Last Stop | | | | | |
| 99-562 | SEQU | Knowingly Conceal Stolen Property (Rss) Bal Susp Upon Successful Comp Last Stop | 08/23/2001 | 0Y 0M 676D | Incarceration | 10/09/2001 | 03/09/2002 |
| 99-562 | SEQU | Knowingly Conceal Stolen Property (Rss) Bal Susp Upon Successful Comp Last Stop | 08/23/2001 | 6556D | Probation | 08/23/2001 | 06/10/2021 |
| 2003-124 | SEQU | Felony Running Roadblock, Afc6f (Split) [Bal Susp On Completion Of Key To Life Or Similar Program] | 11/18/2004 | 5Y 0M 0D | Incarceration | 12/10/2004 | 06/05/2008 |
| 2003-124 | SEQU | Felony Running Roadblock, Afc6f (Split) [Bal Susp On Completion Of Key To Life Or Similar Program] | 11/18/2004 | 20Y 0M 0D | Probation | 11/18/2004 | 11/17/2029 |
| 2003-124 | SEQU | Felony Running Roadblock, Afc6f (Split) [Bal Susp On Completion Of Key To Life Or Similar Program] | 11/18/2004 | 5Y 0M 0D | Incarceration | 12/10/2004 | 06/05/2008 |
| 2003-124 | SEQU | Felony Running Roadblock, Afc6f (Split) [Bal Susp On Completion Of Key To Life Or Similar Program] | 11/18/2004 | 20Y 0M 0D | Probation | 11/18/2004 | 11/17/2029 |
| 2004-19 | SEQU | Knowingly Concealing Stolen Property [Bal Susp On Completion Of Key To Life Or Similary] (Split) | 11/18/2004 | 5Y 0M 0D | Incarceration | 12/10/2004 | 06/05/2008 |
| 2004-19 | SEQU | Arson, 2nd Degree (Bal Susp Upon Completion Of Key To Life Or Similary) (Split) | 11/18/2004 | 5Y 0M 0D | Incarceration | 12/10/2004 | 06/05/2008 |
| 2004-19 | SEQU | Burglary 2nd Degree, Afc6f [Bal Susp On Completion Of Key To Life Or Similary] (Split) | 11/18/2004 | 5Y 0M 0D | Incarceration | 12/10/2004 | 06/05/2008 |
| 2004-19 | SEQU | Burglary 2nd Degree, Afc6f [Bal Susp On Completion Of Key To Life Or Similary] (Split) | 11/18/2004 | 20Y 0M 0D | Probation | 11/18/2004 | 11/17/2029 |
| 2004-19 | SEQU | Arson, 2nd Degree (Bal Susp Upon Completion Of Key To Life Or Similary) (Split) | 11/18/2004 | 20Y 0M 0D | Probation | 11/18/2004 | 11/17/2029 |
| 2004-19 | SEQU | Knowingly Concealing Stolen Property [Bal Susp On Completion Of Key To Life Or Similary] (Split) | 11/18/2004 | 20Y 0M 0D | Probation | 11/18/2004 | 11/17/2029 |
| 1998-346 | SEQU | Poss Of Controlled Substance | | 17.33 Y | SUSPENDED | 08/12/2002 | 12/08/2019 |

334

| 1998-363 | SEQU | Uttering Forged Instruments | 17.33 Y | SUSPENDED | 08/12/2002 | 12/08/2019 |
| 1999-562 | SEQU | Rec/Poss/Conc Stolen Property | 17.33 Y | SUSPENDED | 08/12/2002 | 12/08/2019 |

### Facility

| Current Facility | Phone# | Reception Date | Discharge Date | Parole Hearing Date |
|---|---|---|---|---|
| INACTIVE | | 12/10/2004 | | 09/9999 |

| Address | City | State | Zip | Contact |
|---|---|---|---|---|

335

Offender Lookup - Detail



# OKLAHOMA DEPARTMENT OF CORRECTIONS

Back to Previous Search   New Search

## Name

RICHARD A BARRETT
ODOC# 278117

No photo available

## Alias

No data available

## IDs

**ODOC#:** 278117

**Birth Date:** 06/24/1964

## Appearance

White Male; 5 ft. 9 in. tall; 160 pounds; Brown hair; Blue eyes;

## Body Marks

No data available

## Sentence

| CRF# | County | Offense | Conviction | Term | Term Code | Start | End |
|---|---|---|---|---|---|---|---|
| 98-129 | OSAG | Assault W/Dangerous Weap | 07/30/1999 | 5Y 0M 0D | Probation | 07/30/1999 | 07/29/2001 |
| 98-129 | OSAG | Assault W/Dangerous Weapon | 07/30/1999 | 5Y 0M 0D | Probation | 07/30/1999 | 07/29/2001 |
| 98-129 | OSAG | Burg 1st | 07/30/1999 | 5Y 0M 0D | Probation | 07/30/1999 | 07/29/2001 |
| 99-103 | OSAG | Forfeiture Of Bail | 07/30/1999 | 2Y 0M 0D | Probation | 07/30/1999 | 07/29/2001 |
| 2001-302 | SEQU | Poss Of Controlled Substance | | 10 Y | SUSPENDED | 05/31/2001 | 05/30/2011 |
| 2001-302 | SEQU | Using Offensive Weapon In Felony | | 10 Y | SUSPENDED | 05/31/2001 | 05/30/2011 |
| 2001-302 | SEQU | Possess/Furnish Precurso Substance | | 10 Y | SUSPENDED | 05/31/2001 | 05/30/2011 |

## Facility

| Current Facility | Phone# | Reception Date | Discharge Date | Parole Hearing Date |
|---|---|---|---|---|
| INACTIVE | | 07/30/1999 | | |

| Address | City | State | Zip | Contact |
|---|---|---|---|---|
| | | | | |

# EXHIBIT 7

http://docapp065p.doc.state.ok.us/...e?_pageid=394&_dad=portal30&_schema=PORTAL30&doc_num=278117&offender_book_id=167886[5/17/2010 8:23:23 AM]



# OKLAHOMA DEPARTMENT OF CORRECTIONS

Back to Previous Search   New Search

## Name

SHAWN A HILL
ODOC# 271366



image 1 of 8 >

24 Jun 2005

## Alias

Shawn A Hill

## IDs

**ODOC#:** 271366

**Birth Date:** 04/02/1974

## Appearance

White Male; 5 ft. 8 in. tall; 187 pounds; Brown hair; Brown eyes;

## Body Marks

BAK: TAT L UPP

BIC: SCAR R FRT 1" SCAR

BIC: TAT L BACK SS

CHE: TAT L BRANDY DESTINY

LEG: TAT L BACK BRANDY

LEG: TAT L FRT

SHL: TAT L FRT PEACE SIGN W/ FLAG

TRI: SCAR R TOP 3" SCAR

## Sentence

| CRF# | County | Offense | Conviction | Term | Term Code | Start | End |
|---|---|---|---|---|---|---|---|
| 1998-119 | SEQU | Possession Of Recursor Substance | 12/03/1998 | 10Y 0M 0D | Probation | 12/03/1998 | 12/02/2008 |
| 1998-119 | SEQU | Possession Of Controlled Drug | 12/03/1998 | 15Y 0M 0D | Probation | 12/03/1998 | 12/02/2013 |
| 1998-288 | SEQU | Unlawful Possession Of Controlled Drug | 12/03/1998 | 10Y 0M 0D | Probation | 12/03/1998 | 12/02/2008 |
| 1998-288 | SEQU | Driving Under Suspension | 12/03/1998 | 1Y 0M 0D | Probation | 12/03/1998 | 12/02/1999 |
| 1998-372 | SEQU | Unlawful Possession Of Marijuana | 12/03/1998 | 1Y 0M 0D | Probation | 12/03/1998 | 12/02/1999 |
| 1998-372 | SEQU | Unlawful Possession Of Controlled Drug | 12/03/1998 | 20Y 0M 0D | Probation | 12/03/1998 | 12/02/2018 |
| 98-372 | SEQU | Unlawful Possession Of Marihuana -Rss | 12/03/1998 | 1Y 0M 0D | Incarceration | 04/23/2004 | 09/21/2004 |
| 98-372 | SEQU | Unlawful Possession Of Controlled Drug -Rss | 12/03/1998 | 20Y 0M 0D | Incarceration | 04/23/2004 | 02/19/2022 |
| 98-119 | SEQU | Possession Of Precursor Material -Rss // Bal Susp Upon Compl Of Dowc | 10/09/2003 | 1197D | Incarceration | 04/23/2004 | 06/21/2005 |
| 98-119 | SEQU | Possession Of Controlled Drug With Intent To Distribute -Rss // Bal Susp Upon Compl Of Dowc | 10/09/2003 | 4281D | Probation | 03/22/2004 | 03/21/2019 |

# EXHIBIT 8

337

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 98-119 | SEQU | Possession Of Controlled Drug With Intent To Distribute -Rss // Bal Susp Upon Compl Of Dowc | 10/09/2003 | 1197D | Incarceration | 04/23/2004 | 06/21/2005 |
| 98-119 | SEQU | Possession Of Precursor Material -Rss // Bal Susp Upon Compl Of Dowc | 10/09/2003 | 2455D | Probation | 03/22/2004 | 03/21/2014 |
| 1998-119 | SEQU | Dist Of Cds/Poss W/Intent | | 11.67 Y | SUSPENDED | 06/24/2005 | 02/19/2017 |
| 1998-119 | SEQU | Possess/Furnish Precurso Substance | | 6.66 Y | SUSPENDED | 06/24/2005 | 02/19/2012 |
| 1998-288 | SEQU | Poss Of Controlled Substance | | 6.66 Y | SUSPENDED | 06/24/2005 | 02/19/2012 |
| 1998-372 | SEQU | Poss Of Controlled Substance | | 13.45 Y | SUSPENDED | 06/24/2005 | 12/02/2018 |
| 98-288 | SEQU | Unlawful Possession Of Controlled Drug (Rss) | | 10Y | Incarceration | 04/23/2004 | 04/22/2012 |

### Facility

| Current Facility | Phone# | Reception Date | Discharge Date | Parole Hearing Date |
|---|---|---|---|---|
| INACTIVE | | 04/23/2004 | | 09/9999 |
| **Address** | | **City** | **State** | **Zip** | **Contact** |

338

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF OKLAHOMA

06 MAR -1 PM 3:08

WILLIAM B. GUTHRIE, CLERK

BY_____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )    Case No. CR-00-21-R S |
| | ) |
| THOMAS DOSS GANN, | ) |
| RALPH DOUGLAS GANN, | ) |
| KAREN JEAN REAL and | ) |
| IRENE MARIE GANN also known | ) |
| as Irene Baker, | ) |
| | ) |
| *Defendants.* | ) |

### MOTION FOR REDUCTION OF SENTENCE
### FOR DEFENDANT KAREN JEAN REAL
### PURSUANT TO RULE 35

COMES NOW the plaintiff, the United States of America, by and through Sheldon J.

Sperling, United States Attorney for the Eastern District of Oklahoma, and D. Michael

Littlefield, Assistant United States Attorney for the Eastern District of Oklahoma, and moves this

Honorable Court for a reduction of the sentence of Karen Jean Real pursuant to Rule 35(b),

Federal Rules of Criminal Procedure, for the following reasons:

Rule 35(b)(2) states, in pertinent part, upon the government's motion:

> made more than one year after sentencing, the court may reduce the
> sentence if the defendant's substantial assistance involved (C)
> information, the usefulness of which could not reasonably have
> been anticipated by the defendant until more than one year after
> sentencing and which was promptly provided to the government
> after its usefulness was reasonably apparent to the defendant.

EXHIBIT 9      339

Karen Real testified on behalf of the government in the case of *United States v. Kenneth Eugene Barrett*, and her testimony, in the estimation of the undersigned, constituted substantial assistance warranting a reduction of sentence.

The government filed a complaint alleging capital murder against Kenneth Eugene Barrett in September 2004. In preparation for the Indictment, the undersigned caused Karen Jean Real to be writted to the Eastern District of Oklahoma from the Federal Correctional Institution in which she was incarcerated. The undersigned was aware that Ms. Real had common associations with Barrett. It was hoped that Ms. Real had information that would be of assistance in the prosecution of Kenneth Eugene Barrett and that she would be willing to provide that information. Upon Ms. Real's return to the Eastern District of Oklahoma, the undersigned met with her and learned that Ms. Real had, in fact, associated directly with Mr. Barrett for a substantial period of time during the calendar years of 1997 and 1998. Ms. Real was willing to speak truthfully and freely about information relating to Barrett, his drug dealing activities, and his involvement with firearms. Ms. Real spoke freely, openly, and in the opinion of the undersigned, truthfully. The undersigned advised Ms. Real that there was the possibility that she would be utilized as a witness in the ultimate trial against Kenneth Eugene Barrett. She expressed a willingness to testify without hesitation or reluctance.

One of the strategies utilized by the government in the Barrett prosecution was to establish Barrett's substantial drug distribution activities as well as his extensive involvement with firearms and his willingness to utilize those firearms in the advancement of his drug distribution activities, including the utilization of those firearms against law enforcement officials. Ms. Real testified regarding Mr. Barrett's providing her with methamphetamine as well

2

as his commercial methamphetamine business operations of which she was aware. Ms. Real further testified freely at his trial regarding the firearms that Barrett had in his residence. Her testimony revealed that Barrett always carried firearms with him in relation to his drug distribution activities. Ms. Real further testified that any time a vehicle with which Barrett was unfamiliar would approach his residence, he would retrieve a firearm.

Ms. Real met on more than one occasion in preparation for trial testimony with the undersigned. During those pretrial meetings, Ms. Real was fully cooperative, answering all questions to the best of her ability, and suggesting areas about which she might be able to testify which could potentially be beneficial to the government. Especially impressive to the undersigned, Ms. Real freely advised when she was unaware of information in response to specific questions asked of her. While Ms. Real spoke freely about matters of which she was familiar and aware, it was clear that Ms. Real restricted herself to only those items about which she absolutely certain. She never "guessed" in an effort to enhance her testimony, even though it might enure to her benefit. Ms. Real was uncertain as to the exact dates of her involvement with Barrett and her observations of his commercial drug operations. She limited the time frames about which she was able to testify to periods of which she was certain, even though she knew there was the possibility that the Court could rule those time periods to be too remote to allow her testimony even though such would limit her ability to assist the government to her personal disadvantage. The undersigned has no doubt that Ms. Real's testimony was truthful and was limited to subject matters about which she was certain.

While Ms. Real's testimony was delayed for a substantial period of time, Ms. Real presented the information at the earliest possible opportunity for her to assist the government.

<div align="center">3</div>

The government first presented this matter to a grand jury in November 2004. Ms. Real, at approximately that time, was first approached by the government regarding the knowledge she had involving Kenneth Eugene Barrett. At that time, Ms. Real spoke freely and continued to do so during the duration of her assistance to the government.

While ultimately multiple civilian witnesses spoke of Barrett's drug dealing activities, his use of firearms, and his threats to law enforcement, Ms. Real was the first to do so. Her willingness to provide truthful testimony regarding Barrett's activities made it easier for the subsequent witnesses to come forward . She was the first and cooperated willingly and courageously. Her assistance was substantial and created an environment in which others could cooperate as well. She is clearly deserving of a reduction in her sentence in consideration of her efforts.

Respectfully submitted,

SHELDON J. SPERLING
United States Attorney

D. MICHAEL LITTLEFIELD, OBA # 5461
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK 74401
(918) 684-5100

## CERTIFICATE OF MAILING

I hereby certify that on this 1st day of ~~February~~ March, 2006, a true and correct copy of the foregoing was mailed, with proper postage fully prepaid thereon, to: Michael Abel, Attorney for Karen Real, One West Third Street, Suite 1225, Tulsa, OK 74103-3532.

DML:ljh

4

342

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,               )
                                 )
v.                               )    No. CR-00-21-FHS
                                 )
KAREN JEAN REAL,                 )
                                 )
        Defendant.               )

### ORDER

The government has moved the court pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure for an order reducing the sentence of incarceration previously imposed upon Defendant for the following convictions: (1) conspiracy to manufacture, possess with intent to distribute and distribute methamphetamine in violation of 21 U.S.C. § 846 (Count One), (2) maintaining a place for the purpose of manufacturing, distributing and using methamphetamine in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2 (Count Three), and (3) possessing a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c) (Count Five). Having considered the government's motion, the court concludes a reduction of Defendant's sentence of incarceration is warranted under the facts and circumstances as outlined in the government's motion.

Defendant was originally sentenced to a term of 108 months of incarceration on Count One, a concurrent term of 60 months of incarceration on Count Three, and a consecutive term of 60 months of incarceration on Count Five. The total sentence imposed was 168 months (fourteen years) of incarceration. Defendant has been in federal custody since March 2000 – some six years into her fourteen-year sentence. The government's motion under Rule 35 is

1

EXHIBIT 10                                                    343

based upon Defendant's cooperation and testimony during the investigation and subsequent trial of Kenneth Barrett. During the course of the prosecution of Kenneth Barrett, Defendant provided the government with significant information about Kenneth Barrett - information relevant to his drug dealing activities and his involvement with firearms. In the court's opinion, substantial assistance was provided by Defendant in the government's successful federal court prosecution of Kenneth Barrett. Under these circumstances, the court finds Defendant is entitled to some sentencing relief for her substantial assistance provided to the federal authorities.

Turning to the extent of the reduction, the court finds that after having considered the factors enumerated under the policy statement of United States Sentencing Guideline § 5K1.1, a reduction in Defendant's sentence to time served on each of the three counts of conviction is warranted. Consequently, it is ordered that Defendant's sentence be reduced to time served on each of Counts One, Three, and Five, and that Defendant be released from custody forthwith. The original terms of supervised release imposed in this case shall remain in effect.

**IT IS SO ORDERED** this 25th day of April, 2006.

Frank H. Seay
United States District Judge
Eastern District of Oklahoma

2

344

345

## DECLARATION OF BRET A. SMITH

I, BRET A. SMITH, declare under penalty of perjury, pursuant to the laws of the State of Oklahoma and the United States of America, that the following is true and correct:

1.      On May 5, 2005, I was appointed as Roger Hilfiger's co-counsel to Kenneth Eugene Barrett in the federal death penalty case *United States v. Barrett* (Eastern District of Oklahoma case no. 04-CR-115-JHP).

EXHIBIT 11

Executed at Muskogee, Oklahoma this 5th day of May, 2010:

_____
BRET A. SMITH

DECLARATION OF ROGER HILFIGER

I, Roger Hilfiger, declare under penalty of perjury, pursuant to the laws of the State of Oklahoma and the United States of America, that the following is true and correct:

1. I was an attorney for Kenneth Eugene Barrett in the federal death penalty case *United States v. Barrett* (Eastern District of Oklahoma case no. 04-CR-115-JHP).

EXHIBIT 12

Executed at Muskogee, Oklahoma May 17, 2010.


_____
Roger Hilfiger



EXHIBIT 13



EXHIBIT 14



EXHIBIT 15



EXHIBIT 16



EXHIBIT 17

EXHIBIT 18

# EXHIBIT 19

EXHIBIT 20

153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.)))**

H

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter. See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Tenth Circuit Rule 32.1. (Find CTA10 Rule 32.1)

United States Court of Appeals,
Tenth Circuit.
Blake SCOTT, Petitioner-Appellant,
v.
Joe ROMERO, Warden, Central New Mexico Correctional Facility; Attorney General for the State of New Mexico, Respondents-Appellees.
**No. 04-2262.**

Nov. 2, 2005.

**Background:** State prisoner sought habeas corpus relief. The United States District Court for the District of New Mexico, adopting the magistrate judge's recommendation, denied relief. Prisoner applied for certificate of appealability (COA).

**Holdings:** The Court of Appeals, Terrence L. O'Brien, Circuit Judge, held that:
(1) fair trial and *Brady* claims were procedurally defaulted, and
(2) state court's finding that counsel was not ineffective was not unreasonable application of federal law.

Application denied; appeal dismissed.

West Headnotes

**[1] Habeas Corpus 197 ⬤⟿422**

197 Habeas Corpus
 197I In General
  197I(D) Federal Court Review of Petitions by State Prisoners
   197I(D)6 State's Reliance on or Waiver of Procedural Bar or Want of Exhaustion
    197k422 k. State Court Decision on Procedural Grounds, and Adequacy of Such Independent State Grounds. Most Cited Cases
Petitioner's procedural default as to post-conviction relief in New Mexico, with petitioner deemed to have waived post-conviction claims of denial of fair trial and prosecution's *Brady* due process violation because such claims had not been raised on direct appeal, was independent and adequate state procedural ground for default, and thus, petitioner was procedurally barred from bringing federal habeas corpus claim unless he demonstrated cause and prejudice or fundamental miscarriage of justice. U.S.C.A. Const.Amends. 6, 14; 28 U.S.C.A. §§ 2253(c)(2), 2254.

**[2] Habeas Corpus 197 ⬤⟿486(4)**

197 Habeas Corpus
 197II Grounds for Relief; Illegality of Restraint
  197II(B) Particular Defects and Authority for Detention in General
   197k482 Counsel
    197k486 Adequacy and Effectiveness of Counsel
     197k486(4) k. Evidence; Procurement, Presentation, and Objection. Most Cited Cases
State court's finding that allegedly deficient performance of trial counsel, in failing to object to admission of recording of defendant's telephone call from police station to his mother, was not prejudicial, as element of ineffective assistance of counsel, because objection would have been futile, was not unreasonable application of federal law, and thus, defendant was not entitled to federal habeas corpus relief. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2254(d).

**[3] Habeas Corpus 197 ⬤⟿693**

197 Habeas Corpus

ATTACHMENT ONE

153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.)))**

197III Jurisdiction, Proceedings, and Relief
197III(C) Proceedings
197III(C)1 In General
197k691 Dismissal
197k693 k. Proceedings. Most Cited Cases

The rules governing habeas corpus cases did not prohibit state from filing pre-answer motion to dismiss state prisoner's petition for federal habeas corpus relief. 28 U.S.C.A. § 2254.

**\*496** Patricia A. Gandert, Office of the Attorney General State of New Mexico, Santa Fe, NM, for Respondents-Appellees.

Before KELLY, O'BRIEN, and TYMKOVICH, Circuit Judges.

**ORDER DENYING CERTIFICATE OF AP-PEALABILITY AND DISMISSING APPEAL**

TERRENCE L. O'BRIEN, Circuit Judge.

**\*\*1** After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R.App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Petitioner-Appellant Blake Scott, a state prisoner appearing *pro se,*[FN1] seeks a certificate of appealability (COA) allowing him to appeal the district court's order denying his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He also moves to proceed *in forma pauperis* (*ifp* ) on appeal. Because we conclude Scott's claims are procedurally barred and without merit, we deny a COA and dismiss the appeal.

> FN1. We construe *pro se* pleadings liberally. *Ledbetter v. City of Topeka, Kan.,* 318 F.3d 1183, 1187 (10th Cir.2003).

The parties are familiar with the facts and we need not restate them here. On appeal, Scott reasserts three claims he presented in the district court, specifically 1) he received ineffective assistance of counsel in his state court trial when counsel failed to object to the admission of a recording of Scott's telephone call from the police station; 2) that the prosecution violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding letters he had written to his mother-in-law and then only placing part of the letters into evidence; and, 3) that his Sixth Amendment rights were violated when the district court failed to allow him to present exculpatory evidence.[FN2] The magistrate judge recommended Scott's claims be dismissed because the *Brady* and Sixth Amendment claims were procedurally barred and all three claims were without merit. The district court adopted the magistrate's recommendations and dismissed Scott's habeas petition. In addition to his three claims, Scott also challenges the district court's allowance of the State's motion to dismiss prior to its filing of an answer to his habeas petition.

> FN2. In his petition before this Court, Scott argues he "was denied a fair and impartial trial." (COA Petition at 3.) Although he does not articulate the precise basis for this claim in his COA petition, this is the same language used in his Sixth Amendment claim before the district court.

*Analysis*

Unless this Court issues a COA, Scott may not appeal the dismissal of his § 2254 petition. 28 U.S.C. § 2253(c)(1)(A). "[Section] 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.' " *Miller-El v. Cockrell,* 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (quoting § 2253(c)(2)). To make the requisite showing, a petitioner must demonstrate "that reasonable jurists**\*497** could debate whether ... the petition should have been resolved in a different man-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.)))**

ner or that the issues presented were adequate to deserve encouragement to proceed further." *Id.* (quotation marks and citation omitted).

"When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further. In such a circumstance, no appeal would be warranted." *Id.* "[W]hen reviewing the merits of a claim already decided by the state courts, we are bound to deny relief unless the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.' " *LaFevers v. Gibson,* 182 F.3d 705, 711 (10th Cir.1999) (quoting 28 U.S.C. § 2254(d)).

**\*\*2** [1] With these principles in mind, we have carefully reviewed the record and agree with the district court's conclusions. Scott does not dispute that he failed to raise either his *Brady* or Sixth Amendment claims in his direct appeal. Under New Mexico law, Scott is deemed to have waived these claims by failing to raise them on direct appeal. *Duncan v. Kerby,* 115 N.M. 344, 851 P.2d 466, 468 (1993). "On habeas review, this Court will not consider issues that have been defaulted in state court on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." *Hickman v. Spears,* 160 F.3d 1269, 1271 (10th Cir.1998). This Court has previously held that New Mexico's procedural bar at issue here is an in-

dependent and adequate state procedural ground. *Jackson v. Shanks,* 143 F.3d 1313, 1318 (10th Cir.1998) ( "Our review of New Mexico cases indicates that New Mexico courts have consistently and even handedly applied the rule waiving issues not raised on direct appeal for purposes of post-conviction relief."). Scott has failed to demonstrate cause that would avoid the procedural bar with respect to his *Brady* and Sixth Amendment claims. *See Coleman v. Thompson,* 501 U.S. 722, 754, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("the petitioner ... must bear the burden of a failure to follow state procedural rules.").

[2] In reviewing Scott's ineffective assistance of trial counsel claim, the Dona Ana County, New Mexico District Court evaluated whether trial counsel's failure to object to the admission of a recording of Scott's telephone call from the police station to his mother was ineffective. Although it questioned defense counsel's trial strategy, it noted any error was not prejudicial because any objection would have been futile. Applying *New Mexico v. Coyazo,* 123 N.M. 200, 936 P.2d 882 (1997), the district court held Scott had no reasonable expectation of privacy in a phone call made from the police station, especially where his comments indicated his awareness that the police were listening. This is not an unreasonable application of federal law. *See United States v. Turner,* 209 F.3d 1198, 1200-01 (10th Cir.2000) (no objective expectation of privacy in conversation conducted in a patrol car). Counsel is **\*498** not ineffective for failing to advance a futile argument. *See Dever v. Kansas State Penitentiary,* 36 F.3d 1531, 1537 (10th Cir.1994) ( "To be ineffective, the representation must have been such as to make the trial a mockery, sham, or farce, or resulted in the deprivation of constitutional rights.").

[3] Finally, Scott's objection to the district court's allowance of a motion to dismiss his habeas petition is based on a misreading of the Rules Governing Habeas Corpus Cases Under Section 2254. Rule 4 directs the district court judge to either dismiss the case if the petitioner "plainly is not entitled to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.)))**

relief" or "order the respondent to file an answer, *motion,* or other response." (emphasis added). Rule 5(a) explains that "[t]he respondent is not required to answer the petition unless a judge so orders." The Advisory Committee Notes to the 2004 Amendments state that the revised Rule 5 "does not address the practice in some districts, where the respondent files *a pre-answer motion to dismiss the petition.* But revised Rule 4 permits that practice and reflects the view that if the court does not dismiss the petition, it may require (*or permit* ) the respondent to file a *motion.*" (emphasis added). The rules do not prohibit the State from filing a motion to dismiss prior to filing an answer and the Advisory Committee Notes specifically recognize the district court's discretion to allow the filing of such motion in lieu of an answer. His claim of judicial misconduct is without merit.

**\*\*3** Because Scott's petition is wholly without merit, he has failed to show the existence of a reasoned, nonfrivolous argument on the law and facts in support of the issues he raises on appeal. Accordingly, we deny his request to proceed *ifp* on appeal.

*Conclusion*

Based on the above, we **DENY** Scott's request for a COA and **DISMISS** the appeal. We also **DENY** his motion for leave to proceed *ifp* on appeal. Scott shall remit the full amount of the filing fee within twenty (20) days of the date of this order.

C.A.10 (N.M.),2005.
Scott v. Romero
153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

287 Fed.Appx. 649, 2008 WL 2725857 (C.A.10 (Utah))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 287 Fed.Appx. 649, 2008 WL 2725857 (C.A.10 (Utah)))**

H

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter. See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Tenth Circuit Rule 32.1. (Find CTA10 Rule 32.1)

United States Court of Appeals,
Tenth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Scott D. HEMSLEY, Defendant-Appellant.
**No. 07-4222.**

July 11, 2008.

**Background:** Defendant pleaded guilty in the United States District Court for the District of Utah to manufacture or attempted manufacture of methamphetamine and possession of firearm by restricted person. Defendant appealed. The Court of Appeals, 160 Fed.Appx. 804, affirmed. Defendant filed motion to vacate. The District Court, 2007 WL 2358622, denied motion, and, 2007 WL 3275305, denied defendant's request for certificate of appealability (COA). Defendant requested COA permitting his appeal.

**Holdings:** The Court of Appeals, Paul J. Kelly, Jr., Circuit Judge, held that:
(1) defendant was not prejudiced by defense counsel's failure to object to district court's adoption of iodine-to-methamphetamine conversion ratio of 33% at sentencing, and
(2) defense counsel did not render deficient performance by failing to raise *Booker* objection to judge-found facts that were basis for increase in defendant's sentence.

Request for certificate of appealability denied; appeal dismissed.

West Headnotes

**[1] Criminal Law 110 ⚷1957**

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)2 Particular Cases and Issues
            110k1952 Sentencing in General
               110k1957 k. Other Particular Issues. Most Cited Cases
Defendant, who pleaded guilty to manufacture or attempted manufacture of methamphetamine and possession of firearm by restricted person, did not show reasonable probability that he would have received different sentence had defense counsel objected to iodine-to-methamphetamine conversion ratio of 33% adopted by district court in calculating defendant's sentence, as required to establish prejudice prong of claim of ineffective assistance of counsel based on counsel's failure to object. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. § 922(g)(3); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 401(a)(1), 21 U.S.C.A. § 841(a)(1).

**[2] Criminal Law 110 ⚷1957**

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)2 Particular Cases and Issues
            110k1952 Sentencing in General
               110k1957 k. Other Particular Issues. Most Cited Cases
Defense counsel did not render deficient performance, as required to establish ineffective assistance of counsel, by failing to predict future law by raising *Booker* objection to judge-found facts that were basis for increase in defendant's sentence. U.S.C.A. Const.Amend. 6.
**\*650** Diana Hagen, Office of the United States Attorney, Salt Lake City, UT, for Plaintiff-Appellee.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

287 Fed.Appx. 649, 2008 WL 2725857 (C.A.10 (Utah))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 287 Fed.Appx. 649, 2008 WL 2725857 (C.A.10 (Utah)))**

Scott D. Hemsley, Safford, AZ, pro se.

Before TACHA, KELLY, and McCONNELL, Circuit Judges.

### ORDER DENYING CERTIFICATE OF APPEALABILITY

PAUL KELLY, JR., Circuit Judge.

**\*\*1** Scott Hemsley, a federal inmate appearing pro se, seeks a certificate of appealability ("COA") so that he may challenge the district court's denial of his 28 U.S.C. § 2255(a) motion to vacate, set aside, or correct his sentence. Mr. Hemsley pleaded guilty to the manufacture or attempted manufacture of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and possession of a firearm by a restricted person in violation of 18 U.S.C. § 922(g)(3). The district court sentenced him to 188 months' imprisonment followed by five years' supervised release. His conviction was affirmed on direct appeal. *See United States v. Hemsley,* 160 Fed.Appx. 804 (10th Cir.2005) (unpublished). He then sought relief pursuant to § 2255, asserting two claims of ineffective assistance of counsel, a claim of constitutional *Booker* error, and a claim that his sentence is unconstitutional under *Cunningham v. California,* 549 U.S. 270, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007). He does not pursue his *Cunningham* claim on appeal. The district court denied relief. Having determined that Mr. Hemsley has not made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), we deny a COA and dismiss his appeal, *see Slack v. McDaniel,* 529 U.S. 473, 483-84, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Although Mr. Hemsley also argues that he should receive a COA based upon the government's failure to serve him its response to his petition and the district court's failure to fix a time for him to reply, Mr. Hemsley has not explained how these events deprived him of the ability to make a substantial showing of the denial of a constitutional right.

[1] We recounted the facts underlying Mr. Hemsley's case on direct appeal and need not restate them here. *See Hemsley,* 160 Fed.Appx. at 805-06. Mr. Hemsley first contends that his counsel was ineffective for failing to object to the iodine-to-methamphetamine conversion ratio of 33% adopted by the district court. A criminal defendant asserting ineffective assistance of trial counsel must show both deficient performance and prejudice to his defense in order to receive post-conviction relief. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Mr. Hemsley argues that the prejudice to him was that, on direct appeal, we reviewed his claim for plain error instead of at a lower standard. This argument misunderstands the required showing of prejudice. Mr. Hemsley must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052, *i.e.,* that he would have likely received a different sentence had his counsel objected. Mr. Hemsley has not made this showing and we doubt on these facts that he could do **\*651** so, particularly where the district court held an evidentiary hearing on the drug-conversion issue and received a memorandum from a Drug Enforcement Administration representative saying that 33% was an ultra-conservative ratio. *Hemsley,* 160 Fed.Appx. at 807-08.

**\*\*2** [2] Second, Mr. Hemsley argues that his counsel was ineffective for failing to raise a *Booker* objection to the judge-found facts that were the basis for the increase in his sentence. We agree with the district court that because Mr. Hemsley was sentenced on December 8, 2003, before *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) was decided on January 12, 2005, his counsel was not ineffective "for failing to predict future law," *Bullock v. Carver,* 297 F.3d 1036, 1052 (10th Cir.2002) (quotation omitted).

Finally, Mr. Hemsley argues that his sentence violated the Sixth Amendment because it was increased based on judge-found facts. The district court cor-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

287 Fed.Appx. 649, 2008 WL 2725857 (C.A.10 (Utah))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 287 Fed.Appx. 649, 2008 WL 2725857 (C.A.10 (Utah)))**

rectly explained that *Booker* is not retroactive, relying on *United States v. Bellamy,* 411 F.3d 1182, 1186 (10th Cir.2005). On appeal, Mr. Hemsley argues that *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), was decided before he was sentenced and makes his sentence unconstitutional. However, *Apprendi* does not apply to sentencing factors which increase a defendant's guideline range but do not increase the sentence above the statutory maximum. *United States v. Willis,* 476 F.3d 1121, 1131 n. 3 (10th Cir.2007).

We DENY the motion for a COA and DISMISS the appeal.

C.A.10 (Utah),2008.
U.S. v. Hemsley
287 Fed.Appx. 649, 2008 WL 2725857 (C.A.10 (Utah))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

Only the Westlaw citation is currently available.

United States District Court,
D. Idaho.
Paul Ezra RHOADES, Petitioner,
v.
A.J. ARAVE, Warden, Respondent.
**No. CV 93-0155-S-EJL (Bingham County).**

May 24, 2007.

Dennis Benjamin, Nevin, Herzfeld, Benjamin & McKay, Boise, ID, Joan M. Fisher, Federal Defender's Office, Oliver Winston Loewy, Federal Defenders of Eastern Washington and Idaho, Moscow, ID, for Petitioner.

Kenneth M. Robins, Office of Attorney General, Criminal Law Division, Lynn E. Thomas, Boise, ID, for Respondent.

### MEMORANDUM DECISION AND ORDER

Honorable EDWARD J. LODGE, U.S. District Judge.

**\*1** Paul Ezra Rhoades has been convicted of murder, and other associated felonies, for the shooting deaths of Stacy Baldwin, Susan Michelbacher, and Nolan Haddon, all of whom were killed during an approximately three week period in February and March of 1987. After separate jury trials, Petitioner was sentenced to death in both the Michelbacher and Baldwin cases. Petitioner entered a conditional guilty plea in the Haddon case, and he received two indeterminate life sentences. This habeas corpus matter arises from the state court's judgment in the Baldwin case.

The Court previously dismissed several claims as procedurally defaulted or otherwise lacking in merit. (Docket No. 149.) Currently at issue are the merits of the following claims in the Third Amended Petition: 1-3, 5, 7-13, 15-18, 23, 27-29. After considering the pleadings, briefing, and record, the Court concludes that Petitioner is not entitled to relief. Accordingly, this cause of action shall be dismissed.

### I.

### FACTUAL BACKGROUND

In the late winter of 1987, Petitioner, described as a large man with a "pear shape" and long hair, was seen loitering around convenience stores in the Blackfoot and Idaho Falls area. In one instance, he was observed pulling a hood around his face and peering through a window at a female employee as she was preparing to close a store. On a different occasion, a clerk noticed the outline of a gun and a holster underneath Petitioner's sweatshirt. One particular store that Petitioner had visited was the Red Mini Barn in Blackfoot.

Around 9:45 p.m. on February 27, 1987, Stacy Baldwin arrived at the Mini Barn to assume her usual duties as the overnight clerk. Another employee continued to work with her for about an hour, leaving her alone after 11:00 p.m.

A little past midnight, three girls were approaching the Mini Barn when they saw a man hurriedly leave the store, get into a pickup, and drive away in a reckless manner. As the vehicle passed very near seventeen-year-old Carrie Baier, she could see that another person was sitting next to the driver. Neither she nor her friends would be able to identify the man who was driving, and although their initial descriptions of that person generally did not fit Petitioner's physical attributes, they would later positively match the pickup to a distinctive vehicle that was used by the Rhoades family in their snow plowing business. Petitioner frequently drove this

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

truck.

When Baier arrived the Mini Barn, she noticed that no employee was present. The police were summoned, as was the owner, who discovered that $249 was missing from the cash register. The last recorded transaction occurred 12:15 a.m.

Around 2:00 a.m., Petitioner appeared at a restaurant in the vicinity of the Mini Barn, where he had a cup of coffee with an unidentified male. The waitress who served them remembered Petitioner because of his large size, his ponytail, and the construction dust on his clothes. Petitioner and his companion were not talkative, and they left after about thirty minutes.

**\*2** Baldwin was found dead the next morning near some garbage dumpsters on an access road leading to an archery range. She had been shot three times, but a pathologist would later conclude that she may have lived for a period of time after the fatal wound had been inflicted. Police officers photographed several large shoe prints in the snow, which appeared to be of the same pattern and size as prints that they had observed at the Mini Barn. At that time, however, law enforcement officers had no firm leads or suspects.

Two weeks later, Nolan Haddon was shot to death while he was working at a convenience store in Idaho Falls. Three days later, Susan Michelbacher was abducted from a store parking lot in Idaho Falls, taken to a remote location, raped, and shot to death.

Detective Dennis Shaw, assigned to the Haddon case, was reviewing the Baldwin crime scene photographs when his attention was drawn to the footprints left in the snow. Shaw believed that these prints matched known prints left by Petitioner's boots, which he had photographed during an unrelated investigation. Based on this evidence, a teletype was issued notifying all law enforcement officers in the area that Petitioner was wanted for questioning. Also around this time, Petitioner's

mother reported that her Ford sedan had been stolen.

On March 24, two truck drivers saw the Ford sedan parked on a highway median in Northern Nevada. A person matching Petitioner's description exited the car, fumbled with something in his hands, and then jogged off into the sagebrush. A highway patrolman who responded to the scene found a .38 caliber handgun laying on the ground near the open door of the car. Ballistics testing would confirm that this weapon had fired the bullets in all three Idaho homicides.

Idaho authorities proceeded to Nevada armed with a warrant for Petitioner's arrest for burglary. Once there, they processed Pauline Rhoades's car for evidence and found, among other items, a holster and ammunition that matched the type used in the homicides. Investigators would later learn that Petitioner had purchased this ammunition from a gun store in Idaho Falls.

On March 25, Nevada law enforcement officers arrested Petitioner while he was gambling at the Four-Way Truck Stop and Casino in Wells. Detective Shaw and another Idaho officer, Victor Rodriguez, arrived shortly thereafter; as they approached Petitioner, he looked up at them and blurted out, "I did it." Upon hearing this, Rodriguez read Petitioner his *Miranda* warnings. Detective Shaw then frisked Petitioner and discovered an inexpensive watch like that worn by Stacy Baldwin the night she was killed, which Petitioner claimed to have found in a "barrow pit."

Petitioner was transported from the truck stop to a highway patrol substation for processing, where Detective Shaw remarked that if he arrested him sooner, three murder victims might still be alive. Petitioner responded to this comment by again saying, "I did it."

**\*3** At the time of his arrest, Petitioner's boots were photographed and confiscated, and a criminalist working for the State would conclude that the pat-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

tern from these boots were consistent with the prints at the crime scene. A sample of Petitioner's hair was also taken, and another criminalist determined that the sample was consistent with a hair that had been found on Baldwin's blouse when her body was discovered.

The State charged Petitioner with the murders of Baldwin, Haddon, and Michelbacher, but it proceeded with separate prosecutions in Bonneville and Bingham Counties. The district court in Bonneville County severed the Michelbacher and Haddon charges for trial purposes, and Petitioner was first tried and found guilty of all charges in the Michelbacher matter.

Before trial in Bingham County, a jail inmate named David Holm came forward and told the prosecutors that Petitioner had confessed to him. According to Holm, Petitioner admitted that he had kidnapped Baldwin from the Mini Barn and took her to the archery range intending to rape her, but that he was unable to do so because she was hysterical and screaming. Petitioner allegedly told her to pray before he fired several shots at her, finally hitting her twice in the back. Holm claimed that Petitioner briefly considered throwing Baldwin in one of the nearby dumpsters, but he decided against that course of action because he did not want to get bloody.

The district court in Bingham County excluded evidence that was related solely to the Bonneville County murders, but it allowed all of the other evidence recited above. In his defense, Petitioner, who did not testify, presented his mother's testimony that he was at home babysitting on the night that Baldwin was killed. He called several witnesses who claimed that David Holm was a manipulative and untruthful person, and he presented evidence related to the general availability of boots that could have made the prints at the crime scene and watches similar to the one found on Petitioner. A psychologist also testified about the unreliability of eyewitness identification.

After all of the evidence had been presented, the jury found Petitioner guilty of murder in the first degree, kidnapping in the first degree, and robbery. After an aggravation and mitigation hearing, the state court sentenced him to death for murder and kidnapping, and to fixed life in prison for robbery. The court enhanced the sentences by an additional fifteen years for the use of a firearm during the commission of the crimes.

## II.

### STATE AND FEDERAL POST-CONVICTION PROCEEDINGS

In accordance with Idaho's special procedure applicable to capital cases, Petitioner sought post-conviction relief before completing his direct appeal. The Idaho Supreme Court consolidated the appeal from the district's denial of post-conviction relief with the direct appeal and affirmed in all respects. *State v. Rhoades,* 120 Idaho 795, 820 P.2d 665 (Idaho 1991) (*Rhoades I* ).

**\*4** In 1993, Petitioner filed a Petition for Writ of Habeas Corpus, which he amended twice, raising twenty-seven habeas claims. On April 10, 1997, after the parties had completed briefing on procedural default issues, the Court entered an order dismissing all or part of eleven habeas claims, one of which contained Petitioner's allegations of ineffective assistance of trial counsel.[FN1] (Docket No. 149.) One year later, the Court denied Petitioner's motion for an evidentiary hearing. (Docket No. 167.) Petitioner thereafter returned to state court in an effort to exhaust additional constitutional claims, but the Idaho Supreme Court concluded that his new post-conviction petition was untimely. *Rhoades v. State,* 135 Idaho 299, 17 P.3d 243 (Idaho 2001) (*Rhoades II* ). Subsequently, this Court granted Petitioner leave to amend his Petition yet again to add two new claims, which are included as Claims 28 and 29 in the Third Amended Petition, filed on September 27, 2001. (Docket Nos.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

251 & 252.)

> FN1. Claims of ineffective assistance of appellate counsel were not dismissed.

While this habeas case was pending, the Ninth Circuit Court of Appeals decided *Hoffman v. Arave,* 236 F.3d 523 (9th Cir.2001). In *Hoffman,* the Court of Appeals held that Idaho's forty-two day time limitation for bringing all post-conviction claims, coupled with the state court's failure to appoint new counsel during that time, frustrated the petitioner's right to raise claims of ineffective assistance of counsel in state court. *Id.* at 535. The procedural default of such claims under those circumstances would be excused. In light of *Hoffman,* this Court reconsidered its earlier decision to dismiss Petitioner's claims of ineffective assistance of trial counsel, and the parties were allowed to submit supplemental briefing to separate triable issues from issues that could be decided as a matter of law. (Docket No. 290.)

On May 18, 2006, the Court issued a Memorandum Decision and Order denying an evidentiary hearing on most allegations of ineffective assistance of trial counsel, but the Court reserved its decision in one limited area. (Docket No. 312, p. 1.) The Court then ordered supplemental briefing on the merits of all non-dismissed habeas claims. The parties have now submitted their supplemental briefing, and Petitioner has lodged numerous documents that he intends to comprise a factual proffer in support of his allegation of ineffective assistance of counsel at the penalty phase of the trial.

The Court has considered the pleadings, the record, and the parties' briefing, and it is now prepared to rule.

## III.

## HABEAS STANDARDS

Because this case was initiated before the enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA), it is not governed by AEDPA's provisions. *Lindh v. Murphy,* 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

Under pre-AEDPA law, the Court must presume that the state court's findings of historical fact are correct and defer to those findings unless there is convincing evidence to the contrary or a lack of fair support in the record. 28 U.S.C. § 2254(d) (1994); *Mayfield v. Woodford,* 270 F.3d 915, 922 (9th Cir.2001). The Court exercises its independent judgment over questions of federal law and must resolve legal issues on the merits under ordinary rules. *Summerlin v. Schriro,* 427 F.3d 623, 628-29 (9th Cir.2005).

## IV.

## ANALYSIS

### *Claim 1: Jury Bias*

**\*5** In first claim for relief, Petitioner alleges that he was deprived of his constitutional right to be tried by an impartial jury. The state trial court conducted a hearing to investigate this matter and concluded that all jurors could remain fair and impartial. Because this finding is fairly supported by the record, Petitioner is not entitled to relief.

1. *Standard of Law*

A criminal defendant has a fundamental right under the Sixth and Fourteenth Amendments to a fair trial by an impartial jury. *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). To be impartial, the jury must be "capable and willing to decide the case solely on the evidence before it." *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 554, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). Actual bias is "the existence of a state of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

mind that leads to an inference that the person will not act with entire impartiality.' " *United States v. Gonzalez,* 214 F.3d 1109, 1112 (9th Cir.2000). Even if just a single juror is biased, the defendant has been denied his right to fair trial. *Dyer v. Calderon,* 151 F.3d 970, 973 (9th Cir.1998).

The determination whether a particular juror is biased is highly dependent on credibility and demeanor, and when a state court has conducted an investigation that is "reasonably calculated to resolve the doubts raised about the juror's impartiality," its ultimate determination on this issue is a finding of fact that is presumed to be correct in a federal habeas proceeding. *Dyer,* 151 F.3d at 974-75; *see also Patton v. Yount,* 467 U.S. 1025, 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). A state court's finding that a juror can be fair and impartial will be upheld as long as it is fairly supported by the record. *Patton,* 467 U.S. at 1036-37.

2. *Discussion*

In the present case, prospective juror Dennis Webster was questioned during voir dire and passed for cause. At the conclusion of voir dire, the prosecution and the defense made their peremptory challenges and a recess was called. During that recess, Deputy Sheriff Edgar Smith allegedly overheard Webster say to another prospective juror, Roy Hinrichs, "you can just look at him and tell he's guilty. I think you ought to hang the sucker." [FN2] Webster was eventually seated on the jury, and Hinrichs was seated as an alternate. Deputy Smith reported the comment to his supervisor at the end of the day and submitted a written report.

> FN2. Deputy Smith was unsure whether Webster used the word "sucker" or a more profane expletive.

Upon being informed of Smith's report, the state trial court convened a hearing. The court and counsel examined Smith extensively about the circumstances surrounding Webster's supposed comment, including when the comment was made, who was present, and what was said. Following that testimony, Webster and Hinrichs were each questioned individually by the court; Webster denied making the comment, and Hinrichs denied overhearing it. Next, all other members of the jury panel were questioned individually. Each denied hearing the statement, and each claimed that they had not formed an opinion about the case. At every point in this process, the prosecuting attorney and defense counsel were given opportunities to ask questions of the witnesses.

**\*6** After finishing the inquiry, the trial court denied Petitioner's motion for a mistrial, concluding that Webster and Hinrichs would be fair and impartial jurors:

> There was a so called out of court statement-or in court statement that one of our officers overheard. Testified he overheard. There's some matters about that situation that I'm not really certain exactly when it was said. *And I do for this purpose assume there was something perhaps said. In other words, I'm not going to make a finding of fact as to who said what.*
>
> I am going to make a finding though as I look at these gentlemen that have testified that whatever might or might not have been said, that they are of the frame of mind that they have not formed or expressed an opinion as to the innocence of [sic] guilt of the defendant. That they can sit as fair and impartial jurors. And that's a requirement of the court to make sure that that's done.

(Tr. Vol.III, pp. 780-81.) (Emphasis added.)

Petitioner now argues that the trial court assumed that Webster had made the precise statement that Deputy Smith attributed to him but then erroneously concluded that Webster and Hinrichs could still be fair and impartial. (Docket No. 124, pp. 8-15; Docket No. 316, pp. 1-6.) The Court does not share Petitioner's interpretation of the record. While

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

it is true that trial court noted that "there was something perhaps said," it specifically declined to "make a finding of fact as to who said what." (Tr. Vol.III, pp. 780-81.) In other words, the trial court made no assumptions or findings as to the content of anything that might have been said.

Moreover, the trial court revisited this issue during the post-conviction proceeding and made additional findings. When confronted with new affidavits from Deputy Smith containing, in part, second-hand allegations of collusion in jury selection between the prosecutors, county sheriffs, and even the trial judge-accusations that were contradicted by other witnesses-the trial court noted that Smith "lacks credibility with the Court." (R. PCR., p. 147.) The court also found that "Smith was not in a position to hear the conversation that he claims he heard and that any conversation he heard did not include the jurors on the jury panel." (R. PCR, pp. 147-48.)

Therefore, the record shows that the state court conducted an investigation that was "reasonably calculated to resolve the doubts raised about the juror's impartiality," *see Dyer,* 151 F.3d at 974-75, and its ultimate finding of impartiality is presumed to be correct. That finding is also fairly supported by the record. *Patton,* 467 U.S. at 1036-37. Dennis Webster flatly denied making the comment that Deputy Smith said he made, and Hinrichs denied hearing it. All other jurors told the court that they did not hear the comment and that they could remain fair and impartial. To the extent that Smith's testimony may have conflicted with Webster's denial, the trial court was in the best position to gauge the demeanor and credibility of the witnesses and to resolve any conflicts. Petitioner points to no other evidence that rebuts the state court's factfinding on this issue.

**\*7** The thoroughness of the investigation in this case separates it from *Dyer v. Calderon.* There, after it became apparent that a juror may have been dishonest during voir dire, the trial court briefly questioned her in chambers. *Id.* at 974-75. This superficial inquiry lasted no more than five minutes,

and the court accepted the juror's implausible explanations at face value, without probing any deeper, despite being alerted to evidence that strongly suggested that she had lied. *Id.* Because the state court failed to develop the material facts, the Ninth Circuit held that the finding of impartiality was not entitled to deference on habeas review. *Id.* at 979. Liberated from this finding, the Ninth Circuit independently reviewed the record and determined that the juror had "lied, and lied repeatedly." *Id.* at 981.

Here, unlike *Dyer,* the state court conducted a thorough and complete investigation, which included the questioning of Deputy Smith, Webster, Hinrichs, and all other sitting jurors. Aside from Smith's allegations, which were examined in great detail, the court had no other reason to believe that Webster had been dishonest. This is in stark contrast to *Dyer,* where the trial court chose to ignore readily available evidence that was contrary to the juror's innocent explanations. *Dyer* does not control the result here. [FN3]

> FN3. Petitioner also cites *Fields v. Brown,* 431 F.3d 1186, 1194 (9th Cir.2005). *Fields* has since been withdrawn from publication and is awaiting review *en banc.* 465 F.3d 397 (9th Cir.2006). Regardless, *Fields* would not help Petitioner. In that case, the state courts made no factual findings on the issue of bias, so no deference was due on habeas. *Fields v. Woodford,* 309 F.3d 1095, 1103, 1106 (9th Cir.2002).

Petitioner alternatively contends that even if he cannot show actual bias, Webster's bias must be implied. Petitioner is correct in noting that the Ninth Circuit has held that bias can be implied in "extraordinary cases," such as when a juror has a close relationship with some aspect of the litigation, or, as in *Dyer,* when the juror clearly lied to secure a seat on the jury. *Id.* at 984; *see also Green v. White,* 232 F.3d 671, 675-76 (9th Cir.2000) (following *Dyer,* bias was presumed because the evidence presented in state court showed that the juror had engaged in a "pattern of lies"). But Peti-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

tioner's argument for implied bias suffers from the same flaw as his argument for actual bias; that is, contrary to his assertion, the trial court did not assume that Webster had actually said, "you can just look at him and tell he's guilty," and the court did not make contradictory findings.

As a result, Petitioner has not shown, based on the factual record developed in state court after a full and fair hearing, that he was denied his constitutional right to an impartial jury.

### Claim 2: Alleged Brady Violations

Relying on *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Petitioner alleges that his constitutional right to due process of law under the Fourteenth Amendment was violated when the prosecution withheld the following items from the defense: (1) two police reports that included incriminating statements from an individual named Kevin Buchholz; (2) information regarding Buchholz's criminal and mental health history; (3) Detective Dennis Shaw's police report relating to a discussion that he had with Petitioner after his arrest; and (4) a videotaped statement by eyewitness Loretta Wallace.

**\*8** For the reasons that follow, the Court concludes that Petitioner has not shown a *Brady* violation.

### 1. *Standard of Law*

It is well established that the prosecution has a duty under the due process clause of the Fourteenth Amendment to disclose exculpatory evidence to the defense that is material to guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A meritorious *Brady* claim contains three essential components: (1) the evidence must be favorable to the accused, either because it is exculpatory or impeaching; (2) the prosecution must have withheld the evidence, either intentionally or inad-

vertently; and (3) the evidence must be material to guilt or punishment. *Strickler v. Greene,* 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

Suppressed evidence is material under *Brady,* and its non-disclosure is prejudicial, when there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. *Bagley,* 473 U.S. at 682; *Kyles v. Whitley,* 514 U.S. 419, 433-34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). In assessing materiality, the court must review the evidence collectively, rather than item by item. *Kyles,* 514 U.S. at 433-34.

### 2. *Kevin Buchholz*

#### (a) *Background*

Two weeks after Stacy Baldwin's murder, Kevin Buchholz was arrested on a drunk and disorderly charge in Firth, Idaho. Buchholz told the arresting officer, Joseph Love, that if he was going to jail on what he considered to be bogus charges, Love might as well add a murder charge, too, because he "was the one who killed the girl at the Mini Barn." (PCR Tr., pp. 254-55.) Love prepared a written statement that included this information.

After he had been placed in a holding cell, Buchholz continued his tirade, informing the jailor, Larry Christian, that he had shot "the girl" from the Mini Barn twice in the back, though he had fired at her several times with a .38 caliber or a nine millimeter handgun. (PCR Tr., pp. 145, 193.) He claimed to have stolen a green pickup, which he abandoned after committing the crime. (PCR Tr., p. 146.) Christian also prepared a report reflecting his exchange with Buchholz. (PCR Tr., p. 147.)

Within a few days, the lead investigator in the Baldwin case, James Jackson, learned of Buchholz's statements. (PCR Tr., p. 252.) Jackson brought Buchholz to the police station, where he was fingerprinted, photographed, and interviewed for two to three hours. (PCR Tr., p. 254.) Buchholz

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

admitted making some of the statements, denied others, and asserted that the entire "confession" was untrue and made out of anger because he believed the arresting officer was piling on charges. (PCR Tr., pp. 254-55.) He also claimed that he had been at the hospital for his daughter's emergency surgery on the morning that Baldwin was killed. (PCR Tr., p. 259.) Police officers confirmed Buchholz's alibi, found no other evidence tying him to the murder, and did not consider him to be valid suspect. (PCR Tr., p. 259, 261, 280.) At the conclusion of this investigation, another detective, Paul Newbold, wrote his own report that summarized, in great detail, Buchholz's incriminating statements to Christian. Newbold's report was disclosed to the defense during pretrial discovery, but the reports of Love and Christian apparently were not.

**\*9** Defense counsel attempted to subpoena Buchholz for trial but he could not be located. Instead of presenting his live testimony, then, counsel attempted to call Deputy Christian to testify about the confession. The State objected and requested that the court exclude this proposed evidence as hearsay. The trial court agreed, concluding that Buchholz's confession did not contain sufficient corroboration and trustworthiness to be admissible as a statement against penal interest under Rule 803(b)(3) of the Idaho Rules of Evidence.

When it became apparent during post-conviction proceedings that the reports by Christian and Love existed, Petitioner claimed that the State had not complied with its *Brady* obligations. Buchholz was located, and he testified. Consistent with his earlier police interview, he admitted that he made some of the statements attributed to him, but he denied others. He reiterated that he had fabricated the entire confession because he was simply intoxicated and angry at being arrested on what he perceived to be unfair charges. Buchholz's father corroborated his son's assertion that they were together on the night and morning that Baldwin was killed.

The trial court concluded that Buchholz "made a credible witness" and that Petitioner failed to show

that he was prejudiced by the non-disclosure of any material related to the confession. (PCR R., pp. 149-50.) On appeal, the Idaho Supreme Court affirmed, concluding that because the State had disclosed the Newbold report, the defense could have conducted additional inquiry into the matter had it chosen to do so. *Rhoades I,* 820 P.2d at 673.

(b) *Discussion*

Although Buchholz's claim of responsibility for Baldwin's murder is exculpatory for *Brady* purposes, Petitioner has not established that the prosecution actually withheld or suppressed that information from the defense. Instead, it is clear from the record that defense counsel was fully aware of the particulars of the purported third party confession from having received Newbold's report, which included Buchholz's claim that he shot at "the girl from the Mini Barn" several times with a .38 caliber or a 9mm, hitting her twice in the back, and that he abandoned a green pickup truck after the crime. While the reports by Officers Love and Christian on this same general subject may not have been disclosed, Petitioner has failed to explain how they differ in substance from that which had already been revealed. Indeed, Christian's report is fully summarized by Newbold, and defense counsel had spoken to Christian personally about the matter before attempting to introduce his testimony. (Parmenter Depo., p. 28.) Officer Love's undisclosed general statement that Buchholz had admitted that he "killed the girl at the Mini-Barn" does not add any new detail. When, as here, the defense is already aware of the essential facts that comprise the allegedly exculpatory information, the prosecution has not committed a *Brady* violation. *Raley v. Ylst,* 470 F.3d 792, 804 (9th Cir.2006) (citations omitted); *Lambert v. Blackwell,* 387 F.3d 210, 265 (3d Cir.2005); *Spirko v. Mitchell,* 368 F.3d 603, 611 (6th Cir.2004).

**\*10** In addition to the police reports, Petitioner also contends that the State withheld Buchholz's criminal history and his "serious personality disorder."

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

(Docket No. 252, pp. 10-11.) Given that Buchholz did not testify at trial, Petitioner has not explained why the State had a duty to disclose his criminal or mental health history, or, even if such a duty existed, how that information would have led to the development of admissible exculpatory or impeachment evidence. Petitioner also mentions the result of a polygraph examination, but absent a stipulation polygraph results are inadmissible under Idaho law. *State v. Fain,* 774 P.2d 254, 256-57 (Idaho 1989). Information that the jury would never hear cannot be material for *Brady* purposes because, by definition, there is no possibility of a different outcome. *See United States v. Kennedy,* 890 F.2d 1056, 1059 (9th Cir.1989) (citing *United States v. Ranney,* 719 F.2d 1183, 1190 (1st Cir.1983)).

Petitioner suggests that disclosure of all of this material would have triggered a more vigorous effort to locate Buchholz. The record does not support this assertion. Buchholz's claim of responsibility for Baldwin's murder was not a secret, and defense counsel proffered to the trial court the efforts that he and the attorneys in the Bonneville County matter had made to locate him. (Tr. Vol.VIII, pp. 2148-50.) Petitioner's implicit argument that the defense team would have found Buchholz if it had only been given the largely cumulative police reports of Love and Christian and some information regarding Buchholz's criminal history is speculative. *See Wood v. Bartholomew,* 516 U.S. 1, 6, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995) (finding no *Brady* violation based upon speculation that the disclosure of polygraph results would have lead to exculpatory and admissible evidence). However, in an abundance of caution, at the end of this section the Court will address why evidence relating to the Buchholz episode would not have been material to guilt or punishment.

### 3. *Shaw's Police Report*

Petitioner next contends that the prosecution failed to disclose a different police report written by Detective Dennis Shaw, in which Shaw recites a brief verbal exchange that he had with Petitioner at the time of his arrest in Nevada. In the report, Shaw indicates that he told Petitioner that he had lied to him about an unrelated burglary and that he should "get it off [his] chest," to which Petitioner responded by saying, "I don't want to talk about it." (Shaw Depo., Exhibit 5.)

Petitioner contends that this information reveals that he invoked his right to silence as to the murders, a fact that was not presented to the state courts. His argument as to how this information is exculpatory is less than clear, but he suggests that had the report been disclosed and used appropriately by defense counsel at a suppression hearing, his "I did it" statements would have been suppressed. Without that evidence, he contends, there is a reasonable probability that he would have been acquitted. He also makes a vague argument that the report contained impeachment material.

**\*11** Earlier in this proceeding, this Court denied an evidentiary hearing on this portion of the *Brady* claim after concluding that Petitioner had not demonstrated that Shaw's report was "newly discovered evidence." (Docket No. 167, pp. 12-13.) In reaching that conclusion, the Court relied on trial counsel's deposition testimony in which he seemed to indicate that he had seen the report before trial. (Docket No. 167, p. 12.) The Court subsequently denied Petitioner's motion to reconsider that decision, concluding that even if trial counsel now believed that he did not receive the report, Petitioner had not established that counsel was unaware of the *information* contained therein. (Docket No. 213, p. 4.) In other words, Petitioner did not, and has not, established that the prosecution suppressed or withheld this information from the defense. In the absence of prosecutorial suppression, there can be no *Brady* violation.

### 4. *Loretta Wallace's Videotaped Statement*

For the final component of his claim, Petitioner alleges that the State failed to turn over a recorded

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

statement made by eyewitness Loretta Wallace, which is contained on a videotape marked "Baldwin Crime Scene." (Docket No. 252, p. 11.) Petitioner asserts that Wallace can be seen, in and out of hypnosis, describing a man leaving the Mini Barn whose physical characteristics do not match Petitioner. Although this evidence may be favorable to Petitioner for *Brady* purposes, the Court previously determined that he had "failed to establish how this evidence, if proven, would entitle him to relief." (Docket No. 167, p. 10.) The Court reaffirms that decision here.

Initially, because Petitioner concedes that defense counsel had the videotape within his possession, it is debatable whether the prosecution can be said to have withheld or suppressed any of the information on that tape. Petitioner attempts to make that case by claiming that Wallace's statements are buried on the tape after a long pause during which nothing is shown. Consequently, he suggests that the prosecution had an independent duty to point out Wallace's statement.

Petitioner is correct that the prosecution may not play a game of hide and seek with exculpatory evidence. *See Banks v. Dretke,* 540 U.S. 668, 696, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004). Conversely, it is unlikely that the due process clause would be offended by placing a minimal burden on the defendant to exercise some diligence in inspecting evidence that has already been disclosed. *Cf. United States v. Mulderig,* 120 F.3d 534, 541 (5th Cir.1997) (finding no *Brady* violation when the allegedly exculpatory information was contained within a larger mass of material). The facts, as Petitioner has alleged them, fall somewhere between these two extremes, but the Court need not resolve the matter, because even if Wallace's statement was suppressed, the Court concludes that the evidence was not material.

5. *Materiality/Prejudice Analysis*

**\*12** In applying the materiality standard, the Su-

preme Court has advised that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434. A court must review the impact that the withheld evidence would have had on the petitioner's right to a fair trial collectively, rather than item by item, to determine whether, had the evidence been disclosed, there is a reasonable probability of a different outcome. *Id.*

This Court will begin with a review of the evidence that was presented at trial, the most incriminating of which related to the murder weapon and the results of ballistics testing. That evidence demonstrated that the weapon that had fired the bullet that lodged in Stacy Baldwin's arm was found near the car that Petitioner had recently abandoned on a roadside in Nevada, and ammunition like that used in the murder was retrieved from inside of the vehicle. A witness had seen Petitioner with a similar handgun in his possession after Baldwin had been killed, and a gun store employee identified Petitioner as the purchaser of .38 caliber ammunition like that found in the abandoned car.

Other evidence built upon this strong foundation. During February and March of 1987, Petitioner was interrupted while he "cased" a convenience store, watching a female employee, and he was observed in a different store with a handgun under his sweatshirt. Petitioner had visited the Mini Barn before, and a distinctive pickup that he often drove was spotted driving recklessly away from the store at the exact time that Stacy Baldwin went missing. About two hours later, he arrived at a nearby cafe for a late night cup of coffee with an acquaintance.

Footprints in the snow at the location where Baldwin's body was discovered were consistent with the tread on Petitioner's large-sized boots, and a hair found on Baldwn's shirt was consistent with a sample of Petitioner's known hair. When Petitioner was arrested in Nevada, Detective Shaw retrieved a watch from his pocket that was similar to the one

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

that Stacy Baldwin wore the night she was killed, and when he was informed that Baldwin's homicide may have been avoided had he been apprehended sooner, Petitioner said "I did it."

Last, but certainly not least, David Holm testified at trial about Petitioner's admission of guilt, in which he allegedly claimed to have kidnapped Baldwin with the intent of raping her, told her to pray, and then shot at her several times, hitting her twice in the back.

While Petitioner's mother testified that he was at home babysitting on the night of the murder, he offered no other evidence to corroborate this alibi. He did call witnesses who painted David Holm as a manipulative liar, but the defense had no answer for why Holm knew certain details about the crime that were not widely known or that were not contained in police reports that Petitioner had with him in the county jail. Petitioner's other evidence related to eyewitness identification and the availability of watches and boots in the community was ultimately not persuasive.

**\*13** The picture to emerge at the end of the trial was a circumstantial but compelling case pointing toward Petitioner's guilt. Nothing about this picture would have changed in materially in his favor had information related to Buchholz and Wallace been presented.

First, as this Court has noted, the exclusion of the Buchholz confession was not due to the prosecution's suppression of that information but was instead the result of his absence from the jurisdiction. But even assuming, for the sake of argument, that Buchholz could have been located and that he would have testified similarly to his post-conviction testimony, this evidence would not have assisted Petitioner in a material way. The prosecution would have undoubtedly been permitted to explore the full circumstances showing that the confession was unreliable and most likely false.

In particular, the jury would have heard that Buch-

holz was belligerent, crying, and extremely intoxicated when he was arrested. (PCR Tr., pp. 145, 151-52.) The general tenor of his comments was that because he was being charged for other crimes that had no basis in fact, the police might as well charge him for murder. He recanted his statements when he was sober, claiming that he had been seeking attention and had been just spouting off because he was angry at being taken into custody. (PCR Tr., pp. 254-55.) The police later investigated his alibi and confirmed that he had been with his family and at the hospital during the time frame that Baldwin was likely killed, and officers could find no other evidence that linked him to the crime, despite having taken samples of his fingerprints, hair, and shoe prints. (PCR Tr., p. 259.)

Petitioner has not come forward with any evidence that undermines the alibi or that independently ties Buchholz to Baldwin's homicide. Though he makes much of Buchholz's knowledge of a few details of the crime, he has not shown that Buchholz would have been unable to gather these facts from the media, gossip, or other sources, given that the crime was a major source of interest in the community at the time.[FN4] Given all of these circumstances, the jury would have likely taken Buchholz's comments the same way that the police and the trial court ultimately did: the unreliable statements of a drunk person seeking attention.

> [FN4]. Petitioner also slightly overstates the degree to which Buchholz's confession was corroborated by other evidence. For instance, while it is true that a green pickup was found abandoned on the highway, an officer had stopped that same pickup on the night that Baldwin was killed, and the driver was not Buchholz. (PCR Tr. pp. 258-59.) Carrie Baier, who saw the suspect vehicle leave the Mini Barn, testified at trial that there was "no question" in her mind that the pickup that had been abandoned was not the one that she saw leave the Mini Barn. (Tr. Vol. V, p. 1326; Tr. Vol.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

IX, p. 2286.) Moreover, although tire tracks on the access road leading to the archery range, a well-traveled area, were similar to the tread on this pickup, they were also generally similar to the tread on Petitioner's pickup, and no positive match to any vehicle could be made. (Tr. Vol.IV, p. 912.)

> The same holds true regarding Petitioner's reference to Buchholz's alleged attempts to sell a handgun in March 1987. This assertion is based mainly on vague and second-hand information that has not been corroborated. Further, Petitioner has produced no reliable evidence linking the supposed handgun, if it existed, to this crime. The evidence adduced at trial fairly conclusively showed that Petitioner dropped the murder weapon himself when he abandoned his mother's car in Nevada.

With respect to Loretta Wallace, Petitioner presumably believes that if she had been called and testified similarly to her videotaped statement, the jury would have heard that her initial description of the man that she saw leaving the Mini Barn did not match Petitioner. But such evidence was already squarely before the jury. On cross-examination, Detective Newbold testified that the suspect was considered to be of average height, average build, between the ages of thirty five to forty, with short, grayish hair and no facial hair. (Tr. Vol.IV, pp. 919-930.) Defense counsel also cross-examined Carrie Baier regarding this issue, and though she claimed not to remember certain parts of her initial description to the police, she admitted that she had said that the man had short hair and was of average height. (Tr., Vol.V, pp. 1139-39.) As part of his closing argument, counsel emphasized how this initial description did not match Petitioner, and he argued that Carrie Baier, who was acquainted with Petitioner, was unable to identify him as the man who fled the Mini Barn. (Tr. Vol.IX, pp. 2424-25.)

As a result, the information that Petitioner believes that Wallace would have offered was cumulative to that which was already in evidence through Newbold and Baier. *Cf Williams v. Woodford,* 384 F.3d 567, 598-99 (9th Cir.2004) (holding that the failure to disclose cumulative impeachment evidence did not amount to a *Brady* violation).

**\*14** Accordingly, after taking all of the evidence into consideration, the Court concludes that Petitioner has not shown a reasonable probability that the result of the state court proceeding would have been different had this material been disclosed and used effectively. While Buchholz's incriminating statements, when viewed in isolation, may have been helpful to the defense, any initial benefit would have been negated by the circumstances in which the statements were made, the subsequent recantation and alibi, and the lack of independent evidence tying him to the crime. Wallace's videotaped statement, to the extent that it was reliable, was cumulative. The Court's confidence in the fairness of the proceeding has not been undermined, and Petitioner's *Brady* claim shall be denied.

### Claim 3: Reasonable Doubt Instructions

Petitioner next contends that the trial court's jury instructions lowered the constitutional standard of proof necessary to convict, in violation of his rights under the Sixth and Fourteenth Amendments.

1. *The Claim is not Barred by Teague*

As a threshold matter, Respondent argues that Petitioner's claim must be dismissed under the non-retroactivity principles set out in *Teague v. Lane,* 489 U.S. 289 (1989). (Docket No. 246, p. 16; Docket No. 370, p. 19.) In *Teague,* the Supreme Court held that a habeas petitioner is generally not entitled to the retroactive application of a new rule of constitutional law on collateral review. *Id.* at 301. A constitutional rule is "new" for *Teague* purposes if it was not dictated by precedent that existed at the time that the petitioner's conviction was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

final in state court. *Id.*

The applicable rule here is derived from the Fourteenth Amendment's due process clause. It has long been established that the due process clause requires the State to prove every essential element of the crimes charged beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1971). In *Cage v. Louisiana,* 498 U.S. 33 (1990), the Supreme Court held, for the first time, that a jury instruction will be deemed unconstitutional if there is a reasonable likelihood that the jury understood the instruction to allow a conviction without proof beyond a reasonable doubt. *See Id.* at 41; *Cf. Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (clarifying that a reviewing court must determine whether there is a likelihood that the jury actually misunderstood its instructions). Petitioner relies on *Cage,* and because *Cage* was issued over a year before the Idaho Supreme Court finally resolved his direct appeal, it is not "new" as applied to this case.

Nevertheless, Respondent also contends that because Petitioner is challenging an instruction that refers to the "presumption of innocence" (Instruction 17) FN5, a matter that was ostensibly not at issue in *Cage,* he is still seeking the application of a new rule of law. (Docket No. 370, pp. 19-20.) The Court is not persuaded. Petitioner's argument is that this instruction, in conjunction with other instructions, made it reasonably likely that the jury based its verdict on a standard of proof below that which is required by the due process clause. This is a relatively straightforward application of the *Cage* rule, albeit to an instruction that is worded differently.

> FN5. All of the written jury instructions in the state court record are labeled as "preliminary instructions." (R. Vol III, pp. 617-687.) The trial court read portions of the complete set of instructions to the jurors at different times: before jury selection, before opening statements, and at the close of evidence. (Tr. Vol.IX, pp. 2306-2341.)

Upon the last reading, the court informed the jurors that all of the instructions that had been read to them throughout the trial would be provided in written form and that the written packet comprised the entire set of instructions. (Tr. Vol.IX, p. 2341.) Therefore, for simplicity, this Court shall drop the "preliminary" label.

**\*15** The timing of the *Cage* decision is also what separates the present case from the Ninth Circuit's conclusion that a similar argument was *Teague-*barred in *Leavitt v. Arave,* 383 F.3d 809, 817-818 (9th Cir.2004). Leavitt's conviction became final one year before *Cage,* so he was unable to use its rule to his benefit.

2. *The Reasonable Doubt Instructions*

Petitioner's initial complaint is about the trial court's references in Instruction 16 to the terms "moral evidence" and "moral certainty":

> Reasonable doubt is defined as follows: It is not mere possible doubt because everything related to human affairs, and depending upon *moral evidence,* is open to some possible or imaginary doubt. It is the state of the case which, after an entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction *to a moral certainty* of the truth of the charge.

(R. Vol.IIII, p. 637.) (Emphasis added.)

The trial court also used the term "moral certainty" again in Instruction 29:

> The law does not require demonstration or that degree of proof which, excluding all possibility of error, produces absolute certainty for such degree of proof is rarely possible. *Moral certainty only is required,* which is that degree of proof which produces which produces conviction in an unprejudiced mind.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

(R., Vol.III, p. 651.) (Emphasis added.)

In *Victor v. Nebraska,* 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), the Supreme Court addressed similar complaints about the use of "moral evidence" and "moral certainty." There, the Court was untroubled by the phrase "moral evidence," because, when placed in the context of the words immediately surrounding it, the jury would have understood that "moral evidence" meant the same thing as "the proof introduced at trial." *Id.* at 13. The Court was further reassured by language that informed the jury that it must base its decision solely on the evidence that had been presented at trial. *Id.* This is equally true here; the trial court clearly and repeatedly informed the jury that its decision must be based upon the evidence presented in court and not on any other extraneous factor. ( *See* Instructions 2, 11, 14, 18, 23, 52.)

The Supreme Court was slightly more concerned with the phrase "moral certainty," which it noted may not bring the same archaic meaning to a modern jury (essentially, subjective certitude based on proof beyond a reasonable doubt). Yet the Court still did not find constitutional error, as it determined that the rest of the instructions provided content to that potentially ambiguous phrase. *Id.* at 14, 21. The jurors were told that they must have an "abiding conviction" of the truth of the charge, which, without reference to moral certainty, correctly states the prosecution's burden of proof and "does much to alleviate the concerns that the phrase 'moral certainty' might be misunderstood in the abstract." *Id.* This same qualifying remark was included in the set of instructions in the present case, and the requirement that the jury may rely only on evidentiary proof, as in *Victor,* was a recurring theme throughout the trial court's instructions. Petitioner's concerns about Instructions 16 and 29 are resolved by *Victor.*

**\*16** Nor has Petitioner established any defect with the trial court's instruction to the jury that "[i]t is not necessary that all the facts and circumstances surrounding the testimony and evidence which is

given on behalf of the State shall be established beyond a reasonable doubt. All that is necessary is that all facts and circumstances in evidence, together, establish the defendant's guilt beyond a reasonable doubt." (R. Vol. III, p. 636; Instruction 27.) The Ninth Circuit has concluded that this instruction "is and always has been a perfectly correct statement of the law; the prosecution need not prove every *fact* in the case beyond a reasonable doubt so long as it proves every *element* beyond a reasonable doubt." *Leavitt,* 383 F.3d at 822 (emphasis in original). As an added protection in the present case, the trial court instructed the jury that the State must prove beyond a reasonable doubt all of the material elements of each crime, which it then listed separately. (R. Vol. III, p. 658; Instruction 36.)

For all of these reasons, Instructions 16, 27, and 29 pass constitutional muster. More problematic is the trial court's use of Instruction 17, which reads in its entirety:

> The rule of law which clothes every person accused of crime with the presumption of innocence, and imposes upon the state the burden of proving his guilt beyond a reasonable doubt, is not intended to aid anyone who is in fact guilty to escape, but is a humane provision of the law, intended so far as human agencies can, to guard against the danger of innocent persons being unjustly punished.

(R., Vol.I, p. 590.)

Courts reviewing similar "protect the innocent" instructions have generally condemned them, though this is not a universal opinion. *See Reynolds v. United States,* 238 F.2d 460, 463 (9th Cir.1956) (holding, on direct review, that a similar instruction created prejudicial error); *Gomila v. United States,* 146 F.2d 372, 373 (5th Cir.1944); *United States v. Doyle,* 130 F.3d 523, 538 (2d Cir.1997); *but see DelValle v. Armstrong,* 306 F.3d 1197, 1200 (2d Cir.2002) (holding that no habeas relief under AEDPA was available on a similar instruction); *State*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

*v. Schiappa,* 248 Conn. 132, 728 A.2d 466, 486 (Conn.1989) (disapproving of instruction, but rejecting a constitutional challenge); *Heald v. State,* 492 N.E.2d 671 (Ind.1986) (noting that the instruction had been approved). The danger inherent in such an instruction is that the jury could conclude that it need not apply the presumption of innocence, nor hold the prosecution to its burden to prove the defendant's guilt beyond a reasonable doubt, if it has first determined by some undefined standard that the defendant is actually or "in fact" guilty. The presumption of innocence and the reasonable doubt standard, of course, apply at all criminal trials, and any implication to the contrary is improper. *See, e.g., Doyle,* 130 F.3d at 538.

On the other hand, a more benign interpretation of this instruction is that it simply explains to the jury *why* the presumption of innocence and the reasonable doubt standard must apply to *all* criminal defendants. *See Leavitt,* 383 F.3d at 844 (Fernandez, J., concurring). Even so, this Court does not doubt that the trial court's use of Instruction 17 in this case was unwise.

**\*17** It is not enough, however, for this Court to find that the instruction is " 'undesirable, erroneous, or even 'universally condemned.' " *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). Instead, the Court must be convinced that there is a reasonable likelihood that the jury in this case understood the instructions as a whole to allow a guilty verdict based on proof less certain than beyond a reasonable doubt. *Victor,* 511 U.S. at 6. The Court is not persuaded that such a likelihood exists.

The jury would have been disabused of any misleading construction of Instruction 17 by the trial court's numerous other instructions that properly defined the jury's obligation to hold the State to its correct burden. The jury was informed of the following: (1) Petitioner is presumed to be innocent (Instructions 2, 16); (2) the State had the burden to prove every material allegation for each crime charged beyond a reasonable doubt (Instructions 15, 16, 36, 37, 39); (3) the jury's decision must be based solely upon the evidence presented in court, and not on any other consideration (Instructions 2, 11, 14, 18, 23, 52, 53.); (4) sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling must not be considered (Instruction 11); and (5) the jury must not convict solely on circumstantial evidence unless it was convinced that the circumstances could not be reconciled with any other rational theory of innocence (Instruction 28). When read together, these instructions notified the jury that the presumption of innocence and the reasonable doubt standard must be applied in the specific case before it, eliminating any potential ambiguity in Instruction 17 on that score.

Still, Petitioner cites Chief Judge Winmill's conclusion in *Leavitt* that an identical instruction, when viewed in light of other "confusing and ambiguous instructions" in that case, diluted the State's burden of proof. (*Leavitt v. Arave,* Case No. CV 93-24-S-BLW, Docket No. 141, p. 15.) Petitioner argues that even though the district court's granting of relief was reversed on *Teague* grounds, its merits-based decision should control here. The Court disagrees and finds several material distinctions between the instructions in this case and the instructions given in *Leavitt.*

Absent here was an instruction that the jury "should," rather than "must," require the prosecution to prove each element of the offenses beyond a reasonable doubt. (*Leavitt v. Arave,* Case No. 93-024-S-BLW, Docket No. 120, pp. 93-94.) The court also did not instruct the jury not to "create sources or material of doubt by trivial and fanciful suppositions or by remote conjectures." (Case No. 93-024-S-BLW, Docket No. 141, p. 11.) Also absent was an instruction that placed the burden of proving an alibi on the defendant. (Case No. 93-024-S-BLW, Docket No. 120, p. 97, n. 35.)

Furthermore, the district court's decision in *Leavitt* must now be viewed through the lens of the Ninth Circuit's decision on appeal, and while the appellate court ultimately decided that Leavitt's claim was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

*Teague*-barred, it made several observations on its way to this conclusion that betrayed its skepticism with the merits-based decision. Perhaps most relevant is that the *Leavitt* panel did not believe that the surrounding instructions were as confusing, ambiguous, or misleading as the district court found them to be. *Id.* at 821. The Ninth Circuit was not overly concerned with instructing the jury that it "should," rather than "must," require proof beyond a reasonable doubt. *Id.* at 822. It was equally untroubled by the trial court's use of "moral evidence," "moral certainty," and "not mere possible doubt," noting that a nearly identical reasonable doubt instruction was upheld in *Victor. Id.* It also found unproblematic an instruction that informed the jury that the prosecution need not prove every fact in the case beyond a reasonable doubt, only every element of the crimes charged. *Id.* Though the Ninth Circuit did conclude that the trial court's alibi instruction erroneously placed a burden on the petitioner, it determined that the instruction did not play a significant role in the jury's understanding of reasonable doubt. *Id.* at 823.

**\*18** Accordingly, given that the entire set of instructions in this case properly and repeatedly informed the jury that Petitioner was entitled to the presumption of innocence and that the State was required to prove his guilt beyond a reasonable doubt, and in light of dispositive differences between the present case and *Leavitt,* this Court concludes that there is no reasonable probability that the jury understood its instructions as allowing conviction under a lower standard of proof.

### Claim 5: The "I did it" Statements

In this claim, Petitioner contends that the admission of statements that he had made after his arrest violated his Fifth and Fourteenth Amendment rights, as interpreted by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

1. *Factual Record Developed in State Court*

Petitioner was arrested by two Nevada law enforcement officers, but those officers did not interview or interrogate him. When Idaho officers Victor Rodriguez and Dennis Shaw arrived at the scene, Petitioner was handcuffed and bent over the trunk of a patrol car. As they approached, Petitioner turned toward them and said, "I did it." Detective Rodriguez then advised Petitioner of his rights. A Nevada officer saw Petitioner respond to Rodriguez by first nodding his head as if he understood his rights, and then, after Rodriguez said something else that the officer could not hear, shaking his head from side to side.

After a brief stop at the local police station, Petitioner was transported to a highway patrol substation for processing. Once there, Detective Shaw made a comment to the effect that if he had arrested Petitioner earlier, three victims would still be alive. In response, Petitioner again stated, "I did it." [FN6]

> FN6. The state court record reflects that Shaw followed this remark with something similar to "the girl in Blackfoot, and the two in Idaho Falls," to which Petitioner repeated, "I did it." At trial, reference to other victims was excluded. For simplicity, the Court will refer to Petitioner's combined comments at the substation as the second "I did it" statement.

The "I did it" statements were admitted into evidence at the Michelbacher and Baldwin trials, over Petitioner's objection, and would have been presented at a trial in the Haddon matter had Petitioner not entered a conditional guilty plea.

On appeal, the Idaho Supreme Court determined that Petitioner's first statement, which he made at the scene of the arrest, was admissible as a voluntary and spontaneous comment, regardless whether it occurred before or after he had been read his *Miranda* rights. *Rhoades I,* 820 P.2d at 675. With respect to the second statement at the highway patrol substation, the court found that although Shaw had engaged in the "functional equivalent of interroga-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

tion" while Petitioner was in custody, implicating *Miranda,* Petitioner's statement was admissible because he had been advised of his rights, which he indicated that he understood, and he had not invoked his right to silence. *Id.* at 675-76.

2. *Discussion*

In *Miranda,* the United States Supreme Court set forth the now familiar rule that before a law enforcement officer interrogates an individual who is in custody, the officer must inform the individual of his right to silence and his right to have the assistance of an attorney. 384 U.S. at 475-78. Absent a knowing and voluntary waiver of those rights, any statement taken during custodial interrogation will be excluded from evidence. *Id.* at 476. The prosecution has the burden to show a valid waiver, but such a waiver may be implied, rather than expressed, based upon a totality of the circumstances. *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). A spontaneous and voluntary statement that is not the product of police interrogation or its functional equivalent will be admissible regardless whether the individual was warned of his rights. *Miranda,* 384 U.S. at 478.

**\*19** In the present case, the Idaho Supreme Court's finding that the first "I did it" statement was voluntary and not the product of police questioning is supported by the record. The officers who claimed to have heard the comment all testified that Petitioner blurted it out as the Idaho officers approached him. In *Miranda* itself, the Supreme Court noted that "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." 384 U.S. at 478.

Regarding the second statement, this Court concludes that the Idaho Supreme Court's factual determinations that Petitioner was warned of his rights when he was arrested, he understood those rights, and he did not assert his right to silence when he shook his head, are all reasonable findings based upon the record that was before the court and

are presumed to be correct here. *Rhoades I,* 820 P.2d at 675-76. Although Petitioner argues that he invoked his right to silence by shaking his head negatively in response to something that Rodriguez said to him, he has not presented any evidence that would rebut the state court's factual finding to the contrary. The Idaho Supreme Court noted that while one police officer assumed that Petitioner was indicating that he did not want to answer questions, there was no conclusive evidence in the record to support that assumption. *Id.* at 675.

This Court also concurs with the Idaho Supreme Court that Detective Shaw's comment, which the state court found was "made to the defendant," amounted to the functional equivalent of interrogation for purposes of *Miranda.* Shaw's comment carried an implied accusation that Petitioner had committed three homicides, which was reasonably likely to elicit an incriminating response. *Rhode Island v. Innis,* 446 U.S. 291, 300-01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

However, the Idaho Supreme Court's application of the rule of constitutional law relating to an individual's waiver of *Miranda* rights is more problematic. The state court declared that, "the *Miranda* rule does not require police to maintain total silence toward the suspect until they are presented with a valid waiver of *Miranda* rights ... [a]fter rights are read to and acknowledged by the detainee and until the right to silence or counsel is asserted, the police may initiate questioning." *Id.* at 675. To the extent that the Idaho Supreme Court applied a rule that requires a defendant to shoulder a burden to affirmatively prove that he had invoked his right to silence or counsel, this was an incorrect statement of law. Rather, the *prosecution* must demonstrate that a defendant has waived his rights before a statement that was made during custodial interrogation will be admissible. *Miranda,* 384 U.S. at 475; *Butler,* 441 U.S. at 373. To the extent that the state court's ultimate decision was perhaps a less than artful determination that Petitioner had implicitly waived those rights, this Court agrees.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

**\*20** A waiver need not be expressed orally or in writing but instead may be implied based upon the facts and circumstances of the case. *Butler,* 441 U.S. at 373. Though silence alone is insufficient, a waiver may be "inferred from the defendant's understanding of his rights coupled with a course of conduct reflecting his desire to give up his right to remain silent and have the counsel of an attorney." *Fare v. Michael C.,* 442 U.S. 707, 724, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). That situation exists here.

Petitioner had been advised of his rights at the time of his arrest, and he indicated that he understood those rights. The state courts acknowledged that Petitioner may have been under the influence of narcotics, but they credited the officers' testimonies that he was alert enough to understand what was going on around him. *See Rhoades,* 822 P.2d at 971. This is a reasonable finding of fact based upon the record, and the presumption of correctness has not been rebutted. 28 U.S.C. § 2254(d). Further, this Court will not disturb the state court's finding that Petitioner did not invoke his right to silence by shaking his head in a negative fashion when he was detained.

The second "I did it" statement occurred relatively soon, though not immediately, after Petitioner's arrest and the reading of *Miranda* warnings. And while his statement may have been elicited by Detective Shaw's remark, it was not the product of a coercive interrogation in the classic sense of a lengthy interview designed to extract a full and detailed confession, nor was it even in response to pointed questioning. Rather, it was uttered during a brief exchange during the preliminary phases of booking and processing in which the arresting officer made an offhand comment. There is no showing that any officer used force, pressure, or trickery to disgorge a waiver or a confession from Petitioner. Under the totality of the circumstances shown by the evidence presented in state court, this Court concludes that Petitioner waived his *Miranda* rights when, with an awareness and understanding of those rights, he responded to Shaw's comment.

In order to avoid this conclusion, Petitioner seeks to present evidence that was not developed in the state courts. He relies on a police report written by Detective Dennis Shaw and testimony that Shaw gave during a 1996 deposition. In his report, Shaw indicates that he had a brief exchange with Petitioner about an unrelated burglary while he was transporting Petitioner to the substation, before he made his second "I did it" statement:

On the way to the police station I continued to talk with him. He was very uncomfortable as he was so large and the car did not give him much room. I told him I was disappointed in him and he had lied to me about the burglary. I had tried to believe him and give him a chance but he had lied and conned me. I said we need to talk about it now so that you can get it off your chest. He said, "Aw bullshit, I don't want to talk about it. Get these fuckin cuffs off me."

**\*21** (Shaw Depo., Exhibit 5, p. 70.)

At his deposition, Detective Shaw described the situation as follows:

When we were in the car and I started to talk to him about-I was talking about [the burglary of] Lavaunda's Lingerie and only Lavaunda's Lingerie in the car because I wanted to start chronologically and get this whole thing-you know, I wanted to start there because that's where my warrant was. And he said he didn't want to talk about it, get these handcuffs off of him because it was cramped in that car, and it was cramped. It was cramped for me and I'm pretty good sized, too, so I understood that, and so I-when we got inside I took the handcuffs off and then we, you know, proceed to talk.

(Shaw Deposition, pp. 81-82.)

Petitioner seeks to include this evidence to support his contention that rather than waive his rights, he specifically invoked his right to silence about the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

murders. This Court previously found that he had been given full and fair opportunities to develop these facts in state court and that he had not shown cause and prejudice for his failure to do so. (Docket No. 167, pp. 9-12.) The Court has since excused the default of Petitioner's allegations of ineffective assistance of trial counsel, opening the possibility that Petitioner could now argue that his counsel's ineffectiveness led to his failure to develop this evidence. He has raised an analogous claim in this proceeding based upon his trial counsel's alleged deficiencies with respect to litigating the motion to suppress. (Docket No. 252, pp. 32-33, Claim 23 (xvii)). Regardless, even if the new evidence is taken into consideration, the Court concludes that Petitioner would still not be entitled to relief.

The brief exchange in the patrol car involved an unrelated burglary, not the murder of Stacy Baldwin, and when Petitioner said that he "didn't want to talk about it, get these handcuffs off," he was apparently complaining about the cramped conditions of the car. Shaw understood Petitioner's comment to mean that he did not want to discuss the burglary charge until he was out of the car and free from the uncomfortable conditions. (Shaw Depo., p. 82.) This was a reasonable interpretation under the circumstances, and Petitioner's remark was at most an ambiguous or equivocal statement regarding his right to silence.

In a related context, the Supreme Court has held that an ambiguous reference to the assistance of counsel is insufficient to invoke that particular right under *Miranda* or to shut down further police questioning. *Davis v. United States,* 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). While neither the Supreme Court nor the Ninth Circuit has yet concluded whether the *Davis* rule applies to an ambiguous invocation of the right to silence, several jurisdictions have so held, and this Court is persuaded by their reasoning. *See, e.g. Simmons v. Bowersox,* 235 F.3d 1124, 1131 (8th Cir.2001); *United States v. Hurst,* 228 F.3d 751, 759-60 (6th Cir.2000); *United States v. Banks,* 78 F.3d 1190,

1198 (7th Cir.1996), *vacated on other grounds by Mills v. United States,* 519 U.S. 990, 117 S.Ct. 478, 136 L.Ed.2d 373 (1996); *Medina v. Singletary,* 59 F.3d 1059, 1100 (11th 1995); *cf. Evans v. Demosthenes,* 98 F.3d 1174, 1176 (9th Cir.1996) (concluding that the issue need not be resolved). Because Petitioner's comment in the patrol car did not constitute a clear and unambiguous invocation of his right to cease all discussion, he has misplaced his reliance on *Michigan v. Moseley,* 423 U.S. 96, 103, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (holding that the police must "scrupulously honor" a suspect's invocation of his right to silence).

### Claim 7: *Idaho Code § 19-2719*

**\*22** Petitioner claims that the application of Idaho's special capital post-conviction statute, Idaho Code § 19-2719, violated his Fourteenth Amendment rights to equal protection and due process of law.

Idaho's special post-conviction statute requires a capital defendant to raise all known legal or factual challenges to his conviction or sentence in one application for post-conviction relief within forty-two days of sentencing. Idaho Code § 19-2719(3). The direct appeal is held in abeyance pending completion of the post-conviction proceeding, and the appeal from the post-conviction matter is consolidated with the direct appeal. Idaho Code § 19-2719(6). Claims that were known or reasonably should have been known at the time of the first post-conviction proceeding are forfeited if they were not included in that proceeding. Idaho Code § 19-2719(5).

Petitioner's equal protection challenge is based upon the discrepancy between the forty-two day statute of limitations for capital defendants and, at the time of his case, the five year statute of limitations for non-capital defendants. Petitioner has not shown that convicted capital defendants are a suspect or protected class, or that a particular type of state post-conviction procedure is a fundamental right, such that strict scrutiny must be applied to the statute. *See, e.g., Dickerson v. Latessa,* 872 F.2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

1116, 1119 (1st Cir.1989) (holding that requiring a defendant convicted of a capital offense to obtain permission to appeal the denial of a post-conviction motion does not deny equal protection). Rather, the appropriate question is whether there is a rational basis for the State's decision to treat convicted capital defendants differently from non-capital defendants with respect to the time available in which to seek post-conviction relief. *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Under this standard, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* at 440. Idaho's statute survives this modest review.

In enacting Idaho Code § 19-2719, the Idaho Legislature expressed the State's interest in eliminating unnecessary delay in carrying out a valid death sentence. The orderly and expeditious processing of collateral actions in capital cases is a legitimate governmental interest. *Cf. Barefoot v. Estelle,* 463 U.S. 880, 886-88, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983); *see also Murch v. Mottram,* 409 U.S. 41, 45-46, 93 S.Ct. 71, 34 L.Ed.2d 194 (1972). Because the timeliness and waiver provisions of the statute are rationally related to this legitimate interest, the provisions withstand Petitioner's equal protection challenge. *Fetterly v. Paskett,* 747 F.Supp. 594, 600-01 (D.Idaho 1990) *remanded on other grounds* by 997 F.2d 1295 (9th Cir.1993).

Petitioner next asserts that the shortened time period, apparently combined with the state court's failure to appoint new counsel for him during the post-conviction matter, deprived him of federal due process of law. Petitioner appears to argue that the interplay of the time limitation and the lack of new counsel prevented him from raising claims of ineffective assistance of trial counsel in state court. Whatever could be said about the operation of Idaho Code § 19-2719 to bar such claims, *see Hoffman v. Arave,* 236 F.3d 523 (9th Cir.2001), this Court has since excused Petitioner's default, and those issues are now being considered on the mer-

its. Thus, Petitioner can show no injury or prejudice. As to all other constitutional claims, the Court reaffirms its decision that the statute, as interpreted by the Idaho Supreme Court, comports with the due process baseline of providing capital defendants with adequate notice and a reasonable process in which to challenge their convictions and sentences. *Hoffman v. Arave,* 73 F.Supp.2d 1192, 1212-23 (D.Idaho 1998) *reversed and remanded on other grounds by* 236 F.3d 523 (9th Cir.2001); *Fetterly v. Paskett,* 747 F.Supp. 594, 600-01 (D.Idaho 1990) *remanded on other grounds by* 997 F.2d 1295 (9th Cir.1993).

**\*23** Accordingly, Petitioner has not shown that he is entitled to relief under either an equal protection or a due process theory.

### Claim 8: Victim Impact Statements

Petitioner next alleges that the "trial court, in imposing sentence upon Petitioner, relied upon inadmissible victim impact statements in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States." (Docket No. 252, p. 20.)

In *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Supreme Court held that the introduction of victim impact evidence at the sentencing phase of a capital trial violates the Eighth Amendment. Four years later, in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Court overruled *Booth* in part, holding that evidence regarding the personal characteristics of the victim and the impact of the victim's death on his or her family was not *per se* inadmissible. *Id.* at 829. The *Payne* Court did not decide whether statements from family members about the crime, the defendant, or the appropriate punishment would also be admissible. *Id.* at 829 n. 2. Thus, the portion of *Booth* that prohibited that type of evidence has apparently survived *Payne.*

In support of his claim, Petitioner relies on the fol-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

lowing statements by members of Stacy Baldwin's family, which were reported by the presentence investigator:

> [Stacy Baldwin's husband] states that he wants the maximum sentence given to the man who killed Stacy. He added that he believes in the death sentence. Mr. Baldwin further indicated "I don't want him ever to have the chance to do this to anyone else."

> \* \* \*

> [Baldwin's mother-in-law] related that [the family] favors a death sentence in this case.

> \* \* \*

> [Baldwin's mother] stated "I hope he burns in hell for what he did to Stacy. I'm glad she fought him." She added "I approve of Capitol [sic] punishment."
> (Presentence Investigation Report, pp. 2-3.)

The Idaho Supreme Court found that these comments fell within the category of statements that the United States Supreme Court had determined were improper under *Booth. Rhoades I,* 820 P.2d at 678-79. The state court did not discuss *Payne,* but because the portions highlighted above are opinions about the appropriate punishment, they would have still been inadmissible even after *Payne.*

The Idaho Supreme Court nonetheless found any error to be harmless beyond a reasonable doubt. *Id. at 679.* This Court agrees. It is of no small import that the sentencer in this case was a judge, who is presumed to follow the law and to exclude inadmissible evidence from his consideration. *See Beaty v. Stewart,* 303 F.3d 975, 985 (9th Cir.2002) ("[w]hen a judge, as opposed to the jury, reviews victim impact statements, we presume that the judge properly applied the law and considered only the evidence submitted"). Additionally, there is no indication that the family's statements influenced or

swayed the trial court beyond the evidence that it had already heard by presiding over the trial and the sentencing hearing. This Court is satisfied, beyond a reasonable doubt, that any error did not contribute to the trial court's decision to impose death sentences. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[FN7]

> FN7. Because the Court concludes that any error would be harmless under *Chapman,* it does not need to resolve whether the more stringent test under *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) is applicable to this claim.

### Claims 9, 10, 11, and 12: Challenges to the Aggravating Factors for Murder

**\*24** In these four related claims, Petitioner brings various challenges to the aggravating circumstances that the state court found to support a death sentence for first-degree murder.

Under Idaho law, a defendant convicted of first-degree murder is eligible to be sentenced to death if the sentencer finds at least one statutory aggravating circumstance beyond a reasonable doubt. Idaho Code § § 18-4004, 19-2515(c). In this case, the state court found five such circumstances: (1) based upon Petitioner's convictions in the Michelbacher and Haddon matters, Petitioner had been "previously convicted of another murder" (Idaho Code § 19-2515(g)(1) (1987));[FN8] (2) the murder in this case was "especially heinous, atrocious, or cruel, manifesting exceptional depravity" (Idaho Code § 19-2515(g)(5)); (3) Petitioner exhibited "an utter disregard for human life" (Idaho Code § 19-2515(g)(6)); (4) the murder qualified as "felony murder" accompanied "with the specific intent to cause the death of a human being" (Idaho Code § 19-2515(g)(7)); and (5) "by prior conduct or conduct in the commission of the murder at hand, [Petitioner] has exhibited a propensity to commit murder which will constitute a continuing threat to society" (Idaho Code § 19-2515(g)(8)).

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

FN8. The Court will cite the specific statutory subsections as they existed at the time of Petitioner's sentencing.

The state court concluded that "the mitigating circumstances did not outweigh the gravity of the statutory aggravating circumstances so as to make unjust the imposition of the death penalty." (R. Vol. III, p. 788.) During the post-conviction proceeding, the court clarified that it had weighed all of Petitioner's mitigating evidence against each aggravating circumstance found to exist individually, and it had concluded that each aggravating circumstance outweighed all of the mitigating evidence combined. (PCR R. III, pp. 144-145.)

1. *Heinous, Atrocious, or Cruel*

In Claim 10, Petitioner alleges that Idaho's "heinous, atrocious, or cruel" (HAC) statutory aggravating factor is unconstitutionally vague under the Eighth and Fourteenth Amendment.

To minimize the risk of wholly arbitrary and capricious infliction of a death sentence, states seeking to impose the death penalty must sufficiently narrow the sentencer's discretion. *See, e.g., Gregg v. Georgia,* 428 U.S. 153, 189, 206-207, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). A state's death penalty "system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing ... could occur." *Id.* at 195 n. 46. Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes assert that the challenged provision fails adequately to inform sentencers of what they must find to impose the death penalty. *Maynard v. Cartwright,* 486 U.S. 356, 361-62, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

By the time of Petitioner's sentencing in this case, the Idaho Supreme Court had placed a limiting construction on the words, "especially heinous, atrocious, or cruel, manifesting exceptional depravity."

In *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (Idaho 1981), the court concluded that:

**\*25** especially heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies-the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

*Id.* at 200 (quoting *State v. Dixon,* 283 So.2d 1, 9 (Fla.1973)). In *Leavitt v. Arave,* 383 F.3d 809, 836-37 (9th Cir.2004), the Ninth Circuit turned aside a vagueness challenge and held that *Osborn's* limiting construction provided sufficient guidance to district courts in Idaho for making principled distinctions between those who deserve the death penalty from those who do not. That finding applies with equal vigor here, and Petitioner's claim is resolved by *Leavitt.*

Petitioner next contends that even if the HAC aggravator survives an attack on vagueness grounds, "nothing more than speculation" supported the trial court's finding that it was supported by the evidence in this case. This Court disagrees.

A reviewing court must uphold the application of a constitutionally valid aggravating circumstance if, after viewing the evidence in a light most favorable to the prosecution, the court concludes that any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Lewis v. Jeffers,* 497 U.S. 764, 781, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). Viewing the evidence in a light most favorable to the prosecution here demonstrates that Petitioner forcefully abducted Stacy Baldwin from her place of employment, took her to a secluded spot, attempted to attack her sexually, and, when that failed, shot at her numerous times

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

from behind, perhaps while she attempted to escape. Several of Petitioner's shots missed Baldwin, ricocheting into the ground around her, before he fatally struck her in the back. That wound caused internal bleeding and the accumulation of air in Baldwin's chest cavity while she continued to inhale for a period of time before she died. (Tr. Vol.VI, pp. 1459-60.)

Although Petitioner may be able to conceive of killings that are designed to inflict a higher degree of pain or involve a greater degree of torture, it is sufficient for present purposes that a rational trier of fact could find beyond a reasonable doubt that these facts amounted to a conscienceless or pitiless crime that was unnecessarily torturous to Baldwin. The trial court's finding of the HAC aggravator shall be upheld.

2. *Utter Disregard*

In Claim 12, Petitioner contends that the evidence was insufficient to show that Petitioner exhibited an "utter disregard for the value of human life."

In *Osborn,* the Idaho Supreme Court also applied a narrowing construction to this aggravating circumstance, limiting it to the "acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded, pitiless slayer." *Osborn,* 631 P.2d, at 200-201. In *Creech v. Arave,* 507 U.S. 463, 473, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993), the United States Supreme Court held that this limiting construction was sufficiently definite to comply with the Eighth Amendment. The Supreme Court noted that a "cold blooded, pitiless slayer" is one who kills without feeling or sympathy, and that a sentencer could find this fact objectively based upon the defendant's "attitude toward his conduct and his victim." 507 U.S. at 472-73.

**\*26** In finding the "utter disregard" circumstance in this case, the trial court noted that Baldwin lived for a significant period of time after she was shot.

(R. III, p. 780.) The evidence, again viewed in a light most favorable to the State, supports that finding, based upon the pathologist's testimony regarding Baldwin's aspiration of vomit and the accumulation of two quarts of blood and air in her chest. (Tr. Vol.VI, pp. 1455, 1458-59.) The evidence further shows that Petitioner briefly considered dumping Baldwin in a trash bin, but then decided against that course of action because he didn't want to get bloody, so he simply left her to die where she had fallen. (Tr. Vol.VI, p. 1533.) After committing this crime, he met an acquaintance at a local restaurant for a cup of coffee. (Tr. Vol. V, p. 1260, 1372; Tr. VI, pp. 1533.)

While Petitioner quibbles with the trial court's conclusion that Baldwin lived for ninety minutes after she was shot, it is reasonably clear from the record that the pathologist believed that Baldwin lived for some period of time. He testified that "it's difficult to estimate how long a person responds to a fatal injury," and that Baldwin may have lived for "an hour or so." (Tr. Vol.VI, p. 1460.) The evidence is therefore sufficient to support a finding that the victim died relatively slowly in the cold while Petitioner went about his business. On this record, a rational factfinder could conclude that Petitioner's "attitude toward his conduct and his victim" was that of a "cold blooded, pitiless slayer," one who killed without feeling or sympathy.

3. *Previously Convicted of Another Murder*

Petitioner contends that the statutory aggravating circumstance that the defendant has been "previously convicted of another murder" is unconstitutionally vague. (Claim 9). As an initial matter, the Court notes that the statutory language appears to be unambiguous and requires only that a previous *conviction* for a murder exist before the defendant is sentenced, regardless of the timing of the *commission* of the other murder. That is precisely what the trial court determined. (R. III, p. 779.)

Regardless, this Court has already concluded that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

the HAC and utter disregard aggravating circumstances are constitutional as limited by the Idaho Supreme Court and were supported by the evidence in this case, and Petitioner does not challenge the separate aggravating factor that he committed a felony murder with the specific intent to kill. Further, despite the ambiguity in the state's court's original findings after the sentencing hearing with respect to whether it had weighed all mitigating evidence against each aggravator individually (R. Vol.III, pp. 775-76, 788), during the post-conviction matter it clarified that it had "weighed the mitigating circumstances collectively against each separate aggravating circumstance found to exist." (PCR, p. 144.) Accordingly, even if this aggravating factor were eliminated from consideration, the result would be the same, and any error would be harmless. See *Pizzuto v. Arave,* 280 F.3d 949, 970-71 (9th Cir.2001).

### Claim 13: Double Counting of the Aggravating Circumstances

**\*27** Petitioner asserts that the trial court violated a state rule against relying on the same facts to support different aggravating circumstances, as set forth in *State v. Caudill,* 109 Idaho 222, 706 P.2d 456 (Idaho 1985) and *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (Idaho 1981). Petitioner has not provided any federal case authority for this claim. *Cf. Jones v. United States,* 527 U.S. 373, 398-99, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (noting that the Supreme Court has never before held that allegedly duplicative or double counted aggravating circumstances would pose a constitutional problem). But to the extent that the issue is reviewable, Petitioner has failed to show prejudicial error. He does not challenge the felony murder aggravator, and even if two of the four allegedly "double counted" circumstances were removed from consideration, three aggravators would remain undisturbed and supported by sufficient evidence. Because the trial court determined that the collective mitigating evidence did not outweigh any of the aggravating factors individually, Petitioner would not be en-

titled to relief either under state law, *Sivak v. State,* 127 Idaho 387, 901 P.2d 494, 499 (Idaho 1995), or federal law, *Pizzuto v. Arave,* 280 F.3d 949, 970-71 (9th Cir.2001).

### Claims 15, 16, 17, and 18: The Death Sentence for Kidnapping

In addition to imposing a death sentence for murder, the trial court sentenced Petitioner to death for first-degree kidnapping under the authority of Idaho Code § 18-4505. (Tr. X, pp. 2630-31.) Petitioner challenges this sentence, claiming that "[a] sentence of death for a crime less than murder is a violation of [his] rights under the Eighth Amendment to the Constitution of the United States, and grossly disproportionate to the offense. *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977); *Edmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982)." (Docket No. 252, p. 26.)

In *Coker,* the Supreme Court held that a death sentence for the offense of rape is prohibited by the Eighth Amendment because the penalty is excessive and grossly disproportionate to that crime. *Id.* at 598. The Court emphasized, though, that the scope of its decision was limited to circumstances involving the rape of an adult woman who was not killed:

> We have the abiding conviction that the death penalty, which 'is unique in its severity and irrevocability,' [citation omitted] is an excessive penalty for the rapist who, as such, *does not take human life.*

> \* \* \*

> It is difficult to accept the notion, and we do not, that the rapist, with or without aggravating circumstances, should be punished more heavily than the deliberate killer *as long as the rapist does not himself take the life of his victim.*
> *Coker,* 433 U.S. at 598, 600 (emphasis added). In

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

a memorandum opinion issued the same day, the Supreme Court also found that a defendant's death sentence for kidnapping violated the Eighth Amendment, but, as in *Coker,* the victim had not been killed. *Eberheart v. Georgia,* 433 U.S. 917, 97 S.Ct. 2994, 53 L.Ed.2d 1104 (1977) (reversing *Eberheat v. State,* 232 Ga. 247, 206 S.E.2d 12 (Ga.1974)).

**\*28** Five years later, the Court applied *Coker* to conclude that the Eighth Amendment prohibits a death sentence for a defendant who aided and abetted the commission of another felony that resulted in death, but who did not kill, attempt to kill, or contemplate that a life would be taken. *Enmund v. Florida,* 458 U.S. 782, 801, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *but cf. Tison v. Arizona,* 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (holding that a death sentence does not offend the Eighth Amendment when the defendant was substantially involved in the crime that led to the victim's death, and the defendant had at least a reckless disregard for human life).

Some courts have since construed *Coker* and its progeny as not erecting a *per se* bar on the death penalty for the crime of kidnapping when that crime resulted in the victim's death. In *State v. Coleman,* 185 Mont. 299, 605 P.2d 1000, 1017 (Mont.1979), the Montana Supreme Court rejected an Eighth Amendment challenge to the defendant's death sentence for aggravated kidnapping, noting that *Coker* "is relevant only to crimes for which the penalty has been imposed which did not result in the loss of a life." *Accord McKenzie v. Osborn,* 195 Mont. 26, 640 P.2d 368, 381 (Mont.1981); *see also State v. Keith,* 231 Mont. 214, 754 P.2d 474, 482-83 (Mont.1988) (reaffirming the analysis). Similarly, in upholding a death sentence for aggravated kidnapping, the Kentucky Supreme Court has distinguished *Coker* and *Eberheart* on the ground that "in neither of those cases was the victim of the rape and kidnapping also murdered." *Salinas v. Commonwealth,* 84 S.W.3d 913, 916 (Ky.2002).

This Court is persuaded that these subsequent cases

have correctly interpreted the proper scope of *Coker* and its progeny, and the Court concludes that the Eighth Amendment does not automatically prohibit a death sentence when a kidnapping results in an intentional death. Here, of course, Petitioner intentionally killed Stacy Baldwin, a fact that was found by the trial court in its written findings in support of the death sentence for kidnapping. (R., Vol.III, p. 783.) While this Court has little doubt that a death sentence could be imposed under Idaho Code § § 18-4504-4505 when the victim has not been killed, which would raise grave constitutional questions, this is not such a case. The Court will leave for another day the constitutional issues that would arise in that scenario.

Petitioner next contends that the aggravating circumstances that the trial court relied upon to impose the death sentence for kidnapping are unconstitutionally vague. The trial court found that three statutory circumstances from Idaho Code § 18-4505 existed for the kidnapping conviction:

(a) "The victim of the kidnapping was subjected by the kidnapper to torture ... the intentional infliction of grievous mental or physical injury." At the time the defendant kidnapped Mrs. Baldwin, he intended to take her to a secluded spot, rape her, and then shoot her.

\* \* \*

The transportation from the Red Mini Barn in Blackfoot to the secluded spot on Rose Road-a distance of several miles-inflicted grievous mental injury and the attack and subsequent shooting which caused Mrs. Baldwin to lay wounded for over an hour before she died, constitutes, beyond a reasonable doubt, torture and grievous physical injury. The defendant, at the time, intended to inflict the harm upon his victim. [Idaho Code § 18-4505(6)(a) ]

**\*29** (b) "The defendant knowingly created a great risk of death to any person, including the kid-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

napped." The defendant, without a doubt, intended at the time he abducted the victim that she would die. [Idaho Code § 18-4505(6)(b) ]

(c) "The kidnapping was especially heinous, atrocious, or cruel, manifesting exceptional depravity." The defendant did not know the victim. Considering the victim's sensibilities and fear of attack and the circumstances surrounding the uncalled-for-abduction at gunpoint, and the purpose of the kidnapping, the Court finds beyond a reasonable doubt that, the abduction was especially heinous, atrocious, cruel, and manifested exceptional depravity. [Idaho Code § 18-4505(6)(d) ]

(R. Vol.III, pp. 782-83.) (Quotation marks in original.)

As noted, in *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (Idaho 1981), the Idaho Supreme Court placed a limiting construction on "especially heinous, atrocious, or cruel, manifesting exceptional depravity," as that language appeared in Idaho Code § 19-2515(g)(5). The Ninth Circuit Court of Appeals has upheld the *Osborn* construction. *Leavitt v. Arave,* 383 F.3d 809, 836-37 (9th Cir.2004). Though *Osborn's* analysis was directed at the HAC aggravator found in Idaho Code § 19-2515, which was applicable to defendants who have been convicted of murder, and the court did not expressly mention Idaho Code § 18-4505(6), there is no reason that the limiting construction does not apply equally to the identical language in that statutory subsection.

Here, the state court cited *Osborn* in its findings (R. Vol.III, p. 780), and it is presumed to have known that it must find that the kidnapping and associated acts that resulted in the killing were conscienceless, pitiless, and unnecessarily torturous to the victim. Accordingly, the sentencer was provided sufficient guidance, and its discretion was sufficiently narrowed, to comply with the Eighth Amendment.

Additionally, contrary to Petitioner's argument, a rational finder of fact could have found this aggravating circumstance to exist beyond a reasonable doubt. That evidence showed that Stacy Baldwin was a random kidnapping victim selected by Petitioner. She would not willingly leave the Mini Barn, and it can be inferred that Petitioner forced her to do so at gunpoint. Petitioner told David Holm that he intended to sexually assault Baldwin while he held her against her will, but that he was unable to complete this mission because she was hysterical and fighting with him. There is some evidence of a struggle between Petitioner and Baldwin. Petitioner told Baldwin to pray, shot at her several times in the dark, and left her in the snow after she had been shot. A rational factfinder could have found that the kidnapping that resulted in the homicide was conscienceless, pitiless, and unnecessarily torturous to the victim. Additionally, because the court weighed all mitigating circumstances against each aggravating circumstance individually, any constitutional infirmities in the other aggravating circumstances would be harmless. *See Pizzuto v. Arave,* 280 F.3d 949, 970-71 (9th Cir.2001).

**\*30** Finally, Petitioner contends that the imposition of a death sentence for the crime of kidnapping, when kidnapping was an underlying felony supporting the felony murder charge, violated his right against "double jeopardy as guaranteed by Idaho law" under *State v. Sivak,* 112 Idaho 197, 731 P.2d 192, 206 (Idaho 1986). (Docket No. 252, pp. 27-28.) Petitioner's attempt to transform what appears to be a state law issue into a federal one simply by citing the Eighth and Fourteenth Amendments is unavailing. *Estelle v. McGuire,* 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

Assuming that there is a cognizable federal claim here, Petitioner still would not be entitled to relief. Though his argument is somewhat unclear, he seems to contend that: (1) to the extent that the murder conviction was based on a theory that a killing occurred during the course of a kidnapping (felony murder), the kidnapping conviction merged with the conviction for first-degree murder; (2) because of merger, the kidnapping could not be used to support the felony murder aggravating circum-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

stance; and (3) because there was insufficient evidence to show a robbery or attempted rape, the alternative bases for felony murder, the error was not harmless. This Court is not persuaded.

Petitioner was charged with murder in the first degree on alternative theories of premeditated homicide and felony murder (R. Vol.II, p. 123-24), and the jury found him guilty under both theories. (R. Vol.III, pp. 658-59, 688.) The felony murder verdict and the subsequent analogous aggravating circumstance were predicated on the commission or the attempt to commit the crimes of kidnapping "and/or" rape "and/or" robbery. (R. Vol.III, pp. 658-59, 688.)

Contrary to Petitioner's argument that the evidence was insufficient to support the non-kidnapping alternatives, at the very least a rational factfinder could determine beyond a reasonable doubt that Petitioner killed Baldwin during the perpetration of a robbery. His assertion that robbery was complete before Baldwin was murdered is not persuasive, and a more plausible interpretation of the evidence is that all of these crimes, including the taking of cash from the Mini Barn and the theft of Baldwin's watch, occurred during a continuous stream of events. *See State v. Fetterly,* 109 Idaho 766, 710 P.2d 1202, 1207-08 (1985) (holding that a felony murder conviction can be based upon an underlying crime that occurred first during a unbroken chain of events culminating the victim's death). As there was ample evidence to support robbery/felony murder, the Court sees no reason to discuss whether the evidence was also sufficient to establish an attempted rape.

Therefore, because Petitioner's conviction and punishment for first-degree murder, either as a premeditated homicide or as a felony murder, would stand independently of the kidnapping conviction, Petitioner has not established prejudicial error.

### *Claim 23: Ineffective Assistance of Counsel*

Petitioner raises twenty-eight separate instances of ineffective assistance of counsel at trial, sentencing, and on appeal. In a comprehensive Memorandum Decision and Order, dated May 18, 2006, this Court determined that Petitioner was not entitled to an evidentiary hearing on nearly all of these issues. [FN9] (Docket No. 312.) For most of these subclaims, the Court found that even if the factual allegations were proven to be true, Petitioner would not be entitled to relief. The Court will not cover this ground a second time. Thus, where noted herein, the Court incorporates that analysis and will deny relief on selected subparts or issues without further comment.

> FN9. The Court reserved its evidentiary hearing ruling regarding counsel's alleged failure to conduct a reasonable mitigation investigation. (Docket No. 312, p. 1.)

1. *Standard of Law*

**\*31** To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show that his counsel's performance fell below an objective standard of reasonableness and that the defense was prejudiced as a result. *Strickland v. Washington,* 466 U.S. 668, 684, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In assessing whether counsel's performance was unreasonable, counsel's conduct must be viewed as of the time that the challenged act or omission occurred, and every effort must be made to eliminate the distorting lens of hindsight. *Id.* at 689. To prove prejudice, the petitioner must demonstrate that there is a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have been different. *Strickland,* 466 U.S. at 684. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.* at 694.

The *Strickland* standard also applies to claims of ineffective assistance of counsel on direct appeal. *Smith v. Robbins,* 528 U.S. 259, 286, 120 S.Ct. 746,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

145 L.Ed.2d 756 (2000). Generally, to show unreasonable representation, an omitted issue must have been "significant and obvious" on the record and clearly stronger than the issues that were raised. *See, e.g., Gray v. Greer,* 800 F.2d 644, 646 (7th Cir.1985); *Miller v. Keeney,* 882 F.2d 1428, 1434 (9th Cir.1989). To show prejudice, the petitioner must demonstrate that had counsel presented the issue on appeal, there is a reasonable probability that the appellate court would have reversed. *Robbins,* 528 U.S. at 288.

Unless the petitioner can show both deficient performance and prejudice, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland,* 466 U.S. at 687.

### 2. *Handling of the Insanity Issue*

Petitioner first contends that his trial counsel, David Parmenter, "perpetrat[ed] a fraud upon the state courts by pursuing an insanity issue knowing there was no factual basis for the defense." (Docket No. 252, p. 30.) This Court previously determined that Petitioner has not established a colorable Sixth Amendment claim with respect to counsel's actions prior to trial, as he has alleged no specific facts showing that counsel's "pursuit" of the insanity issue was unreasonably deficient or, even if it were, that it resulted in actual prejudice. (Docket No. 312, pp. 4-5.) To the extent that Petitioner claims that Parmenter's focus on this issue prevented him from developing other psychological evidence in mitigation of punishment at sentencing, that matter is discussed below.

Petitioner also appears to argue that counsel should have excluded from the appeal an issue related to the abolition of the insanity defense. This argument lacks merit, as he has failed to show that had counsel not raised that issue, there is a reasonable probability that the Idaho Supreme Court would have reversed. *Robbins,* 528 U.S. at 288.

### 3. *Failure to Call Eyewitnesses*

**\*32** For his next subclaim, Petitioner contends that trial counsel was constitutionally ineffective in failing to call "critical eyewitnesses" to the Baldwin abduction. The scope of this claim has shifted through time, but Petitioner seems to argue primarily that counsel was remiss in not calling Loretta Wallace to testify about her description of the man that she saw leaving the Mini Barn.

The Court reaffirms its decision that Petitioner has failed to show a colorable claim of ineffective assistance of counsel. (Docket No. 312, pp. 7-8.) Through his cross-examination of Carrie Baier and Detective Newbold, Parmenter was successful in eliciting evidence that the three girls' initial descriptions of the suspect did not match Petitioner, and he emphasized that point during his closing argument. To the extent that Petitioner contends that Wallace would have added that she had described the suspect's vehicle as a green pickup, presumably similar to the pickup that was found abandoned on the highway, that information was also before the jury. (Tr. Vol.IX, p. 2426.)

Accordingly, Petitioner has not shown that counsel's performance was unreasonably deficient, nor has he demonstrated a reasonable probability of a different outcome had Wallace testified. The Court sees no reason to repeat its analysis from the May 18, 2006 Memorandum Decision related to any other potential eyewitnesses. (Docket No. 312, pp. 7-8.)

### 4. *Failure to Preserve Attorney/Client Privilege and Attorney Work Product*

The Court reaffirms its decision that this allegation is conclusory, especially related to prejudice. (Docket No. 312, p. 8.)

### 5. *Proposing or Failing to Object to Constitutionally Defective Jury Instructions (subparts iv, v, xix)*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

Petitioner contends that his counsel was ineffective in proposing jury instructions and in failing to object to the instructions that were given relating to the State's burden of proof. Because this Court has now determined that there is no reasonable likelihood that the jury understood the instructions as allowing a conviction on proof less certain that beyond a reasonable doubt, Petitioner can show no prejudice.

Even if trial counsel had objected to the "protect the innocent" instruction (Instruction 17), and assuming that the instruction would have then been omitted from the packet given to the jury, Petitioner has not shown there is a reasonable probability that he would have been acquitted or convicted of a lesser offense. Likewise, he has not established that there is reasonable probability that he would have prevailed on appeal had this issue been raised. (Claim 23, subpart xix.)

4. *Failure to Challenge the Aggravating Factors, Argue that the Sentences Were Imposed Under the Influence of Passion or Prejudice, or Argue that the Penalty for Kidnapping was Disproportionate (subpart vi)*

(a) *Aggravators for Murder*

Given that the Idaho Supreme Court had already narrowed the HAC and utter disregard aggravating factors, and in light of the evidence supporting those factors in this case, there is no reasonable probability that, had counsel objected, the trial court would have eliminated those factors from its consideration. Petitioner has also not demonstrated that a challenge to the "previously convicted of another murder" circumstance would have been sustained, as the trial court specifically found that timing of the commission of the other murder was irrelevant. Further, David Parmenter did, in fact, allege during the post-conviction proceeding that the trial court had "double counted" some of the aggravators, and the trial court indicated that it had not done so.

*\*33* In short, Petitioner has not alleged facts showing unreasonably deficient performance with respect to the aggravators for murder, or, more importantly, a reasonable probability of a different sentence.

(b) *Death Sentence for Kidnapping*

The United States Supreme Court has not held that a death sentence for kidnapping is unconstitutional when the victim has been killed, and at least the HAC aggravating circumstance, as interpreted by the Idaho Supreme Court, is not unconstitutionally vague and is supported by the evidence. Thus, even assuming that a reasonably competent defense attorney would have litigated these issues in state court, Petitioner has not demonstrated a reasonable probability the death sentence for kidnapping would not have been imposed or would have been vacated or reversed on appeal.

(c) *Failing to Argue Against a Death Sentence*

Contrary to Petitioner's argument, defense counsel put on evidence in an effort to show Petitioner's redeeming qualities, and he pressed several points that he believed mitigated the punishment and called for sentence less than death. The nature of an attorney's closing argument is generally considered to be a matter of trial tactics. *Bell v. Cone,* 535 U.S. 685, 701-02, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

Regardless, Petitioner has failed to establish a reasonable probability that the trial court would have been persuaded by a more frontal attack against the death penalty, particularly in light of the weight supporting the aggravating circumstances in this case.

7. *Failure to Call Inmate Witnesses to Impeach David Holm's Testimony*

The Court reaffirms its decision that counsel's per-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

formance in this regard was not unreasonably deficient and that Petitioner cannot show any prejudice from the absence of any marginal impeachment material, particularly given that Parmenter focused a large portion of the defense case on discrediting Holm. (Docket No. 312, pp. 8-9.)

8. *Failure to Call Witnesses at Trial to Testify that Detective Shaw Supplied Marijuana to David Holm While Holm was Incarcerated*

Petitioner has failed to name any witnesses who can confirm this claim. It is conclusory and will be denied on that basis. (Docket No. 312, pp. 9-10.)

9. *Permitting a Ballistics Report to be Disclosed to the State and Failing to Call and Expert to Rebut the State's Ballistics, Hair, and Footprint Evidence (subparts ix and xi)*

The Court reaffirms its decision that Petitioner has not alleged any specific facts from which the Court could find actual prejudice flowing from trial counsel's failure to shield from the prosecution the negative opinion of ballistics expert Ned Stuart, or from counsel's failure to call Richard Fox or another expert to rebut the State's ballistics, hair, or footprint evidence. (Docket No. 312, pp. 10-11.) The only matter that requires additional comment here is Petitioner's argument that Fox should have been called to testify solely about the hair and footprint evidence, irrespective of his testimony as to the ballistics, thereby removing the threat of rebuttal testimony from Stuart. (Docket No. 316, p. 40.)

**\*34** There is no indication in this record that Fox had significant training and experience in hair and footprint examination; rather, Parmenter has testified that Fox was more of a generalist with some unusual theories about ballistics testing. (Parmenter Depo. p. 49.) With respect to the hair evidence particularly, counsel testified that Fox would not have provided "a whole lot of help in that area." (Parmenter Depo., p. 49.) Additionally, Parmenter had already argued at trial that the hair evidence did

not show a "match" but only some consistencies between Petitioner's sample and a hair found on Baldwin. (Tr. IX, pp. 2406-07.) This is equally true regarding the footprint evidence: with the assistance of his investigator, trial counsel presented evidence that the tread that made the footprints could allegedly be found on several different styles and brands of footwear available in Eastern Idaho. (Tr. Vol.VIII, pp.2071-72.) Therefore, Petitioner has not established that the exclusion of Fox's potential testimony in these areas, testimony that is largely undefined, actually prejudiced him.

10. *Failure to Argue that the Trial Court's Refusal to Permit Deputy Christian to Testify Violated Petitioner's Constitutional Right to Present Evidence*

The Court will address this allegation in conjunction with Petitioner's contention in Claim 27 that trial court's exclusion of Christian's testimony violated his constitutional right to present evidence in his defense.

11. *Failure to Call Medical Examiner Donald Reay*

The Court adopts its previous decision that this allegation is not supported by specific facts.

12. *Failure to Investigate, Develop, and Present Mental State Issues at Trial and at Sentencing*

In the Court's May 18, 2006 Memorandum Decision, it determined that Petitioner had not supported this claim with facts showing the nature of the supposed "mental state issues." (Docket No. 312, p. 14.) The Court reaffirms that Petitioner has failed to allege how trial counsel was ineffective in choosing not to present a defense at trial aimed at showing Petitioner lacked the mental state necessary to commit these offenses.

Petitioner was given another opportunity, however, to persuade the Court that he had alleged a colorable claim related to counsel's performance at the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

penalty phase, and the Court left open the possibility of an evidentiary hearing on that issue. In response, Petitioner lodged numerous documents, records, and other papers with the Court. (Docket Nos. 317-354.) Little effort was made to winnow out relevant documents from irrelevant ones, or to otherwise connect the information in a coherent fashion for the Court. In Petitioner's Supplemental Merits Brief on Non-Dismissed Claims, he refers to the voluminous lodging as a "factual proffer of what evidence could have been shown in mitigation at the sentencing." (Docket No. 316, p. 41.)

In a short memorandum introducing the factual proffer, Petitioner suggests that Parmenter was constitutionally ineffective because he failed to offer a complete picture of Petitioner's social and family history, and because counsel failed to present expert testimony related to Petitioner's mental health. (Docket No. 317.) Petitioner has also submitted an illustrative exhibit that purports to lay out his family tree with descriptive labels indicating drug abuse, mental illness, and criminal history. The Court has reviewed this material and concludes that the factual allegations, even if proven to be true, would not establish a Sixth Amendment claim under the *Strickland* standard, and this claim shall be denied without an evidentiary hearing.

**\*35** Before trial, Petitioner's Bonneville County attorneys retained a psychiatrist, Dr. Kenneth Ash, to evaluate Petitioner's mental status. David Parmenter also spoke with Dr. Ash personally in preparation for the Bingham County case, and although Dr. Ash never prepared a written report, he indicated that the facts were not favorable with respect to Petitioner's competency and his sanity at the time of the offense. (Parmenter Depo., p. 85.) Based on that opinion, and based further on counsel's own experiences in working with individuals at a state mental hospital, Parmenter felt that he had a "pretty good handle" on Petitioner's mental state. (Parmenter Depo., p. 86.) As a result, he did not seek another evaluation.

In an effort to compile a mitigation case, Parmenter

spoke with Petitioner's family, friends, and a former employer. (Parmenter Depo., p. 89.) His primary contact was Petitioner's mother, with whom he "spent a lot of time." (Parmenter Depo., p. 89.) Parmenter did not hire a mitigation specialist to obtain records, develop background information, or to conduct interviews, and it appears that he relied on the investigator's work from the Bonneville County case and on his own independent investigation. (Parmenter Depo., p. 92.) He has since estimated that he expended probably 20 to 25 hours to prepare solely for the aggravation-mitigation hearing. (Parmenter Depo., 91.)

At that hearing, Parmenter called several witnesses on Petitioner's behalf. Some of these witnesses testified about Petitioner's bout with polio as a small child and how it left him with permanent disadvantages, including a limp, other coordination problems, and an inability to engage in normal childhood activities. Petitioner's witnesses also testified that he was a gentle, caring, and trustworthy person. In particular, female friends and family members claimed that they never felt threatened or uneasy around him and that he had been a good babysitter. Counsel also presented the testimony of jail officials, who indicated that Petitioner was a well-behaved inmate who had not caused any problems. Petitioner's work skills and dependability as a sheetrocker were also explored. (Tr. Vol.X, pp. 2474-2556.)

Distilled to its essence, the mitigation case that Parmenter chose to present can fairly be characterized as focusing on Petitioner's redeeming qualities and "good" character traits. Petitioner now contends that Parmenter failed to investigate and present evidence related to the darker aspects of his family background and upbringing, and that he was deficient in not presenting expert testimony, particularly related to the effect that longstanding drug abuse would have had on mental functioning.

In deciding whether a capital defense attorney's performance at the penalty phase fell below an objective standard of reasonableness, the relevant in-

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

quiry is not whether counsel should have presented a certain type of mitigating evidence, but whether the investigation supporting counsel's decision was itself reasonable, measured under prevailing professional norms. *Wiggins v. Smith,* 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). The Supreme Court has "long referred [to the American Bar Association Standards for Criminal Justice] as 'guides to determining what is reasonable' " in these circumstances. *Wiggins,* 539 U.S. at 524 (quoting *Strickland v. Washington,* 466 U.S. at 688). According to the standards in effect in at the time of Petitioner's trial and sentencing, defense counsel had a duty "to conduct a thorough investigation of the defendant's background." *Williams v. Taylor,* 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1 (2d ed.1980)). Specifically, competent counsel would be expected to gather information about the defendant's "education, employment record, mental and emotional stability, family relationships, and the like." 1 ABA Standards for Criminal Justice, 4-4.1, commentary, p. 4-55 (2d ed.1980).

**\*36** Although Parmenter did conduct a mitigation investigation, and he called a number of witnesses at the sentencing hearing, by his own admission he devoted only an estimated 20 to 25 hours-the equivalent of about three work days-to prepare for the hearing. If accurate, this estimate strikes the Court as an exceedingly brief amount of time to conduct a "thorough investigation" into Petitioner's background. Petitioner has also submitted a new affidavit from Parmenter in which he asserts that he did not take "any steps to learn about [Petitioner's] mental health, emotional, social, and drug use background in preparation for the sentencing proceedings," not based on some strategic reason, but because he "just did not think to do it." (Docket No. 324, Exhibit 48.)

To some degree, the broadness of trial counsel's claim in his recent affidavit is undermined by the existing record, as he has previously testified that

he conferred with Dr. Ash regarding at least some aspects of Petitioner's "mental health" and that he discussed parts of Petitioner's background with friends, family, and an employer. But the Court takes the affidavit as an affirmation that the *scope* of counsel's mitigation investigation did not include the *type* of information that Petitioner has now proffered. The Court does not doubt that the Sixth Amendment would permit a capital defense attorney to emphasize, as a matter of trial tactics, a defendant's good character and redeeming attributes to the exclusion of other evidence with a less certain impact on the sentencer. But here Parmenter failed to investigate Petitioner's "mental health, emotional, social, and drug use background" because he simply did "not think to do it," an indication that the "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Wiggins,* 539 U.S. at 526. Consequently, this Court concludes that Petitioner has alleged sufficient facts to show at least a colorable claim that trial counsel's mitigation investigation fell below an objective standard of reasonableness for a capital case in the late 1980s.

This determination gets Petitioner only part of the way to his destination, however. He must still allege specific facts that, if true, would also show a reasonable probability that had counsel conducted the type of mitigation investigation that Petitioner now believes he should have, the outcome of the sentencing hearing would have been different. In assessing prejudice under these circumstances, the Court must reweigh the evidence in aggravation against the totality of the available mitigating evidence, including the mitigating evidence adduced in the federal habeas proceeding. *Wiggins,* 539 U.S. at 534. The aggravating circumstances in this case are simply too strong, and the new mitigating evidence, even if credible, adds too little, to create a reasonable probability of a different outcome.

By the time that Petitioner appeared before the court for sentencing in this case he had already been convicted in the Michelbacher matter of kid-

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

napping, rape, the infamous crime against nature, and murder in the first degree. He had also entered a conditional guilty plea in the Haddon matter, albeit while maintaining his innocence, to murder in the second degree and robbery. Thus, regardless whether these facts supported the "previously convicted or another murder" aggravating factor or the aggravator based upon a "propensity to commit murder," or both, Petitioner's recent history of committing a string of violent felonies carried heavy weight on the aggravating side of the balance.

**\*37** Further, despite Petitioner's protestations to the contrary, there was sufficient evidence in the record to establish that the crimes in this case were especially heinous, atrocious or cruel, manifesting exceptional depravity, and that Petitioner exhibited an utter disregard for human life, as those terms have been defined and limited by the Idaho Supreme Court. Petitioner committed acts of random, senseless, and gratuitous violence against an innocent young woman who likely suffered extreme mental and physical anguish during the attack. Of course, the felony murder with specific intent to kill aggravating circumstance was also amply supported by the facts.

On the other side of the scale, the state court was already well aware of, but not swayed by, several mitigating circumstances that were individual to Petitioner, including his difficulties as a young child diagnosed with polio, which hampered his ability to fit in with his peers, and his limited education. The court also noted Petitioner's work skills, cooperative nature with those close to him, kindness to children, and good behavior while incarcerated. The court indicated that Petitioner's female friends trusted him and found him to be compassionate. (R. III, pp. 784-88.)

The additional facts that Petitioner has proffered in this proceeding would not have created a critical mass of mitigating evidence that might have tipped the scales toward life. Much of the new information pertains to remote or extended family members, and its probative force would have been marginal. The

Court recognizes that Petitioner is attempting to show a complete family history, going back several generations, but he has not explained how the rumored behavior of distant relatives has a causal or direct bearing on him.

Within his more immediate family, Petitioner has come forward with evidence that his father was an alcoholic with a relatively low IQ who had a criminal record and who attempted suicide at least once in the past. Petitioner has also submitted declarations indicating that his mother and father fought routinely, both verbally and physically, and that the children witnessed these fights. Clearly, poverty and substance abuse were prevalent throughout the family. (Docket No. 320, Exhibits 1-19.)

Notably absent, however, is any persuasive evidence that Petitioner was himself physically or violently abused as a child, abandoned, placed within the State's custody, or otherwise institutionalized. FN10 Petitioner has also provided no records showing that *he* has a documented history of emotional disturbances, mental illnesses, or organic brain disorders during his developmental years or later. Indeed, a persistent theme running through many of the declarations from family and friends is that Petitioner was a gentle, caring, and likable person until he started abusing drugs. (Docket No. 320, Exhibits 1-19.) This assessment of his character is largely consistent with the information that was already in front of the state court at sentencing.

> FN10. The proffer includes some vague claims of incest within the family, but Petitioner has not included those factual allegations in his Third Amended Petition. Additionally, in his Bonneville County capital habeas case, he asked the Court to delete similar allegations from his Petition, a request that was granted. (Case No. 93-156-S-EJL, Docket No. 154, pp. 3-5, Docket No. 174, p. 5.)
>
> Moreover, any sexual abuse seems to have involved primarily older male relat-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

ives and Petitioner's sisters, rather than Petitioner himself. There may have been an inappropriate relationship between Petitioner and one of his sisters, and perhaps between Petitioner and a female aunt, but reports of the latter are based on second-hand information and it appears that this relationship, if it occurred, began when Petitioner was an adult. (Docket No. 320.)

**\*38** The declarations that Petitioner has submitted from two mental health experts do not conclusively fill in the blanks about his mental or emotional state, either now or at the relevant time. Instead, they largely repeat the family history without providing firm conclusions. For instance, Dr. Craig Beaver, a neuropsychologist, writes that "Paul Rhoades grew up in a family context that deprived him of normal development," and that chronic methamphetamine use "may have well have damaged his brain in areas critical to impulse control and the ability to think clearly in highly pressured situations," but he ultimately concludes that "[f]urther neuropsychological testing has always been necessary to fully and adequately assess Paul Rhoades." (Docket No. 318, pp. 39-40.) Dr. Beaver reaches the conclusion that further neuropsychological testing is necessary despite the passage of twenty years since these crimes were committed.

Similarly, Dr. Pablo Stewart, a psychiatrist, admits that he has not conducted an evaluation of Petitioner, and he indicates that his opinion is a "limited" one based upon his review of selected records and Dr. Beaver's report. Although Dr. Stewart does list several possible diagnoses, including post-traumatic stress disorder, polysubstance abuse, mood disorder, cognitive disorder, substance induced mood disorder, substance induced psychotic disorder, he does not elaborate on these preliminary conclusions and qualifies even his limited opinion as a "working assessment." (Docket No. 319, p. 21.) Even at this late juncture, Petitioner's emotional and mental makeup remains inconclusive.

Recent cases from the Supreme Court that have addressed the quality and strength of undiscovered mitigating evidence further guide and inform this Court's decision. An illustrative example is *Wiggins,* in which the sentencing jury did not hear that the defendant was frequently abandoned as a small child and forced to beg for food before he was placed in foster care, where he was repeatedly sexually assaulted. *Id.* at 534-35, 537. The Supreme Court found that counsel's failure to develop and present that evidence was prejudicial, given that only a "halfhearted" mitigation case was offered. *Id.* Likewise, in *Rompilla v. Beard,* 545 U.S. 374, 392, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), defense counsel failed to unearth a treasure trove of mitigating evidence indicating that the defendant, who suffered from organic brain damage, was beaten often by his alcoholic father and left in a wire mesh dog pen filled with excrement. *See also Williams v. Taylor,* 529 U.S. 362, 370, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (defendant was borderline mentally retarded and had suffered through a nightmarish childhood of deprivation and abuse); *Stankewitz v. Woodford,* 365 F.3d 706, 716 (9th Cir.2004) (defendant was beaten by his alcoholic parents, became a ward of the state, was institutionalized and thereafter sexually abused).

While Petitioner's factual proffer may present a more complete family history of substance abuse, neglect, and general dysfunction, it simply does not depict the same "excruciating" life history that was found to exist in these other cases. More importantly, given the strength of the aggravating circumstances found to exist in this case and the incremental contribution that Petitioner's newly proffered facts, even if proven to be true and credible, would have added to the mitigation case, there is no reasonably probability that the result of the sentencing proceeding would have been different. This claim will be denied, and no evidentiary hearing is required.

13. *Presenting a Deficient Sentencing Memorandum*

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

**\*39** Petitioner has not explained how eliminating or altering the defense sentencing memorandum would have led to a reasonable probability of a different sentence, and this claim shall be denied.

14. *Failure to Establish a Workable Discovery Procedure*

The Court adopts is previous decision that this claim is devoid of specific facts supporting either prong of the *Strickland* test. (Docket No. 312, p. 15.)

15. *Failure to Fully Investigate the Kevin Buchholz Confession*

In his briefing, Petitioner frames this sub-issue by arguing that counsel was deficient in failing to investigate the circumstances surrounding Buchholz's alibi. Petitioner has alleged no facts, however, casting doubt on that alibi, which was supported by Buchholz's father's testimony during the post-conviction hearing. Also, given that Buchholz was unavailable to testify at trial, Petitioner has not demonstrated how trial counsel could have introduced evidence casting doubt on his alibi, had he found any.

16. *Failing to Present Live Witnesses at the Motion to Suppress*

The Court reaffirms its previous decision that Petitioner has not alleged facts showing either deficient performance or prejudice. (Docket No. 312, p. 15.)

17. *Failure to Appeal the Trial Court's Exclusion of Deputy Christian's Testimony*

The Court will address this allegation in conjunction with Petitioner's contention in Claim 27 that trial court's exclusion of Christian's testimony violated Petitioner's constitutional right to present evidence in his defense.

18. *Failure to Argue the Constitutional or Factual Deficiencies of the Aggravating Circumstances*

To the extent that this claim addresses counsel's actions on appeal and does not duplicate Claim 23, subpart vi, Petitioner has not shown how a constitutional or factual challenge to the aggravating circumstances in the Idaho Supreme Court would have reasonably led to a reversal. Petitioner has not shown error, but even if he had, any error in a single aggravator would be harmless, given that the trial court clarified that it had weighed the mitigating circumstances cumulatively against each aggravator.

19. *Failure to Move to Withdraw Following Sentencing*

The Court adheres to its previous decision that Petition cannot show prejudice from this claim. (Docket No. 312, p. 16.)

20. *Failure to Require the Idaho Supreme Court to Comply with Its Statutory Automatic Review*

Petitioner has not established that there is a reasonable probability that the Idaho Supreme Court would have reversed had counsel argued that it was required to review whether the death sentences were the result of passion, prejudice, or any other arbitrary factor and whether the aggravating circumstances were supported by the evidence. Counsel's failure to press those issues in the appellate court was not ineffective.

21. *Failure to Raise, Develop, Brief, or Argue the Unconstitutionality of the Death Penalty for Kidnapping and the Aggravating Circumstances in Support*

**\*40** Even assuming, for the sake of argument, that a reasonably competent defense attorney would have litigated constitutional issues surrounding Petitioner's death sentence for kidnapping, Petitioner has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

not demonstrated a reasonable probability the state appellate court would have reversed his death sentence for that crime.

22. *Failure to Argue Residual Doubt*

The Court reaffirms its previous decision that counsel's decision to focus on the mitigating evidence rather than lingering doubt of guilt is a tactical one, and that counsel did, in fact, briefly touch on residual doubt and questions regarding the extent of Petitioner's role in the offenses. Further, Petitioner has not shown how a different argument would have had any material effect on the sentencer. (Docket No. 312, p. 17.)

23. *Failure to Raise on Appeal that the Aggravating Circumstances Had Been Double Counted*

Regardless whether appellate counsel raised this issue directly, the Idaho Supreme Court appears to have addressed it anyway. Before concluding that the "trial court completed the weighing process correctly," the Idaho Supreme Court cited with approval the trial court's language in its post-conviction decision that it had "avoided 'duplicating' or 'stacking' the statutory aggravating factors ..." *Rhoades I,* 820 P.2d at 680. In any event, Petitioner has not established that he was prejudiced by his counsel's failure to raise the issue more explicitly.

24. *Failure to Argue Evidentiary Rulings on Appeal*

The Court reaffirms that this claim is conclusory. (Docket Nos. 167, p. 18, 312, p. 17.)

25. *Failure to Raise on Appeal that the Sentencing Court Improperly Weighed All Mitigating Circumstances Against All Aggravating Circumstances*

The Idaho Supreme Court addressed this issue on appeal and concluded that it had no merit because the trial court had clarified that it had not, in fact, weighed all mitigators against all aggravators. *Rhoades I,* 890 P.2d at 680.

26. *Failure to be Present at the Presentence Interview*

The Court will address this claim with Claim 28, discussed below.

27. *Cumulative Errors*

The Ninth Circuit had held that although individual errors may not rise to the level of a constitutional violation, a collection of errors might violate a defendant's constitutional rights. *Harris v. Wood,* 64 F.3d 1432, 1438 (9th Cir.1995). But for any professionally unreasonable errors that Petitioner's counsel may have committed here, which are few, "the nature of the claims does not support a conclusion of cumulative prejudice." *Davis v. Woodford,* 384 F.3d 628, 654 (9th Cir.2004). As in *Davis,* "[c]ounsel's few missteps and misjudgments did not render [Petitioner's] trial fundamentally unfair." *Id.*

### Claim 27: Right to Present Evidence

Petitioner revisits the Kevin Buchholz issue in this claim and alleges that his Sixth and Fourteenth Amendment right to present a meaningful defense was violated when the trial court prevented him from calling Deputy Christian to testify.

**\*41** "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " *Crane v. Kentucky,* 476 U.S. 683, 689-690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). A defendant's right to present evidence, however, is subject to reasonable restrictions based upon other legitimate interests in the criminal trial

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

process. *United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (citations omitted). States have broad latitude to establish rules excluding evidence from criminal trials, and such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." *See Id.* (citing *Rock v. Arkansas,* 483 U.S. 44, 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)).

Here, Petitioner relies primarily on *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). In that case, the Supreme Court held that the due process clause affords a criminal defendant the right to introduce into evidence a third party's declaration against penal interest when the circumstances surrounding the statement contain "persuasive assurances of trustworthiness." *Id.* at 300. But while Buchholz's statements in this case may have been against his penal interest, the circumstances in which he made those statements did not contain persuasive assurances of trustworthiness. He was intoxicated when he "confessed" to Christian, and he recanted those statements when he was sober. (PCR Tr., pp. 254-55.) The police confirmed that Buchholz had been with his family and at the hospital during the time frame that Baldwin was likely killed, and investigators could find no other evidence that linked him to the crime. (PCR Tr., p. 259.)

Thus, although it is true that hearsay rules must not be applied "mechanistically to defeat the ends of justice," *see Chambers,* 410 U.S. at 302, Petitioner has not shown that the rule in this case was applied mechanistically. Rather, the trial court considered the circumstances surrounding the statements, and it determined that the proffered evidence was not sufficiently trustworthy or reliable to be admissible. Idaho has an interest in excluding unreliable evidence from its criminal trials, *see Scheffer,* 523 U.S. at 308, and deference to a trial court's finding of unreliability is especially appropriate on federal habeas review. Furthermore, had Christian been

permitted to testify, all of the other evidence that undermined the Buchholz confession would have certainly followed, and, as a result, Petitioner has not established that any error in excluding this hearsay had a "substantial and injurious influence or effect on the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

Similarly, Petitioner has not demonstrated that his state court counsel was constitutionally ineffective in failing to argue the due process claim to the trial court, or to raise that issue during the direct appeal (Claim 23, part x, xviii), as he has not shown that there is reasonable probability that the result of the trial or appellate proceeding would have been different if only his counsel had framed and argued the issue in the manner that he now believes it should have been framed.

### Claim 28: The Presentence Interview

**\*42** In *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Supreme Court held that a defendant in a capital case has a Fifth Amendment privilege not to incriminate himself during an interview with a psychiatrist who will testify for the state at sentencing. The Ninth Circuit has concluded that the reasoning in *Estelle* applies to an interview with a state official who is conducting a presentence investigation in anticipation of a capital sentencing proceeding. *Hoffman v. Arave,* 236 F.3d 523, 537-38 (9th Cir.2001). The Ninth Circuit further determined in *Hoffman* that a presentence interview in a capital case is a "critical stage" of the proceeding such that the defendant has the right to the assistance of counsel under the Sixth Amendment. *Id.* at 539.

Petitioner cites *Estelle* and *Hoffman* to allege that his Fifth and Sixth Amendment rights when the trial court relied on statements that he had made during the presentence investigation interview. But Petitioner made no statements during the interview that were used by the court in imposing the death

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

penalty. Although he did respond to some questions, those responses were usually on benign subjects that the court ultimately considered to be mitigating. Petitioner did mention that he "liked doing drugs of any kind," but evidence of Petitioner's drug use was already in the record, and there is no indication that the admission to the presentence investigator was considered by the Court in aggravation of punishment. Instead, it appears that the trial court considered drug use to be a mitigating circumstance or, at worst, a neutral factor. (R. III, p. 13.)

Moreover, as in *Hoffman,* Petitioner's Fifth Amendment claim is undercut by the fact that he was aware of his right to remain silent, as he chose not to provide his version of the events. *Id.* at 538. With respect to the Sixth Amendment claim, there is no indication that Petitioner's counsel was prohibited from attending the interview, unlike *Hoffman.*

Finally, because Petitioner has not shown that any statements were relied upon by the state court, he has not established that any error prejudiced him. *Hoffman,* 236 F.3d at 540. This is equally true when the issue is recast as an ineffective assistance of counsel claim (Claim 23, subpart xxviii), because Petitioner has not shown a reasonable probability of a different outcome but for counsel's alleged failure to be present or to object to the trial court's consideration of Petitioner's mainly innocuous statements in the PSI.

### Claim 29: Weighing of Aggravation and Mitigation

Petitioner's final non-dismissed claim is based on *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (Idaho 1989). In *Charboneau,* the Idaho Supreme Court construed Idaho Code § 19-2515(c) as requiring district courts to weigh all mitigating evidence collectively against each aggravating circumstance found to exist individually. *Id.* at 323.

This is an issue of statutory construction. The United States Constitution does not impose this particular requirement, and the Supreme Court has left the development of weighing procedures largely to the states. *Kansas v. Marsh,* 548 U.S. 163, ----, 126 S.Ct. 2516, 2525, 165 L.Ed.2d 429 (2006). And, as noted herein, the trial court clarified during the post-conviction proceeding that it had weighed the collective mitigating evidence against each aggravator found to exist, which the Idaho Supreme Court acknowledged on appeal. *Rhoades I,* 820 P.2d at 680. Given this, Petitioner has not explained how prejudicial error occurred in his case.

### V.

### ORDER

**\*43** NOW THEREFORE IT IS HEREBY ORDERED that the Third Amended Petition for Writ of Habeas Corpus shall be DENIED.

IT IS FURTHER ORDERED that this cause of action shall be DISMISSED with prejudice.

D.Idaho,2007.
Rhoades v. Arave
Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)

END OF DOCUMENT

274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.)))**

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter. See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Tenth Circuit Rule 32.1. (Find CTA10 Rule 32.1)

United States Court of Appeals,
Tenth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Richard Ray ASHLEY, Defendant-Appellant.
**No. 06-2258.**

April 18, 2008.

**Background:** Defendant was convicted in the United States District Court for the District of New Mexico of being a felon in possession of a firearm, for which he was sentenced to 51 months of imprisonment. Defendant appealed.

**Holdings:** The Court of Appeals, Jerome A. Holmes, Circuit Judge, held that:
(1) government's failure to disclose plans of calling witnesses did not amount to a *Brady* violation;
(2) defendant waived for appellate review challenge against prohibition against mentioning first trial in open court; and
(3) sentence was reasonable.

Affirmed.

West Headnotes

**[1] Criminal Law 110 ☞2001**

110 Criminal Law
    110XXXI Counsel
        110XXXI(D) Duties and Obligations of Prosecuting Attorneys
            110XXXI(D)2 Disclosure of Information

110k1993 Particular Types of Information Subject to Disclosure
            110k2001 k. Other particular issues. Most Cited Cases
Government's failure to disclose three witnesses to defendant prior to retrial on charge of being a felon in possession of a firearm did not amount to a *Brady* violation, where, despite defendant's claim that knowledge of witnesses prior to retrial would have assisted the defense in impeaching their testimony, that by itself did not constitute exculpatory evidence necessary for a *Brady* violation.

**[2] Criminal Law 110 ☞1137(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(L) Scope of Review in General
            110XXIV(L)11 Parties Entitled to Allege Error
                110k1137 Estoppel
                    110k1137(1) k. In general. Most Cited Cases
Challenge against district court's refusal to allow defendant to ask questions regarding outcome of previous trial, in prosecution for being a felon in possession of a firearm, was waived for appellate review, where, in addressing the issue before district court, rather than objecting to issue, defendant agreed that the topic should not be discussed in open court.

**[3] Sentencing and Punishment 350H ☞95**

350H Sentencing and Punishment
    350HI Punishment in General
        350HI(E) Factors Related to Offender
            350Hk93 Other Offenses, Charges, Misconduct
                350Hk95 k. Nature, degree, or seriousness of other misconduct. Most Cited Cases

**Weapons 406 ☞343**

406 Weapons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT FOUR

274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.)))**

406V Prosecution
406V(H) Sentence and Punishment
406k343 k. Possession after conviction of crime. Most Cited Cases
(Formerly 406k17(8))

Imposition of 51-month sentence for being a felon in possession of a firearm was reasonable; district court noted defendant's lengthy criminal history spanning more than three decades, which included crimes on seven separate occasions, many involving firearms and some involving violence. 18 U.S.C.A. § 3553(a).

**\*694** David C. Iglesias, Office of the United States Attorney, Albuquerque, NM, Terri J. Abernathy, Office of the United States Attorney District, Las Cruces, NM, for Plaintiff-Appellee.

James W. Klipstine, Jr., Klipstine, Bowlin & Honigmann, Hobbs, NM, for Defendant-Appellant.

Before HENRY, Chief Judge, McWILLIAMS, Senior Circuit Judge, and HOLMES, Circuit Judge.

### ORDER AND JUDGMENT FN*

FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R.App. P. 32.1 and 10th Cir. R. 32.1.

JEROME A. HOLMES, Circuit Judge.

**\*\*1** Defendant-Appellant Richard Ashley was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The district court sentenced him to 51 months of imprisonment, the bottom of the Guidelines recommended range, and 36 months of supervised release. Mr. Ashley now challenges the district court's rulings pertaining to the disclosure and cross-examination of three witnesses and the length of his sentence. Our jurisdiction arises under 28 U.S.C. § 1291 and 18

U.S.C. § 3742(a), and we affirm.

### I. *BACKGROUND*

We report the facts in the light most favorable to the verdict. Mr. Ashley was indicted by a grand jury on the charge of being a felon in possession of a firearm. The charge arose from a trip Mr. Ashley took to Pancho Villa State Park near Columbus, New Mexico, during which Mr. Ashley showed his .22 pistol to a park ranger, Ranger Martinez, and a park volunteer. Also during that trip, a paid informant saw Mr. Ashley wearing a fanny pack that appeared to contain a pistol. The informant, who had gone to the park looking for Mr. Ashley because he had received information about him, told an Immigration and Customs Enforcement agent, Agent Spiess, that he had seen Mr. Ashley and believed he was carrying a firearm. Agent Spiess then went to Mr. Ashley's campsite, where he searched Mr. Ashley's possessions and found an unloaded .22 pistol in a dry storage box. Mr. Ashley told Agent Spiess that his son had left the pistol in the camping gear. FN1

FN1. The reported account of what Mr. Ashley told Agent Spiess is based upon the testimony of the latter. *See* Aplee. Supp.App., Vol. I, at 62 (testifying that Mr. Ashley said "[t]hat his son had left it in the camping gear."). Mr. Ashley disputed this account. He testified that he learned for the first time that the firearm was in the camping gear the evening before his encounter with Agent Spiess and the weapon had been placed there by a friend who was holding it for Mr. Ashley's son. *See id.* at 219-20, 231, 238.

Mr. Ashley was tried on the charge of being a felon in possession of a firearm. The government's main witness was Agent Spiess, who testified about the circumstances under which he found the pistol. The jury was unable to reach a unanimous verdict and a mistrial was declared.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.)))**

Mr. Ashley was retried on the charge. Six days before trial, the government provided Mr. Ashley with Ranger Martinez's name and the names of the paid informant **\*695** and park volunteer, and indicated that it planned to call all three individuals as witnesses. The government also provided Mr. Ashley with Ranger Martinez's affidavit, which summarized his anticipated testimony.

Mr. Ashley objected to the government's use of these witnesses. Principally, he argued that the government failed to disclose the witnesses in a timely manner, thus preventing Mr. Ashley from effectively preparing to explore credibility issues raised by the government's decision not to call the witnesses in the initial trial. Mr. Ashley sought a dismissal of the indictment. In the event the court was opposed to such relief, Mr. Ashley alternatively argued that the court should permit him to cross-examine the witnesses regarding their absence at the initial trial. At no point did Mr. Ashley seek a continuance to address his concerns related to the government's allegedly untimely witness disclosure.

The district court expressed its inclination to deny the motion to dismiss and ultimately did so. It permitted the government to call the witnesses and allowed the defense to cross-examine them regarding their absence at the initial trial, so long as the defense did not mention, or seek to elicit testimony concerning, the outcome of the initial trial.

**\*\*2** The jury returned a guilty verdict, and Mr. Ashley was sentenced to 51 months' incarceration. The applicable United States Sentencing Guidelines Range was 51 to 63 months. Mr. Ashley timely appealed from the district court's judgment and sentence.

## II. *DISCUSSION*

### A. *Disclosure of Witnesses*

[1] Mr. Ashley claims that the failure to timely disclose the identity of the three witnesses before the retrial violated his due process rights. In a motion to dismiss raised before the district court and in his briefing before this court, he has framed the issue as the suppression of material, exculpatory evidence, arguing that the government violated *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 154-55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

"We review questions regarding the disclosure of exculpatory or impeachment evidence de novo." *United States v. Gonzalez-Montoya,* 161 F.3d 643, 649 (10th Cir.1998). To establish a *Brady* violation, Mr. Ashley must demonstrate that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material. *Id.; see also United States v. Wright,* 506 F.3d 1293, 1301 (10th Cir.2007). After thorough review of the record, we reject Mr. Ashley's disclosure challenge.

As the government correctly noted, his challenge fails at the "most fundamental level," Aplee. Br. at 11-the identification of evidence favorable to the defense. Mr. Ashley has not advanced a persuasive theory that would permit us to characterize information related to the three witnesses as exculpatory. The witnesses possessed testimony that was incriminating to Mr. Ashley, not exculpatory. Indeed, Mr. Ashley candidly acknowledged as much: "It is not Mr. Ashley's complaint that the evidence provided by these witnesses was in itself favorable to his defense. It clearly was not." Aplt. Op. Br. at 18.

Mr. Ashley's idea appears to be that the fact that witnesses the government put forward as having relevant testimony for the retrial were not called to testify in the initial trial implicates *Brady* because it raises the possibility of recent fabrication or otherwise calls the witnesses' credibility **\*696** into question. *See* Aplt. Op. Br. at 18 (citing *Brady,* stating, "It is his [Mr. Ashley's] complaint that disclosure of the evidence in a timely fashion would have, as a matter of due process, allowed him to effectively

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.)))**

attack the *credibility of the evidence* " (emphasis added)); Aplee. Supp.App., Vol. I, at 21, 153-54 (e.g., informing the district court, "Basically, ... it's our position that we should have been able to explore the possibility of the *issue of recent fabrication.*" (emphasis added)).

However, logically, there is nothing inherently exculpatory about the fact that the government did not call the witnesses in the initial trial, but elected to do so in the retrial. *Cf. United States v. Watts,* 95 F.3d 617 (7th Cir.1996) (declining to infer from the prosecution's decision not to call a witness to testify that "his testimony would have been adverse to the prosecution").[FN2] In particular, this sequence of events does not naturally suggest that the information the witnesses had to offer "changed" between the two trials.

> FN2. In *Watts,* the government did not call a witness named "Walls" to testify at the defendant's trial for possession of crack cocaine with intent to distribute. 95 F.3d at 618. He was one of only two people "who might have seen" the defendant possess the drugs. *Id.* Nevertheless, in assessing defendant's challenge to the sufficiency of the evidence, the Seventh Circuit declined to infer from the government's failure to call Walls to testify that his evidence was adverse to it (and, thus, presumably favorable to the defense). *Id.* at 619. Specifically, the court noted: "The government may have had strategic reasons for not calling Walls, or it simply may have decided that it did not need his testimony." *Id.* Similarly, we are unwilling to infer the existence of material impeachment evidence within the meaning of *Brady* and *Giglio* by engaging in a high degree of speculation about the government's litigation decision-making. In particular, we will not speculate that at the time of the initial trial the government decided not to call the three individuals at issue as witnesses be-

cause their testimony was unfavorable to its case (and, thus, presumably favorable to the defense) and then elected to call them for the retrial because their testimony "changed" for the better.

**\*\*3** Indeed, as the government noted, the answer could easily lie in the fact that a different prosecutor handled the retrial and exercised independent forensic judgment in selecting witnesses. *See* Aplee. Br. at 12 n. 8 ("The change in prosecutors is reflected in the differing presentations of the evidence."); Aplee. Supp.App., Vol. I, at 156 ("The fact that the United States did not call them is indicative, simply, of the fact that the previous prosecutor on this case must have believed there was sufficient evidence on [sic] the witnesses that were called."). We are hard-pressed, moreover, to see how the credibility of the witnesses could be called into question by the fact that *another person*-the government-changed its mind and decided to avail itself of their testimony in the retrial. The witnesses would not have had any role in this government decision, and Mr. Ashley makes no assertions to the contrary. Consequently, we are puzzled as to how *the fact of* their appearance as witnesses could cast any doubt on their veracity.

"[O]n this record we are left only with speculation and conjecture," *United States v. Nevels,* 490 F.3d 800, 804 (10th Cir.2007), concerning the alleged exculpatory nature of the evidence. That is not enough. *See United States v. Williams-Davis,* 90 F.3d 490, 514 (D.C.Cir.1996) (joining the Third and Ninth Circuits in declining to infer the existence of *Brady* material based upon speculation alone, and therefore rejecting defendant's *Brady* claim because "[e]xcept for bare speculation, ... [defendant] has nothing to suggest the existence of favorable materials"); *United States v. Santiago,* 993 F.2d 504, 506 (5th Cir.1993) (holding that defendant "failed to demonstrate a *Brady* violation" in part **\*697** because he "ha[d] not established the exculpatory nature of the allegedly suppressed evidence-his allegations are mere speculation and con-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.)))**

jecture"), *overruled on other grounds by United States v. Calverley,* 37 F.3d 160, 164 & n. 27 (5th Cir.1994) (en banc), *abrogated on other grounds by Johnson v. United States,* 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

Mr. Ashley has suggested that his real concern was the timing of the disclosure-which allegedly prevented him from effectively responding to the new witnesses and their testimony. For example, when asked by the district court "[w]hat ... about [the character of] that testimony" he thought was "exculpatory," Mr. Ashley responded:

Judge, I suppose it is ... the fact that the Government had this evidence available at a previous trial and did not call these witnesses-*it's the issue of-... the fact that the defendant has not had an opportunity to appropriately and completely evaluate why* the Government would not call these witnesses at a prior trial in that regard....

Basically, ... it's our position that we should have been able to explore the possibility of the issue of recent fabrication. *And the fact that we were not able to know of this information until less than a week before trial put Mr. Ashley in a position where he was not able to adequately prepare his defense* and was, as a result of that, denied the due process of law that he is entitled to receive.

**\*\*4** Aplee. Supp.App., Vol. I, at 153-54 (emphasis added); *see* Aplt. Op. Br. at 13 (contending that Mr. Ashley was "denied the opportunity to effectively impeach critical government witnesses by the late disclosure of the nature of their testimony").[FN3]

FN3. In oral argument before us, Mr. Ashley could be understood to have advanced a somewhat different concern related to the timing of disclosure. Mr. Ashley argued that the government's allegedly belated disclosure created a situation where he "w[as] not able to address that [the prospective witnesses' testimony] *adequately to the*

*court."* Oral Arg. at 15:24 (emphasis added). Mr. Ashley appeared to be arguing that the government's alleged tardiness in disclosing the witnesses impaired his ability to give the district court a proper foundation for evaluating the issue and presumably granting him relief against the government's use of the witnesses. Forced to operate without adequate information, reasons Mr. Ashley, the district court erred. At no point, however, did Mr. Ashley seek a continuance to permit him to mount a more effective challenge to admission of the witness testimony. Nor has he offered any clues to us regarding what he would have done with the additional time to better prepare the record for a ruling by the district court. Insofar as Mr. Ashley's argument encompasses this judicial-relief contention, we conclude that it is untenable.

However, Mr. Ashley's "plea for earlier disclosure fails for one very simple reason: no rule of law requires it." *Watts,* 95 F.3d at 619. "There is no general constitutional right to discovery in a criminal case" and *Brady* "did not create one." *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). In particular, the Due Process Clause does not require the government to disclose before trial the names of its witnesses, just so the defense can have sufficient time to investigate their backgrounds for impeachment information. *Id.* (rejecting the notion that the Due Process Clause required the government to disclose the name of an adverse witness so the defense can "do a background check" on him "for purposes of cross-examination"); *see Nevels,* 490 F.3d at 803 ("The Supreme Court has established that no *constitutional* right to pretrial discovery of witnesses exists in non-capital cases.").

Lastly, even if Mr. Ashley had some legal basis to object to the government's allegedly untimely disclosure of the three **\*698** witnesses, on this record

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.)))**

we could not conclude that Mr. Ashley was prejudiced in his trial preparation by the alleged delay, much less denied a fair trial. *See United States v. Scarborough,* 128 F.3d 1373, 1376 (10th Cir.1997) (reasoning where "the [ *Brady* ] evidence was eventually disclosed to the defense, albeit towards the end of trial," the court focuses not on "the fact that the material, if disclosed earlier, may have affected the defense strategy" but rather "on whether earlier disclosure would have created a reasonable doubt of guilt that did not otherwise exist" (internal quotation marks omitted)). *Compare United States v. Collins,* 415 F.3d 304, 310 (4th Cir.2005) (rejecting *Brady* argument where defendant moved to dismiss charges based on government's alleged untimely disclosure, "only a few days prior to commencement of the trial," of the identities of nontestifying confidential informants, noting, "There is nothing to support Collins' assertion that these informants would have produced exculpatory information"), *and Gonzalez-Montoya,* 161 F.3d at 650 (concluding in *Brady* context that "no prejudice resulted" from government's untimely disclosure during the course of trial of material impeachment evidence, where court afforded defendant opportunity to review evidence and he declined to use the evidence in interviewing or cross-examining the witness), *with United States v. Red Elk,* 185 Fed.Appx. 716, 723 (10th Cir.2006) (unpublished) (reviewing exclusion of expert witness for alleged untimely disclosure and noting "[t]o support a finding of prejudice, the court must determine that the delay impacted the defendant's ability to prepare or present its case" (internal quotation marks and citation omitted)).

**\*\*5** As to the three witnesses, Mr. Ashley has failed to indicate "how he might have better cross-examined them or what he could have done differently at trial if he had" known the witnesses' identities "for a longer period of time before trial." *United States v. Cleaver,* 163 Fed.Appx. 622, 627 (10th Cir.2005) (unpublished), *cert. denied,* 547 U.S. 1103, 126 S.Ct. 1893, 164 L.Ed.2d 578 (2006) . Although the government was not obliged to do so

under any discovery rule (*see, e.g.,* 18 U.S.C. § 3500), it had provided Mr. Ashley with Ranger Martinez's affidavit before trial, so Mr. Ashley would have confronted minimal surprises (if any) concerning the substance of this significant witness's testimony and would have been armed to conduct a thorough impeachment of him. And, importantly, Mr. Ashley never sought a continuance before trial. *See Nevels,* 490 F.3d at 804 (noting that defendant "never asked for a continuance of the trial" as a factor bearing on its conclusion that defendant "failed to establish prejudice" from allegedly untimely disclosure of witness's identity). *Cf. Collins,* 415 F.3d at 311 (rejecting *Brady* challenge brought through motion to dismiss, noting that "when his motion was denied, he did not seek a continuance"); *Watts,* 95 F.3d at 619 (upholding district court's denial of defense motion in limine, aimed at excluding government witness disclosed three days before trial; observing that "[t]here is no indication in the record" that the defendant "requested a continuance after hearing about" the witness's testimony).

Therefore, for the foregoing reasons, we reject Mr. Ashley's constitutional challenge under *Brady* and *Giglio* to the propriety of the government's disclosure of witnesses.

### B. Limitation on Cross-Examination

[2] Mr. Ashley argues that the district court impermissibly limited the scope of the cross-examination of Ranger Martinez, the park volunteer, and the paid informant. Specifically, Mr. Ashley contends that he was not allowed to cross-examine **\*699** these witnesses about whether they were called to testify in the previous trial. Mr. Ashley also argues that he should have been allowed to ask if the witnesses were known by the government before the retrial and whether they were aware of the outcome of the initial trial (i.e., the mistrial). We conclude that Mr. Ashley cannot prevail on these contentions.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.)))**

Initially, to the extent that Mr. Ashley argues that he should have been able to ask questions regarding the outcome of the previous trial, he has waived that argument. In addressing the issue before the district court, Mr. Ashley agreed with the district court that the outcome of the previous trial should not be discussed, stating, "And I agree, I don't think that it's appropriate, nor will we suggest how that other trial ended." Aplee. Supp.App., Vol. I, at 22.

This is not a situation where a challenge is forfeited because it was not timely preserved. *See United States v. Teague,* 443 F.3d 1310, 1314 (10th Cir.), *cert. denied,* 549 U.S. 911, 127 S.Ct. 247, 166 L.Ed.2d 194 (2006). Rather, this is a case where there was an "intentional relinquishment or abandonment of a known right," which amounts to a waiver. *United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (citation omitted). Although Mr. Ashley argues that his statement before the district court merely expressed his understanding of the district court's decision, Oral Arg. at 9:08-9:50, a careful reading of the record contradicts that view. The district court had not made its decision concerning the permissible scope of cross-examination and was specifically inquiring as to whether Mr. Ashley would find acceptable a procedure in which he could cross-examine about the prior trial, but not mention, or ask about, the trial's outcome. Mr. Ashley orally assented to that procedure. We conclude that Mr. Ashley's response waives the issue of asking about the outcome, and we will not review his challenge on appeal.

**\*\*6** Insofar as Mr. Ashley objects to a purported broader cross-examination restriction by the district court-essentially one relating to the fact of a prior trial and the circumstances surrounding the government's failure to call the three witnesses at that trial, we conclude that Mr. Ashley's challenge is misguided and reject it. Specifically, the challenge has no foundation in the record. The district court imposed no restriction relating to such cross-examination. Indeed, it specifically noted that Mr.

Ashley could inquire into such matters, and Mr. Ashley orally acknowledged the advisement.[FN4] Importantly, Mr. Ashley actually did cross-examine two of the three witnesses on the topics. *See* Aplee. Supp.App., Vol. I, at 40-41, 149. Based on our review of the record, then, we reject Mr. Ashley's claim that cross-examination was impermissibly limited.

> FN4. The district court had the following exchange with Mr. Ashley's defense counsel:
>
> > [THE COURT] But what about the solution that we don't tell them [the jurors] what the prior verdict was, but if you think it would be helpful to get into the fact that there was a prior-either you can call it a hearing, or whatever you want to, but if you decide to call it a trial, then that's fine, then you can ask questions as to why that testimony didn't come out. Is that acceptable?
> >
> > [DEFENSE] Yes, Your Honor....
>
> Aplee. Supp.App., Vol. I, at 21.

*C. Reasonableness of Sentence*

[3] Finally, Mr. Ashley argues that his sentence is disproportionate to the crime of possessing a firearm because it was inadvertent possession on a camping trip and not the kind of violent use that Congress sought to punish.

**\*700** We review a federal criminal sentence for reasonableness, giving deference to the district court under "the familiar abuse-of-discretion standard." *Gall v. United States,* 552 U.S. 38, 128 S.Ct. 586, 594, 169 L.Ed.2d 445 (2007); *see United States v. Smart,* 518 F.3d 800, 805 (10th Cir.2008) (noting that it is now "well settled that we review a district court's sentencing decisions solely for abuse of discretion"). Reasonableness "has both procedural and substantive components." *United States v. Atencio,* 476 F.3d 1099, 1102 (10th Cir.2007); *see*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.)))**

*Gall,* 128 S.Ct. at 597 (noting that a reviewing court "must first ensure that the district court committed no significant procedural error" and then should "consider the substantive reasonableness of the sentence").

We review a sentence's length for substantive reasonableness. *See United States v. Hamilton,* 510 F.3d 1209, 1217-18 (10th Cir.2007) ("In evaluating the substantive reasonableness of a sentence, we ask whether the length of the sentence is reasonable considering the statutory factors delineated in 18 U.S.C. § 3553(a)."), *cert. denied,* --- U.S. ----, 128 S.Ct. 1922, 170 L.Ed.2d 782 (2008). "[W]e accord a properly calculated Guidelines sentence a presumption of substantive reasonableness." *United States v. Hernandez,* 509 F.3d 1290, 1298 (10th Cir.2007); *see Gall,* 128 S.Ct. at 597 ("If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness.").

Mr. Ashley argues that the firearm was found with camping supplies when he was on a camping trip and that type of inadvertent possession does not justify the sentence imposed. More specifically, Mr. Ashley contends that his offense conduct is "vastly different from the type of conduct contemplated by Congress in enacting legislation to prevent violent acts by felons owning handguns." Aplt. Op. Br. at 22. The district court also received numerous letters from Mr. Ashley's family and friends describing his many positive characteristics. Although these facts might have led a district court to consider granting a variance, a district court is not required to reduce a sentence simply because it could have justified such a reduction. *United States v. Mares,* 441 F.3d 1152, 1161 (10th Cir.2006), *cert. denied,* 551 U.S. 1162, 127 S.Ct. 3048, 168 L.Ed.2d 757 (2007).

**\*\*7** There are a number of facts that support the reasonableness of Mr. Ashley's sentence under 18 U.S.C. § 3553(a). Mr. Ashley has a lengthy criminal history spanning more than three decades. He was convicted of crimes on seven separate occasions, many involving firearms and some involving violence. Specifically, four of his previous convictions involved firearms, and two of those four were for essentially the same offense at issue here. One of his convictions was for felony burglary of a dwelling, an offense which ordinarily is deemed to be a "crime of violence" under federal statutes and the Guidelines.[FN5] And another offense involved a misdemeanor battery of his ex-wife, during which Mr. Ashley allegedly kicked her and threatened to do further damage to her; specifically, to "pound" her "until this thing is over." Aplee. Supp.App., Vol. II, ¶ 30 at 10 (Presentence Report).

> FN5. *See* United States Sentencing Guidelines Manual § 4B1.2 (defining "crime of violence" to include "burglary of a dwelling"). *Compare* 18 U.S.C. § 16(b) (defining "crime of violence"), *with Leocal v. Ashcroft,* 543 U.S. 1, 10, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004) (noting that § 16(b)'s definition covers burglary "because burglary, by its nature, involves a substantial risk that the burglar will use force against a victim in completing the crime").

**\*701** The district court could have reasonably determined under § 3553(a) that in light of Mr. Ashley's criminal history and characteristics, the 51-month sentence was necessary (among other things) "to protect the public from further crimes" of Mr. Ashley, "to promote respect for the law," and "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C). Even if we were to accept Mr. Ashley's characterization of Congress's purpose in enacting the felon-in-possession statute, the district court could have reasonably concluded that Mr. Ashley is exactly the kind of violence-prone felon that Congress wanted to keep away from firearms.[FN6] Thus, we have no difficulty concluding that Mr. Ashley's sentence is substantively reasonable.

> FN6. We note, moreover, the district court found that Mr. Ashley had willfully obstructed justice by offering perjurious testimony at trial. This is another factor that it

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.)))**

could have reasonably found militated in favor of a within-Guidelines sentence of 51 months.

### III. *CONCLUSION*

We conclude that the district court did not err in rejecting Mr. Ashley's *Brady* challenge to the government's disclosure of three new witnesses for his retrial and in imposing limitations on the scope of cross-examination of those witnesses. Furthermore, we conclude that Mr. Ashley's sentence is substantively reasonable. Accordingly, the district court's judgment and sentence is

**AFFIRMED.**

C.A.10 (N.M.),2008.
U.S. v. Ashley
274 Fed.Appx. 693, 2008 WL 1766868 (C.A.10 (N.M.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Movant/Defendant,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Respondent/Plaintiff.* | ) | |

**MOVANT'S REPLY TO UNITED STATES' RESPONSE
TO SECOND AMENDED § 2255 MOTION**

DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: 405-521-9600

DANIEL J. BRODERICK
Federal Defender
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Counsel
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: 916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

GROUND 2:   TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN BOTH
            STAGES OF THE TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            1.      Trial counsel operated under a conflict of interest. . . . . . . . . . . . . . . . . . 9

            2.      Counsel were professionally unreasonable and ineffective in failing to
                    properly re-urge the motion to suppress under Franks v. Delaware, 438
                    U.S. 154 (1978).  Appellate counsel were ineffective for failing to raise
                    the issue, to the extent it was framed by the record, on direct appeal. . . . 11

            3.      Counsel were professionally unreasonable and ineffective for failing to
                    investigate and introduce evidence of Mr. Barrett's diminished mental
                    capacity in the guilt/innocence stage of trial. . . . . . . . . . . . . . . . . . . . . . . 15

                a.      Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                b.      Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            4.      Failure to raise competency issue was constitutionally ineffective
                    assistance of counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

            5.      Counsel were ineffective for failing to move for a continuance and for
                    failing to conduct a professionally reasonable investigation which
                    would have led to abundant impeachment evidence of the prosecution's
                    informant witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

                a.      Failure to move for a continuance. . . . . . . . . . . . . . . . . . . . . . . . . 25

                b.      Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

                c.      Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

            6.      Counsel were ineffective in failing to make appropriate and timely
                    objections to other bad acts testimony by the informant witnesses. . . . . 40

i

    a.      Mr. Barrett's claim relates back and is, therefore, not
time barred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    b.      Trial counsel's failure to object constituted ineffective assistance of
counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

7.    Trial counsel were professionally unreasonable for failing to engage the
services of an independent crime scene reconstruction expert. . . . . . . . . 45

8.    Trial counsel were ineffective in their failure to secure an independent
expert on police tactics who would have demonstrated that the midnight
raid on Mr. Barrett's house was reckless and dangerous. . . . . . . . . . . . . 47

9.    Failure to adequately cross-examine law enforcement witnesses was
ineffective assistance of trial counsel. . . . . . . . . . . . . . . . . . . . . . . . . . 50

10.    Trial counsel were ineffective in failing to call Toby Barrett
and Alvin Hahn, percipient witnesses, who could impeach
government testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

    a.      Toby Barrett. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    b.      Alvin Hahn. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

11.    To Mr. Barrett's prejudice, trial counsel failed to conduct a reasonable
investigation into evidence that he was not aware of the arrest warrant,
could have been taken into custody without incident, and had not reacted
violently to the police when they had been to his home shortly before the
raid and on other occasions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

12.    Trial Counsel were ineffective for failing to adequately contest "expert"
Horn testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

13.    The verdicts reached at both stages of trial are unreliable due to trial
counsel's unreasonable failure to seek appropriate jury instructions. . . . 63

    a.      Credibility instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

    b.      Instructions on self-defense and theories of defense . . . . . . . . . 65

15.    Trial counsel ineffectively omitted objections to prosecutorial
misconduct in penalty phase closing arguments. . . . . . . . . . . . . . . . . . . 68

419

B. Movant Has Carried His Burden of Demonstrating a Sixth Amendment Violation as to Sentencing; at a Minimum, this Court Should Order an Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

    1. Introduction and summary of argument . . . . . . . . . . . . . . . . . . . . . . . . . . 69

    2. Undisputed facts and law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

    3. The declarations of trial counsel support findings of deficient performance and prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

        a. Internal inconsistencies and adoptive admissions. . . . . . . . . . . . 78

        b. Inconsistencies between Government's theory and other witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

        c. Inconsistencies between the trial record and the Government's theory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

        d. Inconsistencies between the Government's theory and the law of effective assistance of counsel. . . . . . . . . . . . . . . . . . . . . . . . 89

    4. The government's legal arguments have no merit. . . . . . . . . . . . . . . . . . 97

        a. Neither case law nor the record supports the Government's theory on deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . 97

        b. *Neither case law nor the evidence supports the Government's theory on prejudice.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

    5. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

GROUND 3: THE COURT UNCONSTITUTIONALLY DENIED MR. BARRETT NECESSARY EXPERT SERVICES AND RESOURCES. . . . . . . . . . . . . . . . 112

A. The Issue Is Not Procedurally Defaulted. . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

B. The Court Abused its Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

C. The Experts Requested Were Necessary and Relevant . . . . . . . . . . . . . . . . . . 114

    1. Mental health. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

420

2.      Crime scene reconstruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

3.      Expert on police standards and procedure . . . . . . . . . . . . . . . . . . . . . . 117

4.      Mitigation specialist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

GROUND 4:   THE NO-KNOCK SEARCH WARRANT WAS INVALID UNDER
            *FRANKS V. DELAWARE,*438 U.S. 154 (1978). . . . . . . . . . . . . . . . . . . . . . . . 118

GROUND 5(A) and (B):THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY
            EVIDENCE AND KNOWINGLY RELIED ON FALSE TESTIMONY.
            NEWLY DISCOVERED EVIDENCE ALSO
            WARRANTS § 2255 RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

1.      Charles Sanders -- *Brady,* newly discovered evidence, and
        false evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

2.      Travis Crawford -- *Brady*, newly discovered evidence, and use of false
        evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

3.      Cindy Crawford -- *Brady*, newly discovered evidence and false
        evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

4.      Brandie Zane Price -- *Brady*, newly discovered evidence, and false
        evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

5.      Karen Real -- *Brady,* newly discovered evidence, and false evidence . . 136

6.      Randy Turman -- *Brady,* newly discovered evidence, and false
        evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

7.      Law enforcement witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

8.      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

C.      The Prosecution Interfered with the Defense's Right to Interview
        Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

D.      Mr. Barrett Was Prejudiced by the Prosecutors' Misconduct During Trial. . . . 142

1.      Mr. Barrett's claim is subject to collateral review . . . . . . . . . . . . . . . . . 143

2.      The prosecutors improperly questioned the witnesses. . . . . . . . . . . . . . 143

iv

3.      The prosecutors were especially egregious  . . . . . . . . . . . . . . . . . . . . . . . 145

GROUND 7:   THE USE OF THE ELECTRIC SHOCK DEVICE WITHOUT GOOD
            CAUSE WAS ERROR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

A.      The September 13th Finding Made Clear the Court Permitted the Electric
        Shock Device Because it Was a Capital Case. . . . . . . . . . . . . . . . . . . . . . . . . 148

B.      The Order Permitting Use of the Device Did Not Comply with Due
        Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

        1.      The hearing on the issue did not support the court's conclusion.  . . . . . 149

        2.      The electric shock device was not "preferable" to other security
                measures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

        3.      The September 6th Order does not comply with *Deck v. Missouri*  . . . . 153

C.      Compelling Mr. Barrett to Wear the Electric Shock Device Was
        Prejudicial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

        1.      The electric shock device was visible and undermined the
                presumption of innocence.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

        2.      The Court did not consider the impact on Movant's ability to assist
                his counsel  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

        3.      Mr. Barrett renewed his objection on September 9, 2005.  . . . . . . . . . . 154

D.      The Claim is Properly Reviewed in Collateral Proceedings. . . . . . . . . . . . . . 155

GROUND 8:   MR. BARRETT HAD A CONSTITUTIONAL RIGHT NOT TO BE TRIED
            WHILE INCOMPETENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

A.      This Court must Hold an Evidentiary Hearing on the Issue of
        Incompetency.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

B.      The Expert Opinions Relied upon by Mr. Barrett Are Not
        Speculative.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

C.      Trial Counsel's Opinions Are Not Controlling  . . . . . . . . . . . . . . . . . . . . . . . 162

v

GROUND 9:   MR. BARRETT'S DUE PROCESS RIGHTS WERE VIOLATED BY
THE COURT'S FAILURE TO INSTRUCT ON VOLUNTARY
MANSLAUGHTER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

GROUND 10:  THE COURT GAVE AN IMPROPER INSTRUCTION DIRECTING THE
JURY THAT RESIDUAL DOUBT WAS NOT TO BE CONSIDERED AS
A MITIGATING FACTOR, AND WRONGLY PREVENTED EVIDENCE
AND ARGUMENT ON RESIDUAL DOUBT.  . . . . . . . . . . . . . . . . . . . . . . 175

GROUND 12: THE FAILURE TO INSTRUCT THE JURY ON THE BURDEN OF PROOF
REQUIRED FOR WEIGHING THE AGGRAVATING FACTORS
VIOLATED MR. BARRETTS CONSTITUTIONAL RIGHTS.  . . . . . . . . . . 179

   A.   The Issue Was Not Raised or Adequately Resolved on Appeal. . . . . . . . . . . . 179

      1.   The *Ring* issue was inadequately raised and argued on
      direct appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

      2.   Trial counsel failed to raise the issue properly on appeal. . . . . . . . . . . 180

   B.   The Constitutional Principle upon Which Ground 12 Relies Has
   Been Wrongly Rejected. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

      1.   The (Edward) Fields Decision wrongly relied on
      *United States v. Barrett*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

      2.   The Fifth Circuit's (Sherman) Fields Decision wrongly rejected the
      application of *Ring* to the "weighing" element. . . . . . . . . . . . . . . . . . . 183

      3.   The 5th, 6th and 8th Amendments require a jury finding beyond
      a reasonable doubt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

   C.   Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

GROUND 17: THE EIGHTH AMENDMENT'S PROHIBITION OF THE
EXECUTION OF THE MENTALLY ILL IS A TIMELY-RAISED
COGNIZABLE CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

GROUND 18:  INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.  . . . . . . . . . . 189

III.   CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

INDEX OF EXHIBITS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Ake v. Oklahoma*, 470 U.S. 68 (1985)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86, 162

*Alcorta v. Texas*, 355 U.S. 28 (1957)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . 32, 39, 178

*Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007)... . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 180, 184

*Atkins v. Virginia*, 536 U.S. 304 (2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*Banks v. Reynolds*, 54 F.3d 1508 (10th Cir.1995)... . . . . . . . . . . . . . . . . . . . . . . . . 192

*Battenfield v. Gibson*, 236 F.3d 1215 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Battle v. United States*, 419 F.3d 1292 (11th Cir 2005)... . . . . . . . . . . . . . . . . . . . . . . . . 158, 159

*Beck v. Alabama*, 447 U.S. 625 (1980)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Becker v. Kroll*, 494 F.3d 904 (10th Cir.2007)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

*Bell v. Bell*, 512 F.3d 223 (6th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131, 132

*Blackledge v. Allison*, 431 U.S. 63, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1976)... . . . . . . . . . . . . 160

*Blakely v. Washington*, 124 S. Ct. 2531 (2004)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

*Blystone v. Pennsylvania*, 494 U.S. 299 (1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

*Boyde v. California*, 494 U.S. 370 (1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*Boyle v. McCune*, 544 F.3d 1132 (10th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Burger v. Kemp*, 483 U.S. 776 (1987)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 109

*Caldwell v. Mississippi*, 472 U.S. 320 (1985)... . . . . . . . . . . . . . . . . . . . . . . . . . 113, 147, 185

vii

*Cargyle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . 147, 148

*Casey v. Frank*, 346 F. Supp. 2d 1000 (E.D. Wis. 2004)... . . . . . . . . . . . . . . . . . . . . . . . 33, 39

*Chicago, Milwaukee, and St. Paul & Pacific Railroad v. United States*,
585 F.2d 254 (7ᵗʰ Cir. 1978)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Crivens v. Roth*, 172 F.3d 991 (7th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Cunningham v. Zent*, 928 F.2d 1006 (11th Cir. 1991)... . . . . . . . . . . . . . . . . . . . . . . . 145

*Cuyler v. Sullivan*, 446 U.S. 335 (1980)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Darden v. Wainwright*, 477 U.S. 168 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

*United States v. Davis*, 953 F.2d 1482 (10ᵗʰ Cir. 1992)... . . . . . . . . . . . . . . . . . . . . 2, 3, 177

*Deck v. Missouri*, 544 U.S. 622 (2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . 131

*Drope v. Missouri*, 420 U.S. 162 (1975)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162, 163

*Duckett v. Mullin*, F.3d 982 (10th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

*Eddings v. Oklahoma*, 455 U.S. 104 (1982)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

*English v. Romanowski*, 589 F. Supp. 2d 873 (E.D. Mich. 2008)... . . . . . . . . . . . . . . . . . 178

*Evittts v. Lucey*, 469 U.S. 387 (1985)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

*Fero v. Kerby*, 39 F.3d 1462 (10th Cir. 1994)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

*Fisher v. Gibson*, 282 F.3d 1283 (10th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . 8, 190

*Fontaine v. United States*, 411 U.S. 213 (1973)... . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*Foster v. Ward*, 182 F.3d 1177 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Franklin v. Lynaugh*, 487 U.S. 164 (1988)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 176

viii

*Franks v. Delaware*, 438 U.S. 154 (1978)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Gamble v. State of Oklahoma*, 583 F.2d 1161 (10th Cir. 1978)... . . . . . . . . . . . . . . . . . . . . . . . 123

*Garrett v. Selby, Connor, Maddux & Janer*, 425 F.3d 836 (10th Cir. 2005)... . . . . . . . . . . . . . 181

*Giglio v. United States*, 405 U.S. 150 (1972)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122, 137

*Giles v. Maryland*, 386 U.S. 66 (1966)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Goodman v. Bertrand*, 467 F.3d 1022 (7th Cir. 2007)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Graham v. Florida,* --, U.S. -- 230 S. Ct. 2011 (2010)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

*Gray v. Branker*, 529 F.3d 220 (4th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Greer v. Miller*, 483 U.S. 756 (1987)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61

*Gregg v. Georgia*, 428 U.S. 153 (1976)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

*Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966)... . . . . . . . . . . . . . . . . . . . . . . . . . . 142

*Greico v. Meachum*, 553 F.2d 713 (1st Cir. 1976)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Hamilton v. Ayers*, 583 F.3d 1100 (9th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . 30, 91, 103

*Herrera-Castillo v. Holder*, 573 F.3d 1004 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . 181

*Hill v. Bank of Colorado*, 648 F.2d 1282 (10th Cir. 1981)... . . . . . . . . . . . . . . . . . . . . . . . . . . 183

*Hogan v. Gibson*, 197 F.3d 1297 (10th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . 164, 173, 174

*Holbrook v. Flynn*, 475 U.S. 560 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*Hooks v. Ward*, 184 F.3d 1206 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

*Hopkins v. Reeves*, 524 U.S. 88 (1998)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168, 170

*Hopper v. Evans*, 456 U.S. 605 (1982)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

*In re McDonald*, 514 F.3d 539 (6th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

ix

*Jacobs v. Horn*, 395 F.3d 92 (3rd Cir. 2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Johnson v. Mitchell*, 585 F.3d 923 (6th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*Jones v. Barnes*, 463 U.S. 745 (1983)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 191

*Karis v. Calderon*, 283 F.3d 1117 (9th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Kimmelman v. Morrison*, 477 U.S. 365 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92, 107, 123

*Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Kyles v. Whitley*, 514 U.S. 419 (1995)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122, 128, 140

*Le v. Mullin*, F.3d 1002 (10th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

*Mandacina v. United States*, 328 F.3d 995 (8th Cir. 2003).... . . . . . . . . . . . . . . . . . . . . . . 41, 43

*Martin v. Estelle*, 583 F.2d 1373 (5th Cir. 1978)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

*Massaro v. United States*, 538 U.S. 500 (2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . 141, 156, 157

*Mayes v. Gibson*, 210 F.3d 1284 (10th Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Mayle v. Felix*, 545 U.S. 644 (2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*McGahee v. United States*, 520 F. Supp. 2d 723 (E.D. Pa. 2008)... . . . . . . . . . . . . . . . . . . passim

*Miller v. Anderson*, 255 F.3d 455 (7th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Moore v. Marr*, 254 F.3d 1235 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

*Napue v. Illinois*, 360 U.S. 254 (1959)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248 (10th Cir.2001)... . . . . . . . . . . . . . . . . . . . . 182

*Oregon v. Guzek*, 546 U.S. 517 (2006)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 176

*Osborn v. Shillinger*, 861 F.2d 612 (10th Cir. 1988)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 190

x

*Panetti v. Quarterman*, 551 U.S. 930 (2007)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

*Parker v. Dugger*, 498 U.S. 308 (1991)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 182

*Peltier v. Booker*, 348 F.3d 888 (10th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Penry v. Johnson*, 532 U.S. 782 (2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Penry v. Lynaugh*, 492 U.S. 302 (1989)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104, 185

*Phaneuf v. Franklin*, 448 F.3d 591 (2nd Cir. 2006)... . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 124

*Phillips v. Workman,* ___F.3d___, No. 08-7043 (10th Cir. May 12, 2010)
(slip op. at 29-30)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

*Pillette v. Berghois*, 630 F. Supp. 2d 791 (E.D. Mich. 2009)... . . . . . . . . . . . . . . . 29, 32, 39, 178

*Porter v. McCollum*, 130 S. Ct. 447 (2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Powell v. Collins*, 332 F.3d 376 (6th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

*Ramonez v. Berghuis*, 490 F.3d 482 (6th Cir. 2007)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Rhoades v. Arave,* 2007 WL 1550441 (D. Id. May 24, 2007)... . . . . . . . . . . . . . . . . . . . . . . 73

*Richards v. Quarterman*, 578 F. Supp. 2d 849 (N.D. Tex. 2008),
*aff'd* 566 F.3d 553 (5th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 99

*Ring v. Arizona*, 536 U.S. 584 (2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Romano v. Gibson*, 239 F.3d 1156 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Romano v. Oklahoma*, 512 U.S. 1, 114 S. Ct. 2004, 129 L. Ed. 2d 1 (1994)... . . . . . . . . . . . . 147

*Rompilla v. Beard*, 545 U.S. 374 (2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Roper v. Simmons*, 534 U.S. 304 (2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*Sallahdin v. Gibson*, 275 F.3d 1211 (10th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . 177

*Saranchek v. Beard*, 538 F. Supp. 2d 847 (E.D. Pa. 2008)... . . . . . . . . . . . . . . . . . . . . . . . 24

*Seidel v. Merkle*, 146 F.3d 750 (9th Cir. 1998)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Shabazz v. Artuz*, 336 F.3d 154 (2nd Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132, 137

*Simmons v. South Carolina*, 512 U.S. 154 (1994)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Singh v. Prunty*, 142 F.3d 1157 (9th Cir. 1998)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Skipper v. South Carolina*, 476 U.S. 1 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

*Smith v. Black*, 904 F.2d 950 (5th Cir. 1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119, 122

*Smith v. Massey*, 235 F.3d 1259 (10th Cir.2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 105, 112

*Smith v. Murray*, 477 U.S. 527 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 191

*Smith v. Robbins*, 528 U.S. 259 (2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

*Soffar v. Dretke*, 368 F.3d 441 *amended,* 391 F.3d 703 (5th Cir. 2004)... . . . . . . . . . . . . . 20, 100

*Solesbee v. Balkcom*, 339 U.S. 9, 70 S. Ct. 457, 94 L. Ed. 604 (1950)... . . . . . . . . . . . . . . . . . 162

*Starr v. Lockhart*, 23 F.3d 1280 (8th Cir. 1994)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Stone v. Powell*, 428 U.S. 165 (1976)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 118, 122, 123, 124

*Stouffer v. Reynolds*, 168 F.3d 1155 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 190

*Stouffer v. Reynolds*, 214 F.3d 1231 (10th Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 20

*Strickland v. Washington*, 466 U.S. 668 (1984)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Strickler v. Greene*, 527 U.S. 263 (1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Stringer v. Black*, 503 U.S. 222 (1992)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119, 122

*Taylor v. Workman*, 554 F.3d 879 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

*Town v. Smith*, 395 F.3d 251 (6th Cir. 2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Thomas v. Horn*, 570 F.3d 105 (3rd Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*United States v. Antone*, 603 F.2d 566 (5th Cir. 1979)... . . . . . . . . . . . . . . . . . . . . . . . . 122, 128

*United States v. Bagley*, 473 U.S. 667 (1985)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

*United States v. Banks*, 451 F.3d 721 (10th Cir. 2006)... . . . . . . . . . . . . . . . . . . . . . . . . . . 181

*United States v. Barajas-Diaz*, 313 F.3d 1242 (2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

*United States v. Barrett*, 496 F.2d 1079 (10th Cir. 2007)... . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Beckford*, 916 F. Supp. 1415 (E.D. Va. 1997)... . . . . . . . . . . . . . . . . . . . passim

*United States v. Bernal-Obeso*, 989 F.2d 331 (9th Cir. 1993)... . . . . . . . . . . . . . . . . . . . . 12, 124

*United States v. Bolden*, 335 F.2d 453 (7th Cir. 1966)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*United States v. Bowie*, 392 F.3d 1494 (10th Cir. 1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Brown*, 326 F.3d 1143 (10th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Caballero*, 277 F.3d 1235 (10th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . 62

*United States v. Caldwell*, 560 F.3d 1202 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . 45, 140

*United States v. Challoner,* , 583 F.3d 745 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Chandler*, 218 F.3d 1305 (11th Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . . 177

*United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000)... . . . . . . . . . . . 165, 166, 170, 173

*United States v. Cook*, 45 F.3d 388 (10th Cir. 1995)... . . . . . . . . . . . . . . . . . . . . . . 8, 62, 63, 191

*United States v. Cook*, 997 F.2d 1312 (10th Cir. 1993)... . . . . . . . . . . . . . . . . . . . . . 123, 191, 192

*United States v. Davis*, 132 F. Supp. 2d 955 (E.D. La. 2001)... . . . . . . . . . . . . . . . . . . . . 176, 177

*United States v. Davis*, 953 F.2d 1482 (10th Cir. 1992)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Dawkins*, 17 F.3d 399 (D.C. Cir. 1994)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. (Edward) Fields*, 516 F.3d 923 (10th Cir. 2008)... . . . . . . . . . . . . . . . . . 183, 185

*United States v. Erickson*, 561 F.3d 1150 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . 130

*United States v. Espinoza-Saenz*, 235 F.3d 501 (10th Cir. 2000)... . . . . . . . . . . . . . . . . 36, 40, 56

xiii

*United States v. Evans*, 224 F.3d 670 (7th Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*United States v. Foree*, 43 F.2d 1572 (11th Cir. 1995)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Frady*, 456 U.S.152 (1982)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

*United States v. French*, 556 F.3d 1091 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Fuller*, 938 F. Supp. 731 (D. Kan. 1996)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Hall*, 113 F.3d 157 (9th Cir. 1997)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 124

*United States v. Hernandez*, 94 F.3d 606 (10th Cir. 1996)... . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*United States v. Hill*, 799 F. Supp. 86 (D. Kan. 1992)... . . . . . . . . . . . . . . . . . . . . . . . . . . 130, 133

*United States v. Hodge*, 554 F.3d 372 (3rd Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Honken*, 378 F. Supp. 2d 1040 (N.D. Iowa 2004)... . . . . . . . . . . . . . . . . 176, 177

*United States v. Jackson*, 549 F.3d 963 (5th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . 175, 176, 177

*United States v. Johnson*, 403 F. Supp. 2d 721 (N.D. Iowa 2005)... . . . . . . . . . . . . . . . . . . . . . 177

*United States v. Lafayette*, 983 F.2d 1102 (D.C. 1993)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996)... . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*United States v. McVeigh*, 153 F.3d 1166 (10th  Cir. 1998)... . . . . . . . . . . . . . . . . . 164, 170, 171

*United States v. Miller*, 753 F.2d 1475 (9th Cir. 1985)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 124

*United States v. Miller*, 907 F.2d 994 (10th Cir. 1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Nicholson*, 983 F.2d 983 (10th Cir. 1993)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States v. Oliver*, 278 F.3d 1035 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

*United States v. Owens*, 882 F.2d 1493 (10th Cir. 1989)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*United States v. Parker*, 553 F.3d 1309 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Quintinella*, 193 F.3d 1139 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . 128

*United States v. Reddick*, 90 F.3d 1276 (7th Cir. 1996)... . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 124

*United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Rodriguez-Felix*, 450 F.3d 1117 (10th Cir. 2006)... . . . . . . . . . . . . . . . . . . . . 60

*United States v. Scafe*, 822 F.2d 1232 (10th Cir. 1987)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

*United States v. Scheer*, 168 F.3d 445 (11th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

*United States v. Serawop*, 410 F.3d 656 (10th Cir. 2005)... . . . . . . . . . . . . . . . . . . . . . . . 172, 173

*United States v. (Sherman) Fields*, 483 F.3d 313 (5th Cir. 2007)... . . . . . . . . . . . . . 183, 184, 185

*United States v. Sinclair*, 109 F.3d 1527 (10th Cir. 1997)... . . . . . . . . . . . . . . . . . . . . . . . . . . 134

*United States v. Smith*, 692 F.2d 658 (10th Cir. 1982)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States v. Sorrells*, 714 F.2d 1522 (11th Cir. 1983)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Soundingsides*, 820 F.2d 1232 (10th Cir. 1987)... . . . . . . . . . . . . . . . . . . . . . . 167

*United States v. Thomas*, 221 F.3d 430 (3rd Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 56

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 167

*United States v. Tisdale*, 248 F.3d 964 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Torres*, 569 F.3d 1277 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

*United States v. Viefhaus*, 168 F.3d 392 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

*United States v. Vigeant,* 176 F.3d 565 (1st Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . 12, 124

*United States v. Visinaiz*, 428 F.3d 1300 (10th Cir. 2005)... . . . . . . . . . . . . . . . . . . . . . . . . 66, 68

*United States v. Wardell*, 591 F.3d 1279 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*United States v. Durham*, 287 F.3d 1297 (11th Cir 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*United States v. Gutierrez*, 839 F.2d 648 (10th Cir 1988)... . . . . . . . . . . . . . . . . . . . . . . . 159, 160

*United States v. Rivas*, 862 F. Supp. 208 (N.D. Ill 1994)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

xv

*Walker v. Gibson*, 228 F.3d 1217 (10th Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . 160, 161, 191

*Wallace v. Ward*, 191 F.3d 1235 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Waters v. Thomas*, 46 F.3d 1506 (11th Cir. 1995)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Weems v. United States*, 217 U.S. 349 (1910)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

*Wiggins v. Smith*, 539 U.S. 510 (2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Williams v. Bowersox*, 340 F.3d 667 (8th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Williams v. Taylor*, 529 U.S. 362 (2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir 1997)... . . . . . . . . . . . . . . . . . . . . . . . . . 163

*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . passim

*Wood v. Georgia*, 450 U.S. 261 (1981)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Woodward v. Williams*, 263 F.3d 1135 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . 41

*Workman v. Tate*, 957 F.2d 1339 (6th Cir. 1992)... . . . . . . . . . . . . . . . . . . . . . 20, 29, 178, 29

*Young v. Sirmons*, 551 F.3d 942 (10th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

**STATE CASES**

*Frederick v. State*, 902 P.2d 1092 (Okl. Cr. 1995)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Johnson v. State*, 118 Nev. 787, 59 P.3d 450 (2002)... . . . . . . . . . . . . . . . . . . . . . . . 187, 188

*State v. Whitfield*, 107 S.W.3d 253 (Mo. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

*Woldt v. People*, 64 P.3d 256 (Colo. 2003)(A)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

*Woodruff v. State*, 825 P.2d 273 (Okl. Cr. 1992)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

**DOCKETED CASES**

*State of Oklahoma v. John Joseph Romano and David Wayne Woodruff*, Oklahoma County
Case No. CRF-86-3920... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

**FEDERAL STATUTES**

21 U.S.C. § 848(e)(1)(B)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

21 U.S.C. § 848... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

18 U.S.C. § 1111... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165, 166

18 U.S.C. § 1112... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167, 196

18 U.S.C. § 1114... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

28 U.S.C. § 2255(b)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 76, 159, 160

18 U.S.C. § 2332... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

18 U.S.C. § 3432... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 25, 141

18 U.S.C. § 3592(a)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

18 U.S.C. § 924(c)(1)(A)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23, 165, 167

Fed R. Civ. P. 15(c)(1)(B)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Fed. R. Crim. P. 33... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

Fed. R. Evid. 403... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

Fed. R. Evid. 404(b)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 43, 140

Fed. R. Evid. 608(b)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Fed. R. Evid. 702... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Fed. R. Evid. 801(2)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 81, 169

U.S. Const. amend. V... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

**MISCELLANEOUS**

*Stephen P. Garvey, Aggravation and Mitigation in Capital Cases: What Do Jurors Think?,*
98 Colum. L. Rev. 1538 (1998)...   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Pursuant to Rule 5(d) of the Rules Governing Section 2255 Proceedings, Kenneth Barrett files this, his Reply to the Government's Response to his Motion to Vacate His Conviction and Sentence.

## I.     INTRODUCTION

As noted above, Mr. Barrett's Reply is filed pursuant to Rule 5 of the Rules Governing § 2255 Proceedings, which provides "[t]he moving party may submit a reply to the respondent's answer or other pleading within a time fixed by the judge." Rule 5(d), Rules Governing § 2255 Proceedings. The rule uses the word "reply" rather than "terms such as 'traverse[.]'" Commentary, Rule 5, 2004 Amendments. The Committee Notes further explain that "[t] here is nothing in § 2255 which corresponds to the § 2248 requirement of a traverse to the answer." *Id.* As also set out in the Notes, "numerous cases have held that the government's answer and affidavits are not conclusive against the movant, and if they raise disputed issues of fact a hearing must be held." Rule 5, Advisory Committee Notes (citations omitted).

Mr. Barrett's § 2255 Motion raises numerous disputed issues of fact, many of which are made more apparent by the Government's response. He is entitled to a hearing on all of the grounds alleged. Any failure to specifically reply concerning a ground raised in Mr. Barrett's Motion and supporting brief [1], or any fact or argument within any ground in this reply, is not intended, nor shall it be construed, as an admission of any argument or assertion by the

---

[1]Mr. Barrett specifically stands on his Motion and supporting brief without further reply concerning the following grounds: Ground 2(A)(14) (Doc 95 at 178; Doc 149 at 100 ["Ground 2, Part A (13)]); Ground 6 (Doc 95 at 322, Doc 149 at 175); Ground 11 (Doc 95 at 345; Doc 149 at 202); Ground 13 (Doc 95 at 211; Doc 149 at 357); Ground 14 (Doc 95 at 357; Doc 149 at 211); Ground 15 (Doc 95 at 373; Doc 149 at 224); Ground 16 (Doc 95 at 376; Doc 149 at 226); Ground 19 (Doc 95 at 394; Doc 149 at 245).

Government or an abandonment of any ground of error set out in the Motion to Vacate and

Supporting Brief or argument or fact therein.

## II.   ARGUMENT

**GROUND 1:  THE TRIAL COURT UNCONSTITUTIONALLY INTERFERED WITH MR. BARRETT'S DEFENSE AND ENGAGED IN IMPROPER *EX PARTE* CONTACT WITH THE GOVERNMENT.**

Ground 1 of the Second Amended Motion and the supporting brief set out factual and

legal bases for the Court to hold that the trial court unconstitutionally interfered with the defense.

The interference occurred through a variety of actions including (a) misuse of the Court's

administrative responsibilities under the Criminal Justice Act to discourage expert assistance and

reward a willingness to forego assistance; (b) ignoring evidence that lead counsel – hand picked

by the trial judge – was neglecting work on the case, then giving that lawyer a raise; (c) engaging

in improper *ex parte* communications with prosecutors; (d) misrepresenting the nature and

content of those *ex parte* communications; and (e) withholding ruling on a meritless Government

motion knowing that prosecutors were using the outstanding motion to gain leverage against the

defense.

The Government contends issues related to CJA funds are not cognizable, even on

appeal, citing *United States v. Davis*, 953 F.2d 1482 (10th Cir. 1992).  Doc 175 at 17-18.  This is

a gross misrepresentation of the law and Mr. Barrett's claim.  *Davis* and the other cases cited in

the Response stated that "[f]ee determinations by the district judge pursuant to the Criminal

Justice Act are administrative in character and *do not constitute final appealable orders* within

the meaning of 28 U.S.C. § 1291."[2] *Davis*, 953 F.3d at 1497 n.21 (emphasis added). As Mr. Barrett is not seeking review of the trial court's funding decisions as such, *Davis* and the other cases the Government relies upon are inapposite.

The Government's claim that Mr. Barrett makes no attempt to show he was denied resources necessary to the defense is false. Mr. Barrett makes that showing in Ground 3, and refers thereto in Ground 1. 2nd Amend. § Mot. (Doc 95) at 7, 14-15. Moreover, the facts here are not disputed by trial counsel. For example, in Ground 1, Mr. Barrett specifically relied upon the declaration of Dr. Jeanne Russell in which she states that trial counsel Bret Smith told her the defense would not be able to conduct a comprehensive mitigation investigation because the Court would not fund it. *See* Discussion in Merits Brief (Doc 149) at 27-28. The declarations of Mr. Hilfiger and Mr. Smith that are attached to the Response specifically state that trial counsel have reviewed Dr. Russell's declaration. Resp. Exh. 11 at ¶¶ 8-9; Resp. Exh. 12 at ¶¶ 10-11. They do not dispute her account of counsel's thinking at the time.

The Government wholly ignores the constitutional law underlying Mr. Barrett's claim. The sleight of hand at work in the Government's citations to *Davis* is significant for what the Response does not say. Rule 5 of the Rules Governing Section 2255 Proceedings provides that an "answer *must* address the allegations in the motion." (Emphasis added.) Ground 1 alleges the trial court abused its administrative role under the Criminal Justice Act to interfere with the constitutionally protected independence of counsel. Contrary to the Government's assertion that Mr. Barrett showed no effect, Ground 1 shows that the trial court's administrative abuses lead

---

[2] As the Court of Appeals later said, this quotation from *Davis* was dicta. It was adopted as law in *United States v. French*, 556 F.3d 1091, 1094 (10th Cir. 2009).

John Echols to withdraw from the case and influenced the conduct of successor counsel, Roger Hilfiger, who would not use the resources the Court authorized, unreasonably limited as they were.

The Government fails to respond to the facts and the law. Mr. Hilfiger specifically addresses his failure to retain the reconstruction expert authorized by the Court, Resp. Exh. 12 at ¶ 13, which is another example Mr. Barrett gave of interference. Doc 149 at 26. Yet neither counsel dispute Mr. Barrett's contention that the Court misused its administrative authority to create a disincentive for defense counsel to retain experts and investigators. Trial counsel's silence on these issues, in declarations prepared and filed by the Government, should be treated as adoptive admissions. Fed. R. Evid. 801(2). Surely, if Mr. Hilfiger or Mr. Smith did not perceive the trial judge's actions as creating a disincentive to expend resources they would have said so, particularly as they are quoted in declarations saying the opposite.

While the Government cites the trial judge's projection regarding whether his misrepresentation of the *ex parte* hearing, and his withholding ruling on the prosecution's motion for a protective order, influenced defense counsel, (Doc 175 at 23-24), the Government fails to submit any corroboration from defense counsel themselves. On the contrary, Mr. Hilfiger states that the Government's "method of investigation thwarted the defense investigation of the truthfulness of [the snitches] at trial." Resp. Exh. 12 at ¶ 14. Mr. Hilfiger "believed that the witnesses could be effectively impeached with evidence of their prior convictions and agreements with the Government for leniency." *Ibid.*

Mr. Hilfiger previously told appellate counsel Mark Henricksen that his ability to investigate the snitches' prior convictions and offers of leniency was curtailed by the short time

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                4                *Barrett v. U.S.*, 6:09-cv-00105-JHP

before trial.  Exh. 29 at 4, Amended Motion.  Mr. Hilfiger said he did not seek a continuance in part because "he did not want to antagonize the judge," and in part because "he believed that no continuance was possible due to Judge Payne's desire to stay on schedule."  *Ibid.*  Mr. Hilfiger also told Mr. Henricksen that he compromised on the snitches because he believed that was better than nothing.  *Id.* at 4-5.  The matter Judge Payne failed to reveal to Mr. Hilfiger on September 13, 2005 included his belief that a request for a continuance would have merit, and the prosecution's motion – the source of Mr. Hilfiger's concern that he had to compromise or get "nothing" – had no merit.

Under these circumstances, if the Government could respond to these allegations, as Rule 5 requires, it would have done so.  The Government's failure to proffer any refutation of the evidence, particularly after this Court granted Mr. Barrett's request to expand the record with Mr. Henricksen's declaration, should be taken as an adoptive admission.  The only factual basis now before the Court as grounds for denying relief on Ground 1 is the self-serving factual averment of the very judge who, it is conceded, was acting in his administrative capacity, and who caused the constitutional violation.

The facts show that the manner in which the Court administered funding in this case is virtually unprecedented in the annals of federal capital prosecutions.  These funding decisions prejudicially impacted the quality of Mr. Barrett's defense in the retention of necessary experts and other tools required for an adequate defense.  The Court's active and repeated interference in the defense constitutes structural error even without a showing of prejudice, but even if this were not so, Mr. Barrett has demonstrated prejudice.

The Government fares no better with its defense of the Court's *ex parte* hearing with the prosecutors on September 13, 2005.  Doc 175 at 21-24.  The Government states that the Court had no alternative but to hold an *ex parte* hearing when the prosecutors brought to its attention that they feared for witnesses safety.  However, because the Court found at the hearing that: 1) the prosecution's motion could have been filed much earlier and was dilatory; and 2) that the prosecution had produced no evidence to support its concerns, only naked speculation that the witnesses might have had some general, inchoate, and unsupported "fear," there was no reason to take the matter "under advisement" and shield what had been discussed from the defense.  Tr. Hr'g 9/13/05 at 2-4, 7, 12, 19-20, 21.

In other words, there was no basis for a sealing order, and the matters discussed *ex parte* should have been revealed to the defense.  Since the matter improperly remained sealed and there was no basis to take it "under advisement," the defense was never made privy -- as it should have been -- to the Court's concern that the trial had already started for purposes of 18 U.S.C. § 3432, that there was no showing of danger to witnesses, and, in light of the importance of the informant witnesses to the prosecution's case, a continuance would likely be reasonable and necessary for the defense to properly investigate.  Failing to reveal these matters permitted the prosecution to thrust on the defense the untenable "arrangement" for witness "interviews" that never took place, except in one instance, and that was under supervision of the Government.  As shown in Ground 2(5), the improper failure to unseal the earlier portion of the September 13 hearing so the defense could have learned that the security concerns were groundless and the Court itself believed a continuance was appropriate contributed directly to counsel's ineffectiveness in investigating and challenging the informant witnesses.  While the Government contends that Mr. Barrett merely

recites "aspirational" ABA standards showing the Court's conduct was improper (Doc 175 at 22), this is simply not true. There can be no question that the *ex parte* hearing in this case was improper, prejudiced the defense, and permitted the Government to secure an unfair tactical advantage. *E.g., Chicago, Milwaukee, and St. Paul & Pacific Railroad v. United States,* 585 F.2d 254, 263 (7th Cir. 1978); *Greico v. Meachum,* 553 F.2d 713, 719 (1st Cir. 1976) (*ex parte* hearing was prejudicial to one of the parties).

In addition to its procedural bar argument, the Government contends that this issue is foreclosed from consideration in these proceedings because the Tenth Circuit ruled that the prosecutors had complied with the 3-day notice requirement of 18 U.S.C. § 3432. *United States v. Barrett,* 496 F.3d 1079, 1115-16 (10th Cir. 2007). But the appellate court had no opportunity to consider this issue in its proper context, because appellate counsel was ineffective in failing to raise the issue. The Government is correct that since the issue is framed by the record that was available to counsel on direct appeal, it would ordinarily be forfeited in collateral proceedings. However, as lead appellate counsel candidly admits, he negligently overlooked this meritorious issue, and had no strategic reason for doing so. Exhibit 29, Amended Motion. Had the issue of the improper *ex parte* hearing and its prejudicial impact been drawn to the attention of the Court on direct appeal, there is a reasonable probability, sufficient to undermine confidence in the outcome of the appeal, that the result would have been different. *E.g., Strickland v. Washington,* 688 U.S. 668, 684, 696-97 (1984); *Neill v. Gibson,* 278 F.3d 1044, 1057 n. 5 (10th Cir. 2001) ("reasonable probability" standard governing assessment of prejudice under *Strickland* standard applies to evaluation of ineffective assistance of appellate counsel claims; *Neill* specifically disavowed the "dead bang winner" standard erroneously invoked in *United States v. Challoner,*

583 F.3d 745, 749 (10th Cir. 2009), which the Government cites at various points of its

Response; *Challoner* relied on *United States v. Cook,* 45 F.3d 388, 395 (10th Cir. 1995), which

the *Neill* Court specifically discussed and disavowed).  *See also,* reply to Ground 18.

**GROUND 2:   TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN BOTH STAGES OF THE TRIAL.**

**A.      Introduction.**

Before addressing specifically the Government's arguments with respect to each sub-claim of ineffective assistance of trial counsel, it is important to note at the outset that Respondent filters its contentions through flawed and improper frameworks.

The Government incorrectly analyzes the claim as a whole by arguing that in order to prevail, Mr. Barrett must show prejudice under *Strickland v. Washington,* 466 U.S. 668, 684-88 (1984) with respect to each sub-claim of ineffective assistance.  This is manifestly incorrect. Where a number of claims of ineffective assistance are raised, a reviewing Court must determine prejudice collectively, or in the aggregate.  *Fisher v. Gibson,* 282 F.3d 1283, 1289 (10th Cir. 2002); *Stouffer v. Reynolds,* 168 F.3d 1155, 1164 (10th Cir. 1999); *Osborn v. Shillinger,* 861 F.2d 612, 625 (10th Cir. 1988). While it is certainly true that a single professionally unreasonable error or omission on the part of counsel could in and of itself warrant a finding of ineffectiveness, where, as here, numerous sub-claims of ineffective assistance are raised, their combined impact, or combined prejudice, must be examined.  And, Mr. Barrett has shown that several individual errors on the part of counsel by themselves warrant relief.

Throughout, the Government repeatedly invokes the phrase "reasonable likelihood" of a different outcome as a substitute for *Strickland's* prejudice test.  It is also claimed that in

assessing prejudice, the test is more strict than that for judging whether a constitutional error is harmless. The *Chapman* harmless error test requires a reviewing Court to determine whether an error of constitutional dimension is harmless beyond a reasonable doubt. But, properly stated and understood, the prejudice prong of *Strickland* is not as onerous as the incorrect "reasonable likelihood" standard cited by the Government, and is in fact no more exacting than the *Chapman* harmless error test. A defendant claiming ineffective assistance of counsel must show that, but for counsel's unprofessional errors or omissions, there is a "reasonable probability" that the trial outcome would have been different. A reasonable probability of a different outcome does not mean "more probable or likely than not," as the Government's misleading invocation of the non-existent "reasonable likelihood" standard implies. A "reasonable probability" of a different outcome is one that simply undermines confidence in the trial verdict, and is less than a preponderance of the evidence. *Strickland,* 466 U.S. at 693-94; *Stouffer v. Reynolds,* 214 F.3d 1231, 1234-35 (10th Cir. 2000) (*Stoffer II)*; *Miller v. Anderson,* 255 F.3d 455, 459 (7th Cir. 2001).

### 1.     Trial counsel operated under a conflict of interest.

The Government argues Mr. Barrett makes a conclusory and undeveloped claim that trial counsel operated under a conflict of interest detrimental to Mr. Barrett's defense because of the trial court's funding decisions, and counsel's evident unwillingness to "rock the boat" by seeking necessary and proper funding for defense services according to prevailing professional norms. It is argued that Mr. Barrett fails to establish a nexus between the Court's funding decisions and counsel's actions, or inaction, and that Movant has failed to show how counsel's actions with respect to funding prejudiced him. Similarly, the Government urges that the Court's funding

decisions did not create an incentive for trial counsel to save the Court money at the expense of Mr. Barrett's defense.  No such conflicting loyalties existed because, according to Respondent, the Court encouraged counsel to seek additional funding if they deemed it necessary.  Doc 175 at 25-27.

In Ground 1 and throughout Ground 2, Mr. Barrett showed that the Court's funding decisions indeed did create a conflict between counsel and Mr. Barrett, which resulted in prejudice to Mr. Barrett; the claim is not undeveloped.  Mr. Echols aggressively pursued sufficient funding to retain needed experts and investigators, and got little more than trouble and rock-bottom approvals for funding for his efforts.  Exh. 34, Declaration of John Echols; Exh. 64, letter from the Court to Mr. Echols; Exh. 65, response letter from Mr. Echols to the Court, Exh. 118, Declaration of Richard Burr, Amended Motion. Once Mr. Echols was off the case, counsel never challenged the inadequate funding that had been approved, never sought more funding, and, with respect to a crime scene reconstructionist, a mitigation specialist, and assistance from an *appropriate* mental health professional or professionals, did virtually nothing.  Counsel simply acquiesced in the unreasonable conditions imposed by the Court for Mr. Barrett's representation.  The Court wanted to use Mr. Barrett's case as a test case for a capital bar in the Eastern District (Exhs. 54, Declaration of Susan Otto; Exh. 67, Declaration of Julia O'Connell) rather than seeking the most suitable counsel for Mr. Barrett, and trial counsel were evidently part of this experiment.  Mr. Hilfiger received a raise after he was elevated to lead counsel.  All this demonstrates, contrary to the Government's argument, that there were indeed financial and other incentives for counsel to do it the Court's way, rather than seeking the resources to properly and zealously represent Mr. Barrett. *Cuyler v. Sullivan,* 446 U.S. 335, 349 (1980); *Wood v.*

*Georgia,* 450 U.S. 261, 271 (1981); *United States v. Bowie,* 392 F.3d 1494, 1500 (10th Cir.

1990).

> **2.** **Counsel were professionally unreasonable and ineffective in failing to properly re-urge the motion to suppress under *Franks v. Delaware,* 438 U.S. 154 (1978).  Appellate counsel were ineffective for failing to raise the issue, to the extent it was framed by the record, on direct appeal.**

Respondent argues trial counsel were not ineffective due to the manner in which

they raised a mid-trial motion to suppress the evidence seized in the search of Mr. Barrett's home

and property under *Franks v. Delaware,* 438 U.S. 154 (1978).  According to the Government,

even if trial counsel had raised all the arguments in support of the motion based on Charles

Sanders's trial testimony, which, as Movant has shown, conflicted sharply with virtually all the

information he supposedly supplied Clint Johnson in support of the warrant affidavit, it would

have made no difference.  In denying the motion, the Court properly focused on the honesty of

the affiant (Johnson), not the honesty or credibility of the informant (Sanders).  The Government

argues that simply because Johnson stated in the search warrant affidavit that Sanders had given

"reliable" information in the past, Johnson had a "good faith" basis for crediting this information,

and that Johnson's "good faith reliance" on Sanders is unassailable under *Franks*.  Doc 175 at

27-28, 30.

If this were the law, *Franks* would collapse on itself.  Essentially, the Government  argues

that so long as the affiant simply states he has a good-faith belief in the source's information

based on a naked statement that the informant has provided reliable information in the past, a

warrant is immune to attack under *Franks*.  According to the Government, this is true regardless

of whether the surrounding facts actually support such a belief, and regardless of what is actually

contained in or omitted from a warrant affidavit.  It is also true regardless of the honesty of the

informant.  In support of its argument that the Court here rightly focused on the truthfulness of

the affiant rather than the informant, the Government cites *United States v. Tisdale,* 248 F.3d

964, 973-74 (10th Cir. 2001), but this case nowhere supports the broad claim made by the

Government, which is unsupported by the law in any event.  Doc 175 at 27.  In *Tisdale*, the Court

was not even dealing with information from a confidential informant to provide the basis for

probable cause, but a citizen witness who was at the scene of a fatal shooting and the defendant

himself, who had been shot.  Any alleged omission of facts in the warrant affidavit was

inadvertent and immaterial, and based on what the affiant learned at the scene of the shooting, it

was reasonable to conclude that probable cause had been established for the search of an

automobile.  *Tisdale* does not state that an informant's reliability, and information concerning the

informant's reliability (if any) communicated to the magistrate is "irrelevant" under *Franks.*

There was no such issue in the case.

The Government simply ignores the cases cited by Mr. Barrett which show that in

assessing probable cause, the believability of a confidential informant, and the extent to which

the information has been corroborated, is critical.  *United States v. Bernal-Obeso,* 989 F.2d 331,

335-36 (9th Cir. 1993); *United States v. Dawkins,* 17 F.3d 399, 404 (D.C. Cir. 1994); *Phaneuf v.*

*Franklin,* 448 F.3d 591, 597-99 (2nd Cir. 2006).  Likewise, the Government ignores that

information bearing on a confidential informant's believability -- such as motive (escaping their

own troubles with the law), criminal record, drug use, and continuing criminal activities --  if

deliberately or recklessly misstated or omitted from a warrant affidavit, which is exactly what

happened here with Johnson's affidavit -- supports a *Franks* motion.  *United States v. Vigeant,*

176 F.3d 565, 573 (1st Cir. 1999); *United States v. Hall,* 113 F.3d 157, 159 (9th Cir. 1997); *United States v. Sorrells,* 714 F.2d 1522, 1528 (11th Cir. 1983).  An unsupported conclusion that the informant has given reliable information in the past, such as occurred here, not only fails to shield a warrant from an attack under *Franks*, but is virtually meaningless.  *United States v. Reddick,* 90 F.3d 1276, 1280-81 (7th Cir. 1996); *United States v. Foree,* 43 F.2d 1572, 1575-76 (11th Cir. 1995); *United States v. Miller,* 753 F.2d 1475, 1480 (9th Cir. 1985).

Not only were trial counsel ineffective for failing to raise all the many contradictions between Sanders's trial testimony and the information contained in the warrant affidavit as a basis for the *Franks* motion, they were also ineffective for failing to argue that Johnson deliberately or recklessly omitted from the warrant affidavit any and all information bearing on Sanders's motives and credibility as a whole -- the many favors he had received for his informant work, his lengthy and continuing criminal history, including crimes of dishonesty, and his ongoing drug use.  Similarly, counsel failed to argue that in this context, Johnson's statement that the C.I. was "reliable" carried no weight and that it was dishonestly and recklessly made. Counsel also failed to point out, because they had not sufficiently researched Sanders's criminal history, that Johnson gave false testimony before the magistrate judge as to whether Sanders's had a prior record for drug distribution or delivery.  The totality of the facts and circumstances establishes that Johnson in no sense could place "good-faith" reliance on Sanders.

The Government argues in the alternative that "even if" Sanders's honesty or believability could form the basis for a *Franks* challenge, the contradictions and denials of the information contained in the warrant affidavit established by Sanders's trial testimony were insignificant, and could be chalked up to a faded memory.  Regardless, according to the Government, nothing in

Sanders's trial testimony showed that Johnson had any reason to doubt his supposed information at the time the warrant was secured. Doc 175 at 28-30.

These arguments fail. The Government glosses over the numerous material contradictions between Sanders's testimony and the information contained in the search warrant affidavit, which were unreasonably overlooked by defense counsel in making the mid-trial *Franks* challenge. Doc 175 at 29-30. There is no need to repeat here the laundry list of contradictions, which were outlined in Mr. Barrett's Amended Motion. Doc 96 at 34-47; Doc 149 at 39-43. Suffice it to say, the contradictions which emerged between the information alleged in the warrant affidavit and Sanders's trial testimony undermined the entire factual basis for the affidavit, showing both that Sanders was a thoroughly unreliable source who would lie at the drop of a hat for his own self-serving purposes, and that any honest and reasonable law enforcement officer would have no reason to use anything he had to say as the foundation for a search warrant. The numerous and material contradictions between the information contained in the warrant affidavit and Sanders's testimony speak not to a "faded memory," but show he is a pathological liar who has not even a passing acquaintance with the truth. On this record, it is absurd to assert that Sanders's trial testimony does nothing to "undermine" Johnson's belief in him. In his trial testimony, Sanders repudiated virtually the entire factual basis for the warrant affidavit.

Finally, the Government dismisses as unimportant "dicta" the trial court's ruling that the inadequately urged *Franks* motion was without merit because, some six years after the fact, the Government's other informant witnesses "corroborated" Sanders. Doc 175 at 30. Contrary to

the Government's claim, Movant is not "speculating" that this was a basis for the Court's ruling;

it is stated in the order itself as one reason for denying the motion.

Respondent argues that appellate counsel were not ineffective for failing to raise the

*Franks* issue, to the extent it was framed by the record, because the issue lacks merit.  But the

record shows that it is reasonably probable the outcome of the appeal would have been different

had the issue been raised, even based on what was apparent on the record.  At the very least, it is

reasonably probable that the matter would have been remanded for a proper *Franks* hearing.

*Strickland v. Washington,* 466 U.S. 668, 684, 696-97 (1984); *See* Ground 18 and reply to

Government's arguments respecting Ground 18.

> **3.      Counsel were professionally unreasonable and ineffective for failing to investigate and introduce evidence of Mr. Barrett's diminished mental capacity in the guilt/innocence stage of trial.**

The Government argues that trial counsel did not render deficient performance to

Mr. Barrett's prejudice when they failed to investigate and present evidence of Mr. Barrett's

mental illnesses in support of a diminished capacity defense, *i.e.,* that Movant lacked the intent to

commit the offenses charged, or in support of a lesser included offense instruction.  Doc 175 at

32.  It is alleged that counsel had no reasonable duty to investigate, because they were unaware of

Mr. Barrett's mental problems and had no reason to be aware of them.  Doc 175 at 32-33; Resp.

Exhs. 11, 12.  The Government also argues that anything that could have been discovered about

Mr. Barrett's mental state would have been irrelevant to the intent elements of the charges in the

superseding indictment.  Doc 175 at 35-36.  Being unsupported by both the facts and the law, these arguments should be rejected.[3]

### a.      Deficient performance.

Just as it does in connection with counsel's duties to investigate mitigating evidence, the Government badly misstates counsel's responsibilities to investigate Mr. Barrett's mental state in aid of the first stage defense.  As it does throughout its response, the Government falsely asserts that counsel's investigative duties extend only to the information provided by the client, and their observations of him.  The Government argues that because Mr. Barrett appeared to counsel not to have mental problems, there was no duty to delve into this area.

There is no support for this argument.  For one, as is also discussed in the reply to the Government's arguments on penalty phase ineffectiveness, competent counsel in a capital case would never simply rely on what the client tells them, or their observations of the client, to assess the defendant's mental health.  *Gray v. Branker,* 529 F.3d 220, 230-31 (4th Cir. 2008); ABA Guidelines, 10.7, 10.10.1, and 10.11.  As it also does in its discussion of second stage ineffectiveness, the Government invokes Dr. Woods's observation that at first blush, Mr. Barrett evinces no obvious outward signs of mental illness.  Doc 175 at 35.  This simply underscores Mr.

---

[3]  The Government's argument that there were no lesser included offenses to the charges in the superseding indictment will be deferred to Mr. Barrett's reply to the Government's arguments against Ground 9.  Mr. Barrett showed in Ground 9, and shows below, that constitutional error was committed when the Court failed to instruct on voluntary manslaughter as a lesser offense to each of the three charges faced by Mr. Barrett.  That being the case, the failure to investigate and present evidence of Movant's mental state to negate the intent requirements for the crimes charged, in connection with the request (made both by the prosecution and the defense) for a voluntary manslaughter instruction, was both professionally unreasonable and prejudicial under *Strickland* and its progeny.

Barrett's point: appearances mean nothing and counsel must *investigate. McGahee v. United States,* 570 F.Supp.2d 723 (E.D. Pa. 2008) (to investigate means to delve into areas at present unknown).

As Mr. Barrett reiterates later in his discussion of penalty phase ineffectiveness, the claim that counsel were unaware of a need to investigate Mr. Barrett's mental health is flatly belied by the record. The Government baldly ignores the facts.

Mr. Echols and Mr. Hilfiger requested expert psychiatric and psychological assistance, stating it was necessary to investigate the effects on Mr. Barrett of a life and death situation to support the defense that Mr. Barrett was unaware the police were on his property when he fired the shots ("the psychology of individual responses to sudden life or death situations ...is essential to Mr. Barrett's capital defense, which hinges on an understanding of the human mind's response...[and] will negate the Government's allegations of premeditation and malice aforethought relating to capital punishment." Messrs. Echols and Hilfiger also requested the assistance of a neuropsychologist. Doc 46 at 5; Doc 50 at 5-6, 8. Mr. Hilfiger, based on the requests for expert assistance, has thus already acknowledged that this type of investigation and assistance was required to counter the Government's theory of the case -- that Mr. Barrett was expecting a police raid and was ready to repel it with deadly force. This alone disproves the Government's claim that counsel were defensibly ignorant.

As it does in its second stage ineffectiveness argument, the Government dismisses Mr. Barrett's medical records as showing only that he was an ill-tempered drug addict Doc 175 at 34. The facts are otherwise. These records, which were in counsel's actual or constructive possession, put counsel on full notice that Mr. Barrett suffered from mental illness. Given the

facts of the case and the planned defense, an investigation and the development of evidence of mental impairments was crucial. Even Mr. Barrett's use of methamphetamine put counsel on notice of mental or emotional problems, due to the well-known effects of the drug on the brain. The fact that Movant had attempted suicide by shooting himself in the chest with a shotgun and was, after recovery in the hospital, committed to the state mental facility in Vinita was more than a red flag. Counsel were certainly aware of this or were on notice of it, since the records had been acquired by previous defense counsel. The medical records show Mr. Barrett had been diagnosed variously with Major Depression, Bipolar Disorder, and had been medicated with anti-psychotic drugs, which were prescribed for future use. Exh. 147 A-F, Amended Motion. It is simply absurd to argue that counsel were legitimately ignorant of Mr. Barrett's mental problems, and had no reason to investigate.

Counsel were also aware of a prior diagnosis highly relevant to the overall defense theory of the case. In their declarations accompanying the Government's response, counsel state that they recall nothing about Dr. Sharp and his report. Resp. Exhs. 11, 12. Dr. Sharp states otherwise. Exh. 55, Amended Motion. Dr. Sharp had examined Mr. Barrett for the defense in connection with the state proceedings. He found Mr. Barrett suffered from serious mental illness Dr. Sharp describes Mr. Barrett as the most paranoid person he had ever examined and concluded there were signs of organic brain damage that a specialist should further investigate. Dr. Sharp's diagnosis of extreme paranoia would have been extremely important to the defense that was offered at trial, as it would tend to negate knowledge and intent for the reasons described in the brief supporting Mr. Barrett's Amended Motion, and briefly below in the discussion of prejudice. Doc 149 at 49, 52. Based on this alone, since Dr. Sharp had examined

Mr. Barrett in relation to the same event that was being prosecuted in federal court, defense counsel were certainly aware or on notice of him and his report.

But there is more. Counsel were actually aware of Dr. Sharp. At various points in its response, the Government takes pains to argue that counsel had retained and consulted with Dr. Russell, and that this constituted a sufficient investigation of Mr. Barrett's mental state.[4] *E.g.*, Doc 175 at 34. Defense counsel knew about Dr. Sharp because the report written for them by their own expert, Dr. Russell, referenced Dr. Sharp's report explicitly and enumerated the testing instruments he employed. *See* Docs. 208, 210; Mot. Exh. 56 at 3-4. Dr. Sharp's diagnosis, particularly combined with all the other facts mentioned above, undoubtedly imposed on defense counsel a duty to investigate.

Defense counsel also failed to investigate Mr. Barrett's mental state with Movant's family members. Not only would this be a natural first step in any investigation, but it gave "real world" corroboration to medical findings in the records and Dr. Sharp's diagnosis, both of which counsel unreasonably ignored. The Government, skimming the surface of the family members's declarations, broadly claims that Mr. Barrett's family simply related old information that was irrelevant to his mental state at the time of the offense. Doc 175 at 33, 34. This is simply not true. Even a cursory reading of the declarations, particularly taken together, reveals the history of bizarre and paranoid behavior on Mr. Barrett's part, leading up to and including the time of the fatal incident. Exhs. 74, 78, 80-81, 85-87, 91, 93, 96-99, 101, 103, Amended Motion. Yet,

---

[4] This contention itself lacks persuasive force. As shown in Mr. Barrett's reply on the issue of second stage ineffectiveness, Dr. Russell, who simply updated the risk assessment she did in state court, and was neither a psychologist nor a neuropsychologist, was not an "appropriate expert" to diagnose the mental problems Mr. Barrett suffers from.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                         19                         *Barrett v. U.S.*, 6:09-cv-00105-JHP

counsel never discussed these matters with the witnesses, a number of whom were called in the penalty phase. Exhs. 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218.

No legitimate strategy animated counsel's decision not to investigate, since this evidence dovetailed and strengthened the planned defense. In the absence of a competent investigation, no reasoned and informed tactical choice can be made. *E.g., Soffar v. Dretke,* 368 F.3d 441, 474, *amended,* 391 F.3d 703 (5th Cir. 2004); *Workman v. Tate,* 957 F.2d 1339, 1345 (6th Cir. 1992).

### b. Prejudice.

Although in assessing prejudice, the Court must accumulate the individual allegations of ineffective assistance, *e.g., Rompilla v. Beard,* 545 U.S. 374, 391-92 (2005); *Stouffer v. Reynolds,* 214 F.3d 1231, 1235 (10th Cir. 1999), it is clear that counsel's failure to investigate and present mental health evidence prejudiced Mr. Barrett in the first stage of trial.

Citing *United States v. Brown,* 326 F.3d 1143, 1147 (10th Cir. 2003), the Government argues that even if counsel performed a professionally inadequate investigation, the omission of the mental health evidence created no *Strickland* prejudice because it would not have negated the intent elements of the offenses, which the Government seemingly analogizes -- incorrectly -- to strict liability offenses. Doc 175 at 35-36. *Brown,* which was not a murder case, excluded psychiatric evidence because there was no "nexus" between the diagnoses of post-traumatic stress disorder and chemical dependence and the intent element of conspiracy to distribute methamphetamine. Instead of being relevant, the evidence proffered in *Brown* would only present a confusing defense more akin to justification than go to negating the intent element of the charged offense (which is completely unlike the intent elements in Mr. Barrett's case).

That is not the case here.  Although with respect to count 3 of the superseding indictment (charging violation of 21 U.S.C. § 848(e)(1)(B)) the Government tries to downplay the intent element, emphasizing Mr. Barrett only "should have known" that the persons he was firing on were police officers, the intent required is actually quite specific.  The Government had to prove beyond a reasonable doubt that Mr. Barrett had the specific intent to kill Trooper Eales, knowing or having reason to know that he was a law enforcement officer, and that the killing was committed on account of or during the performance of his official duties.  In other words, Mr. Barrett was alleged to have intended to kill Trooper Eales because he was a law enforcement officer.  Count 2 (charging violation of 18 U.S.C. §924(c)(1)(A) and (j)) also required a specific intent to kill a law enforcement officer.  To be found guilty of count 2, which charged Mr. Barrett with using and carrying a firearm during and in relation to a crime of violence, the Government had to prove beyond a reasonable doubt the underlying crime of violence, *i.e.,* that he intentionally killed "any state or local law enforcement officer engaged in, or on account of such official duties."  Thus, the intent elements of counts 2 and 3 are the same.  To convict, the Government had to prove not only an intentional killing, but that the homicide was deliberately (knew or should have known) committed against a law enforcement officer in the performance of his official duties, or on account of those duties.  *United States v. Barrett,* 496 F.3d 1097, 1112-13 (10th Cir. 2007).  The Government's argument that the intent elements did not turn on Mr. Barrett's knowledge that he was shooting at the police conflicts with the law applicable to his case.

The defense in this case was that when he fired his rifle, Mr. Barrett was unaware that he was shooting at law enforcement, and that the Government could not prove that Mr. Barrett

harbored the intent required. The defense relied on the circumstances of the police raid -- *e.g.,* the Tact Team entered the property late at night; the fact that the lead vehicle to all appearances was a civilian automobile which the physical evidence showed had run into Mr. Barrett's cabin; questions surrounding the lighting of the other police vehicles; Mr. Barrett's son yelling out a warning -- to argue that Mr. Barrett thought he was being invaded by trespassers rather than the police. If sufficient doubt could be thrown on the specific intent elements of counts 2 and 3, which hinged on Mr. Barrett's knowledge that the people who had driven onto his property were the police, the Government would not be able to secure convictions.

Contrary to the Government's argument, there is a clear nexus between the intent elements of counts 2 and 3 and the omitted mental illness evidence. Mr. Barrett's extreme paranoia, flight of ideas, sometimes delusional thinking, and inability to accurately process external stimuli and recognize what is going on around him, all manifestations of his mental illnesses, *went directly to the specific intent elements of counts 2 and 3, which required knowledge and intent to kill not just someone, but a police officer because he was a police officer.* This evidence would have powerfully supported the defense that was offered at trial, had it been properly investigated and developed. The upshot of Dr. Woods's diagnoses is that Mr. Barrett's mental illnesses prevented him from recognizing that he was firing at the police rather than in justifiable self-defense, and that he lacked the requisite intent. Exh. 117, Amended Motion. Even if it could be said, as the Government suggests, that an expert could not deliver such an opinion because it would invade the province of the jury -- a dubious proposition in any case, in light of FRE 704 -- an expert could testify to his or her diagnoses, their basis, and how Mr. Barrett's mental illnesses affected his perceptions. Counsel would then be free in closing

argument to draw the inference from this and other testimony that Mr. Barrett lacked the required intent.[5]

This evidence was also relevant to the defense of count 1, which charged Mr. Barrett with violating 18 U.S.C. § 924(c)(1)(A) and (j) by using and carrying a firearm during and in relation to a drug trafficking crime, resulting in death. *United States v. Barrett,* 496 F.3d at 1112-13. To prove Mr. Barrett guilty of this offense, the Government had to establish a nexus between the drug offense and the shooting of Trooper Eales. It is not enough to say that coincidentally or temporally, drug offenses were being committed at the time Trooper Eales was killed. The use of the firearm had to be *in relation to* the drug trafficking crime. This is shown by a case cited by the Government itself in its response to Ground 9 discusses *Beck* error. *United States v. Beckford,* 966 F.Supp. 1415, 1418 (E.D. Va. 1997), *relying on United States v. Tipton,* 90 F.3d 861, 887 (4th Cir. 1996) (proof of temporal connection between homicide and underlying drug trafficking crime will not support conviction under 21 U.S.C. § 848(e)(1)(A), the CCE statute; a substantive connection between the offenses must be shown). If Mr. Barrett fired thinking he was acting in self-defense or defense of his son from illegal intruders, and not the police, his act would have no substantive connection to any drug trafficking crime.

---

[5] The Government elsewhere criticizes the findings of Drs. Woods and Young as being irrelevant to Mr. Barrett's mental state at the time of the shooting. Doc 175 at 121. This argument has no merit. A court determining a post-conviction ineffective assistance claim must take into account evidence developed in the post-conviction proceedings. The diagnoses of Drs. Woods and Young relate back to the time of the offenses. Mr. Barrett cannot be penalized for bringing this evidence forward now, because trial counsel were ineffective for failing to investigate and develop it at the time of trial. *Gray v. Branker,* 529 F.3d at 236-37.

Counsel were ineffective for failing to investigate Mr. Barrett's mental illnesses, which were directly relevant to his trial defense. No reasonable strategy excuses the failure to investigate, and Movant was prejudiced. Ineffective assistance has been found in similar cases involving the failure to investigate mental illnesses similar to those suffered by Mr. Barrett, which aided in establishing a diminished capacity or lack of intent defense. *Jacobs v. Horn,* 395 F.3d 92, 102-07 (3rd Cir. 2005); *Jennings v. Woodford,* 290 F.3d 1006, 1014-19 (9th Cir. 2002), *cert. denied,* 539 U.S. 958 (2003); *Seidel v. Merkle,* 146 F.3d 750, 756-57 (9th Cir. 1998), *cert. denied,* 525 U.S. 1093 (1999); *Saranchek v. Beard,* 538 F.Supp.2d 847, 863-78 (E.D. Pa. 2008).

The prejudice from counsel's failure to investigate is compounded with other errors and omissions in investigating and developing evidence that would have been supportive of the defense theory, including evidence to impeach the informants, the testimony of eyewitnesses Toby Barrett and Alvin Hahn, and the failure secure proper expert assistance in SWAT tactics and crime scene analysis, all of which, taken together, would have refuted or tended to refute the Government's theory of the case.

### 4.     Failure to raise competency issue was constitutionally ineffective assistance of counsel.

The Government's contention that because Mr. Barrett lacked noticeable psychiatric issues his counsel had no notice of his incompetency does not relieve counsel of their duty to know. Doc 175 at 37. When placed in context, the evolving communication actually supports counsel's responsibility to further investigate and litigate Barrett's mental health issues, including the impact that mental health would have on their client's ability to rationally assist in his defense. The mental health history which was known to trial counsel demanded further

inquiry.  Beyond that, as noted below, counsel did know that the Court-ordered stun belt which could send electric shock through their previously abused client was likely to interfere in his ability to assist.  *See* CR 04-115-P at 6; Tr Hrg at 8/31/05 at 95-96; *see also,* Ground 7 hereinbelow.

The Government's reliance on *Foster v. Ward,* 182 F. 3d 1177, 1186 (10th Cir. 1999) should be noted.  In *Foster*, the defendant had a pre-trial competency determination and actually testified at trial, which the Court found was "logical and coherent."  182 F. 3d at 1191.  There is nothing in the case which relieves counsel of the obligation to be alert to the mental health concerns of the client but simply finds counsel were not ineffective for failing to request a post-hearing competency exam because the substantive claim to the exam was non-meritorious.  *Id.* at 1186.  Similarly, in *U.S. v. Rivas*, 862  F. Supp. 208, 212 (N.D. Ill 1994), the Court found only that there was "no evidence that his attorney had reason to question his competence."  *Id.* Neither undermines the strength of the claim here.

> **5.    Counsel were ineffective for failing to move for a continuance and for failing to conduct a professionally reasonable investigation which would have led to abundant impeachment evidence of the prosecution's informant witnesses.**
>
> ### a.    *Failure to move for a continuance.*

The Government asserts that counsel were not ineffective for failing to move for a continuance after the seven informant witnesses, for which there was no discovery, were sprung on the defense shortly before the commencement of the trial proper.  It is maintained there were no grounds for a continuance because the prosecution technically complied with the 3-day notice requirement of 18 U.S.C. § 3432 as determined by the Tenth Circuit on direct appeal; that the

defense reached a reasonable agreement with the prosecution for interviewing the informant witnesses; that any continuance to permit investigation into the informants would have constituted an undeserved windfall for the defense, resulting in mere delay; and that any continuance would not have produced substantial evidence favorable to Mr. Barrett. *E.g.,* Doc 175 at 40, 41. None of these arguments has legal or factual support.[6]

The fact the Tenth Circuit ruled the prosecution complied with the 3-day notice requirement has nothing to do with whether a continuance should have been requested, would have been granted, or whether more time was necessary in order for counsel to conduct a reasonably professional investigation into the informant witnesses. There is no law stating a continuance is unavailable or would be unreasonable simply because the prosecution has complied with the 3-day notice requirement, and the Government cites none. The Tenth Circuit's ruling dealt with a matter of relatively straightforward statutory construction, *Untied States v Barrett,* 496 F.3d at 1115-17; the Court obviously had no opportunity to pass on evidence and arguments showing that notwithstanding compliance with the notice statute, counsel were professionally unreasonable for failing to secure additional time to properly investigate these crucial witnesses. At certain points in its response, the Government argues that these witnesses were not central to the Government's case, or at any rate, their individual credibility was not important (see below) (Doc 175 at 44), but this late-coming assertion conflicts with the statement of the United States Attorney himself, who credited the informants, and AUSA's Littlefield's

---

[6] Movant deals with the prejudice stemming from defense counsel's failure to move for a continuance and failure to investigate and present impeaching cross-examination and evidence relating to the informant witnesses below.

work in cultivating them, as the key to the conviction.  These witnesses were unquestionably the difference between the state trial, where Mr. Barrett was convicted of manslaughter, and the federal case.  Exh. 69, Amended Motion.  This constitutes an admission by a party opponent. FRE 801(d)(2).

The Government's argument that no grounds for a continuance existed is in stark contradiction to the trial court's own statement -- to which the prosecutors did not disagree -- at the *ex parte* hearing that the motion for a protective order was dilatory and that, based on the importance placed on these witnesses by the Government, the prosecutors were setting the case up for a "long continuance."  Tr. Hr'g 9/13/05 at 3-5, 7, 12, 19-20.  The Court recognized the obvious -- it was far too late in the day for the defense to adequately investigate and prepare to cross-examine these witnesses at trial, given their pivotal role in the Government's case. Although the Court ruled during the *ex parte* hearing that the prosecution's motion for protective order was not only late, but without merit, the Court strung the matter along by taking under "advisement" a motion it  already deemed lacked factual and legal support, thereby giving the Government the green light to manipulate defense counsel into a situation that would all but ensure the absence of a proper investigation due to a lack of time and the conditions for "interviewing" the witnesses under the prosecution's watchful eye.

The Government claims that defense counsel's acquiescence in this arrangement was reasonable (Doc 175 at 40), completely overlooking that nothing in the way of investigation was accomplished with it.  All but one of the informant witnesses refused to be interviewed, and the one interview that did take place, of Randy Weaver, occurred under close Government watch. No reasonable defense lawyer would agree to such an arrangement, which was designed to

frustrate, and did frustrate, any *independent* attempt to speak with these witnesses or investigate them further.

The Government is partially correct, so far as it goes, in stating that notwithstanding the *ex parte* hearing, the defense did not have to agree to the one-sided "arrangement," and could have moved for a continuance. Doc 175 at 40-41. But the effect of the *ex parte* conference and its aftermath on what counsel believed they could do is significant. The fact counsel did not move for a continuance underscores Movant's ineffectiveness claim, rather than defeats it. As shown in the Amended Motion, brief in support, and here, counsel's failure to move for a continuance or otherwise appropriately investigate the informant witnesses assured that the *substance* of their testimony would emerge largely intact, and that the impeachment would be "around the edges," concentrating (and even then in an incomplete fashion) only on previous convictions, drug use, and motive. *United States v. Fuller,* 938 F.Supp. 731, 733-34 (D. Kan. 1996) (among other reasons counsel found ineffective was failing to insist on adequate time to prepare for trial).

### b. *Deficient performance.*

Based in part on the declaration of Mr. Hilfiger, the Government argues counsel made a reasoned "strategic choice" to concentrate on impeaching the informant witnesses with their drug use, prior criminal records, and, with respect to some, their hopes of receiving leniency based on their testimony against Mr. Barrett. Resp. Exhs. 12 ¶ 14; Doc 175 at 42. But this ignores that, due to the failure to move for a continuance and in no small part the machinations of the Court and prosecution, this was all counsel believed they were left with. Mr. Hilfiger unreasonably acceded to the arrangement due to his belief, according to the declaration of lead appellate

counsel Mark Henricksen (Exh. 29, Amended Motion) that it was better than nothing, and that nothing else could be done. "Better than nothing" is obviously not consistent with a reasonable investigation and reasoned strategic choices. Mr. Hilfiger states that he believed his ability to investigate the informant witnesses was frustrated by what can only be described as the prosecution's obstructionist tactics. Resp. Exh. 12, ¶ 14.

The Government's argument on this score not only ignores what is apparent from the declarations of trial counsel, but the record itself and the applicable law. A reasoned strategic choice under *Strickland* requires a knowing choice made after adequate investigation, not a *fait accompli* made in an investigative vacuum because counsel was painted into a corner that rendered effective investigation an impossibility. In the face of these obstacles, counsel still failed to utilize the time they had to launch an investigation or move for a continuance. Mr. Barrett has proved, and the Government cannot really contest, that no professionally reasonable investigation was conducted into the informant witnesses. The failure to investigate cannot be excused by after-the-fact rationalizations dismissing the importance of evidence that was never known. The specific claim made here -- that counsel made a "tactical choice" to proceed with the impeachment they had, believing it to be adequate -- is unavailing. *E.g., Wiggins v. Smith,* 539 U.S. 510, 526-27 (2003); *Workman v. Tate,* 957 F.3d 1339, 1345 (6th Cir. 1992); *Richards v. Quarterman,* 578 F.Supp.2d 849 (N.D. Tex. 2008), *aff'd* 566 F.3d 553 (5th Cir. 2009); *Pillette v. Berghois,* 630 F.Supp.2d 791 (E.D. Mich. 2009).

The Government contends, as it does in response to the second stage ineffectiveness claim, that because the witnesses who could have impeached the informants, and/or provided impeaching evidence to use on cross-examination, were friends and relatives of Mr. Barrett's,

counsel's duties to investigate went no further than what Mr. Barrett told them. Doc 175 at 43. If Mr. Barrett did not detail the witnesses to contact, counsel had no duty to independently investigate. As is also discussed in Mr. Barrett's reply to the Government's second stage ineffectiveness argument, this is not the law. Counsel had an independent duty to investigate, regardless of what they were told or not told by Mr. Barrett. Independent investigation must be undertaken even when the client is uncooperative or even obstructive. *E.g., Porter v. McCollum,* 130 S.Ct. 447, 453 (2009); *Rompilla v. Beard,* 545 U.S. 374, 381 (2005); *Hamilton v. Ayers,* 583 U.S. 1100, 1117-18 (9th Cir. 2009). The Government makes the same argument in connection with its claim that, with Mr. Barrett as a source (in the Government's wrongheaded formulation, the only source necessary) for information about these witnesses, counsel could not have made a meritorious motion for continuance. Doc 175 at 40-41. For the same reason stated immediately above and for the reasons stated in subpart 1 of this reply, the "no grounds for a continuance" claim fails.

Without a trace of irony, Respondent alleges that counsel did not render deficient performance (and that Mr. Barrett did not suffer prejudice) because, in the main, the independent fact witnesses who could have given helpful testimony on Movant's demeanor, absence of threats to law enforcement, and who could have contradicted the accounts of Charles Sanders and Travis Crawford as to what was said and what transpired on the afternoon before the shooting, would have had credibility problems because of drug use, prior criminal records (as with Sean Hill), or bias toward Mr. Barrett and against some of the informant witnesses (*i.e.,* Sean Hill, Brandy Hill, and Gwendolyn Crawford with respect to Cindy Crawford). Doc 175 at 43, 47, 57, 61. The same argument is made with respect to those witnesses (some of them the same), who could have

testified that the Government's informants were personally known to them to be dishonest, and had shabby records in the community for dishonesty, as well as witnesses who could have provided counsel with information about past bad acts of the informants which reflected on their dishonesty.[7]  Doc 175 at 43, 47, 57, 61..

Apparently the Government's informant witnesses, who had even more impeaching evidence in their criminal backgrounds than the witnesses omitted here; "came forward" six years after the fact; and in some cases (Sanders, Turman and Real, most prominently) had a powerful motive to please the prosecutors with the (ultimately realized) hopes of quick release from prison or dismissed charges, are above reproach from charges of bias, while Mr. Barrett's witnesses, because they were friends and family, are automatically suspect.  This classic pot-kettle argument cannot be accepted.

Even granting that some of Mr. Barrett's witnesses could have been attacked for bias, drug use[8], and the like, this in no way diminishes the ineffectiveness claim.  These witnesses

---

[7]  Setting up a strawman, the Government responds to an argument Mr. Barrett never made.  The Government states that witnesses who could have provided counsel with fodder for cross-examination on the informants' past bad acts exhibiting dishonesty could not themselves have testified to these facts.  Such would constitute the use of extrinsic evidence to impeach the witnesses on a collateral matter.  Doc 175 at 45.  Fed.R.Evid. 608(b).  The Government is correct.  That is why Mr. Barrett only argued that counsel were ineffective for not discovering this impeachment evidence for use on cross-examination of the witnesses only, a matter which lies in the discretion of the Court.  Doc149 at 61, 62, 64.

[8]  The Government argues that witnesses present at Mr. Barrett's property on the afternoon and evening of September 23 would have undermined Mr. Barrett's defense because they were using drugs there, which would have supported the prosecution's largely drug-based charges.  Doc 175 at 44.  But Mr. Barrett has never denied he was a drug user, or associated with drug users.  The question was whether he was manufacturing or trafficking drugs, and whether there was a substantial connection between the alleged drug crimes and the shooting of Trooper

(continued...)

were unquestionably helpful to the defense, both to impeach the informants' honesty and substantive testimony, as well as support the defense of lack of intent and knowledge. Questions of credibility are to be resolved by a jury, not the Government. *Anderson v. Johnson,* 338 F.3d 382 (5th Cir. 2003) (failure to call eyewitness who would have supported defense theory could not be excused because counsel believed witness would not be credible, and holding that with respect to an ineffectiveness claim grounded in a failure to interview a witness, the potential persuasiveness of the omitted witness is largely immaterial); *Pillette v. Berghois, supra* (deficient performance and prejudice found where counsel failed to interview four witnesses who would have contradicted prosecution witnesses and would have corroborated defendant's testimony, at least in part; prejudice was also established, because even though the jury could have possibly discounted the witnesses due to bias and inconsistencies in accounts, there remained a reasonable probability that the jury would not have rejected their testimony); *McGahee v. United States,* 570 F.Supp.2d 723 (E.D. Pa. 2008) (failure to investigate alibi witnesses could not be justified by after-the-fact rationale, since counsel cannot downplay or dismiss evidence for which no reasonable investigation was made; prejudice shown even though witnesses had their own

---

[8](...continued)
Eales. With respect to Janesse Thomas, the Government argues that her testimony would have been "toxic" to Mr. Barrett's defense (Doc 175 at 58, Resp. Exh. 3), because she had "apparently" been to Mr. Barrett's residence on occasions when drugs were sold, and Ms. Thomas had, according to Resp. Exh. 3, bought drugs from Mr. Barrett in the past. However, her latest declaration in no way diminishes her contradiction of Charles Sanders's accounts of being with her at Mr. Barrett's residence during the critical time period, and her alleged purchase of drugs from Mr. Barrett occurred approximately one year before the raid. On balance, her testimony was helpful to Mr. Barrett, because it would have specifically impeached Charles Sanders. It should be kept in mind that the Government had to show a substantive connection between the underlying drug charges and the shooting of Trooper Eales, at the time of the fatal act.

credibility problems and even contradicted one another to an extent; the credibility of these nonetheless helpful witnesses was for a jury to resolve); *Casey v. Frank,* 346 F.Supp.2d 1000, (E.D. Wis. 2004) (deficient performance and prejudice found where counsel failed to discover or utilize statements in previous counsel's file that undercut witness credibility, where credibility was the key issue in the case).

The bias and interest of the Government's own witnesses and the state of the law aside, the Government's "bias" argument is misplaced. Contrary to the Government's claim, a number of the impeaching witnesses had no bias for Mr. Barrett, or had "cross-biases" (if any) that canceled one another other out. For example, one of the witnesses who could have testified to Charles Sanders's totally lack of honesty was his uncle, Billy Poindexter. Exh. 76, Amended Motion. Sally Davis Johnson had no apparent allegiance to Mr. Barrett. Exh. 95, Amended Motion. Janesse Thomas was a friend of Charles Sanders's and Movant's. Exh. 13, Amended Motion. Witnesses who could have testified to impeaching information, or provided counsel with impeaching facts for cross-examination with respect to several of the witnesses (such as Travis Crawford and his wife, Cindy), were not only related to Mr. Barrett, but to the Crawfords as well. Exhs.77, 78, 83, 88, 92, 95, Amended Motion. As already shown, whether the Government could have impeached the omitted witnesses for bias or drug use does not show that counsel rendered constitutionally adequate performance, because there was a total failure to investigate. The informant witnesses certainly had their own biases and interests, and it would be up to a jury to resolve a credibility contest.

Questioning the informants superficially about their drug use, prior convictions, and hopes for leniency was not sufficient impeachment, based on all the other impeaching evidence

that was out there but never investigated. The Government claims that the "strategy" employed by defense counsel was to impeach the informant witnesses with their prior criminal histories, drug use, and, on the part of some, hopes for leniency. But the Government's survey of what these witnesses were asked in these areas, and what was left out, demonstrate that counsel even did an inadequate job in these impeachment efforts. A few examples suffice.

The Government claims that Sanders was impeached with "all" his criminal convictions, but, the Government's arguments to the contrary, it is clear that only ten of Sanders's eighteen previous felony convictions were explored on cross-examination. Doc 175 at 53-54. *E.g.,* Exhs. 57, 72, 157-68, 175, 183-87, Amended Motion. The Government claims the numbers make no difference, but this is inaccurate on its face and underlines the fact that counsel did not adequately examine the witness in an area that counsel "strategically decided" to focus upon in impeachment.

The Government states that counsel adequately cross-examined Sanders about the deals he received in previous cases, but then contradicts itself, quoting a portion of Sanders's cross-examination where the witness gave Mr. Hilfiger "great resistence," denying that he had actually received many favors at all. Had counsel adequately researched Sanders's record, he could have confronted the witness with the many dismissed counts and cases that common sense shows could only have occurred due to Sanders's work as an informant. Otherwise, he was usually looking at a minimum of 20 years and up to life imprisonment. Exhs. 57, 72, 157-68, 175, 183-87. The Government also claims the potential deal Sanders was to receive in this case was the only important one, but common sense dictates that if it could be conclusively demonstrated – as it could have been here – that the witness did practically nothing during his adult life but commit

crimes and get out of trouble because he was a snitch, a jury would see his testimony against Mr. Barrett was just one more sorry chapter in his career as an informant, and that nothing he said could be trusted in the slightest.

Likewise, the Government argues counsel was not ineffective for failing to question Travis Crawford about his prior work as a testifying informant and his mental problems, even aside from the effects of drug use, because counsel "had no reason to know about these things." Doc 175 at 46-47. The reason counsel did not know was because they conducted no investigation. The failure to inquire into these areas shows yet again that counsel did not even reasonably investigate the impeachment areas they purportedly decided to concentrate on. The same is true of the fact that Cindy Crawford had worked as an informant before, faced acceleration of a deferred sentence in a state drug case at the time of her testimony, could have been charged with a felony rather than a misdemeanor in a marijuana possession case, and had mental problems. The fact that she faced acceleration on her state drug case at the time she testified gave her an obvious motive to please the Government. Doc 175 at 52.

The Government claims that defense counsel effectively cross-examined Randy Turman on whether his multi-count Sequoyah County drug case had been "taken care of." When Turman denied it, all counsel did was state that he had the paperwork with him, but he let Turman slide with the answer that he would not "understand it," instead of confronting the witness directly with the documents and making him read them on the stand, or calling someone from the Sequoyah County Court Clerk's Office to impeach Turman. Contrary to the Government's argument, this would not have run afoul of FRE 608(b). The matter was not "collateral," but went to Turman's bias and motive for testifying: by pleasing the Government, he was hoping to

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                  35                  *Barrett v. U.S.*, 6:09-cv-00105-JHP

470

get the charges dismissed, which is ultimately what happened. Doc 175 at 63-64. Evidence of bias and motive is never collateral. *E.g., Delaware v. Van Arsdall,* 475 U.S. 673, 678-79 (1986).

Trial counsel also failed to impeach Karen Real with a number of dismissed state drug cases. The Government argues that this aspect of Mr. Barrett's claim is time-barred, because it was first raised in the amendment filed in September, 2009, after the 1-year period of limitations expired. The Government also cites 21 O.S. 2001, § 11 for the claim that because of her federal drug conviction, Real could not also have been prosecuted in state Court. Doc 175 at 162. Both arguments fail. Reference to Real's dismissed state charges was not barred by the period of limitation, as it did not constitute a "new claim," only additional evidence supporting an existing claim that was timely. *Mayle v. Felix,* 545 U.S. 644 (2005); *United States v. Espinoza-Saenz,* 235 F.3d 501, 503-04 (10th Cir. 2000); *United States v. Thomas,* 221 F.3d 430, 436 (3rd Cir. 2000). Section 11 of Title 21 of the Oklahoma statutes bars multiple punishments in *state prosecutions only.* The Government also overlooks the dual sovereign doctrine, which permitted Mr. Barrett to be charged in federal court after he had already been acquitted of murder but convicted of manslaughter in state court.

### c.    *Prejudice.*

To the extent that the Government's "bias" argument is part of its assertion that Mr. Barrett suffered no prejudice because the witnesses would have been subject to impeachment by the prosecution, the above demonstrates this contention is legally untenable.

The Government cites a single case, from 1989, to the effect that where witnesses have been impeached by other means, counsel was not ineffective for failing to call "anti-character"

472

witnesses[9], particularly where they could be perceived as having a bias toward the defendant. Doc 175 at 42. *Kubat v. Thieret*, 867 F.2d 351, 364 (7th Cir. 1989). *Kubat* lacks persuasive force for several reasons. First, as shown above, the Government's "bias" argument misses the mark. Second, the far more recent authority cited above shows that even when defense witnesses are subject to impeachment for bias, or even occasional contradictory testimony, their helpful testimony or information outweighs whatever is lost through possible impeachment; it is for the jury to make credibility determinations. Third, *Kubat* does not describe the situation here. Taken as a whole, the impeaching evidence that was unreasonably omitted from Mr. Barrett's trial went not just to impeaching the credibility of the informant witnesses *per se* by showing they were dishonest people, but raised significant doubts about the *substance* of their testimony regarding threats to law enforcement and Mr. Barrett's statements and attitude on the afternoon before the shooting. Fourth, the "other means" used by counsel in an effort to impeach the informants have been shown inadequate and based on no reasonable strategy. Fifth, any impeachment the anti-character witnesses could have provided in *Kubat* was cumulative to trial impeachment that the prosecution witness in question had a perjury case. This type of direct evidence of dishonesty on the part of a prosecution witness or witnesses was absent from the impeachment offered by counsel at Mr. Barrett's trial. Again, the impeachment that was attempted was inferential only.

It is urged that the individual credibility of the witnesses was of no moment; the witness's accounts of Mr. Barrett's hyper-vigilance and threats to the police were consistent, and Mr.

---

[9]  See Exhs. 13, 76, 77, 78, 83, 88, 90, 92, 94, 95, Amended Motion.

472

473

Barrett's lifestyle bespoke a volatile recluse just itching for the opportunity to shoot a law enforcement officer. Doc 175 at 44. Whether the witnesses "corroborated" each other or not does not make them impervious to scrutiny through impeachment of their honesty, and impeachment of their accounts of Mr. Barrett's alleged statements and attitude. Yet again, the Government wants to sit in the jury box.

Mr. Barrett's lifestyle does not point unerringly, or even approximately, to the fact that he was at the ready to shoot it out with the police and was constantly on guard. It just as reasonably shows that Mr. Barrett liked the privacy of his small, rural community and kept to himself. The Government dismisses as insignificant the omitted testimony of Sean Hill and Toby Barrett explaining the purpose and origin of the "warning sign" attached to Mr. Barrett's gate (Exhs.88, 96 Amended Motion), stating that this was just one piece of evidence showing Mr. Barrett's violent propensity toward intruders (particularly, by implication, the police), but it was an important piece of evidence to the Government at trial. According to the prosecutors, the sign crystallized in microcosm Mr. Barrett's alleged violent propensities, to the public in general and the police in particular. There can be no question that the benign explanation for the sign that could have been offered by these two omitted witnesses would have undercut the prosecution's theory of the case.

The omitted witnesses were also "cross-corroborating": they described an individual much different from that sketched by the six-years-late-in-coming informants, a man who was not threatening toward the police or spoiling for a confrontation, and who was unconcerned with police presence in his isolated, rural neighborhood. *E.g.,* Exhs., 37, 77, 90, Amended Motion. The Government contends that just because these witnesses would say that Mr. Barrett was not

473

threatening or aggressive toward the police, that does not necessarily impeach the account of the informant witnesses, but this simply is not so. Doc 175 at 45, 48, 53. This is certainly not the case with the witnesses who could have impeached the accounts of September 23 offered by Travis Crawford about Mr. Barrett's supposed threats toward law enforcement and concern for an imminent raid, and Charles Sanders's claim -- repeated by the prosecution in closing argument -- that he was at Mr. Barrett's that afternoon. Exhs. 37, 77, 90, 96, Amended Motion. Nor is it true for the witnesses who could have testified that Mr. Barrett as, a matter of personality, demeanor and word, was not threatening toward the police. Exhs. 37, 77, 90, 96 Amended Motion. This testimony would have called into serious question the informants' claim that Mr. Barrett had this attitude or ever made such statements..

Mr. Barrett was clearly prejudiced by counsel's professionally unreasonable failure to investigate and present witnesses who could have impeached the Government's informants, and in failing to develop impeaching evidence during the cross-examination of these witnesses. Contrary to the Government's claim, this evidence was not simply "cumulative" to the surface impeachment that was undertaken. This was "substantially favorable" evidence that went to the heart of the Government's case. *United States v. Miller,* 907 F.2d 994, 1000 (10th Cir. 1990); *United States v. Rivera,* 900 F.2d 1462, 1472-74 (10th Cir. 1990) (en banc) The omitted impeachment witnesses and evidence went to the very substance of the informants' testimony. There is a reasonable likelihood that had these witnesses been called and had further impeaching cross-examination been undertaken, the result of the guilt phase would have been different. *E.g., Anderson v. Johnson, supra*; *Pillette v. Berghois, supra*; *McGahee v. United States, supra*; *Casey v. Frank, supra.* Accordingly, Mr. Barrett should be granted § 2255 relief.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion   39   *Barrett v. U.S.*, 6:09-cv-00105-JHP

474

**6.     Counsel were ineffective in failing to make appropriate and timely objections to other bad acts testimony by the informant witnesses.**

The Government attempts to dispute Mr. Barrett's argument regarding trial and appellate counsel's ineffectiveness in failing to properly challenge testimony by informants regarding Mr. Barrett's alleged animosity towards law enforcement officers and his desire to harm them if they came on his property. The Government argues that: 1) Mr. Barrett's claim is untimely; and 2) the underlying testimony was admissible. The Government is wrong.

**a.     *Mr. Barrett's claim relates back and is, therefore, not time barred.***

The Government argues that Mr. Barrett first raised this claim in his Amended § 2255 Motion filed on September 25, 2009 and, as a result, the claim is time barred because Mr. Barrett's one-year period of limitations expired on March 17, 2009. The Government further contends that the claim does not relate back to Mr. Barrett's timely-filed motion because:

> [t]he claim is based on an entirely novel premise, and does not merely clarify, amplify or expand any timely-filed contention. *Cf. United States v. Espinoza-Saenz*, [235 F.3d 501, 505 (10th Cir. 2000)]. In short, the claim arises from different facts than those ineffective assistance claims set forth in the Corrected Motion (Doc 2) and therefore does not relate back to that pleading.

Doc 175 at 65.

Not only is the Government missing the point, its support for its argument is based on a case that pre-dates *Mayle v. Felix*, 545 U.S. 644 (2005), the United States Supreme Court case that definitively defines "relation back" in the habeas context. *Id.* at 664.

Under Federal Rule of Civil Procedure 15, a party may properly raise a new claim or defense that would have been barred by the statute of limitations if the claim or defense "arose out of the conduct, transaction, or occurrence set out-or attempted to be set out-in the original

pleading." Fed R. Civ. P. 15(c)(1)(B); *see also Mayle*, 545 U.S at 656. *Mayle* defined "conduct, transaction or occurrence," holding that "[s]o long as the original and amended petitions state claims that are tied to a *common core of operative facts*, relation back will be in order." *Id.* at 664 (Emphasis added.)

In *Mayle*, the Court gave examples of claims that constitute a common core of operative facts in which relation back was appropriate. *See id.* at 664, n.7. For example, the Court noted an Eighth Circuit case in which the original petition alleged *Brady* violations and the amended petition alleged the Government's failure to disclose a particular document. *See id. (citing Mandacina v. United States*, 328 F.3d 995, 1000-01 (8th Cir. 2003)). Additionally, the Court pointed out a situation in which the original petition challenged the admission of recanted statements, while the amended petition challenged the Court's refusal to allow the defendant to show that the statements had been recanted. *See id. (citing Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001); *see also United States v. Hodge*, 554 F.3d 372 (3rd Cir. 2009) (post-*Mayle* case in which an ineffective assistance of counsel claim was found to relate back to a right to appeal claim because both claims dealt with erroneous advice movant received from counsel regarding the right to file an appeal).

In this claim, Mr. Barrett is challenging his counsel's failure to make timely and appropriate objections to the testimony of the informant witnesses, who alleged that in the months before the shooting, Mr. Barrett engaged in drug activity and made inflammatory comments about law enforcement. Prior to trial, the Government filed a notice that it intended to use this type of evidence and contended that it was not prior bad act evidence under Fed. R. Evid. 404(b). Mr. Barrett's counsel objected, and the Court ruled that the admissibility would be

determined on an as-needed basis. However, as the evidence came out, Mr. Barrett's counsel failed to object or request appropriate limiting instructions. The informant witnesses were permitted to testify to alleged stale threats by Mr. Barrett to law enforcement, as well as evidence of drug activities that were not contemporaneous with the offenses charged.

The Government contends that this claim does not relate back to Mr. Barrett's previously-stated ineffective assistance of counsel claims. Doc 175 at 65. The Government's conclusory statement is wrong. There is a common core of operative facts between this claim and Mr. Barrett's prior claims of ineffectiveness regarding the informant testimony. In his timely-filed Corrected Motion (Doc 2), Mr. Barrett went into great detail setting forth his attorneys' ineffectiveness in dealing with the informant testimony. For example, Mr. Barrett stated that "the defense was woefully unprepared to effectively cross-examine these witnesses, and failed to conduct whatever real investigation could have been accomplished in the little time that remained before the snitches hit the stand." Doc 2 at 78. Mr. Barrett then discussed each of the informant witnesses individually and enumerated ways in which his counsel failed to adequately investigate, discredit or impeach them. *See* Doc 2 at 77-129. Mr. Barrett's "new" claim is simply an expansion of his previous claims regarding his counsel's utter failure to mount any sort of defense against these very same witnesses. Or put differently, Mr. Barrett's claim regarding counsel's failure to timely object to the informant testimony constitutes a common core of operative facts with his earlier claims of counsel's complete ineffectiveness in handling the informant witness testimony.

This situation is analogous to the example set forth in *Mayle*. In that Eighth Circuit case, a cumulative *Brady* claim related back to movant's original *Brady* claim. *See Mayle*, 545 U.S. at

664 n.7 (*citing Mandacina v. United States*, 328 F.3d 995, 1000-01 (8th Cir. 2003)). Here, likewise, Mr. Barrett's cumulative challenge to his counsel's ineffectiveness in dealing with the informant testimony relates back to his original claims regarding the informant testimony. Moreover, the issue of objections based on Fed. R. Evid. 404(b) is an obvious one, as pointed out by the Court in an *ex parte* hearing: "there is 404(b) material obviously in the proposed motion, it appears to me." Tr. 9/13/05 Hr'g at 22. In fact, Mr. Barrett raised the 404(b) issue in his Corrected Motion in his claim regarding the *ex parte* hearing. Doc 2 at 38.

Accordingly, this Court should find that Mr. Barrett's claim relates back to the date of his Corrected Motion.

> **b.      Trial counsel's failure to object constituted ineffective assistance of counsel.**

The Government argues that even if the Court considers the claim, "none of the foregone objections had any merit, and trial counsel had no obligation to raise a futile objection." Doc 175 at 66. Again, the Government's conclusory statement is wrong.

After Mr. Barrett's trial started, on September 22, 2005, the Government filed a Notice of Intent to Offer Evidence of Other Crimes.[10] Doc 206. This was after the Government described the testimony to the Court in an *ex parte* hearing and the Court noted that the testimony would include 404(b) evidence. Tr. 9/13/05 Hr'g at 22-23. Mr. Barrett filed a response to the 404(b) Notice and the Court ruled that it would not make a determination at that time but wait until it actually heard the evidence or the effort to present the evidence, noting that, "[o]f course, I would

---

[10]   The Notice filed by the Government did not include information regarding informant Karen Real. Mr. Barrett's counsel were ineffective for failing to object to that lack of notice.

caution counsel for the Government to approach the bench for conference when that evidence -- when an effort to introduce that evidence is appropriate." R at174.

The Government first argues that Rule 404(b) does not even apply, because the other acts evidence complained of was not other acts, but "intrinsic" to the offenses charged, relying on *United States v. Parker*, 553 F.3d 1309 (10th Cir. 2009) and *United States v. Viefhaus*, 168 F.3d 392 (10th Cir. 1999). The Government is attempting to profess that somehow the statements made by the informants at unknown points in time were intertwined with the charged offense. Because the Government at least realizes the problem with the timing of the statements, it attempts to link them to the time Mr. Barrett "failed to appear for his state trial, resulting in the issuance of a warrant for his arrest." Doc 175 at 68. This is not a straight-faced argument.

*Parker* is completely distinguishable. In that case, the defendant was accused of a conspiracy involving the selling of defective airplane engines. *See Parker*, 553 F. 3d at 1313. The challenged 404(b) evidence was several sales that occurred within the conspiracy time frame but were not charged as overt acts, and several sales that occurred before the conspiracy time frame. *See id.* at 1314. The Tenth Circuit found that the sales that occurred within the conspiracy time frame were not other bad acts because they were intrinsic to the offense charged; however, the sales that occurred prior to the conspiracy time frame were subject to a 404(b) analysis. *See id*. at 1314-15. This is a completely different situation from Mr. Barrett's, in which the Government is trying to assert that his alleged statements that were made months previous to the offense were somehow intrinsic to the offense charged.

The Government's reliance on *Viefhaus* is equally unimpressive. That case only referred to the "intrinsic" argument in dicta; it did not hold that the evidence in that case was intrinsic to

the offense charged such that a 404(b) analysis was unnecessary.  *See* 168 F.3d at 397.  Instead, the Court performed a 404(b) analysis and held that the evidence does not offend Rule 404(b). *See* 168 F.3d at 398.

The Government then argues that even if the statements are considered other acts and analyzed under 404(b), "their admissibility would be patent." Doc 175 at 68. This is hardly the case.  Evidence is admissible under Rule 404(b) if it is offered for a proper purpose, relevant, not unduly prejudicial and accompanied by a proper limiting instruction if requested.  *See United States v. Caldwell*, 560 F.3d 1202, 1211-12 (10th Cir. 2009).  Here, a proper 404(b) analysis was never conducted because of counsel's ineffectiveness.  It is beyond question that there were problems with the evidence involving hearsay, propensity and prejudice.  Moreover, any time frame placed on the statements by the informants was completely unreliable.  The relevance of the statements is further called into doubt by the situation -- if Mr. Barrett had in fact made the inflammatory statements about law enforcement, those statements had nothing to do with law enforcement showing up, unannounced, in unmarked vehicles in the dark of night.  Trial counsel were professionally unreasonable by their unmitigated failure to object to any of these issues or, at a minimum, request a limiting instruction.  This failure caused prejudice to Mr. Barrett.

To the extent that trial counsel did object to the other bad acts evidence addressed here, direct appeal counsel were ineffective for failing to raise a substantive 404(b) issue.

> **7.   Trial counsel were professionally unreasonable for failing to engage the services of an independent crime scene reconstruction expert.**

Trial counsel sought $17,000 for an expert to conduct crime scene reconstruction, in anticipation that the Government would hire Iris Dalley, who appeared as a witness in both of

Mr. Barrett's state court trials.  The Court authorized $4000.  Trial counsel did not use those funds for a crime scene reconstruction expert; instead, counsel used the funds for an investigator who took photographs.  Had trial counsel hired expert Edward Hueske, he would have testified that Dalley's testimony was completely unreliable and not worth of belief.  *See* Exh. 109, 110, Motion.

The Government argues that trial counsel were not ineffective because Dalley's testimony was not damaging to Mr. Barrett.  In fact, reading the Government's argument, one would believe that Dalley testified in Mr. Barrett's favor.  Nothing is farther from the truth.

Dalley's testimony more than supported the Government's position, as evidenced by the Government's closing argument:

> And you'll remember where those trajectories were.  They were directly -- at the drive.  And when someone comes in and you're trying to stop them, when you're trying to stop the law, you take out the lead vehicle.  And how do you do it? You take out the driver.  And that's where all those shots were until it got parked right in front, 15 feet away.  And he changed his focus because Buddy didn't go down between the seats.  He changed his focus to the person trying to get out of the vehicle and he shot and killed Rocky at that point.  The pattern of shots tells you his intention.  It will show somebody who was thinking.
>
> * * *
>
> Remember Iris Dalley.  I believe -- I can't remember which shot, but there was one shot that passed through and hit the inside door molding on the driver's door and she testified that door had to be open when that shot was fired because the inside of the door covers the molding, covers that rubber molding when it's closed.  He shot through that door as Buddy was exiting.

R at4305-06.  Moreover, as admitted by the Government, Dalley firmly concluded that Mr. Barrett could not have fired all the shots in a prone position from inside his house and that Trooper Eales' elbow and flank wounds occurred after he exited the vehicle.  This was detrimental to Mr. Barrett's case.

481

The Government's assertion that trial counsel exercised reasonable strategy by turning Dalley's testimony to Mr. Barrett's advantage is ludicrous. As set forth in Mr. Barrett's Amended § 2255 Motion and Brief in Support, trial counsel were constitutionally ineffective for denying Mr. Barrett his constitutional and statutory right to expert assistance to rebut Government witnesses. This was a critical error; Dalley's testimony was arguably the most important factor in establishing the intent elements of the offenses charged. As a result, Mr. Barrett can establish that he was prejudiced by counsel's failure.

**8.      Trial counsel were ineffective in their failure to secure an independent expert on police tactics who would have demonstrated that the midnight raid on Mr. Barrett's house was reckless and dangerous.**

In Mr. Barrett's second state trial, Chuck Choney, a former FBI agent, testified for the prosecution and when effectively cross-examined, provided favorable testimony to Mr. Barrett regarding the recklessness of the police tactics that were used when Mr. Barrett's house was raided. Choney was upset about this outcome and had absolutely no desire to testify for Mr. Barrett at the federal trial, a fact of which trial counsel were well aware. Nonetheless, trial counsel conducted no investigation into what evidence could be presented by an independent expert and instead called as their expert the very reluctant Choney, who was harmful to Mr. Barrett's case. If trial counsel had engaged Dr. George Kirkham, Dr. Kirkham would have testified that the raid was uncalled for and conducted in a way that provoked violence and minimized the chances that Mr. Barrett would see that he was being confronted by law enforcement officers. Exh. 44, Motion (Doc 70). However, the Government contends that Dr. Kirkham "fails to show that those the [sic] choice of tactics had any bearing on Barrett's intent or

that alternative tactics were reasonably available to the police." Doc 175 at 74.  This statement is an outright lie or, perhaps, the Government did not read Dr. Kirkham's report.

Dr. Kirkham's report clearly and emphatically concludes that "it is my considered professional opinion that the violations of well established standards and procedures of the police profession discussed in this report were a significant cause of the preventable violence which occurred at Kenneth Barrett's residence on September 24, 1999." Exh. 44 at 1, Motion (Doc 70).  Dr. Kirkham's report sets forth in great detail the alternative tactics that the Tact Team should have utilized, including establishing a safe perimeter, communicating with Mr. Barrett from a safe distance, the use of marked patrol cars with overhead flashing lights, the presence of negotiators and/or friends or family members who could talk to Mr. Barrett in the event he refused to surrender, just to name a few.  Exh. 44 at 3, Motion (Doc 70).  In fact, Dr. Kirkham states, "After reviewing the circumstances surrounding the incident, one is led inexorably to ask why the involved District 27 Task Force officers and OHP Tactical Team members would not have opted to use readily and available and vastly safer alternative methods of apprehension." Exh. 44 at 4, Motion (Doc 70).  Certainly, Dr. Kirkham concluded that alternative techniques were available to the police.  As for Mr. Barrett's intent, Dr. Kirkham's findings most assuredly would have cast reasonable doubt on whether Mr. Barrett knew that he was being raided by police officers.  Dr. Kirkham concluded, "The manner in which this arrest operation was conducted renders unanswerable the important question of whether Barrett realized he was being confronted by law enforcement officers, as opposed to narcotics dealers or others whom he believed might do him harm." Exh. 44 at 1, Motion (Doc 70).

The Government further brushes off Mr. Barrett's claim, by stating that trial counsel's strategic choice of witnesses is virtually unchallengable, citing *Boyle v. McCune*, 544 F.3d 1132 (10th Cir. 2008) and *Williams v. Bowersox*, 340 F.3d 667 (8th Cir. 2003). The Government misses the point.  Both cases cited by the Government stand for the proposition that counsel's adequately informed strategic choices are accorded a presumption of reasonableness.  Trial counsel cannot exercise strategy in calling witnesses when they fail to perform adequate research and investigation.  Moreover, the cases cited by the Government are easily distinguishable.

In *Boyle*, the Movant argued that counsel was ineffective for failing to call medical experts in a rape case where nurses testified.  *See* 544 F.3d at 1138.  However, the issue at trial was whether the victims consented and the nurses bolstered the victims' testimony.  *See id.* Movant did not set forth any evidence indicating that other medical experts would have disagreed with the nurses; thus, additional medical testimony could have hurt his case.  *See id.* at 1139. This is a far different situation than Mr. Barrett's, in which he has produced an expert who has set forth an opinion favorable to Mr. Barrett.

Likewise, *Bowersox* is distinguishable.  In that case, the Movant claimed ineffective assistance for his counsel's failure to call two witnesses whom counsel had said he was going to call in his opening statement.  *See* 340 F.3d at 670.  After counsel investigated the witnesses further, he made the strategic decision to not call them.  *See id.* at 670-71.  In finding that counsel was not ineffective, the Court placed much emphasis on the fact that counsel investigated the witnesses before making that strategic decision.  *See id.* at 672.  Again, this is a different situation than Mr. Barrett's, in which trial counsel did not investigate the potential benefit of an independent expert on police tactics.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                49                *Barrett v. U.S.*, 6:09-cv-00105-JHP

The Government also argues that it was a "strategic" decision for trial counsel to call Choney because he would be difficult to impeach. That is not "strategy"; that is cutting your nose off to spite your face. It is not within the bounds of reason for counsel to call a hostile witness rather than to even investigate the possibility of a favorable, respected expert witness, just because a hostile witness might be difficult to impeach.

The Government also takes conclusory pot shots at Dr. Kirkham's expert opinion and states that Dr. Kirkham cannot offer an opinion regarding Mr. Barrett's mental state. Doc 175 at 77. Dr. Kirkham's report does not offer an opinion regarding Mr. Barrett's mental state; instead, it offers an expert opinion about the reckless manner in which the raid was conducted. Dr. Kirkham believes that because of the reckless manner in which the raid was conducted, it's impossible to know, let alone prove, whether Mr. Barrett knew that it was law enforcement officers who were entering his property. This fact was more than critical to Mr. Barrett's case, in which the jury had to find, beyond a reasonable doubt, that Mr. Barrett had the requisite intent to kill a law enforcement officer in the performance of his official duties. Accordingly, trial counsel were wholly and prejudicially ineffective in their failure to retain an independent expert on police tactics.

### 9. Failure to adequately cross-examine law enforcement witnesses was ineffective assistance of trial counsel.

Despite later strenuously arguing that the Court's denial of timely production of the state trial transcripts was not error, (Doc 175 at 145), the Government here relieves trial counsel of its responsibility to adequately cross-examine critical witnesses *because* he did not have the transcripts. Doc 175 at 78. Nor does the fact that it was "a long and complex trial" lessen the

likely prejudice to Mr. Barrett. Doc 175 at 78. The guilt here is not overwhelming. The Government's evidence was susceptible to disbelief, and if disbelieved could have led the jury to a very different understanding of the events which led to the death of the trooper, and ultimately a very different verdict. Failure to adequately cross-examine and impeach state drug task force member Clint Johnson, who put the entire sequence of events into action, cannot be considered minor, no matter the length or complexity of the events which followed.

The Government's argument that the matter of emergency lighting, while important to the defense, "was understandably less important to, and therefore more easily forgotten by, members of the Tact Team," makes clear what the Government's argument would have been, had there been effective cross-examination. It does not, however, relieve trial counsel of his responsibility to secure critical testimony in support of his defense. The Government's admission that "such facts were of great significance to Barrett's trial defense," (Doc 175 at 80), effectively ends the inquiry, establishing both the deficient performance and the prejudice which resulted.

In *Moore v. Marr*, 254 F. 3d 1235, 1241 (10th Cir. 2001), a case relied upon by the Government, the Tenth Circuit notes that "counsel's failure to impeach a key prosecution witness is potentially the kind of representation that falls "outside the wide range of professionally competent assistance[.]" *Id., quoting Strickland,* 466 U.S. at 690. Rejecting a finding of prejudice, the Court says:

> Our review of the trial transcript, shows an overwhelming evidence against Moore was presented at trial, even absent Goudie's testimony. . . .Accordingly, even if Goudie had been impeached we cannot conclude that the outcome would have been different.

*Id.* Ignoring the failure of the Court to cite the correct *Strickland* standard of prejudice[11], here the evidence is not overwhelming, especially without the testimony of the state troopers who were present. Impeachment of the law enforcement was critical to Mr. Barrett's defense. The failure to impeach was constitutionally deficient and reasonably likely to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694.

> **10.    Trial counsel were ineffective in failing to call Toby Barrett and Alvin Hahn, percipient witnesses, who could impeach government testimony.**

Toby Barrett and Alvin Hahn were vital witnesses who would have testified that: 1) the sign on Mr. Barrett's gate had nothing to do with law enforcement; 2) Trooper Hamilton's claim about the condition of the gate at the time of the drive-by was false; 3) there were no police lights visible at the start of the shooting; 4) Toby's cry of alarm was the first indication that Mr. Barrett had of the raid; 5) Mr. Barrett only had a split second view of the scene before he went inside; and 6) there was only one car with its lights on visible within 15 seconds of the shooting. This evidence would have been critical to impeach the Government's contention that Mr. Barrett had an opportunity to observe the scene, see police lights and form the intent to kill before the shooting started. The Government argues that neither Toby Barrett nor Alvin Hahn would have meaningfully undermined the Government's case and the decision not to call them as witnesses was a proper exercise of counsel's trial strategy. Doc 175 at 87.

---

[11]  "That there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. at 694.

### a.     *Toby Barrett.*

Although the Government concedes that Toby Barrett was an eye-witness, the Government argues that Toby's recollection is limited. Doc 175 at 89. In support of this statement, the Government cites to Toby's declaration in a piecemeal manner to make it appear that Toby's knowledge of the raid was vague. The Government concludes that this weighs in favor of trial counsel's "strategy" in failing to call Toby Barrett as a witness.

There are two problems with the Government's theory.  First, before counsel decides to not call a witness, counsel must perform sufficient investigation to make a strategical call. *See Ramonez v. Berghuis*, 490 F.3d 482, 488 (6th Cir. 2007).  In *Ramonez*, the Court found ineffective assistance of counsel because the defense attorneys failed to interview percipient witnesses who could have corroborated defendant's account of the events.  *See id.*  The Court stated that "the investigation leading to the choice of a so-called trial strategy must itself have been reasonably conducted lest the 'strategic' choice erected upon it rest on a rotten foundation." *Id.; see also, Town v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) ("A purportedly strategic decision is not objectively reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.")

Here, the Government cannot assert that trial counsel made a strategic choice because counsel never properly interviewed Toby Barrett. Toby has stated:

> I spoke to Mr. Hilfiger once, I don't know where, and asked him if he was going to want me to testify at the trial. He said he was weighing whether it would be helpful or not, but expected I would. He never asked me about my father's problems, my home life or about me or my mom. I never spoke to him again.

Exh. 96 at 3-4, Motion (Doc 70). Thus, trial counsel had one brief conversation with Toby -- the only eyewitness to the beginning of the raid other than law enforcement -- before counsel made the determination that he was not going to call Toby as a witness at trial.

Second, Toby testified in the two prior state trials that resulted in a much more favorable manner to Mr. Barrett. That should have alerted counsel to the potential advantage of Toby's testimony. In *Goodman v. Bertrand*, 467 F.3d 1022 (7th Cir. 2007), the Court vacated a conviction based on the cumulative effect of counsel's errors. *See id.* at 1031. One of these errors was counsel's failure to call a witness who had testified in defendant's trial on the same charge. *See id.* at 1024. That trial ended in a hung jury. *See id.*

### b.    Alvin Hahn.

Likewise, the Government contends that Alvin Hahn had nothing of value to add to the evidence so that it was not ineffective assistance to fail to call him as a witness. Again, trial counsel failed to conduct a proper investigation to even determine whether Mr. Hahn would be an appropriate witness. *See Bertrand*, 467 F.3d at 1024.

The testimony of Toby Barrett and Alvin Hahn would have conflicted with the accounts provided by the Government witnesses and provide jurors with evidence that Mr. Barrett did not know that the raid conducted on his home was being performed by law enforcement officers. There is a reasonable likelihood that the trial would have ended differently had both Toby Barrett and Alvin Hahn testified.

**11. To Mr. Barrett's prejudice, trial counsel failed to conduct a reasonable investigation into evidence that he was not aware of the arrest warrant, could have been taken into custody without incident, and had not reacted violently to the police when they had been to his home shortly before the raid and on other occasions.**

The Government's theory was that Mr. Barrett, aware of a felony arrest warrant, was anticipating a police raid on his property and was ever-vigilant to meet it with lethal resistence. If the defense could show that Mr. Barrett was either unaware of the warrant, that it was improperly issued, or that he was not worried about it and was simply going about his business, the credibility of the Government's theory, founded as it was on the seven informant witnesses, would have been thrown into substantial doubt.[12]  Likewise, had the jury heard evidence that Mr. Barrett had not reacted violently when he was sought by the police on an earlier occasion, the Government's theory would have taken another hit.

A competent investigation would have produced this evidence, but counsel unreasonably failed to look into these matters, which would have involved nothing more than checking the Court file, talking to family and friends of Mr. Barrett, and contacting his former lawyer and bail bondsman on the state drug delivery case.  Because there was no investigation, no "strategic choice" can excuse counsel's failings.  Trial counsel had "no reason to be aware" of the evidence because they never investigated it.  The Government claims that certain aspects of this evidence, such as Sheriff Philpot's visit to his cabin approximately a month before the raid, would have been known to Mr. Barrett, and counsel cannot be faulted if Movant did not tell them about it.  Doc 175, 96, 97.  Mr. Barrett has shown that counsel's duty to investigate is not limited to

---

[12]  As noted, this evidence was also important to moving effectively for suppression of the evidence under *Franks v. Delaware,* 438 U.S. 154 (1978).

information gleaned from the client.  Mr. Philpot's recent declaration claiming that this event did

not occur should be taken with a grain of salt.  His reversal of what he previously told a defense

investigator (Exh. 6, Amended Motion) is simply an attempt to save the Government's theory of

the case.  The declaration of defense investigator Rodney Floyd is a proper part of these

proceedings and this record, "hearsay" or not.  Declarations are used to make a factual record, the

facts are in dispute, and an evidentiary hearing is warranted.

The Government asserts that Mr. Barrett's arguments respecting the failure to even

summon a jury on the day of his purported trial, which led to an arrest warrant being issued for

him, was raised outside the one-year limitations period, as is the argument that this invalid arrest

warrant to attend a trial that was never scheduled affected the validity of the no-knock search

warrant.  Doc 175 at 192.  This does not represent a "new claim," but simply additional facts

supporting a claim already made which clarify and amplify the argument.  *Mayle v. Felix,* 545

U.S. 644 (2005); *United States v. Espinoza-Saenz,* 235 F.3d 503, 504 (10th Cir. 2000); *United

States v. Thomas,* 221 F.3d 430, 436 (3rd Cir. 2000).

It is maintained that there was no significance to the fact that the notice of jury trial/arrest

warrant was not sent certified mail, because it is "presumed" that a letter properly posted and

deposited with the mail service reached the intended recipient.  Doc 175 at 94.  Regardless of this

legal presumption, the fact that standard procedure was not followed supports the argument that

Mr. Barrett never received the letter, and there is no real proof that he did receive it.

Respondent states that trial counsel did not render deficient performance in failing to

present evidence that Mr. Barrett had nothing to worry about with respect to his drug delivery

case, because his former attorney, Bill Ed Rogers, had secured a plea agreement that called for no

jail or prison time.  Doc 175 at 95.  The Government contends Mr. Rogers's wife, Mary Rogers, could not have testified to this or sponsored her husband's file, because any testimony she would offer would be "hearsay."  This ignores that Mr. Barrett had to rely in the current proceedings on Ms. Rogers to supply this information, because Mr. Rogers died in 2008.  He was alive at the time of Mr. Barrett's federal trial, and could have testified to this information himself.  Yet again, the Government argues that there was no reason for Mr. Barrett's lawyers to have been aware of this information, presumably because Mr. Barrett did not tell them.  This argument ignores what has already been established here and in Movant's earlier filings: that counsel have a duty to investigate beyond whatever they learn from the client.  Surely, counsel should have acquainted themselves with the facts surrounding the issuance of an arrest warrant for their client on a state drug charge that was one of the links in the chain that the Government argued led to Trooper Eales being killed.

In a similar vein, the Government argues that counsel did not perform deficiently for failing to call Mr. Barrett's bail bondsman on the state drug case, Martin Daggs, in the first stage of trial.  Doc 175 at 95-96.  Daggs testified in the penalty phase that he never alerted Mr. Barrett to the existence of the arrest warrant, because he knew where to find Movant if he needed him.  The Government speculates that even if Mr. Daggs had not informed Mr. Barrett of the existence of the arrest warrant, this does not mean that Mr. Barrett could not have learned of it from another source or by other means.  This ignores that Daggs's testimony would have been one more piece of circumstantial evidence showing that the Government's theory of the case was off the mark.  It is argued that, in any event, Mr. Daggs's testimony would have made no difference, because jury found in the second stage that the offenses were committed after substantial

planning and premeditation.  This circular argument skirts the fact that had counsel effectively investigated this case and brought to bear all the omitted evidence conflicting with the Government's theory, a reasonable probability of a different result would have existed.

The Government claims that testimony from Mr. Barrett's relatives that there would have been no need for the type of raid that occurred, if only the authorities had simply contacted the family and asked that Movant be brought in, would be inadmissible hearsay.  Doc 175 at 98. But the family certainly could have testified to their observations of Mr. Barrett.  This is particularly true of Phyllis Crawford, to whom Mr. Barrett ran on an earlier occasion when he learned the police were after him.  Exh. 91, Amended Motion.  Ms. Crawford could have testified to Mr. Barrett's actions and demeanor on that occasion.  Such is not hearsay.

Finally, the Government argues that counsel did not perform deficiently for failing to introduce evidence from witnesses who could have testified that police patrols were routine in his isolated neighborhood, without any reaction from Mr. Barrett, that the police had visited him before when he was working on a car without incident, and that the sign posted on the gate to his property did not have the intent attributed to it by the Government, and was placed there because drug-using trespassers had been on the property a short time before the raid.  Doc 175 at 98-100. Exhibits 45, 77, 95, Amended Motion; second stage testimony of Clyde Edgmon.  The Government claims this evidence would have been irrelevant because it did not deal with how Mr. Barrett would react if his home was raided by police, and actually would have strengthened the testimony of Travis Crawford.  Again, this omitted evidence would have circumstantially shown that Mr. Barrett did not have the vigilant and hateful attitude toward the police as claimed by the Government, and would not have buttressed Travis Crawford's testimony in the slightest.

Counsel's failure to marshal the omitted evidence which is the subject of this sub-proposition is symptomatic and indicative of counsel's inadequate investigation as a whole, and the prejudice that inured to Mr. Barrett as a result, consistent with the authority cited in this reply brief and Mr. Barrett's opening brief.

**12.    Trial Counsel were ineffective for failing to adequately contest "expert" Horn testimony**.

Respondent's briefing concerning defense counsel's handling of the testimony of its so-called "traumatic stress" expert reveals the Government trying to have its cake at trial and to eat it in habeas proceedings:  At trial, the Government called James Horn as its own witness and elicited testimony replete with colorful references to his own, and others', military and law enforcement experiences and to the powerful emotional bonds created by such public service. This Court correctly pinpointed the fact that none of Mr. Horn's testimony was actually relevant to the facts of this case, and ultimately struck the evidence in its entirety when finally prompted to do so by defense counsel.  Now, in §2255 proceedings, in order to protect its unjustly obtained verdict, the Government asks this Court simply to ignore Mr. Horn's repeated references to military and law enforcement camaraderie in combat situations  (*see, e.g.,* R at 843-848, 852-4, 858-860; Doc 175, p. 105) arguing that Mr. Horn's spouting of "generalities" (R at923-27) was both "innocuous and non-controversial" (Doc 175 at 103) and indeed actually helpful to the defense (Doc 175 at 105-06).  Therefore, the Government argues, no mistrial needed to be declared.

This approach is disingenuous.  Even if Mr. Horn's testimony had indeed been limited to the "innocuous and non-controversial," it would still have failed the basic test of admissibility:

Purported to be an expert, Horn did not in fact offer any expertise that met Fed. R. Evid. 702[13]

All he had to offer in terms of actual content, as the Government concedes, was "common sense

observations" and "intuitive and anecdotal observations about the nature of human memory".

Doc 175 at 103-04. To dress up these platitudes as being somehow in the same category as

standard jury instructions (Doc 175 at 104), or like expert testimony in eyewitness identification

cases, where in some "*narrow* circumstances ... subject to the trial court's *careful supervision,*

*properly conceived* expert testimony may be admissible", assuming *Daubert* criteria are satisfied,

borders on the absurd. *See United States v. Rodriguez-Felix*, 450 F.3d 1117, 1124-26 (10th Cir.

2006) (emphasis added).

Also straining the boundaries of logic is the assertion that Horn's testimony was

positively helpful to the defense and that defense counsel must have chosen for tactical reasons

not to challenge it. Doc 175 at 105-106. If that were so, defense counsel were truly irrational to

move, as they did, to strike evidence that was, according to the Government, "potentially very

helpful" to the defense. Doc 175 at 106. The fact is that defense counsel did move to strike the

evidence, recognizing the validity of the Court's opinion of the evidence's intrinsic

worthlessness. Defense counsel's error was not in seeking to eliminate from the jury's

consideration Mr. Horn's testimony, but in failing to even attempt to fully wipe that slate clean.

*See Greer v. Miller,* 483 U.S. 756, 766 (1987) (trial counsel bears primary responsibility for

---

[13]**Rule 702   Testimony by Experts**: If scientific, technical or other specialized
knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a
witness qualified as an expert by knowledge, skill, experience, training, or education, may testify
thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts
or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness
has applied the principles and methods reliably to the facts of the case.

seeing that error is cured in the manner most advantageous to the client). Trial counsel's failure to move for a mistrial, when there was nothing to lose by such a motion, and much to gain, demonstrates an remarkable absence of strategic thinking on their client's behalf.

It is perfectly true that generally a jury is presumed to follow its instructions, but that presumption is rebuttable. For example, in *Penry v. Johnson*, 532 U.S. 782, 799-800 (2001), cited here by the Government, the jury could not "logically and ethically" follow the internally inconsistent instructions it was given. Similarly the Supreme Court of the United States has long recognized that in some circumstances "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994), *quoting Bruton v. United States*, 391 U.S. 123 (1968). Here, the jury had heard Mr. Horn's testimony over a two-day period and, far from being "innocuous", it had provided a ringing endorsement of the fortitude of law enforcement, and what was in effect an apologia for deficiencies in law enforcement testimony after a traumatic event, complete with overtones of victim impact testimony. Trial counsel, having failed to probe the specific facts in Horn's possession because of their misapprehension that his discussions with the prosecution witnesses were privileged, (R at 881, Doc 95 at 165-66), also failed to secure a swift instruction to disregard -- the instruction given came three days later -- or to press for a more resounding instruction than the Court's statement that the instruction given was "not special" but "just an instruction in regard to some testimony that you have heard ..." R at 1739. This was not, therefore, a case like *Greer*, 482 U.S. at 766, where an immediate objection to a single question, followed by two curative instructions sufficed to prevent violation of due process

Movant's Reply to USA' Response
to Second Amended § 2255 Motion  61  *Barrett v. U.S.*, 6:09-cv-00105-JHP

rights. These facts created the overwhelming probability that the jury could not follow the instruction given, and that the effect of Horn's testimony was calamitous to Mr. Barrett's case. *United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002) (mistrial appropriate when probability that instruction will not be followed is overwhelming and there is strong likelihood that effect of the evidence will be devastating). This was made all the more probable by the government's invitation to the jury to recall the testimony when it referred to the witnesses as "soldiers of the law telling you what they remembered, honestly recalling the circumstances of September 24th . . . Yes, many law enforcement officers responded, a soldier of the law had been murdered." R at 4379. *See e.g.,* R at 844-45, 864-65 (testimony of James Horn discussing his military experience); 912 (testimony of Mr. Horn comparing ability of Vietnam veterans abilities to recall events).

Finally, the Government attempts to elevate to a rule of law the Tenth Circuit's catch-phrase for the degree of prejudice required to demonstrate that appellate counsel was ineffective for not raising a claim on appeal, declaring categorically that only a "dead bang winner" claim will suffice. This reads too much into cases such as *United States v. Challoner,* 583 F.3d 745, 750 (10th Cir. 2009) by suggesting that only the failure by appellate counsel to raise a legal issue that, at first blush, mandates reversal can prove sufficient prejudice. To limit appellate ineffectiveness claims solely to those cases where an issue is "obvious from the record, and must have leaped out upon even a casual reading of the transcript" *see United States v. Cook*, 45 F.3d 388, 394 (10th Cir. 1995) (internal quotation omitted) runs contrary to the law in this area: effective appellate counsel must, of course, "winnow out" weaker arguments on appeal - *see Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) - and exercise reasonable professional judgment in

deciding what issues to raise and how to argue them.   However, the traditional *Strickland*

analysis of performance and prejudice applies, 466 U.S. 668, 690 (1984); *see also Smith v.*

*Murray,* 477 U.S. 527 535 (1986)*; Cook*, 45 F.3d at 394-95, and must not be dispensed with

simply because an issue requires consideration going further than a knee-jerk response.  *See*

Ground 18 hereinbelow.

> **13.     The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate jury instructions.**

Mr. Barrett's trial counsel unreasonably failed to seek appropriate instructions regarding

informant witness credibility, drug-addict witness credibility, self-defense, theories of defense

and lesser-included offenses.  The Government attempts to refute this claim by stating that

adequate instructions were given or counsel made proper requests or the omitted instructions

were contrary to law and evidence.  Doc 175 at 106.

> **a.     *Credibility instructions*.**

There is no question in this case regarding the importance of the testimony of the

informant witnesses.  Their testimony was the distinguishing factor in this trial as opposed to the

two state court trials, which turned out much more favorably for Mr. Barrett.  It was crucial that

the Court adequately instruct the jury regarding the testimony of these witnesses so that the jury

could properly evaluate this testimony.  Trial counsel unreasonably failed to seek an informant

witness-credibility instruction and a drug-addict credibility instruction, both of which were

necessary for proper evaluation of the informant witness testimony.

The Government first states that the Court did, in fact, give an informant witness

credibility instruction, citing to Instruction 27 given by the trial court, "Witness -- Personal

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                       63                       *Barrett v. U.S.*, 6:09-cv-00105-JHP

Advantage." That instruction says, in pertinent part, that greater care or scrutiny must be given to the testimony of a witness who provides evidence against the defendant for some advantage that it may give to them or in contemplation of immunity or reduction from punishment or any other inducement. Doc 240, Inst. 27. Contrary to the Government's assertion, that was not an informant instruction. An example of an informant instruction is as follows:

> An informant is someone who provides evidence against someone else for a personal reason or advantage. The testimony of an informant alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt, even though not corroborated or supported by other evidence. You must examine and weigh an informant's testimony with greater care than the testimony of an ordinary witness. You must determine whether the informant's testimony has been affected by self- interest, by an agreement he has with the government, by his own interest in the outcome of the case, or by prejudice against the defendant.

Tenth Circuit Pattern Criminal Jury Instr., 1.14 (2005). This is the type of instruction the jury should have received to specifically alert it to pay special attention to the testimony of the informants. The general instruction given by the Court did not accomplish this.

Trial counsel also unreasonably failed to seek a drug-addict credibility instruction. The Government concedes that such a request should be given upon request when supported by the record. Here, there is no doubt that such an instruction was supported by the record. The evidence clearly established that Karen Real, Randy Turman, Randy Weaver, Charles "Monk" Sanders, Travis Crawford, Cindy Crawford and Brandie Price were drug addicts at the time of their testimony or at the time of the events to which they testified. There is no excuse for counsel's failure to request an addict instruction in light of the evidence presented.

The Government argues that the absence of a drug addict credibility charge in this case was harmless because the Court gave other credibility instructions and testimony about the

informants' drug use came out in trial, relying on *United States v. Smith*, 692 F.2d 658, 660-661 (10th Cir. 1982) and *United States v. Nicholson*, 983 F.2d 983, 991 (10th Cir. 1993). The Government is missing the point. The *Smith* court approved the use of an addict instruction and held that the determination of when such an instruction is required turns on the particular facts of the case. *See* 692 F.2d at 661. In *Smith*, the Court found that the defendant was not prejudiced by the failure to give an addict instruction in that case because of the extensive testimony on drug usage and the fact that the Court gave credibility instructions on "accomplice, immune informant, and felon testimony, along with the general credibility instruction," which were sufficient to alert the jury. *Id.*; *see also Nicholson*, 983 F.2d at 991 (same).

Thus, the Government's cited authority instructs us that whether an addict credibility instruction is required turns on the particular facts of the case. In Mr. Barrett's case, an addict credibility instruction was required because of the paramount importance of the testimony of the informants and the fact that the trial court gave no special instruction to caution the jury about their testimony. The only instructions that the Court gave were general credibility instructions. Those instructions were not sufficient to alert the jury that the informants' testimony must be considered with special care. Counsel was unprofessionally deficient in failing to seek appropriate instructions; this failure prejudiced Mr. Barrett such that there is a reasonable likelihood that the outcome of his trial was unreliable.

### b. *Instructions on self-defense and theories of defense*.

The Government further contends that trial counsel were not ineffective for failing to request instructions on self-defense and theories of defense because the record did not support the giving of such instructions. Doc 175 at 108-09. The Government mis-reads the record.

"Criminal defendants are entitled to jury instructions upon their theory of defense provided there is evidentiary and legal support." *United States v. Visinaiz*, 428 F.3d 1300, 1308 (10th Cir. 2005).  In this case, there was ample support for Mr. Barrett's theory of self-defense to warrant a jury instruction on the issue.[14]  The record supports the following facts: an unmarked Bronco, without lights, came through Mr. Barrett's yard at 12:30 A.M. and hit or came right up against Mr. Barrett's porch.  *See United States v. Barrett*, 496 F.3d 1079, 1084 (10th Cir. 2007).  Mr. Barrett's son, Toby, was in the yard and screamed, "Dad!" *Id*.  Mr. Barrett fired shots at the approaching vehicle and was seen at one point in the interior of his doorway.  *See id*. at 1084-85.  Mr. Barrett was shot through the window when he was inside the house.  *See id*. at 1085.  There is nothing that establishes that Mr. Barrett knew that it was law enforcement approaching his house.  Thus, it was reasonable that Mr. Barrett was in fear for his life and the life of his son, after hearing his son scream and seeing an unmarked car, without lights, come barreling through his yard very late at night.  There is no doubt that a self-defense instruction should have been requested and given in those circumstances.

---

[14] Such a charge would have informed the jury:

A person may use force which is intended or likely to cause death or great bodily harm only if he reasonably believes that force is necessary to prevent death or great bodily harm to himself.

To find the defendant guilty of the crime charged in the indictment, you must be convinced that the government has proved beyond a reasonable doubt:

Either, the defendant did not act in self-defense,

Or, it was not reasonable for the defendant to think that the force he used was necessary to defend himself against an immediate threat.

Tenth Circuit Pattern Criminal Jury Instr., 1.28 (2005).

The Government argues that even if Mr. Barrett had been in fear for his safety when the Tact Team members raided his home, a self-defense instruction was not warranted because "as the Tenth Circuit noted, the evidence indicated that Barrett shot Eales three times as the victim sought cover behind a vehicle," and that Mr. Barrett "had clearly become the aggressor when he shot a fleeing man three times in the back and could not have demonstrated that he was using reasonable force under the circumstances." Doc 175 at 108.  The Government is grossly distorting the facts.  The Tenth Circuit opinion stated that Eales "opened the passenger door, got out of the vehicle and began moving towards the rear of the vehicle.  At some point before he arrived at the rear of the vehicle, Eales was struck by three gunshots," and that Eales' injuries "appeared to have occurred" while Eales was facing away from Barrett.  *Barrett*, 496 F.3d at 1084-85.

There is absolutely nothing in the Tenth Circuit opinion, nor in any of the evidence in this case, stating that Eales was either "seeking cover" or "fleeing" from Mr. Barrett.  This is pure extrapolation,  speculation and fantasy on the part of the Government.  Moreover, the Government fails to point out that it has never been ascertained where Mr. Barrett was standing when the shots were fired.  If Mr. Barrett was inside his home, blindly exchanging gunfire when the Tact Team vehicle came up to his porch in the dead of night, it's very difficult, if not impossible, to assert that Mr. Barrett became the "aggressor" in the raid on his home, especially since law enforcement shot Mr. Barrett four times.  And, as stated, it is very possible that Mr. Barrett had no idea that it was law enforcement raiding his home when the shooting began.  The Government has said nothing that would indicate that a self-defense instruction was not warranted.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                   67                   *Barrett v. U.S.*, 6:09-cv-00105-JHP

Along the same lines, Mr. Barrett was entitled to instructions on his other theories of defense. The Government argues that any instructions of this sort would have been covered in the regular jury charge, which instructed the jury that it must acquit on the basis of reasonable doubt as to any element of any offense charged. Doc 175 at 109. Again, the Government misses the point. Mr. Barrett is entitled to instructions on his theories of defense provided there is support in the record. *See Visinaiz*, 428 F.3d at 1308. The jury should have been instructed that as a defense, Mr. Barrett was asserting that he had no idea that the vehicles contained law enforcement officers. There was evidence in the record to support Mr. Barrett's contention (*i.e.*, the lead vehicle was unmarked, the vehicle was unlit, it was dark outside, there was no indication that law enforcement announced their presence) and, as such, counsel should have requested such an instruction and was unreasonable not to do so. Counsel also should have requested an instruction that Mr. Barrett was asserting as a defense that he was not engaged in drug manufacturing or distribution when the raid took place. There was evidence in the record to support this contention, most obviously, the fact that no drugs were found at Mr. Barrett's home or on Mr. Barrett's person during the raid -- the search revealed only so-called "precursor" items. Counsel were unreasonably ineffective in their failure to request these instructions.

In addition, counsel were ineffective by failing to request a lesser-included offense instruction as discussed more fully, *infra*, in Ground 10.

### 15.   Trial counsel ineffectively omitted objections to prosecutorial misconduct in penalty phase closing arguments.

The Government alleges this particular claim should be rejected because it is stated in a conclusory fashion, and therefore fails to state a ground for relief. Doc 175 at 115. This is

incorrect.  Rather than repeat the same factual basis for this and the prosecutorial misconduct claim twice, Movant specifically incorporated by reference the facts and arguments stated in Ground 5(C), demonstrating that the prosecutors engaged in misconduct in closing argument. Mr. Barrett's supporting brief cited specific authority showing that the failure to object was professionally unreasonable and prejudicial.  Doc 95 at 180; Doc 149 at 101-02.

> **B.     Movant Has Carried His Burden of Demonstrating a Sixth Amendment Violation as to Sentencing; at a Minimum, this Court Should Order an Evidentiary Hearing.**
>
> **1.     Introduction and summary of argument.**

Part B of Ground 2 of the Second Amended § 2255 Motion and supporting brief set forth factual and legal bases for this Court to find the death verdict is unreliable due to defense counsel's failure to investigate and present evidence of Mr. Barrett's unique personal background and character, and the mental impairments he suffers.  Evidence substantiating the allegations is already before this Court following record expansion.  The Government disputes none of the material facts related to counsel's deficient performance, and none of the historical facts related to Mr. Barrett's background, his family history, social history, development, educational history, work history, suicide attempt, or neurocognitive impairments.  Nevertheless, the Government argues the death judgment should be sustained on the following theories:

(1)  Defense counsel's presentation at the penalty phase was a concession to Mr. Barrett's alleged desire that they not "beg for his life," permit "the outcome of the case to hinge on personal sympathy for him," "dwell on his childhood," or involve his family in presenting a mitigation case;

(2)  Defense counsel had no reason to be aware that Mr. Barrett and his family exhibited a long history mental illness;

(3)  Counsel "wisely chose" a "strategy" designed simply to show Mr. Barrett's good qualities, and this "strategy" was partially successful because the jury found a number of mitigating factors and rejected the non-statutory "future dangerousness" aggravator;

(4)  The mitigation evidence proffered in these § 2255 proceedings would have conflicted with and detracted from the evidence showing Mr. Barrett was a non-violent, loved and valued member of his family, and counsel reasonably chose to avoid evidence of Mr. Barrett's past drug use;

(5)  Even if counsel failed to conduct a reasonable investigation, there is no reasonable probability of a different outcome because the omitted mitigation evidence would have undermined the mitigation case that was presented.  Doc 175 at 116-125.

In this Reply, Mr. Barrett shows none of the Government's arguments has factual support either in the trial record or the expanded post-conviction record, or the slightest legal merit under the relevant case law.  The Government's factual theory is based on conjecture or inferences that are contradicted by the trial record.  The Government's legal theory wholly ignores Supreme Court cases contrary to the older cases from lower Courts, none more recent than 2001, on which it relies.[15]

---

[15]  The Government studiously ignores cases such as *Wilson v. Sirmons*, 536 F.3d 1064, 1074, 1083-85 (10th Cir. 2008) (noting that Supreme Court, beginning with *Williams v. Taylor*, 529 U.S. 362 (2000), has placed increased emphasis on counsel's obligation to investigate and present mitigating evidence, often on basis of family upbringing and mental health; due to crucial mitigating impact that evidence of deprived upbringing and mental illness can have in penalty phase of a capital case, counsel *must* pursue this area with due diligence).

As the expanded record amply demonstrates a violation of the Sixth Amendment under *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny, and the Response fails to set forth a factual dispute that could sustain the judgment, this Court should hold that Mr. Barrett has demonstrated his entitlement to relief. At a minimum, this Court should order an evidentiary hearing to resolve any material factual disputes. 28 U.S.C. § 2255(b).

  **2.**   **Undisputed facts and law**.

On the issue of deficient performance, the Second Amended Motion and the exhibits contained in the expanded record set out a detailed chronology of events related to defense counsel's lack of investigation and preparation for the penalty phase. 2nd Amend. Pet. (Doc 95) at 185-194; Merits Brief (Doc 149) at 106-14. The Government has filed declarations from defense counsel Bret Smith (Resp. Exh. 11) and Roger Hilfiger (Resp. Exh. 12). The following facts are not disputed by any evidence cited in the Government's Response or the attached exhibits:

-  defense counsel's ability to investigate mitigation evidence was curtailed by the trial court's funding orders which provided far less resources than was routine in federal death penalty cases (Mot. Exh. 56 at 4-5);

-  prior counsel John Echols advised Mr. Hilfiger and this Court that the mitigation investigation conducted prior to the state-Court trials was done by a novice who did not complete her work, and did not produce a report (Mot. Exh. 64 at 2, 4);

-  this Court found the services of a mitigation specialist were reasonably necessary and authorized counsel to employ one for 100 hours (Doc 97 at 3);

• defense counsel inquired about a mitigation investigator in late June 2005, and in mid-August 2005 asked Dr. Jeanne Russell to perform that service, but counsel never actually retained anyone to investigate a mitigation case;[16]

• defense counsel never interviewed Mr. Barrett's family members about his personal history, the family history, or other matters related in their post-conviction declarations;[17]

• defense counsel possessed medical records showing Mr. Barrett had been diagnosed with and treated for head injuries, depression, bipolar disorder, and attempting suicide by shooting himself in the chest with a shotgun, and they possessed the report of Dr. Russell referring to the state-Court evaluation conducted by Dr. Bill Sharp, Ph.D.;[18]

• defense counsel retained Dr. Russell in August 2005 to update her risk assessment, but Dr. Russell did not perform any other type of mental health evaluation, and counsel otherwise did not consult any mental health expert in preparation for the penalty phase;

---

[16]  Mr. Hilfiger and Mr. Smith state that they read Movant's Exhibit 56, the declaration of Dr. Jeanne Russell.  Resp. Exh. 11 at ¶ 8; Resp. Exh. 12 at ¶ 10.  Dr. Russell states that Mr. Smith asked her in mid-August 2005 to conduct mitigation investigation.  Pet. Exh. 56 at 2. When she declined, it is undisputed that Mr. Smith told Dr. Russell the Court would not approve a comprehensive mitigation investigation, even if there were time to conduct one.  *Id.* at 4-5.

[17]  Mr. Hilfiger and Mr. Smith confirm in their declarations that they spoke with members of Mr. Barrett's family, but do not dispute the accounts of family members regarding the timing or content of those conversations.  *Compare* Resp. Exh. 11 at ¶ 7; Resp. Exh. 12 at ¶ 9, *with* Mot. Exhs. 37, 77, 78, 80, 81, 83, 84, 85, 86, 90, 95, and 96.

[18]  The Government has filed portions of those records, which it acknowledges were cherry-picked to illustrate a point, Govt Resp. at 122 n.15, to argue that doctors changed some of their diagnoses, or disagreed with each other.  Govt. Resp. at 122-23.  However, the Government has not presented any competent evidence disputing the opinions of Dr. George Woods or Dr. Myla Young, who reviewed the documents.

- on September 9, 2005, defense counsel advised the Court that they were contacting prior counsel "because we have been able to find very little on mitigation" in the files of the state trials, and this and other discussion led this Court to describe the defense's preparation as "still a work in progress;" [19]

- due to defense counsel's failures to investigate Mr. Barrett's life history and have him evaluated by a psychologist or psychologist counsel prior to trial counsel neither could have advised Mr. Barrett about the available options for the penalty phase nor could they have made a strategic choice between options of which they were ignorant;[20]

- the performance of counsel described here is below the prevailing professional norms of capital defense practice that are codified in the 2003 revised ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases.[21]

---

[19] Although the Government does not, and could not, dispute the chronology set forth in the trial record and expanded record in these proceedings, including that defense counsel never retained the mitigation expert authorized by this Court, the Government argues defense counsel could have done more "'with the luxury of time.'"  Govt. Resp. at 119, quoting *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995).  That is Mr. Barrett's point.  If defense counsel had acted according to prevailing professional norms and begun work on the penalty phase before August 2005, and made use of resources the Court made available, they could have adduced vastly more mitigation evidence than they did.

[20] The Government argues that defense counsel "elected" to present certain evidence from Mr. Barrett's family and friends, "[i]n view of the circumstances confronting defense counsel," but fails to present any evidence that this alleged election was an informed choice.  On the contrary, neither Mr. Hilfiger nor Mr. Smith state in their declarations that they either knew about the mitigation evidence proffered in these proceedings or, if they knew the facts, that they elected not to present them.  Consequently, the Government has failed to create a disputed issue of material fact on this issue.

[21] The Response contains no references to any evidence or legal authority regarding the professional norms of capital defense practice that were prevailing at the time of trial.  The Government cites only one case decided after 2001, and that is on the issue of prejudice, not deficient performance.  Doc 175 at 125 n.15, citing *Rhoades v. Arave*, No. CV 93-0155-S-EJL,

(continued...)

For the reasons stated in the Merits Brief (Doc 149) and herein, these facts are sufficient to establish that defense counsel's preparation for the penalty phase fell below an objective standard of reasonableness.  This Court should hold Mr. Barrett satisfied the first prong of *Strickland*.

As to the prejudice prong of *Strickland*, the Government does not dispute any of the historical facts set forth on pages 195 to 230 of the Second Amended Motion.  Although these facts are drawn from the accounts of family members, and their releases of personal information to support Mr. Barrett, the Government argues these facts would have undercut the jury's finding that Mr. Barrett was loved by his family.  Govt. Resp. at 125.  This is a matter of pure conjecture that runs contrary to the declarations before this Court which express love for and devotion to Mr. Barrett, and it is contrary to the holdings of numerous Supreme Court decisions that were cited in Mr. Barrett's supporting brief and completely ignored by the Government.  *See Porter v. McCullum*, 130 S. Ct. 447, 455 (2009) (holding it was unreasonable for state Court applying *Strickland* to entirely discount mental health mitigation presented post conviction merely because "State's experts identified perceived problems with the tests that Dr. Dee used and the conclusions that he drew from them" and to discount childhood abuse and military record because they included negative information about defendant); *Rompilla v. Beard*, 545 U.S. 374, 393 (2005) (prejudice established "although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty" because "that is not the test"); *Wiggins v. Smith*, 539 U.S. 510, 536 (2003) (rejecting alleged strategic excuse for omitting mitigation

---

[21](...continued)
2007 WL 1550441 (D. Id. May 24, 2007).

evidence and finding prejudice where historical facts were not disputed because "there is a reasonable probability that at least one juror would have struck a different balance"); and *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (unreasonable for state Court to discount mitigation evidence from defendant's background and lay mental health evidence even though "not all of the additional evidence was favorable to Williams"). Consequently, there is no genuine dispute as to any material fact regarding Mr. Barrett's life history.

As to mental health issues, the Government admits that its disputation of the facts consists solely of cherry-picked excerpts from Mr. Barrett's medical records that are subject only to the interpretation of the Government's lawyers. Govt. Resp. at 122 n.15. The Government opines that evidence of Mr. Barrett's mental health problems would not have been mitigating because "his entire mental health history was inextricably tied to his use of illegal drugs." Govt. Resp. at 124. However, the Government does not dispute the evidence that Mr. Barrett's parents and grandparents modeled alcohol and drug abuse, *see* Exh. 117 at ¶¶ 42 & 44, Motion (Doc 70) or Dr. Woods' scientific conclusion that Bipolar Disorder and Post Traumatic Stress Disorder *predisposed* Mr. Barrett to develop chemical dependency problems, *id.* at ¶ 44, or his conclusion that Mr. Barrett was, particularly at the time before the raid, self-medicated for pre-existing problems, *id.* at ¶¶ 46 & 76. The Government ignores this evidence placing Mr. Barrett's drug use in a mitigating, not aggravating, framework. In this respect, too, the Government's defense is essentially identical to the unreasonable error found in *Porter v. McCullum*, *supra*, i.e. there could be no prejudice because the prosecution opines the mental health mitigation is weak. It is

reasonably probable the undisputed evidence is sufficient to have persuaded at least one juror to spare Mr. Barrett's life.[22]

The Government also does not dispute Mr. Barrett's showing that the available mitigation evidence – both that adduced in support of Part A of Ground2, and the undisputed facts adduced in support of Part B – would have undercut the statutory aggravating circumstances and the jury's finding that Mr. Barrett intended to kill Trooper Eales.  Likewise, the Government does not dispute the record evidence that the prosecution was able to exploit defense counsel's lack of preparation and investigation by eliciting damaging testimony from family members that would have been avoided or rendered harmless if counsel had conducted the most cursory of investigations or made reasonable use of the facts from the skeletal state mitigation investigation.[23]

Taking into account the jury's rejection of the future-dangerous aggravating factor, and "the totality of the evidence" adduced at trial and in post-conviction proceedings, *Strickland*, 466 U.S. at 695; *Wiggins*, 539 U.S. at 536; *(Terry) Williams*, 529 U.S. at 397, this Court should find the evidence  "might well have influenced the jury's appraisal of [the defendant's] culpability," *Williams*, 529 U.S. at 398, and vacate the death sentence.

To say the least, the Government has failed to show the trial record conclusively refutes Mr. Barrett's allegations and the expanded record substantiating those allegations.  28 U.S.C. §

---

[22]  The Government never acknowledges (or disputes) this is the standard for prejudice in a federal death penalty case.

[23]  The Government's two-sentence characterization of Steven Barrett's testimony pales in comparison with the pages of cross-examination that could have been avoided if defense counsel had listened to him prior to trial.  *Compare* Doc 175 at 117 *with* Mot. Exh. 99 *and* Merits Brief (Doc 149) at 111 & n.79.

2255(b). The Government's primary defense asserts that Mr. Barrett's counsel either "elected" not to present evidence of Mr. Barrett's background, or that they lacked information to trigger an investigation of mental health issues. Govt. Resp. at 116. However, as indicated *supra* and discussed at greater length *infra*, the Government's evidence fails to support its contentions and fails to establish a legally viable defense. Therefore, if the Court does not vacate the death judgment and order a new penalty trial, it must at least conduct an evidentiary hearing.

### 3. The declarations of trial counsel support findings of deficient performance and prejudice.

The Government places great emphasis on the declarations of Mr. Hilfiger and Mr. Smith, citing them ten times in the ten pages of the Response devoted to Part B of Ground 2. Doc 175 at 116-25. The Government argues that defense counsel knowingly chose not to present evidence like that proffered with the § 2255 Motion because "Kenneth Barrett did not want to present a case in mitigation that centered on sympathy for him or dwelled on his family." Doc 175 at 116. (We say "like" because the Government never identifies any particular witness or document to which trial counsel or Mr. Barrett objected.)

For at least five reasons addressed in detail *infra*, the Government's theory is distinguishable from the post-hoc rationalization the Supreme Court rejected in *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003), only insofar as the theory in this case constitutes additional evidence of deficient performance. First, the declarations of counsel are internally inconsistent, at least if given the meaning the Government imputes to them. Second, neither declaration specifically endorses, or even refers to, the theory the Government advances. Third, the declarations (as interpreted by the Government) are inconsistent with the statements of numerous

other witnesses whose accounts Mr. Hilfiger and Mr. Smith do not dispute.  Fourth, the

declarations are contradicted by the trial record, including statements of trial counsel.  Fifth,

assuming the declarations mean what the Government argues, they are independent evidence that

Mr. Hilfiger and Mr. Smith did not understand mitigation, and unreasonably failed to carry out

routine responsibilities of capital defense counsel.

### a.        *Internal inconsistencies and adoptive admissions.*

The Government relies upon argument that embellishes and distorts the statements of

defense counsel.  The paragraphs of each declaration to which the Government seems to refer are

verbatim identical.  They say the following:

> Mr. Barrett did not want the defense to "beg for his life" during the penalty phase
> of the trial.  He did not want the outcome of the case to hinge on personal
> sympathy for him.

> Mr. Barrett did not want the mitigation case to dwell on his childhood.  He also
> wanted to minimize the amount of testimony elicited from his relatives,
> particularly his son, mother and ex-wife, though he understood that decision could
> work to his detriment.

> \* \* \*

> I did not want to premise our case in mitigation on Mr. Barrett's drug use because
> I did not believe that the jury would be sympathetic to such a strategy.

Resp. Exh. 11 at ¶¶ 11, 12, 14; Resp. Exh. 12 at ¶¶ 15, 16, 18.  Each attorney also states that he

was not familiar with Dr. William Sharp's evaluation of Mr. Barrett prior to the second state

trial.  Resp. Exh. 11 at ¶ 10; Resp. Exh. 12 at ¶ 12.

From these statements, the Government argues, implicitly at least, that defense counsel

were under no duty to investigate Mr. Barrett's background because he "solemnly and adamantly

wished to avoid presenting a mitigation case based on personal sympathy for him," and "as a

point of pride, he wanted to minimize reliance on his relatives to avoid bringing them unnecessary embarrassment." Doc 175 at 120. The unspoken premise in the Government's argument is that defense counsel wanted to conduct a background investigation, and could have done so prior to trial, but Mr. Barrett precluded them from doing so. The declarations contradict that inference in several ways.

First, neither Mr. Hilfiger nor Mr. Smith relate the alleged statements of Mr. Barrett to any tactical or strategic decisions they actually made in the case. Trial counsel simply do not assert that their failure to investigate Movant's background was influenced by any statement Mr. Barrett made to them. The declarations show Government counsel provided defense counsel with exhibits proffered with the § 2255 Motion, Resp. Exh. 11 at ¶¶ 8-10; Resp. Exh. 12 at ¶¶ 10-12, but neither defense attorney says he could not have investigated or presented a single witness or fact based on the alleged statements from Mr. Barrett.

In fact, the declarations contradict the Government's inference that Mr. Barrett interfered with his counsel. Mr. Smith states, "Mr. Barrett impressed me as among the most cooperative criminal defense clients I have ever had." Resp. Exh. 11 at ¶ 3. Mr. Smith and Mr. Hilfiger "did not find Mr. Barrett disruptive in any way." *Id.* at ¶ 13; Resp. Exh. 12 at ¶ 17 (using same language). Whereas the Government argues that Mr. Barrett's outburst during the penalty argument of Mr. Sperling shows "he was manifestly disinterested in relying on mitigation evidence premised on any alleged dysfunction in his upbringing," and cites trial counsel for this proposition, Doc 175 at 120, according to Mr. Hilfiger, "Mr. Barrett's outburst . . . was a very unusual and *unanticipated* event." Resp. Exh. 12 at ¶ 17 (emphasis added).

Nor do trial counsel state the evidence they actually presented was influenced by Mr. Barrett's alleged statements.  Neither trial attorney asserts that he knew the facts of Mr. Barrett's background and elected not to present them.  Each counsel asserts that he was unaware of the evidence of mental impairments developed by Dr. Sharp prior to the second state trial.  Consequently, counsel could not have made any decision regarding those facts.  And while the Government claims the mitigating evidence presented in these § 2255 proceedings would have contradicted the case that was presented at trial (Doc 175 at 121), neither Mr. Hilfiger nor Mr. Smith endorse that view.

The Government cites the declarations of counsel for the proposition that they would not have presented mental health mitigation because "records demonstrate that his entire mental health history was inextricably tied to his use of illegal drugs."  Doc 175 at 124.  Again the declarations are inconsistent with the Government's theory.  Mr. Hilfiger and Mr. Smith state that they read Dr. Sharp's report prior to giving their declarations.  Resp. Exh. 11 at ¶ 10; Resp. Exh. 12 at ¶ 12.  Neither attorney so much as suggests he would not have presented Dr. Sharp's testimony.  Similarly, it appears defense counsel were provided with the reports of Dr. Woods and Dr. Young before they signed their declarations.  As noted *supra*, Dr. Woods finds that Mr. Barrett, like many individuals discussed in the scientific literature, was predisposed to develop chemical dependency problems due to his underlying Bipolar Disorder and PTSD.  Mot. Exh. 117 at ¶ 44.  Yet neither attorney says the opinions expressed in those declarations would have been excluded by their desire not to premise mitigation on drug use.

On the contrary, counsel's statement that they "did not want to *premise* our case in mitigation on Mr. Barrett's drug use" (emphasis added), suggests they would have welcomed

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    80                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

evidence that premised his drug use on underlying mental illnesses.  Given that the jury would already have convicted Mr. Barrett of a drug offense prior to the penalty phase, and likely credited the informants' testimony about his drug use, the only rational course for counsel would be to explain the drug use as something other than pleasure-seeking or bare defiance of the law.

To the extent defense counsel were apprised of the allegations in the Amended § 2255 Motion, and the supporting exhibits, and either did not dispute them, or failed to endorse the Government's theories, the Court should view the omissions as adoptive admissions by silence.[24] *See*  Fed. R. Evid. 801(d)(2)(B) (discussing adoptive admissions: "a statement of which the party has manifested an adoption or belief in its truth"); 5 Joseph M. McLaughlin et al., *Weinstein's Federal Evidence* (2d ed. 2009) (noting that "[a] party can adopt another's statement by responding to it with silence," and that Courts must look to the circumstances including whether the party "understand[s] the statement" and is able or "unable ... to reply to it").  The identical language used in the two declarations shows either collusion between the witnesses, or more likely, that the Government's lawyers prepared the declarations.  If the Government had been able to substantiate its theories in counsel's declarations, it would have done so.

### b.       *Inconsistencies between Government's theory and other witnesses.*

The Government's expansive interpretation of trial counsel's declarations to suggest Mr. Barrett's alleged statements influenced defense counsel's decision whether to investigate

---

[24]   There is no reason for Mr. Barrett to admit or deny the statements attributed to him by Mr. Hilfiger and Mr. Smith because the declarations of counsel support Mr. Barrett's grounds for relief.  For the reasons stated herein, any such statements either did not influence counsel's conduct, or counsel responded to any such statements in a manner that constitutes ineffective assistance.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    81                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

conflicts with the testimony from at least two disinterested witnesses.  Dr. Jeanne Russell has given this Court a declaration recounting that in mid-August 2005, Mr. Smith contacted her and asked her to perform a mitigation investigation.  She states that she told Mr. Smith she was not qualified to perform that role, and in any event, with the trial only one month away, it was too late.  She states that Mr. Smith told her the Court would not fund a comprehensive mitigation investigation.  Exh. 56 at 2, 4-5, Motion.

Mr. Smith and Mr. Hilfiger state that they have reviewed Dr. Russell's declaration. While they dispute her recollection regarding the presentation of the risk assessment she performed,[25] neither Mr. Hilfiger nor Mr. Smith disputes Dr. Russell's statements about the lack of mitigation investigation.  Resp. Exh. 11 at ¶ 9, Resp. Exh. 12 at ¶ 11.  If Mr. Barrett had indicated to counsel that they should not, or need not, investigate his background, there was no reason for counsel to ask Dr. Russell to do just that one month before the trial.  Similarly, there could be no reason for Mr. Smith to complain about the lack of funding for a mitigation investigation if, per Mr. Barrett's wishes, one was unnecessary.

Similarly, Mr. Hilfiger's declaration does not dispute the declaration of Federal Defender Julia O'Connell in which she states that Mr. Hilfiger left her a voicemail message on June 30, 2005, in which he asked whether he could meet with a mitigation specialist she had used.  Mot. Exh. 67 at 3-4.  Neither does Mr. Hilfiger dispute that Ms. O'Connell advised him by e-mail on July 3, 2005 to contact resource counsel, Richard Burr.  *Id.* at 4.  Mr. Hilfiger does not dispute

---

[25]  This dispute is not material.  Mr. Barrett does not allege it was unreasonable for defense counsel not to present Dr. Russell.  As she states, the sole purpose of her evaluation was to combat evidence of future-dangerousness.  Mot. Exh. 56, at 1-2.  As the jury rejected that non-statutory aggravating factor, there could be no prejudice.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    82                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

Mr. Burr's declaration stating that he had only one contact with Mr. Hilfiger after Mr. Echols left the case, and that was not on a substantive matter.  Mot. Exh. 118 at ¶¶ 13-15.

Dr. Russell and Federal Defender O'Connell are disinterested percipient witnesses who can document their contacts with defense counsel in contemporaneous records.  Dr. Russell's undisputed account is corroborated by the contemporaneous trial record, discussed in the next section of this Reply.  These witnesses contradict the Government's post-hoc claims by showing that throughout the summer of 2005 defense counsel were acting as though they wanted to conduct a thorough mitigation investigation but were hampered only by their own neglect and the Court's funding decisions.

Mr. Hilfiger and Mr. Smith state that they met with various members of Mr. Barrett's family "including (but not limited to)" his mother, father, step-mother, uncle Roger, and son Toby.  Resp. Exh. 11 at ¶ 7; Resp. Exh. 12 at ¶ 9.  These same family members, and many more, have provided this Court with declarations in which they describe the timing and content of their conversations with defense counsel, if any.  Mot. Exhs. 37, 77, 78, 80, 81, 83, 84, 85, 86, 90, 95, and 96.  As set forth on pages 110 to 111 of Mr. Barrett's merits brief (Doc 149), in those instances where defense counsel interviewed family members at all (in the sense of asking questions rather than telling them the questions that would be asked on the stand), defense counsel either did not ask about Mr. Barrett's family history, mental health history, or they actively dissuaded family members from providing such information.  Only Gelene Dotson was interviewed prior to the trial.  Defense counsel's declarations are silent on the timing and content of their conversations with Mr. Barrett's family under circumstances where they would be

expected either to deny their accounts, or explain them in terms of Mr. Barrett's alleged statements.

Still more evidence conflicts with the Government's claim that Mr. Barrett resisted a mitigation case based on dysfunction, abuse and mental illness.  State court counsel began interviewing Mr. Barrett's family members and obtaining releases in order to present evidence about Mr. Barrett's background.  John Echols and Jack Gordon, Mr. Barrett's state lawyers, received no direction that certain areas of mitigating evidence were not to be investigated or presented.  Mr. Echols has informed this Court that

> Mr. Barrett cooperated with all of our requests to be examined by a mental health professional, provided us with potential sources of background information and helped us to locate significant witnesses who knew the details of his upbringing. Because of the attorney-client relationship we established with him and, which in my opinion, any qualified lawyer would endeavor to establish with a capital client, Mr. Barrett did not place any restrictions on the evidence we were permitted to investigate or prepare to present in the event of a penalty phase.

Mot. Exh. 34 at 14.

### c. *Inconsistencies between the trial record and the Government's theory*.

There is a glaring inconsistency between the Government's theory and reality:  defense counsel's penalty phase case actually dwelled upon testimony from the very family members whom the Government contends Mr. Barrett did not want to testify.  *See* Doc 175 at 116-19.

To the extent the Government argues defense counsel knew the facts about Mr. Barrett's family and personal history adduced in these proceedings and "elected" not to present those facts but to present other facts through the same witnesses, the record refutes the argument.  After counsel's contacts with Ms. O'Connell and Dr. Russell, on September 9, 2005, Mr. Smith

advised the Court that he was contacting "Mr. Echols[] because we have been able to find very little on mitigation" in the files from the past trials.  Tr. 9/9/05 Hr'g at 43.  This Court generously described the state of the defense's preparation for the penalty phase as a "work in progress," at that time, and that characterization was confirmed less than one month later when counsel advised the Court they were still attempting to develop mitigation evidence.  Tr. 10/3/05 Hr'g at 7.  These statements and the other evidence before this Court overwhelmingly demonstrate that Mr. Hilfiger and Mr. Smith could not have chosen to exclude facts from their presentation, because they had not investigated the facts.

The Government contends it was reasonable for defense counsel not to conduct any mental health investigation because "Barrett has not shown that the results of [Dr. Russell's] contemporaneous evaluation merited further exploration."  Doc 175 at 121-22.  Defense counsel's current reliance upon Dr. Russell to give them an indication whether "Mr. Barrett suffered from a significant mental health condition," Resp. Exh. 11 at ¶ 8; Resp. Exh. 12 at ¶ 10, is contradicted by the statements they made at the time of trial regarding the purpose for which they retained Dr. Russell.  On September 9, 2005, Mr. Smith advised the Court that the defense was not relying upon Dr. Russell as a mental health expert.  Tr. 9/9/05 Hr'g at 41.  On October 3, 2005, defense counsel advised the Court that they had not consulted with a psychiatrist or psychologist.  Tr. 10/3/05 Hr'g at 7.

The contemporaneous statements of defense counsel are consistent with Dr. Russell's declaration in which she states, "I did not evaluate Mr. Barrett's neuropsychological functioning or focus on his psychological make-up, as the referral request was specific to risk assessment.

The instruments I used were solely for the purpose of this assessment."[26] Mot. Exh. 56 at 1-2.

The implications of counsel's post-conviction declarations, except to the extent that they do not

dispute Dr. Russell's account, are inconsistent with their trial-time statements. To the extent

defense counsel relied upon Dr. Russell to guide them regarding Mr. Barrett's competence to

stand trial or mitigation evidence unrelated to future-dangerousness, their decision-making

reflects an unprofessional lack of understanding of the issues. *See Haliym v. Mitchell*, 492 F.3d

680, 715-16 (6th Cir. 2007) (counsel ineffective for relying solely upon one and one-half our

evaluation of defendant by psychiatrist); *cf. Starr v. Lockhart,* 23 F.3d 1280, 1289-1290 (8th Cir.

1994) (competency evaluation did not satisfy due process right to assistance for defense as it was

inappropriate to purpose of developing mitigation case based on defendant's functional deficits);

*Frederick v. State,* 902 P.2d 1092, 1098 (Okl. Cr. 1995) (prejudicial error in capital case to deny

a continuance where expert appointed under *Ake* lacked the competence to diagnose and assess

the disorder defendant apparently suffered from).

Dr. Russell states that when Mr. Smith contacted her in mid-August 2005 he did not have

a copy of her 2003 report, Mot. Exh. 56 at 2, and throughout their interactions he gave the

impression that he lacked knowledge of Mr. Barrett's background and the investigation of it that

was done prior to the second state trial. *Id.* at 5. Although defense counsel do not dispute her

account, it is worth noting that the trial record substantiates it. Three weeks after their initial

discussions, Mr. Smith indicated that he did not know that Dr. Russell had examined Mr. Barrett,

but he believed she had "reviewed records and what have you." Tr. 9/9/05 Hr'g at 41.

---

[26] This statement conclusively refutes the Government's contention that Dr. Russell's visit with Mr. Barrett constituted a mental health mitigation investigation. Doc 175 at 121 and Resp. Exh. 5.

Counsel's statements in a later hearing corroborate Dr. Russell's statement that Mr. Smith wanted her to be a mitigation expert. During a hearing held that day, Mr. Hilfiger referred to the $15,000.00 the Court had authorized for a mitigation specialist, and said "when he [Mr. Smith] talked to *her* about doing it," he did not think they were "*going to get* to $10,000.00." Tr. 10/3/05 Hr'g at 6:17-21 (emphasis added). *See also id.* at 7:15-21 (referring to female expert who is also a psychologist who "has provided us extensive questions for their psychologist, Mr. Horn").[27] Counsel's statements conclusively show that, contrary to long established standards of practice, they had not investigated a mitigation strategy prior to trial. *See authorities cited in* Doc 149 at 105-06 & nn. 62-69.

The September 9, 2005 hearing also places in context defense counsel's current statements about when they gathered information from the state cases. Mr. Hilfiger's declaration confirms the trial record insofar as he states that he first collected files from Mr. Echols and OIDS in May 2005, after he was elevated to lead counsel. *See* Doc 138. He does not dispute Mr. Echols contemporaneous records showing Mr. Hilfiger had not consulted the online database of state-Court files Mr. Echols had made available. Mot. Exh. 34 at 13. While Mr. Hilfiger says he had believed he received all the materials in May 2005, the record shows that in September 2005, Mr. Smith was not sure and was contacting Mr. Echols. Tr. 9/9/05 Hr'g at 43. Counsel did not follow this Court's order to give the case the "highest priority." Doc 31

---

[27] In *Wiggins v. Smith*, the Supreme Court found "counsel's decision to hire a psychologist sheds no light on the extent of their investigation into petitioner's social background." *Wiggins*, 539 U.S. at 531. In this case, counsel's decision to hire Dr. Russell illuminates the issue and reveals that prior to August 2005 counsel had done nothing to investigate Mr. Barrett's background, and when Dr. Russell declined to perform that role, counsel did nothing afterward, either.

The trial record also refutes the Government's contention that counsel were not on notice of a need to investigate Mr. Barrett's mental health problems because Mr. Hilfiger and Mr. Smith say they were "not familiar with Dr. [William] Sharp."  Resp. Exh. 11 at ¶ 10; Resp. Exh. 12 at ¶ 12.  Mr. Hilfiger states, "I was not aware that there was any . . . contact between Dr. Sharp and Kenneth Barrett" such as a mental health evaluation.  Resp. Exh. 12 at ¶ 12.  Mr. Smith, who worked most closely with Dr. Russell, Resp. Exh. 12 at ¶ 10, says he "did not ask Dr. Sharp to provide me with a report in 2005, nor did I direct anyone else to do so."  Resp. Exh. 11 at ¶ 10.  The Government contends these statements show there were no "documents in the defense file that would have suggested the need to investigate the possibility of serious mental illness."  Doc 175 at 121.

However, in the risk assessment obtained by defense counsel on September 15, 2005, and filed on September 23, 2010, Dr. Russell specifically states on page 3 that she reviewed the "Psychological Evaluation completed by psychologist, William Sharp, dated September 28, 2002."  *See* Docs. 208, 210.  Dr. Russell goes on to list the "Assessment Tools used" by Dr. Sharp.  Most of Dr. Russell's 2005 report, including the reference to Dr. Sharp's evaluation, is identical to her 2003 report which Mr. Smith obtained in August 2005.  *See* Mot. Exh. 56 at 3-4. If defense counsel never heard of Dr. Sharp and never requested his report, it is because they were not paying attention to the very person whom Mr. Hilfiger described as the defense mitigation expert.  Tr. 10/3/05 Hr'g at 6.

To the extent the Government argues that the statements counsel attribute to Mr. Barrett contradict defense counsel's statements that he was cooperative, the trial record also contradicts the Government's claims.  On June 2, 2005, Mr. Hilfiger advised this Court that Mr. Smith had

been speaking with Mr. Barrett and "he indicated that everything's okay; he's on board."  Tr. 6/2/2005 Hr'g at 7:2-6.  On June 6, 2005, this Court confirmed through a colloquy with Mr. Barrett that issues between himself and defense counsel had been resolved.  Tr. 6/6/05 Hr'g at 2:19 - 3:14.  That Mr. Barrett was cooperative with counsel also is confirmed in Exh. 36, Motion (Doc 70), a letter Mr. Barrett wrote to Mr. Hilfiger around the time of these hearings in which he promised to work with and support his counsel.  If counsel had acceded to any desire of Mr. Barrett's that they believed was "to his detriment," they had every reason and opportunity to put that issue on the record, but they gave exactly the opposite representation.

In sum, the record shows trial counsel informing this Court in June 2005 that Mr. Barrett was cooperating with counsel, and Mr. Barrett confirmed that in the presence of counsel without being contradicted.  In September and October 2005 counsel informed this Court that their mitigation investigation was ongoing, and although they identified another impediment (the prior files), they did not suggest Mr. Barrett objected to any form or area of investigation.  Disinterested percipient witnesses also confirm that trial counsel expressed no concerns about the scope of investigation at the time of trial, and counsel's current declarations do not dispute those accounts.

### d.      Inconsistencies between the Government's theory and the law of effective assistance of counsel.

The record shows that whatever statements Mr. Barrett may have made to defense counsel, their unreasonably delayed and fleeting effort to gather mitigation evidence, and the evidence they actually presented, was not influenced by those statements.  As the Supreme Court has repeatedly held, counsel cannot make a strategic (or client-directed) decision about what

evidence to present, if they failed to learn through investigation what the evidence would show. *Wiggins*, *supra*, 539 U.S. at 526 (record shows mitigation presented at trial was not strategic choice but "resulted from inattention"); *id.* at 536 ("counsel were not in a position to make a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable").  Nevertheless, as the Government has raised the defense, we will assume for the sake of this Reply the statements were made, and address whether the evidence indicates defense counsel acted reasonably under *Strickland* and its progeny.

The test is familiar: "'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Wiggins*, 539 U.S. at 521, quoting *Strickland*, 466 U.S. at 690.  Due to the lack of explanation in the declarations regarding what, if anything, Mr. Barrett's alleged statements meant to defense counsel, it is necessary to proceed hypothetically.

While the Government treats counsel's declarations as a shibboleth that precludes a finding of deficient performance, Supreme Court and circuit precedent shows that under a variety of circumstances, statements like those attributed to Mr. Barrett do not obviate the duty to investigate. *Porter*, *supra*, 130 S. Ct. at 453.  In *Porter*, the Court found ineffective assistance for failing to investigate and present mitigation evidence although "counsel described Porter as fatalistic and uncooperative.  But he acknowledged that although Porter instructed him not to speak with Porter's ex-wife or son, Porter did not give him any other instructions limiting the witnesses he could interview."  130 S. Ct. at 453.  The Court assumed what counsel said about Porter was true, and held counsel's "decision not to investigate did not reflect reasonable professional judgment." *Ibid.*  Similarly, in *Rompilla v. Beard*, *supra*, the Supreme Court found

ineffective assistance of counsel where the defendant at times had been "uninterested in helping" and "even actively obstructive" of counsel's efforts, 545 U.S. at 381. The Court also found counsel ineffective because a wealth of mitigation evidence was available from another source the defense attorneys failed to explore, 545 U.S. at 390-93. *See also Hamilton v. Ayers,* 583 F.3d 1100, 1117-18 (9th Cir. 2009); *Gray v. Branker,* 529 F.3d 220, 230-31 (4th Cir. 2008) (retained counsel not excused from developing and introducing mental health evidence because the client said he did not want to spend the money for an expert).[28] In this case, it is undisputed that counsel were free to speak with any member of Mr. Barrett's family about anything they chose, *see* Resp. Exh. 11 at ¶ 7; Resp. Exh. 12 at ¶ 9, that they possessed "Mr. Barrett's medical, educational and mental health records," Resp. Exh. 12 at ¶ 4, and that they failed to ask about family history, or seek a mental health evaluation.

Assuming Mr. Hilfiger and Mr. Smith understood Mr. Barrett's statements to mean they should not investigate evidence of his family's history of mental illness, alcoholism, infidelity, broken marriage, separations, violence, and abuse, because that would be begging or seeking sympathy, counsel exhibited a lack of understanding of mitigation.[29] *See Anderson v. Sirmons,* 476 F.3d 1131, 1144-45 (10th Cir. 2007); *Smith v. Mullin,* 379 F.3d 919, 943 (10th Cir. 2004); *Mayes v. Gibson,* 210 F.3d 1284, 1298 (10th Cir. 2000) (mitigating evidence provides the

---

[28] Indeed, it has been held that even where a client forecloses certain avenues of mitigation, it is arguably more incumbent on counsel to seek out alternative sources of mitigating information. *Hamilton, supra.*; *Karis v. Calderon,* 283 F.3d 1117, 1136 (9th Cir. 2002).

[29] Mr. Hilfiger and Mr. Smith both place the phrase "beg for his life" in ironic quotation marks. That counsel are dubious about the meaning of this phrase suggests, in addition to other evidence, that this alleged statement was not perceived as a direct impediment to any specific area of investigation or mitigation evidence.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                   91                   *Barrett v. U.S.*, 6:09-cv-00105-JHP

opportunity to humanize the defendant and explain the offense in the context of the defendant's life). Decisions based on an erroneous understanding of an issue constitute deficient performance. *See, e.g., Williams*, 529 U.S. at 395 (defense counsel's failure to obtain social service records on defendant based on erroneous belief state law made them unavailable was constitutionally deficient); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (counsel's failure to move to suppress was constitutionally deficient because it was based "on counsel's mistaken beliefs that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense").

Mr. Barrett has already cited numerous cases explaining the object and purpose of mitigation evidence in a capital trial. *See* Merits Brief (Doc 149) at 104-05. As resource counsel Richard Burr states in his supplemental declaration,

> Defense counsel who are familiar with mitigation explain to their clients early on that mitigation does not involve begging for the defendant's life or relying on sympathy. Begging for mercy is not allowed in federal death penalty cases and a "generic" plea for mercy has been found by the Supreme Court to be evidence of ineffective assistance of counsel. [30] * * *
>
> * * * Mitigation evidence involves humanizing the defendant, making his life experiences familiar to jurors, and helping jurors to see that the life they are being asked to end amounts to more than the crime of conviction. Mitigation also involves offering the jury an explanation for the defendant's actions. Nearly every initially-reluctant capital defendant allows this evidence to be presented.
>
> It is not necessary for the jury to see either the defendant's background or an explanation of his actions as grounds for sympathy. Experienced capital defense counsel know it is not even desirable to present mitigation as a basis for sympathy because such a strategy is likely to be ineffective or backfire by causing jurors to weigh sympathy for the victim against sympathy for the man who took his life. Both the experience of capital trial attorneys and scientific studies of how capital jurors decide whether to vote for life or death show that mitigation

---

[30] Citing *Williams v. Taylor,* 529 U.S. 362, 369 n.2, 397-98 (O'Connor, J., concurring).

succeeds when jurors are able to identify with the defendant because of something in his background, or to understand his actions as something other than the product of a will to do harm. *See*, *e.g.*, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538 (1998); Garvey, *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. Rev. 76 (2000).

Defendants to whom mitigation has been explained do not object on grounds of "begging" or "sympathy" because they understand, if they have the capacity to understand, that mitigation is mostly telling their story. The statements attributed to Mr. Barrett about dwelling on his childhood and not relying on members of his family reflect a similar lack of insight into capital defense norms of practice particularly in that Mr. Hilfiger and Mr. Smith do not indicate that they made any effort to correct the misunderstanding. Dwelling on a defendant's childhood could be seen as a plea for sympathy. That kind of one dimensional penalty phase case is not the norm in federal death penalty cases. Presenting the defendant's childhood experiences as a reason for his later use of drugs, or a contributing factor in a mental disorder, enables jurors to understand his criminal behavior as more than the isolated decision of the defendant not to comply with social norms. That kind of multi-dimensional understanding of mitigation is fundamental to death penalty defense practice.

Exh. 219 at ¶¶ 13-16.

As already noted, the declarations of defense counsel do not support the expansive arguments the Government bases on them. Assuming *arguendo* counsel understood Mr. Barrett's alleged statements to be a barrier to investigation, their response, like that of counsel in *Porter* and *Rompilla* was unreasonable. As Mr. Burr states in his supplemental declaration, this sort of occurrence is "death penalty defense 101," and the 2003 ABA Guidelines provided counsel with a variety of responses, none of which they pursued. The 2003 Commentary on ABA Guideline 10.5 (Relationship with the Client) provides the following:

Some clients will initially insist that they want to be executed as punishment or because they believe they would rather die than spend the rest of their lives in prison; some clients will want to contest their guilt but not present mitigation. *It is ineffective assistance for counsel to simply acquiesce to such wishes*, which usually reflect overwhelming feelings of guilt or despair rather than a rational

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    93                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

decision.  Counsel should initially try to identify the source of the client's hopelessness.  Counsel should consult lawyers, clergy or others who have worked with similarly situated death row inmates.  Counsel should try to obtain treatment for the client's mental and/or emotional problems, which may become worse over time.  One or more members of the defense team should always be available to talk to the client; members of the client's family, friends, or clergy might also be enlisted to talk to the client about the reasons for living; inmates who have accepted pleas or been on death row and later received a life sentence (or now wish they had), may also be a valuable source of information about the possibility of making a constructive life in prison.

(Emphasis added).  These guidelines and advice to counsel suggest a much more serious problem than what trial counsel imply in the statements they attribute to Mr. Barrett.  Even so, it does not appear that Mr. Hilfiger or Mr. Smith took any of the recommended steps that are commonly used by capital defense counsel in similar situations.

Neither Mr. Hilfiger nor Mr. Smith indicates that he made any effort to identify the source of their client's alleged concern.  Mr. Barrett's family were very close to him and supportive during the trial.  They have been reinterviewed to ascertain whether Mr. Hilfiger or Mr. Smith ever told them Mr. Barrett did not want mitigation evidence presented.  The evidence shows defense counsel never sought assistance from Mr. Barrett's family.  Indeed, they never mentioned the issue.  Exh. 217 at 1, 3 (federal trial counsel never contacted her ahead of trial; Mr. Barrett stated he only disagreed with counsel's failure to call certain witnesses); Exhs. 216, 212; Exh. 207 at 3; Exh. 206 at 2-3; Exhs. 208, 214.  These declarations, like those submitted with the initial and amended § 2255 Motions show Mr. Barrett's family were extraordinarily supportive of him and his defense, that they were meeting with him regularly prior to the federal trial, and, if an issue arose, could have assisted defense counsel in helping Mr. Barrett understand the nature and importance of his story.

The record shows this Court authorized counsel to retain a mitigation specialist, a person who "possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (*e.g.*, family sexual abuse) that the defendant may have never disclosed." Commentary to ABA Guideline 4.1 (The Defense Team and Supporting Services). It was standard for a competent defense counsel at the time of this trial to rely upon a mitigation specialist's skills and training to develop mitigation evidence. Exh. 219 at ¶¶ 17-20. Although the Court authorized the use of a mitigation specialist and counsel knew how to find one, they did not make use of this resource to address the alleged problem with Mr. Barrett.

Although recommended by the ABA Guidelines, the prior and supplemental declarations of Richard Burr show defense counsel failed to heed the contemporaneous advice of Julia O'Connell and seek the assistance of more experienced capital trial counsel. Exh. 219 at ¶ 22. According to defense counsel's declarations any lack of cooperation from Mr. Barrett would have been unusual. Yet the trial and expanded records show defense counsel never sought the assistance of a mental health professional regarding Mr. Barrett's alleged concerns, or any other matter.

Assuming (contrary to all evidence) that defense counsel in this case, like counsel in *Porter* unreasonably took the alleged statements of Mr. Barrett as an excuse for failing to investigate, their performance was unreasonable for additional reasons. As Mr. Burr explains, if defense counsel had investigated, they could have pursued a variety of means of presenting evidence about Mr. Barrett's family history without "dwelling" on the testimony of family members themselves. Exh. 219 at ¶¶ 10, 23.

Defense counsel state that Mr. Barrett was aware that limiting testimony of his family members "could work to his detriment." Resp. Exh. 11 at ¶ 12; Resp. Exh. 12 at ¶ 16. Counsel's advice on this issue could not have been reasonable. Long before the ABA Guidelines, the ABA Criminal Justice Standards codified the norm of investigating first so that any advice to the defendant about the risks of pursuing a particular strategy. Standard 4-5.1(a) (counsel should advise client "[a]fter informing himself or herself fully on the facts and the law."). The trial record and undisputed post-conviction evidence overwhelmingly shows defense counsel could not have investigated prior to advising Mr. Barrett because they were still attempting to locate an investigator as the trial was beginning, the person they turned to (Dr. Russell) turned them down, family members were not interviewed or consulted, counsel were unfamiliar with past mental health evaluations, and counsel consulted no mental health experts.

Moreover, counsel do not pretend they strictly adhered to Mr. Barrett's other ideas about the case, and it is clear that decisions such as which witnesses will testify are consigned to counsel's judgment. ABA Criminal Justice Standard 4-5.2. While counsel state that Mr. Barrett made suggestions, they do not say they followed them. Res. Exh. 11 at ¶¶ 3-4; Res. Exh. 12 at ¶ 5. Indeed, counsel do not dispute the account of Doris Barrett who observed Mr. Hilfiger on several occasions refuse to make objections urged by Mr. Smith. Mot. Exh. 80 at 2.

The Commentary to ABA Guideline 10.5 establishes that at the time of this trial the phenomenon of defendants expressing resistance to mitigation evidence was well known, and effective strategies were also known and available to address the problem. Taking these codified norms as guides to whether defense counsel acted reasonably, *Wiggins*, 539 U.S. at 523, this

Court must find that the declarations of trial counsel do not refute Mr. Barrett's showing of deficient performance; they corroborate and enhance that showing.

### 4. The government's legal arguments have no merit.

#### a. Neither case law nor the record supports the Government's theory on deficient performance.

The Government relies on *Wallace v. Ward,* 191 F.3d 1235, 1246-49 (10th Cir. 1999), as a case analogous to its theory of what occurred in this case. Doc 175 at 120. *Wallace* is readily distinguishable on its facts, and in particular the trial record in this case. In *Wallace,* the defendant waived jury trial and entered a blind plea of guilty. At the sentencing hearing, he objected to his counsel cross-examining state's witnesses, and affirmatively stated to the Court he wanted no mitigating evidence put forth. Wallace himself insisted on testifying, however, and stated that if free he would continue to commit crimes. Wallace not only affirmatively waived the presentation of mitigating evidence, but practically begged for the death penalty.

Assuming counsel's assertions are consistent with the Government's theory, this case is more closely analogous to those in which Courts found deficient performance. *See*, *e.g.*, *Young v. Sirmons,* 551 F.3d 942, 957-68 (10th Cir. 2008) (due to counsel's deficient performance in investigating and preparing a mitigation case, defendant could not be held to decision to forego live testimony in favor of stipulated facts, although no prejudice could be shown; this was not a case where the defendant adamantly refused to permit mitigation evidence at trial); *Battenfield v. Gibson,* 236 F.3d 1215, 1226-35 (10th Cir. 2001) (case remanded for resentencing where counsel was found to have performed deficiently, to defendant's prejudice, by failing to investigate and present mitigating evidence; counsel stated after the fact that client had instructed him not to

present anything in mitigation, but this could not be credited absent knowing and voluntary waiver of right to put on a mitigation case; purported "waiver" entered by defendant before the trial court was not knowing and voluntary, in part because there was a failure to investigate); *Thomas v. Horn,* 570 F.3d 105, 121-25 (3rd Cir. 2009) ("waiver" of right to present mitigating evidence was invalid; it could not be said that defendant would have blocked any attempts by counsel to put on mental health evidence; defendant only told Court that he waived right to testify personally).

The Government also relies on *Romano v. Gibson,* 239 F.3d 1156, 1174-82 (10th Cir. 2001), but it too is distinguishable.  Doc 175 at 120.  In *Roman*o, co-appellee Woodruff claimed that counsel was ineffective for failing to introduce evidence that he had been abandoned and abused by his birth mother before being adopted as an infant, and that counsel neglected to introduce evidence that he had the judgment of a teenager and was a follower rather than a leader.  According to trial counsel, Woodruff did not want family and friends called as mitigation witnesses, but despite that, counsel put on a mitigation case anyway, consisting of Woodruff's adoptive mother, friends, and the defendant himself.  Counsel conducted a reasonable investigation.  He investigated Woodruff's background, but was told he had a normal upbringing. Post-conviction evidence did not show that Woodruff suffered from any mental illness, and a previous competency examination had failed to disclose any evidence of mental impairments.[31]

---

[31] *Romano* is interesting for what the Court did not say.  Mr. Woodruff and his co-defendant, Romano, were convicted of two murders in separate trials and sentenced to death in both.  Woodruff's conviction on one of these murders was reversed for new trial.  *Woodruff v. State,* 825 P.2d 273 (Okl. Cr. 1992); *State of Oklahoma v. John Joseph Romano and David Wayne Woodruff,* Oklahoma County Case No. CRF-86-3920.  Current lead counsel for Mr. Barrett and another lawyer represented Woodruff at the retrial.  Woodruff was sentenced to life

(continued...)

At most, the Government's argument that trial counsel shied away from presenting unidentified aspects of the available mitigation evidence presents a post-hoc excuse that carries no legal weight. As in *Wiggins,* this argument is simply a belated rationalization to explain away the absence of a competent investigation by lawyers who still apparently do not understand the function of mitigating evidence in a capital case. *See also, Richards v. Quarterman,* 578 F.Supp.2d 849 (N.D. Tex. 2008), *aff'd.* 566 F.3d 553 (5th Cir. 2009) (counsel's alleged strategic choice deemed afterthought based on false premise and disputed by other portions of record), cases cited in Merit Brief (Doc 149) at 34-35 & n.4.

As an alternative to the claim that counsel were merely following the instructions of their client, the Government argues that counsel made a reasonable tactical choice in presenting the second stage case they did. The evidence and the case law show that trial counsel's alleged "strategic decision" to concentrate on a skeletal presentation of scattered "good guy" evidence, rather than present evidence of dysfunction, abuse and mental illness, in combination with what actually was presented, was unreasonable *ab initio* for the reasons already discussed and the following.

---

[31](...continued) without parole at the retrial after counsel presented the evidence he complained on habeas review had been omitted from the second stage of the other murder case. After hearing this evidence, the jury rejected death, even though it heard evidence of the other murder Woodruff had been convicted of committing, as well as evidence that Woodruff had a previous conviction for solicitation to commit murder involving a plot to blow up a coin shop and kill the proprietors and any customers who happened to be on the premises. While all cases must be judged on their own merits, the result in the Woodruff retrial demonstrates the powerful effect evidence of past abuse and dysfunction can have on a jury's punishment decision, even where, unlike Mr. Barrett's case, the defendant is a multiple murderer with other convictions for crimes of violence.

In a capital case, counsel's investigative duties are both broad and deep with respect to a defendant's family history and personal background, including mental, emotional and physical impairments.  Counsel is required to investigate, prepare and present all relevant mitigating evidence.  *Porter*, 130 S.Ct. at 453-54; *Rompilla* 545 U.S. at 387-89; *Wiggins*, 539 U.S. at 522-23; *Williams*, 529 U.S. at 329; *Wilson v. Sirmons,* 536 F.3d 1064, 1074, 1083-85 (10th Cir. 2008), *aff'd on rehearing en banc, Wilson v. Workman,* 577 F.3d 1284 (10th Cir. 2009); *Anderson v. Sirmons,* 476 F.3d 1131, 1141-48 (10th Cir. 2007).   Counsel's investigative duties are not "client-centric."  To "investigate" means to look for and uncover evidence as yet unknown.  *McGahee v. United States,* 570 F. Supp.2d 723, (E.D. Pa. 2008).  An actual failure to investigate such as occurred here "cannot be excused by a hypothetical decision not to use its unknown results."  *Soffar v. Dretke,* 368 F.3d 441, 474 (5rh Cir. 2004), *amended,* 391 F.3d 703 (5th Cir. 2004).

Counsel's failure to undertake a professionally reasonable second stage investigation is deficient performance.  There can be no reasoned "strategic choice" in the absence of a competent investigation that would permit a reasoned tactical choice to be made.  A strategic decision requires a conscious and knowing choice between one or more alternatives.  Such a decision must be borne of deliberation, not happenstance.  A cursory investigation does not automatically justify a tactical decision with respect to sentencing strategy.  *Wiggins v. Smith,* 539 U.S. at 526 (counsel's failure to investigate stemmed from inattention, not a reasoned strategic judgment).  *See also* cases cited in Merits Brief (Doc 149) at 106 n.69 *and* 110-11 nn. 76-79.  Counsel cannot abandon a mitigation investigation after gaining only rudimentary

knowledge about a client's background, which the evidence shows is what counsel did here. *Wiggins,* 539 U.S. at 524.

As with the lack of anything approaching an adequate investigation into Mr. Barrett's personal and family background, the Government argues that counsel had no reason to be aware of any mental illness on Mr. Barrett's part because he was helpful and engaged in the defense, and did not present himself as someone who was clearly laboring under the weight of mental and emotional impairments. Doc 175 at 116, 119. But no competent death penalty defense counsel simply relies on their observations and interaction with the client to gauge whether he has a mental illness. *Gray v. Branker,* 529 F.3d at 231. Equally specious is the Government's reliance on Dr. Wood's statement in his report that at first blush, Mr. Barrett presents himself as a competent, "in control" person with no mental illness. Doc 175 at 121. It obviously takes appropriate expert assistance to get beyond surface appearances to discover a person's true mental state. Despite this surface and misleading appearance, there is no question that Mr. Barrett suffers from a constellation of debilitating mental illnesses, and the Government's criticism of what it terms a late-coming "post-conviction" set of diagnoses carries no weight. Doc 175 121. As shown in the declaration of Dr. Sharp (Mot. Exh. 55), and the declarations of Dr. Young and Dr. Woods, these diagnoses were available at the time of trial and are based on documents that counsel either admit they had, or that they could have had on reasonable investigation.

> **b.      Neither case law nor the evidence supports the Government's theory on prejudice.**

Contrary to the Government's argument that the mental health records in existence at the time of trial simply showed Mr. Barrett to be a "violent drug addict," the current diagnoses of Mr.

Barrett are fully consistent with his history.  As shown *supra*, the Government's theory fails as a matter of law for the same reason the same arguments failed in *Porter*, *Wiggins*, and *Williams*: under the reasonably probability standard, a post-conviction prosecutor's ability to poke tiny holes in a mental health mitigation case is insufficient to rebut or dispel prejudice.  *See also Gray v. Branker,* 529 F.3d at 236-27 (holding that state habeas Court unreasonably rejected any real consideration of diagnoses of mental illness proffered in collateral proceedings; defendant was forced to rely on such a diagnosis because his counsel were ineffective for failing to investigate and present mental health evidence at time of trial; rejecting out of hand post-trial reports on a defendant's mental state would contravene "uncontroversial" requirement that Court must assess an ineffective assistance claim based on evidence developed in post-conviction proceedings, citing *Williams v. Taylor,* 529 U.S. at 398).

The Government's contention that defense counsel had no reason to be aware of Mr. Barrett's mental problems is specious as a matter of law and refuted by the record.  As shown *supra*, the only expert trial counsel consulted, Dr. Russell, specifically referred to Dr. Sharp's 2002 evaluation in both her 2003 and 2005 reports which were provided to counsel.  The issue was simply never discussed with Mr. Barrett's family, who could have provided insight into Mr. Barrett's erratic, delusional and paranoid behavior.  Mr. Barrett's documented history of a serious suicide attempt, which led to him being committed to the state mental hospital in Vinita, as well as his other contact with mental health facilities, were more than "red flags" demanding additional investigation and expert assistance.

The Government argues that Mr. Barrett's medical records simply showed he was a violent drug addict.  Doc 175 at 119-121.  The assertion is incorrect on its face and the

Government's argument is devoid of any competent evidentiary basis.  At one time or another, Mr. Barrett had been diagnosed as suffering from Bipolar Disorder, organicity, and depression, and had been placed on anti-psychotic drugs.  Mot. Exh. 174.  The declarations of Dr. Sharp, Dr. Woods, and Dr. Young show that Mr. Barrett's medical records contain abundant support for expert testimony.  Defense counsel at trial simply never presented those documents to an expert.  If the Government had its experts review these medical and mental health reports, they have apparently been unable to obtain an opinion to substantiate their claims, or they surely would have referenced it.

Viewed in the context of case law and the ABA Guidelines (ignored by the Government), the evidence defense counsel possessed was more than sufficient to trigger consultation with mental health experts.  *See* cases cited in Merits Brief (Doc 149) at 51, 54-55, 114.  Where counsel were aware or should have been aware of a client's mental problems, counsel have been found to have rendered deficient performance for failing to engage the services of appropriate experts and in failing to conduct further, reasonable investigation.  *Wilson v. Sirmons,* 536 F.3d at 1085-87 (counsel ineffective for failing to engage services of mental health expert in timely fashion and to provide him with sufficient time and background materials to effect proper diagnosis); *Hamilton v. Ayers,* 583 F.3d at 117-18 (counsel failed to properly investigate defendant's mental health, where client had documented psychological problems and had attempted suicide in jail); *Gray v. Branker,* 529 F.3d at 229-30 (counsel were confronted repeatedly with fact that defendant had mental problems and had an expert who had offered her assistance, but needed additional time and information to make competent diagnosis).

As the Courts – including the Supreme Court – have recognized, long experience and empirical study show that the type of truncated and misleading case that was presented here (focusing exclusively on the defendant's "good qualities") is almost invariably doomed to failure. *See*, *e.g.*, *Rompilla*, 545 U.S. at 38 (unreasonable not to investigate defendant's prior crimes because investigation may produce abundant mitigation evidence); *Williams*, 529 U.S. at 397-98 (unreasonable not investigate prison records and juvenile records that contained mitigating evidence and evidence of past offenses); *Johnson v. Mitchell,* 585 F.3d 923, 942 (6th Cir. 2009) ("Obviously, confining investigation in the defense of a capital case to only the 'good things' that could be said about the client cannot be considered a reasonable investigation.").

The *most compelling mitigating evidence to which juries respond in deciding to spare a defendant's life is precisely the type of evidence that went un-investigated and un-produced here: evidence of an abusive and dysfunctional background and mental illness.*  This is so because of "the belief, long held by this society, that defendants who commit criminal acts that are attributable to ... emotional or mental problems, may be less culpable than defendants who have no such excuse." *Boyde v. California,* 494 U.S. 370, 382 (1990); *Penry v. Lynaugh,* 492 U.S. 302, 319 (1989).  *See particularly, Wilson v. Sirmons,* 536 F.3d at 1085 (Courts have repeatedly found evidence of mental problems and an abusive background to be "powerful" mitigating evidence; counsel's performance was deficient where counsel relied on superficial evidence of defendant's "good qualities" and limited testimony from an expert who did not have the time or background materials to reach a definitive diagnosis); *Anderson v. Sirmons,* 476 F.3d at 1141-48 (counsel's performance was deficient where he put on a skeletal second stage limited to vague evidence about the defendant's "good qualities" and omitted evidence, due to an inadequate

investigation, of defendant's abusive background, mental illness, and use of methamphetamine, which exacerbated the defendant's mental problems; the omitted evidence was exactly the sort of evidence that garners the most sympathy from the jury, because it humanizes the defendant and explains and puts in context a defendant's behavior and actions that the jury would otherwise view as simply the product of a lack of caring or "meanness"); *Smith v. Mullin,* 379 F.3d 919, 942 (10th Cir. 2004) (it was "patently unreasonable" for counsel to fail to investigate and present evidence of defendant's borderline retardation, organic brain damage, and troubled childhood; this is the type of evidence juries respond to in deciding to spare a defendant's life).

The Government argues that Mr. Barrett was not prejudiced because the omitted mitigating evidence would have "utterly negated" the case that was presented, which was aimed at showing Mr. Barrett was a loved and valued family member.  According to the Government, a mitigation case that included testimony about Mr. Barrett's mental illness and neurocognitive impairment also would have by necessity focused on his drug problem and episodes of violence. Doc 175 121-125.  No evidence or case law is offered to support the novel contention that neither family members nor jurors could find a reason to spare a man who resorted to illegal drugs when he was not being treated for a major mental illness.  The declarations of Mr. Barrett's family members, especially those who testified at trial, show both that they were aware of his cycling from depression to mania and back, and his drug use, and that they loved and cared for him as any family would.

It is equally nonsensical to contend that jurors would have found *Mr. Barrett* was not a good person, and was a future danger, because *his parents* were alcoholics whose marriage fell apart and who neglected and abused him.  At trial, the Government heavily stressed the

sometimes mutually abusive relationship between Mr. Barrett and his ex-wife Abby Stites. Evidence of Mr. Barrett's serious mental impairments would have explained his sometimes volatile, suspicious conduct, particularly because Ms. Stites herself viewed his behavior in that context. Mot. Exh. 103 at 2-3. In other words, the Government has it backwards: It was the defense case itself that permitted the jury to view Mr. Barrett as a violent drug user, (a) by ignoring the pleas of family members like Steve Barrett and Abby Stites who wanted to explain Mr. Barrett's background and illness, and (b) by failing even to read the report of Dr. Sharp much less consult with a mental health expert. The defense left Mr. Barrett's drug use and bouts of domestic violence unexplained, and ripe for prosecutorial argument that Mr. Barrett was simply an unrepentant drug addict with virtually no redeeming qualities.

The Government's argument – unsupported by evidence – confuses cause and effect. Dr. Woods, like Abby Stites, and any informed person familiar with Mr. Barrett's history, explains that Mr. Barrett's mental illness was not "premised" on his drug use, his drug use was premised on having untreated mental illnesses. Mot. Exh. 117 at ¶¶ 42-46 & 76.

Before the penalty phase began, the jury was already well aware Mr. Barrett had been involved with drugs; his convictions were predicated on drug crimes. The defense omitted a mitigation case that would have explained, in a manner that reduced Mr. Barrett's degree of moral culpability, his involvement in drugs.

The Government argues that counsel adopted a "reasonable strategy" -- a conclusion that has no substance in light of the obvious lack of a proper investigation -- in focusing on Mr. Barrett's "good qualities," and points to jury findings to say the mitigation case was partially successful. Doc 175 at 118. The Supreme Court rejected the Government's line of argument in

*Kimmelman v. Morrison*, 477 U.S. 365 (1986).  Morrison challenged his conviction for raping a 15-year-old girl on grounds that his trial attorney unreasonably failed "to file a timely motion to suppress evidence allegedly obtained in violation of the Fourth Amendment."  *Kimmelman*, 477 U.S. at 368.  The State responded, notwithstanding the failure to move to suppress, "defense counsel's vigorous cross-examination attempts to discredit witnesses, and effort to establish a different version of the facts lift[ed] counsel's performance back into the realm of professional acceptability."  477 U.S. at 385-86.  The Supreme Court rejected the argument saying, "Counsel's performance at trial, while generally creditable enough, suggests no better explanation for []his apparent and pervasive failure" to investigate a possible suppression motion.  477 U.S. at 386.

Since at least 1986 it has been clear that an ineffectiveness claim is analyzed on what counsel failed to do, not what they did.  *See also Wilson v. Sirmons,* 536 F.3d at 1084-85 (trio of Supreme Court cases -- *Williams, Wiggins,* and *Rompilla* – focus not on what was presented at trial, but on the adequacy of the penalty phase investigation; "the question is not whether counsel did *something*; counsel must conduct a full investigation and pursue reasonable leads when they become evident.") (emphasis in original).  Consequently, the Government cites absolutely no authority for the proposition that so long as a jury finds some mitigating circumstances and rejects one or more aggravating factors, counsel's performance is immune to an ineffectiveness challenge.[32]  This dovetails with what Mr. Barrett showed in his Amended Motion: that counsel's wholly ineffective penalty phase presentation permitted the Government, in arguing for death,  to

---

[32]  The Government pulls the rug out from under its own argument by later maintaining, in connection with Movant's claim that the prosecutors committed misconduct in second stage closing argument, that the prosecutors rightly ridiculed the weak mitigation case that had been put forward.  A respondent cannot have it both ways.  Either the mitigation case was "effective" or it was ripe for the type of disdain that was heaped on it in the prosecutors' closings.

543

run roughshod over the anemic, skeletal mitigation case that was put forward.  2nd Amend. § 2255 Mot. (Doc 95) at 243-47.

The Government cannot and does not explain how any fact presented in mitigation now would have caused otherwise rational jurors to find "utterly negated" the "partial success" of the mitigation case that was presented.  It beggars the imagination to say that the *addition* of what the Courts recognize as the most persuasive type of mitigating evidence would have harmed Mr. Barrett, particularly because it would have been consonant with what was presented.  Despite his many problems, Mr. Barrett had "good qualities" and did the best he could.

Not only would the omitted mitigating evidence have not conflicted with the evidence that was presented, but it would have supported the defense argument that Mr. Barrett was unfairly treated by the Government.  Doc 175 at 116.  He was all the more susceptible to such unfair treatment due to his mental illness.

In aid of its "no prejudice" claim, the Government makes a series of boilerplate arguments that have no relation to the facts.  Citing *Burger v. Kemp,* 483 U.S. 776, 794 (1987),[33] among other inapplicable cases, the Government contends that Movant has done no more than show that a more thorough investigation "might have borne fruit," and that "unlimited time" to investigate "might have" turned up more under "ideal conditions."  The adequacy of counsel's investigation and the evidence presented as a result should not be judged under a standard of "perfection."  Doc 175 at 120.

---

[33]  *Burger* is inapposite.  In that case, counsel conducted a reasonable investigation but ran into the brick wall of one potential witness after the next having harmful things to say about the defendant.  In Mr. Barrett's case, the omitted evidence would have put an entirely different light on the case in a humanizing, mitigating light.

The Government's theory is most often raised, and recognized when "additional" investigation would only yield cumulative evidence to what the jury actually heard, which was the case in *Burger*. But here the Government itself argues the mitigation case that was not presented conflicted with the mitigation that was presented. Neither contention is correct. The evidence available to trial counsel would have supported the showing that Mr. Barrett is a beloved member of his family and community, and would have dramatically increased the value of that evidence by showing how he and his family struggled to overcome generations of mental illness, alcoholism, poverty, violence, and deprivation.

The Government's claim that defense counsel were not acting under ideal conditions rings particularly hollow given that the undisputed record shows they failed to begin preparation for the penalty phase until the month before trial, and failed to obtain the expert assistance this Court authorized.

Among the many cases cited in Mr. Barrett's brief in support of his Amended Motion and here showing that he was prejudiced by trial counsel's professionally unreasonable errors and omissions, two cases from the Tenth Circuit stand out.

In *Anderson v. Sirmons,* 476 F.3d at 1141-48, the defendant was convicted of *three* brutal murders during what can only be described as an exceedingly violent rampage. In addition to the murders, Anderson also shot or participated in the shooting of another individual who managed to survive, was involved in a kidnapping, and was involved in burning down a dwelling. Just as in Mr. Barrett's case, counsel in *Anderson* relied on a superficial "good guy" mitigation case. The mitigation case consisted of evidence that although Anderson had drug and alcohol problems, he worked and provided for his family; that he was the son of a "good woman" and had a family that

loved him; and that his daughter loved him and he could still be of help to her while he was incarcerated.

The mitigating evidence omitted in *Anderson* is almost a mirror image of what was left unsaid in Mr. Barrett's case. Because the mitigation investigation in *Anderson*, such as it was, was inadequate, the jury never learned that Anderson had a "borderline" I.Q. and organic brain damage stemming from multiple causes, including heavy drug use from a young age and head injuries. Like Mr. Barrett's mental impairments, Anderson's brain damage affected his reasoning, problem solving, and judgment. The Court noted that while these problems could be perceived by laymen as "meanness" or anti-social behavior, with expert evaluation, they were properly explained as deriving from disruptions and impairments to the nervous system. Anderson's mental impairments, like Mr. Barrett's, were exacerbated by his use of methamphetamine. Attempts to get off the drug were unsuccessful, and Anderson was involved in a co-dependent relationship with his wife, who was a drug user herself. The jury in *Anderson*, as in Mr. Barrett's case, never learned that his family history was replete with abuse and neglect. Both parents were alcoholics, and the mother was abusive both to her husband and her children. The children in *Anderson* were whipped with extension cords and struck with hammers. Anderson's mother and stepfather engaged in drunken brawls in front of the children, and the mother carried on extramarital affairs in the home. The Tenth Circuit stated all this was "just the kind of mitigating evidence that trial counsel is obligated to investigate and develop as part of building an effective mitigation case." *Anderson v. Sirmons,* 476 F.3d at 1144.

The Court's determination that Anderson was prejudiced by counsel's deficient performance despite his conviction for multiple murders and a host of other violent crimes –

offenses far more aggravated than Mr. Barrett's – applies *exactly* to the assessment of prejudice here:

> [R]ather than offering the jury a potential explanation for Anderson's actions relating to the murders he participated in, trial counsel's case in mitigation was limited to a simple plea for mercy.
>
> * * *
>
> Against this backdrop, trial counsel mounted an extraordinarily limited case in mitigation.  As noted above, trial counsel adduced the testimony of Anderson's family and co-workers to support the theory that Anderson was a kind, hard-working, normal man who could be of some help to his daughter if his life were spared.  Unfortunately, the case in mitigation presented by trial counsel played into the prosecution's theory that the only explanation for the murders was that Anderson was simply an "evil" man.  The prosecution seized on Anderson's case in  mitigation to assert during closing arguments that there was no excuse for Anderson's conduct because he grew up in a good family and was never abused as a child.  Thus, relying on the exceedingly limited nature of trial counsel's case in mitigation, the prosecution was able to argue convincingly to the jury that there was nothing in the case to diminish Anderson's moral culpability for the murders.
>
> * * *
>
> In this particular case, the absence of this readily available mitigating evidence left the jury with no explanation for the murders other than the assertion that Anderson was "evil." Although the case against Anderson was strong, and the murders in this case were horrific, Courts have not hesitated to grant relief in similar circumstances where the absence of available mitigating evidence left the jury with a "pitifully incomplete" picture of the defendant.  [Citation omitted] Had the jury been presented with a complete picture of Anderson's background and history, there is a reasonable probability at least one juror would have struck a different balance between the aggravating and mitigating factors.  [Citation omitted'

*Anderson v. Sirmons,* 476 F.3d at 1144, 1147, 1148.

In light of the fact that sentencing relief was given in *Anderson*, on facts far more aggravated than those here, can it be said that Mr. Barrett – who was spared the death penalty on two counts, and whose jury rejected the proposition that he would be a continuing danger – was

Movant's Reply to USA' Response
to Second Amended § 2255 Motion

111

*Barrett v. U.S.,* 6:09-cv-00105-JHP

not prejudiced by trial counsel's all but identical failures to present all but identical evidence? The answer has to be "no."

In *Smith v. Mullin,* 379 F.3d at 938-44, the defendant was convicted of five murders. Four of the victims were children. The case for death was obviously strong. However, he was granted sentencing relief because trial counsel presented a skeletal mitigation case bereft of any evidence of his borderline retardation, organic brain damage, and troubled upbringing. It cannot reasonably be said that the omission of analogous evidence in Mr. Barrett's far less aggravated case – a case for which he acquitted of murder conviction in state Court – caused no prejudice.

### 5.    Conclusion.

The facts, argument, authority and exhibits presented in Mr. Barrett's Amended Motion, brief in support, and here demonstrate that counsel's penalty phase performance was both professionally unreasonable and prejudicial. The Government's arguments fall wide of the mark, lacking both factual and legal support. Mr. Barrett's death sentence must be vacated.

**GROUND 3:   THE COURT UNCONSTITUTIONALLY DENIED MR. BARRETT NECESSARY EXPERT SERVICES AND RESOURCES.**

### A    The Issue Is Not Procedurally Defaulted.

Contrary to the Government's assertions, the issue is not defaulted. Movant has alleged and set out supporting facts that the failure to raise the issue on appeal was caused by the ineffective assistance of appellate counsel, one of whom was trial counsel, whose conduct, if the Government's position has any legitimacy, is responsible for failing to provide the Court with the demanded "detailed" substantive showing. Doc 95 at 127-39; Doc 149 at 104-115. It was again

fully argued in the opening Motion and Brief. Doc 95 at 249-263; Doc 149 at 125-141 and supporting documentation. *See also,* Ground 2(A)(7), (8) and 2(B), hereinabove.

Movant has further fully laid out the prejudice to Movant by the Court's denial of the funding to provide a minimal defense to the capital charges pending against him. The Court abused its discretion in denying the funding and used its position and control of the administration of the CJA funding to bludgeon the defense into submission and control by the Court, the result of which was a denial of a fair trial and the right to present a defense.[34] While the Government, like the Court, seeks to nitpick the detail with which trial counsel supported its requests for funding, the record is clear that the Government's case demanded expert response and the Court refused to give Mr. Barrett the ability to do it. While *Caldwell v. Mississippi*, 472 U.S. 320 (1985) at 323-24 n.1, requires a defendant to make a threshold showing for expert assistance, the Court here demanded a full and complete substantive presentation. Cr 04-115 Doc 38 at 2. Even then the Court's unreasonable reduction of fees and denial of travel effectively denied Mr. Barrett the right to present a defense. Movant provided the trial court with the necessary particularized facts sufficient to trigger *Ake's* requirement of assistance. *Powell v. Collins,* 332 F. 3d 376 (6th Cir. 2003). Even the Government's Response sets out the satisfactory threshold for mental health experts requested. *See, e.g.,* Doc 175 at 129-130.

---

[34] As noted in Ground 1(A) hereinabove, Movant alleges the trial court abused its administrative role under the Criminal Justice Act to interfere with the constitutionally protected independence of counsel. Contrary to the Government's assertion that Mr. Barrett showed no effect, Ground 1 shows that the trial court's administrative abuses led John Echols to withdraw from the case and influenced the conduct of successor counsel, Roger Hilfiger, who would not use the resources the Court authorized. The facts and arguments set out in Movant's Motion to Vacate (Doc 95 at 7-25), Brief (Doc 149 at 46-56) and hereinabove under Ground 1, are relevant to the denial of expert assistance and as such are incorporated herein as if fully set out herein.

549

## B.     The Court Abused its Discretion.

The Court's demands for detailed showings to justify CJA experts were an abuse of discretion, an unconstitutional interference with the defense, and a blatant attempt to bludgeon the defense into submission, an effort that was ultimately successful.  The evidence presented amounts to more than an mere abuse of discretion, it amounts to judicial interference with Mr. Barrett's right to present a defense and the use of the "purse" to effect it.  *See* Exh. 34, Motion (Doc 70).  Not only did the Court demand unreasonable justification for expert and investigative assistance but refused to pay counsel for preparing the justification.  Exh. 34 at 5, Motion (Doc 70).  ("In April 2005 the Court held that [Mr. Echols] would not be compensated for any of the time [he] spent preparing the detailed budgets on which Judge Payne insisted.")

Contrary to the Government's assertions otherwise, Movant has sufficiently alleged and supported its allegations of prejudice.

## C.     The Experts Requested Were Necessary and Relevant.

### 1.     Mental health.

On the issue of mental health, the Governments baldly asserts that "Barrett relies on a mistaken assumption in claiming that the allegedly erroneous denial of mental health evidence affected the guilt phase-verdict because it prevented him from rebutting the Government's evidence of malice aforethought."  Doc 175 at 132.  The Government does not refer to any cite in the Motion to Vacate or the Brief upon which it draws the conclusion stated above.  Review of Movant's pleadings show that Movant asserts the prejudice from lack of appropriate mental health experts to rebut the prosecutions' theory of malice aforethought *and intent.*"  Doc 95 at 252.  (Emphasis added).  The convenient omission of the prejudice to Movant's ability to negate

the "intent" element illustrates the weakness of the Government's argument.  In its Brief in support of the Motion to Vacate, Movant again argued prejudice from the Court's arbitrary denial of funds for appropriate mental health experts by it adverse impact on Mr. Barrett's ability to "develop a mental health defense."  Doc 149 at 129.  Indeed, the Government's argument that because Counts 1 and 2 require only an underlying felony to establish "malice aforethought," and "common law malice" was not an element of Count 3, "the absence of mental health evidence had no impact on the guilt phase verdict," Doc 175 at 132,  can only be true if Mr. Barrett has been convicted of strict liability offenses.  Though the Government now asserts no element of "malice aforethought" was necessary, it argued otherwise before the jury.  *See, e.g.,* CT vol 20 at 4375 ("We've become used to coming here day after day and seeing a man that I respectfully suggest the evidence proved beyond a reasonable doubt not only committed all three of the crimes with which he is charged but is a *cold-blooded malice aforethought premeditated murderer.*") (Emphasis added.)  Mental health evidence is relevant to any element of intent, and certainly here, where a specific intent was required for the fatal act itself, as the United States conceded at trial, at least with respect to count 3.  *See also* Argument Ground 2(A)(3) hereinabove and Ground 9, hereinbelow, both of which are incorporated herein as if fully set forth herein.

Similarly, Movant incorporates the relevant arguments concerning ineffective assistance of trial counsel hereinabove to specifically deny the Government's unsubstantiated assertion that "counsel ultimately made a strategic decision not to present any mental health evidence, apparently out of concern for the strength of the Government's potential rebuttal evidence."  Doc 175 at  133 (relying on Mot. Ex 56 at 4; Resp. Exhs. 11 & 12.)  There is nothing in Exhibit 56

(Declaration of Jeanne Russell) or the trial attorneys' declarations, (Resp. Exhs. 11 and 12), which indicate a strategic decision not to pursue a mental health defense.  At best, it can be said counsel elected not to pursue the "risk assessment" which had been made much earlier without the necessary social, medical and family history required for a full mental health evaluation and related only to "future dangerousness."

### 2.   Crime scene reconstruction.

To avoid the prejudice finding as a result of the Court's abusive denial of funds for a crime scene reconstruction, the Government downplays the significance of the evidence upon which it relied for a conviction presented through witness Dalley.  Doc 175 at 136.  ("Dalley provided limited opinions, largely corroborative of existing evidence or conclusions the jury would have naturally drawn from it.")  The testimony of a witness presented as an expert to "corroborate" eyewitnesses, whose testimony was at best inconsistent, lends credibility to the witnesses themselves.  If it was irrelevant and unnecessary, as the Government now contents, Mr. Barrett's expert could have succeeded in keeping it out.  The record is clear that Ms. Dalley testified at length upon a critical issue and the Government pointed to her testimony in both opening and closing arguments urging the jury's reliance on it in its deliberation.  R at 207-208 (Testimony will show that officer was shot when the vehicle stopped in front of the house and he turned to exit out the passenger door); R 20 at 4377 ("Well, no way would that account for the testimony of the trajectory analyst,"); s*ee also,* R at4306-06 (argument quoted at length in Claim 2(A)(7) hereinabove).  Ms. Dalley's testimony attempted to piece the sketchy, frequently unclear eyewitness testimony into a scientific package of intentional killing.  *See* Argument, Ground 2(A)(7) hereinabove, incorporated fully herein.  The Government's attempt to minimize the

impact of her testimony invades the jury's role. *United States v. Oliver*, 278 F. 3d. 1035, 1043 (10th Cir. 2001) (noting that "it is solely within the province of the jury ...to weigh... expert testimony.") The inability of Mr. Barrett to counter that evidence with his own expert who could have debunked her entire testimony was prejudicial and had a substantial injurious effect on the verdict.

### 3. Expert on police standards and procedure.

Similarly, denial of funds and the ability to produce for trial an expert who would have made clear law enforcement's serious missteps in planning and executing the raid, which effectively created a lethal situation, cannot be dismissed as irrelevant. Contrary to the Government's argument otherwise, Doc 175 at 140, the jury finding that Barrett acted with substantial planning and premeditation, which illustrates Barrett's knowledge that the attack was an attack by law enforcement, does not undermine the importance of the defense testimony. It is precisely that jury finding which illustrates the harm caused by denying Mr. Barrett an opportunity to show Mr. Barrett's state of mind as it was impacted by poor judgments made by law enforcement. The jury had a right to hear from an expert for the defense before it was charged with determining Mr. Barrett's state of mind. Presented with a more accurate picture of the events which transpired on the date of the shooting would have likely compelled a different finding of *mens rea* and verdict. *See* Argument 2(A)(8) hereinabove and incorporated fully herein.

### 4. Mitigation specialist.

The Government's argument that Mr. Barrett's claim that he was entitled to a mitigation expert should fail because he has not shown "what information was actually obtained by the

defense, and what was forgone as a result of the funds provided," Doc 175 at 143, is undermined by the Government's own exhibits in which neither of trial counsel's declarations filed on behalf of the Government support its position.  Resp. Exh. 11, 12.  Beyond that, the declaration of Jeanne Russell illustrate trial counsel's inability to conduct the necessary sentencing investigation.  Exh. 56.  The evidence now before the Court on the family, social and medical history of Mr. Barrett amply illustrates the harm to Mr. Barrett by the Court's denial of adequate funding for mitigation.   Nor does the fact that trial counsel may have done some mitigation investigation deprive Mr. Barrett of the right to a professional who would have conducted an adequate investigation and presentation.  *See Sears v. Upton*, 561 U.S. --, *6 (S.Ct. No. 09-8854, June 29, 2010) ("We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant.)  *See also,* Argument 2(B) hereinabove and incorporated fully herein.

### GROUND 4:  THE NO-KNOCK SEARCH WARRANT WAS INVALID UNDER *FRANKS V. DELAWARE,* 438 U.S. 154 (1978).

*Stone v. Powell,* 428 U.S. 165 (1976) does not preclude Mr. Barrett from raising the Fourth Amendment *Franks* issue in these collateral proceedings.  Doc 175 at 147-48. Respondent concedes that if exculpatory evidence regarding Clint Johnson's honesty was suppressed by the Government, Mr. Barrett could raise a *Brady* claim, but that it does not permit a frontal Fourth Amendment attack on the no-knock warrant under *Franks*.  This is incorrect. The suppression of exculpatory evidence regarding Johnson's honesty as a law enforcement officer shows that Mr. Barrett was denied a full and fair opportunity to litigate the issue at trial.

*Smith v. Black,* 904 F.2d 950, 965 (5th Cir. 1990), *abrogated on other grounds, Stringer v. Black,* 503 U.S. 222, 227 (1992).  This is particularly true in light of the Government's argument (incorrect though it is), raised in response to the ineffective assistance of counsel claim respecting the *Franks* issue, that it was Johnson's honesty, not Charles Sanders's, that is the focus of the *Franks* inquiry.  Doc 175 at 147.  Thus, *Stone's* bar against raising a Fourth Amendment argument does not apply; material evidence bearing on Johnson's honesty, as Movant has shown, was suppressed [35].

Rather than defer discussion of the Government's *Brady* violation with regard to Johnson to the reply to the Respondent's arguments on Ground 5, Mr. Barrett addresses it now, because it is pertinent to his *Franks* claim.  In its response to Ground 5, the Government argues in essence that Johnson was victimized by a crooked District Attorney (Richard Gray) with a vendetta against him.  The Government claims that Johnson may have been bad with money or a poor manager, but that he was not corrupt.  For this baseless claim, the Government relies on a

---

[35]  The Government contends that the exculpatory evidence regarding Johnson's improper and illicit activities does not constitute *Brady* material because much of it was developed following Mr. Barrett's trial, and thus could not have been used to attack Johnson's credibility and the search warrant.  The Government cites *United States v. Lafayette,* 983 F.2d 1102, 1105 (D.C. 1993) and *United States v. Bolden,* 335 F.2d 453, 461 (7th Cir. 1966) for this proposition. Both are distinguishable.  In *Lafayette*, the evidence pressed by the defendant related to events that were purely post-trial and long after the fact.  Here, the investigation into Johnson's corruption pre-dated the conclusion of Mr. Barrett's trial, and he was terminated less than two months after trial.  Exhs. 181 A, 181 B, Amended Motion.  In *Bolden,* the defendant claimed newly discovered evidence of a witness's counterfeiting conviction was material evidence that would have impeached the witness's testimony.  The Court rejected this claim not only because the conviction occurred after the defendant's trial,  but also because, even if the conviction was in existence at the time of trial, it was merely cumulative to the impeachment that was accomplished with the witness.  He was cross-examined at length about the counterfeiting case, for which he had been indicted at the time of the defendant's trial. In Mr. Barrett's case, the ongoing investigation into Johnson was never revealed.

declaration from Joel-Lyn McCormick (Resp. Exh. 2), the Oklahoma Assistant Attorney General who prosecuted Mr. Gray in Cherokee County on corruption charges. Her view of Johnson's honesty, whether based on an internal investigation she was involved in or not, is entitled to no weight. McCormick lost the case against Mr. Gray in spectacular fashion. Clint Johnson was her star witness, and his testimony was so impeached and riddled with improbabilities that the trial judge took the rare step of directing an acquittal. In these circumstances, McCormick's vouching for Johnson's honesty has the totally hollow ring of a *post-hoc* attempt to salvage some small measure of integrity out of a failed prosecution based on a disreputable witness. The old saying holds: McCormick and Johnson got run out of town, and they act like they're leading a parade.

The evidence submitted by Mr. Barrett shows the Government's claim that Johnson is simply a sloppy administrator and poor money manager is simply untrue. He was fired from the District 27 Task Force mere weeks after Mr. Barrett's trial concluded not because he was a well-meaning but poor manager, but because he was corrupt. He placed no proper control over his informants, a fact particularly relevant here. Money went missing. He passed hot checks, the Government's contention that these were simply "oversights" notwithstanding. Drug evidence and funds were not properly accounted for. He used state property for personal reasons. Johnson lied to his superiors. He did not account for drug evidence properly; at the time he was fired, he was riding around with drugs and drug paraphernalia, purported "evidence" that had not been sealed. Most serious of all, there was evidence uncovered in District Attorney Gray's investigation that Johnson was running a kickback scheme among favored individuals, some of them attorneys. Exhs. 181 A, 181 B, Amended Motion. All this transpired before, during and

shortly after Mr. Barrett's trial; Johnson was fired in January, 2006.  This is not "after the fact" information, as the Government claims.

It has also been shown that the Government suppressed evidence regarding Charles Sanders's motives for testifying against Mr. Barrett (the deal he ultimately received, Ground 5(A)(1), Amended Motion at 273-78) and the numerous favors he had received from state law enforcement and prosecutors for his work as an informant, which Sanders's falsely denied during cross-examination.  All this was relevant to a *Franks* determination.

In its response to Grounds 5, the Government attempts to overrule *Brady* and its progeny. Without a shred of support in the law, Respondent contends it could adopt a "see no evil" attitude toward Johnson (and everything else) because the DEA, and not local law enforcement, was the "case agency." *E.g.,* Doc 175 at 149.  The Government cannot unilaterally limit the prosecutions' *Brady* duties, which extend to information held by all its agents in law enforcement, regardless of what agency they work for.  That is especially true here, because this case was investigated not by the DEA or some other federal law enforcement agency, but state law enforcement -- the District 27 Drug Task Force, the Sequoyah County Sheriff's Office, and the Oklahoma Highway Patrol.  Against what the Government claims now, the prosecutors designated Sequoyah County Sheriff John Philpot as the case agent at trial.  The informant witnesses were developed by Sheriff Philpot, assisted by AUSA Littlefield.  The case was originally prosecuted in state Court. State law enforcement and their informants provided the overwhelming bulk of the evidence against Mr. Barrett.  The search warrant that led to this tragedy was secured by Johnson himself. The state dog was wagging the federal tail.

The DEA ruse will not fly.  The DEA did virtually nothing in this case, except conduct the search of Mr. Barrett's property after Trooper Eales was killed.  For *Brady* purposes, the Government was on notice of evidence in possession of state law enforcement.  *Kyles v. Whitley,* 514 U.S. 919, 937 (1995); *Giglio v. United States,* 405 U.S. 150, 154 (1972); *United States v. Antone,* 603 F.2d 566, 569 (5th Cir. 1979) (facts known to state law enforcement imputed to federal prosecutors, particularly in a case where they pooled resources and acted in concert).

Because evidence regarding Johnson's dishonesty was known or should have been known by the Government before or at the time of Movant's trial, and was directly relevant to the *Franks* claim, Mr. Barrett was denied the opportunity for a full and fair hearing on the issue, and is not precluded from raising the issue in these proceedings.  Again, the Government concedes that if exculpatory evidence regarding Johnson's honesty was suppressed, the *Stone v. Powell* bar would not apply, but contends the issue "sounds under *Brady*," not the Fourth Amendment.  (Doc 175 at 148)  However, the case cited by the Government demonstrates that a *Brady* violation is relevant to a motion to suppress under *Franks*.  *Smith v. Black,* 904 F.2d 950, 965 (5th Cir. 1990), *abrogated on other grounds, Stringer v. Black,* 503 U.S. 222, 227 (1992) (holding *Brady* claim that evidence relevant to *Franks* issue had been suppressed was not "foreclosed by *Stone*," and proceeding to determine whether non-disclosure of *Brady* material affected outcome of suppression hearing).

The opportunity for a full and fair hearing was denied for other reasons as well.  The Government points out that the magistrate judge held a suppression hearing at which Clint Johnson testified, and where he was questioned about the C.I. who supplied information for the warrant affidavit.  Doc 175 at 147.  But at this time, the identity of the C.I. was still unknown,

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    122                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

and Mr. Echols's attempts to discover his identity, his complete criminal record, and whether he was continuing to commit crimes, went nowhere when the Government objected. Johnson testified falsely that the C.I. had not been involved in dealing drugs; Sanders had a previous conviction for distribution or delivery. When a *Franks* claim was raised during trial at the conclusion of Sanders's testimony, no hearing was held, and counsel were ineffective for failing to marshal all facts bearing on Sanders's credibility. *Gamble v. State of Oklahoma,* 583 F.2d 1161, 1165 (10th Cir. 1978) (full and fair opportunity to raise Fourth Amendment issue includes a full and fair evidentiary hearing, where warranted).

The Government contends the *Franks* issue has now been waived because a number of Fourth Amendment issues were raised. Doc 175 at 147-48. However, the case cited by the Government for this argument actually supports Movant. In *United States v. Cook,* 997 F.2d 1312, 1317 (10th Cir. 1993), aside from making the uncontroversial statement that *Stone v. Powell* bars re-litigation of a Fourth Amendment claim where a full and fair hearing has been conducted, the Court remanded the case to the district Court to determine whether appellate counsel was ineffective for failing to raise certain Fourth Amendment arguments.

Obviously, *Stone v. Powell, supra* does not bar a *Franks* issue from being raised in a § 2255 motion where it is argued counsel was ineffective for failing to properly raise it in the trial court. *E.g., Kimmelman v. Morrison,* 477 U.S. 365, 38391 (1985); *United States v. Owens,* 882 F.2d 1493, 1498-1500 (10th Cir. 1989). In order to prevail on such a claim, a movant must first show that the underlying Fourth Amendment claim is meritorious. That is what Mr. Barrett has done in Ground 4.

Based on the above and what Movant has previously shown, there was no full and fair opportunity to raise the *Franks* issue at trial. The suppressed evidence and counsel's ineffectiveness in raising all grounds for *Franks* suppression that were available based on Sanders's trial testimony precluded both the procedural opportunity to raise the claim, and a full and fair evidentiary hearing.

In the alternative to its *Stone v. Powell* argument, the Government contends Mr. Barrett cannot show, and has made "no effort" to show by a preponderance of the evidence, that Johnson intentionally or recklessly included materially false information, or intentionally or recklessly omitted material information from the warrant affidavit necessary to the magistrate making an informed decision. Doc 175 at 149.

The Government simply ignores Mr. Barrett's showing in this regard, which obviously meets the preponderance of the evidence standard. The Government again parrots its claim that Sanders's credibility was not at issue, ignoring that Johnson, at a minimum, intentionally omitted material information on Sanders's lengthy criminal record, including crimes of dishonesty and continuing criminal acts, not to mention the many favors he had received from law enforcement and local prosecutors for his work as an informant. Johnson also deliberately or recklessly omitted any information -- because there was none -- that would have corroborated Sanders. *E.g., Phaneuf v. Franklin,* 448 F.3d 591, 597-99 (2nd Cir. 2006); *United States v. Bernal-Obeso,* 989 F.2d 331, 335-36 (9th Cir. 1993); *United States v. Vigeant,* 176 F.3d 565, 573 (1st Cir. 1999); *United States v. Hall,* 113 F.3d 157, 159 (9th Cir. 1997). The unadorned conclusory statement that Johnson had found the informant "reliable" on past occasions is meaningless. *E.g., United States v. Reddick,* 90 F.3d 1276, 1280-81 (7th Cir. 1996); *United States v. Miller,*

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    124                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

753 F.2d 1475, 1480 (9th Cir. 1985).  As argued in the ineffective assistance of trial counsel claim, the Government is simply wrong when it states that the credibility of the informant is irrelevant to a *Franks* question.

The magistrate thus could not make a neutral and detached finding of probable cause because all evidence respecting the awful credibility of the informant was omitted, and there was nothing to show the informant's account had been corroborated in any way.  As shown elsewhere in Movant's arguments, Johnson at the very least acted with reckless disregard for the truth because and knowingly supplied false information regarding the substantive basis for the warrant since, against the Government's arguments in response to Ground 2, Part A (1), Sanders's repudiated in his trial testimony the information Johnson relied upon to secure the warrant in the first place.

The Government argues the *Franks* claim is not affected by omission of the fact that Sheriff Philpot visited Mr. Barrett without incident approximately a month before the fatal raid. The Government claims Philpot was never there at that time; otherwise, counsel would have been so informed by Mr. Barrett.  Doc 175 at 150.  This is pure speculation and is irrelevant to Mr. Barrett's claim.  The issue is not what Mr. Barrett knew, but whether, in September, 1999, Johnson made material omissions in the search warrant affidavit for the no-knock, nighttime warrant.  Had this information been supplied to the magistrate, there would be absolutely no need for a no-knock, middle-of-the-night warrant.

The Government claims Sheriff Philpot was not at Mr. Barrett's residence a month before the raid, and that family members who attested to this are mistaken.  Doc 175 at 151.  The Government now offers a declaration from Sheriff Philpot stating that the only time he was at

Movant's cabin to inspect his weapons was in 1998.  Resp. Exh. 1.  However, Janice Sanders's and Gelene Dotson's accounts (Exhs. 85, 97, Amended Motion) are supported by Sheriff Philpot himself, according to the declaration of Rodney Floyd, who interviewed Sheriff Philpot about this subject.  Exh. 6, Amended Motion.  The Government dismisses this declaration as "hearsay," but it is Sheriff Philpot's about-face in his declaration that is suspect.  It can be inferred easily that when he spoke to Mr. Floyd, Philpot did not recognize the significance of what he was saying.  Mr. Philpot's latest statement occurred only when the significance of his statement to Mr. Floyd was brought to his attention by the Government.

Hedging its bets, the Government contends in the alternative that "even if" Sheriff Philpot visited Mr. Barrett's cabin a month before the raid, there is no reason to suppose that Johnson would have known this at the time he sought the warrant.  There was no reason for him to not know, since, as the Government states, he consulted with Sheriff Philpot about the warrant and the need to bring in the OHP Tact Team, and did not agree, at least initially, with the approach being taken by Johnson.  Doc 175 at. 151.  The Government then goes a step further, arguing that even if the month-before incident occurred, and even if Philpot informed Johnson of it, Johnson was still "sincere" in his belief that a no-knock, nighttime warrant spearheaded by the OHP SWAT team was necessary.  Johnson's alleged "sincerity" is irrelevant.  The issue is whether Johnson made false statements or omitted material information in seeking the warrant.  Again, it is clear that if the magistrate were supplied with information that a month before Johnson sought the search warrant, law enforcement had been to Mr. Barrett's property without incident, the "case" for a no-knock search warrant to be served at night due to the "danger" posed to officers by Mr. Barrett would have collapsed.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                126                *Barrett v. U.S.*, 6:09-cv-00105-JHP

Finally, the Government argues that appellate counsel was not ineffective for failing to raise the *Franks* issue on appeal because the issue is "meritless." Doc 175 at 151. The Government's arguments respecting this claim's alleged lack of merit have been conclusively refuted here and in Mr. Barrett's Amended Motion and brief in support. It is also urged that appellate counsel could not be ineffective for failing to raise arguments in support of a *Franks* claim based on extra-record evidence. This is certainly true, but Mr. Barrett never made that argument. He argues that *to the extent the issue was framed by the record*, appellate counsel were ineffective for failing to raise the issue. Brief in Support of Amended Motion at 147. At the very least, based on what was contained in the trial record, an appeal of the Court's *Franks* ruling should have been raised, coupled with a request to remand for a proper evidentiary hearing. There is a reasonable probability that had the issue been raised, the result of the appeal would have been different. *Strickland v. Washington,* 466 U.S. 668, 697 (1984). The entirety of the physical evidence which supported the charges stemmed from an illegal warrant.

Accordingly, the Government's arguments should be rejected, a proper *Franks* hearing should be conducted, and Mr. Barrett should be granted § 2255 relief.

**GROUND 5(A) and (B):** **THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY EVIDENCE AND KNOWINGLY RELIED ON FALSE TESTIMONY. NEWLY DISCOVERED EVIDENCE ALSO WARRANTS § 2255 RELIEF.**

As stated in the reply to Ground 4, the Government responds to Mr. Barrett's *Brady* claim through a false framework. In direct conflict with the applicable law, the Government seeks to unilaterally limit its *Brady* duties by arguing it had no obligation to be aware of exculpatory evidence known to or in the possession of state and local law enforcement because the DEA was

the only law enforcement agency on the prosecution's "team."  *E.g.,* Doc 175 at 160, Resp. Exh. 4 (unilateral declaration by United States Attorney's Office that DEA was the only member of the prosecutor's "investigative team").  Not only is this assertion empty as a matter of law, *Strickler v. Greene,* 527 U.S. 263, 280-81 (1999); *Kyles v. Whitley,* 514 U.S. 419, 438 (1995); *United States v. Antone,* 603 F.3d 566, 569 (5th Cir. 1979), but it is untrue in fact.  As noted in the reply to Ground 4, this case was investigated almost entirely by state and local law enforcement and the prosecution relied on local agencies heavily, extending even to its designated case agent at trial, Sheriff Philpot.  Evidence known to or in the possession of state or local law enforcement is imputed to the federal government in this case, and to argue otherwise is wholly disingenuous.

In attempting to counter Mr. Barrett's newly discovered evidence claims, the Government states that he cannot rely on Fed.R.Crim.P. 33, since at the time the issue was presented in these collateral proceedings, the period for filing a Rule 33 motion had expired.  Doc 175 at 153.  The Government also states that the standard for granting relief under Rule 33 is lower than that in a § 2255 proceeding.  Doc 175 at 153.  A newly discovered evidence claim is cognizable in a § 2255 proceeding.  *United States v. Hernandez,* 94 F.3d 606 (10th Cir. 1996). *See also, Peltier v. Booker,* 348 F.3d 888, 890 (10th Cir. 2003) (discussing previous § 2255 petition filed by Peltier premised in part on newly discovered evidence).  It is a legal basis for seeking collateral relief, and affects the due process fairness of the underlying trial.  U.S. Const. amend. V.  Additionally, the interconnectedness of the *Brady* and newly discovered evidence claims raises a Fifth Amendment due process claim, not simply a claim of "factual injustice."  Doc 175 at 153. *United States v. Quintinella,* 193 F.3d 1139, 1148 n. 9 (10th Cir. 1999).  To the extent Tenth Circuit authority recognizes the viability of newly discovered evidence issues in § 2255

proceedings, the Seventh Circuit case cited by Respondent is inapplicable. *United States v. Evans,* 224 F.3d 670, 674 (7th Cir. 2000).

<div align="center">

**1.      Charles Sanders -- *Brady,* newly discovered evidence, and false evidence.**

</div>

The Government's claim that the prosecution did not suppress Sanders's criminal history -- including records of all convictions, the numerous deals he had obviously received one time after the next preceding Mr. Barrett's trial, and his record of dismissed charges, which were obviously related to his work as an informant (despite the Government's attempt to argue this is "speculation") ignores the facts. Doc 175 at 154-55. Respondent fails to address the fact that the prosecutors permitted Sanders to testify falsely on direct examination that he had a mere four convictions, and failed to correct his false testimony on cross-examination as to the actual number of his convictions and his false denial of a Muskogee County conviction. The Department of Corrections sheet filed as an exhibit by the Government (Resp. Exh. 6) is apparently the one used by defense counsel to cross-examine Sanders, and Movant has demonstrated conclusively that it does not represent his true number of convictions, let alone his many dismissed charges and deals. Exhs. 57, 72, 157-68, 175, 183-87, Amended Motion.

Respondent maintains that the Government had no duty to disclose any of this, because it was "public record," and that Mr. Barrett, through counsel, also had access to it. This could be said of practically any witness's criminal records, but it is well-recognized that the prosecution has an affirmative duty to disclose a witnesses criminal record and other impeaching information associated with it. Relatedly, the Government has an affirmative duty to reveal the full extent of leniency a witness has received, not only in the case at bar, but in the past. A history of receiving

favorable treatment in exchange for information or testimony would tend to impeach the witness. *Crivens v. Roth,* 172 F.3d 991, 995-96 (7th Cir. 1999); *Singh v. Prunty,* 142 F.3d 1157 (9th Cir. 1998); *United States v. Hill,* 799 F. Supp. 86, 89-90 (D. Kan. 1992).

The case primarily relied upon by the Government for its argument, *United States v. Erickson,* 561 F.3d 1150, 1164-65 (10th Cir. 2009), does not support its claim.  The alleged suppressed *Brady* material in *Erickson* consisted of an audit report of the company (a private concern) that the prosecution never had, either actually or constructively under *Brady*, and another financial document that was actually made available to the defense through the prosecution's "open file" policy.  The criminal records involved here are classic *Brady* impeachment material within the control of the prosecution and its agents.  Mr. Barrett's argument that the prosecution sponsored false testimony and failed to correct false testimony given by Sanders respecting his criminal record stands unrefuted.  *Giles v. Maryland,* 386 U.S. 66, (1966); *Alcorta v. Texas,* 355 U.S. 28 (1957); *Napue v. Illinois,* 360 U.S. 254, 269 (1959).

The Government argues that it fulfilled its *Brady* duties by disclosing the only deal it had made with *Sanders*, namely, that the prosecutor would "speak to" state authorities about his cooperation, implying that there was no specific *quid pro quo* that would actually result in favorable treatment.  Doc 175 at 155-57.  The fact that Sanders received deliverance from prison, conversion of sentences to straight probation without supervision, and the rest was something that just happened at a future time, but was not set in stone or even broadly hinted at, according to the Government.  Movant submits that there was much more to the arrangement between Sanders and the Government.  Despite its semantic contortions, the Government cannot escape the fact that the favors Sanders received in Sequoyah County carried the imprimatur "per plea

agreement with feds," which, contrary to the Government's speculation, should be taken to mean what it says: that Sanders got his get out of prison card, "paperless," painless probation, and freedom from financial obligation on his cases due to an agreement, whether explicit or tacit, that preceded or was contemporaneous with his testimony.  The statement that the Government was only going to "speak with" state authorities, both in Sequoyah County and Tulsa County suggested in a misleading fashion much less than what actually transpired.  Movant asserts, and the evidence shows, this was deliberate. *United States v. Torres*, 569 F.3d 1277 (10th Cir. 2009); *Douglas v. Workman,* 560 F.3d 1156, 1186 (10th Cir. 2009).  Mr. Barrett is certainly entitled to an evidentiary hearing to test his claims.

The cases cited by the Government in alleged support of its argument that no *Brady/Giglio* error occurred in the manner Sanders's deal was handled are readily distinguishable.  Doc 175 at 156.  In *Bell v. Bell,* 512 F.3d 223, 224-25 (6th Cir. 2008), the incarcerated witness, on his own initiative, called the prosecutor asking for favors in exchange for his testimony.  The prosecutor declined, and there were no explicit or even tacit agreements entered into for any leniency whatever.  After the defendant's trial, the prosecutor wrote a letter on behalf of the witness to the parole board, which did the witness "no good" at all.  Although the witness's cooperation in the case against the defendant was mentioned, the primary reason for the letter seemed to be that because of his informant status, the witness was in danger of retaliation from other inmates and should be protected.  The witness had a separate pending criminal case, and received a beneficial plea bargain, but the disposition of that case was totally independent of the witness's involvement in Bell's case.  Thus, there was never any agreement at all, of any sort, that the witness would receive any favor for his cooperation against Bell.

*Shabazz v. Artuz,* 336 F.3d 154, 164-66 (2nd Cir. 2003) is likewise distinguishable.  The prosecution completely and forthrightly revealed the plea bargain it had entered into with one of the cooperating witnesses, which called for a certain sentence.  When the witness was sentenced, he received a lower sentence than that specified in the plea agreement.  However, this was not due to any side agreement between the witness and the prosecutor, or at the urging of the prosecutor.  The sentencing judge made a unilateral decision to impose a lower sentence than that called for by the plea agreement.  Two other witnesses were told by the prosecution there would be no promises, explicit or tacit, for their cooperation.  Because they decided to cooperate anyway, their lawyers continued their sentencing dates until after their testimony against the defendant, so the fact of their cooperation could be brought to the attention of the sentencing judge.  The witnesses were ultimately rewarded with breaks on their sentences due to their cooperation, but there was no preceding agreement of any sort that such would be the case.  In addition, the prosecutor had opposed an "own recognizance" release for one of these witnesses, but the judge authorized it anyway.

In contrast to *Bell* and *Shabazz,* the evidence shows that the prosecution here made an agreement with Sanders for leniency well beyond what was revealed to the jury -- that the prosecutor would simply "talk to" state authorities.  The Government also delayed disposition of Sanders's Tulsa County case until he testified against Mr.Barrett so his cooperation could be made known to the Court there.  This benefit was likewise not revealed to the jury.  *Shabazz, supra* (noting that delaying a witness's sentencing until after his cooperation against a defendant is a form of favor or leniency).

The Government states the prosecution did not suppress evidence of the existence of a witness who would impeach Sanders (Doc 175 at 174-75), but the transcript of the *ex parte* hearing of September 13, 2010, shows the prosecutors clearly discussing a female witness they or their agents had interviewed who denied that Mr. Barrett had threatened law enforcement.  Tr. Hr'g 9/13/05 at 11-12.  This would not only impeach Sanders, but the informant witnesses as a whole.  This impeachment evidence was clearly *Brady* material, but the identity of this witness is still unknown.

### 2. Travis Crawford -- *Brady*, newly discovered evidence, and use of false evidence.

Respondent disputes that any *Brady* evidence existed with respect to Travis Crawford. The Government alleges that Mr. Crawford's recantation (Exh. 45, Amended Motion) does not show that he was threatened and intimidated by AUSA Littlefield, but was simply told "bad things" would happen to him unless he told the truth.  Doc 175 at 162.  A fair reading of Mr. Crawford's declaration[36] shows the opposite.  Mr. Crawford was basically given a road map of what to say, backed up by threats if he decided not to play ball.  Threats against witnesses by prosecutors or Government agents constitute *Brady* material.  *United States v. Scheer,* 168 F.3d 445, 451 (11th Cir. 1999); *United States v. Hill, supra.*  This *Brady* evidence was certainly known to the Government, since it stemmed from the conduct of one of the prosecutors.  Additionally, the fact that Crawford had previously acted as an informant, which itself is *Brady*

---

[36] The Government routinely dismisses the witness declarations relevant to Mr. Barrett's *Brady*, false evidence and newly discovered evidence claims as unsworn hearsay which should be given little consideration.  But declarations of the sort used by Movant are recognized as appropriate vehicles for bringing matters to the Courts attention in § 2255 proceedings.  These declarations are now a matter of record, as the record has been expanded on this Court's order.

material was in constructive possession of the Government, because this fact was known to its agents in state law enforcement, who were unquestionably part of the prosecution team.

The Government dismisses Mr. Crawford's "unsworn" recantation as newly discovered evidence, but, again, declarations of this type are appropriate in these proceedings, and raise questions of fact which should be resolved at an evidentiary hearing.  As discussed in Mr. Barrett's opening brief, Crawford's recantation meets the legal standards for newly discovered evidence.  *United States v. Sinclair,* 109 F.3d 1527, 1531 (10th Cir. 1997).  Doc 95 at 161-62. Contrary to the Government's arguments that the statements in Mr. Crawford's declaration do not really constitute a recantation, the declaration shows that in many of its particulars and in its tone, Crawford repudiated his testimony with respect to his trial description of Mr. Barrett's demeanor, attitude, and statements on the afternoon of September 23, 1999.  *In re McDonald,* 514 F.3d 539, 542-47 (6th Cir. 2008) (credible recantation of key prosecution witness would show defendant's constitutional rights to a fair trial were violated).  The Government argues there was no reason for it to know that Crawford gave false testimony, but this is belied by the fact that he was intimidated into giving his story by AUSA Littlefield.

> ### 3.   Cindy Crawford -- *Brady*, newly discovered evidence and false evidence.

Although Ms. Crawford refused to sign a declaration attesting to the statements she made to defense investigators, the declarations of the investigators themselves put the factual matters recited there in issue, requiring an evidentiary hearing.  Crawford told the investigators she had been intimidated and threatened by AUSA Littlefield, both before trial and during her trial testimony, and that this intimidation affected and colored her testimony against Mr. Barrett.

Exhs. 14, 31, and 43, Amended Motion.  In accordance with the authority cited above, Littlefield's threats were *Brady* material that was required to be disclosed to the defense.  This is also a species of newly discovered evidence and use of false evidence, because, again, Littlefield's threats shaped Ms. Crawford's testimony and they were not revealed at trial.

Again based on its specious argument that the prosecutors could turn a blind eye to anything known by state and local law enforcement about their witnesses, the Government argues there was no need to inform the defense of Cindy Crawford's history as an informant.  Doc 175 at 167.  This argument, for the reasons and authorities already stated, should be rejected.  Equally without merit is claim that the prosecution had no duty to disclose Crawford's informant history because, according to various declarants, it was "well known" that Crawford had acted in such a capacity.  Doc 175 at 167. This does not diminish the Government's *Brady* obligations.

The Government suppressed impeaching evidence that at the time of Mr. Barrett's trial, Cindy Crawford was in violation of a deferred sentence and thus had a motive to curry favor with Government authorities, particularly prosecutors.  A sufficient factual question has also been raised as to whether she received favor as a result of her testimony, since her problems with the deferred sentence disappeared after Mr. Barrett's trial.

### 4. Brandie Zane Price -- *Brady*, newly discovered evidence, and false evidence.

The Government contends Mr. Barrett engages in speculation when he argues the prosecution knew or should have known that Price was engaged in drug activities at the time of Mr. Barrett's trial.  Doc 175 at 168-69.  The fact she was charged in a federal drug indictment involving acts occurring, at the latest, shortly after Mr. Barrett's trial raises the inference of

Movant's Reply to USA' Response
to Second Amended § 2255 Motion

135

*Barrett v. U.S.*, 6:09-cv-00105-JHP

571

earlier drug activity and knowledge on the part of the Government that, contrary to her trial testimony, she was involved in drug activities at the time of Mr. Barrett's trial.  In her federal drug case, she received a significant sentencing break not due to the facts of that case, including any cooperation she might have given, but due to her testimony in Mr. Barrett's totally unrelated case.

### 5.  Karen Real -- *Brady,* newly discovered evidence, and false evidence.

As with its argument respecting the leniency Charles Sanders received following his testimony, the Government argues the prosecutors fully revealed Karen Real's expectations of leniency, but this is incorrect.  Doc 175 at 169-72.  The prosecutors soft-peddled the lengths they were willing to go in exchange for her testimony against Mr. Barrett by allowing Real to state that the only thing she had been promised was that the prosecutor would tell her judge she cooperated, that it would be up to the Court as to whether she would actually receive any leniency for her cooperation, and that she was not really expecting to get anything.  The Government comes close to conceding, but does not, that this exchange misrepresented the true nature of the consideration she was being given in exchange for her testimony against Movant.  Doc 175 at 170-71.  The Government should concede the point.  The prosecutors did not just "talk to" Real's sentencing judge, they filed a Rule 35 motion and strongly recommended that she be given a *substantial* reduction in sentence.  Thus, the Government's claim that "no ... particular reduction" was recommended by the Government is untrue.  The "substantial reduction" affirmatively sought by the Government  materialized when Real's sentence was reduced to time served.   The prosecutors clearly concealed the deal they had with Karen Real, and cannot hide behind the claim that so long as a vague assurance is made, acted on only after trial, no *Brady* or

571

*Giglio* violation occurred.  The misleading spin placed on what the prosecutors were prepared to do for Real also constituted the sponsorship of materially false evidence.  Real's deal is also newly discovered evidence, because it was consummated after Mr. Barrett's trial.  For the reasons stated in the above discussion of the undisclosed deal given to Charles Sanders, the Government's reliance on *Bell v. Bell, supra* and *Shabazz v. Artuz, supra* to turn back a *Brady/Giglio* attack with respect to Karen Real fails.

The prosecution also suppressed *Brady* evidence when it failed to disclose that a number of state drug charges had been dismissed against Real.  Doc 175 at 172.  Exh. 47-52, Amended Motion.  Mr. Barrett showed in his reply to Ground 2(5) that issues concerning Real's dismissed state charges do not constitute time-barred "new issues," but merely amplify or clarify issues already raised.  The Government's argument that an Oklahoma state statute absolutely barred her prosecution in state Court because she had been charged in federal court was also shown to be without merit.  The dismissed state charges gave Real a motive to please the federal prosecutors in Mr. Barrett's case lest they possibly be revived if she displeased the Government.  The authority cited above in relation to the suppression of Charles Sanders's criminal records applies equally here.  The Government's argument that there was no reason for the prosecution to know about these charges due the supposed "Chinese wall" between federal and state authorities has no merit for reasons already stated, and is especially unconvincing because Real was prosecuted federally in the Eastern District.  The prosecutors were obviously aware of her state charges.

6.     **Randy Turman --** *Brady,* **newly discovered evidence, and false evidence.**

The Government argues that the prosecution committed no violations with respect to Randy Turman's pending Sequoyah County drug case because defense counsel were aware of that case and cross-examined Turman about it.  Doc 175 at 173.  The evidence indicates Turman was working as an informant, which is the only reasonable explanation for why his case lay fallow for years.  Turman's informant status was not revealed to the defense.  When Turman falsely denied that his multi-count felony drug case was still ongoing, despite counsel's ineffective attempt to establish this, the Government sat idly by, allowing Turman to perjure himself.

Newly discovered evidence raises the factual issue of whether Turman was acting as an informant and was given an explicit or tacit assurance that his testimony against Mr. Barrett would lead to favorable resolution of the witness's case, which is what occurred since it was dismissed outright after no action for a significant period of time.  As reflected in comments made by the prosecutors during the September 13 *ex parte* hearing, the Government was especially solicitous of Turman's plight.  The Government told the Court that Turman feared physical retaliation from drug dealers due to his cooperation, one of whom was involved in the Karen Real federal drug case and was currently imprisoned.  Tr. Hr'g 9/13/05 at 13-14.

7.     **Law enforcement witnesses.**

In his reply to Ground 4, Mr. Barrett discussed the suppression of *Brady* evidence relating to Clint Johnson.  That analysis and argument applies equally here.  It is clear that since Johnson was an important prosecution witness and part of the Government's team, the prosecution knew or should have known of the ongoing corruption investigation into him.  The self-serving

declaration of the Oklahoma Assistant Attorney General who utilized Johnson as the star witness in the failed prosecution of Richard Gray is entitled to little, if any credence.  The Government's argument that much of the evidence relied upon by Mr. Barrett to show Johnson's corruption in office was developed after Mr. Barrett's trial does it no good, because the investigation leading to Johnson's firing from the District 27 Drug Task Force, which occurred shortly after the conclusion of Mr. Barrett's trial, was ongoing.  Any post-trial evidence bearing on Johnson's honesty, which is critical in assessing the credibility of his trial testimony and, particularly, the validity of the no-knock search warrant, constitutes newly discovered evidence under the authority cited in Movant's opening brief and above.

The Government argues Johnson testified truthfully at Mr. Barrett's suppression hearing regarding the then-anonymous C.I.'s involvement with drugs, but the record disputes this.  Doc 175 at 179.  Johnson denied the C.I. was a drug dealer or had been involved in dealing drugs, stating only there was evidence of "some" drug use on the C.I.'s part.  Tr. Hr'g 1/26/05 at 92.  The prosecution suppressed evidence to the contrary, and permitted Johnson to testify falsely.

A disputed factual issue has been raised respecting Sheriff Philpot's uneventful visit to Mr. Barrett's property approximately a month before the raid.  As noted elsewhere in this reply, Sheriff Philpot's current denial that such an incident occurred is entitled to little credence because it is made in the context of an earlier admission that the event in fact took place, and he is now forced to backtrack only because the significance of his earlier admission has been brought to his attention by the Government.  Even aside from Mr. Barrett's *Brady* claim respecting this evidence, it is readily apparent that the Government sponsored false testimony, since this event

itself disproves the theory that Mr. Barrett was a danger to law enforcement, and had to be approached in the way he was in the early morning hours of September 24, 1999.

Former AUSA Mike Littlefield's child abuse case, and the facts surrounding it, constitutes both *Brady* material and newly discovered evidence. Littlefield's abuse of his children was ongoing at the time of Mr. Barrett's trial, as indicated by the search warrant affidavit for his residence. Exh. 189, Amended Motion. Littlefield's abusive conduct is plainly relevant to Mr. Barrett's claim that he used his authority to bully and intimidate witnesses. The Government argues that this evidence would have been inadmissible at trial under Fed.R.Evid. 404(b), but this is not correct. Evidence of Littlefield's pattern of intimidation was relevant to show his motive, intent, and "common scheme and plan" toward those over whom he had authority. *E.g., United States v. Caldwell,* 560 F.3d 1214, 1217, 1220 (10th Cir. 2009). Although, to be sure, the evidence would have been prejudicial to the Government's case, it would not have been *unfairly* prejudicial. Fed.R.Evid. 403.

### 8.    Conclusion.

In assessing *Brady* error, the Court must consider the effect of the suppressed evidence cumulatively, not item by item. *Kyles,* 514 U.S. at 436. The prosecution's repeated suppression of exculpatory evidence, use of false evidence, and the newly discovered evidence bearing on both entitle Mr. Barrett to relief from his convictions and sentences. Because the suppressed evidence, false evidence and newly discovered evidence would have undercut the entire basis for the prosecution's theory of the case, there is at the very least a reasonable probability that the outcome of trial would have been different absent to prosecution's constitutional violations. *See*

*United States v. Bagley,* 473 U.S. 667, 682 (1985); *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994), and the other cases cited in Mr. Barrett's opening brief.  Doc 95 at 149-65.

### C.    The Prosecution Interfered with the Defense's Right to Interview Witnesses.

The Government's claim that this issue was decided on appeal, misapprehends which issue is actually before the Court.  Admittedly, a claim that the late disclosure by the Government of the identities of seven "snitch" witnesses violated the statutory requirement for disclosure and was prosecutorial misconduct was raised.  *See* Appellant's Brief on Appeal at 65-89; Further, the issue of the timeliness of that disclosure under 18 U.S.C. §3432 was resolved on appeal. *United States v. Barrett*, 496 F.3d at 1116.

The issue now before the Court, however, is not the timeliness of the disclosure.  The factual background of that interference does indeed include the untimely disclosure, but the error in question is the Government's interference with, and misrepresentation to, the witnesses that they could not talk with the defense or that any contact by the defense had to occur under the watchful eye of the prosecution.  *See* Doc 95 at 310-314; Doc 149 at 165-168.  The claim rests on extra-record, newly discovered evidence which could not have been raised on appeal and is appropriately brought under Section 2255.  *Massaro v. United States*, 538 U.S. 500, 505 (2003).

The conduct by the prosecutor in insisting that the witnesses be interviewed at his office was an unreasonable interference with the defense.  *See e.g.,* Exh. 91, (Doc 70) (Declaration of Roger Crawford regarding statements made by Travis Crawford that his testimony was the result of fear and intimidation of Government agents); Exh. 31 (Doc 70) (Declaration of Investigator regarding statements made by Travis Crawford that he felt fear and intimidation through Philpot and Littlefield); Exh. 43 (Declaration of Investigator that Karen Real was told not to speak to the

defense.)  *See also* section B hereinabove; Ground 2(A)(15) above.  Without addressing the direct statement by Ms. Real that she was expressly told not to speak to the defense, the Government does concede Ms. Crawford's belief that she could not speak to them which the Government downplays as being the witness' "subjective interpretation."  Doc 175 at 188.  By that concession alone (and the lack of any denial regarding Ms. Real), Mr. Barrett is entitled to further discovery and an evidentiary hearing.  The discovery process including the right to depose the critical witnesses and an evidentiary hearing which should be held will undoubtedly lead to additional evidence to support this claim.

The Government's argument that "simply put, Barrett fails to show that any foregone interview with Cindy Crawford would likely led to his acquittal,"  Doc 175 at 189, again misstates the prejudice requirement.  Here Mr. Barrett was denied a fair opportunity to interview the witnesses which "elemental fairness and due process require that he have." *Gregory v. United States,* 369 F. 2d 185, 188 (D.C. Cir. 1966).  Mr. Barrett is entitled to a new trial or, at a minimum, the right to full discovery and an evidentiary hearing on the issue.

**D.      Mr. Barrett Was Prejudiced by the Prosecutors' Misconduct During Trial.**

During both the guilt and penalty phases of the trial, the prosecutors blatantly interposed improper questions designed to imply falsehoods or bolster the credibility of witnesses.  Additionally, the prosecutors made egregious, inflammatory statements during closing arguments.  The overall effect of these questions and comments so infected that trial that Mr. Barrett was denied due process of law.  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  The Government argues that Mr. Barrett procedurally defaulted this claim and beyond that, the

Government valiantly attempts to twist the prosecutors' inflammatory behavior into some semblance of reasonableness.

### 1. Mr. Barrett's claim is subject to collateral review.

Prosecutorial misconduct was not raised on direct appeal. However, Mr. Barrett can establish constitutionally-cognizable ineffectiveness based on the fact that the misconduct of the prosecutors in both stages of trial was so glaring, no reasonable strategy excused their failure to raise the claim. Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different. *Evittts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984). This claim has not been procedurally defaulted.

### 2. The prosecutors improperly questioned the witnesses.

There are numerous examples of the prosecutors' improper questioning of witnesses, as set forth in Mr. Barrett's Amended § 2255 Motion and Brief in Support. These include: 1) asking questions for which there was no good faith basis, or which were beyond the personal knowledge of the witness; 2) implying, through such questioning, that the prosecutor personally had knowledge of facts not testified to by the witnesses, making the prosecutor, in effect, a testifying witness; 3) commenting on Mr. Barrett's exercise of his trial rights, as if he were somehow doing something wrong by demanding his constitutional right to a trial; 4) asking witnesses whether other witnesses had made false statements, when, again, such would be beyond the knowledge of the witness being examined; 5) utilizing questions as a form of closing argument by repeating, over and over, the testimony of the informant and other witnesses, thus in effect vouching for the testimony of the witnesses. For each of the examples in each of these categories, the

Government goes to great lengths in an attempt to explain the prosecutors' supposedly legitimate

reasons for the challenged questioning.  The Government's convoluted explanations fall woefully

short.

For example, Mr. Barrett challenges the prosecutors' line of questioning regarding his

right to go to trial.  In questioning Deputy Court Clerk Maudeen Vann, Prosecutor Littlefield

engaged in the following:

> Q.   In regards to the felony information about which you've testified for the homicide of David Eales, Mr. Barrett didn't plead guilty, did he, ma'am?
>
> A.   No, sir.
>
> Q.   Put the government to the task of proving its case, didn't he?
>
> A.   Yes, sir.
>
> Q.   And ultimately Mr. Barrett was convicted of manslaughter and given a year sentence in that case?
>
> A.   Yes, sir.

(Tr. 4765.)

The Government contends that the point of this questioning was somehow tied to later

testimony indicating that Mr. Barrett's state manslaughter conviction was based on different

evidence than that presented by the Government in this case.  Doc 175 at 198.  This argument

defies logic.  There is no connection between Mr. Barrett's plea of not guilty and the evidence

presented in his state trial.  The Government is reaching -- albeit feebly -- to explain its

inappropriate questioning.  Prosecutors commit misconduct if they imply that the defendant

somehow abuses the legal system by exercising his Sixth Amendment right to trial.  *See*

*Cunningham v. Zent*, 928 F.2d 1006, 1019 (11th Cir. 1991).  That's exactly what the prosecutor was attempting to do here.

> **3.      The prosecutors were especially egregious in arguing that the jury should impose a death sentence.**

The examples of prosecutorial misconduct in the penalty phase closing argument are numerous and set out in full in Mr. Barrett's Second Amended § 2255 Motion and Brief in Support.  Again, the Government unsuccessfully tries to find justification for the prosecutors' outrageous statements.

The prosecutors made unsubstantiated and inflammatory statements about Mr. Barrett's alleged lack of remorse, such as "There's no proof that Defendant lost one wink of sleep over what he did.  It's almost like nothing happened . . . You know it's almost a oops."  Tr. 5419.  This is complete speculation on the part of the prosecutors, only meant to inflame the jury.  The prosecutors continually pushed the bounds of reasonableness, arguing that it was only the "hand of God" that prevented Mr. Barrett from being a multiple murderer and that this was "way over the capital murder line."  R at5402-03.  Amazingly, the prosecutors told the jury that Mr. Barrett not only had no right to leniency, but really had no right to "fairness."  R at 5408.  It only gets worse.  Prosecutors told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation.  R at 5412.  Speculating outside the record simply to prejudice the jury, prosecutors said that if given life, Mr. Barrett would be a "hero" to his fellow inmates.  R at 5412.  Inflammatory phrases without any evidentiary support were continually used, such as "executioner of the innocent," how unjust was it that Mr. Barrett wanted to "choose his

sentence," Mr. Barrett wanted "the thrill of the kill," (R at 5412-13), and Mr. Barrett "slaughtered an innocent soldier of the law." R at 5423.

And yet again, the Government tries to rationalize this hyperbole. For example, in support of its statement to not let Mr. Barrett be made a "hero" to his fellow inmates, the Government argues that there was "substantial evidence adduced upon which the jurors could have made the inferential leap suggested by the prosecutor." Doc 175 at 206. This substantial evidence pointed out by the Government included the fact that Mr. Barrett allegedly exerted control over other inmates, that he allegedly threatened a guard and, "as a general matter, that prisoners harbored great animosity for inmates who cooperated with law enforcement." Doc 175 at 206. First, the Government exaggerates the "substantial evidence." Mr. Barrett's alleged control over other inmates was actually the fact that he had been incarcerated in that particular location the longest. R at 5234. The alleged threat Mr. Barrett made to a guard was hearsay evidence that Mr. Barrett used some "cuss words" when a television set was removed from his cell and told a guard "he would get him when he got out." R at 5252. Accepting even these exaggerated facts, this is much more than the inferential leap the Government suggests; it's an intergalactic flight to get from those facts to the inference that "prison inmates would look with favor upon someone who murdered a police officer," and "jurors could be expected to understand prisoners' tendency to identify, as incarcerated felons, against a common social adversary, law enforcement." Doc 175 at 206. This "inference" is so ludicrous it does not even warrant a response. It simply goes without saying that the prosecutor's statement most assuredly did not rely on facts adduced in the record. *See Duckett v. Mullin*, F.3d 982, 992 (10th Cir. 2002); *Le v. Mullin*, F.3d 1002, 1014-15 (10th Cir. 2002).

The prosecutors further improperly aligned themselves with the jury by the use of first person pronouns during their argument. The Government admits that "the prosecutor's use of the first-person was ill-advised," but contends that the argument did not confuse the jury so Mr. Barrett was not prejudiced. The Government attempts to distinguish *Cargyle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003), in support of its argument but in so doing, misstates the holding of *Cargyle*. The Government contends that in *Cargyle*, the prosecutor offended the defendant's rights because "it urged the jury to return a death verdict to avoid rendering moot the efforts of the police and prosecution. As such, it implied that the jury bore some duty, or at least allegiance to the government." Doc 175 at 214-15. In *Cargyle*, the offending language contained some of the sentiment the Government cites. However, Cargyle held:

> We agree with the district court that "[t]his is an extremely improper argument" because "it profoundly misleads the jury" about its role in the criminal process "by suggesting that jurors are part of 'the team' of the prosecution and police, rather than impartial arbiters between the State and the defendant." The Supreme Court has stressed repeatedly "that the jury must not be misled regarding the role it plays in the sentencing decision." *Romano v. Oklahoma*, 512 U.S. 1, 8, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (following *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)); *see also Young*, 470 U.S. at 18, 105 S.Ct. 1038 (holding prosecutor's effort "to exhort the jury 'to do its job' ... has no place in the administration of justice").

317 F.3d at 1223. Thus, *Cargyle* stands for the proposition that it is prejudicial for a prosecutor to suggest that jurors are part of the prosecution team.

That is exactly what happened in Mr. Barrett's case. The prosecutor stated:

> Remember the real victims. It is not our job here to forgive. We are not the victims of the Defendant's brutality. It's not our job to feel guilty. The murderer who mercilessly killed in this case as a matter of conscious, premeditation and planning ought to feel guilt and remorse but he doesn't. He is the one who put us all here. What a sense of power he must feel, the narcissistic, selfish collection of reality that he is. He's the one that put us all here.

But we must not refuse to do our duty just because we can't make the victim's family or friends or community whole.

Tr. 5421-22.  The prosecutor was attempting to make the jurors feel a part of the prosecution team, i.e., "our job, " "put us all here," "our duty," and "we can't make the victim's ... whole." Mr. Barrett's case is directly on point with *Cargyle.*

**GROUND 7:  THE USE OF THE ELECTRIC SHOCK DEVICE WITHOUT GOOD CAUSE WAS ERROR.**

**A.     The September 13th Finding Made Clear the Court Permitted the Electric Shock Device Because it Was a Capital Case.**

The Government complains that Mr. Barrett "attempts to demonstrate that the Court relied on an improper rationale because it made a non-dispositive statement *after* issuing its ruling."  Doc 175 at 222.  On September 13, 2005, the Government sought to do precisely what it is now trying to do: to bootstrap the grant of leave by the Court to the U.S. Marshal to use an electric shock device or  "stun belt" during the trial into a finding by the Court that Mr. Barrett was "dangerous."  Thus, on the 13th of September the Government argued that the Court's order regarding the "stun belt" supported the Government's request to be relieved of its duty to timely disclose six previously unidentified witnesses and one previously unused witness.  The Court advised the Government that "probably in any capital case where [he] was the presiding judge a stun belt would be used just because of the nature of the potential punishment." Tr Hrg at 9/13/05 at 13.  That finding by the Court was a specific affirmation of the prior finding and rejection of the premise of the Government's argument here.

**B.      The Order Permitting Use of the Device Did Not Comply with Due Process.**

The Government's assertion that the claim "ignores the Court's reasoning as articulated in the Order" is simply not accurate. Doc 175 at 222. The Court's September 13th conclusion that the use of a "stun belt" in a capital case was just "common sense" was a cogent summary of the Court's September 6th Order. Tr Hrg 9/13/05 at 13.

**1.      The hearing on the issue did not support the court's conclusion.**

It is true that the Court held a hearing and entered an Order regarding the use of the electric shock device during the trial. Tr Hrg at 8/31/05; Order at 9/6/05. It is not true, however, despite the Government's insistence otherwise, that the Court found that "the belt was employed to thwart a potential security risk, rather than mere disruptions," or that "its use reflects an entirely appropriate exercise of the Court's discretion." Doc 175 at 222. *See* Order, 9/6/05. The Court's order was not an exercise of discretion, but rather an abdication of its responsibility to exercise discretion; a matter made clear by both the Order itself, and the Court's clear articulation of the basis at the September 13th hearing.

While the Court Order notes the testimony of the deputy U.S. Marshal, it made no findings regarding credibility or the conclusions regarding the facts. For instance, as the Government notes, Deputy U.S. Marshal Louisia Murrow testified that she saw Mr. Barrett attempting to tamper with his handcuffs, turning his back on the security camera at one point. The deputy also testifies, however, that she believes the electric shock device is necessary because it is a death penalty case and she thinks they should be used in every death penalty case. Tr Hrg 8/31/05 at 39 *ll* ll-12. Murrow also testified, however, that handcuffs can cause irritation if too tight, and then acknowledged that Mr. Barrett's wrists showed signs of redness and

irritation. Tr Hrg 8/31/05 at 43, *ll* 1-20.  She also acknowledged that Mr. Barrett was locked in a cell block at the time she observed him "tampering" with the handcuffs and that she had no information that he was an escape risk. Tr Hrg 8/31/05 at 44 *ll* 5-17.  Nor in the eleven months in which the U.S. Marshal's Office had custody of Mr. Barrett and transported him past numerous "avenues" of escape had she observed Mr. Barrett make any action suggesting an escape.  Tr Hrg 8/31/05 at 48, *ll* 8-10.  Murrow admitted she was not aware of any violent actions by Mr. Barrett in either of his two state trials, both of which had been capital trials.  Tr Hrg 8/31/05 at 45 *ll* 16-21.  Beyond that Murrow testified that there was already increased security in the presence of two additional deputy marshals in the courtroom, making a total of four simply because it was a death penalty case.  Tr Hrg 8/31/05 at 44.  Indeed, the testimony showed a lack of concern for security specific to Mr. Barrett by permitting the Sheriff's deputies to take him to the doctor at which time he was unhandcuffed and unshackled.  Tr Hrg 8/31/05 at 49.  Though the deputy marshal speculated that Mr. Barrett "is thinking in his mind possibly of escaping somewhere else," she confirmed that there was nothing to show that he "tried to do anything to escape from a courtroom."  Tr Hrg 8/31/05 at 52 *ll* 10-12, 13-16.  Murrow testified that the three reasons to put restraints on Mr. Barrett were that it's a death penalty case, "that he looked around the sallyport" and "that he fiddled with his handcuffs."  Tr Hrg 8/31/05 at 53.

The Court's "statement of facts" identifies the testimony and argument received but makes no specific fact-finding based on the testimony.  Order,  9/6/05.  Indeed, the Court notes the defendant's argument as well.  *See* Order, 9/6/05 at 5-6.

> On August 30, 2005, the defendant through counsel, filed a brief objecting to the **use of any type of restraint** during the upcoming trial (docket No. 173).  The defendant argues he has not previously attempted to escape or exhibited any non-compliant behavior while

in custody of the United States Marshal.  Additionally, the defendant argues there has been no violence exhibited by the defendant, either in front of the Court or defense counsel.  Finally, the defendant argues, despite the facts recited above and the allegations currently lodged against him, because he was not restrained by Sequoyah County deputies during his state proceedings, he does not pose an increased risk of danger before this Court such that he needs to be restrained in any way in his upcoming trial herein.

Order, 9/6/05 (emphasis in original).  Nothing in the factual recitations which preceded or followed or the Court's ultimate conclusions refuted those statements.  *See* Order, 9/6/05 at 15.

### 2.     The electric shock device was not "preferable" to other security measures.

While the Court finds that the "use of the stun belt preferable to the use of other security measures, "including additional Marshals within the courtroom, leg irons, leg shackles, or the use of weapons other than the stun belt to subdue the defendant in the event of behavior posing a risk to courtroom security" (Order, 9/6/05 at 19), it makes no finding that any additional security is actually *necessary* at all.  Other than the fact of the capital charges pending against Mr. Barrett, there is nothing in the Court's findings which suggest additional security is necessary.  Indeed, the Court specifically finds "if the stun belt" is not used, additional Marshals would have to be present and the Court "***might*** entertain the possibility of using leg irons on the defendant, at a minimum while being transported to and from the courtroom".  Order 9/5/05 at 18.   (Emphasis added.)  If the Court could not say that leg irons would be required if there were no electric shock device, there was no actual finding of a security risk.  The Court's finding that the electric shock device was "preferable" to additional marshals does not support the finding that the use of an electric shock device was appropriate since additional marshals were already employed. Tr Hrg 8/31/10 at 44 *ll* 18-22.

Beyond that, the Court's finding that the electric shock device was "preferable" to additional personnel is simply not supported in law.  9/6/05 Order at 19.  In *Holbrook v. Flynn*, 475 U.S. 560, 568-69(1986), Justice Thurgood Marshal speaking for a unanimous Supreme Court found that the "conspicuous or at least noticeable deployment of security personnel in a courtroom during trial is [not] the sort of inherently prejudicial practice that, like shackling should be permitted only where justified by an essential state interest specific to each trial."  Similarly, the Tenth Circuit has found that the electric shock device raises the same concerns as shackling or other physical restraints.  *United States v. Wardell,* 591 F. 3d 1279, 1294 (10th Cir. 2009) (finding no violation of due process in the use of the stun belt where the Court made a defendant-specific determination of necessity including two prior convictions for escape-related crimes).  The Court's finding here that the electric shock device was *less* intrusive than additional security personnel or shackling was legally incorrect.

The Court failed to appreciate that the electric shock device, is in fact, more intrusive and "far more likely to have an impact on a defendant's trial strategy than are shackles, as a belt may interfere with the defendant's ability to direct his own defense."  *U.S. v. Durham*, 287 F. 3d 1297, 1306 (11th Cir 2002).  In this case, defense counsel explained that the prejudice from the interference with the ability to participate in the proceedings was greater than in the ordinary case.  Tr Hrg 8/31/05 at 95 ("[A]ny kind of inhibition that is placed on Mr. Barrett to freely be able to converse and talk to us is very crucial because again, while this is so different -- Mr. Barrett knows more about this case, knows more about the testimony in this case than anybody here because he has been involved in two trials.")  The anxiety induced by the belt recognized in *Durham* is substantially compounded by Mr. Barrett's prior beatings by law enforcement and his

fear that the metal in his chest from a prior attempted suicide would create a lethal force through use of the shock device.

### 3.    The September 6th Order does not comply with *Deck v. Missouri*.

The September 6th Court Order following the August 31st hearing made no finding that Mr. Barrett was dangerous, an escape risk, threatening or likely to cause any security problems. Order, 9/6/05 at 1-12.  The Order, therefore, does not comply with *Deck v. Missouri,* 544 U.S. 622, 632 (2005).  The Court's reliance on the fact that the U.S. Marshal used the electric shock device in two prior capital cases in the district supports the Court's later statement that it was just "common sense" to order it in a capital case, Tr Hrg 9/13/05 at 13, and illustrates the lack of defendant-specific findings.  The failure to address the specific issues raised by the defense including the interference with Mr. Barrett's ability to fully participate in the defense and communicate with counsel, as well as, the numerous courtroom appearances, in both state and federal court, without disruption illustrates the lack of individualized determination required in *Deck*, 544 U.S. at 642.

### C.    Compelling Mr. Barrett to Wear the Electric Shock Device Was Prejudicial.

As argued in the opening brief, because of the deficiencies in the Court's Order, prejudice is presumed.  Beyond the presumption, the evidence on this record shows clear prejudice to Mr. Barrett.

### 1.    The electric shock device was visible and undermined the presumption of innocence.

The Order further relies on a finding that the electric shock device will preserve the "presumption of innocence" based on a ***belief*** that it was ***not likely*** jury will not see the electric

shock device.  Order, 16, 19 (emphasis added).  The Court's obligation was to require the Government to *prove* that the jury would not be able to see the belt.  Absent a ***finding*** by the Court that the jury could not see the two inch bulge the belt caused, the "presumption of innocence" was not preserved.  Mr. Barrett has shown that the Court's belief was not well founded by Doris Barrett's declaration that she could see the bulge from the gallery.  Contrary to the Government's claim that the visibility from the gallery is irrelevant, the record establishes the likelihood that the jury observed the bulge.  If seen, the belt 'may be even more prejudicial than handcuffs or leg irons because it implies that unique force is necessary to control the defendant.'" *U.S. v. Durham*, 287 F. 3d 1297, 1305 (11th Cir. 2002) *quoting State v. Flieger,* 955 P.2d 872, 874 (Wash. 1988).  Had the Court not recognized the visibility of the bulge and the prejudice it would cause, it would not have ordered Mr. Barrett be escorted in and out of the courtroom outside the presence of the jurors "in an effort to minimize the prejudice to the defendant." Order at17. (Emphasis added.)

> **2.      The Court did not consider the impact on Movant's ability to assist his counsel.**

Defense counsel specifically argued that the electric shock device would adversely affect Mr. Barrett's ability to communicate and assist counsel was essential to his defense.  Tr Hrg 8/31/05 at 95-96.  The Court makes no mention in its findings of the defense-interference the device could create.

> **3.      Mr. Barrett renewed his objection on September 9, 2005.**

The Government misstates the record when it argues that Barrett only aired the concerns with use of the electric shock device as a result of "metal implanted in his torso" "not by way of

objection, but by a post-ruling question." Doc 175 at 223. Mr. Barrett's counsel specifically renewed the objection to the use of the electric shock device as a result of the free-floating metal implants. Tr hrg 9/9/05 at 27. ("We are – you know--*renew our objection* to the stun– use of the stun belt.") (Emphasis added.) The specific objection was that Mr. Hilfiger understood "[t]hat there would be an examination to determine if there was any medical problems that the stun belt may effect him on." The Government's response was that it was confident that the marshal's service can address this area of concern. The Court directed the marshal to "address it and report to [the court], a copy of which [he would] provide to counsel." Tr hrg 9/9/05 at 28. No such report was made available to Court or counsel. The failure to rule on the renewed objection to the use of the electric shock device in light of Mr. Barrett's specific physical and psychological health was error. While the failure to pursue the ruling was ineffectiveness of trial counsel, it was error for the Court not to insist that his orders be followed and the ensuing reports made available to him for consideration of the objection.

#### D.     The Claim is Properly Reviewed in Collateral Proceedings.

The Government contends that the issue has been procedurally defaulted relying on the general rule that claims not raised on direct appeal may not be raised on collateral review unless the movant shows cause and prejudice. *United States v. Frady*, 456 U.S.152, 167-68 (1982). Doc 175 at 219. Mr. Barrett's medical history including the floating bullet fragments and Mr. Barrett's mental illnesses, as well as at least two prior physical beatings by law enforcement, the factual basis of which were not developed at the hearing, raise special concerns regarding the Court's deferral to the United States Marshal's office in the decision to compel Mr. Barrett to wear a electric shock device. *See* Exhs. 89 ¶66 at 24 ("His disabilities would be further

exacerbated under conditions of [] highly stressful situations."); 117 ¶74 at 26 (Persons, like Mr. Barrett, suffering from Post Traumatic Stress Disorder, are more likely to experience a more severe acute emotional reaction," including emotions such as fear, anxiety"); ¶79 at 27 ("Mr. Barrett's reactivated Post Traumatic Stress Disorder had built-in reminders, namely the bullet fragments that continued to cause him significant pain[.]). Notwithstanding the Court's finding that there was no substantial risk of accidental discharge, the record is clear that there was a risk, a risk which, because of his physical condition and prior experience with law enforcement officials, would necessarily induce significant fear and agitation in Mr. Barrett and negatively affect his ability to freely confer with counsel and participate in his defense.

Unconstitutional restraints during trial are generally considered an issue which should be brought on direct appeal. Given the significant development of the issue in this case, it was ineffective assistance of appellate counsel not to raise the issue on appeal. Nonetheless, additional extra-record evidence was reasonably necessary to fully understand the impact of the electric shock device on this particular defendant makes consideration of the substantive constitutional issues in collateral proceedings appropriate. *See Massaro v. U.S.,* 538 U.S. 500, (2003) (failure to raise trial counsel's failure to take offer of continuance on late disclosure which rested *in toto* on record evidence was not procedurally defaulted and could be properly presented in a § 2255 motion.) "The procedural-default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments." *Massaro v. U.S.,* 538 U.S. at 506. In this case, however, requiring Mr. Barrett to bring the constitutional claims related to the Court's permission to the Government to utilize a "weapon" of their choice to satisfy the

speculative and unsubstantiated concerns regarding Mr. Barrett's behavior on direct appeal, where additional extra-record evidence significantly strengthens the claim, does not promote these objectives.  Mr. Barrett's electric-shock-device-related claims should be permitted in a collateral proceeding under §2255, whether or not he could have raised the due process and eighth amendment claims on direct appeal.  *See Massaro v. U.S.,* 538 U.S. at 506.

In this case, without additional factual development including the visibility and, more importantly, the impact of the electric shock device on Mr. Barrett as a result of his psychological and mental health exacerbated by a history of abuse by law enforcement, the appellate court may not have been able "to ascertain whether the alleged error was prejudicial." *Id.*  Presentation of the claim on appeal would have resulted in a duplication of time and a waste of resources and ultimately been an inefficient way to present the issues, ...unnecessarily burden[ing] both the parties and the court . . .".  *United States v. Galloway*, 56 F. 3d 1239, 1241(10th Cir. 1955).

The substantive due process issue arising from the electric shock device is properly before the Court on collateral review.

In any event, the issue is properly before the Court as substantive constitutional violations caused by the ineffective assistance of counsel at trial and on appeal.  *Massaro v. U.S.,* 538 U.S. at 506.  Even if the Court finds the question of the electric shock device as an unnecessary security measure should have been brought on appeal, Mr. Barrett alleges the failure of its presence on appeal as ineffective assistance of counsel at both trial and appeal.  To the extent that the record supports a finding of a due process violation, the failure to raise it on appeal fell below the prevailing professional norms and was objectively unreasonable under *Strickland,*, 466 U.S.

at 687.  These ineffectiveness claims establish cause and prejudice for the due process claim as well as serving as independent claims for relief.  *See also,* Ground 18 hereinbelow.

There was no adequate security reason to permit the U.S. Marshal to restrain Mr. Barrett with the threat of electric shock in a manner visible to the jury and destructive of Mr. Barrett's ability to communicate with his counsel and participate in his defense.  He is entitled to a new trial.

## GROUND 8:  MR. BARRETT HAD A CONSTITUTIONAL RIGHT NOT TO BE TRIED WHILE INCOMPETENT.

The Government overstates its evidentiary support of its three arguments in opposition to Mr. Barrett's substantive due process claim that he was incompetent during trial:  1.) The Motion to Vacate does not present "clear and convincing evidence" of incompetency; 2.)  That the opinions of Mr. Barrett's mental health experts are speculative and do not constitute clear and convincing evidence of incompetence; and, 3.)  Mr. Barrett's trial counsel's declarations contradict and defeat the claim.  The Government overstates its evidentiary support for each argument.  While the Government's concerns are relevant to the ultimate determination of the claim on the merits, they are neither controlling nor grounds for summary  dismissal.

**A.      This Court must Hold an Evidentiary Hearing on the Issue of Incompetency.**

The Government relies on the standard of proof set out in *Battle v. United States,* 419 F. 3d 1292, 1298-99 (11th Cir 2005).  Doc 175 at 224.  Its reliance is misplaced.  As set out by the Government, the Court of Appeals for the Eleventh Circuit in *Battle* held that to prevail on a claim of having been tried while incompetent, the defendant must present by clear and convincing evidence a real, substantial and legitimate doubt regarding his competence to stand

trial. 419 F. 3d at 1298-99. See Doc 175 at 225. The *Battle* opinion, however, rested on a complete record developed in an extensive pre-trial hearing in which the Court was faced with "diametrically opposite expert testimony." 419 F. 3d at 1299.

Nothing in the Government's response refutes the fact that at the very least, Mr. Barrett is entitled to a hearing on the issue. Section 2255 provides that "[u]nless the motion and the files and records of the case *conclusively* show that the prisoner is entitled to no relief, the Court *shall* . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. §2255 (emphasis added). *See e.g., Fontaine v. United States,* 411 U.S. 213, 215 (1973) (reversing summary dismissal and remanding for hearing because "motion and the files and records of the case [did not] conclusively show that the petitioner is entitled to no relief"). In *U.S. v. Gutierrez*, 839 F. 2d 648, 653 (10th Cir 1988) the Tenth Circuit Court of Appeals remanded the issue of competency for an evidentiary hearing under 28 U.S.C. §2255 "where the record did not conclusively show that defendant [was] entitled to no relief." In *Gutierrez,* the petitioner claimed "he was suffering from the symptoms of withdrawal from heroin addiction at the time of his plea and hence was incompetent to enter a knowing and voluntary plea. *Id.* at 649. In remanding for an evidentiary hearing the Tenth Circuit relied on *Sanders v. United States,* 373 U.S. 1, 64820 (1963), where the Supreme Court had ordered an evidentiary hearing under similar factual circumstances. *Guttierez,*839 F.2d at 652.

> In *Sanders,* the petitioner alleged that he was mentally incompetent at the time of his guilty plea due to the administration of narcotic drugs during his incarceration. "However regular the proceedings at which [petitioner] ... pleaded guilty might appear from the transcript, it still might be the case that petitioner did not make an intelligent and understanding waiver of his constitutional rights. (Citations omitted)

For the facts on which petitioner's claim in his second application is predicated are outside the record." *Id.* at 20, 83 S. Ct. At 1079; *Blackledge v. Allison,* 431 U.S. 63, 74, 97 S. Ct. 1621, 1629, 52 L.Ed. 2d 136 (1976) ("the barrier of the plea of sentencing proceeding record, although imposing, is not invariably insurmountable").

*Gutierrez,* 839 F. 2d at 652. Here, too, the facts upon which Mr. Barrett's claim is predicated are outside the record and were unknown to Court and counsel at the time of trial. An evidentiary hearing is warranted.

Mr. Barrett has produced an expert medical opinion that Mr. Barrett was "unable to rationally assist his attorneys" before and during trial because he is a brain-damaged individual who during the trial was suffering from "a triad of neuropsychiatric impairments, including "acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder" and "Dysexecutive Syndrome." Exh. 119 at 24, 26, 27. That information was not known to trial counsel or the Court, though it presumably *should* have been known to counsel. Beyond that, as pointed out in Claim 7, the added stress caused by the U.S. Marshal's insistence that he wear an electronic shock device throughout the trial inhibited his ability to participate in the proceedings, an impact specifically argued by his trial counsel. *See Objection to Use of Restraint and Brief in Support,* CR 04-115-P at 6; Tr Hrg 8/31/05 at 95-96. The record and files simply do not conclusively show that Mr. Barrett is entitled to no relief in light of the evidence now before the Court.

**B.      The Expert Opinions Relied upon by Mr. Barrett Are Not Speculative.**

Relying on *Walker v. Gibson,* 228 F. 3d 1217, 1229 (10th Cir. 2000), *abrogated on other grounds*, *Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001), to defeat the otherwise unrefuted medical opinion of Mr. Barrett's trial-time incompetence, the Government dismisses the expert

opinion as a "retrospective, speculative post-conviction evaluation which does not meet the clear and convincing evidence standard." Doc 175 at 26. In *Walker,* the Court of Appeals determined the opinions of experts, conducted over seven years after trial, did "not establish by clear and convincing evidence a real, substantial, and legitimate doubt as to Mr. Walker's competency at the time of trial" because one of two post-trial experts offering an opinion on competency "had no medical records regarding Mr. Walker's response to treatment and thus, [] merely speculated any symptoms of somnolence and ataxic gait were side effects of medication and because the other expert's opinion was patently speculative."[37] 228 F. 3d at 1230.

Here, the Government itself speculates that Dr. Woods "appears to have ignored" prior medical records which found Barrett was "oriented in all three spheres." Doc 175 at 225 (without record citation). Dr. Woods unambiguously states that he reviewed *and considered* "significant institutional records, to include available academic, medical and custodial records; declarations and/or social records of various family members." Exh. 117 at 5 ¶14 . The expert opinion here is not speculative but based upon specific findings which the expert psychiatrist attests he finds to a reasonable medical certainty. Exh. 117 at 28 ¶¶81, 82.

Dr. Woods' consideration and review of the extensive medical and social records and history in reaching his expert opinion may be fodder for cross-examination but it does not change the fact that no trial-time competency evaluation was undertaken in Mr. Barrett's case. Dr. Woods has stated to a reasonable medical certainty that Mr. Barrett's mental health conditions, uninvestigated by and thus unknown to trial counsel, precluded Mr. Barrett's rational assistance

---

[37]The expert's opinion stated the he" *believed* the use of the medications *'appear[ed]* to raise issues of competency[,]'" *Walker v. Gibson*, 228 F. 3d at * (emphasis added).

in his defense. Evidence of mental health is relevant to a competency claim. *Drope v. Missouri,* 420 U.S. 162, 179 (1975). Dr. Woods' declaration raises serious concerns about Mr. Barrett's mental illness and its effect on Mr. Barrett at the time he was tried. As the United States Supreme Court observed in *Ake v. Oklahoma,* 470 U.S. 68, 80-81(1985):

> [T]he assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense. In this role, psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. They know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers. Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the "elusive and often deceptive" symptoms of insanity, *Solesbee v. Balkcom*, 339 U.S. 9, 12, 70 S.Ct. 457, 458, 94 L.Ed. 604 (1950), and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand. Through this process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense.

*Id.* An expert's evaluation, even post-trial, is no less relevant or critical to the question of competency. Dr. Woods' medical opinion, based on comprehensive review of relevant historic records, complete neuropsychological testing and evaluation and his own psychiatric evaluation that Mr. Barrett was incompetent to be tried, at the very least, entitles Mr. Barrett to a hearing.

## C. Trial Counsel's Opinions Are Not Controlling.

The Government would have this Court wholly disregard Dr. Woods' opinion because it "appears" to contradict the Government's assessment of Mr. Barrett's courtroom demeanor

(while wearing an electric shock belt) and trial counsel's declarations (also made years after the fact and subsequent to Mr. Barrett's allegations of ineffectiveness).  Doc 175 at 227.  In support of its argument, the Government attaches declarations by both trial counsel each of which states:

> In view of my interaction with Mr. Barrett, I harbored no doubts concerning his mental competence to stand trial and was unaware of any symptom that suggested he suffered from a significant mental health condition.

Doc 175, Exh. 11 at 1 ¶6 (Smith); Exh. 12 at 1 ¶7 (Hilfiger).  Mr. Barrett's motion makes clear trial counsel were wholly unaware of their client's mental health.  *See e.g.,* Amended Motion to Vacate at 48-56; Ground 2(A)(3) hereinabove.  Trial counsel's opinions or observations regarding competency are undoubtedly relevant.  *See Drope v. Missouri, supra*.  They are, however, not dispositive.  Lawyers are not experts when it comes to medical or psychological diagnoses.  *See Panetti v. Quarterman*, 551 U.S. 930, 970 (2007) (Thomas, J. dissenting); *see also*, *Martin v. Estelle*, 583 F.2d 1373 (5th Cir. 1978) (rejected incompetency claim where "slender evidence" of the "*lay* testimony of [the petitioner's] attorney was not a sufficient predicate on which to make a decision that" "would be anything more than speculation." (Emphasis added.)).  Here the fact that trial counsel face serious well-documented  allegations of ineffectiveness including a substantial record of their absymal failure to develop the mental health issues of their client, necessarily weaken the reliability of their confidence in their client's competence.  *See, e.g., Williamson v. Ward,* 110 F. 3d 1508, 1517 (10th Cir 1997).  The "proclamation of competence" by Messrs. Hilfiger and Smith merits close scrutiny and certainly does not dispose of the issue.  At issue is not whether trial counsel harbored a doubt concerning their client's mental competence but whether Mr. Barrett was, in fact, incompetent.  Dr. Woods' opinion, when considered with the mental health records and diagnoses now before the Court, as

well as trial counsel's own concern about the inhibition of Mr. Barrett's participation in the trial and communication with counsel if the U.S. Marshal's were permitted to use the "stun belt," defeats the Government's effort to conclusively show that the prisoner is entitled to no relief.

Mr. Barrett is entitled to a hearing on the issue.

**GROUND 9:  MR. BARRETT'S DUE PROCESS RIGHTS WERE VIOLATED BY THE COURT'S FAILURE TO INSTRUCT ON VOLUNTARY MANSLAUGHTER.**

Quick work can be made of two of the Government's arguments.  The Government maintains that if there is *Beck*[38] error, it can be deemed harmless.  Doc 175 at 231, 233. Respondent recognizes this is not the law in the Tenth Circuit.  *Beck* error is automatically deemed prejudicial.  *Hogan v. Gibson,* 197 F.3d 1297, 1312 and n. 13 (10th Cir. 1999); *Hooks v. Ward,* 184 F.3d 1206, 1227 (10th Cir. 1999).  The Tenth Circuit recently reaffirmed this principle.  *Phillips v. Workman,* ___F.3d___, No. 08-7043 (10th Cir. May 12, 2010) (slip op. at 29-30).  This is not only the law in the Tenth Circuit; the Supreme Court has so decreed.  *Hopper v. Evans,* 456 U.S. 605, 610 (1982).

It is argued that *Beck* does not apply to the federal death penalty scheme because the jury was not confronted with an "all or nothing" choice between acquittal and a conviction automatically leading to the death penalty.  Before Mr. Barrett could be death-eligible upon conviction, the jury first had to find one or more of the "gateway" intent factors and at least one statutory aggravating circumstance.  Doc 175 at 232-33.  Again, the Government recognizes this is not the law of the circuit.  *Hooks v. Ward,* 184 F.3d at 1126-27 (explicitly disapproving as against circuit precedent the reasoning of *United States v. McVeigh,* 153 F.3d 1166, 1197 (10th

---

[38]  *Beck v. Alabama,* 447 U.S. 625 (1980).

Cir. 1998), which tracks the argument the Government makes here, and noting that *Beck* extends to capital schemes, such as Oklahoma's (and, by implication, all similar statutory schemes), where the defendant is not automatically eligible for or subject to the death penalty on conviction, because aggravating circumstances must first be found in the penalty phase).

The Government asserts lesser degrees of homicide could not apply to count 2 (which charged violation of 18 U.S.C. § 924(c)(1)(A) and (j)), because the crime has no intent elements independent of the underlying felony.  Doc 175 at 228-29.  For this, the Government cites *United States v. Chanthadara,* 230 F.3d 1237, 1257-59 (10th Cir. 2000).  Chanthadara was convicted under 18 U.S.C. § 924 (j) for using a firearm during and in relation to a crime of violence (in his case, a Hobbs Act armed robbery), resulting in death to the victim (which amounted to first degree murder under 18 U.S.C. § 1111).  The elements of the offense were: 1) the armed robbery of a restaurant as charged in the first count of the indictment; 2) knowingly using or carrying a firearm during and in relation to the robbery; 3) during the robbery, the defendant directly caused the victim's death by use of the firearm; and 4) the killing was murder with malice aforethought. *Id.*

On appeal, Chanthadara contended he was entitled to a second degree murder instruction, but the Court ruled that based on the charges and the facts of his case, second degree murder was not a lesser included offense of the first degree murder alleged under § 924(j). The "malice" required for first and second degree murder in *Chanthadara* were different in kind, rather than degree.  Thus, the elements of second degree murder were not a "subset" or subsumed within the top charge; one could commit the higher offense without necessarily committing the lesser.  The commission of the underlying felony -- armed robbery -- supplied the "malice" for the first

degree murder charge.  There was no independent intent requirement other than that required for the commission of the robbery.  In other words, in proving first degree murder, the prosecution needed only to show the commission of the felony of armed robbery (felony murder).  On the other hand, the "malice" for second degree murder goes to the intent or *mens rea* with which the killing itself is done.  *Id.*

Chanthadara* did not foreclose a voluntary manslaughter instruction on count 2 of Mr. Barrett's superseding indictment.  While no specific intent or *mens rea* in association with the killing was required to prove first degree murder in *Chanthadara,* because the commission of the robbery supplied the necessary malice, this was not so with respect to count 2.  As stated in Mr. Barrett's reply to Ground 2(3), in order to convict Mr. Barrett of count 2, the jury had to find that he committed the "crime of violence" in count 3, which was a specific intent murder with knowledge that the victim was a law enforcement officer in the performance of his official duties, or on account of those duties.  *United States v. Barrett,* 496 F.2d 1087, 1112-13 (10th Cir. 2007).

Thus, count 2 was not the type of felony murder committed in *Chanthadara.*  In Mr. Barrett's case a specific intent was required for the fatal act itself, as the United States conceded at trial, at least with respect to count 3.  (See below.)  Killing in the heat of passion, and without knowledge that the person or persons being fired upon were law enforcement officers (which was the defense) would diminish or negate the intent element of count 2, which relates to the killing itself, not an underlying felony.  Heat of passion is different in degree, but not in kind, from the specific intent to kill required to establish the *mens rea* of count 2.  A heat of passion negates a the malice of a specific intent murder.  It is murder without malice.  *United States v. Scafe,* 822

F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides,* 820 F.2d 1232, 1242 (10th Cir. 1987); Tenth Circuit Pattern Instruction 2.54.  Though not dispositive (see below), 18 U.S.C. § 924(j)(1)(2) provides for both murder and the lesser offense of manslaughter, as defined by 18 U.S.C. §§ 1111, 1112.

Voluntary manslaughter was also a lesser offense of the crime charged in count 1, which alleged that Mr. Barrett used or carried a firearm during and in relation to a drug trafficking crime, resulting in death.  18 U.S.C. § 924(c)(1)(A) and (j).  *Barrett, supra.*  While the intent or "malice" required for this offense was supplied by commission of the drug trafficking crime, the offense requires, as noted in the reply to Ground 2(3), a nexus between the drug trafficking crime and using a firearm, resulting in death.  *E.g., United States v. McCullah,* 76 F.3d 1087, 1102 (10th Cir. 1996) (discussing requirement of a nexus between the homicide and the continuing criminal enterprise); *United States v. Tipton,* 90 F.3d 861, 867 (4th Cir. 1996).  Mere temporal coincidence is not sufficient; the firearm must be used *in relation to* the drug trafficking crime. Evidence severing the substantive connection between "use of a firearm" and "during and in relation to" a drug trafficking offense, *i.e.,* Mr. Barrett's acting in a heat of passion because he did not believe the individuals on his property were police, or in the United States Attorney's formulation at trial, was acting in imperfect self-defense and defense of his son, should reduce the crime to voluntary manslaughter.  Again, while not conclusive, § 924 (j) provides for a manslaughter conviction.

The Government cites the non-binding and unpersuasive district Court opinion in *United States v. Beckford,* 916 F.Supp. 1415, 1424-33 (E.D. Va. 1997)[39] as support for its argument that no error occurred in refusing to give a voluntary manslaughter instruction as a lesser included offense of count 3. Construing the CCE statute (21 U.S.C. § 848(e)(1)(A); intentional killing during and in relation to a drug trafficking crime), and not the § 848(e)(1)(B) offense charged against Movant, the district Court held that because Congress had not provided for lesser homicide offenses in the statute, there was no lesser included offense as a matter of law. *See also, Hopkins v. Reeves*, 524 U.S. 88, 90-91(1998) (where defendant was convicted of felony murder, with rape being the underlying felony and supplying the"intent," and the Nebraska Supreme Court had ruled for the last hundred years that there were no lesser included offenses of this species of felony murder, there was no *Beck* error in refusing to instruct on second degree murder and manslaughter; by state law, they were not lesser offenses of the main charge).

*Beckford* does not apply here. First, unlike Mr. Barrett's case, where the jury had no "third option" between conviction and sending the case into the penalty phase, a third option did exist in *Beckford*. The jury could have rejected the CCE charge and convicted the defendants of drug conspiracy, which did not carry the death penalty. Second, the *Beckford* Court ruled, against Tenth Circuit law, *Hooks v. Ward, supra*, that the federal death penalty scheme did not present the type of "all or nothing" choice the Supreme Court confronted in *Beck*, since conviction would not automatically make the defendant eligible for the death penalty or would

---

[39] Moreover, there was no appeals Court opinion on the district Court's ruling in *Beckford*.

not automatically lead to a death sentence. The jury was required to find one or more intent factors and a statutory aggravating circumstance before the defendant became death-eligible.

Third, as alluded to, the Court, reading the CCE provision of § 848 strictly, held that Congress provided for no lesser included offenses in the statute. Therefore, none existed as a matter of law. Additionally, the *Beckford* Court also held that other federal homicide statutes, such as second degree murder and voluntary manslaughter, 18 U.S.C. §§ 1111, 1112, could not serve as lesser included offenses because these offenses "must be committed within the maritime or territorial jurisdiction of the United States to be federally prosecuted." *Beckford,* 966 F.Supp. at 1418. These rationales find no support in Tenth Circuit law.

Before addressing the inapplicability of the last two mentioned portions of *Beckford* to the law of the circuit, and Mr. Barrett's case, it should be pointed out that the Government's current position conflicts with the United States Attorney's position at trial. The prosecution, along with the defense affirmatively requested, in connection at least with count 3, a voluntary manslaughter instruction, as there was evidence in the record to negate the specific intent required in count 3 -- in essence, intentionally killing a police officer because he is a police officer. R at 4212-13, 4215, 4218-19, 18 U.S.C. § 1112. This constitutes an admission by a party opponent that forecloses the Government's current argument. Fed.R.Evid. 801(d)(2)(A)-(D). In any sense, it is a concession that Mr. Barrett was entitled to a voluntary manslaughter instruction.

The *Beckford* "statutory language provides for no lessers" and "no federal territory and maritime nexus, no § 1112 instruction" arguments have evidently found no takers in the Tenth Circuit, and in fact conflict with circuit precedent. Taking the latter point first, invocation of the

federal murder statutes is not dependent on a homicide being committed on federal land or within federal maritime jurisdiction. For instance, in *Chanthadara*, the charge alleged that the offense constituted murder under § 1111, which obviously could not be the case if the federal murder statutes are applicable only on federal land. The murder in Chanthadara was committed during a Hobbs Act robbery, which was charged in count 1, but federal jurisdiction was also proper under § 924 because a firearm was involved. In Mr. Barrett's case, federal jurisdiction for the murder charged in count 3 was predicated on the commission of a federal drug offense. (Doc 52)

The fact that lesser included offenses are not specifically mentioned in § 848(e)(1)(B) does not mean they do not exist, and Respondent can point only to a lone, thirteen-year old district Court opinion to support its argument. This is not a situation like *Hopkins v. Reeves, supra.*, where there was a century of unbroken authority from the highest Court in the state holding there were no lesser included offenses to the rape-murder charged against the defendant.

The Tenth Circuit implicitly rejected the conclusion the Government draws from *Beckford* in *United States v. McVeigh,* 153 F.3d at 1192-98. McVeigh argued that *Beck* error occurred where the Court refused to instruct on second degree murder with respect to both the use of a weapon of mass destruction charge in violation of 18 U.S.C. § 2332a and federal first degree murder charges under 18 U.S.C. § 1114. While *Hopkins v. Reeves, supra* was cited, the denial of lesser included offense instructions on the weapon of mass destruction charge did not turn on a finding that the statute precluded any lesser included offenses, even though, as in *Beckford*, the statute being construed did not provide in its text for any lesser included offenses. Rather, the Court rejected McVeigh's argument that there were number of gradations of the offense based on differing levels of intent. McVeigh argued that conviction on this count

required an intent to kill or specific intent to kill. The statute was silent on the required intent, so the Court read into it a "knowingly" mental state based on the language of the statute as a whole. Because no intent or specific intent to kill was required, there were no gradations of intent respecting the commission of the fatal act. Therefore, as there were no different degrees of mental state based on the level of intent, there were no intent-based lesser offenses.

The clear implication from *McVeigh* is that had the weapon of mass destruction statute contained a specific intent provision, there would be lesser included homicide offenses in cases where such intent was lessened or negated (but still criminal), regardless of whether the language of the statute itself provided for lesser included offenses. Mr. Barrett's case is unlike *McVeigh* because the statute under which Movant was charged required a specific intent to kill a person or persons he knew or had reason to know was a law enforcement officer engaged in or on account of his duties. The Government's argument that this was not a specific intent crime (Doc 175 at 231) is belied by the statutory language, the Government's arguments at trial, and the Court's instructions. The Courts generally reject the argument that a lesser offense of homicide has been committed when the charge is felony murder or something like it, and there is no specific intent to kill required, thus making the mental state with which the killing was done irrelevant. *Hopkins, Chanthadara* and *McVeigh* all stand for this proposition. Where, as with count 3, specific intent is required -- which necessarily implies gradations of *mens rea* and criminal

responsibility -- § 848(e)(1)(B) would be unconstitutional as applied in violation of *Beck*[40] if it were held the statute provided for no lesser included offenses.

The Government seemingly comes close to conceding as much, stating that if the statute had employed a common-law term like malice, gradations of intent, and therefore lesser included offenses, could be discerned in the statute despite its silence. Doc 175 at 230. This is merely playing with semantics. The Tenth Circuit looks to common law terms like "malice" in determining the intent elements of federal homicide statutes. *United States v. Serawop,* 410 F.3d 656, 658, 661 (10th Cir. 2005). Section 848(e)(1)(B) is a federal homicide statute. Though the word "malice" is not used in the statute, that is what its intent element amounts to. The type of homicide proscribed by the statute is not just one committed with an intentional (as charged here) or reckless mental state, but one done without justification, excuse, or mitigation. *Id.* (defining malice in these terms). The homicide committed under § 848(e)(1)(B) clearly is one, as charged, which is done both intentionally and without justification or excuse. Otherwise, it wouldn't amount to the equivalent of first degree murder. For all intents and purposes, a § 848(e)(1)(B) killing is done with specific intent malice, and therefore admits to gradations of the offense based on the quality of the offender's intent or mental state.

Accordingly, with respect to count 3, Mr. Barrett was entitled to an instruction on voluntary manslaughter as an alternative to the specific intent murder charged. As the Government agreed at trial, there was sufficient evidence in the record that Mr. Barrett was

---

[40] *Beckford* is also distinguishable from Mr. Barrett's case because the intent required for the commission of a § 848(e)(1)(B) homicide is more specific than that required for a CCE murder -- an intentional killing. The mental state required here was not simply an intentional killing, but one tied to knowledge and intent with respect to the victim's status as a law officer.

unaware or could have been unaware that he was firing at the police, though not in self-defense, to warrant the manslaughter instruction. Of course, the case for *conviction* of manslaughter or acquittal, sufficient to undermine confidence in the outcome of trial, would have been made much stronger had counsel conducted a proper investigation and brought to bear the wide array of evidence, discussed specifically elsewhere in Mr. Barrett's opening brief and here, that challenged the Government's theory of the case. But that is not the point here. There was sufficient evidence in the record, as the prosecution conceded, to warrant a manslaughter instruction.

The Government is simply wrong when it argues that the elements of heat of passion manslaughter consists of some, but not all, of the elements of the charged offense. Doc 175 at 228. *Chanthadara,* 230 F.3d at 1257. Heat of passion manslaughter clearly negates a specific intent to kill. Heat of passion is shown where there is a general intent to kill (or knowledge that the likely result of the act will be the death of another), the intent to do serious bodily injury, or depraved heart recklessness. In other words, there must be a heat of passion coupled with an intentional or reckless mental state. *Serawop,* 410 F.3d at 658. There was a dispute at trial as to Mr. Barrett's mental state and intent. Voluntary manslaughter is "actually" a lesser included offense of § 848(e)(1)(B). *Hogan,* 197 F.3d at 1306.

The Government claims that if error in the failure to give a lesser included offense instruction could ever be harmless, it was harmless here because the jury, relying on guilt phase evidence, found in the second stage that the murder was committed with substantial planning and premeditation. Doc 175 at 232. This argument does the Government no good because it has conceded that in the Tenth Circuit, *Beck* error is never harmless. Additionally, based on the request for a lesser included instruction by the prosecution at trial, the Government has in fact

conceded what the trial evidence showed -- that a jury could rationally have convicted Mr. Barrett of the lesser offense and acquitted him of the main charge or charges. *Taylor v. Workman,* 554 F.3d 879, 888 (10th Cir. 2009). The fact that, as the Government argues, the shooting might be characterized as heinous, in that it involved multiple gunshots from a high-powered rifle, fails to show the jury could not still conclude that the shooting was a response to what Mr. Barrett perceived as adequate provocation, and that he fired the weapon in a heat of passion as the result of fear and terror. *Hogan,* 197 F.3d at 1310 (fact that victim received approximately 25 stab wounds did not foreclose a rational decision to convict of manslaughter).

Of course, the Government argues that this issue is procedurally defaulted because it was not raised on direct appeal, even though it was established by the record, and that the issue is meritless in any case. Doc 175 at 228. Cause and prejudice exist for excusing any procedural bar, because counsel were clearly ineffective for failing to raise this record-bound claim. It was obviously meritorious; both parties agreed the instruction should be given, and the evidence unquestionably supported it. As shown conclusively above, voluntary manslaughter is a lesser offense of a § 848(e)(1)(B) murder. No legitimate strategy explains the omission of this preserved issue, particularly in light of the fact that numerous issues were raised on appeal that had to be reviewed under a plain error standard. Counsel's unprofessional omission clearly prejudiced Mr. Barrett. As the Government acknowledges, *Beck* error can never be harmless. *E.g., Strickland v. Washington,* 466 U.S. 668, 694, 696-97 (1984). *See also,* reply to Ground 18.

The Government's arguments should be rejected, and Mr. Barrett should be granted § 2255 relief from his convictions. The failure to give the proper lesser included offense instructions

Movant's Reply to USA' Response
to Second Amended § 2255 Motion

174

*Barrett v. U.S.,* 6:09-cv-00105-JHP

clearly enhanced the risk of unwarranted convictions on the charged offenses, particularly, but not exclusively, with respect to count 3.  *Beck,* 447 U.S. at 637.

**GROUND 10:**     **THE COURT GAVE AN IMPROPER INSTRUCTION DIRECTING THE JURY THAT RESIDUAL DOUBT WAS NOT TO BE CONSIDERED AS A MITIGATING FACTOR, AND WRONGLY PREVENTED EVIDENCE AND ARGUMENT ON RESIDUAL DOUBT.**

The Government claims no constitutional error occurred when the Court ruled before trial that Mr. Barrett could not rely on the result of the state case as a mitigating circumstance and, relatedly, could not rely on residual doubt as a mitigating circumstance.  The Government's primary argument is that a defendant in a capital case has no right to rely on residual doubt to argue against the death penalty, citing *Franklin v. Lynaugh,* 487 U.S. 164, 174 (1988), *Oregon v. Guzek,* 546 U.S. 517, 523-27 (2006) and *United States v. Jackson,* 549 F.3d 963, 981 and n. 24 (5th Cir. 2008).  Doc 175 at. 234.

These cases do not stand for what the Government claims.  The Supreme Court has never held that a defendant in a capital case is barred from introducing residual doubt evidence and/or argument.  The plurality opinion in *Franklin* has been read to mean that there is no constitutional basis for a residual doubt *instruction*, but it did not rule that residual doubt could not be used as a mitigating factor.  In fact, the Court in *Franklin* pointed out that the defendant could have suffered no prejudice from the absence of a residual doubt instruction, because he was allowed to introduce residual doubt evidence and argue it without limitation.

*Guzek* likewise affords the Government no help.  The issue there was not whether the defendant could introduce residual doubt or argue it as a basis for rejecting a death sentence, since Oregon law permits the defendant in the penalty phase to introduce any evidence and make any

argument that the defendant is in fact innocent, or that doubts about guilt remain.  The issue in *Guzek* was whether, on *resentencing*, the defendant could introduce "new" alibi evidence that had not been heard in the previous guilt/innocence stage of trial.  Guzek was permitted to rely on transcripts of alibi evidence that were already a matter of record.  *Guzek,* like *Franklin,* passed on ruling whether there was a constitutional right to present evidence and argument of residual doubt.

*United States v. Jackson, supra.,* supports the Government's argument not at all.  Though ruling, in line with *Franklin*, that there was no constitutional right to a residual doubt instruction, the *Jackson* Court held the defendant, like the defendant in *Franklin*, suffered no prejudice from the lack of a specific instruction because he was not obstructed in the slightest from arguing residual doubt as a reason to reject the death penalty.  In footnote 24 to the opinion, the Fifth Circuit noted Jackson had cited numerous cases holding that a jury can consider residual doubt in determining sentence; there simply is no constitutional right to an instruction.

Here, not only did the Court's pretrial ruling preclude evidence and argument of residual doubt (Tr. 0/26/05 Hr'g at 10-11), the Court affirmatively instructed the jury that residual doubt could not be considered a mitigating circumstance.  Doc 257, Inst. 19, R at 5320-21.  This goes well beyond what the Supreme Court and other Courts have sanctioned.  Mr. Barrett submits he not only  had an Eighth Amendment right to introduce evidence and make argument on residual doubt, *cf. Skipper v. South Carolina,* 476 U.S. 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104 (1982), but that such was sanctioned by the applicable federal statutes, 18 U.S.C. § 3592(a) and 21 U.S.C. § 848(m).  *United States v. Honken,* 378 F.Supp.2d 1040, 1041 (N.D. Iowa 2004); *United States v. Davis*, 132 F.Supp.2d 955, 456-67 (E.D. La. 2001).  The trial court's instruction, in violation of the Eighth Amendment as construed in the *Lockett* line of cases, prevented the jury

from considering a relevant mitigating circumstance. This alone requires vacation of Mr. Barrett's death sentence.

The Government dismisses the Tenth Circuit state habeas cases cited by Movant which held, against ineffective assistance of trial counsel attacks, that counsel were effective for concentrating on a residual doubt penalty phase strategy, which is often highly effective. *E.g., Sallahdin v. Gibson,* 275 F.3d 1211, 1240 n. 10 (10th Cir. 2002). The Government states this just reflects that the practice is permitted in Oklahoma. Doc 175 at 235. But there is no Oklahoma state law respecting residual doubt evidence and argument, one way or the other. Numerous Courts have held that a defendant has a right to raise residual doubt, through both evidence and argument. *E.g., United States v. Honken, supra.* (§ 848 case); *United States v. Davis, supra*; *United States v. Jackson, supra*; *United States v. Johnson,* 403 F. Supp.2d 721, 782 (N.D. Iowa 2005) (§ 848 case); *United States v. Chandler,* 218 F.3d 1305 (11th Cir. 2000) (§ 848 case). The *Davis* Court (collecting cases) noted that both the Fifth and Eleventh Circuits (as does the Tenth Circuit) had routinely approved or commented on residual doubt evidence and argument introduced in state capital cases. The Government cites no case where a Court has affirmatively prevented residual doubt evidence and argument by way of instruction.

The Government states that trial counsel failed to challenge the Court's ruling or introduce evidence supporting a residual doubt argument (Doc 175 at 233), but this is not altogether correct. The Court ruled before trial that such evidence and argument were off-limits, and in defending appellate counsel's failure to raise the issue*,* the Government, contradicting its earlier argument, says counsel were bound to obey the Court's order. Doc 175 at 237. Evidence that Mr. Barrett

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                177                *Barrett v. U.S.*, 6:09-cv-00105-JHP

had been convicted of manslaughter in state Court was introduced, but the Court's ruling prevented a residual doubt argument in connection with it.

Moreover, as Mr. Barrett has argued, counsel were ineffective for conducting a professionally unreasonable investigation to unearth evidence that would have impeached the informant witnesses, as well as mental health evidence and testimony from percipient witnesses (Toby Barrett and Alvin Hahn) who could have supported the defense that Mr. Barrett fired without realizing law enforcement officers were on his property.  Counsel also failed to secure the services of expert witnesses who could have cast doubt on the prosecution's theory of the case, and failed to lodge appropriate objections to the instructions.  So, in large measure, any failure to introduce evidence supporting a residual doubt theory was due to ineffective assistance, even aside from the fact that the Court's pretrial order affirmatively prevented counsel from doing so.

Counsel's failures undermine the Government's circular argument that any error was harmless because the evidence was "strong," the jury found the "gateway" intent factors, and also found  the substantial planning and premeditation aggravating circumstance.  Doc 175 at 236. Due to counsel's failures, the jury never heard a great deal of countervailing evidence that would have conflicted with the Government's case.  Elsewhere, the Government dismisses evidence that could have been used to impeach the informant witnesses, arguing the informant's were "cross-corroborating," and that Mr. Barrett's witnesses would have been subject to impeachment for bias. As Movant has argued, it is not up to the Government to resolve the question of credibility, which is the lone province of the jury. *E.g., Anderson v. Johnson,* 338 F.3d 382, 393 (5th Cir. 2003); *Workman v. Tate,* 957 F.2d 1339, 1346 (6th Cir. 1992); *Pillette v. Berghuis,* 630 F.Supp.2d 791 (E.D. Mich. 2009); *English v. Romanowski,* 589 F.Supp.2d 873, 902 (E.D. Mich. 2008); *McGahee*

*v. United States,* 520 F.Supp.2d 723 (E.D. Pa. 2008). Movant need only show a reasonable probability that only a single juror would have rejected the death penalty. *Wiggins v. Smith,* 529 U.S. 510, 537 (2003).

The Government asserts that in any event, consideration of this issue is procedurally barred because it was defined by the record and not raised on direct appeal (Doc 175 at 234), and that appellate counsel were not ineffective for failing to raise the issue, because it was meritless. Doc 175 at 236. Movant has shown that the issue was meritorious, particularly in light of a fact the Government ignores -- the trial court affirmatively instructed the jury that it could not consider residual doubt as a mitigating factor, a state of affairs that is all but unprecedented in federal death penalty law. Since the issue was framed by the record, counsel had no excuse for failing to raise it. Because of the significance of this Eighth Amendment and statutory error, there is a reasonable probability the result of the appeal would have been different. *Strickland v. Washington,* 688 U.S. 668, 696-97 (1984).

The Government's arguments should be rejected. Relief should be granted from Mr. Barrett's death sentence.

**GROUND 12:** **THE FAILURE TO INSTRUCT THE JURY ON THE BURDEN OF PROOF REQUIRED FOR WEIGHING THE AGGRAVATING FACTORS VIOLATED MR. BARRETTS CONSTITUTIONAL RIGHTS.**

**A.** **The Issue Was Not Raised or Adequately Resolved on Appeal.**

**1.** **The *Ring* issue was inadequately raised and argued on direct appeal.**

The Government here attempts to dismiss the claim by asserting that "[o]n appeal, Barrett made essentially the same claim, which the Tenth Circuit rejected on the merits." Response, at

243.  On appeal, Mr. Barrett's counsel, one of whom was trial counsel, asserted "The District Court Erred by Failing to Declare the Federal Death Penalty Act Unconstitutional."  Appellant's Opening Brief, 2006 WL 3099220 at 32 (Proposition VI).  The first of six arguments concerning the statute's unconstitutionality alleged:

> The Federal Death Penalty Act is unconstitutional and violated Mr. Barrett's right to due process; his 6th Amendment right to a jury trial as interpreted by *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); *Blakely v. Washington,* 124 S. Ct. 2531 (2004); and violates the 8th Amendment prohibition against cruel and unusual punishment.  Barrett filed a pretrial motion seeking to have the federal death penalty statute declared unconstitutional, but the motion was denied.  Doc 78, 147, 153.

*Id.*  That is the entire issue and argument on appeal relating to ground 12.

### 2.      Trial counsel failed to raise the issue properly on appeal.

As explained in Mr. Barrett's Motion and Brief, the failure to adequately raise this issue was ineffective assistance of appellate counsel.  *See* Movant's Motion to Vacate, Claim 12 (b) at 355.  Movant's Brief on the Merits, Doc 149 at 206.   Despite the lack of any specific argument on direct appeal the Tenth Circuit Court of Appeals addressed the catch-all argument made by appellate counsel *de bene esse*.  The Court of Appeals noted,

> In his appellate brief, Barrett cites to *Ring* and generally alleges that the federal death penalty scheme is violative of the Sixth Amendment, but does not otherwise flesh out his argument.  Because, however, he submitted a more detailed argument on this point to the district court, we have proceeded to analyze that argument on the merits.

496 F. 3d at 1107-08 n.12.  Though appellate counsel had cited the motion made below, counsel cited no argument or constitutional principles or even reference pages supporting the argument made therein.  Cr-04-115, Doc 78.  Indeed, as the Court noted, Mr. Barrett was not actually convicted or convicted under the Federal Death Penalty Act.  *Barrett,* 496 F. 3d at 1106

("Obviously [Barrett] lacks standing to challenge the FDPA because he was not sentenced to death under that Act.").

Nonetheless, the Court chose to address the claim "out of an abundance of caution" and "because Barrett challenged the constitutionality of both the FDPA and §848 in the district court[.]" 496 F. 3d at 1107.  The Court assumed for purposes of appeal that [Barrett] intended to attack the constitutionality of the relevant death penalty statute in 21 U.S.C. §§848 (g)-(p).  *Id.* The Court then took up the issue of "Section 848's scheme for weighing of aggravating and mitigating factors."  *Id.*  496 F. 3d at 1107 n.12.[41]

Due to counsel's deficient performance, the issue was not properly before the Court, and ought not to have been decided without full and adequate briefing.  See F.R.A.P. Rule 28 (9).  The Tenth Circuit has recognized, even in the case of *pro se* litigants, that it cannot "fill the void by crafting argument and performing necessary research."  *Garrett v. Selby, Connor, Maddux & Janer*, 425 F. 3d 836, 841 (10th Cir. 2005).  An issue may be waived where, as was the case here, an appellant's statement in support of the issue "consist [] of mere conclusory allegations with no citations to the record or any legal authority . . . ."  *Id.  See also United States v. Banks,* 451 F. 3d 721, 728 (10th Cir. 2006) (declining to address issue for which the appellant provided no supporting legal authority), *cert. denied,* 129 S. Ct. 952 (2009).  Likewise, in *Herrera-Castillo v. Holder*, 573 F. 3d 1004, 1010, the Court of Appeals found that where the brief lacked an

---

[41]  Trial counsel's briefing on the argument was particularly deficient for its failure to recognize and emphasize the distinction between the fact of whether the "aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death" and the ultimate discretionary decision of life or death.  *See* Doc 78 at 8-9.

argument and did not "articulate [the] specific contentions" the issue was deemed waived. The

Court said:

> We have previously declined "[to] make arguments for [the appellant] that it did not make in its briefs," *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1257 n. 1 (10th Cir.2001), and decline to do so here as well. Herrera has therefore waived his equal protection argument. *See Becker v. Kroll,* 494 F.3d 904, 913 n. 6 (10th Cir.2007) (an issue "insufficiently raised in the opening brief is deemed waived").

*Id.*

In this case, the Court's attempt to address an un-briefed and unspecified argument did not

satisfy Mr. Barrett's right to have the claim adequately raised by competent counsel before it was

considered by the Court. The Tenth Circuit's decision in itself illustrates the deficiency in

performance by appellate counsel. *Id.* Counsel's actions in raising the issue without briefing the

same was ineffective and therefore led the Tenth Circuit to devise and reject its own issue and

argument. Mr. Barrett ought to be able to have the issue considered after full briefing. The failure

to do so denies him his right to meaningful appellate review required in capital cases under the

Due Process Clause of the Fifth Amendment and the right to be free of cruel and unusual

punishment guaranteed by the Eighth Amendment. *See Parker v. Dugger*, 498 U.S. 308, 321

(1991) ("We have emphasized repeatedly the crucial role of meaningful appellate review in

ensuring that the death penalty is not imposed arbitrarily or irrationally.").

**B.** **The Constitutional Principle upon Which Ground 12 Relies Has Been Wrongly Rejected.**

**1.** **The (Edward) Fields Decision wrongly relied on *United States v. Barrett*.**

The Government argues that the "Tenth Circuit recently reaffirmed its rejection of

Barrett's argument about the application of reasonable doubt to the death penalty selection

process, rejecting precisely the claim that Barrett attempts to raise in this §2255 litigation." Doc 175 at 243, citing *United States v. (Edward) Fields,* 516 F. 3d 923, 950 (10th Cir. 2008).[42] That reaffirmation, however, was not based upon consideration and adjudication of the arguments supporting the jury fact-finding requirement but instead, a superficial deference to the previously decided case. 516 F. 3d at 950 ("The issue is controlled by our decision in *Barrett,* which followed the Fifth Circuit in holding that a reasonable doubt standard is not required in the weighing process.") The snowball effect of a court's failure to consider an important constitutional issue which has not been properly raised and argued cannot bootstrap that ruling into a decision worthy of stare decisis. *Hill v. Bank of Colorado,* 648 F.2d 1282 (10th Cir. 1981) ("The rule of stare decisis does not require any Court to follow a judicial rule which is erroneous.")

> **2.    The Fifth Circuit's (Sherman) Fields Decision wrongly rejected the application of *Ring* to the "weighing" element.**

Because it had no actual briefing or argument before it, the Court of Appeals looked to a Fifth Circuit case and adopted the reasoning therein to reject the jury fact-finding requirement on the weighing procedure in this case. *United States v. Barrett,* 496 F. 3d at 1108, adopting *United States v. (Sherman) Fields,* 483 F. 3d 313, 346 (5th Cir.2007) ("Although not binding on us, we find this decision highly persuasive. Accordingly, we reject Barrett's argument for the same reasons stated by the Fifth Circuit in *Fields*.") The *(Sherman) Fields* analysis, however, was fatally flawed in ways which were not brought to the Tenth Circuit's attention because the Tenth Circuit was acting on its own and not pursuant to any specific argument.

---

[42]Since two different decisions, both styled *Fields v. United States*, are discussed here, the first names of the appellants are given to avoid confusion.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                     183                   *Barrett v. U.S.*, 6:09-cv-00105-JHP

In *(Sherman) Fields,* the Court of Appeals held, "[s]ince the Constitution does not require a jury to do the weighing, we cannot conclude that the showing required must be proof beyond a reasonable doubt." 483 F. 3d at 346. It is true that the Constitution does not require a jury to make a separate decision of life or death after the weighing process. *Blystone v. Pennsylvania,* 494 U.S. 299, 301(1990) (finding constitutional a Pennsylvania's death penalty statute which required a sentence of death if a jury unanimously found at least one aggravating circumstance and no mitigating circumstances or one or more aggravating circumstances that outweigh any mitigating ones). In that case, the Supreme Court found that "[t]he fact that other States have enacted different forms of death penalty statutes which also satisfy constitutional requirements casts no doubt on Pennsylvania's choice." *Id.* at 309. Similarly, here it is the statute which controls and 21 U.S.C. Section 848 made clear that the weighing of aggravating factors against mitigating facts was required *before* consideration of the life or death decision could be made. Under 848k a jury was required to make the finding of fact that the aggravating factors sufficiently outweighed any mitigation found to justify a death sentence before it could, if it decided to, impose the death penalty.

> If an aggravating factor set forth in subsection (n)(1) of this section and one or more of the other aggravating factors set forth in subsection (n) of this section are found to exist, the jury, or if there is no jury, the court, *shall then consider* whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death.

21 U.S.C. §848(k) (emphasis added). *Apprendi* and *Ring* do not control what fact finding is constitutionally required, but once a statutory scheme does require specific fact finding which elevates the potential punishment, that fact-finding must be made by a jury. *Apprendi v. New*

*Jersey*, 530 U.S. 466, 491 (2000);  *Ring v. Arizona,* 436 U.S. 584, 589 (2002)(extending the

*Apprendi* holding to capital defendants).  As Justice Scalia stated,

> [All] facts essential to imposition of the level of punishment that the defendant receives – whether the statute calls them elements of the offense, sentencing factors, or Mary Jane – must be found by the jury beyond a reasonable doubt.

*Ring*, 436 U.S. at 610 (Scalia, J., concurring).  Because it was not dealing with §848,  *Fields* did

not address the statute's clear provision that death does not automatically follow the weighing

process.  The Tenth Circuit's failure to appreciate the difference, or to fully apprehend the effect

of 848k's mandate of full discretion following the weighing renders its hasty embrace of the

*(Sherman) Fields* decision erroneous.

> The Fifth Circuit Court of Appeals also erred when it found,

> Moreover, the *Apprendi*/*Ring* rule should not apply here because the jury's decision that the aggravating factors outweigh the mitigating factors is not a finding of fact. Instead, it is a "highly subjective," "largely moral judgment" "regarding the punishment that a particular person deserves ...." *Caldwell v. Mississippi,* 472 U.S. 320, 340 n. 7, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In death cases, "the sentence imposed at the penalty stage ... reflect[s] a reasoned *moral* response to the defendant's background, character, and crime." *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (emphasis in original). The *Apprendi*/ *Ring* rule applies by its terms only to findings of fact, not to moral judgments. *See Ring,* 536 U.S. at 602, 122 S.Ct. 2428.

483 F. 3d at 346.  As noted below, the "weighing process" is a fact necessary before a jury can

make the "highly subjective," "largely moral judgment" "regarding the punishment that a

particular person deserves ...."  The jury must first determine whether the aggravating factors

outweigh the mitigating factors sufficiently to justify the death penalty.  If and only if the jury

finds that they do, it must then make that moral judgment for which the constitution does not

impose a standard of proof.  The fact of weight, however, must be decided prior to the discretionary exercise of the highly subjective life or death decision.  21 U.S.C. §848k.

### 3.       The 5th, 6th and 8th Amendments require a jury finding beyond a reasonable doubt.

It is the weighing process which leads the jury to decide whether or not the sentence should be death.  In *Gregg v. Georgia*, 428 U.S. 153, 189  (1976), the Supreme Court stated, "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.*  The death penalty statute under which Mr. Barrett was sentenced to death clearly separated the weight finding and the ultimate punishment decided.  21 U.S. C. §848 (k)(repealed).  Immediately following the directive on the jury's obligation to consider the weight of the aggravating factors outweigh the mitigating factors, if any, sufficiently to justify a death sentence, the statute provides:

> The jury or the court, regardless of its findings with respect to aggravating and mitigating factors, is never required to impose a death sentence and the jury shall be so instructed.

*Id.*  The elements of capital murder include decisions right up to the point where it makes a factfinding that the aggravating circumstances actually outweigh the mitigating circumstances to a sufficient degree that a sentence of death is justified.  In truth, the "selection" decision is not made until the jury reaches the final decision-point of determining whether the aggravating factors found to exist sufficiently outweigh all the mitigating factors found to exist to justify a death sentence of death . . . ."  21 U.S.C. §848k (now repealed); *see and compare,* 18 U.S.C.

§3593(e))(emphasis added). A simple outweighing is not enough. It is not difficult to imagine a conscientious juror finding that, although the aggravating circumstances do tip the balance in favor of death, the degree to which that balance tips is not *sufficient* to *justify* imposition of a sentence of death. It is not until the actual finding is made that the defendant's potential punishment increases to death.

Ultimately, the question presented must be decided by the United States Supreme Court.[43] A number of states have already determined the Constitution does indeed require a jury finding on the weighing question. *State v. Whitfield*, 107 S.W.3d 253, 261 (Mo. 2003) (finding step where, as in 848, the jury has full discretion *after* the required weighing to impose or not impose the death penalty, the weighing is a fact-finding necessarily to be made by a jury); *Woldt v. People*, 64 P. 3d 256, 265-66 (Colo. 2003) (finding Colorado's statute unconstitutional under *Ring* because it permitted a three-judge panel to engage in the fact finding including determining whether "[t]here are insufficient mitigating factors to outweigh the aggravating factor or factors that were proved." 6 C.R.S. §11-103(2)(b)(II)(A)-(B) (2000)); *Johnson v. State,* 118 Nev. 787, 802-03, 59 P. 3d 450 (2002) ("[A]s applied to Nevada law, *Ring* . . . requires [a] jury to weigh mitigating and aggravating factors under Nevada's statute requiring the fact finder to further find whether mitigating circumstances are sufficient to outweigh the aggravating circumstances.) 848 makes clear that the death penalty scheme establishes the same 4-step process, the first three of which,

---

[43]The fact that this issue is not yet decided by the United States Supreme Court does not prevent its consideration by this Court, since the issue was raised at Mr. Barrett's trial which occurred three years after the *Ring* decision, which was issued in 2002. Consequently no problems of retroactivity are raised, the issue having been presented to the Court before Mr. Barrett's case became "final". *See United States v. Barajas-Diaz*, 313 F.3d 1242 (2002)(Court does not generally apply new constitutional rules of criminal procedure to cases on collateral review).

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    187                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

including the weighing, are fact finding and the last of which is the exercise of discretion on the ultimate decision.

The Court's failure to instruct the jury on all fact-finding requirements of capital murder, including the weighing, means the conviction of "death" must be set aside.

### C.     Conclusion.

As a result of the deficient performance of appellate counsel, the decision of the Court of Appeals on direct appeal was not based on adequate briefing and argument.  The issue can and should now be considered, and Mr. Barrett's death sentence vacated as a result.

**GROUND 17:          THE EIGHTH AMENDMENT'S PROHIBITION OF THE EXECUTION OF THE MENTALLY ILL IS A TIMELY-RAISED COGNIZABLE CLAIM.**

The Government asserts that the ground of error which asserts that Mr. Barrett's execution is barred by the Eighth Amendment because he is severely mentally and suffers from organic brain impairments is "otherwise indistinguishable from a contention that he lacks the capacity to be executed" and that such claims of incompetence are not ripe until execution is imminent.  Doc 175 at 270.  Because execution in this case is not yet imminent, the Government asserts the claim is not ripe.  *Id.*  Secondly, the Government argues the claim is not cognizable because it lacks a basis in existing law.  Doc 170 at 271.

The claim, however, is rooted in the Eighth Amendment's preclusion from the death penalty of certain classes of individuals for whom execution is prohibited, including the mentally retarded, *Atkins v. Virginia*, 536 U.S. 304 (2002) and persons whose crimes were committed before their eighteenth birthday, *Roper v. Simmons,* 534 U.S. 304 (2005).  *See*  Doc 95 at 379; Doc 149 at 228-29.  In neither *Atkins* nor *Simmons* did the United States Supreme Court find the

issue untimely because execution was not imminent nor that the claim was non-cognizable, but addressed the claims under the constitutional precept that "punishment for crime should be graduated and proportioned to [the] offense." *Graham v. Florida*, -- U.S. --, 230 S. Ct. 2011, 2021 (2010) (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)). The claim at issue here arises specifically under the need to continuously review the Eighth Amendment's "evolving standards of decency" which in this case extend to Mr. Barrett a "status" based on "categorical rules" that define Eighth Amendment standards and which preclude his execution. *Graham*, 130 S. Ct at 2022 (identifying two subsets of rules precluding execution: those concerning the nature of the offense and those considering the characteristics of the offender) . The classification upon which this claim rests turns on a characteristic of Mr. Barrett, that he is a severely mentally ill and organically brain-damaged individual.

The claim is timely and cognizable. Because the Eighth Amendment precludes Mr. Barrett's execution, the sentence of death must be vacated and Mr. Barrett, sentenced anew in conformance with the Eighth Amendment's "evolving standards of decency."

**GROUND 18:          INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.**

The Government argues that Mr. Barrett's claim that the cumulative impact of appellate counsel's errors and omissions violated his constitutional right to the effective assistance of counsel is untimely because it was not asserted until he filed his Amended §2255 Motion. The argument is without merit. Whether asserted affirmatively or not, the standard for prejudice in an ineffective assistance of counsel claim is determined by sum total of the errors of counsel. The standard for determining prejudice in an ineffectiveness claim is a cumulative weighing of the deficient performance and its impact on the reliability of the verdict and/or result on appeal.

*Strickland v. Washington*, 466 U.S. 694 (Claimant must show "there is a reasonable probability that, but for counsel's *errors*, the result would have been different") (Emphasis added.)   Where a number of claims of ineffective assistance are raised, a reviewing court must determine prejudice collectively, or in the aggregate.  *Fisher v. Gibson,* 282 F.3d 1283, 1289 (10th Cir. 2002); *Stouffer v. Reynolds,* 168 F.3d 1155, 1164 (10th Cir. 1999); *Osborn v. Shillinger,* 861 F.2d 612, 625 (10th Cir. 1988).

Beyond that Mr. Barrett asserted the claim in his first 2255 Motion.  While the organization of the Amended Motion included the separate claim of Ineffective Assistance of Counsel on Appeal, the original Motion expressly asserted:

> Mr. Barrett's convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eight, and Fourteenth Amendments to the United States Constitution, because the *cumulative effect* of the errors involved in Mr. Barrett's guilt and penalty phases violated his rights to a fair trial, trial by jury, *due process*, *effective assistance of counsel,* presentation of a defense, and a reliable determination of guilt and penalty and fundamental fairness.
>
> * * * *
>
> If none of the claim [sic] presented in this Motion individually justifies reversal, when considered cumulatively, these errors denied Mr. Barrett his constitutional rights.

Doc 2 at 376.  At worst, the cumulative error claim under the failure to provide the effective assistance of appellate counsel is a known subset of the original claim.

Finally, the Government throughout it's Response relies on the wrong standard of the prejudice which must be shown to proceed on an ineffective assistance of appellate counsel claim. It attempts to elevate to a rule of law the Tenth Circuit's catch-phrase for the degree of prejudice required to demonstrate that appellate counsel was ineffective for not raising a claim on appeal, declaring categorically that only a "dead bang winner" claim will suffice.   This reads too much

626

into cases such as *United States v. Challoner,* 583 F.3d 745, 750 (10th Cir. 2009) by suggesting that only the failure by appellate counsel to raise a legal issue that, at first blush, mandates reversal can prove sufficient prejudice.   To limit appellate ineffectiveness claims solely to those cases where an issue is "obvious from the record, and must have leaped out upon even a casual reading of the transcript" *see United States v. Cook*, 45 F.3d 388, 394 (10th Cir. 1995)(internal quotation omitted) runs contrary to the law in this area.   Effective appellate counsel must, of course, "winnow out" weaker arguments on appeal - *see Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) - and exercise reasonable professional judgment in deciding what issues to raise and how to argue them.   However, the traditional *Strickland* analysis of performance and prejudice applies, 466 U.S. 668, 690 (1984).  *See Smith v. Robbins,* 528 U.S. 259, 285-286(2000) (applying *Strickland* when considering claim of ineffective assistance of appellate counsel claims); *see also Smith v. Murray,* 477 U.S. 527 535 (1986)*; Cook*, 45 F.3d at 394-95, and must not be dispensed with simply because an issue requires consideration going further than a knee-jerk response.

Notwithstanding the inclination of *Challoner*, to revert to the old, unconstitutional standard, *Strickland* is the standard in the Tenth Circuit as stated in *Neill v. Gibson*, 278 F. 3d 1044, 1062 (10th Cir 2001) (relying on *Smith v. Robbins*, *supra* and applying *Strickland* standard to claims of ineffective assistance of appellate counsel).   In *Neill*, the en banc court specifically addressed the standard of the "dead-bang winner" expressed in *Cook*.

> This court has expressed this test in terms of appellate counsel's omitting a "dead-bang winner," often defined in part as a claim that "would have resulted in a reversal on appeal." *United States v. Cook,* 45 F.3d 388, 395 (10th Cir.1995). To the extent this language can be read as requiring the defendant to establish that the omitted claim would have resulted in his obtaining relief on appeal, *see, e.g., Smith v. Massey,* 235 F.3d 1259, 1274 (10th Cir.2000), *cert. denied,* 534 U.S. 904, 122 S.Ct. 235, 151 L.Ed.2d 169 (2001) (No. 01-5117); *Walker v. Gibson,* 228 F.3d

1217, 1237 (10th Cir.2000), *cert. denied,* 533 U.S. 933, 121 S.Ct. 2560, 150 L.Ed.2d 725 (2001), rather than there being only a reasonable probability the omitted claim would have resulted in relief, *see Banks v. Reynolds,* 54 F.3d 1508, 1515 n. 13 (10th Cir.1995), this language conflicts with *Strickland. See* 466 U.S. at 694, 104 S.Ct. 2052. The en banc court, therefore, ***expressly disavows*** the use of the "dead-bang winner" language *to imply requiring a showing more onerous than a reasonable probability* that the omitted claim would have resulted in a reversal on appeal.

*Neill,* 278 F. 3d at 1057 n. 5 (emphasis added).  In light of the express repudiation of the standard cited in *Cook*, the reliance on *Cook* by a panel of the 10th Circuit in *United States v. Challoner,* 583 F. 3d at 749, and reiteration there of the "dead-bang winner" is inexplicable.  To the extent the Government relies on *Challoner* as a revival of the old standard, it is "dead-bang" wrong.

Moreover, here, the errors and omissions of Mr. Barrett's appellate counsel were pervasive and included the omission of issues in which trial counsel properly objected to clear constitutional violations (*see e.g.,* Claims 7, 12) as well as numerous constitutional errors which were plainly apparent on the record, and yet appellate counsel still did not find these issues important enough to brief.  Instead, appellate counsel chose to assert evidentiary challenges or statutory challenges that had no likelihood of success or which were briefed so poorly, they failed to preserve Mr. Barrett's right to a meaningful appeal (*see e.g.,* Claim 12).  Appellate counsel's failure to raise the issues which - whether raised alone or together - presented a reasonable probability that Mr. Barrett would have prevailed on appeal, *see Neill v. Gibson*, 278 F. 3d at 1062, renders counsel's assistance constitutionally ineffective.

## II.    CONCLUSION

For the foregoing reasons, together with those alleged in Mr. Barrett's Motion To Vacate Under 28 U.S.C. Section 2255 (Doc 95) and the Original, Corrected and Amended Motions filed

previously thereto (Docs 1, 2 and 70) and the Brief filed in Support of his Motion (Doc 145), this Court should grant Mr. Barrett relief in the manner requested in his Motion (Doc 95 at 400-401) and Supporting Brief (Doc 149 at 248-249) including but not limited to:

1.  That United States District Judge James H. Payne recuse himself and have all proceedings regarding the Motion to Vacate randomly reassigned to another judge;

2.  Permit Mr. Barrett to amend his motion with any newly discovered evidence or grounds for relief which may arise through investigation of that evidence, discovery  or an evidentiary hearing;

3.  Permit Mr. Barrett to utilize the processes of discovery set forth in the Federal Rules of Civil Procedure Rules 26-37, to the extent necessary to fully develop and identify the facts that support his Motion and refute any defenses raised by the Government's Response;

4.  Permit Mr. Barrett to expand the record, if necessary and appropriate;

5.  Grant Mr. Barrett's motion for evidentiary hearing to resolve any and all of the factual disputes raised by the Government's Response to the Motion and this Reply;

6.  Permit oral argument as appropriate and/or required;

7.  Vacate Mr. Barrett's convictions and sentences and order that appropriate retrial and/or resentencing hearing be conducted; and,

8.  Any such further and additional relief as may be just.

DATED:  July 1, 2010

Respectfully submitted,
 */s/ David B. Autry*
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender
 */s/ Joan M. Fisher*
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender

 */s/ Tivon Schardl*
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

## INDEX OF EXHIBITS

**VOLUME I**

Exhibit 206                    Supplemental Declaration of Ernie Barrett

Exhibit 207                    Supplemental Declaration of Doris Barrett

Exhibit 208                    Supplemental Declaration of Issac Barrett

Exhibit 209                    Supplemental Declaration of Phyllis Crawford

Exhibit 210                    Supplemental Declaration of Gelene Dotson

Exhibit 211                    Supplemental Declaration of Mark Dotson

Exhibit 212                    Supplemental Declaration of Ruth Harris

Exhibit 213                    Supplemental Declaration of Carolyn Joseph

Exhibit 214                    Supplemental Declaration of Linda Riley

Exhibit 215                    Supplemental Declaration of Janice Sanders

Exhibit 216                    Supplemental Declaration of Abbie Stites

Exhibit 217                    Supplemental Declaration of Kathy Trotter

Exhibit 218                    Supplemental Declaration of Leonard Post re Supplemental

                               Declaration of Toby Barrett

Exhibit 219                    Supplemental Declaration of Richard Burr

631

**Certificate of Electronic Filing and Service**


I hereby certify that on this 1st day of July 2010 I caused the foregoing Movant's Reply to

United States' Response to Second Amended § 2255 Motion to be filed with the Clerk of the

Court using the ECF System for filing.  A copy will be served electronically to Christopher J.

Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and Jeffrey B. Kahan, U.S.

Dept. of Justice, 1331 F Street, NW, Washington, DC 20530.


/s/ *Joan M. Fisher*
Joan M. fisher

631

# EXHIBIT   206

### Supplemental Declaration of Ernest Eugene Barrett

I, ERNEST EUGENE BARRETT, declare as follows:

I am the father of Kenneth Eugene Barrett.

The investigator who worked with me to get my first declaration done called me on the phone to ask some more questions. I am half deaf, likely more, so he talked to my wife Doris Barrett who relayed the questions to me. Then she repeated my answers, but I spoke loudly so he could likely hear, too. When he called back and read it out loud, he read it to her and she repeated back to me slowly, like I was taking an oath. Anyway, I read this over and he got it right.

I met with Roseann Shaye before the first state trial at my home. She wanted to get information to help Kenny. I had no idea how it would be used. I just assumed she was cooperating with John Echols. That was good enough for me. If she told me why she was asking those questions, I don't remember.

No one else ever asked me about raising Kenny, not one lawyer, state or federal. Sperling asked me more than anyone about it when I testified.

Nobody ever talked to me about how they would try to save Kenny's life if he was convicted, what kind of evidence was important for the jury to hear, nothing like that.

The only the strategy the lawyers ever talked to me about was after the prosecution put on their first state case, John Echols asked me and Doris and Kenny—Doris says a woman was there too, Joan Brown—whether we thought he needed to call any witnesses. We questioned that, but John said that he didn't think the state had presented enough evidence to convict. John never did call any witnesses in either trial.

I saw Kenny every other weekend after he was arrested until they sent him to

EEB

Page 1 of 3

McAlester after he was convicted.  That was while he was in Sallisaw *and* Muskogee.  Doris came with me, but I saw Kenny alone except for the last time.  Doris came in so she could say goodbye.

Kenny never once said he didn't want us to testify about mental health subjects or family history.  He didn't say the lawyers wanted him to, and that he didn't, nothing like that.

Hilfiger and Smith talked to me about nothing except to be careful with Sperling, to answer questions "yes" or "no," because an open-ended answer could open a can of worms.  He didn't tell me what the "can of worms" was.  I had no idea.

Hilfiger and Smith did not tell me what they were going to ask me.  They didn't even tell me why they were calling me.  Sperling knew more about me than they did.  Sperling knew where I worked, how long I had been there, how many people I had under me, and that people at work liked me.  Hilfiger hardly asked me anything and Sperling went on and on.

When Sperling asked me how come my youngest son Steve and me were able to make it and Kenny wasn't, I really didn't know what to say.  Kenny's lawyers never discussed that question with me.  They didn't talk to me about nothing.

When we were driving to court the day I testified, Doris and I were talking about how ugly it might get for me on the witness stand.  I was willing to talk about the family history of mental problems, about myself, my marriage to Gelene, and Kenny and me up until the day I testified, so the jury could understand the role I played in Kenny's life.  I said what a sorry father I was in my first declaration and how sorry I was for it.  I didn't care how I looked.  I mean I cared, who wouldn't, but I was willing.  When I say I was willing, what I mean by that is that is I wanted to.  Doris and I assumed that was why they

Page 2 of 3

called me to testify, but it wasn't.  I guess I'll never know what Kenny lawyer's had in mind when they called me.

The investigator said he was going to send this to me and that I should read it over carefully, and only to sign it if every word was truthful.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct.

Executed by me this /7 day of June 2010, in Creek County, Oklahoma.

Ernest Eugene Barrett

EEB

Page 3 of 3

635

# EXHIBIT   207

## Supplemental Declaration of Doris Barrett

I, Doris Barrett, declare the following:

I am married to Kenny's father Ernie Barrett. While Kenny is not blood kin and I didn't raise him, I think of Kenny as one of my children.

This is my third declaration in Kenny's case. The same investigator who interviewed me to prepare the first two called me again recently to talk some more about the case. We talked about some things we talked about before, but a lot of new things too.

As I said in my first declaration, I attended both of Kenny's state trials and his federal trial, including all the hearings before the trials except one that was held in Stilwell. I missed one hour of one day in state court and a half a day in federal court, but I was there every day except that one. I got to know the lawyers and I made sure they got to know me.

Ernie visited Kenny in jail during the trials every other week, sometimes every week if Gelene, Kenny's mother, couldn't take her turn. I waited outside so that Kenny could have this private time with his dad. Every other night, Kenny would call the house and talk to one or both of us. You should have seen our phone bills. In state court, they let me sit right up next to Kenny and we would talk sometimes and share looks. Kenny and me got really close during the state trials. In the federal trial, they wouldn't let me near him in court, but we still talked most every other night.

Roseann Shaye interviewed both my husband and me before the state trial. It was at our house. She spent about an hour an a half just with me. It was the summer before the first state trial. She told me she was interviewing family because she wanted to make a plea of insanity. Yes, she used the word "insanity," I'm sure. I thought she was weird. She said it was Kenny's

D.B.

DB

Page 1 of 3

best bet based on what she had learned about his growing up. When I talked to John Echols about it, he said he wasn't going there.

John told me that if the jury convicted Kenny, it was important for the jury to see what kind of life Kenny had growing up because many jurors were sympathetic to people who had a rough childhood, that some of them might have been in the same shoes as Kenny. That was how John planned to save Kenny's life if he got convicted of murder, but he never really thought that would happen and it didn't.

That was a big difference between John and Roger Hilfiger. John had a strategy for winning the trial and he had a plan in case we didn't. Roger didn't have a plan that I could see and certainly none that he told me about. When I would tell him that prosecution witnesses, mainly cops and OHP, had testified different in state court, he would ignore me and tell me not to tell him what to do.

At least Bret Smith listened and told me he would bring it to Roger's attention whenever I told him a witness had said something different in state court. I don't know if Bret did tell Roger or not.

Neither Roger or Bret ever asked about what I had heard about Kenny's life growing up, or asked me anything about his family. I don't think they asked anyone, not Kenny's father for sure. They never talked to me about the importance of the jury getting to know Kenny and where he came from. They just asked me if I would miss him if he was executed.

When they sentenced Kenny to death, Roger didn't even turn around to say he was sorry or to say that he would keep fighting or anything like that. Maybe that's just on TV, but he never said one word to us—we left the courthouse thinking this was the end.

D.B.
_____

DB

Roger never told us that Kenny didn't want the family involved in his case, never. He did ask me if I would help him get Kenny to testify. That's the only thing he ever told me that him and Kenny disagreed about, Kenny testifying. I told him that I wouldn't help him do that, that I didn't want to be responsible for killing Kenny.

Kenny never told me he didn't want my help. He did say once that we shouldn't stress out over him, but never that he didn't want our help. In fact, he knew I was going to testify and he never said not to testify or not to talk about family, nothing like that. Of course, I had no idea what I was going to testify about because the lawyers never told me—I was so nervous, to this day I can't remember what he asked me or what I said.

Kenny also told me that Roger wouldn't call some witnesses he wanted him to, but for the life of me I can't remember who.

The investigator who called said he would write up what I said the way we did the last times, but this time he would call and read it to me. He did and it said what I had told him. He then told me he was going to FedEx it for me, to go over it and sign if it was accurate. He said he was going to send a prepaid return label to send it back to him.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this _17_ day of June 2010, in Creek County, Oklahoma.

Doris Barrett

DB

# EXHIBIT  208

### Supplemental Declaration of Issac Barrett

I, Issac Barrett, declare the following:

I am Kenneth Barrett's uncle on his father's side of the family. Ernie Barrett, Kenny's father, is my brother. I signed a declaration sometime in the early part of 2009 after meeting many times with an investigator. That investigator called me on June 4, 2010 to ask me some additional questions and to ask if I would be willing sign another declaration. I said that I would.

He asked me if I had ever talked to Roger Hilfiger, Bret Smith, John Echols or Jack Gordon about my nephew Kenny. I told him that I hadn't. He then asked me if I had spoken to Rosanne Schaye. I recalled speaking to a woman named Roseanne in regard to Kenny's state case, and the last name kind of rang a bell when he mentioned it. It was many years ago that I met her at Leslie's Café, which is no longer in business. I recall that we talked for a considerable amount of time. We met about 9:00 A.M. and I spent about three hours talking about my family with her. I don't know exactly when that was, but I think it was before Kenny's state trials. I'm just not positive.

I answered all her questions. She said she would call me again, but never did.

I had no idea why she was asking me about the family. I didn't know if she worked in Mr. Echols office or what her role was. If she explained it to me, I didn't comprehend it. I had no idea how she intended to use the information I gave her or why she was assembling information about the family. At that time, I didn't know how it could help Kenny, but I wanted to.

*ICB*
ICB

Page 1 of 2

I also met Steve Leedy, an investigator for Mr. Echols.  We met in Sallisaw in the back parking lot of the Dinner Bell Restaurant that is now out of business.  He came to see me before Kenny's first trial to talk to me about the circumstances of the way things are in Sallisaw.  By that I mean who pulled the strings, who was the money behind the sheriff and the D.A, who the major players were in the drug business in town, none of whom were Kenny, that's for sure.  I told him all I knew, which is common knowledge in this town.  You'd have to be deaf and blind not to know.  He didn't ask me anything about Kenny or our family that I can recall.

I saw Kenny when I attended his trial in state court.  When they brought him in I said "hi."  He welcomed whatever family came to the trial.   He seemed grateful for the little we did.

No one ever told me that Kenny didn't want to get his family involved in his case or that he didn't want our help.  No one ever told me he ever felt that way, not Mr. Leedy, not Ms. Schaye.  None of the lawyers ever asked me to help.  I would have if I knew how.  Like I said, none of the lawyers ever talked to me.

The investigator called me again the following week and read this declaration to me.  What he read is what I told him in our conversation, what is written here.  He said he would FedEx it to me with a prepaid label to send it back to him.  I have read this declaration carefully and it accurately says what I told him.

I declare, under penalty of perjury, that the foregoing 2-page declaration is true and correct.

Executed by me this _28_ day of June 2010, in Sequoyah County, Oklahoma.

_Issac C. Barrett_
Issac C. Barrett

ICB

Page 2 of 2

642

# EXHIBIT   209

## Supplemental Declaration of Phyllis Crawford

I, Phyllis Crawford, declare the following:

I am Kenneth Barrett's maternal aunt. On June 4th, I received a phone call from an investigator who I had met with many times before I signed my previous declaration. He asked me several questions. In response, I told him that other than him and family, nobody had ever come out here to my house to talk to me about Kenny or about anything having to do with Kenny's state trials or his federal trial. Then he asked me specifically about Roger Hilfiger, John Echols, a man named Smith, a man named Gordon and a woman named Schaye. I told him again that nobody had come out here and that I didn't remember anyone calling.

Since it has been 10 years, I checked with my husband Roger to see if he remembered anyone calling or coming to our house. He said no, that no one had come out here or called to talk about Kenny.

I did go over to my sister Gelene's shortly before Kenny's federal trial. My sister Carolyn and my cousin Janice were there with Mr. Hilfiger and Mr. Smith, I think that was his name, a short heavy guy. Mr. Hilfiger sat on the couch and Mr. Smith sat in a chair. That's about all I can remember.

I didn't see Kenny when he was in jail. I did see him when we went to court, but there was no chance to talk. He never called to tell me, or ever told me, that he didn't want me or the family involved in his case. I live next door to his mother. She never told me that Kenny told her that he didn't want the family involved in his trial or that he didn't want our help or her help.

I recently got a really nice letter from Kenny and wrote him back.

PC

Page 1 of 2

644

This time the investigator interviewed me entirely over the telephone. He then wrote up what I said and called me again to read it to me. I told him what he read is what I had told him and that I would sign it. He mailed it to me and I read it. It says what I told the investigator.

I declare, under penalty of perjury, that the foregoing 2-page declaration is true and correct.

Executed by me this ___17th___ day of June 2010, in Sequoyah County, Oklahoma.

Phyllis Crawford

PC

# EXHIBIT   210

**Supplemental Declaration of Gelene Dotson**

I, SYLVIA GELENE DOTSON, declare the following:

I am Kenneth Eugene Barrett's mother.

The investigator who met with me many times when drafting my last declaration in Kenny's case called me to ask me additional questions about my contact with various members of my son's legal teams.

The first one I met with was John Echols, his state lawyer. He came out to the house twice, I think. The first time he came out with Joan, who worked with him, and Traci Swearingen, a friend of Kenny's. John went over with me what happened that night, the night they came for Kenny and the shooting happened.

The second time John came over was mostly to go over to Kenny's place and look around. He really cared about Kenny. I feel like he did a good job. He sent over an investigator too. His name was Jim Allison. Jim talked to me about what happened the night of the incident. Mr. Echols also sent another investigator, Lisa, who spent time over at Kenny's place.

John also sent Roseann Schaye to see me. I saw her quite a few times, at least five. She asked me questions about Kenny, me, my marriage to Ernie and my family. That was before Kenny's first trial. I signed lots of forms, releases. She even tried to get my elementary school records from Albuquerque, but the school was gone. She went to Joliet, Illinois, where we lived when Kenny was a kid. She talked to my cousin Nelda and some of my friends.

Ms. Schaye was doing this to check out Kenny's background in case they needed to do the second phase of the trial. She explained it all to me. The last time I heard from her is when

SGD

Page 1 of 4

647

she sent me copies of some newspaper articles about my grandfather when he was murdered. Anyway, there was no second phase in the state trials.

If I met Jack Gordon, I don't remember. His name sounds familiar. I went to some pre-trial hearings, but I was excluded from the trial because John Echols said he might call me as a witness.

Roger Hilfiger came to my house with Bret Smith once, and a second time with an investigator that used to be an agent with ATF. I can't remember when the first time was, but the second time was just before the trial. They talked about the incident, nothing else. Nobody ever talked to me about anything but the incident except for Roseann Schaye.

Roger Hilfiger did not impress me as someone who cared about Kenny. He and Mr. Smith called me to testify in the penalty phase of the trial. They didn't tell me why, but I knew from my dealings with Rosanne Schaye what was likely. When I got to Muskogee, they told me what they thought the prosecutor would ask me. Then they asked me if I loved Kenny and if I would miss him if he was executed, the same questions they asked me when I testified. They didn't ask about the things Ms. Schaye and I talked about.

After Kenny was arrested, I saw him once a week in the jail in Sallisaw and every other week when he was in jail in Muskogee. Kenny never told me he wanted to minimize the family's involvement in the case or that I shouldn't be discussing his mental health or anything like that. He would never tell us that. We're family. We stick together.

Kenny wasn't satisfied with Mr. Hilfiger and it wasn't just that he wasn't John Echols. It's because they wouldn't do what he wanted. Lots of things, but I can only remember one

SGD

Page 2 of 4

specific example.  For a jailer, Mr. Hilfiger called Robert Good, someone who didn't like Kenny much.  Kenny had asked them to call a different jailer, Buck Locust or Christenberry.  They both liked Kenny.  Buck has already told me that he wanted to testify for Kenny and that he would do all for Kenny that he could.

Kenny really missed John Echols, but he wouldn't have missed him as much if he thought Hilfiger was doing right by him.  Kenny liked Bret Smith, although I can't remember why exactly—I think Kenny liked the way Mr. Smith related to him, but Mr. Hilfiger made all the decisions as far as Kenny and me knew.  Kenny just wasn't satisfied with Roger Hilfiger.  None of us were.

Mr. Hilfiger and Mr. Smith never asked for my help in getting Kenny to do anything for them.  I didn't know that there was anything they wanted Kenny to do that he wasn't doing. They never talked to me about what they hoped the second phase of the trial would be if there was one.  If they had a plan, they didn't tell me or anyone that I know.  They never talked to me about Kenny's family history of mental illness and alcoholism on both sides, or about Kenny's upbringing, or why he might live in a shack without water, electricity or even a drain, or why he might have shot himself in the chest with a shotgun—nothing like that.  I would have shared all that to save my son's life.

No, Kenny's lawyers never told me that Kenny didn't want them to beg for his life or anything like that.  I wonder who is saying that.  I would have begged for his life.

The investigator who interviewed me for this declaration called me back and read it to me.  It says what I told him.  He said he would send it, and that I should read it over carefully to

SGD

Page 3 of 4

make sure it was accurate in every way. I did that and now I'll sign it like he asked and send it back to him.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this **2 3** day of June 2010, in Sequoyah County, Oklahoma.

Sylvia Gelene Dotson

SGD

Page 4 of 4

# EXHIBIT  211

## Declaration of Mark Dotson

I, Mark Dotson, declare the following:

I am Kenneth Barrett's maternal uncle.

I signed a declaration for Kenny's case more than a year ago after speaking with an investigator. That same investigator called me on June 6, 2010 to review a couple of things, which he recalled accurately, that were not included in my first declaration. He also asked me a few new questions and asked if he could include my answers in a new declaration. I said that would be fine.

I told him again that I had never been contacted by anyone about Kenny's state or federal cases. Then he specifically asked if I had been contacted by Roger Hilfiger, Brett Smith, John Echols, Jack Gordon or Roseann Schaye. I have heard the name John Echols—one of Kenny's lawyers I think— but none of them or anybody working for them ever contacted me.

I also told him that Kenny had never told me he didn't want to trouble the family by having them involved in his case. I never heard from Kenny or anyone that Kenny didn't want the family's involvement for whatever reason. If any one of his lawyers had asked for my help, if they had showed me how I could help, I would have done my honest best.

The investigator called back and read this declaration to me after we talked. It says what we talked about. He sent it to me to read, sign if it was truthful, and send it back to him.

I have read it carefully and it says what I told him on the phone and what he read to me.

I declare, under penalty of perjury, that this 2- page declaration is true and correct.

Executed by me this 21st day of June 2010, in Sequoyah County, Oklahoma.

_____  6-21-10
Mark Dotson

_____
MD

Page 1 of 1

652

# EXHIBIT   212

### Supplemental Declaration of Ruth Harris

I, Ruth Harris, declare as follows:

I am one of Kenneth Barrett's maternal aunts.

The investigator who I gave the information to for my first declaration called me on June 7, 2010, to ask me a few more questions. I felt bad because I didn't know anything about what he was asking even though I went to both state trials. I don't remember missing one day.

I met John Echols several times. He was an excellent lawyer. I had very high hopes. He cared about Kenny.

I didn't go to the federal trial and never met those lawyers or anybody working with them. They never tried to contact me. Where was the fairness when they took John Echols away from Kenny? It was like the government wanted to take control when they didn't like what happened in state court, so they even took Kenny's lawyer away.

Not even John Echols talked to me about how family testimony could be important. I didn't even know that there could be two parts of the trial. I thought if they convicted him of murder that was it. I don't know about those kinds of things.

The investigator who called me is the only one who ever talked to me about the need for a jury to understand Kenny's upbringing and his family's history. I never talked to Roseann Schaye or Bret Smith or Roger Hilfiger or Jack Gordon about anything.

I couldn't get very near Kenny at the trials, just near enough to tell him we love him. I know Kenny wanted us there because he sent word through his mother when his federal trial was going on, wondering where we were. It must have hurt him that we didn't go.

*R. H*
RH

Page 1 of 2

654

I never heard Kenny didn't want the family to participate in his trial. Nothing like that. Kenny never said that. Neither did the lawyers. If the lawyers had asked me, I would have done all that I could to help the jury understand Kenny and care for him like I do.

The investigator read this declaration over the phone and said he would send it for me to sign, but that I should read it over before I did. I have read it carefully and it says what I told the investigator.

I declare, under penalty of perjury, that the foregoing 2- page declaration is true and correct.

Executed by me this _17 th_ day of June 2010, in Le Flore County, Oklahoma.

_Ruth Harris_
Ruth Harris

_RH._
RH

# EXHIBIT  213

## Supplemental Declaration of Carolyn Joseph

I, Carolyn Joseph, declare the following:

I am a maternal aunt of Kenneth Barrett.

I signed a declaration in Kenny's case a while back. The investigator who questioned me for it called me a few days ago and asked me some more questions. He wanted some details of things we already talked about.

He started out by reading the following, which he said was in my first declaration:

Kenny's trial attorney only met me for a few minutes. He asked me about Kenny threatening to burn down Janice's house. I confirmed that I heard the threat, and the attorney did not ask me any other questions so he never learned that no one believed it for a second. He never gave me a chance to tell him. The attorney just told me my testimony would not be required. The attorney never asked whether Kenny had attempted to carry out the threat or whether anyone believed that he would. My answer would have been no. Kenny never had done anything to anyone. The attorney did not ask anything about what Kenny was like as a person, what kind of life he had growing up, or what kind of mental illness runs in our family. I would have answered any questions the attorneys asked and I would have answered them truthfully.

I told the investigator that was exactly right. He asked me when that conversation happened. I couldn't remember, but I remembered where it was. Gelene called to ask me to come over to her house, said Kenny's lawyers wanted to talk to me. It was me and Janice and Gelene, and I think Phyllis was there too, and the two lawyers. One was named Hilfiger, I think. I don't know the other lawyer's name.

They asked me what they asked me in front of everybody, wasn't even five minutes that they talked to me, and then never said another word to me. But I could hear what they asked my sisters and my cousin Janice. They asked Janice the same thing they asked me about. They talked to Gelene and Phyllis about the night of the raid on Kenny's, that's all. The lawyers never



CJ

Page 1 of 2

asked any of us about our family's history of mental illness or about Kenny's upbringing.  The lawyers treated us cold.

The lawyers didn't say that Kenny told them he didn't want our help.  I know the lawyers didn't want my help because they told me so, because I told the truth.  I would have been willing to do anything for Kenny except lie.  I still would do anything I could for him.

I never met Kenny's state lawyers.  They sent a woman by to see me not too long after Kenny was arrested.  I barely remember her.  I don't recall her name, what she looked like, what she asked or what I told her.  I couldn't even tell you why she came.

The investigator told me he was going to call and read this declaration to me, and that we could make changes if he got something wrong.  It was exactly like I told him.  He said he would send it, and that I should read it over carefully before I signed it, which I did.

I declare, under penalty of perjury, as provided in the laws of the United States of America, and the State of Oklahoma, that the foregoing 2-page declaration is true and correct.

Executed by me this *1st* day of June 2010, in Sequoyah County, Oklahoma.


*Carolyn Joseph*
Carolyn Joseph

CJ

658

# EXHIBIT  214

**<u>Supplemental Declaration of Linda Riley</u>**

I, Linda B. Riley, declare the following:

I am Kenny Barrett's surviving paternal aunt. I provided a declaration in Kenny's case more than a year ago after long talks with an investigator. That same investigator called me last week. He said the government had responded to Kenny's legal papers and that he was calling on family members again to ask some questions.

No lawyer ever talked to me about Kenny or his case. Not ever. Roseann Schaye, who I talked to once, and the investigator who asked me to do these declarations are the only ones, outside of the family, that ever talked to me about Kenny's case.

Ms. Schaye just wanted to know things. I remember I told her about when Gelene, Kenny and Richie lived with my mom and dad.

I think I saw Ms. Schaye when Kenny was still in jail in Sallisaw, that's all I can remember about when. It was a long time ago. She came to the house. She didn't stay that long. She never told me how it could help Kenny; just collecting facts. She said she would come back again, but never did. I never saw her again.

Once before the first trial, my brother Ernie, Kenny's father, asked me if my husband Fred would cut Kenny's hair in jail—Fred was a barber. After Fred did it, he told me that he and Kenny had talked about cars and all kinds of things. Kenny never told him that he didn't want the family's help with his case. I'm sure Fred would have told me that.

The investigator I spoke to called me again and read this to me. It says what he read to me. He said he would send it to me to read over to make sure it was accurate. If it was, he

_LBR_

Page 1 of 2

asked me date, sign and it send it back to him.

I declare, under penalty of perjury, that the foregoing 2-page declaration is true and correct.

Executed by me this _15_ day of June 2010, in Sebastian County, Arkansas.

Linda Riley

LBR

# EXHIBIT  215

### Supplemental Declaration of Janice Sanders

I, Janice Sanders, declare as follows:

I am Kenneth Barrett's maternal cousin and was his neighbor.

This will be my second declaration in Kenny's case. The same investigator who helped me with my first one called me on June 13, 2010 and asked me some more questions for this one.

He first asked about whether I had met Kenny's state lawyers and investigators. Soon after Kenny got a lawyer appointed, Mr. Echols came around to my house—I think that's where I saw him—and asked questions about the gunshots I heard and some other questions about the raid on Kenny's. The first person who came was someone from OSBI and the second was John Echols. Then the prosecutors from the state case came out. Nobody had questions about our family history or about Kenny's life.

No one else came out until Kenny's lawyers from Muskogee came. I met them at Gelene's house. After I told the investigator this, he read me the following statement, which he said was in my first declaration:

> "Mr. Hilfiger came to my house with a heavyset younger man whose name I do not know. I told him everything I am stating in this declaration except the part about Kenny being hyper. Mr. Hilfiger did not ask anything about Kenny's childhood or background. The man with Mr. Hilfiger said, "Aren't you going to put her on the stand?" He was referring to me. Mr. Hilfiger said, "No." The man with Mr. Hilfiger acted like he could not understand why Mr. Hilfiger felt that way."



JS

Page 1 of 2

The investigator asked me if that were true. I was mistaken when I said they came to my house. I met Kenny's lawyers from his third trial at Gelene's house. Carolyn and Phyllis were there too, along with Gelene. It was probably about two weeks before the trial started. The rest of what the investigator read me from my first declaration is exactly true.

None of Kenny lawyers ever talked to me about our family, or that they had disagreements with Kenny, or asked me for help with Kenny, or discussed plans they had for saving Kenny's life if he was convicted. I would have helped anyway I could if they had asked. Nobody in the family ever told me that they had heard that Kenny didn't want us to help save his life. The term "mental illness" never came up, or anything like it.

The investigator told me he was going to call and read this to me, and that we could make corrections if need be. He called me back and read this to me. It says what I told him. He said he was going to send it to me and that I should read it carefully to make sure that everything that was in it was true before I signed it. I did that and will send it back FedEx in a prepaid envelope.

I declare, under penalty of perjury, that this 2-page declaration is true and correct. Executed by me this _26_ day of June 2010, in Sequoyah County, Oklahoma.

*Janice Sanders*
Janice Sanders

*JS*

# EXHIBIT  216

## Supplemental Declaration of Abby Stites

I, Abby Stites, declare the following:

I was married to Kenneth Barrett. Toby Barrett is my son.

I was interviewed by an investigator several times more than a year ago. After that, I signed a declaration. That same investigator called me to ask me some more questions.

Becky Teague, a friend of mine called to tell me that Mr. Littlefield was going to subpoena me to testify against Kenny. She knew from her daughter Mandy who worked with those folks. That was about three weeks before I did testify. Soon after that, Mr. Littlefield came to my house and served me the papers himself. Mandy brought him to show him where I lived. I took his paper, but I didn't talk to him.

To the best of my recollection, maybe a week after that Roger Hilfiger phoned and told me that he wanted to call me as a witness. I told him that I had already been served a subpoena by Mr. Littlefield. He was mad the prosecution got to me first, but there was nothing he could do, he said. He didn't tell me why the government was calling me or why he had wanted to.

I told Mr. Hilfiger that I wasn't going to testify, that I didn't want any part of it, that I was not going to help them kill Kenny. Mr. Hilfiger said I didn't have a choice, but to testify.

The next time I spoke to Mr. Hilfiger was the day I testified. There might have been another lawyer there too, but I'm not sure. He prepared me by telling me not to be nervous, to tell the truth and if I didn't remember to say so. I knew the prosecution didn't call me to talk about Kenny's problems. I knew they only wanted to talk about the restraining orders.

---

AS                                                                                          Page 1 of 2

That was all Mr. Hilfiger wanted to talk about too.  I wanted to talk to him about Kenny's problems, but he said he didn't want to hear about it.  I thought Kenny's problems were important to the case and I tried to tell him.  I tried to bring up Vinita, the mental hospital which I had pick up Kenny once because the doctor at Bill Willis thought Kenny might hurt himself.  They kept Kenny two weeks and would have kept him longer, but his mother came and got him.  If she had let him stay, he might have gotten better.  He was doing real good.

When I was testifying Mr. Sperling got so nasty the judge had to step in to protect me from him.  Mr. Sperling didn't like my answers to his questions.

I don't know the name Roseann Schaye, but I remember going to a motel to talk to a woman who worked on Kenny's side.  She was mostly asking me questions about my relationship with Kenny.  I don't remember that she said why.  I just answered her questions.  It was before Kenny's first state trial, that's all I can say for sure about when I saw her.

I never talked to Kenny's state lawyers or to Kenny.  No one told me that Kenny didn't want people to testify about how he was messed up in the head.

The investigator called me back and read this declaration to me.  I told him that it said what I said.  He said someone would send it to me and that I should read it again carefully before I signed it to make sure.

I declare, under penalty of perjury, that the foregoing 2-page declaration is true and correct.  Executed by me this _17_ day of June 2010, in Sequoyah County, Oklahoma.

Abby Stites

AS

# EXHIBIT   217

## Supplemental Declaration of Kathy Trotter

I, Kathy Trotter, declare as follows:

I am Kenneth Barrett's paternal first cousin.  My father is Ike Barrett.  Kenny's father is my uncle.

The investigator who helped me prepare my first declaration recently called me to ask some additional questions.

I put my heart into Kenny's state cases and offered to help out the federal lawyers too, but they never took me up on it.  I spent a lot of time with John Echols.  I've even been to his house in Jenks, outside of Tulsa, where we went through juror questionnaires together.  I also spent time with John's investigators from OIDS, Steve Leedy and Jack Stringer.  I helped them find witnesses.  I went to Arkansas with them to locate Tara Barrett, for example.

I never met Roseann Schaye or had much contact with Jack Gordon.  I didn't meet Bret Smith until the day I testified.  Roger Hilfiger never contacted me.  I would guess they asked me to testify because Kenny gave them my name, but I don't know.  They never told me what they wanted me to testify about.

Not one of the lawyers, including John Echols, ever talked to me about how important it was for the jury to get to know Kenny.  Roseann Schaye, a psychologist, I think, interviewed my father and my Aunt Elnora.  Elnora told me that Roseann told her it was to gather family history so that a jury would learn why Kenny was the way he was, understand his mental health and spare his life.  When I asked John about that, I recall he just said that

KT

Page 1 of 3

669

we could talk about that once it got to that point.  Of course, it never did when he was on the case.  I don't think my dad understood why Roseann wanted to know the things she did, but he talked to her anyway because he knew he was helping Kenny.

On several occasions, when I was with John or the investigators, I would comment about how hard Kenny's childhood was.  I remember Steve Leedy once said to me, so he had a bad childhood, whatever.  No one ever asked me for details or to talk about the family more.  They would just kind of shrug.  It was not the kind of thing that interested them.

Bret called me a few days before I testified, I think, anyway in enough time to make arrangements for someone to take care of my child.  He didn't tell me to bring anything, family things, pictures, nothing.  He didn't tell me what to think about, but of course I thought about what I could say that would help Kenny.  I thought I would testify about how things were, so the jury could see a side of our family that wasn't as bad as the prosecution tried to make us look.

Bret asked me just a few questions when I got to Muskogee; we talked 10 or 15 minutes, tops.  I can't remember what he asked me, but I was shocked when he asked me completely different questions when I was on the witness stand and none of the same ones he asked me before.  The questions he asked didn't seem important; it was nothing to help the jury understand Kenny.  I said in my first declaration that I thought my testimony was pointless.  I'll say it again.

At the time of the trial, the lawyers never said that Kenny didn't want the family's help or for us not to testify about our lives and what we knew about our family history.  If they had told me that, it wouldn't have been true.  I talked to Kenny all the time.  He wanted help from his family and friends.  In a way, this was the closest our family had ever been—we would have

KT

Page 2 of 3

done anything to save Kenny's life, but nobody asked us to.   None of the lawyers ever asked for family records or for help in getting them, which I'm very good at because of my job serving process and because I know everyone over at the courthouse.

The only thing I know that Kenny and his attorneys disagreed about was some of the witnesses Kenny wanted to call and some he didn't that they did.  I know this from Kenny.  He asked me to try and get the lawyers to listen.  John Echols didn't want to hear it and neither did Bret Smith, who I must have told when he called me to testify.  Also, maybe during the guilt phase I had called him for Kenny, but he didn't listen.  And as I said, I called and offered to help before the trial began.  I can't remember who I talked to, but they never called me to ask me if I knew something or to do anything.

After my recent phone interview, the investigator called me back and read a draft of this declaration.  We fixed a couple of things on the phone and then he mailed it to me.  He asked me to read it carefully to make sure it is accurate.  I have and it is.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct.  Executed by me this _17th_ day of June 2010, in Sequoyah County, Oklahoma.

Kathy Trotter

KT

# EXHIBIT  218

673

**Supplemental Declaration of Leonard Post
re Supplemental Declaration of Toby Barrett**

I, Leonard Post, do declare:

I conducted a telephonic interview with Toby Barrett before drafting his supplemental declaration. I then called Mr. Barrett and slowly read the draft back, making minor edits suggested by him as we went along.

I then had the Federal Defender's office send Mr. Barrett his declaration via US Postal Service, Priority Mail, Postage Prepaid along with a prepaid self addressed Federal Express return envelope. Unfortunately, the declaration reached Mr. Barrett on the day he had already left for his bi-weekly shift on an oil rig in the Gulf of Mexico. He will be returning to his home in Sallisaw, Oklahoma, on July 1, 2010.

I have attached an unsigned copy of his declaration to mine. It is a true and correct copy of the one sent Mr. Barrett and the one he has agreed to sign on July 1st because it is truthful rendition of what we discussed and what was read to him.

I declare, under penalty of perjury, that this 1-page declaration is true and correct. Executed by me, this 29 day of June 2010 in New York County, New York.

Leonard Post
NYS Investigator's License #11000145413

### Supplemental Declaration of Toby Barrett

I, Toby Barrett, declare the following:

I am Kenny Barrett's son, his only child.

I signed a declaration early last year.  The investigator who interviewed me many times to gather the information for that declaration called me on June 5, 2010 and told me he had a few more questions for me.

He asked me if Mr. Hilfiger spoke to me about my family history.  I told him that Mr. Hilfiger spoke to me once, for a very short time, but it wasn't about my family.  Mr. Hilfiger told me he wasn't sure if he was going to call me to testify.

The investigator then read me the following paragraph, which he said was from my previous declaration and asked me if it was accurate.  I said that it was.

"I spoke to Mr. Hilfiger once, I'm not sure where, and asked him if he was going to want me to testify at the trial.  He said he was weighing whether it would be helpful for my dad or not, but that he expected I would.  He never asked me about my father's mental problems, my home life or about me or my mom.  I never spoke to him again."

Mr. Hilfiger never talked to me about his plans for defending my dad or for saving my dad's life.  I can't remember where we spoke or put a time to it except that it was sometime before my dad's federal trial.

I spoke to Mr. Echols, my father's state lawyer, once for a very short time.  It was before my dad's first trial.  It might have been in court.  It might have been somewhere else.  I don't remember it being arranged, but it could have been.  I can't remember one thing we talked about.  It could have been just small talk.  We never talked about my family.  To the best of my

TB                                                                 Page 1 of 2

674

recollection, nobody ever talked to me about my family in regards to my father's case until the investigator who gathered the information for these declarations did.

The investigator asked me if I had spoken to Bret Smith, Roseanne Schaye or Jack Gordon. If I did I don't recall it. I felt bad that I couldn't remember talking to them so I asked the investigator if they were saying that they had talked to me and he said no, that he hadn't heard that they were saying that. I felt better.

I have talked to my dad many times since he was arrested. He never once said he didn't want my help or for the family not to get involved in the case. None of the lawyers ever told me he said that. I have never heard him say he didn't want the family to get involved in his defense or in saving his life. My grandma, my dad's mother, never told me that he didn't want her involved either. I always felt just the opposite, that he wanted our help. I didn't know how to help him. I don't think anybody in the family did.

The investigator called me again a few days after this last interview and read this to me. I told him it was accurate. Then he sent it to me to read over. I have read it carefully and it says what I said to the investigator.

I declare, under penalty of perjury, that the foregoing 2-page declaration is true and correct.

Executed by me this _____ day of July 2010, in Sequoyah County, Oklahoma.


_____
Toby Barrett

# EXHIBIT   219

**DECLARATION OF RICHARD H. BURR**

Richard H. Burr, under penalty of perjury, declares the following:

*Qualifications and Experience of Declarant*

1.        I am an attorney in private practice in Houston, Texas.  My practice has been devoted entirely to the trial, appellate, and post-conviction representation of defendants in capital cases since 1979.  I have represented persons in well over one hundred capital cases in twelve states and in the federal courts during this time.  Although my work has been heavily oriented toward post-conviction and habeas corpus proceedings, I have been trial counsel in three capital prosecutions, including *United States v. Timothy James McVeigh*, No.  96-CR-68 (D. Colo.) (the Oklahoma City bombing case), where I was lead counsel for the penalty phase and for penalty-related work.  I have argued two capital cases in the Supreme Court of the United States, *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Selvage v. Lynaugh*, 494 U.S. 108 (1990), and served as co-counsel on two others, *Hitchcock v. Dugger*, 481 U.S. 393 (1987), and *Tennard v. Dretke*, 542 U.S. 274 (2004).

2.        Because of my experience, I have been retained by the Office for Defender Services of the Administrative Office of the United States Courts, along with eight other similarly experienced attorneys, to serve through the Federal Death Penalty Resource Counsel project as an advisor and consultant to court-appointed and federal defender attorneys engaged in the defense of capital cases in the federal courts.  Through this project, I work extensively with counsel appointed to represent people charged in federal capital cases.  In a report by the Subcommittee on Federal Death Penalty Cases of the Committee on Defender Services of the Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998) (hereinafter

"Judicial Conference Recommendations") – which was adopted by the Judicial Conference – the work of our project was found to be "essential to the delivery of high quality, cost-effective representation in death penalty cases...." *Id.* at 50.

3.      I have submitted several other declarations to the Court regarding Mr. Barrett's case. In the declaration dated March 3, 2009, I recounted my contact with trial counsel for Mr. Barrett in my role as resource counsel.

### *Referral Questions and Response*

4.      Mr. Barrett's current attorneys have asked me to address the government's assertion that defense counsel in this case were not under a duty to investigate or present mitigation evidence. Mr. Barrett's current counsel informed me that Roger Hilfiger and Bret Smith have made the following statements in relation to the penalty phase of the trial:

> Mr. Barrett did not want the defense to "beg for his life" during the penalty phase of the trial. He did not want the outcome of the case to hinge on personal sympathy for him.

> Mr. Barrett did not want the mitigation case to dwell on his childhood. He also wanted to minimize the amount of testimony elicited from his relatives, particularly his son, mother and ex-wife, though he understood that decision could work to his detriment.

Mr. Barrett's current counsel have asked me whether I was aware of Mr. Barrett's counsel ever having similar concerns at the time of trial, and how I would have advised trial counsel if they had asked me for assistance regarding this alleged position of Mr. Barrett.

5.      As I stated in my previous declaration in this case, I spoke with John D. Echols about this case beginning in October 2004. At the time Mr. Echols was emphatic about the need to secure enough mitigation investigative and expert resources to develop mitigation fully. I communicated on the phone and through e-mail with Mr. Echols on several occasions from

2

679

October 2004 through April 2005. The topics of those discussions included the need to investigate Mr. Barrett's background and mental health issues. Mr. Echols never indicated that Mr. Barrett disapproved of any form of mitigation investigation.

6.      As I said in my previous declaration, neither Mr. Hilfiger nor Mr. Smith ever approached me for assistance as resource counsel in Mr. Barrett's case. My only contact with Mr. Hilfiger after Mr. Echols was relieved was in late August 2005. I sent an email to a federal death penalty defense list serve requesting information on turnaround time for payment of CJA 30 and CJA 31 vouchers. On August 29, 2005, Mr. Hilfiger responded with information concerning his experience on such time. I emailed him back asking him to bring me up to date on the case and offering my assistance. However, I never heard back from Mr. Hilfiger.

7.      If Mr. Hilfiger or Mr. Smith had contacted me and made the statements quoted above, I would have told them clients often express concerns like that at some point in time, and they most often get over it. While the statements attributed to Mr. Barrett would have confirmed my concerns that Mr. Hilfiger and Mr. Smith lacked the death penalty experience and history of quality work that is called for in federal death penalty trials, reaching out to me for help in working with Mr. Barrett would have been a sign of dedication. However, in the context of what occurred earlier in the case, and later, the quoted statements tend to confirm the concerns Mr. Echols expressed to me regarding Mr. Hilfiger's lack of involvement in the work on the case that was ongoing prior to his withdrawal.

8.      If Mr. Hilfiger or Mr. Smith had contacted me regarding the statements in their declarations, I would have advised them, if the statements were made prior to or during the investigation, that Mr. Barrett should be advised that the first step is to learn what his family knows about his history. After we learn from them, a decision can be made about who should

3

679

testify.  It may be unnecessary for specific family members to testify.  Such an explanation often satisfies the client's concerns sufficiently to enable the investigation to move forward.  In this case, it appears from Mr. Hilfiger's declaration that he had the cooperation of Mr. Barrett's family, and he had "Mr. Barrett's medical, educational and mental health records."  That is, Mr. Hilfiger appeared to have the ability to conduct an investigation that would allow him to explore various options for trial and explain those options to Mr. Barrett so that he could make an informed decision.  If Mr. Hilfiger had responded to my offer of assistance, I would have advised him that he should follow the leads he had.  I also would have noted that early in 2005, in *Rompilla v. Beard*, 545 U.S. 374 (2005), the Supreme Court found ineffective assistance of counsel where the defendant at times had been "uninterested in helping" and "even actively obstructive," 545 U.S. at 381, but a wealth of mitigation evidence was available from another source the defense attorneys failed to explore, 545 U.S. at 390-93.

9.      If Mr. Barrett's trial counsel had informed me that Mr. Barrett's statements were made after the investigation, and before the presentation of evidence, I would have asked them what other avenues they explored for presenting Mr. Barrett's life history, such as the use of a mitigation specialist with qualifications to testify as an expert or the use of a mental health professional.  I also would have asked whether the attorneys had presented these possibilities to Mr. Barrett.  The declarations of trial counsel do not suggest they took any of these steps.

10.      When Mr. Barrett's current counsel informed me about the statements of trial counsel, my initial reaction was, "that's death penalty defense 101."  By this I meant that every experienced capital defense attorney knows defendants sometimes express feelings like those attributed to Mr. Barrett.  The ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases that were revised in 2003 specifically refer to the phenomenon suggested

4

in the statements counsel attribute to Mr. Barrett.  The Commentary on Guideline 10.5 offers a variety of responses to such concerns.  I will address those responses in later paragraphs.  At the outset, it is essential that counsel must assure his client that his views count, and will be considered, but that the first priority is to investigate, to learn what the story is, and later to decide who will testify and what the mitigation case will be.

11.     This common-sense practice is codified in Defense Standard 4-5.1(a) of the ABA Criminal Justice Standards which provides that a defense attorney should discuss the risks of different strategies only "[a]fter informing himself or herself fully on the facts and the law."  Standard 4-5.2 explains that decisions about what evidence should be presented are for the attorney to make.

12.     While reports of capital defendants not wanting certain types of mitigation to be investigated or presented are not uncommon, it is uncommon for an experienced or skilled capital defense attorney to feel the scope of his work must be limited by statements like those attributed to Mr. Barrett.  As the commentary to ABA Guideline 10.5 says, "Often, so-called 'difficult' clients are the consequence of bad lawyering – either in the past or present.  Simply treating the client with respect, listening and responding to his concerns, and keeping him informed about the case will often go a long way towards eliciting confidence and cooperation."  I do not mean to imply that Mr. Barrett was a "difficult" client.  Nothing from my experience working with Mr. Echols suggested Mr. Barrett was difficult, and the statements attributed to him by Mr. Hilfiger and Mr. Smith do not suggest he was difficult to work with.  On the contrary, both Mr. Hilfiger and Mr. Smith stated in their declarations that Mr. Barrett "was very involved in his defense," and cooperated with them.

13.     The statements attributed to Mr. Barrett are more indicative of a problem with

counsel than a defendant who is opposed to mitigation evidence. Defense counsel who are familiar with mitigation explain to their clients early on that mitigation does not involve begging for the defendant's life or relying on sympathy. Begging for mercy is not allowed in federal death penalty cases and a "generic" plea for mercy has been found by the Supreme Court to be evidence of ineffective assistance of counsel. *See Williams v. Taylor*, 529 U.S. 362, 369 n.2, 397-98 (2000) (majority opinion quoting closing argument and mitigation evidence not presented); *id.* at 415 (O'Connor, J., concurring) ("The consequence of counsel's failure to conduct the requisite, diligent investigation into his client's troubling background and unique personal circumstances manifested itself during his generic, unapologetic closing argument, which provided the jury with no reasons to spare petitioner's life").

14.     The *Williams* decision reflects a capital defendant's common misunderstanding of mitigation evidence that can be, and routinely is, dispelled by investigation, thereafter allowing counsel to present the evidence, even in cases where a defendant expresses reluctance to "beg" for "sympathy" or rely upon his family to get sympathy from jurors. Mitigation evidence involves humanizing the defendant, making his life experiences familiar to jurors, and helping jurors to see that the life they are being asked to end amounts to more than the crime of conviction. Mitigation also involves offering the jury an explanation for the defendant's actions. Nearly every initially-reluctant capital defendant allows this evidence to be presented.

15.     It is not necessary for the jury to see either the defendant's background or an explanation of his actions as grounds for sympathy. Experienced capital defense counsel know it is not even desirable to present mitigation as a basis for sympathy because such a strategy is likely to be ineffective or backfire by causing jurors to weigh sympathy for the victim against sympathy for the man who took his life. Both the experience of capital trial attorneys and

6

scientific studies of how capital jurors decide whether to vote for life or death show that mitigation succeeds when jurors are able to identify with the defendant because of something in his background, or to understand his actions as something other than the product of a will to do harm. *See*, *e.g.*, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538 (1998); Garvey, *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. Rev. 76 (2000).

16.    Defendants to whom mitigation has been explained do not object on grounds of "begging" or "sympathy" because they understand, if they have the capacity to understand, that mitigation is mostly telling their story. The statements attributed to Mr. Barrett about dwelling on his childhood and not relying on members of his family reflect a similar lack of insight into capital defense norms of practice particularly in that Mr. Hilfiger and Mr. Smith do not indicate that they made any effort to correct the misunderstanding. Dwelling on a defendant's childhood could be seen as a plea for sympathy. That kind of one dimensional penalty phase case is not the norm in federal death penalty cases. Presenting the defendant's childhood experiences as a reason for his later use of drugs, or a contributing factor in a mental disorder, enables jurors to understand his criminal behavior as more than the isolated decision of the defendant not to comply with social norms. That kind of multi-dimensional understanding of mitigation is fundamental to death penalty defense practice.

17.    The norm in federal death penalty cases tried in 2005 was to follow the 2003 ABA Guidelines and employ a mitigation specialist to gather information about a defendant's family history over several generations, review that information with experts qualified to identify facts relevant to mitigation, and integrate the themes developed through that process into a consistent strategy for both phases of trial. The process of developing a trial strategy includes

taking into account the client's concerns. However, as noted, advising a defendant without conducting an investigation is unprofessional conduct.

18. Recognizing that appeals to sympathy, relying solely upon family witnesses, and dwelling on a bad childhood are ineffectual strategies, the ABA Guidelines codified the norm in capital defense practice of involving experts in the process of gathering background information, interpreting it, and presenting it to jurors. Mitigation specialists are trained and experienced at avoiding problems like those implied in the statements attributed to Mr. Barrett. In 1998, the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, published recommendations including the use of a mitigation specialist. The Subcommittee recognized that mitigation specialists have the training and knowledge necessary to perform "work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal." (Judicial Conference Recommendations.)

19. Mitigation specialists can explain the different purposes of mitigation evidence, and, as the Subcommittee found, they are relied upon in some cases to testify about family history, educational records, work and military records. The Commentary to ABA Guideline 4.1 (The Defense Team and Supporting Services) adds the following:

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. [¶] Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict.

20.     "Without exception, the lawyers interviewed by the Subcommittee stressed the importance of a mitigation specialist to high quality investigation and preparation of the penalty phase. Judges generally agreed with the importance of a thorough penalty phase investigation, even when they were unconvinced about the persuasiveness of particular mitigating evidence offered on behalf of an individual defendant." (Judicial Conference Recommendations.)  I am aware that Mr. Echols requested funding for a mitigation specialist in this case, and Judge Payne authorized some funds.  If Mr. Hilfiger and Mr. Smith did not make use of those funds, they missed an opportunity to avoid the problem they seem to be attributing to Mr. Barrett.

21.     Misunderstandings, or a lack of understanding, like what Mr. Hilfiger and Mr. Smith have stated Mr. Barrett expressed, were seen often enough in cases that the ABA provided guidance for counsel faced with clients who truly oppose the presentation of mitigation evidence.  The Commentary on Guideline 10.5 (Relationship with the Client) provides the following advice:

> Some clients will initially insist that they want to be executed as punishment or because they believe they would rather die than spend the rest of their lives in prison; some clients will want to contest their guilt but not present mitigation. It is ineffective assistance for counsel to simply acquiesce to such wishes, which usually reflect overwhelming feelings of guilt or despair rather than a rational decision.  Counsel should initially try to identify the source of the client's hopelessness.  Counsel should consult lawyers, clergy or others who have worked with similarly situated death row inmates.  Counsel should try to obtain treatment for the client's mental and/or emotional problems, which may become worse over time.  One or more members of the defense team should always be available to talk to the client; members of the client's family, friends, or clergy might also be enlisted to talk to the client about the reasons for living; inmates who have accepted pleas or been on death row and later received a life sentence (or now wish they had), may also be a valuable source of information about the possibility of making a constructive life in prison.

These guidelines and advice to counsel suggest a much more serious problem than what trial counsel imply in the statements they attribute to Mr. Barrett.  Even so, it does not appear that

9

Mr. Hilfiger or Mr. Smith took any of the recommended steps that are commonly used by capital defense counsel in similar situations.

22. As I have already indicated, neither Mr. Hilfiger nor Mr. Smith contacted me to seek assistance with the problem they are alleging in their declarations. Assuming their statements are true, and inferring that the statements they attribute to Mr. Barrett influenced their investigation or trial strategy, their decision not to seek assistance confirms the sense I had in 2005 that Mr. Hilfiger was not interested in obtaining assistance from resource counsel.

23. I am aware that Mr. Echols received some funding for a psychiatrist or psychologist to be employed as part of the mitigation investigation. Mr. Hilfiger's declaration suggests that he did not retain a mental health professional either to talk with Mr. Barrett about the penalty phase, or to testify in mitigation. Mental health professionals, like those I recommended to Mr. Barrett's trial counsel, can advise counsel about what is significant in records or the accounts of family members, and rely upon hearsay when testifying to their opinions. Experienced capital defense counsel understand, and are able to explain to their clients, that dwelling on the past is not the point, and the accounts of family members can be presented through experts who, in any case, are able to place a traumatic or disadvantaged background in an objective context.

24. Reliable information about a defendant's family, medical, and social history is one aspect of the forensic mental health evaluation typically carried out in a capital case. *See* Liebert and Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15 AM. J .FORENSIC PSYCHIATRY 43 (1994). Mr. Hilfiger's declaration indicates that he had access to information about Mr. Barrett from family members and records gathered during Mr. Echols' representation, but he does not indicate that he provided those records to any experts, or

10

687

explained to Mr. Barrett that expert testimony was available.

25.     I also read in the declarations of Mr. Hilfiger and Mr. Smith that they felt they had a good rapport with Mr. Barrett, and that they met with several members of Mr. Barrett's family.  The declarations do not indicate that Mr. Hilfiger or Mr. Smith spoke with Mr. Barrett or his family about the penalty phase, or any concerns they had that Mr. Barrett's views would be detrimental to their efforts.  As the commentary above states, an attorney who feels his client is reluctant to allow mitigation evidence to be investigated or presented should speak with family members about the problem.

26.     In conclusion, if Mr. Barrett told his attorneys not to present his background to the jury because it would involve begging, dwelling on his childhood, placing his family in a vulnerable position, or an appeal to sympathy, that suggests Mr. Hilfiger and Mr. Smith either did not understand the nature or purpose of mitigation evidence, or the various methods of presenting it, or they allowed Mr. Barrett to harbor an inaccurate understanding of the penalty phase.  The declarations from Mr. Hilfiger and Mr. Smith indicate that they took none of the actions commonly taken in similar situations.  They did not speak with more experienced counsel, a mitigation specialist, a mental health professional, the court, family members, or anyone else who could have explained the process of developing mitigation evidence in a way that diffused the alleged concerns.  The declarations also do not offer any reason for failing to take the steps outlined in the ABA Guidelines including those that were available under the court's March 2005 funding order.

Under penalty of perjury, I declare on June 27, 2010, that the representations made in the foregoing declaration are true and correct.

688

Richard H. Burr

12

688

DANIEL J. BRODERICK, SB #89424
Federal Defender
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar No. 73016
Assistant Federal Defender
801 I Street, 3d Floor
Sacramento, California 95814
(916) 498-6666; FAX (916) 498-6656

DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

Attorneys for Petitioner

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | NO.  6:09-cv-00105-JHP |
| | ) | |
| Petitioner/Defendant, | ) | **DEATH PENALTY CASE** |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

————————————————————

**NOTICE OF FILING OF SIGNED
DECLARATION OF TOBY BARRETT**

————————————————————

NOTICE IS HEREBY GIVEN that Petitioner, KENNETH EUGENE BARRETT, files herewith

Exhibit 220,  the original declaration signed by Toby Barrett, the unsigned version of which was filed prior

hereto as Doc 178-14, Exhibit 218.

DATED: July 22, 2010                    Respectfully submitted,


/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600


DANIEL J. BRODERICK
Federal Defender


/s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666


/s/ Joan M. Fisher
JOAN M. FISHER, IDA Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666


Attorneys for Defendant
KENNETH EUGENE BARRETT

DANIEL J. BRODERICK, SB #89424
Federal Defender
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar No. 73016
Assistant Federal Defender
801 I Street, 3d Floor
Sacramento, California 95814
(916) 498-6666; FAX (916) 498-6656

DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

Attorneys for Petitioner

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,              )      NO.  6:09-cv-00105-JHP
                                     )
          Petitioner/Defendant,      )      **DEATH PENALTY CASE**
     vs.                             )
                                     )
UNITED STATES OF AMERICA             )
                                     )
          Respondent/Plaintiff.      )
_____)

_____

**EXHIBIT 220**
**DECLARATION OF TOBY BARRETT**

_____

Declaration of Toby Barrett                    *Barrett v. USA*, 6:09-cv-00105-JHP

## Supplemental Declaration of Toby Barrett

I, Toby Barrett, declare the following:

I am Kenny Barrett's son, his only child.

I signed a declaration early last year.  The investigator who interviewed me many times to gather the information for that declaration called me on June 5, 2010 and told me he had a few more questions for me.

He asked me if Mr. Hilfiger spoke to me about my family history.  I told him that Mr. Hilfiger spoke to me once, for a very short time, but it wasn't about my family.  Mr. Hilfiger told me he wasn't sure if he was going to call me to testify.

The investigator then read me the following paragraph, which he said was from my previous declaration and asked me if it was accurate.  I said that it was.

"I spoke to Mr. Hilfiger once, I'm not sure where, and asked him if he was going to want me to testify at the trial.   He said he was weighing whether it would be helpful for my dad or not, but that he expected I would.  He never asked me about my father's mental problems, my home life or about me or my mom.  I never spoke to him again."

Mr. Hilfiger never talked to me about his plans for defending my dad or for saving my dad's life.  I can't remember where we spoke or put a time to it except that it was sometime before my dad's federal trial.

I spoke to Mr. Echols, my father's state lawyer, once for a very short time.  It was before my dad's first trial.  It might have been in court.  It might have been somewhere else.  I don't remember it being arranged, but it could have been.  I can't remember one thing we talked about.  It could have been just small talk.  We never talked about my family.  To the best of my

TB

Page 1 of 2

692

recollection, nobody ever talked to me about my family in regards to my father's case until the investigator who gathered the information for these declarations did.

The investigator asked me if I had spoken to Bret Smith, Roseanne Schaye or Jack Gordon. If I did I don't recall it. I felt bad that I couldn't remember talking to them so I asked the investigator if they were saying that they had talked to me and he said no, that he hadn't heard that they were saying that. I felt better.

I have talked to my dad many times since he was arrested. He never once said he didn't want my help or for the family not to get involved in the case. None of the lawyers ever told me he said that. I have never heard him say he didn't want the family to get involved in his defense or in saving his life. My grandma, my dad's mother, never told me that he didn't want her involved either. I always felt just the opposite, that he wanted our help. I didn't know how to help him. I don't think anybody in the family did.

The investigator called me again a few days after this last interview and read this to me. I told him it was accurate. Then he sent it to me to read over. I have read it carefully and it says what I said to the investigator.

I declare, under penalty of perjury, that the foregoing 2-page declaration is true and correct.

Executed by me this ___1st___ day of ~~June~~ July 2010, in Sequoyah County, Oklahoma.

_Toby Barrett_
Toby Barrett

TB

694

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Movant/Defendant, | ) | **DEATH PENALTY CASE** |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | NO.  6:09-cv-00105-JHP |
| | ) | |
| Respondent/Plaintiff. | ) | |

---

**NOTICE OF FILING OF DECLARATION OF PAUL D. GORDON**

---

NOTICE IS HEREBY GIVEN that Kenneth Eugene Barrett, Movant herein files herein

and herewith the Declaration of Paul D. Gordon.  Said Declaration is filed  in support of

Amended Section 2255 Motion to Vacate, Set Aside or Correct (Doc 95) , Motion to Supplement

Amended Section 2255 Motion to Vacate (Doc 95) and Supplemental Section 2255 Motion to

Vacate, Set Aside or Correct Judgment/Order and Sentence.

DATED:   March 16, 2012

Notice of Filing of
Declaration of Paul D. Gordon                    1                    Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

694

695

Respectfully submitted,


___/s/ David B. Autry___
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600


DANIEL J. BRODERICK
Federal Defender


___/s/ Joan M. Fisher___
JOAN M. FISHER, Idaho Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666


Attorneys for Defendant
KENNETH EUGENE BARRETT

Notice of Filing of
Declaration of Paul D. Gordon                        2                  Barrett v. USA
                                                                        OKED Case No. 6:09-cv-00105-JHP

695

## <u>CERTIFICATE OF SERVICE</u>

I declare that this Notice under 28 U.S.C. § 2255 was electronically filed on March 16,

2012 and served on:

**Christopher J. Wilson**
**United States Attorney**
**1200 W. Okmulgee**
**Muskogee, OK 74401**

**Jeffrey B. Kahan**
**U.S. Department of Justice**
**1331 F Street, N.W., Room 345**
**Washington, D.C. 20530**

<div align="center">

_/s/ Joan M. Fisher_
Signature of Movant's Attorney

</div>

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Movant/Defendant, | ) | **DEATH PENALTY CASE** |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | NO.  6:09-cv-00105-JHP |
| | ) | |
| Respondent/Plaintiff. | ) | |

---

## DECLARATION OF PAUL D. GORDON

---

698

## DECLARATION OF PAUL D. GORDON

Paul D. Gordon, a person over eighteen (18) years of the age and competent to testify and mindful of the penalties of perjury, deposes and says as follows:

1.      I am currently a Senior Instructor at SOR Training Center, and conduct CLEET re-certification and certification training for security officers and investigators.

2.      I am retired from the Oklahoma Highway Patrol ["OHP"].  I was assigned to the OHP Internal Affairs Division on April 1, 1999.  On September 24, 1999, I was the on-call lead investigator and was assigned to investigate the shooting incident which resulted in Trooper Rocky Eales's death and charges of murder against Kenneth Barrett.

3.      At the time of the call to the shooting event, I lived in the Wellston area, which is approximately 25 miles northeast of Oklahoma City on I-44, or the Turner Turnpike.

4.      My experience and qualifications to conduct investigations for Oklahoma Highway Patrol Internal Affairs Division in September of 1999 are set out in my resume, which is attached hereto, Exhibit 1, and includes but is not limited to the following:

   a.      I was employed with the Oklahoma Highway Patrol from February 1, 1984 until my retirement in 2000.  My primary duties in that employ included Supervisor of Firearms and Defensive Tactics for the State of Oklahoma and the training of the Governor's protective detail in a fifty (50) hour basic protection school and advanced protective efforts by solo officers.

   b.      Vocational Training during my tenure with the Oklahoma Highway Patrol

**DECLARATION OF PAUL D. GORDON -1**

PDG

included:  the Oklahoma Highway Patrol Academy; Booby Trap Devices Recognition; Semi-Automatic Pistol Transition Course; Advanced Shooting Skills; Instructors Orientation Course; Hazardous Materials Awareness Training;  CLEET Security Instructor Certification; Criminal Investigation Academy; Police Survival Course; CLEET Firearms Instructor School; Protective Security Operations Training Program; Bomb Threat Management; Narco-Terrorism Executive Protection Course; Incident Management Training; Defensive Tactics Instructor Training; C.E.R.T. Training, TTT, Sniper School; Hazardous Material Awareness; Advanced Material Awareness; Hazardous Materials- Operations; Hazardous Materials - Incident Commander; Physical Security Specialist Training Program; Fugitive Investigator Training Program.

5.      On the morning of the shooting on September 24, 1999, I took the call for 1st Lt. George Randolph, also of Internal Affairs. At approximately 0130, I received a call from the DPS Com Center in Oklahoma City. The Com Center dispatcher advised that there were two troopers down in a shooting incident in Sequoyah County.  Both troopers were members of the Tactical (or Tact) Team, but it was unknown why they were at the location of the incident.

6.      At approximately 02:00, while driving to the location, Bob Ricks, the Highway Patrol Commissioner, called and told me that the Tact Team had been set up and he wanted me to go over the entire scene and find out exactly what happened.

7.      Upon arrival to the location I conducted several on-scene interviews that were

**DECLARATION OF PAUL D. GORDON -2**

limited in nature and observed the scene as it was at the time of the event, as well as, much of the physical evidence that would later be collected.

8. When I arrived on the scene, I initially spoke to Lt. Kerry Pettingill, who was responsible for the mission. Pettingill advised me that when everything started he thought it was his men who started shooting at the Barrett cabin as they rolled up on it.

9. At the scene that morning, I was the fourth trooper to enter the Barrett cabin after the event and made a videotape recording of the scene and the interior of Mr. Barrett's cabin with my personal video camera because the OHP camera did not work. I have reviewed that videotape to refresh my recollection.

10. During the course of my investigation of this incident, three things were made clear to me: (1) that the East Tact Team of the Oklahoma Highway Patrol had failed to follow appropriate protocol in the execution of the warrants at the residence of Kenneth Barrett on September 24, 1999; (2) that neither the Oklahoma Highway Patrol nor the Oklahoma State Bureau of Investigation ["OSBI"] desired or pursued a thorough objective investigation of the incident and events following the incident; and, (3) my efforts to conduct a thorough objective investigation resulted in attempts by the State of Oklahoma to undermine that investigation and my ability to credibly conduct and report the same.

The facts supporting these conclusions are set out below.

11. There were a number of things that happened in my investigation which were not the usual Internal Affairs's investigatory practices.

**DECLARATION OF PAUL D. GORDON -3**

a.    First, I was not permitted to attend Rocky Eales's funeral by order of my captain. Captain Burris advised me that my attitude concerning the Eales's shooting investigation had caused bad feelings so I needed to stay in Oklahoma City and watch the office.

b.    Secondly, I was not allowed to talk to any of the Tact Team members involved for ten (10) days, even though the usual practice was 72 hours. This directive came from the top of the Highway Patrol per Captain Burris. By the time I was able to talk to the troopers involved, they had already met with a "counselor" and had legal counsel, Gary James, the Trooper's Association counsel.

c.    OHP brought the Troopers' Association legal counsel, Gary James, to the shooting scene.

d.    On the afternoon of September 24, 1999, with the exception of Trooper Ricky Manion who shot Barrett, all of the involved troopers denied firing their weapons and none were willing to give up their state-issued weapons for analysis and testing, despite being routine in any officer-involved shooting. The troopers ultimately had to be ordered to comply and surrender their weapons for analysis.

12.    I did not interview Mr. Barrett; I was advised, however, that 1st Lt. Randolph did interview Mr. Barrett at St. Francis Hospital in Tulsa, Oklahoma where Mr. Barrett was taken after the shooting for gunshot wounds and apparent injuries sustained in a beating by later-identified law enforcement officers at the scene. In the course of my investigation, I asked Lt. Randolph for the Barrett interview tapes and any notes he might have taken during the interview but Lt. Randolph ignored my request. I was never given the information, recordings or notes.

**DECLARATION OF PAUL D. GORDON -4**                                          PDG

Recording interviews and taking notes is called "locking them into their statement," and was standard practice for Internal Affairs.

13.     When I arrived at the scene on the morning of the shooting, I interviewed or attempted to interview DA Diane Barker-Harold, who was among the group of dignitaries or observers that tagged along with the Tact Team. I asked her who the informant on the warrant was to which she replied that "we" know the identity of the informant, but she was not going to disclose this to me. I did not expressly inform DA Barker-Harold that I was tape recording the interview; however, as I spoke to her, I was holding the tape recording device in my hand without trying to hide it.

14.     I routinely used a recorder in all of my investigations with the full knowledge and approval of my supervisors. Despite that fact, I was advised by my superior, Captain Burris that Ms. Barker-Harold had filed a complaint against me for recording her and that I should not have used the recorder. Captain Burris told me to give him the tape recording of Barker-Harold. I refused, stating the recorder was an accepted investigation tool and that it was part of my investigation. Burris forbade me from any further contact with Dianne Barker-Harold or other local law enforcement who filed complaints against me because no contact is to be attempted by the trooper to the complaining party until the complaint was resolved. I never saw any written complaint and I was never advised to address the complaint in writing which would have been the first step in the complaint process. The original of the tape recording of Dianne Barker-Harrold and tapes of interviews of other parties involved in the Barrett shooting were given to Lt. George Randolph when I retired from the patrol under pressure in 2000.

**DECLARATION OF PAUL D. GORDON -5**

PDG

15.     At the shooting site on September 24, 1999, I asked Lt. Pettingill and others on the scene who was responsible for the planning of the mission. I was admittedly vocally critical of the lack of appropriate surveillance and planning before attempting to execute a High Risk Fugitive warrant. As a result, I was advised by Captain Burris and several others there that I was not a "team player" and that I should adjust my attitude.

16.     Despite the fact that as the primary investigator I was responsible for the investigation, I was denied any access to the state troopers on the morning of the shooting. The troopers had written statements which were collected by the Troopers Association attorney Gary James. I was never given access to those statements from me throughout my investigation.

17.     I was not given any access to the troopers for a number of weeks. When I was given access to them, I was permitted to ask only questions which were pre-screened and approved by Lt. George Randolph. Those questions are reflected in the recorded statements which I provided to Mr. Barrett's counsel identified below.

18.     In interviewing the troopers who were involved in the shooting incident, I was prevented from asking questions which would have been routine in any officer-involved shooting incident, specifically a drug or fugitive warrant service like the Barrett raid. Those questions are set out below and are questions which I specifically remember wanting to ask and others which are found in the 1988 U.S. DEPARTMENT OF JUSTICE DRUG ENFORCEMENT HANDBOOK that I had received in a class prior to the shooting incident and which I would normally have consulted in preparation for the interviews.

    a. Number of suspects confirmed by real time eyes on surveillance
    b. The group makeup of persons involved (male or female)

**DECLARATION OF PAUL D. GORDON -6**                                    *PDG*

c. Were children at the arrest site?
d. What were the approximate ages of the occupants?
e. Did you have current photographs of your target?
f. Number of suspects at the targeted location at any given time.
g. The full name and background of the target.
h. The capabilities of the suspect, considering the following:
  i. What type of criminal violations had Barrett committed?
  ii. What target classification did the OHP Tact team assign to Barrett?
  iii. What was Barrett's previous police record involving physical violence?
  iv. Likelihood of resistance by Barrett;
  v. Physical and mental condition of Barrett;
  vi. Was Barrett a user of drugs?
  vii. Was Barrett suffering from mental problems?
  viii. Was Barrett known to assault police?
  ix. Did Barrett have a record of resisting arrest or using firearms against law enforcement?
  x. Was Barrett usually armed at all times and if so, with what kind of weapon
  xi. Did Barrett have a military background?
  xii. Was Barrett knowledgeable about explosives?
  xiii. What was Barrett's mode of transportation?
i. What type of safety equipment were you provided with?
j. What was the exact geographical location of the Barrett Cabin?
k. Who provided the interior layout of Barrett's cabin?
l. Please provide me with a picture of the cabin or sketch of the property?
m. How were the doors and windows of the cabin secured?
n. Please provide me with an aerial map with the Barrett cabin marked on it?
o. What was your primary and secondary approach and escape routes to and from Barrett's cabin?
p. What type of material is Barrett's cabin constructed of?
q. What type of alarm systems were present?
r. What type of guard animals were on the property?
s. What type of utilities were at the Barrett cabin?
t. What were the written rules of engagement?
u. What was the mission abort signal?

19.     The trooper interviews which were ultimately permitted took place in late October to early November of 1999 in my office.  They were recorded and followed the script which was required and pre-approved by Captain Burris.  Even then, if any trooper had a complaint about

**DECLARATION OF PAUL D. GORDON -7**

the manner in which I handled the investigation, he could go directly to my superior, Captain Burris and file a complaint. I am unaware of any complaints.

20. One of the routine steps I took in this investigation was to try to acquire the procedural handbook for the East and West Tact Teams. When I asked for the handbook from Lt. Kerry Pettingill at his office, he told me it was not available. I told him if it needed to be printed I would come back and pick it up. He then told me "you'll never see this book." At that time, I went to my supervisor Captain Burris and advised him of Lt. Pettingill's statement. Burris told me he would get a copy of the Tact Team manual or handbook for me. About twenty minutes later, Burris refused to get me a copy of the manual, telling me it was a restricted document. About an hour later, Asst. Chief Jerry Cason walked into my office and asked me why I wanted the Tact Team book. I told him it was investigative protocol to obtain whatever manual was being used by the officer or unit at the time of the event. Cason told me I would never see the book as it was a restricted document. The lack of cooperation within the OHP upper ranks made the Internal Affairs investigation difficult, to say the least.

21. Within a few days of the refusal to give me the manual, however, when I went to my office, IASI secretary Carol Rawlings told me that there was a bunch of papers lying on the floor inside my office. When I went into my office, I found the papers and among them was the Tact Team handbook that Pettingill had refused to give me. I asked Carol who had been in my office. She said she did not know; that the papers were there when she put a message on my desk.

**DECLARATION OF PAUL D. GORDON -8**                                      PDG

705

22. The manual recited that when a raid was being conducted on a suspected drug house, the Tact Team was not to conduct the raid without clearly identifying themselves as law enforcement officers. Otherwise, the suspected drug dealer would think that he was being "ripped off," setting the stage for a violent confrontation. The copy of the Tact Team Manual which appeared mysteriously in my office was left with Lt. Randolph when I retired.

23. My investigation made clear that the OHP East Tactical Team failed to follow the handbook protocol, at the very least, in this regard: the Broncos were unmarked and the troopers did not activate their emergency lights to warn Barrett he was dealing with the police. When I arrived at the shooting scene on September 24th, the vehicle that was fired upon had its visor flip and emergency lights in the up position as were Lt. Pettingill's, the team leader. When I talked to Trooper Hamilton later, I asked him specifically about the lights. At first, Hamilton said the emergency lights were down. I told him that the flip lights would have been shot up if they had been down. After the recording had been turned off, Hamilton admitted to me that did not activate the lights; in fact, that they did not have any lights on at all. Under the circumstances admitted to me and observed by me, Mr. Barrett would not have known the incoming vehicles were law enforcement.

24. Among other things, my investigation also revealed the following:

a. On the night of the shooting, there was good visibility because there was a full moon with no clouds of any kind.

b. Mr. Barrett's residence was a homemade cabin with no electricity and no running water, undermining any fear of destruction of evidence by announcing law

**DECLARATION OF PAUL D. GORDON -9**

PDX

enforcement's presence. Mr. Barrett did run an electric cord from his mother's residence which was next door to both his garage and cabin.

c.     There had been a "drive by" earlier in the day, with four troopers participating. The troopers used one of their unmarked tactical vehicles. The tell-tale antennas, which could identify the vehicles as law enforcement vehicles, had been removed.

d.     At the time of the drive-by, Mr. Barrett and an unknown individual were standing in the yard and reportedly witnessed by the drive-by troopers. Because the road fronting Mr. Barrett's property dead-ended to the east, the vehicles had to turn around and drive back past the property. There was nothing about the vehicles to convey to Mr. Barrett or anyone else present that the vehicle was law enforcement.

e.     There had been a fly-over of the property, which only lasted 15-20 seconds the day before the execution of the warrant.

f.     No real time surveillance had been conducted up to the start of the raid to ensure intelligence integrity of the mission.

g.     The gate to Mr. Barrett's property was open at the time of the drive-by but on the  night of the raid, the gate was closed and locked.

h.     Earlier in the night before the raid, Mr. Barrett and his son, Toby, had reportedly been working on a vehicle in the garage on the property. In my professional opinion, if proper real time surveillance had been conducted, Mr. Barrett could have been approached and taken by surprise at that time and taken into custody without incident.

i.     The information relayed to the troopers prior to the execution of the

**DECLARATION OF PAUL D. GORDON -10**

warrant regarding Mr. Barrett's dangerousness was that Mr. Barrett's likely response to law enforcement was to run away. Among other things, this was supported by Trooper Manion's interview, Mr. Hise's interview and the placement of OHP manpower at the two adjoining residences to prevent Mr. Barrett's safe escape to either residence.

25.     Based on my observations at the Barrett residence the night of the incident, review of the physical evidence, and interviews with the surviving troopers and other people present or in the area, it was clear that none of the vehicles which approached the residence were driving with their emergency lights activated but that they had, in fact, rolled in dark, not even using headlights initially because of the full moon.

26.     The task force investigator, identified to me at the scene as Frank Lloyd, who was in the lead vehicle of the caravan of state agents, which was supposed to arrive after the state troopers secured the scene, stated that as they approached the scene, Lloyd could see the Tact Team's brake lights when they turned into the Barrett drive. Mr. Lloyd did not mention to me at the scene that morning seeing overheads, rear deck lights or any emergency lighting as they came on the scene which was over by the time they arrived.

27.     The physical evidence supported the conclusion that the officers did not have their emergency vehicle lights on. For example, Hamilton's unmarked Bronco's windshield was damaged by bullets but the emergency lights, which if in use would have been in the line of fire were undamaged.

28.     Though Trooper John "Buddy" Hamilton, who was driving the lead vehicle, initially advised me that his emergency lights were on, when confronted with the physical

**DECLARATION OF PAUL D. GORDON -11**                    PDX

evidence, he admitted to me that he was not running his lights. Though the admission came after I turned the tape recorder off, it would most likely be reflected in my notes of the interview. Those notes were left with Lt. Randolph.

29.     Trooper Hash, who was in a marked unit, also claimed he drove onto the property with his lights and his flashing bar on, but ultimately admitted that somebody just flipped the lights on after the shooting to give needed light during the wounded troopers' evacuation. I have a clear recollection of Trooper Hash's admission regarding the emergency lighting to me, which came after I turned the tape recorder off and Trooper Hash continued to talk. The statement is likely reflected in my notes of the interview which were left with Lt. Randolph when I retired.

30.     Lt. Pettingill's lights, which if activated would have been obvious to Barrett if he looked in that direction, were, in my professional opinion, in the up position because the flipped down lights would have impaired Assistant Team Leader McBride's vision for observation of the raid from their vantage point in the yard next door, which was Kenny Barrett's mother's home.

31.     Mr. Barrett would not have seen the other vehicles approaching from the side in any case, because even when he reportedly was outside the residence, he was on the porch looking where his son was yelling for help. Troopers Darst and Hise had tackled the son in the yard by the garage after they came across the gate in the dark.

32.     The physical evidence and interviews made it clear that Mr. Barrett never left the porch and never went into the yard and that he only responded to the first tactical vehicle when it was accelerating towards the front of the residence, after making a circle in the yard from the side of the cabin.

**DECLARATION OF PAUL D. GORDON -12**                     PDG

33.      When Trooper Hamilton was driving up to the cabin after turning off the main road, he bottomed out hard in a depression on the east side of the cabin, an incident which would have made considerable noise and made him slow down and then gun the vehicle to get out of the deep depression.

34.      The vehicle then ran or slid into the front of Mr. Barrett's cabin, stopping with engine still running.  Barrett was on the porch, shooting at the vehicle from a 45 degree angle, slightly elevated position and hit the vehicle's transmission lines which, under engine power, caused a major transmission fluid leak that emptied the transmission fluid onto the ground exactly where the vehicle originally stopped and the shooting occurred.

35.      With appropriate expert testing, this transmission fluid may still be detectable on the Barrett property and able to establish the precise location of the lead Bronco during the shooting incident.

36.      According to Lt. Pettingill, the Hamilton vehicle was backed out away from the house to be used to transport Trooper Eales.  Because the vehicle would not drive forward due to transmission fluid loss, another vehicle was selected for the transport.

37.      As a result, on the evening of September 24th, OSBI with the assistance of OHP Vernon Phillips, inappropriately processed the Eales /Hamilton vehicle at the place where the vehicle had been moved, rather than where it had been positioned during the shooting.

38.      I advised my supervisors Lt. George Randolph and Captain Rodney Burris that the vehicle was being processed in the wrong place and would give the wrong evidentiary information about location and bullet angle.  They both advised me this was an OSBI

**DECLARATION OF PAUL D. GORDON -13**

_PDG_

investigation and to stay out of it. I filmed the process showing where the processing effort took place for further review.

39.      My recollection of these events are substantiated by the statements of the surviving troopers that when Trooper Eales exited his vehicle with the ballistic shield he turned towards Barrett and then turned and walked to the rear of the vehicle where he collapsed. The troopers retrieved the trauma kit by knocking out the rear window of the vehicle and cared for Eales at the rear of the vehicle where he had collapsed. The troopers and others then loaded Eales into the vehicle and moved the vehicle back to where OSBI later processed it.

40.      The video clearly shows that the Hamilton vehicle is behind the ballistic shield and trauma kit, indicating an obvious movement.

41.      When I first arrived on the scene in the early morning hours of September 24, 1999, 1st Lt. Pettingill told me that everything was laying where it was dropped during the event including the transmission fluid in front of the porch.

42.      Trooper Hamilton claimed to me that his brakes failed, but when I had the brakes tested at the DPS garage, they were found to be in good operating order and that nothing was lodged under them.

43.      Since the vehicle was unmarked and no other vehicles were running their lights, and without any announcement that law enforcement was on the property, Mr. Barrett, or any person like Mr. Barrett, who was paranoid as a result of his-off-the-grid lifestyle, would reasonably have believed that he was shooting at criminal intruders.

44.      Most of the rounds fired by Mr. Barrett were fired from inside the house which are

**DECLARATION OF PAUL D. GORDON -14**                          _PDG_

also visible in the video I made that morning.  Trooper Manion shot Mr. Barrett in the legs in the residence.

47.    When the shooting stopped, Mr. Barrett was handcuffed behind his back in the house and dragged out onto the porch by Trooper Hamilton and searched by Trooper Manion for weapons.  Mr. Barrett was searched at least a total of two times while at the scene, once by Trooper Manion and again when taken into custody by the Sheriff.  His clothing would have been thoroughly searched at that time.  Neither Trooper Manion nor the sheriff reported that anything other than the S&W semi-automatic handgun was found on Mr. Barrett's person  found by Trooper Manion.

46.    I know that Sheriff Philpot and his deputies searched Barrett before they beat him as a result of my interview with the sheriff.  I observed the sheriff walking across the Barrett yard on the morning of the 24th.  I asked him who he was and he told me that he was the sheriff.  I asked him if he had any contact with Barrett and he advised me that he and his deputies searched Barrett when they took custody of him.  I asked the sheriff specifically at that time if they found any guns or anything else dangerous on Barrett and he said no.

47.    Every trooper, and certainly drug task force members, would have answered the question of whether anything dangerous had been found would have responded "yes" if Barrett had red phosphorus on his person because of the inherent dangers of inhalation, absorption and ingestion associated with red phosphorous, not to mention flammability problems.

48.    At the time of our conversation, outside of my OHP vehicle, I asked the sheriff if he would let me conduct a formal interview while we were there at the scene and he consented.

**DECLARATION OF PAUL D. GORDON -15**

During this tape-recorded interview inside my OHP vehicle on September 24, 1999, Sheriff Philpot admitted to me on tape that he and his deputies beat Barrett badly, saying they had done all they could and would have done more if there had not been so many people around. Sheriff Philpot never mentioned red phosphorus to me at that time or I would have notified all of the troopers involved to take necessary decontamination procedures. Anyone with any understanding of red phosphorous who found anything which had come into contact with red phosphorous would immediately have reported it because of the danger of contact transfer from hands to your face within 5 minutes and in your eyes requiring immediate medical attention. Sheriff Philpot did not mention either the pill bottle or the baggie in the pill bottle with red phosphorous residue in it.

49.     The tape of this interview was kept with all of my investigative tapes related to this matter and turned over to Lt. Randolph when I retired.

50.     OHP divides the state into Western and Eastern Tact Teams; the raid on Mr. Barrett's property was undertaken by the East Tact Team. Assistant Team Leader Lt. McBride, who was assigned to the West Tact Team, was temporally assigned to the East Tact Team. I interviewed Lt. McBride. After the formal approved questions had been asked and answered and the tape recorder turned off, Mr. McBride became very emotional and told me that he had recommended that East Tact Team abort the mission because the raid was going to be undertaken with inadequate information and planning and no real surveillance had been conducted, but his advice was not taken. McBride was advised by the East Team to go back to the West Team if he did not want to participate. McBride was so upset over what happened that he began crying by

**DECLARATION OF PAUL D. GORDON -16**

the end of the interview. Though the recording does not reflect this portion of the conversation, my notes would most likely reflect it. Those notes were given to Lt. Randolph when I retired.

51. Mr. Barrett's property was thoroughly searched the morning of the shooting. This included agents going layer by layer through the ashes in his burn barrel behind the cabin. There was nothing found that I observed which indicated drug activity nor was I ever advised that anything had been found by anyone.

52. I was never advised that there was any information to support an anticipated finding of drug manufacturing at Barrett's residence but rather was informed that Mr. Barrett was believed to be an enforcer, *i.e.,* he facilitated sales of drugs between buyers and sellers who might not want to deal directly with each other.

53. There was no air monitoring device at the scene and I did not see any of the investigators wearing special gear consistent with an active meth lab.

54. Prior to entering the premises to videotape the inside of the cabin, the property was cleared by Vernon Phillips, who was also an OHP Tact Team member and Explosive Ordinate Disposal ["EOD"] expert and per meth lab requirements, would have alerted everyone to any possibility of booby traps or dangerous drug activity in the residence.

55. I entered the premises without any special personal protective equipment, such as eye protection, vinyl rubber gloves, special protective clothing, or rubber boots. Where exposure levels are unknown, persons entering a potentially dangerous area would wear a full-face, positive-pressure, and air-supplied respirator. I was not instructed to discard contaminated clothing or shoes, which would have been the case if a meth lab was present in any one of its

**DECLARATION OF PAUL D. GORDON -17**

three forms: boxed; set-up not functional; or, set up functional cooking.

56.     The Manual and Training Videos available to the East Tact Team at the time make clear that on September 24, 1999, the manner of serving or executing the High Risk Warrant/s on Kenneth Barrett was against protocol, grossly unprofessional and created far greater risk of injury or death than the situation would have presented if appropriate planning and measures had been taken.   I have provided these videotapes to Mr. Barrett's counsel and can attest that they were available to the East Tact Team for training prior to the execution of the warrant at Mr. Barrett's residence on September 24, 1999.  Exhibit 2 (DEA Dangers of Drug Labs), Exhibit 3 (The Meth Lab), Exhibit 4 (Kitchens of Death).  In 1989, three sections of Exhibit 4 "Kitchens of Death" were required viewing by the OHP.

57.     As my investigation continued, I was advised by at least two state troopers to watch my back and that the Highway Patrol was after me.

58.     At one point in my investigation, Lt. Randolph, Captain Burris, and Jerry Cason came into my office with others, whose identity I do not recall, and aggressively accused me of putting the wrong serial number for Rocky Eales' gun in my report.  I was told that the Widow Eales had noticed it and brought it to their attention while she was reading my un-released report. I told them that I had taken the number from the OSBI report and pulled that report out to show them that OSBI had recorded the number incorrectly.  I corrected the serial number on the report. More importantly, I inquired, why anyone from outside the division had access to my on-going investigation.  I was advised that they wanted to nominate Rocky for a medal of honor and had sent the report to Dallas and that they had let Mrs. Eales review the report.  I again pointed out

**DECLARATION OF PAUL D. GORDON -18**

that the investigation summary report was taken from my computer without my permission, authorization or even notification. I told them that my office had been locked on a weekend when no one was present to allow access to the report. They told me I needed to relax; that we all needed to be on the same team.  At that point, I became very concerned about what was happening in the Internal Affairs Division and began to make copies of some of the recordings I had made.  I did not have access to all of my recordings at that time.

59.     Because I believed the work environment to be hostile, in February of 2000, I began the employment process with Dyn Corps, a private overseas contractor, with the intent to vest my retirement and get away from the problems which I felt were only going to worse.  I was contacted in March by DYN Corps and advised that I was good to go for a mission in Bosnia with processing classes forming in May and June. I advised them I needed to talk with my wife and give them a firm answer by May.

60.     In April, 2000, I attended a High Risk Fugitive training course given by the U.S. Marshals' Service at FLETC in Georgia.  While there, I discussed the manner in which the Barrett raid had been conducted and was advised that it was everything that shouldn't happen.

61.     When I returned from the training, I decided to go ahead and vest my retirement from the Highway Patrol rather than to continue in the openly hostile work environment.  I knew that as soon as I took the stand in the Barrett case, I would be in a position adverse to the Highway Patrol and thus, decided to retire from the Patrol and wait to see what happened in the Barrett case.

**DECLARATION OF PAUL D. GORDON -19**

_PDG_

62.    In June of 2000, I took a position with DYN Corps, an International Police Task Force, as CO-locator and patrol officer in small villages in and around Sarajevo, Bosnia, where my assignment was expanded to assist in Haz Mat training and evaluating Tactical Teams in controlled use of force in training situations.

63.    While in Bosnia, my wife, Susan Gordon received subpoenas for records from the Oklahoma Attorney General's Office.  I was investigated for, and later charged with, what amounted to misappropriation of state funds and property for taking "unapproved" comp time and for using a state telephone while working on the side as a private investigator.

64.    I was advised by the Attorney General's Office that if I did not return to face the charges, they would come and get me.

65.    The comp time and use of the state phone and other equipment had been explicitly approved by my superiors, Lt. Randolph and Captain Burris when I was assigned to the Internal Affairs Unit.  While I was assigned to the Internal Affairs Division, there existed a "hidden 32-hour comp time" policy which applied to everyone assigned to Internal Affairs.  If you were on-call, you automatically got 32 hours comp time, whether or not you were called out.  A person was on-call for two weekends and thus was supposed to claim sixteen hours comp time for each weekend.

66.    In the investigation of the charges against me, which were primarily the abuse and/or misuse of government property, services and compensation investigation, Burris and Randolph gave false statements to the Attorney General's office investigator, Larry Andrews,

**DECLARATION OF PAUL D. GORDON -20**

when they told him that they did not get comp time as a result of their job responsibilities which included being "on call." They also gave false statements to the grand jury.

67.     While the charges were pending against me, I was advised by Lt. John Matlock that he had been requested to perform an internal audit by Commissioner Bob A. Ricks, as suggested by the Grand Jury, and the audit revealed that the policies regarding comp time and use of state property for personal business were not clearly set out and that it was clear that Captain Burris and Lt. Randolph had misrepresented the fact that they, too, claimed comp time for weekend on-call time.

68.     Lt. Matlock told me that he advised both OHP Commissioner Bob Ricks and his Captain Jerry Simpson of the audit teams findings and that he had heard recorded telephone conversations with me and agency personnel, including Assistant OHP Chief Jerry Cason, who complained about the leadership of the agency, and defended use of the 32 hours on-call comp time as a standard practice. Cason confirmed to Matlock that I was entitled to the comp time like everybody else and that he expected subordinates to drive their units all the time to enable immediate response to investigations. Cason stated he would testify for me. I also allowed Matlock to hear tapes of Captain Burris stating that recording on-call time as comp time had been approved and was standard practice. Burris gave me permission on many occasions to leave DPS because I had "lots of comp time" coming. On those occasions, I was expected to drive my unit and was assured by Burris that I shouldn't worry because he "had my back."

69.     According to Lt. John Matlock, one of the OHP troopers assigned to conduct an audit of comp time policies in Internal Affairs, Diana McKnight, the Deputy Attorney General

DECLARATION OF PAUL D. GORDON -21

who prosecuted my case, became aware in the course of the investigation that Randolph and Burris committed perjury in the grand jury proceeding and advised OHP auditors that both Burris and Randolph compromised themselves in the grand jury. John Matlock also told me that Deputy AG McKnight advised Lt. Don Stockton, a member of the OHP audit team, that I was the only trooper to be prosecuted. When Ms. McKnight discovered that Lt. Stockton kept notes of the meeting with McKnight, she requested that he give her all of the notes concerning the grand jury testimony.

70.    Deputy AG McKnight nonetheless vigorously pursued the prosecution in my case after being told about Burris and Randolph and the hidden illegal 32 hours of comp time by OHP auditors.

71.    In my criminal case, I was represented by attorney Miles Zimmerman. Deputy AG McKnight did not notify Mr. Zimmerman that Burris and Randolph committed perjury in the grand jury. She did not advise him of the results of the audit which showed that the accumulation of comp time in the manner for which I was being prosecuted was an approved method used by all Internal Affairs personnel or that I was the only person being prosecuted for it.

72.    Mr. Zimmerman worked out a plea deal where I could keep my retirement. I was allowed to enter a plea of *nolo contendere* to misuse of a state telephone, and received a five (5) year deferred sentence which has now been expunged after successful completion of the sentence. After the agreement to permit a *nolo* plea had been made, Ms. McKnight advised Mr. Zimmerman that they would only accept a guilty plea. Mr. Zimmerman asked to talk with

**DECLARATION OF PAUL D. GORDON -22**

someone else, and Mrs. Goodspeed, who was McKnight's supervisor, approved the original agreement for a *nolo* plea which preserved my retirement.

73.    I entered the plea on August 16, 2001 because I was tired and extremely paranoid of the prosecution which was occurring.  I was out of money and every effort to subpoena material witnesses was being quashed.  I knew that the Commissioner of the Department Of Public Safety, Bob Ricks, was advised by the audit team about the conspiracy but had decided not to intervene or take any action against any of my superiors other than to transfer them to other units.  He did not refer their conduct to the AG's office for review even though both Burris and Randolph committed a felony when they blatantly lied to the Attorney General investigator, Larry Andrews.  Both officers then attempted to keep the investigation on me in the Internal Affairs unit so attention was not called upon them.

74.    The audit, the results of which were not disclosed to me prior to my plea, shows that I did not engage in any act which had not been specifically authorized by my superiors and which was not common practice in the division.

75.    Despite having entered a specific plea agreement, the terms of my probation were constantly changed by the prosecuting deputy attorney general, Diana McKnight, in significant ways, changing the conditions of my probation and making it more and more difficult to comply with those conditions. Additionally my police certification was revoked by the Council on Law Enforcement Education and Training despite the plea agreement to suspend the certification for the deferred sentence and not to contest my re-certification as a peace officer once my deferment was set aside.

**DECLARATION OF PAUL D. GORDON -23**

76.     After the plea, and while I was on probation pursuant to a deferred adjudication, I received from Lt. John Matlock a copy of the Report on the Multi-County Grand Jury, Partial Report SC-99-56 prepared for Commissioner Bob A. Ricks, dated September, 2001.  A true and correct copy of the Internal Audit including the Response to the Chief's Inquiry which I received from Lt. John Matlock is attached hereto and marked Exhibit 5.

77.     In that report, findings included a response to the Chief's Inquiry which had downplayed the significance of the audit requested by the Grand Jury.

78.     Included in the Internal Audit completed by OHP Auditors John Matlock, Jerry Simpson and Don Stockton is a section entitled "Audit's Response to Chief's Inquiry Re: OIA-01-04."  The audit team attempted to resolve "some disturbing discrepancies found in the Internal Affairs and Special Investigation Units handling of the case involving 2d Lt. Paul Gordon that were not explained or addressed in the Chief's Inquiry."  That response points out that when the investigation resulting in the felony charges against me were referred to the Attorney General's Office, "no mention was made of the application or accrual of comp time or the fact that [I] was or may have been authorized comp time when [I] was alleged to have been working for the State Insurance Fund."  The report concluded that had that fact or an internal memo or other notice of the accrual of comp time and its use inside IASI been made, "it is highly likely this incident would have never escalated beyond that point.  Failing to do so casts a dim light on the motivation to omit that information by the management of IASI."  Exhibit 5.

79.     Additionally the Response found that the DPS and IASI management "violated a basic rule of ethics and segregation of duties by proceeding with an investigation of serious

**DECLARATION OF PAUL D. GORDON -24**

wrongdoing by an employee within that division, a decision which casts doubt upon the objectivity of the investigator and his motives for not referring the matter to outside investigators." Exhibit 5.

80.     After addressing other matters including the calculations of comp time taken by both Burris and Randolph, the Response concluded that the circumstances . . .

> . . . imply that conspiracy to commit fraud has been perpetrated by certain individuals who were over-reporting time worked. In the course of concealing their behavior, they withheld information regarding the accrual and usage of compensated time and provided a misleading report to the Commissioner and Attorney General's Office. The individuals continued the practice even after a fellow trooper resigned [footnote omitted] and was subsequently indicted by a multi-county grand jury. There were no indications they would have stopped until the practice was revealed by an audit."

Exhibit 5.

81.     Shortly after I entered the plea *nolo contendere* and received the 5-year deferred sentence, I was contacted at my residence by Lt. John Matlock. He asked me if I had read the newspaper articles about the testimony being given by the state troopers against Mr. Barrett in his state trial which, if reported correctly, was a lie. I contacted Mr. Barrett's state trial counsel, John Echols by telephone and voiced my concern. I answered all of the questions he had about the ill-fated execution of the warrant on Mr. Barrett and the investigation of it.

82.     The felony charges against me were career-ending and I was emotionally distraught and suffering from a high degree of anxiety as a result of the prosecution against me. Though subpoenaed for both state trials and willing (though nervous) to honor those subpoenas, I did not testify for either the state or the defense.

**DECLARATION OF PAUL D. GORDON -25**

83. At some point, while the Barrett state court proceedings were ongoing, a second copy of the Tact Team manual was anonymously hand-delivered to me through the mail slot at my school in Moore, Oklahoma. The first copy had been left with Randolph and reportedly was no longer in existence. I contacted by telephone Oklahoma Indigent Defense Services ("OIDS") investigator Jack Stringer and informed him that I had received another copy of the Manual. I was asked to bring the manual to Judge Garrett's chambers. I met with Judge Garrett, Mr. Echols, the prosecutor, and representatives of OSBI. When Judge Garrett asked me what was important about the manual, I related the critical passage about the Tact Team protocol when serving a drug search/arrest warrant requiring positive identification as law enforcement to avoid the suspect from believing he was being ripped off, procedures which were not followed in this case. I gave the manual delivered to me to Judge Garrett and did not make a copy for myself.

84. I was subpoenaed by both the Government and the Defense for the federal trial. One of the federal prosecutors, who I believe is Mr. Littlefield, called me and was very aggressive, threatening and intimidating. He basically told me that he was going to tear me up on the witness stand over the deferred sentence I received and challenged my credentials because I was not a SWAT officer and was in no position to second-guess the Tact Team. I told my wife about the conversation and she reminded me that I had been trained by the U.S. Marshalls's Service on how to execute high risk warrants. I called the prosecutor back and left a message about this training because I did not want him to think I was sandbagging him. The prosecutor called my residence the next morning and left a message with my wife, Susan, that I did not need to come to Muskogee to testify at the federal trial.

**DECLARATION OF PAUL D. GORDON -26**



85.    I talked to defense counsel in the federal case, who I believe to be Roger Hilfiger, only once on the telephone for a very short period of time in a call initiated by me because I had been subpoenaed and wanted to know the questions he was going to ask. I believe an investigator from the defense did make a short visit before that but I do not specifically recall the details of the conversation other than that the investigator did not ask me any substantive questions. Defense counsel told me that it was his understanding that I had a relationship with Mr. Barrett. I advised him that there was no such relationship and told him that if called to testify, I would simply tell the truth. I emphasized a couple of times during the interview that I had no affection for Mr. Barrett because he killed a state trooper but that if he asked me the questions, I would give him the answers. I told him that it depended on the questions he asked whether or not my testimony would help Mr. Barrett. Hilfiger did not ask me any questions and I was not called to testify. If called and asked the questions, I would have testified to everything to which I attest herein.

86.    I was interviewed on this matter by Mr. Barrett's present counsel, Assistant Federal Defender Joan Fisher, Attorney David Autry and the Federal Defender's investigator, Paul Mann on November 3, 2011. Since that time, I have cooperated with them, answering any questions posed and attempting to provide whatever documentation or recordings I have been able to locate to support the truth of this Declaration.

87.    After my discussion with the attorneys and investigator for Mr. Barrett, I remembered that once I became aware of the removal of my report from my computer and was worried for my professional security, I began making copies of interviews that were then

**DECLARATION OF PAUL D. GORDON -27**

PDG

724

available to me. I put the copies in a box and took them to my mother-in-law's residence where they remained until she died. Prior to my mother-in-law's death, I was responsible for cleaning her house and removing her property so the house could be sold. While removing the property, I came across the box of tapes which was then put in storage at my school in Moore, Oklahoma. After talking with Barrett's defense team, I searched for them and gave copies of those tapes that I have been able to find to Ms. Fisher and Mr. Autrey on December 8, 2011.

88. I did not advise either Mr. Echols or Mr. Hilfiger that I had these recordings because I did not remember that I had them and nothing in the my conversations with them reminded me of them.

89. I also had copies of training videos which I later copied and sent to Ms. Fisher.

90. Among the documents upon which I have relied to refresh my recollection and to support my assertions which I have provided to counsel are the following:

    a.    Memorandum for 27th District Attorney Richard Gray regarding the Subpoena;

    b.    The Subpoena issued by the prosecutor;

    c.    Release from the subpoena dated September 19, 2002;

    d.    May 7, 2001 Request by John Matlock "for monthly time sheets for the last three years or while assigned to IASI of Captain Rodney Burris, Captain Rick Adams, 1 Lt. Eddie Davenport, 1 Lt. George Randolph, 2 Lt. Paul Gordon, 2 Lt. Leanne Spears, 2 Lt. Deryckere;"

    e.    State of Oklahoma Office of Attorney General Grand Jury Investigation

**DECLARATION OF PAUL D. GORDON -28**

Unit, June 9, 2000 report by Larry W. Andrews regarding interviews with Captain Rodney Burris and Lt. George Randolph;

f.      October 16, 2001 statement by 1 Lt. John Matlock #44 regarding an April 17, 2001 meeting with 1 Lt. Don Stockton, Capt. Jerry Simpson #18, Asst. Atty. Gen. Diana McKnight and B. J. Schmidt wherein McKnight stated that 1 Lt. Randolph and Capt. Burris of Internal Affairs compromised themselves testifying in front of the Grand Jury to events regarding Paul Gordon;

g.      Correspondence between Miles C. Zimmerman to Diana McKnight, Assistant Attorney General, dated April 21, 2001;

h.      Report on Multi-County Grand Jury Partial Report SC-99-56 (September 2001), including comparative comp days claimed, taken and calculated cost by Burris and Randolph in 1999;

i.      October 21, 2001 leave Request by 1 Lt. Matlock to Captain Jerry Simpson resulting from treatment in response to his efforts in conducting the Internal Audit "[a]long with [his] knowledge of Atty General Behavior and DPS involvement".

j.      OSCN copy of the Docket Sheet in State of Oklahoma vs. Paul D. Gordon, Oklahoma County No.  CF 2001-2226

k.      Application for Clarification of Terms and Conditions of Probation, State v. Gordon, Case No. CF 2001-2226;

**DECLARATION OF PAUL D. GORDON -29**                                    PDG

l.     Order of Expungement and Vacation of Previously Entered Plea dated 13th day of October 2006, filed October 18, 2006 in State v. Gordon, Case No CF-2001-2226

m.    Current Resume of Paul Donahue Gordon (Exhibit 1)

91.    Among the recorded statements upon which I have relied to refresh my recollection and to support my assertions which I have provided to Mr. Barrett's counsel are the following:

a.    Tape by Paul Gordon - 09/24/1999

b.    TRP Eales Shooting - 09/24/1999

c.    Danny Oliver [mislabeled Scott Jenkins]- 09/24/1999

d.    Gene Hise - 11/08/1999

e.    Rick Manion - 11/09/1999

f.    John Matlock  - 07/21/2001

g.    Matlock - 08/01/2001

h.    Terry Morris- 06-24-03

i.    Steve Hash - November 19, 1999

j    Training Videos

      i.    DEA- DANGERS OF DRUG LABS (EXHIBIT 2).

      ii.    THE METH LAB (EXHIBIT 3)

      iii.    COPS SURVEILLANCE "DRUGS"

      iv.    KITCHENS OF DEATH  (EXHIBIT 4)

**DECLARATION OF PAUL D. GORDON -30**        PDG

v..      RAID PLANNING

92.      After I spoke with Mr. Barrett's counsel and before signing this Declaration, Ms. Fisher provided me with copies of the typewritten transcripts of the interviews I conducted with Troopers Darst (Exhibit 6), Greninger (Exhibit 7), Hamilton (Exhibit 8), Hash (Exhibit 9), Hise (Exhibit 10), McBride (Exhibit 11), Manion (Exhibit 12), and Poe (Exhibit 13), as well as, Lt. Pettingill (Exhibit 14) and DEA Liaison Danny Oliver (Exhibit 15).  I reviewed those transcripts and they confirmed my recollection of the those interviews.

93.      Prior to and during the federal capital trial of Kenneth Barrett, I was able and willing to testify under oath to all of the matters discussed in this Declaration including the statements made to me in all of the interviews indicated above as well as to the conversations with the interviewees which occurred after I completed the scripted interviews and turned the recorder off.  I am willing to testify to same now.

94.      I declare under penalty of perjury that, to the best of my recollection as refreshed in part by my  review of the documents identified above, the foregoing twenty-nine  (31) page declaration is true and correct.

Executed by me this _14_ day of March, 2012 in _LINCOLN_____ County, Oklahoma.


_____
Paul D. Gordon


**DECLARATION OF PAUL D. GORDON -31**                                    _____

**Declaration of Paul D. Gordon**
**EXHIBIT INDEX**

**Exhibit #**                                                                                           **Tab #**

1.    Paul Gordon Resume . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.    DEA Dangers of Drug Labs - Training Video . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

3.    The Meth Lab - Training Video . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

4.    Kitchens of Death - Training Video . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

5.    Multi- County Grand Jury, Partial Report SC-99-56 . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Transcripts**

6.    Transcript of Interview with Robert Darst . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

7.    Transcript of Interview with Raymond Greninger . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

8.    Transcript of Interview with John Hamilton . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

9.    Transcript of Interview with Steve Hash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

10.   Transcript of  Interview with Gene Hise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

11.   Transcript of Interview with Jim McBride  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

12.   Transcript of Interview with Rick Manion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

13.   Transcript of Interview with Billie C. Poe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

14.   Transcript of Interview with Kerry Pettingill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

15.   Transcript of Interview with Danny Oliver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# EXHIBIT 1

731

# RESUME

**PAUL DONAHUE GORDON**
402 W. Highway 66
Wellston, Oklahoma  74881
Cell:  (405)306-9872
Bus:  (405)793-0869

## EDUCATION

| | | |
|---|---|---|
| G.E.D.- | | McAlester Public Schools |
| | | McAlester, Oklahoma |
| | | November 16, 1974 |

College - Tulsa Junior College,  Tulsa, Oklahoma
January 1981 to May 1983
Course of Study:     Law Enforcement
Degree Earned:     Associate of Arts

- Central State University, Edmond, Oklahoma
July 1984 to May 1987
Course of Study:     Criminal Justice
Degree Earned:     Bachelor of Arts

## MILITARY EXPERIENCE

United States Marine Corps          February 4, 1973 to November 9, 1979
Rank:                                           Staff  Sergeant, E-6
Discharge:                                    Honorable
Duties: Primary Marksmanship Instructor in the U.S.M.C. Marksmanship Program. This
included heavy classroom contact and extensive practice with the M-16, M-14, and  .45
Semi-automatic pistol.

## EMPLOYMENT

01/01/93 to Present   SECURITY OFFICER Re-QUALIFICATION
2339 N. Moore Ave., Bldg B
Moore, Oklahoma  73160

Senior instructor of a private security training school licensed by the State of
Oklahoma Board of Private Vocational Schools and the Council on
Law Enforcement  Education and Training (CLEET) for the State of Oklahoma.

06-01-2000 to 05-01-2001  DYN CORPS
International Police Task Force
Sarajevo, Bosnia

Primarily assigned as CO-locator and patrol officer in small villages, however
Assignment was expanded to training and evaluation of tactical teams in
Controlled force situations. Additional duties included hazardous material
Response and training of national police officers in the Sarajevo Law
Enforcement Academy.

02/01/84 to 2000  OKLAHOMA HIGHWAY PATROL, 2nd Lieutenant
3600  Martin Luther King Boulevard
Oklahoma City, Oklahoma  73111

Primary duties include Supervisor of Firearms and Defensive Tactics for the State
of Oklahoma and the training of the Governor's protective detail in a 50 hour basic
protection school and advanced protective efforts by solo officers.

01/01/90 to 12/01/91  PLATT COLLEGE
6105 West Reno
Oklahoma City, Oklahoma  73127

Duties included instruction of students in the field of private security and law
enforcement.

06/30/83 to 02/01/84  OKLAHOMA CAPITOL PATROL
Oklahoma Department of Public Safety
3600 Martin Luther King Boulevard
Oklahoma City, Oklahoma  73111

Duties consisted of security related tasks with an emphasis of assisting the public  on
state property.

## VOCATIONAL SCHOOLS

Security Training Institute
Tulsa, Oklahoma
 07/01/80 to 08/01/80

State of Oklahoma, Basic Police School
Broken Arrow, Oklahoma
03/01/82 to 04/09/82

Street Survival School
Norman, Oklahoma
12/04/82 to 12/05/82

Uniform Crime Reporting School
Coweta, Oklahoma
03/23/83

**Armed Robbery Investigation School**
**Seminole, Oklahoma**
**04/28/83 to 04/29/83**

**Oklahoma Highway Patrol academy**
**Oklahoma City, Oklahoma**
**02/10/84 to 06/30/84**

**Booby Trap Devices Recognition**
**Oklahoma County Sheriff's Department**
**06/27/85**
**Oklahoma City, Oklahoma**

**Semi-Automatic Pistol Transition Course**
**Oklahoma Highway Patrol**
**08/21/89 to 08/23/89**
**Oklahoma City, Oklahoma**

**Standard Field Sobriety Testing**
**Oklahoma Highway Patrol**
**02/25/90 to 02/16/90**
**Oklahoma City, Oklahoma**

**Advanced Shooting Skills**
**Indian Meridian Vo-Tech**
**06/05/90**
**Stillwater, Oklahoma**

**Instructors Orientation Course**
**3600 North Martin Luther King Boulevard**
**10/15/90 to 10/19/90**
**Oklahoma City, Oklahoma**

**Hazardous Materials Awareness Training**
**Department of Public Safety**
**08/16/91**
**Oklahoma City, Oklahoma**

**Latent Fingerprint Development**
**Oklahoma State Bureau of Investigation**
**09/10/91**
**Oklahoma City, Oklahoma**

**Domestic Disturbance Seminar**
**Council on Law Enforcement Education & Training**
**11/19/91**
**Oklahoma City, Oklahoma**

CLEET Security Instructor Certification
Oklahoma Department of Vocational &
10/25/92
Technical Education
Oklahoma City, Oklahoma

NRA Police Firearms Instructor Development School
Mesa Police and Mesa PPC
03/01/92 to 03/06/92
Mesa, Arizona

Monadnock PR-24 Police Baton Instructors Course
Oklahoma Highway Patrol
03/15/92 to 03/17/92
Oklahoma City, Oklahoma

Criminal Investigation Academy
Council on Law Enforcement Education & Training
05/03/92 to 05/22/92
Oklahoma City, Oklahoma

Police Survival Course
Chapman Academy
10/11/92 to 10/16/92
Columbia, Missouri

Aerosol Subject Restraint Instructor's Course
Police Training Consultants
02/24/93
Midlothian, Texas

ASP - Tactical Baton Instructor's Course
Oklahoma Highway Patrol
04/10/93 to 10/13/93
Oklahoma City, Oklahoma

CLEET Firearms Instructor School
Council on Law Enforcement Education & Training
07/10/92 to 03/29/93
Oklahoma City, Oklahoma

Protective Security Operations Training Program
Federal Law Enforcement Training Center
08/05/94 to 08/19/94
Glynco, Georgia

Bomb Threat Management
Oklahoma Highway Patrol
10/27/94
Oklahoma City, Oklahoma

734

Executive Protection and Security
Vance International
06/23/95 to 06/27/95
West Virginia

Street Survival '95 Tactical Edge Seminar
Oklahoma County Sheriff's Department
10/23/95 to 10/24/95
Oklahoma City, Oklahoma

Hostage Negotiation Training
Oklahoma Highway Patrol
05/13/96 to 05/17/96
Oklahoma City, Oklahoma

Executive and Dignitary Protection
Texas A&M Law Enforcement & Security
05/27/96 to 05/31/96
Training Division
College Station, Texas

Interviews and Interrogations Training, Reid Technique
Council on Law Enforcement Education & Training
06/24/96 to 06/28/96
Oklahoma City, Oklahoma

Narco-Terrorism Executive Protection Course
USA Army - Military Police School
01/06/97 to 01/10/97
Fort Mc-Clellan, Alabama

Incident Management Training
FEMA
04/28/98 to 04/29/98
Port of Catoosa, Oklahoma

Defensive Tactics Instructor Training
PPCT Defensive Tactics School
06/14/98 to 06/19/98
McKenny, Texas

C.E.R.T. Training TTT
Oklahoma City FEMA
06/30/98 to 07/01/98
Oklahoma City, Oklahoma

Sniper School
07/21/99 to 07/23/99
McKenny, Texas

735

**Basic Terrorism Awareness**
**08/10/98 to 08/11/98**
**Oklahoma City, Oklahoma**

**Terrorism  Awareness - Train the Trainer**
**08/23/98 to 08/14/98**
**Oklahoma City, Oklahoma**

**Hazardous Material Awareness**
**08/26/98**
**Oklahoma City, Oklahoma**

**Hazardous Material Awareness - Train the Trainer**
**08/27/98**
**Oklahoma City, Oklahoma**

**Advanced Hazardous  Materials -**
**09/15/98 to 09/18/98**
**Incident Commander**
**San Antonio, Texas**

**Hazardous Materials - Operations**
**09/21/98 to 09/25/98**
**Oklahoma City, Oklahoma**

**Electronic Counter Measures I**
**10/12/98 to 10/16/98**
**Jarvis International**
**Tulsa, Oklahoma**

**Electronic Counter Measures II**
**10/19/98 to 10/23/98**
**Jarvis International**
**Tulsa, Oklahoma**

**Hazardous Materials - Incident Commander**
**11/16/98 to 11/21/98**
**Oklahoma City, Oklahoma**

**Physical Security Specialist Training Program**
**Federal Law Enforcement Training Center**
**02/01/99 to 02/12/99**
**Glynco, Georgia**

**Fugitive Investigator Training Program**
**05-05-2000 to 05-15-2000**
**Federal Law Enforcement Training Center**
**Glynco, Georgia**

736

**Introduction to Search and Rescue**
**10-15-2005 to 11-20-05**
**National Assoc. of Search and Rescue**
**Houston, Texas**

**Search and Rescue Technician Two**
**11-15-2005 to  01-22-2006**
**National Assoc. of Search and Rescue**
**Houston Texas**

**Asp  Handcuff Instructor School**
**06- 09- 2006**
**St. Louis Police Department**
**St. Louis, Missouri**

**DUI Detection and Standardized Field Sobriety Testing (NHTSA)**
**06-24 thru 26-2010**
**Atlanta, Georgia**

**DUI Detection and Standardized Field Sobriety Testing Instructor**
**09-23 thru 26-2010**
**Atlanta, Georgia**

**Understanding, Attacking, and Winning DUI Cases**
**September, 2011**
**Wichita, Kansas**

# EXHIBIT 2

(DEA Dangers of Drug Labs)

DVD- ROM labeled " DEA Dangers of Drug Labs" submitted under
separate cover for conventional filing

739

# EXHIBIT 3

(The Meth Lab)

DVD- ROM labeled "The Meth Lab" submitted under
separate cover for conventional filing

# EXHIBIT 4

(Kitchens of Death)

DVD-ROM labeled "Kitchens of Death" submitted under
Separate cover for conventional filing

# EXHIBIT 5

# Report on Multi-County Grand Jury Partial Report SC-99-56

*OIA-01-04*



September 2001

Prepared for Commissioner Bob A. Ricks
By Department of Public Safety
Office of Internal Audits

Filename: c:\docs\audits\oia-01-04\finalreport_v1

742

# Oklahoma Department of Public Safety

OFFICE of INTERNAL AUDITS
Review of Management Practices
Preliminary Report OIA 01-04
June 3, 2001

The DPS Office of Internal Audits was directed by Commissioner Bob A. Ricks to conduct a review of DPS management practices on April 4, 2001, in response to recommendations made by a Multi-County Grand Jury Partial Report. This review is not yet complete; however, a preliminary report was requested by the administration to enable it to take action on certain critical areas in a timely manner.

**FINDING #1:**        *Misinterpretation and application of the state's "official duty" status.*

The audit found the misunderstanding of "official duty" to be the common thread in all of the findings. "Official Duty" is the term used by the state to describe job duties and latitudes of activities for employees responsibilities. It is a guide as to how we expend the resources provided by our state. DPS created, but has not sufficiently defined, the terms of "subject to call," "on call," and "on standby" and employees do not share a common understanding of these terms and applications. This misunderstanding crosses all ranks and divisions. These terms impact the appropriate use of state equipment and the expectation of compensation in some cases, under the Fair Labor Standards Act.

RECOMMENDATION:

Define "subject to call," "on-call," and "on standby" in respect to official duty status. DPS should conduct a review emphasizing the progression of each call status with regard to employees being restricted, receiving compensation and the use of state resources. The review should consider the Fair Labor Standards Act, Merit Rules for Employment, retraining issues and revisions to the DPS Operations Manual.

DPS should develop pro-active initiatives to minimize future such instances by reinforcing core values and ethics in the mind set and daily activities of all personnel. The critical component of this adjustment is for all employees to understand risk in the existing practice and understand that a general practice does not supercede the law.

**FINDING #2:**        *Poor management and a lack of supervisory oversight.*

Many of the problems found by this audit result from some managers failing to do their jobs with a high level of consistency. The likelihood of anyone discovering inaccuracies and indiscretions was practically nil. This is not to say that every document was riddled with errors. However, it is important that the quality of any report should be scrutinized by staff and command personnel whose job it is to oversee their commands and ensure that things are being done correctly. That simply did not happen.

743

RECOMMENDATION:

Review DPS Operations Manual Sub-chapter 2: Conduct. Assure that all patrol members are familiar with these guidelines and understand that consequences exist for failure to obey and uphold this standard.

**FINDING #3:**        *Erratic submission and retention of Outside Employment Request forms.*

Current DPS policy appears to be sound, however, in application, internal controls at the Troop level to assure compliance are absent.

RECOMMENDATION:

Provide an addition to the annual Performance Management Process form of each employee, requiring supervisory personnel to ask and record whether the employee is currently employed outside the agency. If so, the supervisor should assure that an Outside Employment Request Form is submitted at that time or is currently on file in the employee's personnel files.

DPS Administration should revisit the issue of outside employment for those members who are self-employed or business owners, and clarify requirements for reporting purposes.

**FINDING #4:**        *Inconsistent personnel file content and integrity.*

DPS Operations Manual 1.1.8 states that the DPS will maintain two "201" (personnel) files on each member of the Oklahoma Highway Patrol. The official 201 file is to be housed in the Personnel Division and the permanent 201 File is maintained at Troop level.

A third 201 file is housed in the Major's Office, possessing data not available elsewhere. The auditors found varied interpretations of instructions for file maintenance leading to non-standard entries, mishandling of date-sensitive materials, constant handling of files, and duplication of effort.

RECOMMENDATIONS:

Merge the 201 file currently being kept at the Major's office with the official file in the Personnel Office.

Provide training to supervisory and secretarial personnel regarding the appropriate maintenance of 201 files.

A digital imaging solution should be pursued whereby personnel data is scanned and stored in one digital file and accessed through a relational database complete with security levels and computer-triggered edits.

**FINDING #5:**        *Inconsistent standards for reporting and recording time worked and work assignments for employees.*

Obscure standards and weak controls have compromised the appropriate recording and reimbursement of time as promulgated by the Fair Labor Standards Act. Some exempt employees may be incorrectly classified.

Ongoing changes in the Fair Labor Standards Act are not being sufficiently researched and implemented by DPS to stay abreast with current opinions and rulings.

The absence of formalized training has left newly promoted personnel to their own devices in formulating and administering time accountability issues. Written instructions for the proper completion of time reports have been lost or forgotten over time.

RECOMMENDATIONS:

A thorough review by the DPS Personnel Division of the Fair Labor Standards Act and Merit Rules to establish the Department's position with regard to:
1. Correct classification of non-exempt and exempt employees
2. Reporting and recording of all employee time elements
3. The lawful range of the Departments ability to restrict employees with "call" definitions

Explore the possibility and feasibility of integrating the Department's computerized time records program with the Office of Personnel Management payroll system currently used by DPS.

Devise a comprehensive time accountability retraining curriculum for all employees and a method to reinforce the lessons throughout employees' careers.

Develop a training program to assure that employees who move from a non-exempt to an exempt status are trained in reporting and recording their time correctly.

Conduct periodic audits of division and individual time reports to assure that rules and procedures are being followed.

**FINDING #6:**          *Inadequate guidelines for the use of state equipment.*

DPS lacks specific rules and guidelines to assure lawful compliance with state statutes governing the use of state resources. These resources include, but are not limited to: fuel credit cards, mobile telephones, turnpike "PikePasses," telecommunication terminals, and state vehicles.

RECOMMENDATION:

While state law is clear regarding the use of state equipment, its actual application is not as simple. DPS should establish written guidelines and audit controls to assure compliance with state statutes.

## CONCLUSION

It is important to remember that the vast majority of our personnel are hardworking, honest and responsible individuals who come to work every day with a sincere desire to serve the State of Oklahoma. However, as an organization we must recognize that a failure to carefully review reports, a failure to examine events closely to identify patterns, and a failure to provide effective oversight and auditing creates the opportunity for inappropriate behavior. DPS can do much better in providing employees with written policies and guidelines to minimize confusion and encourage proper work ethics. At the same

745

time, management control by superiors is essential to ensure that employees do not stray into unlawful or unethical areas.

With a very tight time frame, certain areas of this review are incomplete. We feel this work should be continued to ensure that a full and complete analysis has been conducted, and to ensure that there are no additional problems left unaddressed.

# DEPARTMENT OF PUBLIC SAFETY

*"Don't Say It - Write It"*

**TO** Commissioner Bob A. Ricks **DATE** July 13, 2001

**FROM** LTC Jerry N. Cason #4

**SUBJECT** Internal Audit Directive

On June 11, 2001 this office was directed to put a committee together to review areas of deficiency in the agency brought about by an internal audit. Committee members were:

| | |
|---|---|
| LTC Jerry Cason | 1LT John Matlock |
| 1LT Don Stockton | 1LT George Green |
| Bill Hollars | Gene Thaxton (Telecommunications) |
| John Lindsey | Brad Long (OLETS) |
| Major Garry Thomas | Captain Gerald Davidson |
| Judi Burton | Donna Hardridge (Chief's Office) |

The following areas were addressed:

IX. **Description #1**: PikePass Policy & Procedures
**Criteria**: *What should exist?* A policy informing members of the intent and official procedures for use of the PikePass issued to the member's patrol unit.

X. **Description #4**: Define "Subject to Call," "On Call," and "Standby" status within DPS.
**Criteria**: *What should exist?* A criteria that defines the difference and a clearly stated policy for members to follow.

XI. **Description #5**: Use of State Vehicles
**Criteria**: *What should exist?* Clear understanding of state statutes and DPS policy regarding use of DPS vehicles.

XII. **Description #6**: Outside Employment Requests
**Criteria**: *What should exist?* Supervisory personnel should possess current Outside Employment Request forms for all subordinates who have outside jobs.

XIII. **Description #7**: 201 Files Content & Integrity
**Criteria**: *What should exist?* File maintained in accordance with OPM Rules and Operations Manual 1.1.8.

XIV. **Description #8**: Time sheet vs. Assignment reconciliation
**Criteria**: *What should exist?* A Department-wide standard for recording time worked and assignment for exempt employees, clearly addressing the appropriate recording and reimbursement of time according to FLSA.

Commissioner Bob A. Ricks
Internal Audit Directive
July 13, 2001

Page 2


XV.     **Description #9**: Policy & Procedure for Mobile Phone Usage
        **Criteria**: *What should exist?*  A policy whereby all employees who are assigned a mobile phone has a clear understanding of the proper use of state equipment and resources.

XVI.    **Description #10**: Restate OLETS Policy
        **Criteria**: *What should exist?*  Every member of DPS with access to the OLETS system should possess a clear understanding of the law and department policy with respect to the use of the system.

JNC/dh

## INTERNAL AUDIT RECOMMENDATIONS
July 13, 2001

I.    **Description #1**: PikePass Policy & Procedures

**Criteria**: *What should exist?*  A policy informing members of the intent and official procedures for use of the PikePass issued to the member's patrol unit.

The Oklahoma Transportation Authority (OTA) policy states that any Oklahoma law enforcement officer, while in the performance of their official duties, are not subject to paying associated tolls when utilizing and properly displaying a law enforcement PIKEPASS tag.  Applicable toll charges incurred by the use of a law enforcement PIKEPASS for purposes not associated with official business shall be reimbursed by the agency. Personal use of law enforcement PIKEPASS tags is strictly prohibited. Re-education of all personnel will be conducted as to the regulations via an Informational Bulletin. The agency and/or OTA will conduct random audits to ensure strict compliance with the policy.  A change to the operations manual has been prepared under "Use of State Equipment" to note compliance with established OTA guidelines.

II.   **Description #4**: Define "Subject to Call," "On Call," and "Standby" status within DPS.

**Criteria**: *What should exist?*  A criteria that defines the difference and a clearly stated policy for members to follow.

The *Department of Public Safety Patrol Divisions Operation Manual* currently states in the minimum qualifications for troopers, "...a willingness to be on call 24 hours per day..."  This statement clearly conveys to employees, who have accepted the responsibilities of being a member of the Patrol, they will be "subject to call."  A change should be made to the wording to indicate, "...a willingness to be **subject to call** 24 hours per day..."

"On call" and "On standby" are already defined in the *Definition of Terms* section of the manual.  Historically in the agency, "on call" has been less restrictive for employees than "on standby."

A change in the wording of the Operations Manual should show:

Current wording:  On call - the time before or after a scheduled work shift, when a member is required to be available for a specified time to respond to calls and notify his troop office where he can be contacted by telephone.

New wording: On call - time the member is somewhat restricted in his/her movement and should be ready to be respond to call should the need arise.   The members are not necessarily restricted to a specific location, but must provide information as to how to be contacted. This time is not considered as compensatory time.

Internal Audit Recommendations
July 13, 2001

Page 2

Current wording: On standby – the time when a member is off duty but required to be available to go on duty quickly and to notify his troop office where he can be contacted.

New wording: On standby - **time that is more restrictive than "On call" time, wherein a member must be ready to be respond at a moments notice.   The member's movement is restricted and this time is considered as compensatory time.**

III.   **Description #5**: Use of State Vehicles

**Criteria**: *What should exist?*  Clear understanding of state statutes and DPS policy regarding use of DPS vehicles.

Title 47 §156.1.B.2 provides any DPS commissioned employee be permitted use of a state-owned vehicle from his residence to place of employment, or places other than employment when in the scope of their assignment.   It is the interpretation of Legal that this statute provides sufficient legal authority for members on call to use their vehicle as necessary to remain available to the agency.  A review should be conducted of any civilian employee who has use of a state vehicle to their residence to ensure they meet compliance with Title 47 §156.1.B.1.   Individual approvals should be granted by the Commissioner's Office on a case-by-case basis as recommended by division directors.

IV.   **Description #6**: Outside Employment Requests

**Criteria**: *What should  exist?*  Supervisory personnel should possess current Outside Employment Request forms for all subordinates who have outside jobs.

A draft policy has been prepared which clearly defines the agency's position on outside employment and places the responsibility of our employees to comply with the provisions thereof.   An informational bulletin will be distributed to educate all employees to the new provisions of the policy.

V.   **Description #7**: 201 Files Content & Integrity

**Criteria**: *What should exist?*  File maintained in accordance with OPM Rules and Operations Manual 1.1.8.

It has been determined that an employee's permanent 201 file will be maintained in the agency's Personnel Division and a working file may be maintained at the individual troop headquarters.   The only release for records will come from our Personnel Division.  All divisions have been

Internal Audit Recommendations
July 13, 2001

Page 3

instructed to ensure all documents maintained in their files are forwarded to Personnel in a timely basis. We will continue to make an effort to ensure no documents are maintained locally which are not on file in the permanent, official personnel file. It is not practical to eliminate all files throughout the agency. But, better effort will be made to ensure consistency between the files.

VI.    **Description #8**: Time sheet vs. Assignment reconciliation

**Criteria**: *What should exist?*   A Department-wide standard for recording time worked and assignment for exempt employees, clearly addressing the appropriate recording and reimbursement of time according to FLSA.

The time recording method for exempt employees currently in place meets the standards of FLSA. What is probably a more accurately identified problem is the proper completion of the *Individual Daily Time Report* by exempt employees. The form and instructions were developed in 1986. Through time and lack of instruction, employees are not aware of the correct procedure to follow when completing the report. This can be remedied through training of the procedures and forms.

Also recommended is a change in exempt status for all First Lieutenants and Second Lieutenants to a non-exempt status. This would allow for better accountability at the troop level.

It has been determined that the TIME program on our mainframe can be modified to show actual hours and non-scheduled hours work by exempt employees. However, it will not accurately calculate the hours.

VII.   **Description #9**: Policy & Procedure for Mobile Phone Usage

**Criteria**: *What should exist?*   A policy whereby all employees who are assigned a mobile phone has a clear understanding of the proper use of state equipment and resources.

The Department of Public Safety (DPS) has determined that its functions and responsibilities require certain employees to be accessible by telephone from remote locations and at hours other than normal business hours. Certain employees are required to have access to telephones from locations other than their normal workstations and at hours other than normal business hours in order to adequately and efficiently perform their duties.

Employees who are assigned DPS mobile phones shall reimburse DPS for the following: (1) all non-governmental long distance charges, roaming charges, directory assistance charges and taxes attribute thereto and (2)

751

Internal Audit Recommendations
July 13, 2001

Page 4

charges for all personal local calls in excess of the "flat rate" if the employee's use of local calling exceeds the 'flat rate' amount of local calling permitted by the particular plan to which the employee is assigned.

The Telecommunication Division, will review the mobile telephone bill and shall notify any employee who is required to reimburse DPS for any of the charges set forth in the preceding paragraph. The Telecommunication Division shall also notify any employee of an unexplained call(s) and request an explanation for the call(s). The employee shall reimburse DPS for personal calls or calls which cannot be verified as relating to the employee's duties within 30 days of receipt of the request from the Telecommunication Division. Falsification of statements concerning mobile telephone usage or failure to provide reimbursement may result in disciplinary action up to and including termination.

VIII.   **Description #10**: Restate OLETS Policy

**Criteria**: *What should exist?*  Every member of DPS with access to the OLETS system should possess a clear understanding of the law and department policy with respect to the use of the system.

Appropriate OLETS Rules and Regulations governing the access and dissemination of OLETS information should be reviewed yearly as part of the PMP evaluation process for all DPS sworn and non-sworn employees having access to the OLETS system.

The OHP Training Bulletin Number 92-13, though dated November 20, 1992, is still appropriate. It is proposed that this policy be updated and distributed to all personnel with OLETS access.

The investigation of our Internal Affairs and Special Investigations Division is being handled by Captain Bill Hughes and 1LT Todd Blish, and will be addressed under a separate report.

752

## TIME ACCOUNTABILITY INQUIRY RESULTS

The following issues were addressed in a Chief's Inquiry conducted by Capt. Bill Hughes #17 and 1Lt. Todd Blish #41 concerning personnel of the IASI Unit. The findings and recommendations are as follows:

**ISSUE #1: Time reporting improprieties by personnel of IASI**

**FINDINGS: This inquiry has determined that previous high ranking officials of the Oklahoma Highway Patrol approved a practice, sometime between 1989 and 1996, which allowed IASI personnel to claim weekends while "on-call" as days worked. This practice was established because the assignment in IASI was determined to be highly restrictive and for longer than normal periods of time creating a substantial interference on the employee's ability to use the time for personal purposes. It is the opinion of the personnel conducting this inquiry that no malicious intent to defraud this agency or the people of the State of Oklahoma of time or other compensation has occurred in the IASI Unit.**

**RECOMMENDATION: The agency should clearly define terms such as "on-call", "subject-to-call", and "on-standby", and create internal written policies which clarify an employee's status for each assignment for reporting purposes.**

**ISSUE#2: Perjury by members of the IASI Unit before the Grand Jury**

**FINDINGS: This inquiry was unable to resolve this issue due to the Attorney Generals Office denying DPS Legal Division's request to access the sealed testimony.**

**RECOMMENDATION: At the conclusion of the current litigation involving the testimony in question DPS should again request copies of said testimony to rectify this issue.**

753

I.      Intelligence phase

The initial portion of the Chief's inquiry focused on the Audits and Inspection Unit where 1LT Don Stockton and 1LT John Matlock were interviewed. Both Members were involved in an audit of time accountability records where discrepancies developed in the Internal Affairs Division. There were indications of possible bias in the initial briefing they gave us regarding audit of time records from IASI. 1LT Stockton, when interviewed by 1LT Blish, indicated that this particular issue was his opportunity to prove himself to the current administration. This, as well as 1LT Matlock's indication of his friendship with former 2LT Paul Gordon, indicates the possibility of personal bias being involved in the interpretation of the findings of the internal audit of IASI time records. Despite these indicators the appearance of improprieties does exist in regard to time accountability practices within IASI. These practices include showing "on-call" time as time worked, then using the accrued time as leave on a later date.

We recovered time accountability reports from both current and past Members assigned to the Internal Affairs Division as well as a partial report from the Multi-County Grand Jury of Oklahoma County (SC-99-56). The Grand Jury wished to address the supervisory and internal audit mechanisms within the Department of Public Safety as well as the existing management practices as it applies to oversight of work assignments.

The Internal Audit personnel also indicated possible perjury before the Grand Jury on the part of CPT Rodney Burris and 2LT George Randolph. DPS Legal Division was contacted in an effort to obtain copies of Grand Jury testimony as it related to our inquiry. The Office of Attorney General refused to supply copies of testimony related to the case because of ongoing litigation.

Base questions were developed which addressed time accountability questions within the Division. Those questions focused on the use and completion of monthly time accountability records and any Troop policies regarding the accrual and use of compensated time. The following represents a sample of baseline questions presented during each Member's interview with minor variances;

| 1. | (Qualifying questions related to time in grade, current and past assignments, Supervisor's name, etc.) |
| --- | --- |
| 2. | When you were initially assigned to the Internal Affairs/Special Investigations Division were you instructed in the completion and use of the monthly time accountability report? (If so) By whom?, (If not) Knowing you were not instructed, how did you complete the report? |
| 3. | What instructions have you received in showing "on-call" time while in other assignments? |
| 4. | (Presented with time report if available) Is this an accurate copy of a time sheet completed by you on _____ ? Is this your signature? |
| 5. | Was it the accepted practice to show a "W" (representing a day worked) on the weekend days that you were scheduled to be "on-call" whether called out or not? |
| 6. | What explanation was provided for this? (Question 5) |

| 7. | The nature of your position in Internal Affairs requires specialized training and skills. What type of training have you received as it relates to internal affairs? (how, why) Are these skills unique to the function of IASI versus other Divisions? |
|---|---|
| 8. | What is the Troop "Z" policy concerning restrictions while "on-call"? Is this policy written or verbally passed from one member to another? |
| 9. | What, if anything, is the difference between being "on-call" in your IASI assignment versus a traffic related assignment? |
| 10. | Have you ever signed another member's time accountability report, as a supervisor, when they may have shown "on-call" time as a "W" indicating time worked? |
| 11. | Is this practice a violation of Department policy or State law? Can you see where it may be construed as such? |

## II.    Identification phase

We identified four (4) current members of IASI and up to five (5) previous members of the division that may have an internal knowledge of the time accountability practices within IASI.

CPT Hughes interviewed current IASI personnel CPT Rodney Burris, 1LT George Randolph, and former IASI investigator 1LT Rick Fagan. 1LT Blish interviewed current IASI Members 2LT Doug Deryckere, 2LT Leanne Spears, and previous member 2LT Donnie Robins. Attempts were made to contact retired IASI Investigator Larry Punneo who did not return phone messages. Retired IASI Troop Commander Larry Rutherford was contacted and interviewed by 1LT Blish as to time management practices during his assignment to the division. Current 1LT Jeff Griffith, a former IASI investigator, was on vacation at the time of the interviews.

Because of the general issues which we were instructed to address and the limited time frame, not every past member of this unit was contacted nor were specifics as detailed as the Internal Auditors presented to us noted. The information passed to us along with tapes of the interviews we conducted are included for review in this file.

## III.    Interview phase

### A.    2LT Donnie Robins #111

LT Blish conducted an interview with 2LT Donnie Robins #111 in his office at 1143 hours on July 4th. 2LT Robins was transferred to the Internal Affairs and Special Investigations Division (IASI) from Troop "A" in late 1999 and remained approximately 18 months.

2LT Robins states that he was instructed jointly by 1LT George Randolph and Captain Rodney Burris in the completion of his monthly time accountability report. 2LT Robins continued by stating that persons assigned to IASI were on call for a period of two (2) weeks at a time. The "on-call" IASI Investigator was subject to call after business hours including 24 hour responsibility on weekends.

2LT Robins was instructed jointly by 1LT Randolph and Captain Burris to take "make up" days off to replace the weekends lost while "on-call". It was an accepted practice while assigned to IASI to use the "make up" days as time off on a routine basis.

2LT Robins confirmed that "on-call" time was managed differently in other Divisions he had worked. LT Blish inquired of him to explain the difference in being on call in a traffic assignment as opposed to Internal Affairs. Robins stated that he was told to show the weekend "on-call" days as "worked" due to their being subject to call for a complete 48 hour period on a statewide basis. Robins stated it was verbally understood he would be subject to travel anywhere in the State of Oklahoma at any given moment. He states that IASI policy required him to carry a cellular telephone and pager on weekends. 2LT Robins furthered his explanation that IASI investigators routinely worked more than 40 hours during the week and that the nature of the assignment required a quick response when called. He felt compelled by the nature of the assignment to be readily available for deployment on weekends.

2LT Robins did not maintain any subordinates while assigned to IASI; thus he was not responsible for signing time accountability reports where a subordinate may have shown "on-call" time as time worked.

When asked if he ever witnessed the IASI Secretary, Carolyn Rawlings, make changes to time accountability reports, Robins replied, "Not to my knowledge".

### B.    2LT Doug Deryckere #103

LT Blish conducted an interview with 2LT Doug Deryckere #103 on July 5th, at 1330 hours, in the Captain's conference room. 2LT Deryckere was transferred from Troop "S" into IASI in July of 2000. 2LT Deryckere stated he was never instructed in the completion of the time accountability report while in Troop "S" but was instructed upon his transfer into IASI by the Secretary, Carolyn Rawlings. 2LT Deryckere confirmed 2LT Robins statement that IASI Investigators were on call for a period of two weeks at a time where they were subject to all calls after business hours including a full 48 hours on weekends. He was instructed by Mrs. Rawlings to show the "on call" weekends as time worked.

2LT Deryckere noted that the current time accountability report provides space for indicating time taken not time "accrued".  This portion of the issue is invalid as there is a "remarks" section available for indicating accrued time.

2LT Deryckere indicated that the Troop "Z" policy concerning "on-call" time was verbally expressed to him by his superiors. The general policy of the Division, however un-written, indicated that Investigators were to be restricted during their "on-call" periods to being available for travel statewide at any given moment. He stated that he was verbally instructed to refrain from the consumption of alcoholic beverages during his on-call period and required to carry both a telephone and pager at all times. He felt that he was unduly restricted during these "on-call" periods.

2LT Deryckere did not maintain any subordinates while assigned to IASI, thus he was not responsible for signing time accountability reports where a subordinate may have shown "on-call" time as time worked.

C.    2LT Leanne Spears #116

LT Blish conducted an interview with 2LT Leanne Spears #116 on July 5th, at 1617 hours in the Captain's conference room. 2LT Spears has been assigned to IASI for approximately five (5) months. She stated that she was verbally instructed by 1LT Randolph to inscribe a "W" on her time report for weekend days of which she was on call. 2LT Spears stated she was on call for two weeks at a time. LT Blish inquired whether she showed comp time for time spent on call during her previous assignments. She stated no. LT Blish asked Spears to clarify the call out system in the Internal Affairs Division, she stated that she did not clearly understand some of the time policies being used as she only had limited experience in the division.

2LT Spears states that she was instructed to be "10-8" in time to make it to the office by 0800 and remain until 1645 hours each day, with total time spent 10-8 to be a 10 hour shift. Her impression was these hours equated to a 50 hour work week which would encompass the two make up days used for time spent "on-call". She confirmed that it was accepted practice within IASI to reflect a "W" for weekend days (Saturday & Sunday) spent on call, whether called or not.

2LT Spears stated that the Troop "Z" policy changed around May 1, 2001 (She was unsure of the exact date). She was verbally instructed not to use her Department issued vehicle for local-personal trips when "on-call", despite the assumption that members of the division were required to travel at any given moment. She confirms that the nature of the position caused her to feel highly restricted when off duty and "on-call".

When asked to define "on-call" time versus "on-stand by" time, 2LT Spears defined "on-call" as being subject to work within a reasonable time while "on-stand by" as being uniformed or dressed for an event, fueled, and awaiting an imminent call. 2LT Spears was also instructed to carry her Department pager and phone when off-duty.

2LT Spears did not maintain any subordinates while assigned to IASI; thus she was not responsible for signing time accountability reports where a subordinate may have shown "on-call" time as time worked.

D.    Larry Rutherford (Ret.)

LT Blish interviewed *Retired* 1LT Larry Rutherford who was assigned as Troop Commander in IASI between 1989 and 1997. Rutherford stated that during his term as Troop Commander he was directly responsible to either Colonel Kenneth Vanhoy (then LT. Colonel), or LT COL Bob Shaw. Rutherford recalled a meeting with Shaw but could not recall the exact date. The meeting focused on responsibilities of IASI members as it relates to call-out time and reporting procedures. It was decided that IASI members would be restricted to the OKC area while on call in order to facilitate travel to any portion of the State without delay. The centralized location of the OKC area was ideal for response given any incident that may occur in any other portion of the State. He also added that Captains during this period of time also showed time spent at "duty officer" as time worked as well. The rationale behind their decision was based on the fact that when "on-call" they were subject to travel at any given time and restricted to the OKC area. Members were also to report their location at all times to the Communications Center and remain "on alert" for incidents that may arise during their assigned call-out period. Rutherford recalls Colonel Vanhoy conducting classes in the completion of the time accountability report and management of time within IASI. The practice of showing "on-call" time as time worked began under the command of Larry

**Rutherford, as well as using the time as "make up" days off under the direction of LT Col. Bob Show (Ret.)**

### E.     1LT Rick Fagan #25

Capt. Bill Hughes interviewed 1LT Rick Fagan #25 on July 9th at DPS Headquarters. LT Fagan was assigned to IASI from Troop J  January of 1998 and served in that capacity until June of 1998. Also assigned to IASI at that time were Capt. Rodney Burris, 1LT Eddie Davenport, and 1LT Jeff Griffith. LT Fagan advised that after he submitted his first time sheet report it was returned to him. He was unable to remember if it was CPT Burris or LT Davenport who instructed him to show the on-call weekends as days worked. He stated this was the standard practice in IASI at that time. LT Fagan could not recall the reason given to him to report his time this way. He indicated  he was instructed to wear civilian clothes by CPT Burris. He felt the verbal instructions he received relating to on-call time were more restrictive than other assignments he has had with on-call requirements.

1LT Fagan did not maintain any subordinates while assigned to IASI; thus he was not responsible for signing time accountability reports where a subordinate may have shown "on-call" time as time worked.

### F.     1LT George Randolph #22

1LT George Randolph was interviewed by Capt. Hughes on July 13th at DPS. LT Randolph is currently assigned to IASI as Office Manager. He has been in IASI for approximately three years and one month after transferring from the Training Division. CPT Burris was in command over IASI at that time as he currently is. LT Randolph advised that he was not instructed on how to complete his time sheet in IASI until after he had turned in his first one. He stated CPT Burris  instructed him after he had turned it in to count weekends on-call as days worked. He told CPT Burris he had not done that on his first one and CPT Burris told him he had fixed his previous one. LT Randolph told CPT Hughes that this did not seem to be any type of violation of policy or law because this on-call time seemed highly restricted. It was his impression that his travel from his residence and other activities during this time were extremely limited knowing that the on-call person was expected to respond anywhere in the state at a moments notice. He advised that this reporting practice had ceased in May 2001 when he was told his status was subject-to-call by LT COL Jerry Cason. He further  stated he was told at that time, for the first time, that the restrictions under which they had all operated under did not exist. He was told that restrictions such as limited travel from his residence and consumption of alcoholic beverages are not in place during subject-to-call time. LT Randolph said he operated until May by the instructions he was given when he arrived in IASI. LT Randolph stated that he felt written directives should be issued to clarify this situation.

1LT Randolph does maintain subordinates while assigned to IASI; thus he was responsible for signing time accountability reports where a subordinate may have shown "on-call" time as time worked.

### G.     CPT Rodney Burris #16

CPT Burris was interviewed July 12, 2001, by CPT Hughes at DPS. CPT Burris has been assigned to the IASI Unit for approximately seven (7) years. At the time of receiving his assignment from the Training Division to that unit CPT Burris reported directly to 1LT Larry

Rutherford. LT Rutherford reported directly to LT COL Bob Shaw. CPT Burris could not remember specifically if it was LT Rutherford or LT COL Shaw who instructed him to wear civilian clothing for this assignment. CPT Burris initially did not receive any instructions regarding the time sheet because it was the same one he had used at Training. CPT Burris stated 1LT Rutherford came back later and told him to show the weekend days he was on-call as days worked. He said he did not question his orders. He did not recall an explanation for the different reporting method. He elaborated that whoever was on call had to respond instantly and was considered the lead investigator on the case. Typically, all IASI personnel respond to a call. CPT Burris felt strongly that there was a difference for IASI personnel and their restrictiveness due to the timely response and the types of calls they receive. CPT Burris went on to explain that the practice of reporting the on-call weekends continued until he received word of this inquiry. He stated he did not at any time feel they were violating a policy or law the way they were reporting their time or he would have stopped. He did indicate he had several meetings with LT Rutherford and LT COL Shaw over shift differential and clothing allowance issues which he thought were justified because of what the IASI personnel are expected to do.

CPT Burris does maintain subordinates while assigned to IASI; thus he was responsible for signing time accountability reports where a subordinate may have shown "on-call" time as time worked.

## IV.    Summary

### ISSUE #1 - TIME REPORTING

While the initial auditors (Matlock, Stockton) discovered improprieties in the management of time accountability, it is important to acknowledge that the accepted practice before May 2001 was established prior to the assignment of any current Members to the division.

Current and past members of the division confirm they were instructed by Members of a superior rank to show their time accountability as indicated in the audit. This was explained on several different avenues within our investigation. One explanation, which is prevalent among current IASI Members, is they feel highly restricted by the nature of their assignment. The "on-call" investigator must be prepared to travel statewide at any given time in the event of an internal crisis. Current and past members of the division were under the impression they were restricted in their ability to perform certain personal activities or travel far from home while in "on-call" status.

Another avenue of explanation for the practice centers around regular work hours during the week. The desire that members of the division be in the office by 0800 and remain until 1645, unless out of the office on official business, was interpreted by 2LT Deryckere to be a fifty hour work week. Because of his lengthy travel time he interpreted that the time would be compensated through the "on-call" weekends.

The DPS Operations Manual does not give a solid definition of "on-call" or "on-standby" duty status. Additionally, the current time accountability report use by exempt members of the Department does not provide a clear definition of how to reflect overtime work. This is a source of confusion for some, despite the provision of a "remarks" section.

There were no obvious indications of any malicious intent to deceive in this case. Despite the appearance of abuse, time accountability practices within the Internal Affairs Division were acceptable through several different commanders.

The issue is obviously in need of direct attention in order to clarify "on-call" or "subject-to-call" policies within the Internal Affairs Division.  Initially the definition of "on-call" or "subject-to-call" versus "on-standby" should be clarified within the DPS Patrol Divisions Operations Manual or in the form of a memorandum from the Chief's Office. Subsequently it is highly recommended that time accountability practices, including an "on-call" policy, a shift coverage policy, and scheduling policy be clearly defined in writing and distributed to the members of the division.

It should also be noted that the current Captain's time sheets were reviewed by the Internal Auditors. They reported CPT Burris and CPT Rick Adams were the only two current Captains who have shown weekends as worked while in "Duty Officer" status. CPT Adams was assigned under CPT Burris while he was a lieutenant in the CID Unit.

There were numerous times in the IASI Division when two members claimed the same weekend days as days worked. Some of this occurred when CPT Burris was Duty Officer and an additional IASI member was "on-call". Clarification in this area would be recommended.

## ISSUE #2 - PERJURY

As previously noted the Internal Auditors made note of possible perjury on the part of CPT Burris and 1LT Randolph. This investigation was unable to either prove or disprove these allegations due to the fact that the Attorney General's Office denied the request by DPS Legal Division for copies of the Grand Jury testimony. This issue can be resolved at the time that testimony is released.

AUDIT RESPONSE TO
CHIEF'S INQUIRY
RE: OIA-01-04

The audit team would like to resolve some disturbing discrepancies found in the Internal Affairs and Special Investigation Units handling of the case involving 2Lt. Paul Gordon that were not explained or addressed in the Chief's Inquiry.

The Department of Public Safety Operations Manual's Implementation Order states, "Any provision within this Manual contrary to law is void, and if any provision herein is declared invalid by a court of competent jurisdiction, such holding shall not affect remaining valid provisions."

Fact:            When the letter referring the Gordon matter for further investigation to the Attorney General was sent, no mention is made of the application or accrual of comp. time, or the fact that Gordon was or may have been on authorized comp. time when he was alleged to have been working for the State Insurance Fund.

Fact:            There are no internal memo's or other notice's given regarding the application or accrual of comp. time in the Gordon matter, or it's use inside I.A.S.I. until the Office of Internal Audits exposed the practice.

Conclusion:      Had either of these simple facts been conveyed to the Commissioner or Attorney General it is highly likely this incident would have never escalated beyond that point. Failing to do so casts a dim light on the motivation to omit that information by the management of I.A.S.I.  Statements made by current and former I.A.S.I. personnel did affirm that the practice  was perpetuated by unwritten rules and verbal instructions.

---

Fact:            DPS and I.A.S.I. management violated a basic rule of ethics and segregation of duties by proceeding with an investigation of serious wrongdoing by an employee within that division.

Conclusion:      Again, this decision casts doubt upon the objectivity of the investigator and his motives for not referring the matter to outside investigators.

---

Fact:            The I.A.S.I. investigation of 2Lt. Gordon centered around his working a part-time job while indicating on duty with DPS. His superiors are required to approve accrual and application of comp. time (DPS Operations Manual 1.1.6.A.4d) as well as, assuring that the off-duty job does not interfere with DPS activities. (DPS Operations Manual 1.1.10.10)  I.A.S.I. managers cannot absolve themselves from these responsibilities. (DPS Operations Manual 2.1.3.B)

Conclusion:      I.A.S.I. managers were directly responsible for 2Lt. Gordon's daily activities. Their

Audit Response
August 9, 2001

2

omission of the fact that they approved the accrual and application of Gordon's significant amount of comp. time, appear to be an attempt to deny the Commissioner that information which ultimately led to the order to send the informational letter to the Attorney General. Should they deny knowledge of Gordon's activities they would be forced to admit gross dereliction in their duties to properly supervise a subordinate. (DPS Operations Manual 2.1.3.B)

---

Fact: The I.A.S.I. captain, troop commander, and other similarly ranked personnel, who were directly responsible for Gordon's activities, signed his time sheets as accurate and correct. This indicates that I.A.S.I. managers either were extremely negligent in overseeing his daily activities or had approved his application for, and use of, comp. time and the method he was using to report it.

Conclusion: It appears that 2Lt. Gordon may have been misinstructed in the proper method to report comp. time used. Many other members have reported similar instructions regarding the application of comp. time. No mention of this is made in the I.A.S.I. official investigation or the Chief's Inquiry, nor has any notation been found that 2Lt. Gordon's time sheets were ever returned or corrected by I.A.S.I. managers.

---

Fact: When 2Lt. Gordon's excess time, such as annual, sick leave and comp. time was settled upon his departure from the agency, no record is found of I.A.S.I. managers mentioning or reporting any comp. time accrued by 2Lt. Gordon as required in DPS Operations Manual 1.1.6.A.4f

Conclusion: Troop commanders are required to complete "Notice of Personnel Action" forms that inform the Personnel Division when members resign. Included on these forms are the resigning members remaining annual, sick and overtime data which is used to determine the official departure date and any additional payment due the member. Lt. Randolph did not record or mention any accrued comp. time for 2Lt. Gordon, yet according to records compiled by Internal Audits from 1/18/99 to 4/23/2000 Gordon had accumulated 288 hours of "on call" comp. time and taken 24 hours. This leaves a balance of 264 hours, or 6.6 weeks, which was not reported by Lt. Randolph. An explanation should have been reported by the Chief's Inquiry.

---

Fact: Lt. Randolph's time records reflect a number of "U's" indicating that they have been updated since originally input. It is curious why this has occurred as 2Lt. Gordon's time records do not show similar frequency of updates.

Conclusion: Lt. Randolph's time records indicate that it was a common practice to adjust or

Audit Response
August 9, 2001

3

correct time records after they were input.  It is curious why Gordon was not given the same courtesy?

---

Fact:    Information was provided to the Chief's Inquiry team of the possible existence of a taped statement by Captain Burris to a meeting of the O.S.T.A. in which he denied the practice of providing compensatory time to I.A.S.I. employees while they were on an "on call" status.  This information, critical to a complete investigation, does not appear to have been pursued by the Chief's Inquiry or mentioned in their final report.

Conclusion:    The failure of the Chief's Inquiry to pursue this lead casts doubt on the value and completeness of the report.  It also places them in favor with the possible conspiracy to mitigate the effects of the fraudulent behavior by justifying the act and discrediting the internal auditors with unsubstantiated, out of context comments of bias.  Unwittingly, the Chief's Inquiry has now proven, without doubt, that the I.A.S.I. division has been violating state law by allowing members to claim time worked when in fact they were only "on call" which has been determined a non-pay status.  The report also reveals that subordinates within I.A.S.I. are not thoroughly informed regarding the reporting of time and left to their own to justify why they are suddenly able to claim an additional eight hours for every day they show "on call." (RE: Interviews of 2Lt.s Spears and Deryckere) This begs the question why did they stop at eight hours and not claim the entire 48 hour weekend?  Obviously, this practice would have required them to take so much comp. time as to never be at work during the week, thus causing the fraud to be understood by superiors who would, and did, stop the practice once it was exposed by the internal audit.

---

Fact:    The Chief's Inquiry reported unwritten rules and verbal instructions by I.A.S.I. managers regarding the accrual of "on call" comp. time.  Some I.A.S.I. members admitted being confused by the unusual practice and offered a variety of explanations to justify it.  They also expressed a feeling of being restricted but in every instance admitted to being issued a Department mobile phone and pager to further reduce the restriction beyond what it was when the practice was begun in the early 1990's.

Conclusion:    Neither state statutes nor DPS Operations guidelines afford members the ability to accrue comp. time while in an "on call" status.  The Department has long held that members be on call to quickly respond to situations.  The Commissioner, Assistant Commissioner, Chief, Assistant Chief, Duty Officers, Public Information Officers and other administrators are held to the same standard.  Even field troopers who are required to respond to emergency life or death situations have traditionally been held to this standard.  The advent of pagers and mobile phones have afforded an even greater flexibility to the restrictions placed on members who must serve in these capacities.

763

Audit Response
August 9, 2001

4

---

Fact:        The Chief's Inquiry reports having interviewed a previous commander of I.A.S.I. who related a verbal decision by either Lt. Col. Vanhoy or Lt. Col. Shaw to allow the accrual of comp. time while on call for the I.A.S.I. division. The Inquiry does not indicate that the statement or decision was ever confirmed by interviewing Vanhoy or Shaw.

Conclusion:    A prudent and complete investigation should have included such an interview and the Chief's Inquiry is remiss in its duties for not obtaining this information.

The fact remains that 2Lt. Gordon was investigated by his immediate supervisor regarding charges of obtaining funds by false pretense and the fact that the supervisor omitted crucial information regarding Gordon's ability to accrue and apply comp. time. At best, this displays a conflict of interest since the supervisor too was accruing a great deal of comp. time. However, the fact that the supervisor and his commanding officer failed to properly inform their superiors and report the possibility that 2Lt. Gordon may have been using comp. time while he was alleged to be working off duty is incomprehensible, cowardly and prima-facie evidence of a conspiracy.

These circumstances imply that a conspiracy to commit fraud has been perpetrated by certain individuals who were over-reporting time worked. In the course of concealing their behavior, they withheld information regarding the accrual and usage of compensated time and provided a misleading report to the Commissioner and Attorney Generals Office. The individuals continued the practice even after a fellow trooper resigned and was subsequently indicted by a multi-county grand jury. There is no indication they would have stopped until the practice was revealed by an audit.

BURRIS 1999
$28.81

765

| DATES | CALL MAKEUP DAYS CLAIMED | DATES | CALL MAKEUP DAYS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 01–09 | 8 | 01-15 | 8 | 96 | $2,765.76 |
| 02–06 DO | 8 | 02-12 | 8 | | |
| 02–07 DO | 8 | 03-18 | 8 | | |
| 03–27 DO | 8 | 03-19 | 8 | | |
| 03–28 DO | 8 | 04-16 | 8 | | |
| 04–25 VINITA | 8 | 05-13 | 8 | | |
| 05–22 DO | 8 | 05-14 | 8 | | |
| 05–23 DO | 8 | 06-29 | 8 | | |
| 06–12 VINITA | 8 | 06-30 | 8 | | |
| 07–10 DO | 8 | 07-02 | 8 | | |
| 07–11 DO | 8 | 10-21 | 8 | | |
| 08–21 DO | 8 | 10-22 | 8 | | |
| 08–22 DO | 8 | | | | |
| 09–25 EALES | 8 | | | | |
| 11–06 DO | 8 | | | | |
| 11–07 DO | 8 | | | | |
| 11–13 SHTING | 8 | | | | |

**BURRIS 2000**
**$28.81**

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 01-01 Y2K | 8 | 02-11 | 8 | 144 | $4,148.64 |
| 01-17 MLK | 8 | 03-13 | 8 | | |
| 01-22 52ND ACAD | 8 | 03-14 | 8 | | |
| 01-23 52ND ACAD | 8 | 03-15 | 8 | | |
| 02-05 DO | 8 | 03-16 | 8 | | |
| 02-06 DO | 8 | 03-17 FOR 01-01 | 8 | | |
| 04-01 DO | 8 | 04-18 | 8 | | |
| 04-02 DO | 8 | 05-05 | 8 | | |
| 05-13 | 8 | 06-13 | 8 | | |
| 05-20 DO | 8 | 06-19 | 8 | | |
| 05-21 DO | 8 | 08-25 | 8 | | |
| 08-12 DO | 8 | 09-15 | 8 | | |
| 08-13 DO | 8 | 09-29 MUDO | 8 | | |
| 08-25 SHTING TISH | 8 | 11-05 IRVING TX | 8 | | |
| 09-17 CHICAGO | 8 | 11-17 | 8 | | |
| 09-23 DO | 8 | 12-15 LAS VEGAS | 8 | | |
| 09-24 DO | 8 | 12-28 | 8 | | |
| 10-21 LANSTON | 8 | 12-29 | 8 | | |
| 11-10 VET DAY | 8 | | | | |
| 11-11 DO | 8 | | | | |
| 11-12 DO | 8 | | | | |
| 12-10 LAS VEGAS | 8 | | | | |
| 2-23 DO | 8 | | | | |
| 12-24 DO | 8 | | | | |
| 12-25 DO CHRISTMAS | 8 | | | | |
| | 8 | | | | |

**BURRIS  01   $28.81**

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 01-27 DO | 8 | 03-16 | 8 | 16 | $460.96 |
| 01-28 DO | 8 | 04-06 | 8 | | |
| 02-03 ACLU FT WORTH | 8 | | | | |
| 03-10 DO | 8 | | | | |
| 03-11DO | 8 | | | | |
| 04-14 DO | 8 | | | | |
| 04-15 DO | 8 | | | | |
| 04-21 GUTHRIE 89ER PARADE | 8 | | | | |

RANDOLPH 98 $26.51

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 06-20 OC | 8 | 09-23 MUD | 8 | 88 | $2,332.88 |
| 06-21 OC | 8 | 09-24 MUD | 8 | | |
| 06-27 OC | 8 | 09-25 MUD | 8 | | |
| 06-28 OC | 8 | 11-20 MUD | 8 | | |
| 09-05 OC | 8 | 11-23 MUD | 8 | | |
| 09-06 OC | 8 | 11-24 MUD | 8 | | |
| 09-07 OC LABOR DAY | 8 | 12-21 HOL | 8 | | |
| 09-12 OC | 8 | 12-22 HOL | 8 | | |
| 09-13 OC | 8 | 12-23 HOL | 8 | | |
| 10-31 | 8 | 12-28 HOL | 8 | | |
| 11-01 OC | 8 | 12-29 HOL | 8 | | |
| 11-07 OC | 8 | | | | |
| 11-08 OC | 8 | | | | |
| 11-27 THANKS. FRIDAY | 8 | | | | |
| 11-28 OC | 8 | | | | |
| 11-29 OC | 8 | | | | |
| 12-12 OC | 8 | | | | |
| 12-13 OC | 8 | | | | |

**RANDOLPH 99    $26.51**

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 01-24 OC | 8 | 05-21 MUDO | 8 | 232 | $6,150.32 |
| 01-30 OC | 8 | 06-14 MUDO | 8 | | |
| 01-31 OC | 8 | 06-15 MUDO | 8 | | |
| 03-06 OC | 8 | 06-16 MUDO | 8 | | |
| 03-07 OC | 8 | 06-17 MUDO | 8 | | |
| 03-13 OC | 8 | 07-02 MUDO | 8 | | |
| 03-14 OC | 8 | 07-05 INDEP. DAY | 8 | | |
| 04-03 OC | 8 | 07-06 MUDO | 8 | | |
| 04-04 OC | 8 | 07-07 MUDO | 8 | | |
| 04-10 OC | 8 | 07-08 MUDO | 8 | | |
| 04-11 OC | 8 | 07-09 MUDO | 8 | | |
| 05-08 OC | 8 | 07-12 MUDO | 8 | | |
| 05-09 OC | 8 | 07-13 MUDO | 8 | | |
| 05-15 OC | 8 | 07-14 MUDO | 8 | | |
| 05-16 OC | 8 | 07-15 MUDO | 8 | | |
| 06-19 OC | 8 | 07-16 MUDO | 8 | | |
| 06-20 OC | 8 | 07-21 MUDO | 8 | | |
| 06-26 OC | 8 | 07-28 MUDO | 8 | | |
| 06-27 OC | 8 | 11-15 MUDO | 8 | | |
| 07-31 OC | 8 | 11-16 MUDO | 8 | | |
| 08-01 OC | 8 | 11-17 MUDO | 8 | | |
| 08-07 OC | 8 | 11-18 MUDO | 8 | | |
| 8-08 OC | 8 | 11-19 MUDO | 8 | | |
| 09-04 OC | 8 | 11-22 MUDO | 8 | | |
| 09-05 OC | 8 | 11-23 MUDO | 8 | | |
| 09-06 OC LAB( | 8 | 11-24 MUDO | 8 | | |
| 09-11 OC | 8 | 11-25 THANKS. DAY MUI | 8 | | |
| 09-12 OC | 8 | 12-21 MUD | 8 | | |
| 09-25 EALES S | 8 | 12-22 MUD | 8 | | |
| 10-16 OC | 8 | | | | |
| 10-17 OC | 8 | | | | |
| 10-23 OC | 8 | | | | |
| 10-24 OC | 8 | | | | |
| 11-13 EDMONI | 8 | | | | |
| 11-26 THANKS | 8 | | | | |
| 11-27 OC | 8 | | | | |
| 11-28 OC | 8 | | | | |
| 12-24 CHRISTI | 8 | | | | |
| 12-25 OC | 8 | | | | |
| 12-26 OC | 8 | | | | |

769

**RANDOLPH 2000  $26.51**

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 01-01 OC Y2K | 8 | 01-13 MUDO | 8 | 264 | $6,998.64 |
| 01-02 OC | 8 | 01-14 MUDO | 8 | | |
| 02-05 OC | 8 | 04-07 MUDO | 8 | | |
| 02-26 OC | 8 | 05-19 MUDO | 8 | | |
| 02-12 OC | 8 | 06-26 MUDO | 8 | | |
| 02-13 OC | 8 | 06-27 MUDO | 8 | | |
| 03-18 OC | 8 | 06-28 MUDO | 8 | | |
| 03-19 OC | 8 | 06-29 MUDO | 8 | | |
| 03-25 OC | 8 | 06-30-MUDO | 8 | | |
| 03-26 OC | 8 | 07-03 MUDO | 8 | | |
| 04-16 OC | 8 | 07-04 MUDO INDEP DAY | 8 | | |
| 04-22 OC | 8 | 07-05 MUDO | 8 | | |
| 04-23 OC | 8 | 07-06 MUDO | 8 | | |
| 05-06 OC | 8 | 07-07 MUDO | 8 | | |
| 05-07 OC | 8 | 08-04 MUDO | 8 | | |
| 05-13 OC | 8 | 08-07 MUDO | 8 | | |
| 05-14 OC | 8 | 08-08 MUDO | 8 | | |
| 06-10 OC | 8 | 08-09 MUDO | 8 | | |
| 06-11 OC | 8 | 08-10 MUDO | 8 | | |
| 06-17 OC | 8 | 08-11 MUDO | 8 | | |
| 06-18 OC | 8 | 08-14 MUDO | 8 | | |
| 07-15 OC | 8 | 08-15 MUDO | 8 | | |
| 7-16 OC | 8 | 08-16 MUDO | 8 | | |
| 07-22 OC | 8 | 08-17 MUDO | 8 | | |
| 07-23 OC | 8 | 08-18 MUDO | 8 | | |
| 08-20 JOHNSTON CO. | 8 | 09-08 MUDO | 8 | | |
| 08-26 OC | 8 | 10-20 MUDO | 8 | | |
| 08-27 OC | 8 | 12-01 MUDO | 8 | | |
| 09-02 OC | 8 | 12-19 HOLIDAY MUDO | 8 | | |
| 09-03 OC | 8 | 12-20 HOLIDAY MUDO | 8 | | |
| 09-04 OC | 8 | 12-21 HOLIDAY MUDO | 8 | | |
| 10-07 OC | 8 | 12-22 HOLIDAY MUDO | 8 | | |
| 10-08 OC | 8 | 12-27 MUDO | 8 | | |
| 10-14 OC | 8 | | | | |
| 10-15 OC | 8 | | | | |
| 11-11 OC | 8 | | | | |
| 11-12 OC | 8 | | | | |
| 11-23 OC THANKS HOLIDAY | 8 | | | | |
| 11-24 OC THANKS HOLIDAY | 8 | | | | |
| 11-25 OC | 8 | | | | |
| 11-26 OC | 8 | | | | |
| 12-28 OC | 8 | | | | |
| 12-29 OC | 8 | | | | |
| 12-30 OC | 8 | | | | |
| 12-31 OC | 8 | | | | |

**RANDOLPH 2001   $26.51**

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 01-01 NEW YEARS DAY OC | 8 | 01-16 MUDO FROM 2000 | 8 | 72 | $1,908.72 |
| 01-06 OC | 8 | 01-17 MUDO FROM 2000 | 8 | | |
| 01-07 OC | 8 | 01-18 MUDO FROM 2000 | 8 | | |
| 01-27 OC | 8 | 01-19 MUDO FROM 2000 | 8 | | |
| 01-28 OC | 8 | 01-22 MUDO FROM 2000 | 8 | | |
| 02-03 OC | 8 | 01-23 MUDO FROM 2000 | 8 | | |
| 02-04 OC | 8 | 01-24 MUDO FROM 2000 | 8 | | |
| 02-10 OC | 8 | 03-09 MUDO | 8 | | |
| 02-11 OC | 8 | 03-14 MUDO | 8 | | |
| 03-24 OC | 8 | | | | |
| 03-25 OC | 8 | | | | |
| 03-31 OC | 8 | | | | |
| 04-01 OC | 8 | | | | |

# EXHIBIT 6

## DISCIPLINARY INTERVIEW ADVICE OF RIGHTS

I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and narrowly related to the performance of my official duties or fitness for office. I also understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate myself. In addition, I understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

_____
Signature of Affected Employee

STATE OF OKLAHOMA        )
                         )
COUNTY OF _Oklahoma_     )

Witnessed before me this _24_ day of _Sept_____, 19 _99_

_____
NOTARY PUBLIC

My commission expires:

_12/18/2001_



111

DEFENDANT'S
EXHIBIT
16

STATE OF OKLAHOMA )
                  )SS.
COUNTY OF OKLAHOMA )

I, Robert Darst, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
ROBERT DARST

SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of _____, 1999.

_____
Notary Public

My Commission expires:

_____

774
KEB204619

STATE OF OKLAHOMA  )
                   )SS
COUNTY OF OKLAHOMA )

ROBERT DARST
TROOPER
OHP

**AFFIDAVIT**

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol. Today's date is 11-9-1999. The time is 10:25. I am at 3600 Martin Luther King, at the Internal Affairs Office of the Department of Public Safety. Present in the room with me is Trooper

DARST:   Darst

GORDON:   What's your first name?

DARST:   Robert.

GORDON:   Robert Darst #474. Trooper, are you aware that our conversation is being recorded and may be reduced to a typed sworn affidavit for your signature at a later date?

DARST:   Yes I am.

GORDON:   Sir, is this recording being made with your permission?

DARST:   Yes.

GORDON:   Sir, I have handed you a Disciplinary Interview Advice of Rights which you have read and signed. You understand what that Disciplinary Interview say sir?

1

KEB204620

STATE OF OKLAHOMA    )                       ROBERT DARST

                      )SS               TROOPER

COUNTY OF OKLAHOMA   )                       OHP

**AFFIDAVIT**

DARST:    Yes.

GORDON:    All right sir, so you are giving this interview freely.

DARST:    Yes.

GORDON:    All right sir, I need to cover a few basic questions with you, could you please state your complete name?

DARST:    Trooper Robert C Darst.

GORDON:    Could you spell your last name for me?

DARST:    D A R S T

GORDON:    What is your date of birth sir?

DARST:    █████████

GORDON:    And your social security number?

DARST:    █████████

GORDON:    How long you been on the patrol sir?

DARST:    Approximately five years.

2

776
KEB204621

STATE OF OKLAHOMA    )                          ROBERT DARST
                     )SS                        TROOPER
COUNTY OF OKLAHOMA   )                          OHP

AFFIDAVIT

GORDON:   Where are you currently assigned?

DARST:   Hugo, Choctaw County detachment.

GORDON:   What is your ah, are you a regular road Trooper?

DARST:   Yes.

GORDON:   Are you on the TAC Team?

DARST:   Yes sir.

GORDON:   Which team are you on, east or west?

DARST:   East.

GORDON:   What is your assigned position sir?

DARST:   Ah, we don't normally have assigned positions, I'm assigned to the tracking team, ah, but it varies with assignments what your job will be.

GORDON:   Sir, did you participate in the events that occurred at ah, 0038 Hrs on September 24, 1999, near Sallisaw, Oklahoma sir?

DARST:   Yes.

3

777
KEB204622

STATE OF OKLAHOMA )                  ROBERT DARST
                      )SS                      TROOPER
COUNTY OF OKLAHOMA )                 OHP

<div align="center">AFFIDAVIT</div>

GORDON: Could you please tell me what happened from the time that you got off I-40 and were in route to Dwight Mission Road to include the events that took place at the residence.

DARST: Ah, Trooper Gene Hise was driving the vehicle I was riding in, I was the front seat passenger, ah, Trooper Billy Poe was the rear seat passenger, ah, we were in a convoy of five vehicles, we were the fourth vehicle ah, we were in route to serve a search warrant, felony arrest misdemeanor arrest warrant at a location that was determined by the Attorney Task Force in that area ah, we had, I had seen the warrants, they looked like good warrants to me, we had done some planning earlier in the day in order to effect these warrants in service and ah turned northbound of of Interstate 40 on to Dwight Mission Road approximately four miles west of Sallisaw, and approximately a half a mile north of the interstate we came to a crossing, I'm not sure what the highway number is, I believe it's Highway 64, ah, intersection then just north of that intersection we met members of the Drug Task Force for that district. We stopped for a few moments, no one got out of our vehicle, there's some OHP personnel that were on the team that met with some of the people that were there, outside the vehicle, I'm not sure who those people were. Not sure who it was that talked with them. After a few minutes we proceeded northbound in route to the location which was about three miles, approximately three miles north of where we had stopped and then back a mile east. Ah, we were, like I said we were the fourth vehicle in the

<div align="center">4</div>

778
KEB204623

STATE OF OKLAHOMA      )
                       )SS
COUNTY OF OKLAHOMA     )

ROBERT DARST
TROOPER
OHP

AFFIDAVIT

convoy, ah, Lt's Pettingill and McBride were in the fifth vehicle which was behind us, ah, the three vehicles in front of us were to enter a driveway just past the residence that we were serving the warrant on and approach it from that driveway. We were to stop in front of the residence, the suspects residence in our vehicle and Trooper Hise and I were to ah scale the fence at the gate and proceed northbound from the county road ah to a point just west of the suspect residence in order that we might be the chase team so that if we had some suspects flee the residence that we might be able to take them into custody. Ah, we made a little distance, we slowed down a little bit, made a little distance between our unit, Trooper Hise made a little bit of distance between our unit and the third unit in the convoy so that they might be able to get in position without us ah, being there too soon, maybe tipping off the people in the residence. As we, as we pulled up and stopped in front of the gate, it seems that the third vehicle was approaching the gate where they were entering which was a few, oh possibly two hundred yards down the road from where we stopped. Ah, Trooper Hise and I got out of the patrol vehicle and went over the gate, I'm not sure if he went over in front of me or behind me, I don't really remember, ah, I went over the gate, I started running northbound across the yards, kind of in a driveway area and I made probably 30 or 40 feet, approximately that much ah, north of the gate in the yard area and I saw a person directly in front of me, north of my location, ah, almost in the area of where I was running to, and standing in the yard ah, looking back toward the residence

5

779
KEB204624

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

ROBERT DARST
TROOPER
OHP

AFFIDAVIT

it was like he's moving away from the residence, but he's looking back walking backwards maybe.  I didn't see any weapons on that subject ah, I could see red and blue lights flashing on that subjects from the units that were coming in from the other side of the yard, which would of been Trooper Hamilton, Trooper Grinenger and Trooper Hash's units and ah, I drew my sidearm because that was all the weapon I had on my person, due to my assignment, and started ordering that person that I saw in the yard, to the ground and I'm not positive, but it was something to the effect of "police, get on the ground" and ah, I think I said it twice, but that person never responded to me, never even looked at me, like he hadn't even heard what I said and about the time I said those commands, I had stopped and dropped to one knee and was directing my weapon in the direction of this person I saw and about the time I got those commands out, I heard gunfire that sounded like automatic gunfire to my right in the area of the residence that we were serving the warrants on, and as I turned to my right to address that I was looking for a target on the porch, I could see the porch was real well lit because I could see ah, white Bronco that I later I knew was Trooper Hamilton's Bronco approaching the residence, moving almost straight towards it, ah, and his headlights were lighting up the porch area and I could see a lot of smoke right in front of the front door, but I couldn't see anyone on the ground or anyone, I could not see any, any target, any person, ah, I saw the glass coming off the windshield of Trooper Hamilton's vehicle ah, I kept looking for a target and I couldn't,

6

780
KEB204625

STATE OF OKLAHOMA )      ROBERT DARST
                     )SS      TROOPER
COUNTY OF OKLAHOMA )      OHP

<center>AFFIDAVIT</center>

I couldn't see anyone, so I moved on up to the position where I was supposed to be it was a vehicle parked kind of, oh, approximately 20 yards west of the residence and just in front of it maybe five yards, in front of the residence and it was like a '63 Chevrolet Pickup, blue in color, '60's model Chevrolet pickup, and I moved up on the drivers side of it, keeping it between me and the residence, maintaining cover on the residence, and as I moved up on the driver's side of it, I saw that Trooper Hise had a subject on the ground that looked to be the subject that I had seen as I crossed the fence and stopped in the yard and I know now that that was who it was and he was handcuffing that subject. So I moved between Trooper Hise and the residence maintaining cover on residence as he handcuffed that subject. Ah, after he had advised he had him secured, had the subject secured so he and I both moved back behind the fender, front fender of this pickup that was sitting there and approximately at that time, there was still shots being fired, sounded like automatic gunfire to me, ah, I could see, I could see someone on the ground on the other side of the Bronco, cause it appeared silhouetted with the lights from the other patrol vehicles that were on the other side of the residence. Ah, I kept looking through a window, or looking at a window there on the west edge, er west side of the residence and looking at the back of the residence what I could see of the back of the residence ah looking for a target, and I couldn't find a target and about that time was when the ah we heard someone come over our radio, our TAC radio, and said they needed some help, we had a man down, they needed a

<center>7</center>

781
KEB204626

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

ROBERT DARST
TROOPER
OHP

782

AFFIDAVIT

vehicle, Trooper Hise said at that point and time, "I'm gonna crash the gate with my car and get my car in there and get them out". So he left and I maintained cover in that position as I was assigned to do and I grabbed the individual that had been handcuffed, he was laying prone on the ground, ah, I grabbed him by the foot and drug him back, I grabbed him by his right foot, I drug him back to where I could maintain cover behind the front fender of the pickup and still maintain control of him and I stood on his right lower leg so he couldn't move and I maintained cover at that point until ah, I hadn't heard any shots for a few moments, I don't know how long of time it was and I called out directly not over radio, I called out directly to ah, the other members that I could see in front of the residence, and ask if the residence was secured, one of them advised, and I don't know who that was, called back to me directly and said "no, the residence had not been secured" so I maintained my position, at some point in there Lt Pettingill ah came through that area en route to where that person was on the ground, he ask me if I was okay and I said "yes sir" he went on and ah, few moments later after some of our team members had entered the residence and they exited again, I ask them again directly if the residence had been secured and one of them, I don't know again who it was, advised that "yes, the residence was secured" there were no other people in there other than the one they had already taken out. And at that point, I ah, escorted this prisoner that I was in custody of to a gate that Trooper Hise had crashed with his unit and turned him over to some of the drug task force, or Sheriff's

8

782
KEB204627

STATE OF OKLAHOMA )                    ROBERT DARST
                  )SS                  TROOPER
COUNTY OF OKLAHOMA )                   OHP

AFFIDAVIT

office people that were waiting outside (inaudible) and then I returned back to the scene to assist however I needed.

GORDON:   Okay.  Did you fire any rounds?

DARST:   No sir, I didn't.

GORDON:   Do you know if Buddy Hamilton fired any rounds?

DARST:   I don't know.

GORDON:   Did you assist in the taking of the suspect Kenneth Barrett into custody.

DARST:   No, I did not.

GORDON:   Did you know what the suspect looked like before the forced entry was attempted?

DARST:   I had a verbal description of the suspect.

GORDON:   Do you remember what the verbal description was?

DARST:   I don't remember exact heights, somewhere around 5'7" - 5'8", something like that, slight built, skinny, with long stringy blondish hair.

9

783
KEB204628

STATE OF OKLAHOMA )                    ROBERT DARST
                  ) SS                 TROOPER
COUNTY OF OKLAHOMA )                   OHP

AFFIDAVIT

GORDON: The individual that you took into custody, you and Hise,

DARST: Yes sir.

GORDON: Would he of fit that description?

DARST: Ah, no they also gave us an age, they did have an age on this suspect of Kenneth Barrett of being approximately 38 years old, if I remember correctly, I don't know right off hand how old he was.

And I don't remember if I ever did know exactly how old he was, but it was in that area, and the subject that we took into custody was obviously or less, approximately 20 years old.

GORDON: But physically would he of looked the same?

DARST: He could have, yes sir.

GORDON: Did you know how many weapon and, how many and what type weapons that were inside the house?

DARST: Ah, we had some intelligence that there might possibly be an automatic weapon in the house and that this subject, Kenneth Barrett, was known to carry a handgun on his person at all times.

GORDON: Did ah, was his criminal history and his ah, threats

10

784
KEB204629

STATE OF OKLAHOMA )                          ROBERT DARST
                 )SS                         TROOPER
COUNTY OF OKLAHOMA )                          OHP

AFFIDAVIT

against law enforcement related to you?

DARST:    Excuse me?

GORDON:    Ah, was his criminal history and his threats against law enforcement related to the TAC Team?

DARST:    Yes sir, in the earlier briefing ah, we had been told that at some point prior to this ah, he had been in a stand-off with some law enforcement officers, I believe they were local law enforcement, and ah, he had attempted suicide by shooting himself in the abdomen with a long gun, I believe.

GORDON:    Do you know who provided the intelligence for this mission?

DARST:    Ahem, there were two drug task force agents ah, I'm not sure what their names are.   I've heard their names a number of times but I just can't recall them right off hand.

GORDON:    Were you all told about the sensormatic listening device on the back of the house?

DARST:    I wasn't aware of it, no.  I don't know if anyone else on the team was.

785
KEB204630

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

ROBERT DARST
TROOPER
OHP

AFFIDAVIT

GORDON: Did you think the intelligence was okay for this mission?

DARST: Ah, for my part of the mission, I had, I had ah, I personally had enough knowledge to perform the job that I was assigned.

GORDON: You think it was, it was adequate for the overall mission?

DARST: I'm not for sure about that, ah, it would be ah, I, I don't feel like I have the ability to judge that since I was not on the entry team on this particular ah, operation, ah, and I'm not sure if the, I'm sure there people that might say there was enough intelligence, ah, looking back, maybe we did need to know a little bit more, I don't know. I don't know if there could of been more intelligence.

GORDON: You know how the TAC Team conducted surveillance for the mission?

DARST: Yes sir. I, I was told by some members that did some surveillance on the mission as to what they did, but that's all I have, I don't have any direct knowledge of it.

GORDON: What did they tell you they did?

12

786
KEB204631

STATE OF OKLAHOMA  )                    ROBERT DARST
                   ) SS                 TROOPER
COUNTY OF OKLAHOMA )                    OHP

### AFFIDAVIT

DARST:    Ah, I believe Trooper Hamilton and Trooper Grinenger and ah, Trooper Manion did a drive by earlier in the evening in Trooper Hamilton's white Bronco.  I believe that's the Bronco they used earlier in the evening ah, so that they might put eyes on this particular residence so that they might know a little bit more about it, rather than just the ah ariel photographs that we had, ariel video tape

GORDON:    Okay.

DARST:    and officers descriptions that had been their prior.

GORDON:    Do you ah, you think of anything else, ah, one last question do you know how you all arrived at 0030 to hit the hours as far as time frame?

DARST:    We discussed it as a team ah, we didn't want to go too early, we had a no knock day or night search warrant which I'm sure your aware of is a good thing to have gives you a lot of options that you don't normally have on a daytime search warrant and ah, I do believe that in many of the members mind and I know in my mind that I felt like it was better to do it at some point during regular sleeping hours since we were unable to, it was decided by the team and that we were unable to put forward snipers for (inaudible) ah, (inaudible) that we felt more comfortable going at a time that would be an abnormal time for people to be out of bed

13

787
KEB204632

STATE OF OKLAHOMA )  
                 )SS  
COUNTY OF OKLAHOMA )

ROBERT DARST  
TROOPER  
OHP

AFFIDAVIT

when ah, one might expect that ah, even in my mind I would think you'd be more likely to have a ah, a drug dealer or drug user would be more likely to be in bed and not as as alert somewhere after 12:00, between 12:00 and 4:00 or 5:00 in the morning. Ah, I know that was part of what I was thinking, I can't say what anybody else was thinking.

GORDON: When you all rolled up did you see lights on in the house?

DARST: I wasn't looking to see if there were lights on in the house, I had a particular mission ah, like I say Trooper Hise and I were assigned to the chase team and we had a particular area that we wanted to get to, a particular location that would provide us with some cover, it would also put us in the proper location so that anybody jetted out of the back of the house or out of the front of the house we would be able to take them in custody with the least amount of effort on our part because we weren't as familiar with the area and what not, the dangers in that there was a lot of vehicles and ah scrap iron, there was a lot of trip hazards and things that might get you injured in the dark, in a dark chase if you weren't aware of them so we wanted to put ourselves in the best location we could, so I wasn't really concentrating that closely on the house and wouldn't have at all had the shots not opened up, had there not been gunfire prior to me even reaching my post.

14

788  
KEB204633

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

ROBERT DARST
TROOPER
OHP

AFFIDAVIT

GORDON: Sure.

DARST: Ah, but I can't say if there were lights on in the house or not the lights I saw were the lights, what I see in my mind I believe were the lights of Trooper Hamilton's Bronco reflecting off the front porch and it was it was well on it because as I say, Trooper Hamilton's Bronco was pointed was right towards the front of the house and even rolled up very close to the house

GORDON: How far did he get, do you know.  How far did Hamilton's vehicle get to the house,

DARST: I'm not sure it didn't touch the front porch.

GORDON: I mean was it like six feet, ten feet,

DARST: At some point I think it touched the front porch.

GORDON: Okay.

DARST: I think it rolled up in front of the actual flooring on the porch (inaudible).  Ah, at some point while I was maintaining control of this prisoner that Trooper Hise and I had ah, affected the arrest on (inaudible) some point after Trooper Hise left me and, and I walked that prisoner out, there were some attempts being made by some of our team members to ah, load Trooper Eales into a

15

789
KEB204634

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

ROBERT DARST
TROOPER
OHP

AFFIDAVIT

vehicle and they, they tried to use Trooper Hamilton's vehicle for that and I believe it was actually pushed backward approximately 10 or 15 feet away from the residence so that when your people and the OSBI got there to do the investigation that that's not an actual representation of where that vehicle stopped.

GORDON:   Okay.  Who pushed the vehicle back?

DARST:   I'm not sure, some of our team members I think.

GORDON:   Okay.

DARST:   But I'm not sure who did it, and I'm not even sure if they know who did it.  Ah, but I believe that vehicle was pushed backward and it never was put into park

GORDON:   Okay.

DARST:   until maybe after it was pushed backward.

GORDON:   Okay.  Can you think of anything else Trooper that might help me conclude my investigation on the events that occurred in Sallisaw on September 24, 1999?

DARST:   Ah, I don't know of anything else, (inaudible).

16

790
KEB204635

STATE OF OKLAHOMA   )                       ROBERT DARST
                      )SS                TROOPER
COUNTY OF OKLAHOMA  )                       OHP

### AFFIDAVIT

GORDON:   Sir, with your permission, I'm gonna turn off the tape recorder at this time.

17

791
KEB204636

# EXHIBIT 7

STATE OF OKLAHOMA )
)SS.
COUNTY OF OKLAHOMA )

I, Raymond Greninger, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
RAYMOND GRENINGER

SUBSCRIBED AND SWORN to before me, a Notary Public, this

_____ day of _____, 1999.

_____
Notary Public

My Commission expires:

_____

793
KEB203352

STATE OF OKLAHOMA )                    RAYMOND GRENINGER
                              )SS                TROOPER
COUNTY OF OKLAHOMA )                    OHP

AFFIDAVIT

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol. Today's date is 11-02-99. The time is 1:07. I am in the Internal Affairs office in Oklahoma City at 3600 Martin Luther King. Present in the room with me is Trooper Raymond Greninger.

GORDON:     Trooper Greninger, is you would, I'm handing you the Disciplinary Interview Advice of Right, could you please read that out loud for me sir?

GRENINGER:     I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and narrowly related to the performance of my official duties or fitness for office. I also understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate myself. In addition, I

1

794
KEB203353

STATE OF OKLAHOMA   )                          RAYMOND GRENINGER
                    ) SS                       TROOPER
COUNTY OF OKLAHOMA  )                          OHP

AFFIDAVIT

understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

GORDON:     Okay sir, would you please sign where it says signature of affected employee and date it please. Could you please state your complete name?

GRENINGER:  Raymond C Greninger, Jr.

GORDON:     Sir, could you spell your last name for me?

GRENINGER:  G R E N I N G E R

2

795
KEB203354

STATE OF OKLAHOMA   )                      RAYMOND GRENINGER
                    ) SS                   TROOPER
COUNTY OF OKLAHOMA  )                      OHP

AFFIDAVIT

GORDON:      Could you state your date of birth?

Greninger:   ████████

GORDON:      Your social security number?

Greninger:   ████████████

GORDON:      How long have you been on the patrol?

Greninger:   Ah, since March of 1984.

GORDON:      Where are you currently assigned at?

Greninger:   Ah, I'm assigned to the Bomb Squad Division out of Pryor area.

GORDON:      Ah, sir, are you on the Tac Team?

Greninger:   Yes sir.

GORDON:      What is your assigned position on the Tac Team?

Greninger:   Ah, building entry.

GORDON:      Can   you   please   tell   me   what   happened   at

3

796
KEB203355

STATE OF OKLAHOMA   )                          RAYMOND GRENINGER
                    )SS                        TROOPER
COUNTY OF OKLAHOMA   )                         OHP

AFFIDAVIT

approximately 0038 on September 24, 1999?

Greninger:    Okay, you just want to start when it happened, you want the background as to what we did up til this

GORDON:    If you could start with, specifically in reference to what happened in that event from the time you got off the Interstate.

GRENINGER:    Okay, we were going to execute a search warrant and a felony arrest warrant and we also had a misdemeanor warrant for an individual for named Kenneth Barrett, ah, we exited Interstate 40 on to ah I believe it's Dwight Mission Road was the name of it, when we exited the Interstate we were to link up with a task force group of Sequoyah Personnel, ah which was supposed to consist of ah, two investigators, ah, and a small group to actually take care of the, the scene once we secured the residence with a search warrant. Ah, when we pulled off the Interstate and turned north ah there was a large group of people ah, probably rough guess and I don't really know how many was there, maybe 15 or 20 people which consisted of the D.A., ah a Sheriff from another county ah, and other people that I'm not familiar with who it was.  We paused there for a minute, ah, advised them that we were en route and they were told wait, to give us two minutes and ah they could follow the procession, follow in behind us but to give us two minutes which we felt was more than enough time to get in and take care of the

4

797
KEB203356

STATE OF OKLAHOMA   )
                       )SS
COUNTY OF OKLAHOMA  )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

situation that we had, our part of the situation. We left there and went northbound which consisted of Trooper Hamilton's unit was in front, my unit, ah, Trooper Hise's unit, ah, Trooper Hash's unit and Lt Pettingill's unit, we had five units, we continued north to the intersecting road that turned us east to go to the residence that we were going to execute the search warrant on. As we crossed the final intersection ah to go to the house, there was another 200 or 300, 400 yards to ah the residence which had a gate which from the Intel that we had done the prior two days and we knew that the gate was was locked and having double strand of log chain around it and two padlocks. The plan was is for Trooper Hamilton's unit, my unit and Trooper Hash's unit to continue on a very short distance 20 - 30 yards on up, there was another road that went to another residence that ah, was not, that did not have a gate and there was, from the aerial photos, and from the drive by there was another road that we could turn into to make entry into the house to get there as quickly as possible. As we turned into the other road, Trooper Hise's was going to peel off and stop at the gate which consisted of three people, their objective was to ah provide cover for us, also to ah, get to the site of the residence, we had information that the guy would run and try to make it to his mother's house which was next door, and also Lt Pettingill and Lt McBride ah pulled into the mother's residence and that was also their job there to take down anybody that would come. The other three units led by Trooper Hamilton's unit, my unit was second and Trooper Hash's unit was third, was to enter the next road ah, make

5

798
KEB203357

STATE OF OKLAHOMA    )                    RAYMOND GRENINGER
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

an approach to the house and make entry into the house and secure the residence. As we turned into the road, and turned off of that road into the little lane that would take us into it, there ah, I, as Trooper Hamilton's unit dropped down in it, there was a ditch that was quite a bit deeper than we anticipated, I can remember seeing Trooper Hamilton's unit, the rear end of it, his bumper rear bumper bottoming out in that ditch, there was no pause though it was just a continuous motion and as I knew that I had to hit the gas, I hit the gas and we went through the ditch and we started our approach and I have drawn a blank from the time I hit the ditch up until we actually came up, I can actually hear rounds going off as we're pulling up to stop, I can see Buddy's car still moving but the distance in there I don't exactly know where in relation to where we were when we started hearing the rounds. As we pulled up to stop, I could see debris and stuff coming up, I could hear automatic, sounded like automatic gun fire and I could see debris coming up from the area of ah Trooper Hamilton's vehicle and I'm thinking, I initially my thoughts are, it's dirt, why are we shooting in the ground and ah, I can see ah, ah debris coming up, I'm sure what I was seeing was the windshield off his vehicle, fragments of glass going up in the air from the bullets, it took a few seconds to ah determine if the shots were coming from them, if the shots where coming from there and as we stopped Trooper Manion, I was driving, Trooper Manion was my passenger, ah, we stopped our vehicle in the area of where ah in relation to Trooper Hamilton, we both exited the vehicle as Trooper Manion came around first as I

6

799
KEB203358

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

was still putting it in park, getting it stopped and as I come out we met Trooper Eales who had made it to the rear of the Trooper Hamilton's Bronco and he dropped face down on the ground. Trooper Manion dropped and was asking "Rocky, are you okay, are you okay", and I ran back to my unit and grabbed the mike and yelled "Officer down, need help, man down" and we were gonna make entry with a hand gun, my rifle was laying right there, I grabbed my rifle and came back around the front of the car and Trooper Manion had, while he was looking Rocky, had seen movement inside the house and the guy stepped across into a window on the east side and Trooper Manion was going around to that side, I continued around the front of the car to go with him and as he got to the window, he seen the individual ah inside the room, or movement or whatever he seen and he fired a burst from an MP5 into the window, ah, as I'm coming around I can see Trooper Hamilton stepping up on the porch and I'm thinking, I can hear him yelling something at somebody, has his pistol pointed towards the door and I can hear him saying something, he's stepping up to the door, and I start yelling at Rick "Buddy's going in, Buddy's going in" ah, my intent was so Rick wouldn't fire anymore rounds because I didn't want him to, to shoot our own person. Rick heard me, he, he did not fire anymore, Buddy steps in the door, I go to Buddy and as Buddy, as I get to Buddy he's got the individual, he's drug him out and he's placed on the ah, he's placed there on the ground ah, Trooper Manion's made it back there to us then, he takes him and they place the handcuffs on him and our focus immediately, at that point, ah turns to Trooper

7

800
KEB203359

STATE OF OKLAHOMA   )
                ) SS
COUNTY OF OKLAHOMA   )

RAYMOND GRENINGER
TROOPER
OHP

**AFFIDAVIT**

Eales to what we can do for him.  Trooper Poe had made it up to the vehicle, he has the house, he has a, his A2K rifle and he has, he is holding ah, he's maintaining cover on the residence so we can do what we need to do to get Trooper Eales out of there, ah, Trooper Hise has also made it there, Trooper Hise and Trooper Hamilton and Trooper Manion are, have, we've all got to Rocky, they start working on Rocky, I look up and see that Lt Pettingill's vehicle has made it into the yard, I run down to him and tell him we need an ambulance, we need something and he tells me to get him in to one of the Broncos and get him out of there.  I run back to Trooper Hamilton's Bronco which I ah, tried to roll the back glass down from the inside, the driver's door was still open, it wouldn't go down, I ran behind it, I took my rifle I beat the back glass out of it to try to get the tailgate down and it dawns on me that the vehicle is disabled, that we can't do it, so I yell at them to get him to my vehicle, I get the tailgate down, I get everything ready, we get Rocky over, put him into the back of my vehicle and Trooper Hise get's in it and he drives it ah and takes it out, the Sheriff of, of, of Cherokee County, I can't remember her name off the top of my head and she's an RN, and a D.A.'s investigator, Clint Johnson, ah, she had gotten in, she is a registered Nurse, she's gotten in the back and she's working on Rocky and Clint Johnson's helping her and Trooper Hise and we get them out of there and they leave.  We immediately focus back on the job that we have to do and that is to secure the residence because at that point and time we don't know whether we have the shooter or the only shooter, or or

8

801
KEB203360

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

whether there's more, so we go back to the residence, ah Trooper, myself and Trooper Poe and Trooper Manion and Danny Oliver, who is a retired Trooper, and I don't remember if, Trooper Hash was there somewhere, I don't remember, I know the four of us made entry into the residence, secured the residence and when we got to the area that we knew had an upstairs, a small room, we needed a mirror to look up there to see if anybody was there, we yelled for a mirror and Trooper Hamilton brought the mirror in, which I took from him, handed to Trooper Manion who actually did the deal, and at that time I noticed blood on Trooper Hamilton and I could see ah, some debris in his eye, I can see some blood under his eye, and I, he was still holding his pistol and I, I ask him "Buddy, are you okay" and I reached down and touched him on the shoulder and he flinched, and when he did I felt blood and noticed here was blood on his shoulder and I did a quick physical scan of him to see if there was, I could see any other injuries to him and he says "no, I think that's all there is" I took his Sig from him, placed it in my waistband and told him "com on, I'm gonna get you to the hospital" and I took him out as I went by Lt Pettingill I told him what I was doing and I took him back out to the fence that was on the road and there was a Sheriff's deputy, I don't recall his name, I put him inside his Ram Charger and told him to get him to the hospital in Sallisaw as fast as he could get him there.  I came back up to Lt Pettingill and told him that I had got Buddy out of there and got him headed toward a hospital, told him that I had Buddy's service weapon, which was his Sig, and ask him what he wanted me to do with

9

802
KEB203361

STATE OF OKLAHOMA    )
                     )SS          RAYMOND GRENINGER
COUNTY OF OKLAHOMA   )            TROOPER
                                  OHP

AFFIDAVIT

it and he told me to place it ah, on the porch of the residence and to advise whoever showed up to do the investigation, that that's what had been done, that that weapon, how that weapon come to be on the porch.  Ah, at that time we backed out of it, placed the crime scene around it and waited for the appropriate people to get there to process the crime scene.

GORDON:       You fire any rounds during the confrontation?

GRENINGER:    No sir.

GORDON:       Did you assist in taking the suspect Kenneth Barrett into custody, in any way, did you touch him in any way?

GRENINGER:    I never physically touch him.

GORDON:       Did you see anybody else touch him or do anything mean to him?

GRENINGER:    No sir, I did not.

GORDON:       Basically just our Troopers touched, did we keep control of him or did we pass him off to

GRENINGER:    No sir, at some point and time into the process of of, getting Trooper Eales out and securing the residence and that

803
KEB203362

STATE OF OKLAHOMA      )                    RAYMOND GRENINGER
                       )SS                  TROOPER
COUNTY OF OKLAHOMA     )                     OHP

AFFIDAVIT

from the proximity of where he was laying in front of it, there was also a residence, which I stated was his Mom's, at some point and time the deputies for Sallisaw ah, obtained custody of him and moved him around to the east side of the house. When that happened or who moved him, or what I have no idea, I was not there, I didn't see anything, I don't know the time frame that it was, we were still in the process of finishing what we were sent there to do and that was to secure the residence and, and I have no idea when he was moved.

GORDON:       Okay. And you know what the suspect looked like, you know the suspects name?

GRENINGER:    Ah, I do now, the suspects name is Kenneth Barrett.

GORDON:       Okay, did you know what he looked like prior to the entry being attempted.

GRENINGER:    No sir.

GORDON:       Did you have any kind of physical description or anything of him.

GRENINGER:    They gave us a rough physical description, but it didn't really match and right off the top of my head right now, I

11

804
KEB203363

STATE OF OKLAHOMA    )
                     )SS
COUNTY OF OKLAHOMA   )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

drew a blank as to what it was, it seemed like they told us he was 5'6" or 5'7" and weighed around 150 or 160 lbs which is not, the first time that I actually seen him to look him in the face was at his arraignment in Sallisaw. We ah, something off the question that you ask, we ask for pictures we were told that there was no pictures of Kenneth Barrett off the other arrests or or the things that he had been in trouble because they had always found a way to slide him out before the actual booking and the arrest photos could be made. We were under the impression that there were no arrest photos of Kenneth Barrett from any other times dealing with law enforcement personnel.

GORDON:      You know how many suspects were in the house or on the property prior to being there?

GRENINGER:      Prior to

GORDON:      Prior to your getting to the house er, or prior to your making entry to the house.

GRENINGER:      There was, the only thing that was told during our, I'm gonna have to back up a couple of days now, okay, we started from the deal, Trooper Hamilton and I, three days, two days prior, did a, we met with the District Attorney, er the D.A.'s Task Force which was Clint Johnson and Frank ah, I can't remember Frank's last name right now, we met with them at the Sallisaw Airport on

12

805
KEB203364

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

instructions from Lt Pettingill to do a fly over of the area and take some aerial photos and also a video of, during that time Trooper Hamilton and I ah, we did the fly over, out pilot was Kenneth Stafford, we did the fly over, took some aerial photographs and still photos and used a video camera which was my personal video camera and and took a video of the area to attempt to formulate some sort of a plan, to look at the area to see what would be our best option to be able to maintain the element of surprise off this deal. At that time the questions that was ask, is, you know, is he there, who lives with him, ah, all this information, we were led to believe under the assumption that he was a real recluse, he never left the property, he lived by himself, and that ah, to distribute his drugs that the people came to him, that there was nobody that lived there with him. Ah, that was two days, in the afternoon before we executed the raid after midnight that night, Trooper Hamilton, Trooper Manion and myself did a drive by of the residence to ah, to look at it a little closer just to maintain that all the information that we had was accurate and true and that we had that we had the best plan, we had met when we arrived that morning and formulated a plan and we just wanted, we always attempt to do a drive by to make sure what we're looking at from the air is actually what we're looking at from the ground. Ah, our initial plan was to deploy snipers across the road, they were gonna come up and cut the gate for us, but after we did the drive by the area was so tight there's so many houses, so many dogs and everybody is there, that there was no place to deploy

13

806
KEB203365

STATE OF OKLAHOMA        )                 RAYMOND GRENINGER
                         )SS               TROOPER
COUNTY OF OKLAHOMA       )                 OHP

AFFIDAVIT

those people without taking an extremely high risk of compromising them and ah causing us problems other than that. Ah, at that time when we did the drive by, at the residence, there was two male individuals in the outside of the residence. There was a bunch of cars out front and there was two male individuals out there, we still didn't know because we did not have a photograph, all we had was a physical description of the individual, whether one of them was Kenneth Barrett or not at that time, ahem, so to answer your question, we at that point and time, we took under the assumption that there was possibly gonna be more because we had seen people, that we were led to believe by the people that we were actually executing the warrant for that he was a recluse that lived by himself, and there would probably be nobody else there.

GORDON:        You know how many and what type of weapons were inside the house?

GRENINGER:        The only type of weapons that I can, there was a, when we made entry into the residence to secure it after he had been brought out, course he had a handgun on him, there was a, in the, as you go into the door there's, ah, this is an extremely, extremely small place, there's a living room type area or whatever in the front and there a, immediately to the right there's a, a little nother type room, I mean it's too little to be, my closet in my house is bigger than that, but it's a real small room, in the floor of that residence when we did make entry the stairway to go

14

807
KEB203366

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

up was right there, there was a M-16/AR15 type rifle laying on the, in that floor, there was a sawed off double barrel shotgun laying in that floor that was not picked up and not disturbed in any way by any of the people that we had there so what they were, caliber or anything like that I don't know, but there was two weapons laying there and that is the only weapons that I seen inside the house.

GORDON: Okay. Were you all advised of the criminal history of the suspect?

GRENINGER: Ah, yes, we were advised that, off the warrants were advised that he'd made, we'd been advised that he'd been making statements that he wouldn't be taken alive, we knew that the ah, the felony arrest warrant that we had ah, was a felony arrest warrant for ah, unlawful delivery or something of ah, of a controlled substance and that the misdemeanor warrants were, had occurred then they attempted to arrest him on that deal and he had pulled weapons, we were familiar about this criminal history, yes.

GORDON: Do you know who provided intelligence for this mission to the patrol tactical team?

GRENINGER: Ah, yeah, I believe it would be the people that I stated earlier, it was Clint Johnson, and Frank, I can't remember

15

808
KEB203367

STATE OF OKLAHOMA )                           RAYMOND GRENINGER
                       )SS                    TROOPER
COUNTY OF OKLAHOMA )                           OHP

AFFIDAVIT

Franks last name right now, they are the D.A.'s Task Force for Sequoyah/Cherokee County, that type, that area.

GORDON:        Do you think that the intelligence that they provided the TAC team was okay?

GRENINGER:     Well, that's ah, that's a rough question, ahem, I think, I think, Franks last name I think is Lloyd, I'm not sure, but I think that's what it is, but the information that we were given, I think that there was other information that we didn't receive ah, and the only reason I say that is because after the fact information has surfaced and I don't know whether that information is accurate or whether or whether it's people talking. At that particular time when we did the warrant, we believe that we had the most up to date and accurate information that we could go off of, ah, so not knowing whether all the speculation and the talk and the rumors and all of that are true, I would have to say from doing the actual warrant that day, I felt that we had the most up to date information and not knowing whether everything else is true or not  and you know, it's hard for me to answer that question.

GORDON:        Okay.  Do you know what type of vehicles were used to conduct surveillance on the residence, either by the patrol or the D. A.'s Task Force?

GRENINGER:     The only vehicle on the patrol side that was used to

16

809
KEB203368

STATE OF OKLAHOMA    )                    RAYMOND GRENINGER
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

do surveillance on it was a white 1985 Ford Bronco which was Trooper Hamilton's Bronco, it was totally unmarked, it does have antennas on the top but we stopped and removed all the antennas off the vehicle before we made the drive by.  Ah, there was no markings, it has a plain tag on it, that was the only vehicle that we used, used by patrol personnel that I am aware of other than the aircraft to do any surveillance on it.

GORDON:    Did you say '85 or '95?

GRENINGER:    I mean ah, I'm sorry it's '95, drives like an '85.

GORDON:    Do you know, do you know why the interior lights were not deactivated, on Hamilton's vehicle?

GRENINGER:    Well, I'll tell you Lieutenant, I've, the interior light on that vehicle had no bearing on what happened there in my opinion.  I've been a firearm instructor a long time and I've done that and I walked into the (inaudible) and he had a pet peave for me I walked into the garage and Darrell at the garage, when I pulled my vehicle with Trooper Hamilton in it, I'm sorry, it was Trooper Hise, when we come up he walks out there and I'm trying to get something worked on on mine and he looks into mine, when the door opens on it and he looks in there and says "that light right there it's working in here, that's what killed Trooper Eales".  I'm

17

810
KEB203369

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

sorry, that's not what killed Trooper Eales, that light had no bearing whatsoever, they were taking fire a long time before that, you can look at the patterns on the windshield and when that, when that door opened, the man was already shooting, the pattern was aiming at the center of the windshield coming that way, I'm sure he seen the door open, I don't believe there was enough light off of that that it made a difference. Why it was not deactivated, I do not know, why is not every passenger dome light on ever patrol car we have across the state deactivated, but they work, and that's an individual preference, up to the Trooper. I do not believe that that light had any bearing over what happened.

GORDON: Okay. Can you think of anything else that might help me conclude my investigation of the events that occurred in Sallisaw on September 24, 1999.

GRENINGER: No.

GORDON: Trooper Greninger, are you aware that our conversation has been recorded and may be reduced to a typed sworn affidavit for your signature at a later date sir?

GRENINGER: Yes sir.

GORDON: Sir, with your permission, I'm gonna turn off the tape recorder at this time.

18

811
KEB203370

STATE OF OKLAHOMA )            RAYMOND GRENINGER
                  )SS            TROOPER
COUNTY OF OKLAHOMA )            OHP

AFFIDAVIT

19

812
KEB203371

# EXHIBIT 8

STATE OF OKLAHOMA     )
                      )SS.
COUNTY OF OKLAHOMA    )

I, John Hamilton, Jr, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
JOHN HAMILTON, JR

SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of _____, 1999.

_____
Notary Public

My Commission expires:

_____

814
KEB201816

STATE OF OKLAHOMA      )
                       ) SS
COUNTY OF OKLAHOMA     )

JOHN HAMILTON
TROOPER
OHP

AFFIDAVIT

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol. Today's date is 11-02-1999. The time is approximately 2:04. I am present in the Internal Affairs office, 3600 Martin Luther King, Oklahoma City. Present in the room with me is Buddy Hamilton.

GORDON:    Trooper Hamilton, are you aware that our conversation is being recorded and may be reduced to a typed sworn affidavit for your signature at a later date?

HAMILTON: Yes.

GORDON:    Is it being done with your permission sir?

HAMILTON: Yes.

GORDON:    Sir, I have handed you the Disciplinary Interview Affidavit, could you please read that out loud for me?

HAMILTON: I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and narrowly related to the performance of my official duties or fitness for office. I also

1

815
KEB201817

STATE OF OKLAHOMA )
                  ) SS                    JOHN HAMILTON
COUNTY OF OKLAHOMA )                      TROOPER
                                          OHP

                         AFFIDAVIT

understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of the state and the Constitution of the United States, including the right not to be compelled to incriminate myself. In addition, I understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

GORDON:   Okay, sir if you will please sign right there where it says signature of affected employee.

HAMILTON:   (writing noise)

GORDON:   Thank you sir.   Sir can you please state your complete name for me?

2

816
KEB201818

STATE OF OKLAHOMA    )
                     )SS
COUNTY OF OKLAHOMA   )

JOHN HAMILTON
TROOPER
OHP

AFFIDAVIT

HAMILTON: John Mark Hamilton, Jr.

GORDON:   Could you spell your last name?

HAMILTON: H A M I L T O N

GORDON:   Could you give me your date of birth sir?

HAMILTON: ▮▮▮▮▮▮

GORDON:   And your social security number?

HAMILTON: ▮▮▮▮▮▮▮

GORDON:   Sir, how long have you been on the patrol?

HAMILTON: Approximately 15 years.

GORDON:   Where are you currently assigned?

HAMILTON: Bomb Squad.

GORDON:   Are you on the Tac Team sir?

HAMILTON: Yes.

3

817
KEB201819

STATE OF OKLAHOMA ) JOHN HAMILTON
)SS TROOPER
COUNTY OF OKLAHOMA ) OHP

AFFIDAVIT

GORDON:  What is your assigned position on the Tac Team?

HAMILTON: I'm assistant team leader.

GORDON:  What does assistant team leader do?

HAMILTON: Help coordinate with the team leader planning activities, training, missions.

GORDON:  Sir, can you tell me what happened at 0038 on September 24, 1999 and I would like you to start from ah, the time that you got off the Interstate.

HAMILTON: Got off, exited the Interstate at Dwight Mission Road and I-40, turned northbound on Dwight Mission Road, we met (inaudible) task force unit, consisting of about 10, well maybe as many as 15 people ah, we had a short meeting there in which we discussed we would go in and take the subject down (inaudible) Kenny Barrett and then they would give us a two minute interval then they would come in with the rest of the team to process the scene, subsequent to a search warrant, and they already had a misdemeanor and one felony search warrant.  We left from that meeting and I was the lead unit and there was five units total, I think 11 people in all the units all together.  As we approached ah subject's house, saw someone standing close to it, either the house or in the yard, (inaudible) we had a physical description of this guy, he had scraggly hair,

4

818
KEB201820

STATE OF OKLAHOMA        )
                         ) SS
COUNTY OF OKLAHOMA       )

JOHN HAMILTON
TROOPER
OHP

AFFIDAVIT

and he was small build and this seemed to match our description. We couldn't go in the main gate at the house because it had ah ah, aluminum gate with heavy chains around it, so we went to the next drive to the east of the residence and (inaudible), as we turned in and went north on this, just a little ways then veered off to the left toward the subjects house which there was a big ditch, when we hit the ditch, we came up out of it the person was still standing there in the yard, and some time between the time that we turned off the road and the time we hit the ditch I heard someone yelling, (inaudible) around the house, I couldn't tell what they were saying, I just (inaudible) after we crossed the ditch and shortly thereafter, the shooting started, bullets started hitting the Bronco, (inaudible) and Trooper Eales (inaudible) I kept driving towards the subject that had been standing in front of the house. The vehicle stopped, bullets were still coming, we were still under fire, the vehicle came to a stop and maybe even before it stopped ahem, I just stopped the vehicle and I laid down between the seats and I had a stun (?) or flash bang in my hand that we were gonna use on the entry to the house and I throwed it outside the vehicle and it detonated, and when it detonated I exited the vehicle and went to the back of the Bronco and there where I saw Trooper Eales (inaudible) on the ground and Trooper Manion was kneeling next to him then I turned and went back toward the front, I didn't know it was Trooper Manion at the time, I just knew it was one of our people, I went back to the front of the Bronco and we had a five man entry team which Rocky and I, Raymond, Rick, and Steve Hash

5

819
KEB201821

STATE OF OKLAHOMA    )                    JOHN HAMILTON
                     ) SS                 TROOPER
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

were a part of it, and we were (inaudible). I looked inside the house door, the house was open, I couldn't see anything then I saw movement in the house, ah, just some hands and a (inaudible) I had been shot near the left eye and I, I, didn't know who was in the house, I didn't know if it was some of our people or or if it was the suspect or who. Shortly thereafter I heard some shots from an MP5, the guy fell through the door, and I could see it wasn't one of our people, then I went in the house and grabbed him and drug him out by his hair (inaudible) once I got him outside I released him and I believe it was Trooper Hash took him from there, or Trooper Manion, I don't know which one. One of them searched him real quick, cause once I got him out I released him, and I went back to Rocky, they found a handgun in his waistband that I didn't see, I saw that he had a rifle in the house, Trooper Hash (inaudible) Ricky, myself, Gene Hise (inaudible) cut the shirt off and vest off of him, (inaudible) with the shirt off of him I looked for bullet hole wounds, I saw a small hole on his left side, and somebody said they needed something that I had in my medical kit, that's when Gene and Rick stayed there and Gene lifted him to (inaudible), I went to get my medical kit from the Bronco, came back, they had hollered for another vehicle to come up, another vehicle came up, which was Raymond Bronco, loaded Rocky in the back of it, I had Rocky by his feet and Rick had him around the arm and loaded him in the Bronco and they took Rocky. The rest of the house wasn't cleared so ah, (inaudible) I'm not sure about that and that's when Raymond saw that I was bleeding around the face and

6

820
KEB201822

STATE OF OKLAHOMA )      JOHN HAMILTON
        )SS      TROOPER
COUNTY OF OKLAHOMA )      OHP

## AFFIDAVIT

(inaudible) the Deputy ( inaudible) and went to the hospital, I left the scene at that time.

GORDON: Did you fire any rounds during the confrontation?

HAMILTON: (inaudible)

GORDON: Did you know what the suspect looked like prior to the forced entry?

HAMILTON: Just (inaudible) we had no picture, no photograph to look at (inaudible) they just gave a description of him, long blond hair, and small build.

GORDON: Was there any explanation given why they didn't have a photograph of Kenneth Barrett?

HAMILTON: Said he had never been arrested, he had been arrested but he had never been booked into the County jail, (inaudible).

GORDON: Did you know how many suspects were in the house on the property prior to the forced entry.

HAMILTON: We were told he lived by hisself and (inaudible) supposed to be a distribution point for a lot of the area,

7

821
KEB201823

STATE OF OKLAHOMA )
) SS
COUNTY OF OKLAHOMA )

JOHN HAMILTON
TROOPER
OHP

AFFIDAVIT

GORDON: So basically you did not know how many people were in the house at the time.

HAMILTON: We were (inaudible)

GORDON: Did you know how many and what type of weapons were in the house?

HAMILTON: There was information given to us from the Task Force Agents, (inaudible) rumor had it he was (inaudible), from information there was automatic weapons, (inaudible) as far as (inaudible) he had backed a Deputy down and shoot hisself, that was one of the things that (inaudible).

GORDON: Were you advised of the suspects threats against law enforcement and his criminal history, did they give you a complete run down about him?

HAMILTON: They, they did a bio segment. He had made threats to law enforcement, (inaudible)

GORDON: Do you know who provided intelligence for the mission to the Tac Team?

HAMILTON: I know two people told, myself and Trooper Greninger prior to the execution of this, I don't know who

8

822
KEB201824

STATE OF OKLAHOMA    )                      JOHN HAMILTON
                     )SS                    TROOPER
COUNTY OF OKLAHOMA   )                      OHP

AFFIDAVIT

GORDON:   You think that the intelligence was acceptable for this mission?

HAMILTON: At the time yes, but now, no.

GORDON:   Did the Tac Team conduct surveillance for this mission?

HAMILTON: Yes,

GORDON:   What type of surveillance did the Tac Team conduct?

HAMILTON: We drove by the residence (inaudible) and observed it just to get a (inaudible) of the lay out, see what was going on, that's where we observed the chain on the gate, the size of the house, (inaudible), houses, animals, that might give us up (inaudible). The people that lived around this subject were either sympathetic or family member. (Inaudible).

GORDON:   There was a sensor device on the back door, tell about that?

HAMILTON: No.

GORDON:   You know what type of vehicle they used to conduct surveillance,

9

823
KEB201825

STATE OF OKLAHOMA    )                          JOHN HAMILTON
                     )SS                        TROOPER
COUNTY OF OKLAHOMA   )                          OHP

AFFIDAVIT

HAMILTON: we used a white Bronco, we removed all the antennas, his windows were tinted, we went by with street clothes, myself, Trooper Greninger and Trooper Manion.  We drove by went down the dead end road and there's a man baling hay, we acted like we were (inaudible), one way in and one way out

GORDON:    See anybody at any time?

HAMILTON: Yeah, the person now we know is the son was standing right there and I believe he was talking to some man (inaudible)

GORDON:    Do you know why the lights, interior lights of your unit were still activated?

HAMILTON: my interior lights?

GORDON:    yes sir, on your Bronco.

HAMILTON: (inaudible)

GORDON:    Did you make the request at any time for the lights to be turned off, or deactivated?

HAMILTON: (inaudible)

GORDON:    Buddy can you think of anything else that might help me

10

824
KEB201826

STATE OF OKLAHOMA     )                    JOHN HAMILTON                    825
                      ) SS                 TROOPER
COUNTY OF OKLAHOMA    )                    OHP

AFFIDAVIT

conclude my investigation of the events that occurred in Sallisaw on September 24th?

HAMILTON: As far as the interior light, I don't know (inaudible)

GORDON:   Inaudible.

HAMILTON: Headlights on, (inaudible) interior lights on, I've heard (inaudible), I don't know, maybe that's possible, but we had a plan, everybody (inaudible) and this went bad, looking back now we could of done some things different, but (inaudible).  The guy was either ready by way of being informed on the, yard and he saw several vehicles coming up the road, and you thought they might be the (inaudible) units behind him which one of them is a marked black and white unit, had overheads on as they turned off the county road, so he knew who we were, (inaudible), so, I guess the reason the lights were not on when we hit that ditch, it was such a jar, I, I, (inaudible) shortly there after that when (inaudible) started.

GORDON:   Buddy the time is approximately 19 minutes after 2:00 and I'll turn off the tape recorder.

11

KEB201827

# EXHIBIT 9

## DISCIPLINARY INTERVIEW ADVICE OF RIGHTS

I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and narrowly related to the performance of my official duties or fitness for office. I also understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate myself. In addition, I understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

_____
Signature of Affected Employee

STATE OF OKLAHOMA )
)
COUNTY OF _OklAHOMA_ )

Witnessed before me this _24_ day of _Sep_ , 19 _99_

_____
NOTARY PUBLIC

My commission expires:

_Sep 15, 2002_

108

DEFENDANT'S EXHIBIT 14

STATE OF OKLAHOMA    )
                      )SS.
COUNTY OF OKLAHOMA  )

I, Steve Hash, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
STEVE HASH

SUBSCRIBED AND SWORN  to before me, a Notary Public, this

_____ day of _____, 1999.

_____
Notary Public

My Commission expires:

_____

828
KEB204434

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

STEVE HASH
TROOPER
OHP

**AFFIDAVIT**

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety. I am conducting a personal interview with Trooper Steve Hash, #720 at the Internal Affairs and Special Investigations office located at 3600 Martin Luther King. Present in the room with me are Trooper Steve Hash and myself.

GORDON: Trooper Hash, are you aware that our conversation is being recorded and may be reduced to a typed sworn affidavit for your signature at a later date?

HASH: Yes.

GORDON: Trooper Hash, is this being done with your permission?

HASH: Yes it is.

GORDON: Trooper Hash, at this time I'm going to hand you a Disciplinary Interview Advice of Rights form and I need for you to read it out loud for me sir.

HASH: I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and narrowly related to the performance of my

1

829
KEB204435

STATE OF OKLAHOMA    )                    STEVE HASH
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

official duties or fitness for office. I also understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate myself. In addition, I understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

GORDON: Okay, will you please sign that for me and date it. Okay, today's date if Friday, November 19th, the ah time is approximately 20 minutes until 2:00. Trooper Hash, I have a few questions here for you sir. Could you please state your complete name

2

830
KEB204436

STATE OF OKLAHOMA     )                    STEVE HASH
                      )SS                  TROOPER
COUNTY OF OKLAHOMA    )                    OHP

AFFIDAVIT

HASH:     Steven Eugene Hash.

GORDON:   Can you spell your last name sir?

HASH:     H A S H

GORDON:   Could you give me your date of birth?

HASH:     ▮▮▮▮▮▮

GORDON:   And your social security number sir.

HASH:     ▮▮▮▮▮▮

GORDON:   Sir, how long have you been with the patrol?

HASH:     15 years this month.

GORDON:   Where are you currently assigned?

HASH:     Troop C, Wagoner detachment.

GORDON:   What is your current position at that assignment?

HASH:     Road Trooper.

3

831
KEB204437

```
STATE OF OKLAHOMA    )                    STEVE HASH
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

                         AFFIDAVIT
```

GORDON: Road Trooper.  Sir, are you on the Tac Team?

HASH: Yes I am.

GORDON: Ah, I understand that the Tac Team is divided ah, by I-35 being East and West Team, which team are you on?

HASH: I'm on the East Team.

GORDON: East Team.  What is your assigned position on the team sir?

HASH: I'm tracking member.

GORDON: Can you tell me, sir were you present in Sallisaw, Oklahoma on September 24, 1999?

HASH: Yes I was.

GORDON: Can you tell me what happened at approximately 0038, September 24, 1999, from the time that you left the Interstate, which would be I-40 and Dwight Mission Road.

HASH: From the time we left there?

GORDON: Yes sir.

4

832
KEB204438

STATE OF OKLAHOMA      )                    STEVE HASH
                       )SS                  TROOPER
COUNTY OF OKLAHOMA     )                     OHP

AFFIDAVIT

HASH:     We had met with the D.A.'s investigators, Sheriff Department members by I-40, drove off going to serve a search warrant, arrest warrant.  I was the third unit back, I was the ram man, I had the door ram, I was the third unit back ah, on the entry team that day.  Traveled, followed Buddy Hamilton, Buddy had already been by the house that we were going to and knew the location.  Buddy and Rocky were in their truck, I was behind Raymond Greninger, Ricky Manion, they were directly in front of me, followed them on the black top road off on a county road, there's a driveway, made a left turn into a driveway, just as soon as we made the left hand into the driveway I knew from our briefing that's the house we were gonna hit right by that area, had a ah marked car with overhead lights, I turned my overhead lights on followed them in the driveway, got to a ditch, had to cross a ditch, came out of the ditch Buddy was in front of me and Rick Manion, Raymond were in front of me also, just as soon as crossed the ditch, I could hear pops ah, looked toward the front of the house to see gunshots coming from the front of the house, ah, saw something fly off the front of Buddy's truck over the top of it, had Agent, retired Trooper, Danny Oliver with me, I told Danny "we've got shots fired" Raymond Greninger's break lights came on, I locked my car down and stopped, ah, started exiting the car, I was the ram man, had my hands tied up with the ram, had a shotgun strapped my back, got out of my car, kicked the ram off one side, got the shotgun off my back, trying to find where the shots were coming from, had been coming from, there was on Bronco, which I

5

833
KEB204439

STATE OF OKLAHOMA )                     STEVE HASH
                 )SS                    TROOPER
COUNTY OF OKLAHOMA )                    OHP

AFFIDAVIT

find out is Buddy's, it close to the front of the house, still see some shots being fired, there's flames coming off, took a run on the house trying to find a target, ah, Rick Manion crossed in front of me he went to a window on the side of the house and went to the window on the side of the house, just as I got to Rick he raised up and fired through the window, saw a shadow fall, the only think I saw was a shadow that fell ah, (inaudible) fast it went, it was about that fast.  Shadow falls, I heard somebody holler, "Buddy" er I heard Buddy hollering at somebody, I could tell that he had somebody spotted and he was hollering at them to "come out, come out", and he had somebody spotted, and somebody else hollering, said ah, "Buddy's going in, hot footed around in front of the house, Buddy's going in the house, went in the house, Buddy had his hands on one suspect, we drug him out, drug him off the porch got him out in the yard, handcuffed him, Rick Manion and I handcuffed him, had slight resistance, had him hands underneath him, had that prisoner, like we was cuffing him up some of the other members went inside cleared the house, Raymond Greninger talked to Buddy, was telling Buddy, you know, "your hit" telling Buddy that he was hit, took his gun away from, I saw that, laid it on the porch, somebody else, somebody said Rocky'd been hit, come back out to move the suspect I could see Rocky laying in the back of the Bronco, went on over towards where Rocky was at, Ricky Manion and somebody else started working on Rocky, they were talking to him, not gettin much response out of him, come back over to where the suspect was, he moved over, he started rolling on one side and I stay with the

6

834
KEB204440

STATE OF OKLAHOMA )
 )SS
COUNTY OF OKLAHOMA )

STEVE HASH
TROOPER
OHP

AFFIDAVIT

suspect until the Sheriff Deputy or Sheriff, I believe it was the Sheriff that showed up, Sheriff showed up and said that we should move him around to the side of the building, (inaudible) we moved him around the side if ask him if he'd take control of him, he did, and I went back to where they were loading Rocky up, got Rocky out of there, got Buddy loaded up, got Buddy out of there about that the all (inaudible) showed up,

GORDON: When you went through the gate, you said you guys went down and turned into a drive way, did you all have your emergency lights on at that time?

HASH: I did not. Someplace (inaudible) county road, before I, about the time I turned in when is turned the lights on.

GORDON: Did Buddy Hamilton or Raymond Greninger either one turn their lights on?

HASH: They've got front lights, I was behind them I couldn't tell.

GORDON: Did you see any (inaudible) guys pull in behind any back lights (inaudible)

HASH: No, (inaudible)

7

835
KEB204441

STATE OF OKLAHOMA    )
                  )SS
COUNTY OF OKLAHOMA  )

STEVE HASH
TROOPER
OHP

### AFFIDAVIT

GORDON: Ahem, when you guys made the turn, you got Buddy Hamilton, Rocky Eales, Raymond Greninger and ah

HASH: Rick Manion

GORDON: Rick Manion, yourself and Danny Oliver, was your caravan?

HASH: Right.

GORDON: Okay, when you all are going into that, when you say you hit this ditch, did you pause any there in the ditch?

HASH: No, nobody did.

GORDON: Okay, so you just hit it and ran

HASH: That all, soon as I saw Buddy hit, I saw where he had (inaudible) and I saw Rick and Raymond hit it and I knew it was rough, I kind of just made it across.

GORDON: You kind of made it across. How long did it take them to get in and out of it, do you think?

HASH: Ah, we were moving at a good clip, just a few seconds between cars.

8

836
KEB204442

STATE OF OKLAHOMA    )                    STEVE HASH
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

COPY

AFFIDAVIT

GORDON:   Okay, you said you heard shooting and you saw muzzle flashes, could you see where Buddy's vehicle was in reference to the muzzle, was it already up close to the house, was it at the ditch, where was it

HASH:   It had cleared the ditch, I was the last unit in, whenever I cleared the ditch, about the time I cleared the ditch, that's whenever I heard the shots and I glanced up and seen the flashes coming out, Buddy was (inaudible) it would be two car lengths in front of me, he had his still moving.

GORDON:   Okay, so, could you see the suspect standing at the end of the porch?

HASH:   No.  I never saw anybody on the porch, the only flashes I could see were coming out of the doorway.  I never saw anybody on the porch.

GORDON:   Okay.

HASH:   I did see ah, you know, during all this time I could see somebody straight across from the house going over to his momma's house, (inaudible) but I was concentrating on the muzzle flash.

GORDON:   Okay, so, so you didn't see anybody on the porch, you saw the muzzle flash from inside the door?

837
KEB204443

STATE OF OKLAHOMA    )                          STEVE HASH
                     )SS                        TROOPER
COUNTY OF OKLAHOMA   )                          OHP

AFFIDAVIT

HASH:    It was inside the door.

GORDON:   Okay.   And then Buddy's vehicle was coming up, your saying he's taking hits?

HASH:    Yeah, Buddy when he started in the curve (inaudible) he was out of my vision, but he was right in front of me a little bit (inaudible) then he curved back in and I could see something coming off the front of the car, I thought, I didn't know what it was, I know now.

GORDON:   So Buddy continued to drive up to the car even though he was taking hits?

HASH:    Driving up towards the house?

GORDON:   Yeah.   Did you fire any rounds during the confrontation?

HASH:    Did not.

GORDON:   Did you have a chance to or not an available target?

HASH:    No target.

GORDON:   You said that when you looked at the window ah, you saw a shadow, what, what only allowed you to see a shadow in that

10

838
KEB204444

STATE OF OKLAHOMA    )                    STEVE HASH
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

window?

HASH:     Curtain.   (Inaudible) what I figured would be the front room

GORDON:   Okay.

HASH:     (inaudible) I could see the curtain moving whenever Rick fired, so I knew he had a target (inaudible)

GORDON:   Could you, so your saying you could absolutely make out Kenneth Barrett or couldn't

HASH:     I couldn't.

GORDON:   Is that the reason you held your fire, you couldn't make out

HASH:     Oh, I'd see something fall, I didn't know what was falling,

GORDON:   But you didn't know if it was Kenneth Barrett or not?

HASH:     I did not.

GORDON:   Did you know what the suspect looked like before the

11

839
KEB204445

STATE OF OKLAHOMA   )            STEVE HASH
                      )SS         TROOPER
COUNTY OF OKLAHOMA  )            OHP

<div align="center">AFFIDAVIT</div>

forced entry was attempted?

HASH:    Ah, I knew he was lean, blond headed, shaggy blondish-brown hair, (inaudible)

GORDON:  How, how did you get that information (inaudible)

HASH:    Ah, (inaudible) in the briefing before they were talking about a white male, blond headed.

GORDON:  Now was that the briefing that was held at Camp Gruber?

HASH:    Yes.  I think they gave an approximate age on him, but (inaudible).

GORDON:  Did you know how many suspects were in the house, or on the property at the time of the forced entry?

HASH:    No.

GORDON:  Did you have an approximate?

HASH:    Are you talking about before we got there,

GORDON:  Right, before you got there, from information in the briefing

<div align="center">12</div>

840
KEB204446

STATE OF OKLAHOMA    )                           STEVE HASH
                     )SS                         TROOPER
COUNTY OF OKLAHOMA   )                           OHP

                         AFFIDAVIT

HASH:     We figured at 12:30 there would probably one or two, (inaudible)

GORDON:   You how many and what type of weapons were in the house?

HASH:     No.

GORDON:   Had any of that been covered in the briefing?

HASH:     Ah, they said he had a handgun all the time, there was no information about his rifles, shotguns, anything like that (inaudible).

GORDON:   There was a sensomatic listening device on the back of the house, was that related at the briefing?

HASH:     No.

GORDON:   Any kind of security measures that Mr Barrett might of taken if he thought that he was going to be taken, if he thought he was going to be arrested by the police or anything like that?

HASH:     (inaudible) D.A.'s office the Task Force members, he had barricaded himself in the house before and he had a habit of running to his mothers house.

13

841
KEB204447

STATE OF OKLAHOMA )                    STEVE HASH
                    )SS                TROOPER
COUNTY OF OKLAHOMA )                    OHP

AFFIDAVIT

GORDON:   Did anybody say anything about any devices that he might of used.

HASH:    No.

GORDON:   You know what kind of criminal history he had?   Was it violent, not violent.

HASH:    Ah, (inaudible) in the house once before and he had shot himself once before.

GORDON:   Had he ever used any violence toward any police officers or anybody, did they say?

HASH:    Ah, I really don't recall, (inaudible)

GORDON:   Did ah, do you know who provided the intelligence to the patrol tactical team?

HASH:    (inaudible)

GORDON:   You also had a confidential informant that had been inside the house and had some diagrams?

HASH:    He might of been, he had a mock of the house, (inaudible)

14

842
KEB204448

STATE OF OKLAHOMA    )
                       )SS
COUNTY OF OKLAHOMA   )

STEVE HASH
TROOPER
OHP

**AFFIDAVIT**

GORDON:  Was it accurate?

HASH:  I never made to, past the front door, (inaudible) I could see pretty much everything from the front door there was (inaudible)

GORDON:  You think the intelligence was okay for this mission?

HASH:  I think it was except for (inaudible)

GORDON:  Why did you all, the tac team elect to do this assault at 12:30 AM?

HASH:  Well, trying to give him enough time to where he would be at the house and even have some people there, (inaudible).

GORDON:  (inaudible) concerned about the security possibly an informant. Do you know why that concern was there, was it just information, what.

HASH:  I don't think so.

GORDON:  Okay ah,

HASH:  (inaudible)

15

843
KEB204449

STATE OF OKLAHOMA     )
                      )SS
COUNTY OF OKLAHOMA    )

STEVE HASH
TROOPER
OHP

AFFIDAVIT

GORDON:   Any of them did you have reason to believe somebody was leaking information back to the suspect?

HASH:     No (inaudible)

GORDON:   As far as you knew, intelligence for this particular mission, was it secure or

HASH:     (inaudible)

GORDON:   You know what type of vehicles were used to conduct surveillance on the residence?

HASH:     (inaudible) they drove the Bronco's (inaudible) I don't know what the D. A.'s office used.

GORDON:   Ahem, back to the entrance, you had your lights going, okay did you turn your lights on just as quick as you turned into the gate or after you came out of the ditch?

HASH:     No, probably before the got off the road, just about the time (inaudible)

GORDON:   Did you ah, while you were out there you know who (inaudible)

16

844
KEB204450

STATE OF OKLAHOMA     )             STEVE HASH
                      )SS           TROOPER
COUNTY OF OKLAHOMA    )             OHP

COPY

AFFIDAVIT

HASH:      (inaudible)

GORDON:    Did you see their lights, did they have their lights activated?

HASH:      I don't know.

GORDON:    How about Lt Pettingill and Lt McBride, did they have their lights on?

HASH:      Now they peeled off and went in the driveway before, (inaudible) if they had em on, (inaudible) whenever they went in (inaudible)

GORDON:    Somewhere Hise's vehicle was there at the gate, to the house do you know how far that was?

HASH:      (inaudible)

GORDON:    Sir, can you think of anything else that might help me complete my investigation of the Sallisaw incident?

HASH:      No.

GORDON:    Okay, at this time I'm gonna turn off the tape recorder.

17

845
KEB204451

STATE OF OKLAHOMA    )                    STEVE HASH
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

18

846
KEB204452

# EXHIBIT 10

STATE OF OKLAHOMA )
                  )SS.
COUNTY OF OKLAHOMA )

I, Gene Hise, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
GENE HISE

SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of _____, 1999.

_____
Notary Public

My Commission expires:

_____

848
KEB201703

STATE OF OKLAHOMA      )
                       ) SS
COUNTY OF OKLAHOMA     )

GENE HISE
TROOPER
OHP

AFFIDAVIT

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol. Today's date is November 8, 1999. The time is 4:00. I am present in the Internal Affairs Office at 3600 Martin Luther King. Present in the room is Trooper Gene Hise.

GORDON:   Trooper, are you aware that our conversation is being recorded and may be reduced to a typed sworn affidavit for your signature at a later date?

HISE:   Yes.

GORDON:   Is this conversation being recorded with your permission?

HISE:   Yes sir.

GORDON:   Okay Gene, I've got some questions that I need to ask you sir, and we'll start out with ah, can you please state your complete name?

HISE:   Gene Andrew Hise, Jr.

GORDON:   Can you spell your last name for me.

HISE:   H I S E

1

849
KEB201704

STATE OF OKLAHOMA )　　　　　　　　　GENE HISE
　　　　　　　　　　　)SS　　　　　　　　　TROOPER
COUNTY OF OKLAHOMA )　　　　　　　　　OHP

AFFIDAVIT

GORDON:　Ah, can you please give me your date of birth?

HISE:　████████████████

GORDON:　And your social security number?

HISE:　███████████

GORDON:　How long have you been on the patrol?

HISE:　Approximately nine years.

GORDON:　Where are you currently assigned sir?

HISE:　Ah, Will Rogers Turnpike, Troop XA, Northeast Oklahoma.

GORDON:　Are you on the Tac Team?

HISE:　Yes sir, I am.

GORDON:　What is your position on the Tac Team?

HISE:　Entry team.

GORDON:　Entry team.　How long have you been on the Tac Team?

2

850
KEB201705

STATE OF OKLAHOMA   )
                      )SS
COUNTY OF OKLAHOMA   )

GENE HISE
TROOPER
OHP

AFFIDAVIT

HISE: Ah, approximately 2 years come February of 2000.

GORDON: Okay, can you tell me what happened on September 24th, at 0038 and start from when you got off of the, of I-40.

HISE: East Divisional Tactical Team was serving a warrant at a known location on ah Dwight Mission Road from Interstate 40. Approximate time was ah, 0035 or 38 hours when we arrived at the location. My assignment this date was ah security, to provide to keep the suspect or suspects from entering the Mother's residence which is directly west of his place of residence. Subject was a Kenny Barrett. Myself and Doc Darst and Billy Poe were in my unit ah, we would of been the fourth unit in the ah, you can call it a motorcade en route the ah residence. At the time I mentioned a while ago, I pulled up to the ah gate which was my assignment ah, exited my vehicle, went over the fence that was chained ah, started up through the front yard ah between two pickups ahem, a gentleman appeared right in front of me, I didn't know who it was at that time, ah, my weapon was drawn, I told him to get on the ground. At that time as I came between two pickups, and this person appeared there and like I say have anything in their hands yelling them to get on the ground, see no weapon, no threat, the person out there yelling, two or three times yelling, finally went to the ground ah, a barrage of gunfire broke out, I was trying to cover this person and duck, I yelled at ah, Doc to cover me, Doc was behind me, leaned over a pickup truck to support him and after approximately

3

851
KEB201706

STATE OF OKLAHOMA    )
                      )SS
COUNTY OF OKLAHOMA  )

GENE HISE
TROOPER
OHP

AFFIDAVIT

what I feel was about 11 to 12 second ah gun battle, sounded like automatic gunfire and I heard a shift in fire, remember a flash bang going off and there was a light ah, got the last cuff on I ran, well before I took off running ah, I remember looking straight would be back to the east and I remember someone yelling "man down", it sounded like Ricky Manion, I looked over saw someone face down at the rear of a Blazer, er, I'm sorry, a Bronco, I ah, immediately went to ah train vehicle extraction, knew that we needed a vehicle to remove man down. I ran to my unit, jumped the fence, I drove through the, busted through the gate, drove through the gate ah, pulled my vehicle tactically in front, unaware if we still had another suspect or if we were still gonna be in a long drawn out gun battle or what we're gonna be. I come out of my unit, went over saw that, at the same time I heard Manion yelling Rocky's name, Rocky Eales, they rolled Rocky over and ah, started to remove Rocky's clothes, vests as quickly as possible to, to assess the damage and ah, cause he was shot, ah, remember being yelled at to get a trauma kit so I went to my car, I ran back to my car popped the trunk lid and grabbed my tactical gear and got my trauma, my trauma dressings out, pulled a trauma dressing out, by that time ah, he was free of his shirt and his vest, I'm talking about Rocky ah, there was blood coming from his sides and from ah Rocky's mouth and ah, he was trying to breath and ah, Ricky was losing pulse and ah, Ricky started to, he said "we have to start CPR", I agreed. Trooper Manion started compressions and I started breathing for Rocky, understand it's hard for me and ah, between

4

852
KEB201707

STATE OF OKLAHOMA    )                    GENE HISE
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

the spitting up blood and breathing for Rock, compressions we done that for, it seemed like a while, it wasn't very long, ah, we got ah, I guess Trooper Greninger's vehicle, ah, we got the tailgate down on the Bronco, we got Rocky loaded up on the Bronco and ah, at that time I drove while a deputy and a registered nurse was on the back and they were taking turns, I drove out to, I left the scene immediately through the gate, Dwight Mission Road to Interstate 40, told Muskogee "man shot", had a man down, which I think they, from later I think they already knew, Lt Pettingill, Lt McBride had already contacted them, but at that time I didn't know, ah, got out to Interstate 40 and ah I told them to get a bird in the air and got to Interstate 40 immediately went to the rear where they were and ah, for ah, oh, five, ten, fifteen minutes we took turns ah, doing CPR for Rocky, took turns breathing, check compressions ah, never could get, never could get a pulse.  (Inaudible) later an ambulance come in from Sallisaw and ah, took over, we ah, got Rocky on a gurney and ah, got him to the back of the ambulance, putting him in the ambulance and moving the equipment around Rocky, his eyes were still open, I choked and I closed Rocky's eyes, I thought it was too bad at that point, I, from the wound I saw on the back of the Bronco tailgate, ah, I ran interference in front of the ambulance into the Sallisaw City Hospital, I looked at my watch at it was 0105 Hrs, when we pulled into the emergency room, they got Rocky inside ah, trauma team waiting standby immediately went to work on Rocky ah, I go through the doors and looked over and I saw Buddy Hamilton sitting on the gurney and ah, he had, he was

5

853
KEB201708

STATE OF OKLAHOMA )
 )SS
COUNTY OF OKLAHOMA )

GENE HISE
TROOPER
OHP

AFFIDAVIT

bleeding from his head and shoulder, obviously he'd been shot, ah, I didn't know, I didn't even know Buddy had been shot. I stayed there with Buddy, they worked on Rocky in the next room over until ah, 0138 hours, they pronounced Rocky, by then the Lifeflight had made it in from Tulsa, I ah, I went with ah Buddy, I stayed with Buddy and we flew to Tulsa and ah, I'd say I was, from the time my unit arrived to execute the warrant and the time I left the scene, couldn't of been two minutes, minute and a half to two minutes.

GORDON: Did you fire any rounds during the confrontation?

HISE: No sir, I didn't.

GORDON: Did you assist in taking the suspect Kenneth Barrett into custody?

HISE: No sir, I did not.

GORDON: Did you know what the suspect looked like before the forced entry was attempted?

HISE: No sir.

GORDON: Did they give you a physical description?

HISE: Yes sir.

6

854
KEB201709

STATE OF OKLAHOMA    )                    GENE HISE
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

                      AFFIDAVIT

GORDON:   Have you had an opportunity to see Kenneth Barrett later?

HISE:     Yes sir, I did.

GORDON:   Was the physical description they gave you good enough to identify Kenneth Barrett?

HISE:     Yes sir.

GORDON:   The reason I ask that is this CI, confidential informant, all I'm trying to determine is if they gave you guys good information or not, if it was good enough you know, because they kind of threw you into it there, when I say "they" I'm talking about the confidential informant, was his information good enough to assist the Tac Team once you got in there.

HISE:     I would say with the knowledge that we had of the ah, the intel from the Task Force because he had been arrested before and that was part of the intel we did know, he had been arrested before but there was no photograph taken of him when he was arrested, I guess he had turned himself in with his attorney and they came in to the courthouse, but was never officially booked in where they took a photograph, so we had to go on a physical description.

GORDON:   You know how many suspects were in the house or on the property at the time of the forced entry?

                          7

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

GENE HISE
TROOPER
OHP

AFFIDAVIT

HISE:    Ah, what I found out after the person that I handcuffed and took to the ground was apparently the son because I remember him yelling in the barrage of gunfire I remember him yelling "Dad, Dad" so I took it as I was cuffing, that this must be the son.

GORDON:    Did you know that he was in the house before you attempted the entry or the team got there?

HISE:    No sir, I did not.

GORDON:    Okay. Ah, did you know if anybody else was in there besides Kenneth Barrett at all, girl friend?

HISE:    No sir, I did not.

GORDON:    Ah, do you know, or did they discuss how many and what type of weapons were in the house?    Did anybody during the briefing (inaudible) did anybody pass any kind of information through the CI or any anything else as to what type of weapons Kenneth Barrett may of had on his person or in the house.

HISE:    I don't recall that sir.

GORDON:    Did ah, they go into the criminal history of Kenneth Barrett when you all were briefed?

8

856
KEB201711

STATE OF OKLAHOMA    )                         GENE HISE
                     )SS                       TROOPER
COUNTY OF OKLAHOMA   )                         OHP

AFFIDAVIT

HISE:    Ah, yes sir, I believe they did.

GORDON:  Okay, did they tell you about his threats against law enforcement officials?

HISE:    Ah, there was something mentioned about that and you know we hear those types of statements made before in the past and several other warrants we've done, and you know people say, you know, that's hearsay I'm saying but you know "I won't be taken alive" and things like that, ah, I don't remember any exact statement that this guy may of made or anything like that.

GORDON:  Did ah, okay there was a sensormatic listening device on the back of the house, okay.  Did the confidential informant advise the team of that, was the team ever advised that there was any kind of listening devices in or around the house?

HISE:    I heard about it a later date, after everything had taken place, I didn't know that before.

GORDON:  Okay, prior to the event itself, you did not know that?

HISE:    No sir, did not.

GORDON:  Do you know who provided the intelligence for the mission for the Tac Team?

9

857
KEB201712

STATE OF OKLAHOMA    )
                    )SS
COUNTY OF OKLAHOMA   )

GENE HISE
TROOPER
OHP

**AFFIDAVIT**

HISE:    Prior to executing the warrant?

GORDON:   Yes sir.

HISE:    Ah, I do know that ah two of our Troopers, Trooper Greninger and Trooper Hamilton had flow in an OHP aircraft, they done aerial photos, aerial video tapes of the residence to provide some intel of the location and ah, of the surroundings, any residences that may be around, any hazzards that we may have, ah, I don't recall, I'm sure there was, I don't recall anything from ah, the Task Force, I do remember them saying this person stayed at home, never left, pretty much as a hermit, you know, just stayed right there at the residence, he was very seldom ever seen out.

GORDON:   You know how the Tac Team did, you said, you mentioned the air plane, you know if the Tac Team did any other surveillance in preparation for the mission?

HISE:    Ah, yes sir, there was a drive by of the residence done, ah, yes sir, there was a drive by of the residence done.

GORDON:   Do you know who did it?

HISE:    I want to say it was Trooper Hamilton, Trooper Manion and Trooper Greninger.  I believe that was the three.

10

858
KEB201713

COPY

STATE OF OKLAHOMA )
                   ) SS
COUNTY OF OKLAHOMA )

GENE HISE
TROOPER
OHP

AFFIDAVIT

GORDON: Did they say

HISE: I'm not quite for sure, but I believe that was the three?

GORDON: Did they say anything about, did you, were you able to hear later about what their surveillance ah

HISE: They said there was ah, remember them saying something, there was someone standing in the front yard, there was two people standing in the front yard, but unsure if it was the suspect or not.

GORDON: You know what type of vehicles were used to conduct the surveillance drive by?

HISE: I believe it was one of the Ford Broncos from the Bomb, one of the Bomb Tech's on the team.

GORDON: Looking back on it now, and of course it's easy to Monday night quarterback, it's easy to second guess, do you think the intelligence was adequate for the mission?

HISE: I feel it was for what we had, it would of probably been nice to have a photograph of the person, ah, looking back on it, had to do it over again with the intel that we had, I would of, we would of done it the same way, I feel I would of done it the same

11

859
KEB201714

STATE OF OKLAHOMA    )     GENE HISE
         )SS      TROOPER
COUNTY OF OKLAHOMA   )     OHP

## AFFIDAVIT

way, I would of done my assignment that evening the same way, I wouldn't of deviated different from it, ah, far as changing some things, I would like to change some things, knowing what I know now, Lieutenant, but

GORDON:   You know how the Tac Team arrived at the time of 12:30 to conduct the entrance?

HISE:    That was ah, the time that the team had chosen to execute the warrant, ah, Lieutenant Pettingill and the team, it's a time that we all arrived with and agreed with that that would be the time that we would execute the ah, warrant.

GORDON:   Did you see any lights on in the house when you all rolled up?

HISE:    Ah, yes sir, there was lights coming from in the house, in the target residence

GORDON:   Now at the residence, did you, you got this guy out in the yard, did you see him when you rolled up?

HISE:    No sir, I didn't, I ah, I was going up like I said when I went over the fence I was going up between the vehicles, next thing I know (hands hit together) there's someone standing in front of me and I knew that was not a team member because I only had one

12

860
KEB201715

STATE OF OKLAHOMA    )                          GENE HISE
                     ) SS                       TROOPER
COUNTY OF OKLAHOMA   )                          OHP

AFFIDAVIT

other man go with me and there isn't no way he beat me over the fence.

GORDON:   Do you know how long, and this is an estimation, and this is an estimation 30 days after the fact, do you have any idea how long it was from the time that you got there, stopped, went over the fence, met up with this individual where you had to take him into custody, before the shooting started.

HISE:     I could of been 10 to 12 seconds

GORDON:   Just out, boom, it's going.

HISE:     Yeah.

GORDON:   Trooper Hise can you think of anything else that might help me conclude my investigation of the events that occurred in Sallisaw on September 24, 1999?

HISE:     No sir, I just, like to ask you a question if I could?

GORDON:   Sure,

HISE:     When this was going down and you could hear the gunfire, nobody could tell exactly where it was coming from, (inaudible) coming from the front of the house but, with the shooter standing

13

861
KEB201716

STATE OF OKLAHOMA )          GENE HISE
                   ) SS         TROOPER
COUNTY OF OKLAHOMA )         OHP

AFFIDAVIT

back in the doorway, has that ever been determined yet?

GORDON: We believe from the cases, he came out on the front porch, but quickly retreated back into the house,

HISE: For cover,

GORDON: we know that there was approximately, he had three 30 round magazines taped together, there was one magazine, OSBI has been able to account for all 30 rounds that was in that magazine,

HISE: I'm still having a little bit of a problem with, you know, I was, I was right there and never saw a target to engage and could see glass blowing off the Bronco and you know, at the same time I'm doing this and looking, so he, if he shot from outside on the porch he must of busted a (inaudible) and went back into the doorway, cause I never had a target

GORDON: Yeah, and that's what we're getting ah, through everything so far, and OSBI believes that he came out on the front porch, fired a few rounds and then went back inside the house where most of his, and probably you may of been able to see his, ah, maybe the powder coming off the, you know, from the muzzle flash, but we believe he was that far back inside the house shooting.

HISE: I distinctly remember after cuffing, I guess it was his

14

862
KEB201717

STATE OF OKLAHOMA   )
                        )SS
COUNTY OF OKLAHOMA  )

GENE HISE
TROOPER
OHP

**AFFIDAVIT**

son, and retreating back to my car the smell of gunfire was heavy.

GORDON: Do you know if

HISE: Cause that cloud was coming over toward

GORDON: Sure.

HISE: the way the wind was that evening, out of the north.

GORDON: You know if Trooper Buddy Hamilton fired his weapon? You don't know or he

HISE: No he didn't fire his weapon, he told me he didn't fire his weapon

GORDON: Okay, that is

HISE: After talking, after the team talking the only person that fired their weapon would of been Trooper Manion.

GORDON: That's, you know, like I said we can account for approximately 18 rounds going through the cab of the vehicle. You know, OSBI with their wooden dowels?

HISE: Um hum.

15

863
KEB201718

STATE OF OKLAHOMA      )              GENE HISE
                        )SS           TROOPER
COUNTY OF OKLAHOMA     )              OHP

## AFFIDAVIT

GORDON:   on the trajectory of the rounds that we could account for all 30 rounds and ah, so we do know that Kenneth Barrett was standing up when he was firing his rounds

HISE:   (inaudible) kneeling, he would of

GORDON:   Based on what OSBI is telling us about the trajectory of the rounds, the way, this guy standing up, he had, he had to of been in an elevated position to get the rounds to go where he was wanting them to go, ah, which, what that does it affects the idea that ah, one of his defenses is that he was shot by the Tac Team and the Tac Team rolled up and this guy, he's now laying on the ground fighting for his life, OSBI says that in fact is not at all what happened, he was standing up shooting into the cab of the vehicle. So,

HISE:   I'm just, somewhat grateful, I'm very grateful that ah, Trooper Hamilton got off the flash bang because it seems liked when the flash bang went I don't remember hearing but one to two rounds after that and he had fire superiority and the element of surprise for us tactically was lost. It was overcome with the flash bang and he, I guess, retreated deeper into the house, I don't know, and ah, that I think glad he didn't get another magazine in,

GORDON:   Yeah, because he was definitely loaded up. Well Trooper, I'm gonna turn off the tape recorder with your permission sir.

16

864
KEB201719

STATE OF OKLAHOMA    )                            GENE HISE
                             )SS               TROOPER
COUNTY OF OKLAHOMA   )                            OHP

<div align="center">AFFIDAVIT</div>

HISE:     Yeah.

<div align="center">17</div>

865
KEB201720

# EXHIBIT 11

STATE OF OKLAHOMA    )
                           )SS.
COUNTY OF OKLAHOMA   )

    I, Jim McBride, of legal age, being first duly sworn upon oath, deposes and states.

    That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
JIM McBRIDE

    SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of _____, 2000.

_____
Notary Public

My Commission expires:

_____

867
KEB017465

STATE OF OKLAHOMA    )
                     )SS
COUNTY OF OKLAHOMA   )

JIM MCBRIDE
2LT
OHP

AFFIDAVIT

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol. Today's date is November 1, 1999. The time is approximately 1:15 PM. I am present in the Internal Affairs Office in Oklahoma City. Present in the room with me is 2LT Jim McBride.

GORDON: Lt McBride, are you aware that our conversation is being recorded and may be reduced to a typed sworn affidavit for your signature at a later date?

McBRIDE: Yes I am.

GORDON: Sir, is this recording being made with your permission?

McBRIDE: Yes it is.

GORDON: Sir, if you could would you please state your complete name and spell your last for me.

McBRIDE: Jim L McBride, #109, last name is M c B R I D E.

GORDON: Could you give me your date of birth sir?

McBRIDE: █████████

1

868
KEB017464

```
STATE OF OKLAHOMA      )                    JIM MCBRIDE
                       )SS                  2LT
COUNTY OF OKLAHOMA     )                     OHP
```

AFFIDAVIT

GORDON:    Could you give me your social security number?

McBRIDE:   [REDACTED]

GORDON:    Sir, how long have you been on the patrol?

McBRIDE:   Ah, almost, it will be 22 years in January, 22 years and two months.

GORDON:    Which Academy did you come out of?

McBRIDE:   37th.

GORDON:    Where are you currently assigned at?

McBRIDE:   Ah, Special Operations as a, currently serving as the Acting Troop Commander in Special Operations, but my normal position is supervisor over criminal interdiction.

GORDON:    What all does Special Operations entail?

McBRIDE:   It had Criminal Interdiction Troopers, ah, Asset Forfeiture and Auto and Marine Theft Troopers.

GORDON:    Okay.    Are you a member of the Tac Team?

2

STATE OF OKLAHOMA     )
                      ) SS
COUNTY OF OKLAHOMA    )

JIM MCBRIDE
2LT
OHP

AFFIDAVIT

McBRIDE:  Yes I am.

GORDON:    Ah, which Tac Team, and know it's divided into two separate Tac Teams, can you elaborate on the Tac Team division.

McBRIDE:  Yeah, the Tac Team is divided into two, somewhat geographic divisions, East and West, primarily divided by I-35.

GORDON:    Which team are you assigned to sir?

McBRIDE:  Neither, I'm the Assistant Tac Team Commander, Lt Pettingill's assistant and respond with either team ah, as directed by Lt Pettingill.

GORDON:    Okay, in that position is there ever a time that you would possibly have to direct the Tac Team yourself, on a mission.

McBRIDE:  In Lt Pettingill's absence ah, step into the role as the Tac Team Commander.

GORDON:    Okay.  How long have you been in your assigned position with the Tac Team?

McBRIDE:  In my assigned position?

GORDON:    Yes sir, as the ah

3

870
KEB017468

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

JIM MCBRIDE
2LT
OHP

AFFIDAVIT

McBRIDE: Nine months, maybe.

GORDON: Nine months, before that were you just a regular Tac Team member or how did that work?

McBRIDE: I was the team leader for the west Tac Team.

GORDON: Okay, as the team leader ah, what were your responsibilities there sir?

McBRIDE: Ah, the team leader ah, does the ah, if the patrol had a Sergeant, that would be the Sergeant, he's the one that runs the respective Tac Team, Tac Team has ten members assigned and then the team leader makes up the eleventh, ah, so he's the overseer of training, ah, put the plan in motion and, and is the one that the Tac Team Commander gives the orders to, to be carried out.

GORDON: How often does the Tac Team train sir?

McBRIDE: Two days every month, and then two - one week periods each year usually in April and September.

GORDON: Can you tell me what happened of September 24, 1999.

McBRIDE: Ah, yes.

4

871
KEB017469

STATE OF OKLAHOMA          )
                          )SS
COUNTY OF OKLAHOMA         )

JIM MCBRIDE
2LT
OHP

AFFIDAVIT

GORDON:   Can you elaborate on that please.

McBRIDE:   Ah, Lt Pettingill, how much detail do you want, from the time we were notified, the time we arrived

GORDON:   From the time that you left I-40

McBRIDE:   And executing the mission?

GORDON:   Yes sir.

McBRIDE:   We were given a mission, prior to leaving I-40 we made a plan for the mission and we were in the processing executing the mission, ah, we exited off of I-40 on to a memorial road that I don't remember the name of en route to execute a high risk, no knock, day or night, search warrant and arrest warrant to be served. I was ah, the passenger in Lt Pettingill's vehicle, ah, as he exited, goes under I-40, the first thing out of the ordinary was the number of people that were gathered there, ah, we had been told in our briefing that there was only three people, an investigator from the D.A.'s office, the Sheriff and a Task Force member, I believe and I don't know the positions of, I do know the Sheriff investigator and there was someone else, there were only three people that knew about this, however when we arrived there was a large number of people there, I would estimate a minimum of 15 people there on the north side of I-40 where we met em, we stopped

5

872
KEB017470

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

JIM MCBRIDE
2LT
OHP

AFFIDAVIT

there ah, didn't deviate from our plan, briefed them very briefly on what our plan was, I heard Lt Pettingill tell them as he topped the hill crest wait a period of time, and, and I believe it's two minutes, I'm not sure on the amount of time, but I think it's two minutes he said, we were the last vehicle in the group, ah, when our tail lights went below the hill there, they were to wait a period of time then they would come in, then by that time we would have, planned on having the search warrant executed, people in custody, turn the searching for the narcotics and other contraband over to the investigators. Ah, we left that location, and preceded in a group of five vehicles ah, (inaudible) the rear, Lt Pettingill and myself being at the rear in his Suburban, first four vehicles ah, proceeded uneventfully to the location, ah, I saw one of the four vehicles stop at the entrance to the location as to the plan while the other three vehicles went down the road make a left turn they were then out of my sight, we pulled in to the west of the residence into the trailer house that we described as mother's trailer house, our mission, Lt Pettingill and my mission was to head off somebody if they ran over there, if we could do it easily, but we weren't to chase people, that the Troopers at the gate were the chase personnel. Our main function was if someone ran from the house, (inaudible) search warrant for the trailer houses, was to observe them go in the trailer and then set up a hasty perimeter around the trailer house to preclude them from exiting. Obviously if we have a felony arrest warrant we can say the persons inside the trailer house were (inaudible) without a search warrant. In

6

873
KEB017471

STATE OF OKLAHOMA )
               )SS
COUNTY OF OKLAHOMA )

JIM MCBRIDE
2LT
OHP

AFFIDAVIT

our briefing we had been told that in prior cases when they tried to arrest him that he'd take off to his mother's trailer house, they believe that's what happened, however since they didn't see him physically go in there couldn't enter it and she wouldn't allow them in. That was our mission to kind of observe if he went in there and set up a hasty perimeter to preclude him from coming out bring the team over and then go in there and arrest him on the felony warrant. We got into position, ah, well actually before we got in position, we were rolling to a stop because someone on the west side of the residence running to the west of the, (inaudible) the chase team ah, stopped by the road coming up at about the same time that I heard, well, I believed at the time and still believe that it was full automatic M-16 rifle fire, I looked to the, to my right, faced kind of to the north over to the east and saw flames, muzzle flash, flames coming from the front porch area of the residence ahem, I was hoping in my mind, I knew that Danny Oliver who was a Task Force member over there had a M-16, I had no doubt in my mind it was an M-16 fired, hoping it was Danny that was firing ah, then it became confusing, over the radio it said "we have a man down", we tried to verify if the man down was one of us or one of them ah, there was another shots fired at about the same time that the radio call, when the radio call first came out someone else got on the radio, not (inaudible) and said "who's down" and they said "we don't know", again, we don't know whether it's a good guy or bad guy when they say "we have a man down" ah, there was some confusion (inaudible) a little while, I don't know

7

874
KEB017472

STATE OF OKLAHOMA  )
               )SS
COUNTY OF OKLAHOMA )

JIM MCBRIDE
2LT
OHP

AFFIDAVIT

how long, second, could of been as much as a minute, but I don't think so, to identify that we did have a Trooper down, I got on the radio, called Muskogee and had emergency traffic, that we need an ambulance and Med-Evac started, our directions, told them the Sheriff's office would be setting up a landing strip location at I-40, Lt Pettingill came back, told me it was Rocky that was down, ahem, they, that's the same time I was calling on the radio, the marked unit that was providing security at the gate, busted through the gate and drove up there, they opened the trunk of it and then moved Rocky into a second Bronco, ah, the one Bronco that was up there that appeared to be real close to the porch, Rocky was behind it, they loaded him into the second bronco and I saw Rocky laying on the back with two people that were not with us. Ah, it was the Sheriff Department people ah, back there working on Rocky as they exited. Ah, kind of brief and sketchy, two or three point I probably need to make for sure, is the first time that I saw the muzzle flash coming off the porch, when I looked over there I do not know where Steve Hash's unit was, but I could see ah, lights off of the rotating light, not flashing light, but a rotating light across the porch area, the way a rotating light does you hit one side of the porch then go across it and then (inaudible). I do not ever, I'm not saying they weren't on, I did not look, I don't recall seeing any emergency lights flashing on the white Bronco.

GORDON:   Either white Bronco or just the that was there.

8

875
KEB017473

STATE OF OKLAHOMA    )                    JIM MCBRIDE
                     )SS                  2LT
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

McBRIDE: Either, either white Bronco. But by the same token I didn't, until I looked, Steve Hash's car was also blocked from my view, but in my mind I believe it was his lights that I was seeing reflecting and going across the front porch, it could of been flashing lights, but if they would of had a Kojak light on the back of the Bronco it could of been that type of light, it appeared to me to be brighter than that. The first time I heard the shot and saw that, the lights were going across. (Inaudible) the lights came on exactly the same split second the first round was fired or they were on before the round was fired, I believe they were on before the round was fired, but I didn't specifically look in that direction and I heard a shot and looked that way and seen the muzzle flash, light, lights washing across the

GORDON: You said (inaudible) you saw the three vehicles go down the road and turn to the left, were there any emergency lights on then?

McBRIDE: No there was not. Ah,

GORDON: You referred to him in you statement sir, do you know who he was, who the suspect was?

McBRIDE: Ah, the person that shot Rocky, the older guy, ah, another (inaudible) that obvious before this, and I don't recall his name, he was the father and the person we had the arrest

9

876
KEB017474

STATE OF OKLAHOMA )           JIM MCBRIDE
                    ) SS               2LT
COUNTY OF OKLAHOMA )           OHP

## AFFIDAVIT

warrant for.

GORDON:   Would his name be Kenneth Barrett?

McBRIDE:   Kenneth Barrett is it, yes.

GORDON:   Ah, in your ah, any of the information received prior to this event, did you have a picture of Kenneth Barrett?

McBRIDE:   No, we did not.

GORDON:   Okay, you did not know, or to your knowledge nobody on the team knew exactly what Kenneth Barrett looked like.

McBRIDE:   We had a physical description of him, I think they described him as 5'8", skinny, shoulder length hair and he had a big scar on his stomach where he shot himself in the stomach.

GORDON:   Okay.  Did ah, did the Tac Team have any information in reference to what type of weapons that Kenneth Barrett might be armed with?

McBRIDE:   Yes, ah, I don't to say it was routine, but, but, the typical stuff on these, somebody said that somebody else said that somebody said that he had a machine gun, and that he always carried the gun on his person and that he's got guns all over the house.

10

877
KEB017475

STATE OF OKLAHOMA )                    JIM MCBRIDE
                        )SS                2LT
COUNTY OF OKLAHOMA )                    OHP

AFFIDAVIT

Now, looking back on it, that sounds pretty ah, traumatic and pretty severe statement, but those same statements are probably made on 90% of the people we arrest and we execute (inaudible) if that scenario of information wasn't given we probably wouldn't of been there, I mean, or we normally try to reserve our commitment to high risk type stuff and had they just said this guy is just a pussy cat, all you got to do is walk up there and he'll stick his wrist out and you can handcuff him, we probably wouldn't of been there. Yes we did hear that the rumor is that he has a machine gun, rumor is he always has a gun on him, rumor is he's not gonna be taken alive and and those things were heard, but their also heard in 90% of the ones I've been on.

GORDON: Ah, could the vehicle that was assigned to the gate for security (inaudible), you said they had to crash through the gate, why did they have to crash through the gate, do you recall?

McBRIDE: Yeah, the gate had a heavy chain and heavy lock on it, that's why we didn't make an entrance at that point, they elected to go further east, turn in to a neighbors yard and then drive through a path that was visible from the air, from the neighbors trailer house up to Barrett's house and that was the plan, rather than, we had bolt cutters but ah, it was determined that there was a possibility, as big as the chain was that our bolt cutter may not even cut it. Had they cut it we would certainly of drawn attention to the (inaudible).

11

878
KEB017476

STATE OF OKLAHOMA      )                    JIM MCBRIDE
                       )SS                  2LT
COUNTY OF OKLAHOMA     )                    OHP

AFFIDAVIT

GORDON:   Did the Troopers have, at the gate did they have the bolt cutters?

McBRIDE:  I don't know.  Ah, the bolt cutters were present at the briefing, they identified where they were ah, the assigned, they, Buddy Lambert was the acting team leader for the operation, I mean Buddy Hamilton was the acting team leader for this and they assigned the equipment to include the bolt cutters.  I don't have any first hand knowledge that they were there, I would assume that they were there, but I do not know.

GORDON:   Did you fire any rounds during the confrontation?

McBRIDE:  No I didn't.

GORDON:   You know who did fire rounds?

McBRIDE:  I know who told me they fired rounds.

GORDON:   Who said they fired rounds.

McBRIDE:  Rick Manion said he did, and I've been told that that's been substantiated by ah, ballistic test, but I did not see him fire a round.

GORDON:   Okay.  You know if Buddy Hamilton fired a round?

12

879
KEB017477

STATE OF OKLAHOMA )       JIM MCBRIDE
          )SS         2LT
COUNTY OF OKLAHOMA )       OHP

### AFFIDAVIT

McBRIDE: Ah, no, I don't think he did, but I don't know that.

GORDON: Do you have any idea, and this is just, just, you, ahem, in your opinion, you have any idea why the internal lights of the Bronco, why they were left operational?

McBRIDE: Ah, when I came on the patrol, it was unheard of to have internal light operation, my first patrol car, first thing they do, on my newest patrol car they say they can't wire over those and all kinds of stuff, til I pulled the bulb out of my new ford that was issued to me, has a dome light that not only comes on but slowly goes off, I think the patrol for some reason does not look at that the same as they did 20 years ago and I see a lot of Troopers that the dome light come on when they get out of the car ah, I don't believe, and it's my opinion, the reconstruction I did in my mind, and that's all it is, I don't think the dome light had anything to do with it, I believe that Rocky and Buddy were fired upon long before Rocky opened the door.

GORDON: Okay. Did you assist in the actual taking of ah, Kenneth Barrett into custody?

McBRIDE: No I didn't.

GORDON: Do you know which Troopers did take Kenneth Barrett into custody?

13

880
KEB017478

STATE OF OKLAHOMA    )                    JIM MCBRIDE
                     )SS                  2LT
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

McBRIDE:  Ah, (inaudible) Buddy went in and got him, Raymond Greninger assisted in it and I know Ricky Manion, I know for a fact Buddy and Rick were there and I think Raymond Greninger was, ah kept him on the ground, handcuffed him then turned him over to the Sheriff's office when they arrived from (inaudible)

GORDON:  Lieutenant can you think of anything else that I would need to know in this statement ah, in retrospect to what you thought about with the situation, ah, that I could use to complete my investigation, sir.

McBRIDE:  I can't think of (inaudible), I can't think of anything.

GORDON:  Okay sir, the time approximately 1:38.  I'm gonna turn off the tape recorder with your permission.

McBRIDE:  Okay.

14

881
KEB017479

# EXHIBIT 12

STATE OF OKLAHOMA )
        )SS.
COUNTY OF OKLAHOMA )

  I, Ricky Manion, of legal age, being first duly sworn upon oath, deposes and states.

  That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

           _____
           RICKY MANION

  SUBSCRIBED AND SWORN to before me, a Notary Public, this

_____ day of _____, 1999.

           _____
           Notary Public

My Commission expires:

_____

883
KEB202098

STATE OF OKLAHOMA    )
                     )SS
COUNTY OF OKLAHOMA   )

RICK MANION
TROOPER
OHP

AFFIDAVIT

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol. Today's date is November 9, 1999. The time is approximately 9:25. I am at the Internal Affairs office located at 3600 Martin Luther King. Present in the room with me Trooper Rick Manion.

GORDON: Trooper Manion, are you aware that our conversation is being recorded and may be reduced to a typed sworn affidavit for your signature at a later date?

MANION: Yes I am.

GORDON: Sir, is this conversation being recorded with your permission?

MANION: Yes.

GORDON: Sir, at this time I'm going to hand you a Disciplinary Interview Advice of Rights also known as the Garrity Form, if you would please read it out loud for me sir.

MANION: I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and

1

884
KEB202099

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

RICK MANION
TROOPER
OHP

AFFIDAVIT

narrowly related to the performance of my official duties or fitness for office. I also understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United State, including the right not to be compelled to incriminate myself. In addition, I understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

GORDON: Okay sir, can you please sign that for me?

MANION: (writing sounds)

GORDON: Thank you sir. All right sir, I've got some questions I

2

885
KEB202100

STATE OF OKLAHOMA )                          RICK MANION
                   )SS                       TROOPER
COUNTY OF OKLAHOMA )                          OHP

AFFIDAVIT

need to ask you in reference ah to the events that took place in Sallisaw on September 24th at approximately 0038. Ah, but we need to start out with just some basic questions, sir, could you please state your full name for me.

MANION:   Ricky Manion.

GORDON:   Could you ah spell your last name?

MANION:   M A N I O N

GORDON:   Could you please give me your date of birth?

MANION:   ▇▇▇▇▇▇▇

GORDON:   And your social security number sir.

MANION:   ▇▇▇▇▇▇▇

GORDON:   Sir ah, what is your current position?

MANION:   State Trooper of the Oklahoma Department of Public Safety, Oklahoma Highway Patrol stationed in Troop E, Madill.

GORDON:   How long have you been on the patrol sir?

3

STATE OF OKLAHOMA     )                              RICK MANION
                      ) SS                           TROOPER
COUNTY OF OKLAHOMA    )                              OHP

AFFIDAVIT

MANION:   Seventeen and a half years.

GORDON:   Are you ah currently on the Tac Team?

MANION:   Yes.

GORDON:   Which Tac Team are you on sir?

MANION:   I'm on the east side Tac Team.

GORDON:   What is your designated position?

MANION:   I'm currently designated as a sniper.

GORDON:   Okay.  Ah, sir, did you participate in the activities that occurred on September 24, 1999, at approximately 0038 in the morning.

MANION:   Yes I did.

GORDON:   Sir, could you please relate to me what happened at that time on that date starting with when you got off the Interstate at I-40 and Dwight Mission Road.

MANION:   I was riding as a passenger with Trooper Ray Greninger in his state issue Bronco, we exited off the Interstate and met with

4

887
KEB202102

STATE OF OKLAHOMA    )                          RICK MANION
                     ) SS                       TROOPER
COUNTY OF OKLAHOMA   )                          OHP

AFFIDAVIT

the ah, drug task force people there at that location ah, I did not personally talk to any of the drug task force people, I stayed mostly over by the unit, got back in the unit after ah, team leaders and Lieutenants talked to the drug task force people and then we proceeded on to the target house that we had the warrant for. We were to second car in line. When we turned east on ah, the county road off a blacktop road and proceeded on down, I think it's just over a mile when ah, we drove by the residence on the county road we could see that the lights was on at the house ah, we drove by it and entered at the east driveway. As we entered the east driveway I could hear gunfire, directed at the first unit that was in front of us, another Bronco, driver by Trooper John Hamilton and ah, Trooper Rocky Eales as a passenger. I also heard someone on the radio, which turned out to be Lt Pettingill say "there's someone in the yard" or "out in the yard", something to effect. I'm looking for the subject in the yard, also hear the gunshots and see that Buddy and Rocky was taking fire ah, as we had turned into the yard, I had turned the lights on, Greninger's vehicle has red and blue lights, ah, as we come up behind em, Hamilton and Eales, I had my door open and getting ready to exit the vehicle ah, I could see smoke coming out of the house and a large amount of gunfire directed into the windshield and front area of Trooper Hamilton's vehicle. As I was getting out, I never saw anybody on the ground, any suspects ah, at all, never saw anyone on the ground, as I got out I was Rocky get out of his vehicle and start back to the rear of the Bronco, ah, I could tell by the way he was

5

888
KEB202103

STATE OF OKLAHOMA    )               RICK MANION
                  )SS           TROOPER
COUNTY OF OKLAHOMA   )               OHP

**AFFIDAVIT**

moving that he was injured, I went directly to Rocky, as I got to the back of the Bronco, that's where Rocky was, I met him about the same time he got to the back I got to the back, ah, Rocky went to his knees and I grabbed him by the back of the shirt and he went all the way to the ground, face down. I ask Rocky, "are you hit, are you hurt", he says "I'm hit bad" ah, same time I heard a flash bang go off that ah, Trooper Hamilton had thrown ah, it was about this same time period I looked to my left, I heard a commotion, I looked to my left I could see that some of the other team members had a white male down on the ground handcuffing just a few yards from us, but we're still taking gunfire so I know that someone is still in the house. Buddy comes to the back of the vehicle, all at the same time this is going on, I can see blood on Buddy's face, I can see blood and where his shirt is kind of puffed up where it hit the shoulder and I said "Buddy, you been hit" he say "hit twice, but I'm okay, I'm all right" or something to that effect. Ah, there was some shots coming out of the house directed toward us and I looked around the back of the Bronco, peep around it, I see a white male carrying a rifle step from, step in a sideways motion ah what would be the living room area to a room on the east end of this small house. I've already yelled "Rocky's down, get us some help, Rocky's hit" ah, (inaudible) is on the radio trying to get us some help, I see the man step into the east room, I leave the rear of the Bronco and go to the east side of the house and there's an old blue pickup sitting there close to the house, there's also a window there with blinds on it, ah, took a position of cover behind

6

889
KEB202104

STATE OF OKLAHOMA )                    RICK MANION
                  )SS                  TROOPER
COUNTY OF OKLAHOMA )                    OHP

AFFIDAVIT

this pickup, I don't know if he looked out the window or if his movement just caused the blinds to move or what, but I saw some movement in the blinds, I fired ah two short bursts, state issue MP5, ah, I heard, I thought I fired about six rounds, (inaudible) so, I fire, immediately fire again, take the window out and Greninger yelled at me, well first of all I heard the man yell in the house, don't know what he yelled, I just heard him yell, ah, then Greninger yells at me "Rick don't shoot, Buddy's going in the house" so I leave my position and I run around to the front of the house, Trooper Hamilton is pulling the subject out of the house ah, he's yelling that his legs are hurt, and shot, he dropped kind of on his knees I guess, pulls him off the porch and there's someone else standing there, another Trooper, but I'm not sure, I think it was Steve Hash, ah, I grab the guy, we handcuff him and I take a weapon and sniff, semiautomatic pistol from ah, his shirt was out it wasn't tucked in, his raised his shirt up and he had a pistol directly in front of his stomach tucked into his pants, I took it away, laid it off on the ground finished searching him, Steve is maintaining cover on the house, ah, I ask the guy who he was and he tells me he's Kenny Barrett and ah, I ask him if there was anybody else in the house and he said "no, there's no one else in there" so I immediately leave him and go to Rocky ah, I yelled to get a vehicle, I yelled sometime during this period that we needed a vehicle, ah, I roll Rocky over, rip his shirt open, take out my pocket knife, cut his vest off of him, he wore two vests, regular second chance vest and ceramic (inaudible) vest. I cut those off

7

890
KEB202105

STATE OF OKLAHOMA        )
                         )SS
COUNTY OF OKLAHOMA       )

RICK MANION
TROOPER
OHP

AFFIDAVIT

of him and removed his ah, protective helmet ah, trying to get him to talk to me, he's not responding, feel for a pulse at that time he had a pulse, I lost it, myself and Gene Hise start giving him CPR ah, continue that for just a second or two feel again, Rocky has a pulse, he's breathing and then he stops again, we're still giving CPR and ah, Lt Pettingill tells us "let's load him up, get him out of here" so we grab him and load him up in the back of Greninger's Bronco, I go to get in and ah, the Sheriff of Cherokee County, she's there by them, Task Force and she is an RN so she jumps in the back with another member of the Task Force, EMT or Paramedic, they continue giving CPR and Gene Hise drives and leaves. At that time we ah, go in and secure the house, ah, myself and Greninger, Danny Oliver DEA Task Force and maybe one or two more. I clear the upstairs, what would be the loft area where he sleeps, I cleared that, didn't find anybody, came out then we secured the residence, Lt Pettingill and Lt McBride taped it off and we stayed out of it, I didn't enter it again until the next day and we was asked to go out and help recreate some things for the OSBI and Internal Affairs investigation.

GORDON:    Ah, you said you fired approximately six rounds?

MANION:    I thought at the time I did.

GORDON:    Did your weapon malfunction?

8

891
KEB202106

STATE OF OKLAHOMA    )
                     ) SS                    RICK MANION
COUNTY OF OKLAHOMA   )                       TROOPER
                                             OHP

AFFIDAVIT

MANION:   Not that I'm aware of.

GORDON:   Okay.  The reason I ask that is because in the trunk of the car your weapon had (inaudible) when we looked at it in the car it was just laying in the car, course we didn't touch it because we didn't want to taint anything but Ron Jones over at OSBI had made a notation that your weapon had malfunctioned, that it had double loaded off the magazine, so

MANION:   I wasn't aware, it would of had to of done it with the last shot, because I fired, I intentionally fired two bursts and as I was getting ready to take the window completely out ah Raymond hollered at me "Rick don't shoot, Buddy's goin in the house" so I didn't want to shoot while Buddy was in there.

GORDON:   Okay.  You say when you looked into the house you could see him moving, you could see Barrett?

MANION:   Yes, I saw him facing, he was inside the house facing out, ah, he stepped in a sideways motion into the east room and he had a rifle in his hand.

GORDON:   And you fired through the window could you absolutely identify Kenneth Barrett?

MANION:   At that time, no.

9

892
KEB202107

STATE OF OKLAHOMA     )                         RICK MANION
                      )SS                       TROOPER
COUNTY OF OKLAHOMA    )                         OHP

AFFIDAVIT

GORDON:   Okay.   Why did you fire, if you could not identify Barrett and not somebody else, what I'm getting out, could you identify him as the aggressor, whoever it was?

MANION:   Oh, yes, I, I, he had a rifle that I took to be an AR15,

GORDON:   I mean, when your looking through the window, when your on the side of the house

MANION:   When I looked through the window, no I did not, I knew that the person that was doing the shooting had stepped into that room.   My initial thought was I knew Rocky was hit bad and I knew he could not survive if we had a sustained fire fight there.   That was the first thing went through my mind, we got to stop this cause Rocky can't survive this.

GORDON:   Ah, you said that you actively participated in the arrest of Kenneth Barrett, getting him in cuffs and everything.

MANION:   Yes,.

GORDON:   You know if Buddy Hamilton fired any rounds?

MANION:   I'm not aware that he did.

GORDON:   You didn't see him shoot any.

10

893
KEB202108

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

RICK MANION
TROOPER
OHP

AFFIDAVIT

MANION: I didn't see him shoot, the only thing ah, that I knew for sure that he had thrown a flash bang.

GORDON: Ah, did you all have any idea, did any member of the Tac Team know what Kenneth Barrett looked like before you got there, did you have pictures of him?

MANION: We did not have pictures, we had a general description, you know, white male, tall, somewhat slender and told that he weighed a lot less then he appeared to be, long scraggly blond hair

GORDON: Did that ah, ah, did the confidential informant advise you all or did anybody advise you as to the type of weapons that Kenneth Barrett was armed with?

MANION: The only thing I can remember is he said that, we was told that at one time he had had some ah, ah, he always had guns in the house and he may of had some automatic weapons. But the Sheriff's office had taken some of his bullets and some automatic gunfire out there sometime in the past.

GORDON: Had you all been advised of ah, his threats against law enforcement?

MANION: Yes.

11

894
KEB202109

STATE OF OKLAHOMA    )
                     ) SS
COUNTY OF OKLAHOMA   )

RICK MANION
TROOPER
OHP

AFFIDAVIT

GORDON:   You remember what those threats were?

MANION:   That, that he would ah, that he would mainly run from law enforcement and also that nearly everybody in the community ah, and even the people in the drug community was scared of him.  They didn't like to go out there, that he would shoot you if you came on to his property and he didn't know you.

GORDON:   Okay, you said that earlier, that when you turned into the driveway on the east side of the house, when you all turned in, you were taking fire at that time.

MANION:   When we turned into the driveway and started, the driveway goes up to the other house, we turned off that driveway on to his property, crossed a small ditch there ah, we started taking fire.

GORDON:   Now was that when you heard the fire

MANION:   That's when I heard the fire.

GORDON:   How far were you behind Buddy's Bronco

MANION:   Directly behind him.

GORDON:   Ah, you know what kind of surveillance was conducted in

12

895
KEB202110

STATE OF OKLAHOMA       )
                        )SS          RICK MANION
COUNTY OF OKLAHOMA      )            TROOPER
                                     OHP

AFFIDAVIT

preparation for the assault?

MANION:   As far as the Task Force or

GORDON:   County, OHP, anybody.

MANION:   I know that Raymond Greninger and Buddy Hamilton along with one of our aircrafts taking pictures from the air and video, we had those in our initial planning ah, as far as the surveillance on the residence ah, before and up to the raid there was none.  It was our initial plan to sit the two snipers, myself and Billy Poe, ah out just across the road by the gate, we knew he always kept his gate locked or usually kept his gate locked ah, the chain, the initial plan was he and I would go in ahead of time and as surveillance, approximately hour and a half and we would, just before the raid that I would cross the road with bolt cutters, cut the locks and chains, ah off the gate and open the gate so the raid team could drive through, we did do a drive by in an unmarked vehicle, ah, the small little neighborhood that's there, houses ah, and due to the gate being very close to Barrett's Mother's house very close to his house, ah, and the fact that houses were a lot closer than they appeared from the aerial photographs and there was a lot of loose animals, dog running in that neighborhood, ah we felt that a sniper would be compromised and that that wasn't a feasible plan, we'd do a vehicle assault.  As far as setting up surveillance at that time, that's what we usually do, the snipers

13

896
KEB202111

STATE OF OKLAHOMA      )
                       )SS
COUNTY OF OKLAHOMA     )

RICK MANION
TROOPER
OHP

AFFIDAVIT

will go in a couple of hours ahead of time and set up surveillance and watch for movement such as that, but ah, we didn't do that because the houses were so close, the animals and we felt like we would compromise it.

GORDON:  Based on your skills as a sni, how long you been a sniper?

MANION:  Three years

GORDON:  Okay, based on your still, have you done very many creeps?

MANION:  Yes.

GORDON:  Based on your skills as a sniper and having done creeps before do you think you could of got inside that ah grass line which had the trees and stuff like that along the fence, could you have got there and established a surveillance post yourself?

MANION:  I could of, I could of got in there but I think it would of been compromised by the amount of dogs that were running loose around there, it's always a problem.  Ah, the reason, one of the other reasons we didn't, anytime you put people on the ground you have to have a reaction team, say you want to get them out in case things go wrong, or they need backup (inaudible) more than likely

14

897
KEB202112

STATE OF OKLAHOMA     )                          RICK MANION
                      )SS                        TROOPER
COUNTY OF OKLAHOMA    )                          OHP

                        AFFIDAVIT

the radio communications if nothing else.  That would of put another strange car in what we consider a hostile environment because we was told that everyone that's down there was dopers, and related or friends with Barrett, so that would put a strange vehicle in a very small neighborhood, hour and a half or two hours would raise suspicion.  Always feel like I can get into most places but it's not always feasible simply due to the fact that you never know if you've been compromised or not, ah, due to animals, traffic stuff like that.  I don't know that ah, I'm sure we could of got into the south side ah, I feel, but I don't think that snipers would of been effective surveillance there due to the fact (inaudible)

GORDON:  Based on your previous experience as a sniper and the fact your a sniper now, do you think if you would of been on the glass at the time that the vehicular assault took place, if Barrett had of came to the door with his rifle, do you think you could of surgically removed him?

MANION:  If I would of been on the

GORDON:  If you'd been on the rifle, on the scope

MANION:  If I had been on the north side of the road, our plan was to be on the south side cause that offered the best cover, there's a small rise there

                            15

898
KEB202113

STATE OF OKLAHOMA )
                  )SS                    RICK MANION
COUNTY OF OKLAHOMA )                     TROOPER
                                         OHP

AFFIDAVIT

GORDON: So a sniper wouldn't of made a difference in the final outcome?

MANION: No.

GORDON: Can you think of anything else that would help me conclude my investigation?

MANION: That's everything I know.

GORDON: Sir, with your permission I'm gonna turn off the tape recorder.

MANION: Fine.

16

899
KEB202114

# EXHIBIT 13

### DISCIPLINARY INTERVIEW ADVICE OF RIGHTS

I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and narrowly related to the performance of my official duties or fitness for office. I also understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate myself. In addition, I understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

_TRP. BCFord #830_
Signature of Affected Employee

STATE OF OKLAHOMA   )

COUNTY OF _OKLAHOMA_   )

Witnessed before me this _24_ day of _SEPT_ , 19 _99_

_GO Kam_
NOTARY PUBLIC

My commission expires:

_SEPT 15, 1999 2002_



110

STATE OF OKLAHOMA   )
                    )SS.
COUNTY OF OKLAHOMA  )

I, Billy C Poe, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
BILLY C POE

SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of _____, 1999.

_____
Notary Public

My Commission expires:

_____

902
KEB201601

```
STATE OF OKLAHOMA      )                    BILLY C POE
                       )SS                  TROOPER
COUNTY OF OKLAHOMA     )                    OHP
```

<p style="text-align:center">**AFFIDAVIT**</p>

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol. Today's date is 11-09-1999. The time is 10:02 AM. I am present at 3600 Martin Luther King, at the Internal Affairs Office. Present in the room with me is Trooper Billy Poe.

GORDON:   Trooper Poe, are you aware that our conversation is being recorded and may be reduced to a typed sworn affidavit for your signature at a later date?

POE:      I do.

GORDON:   Ah, sir are you aware, is this recording being made with your permission?

POE:      Yes.

GORDON:   Okay sir, can you please state your complete name for me?

POE:      It's Billy Carrol Poe

GORDON:   Could you spell your last name?

POE:      P O E

GORDON:   Sir, what is your social security number?

<p style="text-align:center">1</p>

903
KEB201602

STATE OF OKLAHOMA     )                    BILLY C POE
                      )SS                  TROOPER
COUNTY OF OKLAHOMA    )                    OHP

AFFIDAVIT

POE:    ████████████

GORDON:   And your date of birth sir.

POE:    ██████████

GORDON:   How long have you been on the patrol?

POE:    Ah, about 13½ years.

GORDON:   Where you currently assigned?

POE:    Ah, Pushmataha County, Troop S

GORDON:   Are you currently on the Tac Team?

POE:    Yes.

GORDON:   What is your designated position on the Tac Team?

POE:    I'm a counter sniper.

GORDON:   How long you been a sniper sir?

POE:    Around, going on two years I guess.

2

904
KEB201603

STATE OF OKLAHOMA    )                    BILLY C POE
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

GORDON:   Sir, can you tell me what happened, did you participate in the events that occurred in Sallisaw?

POE:   Yes.

GORDON:   Can you please relate to me what happened at Sallisaw from the time that you got off the Interstate, off of I-40 and drove onto Dwight Mission Road.

POE:   Okay, you want the whole trip down the road or just from the time we drove up to the residence (inaudible)

GORDON:   Ah, that's fine, from the time you rolled up to the residence.

POE:   Okay.  Ah, I was in a car with Trooper Darst, Trooper Hise.  I was in the backseat on the right hand side of the car.  We pulled up to the gate in front of the house along the road, Trooper Darst, Trooper Hise were going to act as chase men, in case somebody left the residence, I was supposed to act as a cover man while the team was assembling to make entry.  As we pulled up, we get out of the car, I let Trooper Darst get out get a start, then I get out.  As I'm approaching, there's a big fence post there by the gate, the gates (inaudible) I guess, ah I intended to get a better position, I hear gunfire.  To my knowledge we're the only two at this point (inaudible) so I thought maybe the fire was

3

905
KEB201604

STATE OF OKLAHOMA    )
                )SS
COUNTY OF OKLAHOMA  )

BILLY C POE
TROOPER
OHP

AFFIDAVIT

coming in our direction so I got down low, got behind my cover and come up to see if I could find a target, as I get along the post ah, I see ah, Trooper Hamilton's Bronco come into the picture, (inaudible) they can shoot at which, so I go around and go through the fence so I can stay low and I run up to Trooper Hamilton take the cover position up, I can see inside the residence, Trooper Hamilton's up on the porch ah, hollering at a subject that's laying in the floor inside the house, plainly see his head ah, sticking out of the doorway. Trooper Hamilton told him to come out ah, I'd seen that we got a man down as I was approaching, ah, (inaudible) was taking cover position, Buddy's hollering at the guy "come out, come out" and the guy tells Buddy to the effect that he can't walk because he's been shot in the legs. Buddy entered the residence pulled the guy out, they pulled him off the porch, I maintain my position because I don't know if there's anybody in the house or not so I just stay over near the Bronco, ah, I can hear them working on Rocky, ah, load him up, I maintain my position, soon as they get him loaded up, I go up on the porch with Ray Grinenger, we make entry, clear the lower part of the house, it don't take, small as the house was it don't take long and ah, I clear the back room and I look around and ah, Rick Manion, Danny Oliver, and ah, Buddy Hamilton was also there, but Rick had went up the stairway to the loft, inside the room I observed this when we was clearing it was ah, AR15, M16 style rifle laying and then over by the window was a double barrel shotgun. Rick had climbed up on the ladder to the loft and Danny Oliver and I were (inaudible) I was doing it,

4

906
KEB201605

STATE OF OKLAHOMA      )                     BILLY C POE
                       )SS                   TROOPER
COUNTY OF OKLAHOMA      )                     OHP

AFFIDAVIT

maintained a cover position on the ceiling.  Rick said he needed a mirror, and I said, told them that Rick needs a mirror and ah, Buddy went out, Hamilton went out to the vehicle and got a mirror, come back in, er Raymond said Buddy had been hit, or were you hit, that's when I glanced at Buddy to see if he'd been hit, so Raymond takes Buddy back out, Rick does the mirror, him and Danny go up and clear the top, we back out, seal it off and that's about it.

GORDON:    Did you fire any rounds during the confrontation?

POE:    No.

GORDON:    Did you assist in taking the suspect, Kenneth Barrett, in custody, did you ever lay your hands on him?

POE:    No sir.  I maintained just a cover position on the house, I didn't know if he was the only one, I didn't know if he was the one that did the shooting, I didn't, at this point I didn't know, so I just maintained my, I knew that was being taken care of and I felt the best thing I could do was cover the house.

GORDON:    Did you know how many suspects were in the house or on the property?

POE:    No.

5

907
KEB201606

STATE OF OKLAHOMA      )                    BILLY C POE
                       )SS                  TROOPER
COUNTY OF OKLAHOMA     )                    OHP

### AFFIDAVIT

GORDON:   Could I get you to sign that please.   Thank you.   Ah, so you didn't know how many suspects were in the house at all, was there a briefing, did they ever brief you guys?

POE:   Well, they said, you know, there was a possibility of, well the bad guy of course, and then possibly his son, but in these dope deals you never know how many people's gonna be in the house or anything like that, so I felt that that was an area, still a threat area that hadn't been cleared that needed to be covered, so that's why I just maintained cover.

GORDON:   Did they tell you what kind of weapons Kenneth Barrett was carrying or may have in his possession?

POE:   I don't recall, ah, firearms were mentioned, I can't remember as to the type they told us, exact types or anything to that effect.

GORDON:   Did they tell you anything about his threats against law enforcement?

POE:   Yes.

GORDON:   What did they say about that?

POE:   Ah, they said he'd always scared off the deputies, you

6

908
KEB201607

STATE OF OKLAHOMA     )
                      )SS
COUNTY OF OKLAHOMA    )

BILLY C POE
TROOPER
OHP

AFFIDAVIT

know, he was just a real bad guy everybody is scared of him, that's what we was told in the briefing.

GORDON:   You know who provided the intelligence for this mission?

POE:   No, not really.  I just know ah, I can assume but I don't know, don't recall who they told us brought the information.

GORDON:   Did they tell you about the listening device on the back of the house?

POE:   No.  I didn't find out about that until way later, ah, I guess Lt Pettingill told us or something the next few days or something.

GORDON:   You think the intelligence was okay for this mission?

POE:   It could of been better, I guess, I don't you know, it's just, sometimes you go with what you got and it's hard to second guess.

GORDON:   Did you all have a picture of Barrett?

POE:   Nope.

GORDON:   Okay.

7

909
KEB201608

STATE OF OKLAHOMA    )                          BILLY C POE
                     )SS                        TROOPER
COUNTY OF OKLAHOMA   )                          OHP

                    AFFIDAVIT

POE:     They told us er, ah, we were told to, we had a sketch description of what he looked like, that's all, they said they didn't have a picture of him.

GORDON:  Ah, do you know how surveillance was conducted?

POE:     No.

GORDON:  You said you been on the Tac Team for two years, er you been a sniper for two years?

POE:     Yes.

GORDON:  Have you ever done any creeps?

POE:     Yes.

GORDON:  Based on your experience as both a counter sniper and you ability to do creeps, do you think you could of got close to the house and conducted surveillance on it?

POE:     Well, I think we could of got in, there's so many dog in the area, we originally planned, me and Rick Manion as we go in to (inaudible) along the ditch line or across the road from the house, but they did a drive by on the residence, Rick and ah Raymond, Buddy I believe and there was I don't know how many dogs, small

8

910
KEB201609

STATE OF OKLAHOMA   )
                  )SS
COUNTY OF OKLAHOMA  )

BILLY C POE
TROOPER
OHP

AFFIDAVIT

dogs running loose and plus the close proximity of the residence, which I think, if it wasn't for the dog factor we could of got in, around the residence we was afraid we would be compromised by the dogs coming to us.

GORDON: This ah, assault went at 12:30 at night,

POE: Approximately

GORDON: 0038, why was that time picked?

POE: It was a, any time a warrant and I'm not for certain why we come up with this time, I mean, it, say we'll do it at 12:30 or whatever, originally we planned on getting there at 1:30 with me and Rick laying on surveillance for a while, but, but we've done several deals over there and they all been daylight only warrants, you know, we always hit them just a little after 6:00, so we thought we'd change it up some and instead of being like our routine the time we always hit, (inaudible) anytime warrant to go ahead and hit them early in the morning instead of in daylight.

GORDON: Based on your previous experience with drug houses cause obviously you've hit a few, do you think 12:30 at night is a pretty good time to hit a drug persons house.

POE: It's just as good as any other time.

9

911
KEB201610

STATE OF OKLAHOMA    )                    BILLY C POE
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

GORDON:   Ah, did you all see any lights on in the house, when you, as you rolled up?

POE:   I think, I think I remember seeing lights when we pulled up.

GORDON:   You know what type of vehicles they used to conduct surveillance.

POE:   No.  The only surveillance I know ah that was, know how it was conducted was ah, ah, I guess Buddy and Raymond maybe, one or the other or both in the airplane, (inaudible) pictures and that's what we were shown, this (inaudible).

GORDON:   You know if Buddy Hamilton ever fired any rounds?

POE:   No, not that I know of.

GORDON:   You ever see his gun in his hands?

POE:   Yes.  He had his gun in his hand when I went on the porch, then Raymond when he was taking him out, Buddy still had his gun, Raymond took his gun from him, took him out.

GORDON:   Trooper Poe, can you think of anything else that might help me conclude my investigation of the events in Sallisaw on

10

912
KEB201611

STATE OF OKLAHOMA     )                    BILLY C POE
                      )SS                  TROOPER
COUNTY OF OKLAHOMA    )                    OHP

AFFIDAVIT

September 24th?

POE:      No.  Not right off hand.

GORDON:   Sir,  with  your  permission,  we'll  turn  off  the  tape.

11

913
KEB201612

# EXHIBIT 14

DISCIPLINARY INTERVIEW ADVICE OF RIGHTS

I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and narrowly related to the performance of my official duties or fitness for office. I also understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate myself. In addition, I understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

Signature of Affected Employee

STATE OF OKLAHOMA          )
                          )
COUNTY OF _Oklahoma_      )

Witnessed before me this _2nd_ day of _Sept_____, 19 _99_

NOTARY PUBLIC

My commission expires:

_12/18/2001_

105

DEFENDANT'S EXHIBIT 8

00000910
00000910
915
KEB203641

STATE OF OKLAHOMA )
         )SS.
COUNTY OF OKLAHOMA )

   I, Kerry Pettingill, of legal age, being first duly sworn upon oath, deposes and states.

   That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

              _____
              KERRY PETTINGILL

   SUBSCRIBED AND SWORN  to before me, a Notary Public, this _____ day of _____, 1999.

              _____
              Notary Public

My Commission expires:

_____

916
KEB203642

STATE OF OKLAHOMA    )
                     )SS
COUNTY OF OKLAHOMA   )

KERRY PETTINGILL
1LT
OHP

AFFIDAVIT

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol. Today's date is 11-02-1999. The time is 2:55. I am at the Internal Affairs office, 3600 Martin Luther King at the Department of Public Safety. Present in the room with me is 1LT Kerry Pettingill.

GORDON:    Lt Pettingill, are you aware that our conversation is being recorded and may be reduced to a typed sworn affidavit for your signature at a later date?

PETTINGILL:    Yes I am.

GORDON:    Is this conversation being recorded with your permission?

PETTINGILL:    Yes it is.

GORDON:    Sir, I have handed you the Disciplinary Interview Advice of Rights, ah, could you please read that out loud for me?

PETTINGILL:    I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and narrowly related to the performance of my official duties or

1

917
KEB203643

STATE OF OKLAHOMA    )
                     ) SS            KERRY PETTINGILL
COUNTY OF OKLAHOMA   )               1LT
                                     OHP

AFFIDAVIT

fitness for office. I also understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate myself. In addition, I understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

GORDON:     Okay sir, would you please sign where it says signature of affected employee and date it for me sir. Thank you sir. Sir, can you please state your complete name?

PETTINGILL:     Kerry Lee Pettingill.

GORDON:     Can you please spell you last name for me.

2

918
KEB203644

STATE OF OKLAHOMA )
        )SS       KERRY PETTINGILL
COUNTY OF OKLAHOMA )        1LT
                  OHP

<center>AFFIDAVIT</center>

PETTINGILL: P E T T I N G I L L

GORDON: Can you give me your date of birth sir?

PETTINGILL: ███████

GORDON: And your social security number?

PETTINGILL: ███████

GORDON: How long you been on the patrol?

PETTINGILL: Ah, 17 ½ years.

GORDON: Where are you currently assigned?

PETTINGILL: Ah, I'm currently commander of tactical teams and bomb squad.

GORDON: Ah, is that here in Oklahoma City sir?

PETTINGILL: Yes it is.

GORDON: Are you on the Tac Team itself sir?

PETTINGILL: I'm commander of the team, yes.

<center>3</center>

919
KEB203645

STATE OF OKLAHOMA      )                          KERRY PETTINGILL
                       )SS                        1LT
COUNTY OF OKLAHOMA     )                          OHP

                            AFFIDAVIT

GORDON:        And so your assigned position would be the Commander and can you tell me what the Commanders duties are.

PETTINGILL:    Overseeing any and all operations or potential operations to ah, decide, assist the Chief's office in deciding whether or not activation should take place.  To oversee training, and make sure training takes place as well as procuring equipment and ah, other items that may be necessary for the tactical units to carry out their duties.

GORDON:        You have anybody that assists you with that?

PETTINGILL:    Ah, in addition to the Commander there are two assistant commanders.

GORDON:        And who are they?

PETTINGILL:    2LT Jim McBride and 2LT Mike Holloway.

GORDON:        Okay now, any one of the assistant commanders in your absence could they step into your position?

PETTINGILL:    Yes.

GORDON:        Can you tell me what happened at 0038 on September 24, 1999, from the time that you got off the Interstate.

4

920
KEB203646

STATE OF OKLAHOMA )
) SS
COUNTY OF OKLAHOMA )

KERRY PETTINGILL
1LT
OHP

AFFIDAVIT

PETTINGILL:    Ahem, we got off the Interstate at Dwight Mission Road, went probably quarter to half a mile north of the Interstate and met with several members of the Task Force, DEA's Task Force and also the District Attorney's, District 27 ah Drug Task Force. Ah, I met specifically with Clint Johnson and ah, Frank Lloyd with D.A.'s Task Force and Diane Barker-Harrold, who is the District Attorney for District 27. They ask how they wanted, how I wanted them to proceed in following us to the residence of Kenneth Barrett who we had a day or night no knock search warrant that we were there to execute. Because there were so many people there, I anticipated probably half a dozen, no more than eight individuals ahem when I got off the Interstate, I counted as I drove by 12 individuals and that was just as I was driving by, what I could count, I didn't get a full head count as far as who all was there, but because there was so many people and so many different vehicles I told them that I would prefer for the Tactical Team to go ahead and for them to delay in following us for two minutes. Ah, my thoughts on that were in the past we ah, we served many of these warrants ah, search warrants, usually we don't have arrest warrants but we go ahead and secure everybody in the residence for our safety and theirs and the longest that it's ever taken us was 20 seconds to clear a house and secure everyone inside and ah, my thoughts were we'd have everybody secured and ah in the front yard by the time they got there, and we could turn those people over to them and we could be on with our business, so I ask for a two minute delay.    Ah, we got back in our vehicles and ah started

5

921
KEB203647

STATE OF OKLAHOMA    )
                         )SS
COUNTY OF OKLAHOMA   )

KERRY PETTINGILL
1LT
OHP

### AFFIDAVIT

toward the house, they agreed to that, that that's what they would do. We ah, the way we were approaching was ah Trooper Hamilton, who is an assistant team leader, I had designated him as the team leader for this operation due to the fact that the East Team leader, Trooper Roger Lee, was out of state on vacation. And because it was Buddy's area and he had been doing some preliminary on this deal for us, ah, I told him he'd be the team leader so he was in the lead vehicle with Trooper Eales, followed by second vehicle, Trooper Greninger and Trooper Manion and then the third vehicle was ah Trooper Hash, who had a DEA Task Force officer ah, Danny Oliver with him and then ah, Trooper Hise was in his vehicle and he had ah, Trooper Poe and Trooper Darst in the vehicle with him and them I was the fifth vehicle with ah, 2LT McBride in the vehicle with me. As we made our approach to the residence, ahem, the gate to the ah house that we were going to execute the warrant on, we knew that it was double chained so we wouldn't be able to take time to cut it so the plan was for the front three vehicles to go past that residence and ah go through a wash-out, we thought it was a wash-out, ah, and then over to the side of the residence where they would exit their vehicles and make the entry. The fourth vehicle was to stop at the gate ah, and I was to pull into the driveway at the house immediately to the ah, west of Barrett's residence so that if, if he were to run from the residence to his Mother's house, which was the first house ah, west, we would either one, be able to intercept him or we knew that we had a ah, felony arrest warrant for him and if we could identify him going into the

6

922
KEB203648

STATE OF OKLAHOMA  )                              KERRY PETTINGILL
                        )SS                        1LT
COUNTY OF OKLAHOMA  )                              OHP

**AFFIDAVIT**

residence then we could pursue him into that residence and apprehend him. As, so there was a separation between the first three vehicles, the fourth vehicle and my vehicle so that we would all arrive at the same time, having vehicles parking in the front as the other vehicles were still on their approach. So as the other vehicles started across the creek area, which I called it a wash-out earlier, it turned into be more of a creek but as they were crossing it we were arriving at the gate and the driveway. The vehicle directly in front of me, Trooper Hise stopped at the gate, I pulled into the driveway, as I was pulling into the driveway ah, Lt McBride was, strobe lights on the visor, he was initiating those and I was supposed to hit the panel to turn the other hidden lights on my vehicle on, however I saw someone walking across the yard. On the west side of the house, ahem, there were some lights on in the house so I saw their head as they walked by on the exterior. So, I was driving with my left hand instead of hitting the light, I grabbed, I have a lapel mike for my tac radio, I ah keyed it up with my right hand and started calling out to the units that there was, there was movement in the yard, that I have a suspect in the yard. Ahem, probably before I ever got off the air shots were being fired, ahem I exited my vehicle and went to the front of it and by the time I got there I was, ah Trooper Greninger was on the air saying that we had a Trooper down, I went to a line of cars that was on the west side where I saw a Trooper and it turned out to be Trooper Darst, I went to him because there was somebody down on the ground in front of him, it turned out to

7

923
KEB203649

STATE OF OKLAHOMA )                          KERRY PETTINGILL
                  )SS                        1LT
COUNTY OF OKLAHOMA )                          OHP

AFFIDAVIT

be the person that was in the yard, which was later identified as Toby Barrett. Ahem, so I left him and went to the back of the vehicles where I saw one of the Trooper laying down, face down on the ground, went to him and ah, tried to identify who it was and ah, recognized that it was Trooper Eales and he had considerable amount of bright red frothy blood and it looked like other particles were in it probably lung and ah, he was having difficulty breathing, I rolled him on his side and attempted to clear his mouth, I was unable to do that ahem, I wanted to make sure that Troo, ah, 2LT McBride was on the air calling for assistance so I made my way, someone else, I think it was Trooper Greninger showed up at the back of the vehicle and then I went ahead and left cause there was somebody there with Rocky, I went ahead and went back toward my vehicle ah, McBride was on the air, on the radio talking to Muskogee Headquarters advising them that we did have a Trooper down and requesting net 10-63 to us and ah, also requesting a Mediflight Helicopter. I, for whatever reason, I ah, got in on the driver's side of my vehicle and drove it around because I saw Trooper Hise crash the gate, so I drove my car through and the, my thought process at the time was I knew I was gonna be over there and not in that yard and I did not want to leave that vehicle unattended. And that the other residences around, the house where I was parked was a Barrett and the house directly west of it was a Barrett and I just didn't want to leave the vehicle there unattended I had other weapons and things in the vehicle that I just couldn't feel safe leaving it there. So I went ahead and

8

924
KEB203650

STATE OF OKLAHOMA    )                    KERRY PETTINGILL
                     )SS                  1LT
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

moved the vehicle around into the driveway of Kenny Barrett's where the gate had been opened by ah Trooper Hise driving his vehicle through it. Ah, at ah, some point and time, I got back over to where Rocky was and this is the second time, I have to go back, prior to going back to my vehicle I had told ah, Greninger to get Rocky loaded. We have a (inaudible) officer down rescue plan that we use one of the vehicles and we had two Broncos there and they had both been designated as ah rescue vehicles, so if somebody was down we would load them in it and go with them. Ahem, told him to go ahead, told him to load em, get him out of there, by the time I got back, he was still there, they were still working on him and I told them again to get a vehicle over here and get him loaded and get him out of here ah, that's when I noticed that the deputies and the task force people were arriving and there were numerous vehicles and they were blocking the road, so I ran out to the road and told them to clear the road because we had an officer down. I went back to where Rocky was and ah Clint Johnson, who's an EMT and ah, Sheriff Doss from ah Cherokee County, she's a registered nurse and both of them arrived with me right about the same time back up to where Rocky was. Then Gene Hise, Manion, Sheriff Doss, and Clint Johnson grabbed Rocky and got him in the back of Trooper Greninger's vehicle, Trooper Hise got in the front and started driving off. Ahem as they were leaving, Troopers Greninger, Manion and Poe, Poe had moved up from the gate area whenever they moved the vehicle up and he was, he was covering the front of the house while we were at the back of this vehicle. Once Greninger's

9

925
KEB203651

STATE OF OKLAHOMA     )
                      ) SS          KERRY PETTINGILL
COUNTY OF OKLAHOMA    )             1LT
                                    OHP

AFFIDAVIT

vehicle left, I believe this is how it happened, once the vehicle with Rocky left then Manion, and Greninger, Poe and ah, task force officer Oliver went into the residence to clear the residence and secure it and to be sure that there was no one else inside. I started back to my vehicle to ah, to start making, I think was going back over there to make a phone call to ensure that the duty officer was being notified and that Captain Harris was being notified, my Captain. Ahem, that's, before I got back over to my vehicle Greninger called on the radio again and said that Trooper Hamilton had been shot, so I turned and went to them and met them as they were coming off the porch, Trooper Hamilton had blood on his face and on his around his left eye and shoulder, left shoulder area and ah, Trooper Greninger had Trooper Hamilton's weapon in his hand, his handgun in his hand, he said "this is his gun, what do you want me to do with it", I said "just lay it on the porch", I said "has it been fired", "I don't know", said "just lay it on the porch, leave it there" and of by this time the other guys had come out of the house and said it was secure, that's how come I said to go ahead and leave the gun on the porch. Ah, we started back toward the vehicles and ah they were out in the roadway with Buddy and I told Raymond, somebody said something about an ambulance, I said "forget the ambulance" I probably didn't say those words, but I said "forget the ambulance", I said "just get him in a car and get him out of here and so he was, Raymond took him, Greninger took him to one of the Sheriff's deputies cars and loaded him and the deputy transported him to the hospital. By this time I was again

10

926
KEB203652

STATE OF OKLAHOMA    )                    KERRY PETTINGILL
                     )SS                  1LT
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

on my way back to my vehicle when I noticed somebody started to pick something up in the yard, cause everything was really had settled down quite a bit at that time. At that moment it was very quiet for whatever reason and I noticed somebody bent over starting to pick something up I called out to them not to pick anything up, not to load any magazines, to secure all their weapons to leave everything where it was at, went to my vehicle retrieved some crime scene tape and Lt McBride and I, McBride actually took the crime scene tape from my hand and went over and tied it over on the porch and he and I walked together as he lied out the line and then as we made it back to our vehicle the ah, McBride got a sheet of paper and signed off on the crime screen saying what time he had roped it off and signed off on it. Kenneth Barrett was on the east side of the house, two deputies and the Sheriff were with him maintaining him, ah, there had been an ambulance called already, actually one was already responding decision was made that they would go ahead and have it come to the scene to ah, transport him. Ah, I made my notification to Captain Harris, and that's about it, I mean, there's a lot in there and I think, I start thinking back there's probably a lot I left out and as, like as we were pulling up I saw the guy in the yard and before I got off the radio there was gunfire and ah, it sounded like to me automatic gunfire because it was so rapid, but I recall looking at towards where the gunfire was coming from, it was coming from the front of the house and there was a porch area there, but I couldn't see anybody, there was just a great deal of smoke and ah, I could see muzzle flashes ah coming

11

927
KEB203653

STATE OF OKLAHOMA ) KERRY PETTINGILL
) SS 1LT
COUNTY OF OKLAHOMA ) OHP

AFFIDAVIT

from, first I thought the fire was coming from out people, but then I saw the muzzle flash and could see that it was coming from the residence or porch area and then occasionally I could see either glass or brass, I don't know what it was that was flying and ah that was as I was making my way towards ah where Trooper Darst was and I can't tell you when the weapons fire stopped.

GORDON:       On the ah, where the suspect Kenny Barrett was at, was he elevated up above the vehicle?

PETTINGILL:   Yes.

GORDON:       So, do you know if he was standing or laying down?

PETTINGILL:   I never saw Kenneth Barrett until he was secured.

GORDON:       You never actually saw the person shooting

PETTINGILL:   There was so much smoke, I couldn't even see a silhouette of a person.

GORDON:       Did you fire any rounds during the confrontation yourself?

PETTINGILL:   I did not.

12

928
KEB203654

STATE OF OKLAHOMA        )                      KERRY PETTINGILL
                         )SS                    1LT
COUNTY OF OKLAHOMA       )                      OHP

                         AFFIDAVIT

GORDON:        Did you assist in taking the suspect Kenny Barrett into custody?

PETTINGILL:    No.

GORDON:        Okay, so that was out Troopers

PETTINGILL:    Physically, Trooper, once he was shot in the house Trooper Hamilton saw him fall to the, to the floor, Trooper Hamilton ran up on the porch and into the residence and grabbed Barrett and drug him onto the porch from the inside of the residence, that's when two of three other Troopers grabbed, grabbed him and drug him into the yard, ah, they handcuffed him there and ah, did a pat down search and Trooper Manion found a handgun in Barrett's waistband and pulled it from his waistband and just kind of threw it away from his body and we left it laying in the yard, ah, I mean, our guys physically took him into custody but once the other deputies and everybody started arriving, the deputies, the Sheriff and two deputies took over maintaining control of Kenneth Barrett, Trooper Darst maintained control over Toby Barrett, ah until we had people there and I think he actually took him to the road area where he turned Toby Barrett over to a deputy. Ahem, I, I don't know, I, I, I believe in my mind that the Sheriff and them were there taking custody of Kenneth Barrett just prior to the team members going into the residence to secure it and ensure nobody else was there, and then he was drug from that area by the

13

929
KEB203655

STATE OF OKLAHOMA     )
                      ) SS          KERRY PETTINGILL
COUNTY OF OKLAHOMA    )             1LT
                                    OHP

AFFIDAVIT

Sheriff's deputies, I think, cause he was in the front, just in front of the vehi, not in front of the vehicle, but to the, between the porch area and the first Bronco, which was the Bronco they out at, he was between the porch and that Bronco lying face down on the ground, handcuffed and ah, and then the next time I saw him he was on the east side of the house, that's when 2LT McBride and I were laying out the crime scene tape and the Sheriff and two deputies were with him at that time.

GORDON:      Did you know what the suspect looked like prior to the forced entry.

PETTINGILL:    No.

GORDON:      Did they not have any pictures of him?

PETTINGILL:    Nope.  Ahem, Kenneth Barrett had been arrested prior to this, we checked with Sequoyah County, they had no photographs even though he had been arrested and was ah, had a felony warrant for failure to appear for a jury trial, or ah, unlawful distribution or unlawful deliver of a controlled dangerous substance, ah, they had no photographs and we received a story that ah it was a different Sheriff back when that occurred and it was a backdoor type deal he was brought in, his lawyer came up and got him out before he was ever really processed into the jail, I can't verify that, that's just the story that was related to me.

14

930
KEB203656

STATE OF OKLAHOMA  )                           KERRY PETTINGILL
                       )SS                          1LT
COUNTY OF OKLAHOMA  )                           OHP

**AFFIDAVIT**

GORDON:      Did you know how many suspects were in the house or on the property at the time of the forced entry?

PETTINGILL:      Well, we really never did a forced entry ahem, as the vehicles were rolling up they started receiving the gunfire.

GORDON:      Right, I mean, okay, prior to the attempt

PETTINGILL:      and the front door was open, we didn't kick a door, we didn't do, there was no forceful, so, I mean, we never know how many people is gonna be in a house, we always go on the assumption there could be ah, one or there could be twenty,

GORDON:      Right, I mean was there any intelligence indicating how many there was?

PETTINGILL:      No.  We we told occasionally his son is there, ah, we were told that Barrett was a recluse and never left the residence, ahem that he would probably be there, there were times when other dopers would show up cause he was supposed to be a distributor of drugs, he wasn't supposed to be a cooker, ahem, it was more like he had, everybody was afraid of Barrett so, they would take their, they would cook the dope and take it to him and he'd sell it because nobody would go up there and mess with him and ah, so we didn't know at the time that we hit the house whether Barrett would be alone or whether a carload of people had brought

15

STATE OF OKLAHOMA    )
                     )SS
COUNTY OF OKLAHOMA   )

KERRY PETTINGILL
1LT
OHP

AFFIDAVIT

some stuff over, I mean anything was possible.

GORDON:        Did you know how many and what type of weapons were in the house?

PETTINGILL:    No, just, actual I don't, I don't know.  Ah, we were told prior to this that Ken Barrett had numerous handguns, that he had a handgun in almost every room and he generally had a handgun on him.  Ah, there had been talk about ah, a rifle but the CI that was working with the Task Force ah, said he had not seen one, so all we were going on was there was a possibility of more, we, we understood there were handguns there according to the confidential informant, but ah, the actual types or how many we didn't have a sure number.

GORDON:        Did you ever get an opportunity to talk with the CI?

PETTINGILL:    No.

GORDON:        Were you advised of the suspects threats against law enforcement officials?

PETTINGILL:    Yeah, I'd been told that he was ah, a bad ass and that he had threatened to kill law enforcement officers before, that there was an incident a few years back, or several years back where ah, he had an incident where he was ah, ended up barricading

16

932
KEB203658

STATE OF OKLAHOMA    )
                     )SS
COUNTY OF OKLAHOMA   )

KERRY PETTINGILL
1LT
OHP

## AFFIDAVIT

himself or something and ended up shooting himself. Ah, so, you know, deals like that you have to weigh it from, you know, from past actions, he was a big talker, had an opportunity at that time, ended up shooting himself, so his past actions were that, maybe he would shoot, but who's he gonna shoot, is he gonna shoot at us or is he gonna shoot himself, or what's he gonna do, so it was one of those situation where we knew there was a strong potential for some kind of violence.

GORDON:    Did you know who provided the intelligence for the mission to the Tac Team?

PETTINGILL:    Yes, ah, Clint Johnson and ah, Floyd,

GORDON:    Frank Floyd

PETTINGILL:    Yeah, whatever his name is, that ah, task force, supposed to be the District Attorney's Task Force, supposed to be District Attorney's Task Force officer. We'd worked with them on numerous occasions ah serving warrants and most times they provide reliable information ah, this time, it was just very limited information.

GORDON:    Did you think the intelligence was okay for this mission?

17

933
KEB203659

STATE OF OKLAHOMA    )
                     )SS
COUNTY OF OKLAHOMA   )

KERRY PETTINGILL
1LT
OHP

### AFFIDAVIT

PETTINGILL:    Yes. We knew that he was a bad guy and ah, they had a ah, no knock, day or night search warrant for the residence, there was a potential for the drugs to be at the residence and they had to be, they had secured the warrant on Monday, we had ah, done a fly over on Wednesday, we arrived on Thursday hitting early Friday morning ah, I felt that ah, with the information we had yeah, I mean, we didn't have the information that he ah, had been out a couple of weeks before driving around and gotten in a chase, we didn't have that information, still the same, we've done it the same way just for the fact that it was we weren't there after Kenny Barrett, we were there to execute a search warrant, and if Kenny Barrett was there we could arrest him because we had an arrest warrant for him, if he wasn't there, no big deal, we were there to serve a search warrant.

GORDON:    Ah, did the Tac Team conduct surveillance?

PETTINGILL:    No, well, I say no, yeah we did. We did a fly over, aerial reconnaissance on ah, Wednesday and Thursday, I sent ah, Hamilton, Greninger and Manion into the area in an unmarked vehicle to see if they could tell anything from the ground, what type of differences, aerial stuff is a lot different from actually being on the ground and ah, they came back and said it was nothing like the aerial photographs, what we were thinking it was, that ah, the ah, we had talked at first about putting ah an observation, listening type team on the ground, ah, and serving them and putting them in

18

934
KEB203660

STATE OF OKLAHOMA     )
                      )SS          KERRY PETTINGILL
COUNTY OF OKLAHOMA    )            1LT
                                   OHP

AFFIDAVIT

a couple of hours before our arrival ah, but once they did their drive around in the area, they came back and said there's no way they were gonna be able to put them in, it's just gonna be too dangerous with the number of people that live in the area. The intelligence that we received was that all the people in that immediate area are either related to Kenneth Barrett or they are friendly with Kenneth Barrett and ah, if we put two people on the ground we were gonna have to stay in the area, we'd have to have another vehicle in the area and to have a strange vehicle in that small of an area with that many people living there, for a two hour time period would draw too much attention to us and ah, we just felt that it was, it was more of a risk to put them in than it would be for us not to have the people in place for that time period.

GORDON:          You know what type of vehicles were used to conduct surveillance on the residence, wither by the Tac Team or by the County?

PETTINGILL:      I don't know what the County used if they did any, as far as whenever they were in there in that immediate area, ah, the vehicle that we used was a, '95 Ford Bronco and ah, solid white, tinted windows and ah, they took the antennas off of it whenever they went through so it wouldn't draw attention to the antennas.

19

935
KEB203661

STATE OF OKLAHOMA    )                   KERRY PETTINGILL

                        )SS                   1LT

COUNTY OF OKLAHOMA    )                   OHP

COPY

**AFFIDAVIT**

GORDON:     Do you know if when they ran surveillance did they in fact see anybody in or around the

PETTINGILL:     They saw two people, if I remember correctly, but because we didn't have any information or a picture of Barrett, they didn't know if it was Barrett or not.

GORDON:     Ah, do you know why, on Hamilton's vehicle, why the interior lights we activated or not deactivated?

PETTINGILL:     No.  I mean, see he started shooting at em as he was coming through on the approach, so he'd of had headlights facing him and only time the lights would of been on would of been when they were getting out of the vehicle and that was after, Hamilton had a flash bang in his left hand as they were on their approach and cause as he was getting out he was gonna do this, be the distraction while the other team members got on the porch, ah, he found a moment in time to pull the pin throw it out of the vehicle towards the residence, it went off and that's when he was able to exit the vehicle, ahem, and it wouldn't of been until one of the doors opened that the light inside the vehicle would of come on, but ah, I mean I don't know, that's not our deal, you know I guess the garage does that or whatever, I don't know.

GORDON:     Can you think of anything else that might help me conclude my investigation of the events that occurred in Sallisaw

936
KEB203662

STATE OF OKLAHOMA )                          KERRY PETTINGILL
                  )SS                        1LT
COUNTY OF OKLAHOMA )                          OHP

AFFIDAVIT

on September 24, 1999?

PETTINGILL:    I can't think of anything, I know I'm probably leaving some things out, you know, it not, it's just that so many things happened in a short amount of time, I couldn't tell you how long the whole thing transpired, ah, I, I think I covered a lot of specific points but there could be small things that you know, I'm not recalling right now, but ah, like I said a lot of things happened in a very short amount of time and I think we covered most of it, our planning as far as the ah, the raid was concerned, we had a ah, we had a small makeshift models that one of the task force agents had made of the residence and ah, we spent two to three house at Camp Gruber in a building over there, we had the floor plan laid out, walls built with tables and chairs, those type of things, practicing entry where everybody was gonna go, and what everybody was gonna do, it got to the point we weren't able to execute our plan because he started shooting before we ever got there,

GORDON:        Sir, it's approximately 3:33, with your permission, I'll turn off the tape sir.

21

937
KEB203663

# EXHIBIT 15

STATE OF OKLAHOMA  )
                   )SS.
COUNTY OF OKLAHOMA )

I, Danny Oliver, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
DANNY OLIVER

SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of _____, 1999.

_____
Notary Public

My Commission expires:

_____

939
KEB203541

STATE OF OKLAHOMA   )                DANNY OLIVER

                      )SS                DEA

COUNTY OF OKLAHOMA  )

AFFIDAVIT

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol. Today's date is 11-08-1999. The time is 10:45 AM. I am at the Internal Affairs Office at 3600 Martin Luther King. Present in the room with me is Mr Danny Oliver with the DEA.

GORDON: Mr Oliver, are you aware that our conversation is being recorded and may be reduced to a typed sworn affidavit for your signature at a later date?

OLIVER: Yes sir, I am.

GORDON: Is it being recorded with your permission sir?

OLIVER: Yes sir, it is.

GORDON: Thank you. Ah, Mr Oliver could you please state your complete name for me.

OLIVER: Danny L. Oliver.

GORDON: Sir, could you ah, spell your last name?

OLIVER: O L I V E R

1

940
KEB203542

STATE OF OKLAHOMA    )                          DANNY OLIVER
                     )SS                        DEA
COUNTY OF OKLAHOMA   )

AFFIDAVIT

GORDON:   Could you give me your date of birth?

OLIVER:   ██████████

GORDON:   And your social security number.

OLIVER:   ██████████

GORDON:   Sir, what is your current job, where are you currently employed at?

OLIVER:   I work out of the DEA office out of McAlester.

GORDON:   Now do you work directly for the DEA or are you on a Task Force sir?

OLIVER:   I'm a DEA Task Force Officer,

GORDON:   Okay

OLIVER:   employed through the Cherokee County Sheriff's office.

GORDON:   Cherokee, and then the DEA pays your salary?

OLIVER:   Partial.

2

941
KEB203543

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

DANNY OLIVER
DEA

### AFFIDAVIT

GORDON: What are your specific duties associated with the Task Force?

OLIVER: I'm a Drug Task Force Officer, I work mainly drugs in the McAlester District, 20 plus counties and ah, mostly it's drug interdiction cases ah, and warrants.

GORDON: And warrants, ah, have you ever had an opportunity to work with the ah East Tac Team sir, of the Oklahoma Highway Patrol?

OLIVER: Yes sir, I have.

GORDON: You used to be on the Oklahoma Highway Patrol, weren't you sir?

OLIVER: Yes sir, retired April of '99.

GORDON: How many years did you spend on the Patrol sir?

OLIVER: Twenty-eight.

GORDON: Twenty-eight years. Did you have any association with the Tactical Team at that time?

OLIVER: Yes sir, I was a Tactical Team member for a period of 15 years.

3

942
KEB203544

STATE OF OKLAHOMA ) DANNY OLIVER
)SS DEA
COUNTY OF OKLAHOMA )

AFFIDAVIT

GORDON: Which team were you on sir?

OLIVER: East Team.

GORDON: East Team. Ah, sir since you've retired from the Patrol have you had any association with the East Tac Team?

OLIVER: Yes sir, I have.

GORDON: How about, I should say, official contact with the East Tac Team?

OLIVER: Yes sir.

GORDON: Okay, can you tell me what kind of contact that was?

OLIVER: Ah, yes I ah, in different times I've assisted with training at one time I assisted in the running of a felony drug warrant.

GORDON: Would that of occurred on September 24th, at approximately 0038 in the morning sir?

OLIVER: Yes sir.

GORDON: Could you please tell me what happened ah at 0038 on

4

943
KEB203545

STATE OF OKLAHOMA   )                         DANNY OLIVER
                    )SS                        DEA
COUNTY OF OKLAHOMA  )

AFFIDAVIT

September 24, 1999 and where it was at, where this took place at.

OLIVER:   Yes, ah, going back just a few hours before the issuance or execution of a warrant I arrived at Camp Gruber, Braggs, Oklahoma, with the East Tac Team, ah, we was at that point and that's where they were actually staying, the staging point for this for this mission.  I hooked up with them there, I had been tied up the three days before teaching a rifle, long range rifle school for Adair County.  I had known about the, a warrant was going to be served I was called Sunday night prior to that late by ah, Task Force Officer Johnson out of ah LeFlore County and ask to assist in ah tactical operation in issue of this drug warrant.  I told him at the time I couldn't because I was already obligated on this three day rifle school, me and Trooper Barry Clay, teaching it.  And I ah, one person couldn't teach it so I had to help him, which I did, I arrived at Gruber approximately 1600 hrs on that Thursday, the 23rd, I believe it was.  When I arrived ah, part of the Tac Team was there, course I talked to them, part of them were doing their drive by surveillance on the target we were gonna hit, they got back we all went to eat, ah most of us, I think a few of them didn't go eat, we went over to a cafe close there, south end (inaudible) come back caught the at 1930 hrs had a briefing ah, I listened to the briefing of about what was to take place, listened to the operations order ah, listened to, (inaudible) residence we were taking, listen to information got by recon.  Trooper Buddy Hamilton

5

944
KEB203546

STATE OF OKLAHOMA    )                          DANNY OLIVER
                     )SS                        DEA
COUNTY OF OKLAHOMA   )

AFFIDAVIT

was ah as team leader, he was assistant, is an assistant team leader on East Tactical Team, Trooper Roger Lee was ah, not present for that mission so Trooper Hamilton was acting team leader at that time, and he was doing the briefing.  Ah tactics were discussed ah, I overheard the whole conversation being familiar with tactics and tactical, seeing the experience I had I didn't ah circumstances the best tactic were discussed, planned and we were going to be put forth in an operation that were available at that time.  Ah, few of them laid down ah, got a little rest, most of us just stayed up and talked, talked about old times and what was going on and how everybody was doing.  We left Camp Gruber area approximately 12:00. Trooper Hamilton had called Officer Johnson, think Johnson was Task Force, DA's Task Force him and the Sheriff's Department, Sequoyah County Sheriff's Department were to meet us under the ah bridge overpass bridge at I-40 and Dwight Mission Road at 12, or at 0030 on the 24th; we were to meet there and from that location we would go forth and ah, do the warrant.  We pulled off the interstate, I looked at my watch it was approximately ah, 0020, first thought to hit my mind was you know, we're early and I'm, I'm worried about sitting there waiting on someone (inaudible) marked unit in that area, all of Sequoyah County has a lot of drug traffic, and I didn't know, one of my biggest worries sitting there in that marked unit was somebody come by maybe know this person, go up and have a leak there.  Fortunately when we pulled in everybody was there, District Attorney's office was there ah, Sheriff was there, Sequoyah County, Cherokee County Sheriff was there, bunch of

6

945
KEB203547

STATE OF OKLAHOMA )          DANNY OLIVER
              )SS          DEA
COUNTY OF OKLAHOMA )

**AFFIDAVIT**

deputies, ah, was there from Sequoyah County also, I don't know how many but there was quite a few people there. We pulled up and stopped and waited for approximately, got out and talked approximately 30 seconds to a minute, ah, there were going to, that group of people was going to give us two minute lead time and then they were gonna come as backup. The lead vehicle, the first one was Trooper Hamilton and Trooper Eales in a white Bronco, full size Bronco; second vehicle was Trooper Manion, Trooper Greninger in a white full size Bronco; and third vehicle was myself and Trooper Steve Hash. We were gonna be the entry team and ah I don't remember how the other vehicles lines up, but the rest of the team including Lt Pettingill ah was behind the first three vehicles and their job was outside (inaudible). Ahem, from that location approximately two miles to the target, the house we were gonna hit, we left out, didn't have not problems en route as far as any vehicle problems or traffic problems, dark of course at that time of night ah, I don't believe it was overcast, it was not raining, it was dry, temperature was probably 60 degrees. We got close to the residence, I'd never been there, I hadn't even done a drive by recon, and I live in Sequoyah County but I've never been up that far off Dwight Mission Road, the only thing I knew was what the house looked like on, you know, the photos that had been taken. But we come up ah, I don't remember the direction but we come up, the house I believe is facing, if I'm not mistaken, facing east ah, we come up basically going north, I could be completely wrong in these directions, to the side of the house which would be the right

7

946
KEB203548

STATE OF OKLAHOMA    )
                     )SS
COUNTY OF OKLAHOMA   )

DANNY OLIVER
DEA

AFFIDAVIT

side if your looking out of the front door and the entrance to the house or the driveway to the house is, was discussed in the briefing, had a steel gate across it, it had a chain wrapped around the gate and a lock. Because of the dogs in the vicinity and so closeness of the residences around it ah, they had decided not to cut the lock, unwrap the chain (inaudible) go in there because they would be detected. We turned left in front of the house which was a little driveway type road and as soon as we got where we could see the house, I saw that the lights was on. Ah, we turned left, 10 or 15 yards turned left again across an entrance we had been driving across, across (inaudible) gate. When the first vehicle cross I seen it have a little bit of problem cause I think the right rear bumper guard (inaudible) ditch which was fairly deep, course we were in a marked Ford patrol unit and I told Steve, I said "we're gonna have to gun it good, give it a lot of gas to get across there or we're gonna be stuck in that ditch. Approximately the time the first vehicle went through the ditch I started hearing gunfire, semi-automatic, ah, rifle fire, the second one come across the ditch, I'm still hearing rifle fire and about the time we were coming across the ditch it turned to semi-automatic, I'm sorry fully automatic fire. The first vehicle pulled up approximately to the left, if your looking out the front door to the left of the front door, the second vehicle pulled up to the ah driver's side to the right of that one and we pulled up to the right of the second vehicle, pointing to the side of the house. We exited the car at this time, the gunfire was real heavy, first thing that hit my mind

8

947
KEB203549

STATE OF OKLAHOMA    )
                     )SS
COUNTY OF OKLAHOMA   )

DANNY OLIVER
DEA

AFFIDAVIT

at this point was someone in these front two vehicles was shooting with automatic fire instead (inaudible). I go out by the right front fender of the patrol car and I'm looking at the porch, smoke everywhere and it suddenly dawns on me the gunfire is coming out of the doorway, the smoke is still coming out. Whoever was shooting was shooting three to five round bursts, fully automatic ah, as we drove in the yard, I seen a male approximately six foot tall, I don't know what age, what color of hair, I could tell by the stature it was a male not a female, run from the, into the house which would be the right if your looking out the front door or off into the yard. Understand later it was Barrett's son (inaudible). Ah, I saw him as soon as, before we crossed the ditch, I didn't see any weapons in his hand, I didn't see anybody outside the house other than that (inaudible) before the capture. Getting back, after I exited the patrol car I seen the gunfire coming out of the house, I dove to the second vehicle as you come in, got cover on the back left corner just (inaudible) I look over to the next vehicle, which were just a few yards apart and I see a camouflage body to the right rear corner of the vehicle on the ground, face down. Ah, had camouflage on (inaudible), gunfire was still going heavy. I'd seen it was one of the Tac Team member, I didn't know who at the time. I run to him, and I seen it was Trooper Eales, Rocky wore two vests, we always (inaudible) Tac Team policy was to issue, body armor were issued and he also had a ah, I don't know where he got it, he purchased it I'm sure hisself, I know he got it some while back, probably from a arms surplus, I don't know where

9

948
KEB203550

STATE OF OKLAHOMA )
                   ) SS
COUNTY OF OKLAHOMA )

DANNY OLIVER
DEA

AFFIDAVIT

he got it from, it was a green (inaudible) vest and he always zipped it up twice. And when I was, (inaudible) I seen Rocky (inaudible) I looked down, I leaned over him, I grabbed him by the right shoulder cause I was gonna turn him face up, he was on his elbows, hands out in front of him, I couldn't see any blood at the time, I grabbed him and he let out a painful scream, and I said "Buddy, help's on the way, hang on", the gunfire stopped somewhat now, I turned around Trooper Hash and I believe, I'm not positive on this, Greninger was dragging Mr Barrett outside, had him by the arms, about the time I had turned around and got a good look, Trooper Hash was ah, was in a semi, handcuffing the victim (inaudible). At this time Trooper Manion had run over to Rocky, had run over to me and Trooper Hash was still on Mr Barrett and ah, he run over to me and was talking to Rocky and telling him to hold on. Trooper Greninger had went inside the Bronco and was hollering for help and I was, I was screaming, "get us some help, Rocky's down, Rocky's down" ah, seemed like it was forever , we didn't hear any response back on the radio, so I jumped out of the vehicle and I was hollering as loud as I can, "get some help, we got a man down, get some help". I got out of the vehicle, I was out of the vehicle and I turned around Greninger and Manion were working on Rocky giving him CPR and had ah, his vest back and his shirt pulled back to where his chest was visible and Rocky had blood all over is (inaudible) top of his chest and I went over to him and I cupped my hand, I wiped the blood away looking for a hole. I couldn't see any holes, I looked his head and neck over, cause I knew the blood

10

949
KEB203551

STATE OF OKLAHOMA     )                    DANNY OLIVER
                      )SS                  DEA
COUNTY OF OKLAHOMA    )

AFFIDAVIT

was coming from somewhere, but I didn't think about him being shot anywhere else because he had two vests on, I figured you know, I'm looking for holes cause I know he's all right because he's got two vests on, can't be hurt with vests protecting him. I, you couldn't see no holes, about this time ah, Trooper Greninger was trying to get the back tailgate down from the first vehicle, he knocked the window out trying to open it and it wouldn't open. Ah, then he got into the second vehicle and got the tailgate down and we laid Rocky up on the tailgate, about this time ah, (inaudible) she's the Cherokee County Sheriff and she was an RN before she became Sheriff, many years as a RN in the emergency room, so she just jumped up on top of Rocky on the tailgate and started giving him CPR, Raymond told me that to drive him to the hospital, I go around and Clint Johnson, who's a Task Force Officer is in the driver's seat and by this time Trooper Hise comes around and jerks Johnson out and gets in, says he knows where the hospital is. Johnson then climbs in the back and I'm yelling at them, please don't fall off that tailgate, cause they ain't got nothing to hold. They take off, in the mean time, prior to this, ah, Trooper Hise has his patrol car run through the gate, you could tell it was a patrol car because of the lights, I turn back around Barrett, Hash is still on top of Barrett, I told Raymond and Manion, I said "we need to clear this house, don't know many people been in it" so me and him, us three go inside and clear the house. We clear the bottom floor, inside the house, you go in and it's a very small building, (inaudible) to your right as you go in there a little room and use

11

950
KEB203552

STATE OF OKLAHOMA    )
                         )SS
COUNTY OF OKLAHOMA   )

DANNY OLIVER
DEA

## AFFIDAVIT

the doorway to the right. Inside this doorway was a 405 full length barrel ah, Colt, looked like a Colt, could of been another brand, AR15 looking weapon. Three magazines, one in the weapon, two taped down in the weapon, and either on top, I don't remember, or underneath, they were kind of crossed, there was a 12-gauge double barrel shotgun. Ah, as I went by Barrett, there was a Smith and Wesson pistol thrown over on the ground that I understand he had in his belt, I didn't see, but I understand it. We clear the house, the bottom floor and I hollered to Raymond, I said "we need a mirror, there's an upstairs" I said "we need a mirror" so Buddy Hamilton comes in with a mirror, Buddy's bloody, his left eye, (inaudible) hanging out, there's blood all over his face and all over his left shoulder and some on his right shoulder, I didn't, first time I'd saw Buddy, you know, since we left down at Dwight Mission Road and I told Raymond, I said "get him some help, get him to the doctor now", Raymond took him out and I was standing as they put him in the car, sent him to the hospital. At this time me and Manion cleared the, the top floor, which there's nobody in it and that time we didn't see any guns up there. Once the house was clear we come back out, course by this time the Sheriff's Department, everybody was there at the house. The Sheriff's at that time took custody of this Barrett and ah, moved him from the house to the side of the house, your looking out the front door it would be the left side of the house, over by our (inaudible) course at that time ah, we got, we had gotten all the injured out and started taping off the crime scene, telling everybody, everybody

12

951
KEB203553

STATE OF OKLAHOMA )                                    DANNY OLIVER
                  )SS                                  DEA
COUNTY OF OKLAHOMA )

                              AFFIDAVIT

was telling everybody else "don't touch nothing in the crime scene, don't go back in the house, it's all clear" and then the Tactical Team kind of gathered over there in the corner and they, I don't know, probably, seemed like a long time, probably 30 minutes after the shooting they called back and said Rocky was dead and ah, we ah, we kind of hung there together till the D.A. got there and ah, I don't know how long a time it was, but they took us to ah, I think the Child Support Office there at the Sallisaw D.A.'s office and at that point in time we stayed until the next morning, we went back out to the scene and that's basically what happened.

GORDON:   Did you fire any rounds during the confrontation?

OLIVER:   No sir.

GORDON:   Ah, did you ever actually touch Kenneth Barrett during the taking when you were taking him into custody or was it just the other Troopers that were doing it?

OLIVER:   I bent down I think one and put my hand on his back.

GORDON:   Did you all know what the suspect looked like, did you have a picture of him before the forced entry was attempted?

OLIVER:   I never did see one, no.

                                 13

952
KEB203554

STATE OF OKLAHOMA        )                    DANNY OLIVER
                         )SS                  DEA
COUNTY OF OKLAHOMA       )

AFFIDAVIT

GORDON:   Okay.  You know how many suspects were in the house, or on the property prior to you arriving at the house?

OLIVER:   Prior information I got in briefing was one, Mr Barrett.

GORDON:   Okay, was that hard intelligence or was that just

OLIVER:   That information I got, the information (inaudible) briefing, this comes from an informant and the informant had been in there recently, and said that Mr Barrett had lived alone, and was usually there by himself, or there could of possibly been several other people there at different times.  On the drive by, surveillance, I believe the Trooper said there were two people out in the yard.

GORDON:   Did the ah, informant advise you how many and what type of weapons were in the house?

OLIVER:   Course I never did talk to the informant and the informant never did talk to us, never did talk to the Tactical Team is my understanding from information they got, but the informant talked to the D.A.'s Task Force, ah, the information that come to us from D.A.'s Task Force was that this man always had weapons.

GORDON:   Did, did they advise you about his criminal history?

14

953
KEB203555

STATE OF OKLAHOMA     )                          DANNY OLIVER
                      ) SS                       DEA
COUNTY OF OKLAHOMA    )

AFFIDAVIT

OLIVER:    Yes.

GORDON:    And about his threats against law enforcement?

OLIVER:    Yes.

GORDON:    Did they ever, I know you said the CI, but did they ever take and say ah, anything about the CI, his credibility?

OLIVER:    The only thing, ah, they said they had run several warrants off this CI and (inaudible)

GORDON:    There was an alarm, a sensormatic alarm on the back of the house, you know if the informant er did that pass during the ah ah, briefing about the alarm on the back of the house.

OLIVER:    I did not hear if it was.

GORDON:    You think the intelligence was okay for this mission?

OLIVER:    As far as intelligence (inaudible) Trooper job, ah, and the warrants that we usually do, ah, I think we, I think the Troopers, the team acted on all the intelligence they had, I don't think the intelligence was correct,.

GORDON:    Okay.  During the, you were driving down the road with a

15

954
KEB203556

STATE OF OKLAHOMA   )                    DANNY OLIVER
                      )SS               DEA
COUNTY OF OKLAHOMA   )

**AFFIDAVIT**

set of lights on, is, do you, how was the decision reached that this take place at 12:30 instead of, at night, instead of early in the morning.

OLIVER:   I don't know, that was my understanding that intelligence was left, was made ah through the Tactical Team and the Task Force.

GORDON:   Did you hear anybody voice an opinion one way or the other when they said they were gonna do it at 12:30, good or bad.

OLIVER:   Rocky said "well, let's just do it now".

GORDON:   You mean as far as "just go out and do it at 12:30".

OLIVER:   No, it was 7:30 when we did the briefing.

GORDON:   Okay, he said "just go ahead and do it"

OLIVER:   "Let's just go ahead and do it now and get it over with".

GORDON:   You know how the Tac Team conducted surveillance for this mission?

OLIVER:   My understanding they did a drive by with an unmarked vehicle, (inaudible) would be the Bronco, it may of been another vehicle, I know we had already gone to eat and they come met us, I

16

955
KEB203557

STATE OF OKLAHOMA   )
                   )SS
COUNTY OF OKLAHOMA  )

DANNY OLIVER
DEA

**AFFIDAVIT**

don't know exactly what, if they had ah vehicle from the Task Force or, that's something that I really don't know.

GORDON: Based on your experience, you know being on the Tac Team 15 years obviously you've been on some deals, you think the surveillance was adequate for this particular mission?

OLIVER: Yes.

GORDON: Okay. Ah, you think you all should of had a picture of Barrett?

OLIVER: Yes.

GORDON: Ah, been my understanding, I've never been on the Tac Team, but it's been my understanding that ordinarily the Tac Team will run surveillance for an hour or two prior to an event occurring.

OLIVER: Yes.

GORDON: Ah, is there any reason why that did not occur at this time?

OLIVER: Yes, that was ah, Mr Barrett's house, you've been there cause I saw you there, Mr Barrett's house is so closely surrounded

17

956
KEB203558

STATE OF OKLAHOMA     )                    DANNY OLIVER
                      )SS                  DEA
COUNTY OF OKLAHOMA    )

AFFIDAVIT

by residences that are kin to him, very close, his mother's house (inaudible), ah, in the Tactical Teams opinion ah, that a surveillance team couldn't (inaudible),

GORDON:   Do you hold that same opinion?

OLIVER:   Yes I do.

GORDON:   Can you think of anything else that might help me to conclude my investigation of the events that occurred in Sallisaw on September 24, 1999?

OLIVER:   No.

GORDON:   Sir, with your permission I'm gonna turn the tape recorder off at this time.

OLIVER:   Yes sir.

18

957
KEB203559

958

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Movant/Defendant, | ) | **DEATH PENALTY CASE** |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | NO.  6:09-cv-00105-JHP |
| | ) | |
| Respondent/Plaintiff. | ) | |

---

### NOTICE OF FILING OF DECLARATION OF LEONARD POST

---

NOTICE IS HEREBY GIVEN that Kenneth Eugene Barrett, Movant herein files herein and herewith the Declaration of Leonard Post.  Said Declaration is filed  in support of Amended Section 2255 Motion to Vacate, Set Aside or Correct (Doc 95), Motion to Supplement Amended Section 2255 Motion to Vacate (Doc 95) and Supplemental Section 2255 Motion to Vacate, Set Aside or Correct Judgment/Order and Sentence.

DATED:  March 16, 2012

Notice of Filing of
Declaration of Leonard Post                     1                     Barrett v. USA
OKED Case No. 6:09-cv-00105- JHP

Respectfully submitted,


        /s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600


DANIEL J. BRODERICK
Federal Defender


        /s/ Joan M. Fisher
JOAN M. FISHER, Idaho Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666


Attorneys for Defendant
KENNETH EUGENE BARRETT

**CERTIFICATE OF SERVICE**

I declare that this Motion under 28 U.S.C. § 2255 was electronically filed on March 16,

2012 and served on:

**Christopher J. Wilson**
**United States Attorney**
**1200 W. Okmulgee**
**Muskogee, OK 74401**

**Jeffrey B. Kahan**
**U.S. Department of Justice**
**1331 F Street, N.W., Room 345**
**Washington, D.C. 20530**

 _/s/ Joan M. Fisher_
Signature of Movant's Attorney

Notice of Filing of
Declaration of Leonard Post                3                Barrett v. USA
                                                           OKED Case No. 6:09-cv-00105- JHP

960

961

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,    ) <br> ) <br> Movant,      ) <br> ) <br> ) <br> v.      ) <br> ) <br> UNITED STATES OF AMERICA,    ) <br> ) <br> Respondent.      ) <br> _____) | **DEATH PENALTY CASE** <br><br><br> Case No. 09-CIV-105-JHP |

---

## DECLARATION OF LEONARD POST IN SUPPORT OF
## SUPPLEMENTAL SECTION 2255 MOTION TO VACATE

---

I, Leonard Post, a person over the age of eighteen (18) and competent to testify and mindful of the penalties of perjury, declares as follows:

1. I am an investigator retained by the Federal Defenders Office of the Eastern District of California to assist in the postconviction investigation in the above-numbered and styled matter.

2. David Autry, counsel for Kenneth Eugene Barrett and I interviewed the Hon. John Garrett at the Adair County courthouse in Courtroom One, which was otherwise unoccupied, on July 1, 2011.

3. The following is a true and correct accounting of Judge Garrett's statements to us.

A. Re Judge Garrett:

    1. Judge Garrett presided over two state trials brought by the state of Oklahoma against Kenneth Barrett for capital

DECLARATION OF LEONARD POST IN SUPPORT OF
SUPPLEMENTAL SECTION 2255 MOTION TO VACATE **-1**

murder in the shooting death of Trooper Rocky Eales.

2.  Publicly available information shows Judge John Garrett to now be seventy (70) years of age.

2.  Judge Garrett retired approximately five years ago.

B.  Re: Monk Sanders

1.  Judge Garrett told Clint Johnson he did not want to know who the Confidential Informant [CI] for the warrant was. At the time of the interview, Judge Garrett still didn't know who the CI was.

2.  When Judge Garrett was advised that the CI was Monk Sanders, he said, "Hell you say." When asked if he knew Monk, he said that he did and that "No, I would not believe anything he told me."

C.  Re: Clint Johnson

1.  Judge Garrett said that Clint Johnson "was not a truthful guy and not to be trusted. We have an Oklahoma expression for someone like him. 'He'd slap you on the back and piss in your boots at the same time.' He did lots of shaky things....slime around and finagle a lot of stuff....various and sundry things...people were afraid of him, because of what he had the power to do—I like to think I wasn't—the black gown will always prevail—but other people were afraid of him and had reason to because of what he held over your head....I was always suspect of him."

2.  "Johnny Philpot had been out there [Kenny's] the week before [the raid] and talked to him [Kenny]." Judge Garrett believes that Philpot testified to that. "The warrant was already good at that time.

C.  Re: OHP:

1.  "I wouldn't let them bring their firearms into the courtroom. They would argue that that it offered the court protection. I told them that I had two armed deputies...." He finally had to tell them "You're not going to wear your . . . guns."

2.   OHP officers "filled the courtroom. They were trying to intimidate a lot of people. I think they thought they were going to intimidate me."

D.   Re Kenneth Barrett:

1.   Judge Garrett advised that while presiding over the trial, he never thought Mr. Barrett was a danger. "We'd have lots of hearings. He was never anything but a gentleman in all respects. He showed me the greatest of respect[.]"

2.   Judge Garrett also said that Mr. Barrett had treated his secretary, Audrey, with the same degree of respect.

E.   Re: Echols:  Judge Garrett thinks that John Echols is the best lawyer who ever tried a case in front of him.

I declared under penalty of perjury that this three page declaration is true and correct.

Executed by me on this _15th_ day of March, 2012 in New Yourk County, New York.

Leonard Post
NYS Investigator's License
#110001455413

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,     )

     )

         Petitioner,     )

     )

v.     )         **Case No. 6:09-cv-00105-JHP**

     )

UNITED STATES OF AMERICA,     )

     )

         Respondent.     )


### PETITIONER'S MOTION FOR LEAVE TO SUPPLEMENT THE PENDING AMENDED MOTION TO VACATE, SET ASIDE OR CORRECT A JUDGMENT, ORDER AND/OR SENTENCE UNDER 28 U.S.C. SECTION 2255

Petitioner's Motion for Leave to Supplement Amended Motion            Barrett v. USA
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence        OKED Case No. 6:09-cv-00105-JHP

964

**TABLE OF CONTENTS**

I.      Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Introduction and Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      This Court Should Grant Petitioner Leave to File the Motion to Supplement
                the Pending 2255 Motion to Vacate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.     Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Petitioner's Motion for Leave to Supplement Amended Motion                    Barrett v. USA
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence       i       OKED Case No. 6:09-cv-00105-JHP

965

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Buder v. Merrill Lynch*, 644 F.2d 690 (8th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Conley v. Gibson*, 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Foman v. Davis*, 371 U.S. 178 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Gillette v. Tansy*, 17 F.3d 308 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Mayle v. Felix*, 545 U.S. 644 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Moore v. Balkcom*, 716 F.2d 1511 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Riley v. Taylor*, 62 F.3d 86 (3rd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7

*United States v. Espinoza-Saenz*, 235 F.3d 501 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 7

*Woodford v. Williams*, 263 F.3d 1135 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## FEDERAL STATUTES

Fed.R.Civ.P. 15(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Petitioner's Motion for Leave to Supplement Amended Motion          Barrett v. USA
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence   ii   OKED Case No. 6:09-cv-00105-JHP

966

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )
                                   )
            Petitioner,            )
                                   )
v.                                 )          Case No. 09-CIV-105-JHP
                                   )
UNITED STATES OF AMERICA,          )
                                   )
            Respondent.            )

**PETITIONER'S MOTION FOR LEAVE TO SUPPLEMENT
THE PENDING AMENDED MOTION TO VACATE, SET ASIDE
OR CORRECT A JUDGMENT, ORDER AND/OR SENTENCE
UNDER 28 U.S.C. SECTION 2255**

**I.      Motion**

Petitioner, Kenneth Eugene Barrett, by and through his undersigned counsel, hereby moves this Court for leave to amend and/or supplement his pending second amended Motion to Vacate, Set Aside Or Correct a Judgment, Order and/or Sentence, Under 28 U.S.C. Section 2255. (Doc. 95)

Mr. Barrett respectfully submits this Court should grant the motion because leave is to be freely given and it would be an abuse of discretion to withhold leave under the circumstances of this case. Since filing the Second Amended Motion (Doc 95), substantive, relevant and material information has been discovered which relates back to Movant's claims. The interests of justice, as well as the Fifth, Sixth and Eighth Amendments, require that this motion be granted.

Petitioner's Motion for Leave to Supplement Amended Motion            Barrett v. USA
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence    1    OKED Case No. 6:09-cv-00105-JHP

967

## II.    Introduction and Summary of Argument

Since the filing of the Second Amended Motion, Mr. Barrett has, as he said he would, continued the investigation into the conduct of both the Government, its agents and appointed defense counsel which led directly to the unjust verdict and sentences sought to be vacated. Interviews of a number of witnesses have produced additional evidence to support the claims pending in Mr. Barrett's §2255 Motion (Doc 95).

The most critical of the newly produced witnesses is Paul D. Gordon, a retired OHP Internal Affairs Investigator originally responsible for the investigation of the September 24, 1999 shooting. Mr. Gordon's investigative efforts were blocked, hampered, and ultimately stopped because the investigation revealed the OHP was covering up the mistakes of the fatal raid on Mr. Barrett's residence. Based on the facts recited in Mr. Gordon's declaration, much of the evidence presented in this Court resulting in Mr. Barrett's convictions and sentences is untrue. In order to render Mr. Gordon either incredible or intimidated, either of which prevented the truth from emerging, the State of Oklahoma, primarily the same actors and agents who assisted the federal government in the current prosecution, went so far as to prosecute Mr. Gordon for acts of accepted policy within OHP despite knowing that perjury had been committed to secure his prosecution. The Government failed to disclose to the defense matters regarding Mr. Gordon's investigation which were unquestionably exculpatory and material both substantively and as impeachment of the Government's law enforcement witnesses. Mr. Gordon's proffered testimony is set out in significant detail and filed separately in support of this Supplemental §2255 Motion to Vacate, as well as Mr. Barrett's pending §2255 Motion to Vacate (Doc 95). It is this testimony that provides the substantial portion of additional evidence in

Petitioner's Motion for Leave to Supplement Amended Motion
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence        2        Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

968

support of Mr. Barrett's claims of prosecutorial misconduct and ineffective assistance of counsel, as well as the related substantive claims of the unconstitutional use of restraints and judicial interference with the defense

Another witness who was interviewed is retired Sequoyah County District Judge John Garrett, who presided at Mr. Barrett's state trials.  Because of his status as a retired judge, the evidence which Judge Garrett could offer is proffered by the Declaration of Leonard Post, an investigator retained by Mr. Barrett's counsel who, along with counsel David Autry, interviewed him.  Judge Garrett's evidence goes to the good conduct of Mr. Barrett in the state trials.  Judge Garrett's characterization of the conduct of Mr. Barrett as at all times respectful undermines this Court's acquiescence to the U.S. Marshal in unconstitutionally restraining Mr. Barrett with a visible stun belt, an unnecessary encumbrance which interfered with Mr. Barrett's communications with his counsel and prejudicially detracted from the presumption of innocence.

Kenneth Barrett's conviction and the resulting sentences of Life without Parole and Death are based on a web of lies and deceit, fabrication and prevarication, all of which was designed to spare the troopers of the East Tact Team of the Oklahoma Highway Patrol the embarrassment, humiliation and burden of having contributed to the death of their friend and fellow trooper, Rocky Eales.  The Tact Team deliberately, intentionally and inexplicably ignored OHP policies and procedures in planning and executing the raid, thus ensuring that Kenneth Barrett's response to the Tact Team's presence could be nothing other than it was to defend his family, his home and his life against what he perceived to be an illegal intrusion and confrontational attack by persons unknown.

Petitioner's Motion for Leave to Supplement Amended Motion
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence    3    Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

969

Since filing his original Section 2255 Motion to Vacate his convictions and sentences (Doc 1), the correction thereof (Doc 2) and the First and Second Amended Motions, (Docs.74, 95), previously undiscovered information has come into Movant's possession which demonstrates the United States Government, by and through its agents, including the State of Oklahoma and the Oklahoma State Highway Patrol, engaged in a continuous course of conduct to obscure, misrepresent, deceive and preclude discovery and/or presentation of matters which, when considered individually, cumulatively and/or together with the facts and claims currently pending, make clear that violations of Mr. Barrett's constitutional rights as guaranteed by the Fifth, Sixth, and Eighth amendments to the United States Constitution compel relief from both his convictions and sentences.

In the course of the continuing investigation in this matter, counsel for Mr. Barrett located and interviewed Paul Gordon, retired Oklahoma State Trooper, a former investigator for the Internal Affairs Division of the Oklahoma Highway Patrol.  Mr. Gordon was the primary and lead investigator assigned to the shooting at the Barrett residence.  Mr. Gordon recently disclosed matters previously known to the prosecution but which were not disclosed to the defense before and during the federal trial, in violation of the Government's obligation to produce exculpatory evidence.  Independent of this constitutional violation, trial counsel were ineffective for failing to reasonably investigate, to Mr. Barrett's prejudice, evidence gleaned from Mr. Gordon's investigation.  See Declaration of Paul Gordon (Doc. 199-1).

Petitioner's Motion for Leave to Supplement Amended Motion
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence          4          Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

970

**A.      This Court Should Grant Petitioner Leave to File the Motion to Supplement the Pending 2255 Motion to Vacate.**

This Court should permit the filing of the supplemental amendments to the pending Motion to Vacate, and should fully consider them in the interests of justice. Where an amendment is filed following the service of a responsive pleading, a court should "freely give leave when justice so requires." Fed.R.Civ.P. 15(a)(2).  This is particularly true where, as here, no new claims are raised in the amendments to the petition, and therefore there is no violation of the statute of limitations and no prejudice to the opposing party.

In the following section, Petitioner presents grounds for allowing his amendment.

The phrase "freely given" in Rule 15(a)(2) is a limit on a district court's discretion. *Gillette v. Tansy,* 17 F.3d 308, 313 (10th Cir. 1994); *Riley v. Taylor,* 62 F.3d 86, 90, 92 (3rd Cir. 1995) (denial of leave to amend was reversible error; "the district court's order denying Riley leave to amend his petition for a writ of habeas corpus is inconsistent with the exercise of sound discretion in light of Rule 15(a)'s command that amendments should be freely allowed when justice so requires.")

Refusal to allow amendment of a §2255 motion in a capital case, where the cost to Petitioner may be his life, and where the Government can claim no prejudice, would be a particularly extreme abuse of discretion, and contrary to the Supreme Court's statement in the seminal Rule 15(a) case that "the purpose of pleading is to facilitate a proper decision on the merits." *See Foman v. Davis,* 371 U.S. 178, 182 (1962) (quoting *Conley v. Gibson,* 355 U.S. 41, 48 (1957)); *see also, Moore v. Balkcom,* 716 F.2d 1511 (11th Cir. 1983) (affirming denial of leave to amend on "futility" grounds, but noting that "[c]ertainly in a capital case, the district court

Petitioner's Motion for Leave to Supplement Amended Motion  
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence         5         Barrett v. USA  
OKED Case No. 6:09-cv-00105-JHP

971

should be particularly favorably disposed toward a petitioner's motion to amend").  Refusal to allow a habeas litigant to amend his petition in order to expand or clarify claims already made would constitute an abuse of discretion.  *Gillette v. Tansy, supra.*

Declining leave to amend must be justified.  *Foman v. Davis,* 371 U.S. at 182; *Riley,* 62 F.3d at 90.  Permissible justification for refusing to allow amendment include: 1) undue delay; 2) bad faith or dilatory motive; 3) undue prejudice to the opposition; 4) repeated failures to correct deficiencies with previous amendments; and 5) futility of the amendment.  *Foman,* 371 U.S. 182; *Riley,* 62 F.3d at 90.  None of these potential justifications for denying an amendment is present here.

The Supplemental Motion to Vacate sought to be filed  does not create "undue delay" because Mr. Barrett has already timely moved for relief under § 2255.  The Court has yet to make any findings, preliminary or otherwise.  Any delay in this case has been occasioned by the circumstances cited in Mr. Barrett's motion to toll the statute of limitations, the Government's untimely disclosure of information previously undisclosed, and the need to conduct further investigation or difficulties in obtaining additional evidence; and, the Court's failure to rule on pending motions to vacate the protective order and permit discovery on newly disclosed information.  No undue delay is created by the amendments, which merely supplement, elaborate, clarify, and expand upon arguments already made.

The amendments for which leave to file is sought by Mr. Barrett do not evince "bad faith" or "dilatory motive."  Mr. Barrett has not lain behind the log, springing new arguments that do not relate back to the timely filing.  Rather, while the Court is still formulating its initial review, Mr. Barrett's counsel and those assisting them have continued to investigate and work on his

Petitioner's Motion for Leave to Supplement Amended Motion                                    Barrett v. USA
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence     6          OKED Case No. 6:09-cv-00105-JHP

972

case. Beyond that, any delay in the amendments or supplementation sought here is the direct result of the misconduct of the Government in its deliberate intent to hide the evidence now known, in part by intimidation, perjury, selective bad faith prosecution of the witness whose testimony is the primary basis of the pending amendments, and destruction of corroboration for that evidence.

There has been only one actual previous amendment to Mr. Barrett's §2255 motion, namely, the amendment timely and properly filed on September 25, 2009 under Rule 15(a)(1)(A), which by Court Order was transferred to a District Court's Indigent Prisoner §2255 form. (Docs. 74, 81). That properly amended motion was then transferred onto the Indigent Prisoner form at the direction of the Court. (Doc 95).

The amendment for which leave is sought is not "futile." Amendments are futile if "they assert clearly frivolous claims." *Riley,* 62 F.3d at 91 ("[t]hough we cannot say Riley will prevail on any of the [proposed amendments], we are equally unable to say the amendments he proposed are so unlikely to affect the outcome that they would be futile."); *Buder v. Merrill Lynch,* 644 F.2d 690, 695 (8th Cir. 1981). In the supplemental amendment, Mr. Barrett does not advance new claims that would be barred by the limitation period, and thus futile, as in *Mayle v. Felix,* 545 U.S. 644 (2005). The amendment elucidates, expands or clarifies matters already raised which relate back to the timely filed motion based on counsel's continuing investigation and research. The amendment simply asserts claims arising out of the "conduct, transaction or occurrence" set out before. *See Woodford v. Williams*, 263 F.3d 1135 (10th Cir. 2001); *United States v. Espinoza-Saenz*, 235 F.3d 501 (10th Cir. 2000); *cf. Felix, supra*, 545 U.S. at 664. Unlike the situation in *Felix* and similar cases, Mr. Barrett's proposed supplemental amendments "relate

Petitioner's Motion for Leave to Supplement Amended Motion
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence      7      Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

973

back" to the date of his timely filed motion under Rule 15( c)(1)(B), because they contain no new ground or grounds for relief supported by facts that differ both in time and type from those previously set forth.  The claims raised by Mr. Barrett are substantial, not frivolous.[1]

The Supplemental Motion sets out under each supplemented ground for relief the specific ground for relief to which  it relates back.

The grounds which Movant requests supplementation all relate to the proffered testimony of Paul Gordon, a retired OHP internal affairs investigator, and an interview with Hon. John Garrett, the presiding judge in the two state trials in which Movant faced a capital charge. The evidence pertains primarily to the previously alleged and currently pending claims of prosecutorial misconduct (Doc 95 Ground 5) and ineffective assistance of counsel (Doc 95 Ground 2) and to a lesser extent the claims of denial of due process and the presumption of innocence by the Court's order compelling Mr. Barrett to wear a visible stun belt during the proceedings (Doc 95 Ground 7), as well as judicial interference with the defense (Doc 95 Ground 1).

For reasons already alluded to, the amendment does not cause undue prejudice to the Government.  The amendment elaborates upon or clarifies claims already made in March, 2009. Counsel for Mr. Barrett did not "wait" to file the proposed amendment; they continued to collect

---

[1]  It is impossible for Mr. Barrett to say more regarding the relation-back doctrine because he has no notice whether this Court or the Government contests the timeliness of any part of the amended Petition.  Whether an amended claim relates back to an earlier filed claim is contingent both upon a comparison between two sets of facts alleged, and the substantive law governing the claim or claims. *See Felix, supra,* 545 U.S. at 664 & n.7.

Petitioner's Motion for Leave to Supplement Amended Motion
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence     8     Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

974

evidence, and filed when that evidence could be incorporated into the existing claims as supplements to the pending Motion to Vacate and the exhibits previously filed.

All the above demonstrates the court would abuse its discretion in not allowing the amendment.

**IV.   Conclusion**

Based on the foregoing arguments and authorities, Mr. Barrett respectfully requests that this motion be granted.

DATED March 16, 2012

Respectfully submitted,

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]

DANIEL J. BRODERICK
Federal Defender

/s/ Joan M. Fisher
JOAN M. FISHER
Idaho Bar No. 2854
801 I Street, 3rd Floor
Sacramento, CA 95814
(916) 498-6666
(916) 498-6656 [fax]

Attorney for Petitioner,
Kenneth Eugene Barrett

**Certificate of Service**

I hereby certify that on this 16TH day of March, 2012, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing.  A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401 and Jeffrey B. Kahan, U.S. Department of Justice, 1331 F Street, N.W., Washington, D.C. 20530.

/s/ Joan M. Fisher

Petitioner's Motion for Leave to Supplement Amended Motion
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence     10          Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

976

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Movant/Defendant, | ) | **DEATH PENALTY CASE** |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | NO.  6:09-cv-00105-JHP |
| | ) | |
| Respondent/Plaintiff. | ) | |

---

## SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR CORRECT A JUDGMENT, ORDER AND/OR SENTENCE UNDER 28 U.S.C. § 2255

---

## TABLE OF CONTENTS

TWENTIETH GROUND.

THE GOVERNMENT SUPPRESSED EXCULPATORY EVIDENCE WHICH WOULD HAVE COMPLETELY UNDERMINED ITS THEORY OF THE CASE AND SUPPORTED MR. BARRETT'S CLAIM OF SELF-DEFENSE.  THE GOVERNMENT KNOWINGLY SPONSORED FALSE EVIDENCE IN CONFLICT WITH THE EXCULPATORY EVIDENCE IT SUPPRESSED.  MR. BARRETT WAS THEREFORE DENIED HIS FIFTH AMENDMENT DUE PROCESS RIGHTS, HIS RIGHT TO A FAIR TRIAL, AND HIS EIGHTH AMENDMENT RIGHTS TO A RELIABLE SENTENCING DETERMINATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

1.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2.      Facts supporting the claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

TWENTY-FIRST GROUND.

APPOINTED TRIAL COUNSEL'S FAILURE TO REASONABLY INVESTIGATE THE RELEVANCY AND MATERIALITY OF INFORMATION KNOWN TO THE OKLAHOMA HIGHWAY PATROL INTERNAL AFFAIRS INVESTIGATOR AND TO CALL HIM AS A WITNESS TO  TESTIFY TO THE FALSE VERSION OF EVENTS PRESENTED BY THE GOVERNMENT WAS PREJUDICIAL TO AND DEPRIVED MR. BARRETT HIS CONSTITUTIONALLY AND STATUTORILY GUARANTEED RIGHTS TO THE EFFECTIVE ASSISTANCE OF QUALIFIED AND COMPETENT ATTORNEYS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

1.      Availability of Mr. Gordon to Testify. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

2.      Summary of Paul Gordon's Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

3.      Specific Acts of Prejudicial Deficient Performance by Trial Counsel. . . . . . . . . 16

    a.      Mr. Barrett's Counsel unreasonably failed to investigate and present the testimony of Paul Gordon to refute the affidavit supporting the Search warrant to support the *Franks v. Delaware* reconsideration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    b.      Trial counsel failed to investigate, interview, and present testimony of a critical material witness,  Mr. Paul Gordon, retired OHP Internal Affairs Investigator, that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for acquittal or conviction of a lesser offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Supplemental Motion to Vacate, Set Aside                                    Barrett v. USA
or Correct Judgment, Order and/or Sentence          -i-          OKED Case No. 6:09-cv-00105-JHP

978

i.       The Mission Should Have Been Aborted. . . . . . . . . . . . . . . . . . 19

ii.      There was No Emergency Lighting Activated Identifying Law
         Enforcement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

iii.     There is credible substantive and impeaching evidence
         through Paul Gordon's Interviews and Investigation that a
         member of the OHP East Tact Team, not Mr. Barrett. initiated
         the gunfire.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

iv.      Information known to OHP indicated Mr. Barrett would run
         from  to law enforcement.  . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

v.       Credible evidence undeveloped by trial counsel would have
         shown that Mr. Barrett did not have a pill bottle with red
         phosphorous residue in his pocket.  . . . . . . . . . . . . . . . . . . . . . 24

vi.      After arrest, Mr. Barrett was beaten by the Sheriff and two of
         his deputies. Denials that a beating was administered
         were false.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

c.    Trial Counsel was constitutionally ineffective for failing to call Mr.
      Gordon to refute the legitimacy of the experiment of Iris Dally
      both as a fact witness and expert witness.  . . . . . . . . . . . . . . . . . . . . . 27

d.    Trial Counsel's failure to interview, prepare and present the
      testimony of Mr. Gordon regarding the OHP witnesses and the
       lack of adherence to any reasonable protocol, including their own,
      in the execution of the High Risk Warrant which created Mr.
      Barrett's reasonable belief that he was being attacked by unknown
      criminals and the OHP witnesses's continuous efforts to avoid
      disclosing the same fell far below prevailing norms and wholly
      undermined the reliability of the verdicts and sentence
      in this case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

TWENTY-SECOND GROUND.
      MR. BARRETT'S COUNSEL UNREASONABLY FAILED TO INVESTIGATE AND
      PRESENT THE TESTIMONY OF THE HONORABLE JOHN GARRETT, WHO
      COULD HAVE TESTIFIED TO THE REPUTATIONS FOR TRUTH AND VERACITY
      OF SANDERS AND JOHNSON. THE TESTIMONY WOULD HAVE REASONABLY
      LED TO A DIFFERENT OUTCOME ON THE *FRANKS* ISSUE.  . . . . . . . . . . . . . . . . 29

TWENTY -THREE GROUND.
THE COURT'S FAILURE TO CONSIDER SIGNIFICANT AND READILY
AVAILABLE EVIDENCE TO SUPPORT A FINDING THAT USE OF A STUN BELT
WAS UNNECESSARY, AND TRIAL COUNSEL'S FAILURE TO URGE
CONSIDERATION OF THE SAME, DEPRIVED MR. BARRETT OF DUE PROCESS
AND THE EFFECTIVE ASSISTANCE OF COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . 30

TWENTY-FOURTH GROUND.
MR BARRETT WAS UNCONSTITUTIONALLY PREJUDICED BY THE TRIAL
COURT'S INTERFERENCE WITH HIS DEFENSE WHICH COMPELLED MR. JOHN
ECHOLS TO WITHDRAW BECAUSE MR. ECHOLS KNEW OF AND WOULD
HAVE PURSUED THE POTENTIAL TESTIMONY OF RETIRED TROOPER
GORDON. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

TWENTY- FIVE GROUND.
MR. BARRETT'S CONVICTION AND SENTENCE MUST BE VACATED
DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS
IN THIS CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Supplemental Motion to Vacate, Set Aside                                    Barrett v. USA
or Correct Judgment, Order and/or Sentence            -iii-            OKED Case No. 6:09-cv-00105-JHP

980

**APPENDICES INDEX**

Appendix A
   Audio Tape at Crime Scene by Paul Gordon on September 24, 1999 . . . . . . . . . . . . . A-1

Appendix B
   Crime Scene Videotape by Paul Gordon on September 24, 1999   . . . . . . . . . . . . . . B-1

Supplemental Motion to Vacate, Set Aside                   Barrett v. USA
or Correct Judgment, Order and/or Sentence      -iv-      OKED Case No. 6:09-cv-00105-JHP

981

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Movant/Defendant, | ) | **DEATH PENALTY CASE** |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | NO.  6:09-cv-00105-JHP |
| | ) | |
| Respondent/Plaintiff. | ) | |

———————————————————

**SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR CORRECT A JUDGMENT, ORDER AND/OR SENTENCE UNDER 28 U.S.C. § 2255**

———————————————————

COMES NOW, Movant, KENNETH EUGENE BARRETT, by and through his undersigned counsel, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, Rule 2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct the sentence based on the Grounds previously alleged in Mr. Barrett's Amended §2255 Motion to Vacate Judgment/Order/Sentence (Doc 95) supplemented by the Grounds alleged herein which specifically relate back to the Grounds raised in the § 2255 Motion to Vacate (Doc 95) now pending.

Mr. Barrett states for relief requested the following supplemental grounds:

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                    1                    Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

982

**TWENTIETH GROUND**

**THE GOVERNMENT SUPPRESSED EXCULPATORY EVIDENCE WHICH WOULD HAVE COMPLETELY UNDERMINED ITS THEORY OF THE CASE AND SUPPORTED MR. BARRETT'S CLAIM OF SELF-DEFENSE.  THE GOVERNMENT KNOWINGLY SPONSORED FALSE EVIDENCE IN CONFLICT WITH THE EXCULPATORY EVIDENCE IT SUPPRESSED.  MR. BARRETT WAS THEREFORE DENIED HIS FIFTH AMENDMENT DUE PROCESS RIGHTS, HIS RIGHT TO A FAIR TRIAL, AND HIS EIGHTH AMENDMENT RIGHTS TO A RELIABLE SENTENCING DETERMINATION.**

### 1.  Introduction

The Government's theory of the case, based on the testimony of the OHP Tact Team members, was that Mr. Barrett knew full well that the individuals who entered his property on the night of September 24, 1999 were law enforcement officers, because the emergency lights on at least some of the vehicles were engaged from the very inception of the raid.  Therefore, Mr. Barrett shot Trooper Eales knowing or having reason to know that he was a law enforcement officer, and killed him based on this knowledge while Trooper Eales was engaged in his official duties.   Several of the informant witnesses, who testified that Mr. Barrett had threatened to shoot or kill any law enforcement officer or officers who came on his property, lent support to this theory.  Taking these witnesses together, the Government argued that Mr. Barrett made good on his alleged threats because he knew, at the time he fired his weapon and shot and killed Trooper Eales, that he was firing at law enforcement officers.  The Government also relied on the testimony of Charles Choney, an expert on SWAT tactics who was inexplicably called by the defense.  Choney testified that the raid was properly conducted and that the members of the OHP Tact Team "did nothing wrong."

Charges of manufacturing and/or attempting to manufacture methamphetamine provided jurisdiction for this federal prosecution.  One of the key pieces of evidence for the underlying

Supplemental Motion to Vacate, Set Aside or Correct Judgment, Order and/or Sentence                    2                    Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

983

drug charges was that a quantity of red phosphorous, an ingredient in the manufacturing of methamphetamine, was found on Mr. Barrett's person by local law enforcement when he was searched following the shooting.

The defense argued that due to the manner in which the raid was conducted, Mr. Barrett was unaware that law enforcement was on his property, and that he reasonably believed he was acting in defense of himself and his son, Toby Barrett.  With respect to the underlying drug charges, the defense argued that the evidence was insufficient to support them because no working lab was found on the property and only trace amounts of methamphetamine were found.

These arguments foundered because critical exculpatory evidence which would have supported them and thoroughly discredited the Government's version of events was not disclosed by the prosecution.  The exculpatory evidence suppressed by the Government, which went to the manner in which the raid on Mr. Barrett's property was actually conducted, would have shown that Mr. Barrett reasonably believed that trespassers, not law enforcement, were on his property, and that he justifiably used lethal force to repel them.  Along with discrediting the "official" version of events, this exculpatory evidence would have rendered irrelevant the testimony from the informant witnesses that Mr. Barrett had threatened to shoot or kill any law enforcement officer who came on his property.

**2.  Facts supporting the claim**

Paul Gordon was the OHP internal affairs investigator who responded to Mr. Barrett's property at the direction of his superiors on the night of the shooting.  Mr. Gordon has extensive experience both with OHP and other law enforcement.  (Declaration of Paul D. Gordon in Support of §2255 Motion to Vacate (Doc 95) and Supplemental 2255 Motion herein ("Gordon Dec") at 1-2 ¶ 4)  He was responsible for investigating the shooting and reconstructing the crime

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                    3                    Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

984

scene.  The Government failed to disclose exculpatory facts and conclusions from his investigation, and, along with agents of State government relied upon in the Government's case, acted improperly to prevent Gordon from being a credible witness.  The exculpatory facts and conclusions the Government failed to disclose include:

• Contrary to the testimony of the OHP Tact Team witnesses, including Trooper Kerry Pettingill, Pettingill told Mr. Gordon that he believed members of the Tact Team *fired weapons* when they "rolled up" on Mr. Barrett's property.  (Gordon Dec at 3 ¶ 8)  This would obviously support Mr. Barrett's claim of self-defense.  The prosecution knowingly introduced false evidence from the OHP witnesses which portrayed any shooting by the OHP Tact Team as purely defensive in character.

• Contrary to the testimony of the OHP Tact Team witnesses (and defense witness Chuck Choney, who was quickly converted into a prosecution witness both on direct and cross-examination), the raid was poorly planned, lacked adequate intelligence and surveillance, and directly violated OHP policies and procedures for an arrest of an alleged "high risk" fugitive. Tact Team vehicles entered Mr. Barrett's property without warning that law enforcement was on the premises.  This violated OHP policy that an announcement should be made for the safety of all concerned.  Otherwise, just as occurred in this case, the target might believe trespassers (for example, rivals from the drug world) are invading his property and react violently in apparent self-defense.  (Gordon Dec at 3, 6, 9-10, 15, 17, 19 ¶¶ 10, 15, 22-24, 43, 50, 56)  Mr. Barrett's belief that trespassers had roared onto his property was heightened by the fact the OHP "drive by" on the afternoon preceding the raid was made in what appeared to be a civilian vehicle. (Gordon Dec at 11 ¶ 24)

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                    4                    Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

985

In brief, Mr. Gordon concluded "[t]he Manual and Training Videos available to the East Tact Team at the time make it clear that on September 24, 1999, the manner of serving or executing the High Risk Warrant/s on Kenneth Barrett was against protocol, grossly unprofessional and created far greater risk of injury or death than the situation would have presented if appropriate planning and measures had been taken." (Gordon Dec at 19 ¶ 56)

This conclusion from Mr. Gordon's investigation clearly conflicted with the prosecution theory and testimony, and supported Mr. Barrett's defense that he acted in self-defense while thinking criminal trespassers had invaded his property.  To the extent OHP witnesses testified that the raid was properly planned, was based on adequate intelligence and surveillance, and was executed "by the book," the prosecution knowingly sponsored false testimony.

The problems with the planning, intelligence and surveillance in connection with this raid were so pronounced that OHP Lieutenant McBride, who was delegated from his usual position on the West Tact Team to the East Tact Team for this particular operation, advised that the raid be aborted.  Lieutenant McBride was told to go back to the West Tact Team if he disagreed with the way the raid was going to be conducted.  Lieutenant McBride was extremely upset and emotional when he related this to Mr. Gordon.  (Gordon Dec at 17 ¶ 50)

It is Mr. Gordon's view that had the OHP conducted adequate, real-time surveillance as directed by policy, Mr. Barrett could have been arrested, likely without incident, while he and his son Toby were working on a vehicle the day of the raid.  (Gordon Dec at 11 ¶ 24)  Based on the limited intelligence that was available, Mr. Barrett's likely reaction to law enforcement presence on his property would be to attempt to flee on foot.  This was supported not only by the fact that OHP personnel were stationed at adjoining residences at the time of the raid, but by statements made to Mr. Gordon by Troopers Manion and Hise.  (Gordon Dec at 11-12 ¶ 24)  Therefore, a

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                    5                    Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

986

sudden confrontation without warning involving numerous vehicles charging onto the property in the middle of the night was an ill-advised and improper tactic, aside from the fact that it violated OHP protocol to begin with. (Gordon Dec at 3, 6, 9-10, 15, 17, 19 ¶ 10, 15, 22-24, 43, 50, 56, )

   • Against the testimony of the OHP Tact Team witnesses, the members of the Tact Team *did not* engage their emergency lights during the raid. Indeed, no vehicle lights were engaged. The Tact Team "rolled in dark." (Gordon Dec at 10, 12 ¶¶ 23, 25) The Government knowingly sponsored false testimony to the effect that Mr. Barrett was "warned" of the law enforcement presence because emergency lights were activated on some of the vehicles from the inception of the raid.

   Trooper Hamilton, who drove the lead Ford Bronco in which Trooper Eales was a passenger, initially told Mr. Gordon that the "flip lights" on the vehicle's visor had been engaged, but later admitted he did not engage these or any other emergency lights. The physical evidence itself showed that the "flip lights" had not been activated. Had the visors been lowered and the "flip lights" engaged, they would have been shot out by the rounds fired by Mr. Barrett through the windshield of the Bronco, but this did not happen. (Gordon Dec at 10, 12 ¶¶ 23, 27-28 )

   Task Force Agent Frank Lloyd, who arrived on the scene in the immediate aftermath of the shooting, told Mr. Gordon that he could see the tail lights of the OHP vehicles when they turned onto Mr. Barrett's drive, but mentioned nothing about seeing any emergency lights. (Gordon Dec at 12 ¶ 26)

   One of the key "facts" elicited and argued by the prosecution at trial for the proposition that Mr. Barrett "knew" law enforcement officers rather than trespassers were on his property was that Trooper Hash, who was in a marked unit, drove onto the property with his lights and flashing bar on. This is what Trooper Hash initially told Mr. Gordon, and what he testified to at

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence
6
Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

987

trial, but Hash ultimately admitted to Mr. Gordon that "somebody just flipped the lights on after the shooting to give needed light during the wounded trooper's evacuation."  (Gordon Dec at 13 ¶ 26)

Likewise, Mr. Gordon's investigation revealed that no emergency lights on Lieutenant Pettingill's vehicle were engaged.  Had emergency lights on Pettingill's vehicle been activated, they would have been seen by Mr. Barrett had he looked in that direction.  However, when Mr. Gordon examined Pettingill's vehicle, the flip lights were in the "up" position.  These lights would not have been engaged because they would have impaired the view Trooper McBride, the assistant team leader, who was stationed near Mr. Barrett's mother's residence.  (Gordon Dec at 13 ¶ 30)

• Mr. Gordon's evaluation of the physical evidence, coupled with interviews of the troopers, supports Mr. Barrett's claim that he was unaware law enforcement was on his property because he was not at a vantage point to see the vehicles, including the lead Bronco driven by Trooper Hamilton, which entered from the east.  Most of the shots fired by Mr. Barrett were fired from inside the cabin.  For the brief period of time he was on the porch, his attention was directed to the west where his son was crying for help.  Mr. Barrett first fired his weapon after Trooper Hamilton struck his cabin with the lead Bronco.  (Gordon Dec at 13, 15-16 ¶¶ 31-32, 44)

• Mr. Gordon's analysis of the crime scene confirmed what the defense attempted to argue at trial – that Hamilton's vehicle indeed struck the cabin, and was later moved back. Lieutenant Pettingill confirmed this to Mr. Gordon, as did the location of various items of physical evidence.  Government testimony to the effect that Trooper Hamilton's Bronco did not strike Mr. Barrett's cabin was knowingly false.  The after-the-fact placement of the Bronco away from Mr. Barrett's cabin compromised, and rendered false, the crime scene reconstruction and

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                    7                    Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

988

trajectory analysis done by the OSBI's Iris Dalley, as well as the processing of the vehicle itself done by the OHP's Vernon Phillips.  When Mr. Gordon tried to advise his supervisors, Lieutenant George Randolph and Captain Rodney Burris, that "the vehicle was being processed in the wrong place and would give the wrong evidentiary information about location and bullet angle(s)," he was brushed off and told to stay out of it, because it was the OSBI's investigation. (Gordon Dec at 14-15 ¶¶ 33- 40)

• The conclusions drawn by Mr. Gordon in his investigation also would have critically undermined the drug charges against Mr. Barrett.  Even taken in their most flattering light, the drug charges were weak.  There was no working lab on the property.  Only a trace amount of methamphetamine was found, and this was located in the trailer used by Mr. Barrett's son, Toby.  The overwhelming majority of the instrumentalities the Government claimed could be used for a meth lab were ordinary household goods or mechanical implements.

As alluded to above, Sequoyah County Sheriff John Philpot testified at trial that during a search of Mr. Barrett's person conducted by his officers after he was removed from the cabin by OHP officers, a quantity of red phosphorous, an ingredient in the manufacture of methamphetamine, was found in his pants pocket.  However, when Sheriff Philpot was interviewed by Mr. Gordon on the night of the raid and was asked whether he or his officers found anything dangerous on Mr. Barrett, he replied "no," even though it is well-recognized by any experienced law enforcement officer that red phosphorous is a highly toxic, dangerous substance.  Had Philpot stated red phosphorous was found on Mr. Barrett, Mr. Gordon would have immediately alerted the troopers to this fact and advised them to begin decontamination procedures.   Philpot admitted to Mr. Gordon that he and his deputies severely beat Mr. Barrett after he was removed from the cabin, and would have done more had there not been other people

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                8                Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

989

around. Significantly, the "red phosphorous" *was not found* when Mr. Barrett was searched by Trooper Manion after he was removed from the cabin by Trooper Hamilton. (Gordon Dec at 16-17 ¶¶ 45-49)

According to Mr. Gordon, the manner in which the scene was searched and processed completely belied the Government's later claim that Mr. Barrett was manufacturing or attempting to manufacture methamphetamine. None of the precautionary measures used by law enforcement for taking down a meth lab or a suspected meth lab were undertaken. (Gordon Dec at 18-19 ¶¶ 57- 55)

• The conduct of the powers that be at the Oklahoma Highway Patrol toward Mr. Gordon and his internal affairs investigation was also exculpatory evidence suppressed by the Government. As stated in Mr. Gordon's declaration, his efforts to conduct an objective investigation, going wherever the facts led him, were blocked at virtually every turn by his superiors at OHP. OHP administration in effect embarked on a cover-up of the actual events of September 24, 1999.

Against policy, Mr. Gordon was denied timely access to the Tact Team members for formal interviews. He had to wait ten or more days after the incident to interview them. While Mr. Gordon was prevented from doing timely interviews, the members of the Tact Team "lawyered up" with OHP outside counsel Gary James. (Gordon Dec at 4, 6 ¶¶ 11, 16) In violation of standard policy for internal affairs investigations involving a shooting, the Tact Team members initially refused to turn over their weapons for forensic testing. (Gordon Dec at 4 ¶ 11) When Mr. Gordon was finally permitted to interview the Tact Team members, questions he would ordinarily ask in any investigation involving a law enforcement raid which resulted in a shooting were ruled out of bounds by his superiors, and he was limited to asking a set of

questions "pre-approved" by Lieutenant George Randolph, which were designed to obscure the truth rather than reveal it.  (Gordon Dec at 6-9 ¶¶ 17-19)   If Tact Team members did not like any question asked by Mr. Gordon, they were not required to answer.  (Gordon Dec 8-9 ¶ 19)  Mr. Gordon tape recorded the interviews he was eventually able to conduct with the Tact Team (Gordon Dec 8-9 ¶ 19), but these tapes were apparently not turned over to the defense by the Government.  Mr. Gordon was constantly exhorted to be a "team player," and his attempt to conduct an objective investigation was met with hostility and roadblocks within OHP.  (Gordon Dec at 3, 6, 19-20 ¶¶ 10, 15, 57-58,)  At one point, a summary of Mr. Gordon's report was taken from his office computer without permission.  (Gordon Dec at 19 ¶ 58)  Mr. Gordon was at a loss to explain this resistance if, as was claimed, the Tact Team had done nothing wrong when it attempted to serve the warrant on Mr. Barrett.   (Gordon Dec at 4 ¶ 11)  Because Mr. Gordon attempted to conduct a thorough, objective investigation and was perceived as not being a "team player," he was even told that he could not attend Trooper Eales' funeral. (Gordon Dec at 4 ¶ 11)

Mr. Gordon was also admonished for tape recording his interview of Sequoyah County prosecutor Diane Barker-Harrold, one of the "dignitaries" who tagged along with the Tact Team to observe the raid, even though the use of tape recorders in interviews was standard procedure. When asked by Mr. Gordon about the informant who supplied information for the warrant, Barker-Harrold stated "we" were aware of the informant's identity, but she refused to reveal it. Barker-Harrold complained about her interview being tape recorded to OHP, and OHP Captain Rodney Burris told Mr. Gordon he was to have no further contact with her.  (Gordon Dec at 5-6 ¶¶ 13-14)

Significantly, OHP administration even refused to provide Mr. Gordon with the policy manual for the East Tact Team, a document which was, to say the least, highly relevant if Mr.

Gordon were to conduct a competent investigation into whether the Tact Team had acted appropriately or against training and policy.   Kerry Pettingill told Mr. Gordon that the Tact Team manual was "not available" and that he would "never see this book."  A few days later, the policy manual or handbook mysteriously appeared in Mr. Gordon's office among debris and trash that had been placed on the floor.  Mr. Gordon's review of the handbook showed that the Tact Team had failed to adhere to policy in its raid on Mr. Barrett's home.  Against policy, the Ford Broncos used in the raid were unmarked, no warning that law enforcement was on the premises was given, and emergency lighting was not engaged on the vehicles.  (Gordon Dec at 9-10 ¶¶ 20-23)

Due to the fact that Mr. Gordon tried to conduct an objective, fact-based investigation into the circumstances which led to Trooper Eales' death, he was constantly harassed by his superiors at OHP and ultimately decided to retire.  In further retaliation for his efforts, the State of Oklahoma manufactured bogus criminal charges against Mr. Gordon for misappropriation of state funds for taking unapproved "comp time" and misuse of a state telephone, even though the comp time taken by Mr. Gordon and his use of a state telephone had been approved by his superiors and was authorized by informal policy within OHP.  An internal audit later revealed that two of the witnesses against Mr. Gordon, Lieutenant Gordon and Captain Burris, had given false testimony before the grand jury investigating Mr. Gordon.  In order to bring his ordeal to an end, Mr. Gordon ultimately entered a no contest plea to the charges in exchange for a five year deferred sentence, which has since been expunged.  (Gordon Dec at 20-26 ¶¶ 59-82)

The politically motivated criminal charges against Mr. Gordon were brought in retaliation for his internal affairs investigation of Trooper Eales's shooting and to adversely affect his credibility as a witness in any trials involving Mr. Barrett.  State authorities thus sought to prevent Mr. Barrett from having exculpatory evidence in aid of his defense.  Mr. Gordon did not

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                11                Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

992

testify in Mr. Barrett's state trials, although he shared at least some of the information he gleaned from his investigation with state trial counsel John Echols and Judge John Garrett, who presided at the trials.  (Gordon Dec at 25-26 ¶ 81-84)

Former Assistant United States Attorney Mike Littlefield also acted to suppress Mr. Gordon's exculpatory evidence by threatening him in connection with the federal trial.  In a telephone conversation, Littlefield sought to intimidate Mr. Gordon, telling him that because of his deferred sentence, Littlefield was going to tear Mr. Gordon up on the stand and that Mr. Gordon did not know what he was talking about because he was not a trained in SWAT tactics and procedures.  After being berated by Littlefield in this initial phone call, Mr. Gordon later called him back and informed him that he had received training in these areas by the United States Marshal's service.  After being told this, Littlefield told Mr. Gordon that he did not need to worry about having to testify in the federal trial.  (Gordon Dec at 27 ¶ 85)

The above facts, and the facts recited in Mr. Gordon's declaration, show that the prosecution suppressed material exculpatory evidence.  There is a reasonable probability that had this evidence been heard by Mr. Barrett's jury, the outcome of the guilt-innocence stage of trial would have been different.  At a minimum, this evidence also undermines the reliability of Mr. Barrett's death sentence.

This supplemental ground for relief relates back to Ground 5 of Mr. Barrett's amended § 2255 motion.  (Doc. 95)  There, it was alleged that in numerous respects, the Government suppressed exculpatory evidence and sponsored false testimony, including with respect to law enforcement officers.

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                    12                    Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

993

## TWENTY-FIRST GROUND.

**APPOINTED TRIAL COUNSEL'S FAILURE TO REASONABLY INVESTIGATE THE RELEVANCY AND MATERIALITY OF INFORMATION KNOWN TO THE OKLAHOMA HIGHWAY PATROL INTERNAL AFFAIRS INVESTIGATOR AND TO CALL HIM AS A WITNESS TO TESTIFY TO THE FALSE VERSION OF EVENTS PRESENTED BY THE GOVERNMENT WAS PREJUDICIAL TO AND DEPRIVED MR. BARRETT HIS CONSTITUTIONALLY AND STATUTORILY GUARANTEED RIGHTS TO THE EFFECTIVE ASSISTANCE OF QUALIFIED AND COMPETENT ATTORNEYS.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett was denied his statutory and constitutional rights to the effective assistance of counsel by his trial counsel's failure to competently and reasonably investigate, engage, interview, prepare, corroborate and present the testimony of Retired OHP Internal Affairs Investigator Paul D. Gordon, now submitted and proffered to the Court by Notice of Filing the same in support of Mr. Barrett's pending Sec. 2255 Amended Motion to Vacate (Doc 95), his Motion to Supplement the Pending Sec. 2255 Amended Motion to Vacate and this document, his Supplemental Motion to Vacate, to be lodged with the Court pending his Motion to Supplement. Had trial counsel interviewed Mr. Gordon in any meaningful way, they would have known that Mr. Gordon's testimony would credibly and materially support Mr. Barrett's substantive defense that Mr. Barrett did not know the trespassing vehicles carried law enforcement officials. Counsel would have acquired significant corroborating evidence from Mr. Gordon to show that, from the time of Trooper Eales' death and throughout the federal trial, OHP engaged in unethical and illegal conduct to hide the truth of the planning and execution of the raid.

The testimony of Mr. Gordon would have irreparably undermined the Government's case substantively and through the impeachment of its law enforcement witnesses to such an extent

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence     13     Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

994

that there is a reasonable probability that Mr. Barrett would now not stand convicted of capital murder and the charges which resulted in sentences of death and life without parole. Had this evidence been reasonably investigated and produced at trial, there is a reasonable probability that Mr. Barrett would have been acquitted or, at a minimum, been convicted of lesser charges. Alternatively, counsels' failure to reasonably investigate and introduce this evidence led to an unreliable death sentence.

This claim relates back to Mr. Barrett's Ground Two, which raises numerous acts of constitutionally ineffective assistance of counsel. Doc 95 at 33 *et seq.*

## 1.      Availability of Mr. Gordon to Testify.

The record is clear that Mr. Gordon was available to testify at Mr. Barrett's trial in this case. (Gordon Dec at 31 ¶ 93) Defense counsel was aware of Mr. Gordon, listed him as a defense witness and subpoenaed him. According to Mr. Gordon, he was contacted by an investigator for the defense, who asked no substantive questions. (Gordon Dec at 27 ¶ 85) When he received a subpoena from the defense, it was Mr. Gordon who called Mr. Hilfiger, not the other way around. *Id.* The conversation was extremely short and insubstantial and was prematurely aborted by Mr. Hilfiger's dismissive remark about Mr. Gordon's "relationship" with Barrett. (Gordon Dec at 27 ¶ 85) Had trial counsel made even minimal effort in his defense of Mr. Barrett, he would have been aware that Mr. Gordon's knowledge of the events resulting in Trooper Eales' death had served Mr. Barrett well in his state trials through Mr. Gordon's non-testimonial cooperation with Mr. Echols.

Mr. Gordon was available to testify for Mr. Barrett at the federal trial. (Gordon Dec at 27 ¶ 93) He had relevant, material information which he would have presented to the jury if called to testify. That testimony would have revealed a continuing conspiracy on the part of law

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                 14                 Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

995

enforcement to misrepresent their actions and avoid responsibility for the death of Trooper Eales. Defense counsel were woefully uninformed by inadequate preparation and resources and failed to understand the facts and circumstances leading to Mr. Barrett's deadly predicament.  By not calling Mr. Gordon as a witness, the defense lost their best opportunity to persuade the jury that Mr. Barrett's actions were in defense of himself and his son under the circumstances.  Mr. Barrett had only a very few seconds to comprehend the nature of the attack on his home in the middle of the night by unknown and unidentified persons wielding automatic weapons.

**2.        Summary of Paul Gordon's Testimony**

If called and questioned accordingly, Mr. Gordon shown would have testified that the planned execution of the no-knock nighttime warrant was based on insufficient intelligence and realtime surveillance and thus, should not have taken place at all. (Gordon Dec at 10 ¶ 24 (f))  As outlined above in Ground Twenty, and contrary to testimony presented at Mr. Barrett's trial, the information known to the troopers when they intruded onto Mr. Barrett's property was that Mr. Barrett was likely to run away individuals he knew to be law enforcement, not respond with violence.

Beyond supporting Mr. Barretts claim that no emergency lighting was activated and there was no meth lab on Mr. Barrett's property (Gordon Dec at 17 ¶¶ 51-55) , Gordon's interviews of the troopers confirm the very real possibility that the gunfire was initiated by OHP and not Mr. Barrett.  According to Jim McBride and Danny Oliver, the initial gunfire heard was from an automatic weapon. ("Gordon Dec" Exh 11 at p. 7 (McBride interview); Exh 15 at 8 (Oliver Interview))  Mr. Barrett had no automatic weapons.  When Lt. Pettingill spoke to Mr. Gordon on the scene shortly after the shooting, he specifically said that he thought it was his people firing. Exhibit A, referenced in Gordon Dec at  30 ¶ 93 (a) (a hard copy of which will be submitted to

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                        15                        Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

996

the Court).

**3. Specific Acts of Prejudicial Deficient Performance by Trial Counsel.**

    a.    **Mr. Barrett's Counsel unreasonably failed to investigate and present the testimony of Paul Gordon to refute the affidavit supporting the Search warrant to support the *Franks v. Delaware* reconsideration.**

The failure to competently investigate and reargue the *Franks v. Delaware* motion after it was disclosed that Monk Sanders was the alleged informant, and after Sanders testified, as alleged in the Amended § 2255 Motion to Vacate (Doc 95) is particularly egregious based on the testimony that would have been available to counsel had they simply taken the opportunity to talk to Mr. Gordon, a named defense witness. Mr. Gordon's observations of the entry into Mr. Barrett's home and buildings made clear that the law enforcement on the scene had no reason to believe that Mr. Barrett was manufacturing meth on the premises. *See* Gordon Dec at 17 §§51-55.

    Mr. Gordon would have testified:

> Mr. Barrett's property was thoroughly searched the morning of the shooting. This included agents going layer by layer through the ashes in his burn barrel behind the cabin. There was nothing found that I observed which indicated drug activity nor was I ever advised that anything had been found by anyone.
> I was never advised that there was any information to support an anticipated finding of drug manufacturing at Barrett's residence but rather was informed that Mr. Barrett was believed to be an enforcer, *i.e.,* he facilitated sales of drugs between buyers and sellers who might not want to deal directly with each other.
> There was no air monitoring device at the scene and I did not see any of the investigators wearing special gear consistent with an active meth lab.
> Prior to entering the premises to videotape the inside of the cabin, the property was cleared by Vernon Phillips, who was an OHP tactical team member and Explosive Ordinance Disposal ["EOD"] expert and per meth lab requirements, would have alerted everyone to any possibility of booby traps or dangerous drug activity in the residence.
> I entered the premises without any special personal protective equipment, such as eye protection, vinyl rubber gloves, special protective clothing, or rubber boots. Where exposure levels are unknown, persons entering a potentially dangerous area would wear a full-face, positive-pressure, and air-supplied

Supplemental Motion to Vacate, Set Aside                      Barrett v. USA
or Correct Judgment, Order and/or Sentence     16         OKED Case No. 6:09-cv-00105-JHP

997

respirator.   I was not instructed to discard contaminated clothing or shoes, which would have been the case if a meth lab was present in any one of its three forms: boxed; set-up not functional; or, set up functional cooking.
The Manual and Training Videos available to the East Tact Team at the time make clear that on September 24, 1999, the manner of serving or executing the High Risk Warrant/s on Kenneth Barrett was against protocol, grossly unprofessional and created far greater risk of injury or death than the situation would have presented if appropriate planning and measures had been taken.

(Gordon Dec at 17-18 ¶¶ 51-56); *see also*, Gordon Dec Exh Nos. 2, 3, 4.

Mr. Barrett was seriously prejudiced by the constitutional shortcomings of his appointed counsel by their failure to challenge the alleged drug evidence in a *Franks v. Delaware* hearing. Had trial counsel properly prepared and reasonably interviewed Mr. Gordon, together with the available testimony and documentation set out in Mr. Barrett's Motion to Vacate (Doc 95 at 33-47) and the available testimony of Judge Garrett, set out below in Claim 23, there is a reasonable probability that upon reconsideration, the Motion to Suppress would have been granted, the result of which would have been either a likely refusal of further federal prosecution, or an acquittal of the same.

This subclaim relates back to sub-claim 2(A)(2), *i.e.*,  Failure to Competently Reargue *Franks v. Delaware* Claim (Doc 95 at 34) and if merged in the pending Second Amended §2255 Motion to Vacate, would be inserted prior to the first full paragraph at page 46 of Doc 95.

> **b.** **Trial counsel failed to investigate, interview, and present testimony of a critical material witness,  Mr. Paul Gordon, retired OHP Internal Affairs Investigator, that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for acquittal or conviction of a lesser offense.**

In the transcripts and records of Mr. Gordon's interviews and investigation lies a treasure trove of impeachment untapped by trial counsel.  Portions of the interview transcripts were very effectively used by state trial counsel, John Echols, to impeach law enforcement witnesses in the state trial.  They were not used ineffectively, or not at all, by defense counsel in Mr. Barrett's

federal trial. Counsel's failure to effectively present the contents of the interviews, including and beyond the content of the transcripts themselves, to impeach the law enforcement witnesses through the testimony of Paul Gordon is indefensible and far below the minimum standards of prevailing professional norms. The factual issues raised at trial, which could have been resolved in Mr. Barrett's favor by reasonable lawyering include: whether the no-knock nighttime warrant was justified based on the information conveyed to the troopers; when, if at all, the emergency lighting was activated during the warrant execution; who initiated the gunfire; where did the lead OHP Bronco eventually stop and why it was moved prior to the trajectory analysis experiment; and once moved, was the Iris Dalley dowel rod scientific experiment reliable or accurate; and, whether Mr. Barrett was severely beaten at the time of his arrest, with "red phosphorous" planted on him.

Trial counsel was professionally unreasonable for failing to investigate, prepare and introduce testimony from then 2d Lt. Gordon that would have seriously undermined and rebutted the Government's theory as to how the shooting occurred, and whether the police made their official presence known by the use of emergency lighting. Mr. Gordon's proffered testimony also shows that the actions of the Tact Team fell outside professional standards for law enforcement and that the use of unprofessional procedures that minimized the chances of being recognized as law enforcement was reckless and cost Trooper Eales his life.

Trial counsel failed to reasonably investigate and present credible evidence, including the testimony of Mr. Paul Gordon and the witnesses and documents to which his testimony or information would have led, that would have substantively supported Mr. Barrett's defense and credibly refuted the testimony of law enforcement regarding the controverted issues.

*i. The Mission Should Have Been Aborted.*

If appointed defense counsel had contacted Mr. Gordon and questioned him in a manner which reflected the theory of the defense and a working knowledge of the Government's case, counsel would have discovered that Lt. McBride told Mr. Gordon and others that the mission should have been aborted due to insufficient intelligence and surveillance. Mr. Gordon would also have testified that after the formal interview,

> McBride became very emotional and told [Gordon] that he had recommended that East Tact Team abort the mission because the raid was going to be undertaken with inadequate information and planning and no real surveillance had been conducted, but his advice was not taken. McBride was advised by the East Team to go back to the West Team if he did not want to participate. McBride was so upset over what happened that he began crying by the end of the interview.

Gordon Dec at 16 ¶ 50.

Had the statements of Mr. McBride been presented to the jury either through admissions extracted from McBride, or ultimately through Mr. Gordon and others, the jury would have realized that it was not simply the "trauma" of the event which caused the lapses in memory and inconsistencies with the troopers' testimony but the cover-up of tactical errors known before the mission was ever begun. The cowboy-like insistence in executing a warrant with insufficient intelligence and/or real-time surveillance could reasonably benefit Mr. Barrett's on every other fact issue raised in the trial, creating a reasonable probability that the jury would not have convicted Mr. Barrett.

*ii. There was No Emergency Lighting Activated Identifying Law Enforcement*

If defense counsel had contacted Mr. Gordon and questioned him in a manner which reflected an informed theory of defense and a working knowledge of the Government's case, counsel would have discovered that Mr. Gordon could and would have testified that his investigation revealed that the troopers "rolled in dark" and did not activate any emergency

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence
19
Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1000

lighting until after the shooting was over, when Trooper Hash's overhead lights were activated to help illuminate the scene. (Gordon Dec at 9 - 12, ¶¶ 23 -28)  Specifically Mr. Gordon would have testified that in an interview with Trooper Hamilton, Hamilton at first insisted that he had activated his emergency lights.  Like the question of whether he fired his weapon, when confronted with physical evidence disproving his version of events, Hamilton admitted to Gordon that he had not activated the lights. (Gordon Dec at 9 ¶ 23, 11 ¶ 28)  Trooper Hash, who was in a marked unit, also claimed he drove onto the property with his lights and his emergency overhead bar activated but ultimately admitted that somebody just flipped the lights on after the shooting to give needed light during the wounded troopers' evacuation. (Gordon Dec at 12 ¶ 30)

Mr. Gordon would have testified that "[t]he physical evidence supported the conclusion that the officers did not have their emergency vehicle lights on." ("Gordon Dec" at 11 ¶ 27; *see also* Gordon Dec at 9 ¶ 23, 11 ¶ 27, 12 ¶ 30)  Even Frank Lloyd's brief encounter with Mr. Gordon shortly after the shooting confirms the lack of emergency lights.

Sheriff John Philpot's testimony that he saw the emergency overhead bar flashing and illuminating the area (Tr 8:1797 *ll* 14-15), though elicited by Prosecutor Littlefield in a manner intended to misrepresent the facts, is consistent with Frank Lloyd's statement that they came over the hill when the shooting was over and saw taillights.  Appendix A.  Tr v. 8 at 1797 *ll* 5-7.  The question by Littlefield about the emergency lights refers to a later time when Philpot is in the yard, a time at which Hash admitted the shooting was over.  (Gordon Dec at 12 §12)

It is undisputed that the question of the activation of emergency lights was critical to the Government's case.  Mr. Gordon's testimony, at the very least, would have been admissible to impeach by prior inconsistent statements the testimony of the troopers and other law enforcement officers.  *See e.g.*, (Gordon Dec at 12 ¶ 29 Exh 7) (Greninger makes no mention in his interview

Supplemental Motion to Vacate, Set Aside                                    Barrett v. USA
or Correct Judgment, Order and/or Sentence                   20        OKED Case No. 6:09-cv-00105-JHP

1001

of any lighting); (Gordon Dec  Exh 15) (Oliver, who is the car with Greninger, also makes no mention of activating or observing activated lights.).

Had trial counsel reasonably investigated the case and interviewed Mr. Gordon in a substantive way, he could have presented credible evidence that the OHP troopers did not activate their lights during the approach or shootout, and that they were lying, or at the very least, intentionally misleading the jury, when they testified that they did. The importance and impact of credible evidence showing that Mr. Barrett did not know the vehicles invading his property and charging his front porch were law enforcement is incalculable.  There is a reasonable probability that this testimony alone, or together with the corroborating physical evidence and adequate expert testimony on that physical evidence, would have resulted in a directed verdict, an outright acquittal or, at the very least, consistent with the state verdict, a conviction for manslaughter.

Mr. Gordon's testimony of his investigation and the troopers' clear admissions that they had not had their emergency lights on would have corroborated and cemented the truth of the testimony of Toby Barrett and Alfred Hahn.  See Doc 95 Ground 2(A)(10).  If the jury believed Gordon, Barrett and Hahn, that there was no indication that the charging vehicles were law enforcement, there is little doubt the jury's verdict would have been different.  In light of Mr. Gordon's status as an OHP Trooper trained in and trusted with the most sensitive investigations, there is little doubt the jury would have placed significant stock in his testimony.

> iii.   *There is credible substantive and impeaching evidence through Paul Gordon's Interviews and Investigation that a member of the OHP East Tact Team, not Mr. Barrett. initiated the gunfire.*

Had counsel actually interviewed Gordon, he would have been able to impeach or raise serious questions of the veracity the testimony and inferences throughout the trial that Mr. Barrett initiated the gunfight.  Mr. Gordon's testimony could also have shown that even the OHP

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                21                Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1002

troopers, including the team leader, believed their people started the firefight.

Trooper Hise in his interview with Mr. Gordon describes that what he hears is automatic gunfire. (Gordon Dec  Exh 10 at 4)  And as recorded by Mr. Gordon, the team leader, Kerry Pettingill, said he initially thought it was "our folks" who fired.  Appendix A.  And later in his interview with Paul Gordon, Pettingill says "it sounded to me like automatic gunfire." ("Gordon Dec" Exh 14 at 11)  As noted in the Amended Motion, at the second state trial, Trooper Poe testified he did not know who fired or where the gunfire was coming from, despite having an unobstructed view of the house.  (2nd St. Tr. Tx at 757, 766.)  Greninger's description comes the closest to admitting that the gunfire was begun presumably by Hamilton.

> As we pulled up to stop, I cold see debris and stuff coming up, I could hear automatic, sounded like automatic gun fire and I could see debris coming up from the area of Trooper Hamilton's vehicle and I'm thinking, I- initially my thoughts are, it's dirt, why are they shooting in the ground, it took a few seconds to ah determine if the shots were coming from them.

("Gordon Dec" Exh 7 at 6)  None of this was brought out on cross-examination at Mr. Barrett's federal trial.  The Government's decision not to call Jim McBride as a witness in the federal trial is telling, since McBride was certain he heard automatic gunfire.  (Gordon Dec Exh 11 at 7)  The failure of the defense to call McBride is inexplicable.  With credible testimony that the gunfight was begun by automatic gunfire and thus was necessarily commenced by the trooper(s) and not Barrett, there is a reasonable probability that a different result would have occurred, *i.e.*, a not guilty verdict or at the very least, a conviction on the lesser included offense.

This section supplements Claim 2(A)(9), Doc 95 at 146, again by the testimony of an available witness, Mr. Gordon.  As noted in the Amended Motion, "[t]here obviously was a critical question as to whether Mr. Barrett or the police opened fire first."

iv.     *Information known to OHP indicated Mr. Barrett would run from
to law enforcement.*

The most consistent of all the responses to Mr. Gordon's pre-scripted questions was about the intelligence the East Tact Team had on Kenneth Barrett's level of dangerousness. Steve Hash said the only criminal history of which he was aware was that Mr. Barrett had barricaded himself in his house and he had shot *himself* once before.  (Gordon Dec Exh 9 at 14) Hash could not recall any use of violence against any police officers or anybody else.  *Id.* Similarly Robert Darst recalled the "standoff" with local law enforcement and the attempted suicide.  (Gordon Dec Exh  6 at 11)  Gene Hise was aware that Mr. Barrett had been arrested before and "turned himself in."  (Gordon Dec 10 at 7)  Asked by Gordon if they had been told about any threats against law enforcement, Hise did not remember any statement Mr. Barrett may have made.  *Id.* at 9.  Oliver told Gordon they had been given information about threats but offered none that he had been given.  (Gordon Dec Exh 15 at 15)  Hash recalled no information regarding violence against law enforcement, though recalled that Mr. Barrett had barricaded himself in the house and had a "habit of running to mom."  (Gordon Dec Exh 9 at 14)  Pettingill noted the barricading and attempted suicide as well, and then noted that "he was a big talker[.]"  (Gordon Dec Exh 14 at 17)  McBride noted that the information they received that "those statements are probably the same statements made on 90% of the people we arrest." and indicated the scenario is generally given to secure the Tact Team's involvement.  (Gordon Dec 11 at 11)  Greninger told Gordon that the information they had was that "the guy would run and try to make it to his mother's house which was next door[.]" (Gordon Dec  Exh 7 at 5)  Ricky Manion characterized the threats by Barrett as: "That, that he would ah, that he would mainly run from law enforcement.."  (Gordon Dec Exh 12 at 12)  Mr. Gordon's testimony or impeachment of the troopers would have made known to the jury that the OHP acted contrary to the known

intelligence in the manner the Tact Team executed the warrant.  Trial counsel's failure to develop the testimony was constitutionally inexcusable.

> v.    *Credible evidence undeveloped by trial counsel would have shown that Mr. Barrett did not have a pill bottle with red phosphorous residue in his pocket.*

The testimony that Mr. Barrett had red phosphorous in his right front pocket is highly suspect in light of prior searches by OHP without any mention in the Gordon interviews of having found or felt the pill bottle.  The saga of the supposed seizure of a pill bottle from the pocket of Mr. Barrett's jeans is rife with inconsistencies and outright perjury.  At trial, Hash testified that he and Manion searched Mr. Barrett and he felt the pill bottle but did nothing with it.  Sheriff Johnny Philpot testified that he searched Mr. Barrett afterwards and pulled the bottle out of Mr. Barrett's front pocket, looked inside and saw a baggie with red powder, held it up for Stanley Philpot to see, and then put the pill bottle with the baggie back into Mr. Barrett's pocket.

If called to testify, Mr. Gordon would have stated that Ricky Manion and Steven Hash both searched Mr. Barrett before turning him over to the custody of the local sheriff.  Both mentioned the handgun and neither mentioned a pill bottle.  Mr. Gordon is familiar with the standard OHP searches at the time a suspect is arrested, especially after a firefight.  If there was a pill bottle on Mr. Barrett's person, the OHP search would have uncovered it.

The likelihood that Mr. Barrett was nonchalantly walking around with red phosphorous in his pocket is patently incredible.  The two prior searches by OHP troopers, the dangerous nature of red phosphorous, the failure of Hash to mention the pill bottle in his interview with Lt. Gordon, the incredible testimony of Stanley and John Philpot and the information and belief that Mr. Barrett was a middle man, not a drug manufacturer, when considered with the prior other evidence produced regarding the purported discovery, confiscation and chain of custody of the

pill bottle, would have led a reasonable juror to totally discredit the testimony regarding the red phosphorous.

Mr. Gordon would also have testified that he is trained in the execution of high risk warrants and the appropriate protocol for clearing and searching a building in which the manufacture of methamphetamine is suspected. Included in that training is an understanding of the dangers of red phosphorous. The very real and substantial danger attached to handling or mishandling red phosphorous renders the events described by Hash and the Philpots in relation to the manner in which they handled the pill bottle inherently incredible. No red phosphorous, no meth. No meth, no conviction.

With competent and reasonably well-prepared counsel, any testimony regarding the red phosphorous would have been either suppressed or rendered incredible, leaving the jury with the incredible and thoroughly self-serving testimony of the seven snitches. The drug trafficking was the purported basis for the federal prosecution. Without it, the prosecution itself is suspect and raises double jeopardy concerns for vindictive prosecution of a capital crime which has no elements not present in the state prosecution. There is a reasonable possibility no federal prosecution would have or could have occurred but for the fabricated "red phosphorous" story by Trooper Hash that he felt the pill bottle but did nothing with it. There is a very reasonable probability that the jury would have returned an acquittal or at worst convicted on a lesser included offense.

> vi.     *After arrest, Mr. Barrett was beaten by the Sheriff and two of his deputies. Denials that a beating was administered were false.*

At trial, Sheriff Philpot denied having observed any physical action taken toward Mr. Barrett while he was in custody. However, if Mr. Gordon had been called as a witness, he would have testified that on September 24, 1999, he interviewed Sheriff Philpot in Mr. Gordon's

Supplemental Motion to Vacate, Set Aside    Barrett v. USA
or Correct Judgment, Order and/or Sentence    25    OKED Case No. 6:09-cv-00105-JHP

1006

vehicle and Philpot admitted that he and his men had beaten Mr. Barrett and would have caused greater injuries but for the number of people around. In short, Sheriff Philpot lied to the jury. Had defense counsel showed the sheriff to be a liar, as well as to have violated the Mr. Barrett's rights, it would have undermined all of the Philpots' testimony, including, most importantly, the pill bottle tale.

Sheriff Philpot's interview with Mr. Gordon was recorded and the recording placed with the investigation results, which he left in the custody of Lt. George Randolph when he retired from the OHP in May, 2000 as a result of the extreme pressures placed upon him by members of the Oklahoma Highway Patrol as a result of his investigation. The failure of trial counsel to discover the existence of that recording and demand disclosure of the same was consistent with trial counsel's continual constitutionally substandard representation.

As set out in the Amended Motion to Vacate, Doc 95 at 58, this evidence would have raised a reasonable doubt with respect to Mr. Barrett's knowledge and intent, especially as to Count 3, and refuted any evidence of actual drug trafficking required in Counts 1 and 2, compelling a dismissal of the same, or resulting in outright acquittal or a finding that, at most, Mr. Barrett was guilty of voluntary manslaughter. This subclaim relates back to Claim 2(A)(3), of the § 2255 Motion (Doc 95) which asserts failure to present testimony of witnesses Toby Barrett and Alfred Hahn that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense, and Claim 2(A) (9) which asserts that Mr. Barrett's trial counsel unreasonably and prejudicially failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials. Doc 95 at 143.

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence
26
Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1007

**c.      Trial Counsel was constitutionally ineffective for failing to call Mr. Gordon to refute the legitimacy of the experiment of Iris Dally both as a fact witness and expert witness.**

As alleged in the §2255 Motion to Vacate (Doc 95), trial counsel were professionally unreasonable for failing to hire an independent crime scene analyst or reconstruction expert in order to rebut the testimony of OSBI agent Iris Dalley.  Trial counsel's failure to interview, prepare and present the testimony of Mr. Gordon as both a fact and expert witness to undermine the reliability of Ms. Dalley's experiment fell far below prevailing professional norms.

Had trial counsel acted in a professionally reasonable manner, Mr. Gordon would have testified to the unreliable manner and necessarily inaccurate results of Ms. Dalley's trajectory dowel-rod experiment.  Mr. Gordon would have testified that the Bronco which Ms. Dally used to determine and demonstrate the projectile paths of the various shots directed at it had been moved from the position it had been in when Mr. Barrett shot at it.  Indeed, Mr. Gordon would have testified that he warned OHP of the inaccuracy.  Mr. Gordon would also have produced and authenticated the videotape which he took the evening of September 24 when the experiment was being concocted, which showed Dalley's actions were obviously unreliable and unscientific. (Appendix B)   (Dowel-Rod Experiment videotape, a copy of which will be delivered to the Court for filing.)

This claim is filed in conjunction with and to supplement, Claim 2(A)(7) of Mr. Barrett's §2255 Motion to Vacate which alleges "[d]ue to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence."   Doc 95 at 127.  Specifically, Mr. Gordon's testimony would support the allegations of Mr. Barrett set out in Claim 7 (k).  If a single amended Motion were filed, this claim would be inserted at Doc 95 at 135 immediately following and within

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                    27                    Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1008

subsection k.

> **d.     Trial Counsel's failure to interview, prepare and present the testimony of Mr. Gordon regarding the OHP witnesses and the lack of adherence to any reasonable protocol, including their own, in the execution of the High Risk Warrant which created Mr. Barrett's reasonable belief that he was being attacked by unknown criminals and the OHP witnesses's continuous efforts to avoid disclosing the same fell far below prevailing norms and wholly undermined the reliability of the verdicts and sentence in this case.**

Mr. Gordon was well-qualified to investigate the events of September 24, 1999.  (Gordon Dec 1-2 ¶ 4; *see also,* Exh 1)  He had the qualifications, experience and was professionally familiar with Mr. Barrett's residence and the events leading up Rocky Eales death.  At a minimum, a reasonable defense in a case of this seriousness, particularly in light of the limitations the court placed on defense resources, would have mandated interviewing Mr. Gordon.  It is not only in hindsight that it becomes apparent Mr. Gordon would have provided trial counsel far more to support the defense than Mr. Choney, who was in effect a prosecution witness.

This claim is intended to and does supplement the factual basis for Movant's subclaim 2(A)(8) which alleges that "[t]he outcome of the trial is unreliable due to trial counsel's unreasonable failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death.  Doc 95 at 139.

**TWENTY-SECOND GROUND .**

**MR. BARRETT'S COUNSEL UNREASONABLY FAILED TO INVESTIGATE AND PRESENT THE TESTIMONY OF THE HONORABLE JOHN GARRETT, WHO COULD HAVE TESTIFIED TO THE REPUTATIONS FOR TRUTH AND VERACITY OF SANDERS AND JOHNSON. THE TESTIMONY WOULD HAVE HAVE REASONABLY LED TO A DIFFERENT OUTCOME ON THE *FRANKS* ISSUE.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

To compliment and corroborate the compelling and detailed testimony of Mr. Gordon, which would have been available to refute the "meth" evidence, there was also available to defense counsel the Hon. John Garrett, the state judge who presided at the state capital trials of Mr. Barrett.  Judge Garrett  could have, and presumably would have, testified that he was familiar with both Mr. Monk Sanders and Mr. Clint Johnson and neither of them were credible persons.  (Declaration of Leonard Post ("Post Dec"), filed herewith in support hereof and in support of Mr. Barrett's §2255 Motion to Vacate (Doc 95))  Mr. Barrett was denied his statutory and constitutional rights to the effective assistance of counsel by the trial counsels' failure to competently and reasonably investigate, prepare, corroborate and present the testimony of the Hon. John Garrett to impugn the credibility of Clint Johnson, affiant on the critical nighttime no-knock search warrant, and Charles "Monk" Sanders, purported confidential informant, upon whose information the affidavit in support of the search warrant relies.

 Had Judge Garrett been called to testify on the lack of trustworthiness of both Johnson and Sanders, there is a reasonable probability that the Court would have granted Mr. Barrett's *Franks v. Delaware* motion and/or that the jury would have disbelieved the drug-related evidence, as well as the numerous law enforcement officers and drug informants testifying to drug related evidence, and returned a verdict of not guilty or guilty of a lesser included offense.

Trial Counsel was remiss in failing to interview Judge Garrett concerning his knowledge of the truth and veracity of Mr. Sanders, be it by reputation or specific acts.  Judge Garrett would have testified that Mr. Sanders was a totally incredible person.  It is indisputable that the testimony of the judge who presided over the two state cases that he wouldn't believe Monk Sanders farther than he could throw him would have impacted the jury's assessment of Mr. Sanders' credibility.  (Post Dec)

This claim expands, explains, supplements and relates back to Claim 2(A)(1) (Doc 95), described above. In his Amended §2255 Motion, Doc 95 at page 103, Mr. Barrett alleges '[c]ounsel unreasonably failed to interview and present at trial some of the witnesses discussed immediately above, and others who could have testified that Sanders is a pathological liar whose word should not have been relied upon by Clint Johnson or the jury."

### TWENTY -THREE GROUND.

**THE COURT'S FAILURE TO CONSIDER  SIGNIFICANT AND READILY AVAILABLE EVIDENCE TO SUPPORT A FINDING THAT USE OF A  STUN BELT WAS UNNECESSARY, AND TRIAL COUNSEL'S FAILURE TO URGE CONSIDERATION OF THE SAME, DEPRIVED MR. BARRETT OF DUE PROCESS AND THE EFFECTIVE ASSISTANCE OF COUNSEL.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Judge John Garrett presided over the two state trials in which Mr. Barrett faced essentially the same capital murder charge.  Had Judge Garrett been called to testify to Mr. Barrett's good behavior in the courtroom despite facing the death penalty, there is a reasonable probability that this Court would not have acceded to the U.S. Marshal's unreasonable request that Mr. Barrett be restrained by the use of a visible stun belt, which unconstitutionally

undermined Mr. Barrett's presumption of innocence.

The Court was well aware that Mr. Barrett had been tried twice before for the same capital murder in state court. Easily available to the court was Judge Garrett, to whom this Court needed only make an administrative inquiry as to the conduct of Mr. Barrett and the likely necessity of restraint. Judge Garrett would have advised the Court that Mr. Barrett was at all times respectful and submissive to court procedures and security. Judge Garrett would also have advised the Court that Mr. Barrett was extraordinarily polite and helpful to both the judge and his secretary during the proceedings. (Post Dec)

This Claim supplements Mr. Barrett's Section 2255 Motion to Vacate, seventh ground in which he alleges that his "[r]ights under the Fifth, Sixth, and Eighth Amendments were [v]iolated when the Trial Court Permitted the Marshals to [r]estrain him [w]ithout [j]ustification." Doc 95 at 326. To the extent that an affirmative showing of the evidence of Mr. Barrett's behavior in Judge Garrett's courtroom should have been presented by trial counsel, the failure to present the testimony of Judge Garrett, or even to interview or inquire of him, fell below prevailing professional norms, and prejudiced Mr. Barrett by denying or adversely affecting the presumption of innocence and Due Process, in violation of the Sixth Amendment right to the effective assistance of counsel. This claim relates back to Claim 7 of the Amended §2255 Motion to Vacate which is supplemented by the same. Doc 95 at 329.

Supplemental Motion to Vacate, Set Aside or Correct Judgment, Order and/or Sentence     31     Barrett v. USA OKED Case No. 6:09-cv-00105-JHP

1012

## TWENTY-FOURTH GROUND.

**MR BARRETT WAS UNCONSTITUTIONALLY PREJUDICED BY THE TRIAL COURT'S INTERFERENCE WITH HIS DEFENSE WHICH COMPELLED MR. JOHN ECHOLS TO WITHDRAW BECAUSE MR. ECHOLS KNEW OF AND WOULD HAVE PURSUED THE POTENTIAL TESTIMONY OF RETIRED TROOPER GORDON.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

The result of the Court's interference with and unreasonable imposition upon original lead counsel Mr. John Echols, who had represented Mr. Barrett in two prior unsuccessful prosecutions for capital murder in state court, was a denial of a likely verdict of acquittal or conviction on a lesser included offense, or, at the very least, a sentence less than death.

During the course of the first trial, Mr. Echols was contacted by Mr. Paul Gordon, Because of matters which Mr. Gordon read in the paper summarizing testimony by the troopers which Mr. Gordon knew to be untrue, he contacted Mr. Echols.  Mr. Echols used some of what Mr. Gordon reported to him about the troopers activities  in his cross-examination of the troopers and other witnesses in the state trials.  Indeed, during the first state trial, Mr. Gordon ultimately produced for Judge Garrett the East Tact Team Manual, which Lt. Pettingill insisted did not exist.  Had Mr. Echols remained as lead counsel, he would have known he had available to him a source who knew that the testimony of the troopers given in federal court was false in the many significant respects discussed above. Mr. Echols' previous use of information from Mr. Gordon and his cooperative relationship with him would have alerted Mr. Echols to search Mr. Gordon out when faced with drug evidence which had not been an element of the charges or admitted in state court.

If the Court had not interfered with Mr. Echols' defense of Mr. Barrett to such a degree that Mr. Echols felt compelled to withdraw, the defense would likely have produced Mr. Gordon as a fact and expert witness – and justice would have prevailed.  There is a reasonable probability that Mr. Gordon's testimony, as set out in his declaration, would have resulted in a verdict of not guilty on all three counts as alleged in the indictment, or a conviction of lesser offenses, and unquestionably would not have resulted in a sentence of death or even in life without parole.

This Claim expands, explains, supplements and relates back to Mr. Barrett's Claim 1, i.e., "Mr. Barrett was Prejudiced by the Trial Court's Actions and Interference and Ultimate Deprivation of Prior Qualified Counsel, John Echols, in violation of Mr. Barrett's Right to Due Process, his Sixth Amendment Right. . ."

## TWENTY- FIVE GROUND.

### MR. BARRETT'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

To the extent the Claims and subclaims set out above add considerable weight to the constitutional errors leading to the convictions and sentences of Kenneth Barrett, the cumulative impact of the errors now alleged for purposes of supplementing the claims set forth in Mr. Barrett's Amended §2255 Motion to Vacate Judgment/Order and Sentences (Doc 95) compels the reversal of Mr. Barrett's convictions and sentences and dismissal of the same, or alternatively, an order granting a new trial on each and every count charged, or vacation of each and every sentence imposed and an order for new sentencing proceedings.

This ground of error relates back to Ground Nineteen of Doc 95.

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                33                Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1014

**PRAYER FOR RELIEF**

Therefore, Kenneth Barrett asks that the Court grant the relief requested in his pending

Amended Sec. 2255 Motion to Vacate (Doc 95 at 400) including but not limited to:

Vacate Movant's convictions and sentences and order that appropriate retrial and/or

sentencing hearings be conducted; and or any other relief to which Movant may be entitled.

DATED:   March 16, 2012

Respectfully submitted,

___/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

/s/ Joan M. Fisher
JOAN M. FISHER, Idaho Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                    34                    Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1015

**CERTIFICATE OF SERVICE**

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was electronically filed on March 16, 2012 . This document will be served electronically to all counsel in this case.

 /s/ Joan M. Fisher
Signature of Movant's Attorney

**VERIFICATION**

I am an attorney licensed to practice law by the State of Idaho, and I am a member in good standing of the bar of the United States District Court for the Eastern District of Oklahoma. I am an Assistant Federal  in the Office of the Federal Defender for the Eastern District of California.  Pursuant to the appointment of the Federal Defenders of the Eastern District of California to represent Mr. Barrett in this proceeding, I filed a Notice of Appearance as co-counsel for Kenneth Eugene Barrett with David B. Autry as lead counsel.

I am authorized by Kenneth Eugene Barrett to file the foregoing amended motion to vacate, set aside, or correct the sentence pursuant to 28 U.S.C. § 2255.  I am filing the amended motion on Mr. Barrett's behalf.  Mr. Barrett is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.

I declare that the contents of the foregoing amended motion for collateral relief, to vacate, set aside, and correct the conviction and death sentence is made pursuant to 28 U.S.C. § 2255.  I declare that the contents of the foregoing amended motion are true except for those matters based upon information and belief, and I believe the latter matters to be true.  The sources of my information include, but are not limited to, official court records, various documents obtained or prepared during investigation of this amended motion, and items in the possession of other

lawyers, investigators and/or experts connected with the preparation of this amended motion.  I

make this verification pursuant to Rule 2(b)(5) of the Rules Governing § 2255 Proceedings

because these matters are more within my knowledge than Mr. Barrett's knowledge.

Dated this 16th day of March, 2012.

<div style="text-align:right">

/s/ Joan M. Fisher
Joan M. Fisher

</div>

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence            36            Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1017

# Appendix A

(Audio Tape at Crime Scene by Paul Gordon on September 24, 1999)

CD-ROM labeled "Audio Tape at Crime Scene by Paul Gordon on September 24, 1999"
submitted under separate cover for conventional filing.

# Appendix B

(Crime Scene Videotape by Paul Gordon on September 24, 1999)

DVD- ROM labeled "Crime Scene Videotape by Paul Gordon on September 24, 1999 "
submitted under separate cover for conventional filing

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT )
)
*Movant*, )
)
v. ) Case No. 09-CV-00105-JHP
)
UNITED STATES OF AMERICA )
)
*Respondent*. )

**RESPONSE IN OPPOSITION TO PETITIONER'S MOTION FOR LEAVE TO
SUPPLEMENT THE PENDING AMENDED MOTION TO VACATE, SET ASIDE OR
CORRECT A JUDGMENT, ORDER AND/OR SENTENCE UNDER 28 U.S.C. § 2255**

**COMES NOW** the United States of America by and through undersigned counsel and
files this response in opposition to Barrett's Motion for Leave to Supplement the Pending
Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence Under 28
U.S.C. § 2255 (Doc. 201). The Court should deny the Motion because the defendant has failed
to establish that justice requires leave for filing his untimely supplement.

**PROCEDURAL HISTORY**

On November 4, 2005, a jury empanelled by this Court convicted Barrett of three
offenses charged by indictment: firearm murder in relation to drug trafficking crimes (18 U.S.C.
§ 924(c) & (j)); firearm murder in relation to a crime of violence (18 U.S.C. § 924(c) & (j)); and
intentionally killing a state law enforcement officer during the commission of a drug trafficking
crime (21 U.S.C. § 848(e)(1)(B)). Trl. Doc. 241. On November 17, 2005, at the conclusion of a
penalty phase trial, the jury recommended a death sentence for Count Three (Trl. Doc. 257),
which this Court imposed on December 19, 2005. The Tenth Circuit Court of Appeals affirmed
the judgment. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007).

1

1020

On March 16, 2009 (364 days after the Supreme Court denied certiorari from the Tenth Circuit's judgment), Barrett filed a 17-claim motion for relief under 28 U.S.C. § 2255. Doc. 1. On March 17, 2009, he filed a corrected § 2255 motion, again asserting 17 claims. Doc. 2. On September 25, 2009, he filed an amended motion for collateral relief, asserting 19 claims. Doc. 70. This Court then ordered Barrett to file a second-amended motion that complied with the Rules Governing § 2255 Proceedings, and also permitted him to file a brief in support. Doc. 81. On December 5, 2009, Barrett filed a second-amended § 2255 motion, asserting 19 claims (Doc. 95), and on March 1, 2010, he filed a supporting brief (Doc. 149). On May 17, 2010, the government filed an Answer. Doc. 174.

Barrett now moves for leave to supplement his second-amended § 2255 motion, raising five new claims and a restated assertion of cumulative error. Doc. 201. This Response in Opposition follows.

**BARRETT HAS NOT ESTABLISHED GOOD CAUSE FOR FILING AN UNTIMELY SUPPLEMENT TO HIS § 2255 MOTION**

Barrett argues that this Court should permit him to supplement his second-amended § 2255 motion because his new claims relate to existing contentions. He asserts that any denial of his request would be an abuse of discretion under Federal Rule of Civil Procedure 15. Doc. 201 at 5-9. Barrett's supplemental claims, filed years after the deadline for timely inclusion in a § 2255 action, do not relate back to an existing issue because they are premised on new factual allegations. Barrett has made no effort to identify circumstances outside of his control that prevented him from timely raising these claims. Accordingly, the government urges this Court to deny the Motion to Supplement.

After the following of an answer, a § 2255 movant may amend his motion only with the government's written consent or with leave of court, which should be freely given when justice

2

requires.  Fed. R. Civ. Proc. 15(a)(2); *see United States v. Harrison*, 469 F.3d 1216, 1217 (8th Cir. 2006) (concerning the applicability of the rule to § 2255 proceedings).  The courts' discretion to provide such leave is limited by the Antiterrorism and Effective Death Penalty Act of 1996, which imposes a one-year period of limitations in which federal prisoners may seek collateral relief from criminal judgments.  28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d 1279, 1280 (10th Cir. 2000).  The limitation period begins on the date the Supreme Court denies a defendant's petition for writ of certiorari from a direct appeal.  *Willis*, 202 F.3d at 1280-81.  The limitation period bars untimely amendments that add new claims to an initial § 2255 motion.  *United States v. Guerrero*, 488 F.3d 1313, 1316 (10th Cir. 2007).

The limitation period is not an absolute bar: Section 2255 movants may make untimely amendments that relate back to existing claims.  *United States v. Espinoza-Saenz*, 235 F.3d 501, 504-05 (10th Cir. 2000).  Arguments premised on new facts do not, however, relate back to earlier contentions just because they both rely on the same constitutional principle.  *See id*.  An untimely amendment that "clarifies or amplifies" an existing claim relates back to the original motion.  *United States v. Weeks*, 653 F.3d 1188, 1206 n.12 (10th Cir. 2011) (quoting *Espinoza– Saenz*, 235 F.3d at 505); *see also Mayle v. Felix*, 545 U.S. 644, 655 (2005) ("Amendments made after the statute of limitations has run relate back to the date of the original pleading if the original and amended pleadings arise out of the same conduct, transaction, or occurrence").  Thus, a proposed amendment may not introduce a new theory based on facts different from those underlying existing issues.  *See Dean v. United State*s, 278 F.3d 1218, 1221 (11th Cir. 2002) ("Congress did not intend Rule 15(c) to be so broad as to allow an amended pleading to add an entirely new claim based on a different set of facts").  Section 2255 movants may justify otherwise inexcusably untimely pleadings by showing a need for equitable tolling based on

3

extraordinary circumstances beyond their control. *United States v. Gabaldon*, 522 F.3d 1121, 1124 (10th Cir. 2008); *see generally Holland v. Florida*, ___ U.S. ___, 130 S. Ct. 2549, 2562 (2010) (holding equitable tolling applicable to § 2254 cases when the petitioner diligently pursued his rights but an extraordinary circumstance prevented timely filing).

Barrett's proposed supplement,[1] for which he never sought the government's consent, raises five new claims of relief and one restated assertion of cumulative error. Each new claim is a factual departure from the contentions raised in his prior Motions for § 2255 relief. The supplement raises the following issues: the government suppressed exculpatory information about the investigation of Oklahoma Highway Patrol Internal Affairs investigator Paul Gordon (Doc. 201-1 at 2-12); trial counsel ineffectively failed to investigate and present information and opinions possessed by Paul Gordon (*id*. at 13-28); trial counsel ineffectively failed to investigate and present information and opinions possessed by Oklahoma State Court Judge John Garrett (*id*. at 29-30); this Court failed to consider significant testimony (available through Judge Garrett) that the use of a stun belt was unnecessary to restrain the defendant (*id*. at 30-31); this Court interfered with the defense by compelling the withdrawal of John Echols who had previously relied on information from Paul Gordon (*id*. at 32-33).

Barrett makes no pretense that the novel claims are facially timely, nor could he. Over four years have passed since the Supreme Court denied a petition for writ of certiorari from the Tenth Circuit's opinion affirming the judgment in this case. The supplement clearly falls outside of the one-year period of limitations applicable to § 2255 motions. *See* 28 U.S.C. §2255(f).

---

[1] The government observes that "supplement" is a misnomer in this instance. A "supplement," under Rule 15(d), sets out events that occur after an initial pleading, while Barrett's new claims concern events that occurred at or around the time of trial. To avoid confusion, however, the government maintains reference to the new claims as a "supplement."

Barrett argues in conclusory terms that his new claims relate back to issues in his second-amended motion.[2] Doc. 201 at 7-8. He contends that he cannot address the relation-back doctrine absent notice that the government will contest the timeliness of his supplement. Doc. 201 at 8 n.1. Barrett misapprehends his burden: he must establish that he satisfied the relation back doctrine under Rule 15, rather than simply rebut arguments concerning a presumption of timeliness. *See King v. Ryan*, 564 F.3d 1133, 1142-43 (9th Cir. 2009) (placing burden on § 2254 petitioner); *In re Alstom S.A.*, 406 F. Supp. 2d 402, 430 (S.D.N.Y. 2005) (noting the plaintiff's burden to establish relation back under Rule 15). Not only does Barrett avoid the effort of showing that his new arguments expand or clarify existing issues, he could not do so because his supplementary contentions arise from novel factual premises. In truth, the only relationship between his new and old claims lies in generally-stated legal doctrines, such as the rights to due process and competent counsel.

Barrett's new claims rely, centrally, if not exclusively on information from Paul Gordon and Judge John Garrett, who go essentially unmentioned in the earlier § 2255 motions. Barrett's most recent § 2255 Motion, filed in 2010, does not mention Gordon and refers to Judge Garrett once in the context of an unrelated case. *See* Doc. 95 at 76 (concerning a letter Judge Garrett received while presiding over a domestic matter). The Brief filed in support of the § 2255 Motion does not mention Gordon or Judge Garrett. *See* Doc. 149. Barrett's original two motions also lack references to Mr. Gordon and Judge Garrett that would suggest either man possessed information that might give rise to relief. *See* Docs. 1 & 2. While the proposed supplement asserts claims that are broadly reminiscent of existing contentions – ineffective assistance of counsel, prosecutorial misconduct and judicial interference – the new arguments do

---

[2] The government asserts that portions of that Motion are, themselves, untimely. *See, e.g.*, Doc. 147 at 19, 62, 64-66, 92-93, 153, 169, 171-72, 217, 246, 269, 271, 273.

5

not relate back because they rely on factual allegations without any relationship to the earlier pleadings. *Espinoza-Saenz*, 235 F.3d at 504-05.

Barrett makes no attempt to excuse the lateness of his new claims by attributing his delay to extraordinary circumstances beyond his control, which might provide a basis for equitable tolling. Surely, current counsel knew or could easily have determined within days of appointment that Judge Garrett presided over the Barrett's state court trials and that he might, as a result, have made observations or formed opinions that bore on the present litigation. As to Paul Gordon, current counsel cannot assert that they were previously unaware of him, as his investigation was frequent referenced during trial. *See e.g*., Tr. 3:630, 632; 4:686, 812, 816; 5:1071, 1075, 1119-20, 1129, 1142-43; 6:1204, 1291-94, 1297-98, 1325, 1329-30; 7:1549, 1559; 17:4040-41, 4047-51. Despite obvious notice about the roles of Gordon and Judge Garrett, Barrett provides no hint why he required more than four years to identify them or their observations as bases of potential § 2255 claims.

Barrett may attempt to justify his tardiness by relying on his allegation that the government did not disclose exculpatory information about Paul Gordon, at least in regard to the new claims concerning that witness. Doc. 201-1 at 2-12. However, Barrett clearly knew of Gordon in 2005, having listed him as a trial witness. *See id*. at 14. Indeed, Barrett recognizes that Gordon made overtures to the defense before trial. *Id*. On these facts, it does not appear that Barrett could show that any discovery violation by the government created extraordinary circumstances beyond Barrett's control that prevented him from timely raising the supplementary claims. *Cf. United States v. Gabaldon*, 522 F.3d at 1124.

6

1025

**CONCLUSION**

Based on the foregoing reasoning and authority, the government respectfully urges the Court to deny Barrett's Motion for Leave to Supplement the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence under 28 U.S.C. § 2255.

Dated: April 27, 2012

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ Christopher J. Wilson
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ Jeffrey B. Kahan
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 345
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,                )
                                       )
                Movant,                )
                                       )
v.                                     )        Case No. 6:09-cv-00105-JHP
                                       )
UNITED STATES OF AMERICA,              )
                                       )
                Respondent.            )

**REPLY TO RESPONSE IN OPPOSITION TO PETITIONER'S MOTION FOR
LEAVE TO SUPPLEMENT THE PENDING AMENDED MOTION TO VACATE,
SET ASIDE, OR CORRECT A JUDGMENT, ORDER AND/OR SENTENCE
UNDER 28 U.S.C. § 2255**

The Government asserts Mr. Barrett's supplemental arguments should not be considered by the Court because the issues, and the facts supporting them, were raised well after the one-year period of limitations expired.  28 U.S.C. §2244(d).  The Government declares bluntly that the issues raised in the supplement do not "relate back" to arguments raised in Mr. Barrett's timely filed § 2255 motion and the previous amendment(s) to it, because he is raising entirely new issues predicated on facts different from those alleged before, and that Petitioner has not demonstrated how the claims raised in the supplement relate back to previously stated claims. (Doc. 206, pp. 1-6)  The Government's arguments should be rejected.

Rule 15 ( c)(1)(B) of the Federal Rules of Civil Procedure states that "a party may properly raise a new claim or defense that would have been barred by the statute of limitations if the claim or defense 'arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading.'" *Hodge v. United States,* 554 F.3d 372, 377 (3rd Cir. 2009).

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,
or Correct a Judgement, Order and/or Sentence                1

*Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

1027

In *Mayle v. Felix,* 545 U.S. 644, 664 (2005), the Supreme Court applied the "relation back" provision of Rule 15 in the context of a § 2254 action.  Rule 15 and *Mayle* unquestionably apply also in § 2255 proceedings, as the Government concedes in its response.  *United States v. Jordan,* ___F.3d___, No. 11-1108 (10th Cir. Feb. 15, 2012 (slip op.); *United States v. Weeks,* 653 F.3d 1188, 1206 n. 12 (10th Cir. 2011).  The Supreme Court defined in *Mayle* the phrase "conduct, transaction, or occurrence" in the habeas context, holding that "[s]o long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order." *Mayle v. Felix,* 545 U.S. at 664; *Hodge v. United States,* 554 F.3d. at 378.  Put a slightly different way, in order for a claim or claims in an amended or supplemental motion to "relate back" to the timely filed motion, they must be of the same "time and type" as those in the original motion, such that they arise from the same set or core of operative facts.  *United States v. Weeks, supra.*  Where the claims differ in time and type, amendment or supplementation will not be allowed. *United States v. Jordan, supra.*  An untimely amendment to a timely filed petition which, *by way of additional facts,* clarifies or *amplifies or expands* a claim or theory advanced in the timely motion may, in the district court's discretion, relate back.  *United States v. Weeks, supra*; *Espinoza v. Saenz,* 235 F.3d 501, 505 (10th Cir. 2000).  An amendment or supplement that serves to *expand facts* or cure deficiencies in an original claim or claims relates back to the original claim.[1]  *Dean v. United States,* 278 F.3d 1218, 1223 (11th Cir. 2002)(per curiam).  On the

---

[1] In essence, the Government argues that any amendment or supplement purporting to relate back to an original, timely filing cannot be predicated on facts that were not pled before (Doc. 206 at p. 5), but this is incorrect.  If the Government were right, there would be literally no occasion to invoke the "relation back" provision of Rule 15, since by definition such amendments rely on or may rely on facts not previously addressed or presented.

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,                    *Barrett v. USA*
or Correct a Judgement, Order and/or Sentence            2            OKED Case No. 6:09-cv-00105-JHP

1028

other hand, an *entirely new* claim or theory of relief will not relate back. *Hodge v. United States,* 554 F.3d at 377, *citing United States v. Thomas,* 221 F.3d 430, 436 n. 4 (3rd Cir. 2000). The rationale behind the "relation back" provision of Rule 15 is that a party who has been notified of litigation concerning a particular type of conduct, transaction, or occurrence has been given all the notice the statute of limitations was intended to provide. *United States v. Mandacina,* 328 F.3d 995, 1100 (8th Cir. 2005).

Ground Twenty in Mr. Barrett's proposed supplement (Doc. 201-1, pp. 2-13), alleging that the Government suppressed exculpatory evidence from Paul Gordon's Internal Affairs investigation of the raid, information regarding what appears to be the red phosphorous that was planted on Mr. Barrett, that Mr. Gordon was pressured into retirement when he attempted to conduct an objective investigation, that agents of the government tried to silence him with bogus criminal charges, and that Gordon was intimidated by AUSA Littlefield during Mr. Barrett's federal trial, relates back to Ground Five of the original and amended § 2255 motions, in which Mr. Barrett claims that the Government knowingly relied on false evidence and suppressed exculpatory evidence. (Doc. 95, pp. 270-310)

The suppression of exculpatory evidence stemming from Mr. Gordon's investigation and its aftermath relates to a common core of facts of the same time and type previously raised, and of which the Government was on notice. *Valdovinos v. McGrath,* 598 F.3d 568, 574-75 (9th Cir. 2010)(where original petition alleged that Valdovinos was denied due process and a fair trial by the prosecution's withholding exculpatory evidence of prior photo lineups, evidence of drugs and guns found in a Government witness's possession, and the favorable treatment the witness

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,
or Correct a Judgement, Order and/or Sentence                3                *Barrett v. USA*
                                                                            OKED Case No. 6:09-cv-00105-JHP

1029

received for her testimony, amended claim that the prosecution suppressed *other and additional* exculpatory evidence in the form of anonymous letters and a photograph related back to the original petition; the claimed suppression of exculpatory evidence raised in the original and the amended petitions were both of the same time and type, since all the suppressed evidence was exculpatory information the government had in its file and of which it was aware); *Mandacina v. United States,* 328 F.3d 995, 1000 (8th Cir. 2003)(where original petition alleged the Government suppressed exculpatory evidence and the petitioner sought to amend his habeas petition to include the "Borland Report," which also contained alleged exculpatory evidence but was totally unmentioned in the original petition, relation back was appropriate because the report was "evidence of other suspects" obtained by the police during its investigation into the murder for which the petitioner was convicted).

There can be little question, in relation to the Twenty-First Ground in Petitioner's supplement (Doc. 201-1, pp. 13-30), that the Paul Gordon evidence relates back to, and amplifies and expands with additional facts, a number of ineffective assistance of counsel arguments already made by Mr. Barrett in his original and amended § 2255 motions. It has been argued that:

• Counsel were ineffective for failing to investigate and introduce expert and other evidence attacking the Government's evidence that the raid was properly planned, conducted according to accepted tactical operation protocol, and that Mr. Barrett had notice that law enforcement was on his property due to the display of emergency lights.  Had counsel conducted a professionally reasonable investigation, this evidence would have undermined Government testimony on these points and supported the defense theory that the Tact Team entered Mr. Barrett's property in a manner that led him to reasonably believe that trespassers, rather than law enforcement, were present. (*E.g.,* Doc. 95, Ground Two, parts A(3), (8), (10) at  pp. 47-58, 139-43, 149-54)

• Counsel failed to competently challenge and impeach the accounts of the raid and its aftermath given by the Tact Team witnesses and other law enforcement personnel with respect to

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,                    *Barrett v. USA*
or Correct a Judgement, Order and/or Sentence          4          OKED Case No. 6:09-cv-00105-JHP

how the raid was conducted and how Mr. Barrett was taken into custody. (*E.g.,* Doc. 95, Ground Two, part  9 at pp. 143-49)

• Counsel failed to reasonably investigate and prepare to challenge the crime scene reconstruction testimony and trajectory analysis of Iris Dalley, which was intended to support the Government's theory that Mr. Barrett "ambushed" the Tact Team and had fair warning of the presence of law enforcement.  Counsel was professionally unreasonable for failing to call as a witness crime scene reconstruction expert Ed Hueske to rebut Dalley's methodology and conclusions.  (*E.g.,* Doc. 95, Ground Two, part A(7) at pp. 127-39)

• Counsel unreasonably failed to object to the "expert" testimony of James Horn, which was intended to legitimize the conduct of the Tact Team and excuse their incomplete and conflicting accounts of what actually transpired during the raid. (Doc. 95, Ground Two, part A (12) at pp. 163-76)

• Counsel unreasonably failed to introduce evidence that had law enforcement approached Mr. Barrett in a non-confrontational manner and properly identified themselves, Mr. Barrett would not have reacted with violence, but either would have tried to run way or surrendered peacefully.  Counsel unreasonably failed to investigate and introduce evidence (and the Government failed to disclose) that a short time before the raid, Sheriff Philpot had gone to Mr. Barrett's residence without incident.  (*E.g.,* Doc. 95, Ground Two, part A(11), pp. 159-63; Ground Five, part B(3) at pp. 307-08)

• Counsel unreasonably failed to investigate and introduce evidence which would have impeached the legal basis and supporting evidence for the no-knock, nighttime warrant, and shown that the warrant was issued in violation of *Franks v. Delaware,* 438 U.S. 154 (1978). (Doc. 95, Ground Two, part A( 2) at pp. 34-47, Ground Five, parts B(1) and B(3) at pp. 296-303, 307-08)

Because Mr. Gordon's evidence amplifies and expands with additional facts arguments already made or attempted to be made, of which the Government was and is on notice through the original and amended § 2255 motions, relation back is appropriate.  The supplemental ineffective assistance claim arising from Mr. Gordon's evidence stems from the same attorney conduct as set forth previously, is tied to a common core of operative facts, and is of the same time and type as a variety of previously raised ineffectiveness arguments, all of which addressed counsels' professionally unreasonable failures to investigate and present evidence which would

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,                              *Barrett v. USA*
or Correct a Judgement, Order and/or Sentence                 5                OKED Case No. 6:09-cv-00105-JHP

1031

have refuted evidence supporting the search warrant, shown that the raid was poorly planned in violation of protocol, and that the raid itself violated law enforcement standards and unnecessarily created a situation fraught with danger to both the officers and Mr. Barrett, who was unaware police were on his property.  The exact same form of attorney misfeasance, going to the same factual issues, is present vis a vis Mr. Gordon's evidence and what was previously raised. *E.g., Davenport v. United States,* 217 F.3d 1344, 1346 (11th Cir. 2000).

This is not an instance where a petitioner is asserting for the first time wholly new, distinct and separate grounds for relief on new legal theories which fail to tie back to ineffective assistance claims already made. *Compare, United States v. Jordan, supra* (failure to present evidence vs. failure to object to the rejection of a proffer which would have resulted in a different standard of review on appeal; no relation back); *United States v. Gonzalez,* 592 F.3d 675, 679-80 (5th Cir. 2010)(attorney error during sentencing phase and error in advising defendant to proceed to trial in the face of overwhelming evidence vs. failure to file notice of appeal; no relation back); *United States v. Hernandez,* 436 F.3d 851, 858 (8th Cir. 2006)(claims relating to attorney's failure to cross-examine two witnesses and those relating to failure to object to evidence were "not similar enough to satisfy the 'time and type test' of *Felix*"); *United States v. Ciampi,* 419 F.3d 20, 24 (1st Cir. 2005)(attorney's alleged failure to discuss with the defendant his appellate rights did not relate back to original claim dealing with attorney's advice to accept plea bargain); *Hodge v. United States, supra* (claim that counsel was ineffective for failing to file notice of appeal related back to denial of right to appeal claim).

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,
or Correct a Judgement, Order and/or Sentence                     6                     *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

1032

Judge Garrett's evidence attacking the credibility of Charles "Monk" Sanders and Task Force Officer Clint Johnson[2] unquestionably relates back to the claim that counsel were ineffective for failing to marshal evidence which would have undermined the testimony of Sanders and Johnson with respect to the *Franks* issue, and generally. In Mr. Barrett's timely original and amended § 2255 motions, he argued at length that counsel was ineffective for failing to impeach Sanders' credibility with the full nature and number of his previous convictions and bad acts, as well as with witnesses who could attest that Sanders, by reputation and based on their personal opinions, was a dishonest, untruthful person. It was argued also that counsel failed to investigate and introduce evidence of bad acts and dishonest conduct which reflected adversely on the credibility of Clint Johnson. Judge Garrett's evidence on these scores simply amplifies, by way of additional facts, arguments previously made, or a theory or claim previously addressed. Judge Garrett's evidence is tied to a common core of operative facts which are of the same or similar time and type – counsels' ineffectiveness in failing to investigate evidence which would have impeached Sanders and Johnson. No new or entirely new claim for which the Government lacked notice is made. (Doc. 95, Ground Two, parts 2, 5, pp. 34-47, 61-120)

The same analysis applies to Ground Twenty-Three in the supplement. (Doc. 201-1, pp. 30-32) Mr. Barrett argued previously (Ground Seven in the original and amended motions to vacate, *e.g.,* Doc. 95, pp. 326-30) that his constitutional rights were violated when the Court ordered that he would wear a "stun belt" during trial, because no factual or legal necessity was shown for the Court's order. Again, the evidence that could have been obtained from Judge

---

[2] Twenty-Second Ground in supplemental motion, Doc. 201-1, pp. 29-30.

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,
or Correct a Judgement, Order and/or Sentence

7

*Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

1033

Garrett to the effect that Mr. Barrett was not a dangerous or disruptive presence at the state trials, and, in the alternative, that counsel was ineffective for failing to produce evidence that would have demonstrated use of a stun belt was completely unnecessary and impinged on Petitioner's constitutional rights, relates back to an argument already made, relates to the same core of operative facts addressed previously, and is of the same time and type as arguments already advanced and of which the Government was and is on notice.

The Twenty-Fourth Ground for relief in Mr. Barrett's supplement relates back to Ground One of the original and amended motions to vacate, in which it is argued that the trial court unconstitutionally interfered with and denied Mr. Barrett's Sixth Amendment rights by forcing John Echols off the case with unreasonable funding and other limitations.  The trial court's actions, which have already been addressed and of which the Government is well aware, prevented Mr. Barrett from having a full, competent and complete defense in the ways argued previously, and in addition prevented competent counsel from using the Paul Gordon evidence, which would have devastated the Government's theory of the case.  The Gordon evidence simply expands or amplifies with additional evidence a claim already made, is related to the same core of operative facts of the same or similar time and type, and therefore relates back to Ground One of the original and amended § 2255 petitions based on the authority cited above.  (Doc. 95, pp. 7-33)

Likewise, with respect to the Twenty-Fifth Ground raised in Mr. Barrett's proposed supplement (Doc. 201-1, pp. 33), the Paul Gordon evidence and the evidence that could have been provided by Judge Garrett amplify and expand with additional evidence the cumulative

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,                           *Barrett v. USA*
or Correct a Judgement, Order and/or Sentence                    8                OKED Case No. 6:09-cv-00105-JHP

effect of the constitutional errors committed at Petitioner's trial.  Relation back to Ground

Nineteen in the original and amended motions to vacate is appropriate, since it has been shown

that the evidence outlined in the supplement clearly relates back to other issues previously raised.

(Doc. 95, pp. 394-96)

As a final matter, the Government in its response argues that Mr. Barrett cannot excuse

the lateness of his proposed supplemental claims "by attributing his delay to extraordinary

circumstances beyond his control, which might provide the basis for equitable tolling," because

Paul Gordon's investigation was referenced during trial and habeas counsel were clearly aware

that Judge Garrett presided over Mr. Barrett's state trials.  (Doc. 206 at p. 6)   The Government's

argument misses the mark.  First, because the claims raised in the proposed supplement clearly,

as shown above, relate back to grounds for relief previously raised or attempted to be raised and

of which the Government was on notice, there is no necessity for Mr. Barrett to rely on an

equitable tolling argument.  Second, and in the alternative, equitable tolling would be appropriate

in this case because the intimidation of Paul Gordon by both agents of the state and federal

government (former AUSA Mike Littlefield) and the filing of baseless criminal charges against

Mr. Gordon to render him an "impeachable" and "discredited" witness lulled petitioner into

inaction based on reliance on that conduct (or, more appropriately, misconduct), and constituted

extraordinary circumstances created by the Government which were beyond Mr. Barrett's

control.  *E.g., Maghee v. Ault,* 410 F.3d 473, 476 (8th Cir. 2005); *United States v. Martin,* 408

F.3d 1089, 1093 (8th Cir. 2005).

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,                    *Barrett v. USA*
or Correct a Judgement, Order and/or Sentence          9              OKED Case No. 6:09-cv-00105-JHP

1035

Accordingly, based on the above argument and authority, the Government's arguments should be rejected, and the Court should consider fully Mr. Barrett's supplemental motion, and all facts and arguments raised therein.

Respectfully submitted,

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at Law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: 405-521-9600

DANIEL J. BRODERICK
Federal Defender

/s/ Joan M. Fisher
JOAN M. FISHER, Idaho Bar No. 2854
Assistant Federal Defender
801 I Street, Third Floor
Sacramento, California 95814
Telephone: 916-498-6666

Attorneys for Movant
KENNETH EUGENE BARRETT

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,
or Correct a Judgement, Order and/or Sentence          10          *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

1036

## CERTIFICATE OF ELECTRONIC FILING AND SERVICE

This is to certify that on this 7th day of May, 2012, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing. This document will be served electronically to all counsel in this case. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ Joan M. Fisher

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,          11          *Barrett v. USA*
or Correct a Judgement, Order and/or Sentence                                 OKED Case No. 6:09-cv-00105-JHP

1037

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA, MUSKOGEE

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | DEATH PENALTY CASE |
| | ) | |
| Petitioner, | ) | |
| | ) | No.  6:09-CIV-00105-JHP |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Respondent. | ) | |
| | ) | |

## MOTION TO PRESERVE TESTIMONY  OF
## JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY

Petitioner Kenneth Eugene Barrett, through his counsel, respectfully requests that the Court enter an Order and allow the testimony of a material witness, namely, the Hon. John J. Garrett to be taken by deposition as soon as practicable to preserve the testimony thereof.  The perpetuation of that testimony will "prevent a failure or delay of justice."  Fed. R. Civ. P. 27(a)(3).

In support of this Motion, Mr. Barrett shows the Court the following:

1.  The testimony of the witness is critical, material and relevant to the claims pending before the Court;

2.  The testimony of the witness is at risk of being lost or unavailable as a result of the advanced age of the witness and the lengthy delay between the events and matters to which the witness will testify and the hearing in this matter.

3.      On June 11, 2012, the undersigned counsel, Joan M. Fisher, contacted opposing counsel, Messrs. Chris Wilson and Jeffrey Kahan, requesting of each their position on the instant motion by telephone and email communications.  That same day, counsel received an email from Mr. Wilson advising counsel of the Goverment's opposition to the Motion.

Wherefore, Mr. Barrett respectfully requests an Order Granting  permission  to take and preserve the testimony of Hon. John Garrett, out of court as soon as practicable for consideration herein.

This Motion is based on the pleadings and files herein and the Brief in Support hereof, filed herewith.

Dated this 18th day of June, 2012.

Respectfully submitted,

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender
/s/ Joan M. Fisher
JOAN M. FISHER, ID Bar No. 2854
Assistant Federal Defender

TIVON SCHARDL, Fla. Bar No. 73016
Trial and Habeas Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for KENNETH EUGENE BARRETT

**Motion to Take Testimony of Hon. Judge John Garrett,**          ***Barrett v. United States***
**Retired, Outside of Court without Further Delay**          2          **Case No. 6:09-CIV-00105-JHP**

1039

**Certificate of Electronic Filing and Service**

I hereby certify that on this  18th day of June,  2012, I caused the foregoing Motion for

Extension of Time to be filed with the Clerk of the Court using the ECF System for filing. A

copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street,

Muskogee, OK 74401, and Jeffrey B. Kahan, U.S. Dept. of Justice, 1331 F Street, NW,

Washington, DC 20530.

Jeffrey B. Kahan: jeffrey.kahan@usdoj.gov

Christopher Wilson: Chris.Wilson@usdoj.gov


/s/ *Joan M. Fisher*
Joan M. Fisher


**Motion to Take Testimony of Hon. Judge John Garrett,**          *Barrett v. United States*
**Retired, Outside of Court without Further Delay          3          Case No. 6:09-CIV-00105-JHP**

1040

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA, MUSKOGEE

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Movant, | ) | DEATH PENALTY CASE |
| | ) | |
| vs. | ) | |
| | ) | No.  6:09-CIV-00105-JHP |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

---

**BRIEF IN SUPPORT OF MOTION TO PRESERVE TESTIMONY
OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY**

---

Kenneth Barrett, through counsel, files this Brief in support of his Motion to Preserve Testimony of Judge John Garrett, Retired,  Outside of Court Without Further Delay.

**1.       Background**

Pending before this Court is an Amended Motion to Vacate (Docs 70, 95) upon which Petitioner seeks an evidentiary hearing.  *See* Doc 95 at 268,354,357,371, 401; Doc 150 (Motion for Evidentiary Hearing)[1].  The Amended Motion to vacate has been pending for over two and one-half years (filed  Dec. 4, 2009) and fully briefed for over a year and a half (Doc 178, Reply filed as of July 1, 2010).  Also pending before the Court is a Sealed Motion for Leave to File

---

1. The Motion was denied as premature and because Court would review pleadings and if appropriate order an evidentiary hearing.  Doc 157.

**Brief in Support of Motion to Preserve Testimony of**          **Barrett v. United States**
**Hon. John Garrett, Retire, Without Further Delay**          **1**          **Case No. 6:09-CIV-00105-JHP**

1041

Discovery (Doc No 186, filed Feb. 11, 2011) and a Sealed Motion to Vacate Protective Order (Doc No. 184). Both are fully briefed and have been pending without further argument or disposition for well over a year. Further and additional discovery motions are anticipated.

**2.      Judge John Garrett's Testimony is Relevant and Necessary to the 2255 Motion.**

One of Mr. Barrett's principal witnesses concerning claims raised in his Amended Motion to Vacate, including judicial interference with the defense; prosecutorial misconduct; the deficient performance of his trial counsel; and the denial of a fair trial by compulsion to wear a stun belt during trial (Doc 95 at 326) is the Honorable Judge John Garrett, Retired. Doc 95 at 25, 34, 100, 180, 264, 270, 271,273, 296, 297, 326 [Claims 1, 2(A)(2), 2(A)(4)(c)(2), 4, 5(A)(1), 5(B)(1), 7]. Judge Garrett presided over Mr. Barrett's two state trials for capital murder arising out of the very same events upon which Mr. Barrett currently stands convicted and sentenced to death. A recent interview of Judge Garrett by undersigned counsel and an investigator discloses the lack of credibility of former Task Force Officer Clint Johnson and his purported "confidential informant" Monk Sanders, as well as Judge Garrett's observations and findings regarding Mr. Barrett's conduct and the lack of necessity of any extraordinary restraint. *See* Appendix 1 (Declaration of Leonard Post, investigator).[2]

By consulting a commercial public records database, a paralegal working on behalf of undersigned counsel has determined that Hon. John Garrett was born September 18, 1941, making him over 70 years of age.

---

2. For the Court's convenience and in support hereof, the declaration is attached hereto.

**Brief in Support of Motion to Preserve Testimony of**          **Barrett v. United States**
**Hon. John Garrett, Retire, Without Further Delay          2          Case No. 6:09-CIV-00105-JHP**

1042

**3.      Unless Permitted to Depose Judge Garrett, His Testimony May Be Lost.**

The length of time Movant's Motion to Vacate and ancillary motions have been pending without any action by this Court, and the critical nature of the testimony sought and the importance of a fair and full adjudication of Mr. Barrett's constitutional claims, compel the conclusion that Judge Garrett's testimony should be taken sooner rather than later.  There is an arguable and unnecessary risk that the witness will not be available to either party if his testimony must await the scheduling of an in-court hearing, especially in light of the pace this case is being adjudicated.

This Motion is not made lightly and is unlikely to be the only Motion of its kind.  A number of witnesses relied upon by Mr. Barrett, whose testimony is critical to the claims raised in his §2255 Motion, are over the age of 70 and at significant risk of being unavailable to testify, especially in light of the lack of any demonstrable movement in this case. [3]

**a. The Testimony of the Witness is Necessary, Material and Relevant.**

Judge Garrett's importance to Mr. Barrett's case is demonstrated by the extensive summary of his proposed testimony in Mr. Barrett's Supplemental and/or Amended Motion to Vacate and the supporting declaration of Leonard Post.  Docs. 201, 200, 200-1.  In brief, Judge Garrett presided over the two state trials arising out of the same conduct for which Mr. Barrett stands convicted in this Court.  Judge Garrett is well familiar with the factual allegations originally asserted and with the conduct and good behavior of Mr. Barrett during the capital state

---

3. Counsel for Mr. Barrett notes for the Court the very recent death of Kenneth Barrett's father, Mr. Ernie Barrett, on June 4, 2012, who was (and is by Declaration) a material and relevant witness to Mr. Barrett's ineffective assistance of counsel claims at sentencing.

| | | |
|---|---|---|
| **Brief in Support of Motion to Preserve Testimony of** | | ***Barrett v. United States*** |
| **Hon. John Garrett, Retire, Without Further Delay** | **3** | **Case No. 6:09-CIV-00105-JHP** |

trials commencing with state capital murder charges in 1999 through the subsequent trials held in 2003 and 2004.  As District Judge of Sequoyah County for many years, Judge Garrett is also well familiar with the credibility and reliability of the informant purportedly relied upon by the affiant, Monk Sanders, and Drug Task Force investigator, Clint Johnson.  Judge Garrett had a unique vantage point of Mr. Barrett's lack of any threatening or hostile conduct, such as would necessitate extraordinary precautions like the compelled wearing of a stun belt.  Judge Garrett also has knowledge of Mr. Johnson's and Mr. Sanders' credibility, which directly impacts questions surrounding the issuance of the search warrant and the likelihood that Mr. Barrett's behavior demanded or even supported the issuance and execution of a no-knock, nighttime warrant.  *See* Claim 2(A)(1) (Doc 95). In his Amended §2255 Motion, Doc 95 at page 103, Mr. Barrett alleges '[c]ounsel unreasonably failed to interview and present at trial some of the witnesses discussed immediately above, and others who could have testified that Sanders is a pathological liar whose word should not have been relied upon by Clint Johnson or the jury." Judge Garrett is one of those "other witnesses."  He is a material witness to that claim.

Judge Garrett is also  a critical, material witness on the unnecessary use of restraints, which effectively denied Mr. Barrett his constitutional right to the presumption of innocence and to assist his counsel at trial in violation of the Sixth Amendment to the United States Constitution.  Had appropriate judicial inquiry been made and/or had trial counsel presented the testimony of Judge Garrett in support of his Motion in opposition to the U.S. Marshall's request to restrain Mr. Barrett during trial, Judge Garrett  would have advised the Court that Mr. Barrett was at all times respectful and submissive to court procedures and security, notwithstanding the capital charge for which he was standing trial.  Judge Garrett would also have advised the Court

that Mr. Barrett was extraordinarily polite and helpful to both the judge and his secretary during the proceedings.  Appendix A.

The testimony which was available at the time of the federal trial illustrates counsel's failure to perform the necessary pretrial investigation which would have resulted in exculpatory and mitigating evidence.  His testimony relates directly to Mr. Barrett's §2255 claims of ineffective assistance of counsel in the investigation and litigation of issues including denial of his Fourth Amendment rights under *Franks v. Delaware* motion.  Additionally, had Judge Garrett's testimony been presented, there is a reasonable probability the jury would have disbelieved the drug-related evidence, as well as the numerous law enforcement officers and drug informants, and returned a verdict of not guilty or guilty of a lesser included offense.  Doc 95 at 103.  Judge Garrett's testimony would also have been relevant to counsel's failure to adequately contest the necessity of Mr. Barrett being compelled to wear a stun belt during trial. Doc 95 at 326-329.

Mr. Barrett's ability to prove the allegations raised in his §2255 Motion will be significantly prejudiced if Judge Garrett is unable to testify due to loss of the testimony by the increasing risk of death and/or lack of recall, made significantly more likely by age and the passage of time.  If Judge Garrett's testimony is not preserved and he becomes unavailable, Respondent would likely argue that Judge Garrett's statements to the investigator and Mr. Barrett's current counsel are inadmissible, or that the value of Judge Garrett's statements is diminished because of Respondent's inability to cross-examine him.

**Brief in Support of Motion to Preserve Testimony of**          ***Barrett v. United States***
**Hon. John Garrett, Retire, Without Further Delay**          5          **Case No. 6:09-CIV-00105-JHP**

1045

**b. The Law Supporting Preservation of the Testimony.**

This Court may order the taking of a deposition pursuant to Rule 27 if it is "satisfied that perpetuating the testimony may prevent a failure or delay of justice." Fed.R.Civ.P. 27(a)(3). Under Rule 27(b) the court "may" allow the perpetuation of testimony pending appeal where it is "proper to avoid a failure or delay of justice." Here, with an aging witness whose material and relevant testimony in a capital case relates to events transpiring eight to thirteen years ago, the circumstances clearly favor permitting the Movant to perpetuate that testimony as soon as practicable. *Ash v. Cort,* 512 F.2d 909, 913 (3d Cir.1975) (cited in *In re Eisenberg,* 654 F.2d 1107, 1111 (5th Cir.1981) (Unit B)); *see also Rose v. McNamara,* 375 F.2d 924, 925 & n. 2 (D.C.Cir.), *cert. denied,* 389 U.S. 856, 88 S.Ct. 70, 19 L.Ed.2d 121 (1967).

Because advanced age certainly carries an increased risk that the witness will be unavailable by the time of trial or hearing, it is well-recognized as a ground for perpetuation of testimony under Rule 27. *See, e.g.*, *Penn Mutual Life Ins. Co. v. United States*, 68 F.3d 1371 (D.C. Cir. 1995) (court erred by denying Rule 27 motion without considering that witness was 81 years old); *Texaco, Inc. v. Borda*, 383 F.2d 607 (3d Cir. 1967) (abuse of discretion to deny permission to take testimony of a 71-year-old witness in a case otherwise stayed); *DeWagenknecht v. Stinnes*, 250 F.2d 414 (D.C. Cir. 1957) (Rule 27 used to take testimony of 74-year-old witness); *cf. Ash v. Cort*, 512 F.2d 909, 913 (3d Cir. 1975) (allegation that "it is probable that" witnesses "are over fifty years of age" is insufficient to invoke Rule 27). *See also, In re McBean,* __ F.Supp__, (D.Colo. No. 12-cv-00579, March 8, 2012), 2012 WL 769521 (citing with approval age-related reasons for permitting deposition). *A fortiori*, at age 70+, age alone justifies taking Judge Garrett's testimony out of court at this time.

**Brief in Support of Motion to Preserve Testimony of**                 ***Barrett v. United States***
**Hon. John Garrett, Retire, Without Further Delay**          6          **Case No. 6:09-CIV-00105-JHP**

1046

**4.      Conclusion**

For the reasons stated, Mr. Barrett's Motion to preserve Judge John Garrett's testimony and permit it to be taken outside the courtroom without further delay, with video recording if respondent wishes, should be granted.

DATED this 18th day of June, 2012.

Respectfully submitted,

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

/s/ Joan M. Fisher
JOAN M. FISHER, ID Bar No. 2854
Assistant Federal Defender

TIVON SCHARDL, Fla. Bar No. 73016
Trial and Habeas Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Movant
KENNETH EUGENE BARRETT

**Brief in Support of Motion to Preserve Testimony of**          *Barrett v. United States*
**Hon. John Garrett, Retire, Without Further Delay**          7          **Case No. 6:09-CIV-00105-JHP**

1047

**Certificate of Electronic Filing and Service**

I hereby certify that on this 18th day of June, 2012, I caused the foregoing Motion for Extension of Time to be filed with the Clerk of the Court using the ECF System for filing. A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and Jeffrey B. Kahan, U.S. Dept. of Justice, 1331 F Street, NW, Washington, DC 20530.

Jeffrey B. Kahan: jeffrey.kahan@usdoj.gov

Christopher Wilson: Chris.Wilson@usdoj.gov

/s/   *Joan M. Fisher*
Joan M. Fisher

1048

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,      )
                             )      **DEATH PENALTY CASE**
Movant,                      )
                             )
                             )
v.                           )      Case No. 09-CIV-105-JHP
                             )
UNITED STATES OF AMERICA,    )
                             )
Respondent.                  )
                             )

---

### DECLARATION OF LEONARD POST IN SUPPORT OF SUPPLEMENTAL SECTION 2255 MOTION TO VACATE

---

I, Leonard Post, a person over the age of eighteen (18) and competent to testify and mindful of the penalties of perjury, declares as follows:

1.      I am an investigator retained by the Federal Defenders Office of the Eastern District of California to assist in the postconviction investigation in the above-numbered and styled matter.

2.      David Autry, counsel for Kenneth Eugene Barrett and I interviewed the Hon. John Garrett at the Adair County courthouse in Courtroom One, which was otherwise unoccupied, on July 1, 2011.

3. The following is a true and correct accounting of Judge Garrett's statements to us.

A.      Re Judge Garrett:

1.      Judge Garrett presided over two state trials brought by the state of Oklahoma against Kenneth Barrett for capital

DECLARATION OF LEONARD POST IN SUPPORT OF
SUPPLEMENTAL SECTION 2255 MOTION TO VACATE -**1**

murder in the shooting death of Trooper Rocky Eales.

2. Publicly available information shows Judge John Garrett to now be seventy (70) years of age.

2. Judge Garrett retired approximately five years ago.

B. Re: Monk Sanders

1. Judge Garrett told Clint Johnson he did not want to know who the Confidential Informant [CI] for the warrant was. At the time of the interview, Judge Garrett still didn't know who the CI was.

2. When Judge Garrett was advised that the CI was Monk Sanders, he said, "Hell you say." When asked if he knew Monk, he said that he did and that "No, I would not believe anything he told me."

C. Re: Clint Johnson

1. Judge Garrett said that Clint Johnson "was not a truthful guy and not to be trusted. We have an Oklahoma expression for someone like him. 'He'd slap you on the back and piss in your boots at the same time.' He did lots of shaky things....slime around and finagle a lot of stuff....various and sundry things...people were afraid of him, because of what he had the power to do—I like to think I wasn't—the black gown will always prevail—but other people were afraid of him and had reason to because of what he held over your head....I was always suspect of him."

2. "Johnny Philpot had been out there [Kenny's] the week before [the raid] and talked to him [Kenny]." Judge Garrett believes that Philpot testified to that. "The warrant was already good at that time.

C. Re: OHP:

1. "I wouldn't let them bring their firearms into the courtroom. They would argue that that it offered the court protection. I told them that I had two armed deputies...." He finally had to tell them "You're not going to wear your . . . guns."

2.      OHP officers "filled the courtroom. They were trying to intimidate a lot of people. I think they thought they were going to intimidate me."

D.      Re Kenneth Barrett:

1.      Judge Garrett advised that while presiding over the trial, he never thought Mr. Barrett was a danger. "We'd have lots of hearings. He was never anything but a gentleman in all respects. He showed me the greatest of respect[.]"

2.      Judge Garrett also said that Mr. Barrett had treated his secretary, Audrey, with the same degree of respect.

E.      Re: Echols:  Judge Garrett thinks that John Echols is the best lawyer who ever tried a case in front of him.

I declared under penalty of perjury that this three page declaration is true and correct.

Executed by me on this 15th day of March, 2012 in New Yourk County, New York.

_____
Leonard Post
NYS Investigator's License
#110001455413

DECLARATION OF LEONARD POST IN SUPPORT OF
SUPPLEMENTAL SECTION 2255 MOTION TO VACATE -3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| **Petitioner/Defendant,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. CIV-09-105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent/Plaintiff.** | ) | |

## ORDER

This matter comes on for decision on petitioner's motion for leave to supplement the pending amended motion to vacate, set aside, or correct a judgment, order and/or sentence under 28 U.S.C. § 2255 (Doc. # 201). The government has responded (Doc. # 206) and petitioner has filed a reply (Doc. # 207). For the reasons set forth herein, plaintiff's motion is denied.

Fed.R.Civ.P. 15 authorizes amendment or supplementation of a pleading subject to certain restrictions. Rule 15(c)(2) provides, in pertinent part, as follows:

> An amendment to a pleading relates back to the date of the original pleading when:
>
> > (A) the law that provides the applicable statute of limitations allows relation back;
> >
> > (B) the amendment asserts a claim or defense that arose out of conduct, transaction or occurrence set out—or attempted to be set out—in the original pleading; . . . .

Pursuant to this rule, an amendment is intended to clarify or amplify a claim or theory raised

in the original pleading.  Under Rule 15(a), a petitioner may amend his pleading once as a matter of course at any time before a responsive pleading is served.  Once, however, a responsive pleading is served, a party may only amend a pleading if the opposing side consents in writing or the court grants leave to amend.  Fed.R.Civ.P. 15(a)(2).  "[L]eave to amend should be freely granted unless there is evidence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowing the amendment or futility of amendment." *United States v. Thomas*, 221 F.3d 430, 435 (3rd Cir. 2000).

> Whereas, Rule 15(d) of the Federal Rules of Civil Procedure provides
>
> . . . .the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that **happened after the date of the pleading to be supplemented**.  The court may permit supplementation even though the original pleading is defective in stating a claim or defense.  (Emphasis added).

A supplemental pleading is not amendatory in effect.  Rather, a supplemental pleading deals with events or issues that arise *after* the filing of the original pleading.  Looking at the pleading petitioner proposes to file, there is no doubt in this Court's mind that none of the events set forth in the proposed supplement happened after September 25, 2009, the date of the filing of the Amended Motion for Collateral Relief to Vacate, Set Aside, or Correct Sentence, and for a New Trial.  Doc. 70.  Furthermore, based upon the fact that the petitioner has waited more than three years after the statute of limitations has expired to seek leave to add six propositions of error, all of which were discoverable by counsel at the time of their

appointment herein, this court finds the proposed amendments would be futile.  Accordingly, this Court hereby denies the Motion for Leave to Supplement (Doc. 201) the pending amended motion to vacate.

It is so ordered on this 20th day of June, 2012.

James H. Payne
United States District Judge
Eastern District of Oklahoma

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | DEATH PENALTY CASE |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 6:09-CV-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff, | ) | |
| | ) | |

**MOTION FOR  RECONSIDERATION OF COURT'S ORDER OF JUNE 20, 2012
(DOC. 210) AND BRIEF IN SUPPORT**

Petitioner/Defendant, Kenneth Eugene Barrett, moves that the Court reconsider its denial of his motion for leave to supplement his pending amended motion to vacate, set aside, or correct a judgment, order and/or sentence under 28 U.S.C. § 2255. (See Docs. 201, 206, 207, 210)

The Court denied the motion for leave to supplement for two reasons.  First, the Court relies on Fed.R.Civ.P. 15(d) to hold that a supplemental pleading is not amendatory in effect and deals only with events arising after the filing of the original pleading.  The Court holds that none of the events referred to in the proposed supplement happened or occurred after September 25, 2009, the date the amended § 2255 petition was filed.  (Doc. 210 at p. 2)

**Motion for Reconsideration of Court's Order
of June 20, 2012 (Doc. 210) and Brief in Support**                1                *Barrett v. United States*
*Case No. 6:09-CV-00105-JHP*

Additionally, the Court holds that because over three years had elapsed from the running of the 1-year period of limitations, and Petitioner's supplemental claims of error were discoverable by counsel before the period of limitations expired, the amendments would be futile. (Doc. 210 at pp. 2-3)  The Order cites Fed.R.Civ.P. 15(a)(2), which states leave to amend should be freely granted unless there is evidence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowing the amendment or futility of amendment." *United States v. Thomas,* 221 F.3d 430, 435 (3rd Cir. 2000).  (Doc. 210 at p. 2)

The Court should reconsider its ruling and allow the proposed supplement or amendment. Regardless of the semantics involved, Mr. Barrett has shown that the additional arguments he makes clearly "relate back" to arguments previously made under Fed.R.Civ.P. 15(a).  Petitioner's proposed supplement or amendment simply expands or amplifies with additional facts claims or theories already set out or attempted to be set out in previous pleadings.  Both the original and previously amended § 2255 motions, and the proposed supplement or amendment, state claims tied to the same core of operative facts, and are of the same "time and type."  Mr. Barrett is not setting forth entirely new claims.  *E.g., Mayle v. Felix,* 545 U.S. 644, 664 (2005); *Hodge v. United States,* 554 F.3d 372, 377 (3rd Cir. 2009); *Valdovinos v. McGrath,* 598 F.3d 568, 574-75 (9th Cir. 2010).

As shown in Petitioner's reply to the Government's response (Docs. 206, 207), the additional facts pled in the proposed supplement or amendment simply expand arguments *already specifically made, and of the same time and type*, concerning the suppression of exculpatory evidence, ineffective assistance of counsel, forcing Mr. Barrett to wear a stun belt at trial, the Court's unconstitutional interference with trial counsel, and cumulative error.  Put simply, it is irrelevant whether the facts

**Motion for Reconsideration of Court's Order**
**of June 20, 2012 (Doc. 210) and Brief in Support**          2          *Barrett v. United States*
**Case No. 6:09-CV-00105-JHP**

1056

relied upon "happened after the date of the pleading to be supplemented" under Rule 15(d), because, regardless of when the events or facts occurred, there is a clear "relation back" under Rule 15(a). If, as is the case here, "the amendment asserts a claim or defense that arose out of conduct, transaction or occurrence set out – or attempted to be set out – in the original pleading," Rule 15(c)(2)(B), it does not matter whether the additional facts could have been discovered with the exercise of due diligence within the 1-year period of limitations, and an equitable tolling argument is unnecessary.  In any event, and in the alternative, Government misconduct creates a basis for equitable tolling.  (See Doc. 207 at p. 9)

In its order, the Court focuses on the "futility" of the proposed supplement or amendment, and does not make a finding that there was "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the opposing party." (Doc. 210 at pp. 2-3) That the proposed amendment or supplement is not "futile" but is at the least arguably meritorious with respect to specific issues and arguments already raised is amply demonstrated by the additional amplifying and clarifying facts pled.  There can be little question that counsel for Mr. Barrett have been diligent in investigating and continuing to investigate his case.  Denying the proposed supplement or amendment is clearly not in the best interests of justice.

Throughout, Petitioner has asserted that the Government has suppressed exculpatory evidence.  The Government is under a continuing duty to disclose exculpatory evidence, and that duty extends even to habeas or collateral proceedings.  *Smith v. Roberts,* 115 F.3d 818, 820 (10th Cir. 1997); *United States v. Quintanilla,* 193 F.3d 1139, 1146-49 (10th Cir. 1999); *Steidl v. Freeman,* 494 F.3d 623, 630 (7th Cir. 2007).  Regardless of whether Petitioner could have previously discovered

**Motion for Reconsideration of Court's Order**
**of June 20, 2012 (Doc. 210) and Brief in Support**          3          *Barrett v. United States*
*Case No. 6:09-CV-00105-JHP*

1057

the full depth and breadth of the information provided by Paul Gordon, for example, the Government failed to discharge its *independent* duty to reveal it, even up to the present day; but rather, intimidated him during Mr. Barrett's trial, and left undisclosed the fact that law enforcement concocted baseless criminal charges against him to keep him quiet.  The Government cannot profit from or take advantage of its own misconduct to keep these facts from being heard now.  *In re Pickard,* ___F.3d___, No. 11-3030 (10th Cir. June 18, 2012)(slip. op. at pp. 6-14)(holding that claim of suppression of exculpatory evidence relating to credibility of Government witness based on evidence secured through FOIA request after denial of § 2255 motion was a second and successive § 2255 petition, but remanding for determination on the merits of whether defendant was entitled to relief under Rule 60(b) because the Government's misconduct in falsely denying the existence of impeaching facts relative to the witness adversely affected the § 2255 proceedings themselves.)  Here, Mr. Barrett's § 2255 motion is still pending and he is raising claims of misconduct that affect the ongoing § 2255 proceedings.  The issues sought to be raised relate back and should be determined now on the merits.

Finally, the Supreme Court ruled recently in *Martinez v. Ryan,* 566 U.S.___, No. 10-1001 (March 20, 2012) that where, as for example in § 2255 proceedings, *Massaro v. United States,* 538 U.S. 500 (2003), the first available avenue for raising claims of ineffective assistance of counsel is on collateral review, and counsel on collateral review fails to raise a substantial, meritorious claim of ineffective assistance of trial counsel, counsel on collateral review may be deemed ineffective, even though no Sixth Amendment right to counsel ordinarily attaches in collateral proceedings.  If, for the sake of argument, the facts sought to be raised in the proposed amendment or supplement do not relate back, and should have been raised in the original or amended petition, then § 2255

**Motion for Reconsideration of Court's Order**
**of June 20, 2012 (Doc. 210) and Brief in Support**                 4                 *Barrett v. United States*
*Case No. 6:09-CV-00105-JHP*

counsels' failure to raise them earlier is indicative of ineffective assistance. Because, in the event the § 2255 motion were denied, this would be grounds for a Rule 60(b) motion since the § 2255 action would itself be adversely affected, the matters addressed in the proposed amendment or supplement should be heard now while the § 2255 action is still pending. *E.g. In re Pickard, supra.* Given the heavy burden required in a 60(b) motions and the "freely given" dictate of Rule 15, it would be an abuse of discretion to deny the amendment/supplement requested.

Based on the foregoing argument and authority, the Court should reconsider its Order of June 20, 2012 (Doc. 210) and grant the motion to supplement.

DATED this 28th day of June, 2012.

<div style="text-align:right">

Respectfully submitted,

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at Law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: 405-521-9600

DANIEL J. BRODERICK
Federal Defender

/s/ Joan M. Fisher
JOAN M. FISHER, Idaho Bar No. 2824
Assistant Federal Defender
801 I Street, Third Floor
Sacramento, California 95814
Telephone: 916-498-6666

Attorneys for Movant
KENNETH EUGENE BARRETT

</div>

**Motion for Reconsideration of Court's Order**
**of June 20, 2012 (Doc. 210) and Brief in Support**                5                *Barrett v. United States*
*Case No. 6:09-CV-00105-JHP*

1059

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 28th day of June, 2012, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing.  A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and Jeffrey B. Kahan, U.S. Dept. of Justice, 1331 F Street, NW, Washington, DC 20530.

Jeffrey B. Kahan: jeffrey.kahan@usdoj.gov

Christopher Wilson: Chris.Wilson@usdoj.gov

/s/ Joan M. Fisher
Joan M. Fisher

**Motion for Reconsideration of Court's Order**
**of June 20, 2012 (Doc. 210) and Brief in Support**                     6                     *Barrett v. United States*
**Case No. 6:09-CV-00105-JHP**

1060

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | Case No. 09-CV-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| Respondent. | ) | |

**RESPONSE IN OPPOSITION TO PETITIONER'S MOTION FOR
RECONSIDERATION OF COURT'S ORDER OF JUNE 20, 2012**

**COMES NOW** the United States of America by and through undersigned counsel and files this response in opposition to Barrett's Motion for Reconsideration of this Court's Order of June 20, 2012 (Doc. 212 (denying Barrett's request to add new claims to his § 2255 motion and to conduct discovery in support of those claims)).   The Court should deny the Motion because the Barrett has failed to establish a legal basis for this Court to consider the proposed amendment to his § 2255 motion.[1]

**PROCEDURAL HISTORY**

On March 16, 2009, Barrett filed a 17-claim motion for relief under 28 U.S.C. § 2255, attacking his federal homicide conviction and death sentence.   Doc. 1.   His current collateral attack on the judgment – a second-amended § 2255 motion – was filed with on December 5, 2009 and raised 19 claims:

1.   The Court's administration of the Criminal Justice Act and its ex parte meeting with prosecutors demonstrates bias that requires relief without a showing of prejudice.

---

[1] Barrett's motion referred to the new claims as a "supplement," but this Court found that they actually constituted a potential "amendment" to the existing § 2255 Motion.  Doc. 210. Consistent with that finding, the government refers to the new arguments as an "amendment."

1

2.  Barrett received ineffective assistance of counsel at trial.

3.  The Court deprived Barrett of funding necessary to employ experts and purchase pre-trial hearing transcripts.

4.  Newly discovered evidence requires this Court to grant a hearing to determine whether the police acted in good faith when they obtained a search warrant for Barrett's house.

5.  The prosecutors committed misconduct, by suppressing evidence favorable to the defense, interfering with the defense, improperly examining witnesses, and unfairly arguing for a death sentence.

6.  The Court erroneously excluded evidence of Barrett's remorse.

7.  The Court improperly ordered Barrett to wear an electronic stun belt during the trial.

8.  The Court permitted Barrett to stand trial while he was mentally incompetent.

9.  The Court erroneously failed to instruct the jury on voluntary manslaughter as a lesser included offense to the three charged crimes.

10.  The Court improperly failed to instruct the jury that it could consider residual doubt as a factor in mitigation during its penalty deliberations.

11.  The Court improperly excused a juror based on her opinions about the death penalty.

12.  The penalty phase instructions unconstitutionally relieved the jury of employing the reasonable doubt standard when it weighed the aggravating and mitigating factors.

13.  Following Barrett's disruption of the trial, the Court and counsel improperly responded to the defendant's request to absent himself from the proceedings.

14.  Statistical information demonstrates that the federal government disproportionately seeks the death penalty in cases involving White, rather than minority, victims.

15. The indictment in this case that did not refer to the death penalty and did not allege the aggravating factors upon which the prosecution relied at trial.

16. The Court failed to sequester the jury and, as a result, the jurors committed misconduct by consulting information outside the record.

17. Barrett is not competent to be executed.

18. Barrett received ineffective assistance of appellate counsel.

19. Cumulative error requires reversal.

Doc. 95. The government answered the second-amended motion (and supporting brief (Doc. 149)) on May 17, 2010. Doc. 174.

On March 16, 2012, Barrett moved for leave to amend his second-amended § 2255 motion, raising five new claims and a restated assertion of cumulative error. Doc. 201. The amendment raises the following specific issues: the government suppressed exculpatory information about the investigation of Oklahoma Highway Patrol Internal Affairs investigator Paul Gordon (Doc. 201-1 at 2-12); trial counsel ineffectively failed to investigate and present information and opinions possessed by Paul Gordon (*id.* at 13-28); trial counsel ineffectively failed to investigate and present information and opinions possessed by Oklahoma State Court Judge John Garrett (*id.* at 29-30); this Court failed to consider significant testimony (available through Judge Garrett) that the use of a stun belt was unnecessary to restrain the defendant (*id.* at 30-31); this Court interfered with the defense by compelling the withdrawal of John Echols who had previously relied on information from Paul Gordon (*id.* at 32-33). Barrett subsequently sought leave to preserve the testimony of Judge John Garrett in support of claims in the proposed amendment. Docs. 208 & 209. On June 20, 2012, this Court denied the motion to amend and the motion to preserve Judge Garrett's testimony. Doc. 210.

1063

On June 28, 2012, Barrett moved for reconsideration of the Court's order denying his previous two motions.  This Response in Opposition follows.

## BARRETT HAS NOT ESTABLISHED GOOD CAUSE FOR FILING AN UNTIMELY SUPPLEMENT TO HIS § 2255 MOTION

Barrett argues that this Court should reconsider its order denying his request to supplement his second-amended § 2255 motion because his new claims are of the same time and type as his original contentions.  Ignoring the statutory period of limitations, Barrett contends that his proposed amendment is timely under Federal Rule of Civil Procedure 15(a).  He also asserts that any delay in presenting his new claims is attributable to the government's failure to disclose exculpatory evidence and his present counsel's alleged ineffectiveness.  Doc. 212.  The proposed amendment is untimely, and Barrett has failed to demonstrate that it relates back to his existing motion.  Similarly, he has failed to identify any conduct attributable to the government that prevented him from timely filing it within the period of limitations.  Moreover, his counsel's alleged ineffectiveness cannot excuse an untimely filing.  The government therefore urges this Court to deny the Motion for Reconsideration.

Relying on Federal Rule of Civil Procedure 15(a), Barrett argues that this Court denied his proposed amendment without expressly finding that the request to add claims involved "undue delay, bad faith or dilatory motive."  Doc. 212 (citing Rule 15(a) as interpreted by *United States v. Thomas*, 221 F.3d 430, 435 (3d Cir. 2000)).  Barrett's criticism misses the mark: the Court properly found that the proposed amendment was untimely under 28 U.S.C. § 2255(f).  *See* Doc. 210 ("based upon the fact that the petitioner has waited more than three years after the statute of limitations has expired to seek leave to add six propositions of error, all of which were discoverable by counsel at the time of their appointment herein, this court finds the proposed amendments would be futile").  While Rule 15 generally applies to § 2255 litigation, application

4

is limited "to the extent [the rule is] not inconsistent with any statutory provisions." Rules foll. 28 U.S.C. § 2255, Rule 12; *see Mayle v. Felix*, 545 U.S. 644, 654 (2005). The one-year period of limitations under § 2255(f), when applicable, takes precedence over Rule 15's directive to freely permit amendments. *See Thomas*, 221 F.3d at 435-36. Because Barrett submitted his amendment several years after the finality of the judgment, he must show relation back under Rule 15(c), irrespective of the fact that Rule 15(a) appears to otherwise encourage amendment. *Id*. at 435-37. This he has failed to do.

Barrett presents a flawed construction of the relation back doctrine premised on an overly-expansive construction of Supreme Court authority. An amendment relates back to an earlier pleading when it "clarifies or amplifies" an existing claim. *United States v. Weeks*, 653 F.3d 1188, 1206 n.12 (10th Cir. 2011); *see also Mayle v. Felix*, 545 U.S. at 655 (holding that "Amendments . . . relate back . . . if the original and amended pleadings arise out of the same conduct, transaction, or occurrence"). Barrett ignores that standard and argues, on the basis of language in *Mayle v. Felix*, that his new claims relate back because they are of the same "time and type" as his earlier ones. As used in *Mayle* and its progeny, new claims that are *not* of the same "time and type" *do not* clarify or amplify and *do not* relate back. *See United States v. Espinoza-Saenz*, 235 F.3d 501, 504-05 (10th Cir. 2000) (holding new claims untimely because they of *different* time and type than earlier arguments, and citing similar Fourth, Eighth and Eleventh Circuit opinions). But the inverse rule does not follow: arguments of the same time and type as earlier contentions do not invariably clarify or amplify those initial contentions and therefore relate back. Thus, an untimely amendment may not introduce a new theory based on facts different from those underlying existing issues. *See Dean v. United State*s, 278 F.3d 1218,

1221 (11th Cir. 2002) ("Congress did not intend Rule 15(c) to be so broad as to allow an amended pleading to add an entirely new claim based on a different set of facts").

Barrett's proposed amendment does not clarify or amplify his existing § 2255 motion – it adds novel arguments that should not be reviewed. As set forth in the government's opposition to the motion to amend (Doc. 206), Barrett's new claims rely largely on information from Paul Gordon and Judge John Garrett, who are essentially unmentioned in the earlier § 2255 motions. While the proposed amendment asserts claims that are broadly reminiscent of existing ones, the new arguments do not relate back because they rely on new factual allegations. *Weeks*, 653 F.3d at 1206 n.12; *see Dean*, 278 F.3d at 1221.

As an alternative to the relation back doctrine, Barrett argues that this Court should permit the amendment because its tardiness is attributable to prosecutorial misconduct. Specifically, he alleges that the government has failed to meet its continuing duty to disclose exculpatory evidence concerning the official mistreatment of Paul Gordon, thereby preventing Barrett from timely raising the new issues. The government, however, has no continuing duty in a § 2255 action to disclose exculpatory evidence. The Supreme Court has held that the prosecution's obligation under *Brady* does not apply after a defendant has been convicted. *District Attorney's Office for the Third Judicial District v. Osborne*, 129 S. Ct. 2308, 2319-20 (2009); *see also Tevlin v. Spencer*, 621 F.3d 59, 70 (1st Cir. 2010) (noting that the Supreme Court in *Osborne* "explicitly rejected *Brady's* applicability to postconviction proceedings").

Regardless of the applicability of *Brady*, Barrett has not shown that the government actually or constructively possessed any exculpatory information about Gordon, who complains that Oklahoma state officials mistreated him and obstructed his Internal Affairs investigation of the circumstances surrounding the instant murder. *See e.g.*, Doc. 199 at ¶¶ 15-21, 62-74. The

only actions Gordon attributes to a federal official are statements by an Assistant U.S. Attorney who reportedly said he would "tear [Gordon] up on the witness stand" by impeaching him with a prior conviction and a lack of expertise in SWAT procedures. *Id*. at ¶ 84. The prosecutor's opinion of Gordon was not discoverable under *Brady*. *See United States v. Kohring*, 637 F.3d 895, 907 (9th Cir. 2011) (holding a prosecutor's opinions of a case are not discoverable unless they contain underlying exculpatory facts). Barrett cannot show that the supposed malfeasance alleged by Gordon against Oklahoma state officials (see Doc. 199), was known by the U.S. Attorney and was therefore discoverable. *See United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999).

Even if the government had a demonstrable duty to disclose information about Gordon, Barrett has not shown how the absence of that discovery prevented him from timely raising his new contentions. To justify his belated filing on the basis of government malfeasance, Barrett must show that he submitted the amendment within one year of "the date on which the impediment . . . created by governmental action in violation of the Constitution or laws of the United States [was] removed . . . ." 28 U.S.C. §2255(f)(2); *see Adams v. United States*, 173 F.3d 1339, 1341 (11th Cir. 1999). Barrett makes no specific argument in that regard. He obtained the information that supports several of his new contentions by interviewing Gordon on November 3, 2011, and does not demonstrate that the government ever impeded that meeting. *See* Doc. 199 at ¶ 86. Indeed, Barrett cannot credibly assert prior ignorance of Gordon given the frequent references to him at trial. *See e.g*., Tr. 3:630, 632; 4:686, 812, 816; 5:1071, 1075, 1119-20, 1129, 1142-43; 6:1204, 1291-94, 1297-98, 1325, 1329-30; 7:1549, 1559; 17:4040-41, 4047-51. Even if Barrett showed some government-generated impediment to the discovery of issues concerning Gordon, it would not reach the claims in the amendment that do not concern Gordon.

Barrett is similarly unpersuasive in arguing that present counsel's ineffectiveness excuses his delay. As he observes, the Supreme Court recently recognized a doctrine of ineffective assistance of collateral counsel in *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309, 1320 (2011). However, the *Martinez* doctrine has far less reach than Barrett indicates and does not apply in this setting. *Id*. at 1315 (noting the majority opinion recognizes only a "narrow exception" to a 1991 opinion concerning the procedural default doctrine); *id*. at 1319 (observing that "this limited qualification" to prior jurisprudence "does not implicate the usual concerns with upsetting reliance interests protected by *stare decisis* principles"). Under *Martinez*, "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id*. at 1315. The procedural default rule "precludes federal review of . . . claims" denied on independent and adequate state law grounds. *Martinez*, 132 S. Ct. at 1316. As a limitation on subject matter jurisdiction, the procedural default doctrine permits different exceptions than the statutorily-defined one-year period of limitations applicable to federal collateral proceedings. *United States v. Goodwin*, Nos. CV–10–141–E–BLW, CR–06–259–E–BLW, 2010 WL 2404350, *2 (D. Idaho, June 9, 2010).

Congress allowed for only three circumstances in which a § 2255 claim could be reviewed if filed more than one year after the finality of the underlying judgment.

> (f) A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—
>
> > (1) the date on which the judgment of conviction becomes final;
> >
> > (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
> >
> > (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

<div align="center">8</div>

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).  To adopt Barrett's position, and permit the filing of belated § 2255 claims simply because counsel failed to timely submit them, would render nugatory the statutorily enumerated exceptions to the period of limitations.[2]  *Cf. Planned Parenthood of Rocky Mountains Services, Corp. v. Owens*, 287 F.3d 910, 927 (10th Cir. 2002) (holding the courts may only consider interpretations of statutes that are "fairly possible").  In fact, Barrett's construction of the statue would excuse the negligent actions of counsel despite Congress's insistence that only duly diligent investigations could excuse an otherwise belated claim.  *See* 28 U.S.C. § 2255(f)(4)*; cf. Andersen v. Director, Office Of Workers' Compensation Programs*, 455 F.3d 1102, 1106 (10th Cir. 2006) (prohibiting constructions of statutes that render any part of the law meaningless, redundant or superfluous).  Thus, Barrett's attempt to expand the reach of *Martinez* would lead to the virtual nullification of § 2255's period of limitations.

The period of limitations does admit to one judicial exception, equitable tolling.  Barrett, however, does not attempt to justify his belated amendment under the equitable tolling doctrine, nor could he.  Equitable tolling lies only in "rare and exceptional circumstances," when the movant "diligently pursues his claims and demonstrates that the failure to timely file was caused by extraordinary circumstances beyond his control."  *Garcia v. Shanks*, 351 F.3d 468, 473 n.2 (10th Cir. 2003) (internal quotations omitted).  Absent "egregious misconduct," the negligence of counsel does not constitute an extraordinary circumstance meriting equitable tolling.  *Fleming v. Evans*, 481 F.3d 1249, 1256 (10th Cir. 2007).  Barrett, however, does not even admit that counsel acted negligently.

---

[2] An exception for equitable tolling, discussed below, applies only rarely "lest the exception swallow the rule." *United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000).

Barrett argues only that his attorneys' prior omission of his new claims "is indicative of ineffective assistance." Doc. 212 at 5. He refuses to concede ineffectiveness, insisting, "There can be little question that counsel for Mr. Barrett have been diligent in investigating and continuing to investigate his case." *Id.* at 3. The diligence of Barrett's attorneys should bar a finding of ineffectiveness. *United States v. Afflerbach*, 754 F.2d 866, 870 (10th Cir.) (denying a finding of ineffectiveness because counsel exercised "the skill, judgment and diligence of a reasonably competent defense attorney"). As a result, Barrett cannot meet the cause standard announced by *Martinez*, which requires a demonstrable Sixth Amendment violation. *See* 132 S. Ct. at 1318. Not only has Barrett failed to establish cause, he has failed to establish prejudice – the other prong of the test for excusing default. *See Martinez*, 132 S. Ct. at 1321. In regard to prejudice, Barrett makes no showing that errors of current counsel "worked to his *actual* and substantial disadvantage, infecting his entire [§ 2255 proceeding] with errors of constitutional dimension." *See Daniels v. United States*, 254 F.3d 1180, 1191 (10th Cir. 2001) (emphasis original and internal quotations omitted). Instead, he argues only that his untimely claims are "at the least arguably meritorious." Doc. 212 at 3.

None of the arguments advanced by Barrett demonstrate that this Court erred in denying his request to permit an untimely amendment to the § 2255 motion. By extension, he cannot justify his implied request that the Court permit, on reconsideration, a deposition of Judge Garrett, whose testimony supposedly supports claims in the amendment.

**CONCLUSION**

Based on the foregoing reasoning and authority, the government respectfully urges the

Court to deny Barrett's Motion for Reconsideration of this Court's Order of June 20, 2012.

Dated: July 10, 2012

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ Christopher J. Wilson
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ Jeffrey B. Kahan
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 345
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779

**CERTIFICATE OF SERVICE**

I, hereby certify that on 10th day of July, 2012, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry, Attorney for Petitioner
Joan Fisher, Attorney for Petitioner

/S/ Christopher  J. Wilson
United States Attorney's Office

11

1071

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| vs. | ) | Case No. 09-CIV-105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**<u>OPINION AND ORDER</u>**

This is a proceeding initiated by the above-named petitioner by filing a Motion for

Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial. The motion

to vacate conviction and sentence is brought pursuant to 28 U.S.C. § 2255. The government

has filed a response by and through the United States Department of Justice and the United

States Attorney for the Eastern District of Oklahoma. On July 1, 2010, the petitioner filed

his reply.

Petitioner has expanded the record in this case to voluminous proportions. He has

filed multiple amendments to the motion and exhibits in support thereof. Additionally, on

March 16, 2012, three years after the statute of limitations expired herein, the petitioner

sought leave to supplement his motion filing in excess of 500 more pages of pleadings. On

June 20, 2012 this court denied the petitioner's motion to supplement. *See*, Doc. # 210. This

court has, however, reviewed the relevant trial court records associated with Case No. CR-

04-115-JHP, including pleadings, pretrial and trial transcripts as well as all of the pleadings

and exhibits filed by the petitioner and the government herein. The records reflect the petitioner was named in a three-count indictment on November 9, 2004 and a three-count superseding indictment on February 9, 2005. The superseding indictment charged the petitioner with Count I: using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A) and (j); Count II: using and carrying a firearm during and in relation to a crime of violence and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (j); and Count III, intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer, engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B). On February 15, 2005, the government gave notice of its intention to seek the death penalty on all three counts of the superseding indictment.[1]

On September 12-16, 2005, the court conducted individual juror death qualification proceedings. Thereafter, on September 26, 2005, the jury trial was commenced. Following presentation of evidence during the first stage of trial, on November 4, 2005, the jury returned verdicts finding the defendant guilty on all three counts. On November 9, 2005, the second stage of trial commenced. On November 17, 2005, the jury returned verdicts of Life in prison without the possibility of release on Counts I and II and a death sentence on Count

---

[1]Doc. Nos. 59 and 60 filed in Case No. 04-CR-115-JHP. All further references to documents filed in the criminal case shall be referred to as "Cr. Doc." References to documents contained in the civil case shall be referred to as "Doc." All page number references to documents contained within the civil case are to the page numbers assigned by CM/ECF as opposed to the page number printed at the bottom of the documents.

III.  On December 19, 2005, the defendant was sentenced in accordance with the jury verdicts.  The court ordered the sentences to run consecutively.  Additionally, the defendant was ordered to pay a special assessment of $100 on each count for a total assessment of $300.

Following his conviction, the defendant filed a direct appeal.  The following issues were raised on appeal:

1.  The district court committed error in denying the motion to suppress because the warrant: a) did not satisfy Oklahoma standards for a nighttime warrant; b) did not satisfy Oklahoma standards regarding executing officers; c) did not comply with Fed.R.Crim.P. 41; and, d) should have been suppressed on double jeopardy grounds.

2.  The indictment was insufficient for failure to set forth elements of predicate offenses; improperly charged multiple crimes; and improperly joined defenses.

3.  The district court erred in admitting improper victim impact evidence.

4.  Juror misconduct occurring during the trial resulted in the deprivation of the defendant's Fifth, Sixth, and Eighth Amendment rights.

5.  The government violated *Batson*.

6.  The federal death penalty scheme is unconstitutional and violated the defendant's rights to due process, 6th Amendment right to a jury trial; and  the 8th Amendment prohibition against cruel and unusual punishment.

7.  The "intent to kill" aggravating factor was unconstitutional.

8.  There was insufficient evidence of an intent to kill.

9.  The government failed to timely disclose the names of its witnesses.

10.  The district court erred in failing to dismiss the indictment based on double jeopardy, collateral estoppel and the statute of limitations.

11.  The district court erred in failing to follow the "Petite policy."

12.  Cumulative errors occurring at trial deprived the defendant of a fair trial.

After considering each of these issues, the Tenth Circuit Court of Appeals affirmed the defendant's conviction.  *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 128 S.Ct. 1646, 170 L.Ed.2d 359 (2008).[2]

## I.  Procedural History of this Action

On March 19, 2008, two days after the United States Supreme Court denied *certiorari* from his direct appeal, the defendant filed a Motion for Appointment of Counsel to Pursue Post-Conviction Remedies, and Memorandum of Law in Support in the underlying criminal action, which this court construed as a Motion for Substitution of Counsel.[3]  Thereafter, on March 27, 2008, this court appointed David B. Autry as lead counsel and the Federal Defender for the Eastern District of California, Capital Habeas Unit as co-counsel for the purpose of "pursuing any and all available post-conviction remedies, including the investigation, preparation and prosecution of a motion for post-conviction relief pursuant to 28 U.S.C. § 2255."[4]  The order of appointment directed the Court Clerk to note the substitution of these attorneys as counsel of record upon the filing of their entries of appearance.  The order also directed Mr. Autry to obtain a complete copy of the record below and on appeal within fifteen (15) days of appointment.  In the event any delays were

---

[2]Certiorari was denied on March 17, 2008.

[3]Cr. Doc. 370.

[4]Cr. Doc. 371, at p. 1.

1075

encountered, counsel were directed to make the court aware of those delays.  Further, Mr. Autry was instructed to submit his proposed litigation budget to the assigned magistrate judge within twenty (20) days after appointment.

On April 2 and 3, 2008, counsel filed their entries of appearance[5] and the clerk entered a minute order showing the substitution of counsel of record had occurred.[6]  On April 16, 2008, Mr. Autry filed *ex parte* his proposed preliminary litigation budget which the magistrate judge, by minute order on April 22, 2008, recommended be approved.  The magistrate judge further recommended that the court's sealed order dated March 27, 2008 should govern the payment for costs and attorneys' fees.[7]  This court formally adopted the magistrate judge's recommendation by written order on July 3, 2008.[8]

On February 9, 2009, the petitioner's counsel filed an Emergency Motion requesting this court to toll the statute of limitations.[9]  On February 11, 2009, a hearing was held on the petitioner's motion.  Although the parties were given additional time to submit authorities to the court in support of their motion, the court intimated that it was not comfortable tolling the statute, because of the implications if a reviewing court later held that the statute of limitations should not have been tolled, and advised counsel they should be prepared to

---

[5]*See*, Cr. Docs.  372 and 373, respectively.

[6]Cr. Doc. 374.

[7]Cr. Doc. 376.

[8]Cr. Doc. 377.

[9]Cr. Doc. 382.

1076

timely file their motion to vacate.  On February 27, 2009, the court entered a written order denying the petitioner's request to toll the statute of limitations.[10]

On March 16, 2009, the defendant/petitioner filed a "Motion for Collateral Relief"[11] which requested this court to vacate his convictions and sentences.  This motion was not, however,  signed under penalty of perjury by the movant or any person authorized to sign on his behalf as required by Rule 2 of the Rules Governing § 2255 Motions.

Thereafter, on March 17, 2009, the petitioner filed a pleading entitled "Defendant's Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial."[12]  This document contained a "modified" version of the declaration required by Rule 2 of the Rules Governing Section 2255 Motions.  This motion referenced the exhibits previously filed on March 16, 2009.  In this motion, the petitioner  raised seventeen (17) grounds for relief.  Specifically, the petitioner asserted the following errors entitled him to release from custody: (1) actions of the trial court in the appointment and compensation of counsel violated his rights to due process, effective assistance of counsel, cross-examination of witnesses and equal protection of the laws, statutes, and administrative guidelines for the appointment and compensation of counsel; (2) ineffective assistance of trial counsel; (3) denial of his constitutional rights of due process and equal protection of the laws and his right

---

[10]Cr. Doc. 397.

[11]Doc. 1. *See also*, Cr. Doc. 403.  This Motion was 377 typewritten pages, excluding the table of contents and authorities.  Additionally, approximately 172 exhibits (in excess of 350 additional pages) were attached to said motion. *See*, Doc. Nos. 1, 3, and  8 thru 43 (Exhibit. Nos. 1-36, 59-60, 71-135, 136A, 136B, 136C, 136D, 137-143, 144A, 144B, 145-146, 147A1, 147A2, 147A3, 147B1, 147B2, 147B3, 147C1, 147C2, 147D, 147E1, 147E2, 147F, 147G, 148-175, 176A, 176B, 176C1, 176C2, 177A, 177B, 178-180, 181A, 181B, 181C, 181D, and 182-195).

[12]Doc. 2.

to expert and investigative assistance under 18 U.S.C. § 3006A; (4) the use of false information in obtaining the no-knock warrant for his arrest, which was invalid, deprived the petitioner of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and appellate counsel was ineffective for failing to raise this issue on appeal; (5) the government's suppression of exculpatory evidence and knowing use of perjured testimony deprived the petitioner of his Fifth Amendment right to due process, his Sixth Amendment right to counsel and confrontation, and his Eighth Amendment right to a fair and reliable sentencing process; (6) violations of Fifth, Sixth and Eighth Amendment rights when court restricted use of the petitioner's statements to law enforcement at the time of his arrest; (7) the restraint of the petitioner during trial by the marshal violated his Fifth, Sixth and Eighth Amendment rights; (8) the petitioner was tried while incompetent in violation of the Fifth, Sixth and Eighth Amendments to the United States Constitution; (9) failure of the trial court to instruct on a lesser included homicide offense violated his Fifth, Sixth and Eighth Amendment rights and appellate counsel was ineffective for failing to raise this issue on direct appeal; (10) failure to instruct the jury that they could consider residual doubt as a mitigating factor violated the petitioner's Fifth, Sixth and Eighth Amendment rights; (11) improper excusal of a juror based upon her opinions about the death penalty violated his Fifth, Sixth and Eighth Amendment rights; (12) not requiring the jury to find that death was an appropriate punishment beyond a reasonable doubt violated the petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights; (13) the petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated due to the effects of drugs

1078

he was given in jail and his removal from the courtroom during the second stage of trial; (14)

the federal death penalty, as administered, is disproportionately and unconstitutionally

applied according to the race of the victim thereby depriving him of due process, equal

protection and the right to be free from cruel and unusual punishment; (15) errors in the

indictment deprived the petitioner of his Fifth, Sixth, Eighth and Fourteenth Amendment

rights; (16) juror misconduct deprived him of his Fifth, Sixth, Eighth and Fourteenth

Amendment rights; and (17) the cumulative effect of the aforementioned errors warrant

vacating his sentence.[13]

On March 18, 2009, the court ordered the government to respond to the petitioner's

allegations by June 16, 2009.[14] On May 29, 2009, the petitioner filed a Motion to Disqualify

and Recuse the undersigned judge from further participation in this matter.[15] On June 11,

2009, the government filed two motions requesting an extension of time to respond. In the

first motion for extension of time, the government sought an extension of thirty (30) days to

respond to the disqualification motion.[16] The second motion for extension of time requested

an additional six months to respond to the amended motion to vacate.[17] Neither motion was

---

[13]Throughout his Amended Motion to Vacate and Brief in Support the petitioner asserts violations of his Fourteenth Amendment rights. The Fourteenth Amendment does not, however, apply to actions of the federal government. *See*, *San Francisco Arts and Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 542, 107 S.Ct. 2971, 2984, 97 L.Ed.2d 527 (1987), n. 21. As a result, even though this opinion refers to each claim as brought by petitioner, this court will not specifically comment on the Fourteenth Amendment as it addresses each of the issues herein.

[14]Doc. 44.

[15]Doc. 45.

[16]Doc. 47.

[17]Doc. 48.

opposed by the petitioner.  Subsequent thereto, this court entered minute orders granting the government until July 15, 2009 to respond to the disqualification motion and until September 16, 2009 to respond to the amended motion to vacate.[18]

On July 13, 2009, the government filed a response opposing the petitioner's motion to disqualify and on July 24, 2009 the government filed a motion to unseal certain proceedings in the underlying criminal case.[19]

On August 14, 2009, the petitioner filed a motion to file his response to the government's  motion to unseal certain documents out of time.[20]  On August 19, 2009, this court entered a minute order directing the petitioner to supplement his motion by 5:00 p.m., to include a statement regarding whether the government objected to the motion.  On August 19, 2009, the petitioner filed a Supplement to the Motion to File Response to Pleading Out of Time.[21]  Later that day, the court entered the following minute order:

> Petitioner's Motion to File a Response to Government's Motion to Unseal out of time (Doc. 53) is hereby granted.  The Court notes that the Government's objection to Petitioner's request is based upon the impending deadline for the Government to respond to the Petitioner's § 2555 Motion (Doc. #2) and that the Government's Motion to Unseal (Doc. #52) indicates the pleadings sought are needed for the Government to be able to prepare its response to the Petitioner's § 2255 Motion.  To the extent that any delay in ruling on the Government's Motion to Unseal is directly attributable to Petitioner's failure to timely respond to the Government's Motion to Unseal, this Court will consider that in the event the Government becomes unable to meet their

---

[18]Docs. 49 and 50, respectively.

[19]Docs. 51 and 52, respectively.

[20]Doc. 53.

[21]Doc. 57 and 58, respectively.

1080

current response deadlines on the § 2255 Motion. Accordingly, Petitioner shall be given until August 26, 2009 to file a Response to the Government's Motion (Doc. 52) and the Government shall be given until September 2, 2009, to Reply.

Doc. 60.

On August 26, 2009, the petitioner filed a Response opposing the government's motion to unseal claiming that the government had failed to establish "good cause" or "materiality;" the petitioner had not waived his attorney-client privilege; his protections under the work-product doctrine; and/or confidentiality of his mental health records. Additionally, the petitioner objected to the court ruling on the government's motion to unseal documents prior to ruling on the disqualification motion.[22] On August 28, 2009, the government filed a reply thereto.[23] On September 4, 2009, the government requested an additional month to file their response to the amended motion to vacate.[24] This motion was not opposed by the petitioner and the government was given until October 16, 2009 to file their response.

On September 11, 2009, in a twenty-two page order, this court denied the petitioner's motion to recuse and/or disqualify.[25] Additionally, on the same day, the court entered a fifteen page order ruling on the government's motion to unseal, or to gain full access to motions, orders, reports and proceedings which had occurred in the underlying criminal

---

[22]Doc. 61.

[23]Docs. 62.

[24]Doc. 63.

[25]Doc. 66.

1081

case.[26]  To the extent the petitioner claimed that some of the requested items were protected by various privileges, the court gave the petitioner until September 22, 2009, to advise the court whether he was abandoning any of his claims in order to preserve those privileges.  On September 22, 2009, the petitioner filed a Notice of Intention not to abandon claims and a request for a protective order.[27]  Since the proposed protective order submitted by the petitioner implied that some of the documents sought to be governed by the protective order might have been previously disclosed, the court entered an order on September 23, 2009 requiring the petitioner to advise the court by September 30, 2009, if the particular documents identified in the September 11, 2009 order had previously been disclosed by either the Petitioner or his counsel.[28]

On September 25, 2009, the petitioner filed an Amended Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial.[29]  In this amended motion the petitioner raised nineteen (19) grounds for relief.  In addition to the grounds previously raised, the petitioner added a claim that his execution would violate the Eighth Amendment due to his "chronic and severe mental illness and organic brain impairments" and a separate claim of ineffective assistance of appellate counsel.  The petitioner also claims he should be allowed to conduct discovery "to fully develop and identify the facts supporting his

---

[26]Doc. 67.

[27]Doc. 68.

[28]Doc. 69.

[29]Doc. 70.

1082

[motion]" and "an evidentiary hearing to resolve any factual disputes" and "to establish the facts he alleges."[30]

On September 28, 2009, the respondent filed an Objection to the petitioner's proposed protective order.[31] On September 29, 2009, this court entered an order setting the matter for a show cause hearing for the court to ascertain why an amendment should be allowed so long after the filing of the motion and the amended motion and a scheduling conference.[32]

On September 30, 2009, the petitioner filed a Memorandum in Response to the court's order regarding waiver of privileges and again sought a protective order concerning release of any documents.[33] Thereafter, on October 2, 2009, the petitioner filed an Emergency Motion to Vacate Show Cause Order or Continue Hearing Date.[34] By minute order on the same date, this court denied the petitioner's motion to vacate but waived the presence of co-counsel. The parties were also advised that the court intended to conduct a status and scheduling conference at the same time. On October 5, 2009, the petitioner filed an "Objection to and Motion to Reconsider the Order filed on October 2, 2009, Motion to Continue Hearing, and Motion for Counsel to Appear by Telephone."[35] On October 5, 2009,

---

[30]Doc. 95, at pp. 400-401.

[31]Doc. 73.

[32]Doc. 74.

[33]Doc. 75.

[34]Doc. 76.

[35]Doc. 78.

12

the court denied, by minute order, the petitioner's Motion to Reconsider and Motion to Continue Hearing, as well as other miscellaneous findings related to said filing.[36]

On October 6, 2009, after hearing comments of counsel, the court gave the petitioner until November 6, 2009, to refile his amended Motion to Vacate in compliance with the Rules Governing § 2255 Proceedings and until January 5, 2010 to file a Brief in Support.[37] These deadlines were subsequently extended.

On October 13, 2009, the petitioner filed a Writ of Mandamus in the Tenth Circuit Court of Appeals seeking "either the recusal of the district judge who presided over his federal criminal trial and now is hearing his 28 U.S.C. § 2255 motion to vacate, set aside, or correct his sentence, or, in the alternative, an evidentiary hearing before a different district judge on the facts underlying his recusal motion."[38] On October 16, 2009, the petitioner filed a Motion to Stay these proceedings pending disposition of the mandamus action by the circuit court.[39] On October 20, 2009, this court denied the petitioner's motion to stay.[40]

On December 3, 2009, this court entered a minute order setting a Show Cause Hearing for December 15, 2009 "for David Autry to show cause why he has failed to comply with this court's prior orders regarding submission of CJA vouchers."[41] Thereafter, on December

---

[36]Doc. 79.

[37]*See*, Doc. 81.

[38]Doc. 96.

[39]Doc. 86.

[40]Doc. 87. On December 14, 2009, the Tenth Circuit denied the writ. *See*, Doc. 96.

[41]Doc. 92.

13

4, 2009, the petitioner filed a Notice basically objecting to this court's handling of this matter and stating he was filing his amended motion as ordered by the court despite his disagreement with the court's order.[42]  Additionally, on December 4, 2009, the petitioner filed his amended Motion to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody, pursuant to 28 U.S.C. § 2255.[43]  Thereafter, on March 1, 2010, the petitioner filed his Brief in Support.[44]

On January 11, 2010, the government submitted a letter for *in camera* review to the court to determine whether the government should disclose the information contained therein to the petitioner.  After reviewing the letter, the court entered a protective order finding that the government should disclose the subject-matter of said letter to counsel for the petitioner but preventing the information to be revealed to the petitioner or any person other than counsel of record for the petitioner and/or persons working for counsel for the petitioner in connection with these proceedings without prior approval and order.[45]

On February 18, 2010, the petitioner filed an Unopposed Motion to File Exhibits under Seal.[46]  On February 26, 2010, this court entered an Order giving the petitioner until March 12, 2010 to advise the court how the records consisting of approximately 1,274 pages

---

[42]Doc. 94.

[43]Doc. 95.

[44]Doc. 149.

[45]Doc. 102.

[46]Doc. 110.

14

were relevant to the issues contained within the motion.[47]   Following the petitioner's response, on March 30, 2010, the court granted the petitioner's motion to file his exhibits under seal.[48]

On March 1, 2010, the petitioner filed a Brief in support of his Motion, a Motion for Evidentiary Hearing, and Motion to Expand the Record.[49]   On March 3, 2010, the parties filed a joint motion to Modify the Protective Order entered on January 11, 2010.[50] Following a hearing on said Motion, the court orally amended the protective order.[51]   After receiving additional information from counsel for the government, the court denied the joint motion to Modify the Protective Order and the oral amendment made to the protective order was withdrawn.[52]

On May 17, 2010, the government filed their Response in Opposition to Petitioner's Motion to Vacate.[53]   On June 30, 2010, the petitioner requested leave to file an oversized

---

[47]Doc. 147.

[48]Doc. 161.

[49]Doc. Nos. 149, 150 and 151, respectively.  Since no answer had been filed to the Motion to Vacate, on March 29, 2010, this court denied the petitioner's Motion for Evidentiary Hearing.  Doc. 157.  On March 30, 2010, this court granted the petitioner's Motion to Expand the Record in order that the court could consider previously filed exhibits in support of the petitioner's motion without requiring the refiling of said exhibits and directed the court clerk to file two additional exhibits which had not previously been filed by the petitioner.  Doc. 161.

[50]Doc. 152.

[51]See, Doc. 164.

[52]Doc. 168.

[53]Doc. 175.

1086

brief in Reply to the Government's Response which was granted.[54] On July 1, 2010, the petitioner filed his Reply.[55]

On February 8, 2011, the petitioner filed two additional motions. Specifically, the petitioner filed a Motion for Leave to Conduct Discovery and Brief in Support thereof.[56] The petitioner also filed a Motion to Modify Protective Orders and a Request for Hearing and Brief in Support thereof.[57] Based upon the findings made in this opinion, this court denies the petitioner's Motion for Leave to Conduct Discovery and Motion to Modify Protective Order. Petitioner has not established that any relevant information could be obtained by pursuing discovery herein.

---

[54]Doc. Nos. 176 and 177, respectively.

[55]Doc. 178.

[56]Doc. Nos. 186 and 187, respectively.

[57]Doc. Nos. 184 and 185, respectively.

**STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA" or the "Act")

delineates the circumstances under which a federal court may vacate a sentence. Title 28,

section 2255 provides, in pertinent part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress
> claiming the right to be released upon the ground that the sentence was
> imposed in violation of the Constitution or laws of the United States, or that
> the court was without jurisdiction to impose such sentence, or that the sentence
> was in excess of the maximum authorized by law, or is otherwise subject to
> collateral attack, may move the court which imposed the sentence to vacate,
> set aside or correct the sentence.

28 U.S.C. § 2255(a).  A prisoner seeking post-conviction relief under this statute must allege

as a basis for relief:  (1) lack of jurisdiction by the court entering judgment; (2)  an error of

constitutional magnitude; (3) a sentence imposed outside the statutory limits; or (4) an error

of law or fact where the claimed error constitutes "a fundamental defect which inherently

results in a complete miscarriage of justice." *United States v. Addonizio*, 442 U.S. 178, 185,

99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979).

**TIMELINESS OF § 2255 PROCEEDINGS**

Under the AEDPA, there is a one-year limitations period for filing a motion to vacate

a federal criminal conviction which begins to run from the date on which a prisoner's

conviction becomes final. 28 U.S.C. § 2255(f)(1).[58]  In this case, the petitioner's conviction

became final on March 17, 2008, the date the United States Supreme Court denied *certiorari*

---

[58]There are a couple of other events which may extend the limitations period, but those events are not relevant to the facts of this case.

review of his direct appeal. As a result, his one-year limitations period began to run on March 17, 2008. As indicated previously, Petitioner had a verified motion to vacate on file on March 17, 2009. On September 25, 2009, Petitioner filed a amended motion (Doc. 70) which arguably contained some new claims.

Fed.R.Civ.P. 15 allows a party to amend or supplement a pleading, subject to certain restrictions. Rule 15(c)(2) provides that "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." In considering the effect of Rule 15(c) on a § 2255 motion to vacate, the Tenth Circuit has held an untimely amendment to a § 2255 motion

> which, by way of additional facts, clarifies or amplifies a claim or theory in the [original motion] may, in the District Court's discretion, relate back to the date of [the original motion] if and only if the [original motion] was timely filed and the proposed amendment does not seek to add a new claim or to insert a new theory into the case.

*United States v. Espinoza-Saenz*, 235 F.3d 501, 505 (10th Cir. 2000)(citing *United States v. Thomas*, 221 F.3d 430, 431 (3rd Cir. 2000).

**GENERAL PRINCIPLES GOVERNING § 2255 ACTIONS**

Section 2255 is not a substitute for an appeal and is not available to test the legality of matters which should have been challenged on appeal. *United States v. Khan*, 835 F.2d 749, 753 (10th Cir. 1987), *cert. denied*, *Ali-Khan v. United States*, 487 U.S. 1222, 108 S.Ct. 2881, 101 L.Ed.2d 915 (1988). As a result, "failure to raise an issue either at trial or on direct appeal imposes a procedural bar to habeas review." *United States v. Cervini*, 379 F.3d

987, 990 (10th Cir. 2004) (quoting *United States v. Barajas-Diaz*, 313 F.3d 1242, 1245 (10th Cir. 2002). Failure to raise an issue on direct appeal bars the movant/defendant from raising such an issue in a § 2255 Motion to Vacate Sentence unless he can show "both good cause for failing to raise the issue earlier, and that the court's failure to consider the claim would result in actual prejudice to his defense, . . ." *Id.* Since a writ of habeas corpus is an equitable remedy, a court may consider the merits of the procedurally barred claim if the defendant alternatively demonstrates "that 'failure to consider the federal claims will result in a fundamental miscarriage of justice.'" *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991).

In *United States v. Galloway*, 56 F.3d 1239, 1242 (10th Cir. 1995), the Tenth Circuit held claims of constitutionally ineffective counsel should be brought on collateral review. Consequently, no procedural bar will apply to ineffective assistance of counsel claims which could have been brought on direct appeal but are raised in post-conviction proceedings.[59] A habeas petitioner may also raise substantive claims which were not presented on direct appeal if he can establish cause for his procedural default by showing he received ineffective assistance of counsel on appeal.

A court considering a claim of ineffective assistance of appellate counsel for failure to raise an issue is required to look to the merits of the omitted issue. Where the omitted

---

[59]While the petitioner complains about this court leaving Mr. Hilfiger on as counsel for purposes of appeal, the United States Supreme Court has specifically recognized that "[a]ppellate counsel often need trial counsel's assistance in becoming familiar with a lengthy record on a short deadline, . . ." *Massaro v. United States*, 538 U.S. 500, 506, 123 S.Ct. 1690, 1695, 155 L.Ed.2d 714 (2003) (allowing defendant to raise claim of ineffective assistance of counsel on motion to vacate, even though he could have, but did not raise claim on direct appeal).

issues are meritless, counsel's failure to raise it on appeal does not constitute constitutionally ineffective assistance of counsel. *Hooks v. Ward*, 184 F.3d 1206, 1221 (10th Cir. 1999). *See also*, *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 765, 145 L.Ed.2d 756 (2000). Additionally, where claims have been raised and rejected on direct appeal, they can not be relitigated in a § 2255 motion. *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994).

### NECESSITY FOR AN EVIDENTIARY HEARING

"If [a § 2255] motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted . . . to determine whether an evidentiary hearing is warranted." Rule 8, Rules Governing Section 2255 Proceedings for the United States District Courts. In this case, as previously indicated, the Petitioner has expanded the record to voluminous proportions. Without counting the one amendment that this court required to bring the motion in compliance with the federal rules governing these proceedings, he has filed multiple amendments to the motion and exhibits in support thereof. In addition, the extensive record in the criminal proceedings, including pleadings, pretrial and trial transcripts have been placed before and reviewed by this court.

Where the "record conclusively demonstrates that a defendant is entitled to no relief on his § 2255 motion to vacate, a full evidentiary hearing is not required." *Menzer v. United States*, 200 F.3d 1000, 1006 (7th Cir. 2000). *Accord*, *United States v. Marrs*, 856 F.2d 1471, 1472 (10th Cir. 1988). Additionally, no hearing is required where petitioner's allegations "cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Engelen v. United States*, 68 F.3d

20

238, 240 (8th Cir. 1995). Conclusory allegations contained within affidavits will not require a hearing. *Eskridge v. United States*, 443 F.2d 440, 443 (10th Cir. 1971). In an unpublished opinion, the Tenth Circuit stated that "[t]he district court is not required to hold an evidentiary hearing when a 2255 claim of ineffective assistance is based merely on conclusory allegations unsupported by specific facts." *United States v. Scott*, 7 F.3d 1046, 1993 WL 389463, *2 (10th Cir. 1993)(citing *Eskridge, supra*.)

## STATEMENT OF THE FACTS

While the record in this case appears voluminous, other than being a death penalty proceeding this was not a complex case. Because the defendant was tried twice in state court on state charges before being indicted in federal court,[60] the underlying facts of the criminal case were well known at the time the indictment was filed herein. On appeal the Tenth Circuit accurately set forth the facts as relayed to the jury in this case. *See*, *United States v. Barrett*, 496 F.3d 1079, 1082-1086 (10th Cir. 2007). Therefore, this court will not reiterate them herein. The court would note, however, that during the federal criminal trial, the government presented forty-one (41) witnesses during the guilt phase of trial; the defendant put on nine (9) witnesses and then the government called two (2) rebuttal witnesses. Thereafter, during the penalty phase of trial, the government presented eleven (11) witnesses; the defendant called fourteen (14) witnesses and then the government put on five (5) rebuttal witnesses.

---

[60]*See*, *United States v. Barrett*, 496 F.3d 1079, 1086 (10th Cir. 2007).

1092

## PETITIONER'S CLAIMS FOR RELIEF

### I.  FUNDING CHALLENGES[61]

In Grounds 1 and 3, the petitioner claims he was deprived of his due process and equal protection rights when the trial court did not simply rubber stamp his budget requests.  The Sixth Amendment to the United States Constitution provides, in pertinent part: "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . . have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  *See also*, *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).  Rule 44(a) of the Federal Rules of Criminal Procedure grants a criminal defendant "who is unable to obtain counsel" the right to have counsel assigned to represent said defendant at every stage of the proceedings.  *United States v. Reilley*, 948 F.2d 648, 650 (10th Cir. 1991).  An indigent defendant does not, however, have the right to choose appointed counsel.  *United States v. Nichols*, 841 F.2d 1485, 1504 (10th Cir. 1988).

Title 18 U.S.C. § 3005 governs appointment of counsel in capital cases.  It provides, in pertinent part, as follows:

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon defendant's request, assign 2 such counsel, *of whom at least 1 shall be learned in the law applicable to capital cases*, and who shall have free access to the accused at all reasonable hours.  In assigning counsel under this section, the court shall consider the recommendation of the Federal Public Defender organization, or,

---

[61]To the extent that any information contained within this section would not generally be released under the provisions of 18 U.S.C. § 3006A, this court finds that the challenges made by the petitioner herein require disclosure of such information.

1093

if no such organization exists in the district, of the Administrative Office of the United States Courts. . . . . . (italics added).

Despite the petitioner's conclusory allegations, there is no authority which indicates a court must approve all costs requested in a particular case or that the costs in every federal death penalty case will be identical. What may be necessary in a given case clearly depends upon the facts of that case, including the going rates for counsel in the area where the case is tried, the amount of investigation that has already been completed and the complexity of the issues involved. An indigent criminal defendant is, however, entitled to "the minimum assistance necessary to assure him 'a fair opportunity to present his defense' and 'to participate meaningfully in [the] judicial proceeding.'" *Medina v. California*, 505 U.S. 437, 445, 112 S.Ct. 2572, 2577, 120 L.Ed.2d 353 (1992). This does not mean that indigent defendants are entitled to all of the assistance that their wealthier counterparts might buy; they are only entitled to the "basic and integral tools" needed to present an adequate defense. *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53 (1985) (citing *Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974)). Courts consider three factors in determining the minimum assistance required:

> (1) the effect on [the petitioner's] private interest in the accuracy of the trial if the requested service is not provided; (2) the burden on the government's interest if the service is provided; and (3) the probable value of the additional service and the risk of error in the proceeding if such assistance is not offered.

*Moore v. Reynolds*, 153 F.3d 1086, 1112 (1998). *See also*, *Rojem v. Gibson*, 245 F.3d 1130, 1139 (10th Cir. 2001) (because petitioner did not show necessity, the district did not abuse its discretion in denying funding for an investigator or experts); *Moore v. Johnson*, 225 F.3d

495, 503 (5th Cir. 2000) (finding defendant does not lack 'an adequate opportunity to present [his] claims fairly' where he was denied a jury consultant since "[communicating] with the jury is a quintessential responsibility of counsel.")

As indicated in a previous order entered by this court on September 11, 2009, as Chief Judge, this court considered the recommendation of the Federal Public Defender and then decided to appoint John David Echols as lead counsel and Roger Hilfiger as co-counsel. *See*, Doc. 66, at pp. 17-18 regarding the reasons for this decision.[62]  On November 29, 2004, Mr. Echols filed his first Ex Parte Motion for an order concerning the funding of defense.[63]  In this motion, counsel advised the court he was requesting the court to approve expenditures between $55,000 and $82,000, exclusive of attorney fees.[64]

On November 30, 2004, this case was reassigned to the undersigned judge.[65]  On December 1, 2004, this court entered an order setting the matter for a budget conference before Magistrate Judge Steven P. Shreder.[66]  On December 8, 2004, co-counsel filed a motion requesting to be excused from the budget hearing before the magistrate judge due to

---

[62]This court respectfully disagrees with the Federal Defender for the Western District of Oklahoma's opinion that there were only two or three attorneys in the entire state of Oklahoma who were qualified to serve as lead counsel in a federal capital case, *see* Petitioner's Exhibit 54.  Additionally, to imply, as the Federal Defender does, that to be qualified to serve as lead counsel in a federal death penalty trial an attorney has to have agreed to serve and been approved "by a selection committee and the United States District Judges as qualified to serve as counsel in capital habeas cases initiated pursuant [to] Title 28, United States Code, Section 2254" is ludicrous.

[63]Cr. Doc. 16.

[64]This motion indicated that "[t]his is the first federal death penalty case for both of Mr. Barrett's appointed counsel . . . ."  This statement was, however, untrue.  Mr. Hilfiger, in addition to having previously been the United States Attorney for the Eastern District of Oklahoma, had previously been retained and actually tried a federal capital case in the Eastern District of Oklahoma in which the jury decided not to impose the death penalty against his client.  *See*, *United States v. James Norwood Hutching, et al.*, Case No. CR-92-32-FHS (E.D. Okla.).

[65]Cr. Doc. 17.

[66]Cr. Doc. 19.

1095

a family member's prior scheduled surgery and this motion was granted on December 8, 2004.[67]  Additionally, on December 8, 2004 a scheduling conference was held.

On December 9, 2004, a budget conference/hearing was held before Magistrate Judge Shreder.  At that hearing, Mr. Echols discussed the reasons behind his various requests for expert assistance and the magistrate judge requested that Echols put together a proposed litigation budget.  Mr. Echols was told that his C.J.A. vouchers needed to be fairly specific in order for the court to ascertain that the requests were reasonable and necessary.[68]  On December 29, 2004, Mr. Echols filed his second Ex Parte Motion for Authorization to purchase a partial transcript of Mr. Barrett's 2004 State Court Jury Trial and third Ex Parte Motion for Approval of "Pre-Authorization" Budget.[69]  In the second motion, counsel requested $9,000-11,000.00 to purchase the second state court trial transcript, "excluding *voir dire*, opening statements, and closing statements, but including the testimony of all state's witnesses, the *in camera* testimony of Stephen Smith, hearings held during the course of the trial and the jury instruction conference."  Cr. Doc. 23, at pp. 2-3.  The third motion requested the court approve a "pre-authorization budget of $72,000.00."  Cr. Doc. 24, at pp. 3-5.  Despite the petitioner's allegations that this court failed to promptly act upon his requested litigation budget,[70] footnotes to some of the items requested in the various motions

---

[67]Cr. Doc. 20 and 21, respectively.

[68]Cr. Doc. 310, at pp. 40-42.

[69]Cr. Doc. 23 and 24, respectively.

[70]*See*, Doc. 95, at p. 10.

25

indicated the approval of the items could be deferred until after rulings on jurisdictional motions. *Id.* On December 30, 2004, counsel filed a fourth "Ex Parte Motion for Authorization for Counsel to Travel to Washington, D.C., For Conference with the Attorney General's Representatives Concerning Authorization for Seeking the Death Penalty in this Case."[71] On the same day, this court entered a minute order granting counsel's request to travel to Washington, D.C.[72] Thereafter, counsel filed several motions in the case, which were, on January 14, 2005, referred to the magistrate judge for hearing.[73]

On January 19, 2005, United States Magistrate Judge Steven P. Shreder entered a detailed order advising counsel what was expected in terms of approval of a "Pre-Authorization" Budget.[74] At that time, counsel was advised to submit a proposed litigation budget covering the period from February 1, 2005, through June 30, 2005, setting forth:

> *separately and with specificity* the time each of the appointed attorneys anticipates spending on: (i) review of the record; (ii) investigation of claims; (iii) client interviews; (iv) consultation with experts and investigators; (v) legal research; (vi) preparation of pleadings; (vii) attendance at court proceedings; and, (viii) any other compensable activities undertaken in this matter.[75]

Additionally, counsel were directed to

> set forth *separately and with specificity* any expert witness counsel seeks to hire. A request shall: (i) identify the proposed expert and describe his credentials and experience; (ii) describe the subject matter to be covered by the

---

[71]Cr. Doc. 25.

[72]Cr. Doc. 26.

[73]See, Cr. Doc. Nos. 28, 29, 33, 34.

[74]Cr. Doc. 38.

[75]*Id.*, at pp. 1-2, ¶s 1 and 2.

1097

expert; (iii) address why the expert is need, (sic) *i.e.*, explain both the facts indicating that further analysis is justified and the reason an expert witness is needed to interpret those facts; (iv) discuss the stage of the proceedings at which the expert is needed; and, (v) provide a specific time budget identifying the expert's billing rate and amount of time the expert anticipates spending on each portion of the investigation or analysis.[76]

Further, counsel were told to set forth

> *separately and with specificity* any investigator counsel seeks to hire. A request shall include a specification of the factual issues counsel intends to investigate, the facts suggesting that such an investigation is warranted, and an estimated time budget for each task. The time budget should be broken down into discrete portions of the investigation, so the Court may assess the reasonableness of each request. In the case of a request to hire a special purpose investigator, counsel shall identify the proposed investigator and describe his credentials and experience.[77]

Thereafter, on January 31, 2005, a fifth Ex Parte Motion concerning funding was filed. For the first time, defense counsel sought the court's approval of an overall budget of $407,875.00.[78] The motion further indicated if additional funds became necessary, counsel would supplement their budget request. This motion did not, however, comply with the order entered on January 19, 2005. As a result, on February 1, 2005, counsel was advised to submit a proposed defense budget in compliance with the court's earlier order.[79] At that time, counsel was advised that

---

[76]*Id.*, at p. 2, ¶ 3.

[77]*Id.*, at pp. 2-3, ¶ 4.

[78]Cr. Doc. 46. It should be noted that the "conclusion" paragraph of this motion indicated counsel was requesting approval of a budget of $406,350.00, but paragraph 6 of the motion indicated the total request, including attorney fees was $407,875.00.

[79]Cr. Doc. 47.

[t]he proposed defense budget *may not* simply project an arbitrary number of hours per week for a particular period, but must instead set forth the time each attorney anticipates spending on each of the listed activities, and describe in detail what each attorney anticipates doing with such time.[80]

On February 7, 2005, in response to this order, counsel submitted their sixth and seventh Ex Parte Motions regarding the Budget. The sixth motion requested court approval of $138,125.00 for various experts and miscellaneous and unforeseen expenses.[81] The seventh motion requested approval of $141,250.00 for lead counsel consisting of 1,130 hours at the rate of $125.00 per hour and $101,250.00 for co-counsel consisting of 810 hours at the rate of $125.00 per hour, for a grand total of $242,500.00 in attorney fees.[82] Thereafter, on February 11, 2005, an eighth Ex Parte Motion was filed requesting the court enter an order allowing transcription of the testimony of Clint Johnson and Juan Beal from a hearing held before the magistrate judge on January 26, 2005.[83]

After reviewing defense counsel's ex parte motions, on February 22, 2005, this court, instead of entering an order, sent a letter to defense counsel Echols asking counsel to address several questions which the court had in regard to the preliminary budget requests. Specifically, the court was interested in ascertaining the amount of compensation necessary to provide "fair compensation" in light of the fact Mr. Echols had previously defended Barrett in two state court proceedings arising out of the same factual scenario. As a result,

---

[80]*Id.*

[81]Cr. Doc. 50.

[82]Cr. Doc. 51.

[83]Cr. Doc. 57.

the court asked Echols to disclose the amounts paid for representation of the defendant in each of the two previous state trials, including the number of hours which were billed to the Oklahoma Indigent Defense System and the amounts paid for experts and investigators in each of those trials.[84]

Instead of responding directly to the court's inquiries, Mr. Echols advised this court that his budget was "in line with the time and fees expended in other federal capital prosecutions."[85] Additionally, counsel indicated the proposed budget had taken into account "the fact that [he] was not starting from zero, and that a great deal of the work already performed can serve as a foundation for further efforts."[86] Counsel further advised this court that

> The Oklahoma Indigent Defense System pays contract "lead" counsel in a capital case $60 per "out of court" hour, and $80 per "in court" hour. The contracts also specify that the maximum payment for lead counsel is $20,000, although this amount can be exceeded if the OIDS Board of Directors makes a finding, as it did in Mr. Barrett's case, that a given case is an exceptional one.
>
> I received approximately $72,229.00 for the first state court trial, although the bulk of this amount was not paid until the summer of 2003 because OIDS was literally out of money. I do not have available a complete breakdown of the "in court" vs. "out of court" hours for the first $29,214.00 of this sum, but for the balance of $43,015.00, the breakdown was 455.25 out of court hours and 196.25 in court hours. From January 1, 2003, through sentencing in the second trial, I billed and received $59,105.00, representing 720.75 out of court hours and 198.25 in court hours.[87]

_____

[84]*See*, Sealed letter dated February 22, 2005.

[85]*See*, Sealed letter dated February 28, 2005.

[86]*Id.*

[87]*Id.*, at pp. 1-2.

Additionally, counsel advised this court that approximately $39,000 was expended on experts during the first trial even though several of these experts later refused to testify without payment of additional sums of money. None of these individuals testified at trial. During the second trial, additional sums of approximately $9,000 were paid for experts. While counsel admitted the legal issues between the two state trials were similar, he indicated that he would be "in large part 'writing the book as we go'" and, therefore, the legal issues in the federal case would be substantially more demanding.[88]

Thereafter, this court entered an order authorizing a total of 1160 hours for attorneys at a rate of $125.00 per hour. Additionally, the court approved a budget for investigative, experts and other services in the sum of $37,125.00 to 39,125.00. While this order denied counsel's request for a copy of the second state court trial transcript, the court indicated it would reconsider the issue if defense counsel still felt like they needed the transcript and if it was relevant to the federal charges. Finally, the court advised counsel they needed to advise the court in advance of incurring fees or costs not authorized by the budget that they were going to exceed said budget.[89]

On October 31, 2005, defense counsel filed a Motion to Modify the Order Approving the Budget of March 18, 2005.[90] On November 4, 2005, this court entered a minute order

---

[88]*Id.*, at pp. 2-4. It should be noted that Mr. Echols was the only attorney of record in the state court case. *See*, Sequoyah County Court Records.

[89]Cr. Doc. 97.

[90]Cr. Doc. 232.

approving the modification of the budget as requested.[91]  At that time, the court indicated the total budget was not to exceed $192,007.00.

Further, despite counsel's innuendos that this court paid Mr. Hilfiger more money than Mr. Echols for nefarious reasons and as a way to develop a local capital defense panel, two observations are in order.  First, at the time of initial appointment of Mr. Echols and Mr. Hilfiger, the maximum hourly rate allowed for capital defense counsel was $125.00 per hour.  18 U.S.C. 3006A(d)(1).  At the time Mr. Echols withdrew, the maximum hourly rate allowed for capital defense counsel had been raised by Judicial Conference to $160.00 per hour.  *Id.* *See also*, CJA Memo from Administrative Office of the United States Courts dated January 28, 2005.  Second, the Criminal Justice Act does not require that the court pay counsel a specific hourly rate.  Rather, it sets the **maximum hourly rate** which can be authorized by a court.  *See*, 18 U.S.C. § 3006A(d)(1).  In light of Mr. Hilfiger assuming the role of lead counsel, this court raised his compensation to $150.00 per hour.  Additionally, when new counsel was appointed, this court encouraged counsel to submit an amended budget request solely because, unlike Mr. Echols, they were unfamiliar with the intimate details surrounding the previous state court trials.[92]

A review of the CJA vouchers approved in this case indicates trial counsel for Mr. Barrett were paid a total of $168,484.97, which does not include $3,903.17 paid by this court for the work done by the attorney who was appointed following the jury verdict to represent

---

[91]Cr. Doc. 244.

[92]Cr. Doc. 133.

31

Barrett at sentencing and who ultimately filed Barrett's notice of appeal and designation of record. Additionally, this court approved payment of $5,844.50 for state court transcripts and $11,067.50 for expert services obtained by the petitioner's counsel, for a total payment in relation to the trial itself of $185,396.97. An additional $24,585.43 was paid for transcripts related to the petitioner's appeal.

Furthermore, the record makes it clear that the budget was not carved in stone but was an estimate of what might reasonably be required. Until counsel has conducted some investigation and spoken with potential witnesses, it is not possible to ascertain the reasonableness of funding requests. Thus court, in carrying out its administrative functions in this case, attempted to get counsel to focus on exactly what would be needed in the way of experts in order to ensure that the requests were reasonable and necessary to provide fair compensation. Additionally, since the underlying incident had been the focus of two prior state court trials, counsel should have been able to utilize the factual investigations completed in the earlier cases to a large extent to reduce the overall amount of investigation necessary to defend the federal case. Once the court approved a budget, however, counsel were not prevented from approaching the court with additional facts and/or information to support a request for increasing any of the budgeted amounts and the court, on several occasions, encouraged defense counsel to submit supplemental budget requests if they felt they needed additional funding.[93]

---

[93]*See*, Doc. 321, Transcript of Sealed Telephone conference held on May 5, 2005 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115 (court advised Mr. Hilfiger that it was granting Mr. Echols Motion to Withdraw and advised counsel he would be given an opportunity to inform the court of the effect of this decision on the trial schedule, the budget and anything else to do with the case); Doc. 318, Transcript of Sealed Ex Parte Budget Hearing held on October 3, 2005 in *United*

While the petitioner claims this court "expressed an interest in appointing less-qualified attorneys to represent [him],"[94] the record establishes the court followed the requirements of 18 U.S.C. § 3005 by considering the recommendation of the Federal Public Defender and appointing John Echols as lead counsel and appointing Roger Hilfiger as co-counsel.  The court considered both of these counsel to be "learned in the law applicable to capital cases," in that Mr. Echols had previously tried state capital cases and Mr. Hilfiger had previously tried a federal capital case.  While the court did not seek the Federal Public Defender's recommendation regarding who to appoint as co-counsel upon the withdrawal of Mr. Echols, the petitioner has failed to establish that the purpose of the statute, *i.e.*, to ensure the high-quality representation necessary in capital cases, was not fulfilled since Mr. Hilfiger was clearly "learned in the law applicable to capital cases" and Mr. Smith was a well-respected attorney who was admitted to practice in this court on April 3, 1992. Additionally, both Mr. Hilfiger and Mr. Smith were active members of the CJA defense panel for the Eastern District of Oklahoma.

Simply because counsel did not use the entire budget as originally approved by this court for experts,[95] the petitioner can not, despite his many statements to the contrary,

---

*States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP (court advised defense counsel that after granting Mr. Echols Motion to Withdraw the court had indicated that an amended budget request would be considered but no amended budget was ever filed.  Counsel were again encouraged to advise the court of any supplemental budget requests they might have; but counsel advised the court that they felt the budget was sufficient for everything including all of the experts that they needed).  *See also*, Doc. No. 128, Order regarding funding issues filed on May 5, 2005 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

[94]Doc. 95, at p. 9.

[95]Counsel modified his request on October 31, 2005, seeking an additional $7882.00, which this court approved.  Cr. Doc. 244.

establish that this court violated his constitutional rights by denying him expert and/or investigative funds.  On March 18, 2005, in approving counsel's budget, this court did indicate it would not pay for the transcript of a hearing held on January 26, 2005.  Counsel did not, however, submit a CJA 24 form to the court requesting authorization and/or payment of transcripts.  Also, counsel never asked this court to reconsider their motion for a copy of the transcript of January 26, 2005, or provided the court with any additional facts or law to support the request.  Finally, the petitioner has not shown that denial of this transcript deprived him of the necessary tools to mount a defense or to participate meaningfully in the judicial proceedings.  *Medina v. California*, *supra*.

The petitioner continually claims that he was not provided routine services provided to "similarly situated defendants."  Yet, the petitioner does not identify one service he was not able to obtain which prejudiced his case.  Furthermore, the court approved almost all of the vouchers submitted by defense counsel.  The only vouchers which were not approved as submitted were the first two vouchers submitted by Mr. Echols.  As previously indicated in this case, an adjustment of time was made to those vouchers, in part, because of "striking similarities between the substance of pleadings" filed in Petitioner's criminal case and the substance of pleadings filed in a state court case in which Mr. Echols was involved.[96] Furthermore, the petitioner does not identify even one federal death penalty case which contains the same factual scenario as his case, *i.e.* two prior state criminal trials were held relating to the incident which formed the basis for the federal charges prior to the federal

---

[96]*See*, Cr. Doc. 106.

court trial. Moreover, while this court did not approve separate payment for a jury consultant, the petitioner also complains because Mr. Hilfiger actually obtained the services of a private jury consultant and this court "expressed no concern or objection to Mr. Hilfiger's unauthorized retention" of this jury consultant.[97] Counsel was free to obtain any services he desired and he had no duty to request reimbursement for any of the services he obtained. Based upon the facts of this case, this court finds the petitioner has not shown that this court's administrative decisions regarding appointment of counsel or funding issues deprived him of his constitutional rights.[98]

Additionally, since a district court's attorney fee determination is not an appealable order, *United States v. French*, 556 F.3d 1091 (10th Cir. 2009), and because the budget approved by the court was not exhausted, this court finds appellate counsel was not ineffective in failing to challenge the administrative decisions of this court on appeal.

## II.   SUPPRESSION OF EXCULPATORY EVIDENCE

In his fifth ground for relief, the petitioner asserts he was deprived of his Fifth Amendment right to Due Process, his Sixth Amendment rights to counsel and confrontation, and his Eighth Amendment right to a fair and reliable capital sentencing process because the government suppressed exculpatory evidence, knowingly used perjured testimony and failed to correct false testimony. Additionally, the petitioner claims newly discovered evidence

---

[97]Doc. 95, at pp. 24-25.

[98]Petitioner also claims this court engaged in improper *ex parte* communications with the government to bolster his argument that the court was biased against him and treated him unfairly. This allegation was previously addressed by this court in the order ruling on the petitioner's Motion to Disqualify and Recuse, Doc. 66 at pp. 6-16, and will not be re-addressed herein.

entitles him to relief from his convictions and sentences. The government argues they did not violate any disclosure requirements. Further, the government asserts none of their actions amounted to prejudicial misconduct. In reply, the petitioner claims evidence known to or in the possession of state or local law enforcement is imputed to the federal government.

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment. . . . " 373 U.S. at 87, 83 S.Ct. at 1196-1197. There are three essential elements to a *Brady* claim: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke,* 540 U.S. 668, 691, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

Thus, in order to establish a *Brady* violation, a habeas petitioner must prove the prosecution suppressed evidence, the evidence was favorable to petitioner, and the evidence was material. *United States v. DeLuna*, 10 F.3d 1529, 1534 (10th Cir. 1993). To show the evidence was 'material,' there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United*

36

*States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). *See also*, *Douglas v. Workman*, 560 F.3d 1156, 1173 (10th Cir. 2009). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, S.Ct. at 1566.

> A *Brady* claim fails if the existence of favorable evidence is merely suspected. That the evidence exists must be established by the defendant. *See United States v. Lopez*, 372 F.3d 1207 1209-11 (10th Cir. 2004) (because defendant failed to establish that government had promised leniency to prosecution witnesses, there could be no *Brady* violation in government's failure to turn over documentation of such promises); *United States v. Warren*, 454 F.3d 752, 759 (7th Cir. 2006) (defendant failed to establish existence of any document withheld by government, so "his *Brady* claim fails to get off the ground.").

*United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009).

"[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, U.S. at 437, S.Ct. at 1567. While courts have refused to draw a distinction between different agencies under the same government,[99] the Tenth Circuit has held where "there is no indication that the investigation was a joint effort between the state and federal government," materials possessed by the state government will not be imputed to the federal government. *United States v. Beers*, 189 F.3d 1297, 1303 (10th Cir. 1999). Other circuits have adopted this same approach by defining the "prosecution team" as "the prosecutor or anyone over whom he has authority." *Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002).

---

[99] *See, United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979).

. . . . knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor's office on the case in question would inappropriately require us to adopt "a monolithic view of government" that would "condemn the prosecution of criminal cases to a state of paralysis." *United States v. Gambino*, 835 F.Supp. 74, 95 (E.D.N.Y. 1993), *aff'd*, 59 F.3d 353 (2d Cir. 1995), *cert. denied*, 517 U.S. 1187, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996). Thus, in *United States v. Locascio*, 6 F.3d 924 (2d Cir.1993) ("*Locascio*"), cert. denied, 511 U.S. 1070, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994), we refused to impute to the AUSAs prosecuting that action knowledge of reports prepared by FBI agents who were "uninvolved in the investigation or trial of the defendants-appellants." *Id*. at 949 ("We will not infer the prosecutors' knowledge simply because some other government agents knew about" the evidence.). In *United States v. Quinn*, 445 F.2d 940 (2d Cir.), *cert. denied*, 404 U.S. 850, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971), we refused to impute the knowledge of a Florida prosecutor to an AUSA in New York, rejecting as "completely untenable [the] position that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor.' " *Id*. at 944.

*United States v. Avellino*, 136 F.3d 249, 255 -256 (2nd Cir. 1998). *See also*, *Johnston v. Love*, 940 F.Supp. 738, 768-71 (E.D.Pa. 1996), *aff'd*, 128 F.3d 1576 (3rd Cir. 1997), *cert. denied*, 522 U.S. 972, 118 S.Ct. 425, 139 L.Ed.2d 326 (1997) (refused to impute to the state attorney the federal prosecutor's knowledge of a witness immunity agreement because the federal prosecutor was not an agent for the State, did not consult or obtain the consent of the State, and did not bind the State when he entered into the immunity agreement with the witness). Where, however, state and federal governments pool their investigative energies to prosecute the defendants, courts have imputed information possessed by state investigators to the federal prosecutor. *United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979) and *United States v. Risha*, 445 F.3d 298 (3rd Cir. 2006).

In *Risha*, the Third Circuit held that a "case-by-case analysis" should be used when considering a federal prosecutor's constructive knowledge of information that was known by state agents. Courts addressing the issue of cross-jurisdiction have looked at:

> 1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; 2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and 3) whether the entity charged with constructive possession has 'ready access' to the evidence."

*Id.*, at 304. *See also*, *United States v. Reyeros*, 537 F.3d 270 (3rd Cir. 2008) (while Columbian government which acted at request of federal government and participated in a Columbian extradition proceeding, they did not function as agents of the United States government or act under its control).

In addition to invoking the due process protections of *Brady*, the petitioner asks this court to construe his suppression claims as newly discovered evidence under FED.R.CRIM.P. 33. The government, citing *United States v. Evans*, 224 F.3d 670, 674 (7th Cir. 2000), argues Rule 33 is meant to correct "factual injustice" as opposed to legal errors and that the petitioner's request for relief under Rule 33 is untimely. In his reply, the petitioner, citing *United States v. Hernandez*, 94 F.3d 606 (10th Cir. 1996), asserts the Tenth Circuit has recognized the viability of newly discovered evidence issues in § 2255 proceedings and, therefore, *Evans* is not applicable herein. There is no question that newly discovered evidence issues can be raised in § 2255 proceedings. *Hernandez* did not, however, contain any indication that the newly discovered evidence claims raised therein were or were not timely raised. In fact, the § 2255 proceeding was initially brought while the appeal was

pending.   Furthermore, Rule 33 of the Federal Rules of Criminal Procedure has been amended since the *Hernandez* case was decided to change the time for filing a motion for new trial from "within two years after final judgment"[100] to "within 3 years after the verdict or finding of guilt."[101]

In this case, the petitioner was found guilty on November 4, 2005.  The first § 2255 filing was not made until March 16, 2009, well after the expiration of time to seek relief under Rule 33 of the Federal Rules of Criminal Procedure.  As a result, this court finds the petitioner's request for relief under Rule 33 is untimely.

Petitioner claims the government suppressed exculpatory evidence about six civilian witnesses, three law enforcement witnesses, and one trial prosecutor.  In considering this claim, it is important to keep in mind that the United States government was not initially involved in seeking or obtaining the search warrant in this case.  Rather, this case was initiated solely by officers employed by the office of the District Attorney for the Twenty-Seventh (27th) Prosecutorial District Drug Task Force for the State of Oklahoma.[102]  During the motion to suppress hearing in this case, Darren Lane from the Drug Enforcement

---

[100]18 U.S.C. (1996), FED.R.CRIM.P. 33.

[101]FED.R.CRIM.P. 33.

[102]Petitioner's Exhibit No. 194, at p. 1 and Government's Exhibit No. 4, at p. 2 ¶ 5 and p. 3 ¶ 16.  *See also, United States v. Barrett*, 496 F.3d at 1082 and  Cr.Doc. 105, at p. 2 which indicates:

> Clint Johnson, an Oklahoma drug task force agent, secured a state court warrant to search the Defendant's home for drugs.  Agent Johnson had information that the Defendant had threatened "to kill the first cop through the door," and that there were guns around the house, so he sought the assistance of the Oklahoma Highway Patrol with entering and securing the Defendant's home.  The federal drug task force of the Drug Enforcement Agency also was notified because Agent Johnson anticipated there would be a methamphetamine lab to clean up at the scene, although the federal agents were not expected to participate in the raid itself.

Administration was designated as "case agent."[103]  At trial, the government designated Special Agent Darren Lane with the Drug Enforcement Agency (DEA) and Special Agent Ben Rosser with the Oklahoma Bureau of Investigation.[104]  Finally, it appears that as early as March 24, 2004, the federal prosecutors were having difficulties communicating and/or obtaining cooperation from the District 27 District Attorney's Office Drug Task Force.[105]

### *Claims involving Civilian Witnesses*

### A.  Charles Sanders

Initially, the petitioner attacks the use of the confidential informant, Charles Sanders, alleging the government did not fully disclose Sander's complete criminal history and that the government suppressed deals it made with Sanders in exchange for his testimony. Despite the petitioner's assertions, the trial transcript establishes that the defense counsel was aware of  the state court charges which could be used to impeach Mr. Sanders at the time of trial.[106]  Additionally, Sanders admitted to the jury his extensive history of drug abuse. Assuming for purposes of argument that Sanders had additional state criminal convictions,

---

[103]Tr. of Hearing on Motions held on January 26, 2005, at p. 3.

[104]J.T.Tr. Vol. 1, at p. 3.  *See also*, J.T.Tr. Vol. 4, at p. 423.

[105]*See*, Government's Exhibit No. 4, at p. 4.

[106]Compare, J.T. Vol. 11, at pp. 2491-2494 and 2524-2534 with Government Exhibit 6 and with Petitioner's Exhibit Nos. 157-162, and 164-165.  Petitioner's Exhibit Nos. 157, 158, and 159 contain court pleadings in felony case numbers CF-97-9, CF-97-75, and CF-98-128, respectively but none of these exhibits contain a judgment and sentence rendered in the case, so they could not have been used to impeach Sanders at the time of trial.  *See*, F.R.E. 609.  Petitioner's Exhibit No. 163 contains court pleadings in a felony case number CF-2001-314 but it also does not contain a judgment and sentence.  Petitioner's Exhibit No. 166 contains court pleadings in a misdemeanor case which was ultimately dismissed costs to state on December 8, 2008. Petitioner's Exhibit No. 167 contains court pleadings in another misdemeanor case but does not contain a judgment and sentence. Petitioner's Exhibit No. 175 contains court pleadings in a felony case number CF-97-140, but again it does not appear that any judgment and sentence was ever filed in this case.  Absent a conviction, counsel simply would not have been able to use these exhibits to impeach Sanders.

there is no evidence to suggest the federal government was even aware of those convictions.

The government generally does not have a duty under *Brady* to seek out information that is

not in its possession, including a witness's criminal history. *United States v. Jones*, 34 F.3d

596, 599 (8th Cir. 1994) (holding "the prosecutor has no duty to undertake a fishing

expedition in other jurisdictions in an effort to find impeaching evidence"). Further, in light

of Sanders extensive criminal history which was relayed to the jury, this court would find the

petitioner has failed to show any additional criminal records concerning Sanders were

material or that this court's confidence in the outcome of the trial is undermined by additional

criminal history of this particular witness.

Furthermore, the trial transcript establishes that Sanders advised the jury of the

agreement which he had with the federal government in the following colloquy with the

federal prosecutor:

> Q: And I advised you of any assistance that I would provide to yourself in relation - - for your cooperation, testimony in this case, haven't I?
>
> A: Yes, sir.
>
> Q: What did I tell you I would do in your behalf?
>
> A: You tell - - you didn't make me no promises. You told me that you would talk to the prosecution upon completion. That - - no, you haven't guaranteed me nothing.
>
> Q: In relation to talking to the prosecutors, the conviction you're serving now in Sequoyah County; is that correct?
>
> A: Yes, sir.

Q: Did I advise you that I talked to the prosecutors in Sequoyah County and tell them of your cooperation?

A: Yes, sir.

Q: And since then you also had an application to revoke a misdemeanor sentence in Tulsa County, didn't you?

A: Yes, sir.

Q: And in fact, I called the District Attorney's Office in Tulsa County and advised them that you were cooperating in this case as well, didn't I?

A: Yes, sir.

Q: Beyond doing that, contacting the D.A.'s Office in Sequoyah County and the D.A.'s Office in Tulsa County and advising them that I anticipate you're going to cooperate, have I told you any promises in regards to what would happen to any sentence that you may be facing or any time you may be serving?

A: Have you advised me of what now?

Q: Have I told you anything about what would happen to any sentence you have?

A: No.

Q: Has any promise been made in regards to your early release or anything that might happen in Tulsa County at all?

A: No, sir.

J.T. Vol. 11, at pp. 2494-2496. Despite Barrett's claims to the contrary, he has failed to show

that any benefits Sanders received were inconsistent with what he told the jury. While some

notation on a uncertified copy of a document purportedly filed in the District Court of

Muskogee, Wagoner, Cherokee and Sequoyah Counties in which someone other than the

43

judge who signed the Order wrote "*per plea agreement with the feds, banish from Sequoyah County,"[107] this hearsay statement does not convince this court that any more was done in Sander's criminal cases than what was disclosed to the jury. Barrett's allegations are purely speculative as to the actual reasons Sander's state cases were handled the way they were. He has not presented any affidavits from state prosecutors or any other person which establish an agreement different from what Sanders testified to. As a result, this court finds the petitioner has failed to establish a *Brady* violation in relation to Sanders.

## B. Travis Crawford

Next, under the guise of a *Brady* claim, the petitioner asserts Travis Crawford lied on the stand and that he has since recanted his trial testimony. Petitioner first relies on the hearsay accounts provided by his investigator and Crawford's parents of Crawford's purportedly unsworn statements.[108] This court will not consider hearsay accounts of unsworn recantations. *See*, *United States v. Pearson*, 203 F.3d 1243, 1275 (10th Cir. 2000) ("Sworn trial testimony is generally not refuted by unsworn repudiation of that testimony.") *See also*, *Herrera v. Collins*, 506 U.S. 390, 417, 113 S.Ct. 853, 869, 122 L.Ed.2d 203 (1993) (federal habeas case noting that affidavits containing hearsay are "particularly suspect").

Petitioner also relies on Crawford's own declaration in which Crawford states, in pertinent part:

---

[107]*See*, Petitioner's Exhibit No. 160, at p. 88. Copies of this same pleading appear at Petitioner's Exhibit Nos. 161, at p. 45; 162, at p. 61; 164, at p. 28; and 165, at p. 55.

[108]*See*, Petitioner's Exhibit Nos. 31, 91 and 92.

I testified falsely at Kenny's trial.  At the time I testified, I was living in so many places and was so strung out, I did whatever I was told to keep out of trouble.  I did methamphetamine all the time, every day.  When I testified against Kenny, I was high on speed; . . . .

When Mr. Littlefield interviewed me about Kenny, I was terrified of losing my freedom and said whatever I thought Mr. Littlefield wanted me to say.  Mr. Littlefield asked me if Kenny said he (Kenny) "was going down in a blaze of glory," and before I could answer, Mr. Littlefield told me all the bad things that would happen to me if I "lied."  I was so scared I said, "yes" that Kenny had said he would go down in a blaze of glory if the cops came.  I was panicking because I was afraid.  Mr. Littlefield said he knew things about me. I was so scared.

I never heard Kenny say he was going down in a blaze of glory. . . .

Petitioner's Exhibit No. 45, at p. 2.

Since the recantation is really just a ploy to obtain a new trial under Rule 33 and the petitioner's initial request for a new trial was not filed until four and a half months after the limitations set out in Rule 33 had expired,[109] this court finds this information was not timely filed.  However, even if the declaration had been timely filed, this court finds it is extremely suspicious in light of Crawford's actual trial testimony; the fact Crawford is Barrett's cousin; and because Crawford was persuaded by a defense investigator to recant in the presence of his mother and father.  At trial, Crawford testified, in pertinent part, as follows:

Q: . . . .What happened as that vehicle drove down the road in a westerly direction?

A: I seen my cousin going to the gate.

Q: When you say your cousin, who?

A: Kenneth.

---

[109]It should be noted that Crawford's declaration was not signed until June 3, 2009 and was not filed in this court until September 25, 2009, six months after the limitations had expired.

Q: Okay. And where was the gate located?

A: Kind of the west side, right there by the road.

Q: Okay. And when your - - and when did Kenneth Barrett go to the gate in relation to the white vehicle passing? Was it before it got to there, or after it passed on by?

A: After it passed by, about past my mom's house. It was right in about there, I guess.

Q: That's where the vehicle was?

A: Yeah.

Q: Okay. And when Mr. Barrett went to the gate, what did he do? What'd (sic) you see him doing?

A: I thought he'd closed the gate, but they said it was already closed.

Q: Okay. You think he was closing the gate?

A: Yeah.

Q: Okay. What did you do?

A: I just talked to him.

Q: Did you holler or go down there?

A: I walked down there to him, talked to him.

Q: Okay. And what did Mr. Barrett say when you got down there, about that vehicle – the vehicle that went past?

A: That he knew those was laws.

Q: Did he say anything else? What did you say when he said he knew that they were the law?

A: Yeah.  I knew there was a warrant out for him.  I said those probably right there – they're going to come back and serve that warrant.

Q: What did he say?

A: He said D.G.F.

Q: What do you mean by D.G.F.?

A: He just – I guess he was just tired of it all, said he didn't –

Q: What's D.G.F. mean?

A: Don't give a fuck.

Q: After Mr. Barrett said D.G.F., what did he say then?

A: He said he was going out in a blaze of glory.  But he said that a thousand times, not just then.

J.T. Vol. III, at pp. 465-466.  The prosecutor did not lead Crawford in any way to say what he said.  Additionally, the prosecutor did not specifically ask Crawford if "Kenny said he (Kenny) 'was going down in a blaze of glory.'"  Instead, the prosecutor asked what had been said and Crawford volunteered that Barrett said "he was going out in a blaze of glory." Crawford further stated Barrett had said this a thousand times.  On cross-examination, Crawford indicated he had heard a million people, in the "dope world" say "I'm going out in a blaze of glory."[110]  Finally, Crawford admitted that he had used a lot of dope over a period of approximately fifteen years and that his mind was "not sharp like it always has been."[111]  Consequently, this court does not believe the recantation which was not made until

---

[110]J.T.Tr. Vol. 3, at p. 480.

[111]*Id.*, at pp. 457 and 468.

47

more than three years after Barrett's trial and after Barrett had already been sentenced to death.

Barrett also claims the government withheld evidence that Crawford spent two months in a military brig and had once cooperated with local law enforcement. He has not, however, established that the United States Attorney's office knew this information. *Brady* requires disclosure only of evidence within the actual or constructive possession of the prosecution and its investigative team. *United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999). In this case, the warrants executed on September 24, 1999 were not federal search warrants. The only involvement by the federal government in this matter was to assist in the execution of the search warrant after state agents had been involved in a fatal shooting at the location which was to be searched. *See*, Government's Exhibit No. 4. The investigative team for purposes of the federal charges was the United States Drug Enforcement Agency (DEA) and this court finds no evidence to suggest that either the DEA or the United States Attorney was aware of Crawford's involvement with local law enforcement. Similarly, there is no evidence to establish that the prosecution team knew that Crawford spent time in a military brig almost twenty years before this trial for an unknown reason that may or may not have reflected on his credibility. *Brady* does not require a prosecutor to seek out and disclose exculpatory or impeaching material not in the government's possession. *United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002); *United States v. Jones*, *supra*. Furthermore, based upon the fact Crawford testified to his extensive drug use;[112] admitted on cross-examination

---

[112]*Id.*

48

his arrests for child support violations and hot checks after testifying on direct examination that he had never been arrested;[113] admitted that his drug use affected his memory;[114] and admitted that six years had passed since the events about which he was testifying and that he had never provided a written statement to law enforcement,[115] this court finds this "newly discovered evidence" would not have had a material effect on the verdict.

Next, Barrett claims the government knew or should have known that Crawford was a drug addict at the time he was interviewed by the prosecution and at the time he testified at trial and therefore, they had an obligation under *Brady* to disclose this information to the defense.  As previously stated, Crawford testified at trial about his extensive drug use; so despite the petitioner's allegations, defense counsel was aware that he was a drug addict. Further, Barrett claims, in light of Crawford's affidavit which indicates he "was high on speed" when he testified at trial,[116] the prosecution had an obligation to correct Crawford's allegedly false trial testimony that he had been off drugs for nine months prior to his testimony.[117]  Petitioner does not, however, present any evidence that the government actually knew Crawford was using drugs at the time of his testimony.  Conclusory or "purely speculative" allegations are insufficient to establish a *Brady* claim.  *Murphy v. Johnson*, 205 F.3d. 809, 814 (5th Cir. 2000).  If, as the petitioner alleges, it should have been obvious that

---

[113]*Id.*, at pp. 456 and 467-468.

[114]*Id.*, at pp. 468 and 472.

[115]*Id.*, at pp. 481-482.

[116]Petitioner's Exhibit No. 45, at p. 2.

[117]J.T.Tr. Vol. 3, at p. 457.

Crawford was on drugs at the time of his testimony, there is no merit to this *Brady* claim because the defense would or should have known that he was on drugs.

Finally, the petitioner claims the government should have disclosed that threats were made to Crawford to secure favorable trial testimony. Again, the petitioner does not present any evidence that Crawford was actually threatened. Based on one statement in Crawford's affidavit in which Crawford says: ". . . Mr. Littlefield told me all the bad things that would happen to me if I 'lied,'"[118] the petitioner speculates that Crawford was threatened. While the prosecution may have encouraged Crawford to be honest, that does not establish that threats were made to Crawford to encourage him to testify untruthfully. Further, when asked at trial whether he had "been threatened with any sort of prosecution if you don't come up here and testify," Crawford stated: "No sir. I was just subpoenaed to be here. That's why I'm here doing this."[119] After reviewing all of the allegations against Travis Crawford, this court finds the petitioner has failed to establish that Travis Crawford testified falsely at trial. As a result, the petitioner has not shown that the prosecutor knew or should have known of any falsity in Crawford's testimony, a fact fatal to his *Brady* claim.

## C. Cindy Crawford

Petitioner claims Cindy Crawford was coached and threatened by the prosecutor; that she was, contrary to her testimony, an active drug user and that she was either high or "coming down" from a high when she was interviewed by the government and when she

---

[118]Petitioner's Exhibit 45, at p. 2.

[119]J.T.Tr. Vol. 3, at p. 470.

testified at trial; that she suffered mental impairments which affected her ability to accurately recall and relate past occurrences, and which caused her to embellish and exaggerate; that she had regularly worked as an informant in the past and had received breaks on a Sequoyah County drug case; at the time of her testimony she was in violation of deferred sentence in Sequoyah County and that case was resolved in her favor after her testimony. Again, this court will not consider hearsay accounts of unsworn recantations. *See*, *United States v. Pearson*, 203 F.3d 1243, 1275 (10th Cir. 2000).

Petitioner also claims the government withheld evidence that Ms. Crawford was mentally ill and an active user of methamphetamine at the time of trial. In support of this claim, the petitioner attaches medical records of Ms. Crawford.[120] Petitioner does not, however, present any evidence which tends to establish the government knew, prior to cross-examination by defense counsel during the second stage of trial, that Ms. Crawford had been diagnosed with post-traumatic stress disorder. Similarly, the petitioner does not present any evidence which establishes that the government knew Ms. Crawford was using drugs at the time of her testimony. Conclusory allegations that evidence was known by the prosecution does not state a claim for relief. As previously indicated, *Brady* does not require a prosecutor to seek out and disclose exculpatory or impeaching material not in the government's possession. *United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002).

Further, the petitioner claims "it was well known in the community that [Ms. Crawford] acted on a regular basis as a snitch for local law enforcement" and that the

---

[120]Petitioner's Exhibit 144.

Government "or its agents" had to know this, yet they failed to disclose this information.[121]

This claim fails on two levels. First, if it was "well known" within the community, defense counsel could have easily discovered the information. "There is no *Brady* violation "where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information,' or where the evidence is available . . . from another source," because in such cases there is really nothing for the government to disclose." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998). Specifically, in this case, two of the three declarations submitted by the petitioner to establish the knowledge within the community, were provided by the petitioner's cousin, who indicates her brother is married to Ms. Crawford,[122] and the petitioner's uncle, the father of Travis Crawford.[123] Travis Crawford's parents lived in close proximity to the petitioner's house.[124] On the other hand, while these three declarant's claim Ms. Crawford was a police informant, Barrett fails to show that Ms. Crawford had, prior to her testimony in 2005, actually provided any documented assistance to law enforcement in exchange for favorable treatment. Even assuming the petitioner's allegations that Ms. Crawford had worked for local law enforcement is true, "it is unrealistic to expect the federal prosecutors to know all information possessed by state officials affecting a federal case,

---

[121]Petitioner supports this statement with three declarations. *See*, Petitioner's Exhibit No. 83, at p. 2 ("It is common knowledge in the community that Cindy Crawford has worked as a "snitch" for local law enforcement for a long time to get others in trouble and to avoid getting in trouble herself."); Petitioner's Exhibit No. 88, at 2 ("It is common knowledge in the community that Cindy Crawford has worked as an informant for the police for an extensive period of time. . . . ."); and Petitioner's Exhibit No. 92, at p. 1 ("I am aware that Cindy has worked as an informant for the local police around here . . . . . .").

[122]*See*, Petitioner's Exhibit No. 83, at p. 2.

[123]*See*, Petitioner's Exhibit No. 92, at p. 1.

[124]J.T.Tr., Vol. 3, at pp. 451-456.

especially when the information results from an unrelated state investigation." *United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999). Therefore, this court finds no *Brady* violation occurred in relation to this information.

Additionally, the petitioner alleges that "Cindy Crawford continues to milk benefits from her work as an informant, and her testimony against Mr. Barrett, up to the present day." Doc. 95, at p. 289. In support of this flowery statement, the petitioner alleges Crawford was charged in Sequoyah County on June 18, 2008 with first degree burglary and conspiracy and on December 15, 2008, more than three years after the petitioner's trial herein, received a two year deferred sentence on the first degree burglary charge and dismissal of the conspiracy charge. Barrett's conclusory allegations that the federal government has exerted and/or continues to exert influence in Ms. Crawford's state court proceedings are meritless. This statement, like many others contained within the petitioner's pleadings, is purely speculative. Again, speculative allegations are insufficient to state a *Brady* claim. *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000).

## D. Brandie Zane Price

Next, the petitioner asserts the government or its agents knew or had reason to know that Ms. Price was involved in drug use and drug dealing at the time of her trial testimony despite her testimony, on October 26, 2005, that she had not been using illegal narcotics since 1999.[125] In support of this assertion, the petitioner submits court records from the

---

[125]At trial, Ms. Price was asked, "Since 1999 have you been using illegal narcotics?" She replied, "No, sir." J.T.Tr. Vol. 15, at p. 3488.

Eastern District of Oklahoma Case No. CR-07-016-RAW in which the grand jury returned an indictment on March 14, 2007 which alleged that "Beginning prior to approximately May, 2006, the exact date being unknown to the Grand Jury, and continuing until on or about February 20, 2007," Price and others were involved in a drug conspiracy.[126]  Subsequent to being indicted, Price pled guilty to a superseding Information to the crime of Possession of Methamphetamine with Intent to Distribute a mixture or substance containing a detectable amount of methamphetamine in excess of 500 grams.  The Information alleged the crime occurred "[f]rom approximately May, 2006 to on or about February 20, 2007."  Ultimately, Price received a sixty (60) month sentence in that case.  Barrett claims Ms. Price "received a substantial downward departure or variance from the advisory Guideline range based *on her cooperation and testimony against Mr. Barrett at his federal trial.*"  *See*, Doc. 95, at pp. 290-291.  Further, Barrett "alleges that the Government or its agents knew full well (or had reason to know) at the time of Brandie Price's testimony against [him] that she was involved in drug use and drug dealing."  *Id.*, at p. 291.

Again, these claims are clearly speculative and this court fails to see how the government could or should have known about drug activity which was not alleged to have begun until more than six months after Price's testimony.  Further, even if the government subsequently considered Price's previous testimony in Barrett's case in requesting a downward departure, this does not establish that the government had any agreement with Ms. Price prior to her testimony in his case.  As the government points out, "Barrett provides no

---

[126]Petitioner's Exhibit No. 174.

54

theory as to how the government might have induced Price's cooperation by promising leniency in a prosecution it had not undertaken for a crime the witness had not yet committed." Doc. 175, at p. 193. As a result, this court finds the petitioner has failed to state a *Brady* claim in relation to the testimony of Ms. Price.

## E.  Karen Real

As to the final civilian witness, the petitioner asserts the government misled the jury with respect to the assistance it was going to give Real in exchange for her testimony and that the government failed to disclose numerous state cases which were dismissed against Real, which could have been used to impeach her. The government argues Barrett has failed "to show that the benefit received by Real was not the one described by the witness in open court." Additionally, in regard to Barrett's claim regarding state cases, the government argues this portion of Barrett's claim is untimely because it was not raised until March 1, 2010, and without merit since Barrett has failed "to establish that the government possessed any material information about Real's state prosecutions."

### a.  Statute of Limitations

In reviewing the petitioner's Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and For a New Trial filed herein on March 17, 2009, it is clear the only issue raised at that time regarding Ms. Real was

> . . . that the Government misled the jury with respect to the assistance it was going to give Real. The Government surely knew all along that it would ask that Real's sentence be reduced to time served based on her cooperation

against Mr. Barrett, an eventuality which in fact occurred.  The Government has a continuing duty to disclose exculpatory evidence under *Brady*.  This Government's true intentions were never disclosed to the defense or told to the jury.  Additionally, the tremendous break Real received on her sentence is newly discovered evidence adversely impacting her credibility and the Government's lack of forthrightness at trial.  Evidence of Real's deal could not have been discovered with the exercise of due diligence before or during trial, because it post-dated Mr. Barrett's trial.  Yet again, the Government's conduct in soft-peddling the assistance it was going to give Real in exchange for her testimony constituted a violation of *Giglio v. United States*, 405 U.S. 150 (1972) and *Napue v. Illinois*, 360 U.S. 264 (1959).

Doc. 2, at p. 297.

As the government claims, the petitioner did not timely raise a *Brady* violation occurred because of failure to disclose to defense Real's criminal record, including pending state criminal cases.  Since this claim was not raised until the filing of the petitioner's brief in support of his Amended Motion to Vacate, Set Aside, or Correct a Sentence By a Person in Federal Custody which was filed herein on December 4, 2009, *see*, Doc. 95, at p. 293, this court finds it is barred by the statute of limitations.[127]

b.  Sufficiency of claim regarding government assistance in exchange for Real's testimony

At trial, Ms. Real testified she had been convicted of "Conspiracy to manufacture, maintaining a house and a gun charge" and was serving a fourteen (14) year sentence in federal prison.  Thereafter, the following colloquy occurred between the prosecutor and Ms. Real:

Q: And we visited previously to your being here, have we not?

---

[127]All of the state court cases which the petitioner claims should have been disclosed were dismissed by the State of Oklahoma prior to Real's testimony in this case.  Furthermore, none of those cases resulted in a conviction.

A: Yes, sir.

Q: And did I indicate anything that I would do for you or attempt to do for you in relation to your cooperating with the Government in this case?

A: No, sir.

Q: Did I talk about anything I'd say to the Court?

A: Well, you just mentioned that, you know, you could tell the Judge, you know, what I did.  And then it would be up to the Judge.

Q: Okay.  Any relief from your sentence - - you're aware it's not going to come from me, its got to come for (sic) the court?

A: Yes.  The court.

J.T.Tr., Vol. 13, at pp. 3080-3081.  Ms. Real further advised the jury that she started using methamphetamine in 1994 or 1995, and she continued doing so until her arrest in 2000. *Id*., at p. 3081.

Ms. Real testified in the petitioner's trial on October 24 and 25, 2005.  *See*, J.T.Tr., Vol. 13, pp. 3079-3092 and Vol. 14, 3098-3135.  On March 1, 2006, the government filed a Motion for Reduction of Sentence for Defendant Karen Jean Real Pursuant to Rule 35, in Case No. CR-00-21-FHS.  *See*, Petitioner's Exhibit No. 68 and Respondent's Exhibit No. 9. The government's motion advised the court that a complaint had been filed against Barrett in September 2004.  The government indicated, in preparation for the Indictment, Ms. Real was writted to the Eastern District of Oklahoma from a federal correctional institution and asked about her associations with Barrett.  The government further advised the court when Ms. Real was told there was a possibility that she would be used as a witness against Barrett,

she "expressed a willingness to testify without hesitation or reluctance." Additionally, the government indicated:

> While Ms. Real's testimony was delayed for a substantial period of time, Ms. Real presented the information at the earliest possible opportunity for her to assist the government. The government first presented this matter to a grand jury in November 2004. Ms. Real, at approximately that time, was first approached by the government regarding the knowledge she had involving Kenneth Eugene Barrett. At that time, Ms. Real spoke freely and continued to do so during the duration of her assistance to the government.
>
> While ultimately multiple civilian witnesses spoke of Barrett's drug dealing activities, his use of firearms, and his threats to law enforcement, Ms. Real was the first to do so. Her willingness to provide truthful testimony regarding Barrett's activities made it easier for the subsequent witnesses to come forward. She was the first and cooperated willingly and courageously. Her assistance was substantial and created an environment in which others could cooperate as well. She is clearly deserving of a reduction in her sentence in consideration of her efforts.

*Id.* Thereafter, on April 25, 2006, the Honorable Frank H. Seay entered an order reducing Ms. Real's sentence to time served, with the original terms of supervised release being left in effect. *See*, Petitioner's Exhibit No. 68 and Respondent's Exhibit No. 10.

Although Ms. Real did not advise the jury of the technical procedure that the government would use to inform the judge of her assistance, (*i.e.*, filing of a Rule 35 Motion) she clearly advised the jury that she anticipated that the government would make known to the judge what she had done and then it would be up to the judge to decide what to do. Based on the record in Ms. Real's case, this appears to be exactly what the government did. Petitioner, or at least the petitioner's counsel, clearly knew or should have known of the technical procedure for "informing a judge of a defendant's assistance." Thus, this court finds petitioner has failed to establish a *Brady* violation as it relates to Karen Real.

## F.  Randy Turman

Petitioner states

[t]he Government or its agents obviously knew that Turman was committing perjury when he stated he no longer had a pending felony case in Sequoyah County, but they let him give false testimony anyway.  It is equally clear the Government knew, despite Turman's denials, that he had worked or was working as a snitch.  Otherwise, there was no reason for his case to lie dormant for two years.  The Government let Turman get away with another blatant falsehood when he stated the Government had nothing to hang over his head.  Clearly, his testimony was motivated by the fact he had a still pending felony case.

Doc. 95, at p. 294.

The testimony to which the petitioner refers, however, was elicited at trial by defense counsel.  First, defense counsel asked: "So, you're real familiar with cooking dope; aren't you?" Turman responded: "Yes, sir, I've been arrested for cooking dope." Defense counsel then indicated they were "going to talk about that in a second."[128]  A few questions later, the following colloquy occurred:

Q: . . . . you have manufactured dope within a thousand feet of a school; haven't you.

A: No, sir.

Q: You have manufactured dope in the presence of a minor child under the age of 12, haven't you?

A: No, sir.

Q: And, sir, you have manufactured dope while possessing a firearm?

A: Yes, sir.

---

[128]J.T.Tr. Vol. 4, at p. 433.

Q: In fact, you manufactured methamphetamine while possessing a firearm, an AK-47, that had the serial numbers obliterated; didn't you?

A: No, sir.

Q: Well, you've been charged with all those crimes; haven't you?

A: I have been charged with alternating a serial number on a firearm, it was a SKS where it was dropped and hit on a nine, and it looked like that it was tried to be changed, but it hadn't.

Q: And on that case, you're currently out on bond on another $100,000; aren't you?

A: No, 120,000.

Q: And the status of that case is what?

A: There's - - there's nothing, no status.  I've done been to court, and it's done been taken care of.

Q: It's over with?

A: As far as I know.

Q: Have you looked at the records?

A: No, sir.

Q: Do you want to look at them?

A: I don't know what good it would do me.

Q: I've got them right here.  I've looked at them.  You want to look at them?

A: I probably wouldn't understand them.

Q: It's not over with - -

1131

A: The last time I went to court on that was two years ago, and I have never been - - made another court date. That was when Kelly Karnes was fired from the sheriff's department. He brought in bogus charges on me - -

J.T.Tr. Vol. 3, pp. 434-436.

. . . . *Brady* obviously does not apply to information that is not wholly within the control of the prosecution. There is no *Brady* violation "where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information,' or where the evidence is available . . . from another source," because in such cases there is really nothing for the government to disclose.

*Coe v. Bell*, 161 F.3d 320, 344 (6ᵗʰ Cir. 1998) (citations omitted).

Despite the petitioner's allegations, the record establishes the falsity of the allegations regarding Turman. The government did not elicit the testimony and, therefore, they could not have "let him give false testimony" nor did they "let [him] get away with another blatant falsehood when he stated the Government had nothing to hang over his head." Defense counsel was clearly aware of the essential facts surrounding Turman's pending criminal case and he took advantage of that information to cross-exam Turman. Furthermore, the petitioner's allegations that Turman "had worked or was working as a snitch" is another example of defense counsel's speculation which has no basis in fact. There is simply no merit to the petitioner's claim. As a result, this court finds the petitioner has failed to establish a *Brady* violation as it relates to Randy Turman.

## G. Failure to disclose unknown witness

Barrett next asserts the government

. . . . had spoken with, and knew the identity of, a witness who when questioned failed to corroborate information to which Charles "Monk" Sanders

61

> would eventually testify in the penalty phase of Mr. Barrett's trial. (Tr. 9/13/05 H'rg at 14, 17.) [The Assistant United States Attorney] advised the court that he attempted to corroborate Sanders's claim that he (Sanders) was in a woman's house when he overheard her speaking on the telephone. Sanders, as he later testified, claimed he could recognize Mr. Barrett's voice over the phone, and that he heard the voice say they had to identify the C.I. and get rid of him. [The Assistant United States Attorney] told the court he had spoken with the woman himself, and she did not corroborate Sanders, although [the assistant] claimed he subjectively believed the woman's denial was motivated by fear.

Doc. 95, at p. 295.

Other than to cite to a transcript from a sealed hearing held on September 13, 2005, at pages 14 and 17, the petitioner does not cite the actual statements made by the government which establish that the government failed to disclose the identity of a person who purportedly "failed to corroborate Charles Sanders." A review of that transcript convinces this court that this claim is without merit. The entire colloquy between the court and prosecutors concerned witnesses to events that occurred at the petitioner's residence "during the months leading up to this particular incident." Tr. of September 13, 2005, at p. 9. The prosecutor advised the court he expected "them to testify that Mr. Barrett knew there was an arrest warrant outstanding, he expected law enforcement to come to his residence at some point in time and advised that - - words to the effect of I'm going to shoot when they come." *Id.*, at pp. 9-10. The court then engaged in the following colloquy with the prosecutors:

> THE COURT: Haven't you in effect disclosed to counsel then essentially who they are by telling them what the testimony is?
>
> MR. LITTLEFIELD: No, no, because - -
>
> MR. SPERLING: Well, what the testimony is - -

MR. LITTLEFIELD: We have told them what the testimony - -

THE COURT: Once you have told them what the testimony is, if they talk with their client about it, isn't he going to be able to determine roughly who we are talking about?

MR. LITTLEFIELD: I don't believe so.

MR. SPERLING: Mike, hold on. Excuse me just a second.

> (OFF THE RECORD DISCUSSION BETWEEN MR. SPERLING AND MR. LITTLEFIELD)

MR. LITTLEFIELD: If - - Your Honor asks about does that notice them, the defense, as to who it is and my response would be yes and no. Yes, because the defense could go back through his recollection of who he might have said that to and have an access to the names. No, because it is my belief that the defendant said that to many, many more people than those that we have found. I have learned of one person, for example, who - - through witnesses, who would have been a participant in a conversation with Mr. Barrett in which statements of this nature would have been made. I talked to that person. That person refused to acknowledge it, I think in large measure because of the fear.

*Id*., at pp. 11-12. Simply because some other person did not acknowledge hearing petitioner make similar statements to what Sanders heard, does not establish that the person was even a participant to the conversation which Sanders described. Sanders never claimed to know who Barrett was speaking to when he heard the statements he testified about. Moreover, Sanders never testified he was in a woman's house when he overheard Barrett say "they had to identify the C.I. and get rid of him." Rather, Sanders testified he was in jail when he overheard Barrett talking to someone on the telephone and Barrett made these comments to the person he was talking to. See, J.T.Tr. Vol. 22, at pp. 4587-4588.

Shortly after being advised that the petitioner may have made threatening statements, the court advised counsel it was interested in hearing evidence to support the government's allegations that the witnesses' were in danger. *Id*., at p. 13.  At that point, the following colloquy occurred:[129]

> MR. SPERLING: I think that our brief with regard to the defendant being reasonably believed to be dangerous, that if convicted he faces substantial sentences, that there may well be media coverage. . . I need not belabor that. I want to focus on, C, exactly why the Court should delay the production of certain witnesses in this case.  We have identified each of these witnesses, Your Honor.  Two of them are in prison; one in federal, one in state.  Others live in and around Sequoyah County, which is the home county of the defendant.  It is - - there is common knowledge, Your Honor, that guns and drugs go hand in hand and particularly in Sequoyah County, methamphetamine distributors are often armed.   The defendant is a hero to certain drug traffickers, as at Doss Gann's residence.  He was a federal defendant and was prosecuted here.  In fact, Mr. Littlefield was the prosecutor in that case and Doss had a picture of the defendant on the wall with the inscription hero after the time of this incident, this shooting.  Randy Turman and Brandie Price have explicitly expressed concern about intimidation, threats, and safety of family members.  The confidential informant that has been identified in our pleading, Your Honor, stated such.  He was at the house of defendant's associate and overheard the defendant speaking on the phone saying we have got to find out who the C.I. is and take care of him.  Mr. Littlefield has spoken directly with that confidential informant, who is identified in our pleading by name.
>
> THE COURT: What is the time frame of that?
>
> MR. LITTLEFIELD: It was after the arrest, while Mr. Barrett was - - and I don't know - -
>
> THE COURT: In '99?

---

[129]Since the petitioner asserts evidence of his allegation is found on page 14 and 17 of the transcript of the September 13, 2005 hearing at pages 14 and 17, the court has included the entire colloquy between the court and the government beginning on page 13 to page 18.

MR. LITTLEFIELD: It would have been in the time frame of '99, early 2000 is my best guess. I didn't ask specifically because I - - but the informant was at someone's residence, a phone call was made, the informant was next to the person who was the recipient of the phone call, recognized Mr. Barrett's voice over the telephone and heard Mr. Barrett tell this associate that we need to find out who the confidential informant is and take care of him.

THE COURT: Okay. You may proceed.

MR. SPERLING: All right. I think the pleading speaks for itself with regard to Cindy Crawford and Randy Turman, but we would point out in particular that Randy Turman has explicitly stated to counsel that he seriously fears Jerry Graham, who is a very dangerous man, recently released from prison and believed involved in Sequoyah County drug activity. This is according to District Attorney Investigator Clint Johnson. Jerry Graham is a neighbor of Randy Turman's and several law enforcement officers, as we noted in our pleading, who are familiar with Jerry Graham advised that he is believed to have killed in the past.

There is another matter, another man by the name of Randy Weaver. We have set forth the substance of what we expect that he will testify to. Brandie Price is also an associate of the defendant, whom we have identified in our pleading as saying that as an associate of the defendant that the defendant told her the cops were going to come, bullets would fly and she should either grab a gun or stay low and that the defendant intended to kill as many of them as he could. She is often in Sequoyah County, although her marital relationship is on and off with a husband and when it's on they live in Van Buren or Fort Smith. She is often then with her mother or grandmother in Sequoyah County and is the object of substantial concern. And then there is Charles Sanders. He is the confidential informant. Early in this proceeding there were allegations by predecessor defense counsel that the C.I. was really fiction. He is not, he is real. We have identified him in this pleading. He knew that the defendant cooked meth. He had been there, smelled the odor of meth at the defendant's residence, had seen cooking items at the defendant's residence, knew that the defendant cooked crank at his residence at a time approximate to the charged murder, and this informant, Mr. Sanders, said that the defendant expected cops to come and said he was going to kill the first one through the door. There was other - - there were other allegations about interaction between the informant and the defendant and sometime after the defendant's arrest, the informant was at the residence of a female associate of Barrett's when Barrett called and that's when Barrett advised the female that

they needed to identify the informant and, quote, "take care of him," end quote.

There is also Travis Crawford and Travis Crawford is - - you know, this statement about taking care of someone - - I mean, I must admit that sometimes perception is reality and the Court needs to deal with reality rather than someone's unreal fears, but I don't believe in the context of this case that these concerns are unrealistic.  Travis Crawford was in Kenneth Barrett's yard on the afternoon of the charged murder when there was an apparent drive-by by an unmarked police vehicle.  Travis Crawford apparently was told by the defendant that the defendant recognized the Bronco as a cop car, expressed that he didn't give an explicitive (sic), that the law was coming in, and said that he was going to go out in a blaze of glory.  As we have - -

THE COURT: When did that witness testify?

MR. LITTLEFIELD: He has not yet testified.  Part of our concern too here is, Your Honor, these are not witnesses that have previously testified in state court.  So does the defendant have some idea as to whom he interacted with at or about that time?  Yes.  Does he know about these specific people by name? No.

*Id.*, at pp. 13-18.  As can be seen from the transcript of the proceedings, Barrett's claim that the government suppressed the identity of a witness who would have refuted Charles Sanders is a figment of defense counsel's imagination.  There is simply no evidence in this record, to establish that some undisclosed witness was in a position to contradict Sanders claim that he had been threatened *after* the murder.  The fact the government might have learned of a person who, "according to witnesses," would have been a participant in a conversation with Barrett in which statements concerning the confidential informant were made does not establish that the person the government interviewed was the actual person who was talking to Barrett when the confidential informant overheard Barrett speaking.  As a result, this court finds the petitioner has failed to establish that a *Brady* violation occurred.

66

### *Claims involving credibility of Law Enforcement Personnel*

Petitioner next asserts the government suppressed exculpatory evidence favorable to the defense about four law enforcement officials involved in his case, *i.e.* Clint Johnson, Vickie Lyons, Assistant United States Attorney Mike Littlefield, and Sequoyah County Sheriff Johnny Philpott. Many of the allegations have no basis, involve post-trial misconduct about which the government could not have known at the time of trial, and/or concern matters which are clearly not relevant. This court will, however, attempt to address these allegations.

## A.  Clint Johnson

First, the petitioner claims "[t]he Government or its agents knew that Johnson, just like his alleged snitch, Sanders, is untrustworthy and was subject to impeachment in a variety of areas." Doc. 95, at p. 297. Petitioner further asserts "[a]t the time of Mr. Barrett's trial and shortly thereafter, Johnson was under official investigation for embezzlement of funds, illegal drug use, perjury, and gross misuse of his official office." *Id*. In support of most of these allegations, the petitioner relies on a "defense attorney's suggestions" during cross-examination in a criminal case against that defense attorney's client, Richard Gray. All of the documents which the petitioner submits in support of these allegations are blatant hearsay. Further, while the petitioner claims "[o]n November 23, 2005, Sheridan[130] noted

---

[130]Jeff Sheridan appears to have been an employee of Richard Gray, the District Attorney for Cherokee and Sequoyah Counties. Mr. Gray was indicted, following an Oklahoma multi-county grand jury investigation, in October, 2006 for embezzling money seized as evidence from drug investigations. While the charges were ultimately dismissed against Mr. Gray, no charges were ever filed against Mr. Johnson and the petitioner's statement that the charges against Gray were dismissed at the conclusion of the prosecution's case "based on defense counsel's scathing impeachment of Clint Johnson," is nothing more than speculation.

Johnson's possible involvement, as either a target or witness, in a Multi-County Grand Jury criminal investigation," the petitioner does not submit any evidence that establishes Johnson was personally involved in any criminal activity or that an official investigation into Johnson's activities was being undertaken at the time of the petitioner's trial.[131]   The government, on the other hand, submitted an affidavit from Joel-lyn McCormick which indicates Ms. McCormick was responsible for prosecuting Mr. Gray's case and during her preparations for the trial in Mr. Gray's case, she investigated allegations of misconduct leveled against Mr. Johnson.  Ms. McCormick states, in reference to Petitioner's allegations that Mr. Johnson was writing hot checks in September 2005:

> . . . . I directed Attorney General Investigator Fred Ellis to verify an allegation that Mr. Johnson had written checks to a merchant on insufficient funds in September 2005.  As I understood the situation, the merchant had not perceived any fraudulent intent on Johnson's part.  However, I recall that an investigator from the District 27 District Attorney's Office contacted the merchant and urged him to turn the checks over to the DA's office for prosecution.

Respondent's Exhibit No. 2.  Additionally, Ms. McCormick indicates she became aware of an audit of confidential informant funds used by Clint Johnson's former employer, the

---

[131]Petitioner's Exhibit No. 181b  indicates, at p. 117,  that "During 2005, Johnson encountered several problems with operational procedures at the Drug Task Force.  One of the Assistant District Attorney's (A.D.A.) for the district had stolen "Crank" from a house during one of JOHNSON'S search warrants.  This A.D.A. was JANET BICKEL (phonetic).  JOHNSON told the District Attorney, RICHARD GRAY what had happened.  Nothing was done about the incident.  There were also other problems within the District Attorney's office and JOHNSON ended up having to testify before the Multi-County Grand Jury in Oklahoma City, Oklahoma.  JOHNSON told the truth to the Jury and several indictments were handed down against co-workers."  The interview in which this statement appears was conducted in late February, 2006.  Furthermore, it does not establish that Clint Johnson was personally involved in any criminal activities.  Finally, the A.D.A. Janet Bickel ultimately pled guilty "on September 8, 2006 in exchange for a five (5) year deferred sentence in Wagoner County District Court Case No. CF-2006-037 for offering false evidence in violation of 21 O.S. 453 and for Possession of Controlled Dangerous Substance in violation of 63 O.S. 2-402, and in Oklahoma County District Court Case No. CF-2006-597 for Perjury in violation of 21 O.S. 491."  *State ex rel. Oklahoma Bar Ass'n v. Phillips*, 175 P.3d 353, 353-354 (Okla. 2007).

District 27 Drug Task Force.  However,  Ms. McCormick states:  "The audit did not find Clint Johnson had misappropriated confidential informant funds."  *Id.*

Finally, assuming the petitioner's allegations that the District Attorney's office had some "concern" over Johnson's inability to account for funds allegedly used for drug buys as early as November, 2005, the government's disclosure obligations under *Brady* do not extend to merely subjective assessments by the prosecutor of a witness's veracity.  *United States v. Torrez-Ortega*, 184 F.3d 1128, 1137 (10th Cir. 1999).  Moreover, mere suspicions of misconduct would not have been admissible to impeach Johnson's credibility.  *See*, Fed.R.Evid. 608 and 609.  Furthermore, this court finds that any evidence of a internal investigation within the state District Attorney's office was not in the actual or constructive possession of the federal government.  This finding is based upon the facts of this particular case, to-wit:  (1) the state District Attorney's office was not acting on behalf of the federal government or under its control; (2) the federal government apparently conducted its own investigation, interviewing and calling witnesses not previously called by the state prosecutor; (3)  a Federal Bureau of Investigation (FBI) visual information specialist spent two complete days at the scene, taking over 200 photographs to develop a model of the crime scene;[132] (4) the DEA performed drug analysis on physical evidence which was seized;[133] and

---

[132]J.T.Tr., Vol. 2, at pp. 241-300.

[133]J.T.Tr., Vol. 12, at pp. 2770-2820 and Vol. 13, at pp. 2827-2835, 2889-2920, 2929-3013*; 3016-3057.  See also*, Respondent's Exhibit No. 4, at p. 2 ¶s 5, 7, 10, 12, 13 and p. 3, at ¶s 15 and 16.

(5) as early as March 24, 2004, the federal government was having trouble in obtaining cooperation from the state District Attorney's office.[134]

Petitioner also claims Johnson mismanaged his personal finances, declared bankruptcy and gave materially false testimony regarding his knowledge of Charles Sanders's criminal activity before September 24, 1999.  While the petitioner speculates because of Johnson's bankruptcy filings he "mismanaged his personal finances," the petitioner submits no evidence establishing how or when Johnson mismanaged his personal finances.  Furthermore, in relation to Johnson's public bankruptcy filings, there was "really nothing for the government to disclose." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).  Additionally, the petitioner has not shown that disclosure of Johnson's bankruptcies which occurred more than four years prior to the petitioner's trial would have had any affect on the verdict in the petitioner's case. *See*, *United States v. Smith*, 534 F.3d 1211, 1222 (10th Cir. 2008).  Finally, the petitioner claims "Johnson's testimony was false on a material matter" in relation to the confidential informant (Charles Sanders). *See*, Doc. 95, at pp. 301-303.  Other than citing to the transcript from the hearing on the petitioner's motion to suppress in federal court, the petitioner does not provide **any** factual information which establishes that Johnson testified falsely.  Rather, this entire allegation is once again premised upon conjecture and speculation.  As a result, this court finds no *Brady* violation occurred in relation to Clint Johnson.

---

[134]Respondent's Exhibit No. 4, at p. 4.

**B.  Vickie Lyons**[135]

Petitioner makes the following allegations against Ms. Lyons:

Agent Vickie Lyons of the Oklahoma State Bureau of Investigation, another critical witness in the Government's case against Mr. Barrett, colluded with and protected Johnson. . . . .Likewise, the credibility of Vickie Lyons would have suffered greatly had the jury learned of her participation in her boyfriend Clint Johnson's numerous illegal activities.

Doc. 95, at p. 297.  Petitioner also states ". . . . Johnson lived with another critical prosecution witness in Mr. Barrett's case, Vickie Lyons of the OSBI." *Id*., at p. 300. Petitioner submits absolutely no evidence of these allegations.  Rather, the petitioner relies upon suggestions made by Richard Gray's defense lawyer, Clark Brewster, in questioning Mr. Johnson.  Mr. Johnson, however, denied under oath that he had ever lived with Ms. Lyons.  Petitioner's Exhibit No. 181A, at p. 73.  This allegation is without any merit. Therefore, this court finds the petitioner has failed to establish a *Brady* violation as it relates to Vickie Lyons.

**C.  Johnny Philpot**

Next, the petitioner claims the government suppressed evidence that Johnny Philpott visited his property and inspected his weapons less than a month before the murder.  In support of this allegation, the petitioner submits a declaration containing hearsay statements attributed to Johnny Philpott.  According to Barrett, this evidence would have allowed him to attack the validity of the no-knock nighttime warrant and would have discredited the snitch

---

[135]Although the petitioner refers to "Vickie Lyons", the court is unsure of the true spelling of Ms. Lyons first name. At the hearing on the motion to suppress, it was spelled "Vicky." *See*, Tr. of hearing on Motions held on January 26, 2005, at p. 48. *See also*, Petitioner's Exhibit No. 181A, at p. 75. During trial, it was spelled "Vicki." *See*, J.T.Tr., Vol. 9, at p. 1849.

witnesses and undermined the government's proof of intent to kill any law enforcement officers entering his property. Doc. 95, at pp. 307-310. The government, however, submits a declaration from Philpott in which Philpott personally states, in part:

> 1. I was the Sheriff of Sequoyah County, Oklahoma from November 12, 1996 to December 31, 2008.
>
> 2. On July 29, 1998, I responded with some of my deputies, Shelton Fair (#826), Larry Lane (#824) and Walter Ross, Undersheriff (#821), to the home of Kenneth Eugene Barrett. On that occasion, I spoke with Mr. Barrett, and some of my deputies inspected some rifles of Mr. Barrett's. Though Mr. Barrett had an outstanding Sequoyah County misdemeanor warrant at that time, I did not arrest him or cause him to be arrested.
>
> 3. Prior to Mr. Barrett's arrest in connection with the shooting death of David "Rocky" Eales, the July 29, 1998 incident described in paragraph 2, above was the last occasion on which I visited Mr. Barrett's home in Mr. Barrett's presence.

Doc. 175, Government's Exhibit 1.[136]

If, despite Philpott's declaration, Philpott was at Barrett's residence less than a month before the police raid and inspected Barrett's guns, this evidence would have been readily available to defense counsel from Barrett himself. As a result, the petitioner has failed to establish a *Brady* violation in regard to Johnny Philpott.

## D. Michael Littlefield

Finally, and perhaps most disturbing to this court, are the petitioner's allegations that the prosecution suppressed evidence that Assistant United States Attorney Michael Littlefield

---

[136]This exhibit contains another paragraph which says declarant is attaching a copy of the radio log from July 29, 1998 as Exhibit A; however, no such log is attached to the exhibit. It should be noted that Philpott's declaration is consistent with the testimony given by Philpott at Petitioner's trial. *See*, J.T.Tr., Vol. 8, at p. 1789-1790 and Vol. 22, at p. 4562.

was abusing his children around the time of this trial and disclosure of this exculpatory evidence would have demonstrated that this prosecutor likely threatened and intimidated witnesses to provide false testimony. Petitioner supplies no competent evidence of these allegations and it appears from exhibits filed under seal that the information submitted by the petitioner did not occur until approximately one and a half (1½) years after the petitioner's federal trial. Based upon the sensitivity of the information and the fact that release of this information would undermine previous state court proceedings, this court is entering a separate order under seal which more fully addresses this claim in light of the sensitive nature of the information. For purposes of this order, however, this court finds that the petitioner has failed to establish a *Brady* violation as it relates to Michael Littlefield.

After having reviewed all of the petitioner's *Brady* claims and thoroughly examining the exhibits cited in support thereof, this court finds the petitioner has failed to establish any *Brady* violations actually occurred in the petitioner's trial. Accordingly, this claim is denied.

### III. VALIDITY OF SEARCH WARRANT

Petitioner argues, in his fourth ground for relief, that his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments were violated by the use of false information in obtaining the search warrant and, as a result, the search warrant was invalid. The government asserts the petitioner can not raise a Fourth Amendment search and seizure claim on collateral review because he had a full and fair opportunity to litigate this claim. In reply, the petitioner argues the suppression of exculpatory evidence regarding the affiant's honesty as a law enforcement officer shows that he was denied a full and fair opportunity to litigate the search and seizure warrant.

In *United States v. Cook*, 997 F.2d 1312, 1317 (10th Cir. 1993), the Tenth Circuit held "that Fourth Amendment violations are not reviewable in a § 2255 motion when the federal petitioner has had a full and fair opportunity to litigate the Fourth Amendment claim at trial and present issues on direct appeal." (citations omitted). In this case, it is clear that the petitioner had a full and fair opportunity to litigate his Fourth Amendment claims. First, on January 12, 2005, the defendant filed a motion to suppress.[137] On January 26, 2005, the magistrate judge held a hearing on the motion to suppress. Thereafter, on April 1, 2005, the magistrate judge recommended that the motion to suppress be denied.[138] On April 17, 2005, the defendant filed objections to the magistrate's report and recommendation regarding the motion to suppress and on April 26, 2005, the government filed a response to the defendant's

---

[137]Cr. Doc. 33. *See also*, Cr. Doc. Nos. 33, 43, 56 and 63.

[138]Cr. Doc. 105.

objections.[139]   On May 5, 2005, this court adopted and affirmed the magistrate's recommendation.[140]

Shortly after the trial began, Charles Sanders testified he was Johnson's confidential informant and Barrett's attorneys orally re-urged their motion to suppress claiming it was based on a faulty affidavit.[141]   Thereafter, defense counsel filed a written motion re-urging their motion to suppress.[142]   This court entered a seven page written order denying the defendant's motion specifically finding:

> Having heard both the testimony of Clint Johnson and Charles Sanders in this trial, as well as the testimony of numerous other witnesses regarding the activities occurring at the defendant's residence during the time period in which Johnson was receiving information from Sanders, this Court finds there is absolutely no basis for the defendant's assertion that the information contained within the affidavit was not truthful.  Specially, because the affiant accepted as true what he was told by Sanders, and had found him to be reliable in the past, the Court finds the affidavit was properly supported.  Furthermore, based upon the totality of testimony presented herein, this Court finds the defendant has not even established that the information provided in 1999 by the informant was untruthful or unreliable.  As such, the affiant's affidavit concerning that information could not have been made with deliberate or reckless disregard for the truth.  Accordingly, the defendant's motion to suppress is hereby overruled.

Cr. Doc. No. 253.

On appeal, the petitioner argued the district court erred in denying the motion to suppress, although the exact argument raised in his motion to vacate  was not presented on

---

[139]Cr. Doc. 117 and 122, respectively.

[140]Cr. Doc. 124.

[141]J.T.Tr., Vol. 12, at pp. 2667-2680.

[142]Cr. Doc. 228.  *See also*, Cr. Doc. No. 231, Government's Response to Defendant's Request to Reurge Defendant's Motion to suppress the Drug Search Warrant.

appeal.  *See*, *United States v. Barrett*, 496 F.3d 1079, 1088-1091 (10ᵗʰ Cir. 2007).   In rejecting the petitioner's argument, the Tenth Circuit held "there was no violation of Oklahoma state law, let alone a federal constitutional violation that would justify suppression of the evidence seized from Barrett's residence."  *Id.*, at 1090.

Since this court has previously found that the government did not suppress any exculpatory evidence about the affiant's honesty as a law enforcement officer, this court finds the petitioner had a full and fair opportunity to litigate his Fourth Amendment issues at trial.  Further, since his allegations concerning the affiant's honesty are nothing more than unfounded scandalous attacks on the affiant, this court finds appellate counsel was not ineffective in failing to raise these unfounded allegations on appeal.  Accordingly, this claim is denied.

## IV.  EVIDENTIARY ISSUES

Barrett's sixth ground for relief asserts his rights under the Fifth, Sixth, and Eighth Amendments were violated because of the trial court's restrictions on the use of statements he purportedly made at the time of his arrest and improper restrictions on the jury's consideration of the state-court verdict.  To overcome any procedural default, the petitioner asserts appellate counsel was ineffective in failing to raise the issue on appeal. The government argues the petitioner first raised his claim that the court improperly excluded evidence of his state court trial in a brief filed herein on March 1, 2010, well after the statute of limitations had expired.  As a result, the government asserts this portion of his claim is time barred.  Additionally, the government claims the petitioner has inadequately pled this

76

claim by failing to identify the judicial ruling which he is attacking and that the petitioner is procedurally barred from raising the claim because of his failure to raise the issue on appeal. The petitioner did not submit any reply to the government's response on this issue.

## A.  Statute of Limitations

As previously indicated, the one-year limitations period ended on March 17, 2009. In reviewing the Motion filed herein on March 17, 2009, it is clear the only issue raised at that time regarding the restriction of the jury's consideration of the state-court verdict dealt with the court's exclusion of evidence during the penalty phase of the trial.  *See*, Doc. 2 at pp. 323-327.  As the government argues, the petitioner did not timely claim that this court erred in excluding, in the first stage of trial, evidence regarding the prior state court trials and verdict.  Since this claim was not raised until the filing of the petitioner's brief in support of his Amended Motion to Vacate which was filed herein on March 1, 2010, *see*, Doc. 149 at p. 179, this court finds it is barred by the statute of limitations.

## B.  Sufficiency of claim

While the petitioner claims his counsel sought to admit a "number of statements made by Mr. Barrett shortly after his arrest that showed his deep remorse for the death of Trooper Eales,"[143] the petitioner identifies only one statement which he claims was erroneously excluded at trial.  He does not, however, provide any citations to the ruling which purportedly excluded this statement or establish why the ruling was flawed in light of the facts and circumstances known at the time of the ruling.  It is not this court's job to develop

---

[143]Doc. 149, at p. 176.

77

the petitioner's claims where they are devoid of factual support.  *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)) and *Hilliard v. United States*, 345 F.2d 252, 255 (10th Cir. 1965).  Rather, it is the petitioner's responsibility to identify the specific rulings which he claims were erroneous and articulate why they were wrong.  While the petitioner does provide legal authority for the proposition that statements of remorse may be considered as mitigating evidence, he does not pinpoint what the court's ruling that he is challenging was or explain why the specific ruling was erroneous.[144]  Judges are not required to search for the proverbial needle in a haystack in order to ferret out facts to support allegations contained in a motion to vacate.  Since the petitioner has not specifically identified the ruling which was erroneous, this court finds the petitioner has failed to establish that any error was made or that appellate counsel was ineffective in failing to raise the issue on appeal.  Accordingly, this claim is denied.

## V.  USE OF STUN BELT

In his seventh ground for relief, the petitioner argues his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were violated because the trial court permitted the marshal to "place visible restraints on [him] during the trial. . . ."  Doc. 95, at p. 326.  In support of this assertion, the petitioner states "[t]he stun belt created a visible bulge in Mr. Barrett's clothing that was observable by the jury. (Exhibit 80.)"[145] *Id.*,

---

[144]Both Petitioner's mother and father were all allowed to testify during the second stage of trial that the defendant knew he made the wrong decision, that he would do things differently if he could, and that he was sorry it happened.  *See*, Cr.Doc. 353, at pp. 5089 and 5114-5115.

[145]Exhibit 80 is a declaration by the petitioner's mother, Doris Barrett.

1149

at p. 327. No such statement, however, is contained in Petitioner's Exhibit 80. In fact, no mention whatsoever is made in Exhibit 80 about the stun belt. Rather, Exhibit 29[146] indicates trial counsel told appellate counsel that he did not believe the stun belt was visible to the jury.

The government argues the petitioner has procedurally defaulted this issue for failing to raise it on direct appeal. To overcome the procedural default, the petitioner claims both trial and appellate counsel were ineffective for failing to preserve this issue or raise it on appeal.

In *Deck v. Missouri*, 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2007), the United States Supreme Court held on review of a trial conducted by the State of Missouri that the Constitution forbids

> the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion that they are justified by a state interest specific to a particular trial. Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.

*Id.,* 544 U.S., at 629, 125 S.Ct., at 2012. Visible shackling has been deemed inherently prejudicial because 1) it undermines the presumption of innocence and the related fairness of the factfinding process; 2) it can interfere with a defendant's "ability to communicate" with his lawyer; and 3) it could undermine the dignity of the judicial process. *Id.*, 544 U.S., at 630-631, 125 S.Ct., at 2013. In *United States v. Wardell*, 591 F.3d 1279, 1293-1294 (10th Cir. 2009), the Tenth Circuit recognized that "requiring a defendant in a criminal trial to wear

---

[146]Exhibit 29 is a declaration by appellate counsel, Mark Henricksen.

1150

a *visible* stun belt, like restraining him with visible shackles, may erode a defendant's constitutional presumption of innocence." (Emphasis added)

Criminal defendants do not, however, enjoy an unqualified right to appear before a jury without restraints. Courts retain the discretion to take measures to maintain order and security within the courtroom. *United States v. Hack*, 782 F.2d 862, 867 (10th Cir. 1986). Where compelling reasons exist to justify the use of physical restraints, the general presumption against their use will "yield to the competing interests of courtroom participants for the safe conduct and orderly progress of the trial." *Id.* Furthermore, prejudice should not be presumed from the use of a stun belt, where there is no evidence that any juror actually observed it. *United States v. McKissick*, 204 F.3d 1282, 1299 (10th Cir. 2000).

In this case, the United States Marshal made a request of the court to authorize the use of a stun belt during the trial to ensure the security of the courtroom. Prior to reaching any decision on the matter, the court entered a sealed minute order ordering the parties to submit briefs on the issue and set the matter for an evidentiary hearing.[147] Following the entry of the sealed minute order, the government filed under seal a Brief in Support of the United States Marshal's request.[148] Attached to said brief was an affidavit by John W. Loyd, United States Marshal for the Eastern District of Oklahoma. In his affidavit, Mr. Loyd indicated "[t]he belt will not be visible to the jury and will not impede the defendant's normal physical

---

[147]Cr. Doc. 166. As indicated in the sealed minute order, the court decided to seal the minute order and all subsequent pleadings and court hearings on the stun belt issue in an effort to prevent any prejudicial inferences to be drawn against the defendant.

[148]Cr. Doc. 175.

80

movements during trial." Cr. Doc. 175. Further, in advising the court of the advantages of using a stun belt over using leg irons, Marshal Loyd stated that "[s]tun belts are worn under a defendant's clothing and not visible to the jury." *Id*.

On August 30, 2005, the court conducted an evidentiary hearing at which Louisia Murrow, Supervisory Deputy Marshal for the Eastern District of Oklahoma, testified regarding why the United States Marshal's service considered Barrett an escape risk. Ms. Murrow testified that she had personally observed Barrett while he was in the marshal's holding cell attempting to tamper with his handcuffs. Specifically, Ms. Morrow testified:

> He was twisting them and pulling on them and he even went so far as to walk out of the camera vision and turn his back and face the wall so that I could not fully see what he was doing. You know, I could see the back of his arms moving and stuff and I could - - when he was seated in the cell block, I could watch him twisting his hands and attempting to tamper with the handcuffs.

Cr. Doc. 330, Tr. of Sealed Criminal Pretrial Hearing held on August 31, 2005, at pp. 10-11. Ms. Morrow indicated that the behavior of the defendant in the holding cell was very extraordinary. *Id.*, at p. 14. Additionally, Ms. Morrow testified the defendant had continuously been in custody since approximately September 24, 1999; that defendant, prior to coming into the custody of the United States Marshal, had been incarcerated in the maximum security portion of the Oklahoma State Penitentiary where the defendant had been on lockdown for 23 hours per day; and that other deputy marshals had reported to her that they felt the defendant was "checking out the exits more than a normal prisoner would do." *Id.*, at pp. 11- 15. Finally, Ms. Morrow testified the charges pending against the defendant

81

indicated that the defendant had a propensity of violence. *Id.*, at pp. 53-54. The government also admitted as Government Exhibit 1 a copy of the policy of the United States Marshal Service regarding the use of stun belts which indicated that, if used, the device was to be concealed from the general public.[149] *Id.*, at p. 19. Additional testimony indicated that the use of the stun belt had never prevented a defendant from consulting with his attorney or participating in his defense. *Id.*, at pp. 21-22.

The defendant then called his stepmother, Doris Barrett, to rebut the government's testimony. Ms. Barrett testified that no restraints had been used on the defendant during state trial proceedings which occurred prior to defendant's indictment in federal court and that she never saw any type of threatening gesture by the defendant or any attempt or gesture by the defendant to escape. *Id.*, at pp. 75-80. Following the testimony, the court took the matter under advisement and on September 6, 2005, in a sealed order the court made specific findings of fact and conclusions of law regarding why the court felt the use of the stun belt was appropriate in this case.[150]

Furthermore, this court observed the petitioner during his criminal trial. The stun belt did not inhibit the petitioner's communications with his counsel. Petitioner continually took notes and freely communicated with both of his counsel during his trial. The stun belt was not visible to the jury. The defendant was brought into the courtroom and seated at the

---

[149]The government also had Ms. Murrow put the stun belt around her waist to demonstrate for the court what such a device would look like if worn by the defendant under his clothes.

[150]Cr. Doc. 178. In his Reply brief, the petitioner argues this order does not comply with *Deck* because there were no findings that the defendant "was dangerous, an escape risk, threatening or likely to cause any security problems." Reply at p. 153. The court's order, however, clearly establishes that the court allowed the use of the stun belt because of specific security concerns present in this particular case. *See*, Cr. Doc. 178, at pp. 16-18.

defense table prior to the jury being escorted into the courtroom and the defendant remained seated and was not escorted out of the courtroom until the jury had left the courtroom.  It is highly unlikely, based upon the way the jurors entered and existed the courtroom and the seating position of the defendant at the defense table, that any juror would have taken particular notice of petitioner's waist.[151]  To the extent, however, that even one juror might have observed a bulge around the petitioner's waist, they could not have known what caused the bulge.  In light of medical advances today, numerous medical devices could be placed on a person's waist and even if the jury observed a bulge around petitioner's waist, it is mere speculation to assume the jury would know that petitioner was wearing a stun belt for security reasons.  Additionally, when the petitioner jumped out of his seat during the trial and demanded that the United States Attorney "get off his family," the United States deputy marshal in charge of the stun belt did not deploy the stun belt.  As a result, this court finds there is no evidence in the record that any member of  the jury in this case knew that the defendant was wearing a stun belt.  Accordingly, based upon the record herein, this court finds this claim has no absolutely no merit and counsel were not ineffective for failing to raise this issue on appeal.

---

[151]It should also be noted that had the defendant been required to wear full restraints, which is standard practice in the Eastern District of Oklahoma when the United States Marshal brings a defendants from the secure holding facility down the public hallway into the courtroom, (*see*, Cr. Doc. 178, at p. 11) it is highly more likely, based upon the configuration and acoustics of the federal courthouse, that the jury would have become aware of those security measures.  Specifically, the courthouse floor is marble; defendants are required to walk past the outside of the jury assembly room every time the court takes a recess, both on the way out of court and on the way back into court; and the clanking of the waist chains can be heard throughout the entire second floor of the courthouse where the courtroom and jury assembly room are located.

## VI.  COMPETENCY TO STAND TRIAL

In his eighth ground for relief, the petitioner asserts he was tried while incompetent in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. The issue of a defendant's competency to stand trial centers on whether he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a  rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960).  "To prevail on a substantive due process competency claim, a petitioner must demonstrate by clear and convincing evidence a real, substantial, and legitimate doubt regarding his competence to stand trial."  *Walker v. Gibson*, 228 F.3d 1217, 1229 (10th Cir. 2000) (*overruled on other grounds*).

> The Constitution forbids trial of one who, for whatever reason, is unfit to assist in his own defense because our adversarial system of justice depends on vigorous defenses.  The Constitution does not necessarily forbid trial of the mentally ill.  'Not every manifestation of mental illness demonstrates incompetence to stand trial; rather the evidence must indicate a present inability to assist counsel or understand the charges.'  *United States ex rel. Foster v. DeRobertis*, 741 F.2d 1007, 1012 (7th Cir. 1984); *Galowski v. Berge*, 78 F.3d 1176, 1182 (7th Cir. 1996); *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995) ('[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial.').

*Eddmonds v. Peters*, 93 F.3d 1307, 1314 (7th Cir. 1996), *cert. denied*, 520 U.S. 1172, 117 S.Ct. 1441, 137 L.Ed.2d 548 (1997).

Since capacity to assist in one's defense is the main concern, where fitness is challenged post-trial "[e]vidence of a defendant's behavior and demeanor at trial are relevant

84

to the ultimate decision of competency to stand trial." *Id.* (citing *United States v. Prince*, 938 F.2d 1092, 1094 (10th Cir. 1991)).   To show entitlement to a hearing on a substantive competency claim, Petitioner must present "'clear and convincing evidence creating a real, substantial and legitimate doubt [about] his competence to stand trial.'   This standard of proof is high; and 'the facts must positively, unequivocally, and clearly generate the legitimate doubt.'"   *United States v. Battle*, 419 F.3d 1292, 1299 (11th Cir. 2005).

To support his substantive due process claim that he was tried while incompetent, the petitioner relies almost exclusively upon the declarations of two experts who examined him more than three years after his criminal trial.   Neither of these experts, however, appear to have consulted with former counsel, the psychologist who examined Petitioner at the time of trial or any of the other people who interacted on a daily basis with Petitioner during his federal trial such as federal marshals or Muskogee County Jail employees.[152]

The records in this case, however, contradict the findings by these experts. Specifically, on August 31, 2005, this court held a pretrial hearing for the purpose of deciding whether the defendant would be required to wear a stun belt during the trial. At said hearing, the petitioner's step-mother, Doris Barrett, testified that she had been in contact with the defendant.   When asked: "Did Kenny Barrett express to you that he realizes what is going

---

[152]The affidavit of Myla H. Young, Ph.D. indicates she did not even review any records from the Muskogee County Jail, the Oklahoma Department of Corrections or any other institutional records related to Mr. Barrett's incarceration from approximately 1999 to date nor did she talk with his any of his custodians either before or during his trial. *See*, Petitioner's Exhibit 89 at ¶ 20.   The affidavit of George W. Woods, Jr., M.D. reveals that he looked at institutional records including "*available* academic, medical and custodial records."  Petitioner's Exhibit 117, at ¶ 14 (italics added).  His affidavit does not, however, indicate that he spoke with any of the persons who interacted on a daily basis with the petitioner during the trial herein.

1156

on in this case?", she responded: "Yes, sir." She also indicated the defendant knew that his case was before the jury.[153]

Furthermore, this court's observations during the trial, as well as affidavits of the petitioner's trial counsel and the petitioner's own actions and comments during his trial, clearly indicate the defendant was competent during his trial. As discussed previously herein, this court observed the defendant taking notes and freely communicating with both of his trial attorneys. Additionally, during second stage closing arguments when the prosecutor[154] began to discuss testimony that his family members had given as mitigation, the defendant leapt from his chair and said:

> Get off my family, Sperling. This is about murder, not my family. You didn't mention the fact that I made two statements to OSBI Internal Affairs that you wouldn't let this jury hear, would you? I've heard enough of him talking about my family. Take me out of the courtroom. Take me out.

Cr. Doc. 355, at p. 5421.[155]

Following this outburst, the defendant was, at his request, removed from the courtroom.[156] After the prosecutor had completed his closing remarks, even though defense counsel indicated the defendant did not desire to return to the courtroom, the court had Mr.

---

[153]Cr. Doc. 333, at p. 88.

[154]Mr. Sperling gave the second closing argument for the government. *See*, Cr. Doc. 355, at pp. 5418- 5421.

[155]This statement alone demonstrates the petitioner had a fairly sophisticated understanding of the proceedings. Further, the decision to leave the courtroom may be reflective of the defendant's anger and frustration with the judicial process, but they were not incoherent.

[156]*Id.*, at pp. 5430-5434 for a discussion of the court and counsel's observations regarding the defendant's behavior. *See also*, p. 5438 in which the court advised the parties that "the marshal has also brought to my attention that the defendant has said if you force me to come to the court, I can give you some problems."

1157

Barrett brought to court outside the presence of the jury and the following colloquy between

the court and Mr. Barrett occurred:

> THE COURT: Let the record reflect counsel for the Government is present and the Defendant is present with counsel. Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings. I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?
>
> MR. BARRETT: Yes, Your Honor.
>
> THE COURT: Do you have any questions of the Court about that?
>
> MR. BARRETT: No, sir.
>
> THE COURT: Any questions of your attorneys?
>
> MR. BARRETT: No, sir.
>
> THE COURT: I'll ask the marshal to return - - (interrupted)
>
> MR. HILFIGER: One more. Does that include the verdict?
>
> MR. BARRETT: Yes, Your Honor.
>
> THE COURT: Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.
>
> MR. BARRETT: Yes, sir.

*Id*., at pp. 5438-5439.

Additionally, both trial counsel submitted declarations regarding their actual

interactions with Petitioner during the trial. Mr. Hilfiger stated, in relevant part:

> Mr. Barrett manifested a clear understanding of the trial proceedings. He was very involved in his defense. Mr. Barrett discussed witnesses, individual questions, and lines or areas of questions for certain witnesses. Because of the two prior State

court trials, Mr. Barrett also was able to identify inconsistencies between the evidence in the federal and state trials. Mr. Barrett wrote contemporaneous notes of the testimony and used those notes in later discussions with Mr. Smith and myself concerning testimony already covered. Mr. Barrett appeared very attentive during the trial and he avoided unnecessarily interrupting his attorneys in court by writing messages, rather than by addressing us orally.[157]

In view of my interaction with Mr. Barrett, I harbored no doubts concerning his mental competence to stand trial and was unaware of any symptom that suggested he suffered from a significant mental health condition.

I cannot recall ever discussing with Mr. Echols any concern by him about Mr. Barrett's mental competence to stand trial, and I was never made aware of, by any conversations, or reports in the defense file, that Mr. Echols ever harbored a concern about Mr. Barrett suffering from a significant mental health condition. Similarly, none of the materials in the defense file raised a concern in my mind that Mr. Barrett was incompetent or suffered from a significant mental health condition unrelated to his use of drugs.

Both Bret Smith and I, jointly and individually, met with several of Mr. Barrett's relatives, including (but not limited to) his mother Gelene Dotson, his father Ernest Barrett, his step-mother Doris Barrett, his brother Steven Barrett, his uncle Roger Barrett, and his son Toby Barrett. None of them reported to me that Mr. Barrett had suffered significant head injuries or had exhibited any symptoms of mental illness that led me to question the defendant's competence to stand trial. In fact, none of the defendant's relatives provided me with any information that led me to believe Mr. Barrett had suffered from a significant mental health condition.

. . . . Mr. Smith and I met with Jeanne Russell, at her office in Tulsa. Mr. Smith had more direct contacts with Dr. Russell

---

[157]Ms. Barrett's testimony at the pretrial hearing held on August 31, 2005, establishes that the petitioner was also active in similar ways in his two state trial proceedings. *See*, Cr. Doc. 333, at pp. 82-83 and 87.

concerning her contacts with Mr. Barrett, but she never indicated to me that she had any concern about Mr. Barrett's mental competence to stand trial or suggested anything to me that indicated she believed that Mr. Barrett suffered from a significant mental health condition.

Government's Exhibit 12, at ¶s 5, 7, 8, 9 and 10, respectively (footnote added).

Mr. Smith stated, in pertinent part:

Mr. Barrett impressed me as among the most cooperative criminal defense clients I have ever had. He clearly understood the proceedings, and assisted Mr. Hilfiger and me in selecting witnesses, in suggesting questions, and in identifying inconsistencies between the evidence in the federal and state trials. He was very involved in his defense. He took notes and avoided unnecessarily interrupting his attorneys in court by writing messages, rather than by addressing us orally.

On occasion, I met with Mr. Barrett outside the presence of Mr. Hilfiger. Mr. Barrett would attend those meetings prepared with lists of points he wanted communicated to me and to Mr. Hilfiger.

Mr. Barrett believed he was being unfairly targeted by the government, but I did not find him to be unduly paranoid under the circumstances. During our initial meeting, which occurred soon after my appointment to the case, he was suspicious of my identity. But over the course of our initial few meetings, I found it easy to build a rapport with him. I did not observe him looking over his shoulder to see if anyone was listening to him or engaging in other behaviors that would have demonstrated irrational suspicion of his surroundings or an abnormal degree of paranoia.

In view of my interaction with Mr. Barrett, I harbored no doubts concerning his mental competence to stand trial and was unaware of any symptom that suggested he suffered from a significant mental health condition.

> I met with several of Mr. Barrett's relatives, including (but not limited to) his mother Gelene Dotson, his step-mother Doris Barrett, and his uncle Roger Barrett. No one, including the family members I interviewed, reported to me that Mr. Barrett had suffered significant head injuries or had exhibited any symptoms of mental illness that led me to question the defendant's competence to stand trial. In fact, none of the defendant's relatives provided me with any information that led me to believe Mr. Barrett suffered from a significant mental health condition.
>
> . . . . I met with Jeanne Russell, at her office, in the presence of Mr. Hilfiger. Dr. Russell never indicated to us that she had any concern about Mr. Barrett's mental competence to stand trial or suggested anything to me that indicated she believed that Mr. Barrett suffered from a significant mental health condition.

*Id.*, Exhibit 11 at ¶s 3, 4, 5, 6, 7, and 8, respectively. *See also*, Doc. 310, at p. 36 in which

Mr. Echols indicated the petitioner

> is far from retarded. He is very bright, not educated, but he is very bright. He will tell me things during the trial - - he recalls something being said in court. I will check ranscripts (sic) or computer files and all of this other stuff and low and behold it will turn out to be right almost all of the time.

Additionally, tests conducted by a psychologist named Faust Bianco, during the state court

proceedings, indicated Mr. Barrett did not have any "personality disorders or any indication

of any brain disfunction. (sic)." *Id.*

In light of this record, the petitioner's proffer of Dr. George W. Woods' opinion

(based upon his evaluation of Mr. Barrett more than three years after trial) that "Mr. Barrett

was unable rationally to assist his attorneys in the preparation of his trial.,"[158] does not

"'positively, unequivocally and clearly generate a real, substantial and legitimate doubt

---

[158]Doc. 72, Exhibit 117, at ¶ 81.

concerning [Barrett's] mental capacity.'" *Foster v. Ward*, 182 F.3d 1177, 1191 (10th Cir. 1999) (citing *Nguyen v. Reynolds*, 131 F.3d 1340, 1346 (10th Cir. 1997)). *See also*, *Walker, supra* at 1229-1230 (holding several post-conviction affidavits, prepared over seven years after trial, regarding defendant's competence at time of trial were of little significance in light of other evidence). Therefore, this court finds the petitioner has failed to establish by clear and convincing evidence that he was incompetent at the time of trial.[159] Accordingly, this claim is denied.

## VII.  JURY INSTRUCTIONS

Barrett raises challenges to his jury instructions as three separate claims arguing that his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated by failure of this court to: 1) instruct on a lesser included homicide offense; 2) instruct the jury they could consider residual doubt as a mitigating factor; and 3) require the jury to find that death was an appropriate punishment beyond a reasonable doubt. Further, the petitioner asserts his rights to effective appellate counsel were violated due to appellate counsel's failure to raise the first and third issues on appeal. The government claims petitioner has procedurally defaulted the first and second claims and that he can not relitigate the third claim because it was raised on direct appeal.

As a general rule, improper jury instructions do not form the basis for federal habeas corpus relief. *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368

---

[159]*See also*, Cr. Doc. 237, Sealed Psychological Evaluation/Risk Assessment prepared by J. Randall Price on October 25, 2005, and the videotape of the interview of the petitioner conducted by Dr. Price and Cr. Doc. 265, Sealed Notice with disk of telephone calls from the Muskogee County Jail made by the petitioner between October, 2005 and November, 2005.

(1973). In *United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), the Supreme Court indicated a federal inmate attempting to establish prejudice from an allegedly erroneous jury instruction has a heavy burden and must show that the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."

## A. Lesser included offense

In *United States v. Keeble*, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973), the Supreme Court stated: "[I]t is now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *See also*, *Beck v. Alabama*, 447 U.S. 625, 635, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) (holding that the verdict of death may not be constitutionally imposed after a jury verdict of guilt of a capital offense where jury was not permitted to consider a verdict of guilt of a lesser included offense). In *Schmuck v. United States*, 489 U.S. 705, 716, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), the Supreme Court adopted the "elements approach" in determining when a lesser offense has been established by the evidence at trial. "Under this test, one offense is not 'necessarily included' in another unless the elements of the lesser offense are a subset of the elements of the charged offense." *Id*. Before a lesser offense will be deemed a "subset" of the greater offense, "the lesser [offense] must be such that it is impossible to commit the greater without first having committed the lesser." *Id*., U.S. at 719, S.Ct. at 1452 (quoting *Giles v. United States*, 144 F.2d 860, 861 (9th Cir. 1944). Thereafter, in *United States v. Chanthadara*, 230

1163

F.3d 1237 (10th Cir. 2000), the Tenth Circuit Court set forth a four-part test for determining whether a lesser included offense instruction is warranted stating:

> [A] lesser included offense instruction is to be given when [1] there is a proper request for one; [2] the lesser included offense consists of some, but not all, the elements of the offense charged; [3] proof of the element or elements differentiating the lesser and greater offenses is a matter in dispute; and [4] a jury could rationally convict on the lesser offense and acquit on the greater offense.

*Id.*, at 1257.  Courts need not instruct on lesser offenses in capital cases when such offenses are not lesser included offenses of the charged crime.  *Hopkins v. Reeves*, 524 U.S. 88, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998).  Accordingly, no instruction is to be given, when the lesser offense requires an element not required for the greater offense.  *Schmuck*, *supra*, U.S. at 716, S.Ct. at 1450.

In this case, both parties requested this court to instruct on voluntary manslaughter. The reason this request was made was due to the fact that the petitioner was charged with First Degree Murder in state court but was convicted of First Degree Manslaughter.  Here, however, Barrett was charged, in Count 1, with using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A) and (j), and, in Count 2, with using and carrying a firearm during and in relation to a crime of violence and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (j).  While Petitioner recognizes that Counts 1 and 2 were "felony murder" counts, he nonetheless argues heat of passion would have negated the malice

aforethought element. In *Chanthadara*, *supra*, the Court indicated that to prove the malice aforethought element of first-degree felony murder, the prosecution need only show commission of the specified felony. *Id*., at 1258. As a result, the Court held second degree murder was not a lesser included offense of felony murder under § 1111(a). *Id*. Furthermore, since felony-murder does not necessarily entail a sudden quarrel or heat of passion, voluntary manslaughter is not a lesser included offense of felony murder. *United States v. Miguel*, 338 F.3d 995, 1005-1006 (9th Cir. 2003). Finally, it is important to remember that the petitioner was sentenced to life without the possibility of release on Counts 1 and 2. As a result, this court finds no violation of the principles enunciated in *Beck* occurred in relation to these two counts. *See also*, *Trujillo v. Sullivan*, 815 F.2d 597 (10th Cir. 1987) (finding that failure to give lesser included offense instructions was not constitutionally erroneous and therefore could not be reviewed on habeas where death penalty was sought but not imposed), *cert. denied*, 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987). Thus, appellate counsel was not ineffective for failing to raise this issue in relation to Counts 1 and 2.

As to Count 3 of the superseding indictment, Barrett was charged with Intentionally Killing, During the Commission of a Drug Trafficking Crime, a State Law Enforcement Officer, Engaged in the Performance of His Official Duties, in violation of 21 U.S. § 848(e)(1)(B). Barrett's intent was an essential element of Count 3. *United States v. Barrett*, 496 F.3d at 1112. Therefore, to convict Barrett of Count 3, "the government had to prove,

as it did with respect to Count 2, that Barrett intentionally killed Eales." *Id.* (citations omitted).

In enacting § 848(e), Congress clearly chose to omit any grades of homicide lesser than intentional killing committed in furtherance of a felony drug crime. An examination of federal homicide offenses contained within Title 18 confirms that other federal homicide statutes such as voluntary manslaughter[160] and second degree murder[161] cannot serve as lesser included offenses because those offenses can only be prosecuted in federal court when committed within the maritime or territorial jurisdiction of the United States. Whereas, a killing under § 848(e)(1)(B) does not have to occur within federal territorial jurisdiction. The federal jurisdictional nexus of § 848(e)(1)(B) is met if the defendant is engaged in certain, enumerated federal drug crimes. *United States v. Beckford*, 966 F.Supp. 1415, 1418 (E.D.Va. 1997). Further, since there are no common law federal crimes, this court cannot imply lesser included homicide offenses to § 848(e)(1)(B). *Id.* Accordingly, this court finds voluntary manslaughter is not a lesser included offense of 21 U.S.C. § 848(e)(1)(B). As a result, appellate counsel was not ineffective in failing to raise this issue in relation to Count 3.

## B.  Residual doubt

In his tenth ground for relief, the petitioner argues this court erred in not instructing the jury that they could consider residual doubt as a mitigating factor. Specifically, the

---

[160]18 U.S.C. § 1111.

[161]18 U.S.C. § 1112.

petitioner argues he should have been allowed to introduce evidence and the court should have instructed the jury that it was appropriate for them to consider as a mitigating factor that "a prior jury was convinced that the death of Trooper Eales was not brought about in the manner which the Government claimed in the federal proceedings." Doc. 149, at p. 199. The government argues the petitioner has procedurally defaulted this claim by failing to raise it on appeal.

Petitioner does not provide any legal authority for his argument that his constitutional rights were violated by this court not instructing the jury regarding doubts of a prior state court jury on completely different charges. Rather, the cases cited by the petitioner stand for the proposition that ". . . the Eighth Amendment to the United States Constitution does not require an instruction on "residual doubt" at the penalty phase. *Franklin v. Lynaugh*, 487 U.S. 164, 172-75, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)." *United States v. Honken*, 378 F.Supp.2d 1040, 1041 (N.D. Iowa 2004); and *United States v. Davis*, 132 F.Supp.2d 455, 458 (E.D. La. 2001). The Tenth Circuit in *Sallahdin v. Gibson*, 275 F.3d 1211 (10th Cir. 2002) did not hold that a defendant has a constitutional right to an instruction regarding "residual doubts." Instead, it recognized where the first stage defense was "actual innocence," a residual doubt theory might have been a reasonable strategy for defense counsel to adopt. *Id.*, at 1240 n. 10. While the petitioner now argues the court erred in not allowing him to argue "residual doubt" to the jury by advising the jurors, during the penalty phase of trial, that the state court jury did not believe the defendant had intentionally killed Trooper Eales, the petitioner never claimed he was actually innocent. Further, the issue of "residual doubt"

was initially raised in this case not because of the federal jury having doubts over its own

verdict, but this court's concern that the parties wanted to utilize the state court verdict based

upon different charges to which the United States was not a party, to nullify the federal court

jurors sworn duty to consider the facts presented to them in reaching a verdict, during the

first stage of trial, regarding whether the actions of the defendant were intentional or, during

the second stage of trial, entailed any of the statutory aggravating factors alleged in the

case.[162]    The court clearly advised the parties, during pretrial proceedings, of its

understanding of mitigating factors stating:

> . . . as to the mitigating factors, which are defined in 189 (sic) U.S.C. Section 3592, evidence is relevant if it tends logically to prove or disprove some fact or circumstance that could reasonably serve as a basis for a sentence less than death.  Under the statute, such evidence may include factors in the defendant's background, record, or character, or any other circumstance of the offense.  This Court does not find that evidence of prior proceedings against the defendant relates to the defendant's background, record, character, or offense in any way that could mitigate against the imposition of a death sentence.  Such evidence is not relevant and Defendant shall therefore refrain from any mention of prior proceedings against this defendant in the sentencing stage of this trial.
>
> Defendant may, however, introduce his prior conviction and the resulting 30-year sentence as a mitigating factor.  Due process and the Eighth Amendment mandate that when a defendant is not eligible for parole, and the government uses future dangerousness as an aggravating factor, the jury must be informed that if it does not sentence the defendant to death, he will spend the rest of his life in prison.  The Court stresses that the defendant's use of this evidence is relevant and admissible solely on this point.  The defendant may not use this evidence to raise residual doubts about the defendant's guilt or any - - or for any other purpose, because it does not relate to any aspect of the defendant's background, record, character or any other circumstance of the offense charged herein, and is, therefore, not relevant.

---

[162]*See*, Cr.Doc. 314, Tr. of September 26, 2005, at pp. 9-10.  *See also*, Cr.Doc. 317, Tr. of September 20, 2005, at pp. 4-5.

Cr. Doc. 314, *supra* at pp. 10-11. Thereafter, during the sentencing phase of trial, the court

instructed the jury as follows regarding mitigating circumstances:

> You have found the defendant guilty of three capital crimes. Your consideration of guilt or innocence has, therefore, been completed. You must now determine an appropriate punishment. In considering the appropriate punishment to impose, you are not to revisit the issue of guilt or innocence. All twelve jurors are bound by your verdict in the first portion of this case.
>
> Additionally, you are instructed that you must not speculate about the reasons for the jury's verdict or sentences in the Sequoyah County District Court case. Only the charges and the evidence presented in this court are relevant to the task now before you. The sentences in the Sequoyah County District Court case may, therefore, only be considered with regard to their mitigating effect, if any, on the defendant's sentence for the charges at issue in this federal court case.
>
> You must consider **any** mitigating circumstances you find to exist. Mitigating circumstances are facts about the defendant's character, background, or record, or the circumstances of the particular offenses, or other similar relevant factors, that may call for a penalty less than death. However, any lingering doubt that you may have about the defendant's guilt is **not** a mitigating circumstance and cannot be considered by you in determining the appropriate punishment.

Cr. Doc. 257, Instruction No. 19 (bold in original).

In *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), the

Supreme Court said:

> Our edict that, in a capital case, " 'the sentencer . . .[may] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense,'" *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting *Lockett*, 438 U.S., at 604, 98 S.Ct., at 2964), in no way mandates reconsideration by capital juries, in the sentencing phase, of their "residual doubts" over a defendant's guilt. Such lingering doubts are not over any aspect of petitioner's "character," "record," or a "circumstance of the offense." This Court's prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor.

*Id.*, U.S. at 174, S.Ct. at 2327.  In her concurring opinion, Justice O'Connor made this point

even clearer saying:

> Our cases do not support the proposition that a defendant who has been found to be guilty of a capital crime beyond a reasonable doubt has a constitutional right to reconsideration by the sentencing body of lingering doubts about his guilt. . . . as the plurality points out, we have approved capital sentencing procedures that preclude consideration by the sentencing body of 'residual doubts' about guilt.
>
> Our decisions mandating jury consideration of mitigating circumstances provide no support for petitioner's claim because 'residual doubt' about guilt is not a mitigating circumstance. . . . 'Residual doubt' is not a fact about the defendant or the circumstances of the crime.  It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between 'beyond a reasonable doubt' and 'absolute certainty.' . . . Nothing in our cases mandates the imposition of this heightened burden of proof at capital sentencing.

*Id.*, U.S. at 187-188, S.Ct. at 2334-2335 (citations omitted).  Thereafter, in *Oregon v. Guzek*,

546 U.S. 517, 126 S.Ct. 1226, 163 L.Ed.2d 1112 (2006), the Court reaffirmed *Franklin*

finding no constitutional right to introduce residual doubt evidence at sentencing.

In this case, the defendant was not prevented from advising the jury that he had

already been convicted by a state court jury.  In fact, during the penalty phase of trial, the

defendant elicited testimony from Maudeen Vann, the First Deputy Court Clerk in Sequoyah

County, Oklahoma, that the defendant was originally charged by information in the District

Court of Sequoyah County with one count of first degree murder and three counts of shooting

with intent to kill.  The information was subsequently amended to include one count of first

degree murder, one count of shooting with intent to kill, and two counts of discharging a

firearm with intent to kill.[163]  Additionally, Ms. Vann went on to advise the jury of the state

court jury verdict, telling them that the state court verdict form indicated that the defendant

was found guilty by the state court jury on Count I of Manslaughter in the First Degree; on

Count Two he was found guilty of the crime of Assault and Battery with a Dangerous

Weapon; and on the two counts of discharging a firearm with intent to kill, he was found not

guilty.[164]  Finally, Ms. Vann advised the jury of the sentence imposed on the two state court

charges for which Mr. Barrett was convicted[165] and a copy of the state court judgment was

admitted into evidence.[166]  While the petitioner claims counsel should have pointed out that

the evidence of the prior conviction established the death was not caused in the manner in

which the government claimed, the petitioner was not prohibited from introducing any

evidence relating to the manner in which the death occurred and the petitioner does not now

identify any evidence relating to the manner of the victim's death which was improperly

excluded at trial.  Furthermore, the jury was actually advised in detail of the outcome of the

prior state court proceedings.

Petitioner argues, however, that his jury should have been instructed it could consider

"residual doubt" as a mitigating factor.  Since there is no constitutional right to such an

instruction and the petitioner does not identify a statutory provision requiring such an

---

[163]J.T. Tr., Vol. 24 at pp. 4715-4721.  *See also*, Defendant's Trial Exhibit Nos. 230 and 231.

[164]J.T.Tr., Vol. 24 at pp. 4722-4724.

[165]*Id*., at pp. 4724-4725.

[166]*See*, Govt. Exhibit 331.  *See also*, J.T.Tr., Vol. 24, at pp. 4726-4738 and Defendant's Trial Exhibit Nos. 230-235.

instruction, the petitioner has failed to establish that the court's instruction regarding mitigating circumstances violated due process.  Thus, he is not entitled to relief on this issue and neither trial or appellate counsel were ineffective in failing to raise this issue.

**C.  Jury not required to find appropriateness of death penalty beyond a reasonable doubt**

Petitioner claims, in his twelfth ground for relief, that the court's instructions violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the jury was not instructed that they had to find that death was an appropriate punishment beyond a reasonable doubt.  The government asserts the petitioner raised this issue on appeal and is, therefore, barred from relitigating this issue.  In reply, the petitioner claims the issue "was not raised or adequately resolved on appeal."  Doc. 178, at p. 179.

Although the petitioner claims appellate counsel did not properly raise the issue on appeal, a review of the Tenth Circuit decision leaves no doubt that the issue was addressed on appeal.  In fact, in reaching its decision regarding the constitutionality of 21 U.S.C. § 848's scheme for weighing of aggravating and mitigating factors, the court cites the same Supreme Court cases which Petitioner now attempts to utilize to support his expanded constitutionality argument saying:

> Barrett, effectively seeking to extend the Supreme Court's decision in *Ring*, argues that § 848 violated the Sixth Amendment because it does not require the jury to apply the reasonable doubt standard in weighing the aggravating and mitigating factors. According to Barrett, "[t]here is simply no functional difference between 'finding' and 'weighing,'" and thus "[t]he determination of whether aggravating circumstances outweigh mitigating

> circumstances is a factual determination which could lead to an increase to the ultimate penalty-death."

*United States v. Barrett*, 496 F.3d 1079, 1107 (10th Cir. 2007). Although the court indicated appellate counsel had not made as broad an argument on appeal as he had in the district court,[167] the court analyzed the issue in full and held a reasonable doubt standard is not required in the weighing process. *See also, United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008). Accordingly, the petitioner is barred from relitigating this issue and appellate counsel was not ineffective for failing, as the petitioner alleges, to raise this claim.

## VIII. REMOVAL FROM COURTROOM

In his thirteenth ground for relief, the petitioner argues his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution were violated when he was removed from the courtroom in the presence of the jury and that counsel were ineffective in not raising this issue on appeal. The government argues the petitioner procedurally defaulted this claim by not raising it on direct appeal. The government further asserts that because the claim lacks merit, appellate counsel were not ineffective for failing to raise the claim on appeal. Finally, the government argues that two of the subclaims raised are barred by the statute of limitations. Petitioner does not address the government's arguments in his Reply brief.

---

[167]*Id.*, n. 12.

The record is clear that the petitioner did not raise this issue on appeal. Since the petitioner claims, however, appellate counsel were ineffective for failing to raise it on appeal, this court will proceed to the merits of the claim.

As indicated above, during the government's final penalty stage closing argument, the defendant got up from his chair and told the marshals to take him out of the courtroom. With the court's permission, the deputy United States Marshals walked the defendant out of the courtroom and the prosecutor completed his argument.[168]

Following completion of the government's argument, but prior to the jury leaving the courtroom, the court called counsel to the bench and had a hearing outside the presence of the jury in which the court asked if the defense had any requested instructions in regard to the defendant's outburst. Counsel requested a recess to consider the issue further and the court granted that request.[169] After a short recess, but still outside the presence of the jury, the court inquired of counsel if they had any requested instructions. When both sides indicated they had none, the court advised the parties it was inclined to give the following instruction:

> Members of the jury: You are instructed that neither the Defendant's conduct nor his statements during closing argument are evidence in this case and you should not consider them when rendering your verdict herein.

Cr. Doc. 355, J.T.Tr. Vol. 27, at p. 5435. Counsel indicated they did not care whether the court gave this instruction or not because it "highlights it to an extent, but then it also, you

---

[168]Cr. Doc. 355, J.T.Tr. Vol. 27, at p. 5421.

[169]Cr. Doc. 355, at pp. 5426-5429.

103

know, cautions the jury." *Id.*  Then, the court inquired as to whether the defendant needed to be brought to the courtroom for the court to inquire as to whether or not he wanted to be present during the remainder of the proceedings.  Even though defense counsel advised the court that the defendant had specifically told them he did not want to be present, the court advised counsel he was going to have the marshal bring the defendant to the courtroom in minimum restraints outside the presence of the jury.[170]  Defense counsel requested a chance to speak with their client before he was brought to the courtroom and so another short recess was taken.  Thereafter, the defendant was brought into the courtroom, outside the presence of the jury, and the following colloquy occurred:

> THE COURT: Let the record reflect counsel for the Government is present and the Defendant is present with counsel.  Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings.  I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?
>
> MR. BARRETT: Yes, Your Honor.
>
> THE COURT: Do you have any questions of the Court about that?
>
> MR. BARRETT: No, sir.
>
> THE COURT: I'll ask the marshal to return - - (Interrupted)
>
> MR. HILFIGER: One more.  Does that include the verdict?
>
> MR. BARRETT: Yes, Your Honor.
>
> THE COURT: Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.

---

[170]Minimum restraints were allowed because the marshal advised the court that the defendant had said if he was forced to come to court, he could give them problems.  *Id.*, at p. 5438.

104

MR. BARRETT: Yes, sir.

Cr. Doc. 355, J.T.Tr. Vol. 27, at pp. 5438-5439. The court took a short recess for the defendant to be removed from the courtroom. Thereafter, the jury was brought back into the courtroom and the court gave the cautionary instruction discussed above and the concluding instructions to the jury. The jury then was placed in charge of the bailiff and taken to the jury room to begin their deliberations. *Id.*, at pp. 5440-5444.

Petitioner now argues that he was not competent to waive his presence at trial and that this court violated his constitutional rights by:

> (a) removing him from the courtroom without just cause, warning or hearing; (b) forcing Mr. Barrett to unnecessarily wear additional restraints; (c) failing to advise Mr. Barrett of his constitutional right to be present at trial; (d) failing to determine whether Mr. Barrett was competent to knowingly and voluntarily waive his constitutional right to be present at trial; (d) failing to determine whether Mr. Barrett had in fact knowingly and voluntarily waived that right; and (e) failing to give the jury a curative instruction.

Doc. 149, at p. 240. Additionally, the petitioner asserts that trial counsel acted unreasonably

> (a) by failing to consult mental health or other medical experts regarding Mr. Barrett's condition, including his competence to make a valid waiver; (b) by failing to raise a doubt about Mr. Barrett's competence; (c) by failing to seek a hearing on his competence and/or the effects of his not taking medication for depression or bipolar disorder and the affects of the steroids; (d) by failing to object to the additional restraints; (e) by failing to object to the choice the court gave Mr. Barrett (be present in unlawful restraints or absent); (f) by failing to advise him of the risks of being absent immediately before the jury began to deliberate whether he would live or die; and (g) by failing to seek an appropriate instruction regarding the actions of the marshals, the court and Mr. Barrett's absence.

*Id.*, at pp. 240-241.

While the petitioner argues he has a fundamental right to be present at all stages of trial, the court did not, as the petitioner argues, remove the defendant without warning because of the defendant's outburst.  Rather, the defendant voluntarily requested to be removed from the proceedings and the court simply complied with his request.

Rule 43(c) of the Rules of Criminal Procedure provides, in pertinent part:

**(c) Waiving Continued Presence.**

(1) **In General.**  A defendant who was initially present at trial, . . . . waives the right to be present under the following circumstances:

(A) when the defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial; . . . . . .

(2) **Waiver's Effect.**  If the defendant waives the right to be present, the trial may proceed to completion, including the verdict's return and sentencing, during the defendant's absence.

Petitioner cites no authority to support his argument that when a defendant asks to be removed from the courtroom that he first must be advised that he has a constitutional right to be present before the court acquiesces to the request.  The plain language of Rule 43(c) of the Federal Rules of Criminal Procedure allows a defendant to voluntarily absent himself after the trial has begun without being advised that he has a obligation or constitutional right to remain.  Furthermore, while the petitioner argues *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), prevents his removal from the courtroom without a warning by the judge that he would be removed if he continued to exhibit disruptive behavior, the

106

defendant was not removed from the courtroom based upon his behavior.  Rather, he was removed from the courtroom only after he personally requested to be taken from the courtroom.  By simply acquiescing in his request, this court avoided drawing unnecessary attention to the situation.  As soon as the prosecutor completed his closing argument, which was no more than 5 or 10 minutes after the defendant voluntarily absented himself from the courtroom, the jury left the courtroom.[171]  Immediately thereafter, outside the presence of the jury, the court addressed the issue with counsel.  After conferring with counsel and giving defense counsel an opportunity to consult with their client, the court had the defendant brought back into the courtroom, outside the presence of the jury, to ensure that the defendant's continued absence was voluntary and that the defendant was aware that he had a right to be present.  The court also advised the defendant he could return to the courtroom at anytime if he chose to do so.  *See, United States v. Sealander*, 91 F.3d 160, *15 (10th Cir. 1996) (court recognized a distinction between forcible removal and voluntary removal from proceedings).  There is nothing in this record which indicates the defendant would have chosen to remain in the courtroom if the court had stopped the proceedings and addressed the defendant before he was allowed to leave the courtroom.

Further, this court is not aware of any authority which has held that a trial court must advise a defendant of his right to remain in the courtroom before allowing the defendant to leave.  To the contrary, in a case where the defendant failed to return to court following a

---

[171]According to the courtroom deputy's log notes, the government's final closing argument took approximately 42 minutes (1:37:21 to 2:19:01), including the defendant's statements and removal, and the transcript of this portion of the trial consists of 25 pages.  Less than six pages of this portion of the transcript occurred after the defendant left the courtroom.

1178

lunch break and was, thereafter, convicted in absentia, the Supreme Court in rejecting the defendant's argument that "his mere voluntary absence from his trial cannot be construed as an effective waiver," the Supreme Court held:

> It is wholly incredible to suggest that petitioner, who was at liberty on bail, had attended the opening session of his trial, and had a duty to be present at the trial, entertained any doubts about his right to be present at every stage of his trial.  It seems equally incredible to us, as it did the Court of Appeals, 'that a defendant who flees from a courtroom in the midst of a trial-where judge, jury, witnesses and lawyers are present and ready to continue-would not know that as a consequence the trial could continue in his absence.'

*Taylor v. United States*, 414 U.S. 17, 20, 94 S.Ct. 194, 196, 38 L.Ed.2d 174 (1973) (internal citations omitted).  *See also*, *United States v. Newman*, 733 F.2d 1395, 1401 (10th Cir. 1984).

While the defendant in this case was clearly not at liberty on bail, it is ludicrous to suggest that the defendant could demand to leave the courtroom during the prosecutor's closing argument but not recognize that the court would continue the trial in his absence.  Rule 43(c)(1)(A) permitted the defendant to waive his right to be present by requesting the court's permission to leave the courtroom without the court informing the defendant of his constitutional right to be present.  Further, the coherent statements by the defendant at the time of his request to leave the courtroom establish that he was fully aware of what he was doing.  Therefore, this court finds the petitioner was not deprived of any constitutional rights when he was allowed to leave the courtroom.

Petitioner does not provide any authority to support his argument that the court violated his rights by allowing additional restraints upon him prior to returning him to the courtroom outside of the jury's presence.  As previously indicated, courts retain the

108

discretion to take measures to maintain order and security in the courtroom.  *United States v. Wardell*, 591 F.3d 1279 (10th Cir. 2009), citing *Deck v. Missouri*, 544 U.S. 622, 632, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005) and *United States v. Hack*, 782 F.2d 862, 867 (10th Cir. 1986).  Here, the record reflects the defendant had indicated he could cause trouble if he was returned to the courtroom.[172]  Thus, the additional restraints were appropriate to maintain order and security in the courtroom.  Further, these additional restraints could not have been observed by the jury as the defendant was brought into the courtroom outside of their presence.  As a result, this court finds the defendant's constitutional rights were not violated by the use of additional restraints.

To the extent this court has previously found the petitioner was competent to stand trial, the petitioner's arguments to the contrary will not be further addressed.  Additionally, since the record is clear that defense counsel consulted with their client and thereafter, the court made specific inquiries of the defendant regarding his not returning to the courtroom, after which a cautionary instruction was given to the jury regarding the incident, this court finds the petitioner's remaining arguments are  frivolous.

After having considered the merits of the arguments herein, this court finds appellate counsel was not ineffective for failing to raise these issues on appeal.  *See*, *Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir. 1995) ("An appellate advocate may deliver deficient performance and prejudice a defendant by omitting a 'dead-bang winner.'") (quoting *United States v. Cook*, 45 F.3d 388, 394-95 (10th Cir. 1995).  Having failed to establish appellant

---

[172]*See* Cr. Doc. 355, J.T.Tr. Vol. 27, at p. 5438.

counsel rendered ineffective assistance of counsel on this issue, the petitioner is procedurally barred from raising this issue herein.

## IX.  CONSTITUTIONALITY OF FEDERAL DEATH PENALTY

Petitioner asserts in his fourteenth ground for relief that he was denied due process, equal protection, the right to be free from cruel and unusual punishment and the effective assistance of counsel because the federal death penalty, as administered, is "disproportionately and unconstitutionally applied according to the race of the victim, and trial and appellate counsel made no objection based on this fact."  Doc. 95, at p. 368. Petitioner bases his argument on a memorandum regarding "DOJ report on the Federal Death Penalty System" from Professor David Baldus to The Honorable Russell D. Feingold[173] and data compiled by Lauren Cohen Bell, Ph.D., in the death penalty case of Rejon Taylor.[174]

While recognizing that a racially disproportionate pattern of capital charging is insufficient to demonstrate purposeful discrimination on the basis of race, the petitioner argues it is sufficient to warrant discovery and an evidentiary hearing.  This court finds, however, that the petitioner's allegations are mere conclusory allegations based upon statistical data of questionable reliability.  Furthermore, the petitioner does not provide any authority for his theory that a defendant can establish an equal protection racial bias claim based upon the race of the victim as opposed to the race of the defendant.

---

[173]*See*, Petitioner's Exhibit 115.

[174]*See*, Petitioner's Exhibit 112.  This exhibit indicates the *curriculum vitae* of Dr. Cohen is attached to the exhibit.  It is not, however, attached to this exhibit.  Additionally, the data used by Dr. Cohen involved cases from 1989 to August 2008 and there is no way to extract the information from the relevant time frame herein.  The defendant in this case was tried in 2005.

In order to prevail on a selective prosecution claim, a defendant must show that the decision to prosecute had both a discriminatory purpose, *Whitus v. Georgia*, 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967), and a discriminatory effect on him, *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985). *See also*, *United States v. Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 1487, 134 L.Ed.2d 687 (1996). Thus, the defendant must establish that "decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987) (emphasis in original). A discriminatory effect will be shown by establishing that "similarly situated individuals of a different race were not prosecuted."

*United States v. Armstrong*, *supra*.

> If the defendant seeks to obtain discovery to prove a claim for selective prosecution, he or she must first establish a 'colorable' claim of selective prosecution. In addition, the 'evidence [must be] specific to [the defendant's] own case that would support an inference that racial considerations played a part' in the prosecutor's decision to seek the death penalty.

*United States v. Cooper*, 91 F.Supp.2d 90, 115 (D.D.C. 2000) (citations omitted).

Just like the defendant in *McCleskey*, the petitioner offers no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence and the statistics he offers without more are insufficient to support an inference that the decisionmakers in his case acted with a discriminatory purpose. In fact, the statistics offered by the petitioner are less specific than those offered in *McCleskey*. For instance, the data used in the Baldus study which was considered in *McCleskey* was subjected "to an extensive analysis, taking account of 230 variables that could have explained the disparities

on nonracial grounds."  In this case, the declaration of Lauren Cohen Bell indicates that she considered no variables which could have explained the discrepancies.  Rather, she concludes solely on the numbers that ". . . it is my opinion to a reasonable degree of certainty that this correlation of more severe sentencing outcomes and white victims is unlikely to disappear even in the presence of other potentially explanatory variables."  Petitioner's Exhibit No. 112, Doc. 72-61, at p. 7.[175]  The other exhibits which the petitioner submits are similarly insufficient to establish a discriminatory intent by the federal prosecutors.  The memorandum from David C. Baldus dated June 11, 2001 states, in part:

> Without data on the comparative culpability of the offenders (and the race of the victims) in the cases affected by these post-authorization pleas (sic) bargaining decisions, *one has no idea the extent to which similarly situated defendants were in fact treated comparably.*
>
> <div align="center">* * * * *</div>
>
> No one with an understanding of the system suggests that it is driven by such a conscious and blatant animus against minority defendants or defendants whose victims are white.
>
> The concern about racial unfairness in the system is whether defendants with similar levels of criminal culpability and deathworthiness are treated comparably or differently because of their race or the race of their victims. *The reasons for differential treatment by U.S. Attorneys - and by agents of the FBI, the DEA and other are (sic) federal law enforcement agencies - are almost certainly nonconscious.*  (italics added)

---

[175]The government asserts that the statistics relied upon by Dr. Bell and those generated by David Baldus are not reliable under the principles enunciated in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.  579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) because petitioner has failed to show that the calculations have been tested, subjected to peer review, and/or published.

1183

Petitioner's Exhibit No. 115, Doc. 72-64, at pp. 6-7.  One of the declarations of Kevin

McNally[176] was prepared for use in the case of Rejon Taylor and contains references to

information "captured in a report previously filed with the Court."  However, no such report

has previously been filed with this court.[177]  The second declaration of Kevin McNally[178]

contains statistics relating to filing of federal death penalty cases.  After detailing those

statistics, McNally states that he is attaching three graphs depicting the information;[179]

however, once again, the information referenced is not attached.  "Statistics at most may

show only a likelihood that a particular factor entered into some decisions." *McCleskey*, U.S.

at 308, S.Ct. at 1776.

Even if shown to be reliable under *Daubert*, petitioner's own exhibits do not establish

a discriminatory intent to prosecute solely for racial reasons.  The petitioner has not shown

either the prosecutor in his case or the jury[180] acted with a discriminatory intent or purpose

in deciding to seek and ultimately imposing the death penalty.  All things considered,

petitioner's proffer regarding selective prosecution contains nothing more than conclusory

---

[176]Petitioner's Exhibit No. 113, Doc. 72-62.

[177]This declaration also states that Lauren Cohen Bell's analysis is attached; however, it is not attached to the declaration.  Finally, the declaration indicates the declarant "can testify about facts and circumstances of other cases involving the murder of government informant or witness which resulted in life sentence" and it refers to another declaration filed of record.  No such document has been filed in this case.

[178]Petitioner's Exhibit No. 116, Doc. 72-65.

[179]Petitioner's Exhibit No. 116, Doc. 72-65, at p. 4  ¶ 9.

[180]As part of their verdict, all twelve jurors signed a certification which stated:
> By signing below, each juror certifies that consideration of race, color, religious beliefs, national origin, or gender of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same decision regarding the appropriate sentence for the offense in question regardless of the race, color, religious beliefs, national origin, or gender of the defendant or the victim.

Cr.Doc. 258.

allegations. Conclusory allegations are insufficient to state a claim under § 2255, and do not support a request for discovery.

> To earn the right to an evidentiary hearing, a movant is required to allege specific facts which, if true, would entitle him to relief. *See Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997); Rule 4(b) of the Rules Governing Section 2255 Proceedings. The Rules Governing Section 2255 do not authorize fishing expeditions, and "'conclusory allegations unsupported by specifics' . . . will not entitle one to discovery or a hearing." *Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir. 1996) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977)).

*United States v. Zuno-Arce,* 25 F.Supp.2d 1087, 1118 (C.D.Cal. 1998). *See also*, *United States v. Rollow*, 357 Fed.Appx. 966 (10th Cir. 2009) and *United States v. Scott*, 7 F.3d 1046 (10th Cir. 1993) (citing *Eskridge v. United States*, 443 F.2d 440, 443 (10th Cir. 1971)).

Systemic statistics alone-that is, discriminatory intent in a particular prosecution can not conclusively be inferred from system-wide findings suggestive of racially disparate impact. *United States v. Bin Laden*, 126 F.Supp.2d 256, 260 (S.D.N.Y. 2000). Furthermore, as previously stated, in order to prove discriminatory effect, petitioner must show that similarly situated individuals of a different race were treated differently. Statistics, in the context of capital sentencing, about the general operation of a death penalty scheme are insufficient to support conclusory allegations of a discriminatory purpose. In this case, the petitioner's conclusory allegations do not establish either a discriminatory intent or a discriminatory effect. Accordingly, this court finds the petitioner has failed to establish that the federal death penalty act as administered is unconstitutional.

Moreover, trial counsel did ask this court to declare the federal death penalty statute unconstitutional.[181]  In his motion, trial counsel specifically stated that "[th]e federal death penalty scheme, . . . . . results in arbitrary classifications based upon the race, sex and economic class of the victim and of the accused. . . . ."  Cr. Doc. 78, at p. 3.  Rather than focus on statistics dealing with an equal protection argument, however, counsel chose to use statistics to support his due process claim.  In addressing this portion of defendant's motion, the United States Magistrate Judge stated the following:

> The specific arguments made here by the Defendant would appear to arise under the Due Process Clause of the Fifth Amendment, not under the Eighth Amendment, but they lack merit nevertheless.  First, the federal death penalty is not unconstitutional simply because it may be erroneously imposed.  *See, e.g., Herrera v. Collins*, 506 U.S. 390, 399 (1993) ("But we have also observed that '[d]ue process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person.'  To conclude otherwise would all but paralyze our system for enforcement of the criminal law."), *quoting Patterson v. New York*, 432 U.S. 197, 208 (1977).  *See also United States v. Church*, 217 F.Supp.2d 700, 702 (W.D.Va. 2002) ("The Supreme Court's decision in *Herrera* thus forecloses the argument that the inherent fallibility of the criminal justice system supports a due process attack on the death penalty.").  In any event, the statistical evidence cited by the Defendant is irrelevant, as it is founded upon studies of state death penalty cases.  *See United States v. Denis*, 246 F.Supp.2d 1250, 1253 (S.D.Fla. 2002), *aff'd by* 107 Fed.Appx. 182 (11th Cir. May 13, 2004), *cert. denied*, 125 S.Ct. 640 (2004) ("[T]he use of statistics that apply to *state* death penalty cases *cannot* support a conclusion of that possibility in *federal* cases.  This use of statistics is inappropriate, not only because they can be easily manipulated, but because they relate to cases from states with different capital sentencing schemes.")[emphasis in original]; *United States v. Taylor*, 302 F.Supp.2d 901, 908 (N.D.Ill. 2003)("[T]he issue . . . is not the reliability of state death penalty prosecutions but rather federal capital prosecutions.").  *See also United States v. Quinones*, 313 F.3d 49 (2nd Cir. 2002), *cert. denied*, 540 U.S. 1051 (2003) (reversing a lower court decision accepting state

---

[181]*See* Cr. Doc. 78.

statistical evidence as proof that the FDPA violates substantive due process). To the extent there is relevant statistical evidence, *i.e.*, evidence based upon studies of the federal death penalty scheme, such evidence suggests that the federal death penalty is not imposed arbitrarily, capriciously or unreliably. *See Taylor*, 302 F.Supp.2d, at 908 ("This Court follows other courts in finding that based on these statistics regarding the federal death penalty system, that the 'federal experience with death penalty cases certainly does not support an argument that the federal court system is likely to convict the truly innocent.'"), *quoting Church*, 217 F.Supp.2d, at 702; *Denis*, 246 F.Supp.2d, at 1253 ("Therefore, this Court agrees with the holding of [*Church*]").

Cr.Doc. 147, at pp. 3-5 (footnote omitted).  On July 18, 2005, this court adopted the Magistrate's Report and Recommendation.[182]

While petitioner now has the advantage of hindsight and can see that an attack based on the principles of due process was not effective, he chooses to change tactics and challenge the Federal Death Penalty Act on equal protection grounds.[183]  Since, however, no legal authority exists to suggest that a defendant can establish an equal protection racial bias claim based upon the race of the victim, as opposed to the race of the defendant, and statistics alone do not establish a discriminatory purpose, this court finds the petitioner has failed to establish that the absence of this specific claim, at trial or on appeal, deprived him of his Sixth Amendment right to effective assistance of counsel.  *Strickland v. Washington*,  466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

---

[182]Cr.Doc. 153.

[183]As indicated previously, the heading of the petitioner's Ground Fourteen claims a denial of due process of law as well as a deprivation of equal protection of the law.  His argument, however, focuses exclusively on the racial discrepancies that he perceives exist within the administration of the Federal Death Penalty Act.

## X.  SUFFICIENCY OF INDICTMENT

In his fifteenth ground for relief, the petitioner claims his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated because the indictment "made no mention of the federal death penalty or any of the additional non-statutory aggravating factors relied upon by the Government during the penalty phase."  Doc. 149, at pp. 251-252.  Thus, the petitioner asserts "[t]he indictment (and the death penalty statute) under which petitioner was tried and sentenced denied petitioner his right to notice in the charging document of the aggravating circumstances which would make him eligible to be sentenced to death."  *Id.*, at p. 252.  To support this argument, the petitioner relies upon *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) and *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed. 2d 311 (1999).  The government asserts petitioner has defaulted this claim by failing to properly raise it before this court or on appeal.  Alternatively, the government asserts that the petitioner was properly charged by superseding indictment.

### A.  Procedural Default

As previously indicated, failure to raise a claim either at trial or on direct appeal prevents a party from raising the issue in a § 2255 proceeding.  The two recognized exceptions to this rule are 1) the defendant can show good cause for failing to raise the issue earlier and that failure to consider the issue would result in actual prejudice to his defense, *United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) ; and 2) if "failure to consider the claim would result in a fundamental miscarriage of justice," *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 l.Ed.2d 640 (1991).

1188

Petitioner attempts to overcome his default by claiming ineffective assistance of appellate counsel. Where ineffective assistance of counsel is raised as cause for excusing procedural default, the court is required to look at the merits of the omitted issue. *Hain v. Gibson*, 287 F.3d 1224, 1231 (10th Cir. 2002).

## B. Sufficiency of superseding indictment

Petitioner fails to provide any legal authority for the proposition that non-statutory aggravating factors must be proven to a grand jury and alleged in the indictment. A review of the superseding indictment[184] reveals that the statutory aggravating factors, which made the defendant "death-eligible," were, despite the petitioner's assertions to the contrary, alleged in the superseding indictment. The government concedes the superseding indictment did not include allegations of any non-statutory aggravating factors, but asserts the superseding indictment was consistent with prevailing Supreme Court authority and, therefore, was sufficient.

The Indictment Clause of the Fifth Amendment provides, in pertinent part, that [n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a Grand Jury." U.S. Const. amend.V. Its purpose is to limit a defendant's jeopardy "to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960). In addition, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be

---

[184]Cr. Doc. 52.

118

informed of the nature and cause of the accusation. U.S.Const. amend. VI. Together, these provisions of the constitution afford a defendant the right to notice of the charges against him in a sufficiently detailed manner that he is able to prevent double jeopardy following conviction or acquittal.

> . . . .an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.

*Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974).

In *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 2365, 147 L.Ed.2d 435 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.*, U.S. at 490, S.Ct. at 2362-2363. Thereafter, in *Ring v. Arizona*, 536 U.S. 584, 609, 122 S.Ct. 2428, 2443, 153 L.Ed.2d 556 (2002), the Court held that facts necessary to render a defendant eligible for a death sentence "operate as 'the functional equivalent of an element of a greater offense.'" While the Supreme Court has not specifically extended *Ring* to require grand jury findings of eligibility factors pursuant to the Indictment Clause of the Fifth Amendment, circuit courts examining the issue have consistently held that the eligibility factors – at least one threshold intent factor under § 3591(a)(2) or § 848(n)(1) and at least one statutory aggravating factor under § 3592(c) or § 848(2) to (12) – must be charged in the indictment and found by the grand jury. *See*, *e.g.*, *United States v. Purkey*, 428 F.3d 738, 749 (8th Cir. 2005), *cert. denied*,

549 U.S. 975, 127 S.Ct. 433, 166 L.Ed.2d 307 (2006); *United States v. Robinson*, 367 F.3d

278, 284 (5ᵗʰ Cir. 2004), *cert. denied*, 543 U.S. 1005, 125 S.Ct. 623, 160 L.Ed.2d 466 (2004);

and *United States v. Higgs*, 353 F.3d 281, 295-307 (4ᵗʰ Cir. 2003), *cert. denied*, 543 U.S. 999,

125 S.Ct. 627, 160 L.Ed.2d 456 (2004).

> 'There is no requirement that the indictment allege *all* of the factors that might
> be weighed by the jury when deciding whether to impose a death sentence.'
> *Higgs*, 353 F.3d at 299.  Non-statutory aggravating factors do not increase the
> maximum punishment to which a defendant is subject.  They are neither
> sufficient nor necessary under the FDPA for a sentence of death.  Their
> purpose is merely to aid the sentencer 'in selecting the appropriate sentence
> from the available options,' *id*. at 298, "'on the basis of the character of the
> [defendant] and the circumstances of the crime,'" *id*. (quoting *Tuilaepa v.
> California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994)).

*United States v. Purkey*, *supra*.  *See also*, *United States v. Fields*, 516 F.3d 923, 944 (10ᵗʰ Cir.

2008) ("non-statutory aggravators play no role in the eligibility determination under the

FDPA, but are relevant only in the weighing process at the ensuing sentence-selection

stage.").

Since non-statutory aggravating factors do not increase the maximum punishment a

defendant is subjected to,  neither the Indictment Clause nor the Sixth Amendment require

that they be alleged in an indictment  The weighing process contained within 18 U.S.C. §

3593(e) is simply a method for the jury to give individualized consideration regarding

"whether the defendant should be sentenced to death, to life imprisonment without possibility

of release or some other lesser sentence."  *United States v. Purkey*, 428 F.3d, at 750.

A review of the superseding indictment shows it set forth the elements of the offenses

charged and the functional equivalents sufficient to apprise Barrett of the charges against

him. *See also*, *United States v. Barrett*, 496 F.3d 1079, 1091-1095 (10ᵗʰ Cir. 2007) (discussing sufficiency of indictment issues which appellate counsel raised). In particular, the superseding indictment provided him with notice of the intent factor and the statutory aggravating factors upon which the government, during the penalty phase, ultimately relied. Therefore, this court finds the superseding indictment was legally sufficient and appellate counsel was not ineffective in failing to argue that the superseding indictment was insufficient because it did not allege the non-statutory aggravating factors. As a result, this court finds the petitioner is procedurally barred from raising this claim.

## XI.  JURY ISSUES

Petitioner asserts in his eleventh proposition that his Fifth, Sixth, and Eighth Amendment constitutional rights were violated when the court improperly excused Juror 62 for cause. In his sixteenth proposition, the petitioner claims he was deprived of his Fifth, Sixth, Eighth and Fourteenth Amendment constitutional rights because of "juror misconduct." The government argues each of these claims have been procedurally defaulted.

### A.  Juror excused for cause

Petitioner claims Juror 62 was excused "solely because of her conscientious scruples against the death penalty. . . ." Doc. 95, at p. 345. Respondent argues the petitioner defaulted this claim by not raising it on direct appeal. Further, the respondent asserts the petitioner cannot establish that his attorneys were ineffective for failing to raise the issue on appeal and, as a result, the petitioner has failed to establish cause to excuse his default.

121

There can be no doubt that this claim relies on facts contained within the trial court record.[185]  As a result, the petitioner should have raised this claim on direct appeal.  Since the petitioner did not raise the claim on direct appeal, the claim is procedurally defaulted.  To overcome this default, the petitioner once again claims appellate counsel were ineffective for failing to raise the issue.  After a review of the transcript, this court finds that Juror 62 was properly removed for cause under the principles enunciated in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

In *Witherspoon*, the Supreme Court indicated prospective jurors must be "willing to consider all of the penalties provided by state law" and that a prospective juror can "not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings."  *Id.*, 391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21.  In capital cases, not all prospective jurors who oppose the death penalty are subject to removal for cause.  Rather, "those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law."  *Lockhart v. McCree*, 476 U.S. 162, 176, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137 (1986).  In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court indicated a prospective juror may be excluded for cause when "the juror's views would 'prevent or substantially impair the

---

[185]*See* Cr. Doc. 333, Tr. of Individual Juror Qualification for Purposes of Stage One Proceedings held on Sept. 14, 2005, at pp. 819-829.

performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.*,

469 U.S. at 424, 105 S.Ct. at 852; *see also Uttecht v. Brown*, 551 U.S. 1, 127 S.Ct. 2218,

2224, 167 L.Ed.2d 1014 (2007).

> [I]t is not necessary that prospective jurors would vote automatically against the death penalty or that their opinions on capital punishment would prevent them from rendering an impartial verdict.   If a prospective juror conscientiously disapproves of the death penalty, that juror can be eliminated if any of that person's jury duties would be "substantially impaired."

*Coleman v. Brown*, 802 F.2d 1227, 1231 (10th Cir. 1986).

Potential Juror 62 was extensively questioned by this court regarding her ability to

follow the court's instructions and impartially consider both potential sentencing options in

this case.  Initially, when asked by the court if she had an opinion about the death penalty the

following colloquy occurred:

> Juror:  I don't - - I could not do it.  I could not say anybody to be sentenced to death.
>
> Court: When you say you could not do it, do you mean you couldn't be the one that carried out the execution, or - -
>
> Juror: I couldn't even say that they deserve it, no.  I don't believe in it.
>
> Court: Okay.  Let me - - this question - - it's part question and part information to you.  But you heard me give you a little bit of the background of this case, and there's two parts of it, the guilt stage and the sentencing stage.  So, as to the sentencing, you realize that in this case you may be asked at some point to consider whether to impose a sentence of life in prison without the possibility of release or the death penalty?  Those two things are in play in this case.  Do you understand that?
>
> Juror: I do now.  I didn't then, but I do now.
>
> Court: They're both - -

Juror: Now that you say it again, yes.

Court: And you understand that as a juror, if you are selected as a juror in this case, you would have to follow the law and render a verdict within the law? Do you know that?

Juror: Yes, I do.

Court: I mentioned - - or I think I mentioned, or I intended to mention, issues about moral, religious, philosophical or personal opinions. I said something about that, that I'd ask you a question about that.

Juror: Yes.

Court: There are really two questions. And the first of those is: Do you have any moral, religious, philosophical, or personal opinions which would prevent you from considering the imposition of a life sentence without the possibility of release?

Juror: I could do that. I mean, I could do that.

Court: Okay. Well, then, the second question, then: Do you have any moral, religious, philosophical, or personal opinions which would prevent you from considering the imposition of a death sentence?

Juror: Yes, I do.

Cr. Doc. 333, Tr. of Individual Juror Qualification for Purposes of Stage One Proceedings, at pp. 820 - 821.[186] Following this colloquy, the court gave defense counsel an opportunity to rehabilitate the juror. The juror advised counsel that she had held these views about the death penalty all of her adult life. *Id.*, at p. 823. Further questioning by defense counsel did not change this juror's responses. Rather, this colloquy occurred:

---

[186]For ease of reading, in quoting from this portion of the transcript, the court has inserted the person speaking instead of simply using the "Q" and "A" contained in the transcript.

124

Mr. Smith: You understand, ma'am, that in a case like this, because [the death penalty] is an ultimate punishment, you have to be able to consider the facts as they come, not only from the Government but from the defendant, if he chose to put any forward, as to why his life might be spared. And that what you would have to be eligible to do is to listen to the evidence that the Government would put on in a punishment phase, as to those aggravating reasons, those reasons why this particular murder is so heinous that, in fact, this should result in the imposition of a death sentence. It is those factors that you must be able to listen to, hold them to a high standard of proof, but listen to them and give them due consideration. Is that what you would be able to do or not be able to do?

Juror: Well, I don't know if I understand your question, but I could listen to that and see whether he needs to either have the death penalty or go to prison for life without parole.

Mr. Smith: Yes, ma'am. And that is what is required, is for your ability to be able to engage in this weighing process. That is, to listen to the factors that the Government may present in aggravation, the reasons that they say the death penalty is warranted. Those can be balanced. The defendant can offer, if he chooses to, reasons why the death penalty is not an appropriate sanction, that, in fact, "I should be able to live and shouldn't have death." But it's that weighing process that you would have to be able to engage in. Do you think you could do that?

Juror: Well, I'm not for sure what you're asking me. Do I think that I could give him the death penalty, if I thought the reasons were enough to do so?

Mr. Smith: Could you consider the Government's evidence as they presented it in support of the death penalty?

Juror: As long as I didn't say that he had to go - - had to be put to death, leave it to somebody else's decision what to do with him. I could say he probably needed to or should, but I could not say that he - - myself, that he needs the death penalty.

Mr. Smith: Can you ever imagine a situation so heinous, a murder so heinous, when after having considered the Government's evidence, that you could find for the death penalty?

Juror: No.

125

Mr. Smith: Not under any circumstances?

Juror: I don't think I could do it under any circumstances. I've never been asked to, but I don't think I could do it.

*Id.*, at pp. 823-825.

When the prosecutor attempted to follow-up, the juror became less sure of herself and began equivocating with the following colloquy occurring:

Mr. Sperling: . . . . . In this case, if the law permitted it and the evidence justified it, could you sign your name to a jury verdict form knowing that the result of that verdict would be the death by execution of another human being, the defendant in this case?

Juror: If I thought the crime deserved it, I probably could sign a paper saying that he should get the death penalty, but I couldn't say to do it. I could not sign a paper that says the death penalty for him.

\* \* \* \* \*

Mr. Sperling: Do you understand that in this case it's not just a jury recommendation but it is a jury finding, and the judge would not change that recommendation. That would be the penalty that would be imposed. Do you understand that, ma'am?

Juror: I could not do that, huh-uh.

*Id.*, at pp. 825-826. Thereafter, on further questioning by the court, Juror 62 equivocally stated she would "consider " the death penalty since that was her "duty" as juror. *Id*., at pp. 826-829. When asked by the prosecutor about her ambiguous responses, the juror made it clear that she was only responding the way she thought she should respond as opposed to what she really believed. For instance, the prosecutor asked ". . . can you ever envision a situation in which you would sign your name to a death verdict?", and the juror stated: "If

126

the judge told me that that was my options, either the death or - - the death penalty and - - I would do that, yes. That would be my duty. I'm here, and that would be what I'm here for. But I couldn't live with it, but I would do that, yes." *Id*., at p. 830. A few questions later, when asked "If [the judge] simply says, "This is your choice," at the end of the day, are you capable of returning a death verdict for this defendant?" The juror said "I don't know whether I could or not" and that as a matter of "[personal] conviction, I would never do it." *Id*., at pp. 830-831. Further, the juror indicated there were limited circumstances in which she could ever consider the death penalty. *Id.*, at pp. 832. Additionally, when asked if she could live with herself if she were to sign a death verdict for a defendant she said no she could not sign it. *Id*., at p. 834.

The court then made one last attempt to determine whether the juror's views would prevent or substantially impair the performance of her duties as a juror by asking the following:

> . . . if I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions - - and I want to repeat those - - if they are, tell me - - your personal opinions about the death penalty, are they so strong that you would not be able to follow the instructions?

The juror responded as follows:

> Well, I have to say it again, it's my duty to do this or not to do this, but if you told me that that was one or the other, and I thought he deserved the death penalty, I would have to - - I think I could sign the death penalty, if I listened to the information and that it was bad enough, I - - and you told me that this was my duty and that this - - I probably could sign the death penalty.

127

*Id.*, pp. 835-836. When asked if she could likewise consider the possible imposition of life imprisonment without the possibility of release, the juror simply said she "certainly could." *Id.*, at p. 836.

Prior to voir dire qualification, this potential juror completed a juror questionnaire in which she was asked certain questions which were relevant to this court's ultimate decision. Specifically, the juror was asked: "Do you have any political, social or philosophical beliefs that may affect your service as a juror? Yes ☐ No ☐ If yes, please explain:" This juror placed an "X"in the box next to "Yes" and responded, "Couldn't use or Recommend Death Penalty." She was also asked a couple of questions about her views and opinions regarding the death penalty, to-wit:

1. Please describe your feelings about the death penalty in your own words. Additionally, how strong are they and how long have you had them?" and she responded, "I couldn't sentence any one to die - as long as I can remember."

2. Regarding the death penalty, which of the following statements most accurately represents the way you feel? (You may check one or more than one of the choices):

☐ A. If a person is convicted of murder and the death penalty is requested, I will always vote to impose it, regardless of the facts and the law in the case.

☐ B. I am strongly in favor of the death penalty, and would have a difficult time voting against it, regardless of the facts and the law in the case.

☐ C. I generally favor the death penalty, but I would base a decision to impose it on the facts and the law in the case.

☐ D. I am generally opposed to the death penalty, but I believe I can put aside my feelings against

128

the death penalty and impose it if it is called for by the facts and law in the case.

☐     E. I am strongly opposed to the death penalty, and I will have a difficult time voting to impose it, regardless of the facts and the law in the case.

☐     F. I am personally, morally, or religiously opposed to the death penalty, and would never vote to impose it, regardless of the facts and the law in the case.

☐     G. I have no opinion either for or against the death penalty, and I could base a decision to impose it based on the facts and the law in the case.

Juror 62 responded to this question by marking the boxes next to both paragraphs "E" and "F." Finally, based upon the juror's questionnaire, the court was aware that this particular juror was 70 years old.

When requested by the prosecutor to excuse Juror 62 for cause, this court considered the juror's demeanor, in addition to her remarks both in the courtroom and on her juror questionnaire, in ruling that the juror was "substantially impaired" and was thus, not qualified to serve as a juror. Since appellate courts are required to give deference to a trial court's assessment of a juror's demeanor,[187] this court finds the petitioner has failed to establish that this issue would have been a "dead-bang winner"[188] if it had been raised on appeal. As a result, counsel was not ineffective for failing to raise this issue on appeal. Accordingly, this

---

[187] *Uttecht v. Brown*, 551 U.S. at 7, 127 S.Ct. at 2223, citing *Wainwright v. Witt*, 469 U.S. at 424-26, 105 S.Ct. at 852-853.

[188] Only omission of a "dead bang winner" can result in a finding of ineffective assistance of counsel on appeal. *U.S. v. Challoner*, 583 F.3d 745, 749 (10th Cir. 2009) citing *U.S. v. Cook*, 45 F.3d 388, 395 (10th Cir. 1995).

court finds the petitioner defaulted this claim and has not established cause to excuse the default.

## B.  Juror misconduct

Petitioner does not identify any facts which establish that any misconduct occurred. Rather, the petitioner relies solely on the fact that the jury was not sequestered during the trial to leap to his conclusory allegations that the jurors engaged in "improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Mr. Barrett and the case;" that the jurors gave "false or misleading responses on voir dire" and held "improper biases which infected [their] deliberations;" that the jury was improperly exposed to the prejudicial opinions of third parties and had "improper communications with third parties, and/or the trial judge;" and that the jurors improperly prejudged the guilt/innocence and penalty phases of Mr. Barrett's trial.  Doc. 95 at p. 376.  Petitioner does not identify even one matter which was improperly considered by the jury.  He does not identify any publicity which occurred during the trial of this matter, let alone publicity that might have had an influence on the jury.  He does not identify any juror who gave a false or misleading response on voir dire.  He does not identify any juror who improperly communicated with third parties or the judge during the trial proceedings held in this case. Finally, he does not articulate how the jurors improperly prejudged the guilt/innocence and/or penalty phases of his trial.

The government asserts this claim has been procedurally defaulted because it was not raised on appeal.[189]  To overcome the default, the petitioner claims appellate counsel were ineffective for failing to raise the issue on appeal.

Rule 2(b)(2) of the Rules Governing Section 2255 Proceedings requires a motion to vacate to "state the facts supporting each ground."  Conclusory allegations are insufficient to support a §2255 claim.  *See*, *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994).  To the extent the underlying claim lacks any specificity, as does the claim of ineffectiveness, the petitioner has failed to establish constitutionally-cognizable error on the part of counsel nor can he show legal cause for his default.  Furthermore, despite the government's argument that the petitioner failed to raise the issue on appeal, this court finds the petitioner raised the issue of juror misconduct on appeal actually identifying two particular instances of alleged misconduct and they were rejected by the appellate court.  *See*, *United States v. Barrett*, 496 F.3d 1079, 1101-1102 (10th Cir. 2007).  Accordingly, this court finds this error is frivolous and denies relief thereon.

## XII.  CONSTITUTIONALITY OF PETITIONER'S EXECUTION

---

[189]The Government classifies the issue raised by Petitioner as being "failure to sequester the jury."  While Petitioner may be attempting to assert a claim that it was error not to sequester the jury, he provides no legal authority nor is this court aware of any legal authority that makes it mandatory that the jury be sequestered.  Furthermore, his claim is more appropriately classified as a claim of "juror misconduct."  In fact, the heading of this claim in both the Motion to Vacate (Doc. 95) and the Brief in Support (Doc. 149) is "Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's rights . . . ."  Petitioner then lists, without identifying any particular jurors or identifying any specific facts to support the allegation, what the misconduct consisted of as indicated above.  Only after generically listing the alleged juror misconduct without any particular facts to establish what actually occurred in his case, does Petitioner state "[t]he jury was not sequestered in such a way to avoid contact with prejudicial publicity and hostility to the defendant, and to avoid contact and communications with third parties. . . ."  *See*, Doc. 95 at p. 376.  *See also*, Doc. 149 at p. 253.

1202

Petitioner claims in his seventeenth ground for relief that executing him would violate the Eighth Amendment because he has "chronic and severe mental illness and organic brain impairments." Doc. 95, at p. 379. Basically, the petitioner argues this court should expand the Eighth Amendment to include not only the mentally retarded and underage offenders, but to also include "mentally ill individuals." *Id.* The government argues 1) the claim is not ripe and 2) the claim is untimely. Even if the court were to consider the claim, the government argues because the claim lacks any basis in existing law, it would require the legally impossible, *i.e.* the retroactive application of a new rule of law. In his reply, the petitioner asserts this claim arises "under the need to continuously review the Eighth Amendment's 'evolving standards of decency' which in this case extend to Mr. Barrett a 'status' based on 'categorical rules' that define Eighth amendment standards . . . ." Doc. 178, at p. 208.

The ripeness doctrine was developed to ensure that courts decide only existing, substantial controversies, not hypothetical questions or possibilities. *In re Cassim*, 594 F.3d 432 (6th Cir. 2010). In the context of a competency to be executed claim, the courts have held that the claim does not become ripe until the execution is imminent. *Panetti v. Quarterman*, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007).

In *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), the Supreme Court held the Eighth Amendment prohibits a state from executing an insane inmate. Thereafter, in *Stewart v. Martinez-Villareal*, 523 U.S. 637, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998), the Supreme Court held a competency to be executed claim which had been initially raised in a federal habeas petition but dismissed without prejudice as

premature, was not a "second or successive" petition, when the claim became ripe for review by the state obtaining a warrant for execution. The problem with treating the petitioner's claim as a competency to be executed claim and dismissing it as premature, however, is that the petitioner does not allege that he is incompetent.[190] Rather, he alleges he is "mentally ill." Neither the Supreme Court nor the Tenth Circuit Court of Appeals have ever held that execution of a mentally ill person is cruel and unusual punishment. Further, in *Stewart*, the Supreme Court indicated in a footnote that the "second or successive" rules might apply if the *Ford* claim was not raised in the initial habeas petition. *Id.*, U.S. at 645, S.Ct. at 1622.

Petitioner first raised this claim in his Amended Motion to Vacate filed on September 25, 2009. Doc. 70, at p. 413. Based upon the facts of this case, this court finds the claim was not timely filed. Further, the petitioner has totally failed to support his argument with any legal authority. In fact, existing Supreme Court precedent is directly contrary to the petitioner's argument. *Ford v. Wainwright*, *supra*. Since there is no basis for the petitioner's claim, neither trial or appellate counsel were ineffective in failing to raise this claim. Accordingly, the claim is denied.

## XIII. INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner's second ground for relief alleges he was denied effective assistance of counsel as guaranteed by 18 U.S.C. §§ 3005 and 3006 and the Sixth Amendment to the United States Constitution. Petitioner claims the following acts and/or omissions of trial

---

[190]In a separate ground for relief, Petitioner alleged he was incompetent to stand trial. In this particular claim, however, Petitioner alleges only that he has "chronic and severe mental illness and organic brain impairments." Doc. 95, at p. 379.

counsel fell below professional norms of capital defense practice: 1) conflict of trial counsel; 2) unreasonable omissions in relation to rearguing motion to suppress; 3) failure to investigate and present evidence of the petitioner's alleged diminished capacity; 4) failure to challenge the petitioner's competence; 5) failure to adequately investigate government's "snitch" witnesses; 6) failure to timely object to allegedly improper hearsay evidence of other bad acts; 7) failure to engage the services of an independent crime scene reconstruction expert; 8) failure to engage a expert on police tactics; 9) failure to impeach law enforcement witnesses with prior inconsistent statements from the state trials; 10) trial counsel unreasonably failed to call Toby Barrett, the petitioner's son, and Alvin Hahn, the petitioner's neighbor; 11) trial counsel unreasonably failed to introduce evidence concerning Barrett's lack of knowledge regarding outstanding warrant; 12) trial counsel unreasonably failed to contest the admission of the testimony of James Horn; 13) trial counsel failed to seek appropriate jury instructions during the first stage of trial; 14) trial counsel failed to make proper objections at trial to preserve issues for appeal, including alleged instances of prosecutorial misconduct; and 15) trial counsel failed to investigate, develop and present appropriate mitigation evidence during the second stage of trial.

In his eighteenth ground for relief, the petitioner asserts he was denied effective assistance of appellate counsel. Specifically, he claims appellate counsel unreasonably: 1) failed to raise the due process violation resulting from the court's *ex parte* communications with the government; 2) failed to raise the *Franks v. Delaware* issue; 3) failed to argue government's inappropriate use of hearsay evidence; 4) failed to challenge jury's exposure

134

to Horn's testimony; 5) failed to challenge improper prosecutorial conduct; 6) failed to challenge court's restrictions on use of Barrett's statements; 7) failed to appeal use of stun belt during trial; 8) failed to appeal denial of jury instructions on lesser included offenses; 9) failed to appeal denial of residual doubt instruction; 10) failure to challenge court's dismissal of juror 62; 11) failure to appeal lack of a jury instruction requiring proof beyond a reasonable doubt as a weighing factor necessary to impose a death sentence; 12) failed to challenge the removal of the petitioner from the courtroom; 13) failed to raise an issue regarding the allegedly unconstitutional racial bias in the administration of the death penalty; and 14) failed to raise allegedly unconstitutional deficiencies in the indictment.

Many of the allegations have previously been addressed in this opinion. To the extent this court has found no error in the substantive allegations, the court will not readdress counsel's performance, *i.e.* arguments relating to motion to suppress; competency; challenges to jury instructions; restriction on use of Barrett's statements; failure to challenge removal of juror 62; failure to challenge removal of defendant from courtroom; failure to challenge *ex parte* communication with court; failure to challenge the constitutionality of the federal death penalty act; and failure to challenge the sufficiency of the indictment, since the Petitioner could not have suffered prejudice. Where, however, additional allegations have been made, this court has attempted to address each of those allegations.

### ***Legal Principles applicable to claims of ineffective assistance of counsel***

Petitioner's claim of ineffective assistance of counsel is governed by the familiar two-part test announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104

135

S.Ct. 2052, 80 L.Ed.2d 674 (1984).  First, the Court indicated that the defendant must establish that the representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms.  In order to establish that counsel's performance was deficient, the petitioner must establish counsel made errors so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*, 466 U.S. at 687, 104 S.Ct. at 2064.  It is important to remember that the focus of the first prong is "not what is prudent or appropriate, but only what is constitutionally compelled."  *Breechen v. Reynolds*, 41 F.3d 1343, 1365 (10th Cir. 1994).  "For counsel's performance to be constitutionally ineffective, it must have been 'completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.'"  *Le v. Mullin*, 311 F.3d 1002, 1025 (10th Cir. 2002) (citing *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997) (quoting *Hatch v. Oklahoma*, 58 F.3d 1447, 1459 (10th Cir. 1995), *overruled on other grounds by Daniels v. United States*, 254 F.3d 1180, 1188 n. 1 (10th Cir. 2001)).

Second, the defendant must establish that the deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.  "Prejudice" in this context means "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.*   In other words, the petitioner must prove that "there is a 'reasonable probability' that the outcome would have been different had those errors not occurred."  *United States v. Haddock*, 12 F.3d 950, 955 (10th Cir. 1993) (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. 2068).

136

Courts may address the performance and prejudice components in any order and need not address both if a defendant fails to make a sufficient showing of one. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. Failure to establish either prong of the *Strickland* standard will result in a denial of the petitioner's Sixth Amendment claims. *Id.*, 466 U.S. at 696, 104 S.Ct. at 2069-2070.

In order to establish prejudice in the guilt stage, the defendant has to show "there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.,* 466 U.S. at 694, 104 S.Ct. at 2068. While at the penalty stage of a capital case, the defendant must show "there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* In other words, deficient performance is prejudicial only where it is clear that "but for trial counsel's errors, there is a reasonable probability that the ultimate result would have been different," *Washington v. Johnson*, 90 F.3d 945, 953 (5th Cir. 1996), *cert. denied,* 520 U.S. 1122, 117 S.Ct. 1259, 137 L.Ed.2d 338 (1997); so that, the "confidence in the reliability of the verdict is undermined." *Id.*

The United States Supreme Court has indicated that every effort must be made by a reviewing court to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 1065. In addition, the Court indicated the conduct of counsel is "strongly presumed" to have been within the wide

137

range of reasonable professional assistance. *Id.* Further, the Court acknowledged that there are numerous ways to provide effective assistance in a particular case and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.*, 466 U.S. at 690, 104 S.Ct. at 2066. As a result, in deciding ineffective assistance of counsel claims, this court is required to "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct." *Id.*

Prevailing norms of practice can be used as guides in determining what is reasonable, however, it must be remembered that they are only guides. *Id.*, 466 U.S. at 689, 104 S.Ct. at 2065. As the Supreme Court has indicated, "'American Bar Association standards and the like' are 'only guides to what reasonableness means, not its definition.'" *Bobby v. Van Hook*, — U.S. —, 130 S.Ct. 13, 17, 175 L.Ed.2d 255 (2009).

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.

*Strickland*, 466 U.S. at 688-689, 104 S.Ct. at 2065 (citation omitted). "[T]he Federal Constitution imposes one general requirement: that counsel make objectively reasonable

choices." *Bobby v. Van Hook*, 130 S.Ct. at 17 (2009)(citing *Roe v. Flores-Ortega*, 528 U.S. 470, 479, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000).

As will become obvious during the balance of this opinion, the petitioner spends a substantial portion of time in his motion and brief in support thereof complaining about defense counsel's failure to investigate. In considering whether counsel should have conducted more investigation, it is important to remember that the underlying facts of this case were the subject of two prior state court trials which were conducted before an indictment was ever filed in this case. Thus, a substantial amount of investigation had been undertaken during the state trial proceedings, including compilation of Mr. Barrett's medical, educational and mental health records, prior to the initiation of the federal proceedings.[191] Additionally, counsel had the benefit of having access to the prior state court trial transcripts and, therefore, substantially more information regarding what many of the government's witnesses were going to testify to than is generally available in a criminal trial.

## A. *Ineffectiveness of Trial Counsel*

Since Petitioner has challenged the effectiveness of trial counsel during both stages of trial, this court will consider each stage of trial separately.

### **Petitioner's Challenge to Conviction**

Because the petitioner alleges the omissions and/or errors of his trial attorney deprived him of due process, this court will examine each of these errors for violations of constitutional significance. If any of the errors alleged by the petitioner did, in fact, deprive

---

[191]Respondent's Exhibit No. 12. *See also*, Doc. 310.

the petitioner of his constitutional right to a fair trial, the court must decide if the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

1.  Counsel acted under an "actual conflict" of interest

Petitioner claims that this "court's stated desire to minimize costs associated with Mr. Barrett's defense and to appoint local counsel to this case for the purpose of establishing their credentials for appointment in future capital cases, . . . . created an actual conflict between the financial and professional interests of appointed counsel and Mr. Barrett's interest in thorough investigation and a vigorous defense." Doc. 95, at p. 34. An "actual conflict" for, Sixth Amendment purposes, "is a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172, 122 S.Ct. 1237, 1244, 152 L.Ed.2d 291 (2002), n. 5. In *United States v. Alvarez*, 137 F.3d 1249, 1252 (10th Cir. 1998), the Court said,

> [a]n actual conflict of interests results if counsel was forced to make choices advancing other interests to the detriment of his client. *See Stoia v. United States*, 22 F.3d 766, 771 (7th Cir. 1994). Without a showing of inconsistent interests, any alleged conflict remains hypothetical, and does not constitute ineffective assistance. *See Thomas*, 818 F.2d at 481. Indeed, '[t]o demonstrate an actual conflict of interest, the petitioner must be able to point to specific instances in the record which suggest an impairment or compromise of his interests for the benefit of another party.' *Danner*, 820 F.2d at 1169.

Although the petitioner attempts to create an actual conflict of interest from innuendos, speculation and suggestions, he does not allege any facts to support his conclusory allegations of conflict. Conclusory allegations contained within affidavits do not

140

require a hearing.  *Strong v. Johnson*, 495 F.3d 134, 139-40 (4ᵗʰ Cir. 2007).  Many of the statements made in support of this artificially created conflict are not supported by the actual court record.  Specifically, the orders in this case establish, at best, a desire to ensure that the funds requested were reasonably necessary and that the court did not authorize the hiring of experts who would later refuse to testify without additional funds, as was apparently done in state court.[192]  Counsel was advised on several occasions to provide some specificity in regard to their proposed budget.[193]  It became apparent very early in the budgeting of this case that Mr. Echols was attempting to be compensated for items that were improper.  For instance, at the budget hearing when advised that the court generally paid one-half of the allowable hourly rate for travel expenses and treated the rest as overhead, Mr. Echols made the following comments:

> Mr. Echols: "Sometimes I - - my secretary acts more as a - - sort of an assistant.  She goes with me to court.  I'm a sole propractitioner, (sic) so when I'm in court, she is with me and my office has a voice mail system.  Sometimes she travels with me and we will do things like she will read to me and this kind of thing.  We will actually have some meaningful discussion.  Do I note that separately, if that's appropriate?

> The Court: If you can do that, if you can show that you are working while you are driving, well, you can get the whole hourly rate, but most of the time it's just strictly windshield time and you don't get the full hourly rate for that.  It is hard to give somebody the full hourly rate for driving.

> Mr. Echols: I couldn't agree more.  That seems reasonable.  One of the things I thought about, I have read these - - we have got all of these records that have got to be put back together.  If I had Jan do it, is that something she

---

[192]*See*, Cr. Doc. 310, at p. 32.

[193]*See*, Doc. Nos. 38 and 47.

1212

could charge like 25 bucks an hour for or do you just want to stay away from that?

> The Court: The thing is, when you are talking about anything other than attorney time, it has to be your actual costs.

> Mr. Echols: Okay.

> The Court: So we can't just - - like, say, we normally bill somebody $25.00 an hour for legal assistant time, it has to be some - - it has to approximate what you actually spent on her doing that.

> Mr. Echols: We will just leave that alone because we live together. We don't need to - - we don't need to go into that then.

*Id*., at pp. 42-44.  Additionally, in reducing the number of hours which the Magistrate Judge recommended Mr. Echols be paid in regard to one of only two CJA vouchers submitted by Mr. Echols, the Magistrate Judge found duplication of effort and that there were "striking similarities between the substance of pleadings" which Mr. Echols had previously filed in another death penalty case.  Doc. 106, at pp. 3-4.  Surely due process does not demand that the court pay for work which is not performed in the specific case that is before the court.

Furthermore, as previously indicated herein, the court on numerous occasions urged defense counsel to submit additional budget requests if they felt the budget needed to be increased.  Despite the record, the petitioner asserts because defense counsel never sought to amend the budget,[194] he has shown that defense counsel "were not exercising independent professional judgment on what was in their client's interests."  Doc. 149, at p. 25.  Such

---

[194]As previously indicated herein, on October 31, 2005, defense counsel did seek a modification of the budget which was granted by this court.  *See*, Cr. Doc. Nos. 232 and 244, respectively.

conclusory allegations simply do not establish a conflict of interest. Accordingly, this claim is denied.

## 2.  Failure to Investigate Evidence tending to show Diminished Capacity to Form Intent

Petitioner asserts trial counsel failed to fully investigate and present evidence, during the first stage of trial, that he suffered from mental illnesses that would have negated the government's showing of intent. First, the petitioner claims counsel unreasonably failed to investigate and call eyewitnesses Toby Barrett and Alvin Hahn who would have rebutted the government's theory as to how the shooting occurred.[195] Petitioner also claims counsel failed to investigate and/or call witnesses to establish that the actions of the Tact Team were reckless and unprofessional.[196] Finally, the petitioner asserts trial counsel failed to obtain a proper mental health examination or to obtain testimony from readily available witnesses regarding Mr. Barrett's mental and emotional state. Other than his two sentence statement about failing to call Toby Barrett, Alvin Hahn and some unknown witness about the actions of the Tact Team, the gist of this allegation against counsel revolves around the petitioner's mental health claims.

As the Supreme Court has indicated "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations

---

[195]Doc. 95, at p. 48. Petitioner does not elaborate on this statement as it relates to his allegation of ineffective assistance of counsel for failing to investigate evidence of diminished capacity. Rather, he later states that Toby Barrett and Alvin Hahn would have "corroborated several law enforcement witnesses, and showed that at the critical moment, Mr. Barrett likely could not see any emergency lights or other indications that the vehicle heading toward his house and young son contained law enforcement officers." *Id.*, at p. 57.

[196]Petitioner also does not elaborate on this statement as it relates to a failure to investigate evidence of diminished capacity. *See*, Doc. 95, at p. 48.

unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*,  466 U.S. at 691, 104 S.Ct. at 2066.  "A reasonable investigation is not, however, the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct." *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998).  To be effective, counsel is not required to "pursue every path until it bears fruit or until all hope withers." *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999).  *See also*, *Lovett v. Florida.*, 627 F.2d 706, 708 (5th Cir. 1980).  ". . . *Strickland's* approach toward investigation 'reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources.'  How a lawyer spends his inherently limited time and resources is also entitled to great deference by the court." *Chandler v. United States*, 218 F.3d 1305, 1318 (11th Cir. 2000), n. 22 (citation omitted).  Counsel's actions are usually based, quite properly, upon information supplied by the defendant.  *Strickland*, *supra*, 466 U.S. at 691, 104 S.Ct. at 2066.

Again, it is important to remember that this is not a case where **no** investigation was undertaken.  Rather, the record reflects counsel had the work product of Mr. Echols, who had undertaken substantial investigation for use in two prior state court trials involving the same incident, as well as investigative materials assembled by the Oklahoma Indigent Defense

144

System (OIDS).[197]  Additionally, counsel was aware of the actual testimony in the prior two state court trials because he obtained copies of the transcripts from those trials.

Petitioner has failed to establish that counsel had any reason to suspect that the diagnoses proffered in the § 2255 Motion might have been available.  As this court has previously discussed, there was no indication that the petitioner was incompetent at the time of trial.  Petitioner acknowledges that defense counsel consulted with a psychologist, Dr. Jeanne Russell, who "reprise[d] the risk assessment she had done in preparation for a second stage proceeding in state court."  Doc. 95, at pp. 48-49.  What the petitioner fails to acknowledge, however, is that defense counsel employed Dr. Russell for "mitigation and assistance on mental health questions."  *See*, CJA Voucher 060224000004 approved for payment by this court on February 24, 2006.  Furthermore, the documentation supporting this voucher indicates that defense counsel consulted with Dr. Russell "because she was consulted during the State trials as the mitigation expert.  She had accumulated a large amount of information on Kenneth Barrett, . . . ."  *Id.*  Dr. Russell revised her risk assessment concerning Mr. Barrett for use in the federal trial and discussed this information with defense counsel.  *Id.*  Also, on October 11, 2005, Dr. Russell visited Mr. Barrett in the Muskogee County Jail.[198]  Petitioner does not, however, provide any indication that Dr. Russell reported

---

[197]Respondent Exhibit No. 12, at ¶ 4.  Although Petitioner submits a declaration from an OIDS investigator which claims his investigative file was never picked up by Mr. Hilfiger or his staff (Petitioner's Exhibit No. 111), to the extent that OIDS delivered boxes of materials that they had from the state cases to Mr. Hilfiger's office, Petitioner has failed to show that counsel should have contacted Steve Leedy to obtain additional materials or that counsel's failure to do so was unreasonable.

[198]Respondent's Exhibit No. 5 reflects that Anita Russell/Norene Gay - psychologist - visited with Mr. Barrett on October 12, 2005.  Dr. Russell's billing statement indicates she interviewed Mr. Barrett on October 11, 2005.  *See*, supporting documentation accompanying CJA Voucher 060224000004.

145

anything to counsel that should have led a reasonably competent attorney to suspect neurological and/or psychiatric impairments so profound they would have negated the government's evidence of intent as it related to Count 3.[199]  Furthermore, none of the declarations submitted by lay witnesses[200] herein establish that counsel should have questioned the petitioner's capacity to form intent at the time of the crime involved herein. As a result, this court finds the petitioner has failed to establish that counsel's investigation of his mental health was unreasonable.

3.  Failure to Adequately Investigate Government's Civilian Witnesses

Petitioner claims he received ineffective assistance of counsel because his attorneys did not adequately investigate the seven government civilian witnesses.  Petitioner asserts that, upon learning the identities of these witnesses, counsel should have moved for a continuance of the trial.  Additionally, the petitioner argues his trial counsel should have identified and presented evidence to contradict the civilian witnesses testimony and to establish that the witnesses had poor reputations for truthfulness within the community.  The government argues that the petitioner has failed to show that his attorneys' conduct was unreasonable or prejudicial.

While the petitioner surmises this court would have granted a continuance if requested, since no motion was ever filed it is impossible to guess what might have happened.  Further,  to engage in speculation over what might have occurred would involve

---

[199]This court's discussion of lesser included offenses in relation to the felony murder counts addresses why this evidence would not have been important in relation to Counts 1 and 2.

[200]*See*, Petitioner's Exhibit Nos. 74, 78, 81, 86, 93, 96-99, 101 and 103.

146

the very type of hindsight that the Supreme Court has specifically cautioned against. *See*, *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Pursuant to 18 U.S.C. § 3432, the government was not required to provide the names of any of its witnesses until three days before trial. Additionally, the statute authorized the government to delay furnishing the names of its witnesses "if the court [found] by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person." *Id*. While this court never ruled on the government's motion to delay disclosure of these witnesses' names, the government's disclosure of the names was, in fact, timely. *Barrett*, 496 F.3d at 1116-17.

Further, the petitioner cannot show that the timing of the disclosures prevented him from developing substantial evidence to impeach these witnesses. All of these witnesses were relatives and/or friends of Barrett. Moreover, Barrett was obviously familiar with the people and incidents about which they testified. Each of these witnesses testified to extremely limited events and/or aspects of their relationships with Barrett. Trial counsel believed they could effectively impeach the witnesses with the evidence they had[201] and based upon what this court observed, defense counsel did, in fact effectively, if not perfectly, cross-examine these witnesses. Specifically, counsel highlighted the fact that most of these witnesses had extensive criminal records and apparent motives for bias, because they stood to benefit from their testimony. Counsel also called one witness, Ron Baldwin, to counter Brandie Price's testimony that she had entered Barrett's property thru the ditch in July when they went to Barrett's house. This witness admitted, however, that he might have been with

---

[201]Respondent's Exhibit No. 12, at ¶ 14.

Brandie Price in July when he provided her with methamphetamine and that he had been using drugs heavily during that period of time.[202]   Counsel's decision not to search for additional character witnesses to establish that the government's witnesses did not have a character for truthfulness within the community was reasonable under the facts of this particular case.   The character flaws and questionable memories of these seven witnesses, due to their extensive use of drugs, was readily apparent following their cross-examination.[203]

Additionally, the omission of the character witnesses now identified, most of whom were related to the defendant or were drug associates of the defendant around the time the crimes were committed, would not have changed the jury's perception of the credibility of these seven witnesses.   Based upon the declarations submitted, however, some of these "newly discovered" witnesses could have been more detrimental and/or prejudicial to the defendant. For instance, one of the witnesses acknowledges that the reason he was at defendant's residence was to obtain drugs.[204]   Since the government was required to prove beyond a reasonable doubt that the Defendant was, in Count 1, engaged in drug trafficking crimes, calling this witness could have aided the government's case.   Moreover, unlike the government's witnesses, the witnesses now identified do not even corroborate each other on

---

[202]Cr. Doc. 346, J.T.Tr. Vol. 18, at pp. 4116-4140.

[203]*See*, testimony of: 1) Randy Turman, Cr. Doc. 324 and 325, J.T.Tr. Vol. 2, at pp. 363-392 and Vol. 3, at pp. 396-449; 2) Travis Crawford, Cr. Doc. 325, J.T.Tr. Vol. 3, at pp. 450-480; 3) Randall Weaver, Cr. Doc. 336, J.T.Tr. Vol. 8, at pp. 1834-1849; 4) Charles Sanders, Cr. Doc. 339, 340 and 342, J.T.Tr. Vol. 11, at pp. 2488-2541; Vol. 12, at pp. 2579-2652; and Vol. 22, at pp. 4586-4590; 5) Cindy Crawford, Cr. 341 and 342, J.T.Tr. Vol. 13, at pp. 3058-3076 and Vol.  22, at pp. 4575-4585; 6) Karen Real, Cr. Doc. 341 and 342, J.T.Tr. Vol. 13, at pp. 3079-3092 and Vol. 14, at pp. 3098-3135; and 7) Brandie Price, Cr. Doc. 343, J.T.Tr. Vol. 15, at pp. 3485-3511.

[204]*See*, Petitioner's Exhibit No. 90.

facts that the petitioner claims are relevant to establish that the government's witnesses were lying at trial. *Compare*, Petitioner's Exhibit No. 95 (Declarant claims Sanders "was never in Kenny's house because Kenny would never have let him in."), with Petitioner's Exhibit No. 13 (Declarant claims she was at defendant's residence on two or three occasions when Sanders was present.).

Further, while some of these declarant's now claim Barrett never made statements about wanting to kill cops or going out in a blaze of glory,[205] five of the government's witnesses offered testimony about Barrett's hostility towards police and/or these specific type of statements being made by Barrett.[206] Additionally, at least one of the witnesses the petitioner claims should have been called, would have corroborated at least three of the government's witnesses regarding the extensive drug use and distribution occurring at the petitioner's house.[207]

Furthermore, much of the evidence which the petitioner now proffers would not have been admissible during his trial to impeach these witnesses. In particular, collateral evidence to establish specific acts of misconduct by government witnesses, including acts of dishonesty and drug use, would not have been admissible to attack the witnesses' character

---

[205]*See*, Petitioner's Exhibit Nos. 95, 90, 77, and 37.

[206]*See*, trial testimony of: 1) Randy Turman (Cr. Doc. 325, J.T.Tr. Vol. 3, at p. 401 and 412); 2) Travis Crawford (Cr. Doc. 325, J.T.Tr. Vol. 3, at p. 466); 3) Charles Sanders (Cr. Doc. 339, J.T.Tr. Vol. 11, 2515); 4) Cindy Crawford (Cr. Doc. 341, J.T.Tr. Vol. 13, at pp. 3068-3069); and 5) Brandie Price (Cr. Doc. 343, J.T.Tr. Vol. 15, at pp. 3492-93).

[207]*See*, Petitioner's Exhibit No. 90 (Declarant claims to have done drugs at the petitioner's residence shortly before police raid and says many people were coming and going during the 33 hours he was at the petitioner's residence).

for truthfulness.  *See*, Fed.R.Evid. 608(b) and *Palmer v. City of Monticello*, 31 F.3d 1499, 1507 n. 11 (10th Cir. 1994).

Finally, it should be noted that although the petitioner obtained, almost five years after trial, declarations to establish that there were witnesses which might have been able to contradict testimony given at trial, the petitioner does not allege that he provided trial counsel with these specific witnesses' names or that he provided counsel with information regarding how to contact these witnesses during his trial and that counsel refused to issue subpoenas to them.  Thus, this court finds the petitioner has failed to establish ineffective assistance of counsel in regard to the investigation of the civilian witnesses.  Moreover, even if counsel did not adequately investigate these witnesses, the petitioner has failed to establish prejudice.

4.  Failure to make appropriate and timely objections to improper hearsay evidence of other bad acts

Next, the petitioner asserts his counsel failed to timely object to admission of evidence regarding statements made by the petitioner which were introduced  to establish hostility toward law enforcement and intent to engage them in violence if they came upon his property.  To the extent trial counsel did interpose objections under Federal Rule of Evidence 404(b), the petitioner claims his appellate attorneys were ineffective for failing to pursue the matters on appeal.  The government argues the petitioner failed to timely raise these arguments and therefore, the statute of limitations bars this court's consideration of the same.  In his reply, the petitioner alleges because this particular claim is raised only as it relates to testimony offered by the government's civilian witnesses it relates back to his claim of

ineffectiveness of counsel in dealing with informant testimony. To support this position, the petitioner cites *Mayle v. Felix*, 545 U.S. 644, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005).

In *Mayle*, the court refused to allow relation back where the original petition raised a confrontation clause claim regarding the admission in his murder trial of videotaped testimony of a witness for the prosecution and his amended petition sought to challenge the admission of inculpatory statements he made during pretrial police interrogation under the privilege against self-incrimination. Although both claims involved the admission of out-of-court statements during the prosecution's case in chief, the Court held the second ground for relief arose out of facts different in both time and type from those set forth in the original pleading.

Here, while both claims deal with ineffectiveness of counsel in dealing with the government's civilian witnesses, the petitioner made no attempt in his amended petition to tie these two claims together. Even though the petitioner claims he raised the 404(b) issue timely by alluding to it in his first claim alleging that this court's actions violated his constitutional rights,[208] the petitioner never made any allegations that trial counsel were ineffective for failing to object to the testimony given at trial. To the extent the allegations that counsel were ineffective for failing to investigate these witnesses occurred prior to trial and the failure to object to some of these witnesses' testimony occurred during the trial, this court finds the allegations arise out of different facts in time than those alleged in the original

---

[208] *See*, Doc. 2, at p. 38.

151

and/or first amended motion.[209]  *See*, *United States v. Hernandez*, 436 F.3d 851, 858 (8th Cir. 2006) (holding where original claim referred to admission of evidence and amended claim referred to trial testimony and cross-examination of witnesses, the claims were not similar enough to satisfy the "time and type" test nor did they arise out of the same set of operative facts).

Even if this court were to consider this claim, however, the petitioner would not prevail because counsel were not ineffective for failing to object to statements made by the petitioner or to statements which were intrinsic to the crime charged.  *See*, Fed.R.Evid. 801(d)(2)(A) (a statement is not hearsay if it is offered against a party and is the party's own statement) and Fed.R.Evid. 404(b) (evidence of prior drug transactions can be admissible to prove intent in drug prosecutions).  The statements which the petitioner now claims counsel should have objected to were statements made by the petitioner.[210]  While the petitioner argues his attorney should have objected to these statements because they were inadmissable under Fed.R.Evid. 404(b), this court finds each of the statements challenged were intrinsic evidence of the crimes charged.  *See*, *United States v. Viefhaus*, 168 F.3d 392, 398 (10th Cir. 1999) (quoting *United States v. O'Brien*, 131 F.3d 1428, 1432 (10th Cir. 1997) "It is well settled that Rule 404(b) does not apply to other act evidence that is intrinsic to the crime

---

[209]Despite the similarities in the "dump-it-all-in" approach which has been taken in this case with *pro se* filings, this is not a case in which the original and amended timely filed motions were filed by a *pro se* litigant and the subsequent amendment was filed after the statute of limitations expired.  Rather, all of the pleadings filed by the petitioner herein were filed by counsel who were presented to this court as "extremely well-qualified" in federal habeas litigation.  In the opinion of this court, many of the documents have not been submitted in a good faith attempt to direct the court to the legitimate issues in this case, but rather as a way to slow the disposition process.

[210]*See*, Doc. 95, at pp. 122-124.

152

charged, and that other act evidence is intrinsic when the evidence of the other act and the evidence of the crime charged are inextricably intertwined."). Petitioner's statements regarding hostility toward law enforcement and/or what he intended to do if law enforcement came onto his property were all intrinsic evidence of the petitioner's express intent. Finally, whether the time frames of these statements, once challenged on cross-examination, were accurate was a question for the jury. Accordingly, this court finds counsel was not ineffective for failing to make objections which would not have been sustained. Similarly, appellate counsel was not ineffective in failing to raise this issue on appeal.

5. Failure to engage a crime scene reconstruction expert

Petitioner claims trial counsel were ineffective in failing to obtain the services of a crime scene expert, in particular Edward Hueske of Denton, Texas, to counter the testimony of Iris Dalley, who had appeared as a witness in Petitioner's two state court trials.[211] Petitioner argues that Dalley's analysis was critical to the jury's consideration of the issue of intent since the only other evidence was "the often conflicting accounts and compromised memories of the tactical team members who testified." Doc. 95, at p. 138. Ms. Dalley's presentation was not, however, critical or necessary for the jury to determine what had happened in this case nor did it ultimately assist the government, as the petitioner claims, in proving intent.

---

[211]Instead of hiring Hueske, defense counsel employed the services of an investigator who helped counsel in preparing questions to challenge the ballistics testimony. *See*, CJA Voucher 060208000004.

Specifically, despite the petitioner's allegations, the record establishes that defense counsel were prepared to meet Dalley's testimony. The transcript reveals defense counsel specifically asked some of the very questions which the petitioner's expert now uses to show the inadequacy of Dalley's reconstruction analysis. Dalley was unable to determine the position of the shooter or the position of the victim's vehicle for any of the trajectories.[212] Additionally, as the government's brief points out, trial counsel "effectively elicited [Dalley's] concession that she could not exclude the possibility that Barrett had fired every shot from inside his house, thus confirming the viability of the defense theory." Doc. 175, at p. 71. Furthermore, notwithstanding the petitioner's assertions to the contrary,[213] Dalley never testified Barrett was firing from the porch. Rather, as previously indicated, she consistently denied knowing the exact position of the shooter and the victim's vehicle. Moreover, Dalley only reached two significant conclusions: 1) the defendant could not have fired all of the shots from a prone position and 2) the wounds to Eales's flank and elbow were sustained after he exited his Bronco.[214]

As is amply demonstrated by this case, virtually every cross-examination can be reviewed in hindsight and criticized for failure to ask additional questions and no two criminal defense attorneys will defend a particular client in the same way. *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. However, as previously stated, this court must make every

---

[212]*See*, Cr. Doc. 342, J.T.Tr. Vol. 14, at p. 3175 and 3226.

[213]Doc. 95, at p. 128.

[214]*See*, Cr. Doc. 342, J.T.Tr. Vol. 14, at pp. 3228-3229, 3247, 3254-3255 and 3259.

effort to eliminate the distorting effects of hindsight. *Id.*, 466 U.S. at 689, 104 S.Ct. 2052. Considering the totality of defense counsel's cross-examination of Ms. Dalley, the questioning constituted adversarial testing and maintained the viability of the defense theory, that Barrett was not shooting from the porch and, therefore, may have had trouble actually observing who was entering his property such that he may not have known that he was shooting at a law enforcement officer. The relevant inquiry under *Strickland* is not what defense counsel could have done, "but rather whether the choices made by defense counsel were reasonable" under the facts of the specific case before the court. *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Furthermore, the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel. To the extent defense counsel had the benefit of knowing exactly what Ms. Dalley's testimony would be, since she had previously testified in Petitioner's prior state court trials, this court finds the Petitioner has failed to establish that counsel's strategic decision to allow the testimony and then use it to further his client's defense was not unreasonable. Therefore, this court finds the petitioner has failed to establish that counsel provided ineffective assistance of counsel by not hiring Mr. Hueske.

6. Failure of trial counsel to present independent expert on police tactics

Petitioner also attacks counsel's failure to secure the testimony of an "independent" expert to establish that the raid on his house was "rife with tactical errors and poor planning"

155

and that these errors contributed to Trooper Eales's death.[215]   Again, the petitioner claims counsel should have hired a specific expert, George Kirkham.

Instead of hiring Kirkham, counsel relied upon the testimony of Chuck Choney, a former FBI agent, who had previously criticized the Tact Team's operation.   Petitioner claims counsel could not have made a reasonable decision to forego the testimony of Kirkham since counsel never consulted with him.   Trial counsel was not, however, required to try this case in the same way Echols would have tried the case.[216]   Decisions regarding what witnesses to call at trial are a matter of trial strategy.   *Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008).   The fact counsel called Choney to discuss the tactics was a reasonable trial strategy.   Choney's reluctance to testify for the defense and his association with the victim added to his credibility.   Whereas, a retained expert could have been impeached on the basis of his receiving payment from the defense for his testimony.

Further, Choney actually provided numerous criticisms of the Tact Team operation.[217] While Kirkham might have provided more or different criticisms of the operation, the petitioner has failed to establish that his testimony would have altered the outcome of the trial.   As a result, this court finds the petitioner has failed to establish that counsel provided

---

[215]Doc. 95, at p. 139.

[216]The record reflects that Choney was actually perceived by former counsel as "the most honest and upright appearing and sounding and testifying witness you would ever want to see.  He used to run the swat team for the FBI in Oklahoma City. He has worked all around the country.  He is now on the Indian Gaming Commission in Washington.  Just a super guy. Credentials, you know, perfect."  Cr. Doc. 310, at p. 13.

[217]*See*, Cr. Doc. 345, J.T.Tr. Vol. 17, at pp. 3906-3909, 3919 and 3974-3975.

156

ineffective assistance of counsel for failing to retain Mr. Kirkham, because no prejudice has been shown.

7.  Failure to impeach law enforcement witnesses with prior inconsistent statements

Petitioner claims his trial counsel provided ineffective assistance of counsel by failing to adequately impeach the testimony of the Tact Team members regarding the circumstances of the shooting.  While the petitioner cites to some of the state court trial transcripts to establish differences in the witnesses' testimony between the state trials and the federal trial, despite submitting more than 3500 pages of exhibits herein, the petitioner has not provided this court with a copy of the pages of the state court transcripts which they have referenced.[218]  It is well-established that "counsel's decisions regarding how to best cross-examine witnesses presumptively arise from sound trial strategy." *Delozier v. Sirmons*, 531 F.3d 1306, 1326 (10th Cir. 2008).  "In hindsight, there are a few, if any, cross-examinations that could not be improved upon.  If that were the standard of constitutional effectiveness, few would be the counsel whose performance would past (sic) muster." *Willis v. United States*, 87 F.3d 1004, 1006 (8th Cir. 1996).

Petitioner has failed to establish that the strategy employed in this case was not sound. Specifically, a review of the cross-examination by counsel of the law enforcement witnesses establishes that counsel emphasized the areas which were of importance to the defense. Specifically, counsel demonstrated that the model created by the prosecution's witness did

---

[218]During the trial herein, this court attempted to obtain copies of the state court transcripts from the Sequoyah County Court Clerk's office.  At that time, the court was advised that the transcripts had never been filed in the Sequoyah County District Court.  *See*, Cr. Doc. 336, J.T.Tr. Vol. 8, at p. 1637.

not accurately reflect the house and furnishings as it existed in 1999, including the fact that heavy coverings were over the windows of the defendant's house (allowing counsel to argue it would have been hard for Barrett to see who was coming onto his property); nor did it contain all of the vegetation which existed on the defendant's property at the time of the raid.[219]

While the petitioner complains defense counsel did not impeach Johnson with his earlier state court testimony "that he was thirty seconds behind the tactical team and saw red and blue police lights at the intersection after turning onto the dirt road,"[220] it would have been counter-productive for defense counsel to have pointed this discrepancy out to the jury since Johnson testified on cross-examination during the federal trial that he was told to give the tact team a two minute headstart, which he did, and all he could see when he approached the residence was taillights on a vehicle turning into the residence.[221]  Additionally, Barrett claims trial counsel should have impeached Johnson's testimony by eliciting evidence regarding his initial statement to Investigator Jones.[222]  Counsel did, however, examine Johnson's statement to Jones, adducing Johnson's admission that he might not have told her about the lights.[223]  Even if inconsistencies occurred between Johnson's testimony regarding lighting, defense counsel made the most important point by establishing that Johnson had

---

[219]*See*, Cr. Doc. 324, J.T.Tr. Vol. 2, at pp. 277-294, 298-300.

[220]Doc. 95, at p. 145.

[221]Cr. Doc. 324, J.T.Tr. Vol. 2, at pp. 343-344 and 349.

[222]Doc. 95, at pp. 145-146.

[223]Cr. Doc. 324, J.T.Tr. Vol. 2, at pp. 361-362.

158

absolutely no idea what lights were on at the time the shooting occurred because he was, at least two minutes behind the tact team and, therefore, he had no way of observing whether the lights were activated at the time of the shooting.[224]

Petitioner also claims counsel failed to challenge Trooper Poe's testimony that "he initially observed emergency lights when he saw the first Bronco come into view from the east" with prior testimony that "he first became aware of seeing emergency lights *after* he heard shooting break out." Doc. 95, at p. 145. During the federal trial Poe testified as soon as he got out of his car and started toward the fencepost, he heard gunfire. After Poe ascertained he was not the target of the shooting, he came up from behind the fencepost and looked toward the house. At that point he saw Hamilton's Bronco come into view from the east and it appeared the Bronco was taking gunfire.[225] On cross-examination, however, Poe explained that he didn't remember seeing emergency lights from the time he left his car until he reached his assigned position by the post.[226] Thus, the testimony was not inconsistent and counsel was not ineffective for not impeaching Poe with his prior testimony.

Petitioner also complains because counsel did not elicit testimony from Trooper Poe that "he did not know who fired or where the gunfire was coming from, despite having an unobstructed view of the house." Doc. 95, at p. 146. The testimony at the federal trial, however, made it clear that from the time Trooper Poe exited his vehicle, he was focused

---

[224]Cr. Doc. 324, J.T.Tr. Vol. 2, at p. 351 (shooting was over when he arrived and Trooper Eales was being carried to Bronco).

[225]Cr. Doc. 329, J.T.Tr. Vol. 7, at pp. 1411-1413.

[226]Cr. Doc. 329, J.T.Tr. Vol. 7, at p. 1444.

upon his own safety as well as the two other troopers who were closest to him.  As a result, he took cover and did not really see anything at that point.[227]  Thus, it was not unreasonable for defense counsel to rely on his testimony that other than hearing gunfire, he couldn't see anything.

Petitioner attacks counsel's failure to impeach Trooper Greninger's testimony with what he claims was "conflicting evidence between the second state trial and the federal trial regarding what lighting he observed." *Id.*, at p. 145.  Petitioner states that Greninger testified in the federal trial that:

> Trooper Manion activated his emergency lights as he turned into the driveway before entering the property.  He noticed also that Trooper Hash had his emergency lights on, but did not know when they were engaged.  He was not completely sure Trooper Hise's emergency lights were on.  Trooper Pettingill did not activate his lights.

Doc. 95, at p. 145.  Petitioner indicates this testimony conflicts with Greninger's testimony in the second state trial that "he turned on his emergency lights after turning left to approach Mr. Barrett's residence, and recalled seeing Trooper Hise's emergency lights on." *Id.*  The inconsistencies between these two accounts are insignificant and they certainly do not impeach the evidence that the emergency lights on Greninger's vehicle were activated shortly after the car turned from the roadway in front of Barrett's house.  Additionally, defense counsel elicited from Greninger an admission that he did not recall precisely where his car was when the emergency lights on his vehicle were turned on and he did not know when

---

[227]Cr. Doc. 329, J.T.Tr. Vol. 7, at p. 1410.

160

Hash's lights were activated.[228]  Since Greninger admitted upon cross-examination that his memory was not clear, there was no need for counsel to use the prior slightly inconsistent statement as to who in the vehicle activated the lights and when.  As a result of Greninger's admission in the federal trial, counsel could argue that the lights were not on when Barrett first observed the vehicles coming onto his property.  Additionally, to the extent Greninger readily admitted that his memory of the events was imperfect, there would not be much value in trying to refresh the witness's memory about facts that could have been more damaging to the defense.  Thus, the omission was neither unreasonable nor prejudicial.

Petitioner attacks trial counsel saying he failed to impeach Trooper Hamilton's testimony regarding where his vehicle first began receiving gunfire.  During the federal trial, Hamilton testified that his vehicle was initially hit by gunfire "[s]hortly *after* we came out of the ditch."[229]  This appears to be consistent with the statement Petitioner attributes to Hamilton from the state court trial, "that the shooting started as his vehicle was coming out of the ditch."  Doc. 95, at p. 147.  Further, since Hamilton's recollection supported the defense theory that the lead vehicle was closer to the house when the shooting began, counsel could reasonably have relied on Hamilton's testimony instead of exploring this issue with Greninger as Petitioner claims he should have done.

Petitioner also complains because trial counsel did not contrast Trooper Poe and Trooper Greninger's testimony about guns in the defendant's house with the fact that neither

---

[228]Cr. Doc. 326, J.T.Vol. 4, at p. 771.

[229]Cr. Doc. 325, J.T.Vol. 3, at p. 537.

testified to seeing any guns in the state trial.  Petitioner does not cite to any portion of the state court transcript and, therefore, it is impossible to know if they were even asked about guns in the prior trials.  Accordingly, this court finds the petitioner has not shown that the prior testimony was inconsistent with the testimony offered in federal court.

After thoroughly reviewing counsel's cross-examination, this court finds the petitioner has failed to establish that counsel's cross-examination was unreasonable or prejudicial.  Therefore, the petitioner has failed to establish ineffective assistance of counsel.

8.  Failure to elicit testimony of son and neighbor

Petitioner next faults trial counsel for failing to call as defense witnesses his son, Toby Barrett, and his neighbor, Alvin Hahn.  Petitioner claims these two witnesses could have undermined evidence that emergency lighting had been turned on prior to the initial shots being fired.  Toby Barrett is the only one of these two witnesses who actually observed the police enter Barrett's property.[230]  The government argues neither of these witnesses would have meaningfully undermined the prosecution's case, and counsel's omission of their testimony was not prejudicial ineffectiveness.

As previously indicated, decisions regarding which witnesses to call are matters of trial strategy.  Again, based on the prior trials, there can be no question that defense counsel

---

[230]While the petitioner implies counsel did nothing to contradict testimony regarding Barrett's knowledge that the people attacking his property were law enforcement, the record establishes the falsity of this claim.  In particular, Gelene Dotson, the defendant's mother, testified that she heard a loud noise followed by some gunshots and she glanced out her kitchen window and saw headlights in her driveway.  She further testified that she did not see any flashing lights nor any kind of lights on that vehicle she would consider "emergency lights."  Also, she indicated she saw a lot of people milling about, answered her phone and then observed a patrol car come through the gate.  The patrol car she observed did not have any lights on, but as it pulled closer to the defendant's residence "it turned it (sic) lights on."  Cr.Doc. 346, J.T.Tr. Vol. 18, at pp. 4142-4145.  Additionally, Loyd Cobb, an investigator for the defense, testified that you would not have been able to see the three police cars coming through the ditch if you were inside the cabin.  *Id.*, at pp. 4145-4154.

162

was aware of the prior testimony of Toby Barrett.  Moreover, both Toby Barrett and Alvin

Hahn were originally listed as witnesses for the defendant.  In order to demonstrate prejudice

for failure to call a witness, the petitioner must prove that the witness's testimony would have

produced a different result. *Patel v. United States*, 19 F.3d 1231, 1237 (7th Cir. 1994).

In reviewing the declarations of Toby Barrett and Alvin Hahn submitted by the

petitioner, it becomes clear that neither of these witnesses' testimony would have changed

the outcome of the first stage of trial.  Specifically, as the petitioner acknowledges,

> a primary contention of the defense in the first stage of trial was that when Mr.
> Barrett fired on the Ford Bronco driven by Buddy Hamilton, he was unaware
> that it was a police vehicle, and was unaware that several police vehicles had
> driven onto his property.  It was undisputed that the lead vehicle driven by
> Hamilton, which the evidence showed struck Mr. Barrett's porch, had no
> emergency lights engaged and appeared to be a civilian vehicle.

Doc. 95, at pp. 149-150.

Petitioner states that Toby Barrett testified in the first state trial that "when the

shooting occurred, there were no police vehicles with emergency lights on at all that were

visible." Doc. 95, at p. 152.  Petitioner goes on to state that Toby's declaration is consistent

with his state court testimony.  *Id*.  The declaration indicates the following in regard to what

Toby Barrett actually observed:

> Just before they raided the place, the first thing I saw were taillights that
> went past the driveway and then a flash of light—maybe like the interior light
> of a car when somebody opened a door to get out.  Then an SUV and a Crown
> Vic went up my great grandma's driveway and then the Bronco turned toward
> the house and I yelled "Dad."  I don't recall how many times I yelled it.  It all
> happened so fast.  I thought I saw dad come onto the porch for just a second,
> and then the Bronco was just coming over the ditch made a boom, like it

bottomed out, if that's where the sound came from.  I looked at the porch again and my dad was already gone.

The Bronco's headlights were coming toward me at first.  I know for sure that nothing hit the Bronco until it came to a stop in front of the house, because that's when the windshield exploded and a cop knocked me down and wouldn't let me look toward the house.  There may well have been shots before that—again it happened so fast and I was so scared, but my dad wasn't on the porch and I know for sure that nothing hit the Bronco before it came to a stop.

\* \* \* \* \*

The first police lights I seen was on the police car that crashed through the gate when the shooting was over.  I'm sure of that.  There was no vehicle near me.  The cop who knocked me down must have come over Grandma's fence.

Petitioner's Exhibit No. 96.

Based upon Toby's relationship to the petitioner, there is no question that his testimony would have been susceptible to impeachment for bias.  Further, Toby Barrett concedes that he had limited recall of what actually happened because it occurred so fast.  However, if as Toby claims he could identify the "Crown Vic" coming onto the property, this testimony would have allowed the prosecutor to argue that the defendant, who was somewhat closer to the vehicles, should also have been able to identify the same vehicle.  According to the testimony at trial, the "Crown Vic" observed by Toby had to be the marked police unit driven by Hash with the overhead light bar.  Thus, the prosecution could easily have argued, based on Toby's testimony, that the defendant had to have observed the light bar regardless of whether the emergency lights were activated or not.

Even though Toby Barrett might have testified that the defendant didn't fire until the lead Bronco had stopped in front of the house, this testimony would have been undermined

164

by his testimony that he was not sure when the shooting actually began and, therefore, it could have occurred, as the officers testified, before the Bronco stopped. Furthermore, to the extent no witness was able to place the defendant on the front porch during the shooting, Toby's testimony would have allowed the government to argue the defendant was on the front porch when the shooting began.

Additionally, defense counsel have submitted declarations in which they both claim that the petitioner "wanted to minimize the amount of testimony elicited from his relatives, particularly his son, . . . though he understood that decision could work to his detriment."[231] To counter these declarations, the petitioner submits declarations from family members who claim trial counsel never told them that Barrett didn't want them involved in case and/or that Barrett never told them he didn't want them involved. *See*, Petitioner's Exhibit Nos. 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, and 220. These declarations are full of hearsay. What the petitioner does not do, however, is submit his own declaration to refute counsel's declaration. Whether or not defense counsel advised Barrett's family of his conversations with Barrett and/or whether Barrett advised his family of his conversations with trial counsel are not the issue. Finally, to imply, as the petitioner does, that Toby Barrett's testimony was the difference between the more favorable results in the state court trials and the federal trial is nothing more than speculation and second-guessing in hindsight as to what might have been.

---

[231]*See*, Respondent's Exhibit Nos. 11 and 12.

165

While many of the facts between the two cases were the same, the state cases did not involve the same charges or all of the same witnesses as the federal case. Rather, in state court the petitioner was charged with murder and the evidence dealt solely with the raid and shooting which occurred during the raid. Whereas, in the federal case, Count 1 focused on the petitioner's using and carrying a firearm in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death; Count 2 focused on the petitioner's using and carrying a firearm in relation to a crime of violence and possessing a firearm in furtherance of such crime of violence, resulting in death; and Count 3 focused on intentional killing, during the commission of a drug trafficking crime, a state law enforcement officer engaged in the performance of his official duties. Thus, the jury heard much more evidence about the drug activities and/or associations with drug abusers which was occurring at Barrett's residence in the days and months shortly before the shooting. Further, the prosecutor would have been able to ask specific questions of Toby Barrett regarding the drug activities which were occurring on Barrett's property and, in light of the evidence which was seized from the travel trailer in which Toby supposedly lived, it would have been hard for him to deny knowing anything about those activities. As a result, this court finds defense counsel's decision not to call Toby Barrett was not unreasonable or prejudicial.

Petitioner also complains because trial counsel did not call Alvin Hahn to testify about what he saw approximately fifteen seconds after the shooting stopped. While the petitioner

claims Mr. Hahn would say "he saw only one vehicle with its police lights on,"[232] Mr. Hahn's declarations actually says "there was at least one vehicle with its police lights on."[233]  Mr. Hahn does not identify where that vehicle was located and certainly this statement does not preclude there having been several vehicles with emergency lighting on.  Furthermore, Mr. Hahn does not claim to have had an unobstructed view of the property such that he could have seen all of the vehicles.  Finally, to the extent Mr. Hahn could not testify about the lighting prior to the initiation of the shooting, it is unlikely his testimony would have altered the outcome of the jury's verdict.  As a result, this court finds counsel was not ineffective in failing to call Mr. Hahn as a witness nor was the petitioner prejudiced thereby.

9.  Failure of counsel to develop evidence that Barrett was not aware that there was an active felony arrest warrant outstanding

Petitioner asserts counsel provided ineffective assistance by not presenting evidence that he was unaware that the state court had issued a warrant for his arrest.  The government argues the petitioner failed to timely raise this argument and therefore, the statute of limitations bars this court's consideration of the same.

A review of the pleadings herein, convinces this court that the petitioner first raised this issue on September 25, 2009[234] and this court finds the allegations arise out of different facts in time than those alleged in the original and/or first amended motion.  Thus, the claim is barred by the statute of limitations.

---

[232]Doc. 95, at p. 153.

[233]Petitioner's Exhibit No. 75.

[234]*See*, Doc. 70, at pp. 173-174.

10.  Failure of counsel to contest James Horn's testimony

Petitioner also complains trial counsel were ineffective for failing to prepare for James Horn's testimony and to interpose a *Daubert*[235] challenge to the testimony prior to trial. Additionally, the petitioner asserts trial counsel were ineffective for failing to obtain an adequate curative instruction and/or to seek a mistrial after they successfully moved to strike Horn's testimony. Finally, the petitioner argues his appellate attorneys were ineffective for failing to argue that the jury's exposure to Horn constituted plain error. The government contends trial counsel's successful motion to strike Horn's testimony moots his various complaints about counsel's alleged failures to prepare for the witness. Additionally, the government argues the jury's exposure to Horn's testimony was not a valid basis for mistrial or an appellate claim of plain error.

Despite the petitioner's assertions regarding counsel's lack of preparation, it is clear counsel was prepared for Horn's testimony because he had been allowed to testify in both of the prior state trials.[236] After hearing Horn's testimony, including some of the cross-examination questions posed by defense counsel, the court became concerned that while Horn might have expertise concerning traumatic events, he was not being called to discuss the specific facts in the defendant's case. Thereafter, defense counsel moved to strike the testimony.[237] Since defense counsel had not completed their cross-examination, the court

---

[235]*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

[236]Cr. Doc. 327, J.T.Tr. Vol. 5, at p. 942.

[237]Cr. Doc. 327, J.T.Tr. Vol. 5, at p. 938.

168

took the issue under advisement and allowed defense counsel an opportunity to complete their cross-examination.[238] After defense counsel obtained the admission of Horn that he was not there to discuss any specific individual comments which the Tact Team members had made to him, defense counsel renewed their motion to strike Horn's testimony.[239] The court gave the government an opportunity to rehabilitate the witness but after defense counsel pointed out that Horn could not express an opinion about any of the individuals involved, the court  made the following findings:

> Based upon the testimony before the Court, there is no way to challenge Mr. Horn's theories in an objective sense.  While Mr. Horn clearly has had real life experiences far in excess of an average person dealing with the issues he discussed, this Court is not convinced that his testimony has been subjected to or been scientifically tested in such a manner to make the evidence reliable under *Daubert*.  The Court would note, however, based upon defense counsel's questioning, that the subject of Mr. Horn's testimony aimes (sic) to have been the subject of peer review and publication.  Furthermore, it would appear that defense counsel made a strategic decision to allow the testimony and then challenge it before the jury in an effort to discredit the value of the testimony.  Defense counsel did an admirable job in his cross examination of Mr. Horn.  Generally, a trial court's focus should not be on the methodology employed in reaching those conclusions.  That's by Butler (sic) versus A.O. Smith, 391 F.3d 1114, at 1121, 10th Cir. 2005.
>
> This Court doesn't know what methodology was used, nor what conclusions Mr. Horn reached, if any, based upon the actual facts involved in this case.  Furthermore, as indicated earlier, this Court does not believe Mr. Horn's testimony will assist the tryer (sic) of fact in determining the issues herein.  At best, Mr. Horn's testimony is simply an attempt by the government to bolster the credibility of its witnesses for memory lapses of those witnesses at issue.  Additionally, my review of Mr. Horn's testimony leaves me with a definite conviction that Rule 702 only authorizes testimony by an expert in the form of an opinion, if, (1), the testimony is based on sufficient facts or data;

---

[238]Cr. Doc. 327, J.T.Tr. Vol. 5, at p. 949.

[239]Cr. Doc. 327, J.T.Tr. Vol. 5, at p. 958.

(2), the testimony is the product of reliable principles and methods; and (3), the witness has applied the principles and methods reliably to the facts of this case, and I emphasize the facts of this case. Mr. Horn did not testify regarding any opinions based on the underlying facts or data of this case or the individual responses of the officers involved. He did not offer an opinion regarding the specific facts of this case or identify any reliable principles or methods which he actually applied to the facts of this case. Rather, his testimony indicated that his focus was on helping the officers cope with the traumatic experience, not critiquing the differences in their memories or whether the differences were explained by the traumatic event they experienced.

Therefore, this Court finds Mr. Horn's testimony is neither reliable, nor will it assist the tryer (sic) of fact in determining an issue of fact in this case pursuant to Rules 702 and 1046 (sic) of the Federal Rules of Evidence. It should not have been admitted herein. Accordingly, I'm going to strike the testimony and admonish the jury to disregard it.

Cr. Doc. 336, J.T.Tr. Vol. 8, at pp. 1634-1636.

Later that day, the court advised the jury that it had struck Horn's testimony and

instructed the jury as follows:

Ladies and gentlemen of the jury, when we started this trial I gave you some preliminary instructions to guide you in your participation in this trial. As I advised you at that time, it is my duty to determine the law applicable to this case and it is your duty to accept and follow my instructions regardless of whether or not you agree with the law. As a matter of law, I have determined that the testimony which you heard on Monday afternoon and Tuesday morning of James Horn should not have been admitted into this trial. You should not speculate about the reasons for my ruling on this issue; it is based solely on my interpretation of the law applicable in this case. Therefore, I instruct you that you should disregard Mr. Horn's testimony in its entirety and not consider it for any purpose in making your decision when reaching a verdict in this case.

*Id.*, at pp. 1739-1740.

Federal courts are to

presume that jurors will follow clear instructions to disregard evidence 'unless there is an overwhelming probability that the jury will be unable to follow the

170

court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant.' *United States v. Cabellero*, 377 F.3d 1235, 1243 (10th Cir. 2002) (quoting *Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987)).

*United States v. Lamy*, 521 F.3d 1257, 1266 (10th Cir. 2008).

A careful review of Horn's testimony establishes that the testimony was potentially as helpful to the defendant as to the government in that defense counsel's cross-examination focused on the unreliability of witness testimony six years after the event providing opportunities for defense counsel to argue there was reasonable doubt about what occurred during the raid on Barrett's property.[240] Because the testimony was potentially helpful to the defendant and because the jury was admonished to disregard the testimony in its entirety, this court finds the petitioner has failed to establish that defense counsel's strategy was unreasonable or that he was prejudiced by the jury hearing the testimony or trial counsel's failure to move for a mistrial following the court's striking of the testimony in its entirety. As a result, the petitioner's claim of ineffective assistance of counsel must fail. Furthermore, since the petitioner was not prejudiced by trial counsel's actions, appellate counsel was not ineffective in failing to raise this issue on appeal.

11. Trial counsel's failure to make "proper objections"

Next, the petitioner claims trial counsel were ineffective for omitting objections which resulted in the appellate court reviewing many of his appellate claims for "plain error." Doc. 95, at pp. 178-180. Barrett has not, however, established that he was prejudiced by the

---

[240] *See*, Cr. Doc. 326, J.T.Tr. Vol. 4, at pp. 863-889 and 891-917; and Cr. Doc. 327, J.T.Tr. Vol. 5, at pp. 950-957 and 972-975.

171

failure of trial counsel to object to any of the items which the Tenth Circuit reviewed for plain error.

Specifically, Barrett first argues trial counsel was ineffective for failing to object to "the prosecution's violation of Oklahoma state law requirements for nighttime search warrants." *Id.* In considering the merits of this claim, the Tenth Circuit found "there was no error on the part of the district court, let alone plain error." *United States v. Barrett*, 496 F.3d 1079, 1089 (10th Cir. 2007). Thus, the petitioner can not establish prejudice.

Second, Barrett claims trial counsel was ineffective for failing to object to "the improper execution of search warrants by federal officers" and "the violation of Fed.R.Crim.P. 41, because no federal judge or magistrate authorized the search warrant executed on Mr. Barrett's home." Doc. 95 at p. 178. In rejecting Barrett's challenge to the execution of the search warrants, the Tenth Circuit found it was permissible under Oklahoma law for the federal law enforcement officers mentioned in the search warrant to be involved in the execution of the warrant. *Barrett*, 496 F.3d, at p. 1090. Additionally, the Tenth Circuit found the warrant was not federal in character. *Id.*, at p. 1091. Therefore, the warrant was not subject to the requirements of Fed.R.Crim.P. 41. As a result, even if trial counsel had objected to federal officers being involved in the execution of the warrant, Barrett would not have prevailed on this claim.

Barrett also argues trial counsel was ineffective in failing to raise various objections to the indictment. Doc. 95 at p. 178. Again, although the Circuit Court reviewed Barrett's challenges to the indictment for plain error, the court made clear that there was no error in

172

the indictment.  *See*, *e.g.*, *Barrett*, 496 F.3d at 1093 (". . . Counts 1 and 2 of the superseding indictment clearly gave Barrett fair notice of the charges he had to defend against, and likewise were sufficient to enable him to assert a double jeopardy defense . . ."); *id*. at 1094 ("As for Barrett's second sufficiency-related argument, it is unnecessary for a criminal defendant charged with a § 924(c) offense to be separately charged with and convicted of the underlying offense."); and *id*. at 1094-95 (rejecting *Ring*[241] claim because it did not apply to defendant's indictment).  Additionally, in rejecting the defendant's multiplicity argument, the Tenth Circuit applied the same test to the indictment that would it would have utilized under *de novo* review,  *i.e.*, the test established in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).  The Tenth Circuit also rejected "Barrett's misjoinder arguments as wholly lacking in merit."  Finally, a previously indicated herein, the superseding indictment was legally sufficient.  As a result, this court finds trial counsel was not ineffective in failing to make futile objections to the indictment.

Further, Barrett challenges trial counsel's failure to object to the victim impact evidence.  In reviewing this claim on appeal, the Tenth Circuit found:

> . . . . the victim impact testimony now objected to by Barrett was relevant and properly admitted by the district court to show Eales' uniqueness as an individual human being. . . . . . we conclude there was no error, let alone plain error, arising from the admission of this victim impact testimony.
>
> * * * * *
>
> . . . it is clear that the district court did not violate the Federal Rules of Evidence in admitting the challenged testimony from Kelli Eales.

---

[241]*Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

173

*Barrett*, 496 F.3d, at pp. 1099-1100.  Additionally, as to the admission of four photographs of Trooper Eales, the Circuit Court held ". . . we are not persuaded that the district court committed any error, let alone plain error, in admitting these four photographs.  *Id.*, at p. 1101.  Given the Tenth Circuit's consideration of Barrett's challenges to the victim impact evidence, it is clear that a different result would not have been reached even if trial counsel had interposed objections to the victim impact evidence.  As a result, Barrett was not prejudiced by trial counsel's lack of objections to this evidence.

Petitioner next challenges trial counsel's failure to object to "the prosecutor's use of racially motivated strikes in violation of *Batson*."[242]  While the petitioner states "defense counsel failed to present reasons why the government's purported race-neutral reasons for peremptory strikes were false and pretextual,"[243] the petitioner presents no argument to support this conclusory statement.  Further, the petitioner's *Batson* claim would have been rejected even if counsel had  made contemporaneous objections to the government's peremptory strikes.  *See*, *Barrett*, 496 F.3d, at 1105-1106.  Thus, trial counsel was not ineffective for failing to raise a frivolous objection.

Petitioner also alleges trial counsel was ineffective for failing to challenge the constitutionality of the federal death penalty statutes.  While the Tenth Circuit referred to the plain error standard in rejecting the challenges on appeal, it is clear that the same result would have been reached if the court had reviewed the claims *de novo*.  Specifically, the

---

[242]*Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

[243]Doc. 95, at p. 179.

174

petitioner's challenge to the federal death penalty statute's use of non-statutory factors in aggravation was foreclosed by prior Tenth Circuit precedent, to-wit: *United States v. McCullough*, 457 F.3d 1150, 1162 (10th Cir. 2006).  Similarly, the petitioner's challenge regarding proportionality review was governed by prior Supreme Court precedent, to-wit: *Pulley v. Harris*, 465 U.S. 37, 43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).  Furthermore, even if trial counsel had argued that the court's use of "a relaxed standard for the admissibility of evidence" violated *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), it is clear this challenge would have not been successful.  *See*, *Barrett*, 496 F.3d, at 1109-1110 ("Although the Court in *Woodson* emphasized that it is constitutionally problematic for a jury in the sentencing phase of a capital case to be provided "unguided and unchecked . . . discretion," 428 U.S. at 302, 96 S.Ct. 2978, the sentencing phase evidentiary standard employed by the FDPA clearly does not afford the jury any such unbridled discretion.")  Finally, the petitioner would have faired no better if trial counsel had challenged  the "impermissibly vague aggravating factors,"[244] since the Tenth Circuit held ". . .it is clear that § 848's general allowance of non-statutory aggravating factors is constitutionally permissible," *Barrett*, 496 F.3d, at 1110, and the petitioner makes no attempt in his motion to vacate to address any particular non-statutory aggravating factor alleged in his case.  Furthermore, the petitioner still does not attempt "to explain how this alleged deficiency in § 848's sentencing scheme prejudiced him."  *See*, *id*.  Therefore, this court finds trial counsel was not ineffective for failing to raise these arguments.

---

[244]Doc. 95, at p. 179.

175

Next, the petitioner has asserted that counsel was ineffective for failing to challenge "the improper double counting of Mr. Barrett's alleged intent to kill as both a special circumstance and an aggravating factor." Doc. 95, at p. 179. In rejecting this claim on appeal, the Tenth Circuit held ". . Barrett has failed to establish any error, let alone plain error, resulting from the manner in which the jury was instructed to utilize the mental culpability aggravating factor in determining the appropriate sentence with respect to Count 3." *Barrett*, 496 F.3d, at 1111. As a result, this court finds counsel was not ineffective in failing to raise this objection.

Finally, the petitioner asserts trial counsel was ineffective for failing to object to "the Government's improper failure to give timely discovery of the names of seven prosecution witnesses called to establish Mr. Barrett's intent to kill." Doc. 95 at p. 179. To the extent that the trial in Barrett's case did not commence until the jury voir dire began, *see*, *Barrett*, 496 F.3d, at 1115-1117, the government was not required, pursuant to 18 U.S.C. § 3432, to turn over the names of its witnesses until three days prior to Monday, September 26, 2005. The government disclosed these witnesses on September 19, 2005 or a full week before Petitioner's trial actually began. As a result, this court finds counsel was not ineffective in failing to raise this objection.

## Petitioner's Challenge to Second Stage of Trial

Petitioner claims that trial counsel acted ineffectively in failing to present mitigating evidence regarding his dysfunctional childhood and that he suffered from bipolar syndrome and organic brain damage. Petitioner claims "trial counsel had a duty to retain a mitigation

176

1247

specialist to assist in preparation for the penalty phase" of trial and that trial counsel failed to consult with experts and/or counter the government's case.  Doc. 95 at p. 186.

In support of this allegation, the petitioner has submitted declarations from three attorneys who have opined as to the effectiveness of representation provided by trial counsel.[245]  Each of these declarations are laden with hearsay and contain no citations to the record of what actually occurred in this case.   The first affidavit is from John Echols regarding what he felt should have been done after he voluntarily requested permission to withdraw from the case.  *See*, Petitioner's Exhibit No. 34.  Despite Mr. Hilfiger's extensive federal criminal trial experience as well as prior experience trying a federal death penalty case in the Eastern District of Oklahoma, Mr. Echols states "Mr. Hilfiger was not qualified" to act as first chair in a federal capital case.  Further, it is interesting that Echols, who the Federal Public Defender represented as being qualified to try this case, claims several additional things needed to be done to adequately prepare for the second stage of a capital case.  However, based upon his own statements these things were not done for either of the two prior state court capital trials which he was responsible for trying.

Mark Hendricksen states:

It was apparent to me after reviewing the trial transcript, the other transcripts in association with the federal trial, and the investigation that was conducted by Messrs. Hilfiger and Smith that nothing close to a complete second stage investigation was ever conducted.  There was effectively no second stage investigator for Mr. Barrett.

---

[245]Petitioner also cites to exhibits which have no discernable relevance to the allegations regarding ineffective assistance of trial counsel during the second stage of trial.  *See*, Petitioner's Exhibit Nos. 50 and 51.

177

Petitioner's Exhibit No. 29, at p. 1.

Finally, Julia O'Connell submits a declaration containing her "suspicions" and "impressions" regarding trial counsel as opposed to factual information. Further, without any knowledge as to what information counsel actually possessed or even when the trial was scheduled to start, she states "there was no time for an adequate second stage investigation." Petitioner's Exhibit No. 67.

Despite the petitioner's allegations that trial counsel did not secure the services of a mitigation specialist, the record in this case establishes that counsel did, in fact, retain a mitigation specialist.[246] This specialist, Dr. Jeanne Russell and another psychologist met with the petitioner in the jail[247] and Dr. Russell updated her information about the defendant and was prepared to talk about prison life and future dangerous.[248] Petitioner, however, did not want to present a case in mitigation that centered on sympathy for him or dwell on his family even though he was apprised by counsel that this could work to his disadvantage. *See*, Government's Exhibit Nos. 11 and 12. Additionally, as previously discussed herein, defense counsel met with several of the petitioner's relatives and none of them provided any information that led counsel to believe the petitioner suffered from a significant mental health condition. *Id.* Petitioner was cooperative, helpful and communicative with counsel. He was well behaved in trial and had a clear understanding of the proceedings. *Id.* While the

---

[246] *See*, CJA Voucher No. 06022A000004.

[247] *See*, Government Exhibit No. 5.

[248] *Id. See also*, letter from Roger Hilfiger attached to the CJA Voucher.

178

petitioner has produced documents and declarations establishing that his family is genetically predisposed to mental illness, he has not shown that this information was ever shared with trial counsel or that there were any documents in the files delivered to trial counsel that would have suggested a need to investigate the possibility of mental illness.  Trial counsel have no memory of having received the report from Bill Sharp which the petitioner now claims should have informed trial counsel of the need to investigate the petitioner's mental health.  *Id.*  Petitioner has not presented any evidence to show counsel were ever provided this specific information.  In fact, although OIDS had boxes of files delivered to Mr. Hilfiger, according to the declaration by Steve Leedy, at least one box of OIDS' files remained in his office.[249]  Since counsel did not know of facts that should have alerted them to the need to conduct a mental health examination, their failure to investigate this issue further can not be considered deficient.  *See*, *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003).

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.

*Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066.  Thus, competent counsel would choose to omit investigation of areas which they had no basis to suggest would be fruitful and focus on areas they knew would be important at trial.

Even assuming Petitioner's allegations that trial counsel provided ineffective assistance in the second stage were true, this court finds the petitioner has failed to establish

---

[249]Petitioner's Exhibit No. 111.

179

prejudice.  Specifically, defense counsel presented testimony during the second stage to establish that the defendant was a valuable member of his family and community who had been treated unfairly by the government.  Defense counsel made a strategic decision not to focus on Barrett's history of drug abuse because they felt it would not be well received by the jury.  *See*, Government's Exhibit Nos. 11 and 12.

As a result, counsel presented evidence that the defendant had already been punished for the death of Trooper Eales and the shooting of Trooper Hamilton and that the defendant had no prior felony convictions.[250]  Additionally, counsel presented evidence from the defendant's case manager[251] at the Oklahoma Department of Corrections to establish that the defendant was being treated differently than other inmates with the same security level based on a decision from top management.  According to the testimony, as a result of the administrative notice, the defendant would not be able to receive the normal good time credits allowed other inmates and he would be locked down at the Oklahoma State Penitentiary (a maximum security prison) twenty-three hours a day.[252]  The evidence also established the defendant had not engaged in any acts of misconduct while in prison and that he was considered moderately likely to succeed if provided with substance abuse treatment.[253]

---

[250]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4715-4782.

[251]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4794-4877.

[252]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4823-4827.

[253]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4828 and 4840-4843.

Counsel also presented evidence from several of the defendant's friends and relatives that gave the jury some insight into his upbringing. Basically, Kathy Trotter, the defendant's cousin, testified that she grew up with the defendant. While she moved away from the community when she was a senior in high school, Ms. Trotter testified she moved back and had been a process server for sixteen years and, therefore, she was very familiar with what happened in her community. Ms. Trotter testified she never knew of any violent actions on the part of the defendant, prior to September 1999, other than rumors about his marriage to Abby Stites. Ms. Trotter also testified that everyone in the defendant's family grew up around and always had guns.[254]

The defendant's brother, Steven Barrett, testified that the defendant is seven (7) years older than him and that they have another brother, Richard, who is two (2) years younger than the defendant. He also testified that his parents were divorced when he was approximately two years old and moved to Sallisaw when he was four years old. Further, he testified that the defendant was not a violent person; rather, he was just anti-social and preferred to be by himself. Steven admitted that the defendant had smoked marijuana when he was younger; but he was not aware of the defendant using any other drugs.[255]

Roger Crawford, the defendant's uncle and neighbor, testified that the defendant was a good neighbor who could always be counted upon if his uncle ever needed anything. Crawford testified he never felt threatened by the defendant and that he had been over to the

---

[254]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4783-4793.

[255]Cr. Doc. 353, J.T.Tr. Vol. 25, at pp. 5030-5051.

181

defendant's when the defendant overhauled an engine for him.  He indicated Barrett was a good hardworking mechanic and a good framer, carpenter.  While Crawford said he might have suspected the defendant used drugs, he had no personal knowledge that the defendant had ever used drugs.  Finally, Crawford testified that Barrett was "a good person," who had a good relationship with his son.[256]

Craig and Clyde Edgmon also indicated the defendant was a good neighbor and that they had never known him to be violent or make any kind of threats to anyone.  Further, they testified Barrett was a good mechanic and that he did a lot of mechanical work for them  for small sums of money and/or for free.[257]

The defendant's mother, Gelene Dotson, advised the jury that she lived in Illinois and New Jersey with her husband and three sons until she left her husband, Ernie Barrett, and moved back with her sons to Oklahoma.  She testified the defendant was 12 years old when she moved back to Oklahoma and that he went to school in Sallisaw.  She indicated the defendant was an average boy, but he was always hyper.  She also testified Barrett moved back to Indiana and lived with his dad for a year when he was in the 9th grade and then he came back to Oklahoma and lived with her.  When the defendant was 16 he quit school, after a disagreement with the superintendent over the length of his hair.  Once he quit school, Dotson indicated that the defendant went to work at Blue Ribbon Downs caring for horses for about a year.  After he turned 18, the defendant left home to work pipeline and oil rigs

---

[256]Cr. Doc. 353, J.T.Tr. Vol. 25, at pp. 5052-5070.

[257]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4920-4927 and 4929-4939.

in Western Oklahoma. While working pipelines in Idaho, the defendant came back to Sallisaw around 1980 and married Abby Stites. Dotson testified the defendant had a stormy relationship with his wife indicating, however, that there arguments were verbal not physical. After about 13 years of marriage, the defendant and his wife got a divorce. At the time of the divorce, Dotson stated the defendant worked out of town all week and would come and stay at her house with her on the weekends. Shortly thereafter, in about 1994, the defendant began building his cabin next door to her house. Dotson denied ever seeing the defendant use drugs. The defendant ate his meals and took showers at Dotson's house. Dotson also told the jury that the defendant seemed calmer since the incident and that he knew he had made a wrong decision on the night of the shooting and if he could he would do it differently. Finally, Dotson advised the jury that although she had disagreements with the defendant over the years, he never touched her physically and she never feared that he would.[258]

Abby Stites, the defendant's ex-wife and mother of his son Toby, testified that she was married to the defendant for 14 years. During the marriage, Stites admitted that the couple often engaged in mutual physical combat. Stites indicated, however, weapons were never used. Stites further testified that she often observed the defendant boasting of a willingness to use violence, but she had never seen him act on those threats. Finally, Stites mentioned the fact that she had participated in an effort to have Barrett committed to a

---

[258]Cr. Doc. 353, J.T.Tr. Vol. 25, at pp. 5071-5105.

183

hospital in 1986, because she felt like he needed "mental help."[259]  Following her divorce

from the defendant, she testified they shared joint custody of their son.[260]

Ernest Barrett, the defendant's father, also testified conceding that he did not have a

close relationship with his son until after this incident.  Mr. Barrett testified that he visits with

his son by phone, letter and that he had visited him every other week when he was in the

county jail.  Further, Mr. Barrett stated that he never knew the defendant to be violent

towards anyone.  Moreover, Mr. Barrett advised the jury that the defendant was sorry for

what had happened and that the defendant never really intentionally shot anybody; rather, all

he ever saw was a headlight.[261]  Finally, Doris Barrett, the defendant's step-mother testified.

She claimed that she had developed a very close relationship with the defendant following

the shooting incident.  She testified she cared for the defendant like her own son; that she was

very concerned about him; and she intended to maintain her relationship with him.[262]

Trial counsel tried to persuade the defendant to testify during the second stage, but

despite not having been in the courtroom to hear the evidence prior counsel John Echols,

through the defendant's step-mother, convinced the defendant that he should not testify.  *See*,

computer disk of telephone calls from Muskogee County Jail attached to Cr. Doc. 265.  In

this court's opinion, this decision had a negative effect on the jury who had witnessed the

---

[259]Although Stites claimed the defendant needed "mental help," records introduced by the defendant from the Oklahoma Department of Corrections indicated the defendant was inpatient at Eastern State Hospital for drug treatment in 1987. *See also*, Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4830-4831.

[260]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4877-4920.

[261]Cr. Doc. 353, J.T.Tr. Vol. 25, at pp. 5105-5119.

[262]Cr. Doc. 353, J.T.Tr. Vol. 25, at pp. 5119-5125.

defendant display absolutely no remorse by jumping out of his seat and verbally attacking the prosecutor during closing arguments and then requesting to be removed from the courtroom.     While the defense case was not ultimately successful, this court agrees with the government that, it was clearly persuasive.  After hearing the evidence and observing the defendant's own conduct, the jury unanimously found that the defendant was not likely to commit future acts of violence. Cr. Doc. 258.  Furthermore, the jury unanimously found the following mitigating factors: 1) the defendant, at the time of the incident, had no prior felony convictions; 2) the defendant was a father; 3) the defendant was a loved son and stepson; and 4) the defendant's death will impact his child, family and friends.  *Id*.  A majority of the jurors also found the defendant was a good neighbor and friend.  *Id*.  Additionally, five jurors found that the defendant had accepted responsibility for Eales's death from his prior conviction and that he had been punished and convicted for that death.  *Id*.  Finally, two jurors found as mitigating factors that the defendant did not constitute a future danger to society.  *Id*.

To the extent the petitioner now argues his counsel should have presented evidence that he was mentally ill and came from a dysfunctional family, he simply can not show that such evidence would have led to a more favorable outcome.  Many of the records contained within the petitioner's medical records could have been used by the government to totally negate the jury's findings that the petitioner was a loved son and stepson, a good neighbor and friend, or a person whose death would have an impact on his family and friends.  While the petitioner may have obtained a diagnosis of bipolar syndrome, post-traumatic stress

185

disorder and organic brain damage in 2009, the medical records which he has submitted establish that medical professionals who saw him much closer to the murder observed that the petitioner was a dangerous and assaultive drug addict. For instance, on October 8, 1986, Abby Barrett, the Petitioner's ex-wife, executed a sworn statement in which she stated, in part:

> Kenny Barrett has sexually abused me, he has threatened to kill me, he has threatened to kill himself. He has came and kidnapped my son, . . . . He has come in my house sliced up all my furniture, before he took everything and burned it in the front yard. Kenny is a very dangerous person to himself and others. He is abusing drugs, . . . .

Government Exhibit No. 13. The medical document prepared by the staff at Eastern State Hospital that same day describes the petitioner has having no neurological impairment and the petitioner denies he has had any head injuries. Government Exhibit No. 15. Another document indicates the petitioner did not follow thru with his psychiatric regimen following a prior suicide attempt and that the petitioner had a history of drug abuse. Government Exhibit No. 16. The discharge summary nine days later, indicates, in part:

> Patient and his ex-wife are not getting along; ex-wife reports he sexually and physically assaulted her, not knowing if charges would be filed or not, and the mother of the patient petitioned for a commitment for treatment of the patient. . . . . Patient has been abusing different kinds of drugs since the age of 16, and admitted taking marijuana and downers.

> \* \* \* \* \*

> PROGNOSIS: Guarded, because of the unpredictability of his behavior, depending on the circumstances and depending on whether or not he is taking drugs at the time.

Government's Exhibit No. 16.

1257

A report explaining the denial of a social security claim decided a few months after the petitioner's stay at Eastern State hospital summarized the petitioner's medical records as far back as 1980, concluding that the petitioner showed "no signs of a severe mental illness" and was able most of the time "to think clearly and carry out normal activities." Government's Exhibit No. 20.

In January of 1995, the petitioner was brought to the emergency room of the Sequoyah Memorial Hospital in an agitated state by his mother. He was treated with Haldol and received a provisional bi-polar diagnosis. Government's Exhibit 19. Three days later, however, the petitioner was discharged with a final diagnosis of organic effective disorder, polysubstance abuse, amphetamine dependence, urine drug screen positive for cannabis and marital conflicts. Government's Exhibit 18. According to the medical records, the petitioner reported "that he got into an argument with his wife and he was afraid that he was going to lose his temper and so he decided that he would leave home for a little while, come here and cool himself down." *Id.* Additionally, the treating doctor indicated that the petitioner

> did not appear anxious or depressed. . . .Petitioner reported that he was feeling calm, denying any suicidal/homicidal ideations, denying any auditory or visual hallucinations. Thought process was not paranoid or delusional. Patient's memory was intact in all three spheres. He had good attention and concentration span. . . . .

*Id.* Finally, at the time of the murder, a blood test established that the petitioner had used amphetamines and marijuana. Government's Exhibit No. 17.

As the government points out, "Barrett's records demonstrate that his entire mental health history was inextricably tied to his use of illegal drugs." Doc. 175, at p. 149. As

187

previously indicated, the petitioner's trial counsel did not believe the jury would be sympathetic to the petitioner's drug use[263] and the petitioner has failed to establish that the introduction of this evidence would not have been more negative than positive. To the extent that this evidence would have shown the petitioner was drug-dependent and violent towards his own family, this evidence would have strengthened the government's argument that he was a future danger to society.

Moreover, while the petitioner goes to great links to establish that many of his relatives suffered hardships or the effects of mental illness, he fails to establish any nexus between the suffering of his relatives and any viable theory of mitigation. Evidence that the petitioner had suffered a dysfunctional upbringing at the hands of mentally ill relatives could have also convinced the jury not only that the petitioner was a future danger but also that his family was too dysfunctional to have cared about him.

Finally, if the petitioner had introduced the evidence now offered, the government would have been able to introduce evidence from their mental health expert, which trial counsel was aware of, that would have portrayed the petitioner as a psychopath. *See*, Cr. Doc. 238. Thus, this court finds the omitted evidence could only have been submitted as an alternative theory to the mitigation case actually developed by trial counsel. Accordingly, this court finds the attack on trial counsel's strategy is based entirely upon the benefits of hindsight and, therefore, is inappropriate. Petitioner has completely failed to establish he was prejudiced by the omission of evidence regarding his alleged mental illness.

---

[263]Government's Exhibit Nos. 11 and 12.

188

Furthermore, if the defendant had called an expert to testify about his alleged mental deficiencies, the government would have countered that testimony with their own expert. *See*, Cr. Doc. 237.  Just from the portion of the psychological report submitted to defense counsel, they had to have been concerned about Dr. Price potentially testifying that the defendant was a psychopath.  *See*, Cr. Doc. 238.  Moreover, since Dr. Russell had conducted and updated her risk assessment of the defendant, counsel made a tactical decision after consulting with Dr. Russell "that a mitigation expert would be more detrimental than advantageous"[264] to the defendant.

## B.  *Ineffectiveness of Appellate Counsel*

Having found no merit to the allegations of ineffective assistance of trial counsel, this court finds no merit to those same claims raised as ineffective assistance of appellate counsel for failure to raise those issues on appeal.  Accordingly, this claim is denied.

## XIV.  CUMULATIVE EFFECT OF ERRORS

Petitioner alleges in his nineteenth ground for relief that the cumulative effect of the errors involved in his case "violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness" and, therefore, his conviction and sentence must be vacated.  In considering cumulative error, the Tenth Circuit has indicated a reviewing court should conduct the same inquiry as for individual errors – were the defendant's substantial rights affected; with the focus being on "the underlying fairness of the trial."  *United States*

---

[264]*See*, letter of Roger Hilfiger attached to CJA voucher # 060224000004.

1260

*v. Woods*, 207 F.3d 1222, 1237 (10th Cir. 2000).  Having reviewed the entire record in this case, this court finds the petitioner ultimately received a fundamentally fair trial.  Simply because the federal jury's sentence was different from the previous state court trials on different charges does not establish that Petitioner was denied a fair trial.  Accordingly, this claim is also denied.

## XV.  EVIDENTIARY HEARING

In his request for relief (Doc. 95 at pp. 400-401), the petitioner requests leave to conduct discovery and asks for an evidentiary hearing to resolve any factual disputes.  As the disposition of the petitioner's Motion does not require reference to any materials beyond those that are available and currently before the court, this court finds that: 1) the petitioner has failed to establish good cause to conduct discovery herein; and, 2) an evidentiary hearing is not necessary to resolve the issues raised in the petitioner's Motion to Vacate.  Accordingly, the petitioner's request for an evidentiary hearing is denied.

## CONCLUSION

For the reasons stated herein, the petitioner's Motion to Vacate, Set Aside, or Correct a Sentence, pursuant to 28 U.S.C. § 2255, is hereby denied.  Furthermore, this court finds the petitioner has failed to make a "substantial showing" of the denial of any constitutional rights. 28 U.S. § 2253(c)(2).  Therefore, pursuant to Rule 11 of the Rules Governing Section 2255 Proceedings, this court hereby declines to issue a certificate of appealability.

Finally, based upon the findings herein, this court hereby denies petitioner's motion to vacate or modify protective orders and request for hearing (Doc. 184), petitioner's motion

for leave to conduct discovery (Doc. 186), and petitioner's motion for reconsideration of

court's order of June 20, 2012 (Doc. 212).

**It is so ordered on this  16th  day of August, 2012.**

James H. Payne
United States District Judge
Eastern District of Oklahoma

1262

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,                    )
                                           )
            Petitioner,                    )
                                           )
v.                                         )        Case No. 09-CV-105-JHP
                                           )
UNITED STATES OF AMERICA,                  )
                                           )
            Respondent.                    )

## JUDGMENT

This matter came before the Court for consideration of defendant's motion to vacate,

set aside, or correct sentence, pursuant to 28 U.S.C. § 2255.  The issues having been duly

considered and a decision having been rendered in accordance with the Order filed

simultaneously herewith,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment is entered

for respondent, United States of America, and against petitioner, Kenneth Eugene Barrett, on

his challenge to the legality of his sentence.


IT IS SO ORDERED this 16th day of August, 2012.


_____
James H. Payne
United States District Judge
Eastern District of Oklahoma

# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | DEATH PENALTY CASE |
| | ) | |
| vs. | ) | Case No. 6:09-cv-00105 JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## PETITIONER'S MOTION TO ALTER OR AMEND JUDGMENT
### (Doc. Nos. 214, 216) and BRIEF IN SUPPORT

DANIEL J. BRODERICK, #89424
Federal Defender
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
JOAN M. FISHER, Idaho Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: (916) 498-5700

DAVID B. AUTRY, OBA #11600
Attorney at Law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: (405) 521-9600

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Petitioner's Motion to Alter or Amend Judgment          Barrett v. United States
(Doc. Nos. 214, 216) and Brief in Support               Case No. 6:09-cv-00105-JHP

1264

**TABLE OF CONTENTS**

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     STANDARD GOVERNING APPLICATION OF FED. R. CIV. P. 59(e) . . . . . . . . . . . 3

III.    THE COURT'S OPINION DEMONSTRATES JUDGE PAYNE'S
        INABILITY TO ADJUDICATE CLAIMS WITHOUT BIAS OR
        PARTIALITY SUCH THAT HE SHOULD HAVE RECUSED
        HIMSELF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.     The Court Has Treated Mr. Barrett Different From Similarly
               Situated Litigants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        B.     The Court Evidenced Its Bias Towards Mr. Barrett In Its
               Written Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.     THE COURT COMMITTED LEGAL ERROR BY ENGAGING IN
        SUBJECTIVE ANALYSIS AND NOT ALLOWING FOR FACTUAL
        DEVELOPMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.     The Court Erred by Failing to Conduct an Evidentiary Hearing . . . . . . . . . . . . 10

        B.     Specific Examples of the Court's Wrongful Use of Subjective
               Analysis or its Own Recollection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

               1.     Judicial Interference with Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

V.      THIS COURT ERRED BY DENYING MR. BARRETT A CERTIFICATE
        OF APPEALABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

VI.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Petitioner's Motion to Alter or Amend Judgment                                    Barrett v. United States
(Doc. Nos. 214, 216) and Brief in Support              -i-                        Case No. 6:09-cv-00105-JHP

1265

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Abdul-Kabir v. Quarterman*, 553 U.S. 233 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Aron v. United States*, 291 F.3d 708 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Barefoot v. Estelle*, 463 U.S. 880 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Bracy v. Schomig*, 286 F.3d 406 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Commonwealth Property Advocates, LLC v. Mortgage Electronic Registration Systems, Inc.*, 680 F.3d 1194 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . 3

*Ellis v. United States*, 313 F.3d 636 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

*Florida v. Nixon*, 543 U.S. 175 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Fontaine v. United States*, 411 U.S. 213 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hicks v. Town of Hudson*, 390 F.2d 84 (10th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re Murchison*, 349 U.S. 133 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Lavespere v. Niagra Machine & Tool Works*, 910 F.2d 167 (5th Cir. 1990) . . . . . . . . . . . . . . 3, 4

*Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988) . . . . . . . . . . . . . . . . . . . . 16

*Liteky v. United States*, 510 U.S. 540 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Machibroda v. United States*, 368 U.S. 487 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Massaro v. United States*, 538 U.S. 500 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Miller-El v. Cockrell*, 537 U.S. 322 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Mills v. Maryland*, 486 U.S. 367 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Moreno v. Dretke*, 450 F.3d 158 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Murchu v. United States*, 926 F.2d 50 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Petitioner's Motion to Alter or Amend Judgment                                    Barrett v. United States
(Doc. Nos. 214, 216) and Brief in Support                    -ii-                 Case No. 6:09-cv-00105-JHP

1266

*Nichols v. Alley*, 71 F.3d 347 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Slack v. McDaniel*, 529 U.S. 473 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Smith v. Texas*, 543 U.S. 37 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Stead v. United States*, 67 F. Supp. 2d 1064 (D.S.D. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 12

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Taylor v. Hayes*, 418 U.S. 488 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Tennard v. Dretke*, 542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Townsend v. Sain*, 372 U.S. 293 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

*Tumey v. Ohio*, 273 U.S. 510 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Becker,* 109 Fed. Appx. 264, 268, 2004
        WL 1949154 at *3 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Cooley*, 1 F.3d 985 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*United States v. Duran-Salazar,* 307 Fed. Appx. 209, 211, 2009
        WL 74476 at *2 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Greenspan*, 26 F.3d 1001 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Lopez*, 100 F.3d 113 (10th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Pearson*, 203 F.3d 1243 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Ringer*, 139 Fed. Appx. 969, 973, 2005
        WL 1666105 at * 4 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Weeks*, 653 F.3d 1188 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Ward v. Village of Monroe*, 409 U.S. 57 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Warren v. American Bankers Insurance*, 507 F.3d 1239 (10th Cir. 2007) . . . . . . . . . . . . . . . . 3

Petitioner's Motion to Alter or Amend Judgment                                    Barrett v. United States
(Doc. Nos. 214, 216) and Brief in Support                 -iii-                   Case No. 6:09-cv-00105-JHP

1267

*White v. New Hampshire Department of Employment Sec.*, 455 U.S. 445 (1982) . . . . . . . . . . . . 3

*Wiggins v. Smith*, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Williams v. Taylor*, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Wood v. Georgia*, 450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18

## FEDERAL STATUTES

28 U.S.C. § 2253(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 22

28 U.S.C. § 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 2254(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 U.S.C. §2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 25

28 U.S.C. § 2255, ¶ 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

28 U.S.C. § 2255(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 U.S.C. § 2255, filed December 24, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 455(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fed. R. Civ. P. 59 (e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

Petitioner's Motion to Alter or Amend Judgment                                    Barrett v. United States
(Doc. Nos. 214, 216) and Brief in Support          -iv-                           Case No. 6:09-cv-00105-JHP

1268

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | DEATH PENALTY CASE |
| | ) | |
| vs. | ) | Case No. 6:09-cv-00105 JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

---

**PETITIONER'S MOTION TO ALTER OR AMEND JUDGMENT
(Doc. Nos. 214, 216) and BRIEF IN SUPPORT**

---

Petitioner/Defendant, Kenneth Eugene Barrett, through undersigned counsel and pursuant

to Fed. R. Civ. P. 59 (e), moves to alter or amend the Court's Opinion and Order (Doc. 214) and

Judgment (Doc. 216)[1] entered in this case on August 16, 2012.  In support of this Motion, Mr.

Barrett states the following:

**I.      INTRODUCTION**

Contrary to this Court's assertion otherwise,[2] Mr. Barrett submits the Amended Motion to

Vacate, Set Aside or Correct a Sentence Pursuant to 28 U.S.C § 2255, filed December 24, 2009,

presented a myriad of factual and legal issues.  Mr. Barrett supported his factual averments with

over 200 exhibits.  Pursuant to Rule 7 of the Rules Governing § 2255 Proceedings, this Court

---

[1]      Unless otherwise noted, cites to "Doc." refer to documents in Case No. 09-cv-105-JHP.

[2]      "While the record in this case appears voluminous, other than being a death penalty
proceeding this was not a complex case."  (Doc. 214 at p. 21).

expanded the record to include many of those exhibits.  Pursuant to the Court's order Mr. Barrett supported his Motion with legal arguments in a separately filed brief.  This Court's summary disposition of the claims overlooked or misapprehended issues of fact and law.   Therefore, it is appropriate that this Court reconsider, alter or amend its opinion and judgment.

This Court ruled on Mr. Barrett's Motion on August 16, 2012, in a 191 page Opinion. (Doc. 214).  In its Opinion, this Court failed to acknowledge or impartially evaluate the strength of evidence and argument presented by Mr. Barrett; instead, the Court made conclusory determinations that resulted in serious, substantial and troubling errors of law and fact.  In purporting to resolve without a hearing matters involving the District Judge's administrative actions, his motivations in carrying out those actions, and the influence of those actions on Mr. Barrett's counsel and defense, this Court lacked impartiality.

This Motion to Alter or Amend will focus on three areas.  First, the Motion will address Judge James H. Payne's demonstrated inability to judge impartially the credibility of witnesses who have testified in declarations about his off-the-record statements, and to address in other ways the motivations and effects of his own administrative actions.  Second, the Motion will discuss the Court's failure to allow for factual development of Mr. Barrett's claims as the law requires, instead engaging in a subjective analysis of the evidence presented.  This issue will be discussed along with the Court's wrongful denial of Mr. Barrett's request for an evidentiary hearing.  Finally, Mr. Barrett will address the Court's refusal to grant a Certificate of Appealability (COA),  pursuant to 28 U.S.C. § 2253(c), as to each of his claims,

Mr. Barrett submits, with respect to each of the claims discussed herein, that the Court has committed either manifest errors of law or fact or failed to recognize or fully consider the

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                    2                    Barrett v. United States
                                                                                   Case No. 6:09-cv-00105-JHP

arguments that Mr. Barrett presented in his § 2255 Motion.  Mr. Barrett emphasizes, however, that in the instant Motion he is not addressing each and every claim that he set forth in his § 2255 Motion.  Mr. Barrett continues to assert that all claims brought forth in his § 2255 are meritorious.  Mr. Barrett's decision not to address any particular claim in this Motion constitutes neither a waiver nor a withdrawal of that claim.

## II.      STANDARD GOVERNING APPLICATION OF FED. R. CIV. P. 59(e)

The Supreme Court has noted that Fed. R. Civ. P. 59(e) was adopted "to make clear that the district court possesses the power to rectify its own mistakes in the period immediately following the entry of judgment."  *White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445, 450 (1982) (internal quotations omitted); *see also Warren v. American Bankers Ins.,* 507 F.3d 1239, 1245 (10th Cir. 2007) ("the purpose of Rule 59 is to provide the district court an opportunity to correct its own errors").  A Rule 59(e) motion is appropriate "to correct manifest errors of law or to present newly discovered evidence." *Commonwealth Property Advocates, LLC v. Mortgage Electronic Registration Systems, Inc.,* 680 F.3d 1194, 1200 (10th Cir. 2011) (citations omitted).  A district court's failure to notice or consider arguments or authorities that justify relief also constitutes an appropriate ground to grant a motion to amend judgment if these failures affected the correctness of the court's decision.  *See, e.g., Hicks v. Town of Hudson,* 390 F.2d 84, 87-88 (10th Cir. 1967).

A district court has broad discretion to grant a motion to alter or amend judgment. *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 174 (5th Cir. 1990) (*overruled on other grounds*).  Moreover, Rule 59(e) does not set forth any particular grounds for relief.  *Id.*  Rather,

Rule 59(e) relief is appropriately considered after weighing relevant circumstances on a case-by-case basis. *Id.*

### III. THE COURT'S OPINION DEMONSTRATES JUDGE PAYNE'S INABILITY TO ADJUDICATE CLAIMS WITHOUT BIAS OR PARTIALITY SUCH THAT HE SHOULD HAVE RECUSED HIMSELF

Throughout these proceedings Mr. Barrett has objected to Judge Payne attempting to adjudicate claims that involve his administrative and other extra-judicial actions. These issues were documented in Mr. Barrett's Motion to Disqualify and Recuse filed on May 29, 2009. (Doc. 45). In that Motion, Mr. Barrett set forth his claims that the Court *inter alia*: 1) engaged in *ex parte* communications with prosecutors; 2) made administrative decisions to Mr. Barrett's disadvantage, including decisions regarding approval of funds for his case; and 3) relied on evidence outside of the record. The Court denied those allegations and denied Mr. Barrett's motion. (Doc. 66). In doing so, the Court stated that its earlier actions regarding counsel and defense resources did not reflect any prejudgment of Mr. Barrett's claims. *Id.* at 19. However, the Court's opinion rejecting Grounds 1 and 3 relies extensively on its prior rulings as virtually *ipso facto* dispositive of Mr. Barrett's allegations. Opinion (Doc. 214) at 22-34.

As stated in the opinion of Professor Monroe H. Freedman, appended hereto as Exhibit A, this Court's decision presents evidence that would cause any reasonable person to question its impartiality. Recusal was required prior to adjudication. 28 U.S.C. § 455(a). Professor Freedman is perhaps this Nation's foremost authority on the law of lawyers' and judicial ethics. *See* App. A to Exh. A. After reviewing the relevant allegations and this Court's manner of evaluating them, Professor Freedman concluded that recusal was required prior to adjudication. The opinion should be withdrawn.

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                    4                    Barrett v. United States
                                                                                   Case No. 6:09-cv-00105-JHP

1272

The fair trial guarantees of the Due Process Clause of the Fifth Amendment encompass a litigant's right to have "a neutral and detached judge" preside over judicial proceedings. *Ward v. Village of Monroe*, 409 U.S. 57, 62 (1972). In *In re Murchison*, 349 U.S. 133 (1955), the Supreme Court stated:

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. . . . Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way, "justice must satisfy the appearance of justice."

*Id.* at 136 (citations omitted). So important is this constitutional guarantee that its denial is not subject to the harmless error rule. *See, e.g., Tumey v. Ohio*, 273 U.S. 510 (1927); *Bracy v. Schomig*, 286 F.3d 406, 414 (7th Cir. 2002) ("There is no harmless error analysis relevant to the issue of judicial bias.").

Title 28 § 455(a) provides that disqualification of a United States judge is warranted not only when there is actual bias or prejudice but also when "his impartiality might reasonably be questioned." The goal of Section 455(a) is to avoid even the appearance of partiality. *See Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995). "The test in this circuit is 'whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality.'" *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993) (citations omitted); see also *United States v. Greenspan,* 26 F.3d 1001, 1005 (10th Cir. 1994) (the statute imposes on the trial judge "a continuing duty to ask himself what a reasonable person, knowing all the relevant facts, would think about his impartiality").

Whether recusal is required is determined by an objective standard that considers what a reasonable person might believe.  As summarized by the Supreme Court: "[W]hat matters is not the reality of bias or prejudice but its appearance.  Quite simply and quite universally, recusal was required [pursuant to § 455(a)] whenever 'impartiality might be questioned.'"  *Liteky v. United States*, 510 U.S. 540, 548 (1994) (citation omitted).  A judge has a continuing duty to recuse under § 455(a) if sufficient factual grounds exist to question the judge's impartiality.  *United States v. Pearson,* 203 F.3d 1243, 1277 (10th Cir. 2000) (*citing Cooley,* 1 F.3d at 992–93).

Here, recusal is required because a reasonable person would expect a court to treat all similarly situated litigants the same.  That has not happened in this case.  The Court has treated Mr. Barrett differently by erecting unreasonable barriers throughout the filing process and by exhibiting bias throughout the written opinion.

> **A.  The Court Has Treated Mr. Barrett Different From Similarly Situated Litigants**

Mr. Barrett submits that this Court's recent evaluation, without a hearing, of witness accounts of off-the-record discussions with Judge Payne continues a well documented pattern of this Court making rulings on matters in which it has an unacknowledged interest or bias.  The decision is similar to the one vacated in *Murchu v. United States*, 926 F.2d 50, 57 (1st Cir. 1991), where the court held a sentencing judge should not adjudicate factual allegations involving off-the-record conversations with the judge.  *See also Ellis v. United States*, 313 F.3d 636, 641-42 (1st Cir. 2002) (trial judge was correct to recuse himself from consideration of 2255 motion's claim of judicial bias and improper conduct).

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support      6      Barrett v. United States
Case No. 6:09-cv-00105-JHP

1274

Among the indicia of bias in this Court's decision is the false and denigrating characterization of Mr. Barrett's claims, *e.g.*, Opinion (Doc. 214) at 22, and attacks on his counsel. As shown in the material considered by Professor Freedman, these gestures are the culmination of a pattern. Previously, this Court arbitrarily required that Mr. Barrett use the form proscribed by Rule 2(c) of the Rules Governing Section 2255 Proceedings to file his § 2255 Motion, file the Motion and Brief in Support separately, and ask leave of court to file pleadings in excess of 25 pages. These have not been imposed on other similarly situated persons. *See* Exh. B (Decl. Tivon Schardl and Appendix thereto, attached). While purporting to be concerned about the volume of Mr. Barrett's pleadings and the time consumed by amendments, this Court required months of unnecessary work splitting factual averments from legal arguments into two lengthy documents no other similarly situated person in this District was required to file for the preceding decade or more. Reasonable people would consider the Court's contradictory actions evidence of partiality against Mr. Barrett or his counsel.

On September 25, 2009, Mr. Barrett filed an Amended Motion to Vacate, Set Aside or Correct Sentence Pursuant to § 2255. (Doc. 70). On September 29, 2009, this Court entered an order to show cause why the court should allow Mr. Barrett to amend his § 2255 Motion. (Doc. 74). On October 6, 2009, the Court conducted a hearing on its show cause order that began with the Court reading from a prepared statement detailing numerous criticisms of Mr. Barrett's pleadings and his counsel. (Doc. 85, Tr. 10/6/09 Hr'g at pp. 3-13). In particular, the Court chastised Mr. Barrett's counsel for failing to use a standard form to file the motion, for filing a pleading in excess of 25 pages without leave of court, for filing both the motion and brief in support in the same pleading, and for failing to use the exact language set forth in Rule 2 of the

Petitioner's Motion to Alter or Amend Judgment          Barrett v. United States
(Doc. Nos. 214, 216) and Brief in Support          7          Case No. 6:09-cv-00105-JHP

1275

Rules Governing § 2255 Motions in the verification. *See id.* The Court also complained about the form of Mr. Barrett's requests to seal exhibits and requests for discovery and an evidentiary hearing. *See id.* The Court berated Mr. Barrett's counsel as follows:

> While this Court doesn't question the rules that require courts to construe *pro se* litigants complaints liberally due to their lack of legal training, this is not such a case. Rather, this Court appointed counsel who were represented to this Court as being well-qualified death penalty practitioners. If this Court were dealing with a *pro se* petitioner, it would understand that the petitioner had difficulty understanding the court rules and procedures. Yet, this Court is concerned that counsel does not seem to understand the implications of the statute of limitations issues, or that they must comply with the rules governing Section 2255 proceedings and the local rules of this court.

*Id.* at p. 7. The Court then ordered Mr. Barrett to re-file his § 2255 Motion in 20 days on the standard form and file a Brief in Support of the Motion 60 days thereafter. *See id.* at p. 11.

Mr. Barrett showed this Court's statements misrepresented the standard practice before this Court in the similarly situated context of capital habeas petitions filed pursuant to 28 U.S.C. § 2254. Exh. B.

This Court's CM/ECF treats § 2254 and § 2255 cases as the same. The practice of § 2254 petitioners represented by experienced counsel is consistent with the object and purpose of the drafters of the form who intended it as an "[a]dministrative convenience" that would minimize the number of "lengthy and often illegible petitions, arranged in no logical order" submitted by prison inmates who have no right to counsel. R. Gov. § 2254 Cases 2, Advisory Committee Notes. That the form is primarily intended for use by those proceeding *pro se* is confirmed in the instructions to the form available on this Court's website which cautions those under sentence of death that they are entitled to counsel, implying that they should not file the form on their own behalf.

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                    8                    Barrett v. United States
Case No. 6:09-cv-00105-JHP

1276

There is no rationale explanation for the Court requiring Mr. Barrett to file his § 2255 Motion on the *pro se* form while not requiring others to do so.

**B.      The Court Evidenced Its Bias Towards Mr. Barrett In Its Written Opinion**

Mr. Barrett acknowledges that judicial rulings are in most instances immune from challenge under § 455.  *Liteky*, *supra*.  However, as in *Murchu*, where a judge purports to evaluate the credibility of witnesses – in this case including two third-parties, the Federal Defenders for the Northern and Western Districts of Oklahoma – without a hearing, there is at least an appearance of bias that requires recusal.  Exh. A.  In its Opinion, the Court continually disparages Mr. Barrett and his counsel.

First, the Court complains throughout the opinion regarding the fact that Mr. Barrett "expanded the record to voluminous proportions."  Opinion (Doc. 214) at p. 1, 20.  The Court stated:

> Despite the similarities in the "dump-it-all-in" approach which has been taken in this case with *pro se* filings, this is not a case in which the original and amended timely filed motions were filed by a *pro se* litigant and the subsequent amendment was filed after the statute of limitations expired.  Rather, all of the pleadings filed by the petitioner herein were filed by counsel who were presented to this court as "extremely well-qualified" in federal habeas litigation.  *In the opinion of this court, many of the documents have not been submitted in a good faith attempt to direct the court to the legitimate issues in this case, but rather as a way to slow the disposition process*.

(Doc. 214 at p. 152, n.209) (emphasis added).  This Court conversely required Mr. Barrett to file a petition and brief other similarly situated petitioners were not required to file.

There is no basis in the record for this Court's assertion that the case is simpler than other federal death penalty cases.  This is a federal death penalty case in which there were two prior state court jury trials.  The record of the federal jury trial below consists of almost 6000 pages,

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                              9                              Barrett v. United States
Case No. 6:09-cv-00105-JHP

1277

notwithstanding pretrial proceedings.  Following the trial, there was an appeal in the United States Court of Appeals for the Tenth Circuit.  Yet, despite this record, not only does the Court complain about the size of the pleadings, the Court is annoyed that Mr. Barrett failed to ask for leave to file his § 2255 Motion in excess of twenty-five pages. The Court's characterization of this case is evidence of bias against finding error in the administrative actions of Judge Payne prior to trial.

Recusal is required where a judge has become so embroiled in conflicts with counsel that a reasonable person would think compromised the judge's ability to be impartial.  *Taylor v. Hayes*, 418 U.S. 488, 501 (1974).  This Court previously required Mr. Barrett's counsel to perform tasks not required of similarly situated counsel.  This Court required Mr. Barrett's counsel to file a lengthy brief justifying the filing of sealed documents or redactions.  The Court accepted those documents for filing then found they or others were not filed in good faith.  The Court's recent summary finding came without notice of specifics and with no prior notice of the concern or opportunity to be heard.  Such a summary finding, alone or viewed together with the other examples described in the record, would lead a reasonable person to question this Court's impartiality.

## IV.     THE COURT COMMITTED LEGAL ERROR BY ENGAGING IN SUBJECTIVE ANALYSIS AND NOT ALLOWING FOR FACTUAL DEVELOPMENT

### A.     The Court Erred by Failing to Conduct an Evidentiary Hearing

Mr. Barrett requested an evidentiary hearing in this case in his § 2255 Motion (Doc. 95 at pp. 400-401) and then filed a separate request for an evidentiary hearing on March 1, 2010 (Doc.

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                    10                    Barrett v. United States
                                                                                   Case No. 6:09-cv-00105-JHP

1278

150), which the Court denied on March 29, 2010. (Doc. 157).  This Court's denial of an evidentiary hearing constituted a manifest error of law.

The standard for granting an evidentiary hearing in a § 2255 case is set out in 28 U.S.C. § 2255, which states:  "Unless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States Attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."  28 U.S.C. § 2255, ¶ 2; *accord United States v. Lopez,* 100 F.3d 113, 119 (10th Cir.1996).  As the plain text of the statute makes clear, there is a presumption in favor of holding an evidentiary hearing in a § 2255 proceeding: "*Unless* the motion and the files and the records of the case *conclusively show that the prisoner is entitled to no relief*, the court *shall . . .* grant a prompt hearing thereon . . .*" (emphasis added).

Indeed, Congress intended that the standard for obtaining an evidentiary hearing in a § 2255 proceeding be a liberal one, a fact which is borne out by the legislative history of this statute.  Prior to the passage of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), the standard governing the granting of evidentiary hearings in federal court for both §§ 2254 and 2255 proceedings was set out by *Townsend v. Sain*, 372 U.S. 293, 312 (1963):  "Where the facts are in dispute, the federal court in habeas corpus *must* hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding."  (Emphasis added).

When Congress passed AEDPA, it made revisions to both § 2255 and § 2254, but those revisions differed as to the evidentiary hearing provisions of the respective statutes. With respect to § 2254 proceedings, Congress legislatively modified the *Townsend* standard and severely

limited a federal district court's discretion to even grant an evidentiary hearing on a § 2254 petition. *See* 28 U.S.C. § 2254(e)(2). The stated rationale for this change was that in a § 2254 proceeding, a petitioner has purportedly already had the opportunity for an evidentiary hearing as part of the state court post-conviction proceedings, so principles of comity and federalism required deference to findings of fact made by the state courts.

Congress however, placed no such similar limitations on the standard for granting an evidentiary hearing in § 2255 proceedings, as is evident by comparing the text of § 2254(e) with § 2255. *See Stead v. United States*, 67 F. Supp. 2d 1064, 1074 n.5 (D.S.D. 1999) ("Although the AEDPA modified, to some extent, the *Townsend* standard for obtaining evidentiary hearings in 28 U.S.C. § 2254 cases, Congress made no parallel changes in § 2255 practice and evidently chose to leave intact the *Townsend* standard and to create a discrepancy between the right to a hearing in § 2254 and § 2255 cases."). As a result, Mr. Barrett's request for an evidentiary hearing is governed by the more liberal pre-AEDPA standard articulated in *Townsend*, which states that an evidentiary hearing must be granted if there are disputed issues of fact in the proceeding. This is even more so on claims which ordinarily cannot be resolved on the extant record because the allegation involves events and occurrences that took place outside the courtroom. *See Massaro v. United States*, 538 U.S. 500, 504-06 (2003).

The United States Supreme Court addressed the standard in this context in *Machibroda v. United States*, 368 U.S. 487 (1962). There, the Court remanded for an evidentiary hearing to determine whether the movant's plea was involuntary because it was allegedly induced by promises made by the prosecuting attorney as to the length of the sentences that would be imposed. *Id.* at 489. The movant and the prosecutor filed conflicting affidavits on the factual

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support
12
Barrett v. United States
Case No. 6:09-cv-00105-JHP

1280

matter of whether such promises were made. 368 U.S. at 490-91, 492. The district court decided -- without a hearing -- that the movant's allegations were false and denied the § 2255 motion. *Id.* at 492. The Supreme Court held that the district court did not act in conformity with the provisions of § 2255. As the Court stated:

> This was not a case where the issues raised by the motion were conclusively determined either by the motion itself or by the "files and records" in the trial court. The factual allegations contained in the petitioner's motion and affidavit, and put in issue by the affidavit filed with the Government's response, related primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light. Nor were the circumstances alleged of a kind that the District Judge could completely resolve by drawing upon his own personal knowledge or recollection.

368 U.S. at 494-95. The Court further noted: "'The Government's contention that [movant's] allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence. On this record it is his right to be heard.'" *Id.* at 495 (citation omitted); *see also United States v. Weeks,* 653 F.3d 1188, 1206 (10th Cir. 2011) (overturning district court's denial of evidentiary hearing because petitioner's allegations regarding the voluntariness of his plea and effectiveness of counsel, taken as if true, would entitle him to relief); *United States v. Duran-Salazar,* 307 Fed. Appx. 209, 211, 2009 WL 74476 at *2 (10th Cir. 2009) (overturning district court's denial of evidentiary hearing, finding that "it may be that [defendant] cannot ultimately prevail; however, the allegations in his motion coupled with the difficulty the jury had in reaching a verdict are sufficient to entitle him to a hearing"); *United States v. Ringer*, 139 Fed. Appx. 969, 973, 2005 WL 1666105 at * 4 (10th Cir. 2005) (overturning district court's denial of evidentiary hearing, finding "it is impossible to tell whether [defendant] should prevail on his

ineffective assistance of counsel claim without the aid of an evidentiary hearing"); *United States v. Becker,* 109 Fed. Appx. 264, 268, 2004 WL 1949154 at *3 (10th Cir. 2004) (same).

Moreover, every inference must be drawn in Mr. Barrett's favor, particularly where, as here, Mr. Barrett has pled facts that, if true, would entitle him to relief, and yet, the district court has not granted an evidentiary hearing. See 28 U.S.C. § 2255 ¶ 2; *Townsend v. Sain*, 372 U.S. 293, 312-13 (1963) (requiring a hearing in federal habeas proceedings where the petitioner has alleged facts which, if proven, would entitle him to relief and where the district court has not resolved the merits of the factual dispute in a full and fair hearing); *Fontaine v. United States*, 411 U.S. 213, 215 (1973) (vacated for an evidentiary hearing where, on the record, the court could not conclude "with the assurance required by the statutory standard 'conclusively show' that under no circumstances could the petitioner establish facts warranting relief under § 2255."); *Aron v. United States*, 291 F.3d 708, 715 n.6 (11th Cir. 2002) ("The law is clear that, in order to be entitled to an evidentiary hearing, a petitioner need only allege – not prove –  reasonably specific, non-conclusory facts that, if true, would entitle him to relief.").

Consistent with all the aforementioned statutory authority and legal precedent, this Court must vacate its denial of the § 2255 motion, allow discovery and grant an evidentiary hearing or alternative means of factual development in order that a factual record can be made as to Mr. Barrett's claims.

    **B.**    **Specific Examples of the Court's Wrongful Use of Subjective Analysis or its Own Recollection**

        **1.**    **Judicial Interference with Defense**

Petitioner's Motion to Alter or Amend Judgment            Barrett v. United States
(Doc. Nos. 214, 216) and Brief in Support      14          Case No. 6:09-cv-00105-JHP

1282

In denying Mr. Barrett's claim regarding judicial interference with defense counsel (Petitioner's Grounds 1 and 3), the Court found that Mr. Barrett did not show that the Court's decisions regarding appointment of counsel or funding deprived him of his constitutional rights. (Doc. 214 at p. 35).  The Court gave no credence to the evidence Mr. Barrett submitted in support of this claim.  Moreover, the Court improperly used its own subjective analysis or its own recollection in making this determination.

First, the Court addressed Mr. Barrett's claim that it showed preferential treatment to Mr. Hilfiger over Mr. Echols.  The Court stated that it authorized a higher payment to Mr. Hilfiger because he was "assuming the role of lead counsel" and "this court encouraged [Mr. Hilfiger and Mr. Smith] to submit an amended budget request solely because, unlike Mr. Echols, they were unfamiliar with intimate details surrounding the previous state court trials."  (Doc. 214 at p. 31).

The Court's reliance on these types of statements in denying Mr. Barrett's claim exceeds the scope of what it may properly rely upon in terms of its own recollections in adjudicating this claim.  The underlying rationale is that a § 2255 court is empowered to take judicial notice of events that that same court observed in the course of presiding over the original criminal trial.  However, this Court's explanations, or in its words, "observations," *id*., regarding its reasoning why it paid Mr. Hilfiger more money than Mr. Echols are not statements about events that did or did not occur at the trial, but rather findings that the Court is making about itself.  These "observations" were never vetted in the record of the case, because the first time that the Court raised them was in its written Opinion.  Mr. Barrett should be permitted to make appropriate inquiries of the Court so that this issue can be adequately developed on the record.  This is the

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                    15                    Barrett v. United States
                                                                                                    Case No. 6:09-cv-00105-JHP

exact situation in which an evidentiary hearing is appropriate.  At such a hearing it would be inappropriate for Judge Payne to preside.  Exh. A; *Murcha, supra*.

This Court employed similarly flawed methods when discussing the budget for investigation: "[This] court, in carrying out its administrative functions in this case, attempted to get counsel to focus on exactly what would be needed in the way of experts in order to ensure that the requests were reasonable and necessary to provide fair compensation."  Opinion (Doc 214) at 32.  The Court is not relying on evidence in the record or even its own recollection; instead, the Court is giving an opinion or reason for its actions.  The Court is, in effect, testifying.  The extra-record accounts of witnesses to this Court's subjective views prior to trial, at a minimum, raise a material factual dispute as to whether Judge Payne's principle concern was financial as opposed to the interests of the defendant, *see Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864-65 (1988), and whether his expressed fiscal concern unduly influenced Mr. Hilfiger's acts and omissions, *see Wood v. Georgia*, 450 U.S. 261, 272-73 (1981).

Another example of this Court's erroneous reliance upon its subjective knowledge to adjudicate claims supported by the testimony of witnesses appears when it discusses why it made the decisions it did in appointing counsel.  Opinion (Doc 214) at 33 (stating, for example, that it considered that "Mr. Hilfiger and Mr. Smith were both active members of the CJA defense panel for the Eastern District of Oklahoma").  The Court is once again defending its actions rather than making factual determinations, and using its defense as a rationale for denying Mr. Barrett's claim.

Contrary to § 2255(b) and *Machibroda*, this Court either ignored or discredited the evidence Mr. Barrett presented in support of his claims without a hearing and, at times, in

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                    16                    Barrett v. United States
                                                                                            Case No. 6:09-cv-00105-JHP

1284

reliance upon this Court's subjective view of its own motives.  For example, Mr. Barrett

submitted the declaration of Susan Otto, the Federal Public Defender for the Western District of

Oklahoma (Doc. 95, Petitioner's Exh. 54).  In her declaration, Ms. Otto set forth the

qualifications necessary to serve as lead counsel for a defendant in a federal capital case and her

interactions with the Court regarding appointment of counsel in this case.  The Court summarily

dismissed the Federal Defender's opinion as "ludicrous."  (Doc. 214 at p. 24, n.62).  This Court

substituted its own opinion that "Mr. Hilfiger was clearly 'learned in the law applicable to capital

cases,'" without stating a basis for that opinion.  *Id.* at p. 24.

Mr. Barrett also submitted the declaration of John Echols.  In a manner materially

indistinguishable from the actions of the district court in *Machibroda,* this Court opined that Mr.

Echols should have been able to try the case with little resources because "the underlying

incident had been the focus of two prior state court trials, [so] counsel should have been able to

utilize the factual investigations completed in the earlier cases."  *Id.* at p. 32.  The Court gave no

indication that it considered Mr. Echols' statement:

> I explained to Judge Payne at the time that there were significant tasks that needed
> to be undertaken to prepare the case adequately for another trial.  For example,
> while the preliminary investigation begun by Roseann Schaye had identified
> certain evidence and avenues of investigation regarding potential mental state
> guilt and penalty phase defenses, significant additional investigation and expert
> consultation remained to be done.  Similarly, questions regarding the existence
> and role of a confidential informant in this case had not been resolved to my
> satisfaction by the conclusion of the state proceedings.  The federal authorities'
> decision to prosecute Mr. Barrett in a capital case therefore made it imperative for
> me to investigate the practices of the District 27 Drug Task Force including, but
> not limited to, their cultivation and reliance on purported informants or "snitch"
> witnesses.

(Doc 95, Petitioner's Exh. 34, Echols Decl. at p. 3).

Similarly, the Court jumped to the conclusion or improperly inferred that "[i]t became apparent very early in the budgeting of this case that Mr. Echols was attempting to be compensated for items that were improper." Opinion (Doc. 214) at p. 141. The Court made no such finding on the record at the time. Rather, the Court apparently relied upon Mr. Echols' inquiry as to whether he could seek compensation for traveling time if his assistant is reading to him in the car. *Id.* at 141-42. The Court fails to explain, however, how Mr. Echols' inquiries to the Court as to what activities are reimbursable constitute "attempts at improper compensation." Indeed, it would seem that if Mr. Echols was attempting to obtain improper compensation, the last thing he would do is ask the Court whether it was a proper expense.

Nor does the Court recognize Mr. Echols' account of compensation, as recited in his declaration:

> For example, payment vouchers I sent in for legal research would be cut in half. The judge believed I did not need to do much if any research on federal death penalty law because I was "learned counsel." The same was true for research I did on search and seizure issues. Simply stated, my fee requests and budgeting requests were not being approved, or were being approved for far less than the time I devoted to tasks that I and Federal Death Penalty Resource Counsel believed were reasonably necessary to prepare the case for trial.

(Doc 95, Petitioner's Exh. 34, Echols Decl. at p. 5).

Mr. Barrett submitted declarations from expert counsel regarding the prevailing professional norms in federal death penalty cases, cited and quoted numerous standards adopted by bar organizations, and provided evidence of the norms for compensation in federal death penalty cases. Although this Court received the declarations in evidence pursuant to Rule 7 of the Rules Governing § 2255 Proceedings, it then refused to consider them on grounds that they contained hearsay and did not cite the record in this case. Opinion (Doc. 214) at 177. Neither of

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                18                Barrett v. United States
Case No. 6:09-cv-00105-JHP

1286

those grounds has any basis in the law of ineffective assistance of counsel or § 2255(b).

Evaluation of ineffective-assistance claims requires consideration of objective evidence of

reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688-89 (1984). This Court did not

mention these guidelines for reasonableness and instead appeared to rely upon one judge's

subjective view of what was reasonable for this case.

In addition, the Court based its determination regarding prejudice on a subjective,

incomplete, and false evaluation of the proffered mitigation evidence. Opinion (Doc. 214) at

180-89. Except in its application of the improper "nexus" requirement discussed *infra*, this

Court did not expressly consider the vast majority of the mitigation Mr. Barrett proffered.

Without addressing the substance of the evidence favorable to Mr. Barrett, the Court did discuss

a portion of the mental health evidence. The Court states Mr. Barrett "failed to establish that the

introduction of this evidence [of his mental health problems] would not have been more negative

than positive," because it would have been accompanied by evidence of Mr. Barrett's drug use.

*Id.* at 188. There is no evidence in the record that evidence of Mr. Barrett's drug use (a) would

have introduced anything the jury did not already know, or (b) would have been considered

negatively by jurors. The Court appears to accept the proposition that the evidence would be

viewed negatively based upon the *ipse dixit* of the Government's lawyers, *id.* at 187, or the

conveniently stated opinion of trial counsel while simultaneously denying Mr. Barrett any

opportunity to cross-examine them. *Id.* at 188. As shown in the attached declaration of Scott E.

Sundby, the supposition that jurors would have placed negative value on evidence of Mr.

Barrett's drug use is demonstrably false. Exh. C.

*Strickland* requires reviewing courts to "proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision" whether to impose a death sentence. *Strickland*, 466 U.S. at 695. The Supreme Court and Tenth Circuit have relied upon scientific studies of juror decisionmaking in similar situations to ascertain the probable value evidence proffered in post-conviction proceedings. *Florida v. Nixon*, 543 U.S. 175, 192 (2004); *Wilson v. Sirmons*, 536 F.3d 1064, 1095 n.4 (10th Cir. 2008). This Court eschewed a search for objective evidence.

The Court also erroneously characterized the mitigation proffer as inconsistent, or in conflict, with the evidence presented at trial. Opinion (Doc. 214) at 180. The Court recounts the evidence presented at trial – omitting the damaging evidence the Government presented on cross-examination that Mr. Barrett diffused or rebutted in his post-conviction filings – and recounts the jurors' votes on mitigating circumstances. *Id.* at 180-85. Contrary to precedent requiring a cumulative evaluation of that evidence and the evidence Mr. Barrett proffered with his petition, *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000), this Court's discussion of the post-conviction evidence it did consider (much was ignored) contains no cumulative weighing. Opinion (Doc. 214) at 185-89. Rather, the Court states that many of the records that Mr. Barrett submitted "could have been used by the government to totally negate the jury's findings" in mitigation. *Id.* at 185. As Professor Sundby explains that analysis is based on an erroneous understanding of how jurors actually view such evidence. Exh. C.

In addition, the Supreme Court has held it is unreasonable – even after affording the petitioner an evidentiary hearing – to conduct a prejudice analysis in the manner of this Court's analysis. *Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447, 455 (2009). If it is unreasonable for

a state court to reduce to irrelevance mitigation proffered in post-conviction after supposedly "negative" evidence had been tested in an adversarial hearing, there can be no question of this Court's error, given that its decision was limited to whether "the motion and the files and records of the case conclusively show[ed]" Mr. Barrett was not entitled to relief.  28 U.S.C. § 2255(b).

The Supreme Court's decision in *Porter* pointed to the relevance of Eighth Amendment law in a *Strickland* prejudice analysis, in particular the requirement that a capital sentencing jury must be permitted to consider any relevant mitigating factor.  130 S. Ct. at 454-55.  This Court violated that principle when it faulted Mr. Barrett for failing "to establish any nexus between the suffering of his relatives and any viable theory of mitigation."  Opinion (Doc. 214) at 188.  As a factual matter, the assertion is refuted by the record including, *inter alia*, Pet. Exh. 117.  As a legal issue, the Supreme Court has held it is error for a court to require such a nexus when evaluating the mitigation value of evidence.  *Abdul-Kabir v. Quarterman*, 553 U.S. 233, 246 (2007); *Smith v. Texas*, 543 U.S. 37, 45 (2004) (citing rejection of nexus notion in *Tennard v. Dretke*, 542 U.S. 274, 287 (2004)).  To the extent this Court's reference to a "viable theory of mitigation" referred to the supposed relative value of Mr. Barrett's proffered evidence compared with evidence the Government might have argued, its decision was contrary to *Strickland* and *Porter*.  To the extent this Court had in mind distinguishing between the theories of mitigation Mr. Barrett proffered and some unspecified understanding of mitigation that this Court subjectively considers "viable" its analysis was contrary to *Strickland* and the Eighth Amendment law discussed in *Abdul-Kabir* and *Tennard*.  As Professor Sundby points out in his attached declaration, this Court's view of what constitutes a viable theory of mitigation has no basis in objective fact.  Exh. C.

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support
21
Barrett v. United States
Case No. 6:09-cv-00105-JHP

1289

Professor Sundby points out another assumption underlying this Court's opinion that is both legally and factually wrong. This Court repeatedly adverts to supposition about how "the jury" would view mitigation evidence in its deficient performance analysis, Opinion (Doc. 214) at 187-88, and in its prejudice analysis. *Id.* at 188. As Professor Sundby points out, both *Mills v. Maryland*, 486 U.S. 367 (1988) and empirical findings of the Capital Jury Project support considering whether any individual jurors would have been moved by mitigation evidence. Exh. C. *Strickland* progeny that this Court did not mention also plainly require reviewing courts to consider whether "there is a reasonable probability that at least one juror would have struck a different balance" based upon the cumulative effect of the mitigation evidence adduced at trial and in post-conviction proceedings. *E.g.*, *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

## V.  THIS COURT ERRED BY DENYING MR. BARRETT A CERTIFICATE OF APPEALABILITY

At the conclusion of its 191-page opinion, the Court states "petitioner has failed to make a 'substantial showing' of the denial of any constitutional rights. 28 U.S.C. § 2253 (c)(2). Therefore, pursuant to Rule 11 of the Rules Governing § 2255 Proceedings, this court declines to issue a certificate of appealability." (Doc. 214 at p. 190). The denial of a Certificate of Appealability (COA) under these circumstances violates the governing law.

Under the "substantial showing of the denial of a constitutional right" standard of 28 U.S.C. §2253(c)(2), a petitioner need only "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (internal citations and quotation marks omitted). The *Barefoot* standard

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                     22                     Barrett v. United States
                                                                                Case No. 6:09-cv-00105-JHP

1290

was reaffirmed in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) and in *Miller-El v. Cockrell*, 537 U.S. 322 (2003).  *Miller-El*, reaffirmed that a COA should be allowed when the petitioner's case is "debatable," or the issues could be "resolved in a different manner," or when the case "deserve[s] encouragement to proceed further."  *See id*. at 336.

As illustrated above, the issues described herein are certainly debatable.  Indeed, the Court wrote 191 pages to address the issues.  Certainly, in those pages, this Court took on the "debate."  Moreover, while this Court has yet to be convinced of the merits of any of Petitioner's claims, given this Court's treatment of the issues, it cannot say that "jurists of reason" could not resolve them differently.

And, in that regard, *Miller-El* is significant. It states that "a COA does not require a showing that the appeal will succeed.":

> The holding in *Slack* would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail.  It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief.  After all, when a COA is sought, the whole premise is that the prisoner has already failed in that endeavor.
>
> ***
>
> We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus.  Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.

*Miller-El*, 537 U.S. at 336-38 (internal quotation marks and citations omitted).

In capital cases, "the nature of the penalty is also a proper consideration in determining whether to issue a certificate of appealability."  *Barefoot,* 463 U.S. at 893.  Because this case

involves the death penalty, "any doubts as to whether a certificate of appealability should issue

must be resolved in [petitioner's] favor." *Moreno v. Dretke*, 450 F.3d 158, 163 (5th Cir. 2006).

Given that this is a federal capital case and the issues presented are easily debatable

among reasonable jurists, this Court committed error by failing to issue a COA on the claims Mr.

Barrett brought in his § 2255 Motion.

## VI.   CONCLUSION

For the foregoing reasons, Mr. Barrett requests that the Court provide the following relief:

1.   Enter an Order of Disqualification and Recusal and any other necessary Order so that this matter is assigned to another judge; or in the alternative,

2.   Order the Government to Respond to this Motion;

3.   Permit Mr. Barrett to file a Reply Memorandum;

4.   Entertain oral argument on this Motion, including the Recusal issue;

5.   Grant Mr. Barrett's request for leave to conduct discovery and for an evidentiary hearing to resolve any outstanding factual disputes in his § 2255 Motion;

6.   Alter or Amend its Judgment to award relief to Mr. Barrett by vacating his convictions or sentences on each of the above described grounds, individually or collectively; or,

7.   Should the Court not grant Mr. Barrett relief from his convictions and sentence, then Mr. Barrett requests that the Court award a COA to all the claims brought forth in his § 2255 Motion.

DATED: September 13, 2012.

Respectfully submitted,

/s/ David B. Autry
**DAVID B. AUTRY**, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: 405-521-9600

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                    24                    Barrett v. United States
                                                                                  Case No. 6:09-cv-00105-JHP

1292

DANIEL J. BRODERICK
Federal Defender

/s/ Tivon Schardl
**TIVON SCHARDL**, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: 916-498-6666

/s/ Joan M. Fisher
**JOAN M. FISHER**, IDA Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: 916-498-6666

Attorneys for Defendant/Petitioner
**KENNETH EUGENE BARRETT**

### CERTIFICATE OF SERVICE

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was electronically filed on September 13, 2012. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Jeffrey B. Kahan: jeffrey.kahan@usdoj.gov

Christopher J. Wilson: Chris.Wilson@usdoj.gov

/s/ Joan M. Fisher
Signature of Movant's Attorney

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBITS IN SUPPORT OF**

**PETITIONER'S MOTION TO ALTER OR AMEND JUDGMENT**
**(Doc. Nos. 214, 216) and BRIEF IN SUPPORT**

---

DANIEL J. BRODERICK, #89424
Federal Defender
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
JOAN M. FISHER, Idaho Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: (916) 498-5700

DAVID B. AUTRY, OBA #11600
Attorney at Law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: (405) 521-9600

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

1294

## INDEX OF EXHIBITS

Exhibit A       Opinion Letter from Monroe H. Freedman, September 7, 2012

                Appendix A - Curriculum Vitae

                Appendix B - Qualifications


Exhibit B       Declaration of Counsel in Support of Petitioner's Notice Regarding Amended Petition Filed Pursuant to Court Order

                Appendix A -  Capital Habeas Cases Filed in the Eastern District of Oklahoma Between January 1, 1998 and March 2009


Exhibit C       Declaration of Scott E. Sundby, September 13, 2012

                Appendix A - Publications of Scott E. Sundby

Exhibits in Support of Petitioner's Motion to Alter                                    Barrett v. United States
or Amend Judgment (Doc. Nos. 214, 216) and                                    Case No. 6:09-cv-00105-JHP
Brief in Support                                    i

1295

# EXHIBIT A

**Monroe H. Freedman**
**Professor of Law**
**Hofstra University Law School**
**320 West 38th Street, New York, NY 10018**

**lawmhf@hofstra.edu**                                    **Telephone: 212-564-8111**
                                                          **Fax: 212-564-8877**

September 7, 2012


Tivon Schardl, Esquire
Trial & Habeas Counsel
Federal Defender for the Eastern District of California
801 I Street, 3rd Floor
Sacramento, CA 95814

Dear Mr. Schardl,

       This letter is in response to your request for an expert opinion
regarding lawyers' and judges' ethical issues that have arisen in the
§2255 petition in *Kenneth Eugene Barrett v. United States*.


                              Introduction

       My qualifications as an expert on lawyers' and judges' ethics
are set forth in Appendix A to this letter, and a standard resume is in
Appendix B.  In brief, I have qualified as an expert on lawyers' and
judges' ethics in federal and state courts throughout the country;
testified as an expert witness on behalf of the U.S. Department of
Justice; written extensively on both lawyers' and judges' ethics,
including judicial disqualification; and received the American Bar
Association's Michael Franck Award, which is the highest award the
ABA gives for professionalism.


                                 Facts

       In preparing this opinion, I have reviewed the following
documents relating to this case: Amended Motion for Collateral

Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial, pp. i-xxii, 1-21 (Filed 09/25/09); Declaration of Counsel in Support of Petitioner's Notice Regarding Amended Petition Filed Pursuant to Court Order (Executed 11/30/09); Petitioner's Brief in Support of Second Amended §2255 Motion and in Support of Petitioner's Motion for Evidentiary Hearing and Motion for Record Expansion, pp. I-vii, 125-141 (Filed 03/01/10); Opinion and Order, pp. 2-35 (Filed 08/16/12); Notes for MHF prepared by Tivon Schardl, Esquire (Received by me 8/30/12); Capital Habeas Cases Filed in the Eastern District of Oklahoma Between January 1, 1998 and March 2009 (Received by me 9/5/12); United States v. Kenneth Barrett, E.D., Okl. Case No 04-cr-JHP Defense Expert & Investigative Resources (Received by me 9/5/12).

These documents reveal substantial factual disagreements among Judge James H. Payne, witnesses who spoke with Judge Payne off the record prior to trial, and present counsel for Mr. Barrett, on issues that are critical to this §2255 proceeding. These disagreements relate to whether Judge Payne has demonstrated partiality against counsel and/or their client, or has created the appearance of partiality against counsel and/or their client; whether Judge Payne's administrative decisions relating to the appointment, compensation, and provision of resources for defense counsel, John D. Echols and Roger Hilfiger, prejudiced Mr. Barrett because of an overriding concern for fiscal and administrative concerns, or appears to have done so; whether Judge Payne earlier demonstrated partiality against John D. Echols, who was Mr. Barrett's original lead counsel in his trial, or appears to have done so; whether Judge Payne improperly appointed Roger Hilfiger second chair and then lead counsel to represent Mr. Barrett in his trial, or appears to have done so; and whether Mr. Hilfiger had a conflict of interest and, as a result of that conflict, sought to curry favor with Judge Payne in ways that rendered his representation of Mr. Barrett incompetent and a denial of Mr. Barrett's Sixth Amendment right to the effective assistance of counsel.

2

It would not be appropriate for me to attempt to resolve those disputed facts and to render an opinion on the issues. That will require a hearing before an impartial judge in a §2255 hearing. What follows, therefore, is my opinion as an expert on judicial ethics regarding whether Judge Payne should have attempted to resolve those questions himself without a hearing; whether Judge Payne can preside at such a hearing; or whether the Federal Disqualification Statute, 28 U.S.C. §455, mandates his recusal.

## Opinion

In brief, it is my opinion that Judge Payne was required by 28 U.S.C. §455 to recuse himself from participating in this proceeding before attempting to adjudicate any of the disputes to which he is a party. My opinion is not based on a conclusion that Judge Payne has prejudiced Mr. Barrett's trial because of bias against Mr. Barrett and/or his counsel. That issue can only be decided by impartial resolution of disputed facts. It is not necessary to resolve any disputed facts, however, to conclude that (1) Judge Payne could not and cannot lawfully adjudicate whether he himself has prejudiced Mr. Barrett, and (2) Judge Payne could not and cannot lawfully adjudicate whether Mr. Hilfiger failed to provide Mr. Barrett with the effective assistance of counsel because of a desire to ingratiate himself with Judge Payne.

Section 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality *might* reasonably be *questioned*."[1] What the statute requires, therefore, is not that a reasonable person conclude that a judge is in fact partial, but that a

---

[1]Emphasis added. See also, Code of Conduct for U.S. Judges, Canon 3C(1): "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned."

3

reasonable person might have questions about the judge's impartiality.  In discussing the perspective of a reasonable person, the Supreme Court has referred to both "the public" and to "the skeptic."[2]  A member of the public or, certainly, a skeptic, might question whether Judge Payne can impartially adjudicate a dispute to which he is a party.

Also, the Supreme Court has recognized that members of the public too often have "suspicions and doubts" about the integrity of judges.[3]  Congress enacted §455(a), the Court explained, to eliminate such suspicions and doubts and to avoid the appearance of impropriety "whenever possible."[4]   Moreover, under §455, the obligation of recusal is "upon the judge himself, rather than requiring recusal only in response to a party affidavit."[5]

The clearest instance of the appearance of impropriety is when a judge is, in effect, deciding his own case.  Moreover, as the Federal Judicial Center has said, "When the judge is the actual trier of fact, the need to preserve the appearance of impartiality is especially pronounced."[6]

---

[2] *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860 and 865, n.12,  108 S.Ct. 2194, 2203 and 2205, n.12 (1988).

[3] *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864, 108 S.Ct. 2194, 2205 (1988).

[4] *Id*. at 864-865 and 2205.

[5]*Liteky v. United States*, 510 U.S. 540 (1994).

[6] Federal Judicial Center, Judicial Disqualification: An Analysis of Federal Law 15 (2d ed., 2010).

4

For example, in *In re Murchison*[7] the Supreme Court reversed a conviction on due process grounds where a state judge had held a defendant guilty of contempt for conduct before a prior grand jury proceeding where the same judge had presided.  The judge had had no pecuniary interest in the case, nor was there any showing, or even any contention, that the judge had become embroiled in the case, or that he had been in any way biased.[8]  Nevertheless, the Supreme Court held that "to perform its high function in the best way, 'justice must satisfy the appearance of justice.'"[9]

That standard of the appearance of justice has since been enacted by Congress in §455(a).  The Federal Judicial Center has explained that "The justification for making *perceived* partiality a grounds for disqualification is at least twofold.  First, regardless of whether judges are partial in fact, *public perceptions* of partiality can undermine confidence in the courts.  Second, disqualifying judges for outward manifestations of what could reasonably be construed as bias obviates making subjective judgment calls about what is actually going on inside a judge's heart and mind."[10]

Accordingly, this opinion has not purported to determine "what is actually going on inside [Judge Payne's] heart and mind."  Rather, the issues here are whether there is an appearance of partiality in Judge Payne's having adjudicated critical factual disputes to which he is himself a party, without holding a hearing, and whether there

---

[7] 349 U.S. 133, 75 S.Ct. 623 (1955).

[8] 349 U.S. at 141, 75 S.Ct. at 623 (Reed, J., dissenting).

[9] 349 U.S. at 136, 75 S.Ct. at 625, quoting *Offutt v. United States*, 348 U.S. 11, 14.

[10]Federal Judicial Center, Judicial Disqualification: An Analysis of Federal Law 17 (2d ed., 2010) (emphasis added).

5

would be an appearance of partiality if Judge Payne were to adjudicate those critical factual disputes, to which he is himself a party, in a §2255 hearing.

<div align="center">Conclusion</div>

For the reasons given above, Judge Payne has been required by 28 U.S.C. §455(a) to avoid "suspicions and doubts" about his impartiality by recusing himself from participation in this §2255 proceeding, because a reasonable person might question Judge Payne's impartiality in resolving disputes to which he is himself a party.

Sincerely yours,

/s/
Monroe H. Freedman
Professor of Law

1302

# APPENDIX A

**MONROE H. FREEDMAN**

320 West 38th Street, #2523
New York, N.Y., 10018
212-564-8111

See also listings in WHO'S WHO IN AMERICA
WHO'S WHO IN AMERICAN LAW
WHO'S WHO IN THE WORLD

**EDUCATION**

A.B., 1951, Harvard College (cum laude; honors thesis, magna cum laude)
LL.B., 1954, Harvard Law School
LL.M., 1956, Harvard Law School (Faculty Fellowship)

**FACULTY POSITIONS**

Hofstra Law School, Dean, 1973-1977; Professor of Law, 1973-present
Hofstra Law School, Lichtenstein Distinguished Professor of Legal Ethics,
1989-2003
Georgetown Law Center, Visiting Professor of Law, 2007-present
George Washington Law Center, Professor of Law, 1958-1973
Cleveland-Marshall Law School, Baker-Hostetler Professor of Law, 1992
Harvard Law School, Faculty Assistant and Faculty Fellow, 1954-1956
Harvard Law School, Lecturer on Legal Ethics and Trial Instructor, Trial
Advocacy Workshop, 1978-2010

**GOVERNMENT POSITIONS**

Executive Director, United States Holocaust Memorial Council, 1980-1982
(Presidential appointment, under the chairmanship of The Honorable Elie
Wiesel)
Consultant, United States Commission on Civil Rights, 1960-1964
Legislative Consultant, Senator John L. McClellan, 1959 (drafted major part of
Landrum-Griffin Act)

[Continued]

**LAW PRACTICE AND PROFESSIONAL ACTIVITIES (Selected)**

Qualified as an expert witness in state and federal court proceedings and before
    Judiciary Committees of United States Senate and House of Representatives
Expert on legal ethics for the United States Department of Justice, 1978
Senior Fact-Finder, Rochester Institute of Technology (to investigate and report
    on CIA involvement at RIT) (1991)
Reporter, American Lawyer's Code of Conduct, 1979-1981
Associate, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, 1956-1958
Director, Stern Community Law Firm, Washington, D.C., 1970-1971
Director, Criminal Trial Institute, D.C., 1965-1966
Special Litigation Counsel, ACLU, 1971-1973
Consultant (litigation), Neighborhood Legal Services Program, 1970
Consultant, Association of the Bar of the City of New York, Special
Committee on Courtroom Conduct, 1972
Arbitrator, American Arbitration Association, 1964-present (Service Award,
    1986)
Associate Director, Institute for the Study of Legal Ethics, 1995-present
Columnist ("Cases and Controversies"), American Lawyer newspapers, 1990-
    1996 (over 60 columns published)
Martindale Hubbell rating: a v
Television:  CBS 60 Minutes, CNN Moneyline, C-Span, CNN Late Edition, CNN
    Burden of Proof, CBS News/Dan Rather, Donahue, Court TV, The O'Reilly
    Factor, Hannity & Colmes, Fox News Live, Powerplay

Bar Admissions (Selected)

    Massachusetts, 1954
    Pennsylvania, 1957
    District of Columbia, 1960
    New York, 1978
    United States Court of Appeals for the
        District of Columbia Circuit, 1960
    Second Circuit, 1968
    Ninth Circuit, 1982
    Eleventh Circuit, 1986
    Federal Circuit, 1987
    Supreme Court of the United States, 1960                    [Continued]

2

**OFFICES IN PROFESSIONAL AND CIVIC ASSOCIATIONS (Selected)**

Governing Board, District of Columbia of Bar, 1972-1973 (resigned upon
 moving to New York)
Chairman, Legal Ethics Committee, D.C. Bar, 1974-1976; member, 1974-1980
Chairman, Committee on Professional Responsibility, Society of American
 Law Teachers, 1974-1980
Chairman, Committee on Professional Disciplinary Standards and Procedures,
 Federal Bar Association, 1969-1970
Vice Chairman, Ethical Considerations Committee, ABA Criminal Justice
 Section, 1987-1990
Co-Chair, Ethics Advisory Committee, National Association of Criminal
 Defense Lawyers, 1991-1993
National Board, American Civil Liberties Union, 1971-1980
National Advisory Council, American Civil Liberties Union, 1980-present
Committee on Professional Responsibility, Association of the Bar of the City
 of New York, 1986-1990
Committee on Professional and Judicial Ethics, Association of the Bar of the
 City of New York, 1991-1992
Ethics Committee, Criminal Justice Section, New York State Bar Association,
 1990-1992
Committee on Legal Education and Admission to the Bar, New York State Bar
 Association, 1987-1989
Committee on Model Rules of Professional Conduct, D.C. Bar, 1983-1986
Executive Committee and Governing Board, Society of American Law
 Teachers, 1976-1979
Associate Director, Institute for the Study of Legal Ethics, 1995-present
Ethics Advisory Committee, United States District Court for the Eastern District
 of New York, 1994-1996
Ethics Advisor to the Chair, ABA Criminal Justice Section, 1993-1995
Advisory Council, The Appleseed Foundation, 1996-present
Panel of Acadmic Contributors, Black's Law Dictionary, 2002-present
Members Consultative Group, ALI, Restatement of the Law Governing Lawyers,
 1989-1999
American Law Institute, (Elected) (Life Member)

[Continued]

3

**HONORS, GRANTS, AND LECTURESHIPS (Selected)**

ABA Michael Franck Award for Professional Responsibility (1998), for "outstanding contributions to the field of professional responsibility" and "a lifetime of original and influential scholarship in the field of lawyers' ethics."

Howard Lichtenstein Distinguished Professor of Legal Ethics, Hofstra University (1989-2003)

Martin Luther King Humanitarian Award (1986) (for "decades of work to advance human dignity and social justice")

Lehman-Laguardia Award for Civic Achievement (1996)

Baker-Hostetler Chair in Law, Cleveland-Marshall Law School (1992)

Annual Award, Black Law Students Association (1987)

Award of Merit, District of Columbia Bar (1979) (for "exceptional performance as a member of the Legal Ethics Committee")

First Annual Wickwire Lecturer on Legal Ethics and Professional Responsibility, Dalhousie Law School, Canada (1992)

President's Commendation Award, National Association of Criminal Defense Lawyers (1992)

Pope John XXIII Lecture, Catholic University Law School (1978)

Dedication of Symposium Issue of Hofstra Law Review, vol. 6, no. 3, part II (1978)

Dedication of Crystal, Professional Responsibility (2d ed., 2000) (Aspen Law & Business): "To Monroe Freedman, who has so often led the way."

Certificate of Merit, American Bar Association (1976) (for "distinguished contribution to public understanding of the American legal system")

Certificate of Special Acknowledgment, Wisconsin Department of Justice (1988)

Ford Foundation grant to establish and direct the Criminal Trial Institute, Washington, D.C. (1965-1966)

Stern Family Fund grant to establish and direct the Stern Community Law Firm, a public interest law firm, Washington, D.C. (1970-1971)

Ford Foundation Research Fellowship in Legal Ethics (1973)

Life Fellow, American Bar Foundation

Honorary Fellow, American Board of Criminal Lawyers (2003–)

Faculty Fellowship, Harvard Law School (1954-1956)

[Continued]

4

**HONORS (Continued)**

New York State Bar Association Sanford D. Levy Award "in recognition of your extraordinary contribution to the field of professional ethics through a body of work that spans four decades" (2005)

New York State Bar Association Award for Dedication to Legal Scholarship and Public Service (1997)

New York State Bar Association Award for Outstanding Contributions to Criminal Law Education (2006)

Distinguished Faculty Award, Hofstra University (2007)

**PUBLICATIONS**

**Books**

LAWYERS' ETHICS IN AN ADVERSARY SYSTEM (1975) (ABA Gavel Award Certificate of Merit as an "outstanding" contribution to the field, 1976)

UNDERSTANDING LAWYERS' ETHICS (1st ed., 1990)

UNDERSTANDING LAWYERS' ETHICS (4th ed., 2010) (with Abbe Smith)

CONTRACTS (West Pub. Co., 1973)

TEACHER'S MANUAL, CONTRACTS (265 pp.) (West, 1978) (with Professor Alan Resnick)

CONTRACTS: AN INTRODUCTION TO LAW AND LAWYERING (photocopied)

GROUP DEFAMATION AND FREEDOM OF SPEECH (Greenwood, 1995) (ed., with Professor Eric Freedman)

**Articles Published In (Selected)**

| | |
|---|---|
| ABA Journal | NYU Law Review |
| Georgetown Law Journal | Ohio State Law Review |
| George Washington Law Review | Pennsylvania Law Review |
| Hofstra Law Review | Stanford Law Review |
| Journal of Legal Education | Texas Law Review |
| Journal of the Legal Profession | Yale Law Journal |
| Michigan Law Review | |

**PEER EVALUATIONS**

Lawrence Fox, Email to the ABA Board of Governors (2008)

> Monroe Freedman [is] the conscience of our profession.

[Continued]

5

1308

David Luban, THE GOOD LAWYER 10 (1984):

> [O]ne cannot emphasize too strongly [Freedman's] influence on discussions of legal ethics.

Ralph Temple, 13 Jour. of the Legal Profession 233 (1988):

> [Monroe Freedman's] thinking, writing and lectures ... have been the primary creative force in legal ethics today, both in the practice of law and in legal education.

William Simon, 27 Hofstra L. Rev. 1 (1998):

> Suppose you had to pick the two most influential events in the recent emergence of ethics as a subject of serious reflection by the bar.  Most likely, you would name the Watergate affair of 1974 and the appearance a few years earlier of an article by Monroe Freedman....  Of the two events, Watergate is the most famous, but ... the least important.

Steven Lubet, 34 Hofstra L. Rev. 673 (2006):

> Monroe Freedman ... is one of the few people, maybe the only person, who has actually managed to change the entire discourse in a field of legal studies.

Alan Dershowitz, 34 Hofstra L. Rev. 748 (2006):

> I regard [Monroe Freedman] as the Holmes and Brandeis of Legal Ethics.

Frank H. Armani (lawyer in the Buried Bodies Case), The Professional Lawyer, 2007 Symposium Issue, 19, 25:

> [M]y guiding light and only ray of hope was the writings of Monroe Freedman.  He was the only one that made any sense....

Ronald Rotunda, 34 Hofstra L. Rev. 1337 (2006):

> If we had to pick the one person who first created modern legal ethics as a serious academic specialty, it would be Monroe Freedman.

# APPENDIX B

**QUALIFICATIONS OF MONROE H. FREEDMAN
AS AN EXPERT WITNESS ON LAWYERS' AND JUDGES' ETHICS**

1. My name is Monroe H. Freedman. I am a Professor of Law, and the former Dean, of Hofstra University School of Law, Hempstead, New York, 11550.

2. My qualifications as an expert witness on lawyers' ethics are set forth more fully in paragraphs 3-34 below. In brief:

    (a) I have qualified as an expert witness on lawyers' and judges' ethics in state and federal courts and before the Judiciary Committees of the United States Congress, and have served as a consultant and expert witness on lawyers' ethics for the United States Department of Justice.

    (b) Honors that I have received include the American Bar Association's Michael Franck Award for Professional Responsibility. This is the highest award conferred by the ABA for professional responsibility, and was given for "outstanding contributions to the field of professional responsibility" and "a lifetime of original and influential scholarship in the field of lawyers' ethics."

    (c) For over a third of a century, I have taught and consulted on lawyers' and judges' professional responsibilities. I currently teach lawyers' ethics at Hofstra Law School and, since 1978, have lectured annually on lawyers' ethics at Harvard Law School. I have also been a Visiting Professor of Law at Georgetown Law Center since 2008.

    (d) My earlier book, LAWYERS' ETHICS IN AN ADVERSARY SYSTEM (1975), received the American Bar Association's Gavel Award Certificate of Merit. The *Harvard Civil Rights/ Civil Liberties Law Review* called it one of the few "monumental contributions to legal education in the past generation."

(e) My current book is UNDERSTANDING LAWYERS'
ETHICS (4th ed., 2010) (with Abbe Smith). *The Professional
Lawyer*, published by the ABA's Center for Professional
Responsibility, called the 1990 edition "thoughtful and elo-
quent," "rich with practical examples," and "idealistic in the
best sense of the word."

(f) My testimony, books, and/or articles have been relied
upon by numerous courts, including the United States Supreme
Court.

(g) An article in *The Journal of the Legal Profession*
concludes:

> [Monroe Freedman's] thinking, writing and
> lectures ... have been the primary creative
> force in legal ethics today, both in the
> practice of law and in legal education.

Additional peer comments are in paragraph 34, below.

## QUALIFICATIONS AS AN EXPERT WITNESS

3. My name is Monroe H. Freedman. I am a Professor of Law,
and the former Dean, at Hofstra University School of Law,
Hempstead, New York, 11550.

4. I was Dean of the Hofstra University Law School from
1973-1977. From 1989 to 2003, I was the Lichtenstein Distinguished
Professor of Legal Ethics at Hofstra Law School. I resigned the
Lichtenstein Chair in 2003 so that my colleague in the ethics field
could be appointed to it.

2

5. I have qualified as an expert witness on lawyers' ethics in federal and state proceedings throughout the country; before a Judicial Investigative Committee of the Eighth Circuit Judicial Council; before a Disciplinary Hearing Board of the United States Air Force; and before the Judiciary Committees of the United States Senate and House of Representatives.

6. I have served as a consultant and expert witness on lawyers' ethics for the United States Department of Justice.

7. I was the first Chairman of the Legal Ethics Committee of the District of Columbia Bar. By unanimous vote of the members of the Committee, I served as Chairman for two terms.

8. I have also been a member of the Committee on Legal Education and Admission to the Bar of the New York State Bar Association; a member of the Committee on Professional Responsibility of the Criminal Justice Section of the New York State Bar Association; Vice Chairman of the Ethical Considerations Committee of the ABA Section on Criminal Justice; Chairman of the Committee on Professional Responsibility of the Society of American Law Teachers (four terms); Chairman of the Committee on Professional Disciplinary Standards and Procedures of the Federal Bar Association; Co-Chairman of the Ethics Advisory Committee of the National Association of Criminal Defense Lawyers; Ethics Adviser to the Chair of the ABA Section on Criminal Justice; a member of the Committee on Professional Responsibility of the Association of the Bar of the City of New York; a member of the Committee on Professional and Judicial Ethics of the Association of the Bar of the City of New York; and a member of the Board of Governors of the District of Columbia Bar.

9. My first ethics book, LAWYERS' ETHICS IN AN ADVERSARY SYSTEM (1975), received the American Bar Association's Gavel Award Certificate of Merit. The ABA Certificate refers to the book

3

as "outstanding" in its examination of "the most difficult ethical problems a lawyer faces." About three dozen favorable reviews of the book appeared, including those in the *ABA Journal* ("scholarly ... powerful"), *ABA Litigation* ("thorough and scholarly"), and the *George Washington Law Review* ("undoubtedly, the best book published in the field of legal ethics"). In the *Harvard Civil Rights/Civil Liberties Law Review*, Professor Norman Dorsen called the book one of the few "monumental contributions to legal education in the past generation."

10. My current book is UNDERSTANDING LAWYERS' ETHICS (4th ed., 2010) (with Abbe Smith). It has been required reading at law schools including Harvard Law School, the University of California at Berkeley,  and the Georgetown Law Center; is assigned and/or recommended at other law schools; has been used in training programs for the bar in Canada; and is being translated into Chinese. *The Professional Lawyer*, published by the ABA Center for Professional Responsibility, calls the book "thoughtful and eloquent" and "idealistic in the best sense of the word, pragmatic, but not cynical, and rich with practical examples." The *Massachusetts Law Review* adds that the book is "a 'must' for every desk, bench, and briefcase."

11. Selections from my writings on lawyers' ethics are part of the assigned reading at most law schools in the United States and in law schools in Canada.

12. My testimony, books and/or articles have been cited by numerous courts, including the Supreme Court of the United States, the New York Court of Appeals, the Supreme Courts of Alaska, Arizona, Colorado, Illinois, Maryland, and New Jersey, the Court of Appeals of New Mexico, the Court of Criminal Appeals of Texas, the District of Columbia Court of Appeals, the United States District Court for the Southern District of New York, and the United States Courts of Appeals for the First, Eighth, and Ninth Circuits.

4

13.  My article on <u>The Professional Responsibility of the Criminal Defense Lawyer:  The Three Hardest Questions</u> has been excerpted and reprinted over four dozen times.

14.  The following is a partial list of my articles on lawyers' professional responsibilities:

<u>The Professional Responsibility of the Criminal Defense Lawyer:  The Three Hardest Questions</u>, 64 Mich. L. Rev. 1469 (1966)

<u>Reprint or excerpt permission requested</u>:

Hall & Kamisar, Modern Criminal Procedure (1966)
Hazard & Koniak, The Law and Ethics of Lawyering (1989)
Morgan & Rotunda, Professional Responsibility (all editions)
Schwartz & Wydick, Problems in Legal Ethics (1988)
Aronson, Devine & Fisch, Problems, Cases and Materials in Professional Responsibility (1985)
Kamisar, LaFave & Israel, Criminal Procedure (1980)
Countryman, Finman & Schneyer, The Law in Modern Society (1976)
Bishin & Stone, Law, Language, and Ethics (1972)
Kadish & Paulsen, Criminal Law and its Processes (1975)
Kaufman, Problems in Professional Responsibility (1976)
1 ABA Litigation 26 (Winter, 1975)
National Conference on Teaching Professional Responsibility (1977)
Kaplan, Criminal Justice (1978)
Tanford, The Trial Process (1983)

5

1315

Lempert & Saltzburg, A Modern Approach to Evidence
(1984)
Arthur & Shaw, Readings in Philosophy of Law (1984)
Berch, Introduction to Legal Method (1985)
Allen & Kuhns, Constitutional Criminal Procedure
(1985)
Summers et al., Law: Its Nature, Functions, and Limits
(3d ed.,1986)
Elliston & Davis, Ethics and the Legal Profession (1986)
Delisle & Stuart, Learning Canadian Criminal Procedure
(1986)
Katsh, Taking Sides (1986)
Schroder, Ethics and the Practice of Law (1988)
Callahan, Ethical Issues in Professional Life (1988)
Sharpe, Canadian Civil Procedure: Cases and Materials
(3d ed.,1988)
Shaw, Moral Issues in Business (1989)
Fairbanks, Fact, Value, Policy: Critical Thinking in
Argument (1993)
Tuedio & Trujillo, Professional Ethics in a Free-Market
System (1990)
The Legal Profession and Professional Responsibility
(University of Pennsylvania Law School, Center
on Professionalism, 1990)
D. Rhode, Professional Responsibility: Ethics by the
Pervasive Method (1994)
Luban & Rhode, Legal Ethics (1995)
Zitrin & Langford, Legal Ethics in the Practice of Law
(1995)
N. Crystal, Professional Responsibility in the Practice of
Law (1995)
Wettick, Course Materials on Professional
Responsibility (1997)
Swift, The Lawyer's Role in the American Legal System
(1997)

6

1316

Acker & Brody, Criminal Procedure: A Contemporary Perspective (1998)

Avery & Konefsky, Introduction to Law and Perspectives (1998)

Hazard, Koniak, & Cramton, The Law and Ethics of Lawyering (3d ed., 1999)

May, Snow & Bolte, Legal Philosophy: Multiple Perspectives (2000)

Hatch, Arguing in Communities: Reading and Writing Arguments in Context (2002)

Kaufman & Wilkins, Problems in Professional Responsibility (4th ed., 2002)

Koniak & Cohen

Moliterno, Cases and Materials on the Law Governing Lawyers (2d ed., 2003)

Holdstein, Challenging Perspectives (2005)

Coquillette, Real Ethics for Real Lawyers (2005)

Youngstown State Univ., Professional Ethics (2006)

Performances from "Oscar" Winning Litigators: Ethical Conundrums in Criminal Cases (N.Y. City Bar, 2007)

Moralnosc a Profesjonalizm (Morality and Professionalism), ed. Wlodzimierz Galewicz (Universitas Publishing House, Cracow, Poland, 2008)

Book Review: Carlin, Lawyers' Ethics: A Study of the New York City Bar, 16 Amer. U.L. Rev. 177 (1966)

Professional Responsibility of the Prosecuting Attorney, 55 Geo. L. Jour. 1030 (1967)

Reprinted or excerpted:

3 Crim. L. Bull. 544 (1967)

7

1317

Kaplan, Criminal Justice (1978)
Hall, Kamisar LaFave & Israel, Modern Criminal
    Procedure

<u>Professional Responsibility of the Civil Practitioner: Teaching
Ethics in the Contracts Course</u>, 21 Jour. Legal Ed. 569 (1969)

<u>Reprinted or excerpted</u>:

41 U. Colo. L. Rev. 303 (1969)
Education in the Professional Responsibilities of the
    Lawyer (ed., Weckstein) (1969)

<u>Where the Bodies Are Buried:  The Adversary System and the
Obligation of Confidentiality</u>, 10 Crim. L. Bull. 979 (1974)

<u>Reprinted</u>:

ABA, Adversarial Justice:  The American Approach to
    Adjudication (1988)
Shaw, Moral Issues in Business (1989)
Windt & Francis, Ethical Issues in the Professions
    (1989)
Shaw, Taking Sides: Clashing Views on Controversial
    Legal  Issues (1988)
J. Arthur & W.H. Shaw, Readings in Philosophy of Law
    (1984)
Berman & Geiner, The Nature and Functions of Law (4th
    ed., 1980)
Shaw & Shapiro, Readings in the Philosophy of Law
    (2013)

<u>A Civil Libertarian Looks at Securities Regulation</u>, 35 Ohio St.
L. Jour. 280 (1974)

1318

Reprinted or excerpted:

Schwartz, Lawyers and the Legal Profession
          (1979)

Judge Frankel's Search for Truth, 123 U. Pa. L. Rev.1060
(1975)

Reprinted or excerpted:

National Conference on Teaching Professional
          Responsibility (1977)
Morgan & Rotunda, Professional Responsibility (all
          editions)
Schroeder, Ethics and the Practice of Law (1988)
Luban & Rhode, Legal Ethics (1995)
Levine, Doernberg, & Nelken, A Civil Procedure
          Anthology (1998)
P.G. Haskell, Why Lawyers Behave As They Do (1997)

Solicitation of Clients:  For the Poor, Not the Privileged,  Juris
          Doctor (Apr., 1971)

Advertising and Solicitation by Lawyers: A Proposed Redraft of
Canon 2 of the Code of Professional Responsibility, 4 Hofstra
L. Rev. 183 (1976)

Advertising and Solicitation: The Professional Obligation to
Chase Ambulances, LAWYERS' ETHICS IN AN ADVERSARY
SYSTEM (1975)

Reprinted:

Nader & Green,Verdicts on Lawyers (1976)
Callahan, Ethical Issues in Professional Life (1988)

9

Solomon, Martin, & Vaught, Ethics for Professionals
    (2009)

Counseling the Client: Refreshing Recollection or Prompting
Perjury? ABA Litigation 35 (Spring, 1976)

   Reprinted or excerpted:

   ABA, The Litigation Manual (all editions)
   Tanford, The Trial Process (1983)
   Twerski & Henderson, Products Liability:  Problems and
        Process (Teacher's Guide) (3d ed., 1997)
   Berke, Professional Responsibility of Criminal Law
        (1999)

The Life-Saving Exception to Confidentiality: Restating the
Law Without the *Was*, the *Will Be*, or the *Ought to Be*, 29
Loyola (L.A.) L. Rev. 1631 (1996)

Are There Public Interest Limits on Lawyers' Advocacy?  11
Social Responsibility 31 (1976)

   Reprinted:

   2 Jour. Legal Prof. 47 (1977)

Prior Restraints on Freedom of Expression by Defendants and
Defense Attorneys, 29 Stan. L. Rev. 608 (1977) (with Janet
Starwood)

   Revised and reprinted:

   Criminal Defense Techniques (Matthew Bender) (with S.
        Kahan)

10

For a New Rule [on the former government lawyer's conflict of interest], 63 ABA Jour. 724 (1977)

Reprinted or excerpted:

Morgan & Rotunda, Professional Responsibility (1984)

The Loss of Idealism -- By Whom, And When? 53 N.Y.U. L. Rev. 658 (1978)

Personal Responsibility in a Professional System, 27 Cath. U.L. Rev. 191 (1978) (Pope John XXIII Lecture)

Reprinted or excerpted:

7 ABA Human Rights 28 (1978)
Roscoe Pound/ATLA Found., Ethics and Advocacy (1978)
Wolfman & Holden, Ethical Problems in Federal Tax Procedure (1981)
Pirsig & Kirwin, Professional Responsibility (1984)
Luban, The Ethics of Lawyers (1994)
Cochran & Collett, Cases and Materials on the Rules of the Legal Profession (1996)

Removal and Discipline of Federal Judges, 31 Mercer L. Rev. 681 (1980)

The Securities and Exchange Commission Enforcement Program, 38 Wash. & Lee L. Rev. 781 (1981) (with S. Sporkin)

The Kutak Model Rules vs. The American Lawyer's Code of Conduct, 26 Vill. L. Rev. 100 (1981)

11

Lawyer-Client Confidences and the Constitution, 90 Yale L. Jour. 1486 (1981)

Reprinted or excerpted:

Dorsen & Gillers, Regulation of Lawyers: Problems of Law and Ethics (1985)

Are the Model Rules Unconstitutional? 35 U. Miami L. Rev. 174 (1981)

Lawyer-Client Confidences -- The Model Rules' Radical Assault on Tradition, 68 ABA Jour. 428 (1982)

Reprinted:

26 Boston Bar Jour. 10 (April, 1982)

Arguing the Law in an Adversary System, 16 Ga. L. Rev. 821 (1982)

The Model Rules:  Improved but Unworthy of Adoption, 69 ABA Jour. 866 (1983)

Reprinted:

54 Okla. Bar Jour. 1681 (1983)

Confidentiality in the Lawyer-Client Relationship, The Neb. Humanist (Fall, 1984)

Lawyer-Client Confidences Under the Model Rules:  Ethical Rules Without Ethical Reason, 3 Crim. Justice Ethics 3 (Summer/Fall, 1984)

12

The Guilty Plea Problem, X Social Resp. 32, 37 (1984)

Undercover Operations Against Lawyers and Judges, 9 Jour. Legal Prof. 73 (1980)

Does Incrimination by Counsel Deny Effective Assistance? ABA Barrister 13 (Fall, 1985)

> Reprinted:
>
> Nat'l L. Jour. 13 (11/4/85)

The Professional Responsibility of the Law Professor: Three Neglected Questions, 39 Vand. L. Rev. 275 (1986)

> Reprinted or excerpted:
>
> Student Law News 8 (11/87)
> 36 Law Rev. Dig. 26 (1986)
> 86 L.A. Daily Jour. Rpt. 16 (8/22/86)

The Ethics of Advocacy in the Advocacy of Ethics, 1 New L. Book Rev. 1 (1986)

The Aftermath of Nix v. Whiteside: Slamming the Lid on Pandora's Box, 23 Crim. L. Bull. 25 (1987)

> Reprinted or adapted:
>
> __ Social Resp. (1986)
> 1 Hofstra L. Mag. 8 (1987)
> Schwartz & Wydick, Problems in Legal Ethics (1988)

Advances in Prosecutors' Ethics, 1 ABA Crim. Just. __ (Winter, 1987)

13

1323

Reprinted:

14 CACJ Forum 9 (July/Aug., 1987)

Legal Ethics and the Suffering Client, 36 Cath. U.L. Rev. 331
(1987)

Reprinted:

Paris & Taslitz, Introductory Constitutional Criminal
Procedure: A Lawyering Perspctive (Foundation
Press, 1997)

Two Fables for Lawyers, ABA Jour. 57 (May, 1, 1988)

Client Confidences and Client Perjury:  Some Unanswered
Questions, 136 U. Pa. L. Rev. 1939 (1988)

Reprinted:

1 Crim Prac. L. Rev. ___ (1989)
J.G. Carr, Criminal Law Review--1990
Hazard & Koniak, The Law and Ethics of Lawyering
(1990)

The Lawyer As Hired Gun, II Memphis Bar Forum 6 (1988)

Reprinted:

4 Wash. Lawyer 22 (Mar./Apr., 1990)
Ariz. Atty. 11 (Aug./Sept., 1990)
N.Y. State Bar Jour. 48 (Nov., 1990)
396 Laches 32 (Oakland Cty. Bar Assn., Mich. 1997)

14

1324

The Need for a Rule 11 for Judges, 128 F.R.D. 437 (1990) (Delivered at the plenary session of the 1989 Federal Circuit Judicial Conference, Wash., D.C.)

Ethical Ends and Ethical Means, 41 Jour. Legal Education 55 (1991)

Excerpted:

J. Levy & J.E. Moliterno, Ethics of the Lawyer's Work (1993)
J.E. Moliterno, Ethics of the Lawyer's Work (2003)

Law in the 21st Century, 60 Fordham L. Rev. 503 (1992)

Disqualification of Judges, 58 Brooklyn L. Rev. 1063, 1078 (1993)

Atticus Finch -- Right and Wrong, 45 Ala. L. Rev. 473 (1994)

Reprinted:

EBSCO (pub.), Critical Insights (2008)

Excerpted:

David R. Papke, et al., Law and Popular Culture (2007)

Quoted:

Malcolm Gladwell, The Courthouse Ring: Atticus Finch and the limits of Southern liberalism (Aug. 10, 2009)

Kaye Scholer -- Overzealous or Overblown? 35 S. Tex. L. Rev. 601 (1994)

15

John T. Noonan, Jr.:  Exemplar of Ethical Conduct, 11 Jour. of Law & Religion 1001 (1995)

But Only If You Know, Chapter 10 in R.J. Uphoff (ed.), Ethical Problems Facing the Criminal Defense Lawyer – Practical Answers to Tough Questions (ABA, 1995)

>Reviewed, ABA Criminal Justice: "There exists no better choice of authority [than Monroe Freedman] to help you answer the ethical dilemma(s) surrounding client perjury, and he delivers in this book."

>Translation into Japanese being prepared by the Japan Federation of Bar Associations for publication in Japan

The Lawyer's Moral Obligation of Justification, 74 Tex. L. Rev. 111 (1995)

Legal Ethics from a Jewish Perspective, 27 Tex. Tech. L. Rev. 1131 (1996)

>Reprinted:

>Baker & Floyd (eds.), Believing and Practicing: Meditations on Faith and the Law (1998)

The Life-Saving Exception to Confidentiality: Restating the Law Without the *Was*, the *Will Be*, or the *Ought to Be*, 29 Loyola (L.A.) L. Rev. 1631 (1996)

The Trouble with Postmodern Zeal, 38 Wm. & Mary L. Rev. 63 (1996)

16

The Threat to Judicial Independence by Criticism of Judges -- A Proposed Solution to the Real Problem, 25 Hofstra L. Rev. 729 (1997)

Religion Is Not Totally Irrelevant to Legal Ethics, 66 Fordham L. Rev. 1299 (1998)

The Ethical Danger of "Civility" and "Professionalism," 6 Crim. Justice Jour. 17 (1998)

Reprinted:

396 Laches 22 (1999)

Caveat Lector: Conflicts of Interest of ALI Members in Drafting the Restatements, 26 Hofstra L. Rev. 641 (1998)

Our Constitutionalized Adversary System, 1 Chapman L. Rev. 57 (1998)

Ethics, Truth, and Justice in Criminal Litigation, 68 Fordham L. Rev. 1371 (2000)

How Lawyers Act in the Interests of Justice, 70 Ford. L. Rev. 1717 (2002)

Professional Discipline of Prosecutors, 30 Hofstra L. Rev. 121 (2002)

The Professional Obligation to Raise Frivolous Issues in Death Penalty Cases, 31 Hofstra L. Rev. 1167 (2003)

Excerpted:

17

D.J. Meador, T.E. Baker, & J.E. Steinman,
Appellate Courts – Structure, Function, Processes,
and Personnel

Duck-Blind Justice: Justice Scalia's Memorandum in the
*Cheney* Case, 18 Georgetown Jour. Legal Ed. 229 (2004)

An Ethical Manifesto for Public Defenders, 39 Valparaiso L.
Rev. 911 (2005)

In Praise of Overzealous Representation – Lying to Judges,
Deceiving Third Parties, and Other Ethical Conduct, 34 Hofstra
L. Rev. 771 (2006)

Henry Lord Brougham – Written by Himself, 19 Georgetown
Jour. Legal Eths. 1213 (2006)

Henry Lord Brougham and Zeal, 34 Hofstra L. Rev. 1319
(2006)

Erroneous Disclosure of Damaging Information, 14 Geo. Mason
L. Rev. 179 (2006)

Judicial Impartiality in the Supreme Court – The Troubling
Case of Justice Stephen Breyer, 30 Okla. City Univ. L. Rev. 513
[2007]

The Buried Bodies Case: Alive and Well after Thirty Years,
ABA, The Professional Lawyer, 2007 Symposium Issue

Henry Lord Brougham – Advocating at the Edge for Human
Rights, 36 Hofstra L. Rev. 311 (2007)

Reprinted:

18

Oregon Law Institute, Continuing Legal Education (2008)

Ethical Issues in Handling Veterans' Claims, 22 Vet. App. Reporter cxxvii (2008)

Getting Honest About Client Perjury, 21 Georgetown Jour. Legal Ethics 133 (2008)

Reprinted:

14 Verdict 21 (October, 2008)
Institute of Chartered Financial Analysts of India,
     Prosecutorial Misconduct (ed., Dr. G. Radha
     Kalyani) (2009)

What Ever Happened to the Search for Truth?, 60 Mercer L. Rev. 851 (2009)

Misunderstanding Lawyers' Ethics, 108 Mich. L. Rev. 925 (2010) (with Abbe Smith)

The Cooperating Witness Who Lies – A Challenge to Defense Lawyers, Prosecutors, and Judges, 2 Ohio State Jour. Crim. L. 739 (2010)

The Influence of the American Lawyers' Code of Conduct on ABA Rules and Standards, 38 Hofstra L. Rev. 927 (2010)

Client-Centered Lawyering – What It Isn't, 40 Hofstra.L. Rev. 349 (2011)

A Critique of Philosophizing About Lawyers' Ethics, 25 Georgetown Journal of Legal Ethics 91 (2012).

19

15. From 1990-1996, I wrote a monthly column, *Cases and Controversies*, in the Legal Times and several other newspapers throughout the country. Commenting in the Georgetown Journal of Legal Ethics, Professor Thomas Morgan called the columns "tough, imaginative essays." Columns have been reprinted or excerpted in Gellhorn, Byse, Strauss, Rakoff & Schotland, Cases and Materials on Administrative Law (9th ed., 1995); The Lawyer As Professional (Eds., Floyd & Newton, 1991); D. Rhode, Legal Ethics by the Pervasive Method (1993); T.D. Morgan & R. Rotunda, Problems and Materials on Professional Responsibility (6th ed., 1995; 7th ed., 2000) (two columns); N. Crystal, Professional Responsibility in the Practice of Law (1995); Cochran & Collett, Cases and Materials on the Rules of the Legal Profession (1996) (two columns); C.D. Johnson, Understanding to Kill a Mockingbird (1994); Zitrin & Langford, Legal Ethics in the Practice of Law (2d ed., 2001); and Rhode & Luban, Legal Ethics (3d ed., 2001) (two columns); and Professor Stephen Gillers has asked permission to reprint a column in Regulation of Lawyers: Problems of Law and Ethics. In addition, two of the columns have been the subject of the *At the Bar* column in the New York Times, another has been reprinted in the Congressional Record, one was appended to a Pennsylvania Bar Ethics Opinion, and others have been quoted or cited in law reviews, including the Yale Law Journal. Yale Professor Harold Bloom has reprinted one of my columns (on Atticus Finch) in his 2003 book on Harper Lee's To Kill a Mockingbird.

16. For forty-five years, I lectured annually on lawyers' professional responsibilities at Harvard Law School, where I also served as an instructor on litigation skills.

17. I have taught a course and/or a seminar on lawyers' professional responsibilities for over 40 years, and am invited to speak several times each year on lawyers' and judges' ethics at bar association meetings, judicial conferences, and law schools throughout the United States and abroad. Judicial conferences include: the Federal

20

Circuit Judicial Conference; the New York State Judicial Conference; the District of Columbia Judicial Conference; the Council of State Intermediate Appellate Court Chief Justices; the Annual Conference of Judges in Tennessee; the Judicial Conference of the U.S. Court of Appeals for Veterans' Affairs, and the Annual Conference of Judges in Florida. I have also given the keynote address at several conferences, including an annual meeting of the National Organization of Bar Counsel, and have spoken innumerable times at American Bar Association conferences.

18. The Wisconsin Department of Justice retained me to give a three and one-half hour lecture to 160 state prosecutors, including the Attorney General of Wisconsin, on prosecutors' ethical responsibilities. Also, the Office of the United States Attorney for the Southern District of Florida and the Office of the State Attorney for Dade County retained me to chair a two-hour ethics seminar for federal and state prosecutors.

19. The Administrative Office of the Illinois Courts retained me to address (in two sessions) all 1,000 Illinois state judges, on judicial ethics.

20. I have been a Consultant on professional responsibility to the Special Committee on Courtroom Conduct of the Association of the Bar of the City of New York; Consultant on professional responsibility to the United States Legal Services Corporation; and was awarded a Ford Foundation Travel-Study Grant to study lawyers' professional responsibilities in the United States, Canada, Scotland, and England.

21. Although I had then been living in New York for ten years, I was appointed in 1983-1986 to serve on the District of Columbia Bar's Special Committee (the Jordan Committee) to make recommendations regarding adoption of the ABA's proposed <u>Model Rules of Professional Conduct</u>. I was also a member of the

21

Committee's Subcommittee on Special Rules for Prosecutors.  In 1997, I was invited to address the Supreme Judicial Court of Massachusetts on the state's proposed new rules on confidentiality.

22.  As Reporter to the Roscoe Pound Foundation, I was the principal draftsman of the <u>American Lawyer's Code of Conduct</u>.  Parts of this code have been the basis for rules adopted in other codes, including  the Rules of Professional Conduct in New York; the Rules of Professional Conduct in Washington, D.C., the ABA Standards Relating to the Prosecution Function, the ABA's Model Rules of Professional Conduct, and the ALI's Restatement of the Law Governing Lawyers.

23.  I held the Baker-Hostetler Chair in Law at Cleveland-Marshall Law School during the spring semester of 1992, teaching a course and giving lectures on lawyers' and judges' ethics.

24.  I delivered the Inaugural Annual Wickwire Lecture in Legal Ethics and Professional Responsibility at Dalhousie University, Nova Scotia, Canada, in 1992, and numerous bar lectures and keynote addresses throughout the United States.

25.  I was the Director of the Criminal Trial Institute in Washington, D.C., in 1965-1966.  In the Institute we used and developed techniques for training trial advocates that have since become standard in the National Institute for Trail Advocacy and similar programs.  The Institute was the first such program to include lawyers' ethics as part of the training program.

26.  I have conducted trial and appellate litigation in several state and federal courts and before administrative agencies.

27.  I have been admitted to the bars of New York, the District of Columbia, Massachusetts, Pennsylvania, the Interstate Commerce Commission, the United States District Court for the District of

22

1332

Columbia, the United States District Court for the Southern District of New York, the United States District Court for the Eastern District of New York, the United States Court of Appeals for the District of Columbia Circuit, the United States Court of Appeals for the Second Circuit, the United States Court of Appeals for the Ninth Circuit, the United States Court of Appeals for the Eleventh Circuit, the United States Court of Appeals for the Federal Circuit, and the Supreme Court of the United States.

28. I have been elected to membership in the American Law Institute, and served on its Consultative Group on the Law Governing Lawyers.

29. I served as an elected a Fellow of the American Bar Foundation. A Fellow is one whose "public and private career has demonstrated outstanding dedication to the welfare of the community [and] the traditions of the profession."

30. I have been elected an Honorary Fellow of the American Board of Criminal Lawyers.

31. I have received the 2005 Sanford D. Levy Award from the New York State Bar Association "in recognition of your extraordinary contribution to the field of professional ethics through a body of work that spans four decades"; a New York State Bar Association Award for Dedication to Legal Scholarship and Public Service (1997); a New York State Bar Association Award for Outstanding Contributions to Criminal Law Education (2006); an Award of Merit from the District of Columbia Bar; a President's Commendation Award from the National Association of Criminal Defense Lawyers; the Martin Luther King Humanitarian Award (1986); the Lehman-LaGuardia Award for Civic Achievement (1996); and the ABA's Michael Franck Award for Professional Responsibility (1998), which cited "outstanding contributions to the field of professional responsibility" and "a

23

1333

lifetime of original and influential scholarship in the field of lawyers' ethics."

32.  I received an A.B., 1951, LL.B., 1954, and LL.M., 1956, at Harvard University.

33.  I have been listed for many years in Who's Who in American Law, Who's Who in America, and Who's Who in the World.

34. Peer comments on my work in lawyers' and judges' ethics include the following:

Lawrence Fox, in an email to the ABA House of Delegates (2008):

> Monroe Freedman [is] the conscience of our profession.

Ralph Temple, 13 Jour. of the Legal Profession 233 (1988):

> [Monroe Freedman's] thinking, writing and lectures ... have been the primary creative force in legal ethics today, both in the practice of law and in legal education.

David Luban, THE GOOD LAWYER 10 (1984):

> [O]ne cannot emphasize too strongly [Freedman's] influence on discussions of legal ethics.

William Simon, 27 Hofstra L. Rev. 1 (1998):

> Suppose you had to pick the two most influential events in the recent emergence of ethics as a subject of serious reflection by the bar.  Most likely, you would name the Watergate affair of 1974 and the appearance a few years earlier of an article by Monroe Freedman....  Of the two

24

events, Watergate is the most famous, but ... the least important.

Steven Lubet, 34 Hofstra L. Rev. 673 (2006):

> Monroe Freedman ... is one of the few people, maybe the only person, who has actually managed to change the entire discourse in a field of legal studies.

Alan Dershowitz, 34 Hofstra L. Rev. 748 (2006):

> I regard [Monroe Freedman] as the Holmes and Brandeis of Legal Ethics.

Frank H. Armani (lawyer in the Buried Bodies Case), The Professional Lawyer, 2007 Symposium Issue, 19, 25:

> [M]y guiding light and only ray of hope was the writings of Monroe Freedman.  He was the only one that made any sense....

Ronald Rotunda, 34 Hofstra L. Rev. 1337 (2006):

> If we had to pick the one person who first created modern legal ethics as a serious academic specialty, it would be Monroe Freedman.

25

1335

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, <br><br><br> Petitioner, <br><br> v. <br><br><br> UNITED STATES OF AMERICA, <br><br><br> Respondent. | 6:09-cv-00105-JHP |

**DECLARATION OF COUNSEL IN SUPPORT OF
PETITIONER'S NOTICE REGARDING
AMENDED PETITION FILED PURSUANT TO COURT ORDER**

I, Tivon Schardl, declare the following:

1.      I am appointed co-counsel for Kenneth Eugene Barrett in this case.  As part of my responsibilities in the case, following the hearing held October 6, 2009, and in response to comments from the Court made during that hearing, I researched all capital habeas corpus cases filed in the Eastern District of Oklahoma since January 1, 1998.

2.      The purpose of this research was to determine whether I and lead counsel had understood Rule 2 of the Rules Governing § 2255 Proceedings, and the local rules, in a manner that was inconsistent with the understanding of other lawyers in capital cases in the Eastern District.

1

3.      I identified all capital habeas corpus cases filed after January 1, 1998 by logging

onto the Court's CM/ECF system using the Federal Defender's generic login.  I clicked the

"query" button and entered search parameters under the second option on the query page as

follows:

In this way, I believed I was querying the CM/ECF database for all cases filed under the

same code as Mr. Barrett's case, and therefore for all similarly situated cases.

4.      That query produced a list of seventeen (17) cases, including Mr. Barrett's.  I

entered each of those cases into the table appended to this declaration.  Insofar as the issues I was

researching involved the application of the local rules, that Mr. Barrett's case was classified the

same way as capital habeas cases filed under 28 U.S.C. § 2254, and that L.Cv.R. 9.2 treated §

2255 and § 2254 cases identically, this list appeared to represent the complete set of relevant cases.

5.     I attempted to learn whether the petitions in the sixteen (16) cases other than Mr. Barrett's were different from his in the following respects:  (a) whether the petitions were filed on the form appended to the Rules Governing § 2254 Cases in the District Courts; (b) whether, if not, they contained "argument" and citations to law, i.e. whether they were in the form of a motion/brief; (c) whether, if the petitions were not filed on the form, they were longer than 25 pages; (d) whether the petitions sought various forms of relief including discovery or evidentiary hearings; and, (e) whether, if the answers to (a), (b), (c), or (d) were in the affirmative, the District Court had made an issue of it and requested the petitioners to modify their pleadings accordingly.

6.     In order to answer these questions, I first attempted to form at least an educated guess based upon the documents available through CM/ECF.  For nearly all the cases, the petitions and relevant orders, if any, were not available for download.  After reviewing the docket entries, and hypothesizing that no capital habeas petitioner on the list had used the form, or been faulted for failing to do so, I decided to conduct a telephone and e-mail survey of counsel in order to test that theory.  However, based on a review of the dockets, it appeared that one case, *Braun v. Keating*, Case No. 6:00-cv-00102-JHP-KEW, was a second or successive petition, and I therefore eliminated it from further inquiry.

7.     In ten (10) of the fifteen (15) similarly situated cases, counsel were current or former attorneys from the Capital Habeas Unit of the Federal Public Defender for the Western District of Oklahoma.  I spoke with some of these lawyers by telephone and then sent a

3

confirming e-mail regarding the five issues of concern.  Randy Bauman, Vicki Werneke, Kristi Christopher, and Scott Braden, lawyers I have known for many years, confirmed that the CHU had not in the past eleven years filed a petition on the form, had filed in the form of a motion/brief, that the petitions had exceeded 25 pages in length without seeking prior leave, and had sought evidentiary hearings (at least), and there had been no issue made of any of these things.  Mr. Braden reported, however, that in at least one case filed sometime before my survey period, he thought he recalled the Court requesting that a petition be refiled on the form.

8.  In addition to speaking with and/or e-mailing the CHU attorneys, I spoke by telephone with Steve Presson, Chris Eulberg, and Gregory Laird.  These attorneys represented the petitioners in four (4) of the five (5) cases not handled by CHU attorneys.  I asked them the same questions I had asked the CHU attorneys, and received the same responses.

9.  I resolved questions about the remaining case, *Wackerly v. Sirmons*, Case No. 6:01-cv-00567-FHS-KEW, by reviewing the District Court's opinion at 2007 WL 963210, and the opinion on appeal in *Wackerly v. Workman*, 580 F.3d 1171 (10th Cir. 2009).

10.  Based on the records and recollections of counsel, and in some cases counsel's review of the petitions they filed, no capital habeas corpus petitioner in the Eastern District of Oklahoma for the eleven years preceding Mr. Barrett's application for habeas relief, has been required to file on the form, seek leave for filing a petition containing argument in excess of 25 pages, or been faulted for seeking an evidentiary hearing or other process in his prayer for relief. In the majority of cases, the Court denied relief after the parties filed their answer and reply, respectively.  The Court had allowed limited time for filing replies.  Thus, the orderly processing

4

1340

of capital habeas cases has appeared to rely upon argument being presented in the petitions themselves.

I declare, under penalty of perjury as provided in the laws of the United States of America, that the foregoing five-page declaration is true and correct.

Executed by me this 30th day of November, 2009, in Sacramento County, California.

/s/ Tivon Schardl

5

1341

# APPENDIX A

**CAPITAL HABEAS CASES FILED IN THE EASTERN DISTRICT OF OKLAHOMA
BETWEEN JANUARY 1, 1998 AND MARCH 2009**

| | CASE | FILED DATE & DOC. # | ON FORM | COUNSEL |
|---|---|---|---|---|
| 1 | *Battenfield v. Ward*, 6:98-cv-00036-JHP<br>*Battenfield v. Gibson*, 236 F.3d 1215 (10th Cir. 2001). | 6/15/1998 (Doc. #16); Appendix filed 6/15/1998 (Doc. #17); denied without briefing, argument or hearing of any kind 5/5/1999 (Doc. #28) | No, per counsel, but contained all info req'd by form, contained brief, over 25 pages, appendix included exhibits | Robert Jackson Steve Presson 10-20-09 |
| 2 | *Johnson v. Gibson*, 6:98-cv-00072-FHS-JHP<br>*Johnson v. Gibson*, 10th Cir. Case No. 99-7089, 2000 WL 1158335 (10th Cir. 8/16/2000) | 7/16/98 (Doc. # 11); State court appendix filed separately 5/1/98 (Doc. 8); response filed 9/30/98 (Doc. 18); reply filed 11/2/98 (Doc. 22); petition denied 6/29/99 (Doc. 30) | No, per counsel. Separate motions for discovery & record expansion. Denied after reply w/o fact-development. | Randy Bauman, FDP CHU |
| 3 | *Johnson v. Gibson*, 6:98-cv-00331-FHS<br>*Johnson v. Gibson*, 254 F.3d 1155 (10th Cir. 2001) | Minute order of 12/1/98 says "all motions to be filed within petition" (Doc. 11); 2/1/99 petition filed (Doc. 12); brief filed separately 2/1/99 (Doc. 14); 3/23/99 response (Doc. 17); 6/30/99 reply (Doc. 24; 12/9/99 order denying (Doc. 30) [10th Cir. reversed and remanded] | No, per FPD CHU attorneys, no CHU case has been filed on form. | Stephen J. Greubel, FPD CHU |
| 4 | *Humphreys v. Gibson*, 6:98-cv-00568-FHS-JHP<br>*Humphreys v. Gibson*, 261 F.3d 1016 (10th Cir. 2001) | 5/18/1999 (Doc. #11); Order denying filed 3/30/2000 (Doc. #24) after response and reply | No, per counsel, cites cases, 81 pages | Chris Eulberg 405-232-3450 10-21-09 |
| 5 | *Cummings v. Gibson*, 6:99-cv-00447-FHS-KEW<br>*Cummings v. Sirmons*, 506 F.3d 1211 (10th Cir. 2007) | Denied 8/11/2006, 2006 WL 2434462 | Apparently not. Eulberg said he'd never used the form. Neither district court opinion nor 10th Cir. opinion mentions. | Chris Eulberg 405-232-3450 10-21-09 |
| 6 | *Snow v. Gibson*, 6:00-cv-00070-FHS<br>*Snow v. Sirmons*, 474 F.3d 693 (10th Cir. 2007) | 7/31/2000 (Doc. #13); with appendix filed same day (Doc. # 14). | No, per counsel. Not mentioned in 10th Circuit opinion. | Vicki Wernecki 10-20-09 |
| 7 | *Delozier v. Gibson*, 6:00-cv-00102- | 8/31/2000 (Doc. #18), withdrawn and | No, per counsel and docket entries | Randy Bauman |

|   | CASE | FILED DATE & DOC. # | ON FORM | COUNSEL |
|---|------|--------------------|---------|---------|
|   | JHP-KEW<br>*Delozier v. Sirmons*, 532 F.3d 1306 (10th Cir. 2008) | supplemented on 10/10/2000 (Doc. # 23); appendix filed 10/10/2000 (Doc. #24); on 10/20/2003 JHP granted motion to amend with recent authority (Doc. ##48, 49) | on legal authority.  Not mentioned in 10th Circuit opinion. | 10-20-09 |
| 8 | *Braun v. Keating*, 6:00-cv-00371-MB-JHP | 7/18/2000 (Doc. #3), appendix filed 7/18/2000 (Doc. 4) [This appears to have been a successor filed under warrant.] | n/a | Benjamin McCullar 405-214-2889 |
| 9 | *Phillips v. Gibson*, 6:01-cv-00045-JHP-KEW | 10/1/2001 (Doc. #18); Mot. Leave to Amend (post exhaustion) (Doc. #37); Order granting leave to amend (Doc. #40); Amendment to Pet. filed 4/15/2004 (Doc. #43) | No, counsel said it was a "brief" | Gregory W. Laird 405-632-6668 10-22-09 |
| 10 | *Taylor v. Workman*, 6:01-cv-00252-JHP-KEW<br>Opinion denying relief:  2007 WL 778043<br>*Taylor v. Workman*, 554 F.3d 879 (10th Cir. 2009). | 11/29/2001 (Doc. #14)[included request for evidentiary hearing]; 3/12/2007 Order denying petition & request for hearing (without briefing) (Doc. #32).  Although District Court opinion notes it was improper under Rule 2 for petitioner to name Attorney General as respondent, there is no other mention of rule or form. 2007 WL 778043 at *1 | No, per Randy Bauman. | Randy Bauman |
| 11 | *Hammon v. Gibson*, 6:01-cv-00253-FHS-KEW | 12/18/2001 (Doc. #18); 12/18/2001 separate mot expand record (Doc. #19); 2/13/2002 response filed; [Case dismissed after petitioner sentenced to life based on *Atkins v. Virginia*] | No, per counsel. | Kristi Christopher, Scott Braden, Vicki Werneke |
| 12 | *Wackerly v. Sirmons*, 6:01-cv-00567-FHS-KEW<br>*Wackerly v. Workman*, 580 F.3d 1171 (10th Cir. 2009) | 5/7/2002 (Doc. #19), appendix filed same day (Doc. #20), mot. expand record filed same day (Doc. #22); 7/15/2002 order granting mot. to expand for purpose of determining whether P entitled to evid hr'g; 8/7/2002 response; 9/13/2002 reply | Not mentioned in opinion 2007 WL 963210, or appeal. | James T. Rowan 405-239-2454 Joseph Wells 405-942-8800 |

| | CASE | FILED DATE & DOC. # | ON FORM | COUNSEL |
|---|---|---|---|---|
| 13 | *Murphy v. Mullin*, 6:03-cv-00443-RAW-KEW | 3/5/1004 (Doc.14); Amended Petition Removing unexhausted claims filed 9/10/2004 (Doc. #34); 2nd Amendment filed 12/28/2005 (Doc. #54) [not on form; includes points and authorities; requests hearing & briefing; is 46 pages long; list of exhibits; no verification]; 8/1/2007 opinion denying relief does not mention form of petitions | No, per counsel | Kristi Christopher |
| 14 | *Duty v. Mullin*, 6:05-cv-00023-FHS-SPS | 7/28/2005 (Doc. #32) | No, per counsel | Randy Bauman |
| 15 | *Ryder v. Mullin*, 6:05-cv-00024-JHP-KEW | 9/13/2005 (Doc. #13); Suppl. Auth filed 3/21/2006 contains argument (Doc. 21) | No, per counsel | Randy Bauman |
| 16 | *Derosa v. Mullin*, 6:05-cv-00213-JHP-SPS | 12/23/2005 (Doc. #17); Attachments filed 12/23/2005 (Doc. #18); Response filed 3/22/2006 with attachments (Doc. #19). | No, per counsel | Patti Palmer Ghezzi (FPD) |
| 17 | *Barrett v. USA*, 6:09-cv-00105-JHP | | Yes, per order of the court. | |

# EXHIBIT C

**Declaration of Scott E. Sundby**

I, Scott E. Sundby, of Miami, Florida, do hereby swear and affirm the following:

1.      I am a Professor of Law and Dean's Distinguished Scholar at the University of Miami, School of Law in Miami, Florida.

2.      I have been involved as a primary investigator with the Capital Jury Project (CJP) since 1992.  The CJP is funded by the National Science Foundation as an ongoing study to determine how jurors in capital cases decide between life and death sentences.  The CJP has conducted in-depth standardized interviews (lasting on average three to four hours) with approximately 1200 jurors from 353 capital cases from 14 different states.

3.      Since its inception, CJP researchers have published over fifty articles and two books based on the data.  I personally have written one book (A LIFE AND DEATH DECISION: A JURY WEIGHS THE DEATH PENALTY) and six articles looking at various aspects of capital jury decision making.  I also have lectured widely to judges through the National Judicial College and other programs (such as Florida's Advanced Judicial Studies) about the death penalty, including the CJP's findings.  The CJP has been cited in a number of judicial opinions, including by the United States Supreme Court (Florida v. Nixon, 543 U.S. 175, 192 (2004)).

4.      In assessing the likely impact of mitigating evidence, the Capital Jury Project (CJP) has found that the critical inquiry is how the mitigation would fit into the overall "case for life" that would have been presented to the jury. Jurors are most likely to return a life sentence in cases where the defendant's life story is one where the defendant is seen as having ended up committing the murder because of events or influences that were largely beyond his control.  As a result, mitigating evidence such as mental illness or an abusive childhood that left a defendant without the guiding hand of an adult are particularly powerful because a juror is likely to find that such mitigation meant that the defendant lacked full control over his decision making and the events that eventually culminated in the murder.

One of the CJP's key findings, therefore, is that mitigating evidence cannot be evaluated in isolation or in the abstract, but must be assessed within the context of an overall case.  This finding is particularly important when it comes to mitigation that is sometimes described as "double-edged" mitigation on the theory that it might also have the potential to make a juror less sympathetic to the defendant.  A mitigating factor like drug abuse, for example, in the abstract might not appear to be a powerful mitigator because some jurors might see drug abuse as something that the defendant brought upon himself.

In fact, however, a defendant's drug abuse can be a critical component of a properly presented case for life.  If the defendant's drug use, for example, was an effort by the defendant to "self-medicate" because he suffered from mental illness and was not receiving adequate medical or psychiatric treatment, the drug use becomes an important part of the overall mitigation case by reinforcing the theme that the defendant was suffering from an untreated

mental illness.  Likewise, jurors have found drug abuse to be critical mitigating evidence in cases where the defendant is perceived as not having received the help from his family, community or medical facilities that could have helped him overcome the underlying causes of his actions.

5.      Based on the CJP's findings, therefore, an essential lesson for lawyers is to not exclude mitigation that would help establish the most powerful theme of a case for life (i.e., that a defendant was subjected to influences beyond his control) because it might also lead to evidence of "bad" behavior.  After hearing that a defendant grew up in a highly dysfunctional family, jurors are not surprised that the defendant then became involved with drugs or acted in a manner that resembles the dysfunction he grew up in.  Indeed, such evidence often critically reinforces for the jurors that the defendant was raised in circumstances that deprived him of the chance of ever choosing the "high road."  As noted earlier, jurors are most likely to vote for life in cases where a defendant is battling against circumstances not of his own making, such as mental illness and a dysfunctional family.  Moreover, and very importantly, this type of mitigation can often be developed through the testimony of non-expert witnesses (for instance, family members, teachers, coaches, etc), and these are the types of witnesses to which jurors respond most favorably, making expert testimony unnecessary.

6.      The CJP also has found that a case for life built primarily around "good character" evidence (e.g., the defendant was a good father or brother) is not very persuasive mitigating evidence.  Rather, such evidence generally becomes effective only in the context of showing that an individual who has been struggling against difficult circumstances (such as being raised in a dysfunctional household) still has managed to do some good and has the potential for positive acts in the future.  The failure of "good character" evidence to work as the primary theme of mitigation is not surprising when one considers that the jurors have just convicted the defendant of a terrible crime.  From the juror's perspective, therefore, a defendant's "good deeds" are rarely if ever going to outweigh the harm that has been caused.  Instead, what jurors are looking for is some reason to find that the defendant's actions were influenced by factors beyond his control (such as mental illness or an abusive childhood), such that the ultimate penalty of death is not deserved.  Now, if the jurors find that the defendant was battling against factors like mental illness, evidence that the defendant also has positive attributes to contribute if allowed to live can be helpful complementary evidence that the defendant should be allowed to live; as stand-alone mitigation, however, the evidence is unlikely to be fully persuasive on its own.

7.      Another aspect of mitigation that the CJP has found is that a particular piece of mitigation does not have to persuade all twelve jurors of its importance in order to have an impact on the sentence.  The United States Supreme Court has held that each individual juror must be allowed to assess for himself or herself whether a particular piece of mitigation is persuasive. Mills v. Maryland, 486 U.S. 367(1988)(finding unconstitutional any requirement that jurors unanimously agree on a mitigating factor to give it effect).  The CJP data give strong support to this ruling.

Individual jurors often react differently to the same evidence of mitigation in deciding how much weight it should be given.   Importantly, however, because of the nature of jury deliberations at the penalty phase, mitigation evidence that persuades only one or two jurors can still change the outcome from a death to life sentence.  This is because it generally takes only four or five jurors voting for life to dictate a life sentence for the entire jury, and, of course, the jurors voting for life may be doing so for different reasons.  See generally Sundby, War and Peace in the Jury Room: How Capital Juries Reach Unanimity, 62 Hastings L.J. 403 (2011) (CJP data shows that only four to five jurors favoring life is the threshold that almost always produces a unanimous life sentence or a deadlocked jury); see also Theodore Eisenberg, Stephen P. Garvey & Martin T. Wells, Forecasting Life and Death: Juror Race, Religion, and Attitude Toward the Death Penalty, 30 J. Legal Studies 277 (2001) (finding similar threshold based on South Carolina death penalty juries).

As a result, mitigating evidence even if it was found to be persuasive by only one-third of the jurors, is evidence that carries with it the strong probability of producing a life sentence. Indeed, the distinct possibility exists that mitigating evidence that persuades even just a single juror to vote for life can tip the balance in a case from death to life if several other jurors are already leaning towards a life sentence.  Moreover, because jurors consider mitigating evidence as part of the "overall" case for life, the impact of any mitigating evidence should be assessed based on its contribution in conjunction with the other evidence in mitigation.  Thus, the likely effect on a juror of evidence that the defendant battled a drug abuse problem or mental illness must be considered in tandem with other mitigating evidence, such as evidence of a dysfunctional family.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 13, 2012.

<u>  /s/                                            </u>
Scott E. Sundby

Decl. Scott E. Sundby                  Page 3 of  3                  Barrett v. United States
Case No. 6:09-cv-00105-JHP

1349

# APPENDIX A

Appendix

Publications of Scott E. Sundby

Presented by Counsel for Kenneth Barrett

**BOOKS**

- A Life and Death Decision: A Jury Weighs the Death Penalty (Palgrave Macmillan/St. Martin's Press - April 2005; paperback October 2007); finalist for 2006 ABA Silver Gavel Award.

**ARTICLES/ESSAYS**

- *Listening at the Jury Room Door*, Hofstra Law Review (2008) (with John Blume and Sheri Lynn Johnson). (Paper for Symposium in "Guidelines for Mitigation in Death Penalty Cases.")
- *Capital Punishment in the 21st Century*, Forthcoming 2008, (Book Chapter) (with William Bowers).
- *The Death Penalty's Future: Charting the Crosscurrents of Declining Death Sentences and the McVeigh Factor*, 84 Texas Law Review 1929 (2006) (Paper for Symposium on Punishment Law and Policy).
- *Protecting the Citizen Whilst He is Quiet: Suspicionless Searches, Special Needs and General Warrants*, 74 Mississippi Law Journal 501 (2005) (Paper for Symposium on The Tools to Interpret the Fourth Amendment, National Center for Justice and the Rule of Law, University of Mississippi).
- *Moral Accuracy and Wobble in Capital Sentencing*, 80 Indiana Law Journal 56 (2005) (Comments/Essay for Symposium on Toward a Model Death-Penalty Code: The Massachusetts Governor's Council Report, Indiana University School of Law).
- *The Capital Jury and Empathy: The Problem of Worthy and Unworthy Victims*, 88 Cornell Law Review 343 (2003). (Paper for Symposium on Victims and the Death Penalty.)
- *Fallen Superheroes and Constitutional Mirages: The Tale of Brady v. Maryland*, 33 McGeorge Law Review 643 (2002). (Essay/Lecture for McGeorge Law School Distinguished Lecture Series).
- *Burden of Proof*, Encyclopedia of Crime and Justice, 2001 (with Barbara Underwood).
- *The Limits of Privacy*, 570 Annals of the American Academy of Political and Social Science 202 (2000). (Book review of Amitai Etzioni's *The Limits of Privacy*).
- *Mean Justice*, 1999 Trial 95 (Sept. issue) (book review of Edward Humes' *Mean Justice*).
- *An Ode to Probable Cause*, 72 St. John's Law Review 1133 (1998) (Paper for Symposium on the Thirtieth Anniversary of *Terry v. Ohio*).
- *The Jury and Absolution: The Intersection of Trial Strategy, Remorse and the Death Penalty*, 83 Cornell Law Review 1557 (1998) (Paper for Symposium on How the Death Penalty Works: Empirical Studies of the Modern Capital Sentencing System).
- *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert Testimony*, 83 Virginia Law Review 1109 (1997).
- *The Education of Law Professor*, 1996 Virginia Lawyer 24 (April issue)
  *Everyman's Fourth Amendment: Privacy or Mutual Trust Between Government and Citizen?*, 94 Columbia Law Review 1751 (1994).
- *The Lockett Paradox: Reconciling Guided Discretion and Unguided Mitigation in Capital Sentencing*, 38 U.C.L.A. Law Review 1147 (1991).
- *Is Abandoning State Action Asking Too Much of the Constitution?*, 17 Hastings Constitutional Law Quarterly 139 (1990) (Paper for Symposium on the California Constitution).
- *The Virtues of a Procedural View of Innocence - A Response to Professor Schwartz*, 41 Hastings Law Journal 161 (1989).
  *The Reasonable Doubt Rule and the Meaning of Innocence*, 40 Hastings L.J. 457 (1989).
- *A Return to Fourth Amendment Basics: Undoing the Mischief of Camara and Terry,* 72 Minnesota Law Review 383 (1988).
- *The Felony-Murder Rule: A Doctrine at Constitutional Crossroads*, 70 Cornell Law Review 446 (1985) (with Roth).

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT    )
    )
    *Movant*,    )
    )
v.    )    **Case No. 09-CV-00105-JHP**
    )
UNITED STATES OF AMERICA    )
    )
    *Respondent*.    )

**RESPONSE IN OPPOSITION TO PETITIONER'S MOTION
TO ALTER OR AMEND JUDGMENT**

**COMES NOW** the United States of America by and through undersigned counsel and files this response in opposition to Barrett's Motion to Alter or Amend Judgment (Doc. 217). In its present form, the 59(e) Motion is procedurally defective and must be denied or amended, because it mixes successive substantive § 2255 claims with non-successive procedural claims attacking the conduct of the § 2255 proceeding. Alternatively, it fails to state any basis for reconsideration of this Court's orders denying relief, judicial recusal, an evidentiary hearing or a certificate of appealability.

**PROCEDURAL HISTORY**

On March 16, 2009, Barrett filed a 17-claim motion for relief under 28 U.S.C. § 2255, attacking his federal homicide conviction and death sentence. Doc. 1. On December 5, 2009, he filed a second-amended § 2255 motion, raising 19 claims. Doc. 95. On March 1, 2010, he filed a brief in support of his motion. Doc. 149. On May 17, 2010, the government answered the second-amended motion for collateral relief. Doc. 174. On August 16, 2012, this Court issued an Opinion and Order denying relief under § 2255 and denying a certificate of appealability. Doc. 214. On September 13, 2012, 28 days after the Court issued its Order, Barrett filed the

1

instant Motion to Alter or Amend Judgment and Brief in Support.  Doc. 217 ("Mot.").  This Response in Opposition follows.

## I.  THE FIRST TWO CLAIMS ON RECONSIDERATION CONSTITUTE A SECOND OR SUCCESSIVE PETITION FOR RELIEF

Barrett has failed to heed the limitation on his ability to file successive applications for § 2255 relief by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), as codified at 28 U.S.C. §§ 2244(b) & 2255(h).

A motion to reconsider the denial of a § 2255 motion is treated as a request to file a second or successive motion under § 2255 if it "in substance or effect asserts or reasserts a federal basis for relief from the petitioner's underlying conviction [or sentence]."  *United States v. Pedraza*, 466 F.3d 932, 933–34 (10th Cir. 2006).   Such claims should be transferred to the Court of Appeals.  *Id*.  District courts may, however, consider a "true" motion for relief from judgment.  *See Gonzalez v. Crosby*, 545 U.S. 524, 528–32 (2005); *Pedraza*, 466 F.3d at 933–34.  To avoid treatment as a successive motion, the movant must challenge "some defect in the integrity of the federal habeas process" rather than the "substance of the federal court's resolution of a claim on the merits."  *Gonzalez*, 545 U.S. at 532.  Pleadings that mix "true" requests for relief under Rule 59(e) with second or successive § 2255 claims, are viewed as separate documents.  *See Spitznas v. Boone*, 464 F.3d 1213, 1217 (10th Cir.2006).

Ordinarily, a claim of judicial bias in the determination of a § 2255 motion might fall outside the scope of the successive application rule.  Here, however, Barrett presented two claims of judicial bias as part of his § 2255 Motion, and argued within it that the Court should recuse itself.  *E.g*., Doc. 95 at 31 & 400.   Indeed, Barrett specifically relied on alleged judicial bias as a basis for collateral relief.  Doc. 95 at 31 ("For the foregoing reasons, the trial judge should recuse himself from this case.  Thereafter, this Court should grant the relief sought

2

herein."). Barrett maintained the § 2255 request for recusal long after this Court had observed that the local rules required separate filings for separate motions. *See* Tran. Oct. 6, 2009 at 8. Barrett's maintenance of the request within the § 2255 motion clearly indicates his apparent belief that it directly supported collateral relief.

The procedural nexus between Barrett's request for recusal and § 2255 relief clearly reflect a desire for a substantive connection. Presumably, he anticipated that this Court would rely on recusal as a concession of bias supporting his § 2255 claims that the trial defense was improperly denied necessary resources. *See* Doc. 95 (claims I and III). Given the symbiosis between Barrett's claim of judicial bias in the collateral proceedings and his claim of bias during trial, the present claim "in substance or effect asserts or reasserts a federal basis for relief from the petitioner's underlying conviction [or sentence]." *United States v. Pedraza*, 466 F.3d at 933–34. Accordingly, this Court should refuse to consider it as a second or successive request for collateral relief.

Barrett's second claim, that the Court erroneously failed to grant an evidentiary hearing, appears facially to attack an alleged defect in the procedures employed in this case. Barrett begins his argument by identifying instances in which he believes the Court relied on its recollection to the exclusion of the record. Mot. at 15-16. However, his contentions devolve into substantive arguments about the bases of the Court's factual findings and legal rulings. For instance, he argues that the Court improperly rejected the opinion of Susan Otto (Mot. at 17); he argues that the Court baselessly found counsel learned in the law of capital cases (*id*.); he argues that the Court did not adequately address a declaration from former counsel Echols about foregone preparations for trial (*id*.); he argues that the Court relied on unsupportive facts in determining that Mr. Echols was seeking to obtain improper compensation (*id*. at 17-18); and he

3

argues that the Court relied on inappropriate information in determining the reasonableness of trial counsel's conduct (*id*. at 18-19).  Barrett then drops any guise of arguing that he was deprived of an evidentiary hearing and simply takes issue with the Court's interpretation of his proffered mitigation evidence.  *Id*. at 19-21.

Barrett's claim, in large measure a naked attempt to relitigate the § 2255 motion, should be treated as a second or successive petition.

## II.  BARRETT HAS NOT IDENTIFIED ANY ERROR MERITING RECONSIDERATION

Assuming, arguendo, that this Court construes any of Barrett's arguments as "true" requests for reconsideration, rather than as second or successive petitions for collateral relief, it should deny relief as to each contention.  Barrett has failed to meet the pertinent standard for reconsideration of this Court's final order denying relief.

The Federal Rules of Civil Procedure do not recognize a "motion to reconsider."  *Miller v. State of Kan. Highway Patrol*, 383 F. App'x 813, 814 (10th Cir.2010) (quoting *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir.1991)); *Ysais v. Richardson*, 603, F.3d 1175, 1178 n.2 (10th Cir. 2010).  The rules permit litigants to request alteration or amendment of an adverse judgment under Federal Rule of Civil Procedure 59(e).  *Van Skiver*, 603 F.3d at 1178 n.2.  "Grounds warranting a [Rule 59(e)] motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice."  *Devon Energy Production Co., v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1212 (10th Cir. 2012) (quoting *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)).

A.  <u>Barrett Fails to Establish a Basis to Alter or Amend the Denial of a Judicial Recusal</u>

Barrett has not identified any change in the law or evidence[1] that would support judicial recusal following this Court's denial of his repeated requests for such action (*see* Docs. 1, 2, 45, 70, 95 & 178).  In fact, the only changed circumstance identified by Barrett is the Court's issuance of an opinion denying relief.  He makes a perfunctory attempt to rely on the language of the opinion to demonstrate bias (Mot. at 6-10) but his effort is for naught.  For example, he complains that the court disparaged him by observing that he expanded the record to "voluminous proportions."  But Barrett, himself, conceded as much when he sought permission to file an oversized brief: "Petitioner cites as grounds for the oversized brief the serious nature and complexity of the subject matter; the ***voluminous nature of the record and the Amended Motion***."  Doc. 111-2 (emphasis added).  Putting aside Barrett's concession of the obvious, the Court had long-ago noted the out-sized proportions of the pleadings in this case.  *See, e.g.*, Doc. 66 ("the Court is aware that the voluminous § 2255 motion"); Doc. 74 (referring to the "voluminous Motion").

Apart from the references to the size of the record, Barrett also complains about the Court's opinion that his attorneys have not acted entirely in good faith and have filed documents with the intent to delay disposition.  Of course, adverse rulings are not a basis for recusal.  *Glass v. Pfeffer*, 849 F.2d 1261, 1268 (10th Cir. 1988).  Indeed, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-

---

[1] Barrett relies in part on an exhibit that purports to compare this Court's treatment of his motion for collateral relief with those of other litigants.  Mot. Ex. B.  The declaration does not constitute new evidence.  Barrett presented the same information orally to this Court and as an exhibit in support of his mandamus request to the Tenth Circuit.  Tran. Oct. 6, 2009 at 27-28; Doc. 94-2; Petitioner's Reply to Brief for the United States in Opposition to the Petition for Writ of Mandamus, at Appendix A, *In re Barrett*, No. 09-7096 (10th Cir. Dec. 8, 2009).

seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also LoCascio v. United States*, 473 F.3d 493, 495 (2d Cir. 2007) (holding that issuance of contempt decision against attorney did not require recusal).

Not only has Barrett failed to identify any changed circumstance supporting reconsideration, he has not shown any clear error, nor could he. The Tenth Circuit's decision on mandamus precludes a finding of clear error at this juncture. The law of the case doctrine applies to mandamus decisions actually deciding issues on the merits. *See Kennedy v. Lubar*, 273 F.3d 1293, 1299 (10th Cir.2001). In rejecting mandamus in this case, the Tenth Circuit held, "We are not convinced that Mr. Barrett has established a *clear and indisputable right* to the district judge's recusal under any of § 455's subsections or that this case presents the exceptional circumstances required to issue a writ of mandamus." *In re Barrett*, No. 09-7096, Doc. No. 01018330196 (10th Cir. Dec. 14, 2009) (emphasis added). The Tenth Circuit's ruling, on ostensibly the same facts advanced here, demonstrates a lack of clear error in this Court's own recusal ruling and should preclude any relief here.

Accordingly, the Court should deny the request to alter or amend the judgment.

B.  Barrett Fails to Establish a Basis to Alter or Amend the Denial of an Evidentiary Hearing

In arguing that the Court erroneously denied him an evidentiary hearing, Barrett does not identify an intervening change in controlling law or any new evidence in support of his initial request. Instead, he attempts to demonstrate clear error by arguing that the Court improperly relied on its recollection of events, thereby providing untested evidence and avoiding an evidentiary hearing. Mot. at 10-22.

Barrett's effort to demonstrate error fails on a legal and a factual basis. Courts may rely on their recollections in ruling on § 2255 motions, so long as they do not do so to the exclusion

6

of a corroborative or contradictory record: "Where a record is available which would support or contradict a defendant's factual challenge to his conviction, the district court judge cannot rely solely on his own recollection of events to rule on the merits." *United States v. Scully*, 798 F.2d 411, 413 (10th Cir.1986)). In this case, the record expressly supported the Court's findings.

According to Barrett, the Court has improperly opined that it encouraged trial counsel, following a change in appointments, to submit an amended budget request because of their lack of familiarity with the prior state court proceedings. Mot. at 15. In fact, the Court's opinion cites Trial Document 133, which specifically explained the Court's concern and motivation, consistent with its recollection in the opinion:

> Counsel shall have until May 27, 2005, to submit an amended budget proposal if they feel (1) delegation of hours needed to be shifted between counsel, or (2) certain categories may require additional hours due to the unfamiliarity of both counsel with the background of the case. . . . [T]his Court is not so concerned with counsel shifting the approved number of hours . . . as it is with counsel exceeding the total number of hours approved."

Tr. Doc. 133 at 1-2.

Barrett also inaccurately accuses the Court of relying on its present-day opinion when it wrote that it attempted to get counsel to "focus" on the need for expert witnesses. Mot. 16. The Court, in fact, expressly premised the pertinent portion of its opinion on the record:

> *[T]he record makes it clear* that the budget was not carved in stone but was an estimate of what might reasonably be required. . . . Thus [this] court, in carrying out its administrative functions in this case, *attempted to get counsel to focus on exactly what would be needed in the way of experts in order to ensure that the requests were reasonable and necessary to provide fair compensation*. . . . since the underlying incident had been the focus of two prior state court trials, counsel should have been able to utilize the factual investigations completed in the earlier cases to [defray expenses]. Once the court approved a budget, however, counsel were not prevented from . . . [requesting increases in] budgeted amounts and the court, on several occasions, encouraged defense counsel to submit supplemental budget requests if they felt they needed additional funding.

Doc. 214 at 32 (emphasis added).  In support, the Court relied on three documents from the record (Tr. Docs. 321, 318 and 128), explaining its citations with parentheticals.  Doc. 214 at 32-33 n.93.  The Court's order appointing Messrs. Hilfiger and Smith, while not cited, also set forth the Court's concern for identifying expert witness expenses.  Doc. 133 at 2-3.  Thus, the opinion denying § 2255 relief reflected the record, rather than the Court's present-day recall of events.

Barrett also attacks the Court's opinion that Messrs. Hilfiger and Smith were active members of the CJA defense panel.  But these facts are supported by contemporaneous records.  In May of 2005, the Court noted Mr. Hilfiger's substantial experience, as prosecutor and defense counsel, in its order granting Mr. Echols's request to withdraw.  Tr. Doc. 128 at 5.  As to Mr. Smith, the Court's records amply demonstrate his federal court experience at the time of appointment.  A search of his name as attorney in this District's PACER system, indicates that he had appeared as counsel in 66 cases when he was appointed in this one.  Ex. A.

Barrett claims the Court improperly dismissed as "ludicrous" a declaration concerning qualifications for appointment as defense counsel in a capital case.  Mot. at 17.  While the Court characterized as "ludicrous" a single, erroneous assertion in that declaration, it made no such determination as to the balance of the document.[2]  Doc. 214 at 24 n.62.  More significantly, the Court amply explained its reasoning for finding Barrett's lead trial counsel, Mr. Hilfiger, learned in the law applicable to capital cases – he had served as a defense attorney, the U.S. Attorney, and as defense counsel for a capital defendant in the Eastern District of Oklahoma, facts the Court recounted when it appointed him in Mr. Echols's place.  Tr. Doc. 128 at 5.

Barrett next argues that the Court improperly relied on its present-day opinions of Mr. Echols, who withdrew as lead trial counsel prior to trial.  Mot. at 18.  Barrett's argument simply

---

[2] Barrett makes no attempt to defend the accuracy of the declarant's statement.

disregards the record citations in support of the Court's findings.  *See* Doc. 214 at 141-43 & nn. 192-94.

Barrett also faults the Court for failing to rely on the declarations of experts that he submitted in support of his ineffective assistance of counsel claims.  Specifically, Barrett complains that the Court failed to heed the command of *Strickland v. Washington*[3] to impose an objective standard of reasonableness on counsel's conduct.  Mot. at 18-19.  He misconstrues the opinion, which states that "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."   466 U.S. at 688-89.  The opinion continues in this vein: "Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance . . . .and it is all too easy for a court . . . to conclude that a particular act or omission . . . was unreasonable."  *Id.* at 690.  This Court stood on firm legal ground in rejecting the opinions of Barrett's speculative experts in favor of the explanations offered by trial counsel and cited in the opinion denying § 2255 relief.  *See* Doc. 214 at 178-79.

Barrett also complains that this Court improperly rejected his position that counsel's alleged errors had prejudiced him.  Doc. 19-20.  Barrett does not attempt to demonstrate legal error: he simply states his disagreement with the Court's judgment.  He does rely on the declaration of a supposed jury expert in contradicting the Court's findings about the value of certain omitted evidence.  That declaration was never presented to the Court prior to the filing of this Motion, but the reasoning and information offered in it could not carry the day for Barrett. The declarant purports to forecast the views of the jury in this case based on his extensive

---

[3] *Strickland v. Washington*, 466 U.S. 668 (1984).

1360

interviews of capital case jurors.  Were the jurors in this case available, their own opinions would not be admissible.  Fed. R. Evid. 606(b).  A witness's speculation, premised on the hearsay views of jurors in other cases does not demonstrate any error, much less clear error.

Finally, Barrett argues that the Court did not properly analyze the prejudice prong of his ineffective assistance of counsel claims in light of *Porter v. McCollum*, 558 U.S. 30 (2009). Mot. at 20-22.  He appears to take the position that this Court must give weight to any mitigation evidence he can identify, but he has once again misconstrued the pertinent law.  A determination of prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 687.  In the context of a challenge to a sentence of death, the question is whether "there is a reasonable probability that [the judge and jury] would have returned with a different sentence." *Wiggins v. Smith*, 539 U.S. 510, 536 (2003).  "To assess that probability, [courts] consider the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweig[h] it against the evidence in aggravation." *Porter*, 558 U.S. at ___, 130 S. Ct. at 453-54 (citation and internal quotes omitted).  "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011).  As the Supreme Court did in *Porter*, this Court properly considered the weight of the mitigation evidence offered by the petitioner.  *Porter* did not obligate the Court to blindly credit Barrett's proffer, and this Court correctly declined to do so.  Accordingly his attempt to demonstrate clear error should fail.

Barrett's entire attack on the decision to deny him an evidentiary hearing is fraught with legal and factual error.  This Court should therefore deny the request to alter or amend the judgment.

C. <u>Barrett Fails to Establish a Reason to Alter or Amend the Denial of a Certificate of Appealability</u>

<div align="center">10</div>

Barrett asks this Court to reconsider its denial of a certificate of appealability as to every issue raised in his § 2255 motion. He asserts that the length of the Court's opinion denying relief is evidence that his claims are "debatable" and therefore merit appeal. Mot. at 22-24. Barrett's inference finds no support in the law or the record.

A petitioner must make a "substantial showing of the denial of a constitutional right" in order to obtain a certificate of appealability. *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). In other words, he "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong." *Slack*, 529 U.S. at 484. The length of an opinion denying collateral relief does not necessarily signal that reasonable jurists would find the claims debatable. No inference of debatability arises if the claims contain legal, factual or logical flaws that the court must address at length in order to place the assertions in context. *See Pantano v. Donat*, No. 3:08–cv–00685–ECR–VPC, 2012 WL 3929515, *58 (D. Nev. Sept. 7, 2012).

Barrett cannot show, based on the length of the Court's opinion, that it was clearly obligated to grant him an appeal. In fact, the sheer size of the case, discussed above, necessitated a lengthy opinion. The Court confronted a 403-page Second Amended Motion for § 2255 relief (Doc. 95) that was supported by a 277-page legal brief (Doc. 149), a 215-page reply brief (Doc. 178) and a total of 219 exhibits (Docs. 95 & 178). The Court's opinion addressed Barrett's 895 pages of argument and a few thousand pages of exhibits in a little under 170 pages of text. The Court's brevity, under the circumstances, provides no basis for concluding that it identified issues subject to debate. Instead, it confronted several claims that were time or procedurally barred. *E.g.*, Doc. 214 at 56, 77, 102, 109-10, 12, and 167. It also corrected factual flaws (e.g., *id*. at 70 and 78) and legal errors (*e.g. id*. at 8 n. 13, 40) in Barrett's claims. On this record,

Barrett cannot show that the denial of a certificate of appealability constituted clear error because the Court required a lengthy opinion to address his claims. *See Jackson v. United States*, 638 F. Supp. 2d 514 (W.D.N.C. 2009) (251-page slip opinion denying § 2255 relief in a capital case reduced to 104-pages in official reporter), *certificate of appealability denied*, 2010 WL 2775402 (W.D.N.C. July 13, 2010), *certificate of appealability denied, sub nom.*, *United States v. Jackson*, No. 09-10, Doc. 30 (4th Cir. 2011), *cert. denied, sub. nom., Jackson v. United States*, ___ S. Ct. ___, 2012 WL 4475543 (2012).

## CONCLUSION

Based on the foregoing reasoning and authority, the government respectfully urges the Court to transfer in part or deny in total Barrett's Motion to Alter or Amend the Judgment.

Dated: October 29, 2012

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ Christopher J. Wilson
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ Jeffrey B. Kahan
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 345
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779

12

1363

**CERTIFICATE OF SERVICE**

I, hereby certify that on 29th day of October, 2012, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry, Attorney for Petitioner
Joan M. Fisher, Attorney for Petitioner
Tivon Schardl, Attorney for Petitioner

<div align="right">
/S/ Christopher J. Wilson<br/>
United States Attorney's Office
</div>

13

1364

383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.)))**

H

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter. See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Tenth Circuit Rule 32.1. (Find CTA10 Rule 32.1)

United States Court of Appeals,
Tenth Circuit.
Barney MILLER, Plaintiff-Appellant,
v.
STATE OF KANSAS HIGHWAY PATROL, Defendant-Appellee.

No. 10-3046.
June 23, 2010.

**Background:** Applicant brought action alleging that state highway patrol discriminated against him, in violation of Americans with Disabilities Act (ADA), by not allowing him to test for position for which he had applied. The United States District Court for the District of Kansas, 2010 WL 497651, dismissed complaint and denied applicant's motion to reconsider. Applicant appealed.

**Holdings:** The Court of Appeals, Deanell Reece Tacha, Circuit Judge, held that:
(1) applicant's complaints did not provide basis for altering or amending judgment, and
(2) applicant forfeited his right to appellate review.

Affirmed.

West Headnotes

**[1] Federal Civil Procedure 170A ⟋2653**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(G) Relief from Judgment
            170Ak2651 Grounds

170Ak2653 k. Error in general. Most Cited Cases

**Federal Civil Procedure 170A ⟋2655**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(G) Relief from Judgment
            170Ak2651 Grounds
                170Ak2655 k. Further evidence or argument. Most Cited Cases
    Plaintiff's complaint about adequacy of his attorney's representation in employment discrimination case and his request to have his case reinstated so he could bring claim under different statute did not implicate manifest errors of law or newly discovered evidence, and thus did not provide basis for altering or amending judgment. Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

**[2] Federal Courts 170B ⟋915**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)7 Waiver of Error in Appellate Court
                170Bk915 k. In general. Most Cited Cases
    Pro se plaintiff in employment discrimination action forfeited his right to appellate review of district court's dismissal of his complaint as result of his failure to present court with any reasoned arguments supported by citations to record or legal authority. F.R.A.P.Rule 28(a)(5-9), 28 U.S.C.A.

**\*813** Barney Miller, Dwight, IL, pro se.

Christopher M. Grunewald, Kimberly Michelle Grunewald, Attorney General for the State of Kansas, Topeka, KS, for Defendant-Appellee.

Before TACHA, HOLLOWAY, and ANDERSON, Circuit Judges.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT ONE

383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.)))**

**\*814 ORDER AND JUDGMENT** [FN*]

> [FN*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

DEANELL REECE TACHA, Circuit Judge.

**\*\*1** Barney Miller, proceeding pro se, appeals from the district court's dismissal of his complaint and the denial of his motion to reconsider. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

*Background*

Mr. Miller filed a pro se "Employment Discrimination Complaint" against the State of Kansas Highway Patrol, alleging that the State discriminated against him in violation of the Americans with Disabilities Act (ADA) by not allowing him to "test" for a "Communication Specialist" position for which he had applied. *See* R. at 6-11. The district court later appointed counsel to assist Mr. Miller with his case. The State filed a motion to dismiss Mr. Miller's complaint, arguing that his ADA employment discrimination claim was barred by the State's sovereign immunity under the Eleventh Amendment. Mr. Miller responded through counsel, asserting that the State's immunity to suit only applied to claims brought under Title I of the ADA and that his claim should be allowed to proceed under Title II of the ADA. The district court granted the motion to dismiss based on the following reasoning:

> If the plaintiff is asserting the claim pursuant to Title I of the ADA, the claim[ ] is dismissed pursuant to Rule 12(b)(1) for a lack of jurisdiction, as the State is immune from suit. If the plaintiff is asserting a claim pursuant to Title II of the ADA, the claim is dismissed pursuant to Rule 12(b)(6) for failure to state claim, as the plaintiff has not shown that Title II of the ADA applies to employment discrimination claims.

> *Id.* at 53.

Mr. Miller then filed a pro se motion to reconsider the district court's dismissal of his complaint. Mr. Miller first notified the court that he was no longer represented by an attorney. He then asked the district court to "consider reversing the[ ] earlier dismissal of [his] case" and to have his case "reinstated under section 504 of the rehabilitation act of 1973." *Id.* at 55. The district court denied the motion to reconsider. Mr. Miller then filed a pro se notice of appeal.

*Discussion*

We first consider the district court's decision to deny Mr. Miller's motion to reconsider.

> The Federal Rules of Civil Procedure do not recognize a "motion to reconsider." Instead, the rules allow a litigant subject to an adverse judgment to file either a motion to alter or amend the judgment pursuant to Fed. R. Civ. P. 59(e) or a motion seeking relief from the judgment pursuant to Fed. R. Civ. P. 60(b).

Van Skiver v. United States, 952 F.2d 1241, 1243 (10th Cir.1991). Here, Mr. Miller did not specify whether he was seeking relief under Rule 59(e) or Rule 60(b). In his motion, Mr. Miller asked the court to reconsider the dismissal of his complaint and to allow him to amend his complaint to add a new claim under section 504 of the Rehabilitation Act of 1973. He asserted that he did not know about the possibility of bringing such a claim until after his **\*815** complaint was dismissed and that his attorney had not adequately represented him.

**\*\*2** Without a specific reference to Rule 59(e) or Rule 60(b), the district court considered the mo-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT ONE

383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.)))**

tion to reconsider under both rules. The district court first concluded that, if the motion was seeking relief under Rule 59(e), then it was not timely filed because it was filed more than ten days after judgment was entered. The district court then determined that Mr. Miller's motion failed to set forth any grounds for relief under Rule 60(b). Accordingly, the district court denied the motion to reconsider.

We review the denial of a Rule 59(e) or Rule 60(b) motion for abuse of discretion. *See Ysais v. Richardson,* 603 F.3d 1175, 1180 (10th Cir.2010), *petition for cert. filed,* (June 10, 2010) (No. 09-11225); *Manning v. Astrue,* 510 F.3d 1246, 1249 (10th Cir.2007). Mr. Miller initially complains about the district court's decision to deny his motion to reconsider because it was filed more than ten days after the district court's dismissal order. He contends that his attorney did not give him timely notice of the district court's ruling. We conclude that the district court erred in denying the motion as untimely because Mr. Miller's motion was timely filed under the amended Rules of Civil Procedure that took effect on December 1, 2009.

[1] The district court entered judgment on December 18, 2009; as a result, Mr. Miller had twenty-eight days to file a motion to alter or amend the judgment. *See* Fed. R. Civ. P. 59(e). His motion was filed on January 11, 2010, which was timely under Rule 59(e) because it was twenty-four days after judgment was entered. But denial of a Rule 59 motion as untimely is harmless error if there was no basis for granting the motion on its merits. *See An-derson v. Deere & Co.,* 852 F.2d 1244, 1246 (10th Cir.1988); *Monod v. Futura, Inc.,* 415 F.2d 1170, 1175 (10th Cir.1969). "A Rule 59(e) motion to alter or amend the judgment should be granted only to correct manifest errors of law or to present newly discovered evidence." *Phelps v. Hamilton,* 122 F.3d 1309, 1324 (10th Cir.1997) (quotations omitted). In his motion to reconsider, Mr. Miller complained about the adequacy of his attorney's representation and asked to have his case reinstated so he could bring a claim under a different statute. Neither of these issues implicate manifest errors of law or newly discovered evidence. We therefore conclude it was harmless error for the district court to deny the motion as untimely.[FN1]

> FN1. Mr. Miller's brief does not articulate a challenge to the district court's decision that he was not entitled to relief under any of the provisions of Rule 60(b). Accordingly, he has waived any challenge to that portion of the district court's decision. *See Becker v. Kroll,* 494 F.3d 904, 913 n. 6 (10th Cir.2007).

[2] As for the district court's decision to dismiss his complaint, Mr. Miller has not provided this court with any substantive basis on which to overturn the district court's decision. His pro se brief contains a rambling narrative about his case in which he includes complaints about his attorney[FN2] and the district court judge. *See* Aplt. Br. at 1-6. He has made no attempt to comply with Federal Rule of Appellate Procedure 28. His brief fails to include a statement of issues for review, a statement of the case, a statement of the facts, a summary of the argument, and an **\*816** argument section with citations to legal authority or to the record-all of which are required by Rule 28(a)(5)-(9).

> FN2. We note that any alleged ineffective assistance by Mr. Miller's counsel is not a basis for appeal or retrial. *See Nelson v. Boeing Co.,* 446 F.3d 1118, 1119 (10th Cir.2006); *MacCuish v. United States,* 844 F.2d 733, 735-36 (10th Cir.1988). His remedy is a legal malpractice suit against his attorney. *See id.*

**\*\*3** Although a pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers, this court has repeatedly insisted that pro se parties follow the same rules of procedure that govern other litigants. Thus, although we make some allowances for the pro se plaintiff's failure to cite proper legal authority, his confusion of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT ONE

383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.)))**

various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements, the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record. *Garrett v. Selby Connor Maddux & Janer,* 425 F.3d 836, 840 (10th Cir.2005) (quotations, citations, and alterations omitted). We conclude that Mr. Miller has forfeited his right to appellate review of the district court's dismissal of his complaint because he has failed to comply with Rule 28 and he has not presented this court with any reasoned arguments that are supported by citations to the record or legal authority.[FN3] *See id.* at 840-841 (concluding that appellant had forfeited his right to appellate review where his brief failed to comply with Rule 28 and his issues on appeal consisted of "mere conclusory allegations with no citations to the record or any legal authority or support"); *see also Eateries, Inc. v. J.R. Simplot Co.,* 346 F.3d 1225, 1232 (10th Cir.2003) (concluding that appellant's superficial argument with no record citations or legal authority was "insufficient to garner appellate review"). Accordingly, the judgment of the district court is AFFIRMED. Mr. Miller's "Motion to Recuse" is DENIED.

> FN3. Mr. Miller appears to summarize the basis for his appeal as follows:
>
> I'm appealing Judge Brown[']s decision to dismiss this case under inadequate representation of counsel, evidence of malicious intent by the state of Kansas, the EEOC, and the Attorney General, and even though Judge Brown used case law against me he also did it out of spite and even though it can't be directly proven its v[e]ry suspicious.
>
> Aplt. Br. at 5.

C.A.10 (Kan.),2010.
Miller v. State of Kansas Highway Patrol

383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.))

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT ONE

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

H

Only the Westlaw citation is currently available.

United States District Court,
D. Nevada.
Angelo PANTANO, Petitioner,
v.
William DONAT, et al., Respondents.

No. 3:08–cv–00685–ECR–VPC.
Sept. 7, 2012.

Megan Hoffman, Federal Public Defender, Las Vegas, NV, for Petitioner.

ORDER

EDWARD C. REED, District Judge.

**\*1** This represented habeas matter under 28 U.S.C. § 2254 comes before the Court for a final decision on the merits.

### Background

Petitioner Angelo Pantano seeks to set aside his 2004 Nevada state judgment of conviction, pursuant to a jury verdict, of sexual assault of a minor under the age of 14. He is serving a life sentence with the possibility of parole after 20 years.

In its published decision on direct appeal, the Supreme Court of Nevada summarized the principal trial evidence as follows:

Respondent Angelo Pantano digitally penetrated his seven-year-old female cousin, D.D., while visiting at her home in Las Vegas. Several days elapsed before D.D. disclosed the incident. Ultimately, after D.D.'s mother discovered the child's stained underwear, D.D. indicated that Pantano had digitally penetrated her "kiki," a term she used for her vagina.

The mother later asked D.D. to repeat to her father what she had said about the incident. D.D.'s initial failure to respond evoked the father's concern that someone had inappropriately touched her at school. When he asked her if that had been the case, D.D. implicated Pantano. Because Pantano would not have had access to D.D. at the school, and because she remained reluctant to describe the incident, her father more specifically inquired as to whether someone had been touching her in a sexual manner. To this, D.D. responded in the affirmative as follows: "he [Pantano] stick [sic] his finger in my kiki, Daddy." The father asked her three further times if she was sure about the accusation and received uniform affirmative responses. When asked why D.D. did not report the incident sooner, she responded that Pantano had warned her that she would be in trouble if she did so. Shortly thereafter, the parents reported the matter to the Las Vegas Metropolitan Police Department (LVMPD).

As part of the initial investigation, LVMPD Detective Rick Given took a further statement from the child confirming the incident. Detective Given also took a voluntary statement from Pantano, during which Pantano confessed to digitally penetrating the child. He further admitted to touching D.D.'s buttocks with his penis while masturbating behind her in her bed.

The State charged Pantano with sexual assault with a minor under the age of 14 for the digital penetration, and lewdness with a child under the age of 14 for the penile contact. At a pretrial hearing, the district court conducted a statutory reliability determination under NRS 51.385, discussed infra, regarding D. D.'s hearsay statements to her mother, father, and Detective Given. The district court permitted use of all three sets of statements at trial, concluding that they were sufficiently reliable under the statute. D .D. testified regarding the digital penetration at a preliminary hearing and at trial, but she failed to confirm the facts underlying the lewdness charge. When asked at trial on cross-examination and redirect if

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

she had spoken to anyone regarding the incident, she either responded negatively or that she could not remember.

**\*2** *Pantano v. State* 122 Nev. 782, 785–86, 138 P.3d 477, 479–80 (2006). Petitioner has not demonstrated by clear and convincing evidence to the contrary in the state court record that the state supreme court's summary of the trial evidence was incorrect. The foregoing summary of the evidence thus is presumed to be correct. *See, e.g., Sims v. Brown,* 425 F.3d 560, 563 n. 1 (9th Cir.2005).

### *Generally Applicable Standard of Review*

The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating state-court rulings that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster,* —— U.S. ——, ——, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011). Under this standard of review, a federal court may not grant relief merely because it might conclude that the state court decision was incorrect. 131 S.Ct. at 1411. Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established law as determined by the United States Supreme Court based on the record presented to the state courts; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 131 S.Ct. at 1398–1401.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *E.g., Mitchell v. Esparza,* 540 U.S. 12, 15–16, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Supreme Court has held that a state

court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." 540 U.S. at 16. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., Mitchell,* 540 U.S. at 18; *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir.2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett,* 393 F.3d 943, 972 (9th Cir.2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

**\*3** .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox,* 366 F.3d 992, 1000 (9th Cir.2004); *see also Lambert,* 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court fac-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1370

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

tual findings are presumed to be correct unless rebutted by clear and convincing evidence.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster,* 131 S.Ct. at 1398.

### *Discussion*
### Ground 1: Confrontation Clause—"Facial Challenge" to N.R.S. 51.385

In Ground 1, petitioner alleges that he was denied rights to confrontation, due process, and a fair trial because N.R.S. 51.385 allegedly is unconstitutionally overbroad, essentially because the statute provides for the admission of hearsay in some circumstances that allegedly would violate the Confrontation Clause under the standards set forth in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

The Supreme Court of Nevada rejected the corresponding claim along with related claims presented to that court on direct appeal on the following grounds:

*Constitutionality of NRS 51.385*

Pantano challenges the constitutionality of NRS 51.385 facially and as applied based on the United States Supreme Court decision in *Crawford v. Washington.*

NRS 51.385 provides in pertinent part:

1. In addition to any other provision for admissibility made by statute or rule of court, a statement made by a child under the age of 10 years describing any act of sexual conduct performed with or on the child or any act of physical abuse of the child is admissible in a criminal proceeding regarding that act of sexual conduct or physical abuse if:

(a) The court finds, in a hearing out of the presence of the jury, that the time, content and circumstances of the statement provide sufficient circumstantial guarantees of trustworthi-

ness; and

(b) The child testifies at the proceeding or is unavailable or unable to testify.

2. In determining the trustworthiness of a statement, the court shall consider, without limitation, whether:

(a) The statement was spontaneous;

(b) The child was subjected to repetitive questioning;

(c) The child had a motive to fabricate;

(d) The child used terminology unexpected of a child of similar age; and

(e) The child was in a stable mental state.

As demonstrated above, this statute permits introduction of statements made by a child declarant describing sexual conduct or physical abuse as an exception to the hearsay rule if (1) a court holds a hearing outside the jury's presence to assess the circumstances surrounding the trustworthiness of such statements, (2) the child testifies at the hearing or is unavailable or unable to testify, and (3) the court finds such statements sufficiently trustworthy.

**\*4** In *Bockting v. State,* relying upon the 1980 United States Supreme Court decision in *Ohio v. Roberts,* this court upheld the constitutionality of NRS 51.385. *Roberts* concluded that a trial court may admit hearsay statements without violence to the Confrontation Clause of the Sixth Amendment when the hearsay declarant is unavailable for cross-examination, if "(1) the statement satisfies the indicia of a 'firmly rooted' hearsay exception; or (2) the statement reflects 'particularized guarantees of trustworthiness.' " In *Bockting,* this court determined that, despite the declarant's unavailability, NRS 51.385 survived constitutional muster under the second *Roberts* criterion because the statute requires dis-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

trict courts to determine if the " 'time, content, and circumstances of ... [hearsay] statement[s] provide sufficient circumstantial guarantees of trustworthiness.' "

In *Crawford v. Washington,* decided in 2004, the United States Supreme Court overturned *Roberts* with regard to testimonial hearsay. Under *Crawford,* if a hearsay statement of an unavailable declarant is "testimonial" in nature, the statement is admissible only if the defendant had prior opportunity to cross-examine the declarant concerning it. Therefore, under *Crawford,* when the declarant is unavailable, reliability assessments of testimonial hearsay cannot survive scrutiny under the Confrontation Clause without actual confrontation.

The Court provided the following illustrations of testimonial hearsay: (1) ex parte in-court testimony, or its functional equivalent, such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or " 'similar pretrial statements that declarants would reasonably expect to be used prosecutorially' "; (2) " 'extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions' "; (3) " 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial' "; and (4) statements made to law enforcement in the course of interrogations.

NRS 51.385 implicates *Crawford's* holding because the statute permits a district court to assess the reliability of a child-declarant's statements, rather than requiring assessment by means of cross-examination. We recognized this implication in *Flores v. State,* in which we stated that "our prior ruling in *Bockting,* holding that NRS 51.385 is constitutional under *Roberts,* cannot survive analysis under *Crawford.*"

Our recognition of this constitutional dilemma does not end our analysis of the instant matter. The Court in *Crawford* also stated that, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." Notwithstanding D.D.'s presence and testimony at trial, Pantano asserts that several of D.D.'s nonresponsive answers during cross-examination effectively rendered her unavailable for confrontation purposes. From this, he reasons that introduction of her prior statements through the testimony of others renders NRS 51.385 unconstitutional as applied to him. We disagree.

**\*5** In *Delaware v. Van Arsdall,* the United States Supreme Court stated that " 'the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " Further, "[w]hen a witness gives 'testimony that is marred by forgetfulness, confusion, or evasion ... the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination.' "

We conclude that Pantano had an adequate opportunity to cross-examine D.D. The fact that she answered negatively or "I don't know" when asked on cross-examination to identify to whom she spoke regarding the incident does not render the cross-examination ineffective. If anything, such testimony served to undermine her testimony and that of the surrogate witnesses.

We therefore further conclude that D.D.'s availability for cross-examination at trial defeats Pantano's "as-applied" challenge to NRS 51.385 and renders immaterial the testimonial nature of her statements to others regarding the assault. Having said this, we now take this opportunity to clarify *Flores* regarding the circumstances under which NRS 51.385 does and does not pass constitutional muster. First, subject to general rules of admissibility, a district court may properly admit

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

a statement under this statute when a competent child witness testifies, regardless of whether the hearsay statement at issue is testimonial. Here, as noted, the child was competent to testify as to her allegations against Pantano. Second, if the hearsay statement is nontestimonial, a district court may exercise its discretion under NRS 51.385 to admit the statement, even though the child does not testify. Finally, per *Crawford* and *Flores,* when testimonial hearsay is at issue, admission of a child-victim's hearsay statement under NRS 51.385 violates confrontation rights when the victim is unavailable and the defendant has not had a prior opportunity to cross-examine. Accordingly, NRS 51.385 is not facially unconstitutional in all of its applications.

122 Nev. at 480–83, 138 P.3d at 787–91 (citation footnotes omitted).

The state supreme court's rejection of petitioner's claim or claims in this regard was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court at the time of the court's July 20, 2006, decision on direct appeal.

Petitioner maintains that N.R.S. 51.385 is unconstitutional and overbroad "on its face" because it allows the introduction of testimonial hearsay so long as the statement is reliable and trustworthy regardless of whether or not the child testifies or was subject to prior crossexamination. As discussed, *infra,* as to Ground 2, the victim testified at trial, although petitioner challenges whether she nonetheless was "available" for purposes of *Crawford.* On Ground 1, petitioner maintains that because of the above alleged "facial unconstitutionality" of the statute, "the improper admission of evidence through an unconstitutional statue violated Pantano's rights to due process, confrontation, and a fair trial."FN1

> FN1. # 46, at 6; see also # 20, at 12 (Petitioner maintains: "A conviction obtained by the admission of evidence

through an unconstitutional statute cannot stand.") Petitioner contends that the state supreme court's holding—that the statute survives scrutiny because is not facially unconstitutional in all of its applications—is contrary to *Crawford.*

**\*6** Petitioner's "facial" challenge to this evidentiary statute for "overbreadth" has no valid underpinning in clearly established United States Supreme Court constitutional doctrine. It would be one thing to hold, on the claim discussed *infra* under Ground 2, that a defendant was denied his right to at least confrontation if evidence in fact was admitted at *his* trial that violated the Confrontation Clause. It would be quite another to hold that a defendant can overturn his conviction because an *evidentiary* statute was "facially overbroad and/or unconstitutional" without regard to whether the evidence admitted at *his* trial in fact violated the Confrontation Clause. And that in truth is what petitioner argues in the "facial challenge" in Ground 1. He is urging that the alleged "overbreadth" of the law renders the introduction of the evidence at his trial unconstitutional because the statute allegedly is not constitutional as written in all of its applications. See also # 22, Ex. 36, at 27–28 (direct appeal brief).

Petitioner does not cite a single decision of the United States Supreme Court overturning a conviction based upon a holding that an evidentiary statute was "facially unconstitutional" and "overbroad" under the Confrontation Clause without regard to whether the evidence actually introduced at the defendant's trial was admitted in violation of the Confrontation Clause. *Crawford* clearly made no such holding. There is no Supreme Court authority holding that the introduction of otherwise *arguendo* constitutionally admissible evidence is rendered unconstitutional because it was admitted through a statute that was in some other respect unconstitutional because it allegedly allows other evidence in other cases that violates confrontation rights.

There is no such authority with good reason,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

because established Supreme Court constitutional doctrine instead leads inexorably to the contrary conclusion.

It is a firmly entrenched fundamental principle of constitutional doctrine that "a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *New York v. Ferber,* 458 U.S. 747, 767, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982).

As the Supreme Court repeatedly has instructed, "facial challenges" for "overbreadth" are restricted to *First Amendment* challenges, and then only in narrow circumstances:

Prototypical exceptions to this traditional rule are First Amendment challenges to statutes based on First Amendment overbreadth. "At least when statutes regulate or proscribe speech ... the transcendent value to all society of constitutionally protected expression is deemed to justify allowing 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' " *Gooding v. Wilson,* 405 U.S. 518, 520–521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (quoting *Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S.Ct. 111, 14 L.Ed.2d 22 (1965)). "This is deemed necessary because persons whose expression is constitutionally protected may well refrain from exercising their right for fear of criminal sanctions provided by a statute susceptible of application to protected expression." *Gooding v. Wilson, supra,* at 520–521, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408. *See also Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

.....

**\*7** But the allowance of a facial overbreadth challenge to a statute is an exception to the traditional rule that "a person to whom a statute may

constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *Ferber, supra,* at 767, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (citing *Broadrick, supra,* at 610, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830). This general rule reflects two "cardinal principles" of our constitutional order: the personal nature of constitutional rights and the prudential limitations on constitutional adjudication. 458 U.S., at 767, 102 S.Ct. 3348, 73 L.Ed.2d 1113. "By focusing on the factual situation before us, and similar cases necessary for development of a constitutional rule, we face 'flesh and blood' legal problems with data 'relevant and adequate to an informed judgment.' " *Id.,* at 768, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (footnotes omitted).

Even though the challenge be based on the First Amendment, the overbreadth doctrine is not casually employed. "Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, we have recognized that the overbreadth doctrine is 'strong medicine' and have employed it with hesitation, and then 'only as a last resort.' " *Id.,* at 769, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (citing *Broadrick, supra,* at 613, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830). " '[F]acial overbreadth adjudication is an exception to our traditional rules of practice and ... its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from "pure speech" toward conduct and that conduct-even if expressive-falls within the scope of otherwise valid criminal laws....' " 458 U.S., at 770, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (quoting *Broadrick, supra,* at 615, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830). *See also Board of Airport Commis of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

*Los Angeles Police Dept. v. United Reporting Publishing Corp.,* 528 U.S. 32, 38–40, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999).

Petitioner has not invoked—either in this Court or significantly for exhaustion purposes in the state supreme court—the First Amendment on this claim. Nor has he articulated any related First Amendment interests. Clearly, no such interests are implicated on this claim.

Petitioner's "facial challenge" for "overbreadth" thus never even gets out of the starting gate, whether on deferential AEDPA review or even on *de novo* review. There simply is no constitutional doctrinal underpinning for a "facial challenge" to an evidentiary statute for "overbreadth" based upon the fact that a statute allegedly may violate the Confrontation Clause in some circumstance or circumstances not then presented to the reviewing court.

To be sure, some lower federal courts and state courts, as in the Nevada *Bockting* case, will address an issue of whether an evidentiary statute is unconstitutional "on its face" or "facially" under the Confrontation Clause. However, such inquiry is directed not to whether the statute is "overbroad" and allows for the admission of both constitutional and unconstitutional evidence. Rather, such inquiry is directed to whether the statute is *wholly* unconstitutional, "on its face," in all of its potential applications, which of course necessarily also would include the particular application to the case then before the bar. Petitioner cannot validly morph that quite distinct "facial" validity inquiry—conducted in lower court opinions—into clearly established federal law as determined by the United States Supreme Court holding that an evidentiary statute that *arguendo* permits the introduction of unconstitutional evidence in other situations not then before the court is "facially unconstitutional" for "overbreadth." Petitioner thereby necessarily references wholly inapposite constitutional doctrine that instead recognizes a viable overbreadth challenge only for First Amendment challenges, not Con-

frontation Clause claims.

**\*8** Accordingly, even on a *de novo* review, the amorphous "facial challenge" for "overbreadth" in Ground 1 would be at best surplusage and at worst frivolous. If the evidence actually admitted at petitioner's trial was admitted in violation of the Confrontation Clause, then a "facial" challenge to the statute is surplusage vis-à-vis the challenge to his own particular conviction. If, on the other hand, the evidence actually admitted at petitioner's trial was *not* introduced in violation of the Confrontation Clause, then there is no nonfrivolous federal constitutional claim by which the otherwise constitutional admission of the evidence is rendered unconstitutional because the evidentiary statute allegedly would permit the unconstitutional admission of other evidence in other situations in other trials.

A fortiori, on deferential AEDPA review, the state supreme court's rejection of such a "facial challenge" for "overbreadth" indisputably was neither contrary to nor an unreasonable application of clearly established federal law.

Ground 1 therefore in truth does not state, much less present, a viable ground for federal habeas relief, based upon alleged "facial unconstitutionality" for "overbreadth." FN2

> FN2. In the amended petition and reply, petitioner also refers to the specifics of his particular case, but in doing so he cross-references to his discussion of Ground 2. To the extent, if any, that petitioner presents any as-applied claim in Ground 1 as to the specifics of his particular case, such claim is wholly redundant of the claims in Ground 2 and thus is disregarded as a separate claim. The only non-redundant claim in Ground 1, the facial challenge for overbreadth discussed in the text, plainly is without merit.

**Ground 2: Confrontation Clause—"As–Applied" Challenge**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

In Ground 2, petitioner alleges that he was denied rights to confrontation, due process, and a fair trial because allegedly testimonial out-of-court statements by the child victim to her father and to a detective were admitted at trial. Petitioner contends principally: (a) that the child was "unavailable" for purposes of the Confrontation Clause analysis under *Crawford* because her responses in her trial testimony allegedly were so vague and inadequate that effective cross-examination was not possible, allegedly thereby rendering her "unavailable;" and (b) that the child's statements not only to the investigating detective but also to her father were "testimonial" statements for purposes of Confrontation Clause protection under *Crawford.*

The Supreme Court of Nevada rejected the corresponding claim or claims presented to that court on the following grounds: FN3

> FN3. For ease of reference and context, the Court sets forth the previously-quoted holding particularly on the "unavailability" issue and adds newly-quoted material herein with the holding on the "testimonial" issue.

.... The Court in *Crawford* ... stated that, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." Notwithstanding D.D.'s presence and testimony at trial, Pantano asserts that several of D.D.'s nonresponsive answers during cross-examination effectively rendered her unavailable for confrontation purposes. From this, he reasons that introduction of her prior statements through the testimony of others renders NRS 51.385 unconstitutional as applied to him. We disagree.

In *Delaware v. Van Arsdall,* the United States Supreme Court stated that " 'the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " Further, "[w]hen a witness gives 'testimony that is marred by forgetfulness, confusion, or evasion ... the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination.' "

**\*9** We conclude that Pantano had an adequate opportunity to cross-examine D.D. The fact that she answered negatively or "I don't know" when asked on cross-examination to identify to whom she spoke. regarding the incident does not render the cross-examination ineffective. If anything, such testimony served to undermine her testimony and that of the surrogate witnesses.

We therefore further conclude that D.D.'s availability for cross-examination at trial defeats Pantano's "as-applied" challenge to NRS 51.385 and renders immaterial the testimonial nature of her statements to others regarding the assault.....

*Testimonial hearsay*

Despite the immateriality in this case of the testimonial nature of D.D.'s hearsay statements, we will address the issue of whether D .D.'s statements to her father were testimonial, given the likelihood that this issue will arise in future cases.

Pantano asserts that D.D.'s father questioned her to elicit evidence. From this, Pantano analogizes D.D.'s responses to her father's questioning to responses given to questions by law enforcement, which *Crawford* characterized as testimonial.

We reject Pantano's analogy between statements made to D.D.'s father and statements made to law enforcement. A parent questioning his or her child regarding possible sexual abuse is inquiring into the health, safety, and well-being of the child. To characterize such parental questioning as the gathering of evidence for purposes of litigation would unnecessarily and undesirably

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

militate against a parent's ability to support and nurture a child at a time when the child most needs that support. We therefore conclude that D.D.'s statements to her father were nontestimonial in nature.

The State concedes that D.D.'s statements to Detective Given are testimonial. However, in line with the above, the district court acted within its discretion in admitting these statements because the child victim testified and the district court assessed these statements for reliability under NRS 51.385. We therefore discern no error with regard to Detective Given's testimony.

122 Nev. at 482–83, 138 P.3d at 790–91 (footnotes omitted).

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

On the availability issue, the Supreme Court rarely has addressed what it means to be "unavailable" for Confrontation Clause purposes. *See, e.g., Hardy v. Cross,* —— U.S. ——, 132 S.Ct. 490, 181 L.Ed.2d 468 (2011)(per curiam); *Meras v. Sisto,* 676 F.3d 1184, 1191 (9th Cir.2012)(Bea, J., concurring). There are no Supreme Court decisions intimating, much less holding, that a witness may be "unavailable" for Confrontation Clause purposes even though they actually take the stand and testify, albeit allegedly too vaguely to allow allegedly effective cross-examination.

The more general—or undeveloped—that a rule is in Supreme Court jurisprudence, the more leeway that the state courts have in reaching outcomes in particular applications. It is not an unreasonable application of clearly established federal law for a state court to decline to apply a specific legal rule that has not been squarely established by the Supreme Court. *See, e.g., Harrington v. Richter,* —— U.S. ——, ——, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011).

**\*10** Here, as noted by the state supreme court, established principles of Confrontation Clause law cut directly against petitioner's argument. As the Ninth Circuit recently summarized the relevant principles in the Supreme Court's jurisprudence:

" '[t]he Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion.' " *United States v. Owens,* 484 U.S. 554, 558, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988) (quoting *Delaware v. Fensterer,* 474 U.S. 15, 21–22, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)(per curiam)). All the Confrontation Clause requires is the ability to cross-examine the witness about his faulty recollections. *Id.; see also Crawford v. Washington,* 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ( "Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.").

*United States v. Romo–Chavez,* 681 F.3d 955, 961 (9th Cir.2012).

Particularly given the unqualified statement in *Crawford* that the Confrontation Clause places "no constraints at all" on the use of a declarant's prior testimonial statements when the declarant testifies at trial, the state supreme court's rejection of petitioner's claim clearly was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. This Court has substantial doubts as to whether petitioner's novel "unavailability" argument would carry the day even on a *de novo* review. The argument plainly does not carry the day on highly deferential merits review under AEDPA. FN4

> FN4. The Court does not tacitly adopt petitioner's characterization of the then eight-year-old child victim's testimony as its own. The child victim in fact provided definitive testimony on a number of specif-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

ic points regarding the sexual assault, as to which petitioner was convicted; and she adhered to that testimony on cross-examination and redirect. However, as chronicled by petitioner, she gave inconclusive responses on other points, including in particular regarding the lewdness charge on which petitioner ultimately was not convicted and further regarding with whom she talked about the sexual assault incident. See # 22, Ex. 18, at 12–31. The salient point under previously-established Confrontation Clause case law is that any deficiencies in her testimony were subject to exploration, and were explored, on cross-examination. Under established Supreme Court jurisprudence, that is "[a]ll that the Confrontation Clause requires." *Owens,* 484 U.S. at 558. Petitioner's claim runs against, rather than with, the grain of established Confrontation Clause case law.

If petitioner cannot prevail on the unavailability issue on federal habeas review under AEDPA, that in truth is the end of the matter with regard to the claims in Ground 2. As *Crawford* reflects, if the child victim was "available" and testified, the Confrontation Clause placed no constraints on the admission of her prior statements, even if the prior statements *arguendo* were "testimonial" under *Crawford.*

In any event, on the "testimonial statement" issue, the state supreme court's rejection of petitioner's claim regarding the victim's statements to her father also was neither contrary to nor an unreasonable application of clearly established federal law.

In *Crawford,* the Supreme Court held that admission of an out-of-court "testimonial" statement by a witness, is barred by the Confrontation Clause of the Sixth Amendment unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *See* 541 U.S. at 52, 59 & 68–69. However, quite clearly, "not all hearsay implicates the Sixth Amendment's core

concerns" under *Crawford.* 541 U.S. at 51. Sixth Amendment protections instead apply only to out-of-court statements that were "testimonial" in nature. 541 U.S. at 52.

**\*11** Significantly, the *Crawford* Court did not provide a definitive guide as to what statements were and were not "testimonial." As the Ninth Circuit has observed:

.... The [*Crawford* ] Court identified "[v]arious formulations" that had been offered to define the "core class of 'testimonial' statements." *Crawford,* 541 U.S. at 51, 124 S.Ct. 1354, 158 L.Ed.2d 177. One of these formulations included statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 52, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (internal quotation marks omitted). But the Court did not adopt this formulation, or any other. It left "for another day any effort to spell out a comprehensive definition of 'testimonial,' " and held only that, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. This left the term susceptible to a broad range of reasonable applications. *See Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). Indeed, the Court acknowledged that its "refusal to articulate a comprehensive definition [would] cause interim uncertainty." *Crawford,* 541 U.S. at 68 n. 10, 124 S.Ct. 1354, 158 L.Ed.2d 177.

*Meras,* 676 F.3d at 1188.

In its June 19, 2006, decision in *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Supreme Court again expressly declined to establish "whether and when statements made to someone other than law enforcement personnel are 'testimonial.' " 547 U.S. at 823 n. 2.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

Accordingly, at the time of the July 20, 2006, decision in question by the Supreme Court of Nevada,[FN5] the Supreme Court not only had left the term "testimonial" largely undefined, if further had expressly left open the question of "whether and when statements made to someone other than law enforcement personnel are 'testimonial.'" Clearly, the state supreme court's rejection of petitioner's claim that the child's statements to her father were not "testimonial" under the inchoate standard left by *Crawford* was neither contrary to nor an unreasonable application of clearly established federal law. *Accord Alberni v. McDaniel,* 458 F.3d 860, 866 (9th Cir.2006)(constitutional principle could not be regarded as clearly established where the Supreme Court had expressly declared the issue an open question).

> FN5. In applying the AEDPA deferential standard of review, "clearly established federal law as determined by the United States Supreme Court" refers to the law at the time of the state-court decision on the merits. *Greene v. Fisher,* ––– U.S. ––––, 132 S.Ct. 38, 181 L.Ed.2d 336 (2011).

Petitioner urges that the child's statements to her father were testimonial under *Crawford* because "they were more than casual [remarks] made during casual conversation."[FN6] He relies in this regard upon federal appellate decisions rejecting claims that statements were testimonial in situations where the statements were made during casual conversation between friends or family members. This Court is not sanguine that the lower federal courts in question thereby were stating a rule that noncasual statements between family members thus were "testimonial" under *Crawford.* In all events, however, the decisions of lower federal courts do not constitute "clearly established federal law as determined by the United States Supreme Court" on AEDPA review. There is no Supreme Court precedent—and was no such precedent at the time of the state supreme court's July 20, 2006, decision—holding that a statement to a family mem-

ber that are more than casual remarks during casual conversation are testimonial statements under *Crawford.* Nor was the state supreme court required by then-existing Supreme Court jurisprudence to conclude that, objectively, a young child in the victim's situation reasonably would believe that her statements to her father would be available for use later at a trial, assuming that a child of that age reasonably would know of and contemplate such things.

> FN6. # 46, at 10.

**\*12** The state supreme court's rejection of petitioner's "testimonial statement" argument as to the child's statements to her father thus was neither contrary to nor an unreasonable application of United States Supreme Court precedent at the time of the court's decision.[FN7]

> FN7. Patano did not contend that the child's statements to her mother were testimonial. *See* 122 Nev. at 791 n. 2, 138 P.3d at 483 n. 2.

Ground 2 therefore does not provide a basis for federal habeas relief. Petitioner cannot prevail on the "unavailability" issue on deferential review, and that issue wholly undercuts his claim. Petitioner further cannot prevail on the "testimonial statement" issue with respect to the child's statements to her father, even if he otherwise could prevail on the "unavailability" issue.

### Ground 3: Jury Possession of Excluded Transcript of Confession

In Ground 3, petitioner alleges that he was denied rights to confrontation, due process and a fair trial because the jury was given copies of a transcript of his confession in spite of a trial court ruling that the transcript, as distinguished from an audio recording of the statement played at trial, was not admissible.

The Supreme Court of Nevada summarized the relevant facts and held as follows regarding the cor-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

responding claims presented to that court:

The district court also permitted the playing of an audiotaped interview between Detective Given and Pantano regarding the incident. As part of this procedure, the court also permitted the prosecution to distribute copies of an uncertified transcript of the interview for the limited purpose of allowing the jury to read along while the taped version was played. The transcript, however, was not admitted into evidence. After hearing final arguments and the court's instructions, the jury returned verdicts of guilty on both charges.

Prior to the reading of the verdicts following deliberations, the defense noticed that several jurors were in possession of the excluded transcript. Unsure as to how to proceed, the defense waited until after rendition of the verdicts before moving for a mistrial.

Following a hearing on the mistrial motion, the district court found that the transcript contained an admission relating to the lewdness charge that was not included in the audiotape due to a copying error. Because the portions of the tape played at trial did not contain the admission, and because the State introduced no other evidence in support of the lewdness count, the district court granted a mistrial as to the lewdness count only. The district court eventually dismissed the separate charge after the State elected not to pursue it further.

.....

*Jury's possession of excluded transcript during deliberations*

As stated, the district court restricted its mistrial order to the lewdness verdict. Pantano argues that the continued possession of the excluded transcript infected the deliberations on both charges and, accordingly, that the district court should have granted a mistrial as to the entire case. In addition to the portion of the written statement omitted from the tape, he asserts that

the transcript contained excessive blanks and omissions not reflected on the tape, and improperly failed to reflect the inflection of his voice in response to several questions soliciting admissions. More specifically, Pantano asserts that the tape accurately reflects one "I did" response as interrogative, whereas the transcript erroneously reflects the same "I did" response in the declarative voice.

**\*13** Under *Winiarz v. State,* "[t]he determination of whether reversible prejudice has resulted from jurors' consideration of inadmissible evidence in a given case 'is a fact question to be determined by the trial court, and its determination will not be disturbed on appeal in the absence of a showing of an abuse of discretion.' " Relevant considerations in such an analysis include (1) " 'whether the issue of innocence guilt is close, [ (2) ] the quantity and character of the error, and [ (3) ] the gravity of the crime charged.' "

Because Pantano failed to include the tape or transcript of his confession in the record on appeal, we must resolve this claim of error based upon Detective Given's testimony at trial. That testimony recounted Pantano's confession to sexual assault, which confirmed D.D.'s accusations to her parents and in open court.

We conclude that the district court's limited mistrial ruling satisfies the *Winiarz* criteria. First, as noted, the evidence adduced as to the sexual assault count finds more than adequate support in D.D.'s testimony and Pantano's confession, as conveyed in Detective Given's testimony. Second, the quantity and character of the error appears slight, given that the jury heard the tape with the accurate voice inflections and was previously exposed to the excluded transcript, without objection, during the playing of the tape. Third, although the gravity of a sexual assault charge is serious indeed, it does not appear that the sexual assault verdict was in any way influenced by the lewdness admission or by any of the alleged blanks or omissions. Finally, Pantano offers no

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

concrete theory that the lewdness confession somehow infected deliberations on both charges. Accordingly, any prejudice relating to the sexual assault verdict resulting from the jury's possession of the excluded transcript was harmless beyond a reasonable doubt.

Based upon this record, we conclude that the district court properly acted within its discretion in granting a mistrial as to the lewdness count only.

122 Nev. at 786–87 & 791–93, 138 P.3d at 480 & 483–84 (citation footnotes omitted).

The state supreme court's implicit rejection of petitioner's constitutional claims on the merits was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.[FN8]

> FN8. *Cf. Fenenbock v. Director,* 681 F.3d 968, (9th Cir.2012)(implicit ruling on constitutional claim). The Court further notes that on direct appeal petitioner argued the *Winiarz* case applied by the state supreme court as a case applying the enunciated standard "in light of the confrontation clause and due process implications." See # 22, Ex. 36, at 37. Petitioner has not contended here in the district court that the claim instead is subject to *de novo* review.

At the outset, review under § 2254(d)(1) is limited "to the record that was before the state court that adjudicated the claim on the merits." *Pinholster,* 131 S.Ct. at 1388. Here, petitioner did not include a copy of either the transcript or the tape of the statement in the record presented on appeal to the Supreme Court of Nevada, which is the court that adjudicated the claims on the merits. Federal habeas review thus is restricted under § 2254(d)(1) to the same record presented to the state supreme court on appeal when it adjudicated the claims.[FN9] The transcript, Exhibit 85 in this matter, therefore may not be considered by this Court in applying the

standard of review under § 2254(d)(1).

> FN9. *See also* 131 S.Ct. at 1400 (" 'must be assessed in light of the record the court had before it' ")("must overcome the limitation of § 2254(d)(1) on the record that was before that state court"); *id., at 1402 n. 11* ("has failed to show that the California Supreme Court unreasonably applied clearly established federal law on the record before that court"); *id., at 1404 n. 14* ("Both parties agree that these billing records were before the California Supreme Court.") Nothing in *Pinholster* supports a view that federal habeas review extends to materials *arguendo* in the state district court record that were not included in the record on appeal when the state supreme court adjudicated the claims on the merits.

**\*14** Turning to review of the constitutional claims, the state supreme court's implicit rejection of the Confrontation Clause claim was neither contrary to nor an unreasonable application of clearly established federal law as of the time of the court's July 20, 2006, decision. The alleged statements in question were Pantano's own statements. Their presentation to the jury, regardless of whether or not presented in a manner consistent with the trial court's ruling, therefore did not necessarily implicate Confrontation Clause protections under clearly established federal law on July 20, 2006. *See, e.g., Romo–Chavez,* 681 F.3d at 961 (challenged translations were construed as defendant's own statements and thus did not implicate Confrontation Clause).[FN10]

> FN10. Judge Berzon questioned the viability of the underlying Ninth Circuit case law following upon 2009 and 2010 decisions of the United States Supreme Court. 681 F.3d at 962 n. 1 (Berzon, J., concurring). However, in this case, the reviewing court must look instead to the law as it stood at the time of the state supreme court's July 20, 2006, decision. *Greene,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1381

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

*supra.* Judge Berzon acknowledged that *Crawford* alone likely would not have been enough to overturn the prior circuit precedent, and he of course was writing a concurring rather than a majority opinion.

Petitioner further has not demonstrated that the state supreme court's implicit rejection of his due process and fair trial claims further was either contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Petitioner relies upon an assortment of federal appellate decisions arising in what petitioner maintains are analogous situations in federal criminal cases and/or pre-AEDPA federal habeas cases decided on *de novo* review. Petitioner does not identify any controlling Supreme Court decisions concerning the right to a due process or to a fair trial in apposite circumstances that were contrary to the state supreme court's decision or that were unreasonably applied in rejecting his claims. FN11

> FN11. Petitioner begins the reply on Ground 3 with extended argument and case citation seeking to establish that the presentation of the transcript to the jury violated his rights to an impartial jury and to a jury trial under the Sixth Amendment. # 46, at 13–14. No such legal claims were alleged in Ground 3 in the counseled amended petition. Petitioner may not use the federal reply to amend the petition. *E.g., Cacoperdo v. Demosthenes,* 37 F.3d 504, 507 (9th Cir.1994). The only way to add what in truth are new legal claims to Ground 3 is by a properly-filed amended petition. At this juncture, under Rule 15(a) of the Federal Rules of Civil Procedure, petitioner can amend the petition only with respondents' written consent or by obtaining leave of court to amend. Significantly, neither was obtained, despite repeated rejections by this Court of similar attempts by the Federal Public Defender in prior

habeas cases to *de facto* amend the petition by adding new claims in the reply. Habeas pleading is not notice pleading, either as to the underlying facts or as to the legal theories relied upon. Additionally, it does not appear that these belated new legal claims were exhausted. The late-breaking added legal claims are disregarded herein.

The rights to due process and a fair trial guarantee that a criminal defendant will be treated with " 'that fundamental fairness essential to the very concept of justice.' " *E.g., United States v. Valenzuela–Bernal,* 458 U.S. 858, 872, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982)(quoting prior authority). In order to find such a denial of the rights to due process and a fair trial, the reviewing court " 'must find that the absence of that fairness fatally infected the trial [such that] the acts complained of must be of such quality as necessarily prevents a fair trial.' " *Id.* Trial errors "rise to the level of due process violations only when they so infect the fairness of the trial as to make it 'more spectacle or trial by ordeal than a disciplined contest.' " *Id.*

Even without regard to deferential review under AEDPA, the circumstances under which such a violation will be found are limited. As the Supreme Court explained in *Dowling v. United States,* 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990):

Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. We, therefore, have defined the category of infractions that violate "fundamental fairness" very narrowly. As we observed in *Lovasco, supra,* at 790, 97 S.Ct., at 2048;

"Judges are not free, in defining 'due process,' to impose on law enforcement officials [their] 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.' *Rochin v. California,* 342 U.S. 165, 170, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952).... [They] are to determine only whether the action complained of ... violates

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935), and which define 'the community's sense of fair play and decency,' *Rochin v. California, supra,* at 173, 72 S.Ct., at 210."

**\*15** 493 U.S. at 352–53.

Moreover, with regard to deferential review under AEDPA, as previously noted, the more general that a rule is in Supreme Court jurisprudence, the more leeway that the state courts have in reaching outcomes in particular applications. *See, e.g., Harrington, supra.* The above-described standard for deprivation of rights to due process and a fair trial is as about a general of a rule as there can be in this regard.

In the present case, petitioner's claim boils down to the contention that he was denied fundamental fairness as to his sexual assault conviction because the jury saw: (a) his alleged statement in the transcript as to a charged lewdness offense as to which the state trial court subsequently declared a mistrial and as to which he does not stand convicted; (b) the words "I did"—that the jury heard on the tape—reflected in the transcript as—allegedly—an affirmative declaration when the words instead were said as a question; and (c) allegedly "excessive" omissions and blanks being reflected in the transcript that allegedly were not reflected by the tape that the jury in fact heard. The state supreme court hardly unreasonably applied the general standard discussed above when it rejected petitioner's claims in essence that the improper jury possession of the transcript "violate[d] those 'fundamental conceptions of justice which lie at the base of our civil and political institutions.'" Such matters hardly denied Pantano due process and a fair trial, particularly given: (a) that he admitted—in uncontested undeniably declarative statements in his taped statement—that he sexually assaulted the child victim; and (b) that the jury already had been allowed—without defense objec-

tion—to follow along in the transcript when the tape was played.[FN12]

> FN12. See # 22, Ex. 20, at 123; *id.,* Ex. 28, at 6.

In the alternative, the Court reaches the same conclusion on *de novo* review. For substantially the reasons assigned above, the possession of the transcript in contravention of the trial court's ruling did not deny petitioner fundamental fairness.[FN13]

> FN13. The pre-AEDPA decision upon which petitioner places principal reliance would not dictate the outcome of this case even on *de novo* review, much less on deferential AEDPA review.
>
> In *Dickson v. Sullivan,* 849 F.2d 403 (9th Cir.1988), a deputy sheriff responsible for supervising the jury during trial stated to two jurors that the defendant had "done something like this before." The state appellate court held that the deputy's comment violated the defendant's Sixth Amendment right to confrontation but held that the error did not require reversal of the conviction. The Ninth Circuit vacated the conviction on federal habeas review applying a standard from federal criminal trials that a new trial was required following the comment if there was "a reasonable possibility that the extrinsic material *could* have affected the verdict." 849 F.2d at 405 (emphasis in original).
>
> As discussed in the text, the Confrontation Clause is inapplicable in *this* context under controlling Ninth Circuit law because the statements in question on the transcript are petitioner's own alleged statements. *Dickson* does not state an overarching principle—much less one applicable on deferential AEDPA review—of due process that an occurrence

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

such as was involved in this situation mandates reversal if there was "a reasonable possibility that the extrinsic material *could* have affected the verdict." That is not the governing constitutional standard stated in the Supreme Court opinions discussed in the text, and it would not be applied by this Court even on a *de novo* review.

On deferential review, *Dickson* even more clearly does not dictate the outcome in this case. On such review, petitioner of course must demonstrate that the state court's rejection of his claim was contrary to or an unreasonable application of clearly established law as determined by the United States Supreme Court. Citing a pre-AEDPA federal appellate case applying pre-AEDPA federal criminal appellate case law to a habeas case does not carry petitioner's burden under AEDPA.

The Court further notes in this regard that, if it were to consider the transcript, Exhibit 85 in this matter, on a *de novo* review, the transcript belies two central factual allegations made by petitioner on this claim.

*First,* the transcript in fact shows Pantano's response as a *question, not* as a declarative statement. In the trial court, defense counsel stated that the transcript showed the words as a declaration rather than a question.[FN14] Trial counsel's argument was repeated on direct appeal,[FN15] but, as noted previously, petitioner did not include a copy of either the transcript or the tape in the record presented on appeal to the Supreme Court of Nevada. What the transcript actually contains is the following: "I did?"[FN16] The moving factual premise for this part of petitioner's claim is clearly and directly refuted by the actual record.[FN17]

FN14. # 22, Ex. 28, at 4.

FN15. # 22, Ex. 37, at 50.

FN16. # 24, Ex. 85, at 56.

FN17. The Court additionally would note that the "I did?" response was in response to a question as to whether petitioner put his finger inside the child victim's vagina. At this point in his statement, petitioner still was equivocating and denying the sexual assault offense. He later expressly admitted in his statement sufficient penetration of the child's vagina with his finger to constitute a sexual assault. E.g., *id.,* at 60–64. Even if, *arguendo,* the transcript instead had reflected "I did" rather than "I did?" any prejudice from such a mistranscription—which never happened—would have been wholly eliminated by petitioner's later confession to the crime. But, in all events, petitioner's assertion that the transcript reflected "I did" is utterly refuted by the actual record presented to this Court.

Rule 11 of the Federal Rules of Civil Procedure requires that federal habeas counsel do more than merely parrot factual argument from state court filings without examining the actual record. Arguing a factual point that is directly belied by the record is, at the very best, unpersuasive.

*Second,* per the record presented to this Court, the challenged material regarding the lewdness count that allegedly was in the transcript but not on the tape was not the only evidence supporting the lewdness count, as petitioner maintains.[FN18] According to the transcript, Pantano also admitted in another portion of his statement that his penis "was kinda touchin' her butt" as he was masturbating.[FN19] Petitioner has not argued that other portions of the transcript, such as this particular statement, were not contained in the tape; and, similar to the state court direct appeal, petitioner has not provided

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

this Court with a copy of the tape.[FN20] On the record presented to this Court, the evidence clearly preponderates that there was other, unchallenged evidence in petitioner's statement to support the set-aside lewdness conviction. While Pantano perhaps persuaded the state trial court to declare a mistrial in part on the premise that there was no other evidence supporting the lewdness count, this Court, on *de novo* review, is not required to ignore what it sees with its own eyes in assessing the alleged collateral impact on the sexual assault conviction from the challenged statement as to the lewdness count being before the jury in the transcript. The challenged passage that was in the transcript alone was duplicative of other evidence in Pantano's confession that even more strongly supported the lewdness count.

> FN18. See # 46, at 22, line 19; 24, lines 8–9; & 25, lines 2–3.

> FN19. # 24, Ex. 85, at 73. On the same page, petitioner stated "I don't remember" when asked whether his penis touched the child's "butt crack." However, his statement that his penis "was kinda touchin' her butt" was sufficient for a lewdness conviction. The statements on page 73 of the transcript are not at the start or end of a changed tape.

> FN20. Petitioner—who is represented by counsel herein—at all times has the burden of proof on federal habeas review. If he does not present all possibly available state court record material, then the case will be decided on the inferences supported by the material presented.

**\*16** That would leave only the allegedly excessive omissions and blanks—as to a recorded statement that the jury listened to—as the sole remaining factual underpinning of the claim. On an *arguendo de novo* review, the Court has no difficulty at all holding that the jury's possession of a transcript with such allegedly "excessive" omis-

sions and blanks did not "violate those fundamental conceptions of justice which lie at the base of our civil and political institutions."

Ground 3 does not provide a basis for federal habeas relief.

### Ground 4: Alleged Prosecutorial Misconduct

In Ground 4, petitioner alleges that he was denied rights to due process and a fair trial because of prosecutorial misconduct. He alleges in particular: (a) that the prosecutor inappropriately sought to inflame the jury and appeal to their passions and emotions by urging jurors to convict Pantano to make the victim's parents "feel better" and improperly injected her personal opinion into the argument; (b) that the prosecutor inappropriately argued evidence that was never admitted which implied Pantano's guilt, disparaged defense counsel and the defense, talked about religious characters, and again injected her personal opinion; (c) that the prosecutor improperly elicited testimony from a State witness that lying to a suspect is legal, in an effort to bolster the witness' credibility; and (d) improperly elicited testimony referencing a prior bad act.

With regard to Grounds 4(a) and 4(b), the Supreme Court of Nevada summarized the relevant facts and held as follows regarding the claims presented to that court:

*Prosecutorial misconduct*

*Closing arguments*

Pantano argues that the prosecution made several improper statements during closing argument. The first prosecutorial statement with which Pantano takes issue was as follows: "There's no doubt he's guilty. This is a parent's worst nightmare. Make them feel better. Thank you." The State notes that the prosecutor made this statement after extensively discussing the evidence adduced against Pantano and that the prosecutor was entitled to comment on and interpret the evidence.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

Regardless of any logical or rhetorical connection that the State might wish to draw during closing argument, this type of comment is always improper. With regard to the statement, "[t]here's no doubt he's guilty," the prosecutor improperly stated her personal opinion regarding Patoano's guilt. Further, the two sentences following the statement of guilt were also improper because they urged the jury to convict on a basis other than the evidence. In telling the jury that the crime committed is a "parent's worst nightmare" and asking the jury to aid the parents in their suffering through conviction, the prosecution improperly appealed to juror sympathies by diverting their attention from evidence relevant To the elements necessary to sustain a conviction. Making D.D.'s parents feel better is not one of these elements.

**\*17** Despite the impropriety of these statements, we conclude that they were harmless beyond a reasonable doubt, given that D.D. testified to the acts underlying the alleged sexual assault and that Pantano confessed to them. Further, the district court sustained the defense's objection and instructed the jury to disregard the statements, which supplied Pantano with an adequate remedy. We do, however, admonish the prosecution to refrain from such commentary in the future.

Pantano also takes issue with the State's comments made during its concluding remarks:

BY [State]: Most of what he [defense counsel] just said [argued] is inadmissible, inappropriate, and should never have been said.

[Defense]: Objection, Judge. If it was inadmissible, inappropriate, Your Honor would have sua sponte stopped me.

[State]: Well—

[Defense]: That's improper on her part.

THE COURT: The Court will sustain the ob-

jection.

[Defense]: Move to strike.

BY [State]: If I had said anything about Daniel and the Christians—

THE COURT: Granted.

[State]: Sorry?

THE COURT: Granted.

BY [State]: If I had said anything about Daniel and the Christians, there would have been a mistrial. If I had started talking about, well, speculate about sperm on the panties, there would have been a mistrial, because you can't speculate. There was no DNA analysis done on the panties, so you can't speculate whether or not there was sperm there....

The State made these statements in response to arguments by defense counsel that he felt like the proverbial "Daniel in the lions' den," in dealing with the State's case, and arguing that the State provided no toxicological evidence, *i.e.,* the presence of sperm or semen, in support of its case. Regardless of whether these arguments were "invited," we agree with Pantano's claims of error on this issue.

First, we view as improper the prosecution's rebuttal argument characterizing the defense's closing argument as inadmissible and inappropriate, because such argument improperly disparaged the defense. While the prosecution may object to a defense argument perceived as improper, it may not first argue to the jury, rather than the court, that the defense's argument was improper. We conclude, however, that Pantano received the remedy for this statement when the district court sustained his objection and granted his motion to strike.

Second, the defense polemics concerning "Daniel and the Christians" and the speculation

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

about the lack of physical evidence does not justify the prosecution's continuation of a properly stricken line of argument. It is also improper to argue that the State would somehow not receive the same treatment as the defense under hypothetical situations, such as, "[i]f I had said anything about Daniel and the Christians." Needless to say, there are other more effective ways to demonstrate that the State has met its burden of proof than to complain about something that has not occurred or that there is some inherent unfairness in the rules of trial engagement that negatively affects the State's ability to secure convictions in such matters.

**\*18** Despite the impropriety of the State's arguments, we conclude that they were harmless beyond a reasonable doubt, given D.D.'s testimony and Pantano's confession describing the assault. [FN27]

> FN27. Because we have applied a harmless error analysis to these instances of prosecutorial misconduct, some prosecutors may be tempted to continue use of the arguments discredited in this opinion. We will not hesitate to refer such misconduct in the future for bar discipline.

122 Nev. at 793–95, 138 P.3d at 484–85 (remaining footnotes omitted).

The state supreme court's rejection of petitioner's constitutional claims corresponding to those in Ground 4(a) and 4(b) was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

On federal habeas review of a state court conviction for constitutional error, the standard of review for a claim of prosecutorial misconduct, is " 'the narrow one of due process, and not the broad exercise of supervisory power' " applied in federal criminal trials. *See, e.g., Darden v. Wainwright,*

477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)(quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "The relevant question is whether the prosecutor['s] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Id.* (quoting *Donnelly,* 416 U.S. at 643).

Petitioner proceeds essentially on the premise that the state supreme court's holding that the prosecutor's comments were improper constituted the equivalent of a holding that the comments violated due process, and he then challenges the court's conclusion that the error constituted harmless error.

However, as this Court has observed multiple times in other cases, a conclusion that prosecutorial argument was "improper" under federal decisions based on the exercise of supervisory power in federal criminal trials and that make no pertinent constitutional holding, state court decisions applying state law standards, and/or the American Bar Association (ABA) Standards for Criminal Justice does not necessitate a conclusion that the "improper" argument violated rights to due process or a fair trial. That is, a conceded "improper" argument does not necessarily "so infect the trial with unfairness as to make the resulting conviction a denial of due process." FN21

> FN21. *See, e.g., Mario Lopes Benitez v. McDaniel,* No. 3:08–cv–00543–ECR–VPC, # 70, at 12–15, 2012 WL 2151482, slip op., at *7–9 (D.Nev., June 13, 2012).

The Court need go no further to illustrate this point than the principal case relied upon by petitioner, *Hein v. Sullivan,* 601 F.3d 897 (9th Cir.2010). In *Hein,* the Ninth Circuit applied the due process standard under the aforementioned *Darden* and *Donnelly* Supreme Court decisions in conducting AEDPA review of a state court conviction. The *Hein* panel clearly held that "[t]here were a number of instances of improper argument" in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

State's closing.[FN22] The panel nonetheless did not conclude that the improper argument gave rise to a due process violation. The court applied the prejudice analysis that is subsumed within the underlying due process analysis in *Darden* and *Donnelly,* not a harmless error analysis that potentially also could apply to a wholly state law impropriety.[FN23]

> FN22. 601 F.3d at 912–14.

> FN23. *Id.,* at 914–16.

**\*19** In the present case, a number of factors counsel strongly against a conclusion that the prosecutor's improper argument so infected the trial with unfairness as to make the resulting conviction a denial of due process.

First, the state trial court immediately sustained defense objections to the argument, and the court further expressly instructed the jury to disregard the comments vis-à-vis making the victim's parents feel better.

Second, while the prosecutor made undisputedly improper argument appealing to emotion, referring to her personal opinion, and disparaging defense counsel, she did not misstate the evidence. Petitioner urges that the prosecutor "improperly argued about 'sperm on the panties' and DNA analysis when no such evidence existed."[FN24] What the prosecutor stated, however, in direct response to a defense argument, was: "There was no DNA analysis done on the panties, so you can't speculate whether or not there was sperm there. It's something that you simply cannot consider."[FN25] The prosecutor thus was not "argu[ing] about 'sperm on the panties' and DNA analysis," thereby implying that there was inculpatory evidence "when no such evidence existed." She instead was stating the very fact that *no such evidence existed* and that the jury thus was not to consider it. The prosecutor no doubt engaged in "over the top" contentious rhetoric in other respects, as to which immediate defense objection quite properly was sustained, but just as assuredly she did not misstate the evidence.

> FN24. # 46, at 20, lines 23–24.

> FN25. # 22, Ex. 22, at 30–31. Defense counsel had argued: "I'll tell you something. If there was sperm DNA all over those panties, I wouldn't be standing here right now." *Id.,* at 28. Defense counsel's argument was close to, if not over, the line as well.

Third, the evidence of guilt on the sexual assault charge was compelling. Pantano confessed to the crime. And, while the child victim did not provide testimony supporting the lewdness charge of which Pantano does not stand convicted, she did provide definitive testimony on a number of specific points regarding the sexual assault of which he does stand convicted.[FN26]

> FN26. See discussion in note 4, *supra,* and trial transcript citations therein. The Court is not persuaded by petitioner's contrasting characterization of the then eight-year-old child victim's testimony as wholly unreliable.

The undisputed impropriety of the prosecutor's statements under nonconstitutional standards applicable to federal prosecutors, to Nevada state prosecutors under state law, and under the ABA Standards of Criminal Justice, again, does not equate to a due process violation in and of itself. The state supreme court's rejection of petitioner's constitutional claims was neither contrary to nor an unreasonable application of clearly established federal law on the record presented to the state supreme court. In this regard, the Court reiterates that the more general that a rule is in Supreme Court jurisprudence, the more leeway that the state courts have in reaching outcomes in particular applications. *See, e.g., Harrington, supra.* As with the prior ground, the above-described standard under *Darden* and *Donnelly* for deprivation of rights to due process and a fair trial is as about a general of a rule as there can be in this regard.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

Grounds 4(a) and 4(b) therefore do not provide a basis for federal habeas relief.[FN27]

> FN27. Petitioner further urges that the prosecutor improperly disparaged defense counsel when she stated: "Mr. Banks talks about all the lies, all the deceits, all the this, all the that, he yelled and hooted and hollered for how long about all the things that Detective Given said wrong." # 22, Ex. 22, at 34. She made this comment in the course of responding to a defense argument that the detective's interview technique had been psychologically coercive because he lied to Pantano about DNA and fingerprint evidence that did not exist. *Id.* This "hoot and holler" statement, to which no objection was made, hardly is such as would "so infect the trial with unfairness as to make the resulting conviction a denial of due process."

With regard to Ground 4(c), the Supreme Court of Nevada summarized the relevant facts and held as follows regarding the claims presented to that court:

**\*20** *Testimony concerning propriety of subterfuge in police questioning*

Pantano asserts that the prosecution improperly asked, and Detective Given improperly testified, that lying to a suspect was proper according to his training and this court's precedent. Pantano reasons that the prosecution improperly utilized this line of questioning to vouch for Detective Given's credibility and to convey inadmissible hearsay.

Pantano failed to object to this testimony on the grounds he now claims. His counsel merely objected to the form of the question posed to the witness, rather than to its substance, which is generally insufficient to preserve the claimed error for appellate review [FN28] unless it rises to plain error affecting substantial rights.[FN29] We

conclude that this testimony does not constitute plain error and whatever error that could be ascribed to it did not affect Pantano's substantial rights in light of D.D.'s testimony and Pantano's confession. Finally, beyond misleading a suspect concerning his constitutional rights, it is proper for police authorities to use certain types of subterfuge as part of custodial and noncustodial interrogations.

> FN28. *See Merica v. State,* 87 Nev. 457, 462, 488 P.2d 1161, 1163–64 (1971) (despite the defendant's objection below, the defendant's failure to specifically object on the grounds urged on appeal precluded appellate consideration on the grounds not raised below).

> FN29. *See Green v. State,* 119 Nev. 542, 545, 80 P.3d 93, 95 (2003)(under plain error review, this court examines whether an "error" occurred, whether it was "plain" or clear, and whether it affected the defendant's substantial rights); *see also Dzul v. State,* 118 Nev. 681, 688, 56 P.3d 875, 880 (2002).

122 Nev. at 793–95, 138 P.3d at 484–85 (remaining footnotes omitted).

At the outset as to this claim, respondents contend, without citation to supporting authority, that petitioner "failed to exhaust the claim for review other than review of the Nevada Supreme Court for plain error."[FN28] Although exhaustion may not be waived, the scheduling order directed respondents to present all procedural defenses in a single motion to dismiss without consolidating procedural defenses with the merits. As the Court repeatedly has emphasized, there is nothing about an exhaustion defense such as the one belatedly raised in the answer that could not have been ascertained at the time of the motion to dismiss.[FN29] In this case, counsel has buried an exhaustion defense, without any notice to the Court of its late assertion, literally

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

in the middle of a forty-seven page answer on an over three-year-old case. On the minimal argument made and the absence of supporting citation presented at this late juncture, the Court concludes that the state supreme court addressed the claim on the merits and that it is exhausted. *Accord Walker v. Endell,* 850 F.2d 470, 473–74 (9th Cir.1987)(the panel held that the consideration of a claim as to which no contemporaneous objection was made for plain error constituted an adjudication on the merits, without stating that federal review then was only for plain error).

FN28. # 41, at 23–24.

FN29. See, e.g., *McCaskill v. Budge,* No. 3:08–cv–00687–ECR–WGC, # 91, at 4–5.

**\*21** On the merits, the state supreme court's rejection of the claim corresponding to Ground 4(c) was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Petitioner relies on this ground on Supreme Court and federal appellate decisions in federal criminal trials that appear to be based on principles of supervisory authority rather than federal constitutional doctrine. As the Court has stated also repeatedly, a conclusion that prosecutorial argument was improper under federal decisions based on the exercise of supervisory power in federal criminal trials and that make no pertinent constitutional holding does not necessitate a conclusion that the closing argument violated rights to due process or a fair trial. Petitioner at bottom has failed to present authority on this claim establishing that the state supreme court's rejection of the claim was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court *applying federal constitutional standards.*<sup>FN30</sup>

FN30. See text and note at note 21, *supra.* In *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the Supreme Court held that the prosecutor's argument, although error, did not constitute

plain error warranting overlooking the failure to make a timely objection. The Court appears to have discussed fairness solely in the context of applying the plain error standard of review. Justice Brennan's separate opinion indeed repeatedly distinctly references review as an exercise of supervisory authority. See 470 U.S., at 22 n. 1, 24 n .3, 33 n. 16 & 34 (Brennan, J., concurring in part and dissenting in part). In all events, the Supreme Court found no plain error in *Young,* so citation to the case hardly establishes that the state supreme court unreasonably applied federal *constitutional* law in not finding plain error in its case, under an exceedingly general standard of "fairness." *See Harrington, supra.* The Ninth Circuit decision in *United States v. Molina,* 934 F.2d 1440 (9th Cir.1991), is subject to the same basic comments. The First Circuit decision in *United States v. Manning,* 23 F.3d 570 (1st Cir.1994), which is not binding in this circuit even on *de novo* review, expressly applied supervisory authority review. See 23 F.3d at 574 n. 2. If petitioner wishes to overturn a state court conviction under AEDPA for a constitutional prosecutorial misconduct violation, petitioner needs to demonstrate that the decision is contrary to or an unreasonable application of Supreme Court authority applying federal constitutional law, not federal criminal decisions based on the exercise of supervisory authority that make no constitutional holding. The showing and argument made here fails to even begin to shoulder petitioner's burden under AEDPA.

The Court is not sanguine that it would overturn a conviction on the basis of the challenged testimony even on a *de novo* review. What the prosecutor sought to establish in the testimony is indisputably true—a police officer can lie to a suspect in an effort to ferret out the truth and elicit a confes-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

sion. Petitioner pejoratively characterizes this testimony as "prosecutorial vouching for the witness," relying exclusively on federal criminal cases on direct appeal involving closing argument rather than presentation of testimony. However, what the prosecutor was doing was responding to an extensive focus on this point during the defense cross-examination and seeking to address the very argument in fact made in the defense closing, that the confession should be disregarded because it was obtained through the use of alleged psychological coercion and lies. See # 22, Ex. 21, at 9–18; # 22, Ex. 22, at 13 & 24–27. It is highly questionable whether the testimony—to which no objection was made as to substance—was objectionable in the first instance. What it clearly was not was a matter that so infected the trial with unfairness as to make the resulting conviction a denial of due process, even without also taking into account the fact that Pantano confessed to the sexual assault with corroborating testimony by the then eight-year-old child victim on that offense.

Ground 4(c) does not provide a basis for federal habeas relief.

With regard to Ground 4(d), concerning testimony as to a prior bad act, the state high court denied this claim along with other claims in a blanket summary statement of denial.FN31

> FN31. *See* 122 Nev. at 796 n. 30, 138 P.3d at 486 n. 30 ("We have examined Pantano's other assignments of error and find them without merit.").

The deferential AEDPA standard of review applies fully to a summary rejection of a claim on the merits without assigned reasons. *Harrington,* 131 S.Ct. at 784. When a state court's decision is unaccompanied by an articulated explanation, the petitioner still must demonstrate that there was no reasonable basis for the state court to deny relief. *Id.* The state court's determination that a claim lacks merit precludes federal habeas relief under the AEDPA so long as fairminded jurists could disagree

on the correctness of the state court's decision. 131 S.Ct. at 786. When considering a summary state court denial of a claim, the federal habeas court thus "must determine what arguments or theories ... could have supported ... the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the United States Supreme Court. *Id.*

**\*22** During examination of the victim's mother, Leticia Shand, the prosecutor asked her about Pantano's familial relationship to her, as he was her nephew. During this line of inquiry, the prosecutor asked whether Pantano ever would come over and play with the kids at a point nearly a decade prior to the incident. Defense counsel objected on the basis of relevancy as Shand embarked on a narrative that gave no immediately clear direction as to where it was heading. The trial court overruled the objection, after which Shand stated, without any further questioning: "His mom called me to get him in that house. She told me to get him out in the house because she's scared of him." # 22, Ex. 18, at 36–37.

Defense counsel objected and counsel conferred with the trial court at the bench. Coming off the bench conference, the court stated on the record that counsel had stipulated that the last answer be stricken. The court instructed: "Therefore, the jury will disregard it."FN32 Defense counsel in fact had not stipulated to merely striking the statement, however, and on the next break counsel sought to make a record that he instead had requested a mistrial.FN33 The prosecution did not dispute that the defense had not stipulated to just striking the testimony.FN34 Significantly, as well, defense counsel also acknowledged that "[c]learly, [the prosecutor] didn't expect to hear that answer."FN35 After hearing the on-the-record argument, the trial court denied the defense motion for a mistrial.

> FN32. *Id.,* at 37, 138 P.3d 477.

> FN33. *Id.,* at 48–56, 138 P.3d 477.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

FN34. *Id.,* at 51, 138 P.3d 477.

FN35. *Id.,* at 51 & 53, 138 P.3d 477.

The only possibly applicable substantive standard on this claim is the general standard of fundamental fairness under the Due Process Clause. As noted herein, the more general that a rule is in Supreme Court jurisprudence, the more leeway that the state courts have in reaching outcomes in particular applications. *See, e.g., Harrington, supra.* While petitioner presents this claim, at least on federal habeas review, as a prosecutorial misconduct claim, the Court notes at the outset on this claim that there is absolutely no indication in the record that the prosecutor intentionally elicited the testimony in question. Every indicium in the state court record, including defense counsel's express concession at the time, instead points to the opposite conclusion.

Moreover, even if one were to assume, purely *arguendo,* that there actually was prosecutorial misconduct involved in eliciting the testimony, despite the complete absence of any evidence of same, there is no clearly established law in Supreme Court jurisprudence establishing that the introduction of prior bad act evidence denies a defendant due process of law. The Supreme Court instead expressly reserved the question in *Estelle v. McGuire,* 502 U.S. 62, 75 n. 5, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The Ninth Circuit thus has held that a state supreme court therefore does not act unreasonably in concluding that the introduction of particular propensity evidence does not violate due process. *See Alberni v. McDaniel,* 458 F.3d 860, 863–67 (9th Cir.2006).

**\*23** The Court thus is left on this claim with: (a) a state court record, including an express defense concession, that reflects that the prosecutor did not intentionally elicit the testimony; (b) Supreme Court case law that does not establish now and did not establish at the time of the state supreme court's July 20, 2006, decision that introduction of alleged propensity evidence necessarily vi-

olates due process and denies a defendant a fundamentally fair trial; (c) the fact that the state trial court struck the testimony and expressly instructed the jury to disregard it; and (d) substantial evidence of petitioner's guilt of sexual assault, including his confession and corroborating testimony by the then eight-year-old child victim.

Against this backdrop, the state supreme court's rejection of the claim corresponding to Ground 4(d) was neither contrary to nor an unreasonable application of clearly established federal law, as fair-minded jurists readily could conclude that no due process violation arose in these circumstances under controlling Supreme Court jurisprudence at the time of the state supreme court's decision.

Ground 4(d) not provide a basis for federal habeas belief.

The Court otherwise is not persuaded that the state court's rejection of the claims in Grounds 4(a) through (d) in combined cumulative effect was either contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. The claims are not substantially stronger in aggregate effect than they are when considered individually.

Ground 4 does not provide a basis for federal habeas relief.

### Ground 5: Effective Assistance of Trial Counsel

In Ground 5, petitioner alleges that he was denied a right to effective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments. He alleges fifteen distinct instances of alleged ineffective assistance, which are described in more detail below.

On a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) coun-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

sel's defective performance caused actual prejudice. On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time. The court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *E.g., Beardslee v. Woodford,* 327 F.3d 799, 807–08 (9th Cir.2003).

While surmounting Strickland's high bar is "never an easy task," federal habeas review is "doubly deferential" in a case governed by the AEDPA. In such cases, the reviewing court must take a "highly deferential" look at counsel's performance through the also "highly deferential" lens of § 2254(d). *Pinholster,* 131 S.Ct. at 1403 & 1410.

***Ground 5(a): Alleged Failure to Protect Speedy Trial Rights***

**\*24** In Ground 5(a), petitioner alleges that he was denied effective assistance when trial counsel allegedly failed to protect his constitutional and statutory rights to a speedy trial.

A complaint was filed in the justice court on May 29, 2003, and Pantano was arraigned the next day on May 30, 2003. During extensive proceedings in the justice court from that date through October 2, 2003, the justice court minutes do not reflect that Pantano requested a speedy trial under either state law or the Sixth Amendment.[FN36] Pantano waived any further preliminary hearing on the latter date, and the matter therefore was bound over to the state district court.

> FN36. See # 21, Ex. 1, at electronic docketing pages 2–4.

On October 16, 2003, Pantano was arraigned on an information in the state district court. Defense counsel brought to the court's attention that "[o]n the one hand my client would like me to file a

writ with some suppression issues, on the other hand he wants to a speedy trial, and I've tried to explain to him ... you can't have both of those things." The court explained the same thing to Pantano, that he could pursue the writ "or you can invoke your speedy trial rights and have a speedy trial date set within the next 60 days but you can't have both." Pantano thereupon stated: "Speedy trial is my choice." Nothing in the transcript reflects that Pantano distinctly invoked a Sixth Amendment right to a speedy trial as opposed to the state statutory right under N.R.S. 178.566 to a speedy trial "within 60 days after the arraignment on the indictment or information" to which the judge instead was referring. The matter was set for a December 1, 2003, trial, with a November 25, 2003, calendar call.[FN37]

> FN37. # 21, Ex. 9, at 4–5.

At a November 13, 2003, motion for bail reduction, defense counsel preliminarily raised the matter that Pantano's desire for a speedy trial within the 60–day state period potentially was hampering presentation of his defense. Lab results, including DNA analysis, most likely would not be back from the lab by the time of the scheduled trial date. The defense investigator further was in the hospital. Counsel merely was broaching the topic. He queried preliminarily whether the circumstances might rise to the level possibly requiring a competency determination following upon what at least was an unwise choice by Pantano.[FN38]

> FN38. # 21, Ex. 10, at 6–10.

At the November 25, 2003, calendar call, defense counsel noted that his supervisor, after meeting and speaking with Pantano, had a concern as to petitioner's competency. Counsel further stated that he was not prepared to go to trial and felt that it would be ineffective assistance to do so, as he believed, *inter alia,* that evidentiary matters and suppression issues should be resolved first. Counsel sought a continuance, but the court observed that the existence of a competency issue required that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

the trial date be reset in all events for a competency determination. The trial setting was continued pending the competency evaluation. The transcript of the hearing does not contain any renewed request by Pantano—who had engaged in colloquy with the court earlier in the proceeding on another issue—for a speedy trial, whether under the Sixth Amendment or state law. # 21, Ex. 12.

**\*25** When the matter came back before the trial court for a December 16, 2003, status check, Pantano appeared through a new public defender, *i.e.,* the earlier referenced supervisor. Defense counsel advised the court that Pantano had been found competent. Pantano did speak up at this proceeding, voicing the concern that "[i]sn't that waiving my speedy trial if I—if they give me another attorney?" The trial court stated that "we had to freeze the case because of the competency issue" but that Pantano would remain in "an invoked status" with regard to his original invocation of the 60–day statutory speedy trial right. The trial date again was set for February 2, 2004. Defense counsel represented that he would complete the remaining steps necessary for trial preparation within that time. Pantano personally stated a desire for a quicker trial setting, but the court informed him that the February 2 date was the next available and earliest possible setting. The proceeding closed with an express confirmation by Pantano and the court that he did not waive his speedy trial rights.[FN39]

> FN39. # 21, Ex. 13. Petitioner alleges that the start of trial was delayed by the public defender's office substituting three different attorneys, that the delay was exacerbated because he had a conflict with the attorneys because they would not prepare for trial and instead insisted that he accept a plea offer, and that he continued to claim his actual innocence and invoke his constitutional right to a speedy trial. # 20, at 36. Petitioner does not cite to any portion of the state court record presented to the state supreme court on the state post-conviction

appeal corroborating these factual allegations.

The matter came on for trial as scheduled on February 2, 2004.[FN40]

> FN40. The matter was called for trial that date, but the defense wanted to have a hearing on the child victim's competency to testify. This hearing consumed the better part of the time available. The trial judge finally was able to call the venire in later in the day and had them come back the next day to commence *voir dire.* See # 22, Ex. 16, at 2–5 & 132–34; # 21, Ex. 1, at electronic docketing pages 8–10.

On the state post-conviction appeal, the Supreme Court of Nevada rejected the corresponding claim presented to that court on the following grounds:

> ... [A]ppellant claimed that his trial counsel was ineffective for failing to ensure his speedy trial rights. Appellant failed to demonstrate that he was prejudiced. Appellant failed to identify how the outcome of his trial would have been different had the trial been conducted earlier. Therefore, the district court did not err in denying this claim.

> # 24, Ex. 82, at 4 (citation footnote omitted).

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

At the outset, while petitioner frames the claim as one of a failure to protect Pantano's state and federal speedy trial rights, petitioner presents no apposite authority establishing that either his state or federal constitutional speedy trial rights in fact were violated.

With regard to the Nevada statutory speedy trial right, petitioner cites no Nevada case law estab-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1394

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

lishing that a state speedy trial violation occurred. N.R.S. 178.566 refers to a sixty-day period for a defendant "whose trial has not been postponed upon the defendant's application." Petitioner cites no Nevada state case law establishing that counsel in truth allowed petitioner's statutory speedy trial right to be violated, particularly given the need to pursue a competency evaluation once a question was raised as to competency. While Pantano may have voiced a desire for a speedy trial, in proceedings other than the November 25, 2003, proceeding, petitioner has cited no apposite Nevada state decisions establishing that a state speedy trial violation in fact occurred under N.R.S. 178.566 on the procedural history presented.

**\*26** With regard to the Sixth Amendment speedy trial right, petitioner went to trial eight months after his arrest and the initial charges in the justice court. Such an interval of time does not necessarily approach the threshold at which the Sixth Amendment speedy trial right becomes implicated. While petitioner cites to considerable general "boilerplate" law regarding the Sixth Amendment speedy trial right in the abstract, he does not cite a single apposite case establishing that Pantano's constitutional speedy trial right was violated in this case. *Cf. Doggett v. United States,* 505 U.S. 647, 651–52 & n. 1, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992)(noting that the lower courts had found that post-accusation delay approaching a year generally was necessary to trigger a Sixth Amendment speedy trial right inquiry).

Petitioner thus has not established by apposite citation that either his state statutory or federal constitutional speedy trial right in truth was violated in this case.

Petitioner thus in essence claims that he was denied effective assistance of counsel because trial counsel did not secure a quicker trial setting after he had invoked his state statutory speedy trial right, albeit without a showing of an actual state or federal constitutional speedy trial violation in and of itself.

The state supreme court's conclusion that Pantano failed to present allegations tending to establish prejudice was not an objectively unreasonable application of *Strickland.*

Petitioner seeks to establish prejudice, first, on the premise that the child victim was being coached by her parents during the period before trial and therefore would not have given as definitive testimony had she testified earlier. Petitioner seeks to maintain that the victim's testimony was deficient as maintained on the Confrontation Clause claims in Grounds 1 and 2 but nonetheless was more polished in other respects in this Ground 5(a). He maintains that her responses were more polished in particular with respect to "certain questions and basic concepts such as honesty."[FN41] Petitioner quotes from portions of the victim's July 8, 2003, preliminary hearing testimony that he maintains reflects an inability to distinguish between the truth and a lie.

FN41. # 46, at 25.

The Court is not persuaded that petitioner has demonstrated a reasonable probability that, but for counsel's failure to secure an earlier trial setting, the result of the proceeding would have been different on account of the victim's testimony being substantially different. In the federal reply, petitioner quotes only selectively from the preliminary hearing testimony where the prosecutor sought to establish for the record that the child understood the difference between the truth and a lie. Petitioner drops out the responses indicating that the child understood the difference. Petitioner in particular drops out the critical final responses where the adult lawyer finally made a definitive connection with the child witness on the point in terms that she could relate to, and the child affirmed that she would tell the judge only what really happened and would not make anything up.[FN42] When the child testified at trial, it was the third time that she had testified, including testimony on the very first day of trial when the defense challenged her competency to testify. See # 22, Ex. 16, at 119–132. It is entirely

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

speculative that her answers at trial resulted from alleged coaching, if any, as opposed to merely having been through the same basic line of inquiry as to truth and lies twice before in the normal course of the proceedings. Moreover, her testimony at trial was substantially the same as her testimony at the preliminary hearing regarding the sexual assault. FN43

> FN42. # 21, Ex. 4, at 80–82.

> FN43. Compare # 21, Ex. 4, at 82–92 (preliminary hearing) with # 22, Ex. 18, at 16–19 (trial). Further, as discussed *infra* as to Ground 5(l), petitioner's purported evidence of coaching itself is thin to nonexistent.

**\*27** Petitioner further seeks to establish prejudice, second, on the premise that the delay "also resulted in the destruction of exculpatory evidence," *i.e.,* bedding and other items from the crime scene. Petitioner maintains that the bedding allegedly would have shown an absence of semen and other DNA evidence, contrary to Pantano's confession where he maintained that he masturbated and ejaculated during the offense, thus discrediting his confession. FN44

> FN44. # 46, at 25.

This argument is a *non sequitur.* Whether or not the trial was held sooner rather than later had no causal relationship to whether alleged exculpatory evidence was destroyed. The trial could have been held on the day after petitioner's May 27, 2003, arrest and that would not have resulted in evidence being preserved that theretofore had not been logged into evidence by the police (although that likely would have precluded test results being available on any such evidence). One simply has nothing to do with the other.

Moreover, it is entirely speculative: (a) that the bedding and other materials from the May 3, 2003, incident still would have been available in their im-

mediately post-incident condition by the time of the police investigation, much less by the time of a defense request made after Pantano's arrest on or about May 27, 2003; (b) that petitioner's statement to the police that he ejaculated purportedly "all over the place" necessarily meant that his confession would be disproved if his semen and DNA were not recovered from any such materials that *arguendo* still would have been available; FN45 and (c) what forensic examination in fact would have shown if the post-offense condition of the materials had been preserved, as it is wholly speculative that such examination would have been materially exculpatory—based merely upon an absence of evidence of semen on particular material—rather than directly inculpatory.

> FN45. Pantano stated specifically that his semen "was spread all over everywhere," "was everywhere," and "was all over." He made these statements in the course of questioning as to whether he put his penis rather than his finger inside the child victim and whether his semen possibly might be found on or in her with her panties having been pulled down at the time. See # 24, Ex. 85, at 66–67 & 73. Pantano of course had an incentive to shade what he was saying in order to provide an explanation that did not involve actual penile penetration for his semen possibly being found on or inside the victim, as the officer was insinuating that there might be such evidence. Purportedly disproving Pantano's inherently self-serving response by showing an absence of semen on bedding or other materials would not necessarily disprove his confession, in which he changed and shaded his account throughout.

According to the testimony at trial, the incident occurred on Saturday, May 3, 2003, but the victim's mother did not first learn of the incident until five days later on Thursday, May 8, 2003, when she found certain stained panties while doing laundry

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

and questioned the victim. The mother did not immediately tell the father. She then found blood-stained panties after having finished the rest of the laundry on the Friday. She then told the father on the Saturday, now approximately a full week after the incident, and the sexual assault medical examination and police investigation thereafter ensued. In light of this testimony, it is not only speculative but improbable that the bedding and other materials would have been preserved in their post-offense condition even at the beginning of the police investigation on May 10, 2003, much less when defense counsel became involved at the end of May.[FN46]

> FN46. # 22, Ex. 18, at 33–36 & 39–47; *id.,* Ex. 19, at 9–12. The testimony about finishing the laundry on Friday is at 40 in Ex. 18. Petitioner alleged on state post-conviction review that he told defense counsel on June 13, 2003, to secure the bedding materials. See # 24, Ex. 61, at 17. It is speculative, and improbable, to the extreme that the evidence still would have been available at that time and/or would have proved what petitioner baldly alleges that it would have established.

Even if, *arguendo,* the failure to secure an earlier trial setting had any logical or causal relationship to preservation of such evidence, petitioner has not established a reasonable probability that, but for counsel's failure to secure an earlier trial setting, the result of the proceeding would have been different on account of such evidence somehow being preserved by an earlier trial setting. The claim of prejudice is grounded in pure speculation.

**\*28** Ground 5(a) therefore does not provide a basis for federal habeas relief.[FN47]

> FN47. Petitioner urges that because the state supreme court did not decide the performance issue, that issue is reviewed *de novo.* However, a petitioner must establish both deficient performance and resulting prejudice. If petitioner fails to demonstrate

one, the reviewing court, whether the state court or the federal court, need not address the other, whether on *de novo* or any other standard of review. Petitioner failed to satisfy the prejudice prong under *Strickland,* which ends inquiry on the claim.

### Ground 5(b): Alleged Failure to Seek Suppression of Petitioner's Confession

In Ground 5(b), petitioner alleges that he was denied effective assistance when trial counsel: (1) failed to seek to suppress his confession to the police on the grounds that it was involuntary; and (2) failed to bring forth evidence to demonstrate that his statements to the police were not corroborated by other physical and testimonial evidence.

### Ground 5(b)(1)

In Ground 5(b)(1), petitioner alleges that trial counsel should have challenged the voluntariness of his confession because: (a) the detective allegedly intimidated Pantano by banging or slamming his fists on the table as "clearly indicated" by "thumps" on the audio recording and transcript of the statement; (b) the detective allegedly raised a closed fist to within a few inches of Pantano's face and said: "Okay, well, just tell me, man. Tell me. Tell me what happened."; (c) the detective lied to Pantano about having recovered his fingerprints from inside the child victim and about DNA samples having been collected at the crime scene and from the victim's body; and (d) the detective's alleged actions had an overbearing effect on Pantano because he allegedly had been subjected to, witnessed, and/or heard of prior police excessive force or other misconduct while in the Phillippines, San Diego, and Tijuana.

The Supreme Court of Nevada held as follows on the claim presented to that court:

> ... [A]ppellant claimed that his trial counsel was ineffective for failing to file a motion to suppress his confession. Appellant failed to demonstrate that his trial counsel was deficient or that he was prejudiced. "The question of the admiss-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

ibility of a confession is primarily a factual question addressed to the district court: where that determination is supported by substantial evidence, it should not be disturbed on appeal." Moreover, in determining whether a confession is voluntary, the court looks at the totality of the circumstances. During his interview by Detective Given, appellant was informed that his interview was voluntary and that he could leave at any time. Thus, the circumstances indicate that appellant's confession was voluntary. As such, appellant failed to demonstrate that a motion to suppress had a reasonable likelihood of success. Therefore, the district court did not err in denying this claim.

# 24, Ex. 82, at 2–3 (footnotes omitted).

The state supreme court's rejection of the claim corresponding to Ground 5(b)(1) was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

Petitioner's factual claims that the detective banged his fists on the table and held his fist to within a few inches of his face at point in truth are based on nothing other than his own self-serving *post hoc* assertions in his state post-conviction memorandum.[FN48]

> FN48. # 24, Ex. 61, at 19.

**\*29** The transcript of the statement does indeed refer to "thumps" throughout. However, nothing in the transcript remotely reflects that these thumps were caused by an experienced detective leaving a clearly audible record that he was physically intimidating an interviewee into a confession. Rather, the thumps start from the very first line of the transcribed material, during a wholly mundane preliminary statement in a context where no rational person would suggest that the detective would be pounding the table to intimidate the interviewee:

This is Detective R. Given, P number 4890, (thumping sound) investigating a possible S/A under event number (thump) 030510–2592. Date

and time is 5–28 of 03 (thump) at 1448 hours. We're here at 3010 West Charleston (thump) Boulevard, suite 120, (thump) Las Vegas, Nevada 89102.....

# 24, Ex. 85, at 1. Nothing in the record remotely supports an inference that such thumps were caused by a detective beating on the table—even as he stated his name, badge number and street address—to intimidate Pantano. Rather, a far more likely inference would be that someone—such as perhaps a nervous Pantano—was drumming their fingers or otherwise fidgeting too close to the microphone or recorder. A motion to suppress based upon such thumps would have received short shrift.

Moreover, on the face of the transcript of the statement, the interview technique in fact employed by the detective was fundamentally at odds with the "rubber hose" methodology reflected by Pantano's self-serving statements. It is abundantly clear from the transcript that, throughout, the detective was seeing to coax, cajole and inveigle a statement from Pantano.[FN49] Indeed, the statement specifically referred to by petitioner—"Okay, well, just tell me, man. Tell me. Tell me what happened."—reads in the transcript clearly in that mode, with the detective coaxing and imploring Pantano to "just tell me, man ... what happened."[FN50] No one reading the transcript would come to a conclusion that base physical intimidation, rather than a seasoned interview technique, was being used to secure a confession from Pantano.

> FN49. See, e.g., # 24, Ex. 85, at 29–33 ("I don't want to blow this into anything big, huge")("not, not to make, to blow it into anything bigger than it is, is just say, you know what, this is what happened").

> FN50. *Id.,* at 56. Counsel needs to provide correct record citations rather than unconfirmed record cites parroted from a *pro se* state court memorandum.

At trial, the jury heard the actual tape. No argu-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

ment was made to the jury that the recorded confession that they heard in open court was the product of physical intimidation, as purportedly "clearly indicated" by the multiple thumps heard on the tape. Defense counsel sought to challenge the confession on other factual bases in closing argument, but not one whit of argument was presented to the jury that the detective used base physical intimidation rather than the interview technique reflected on the face of the transcript.[FN51]

> FN51. E.g., # 22, Ex. 22, at 25–26. The Court notes again, as it observed as to Ground 3, that petitioner did not present a copy of the actual tape in the state court record exhibits on federal habeas review. It also does not appear that a copy of the tape was presented to the state supreme court on either direct appeal or state post-conviction review. Petitioner—who is represented by counsel herein—at all times has the burden of proof on federal habeas review. If he does not present all possibly available state court record material, then the case will be decided on the inferences supported by the material presented. The transcript plainly does not support an inference of physical coercion being applied.

Thus, the record in this Court belies, rather than tends to support, petitioner's bald selfserving *post hoc* assertion that the investigating detective banged on the table and held his fist inches from Pantano's face during the interview. There was no probability that a motion to suppress premised upon such allegations would have led to the suppression of petitioner's confession.

**\*30** Given that the record belied rather than supported the factual claim of physical intimidation, what happened in Tijuana, San Diego and/or the Phillippines years before had no significant bearing on the likely admissibility of the confession. There was no probability that such circumstances would have led to a grant of a motion to suppress in this case.

Petitioner's reliance upon the detective's subterfuge regarding the other evidence that the police had as a basis for suppressing his confession flies in the face of long-established law to the contrary. *See, e.g., Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *see also Ortiz v. Uribe,* 671 F.3d 863, 871 (9th Cir.2011), *cert. denied,* ––– U.S. ––––, 132 S.Ct. 1811, 182 L.Ed.2d 631 (2012)("this type of 'deception' is well within the range of permissible interrogation tactics necessary to secure a lawful confession by the police").

For the first time in the federal reply, petitioner further relies upon the fact that he was not given the *Miranda* warnings prior to or during his statement as a new basis for maintaining that there was a reasonable probability that a motion to suppress would have been granted.[FN52] The Court repeatedly has admonished federal habeas counsel that a habeas petitioner may not raise a new legal claim for the first time in the reply. Counsel instead must file a motion for leave to amend the complaint. In all events, petitioner's late-breaking *Miranda* argument is wholly without merit. *Miranda* applies only to custodial interrogations.[FN53] Pantano plainly was told at the outset of the interview that he could leave at any time.[FN54]

> FN52. # 46, at 26–27.

> FN53. *Miranda* bars the admission of statements made during a custodial interrogation without the *Miranda* warnings first having been given. *E.g., Yarborough v. Alvarado,* 541 U.S. 652, 660–61, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). The custody determination is fact specific and the ultimate inquiry is whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. 541 U.S. at 662. The fact that police may view the person being questioned as a suspect does not establish that the questioning is custodial. *See id.* Whatever reference defense counsel may

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

have made to the absence of *Miranda* warnings during a calendar call hearing, the issue simply was a nonstarter.

> FN54. # 24, Ex. 85, at 2.

Finally, as discussed in more detail *supra* regarding Ground 5(a), it was *Pantano* who personally not only made the decision—but indeed insisted—on invoking his state statutory speedy trial right expressly in lieu of pursuing the suppression issue. Petitioner attempts to dismiss this fact by urging that "[e]ven assuming Pantano told counsel not to file a motion because he was concerned about his speedy trial rights, defense counsel" had a professional duty to pursue the motion.[FN55] However, Pantano did not merely tell counsel not to file a motion in some undocumented discussion. He expressly personally elected on the record, after the situation was explained to him by both counsel and the trial court, to invoke his speedy trial right rather than pursuing the suppression issue.[FN56]

> FN55. # 46, at 27.

> FN56. See text, *supra,* at 36–39.

Under Nevada procedure, Pantano could not pursue a pretrial writ seeking to suppress his conviction without waiving the 60–day statutory speedy trial period. *See* N.R.S. 34.700(1)(b)(1). As counsel and the trial judge explained to Pantano, there was not enough time to pursue the writ while also invoking the 60–day rule. After being so advised, Pantano personally elected to invoke the 60–day rule rather than pursue the writ. To be sure, there was additional delay thereafter. But the delay was for a competency determination, and a writ to suppress the confession could not have been pursued while Pantano's competency was being examined. Thereafter, once he was determined to be competent, Pantano thereupon immediately once again expressly and personally not only invoked, but again insisted, on the 60–day rule. His actions necessarily precluded pursuit of a writ to suppress his confession whether or not counsel would have

wanted to pursue such a writ in his professional judgment.

**\*31** Criminal defendants no doubt would favor a rule under which: (a) the defendant personally could make an election, against the advice of counsel, that necessarily precluded certain action being taken by counsel; and (b) the defendant thereafter could overturn his conviction based upon counsel's failure to pursue the action necessarily precluded by the defendant's own personal election. In all events, in the present case, the state supreme court's holding that petitioner could not demonstrate prejudice from counsel's failure to seek to suppress his confession was neither contrary to nor an unreasonable application of clearly established federal law. Ground 5(b)(1) thus does not provide a basis for habeas relief.

### Ground 5(b)(2)

In Ground 5(b)(2), petitioner alleges that counsel failed to contest the following alleged particulars in his confession as not being corroborated by other evidence: (a) whereas he told officers that he gave his cell phone to the victim's brother to play with, he did not own or possess a cell phone at that time; (b) whereas he told officers that he arrived at the residence at 5:30 a.m. and left at 2:00 p.m., the parents instead stated that he arrived at 9:00 a.m. and left at 10:00 p.m., and another witness' testimony allegedly established that Pantano did not have access to the child to commit the offense, which the child had stated occurred at nighttime; (c) whereas Pantano told officers that he had ejaculated with his semen allegedly being "just ... all over," defense counsel failed to test the victim's underwear to establish that the physical evidence allegedly would show that none of Pantano's DNA was present; (d) whereas Pantano told officers that he kissed the victim, the State allegedly presented no evidence to support Pantano's admission on this particular point; and (e) whereas Pantano told officers that the victim's clothes, shorts, and/or panties had been removed to facilitate the offense, the victim instead informed officers that her panties

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

were on during the incident.

The Supreme Court of Nevada rejected the claim or claims presented to that court on the following grounds:

... [A]ppellant claimed that his trial counsel was ineffective for failing to investigate whether appellant possessed a cell phone at the time of the incident. Appellant claimed that he lied to the police about having a cell phone with him during the incident; therefore, his trial counsel should have investigated to show that appellant did not have a cell phone at the time of the assault and that would have shown his confession was false. Appellant failed to demonstrate that he was prejudiced. Appellant confessed to the police that during the sexual assault, he distracted the victim's brother by allowing the brother to play a game on his cell phone. In light of his confession, the victim's testimony and the physical evidence, appellant failed to demonstrate that such an investigation would have resulted in a reasonable probability of a different outcome at trial. Therefore, the district court did not err in denying this claim.

**\*32** # 24, Ex. 82, at 7–8 (footnote omitted).

The state supreme court's express rejection of the claim with regard to the cell phone allegation was neither contrary to nor an unreasonable application of *Strickland.* The child victim also testified that Pantano gave his cell phone to her brother to play with during the incident, so his statement to the police was not wholly uncorroborated.[FN57] Moreover, there was no way to conclusively establish that Pantano had no cell phone in his possession. Even if counsel called a witness from every conceivably possible cell phone carrier in May 2003 to testify that Pantano had no account with them,[FN58] that would not have established that Pantano otherwise did not have a borrowed phone in his possession or possibly a prepaid phone under no name or another name. At bottom, Pantano's claim that he lied to the police about having a cell

phone and that his entire confession therefore allegedly was false would have had to have been based either on his own self-serving testimony (and he did not testify at trial) or the testimony of others who would not have been able to conclusively rule out his possessing a cell phone without their knowing it (even if their testimony otherwise was found credible). Trial counsel thus would have been expending considerable effort—in a case where Pantano was insisting on going to trial within state speedy trial time limits—trying to prove a negative that simply could not be conclusively proved. All to support the most gossamer of inferences that because Pantano allegedly lied to the police about the collateral point of having a cell phone he therefore lied to the police about inserting his finger into the vagina of a seven-year-old child. Clearly, his confession would not have been suppressed on this basis. Nor was there a reasonable probability that such testimony would have changed the outcome at trial. The state supreme court's holding that petitioner could not demonstrate prejudice from counsel's failure to pursue such a pointless avenue of defense was neither contrary to nor an unreasonable application of *Strickland.*[FN59]

FN57. # 22, Ex. 18, at 19. The child also testified consistently at the July 8, 2003, preliminary hearing that her brother was playing with a cell phone during the incident that he got from Pantano. # 21, Ex. 4, at 87.

FN58. Such a list of every conceivably possible carrier would not necessarily have been restricted only to carriers available specifically in Las Vegas, given roaming capability.

FN59. If Pantano had testified in support of this defense avenue, he essentially would have been testifying: "My confession demonstrably was false because I lied to the police about the collateral detail of having a cell phone, but I am not lying now when I state, facing conviction for a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

serious crime, that I did not have a cell phone." A conclusion that there was not a reasonable probability that such self-serving, and inferentially strained, testimony would have led to either the suppression of the confession or a different outcome at trial clearly was neither contrary to nor an unreasonable application of *Strickland.*

The state supreme court's implicit rejection of petitioner's remaining factual arguments in this same general vein also was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

Petitioner's argument with regard to the time that he was at the victim's residence does not appear to make logical sense, so the Court will quote the argument verbatim to assure that it has addressed the argument as made:

.... Further, Pantano informed investigative officers he had arrived at Ms. Shand's apartment at approximately 5:30 a.m. and left on same date at approximately 2:00pm. [sic] ( [Ex. 85,] at 19–20. In fact, two separate police reports immediately following the allegations indicate Leticia Shand and Demetrice Dade [the victim's mother and father] stated that Pantano arrived at Ms. Shand's apartment at 9:00am [sic] and left at approximately 10:00pm [sic] on same date. (Ex. 61, Exs. 3 & 4) Maria Pantano's (Rosero) sworn affidavit states that she was then speaking to Leticia Shand on the telephone at approximately 10:00am [sic] on same date. Ms. Shand informed Maria Pantano that Pantano had arrived approximately one hour earlier and was sleeping while DD and KD were then playing in the presence of Ms. Shand. (Ex. 61, Exh. 2) Thus, Pantano did not have access to DD to commit the instant allegations.

**\*33** ... Pantano's statements to LVMPD Detective Given, if believed, would result in the alleged incidents occurring during daylight hours. In fact, DD's first transcribed statements to LVMPD de-

tectives indicate she stated the alleged incident occurred at "night time." (Ex. 61, Exh. 5.)

# 20, at 38–39.

Pantano initially stated during the police interview that he was at the apartment from "like four, five, three, four o'clock in the morning" until "like until afternoon like probably three or four," such that he was playing with the children during the daytime.[FN60] Petitioner stated this approximately only one quarter of the way through the interview. At this point, Pantano still was denying that he had committed the crime, that he had touched the child inappropriately, or that he even was alone with the children at any time. His stating, initially, that he was at the apartment only during the daytime—in contrast to the evening when the incident occurred—bespoke of an effort to avoid culpability. Such a self-serving statement by an interviewee who then was denying having committed the crime logically does not establish beyond peradventure that he did not have access to the victim, any more than any of his other initial denials did. Nor did Pantano's initial statement as to the timeline demonstrate, logically or otherwise, that his subsequent confession to the crime later in the interview necessarily was false, which is what the claim in Ground 5(b)(2) purportedly concerns.

FN60. # 24, Ex. 85, at 19–21.

In any event, once Pantano did confess, he indicated to the detective, with some hedging, that he thought that he committed the offense at nighttime.[FN61] Pantano's ultimate confession, as opposed to his initial denials, was consistent with the victim's statement to the police. Pantano's statements—in their entirety and in full context—thus do not establish that he did not have access to the victim to commit the offense but instead corroborate the State's evidence that he had such access, that he had such access at the relevant time, and that he committed the offense.

FN61. # 24, Ex. 85, at 74–76.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

Further, alleged statements by the mother and the father that Pantano was at the apartment from 9:00 a.m. until 10:00 p.m. hardly would establish that Pantano did not have access to the child at nighttime. As the Court observed above, much of petitioner's claim in this regard does not make appear to make logical sense.[FN62]

> FN62. See also the discussion of the actual content of the statements in the discussion of Ground 5(g), *infra,* at 70–71.

Nor would the statement alleged to have been made by Pantano's sister, Maria Pantano (Rosero), establish that Pantano did not have access to the victim to commit the offense. According to the sister's alleged statement, the victim's mother said to her over the telephone at 10:00 a.m. on the morning in question that Pantano then was sleeping and the children were playing in her presence. Such a statement, if admitted in the first instance over objections as to hearsay and relevance, would not establish that Pantano did not have access to the child at all other times while he was there. Such testimony would have had virtually nil probative value, even if admitted over objection.[FN63]

> FN63. The sister's affidavit actually attests that the telephone conversation occurred on May 4, 2003, which actually would have been the day *after* the offense. # 24, Ex. 61, Ex. 2 thereto. The Court assumes, *arguendo,* that she meant May 3, 2003. Moreover, even if the testimony had been admitted over objection, the witness was Pantano's natural sister. Her testimony would have been subject to at least argument that her testimony was influenced by familial bias, which is not wholly irrelevant in determining whether there was a reasonable probability that presenting such testimony would have changed the outcome at trial. On its face, however, such testimony would not have changed the outcome even if the witness had been a wholly disinterested witness.

**\*34** Petitioner thus clearly cannot demonstrate prejudice under the *Strickland* standard based on counsel's failure to pursue a defense based upon such timeline testimony as allegedly establishing the falsity of his confession.[FN64]

> FN64. Nor would it appear that counsel rendered deficient performance by not presenting such a factually and conceptually flawed argument.

Nor can petitioner demonstrate prejudice based upon counsel's failure to test the victim's underwear for Pantano's semen and DNA. Similar to the discussion above as to Ground 5(a), petitioner's statement to the police purportedly that he ejaculated "all over the place"[FN65] does not establish that his semen necessarily would be present on the victim's panties or present in sufficient quantity for forensic examination. That is, a statement that semen "was all over" does not categorically establish beyond all peradventure that each and every possible surface that might thereafter be tested was covered in semen in sufficient quantity for forensic examination. Moreover, as discussed *infra* as to Ground 5(d)(1), it is not established that the specific panties in evidence in fact even were the panties worn during the incident.[FN66] Accordingly, *arguendo* establishing that Pantano's semen was not present on the panties worn at the time—much less the specific panties in evidence, which were not even necessarily the panties worn at the time—would not necessarily disprove his confession. It is entirely speculative that such an examination would have been even marginally exculpatory—based upon an absence of semen on the panties tested, which did not necessarily disprove his confession—rather than instead directly inculpatory, by confirming Pantano's confession with direct physical evidence.[FN67]

> FN65. As the Court noted as to Ground 5(a), Pantano actually stated specifically that his semen "was spread all over everywhere," "was everywhere," and "was all over." He made these statements in the course of questioning as to whether he put

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

his penis rather than his finger inside the child victim and whether his semen possibly might be found on or in her with her panties having been pulled down at the time. See # 24, Ex. 85, at 66–67 & 73. As noted as to Ground 5(a), Pantano of course had an incentive to shade what he was saying in order to provide an explanation that did not involve penile penetration for his semen possibly being found on or inside the victim, as the officer was insinuating that there might be such evidence. Purportedly disproving Pantano's inherently self-serving response by showing an absence of semen on the victim's underwear would not necessarily disprove his confession, in which he changed and shaded his account throughout.

FN66. See text, *infra,* at 57–63.

FN67. A defense decision to test the panties for semen and DNA thus would have been placing a bet with no compelling upside and considerable downside. If the test results were negative, little would have been gained because an absence of semen and DNA on the panties would not necessarily have disproved Pantano's confession. If the test results instead were positive for the presence of semen and/or specifically Pantano's DNA, then the evidence then would further corroborate his confession, helping the State prove its case. Moreover, such evidence would establish that he not only inserted his finger into the child but also at least ejaculated on her or her pulled-down underwear, which would not have helped the defense.

What defense counsel instead did was argue that the State's failure to introduce evidence of the sheets and panties having semen on them undercut the State's case, closing with the assertion that "[i]f there was sperm DNA all over those panties, I wouldn't be standing here right now." # 22, Ex. 22, at 27–28. Even if petitioner *arguendo* could establish prejudice, which he cannot, such a tactical decision to pursue the issue instead in that manner virtually is unassailable on the independent performance prong under the *Strickland* standard, whether on deferential review or instead on *de novo* review.

Nor can petitioner demonstrate prejudice from trial counsel not pursuing an alleged discrepancy between his confession and the victim's statement regarding whether her panties were on or off at the time. Petitioner maintains that Pantano told officers that the victim's clothes, shorts, and/or panties had been taken off during the offense but the victim instead informed officers that her panties were on during the incident. Petitioner cites in this regard not to the victim's statement to the police but instead to her trial testimony.[FN68] This argument is not supported by the record upon which petitioner relies. *Both* Pantano *and* the victim stated or testified that her panties were pulled down.[FN69] The victim's cited testimony was fully consistent with what Pantano stated in this regard. There was no discrepancy with one stating that her panties were "off" and the other stating that they were "on." They instead both stated that her panties had been "pulled down." Moreover, even if there *arguendo* were such an alleged inconsistency, there was not a reasonable probability that showing any such *arguendo* inconsistency would have changed the outcome at trial. Demonstrating such an inconsistency would not necessarily demonstrate that the confession was false.

FN68. See # 20, at 39.

FN69. See # 22, Ex. 18, at 18 (child's testimony); # 24, Ex. 85, at 58, 60–63, 67, 68, 71 & 73 (Pantano's confession); see also # 21, Ex. 4, at 87 (child's preliminary hearing testimony); # 22, Ex. 18, at 33 (mother's testimony as to what child told

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

her when she first questioned her).

Finally, petitioner cannot demonstrate prejudice from trial counsel not pursuing a defense based upon there being no other evidence—over and above petitioner's own express admission—establishing that he kissed the victim during the incident. At bottom, petitioner proceeds in Ground 5(b)(2) on the fundamentally flawed premise that if every jot and tittle of his statement to the police is not corroborated by other evidence, then his confession is demonstrably false. Pantano's confession to the crime for which he stands convicted—sexual assault of a child under 14—is corroborated by, *inter alia,* the victim's testimony that Pantano inserted his finger in her vagina and by at least not inconsistent results from the delayed medical exam. Petitioner cites no apposite law establishing that the State was required to independently corroborate his admission that he also kissed the victim during the sexual assault in order to sustain a conviction. His underlying premise on Ground 5(b)(2)—that if his statement was contradicted by or was not corroborated by other evidence on any collateral point then his entire confession was demonstrably false—is wholly flawed. He has not demonstrated prejudice by counsel's failure to pursue such a line of defense.

**\*35** Ground 5(b)(2), which is not argued by habeas counsel in the federal reply, does not provide a basis for federal habeas relief.

### Ground 5(c): Stipulation to Competency of Child Victim

In Ground 5(c), petitioner alleges that he was denied effective assistance when trial counsel stipulated to the competency of the victim.

Defense counsel sought and obtained a hearing when the case was called for the first morning of the trial, prior to *voir dire,* as to the victim's competency. Following testimony by the victim outside the presence of the jury venire, discussed further below, defense counsel stated: "I think she's competent, based on what I saw, so I'll submit it." FN70

FN70. See # 22, Ex. 16, at 2–5 & 119–132.

The Supreme Court of Nevada rejected the corresponding claim presented to that court on the following grounds:

... [A]ppellant claimed that his trial counsel was ineffective for stipulating to the competency of the minor child victim. Appellant argued that the short answers that the victim gave at trial indicate that she was not competent to testify. Appellant failed to demonstrate that his trial counsel was deficient or that he was prejudiced. Prior to trial, the district court held a hearing to determine if the minor child victim was competent to testify. Following the questioning of the victim, appellant's trial counsel stipulated that the victim was competent to testify. "Tactical decisions [of counsel] are virtually unchallengeable absent extraordinary circumstances" and appellant failed to demonstrate any such circumstances. Further, when the testimony of the victim is viewed as a whole, there is nothing to indicate that she was incompetent. Therefore, the district court did not err in denying this claim.

# 24, Ex. 82, at 4–5 (citation footnote omitted).

The state high court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

Petitioner relies upon excerpts from the victim's testimony not from the competency hearing but instead from the preliminary hearing and trial.

With regard to the child's preliminary hearing testimony, as discussed above regarding Ground 5(a), petitioner quotes only selectively from the preliminary hearing testimony where the prosecutor sought to establish for the record that the child understood the difference between the truth and a lie. FN71 Petitioner omits the responses indicating that the child understood the difference. Petitioner in particular drops out the critical final responses

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

where the adult lawyer finally made a definitive connection with the child witness on the point in terms that she could relate to, and the child affirmed that she would tell the judge only what really happened and would not make anything up. FN72

> FN71. Petitioner not only quotes selectively, petitioner further misquotes the child's preliminary hearing testimony, albeit not necessarily always to petitioner's advantage. Compare # 20, at 40–41, with # 21, at 80–81.

> FN72. # 21, Ex. 4, at 80–82.

Petitioner, as noted, does not address the child's testimony at the competency hearing, which was the testimony that defense counsel's challenged statement immediately followed. In that testimony, *inter alia,* the child affirmed, with no difficulty, that she would "promise that while you're in this room that you'll only tell things that really happened," that a lie was a "bad thing," and that the truth was a "good thing." FN73

> FN73. # 22, Ex. 16, at 127–31. The Court would note, in comparing the child's preliminary hearing and competency hearing testimony, that it is not always easy for an adult examiner initially to immediately speak to a child witness in terms that that particular child can relate to and understand. It of course is difficult for lawyers on occasion to speak to even adult witnesses in terms that the witness can relate to and understand. The prosecutor here had the benefit of her prior, ultimately successful, efforts at the preliminary hearing to relate to the child in terms that she individually could understand when she examined her later in the case.

**\*36** With regard to trial testimony, defense counsel of course did not have the benefit of a transcript of the child's trial testimony—which had not

occurred yet—when he submitted the competency issue on the first day of trial. In any event, the child again affirmed in her trial testimony that she would promise to tell the truth. FN74

> FN74. # 22, Ex. 18, at 12–13.

Petitioner otherwise relies upon selected excerpts from the child's preliminary hearing and trial testimony (the latter of which, again, trial counsel did not have the benefit of at the competency hearing) where she did not know or recall the answer to a question and/or gave an inadequate response. As the Court has stated previously herein, it is not persuaded that the then eight-year-old child victim's testimony was rendered wholly unreliable by the selected responses isolated from her full testimony. The child provided definitive testimony, at both the preliminary hearing and trial, on a number of specific points regarding the sexual assault. Selectively presenting responses where she did not know or recall the answer or otherwise gave an inadequate response does not establish that she was not competent to testify.

In this regard, petitioner seeks to establish prejudice on the basis that he was unable to effectively cross-examine the victim in violation of the Confrontation Clause. As discussed regarding Ground 2, FN75 " '[t]he Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion.' " *Romo–Chavez,* 681 F.3d at 961 (quoting prior Supreme Court authority). The fact that petitioner was able to explore such matters in cross-examination wholly mitigated any such alleged prejudice in this regard.

> FN75. See text, *supra,* at 13–14.

Neither tactical decisions of trial counsel—nor decisions by reviewing courts—are made based upon only selected excerpts from a transcript, much less from a transcript of trial testimony that had not even been received at the time of counsel's de-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

cision. The state supreme court's rejection of this claim based upon selective presentation of excerpts from the child's testimony was neither contrary to nor an unreasonable application of clearly established federal law. When the entirety of the child's testimony is considered, including her responses affirming that she would testify truthfully to what happened, it is abundantly clear that there was not a reasonable probability that a competency objection to her testifying would have been sustained. Moreover, the state supreme court found, twice, that the child was competent to testify, first on direct appeal and a second time on state post-conviction review.[FN76] Petitioner's selective presentation cannot overcome that finding.

> FN76. 122 Nev. at 482, 138 P.3d at 790 (direct appeal); # 24, Ex. 82, at 5 (post-conviction appeal).

Ground 5(c) therefore does not provide a basis for federal habeas relief.

### Ground 5(d): Admission of Victim's Underwear and Blood and DNA Evidence

In Ground 5(d), petitioner alleges that he was denied effective assistance when trial counsel: (1) did not object to the admission of the victim's underwear as irrelevant and prejudicial; and (2) stipulated that it was the victim's blood and DNA on her underwear.

**\*37** The Supreme Court of Nevada held as follows regarding the corresponding claims presented to that court:

> ... [A]ppellant claimed that his trial counsel was ineffective for stipulating that the DNA and blood of the victim were on the victims undergarments, for failing to conduct an independent DNA test on the victim's underwear to determine if the blood was actually that of the victim, and for failing to force the State to reveal evidence concerning the underwear that appellant claimed was exculpatory. Appellant failed to demonstrate that his trial counsel was deficient or that he was

prejudiced. The victim's mother found undergarments belonging to the victim which had a dark stain. A test performed by a nurse following an examination of the victim determined that the stain was blood. Appellant failed to identify any reason why the blood on the victim's undergarments would not have come from the victim. Further, tactical decisions of counsel are virtually unchallengeable absent extraordinary circumstances and appellant failed to demonstrate any such circumstances. In addition, as there was overwhelming evidence of appellant's guilty [sic] due to his confession the victim's testimony and corroborating physical evidence, appellant failed to demonstrate that there was a reasonable probability of a different outcome of the trial had his counsel not stipulated that the blood was that of the victim. Therefore, the district court did not err in denying this claim.

# 24, Ex. 82, at 5 (citation footnote omitted).

### Ground 5(d)(1)

The state supreme court did not expressly address a claim corresponding to the claim identified as Ground 5(d)(1) herein, *i.e.,* that counsel was ineffective for failing to object to the admission of the victim's underwear. For the reasons discussed below, this claim does not present a basis for habeas relief even if a *de novo* rather than a deferential standard of review *arguendo* is applied.

The underwear in question was admitted as part of the "Rape Kit" or "Sexual Assault Kit" preserved as part of the sexual assault examination.

As initial background, as discussed below, it was the mother's discovery of a pair of panties that prompted her initially to question the child victim, and it thereafter was the discovery of a second pair of panties that served as a catalyst for her telling her husband.

As also discussed as to Ground 5(a), according to the testimony at trial, the incident occurred on Saturday, May 3, 2003, but the victim's mother did

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

not first learn of the incident until five days later on Thursday, May 8, 2003, when she found stained panties while doing laundry and questioned the victim. She then found blood-stained panties after having finished the rest of the laundry on the Friday. She then told the father on the Saturday, now approximately a full week after the incident, and the sexual assault medical examination and police investigation thereafter ensued.[FN77]

> FN77. # 22, Ex. 18, at 33–36 & 39–47; *id.,* Ex. 19, at 9–12. The testimony about finishing the laundry on Friday is at 40 in Ex. 18. See also text, *supra,* at 42 (similar discussion as to Ground 5(a)).

**\*38** The physician who conducted the sexual assault examination, Dr. Theresa Vergara, M.D., testified in pertinent part as follows. In the more typical context where a patient presented within 72 hours of the incident and did so with panties, the examination team merely would collect the panties in the rape kit for possible later police examination. Dr. Vergara stated that in that context: "I wouldn't touch those." In this instance, however, it was nearly a week later, and there were "several panties that the mother was collecting these past days prior to my examination." Dr. Vergara selected one pair of panties and tested it with an emergency room bedside test for the presence of blood. There were "several pairs of panties," and "they had various dark stains, all of them, that the mom presented to me, and I just randomly took one and tested that one." The test result was "[p]ositive for blood." The panties that were tested then were placed in the rape kit.[FN78]

> FN78. # 22, Ex. 22, at 37–39.

Later in the trial, the sexual assault kit, with the panties, was admitted into evidence without objection at the same time that the parties stipulated as to the victim's blood and DNA being on the panties.[FN79]

> FN79. *Id.,* at ii & 94.

On both state [FN80] and federal post-conviction review, petitioner has claimed that trial counsel provided ineffective assistance by not objecting to the admission of the panties as irrelevant and prejudicial. Petitioner contends: (a) that "other than [the victim's] statement," there was no evidence presented that she wore the underwear on or after the date of the alleged incident; (b) that it was "just as likely" that she instead wore the underwear prior to the incident and placed them in the laundry basket prior to that time; (c) that the blood on her underwear could have been due to her own alleged poor hygiene as per medical testimony at trial; (d) that the presence of stains on several pairs of underwear supports "the theory" that the stains were due to poor hygiene, not sexual assault; (e) that counsel's stipulation allegedly prevented the jury from learning that there were multiple pairs of stained underwear; (f) that the jury instead was led to believe that the underwear in evidence was worn on the day of the incident and that the presence of the blood proved the assault; and (g) that admission of the evidence thus was prejudicial because the presence of the blood allegedly tended to prove that there had been digital penetration.[FN81]

> FN80. See # 24, Ex. 61, at 33–35.

> FN81. # 20, at 43–45; # 46, at 29–30.

The Court, applying *de novo* review *arguendo,* is not persuaded.

The fact that petitioner must qualify the argument with the phrase "other than the [victim's] statement" is telling. The victim testified that after Pantano put his finger inside her "kiki":

.... Then I went to the bathroom and I saw my blood in my panty. Then I felt a nail in my "kiki."

# 22, Ex. 18, at 18. The child testified that it hurt. *Id.*[FN82]

> FN82. See also # 21, Ex. 4, at 88–92 (substantially consistent preliminary hearing testimony). As the Court has indicated

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

previously, the child's testimony was not simply an assemblage of nonresponsive answers. There were, to be sure, lapses in her recollection in her trial testimony, including as to what she did with her panties after the incident, but she nonetheless provided definitive testimony on a number of points.

As discussed in the text previously, the victim's mother also testified that she found the panties while doing the laundry on the Thursday following the Saturday incident. There was no testimony that she found similarly stained panties while doing the laundry prior to the incident.

Petitioner cannot simply disregard the victim's testimony in assessing whether other potentially corroborative evidence is probative and admissible. The child testified that she sustained a bleeding injury from Pantano's assault, and the recovery of panties after the incident with blood stains tended to corroborate her testimony. Petitioner urges that it was "just as likely" that she instead wore the underwear in evidence prior to the incident, but there was no testimony that she was bleeding or had sustained injury prior to the assault. Petitioner was free to argue to the jury that it was just as likely that the panties were worn prior to the incident, but petitioner could not rule out the victim's testimony as a basis for establishing relevancy in admitting the panties into evidence. If no blood-stained panties had been recovered after the assault, petitioner no doubt would have been seeking to draw a favorable inference from that fact. Instead, multiple pairs of stained panties were recovered. The lack of rock-solid chain of custody evidence establishing specifically when the particular panties in evidence were worn and placed in the laundry went to the weight of the evidence, not its admissibility.

**\*39** In this regard, petitioner posits poor hygiene as an alternate theory for the stains, allegedly pursuant to medical testimony at trial.

With respect to this contention, prosecution witness Dr. Vergara testified as follows in pertinent part. When she examined the victim—a full week after the assault—there was only a non-tender localized area of redness in a posterior or six o'clock position. This finding was "at least consistent" with something having been inserted into the vagina, as there could be localized redness a week after a trauma, but it also "just could be her hygiene." The type of tissue involved healed quickly. It was possible with such tissue for a finger to cause a scratching injury with bleeding and for there to not be evidence of that one week later. There was no medical condition extant at the time of the examination that would cause bleeding.[FN83]

FN83. # 22, Ex. 20, at 23–25 & 32–35.

Dr. Vergara provided absolutely no testimony that the *stains,* and in particular the *blood* stains—as opposed to the localized area of redness that she observed—resulted or possibly resulted from hygiene. The representative sample stain that she randomly tested was positive for blood, and the child did not have a bleeding injury at the time of the exam seven days after the assault. The physician, again, provided absolutely no medical testimony that such a blood stain resulted from poor hygiene rather than a bleeding injury.

The non-examining defense expert, Dr. Lawrence Ricci, M.D., in truth testified substantially the same as Dr. Vergara on several points, albeit with different emphasis. He testified that a localized area of redness could result either from a penetrating trauma or from hygiene. However, he found it unlikely that the redness observed would have been caused by a trauma from a week prior, given the rapid healing of the involved tissue. He accordingly also testified, as Dr. Vergara had, that, with such tissue, a scratching injury from a finger with bleeding likely would have been completely healed one week later, leaving no sign.[FN84]

FN84. # 22, Ex. 20, at 48–51.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

Like Dr. Vergara, Dr. Ricci provided absolutely no testimony that the *stains,* and in particular the *blood* stains—as opposed to the localized area of redness that the examining physician observed—resulted or possibly resulted from hygiene. Dr. Ricci provided no testimony that such a blood stain would have resulted from hygiene rather than from a traumatic bleeding injury, an injury that both expert witnesses testified no longer would have been evident at the time of the exam conducted seven days after the incident.

There thus was no medical testimony—at all—supporting petitioner's lay "theory" that the blood stain on the underwear resulted from poor hygiene. Rather, the fact that there were multiple stained pairs of panties consistent with a bleeding injury that no longer was evident on exam—and that per all medical testimony presented no longer *would* be evident on an exam seven days after the incident—supported an entirely permissible corroborating inference that the stains resulted from the injury testified to by the child, before it healed.

**\*40** Moreover, no stipulation entered by counsel either prevented the jury from learning that there were multiple pairs of stained underwear or led the jury to believe that the underwear in evidence was the underwear worn on the day of the incident. The jury heard clear testimony from the stand from Dr. Vergara that the mother presented her with multiple pairs of stained underwear, that the physician then "just randomly took one and tested that one," and that that, randomly-selected, pair of panties was the pair that was placed in the rape kit that was received in evidence. It is axiomatic that how and what the lawyers argue is not evidence. Whatever the lawyers for both sides may or may not have argued in the case, Dr. Vergara's testimony clearly established that the panties received in evidence in the rape kit were only a randomly selected pair of panties and not necessarily the panties worn at the time of the assault.[FN85] The stipulation entered by counsel that the blood found on the panties was the victim's blood in no

sense precluded the jury from learning what they already had heard from the witness stand in open court.

> FN85. See text, *supra,* at 59.

In sum, the panties were neither irrelevant, unfairly prejudicial, nor inadmissible as evidence. The situation presented is a classic instance of petitioner's arguments as to probative value going to the weight rather than the admissibility of the evidence. The victim testified to injury and bleeding thereafter, the medical testimony as to an examination conducted seven days after the incident at least was not inconsistent with her account, and the discovery of stained panties after the incident tended to establish a permissible corroborating inference for the jury's consideration. Each piece of evidence tendered for admission need not establish, standing alone and in and of itself, a particular factual inference beyond a reasonable doubt to be admissible in the first instance. Here, there was not a reasonable probability that an objection to the admission of the rape kit with the panties either would have been successful or altered the outcome at trial, particularly given the victim's testimony and petitioner's confession. Petitioner thus cannot establish prejudice on this claim, even assuming, *arguendo,* first, the application of *de novo* review and, second, deficient performance.

Ground 5(d)(1) therefore does not provide a basis for federal habeas relief.

### Ground 5(d)(2)

In Ground 5(d)(2), petitioner alleges that counsel provided ineffective assistance when he stipulated that it was the victim's blood and DNA on her underwear.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law. Trial counsel did not stipulate that the blood and DNA was that of the victim without the benefit of any forensic examination

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1410

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

whatsoever. Counsel so stipulated only after the lab results from the police lab both confirmed Dr. Vergara's preliminary emergency room test result reflecting that the stain was a blood stain and further established that the blood was the victim's blood. FN86 Petitioner has not identified any flaw in the police lab's methodology or results that would have provided defense counsel with a viable basis for objecting to and excluding testimony presenting the lab results. The state supreme court's conclusion that petitioner could not demonstrate a reasonable probability of a different outcome at trial had his counsel not stipulated to the presence of the victim's blood on her underwear was not an objectively unreasonable application of *Strickland* or other Supreme Court precedent.

FN86. # 22, Ex. 20, at 94.

**\*41** Ground 5(d)(2) does not provide a basis for federal habeas relief.

***Ground 5(e): Failure to Obtain Exculpatory Evidence***

In Ground 5(e), petitioner alleges, in the main, that he was denied effective assistance when trial counsel failed to obtain exculpatory evidence allegedly in possession of the State.

On this claim, petitioner points to argument by defense counsel in support of a continuance request stating that "I believe that there could be some exculpatory evidence which might belie some of what happened" in terms of Pantano's confession. FN87 Counsel did not identify what the exculpatory evidence was that he "believed" "might" belie "some" of what happened. Petitioner nonetheless asserts: (a) that "the physical exculpatory evidence referred to by counsel is *the* underwear, allegedly worn by the victim, *admitted to trial* by the prosecution;" (b) that "the" underwear failed "to contain any traces of his semen, sperm, or other DNA evidence;" (c) that "the" underwear thus supported his claim that his confession was not supported by physical evidence; and (d) that the alleged absence of semen on "the" panties therefore "support[ed] his request for

counsel to investigate and file a motion to suppress his false statement to investigators." # 20, at 45–46 (emphasis added).

FN87. # 21, Ex. 10, at 7.

The state supreme court's rejection of this claim, in the passage quoted in the discussion of Ground 5(d)(1), FN88 together with other related claims, was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

FN88. See text, *supra,* at 58.

At the very outset on this claim, there was no actual evidence presented at trial that the underwear in evidence was the underwear that the victim was wearing at the time of the assault. As discussed at length above as to Ground 5(d)(1), the victim's mother brought multiple pairs of stained panties to the physician conducting the sexual assault examination a full week after the assault, the physician randomly selected one pair of panties and performed an emergency room test for the presence of blood, and the randomly-selected pair of panties then was placed in the rape kit. FN89 *Arguendo* testing the randomly-selected panties that were in evidence and establishing that there was no semen on those panties would have had virtually nil probative value. That is, proving that panties that very well may have been worn by the victim at another point in time after the assault had no semen on them would have established nothing, for lack of actual evidence that the panties in question were "the" panties as baldly asserted by petitioner on post-conviction review. The examining physician's testimony clearly belied any claim that it was established, or even could have been established, that the panties in the rape kit admitted into evidence at trial were "the" panties worn by the victim during Pantano's sexual assault.

FN89. See text, *supra,* at 59–63.

Further, as discussed in regard to his multiple

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

prior related claims, Pantano's statement to the detective—in a context where he had a potential motive to exaggerate to try and explain away the potential presence of his semen where it should not be—that he ejaculated "all over" does not necessarily establish that his semen covered any and all surfaces that thereafter might be tested.[FN90] The absence of semen in sufficient quantity for forensic examination on a particular surface, such as panties (much less panties not actually established to have been worn by the victim during the assault), would not have necessarily disproved Pantano's confession. As noted as to prior similar claims, it is entirely speculative that such testing would have been marginally exculpatory—based upon the absence of a semen on a particular surface—rather than instead directly inculpatory in the event that the panties in evidence not only were the panties worn at the time but also had semen on them.[FN91]

> FN90. See text, *supra,* at 42–43 & n. 45; 52–53 & n. 65.

> FN91. Also, as noted previously, what defense counsel instead did was argue that the State's failure to introduce evidence of the sheets and panties having semen on them undercut the State's case, closing with the assertion that "[i]f there was sperm DNA all over those panties, I wouldn't be standing here right now." # 22, Ex. 22, at 27–28. Even if petitioner *arguendo* could establish prejudice, which he cannot, such a tactical decision to pursue the issue instead in that manner virtually is unassailable on the independent performance prong under the *Strickland* standard, whether on deferential review or instead on *de novo* review.

**\*42** Petitioner has made affirmative declarative assertions that the panties in evidence were the panties worn by the victim during the assault and that no semen would have been detected on the panties. However, these bald allegations in truth are based upon nothing other than sheer, unbridled speculation. Defense counsel's unsworn argument in support of a continuance that he "believed" that there "might" be exculpatory evidence as to "some" of what happened has no evidentiary value whatsoever.

In any event, petitioner's moving premise that his confession was admissible only if every jot and tittle of his statement to the police was proved true is fundamentally flawed.[FN92]

> FN92. See text, *supra,* at 54.

Moreover, as discussed as to Ground 5(b)(1), it was Pantano who personally insisted on invoking the 60–day statutory speedy trial period after being informed that doing so necessarily precluded pursuit of a motion and writ to suppress his confession. Given that his own personal election on the record necessarily precluded pursuit of a writ to suppress his confession, it is subject to some question as to whether petitioner can now claim prejudice based upon his counsel's failure to challenge the admission of his confession.[FN93]

> FN93. See text, *supra,* at 46–47.

In all events, the state supreme court's holding that petitioner had not presented a viable claim of prejudice on this wholly speculative claim was neither contrary to nor an unreasonable application of clearly established federal law. Ground 5(e) therefore does not provide a basis for federal habeas relief.[FN94]

> FN94. To the extent that petitioner claims under Ground 5(e) that counsel was ineffective for delaying petitioner's speedy trial, the discussion as to Ground 5(a) applies fully here as well. To the extent that petitioner claims that the State withheld exculpatory evidence in this regard, the claim similarly is grounded completely on speculation.

***Ground 5(f): Failure to Adequately Cross–Examine***

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

In Ground 5(f), petitioner alleges that he was denied effective assistance when trial counsel failed to adequately cross-examine witnesses. He alleges in particular that counsel failed to impeach the testimony of the child victim and her mother and father with prior inconsistent statements, thereby allegedly failing to subject the State's case to adversarial testing.

The Supreme Court of Nevada rejected the claim presented to that court on the following grounds:

... [A]ppellant claimed that his trial counsel was ineffective for failing to properly cross-examine witnesses. Specifically, appellant claimed that his trial counsel did not question the State's witnesses concerning prior inconsistent statements. Appellant failed to demonstrate that he suffered prejudice. The inconsistencies appellant cited were minor and given the overwhelming evidence of appellant's guilt, appellant failed to demonstrate a reasonable probability of a different outcome of the trial had the witnesses been questioned concerning these minor inconsistencies. Therefore, the district court did not err in denying this claim.

# 24, Ex. 82, at 6.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

In the federal reply, petitioner does not provide any specific argument regarding any of the alleged inconsistencies but instead merely refers *in globo* to the alleged inconsistencies set forth in the amended petition. On the largely conclusory and formulaic argument presented, the Court is not persuaded that the state supreme court unreasonably applied *Strickland* when it held that there was not a reasonable probability that the failure to bring out the inconsistencies alleged in the amended petition would have altered the outcome at trial. For example,

there was not a reasonable probability of a different outcome at trial simply because counsel did not bring out the fact that the child did not testify at trial specifically when the assault occurred, in contrast to her stating in her police statement that it occurred at nighttime . [FN95] Petitioner confessed to the sexual assault with corroborating testimony by the child that he inserted his finger into her vagina. There was not a reasonable probability that parsing over inconsistent or incomplete statements as to sundry details—which hardly are uncommon in witness' accounts over time—would have altered the outcome at trial.

> FN95. Of course, not testifying to a factual detail does not render a prior statement that includes the detail inconsistent. Counsel first would have had to elicit testimony at trial on the detail that was inconsistent with the prior statement to impeach the trial testimony. Otherwise, the prior statement could be referenced only in an effort to refresh the witness' recollection.

**\*43** Ground 5(f) therefore does not provide a basis for federal habeas relief.

### Ground 5(g): Failure to Confer, File Pretrial Motions, and Put Forth a Defense

In Ground 5(g), petitioner alleges that he was denied effective assistance when trial counsel failed to confer with him, failed to file appropriate pretrial motions, and failed to put forth a proper defense. The underlying particulars of the claim, many of which are the subject of other claims, are noted in the discussion below. Petitioner alleges that counsel failed to confer with him "and meet his demands," including demands in letters that Pantano allegedly sent to counsel.

The Supreme Court of Nevada held as follows as to this claim:

... [A]ppellant claimed that his trial counsel was ineffective for failing to sufficiently meet with him to discuss trial strategy, including dis-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

cussing witnesses to call in his defense, inconsistencies in the State's witnesses' stories, which defense strategy to use, and how to question the State's witnesses. Appellant failed to demonstrate that he was prejudiced. As there was overwhelming evidence of appellant's guilt due to his confession, the victim's testimony and corroborating physical evidence, appellant failed to demonstrate a reasonable probability of a different outcome had his trial counsel met further with appellant to discuss these issues. Therefore, the district court did not err in denying this claim.

# 24, Ex. 82, at 6.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

On this claim as well, petitioner provides only cursory supporting argument in the federal reply, largely incorporating *in globo* the list in the amended petition of particular alleged failures, which list basically was copied virtually verbatim from petitioner's *pro se* state court filing.[FN96]

> FN96. Compare # 20, at 51–52, with # 24, Ex. 61, at 47–48.

On the largely conclusory argument made, the Court is not persuaded that the state supreme court unreasonably applied *Strickland* when it held that there was not a reasonable probability of a different outcome at trial had counsel instead proceeded as Pantano allegedly had requested.

*First,* petitioner contends that he requested counsel to call his sister to testify as to "coaching" of the child victim's testimony by her mother. The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for the reasons discussed *infra* as to the parallel claim in Ground 5(l).

*Second,* petitioner contends that he requested counsel to call his mother to testify to the falsity of the child's mother's testimony concerning a prior bad act. The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for the reasons discussed *infra* as to the parallel claim in Ground 5(j).

*Third,* petitioner contends that he requested counsel to call an alibi witness. The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for the reasons discussed *infra* as to the parallel claim in Ground 5(h).

**\*44** *Fourth,* petitioner contends that he requested counsel to obtain testing of the victim's underwear and other materials to refute Pantano's statement that he ejaculated "all over," in order to support a motion to suppress his confession as being uncorroborated and/or contradicted by other evidence. The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for the reasons assigned in the discussion as to the multiple parallel claims in Ground 5(a), at pages 41–42, *supra;* Ground 5(b)(2), at pages 52–53, *supra;* and Ground 5(e), at pages 64–67, *supra.*

*Fifth,* petitioner contends that he requested counsel to investigate and interview the victim's father because he indicated in his police statement that he had returned home at approximately 7:30 a.m. on May 3, 2003, and that Pantano was not at the residence until 9:00 a.m.

The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* in this regard.

When the father testified for the time in the case at trial, he testified that he worked the graveyard shift from 11:00 p.m. until 7:00 a.m., that he came home on the Saturday morning in question and went straight to bed, and that he did not know even that Pantano was in the house until he woke up in the afternoon. The following Saturday, the child's mother told him what had happened, he

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

questioned the child, and then he later spoke with the police at the hospital after they reported the incident.[FN97]

> FN97. # 22, Ex. 20, at 61–66.

Petitioner attached with his state post-conviction filings what appears to be only a single page from a police report. Whoever wrote the page stated that the father "advised that ... [he] remembers that [Pantano] had arrived at approximately 0900 hours in the morning and left about 2200 hours."[FN98] Yet petitioner attached another single page from either the same or a different report that instead stated:

> FN98. # 24, Ex. 61, Exhibit # 4 thereto.

> Demetrice [the father] said Angelo [Pantano] was at their house on the 3rd and he is unaware of what time he arrived, but Angelo was there when he woke up. Demetrice said he works graveyard and was uncertain as to when Angelo got there. When I asked Leticia [the mother] when Angelo arrived at their house, she said that he got there at approximately 0900 hours in the morning, after Demetrice had gone to sleep, and he left at about 2200 hours.
> # 24, Ex. 61, Exhibit # 3 thereto.

The Court is unable to discern anything of substance in the foregoing that would lead to a reasonable probability of a different outcome at trial. Perhaps an officer misstated in the first segment quoted above what the mother instead actually said as being what the father said. Perhaps the father merely was repeating secondhand what he just had heard the mother say. The report of what the father said in the second segment quoted above indeed lines up fully with his trial testimony. In all events, as discussed as to Ground 5(b)(2), a statement by the father and/or mother that Pantano was at the residence from 9:00 a.m. until 10:00 p.m. hardly rules out his being present to commit the offense during nighttime.[FN99] And the existence of a prior statement that Pantano arrived at 9:00 a.m. rather than at 5:30 a.m. as he maintained initially during his confession would not have rendered his confession inadmissible. The potential existence of other inconsistent evidence on one point or another, or even on several points, did not render his confession inadmissible.

> FN99. See text, *supra,* at 51.

**\*45** *Sixth,* petitioner contends that he requested counsel to investigate the tactics used by the interviewing detective to coerce him into making an involuntary statement, "specifically the 'thumping' noises as indicated"[FN100] on the transcript of the statement. The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for the reasons discussed *supra* as to the parallel claim in Ground 5(b)(1).[FN101]

> FN100. # 20, at 51.

> FN101. See text, *supra,* at 43–46.

*Seventh,* petitioner contends that he requested counsel to put forth a defense "based on the facts of Pantano's statement to police being coerced, involuntary, and not corroborated by the physical or testimonial evidence offered by the prosecution."[FN102] The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for the reasons discussed *supra* as to the parallel claims in Grounds 5(b)(1) and 5(b)(2), *supra,* at pages 43–54.

> FN102. # 21, at 51.

*Eighth,* petitioner contends that he requested counsel "to investigate [the father's] preliminary hearing statement that he was in the 'room' with his kids at the time and date Pantano allegedly committed the instant offenses."[FN103] Petitioner does not provide a record citation for this factual contention.

> FN103. # 20, at 51–52.

The record citation given in Pantano's state post-conviction papers is to preliminary hearing

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

testimony by the *mother,* not the father.[FN104] In the testimony in question, the prosecutor is asking questions of the mother about both Pantano and the father—with both the prosecutor and the witness referring to both Pantano and the father as "he" during the questioning. The prosecutor asks the mother "was the defendant still at your home" when the father came home at 7:30 a.m., and she responded "yes." The prosecutor asks the mother "what does he do" when the father come home, and she responded "nothing." The prosecutor asks her "does he go to bed," and she responds that "[h]e was there at the bedroom with the kids."[FN105]

> FN104. Compare # 24, Ex. 61, at 48, with # 21, Ex. 4, at 41, lines 16–17.

> FN105. # 21, Ex. 4, at 41.

The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* in this regard. It appears that what the mother was actually testifying—in testimony lacking immediate clarity when taken out of context because of the use of the indefinite pronoun "he"—was that *Pantano* did "nothing" when the father came home because he "was there at the bedroom with the kids." Indeed, the mother explicitly so testifies on the very next page of the preliminary hearing transcript, specifically that *Pantano* was in the children's bedroom with the children "the whole time." The actual testimony cited by petitioner therefore not only is not by the father but further does not state what petitioner maintains that it states. Even if the testimony *arguendo* had reflected—which it did not—that the children instead were with the father at one point, that would not establish that Pantano did not have access to the children at other times, such as later during the evening. Such strained, if not in truth wholly illusory, inconsistencies are not the stuff of which acquittals, or reversals on deferential AEDPA review, are made.

**\*46** *Ninth,* overlapping the first contention above, petitioner contends that he requested counsel "to put forth a defense based on the complaining

witness being subjected to overly suggestive and repetitive leading interrogation by [the mother] with amounted to 'coaching.' "[FN106] The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for the reasons discussed *infra* as to the parallel claim in Ground 5(l).

> FN106. # 20, at 52.

Ground 5(g) accordingly does not provide a basis for federal habeas relief.

***Ground 5(h): Failure to Investigate and Present Alibi Defense***

In Ground 5(h), petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and present an alleged alibi defense.

The Supreme Court of Nevada held as follows as to this claim:

> ... [A]ppellant claimed that his trial counsel was ineffective for failing to investigate alibi witnesses and failing to call additional witnesses to testify in his defense. Appellant claimed that an investigation would have revealed witnesses that would have testified that he was with them at the time the incident was alleged to have occurred. Appellant further claimed that multiple other witnesses should have been called to testify concerning the victim and her family members' motives for fabricating their stories. In addition, appellant claimed that an expert witness should have been retained to refute the testimony of the State's expert witnesses and to perform an independent psychological examination of the victim. Appellant failed to demonstrate that he was prejudiced. Appellant confessed that he sexually assaulted the victim. Appellant failed to demonstrate that testimony from any additional witnesses had a reasonable possibility of altering the outcome of the trial under the circumstances. Therefore, the district court did not err in denying this claim.

> # 24, Ex. 82, at 6.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

The state high court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

Petitioner alleged in the state court that trial counsel failed to investigate and present the alibi testimony of Jeric Asuncion "and others." According to petitioner, the State's alleged theory was that he was at the victim's residence from 9:00 a.m. until 10:00 p.m. on May 3, 2003. Petitioner asserted that Asuncion "and others" would testify that he was "in the presence of" Asuncion and others from 5:30 p.m. that date until the early morning hours of the next day. He maintained that he therefore could not have been present for the "nighttime" sexual assault referred to by the victim in her statement to police. Petitioner referred to a purported supporting affidavit of Asuncion attached as "Exhibit 12" to his state papers.[FN107]

> [FN107.] # 24, Ex. 61, at 57–59.

However, according to the record presented to this Court, no such purported Asuncion affidavit was presented to the state courts. The exhibits attached with Pantano's state memorandum include cover sheets for Exhibit 12 and certain other exhibits, but no such exhibits.[FN108] The record thus reflects that the state courts were presented only with the bald unsupported allegation that Asuncion "and others" would testify that Pantano was in their presence on from 5:30 p.m. on May 3, 2003, through the early hours of the following morning.

> [FN108.] See # 24, Ex. 61, at electronic docketing pages 133–34 & 144–48. See also *id.,* at 149 (Pantano states that not all of the alleged affidavits referred to in the memorandum were filed with the memorandum).

**\*47** Even taken at face value, the purported alibi testimony would not have eliminated the possibility of Pantano committing the sexual assault at "nighttime" as stated by the victim. Pantano told the police that he was in the residence from the early morning hours of May 3, 2003. The testimony would not rule out Pantano committing the sexual assault during the early morning hours before arising, which the child easily also might consider nighttime.[FN109]

> [FN109.] Pantano initially stated during the police interview that he was at the apartment from "like four, five, three, four o'clock in the morning." # 24, Ex. 85, at 19–21. Petitioner's argument that the children were in another room at least after the father arrived home from the graveyard shift is addressed *supra,* at 72–73.

In all events, even if the purported alibi testimony would have sought to eliminate all time that potentially could be regarded as "nighttime," petitioner cannot establish the requisite prejudice on this claim. Pantano confessed to inserting his finger into the vagina of a seven-year-old child, with corroborating testimony by the victim as to the sexual assault. The state supreme court's determination that there was not a reasonable probability that presenting alleged alibi testimony from a friend "and others" that he instead was elsewhere on the evening of May 3, 2003, would have altered the outcome a trial was neither contrary to nor an objectively unreasonable application of *Strickland.*

Ground 5(h) does not provide a basis for federal habeas relief.

### Ground 5(i): Failure to Present Testimony on Alleged Motive to Fabricate

In Ground 5(i), petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and present testimony by Pantano's sister, Maria Pantano (Rosero), that the victim's mother and father had a motive to fabricate their testimony. According to the amended petition, Pantano's sister would have testified that the victim's parents owed Pantano money and had refused to repay him a portion of the money only a few hours prior to the alleged incident.[FN110]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

FN110. # 22, at 55.

The Supreme Court of Nevada held as follows as to this claim:

... [A]ppellant claimed that his trial counsel was ineffective for failing to present evidence concerning witnesses' motives for fabricating their testimony. Appellant claimed that the mother of the victim owed him money and that she coached the victim's testimony so that she would not have to repay appellant. Appellant failed to demonstrate that he was prejudiced. In light of appellant's confession that he sexually assaulted the victim, appellant failed to demonstrate that this testimony would have had a reasonable possibility of altering the outcome of the trial. Therefore, the district court did not err in denying this claim.

# 24, Ex. 82, at 7.

The state high court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

At the very outset on this claim, the state court exhibits referenced in the federal amended petition do not state what petitioner states that they do. The sister did not state either in the affidavit or in the statement reported by the defense investigator either that the parents owed money to Pantano in particular or that they refused to repay him only hours before the alleged incident. The sister instead stated in her 2007 affidavit that the mother "owed numerous persons in our family money due to her extensive gambling habits" and that "she was going to testify at Angelo Pantano's trial for the prosecution because she was afraid she was going to have to pay for hospital bills she did not have funds for." FN111 In this same vein, the defense investigator's November 25, 2003, report states:

FN111. # 24, Ex. 61, Exhibit 2 thereto, at 3 (at electronic docketing page 104).

\*48 Maria would later state that [the victim's] mother ... [was] sorry that this had to happen, but if the did not go through with this, they would have to pay the medical bill [referring to the medical bill from the examination one week after the assault] and get in trouble if they did not cooperate. The doctor was the one pressing the charges. Maria also stated [that the victim's] mother and father are going through financial problems.

# 24, Ex. 61, Exhibit 16 thereto (at electronic docketing page 143).

Nowhere in either the affidavit or the investigator's report does the sister state that the victim's parents owed *Pantano* money. Nowhere in either the affidavit or the report does the sister state that the victim's parents had refused to repay Pantano only hours before the alleged incident. Further, a concern over a payment of the medical bill from the May 10, 2003, sexual assault examination does not provide a basis for fabricating a story about the May 3, 2003, sexual assault in the first instance.

In all events, petitioner cannot establish the requisite prejudice on this claim. Again, Pantano confessed to inserting his finger into the vagina of a seven-year-old child. The state supreme court's determination that there was not a reasonable probability that presenting testimony from a hardly disinterested witness seeking to establish that the victim's parents had a motive to fabricate their testimony because they allegedly owed Pantano money would have altered the outcome a trial was neither contrary to nor an objectively unreasonable application of *Strickland.*

Ground 5(i) does not provide a basis for federal habeas relief.

### Ground 5(j): Failure to Present Mother's Testimony to Refute Prior Bad Act

In Ground 5(j), petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and present testimony by his mother to refute testimony by the victim's mother regarding an alleged prior bad act. The background circum-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1418

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

stances regarding the victim's mother's testimony are summarized in the discussion of Ground 4(d). FN112

FN112. See text, *supra,* at 33–35.

The Supreme Court of Nevada held as follows as to this claim:

... [A]ppellant claimed that his trial counsel was ineffective for failing to present his mother's testimony to refute claims that his mother was afraid of him. At trial, the victim's mother testified that appellant's mother was afraid of him. Appellant included an affidavit from his mother in which she stated that she was not afraid of appellant. Appellant failed to demonstrate that his trial counsel was deficient or that he was prejudiced. Following an objection to the victim's mother's statement regarding appellant's mother, the district court admonished the jury to disregard the statement concerning appellant's mother's fear. As stated earlier, there was overwhelming evidence of appellant's guilt. Thus, he failed to demonstrate that testimony concerning his mother's feelings towards him would have changed the outcome of the trial. Therefore, the district court did not err in denying this claim.

**\*49** # 24, Ex. 82, at 7.

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

At the outset on this claim, there clearly was no pretrial investigation that reasonably could have been conducted by trial counsel with regard to this particular point. As discussed as to Ground 4(d), the state court record, including an express defense concession, reflects that the prosecutor did not intentionally elicit the testimony. It would have taken a prescience beyond that required by *Strickland* for defense counsel to investigate the point before trial.

In any event, petitioner cannot demonstrate

prejudice on this claim. The victim's mother's testimony in this regard was stricken and the jury was instructed to disregard the testimony. Over and above the points noted by the state supreme court, it was improbable to the extreme that the state trial court would have permitted the defense to present testimony to respond to testimony on a collateral matter that had been stricken in the first instance. In all events, Pantano confessed to inserting his finger into the vagina of a seven-year-old child, with corroborating testimony by the victim as to the sexual assault. The state supreme court's determination that there was not a reasonable probability that presenting testimony from his mother that she was not afraid of Pantano would have altered the outcome a trial was neither contrary to nor an objectively unreasonable application of *Strickland.*

Ground 5(j) does not provide a basis for federal habeas relief.

### Ground 5(k): Failure to Present Evidence of Alleged Lack of a Cell Phone

In Ground 5(k), petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and present testimony establishing that he allegedly did not have a cell phone. The background circumstances regarding this claim are summarized in the discussion of Ground 5(b)(2). FN113

FN113. See text, *supra,* at 48–49.

The Supreme Court of Nevada held as follows as to this claim:

... [A]ppellant claimed that his trial counsel was ineffective for failing to investigate whether appellant possessed a cell phone at the time of the incident. Appellant claimed that he lied to the police about having a cell phone with him during the incident; therefore, his trial counsel should have investigated to show that appellant did not have a cell phone at the time of the assault and that would have shown his confession was false. Appellant failed to demonstrate that he was pre-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1419

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

judiced. Appellant confessed to the police that during the sexual assault, he distracted the victim's brother by allowing the brother to play a game on his cell phone. In light of his confession, the victim's testimony and the physical evidence, appellant failed to demonstrate that such an investigation would have resulted in a reasonable probability of a different outcome at trial. Therefore, the district court did not err in denying this claim.

**\*50** # 24, Ex. 82, at 7–8 (citation footnote omitted).

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

As discussed in more detail as to Ground 5(b)(2), petitioner cannot establish prejudice from trial counsel's failure to pursue what would have been a pointless exercise. There in truth was no way for counsel to conclusively prove the negative that Pantano did not have at least a borrowed cell phone or other cell phone not in his name in May 2003, whether by presenting cell phone carrier testimony or the testimony of friends. Even if Pantano himself had taken the stand, which he did not do at trial, to testify that he did not a cell phone, he essentially would have been testifying: "My confession demonstrably was false because I lied to the police about the collateral detail of having a cell phone, but I am not lying now when I state, facing conviction for a serious crime, that I did not have a cell phone." All to support the strained inference that because Pantano, allegedly, lied to the police about the collateral point of having a cell phone he therefore lied to the police about inserting his finger into the vagina of a seven-year-old child. Nor has petitioner cited apposite case law establishing that he would have been able to prevent introduction of his confession at trial based on this strained argument. The state supreme court's holding that petitioner could not demonstrate prejudice from counsel's failure to pursue such a pointless avenue

of defense was neither contrary to nor an unreasonable application of *Strickland.*

Ground 5(k) does not provide a basis for federal habeas relief.[FN114]

> FN114. As also discussed as to Ground 5(b)(2), Pantano's statement that he had a cell phone was not uncorroborated as petitioner contends on post-conviction review. The child victim also testified—both at the preliminary hearing and at trial—that Pantano gave his cell phone to her brother to play with during the sexual assault. # 21, Ex. 4, at 87; # 22, Ex. 18, at 19.

***Ground 5(l): Failure to Present Evidence of Alleged Coaching of Testimony***

In Ground 5(l), petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and present testimony establishing that the victim's parents coached her testimony.

The Supreme Court of Nevada addressed this claim within the context of the claim pertaining to fabrication discussed as to Ground 5(i) above, holding that petitioner could not demonstrate prejudice. The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

Petitioner alleges on this claim: (a) that the victim's mother spoke to a number of relatives and others about the alleged incident prior to telling the victim's father about the incident one week later; (b) that "[i]t is believed" that this occurred within the hearing of the child; (c) that the victim's mother owed Pantano $1200 and he sought repayment on the morning of May 3, 2003; and (d) that Pantano's then roommates—Bernard Pangalia and LaLain Nicolas—knew of the monies owed by the victim's mother to Pantano, as allegedly reflected in Exhibits 17 and 18 to Exhibit 61 in the record in this Court.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1420

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

**\*51** In principal part, the foregoing allegations in federal court, including what the victim's mother allegedly said in particular to whom during the week after the incident, are based upon bald, unsupported allegations in Pantano's state post-conviction papers.[FN115] The exhibits attached with Pantano's state memorandum included a cover sheet for Exhibits 17 and 18, but no such exhibits.[FN116] Moreover, it is not difficult to discern that there potentially may have been hearsay issues with regard to alleged testimony by Pangalia and Nicolas regarding an alleged debt owed by the mother to Pantano, even if the alleged testimony otherwise were admissible. There further clearly were hearsay issues—at the very least as to the truth of the matter asserted—with regard to the testimony outlined in the 2007 affidavit of Pantano's sister, who asserts that she would have testified that the victim's mother said to her that she rehearsed the child's account with the victim before she spoke with the child's father.[FN117]

> FN115. Compare # 20, at 57–59, with # 24, Ex. 61, at 63–66.

> FN116. See # 24, Ex. 61, at electronic docketing pages 144–48. See also *id.,* at 149 (Pantano states that not all of the alleged affidavits referred to in the memorandum were filed with the memorandum). Federal habeas counsel repeated essentially verbatim the allegations of the *pro se* state court filing citing to alleged supporting exhibits in the state court record that the record in this matter reflects were not actually in the state court record. Rule 11 of the Federal Rules of Civil Procedure requires more of counsel.

> FN117. See # 24, Ex. 61, Exhibit 2 thereto, at 2.

In all events on this claim, petitioner cannot demonstrate the requisite prejudice based upon such an in large part speculative claim of coaching based upon such problematic evidence—perhaps even nonexistent evidence in certain respects. Pantano confessed to inserting his finger into the vagina of the seven-year-old child. The state supreme court's determination that there was not a reasonable probability that presenting testimony as to alleged coaching that not one of the alleged witnesses in question themselves observed would have altered the outcome a trial was neither contrary to nor an objectively unreasonable application of *Strickland.*

Ground 5(l) does not provide a basis for federal habeas relief.

### Ground 5(m): Failure to Object to Jury Instruction

In Ground 5(m), petitioner alleges that he was denied effective assistance when trial counsel failed to challenge a jury instruction stating that the victim's testimony, if believed beyond a reasonable doubt, was sufficient and that no corroboration of the victim's testimony was required in that circumstance. Petitioner contends that the instruction shifted the burden of proof from the State to Pantano, in violation of the due process requirement recognized under *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), that every element of a state criminal offense must be proved beyond a reasonable doubt.

The jury instruction challenged stated:

There is no requirement that the testimony of an alleged victim of sexual offenses be corroborated, and her testimony standing alone, if believed beyond a reasonable doubt, is sufficient to sustain a verdict of guilty.

# 22, Ex. 23, Instruction No. 9.

The charges to the jury included instructions stating, *inter alia,* that the State was required to prove every element of the crime charged beyond a reasonable doubt, that the defendant was presumed innocent until the contrary was proved, and that the instructions were to be considered as a whole, along

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

with instructions regarding assessing the credibility of witnesses. FN118

> FN118. # 22, Ex. 23, Instructions Nos. 2, 12 & 14.

**\*52** The Supreme Court of Nevada held as follows as to this claim:

> ... [A]ppellant claimed that his trial counsel was ineffective for allowing a jury instruction to shift the reasonable doubt burden to the defense. Appellant failed to demonstrate that his trial counsel was deficient. A proper reasonable doubt instruction was used at trial. [FN14] Therefore, the district court did not err in denying this claim.

>> FN[FN 14] NRS 175.211; *see, e.g., Chambers v. State,* 113 Nev. 974, 982–83, 944 P.2d 805, 810 (1997); *Milton v. State,* 111 Nev. 1487, 1492, 908 P.2d 684, 687 (1995).

> # 24, Ex. 82, at 9.

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

Petitioner—who has the burden of persuasion on federal habeas review—has not cited an apposite decision of the United States Supreme Court holding that a jury instruction as was used in this case shifts the burden of proof to the defendant and violates the rule of *In re Winship.* Significantly, the Ninth Circuit held in its July 19, 2004, decision in *Bruce v. Terhune,* 376 F.3d 950 (9th Cir.2004), applying consistent prior Circuit authority, that a California state court decision rejecting a substantially identical challenge to a substantially identical California charge was neither contrary to nor an unreasonable application of *Winship* or other clearly established federal law. 376 F.3d at 954–56. Given *Bruce,* and the prior Ninth Circuit decisions cited therein, the December 17, 2008, decision of the Su-

preme Court of Nevada rejecting a substantially identical challenge in this case indisputably was neither contrary to nor an unreasonable application of *Winship, Strickland,* or other clearly established federal law as determined by the United States Supreme Court.

Moreover, consideration of counsel's performance under the deficient performance prong of *Strickland* must be evaluated from trial counsel's perspective at the time. *E.g., Harrington,* 131 S.Ct. at 779. At the time of the February 2004 trial, there was no apposite Supreme Court jurisprudence supporting petitioner's argument under *Winship,* and there were multiple Ninth Circuit, Supreme Court of Nevada, and other state court decisions rejecting substantially the same or similar arguments. *See Bruce, supra; Gaxiola v. State,* 121 Nev. 638, 647–50, 119 P.3d 1225, 1231–33 (2005)(collecting prior state cases). Particularly under the "doubly deferential" standard of review applicable to this context, petitioner simply cannot establish that the state supreme court's 2008 decision holding that trial counsel's performance in 2004 was not deficient was either contrary to or an unreasonable application of clearly established federal law. FN119

> FN119. Petitioner urges that the challenged instruction suggested that none of the alleged deficiencies in the child victim's testimony mattered and that the jury thereby was allowed to ignore expert testimony and alleged inconsistencies in the testimony of prosecution witnesses. Even if this matter were being reviewed *de novo,* which it is not, petitioner's argument glosses over the fact that the instruction stated that the victim's testimony was sufficient " *if believed beyond a reasonable doubt.* " In all events, the Ninth Circuit's *Bruce* decision establishes beyond any good faith argument to the contrary that the state supreme court's decision was neither contrary to nor an unreasonable application of clearly established federal law.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

It would appear that petitioner's argument is grounded on the contention that the instruction was subject to objection solely under federal law. Of course, if the challenge instead were premised upon a contention that the instruction was subject to objection also under state law, the state supreme court's rejection of any such state law component to the claim would be the end of the matter on federal habeas review in that regard.

Ground 5(m) therefore does not provide a basis for federal habeas relief.

### Ground 5(n): Failure to Object to Alleged Vouching by State Expert

**\*53** In Ground 5(n), petitioner alleges that he was denied effective assistance when trial counsel failed to object to alleged vouching for the credibility of the victim's mother's testimony by the physician who performed the sexual assault examination.

Petitioner alleges that the second question and answer in the following exchange during the physician's testimony constituted such objectionable and impermissible vouching:

Q: Were you able to appropriately do your examination?

A: Yes.

Q: Okay. How about the mother? You indicated that the mother was there. What was her demeanor?

A: Very concerned for her daughter. She, too, was quiet; not shocked, but she knows she's there for her—with a daughter being abused.

# 22, Ex 20, at 20.

The Supreme Court of Nevada held as follows as to this claim:

... [A]ppellant claimed that his trial counsel was ineffective for failing to object when Dr. Vergara vouched for the credibility of the victim. Appellant claimed that Dr. Vergara's testimony concerning the examination of the victim improperly vouched for the credibility of the victim. Appellant failed to demonstrate that his trial counsel was deficient or that he was prejudiced. Statements amounting "to an opinion as to the veracity of a witness in circumstances where veracity might well have determined the ultimate issue of guilt or innocence" are improper. Dr. Vergara simply testified that the examination of the victim revealed injuries that were consistent with sexual assault. As such, Dr. Vergara's testimony was proper and appellant failed to demonstrate that any objection would have had a reasonable probability of changing the outcome at trial. Therefore, the district court did not err in denying this claim.

# 24, Ex. 82, at 9 (citation footnote omitted).

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland.*

Petitioner's core premise on this claim is fundamentally flawed. The physician stated that the mother's demeanor reflected that "she knows she's there for her—with a daughter being abused." Petitioner urges that the physician thereby "testified that [the victim] had in fact been abused and this opinion as to the ultimate issue of guilt was improper."[FN120] The physician was responding to a question about the demeanor of the mother and her apparent state of mind reflected thereby. Nothing in the statement in truth constituted an opinion by the physician herself on the ultimate issue of guilt or a vouching for the credibility of the mother's testimony. It simply was testimony by the physician as to the mother's demeanor and apparent state of mind—as to the mother presenting to the physician as being concerned for a daughter believed by the mother to have been abused. The state supreme court's holding that there was not a reasonable probability that the failure to object to this in truth

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1423

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

largely innocuous testimony would have altered the outcome of the trial was neither contrary to nor an unreasonable application of *Strickland.* [FN121] While petitioner points to an alleged absence of corroborating physical evidence, Pantano confessed to inserting his finger into the vagina of the seven-year-old child. He cannot demonstrate prejudice under *Strickland* based on the failure to object to the physician's testimony.

> FN120. # 46, at 40.

> FN121. Petitioner relies upon a number of federal appellate decisions regarding improper expert witness vouching in federal criminal trials. See # 46, at 47–48. Even if the Court were to assume *arguendo,* that the cases were on point and apposite to the facts of the case at hand, which they are not, the Supreme Court of Nevada is not bound to follow federal court of appeals decisions. This is not *de novo* review.

**\*54** Ground 5(n) therefore does not provide a basis for federal habeas review.

### Ground 5(o): Failure to Obtain Psychological Examination of Child Victim

In Ground 5(o), petitioner alleges that he was denied effective assistance when trial counsel failed to obtain an independent psychological examination of the child victim to assess her propensity for veracity.

The Supreme Court of Nevada held as follows as to this claim:

> [A]ppellant claimed that his trial counsel was ineffective for failing ... to call additional witnesses to testify in his defense. .... In addition, appellant claimed that an expert witness should have been retained to refute the testimony of the State's expert witnesses and to perform an independent psychological examination of the victim. Appellant failed to demonstrate that he was prejudiced. Appellant confessed that he sexually as-

saulted the victim. Appellant failed to demonstrate that testimony from any additional witnesses had a reasonable possibility of altering the outcome of the trial under the circumstances. Therefore, the district court did not err in denying this claim.

> # 24, Ex. 82, at 6.

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland.*

Initially on this claim, it is subject to substantial question whether a motion for a psychological examination of the victim would have been granted in the first instance.

A psychological examination of a sexual offense victim is required neither by the federal constitution nor Nevada statutory law, and the procedure instead has arisen in Nevada as a matter of what has been frequently changing state decisional law. *See, e.g., State v. Eighth Judicial District Court (Romano),* 120 Nev. 613, 619–20 & 621 n. 26, 97 P.3d 594, 598 & 599 n. 26 (2004)(modifying rule in 2000 *Koerschner* decision which in turn had overruled prior authority); *see also Abbott v. State,* 122 Nev. 715, 138 P.3d 462 (2006)(later overruling, after the trial in this case, *Romano* and reinstating *Koerschner* test).

At the time of Pantano's February 2004 trial, the defendant was required to prove a compelling need for the examination. *See Koerschner v. State,* 116 Nev. 1111, 13 P.3d 451, (2000). In determining whether a compelling need had been demonstrated, the state courts looked to a number of factors, including whether the State was calling or benefitting from a psychiatric or psychological expert, whether there was corroborating evidence over and above the child's testimony, and whether there was a reasonable basis to believe that the child's mental or emotional state may have affected her veracity. *Id.*

In Pantano's case, the State was not calling or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

benefitting from a psychiatric or psychological expert,[FN122] the child's testimony was corroborated by Pantano's own confession, and it is subject to substantial question whether the defense could have established under the then-applicable case law that there was a reasonable basis to believe that the child's mental or emotional state may have affected her veracity.[FN123] It thus is subject to substantial question whether a defense motion for a psychological examination would have been granted.[FN124]

> FN122. *Cf. Koerschner,* 116 Nev. at 1117, 13 P.3d at 455 (fact that State did not elicit psychological evidence or use psychological evidence weighed against grant of defense request for victim psychological examination); *Chapman v. State,* 117 Nev. 1, 4–5, 16 P.3d 432, 434 (2001)(similar).

> FN123. *Cf. Chapman,* 117 Nev. at 5, 16 P.3d at 434 (the facts of an ugly divorce between the victim's parents and animosity between the victim's father and the defendant were insufficient grounds to believe that the victim's mental or emotional state may have affected her veracity); *Koerschner,* 116 Nev. at 1117, 13 P.3d at 456 (although the child-victim had experienced a very tragic and stressful childhood, there was no indication in the record that her veracity was affected to any particular degree by her mental or emotional state).

> FN124. Petitioner urges that an examination would have been required because the victim allegedly was coached, but this coaching allegation in truth is based on nothing more than supposition and hearsay that likely was inadmissible for the truth of the matter asserted. See text, *supra,* at 79–81. This discussion further necessarily assumes *arguendo* that Pantano's insistence—personally on the record—on being tried within the state statutory law sixty-day speedy trial period allowed sufficient time for such a motion and then a psycho-

logical examination of the child victim. *Cf.* the discussion as to Ground 5(b)(1), *supra,* at 46–47.

**\*55** In all events, however, given Pantano's confession to inserting his finger into the vagina of the seven-year-old child, the state supreme court's holding that petitioner could not establish a reasonable probability of a different outcome at trial but for counsel's performance in this regard was neither contrary to nor an unreasonable application of *Strickland.*

Ground 5(o) therefore does not provide a basis for federal habeas relief.

### Ground 6: Alleged Ineffective Assistance of Appellate Counsel

In Ground 6, petitioner alleges that he was denied effective assistance of appellate counsel in violation of the Sixth and Fourteenth Amendments. He alleges three distinct claims of alleged ineffective assistance of appellate counsel, which are described in more detail below.

When evaluating claims of ineffective assistance of appellate counsel, the performance and prejudice prongs of the *Strickland* standard partially overlap. *E.g., Bailey v. Newland,* 263 F.3d 1022, 1028–29 (9th Cir.2001); *Miller v. Keeney,* 882 F.2d 1428, 1434 (9th Cir.1989). Effective appellate advocacy requires weeding out weaker issues with less likelihood of success. The failure to present a weak issue on appeal neither falls below an objective standard of competence nor causes prejudice to the client for the same reason—because the omitted issue has little or no likelihood of success on appeal. *Id.*

### Ground 6(a): Transcript and Audio Recording of Confession

In Ground 6(a), petitioner alleges that he was denied effective assistance when appellate counsel failed to include the audio recording and transcript of his confession into the record before the state supreme court on direct appeal.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1425

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

The background to this claim is outlined in the discussion of Ground 3, *supra.* [FN125]

FN125. See text, *supra,* at 17–24.

On state post-conviction review, the Supreme Court of Nevada held as follows:

[A]ppellant claimed that his appellate counsel was ineffective for failing to include the audiotape or a certified transcript of his police interview with the appendix for his direct appeal. Appellant failed to demonstrate that he was prejudiced. At trial, a noncertified transcript was used so that the jury could follow along with an audiotape of the interview. The noncertified transcript was not admitted into evidence. Appellant failed to demonstrate that the transcript of the interview that was used at trial was substantially different from the audiotape. Thus, appellant failed to demonstrate that the result of the direct appeal would have been different if this transcript had been included. Therefore, the district court did not err in denying this claim.

# 24, Ex. 82, at 10 (footnote omitted).

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland.*

In the federal reply, petitioner contends, first, that "unlike the audiotape, the transcript contained Pantano's confession that he touched [the victim's] butt." [FN126] At the outset in this regard, review under § 2254(d)(1) is limited "to the record that was before the state court that adjudicated the claim on the merits." *Pinholster,* 131 S.Ct. at 1388. Here, it does not appear that a copy of either the audio recording or the transcript was in the record before the Supreme Court of Nevada on the *post-conviction* appeal. [FN127] Federal habeas review thus is restricted under § 2254(d)(1) to the same record presented to the state supreme court when it adjudicated the claim on the merits on the state post-conviction appeal. [FN128] Petitioner's asser-

tions as to what was or was not contained in the audio recording as compared to the transcript constitute nothing more than bald assertions vis-à-vis the record actually before the state court that adjudicated the claim on the merits.

FN126. # 46, at 43–44.

FN127. See # 24, Ex. 61. Indeed, the audio recording is not even in the federal record in this matter.

FN128. See also note 9, *supra.*

**\*56** Moreover, as discussed as to Ground 3, petitioner successfully prevailed upon the state district court to dismiss the lewdness charge, which was the charge based upon the alleged touching of the victim's buttocks. Pantano achieved this result despite the fact that another portion of the transcript that was not challenged as containing material not contained in the audio recording in truth also referenced the touching that supported the lewdness charge. [FN129] Pantano thus arguably obtained more relief on this basis than he was entitled in the first instance, and his claim of prejudice as to the remaining sexual assault charge is questionable at best. Particularly on the record presented to the state supreme court on the state post-conviction appeal, the rejection of the claim of prejudice in this regard was not an unreasonable application of *Strickland.*

FN129. See text, *supra,* at 23–24.

Petitioner contends, second, that "without the transcript, the court was unable to properly review the additional inaccuracies and blanks and omissions." [FN130] Again, the record presented to the state supreme court on state post-conviction review also did not include either the audio recording or the transcript. Moreover, as discussed as to Ground 3, *supra,* the alleged inaccuracies identified by petitioner are belied by the transcript. And, as with Ground 3, even on an *arguendo de novo* review, the Court has no difficulty at all holding that the jury's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1426

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

possession of a transcript with such allegedly "excessive" omissions and blanks while they listened to the audio recording itself did not "violate those fundamental conceptions of justice which lie at the base of our civil and political institutions." FN131 Particularly on the record presented on state post-conviction review, the rejection of the claim of prejudice in this regard as well was not an unreasonable application of *Strickland.*

> FN130. # 46, at 44.

> FN131. See text, *supra,* at 21–24.

Ground 6(a) does not provide a basis for federal habeas review.

### *Ground 6(b): Alleged False Statements in Confession*

In Ground 6(b), petitioner alleges that he was denied effective assistance when appellate counsel failed to inform the state supreme court on direct appeal that his statements to police investigators were false and not supported by corroborating facts.

The background circumstances pertaining to this claim are outlined in the discussion of Ground 5(b)(2), *supra.* FN132

> FN132. See text, *supra,* at 48–54.

The Supreme Court of Nevada held as follows as to this claim:

> [A]ppellant claimed that his appellate counsel was ineffective for failing to include assertions that appellant's statements to police, including his confession, were false. Appellant failed to demonstrate that his appellate counsel was deficient or that he was prejudiced. As discussed above, appellant's confession was voluntary and appellant did not identify any additional grounds upon which his confession should have been suppressed. Appellant failed to demonstrate that any claim regarding the veracity of his confession would have had a reasonable probability of success on appeal. Therefore, the district court did

not err in denying this claim.

> **\*57** # 24, Ex. 82, at 10–11.

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland.*

As discussed exhaustively above as to Ground 5(b)(2), the factual, logical, and legal underpinnings of petitioner's core claim that he was entitled to relief because his confession allegedly was demonstrably false all are fundamentally flawed. There was not a reasonable probability either that he would have been able to exclude his confession from evidence on this basis or that he would have been able to obtain a different outcome at trial based on this argument. The state supreme court's rejection of the parallel claim that appellate counsel should have pursued this factually, logically, and legally flawed argument on appeal clearly was neither contrary to nor an unreasonable application of *Strickland.*

Ground 6(b) therefore does not provide a basis for federal habeas relief.

### *Ground 6(c): A Failure to Communicate*

In Ground 6(c), petitioner alleges that he was denied effective assistance when appellate counsel failed to communicate and confer with him regarding the issues to be pursued on appeal.

The Supreme Court of Nevada held as follows as to this claim:

> [A]ppellant claimed that his appellate counsel was ineffective for failing to communicate with him while preparing his direct appeal. Appellant failed to demonstrate that he was prejudiced. Appellant failed to identify any issues, other than the claim relating to his confession, which he wished to raise, but were not raised due to his lack of communication with his appellate counsel. Therefore, the district court did not err in denying this claim.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1427

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

# 24, Ex. 82, at 11.

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

The preceding discussion as to an inability to demonstrate prejudice under *Strickland* as to Grounds 6(a) and 6(b) applies here as well.[FN133]

> FN133. Under established law, a defendant does not have a constitutional right to have appointed counsel on direct appeal present every nonfrivolous issue requested by the defendant. *See Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). The mere fact that counsel did not pursue an issue that petitioner would have wanted him to pursue thus does not establish prejudice in and of itself. Petitioner instead must demonstrate a reasonable probability of a different outcome on appeal from the failure to pursue the particular issue in question.

Ground 6(c) therefore does not provide a basis for federal habeas relief.

### Ground 7: Alleged Cumulative Error

In Ground 7, petitioner alleges that he was denied rights to due process and a fair trial due to the cumulative effect of the alleged trial errors raised on direct appeal combined with the alleged instances of ineffective assistance of counsel raised on state post-conviction review.

The Supreme Court of Nevada held as follows:

[A]ppellant claimed that the cumulative errors of his trial and appellate counsel caused them to be ineffective. Appellant failed to demonstrate that he was prejudiced. As appellant failed to demonstrate any error for the reasons discussed previously, appellant failed to demonstrate cumulative error. Therefore, the district court did not err in denying this claim.

# 24, Ex. 82, at 11.

This Court held previously in this matter that it would review this ground *de novo* because the state supreme court reviewed the claim solely as one based on the cumulative effect of the alleged ineffective assistance of counsel without considering the claim as also based on the cumulative effect of alleged trial error therewith .[FN134]

> FN134. See # 34, at 5–6.

**\*58** On *de novo* review, the Court is not persuaded, for substantially the reasons assigned previously as to the preceding claims, that petitioner has demonstrated the presence of constitutional error in isolation. The Court notes in this regard that petitioner in truth has not demonstrated constitutional error—as opposed to state law error—on his claims of prosecutorial misconduct under Ground 4. Nor has he demonstrated a basis for constitutional error on any of his claims related directly to the admission of either his own confession or the corroborating testimony of the child victim.[FN135] Particularly given his confession and the corroborating testimony of the child victim, the Court is not persuaded that any *arguendo* constitutional error claimed herein—which has not been established—so infected petitioner's trial with unfairness as to make the resulting conviction a denial of due process, whether any such *arguendo* error claimed herein is considered singly or in the aggregate. In all events, the Court, having found no constitutional error in isolation, holds on *de novo* review that the conviction is not infirm based upon alleged cumulative error. *See, e.g., Hayes v. Ayers,* 632 F.3d 500, 524 (9th Cir.2011)("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible.").

> FN135. To the extent that this Court has denied relief on preceding claims under the deferential review standard without assigning additional factual or legal reasons over and above those assigned by the Supreme Court of Nevada, this Court denies relief

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

on a *de novo* review for substantially the reasons assigned by the state supreme court. Applying *de novo* review to petitioner's claims, singly as well as in the aggregate, the Court is not persuaded that petitioner was denied a fundamentally fair trial or that his conviction otherwise is constitutionally infirm. The reasons supporting this conclusion have been adequately canvassed herein in the discussion of the prior claims.

Ground 7 therefore does not provide a basis for federal habeas relief.

### *Evidentiary Hearing Request*

Petitioner's request for an evidentiary hearing is denied, as review under AEDPA is restricted to the record presented to the state court that adjudicated the merits of the claims. *See Pinolster,* 131 S.Ct. at 1398–1401. Petitioner otherwise has not demonstrated a basis for a federal evidentiary hearing under the applicable standards for same.

### *Consideration of Possible Issuance of a Certificate of Appealability*

Under Rule 11 of the Rules Governing Section 2254 Cases, the district court must issue or deny a certificate of appealability (COA) when it enters a final order adverse to the applicant.

As to the claims rejected by the district court on the merits, under 28 U.S.C. § 2253(c), a petitioner must make a "substantial showing of the denial of a constitutional right" in order to obtain a certificate of appealability. *Slack v. McDaniel,* 529 U.S. 473, 483–84, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *Hiivala v. Wood,* 195 F.3d 1098, 1104 (9th Cir.1999). To satisfy this standard, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong." *Slack,* 529 U.S. at 484.

The Court denies a certificate of appealability as to all claims, for the reasons noted below. The length of this order does not signify that the any of the multiple claims presented would be found to be debatable by jurists of reason. On federal habeas review, petitioner has repeated numerous claims from his *pro se* state papers that were flawed factually, logically and/or legally. Additional discussion was required in this order on multiple claims literally to set the record straight and to put petitioner's arguments in proper context.

### *Ground 1*

**\*59** In Ground 1, petitioner alleges that he was denied rights to confrontation, due process, and a fair trial because the state statute allowing admission of prior statements of a child sexual offense victim allegedly is unconstitutionally "overbroad." He alleges that the statute is overbroad essentially because the statute allegedly provides for the admission of hearsay in some circumstances that allegedly would violate the Confrontation Clause under the standards set forth in *Crawford v. Washington, supra.* Such "overbreadth" challenges are restricted to challenges to statutes restricting freedom of speech protected by the First Amendment. Accordingly, even on an *arguendo de novo* review, the amorphous "facial challenge" for "overbreadth" presented in Ground 1 would be at best surplusage and at worst frivolous. If the evidence actually admitted at petitioner's trial was admitted in violation of the Confrontation Clause, then a "facial" challenge to the statute is surplusage vis-à-vis the challenge to his own particular conviction. If, on the other hand, the evidence actually admitted at petitioner's trial was *not* introduced in violation of the Confrontation Clause, then there is no nonfrivolous federal constitutional claim by which the otherwise constitutional admission of the evidence is rendered unconstitutional because the evidentiary statute allegedly would permit the unconstitutional admission of other evidence in other situations in other trials. Reasonable jurists therefore would not find debatable or wrong this Court's conclusion rejection of this claim. **See text,** *supra,* **at 4–11.**

### *Ground 2*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

In Ground 2, petitioner alleges that he was denied rights to confrontation, due process, and a fair trial because allegedly testimonial out-of-court statements by the child victim to her father and to a detective were admitted at trial. Petitioner contends principally: (a) that the child was "unavailable" for purposes of the Confrontation Clause analysis under *Crawford* because her responses in her trial testimony allegedly were so vague and inadequate that effective cross-examination was not possible, allegedly thereby rendering her "unavailable;" and (b) that the child's statements not only to the investigating detective but also to her father were "testimonial" statements for purposes of Confrontation Clause protection under *Crawford.*

On the "availability" issue, there are no Supreme Court decisions intimating, much less holding, that a witness may be "unavailable" for Confrontation Clause purposes even though they actually take the stand and testify, albeit allegedly too vaguely to allow allegedly effective cross-examination. *Crawford* instead states apparently categorically that the Confrontation Clause places "no constraints at all" on the use of a declarant's prior testimonial statements when the declarant testifies at trial, which the child did in this case. Any alleged vagueness in the testimony of a witness on the stand is matter to be highlighted on cross-examination.

**\*60** An adverse ruling on the "availability" issue undercuts the entire claim, including as to the victim's statements to the investigating detective. Moreover, on the "testimonial statement" issue with regard to the child's statements to her father, the Supreme Court not only has not fully defined "testimonial statement," it expressly has declined to establish whether and when statements made to someone other than law enforcement personnel are "testimonial." Given this express reservation of the issue, petitioner cannot establish that the state supreme court's rejection of the claim as to the child's statement to her father was an unreasonable application of clearly established federal law.

Reasonable jurists therefore would not find debatable or wrong this Court's conclusion that the state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. **See text, *supra,* at 11–16 .**

*Ground 3*

In Ground 3, petitioner alleges that he was denied rights to confrontation, due process and a fair trial because the jury was given copies of a transcript of his confession in spite of a trial court ruling that the transcript, as distinguished from an audio recording of the statement played at trial, was not admissible. At the outset, neither the transcript nor the audio recording was presented to the state supreme court in the record on appeal, such that AEDPA review herein is restricted to the record before that court when it decided the merits. Given that the statements in question were Pantano's own statements, a holding that the Confrontation Clause was not implicated was not contrary to clearly established federal law. A state court conclusion that the jury having access to the transcript in the circumstances of the case did not violate a general due process standard, which requires a violation of those "fundamental conceptions of justice which lie at the base of our civil and political institutions," was not an unreasonable application of such a generalized standard. Further, on an alternative *arguendo de novo* review, the actual transcript in question directly belies two of petitioner's central factual allegations in support of the claim. As to the third factual allegation, this Court has no difficulty at all holding that the jury's possession of a transcript with allegedly "excessive" omissions and blanks did not "violate those fundamental conceptions of justice which lie at the base of our civil and political institutions." Reasonable jurists therefore would not find debatable or wrong this Court's rejection of this claim. **See text, *supra,* at 17–24.**

*Grounds 4(a) and 4(b)*

In Grounds 4(a) and (b), petitioner alleges that he was denied rights to due process and a fair trial

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

because of prosecutorial misconduct, contending in particular: (a) that the prosecutor inappropriately sought to inflame the jury and appeal to their passions and emotions by urging jurors to convict Pantano to make the victim's parents "feel better" and improperly injected her personal opinion into the argument; and (b) that the prosecutor inappropriately argued evidence that was never admitted which implied Pantano's guilt, disparaged defense counsel and the defense, talked about religious characters, and again injected her personal opinion.

**\*61** Petitioner proceeds essentially on the premise that the state supreme court's holding that the prosecutor's comments were improper equated to a holding that the comments violated due process, and he then challenges the court's conclusion that the error constituted harmless error. However, a conclusion that prosecutorial argument was improper under federal decisions based on the exercise of supervisory power in federal criminal trials, state court decisions applying state law standards, and/or the ABA Standards for Criminal Justice does not necessitate a conclusion that the improper argument violated rights to due process or a fair trial. In the present case, a number of factors counsel strongly against a conclusion that the prosecutor's improper argument so infected the trial with unfairness as to make the resulting conviction a denial of due process. First, the state trial court immediately sustained defense objections to the argument, and the court expressly instructed the jury to disregard the comments vis-à-vis making the victim's parents feel better. Second, while the prosecutor made undisputedly improper argument appealing to emotion, referring to her personal opinion, and disparaging defense counsel, she—contrary to petitioner's assertions-did not misstate the evidence. Third, the evidence of guilt on the sexual assault charge was compelling. Pantano confessed to the crime, and the child victim corroborated his confession to the sexual assault of which he stands convicted. The clear impropriety of the prosecutor's statements under nonconstitutional standards applicable to federal and state prosecutors, again, does not equate to a

due process violation in and of itself. Reasonable jurists thus would not find debatable or wrong this Court's rejection of these claims. **See text,** *supra,* **at 24–30.**

*Ground 4(c)*

In Ground 4(c), petitioner alleges that he was denied rights to due process and a fair trial because of prosecutorial misconduct, contending that the prosecutor improperly elicited testimony from a State witness that lying to a suspect is legal, in an alleged effort to bolster the witness' credibility. Petitioner at bottom has failed to present authority on this claim establishing that the state supreme court's rejection of the claim was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court applying federal constitutional standards. The Court is not sanguine that it would overturn a conviction on the basis of the challenged testimony even on a *de novo* review. What the prosecutor sought to establish in the testimony is indisputably true—a police officer can lie to a suspect in an effort to ferret out the truth and elicit a confession. It is highly questionable whether the testimony—to which no objection was made as to substance—was objectionable in the first instance. What it was not was a matter that so infected the trial with unfairness as to make the resulting conviction a denial of due process, even without also taking into account the fact that Pantano confessed to the sexual assault with corroborating testimony by the then eight-year-old child victim on that offense. Reasonable jurists thus would not find debatable or wrong this Court's rejection of this claim. **See text,** *supra,* **at 30–33.**

*Ground 4(d)*

**\*62** In Ground 4(d), petitioner alleges that he was denied rights to due process and a fair trial because of prosecutorial misconduct, contending that the prosecutor improperly elicited testimony referencing a prior bad act. The victim's mother testified that petitioner's mother said that she was afraid of him, and the state trial court struck the testimony and instructed the jury to disregard it. The only pos-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

sibly applicable substantive standard on this claim is the general standard of fundamental fairness under the Due Process Clause. There is no indication in the record that the prosecutor intentionally elicited the testimony in question, and every indication instead is to the contrary. Moreover, there is no clearly established law in Supreme Court jurisprudence establishing that the introduction of propensity evidence denies a defendant due process of law. Particularly against the backdrop of the substantial evidence of petitioner's guilt of sexual assault, including his confession and corroborating testimony by the then eight-year-old child victim, the state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. Reasonable jurists thus would not find debatable or wrong this Court's rejection of this claim. **See text,** *supra,* **at 33–35.**

### Ground 5(a)

In Ground 5(a), petitioner alleges that he was denied effective assistance when trial counsel allegedly failed to protect his constitutional and statutory rights to a speedy trial. At the outset, while petitioner frames the claim as one of a failure to protect Pantano's state and federal speedy trial rights, he presents no apposite authority establishing that either his state or federal constitutional speedy trial rights in fact were violated. Petitioner in essence claims that he was denied effective assistance because trial counsel did not secure a quicker trial setting after he had invoked his state statutory speedy trial right, albeit without a showing of an actual state or federal constitutional speedy trial violation in and of itself. Petitioner's claim that he was prejudiced because the child victim was coached prior to the trial is based on a selective presentation of the child's testimony and further on speculation. His claim that he was prejudiced because a later trial setting resulted in exculpatory evidence being destroyed is based on wholly flawed logic and speculation. Reasonable jurists would not find debatable or wrong this Court's rejection of this claim. **See text,** *supra,* **at 36–43.**

### Ground 5(b)(1)

In Ground 5(b)(1), petitioner alleges that he was denied effective assistance when trial counsel failed to seek to suppress his confession on the ground that it was involuntary. The record in this Court belies, rather than tends to support, petitioner's bald self-serving *post hoc* assertion that the investigating detective banged on the table and held his fist inches from Pantano's face during the interview. There was no probability that a motion to suppress premised upon such allegations would have led to the suppression of petitioner's confession or to a different result at trial. Petitioner's reliance upon the detective's subterfuge regarding the other evidence that the police had as a basis for suppressing his confession flies in the face of long-established law to the contrary. Further, petitioner's late-breaking reliance for the first time in the federal reply on the fact that he was not given *Miranda* warnings ignores the fact that the interview indisputably was a noncustodial interview. Moreover, as discussed in Ground 5(a), it was petitioner who personally elected on the record to invoke his state statutory speedy trial right in lieu of pursuing a motion and writ seeking to suppress his confession, which was a clear either/or choice under Nevada procedure. In all events, the state supreme court's holding that petitioner could not establish prejudice was neither contrary to nor an unreasonable application of clearly established federal law. Reasonable jurists would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 36–47.**

### Ground 5(b)(2)

**\*63** In Ground 5(b)(2), petitioner alleges that he was denied effective assistance when trial counsel failed to bring forth evidence to demonstrate that his statements to the police were not corroborated by other physical and testimonial evidence. This claim, which was repeated nearly verbatim on federal habeas review from petitioner's *pro se* state papers, is flawed factually, logically and legally. Petitioner's underlying contention that his confession was subject to exclusion and/or was suspect

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

because it was demonstrably false underlies many of his claims. However, petitioner' claim in this regard is completely without merit, as the Court exhaustively details in the discussion of the claim. Reasonable jurists would not find this Court's rejection of the claim to be debatable or wrong. **See text, *supra,* at 48–54.**

### Ground 5(c)

In Ground 5(c), petitioner alleges that he was denied effective assistance when trial counsel stipulated to the competency of the victim. Petitioner relies upon excerpts from the victim's testimony from the preliminary hearing and trial, not the competency hearing, which occurred prior to *voir dire.* Petitioner's selective presentation omits the responses indicating that the child understood the difference between telling the truth and lying. When the entirety of the child's testimony is considered, including her responses affirming that she would testify truthfully to what happened, it is abundantly clear that there was not a reasonable probability that a competency objection to her testifying would have been sustained. Moreover, the state supreme court found, twice, that the child was competent to testify, first on direct appeal and a second time on state post-conviction review. Petitioner's selective presentation cannot overcome that finding. Reasonable jurists would not find this Court's rejection of the claim to be debatable or wrong. **See text, *supra,* at 54–57.**

### Ground 5(d)(1)

In Ground 5(d)(1), petitioner alleges that he was denied effective assistance when trial counsel did not object to the admission of the victim's underwear as irrelevant and prejudicial because it was not established to be the underwear that she wore during the sexual assault, contending that it was just as likely that the underwear in evidence had been worn by the victim prior to the incident. On an *arguendo de novo* review, a sufficient foundation for the introduction of the underwear in evidence was established by the victim's testimony that she felt a "nail" in her vagina and bled after the assault,

the mother's testimony that she found stained panties when she was doing the laundry several days after the assault, and the examining physician's testimony that she field tested one of several similar pairs of panties brought by the mother with a positive result for blood. The field-tested panties were the panties placed in, and introduced in evidence as part of, the police sexual assault kit. Petitioner's speculation that the underwear in evidence could have been from prior to the incident went at best to weight, not admissibility. Petitioner's assertion that the medical evidence established that the stain on the underwear could have resulted from poor hygiene in fact was not supported by the actual medical evidence at trial. The lack of objection to introduction of the underwear did not prevent the jury from learning that there were multiple pairs of stained underwear because the examining physician testified from the stand to this very fact. The probative value of the evidence accordingly was not substantially outweighed by a danger of unfair prejudice. Reasonable jurists therefore would not find this Court's rejection of the claim to be debatable or wrong. **See text, *supra,* at 57–63.**

### Ground 5(d)(2)

**\*64** In Ground 5(d)(2), petitioner alleges that he was denied effective assistance when trial counsel stipulated that it was the victim's blood and DNA on her underwear. Counsel so stipulated only after the police lab results confirmed that the blood on the underwear was the victim's blood, and petitioner has not identified any viable basis for challenging, objecting to and/or excluding testimony presenting the lab's results. Reasonable jurists would not find this Court's rejection of the claim to be debatable or wrong. **See text, *supra,* at 63–64.**

### Ground 5(e)

In Ground 5(e), petitioner alleges, in the main, that he was denied effective assistance when trial counsel failed to obtain exculpatory evidence allegedly in possession of the State. He contends—directly opposite to his claim in Ground 5(d)(1)—that the underwear in evidence instead

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

*was* the underwear worn by the victim and that testing would have shown no semen on the underwear, allegedly belying his confession that he ejaculated "all over" during the assault. However, as discussed with regard to Ground 5(d)(1), the actual evidence at trial did not establish that the underwear necessarily was the underwear worn by the victim during the assault as opposed to underwear potentially worn thereafter with evidence of *sequelae* from her injury. The examining physician's testimony clearly belied any claim that it was established, or even could have been established, that the panties in the sexual assault kit admitted into evidence at trial were "the" panties worn by the victim during Pantano's sexual assault. Petitioner's factual predicate for this claim thus was undercut by the actual trial evidence from the very outset. Further, as is discussed in regard to multiple claims herein, Pantano's statement to the detective—in a context where he had a potential motive to exaggerate to try and explain away the potential presence of his semen where it should not be—that he ejaculated "all over" does not necessarily establish that his semen covered any and all surfaces that thereafter might be tested. As noted as to such similar claims, it is entirely speculative that such testing would have been marginally exculpatory—based upon the absence of a semen on a particular surface—rather than instead directly inculpatory in the event that the panties in evidence not only were the panties worn at the time but also had semen on them. Moreover, petitioner's underlying legal premise that his confession was admissible only if every jot and tittle of his statement to the police was corroborated or proved true is fundamentally flawed. Reasonable jurists therefore would not find this Court's rejection of the claim to be debatable or wrong. **See text,** *supra,* **at 64–67.**

### Ground 5(f)

In Ground 5(f), petitioner alleges that he was denied effective assistance when trial counsel failed to adequately cross-examine witnesses. In the federal reply, petitioner does not provide any specific argument regarding any of the alleged inconsisten-cies but instead merely refers *in globo* to the alleged inconsistencies set forth in the amended petition. On the largely conclusory and formulaic argument presented, in a case where petitioner confessed to inserting his finger into the vagina of a seven-year-old child, reasonable jurists would not find this Court's rejection of the claim to be debatable or wrong. **See text,** *supra,* **at 67–68.**

### Ground 5(g)

**\*65** In Ground 5(g), petitioner alleges that he was denied effective assistance when trial counsel failed to confer with him, failed to file appropriate pretrial motions, and failed to put forth a proper defense. As discussed in detail herein, petitioner's claims in Ground 5(g) either duplicate other claims in the amended petition and/or present claims that are belied by the actual state court record. Reasonable jurists would not find this Court's rejection of the claims in Ground 5(g) to be debatable or wrong. **See text,** *supra,* **at 68–73.**

### Ground 5(h)

In Ground 5(h), petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and present an alleged alibi defense. On federal habeas review, petitioner cites to a purported affidavit in the state court record that it does not appear ever in fact was presented in state court in support of the bald assertions in petitioner's state papers. Moreover, the purported alibi testimony would not exclude all of the time period in which the offense potentially could have been committed. In all events, there was not a reasonable probability that testimony by a friend or friends seeking to establish that petitioner was not present at the victim's residence after a particular time would have altered the outcome at trial—given Pantano's confession to inserting his finger into the vagina of a seven-year-old child, with corroborating testimony by the victim as to the sexual assault. Reasonable jurists would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 73–75.**

### Ground 5(i)

In Ground 5(i), petitioner alleges that he was

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

denied effective assistance when trial counsel failed to investigate and present testimony by Pantano's sister, Maria Pantano (Rosero), that the victim's mother and father had a motive to fabricate their testimony based on their allegedly owing money to Pantano. At the outset, the state court exhibits referenced in the federal amended petition do not state what petitioner states that they do. In all events, petitioner cannot establish the requisite prejudice on this claim. There was not a reasonable probability that such alleged fabrication testimony would have altered the outcome at trial, given Pantano's confession to inserting his finger into the vagina of a seven-year-old child. Reasonable jurists would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 75–76.**

### Ground 5(j)

In Ground 5(j), petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and present testimony by his mother to refute testimony by the victim's mother regarding an alleged prior bad act. The claim pertains to the testimony discussed as to Ground 4(d) wherein the victim's mother testified that petitioner's mother said that she was afraid of him. The state trial court struck the testimony and instructed the jury to disregard it. It of course would have taken considerable prescience for defense counsel to investigate this unanticipated testimony before trial. Petitioner in any event cannot demonstrate prejudice. It was improbable to the extreme that the state trial court would have permitted the defense to present testimony to respond to testimony on a collateral matter that had been stricken in the first instance. Even if such testimony were allowed, there was not a reasonable probability of a different outcome at trial given Pantano's confession and the victim's corroborating testimony. Reasonable jurists would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 76–78.**

### Ground 5(k)

**\*66** In Ground 5(k), petitioner alleges that he was denied effective assistance when trial counsel

failed to investigate and present testimony establishing that he allegedly did not have a cell phone. As discussed in rejecting a virtually identical claim under Ground 5(b)(2), it would have impossible for defense counsel to conclusively prove the negative that Pantano did not have at the very least a borrowed phone or other phone not in his name in May 2003. All to support the strained inference that because Pantano, allegedly, lied to the police about the collateral point of having a cell phone he therefore lied to the police about inserting his finger into the vagina of a seven-year-old child. Moreover, petitioner's statement to the police in this regard was not uncorroborated because the victim testified that Pantano handed a cell phone with games to her brother to play with during the sexual assault. Nor has petitioner cited apposite case law establishing that he would have been able to prevent introduction of his confession at trial based on this strained argument. Reasonable jurists thus would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 78–79.**

### Ground 5(l)

In Ground 5(l), petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and present testimony establishing that the victim's parents coached her testimony. In principal part, the allegations in federal court are based upon bald, unsupported allegations in Pantano's state post-conviction papers. The purported affidavits cited on federal review in fact were not attached with Pantano's state papers. The purported testimony that is described in petitioner's state memorandum in any event would have been subject to substantial hearsay issues. None of the purported testimony was based on personal observation of such alleged coaching. Petitioner cannot demonstrate prejudice based upon what in truth was a speculative claim of coaching based on such hearsay, given that Pantano confessed to inserting his finger into the vagina of the seven-year-old child. Reasonable jurists thus would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 79–81.**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

*Ground 5(m)*

In Ground 5(m), petitioner alleges that he was denied effective assistance when trial counsel failed to challenge a jury instruction stating that the victim's testimony, if believed beyond a reasonable doubt, was sufficient and that no corroboration of the victim's testimony was required in that circumstance. The Ninth Circuit has held that a substantially identical California jury instruction does not violate due process. Petitioner cannot establish under the doubly deferential standard of review of *Strickland* claims under AEDPA that counsel's failure to challenge the instruction in the February 2004 trial provides a basis for federal habeas relief. Reasonable jurists thus would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 81–83.**

*Ground 5(n)*

**\*67** In Ground 5(n), petitioner alleges that he was denied effective assistance when trial counsel failed to object to alleged vouching for the credibility of the victim's mother's testimony by the physician who performed the sexual assault examination. Petitioner's core premise on this claim is fundamentally flawed, as the physician's testimony did not vouch for the credibility of any witness. Petitioner cannot demonstrate the requisite prejudice, particularly given his confession to the sexual assault. Reasonable jurists would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 83–85.**

*Ground 5(o)*

In Ground 5(o), petitioner alleges that he was denied effective assistance when trial counsel failed to obtain an independent psychological examination of the child victim to assess her propensity for veracity. It is subject to substantial question at the very outset whether a motion for a psychological examination would have been successful under the applicable Nevada state case law at the time. In all events, however, given Pantano's confession to inserting his finger into the vagina of the seven-year-old child, the state supreme court's holding

that petitioner could not establish a reasonable probability of a different outcome at trial but for counsel's performance in this regard was neither contrary to nor an unreasonable application of *Strickland.* Reasonable jurists would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 85–86.**

*Ground 6(a)*

In Ground 6(a), petitioner alleges that he was denied effective assistance when appellate counsel failed to include the audio recording and transcript of his confession into the record before the state supreme court on direct appeal. These items similarly were not presented to the state supreme court in the record presented on state post-conviction review, and the federal record is restricted to what was presented on state review. In all events, as discussed as to Ground 3, petitioner cannot demonstrate prejudice. First, the transcript itself and state court record belies petitioner's principal factual contentions. Second, allegedly "excessive" blanks in the transcript—with respect to an audio recording that the jury heard at trial—did not give rise to a due process violation. Reasonable jurists would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 87–89.**

*Ground 6(b)*

In Ground 6(b), petitioner alleges that he was denied effective assistance when appellate counsel failed to inform the state supreme court on direct appeal that his statements to police investigators were false and not supported by corroborating facts. As the Court noted with respect to Ground 5(b)(2), the underlying substantive claim is flawed factually, logically and legally. Appellate counsel's failure to pursue such a completely meritless claim was not a deprivation of effective assistance of counsel. While petitioner has sought to base a number of his claims on the premise that his confession was false, this meritless argument is the weakest link in, not the strength of, his petition. Reasonable jurists would not find this Court's rejection of the claim to be debatable or wrong. **See text,** *supra,* **at 89–90.**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1436

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

*Ground 6(c)*

**\*68** In Ground 6(c), petitioner alleges that he was denied effective assistance when appellate counsel failed to communicate and confer with him regarding the issues to be pursued on appeal. The discussion as to Grounds 6(a) and 6(b) demonstrates that petitioner cannot demonstrate prejudice on this claim as well. A defendant of course does not have a right to have appellate counsel present every nonfrivolous claim that he would wish to pursue. Reasonable jurists would not find this Court's rejection of the claim to be debatable or wrong. **See text,** *supra,* **at 90–91.**

*Ground 7*

In Ground 7, petitioner alleges that he was denied rights to due process and a fair trial due to the cumulative effect of the alleged trial errors raised on direct appeal combined with the alleged instances of ineffective assistance of counsel raised on state post-conviction review. On *de novo* review, including as to the underlying individual claims, petitioner has not demonstrated, substantially for the reasons noted previously, the presence of constitutional error in isolation. Reasonable jurists would not find the rejection of his cumulative error claim to be debatable or wrong. **See text,** *supra,* **at 91–92.**

A certificate of appealability thus will be denied as to all claims herein.

IT THEREFORE IS ORDERED that the petition is DENIED on the merits and that this action shall be DISMISSED with prejudice.

IT FURTHER IS ORDERED that a certificate of appealability is DENIED as to all claims. **See text,** *supra,* **at 92–107.**

The Clerk of Court shall enter final judgment accordingly in favor of respondents and against petitioner, dismissing this action with prejudice.

D.Nev.,2012.
Pantano v. Donat

Slip Copy, 2012 WL 3929515 (D.Nev.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1437

ATTACHMENT TWO

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

Only the Westlaw citation is currently available.

United States District Court, W.D. North Carolina,
Asheville Division.
Richard Allen JACKSON, Petitioner,
v.
UNITED STATES of America, Respondent.

Civil No. 1:04cv251.
Criminal No. 1:00cr74.
July 13, 2010.

West KeySummary**Criminal Law 110 ⚷1891**

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)2 Particular Cases and Issues
            110k1891 k. Preparation for Trial.
Most Cited Cases

Defense counsel's investigation into the scientific basis of the Government's theory that the defendant tortured his victim with a stun gun was not deficient performance, as required to support a claim of ineffective assistance of counsel, in a trial for capital murder. Counsel secured both the appointment of a forensic pathologist and a mathematician to counter the Government's evidence that a stun gun was used on the victim. Counsel also moved for the appointment of a forensic anthropologist to testify that the alleged stun gun marks actually were the result of insect infestations and moved to subpoena the forensic pathologist who testified at the defendant's state capital trial that the marks were not stun gun marks. The cross-examination of the Government's expert showed that the defense experts had assisted counsel as to the manner in which to approach stun gun evidence. Futhermore, counsel had consulted a forensic entomologist who opined that the marks on the victim's body were consistent with post-mortem insect activity colonizing a corpse, which information was used during cross-examination. U.S.C.A.

Const.Amend. 6.

M. Gordon Widenhouse, Jr., Rudolf, Widenhouse & Fialko, Chapel Hill, NC, Shelagh Rebecca Kenney, Durham, NC, for Petitioner.

Jeffrey Bradford Kahan, United States DOJ, Capital Case Unit, Washington, DC, Richard Lee Edwards, United States Attorney, Asheville, NC, for Respondent.

### *ORDER*

MARTIN REIDINGER, District Judge.

**\*1 THIS MATTER** is before the Court on the Petitioner's Request for Certificate of Appealability [Doc. 54.].

### PROCEDURAL HISTORY[FN1]

> FN1. A more complete procedural history can be found in the Court's Order denying Petitioner's § 2255 Motion to Vacate. [Doc. 47].

The Petitioner's conviction and sentence of death became final on November 17, 2003. *Jackson v. United States of America,* 540 U.S. 1019, 124 S.Ct. 566, 157 L.Ed.2d 434 (2003) (petition for writ of *certiorari* denied). In 2004, the Petitioner filed a Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255, which was denied on June 19, 2009. [Doc. 47]. His Motion to Alter or Amend Judgment was denied on August 26, 2009. [Doc. 52]. The Petitioner filed the pending Request for Certificate of Appealability on October 26, 2009 and the Government responded on January 6, 2010. [Doc. 54; Doc. 60]. The Petitioner's Reply was filed on January 25, 2010. [Doc. 63]. The Petitioner seeks leave to appeal the denial of some of the claims which were asserted in the § 2255 motion. [Doc. 47].

### STANDARD OF REVIEW

Orders denying a motion pursuant to § 2255

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

are not appealable unless a court issues a certificate of appealability (COA). 28 U.S.C. § 2253(c)(1). A COA may issue only if the Petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner satisfies this standard by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong" and that any dispositive procedural ruling by the district court is also debatable. *Miller–El v. Cockrell,* 537 U.S. 322, 336–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003), *quoting Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000).

## DISCUSSION
### I. Denial of an evidentiary hearing

The Petitioner claims that the Court [FN2] erred by failing to grant him an evidentiary hearing but does not identify the claims as to which a hearing was required. [Doc. 54, at 4]. He argues generally that the Court's failure to hold an evidentiary hearing is a matter about which "reasonable jurists could debate' or is 'adequate to deserve encouragement to proceed further." [*Id.* (citation omitted) ].

> FN2. This case was reassigned to the undersigned when Hon. Lacy H. Thornburg retired.

It is first noted that the denial of an evidentiary hearing is not a dispositive procedural ruling. *United States v. Dixon,* 208 Fed.Appx. 257 (4th Cir.2006), *certiorari denied* 552 U.S. 933, 128 S.Ct. 327, 169 L.Ed.2d 231(2007) (declining to issue certificate of appealability as to claim that court should have conducted evidentiary hearing on § 2255 motion); *accord, United States v. Michael,* 141 Fed.Appx. 208 (4th Cir.2005); *Garcia v. United States,* 2007 WL 1652537 (W.D.N.C.2007).

In order to obtain a COA, the Petitioner must show that "reasonable jurists would find the district court's assessment of [a] *constitutional* claim [ ] debatable or wrong.' " *Miller–El,* 537 U.S. at 338 (citation and internal quotation marks omitted) (emphasis provided). A petitioner's right to an evid-

entiary hearing in connection with a motion pursuant § 2255 is governed by the statute which provides that a hearing is not required when "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). The Petitioner's argument is based on his conclusion that the statutory scheme presumes that a hearing will be granted. To the contrary, the statute does not provide for a hearing in every case and, as noted by the Court, "[i]n this case, it is particularly compelling that almost every allegation of ineffective assistance or other ground for relief is refuted by the contemporaneous record." [Doc. 52, at 4].

**\*2** In concluding that a hearing was not required, the Court stated:

> As the Court which presided over all pretrial proceedings as well as the trial of the action, the undersigned is uniquely qualified to compare the contentions of ineffective assistance of counsel with the contemporaneous conduct and statements of counsel. Moreover, concerning the other issues raised in this motion, it is clear from the pleadings, files and records that the Petitioner is not entitled to any relief; therefore, the [Court] concludes that a hearing is not required. "A § 2255 motion 'can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact."

> [Doc. 47, at 22–24] (citations omitted).

Although the Petitioner has argued that he should have been given an evidentiary hearing, he has not identified a constitutional right tied to the failure to hold a hearing. In fact, the Petitioner has not identified the issues as to which he claims a hearing was necessary. "If no constitutional violation is asserted, the non-constitutional claims are only considered to the extent that they are connec-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

ted to a claim on which a COA is granted." *Alix v. Quarterman,* 309 Fed.Appx. 875, 878 (5th Cir.2009), *certiorari denied* ––– U.S. ––––, 130 S.Ct. 364, 174 L.Ed.2d 52 (2009); *United States v. Hadden,* 475 F.3d 652, 660 n. 5 (4th Cir.2007) (rejecting COA because the alleged errors under § 2255 were not of constitutional dimension); *Dixon,* 208 Fed. Appx. at 257 (refusing to issue COA based on court's failure to conduct hearing on § 2255); *United States v. Squillacote,* 183 Fed.Appx. 393 (4th Cir.2006) (granting COA as to claim that hearing in § 2255 proceeding should have been held on issue of whether prisoner had been denied the right to testify at trial). The Petitioner having failed to establish either, no COA may issue.

**II. Exclusion of affidavits**

The Petitioner seeks a COA on the issue of whether the Court improperly refused to consider six affidavits offered in support of the 22 ineffective assistance of counsel claims raised in his § 2255 motion.[FN3] Most of the affidavits were those of attorneys who had prior experience litigating capital cases.[FN4]

> **FN3.** The affidavits were attached as exhibits to the Petitioner's supplemental memorandum in support of his motion to vacate. [Doc. 17, at Exhibits. 6, 15, 28, 34, 36, 85].

> **FN4.** The Petitioner also contends that the Court excluded the affidavits of trial counsel from consideration. [Doc. 54, at 10]. This is a misstatement of the record. Judge Thornburg made reference to these affidavits of trial counsel in his decision regarding the § 2255 Motion when adjudicating the Petitioner's allegations of ineffectiveness and concluded that they either did not support his allegations or were contradicted by the contemporaneous record.

The Petitioner first claims that the Court made an erroneous procedural ruling by excluding the affidavits. That ruling, however, is not a dispositive procedural ruling and thus, there is no issue of whether reasonable jurists could find the ruling debatable. *Slack,* 529 U.S. at 484–85; 28 U.S.C. § 2246 (granting discretion to habeas court to consider affidavits).

The Petitioner also claims that the exclusion of these affidavits deprived him of the ability to show ineffective assistance of counsel. Whether the Petitioner has established a valid Sixth Amendment ineffective assistance claim is a mixed question of fact and law. *U.S. v. Nicholson,* 475 F.3d 241, 248 (4th Cir.2007) (citation omitted). The attorneys who provided the affidavits relied at least partially on facts outside the record of these proceedings.[FN5] Indeed, the attorneys offered their opinions on the reasonableness of trial counsel's actions and drew the legal conclusion that counsel were ineffective. The Court concluded that the affidavits were excludable because they presented legal conclusions on an ultimate issue of law.

> **FN5.** For example, one of the affiants relates experiences he had with one of Jackson's trial counsel in an unrelated capital trial. [Doc. 17 Ex. 85 ¶¶ 21–26.]

**\*3** Although not designated as such by the Petitioner, it is evident that he relies on these affiants as experts in the field of capital litigation. An expert's opinion on an issue of law, in this case whether counsel were ineffective, may be excluded from consideration of the merits of an issue. *United States v. McIver,* 470 F.3d 550, 562 (4th Cir.2006), *certiorari denied* 550 U.S. 936, 127 S.Ct. 2276, 167 L.Ed.2d 1094 (2007) ("[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible"). Furthermore, "when an expert witness is not in a better position than the fact finder to render an opinion on a matter, [for example the reasonableness of counsel's actions,] it is not error to exclude that [expert] witness' testimony." *Noland v. French,* 134 F.3d 208, 217 (4th Cir.1998), *certiorari denied* 525 U.S. 851, 119 S.Ct. 125, 142 L.Ed.2d 101 (1998). Moreover, to the extent that trial counsel

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

made strategic decisions, "the reasonableness of a strategic choice is a question of law to be decided by the court, not a matter subject to factual inquiry and evidentiary proof." *Provenzano v. Singletary,* 148 F.3d 1327, 1332 (11th Cir.1998), *rehearing denied* 162 F.3d 100 (11th Cir.1998). The affiants were therefore in no better position than the Court to assess the adequacy of trial counsel's performance.

Additionally, the Court found the attorneys, through the affidavits, did not provide true expert opinions because their opinions were based on subjective opinion instead of statements of fact. As the Court noted:

> Statements in affidavits filed years after the trial do not create credibility issues when trial counsel's documented contemporaneous statements show the contrary because, in that event, the allegations do not warrant relief pursuant to § 2255 . Such documented contemporaneous statements include, for example, vouchers submitted by trial counsel which show the [voluminous] amount of time spent in trial preparation.

> [Doc. 52, at 10].

For the foregoing reasons, the Court concludes that the Petitioner is not entitled to the issuance of a COA on this issue.

### III. Stun gun evidence

In Claim III of his Motion to Vacate, the Petitioner alleged that trial counsel were ineffective for failing to investigate adequately and challenge the scientific basis for a government witness's testimony regarding the Petitioner's use of a stun gun during the crime. In Claims IV and V, he alleged that counsel were ineffective for failing to challenge the admissibility of the government witness's testimony.

### A. Investigation of stun gun theory

The Petitioner argued that trial counsel conducted an inadequate investigation into the scientific basis of the Government's theory that Petitioner tortured the victim with a stun gun. The Court concluded that trial counsel conducted a reasonable investigation of the Government's stun gun theory. The Petitioner now claims that reasonable jurists would find this ruling debatable.

**\*4** As noted by the Court in its decision, trial counsel secured the appointment of both a forensic pathologist and a mathematician to counter the Government's evidence that a stun gun was used on the victim. Additionally, counsel moved for the appointment of a forensic anthropologist to testify that the alleged stun gun marks actually were the result of insect infestations. That request was denied, as was counsel's motion to subpoena the forensic pathologist who testified at the Petitioner's state capital trial and who was expected to testify at the federal trial that the marks were not stun gun marks. The fact that the Court denied counsel's requests for experts is not ineffective assistance of counsel. See, *e.g., Moore v. Reynolds,* 153 F.3d 1086, 1099 (10th Cir.1998), *certiorari denied* 526 U.S. 1025, 119 S.Ct. 1266, 143 L.Ed.2d 362 (1999) ("Whittaker filed a motion for funds to hire a mental health expert, but the trial court denied that request. Moore offers no explanation in his habeas petition concerning how Whittaker could have discovered and presented this information without receiving the requested funds."); *Barnes v. Johnson,* 184 F.3d 816 (5th Cir.1999), *certiorari denied* 528 U.S. 974, 120 S.Ct. 421, 145 L.Ed.2d 329 (1999).

Indeed, the questioning by trial counsel on cross-examination of the Government's expert, Dr. Robert Stratbucker, clearly showed that the defense experts had assisted trial counsel as to the manner in which to approach the stun gun evidence. For example, although not provided any funds with which to do so, counsel consulted a forensic entomologist who opined that the marks on Karen Styles' body were consistent with post-mortem insect activity and that he did not see any marks on her body "inconsistent with the natural process of insects colonizing a corpse." [Doc. 49 Ex. 3: Byrd Aff. ¶¶

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

7–10]. This information, as well as that received from the other experts, was used during cross-examination.

The Court cannot find, in light of these efforts on the part of trial counsel, that reasonable jurists could debate that counsel were ineffective as to this preparation and investigation.

### B. Admissibility of expert testimony

The Petitioner also alleged that counsel failed to challenge the scientific basis of Dr. Stratbucker's testimony under *Daubert.*[FN6] The record shows otherwise.

> FN6. *Daubert. v. Merrill Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

In addition to hiring and/or consulting the experts referenced in the previous section of this Order, counsel moved twice for a *Daubert* hearing to challenge two potential Government stun gun experts. The Government ultimately decided to call a third expert, Dr. Stratbucker. Prior to his testimony, the Court conducted a *Daubert* hearing at which trial counsel challenged the validity of Dr. Stratbucker's opinion, arguing that it was based only upon review of photographs, not a review of the victim's body; the opinion relied on testimony from the state trial, and the opinion was not reliable under *Daubert.* Counsel also argued that the Government had failed to meet its burden under *Daubert* because it had failed to produce the testimony and documentary evidence upon which Dr. Stratbucker had relied to form his opinion.

**\*5** The record shows that trial counsel did in fact challenge the scientific basis for Dr. Stratbucker's opinion and used the information received from defense experts to attack Dr. Stratbucker on cross-examination.

The Petitioner also alleged that counsel failed to "aggressively" pursue a pretrial *Daubert* hearing, as opposed to a hearing at the time of trial. As this Court has noted previously, trial counsel twice moved for a pre-trial *Daubert* hearing. However, as was the custom of the trial Court, the hearing was deferred until the time of trial. Counsel were not ineffective for failing to raise a third motion for a pre-trial *Daubert* hearing in the face of guaranteed rejection by the Court.

The Court finds that no COA should issue as to these claims.

### IV. Claims related to the investigation and presentation of mitigating evidence at sentencing

Petitioner seeks a COA for a number of ineffective assistance of counsel claims related to the mitigation defense presented during the sentencing phase of the trial. Each raises a specific allegation of ineffectiveness, but all allege that counsel conducted an inadequate mitigation investigation.

### A. The Petitioner's biological sister

The Petitioner seeks to appeal the Court's rejection of his claim that trial counsel were ineffective for not discovering, obtaining, and passing on to his mental health experts all mitigating evidence regarding the Petitioner's biological sister. He argues that this information was critical for a complete assessment of his mental health. However, none of the post-conviction affidavits provided by the Petitioner's mental health experts states how additional information about his sister would have affected their diagnoses of the Petitioner or altered their proposed testimony. Claudia Coleman, Ph.D., the Petitioner's forensic psychologist and neuropsychologist at trial, merely stated that the additional information about the Petitioner's sister would have been "relevant" to her evaluation. [Doc. 17: Ex. 9, Coleman Aff. ¶ 13.] Dr. Seymour Halleck, the Petitioner's forensic psychiatrist, makes no mention of the Petitioner's biological sister in his affidavit. [*Id.* at Ex. 16]. Pamela Laughon, Ph.D., a psychologist who was the Petitioner's mitigation investigator at trial, does not refer to the additional information about the Petitioner's sister in her post-conviction affidavit. [*Id.* at Ex. 25]. In short, the Petitioner has failed to provide any factual support for the allega-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

tions made in this claim. *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (to require counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.").

The Petitioner also seeks to appeal the Court's rejection of his claim that counsel were ineffective for failing to introduce evidence of his biological sister's mental health problems. At the sentencing trial, this Court refused to allow lay testimony about the sister's mental health problems unless the defense also presented expert testimony establishing a link between the Petitioner's alleged mental conditions and those of his sister. This holding was affirmed on direct appeal. *United States v. Jackson,* 327 F.3d 273 (4th Cir.2003), *certiorari denied* 540 U.S. 1019, 124 S.Ct. 566, 157 L.Ed.2d 434 (2003). In the Motion to Vacate, the Petitioner argued that several of his mental health experts had the necessary information to establish such a link and trial counsel rendered ineffective assistance by not presenting their testimony. The Court rejected the claim because trial counsel had made a strategic decision not to present expert mental health testimony at the penalty phase in order to avoid damaging rebuttal testimony from the Government's mental health expert.

**\*6** Prior to trial, the Government provided notice, in writing, that during the penalty phase of the trial, it would introduce mental health evidence only to rebut mental health evidence introduced by the Petitioner during his case-in-chief. [Criminal Case No. 1:00cr74, at Doc. 33.] On April 19, 2001, the Government and defense counsel entered into a consent order pursuant to which the report of the Government's mental health expert, Dr. Park Dietz, and the videotapes of his interviews with Petitioner were disclosed to defense counsel. [*Id.,* at Doc. 132]. After reviewing Dr. Dietz's report, watching the videotapes of his interviews with the Petitioner, and discussing the report with at least one of the de-

fense experts, trial counsel, on May 8, 2001, withdrew their notice of intent to offer evidence of mental condition during the penalty phase of the trial. [*Id.,* at Doc. 177]. It is evident from that very intentional act that trial counsel concluded the mitigating mental health evidence would not have outweighed the damaging impact of Dr. Dietz's testimony, report, and interview tapes offered by the Government in rebuttal.

As he did in his habeas claim, Petitioner labels as "unfounded" counsel's fear that expert testimony showing a genetic connection between the siblings' mental health issues would open the door to rebuttal from government mental health experts. Petitioner made no attempt in his Motion to Vacate to support this conclusory accusation with actual evidence or citation to law. Nor does he make up for that deficiency here. For these reasons the Court will not issue a COA based on this issue. *Sanders v. United States,* 314 Fed.Appx. 212 ——2 (11 th Cir.2008) (decision not to call witness "was strategic, and we will not second guess it."); *Chandler v. United States,* 218 F.3d 1305, 1314 n. 14 (11 th Cir.2000) ("calling some witnesses and not other is 'the epitome of a strategic decision.' "); *United States v. Jenkins,* 132 Fed.Appx. 743 (10th Cir.2005) (declining to issue certificate of appealability as to counsel's strategic decision regarding examination of witness).

**B. The failure to conduct adequate mitigation investigation**

The Petitioner contends that because his trial counsel conducted an inadequate mitigation investigation they were unable to make reasoned, strategic decisions about whether to offer expert mental health testimony or to call witnesses in addition to Sally Jackson, the Petitioner's mother.

To prepare for sentencing, trial counsel requested and received a mitigation specialist, Pam Laughon, Ph.D., who conducted the mitigation investigation. She uncovered a great deal of medical and social information about the Petitioner's biological family. See, *American Bar Association Guidelines*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

*for the Appointment and Performance of Counsel in Death Penalty Cases* 11.4.1(C), 11.8.3(F.2), 11.8.6(B), 11.8.6 cmt.; 1.1 cmt. 5.1.1(A.v), 11.4.1. (1989) (ABA Guidelines); 1 ABA Standards for Criminal Justice 4–4.1, cmt. P.4–55 (2d ed.1982). It was not unreasonable for counsel to rely on Dr. Laughon to discover potential witnesses and to conduct interviews. She was a professional and an expert in her field, and she had worked competently with both defense attorneys on previous occasions. "It is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts." *Fields v. Brown,* 431 F.3d 1186, 1205 (9th Cir.2005), *certiorari denied* 552 U.S. 1314, 128 S.Ct. 1875, 170 L.Ed.2d 752 (2008), *quoting Harris v. Vasquez,* 949 F.2d 1497, 1525 (9th Cir.1990), *certiorari denied* 503 U.S. 910, 112 S.Ct. 1275, 117 L.Ed.2d 501 (1992).

**\*7** Additionally, trial counsel hired a forensic psychiatrist, a future dangerousness expert, and a neuropsychologist. Counsel subpoenaed the Petitioner's records from the United States Navy, the North Carolina Department of Corrections, the Buncombe County Detention Facility, the North Carolina Department of Social Services, the Juvenile Court for Buncombe County, the Blue Ridge Mental Health Center, and the Buncombe County Health Department. *ABA Guidelines.* The Court denied counsel's request to subpoena the Department of Social Services' records for the Petitioner's biological mother and sister. Counsel nonetheless obtained the Petitioner's academic records, reviewed the mitigation evidence offered at the state trial and consulted with the Petitioner's state trial attorneys. Counsel interviewed the Petitioner's adoptive mother, biological mother, relatives of both mothers and some of his foster parents. His mitigation specialist and mental health experts interviewed others, including the adoptive parents of the Petitioner's biological sister.

The Petitioner's complaint is that counsel failed to discover all of the potentially mitigating evidence. The Supreme Court, however, has never held that counsel's mitigation investigation must be anything but reasonable and it has not laid down a requirement that counsel must uncover every available piece of mitigating information about a defendant. See, *e.g., Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Neither this trilogy of cases nor *Strickland* requires "defense counsel to 'investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.' " *Gray v. Branker,* 529 F.3d 220, 228–29 (4th Cir.2008), *certiorari denied* 129 S.Ct. 1579, 173 L.Ed.2d 678 (2009), *quoting Wiggins,* 539 U.S. at 533. "Instead, [the cases] impose[ ] upon counsel 'a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *Id.* In light of the investigative efforts taken by trial counsel, the Court finds that there is no reasonably debatable issue with respect to the adequacy of counsel's mitigation investigation. *See Strickland,* 466 U.S. at 687.

**C. Lay witness testimony**

Next, the Petitioner seeks to appeal the Court's rejection of his claim that trial counsel unreasonably decided to call only one lay witness, Sally Jackson, at sentencing. As with his other ineffective assistance of counsel claims, the Petitioner first alleged that counsel's mitigation investigation was inadequate. The Petitioner, however, failed to identify any mitigating evidence uncovered during postconviction proceedings which was unknown to trial counsel. Instead, the Petitioner merely presented all of the evidence to which various lay witnesses potentially could have testified, had they been called.

**\*8** Most of this information is found in the reports of the Petitioner's mental health experts and mitigation specialist. Consequently, Petitioner failed to provide factual support for his allegation that counsel's investigation was inadequate.

The crux of this claim is the decision by trial

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

counsel to offer lay mitigation testimony only through Sally Jackson, the Petitioner's adoptive mother. After having conducted a reasonable mitigation investigation, counsel lined up a number of lay witnesses who could have testified about the Petitioner's life prior to his adoption by the Jacksons or who could have corroborated Sally Jackson's testimony about the Petitioner after his adoption. [Doc. 17, Ex. 4: Belser Aff. ¶ 19; Ex. 25: Laughon Aff. ¶ 14; Ex. 27: Lindsey Aff. ¶ 26.]. Counsel also had intended to call at least one of the adoptive parents of the Petitioner's biological sister. To do so, however, would have required that counsel present expert mental health testimony which, in turn, would have opened the door to damaging rebuttal testimony from the Government's mental health expert. For these and other reasons presented in the Court's § 2255 decision, counsel made the strategic decision not to call any lay witnesses other than Sally Jackson.[FN7] The Court concluded that trial counsel's decision was a reasoned and strategic one. [Doc. 47, at 70–77]. The rejection of these claims does not create a reasonably debatable issue. Indeed, on direct appeal the Fourth Circuit found Mrs. Jackson's testimony "was broad-ranging, and the conclusions that could have been made [concerning mitigation] covered everything from Jackson's childhood, his disabilities, his mental condition, his intelligence, his remorse, his ability to hold jobs, his social deficiencies, and more." *Jackson,* 327 F.3d at 293–94.

> FN7. For example, counsel were rightfully wary of calling witnesses concerning the Petitioner's life with the Jacksons. During his state court trial, it appears that such evidence of an upper middle class lifestyle backfired.

### V. Failure to secure additional experts for trial

The Petitioner argued in the § 2255 motion that trial counsel should have provided all mitigating evidence to his mental health experts because, had they done so, those experts would have diagnosed him differently resulting in additional experts in the fields of early childhood development and developmental disorders. This argument overlooks the strategic decision made by trial counsel not to inject the Petitioner's mental health into the sentencing phase of the trial in order avoid the damning testimony of Dr. Dietz and the videotape of his interview with the Petitioner.

Moreover, during post-conviction proceedings, the Petitioner moved the Court for the appointment of an expert in early childhood development and developmental disorders. In refusing that request, the Court pointed out that each of the following previously appointed experts had been qualified to testify to such matters: Seymour Halleck, Pam Laughon, Mark Cunningham, and Claudia Coleman. [Doc. 47, at 97].

Dr. Halleck stated that he had reviewed at least a portion of the Petitioner's mental health records. Dr. Coleman, the Petitioner's forensic psychologist and neuropsychologist, testified that her review of subsequent records confirmed her diagnosis of a developmental disorder. Neither of the Petitioner's trial counsel stated they would have changed their strategy regarding presentation of expert mental health testimony had they had a firm diagnosis of autism or any other developmental disorder.

**\*9** The Petitioner's argument rests on the speculative assumption that had trial counsel moved during pre-trial proceedings for the appointment of additional experts, the Court would have granted those motions. That assumption is highly unlikely in light of the Court's previous appointment of three mental health experts and a mitigation specialist with a doctorate in psychology. As previously noted by the Court, any one or more of these witnesses had the expertise to testify regarding the impact of biological factors and early childhood experiences on mental development. Reasonable jurists would not find the Court's handling of these claims debatable or wrong.

### VI. Sally Jackson

The Petitioner also claimed that trial counsel

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

failed to collect all available mitigating evidence from Sally Jackson, their sole penalty phase witness. Had they done so, Petitioner contends, counsel would have discovered a wealth of mitigating evidence that was critical to his mental health experts in performing their evaluations.

The evidence the Petitioner claims should have been elicited is that the Petitioner was afraid of the dark as a child; he had a heightened sensitivity to light; he spoke in an extremely loud voice when excited; he could only calm down after being given a stimulant [sic]; and his behavior during high school was so aberrant that his father began to have a drinking problem. None of the Petitioner's mental health experts mentioned this evidence in their post-conviction affidavits and none of them claimed the evidence was crucial to their ability to accurately diagnose Petitioner. Indeed, the evidence appears merely cumulative and when weighed with all of the other mitigating evidence against the aggravating evidence, there is no reasonable probability that the undiscovered evidence would have changed the jury's verdict. *Wiggins,* 539 U.S. at 534 .

**VII. Absence of a mental health defense**

The Court rejected the Petitioner's argument in the § 2255 motion that trial counsel were ineffective for electing not to present a mental health defense at sentencing. As has been discussed previously, the decision not to offer expert mental health testimony was a reasoned, strategic one.

Prior to trial, the Government provided notice, in writing, that during the penalty phase of the trial, it would introduce mental health evidence only to rebut mental health evidence introduced by the Petitioner during his case-in-chief. [Case No. 1:00cr74, Doc. 33.] By early December 2000, trial counsel had obtained the appointment of a forensic psychiatrist, Dr. Seymour Halleck, who evaluated Petitioner in January, February and March, 2001. In March 2001, when the Government indicated that it might present evidence at sentencing of the Petitioner's propensity for future dangerousness, coun-

sel moved for the appointment of another mental health expert, Dr. Mark Cunningham. That motion was granted on March 15, 2001. [*Id.* at Doc. 89].

**\*10** During pre-trial preparation, trial counsel decided not to offer a mental health defense. At a pre-trial hearing on April 6, 2001, however, counsel indicated that they were reevaluating that decision in light of the Government's service of a subpoena on one of the mental health experts who had testified at the Petitioner's state capital trial. [Case No. 1:00cr74, Mot. Hr'g Tr. 4–5, April 6, 2001, filed under seal Aug. 6, 2001]. That expert would have testified that at the time of the crime, the Petitioner had the capacity to form the specific intent to commit the crime of premeditated murder. In addition, the Government had disclosed new evidence physically linking the Petitioner to the victim's murder. As a result of these developments, counsel sought and was granted, the appointment of another mental health expert, Dr. Claudia Coleman. [*Id.,* at Doc. 123–1].

On April 19, 2001, the Government and defense counsel entered into a consent order pursuant to which the report of the Government's mental health expert, Dr. Park Dietz, and the videotapes of his interviews with the Petitioner were disclosed to defense counsel. [*Id.,* at Doc. 132]. On May 3, 2001, the Government filed a notice advising the Court that Dr. Dietz's final interview with Petitioner would take place on May 6, 2001. [*Id.,* at Doc. 169–1]. After reviewing Dr. Dietz's report, watching the videotapes of his interviews with Petitioner, and discussing the report with at least one of their defense experts, counsel, on May 8, 2001, withdrew their notice of intent to offer evidence of mental condition during the penalty phase of the trial. [*Id.,* at Doc. 177]. In other words, any benefit which might have been attained by a mental health defense during sentencing was greatly outweighed by the evidence on the videotapes and Dr. Dietz's potential testimony. Trial counsel made the strategic decision not to offer a mental health defense at sentencing in order to avoid the introduction of that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

evidence and the Court's rejection of this claim does not create a debatable issue for reasonable jurists. *Sanders,* 314 Fed.Appx. 212 at ——2; *Chandler,* 218 F.3d at 1314; *Jenkins,* 132 Fed.Appx. at 743.

### VIII. Experts in post-conviction proceedings

As previously noted, the Petitioner was provided with some experts in the prosecution of his Motion to Vacate but was denied others. The Petitioner argues that this denial of expert assistance deprived him of the effective assistance of counsel to pursue the Motion to Vacate. [Doc. 54, at 56–57.] Where there is no constitutional right to counsel, however, there can be no deprivation of effective assistance. *See Wainright v. Torna,* 455 U.S. 586, 587–88, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982). There is no constitutional right to counsel in post-conviction proceedings. *Pennsylvania v. Finley,* 481 U.S. 551, 555–56, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987); *Murray v. Giarratano,* 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989). Consequently, there can be no Sixth Amendment deprivation of the effective assistance of post-conviction counsel. *Coleman v. Thompson,* 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Since the Petitioner has not identified a constitutional right which is at stake, no COA may issue.

**\*11** Moreover, access to the assistance of experts to litigate a § 2255 action is provided by statute, not the Constitution. 18 U.S.C. § 3599(a)(2). FN8 To obtain a COA, Petitioner must show that "reasonable jurists would find the district court's assessment of [a] *constitutional* claim[ ] debatable or wrong." *Miller–El,* 537 U.S. at 338 (citation and internal quotation marks omitted) (emphasis added). The Petitioner has not stated a constitutional claim.

> FN8. At the time that Petitioner filed his motions, the appointment of experts in a § 2255 motion was governed by 21 U.S.C. § 848(q)(4)(B)(9), which was repealed in 2006.

### IX: Newly discovered evidence

After filing the § 2255 motion, the Petitioner moved for leave to amend, claiming that he was entitled to a new trial and/or sentencing because of newly discovered evidence that he had an accomplice in his murder of Karen Styles. It is axiomatic that for evidence to be newly discovered, it must have been unknown to the defendant at the time of the relevant legal proceeding. *In re Williams,* 364 F.3d 235, 240 n. 3 (4th Cir.2004), *certiorari denied* 543 U.S. 999, 125 S.Ct. 618, 160 L.Ed.2d 457 (2004) (" 'The traditional definition of newly discovered evidence is evidence discovered since the trial [.]' ") (citation omitted). If Jackson had an accomplice, he would have been aware of that fact at the time of trial.

The Petitioner also claimed that the victim had been taken from Pisgah National Forest to another location and then returned to the federal national forest. Again, the Petitioner, who confessed to raping and murdering the victim within the Pisgah National Forest, would have been aware of that fact. Consequently, the evidence at issue in this claim, if true, cannot be newly discovered.

The Court's ruling on this issue does not present a constitutional claim about which reasonable jurists could debate.

### X: Double jeopardy

Finally, the Petitioner claimed that his federal conviction and death sentence violated the Double Jeopardy Clause of the United States Constitution due to his previous prosecution in state court. The Fourth Circuit Court of Appeals rejected an identical claim raised by Petitioner on direct appeal. *Jackson,* 327 F.3d at 295 (4th Cir.2003) ("Unless and until the Supreme Court overrules its existing precedents, we are bound to conclude that the federal prosecution under federal law is not barred by the fact that the defendant was previously tried and convicted under State law on the basis of the same facts."). Consequently, the Court relied on procedural bar to reject this claim. Petitioner has failed to show that the Court's rejection of this claim on pro-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

cedural grounds created a debatable issue among reasonable jurists. *United States v. Linder,* 552 F.3d 391, 397 (4th Cir.2009), *certiorari denied ––– U.S. ––––, 130 S.Ct. 736, 175 L.Ed.2d 514 (2009)* (" 'It is well established that a § 2255 petition cannot be used to relitigate questions which were raised and considered on direct appeal.' ") (citation omitted). Consequently, no COA may issue.

### CONCLUSION

The Court finds that the Petitioner has not made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2253(c)(2); *Miller–El,* 537 U.S. at 336–38 (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong) (citations omitted). As a result, the Court declines to issue a certificate of appealability. Rule 11(a), *Rules Governing Section 2255 Proceedings for the United States District Courts.*

### ORDER

**\*12 IT IS, THEREFORE, ORDERED** that Petitioner's Request for a Certificate of Appealability [Doc. 54] is hereby **DENIED.**

W.D.N.C.,2010.
Jackson v. U.S.
Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Page 1

--- S.Ct. ----, 2012 WL 4475543 (U.S.), 81 USLW 3161
**(Cite as: 2012 WL 4475543 (U.S.))**

Only the Westlaw citation is currently available.

Supreme Court of the United States
JACKSON, RICHARD A. V. UNITED STATES.

No. 11-6315.
Oct. 1, 2012.

**\*1** The petition for writ of certiorari is denied.

U.S.,2012
Jackson v. U.S.
--- S.Ct. ----, 2012 WL 4475543 (U.S.), 81 USLW 3161

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1449

ATTACHMENT FOUR

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )
                                   )
              Petitioner/Defendant, )
                                   )
vs.                                )        Case No. 09-CIV-105-JHP
                                   )
UNITED STATES OF AMERICA,          )
                                   )
              Respondent/Plaintiff. )

## OPINION AND ORDER

This matter comes before the court on the petitioner's motion to alter or amend judgment (Doc. # 217) filed on September 13, 2012. The government filed its response opposing said motion on October 29, 2012 (Doc. # 220). The government urges this court to deny the motion for two reasons: 1) the first two claims in the petitioner's motion constitute a second or successive petition for relief; and 2) the petitioner has failed to identify any error meriting reconsideration.

Petitioner's motion indicates it is brought pursuant to Fed.R.Civ.P. 59(e)[1] and it is styled "Motion to Alter or Amend Judgment" which is the terminology utilized in Fed.R.Civ.P. 59(e). In reality, the petitioner is requesting this court to "reconsider" its opinion regarding judicial bias, failure to grant an evidentiary hearing, and the denial of a certificate of appealability. To be entitled to relief under Rule 59(e), Petitioner must demonstrate that there has been an intervening change in the controlling law or that there is

---

[1]*See*, Doc. # 217, at p. 6.

new evidence previously unavailable or that there is the need to correct clear error. *See Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Upon careful review of the petitioner's motion and record in this matter, the court finds no basis for reconsidering the Opinion and Order denying the amended § 2255 motion. Contrary to the petitioner's allegations, the court carefully considered the trial record and the petitioner's legal arguments in denying his amended motion to vacate. Nothing provided by the petitioner in his motion to alter or amend judgment persuades the Court that the rulings were clearly erroneous or that there is a need to prevent manifest injustice. Finding no clear error or any other reason to alter or amend the judgment, the Court finds Petitioner's Rule 59(e) motion to alter or amend judgment should be denied.

Insofar as Petitioner also requests reconsideration of the denial of a certificate of appealability, the Court finds that request should be denied. Other than claiming that the length of the court's opinion and the nature of the penalty imposed establishes that the issues are "certainly debatable," the petitioner makes no attempt to establish a "substantial showing of the denial of a constitutional right," *i.e.*, he has not shown that "reasonable jurists would find [this court's] assessment of the constitutional claim debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).

**ACCORDINGLY, IT IS HEREBY ORDERED** that the petitioner's motion to alter or amend judgment (Doc. # 217) is denied.

DATED THIS 30th day of October, 2012.

James H. Payne
United States District Judge
Eastern District of Oklahoma

1451

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Movant/Defendant, | ) | |
| | ) | |
| v. | ) | Case Nos.    CIV-09-105-JHP |
| | ) | CR-04-115-JHP |
| UNITED STATES OF AMERICA, | ) | (underlying criminal |
| | ) | case) |
| Respondent/Plaintiff. | ) | |

**NOTICE OF APPEAL**

Movant/Defendant, Kenneth Eugene Barrett, hereby appeals to the United States Court of

Appeals for the Tenth Circuit from the Judgment and Opinion and Order entered on August 16,

2012 (Docs. 214, 215, 216) denying his motions to vacate, set aside, and correct sentence

pursuant to 28 U.S.C. § 2255 (Docs. 1, 2, 95), and the Opinion and Order entered on October 30,

2012 denying Mr. Barrett's motion to alter order and judgment filed pursuant to Fed.R.Civ.P.

59(e).  (Docs. 217, 221)  Counsel are appointed under the Criminal Justice Act.

Dated this 26th day of December, 2012

1

1452

Respectfully submitted,

/s/ _David B. Autry_
DAVID B. AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone: (405) 521-9600

DANIEL J. BRODERICK, Cal. Bar No. 89424
Federal Defender

by /s/ _Joan M. Fisher_
JOAN M. FISHER, Idaho Bar No. 2854
Assistant Federal Defender

TIVON SCHARDL FL Bar No. 73016
801 I Street, Third Floor
Sacramento, CA 95814
Telephone: (916) 498-5700

Lawyers for Kenneth Eugene Barrett

2

1453

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

       This is to certify that on this 26th day of December, 2012, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with service to be made electronically on the following ECF registrants: Jeffrey B. Kahan, United States Department of Justice, jeffrey.kahan@usdoj.gov, and Christopher J. Wilson, Assistant United States Attorney, Chris.Wilson@usdoj.gov.  To the undersigned's knowledge, there are no non-ECF registrants who are counsel in this case.

                             /s/ David Autry