**IN THE UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

UNITED STATES OF AMERICA,    )
    )
    Respondent/Appellee,    )
    )
v.    )    Case No. 12-7086
    )    (E.D. Okl. Nos. CR-04-115-JHP,
KENNETH EUGENE BARRETT,    )    CV-09-105-JHP)
    )    (lower docket)
    Petitioner/Appellant.    )

## MOTION FOR CERTIFICATE OF APPEALABILITY
## AND STATEMENT OF ISSUES

DAVID B. AUTRY, OBA #11600
Attorney at Law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: (405) 521-9600

JOSEPH SCHLESINGER, CABar No .#87692
Acting Federal Defender
JOAN M. FISHER, Idaho Bar No. 2854
Assistant Federal Defender
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: (916) 498-5700

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**TABLE OF CONTENTS**

MOTION FOR CERTIFICATE OF APPEALABILITY
    AND STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     RECORD REFERENCES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    OVERVIEW OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.   ISSUES FOR WHICH A COA IS REQUESTED. . . . . . . . . . . . . . . . . . . . . . 2

IV.   STANDARD FOR OBTAINING A COA. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

V.    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.     The Court Should Grant a COA on the Ineffective Assistance of Counsel
          Claims.  (Ground 2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          1.     This Court should grant a COA on the guilt/innocence stage claims.
               (Ground 2A).  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

               a.     Failure to retain an independent crime scene reconstruction
                    expert. (Ground 2A(7)) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

               b.     Failure to present independent expert on police tactics.
                    (Ground 2A(8)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

               c.     Failure to investigate and present evidence of experts and
                    eyewitnesses to Mr. Barrett's mental impairment and illness.
                    (Ground 2A(3)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

               d.     Failure to adequately prepare to confront, cross-examine and
                    impeach the government's newly-found, late-disclosed
                    informant witnesses. (Ground 2A(5)) . . . . . . . . . . . . . . . . . 11

               e.     Failure to Object to Inadmissible 404(b) Hearsay.  (Ground
                    2A(6)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

               f.     Failure to impeach law enforcement witnesses with prior
                    inconsistent statements.  (Ground 2A(9)) . . . . . . . . . . . . . . 18

i

g. Failure to call readily available witnesses to refute the government's claim that Mr. Barrett knew that it was law enforcement. (Ground 2A(10)) . . . . . . . . . . . . . . . . . . . . . . 20

h. Failure of counsel to develop evidence that Mr. Barrett was not aware that there was an active felony arrest warrant. (Ground 2A(11)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

i. Trial Counsel were ineffective for failing to adequately contest "expert" testimony. (Ground 2A(12)) . . . . . . . . . . 25

j. The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions. (Ground 2A(13)) . . . . . . . . . . . . . . . . . . . . . . 28

k. The conflict of interest claim created by the court's interference with the defense and restrictive approach to costs. (Ground 2A(1))
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

l. Counsel's unreasonable omissions in re-urging the *Franks* Issue. (Ground 2A(2)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

2. A COA should be granted on the issue of ineffective assistance of counsel in the penalty phase (Ground Two (B)). . . . . . . . . . . . . . . 31

B. Mr. Barrett is Entitled to a COA on his Right to Supplement and Amend the Petition with Facts that Related Back to Pending Claims. (Docs 201, 212:Proposed Grounds Twenty to Twenty-Five) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

C. A COA Should Be Granted on the Issues of *Brady,* Newly Discovered Evidence, and False Evidence and Other Prosecutorial Misconduct (Ground Five) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

1. *Brady,* newly discovered evidence, and false evidence violations (Claims 5 A, B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

a. The evidence withheld. . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

b. The District Court's erroneous analysis and findings. . . . . 51

ii

i.  Charles Sanders  . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

ii.  Travis Crawford . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

iii.  Cindy Crawford. . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

iv.  Brandie Zane Price . . . . . . . . . . . . . . . . . . . . . . . . . 60

v.  Karen Real  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

vi.  Randy Turman  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

vii.  The unidentified impeachment witness  . . . . . . . . . . 63

viii.  Claims involving Credibility of Law Enforcement
Personnel  (Claim 5B)  . . . . . . . . . . . . . . . . . . . . . . . 64

2.  The prosecution interfered with the defense's right to interview
Witnesses.  (Claim 5C) . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

3.  Mr. Barrett was prejudiced by the prosecutors' misconduct during
trial.  (Claim 5D)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

a.  Mr. Barrett's claim is subject to collateral review.  . . . . . . . 69

b.  The prosecutors improperly questioned the witnesses  . . . . 69

c.  The prosecutors were especially egregious in arguing
that the jury should impose a death sentence.  . . . . . . . . . 71

D.  A COA Should Be Granted on the *Franks V. Delaware*,  438 U.S. 154
(1978) Issue (Ground Four).  . . . . . . . . . . . . . . . . . . . . . . . . . . 73

E.  A COA Should Be Granted on Grounds One and Three, Which Argue That
the District Court, to Mr. Barrett's Prejudice, Unconstitutionally Interfered
with Petitioner's Defense, Failed to Provide Funding for Tools Necessary
for an Effective Defense, and Denied Due Process by Failing to Disclose
the Contents of an *ex Parte* Conference with the Prosecutors.  . . . . . . . . 78

1.  *Ex parte* hearing (Ground One)  . . . . . . . . . . . . . . . . . . . . . . 79

2. The district court's interference with the independence of defense counsel and its unreasonable restrictions on funding the defense denied Mr. Barrett his Fifth, Sixth and Eighth Amendment rights (Grounds One and Three). ............................... 83

F. A COA Should Be Granted on the Denial of Mr. Barrett's Requests for an Evidentiary Hearing. .......................................... 87

G. A COA Should be Granted on the Denial of Mr. Barrett's Motions for Discovery. ............................................... 90

H. The District Court Wrongly Denied Mr. Barrett a COA on the Issue of the Use of a Stun Belt During Trial. (Ground Seven) ................... 92

I. This Court Should Issue COAs to Mr. Barrett Based on His Challenges to the Jury Instructions. (Ground Nine, Ten and Twelve) .............. 95

1. Lesser included offense (Ground Nine) ..................... 95

2. Residual doubt (Ground Ten) ............................ 98

3. Jury instruction on finding that death was an appropriate penalty beyond a reasonable doubt (Ground Twelve) .......... 99

J. A COA Should Issue on Whether the Trial Judge Should Have Disqualified Himself in the § 2255 Proceedings. ........................... 101

K. This Court Should Issue a COA to Mr. Barrett Based on His Claim That His Execution Would Violate the Eighth Amendment Because He Is Mentally Ill. (Ground Seventeen) .................................... 105

L. A COA Should Issue on Mr. Barrett's Claims of Ineffective Assistance of Appellate Counsel. (Ground Eighteen) ......................... 106

M. Mr. Barrett Should Receive a COA on the Cumulative Effect of Errors. (Ground Nineteen) ......................................... 108

VI. CONCLUSION ................................................ 109

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Ake v. Oklahoma*, 470 U.S. 68 (1985) .................................................................. 83

*Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007) ........................................ 34

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) .................................... 99, 100, 101

*Atkins v. Virginia*, 536 U.S. 304 (2002) .............................................................. 105

*Beck v. Alabama*, 447 U.S. 625 (1980) ........................................................... 96, 97

*Blakely v. Washington*, 124 S. Ct. 2531 (2004) .................................................. 100

*Bracy v. Gramley*, 520 U.S. 899 (1997) *modified on other grounds,*
  *McGregor v. Gibson*, 248 F.3d 946, 953 (10th Cir.2001) ............................. 90

*Brady v Maryland*, 373 U.S. 83 (1963) ................................................................. 56

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) ...................................................... 72

*Cargyl v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) ............................................... 72

*Chicago, Milwaukee, and St. Paul & Pacific Railroad v. United States*, 585
  F.3d 254 (7th Cir. 1978) ................................................................................... 81

*Cunningham v. Zent*, 928 F.2d 1006 (11th Cir. 1991) .......................................... 71

*Darden v. Wainwright*, 477 U.S. 168 (1986) ........................................................ 69

*Deck v. Missouri*, 544 U.S. 622 (2007) ........................................................... 92, 93

*Duckett v. Mullin*, F.3d 982 (10th Cir. 2002) ....................................................... 72

*Dulworth v. Jones*, 496 F.3d 1133 (10th Cir.2007) .............................................. 65

*Evitts v. Lucey*, 469 U.S. 387 (1985) ............................................................ 69, 109

*Franklin v. Lynaugh*, 487 U.S. 164 (1988) ........................................................... 98

*Franks V. Delaware*, 438 U.S. 154 (1978) ............................................. 2, 31, 48, 73

*Gamble v. State of Oklahoma*, 583 F.2d 1161 (10th Cir. 1978) ........................... 75

*Giglio v. United States*, 405 U.S. 150 (1972) ........................................ 56

*Gray v. Branker*, 529 F.3d 220 (4th Cir. 2008) ........................................ 11, 38, 39

*Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966) .................................... 68

*Greico v Meachum*, 553 F.2d 713 (1st Cir. 1976) ................................. 82

*Hatch v. Oklahoma*, 58 F.3d 1447 (10th Cir. 1995) ............................. 87

*Hogan v. Gibson*, 197 F.3d 1297 (10th Cir. 1999) ............................. 95, 96, 97, 98

*Keeble v. United States*, 412 U.S. 205 (1974) ........................................ 97

*Kimmelman v. Morrison*, 477 U.S. 365 (1985) ...................................... 74

*Le v. Mullin*, F.3d 1002 (10th Cir. 2002) ............................................. 72

*Liteky v. United States*, 510 F.3d 540 (1994) ..................................... 102, 103, 104

*Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013) ........................................ 34

*Lockett v. Ohio*, 438 U.S. 586 (1978) ................................................. 98

*Massaro v. United States*, 538  U.S. 500 (2003) ..................................... 67

*Mayle v. Felix*, 545 U.S. 644 (2005) .................................................... 24

*Medina v. California*, 505 U.S. 437 (1992) .......................................... 83

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ........................................ 3, 49, 53, 65

*Oregon v. Guzek*, 546 U.S. 517 (2006) ................................................. 98

*Parker v. Dugger*, 498 U.S. 308 (1991) ........................................... 107

*In re Pickard*, 681 F.3d 1201 (10th Cir. 2012) ...................................................... 48

*Porter v. McCollum*, 558 U.S. 30, 130 S. Ct. 447 (2009) ........................ 34, 37, 40

*Powell v. Alabama*, 287 U.S. 45 (1932) ............................................................. 15

*Ring v. Arizona*, 436 U.S. 584 (2002) ........................................................ 99, 101

*Ring v. Arizona*, 536 U.S. 584 (2002) .............................................................. 100

*Romano v. Oklahoma*, 512 U.S. 1(1994) ............................................................ 72

*Rompilla v. Beard*, 545 U.S. 374 (2005) ................................................. 34, 37, 40

*Roper v. Simmons*, 543 U.S. 304 (2005) .......................................................... 105

*Silva v. Brown*, 416 F.3d 980 (9th Cir. 2005) .................................................... 13

*Slack v. McDaniel*, 529 U.S. 473 (2000) ..................................................... 4, 101

*Smith v. Black*, 904 F.2d 950 (5th Cir. 1990) ................................................... 74

*Stone v. Powell*, 428 U.S. 165 (1976) ............................................................... 73

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................................ 69

*Strickland v. Washington*, 688 U.S. 668 (1984) ................................................ 82

*Stringer v. Black*, 503 U.S. 222 (1992) ............................................................. 74

*Taylor v. Kentucky*, 436 U.S. 478 (1978) ........................................................ 108

*Tennard v. Dretke*, 542 U.S. 274 (2004) ............................................................. 4

*United States v. Antone*, 603 F.2d 566 (9th Cir. 1979) ...................................... 52

*United States v. Bagley*, 473 U.S. 667 (1985) ................................................... 52

*United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007) ...................... 52, 82, 100

*United States v. Barrett*, 496 U.S. 1079 (10th Cir. 2007) ............................. 41, 44

*United States v. Beckford*, 916 F. Supp. 1415 (E.D. Va. 1997) .......................... 97

*United States v. Beers*, 189 F.3d 1297 (10th Cir. 1999) ....................................... 51

*United States v. Bernal-Obeso*, 989 F.2d 331 (9th Cir. 1993) ............................ 77

*United States v. Caballero*, 277 F.3d 1235 (10th Cir. 2002) ............................... 27

*United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000) .......................... 96

*United States v. Cook*, 997 F.2d 13123 (10th Cir. 1993) ..................................... 74

*United States v. Espinoza-Saenz*, 235 F.3d 503 (10th Cir. 2000) ........................ 24

*United States v. French*, 556 F.3d 1091 (10th Cir. 2009) .................................... 85

*United States v. Lopez*, 100 F.3d 113 (10th Cir. 1996) ....................................... 87

*United States v. Owens*, 882 F.2d 1493 (10th Cir. 1989) ..................................... 74

*United States v. Pearson*, 203 F.3d 1243 (10th Cir. 2000) ................................. 103

*United States v. Reddick*, 90 F.3d 1276 (7th Cir. 1996) ...................................... 78

*United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990) ................................... 108

*United States v. Scully*, 798 F.2d 411 (10th Cir. 1986) ....................................... 93

*United States v. Sinclair*, 109 F.3d 1527 (10th Cir. 1997) ................................... 57

*United States v. Toles*, 297 F.3d 959 (10th Cir. 2002) ....................................... 108

*Wallace v. Ward*, 191 F.3d 1235 (10th Cir.1999) ......................................... 90, 91

*Wiggins v. Smith*, 539 U.S. 510 (2003) ......................................................... 34, 37

*Williams v. Taylor*, 529 U.S. 362 (2000) ........................................................... 39

*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008) ............................................ 42

*Workman*, 560 F.3d 1156 (10th Cir. 2008) ........................................................ 56

**FEDERAL STATUTES**

21 U.S.C. § 848(e)(1)(B) .......................................................... 96, 97, 100

28 U.S.C. § 2254 ................................................................................... 90

28 U.S.C. § 2255 ................................................................................... 87

18 U.S.C. § 3432 ................................................................................... 79

28 U.S.C. § 455 .................................................................................... 102

Fed.R.Civ.P. 15 (a)(2) ........................................................................... 47

Fed. R. Evid. 404(b) .............................................................................. 17

Fed.R.Evid 702 ....................................................................................... 5

Title 28 U.S.C. § 455 ............................................................................. 103

**MISCELLANEOUS**

*United States v. Barrett*, (Appellate Brief) 2006 WL 3099220 ......................... 100

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Appellee, | ) | |
| | ) | |
| v. | ) | Case No. 12-7086 |
| | ) | (E.D. Okl. Nos. CR-04-115-JHP, |
| KENNETH EUGENE BARRETT, | ) | CV-09-105-JHP) |
| | ) | (lower docket) |
| Petitioner/Appellant. | ) | |

**MOTION FOR CERTIFICATE OF APPEALABILITY**
**AND STATEMENT OF ISSUES**

Mr. Barrett, through counsel and pursuant to the Case Management Order

dated February 8, 2013, moves this Court to grant a certificate of appealability on the

issues discussed below.

**I.      RECORD REFERENCES.**

References to the record in the district court will be referred to by docket number,

page number and exhibit number.  References to the underlying criminal case will be to

"CR"  docket number, page number and exhibit number.  References to transcripts of the

trial will be by "R" and page number and other proceedings will be by date and page

number.

**II.      OVERVIEW OF THE CASE.**

Mr. Barrett is the only federal death row inmate to have been acquitted in state

court of the murder that later resulted in a federal death sentence.  In state court, after the

declaration of a mistrial when the jury could not agree on a verdict, Mr. Barrett was

convicted of manslaughter and a related charge and sentenced to a medium-range term of imprisonment. He was haled into federal court the day before the statute of limitations expired because local law enforcement was dissatisfied with the state court verdict.

As shown in his filings in the district court, Mr. Barrett's trial was marred by a number of constitutional errors, including but not limited to ineffective assistance of counsel, the suppression of exculpatory evidence and the offering of false evidence, improper collusion between the trial court and the prosecution, improper interference with and micro-management of the defense, and an illegal search. The district court wrongly denied a certificate of appealability on any issue, and wrongly denied an evidentiary hearing and discovery.

## III.   ISSUES FOR WHICH A COA IS REQUESTED.

Mr. Barrett asks this Court grant a COA on the following issues:

1.   Were trial counsel ineffective in both stages of trial?

2.   Did the district court err in denying Mr. Barrett's motion to supplement the amended petition with facts which related back to the pending petition?

3.   Did the government suppress exculpatory evidence and knowingly rely on false evidence to secure convictions and a death sentence?

4.   Did the nighttime, no-knock search warrant for Mr. Barrett's cabin and property violate *Franks v. Delaware,* 438 U.S. 154 (1978), and were trial and appellate counsel ineffective for failing to properly raise this issue?

5.   Did the trial court engage in an improper *ex parte* conference with the prosecutors in violation of due process and the Sixth Amendment, and otherwise improperly interfere with the defense in its funding and appointment policies?

6. Did the district court wrongly deny an evidentiary hearing?

7. Did the district court wrongly deny discovery?

8. Were Petitioner's constitutional rights violated when he was compelled to wear a "stun belt" at trial?

9. Were Mr. Barrett's Due Process and Eighth Amendment rights denied when the trial court refusal to instruct on lesser included, residual doubt and the burden of proof in weighing the aggravating and mitigating factors?

10. Did the district court wrongly deny Mr. Barrett's motion that it recuse and disqualify itself in these § 2255 proceedings?

11. Will the Execution of Kenneth Barrett Violate the Eighth Amendment because he is mentally ill?

12. Was appellate counsel ineffective for failing to raise meritorious issues?

13. Does cumulative error invalidate the convictions, or at a minimum, Mr. Barrett's death sentence?


## IV. STANDARD FOR OBTAINING A COA.

A habeas petitioner seeking a COA "need only demonstrate 'a substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell,* 537 U.S. 322, 326 (2003), *quoting* 28 U.S.C. § 2253(c). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve

encouragement to proceed further." *Miller-El* at 326. As the Supreme Court has

explained:

> We do not require petitioner to prove, before the issuance of a COA
> that some jurists would grant the petition for habeas corpus. Indeed,
> a claim can be debatable even though every jurist of reason might
> agree after the COA has been granted and the case has received full
> consideration, that petitioner will not prevail.

*Miller-El* at 338; *see also Tennard v. Dretke,* 542 U.S. 274, 281-88 (2004).

Where a claim has been disposed of on a procedural ground without reaching the

underlying merits of the claim, the test for whether a COA will issue is "when the

petitioner shows, at least, that jurists of reason would find it debatable whether the

petition states a valid claim of the denial of a constitutional right and that jurists of reason

would find it debatable whether the district court was correct in its procedural ruling."

*Slack v. McDaniel,* 529 U.S. 473, 484 (2000).

## V.    ARGUMENT.

### A.    The Court Should Grant a COA on the Ineffective Assistance of Counsel Claims. (Ground 2)

Without question, reasonable jurists could disagree with the district court's resolution of

the numerous ineffective assistance of counsel claims at both stages of trial. Mr. Barrett should

receive encouragement to proceed further.

#### 1.    This Court should grant a COA on the guilt/innocence stage claims. (Ground 2A).

The district court's findings with respect to the guilt/innocence stage

ineffectiveness claims ignore or contradict the record as it currently exists.[5] Reasonable

jurists could debate the correctness of the court's decision.

### a. Failure to retain an independent crime scene reconstruction expert. (Ground 2A(7))

Trial counsel sought $17,000 and was granted $4,000 for an expert to conduct crime scene reconstruction in anticipation that the government would hire Iris Dalley, who appeared as a witness in both of Mr. Barrett's state court trials. Trial counsel did not use those funds for a crime scene reconstruction expert; instead, counsel used the funds for an investigator who took photographs. Had trial counsel hired expert Edward Hueske, he would have testified that Dalley's testimony was completely unreliable and unworthy of belief. *See* Exh 109, 110.

The lower court unfairly dismisses the importance of the extensive "expert" testimony of Iris Dalley, finding that she only reached two significant conclusions: 1) the defendant could not have fired all of the shots from a prone position, and 2) the wounds to Trooper Eales's flank and elbow were sustained after he exited his Bronco. Doc 214 at 154. Looking exclusively at those two conclusions, however, it is clear both would have been severely challenged by Mr. Hueske.

If trial counsel had obtained the services of a qualified forensic examiner, they could have challenged the admissibility of any of Dalley's testimony under Fed.R.Evid 702. Dalley failed to adhere to the standard, recognized protocol in the particular discipline for conducting a crime scene reconstruction, including utilizing the appropriate methodology. Her conclusions, aimed at strengthening the government's case, were

scientifically unreliable.  Had a defense expert been presented, at a minimum, the jury would have heard evidence that Dalley's analysis, and her subsequent testimony based on that analysis, were outside the parameters of a proper, legitimate crime scene reconstruction and trajectory analysis.[1]

Had all the flaws in Dalley's testimony been exposed by independent evidence, there would be little if any "physical evidence" to support the prosecution's theory as to how the shooting occurred and the position of Mr. Barrett when he fired the .233 rifle.  If an independent expert such as Mr. Hueske had been retained to critique Dalley's work, the defense would have been placed in a much stronger position to argue, as it did, that Mr. Barrett was inside his house rather than outside when he fired, and was unaware that the vehicle coming directly at his house was a police vehicle, especially since that vehicle's emergency lights were not engaged.

The lower court found that trial counsel were not ineffective because Dalley's testimony was "not critical or necessary for the jury to determine what had happened in this case nor did it ultimately assist the government [] proving intent"  Doc 214 at 153. The government's closing argument, however, suggests otherwise, and relied specifically on her testimony to support of their showing of intent.  R. 4305-06.

---

[1] Had counsel actually interviewed Internal Affairs Special Investigator ("IASI") Paul  Gordon, they would have known that the "trajectory analysis" upon which so much of Dalley's expert opinion relied was flawed from the very moment she commenced the experiment because the vehicle in which Trooper Eales was riding had been moved.  See Doc 199-1 at 13-14 ¶¶ 36-38.

Rebuttal of the government's expert would not have been reliant upon "extracting a concession of a *possibility*" otherwise, through uneven and sometimes confusing cross-examination. Instead, evidence refuting the inference of intent would have been affirmatively presented through a well-qualified expert by the application of accepted scientific principles showing that the government's "expert" lacked sufficient knowledge of ballistics, vehicle construction, and the necessity of using consistent, accurate terms of reference when reconstructing a scene to render reliable, credible opinions about a shooting scene involving a vehicle.

The Court's finding that trial counsel exercised reasonable strategy by relying on cross-examination is not borne out by the record and certainly worthy of further debate; especially here, where the cross examination in federal court was woefully inadequate, bearing little resemblance to the cross-examinations in state court, transcripts of which the trial court assumed counsel used to their advantage, Doc 214 at 155.

Despite the lower court's finding otherwise, Doc 214 at 153, Dalley's testimony was arguably the most important factor in establishing the intent elements of the offenses charged, making the difference between Trooper Eales' death having occurred as a result of a firefight and possible ricochet and being deliberately shot in the back. Counsel's failure to adequately challenge it with expert testimony was below prevailing professional norms, to the serious detriment of their client. A COA should be granted.

### b. Failure to present independent expert on police tactics. (Ground 2A(8))

In Mr. Barrett's second state trial, Chuck Choney, a former FBI agent, testified for the prosecution and when *effectively* cross-examined, to the witness's chagrin, provided favorable testimony to Mr. Barrett regarding the recklessness of the police tactics that were used when Mr. Barrett's house was raided. Trial counsel here conducted no investigation into what evidence could be presented by an independent expert and instead called as a defense expert the very hostile Choney, whose testimony was predictably harmful to Mr. Barrett. If trial counsel had engaged Dr. George Kirkham, Dr. Kirkham would have testified that the raid was uncalled for and conducted in a way that provoked violence and minimized the chances that Mr. Barrett would see that he was being confronted by law enforcement officers. Exh 44, Doc 70. [2]

Dr. Kirkham's report clearly and emphatically concludes that "the violations of well established standards and procedures of the police profession discussed in this report were a significant cause of the preventable violence which occurred at Kenneth Barrett's residence on September 24, 1999." Exh 44 at 1. As for Mr. Barrett's intent, Dr. Kirkham's findings most assuredly would have cast reasonable doubt on whether Mr. Barrett knew that he was being attacked by police officers. Exh 44 at 1, Doc 70.

---

[2] At the very least, consultation on the unprofessional tactics with the one witness who was wholly familiar with both the policy expectations and the actual execution of the planned raid -- IASI Gordon -- would have been appropriate, cost-effective and extraordinarily beneficial to Mr. Barrett. Doc 199-1 at 4 ¶10, 10 ¶¶ 22, 23.

The lower court's finding that trial counsel's strategic choice of witnesses is virtually unchallengable, Doc 214 at 156, is debatable. It is true that counsel's adequately informed strategic choices are accorded a presumption of reasonableness; however, counsel cannot exercise strategy without adequate research and investigation, as was plainly absent here. Here, where trial counsel did not investigate the potential benefit of an independent expert on police tactics nor appreciate the harm Mr. Choney could and did do, the conduct is not within the prevailing professional norms and falls below standards of performance required in a capital case.

Nor does the court's finding that using the government's witness inoculated the defense witness from impeachment convert the decision into a reasonable one where, as here, attempting to elicit beneficial testimony from a hostile witness, harms the client. Then the difficulty in impeaching the witness becomes a liability, not an asset. It is not within the bounds of reason for counsel to call a hostile witness rather than to even investigate the possibility of presenting to the jury a favorable, respected expert witness. A COA should issue.

> **c.  Failure to investigate and present evidence of experts and eyewitnesses to Mr. Barrett's mental impairment and illness. (Ground 2A(3))**

The government's theory of the case was that Mr. Barrett anticipated a police raid, prepared for it, and intended to use deadly force if the police came to his property. The prosecution argued that when Mr. Barrett began firing his weapon, he was well aware that the police, rather than trespassers, had arrived. This argument was highly relevant to

count 3 of the superseding indictment, which charged that Mr. Barrett intentionally killed a state law enforcement officer in the performance of his official duties, CR Doc 52, and for which Mr. Barrett received the death penalty. CR Docs 258, 285.

Competent trial counsel would have investigated Mr. Barrett's background and medical history and, through consultation with appropriate experts, found extensive evidence of organic brain dysfunction, bipolar disorder and PTSD. Had this evidence been produced, there is a reasonable probability that the outcome of the first stage of trial would have been different. This evidence would have raised a reasonable doubt with respect to Mr. Barrett's knowledge and intent, especially as to Count 3, and would have supported either outright acquittal or a finding that, at most, Mr. Barrett was guilty of voluntary manslaughter.

A proper mental health investigation by a qualified expert, and testimony from readily available lay witnesses who could have testified to Mr. Barrett's mental and emotional state, would have revealed that the government's portrait of Mr. Barrett was wholly inaccurate. Rather than the intentional and remorseless killer who deliberately *acted* according to a plan to "take out" any law enforcement officer who stepped onto his property, as depicted by the government, Mr. Barrett is in fact a severely mentally ill individual whose cognitive deficits and mental impairments caused him to *react*, without reflection or deliberation, to what he reasonably perceived was a life-threatening attack by unknown criminals.

The district court erroneously finds that counsel could rely on their client to make

known the claim, that limited resources and time excused counsel's obligations to investigate the mental health issues, and that prior state investigation was sufficient. The availability of the prior investigation and trials put counsel on notice of the need to develop the mental health issues and compelled, rather than relieved, them of their responsibility to develop crucial mental health evidence to challenge the evidence of intent. Competent counsel in a capital case cannot simply rely on what the client tells them, or their own observations of the client, to assess the defendant's mental health. *Gray v. Branker,* 529 F.3d 220, 230-31 (4th Cir. 2008); ABA Guidelines, 10.7, 10.10.1, and 10.11.

Contrary to the court's findings, counsel were aware of the need for and requested the assistance of a neuropsychologist. Doc 46 at 5; Doc 50 at 5-6, 8. This alone renders the lower court's finding that counsel were defensibly ignorant debatable. As noted below, the fact that the lower court makes no mention of Dr. Sharp, a state expert who found Mr. Barrett to suffer from extreme paranoia, at the very least renders the court's rejection of the evidence without an evidentiary hearing unreasonable. *See* Docs 208, 210; Mot. Exh 56 at 3-4. Dr. Sharp's diagnosis, particularly when combined with all the other facts, imposed on defense counsel a duty to investigate and produce the available evidence to rebut intent.

> **d.  Failure to adequately prepare to confront, cross-examine and impeach the government's newly-found, late-disclosed informant witnesses. (Ground 2A(5))**

But for trial counsel's unreasonable omissions, it is reasonably probable that the

jury would have rejected the testimony of the government's eleventh hour "snitch" witnesses and, like the two juries before them, refused to convict Mr. Barrett of premeditated murder.

The court rejects the claim in part because "Barrett was obviously familiar with the people and incidents about which they testified." Doc 214 at 147. The conclusion rests on speculation as to what Mr. Barrett knew and places an unreasonable burden on him of knowing not only his associates but what lies they are likely to tell, what convictions they have suffered, what "deals" they have made to secure benefits to avoid the consequences of those convictions, and other bad acts for which snitching frequently provides relief. The evidence does not support the court's conclusion.

The district court's finding that trial counsel correctly believed they could effectively impeach the witnesses with the evidence they had, Doc 214 at 147, presumes facts not in evidence. There is nothing which shows a reasoned "decision" by counsel; indeed, counsel affirmatively suggest otherwise by asserting that the government's "method of investigation thwarted the defense investigation of the truthfulness of their testimony." Govt Exh 12 at 2 ¶ 14. The fact that counsel nevertheless "believed that the witnesses could be effectively impeached" while being prevented from conducting an investigation is simply not a reasonable strategic decision. The district court's conversion of counsel's docile acceptance of the late disclosure, limited accessibility and unfounded "belief" that they could effectively cross-examine without adequate investigation into an affirmative tactical decision is a conclusion with which reasonable jurists could disagree.

The court also relies on its conclusion that the evidence of the witnesses' incredibility is so clear that further evidence of their dishonesty and likely perjury could have no effect. That can only be true if the jury rejected the evidence. Reasonable jurists have found logic similar to the court's to be strained. "The failure of a defendant's efforts to impeach a witness does not prove that additional impeachment would have been ineffectual, or merely cumulative, any more than it supports the opposite conclusion." *Silva v. Brown*, 416 F.3d 980, 988-89 (9th Cir. 2005). Since the snitch evidence is the only evidence not offered in state court and resulted here in a capital conviction and sentence, the district court's conclusion is undoubtedly debatable.

Next the court finds the evidence to be double-edged, relieving counsel not only of using it, but even discovering it. Based solely on the declarations and without an evidentiary hearing, the court concludes that *some* of these "newly discovered" witnesses *could* have been more detrimental and/or prejudicial to the defendant. For instance, the court finds a witness's admission to seeking drugs at Barrett's residence would assist the government in its burden to prove "that the Defendant was, in Count 1, engaged in drug trafficking crimes[.]," Doc 214 at 148. Equally arguable, however, is that evidence of drug-related expectations of a witness unrelated to actual trafficking at the relevant time would not materially aid the government's case and, if the government went there, could backfire.

Similarly, the district court finds that some of the witnesses fail to corroborate each other, citing for example a witness whose declaration states that Sanders "was never in

Kenny's house because Kenny would never have let him in[,]" Exh 95, with another who "claims she was at defendant's residence on two or three occasions when Sanders was present[,]" Exh 13. Doc 214 at 149. There is, or at least arguably was intended, in the declarations, a factual distinction between "at the residence" and "in the house." The lower court erroneously assumes a conflict not necessarily existent on the face of the declarations. Factual assumptions by the court without the benefit of an evidentiary hearing cannot defeat Mr. Barrett's right to an evidentiary hearing, and certainly is sufficiently debatable to require a COA.

The court also finds fault with the proffer because the witnesses would be impeached by the very witnesses whose credibility the defense sought to undermine. The district court's criticism defies logic. At the very least, Mr. Barrett has a right to be heard on the proffered testimony before the court factually rejects the same on an arbitrary determination of its strength and credibility.

The lower court then finds that "at least one of the witnesses the petitioner claims should have been called, would have corroborated at least three of the government's witnesses regarding the extensive drug use and distribution occurring at the petitioner's house" Doc 214 at 149. The lower court misses the point. It is not drug use or distribution at *any* time in Mr. Barrett's past which is at issue; it is only if the drug activity was closely related in time and substance to the shooting.

The court's next finding is that much of the evidence of specific acts of misconduct by government witnesses, including acts of dishonesty and drug use, would

not have been admissible to impeach these witnesses. Doc 214 at 149-50. Without identifying the witnesses or testimony in question, or the grounds upon which the witnesses' testimony might have been offered, the court's decision on admissibility is arguably insufficient to defeat Mr. Barrett's right, at a minimum, to an evidentiary hearing on counsel's failures to impeach that evidence that put him in federal court and on death row.

Lastly, the court rejects the claim that because "the petitioner does not allege that he provided trial counsel with these specific witnesses' names or that he provided counsel with information regarding how to contact these witnesses during his trial and that counsel refused to issue subpoenas to them." Doc 214 at 150. The district court's finding is erroneous, or at least reasonable jurists could debate it.

While questions of communications between counsel and Mr. Barrett may be appropriate in preparation for and at a hearing, an assertion to that effect is not an "element" of the claim. There is no evidence to suggest Mr. Barrett did not communicate the information to his counsel. Further, like the assertion that Mr. Barrett "knew" what the informant witnesses would testify to because they were his associates, the reasoning stands *Powell v. Alabama*, 287 U.S. 45, (1932) on its head: Mr. Barrett has a right to the effective assistance of counsel – including reasonable fact investigation regardless of the client's ability, propensity or appreciation of the need to disclose information. Extended to its logical conclusion the district court's findings mean counsel have no duty to do any investigation in relation to facts possibly known to, but not specifically disclosed by, the

defendant. Beyond that, the district court misstates the claim. The deficiency, which defense counsel don't deny, see Doc 174 Exh 12, is that they failed to investigate impeachment evidence. Even if Barrett knew about the alleged conversations, or the *impeaching witnesses,* of which there is no evidence, how would he be able to identify the snitches' prior convictions, the people who knew their reputation for truthfulness, the instances in which they snitched in other cases, or the circumstances surrounding their being identified by the government and then solicited for their testimony? Because the district court is only considering impeachment directly related to matters within Barrett's personal knowledge, it failed to conduct a proper prejudice analysis that has to include all the impeachment that was available to counsel through reasonable investigation.

In light of the extensive proffer of evidence which was available to counsel upon investigation of the witnesses, with or without assistance from Mr. Barrett,[3] the question of whether an adequate investigation and impeachment of the seven snitches would have resulted in a different verdict is, at the very least, debatable. A COA should issue.

### e. Failure to Object to Inadmissible 404(b) Hearsay. (Ground 2A(6)).

Mr. Barrett alleges that trial counsel were ineffective in failing to make appropriate and timely objections to improper hearsay evidence of other bad acts. The evidence complained of , namely, testimony of alleged statements by Mr. Barrett of a belief that

---

[3] It must be noted that there is no evidence of Mr. Barrett's lack of cooperation with his counsel.

law enforcement would come onto his property and lead to a shootout, which was shown by the government through the testimony of the seven federal court informants was inadmissible, and was wrongly argued and considered by the jury as propensity evidence in violation of Fed. R. Evid. 404(b). Trial counsel's performance fell below prevailing professional norms when they failed (a) to demand reasonable pretrial disclosure of these statements, (b) to make appropriate objections to the government's delay and to the admissibility of the statements and ( c) to seek an appropriate order under 404(b) limiting the jury's consideration of the evidence to Mr. Barrett's purported state of mind at the time the statements were made.

The district court dismisses this claim on procedural grounds, finding the claims were not raised in the original petition and did not "relate back" to claims which had been timely raised. Doc 214 at 150-51. The court's conclusion is incorrect. In his timely-filed Corrected §2255 Motion (Doc 2), Mr. Barrett details his attorneys' ineffectiveness by his counsel's failure to adequately investigate, discredit or impeach each of the informant witnesses. *See* Doc 2 at 77-129. The claim was not "new" but was simply an expansion of Mr. Barrett's previous claims of counsel's utter failure to mount any sort of defense against these very same witnesses. Mr. Barrett's claim of counsel's failure to timely object to the 404(b) testimony constitutes a common core of operative facts with his earlier claims of counsel's complete ineffectiveness in handling the informant witness testimony. In fact, Mr. Barrett raised the 404(b) issue in discussing the prejudice resulting from the *ex parte* hearing. Doc 2 at 297-98. Repositioning the issue for clarity

and organizational purposes does not render the claim untimely.

The district court's finding that the testimony was admissible is also subject to question. The evidence was offered pursuant to 404(b) and on its face, was inadmissible for lack of notice and/or time-relatedness. The issues were legal in nature, and allowing the jury to hear the evidence was clearly erroneous.

Since the inadmissible evidence was the sole evidence of a general intent to engage in a firefight extrapolated into a specific "intent" to kill a law enforcement officer at the time of the incident, it is, at the very least, debatable that counsel's failure to object to and/or limit the inadmissible testimony fell below prevailing professional norms to Mr. Barrett's prejudice.

> **f.      Failure to impeach law enforcement witnesses with prior inconsistent statements.  (Ground 2A(9))**

Mr. Barrett has set out in his §2255 Motion a number of significant examples of prior inconsistent statements made by many of the government's witnesses which counsel did not use to impeach them. See Doc 95 at 143-47. The inconsistent statements by law enforcement witnesses go to the very heart of the government's case and Mr. Barrett's defense: whether law enforcement or Mr. Barrett initiated the gunfire;[4] whether there was any emergency lighting or other indication that would have notified Mr. Barrett that it

---

[4] For example, two of the officers, Trooper Jim McBride and DEA Liaison Danny Oliver, told Gordon that the initial gunfire was from an automatic, which if true, belonged to law enforcement because Mr. Barrett was not in possession of an automatic weapon. Doc 199-1 Exh 11 at 7; Exh 15 at 8. Additionally, Lt. Pettingill told Gordon he thought it was his people firing.  Doc 199-1 at 30 ¶ 93.

was law enforcement driving aggressively into his home; and, what, if any, drug-making evidence there was on the premises.[5] The statements of law enforcement are inconsistent with each other, and with prior statements since the event, especially at a time when the event was fresh in the witnesses's minds. The testimony laid out by Mr. Barrett, as extensive and damning as it is, was never intended nor presented as a complete recitation of the numerous inconsistent statements made, but to support further discovery and an evidentiary hearing to show counsel's total failure in their investigation and challenges to the government witnesses.

Despite trial counsel's awareness of Paul Gordon as a potential witness, he failed to learn from Gordon of significant evidence, including prior inconsistent statements which, if presented at trial, would have raised a reasonable doubt as to whether Mr. Barrett had any notice that the approaching attack was instigated by law enforcement, that Mr. Barrett fired the first shot, or that Mr. Barrett was engaged in any drug activity at all.

Mr. Gordon's evidence, together with the many inconsistent statements in the pre-trial, state trials and federal trial between law enforcement of the events which transpired on September 24, 1999, may well have resulted in an acquittal. It is clear that law enforcement knowingly testified falsely and *did not* engage their emergency lights during the raid. Indeed, no vehicle lights were engaged." (Gordon Dec at 10, 12 ¶¶ 23, 25). Gordon would have testified that witness Hash's testimony, upon which this Court relied

---

[5] See Doc 199-1 at 17 ¶¶ 51-55.

to find that the second and third vehicles emergency lights were on, was a lie. Doc 199-1 at 13 ¶¶ 26, 30. There can be no strategy to omit the available impeaching evidence, which at the very least would have raised a reasonable doubt in this case.

The lower court does not discuss the declaration of Mr. Gordon. It does, however, discuss some of the inconsistent statements, minimizing the effect or level of inconsistency, or offering its own reason why trial counsel might not wish to impeach on a particular statement, *see generally*, Doc 214 at 157-162. The court ultimately determined that "after thoroughly reviewing counsel's cross-examination, this court finds the petitioner has failed to establish that counsel's cross-examination was unreasonable or prejudicial." Doc 214 at 162. Whether or not the "strategy employed in this case was [or was] not sound," *see* Doc 214 at 157, the inadequate and unprepared execution of that strategy, which failed completely to impeach critical government witnesses on central issues of both the government's and Mr. Barrett's cases, was below the minimum standards of prevailing professional norms.

> **g.  Failure to call readily available witnesses to refute the government's claim that Mr. Barrett knew that it was law enforcement.  (Ground 2A(10))**

Trial counsel failed to call as defense witnesses  Mr. Barrett's son, Toby Barrett and, Alvin Hahn, a neighbor, whose testimony submitted by declarations would have disputed the government's contention that emergency lighting had been activated prior to the initial shots being fired. Exh 96.

Even though Toby Barrett had testified at his father's successful state trials, counsel in the federal case made no effort to interview him or prepare him to testify. In his recent declaration, Toby Barrett states, "I went up to Mr. Hilfiger in court more than once and asked him if he was going to want me to testify at the trial. He said yes each time, but he never called me. He never asked me about the incident, my father's mental problems, my home life or about me or my mom." Exh 96.

The lower court rejects the claim by dismissing Toby's testimony's value despite the clear consistency of the witness's potential testimony with the defense offered at trial. First, the court finds that because Toby Barrett is Mr. Barrett's son, he would have been impeached for bias. Doc 214 at 164. The mere fact that Toby Barrett is Mr. Barrett's son does not disqualify him as a witness. He also was the only civilian besides Mr. Barrett on the premises at the time of the raid, and he was a prosecution witness in the state trials -- both of which weighed in favor of calling him as a witness.

Next the court cites trial counsels' declarations asserting that Mr. Barrett purportedly wanted to limit use of his family *at sentencing* as evidence that failure to call Toby Barrett on substantive factual issues at the guilt/innocence stage was dictated by the client.[6] Doc 214 at 165. As the court notes elsewhere, decisions on which witnesses to call belong to counsel, not the client.

---

[6] Trial counsels' assertions to this effect are vociferously disputed by the family, a matter dismissed by the trial court as "hearsay." Doc 214 at 165.

The court then goes into great detail of the harm, for which there is absolutely no evidence, calling Toby might have caused. *Id.,* at 166. The trial court engages in a speculative analysis of reasons counsel would not call Toby Barrett, including because it would have been hard for Toby not to have seen all of the drug use testified to by the informants. The court assumes not only that the government would have delved into that area with Toby but what Toby's answers would have been. Since Toby testified for the State, where contrary to the trial court's statement, drugs were in fact at issue -- an issue neutralized by effective investigation and cross-examination in the state prosecution it is more reasonable to assume that Toby Barrett would not have supported the government's position. The court's analysis of Toby Barrett's testimony goes far beyond the analysis appropriate for preliminary review of § 2255 pleadings and does not defeat, but indeed enhances, the likelihood that reasonable jurists would debate the accuracy of the court's opinion.

Similarly, counsel failed to interview and/or call Alvin Hahn, a neighbor, whose testimony would also have corroborated Mr. Barrett's claim that he did not know he was being invaded by law enforcement. On the night of the shooting, Hahn was awakened by gunfire. When he looked outside about fifteen seconds after the shooting stopped, he saw only one vehicle with its police lights on. Exh 75.

Mr. Hahn's account is consistent with Toby Barrett's, and would have corroborated Toby's testimony that *after* the shooting, there was only one police vehicle with its emergency lights on, namely the vehicle that crashed through the gate. It is also

consistent with former IASI Gordon's declaration, which is based upon interviews with the troopers themselves. Doc 199-1 at 12-13, Exh ¶¶ 27-30. The lower court's conclusion that the testimony was not corroborative of Mr. Barrett's defense is incorrect. A COA should issue.

<blockquote>

**h.** **Failure of counsel to develop evidence that Mr. Barrett was not aware that there was an active felony arrest warrant. (Ground 2A(11))**

</blockquote>

Mr. Barrett proffered extensive evidence readily available to trial counsel which would have shown that he was unaware he was subject to an active felony arrest warrant at the time of the shooting incident, and was neither "hiding out" on his property in anticipation of a police raid nor prepared to meet any police presence with violence. See Doc 95 at 154 - 163, citing numerous records and exhibits.

The court does not address the merits of the claim but finds that the petitioner first raised this issue on September 25, 2009, and finds the claim is barred by the statute of limitations because the allegations arise out of different facts in time than those alleged in the original and/or first amended motion. Doc 214 at 167, 167 n. 260 (citing Doc 70 at 173-74).

The finding is not supported by the record. The claim raised in the original 2255 Motion is exactly the same claim as that raised in the Amended Motion. *Compare* Doc 70 at 172-180 *with* Doc 95 at 154 - 163. There are only two facts in the Amended Motion not expressly found in the original petition: the failure of the court to even summon a jury on the day of the purported trial, which supposedly led to an arrest warrant being issued

for Mr. Barrett, and the assertion that this invalid arrest warrant to attend a trial that was never scheduled affected the validity of the no-knock search warrant which the government claimed were "new." Doc 175 at 192. This does not represent a "new claim," but simply additional facts supporting a claim already made, which clarify and amplify the argument. This is especially true where the state court file and clerk of the court are proffered in support of the claim, and were also proffered at the time of the original petition. *Mayle v. Felix,* 545 U.S. 644 (2005); *United States v. Espinoza-Saenz,* 235 F.3d 503, 504 (10th Cir. 2000). The district court's dismissal of the claim under the statute of limitations is in error.

A key component of the government's case was its theory that Mr. Barrett was well aware there was a warrant out for him for failing to appear for trial in a minor felony drug case. *See* file, Sequoyah County Case No. CF-97-80, *State of Oklahoma v. Kenneth Eugene Barrett.* According to the government, Mr. Barrett anticipated the police were going to arrest him at any time on this warrant, and he was therefore making preparations to repel the police with deadly force. This theory was founded on the testimony of the informant witnesses who testified that Mr. Barrett told them about the warrant, and stated he would kill the first policeman who came on his property and would "go out in a blaze of glory." The government argued that the killing of Trooper Eales was the fulfillment of Mr. Barrett's "plan."

It was imperative that trial counsel rebut this linchpin theory of the government's case; yet, trial counsel did virtually nothing to rebut this argument other than rely on

cross-examination. Had counsel conducted anything approaching a reasonable, professional investigation into Mr. Barrett's alleged failure to appear, or had they been paying sufficient attention to certain testimony that was introduced at the hearing on Mr. Barrett's motion to suppress (R 1/ 26/05 Hr'g at 25-45, testimony of Bernell Edwards, Deputy Sequoyah County Court Clerk), the government's theory would have evaporated, the snitches would have been further impeached, and the government's case for intent would have suffered mightily. The evidence and argument submitted amply supports the allegations of ineffective assistance of counsel and at the very least, requires an evidentiary hearing. Here, where the court made only the erroneous finding that the entire claim was barred by the statute of limitations, there is reason to issue a COA.

     **i.**       **Trial Counsel were ineffective for failing to adequately contest "expert" testimony. (Ground 2A(12))**

At trial, the government called James Horn as an expert witness and elicited testimony replete with colorful references to his own, and others', military and law enforcement experiences and to the powerful emotional bonds created by such public service. This Court correctly pinpointed the fact that none of Mr. Horn's testimony was actually relevant to the facts of the case, and ultimately struck the evidence in its entirety when finally prompted to do so by defense counsel.

The lower court found that "[b]ecause the testimony was potentially helpful to the defendant and because the jury was admonished to disregard the testimony in its entirety," the petitioner "failed to establish that defense counsel's strategy was

unreasonable or that he was prejudiced by the jury hearing the testimony or trial counsel's failure to move for a mistrial following the court's striking of the testimony in its entirety." Doc 214 at 171.

The court found Horn's testimony "as potentially helpful to the defendant as to the government in that the defense counsel's cross-examination focused on the unreliability of the witness testimony six years after the event" providing opportunities for defense counsel to argue there was "reasonable doubt about what occurred during the raid on Barrett's property." Doc 214 at 171. If that were so, defense counsel were truly irrational to move, as they did, to strike the potentially helpful evidence. And they would have argued as the court suggests. But defense counsel did move to strike the evidence. The failure to keep the evidence out completely then, cannot have been the result of a reasonable strategy. Trial counsel's failure to move for a mistrial, when there was nothing to lose by such a motion, and much to gain, demonstrates an absence of strategic thinking on their client's behalf.

Similarly, the court's reliance on the maxim that a jury is presumed to follow its instructions, fails to consider that the presumption is rebuttable. Here, the jury had heard Mr. Horn's testimony over a two-day period and, far from being "innocuous", it had provided a ringing endorsement of the fortitude of law enforcement, and what was in effect an apologia for deficiencies in law enforcement testimony after a traumatic event, complete with overtones of victim impact testimony. Trial counsel, having failed to probe the specific facts in Horn's possession because of their misapprehension that his

discussions with the prosecution witnesses were privileged, (R 881, Doc 95 at 165-66), also failed to secure a swift instruction to disregard -- the instruction given came three days later -- or to press for a more resounding instruction than the Court's statement that the instruction given was "not special" but "just an instruction in regard to some testimony that you have heard ..." R 1739. These facts created the overwhelming probability that the jury could not follow the instruction given, and that the effect of Horn's testimony was calamitous to Mr. Barrett's case. *United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002) (mistrial appropriate when probability that instruction will not be followed is overwhelming and there is strong likelihood that effect of the evidence will be devastating). This was made all the more probable by the government's invitation to the jury to recall the testimony when it referred to the witnesses as "soldiers of the law telling you what they remembered, honestly recalling the circumstances of September 24th . . . Yes, many law enforcement officers responded, a soldier of the law had been murdered." R 4379. *See e.g.,* R 844-45, 864-65 (testimony of James Horn discussing his military experience); 912 (testimony of Mr. Horn comparing Vietnam veterans' abilities to recall events). The district court's application of the presumption that the jury will follow the law and finding no prejudice in these proceedings is subject to debate. A COA should be granted.

### j. The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions.  (Ground 2A(13))

Mr. Barrett's trial counsel unreasonably failed to seek instructions that would have given the jury a way to give effect to the defense evidence and argument.  Although trial counsel argued to the jury that the informant witnesses' testimony should not be credited, counsel unreasonably failed to seek a jury instruction to the same effect.  The instructions trial counsel unreasonably failed to seek include an instruction on informant witness credibility, an instruction on drug-addict witness credibility, an instruction on self-defense, instructions on the theory of the defense, and instructions on lesser-included offenses.

The prosecution relied heavily on the testimony of seven informant witnesses.  These witnesses, as the prosecutor has conceded, were critical to distinguishing the prosecution in this case from the two previous state-court prosecutions. Exh 69, Amended Motion.  This constitutes an admission by a party opponent.  F.R.E. 801(d)(2).  Some of these witnesses acknowledged at trial, or have acknowledged since the trial, that they were involved in illegal activities before, during, and after their testimony or the events about which they testified.  These activities included illegal drug possession, use, and/or distribution, various civil violations, making false statements, weapons violations, and violations of court orders.

An attorney has a duty to conduct legal research, and be informed about, and seek from the trial court, such orders as may be available to assist in the presentation of the defense.

The informant witnesses also confessed to being drug addicts, either at the time of their testimony, or at the time they allegedly perceived the "events" they described in their testimony. Karen Real, Randy Turman, Randy Weaver, Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, and Brandie Price were all drug addicts at relevant times. Indeed, the district court relied on this information to find the failure to impeach harmless, given their already destroyed characters for truthfulness and diminished memory through drug use. Doc 214 at 148.

Mr. Barrett was entitled to an instruction on his theory of defense. The defense theories were (a) that at the point in time when Mr. Barrett fired his weapon he had no indication that the vehicle speeding toward him contained law enforcement officers (R 4314), and (b) Mr. Barrett was not engaged in drug manufacturing or distribution when the raid took place. As evidenced by the state-court verdicts, the inconsistent testimony of the law enforcement percipient witnesses in federal court, and the jury's verdict in this case, there was evidence and legal support for a theory-of-defense instruction.

The district court made no findings on this issue. There can be no reasonable strategy to fail to seek an instruction on the very defense pursued. At the very least, reasonable jurists would debate the validity of this claim and encourage further proceedings on it.

**k.     The conflict of interest claim created by the court's interference with the defense and restrictive approach to costs.  (Ground 2A(1))**

As set out in Mr. Barrett's request for a COA on the issue of judicial interference and bias below, the district judge's focused intent to minimize costs associated with Mr. Barrett's defense and to appoint local counsel to this case for the purpose of establishing their credentials for appointment in future capital cases created an actual conflict between the financial and professional interests of appointed counsel and Mr. Barrett's interest in thorough investigation and a vigorous defense. This conflict adversely affected counsel's performance to Mr. Barrett's detriment in that they failed to obtain the services of numerous experts, failed to devote time to preparing for and conducting the trial that counsel himself had considered necessary prior to the court's rulings, and failed to use other resources which prevailing professional norms required.

In its rejecting the actual conflict issue, the district court concluded: "petitioner attempts to create an actual conflict of interest from innuendos, speculation and suggestion, but does not allege any facts to support his conclusory allegations of conflict."  Reasonable jurists could debate whether the allegations by counsel are supported by credible evidence and/or are worthy of further encouragement.  See Claim 1, discussed hereinabelow.

### l. Counsel's unreasonable omissions in re-urging the *Franks* Issue. (Ground 2A(2))

This claim cross-references with Mr. Barrett's request for certificates of appealability on the *Franks* issue and the *Brady* claim. See requests for COA on Claims 4, 5 below.  Indeed, the district court does not address this claim separately.  Taken together the claims illustrate the central role in the conviction and death sentence of Mr. Barrett played by Sanders, an indisputably incredible and untrustworthy individual.[7] Because cross-examination of Sanders showed that the material averments made in the search warrant affidavit were false, or were made in reckless disregard for the truth and for other reasons, facts unquestionably known to the affiant, Clint Johnson, all the evidence seized in the search of Mr. Barrett's cabin and property was subject to suppression under *Franks v. Delaware,* 438 U.S. 154 (1978).

Read in context of the claims of Johnson's incredibility and recklessness, and Sanders' unsuitability to serve as key witness in a capital case, once Sanders had testified, counsel should have relied on the same to support the *Franks* claim.

### 2. A COA should be granted on the issue of ineffective assistance of counsel in the penalty phase (Ground Two (B)).

Reasonable jurists could certainly disagree with the district court's resolution of the second stage ineffective assistance of counsel claim.  Mr. Barrett should receive

---

[7] *See also* Doc 200-1, setting out the state court judge's later  reaction to the revelation that Sanders had been named as the informant and the judge's affirmation of lack of any credibility attributable to Mr. Sanders.  Doc 200-1 at 2 ¶B.

encouragement to proceed further. The district court's findings, unsupported with scarcely a citation of authority, ignore or contradict the record as it currently exists and find no support in the law.

Petitioner contends that trial counsels' second stage performance was ineffective because they failed to investigate, develop and present powerful mitigating evidence regarding his dysfunctional and abusive childhood and family history; his severe mental and physical impairments, including Bipolar Disorder, PTSD, head injuries, organic brain damage, a relatively low I.Q., developmental delays, and Dysexecutive Syndrome; and his family's multi-generational history of mental illness, which genetically predisposed Mr. Barrett to the same. Doc 95 at 195-243, and exhibits cited therein.

The district court rejected Petitioner's claims by holding: 1) that Mr. Barrett foreclosed certain lines of mitigating evidence because he did not want to "beg" for his life and did not want a second stage case that focused on sympathy for him or his family, or which relied on his family as witnesses, Doc 214 at 178, Doc 175, Exhs 11, 12; 2) that counsels' performance was not deficient because they reasonably chose a strategy of focusing on Mr. Barrett's good qualities, his family's love for him, and that he had already been punished in state court for Trooper Eales's death and was being unfairly treated by the government, Doc 214 at 180, 187-88; 3) that counsels' performance was not deficient because they had no way of knowing about Mr. Barrett's mental problems, Doc 214 at 178-79; 4) that any evidence of mental impairments was inextricably tied to drug use, and counsel made a reasoned strategic decision that evidence of Petitioner's

drug use would not resonate with the jury and would backfire, and that, relatedly evidence

of his dysfunctional and abusive background would "negate" the mitigating evidence that

Mr. Barrett's family valued him because it would show the family was too dysfunctional

to care about him, and would support a finding that he was a continuing threat, Doc 214

at180, 185-88;  5) that evidence of Petitioner's family's extensive history of mental

impairments was unrelated to any viable theory of mitigation, Doc 214 at 188; 6) that

while not ultimately successful, the second stage case that was presented was

"persuasive," in that the jury, or some jurors, found several mitigating circumstances and

rejected the "continuing threat" aggravator, Doc 214 at 185; 7) that evidence of

Petitioner's mental illnesses and organic impairments would have "opened the door" to

rebuttal testimony that Mr. Barrett was a sociopath, Doc 214 at 188; and 8) that, because

the omitted mitigating evidence would have been more negative than positive, and

conflicted with the mitigation case that was presented, Petitioner could show no

prejudice. Doc 214 at 179-80, 185.

This reasoning is hollow, and reasonable jurists could certainly disagree with it.[8]

At the outset, this much is clear: this Court has found repeatedly that the type of

mitigating evidence presented in these § 2255 proceedings, but never investigated or

presented by trial counsel, is the evidence juries find most compelling and persuasive in

---

[8]  Mr. Barrett refers the Court to his reply brief in the court below, in which each
of the district court's findings, which were lifted directly from the government's
arguments (Doc. 175, pp. 115-26), were addressed in detail. (Doc. 178, pp. 69-112).

deciding to return a life sentence, while the superficial "good guy who is loved by his family" case that was actually presented often leads, as it did here, to a death sentence. *E.g., Littlejohn v. Trammell,* 704 F.3d 817, 855-68 (10th Cir. 2013)(remanding for evidentiary hearing on claim of second stage ineffectiveness due to evidence of organic brain damage that was not introduced, and recognizing the powerful impact of such evidence on juries); *Anderson v. Sirmons,* 476 F.3d 1131, 1141-48 (10th Cir. 2007).

The belated claim that Mr. Barrett somehow prevented his lawyers from investigating and developing certain types of mitigation evidence based on his alleged statement to them is the type of post-hoc rationalization for a failure to investigate that has been rejected by the courts. *Wiggins v. Smith,* 539 U.S. 510, 536 (2003). The Supreme Court has likewise held that such a post-trial rationalization carries little or no weight, because the duty to investigate is not diminished by such sentiments or a lack of client cooperation. *Porter v. McCollum,* 558 U.S. 30, 130 S.Ct. 447, 453 (2009); *Rompilla v. Beard,* 545 U.S. 374, 381 (2005). If, indeed, counsel took this supposed statement, which shows a misunderstanding of mitigating evidence and its purpose, as a reason not to investigate, it simply shows that counsel (and by extension, the district court) failed to understand the purpose of a mitigation case. Effectively dealing with such sentiments expressed by a client, which are not at all infrequent in capital cases, is "Death Penalty 101." Doc 95, Exh 118, Doc 178 at 91-94, Exh 219 (declarations of federal death penalty resource counsel Richard Burr).

As shown in detail in Petitioner's reply brief, this late-coming rationalization also contradicts the record. Trial counsel, in their post-trial affidavits, describe Mr. Barrett as fully cooperative and engaged in his defense. Counsel in the state case, one of whom was originally lead counsel in the federal prosecution, state that Mr. Barrett placed no restrictions on them. Trial counsel never told the court that Mr. Barrett was interfering with or limiting the second stage investigation, or was precluding them from introducing certain types of evidence. Counsel never told Mr. Barrett's family members that he was being uncooperative in this regard. Although late in the day, counsel were casting about for a mitigation investigator, which makes little sense if they were precluded from developing the precise types of evidence such an investigator looks for. Contrary to the post-hoc rationalization offered by trial counsel, the mitigation case that was presented largely relied on family members – the very witnesses Mr. Barrett supposedly did not want. Perhaps most significant of all, counsel never state what types of evidence Mr. Barrett's statement supposedly foreclosed, and what informed strategic decisions they made in light of it. Nor do they state that they would have been prevented from and would not have introduced the wealth of mitigating evidence developed in the post-conviction proceedings. Doc 175, Exhs. 11, 12, Doc 178 at 77-97, and exhibits cited therein, including Exhs. 206-08, 212, 214, 216-17.

The record shows that trial counsels' second stage investigation was woefully inadequate. It consisted merely of speaking briefly to some of Petitioner's family members and friends to get some general "good guy" evidence. More often than not, the

witnesses that were called in the penalty phase were simply told what questions would be asked. With the exception of Mr. Barrett's mother, who was interviewed once in her home, the second stage witnesses were hurriedly interviewed at the courthouse shortly before their testimony. Counsel asked none of the family witnesses they did interview about Mr. Barrett's mental and emotional health or anything that would touch on family dysfunction or abuse. Any brief attempts by witnesses to discuss these matters was cut off. A number of family witnesses who were never contacted could have provided testimony helpful to Petitioner. Doc 95 at188, Exhs 37, 74, 77, 81, 83-86, 90, 95-96, 101, 103, Doc 178 at 83-84, Exhs 206-08, 212, 214, 216-17. In their post-conviction affidavits, trial counsel do not dispute anything said by these witnesses in their declarations regarding the nature and scope of their interviews. Doc 175, Exhs 11, 12. The district court's order and opinion itself, which summarizes the testimony of the family witnesses that were called, highlights the superficial and unilluminating nature of their testimony. Doc 214 at 181-84.

Contrary to the district court's conclusion, Doc 214 at 178, trial counsel did not have the services of a mitigation investigator, because Dr. Jeanne Russell, when approached by Mr. Smith shortly before trial, declined to perform this task, and was told that the court would not adequately finance a proper investigation anyway. Doc 95 at 192-94, Exh 56. Both the district court and trial counsel were on notice that the second stage investigation from the state case was incomplete. Doc 95 at 186, 188, Exhs 34, 66 Dr. Russell's declaration in these respects is not contradicted by trial counsel. Doc 175,

Exhs 11, 12. As of September, 2005 (the month trial started) and October, 2005, counsel informed the court that very little had been found in the states files they had on mitigation, and that Dr. Russell would not be presenting testimony relating to Petitioner's mental health.[9] Doc 95 at 193-94, CR 9/9/05 at 41-43, CR 10/3/05 at 7). Defense counsel never had Mr. Barrett evaluated by a psychologist, neuropsychologist, or a psychiatrist, and never sought additional funds above the inadequate resources the district court reluctantly allowed. Doc 95 at 191-94, Exh 56, CR 9/9/05 at 41-43, CR 10/3/05 at 7.

In this investigative vacuum, and contrary to the district court's finding, counsel simply could not and did not make a reasoned and informed strategic choice to forego evidence of mental illness, organic impairments, and Petitioner's abusive, neglectful and dysfunctional history and background in favor of the sketchy, superficial, and inaccurate mitigation case the jury heard. *Porter v. McCollum, supra*; *Rompilla v. Beard, supra*; *Wiggins v. Smith, supra*. It is telling that trial counsel's post-conviction affidavits do not contest Petitioner's claims regarding their lack of investigation. Doc 175, Exhs 11, 12.

As an excuse for the failure to investigate Mr. Barrett's mental illnesses and organic impairments, as well as the family history of mental illness, the district court concluded that counsel had no reason to do so because they were not on notice of this evidence. They had not been told by Petitioner or his family about any such problems,

---

[9] The extent of Dr. Russell's work in the federal case was simply to update a "risk assessment" she had done for the state case. Doc. 95, Exh 56.

and Mr. Barrett was cooperative and communicative with them. According to the district court, trial counsel were unaware of Dr. Sharp's report from the state case, which found significant mental illness and was consistent with the later findings of Drs. Woods and Young in the § 2255 proceedings. Doc 214 at 178-79, Doc 95, Exhs 55, 89, 117. Dr. Sharp's report, and the mitigation file from the state case, were never delivered to trial counsel. Doc 214 at178-79.

This analysis is flawed because: 1) it is no surprise counsels' superficial and brief interviews of family members failed to uncover sensitive information about Mr. Barrett's and his family's extensive mental problems or, for that matter, Petitioner's abusive and dysfunctional background; 2) Petitioner's surface appearance was not a reason to abandon an investigation into his mental health, because counsel were on notice of his prior mental health history and serious suicide attempt; original lead counsel requested, with good reason, the services of a psychiatrist and a neuropsychologist based on that history and the previous findings of Dr. Sharp in the state case, *e.g., Gray v. Branker,* 529 F.3d 220, 231 (4th Cir. 2008); and 3) if trial counsel were indeed ignorant of Dr. Sharp's report and the mitigation investigation that had been done for the state case, it was due only to their own inertia; Dr. Sharp's report and the state mitigation file were in the possession of OIDS investigator Steve Leedy, but trial counsel never bothered to contact him or Jack Gordon, the lawyer in the state prosecution who was responsible for the penalty phase. Post-conviction counsel easily retrieved these materials after appointment. Trial counsel were on notice of Dr. Sharp's report, at the very least because Dr. Russell referred to it in

the risk assessment she did for the state trial and updated for the federal case. Doc 95 at 50, 56, 186, 189, 190-91, 224-27, 241, 246, Exhs 34, 56, 64, 82, 111, 147, CR Doc 50.

Reasonable jurists could disagree with the district court's finding that trial counsel made an informed choice not to pursue a mental health/organic brain damage second stage defense because, as shown by the records preexisting the federal trial, any mental or organic problems Petitioner suffered were the product of and inextricably linked to his drug abuse. Counsel believed such evidence would have a negative effect on the jury. Moreover, these records contained evidence of incidents of domestic violence and the threat of such against Mr. Barrett's ex-wife, Abby Stites, and other evidence of erratic behavior.

This ignores the following: 1) due to counsels' failure to conduct a professionally reasonable investigation, there could be no informed strategic choice; 2) to reach this conclusion, the district court simply discounts the detailed post-conviction reports of Drs. Woods and Young (which state that Mr. Barrett's serious mental problems are not caused by drug use, but that drug use is a common product of those impairments, and that his impairments preexisted the offense), simply because they examined him in 2009 rather than closer to the time of the incident, a form of analysis that has been rejected by the courts, *e.g. Williams v. Taylor,* 529 U.S. 362, 398 (2000); *Gray v. Branker,* 529 F.3d at 236-37; 3) Dr. Sharp, of whom the defense was or should have been aware, made findings consistent with Drs. Woods and Young during the pendency of the state case years before Doc 95, Exhs 55, 89, 117; 4) the district court, as the government did in its response,

inaccurately characterizes (absent Dr. Sharp's report) Mr. Barrett's then-existing mental health records as focusing exclusively on the effects of drug use, when in fact, he had received a provisional diagnosis of Bipolar Disorder, organicity, paranoid thinking, and had been prescribed anti-psychotic drugs, Doc 95, Exh 147; 5) Drs. Woods' and Young's findings were consistent with Mr. Barrett's previous mental health history, and they took these records into account at arriving at their diagnoses Doc 95, Exhs 89, 117; 6) the jury was already well aware of Mr. Barrett's involvement with drugs, in no small part because his convictions were predicated on drug crimes; what was entirely lacking was a mitigating explanation for his drug use, which the mental health evidence would have provided; 7) the jury was aware of domestic violence between Mr. Barrett and his ex-wife through her cross-examination and the cross-examination of other family members, but Ms. Stites, who firmly believed Petitioner's behavior was caused by mental illness, was never asked about it, Doc 95 at 222-26, Exh 103; and 8) the mitigating circumstance that Mr. Barrett had been treated unfairly by the government and had already been punished in state court would have been enhanced by evidence of his mental and organic impairments.

The district court's conclusion that evidence of Petitioner's history of dysfunction and abuse, as well as his family's history of dysfunction, would "negate" evidence that Mr. Barrett was a loved and valued family member, and that this would somehow support a finding that Petitioner was a continuing threat, makes little sense and finds no support in the relevant case law. *Porter v. McCollum,* 130 S.Ct. at 455; *Rompilla v. Beard,* 545 U.S.

at 393 (alleged "negative" aspects of mitigating evidence no reason not to introduce it when, as here, the overall effect of the evidence is mitigating, particularly in comparison to the evidence that was actually introduced).  Damaged people can still have good qualities and be regarded as valuable people to their loved ones, and damaged people can care about others.  There would have been no conflict in theories of mitigation.  The post-conviction declarations of Mr. Barrett's family members – those who were briefly interviewed before and during trial and those who were never previously contacted – reaffirm their affection for Mr. Barrett.  Nor would this evidence, viewed by the courts as the most persuasive type of mitigation, have shown that Petitioner, who had no previous felony convictions other than those arising from this case, and who was well-behaved in a prison setting, was a future threat.  The continuing threat aggravator specifically directed the jury's attention to whether Mr. Barrett would be a continuing threat in a prison setting.  *United States v. Barrett,* 496 U.S. 1079, 1087 (10th Cir. 2007).

The finding by the court below that Petitioner failed to connect his family history of mental illness and dysfunction to any viable theory of mitigation finds no support in the relevant law. The extensive family history of dysfunction and mental illness, which strongly predisposed Mr. Barrett to both, and demonstrates that a *proper* case in mitigation had documented, historical roots, is the very definition of a "viable" theory of mitigation.

The fact that counsel presented some evidence and that the jury found some mitigating circumstances, as well as rejecting the non-statutory continuing threat

aggravator, places matters in entirely the wrong focus.  The emphasis in any ineffective assistance analysis is not what counsel did, but what they failed to do.  *E.g., Wilson v. Sirmons,* 536 F.3d 1064, 1084-85 (10th Cir. 2008).  As noted, in comparison to the omitted mitigating evidence, the case in mitigation the jury heard was exceedingly weak. The district court overlooked altogether that the prosecution predictably and effectively ridiculed the anemic defense presentation as serving up very thin gruel for a sentence of less than death.  Absent the mental health evidence and the evidence of dysfunction and abuse, the prosecution was able to portray Mr. Barrett as a perfectly "normal" doper and cop killer who simply chose to live a criminal, and ultimately violent, lifestyle.  Doc 95, 243-46.

Against the district court's conclusion, trial counsel did not make a reasoned strategic decision to abandon the omitted mitigating evidence out of fear of rebuttal testimony from a government doctor.  Since no investigation was conducted into Mr. Barrett's mental health and background and history, no reasoned strategic decision could be made.  Counsels' affidavits do not support this finding, because they never state that, had it been available, they would not have introduced the mental health and other evidence developed in these post-conviction proceedings.  Doc 175, Exhs. 11, 12.  In its response, the government produced no evidence that would conflict with the findings of Drs. Sharp, Woods and Young.  Nor did it show, given these findings, that the government's examiner, Dr. Price, would have disagreed with them.  Dr. Price was to be prepared to rebut any "risk assessment" produced by the defense.  CR Doc 238.  In any

event, juries are routinely called upon to decide conflicts in expert testimony, assuming a conflict would have even arisen in this case.

With respect to the prejudice prong of the ineffective assistance inquiry, the district court, at bottom, stated that the omitted mitigating evidence would have been more harmful than not, and would have conflicted with the second stage case that was presented. Based on the above discussion, reasonable jurists could plainly disagree. Not only was the omitted evidence much more compelling than what was presented, but the mental health evidence would have cast substantial doubt on the existence of the substantial planning and premeditation statutory aggravating circumstance and the gateway intent factors due to Mr. Barrett's paranoid, hyper-vigilant state, inability to make rational choices under the pressure of what he believed to be a lethal attack by trespassers, and physical inability to accurately perceive and process events. Doc 95 at 195-243, Exhs 55, 89, 117. As shown in the discussion of first stage ineffectiveness, the unreasonably omitted mental health evidence would also have supported the first stage defense that Mr. Barrett was not aware the intruders on his property were law enforcement, and thought he was legitimately defending himself and his son, making the first and second stage defenses consistent with each other and therefore more persuasive and effective.

Left unsaid by the district court is that this was not an overly strong case for the death penalty, which makes the existence of prejudice more likely. The jury rejected the death penalty on counts 1 and 2. It did not find Mr. Barrett would be a continuing threat

in prison.  Mr. Barrett had not even been convicted of first degree murder in state court.

He was convicted of manslaughter and received a medium range prison sentence.

A COA should issue on Petitioner's second stage ineffective assistance of counsel

claim.

**B.      Mr. Barrett is Entitled to a COA on his Right to Supplement and
Amend the Petition with Facts that Related Back to Pending Claims.
(Docs 201, 212:Proposed Grounds Twenty to twenty-Five)**

In *United States v. Barrett,* 496 U.S. 1079 (2007), in affirming the convictions and

sentences, this Court found:

> Unlike the first vehicle, the second vehicle had its emergency lights on,
> including a flashing strobe-type light on the sun visor and wig-wag
> headlights. The third Tact Team vehicle, a marked highway patrol unit
> driven by Trooper Hash, also had its emergency lights on, including a full
> light bar on top. The lights from the light bar were bright enough to light up
> the entire area of Barrett's residence. This third vehicle was traveling less
> than a car length behind the second vehicle.

*Id.* at 1084.  What this Court did not know when it affirmed the convictions and sentences

of Mr. Barrett was that there was a critical credible witness, Oklahoma Highway Patrol 2d

Lt. Paul Gordon,  a career law enforcement officer then serving as the internal affairs

investigator, whose personal knowledge of the events of September 24, 1999, leading up

to the shooting of Trooper Rocky Eales and prosecutions of Kenneth Barrett who refutes

in almost every material way the government's version of events.  Trooper Gordon's

personal knowledge of the relevant events included observation of physical evidence and

statements by the testifying and non-testifying law enforcement officials at the scene

which unambiguously confirmed Mr. Barrett's defense that there was no emergency

lighting or notice to Mr. Barrett that would have made known to him that the onslaught of vehicles on his property in the middle of the night was law enforcement. Doc 199-1 at 10-12. Nor was there any reasonable indication of drug making or dealing on Mr. Barrett's premises at the time of the raid. *Id.* at 15, 17.

The declaration of retired Trooper Gordon was filed in the district court on March 16, 2012 in support of the pending Amended § 2255 Motion to Vacate along with a simultaneously filed Motion for Leave to File Supplemental or Amended Petition. Doc 201. Also submitted by Mr. Barrett was the state trial judge's opinion voicing incredulity at the revelation that Charles "Monk" Sanders was identified as the warrant informant. Judge Garett fully corroborated Mr. Barrett's allegations of prosecutorial misconduct and ineffective assistance of counsel on issues of credibility and trustworthiness of both the warrant declarant, Clint Johnson of the Local Drug Task Force, and his supposed informant, Sanders. Doc 200-1 at 2 (Declaration of investigator Leonard Post regarding interview with Hon. John Garett, Ret'd.). The Supplemental Petition expanded the pending claims to include the factual allegations made by Trooper Gordon as they related to the following claims:

- Ineffective assistance of counsel on the issues including:

    ♦ the failure to investigate and interview available witnesses who could support Mr. Barrett's defense,

    ♦ the failure to adequately develop and challenge the warrant and *Franks* issue

- ♦ the failure to challenge the credibility of law enforcement witnesses including Trooper Hash and Hamilton, Sheriff Philpot, and Drug Task Force Investigator Clint Johnson;

■ Prosecutorial misconduct, the trial court's interference with the defense and the unconstitutional order compelling Mr. Barrett to be restrained by wearing a stun belt.

Doc 201-1. With his declaration, Mr. Gordon submitted numerous exhibits including transcriptions of statements made by the relevant government witnesses and recordings, OHP training videos, and an audiotape taken on the night of the incident.

At the time of its decision, this Court did not know of the potentially explosive testimony of Trooper Gordon because the government and its agents in the State of Oklahoma's Highway Patrol and Attorney General's Office went to extraordinary lengths to conceal and suppress the results of his investigation and potential testimony, going as far as committing perjury to secure his silence and/or destroy his credibility. Trial counsel, though aware of the 2d Lt. Gordon, failed to adequately interview and investigate the matters known to Trooper Gordon and to use them to his client's benefit. As a result, this Court, the lower court and most importantly, the jury, was never informed of the critical evidence but were affirmatively misled on the central issues of the criminal proceedings. Gordon's testimony and the statements made by the state trial judge are consistent with Mr. Barrett's defense and corroborative of the § 2255 Motion's allegations, and render the government's version of events riddled with such profound

doubt that no reasonable jurist would have found Mr. Barrett guilty of murder. It is far more likely that the jury would have acquitted Mr. Barrett, especially in light of the self defense laws of Oklahoma in effect at the time. There is no doubt that the evidence would have raised a sufficient question of the government's case to deter any rational jury from imposing death.

The lower court's opinion denying the Motion for Leave to File a Supplemental Petition does not mention Trooper Gordon or his credible testimony beyond finding that the factual issues raised by the sworn declaration with which Mr. Barrett sought to supplement his 2255 Motion came too late to be considered. Doc 214 at 1.[10] Nor does the lower court make mention of the state court trial judge but instead, affirmatively denies both the request to supplement the petition, Doc 210 and a request to depose the judge to preserve his potential testimony, Docs 208, 209. The lower court's failure to recognize the relation back doctrine, which informs Mr. Barrett's request to supplement the pending petition, was clearly erroneous. [11]

Given the timely raised issues in the § 2255 Motion,[12] the lower court's denial of

---

[10] In its separate Order denying the Motion to Supplement, the lower court relied on Fed.R.Civ.P. 15 (a)(2), (d). Doc 210 at 2.

[11] To that extent, references to Trooper Gordon's Declaration and Judge Garrett's statements concerning Johnson and Sanders are noted throughout this COA request.

[12] *See e.g.,* Doc. 95, Ground Two, parts A(3), (8), (10) at pp. 47-58, 139-43, 149-54) (failure to investigate and introduce expert and other evidence attacking the government's evidence that the raid was properly planned, conducted according to accepted tactical operation protocol, and particularly that Mr. Barrett had notice of law enforcement via the alleged display of emergency lights); Doc. 95, Ground Two, part 9 at

Mr. Barrett's motion to supplement is at the very least debatable and worthy of

encouragement to proceed further.[13]

### C. A COA Should Be Granted on the Issues of *Brady,* Newly Discovered Evidence, and False Evidence and Other Prosecutorial Misconduct (Claim 5)

On the *Brady* violations which the court analyzes and rejects, there is no question

that reasonable jurists could disagree with the district court's resolution. Mr. Barrett

should receive encouragement to proceed further. The district court's findings with

respect to the *Brady* claims and argument misapply the law and ignore or contradict the

---

pp. 143-49 (failure of counsel to competently challenge and impeach the accounts of the raid and its aftermath given by the state and federal law enforcement personnel at the scene, including the arrest and beating of Mr. Barrett); Doc. 95, Ground Two, part A(7) at pp. 127-39) (failure to investigate and challenge the crime scene reconstruction testimony by Dalley, generally debunked in state court"). *See also,* Doc. 95, Ground Two, part A (12) at pp. 163-76) (failure to object to "expert" testimony which "excused" "incomplete and conflicting accounts" of the raid); Doc. 95, Ground Two, part A(11), pp. 159-63; Ground Five, part B(3) at pp. 307-08) (approaching Mr. Barrett in a non-confrontational manner and properly identifying themselves, would have avoided the violent confrontation); (Doc. 95, Ground Two, part A( 2) at pp. 34-47, Ground Five, parts B(1) and B(3) at pp. 296-303, 307-08) ( failure to challenge the legal basis and impeach purported support for the no-knock, nighttime warrant, which was issued in violation of *Franks v. Delaware,* 438 U.S. 154 (1978)).

[13] Nor does the lower Court's finding of "futility" preclude issuance of a COA on this claim. Regardless of whether Petitioner could have previously discovered the full depth and breadth of the information provided by the Internal Affairs's Investigator, for example, the government failed to discharge its *independent* duty to reveal it. Instead the government intimidated Trooper Gordon at the time of Mr. Barrett's trial, and left undisclosed the fact that law enforcement concocted baseless criminal charges against him to prevent or undermine his testimony. The government cannot profit from or take advantage of its own misconduct to keep these facts from being heard now. *In re Pickard,* 681 F.3d 1201, 1207 (10th Cir. 2012).

record as it currently exists.[14]

The claims made, however, are not *solely* allegations of *Brady* violations. The claims raised are far broader, implicating significantly more analysis and consideration than given by the court. Though the court acknowledges the broader constitutional claims, [15] it does not address the merits of them. At the conclusion of the court's analysis and rejection of the claims discussed above, the lower court found:

> After having reviewed all of the petitioner's *Brady* claims and thoroughly examining the exhibits cited in support thereof, this court finds the petitioner has failed to establish any *Brady* violations actually occurred in the petitioner's trial. Accordingly, this claim is denied.

Doc 214 at 73. That finding by itself shows the district court's misapprehension of the legal questions before it. All that is required for a COA on those claims left unaddressed is "an overview of the claims ... and a general assessment of their merits." *Miller-el, supra,* 537 U.S. at 338. As to claims discussed below which the court did not rule on, Mr. Barrett has certainly "prove[n] something more than the absence of frivolity or the existence of mere good faith on his [] part" meriting a COA on each.

---

[14] Because there are ten (10) individual claims of prosecutorial misconduct claims laid out by Mr. Barrett sections A and B alleging "*Brady*, Newly Discovered Evidence and False Evidence," despite apparent length of this request, as it relates to those sections, it averages less than the recommended two pages per claim.

[15] "Petitioner asserts he was deprived of his Fifth Amendment right to Due Process, his Sixth Amendment rights to counsel and confrontation, and his Eighth Amendment right to a fair and reliable capital sentencing process due to the government's suppression of exculpatory evidence, knowing use of perjured testimony, and failures to correct false testimony Additionally the petitioner claims newly discovered evidence entitles him to relief from his convictions and sentences." Doc 214 at 35.

**1.** ***Brady,* newly discovered evidence, and false evidence violations (Claims 5 A, B)**

**a.      The evidence withheld.**

Mr. Barrett lays out compelling, painstakingly detailed, fully documented[16] claims that the prosecution in his case suppressed, before, during and after trial, exculpatory evidence relevant to six of the informant witnesses,[17] three law enforcement officers, and the trial prosecutor,[18] including:

- Deals or leniency given to the informant witnesses in exchange for their testimony in Mr. Barrett's case;

- the extent and nature of the witnesses's work with law enforcement as informants;

- Threats made by the trial prosecutor to witnesses to secure and coach their testimony; [19]

- Numerous impeaching acts of dishonesty and criminality by Clint Johnson and his

---

[16] *See* Doc 95 at 272-310, and Exhibits referenced therein; Doc 178 at 127-141, and Exhibits referenced therein.

[17] Including Monk Sanders, Cindy Crawford, Brandie Price, Karen Real, Randy Turman and as yet unidentified witness.

[18] Some of the evidence proffered was material not only to the credibility of witnesses, but the propriety of the initial nighttime, no knock search warrant that was secured by Drug Task Force agent Clint Johnson, based on the information purportedly acquired from  Monk Sanders.

[19] Relevant to this were the ongoing criminal activities of former AUSA Mike Littlefield, which came to light in 2007, when he was allowed to enter an *Alford* plea in Muskogee County District Court to charges of physically abusing his own children, which in its substance is similar to and consistent with allegations regarding his treatment of witnesses.

girlfriend, OSBI agent Vickie Lyons.

The prosecution also permitted the knowing perjured testimony by Monk Sanders and Randy Turman. The government failed to disclose the identity of a known informant witness who could impeach Charles Sanders. [20] The government also sponsored false testimony from Travis and Cindy Crawford and failed to disclose that their testimony was the product of threats and intimidation.

### b.    The District Court's erroneous analysis and findings.

Underlying the lower court's rejection of the claims are at least two erroneous assumptions and application of law.

First, the district court rejects summarily most of the claims on the basis that there was no *Brady* violation because the federal government had no duty to know the state court activities of their witnesses.[21] In so doing, the court simply assumes the lack of a relationship between the state and federal governments justifying a duty to disclose with the inapplicable principle that "'it is unrealistic to expect the federal prosecutors to know all information possessed by state officials affecting a federal case[.]'" Doc 214 at 52, quoting *United States v. Beers,* 189 F. 3d 1297, 1304 (10th Cir. 1999). The circumstances here which suggest a very close working relationship between state, local and federal

---

[20] While the prosecution has never specifically identified this witness, information provided to the court under seal and kept erroneously under a protective order may be related to this claim. It will be dealt with in a separate COA request filed under seal.

[21] Doc 214 at 42 (Sanders), 48 (T. Crawford), 52-53 (C. Crawford), 61 (Turman), 69 (Johnson)

agents imposed upon the government a duty to know or search out and disclose

exculpatory information in the possession of the state. *See United States v. Bagley*, 473

U.S. 667 (1985); *United States v. Antone*, 603 F.2d 566, 570 (9th Cir. 1979) (where, as

here, the federal and state agencies pooled their investigative energies to prosecute the

defendant). Because this court has acknowledged the working relationship between the

federal and state agents, *Barrett,* 476 F. 3d at 1090,[22] and the many state agent witnesses

upon whom the government relied to prove its case, including Johnson and Lyons whose

conduct is at issue here, the district court's finding is questionable, if not obviously

wrong. The court's passing reference that "cooperation" was beginning to fray between

the federal and local agents cannot, per se, relieve the government of its obligation to

search out and disclose what the state agents knew or had in their possession.

Secondly, the District Court routinely refuses to consider the witness declarations

relevant to Mr. Barrett's *Brady*, false evidence and newly discovered evidence claims as

hearsay. Declarations of the sort used by Movant are recognized as appropriate vehicles

for bringing matters to the court's attention in § 2255 proceedings. Whether ultimately

determined to be hearsay or not,[23] the declarations in question are a matter of record, as

expanded on the lower court's order, Doc 161, imbued with the indicia of reliability and

---

[22] "[T]he search warrant for Barrett's residence was issued to not only state law enforcement officers, but also to "Special Agents and Task Force Officers of the Drug Enforcement Administration, Special Agent[s] with the Bureau of Alcohol, Tobacco and Firearms, or any other ... federal peace officer."

[23] The lower court's propensity to find non-hearsay declarations "hearsay" is also evident throughout.

"prove something more than the absence of frivolity or the existence of mere good faith," and are certainly worthy of consideration for those purposes. *See Miller–El v. Cockrell, supra,* 537 U.S. at 336 (quotations omitted). As its evidentiary companion, the lower court does, however, rely upon conclusory, self-serving declarations submitted by the government. To the extent the declarations put the factual contentions into issue, reasonable jurists would encourage further proceedings, rather than unilateral determinations of credibility on issues of disputed fact.

### *i.* Charles Sanders

The district court's finding that the "trial transcripts establish that the defense counsel was aware of the state court charges which could be used to impeach Mr. Sanders at the time of the trial," Doc 214 at 41, is not borne out by the transcripts.

Mr. Barrett supported his claims with numerous copies of criminal files concerning Sanders. In addition to the court records, Mr. Barrett cites specific record cites and exhibits to support his claim, which taken together, at the very least, present sufficient credible, debatable support for the allegations to merit, at the very least, discovery, an evidentiary hearing, and a COA.

Under questioning by former AUSA Littlefield, Sanders acknowledged as "all" of his prior history four convictions. R 2493.[24] Under cross-examination, however, Sanders

---

[24] 1986 AK illegal distribution(see Exh 161 at 2 [No. 86-604B]); 1989 uttering a forged instrument(Exh 162 at 2 [No. 89-396]); 1992 Possession of Controlled Dangerous Substance: cocaine (Exh 168Exh 168: No. 92-91) and "running a roadblock, concealing stolen property, arson and 2d degree burglary" (Exh 165 No. 2004-19)

admits to ten convictions.[25]  R 2536.  Records proffered by Mr. Barrett show Sanders has a far more extensive criminal history, notable for its impeachment value on truthfulness and trustworthiness, as well as for violence against women.[26]  The court files show that Mr. Sanders lied under oath on direct at least once when he offered only one further conviction in response to the question as to whether there were any more convictions. R 2493, and during cross-examination at least twice.[27]  Comparison of the cross-examination by Mr. Hilfiger with the court records filed by Barrett in support of his claim reveals defense counsel's ignorance of at least fourteen other criminal convictions.

The court's rejection of numerous criminal convictions because records of criminal charges and various dispositions of those charges do not contain a "judgment and sentence." *Id.,* at n.106, under F.R.E. 609, is patently unreasonable.  F.R. E. 609 requires only "*evidence* of a criminal conviction."  It does not limit the manner of proving the prior criminal conviction.  The court records submitted by Mr. Barrett are replete with some "evidence" reflecting the conviction on each charge for which the court finds fault. Beyond that, the records reflect matters beyond mere criminal conviction relevant to Mr. Sanders' credibility and testimony.  *See e.g.,* F.R.E. 404(b), 608.

The district court's determination that the extensive history which was relayed to the jury, undermines a finding of materiality in the failure to disclose the additional

---

[25] 1990 sexual battery and possession of CSS, cocaine; 1993 escape;

[26]  Exh 157-168, 175, 183-187.

[27]  Compare R 2526, 2528, 2536 with Exhs 168, 183

criminal records now at issue.  Doc 214 at 42.  *See e.g., Brown v. Silva,* 416 F. 3d 980,

988-89 (9th Cir. 2005).

The finding that there was *no* evidence that the  government was aware of those

convictions or had duty to be aware of them is simply wrong.  The evidence strongly

suggests that the federal government was aware of their informant's state criminal records

by the fact that the government opened the discussion of Sanders' criminal record on

direct, specifically referencing certain convictions, and concluded with the question:

"Any more we haven't covered?", R 2492 -2493, giving the clear impression to the jury

that it was hearing Sanders' complete criminal history.

Next, the court found that the trial transcripts establish the agreement between the

prosecutor and Sanders, thus refuting Mr. Barrett's claim of non-disclosure.  The record

shows otherwise.  The criminal records show that after Sanders testified, orders of

dismissal of five serious felony charges in different counties were filed.  The order has the

notation of "per plea agreement with the feds, banish from Sequoyah County" are in the

record.  The court refused to consider the evidence of the plea agreement because the

records were "uncertified" copies and "someone other than the judge who signed the

Order wrote a hearsay statement[.]"  The rejection of records which clearly bear indicia of

reliability, not refuted by the government, at the preliminary stage of the § 2255 Motion is

certainly open to debate.  So, too, is the finding that Mr. Barrett's suggestion that the

notation evinced a plea agreement with the feds was "pure speculation."[28]

<i>ii</i>.    <u>Travis Crawford</u>

According to sworn declarations, including by Travis Crawford himself, Mr. Crawford was pressured to testify by AUSA Littlefield by means of threats and intimidation in such a manner as to compel Crawford to lie. Additionally, the record shows that the government withheld exculpatory impeaching information regarding Mr. Crawford's prior dealings with law enforcement and drugs in violation of *Brady v Maryland,* 373 U.S. 83 (1963), *Giglio v. United States,* 405 U.S. 150 (1972) and *Douglas v. Workman,* 560 F. 3d 1156 (10th Cir. 2008). The trial court rejected this claim as well. Doc 214 at 44-50.

First, the court refused to consider the declarations submitted by Mr. Barrett's investigator and Mr. Crawford's parents, all of which confirm Mr. Crawford admitted he lied in his testimony against Mr. Barrett out of fear and intimidation, because the declarations were hearsay. The statement by Mr. Crawford is an admission to a crime, clearly against his interest and consistent with Mr. Crawford's own sworn declaration; thus, it bears a sufficient indicia of reliability to sustain the preliminary showing necessary in these proceedings. Mr. Crawford's claims as heard by his parents and the

---

[28] Summary rejection of the Orders in question is particularly ironic in light of the fact that the Order was signed by the state trial judge in Mr. Barrett's case, Hon. John Garrett, who when interviewed for these proceedings made clear that Charles Sanders was a notoriously dishonest person. Doc 200-1. Efforts to secure Judge Garrett's testimony to that effect, Doc 208, 209, were denied by the Court. Doc 211.

investigator raise serious questions of fact suggesting denial of Mr. Barrett's right to due process and a fair trial which should be resolved at an evidentiary hearing.

Incredibly, however, the lower court also rejects Mr. Crawford's own recantation in which he states that he falsely testified against Mr. Barrett out of fear and was led by Mr. Littlefield in what he was to say because the "recantation is just a ploy to obtain a new trial" which the court "finds suspicious in light of Mr. Crawford's actual trial testimony; the fact that Crawford is Barrett's cousin; and because Mr. Crawford was persuaded by a defense investigator to recant in the presence of his mother and father." Doc 214 at 45. Because Mr. Crawford's recantation meets the legal standards for newly discovered evidence under *United States v. Sinclair,* 109 F.3d 1527, 1531 (10th Cir. 1997), rather than reject the recantation for the reasons stated, reasonable jurists could find the issue worthy of further encouragement and appropriate for an evidentiary hearing.

### *iii.* Cindy Crawford.

Mr. Barrett also presented credible evidence that Ms. Crawford was threatened, intimidated and coached by AUSA Littlefield; that, contrary to her testimony, she was an active drug user and was high or "coming down" when she was interviewed by the government and when she testified; and that she suffered from mental impairments which affected her ability to recall accurately. The government failed to disclose the nature and extent of her work as an informant with law enforcement and benefits received in exchange for her testimony against Mr. Barrett.

The lower court again rejected the declarations offered in support of the claims as hearsay.  The court also determined that the information regarding her work as an informant was easily discovered by the defense,  but that it was "unrealistic to expect the federal prosecutors to know all information possessed by state officials affecting a federal case especially when the information results from an unrelated state investigation, " concluding that the allegation of continued benefits is purely speculative and Mr. Barrett had failed to show a *Brady* violation.  Doc 214 at 50-53.

Although Ms. Crawford refused to sign a declaration attesting to the statements she made to defense investigators, the declarations of the investigators themselves put the factual matters recited in issue, requiring an evidentiary hearing.  Crawford told the investigators she had been intimidated and threatened by AUSA Littlefield, both before trial and during her trial testimony, and that this intimidation affected and colored her testimony against Mr. Barrett.  Exhs. 14, 31, and 43, Amended Motion.  Littlefield's threats were *Brady/Napue* material that was required to be disclosed to the defense.  This is also a species of newly discovered evidence and use of false evidence, because, again, Littlefield's threats shaped Ms. Crawford's testimony and they were not revealed at trial. The claims supported by far more than mere speculation raise sufficient concern to merit further inquiry.  The pervasive allegations of the prosecutor's intimidating and threatening manner, brushed aside by the lower court, implicate serious Due Process

concerns and make the truthfulness of the claims more likely. [29]

Again, the court relies on the specious belief that the prosecutors can turn a blind eye to anything known by state and local law enforcement about their witnesses. The government argues there was no need to inform the defense of Cindy Crawford's history as an informant. Doc 214 at 52-53. This finding, for the reasons and authorities already stated, is at least debatable, and arguably plainly wrong. Equally without merit is court's finding that the prosecution had no duty to disclose Crawford's informant history because, according to various declarants, it was "well known" that Crawford had acted in such a capacity, and thus the defense should have been aware of it. Doc 214 at 52. This does not diminish the government's *Brady* obligations.

The government suppressed impeaching evidence that at the time of Mr. Barrett's trial, Cindy Crawford was in violation of a deferred sentence and thus had a motive to curry favor with government authorities, particularly prosecutors. A sufficient factual question has also been raised as to whether she received favor as a result of her testimony, since her problems with the deferred sentence disappeared after Mr. Barrett's trial.

*iv*.    <u>Brandie Zane Price</u>

The court finds that Mr. Barrett engaged in speculation when he argued the prosecution knew or should have known that Price was engaged in drug activities at the

---

[29] *See also*, Doc 199-1 at 27 ¶84, where Paul Gordon also reports Littlefield's threatening manner and his reaction as fearful, Doc 199-1 at 26 ¶84, which, coming from a former OHP internal affairs investigator, renders the claim worthy of further development.

time of Mr. Barrett's trial. Doc 214 at 54. The fact she was charged in a federal drug indictment involving acts occurring, at the latest, shortly after Mr. Barrett's trial raises the inference of earlier drug activity and knowledge on the part of the government that, contrary to her trial testimony, she was involved in drug activities at the time of Mr. Barrett's trial. In her federal drug case, she received a significant sentencing break not due to the facts of that case, including any cooperation she might have given, but due to her testimony in Mr. Barrett's totally unrelated case. While this claim is admittedly less clear than the other informants' undisclosed histories and plea agreements, it is in light of those which show this particular claim should be held pending an adequate determination of the prosecutors' actions, knowledge and treatment of all the informant witnesses, including Ms. Price.

### v. Karen Real

As with the allegations of undisclosed leniency Charles Sanders received following his testimony, the court finds the prosecutors fully revealed Karen Real's expectations of leniency. This is not true. At trial, the prosecutors soft-peddled the lengths they were willing to go in exchange for her testimony against Mr. Barrett by allowing Real to state that the only thing she had been promised was that the prosecutor would tell her judge she cooperated, that it would be up to the Court as to whether she would actually receive any leniency for her cooperation, and that she was not really expecting to get anything. The prosecutors did not just "talk to" Real's sentencing judge, they filed a Rule 35 motion and strongly recommended that she be given a *substantial*

reduction in sentence. Thus, the government's claim that "no ... particular reduction" was recommended by the government is untrue. The "substantial reduction" affirmatively sought by the government materialized when Real's sentence was reduced to time served. The prosecutors clearly concealed the deal they had with Karen Real, and the court in its findings permits them to hide behind the claim that so long as a vague assurance is made, acted on only after trial, no *Brady* or *Giglio* violation occurred.

The misleading spin placed on what the prosecutors were prepared to do for Real also constituted the sponsorship of materially false evidence. Real's deal is also newly discovered evidence, because it was consummated after Mr. Barrett's trial. The court's finding otherwise by choosing to focus on the means of communication with the judge, Doc 214 at 58, rather than the tone and content of that communication, should not cut off Mr. Barrett's efforts to prove this claim.

The prosecution also suppressed *Brady* evidence when it failed to disclose that a number of state drug charges had been dismissed against Real. Exh 47-52, Amended Motion. The court finds this particular contention is barred by the statute of limitations, having been filed in the December 4, 2009 in the Amended § 2255 Motion (Doc 95). The issues concerning Real's dismissed state charges do not constitute time-barred "new issues," but merely amplify or clarify issues already raised. The dismissed state charges gave Real a motive to please the federal prosecutors in Mr. Barrett's case lest they possibly be revived if she displeased the government. The prosecutors were obviously aware of her state charges.

## *vi.* Randy Turman

The court finds the government committed no violations with respect to Randy Turman's pending Sequoyah County drug case because defense counsel were aware of the case and cross-examined Turman about it. Doc 214 at 59. The evidence proffered, however, indicates Turman was working as an informant, and is the only reasonable explanation for why his case lay fallow for years. Turman's informant status was not revealed to the defense. When Turman falsely denied that his multi-count felony drug case was still ongoing, despite counsel's ineffective attempt to establish this, the government sat idly by, allowing Turman to perjure himself. Nothing in the colloquy cited by the court shows either Mr. Turman's admission to the pending nature of the case or the government acknowledgment of the falsity. It is clear defense counsel did not know, or he would have presented the evidence himself rather than merely inquire of the witness's certainty of the status. At the very least, the record is ambiguous and surely does not "establish the falsity [of Mr. Barrett's allegations] regarding Turman." Doc 214 at 61.

Newly discovered evidence raised the factual issue of whether Turman was acting as an informant and was given an explicit or tacit assurance that his testimony against Mr. Barrett would lead to favorable resolution of his case, which is what occurred since it was dismissed outright after no action had been taken on it for a significant period of time. As reflected in comments made by the prosecutors during the September 13 *ex parte* hearing, the government was especially solicitous of Turman's plight. The government told the

Court that Turman feared physical retaliation from drug dealers due to his cooperation, one of whom was involved in the Karen Real federal drug case and was currently imprisoned. R Hr'g 9/13/05 at 13-14.

Based on the facts presented by Mr. Barrett rather than limited by the trial transcript as the lower court would have it, reasonable jurists would debate whether the government's failure to correct a lie made by their witness on cross-examination is misconduct, and reasonably suggests an undisclosed relationship between Turman and the prosecutors. At the very least, it should have been explored at an evidentiary hearing rather dismissed as "another example of defense counsel's speculation which has no basis in fact." Doc 214 at 191.

*vii.* <u>The unidentified impeachment witness</u>

The lower court dismisses the claim that the government's failure to disclose an impeachment witness is a *Brady* violation by limiting its consideration of impeachment to the actual testimony presented. The testimony in the *ex parte* hearing as laid out by the court in its opinion makes very clear that the government was aware of threats by Mr. Barrett as reported by Sanders, and that they were aware of a person who would have been a participant to the conversation who did not corroborate Sanders's claim of threats. Doc 214 at 63. That Mr. Sanders had made a prior statement to the government that is provably false by a witness known to the government is exculpatory information the prosecution had a duty to disclose. They didn't. The court's limitation on a purported event which took place without that witness does not negate the witness's impeachment

value.  The court's finding that '[t]here is simply no evidence in this record, to establish that some undisclosed witness was in a position to contradict Sanders' claim that he had been threatened *after* the murder.[]" is wrong.  The fact that Sanders' or the government's version of the purported threat changed as a result of the knowledge that there was a witness who knew the first version to be a lie, does not amount to "no evidence."

> *viii.* <u>Claims involving Credibility of Law Enforcement Personnel</u>  (Claim 5B)

Mr. Barrett presented evidence of misconduct by Clint Johnson including a county audit of misuse of funds allocated to the Drug Task Force, and a personal relationship between Johnson and OSBI witness Vicki Lyons, which raised questions of her credibility as well.  He presented evidence of an interview with the local sheriff Johnny Philpot whose contact with Mr. Barrett at Mr. Barrett's premises shortly before the raid reflected a knowledge by law enforcement that Mr. Barrett was not dangerous.  And he presented evidence that AUSA Littlefield had been charged with ongoing child abuse, consistent with the bullying reputation witnesses have spoken about.  The evidence submitted was exculpatory, relevant and material to issues of the credibility of the three law enforcement witnesses who testified against Mr. Barrett; the substantive issues related to the issuance and middle of the night execution of the warrant; and to the credibility of the witnesses' alleging prosecutorial intimidation and coaching by Littlefield.

The court simply rejected out of hand the proffer and resolved the factual disputes

without benefit of a hearing. *See e.g.,* Doc 214 at 68 (relying on a self-serving affidavit of an Assistant Attorney General to dispute record-based facts supporting allegations of misconduct against Clint Johnson involving the mishandling of money for drug buys); Doc 214 at 71 (relying on the government's declaration by Johnson denying that he lived with another critical state's witness, Vickie Lyons, whose credibility could have been impugned by her relationship with Mr. Johnson). Doc 214 at 71-72 (relying on Philpot's denial/retraction of the statement made to the investigator.)

Minimally, the claim is sufficiently substantive and supported by the record to find that Mr. Barrett has "demonstrat[ed] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further." *Dulworth v. Jones,* 496 F.3d 1133, 1136–37 (10th Cir.2007) (quoting *Miller–El v. Cockrell,* 537 U.S. 322, 327 (2003)) (internal quotation marks omitted).

The evidence proffered shows that Clint Johnson, the Drug Task Force agent who secured the warrant and enlisted the assistance of the OHP for execution of the same, was not a reliable witness; that he was corrupt; and that there was an investigation ongoing during Mr. Barrett's trial into the corruption which lead to Johnson's firing from the District 27 Drug Task Force some two weeks after Mr. Barrett was sentenced, all of which was known to the government and not disclosed. Further, as set out in the § 2255 Motion, Johnson's testimony in the state trial shows either that he lied in the state trial and knew about Sanders' extensive criminal history, or he lied in the federal trial in

claiming Sanders was the informant who provided the information to secure the warrant. Doc 95 at 301-303. If he did not, then Sanders was not the CI, establishing a separate lie.

The court rejects the claim as premised on conjecture and speculation, finding no *Brady* violation occurred. The evidence of an ongoing investigation is not speculation. The testimony of Clint Johnson in the unsuccessful prosecution of the Sequoyah County prosecutor is not speculation. At the very least, there is a genuine factual dispute about the truthfulness of Johnson's testimony regarding the confidential informant which undermines the very foundation of Mr. Barrett's conviction and death sentence.

Similarly, the court discards exculpatory information of non-violence by Mr. Barrett toward law enforcement when shortly before the nighttime raid, the local sheriff stopped Mr. Barrett's home and checked his weapons without incident. First relying on a declaration by Philpot to refute the facts, and secondly, shifting the government's dereliction of duty to Mr. Barrett, the court again finds no *Brady* error in the government's failure to disclose. A disputed factual issue was raised respecting Sheriff Philpot's uneventful visit to Mr. Barrett's property approximately a month before the raid, undermining the very premise of the raid and heart of the informant witnesses' testimony. Sheriff Philpot's current denial that such an incident occurred is entitled to little credence because it is made in the context of an earlier admission that the event in fact took place.[30]

---

[30] This is notably consistent with Philpot's admission to Trooper Gordon of having beaten Mr. Barrett at the time of the arrest, Doc 199-1 at 15 ¶48, despite later denials.

Even aside from Mr. Barrett's *Brady* claim respecting this evidence, it is readily apparent that the government sponsored false testimony, since this event itself disproves the theory that Mr. Barrett was a danger to law enforcement, and had to be approached in the way he was in the early morning hours of September 24, 1999.

And finally, the lower court finds that suppressed evidence of criminal activity by AUSA Littlefield, namely, child abuse, an act of violence which is consistent with a bully who would intimidate and threaten witnesses, is not a *Brady* violation because the incident took place after the trial. Reasonable jurists, however, might find that former AUSA Littlefield's child abuse case, and the facts surrounding it, constitutes both *Brady* material and newly discovered evidence. Exh 189, Amended Motion. Littlefield's abusive conduct is plainly relevant to Mr. Barrett's claims that he used his authority to bully and intimidate witnesses. At the very least, a reasonable jurist would find the issue worthy of further inquiry.

### 2. The prosecution interfered with the defense's right to interview Witnesses. (Claim 5C)

The district court did not address this claim. Doc 214. The error in question is the government's interference with, and misrepresentation to, the witnesses that they could not talk with the defense or that any contact by the defense had to occur under the watchful eye of the prosecution. *See* Doc 95 at 310-314; Doc 149 at 165-168. The claim rests on extra-record, newly discovered evidence which could not have been raised on appeal and is appropriately brought under Section 2255. *Massaro v. United States*, 538

U.S. 500, 505 (2003).

The conduct by the prosecutor in insisting that the witnesses be interviewed at his office was an unreasonable interference with the defense. *See e.g.,* Doc 70, Exh 91 (Declaration of Roger Crawford regarding statements made by Travis Crawford that his testimony was the result of fear and intimidation of government agents); Doc 70, Exh 31 (Declaration of Investigator regarding statements made by Travis Crawford that he felt fear and intimidation through Philpot and Littlefield); Exh 43 (Declaration of Investigator that Karen Real was told not to speak to the defense.) Without addressing the direct statement by Ms. Real that she was expressly told not to speak to the defense, the government does concede Ms. Crawford's belief that she could not speak to them, which the government downplays as being the witness' "subjective interpretation." Doc 175 at 188. By that concession alone (and the lack of any denial regarding Ms. Real), Mr. Barrett is entitled to further discovery and an evidentiary hearing. The discovery process, including the right to depose the critical witnesses and an evidentiary hearing which should be held, will undoubtedly lead to additional evidence to support this claim.

The government's argument that "simply put, Barrett fails to show that any foregone interview with Cindy Crawford would likely led to his acquittal," Doc 175 at 189, again misstates the prejudice requirement. Here, Mr. Barrett was denied a fair opportunity to interview the witnesses which "elemental fairness and due process require that he have." *Gregory v. United States,* 369 F. 2d 185, 188 (D.C. Cir. 1966). Mr. Barrett is entitled to a new trial or, at a minimum, the right to full discovery and an evidentiary

hearing on the issue.  Most certainly, he is entitled to a COA.

### 3. Mr. Barrett was prejudiced by the prosecutors' misconduct during trial.  (Claim 5D)

During both the guilt and penalty phases of the trial, the prosecutors blatantly interposed improper questions designed to imply falsehoods or bolster the credibility of witnesses.   Additionally, the prosecutors made egregious, inflammatory statements during closing arguments.  The overall effect of these questions and comments so infected that trial that Mr. Barrett was denied due process of law.  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  The claim is worthy of COA.

### a. Mr. Barrett's claim is subject to collateral review.

Prosecutorial misconduct was not raised on direct appeal.  However, Mr. Barrett can establish ineffectiveness based on the fact that the misconduct of the prosecutors in both stages of trial was so glaring, no reasonable strategy excused the failure to raise the claim.  Especially because the government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different.  *Evitts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984).  This claim has not been procedurally defaulted.

### b. The prosecutors improperly questioned the witnesses.

There are numerous examples of the prosecutors' improper questioning of witnesses, as set forth in Mr. Barrett's Amended § 2255 Motion and Brief in Support.

These include: 1) asking questions for which there was no good faith basis, or which were beyond the personal knowledge of the witness; 2) implying, through such questioning, that the prosecutor personally had knowledge of facts not testified to by the witnesses, making the prosecutor, in effect, a testifying witness; 3) commenting on Mr. Barrett's exercise of his trial rights, as if he were somehow doing something wrong by demanding his constitutional right to a trial; 4) asking witnesses whether other witnesses had made false statements, when, again, such would be beyond the knowledge of the witness being examined; 5) utilizing questions as a form of closing argument by repeating, over and over, the testimony of the informant and other witnesses, thus in effect vouching for the testimony of the witnesses.

For example, Mr. Barrett challenges the prosecutors' line of questioning regarding his right to go to trial. In questioning Deputy Court Clerk Maudeen Vann, Prosecutor Littlefield engaged in the following:

Q.     In regards to the felony information about which you've testified for the homicide of David Eales, Mr. Barrett didn't plead guilty, did he, ma'am?

A.     No, sir.

Q.     Put the government to the task of proving its case, didn't he?

A.     Yes, sir.

Q.     And ultimately Mr. Barrett was convicted of manslaughter and given a 20 year sentence in that case?

A.     Yes, sir.

R 4765.

There is no connection between Mr. Barrett's plea of not guilty and the evidence presented in his state trial. Prosecutors commit misconduct if they imply that the defendant somehow abuses the legal system by exercising his Sixth Amendment right to trial. *See Cunningham v. Zent*, 928 F.2d 1006, 1019 (11th Cir. 1991). That's exactly what the prosecutor was attempting to do here. A COA on this issue is appropriate.

>    c.    **The prosecutors were especially egregious in arguing that the jury should impose a death sentence.**

The examples of prosecutorial misconduct in the penalty phase closing arguments are numerous and set out in full in Mr. Barrett's Second Amended § 2255 Motion and Brief in Support.

The prosecutors made unsubstantiated and inflammatory statements about Mr. Barrett's alleged lack of remorse, such as "There's no proof that Defendant lost one wink of sleep over what he did. It's almost like nothing happened . . . You know it's almost a oops." R 5419. This is complete speculation on the part of the prosecutors, only meant to inflame the jury.

The prosecutors continually pushed the bounds of reasonableness, arguing that it was only the "hand of God" that prevented Mr. Barrett from being a multiple murderer and that this was "way over the capital murder line." R 5402-03. Amazingly, the prosecutors told the jury that Mr. Barrett not only had no right to leniency, but really had no right to "fairness." R 5408. It only gets worse. The prosecutors told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison,

where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation. R 5412.

Speculating outside the record simply to prejudice the jury, the prosecutor said that if given life, Mr. Barrett would be a "hero" to his fellow inmates. *Id*. Inflammatory phrases without any evidentiary support were frequently used, such as "executioner of the innocent," how unjust was it that Mr. Barrett wanted to "choose his sentence," that Mr. Barrett wanted "the thrill of the kill," R 5412-13, and that Mr. Barrett "slaughtered an innocent soldier of the law." *Id*. R 5423. The prosecutor's statements most assuredly did not rely on facts adduced in the record. *See Duckett v. Mullin*, F.3d 982, 992 (10th Cir. 2002); *Le v. Mullin*, F.3d 1002, 1014-15 (10th Cir. 2002).

The prosecutors further improperly aligned themselves with the jury by the use of first person pronouns during their argument. This Court held in *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003):

> We agree with the district court that "[t]his is an extremely improper argument" because "it profoundly misleads the jury" about its role in the criminal process "by suggesting that jurors are part of 'the team' of the prosecution and police, rather than impartial arbiters between the State and the defendant." The Supreme Court has stressed repeatedly "that the jury must not be misled regarding the role it plays in the sentencing decision." *Romano v. Oklahoma*, 512 U.S. 1, 8, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (following *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)); *see also Young*, 470 U.S. at 18, 105 S.Ct. 1038 (holding prosecutor's effort "to exhort the jury 'to do its job' ... has no place in the administration of justice").

317 F.3d at 1223. Thus, *Cargle* stands for the proposition that it is prejudicial for a prosecutor to suggest that jurors are part of the prosecution team. That is exactly what

happened in Mr. Barrett's case.  The prosecutor stated:

> Remember the real victims.  It is not our job here to forgive.  We are not the victims of the Defendant's brutality.  It's not our job to feel guilty.  The murderer who mercilessly killed in this case as a matter of conscious, premeditation and planning ought to feel guilt and remorse but he doesn't.  He is the one who put us all here.  What a sense of power he must feel, the narcissistic, selfish collection of reality that he is.  He's the one that put us all here.
>
> But we must not refuse to do our duty just because we can't make the victim's family or friends or community whole.

R 5421-22.  The prosecutor was attempting to make the jurors feel a part of the prosecution team, *i.e.*, "our job, " "put us all here," "our duty," and "we can't make the victim's ... whole." Mr. Barrett's case is directly on point with *Cargle.*

A general assessment of the merits make clear Mr. Barrett is entitled to a COA.

**D.     A COA Should Be Granted on the *Franks V. Delaware*,  438 U.S. 154 (1978) Issue (Ground Four).**

The district court held this Fourth Amendment issue was procedurally barred from consideration in these collateral proceedings because Petitioner was afforded the opportunity for a full and fair hearing in the trial court.  *Stone v. Powell,* 428 U.S. 165 (1976).[31]  The court held that any exception to this rule[32] did not apply because trial

---

[31]  Two of the stated reasons for finding that Petitioner had the required opportunity to press a *Franks* claim at trial are clearly unpersuasive.  The district court recounts that an evidentiary hearing was held on a motion to suppress filed by the defense, which was ultimately denied.  Doc 214 at 74-75.  However, this motion did not raise a *Franks* claim.  The fact a previous motion was filed for which a hearing was held, but which did not address this issue, is irrelevant to whether Mr. Barrett was afforded a full and fair opportunity to litigate the *Franks* challenge.  The identity of the confidential informant on the warrant was not revealed until trial.  The district court also suggested that because some Fourth Amendment and state law search and seizure issues were raised

counsel was not ineffective, appellate counsel was not ineffective, and the government

did not suppress exculpatory evidence showing the dishonesty of the affiant, Clint

Johnson. The court also held, as it did at trial, that because Clint Johnson stated in the

affidavit that he had found the CI (Charles Sanders) reliable in the past, he could rely on

his statements for this search warrant. This ended the inquiry. Doc 214 at 67-70, 74-76.

Reasonable jurists could disagree. At trial, although Charles Sanders repudiated

on cross-examination the statements which formed the basis for the search warrant, thus

showing information was false, counsel did not argue them in the *Franks* motion. Nor

did the district court consider Sanders' testimony as a whole. The trial court also relied

improperly on the testimony of the other informant witnesses, none of whom came

forward until years after the fact, to support the credibility of Sanders' statements recited

in the warrant affidavit. Doc 214 at 75. Because trial counsel failed to argue the

pertinent facts, and the district court did not consider them, Petitioner was denied a full

and fair opportunity to have the *Franks* claim decided. Appellate counsel was ineffective

---

on appeal, this somehow precluded Mr. Barrett from raising the *Franks* claim in § 2255 proceedings. Doc 214 at 75-76. This is not the case. *United States v. Cook,* 997 F.2d 13123, 1317 (10th Cir. 1993)(remanding to determine whether appellate counsel was ineffective for failing to raise certain Fourth Amendment arguments).

[32] *Smith v. Black,* 904 F.2d 950, 965 (5th Cir. 1990), *abrogated on other grounds, Stringer v. Black*, 503 U.S. 222, 227 (1992)(where prosecution suppresses *Brady* evidence relevant to a *Franks* challenge, suppression issue is not barred by *Stone v. Powell, supra* in collateral proceedings); *Kimmelman v. Morrison,* 477 U.S. 365, 383-91 (1985); *United States v. Owens,* 882 F.2d 1493, 1498-1500 (10th Cir. 1989)(*Stone* does not preclude raising a Fourth Amendment claim in collateral proceedings where counsel was ineffective).

for failing to raise the issue as framed by the record and in seeking the evidentiary hearing Mr. Barrett was improperly denied in district court. *Gamble v. State of Oklahoma,* 583 F.2d 1161, 1165 (10th Cir. 1978).

Holding that no exculpatory evidence reflecting on Clint Johnson's honesty was suppressed by the government, the court found that his claimed acts of misfeasance and malfeasance, which were being investigated by the District Attorney's Office (an investigation which was contemporaneous with Mr. Barrett's case) and which led to his firing, amounted only to slanderous attacks devoid of substance. But reasonable jurists could find: 1) that the District Attorney's investigation had uncovered evidence of official misconduct on Johnson's part, including embezzlement, perjury, illegal drug use, and misuse of office which would have fatally impeached Johnson's reliability as the affiant on the search warrant; 2) that these allegations were substantial rather than a "slanderous attack" because they led to Johnson being fired from his job shortly after Mr. Barrett was sentenced; and 3) the allegations were substantial rather than mere slander because the corruption case against the District Attorney who investigated Johnson resulted in a directed verdict of acquittal due to Johnson's performance as a witness in that trial, where his own corruption was explored in depth. Doc 95 at 297-303, and exhibits cited therein. The affidavit of Oklahoma Assistant Attorney General McCormick, whose case against former District Attorney Richard Gray went up in smoke thanks to Johnson, and who attests to Johnson's rectitude, is entitled to little if any weight. Doc 214 at 67-70.

The district court held that even if it could be said the evidence of Johnson's

misdeeds was exculpatory and bore on the validity of the search warrant affidavit, the government was under no obligation to disclose it because the District Attorney's Office and the District 27 Task Force, for whom Johnson worked, were not "agents" of the government in this federal prosecution. Doc 214 at 67-70. The court remarked that federal law enforcement were the only agents of the government for *Brady* purposes, noting that the FBI took some 200 photographs of the scene, and the DEA searched Mr. Barrett's property after Trooper Eales was shot and killed.

The court overlooks that this case was originally investigated by state authorities, and the government relied in substantial part on the state investigation and state law enforcement witnesses, including Johnson himself, whose search warrant set the entire chain of events in motion. The case was originally prosecuted by the very District Attorney's office Johnson worked for, and regardless of any problems of communication or lack of cooperation, the government worked with the District Attorney's office in the federal prosecution of Mr. Barrett, building on the earlier state prosecution. Sequoyah County Sheriff John Philpot, not a federal law enforcement officer, was the government's case agent at trial, and assisted the prosecutors in cultivating the informant witnesses. Because Johnson and his employers were clearly agents of the government in this case, and because Johnson himself was an important witness, the government knew or should have known about the evidence of Johnson's dishonesty, and was required to disclose this evidence to the defense. This evidence would have invalidated the search warrant under *Franks*, because Johnson was an unreliable officer upon whom no neutral and detached

magistrate could rely.

The district court did not discuss, in connection with the *Franks* claim, whether the government suppressed evidence showing that Sanders was thoroughly unreliable because he had received deal after deal in his many criminal cases due to his work as an informant, and that his motivation in providing information to law enforcement was always to escape punishment for his own crimes. Doc 95 at 273-78, and exhibits cited therein. In its response to the § 2255 petition, the government argued that it was the reliability of the affiant, not the informant, that was critical to any *Franks* issue. But the informant's reliability, particularly where, as here, no corroborating evidence for the informant's statements are included in the warrant affidavit, is relevant to a *Franks* inquiry. *E.g., United States v. Bernal-Obeso,* 989 F.2d 331, 335-36 (9th Cir. 1993).

Reasonable jurists could believe the warrant was infirm under *Franks* because Johnson concealed from the magistrate any and all evidence showing his informant to be unreliable, including Sanders' lengthy criminal record, acts of dishonesty, use of drugs, the many deals he had received for his work as an informant, and his self-serving motives in providing information against others. At a minimum, reasonable jurists could believe that Johnson acted with reckless disregard for the truth by relying on Sanders as an informant and failing to provide the magistrate with material information bearing on the credibility of the informant, which would have vitiated the affidavit before any neutral and detached magistrate. Where such information showing an informant to be unreliable exists, a warrant, contrary to the finding of the district court, Doc 214 at 75, is not

immune from a *Franks* challenge simply because the affiant includes unadorned, boilerplate language that he or she had found the informant reliable in the past. *E.g., United States v. Reddick,* 90 F.3d 1276, 1280-81 (7th Cir. 1996).

Petitioner contended that Johnson acted with reckless disregard for the truth in seeking a nighttime, no knock warrant alleging danger to officers when he knew or should have known that Sheriff John Philpot had visited Mr. Barrett's property the month before the raid without incident. Doc 214 at 71-72, Doc 95, Exhs 6, 85, 97. The district court rejected this argument based on Sheriff Philpot's affidavit denying he had been to Petitioner's property the month before the raid. However, this affidavit only represented an effort to back track from statements Philpot made to a defense investigator. Doc 95, Exh 6. Johnson knew or should have known this information, because he worked closely with Sheriff Philpot on the planned raid, and the sheriff had originally opposed the raid.

A COA should be granted on this issue.

**E. A COA Should Be Granted on Grounds One and Three, Which Argue That the District Court, to Mr. Barrett's Prejudice, Unconstitutionally Interfered with Petitioner's Defense, Failed to Provide Funding for Tools Necessary for an Effective Defense, and Denied Due Process by Failing to Disclose the Contents of an *ex Parte* Conference with the Prosecutors.**

Because the district court addressed Grounds One and Three together in its opinion and order denying relief, Mr. Barrett combines them in urging that a COA be issued on both.

### 1. *Ex parte* hearing (Ground One)

Reasonable jurists could disagree whether the district court denied Mr. Barrett his due process right to a fair trial and contributed to a denial of effective assistance of counsel in failing to fully disclose the contents of the *ex parte* hearing it conducted with the prosecutors on September 13, 2005. In its opinion and order denying § 2255 relief, the court did not even mention or address this aspect of Ground One. Presumably, the district court relied on its rejection of this argument in the motion to disqualify from the § 2255 proceedings, even though whether the court should have disqualified on this basis and whether the hearing, and the failure to disclose its contents, denied a fair trial and prejudiced the defense are two entirely separate issues.

The district court's rationale for its holding in denying the motion to disqualify, assuming it could be "imported" to deny this aspect of Ground One *sub silentio,* is unconvincing. In denying the motion to disqualify, the court held that once the prosecution raised the issue of alleged danger to its informant witnesses in a sealed motion, it had no choice but to hold an *ex parte* hearing under 18 U.S.C. § 3432 to determine if the names of the witnesses should be revealed. Doc 66 at 8. While this may be so, there was no reason not to disclose to the defense what had been discussed at the hearing once court determined: 1) that the government's motion was dilatory and could have been filed weeks before, and 2) that the prosecution had not carried its burden to show, by a preponderance of the evidence, that there was any actual threat of harm to its seven informant witnesses that would justify a protective order. Doc 66 at 9-11, Doc 95

at 28, R 9/13/05 at 20. Therefore, no legitimate reason existed to keep the witnesses' identities and contact information secret, to keep the matters addressed at the *ex parte* hearing under seal, or to further delay disclosing the identities of the witnesses.

The court failed to disclose to the defense that the prosecution's motion for a protective order lacked merit; that it was filed disturbingly late; that a long continuance would be justified to prevent a trial by ambush; that its research showed the trial had already begun for purposes of § 3432; that the 404(b) evidence "implicit" in the witnesses' testimony was not being timely revealed; and that the prosecution had knowledge of a witness who would impeach Charles Sanders' claim that Mr. Barrett had made a threat against him. Many of these undisclosed issues had nothing to do with the reason for conducting the *ex parte* hearing in the first place. Doc 95 at 25-27, CR R 9/13/05 at 4-5, 7,10-12, 22-23).

These undisclosed, material facts were the gravamen of Mr. Barrett's argument, but they went completely unmentioned in the district court's denial of the disqualification motion. Doc 66 at 6-16. The court simply recited selective portions of the pertinent record, and concluded that the whole matter was moot once the parties announced they had reached an agreement for the defense to interview the informant witnesses at the government's office under its watchful eye. Doc 66 at 13-16. But the point was that because there was no justification for sealing the *ex parte* hearing or the matters addressed there once it was determined the government possessed no evidence to support a protective order, and in light of the fact that other relevant matters discussed did not

come within the ambit of the reason to seal the hearing, the court permitted the government to hoodwink the defense into acceding to a hasty, eleventh hour arrangement which precluded any real investigation into the seven informant witnesses, all but one of whom refused to even speak to the defense. Doc 66 at 13-16, Doc 95 at 29, R 843.

Without knowing the contents of the *ex parte* hearing, which should have been disclosed (particularly the court's view that the defense would be entitled to a continuance to investigate the informant witnesses), the defense, with the court's assistance, was placed at a huge disadvantage and had no time to adequately investigate the informants and the credibility of their proposed testimony. The court recognized the government was out to ambush the defense, and allowed it to happen. Given adequate time, the credibility of the informants could have been significantly impeached. (See discussion in the COA request for Ground Two). Mr. Barrett was prejudiced by the lack of a continuance, and, due to the fact the contents of the hearing were not revealed, counsel were unable to make an informed choice as to whether to move for a continuance, which the court itself believed to be warranted. Defense counsel Roger Hilfiger has stated that investigation of the informant witnesses was hampered by their late disclosure and the ultimately unsatisfactory, one-sided arrangements that had been made to "interview" them, but that he believed there was no realistic chance for a continuance. (Doc 95, Exh 29; Doc 175, Exh 12. The defense would have been disabused of this notion had the contents of the *ex parte* hearing been revealed, as they should have been. *Chicago, Milwaukee, and St. Paul & Pacific Railroad v. United States,* 585 F.3d 254, 263

(7th Cir. 1978); *Greico v Meachum,* 553 F.2d 713, 719 (1st Cir. 1976)(*ex parte* hearing prejudicial to one of the parties).

The fact this Court ruled on direct appeal that the timing of the disclosure of these witnesses did not run afoul of § 3432 does not dispose of the issue of whether, had it known of all the facts, the defense would have nonetheless been entitled to a continuance (as the district court believed it would be), to investigate and prepare to challenge the informants' testimony. Doc 66 at 16; *United States v. Barrett,* 496 F.3d 1079, 1115-16 (10th Cir. 2007).

This issue was framed by the record and available to counsel on direct appeal. Direct appeal counsel recognized the importance of the informant witnesses and the difficulties trial counsel had in investigating them, but failed to recognize the error stemming from the *ex parte* hearing, and thus, by his own admission, acted unreasonably in failing to raise the claim on appeal. Doc 95, Exh 29. Based on the merits of this issue, reasonable judges could differ on whether there is a reasonable probability that the outcome of the appeal would have been different had the issue been raised. *Strickland v. Washington,* 688 U.S. 668, 684, 696-97 (1984). In a related fashion, as argued in Ground Two, trial counsel in any event were ineffective for failing to move for a continuance in order to properly investigate the government's informant witnesses.

### 2. The district court's interference with the independence of defense counsel and its unreasonable restrictions on funding the defense denied Mr. Barrett his Fifth, Sixth and Eighth Amendment rights (Grounds One and Three).

Reasonable jurists could disagree with the district court's holding that it did not improperly interfere with the independence and professional judgment of defense counsel and did not deny Petitioner, to his prejudice, adequate funding for essential defense tools to ensure a far trial. *Medina v. California,* 505 U.S. 437, 449 (1992); *Ake v. Oklahoma,* 470 U.S. 68, 77 (1985).

The district court mischaracterizes the issue as nothing more than a complaint that it did not simply "rubber stamp" the defense funding requests. Doc 214 at 22-23. This is not the case. The argument is that the district court substituted its own judgment for counsel's as to what was required to defend the case based on national norms, and denied *adequate* funding.

The district court repeatedly delayed ruling on Mr. Echols' budget requests, which took into account work previously done on the case, and demanded an unprecedented and excruciating level of specificity and justification far beyond what is reasonable or required. The district court's attitude was that because this case had been tried in state court[33], it could be tried on the cheap in federal court. Funding was either denied

---

[33] In denying relief on Ground One, the district court stated that counsel had not been able to point to another federal capital case in a similar posture to Mr. Barrett's, which had been tried twice in state court. Doc 214, p. at 32. There were significant differences between the state and federal cases, however. The federal crimes were predicated on drug offenses, but no drug crimes were charged or featured in state court.

outright, drastically reduced, and/or conditioned on not paying expert witnesses, including any mitigation specialist, compensation for expenses.  Counsel was denied payment for work on the budget and consulting with resource counsel, even though these tasks are routinely compensable in other cases.  The court even threatened to reveal the *ex parte* funding requests to the government so it could object ahead of time to various expert testimony, thus cutting costs.  The experts "approved" by the court were not given enough hours to do their jobs properly.  CR Doc 97, CR Doc 107, Doc 95 at 7-13, Exhs 34, 64, 65, 67, 118.

The result is that there would be no incentive for experts and investigators to sign onto the case because they would not be paid adequately.  The fact the defense was not being adequately funded led Mr. Echols to withdraw from the case.  Doc 95 at 19-20, Exhs 34, 118, CR Doc 113.  In its opinion and order denying relief, the district court fails to address the facts and the actual consequences of its funding decisions and instead engaged in a self-serving recitation of what had been provided, which is beside the point. Doc 214 at 24-31, 34.

The district court held that because the budget was not "written in stone," counsel (after Mr. Echols was virtually forced off the case) were encouraged to submit amended

---

The prosecution's entire theory of the case changed with the advent of the seven informant witnesses.  There had been no penalty phase in state court, and the state penalty phase investigation was incomplete.  There had been funding problems with the experts in state court, but the court only authorized payment at the total that had been spent on experts in state court.  Doc 95, p. at 186, 188,; Exhs. 34, 64, 65,;  Doc 214, p. at 30, CR Doc 97.

budget requests if they felt the need to do so, and the budget was ultimately not even

exhausted, Mr. Barrett can prove no prejudice. Doc 214 at 32. But the judge's

"encouragement" to submit supplemental funding requests provided cold comfort in light

of his earlier acts. In Ground Two, it was argued that after Mr. Echols' withdrawal,

counsel were ineffective for failing to seek appropriate funding for experts and

investigators and not attempting to use what meager funds had been made available.[34]

The fact that counsel were ineffective in this regard does not excuse the district court's

arbitrary and unjustified conduct in denying adequate funding in the first instance.[35]

The district court ruled also that no prejudice could be shown because Mr. Barrett

could not demonstrate that he had been denied a single resource to which he was entitled.

Doc 214, p. at 33-34. Reasonable judicial minds could disagree. Due to a combination of

the court's stinginess and trial counsels' ineffectiveness in failing to pursue appropriate

---

[34] Mr. Hilfiger had originally been appointed second chair despite the recommendations of the federal defenders in Oklahoma. Doc 95, p.29, Exhs 34, 54, 67. One of the reasons Mr. Hilfiger, a former U.S. Attorney, and later, Mr. Smith (who had no capital trial experience but was put in charge of the second stage case) were appointed was so that a local federal capital bar could be created. Doc 95, p. 29, Exhs 34, 54, 67. Mr. Hilfiger and Mr. Smith made no additional funding requests, despite the patent inadequacy of what had been permitted. The court was much more lenient with Messrs. Hilfiger and Smith than it had been with Mr. Echols. They were "locals" who made far fewer demands. (Doc. 95, p. 23-24)

[35] The district court ruled that because attorney fee determinations are not appealable orders, Petitioner's funding claim was not properly before the court. Doc\ 214, p. 214 at 35. However, Mr. Barrett is not complaining about the denial of attorneys fees, but contending that the district court denied his constitutional rights to due process and an effective defense because of its funding decisions. Compare, *United States v. French,* 556 F.3d 1091 (10th Cir. 2009).

funding to hire needed investigators and experts, or attempt to utilize some of the funds they had, Petitioner was denied: 1) the services of a fact investigator who, given the time, could have discovered evidence impeaching the government's informant witnesses; 2) the services of a mitigation investigator/expert who could have uncovered extensive mitigating evidence relating to Mr. Barrett's history and background, and the history and background of his family; 3) a psychiatrist and neurospsychiatrist who could have developed compelling evidence of Mr. Barrett's mental impairments, which were relevant to both stages of trial; 4) a crime scene reconstructionist who would have rebutted the testimony – assuming it passed the test of admissibility – of Iris Dalley, the prosecution expert whose highly questionable testimony was designed to support the accounts of the Highway Patrolmen and buttress the government's case for specific intent to kill a law enforcement officer; and 5) an independent expert in SWAT tactics and procedures, who could have testified that the raid on Mr. Barrett's property broke practically every rule in the book, and created a significantly heightened danger of inviting a violent response..[36] The specific prejudice flowing from a lack of necessary expert assistance is addressed in the request for a COA on the grounds of ineffective assistance of trial counsel.

A COA should be granted on these issues.

---

[36] Instead of seeking an independent SWAT expert, the defense relied on the expert who had testified for the prosecution in the state case. This witness, who, as trial counsel knew, was hostile to the defense, turned into a prosecution witness. (See discussion in COA request for Ground Two.)

**F.     A COA Should Be Granted on the Denial of Mr. Barrett's Requests for an Evidentiary Hearing.**

Mr. Barrett requested an evidentiary hearing in his petition, Doc 95 at 400-01, to resolve the many factual issues presented.[37] The district court denied the request without analysis, simply stating "an evidentiary hearing is not necessary to resolve the issues raised in petitioner's Motion to Vacate." Doc 214 at 190.  The district court is dead wrong.

The plain text of 28 U.S.C. § 2255 sets out the standard for granting an evidentiary hearing in a federal habeas case: "Unless the motion and the files and the records of the case *conclusively show that the prisoner is entitled to no relief,* the court shall . . . grant a prompt hearing thereon . . ." *Id.* at ¶ 2 (emphasis added); *accord United States v. Lopez,* 100 F.3d 113, 119 (10th Cir. 1996). In order to obtain an evidentiary hearing, a petitioner must allege facts which, if proven, would entitle him to relief. *See Hatch v. Oklahoma,* 58 F.3d 1447, 1471 (10th Cir. 1995).

Here, Mr. Barrett has set forth numerous specific and particularized facts in the form of declarations and exhibits that raise issues warranting an evidentiary hearing. Instead of allowing factual development of these issues, the district court either disregarded or gave no credence to the evidence that Mr. Barrett submitted. Instead, the court relied on its own subjective analysis or recollection in violation of §2255, this court's precedent and Mr. Barrett's constitutional rights.

_____

[37] On March 1, 2010, Mr. Barrett filed a separate Motion for Evidentiary Hearing, Doc 150, which the court summarily denied, calling it "premature" Doc 157).

In addition to examples that Mr. Barrett has already set forth, *supra,* the following are illustrative of the district court simply ignoring or on its own subjectively discrediting Mr. Barrett's evidence:

- The district court stated that the declaration of Susan Otto, Federal Defender for the Eastern District of Oklahoma was "ludicrous," and instead relied on its own opinion regarding the qualifications of trial counsel. Doc 214 at 24.

- The district court ignored the declaration of John Echols, Mr. Barrett's former counsel, and instead stated its own opinions about Mr. Echols' compensation and the funding of experts. Doc 214 at 29-32.

- The district court summarily discredited virtually all of the mitigation evidence that Mr. Barrett submitted via the declarations and reports of mental health and other experts, stating that Mr. Barrett could not establish prejudice because the jury might consider the evidence negatively. Doc 214 at 188.

- The district court made cursory statements throughout its Opinion such as "the petitioner does not identify one service he was not able to obtain which prejudiced his case." Doc 214 at 34. That statement is flat out wrong, given the fact that Mr. Barrett clearly stated in his petition that

> [t]he types of lawful witnesses to which the trial court denied Mr. Barrett fair access included a psychiatrist, neuropsychologist, psychologist, mitigation specialist, ballistics expert, independent fact investigator, an independent expert on SWAT team practices, a metallurgist, a drug analyst, crime scene reconstruction expert, and a jury consultant. The complete or partial denial of these expert and investigative resources was prejudicial both individually and in combination.

Doc 95 at 250.

- The district court ignored the declarations of experts regarding the prevailing professional norms in death penalty cases, which helped to establish prejudice for this issue. Exh 118.

- The district court made improper credibility determinations in lieu of developing evidence, such as "[b]ased upon the declarations submitted [ ] some of the 'newly discovered' witnesses could have been more detrimental and/or prejudicial to the defendant." Doc 214 at 148.

In the case of conflicting declarations, rather than develop the evidence, the district court dismissed the issue, stating that Mr. Barrett should have submitted a declaration instead of his family members. Doc 214 at 165.

These are just several of the many examples in which the district court ignored evidence in the record and resolved issues by subjective analysis. This is improper and contrary to the spirit of § 2255. Mr. Barrett has alleged specific facts which, if proven, would entitle him to relief. Mr. Barrett is thus entitled to an evidentiary hearing so that he has an opportunity to prove these facts. Reasonable jurists would certainly disagree with the district court's conclusion that the motion and the files and the records of the case *conclusively show that Mr. Barrett is entitled to no relief.* This Court should grant Mr. Barrett a COA for this issue.

**G.      A COA Should be Granted on the Denial of Mr. Barrett's Motions for Discovery**.

Under Rule 6(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts,"[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." In the context of a proceeding under 28 U.S.C. § 2254, "[g]ood cause is established 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief.' " *Wallace v. Ward,* 191 F.3d 1235, 1245 (10th Cir.1999) (quoting *Bracy v. Gramley,* 520 U.S. 899, 908–09,(1997) (ellipses omitted), *modified on other grounds, McGregor v. Gibson,* 248 F.3d 946, 953 (10th Cir.2001) (en banc).

Mr. Barrett made a motion for discovery in his prayer for relief in the 2255 Motion, identifying the areas of discovery within the Motion.  Doc 95 at 400-401.  Later, Mr. Barrett filed another request for discovery, alleging good cause and supported by a memorandum laying our Mr. Barrett's request and legal right to the same.  Docs 176, 177.  Because one of the Motions for Discovery dealt, in part, with a fact for which the court had granted a protective order, the Motion was filed under seal.  Doc 183.[38]  For that reason and brevity's sake, Mr. Barrett does not detail here the extensive good cause laid

---

[38]  With good reason, Mr. Barrett's counsel sought to have the protective order vacated, or at a minimum modified, Docs 184, 185, which requests were also denied. Doc 214 at 16.

out in his discovery documents or the relevant information he has reason to believe discovery would have produced. Suffice it to say Mr. Barrett asserted and provided specific allegations showing reason to believe that the requested discovery would produce information supporting his ineffectiveness, prosecutorial misconduct and suppression claims.

The discovery requested included depositions of relevant law enforcement officials including Frank Lloyd, Drug Task Force Investigator; Clint Johnson, Drug Task Force investigator and informant Monk Sanders's handler; and, two prosecutors, state and federal, Robert Cowan and Michael Littlefield, respectively. Mr. Barrett also requested the depositions of specifically identified non-law enforcement witnesses, laying out the good cause supporting the request and the specific relevant information sought. In addition, Mr. Barrett identified specific, narrowly focused interrogatories and requests for production.

The district court generically denied the discovery requests stating only that "Petitioner has not established that any relevant information could be obtained by pursuing discovery herein." Doc 214 at 16.

The federal rules and the fundamental fairness required by due process entitle Mr. Barrett to discovery. Reasonable jurists could debate that the district court abused its discretion in denying Defendant's request for discovery, *see Wallace,* 191 F.3d at 1245–1246. Mr. Barrett should at a minimum be encouraged to proceed further on this claim.

**H.    The District Court Wrongly Denied Mr. Barrett a COA on the Issue of the Use of a Stun Belt During Trial.  (Ground Seven)**

In his petition, Mr. Barrett demonstrated a substantial showing of the denial of a

constitutional right based on the visible restraints that were placed on him during trial.

Doc 95 at 326.  These restraints eroded his constitutional presumption of innocence and

impaired his ability to fully observe and participate in his trial. *See Deck v. Missouri,* 544

U.S. 622, 630-31 (2007).  In support of this claim, Mr. Barrett argued:

- The trial court forced Mr. Barrett to wear a stun belt that created an unusual bulge

    around his body without making the requisite findings that Mr. Barrett was or

    would be a security risk.  Doc 95 at 326.

- Mr. Barrett's stepmother, Doris Barrett, who attended every day of Mr. Barrett's

    trial, noticed the unusual bulge around Mr. Barrett's waist. ( Exh 105).[39]

- During a sealed hearing, the U.S. Marshal admitted that Mr. Barrett had never

    posed a security risk, R 8/31/05, Hr'g at 45, and that electric shock devices should

    be used in all death penalty cases, *id*. at 39.

- The trial court similarly generalized, stating that "probably any capital case where

    I was the presiding judge a stun belt would be used just because of the nature of

    the potential punishment. It just seems that it's a common – almost a common

    sense call under those circumstances."  R 9/13/05, *ex parte* Hr'g, at 13.

_____

[39] Doris Barrett submitted three declarations in this matter that were all exhibits to Mr. Barrett's petition:  Exh 80;, Exh 105;, and Exh 207. In the petition, the declaration referring to the stun belt was mistakenly referred to as Exh 80 instead of Exh 105.  Doc 95, p. at 327.  Mr. Barrett regrets any inconvenience this error may have caused.

- Based on Mr. Barrett's history of being beaten by law enforcement, it was reasonable for Mr. Barrett to fear that the marshal would set off the stun belt at the slightest provocation, thus inhibiting his movement.

- The trial court was aware that Mr. Barrett was at special risk from the stun belt because of conductive steel wire in his chest and abdomen from past medical issues, increasing Mr. Barrett's fear.

In its Opinion, the district court recognized that visible shackling is deemed inherently prejudicial, citing *Deck,* 544 U.S. at 630-31. Doc 214 at 79. However, the court found that "there is no evidence in the record that any member of the jury in this case knew that the defendant was wearing a stun belt . . . this court finds this claim has absolutely no merit and counsel were not ineffective for failing to raise this issue on appeal." Doc 214 at 83.

In making this finding, the court freely admitted that it relied on its own observations. The district court stated, "this court observed the petitioner during his criminal trial. The stun belt did not inhibit the petitioner's communications with his counsel. . . . The stun belt was not visible to the jury." Doc 214 at 82.

Although a trial judge may rely on his or her own recollection in some circumstances, that judge cannot rely solely on memory when there is evidence in the record to consider. *See United States v. Scully,* 798 F.2d 411, 413 (10th Cir. 1986). In this case, not only did the trial judge rely exclusively on his own recollection, he assumed that his view from the bench was sufficient to determine what exactly the jurors could see

from their vantage, or to fully observe the interactions between Mr. Barrett and his counsel.

If this was not bad enough, the court took it a bit further and turned to pure speculation, stating:

> It is highly unlikely, based upon the way the jurors entered and exited the courtroom and the seating position of the defendant at the defense table, that any juror would have taken particular notice of petitioner's waist. To the extent, however, that even one juror might have observed a bulge around the petitioner's waist, they could not have known what caused the bulge. In light of medical advances today, numerous medical devices could be placed on a person's waist and even if the jury observed a bulge around petitioner's waist it is mere speculation to assume the jury would know that petitioner was wearing a stun belt for security reasons.

Doc 214 at 83 (footnote omitted).

Thus, it is completely clear that the district court determined that Mr. Barrett's claim had no merit based on what the trial judge could see from the bench and random speculation about medical devices.

However, Doris Barrett, a spectator in the courtroom, could clearly see the stun belt. Exh 105. It follows that the device could have been visible to members of the jury. The trial judge can't "guess" what jury members might or might not have thought that the bulge around Mr. Barrett's waist could be. This is the exact kind of issue that warrants further factual development.

Accordingly, jurists of reason could most certainly disagree with the district court's resolution of Mr. Barrett's claim, or conclude that the issue deserves

encouragement to proceed further. At a minimum, an evidentiary hearing is necessary to resolve this issue.

To the extent that this Court believes this claim was procedurally defaulted, both trial and appellate counsel were constitutionally ineffective, exhibiting deficient performance and prejudice to Mr. Barrett. Prejudice is especially likely given the fact that Mr. Barrett's alleged hostility to law enforcement was a central element of his trial. This Court should grant Mr. Barrett a COA on this issue.

## I. This Court Should Issue COAs to Mr. Barrett Based on His Challenges to the Jury Instructions. (Ground Nine, Ten and Twelve)

The district court summarily rejected Mr. Barrett's claims regarding the constitutionality of the jury instructions in his case, stating "as a general rule, improper jury instructions do not form the basis for habeas relief." Doc 214 at 91. Nonetheless, in certain situations, the lack of appropriate jury instructions is never harmless error. *See, e.g., Hogan v. Gibson*, 197 F.3d 1297, 1312, n.13 (10th Cir. 1999)("A *Beck* error can never be harmless"). As such, jurists of reason could disagree with the district court's resolution regarding this issue.

### 1. Lesser included offense (Ground Nine)

At trial, both Mr. Barrett and the government requested the court to instruct on voluntary manslaughter as a lesser included offense. R 4212-13, 4215, 4218-19. The government conceded that evidence in the record indicated that before shots were fired, Trooper Hamilton's unmarked Bronco swerved toward Toby Barrett, and Mr. Barrett's

actions in firing on the vehicle could be seen as a form of self-defense or defense of another, reducing the crime to voluntary manslaughter. Moreover, in state court, Mr. Barrett was charged with First Degree Murder, but was instead convicted of First Degree Manslaughter. The trial court refused to give the instruction, ruling that the case came down to "murder one or nothing." R 4211, 4222.

Mr. Barrett raised the issue in his petition, arguing that a verdict of death may not be constitutionally imposed after a jury verdict of guilt in a capital case, when a jury is not permitted to consider a verdict of guilt of a lesser included offense. *See Beck v. Alabama,* 447 U.S. 625, 635 (1980); *Hogan,* 197 F.3d at 1305-06. Doc 95 at 336. The district court quickly disposed of Mr. Barrett's argument with respect to Counts 1 and 2 of the superseding indictment, failing to recognize Mr. Barrett's distinction of the underlying felony charges in those counts from those in *United States v. Chanthadara,* 230 F.3d 1237 (10th Cir. 2000) Doc 214 at 93-94. More problematic, however, was the district court's treatment of the lack of a lesser included offense instruction for Count 3.[40]

In order to convict Mr. Barrett of Count 3, the government had to prove that he had the specific intent for the crime charged, which necessarily involves gradations of *mens rea* and criminal responsibility. Voluntary manslaughter would therefore be a lesser included offense if Mr. Barrett's specific intent was an element in dispute, which it certainly was in this case. *See Chanthadara,* 230 F.3d at 1257. But, the district court

---

[40] Count 3 is: Intentionally Killing, During the Commission of a Drug Trafficking Crime, a State Law Enforcement Officer, Engaged in the Performance of his Official Duties, in violation of 21 U.S.C. § 848(e)(1)(B).

never got to that issue. Instead, the district court held, as a matter of law, that voluntary manslaughter is not a lesser included offense of 21 U.S.C. § 848(e)(1)(B).

In so finding, the district court relied on a single, fifteen-year old, non-binding district court opinion. *See United States v. Beckford*, 916 F.Supp. 1415 (E.D. Va. 1997). In construing the CCE statute (21 U.S.C. § 848(e)(1)(A) and not the § 848(e)(1)(B) offense charged against Mr. Barrett), the *Beckford* court held that because Congress had not provided for lesser homicide offenses in the statute, there were no lesser included offenses as a matter of law. *See id.* at 1424-33. *Beckford* and the district court's holding in Mr. Barrett's case fly in the face of the law as set forth in *Beck. See Beck,* 447 U.S. at 635; *Hogan,* 197 F.3d at 1305-06; *see also Keeble v. United States*, 412 U.S. 205, 208 (1974)("In the federal courts, it has long been beyond dispute" that a defendant is entitled to an instruction on a lesser offense if the evidence would permit a rational jury to find him guilty of the lesser offense and acquit him of the greater.) Jurists of reason could undoubtedly disagree on the district court's resolution of this issue.

To the extent that the district court found that this issue was procedurally defaulted because it was not raised on direct appeal, cause and prejudice exist for excusing any procedural bar. Appellate counsel was clearly ineffective for failing to raise this claim. It was obviously meritorious; both parties agreed the instruction should be given, and the evidence unquestionably supported it. As set forth above, voluntary manslaughter is a lesser offense of a § 848(e)(1)(B) murder. No legitimate strategy explains the omission of this preserved issue and counsel's unprofessional omission clearly prejudiced Mr.

Barrett because a *Beck* error can never be harmless. *See Hogan,* 197 F.3d at 1312 n.13. Mr. Barrett is entitled to a COA on this issue.

### 2. Residual doubt (Ground Ten)

In his petition, Mr. Barrett argued that he had a constitutionally protected right to introduce evidence and the court should have instructed the jury that it was appropriate for them to consider as a mitigating factor that two state court juries had not been convinced that the death of Trooper Eales was brought about in the manner which the government claimed in the federal proceedings. Doc 95 at 341. Not only had the district court not given such an instruction, the court affirmatively instructed the jury that it could *not* consider such evidence as a mitigating factor. R 5320-21 (Instr. 19).

In its Opinion, the district court denied Mr. Barrett's claim regarding the instruction, finding that there is no constitutional right to a "residual doubt" instruction, relying on *Franklin v. Lynaugh,* 487 U.S. 164 (1988) and *Oregon v. Guzek,* 546 U.S. 517 (2006). Doc 214 at 98-100. However, neither *Franklin* nor *Guzek* resolved the issue of whether the Eighth Amendment affords capital defendants the right to present evidence and argument of residual doubt. *See Franklin,* 487 U.S. at 174; *Guzek,* 546 U.S. at 525. The instruction the court gave prohibited the jury from considering relevant mitigating evidence in direct violation of the Eighth Amendment as construed by *Lockett v. Ohio*, 438 U.S. 586 (1978) and its progeny. This issue demonstrates a substantial showing of the denial of a constitutional right, warranting the grant of a COA.

To any extent this Court finds that this issue was procedurally defaulted, both trial counsel and appellate counsel were constitutionally ineffective for failing to raise this issue for the reasons set forth above.

### 3. Jury instruction on finding that death was an appropriate penalty beyond a reasonable doubt  (Ground Twelve)

In this case, the trial court instructed the jury that it must determine whether the government had proven the aggravating factors beyond a reasonable doubt, but failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors.  In his petition, Mr. Barrett argued that this failure to instruct the jury on the reasonable doubt standard in finding that death was an appropriate penalty was a violation of his constitutional rights.  Doc 95 at 354.  In his argument, Mr. Barrett relied on *Apprendi v. New Jersey*, 530 U.S. 466, 491 (2000) and *Ring v. Arizona*, 436 U.S. 584, 600 (2002), which held that once a statutory scheme requires specific fact finding which elevates the potential punishment, that fact-finding must be made by a jury and proven beyond a reasonable doubt.  *See id.*

The district court dismissed this claim on procedural grounds, finding that "[a]lthough the petitioner claims appellate counsel did not properly raise the issue on appeal, a review of the Tenth Circuit decision leaves no doubt that the issue was raised on appeal."  Doc 214 at 101.  The district court is wrong.  Mr. Barrett's appellate counsel's

entire argument on this issue was as follows:

> The Federal Death Penalty Act is unconstitutional and violated Mr. Barrett's right to due process; his 6th Amendment right to a jury trial as interpreted by *Apprendi v. New Jersey,* 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); *Blakely v. Washington,* 124 S. Ct. 2531 (2004); and violates the 8th Amendment prohibition against cruel and unusual punishment. Barrett filed a pretrial motion seeking to have the federal death penalty statute declared unconstitutional, but the motion was denied.  Doc 78, 147, 153.

2006 WL 3099220 at 32.

In response, the Tenth Circuit decision stated:

> In his appellate brief, Barrett cites to *Ring* and generally alleges that the federal death penalty scheme is violative of the Sixth Amendment, but does not otherwise flesh out his argument.

*United States v. Barrett,* 496 F. 3d 1079, 1107 n.12 (2007).  The Tenth Circuit also noted:

> In his appellate brief, Barrett appears to refer exclusively to the FDPA in making his various constitutional arguments. Obviously, however, he lacks standing to challenge the FDPA because he was not sentenced to death under that Act. . . . Out of an abundance of caution, and because Barrett challenged the constitutionality of both the FDPA and § 848 in the district court, we will assume, for purposes of this appeal, that he intended to attack the constitutionality of the death penalty provisions set forth in 21 U.S.C. §§ 848(g)-(p).

*Id*. at 1106.

In this case, the Tenth Circuit's effort to address an un-briefed and unspecified argument did not satisfy Mr. Barrett's right to have the claim adequately raised by competent counsel before it was considered by the Court.   Counsel's actions in raising the issue without briefing the same was ineffective and therefore led the Tenth Circuit to formulate and reject its own issue and argument.   Mr. Barrett has the right to have the

issue considered after full briefing. Jurists of reason would find it debatable whether the district court's procedural ruling that this issue was properly raised on appeal was correct. *See Slack,* 529 U.S. at 484. Equally so, jurists of reason would, at a minimum, find it debatable whether the motion states a valid claim of the denial of the constitutional right under *Apprendi* and *Ring. See* 530 U.S. at 491; 436 U.S. at 600. Mr. Barrett should receive a COA on this issue.

**J**.  **A COA Should Issue on Whether the Trial Judge Should Have Disqualified Himself in the § 2255 Proceedings.**

Petitioner sought disqualification of the trial court on three grounds: 1) its conduct of the *ex parte* hearing of September 13, 2005 and its aftermath (Ground One); 2) the court's interference with the independence of counsel and with Petitioner's right to present a defense; the disparate treatment between original lead counsel and local, preferred counsel; the court's motives in appointing counsel; and the court's unreasonable, prejudicial funding decisions, which forced original lead counsel off the case (Grounds One and Three); and 3) its acting as an investigator (without notice and without permitting an opportunity for response) in deciding Petitioner's motion to toll the statute of limitations. Doc 45.[41] It was contended that based on each of these grounds, a reasonable person would question the court's impartiality; that the court was required to

---

[41]  After the court denied the motion, Mr. Barrett took the issue to this court, seeking a writ of mandamus. The writ was denied, but the government and the court were required to respond. The fact that a writ of mandamus was denied does not foreclose the granting of a COA on this issue, because the standards for granting extraordinary relief are more onerous.

recuse because it was a fact witness and could not fairly judge what was claimed to be its own misconduct or quasi-misconduct; and that the court had in effect prejudged the funding issue. *Liteky v. United States,* 510 F.3d 540, 555 (1994); 28 U.S.C. § 455. Doc 66 at 1-2, 6.

Mr. Barrett addressed the court's conduct regarding the *ex parte* hearing in his request for a COA on Ground One, and showed that reasonable jurists could disagree whether the district court denied Petitioner's due process right to a fair trial and contributed to ineffective assistance of counsel by its acts. Based on that analysis, reasonable judicial minds could also differ on whether the court, by holding what became an improper *ex parte* hearing, the contents of which were not revealed to the defense to its prejudice, exhibited actual bias or its appearance against. Mr. Barrett. The court is a witness to contested events. Because the court's very conduct is at issue, a reasonable person might question the court's ability to have decided the issue of the *ex parte* hearing impartially.

Reasonable jurists could find that the court's impartiality could reasonably be questioned when called upon to decide the claim that the court had improper motives in the appointment of counsel, drove Mr. Echols off the case with its funding restrictions and extraordinary requirements, treated local counsel in a disparate manner that evinced bias or its appearance, and denied Mr. Barrett's constitutional right to essential defense tools with its funding decisions. There was at least the appearance of partiality where the judge, in deciding the funding claim, had to evaluate witnesses who called into question

the court's conduct and motives. In its order denying the motion to disqualify, the district court relied on reasoning addressed in the request for a COA on Grounds One and Three. That reasoning is problematic. Doc 66 at 17-19.

In denying disqualification on this particular claim, the district court held that because a funding challenge was available on direct appeal, and the issue was not raised, the motion to disqualify in this aspect was untimely. Doc 66 at 19. But timeliness goes to the proceeding in which recusal is sought. Title 28 U.S.C. § 455 requires recusal in *any* proceeding where a judge's impartiality might reasonably be questioned, and the court has a continuing duty to recuse where warranted. *United States v. Pearson,* 203 F.3d 1243, 1247 (10th Cir. 2000). And there is a distinction between raising a funding challenge on direct appeal and arguing the court which made the funding decisions cannot properly judge a claim relating to those decisions.

Additionally, the district court held that this specification in the disqualification motion was immune from attack because the funding decision and conduct toward counsel were immune because they were judicial rulings. *Liteky, supra.* They were more properly understood as administrative decisions, and the argument goes beyond the usual purely legal attack, alleging improper motive and conduct by the court. It is debatable whether a reasonable person would find cause to believe a court could not impartially judge such a claim.

The motion for disqualification argued that the judge had prejudged the funding issues in the petition. But in rejecting the claim, the judge did exactly what Petitioner

said he would do: prejudged the claim by defending each decision it made and denying any improper motive or conduct, thereby in effect denying, or signaling a decision to deny, the arguments made in Grounds One and Three of the petition.  Doc 66 at 17-19.

Reasonable jurists could differ over whether the court's independent investigation in connection with the motion to toll the statute of limitations due to Mr. Schardl's physical problems, without revealing this to counsel or permitting an opportunity to reply, exhibited the appearance of bias, running afoul of Canon 2, Rule 2.9(c) of the Model Code.  (While not binding, the code sets reasonable standards of judicial conduct.)  The court rejected this argument in large part because the fruits of its research had no bearing on the decision to deny the motion.  But the order itself reflects this information was relied upon.  CR Doc 397 at 2.  The court used its research or investigation to erroneously conclude that Mr. Schardl's problems did not warrant a tolling of the statute of limitations because there were plenty of other lawyers who worked in the office.  Counsel were not given a chance to explain that most of these lawyers were not doing capital work, and that there were not lawyers to spare in the office.

The court dismissed the improper investigation argument by pointing out that lead counsel was aware his responsibilities might expand and had registered no health complaints, that the fact the government did not oppose the motion and believed it stated good or sufficient grounds was not binding on the court, and that its denial of the tolling motion was a judicial decision immune from scrutiny under Liteky.  Doc 66 at 20-21. This skirts the question, which is whether the court engaged in an independent

investigation to gather evidence to decide (or deny) the motion, thereby raising at least the appearance of bias. The decision itself – denial of the motion – was not the basis for the disqualification request. Rather, it was argued that the court used improper means suggestive of bias or its appearance in arriving at the decision.

Because questions could reasonably be raised about the district court's ability to have decided the § 2255 petition impartially, a COA should be granted on this issue.

**K.    This Court Should Issue a COA to Mr. Barrett Based on His Claim That His Execution Would Violate the Eighth Amendment Because He Is Mentally Ill. (Ground Seventeen)**

In his petition, Mr. Barrett argued that the Eighth Amendment prohibition against execution of the mentally retarded, *Atkins v. Virginia*, 536 U.S. 304 (2002)) and juvenile offenders, *Roper v. Simmons*, 543 U.S. 304 (2005), should be extended to severely mentally ill individuals such as Mr. Barrett. Doc 95 at 379. Experts have opined that Mr. Barrett suffers from severe mental illness in the form of Bipolar Disorder, Post Traumatic Stress Disorder and Dysexecutive Syndrome, and that his brain is organically damaged. Exh 117; Exh 89.

The district court disposed of the claim, stating that the claim was not timely filed because it was first raised in the Amended Motion to Vacate and that there is no legal authority for this argument. Doc 214 at 133. The district court also found that neither trial nor appellate counsel were ineffective for raising this argument. *Id*.

The claim at issue here arises from the Eighth Amendment's continually "evolving standards of decency." It is timely and cognizable. Similar to people with mental

retardation and juveniles, the execution of the mentally ill serves no retributive or deterrent function. Jurists of reason could disagree on this issue or conclude that the issue deserves encouragement to proceed further. Accordingly, both trial and appellate counsel were constitutionally ineffective for failing to raise the issue. This Court should issue a COA to Mr. Barrett.

**L. A COA Should Issue on Mr. Barrett's Claims of Ineffective Assistance of Appellate Counsel. (Ground Eighteen)**

As noted throughout, Mr. Barrett raised numerous constitutional claims in his petition that were not raised on direct appeal that arguably could have been, based on the trial record. To the extent that those claims should have been raised, the failure of appellate counsel to raise these substantive claims (which most likely would have resulted in reversal and remand) violated Mr. Barrett's constitutional right to effective counsel on appeal. Based on appellate counsel's errors and omissions, taken both individually and cumulatively, reasonable jurists would find that the outcome of the appeal is unreliable and there is a reasonable probability that the outcome of the appeal would have been different.

In its Opinion, the district court chose not to separately address Mr. Barrett's claims of ineffective assistance of appellate counsel; instead, the district court simply stated:

> Having found no merit to the allegations of ineffective assistance of trial counsel, this court finds no merit to those same claims raised as ineffective assistance of appellate counsel for failure to raise those issues on appeal. Accordingly, this claim is denied.

Doc 214 at 189.

The district court's cursory treatment of Mr. Barrett's claims did nothing to properly evaluate whether Mr. Barrett enjoyed the right to meaningful appellate review that is required in capital cases under the Due Process Clause of the Fifth Amendment, and the right to be free of cruel and unusual punishment guaranteed by the Eighth Amendment. *See Parker v. Dugger,* 498 U.S. 308, 321 (1991) ("We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally.").

Jurists could conclude that Mr. Barrett's important claims in this area deserve more than cursory treatment and that these issues deserve encouragement to proceed further. Specifically, Mr. Barrett seeks a COA based on appellate counsel's constitutionally ineffective actions in the following areas: 1) failure to raise the due process violation resulting from the court's *ex parte* communications with the government; 2) failure to raise the *Franks v. Delaware* issue; 3) failure to argue the government's inappropriate use of hearsay evidence; 4) failure to challenge improper prosecutorial misconduct; 5) failure to appeal the use of a stun belt during trial; 6) failure to appeal the denial of jury instructions on lesser included offenses; 7) failure to appeal the denial of a residual doubt instruction; 8) failure to appeal the lack of a jury instruction requiring proof beyond a reasonable doubt as a weighing factor necessary to impose the death penalty; and 8) failure to properly raise the issue of whether Mr. Barrett's execution would violate the Eighth Amendment based on Mr. Barrett's mental illness.

This Court should grant a COA as to all of these issues.

**M.   Mr. Barrett Should Receive a COA on the Cumulative Effect of Errors. (Ground Nineteen)**

A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of trial is such that, collectively, they can no longer be determined to be harmless. *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002); *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (*en banc*).  Mr. Barrett argues that there was cumulative error in his case.  Yet again, however, the district court gave Mr. Barrett's arguments short shrift. The district court's entire response to this argument stated:

> Having reviewed the entire record in this case, this court finds the petitioner ultimately received a fundamentally fair trial. Simply because the federal jury's sentence was different from the previous state court trials on different charges does not establish that Petitioner was denied a fair trial.

Doc 214 at 190.

In light of the myriad constitutional infirmities set forth in Mr. Barrett's petition, jurists of reason could most certainly disagree as to whether Mr. Barrett received a "fundamentally fair trial." *E.g., Taylor v. Kentucky*, 436 U.S. 478, 487, and n.15 (1978) ("[T]he cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness.").  Accordingly, this Court should issue a COA for cumulative error.

## VI.    CONCLUSION

Mr. Barrett is entitled to a COA on his many claims which are supported by extensive pleadings, legal authority and substantial evidentiary support under the Supreme Court standards set out above.  The district court's denial of any COA is insupportable.  Reasonable jurists could debate, and in many cases, find the court's denial plainly wrong.  Failure to grant Mr. Barrett a COA will result in a violation of due process and Mr. Barrett's right to appeal. *Evitts v. Lucey, supra.*  Mr. Barrett's request for a COA on the claims set out above should be granted.

DATED this 22nd day of March, 2013

Respectfully submitted,

/s/ *David B. Autry*
DAVID B. AUTRY, OBA No. 11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma  73106-6405
Telephone:  405-521-9600

JOSEPH SCHLESINGER
Acting Federal Defender

/s/ *Joan M. Fisher*
JOAN M. FISHER, ISB No.2854
Assistant Federal Defender

TIVON SCHARDL Fla SB No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666
Attorneys for Defendant
KENNETH EUGENE BARRETT

## CERTIFICATE OF ELECTRONIC FILING AND SERVICE

This is to certify that on this 22nd day of March, 2013 I caused the foregoing Motion for Certificate of Appealability And Statement of Issues to be filed with the Clerk of the Court of Appeals using the ECF System for filing and with service to be made electronically on the following ECF registrants:

Jeffrey B. Kahan,
United States Department of Justice,
jeffrey.kahan@usdoj.gov,

Christopher J. Wilson,
Assistant United States Attorney,
chris.wilson@usdoj.gov

Linda Epperly
Assistant United States Attorney
linda.epperly@usdoj.gov
United States Department of Justice,
Eastern District of Oklahoma,

To the undersigned's knowledge, there are no non-ECF registrants who are counsel in this case.

Dated:  March 22, 2013          /s/ *Joan M. Fisher*
                                Joan M. Fisher, ISB No. 2854
                                Assistant Federal Defender
                                Office of the Federal Defender
                                801 I Street, Third Floor
                                Sacramento, CA 95814