# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Petitioner/Defendant,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Respondent/Plaintiff.* | ) | |

---

**PETITIONER'S BRIEF IN SUPPORT OF
SECOND AMENDED § 2255 MOTION
AND IN SUPPORT OF
PETITIONER'S MOTION FOR EVIDENTIARY HEARING
AND MOTION FOR RECORD EXPANSION**

---

DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: 405-521-9600

DANIEL J. BRODERICK
Federal Defender
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Counsel
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: 916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

477 U.S. at 385 (counsel's failure to move to suppress was constitutionally deficient because it was based "on counsel's mistaken beliefs that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense").  The evidence described in Ground 2, Part A(4) and in Ground 5, Part A, shows that if defense counsel had sought a continuance and investigated the informants, and if the prosecution had complied with its duty to disclose impeachment evidence, the informant witnesses' credibility would have been totally undermined.

At a minimum, in light of the evidence presented in the Amended Motion, and the legal arguments presented here, the files and records do not conclusively show Mr. Barrett is entitled to no relief.  This Court should order an evidentiary hearing on sufficient notice for Mr. Barrett to obtain discovery and make use of this Court's subpoena power to marshal the abundant evidence. Thereafter, this Court should vacate the conviction.

**Ground 5, Part D.  Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses and Closing Argument**.

Throughout the guilt and penalty phases of Mr. Barrett's trial the prosecutors repeatedly and in various ways violated rules of professional conduct regarding the questioning of witnesses.  (*See* ABA Standard 3-5.6.)  These improper questions, together with the prosecutors' "comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

As shown in Mr. Barrett's previous filings, the Government engaged in the following forms of improper questioning of witnesses: 1) asking questions for which there was no good faith basis, or which were beyond the personal knowledge of the witness; 2) implying, through such questioning, that the prosecutor personally had knowledge of facts not testified to by the witness, making the prosecutor, in effect, a testifying witness; 3) commenting on Mr. Barrett's

exercise of his trial rights, as if he were somehow doing something wrong by demanding his

constitutional right to a trial; 4) asking witnesses whether other witnesses had made false

statements, when, again, such would be beyond the knowledge of the witness being examined; 5)

utilizing questions as a form of closing argument by repeating, over and over, the testimony of

the informant and other witnesses, thus in effect vouching for the testimony of the witnesses.

Each of these categories of questioning was improper. *United States v. Beeks,* 224 F.3d

741, 746 (8th Cir. 2000)(analyzing in detail and condemning repeated questioning by prosecutor

for which no good faith basis existed); *United States v. Davenport,* 753 F.3d 1460, 1462 (9th

1985)(improper to make commentary or ask questions for which no good faith basis exists to

"waft an unwarranted innuendo into the jury box"),  Just as it is improper to engage in

commentary in closing argument that is outside the record evidence, *e.g., United States v.*

*Cheska,* 202 F.3d 947 (7th Cir. 2000); *United States v. Manning,* 23 F.3d 570 (1st Cir. 1994);

*United States v. Blakely,* 14 F.3d 1557 (11th Cir. 1994), it is likewise improper, through the

questioning of witnesses, to imply the existence of certain facts or evidence the witness has not

testified to.  In effect vouching for the testimony of witnesses, or treating their testimony as

established fact in commentary or questioning of other witnesses, is equally beyond the pale.

*United States v. Young,* 470 U.S. 1, 18-19 (1985)(vouching for witnesses vests them with the

imprimatur of the government, and may induce the jury to trust the government's judgment rather

than its own view of the evidence); *United States v. Martinez-Medina,* 279 F.3d 105 (1st Cir.

2002)(improper vouching for credibility of informant witness by implying that if informant were

lying to curry favor with the government, he would have come up with more powerful

testimony); *United States v. Broomfield,* 201 F.3d 1270, 1276 (10th Cir. 2000)(court condemned

increased willingness of prosecutors to "push the envelope" with improper vouching); *United*

*States v. Garcia-Guizer,* 160 F.3d 511, 520 (9th Cir. 1998)(noting that the court had frequently observed that the government may not vouch for the credibility of its witnesses, either through putting the prosecutor's own prestige behind the witness's testimony, or indicating that extrinsic information not presented in court supports the witness's testimony).

The Government's conduct in the penalty phase closing arguments was even more egregious. In his portion of the penalty phase closing argument, AUSA Littlefield, taking unfair advantage of the court's erroneous ruling excluding Mr. Barrett's statements expressing his genuine remorse for Trooper Eales's death by wishing he had been killed rather than Mr. Eales, fastened on an ambiguous statement that had been allowed in evidence: that Mr. Barrett wished things had turned out differently. Knowing full well this isolated statement did not tell the whole story, Littlefield sarcastically told the jury that by this, Mr. Barrett simply meant he was sorry he got caught; what he regretted was that he would not have an opportunity to "kill more of the bastards." (R. 5356-57.) The Tenth Circuit has condemned similar tactics. *Paxton v. Ward,* 199 F.3d 1197, 1217 (10th Cir. 1999) (prosecutorial misconduct justified sentencing relief where, in connection with unadjudicated homicide introduced in the penalty phase, prosecution objection prevented defendant from showing the charge had been dismissed because he passed a polygraph test, and prosecutor took advantage of the ruling to argue "we don't know why" the case was dismissed, implying dismissal could have stemmed from a technicality).

United States Attorney Sperling strayed from the record and appealed to societal alarm, stating at one point the "hand of God" prevented Mr. Barrett from being a multiple murderer. This was "way over the capital murder line." (R. 5402-03.) Similarly, Sperling later asked, "Why wasn't this a double murder or a triple murder or a quadruple murder?" (R. 5412.) Denigrating Mr. Barrett's fundamental right to a fair trial, Sperling, in the form of a rhetorical

question, told the jury Mr. Barrett not only had no right to leniency, but really had no right to "fairness." (R. 5408.)

Trotting out a variation on the old Bob Macy[99] "three hots and a cot" argument, which the Tenth Circuit has condemned on more than one occasion, Sperling repeatedly – and falsely – characterized life without the possibility of release as Mr. Barrett simply being "sent to his room." (R. 5412, 5423.) Continuing in the same improper vein, Sperling told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation. (R. 5412.) Speculating outside the record simply to prejudice the jury, Sperling said that if given life, Mr. Barrett would be a "hero" to his fellow inmates. (R. 5412.) *Duckett v. Mullin,* 306 F.3d 982, 992 (10th Cir. 2002); *Le v. Mullin,* 311 F.3d 1002, 1014-15 (10th Cir. 2002). In the next breath, he engaged in improper name calling, referring to Mr. Barrett as the "executioner of the innocent." (R. 5412.)

Attempting to create resentment among the jurors, as if Mr. Barrett, and not the jury, was in control of his fate, and again denigrating Mr. Barrett's right to a fair trial, Sperling falsely told the jury Mr. Barrett wanted to "choose his sentence." Asking rhetorically, "How unjust is that?" the United States Attorney closed the circle on the "three hots and a cot" theme and appealed to lynch law by inquiring "What opportunity did he give Rocky Eales to live?" The prosecutor again went outside the record when he stated Mr. Barrett wanted "the thrill of the kill." (R. 5412-13.)

---

[99] Mr. Macy is the former long-time District Attorney in Oklahoma County, who was well known, and often criticized by the courts, for his misconduct in death penalty cases.

Fueling alarm that Mr. Barrett was a threat to witnesses, when there was absolutely no evidence in the record to support such a claim[100], and misleading the jury all at once, the prosecutor commented that the state case was "grossly under-evidenced," because "no small effort was involved" in getting the drug-addicted, criminal, deal-swinging snitches "brave enough," to testify. (R. 5414-15.) *Gordon v. Kelly,* 2000 WL 145144 (6th Cir. Feb. 1, 2000) (unpublished) (pervasive efforts by prosecutor to portray defendant as being feared by witnesses required habeas relief).

Left unsaid, of course, was that these individuals, who supposedly knew so much, and were never once threatened by Mr. Barrett to keep them "quiet," were nowhere to be found in 1999 when the shooting occurred, or in 2002 and 2004 when the case was tried in state court. They only crawled out of the woodwork when the federal government put the arm on them. To say, as the prosecutor did, that the state juries got only a "small glimpse" of the whole case falsely implied the seven Johnny and Janie Come Latelys were ready, willing and able to testify back when, but were somehow prevented from doing so by the state prosecutors, or out of "fear."

The prosecutor grossly misled the jury when he referred to the victim impact witnesses and stated "[t]hey didn't testify in state court," as if this explained the state court outcome. (R. 5415.) This falsely implied the victim impact witnesses did not testify in the state trials only because the incompetent, "under-evidenced" state prosecutors did not have sense enough to put them on the stand. Sperling was well aware they *could not have testified by law* because the case never got past the first stage. Shielded by the court's erroneous ruling excluding Mr. Barrett's

---

[100] This was a knowing false statement on the prosecutor's part. As discussed in Ground 1, the Government failed to produce *any* evidence at the *ex parte* hearing on its motion to delay disclosing the identity of the informant witnesses that the witnesses had ever been threatened in any manner by Mr. Barrett. "Monk" Sanders testified in the second stage that Mr. Barrett wanted the snitch who landed him in jail harmed, but anything this pathetic witness had to offer was scarcely worthy of belief.

statements of remorse, and picking up where Mike Littlefield left off, the prosecutor ridiculed the "wish it had been different" statement, remarking this sentiment was "big of him [Mr. Barrett]." (R. 5419.) The prosecutor stated there was no evidence Mr. Barrett had "lost one wink of sleep" over what he did. Mr. Barrett killed "remorselessly" and "selfishly," with no sympathy or empathy for anyone. Mr. Barrett was so unfeeling and callous, it was almost as if he had done "nothing." The "wrong choice" comment was likened to a meaningless mistake, nothing more than an "oops." (R. 5420-21.) There were additional comments on Mr. Barrett's supposed lack of remorse. (R. 5419-20, 5421-22.) *Paxton v. Ward,* 199 F.3d at 1217.

The United States Attorney improperly denigrated Mr. Barrett's right to put on mitigating evidence by stating he was using his family as "props," in contrast to Trooper Eales, who did not receive a similar chance to plead for his life. (R. 5420.) *Cf. Penry v. Lynaugh,* 492 U.S. 302, 319 (1989); *Lockett v. Ohio,* 438 U.S. 586 (1978).

Sperling aligned himself with the jurors as if he and they were on the same team, stating that "we" must not refuse to do "our" duty just because the victim's family and the community could not be made whole again. (R. 5421-22.) Remarks of this nature have always been deemed improper. *Viereck v. United States,* 318 U.S. 236, 247-48 (1943); *Cargle v. Mullin,* 317 F.3d 1196, 1223 (10th Cir. 2003).

It is simply improper for a prosecutor to suggest that a jury has a civic duty to convict or to return a certain punishment. *Thornburg v. Mullin,* 422 F.3d 1113, 1134 (10th Cir. 2005); *Malicoat v. Mullin,* 426 F.3d 1241, 1256 (10th Cir. 2005); *Spears v. Mullin,* 343 F.3d 1215, 1247 (10th Cir. 2003).

Continuing with the civic duty theme, the prosecutor talked of Mr. Barrett having "slaughtered an innocent soldier of the law," warning the jury they would make him a "hero" in

prison if they returned a life sentence, or "sent him back to his room" and merely gave him "more time." (R. 5423.) This was little better than telling the jury that if they spared Mr. Barrett's life, they would be accomplices to any future crimes he might commit. *Bates v. Bell,* 402 F.3d 635, 642 (6th Cir. 2005).

The misconduct in second stage closing arguments was so pervasive that Mr. Barrett's fundamental due process rights to a fair sentencing proceeding were violated, notwithstanding the lack of objections. *See* Ground II. *Darden v. Wainwright,* 477 U.S. 168 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974). The error stemming from prosecutorial misconduct cannot be termed harmless, even under the strict due process test of *Darden* and *Donnelly.* This was not a runaway case for the death penalty. The jury rejected death on counts 1 and 2, and also rejected the non-statutory aggravating circumstance that Mr. Barrett would pose a continuing threat.

"It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. 349, 358 (1977)(plurality opinion); *Bland v. Sirmons,* 459 F.3d 999, 1028 (10th Cir. 2006). The repeated misconduct of the prosecutors prevented the jury from evaluating the second stage evidence fairly, leading to a death verdict based on emotion rather than reason. *Bland,* 459 F.3d at 1024.

Prosecutorial misconduct was not raised on direct appeal. Because the misconduct of the prosecutors in both stages of trial was so glaring, no reasonable strategy excused the failure to raise the claim. Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different. *Evittts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984). *See* Ground XVIII, *infra.*