# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant/Defendant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent/Plaintiff.* | ) | |

---

## MOVANT'S REPLY TO UNITED STATES' RESPONSE
## TO SECOND AMENDED § 2255 MOTION

---

DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Counsel
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

defense.) *See also* section B hereinabove; Ground 2(A)(15) above.  Without addressing the direct statement by Ms. Real that she was expressly told not to speak to the defense, the Government does concede Ms. Crawford's belief that she could not speak to them which the Government downplays as being the witness' "subjective interpretation."  Doc 175 at 188.  By that concession alone (and the lack of any denial regarding Ms. Real), Mr. Barrett is entitled to further discovery and an evidentiary hearing.  The discovery process including the right to depose the critical witnesses and an evidentiary hearing which should be held will undoubtedly lead to additional evidence to support this claim.

The Government's argument that "simply put, Barrett fails to show that any foregone interview with Cindy Crawford would likely led to his acquittal," Doc 175 at 189, again misstates the prejudice requirement.  Here Mr. Barrett was denied a fair opportunity to interview the witnesses which "elemental fairness and due process require that he have." *Gregory v. United States,* 369 F. 2d 185, 188 (D.C. Cir. 1966).  Mr. Barrett is entitled to a new trial or, at a minimum, the right to full discovery and an evidentiary hearing on the issue.

**D.      Mr. Barrett Was Prejudiced by the Prosecutors' Misconduct During Trial.**

During both the guilt and penalty phases of the trial, the prosecutors blatantly interposed improper questions designed to imply falsehoods or bolster the credibility of witnesses.  Additionally, the prosecutors made egregious, inflammatory statements during closing arguments.  The overall effect of these questions and comments so infected that trial that Mr. Barrett was denied due process of law.  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  The Government argues that Mr. Barrett procedurally defaulted this claim and beyond that, the

Government valiantly attempts to twist the prosecutors' inflammatory behavior into some semblance of reasonableness.

### 1.    Mr. Barrett's claim is subject to collateral review.

Prosecutorial misconduct was not raised on direct appeal.  However, Mr. Barrett can establish constitutionally-cognizable ineffectiveness based on the fact that the misconduct of the prosecutors in both stages of trial was so glaring, no reasonable strategy excused their failure to raise the claim.  Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different.  *Evittts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984).  This claim has not been procedurally defaulted.

### 2.    The prosecutors improperly questioned the witnesses.

There are numerous examples of the prosecutors' improper questioning of witnesses, as set forth in Mr. Barrett's Amended § 2255 Motion and Brief in Support.  These include: 1) asking questions for which there was no good faith basis, or which were beyond the personal knowledge of the witness; 2) implying, through such questioning, that the prosecutor personally had knowledge of facts not testified to by the witnesses, making the prosecutor, in effect, a testifying witness; 3) commenting on Mr. Barrett's exercise of his trial rights, as if he were somehow doing something wrong by demanding his constitutional right to a trial; 4) asking witnesses whether other witnesses had made false statements, when, again, such would be beyond the knowledge of the witness being examined; 5) utilizing questions as a form of closing argument by repeating, over and over, the testimony of the informant and other witnesses, thus in effect vouching for the testimony of the witnesses.  For each of the examples in each of these categories, the

Government goes to great lengths in an attempt to explain the prosecutors' supposedly legitimate reasons for the challenged questioning. The Government's convoluted explanations fall woefully short.

For example, Mr. Barrett challenges the prosecutors' line of questioning regarding his right to go to trial. In questioning Deputy Court Clerk Maudeen Vann, Prosecutor Littlefield engaged in the following:

Q.    In regards to the felony information about which you've testified for the homicide of David Eales, Mr. Barrett didn't plead guilty, did he, ma'am?

A.    No, sir.

Q.    Put the government to the task of proving its case, didn't he?

A.    Yes, sir.

Q.    And ultimately Mr. Barrett was convicted of manslaughter and given a year sentence in that case?

A.    Yes, sir.

(Tr. 4765.)

The Government contends that the point of this questioning was somehow tied to later testimony indicating that Mr. Barrett's state manslaughter conviction was based on different evidence than that presented by the Government in this case. Doc 175 at 198. This argument defies logic. There is no connection between Mr. Barrett's plea of not guilty and the evidence presented in his state trial. The Government is reaching -- albeit feebly -- to explain its inappropriate questioning. Prosecutors commit misconduct if they imply that the defendant somehow abuses the legal system by exercising his Sixth Amendment right to trial. *See*

*Cunningham v. Zent*, 928 F.2d 1006, 1019 (11th Cir. 1991). That's exactly what the prosecutor was attempting to do here.

### 3. The prosecutors were especially egregious in arguing that the jury should impose a death sentence.

The examples of prosecutorial misconduct in the penalty phase closing argument are numerous and set out in full in Mr. Barrett's Second Amended § 2255 Motion and Brief in Support. Again, the Government unsuccessfully tries to find justification for the prosecutors' outrageous statements.

The prosecutors made unsubstantiated and inflammatory statements about Mr. Barrett's alleged lack of remorse, such as "There's no proof that Defendant lost one wink of sleep over what he did. It's almost like nothing happened . . . You know it's almost a oops." Tr. 5419. This is complete speculation on the part of the prosecutors, only meant to inflame the jury. The prosecutors continually pushed the bounds of reasonableness, arguing that it was only the "hand of God" that prevented Mr. Barrett from being a multiple murderer and that this was "way over the capital murder line." R at5402-03. Amazingly, the prosecutors told the jury that Mr. Barrett not only had no right to leniency, but really had no right to "fairness." R at 5408. It only gets worse. Prosecutors told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation. R at 5412. Speculating outside the record simply to prejudice the jury, prosecutors said that if given life, Mr. Barrett would be a "hero" to his fellow inmates. R at 5412. Inflammatory phrases without any evidentiary support were continually used, such as "executioner of the innocent," how unjust was it that Mr. Barrett wanted to "choose his

sentence," Mr. Barrett wanted "the thrill of the kill," (R at 5412-13), and Mr. Barrett "slaughtered an innocent soldier of the law." R at 5423.

And yet again, the Government tries to rationalize this hyperbole. For example, in support of its statement to not let Mr. Barrett be made a "hero" to his fellow inmates, the Government argues that there was "substantial evidence adduced upon which the jurors could have made the inferential leap suggested by the prosecutor." Doc 175 at 206. This substantial evidence pointed out by the Government included the fact that Mr. Barrett allegedly exerted control over other inmates, that he allegedly threatened a guard and, "as a general matter, that prisoners harbored great animosity for inmates who cooperated with law enforcement." Doc 175 at 206. First, the Government exaggerates the "substantial evidence." Mr. Barrett's alleged control over other inmates was actually the fact that he had been incarcerated in that particular location the longest. R at 5234. The alleged threat Mr. Barrett made to a guard was hearsay evidence that Mr. Barrett used some "cuss words" when a television set was removed from his cell and told a guard "he would get him when he got out." R at 5252. Accepting even these exaggerated facts, this is much more than the inferential leap the Government suggests; it's an intergalactic flight to get from those facts to the inference that "prison inmates would look with favor upon someone who murdered a police officer," and "jurors could be expected to understand prisoners' tendency to identify, as incarcerated felons, against a common social adversary, law enforcement." Doc 175 at 206. This "inference" is so ludicrous it does not even warrant a response. It simply goes without saying that the prosecutor's statement most assuredly did not rely on facts adduced in the record. *See Duckett v. Mullin*, F.3d 982, 992 (10th Cir. 2002); *Le v. Mullin*, F.3d 1002, 1014-15 (10th Cir. 2002).

The prosecutors further improperly aligned themselves with the jury by the use of first person pronouns during their argument. The Government admits that "the prosecutor's use of the first-person was ill-advised," but contends that the argument did not confuse the jury so Mr. Barrett was not prejudiced. The Government attempts to distinguish *Cargyle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003), in support of its argument but in so doing, misstates the holding of *Cargyle*. The Government contends that in *Cargyle*, the prosecutor offended the defendant's rights because "it urged the jury to return a death verdict to avoid rendering moot the efforts of the police and prosecution. As such, it implied that the jury bore some duty, or at least allegiance to the government." Doc 175 at 214-15. In *Cargyle*, the offending language contained some of the sentiment the Government cites. However, Cargyle held:

> We agree with the district court that "[t]his is an extremely improper argument" because "it profoundly misleads the jury" about its role in the criminal process "by suggesting that jurors are part of 'the team' of the prosecution and police, rather than impartial arbiters between the State and the defendant." The Supreme Court has stressed repeatedly "that the jury must not be misled regarding the role it plays in the sentencing decision." *Romano v. Oklahoma*, 512 U.S. 1, 8, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (following *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)); *see also Young*, 470 U.S. at 18, 105 S.Ct. 1038 (holding prosecutor's effort "to exhort the jury 'to do its job' ... has no place in the administration of justice").

317 F.3d at 1223. Thus, *Cargyle* stands for the proposition that it is prejudicial for a prosecutor to suggest that jurors are part of the prosecution team.

That is exactly what happened in Mr. Barrett's case. The prosecutor stated:

> Remember the real victims. It is not our job here to forgive. We are not the victims of the Defendant's brutality. It's not our job to feel guilty. The murderer who mercilessly killed in this case as a matter of conscious, premeditation and planning ought to feel guilt and remorse but he doesn't. He is the one who put us all here. What a sense of power he must feel, the narcissistic, selfish collection of reality that he is. He's the one that put us all here.

But we must not refuse to do our duty just because we can't make the victim's family or friends or community whole.

Tr. 5421-22. The prosecutor was attempting to make the jurors feel a part of the prosecution team, i.e., "our job, " "put us all here," "our duty," and "we can't make the victim's ... whole." Mr. Barrett's case is directly on point with *Cargyle.*

**GROUND 7:   THE USE OF THE ELECTRIC SHOCK DEVICE WITHOUT GOOD CAUSE WAS ERROR.**

**A.       The September 13th Finding Made Clear the Court Permitted the Electric Shock Device Because it Was a Capital Case.**

The Government complains that Mr. Barrett "attempts to demonstrate that the Court relied on an improper rationale because it made a non-dispositive statement *after* issuing its ruling." Doc 175 at 222. On September 13, 2005, the Government sought to do precisely what it is now trying to do: to bootstrap the grant of leave by the Court to the U.S. Marshal to use an electric shock device or  "stun belt" during the trial into a finding by the Court that Mr. Barrett was "dangerous." Thus, on the 13th of September the Government argued that the Court's order regarding the "stun belt" supported the Government's request to be relieved of its duty to timely disclose six previously unidentified witnesses and one previously unused witness. The Court advised the Government that "probably in any capital case where [he] was the presiding judge a stun belt would be used just because of the nature of the potential punishment." Tr Hrg at 9/13/05 at 13. That finding by the Court was a specific affirmation of the prior finding and rejection of the premise of the Government's argument here.