Q    And what does it show the offense, the criminal offense, the misdemeanor criminal offense is for?

A    Violation of protective order.

Q    And who is the Defendant?

A    Kenneth Barrett.

Q    For there to have been a violation of a protective order, there would have had to have been a protective order on file, wouldn't there?

A    Yes, sir.

Q    Okay.  Now, in regards to the protective orders that were kept in Sequoyah County, do you know how far back those records are maintained?

A    To statehood, 1907.

Q    Are some records -- some documents purged or destroyed in the court's office after -- in the court clerk's office after a period of time?

A    Yes, sir.

Q    And what kind of records are destroyed or purged?

A    We have some traffic, we have some misdemeanor and we have small claims.

Q    When you talk about misdemeanor records being destroyed, would the file itself for this still be available or not, being a 1986 case?

A    No, sir, it's not available.

Q    And on protective orders, sometimes if a period of

A   No, sir, it has not.

MR. LITTLEFIELD:  And that's all with that exhibit, Your Honor.  And may I approach the clerk with the one copy we have, Your Honor?

THE COURT:  You may.

Q   (By Mr. Littlefield) In regards to the felony information about which you've testified for the homicide of David Eales, Mr. Barrett didn't plead guilty, did he, ma'am?

A   No, sir.

Q   Put the government to the task of proving its case, didn't he?

A   Yes, sir.

Q   And ultimately Mr. Barrett was convicted of manslaughter and given a 20 year sentence in that case?

A   Yes, sir.

Q   You're familiar with the Department of Corrections -- and I don't mean intimately familiar with all the rules and regulations.  But you have some experience, having worked in the court clerk's office, with sentences with the Oklahoma State Department of Corrections, haven't you, ma'am?

A   Yes, sir.

Q   And it's not uncommon for somebody to have a 20 year sentence and yet be back in Sequoyah County within a

matter of two, three or four years, is it, ma'am?

A    That's correct.

Q    Twenty years doesn't necessarily mean 20 years in the State of Oklahoma prison system does it, ma'am?

MR. SMITH:  Your Honor, I'm going to object.  I think that's the DOC's area of expertise and we have a fellow here to testify now.

MR. LITTLEFIELD:  She can certainly testify from her experience.

MR. SMITH:  He's asking about the policy and what she can do at DOC.

MR. LITTLEFIELD:  I'm not asking about the policy.  I'm asking that 20 years -- does a 20 year sentence mean that a person's going to be 20 years in prison.

THE COURT:  She answered that question.  She's already answered that.  Objection sustained.

Q    (By Mr. Littlefield) In regards to the conviction, you were asked about Mr. Barrett -- that being final, it wasn't appealed.  Do you recall being asked about that, ma'am?

A    Yes, sir.

Q    Okay.  And he got a 20 year sentence, didn't he?

A    Yes, sir.

Q    What is the maximum punishment for manslaughter,

Q    There's nothing on that document that shows that Mr. Barrett turned himself in, is there, ma'am?

A    No, sir.

Q    And in fact, the bond previous to that was $1,500, wasn't it?

A    Yes, sir.

Q    And after the bench warrant was filed on September the 6th, when Mr. Barrett reappeared, that bond was increased to $5,000, more than three times greater, wasn't it, ma'am?

A    Yes, sir.

Q    Mr. Smith made the statement about incompatibility, reflecting that people don't get along. The documents in the court clerk's office apparently reflect that Abby Barrett and Kenny Barrett didn't get along very well, did they?

A    Yes, sir.

Q    In regards to joint custody of Toby Barrett, what the decree states, do you know who -- you don't know who actually got custody and maintained Toby Barrett, do you?

A    No, sir.

        MR. LITTLEFIELD:  Pass the witness.

        MR. SMITH:  No further questions, Your Honor.

        THE COURT:  May this witness be excused?

        MR. SMITH:  She may as far as we're concerned.

THE COURT:  Cross examination.

CROSS EXAMINATION

BY MR. SPERLING:

Q    Who is the attorney that you worked for as a legal secretary, ma'am?

A    Clark Wood.

Q    And during the time that you have served as a process server, are you independently employed or have you been employed by someone else?

A    I'm independently employed.

Q    And have been so employed for a long time now?

A    Sixteen years.

Q    All right.  Were you aware that there was a bench warrant issued for the Defendant's failure to appear for a jury trial?

A    No.

Q    All right.  Were you aware of his criminal charges for distribution of methamphetamine that were pending at the time of this shooting?

A    No.

Q    Do you know a man by the name of Randy Turman?

A    Only from rumors.  I don't know him personally.

Q    You've never met him?

A    No.

Q    Have you ever met Travis Crawford?

A Yes.

Q Were you -- when's the last time you were at the Defendant's residence?

A When he was a resident there?

Q Uh huh.

A I don't -- I couldn't tell you.

Q Fair to say that you've never been at the house that was built where he was staying at the time of the shooting that led to these charges?

A Other than driving by to do a service in that area, no, I have not.

Q Never been inside, obviously, that residential area with the Defendant?

A No.

Q So you would have no way of knowing what's hidden in a camera in that residence?

A No.

Q Or what may have been in his pocket during the night that he was involved in this murder?

A No.

Q You wouldn't be aware if he had pseudoephedrine hidden in a ceiling above his bedroom?

A No.

Q Do you know a man by the name of Charles Sanders?

A Yes, I do.

EUSTICE REPORTING SERVICE
BOX 700488   TULSA, OK 74170   (918)445-2965

Q    All right.  Do you know what his relationship was with the Defendant?

A    No, I do not.

Q    Do you know a man by the name of Randall Weaver?

A    Just rumored.

Q    Okay.  But do you know what his relationship, if any, was with the Defendant?

A    No, no.

Q    Do you know who Karen Real is?

A    No.  It was rumored to me that she used to be related in marriage in our family somewhere.  But those names and that information is just what I have read in the paper.

Q    Apart from that, are you aware of what relationship if any she had with the Defendant?

A    No.

Q    Cindy Crawford, do you know who she is?

A    She's Travis Crawford's wife.

Q    Yes.  And were you aware that she has had occasion to be at the Defendant's residence or would that be news to you?

A    No, I don't know Cindy.

Q    Do you know Brandie Price?

A    No.

Q    Okay.  So you wouldn't know what relationship, if

any, or what interaction she may have had with the Defendant?

A  No.

Q  Are you aware that there are some nine different case numbers that relate to domestic abuse as between the Defendant and Abby?

A  No.

Q  Have you ever personally witnessed any exchange between the Defendant and Abby that was volatile?

A  No, I have not.

Q  You don't use drugs, do you, ma'am?

A  Oh, no.

Q  And you don't use methamphetamine?

A  No, sir.

Q  You've never been around the Defendant when he was using methamphetamine?

A  No, sir.

Q  All right.  Or on drugs?

A  No, sir.

Q  Certainly never seen him manufacture or attempt to manufacture methamphetamine?

A  Absolutely not, no.

Q  You talked a little bit about guns being part of your family.  Have you ever seen the Defendant with a Colt Sporter?

A    No, sir.

Q    All right.  In the time that your family maintained weaponry, did you ever see any of your family members tape together several clips?

A    No.

Q    All right.  Never saw them electrically taped together various clips in order to increase the magazine capacity?

A    No, sir.  No.

Q    In fact, the guns that you saw when they were presented to you and that you saw would have been for legitimate use, would they not?

A    Yes, sir.

Q    Ever seen the Defendant with a loaded -- chamber loaded nine millimeter pistol in his waistband?

A    No.

Q    To your knowledge, has he ever been armed when he was around you?

A    No.

Q    Do you know about when it was when the Defendant's parents got a divorce?  About what year that would have been?

A    I don't remember.  I really don't.

Q    I know that's going back sometime -- (Interrupted)

A    That's -- we were pretty young.

Q    And that's a standard victim notification form, is it not?

A    Yes, sir, it is.

Q    And that's a form that indicates that if the Defendant is released or transferred or escapes, notification is supposed to be given to the victim, that is, to Kelli Eales and her family, correct?

A    Correct.

Q    Okay. Now, this document doesn't assure the victim of any rights other than it's a notification, correct?

A    Correct.

Q    So it doesn't give the victim an opportunity to move or funding for a move?

A    No.

Q    It doesn't give the Defendant any -- or the victim or the victim's family any opportunity for protection; it doesn't accord them that right?

A    I really don't know what the victims' services do for them. All I know is we handle, through the victim services and they notify the victims.

Q    All right.

A    So what services they provide, I couldn't tell you.

Q    This is merely a matter of notification, isn't it?

A    Correct.

Q    It provides no protective services, does it, sir?

couldn't it?

A Yes, sir. If he got a job, he'd be on level four, earning 44 days a month, plus the day he does.

Q Okay.

A And not for -- less than half.

Q All right. It's possible that the Defendant's custodial status could change, isn't it?

A Correct.

Q And if the Defendant's custodial status changes, if his employment circumstances changed, if he, for example, donates blood and does other things that prisoners may do to accumulate credits, he could accumulate many more credits than that, couldn't he?

A Correct.

Q In fact, you know, we could talk about the range of possibilities, but the long and the short of it is that the Defendant is eligible -- he's eligible for parole -- listen to my wording very carefully. He is eligible for parole consideration today, isn't he?

A Not today, he's not.

Q But he could be brought up for parole consideration today, couldn't he?

A That I don't know. I just know his parole date -- his first parole date.

Q Okay. You know his preferred parole date, correct?

A    Yeah, correct.

Q    Isn't it a fact, sir, that the day that someone hits the Lexington Acceptance and Reception Center, they are at least technically eligible for parole the date that they arrive?

A    I don't know that.

Q    Okay.  The Defendant's parole date could be accelerated substantially from whatever appears in the administrative record today, couldn't it?

MR. SMITH:  Your Honor, I'm going to object --

(Interrupted)

A    I can't -- I don't know --

MR. SMITH:  -- he's indicated he doesn't know the answers to these questions.

THE COURT:  I think that's what he's -- I think he's -- questions have been propounded and I think the witness has answered them to the best of his ability.  He does not know.

Q    (By Mr. Sperling) I wonder today, Mr. Wilson, but it may be I'm not being a bit unfair by asking you a lot of questions that really don't have to do with what a case manager is responsible to do.  And if I should do that, would you let me know that, because I understand as a case manager you are responsible to manage a case, correct?

A    That part we would know about a fight.

Q    All right. But if it were to have happened at a jail, you wouldn't know from this document, would you?

A    Not unless the jail reported it to us.

Q    All right. And if there had been some pressure for commissary or sexual favors or some sexual impropriety, you wouldn't know about it, except for what appears on this document, would you?

A    Correct.

Q    Okay. If I asked you the same questions with regard to the other acts here, is the long and the short of it that this is based on what the Defendant told the official at LARC?

A    Correct.

Q    Thank you, sir.

        MR. SPERLING: Defendant's Exhibit Number 245.

Q    (By Mr. Sperling) This is another document with regard to the Defendant's custodial and separatee status. Again, if the requestor or the approving authority were to change or to resign, transfer, go to another position, could a subsequent person as requestor or approving authority amend, alter or in any way change the directive of this document?

A    Yes, sir.

        MR. SPERLING: Defendant's Exhibit Number 246.

A   The case manager that wrote this is Sherry Allen. Now, I don't know what -- where she got the intake on this part of it. What we usually put in this area is a D.A. narrative and an inmate's version.

Q   Okay.  So you don't -- I'm sorry.

A   I don't know where she got this information at.

Q   Okay.  This could have been, as it says there, according to media and a newspaper account, couldn't it?

A   Yes.

Q   All right.  And if this were inaccurate in that it represents that first it was a drug raid, if this were a search warrant, that is a court ordered search warrant, that does not appear in that wording -- doesn't appear here, does it, sir?

A   No.

Q   And if this court ordered search warrant had been attempted at the home of the Defendant in both marked and unmarked cars, that's not reflected here, is it?

A   No.

Q   And it certainly doesn't reflect here that certain of the vehicles were lit up with emergency lighting, does it?

A   It doesn't say.

Q   It also indicates that Barrett and his son were in the house at the time.  If the evidence is to the

8-23-04, sir?

A    Gave inmate a TV and talked about visiting forms for his mother and father. His mother called visiting control and stated she did not want to visit, just the father. Both are at the major's office waiting for background checks -- that meant the visiting forms. No other issues at this time.

Q    Thank you, sir. Are you aware that the Defendant has a significant history of secret and illegal behavior?

A    No, sir.

Q    Do prisoners do things that go undetected in your experience?

A    A bunch.

Q    All right. I mean, I guess that's kind of like asking a negative. How do I know what is undetected unless, you know, I know about it?

A    Well, eventually we find out a lot of things that have been going on for awhile.

Q    All right, sir. Do prisoners do things that are unreported?

A    It's hard to say on that issue. Of course, we do get reports, sometimes, from what we would call a snitch. They told us something happened and after we investigating it, it did happen. So, yes, it does go on.

Q    By the way, how is a snitch viewed in prison?

Q    Throwing solid food object at a guard --
(Interrupted)

A    Correct.

Q    As serious?

A    Correct.

Q    All right, sir.  The scale that you have talked about that rates prisoners, is this scale something that is cast in stone that must be followed or is it a guide?

A    Oh, it's just a guide.  We have inmates with zero points in maximum security because of their behavior.

Q    Is it plausible, sir, that a prisoner could bide his time to await the opportunity to harm others?

A    It happens all the time.

Q    Would it be plausible, sir, that a prisoner could endeavor to put his best foot forward for a period of time while remaining eligible for parole?

A    Yes, sir.

Q    If a prisoner behaves well for a period of time, may his temporary good behavior be taken into consideration with regard to his custodial status?

A    It has a lot to do with it.

Q    And if he were to harbor some thought in the recesses of his mind -- last time I checked you are unable to read the minds of prisoners, fair enough?

A    I wish I could.

Q    Was there an incident in which you were left naked in the woods?

A    No.

Q    Was there an incident?

A    No.

Q    You answered before I even finished.

A    Because you was going to ask me again and I was just repeating it.

Q    Was there an incident involving your current husband's automobile at a car wash?

A    Yes.

Q    And you were taken from the car wash?

A    No.

Q    You left the car wash, didn't you?

A    Yes.

Q    Okay.  And were keys removed from the vehicle that you -- whose vehicle were you in when you went to the car wash?

A    My husband's that I'm married to now.

Q    Okay.  That's Mike Stites, right?

A    Yes.

Q    And you had his pickup?

A    Yes, I was washing it.

Q    And Mr. Barrett came down there, didn't he?

A    Yes.

Q    Why was he taking you to Webbers Falls?

A    Cause he wanted to discuss us getting back together and I told him that we were not getting back together and he begged me to just get a motel and just talk to him and just try to discuss things and work things out and I told him no.

Q    Was it easy to get away from him in Webbers?

A    Yeah, because when he went in to get the room I left.

Q    Where did you go?

A    I went to somebody's door, knocked on the door and called the cops.

Q    Did you ever tell anyone that you were concerned you were going to be raped at that motel?

A    Not that I recall.

Q    You don't recall telling Donna Hines?

A    No.

Q    Lynn hid you out from Mr. Barrett, didn't he?

A    Do what, sir?

Q    Lynn hid you out from Mr. Barrett, didn't he -- didn't she?  I'm sorry.

A    He knew I was living there.

Q    My question is:  Lynn hid you out from Mr. Barrett, didn't she?

A    I answered your question.  I said he knew I was

A    It was good.

Q    Was that the reason you went back to him?

A    Yes, sir.  Well, a lot of times I didn't have the money to fix it and a lot of times he wouldn't never take no money for it.  So he was good on fixing my carburetor. That's what it was on my truck.

Q    So he just -- he did a lot for work for you without even charging you?

A    Yeah.

MR. HILFIGER:  I have no further questions. Thank you.

THE COURT:  Cross examination.

CROSS EXAMINATION

BY MR. LITTLEFIELD:

Q    You don't know Karen Lynnington, do you?  Or Karen Real?

A    Yes, sir.

Q    She a good -- she a good lady?

A    Do what?

Q    She honest person?

A    As far as I know.  I've never had no dealings with her.

Q    Okay.  How about Travis Crawford?  Do you know Travis?

A    Yes, sir.

Q    Okay.  Travis a straight up guy?

A    I've never had no dealings with him.  He was raised out there.  I just, you know, I know him.

Q    You know Randy Turman?

A    Who?

Q    Randy Turman?

A    No, sir.

Q    Do you know Brandie Price?

A    No, sir.

Q    Essentially, all you can tell the jury is you took a vehicle by Kenny's maybe two, three, four times a year?

A    Yes, sir.

Q    Dropped it off, maybe stayed out there and visited with him for an hour or two while he fixed it and then you left?

A    Well, sometimes he come to my house and got it.

Q    Okay.

A    And took it and worked on it.

Q    And then you'd go pick it up and visit with him for a short period of time?

A    Yes, sir.  And sometimes he would bring it back home.

Q    In which case you'd visit with him there for a short period of time?

A    If I was there, yes, sir.

A    Yes, sir.

Q    In regards to Mr. Barrett, the correct and truthful answer to that question would have been yes, wouldn't it?

A    Yes, sir.

Q    He was in fact kept in protective custody for the entire time, wasn't he?

A    Yes, sir.

Q    The response to question four on this form was not truthful, was it?

A    No, sir.

MR. SMITH: Your Honor, I'm going to object to that in that there's no indication that response was filled out by Kenny Barrett.

MR. LITTLEFIELD: The testimony --

(Interrupted)

MR. SMITH: He can indicate or ask the question whether or not that statement would be a correct statement. But to try to attribute Kenny Barrett filling it out is a misstatement of the testimony.

MR. LITTLEFIELD: Testimony was that that was self-reported, Your Honor.

THE COURT: Let's move on.

MR. LITTLEFIELD: Pass the witness.

Q    By the way, is there any danger in dealing with the bodily fluids of inmates?

A    Yes, there is.

Q    And is there a substantial incident -- incidents of Hep C, Hepatitis C, with regard to inmates?

A    Yes.

Q    Is there some significant incidents of AIDS with regard to inmates?

A    That I would say, yes, but I mean, there's certain things they're not allowed to do when they're HIV positive.

Q    And I'm not suggesting you necessarily know with regard to Mr. Barrett whether or not he has any transmittable disease like that, do you know?

A    I have no idea.

Q    Given the fact that there are 260 inmates at any given point in time, would you expect that Shirley Shores would have absolute recall as to who has what in terms of communicable diseases?

A    No, she wouldn't know at all times.

MR. SPERLING:  I have nothing further.  Thank you very much.

THE COURT:  Redirect?

MR. SMITH:  Briefly, Your Honor.

ma'am?

A   Life in prison.

Q   You didn't hear the trial, did you?

A   No, sir.

Q   You don't know what evidence the jury heard in Sequoyah County, do you?

A   No, sir.

Q   Okay.  You don't know if individuals testified before the Sequoyah County jury about the threats that Mr. Barrett had made to law -- about law enforcement officers, do you?

A   No, sir.

Q   And you aren't familiar with whether or not -- (Interrupted)

MR. SMITH:  Your Honor, I'm going to object to this line of questioning.  She said she didn't hear the evidence.  He just wants to recite this whole case before this witness.  We think that's improper.

THE COURT:  Counsel.

MR. LITTLEFIELD:  I'm not going to recite the whole case, but there are a couple of areas that I want to ask -- (Interrupted)

THE COURT:  You may proceed.  Objection overruled.

Q   (By Mr. Littlefield) To your knowledge -- or you

MR. SMITH: I have no further questions.

THE COURT: Cross examination.

CROSS EXAMINATION

BY MR. LITTLEFIELD:

Q How much time did Ernest Barrett spend in the Sallisaw area with Kenny?

A When Ernie and I got a divorce when Kenny was 12 years old, Ernie lived -- we lived in New Jersey and he stayed in New Jersey for awhile and then moved to Huntington, West Virginia and then to, I think, Delaware and then to Indiana. I don't know exactly how many years this was. He came home on vacations and spent time with his boys during the summer when he was on vacation and they would go to his home.

Q Okay. So, he didn't live in the Sallisaw area while Kenny was growing up?

A No.

Q And so, if somebody's come in and talked about seeing guns around the house, his father having guns, that couldn't have been in the Sallisaw area, could it?

A That was when we lived in Illinois and we lived in New Jersey and then when he -- (Interrupted)

Q Could not have been around Sallisaw, could it?

A No. But when he did go to his dad's, though -- his dad collects guns. There have always been guns.

Q   It's favored -- it's preferable, though, to be on good terms with the judge such that you can go to him and say, judge, give me a few moments or give me a little time, I think that I can locate this guy. I think I can bring him in, right?

A   And that's correct.

Q   Do you keep up on criminality in Sequoyah County that does not concern you unless it's really notorious?

A   No.

Q   So if the Defendant would have been the subject of repeated domestic violence complaints, protective orders or the like, is that something that you would think would escape your attention rather than come to your attention?

A   Unless he went to jail for it, no, I wouldn't have no business in it.

Q   And if we were to run through a series of case numbers that relate to violation of protective orders, criminal misdemeanor, domestic violence cases, domestic abuse dockets and the like, protective orders violations, would that all be news to you with regard to this Defendant?

A   I'm not aware of them unless I have -- like this one, I did write his bail on this one. But outside that, no.

Q   Okay. I'm not going to belabor the record by going

through them individually.

A    Okay.

MR. SPERLING:  Thank you very much, sir.  Thank you, Your Honor.

THE COURT:  Any further direct?

MR. SPERLING:  Excuse me.  Just one moment, Your Honor.

Q    (By Mr. Sperling) I take it given your response in direct examination that you were not aware of accusations of prior violence with regard to the Defendant?

A    No, I am not.

Q    That if the Defendant were to have threatened in the context of domestic violence to go inside a house to retrieve a gun and come back and shoot someone who tried to intervene, that person being Shannon Smith, you would not be aware of that?

A    No, I sure wouldn't.

Q    And if the Defendant were to have spoken to trusted associates of his and were to have threatened a cooperating witness or an informant, that would be news to you, wouldn't it?

A    Absolutely.

Q    And if the Defendant were to have stated to friends and associates of his that he hoped that the first person through the door were to be the sheriff, Johnny Philpot,

or the D.A. investigator Frank Loyd, that would also be news to you, sir, wouldn't it?

A    Yes, it would be.

MR. SPERLING:  Thank you.  I have nothing further.

REDIRECT EXAMINATION

BY MR. HILFIGER:

Q    Mr. Daggs, when did you say you became a bondsman?

A    In 1991.

Q    1991.  So any incidents involving bonding on anything prior to 1991 you would not be aware of; is that correct?

A    That's correct.

Q    Can we see this Government's Number 87 again?  And without belaboring it, but just -- Mr. Sperling kept asking about a bench warrant issued by the judge.  Issued by a judge.  And referred to the bench warrant issued by a judge.  An on Number 87, which judge issued that bench warrant?  Amanda Woody; is that a judge?

A    No, sir, she's not.

Q    So this bench warrant really wasn't issued by a judge, was it?

A    No.

Q    That's sort of their practice down there, isn't it?

A    That's correct.

Q    So you'd been a teacher at Norman for awhile, a principal's job opened up, you applied for it and received it?

A    I was actually a head football coach at Noble for the last three years, and then I took the assistant principal's job.

Q    How come is it that coaches are the ones that become administrators all the time?

A    I don't know.  Know how to deal with people, I guess.

Q    Okay.  You only saw one fight between Kenny and Abby, physical fight?

A    Yes.

Q    And in that one, Kenny attacked Abby?

A    Yes.

Q    And Abby threw no blows?

A    No.

Q    Are you aware that Kenneth broke Abby's nose on an occasion?

A    No.

Q    And a good portion of the fights were after you left, weren't they?  I mean, went to Tulsa and then on down to Norman?

A    I don't know.

Q    You don't know -- you really don't know much about

him. Are you aware, sir, that she has remarried?

A    Yes, sir. I didn't -- that was a slip. I meant his son.

Q    All right, sir. Would it be news to you if the Defendant had ever run a roadblock and nearly ran over two officers? Is that something you ever heard about?

A    I heard something about that, yes.

Q    And do you know how that came to your knowledge?

A    No, sir, I don't.

Q    But are you aware that two officers had to jump out of the way to avoid being hit by him?

A    I don't remember that.

Q    Are you aware of any circumstances under which the Defendant has confronted law enforcement officers while he, Mr. Barrett, was carrying a firearm?

A    No, sir.

Q    Are you aware of whether or not he ever threatened to shoot a man who intervened when he slapped his wife?

A    No, sir.

Q    Has Gelene ever complained to you that the Defendant came over to her house unannounced and without her permission?

A    No, sir.

Q    Has she ever -- she had problems with the Defendant, didn't she?

A    I have visited with him several times, had nice visits. But it just -- sometimes you get a jailer that doesn't like Kenny Barrett or he doesn't like me or whatever and they treat you however they want to.

MR. SMITH:  I have no further questions. Thank you.

CROSS EXAMINATION

BY MR. SPERLING:

Q    Mr. Barrett, I'm going to try to be brief and I will do my best to speak as clearly as I can, okay?

A    Fine.

Q    Thank you, sir.  Did I understand you correctly to say that you hadn't seen Kenny for about two years before this incident?

A    I would say that that was close.

Q    So, you would not have been at his cabin for at least two years before this incident?

A    No.

Q    And in fairness to you, sir, you wouldn't know what activity had gone on there or what was inside that cabin for a number of years prior to this incident; would that be fair?

A    If it had been there that long.  I don't think it had been there that long.  I'm not sure, but I don't think it had been built but a year or so.  I may be