that she thought he was hyper as opposed to being hyped up. Living right next door she didn't even know of the drug activity. How close can that be? Good neighbor, good friend? The only testimony there is he fixed cars cheap. Death would impact his child, his friends and his family. And there was no testimony of impact upon his child. No testimony of what impact his death would have upon his friends. And the only impact coming from his family was his stepmother who said that I could no longer have my relationship with him in jail. I'm sorry. I submit that that mitigating factor does not exist. Or to the extent it does, it comes nowhere near the aggravating factors in this case.

He expressed remorse. How? When? Well, he told his mom he wished it could have been different. Yeah, like not get caught. Yeah, like kill more of the bastards like I intended to. Where's the remorse? He told his dad that, well, I'm sorry that two children had lost their daddy. What are you going to say to your dad? Damn, Dad, I wanted to kill more than that. I didn't do a good enough job. Come on.

Nine, no danger because he's in prison. And we've already dealt with that. Ten, other factors in his background which mitigate against the death penalty. What factors? What factors? One, he didn't get his

haircut so he dropped out of school? Two, he voluntarily chose to use and sell and make methamphetamine? Three, he beat his wife. Four, on the night in question he left his son at the residence knowing the cops were going to come back and he was going to have a shootout? What factors weigh against the death penalty that are not mentioned? And I submit when you look at all of them there are no mitigating factors which exist or to the extent they do, they pale in significance to the aggravating factors the Government has established beyond a reasonable doubt in this case. When you reach that last step, whatever mitigating factors you have to compare to the aggravating factors that the Government has proven all of them beyond a reasonable doubt, when you make that comparison, compare the lives involved. You are going to sit in judgment to see if the aggravating factors substantially outweigh the mitigating factors. And I submit they do. You will sit as judges.

And when you compare the lives -- and that should be in evidence. Compare the life and the loss of Rocky Eales with the life of Kenneth Barrett. But I think there's another comparison. Actually, the word is contrast because comparison is how there are alike. Contrast is how they are different. And I submit there is another contrast that is stark in this case. That is

argument. But I ask you in the final analysis, each one of you, to be the agents of justice and fairness in this case. Last evening I sat down at my computer and I began to write and early this morning I reached this conclusion and that's that words cannot do justice to this extraordinary case.

I want to ask you two preliminary questions. The first is this: What kept the Defendant from being a multiple murderer in this case? Some may say the hand of God, Providence, fate, dumb luck. The Defendant in this case intended to be a multiple murderer. We'll examine the facts. But the second question I want to ask you is this: If 19 rounds -- and I'm going to be careful not to point this at anyone. If 19 rounds from this firearm -- and I admit it, it could be used to shoot skunks. We heard that from his mom. I'll tell you that tells you one thing, he know something about shooting black and whites. But if this gun and 19 shots at highway patrolman, at officers of the law, at soldiers of the law, if 19 shots from this gun at point blank range, but extending farther out to begin, if that's not over the capital line, what is? Must it have been 30 or 60 or the 91 that he had at the ready?

Ladies and gentlemen, I submit to you that when you carefully and you honestly and you dispassionately

look at this evidence in this case -- this may be a very difficult case and a very difficult decision. Mr. Smith tugs at your heart strings. This is a decision that you will live with, yes. It is a difficult decision to sentence someone to death. But, ladies and gentlemen, under this evidence this is not a close call. This is not a close call. Months ago we looked each other in the eye and considered the prospect that this day would come, didn't we? And you looked me, each of you, directly in the eye and asked each of you this question: If the law permits it and the evidence justifies it, are you capable of signing your name to the bottom line of a jury verdict form knowing that the result will be the death by execution of another human being, the Defendant in this case? Each of you reverently and respectfully answered that question in the affirmative. That day has come. The law permits it and the evidence resoundingly justifies a capital sentence in this case based on what you heard as to this Defendant. And I am confident that you will take this decision very seriously. You each fully understand the gravity of the verdict that you're asked to enter. This isn't an easy decision, but it's not a close call. Nineteen shots are way over the capital verdict line. And the Defendant's crimes deserve the death penalty not because we want to impose it, not

That's a telling forecast of what is to come if the Defendant is just sent back to his room.

You know, in the days, weeks and months before this killing, the Defendant had the idea of murder germinating in his mind. The Defendant was on a trajectory, a chosen path. This evidence is unmistakable. Instead of surrendering to arrest, the Defendant took everything Rocky had. And they now complain about unfairness? He took Rocky's hopes and his dreams and his time and his life. This was cold blooded murder. And the question that we asked you originally, why wasn't this a double murder or a triple or quadruple murder? Only because the Defendant was stopped. Before that night and after, the Defendant behaved the way he wanted to. He did what he wanted.

You've heard the defense attorneys ask you to do something other than to render a capital sentence. The Defendant wants to be sentenced to his room as punishment. Justice cannot be served in the case by allowing the Defendant to live in prison. If he's allowed to live in prison, he will have perks like workouts and visitors and phone calls and mail, TV and recreation. Don't let this Defendant -- the evidence may reasonably infer and you may reasonably conclude -- be a hero to his fellow inmates, to his fellow incarcerated

criminals. All with a civilized core must have revulsion at what the Defendant did to have acted as the executioner of the innocent. Don't give this Defendant what he wants. In the name of justice give this Defendant what he deserves. Don't just send him to his room.

The Defendant wants to choose his sentence. He now wants to live. And how unjust is that? What opportunity did he give Rocky Eales to live? How unjust is that? The Defendant made Rocky Eales do something he would never ever do in life, but for the desperation of his moment. Rocky would never have done what the Defendant made him do, but for the fact that he believed there was absolutely nothing he could further do to defend himself or others. His life was ebbing away, he could do nothing for others because he was mortally wounded, bleeding and dying, he retreated for what was left of his life.

This disturbing criminal conduct is way over the capital line. The Defendant didn't need to commit this murder. He wanted the thrill of the kill. And now his lawyer complains because he has been brought to the federal bar of justice, to our doorstep. He has not been placed in double jeopardy. The Court's instructions tell you there is no legal bar to this trial. But let's just

go farther and practically. Let's say I get in trouble at school and that doesn't mean that there wasn't going to be a more serious reckoning when I got home and dad found out about what I had done. If the punishment was insufficient at school, I can assure you that dad had punishment waiting later. That's not unfair, that's just. Let's say, for example, that I had misbehaved and my mother had caught me and she furrowed her brow and she'd scolded me and may have swatted me a couple of times and told me not to leave the house. And then she told dad. And because of disrespect or some other reason, Dad said that original punishment is not enough, it's not just. You know, I could have complained about fairness, say, oh, whoa. Whoa, whoa, mom swatted me, the school tried to punishment me. I can guarantee you that my pleas would have been drowned out by the whack of the belt on the place God made for that appropriate punishment. That's their claim. They're asking you, ladies and gentlemen, not for fairness but for leniency for a man who offered Rocky no leniency, who offered Buddy no leniency, who was ready to kill at will. Ladies and gentlemen, don't let a cop killer get leniency.

So much for analogies, though. Let's talk about the difference in the cases. You heard witnesses testify here that in the state proceeding they didn't --

they were really grossly under-evidenced. Randy Turman didn't testify, nor did Travis Crawford, nor Charles Sanders nor Karen Real nor Brandie Price, Cindy Crawford, Randall Weaver. No small effort was involved in getting them brave enough to hit the stand. They didn't want to testify. We required their testimony.

His friends and associates didn't want to testify against him. But then there was Juan Beal, Kevin -- remember Kevin, no small potatoes, Wilson? Craig Nixon and an array of drug evidence, lab equipment, chemical and proof of the Defendant's serial drug manufacturing, distribution and use. Chemist David Love, Lyndell Griffin and Gerald Skowronski. All of these witnesses were presented to you never set foot in that prosecution down there.

Ladies and gentlemen, this is the time for justice. This is not the time for the leniency that the defense asks. All of those witnesses were presented to you not at the abridged state proceedings. The state jury just got a small glimpse at the wide screen feature length film that you have very patiently experienced in this case. And you heard from Kelli Eales and Bobbie Eales and Nancy Stalcup and Bill DeWeese and Gene Hise. They didn't testify in state court. We need not belabor their testimony, but you also heard from Stanley Philpot.

a child. He was a fully conscious adult who substantially planned, who premeditated in a number of ways in the weeks and months prior to this murder. He expected, he watched, he surveilled and he slaughtered an absolutely innocent man who had done nothing to him. And they ask for increased leniency or fairness?

This was game day for the murderer. He clearly tried to murder at least two human beings, shots at the Bronco, the intentional killing of the passenger. But he wasn't finished. He saw the driver, Buddy Hamilton, getting out of the vehicle, didn't he? Buddy was wounded. He fired at him, too. Buddy was wounded in the front, the face, in the front and back, and back, and back, of his shoulder. And they claim unfairness.

The Defendant still wasn't finished. He was waiting, rifle at the ready, chamber loaded pistol in his waistband, for law enforcement officers to walk onto his porch. Fortunately, two bursts from Rick Manion's MP-5 put a halt to his killing field. Still, the Defendant's substantial plan and premeditation continued. He reaches for a weapon as he's being subdued. Let's not get distracted from the real issues in this case. My judgment is that you have this Defendant figured out. He talked for a long time about what he was going to do, about what he wanted to do. He talked about it long

limped. He said, well, a good person, helps people, son and ex-wife need him. Ex-wife, I asked. Maybe not. Gelene Dotson. Doesn't remember when the Defendant got married or divorced. They fought a lot. Doesn't remember any domestic abuse allegations? And she wasn't going to run his messenger service and didn't want a salvage yard next door. She says Defendant knows he made a wrong decision as to how to react that night. If he could do it different, he would. Now, that's big of him. That's about as weak as his reason for leaving school.

Ernie Barrett gave the Defendant several time -- chances to succeed at work. The Defendant basically blew them. Mother-in-law, Doris, I got to respect her loyalty. She's been in court when he's been in court. But the state trial, as she admitted, was nothing like you heard here. The jailers -- he chunks a potato at one, curses others, he's in a cell with dangerous contraband weapons, he threatens yet another one, he reaches out from a cell and tries to grab another, he thumps a younger cellmate, a cowardly killer himself, I might add, not out of injustice but because of the way he cuts his toenails?

Sympathy. If we're tempted to feel sorry for the Defendant or his relatives, we should remember this. He abandoned them through his conduct. How he must envy

his hard-working, highly achieving bother's success. Abby, every pore of her body oozed that she had been abused, physically and emotionally. The Defendant had sporadic contact, pretty much unwanted, particularly with his mother, until he committed murder and got arrested. They didn't visit him at his house. They hadn't seen the inside of his house by and large. And remember this, hear in court, the Defendant victimizes his own family by making them serve as props, as witnesses on his behalf. Remember, Rocky didn't get this similar chance to plead for his life.

Defendant's parents visit him. Well, whatever he does for them or anyone else is largely undefined and far outweighed by the crimes he committed. The Defendant has paid for his membership into the worst of the worst groups of criminals. He's a murderer. He killed remorselessly, wantonly, senselessly and had no empathy, no sympathy, no thought, no feeling and no emotion for a wonderful man whose life he extinguished like that with semi-automatic gunshots.

There is no proof that this Defendant lost one wink of sleep over what he did. It's almost as if he had done nothing, like nothing happened. And now he says give me leniency. His mother quoted him as saying he made a wrong decision and would do it differently. You

know, it's almost an oops. It's kind of like, well, Derek Jeter may have bobbled a ball in a preseason spring training game that's meaningless. His dad says, well, he's sorry it happened. Sorry two kids are without a father. Boy, that's pathetically understated, even if it's accurately relayed.

MR. BARRETT: Get off my family, Sperling. This is about murder, not my family. You didn't mention the fact that I made two statements to OSBI Internal Affairs that you wouldn't let this jury hear, would you? I've heard enough of him talking about my family. Take me out of the courtroom. Take me out.

THE MARSHAL: We'll take you -- do you want him removed, Your Honor?

THE COURT: Yes.

(Whereupon, Mr. Barrett was escorted out of the courtroom after which the following record was made.)

MR. SPERLING: And he never intentionally shot anybody? Every bullet he fired was in the direction of the man and men he shot. The final shots were deadly accurate. All he saw was headlights. He saw lots of emergency lights, too. Remember the real victims. It is not our job here to forgive. We are not the victims of the Defendant's brutality. It's not our job to feel guilty. The murderer who mercilessly killed in this case

as a matter of conscious, premeditation and planning ought to feel guilt and remorse, but he doesn't. He is the one who put us all here. What a sense of power he must feel, the narcissistic, selfish collection of reality that he is. He's the one that put us all here.

But we must not refuse to do our duty just because we can't make the victim's family or friends or community whole. Remember that the Defendant employed the machinery of death as Rocky sought only to enable a court ordered search of the Defendant's house and then to go home to his family. This tactical team had never fired their weapons or been fired upon. There was only one difference here, the Defendant. The Defendant chose when Rocky would breathe his last breath. This Defendant substantially planned and premeditated and deliberated. His aggravating factor laden murder was unprovoked, it was predatory, it was deliberate and it was premeditated. He had taken steps to get where he was heavily armed that night. He selected the means, the instrument, the place, the victim's pathway. He struck without warning. He killed from a distance and then killed close-up as he cowered in the cover of his house.

They say that the Defendant accepted responsibility by declining to appeal his state conviction for mere manslaughter. Hardly. He made a

strategic choice. If retried, he could have been sentenced up to life in prison. The defense lawyer says the Defendant has people who care for him. But he's manipulative, he's a taker, a narcissistic personality. To him it's all about him. If only they had done things differently. This Defendant chose to be the person that he was before and on September 24th, 1999. Remorse? The evidence indicates that this Defendant has not only not seen the light, he hasn't even felt the heat. The defense lawyer says that the Defendant is not a future danger. Ask yourselves, would any of us want to be in a prison cell next to a man who is capable of coldly attacking law enforcement officers? So he's a good prisoner, to those he can't manipulate or selectively attack.

You did hear an emotional appeal from his lawyers. We predicted -- they asked for fairness. We ask, ladies and gentlemen in this venue, for justice. If we merely send this Defendant back to his room, you may reasonably infer that this cop killer will be a hero to many in the prison population he enters. He will have committed cold blooded murder, yet will have escaped the capital noose. This Defendant will have slaughtered an innocent soldier of the law and merely be given more time. Don't make him a hero.