# ATTACHMENT 1

**D.**    **Mr. Barrett is Entitled to a New Trial Due to the  Prosecution's Improper Questioning of Witnesses and Closing Argument**.

The prosecutor's improper conduct included the following examples:  The prosecutor improperly asked questions for which he lacked a good faith basis, or to which he knew the witness could not give an answer based on personal knowledge, the effect being to imply that the prosecutor had knowledge of the facts.  (R. 4743 (implying existence of records adverse to Mr. Barrett), 4765-66, 4781 (implying Mr. Barrett had been denied custody of his son), 4788-92, 4850, 4852-53, 4859, 4862, 4866, 4869, 4911, 4913, 4925 (bolstering Karen Real by implying prosecutor's knowledge of her reputation for honesty), 4980, 5006 (falsely suggesting prosecutor had knowledge of Mr. Barrett trying to infect jail worker with communicable disease).)

The prosecutor improperly commented upon Mr. Barrett exercising his trial rights in state court.  (R. 4765.)  The prosecutor improperly adduced through a witness who lacked personal knowledge whether someone who is sentenced to 20 years' imprisonment will be released earlier by the Department of Corrections.  (R. 4765-66.)

The prosecutor asked witnesses whether other witnesses had made false statements although, due to Federal Rule of Evidence 615, the witness being questioned could have had no knowledge of the other witnesses' testimony.  (R. 5092.)

The prosecutor repeatedly exceeded the scope of direct examination and asked witnesses questions about the seven informant witnesses the Government presented in federal court, or Abby Stites' charges against Mr. Barrett, although – or because – the prosecutor knew the witnesses lacked personal knowledge of the facts.  (R. 4767, 4788-92, 4925, 4926, 5024-26,

5045 (Littlefield acknowledging he asked question knowing witness had no personal knowledge), 5069, 5116.) As the prosecutor's obvious goal was to merely repeat the testimony of witnesses who claimed to observe various facts, regardless of whether the witness testifying had said anything related to the other witnesses' testimony, the questioning lacked any probative value and trial counsel were ineffective for failing to object. The effect of the prosecutor's improper questioning was to repeat the Government's case over and over and over, and make defense witnesses appear ignorant of facts to which their testimony did not relate. Ultimately, the prosecutor's misconduct – enabled by trial counsel's unreasonable failure to object – completely drowned out the defense witnesses' testimony.

In arguing for death, the prosecutors stooped to conquer.

In his portion of the penalty phase closing argument, AUSA Littlefield, taking unfair advantage of the court's erroneous ruling excluding Mr. Barrett's statements expressing his genuine remorse for Trooper Eales's death by wishing he had been killed rather than Mr. Eales, fastened on an ambiguous statement that had been allowed in evidence: that Mr. Barrett wished things had turned out differently. Knowing full well this isolated statement did not tell the whole story, Littlefield sarcastically told the jury that by this, Mr. Barrett simply meant he was sorry he got caught; what he regretted was that he would not have an opportunity to "kill more of the bastards." (R. 5356-57.)

United States Attorney Sperling strayed from the record and appealed to societal alarm, stating at one point the "hand of God" prevented Mr. Barrett from being a multiple murderer. This was "way over the capital murder line." (R. 5402-03.) Similarly, Sperling later asked, "Why wasn't this a double murder or a triple murder or a quadruple murder?" (R. 5412.)

Denigrating Mr. Barrett's fundamental right to a fair trial, Sperling, in the form of a rhetorical question, told the jury Mr. Barrett not only had no right to leniency, but really had no right to "fairness." (R. 5408.)

Trotting out a variation on the old Bob Macy[46] "three hots and a cot" argument, Sperling repeatedly – and falsely – characterized life without the possibility of release as Mr. Barrett simply being "sent to his room." (R. 5412, 5423.) Continuing in the same improper vein, Sperling told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation. (R. 5412.) Speculating outside the record simply to prejudice the jury, Sperling said that if given life, Mr. Barrett would be a "hero" to his fellow inmates. (R. 5412.) In the next breath, he engaged in improper name calling, referring to Mr. Barrett as the "executioner of the innocent." (R. 5412.)

Attempting to create resentment among the jurors, as if Mr. Barrett, and not the jury, was in control of his fate, and again denigrating Mr. Barrett's right to a fair trial, Sperling falsely told the jury Mr. Barrett wanted to "choose his sentence." Asking rhetorically, "How unjust is that?" the United States Attorney closed the circle on the "three hots and a cot" theme and appealed to lynch law by inquiring "What opportunity did he give Rocky Eales to live?" The prosecutor again went outside the record when he stated Mr. Barrett wanted "the thrill of the kill." (R. 5412-13.)

---

[46] Mr. Macy is the former long-time District Attorney in Oklahoma County, who was well known, and often criticized by the courts, for his misconduct in death penalty cases.

Fueling alarm that Mr. Barrett was a threat to witnesses, when there was absolutely no evidence in the record to support such a claim[47], and misleading the jury all at once, the prosecutor commented that the state case was "grossly under-evidenced," because "no small effort was involved" in getting the drug-addicted, criminal, deal-swinging snitches "brave enough." to testify. (R. 5414-15.)

Left unsaid, of course, was that these individuals, who supposedly knew so much, and were never once threatened by Mr. Barrett to keep them "quiet," were nowhere to be found in 1999 when the shooting occurred, or in 2002 and 2004 when the case was tried in state court. They only crawled out of the woodwork when the federal government put the arm on them. To say, as the prosecutor did, that the state juries got only a "small glimpse" of the whole case falsely implied the seven Johnny and Janie Come Latelys were ready, willing and able to testify back when, but were somehow prevented from doing so by the state prosecutors, or out of "fear."

The prosecutor grossly misled the jury when he referred to the victim impact witnesses and stated "[t]hey didn't testify in state court," as if this explained the state court outcome. (R. 5415.) This falsely implied the victim impact witnesses did not testify in the state trials only because the incompetent, "under-evidenced" state prosecutors did not have sense enough to put them on the stand. Sperling was well aware they *could not have testified by law* because the case never got past the first stage. Shielded by the court's erroneous ruling excluding

---

[47] This was a knowing false statement on the prosecutor's part. As discussed in Ground One, the Government failed to produce *any* evidence at the *ex parte* hearing on its motion to delay disclosing the identity of the informant witnesses that the witnesses had ever been threatened in any manner by Mr. Barrett. "Monk" Sanders testified in the second stage that Mr. Barrett wanted the snitch who landed him in jail harmed, but anything this pathetic witness had to offer was scarcely worthy of belief.

Mr. Barrett's statements of remorse, and picking up where Mike Littlefield left off, the prosecutor ridiculed the "wish it had been different" statement, remarking this sentiment was "big of him [Mr. Barrett]." (R. 5419.) The prosecutor stated there was no evidence Mr. Barrett had "lost one wink of sleep" over what he did. Mr. Barrett killed "remorselessly" and "selfishly," with no sympathy or empathy for anyone. Mr. Barrett was so unfeeling and callous, it was almost as if he had done "nothing." The "wrong choice" comment was likened to a meaningless mistake, nothing more than an "oops." (R. 5420-21.) There were additional comments on Mr. Barrett's supposed lack of remorse. (R. 5419-20, 5421-22.)

The United States Attorney improperly denigrated Mr. Barrett's right to put on mitigating evidence by stating he was using his family as "props," in contrast to Trooper Eales, who did not receive a similar chance to plead for his life. (R. 5420.)

Sperling improperly aligned himself with the jurors as if he and they were on the same team, stating that "we" must not refuse to do "our" duty just because the victim's family and the community could not be made whole again. (R. 5421-22.)

Continuing with the civic duty theme, the prosecutor talked of Mr. Barrett having "slaughtered an innocent soldier of the law," warning the jury they would make him a "hero" in prison if they returned a life sentence, or "sent him back to his room" and merely gave him "more time." (R. 5423.) This was little better than telling the jury that if they spared Mr. Barrett's life, they would be accomplices to any future crimes he might commit.

The misconduct in second stage closing arguments was so pervasive that Mr. Barrett's fundamental due process rights to a fair sentencing proceeding were violated, notwithstanding the lack of objections. *See* Ground Two. The error stemming from

prosecutorial misconduct cannot be termed harmless. This was not a runaway case for the death penalty. The jury rejected death on counts 1 and 2, and also rejected the non-statutory aggravating circumstance that Mr. Barrett would pose a continuing threat.

A claim of prosecutorial misconduct was not raised on direct appeal. Because the misconduct of the prosecutors in both stages of trial was so glaring, no reasonable strategy excused the failure to raise the claim. Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Five:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.