# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| **v.** | ) | **Case No. CV-09-00105-JHP** |
| | ) | **Criminal Case No. CR-04-00115-JHP** |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| *Respondent.* | ) | |

**GOVERNMENT'S ANSWER IN OPPOSITION TO SECOND AMENDED MOTION TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY**

**(Answer Under 28 U.S.C. § 2255)**

SHELDON J. SPERLING
United States Attorney
Eastern District of Oklahoma


CHRISTOPHER J. WILSON, OBA #13801
Assistant United States Attorney
Eastern District of Oklahoma
1200 West Okmulgee
Muskogee, OK 74401-6848
Tel: (918) 684-5100


JEFFREY B. KAHAN, PA Bar No. 93199
Trial Attorney
U.S. Department of Justice
1331 F Street, N.W.; Rm. 345
Washington, D.C. 20530
Tel: (202) 305-8910

Exhibit A

*other grounds by Luce v. United States*, 469 U.S. 38 (1984).  Simply put, Barrett fails to show that any forgone interview with Cindy Crawford would have likely led to his acquittal.  As such, his claim should fail.

3.  The Prosecutors Committed no Prejudicial Misconduct During the Trial

Barrett claims that during the penalty phase of trial, the prosecutors interposed a series of improper questions designed to imply falsehoods or to bolster the credibility of the case.  He further contends that the prosecutors made improper comments during argument.  (Mot. 315-20; BIS 168-74.)  Barrett procedurally defaulted his claim of misconduct by failing to raise it on appeal.  Beyond that, the prosecutor committed no misconduct.

A.  Procedural Default

Because Barrett's claim of prosecutorial misconduct at trial relies on facts wholly within the ambit of the record, he was required to raise the issue on direct appeal, and his failure to do so resulted in a procedural default.  *See United States v. Frady*, 456 U.S.  at 167-68.  To the extent Barrett attempts to explain his default by claiming appellate counsel were ineffective for failing to raise the issue (Mot. 385), the claims lack any legal merit, and the attorneys had no obligation to raise them.  (*See, infra*, Arg. V, 3, B & C.)  Because these claims would have been futile if raised on appeal, Barrett cannot establish constitutionally-cognizable ineffectiveness or, by extension, cause and prejudice to excuse the default.  *See McCleskey v. Zant*, 499 U.S. at 493; *cf. United States v.  Horey*, 333 F.3d 1185, 1187-88 (10th Cir. 2003).  Apart from the fact that he has not shown cause and prejudice, Barrett makes no attempt to demonstrate actual innocence to excuse his default.  Accordingly, Barrett cannot obtain collateral relief based on the alleged

189

prosecutorial misconduct at trial.

B. The Prosecutors Properly Questioned the Witnesses and Argued for Death

Assuming that Barrett had not defaulted his claim, he could not succeed because he has not shown that the prosecutors asked any improper questions in this case.

i. The Prosecutors did not Ask Questions Designed to Imply Personal Knowledge

In an utterly conclusory fashion, founded on a string citation, Barrett claims that the prosecutor engaged in improper cross-examination of defense witnesses. He claims the prosecutors, in an effort to imply their own knowledge, asked questions for which they lacked a good faith basis or for which they knew the witnesses lacked personal knowledge. (Mot. 315.) As shown below, the prosecutors did not engage in improper questioning of witnesses. While they occasionally elicited negative answers from witnesses, the prosecutors either clarified the record or could not have intended to imply their personal knowledge based on the context or content of the examination. As such, they did not commit misconduct.

This Court analyzes claims of prosecutorial misconduct to determine whether the alleged malfeasance violated due process. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Thus, it examines the entire proceeding to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Prosecutors may not ask a question that implies a factual predicate which they know they cannot support or for which they have no reason to believe there is foundation of truth. *United States v. Banks*, 405 F.3d 559, 566 (7th Cir. 2005). Cross-examination may properly embrace any matter germane to direct examination, qualifying or destroying it, or tending to elucidate, modify, explain, contradict or rebut testimony given by

190

the witness.  *Leeper v. United States*, 446 F.2d 281, 288 (10th Cir. 1971).

In this case, the prosecutors did not ask questions designed to imply personal knowledge of facts that they were unprepared to prove, and the government addresses Barrett's allegations to the contrary in turn.

The prosecutor asked Deputy Court Clerk Maudeen Vann if records of Barrett's 1986 criminal case were available.  (Tr. 24: 4743.)  The question did not imply any special knowledge on the prosecutor's part.  Instead, the innocuous inquiry was merely designed to explain the absence from evidence of a protective order filed against Barrett in the 1986 matter.  (*See* Tr. 24: 4743-44.)  The question was part of a larger effort by the prosecution to show the limits of the information concerning Barrett's criminal records (*see* Tr. 24: 4740-41).  *See Leeper*, 446 F.2d at 288.

The prosecutor also asked Vann if, in her experience, it was uncommon for someone who received a 20-year Oklahoma state prison sentence to return to the community in two to four years.  (Tr. 24: 4765.)  The question did not imply personal knowledge on the prosecutor's part.  Instead, it sought Vann's knowledge on the basis of her professional experience.[25]  Moreover, the examination of Vann was a mere prelude to specific evidence adduced through Jimmy Wilson, an employee of the state Department of Corrections:

---

[25]Barrett elsewhere complains that the prosecutor elicited evidence outside Vann's personal knowledge when he asked her whether an inmate sentenced to 20 years imprisonment "will" be released earlier.  (Mot. 300.)  Contrary to Barrett's claim, the prosecutor established Vann's familiarity  with the state Department of Corrections from her work as a court clerk, then elicited her agreement that "it's not uncommon for somebody to have a 20 year sentence and yet be back in Sequoyah County within a matter of two, three or four years, is it, ma'am?"  (Tr. 4765-66.)  The witness did not lack foundation for her answer, and the prosecutor engaged in no impropriety.

> Q. All right. By the way, in DOC custody, 20 years doesn't mean 20 years, does it?
>
> A. No, sir.
>
> Q. Twenty years could mean lots less than that, correct?
>
> A. Less than ten.
>
> Q. And in fact, you have testified about the various rate at which the Defendant was accumulating credits at OSP, McAlester, correct?
>
> A. Correct.

(Tr. 24: 4851.) Thus, the examination of Vann implied nothing the prosecutor was unprepared to adduce through another witness. *Cf. Banks*, 405 F.3d at 566.

The prosecutor asked Vann if she knew who actually received custody of Toby Barrett, given that the defendant's divorce decree indicated that he had received joint custody of his son. (Tr. 24: 4781.) Barrett argues that this question implied that he was denied custody of his son. On its face, the question could not have implied knowledge of such a ruling, since it posited that he received joint custody. At most, the question implied that despite a joint custody decree, the defendant did not take physical custody of his child. As such, the question properly clarified for the lay jury that a joint-custody decree did not necessarily mean that both parents had custody and cared for the child. Furthermore, the prosecutor was not only fully prepared to show who cared for the defendant's son, he did so by eliciting from the defendant's ex-wife that she had almost exclusive custody of Toby until the murder (Tr. 24: 4908-09). *Cf. Banks*, 405 F.3d at 566.

The prosecutor asked process server Kathy Trotter a series of questions, testing her knowledge of Barrett and his associates. (Tr. 24: 4788-92.) These questions were not designed to imply any personal knowledge on the part of the prosecutor. Rather, they were clearly designed to challenge Trotter's hyperbolic testimony, "It's a small community. I'm very aware of pretty much what goes on all the time." (Tr. 24: 4785.) Trotter's lack of personal knowledge about the topics of inquiry undermined the credibility of this assertion and did not imply any

192

particular knowledge on the part of the prosecutor. *See Leeper*, 446 F.2d at 288.

The prosecutor asked Jimmy Wilson about an Oklahoma Department of Corrections document, which indicated that if Barrett escaped or was released from state prison, "notification is supposed to be given to the victim, that is, to Kelli Eales." (Tr. 24: 4850.) Subsequently, the prosecutor asked Wilson if the form provided for any right other than notification, such as "funding for a move." (*Id*.) Wilson answered that the form did not, but in response to a follow-up question regarding the form, the witness volunteered, "I really don't know what the victims' services do for them. All I know is we handle, through the victim services and they notify the victims." (*Id*.) While the unrequested information clearly concerned a matter outside the witness's personal knowledge, the prosecutor did not attempt to elicit the response and could not have committed misconduct by eliciting an unexpected answer.

The prosecutor also asked Wilson whether an Oklahoma state prison inmate became technically eligible for parole on the first day of state custody. Wilson said he did not know, and the prosecutor apologized for asking questions outside the witness's professional capacity. (Tr. 24: 4852-53.) The question was clearly designed to elicit a response within the witness's personal knowledge, but failed to do so. But rather than leaving an ambiguous implication before the jury, the prosecutor later clarified that Wilson believed that Barrett became parole eligible in May 2006. (Tr. 24: 4876.) As such, the prosecution made its point that Barrett was eligible for parole after a very brief period of incarceration, denuding the prior inquiry of any possible prejudicial effect.

The prosecutor adduced from Wilson the fact that local jails did not necessarily report a prisoner's misconduct to the Department of Corrections when the inmate was sent to state

custody. (Tr. 24: 4859.) The questions were apparently intended to neutralize the impression that Barrett had not been assaultive while in jail. (*See* Tr. 24: 4813.) As such, the queries referred to a proper subject for cross-examination. *See Leeper*, 446 F.2d at 288. While the questions alluded to Barrett's misconduct in the county jail, the prosecution later adduced specific evidence of Barrett's assaultive and threatening misconduct in that facility. (*See, e.g.*, Tr. 26: 5220, 5233, 5252, 5264-65.) Accordingly, the prosecutor's question to Wilson clearly was not designed to elicit any fact the government was unprepared to prove.

The prosecutor subsequently attempted to identify inaccuracies in Defendant's Exhibit 247 (Tr. 24: 4862), a Department of Corrections screening form that the defense had introduced through Wilson's direct testimony. (*See* Tr. 24: 4727-28.) The prosecutor attacked the document by asking a series of questions designed to show omissions from the form concerning the facts of Trooper Eales's murder. (Tr. 24: 4861-62.) As such, the prosecutor properly attempted to elucidate the reach of a defense exhibit on cross-examination. *See Leeper*, 446 F.2d at 288. Furthermore, the government had already presented evidence of the murder to the jury, and it would be absurd to suggest that the prosecutor's examination was designed to imply personal knowledge of facts he was unprepared to prove.

The prosecutor also asked Wilson if he knew of Barrett's secret or illegal behavior and whether inmates committed undetected acts of misconduct in prison. (Tr. 24: 4866.) By their nature, these questions could not have implied personal knowledge, as there was no basis in reason for believing that anyone was aware of "secret" misconduct. The questions were properly intended to rebut the inference created by the defense that Barrett was a model inmate because his prison records did not reflect misconduct (*see* Tr. 24: 4828). *See Leeper*, 446 F.2d at 288.

The questions were also a preface to a broader exploration of the fallibility of prison security. (Tr. 24: 4866-68.)  The prosecutor asked a series of questions regarding the possibility that an inmate could put his best foot forward in order to lull officials into complacency.  (Tr. 24: 4869.)  By their nature, these questions could not have implied personal knowledge.  The prosecutor could not have implied personal knowledge by addressing the unknown.  Indeed, he pointed out that jailers could not "read the minds of prisoners."  (*Id*.)  The colloquy properly established that no one could truly know the intentions of prisoners, even those with good records of conduct.

The prosecutor asked Barrett's former wife, Abby Stites, a series of questions concerning her reports of an incident in which Barrett assaulted her.  The prosecutor asked Ms. Stites about specific statements she had made to Lynn Morris and Donna Hines.  (Tr. 24: 4911, 4913.)  These were not questions designed to imply information within the personal knowledge of the prosecutor, but queries designed to impeach Stites with prior inconsistent statements.  *See* Fed. R. Evid., rule 613.  While Stites denied some of the details of the incident, as the prosecutor understood them, her testimony as a whole demonstrated that she and Barrett had engaged in mutual physical combat and that he was an abusive spouse.  (*See, e.g.*, Tr. 4880-81, 4898, 4909-10.)  There is no basis for concluding that the prosecutor examined Stites in bad faith, as Barrett makes no effort to show that the prosecutor lacked a basis for the questions he asked of the witness.

The prosecutor asked Craig Edgmon whether he could speak to the character of Karen Real.  Edgmon said he could not.  (Tr. 24: 4925.)  The question was one in a series of inquiries about Edgmon's knowledge of the defendant's associates.  The entire line of inquiry was properly designed to show that the witness, who testified that the defendant was non-violent (Tr.

195

4924), had only a passing acquaintance with him. *See Leeper*, 446 F.2d at 288. To the extent that the question could have inadvertently resulted in testimony that bolstered another witness, it did not, as Edgmon had no real knowledge of Real.

The prosecutor asked jail employee Courtney Burk whether she knew if Barrett had any communicable disease:

> Q.  And I'm not suggesting you necessarily know with regard to Mr. Barrett whether or not he has any transmittable disease like that, do you know?
> A.  I have no idea.
> Q.  Given the fact that there are 260 inmates at any given point in time, would you expect that Shirley Shores would have absolute recall as to who has what in terms of communicable diseases?
> A.  No, she wouldn't know at all times.

(Tr. 25: 5006.)  This evidence was relevant to demonstrate the fear and uncertainty Barrett would have instilled in Shirley Shores when he spit at her. (*See* Tr. 25: 5005.)  The prosecutor did not imply any knowledge of Barrett's physical condition.  Quite the opposite, he suggested that, in a confrontation with the defendant, a jail worker would not know Barrett's health status. As such, the cross-examination properly elucidated the seriousness of Barrett's misconduct, which the defense had attempted to minimize in importance (see Tr. 25: 4991-93). *See Leeper*, 446 F.2d at 288.

The prosecutor engaged in the following colloquy with Doris Barrett:

> Q.  And so, if somebody's come in and talked about seeing guns around the house, his father having guns, that couldn't have been in the Sallisaw area, could it?
> A  That was when we lived in Illinois and we lived in New Jersey and then when he (Interrupted)
> Q  Could not have been around Sallisaw, could it?
> A  No. But when he did go to his dad's, though his dad collects guns. There have always been guns.

(Tr. 25: 5092.)  The evidence clarified and corrected the testimony of Kathy Trotter, who had

created the impression that Barrett's father kept guns while living in Sallisaw. (*See* Tr. 24: 4786-87.) As such, the testimony adduced from Doris Barrett did not imply the personal knowledge of the prosecutor, but related to previously adduced evidence.

All of these lines of inquiry, whether judged separately or apart, were entirely proper. Moreover, the vast majority of the examination challenged by Barrett concerned the allegations of his future dangerousness, which the jury rejected. (Doc. 257.) As such, Barrett cannot hope to show that the questions at issue here infected his trial with unfairness.[26] *See Donnelly v. DeChristoforo*, 416 U.S. at 643.

### ii. The Prosecutor did not Improperly Comment on the Defendant's Exercise of his Right to Trial

Barrett claims that the prosecutor improperly commented on his exercise of his right to trial during cross-examination of Maudeen Vann. (Mot. 315.) However, the prosecutor did not make any improper comment, or even mention Barrett's election to go to trial in this case.

A prosecutor's remarks on a defendant's exercise of the right to trial amount to misconduct if they imply that the accused is more likely to be culpable if he pleaded not guilty. *See United States v. Hollis*, 971 F.2d 1441, 1454 (10th Cir. 1992). Prosecutors likewise commit misconduct if they imply that the defendant had an ulterior motive for electing to go to trial. *Id.*; *see Cunningham v. Zant*, 928 F.2d 1006, 1019 (11th Cir. 1991). Neither of the aforementioned transgressions occurred here.

In this case, the prosecutor and Vann engaged in the following colloquy:

---

[26]Barrett also suggests that the prosecutor improperly implied knowledge at Tr. 25: 4980, but he is mistaken. The prosecutor, at that juncture, examined Robert Gude about the accuracy of Defense Exhibit 244. Gude never claimed a lack of knowledge about any asserted subject, and the prosecutor implied nothing.

Exhibit A

> Q. (By Mr. Littlefield) In regards to the felony information about which you've testified for the homicide of David Eales, Mr. Barrett didn't plead guilty, did he, ma'am?
> A. No, sir.
> Q. Put the government to the task of proving its case, didn't he?
> A. Yes, sir.
> Q. And ultimately Mr. Barrett was convicted of manslaughter and given a year sentence in that case?
> A. Yes, sir.

(Tr. 24: 4765.)  The prosecutor made no improper comment about Barrett's exercise of his right to trial.  By simply pointing out that Barrett had gone to trial in state court, he did not imply that the defendant was more likely guilty in that case or this one.  Rather, the prosecutor underscored the fact that the state had presented evidence in its prosecution of Barrett.  That fact tied to a later colloquy in which the prosecutor established that Barrett's state court manslaughter conviction was based on different evidence than that presented by the government in this case.  (Tr. 24: 4767.)  For the government, this was an important point, as it forestalled the possibility that the jury might conclude from the state manslaughter verdict that a death sentence was unwarranted.

Because the prosecutor implied nothing untoward about Barrett's exercise of his right to trial, the defendant cannot show that the brief and isolated inquiries about that topic deprived him of a fair trial, especially given the fact that defense counsel had also elicited testimony that the state verdict was delivered by a jury (Tr. 24: 4737).  *See DeChristoforo*, 416 U.S. at 643.

### iii.  The Prosecutor did not Improperly Engage in Cross-Examination Outside the Scope of Direct Exam

Barrett complains that during the penalty phase, the prosecutors improperly engaged in cross-examination outside the scope of direct.  He also complains that the prosecutors asked questions on cross-examination about which the witnesses lacked personal knowledge.  (Mot. 315.)  The prosecutors violated no applicable rule, and created no unfairness through their

198

actions.

Barrett's contentions rely upon Federal Rules of Evidence 602 (regarding the personal knowledge of witnesses) and 611(b) (regarding the scope of cross-examination). Neither of those rules, however, applied to the penalty phase trial. 18 U.S.C. § 3593(c); *see United States v. Basham*, 561 F.3d 302, 334 (8th Cir. 2009); *Barrett*, 496 F.3d at 1100. Accordingly, the prosecutor did not violate any applicable legal doctrine. Regardless of the applicability of the Rules of Evidence, the prosecution did not interpose any question that infected the trial with unfairness. As previously noted, cross-examination may properly seek to limit, explain or contradict any topic explored on direct. *Leeper*, 446 F.2d at 288.

All of the instances of supposed misconduct identified by Barrett involved questions designed to qualify the reach of the evidence adduced by the defense. As such, the queries properly demonstrated what the witnesses did not know. (*See* Mot. 315-16 (citing Tr. 24: 4767, 4788-92, 4925, 4926; 25: 5024-26, 5045, 5069, 5116).) None of the questions implied knowledge solely and wholly within the reach of the government. Instead, they blunted the impact of Barrett's witnesses by showing the limits of their knowledge. For instance, the prosecution elicited Maudeen Vann's concession that she did not know whether the state had relied on the same evidence in Barrett's prior trials that the federal government had in this one. (Tr. 24: 4767.) As noted above, that testimony clarified the fact that the state conviction records adduced by the defense (*see* Tr. 24: 4722-26) were not necessarily based on the same evidence presented in this trial. (*See, supra*, Arg. V, 3, B, ii.)

The prosecutor questioned Craig Edgmon about his knowledge of Barrett's associates (Tr. 24: 4925-26), to properly demonstrate the witness's lack of familiarity with the defendant

199

and, by extension, to undermine his characterization of Barrett as a non-violent person (*see* Tr. 24: 4924-25).  *Leeper*, 446 F.2d at 288; *see, supra*, Arg. V, 3, B, i.  Similarly, the prosecution adduced Steven Barrett's concession that he had limited knowledge of the defendant's failed marriage.  (Tr. 25: 5045.)  That testimony properly undermined the foundation for Steven Barrett's characterization of the relationship as involving "[m]ainly verbal disagreements" and only "one instance" he could recall of a physical altercation.  (*See* Tr. 25: 5033.)

The prosecution cross-examined two witnesses about their limited knowledge of the defendant's prior criminal activity (Tr. 25: 5024, 5069) in response to direct testimony that Barrett was not threatening (Tr. 25: 5059), was a good person (Tr. 25: 5062), was a good son (*id*.), and was not known to have committed a violent offense against anyone but his ex-wife (Tr. 25: 5012).  The government demonstrated Ernest Barrett's ignorance of the  defendant's conduct during the two years preceding the murder (Tr. 25: 5116), to clarify his testimony that he saw the defendant "periodically" and that for "[a] couple of years before this incident[,] I hadn't saw much of him."  (*See* Tr. 25: 5111, 5112.)  And, as noted, the prosecution cross-examined Kathy Trotter about her ignorance of Barrett's associates and criminal record (Tr. 24: 4788-92) to undermine her claim of knowledge concerning the community (see Tr. 24: 4785).  (*See, supra*, Arg. V, 3, B, i.)

All the examination disputed by Barrett was entirely appropriate and meant to test relevant portions of direct examination.  *See Leeper*, 446 F.2d at 288.  But notwithstanding any questions designed to show that the defense witnesses lacked substantial relationships with Barrett, the jury unanimously found that the defendant was a father, a loved son and stepson, a person whose death would impact his child, family and friends, and a person with no prior felony

convictions. (Trl. Doc. 257.) A majority of jurors also found that Barrett was a good neighbor and friend. (*Id*.) Furthermore, in spite of any question designed to show that the state prosecution involved different evidence than this trial, five jurors found in mitigation that Barrett had accepted responsibility for Trooper Eales's death and had been convicted and punished for it. (*Id*.) Thus, Barrett cannot show that he was in any way prejudiced, much less that the government's cross-exam infected his trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

### C. The Prosecutors Properly Argued that the Jury Should Impose a Death Sentence

Identifying isolated fragments of argument, divorced from the context of the case, Barrett argues that the prosecutors committed repeated misconduct during their penalty phase summation and rebuttal. He argues that they took unfair advantage of court rulings, argued outside the record and used improper rhetoric. (Mot. 316-22; BIS 168-74.) As demonstrated below, the prosecutors relied properly on this Court's rulings, used appropriate verbiage, and drew reasonable inferences from the record.

### i. The Prosecutors Properly Relied on this Court's Rulings

Barrett claims that the prosecution improperly took advantage of a supposed evidentiary ruling, in which the Court excluded Barrett's statement that he wished he had been killed instead of Trooper Eales. Barrett argues that, in view of the ruling, the prosecutor had no right to argue as follows: "[The defendant] expressed remorse. How? When? Well, he told his mom he wished it could have been different. Yeah, like not get caught. Yeah, like kill more of the bastards like I intended to." (Mot. 316 (citing Tr. 27: 5356).) Barrett likewise complains that the prosecution should not have attacked his other reported statements of regret as the follows: "[Barrett's mother] says Defendant knows he made a wrong decision as to how to react that

201

night.  If he could do it different, he would.  Now, that's big of him," and "There is no proof that this Defendant lost one wink of sleep over what he did.  It's almost as if he had done nothing, like nothing happened. . . . His mother quoted him as saying he made a wrong decision and would do it differently.  You know, it's almost an oops."  (Mot. 319 (citing Tr. 27: 5419).)

Barrett's claim fails for want of any support in the record.  Barrett has not identified the supposed evidentiary ruling that he claims should have acted as a bar to the prosecution's assertions during argument.  The putative ruling also appears to form the basis of Claim 6 of the § 2255 Motion, but, there again, Barrett has failed to specify the decision about which he complains. (*See, infra*, Arg. VI.)  Accordingly, Barrett has not shown that this Court excluded evidence of his remorse on the government's motion, though he premises his argument on precisely that assertion.

Regardless of Barrett's failure to identify a pertinent ruling, or even a government motion to exclude evidence of his remorse, he still could not gain relief on the basis of this claim.  Prosecutors "may rely in good faith on evidentiary rulings made . . . and make arguments in reliance on those rulings."  *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008) (citing *United States v. Chirinos*, 112 F.3d 1089, 1098 (11th Cir. 1997)).  As such, the prosecutors in this case did not commit misconduct by failing to acknowledge excluded evidence.

Barrett, however, argues that a finding of misconduct should lie based on supposed similarities between this case and *Paxton v. Ward*, 199 F.3d 1197 (10th Cir.1999).  But his attempted analogy does not succeed.  *Paxton* arose as a federal habeas attack on a state court death penalty judgment.  The state had sought to prove in aggravation that the defendant had committed a prior murder.  The prosecution of the prior case had been dismissed in light of the

202

defendant's performance on a polygraph test.  The dismissal was a stipulated fact at trial, but the

court prohibited the parties from referring to the polygraph as a matter of state evidentiary law.

During argument, however, the prosecutor asserted that the defendant

> had the same opportunity to put evidence on that witness stand about that [earlier] killing that we did.  Everything – if he had any evidence – if the defense had any evidence to show that that crime didn't happen exactly the way that our witnesses told you it did he could have put a witness on the witness stand.  You didn't hear from anybody . . . . And there could be a lot of reasons as to why [the earlier prosecution was dismissed] . . . who knows.  We don't know why it was dismissed.

*Id.* at 1212-13.  The Tenth Circuit found that the prosecutor committed misconduct because he

"deliberately made two critical misrepresentations to the jury:  he told the jury that Mr. Paxton

had been given the opportunity to present any evidence showing that he had not killed his wife,

and he told the jury that the reason for the dismissal was unknown."  *Id.* at 1213.

The facts of this case bear no resemblance to those of *Paxton*.  By expressly relying on

Paxton's failure to present evidence, the prosecutor alluded to the very subject the court had

forbidden the parties from mentioning.  In this case, though, the prosecutors attacked evidence

that Barrett did adduce – his statements of apparent remorse to his parents.  (*See* Tr. 27: 5356-57,

5419-22; *see also* Tr. 25: 5089 (Gelene Dotson's testimony about her son's regrets), 5115 (Ernest

Barrett's testimony about his son's regrets).)  The prosecutors made no reference, however

elliptical, to supposedly excluded evidence, plainly distinguishing this case from *Paxton*.  Having

failed to show that the prosecutors offended *Paxton* or flouted this Court's evidentiary rulings,

Barrett cannot show that the their actions infected his trial with unfairness and therefore

constitute prejudicial misconduct.  *See DeChristoforo*, 416 U.S. at 643.

ii.  The Prosecutors Properly Characterized the Record

203

Barrett argues that the government's attorneys made assertions unsupported by the record. (Mot. 316, 317.) As shown below, the prosecutors made entirely appropriate inferences from the evidence, even if those inferences were unfavorable to Barrett.

A prosecutor's summation must rely on facts adduced in the record. *See United States v. Ivy*, 83 F.3d 1266, 1288 (10th Cir. 1996); *United States v. Sullivan*, 919 F.2d 1403, 1425-26 (10th Cir.1991). Prosecutors may, however, argue that the jury should draw reasonable inferences from the evidence in support the government's theory of the case. *United States v. Dazey*, 403 F.3d 1147, 1170 (10th Cir. 2005).

Barrett unsuccessfully contends that the prosecution unfairly strayed from the record and appealed to societal alarm with an argument that the defendant intended to murder multiple police officers. (Mot. 316 (citing Tr. 27: 5402-03, 5412).) The record showed that Barrett had stated his intent to kill as many police officers as he could and to "go out in a blaze of glory." (*See, e.g.*, Tr. 400-01, 412-15, 463-66, 2514-15, 3068-69, 3491-93.) When the Tact Team entered Barrett's land, he fired at least 18 rounds from an AR-15, wounding one trooper and killing a second. (*See* Tr. 318-20, 539, 544, 56-57, 3168, 3236.) Apart from the AR-15, Barrett carried a loaded pistol in his waistband, and was apparently reaching for the weapon just before troopers handcuffed him. (Tr. 548-50, 1112-13.) On this evidentiary record, the prosecutors were well within bounds in arguing that this incident very nearly resulted in multiple murders:

> I want to ask you two preliminary questions. The first is this: What kept the Defendant from being a multiple murderer in this case? Some may say the hand of God, Providence, fate, dumb luck. The Defendant in this case intended to be a multiple murderer. We'll examine the facts. But the second question I want to ask you is this: If 19 rounds . . . from this firearm . . . . 19 shots at highway patrolman, at officers of the law, at soldiers of the law, if 19 shots from this gun at point blank range, but extending farther out to begin, if that's not over the capital line, what is? Must it have been 30 or 60 or the 91 that he had at the ready?

(Tr. 27: 5402.)

The prosecutor's presentation was free of any inappropriate and unprofessional epithets to describe Barrett. *Cf. Wilson v. Sirmons*, 536 F.3d 1064, 1118 (10th Cir. 2008) (finding the terms "animal" and "unadulterated evil" were "pejorative[], unprofessional, inappropriate, and unworthy of an officer of the court"). And while it made a passing reference to "God," the argument did not improperly invoke a higher power as a justification for seeking the death penalty. *Cf. Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2000) (finding misconduct in argument that included "You are not playing God. You are doing what God says."). In fact, the prosecutor's argument was particularly apt here, given that the government alleged and proved a multiple-murder aggravator as to counts one and two (Trl. Doc. 257 at 8, 10). *See Coleman v. Brown*, 802 F.2d 1227, 1239 (10th Cir. 1986) (finding penalty phase argument appropriate when relevant to factors before the jury). The finding was fully supported by the evidence of Barrett's express intent and his use of semi-automatic high-powered rifle to fire into a group of occupied police vehicles. Barrett cannot show that the prosecutor's argument amounted to anything but a fair inference from this record. In no way, has he shown that the summation unfairly infected his trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

Barrett also claims that the prosecutor improperly speculated outside the record when he argued as follows: "Don't let this Defendant – the evidence may reasonably infer and you may reasonably conclude – be a hero to his fellow inmates, to his fellow incarcerated criminals." (Mot. 317 (citing Tr. 27: 5412-13).) The statement was couched as a mere invitation to infer a fact supported by the record. By its very nature, the statement does not imply improper reliance on facts outside of evidence.

205

Exhibit A

Indeed, the government adduced substantial evidence upon which the jurors could have made the inferential leap suggested by the prosecutor. The record demonstrated that Barrett exerted control over other inmates while incarcerated in jail. (Tr. 26: 5235.) The evidence further showed that Barrett had threatened a guard in front of other inmates. (*See* Tr. 26: 5249, 5251-52.) And the evidence showed, as a general matter, that prisoners harbored great animosity for inmates who cooperated with law enforcement. (*See* Tr. 24: 4866-67.) Given this testimony, the jury could have fairly inferred that prison inmates would look with favor upon someone who murdered a police officer. The record aside, the prosecutor could have properly urged this point as a matter of common knowledge, as the jurors could be expected to understand prisoners' tendency to identify, as incarcerated felons, against a common social adversary, law enforcement. *See United States v. Browning*, 390 F.2d 511 (4th Cir. 1968) (observing that counsel may argue matters of common knowledge). Accordingly, Barrett has failed to show that the prosecutor's argument amounted to misconduct, much less that the statement infected his trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

According to Barrett, the prosecutor also argued outside the record when he stated, "The Defendant didn't need to commit this murder. He wanted the thrill of the kill." (Mot. 302 (citing Tr. 27: 5412-13).) The prosecution had, though, adduced evidence that Barrett planned the murder as a suicidal gesture, stating he would "go out in a blaze of glory." (Tr. 3: 463-66; 13: 3068-69.) The government also adduced evidence that Barrett hoped in particular to kill people with whom he had an adversarial history. (Tr. 11: 2515.) Clearly, the evidence permitted a fair inference that Barrett looked forward to a confrontation with the police as a form of catharsis. The prosecutor's contention that Barrett wanted the "thrill of the kill" was a fair deduction from

206

the evidence and in no way infected the trial with unfairness. *See DeChristoforo*, 416 U.S. at 643; *Dazey*, 403 F.3d at 1170.

Barrett also argues unsuccessfully that the prosecution created a false impression that its civilian witnesses feared the defendant. (Mot. 318.) Barrett is wrong. The prosecutor made an utterly rational inference from the evidence in arguing as follows:

> You heard witnesses testify here that in the state proceeding they didn't – they were really grossly under-evidenced. Randy Turman didn't testify, nor did Travis Crawford, nor Charles Sanders nor Karen Real nor Brandie Price, Cindy Crawford, Randall Weaver. No small effort was involved in getting them brave enough to hit the stand. They didn't want to testify. We required their testimony.

(Tr. 27: 5414-15.) The prosecutor's assertion once again represented an appropriate inference from the record. All the witnesses conceded battles with addictive drugs, and all but two of them mentioned involvement in the criminal justice system. (*See, e.g.*, Tr. 2: 365-66; 3: 457; 8: 1835-36; 11: 2491-95; 13: 3061-62, 3079-81; 15: 3486-87.) Two of the witnesses, Karen Real and Charles Sanders, were incarcerated at the time of their testimony. (Tr. 11: 2491; 13: 3079.) As noted above, a defense witness explained that prisoners tended to look with homicidal intent on other inmates who cooperated with law enforcement. (*See* Tr. 24: 4866-67.) Consistent with that testimony, Charles Sanders testified that he overheard Barrett, while the pair were incarcerated, express a desire to seek vengeance against the confidential informant. (Tr. 22: 4587-88.) On that record, the prosecutor could appropriately infer that the witnesses had reasons to avoid the witness stand. Indeed, at least two of them – Travis Crawford and Brandie Price – specifically admitted their lack of enthusiasm for testifying. (*See, e.g.*, Tr. 3: 470; 15: 3497.) Given the evidence adduced at trial, and the fact that the prosecutor never stated or implied that the civilian witnesses all harbored a specific fear of Barrett, the comment did not infect the trial

with unfairness. *See DeChristoforo*, 416 U.S. at 643.

### iii.  The Prosecutors Used Fair and Appropriate Rhetoric

Barrett makes a series of claims about the fairness of the prosecutors' use of terminology to characterize the evidence and the defendant's rights. (Mot. 316-20.)  Once again, his claims are baseless – either entirely lacking in factual support or legal merit.  The government used persuasive, but entirely appropriate language in arguing for a death sentence in this case, particularly in rebuttal to the defense argument.

As noted, prosecutors may urge reasonable inferences from the evidence.  *Dazey*, 403 F.3d at 1170.  They may not, however, utilize disparaging terms to make personal attacks on the defendant.  *See, e.g.*, *Darden*, 477 U.S. at 180-81 (describing the prosecutor's use of the term "animal" as improper); *Wilson v. Sirmons*, 536 F.3d at 1118.  But when supported by the record, the use of emotionally-freighted terms does not constitute misconduct.  *See Wilson*, at 1118 (upholding use of the term "psychopath" in view of expert testimony that the defendant met some criteria for the diagnosis).  Furthermore, courts analyze the prosecution's rebuttal in the context of the defense argument that preceded it.  *See United States v. Young*, 470 U.S. 1, 12-13 (1985).

Barrett, putting words in the mouth of the prosecutor that were never spoken, claims that the government's attorney argued that Barrett had no right to "fairness."  (Mot. 302 (citing Tr. 27: 5408).  Barrett's contention relies upon a fabrication.  The government, in point of fact, argued against leniency and the defense's assertion that a death verdict would be unfair:

> He was a fully conscious adult who substantially planned, who premeditated in a number of ways in the weeks and months prior to this murder. He expected, he watched, he surveilled and he slaughtered an absolutely innocent man who had done nothing to him.  And they ask for increased leniency or fairness?

208

>       This was game day for the murderer.  He clearly tried to murder at least
> two human beings, shots at the Bronco, the intentional killing of the passenger.
> But he wasn't finished.  He saw the driver, Buddy Hamilton, getting out of the
> vehicle, didn't he?  Buddy was wounded.  He fired at him, too.  Buddy was
> wounded in the front, the face, in the front and back, and back, and back, of his
> shoulder.  *And they claim unfairness.*

(Tr. 5408 (emphasis added).)  As the prosecutor implied, the defense had argued – indeed, had

argued passionately and at length – that a death verdict would be "unfair."  (Tr. 27: 5367-75,

5383 ("You've always learned that there will not be twice you'll be subject to jeopardy for the

same offense.  And that's exactly what the Government is asking you to do here today.  They're

asking you to be an instrument of death for the Government.  That, ladies and gentlemen, is

fundamentally unfair.").)  In response to that argument, the prosecution properly asserted that a

death sentence was eminently fair, but never implied or stated that Barrett had anything less than

a right to a scrupulously fair trial on that question.  *See United States v. Young*, 470 U.S. at 12-

13.  Accordingly Barrett has failed to identify any remark that was objectionable, much less that

infected his trial with unfairness.  *See DeChristoforo*, 416 U.S. at 643.

       Citing a different passage in the summation, Barrett again claims that the government

argued he was not entitled to fairness, adding allegations that the prosecutor appealed to "lynch

law" and falsely claimed the defendant was in control of his fate.  According to Barrett, these

errors all occurred in the following passage: "The Defendant wants to choose his sentence.  He

now wants to live.  And how unjust is that?  What opportunity did he give Rocky Eales to live?

How unjust is that?"  (See Mot. 317 (citing Tr. 27: 5413).)  As with the previous passage, this

argument responded to the defense's oft-repeated assertion that a death sentence would be unfair.

(*See, e.g.*, Tr. 27: 5367-75, 5383.)  To the extent the prosecutor noted that the defendant wanted

to choose his sentence, it responded to the defense request that the jury impose a term of

imprisonment.  (*See* Tr. 27: 5382.)  At no time did the prosecutor suggest or state that the jury

should deny the defendant a fair trial, nor did he allude to the applicability of any extra-legal

standard.  Once again, his remarks did not infect the trial with unfairness.  *See DeChristoforo*,

416 U.S. at 643.

Barrett further complains that the prosecutor engaged in improper name calling when he

referred to him as "the executioner of the innocent."  (Mot. 317 (citing Tr. 27: 5413).)  Barrett's

characterization of the record is inaccurate.  The prosecutor did not label Barrett with an epithet,

he attacked Barrett's conduct when he said, "All with a civilized core must have revulsion at

what the Defendant did to have acted as the executioner of the innocent."  (Tr. 27: 5413.)

Assuming, arguendo, that the prosecutor relied upon an epithet, it was not the type of personal

and pejorative labeling that amounts to a due process violation.  *See Alba v. Quarterman*, 621 F.

Supp. 2d 396, 425-26 (E.D. Tex. 2008) (holding defense counsel did not provide ineffective

assistance in omitting to object to government argument, including characterization of defendant

as "executioner").  Given the nature of the murder, in which Barrett repeatedly shot Trooper

Eales as the victim attempted to flee from the confrontation, the nature of the murder was akin to

an execution of a man who had done nothing other than his duty.  The prosecutor's terminology,

while connoting disdain for the defendant's actions, was appropriate on this evidence.  *Wilson*,

536 F.3d at 1118.

Barrett claims that the prosecutor "grossly misled" the jury when he asserted that the

victim-impact witnesses did not testify in the defendant's state court trials.  According to Barrett,

the argument implied that the witnesses had not testified due to the incompetence of the state

prosecutors.  (Mot. 318.)  Certainly, the argument represented a fair inference from the record, as

210

Barrett's own attorneys adduced the fact that the victim's wife had never had a previous opportunity to testify. (*See* Tr. 23: 4692; *see also* Tr. 25: 5122-25 (Doris Barrett testifies to differences between the state and federal trials).) Furthermore, the prosecution's argument responded to the defense contention that the existing state court sentence was ample punishment for this murder. (*See* Tr. 27: 5367-75, 5383.) The prosecutor properly reacted to that view by observing that this trial contemplated different evidence than its predecessor, distinguishing for the jury why a harsher sentence might not be unfair in light of the evidence. *See Young*, 470 U.S. at 12-13. In no way did this isolated and relatively insignificant statement infect the entire trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

The defendant further complains that the prosecutor improperly referred to Barrett's relatives as "props" and denigrated his right to present mitigating evidence by contrasting the defense case with Trooper Eales's death. (Mot. 319 (citing Tr. 27: 5420.)

> The Defendant had sporadic contact, pretty much unwanted, particularly with his mother, until he committed murder and got arrested. They didn't visit him at his house. They hadn't seen the inside of his house by and large. And remember this, hear [*sic*] in court, the Defendant victimizes his own family by making them serve as props, as witnesses on his behalf. Remember, Rocky didn't get this similar chance to plead for his life.

(Tr. 27: 5420.) The prosecutor's statement in no way denigrated Barrett's right to present evidence of any stripe. Rather, it accurately characterized the mitigation presentation as a somewhat hollow gesture, given that Barrett's relatives had demonstrated lack of familiarity with and affection for him. For instance, Steven Barrett conceded he and the defendant had different social circles and had had infrequent contact in the preceding 16 years. (Tr. 25: 5041, 5044.) Likewise, Barrett's mother, who lived next door to him, admitted she never visited his cabin and did not deliver phone messages to him because she "wasn't running a message service" on his

211

behalf.  (Tr. 25: 5082.)  The defendant's father stated he hadn't see Barrett for approximately two years prior to the murder and had never entered his home.  (Tr. 25: 5116-17.)  On this record, the prosecutor accurately and appropriately characterized Barrett's testifying relatives as "props." *United States v. Dazey*, 403 F.3d at 1170.  Despite the evidence and argument, the jury found that Barrett was a loved son and stepson and a person whose death would impact his relatives.  (Trl. Doc. 257.)  As such, the defendant simply cannot show that the prosecutor's argument was especially persuasive or that it infected his trial with unfairness.  *See DeChristoforo*, 416 U.S. at 643.

To the extent the prosecutor urged the jury to disregard the testimony of Barrett's relatives in view of Trooper Eales's violent death, he did not commit misconduct.  In remarkably similar circumstances, the Ninth Circuit found that a prosecutor committed no misconduct when he argued that the defendant "had the right to present his mother's plea for his life," but added that the defendant had not permitted any one to plead for the victim's life.  *McDowell v. Calderon*, 107 F.3d 1351, 1365 (9th Cir.), *opinion superseded and amended on other grounds at* 116 F.3d 364, *and judgment vacated in part on other grounds at* 130 F.3d 833 (1997).  The Ninth Circuit reasoned, "the prosecutor did not state that the jury could not consider the mother's plea.  The prosecutor simply asked the jury not to overlook the victim and not to make its sentencing decision based solely on sympathy for McDowell." *Id.*  The same analysis should apply here, and this Court should find that the prosecutor's comparison of the victim's death with the circumstances of the defendant's trial did not infect the proceeding with unfairness.  *See DeChristoforo*, 416 U.S. at 643.

Barrett also contends that the prosecutor essentially argued that the jury would be

212

accomplices in any of the defendant's future crimes if they sentenced him to a prison term. (Mot. 319.) Barrett's characterization of the government's argument finds no support in the record.

The argument about which he complains is as follows:

> The defense lawyer says that the Defendant is not a future danger. Ask yourselves, would any of us want to be in a prison cell next to a man who is capable of coldly attacking law enforcement officers? So he's a good prisoner, to those he can't manipulate or selectively attack.
>
> You did hear an emotional appeal from his lawyers. We predicted they asked for fairness. We ask, ladies and gentlemen in this venue, for justice. If we merely send this Defendant back to his room, you may reasonably infer that this cop killer will be a hero to many in the prison population he enters. He will have committed cold blooded murder, yet will have escaped the capital noose. This Defendant will have slaughtered an innocent soldier of the law and merely be given more time. Don't make him a hero.

(Tr. 27: 5423.) The prosecutor did not intimate that the jury might bear responsibility for any crime Barrett might commit in the future. In light of an aggravating factor allegation, he properly argued that Barrett was a future danger. (*See* Doc. 257 at Inst. 13.) The prosecutor then changed tacks and properly argued that any sentence short of death was insufficient in light of the crime and would actually enhance the defendant's status in prison. (*See, supra*, Arg. V, C, ii.) At no time did the prosecutor urge, expressly or impliedly, that the jurors should condemn Barrett to obviate any concern that they might somehow share culpability for his future crimes. As such it did not constitute misconduct or infect the trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

### iv. The Prosecutor did not Commit Prejudicial Misconduct in his Use of the First Person During Argument

Barrett claims that the prosecutor improperly aligned himself with the jury in his use of first-person pronouns during argument. (Mot. 319.) Specifically, the prosecutor argued as

213

follows:

> Remember the real victims.  It is not our job here to forgive.  We are not the
> victims of the Defendant's brutality.  It's not our job to feel guilty.  The murderer
> who mercilessly killed in this case as a matter of conscious, premeditation and
> planning ought to feel guilt and remorse, but he doesn't.  He is the one who put us
> all here.  What a sense of power he must feel, the narcissistic, selfish collection of
> reality that he is.  He's the one that put us all here. [¶]  But we must not refuse to
> do our duty just because we can't make the victim's family or friends or
> community whole.

(Tr. 27: 5421-22.)  While the prosecutor's use of the first-person was ill-advised, the argument

did not confuse the jury about its role and therefore did not amount to prejudicial misconduct.

In *Cargle v. Mullin*, the Tenth Circuit held that prosecutors commit misconduct when

they confuse the jury about its role and suggest that the panel is part of the law enforcement

"team" rather than impartial arbiters.  317 F.3d 1196, 1223 (10th Cir. 2003).  The *Cargle* court

found that the prosecutor had likely committed reversible misconduct in arguing

> [Y]ou the jury, [assistant district attorney] Mrs. Smith and me, and the police, all
> fulfilled their roles in this case because that's our duty . . . . [T]his defendant ...
> committed a crime so vile, so vicious, so despicable, so unnecessary that the death
> penalty is the only answer.  Sure your job is hard, but you can do it.  Only you can
> do it.  The police department has done all that it can do. When I sit down, Mrs.
> Smith and I will have done all that we can do.  Only the 12 of you can finish the
> job by going up in that jury room and bringing back a verdict of death.  Unless
> you do that, the efforts of the police department and my office have all been in
> vain.

*Id.* at 1222-23.

The argument at issue in *Cargle* bears nothing more than the most superficial

resemblance to statement at issue here, and Barrett misplaces his reliance on the use of first-

person pronouns as a basis for analogizing the two cases.  The argument in *Cargle* offended the

defendant's rights because it urged the jury to return a death verdict to avoid rendering moot the

efforts of the police and prosecution.  As such, it implied that the jury bore some duty, or at least

214

allegiance to the government.

The prosecutor in this case made no similar argument.  In fact, he made no attempt to directly tie the role of jury to that of law enforcement, apart from the use of the words "us" and "our."  Those isolated uses of the first person did not prejudice the defendant.  *See United States v. Jones*, 468 F.3d 704, 708 (10th Cir. 2006).  In the context of the government's lengthy argument, the very occasional use of the first person was nothing more than an ill-chosen mannerism that the jury would have understood as such.  *See id.*  In fact, the prosecutor concluded his argument by observing that the jury's task involved a weighing under the law, rather than the performance of the government's wishes: "Under the standards of the law and the instructions by the Court, the Defendant should be as it were, weighed in the balance and found wanting."  (Tr. 27: 5426.)  Given the overall thrust of the argument, the brief resort to first-person pronouns did not serve to confuse the jury about its role, especially given that the Court instructed the jury on its role before and after counsels' presentations.  (*See, e.g.* 27: 5296-97, 5440-43.)

v.  <u>The Prosecutor Properly Argued that Prison Was Insufficient Punishment</u>

Barrett claims that the prosecutors improperly argued that a prison sentence was insubstantial punishment for his crime.  According to Barrett, the prosecutor's comments amounted to a variation of, what he terms a "three hots and cot," argument – an apparent reference to the coinage and doctrine of the Oklahoma Court of Criminal Appeals.  (Mot. 316-17 (citing Tr. 27: 5412, 5423).)  In fact, the prosecutor's argument was entirely appropriate under federal law, and would not have constituted a violation of the Oklahoma's "three hots" doctrine.

The prosecutor in this case argued that this crime merited greater punishment than a mere

215

prison sentence:

> You've heard the defense attorneys ask you to do something other than to render a capital sentence. The Defendant wants to be sentenced to his room as punishment. Justice cannot be served in the case by allowing the Defendant to live in prison. If he's allowed to live in prison, he will have perks like workouts and visitors and phone calls and mail, TV and recreation.

(Tr. 27: 5412.) Later, the prosecutor returned to the "room" metaphor, arguing "We ask . . . for justice. If we merely send this Defendant back to his room, you may reasonably infer that this cop killer will be a hero to many in the prison population he enters." (Tr. 27: 5423.)

Prosecutors do not commit misconduct in arguing that incarceration is an inadequate, and arguably indulgent, form of punishment for the crime charged in a capital case. *See United States v. Higgs,* 353 F.3d 281, 332 (4th Cir. 2003) (summarily rejecting a claim that the government improperly argued that imprisonment would be "soft" in view of the privileges available to the defendant as an inmate). As in *Higgs*, in which the defense had argued that the defendant would face high security imprisonment, the prosecutor's argument in this case was an especially apt rebuttal to the defense contention that Barrett was already the subject of close confinement. *See id.*; *see also* Tr. 27: 5368-69. Moreover, the comments at issue would not offend Oklahoma's "three cots" doctrine, which defines as misconduct arguments that compare the relative comforts of prison with the fate of the dead victim. *See Malone v. State*, 168 P.3d 185, 232 (Okla. Crim. App. 2007); *Powell v. State*, 995 P.2d 510, 539 (Okla. Crim. App. 2000). The prosecutor in this case made no such inflammatory appeal, and certainly made no statement that infected the trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

## VI. BARRETT HAS FAILED TO STATE A TIMELY, UNDERSTANDABLE OR COGNIZABLE CLAIM THAT THIS COURT ERRONEOUSLY EXCLUDED EVIDENCE

Barrett claims that this Court erroneously excluded evidence of his remorse about the

216