IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

FILED

MAY 22 2006

W........ ....GUTHRIE
Clerk, U.S. District Court
By _____
Deputy Clerk

UNITED STATES OF AMERICA, )
                          )
       Plaintiff,      )
                          )
-vs-                  )   No. CR-04-115-P
                          )
KENNETH EUGENE BARRETT,   )
                          )
       Defendant.     )

VOLUME 24 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the
United States District Court for the Eastern District
of Oklahoma on November 14, 2005.

A P P E A R A N C E S

For the Plaintiff:     Mr. Sheldon J. Sperling
                       United States Attorney
                       and
                       Mr. D. Michael Littlefield
                       Assistant U.S. Attorney

For the Defendant:     Mr. Roger Hilfiger and
                       Mr. Bret A. Smith
                       Attorneys at Law

**EUSTICE REPORTING SERVICE**
CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Exhibit B

Q    And what does it show the offense, the criminal offense, the misdemeanor criminal offense is for?

A    Violation of protective order.

Q    And who is the Defendant?

A    Kenneth Barrett.

Q    For there to have been a violation of a protective order, there would have had to have been a protective order on file, wouldn't there?

A    Yes, sir.

Q    Okay.  Now, in regards to the protective orders that were kept in Sequoyah County, do you know how far back those records are maintained?

A    To statehood, 1907.

Q    Are some records -- some documents purged or destroyed in the court's office after -- in the court clerk's office after a period of time?

A    Yes, sir.

Q    And what kind of records are destroyed or purged?

A    We have some traffic, we have some misdemeanor and we have small claims.

Q    When you talk about misdemeanor records being destroyed, would the file itself for this still be available or not, being a 1986 case?

A    No, sir, it's not available.

Q    And on protective orders, sometimes if a period of

time passes and it's -- are all protective -- how long do protective orders last for, ma'am?

A    A maximum of three years as of today.

Q    And so, if a case -- if there's a protective order and it's over three years old, are those records always maintained by the court clerk's office?

A    No.

Q    In order to violate a protective order, to get one, what kind of information has to be provided to the court?

A    An application is made and it's a brief statement of the happenings, an example that he may have hit her or something and is asking for protection.

Q    Okay.  If I just walk -- (Interrupted)

MR. SMITH:  I'm going to object to the extent that this doesn't identify who -- was under the protective order was.  So, when you say he may have hit her, that's -- that's not indicated on this document.

MR. LITTLEFIELD:  I think that was for illustrious purposes rather than absolutely identifying what was on the order.  I don't have a problem with that being stricken.

MR. SMITH:  And if that's pointed out, I have no problem.

THE COURT:  Okay.  Answer is stricken.

Q    (By Mr. Littlefield)  Information has to be provided

A    No, sir, it has not.

MR. LITTLEFIELD:  And that's all with that exhibit, Your Honor.  And may I approach the clerk with the one copy we have, Your Honor?

THE COURT:  You may.

Q    (By Mr. Littlefield) In regards to the felony information about which you've testified for the homicide of David Eales, Mr. Barrett didn't plead guilty, did he, ma'am?

A    No, sir.

Q    Put the government to the task of proving its case, didn't he?

A    Yes, sir.

Q    And ultimately Mr. Barrett was convicted of manslaughter and given a 20 year sentence in that case?

A    Yes, sir.

Q    You're familiar with the Department of Corrections -- and I don't mean intimately familiar with all the rules and regulations.  But you have some experience, having worked in the court clerk's office, with sentences with the Oklahoma State Department of Corrections, haven't you, ma'am?

A    Yes, sir.

Q    And it's not uncommon for somebody to have a 20 year sentence and yet be back in Sequoyah County within a

4766

matter of two, three or four years, is it, ma'am?

A    That's correct.

Q    Twenty years doesn't necessarily mean 20 years in the State of Oklahoma prison system does it, ma'am?

MR. SMITH:  Your Honor, I'm going to object.  I think that's the DOC's area of expertise and we have a fellow here to testify now.

MR. LITTLEFIELD:  She can certainly testify from her experience.

MR. SMITH:  He's asking about the policy and what she can do at DOC.

MR. LITTLEFIELD:  I'm not asking about the policy.  I'm asking that 20 years -- does a 20 year sentence mean that a person's going to be 20 years in prison.

THE COURT:  She answered that question.  She's already answered that.  Objection sustained.

Q    (By Mr. Littlefield) In regards to the conviction, you were asked about Mr. Barrett -- that being final, it wasn't appealed.  Do you recall being asked about that, ma'am?

A    Yes, sir.

Q    Okay.  And he got a 20 year sentence, didn't he?

A    Yes, sir.

Q    What is the maximum punishment for manslaughter,

Exhibit B

ma'am?

A    Life in prison.

Q    You didn't hear the trial, did you?

A    No, sir.

Q    You don't know what evidence the jury heard in Sequoyah County, do you?

A    No, sir.

Q    Okay.  You don't know if individuals testified before the Sequoyah County jury about the threats that Mr. Barrett had made to law -- about law enforcement officers, do you?

A    No, sir.

Q    And you aren't familiar with whether or not -- (Interrupted)

MR. SMITH:  Your Honor, I'm going to object to this line of questioning.  She said she didn't hear the evidence.  He just wants to recite this whole case before this witness.  We think that's improper.

THE COURT:  Counsel.

MR. LITTLEFIELD:  I'm not going to recite the whole case, but there are a couple of areas that I want to ask -- (Interrupted)

THE COURT:  You may proceed.  Objection overruled.

Q    (By Mr. Littlefield) To your knowledge -- or you

Q    There's nothing on that document that shows that Mr. Barrett turned himself in, is there, ma'am?

A    No, sir.

Q    And in fact, the bond previous to that was $1,500, wasn't it?

A    Yes, sir.

Q    And after the bench warrant was filed on September the 6th, when Mr. Barrett reappeared, that bond was increased to $5,000, more than three times greater, wasn't it, ma'am?

A    Yes, sir.

Q    Mr. Smith made the statement about incompatibility, reflecting that people don't get along.  The documents in the court clerk's office apparently reflect that Abby Barrett and Kenny Barrett didn't get along very well, did they?

A    Yes, sir.

Q    In regards to joint custody of Toby Barrett, what the decree states, do you know who -- you don't know who actually got custody and maintained Toby Barrett, do you?

A    No, sir.

          MR. LITTLEFIELD:  Pass the witness.

          MR. SMITH:  No further questions, Your Honor.

          THE COURT:  May this witness be excused?

          MR. SMITH:  She may as far as we're concerned.

Q    What does a process server do?

A    I go -- I have a private license.  I'm licensed for the State of Oklahoma.  And I can go out and serve summons, subpoenas, things of civil nature.

Q    Okay.  So you're involved in the legal processes, is that right?

A    Yes.

Q    And you go to the courthouse and become involved in legal actions as far as keeping up with what's going on, is that -- (Interrupted)

A    Yes.  Almost on a daily basis, yes.

Q    And the -- and you've been doing that for the last 16 years?

A    Yes.

Q    And as part of that job of doing a process server, is it necessary for you to sort of keep in tune with what's going on in the county, as far as people getting in trouble and stuff like that?

A    Oh, yes.  It's a small community.  I'm very aware of pretty much what goes on all the time.

Q    Okay.  Now, you know Kenny Barrett as part of family?

A    Oh, yes.  Yes.

Q    Do you know of any -- other than anything with Abby Barrett, do you know of any violent actions that Kenny

Barrett did in the last 16 years?

A    No.  No.

Q    Prior to 1999, the incident with the highway patrol?

A    No.  Aside from his marriage to Abby, no.

Q    Now, you were aware that there was -- that marriage was violent, volatile and -- between both of them, is that right?

A    That's -- from rumors, yes.  That's what I'd heard.

Q    When you were younger -- and as far as the family is set up, were guns part of your family at all?

A    Oh, definitely.  We all grew up with guns.  Every -- you know, everyone in our family -- our fathers hunted. As we got older we hunted.  We were taught to -- how to shoot and how to respect firearms and it was just part of our, you know, lifestyle.

Q    And you're a cousin through your father's -- your father and Kenny Barrett's father being brothers?

A    Yes, sir.  Yes, sir.

Q    And do you know -- what do you know about guns in the -- in his father's home, in Kenny Barrett's father's home?  Do they have guns, too?

A    Yes, they had several.  It was something that he had as a hobby.  His father traded guns and bought guns of different nature and it's just something that, like I said, we grew up with and they enjoyed doing that, for

hunting purposes and just some for collection.

Q   Do you know whether or not -- do you know the name of Kenny Barrett's father?

A   Yes.  It's Ernie Barrett.

Q   Okay.  And Ernie Barrett, do you know whether he had a number of guns in his home?

A   Yes.  He always had guns, yes.

Q   And there -- how many brothers were in that -- how many sons of Ernie Barrett were in that home?

A   How many sons does Ernie have?

Q   Yes.

A   There were -- there're three sons, yes.

Q   Okay.  And while they were growing up, did they also have a lot of guns themselves?

A   I'm sure they did.  We all -- we all did.

Q   So it wasn't anything unusual having a number --
(Interrupted)

A   No, it was nothing to have them around.

Q   Now, I'm going to back up here and jump in here as a process server, were you ever aware of any rumors or anything floating around Sallisaw about violent offenses by Kenny Barrett prior to 1999, September 1999?

A   No, other than his marriage to Abby.  And like I said, that was rumored.  Nothing.

MR. HILFIGER:  I have no further questions.

Exhibit B

THE COURT:   Cross examination.

CROSS EXAMINATION

BY MR. SPERLING:

Q     Who is the attorney that you worked for as a legal secretary, ma'am?

A     Clark Wood.

Q     And during the time that you have served as a process server, are you independently employed or have you been employed by someone else?

A     I'm independently employed.

Q     And have been so employed for a long time now?

A     Sixteen years.

Q     All right.  Were you aware that there was a bench warrant issued for the Defendant's failure to appear for a jury trial?

A     No.

Q     All right.  Were you aware of his criminal charges for distribution of methamphetamine that were pending at the time of this shooting?

A     No.

Q     Do you know a man by the name of Randy Turman?

A     Only from rumors.  I don't know him personally.

Q     You've never met him?

A     No.

Q     Have you ever met Travis Crawford?

A    Yes.

Q    Were you -- when's the last time you were at the Defendant's residence?

A    When he was a resident there?

Q    Uh huh.

A    I don't -- I couldn't tell you.

Q    Fair to say that you've never been at the house that was built where he was staying at the time of the shooting that led to these charges?

A    Other than driving by to do a service in that area, no, I have not.

Q    Never been inside, obviously, that residential area with the Defendant?

A    No.

Q    So you would have no way of knowing what's hidden in a camera in that residence?

A    No.

Q    Or what may have been in his pocket during the night that he was involved in this murder?

A    No.

Q    You wouldn't be aware if he had pseudoephedrine hidden in a ceiling above his bedroom?

A    No.

Q    Do you know a man by the name of Charles Sanders?

A    Yes, I do.

Q   All right.  Do you know what his relationship was with the Defendant?

A   No, I do not.

Q   Do you know a man by the name of Randall Weaver?

A   Just rumored.

Q   Okay.  But do you know what his relationship, if any, was with the Defendant?

A   No, no.

Q   Do you know who Karen Real is?

A   No.  It was rumored to me that she used to be related in marriage in our family somewhere.  But those names and that information is just what I have read in the paper.

Q   Apart from that, are you aware of what relationship if any she had with the Defendant?

A   No.

Q   Cindy Crawford, do you know who she is?

A   She's Travis Crawford's wife.

Q   Yes.  And were you aware that she has had occasion to be at the Defendant's residence or would that be news to you?

A   No, I don't know Cindy.

Q   Do you know Brandie Price?

A   No.

Q   Okay.  So you wouldn't know what relationship, if

any, or what interaction she may have had with the Defendant?

A    No.

Q    Are you aware that there are some nine different case numbers that relate to domestic abuse as between the Defendant and Abby?

A    No.

Q    Have you ever personally witnessed any exchange between the Defendant and Abby that was volatile?

A    No, I have not.

Q    You don't use drugs, do you, ma'am?

A    Oh, no.

Q    And you don't use methamphetamine?

A    No, sir.

Q    You've never been around the Defendant when he was using methamphetamine?

A    No, sir.

Q    All right.  Or on drugs?

A    No, sir.

Q    Certainly never seen him manufacture or attempt to manufacture methamphetamine?

A    Absolutely not, no.

Q    You talked a little bit about guns being part of your family.  Have you ever seen the Defendant with a Colt Sporter?

A    No, sir.

Q    All right.  In the time that your family maintained weaponry, did you ever see any of your family members tape together several clips?

A    No.

Q    All right.  Never saw them electrically taped together various clips in order to increase the magazine capacity?

A    No, sir.  No.

Q    In fact, the guns that you saw when they were presented to you and that you saw would have been for legitimate use, would they not?

A    Yes, sir.

Q    Ever seen the Defendant with a loaded -- chamber loaded nine millimeter pistol in his waistband?

A    No.

Q    To your knowledge, has he ever been armed when he was around you?

A    No.

Q    Do you know about when it was when the Defendant's parents got a divorce?  About what year that would have been?

A    I don't remember.  I really don't.

Q    I know that's going back sometime -- (Interrupted)

A    That's -- we were pretty young.

top -- (Interrupted)

A    Correct.

Q    Would that be fair?  Okay.  Then let's look at some of these other questions.  Number three was has the inmate ever been involved in any of the following.  And it has various different criteria?

A    Correct.

Q    And it wants you to note whether or not there's a race crime, right?

A    Right.

Q    The first one, assaulted another inmate.  What's the answer?

A    No.

Q    Been assaulted by another inmate?

A    No.

Q    Involved in a fight?

A    No.

Q    Pressured for commissary or sexual favors?

A    No.

Q    Involved in homosexual acts or sexual assault?

A    No.

Q    Involved in group disturbances between inmates?

A    No.

Q    Found in possession of a weapon?

A    No.

A   All of it's based on conduct.

Q   Okay.  It has on there inmate profile misconduct screening form.  What does that mean?

A   It also shows misconducts.

Q   That's what I'm getting at.

A   Right.

Q   If there's something that had happened, it would be noted on this form, is that -- (Interrupted)

A   Correct.

Q   Okay -- (Interrupted)

A   There's a section for it.

Q   I'm sorry, sir?

A   There's a section for misconducts in this form.

Q   Okay.  And we're going to get to that.

MR. SMITH:  If I could move for the introduction of 247, Your Honor.

THE COURT:  Any objection?

MR. SPERLING:  No, Your Honor.

THE COURT:  Admitted without objection.

Q   (By Mr. Smith) Sir, I'd like to display this and look at the first page.

THE COURT:  You may.

Q   (By Mr. Smith) Again this relates to Mr. Barrett, correct?

A   Correct.

Q   And that's a standard victim notification form, is it not?

A   Yes, sir, it is.

Q   And that's a form that indicates that if the Defendant is released or transferred or escapes, notification is supposed to be given to the victim, that is, to Kelli Eales and her family, correct?

A   Correct.

Q   Okay.  Now, this document doesn't assure the victim of any rights other than it's a notification, correct?

A   Correct.

Q   So it doesn't give the victim an opportunity to move or funding for a move?

A   No.

Q   It doesn't give the Defendant any -- or the victim or the victim's family any opportunity for protection; it doesn't accord them that right?

A   I really don't know what the victims' services do for them.  All I know is we handle, through the victim services and they notify the victims.

Q   All right.

A   So what services they provide, I couldn't tell you.

Q   This is merely a matter of notification, isn't it?

A   Correct.

Q   It provides no protective services, does it, sir?

A    No.

Q    Defendant's Exhibit Number 241.  By the way, are you able to determine by reviewing this record how long the Defendant was at DOC in McAlester -- at OSP?

A    I can tell you exactly how long he was there.

Q    Could you, please?

A    He came into OSP on 5-11 of '04.  He went out witness on 10-22 of '04.

Q    He was there for five months?

A    Correct.

Q    Not a lot of time to accumulate all of these things.  That's really not a very significant period of time insofar as OSP prisoners are concerned, is it?

A    Correct.  It's not very long.

Q    All right.  By the way, in DOC custody, 20 years doesn't mean 20 years, does it?

A    No, sir.

Q    Twenty years could mean lots less than that, correct?

A    Less than ten.

Q    And in fact, you have testified about the various rate at which the Defendant was accumulating credits at OSP, McAlester, correct?

A    Correct.

Q    That rate could be very significantly accelerated,

couldn't it?

A    Yes, sir.  If he got a job, he'd be on level four, earning 44 days a month, plus the day he does.

Q    Okay.

A    And not for -- less than half.

Q    All right.  It's possible that the Defendant's custodial status could change, isn't it?

A    Correct.

Q    And if the Defendant's custodial status changes, if his employment circumstances changed, if he, for example, donates blood and does other things that prisoners may do to accumulate credits, he could accumulate many more credits than that, couldn't he?

A    Correct.

Q    In fact, you know, we could talk about the range of possibilities, but the long and the short of it is that the Defendant is eligible -- he's eligible for parole -- listen to my wording very carefully.  He is eligible for parole consideration today, isn't he?

A    Not today, he's not.

Q    But he could be brought up for parole consideration today, couldn't he?

A    That I don't know.  I just know his parole date -- his first parole date.

Q    Okay.  You know his preferred parole date, correct?

A    Yeah, correct.

Q    Isn't it a fact, sir, that the day that someone hits the Lexington Acceptance and Reception Center, they are at least technically eligible for parole the date that they arrive?

A    I don't know that.

Q    Okay.  The Defendant's parole date could be accelerated substantially from whatever appears in the administrative record today, couldn't it?

MR. SMITH:  Your Honor, I'm going to object -- (Interrupted)

A    I can't -- I don't know --

MR. SMITH:  -- he's indicated he doesn't know the answers to these questions.

THE COURT:  I think that's what he's -- I think he's -- questions have been propounded and I think the witness has answered them to the best of his ability.  He does not know.

Q    (By Mr. Sperling) I wonder today, Mr. Wilson, but it may be I'm not being a bit unfair by asking you a lot of questions that really don't have to do with what a case manager is responsible to do.  And if I should do that, would you let me know that, because I understand as a case manager you are responsible to manage a case, correct?

A    That part we would know about a fight.

Q    All right.  But if it were to have happened at a jail, you wouldn't know from this document, would you?

A    Not unless the jail reported it to us.

Q    All right.  And if there had been some pressure for commissary or sexual favors or some sexual impropriety, you wouldn't know about it, except for what appears on this document, would you?

A    Correct.

Q    Okay.  If I asked you the same questions with regard to the other acts here, is the long and the short of it that this is based on what the Defendant told the official at LARC?

A    Correct.

Q    Thank you, sir.

MR. SPERLING:  Defendant's Exhibit Number 245.

Q    (By Mr. Sperling)  This is another document with regard to the Defendant's custodial and separatee status. Again, if the requestor or the approving authority were to change or to resign, transfer, go to another position, could a subsequent person as requestor or approving authority amend, alter or in any way change the directive of this document?

A    Yes, sir.

MR. SPERLING:  Defendant's Exhibit Number 246.

Q    (By Mr. Sperling)  And what I'd like to do here, sir, I'd like to turn to the second page of this document.  In sub-paragraph five there is an indication here, and I've highlighted in yellow, it says minimum 7300 days.  Can you tell the jury what that relates to?

A    If they've got less than -- they have to have at least -- less than 7300 days to go to minimum.

Q    To go to minimum?

A    Yes.

Q    Okay.  At that point, may your custodial status within the Oklahoma prison system, even if you are convicted of murder in the first degree be at a minimum security facility?

A    Medium?  Yes.

Q    Could your custodial status be at a minimum security facility?

A    It depends on whether he's doing life without parole or life sentence.  They can't go to a minimum with a life sentence.

Q    Okay.  If the sentence is something other than life without parole at state level, could a convicted murderer be doing his time at Taft, near Muskogee, in a minimum security prison?

A    Yes.

Q    In fact, there are convicted murders who are serving

time at a minimum security prison, aren't there?

A    Yes.

Q    And at that minimum security prison, there are no fences to speak of, are there?

A    None.

Q    In fact, the ability to walk away is dependent on the Defendant's will or motive or interest in walking away, isn't it?

A    Correct.

Q    No guard towers?

A    None.

Q    No electrical fences?

A    No.

Q    No ankle bracelets around prisoners legs?

A    No, sir.

Q    Nothing that would indicate when a prisoner has strayed?

A    No.

Q    All right, sir.

MR. SPERLING:  Government's Exhibit Number 247.

Q    (By Mr. Sperling)  I noted that during the discussion on direct examination under, I believe, it's subsection two where it says assault and battery with a dangerous weapon, then it has this portion per media and newspaper account.  Can you tell us what that means, sir?

A    The case manager that wrote this is Sherry Allen. Now, I don't know what -- where she got the intake on this part of it. What we usually put in this area is a D.A. narrative and an inmate's version.

Q    Okay. So you don't -- I'm sorry.

A    I don't know where she got this information at.

Q    Okay. This could have been, as it says there, according to media and a newspaper account, couldn't it?

A    Yes.

Q    All right. And if this were inaccurate in that it represents that first it was a drug raid, if this were a search warrant, that is a court ordered search warrant, that does not appear in that wording -- doesn't appear here, does it, sir?

A    No.

Q    And if this court ordered search warrant had been attempted at the home of the Defendant in both marked and unmarked cars, that's not reflected here, is it?

A    No.

Q    And it certainly doesn't reflect here that certain of the vehicles were lit up with emergency lighting, does it?

A    It doesn't say.

Q    It also indicates that Barrett and his son were in the house at the time. If the evidence is to the

8-23-04, sir?

A   Gave inmate a TV and talked about visiting forms for his mother and father. His mother called visiting control and stated she did not want to visit, just the father. Both are at the major's office waiting for background checks -- that meant the visiting forms. No other issues at this time.

Q   Thank you, sir. Are you aware that the Defendant has a significant history of secret and illegal behavior?

A   No, sir.

Q   Do prisoners do things that go undetected in your experience?

A   A bunch.

Q   All right. I mean, I guess that's kind of like asking a negative. How do I know what is undetected unless, you know, I know about it?

A   Well, eventually we find out a lot of things that have been going on for awhile.

Q   All right, sir. Do prisoners do things that are unreported?

A   It's hard to say on that issue. Of course, we do get reports, sometimes, from what we would call a snitch. They told us something happened and after we investigating it, it did happen. So, yes, it does go on.

Q   By the way, how is a snitch viewed in prison?

A   Just like any other inmate. As far as inmate-wise or staff-wise?

Q   As far as staff-wise.

A   Just like any other inmate.

Q   How are snitches typically viewed by other prisoners?

A   They want to kill them.

Q   Do prisoners often do things that are unpunished?

A   Oh, yeah.

Q   Can you assure anyone that despite best efforts, contraband does not make it into even the most secure facilities?

A   We find drugs all the time.

Q   And I'm not meaning to demean anyone, sir, but can you assure us that despite your best efforts, that prison staffers will always be above reproach?

A   I can't assure you of that, no.

Q   All right, sir. Can you assure us, sir, that prisoners will not creatively evade even the best surveillance?

A   Can't insure that.

Q   How serious must misconduct be by a prisoner to warrant discipline?

A   Depends on the staff member that catches them doing it. I've seen them let them off for a lot of things that

myself would have wrote them up for. But every staff member, I guess of his on conscious, whether or not he writes them up.

Q    Fair to say that case managers have a significant amount of discretion with regard to interaction with and handling inmates?

A    Everybody does as far as that goes. Every staff member does.

Q    If a prisoner were, for example, to throw a solid food object at a guard and hit that guard in the groin area, how would you regard such behavior?

A    He'd get a misconduct for battery on staff with injury, because more than likely that would injure somebody.

Q    What impact would that have on his evaluation or the rating that you have talked about during your direct and -- (Interrupted)

A    Well, if an inmate gets an oh four eight, which is battery on staff with injury, he can't go above level two for the rest of his incarceration. He gets four security points on his custody assessment scale. So there's several point factors that we'd consider for that.

Q    You would treat certain behavior as that -- (Interrupted)

A    Correct.

Q    Throwing solid food object at a guard --
(Interrupted)

A    Correct.

Q    As serious?

A    Correct.

Q    All right, sir.  The scale that you have talked about that rates prisoners, is this scale something that is cast in stone that must be followed or is it a guide?

A    Oh, it's just a guide.  We have inmates with zero points in maximum security because of their behavior.

Q    Is it plausible, sir, that a prisoner could bide his time to await the opportunity to harm others?

A    It happens all the time.

Q    Would it be plausible, sir, that a prisoner could endeavor to put his best foot forward for a period of time while remaining eligible for parole?

A    Yes, sir.

Q    If a prisoner behaves well for a period of time, may his temporary good behavior be taken into consideration with regard to his custodial status?

A    It has a lot to do with it.

Q    And if he were to harbor some thought in the recesses of his mind -- last time I checked you are unable to read the minds of prisoners, fair enough?

A    I wish I could.

the main boss. And I don't know for sure how many the assistant -- his assistant and two or three under him.

Q Okay. And there is the director and two or three assistants to include the assistant in McAlester?

A Correct.

Q Thank you, sir. Are you able to calculate whether the Defendant's parole eligibility date on that 20 year sentence is as early as next March, 2006?

A I can tell you exactly when it is. May of 2006.

Q May, 2006.

A Yes, sir.

MR. SPERLING: Thank you, sir. Nothing further, Your Honor.

MR. SMITH: Briefly, Your Honor.

FURTHER REDIRECT EXAMINATION

BY MR. SMITH:

Q That is the first time that Mr. Barrett would come up for parole on the 20 year sentence; is that correct?

A Yes, sir.

Q Okay. And do you know what percentage of inmates make parole the first time they come through?

A No, sir, I don't.

Q And how about those inmates that may have been administratively assigned from the top, from the warden, from this administrative director?

MR. LITTLEFIELD: Objection, Judge, leading.

THE COURT: Overruled. You may answer that.

A    Could you ask me that again, please?

Q    (By Mr. Hilfiger) Because of some of the violence between the two of you, were you led to file charges?

A    Yes, on one occasion that I remember. I don't -- like I say, it's been a long time. I don't remember a lot of things -- (Interrupted)

Q    Okay. That's why -- (Interrupted)

A    That happened.

Q    Do you know anything about some of these charges -- the earliest charges you filed?

A    I really can't remember the exact dates or --

Q    About when would you -- during your marriage -- you got married in 1980. Was there a stormy period in your marriage?

A    Yes.

Q    In the mid-80s?

A    Yes.

Q    Okay. And did that stormy period give rise to some violence and some domestic abuse between you and Kenny?

A    I can't really remember. I know there was a couple of times maybe I called the cops on him or something. But it was -- like I said, we fought a lot. I got a very bad temper and they just --

Q   Okay.  In any of these instances that you can recall, was there anything used other than hands, fists or anything like that?  Was there any -- (Interrupted)

A   No.

Q   -- weapons used?

A   No.

Q   You've talked to Mr. Littlefield, haven't you?

A   Yes.

Q   And did Mr. Littlefield talk to you about certain domestic abuse charges or -- (Interrupted)

A   Yes.

Q   Protective order charges?

A   Yes.  He talked about a lot of things I guess people had told him that wasn't true.  A lot of things weren't. And like I said, a lot of -- it's been 20 years.  I don't remember a lot of things that's happened in my life.  I mean --

Q   You got divorced about when?

A   It's been almost 11 years.

Q   Be '90 --

A   Five.

Q   '95?  And in that divorce -- have you looked at the decree of divorce?  You know, with the divorce itself, the final paper?

A   Yes.  We got a divorce on compatibility.

A    Yes.

Q    And during that period of time there was physical abuse in your marriage, wasn't there?

A    We fought a lot, yes. I will not deny it.

Q    I'm sorry, what?

A    I said yes, we did fight a lot.

Q    And the fighting was physical, wasn't it?

A    I'm just as guilty.

Q    Okay. I'm sure that -- by the way, how many domestic abuse petitions did Mr. Barrett file against you?

A    None. But I've never seen very many men that do.

Q    And in 1986, you filed two petitions. Do you recall that?

A    No.

Q    Okay. Well, let's look at Government Exhibit Number 335.

A    Is this the ones that he just showed me? Or are these different?

Q    No, it's the same ones. And I'm asking questions about them. And do you see that this is Case Number DA-86-15? I mean, you don't remember docket sheets; is that correct?

A    I told him I didn't remember. And I'm not going to remember now.

A     Yes.

Q     So while the decree says joint custody, in actuality custody was with Abby, wasn't it?

A     Well, he could -- he had his choice to stay with whoever he wanted.

Q     And he stayed with you, didn't he?

A     Yes.

Q     You and Lynn -- Lynn Morris was abused also, wasn't she?

A     Yes.  She had told me some things, that her and her husband fought a lot.

Q     And in fact, you and she visited, didn't you, about abusive relationships?

A     Yes.

Q     And you told Lynn Morris that Kenny Barrett had physically abused you throughout the marriage?

A     Well, we physically abused each other basically.

Q     How many protective orders did he file against you, ma'am?

A     None.  But that doesn't mean I didn't hit him and I'm not going to sit here and lie and say I didn't.

Q     I didn't ask you if you hit him.  He hit you, didn't he?

A     Yes.

Q     A bunch, didn't he?

Exhibit B

A    When we were fighting, yes.

Q    He hit you hard, didn't he?

A    Yes.

Q    And in fact, you had to get medical attention on occasion, didn't you?

A    No.

Q    Never got any -- did you have any bloody noses?

A    Well, yes, I take that back.  I had a fractured nose.

Q    Who is --

MR. LITTLEFIELD:  May I return to the desk just a second, Your Honor?

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you know Becky Peek?

A    Yes.

Q    It's Becky Stout now, right?

A    Yes.

Q    And do you know Donna Hines?

A    Yes.

Q    She's now Donna Owens?

A    Yes.

Q    And you visited with both of these ladies about the abuse that you were the recipient of from Mr. Barrett, didn't you?

A    On occasions.

Q   Was there an incident in which you were left naked in the woods?

A   No.

Q   Was there an incident?

A   No.

Q   You answered before I even finished.

A   Because you was going to ask me again and I was just repeating it.

Q   Was there an incident involving your current husband's automobile at a car wash?

A   Yes.

Q   And you were taken from the car wash?

A   No.

Q   You left the car wash, didn't you?

A   Yes.

Q   Okay.  And were keys removed from the vehicle that you -- whose vehicle were you in when you went to the car wash?

A   My husband's that I'm married to now.

Q   Okay.  That's Mike Stites, right?

A   Yes.

Q   And you had his pickup?

A   Yes, I was washing it.

Q   And Mr. Barrett came down there, didn't he?

A   Yes.

Exhibit B

Q    And you left the car wash, didn't you?

A    Yes.

Q    With whom?

A    Roger Pentz.

Q    Who's Roger Pentz?

A    He's a guy from Sallisaw.  He give me a ride to Mike's house where I got in my truck because I thought he had taken the keys and I went to his house.

Q    Okay.  You thought who -- (Interrupted)

A    To get them back from him.

Q    You thought who had taken the keys?

A    Kenny.

Q    Keys were missing out of the truck?

A    Yes.

Q    And you went to Kenny's house to get the keys?

A    Because I thought he took them and I wanted to get them back.

Q    Okay.  What happened when you got to Kenny's house?

A    We got into a fight.

Q    Did you go anywhere from there?

A    Yes.

Q    Where to?

A    He got me in the truck with him and we went to Webber Falls and that's where we got into it again and I got out of the truck and called the police on him.

Exhibit B

Q    Why was he taking you to Webbers Falls?

A    Cause he wanted to discuss us getting back together and I told him that we were not getting back together and he begged me to just get a motel and just talk to him and just try to discuss things and work things out and I told him no.

Q    Was it easy to get away from him in Webbers?

A    Yeah, because when he went in to get the room I left.

Q    Where did you go?

A    I went to somebody's door, knocked on the door and called the cops.

Q    Did you ever tell anyone that you were concerned you were going to be raped at that motel?

A    Not that I recall.

Q    You don't recall telling Donna Hines?

A    No.

Q    Lynn hid you out from Mr. Barrett, didn't he?

A    Do what, sir?

Q    Lynn hid you out from Mr. Barrett, didn't he -- didn't she?  I'm sorry.

A    He knew I was living there.

Q    My question is:  Lynn hid you out from Mr. Barrett, didn't she?

A    I answered your question.  I said he knew I was

A    Probably the late '90s.

Q    Okay.  And had you ever -- you had sort of this little business relationship with him, where he worked on your cars, is that right?

A    Yes, sir.

Q    Over and above that, did you have any kind of personal relationship with Kenny?

A    Well, we talked some.

Q    Had you ever known Kenny to do any violence to anybody?

A    Not that I know of.

Q    Have you ever known him to be in any fights?

A    No, sir.

Q    Had you ever known him to shoot anybody -- other than this 1999 incident, have you ever known him to shoot anybody or to shoot at anybody?

A    No, sir.

Q    Had you ever known any kind of threats that he has made to anybody?

A    No, sir.

Q    How often were you around him during the year?

A    Probably half a dozen times.

Q    And these times that he worked on your car, did stuff for you, did he -- what kind of quality was the work?

A    It was good.

Q    Was that the reason you went back to him?

A    Yes, sir.  Well, a lot of times I didn't have the money to fix it and a lot of times he wouldn't never take no money for it.  So he was good on fixing my carburetor. That's what it was on my truck.

Q    So he just -- he did a lot for work for you without even charging you?

A    Yeah.

        MR. HILFIGER:  I have no further questions. Thank you.

        THE COURT:  Cross examination.

                CROSS EXAMINATION

BY MR. LITTLEFIELD:

Q    You don't know Karen Lynnington, do you?  Or Karen Real?

A    Yes, sir.

Q    She a good -- she a good lady?

A    Do what?

Q    She honest person?

A    As far as I know.  I've never had no dealings with her.

Q    Okay.  How about Travis Crawford?  Do you know Travis?

A    Yes, sir.

Exhibit B

Q Okay. Travis a straight up guy?

A I've never had no dealings with him. He was raised out there. I just, you know, I know him.

Q You know Randy Turman?

A Who?

Q Randy Turman?

A No, sir.

Q Do you know Brandie Price?

A No, sir.

Q Essentially, all you can tell the jury is you took a vehicle by Kenny's maybe two, three, four times a year?

A Yes, sir.

Q Dropped it off, maybe stayed out there and visited with him for an hour or two while he fixed it and then you left?

A Well, sometimes he come to my house and got it.

Q Okay.

A And took it and worked on it.

Q And then you'd go pick it up and visit with him for a short period of time?

A Yes, sir. And sometimes he would bring it back home.

Q In which case you'd visit with him there for a short period of time?

A If I was there, yes, sir.

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

FILED

MAY 22 2006

WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By_____
Deputy Clerk

UNITED STATES OF AMERICA, )
                          )
        Plaintiff,        )
                          )
-vs-                      )   No. CR-04-115-P
                          )
KENNETH EUGENE BARRETT,   )
                          )
        Defendant.        )

VOLUME 25 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on November 15, 2005.


A P P E A R A N C E S

For the Plaintiff:        Mr. Sheldon J. Sperling
                          United States Attorney
                          and
                          Mr. D. Michael Littlefield
                          Assistant U.S. Attorney

For the Defendant:        Mr. Roger Hilfiger and
                          Mr. Bret A. Smith
                          Attorneys at Law

**EUSTICE REPORTING SERVICE**

CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Exhibit B

A    Yes, sir.

Q    In regards to Mr. Barrett, the correct and truthful answer to that question would have been yes, wouldn't it?

A    Yes, sir.

Q    He was in fact kept in protective custody for the entire time, wasn't he?

A    Yes, sir.

Q    The response to question four on this form was not truthful, was it?

A    No, sir.

MR. SMITH:  Your Honor, I'm going to object to that in that there's no indication that response was filled out by Kenny Barrett.

MR. LITTLEFIELD:  The testimony --

(Interrupted)

MR. SMITH:  He can indicate or ask the question whether or not that statement would be a correct statement.  But to try to attribute Kenny Barrett filling it out is a misstatement of the testimony.

MR. LITTLEFIELD:  Testimony was that that was self-reported, Your Honor.

THE COURT:  Let's move on.

MR. LITTLEFIELD:  Pass the witness.

A    Yes.

Q    And you searched the records at the Muskogee County Jail, didn't you?

A    Yes, I did.

Q    And you found two records for me that concerned Mr. Barrett?

A    Yes, I did.

Q    I want to talk about those.  I want to talk about the incident that you're aware of that involved Adam Satterfield.

A    Okay.

Q    Are you aware of that incident?

A    Yes, I am.

Q    And you've seen the report?

A    Yes, I have.

Q    Tell us when that occurred.

A    I believe it was last December.

Q    Of '04?

A    Yes, sir.

Q    And what happened?

A    Mr. Barrett was getting his food tray.  He did not have his jumpsuit pulled up all the way, which is required when they come to the slider or get their food tray, they ought to have their jumpsuit completely pulled up and buttoned.  He didn't have.  The guard asked him to

EUSTICE REPORTING SERVICE
BOX 700488   TULSA, OK 74170   (918)445-2965

4992

please pull his side of his jumpsuit up. As he was walking off, he turned around and threw the food tray at the guard and said fuck you.

Q   Okay. And you say threw it at the guard. Where did the tray land?

A   At his -- at the guard's feet.

Q   There wasn't any indication that it hit him or there was?

A   No, there was no indication that it hit the guard.

Q   Okay. And so they wrote a report up about that?

A   Yes, they did.

Q   And what action was taken?

A   I believe Mr. Barrett was locked down for three days.

Q   Okay. Is that the extent of that incident as far as you recall?

A   Yes.

Q   Is there another incident involving a Shirley Shores?

A   Yes.

Q   Okay. What happened with that?

A   Mr. Barrett came down to take his medication. He came to the slider. When they come to the slider, they're to have a cup with water in it. The nurse has to make sure that they do swallow their meds and they're not

Exhibit B

holding it. Mr. Barrett turned around and walked up the steps, said he needed to get more water. The nurse told him to come back and he -- and for him to leave the meds with her until he could get more water.

Q   I guess he had some in a cup and one in his mouth?

A   He had one in his mouth and was holding one in his hand.

Q   Okay.

A   And from what I understand, he put the one in his hand back on her cart and then spit the one in his mouth out, at her or on the cart, I'm not sure.

Q   Spit it out?

A   Yes.

Q   Okay. That the extent of Mr. Barrett and what I'm going to call misconduct in the Muskogee County Jail?

A   To my knowledge, yes.

Q   Whenever you would deal with Mr. Barrett, how would you address him?

A   Usually during the day, unless our jail superintendent wasn't there, I wasn't the one that dealt with him. Our jail superintendent, Raymond Barnes, would. But usually the guard that locked him down is the only one that would address him. He would be locked down by that guard that did the incident report.

Q   I'm talking about whenever you would -- you said you

A    I believe he did turn around and walk back to Shirley, but he spit the medicine out at her or on the cart.

Q    He also took the medication that he had -- or certain medication and threw it at her, didn't he?

A    He threw it on the cart, at her, I guess.

Q    Okay.  Or in the direction.  But he took medication and tossed it, didn't he?

A    Yes, he did.

Q    And then in addition to that, he took a pill that had been given to him that was in his mouth and spit it at her, according to the report, didn't he?

A    Yes.

Q    And as a result of this misconduct, Ms. Shores recommended certain punishment.  Are you aware of that?

A    Yes, she did.

Q    And are you aware that her recommendation was for three days without commissary, without visitation and without phone calls?

A    Well, we don't allow to take their phone privileges away from them unless it's been asked by the superintendent, so probably it was just the three days in lockdown, no commissary and no visitation.  And then they're allowed one hour out a day when they're on lockdown, so he could have used the phone then.

Q    By the way, is there any danger in dealing with the bodily fluids of inmates?

A    Yes, there is.

Q    And is there a substantial incident -- incidents of Hep C, Hepatitis C, with regard to inmates?

A    Yes.

Q    Is there some significant incidents of AIDS with regard to inmates?

A    That I would say, yes, but I mean, there's certain things they're not allowed to do when they're HIV positive.

Q    And I'm not suggesting you necessarily know with regard to Mr. Barrett whether or not he has any transmittable disease like that, do you know?

A    I have no idea.

Q    Given the fact that there are 260 inmates at any given point in time, would you expect that Shirley Shores would have absolute recall as to who has what in terms of communicable diseases?

A    No, she wouldn't know at all times.

MR. SPERLING:  I have nothing further.  Thank you very much.

THE COURT:  Redirect?

MR. SMITH:  Briefly, Your Honor.

Q    At any time did you make Kenny Barrett aware of that bench warrant?

A    No, I did not.

Q    And why not?

A    I was never notified.

Q    You were never notified by who?

A    By the court clerk's office.

Q    Okay.  You were aware of it?

A    I was aware of it but not notified.

Q    Okay.  And what would the court clerk do to notify you?

A    She would send me an order and judgment of forfeiture.

Q    Slow down and say that again now.

A    She would send me an order and judgment of forfeiture.

Q    Okay.

A    That's notification.

Q    And when that would occur, what would you do?

A    That's when I would have contacted Kenny and went and talked to him about the situation, brought him back into court.

Q    Did you have any concern about him being out with that bench warrant issued?

A    No.

Exhibit B

Q It's favored -- it's preferable, though, to be on good terms with the judge such that you can go to him and say, judge, give me a few moments or give me a little time, I think that I can locate this guy. I think I can bring him in, right?
A And that's correct.
Q Do you keep up on criminality in Sequoyah County that does not concern you unless it's really notorious?
A No.
Q So if the Defendant would have been the subject of repeated domestic violence complaints, protective orders or the like, is that something that you would think would escape your attention rather than come to your attention?
A Unless he went to jail for it, no, I wouldn't have no business in it.
Q And if we were to run through a series of case numbers that relate to violation of protective orders, criminal misdemeanor, domestic violence cases, domestic abuse dockets and the like, protective orders violations, would that all be news to you with regard to this Defendant?
A I'm not aware of them unless I have -- like this one, I did write his bail on this one. But outside that, no.
Q Okay. I'm not going to belabor the record by going

through them individually.

A    Okay.

MR. SPERLING:  Thank you very much, sir.  Thank you, Your Honor.

THE COURT:  Any further direct?

MR. SPERLING:  Excuse me.  Just one moment, Your Honor.

Q    (By Mr. Sperling) I take it given your response in direct examination that you were not aware of accusations of prior violence with regard to the Defendant?

A    No, I am not.

Q    That if the Defendant were to have threatened in the context of domestic violence to go inside a house to retrieve a gun and come back and shoot someone who tried to intervene, that person being Shannon Smith, you would not be aware of that?

A    No, I sure wouldn't.

Q    And if the Defendant were to have spoken to trusted associates of his and were to have threatened a cooperating witness or an informant, that would be news to you, wouldn't it?

A    Absolutely.

Q    And if the Defendant were to have stated to friends and associates of his that he hoped that the first person through the door were to be the sheriff, Johnny Philpot,

or the D.A. investigator Frank Loyd, that would also be news to you, sir, wouldn't it?

A    Yes, it would be.

MR. SPERLING:  Thank you.  I have nothing further.

REDIRECT EXAMINATION

BY MR. HILFIGER:

Q    Mr. Daggs, when did you say you became a bondsman?

A    In 1991.

Q    1991.  So any incidents involving bonding on anything prior to 1991 you would not be aware of; is that correct?

A    That's correct.

Q    Can we see this Government's Number 87 again?  And without belaboring it, but just -- Mr. Sperling kept asking about a bench warrant issued by the judge.  Issued by a judge.  And referred to the bench warrant issued by a judge.  An on Number 87, which judge issued that bench warrant?  Amanda Woody; is that a judge?

A    No, sir, she's not.

Q    So this bench warrant really wasn't issued by a judge, was it?

A    No.

Q    That's sort of their practice down there, isn't it?

A    That's correct.

Exhibit B

A    I believe they originally lived with us at the beginning, should have been somewhere around 1980.

Q    Okay.  When you say with us, who would that be?

A    That would be my mother and my brother, Richard.

Q    And how long did they live there with you?

A    I'm not for sure.  I would guesstimate maybe 12 to 14 months maybe, somewhere around there.

Q    Okay.  And then they -- after that they moved out on their own?

A    Yes.

Q    Can you remember the kind of relationship that he had with Abby during the marriage?

A    Yes.

Q    What kind of relationship was that?

A    It was good at times and they struggled at times.

Q    And when you say struggled at times, was there some violent actions?

A    Not necessarily.  Mainly verbal disagreements, just general fighting, argumentative type stuff.

Q    Can you recall any physical fights that they had?

A    Yes.

Q    And was this just things that you heard about or did you see them?

A    I only had one instance where I physically saw them.

Q    And during that, was it -- you know, was it a

Q    So you'd been a teacher at Norman for awhile, a principal's job opened up, you applied for it and received it?

A    I was actually a head football coach at Noble for the last three years, and then I took the assistant principal's job.

Q    How come is it that coaches are the ones that become administrators all the time?

A    I don't know.  Know how to deal with people, I guess.

Q    Okay.  You only saw one fight between Kenny and Abby, physical fight?

A    Yes.

Q    And in that one, Kenny attacked Abby?

A    Yes.

Q    And Abby threw no blows?

A    No.

Q    Are you aware that Kenneth broke Abby's nose on an occasion?

A    No.

Q    And a good portion of the fights were after you left, weren't they?  I mean, went to Tulsa and then on down to Norman?

A    I don't know.

Q    You don't know -- you really don't know much about

A   Yes, sir.  Probably did, yes.

Q   Did you ever go to Kenny's house?

A   Several times.

Q   Is that gate always locked?

A   No, sir.

Q   If it was in the middle of the night that gate was locked?

A   Well, I couldn't tell you.  I worked nights, so I wouldn't know.

Q   Well, let me ask you -- strike that.  Did you ever enter Kenny's property from that east entrance?

A   From the east side, no, sir.

Q   Whenever you go up to Kenny's did you ever feel threatened?

A   No, sir.

Q   Did he ever approach you carrying a Colt Sporter?

A   No, sir, I don't think so.

Q   Was Kenny known to carry a pistol in my waistband?

A   Not that I know of.  I might have seen him carry it once, but it wasn't a regular thing, no.

Q   Did you ever feel threatened by Kenny?

A   No, sir.

Q   Did you ever have any concerns about Kenny as it relates to violence?

A   No, sir, none at all.

Q    What other sort of work did Kenny Barrett do for you as it relates to vehicles or lawnmowers or anything like that?

A    Kenny was a good framer, carpenter.

Q    Would he help you with anything like that?

A    I never had asked him.

Q    Were you there the night of the incident involving the Highway Patrol?

A    Yes, sir.

Q    Did you work that day?

A    I don't recall if I had or not.

Q    And anything unusual in your mind about Kenny's behavior around that period of time?

A    No, sir, not that I knew of.

Q    Anything that caused you concern about Kenny in terms of violence or anything like that?

A    No, sir.

Q    Does Kenny have redeeming qualities?

A    Yes, sir, I'm sure he has.

Q    Do you think that he has?

A    Yes, sir.

Q    What are those?

A    I do.

Q    What are they, sir?  Can you tell me some of them?

A    I'm not sure I -- I know what you --

him. Are you aware, sir, that she has remarried?

A    Yes, sir. I didn't -- that was a slip. I meant his son.

Q    All right, sir. Would it be news to you if the Defendant had ever run a roadblock and nearly ran over two officers? Is that something you ever heard about?

A    I heard something about that, yes.

Q    And do you know how that came to your knowledge?

A    No, sir, I don't.

Q    But are you aware that two officers had to jump out of the way to avoid being hit by him?

A    I don't remember that.

Q    Are you aware of any circumstances under which the Defendant has confronted law enforcement officers while he, Mr. Barrett, was carrying a firearm?

A    No, sir.

Q    Are you aware of whether or not he ever threatened to shoot a man who intervened when he slapped his wife?

A    No, sir.

Q    Has Gelene ever complained to you that the Defendant came over to her house unannounced and without her permission?

A    No, sir.

Q    Has she ever -- she had problems with the Defendant, didn't she?

MR. SMITH: I have no further questions.

THE COURT: Cross examination.

CROSS EXAMINATION

BY MR. LITTLEFIELD:

Q   How much time did Ernest Barrett spend in the Sallisaw area with Kenny?

A   When Ernie and I got a divorce when Kenny was 12 years old, Ernie lived -- we lived in New Jersey and he stayed in New Jersey for awhile and then moved to Huntington, West Virginia and then to, I think, Delaware and then to Indiana. I don't know exactly how many years this was. He came home on vacations and spent time with his boys during the summer when he was on vacation and they would go to his home.

Q   Okay. So, he didn't live in the Sallisaw area while Kenny was growing up?

A   No.

Q   And so, if somebody's come in and talked about seeing guns around the house, his father having guns, that couldn't have been in the Sallisaw area, could it?

A   That was when we lived in Illinois and we lived in New Jersey and then when he -- (Interrupted)

Q   Could not have been around Sallisaw, could it?

A   No. But when he did go to his dad's, though -- his dad collects guns. There have always been guns.

whether or not at that time was he married?

A He was married but separated at the time.

Q And what occurred then? How long did he stay with you at that time?

A Oh, a couple, three months. We put him on the machine -- operated the machine, glass machine, to make bottles and we had some plans for him because he had a fairly good mechanical aptitude. We intended to make a troubleshooter out of him. And he -- I think he was talking to Abby on the phone and they decided they were going to get back together, something of that nature, and he decided to go back to Sallisaw.

Q Okay. So, he had this job -- now you had -- what was your position with the company there in Sand Springs?

A I was production superintendent over all four shifts doing about four or five department, hundred people.

Q And so, was he doing a good job there at Sand Springs?

A Yes, real good.

Q But he was still married and wanted to get back in that marriage?

A That's correct.

Q So, after that did you have any more contact with him on a regular basis?

A Not on a regular basis, just periodically.

Exhibit B

Sometimes I would go to his house, if I could find it. He usually lived back in the boonies some place. And I can remember a couple of times we went fishing. I remember one time we went deer hunting. But it was not very often that we saw each other.

Q So from the mid-'80s until -- was there sometime that the -- from the mid-'80s till this incident that you guys got together again and, you know, sort of renewed your relationship?

A Well, probably after the last couple of years I hadn't seen him for a couple of years before this happened. I mean, outside of seeing him at Wal-Mart one time in Sallisaw.

Q Now, you say a couple of years. Do you mean a couple of years before the -- (Interrupted)

A A couple of years before this incident. I hadn't saw much of him. I think he was working in Arkansas or somewhere.

Q After this incident, have you been with him on a regular basis or seen him on a regular basis?

A I have.

Q And where's that been?

A For about five years at Sallisaw. I go every other week, visit with him.

Q And visit with him there in the jail at Sallisaw?

A    I have visited with him several times, had nice visits. But it just -- sometimes you get a jailer that doesn't like Kenny Barrett or he doesn't like me or whatever and they treat you however they want to.

MR. SMITH:  I have no further questions.  Thank you.

CROSS EXAMINATION

BY MR. SPERLING:

Q    Mr. Barrett, I'm going to try to be brief and I will do my best to speak as clearly as I can, okay?

A    Fine.

Q    Thank you, sir.  Did I understand you correctly to say that you hadn't seen Kenny for about two years before this incident?

A    I would say that that was close.

Q    So, you would not have been at his cabin for at least two years before this incident?

A    No.

Q    And in fairness to you, sir, you wouldn't know what activity had gone on there or what was inside that cabin for a number of years prior to this incident; would that be fair?

A    If it had been there that long.  I don't think it had been there that long.  I'm not sure, but I don't think it had been built but a year or so.  I may be

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, )
                          )
            Plaintiff,    )
                          )
-vs-                      )    No. CR-04-115-P
                          )
KENNETH EUGENE BARRETT,   )
                          )
            Defendant.    )

VOLUME 26 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on November 16, 2005.

A P P E A R A N C E S

For the Plaintiff:      Mr. Sheldon J. Sperling
                        United States Attorney
                        and
                        Mr. D. Michael Littlefield
                        Assistant U.S. Attorney

For the Defendant:      Mr. Roger Hilfiger and
                        Mr. Bret A. Smith
                        Attorneys at Law

**EUSTICE REPORTING SERVICE**
CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Exhibit B

A    He wanted butter.

Q    What did he say?

A    He wanted the butter.  I refused to give it to him.

Q    What did you tell him?

A    I told him due to doctor's orders I could not give it to him.

Q    After you told him because of the doctor's orders you couldn't give him butter, what did he say or do?

A    He threw the baked potato and struck me with it.

Q    How did he throw it?

A    Overhanded.

Q    Like one would throw a baseball?

A    Yes, sir.

Q    Was it a little toss or was it a good throw?

A    It was a pretty good throw.

Q    And where did it hit?

A    It struck me in the groin area.

Q    When it hit you in the groin area, just fall down or what?

A    It exploded.

Q    Burst into pieces?

A    Yes, sir.

Q    Is that appropriate behavior for a prisoner?

A    No, sir, it's not.

Q    What did you do then, sir?

A    He told me he was tired of Mr. Fears clipping his fingernails and toenails, falling on the floor and he told him a -- evidently he'd told him a couple times to stop, didn't happen. And at that time it was -- I cannot recall, honestly, if he had either punched him or kicked him in the head, but it was Mr. Fears' head that bounced off the wall.

Q    All right. And did you examine Mr. Fears' head?

A    Yes, sir.

Q    And what did you find?

A    There was a knot on the back of his head.

Q    This thump that you heard, can you demonstrate for the jury the sound that you heard? Don't bang your head against any cement here.

A    How would you like for me to demonstrate that?

Q    Even -- if the Court will permit, by pounding on the desk in front of you?

THE COURT:  You may.

A    (Witness makes two banging noises.)

Q    And you say that the sound -- or that the nature of the wall that you were on the opposite side of was --?

A    It was -- it was concrete.

Q    By the way, this Fears, about how old was he at the time?

A    Sir, I can't recall that. I don't -- I'm not sure

A   Yes, sir, I did.

Q   What did he say that was a threat?

A   Okay.  He stated that he's not going to be incarcerated forever and he would get him when he got out.

MR. LITTLEFIELD:  May I have a second, Your Honor?

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may cross examine.

MR. SMITH:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. SMITH:

Q   Sir, when did this incident take place?

A   I'm not particularly sure on the day.  I believe it was February of 2003, though.

Q   Old jail or new jail?

A   It would have been the old jail.

Q   Okay.  Now, I thought we moved into the new jail in November of '02.

A   I don't believe that to be accurate.

Q   There was testimony to that effect yesterday.

A   Well, I believe that incident to have occurred February of 2003.

Q   But you're certain that it was in the old jail?

A    May I take a look at my report?

Q    Please.

A    When I handed him the tray with his dinner, he asked me what it was. I explained to him what was on the tray and he declined. He didn't wish to eat it.

Q    All right. Did he use -- (Interrupted)

A    A derogatory statement, yes, sir.

Q    What did he say?

A    What the fuck is this shit.

Q    What did you say?

A    It's your dinner.

Q    And did he have anything else to say about what he had been served?

A    I don't remember him not wanting to eat it. I don't remember him saying anything.

Q    Okay. Well, did you open what is known as the bean hole?

A    Yes, sir.

Q    What happened then?

A    He went to slide his tray through and he did it quite fast. I put my hand up to stop it and I said, you know, you need to watch out. I said you almost threw that tray at me.

Q    What did he say, if anything, at that point?

A    He said you're lucky that I'm in this cage because

if I wasn't, I'd whup your ass.

Q    What was your response?

A    I said really.

Q    What else did he say, if anything?

A    He said, yeah, and you can put that in your fucking computer, too.

Q    Did you have a practice at that point with regard to recording certain instances?

A    Yes, sir.

Q    And did you follow that practice with regard to this report?

A    Yes, sir.

Q    Did you also have a later exchange with the Defendant when he was in the area of his cell?  An interaction with him?

A    I don't recall.

Q    Did he ever try to grab you?

A    Yes, sir.

Q    All right.  Was that before or after this incident with the food tray?

A    I believe it was before, because this is referring to male PC and the incidence he tried to grab ahold of me was when he was in the population on the south tank.

Q    When he stated what you quoted him as saying, that if you ever let him out -- and what were the words?