IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

FILED

MAY 22 2006

WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By_____
Deputy Clerk

UNITED STATES OF AMERICA,  )
                           )
          Plaintiff,       )
                           )
-vs-                       )   No. CR-04-115-P
                           )
KENNETH EUGENE BARRETT,    )
                           )
          Defendant.       )

VOLUME 27 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on November 17, 2005.


A P P E A R A N C E S

For the Plaintiff:        Mr. Sheldon J. Sperling
                          United States Attorney
                          and
                          Mr. D. Michael Littlefield
                          Assistant U.S. Attorney

For the Defendant:        Mr. Roger Hilfiger and
                          Mr. Bret A. Smith
                          Attorneys at Law


**EUSTICE REPORTING SERVICE**
CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Exhibit C

of whether the sentence of death is justified as to the Defendant, you shall not consider the race, color, religious beliefs, national origin, or sex of the Defendant or the victim. These facts are completely irrelevant to the important issues you must consider at this phase of the proceedings.

You are not to impose a sentence of death unless you have concluded that you would have rendered a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of either the Defendant or the victim might have been.

Whatever decision you return, each of you is required by law to sign a certification attesting to the fact that you have followed this instruction. Section Seven of the Special Verdict Form contains a certificate that must be signed by each juror.

Before I give my Concluding Instruction, you will hear closing arguments. First you will hear from the Government.

MR. LITTLEFIELD: May it please the Court. Ladies and gentlemen of the jury: Before I begin the specifics of the closing argument, I want to -- and they may sound like empty words, but I want to tell you I thank you. Nearly been here two months. It has been a

Exhibit C

lengthy and extended process and you all have given a great deal of service, a great deal of care, attention and concern throughout this trial. And again, thank you.

You are about to begin a process of deciding what is the appropriate sentence for Kenneth Eugene Barrett. Should his sentence be death, life imprisonment without parole or a term of years to be decided by the Court. And to reach that, to make that determination for his sentence, you are required to go through a process, a series of steps.

The first step will be determining his age at the time of the commission of the offense. Once that's out of the way you have a five step process through which you will proceed. The first step in that process is determination of whether there are threshold factors, threshold eligibility factors. Step two will be statutory aggravating factors. Step three will be nonstatutory aggravating factors. After you make those determinations you go to step four which is the existence or determination of the existence of mitigating factors. And then step five will be the weighing or deliberative process.

As you move from step one to step two to step three to step four, if you answer -- and I'm telling you the -- the forms are thick and look to be confusing. But

actually they're fairly simple. As you go from threshold to statutory to nonstatutory aggravating factors, if you answer the question yes, yes, the threshold's been met, yes, statutory aggravating factors are met, yes, the nonstatutory aggravating factors are met -- as long as the Government has proven those steps and you move through answering affirmatively, you keep on going. And that's really all there is to it.

I'm going to talk about those four steps. The first four are facts finding. Just like you've done to this point. You will act as a factfinding jury. Does the Government prove those steps, those factors, beyond a reasonable doubt? The fifth takes a different approach. In that final stage, the weighing stage, you will be acting not as factfinders but as judges. As judges weighing the aggravating factors you've found beyond a reasonable doubt versus the mitigating factors, if any you find, beyond a preponderance of the evidence and you will make the determination as to whether or not the statutory and nonstatutory aggravating factors sufficiently outweigh the -- any found mitigating factors to warrant a death penalty. And you will pronounce a sentence.

If you consider the process, consider the steps which you will follow in your deliberations, then I

believe that the evidence establishes beyond a reasonable doubt the existence of all of those steps to reach the determination then of the mitigating factors and the weighing stage.

The first -- first thing you got to do is what was Kenneth Barrett's age at the time of the commission of the offense?  This happened in September -- September 24, 1999.  His mother testified he was born in 1961.  He was 38 years old.  The first question you have to answer:  Yes, he was 18.

Second step -- or actually step one as I've identified it are the threshold factors.  On Counts One and Two you are given four threshold factors.  On Count Three you are given one threshold factor.  And it is only necessary to find yes to one of those threshold factors before you proceed to the second step, the statutory aggravating factors.

The first threshold factor given in each one of those three counts, the first one is did the Defendant intentionally kill the victim?  And I submit you have already made that finding beyond a reasonable doubt.  Your verdict was that Kenneth Eugene Barrett murdered Rocky Eales on Counts One and Two.  Your verdict on Count Three was that the Defendant intentionally killed, intentionally killed, the victim knowing he was a police

Exhibit C

officer. You have already answered that first step beyond a reasonable doubt as guilty. The answer to that question is yes on all three counts.

As to the three other factors in Count One, they are consumed by that first aggravating factor or that first threshold question. He is -- beyond a reasonable doubt, yes, he did intend to kill the victim in this offense. That takes you then with an affirmative answer on step one to step two. The statutory aggravating factors. And there are two statutory -- two different statutory processes or schemes in these counts. Counts One and Two fall under Title 18, murder. Count Three falls under Title 21, which is an intentional killing. And so, there is some variation between the statutory aggravating factors which can be alleged for Counts One and Two as opposed to Count Three. But there is commonality. There are three statutory aggravating factors alleged for Counts One and Two. There are two for Count Three. And both of those in Count Three are listed for Counts One and Two. Those are, one, was there a grave risk of death to more than one person. A grave risk of death to more than one person or additional persons other than -- and this refers to persons other than Rocky, and other than Buddy Hamilton. The Judge read you in your instructions, Instruction Ten, what a

grave risk of death is. And it refers to a significant risk of death to other persons who were in close proximity to those who died in terms of time and location. A grave risk of death other than those who died, that being Rocky and in this case Buddy, in terms of time and location. And if you examine the evidence beyond a reasonable doubt there was a grave risk of death -- enough for the instruction.

Consider first the firearm itself, the .223 Sporter. And consider how it was set up and utilized. Three magazines taped together, fully loaded, 91 rounds. It was a powerful weapon fully prepared, a lethal range -- and you heard this evidence in the first stage -- of 500 meters, five and a half football fields in length. You saw the power of those rounds that were fired in this particular case. They were powerful enough to pass through glass. They were powerful enough to pass through metal, through the door of that automobile. They were powerful enough to pass through the body armor worn through troopers on that night. And you saw what the impact of those rounds could do to a human body. Exhibit Number 85. Under the armpit, that is not a wound caused by the shot. That was the explosion of that shot back out of the body as Dr. Distefano testified. Those rounds were powerful. Those rounds were deadly. The firearm

shows the danger. This firearm was no deer rifle for hunting season. This firearm was for one thing and that was to kill human beings. A substantial danger was imposed when you consider the power of that firearm which was used to multiple individuals.

Consider first the officers on the scene. You recall the approximate location of where the first shots were fired. And you also recall, as to Government Exhibit Number 1, the location of the other two vehicles. Behind Rocky and Buddy's vehicle was Raymond Greninger and Rick Manion, the second automobile. Behind that was Steve Hash and Danny Oliver. They were in the line of fire. Greninger, Manion, Hash and Oliver were in the line of fire. They were in proximity and time close to a grave and deadly danger. Passed through the glass, they could have been hit. Slightly off in aim, they could have been hit. They could have been killed and they were in danger.

But even after the initial shots were fired, consider the location at the porch and where Kenneth Eugene Barrett would have fired from. As he shot into that Bronco, Rick Manion testified he went to the rear to provide assistance to Rocky. Gene Hise went to the rear to provide assistance to Rocky. And even after the flash bang was thrown, firing still continued. They were

exposed. Billy Poe was right in that line of fire at the gate. Robert Darst and Gene Hise were crossing across by that gate when the shots were going. A shot goes through that window, a shot misses and they are in proximity both in time and location to that lethal fire. Those officers were in danger.

And consider also that when Mr. Barrett was taken into custody he didn't stop with the -- this firearm, he reached for this firearm which was in his waistband of his pants. He still continued to pose a grave risk to Robert -- or Trooper Manion, to Trooper Hise who was at that location, Steve Hash, to Billy Poe to Raymond Greninger, to Buddy Hamilton, by his continued assaultive behavior.

But it wasn't just the troopers. It wasn't just the troopers who were exposed and placed in grave danger for their lives. Government Exhibit 184, Mr. Barrett's residence. He fired across this line at the vehicle. Cousin Gwen lived in that trailer and you've heard the testimony that round could have passed through that trailer and injured an individual inside that trailer. As the Bronco moved through here Tommy Sanders and Janice Sanders lived -- his aunt and uncle -- lived within that five hundred meter lethal range. A round from that weapon could have passed through the window.

Had they been awakened and looked out they would have been exposed to a line of fire. In that trailer, his cousin Alvin Hahn, just like Gwen, a round could have passed if fired from this porch in this direction into that trailer. And cousin Alvin Hahn was placed in grave danger. And as he is shooting out this way, in this house his aunt Ada Blount lived, within that five hundred meter lethal range. Had she looked out a window, had she stepped outdoors to see what was happening, a round from that weapon could have passed through the glass, could have passed over the Bronco had he missed, and exposed her to danger. Not only were the troopers exposed to a grave risk, civilians, his relatives in the area were exposed to a grave risk of danger.

As to all three counts, because this statutory aggravating factor is listed as to all three counts. Beyond a reasonable doubt the evidence you have heard in this trial establishes that it exists and you should answer yes for the statutory aggravating factor.

The second statutory aggravating factor that exists as to all three counts is substantial planning and premeditation. And those two items, substantial planning and premeditation, while similar, are different. And the Court tells you what they are in the instructions. Substantial planning lasts for an extended period or a

longer period than premeditation. The Court tells you in Instruction Number 12 that premeditation is one committed upon deliberation or prior design. The Government must prove that it committed it only after thinking over the matter or deliberating whether to act.

In the special verdict form, the special interrogatory, the Court tells you how long one must think -- go ahead and put the special interrogatory up. At the bottom it says it must be long enough for the Defendant to have formed the -- go to the second page -- specific intent to kill, to be fully conscious of that intent and to have considered the killing. It can be formed in an instant before the killing or it can be planned or deliberated for days, months or years.

Premeditation can you formed in an instant and I submit you already have found that this was a premeditated killing because you have found beyond a reasonable doubt that he intended to kill Trooper Eales and he intended to do so knowing, with full knowledge that, he was a law enforcement officer. There was premeditation without question.

What about substantial planning? Go back to Instruction 12 and the Court tell you that -- tells you that at the bottom of Instruction 12, on the first page -- it can be -- planning refers to the creation -- go to

next page -- or development of a method of doing something or achieving some end. Substantial planning means that -- means planning that is ample or considerable for the commission of the crime at issue. And if you look at what was done, considering the nature of this crime, the evidence is beyond a reasonable doubt that also there was substantial planning.

Look to the steps. He planned for the incident. And I'm not going to just beat it to death because we talked about it early on in this trial in the other closing arguments. But he intended this. He planned it, he announced it. He told his friends they're going to come and when they do here's what I'm going to do. He had been planning for this offense for weeks and months and even years.

Look at what he did. He locked the front gate consistently, forcing entry from the east side of that property. And he prepares for the entry from the east side of the property. Remember in the loft, the spotting scope? Vicki Lyons testified -- and we showed the photograph, I'm not going to do it again. But Vicki Lyons testified I looked through that scope and it was trained right on that entry. He forced entry there and he prepared for entry there. But he didn't just do that. He prepared the firearm. 91 rounds, ready to be used. 9

Exhibit C

millimeter in his waistband ready to be used. He left the Colt Sporter at all times in an accessible location. You remember the testimony of Karen Real, Charles Sanders, Brandie Price, Randy Turman. This firearm was leaning again the door or the desk. If he went out to that storage building he took this with him. He took this 9 millimeter, which was chambered and ten rounds in it, he kept it in his waistband at all times. And I submit to you it wasn't to keep his pants up, it was to be prepared for what he knew was coming and knew what was inevitable.

And he also prepared himself mentally. I submit to you that when he talked to his friends and associates and when he exerted is bravado about what he was going to do -- I'm going to take those bastards out, as many of them as I can. I'm going to kill the first one through the door. He was hyping himself up, building himself up mentally to be prepared for what he wanted to do. That was substantial planning.

When he was -- when the incident went down he immediately had access to that rifle and shortly after they got onto the property he began firing. He continued to and backed into the room and when he went into that east room, not only did he have that firearm with still 72 rounds and this pistol with ten rounds in it, in that

same room into which he retreated he had his Browning .22 also fully loaded in a drawer. He went to the room where he had his firearms loaded and ready. And I submit to you that wasn't an accident. That was planning.

He knew that night they were coming. He saw the Bronco drive by and he told his cousin, Travis Crawford, it's a Bronco, I think it's a cop car. There's a warrant, they're coming back and when they do all hell will break loose. That was planning. He was ready. He was prepared physically and mentally and he acted upon his plans.

Folks, for what was necessary to commit this crime he had it fully planned out. And I submit to you beyond a reasonable doubt he premeditated and he substantially planned this crime. And you should find that factor as to all three counts again, yes, beyond a reasonable doubt and be ready to move on.

The third factor is listed only into counts -- as to Counts One and Two. And that is that he intended to kill more than one person. You have already found he intended to kill Rocky beyond a reasonable doubt. The question here is isolated and unique only as to John Mark Buddy Hamilton. Did he intend to kill Buddy Hamilton beyond a reasonable doubt? And if you look to Government Exhibit Number 67, the shots are aimed primarily at the

driver. Iris Dalley testified that both of the shots were directed at the driver. There were the four shots through the door at the passenger. He primarily intended to kill -- to take out the driver of that vehicle. When it stopped and parked at the porch, his attention shifted to Rocky. And once Rocky was injured, when Buddy threw out the flash bang to exit the vehicle, he again returned his focus and intent to Buddy.

Buddy had an injury in the eye, in the cheek and in the front of the left shoulder. And as he was exiting, he was shot in the back of the left shoulder. The distance was the same for the shooting at Buddy at the front porch as it was for the shooting at Rocky. Remember the testimony of Loyd Cobb. Less than 15 feet. With that rifle I just dropped and I'm not going to pick up, from a distance of less than from me to you. He aimed and he shot Rocky and he aimed and he shot Buddy. With that rifle, with that impact and with that power. And I submit to you he intended to kill not only Rocky, he intended to kill Buddy as well. And beyond a reasonable doubt, that third statutory aggravating factor which applies only as to Counts One and Two is proven beyond a reasonable doubt. He was not successful in his intent to both, but it was still his intent.

Once the three statutory aggravating factors as

to Counts One and Two and the two as to Count Three are answered yes affirmatively -- if any one is answered yes, you go to the next step. But I submit all three should be answered yes.

The next step is the non-statutory aggravating factors -- the non-statutory aggravating factors. And they're different in a way from the statutory aggravating factors. Because the Court tells you for you to reach -- for you to have to go to the mitigating factors and determine their existence and weigh, it is only necessary that you find one statutory aggravating factor. Only have to find a statutory aggravating factor and only have to find one.

If you find one or two or all three, as I submit you should, then you may find the non-statutory aggravating factors as well. And if you do find them as well, beyond a reasonable doubt, then you may utilize these in conjunction or combination with the statutory -- step two, the statutory aggravating factors in your weighing process.

And I submit to you when you examine the non-statutory aggravating factors you will find that they exist as well beyond a reasonable doubt. There are two identified by the Government in this case. And they are common to all three counts. They are the same as to all

three counts. And so, I'm going to only talk about them one time, each one of them one time. But remember that they exist in all three counts. There are two, future dangerousness and the victim impact. What about future dangerousness? It's been said that he who fails to learn from history is deemed to repeat or make the mistakes of the past. In Cherokee County we say fool me once, shame on you, fool me twice shame on me. The best predictor of human behavior is past human conduct. And I submit to you that when you examine past human behavior as it relates to that man he is a future danger.

Consider first, 17 years old and Johnny Philpot arrests him and he's ordered by a judge to take him to jail. A judge orders him to take the juvenile to jail. And as they do, this man is fighting and struggling as they're going up a narrow stairway with a wooden banister and Johnny Philpot pops him in the nose. Hard enough to break his hand. Is it an overreaction? Don't know. I do know that Mr. Philpot testified the FBI examined it and cleared him of it. He cleared him of it. We hear from the defense well Mr. Philpot held a grudge. Wait a minute, folks. Who held the grudge? Who -- 18 -- no, 21 years -- pardon my math -- who, 21 years later wanted to kill Johnny Philpot? Who said to two different people Randy Turman and Charles Sanders I hope the first one

through the door is Johnny Philpot so I can kill him? And who bore the grudge? Kenneth Eugene Barrett. He is a danger in the future based upon his past history.

His marriage to Abby Stites, then Abby Barrett, was a marriage filled with violence. Seventeen years ago, Stanley -- or Shannon Smith observed this man in the front yard of the residence holding her by the arm, slapping her around with an open hand. Seven different cases of domestic abuse or violation of domestic abuse in the court of Sequoyah County as to this man against his former wife.

He broke into her trailer and destroyed -- broke her aquarium, flooded the trailer, killed her exotic fish and slashed up her furniture. He abducted her, took her to Webbers Falls. He broke her nose. And what was their response? On redirect they got Abby to admit that, yeah, after he hit me I hit him back. After he struck me, I returned blows. This man's history establishes violence is how he responds to someone who does not do as he wishes.

Look to Shannon Smith himself and we hear, well, those are just threats, those are empty words, they're just talk, it's easy to talk. But remember Shannon Smith, I stopped in the yard and told him, hey, quit slapping her around. And Kenneth Barrett said I'm

getting my gun, you better not be here when I get back and went into the house. Were those empty words? Abby Barrett, then, didn't think so, because she knew him better than anybody. And what did she tell Shannon Smith? You better get out of here. Kenneth Barrett may threaten and not follow through, but he also threatens and follows through. And Abby Barrett was concerned enough for Shannon Smith that she told him get out of here when he said I'm getting a gun.

Consider his recent behavior. The road block incident. He slows down and then floors it, just missing Cindy Smith and Michael Readner, who have to jump over a ditch to avoid being hit. And then goes through the county at speeds in excess of 100 miles an hour for a couple of miles until he ditches the car in a ditch to escape. Stanley Philpot -- he -- boy, the Philpots have a grudge. Rather than towing his car and costing Kenneth Barrett money, Stanley, to get him, said, yeah, I'll follow you home and save you the money. And what was the response from this man? What was the appreciation he showed Stanley Philpot? He dusted him and when he got home, he met him at the front door with a long barrel pistol. .44 magnum shells empty in the living room and a .44 magnum tray in the house. Stanley Philpot backed off because he didn't want to be involved in a shootout. He

Exhibit C

called backup. Is this man just idle threats? Certainly law enforcement didn't think so. Johnny Philpot told his deputies don't go out there by yourself because I fear a shootout, a gunfight and he proved him right.

Consider Karen Real. When unknown persons came up he would retrieve his gun until he knew who they were. Cindy Crawford testified that when she refused his sexual advances -- when she wouldn't put out and started to leave with his brother Richie, he grabbed the shotgun, stuck it to her leg and said never come back here, I'll blow your leg off.

Consider his conduct towards the police on September 24th. He told everybody what he was going to do and he did it. Idle threats or one who has shown danger in his past? He'll do it again. He endangered Rocky, Buddy, the officers, had no concern for the civilians, his relatives. He endangered them. He will remain a danger. He will remain a danger to others who prevent him from getting his way as long as he lives. There has been no evidence of any sudden conversion in Kenneth Barrett's life.

What we hear, that this will be in a jail setting, it will be non-threatening. He cannot threaten anyone from there. He told Charles Sanders -- or he called when Charles Sanders heard him, we need to find

the CI -- and that was from jail. We need to find the CI and kill the son of a bitch.

He thumped a prisoner, Donald Fair, and Donald Fair -- or Fear, I guess -- is characterized as a cold blooded killer. And, yeah, he was. But Kenneth Barrett thumped him, popped his head against the wall hard enough that a jailer on the other side heard it. And why? Because he was a cold blooded -- because Donald Fear was a cold blooded killer? Was it because of Kenneth Barrett's repulsion at his acts? No. He cut his toenails one too many times. We got to beat him up.

Even in a jail setting he is a threat. George Borman heard Kenneth Barrett threaten Brad Boyd. I'll get out of here and I'll get you. Michael Hendricks, if I'm not -- if I wasn't in here I'd kick your ass. And he told him on a second occasion that he tried to grab him through the bars. These two are guards. Remember Mr. Hendricks was asked? Well, that's not the only prisoner who threatened you, was it? And his response. Yeah. Kenny Barrett is the only prisoner in the time I was in the jail who threatened to kick my ass. He was the only prisoner who threatened me.

Kenny Barrett assaulted a guard while in the Muskogee County Jail, Mr. Satterfield. Threw the tray of food at him. And Rick Fargo. He hit him in the

testicles with a potato. Doesn't sound like a big deal, not a deadly weapon, not a dangerous weapon, but it's what he had access to and it shows his willingness to commit assaultive behavior upon authorities in a correctional setting.

Don't be naive. Do not think that the only weapons available in a prison setting are baked potatoes. Mr. Borman told you that the day that there was the confrontation between Brad Boyd and Kenny Barrett they were looking for razor blades and pens, weapons. Didn't say they were Mr. Barrett's. But they were found in that cell.

Do not think that throughout his time in an institution, if that's where he ends up, Mr. Barrett will not have access to shanks, shives, razors and other items that can be made into weapons. And guards and prisoners will be endangered as demonstrated by his response.

You heard his witness, Brad Gude, say that he was bold and arrogant. You heard the guard say Kenny thought he ought to run it. He wanted it to be his way. And the evidence demonstrates what he will do when he does not get his way. Kenneth Barrett is a danger in the future wherever he is. He is a future danger. And the first non-statutory aggravating factor is established beyond a reasonable doubt. Answer it yes and move on.

The second statutory -- non-statutory, pardon me -- aggravating factor is victim impact. And you heard the testimony of his family and friends. You heard Bill DeWeese, the minority leader of the Pennsylvania house of representatives. He met Rocky -- pardon me, it's DeWeese. He met Rocky in the Marines. And Rocky soon became his best friend. He described Rocky as an epitome of American manhood. He -- Rocky helped Mr. DeWeese through physical training. Rocky achieved what he wanted. His desire was to return to Oklahoma and become a Highway Patrol trooper and that's what he did.

And Mr. DeWeese told you about the phone call a month before Rocky's death. Rocky had achieved more than what he wanted. More than just being a trooper. Because Rocky was truly living his dream. And he told Bill DeWeese that in his own way. He told Mr. DeWeese -- he was still a bachelor -- you need to get you a family and settle down. Because Rocky had done that and Rocky knew the true value of living the life he was living.

You heard the testimony of Nancy Stalcup, his sister. Rocky was honest, bright, brave, her confidant. People flocked to him. They gravitated to him. His eyes twinkled. He had a robust laugh. She never got to say goodbye. She will miss him. Every day she dies. The hardest thing she's ever done in her life was having to

tell her children what happened to Rocky.  She spoke with him about the religious faith.  She rests with that comfort.  The pain in her has not diminished and it never will.

You heard the testimony of Bobbie Eales, his mother.  She can no longer go to church because the hymns cause her to break down.  She goes to his grave daily. She told you of the love she felt at seeing him for the last time as he drove off, not knowing it was the last time.  And she told you of what a parent feels when their child dies too early.  No parent should live longer than their child.  You heard Gene Hise, a brother Marine and trooper who said I lost part of myself.  He was my friend, my best friend.  Six years later Trooper Hise still can't talk about it without crying.  And this man says he ought to grow up.  The hardest thing Mr. Hise ever did -- Trooper Hise ever did was tell Rocky -- or tell Kelli about his efforts to save Rocky's life.  He told about the team falling apart.  A large percentage of that team -- marriage is breaking up.  How he almost, because of his own personal PTSD -- Post Traumatic Stress Disorder from this incident -- how he almost lost his wife and child.

And Kelli.  A brave woman.  She had to be.  She fell in love with a trooper who gave her a traffic

citation. She fell in love with a trooper and found a life partner and a lover and a friend who was violently torn from her. She told of the two troopers coming to the porch and her opening the door and seeing the tears. And her remembering what Rocky had said. If you ever have two troopers on the porch and I'm not one of them I'm not coming back.

She told about their love, their life, the birth of their children. She described Allison -- trying to tell Allison, at six and a half, that Daddy's in heaven. He's not -- he got killed. And Allison's question, when's he coming back. You heard Allison's award winning essay written last year, this time. I'm thankful for the six and a half years of love I had with my daddy. It was enough to fill a lifetime. And I wouldn't ever want anyone else. Two year old Mackey -- telling him. When he was four he said, Mommy, I want to die. I want to go to heaven and be angel with Daddy because he's lonesome. You'll have Allie. I want to be with my Daddy.

You got a brief glimpse of a life that's beyond measure. A life too full and cut down too soon. A life that was shamelessly -- shamefully ended. Senselessly ended by this man over $25. Look at Government Exhibit 203. 203 is the affidavit of the charges. Get the

middle -- right -- the type line. It tells you, that area right there. Bought a quarter gram of meth for $25. That's the price this man put on the head of Rocky Eales. Because he was unwilling to go to court and face the charges. $25 is the value this man put on that life that you heard about. The victim impact is established beyond a reasonable doubt.

Once these factors are established -- and I submit they all are beyond a reasonable doubt -- consider the mitigating factors. One, accepted responsibility. How? The only evidence that he accepted responsibility is he didn't appeal his conviction. Twenty years for manslaughter. And you heard the evidence. Manslaughter carries up to life. If he'd have appealed, he could have been retried and faced a life sentence. He made a calculated choice. I'd rather take the 20 than risk life again. Ain't no mitigating factor there. Two, convicted and punished. He got 20 years for this act, for killing Rocky Eales. And you heard Jimmy Wilson from OSP, 20 years is not 20 years. He gets 52 days for every month he's down there. Basically, two for one. He's already served six years. He's only got 14 left. He doesn't have another seven years for Rocky. He is up for parole next May for killing Rocky. Put them all together. Give the extra ten years for killing Rocky and for wounding

Buddy Hamilton. Is that 30 years, which is going to be a whole lot less than that in the Oklahoma prison system, an appropriate punishment? And does that show he accepted responsibility? I submit not. No felony convictions. Why not? Because he jumped bond. He didn't show up for trial. There was a bench warrant.

He is -- number four. He is a father. And do you know what's missing? There's no adjective. He's not described as a loving father, a carrying father, a nurturing father, a good father. He is a father. That, folks, describes nothing more than a biological process. He is also breeds. But there's more to being a father than just making a baby. And that's the only thing that's offered. And I submit that's not a mitigating factor.

A loved son and stepson. That is their feelings for Kenneth Barrett. Notice what's missing? Any feelings they receive back. His father says I hadn't spoken to him for two years prior to this incident. His step mom said I didn't even know him before this. But I started going to jail. If he gets a life sentence he's going to be some place off who knows where. And how strong do you think that relationship is?

His mother? She fights with him and threat -- and they have threats. And she cared about him so much

that she thought he was hyper as opposed to being hyped up. Living right next door she didn't even know of the drug activity. How close can that be? Good neighbor, good friend? The only testimony there is he fixed cars cheap. Death would impact his child, his friends and his family. And there was no testimony of impact upon his child. No testimony of what impact his death would have upon his friends. And the only impact coming from his family was his stepmother who said that I could no longer have my relationship with him in jail. I'm sorry. I submit that that mitigating factor does not exist. Or to the extent it does, it comes nowhere near the aggravating factors in this case.

He expressed remorse. How? When? Well, he told his mom he wished it could have been different. Yeah, like not get caught. Yeah, like kill more of the bastards like I intended to. Where's the remorse? He told his dad that, well, I'm sorry that two children had lost their daddy. What are you going to say to your dad? Damn, Dad, I wanted to kill more than that. I didn't do a good enough job. Come on.

Nine, no danger because he's in prison. And we've already dealt with that. Ten, other factors in his background which mitigate against the death penalty. What factors? What factors? One, he didn't get his

haircut so he dropped out of school? Two, he voluntarily chose to use and sell and make methamphetamine? Three, he beat his wife. Four, on the night in question he left his son at the residence knowing the cops were going to come back and he was going to have a shootout? What factors weigh against the death penalty that are not mentioned? And I submit when you look at all of them there are no mitigating factors which exist or to the extent they do, they pale in significance to the aggravating factors the Government has established beyond a reasonable doubt in this case. When you reach that last step, whatever mitigating factors you have to compare to the aggravating factors that the Government has proven all of them beyond a reasonable doubt, when you make that comparison, compare the lives involved. You are going to sit in judgment to see if the aggravating factors substantially outweigh the mitigating factors. And I submit they do. You will sit as judges.

And when you compare the lives -- and that should be in evidence. Compare the life and the loss of Rocky Eales with the life of Kenneth Barrett. But I think there's another comparison. Actually, the word is contrast because comparison is how there are alike. Contrast is how they are different. And I submit there is another contrast that is stark in this case. That is

Kenneth Barrett with his brother, the defense witness Steven Barrett. Kenneth Barrett dropped out of school because he didn't want to get a haircut. Steven Barrett chose to remain in school and graduated and go to college and get a masters. Kenneth Barrett chose drugs. Steven Barrett chose football and an education. Kenneth Barrett's life revolved around cooking, making and using dope. Steven Barrett's life revolved around educating and nurturing our children. Same house, same circumstances, same parents, same conditions. The difference is choices made. Choices made by Steven Barrett versus choices made by Kenneth Eugene Barrett. And you saw where Steve Barrett's choices have taken him. And you have seen in this trial the choices Kenneth Barrett continually made through his lifetime and where it has taken him.

When you look at the mitigating factors they either fail -- they fail totally as far as the weighing process against the aggravating factors. The death penalty is an appropriate, correct and just punishment for this crime and it should be your verdict. Two months of trial is a long, long time. But it's nothing in comparison to the six years for which Rocky Eales has been awaiting justice. Today is the day and the wait should end. Thank you.

Exhibit C

So, ladies and gentlemen, we rely upon your life experience, we rely upon your common sense, we rely upon your memory to render a verdict in this case. I feel confident on behalf of Mr. Barrett that you're going to do the right thing. And just because the Government has brought this case six years later, spent no told how many thousands of dollars and uncovered every stone that was ever existed in Sequoyah County, that they have not shown this to be the type of case that is deserving of you being an instrument of death. Thank you for your time and attention.

THE COURT: Final remarks from the Government.

MR. SPERLING: May it please the Court. You've been thanked repeatedly. I must admit that I had a different take when I saw you return your first verdict than did Mr. Smith. I didn't see anger. I saw people who took their oaths very seriously, who rendered their verdict very carefully, who obviously examined each piece of evidence, who consulted with each other and who reached a just verdict.

What you've heard for the last 70-80 minutes or so is an emotional plea to ignore the primary evidence in this case. I'm going to ask you to be the agents of justice in this case. There has been a prior prosecution. We're going to examine it in this closing

Exhibit C

argument. But I ask you in the final analysis, each one of you, to be the agents of justice and fairness in this case. Last evening I sat down at my computer and I began to write and early this morning I reached this conclusion and that's that words cannot do justice to this extraordinary case.

I want to ask you two preliminary questions. The first is this: What kept the Defendant from being a multiple murderer in this case? Some may say the hand of God, Providence, fate, dumb luck. The Defendant in this case intended to be a multiple murderer. We'll examine the facts. But the second question I want to ask you is this: If 19 rounds -- and I'm going to be careful not to point this at anyone. If 19 rounds from this firearm -- and I admit it, it could be used to shoot skunks. We heard that from his mom. I'll tell you that tells you one thing, he know something about shooting black and whites. But if this gun and 19 shots at highway patrolman, at officers of the law, at soldiers of the law, if 19 shots from this gun at point blank range, but extending farther out to begin, if that's not over the capital line, what is? Must it have been 30 or 60 or the 91 that he had at the ready?

Ladies and gentlemen, I submit to you that when you carefully and you honestly and you dispassionately

look at this evidence in this case -- this may be a very difficult case and a very difficult decision. Mr. Smith tugs at your heart strings. This is a decision that you will live with, yes. It is a difficult decision to sentence someone to death. But, ladies and gentlemen, under this evidence this is not a close call. This is not a close call. Months ago we looked each other in the eye and considered the prospect that this day would come, didn't we? And you looked me, each of you, directly in the eye and asked each of you this question: If the law permits it and the evidence justifies it, are you capable of signing your name to the bottom line of a jury verdict form knowing that the result will be the death by execution of another human being, the Defendant in this case? Each of you reverently and respectfully answered that question in the affirmative. That day has come. The law permits it and the evidence resoundingly justifies a capital sentence in this case based on what you heard as to this Defendant. And I am confident that you will take this decision very seriously. You each fully understand the gravity of the verdict that you're asked to enter. This isn't an easy decision, but it's not a close call. Nineteen shots are way over the capital verdict line. And the Defendant's crimes deserve the death penalty not because we want to impose it, not

Exhibit C

because it's easy.

You know, they are really kind of like those sirens in mythology when you hear this defense argument, they're tugging at one or two of you saying bolt from the rest. You know, it's kind of an enticing entreaty, isn't it? But ladies and gentlemen, we are not asking that you do this because you want to or because it will make you feel really good. It won't. But because it's the right thing to do.

The evidence, the testimony and the information in this case warrant and dramatically outweigh the aggravating factors, dramatically outweigh the mitigating factors in this case. What the Defendant chose to do is way over the balancing line under the Court's instructions. As I listened to the defense lawyers the thought occurred to me that I wonder if it sometimes takes longer to attack individual facts of the case rather than to look at the entire case, all of the case and all of the facts together. They'd isolate one piece. They'd talk about Abby. They'd talk about a potato. But did you ever say -- hear them say look at all of this together, put it all together? Now what do we have? Oh, they looked at the sign. This is just a no trespassing sign? Not like any that I've seen. This is a threatening prediction of what he was willing to do. But

Exhibit C

I'm not saying base this decision on this. I wouldn't ask you for a moment to base your decision in this case based on what Abby Barrett said or suffered. What I do ask you to do is to consider it as one piece of the puzzle. Put it all together. This conduct is way over the capital line. The 19 rounds fired by the Defendant with precise targeting is way over the capital verdict line.

This Defendant substantially planned, he premeditated, he calculated a murderous rampage that only ended not because he voluntarily decided to stop it. It only ended because of Rick Manion's -- and we're going to look at his PowerPoint now -- because of Rick Manion's accuracy. He couldn't be with us. He was killed in a motorcycle wreck some time ago. But Rick Manion -- he testified, he was under oath and he shared his version of what happened. You know, what we have here is the Defendant who fired at a vehicle that was some distance. And the evidence according to the troopers was that they were as far away as from the reach of this courtroom from one end to another. Ladies and gentlemen, that's way too far away to be firing with impunity at someone who is merely an agent of the law, ordered to serve a no-knock warrant at that time.

But here what we have is the Defendant who even

after he had fired many of those shots -- let's go to this now. Remember Manion said that he -- he activated red and blue visor strobe just before he turned in off the drive. He said that Hash's -- Steve Hash's marked unit's emergency light bar was fully activated. He said that we were directly behind the lead vehicle, less than a car length behind when we turned off. He said that he didn't know whether the troopers in the lead Bronco even had time to activate emergency lights before they took gunfire.

He continue by saying the second Bronco was offset to the right of the lead motor vehicle upon our approach and could see past the lead motor vehicle to the home. He continued. Gunfire at the Bronco occurred when the Bronco was far away. The gunfire intensified upon approach. The gunfire came from the front door area. The gunfire was from the house occupant's rifle. Rocky was mortally wounded and then said I'm hit bad. Gunfire continued as Rocky and Manion were at the rear of the Bronco. Rocky then went to his knees and went down. A commotion attended Toby's detention. And then a flash bang went off, then Buddy came to the rear of the Bronco. Buddy had already been shot. Gunfire from the house continued. Grave risk, yeah. Gunfire from the house continued. The Defendant, holding his -- well,

Exhibit C

EUSTICE REPORTING SERVICE
BOX 700488 TULSA, OK 74170 (918)445-2965

essentially an AR-15 stepped sideways into the east room on the east side of the house. That's the testimony that you heard in transcripted form from Rick Manion. But the Defendant had slipped into the southeast room. Seventy two rounds remained in his chosen weapon of choice, ready for further murder. He continued to grip his murder weapon, he had peppered the lead Bronco with eight lethal rounds through the windshield at the driver, continued to fire at the unarmored vehicle. He observed the Bronco approach his front porch, he saw Rocky get out of the passenger door, he took aim at Rocky and he fired. The blast pierced Rocky's flank. He continued his aim. Another blast penetrated Rocky's side, broke ribs, punctured a lung and perforated Rocky's life -- lifeline, aorta. And then complaining about fairness?

The Defendant maintained his aim at the man the Defendant had already shot twice. He staggered away from the Defendant in desperate, halting steps, in a futile search for safety. The Defendant took aim again at the man who retreated. The Defendant fired again at Rocky while Rocky's back was fully exposed. The bullet struck Rocky's un-holstered pistol, damaged the butt plate as you recall, and relieved the unused weapon of its contents.

The Defendant who committed these crimes isn't

a child. He was a fully conscious adult who substantially planned, who premeditated in a number of ways in the weeks and months prior to this murder. He expected, he watched, he surveilled and he slaughtered an absolutely innocent man who had done nothing to him. And they ask for increased leniency or fairness?

This was game day for the murderer. He clearly tried to murder at least two human beings, shots at the Bronco, the intentional killing of the passenger. But he wasn't finished. He saw the driver, Buddy Hamilton, getting out of the vehicle, didn't he? Buddy was wounded. He fired at him, too. Buddy was wounded in the front, the face, in the front and back, and back, and back, of his shoulder. And they claim unfairness.

The Defendant still wasn't finished. He was waiting, rifle at the ready, chamber loaded pistol in his waistband, for law enforcement officers to walk onto his porch. Fortunately, two bursts from Rick Manion's MP-5 put a halt to his killing field. Still, the Defendant's substantial plan and premeditation continued. He reaches for a weapon as he's being subdued. Let's not get distracted from the real issues in this case. My judgment is that you have this Defendant figured out. He talked for a long time about what he was going to do, about what he wanted to do. He talked about it long

before he stepped over the death penalty line. He hoped that Johnny Philpot or Frank Loyd would be the first ones through the door. Please keep that in mind as we consider what the Defendant planned for approaching law enforcement officers, had Rick Manion's fire not been accurate. Defendant new the law was going to come for him. He could have easily turned himself in. Rather he did what he wanted to do. Were his crimes out of character? No. They were consistent with the character he had become. The Defendant tragically tried to murder two human beings. He succeeded tragically with regard to Rocky Eales. And it's not as if he didn't know that a murdered victim would have a mother and a father, sister, a wife or a husband and children and friends and coworkers. This Defendant did not care. He gave no thought to the suffering of others. We have a mother and father who lost their only son. A sister who lost her only brother and nephew and niece, twins, who lost their favorite uncle. A wife, Kelli, who lost the love of her life and must reckon with a situation that even she can't fully comprehend. A daughter, Allie, who when told by her mom dad wouldn't be coming home asked tearfully, well, when will he be coming home? A young son who longed to be with his father in heaven. A good friend from the Marines who will never be able to share those

memories again. Coworkers like Buddy Hamilton, who survived the murderous hail of gunfire and Ray Greninger and Rick Manion who rushed to Rocky's aid. Steve Hash, who would have been the ram trooper, Danny Oliver who heard perhaps Rocky's last audible sound, a scream in pain as Danny tried to render him aid. Billy Poe who moved forward to suppress gunfire from the Defendant who had come too soon. Doc Darst who moved into the yard to eliminate the danger to or from the Defendant's son. Tactical team supervisors Pettingill and McFry, and last but not least protégé Gene Hise whose CPR, in a desperate race to buy Rocky a few more moments of life, produced mouthfuls of frothy last breath blood.

The suffering of each of these wonderful people who graced our courtroom in this presence, this chamber of justice, was foreseeable to this Defendant. But he cared not about the consequences. He scoffed at the emotional scarring and the psychological suffering of others, at the agonizing pain he so carefully had planned and premeditated to inflict. And what did you hear from Deputy United States Marshal Lloyd Valleck? The Defendant remorsefully reflects after hearing Gene Hise's compelling testimony about how Gene frantically tried to save his mentor's life and raced Rocky to the emergency room. Without a tinge of regret, the Defendant

Exhibit C

heartlessly responded: He acted the same way six years ago. He needs to grow up and be a man. He needs to stop whining. This from the Defendant whose lawyers now plead for fairness?

The Defendant elected to suppress his conscience. He chose a criminal path in this case. His murderous actions were conscious, knowing, intentional, deliberate and a premeditative result of thoughtful choice. You know, he lacked an essentially ingredient of the community of people. He doesn't have empathy for other people.

You know, for others -- over six years the Defendant has been preparing for the prospect of parole. Might he have been pretty well behaved in jail, generally speaking, given the prospect that he may be paroled one of these days? Might he be so motivated? Might that motivation now be gone? And jail rewards good behavior, commissary and reading and visitors and television association. Okay, he hasn't killed anyone in jail. But he showed us the tip of the iceberg. He hurls solid food at a jailer, he threatens other jailers, even tries to grab one through the bars. He thumps a cellmate, himself a murderer. Why? Not because he murdered innocent people but because he clipped his toenails. The Defendant's sense of justice, utter, utter selfish.

Exhibit C

That's a telling forecast of what is to come if the Defendant is just sent back to his room.

You know, in the days, weeks and months before this killing, the Defendant had the idea of murder germinating in his mind. The Defendant was on a trajectory, a chosen path. This evidence is unmistakable. Instead of surrendering to arrest, the Defendant took everything Rocky had. And they now complain about unfairness? He took Rocky's hopes and his dreams and his time and his life. This was cold blooded murder. And the question that we asked you originally, why wasn't this a double murder or a triple or quadruple murder? Only because the Defendant was stopped. Before that night and after, the Defendant behaved the way he wanted to. He did what he wanted.

You've heard the defense attorneys ask you to do something other than to render a capital sentence. The Defendant wants to be sentenced to his room as punishment. Justice cannot be served in the case by allowing the Defendant to live in prison. If he's allowed to live in prison, he will have perks like workouts and visitors and phone calls and mail, TV and recreation. Don't let this Defendant -- the evidence may reasonably infer and you may reasonably conclude -- be a hero to his fellow inmates, to his fellow incarcerated

Exhibit C

criminals. All with a civilized core must have revulsion at what the Defendant did to have acted as the executioner of the innocent. Don't give this Defendant what he wants. In the name of justice give this Defendant what he deserves. Don't just send him to his room.

The Defendant wants to choose his sentence. He now wants to live. And how unjust is that? What opportunity did he give Rocky Eales to live? How unjust is that? The Defendant made Rocky Eales do something he would never ever do in life, but for the desperation of his moment. Rocky would never have done what the Defendant made him do, but for the fact that he believed there was absolutely nothing he could further do to defend himself or others. His life was ebbing away, he could do nothing for others because he was mortally wounded, bleeding and dying, he retreated for what was left of his life.

This disturbing criminal conduct is way over the capital line. The Defendant didn't need to commit this murder. He wanted the thrill of the kill. And now his lawyer complains because he has been brought to the federal bar of justice, to our doorstep. He has not been placed in double jeopardy. The Court's instructions tell you there is no legal bar to this trial. But let's just

Exhibit C

go farther and practically. Let's say I get in trouble at school and that doesn't mean that there wasn't going to be a more serious reckoning when I got home and dad found out about what I had done. If the punishment was insufficient at school, I can assure you that dad had punishment waiting later. That's not unfair, that's just. Let's say, for example, that I had misbehaved and my mother had caught me and she furrowed her brow and she'd scolded me and may have swatted me a couple of times and told me not to leave the house. And then she told dad. And because of disrespect or some other reason, Dad said that original punishment is not enough, it's not just. You know, I could have complained about fairness, say, oh, whoa. Whoa, whoa, mom swatted me, the school tried to punishment me. I can guarantee you that my pleas would have been drowned out by the whack of the belt on the place God made for that appropriate punishment. That's their claim. They're asking you, ladies and gentlemen, not for fairness but for leniency for a man who offered Rocky no leniency, who offered Buddy no leniency, who was ready to kill at will. Ladies and gentlemen, don't let a cop killer get leniency.

So much for analogies, though. Let's talk about the difference in the cases. You heard witnesses testify here that in the state proceeding they didn't --

they were really grossly under-evidenced. Randy Turman didn't testify, nor did Travis Crawford, nor Charles Sanders nor Karen Real nor Brandie Price, Cindy Crawford, Randall Weaver. No small effort was involved in getting them brave enough to hit the stand. They didn't want to testify. We required their testimony.

His friends and associates didn't want to testify against him. But then there was Juan Beal, Kevin -- remember Kevin, no small potatoes, Wilson? Craig Nixon and an array of drug evidence, lab equipment, chemical and proof of the Defendant's serial drug manufacturing, distribution and use. Chemist David Love, Lyndell Griffin and Gerald Skowronski. All of these witnesses were presented to you never set foot in that prosecution down there.

Ladies and gentlemen, this is the time for justice. This is not the time for the leniency that the defense asks. All of those witnesses were presented to you not at the abridged state proceedings. The state jury just got a small glimpse at the wide screen feature length film that you have very patiently experienced in this case. And you heard from Kelli Eales and Bobbie Eales and Nancy Stalcup and Bill DeWeese and Gene Hise. They didn't testify in state court. We need not belabor their testimony, but you also heard from Stanley Philpot.

Exhibit C

Here's a man on donated law enforcement officer time and equipment who put his life on the line after giving the Defendant a gracious opportunity. They have already been generous. Oh, go ahead and drive your car home, we -- or truck home, we won't impound it. And what does he do? He takes advantage of the generosity. But now he asks for more? Here's the Defendant with a cloud of dust who then confronts them with an arm, with a gun, with a big pistol. And what did Stanley do? Rather than to be involved in a gunfight, he first called for a bullet proof vest and then he repaired and basically retreated.

Johnny Philpot drove a white SUV, he said. What was he shooting at? The Defendant was shooting at a white SUV. No wonder he shot so many times at the lead white Bronco. He tried to locate, Johnny did, the Defendant to bring him in. Did he thump him, did he do anything to him in the adult experience? No, he just merely tried to bring him in. Didn't arrest him, didn't harass him other than to check a gun and let him go early. That's not the man who has a vendetta out for this Defendant.

And, yes, you heard from Cindy Crawford. No, not that Cindy Crawford, the one who had the Defendant put a shotgun to her leg and threaten to shoot her. Well, actually he said he'd F-ing kill her if she came

Exhibit C

5417

back.  Charles Sanders -- the Defendant said we need to find that SOB to have him -- that came in and had me arrested and we need to kill him.  Larry Lane, the Defendant slows down, grins, then runs through a traffic checkpoint, ignored lights and sirens and led a hundred mile chase.  Shannon Smith, Micah Reasoner and Cindy Smith had to jump out of the way to keep from getting run over by this man.  Past behavior indicative of what he will do in the future.

And years ago the Defendant was slapping his wife around in broad daylight and Shannon sought to intervene and what's the Defendant's response?  To threaten Shannon that he was going to go inside, get a gun and shoot him.  A crying Abby asked Shannon to leave, obviously for Shannon's safety.  And the defense mitigation in this case?  Let's see.  Maudeen Vann, seven -- count them, seven filed cases of domestic abuse in this case, seven of them.  An affidavit says, quote, he was going to blow my head off.  Oh, mere talk?  Ultimately this Defendant lived out his fantasy.  The Defendant stalked, going to a restaurant, like the abused -- I mean, she was pathetic, like the abused wife she is.  Yeah, it was mutual combat.  Yeah, right.  And Kathy Trotter, a real ear to the ground, who knows all the goings on in the Sallisaw area, never been in the

Exhibit C

EUSTICE REPORTING SERVICE

Defendant's house, never seen him armed, unaware of the seven cooperating witnesses testified about the threats that he had made, unaware of any domestic violence, she didn't know anything of consequence. And Jimmy Wilson, from the prison, the Defendant's parole hearing is next May. An administrative assignment can be changed with a stroke of a pen.

Clyde and Craig Edgmon, okay, the Defendant occasionally fixed their cars for little, if any money. But they didn't know the other Kenneth Eugene Barrett. Jailer Robert Gude. The Defendant was arrogant, bold and showed no signs of remorse. Courtney Burke, when called not to tongue meds, he throws his medication and spit a pill at a 70-year old lady. Adam Satterfield, Defendant throws a large tray at him. Brother Steven, the Defendant came up to Abby from the back, grabbed her and took her to the ground. Oh, that's the Defendant's style, attacking from behind. The Defendant is fairly anti-social, huh uh. Steven pretty much stayed away from family in Sallisaw. Steven took -- selected an entirely different direction. Roger Crawford, well, he really didn't know the Defendant that well. Asked about redeeming qualities -- remember how he stalled. He was asked, well, what about his redeeming qualities? Do you remember that pause, that pregnant pause? And then he

Exhibit C

limped. He said, well, a good person, helps people, son and ex-wife need him. Ex-wife, I asked. Maybe not. Gelene Dotson. Doesn't remember when the Defendant got married or divorced. They fought a lot. Doesn't remember any domestic abuse allegations? And she wasn't going to run his messenger service and didn't want a salvage yard next door. She says Defendant knows he made a wrong decision as to how to react that night. If he could do it different, he would. Now, that's big of him. That's about as weak as his reason for leaving school.

Ernie Barrett gave the Defendant several time -- chances to succeed at work. The Defendant basically blew them. Mother-in-law, Doris, I got to respect her loyalty. She's been in court when he's been in court. But the state trial, as she admitted, was nothing like you heard here. The jailers -- he chunks a potato at one, curses others, he's in a cell with dangerous contraband weapons, he threatens yet another one, he reaches out from a cell and tries to grab another, he thumps a younger cellmate, a cowardly killer himself, I might add, not out of injustice but because of the way he cuts his toenails?

Sympathy. If we're tempted to feel sorry for the Defendant or his relatives, we should remember this. He abandoned them through his conduct. How he must envy

Exhibit C

EUSTICE REPORTING SERVICE

his hard-working, highly achieving bother's success. Abby, every pore of her body oozed that she had been abused, physically and emotionally. The Defendant had sporadic contact, pretty much unwanted, particularly with his mother, until he committed murder and got arrested. They didn't visit him at his house. They hadn't seen the inside of his house by and large. And remember this, hear in court, the Defendant victimizes his own family by making them serve as props, as witnesses on his behalf. Remember, Rocky didn't get this similar chance to plead for his life.

Defendant's parents visit him. Well, whatever he does for them or anyone else is largely undefined and far outweighed by the crimes he committed. The Defendant has paid for his membership into the worst of the worst groups of criminals. He's a murderer. He killed remorselessly, wantonly, senselessly and had no empathy, no sympathy, no thought, no feeling and no emotion for a wonderful man whose life he extinguished like that with semi-automatic gunshots.

There is no proof that this Defendant lost one wink of sleep over what he did. It's almost as if he had done nothing, like nothing happened. And now he says give me leniency. His mother quoted him as saying he made a wrong decision and would do it differently. You

Exhibit C

EUSTICE REPORTING SERVICE

know, it's almost an oops. It's kind of like, well, Derek Jeter may have bobbled a ball in a preseason spring training game that's meaningless. His dad says, well, he's sorry it happened. Sorry two kids are without a father. Boy, that's pathetically understated, even if it's accurately relayed.

MR. BARRETT: Get off my family, Sperling. This is about murder, not my family. You didn't mention the fact that I made two statements to OSBI Internal Affairs that you wouldn't let this jury hear, would you? I've heard enough of him talking about my family. Take me out of the courtroom. Take me out.

THE MARSHAL: We'll take you -- do you want him removed, Your Honor?

THE COURT: Yes.

(Whereupon, Mr. Barrett was escorted out of the courtroom after which the following record was made.)

MR. SPERLING: And he never intentionally shot anybody? Every bullet he fired was in the direction of the man and men he shot. The final shots were deadly accurate. All he saw was headlights. He saw lots of emergency lights, too. Remember the real victims. It is not our job here to forgive. We are not the victims of the Defendant's brutality. It's not our job to feel guilty. The murderer who mercilessly killed in this case

Exhibit C

as a matter of conscious, premeditation and planning ought to feel guilt and remorse, but he doesn't. He is the one who put us all here. What a sense of power he must feel, the narcissistic, selfish collection of reality that he is. He's the one that put us all here.

But we must not refuse to do our duty just because we can't make the victim's family or friends or community whole. Remember that the Defendant employed the machinery of death as Rocky sought only to enable a court ordered search of the Defendant's house and then to go home to his family. This tactical team had never fired their weapons or been fired upon. There was only one difference here, the Defendant. The Defendant chose when Rocky would breathe his last breath. This Defendant substantially planned and premeditated and deliberated. His aggravating factor laden murder was unprovoked, it was predatory, it was deliberate and it was premeditated. He had taken steps to get where he was heavily armed that night. He selected the means, the instrument, the place, the victim's pathway. He struck without warning. He killed from a distance and then killed close-up as he cowered in the cover of his house.

They say that the Defendant accepted responsibility by declining to appeal his state conviction for mere manslaughter. Hardly. He made a

Exhibit C

EUSTICE REPORTING SERVICE

strategic choice. If retried, he could have been sentenced up to life in prison. The defense lawyer says the Defendant has people who care for him. But he's manipulative, he's a taker, a narcissistic personality. To him it's all about him. If only they had done things differently. This Defendant chose to be the person that he was before and on September 24th, 1999. Remorse? The evidence indicates that this Defendant has not only not seen the light, he hasn't even felt the heat. The defense lawyer says that the Defendant is not a future danger. Ask yourselves, would any of us want to be in a prison cell next to a man who is capable of coldly attacking law enforcement officers? So he's a good prisoner, to those he can't manipulate or selectively attack.

You did hear an emotional appeal from his lawyers. We predicted -- they asked for fairness. We ask, ladies and gentlemen in this venue, for justice. If we merely send this Defendant back to his room, you may reasonably infer that this cop killer will be a hero to many in the prison population he enters. He will have committed cold blooded murder, yet will have escaped the capital noose. This Defendant will have slaughtered an innocent soldier of the law and merely be given more time. Don't make him a hero.

Exhibit C

The aggravating factors in this case have been proved beyond a reasonable doubt. Mike Littlefield -- and I'm very thankful for his work in this case -- did a wonderful job of setting forth the evidence and testimony in support of each of the aggravating factors. The mitigating factors, even if accepted as fully proved, cannot outweigh the substantially planned and premeditated murder of 49 year old Rocky Eales. The mitigating factors cannot begin to outweigh one of the tortured steps Rocky took as he stumbled into darkness. This Defendant has earned and deserves the death penalty.

Thousands of years ago, the king of the world's most powerful empire held a great feast for thousands of the rulers of his nation. They ate and they drank from golden and silver cups which had been stolen from the temple of a subdued and now enslaved nation. They drank wine and they worshipped idols. All of a sudden, the fingers of a hand appeared and began to write on the palace wall. The king saw the hand and the writing and he was frightened. He was so scared that his clothes actually loosened and his knees knocked together. He cried out bring the astrologers, bring the wise men of the nation. Whoever interprets this writing will have great wealth and be named the third highest ruler in the country. The wise men came in and they studied and they

Exhibit C

thought and they consulted, they conferred, they thought. But they couldn't read, much less interpret the writing. The king's face turned ashen. The queen remembered a forgotten foreigner. The king made the man the same offer. The man declined all of the riches and all of the honor and then he bravely read and interpreted the writing on the wall. His interpretation was that you're kingdom is at an end. Your kingdom will be divided -- and divided and given to your neighboring enemies and then the prophet said you have been weighed in the balance and found wanting. That night the king was killed and his kingdom was divided.

Ladies and gentlemen, under this evidence, under this testimony, the Defendant has been weighed in the balance and found wanting. We've heard a lot about re-punishment. We've heard a lot about the prosecution in closing argument. But you know that there was very modest punishment handed out in his prior prosecution. You know that Counts One and Two were essentially never brought in the state prosecution. There was virtually -- there was no drug evidence in the trial -- the one that last occurred. That trial did not do justice to the Defendant's criminality or to the Defendant's lethality. You know, he was found guilty of assault and battery with a dangerous weapon. You know, at least it should have

Exhibit C

been shooting with intent to kill. That's dramatically inadequate. But there's no evidence that the loss of Kelli and Hook and Bobbie and Nancy and Ally and Mackey and the troopers and Bill DeWeese has ever been considered by a jury.

Ladies and gentlemen, the punishment should fit the crime. The punishment should fit the crime. You know they asked for generosity. They point to this quotation as we did earlier, as you've been generous with your time. How generous was the Defendant to Rocky Eales?

I'm thankful for the opportunity and I ask you to do this. Under the standards of the law and the instructions by the Court, the Defendant should be as it were, weighed in the balance and found wanting. This is a difficult decision. But I submit to you it's not a close call. Justice demands a capital sentence. We respectfully and reverently ask you to return a death penalty against the Defendant. Thank you.

THE COURT: Let me see counsel at the bench.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT: Any requested instructions from the defense in regard to the incident that just took place?

MR. HILFIGER: No, I really haven't, you know,

Exhibit C