**DAVID B. AUTRY**, OBA No. 11600
Attorney at Law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: (405) 521-9600

**HEATHER E. WILLIAMS**, Bar No. 122664
Federal Defender
**JOAN M. FISHER**, Idaho Bar No. 2854
Assistant Federal Defender
**TIVON SCHARDL**, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: (916) 498-5700
Joan_Fisher@fd.org
Tim_Schardl@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **CAPITAL CASE** |
| | ) | |
| Respondent/Appellee, | ) | |
| | ) | |
| v. | ) | Case No. 12-7086 |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | (E.D. Okl. Nos. 6:04-cr-00115-JHP, |
| | ) | 6:09-cv-00105-JHP) |
| Petitioner/Appellant. | ) | (lower docket) |
| | ) | |

**MOTION FOR AN EXPANDED CERTIFICATE OF APPEALABILITY**

**I.      MOTION**

Mr. Barrett, through counsel and pursuant to the Case Management Conference Order dated May 2, 2013, and for the reasons set out below, moves this Court to grant an expanded certificate of appealability on the additional issues discussed below.

Counsel has this date advised opposing counsel of the Motion and are advised that the government opposes the same.

**II.      INTRODUCTION**

Though factually complex, Mr. Barrett's theory of defense at trial was simple:  Because of the manner in which the Oklahoma Highway Patrol ("OHP") raided Mr. Barrett's premises in the middle of the night, Mr. Barrett did not know the onslaught of vehicles was law enforcement and he reacted in self-defense.  Mr. Barrett further asserts that he was not engaged in any on-going drug activity on the night of the raid.  Evidence to the contrary offered by law enforcement and convicted drug offenders coerced into testifying through threats and promises was misleading and/or outrightly false.  At trial, Mr. Barrett was denied the opportunity to present his defense by the court's denial of his "*Franks* motion," the constitutionally deficient performance of his appointed counsel and the

unconstitutional acts and/or omissions of the Government.

There are three areas of factual concern underlying the requested additional claims relating to the guilt/innocence stage of the trial including an illegal search warrant under *Franks v. Delaware*, the ineffective assistance of counsel and prosecutorial misconduct upon which Mr. Barrett seeks a certificate of appealability ("COA"). Broadly grouped, the factual bases include: (1) the issuance of a the warrant based on the deliberate or reckless disregard of perjury and unreliability of the purported confidential informant ("CI"), Charles "Monk" Sanders ("Sanders");[1] (2) the botched execution of the warrant leading to the tragic death of Trooper Eales and cover-up of the same;[2] and, (3) the prosecution's late disclosure and erroneous reliance on the testimony of unreliable, incredible drug-addicted felons.[3] Mr. Barrett additionally seeks a COA on his sentencing claim that the Government's final argument violated Due Process.

Reasonable jurists could, and probably would disagree with the district

---

[1] Claims 4, 5B(1), Doc 95:264-70, 296-303. Mr. Barrett submits herewith a separately filed request for a COA on additional claims of prosecutorial misconduct and ineffective assistance arising from the same factual underpinnings which cannot be argued herein because it relates to matters subject to a protective order entered by the lower court (Doc 102).

[2] Claims 2A(9),(10), Doc 95:143-49, 150-54; Supplemental Claims 20, 21, Doc 201-1:2-30.

[3] Claims 5A, Doc 95:270-83, 294-96; 2A(5), Doc 95:61-120.

2

court's resolution of the claims asserted above and described in more detail

hereinbelow. *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003); *see also Tennard v.*

*Dretke,* 542 U.S. 274, 281-88 (2004). On Claims 20 and 21 of the Supplemental

Petition (Doc 201-1:2-30), Mr. Barrett has shown, "at least, that jurists of reason

would find it debatable whether the petition states a valid claim of the denial of a

constitutional right and that jurists of reason would find it debatable whether the

district court was correct in its procedural ruling." *Slack v. McDaniel,* 529 U.S.

473, 484 (2000). [4]

## III.  ARGUMENT.

**1.  The Court Should Grant a COA on the Ineffective Assistance of Counsel for Counsel's Failure to Impeach and Present Percipient Witness Testimony (Claims 2A(9), (10); Supplemental Claims 20, 21)**

Trial counsel's failure to competently cross-examine the government's

witnesses together with the failure to produce the testimony of readily-available,

reliable eyewitnesses, whose testimony would have refuted the Government's

version of events and supported Mr. Barrett's defense, fell below prevailing

---

[4]As a result of the evidence in support of each of the issues which was filed in support of his § 2255 Motion, Mr. Barrett should have received discovery and an evidentiary hearing. Mr. Barrett requested an evidentiary hearing twice, Doc 95 at 401; Doc 150. The district court denied the request. Doc 157, 214:190. 28 U.S.C. § 2255 makes clear Mr. Barrett's right to an evidentiary hearing on the issues raised. *Id.* at ¶2. *Accord United States v. Lopez*, 100 F.3d 113, 119 (10th Cir. 1996).

professional norms to Mr. Barrett's prejudice and, is, at the very least, debatable among reasonable jurists. *See* Claims 2A.9, 10, Doc 95:143-154; Doc 201-1:2-30.

Prior to the federal trial, there had been two state trials in which a number of witnesses including Toby Barrett testified for the state. Government witnesses testified significantly differently at the state trials than they did at the federal trial, which would necessarily effect the jury's consideration of the execution of the warrant and Mr. Barrett's knowledge that the middle of the night raid was a police action. Had trial counsel secured the prior transcripts and compared the testimonies of law enforcement witnesses, including Oklahoma Highway Troopers Poe, Greninger and Hamilton and Drug Task Force Agent Clint Johnson, the government's version of events would have been shown to be fabricated. *See e..g,* Doc 95:143-47. The statements of law enforcement officers were inconsistent with each other, and with their own prior statements. Despite the availability of those statements, trial counsel did little to impeach the law enforcement witnesses. The law enforcement witnesses' versions of events went to the core of both the prosecution and defense including: whether law enforcement or Mr. Barrett initiated the gunfire;[5] whether there was any emergency lighting or other indication

---

[5] *E.g.,* on-site OHP Trooper Jim McBride and DEA Liaison Danny Oliver told Gordon that the initial gunfire was from an automatic, which if true, means the gunfire was begun by law enforcement as Mr. Barrett did not have an automatic weapon. Doc 199-1, Exhs. 11:7, 15:8, (Docs 199-12 and 199-16) respectively). *See also,* Doc 199-1,

4

that would have notified Mr. Barrett that it was law enforcement encroaching on his property in the middle of the night; and, what, if any, drug-related activity in which Mr. Barrett was actively engaged on the premises.[6]

Similarly inexplicable, trial counsel did not call Toby Barrett and Alvin Hahn to rebut the law enforcement accounts of the raid. Doc. 95 at 149-154. Toby Barrett testified at the state trial that he did not see police lights until after the shooting was over. Doc 95 Exh 96 (Appendix B).[7] Toby's declaration directly contradicted the prosecutor's argument here that Mr. Barrett had an opportunity to observe the scene, see police lights and form the intent to kill before the shooting started. R. 4299-4302. In his sworn declaration submitted in the § 2255 Motion, Toby Barrett testified among other things that "nothing hit the [unmarked lead vehicle] until it came to a stop in front of the house" and despite having observed the approaching vehicles as they turned into the Barrett property, the first police lights he saw were "on the police car that crashed through the gate when the shooting was over." Appendix B:3.

---

Exh 14:11-12 (Doc 199-13) (Lt. Pettingill, ostensibly in charge of the raid says he thought it was "his people firing.")

[6] See Doc 199-1:17 ¶¶ 51-55 (Appendix A).

[7] For the convenience of the Court, designated declarations and other documents which support the claims upon which he seeks a COA are attached. They are not intended to be the entirety of Mr. Barrett's documentary support.

Counsel also failed to call Alvin Hahn to support Mr. Barrett's claim. Doc 95, Exh 75. Mr. Hahn submitted a declaration in which he states by the time he got to the window to see what was happening, the shooting was over and he saw at at least one vehicle with emergency lights on. The testimony of Toby and Hahn would have conflicted sharply with the government's witnesses, and supported Mr. Barrett's defense that he did not know, in the few seconds he had to act, that the people attacking his cabin in the middle of the night were law enforcement.

The witnesses's observations on the night in question are consistent with the observations of the OHP internal affairs investigator, Paul Gordon ("Gordon") assigned to investigate the shooting incident, who himself could have served as both a fact and expert witness for the defense. Appendix A ¶¶ 27-30. Gordon's observations are based, in part, upon interviews with the troopers and other law enforcement personnel on the scene. Gordon would have testified that the physical evidence and statements taken of the OHP troopers and other law enforcement officials was consistent with Mr. Barrett's claim that he did not know he was defending himself against law enforcement. *Id.*

The evidence could well have supported a jury finding that law enforcement knowingly testified falsely and *did not* engage their lights, emergency or otherwise, during the raid. Appendix A:10, 12 ¶¶ 23, 25. For example, Gordon would have

testified that OHP witness Hash's testimony, upon which this Court on appeal relied to find that the second and third vehicles emergency lights were on, was a lie. *See United States v. Barrett ,* 496 F. 3d 1079, 1090 (10th Cir. 2007). *See* Appendix A:13 ¶¶ 26, 30. There can be no reasonable strategy or tactic for omitting the evidence complained of, which at the very least, would have raised a reasonable doubt in this case. *See also,* Doc 201-1:2-30.

Neither the fact that Toby Barrett is Mr. Barrett's son nor that he could "presumably" testify concerning drug activity, Doc 214 at 164-165, justifies trial counsel's failure to interview and present the testimony, especially since Toby Barrett previously testified at the state trials. Nor is the district court's summary dismissal of the claims for counsel's failure to impeach law enforcement witnesses with readily available prior inconsistent statements, many of which were under oath, *id.*, at 162, beyond debate. A COA should be granted.

**B.    A COA Should Be Granted on the *Franks* Issue (Ground Four).**

The district court held the Fourth Amendment issue was procedurally barred from consideration in collateral proceedings because Petitioner was afforded the opportunity for a full and fair hearing in the trial court under *Stone v. Powell,* 428 U.S. 165 (1976).[8] The court held that any exception such as ineffective assistance

---

[8] The district court's finding that Petitioner had the required opportunity to press a *Franks* claim is incorrect. The district court recounts that an evidentiary

of counsel at trial and appeal, both of which are raised here as cause and

substantive error,  or *Brady*,[9] did not apply.  Doc 214:76.  The court also held, as it

did at trial, that because Johnson stated in the affidavit that Sanders had been

reliable in the past, no further inquiry was necessary.  Doc 214:67-70, 74-76.

On cross-examination, Sanders repudiated the statements which formed the

basis for the search warrant, evidencing that the information was false.  Trial

counsel failed to even cite the repudiation by Sanders to support of a request to

hear a *Franks* motion as a result of the clear incredibility and unreliability of the

confidential informant who purportedly provided the information to secure a no-

knock, nighttime warrant.  The trial court relied improperly on the  testimony of

the other informant witnesses, none of whom were identified until years after the

---

hearing was held on a motion to suppress filed by the defense, which was ultimately denied.  Doc 214 at 74-75.  However, this motion did not raise a *Franks* claim.  The identity of the confidential informant on the warrant was not revealed until trial.  The district court also suggested that due to issues raised on appeal, Mr. Barrett was precluded from raising the *Franks* claim in § 2255 proceedings.  Doc 214 at 75-76.  This is not the case. *United States v. Cook,* 997 F.2d 13123, 1317 (10th Cir. 1993)(remanding to determine whether appellate counsel was ineffective for failing to raise certain Fourth Amendment arguments).

[9] *See e.g., Smith v. Black,* 904 F.2d 950, 965 (5th Cir. 1990), *abrogated on other grounds, Stringer v. Black*, 503 U.S. 222, 227 (1992)(where prosecution suppresses *Brady* evidence relevant to a *Franks* challenge, suppression issue is not barred by *Stone v. Powell, supra* in collateral proceedings); *Kimmelman v. Morrison,* 477 U.S. 365, 383-91 (1985); *United States v. Owens,* 882 F.2d 1493, 1498-1500 (10th Cir. 1989)(*Stone* does not preclude raising a Fourth Amendment claim in collateral proceedings where counsel was ineffective).

fact, to support the credibility of Sanders' statements in the warrant affidavit.  Doc 214:75.  Because trial counsel failed to argue the pertinent facts, and the district court failed to consider them, Petitioner was denied a full and fair opportunity to have the *Franks* claim considered.  Appellate counsel was ineffective for failing to raise the issue as framed by the record and the district court's improper denial of an evidentiary hearing Mr. Barrett was improperly denied in district court.  *Gamble v. State of Oklahoma,* 583 F.2d 1161, 1165 (10th Cir. 1978).

Based on records submitted in the Section 2255 Motion (Doc 95:297-303, and exhibits cited therein, there is also reason to believe that Johnson's reliance on false or absent information was deliberate or at least in reckless disregard to the truth.  A District Attorney's investigation had uncovered evidence of official misconduct on Johnson's part, including embezzlement, perjury, illegal drug use, and misuse of office which would have fatally impeached Johnson's reliability as the affiant on the search warrant; and were substantial.  Evidence of Johnson's misdeeds was exculpatory to Mr. Barrett and bore on the validity of the search warrant affidavit.

The court rejected Mr. Barrett's claim that the government was under an obligation to disclose notwithstanding that the fact that Johnson was not an agent of the federal government.  *See* Doc 214:67-70  The court's finding that the

"evidence within the District Attorney's Office" impeaching Johnson's credibility "was not in the actual or constructive possession of the federal government," Doc 214:69, is wrong. This case was originally investigated by state authorities, and the government relied in substantial part on the state investigation and state law enforcement witnesses, including Johnson himself, whose search warrant set the entire chain of events in motion. County Sheriff John Philpot was the government's case agent at trial, and assisted the prosecutors in cultivating the informant witnesses. The government was required to disclose this evidence to the defense which would have invalidated the search warrant under *Franks*.

On the *Franks* claim, the district court did not discuss the myriad of facts known to the government and undisclosed which rendered Sanders an unreliable informant. Doc 95:273-78, and exhibits cited therein. In its response to the § 2255 petition, the government argued that it was the reliability of the affiant, not the informant, that was critical to a *Franks* issue. But the informant's reliability, particularly where, as here, no corroborating evidence for the informant's statements are included in the warrant affidavit, is relevant to a *Franks* inquiry. *E.g., United States v. Bernal-Obeso,* 989 F.2d 331, 335-36 (9th Cir. 1993). Johnson concealed from the magistrate the evidence showing his informant to be unreliable, including his lengthy criminal record, acts of dishonesty, use of drugs, many deals

10

as a CI, and his self-serving motives in providing information against others. At a minimum, reasonable jurists could believe that Johnson acted with reckless disregard for the truth by relying on Sanders as an informant and failing to provide the magistrate with material information bearing on the credibility of the informant, which would have vitiated the affidavit before any neutral and detached magistrate. Contrary to the district court's finding otherwise, Doc 214:75, where such information showing an informant to be unreliable exists, a warrant is not immune from a *Franks* challenge simply because the affiant includes unadorned, boilerplate language that he or she had found the informant reliable in the past. *E.g., United States v. Reddick,* 90 F.3d 1276, 1280-81 (7th Cir. 1996).

Mr. Barrett also alleged that Johnson acted with reckless disregard for the truth in seeking a nighttime, no knock warrant alleging danger to officers when he knew or should have known that Sheriff John Philpot had visited Mr. Barrett's property the month before the raid without incident. Doc 214:71-72, Doc 95, Exhs 6, 85, 97. The district court rejected this argument based on Philpot's affidavit that the last time he had been on the Mr. Barrett's premises was July 29,1998. Doc 174, Exh 1. Philpot's retraction of his prior statement is not dispositive of the issue; at a minimum, Mr. Barrett ought to have been granted further discovery and an evidentiary hearing on the what Johnson knew or should have known about law

11

enforcement's recent prior non-violent contacts with Mr. Barrett. A COA should

be granted.

**C.     A COA Should Issue on the Due Process Prosecutorial
         Misconduct Claims (Claim 5)**

Petitioner alleges and factually supports constitutional and statutory

violations establishing violations of *Brady v. Maryland*, 373 U.S. 83 (1963),

*Mooney v. Holohan*, 294 U.S. 103 (1935), and its progeny, *Napue v. Illinois*, 360

U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). Mr. Barrett

relies upon the facts set out in the Amended Motion and the exhibits thereto. Doc

95:272-96. A COA should be issued on the prosecutorial misconduct claims and

the related IAC claims of failing to seek a continuance and failing to adequately

investigating and challenging the Government's informant witnesses, Doc 95:61-

120 (Claim 2A(5)).

*1.     Charles "Monk" Sanders.*

The Government suppressed a wealth of exculpatory evidence which would

have impeached Sanders, including evidence of Sanders's complete criminal

history, omitting many felony convictions, arrests, and dismissed charges;[10]

---

[10]On direct, the government permitted Sanders to testify falsely that he had
only four prior felony convictions, when, in fact, he has at least eighteen and
numerous charges dismissed in exchange for his work as an informant. This was
not revealed to the defense. *Crivens v. Roth,* 172 F.3d 991, 995-96 (7th Cir. 1999);
*United States v. Hill,* 799 F.Supp. 86, 89-90 (D. Kan. 1992).

evidence of the breadth of Sanders's work as an informant, with many favorable

deals received over a long criminal career, all of which was relevant to his overall

credibility and motive to testify against Mr. Barrett and misled the jury.[11]  *See*,

Doc 95:273-78 (Claim 5 (a) (1)(i)) (Appendix C).[12]

### 2. *Travis Crawford*

In postconviction, Travis Crawford submitted a sworn declaration that he

falsely testified against Mr. Barrett out of fear and manipulation by the prosecutor.

Doc 96 Exh 45 (Appendix D).  The record also shows the government withheld

exculpatory impeaching information of Crawford's prior dealings with law

enforcement and drugs in violation of *Brady v Maryland,* 373 U.S. 83 (1963),

*Giglio v. United States,* 405 U.S. 150 (1972) and *Douglas  v. Workman,* 560 F. 3d

---

[11]The prosecution misled the jury by getting Sanders to agree that the prosecution would simply "talk to" state authorities in Sequoyah County in the several cases on which he was currently doing time, and would "talk to" authorities in Tulsa County in connection with a pending case Sanders had there. At, and shortly after, the conclusion of Mr. Barrett's trial, the sentences in Sanders' Sequoyah County cases were converted to straight suspended sentences with no supervision by the Oklahoma Department of Corrections pursuant to a "plea agreement with feds." Later, Sanders's obligation to pay costs and fines in these cases was lifted and Sanders received straight probation on his Tulsa County case. *Giglio v. United States,* 405 U.S. at 154; *Douglas v. Workman,* 560 F.3d at 1186.

[12]  *See also*, Supplemental Motion for Additional COA filed herewith under seal.

1156 (10th Cir. 2008). Doc 95:278-83 (Appendix E). Mr. Crawford's recantation meets the legal standards for newly discovered evidence under *United States v. Sinclair,* 109 F.3d 1527, 1531 (10th Cir. 1997). Rather than reject it as the district court did, Doc 214:44-50, it should have held an evidentiary hearing, especially in light of the corroborating declarations by Mr. Crawford's parents and Mr. Barrett's defense investigator. *See* Doc 95 Exhs 31, 92, 91 (Appendix F (Investigator), Appendix G (father), Appendix H (mother)).

### 3. *Randy Turman*

Randy Turman, a methamphetamine manufacturer who had a pending six count drug case hanging over his head at the time he testified against Mr. Barrett, falsely testified on cross-examination that his case had "done been taken care of," when, in fact, it had not. The government sat silently by while their witness perjured himself. The case was still pending when Turman testified, flatly contradicting his testimony and implication that he had nothing to fear from the authorities.

### 4. *The Constitutional Claims*

Trial counsel, deceived in part by the court and government following the *ex parte* communications, failed to seek a continuance to investigate the seven secret informants, including Sanders, Crawford and Turman. Even moderate inquiry

14

would have shown these witnesses were unworthy of belief.  The district court

assumed without factual basis Barrett must have known what the witnesses would

say and failed to communicate it to his counsel. Doc 214:147.  Equally

unreasonable is the lower court's reliance on trial counsel's delusions that they

could effectively impeach the witnesses without sufficient time or investigation,

Doc 214:147, and the assumption that the obvious incredibility of witnesses'

testimony made further impeachment harmless.  *Id*., at 148-49.

The district court's finding that it was unrealistic to expect the federal

prosecutors to know all information possessed by state officials affecting a federal

case,'" Doc 214:52 (citation omitted), is not supported by the circumstances here

which suggest a very close working relationship between state, local and federal

agents imposed upon the government a duty to know or search out and disclose

exculpatory information in the possession of the state.  *See United States v. Bagley*,

473 U.S. 667 (1985); *United States v. Antone*, 603 F.2d 566, 570 (9th Cir. 1979).

This Court itself acknowledged the working relationship between the federal and

state agents, and the many state agent witnesses upon whom the government relied

to prove its case.  *Barrett,* 476 F. 3d at 1090.[13]  Reasonable jurists could disagree

---

[13]  "[T]he search warrant for Barrett's residence was issued to not only state law enforcement officers, but also to "Special Agents and Task Force Officers of the Drug Enforcement Administration, Special Agent[s] with the Bureau of Alcohol, Tobacco and Firearms, or any other ... federal peace officer."

with the district court's summary dismissal of the IAC and misconduct issues related to the late identification of the witnesses together with a failure to fully disclose impeaching information and permitting perjury.

**D.      A COA Should Issue on the Right to Supplement and Amend the Petition with Additional Claims of Ineffective Assistance and Prosecutorial Misconduct. (Docs 201, 212)**

This Court did not know when it affirmed the convictions and sentences of Mr. Barrett that Oklahoma Highway Patrol 2d Lt. Paul Gordon, a career law enforcement officer then serving as the internal affairs investigator for the shooting has personal knowledge of the events of September 24, 1999 which refuted in every material way the government's version of events. Gordon's personal knowledge of the relevant events included observation of physical evidence and statements by the testifying and non-testifying law enforcement officials at the scene. The investigation unambiguously confirmed Mr. Barrett's defense that there was no emergency lighting or notice to Mr. Barrett that would have made known to him that the onslaught of vehicles on his property in the middle of the night was law enforcement. Appendix A:10-12. Despite the evidence and innuendo later offered against Mr. Barrett, on the night of the raid, there was no indication of drug making on Mr. Barrett's premises. *Id.,* at 15, 17. With his expertise as a special investigator of OHP protocol, practices and training and his

16

personal observations, Mr. Gordon was perhaps the most important witness available. Yet, he was not called by the defense, but instead falsely and maliciously prosecuted by the state to suppress or diminish his testimony and intimidated by the federal prosecutor. Doc 201-1:2-30 (Supplemental Claims 20, 21).

The Gordon declaration was filed on March 16, 2012 in support of the pending Amended § 2255 Motion to Vacate, with a simultaneously filed Motion for Leave to File Supplemental or Amended Petition. Doc 201. The Supplemental Petition expanded the pending claims to include the factual allegations made by Trooper Gordon as they related back to the claims of ineffective assistance of counsel for failure to investigate and interview available witnesses, specifically Mr. Gordon, failure to adequately develop and challenge the warrant and the *Franks* issue, with state trial judge, Hon. John Garrett, as witness, *see* Doc 200, and the failure to challenge the credibility of law enforcement witnesses including Troopers Hash and Hamilton, Sheriff Philpot, and Drug Task Force Investigator Johnson.[14]  *See* Doc 201, 212. Mr. Barrett did not set out entirely new claims but

---

[14] *See* Doc. 95, Claim 2A(3), (8), (10):47-58, 139-43, 149-54); Doc. 95, Claim 2A(9):143-49; Doc. 95, Claim 2A(7):127-39). *See also,* Doc. 95, 2A(11):159-63; Claim 5B(3):307-08) (approaching Mr. Barrett in a non-confrontational manner and properly identifying themselves, would have avoided the violent confrontation);  Doc. 95, Claim 2A( 2):34-47, Claim 5B(1),(3):296-303, 307-08 (no *Franks* challenge to the no-knock, nighttime warrant).

17

specifically confined his supplemental issues to relate back to issues pending in the

§ 2255 Motion.  *See United States v. Espinoza-Sainz,* 235 F. 3d. 501 (10th Cir.

2000); *see also Mayle v. Felix,* 545 U.S. 644, 664 (2005).  Additionally, the

government failed to discharge its *independent* duty to reveal what Gordon knew.

Instead the government intimidated him during the trial, and left undisclosed much

of Gordon's evidence and the fact that law enforcement concocted baseless

criminal charges against him to prevent or undermine his testimony.  The

government cannot profit from or take advantage of its own misconduct to keep

these facts from being heard now.  *In re Pickard,* 681 F.3d 1201, 1207 (10th Cir.

2012).

Gordon's testimony renders the government's version of events riddled with

profound doubt. No reasonable jurist hearing it would have found Mr. Barrett

guilty of capital murder.  It is far more likely a jury would have acquitted Mr.

Barrett and undoubtedly deter any rational jury from imposing  death.

The lower court denied the Motion for Leave to File a Supplemental Petition

to include the claims of ineffective assistance of counsel and prosecutorial

misconduct without mentioning the Gordon declaration or its contents.  Doc 214 at

1.[15]  The proposed supplemental petition states valid claims of the denial of

---

[15] *See* Doc 210:2 (denying the Motion under Fed.R.Civ.P. 15 (a)(2), (d)).

constitutional rights. Jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack,* 529 U.S. at 484.

### E. The Prosecutors Violated Due Process in Closing Argument (Claim 5 (C)).

The examples of prosecutorial misconduct in the penalty phase closing arguments are numerous and set out in full in Mr. Barrett's Second Amended § 2255 Motion and Brief in Support. Doc 95:315-20.

The prosecutors improperly aligned themselves with the jury by the use of first person pronouns during their argument, arguing:

> It is not *our* job here to forgive. *We* are not the victims of the Defendant's brutality. It's not *our* job to feel guilty. . . . The murderer . . . [is] the one that put *us all* here. But *we* must not refuse to do *our* duty just because *we* can't make the victim's family or friends or community whole.

R 5421-22. Mr. Barrett's case is directly on point with *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) where this Court held it was "extremely improper argument" because "it profoundly misleads the jury" about its role in the criminal process "by suggesting that jurors are part of 'the team' of the prosecution and police, rather than impartial arbiters between the State and the defendant." *Id.* In this case, where the victim is a law enforcement officer, the improper alignment is especially egregious. A COA should issue.

## VI.    CONCLUSION

In addition to the claims upon which a COA has been granted by the Circuit Judge, Mr. Barrett's request for an expanded COA on the claims set out above should be granted.

DATED this 13th day of May, 2013

Respectfully submitted,

/s/ *David B. Autry*
DAVID B. AUTRY, OBA No. 11600
Attorney at law

HEATHER E. WILLIAMS
Federal Defender, Bar No. 122664

/s/ *Joan M. Fisher*
JOAN M. FISHER, ISB No.2854
Assistant Federal Defender
TIVON SCHARDL
Assistant Federal Defender

Attorneys for Petitioner/Appellant
KENNETH EUGENE BARRETT

## CERTIFICATE OF ELECTRONIC FILING AND SERVICE

This is to certify that on this 13th day of May, 2013, I caused the foregoing

Motion for Certificate of Appealability And Statement of Issues to be filed with

the Clerk of the Court of Appeals using the ECF System for filing and with

service to be made electronically on the following ECF registrants:


Jeffrey B. Kahan,
United States Department of Justice,
jeffrey.kahan@usdoj.gov,

Christopher J. Wilson,
Assistant United States Attorney,
chris.wilson@usdoj.gov

Linda Epperly
Assistant United States Attorney
linda.epperly@usdoj.gov
United States Department of Justice,
Eastern District of Oklahoma,

To the undersigned's knowledge, there are no non-ECF registrants who are
counsel in this case.

Dated:   May 13, 2013        /s/ *Joan M. Fisher*
                             Joan M. Fisher

## Index to Appendices

Declaration of Paul Gordon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

Declaration of Toby Barrett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B

Excerpt From Doc 95 pp. 273-278 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C

Declaration of Travis Crawford . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D

Excerpt From Doc 95 pp. 278-283 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E

Declaration of Leonard Post . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F

Declaration of Roger Crawford . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G

Declaration of Phyllis Crawford . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . H

# Appendix A
Declaration of Paul Gordon

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Movant/Defendant, | ) | **DEATH PENALTY CASE** |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | NO.  6:09-cv-00105-JHP |
| | ) | |
| Respondent/Plaintiff. | ) | |

_____

## DECLARATION OF PAUL D. GORDON

_____

## DECLARATION OF PAUL D. GORDON

Paul D. Gordon, a person over eighteen (18) years of the age and competent to testify and mindful of the penalties of perjury, deposes and says as follows:

1. I am currently a Senior Instructor at SOR Training Center, and conduct CLEET re-certification and certification training for security officers and investigators.

2. I am retired from the Oklahoma Highway Patrol ["OHP"]. I was assigned to the OHP Internal Affairs Division on April 1, 1999. On September 24, 1999, I was the on-call lead investigator and was assigned to investigate the shooting incident which resulted in Trooper Rocky Eales's death and charges of murder against Kenneth Barrett.

3. At the time of the call to the shooting event, I lived in the Wellston area, which is approximately 25 miles northeast of Oklahoma City on I-44, or the Turner Turnpike.

4. My experience and qualifications to conduct investigations for Oklahoma Highway Patrol Internal Affairs Division in September of 1999 are set out in my resume, which is attached hereto, Exhibit 1, and includes but is not limited to the following:

        a. I was employed with the Oklahoma Highway Patrol from February 1, 1984 until my retirement in 2000. My primary duties in that employ included Supervisor of Firearms and Defensive Tactics for the State of Oklahoma and the training of the Governor's protective detail in a fifty (50) hour basic protection school and advanced protective efforts by solo officers.

        b. Vocational Training during my tenure with the Oklahoma Highway Patrol

**DECLARATION OF PAUL D. GORDON -1**

*PDG*

included: the Oklahoma Highway Patrol Academy; Booby Trap Devices Recognition; Semi-Automatic Pistol Transition Course; Advanced Shooting Skills; Instructors Orientation Course; Hazardous Materials Awareness Training; CLEET Security Instructor Certification; Criminal Investigation Academy; Police Survival Course; CLEET Firearms Instructor School; Protective Security Operations Training Program; Bomb Threat Management; Narco-Terrorism Executive Protection Course; Incident Management Training; Defensive Tactics Instructor Training; C.E.R.T. Training, TTT, Sniper School; Hazardous Material Awareness; Advanced Material Awareness; Hazardous Materials- Operations; Hazardous Materials - Incident Commander; Physical Security Specialist Training Program; Fugitive Investigator Training Program.

5.     On the morning of the shooting on September 24, 1999, I took the call for 1st Lt. George Randolph, also of Internal Affairs. At approximately 0130, I received a call from the DPS Com Center in Oklahoma City. The Com Center dispatcher advised that there were two troopers down in a shooting incident in Sequoyah County. Both troopers were members of the Tactical (or Tact) Team, but it was unknown why they were at the location of the incident.

6.     At approximately 02:00, while driving to the location, Bob Ricks, the Highway Patrol Commissioner, called and told me that the Tact Team had been set up and he wanted me to go over the entire scene and find out exactly what happened.

7.     Upon arrival to the location I conducted several on-scene interviews that were

**DECLARATION OF PAUL D. GORDON -2**                    $\underline{PDG}$

limited in nature and observed the scene as it was at the time of the event, as well as, much of the physical evidence that would later be collected.

8.    When I arrived on the scene, I initially spoke to Lt. Kerry Pettingill, who was responsible for the mission.  Pettingill advised me that when everything started he thought it was his men who started shooting at the Barrett cabin as they rolled up on it.

9.    At the scene that morning, I was the fourth trooper to enter the Barrett cabin after the event and made a videotape recording of the scene and the interior of Mr. Barrett's cabin with my personal video camera because the OHP camera did not work.  I have reviewed that videotape to refresh my recollection.

10.    During the course of my investigation of this incident, three things were made clear to me:  (1) that the East Tact Team of the Oklahoma Highway Patrol had failed to follow appropriate protocol in the execution of the warrants at the residence of Kenneth Barrett on September 24, 1999; (2)  that neither the Oklahoma Highway Patrol nor the Oklahoma State Bureau of Investigation ["OSBI"] desired or pursued a thorough objective investigation of the incident and events following the incident; and, (3) my efforts to conduct a thorough objective investigation resulted in attempts by the State of Oklahoma to undermine that investigation and my ability to credibly conduct and report the same.

The facts supporting these conclusions are set out below.

11.    There were a number of things that happened in my investigation which were not the usual Internal Affairs's investigatory practices.

**DECLARATION OF PAUL D. GORDON -3**

a.      First, I was not permitted to attend Rocky Eales's funeral by order of my captain. Captain Burris advised me that my attitude concerning the Eales's shooting investigation had caused bad feelings so I needed to stay in Oklahoma City and watch the office.

b.      Secondly, I was not allowed to talk to any of the Tact Team members involved for ten (10) days, even though the usual practice was 72 hours. This directive came from the top of the Highway Patrol per Captain Burris. By the time I was able to talk to the troopers involved, they had already met with a "counselor" and had legal counsel, Gary James, the Trooper's Association counsel.

c.      OHP brought the Troopers' Association legal counsel, Gary James, to the shooting scene.

d.      On the afternoon of September 24, 1999, with the exception of Trooper Ricky Manion who shot Barrett, all of the involved troopers denied firing their weapons and none were willing to give up their state-issued weapons for analysis and testing, despite being routine in any officer-involved shooting. The troopers ultimately had to be ordered to comply and surrender their weapons for analysis.

12.     I did not interview Mr. Barrett; I was advised, however, that 1st Lt. Randolph did interview Mr. Barrett at St. Francis Hospital in Tulsa, Oklahoma where Mr. Barrett was taken after the shooting for gunshot wounds and apparent injuries sustained in a beating by later-identified law enforcement officers at the scene. In the course of my investigation, I asked Lt. Randolph for the Barrett interview tapes and any notes he might have taken during the interview but Lt. Randolph ignored my request. I was never given the information, recordings or notes.

**DECLARATION OF PAUL D. GORDON -4**                    PDG

Recording interviews and taking notes is called "locking them into their statement," and was standard practice for Internal Affairs.

13.     When I arrived at the scene on the morning of the shooting, I interviewed or attempted to interview DA Diane Barker-Harold, who was among the group of dignitaries or observers that tagged along with the Tact Team.  I asked her who the informant on the warrant was to which she replied that "we" know the identity of the informant, but she was not going to disclose this to me.  I did not expressly inform DA Barker-Harold that I was tape recording the interview; however, as I spoke to her, I was holding the tape recording device in my hand without trying to hide it.

14.     I routinely used a recorder in all of my investigations with the full knowledge and approval of my supervisors.  Despite that fact, I was advised by my superior, Captain Burris that Ms. Barker-Harold had filed a complaint against me for recording her and that I should not have used the recorder.  Captain Burris told me to give him the tape recording of Barker-Harold.  I refused, stating the recorder was an accepted investigation tool and that it was part of my investigation.  Burris forbade me from any further contact with Dianne Barker-Harold or other local law enforcement who filed complaints against me because no contact is to be attempted by the trooper to the complaining party until the complaint was resolved.  I never saw any written complaint and I was never advised to address the complaint in writing which would have been the first step in the complaint process.  The original of the tape recording of Dianne Barker-Harrold and tapes of interviews of other parties involved in the Barrett shooting were given to Lt. George Randolph when I retired from the patrol under pressure in 2000.

**DECLARATION OF PAUL D. GORDON -5**

PDG

15. At the shooting site on September 24, 1999, I asked Lt. Pettingill and others on the scene who was responsible for the planning of the mission. I was admittedly vocally critical of the lack of appropriate surveillance and planning before attempting to execute a High Risk Fugitive warrant. As a result, I was advised by Captain Burris and several others there that I was not a "team player" and that I should adjust my attitude.

16. Despite the fact that as the primary investigator I was responsible for the investigation, I was denied any access to the state troopers on the morning of the shooting. The troopers had written statements which were collected by the Troopers Association attorney Gary James. I was never given access to those statements from me throughout my investigation.

17. I was not given any access to the troopers for a number of weeks. When I was given access to them, I was permitted to ask only questions which were pre-screened and approved by Lt. George Randolph. Those questions are reflected in the recorded statements which I provided to Mr. Barrett's counsel identified below.

18. In interviewing the troopers who were involved in the shooting incident, I was prevented from asking questions which would have been routine in any officer-involved shooting incident, specifically a drug or fugitive warrant service like the Barrett raid. Those questions are set out below and are questions which I specifically remember wanting to ask and others which are found in the 1988 U.S. DEPARTMENT OF JUSTICE DRUG ENFORCEMENT HANDBOOK that I had received in a class prior to the shooting incident and which I would normally have consulted in preparation for the interviews.

    a. Number of suspects confirmed by real time eyes on surveillance
    b. The group makeup of persons involved (male or female)

**DECLARATION OF PAUL D. GORDON -6**                                                 PDG

c. Were children at the arrest site?

d. What were the approximate ages of the occupants?

e. Did you have current photographs of your target?

f. Number of suspects at the targeted location at any given time.

g. The full name and background of the target.

h. The capabilities of the suspect, considering the following:

> *i.* What type of criminal violations had Barrett committed?
>
> *ii.* What target classification did the OHP Tact team assign to Barrett?
>
> *iii.* What was Barrett's previous police record involving physical violence?
>
> *iv.* Likelihood of resistance by Barrett;
>
> *v.* Physical and mental condition of Barrett;
>
> *vi.* Was Barrett a user of drugs?
>
> *vii.* Was Barrett suffering from mental problems?
>
> *viii.* Was Barrett known to assault police?
>
> *ix.* Did Barrett have a record of resisting arrest or using firearms against law enforcement?
>
> *x.* Was Barrett usually armed at all times and if so, with what kind of weapon
>
> *xi.* Did Barrett have a military background?
>
> *xii.* Was Barrett knowledgeable about explosives?
>
> *xiii.* What was Barrett's mode of transportation?

i. What type of safety equipment were you provided with?

j. What was the exact geographical location of the Barrett Cabin?

k. Who provided the interior layout of Barrett's cabin?

l. Please provide me with a picture of the cabin or sketch of the property?

m. How were the doors and windows of the cabin secured?

n. Please provide me with an aerial map with the Barrett cabin marked on it?

o. What was your primary and secondary approach and escape routes to and from Barrett's cabin?

p. What type of material is Barrett's cabin constructed of?

q. What type of alarm systems were present?

r. What type of guard animals were on the property?

s. What type of utilities were at the Barrett cabin?

t. What were the written rules of engagement?

u. What was the mission abort signal?

19.    The trooper interviews which were ultimately permitted took place in late October to early November of 1999 in my office. They were recorded and followed the script which was required and pre-approved by Captain Burris. Even then, if any trooper had a complaint about

**DECLARATION OF PAUL D. GORDON -7**


the manner in which I handled the investigation, he could go directly to my superior, Captain Burris and file a complaint. I am unaware of any complaints.

20.    One of the routine steps I took in this investigation was to try to acquire the procedural handbook for the East and West Tact Teams. When I asked for the handbook from Lt. Kerry Pettingill at his office, he told me it was not available. I told him if it needed to be printed I would come back and pick it up. He then told me "you'll never see this book." At that time, I went to my supervisor Captain Burris and advised him of Lt. Pettingill's statement. Burris told me he would get a copy of the Tact Team manual or handbook for me. About twenty minutes later, Burris refused to get me a copy of the manual, telling me it was a restricted document. About an hour later, Asst. Chief Jerry Cason walked into my office and asked me why I wanted the Tact Team book. I told him it was investigative protocol to obtain whatever manual was being used by the officer or unit at the time of the event. Cason told me I would never see the book as it was a restricted document. The lack of cooperation within the OHP upper ranks made the Internal Affairs investigation difficult, to say the least.

21.    Within a few days of the refusal to give me the manual, however, when I went to my office, IASI secretary Carol Rawlings told me that there was a bunch of papers lying on the floor inside my office. When I went into my office, I found the papers and among them was the Tact Team handbook that Pettingill had refused to give me. I asked Carol who had been in my office. She said she did not know; that the papers were there when she put a message on my desk.

**DECLARATION OF PAUL D. GORDON -8**

22.     The manual recited that when a raid was being conducted on a suspected drug house, the Tact Team was not to conduct the raid without clearly identifying themselves as law enforcement officers.  Otherwise, the suspected drug dealer would think that he was being "ripped off," setting the stage for a violent confrontation.  The copy of the Tact Team Manual which appeared mysteriously in my office was left with Lt. Randolph when I retired.

23.     My investigation made clear that the OHP East Tactical Team failed to follow the handbook protocol, at the very least, in this regard:  the Broncos were unmarked and the troopers did not activate their emergency lights to warn Barrett he was dealing with the police.  When I arrived at the shooting scene on September 24th, the vehicle that was fired upon had its visor flip and emergency lights in the up position as were Lt. Pettingill's, the team leader.  When I talked to Trooper Hamilton later, I asked him specifically about the lights.  At first, Hamilton said the emergency lights were down.  I told him that the flip lights would have been shot up if they had been down.  After the recording had been turned off, Hamilton admitted to me that did not activate the lights; in fact, that they did not have any lights on at all.   Under the circumstances admitted to me and observed by me, Mr. Barrett would not have known the incoming vehicles were law enforcement.

24.     Among other things, my investigation also revealed the following:

        a.      On the night of the shooting, there was good visibility because there was a full moon with no clouds of any kind.

        b.      Mr. Barrett's residence was a homemade cabin with no electricity and no running water, undermining any fear of destruction of evidence by announcing law

**DECLARATION OF PAUL D. GORDON -9**                                    PDX

enforcement's presence.  Mr. Barrett did run an electric cord from his mother's residence which was next door to both his garage and cabin.

    c.    There had been a "drive by" earlier in the day, with four troopers participating.  The troopers used one of their unmarked tactical vehicles.  The tell-tale antennas, which could identify the vehicles as law enforcement vehicles, had been removed.

    d.    At the time of the drive-by, Mr. Barrett and an unknown individual were standing in the yard and reportedly witnessed by the drive-by troopers.  Because the road fronting Mr. Barrett's property dead-ended to the east, the vehicles had to turn around and drive back past the property.  There was nothing about the vehicles to convey to Mr. Barrett or anyone else present that the vehicle was law enforcement.

    e.    There had been a fly-over of the property, which only lasted 15-20 seconds the day before the execution of the warrant.

    f.    No real time surveillance had been conducted up to the start of the raid to ensure intelligence integrity of the mission.

    g.    The gate to Mr. Barrett's property was open at the time of the drive-by but on the  night of the raid, the gate was closed and locked.

    h.    Earlier in the night before the raid, Mr. Barrett and his son, Toby, had reportedly been working on a vehicle in the garage on the property.  In my professional opinion, if proper real time surveillance had been conducted, Mr. Barrett could have been approached and taken by surprise at that time and taken into custody without incident.

    i.    The information relayed to the troopers prior to the execution of the

**DECLARATION OF PAUL D. GORDON -10**

warrant regarding Mr. Barrett's dangerousness was that Mr. Barrett's likely response to law enforcement was to run away. Among other things, this was supported by Trooper Manion's interview, Mr. Hise's interview and the placement of OHP manpower at the two adjoining residences to prevent Mr. Barrett's safe escape to either residence.

25. Based on my observations at the Barrett residence the night of the incident, review of the physical evidence, and interviews with the surviving troopers and other people present or in the area, it was clear that none of the vehicles which approached the residence were driving with their emergency lights activated but that they had, in fact, rolled in dark, not even using headlights initially because of the full moon.

26. The task force investigator, identified to me at the scene as Frank Lloyd, who was in the lead vehicle of the caravan of state agents, which was supposed to arrive after the state troopers secured the scene, stated that as they approached the scene, Lloyd could see the Tact Team's brake lights when they turned into the Barrett drive. Mr. Lloyd did not mention to me at the scene that morning seeing overheads, rear deck lights or any emergency lighting as they came on the scene which was over by the time they arrived.

27. The physical evidence supported the conclusion that the officers did not have their emergency vehicle lights on. For example, Hamilton's unmarked Bronco's windshield was damaged by bullets but the emergency lights, which if in use would have been in the line of fire were undamaged.

28. Though Trooper John "Buddy" Hamilton, who was driving the lead vehicle, initially advised me that his emergency lights were on, when confronted with the physical

**DECLARATION OF PAUL D. GORDON -11**                    PDX

evidence, he admitted to me that he was not running his lights. Though the admission came after I turned the tape recorder off, it would most likely be reflected in my notes of the interview. Those notes were left with Lt. Randolph.

29. Trooper Hash, who was in a marked unit, also claimed he drove onto the property with his lights and his flashing bar on, but ultimately admitted that somebody just flipped the lights on after the shooting to give needed light during the wounded troopers' evacuation. I have a clear recollection of Trooper Hash's admission regarding the emergency lighting to me, which came after I turned the tape recorder off and Trooper Hash continued to talk. The statement is likely reflected in my notes of the interview which were left with Lt. Randolph when I retired.

30. Lt. Pettingill's lights, which if activated would have been obvious to Barrett if he looked in that direction, were, in my professional opinion, in the up position because the flipped down lights would have impaired Assistant Team Leader McBride's vision for observation of the raid from their vantage point in the yard next door, which was Kenny Barrett's mother's home.

31. Mr. Barrett would not have seen the other vehicles approaching from the side in any case, because even when he reportedly was outside the residence, he was on the porch looking where his son was yelling for help. Troopers Darst and Hise had tackled the son in the yard by the garage after they came across the gate in the dark.

32. The physical evidence and interviews made it clear that Mr. Barrett never left the porch and never went into the yard and that he only responded to the first tactical vehicle when it was accelerating towards the front of the residence, after making a circle in the yard from the side of the cabin.

**DECLARATION OF PAUL D. GORDON -12**                                 *PDG*

33.     When Trooper Hamilton was driving up to the cabin after turning off the main road, he bottomed out hard in a depression on the east side of the cabin, an incident which would have made considerable noise and made him slow down and then gun the vehicle to get out of the deep depression.

34.     The vehicle then ran or slid into the front of Mr. Barrett's cabin, stopping with engine still running.  Barrett was on the porch, shooting at the vehicle from a 45 degree angle, slightly elevated position and hit the vehicle's transmission lines which, under engine power, caused a major transmission fluid leak that emptied the transmission fluid onto the ground exactly where the vehicle originally stopped and the shooting occurred.

35.     With appropriate expert testing, this transmission fluid may still be detectable on the Barrett property and able to establish the precise location of the lead Bronco during the shooting incident.

36.     According to Lt. Pettingill, the Hamilton vehicle was backed out away from the house to be used to transport Trooper Eales.  Because the vehicle would not drive forward due to transmission fluid loss, another vehicle was selected for the transport.

37.     As a result, on the evening of September 24th, OSBI with the assistance of OHP Vernon Phillips, inappropriately processed the Eales /Hamilton vehicle at the place where the vehicle had been moved, rather than where it had been positioned during the shooting.

38.     I advised my supervisors Lt. George Randolph and Captain Rodney Burris that the vehicle was being processed in the wrong place and would give the wrong evidentiary information about location and bullet angle.  They both advised me this was an OSBI

**DECLARATION OF PAUL D. GORDON -13**

investigation and to stay out of it. I filmed the process showing where the processing effort took place for further review.

39.     My recollection of these events are substantiated by the statements of the surviving troopers that when Trooper Eales exited his vehicle with the ballistic shield he turned towards Barrett and then turned and walked to the rear of the vehicle where he collapsed. The troopers retrieved the trauma kit by knocking out the rear window of the vehicle and cared for Eales at the rear of the vehicle where he had collapsed. The troopers and others then loaded Eales into the vehicle and moved the vehicle back to where OSBI later processed it.

40.     The video clearly shows that the Hamilton vehicle is behind the ballistic shield and trauma kit, indicating an obvious movement.

41.     When I first arrived on the scene in the early morning hours of September 24, 1999, 1st Lt. Pettingill told me that everything was laying where it was dropped during the event including the transmission fluid in front of the porch.

42.     Trooper Hamilton claimed to me that his brakes failed, but when I had the brakes tested at the DPS garage, they were found to be in good operating order and that nothing was lodged under them.

43.     Since the vehicle was unmarked and no other vehicles were running their lights, and without any announcement that law enforcement was on the property, Mr. Barrett, or any person like Mr. Barrett, who was paranoid as a result of his-off-the-grid lifestyle, would reasonably have believed that he was shooting at criminal intruders.

44.     Most of the rounds fired by Mr. Barrett were fired from inside the house which are

**DECLARATION OF PAUL D. GORDON -14**                    _PDG_

also visible in the video I made that morning.  Trooper Manion shot Mr. Barrett in the legs in the residence.

45.     When the shooting stopped, Mr. Barrett was handcuffed behind his back in the house and dragged out onto the porch by Trooper Hamilton and searched by Trooper Manion for weapons.  Mr. Barrett was searched at least a total of two times while at the scene, once by Trooper Manion and again when taken into custody by the Sheriff.  His clothing would have been thoroughly searched at that time.  Neither Trooper Manion nor the sheriff reported that anything other than the S&W semi-automatic handgun was found on Mr. Barrett's person  found by Trooper Manion.

46.     I know that Sheriff Philpot and his deputies searched Barrett before they beat him as a result of my interview with the sheriff.  I observed the sheriff walking across the Barrett yard on the morning of the 24th.  I asked him who he was and he told me that he was the sheriff.  I asked him if he had any contact with Barrett and he advised me that he and his deputies searched Barrett when they took custody of him.  I asked the sheriff specifically at that time if they found any guns or anything else dangerous on Barrett and he said no.

47.     Every trooper, and certainly drug task force members, would have answered the question of whether anything dangerous had been found would have responded "yes" if Barrett had red phosphorus on his person because of the inherent dangers of inhalation, absorption and ingestion associated with red phosphorous, not to mention flammability problems.

48.     At the time of our conversation, outside of my OHP vehicle, I asked the sheriff if he would let me conduct a formal interview while we were there at the scene and he consented.

**DECLARATION OF PAUL D. GORDON -15**



During this tape-recorded interview inside my OHP vehicle on September 24, 1999, Sheriff Philpot admitted to me on tape that he and his deputies beat Barrett badly, saying they had done all they could and would have done more if there had not been so many people around. Sheriff Philpot never mentioned red phosphorus to me at that time or I would have notified all of the troopers involved to take necessary decontamination procedures. Anyone with any understanding of red phosphorous who found anything which had come into contact with red phosphorous would immediately have reported it because of the danger of contact transfer from hands to your face within 5 minutes and in your eyes requiring immediate medical attention. Sheriff Philpot did not mention either the pill bottle or the baggie in the pill bottle with red phosphorous residue in it.

49.     The tape of this interview was kept with all of my investigative tapes related to this matter and turned over to Lt. Randolph when I retired.

50.     OHP divides the state into Western and Eastern Tact Teams; the raid on Mr. Barrett's property was undertaken by the East Tact Team. Assistant Team Leader Lt. McBride, who was assigned to the West Tact Team, was temporally assigned to the East Tact Team. I interviewed Lt. McBride. After the formal approved questions had been asked and answered and the tape recorder turned off, Mr. McBride became very emotional and told me that he had recommended that East Tact Team abort the mission because the raid was going to be undertaken with inadequate information and planning and no real surveillance had been conducted, but his advice was not taken. McBride was advised by the East Team to go back to the West Team if he did not want to participate. McBride was so upset over what happened that he began crying by

**DECLARATION OF PAUL D. GORDON -16**



the end of the interview.  Though the recording does not reflect this portion of the conversation, my notes would most likely reflect it.  Those notes were given to Lt. Randolph when I retired.

51.    Mr. Barrett's property was thoroughly searched the morning of the shooting. This included agents going layer by layer through the ashes in his burn barrel behind the cabin.  There was nothing found that  I observed which indicated drug activity nor was I ever advised that anything had been found by anyone.

52.    I was never advised that there was any information to support an anticipated finding of drug manufacturing at Barrett's residence but rather was informed that Mr. Barrett was believed to be an enforcer, *i.e.,* he facilitated sales of drugs between buyers and sellers who might not want to deal directly with each other.

53.    There was no air monitoring device at the scene and I did not see any of the investigators wearing special gear consistent with an active meth lab.

54.    Prior to entering the premises to videotape the inside of the cabin, the property was cleared by Vernon Phillips, who was also an OHP Tact Team member and Explosive Ordinate Disposal ["EOD"]  expert and per meth lab requirements, would have alerted everyone to any possibility of booby traps or dangerous drug activity in the residence.

55.    I entered the premises without any special personal protective equipment, such as eye protection, vinyl rubber gloves, special protective clothing, or rubber boots.  Where exposure levels are unknown, persons entering a potentially dangerous area would wear a full-face, positive-pressure, and air-supplied respirator.  I was not instructed to discard contaminated clothing or shoes, which would have been the case if a meth lab was present in any one of its

**DECLARATION OF PAUL D. GORDON -17**

three forms: boxed; set-up not functional; or, set up functional cooking.

56.     The Manual and Training Videos available to the East Tact Team at the time make clear that on September 24, 1999, the manner of serving or executing the High Risk Warrant/s on Kenneth Barrett was against protocol, grossly unprofessional and created far greater risk of injury or death than the situation would have presented if appropriate planning and measures had been taken.   I have provided these videotapes to Mr. Barrett's counsel and can attest that they were available to the East Tact Team for training prior to the execution of the warrant at Mr. Barrett's residence on September 24, 1999.  Exhibit 2 (DEA Dangers of Drug Labs), Exhibit 3 (The Meth Lab), Exhibit 4 (Kitchens of Death).  In 1989, three sections of Exhibit 4 "Kitchens of Death" were required viewing by the OHP.

57.     As my investigation continued, I was advised by at least two state troopers to watch my back and that the Highway Patrol was after me.

58.     At one point in my investigation, Lt. Randolph, Captain Burris, and Jerry Cason came into my office with others, whose identity I do not recall, and aggressively accused me of putting the wrong serial number for Rocky Eales' gun in my report.  I was told that the Widow Eales had noticed it and brought it to their attention while she was reading my un-released report. I told them that I had taken the number from the OSBI report and pulled that report out to show them that OSBI had recorded the number incorrectly.  I corrected the serial number on the report. More importantly, I inquired, why anyone from outside the division had access to my on-going investigation.  I was advised that they wanted to nominate Rocky for a medal of honor and had sent the report to Dallas and that they had let Mrs. Eales review the report.  I again pointed out

**DECLARATION OF PAUL D. GORDON -18**



that the investigation summary report was taken from my computer without my permission, authorization or even notification. I told them that my office had been locked on a weekend when no one was present to allow access to the report. They told me I needed to relax; that we all needed to be on the same team. At that point, I became very concerned about what was happening in the Internal Affairs Division and began to make copies of some of the recordings I had made. I did not have access to all of my recordings at that time.

59.     Because I believed the work environment to be hostile, in February of 2000, I began the employment process with Dyn Corps, a private overseas contractor, with the intent to vest my retirement and get away from the problems which I felt were only going to worse. I was contacted in March by DYN Corps and advised that I was good to go for a mission in Bosnia with processing classes forming in May and June. I advised them I needed to talk with my wife and give them a firm answer by May.

60.     In April, 2000, I attended a High Risk Fugitive training course given by the U.S. Marshals' Service at FLETC in Georgia.  While there, I discussed the manner in which the Barrett raid had been conducted and was advised that it was everything that shouldn't happen.

61.     When I returned from the training, I decided to go ahead and vest my retirement from the Highway Patrol rather than to continue in the openly hostile work environment.  I knew that as soon as I took the stand in the Barrett case, I would be in a position adverse to the Highway Patrol and thus, decided to retire from the Patrol and wait to see what happened in the Barrett case.

**DECLARATION OF PAUL D. GORDON -19**

62.     In June of 2000, I took a position with DYN Corps, an International Police Task Force, as CO-locator and patrol officer in small villages in and around Sarajevo, Bosnia, where my assignment was expanded to assist in Haz Mat training and evaluating Tactical Teams in controlled use of force in training situations.

63.     While in Bosnia, my wife, Susan Gordon received subpoenas for records from the Oklahoma Attorney General's Office.  I was investigated for, and later charged with, what amounted to misappropriation of state funds and property for taking "unapproved" comp time and for using a state telephone while working on the side as a private investigator.

64.     I was advised by the Attorney General's Office that if I did not return to face the charges, they would come and get me.

65.     The comp time and use of the state phone and other equipment had been explicitly approved by my superiors, Lt. Randolph and Captain Burris when I was assigned to the Internal Affairs Unit.  While I was assigned to the Internal Affairs Division, there existed a "hidden 32-hour comp time" policy which applied to everyone assigned to Internal Affairs.  If you were on-call, you automatically got 32 hours comp time, whether or not you were called out.  A person was on-call for two weekends and thus was supposed to claim sixteen hours comp time for each weekend.

66.     In the investigation of the charges against me, which were primarily the abuse and/or misuse of government property, services and compensation investigation, Burris and Randolph gave false statements to the Attorney General's office investigator, Larry Andrews,

**DECLARATION OF PAUL D. GORDON -20**



when they told him that they did not get comp time as a result of their job responsibilities which included being "on call." They also gave false statements to the grand jury.

67.    While the charges were pending against me, I was advised by Lt. John Matlock that he had been requested to perform an internal audit by Commissioner Bob A. Ricks, as suggested by the Grand Jury, and the audit revealed that the policies regarding comp time and use of state property for personal business were not clearly set out and that it was clear that Captain Burris and Lt. Randolph had misrepresented the fact that they, too, claimed comp time for weekend on-call time.

68.    Lt. Matlock told me that he advised both OHP Commissioner Bob Ricks and his Captain Jerry Simpson of the audit teams findings and that he had heard recorded telephone conversations with me and agency personnel, including Assistant OHP Chief Jerry Cason, who complained about the leadership of the agency, and defended use of the 32 hours on-call comp time as a standard practice. Cason confirmed to Matlock that I was entitled to the comp time like everybody else and that he expected subordinates to drive their units all the time to enable immediate response to investigations. Cason stated he would testify for me. I also allowed Matlock to hear tapes of Captain Burris stating that recording on-call time as comp time had been approved and was standard practice. Burris gave me permission on many occasions to leave DPS because I had "lots of comp time" coming. On those occasions, I was expected to drive my unit and was assured by Burris that I shouldn't worry because he "had my back."

69.    According to Lt. John Matlock, one of the OHP troopers assigned to conduct an audit of comp time policies in Internal Affairs, Diana McKnight, the Deputy Attorney General

**DECLARATION OF PAUL D. GORDON -21**



who prosecuted my case, became aware in the course of the investigation that Randolph and Burris committed perjury in the grand jury proceeding and advised OHP auditors that both Burris and Randolph compromised themselves in the grand jury. John Matlock also told me that Deputy AG McKnight advised Lt. Don Stockton, a member of the OHP audit team, that I was the only trooper to be prosecuted. When Ms. McKnight discovered that Lt. Stockton kept notes of the meeting with McKnight, she requested that he give her all of the notes concerning the grand jury testimony.

70.    Deputy AG McKnight nonetheless vigorously pursued the prosecution in my case after being told about Burris and Randolph and the hidden illegal 32 hours of comp time by OHP auditors.

71.    In my criminal case, I was represented by attorney Miles Zimmerman. Deputy AG McKnight did not notify Mr. Zimmerman that Burris and Randolph committed perjury in the grand jury. She did not advise him of the results of the audit which showed that the accumulation of comp time in the manner for which I was being prosecuted was an approved method used by all Internal Affairs personnel or that I was the only person being prosecuted for it.

72.    Mr. Zimmerman worked out a plea deal where I could keep my retirement. I was allowed to enter a plea of *nolo contendere* to misuse of a state telephone, and received a five (5) year deferred sentence which has now been expunged after successful completion of the sentence. After the agreement to permit a *nolo* plea had been made, Ms. McKnight advised Mr. Zimmerman that they would only accept a guilty plea. Mr. Zimmerman asked to talk with

**DECLARATION OF PAUL D. GORDON -22**



someone else, and Mrs. Goodspeed, who was McKnight's supervisor, approved the original agreement for a *nolo* plea which preserved my retirement.

73.     I entered the plea on August 16, 2001 because I was tired and extremely paranoid of the prosecution which was occurring.  I was out of money and every effort to subpoena material witnesses was being quashed.  I knew that the Commissioner of the Department Of Public Safety, Bob Ricks, was advised by the audit team about the conspiracy but had decided not to intervene or take any action against any of my superiors other than to transfer them to other units.  He did not refer their conduct to the AG's office for review even though both Burris and Randolph committed a felony when they blatantly lied to the Attorney General investigator, Larry Andrews.  Both officers then attempted to keep the investigation on me in the Internal Affairs unit so attention was not called upon them.

74.     The audit, the results of which were not disclosed to me prior to my plea, shows that I did not engage in any act which had not been specifically authorized by my superiors and which was not common practice in the division.

75.     Despite having entered a specific plea agreement, the terms of my probation were constantly changed by the prosecuting deputy attorney general, Diana McKnight, in significant ways, changing the conditions of my probation and making it more and more difficult to comply with those conditions. Additionally my police certification was revoked by the Council on Law Enforcement Education and Training despite the plea agreement to suspend the certification for the deferred sentence and not to contest my re-certification as a peace officer once my deferment was set aside.

**DECLARATION OF PAUL D. GORDON -23**

76.     After the plea, and while I was on probation pursuant to a deferred adjudication, I received from Lt. John Matlock a copy of the Report on the Multi-County Grand Jury, Partial Report SC-99-56 prepared for Commissioner Bob A. Ricks, dated September, 2001.  A true and correct copy of the Internal Audit including the Response to the Chief's Inquiry which I received from Lt. John Matlock is attached hereto and marked Exhibit 5.

77.     In that report, findings included a response to the Chief's Inquiry which had downplayed the significance of the audit requested by the Grand Jury.

78.     Included in the Internal Audit completed by OHP Auditors John Matlock, Jerry Simpson and Don Stockton is a section entitled "Audit's Response to Chief's Inquiry Re: OIA-01-04."  The audit team attempted to resolve "some disturbing discrepancies found in the Internal Affairs and Special Investigation Units handling of the case involving 2d Lt. Paul Gordon that were not explained or addressed in the Chief's Inquiry."  That response points out that when the investigation resulting in the felony charges against me were referred to the Attorney General's Office, "no mention was made of the application or accrual of comp time or the fact that [I] was or may have been authorized comp time when [I] was alleged to have been working for the State Insurance Fund."  The report concluded that had that fact or an internal memo or other notice of the accrual of comp time and its use inside IASI been made, "it is highly likely this incident would have never escalated beyond that point.  Failing to do so casts a dim light on the motivation to omit that information by the management of IASI."  Exhibit 5.

79.     Additionally the Response found that the DPS and IASI management "violated a basic rule of ethics and segregation of duties by proceeding with an investigation of serious

**DECLARATION OF PAUL D. GORDON -24**



wrongdoing by an employee within that division, a decision which casts doubt upon the objectivity of the investigator and his motives for not referring the matter to outside investigators." Exhibit 5.

80.     After addressing other matters including the calculations of comp time taken by both Burris and Randolph, the Response concluded that the circumstances . . .

> . . . imply that conspiracy to commit fraud has been perpetrated by certain individuals who were over-reporting time worked.  In the course of concealing their behavior, they withheld information regarding the accrual and usage of compensated time and provided a misleading report to the Commissioner and Attorney General's Office.  The individuals continued the practice even after a fellow trooper resigned [footnote omitted] and was subsequently indicted by a multi-county grand jury.  There were no indications they would have stopped until the practice was revealed by an audit."

Exhibit 5.

81.     Shortly after I entered the plea *nolo contendere* and received the 5-year deferred sentence, I was contacted at my residence by Lt. John Matlock.  He asked me if I had read the newspaper articles about the testimony being given by the state troopers against Mr. Barrett in his state trial which, if reported correctly, was a lie.  I contacted Mr. Barrett's state trial counsel, John Echols by telephone and voiced my concern.  I answered all of the  questions he had about the ill-fated execution of the warrant on Mr. Barrett and the investigation of it.

82.     The felony charges against me were career-ending and I was emotionally distraught and suffering from a high degree of anxiety as a result of the prosecution against me. Though subpoenaed for both state trials and willing (though nervous) to honor those subpoenas, I did not testify for either the state or the defense.

**DECLARATION OF PAUL D. GORDON -25**

83.     At some point, while the Barrett state court proceedings were ongoing, a second copy of the Tact Team manual was anonymously hand-delivered to me through the mail slot at my school in Moore, Oklahoma.   The first copy had been left with Randolph and reportedly was no longer in existence.  I contacted by telephone Oklahoma Indigent Defense Services ("OIDS") investigator Jack Stringer and informed him that I had received another copy of the Manual.  I was asked to bring the manual to Judge Garrett's chambers.  I met with Judge Garrett, Mr. Echols, the prosecutor, and representatives of OSBI.  When Judge Garrett asked me what was important about the manual, I related the critical passage about the Tact Team protocol  when serving a drug search/arrest warrant requiring positive identification as law enforcement to avoid the suspect from believing he was being ripped off, procedures which were not followed in this case.  I gave the manual delivered to me to Judge Garrett and did not make a copy for myself.

84.     I was subpoenaed by both the Government and the Defense for the federal trial. One of the federal prosecutors, who I believe is Mr. Littlefield, called me and was very aggressive, threatening and intimidating.  He basically told me that he was going to tear me up on the witness stand over the deferred sentence I received and challenged my credentials because I was not a SWAT officer and was in no position to second-guess the Tact Team.  I told my wife about the conversation and she reminded me that I had been trained by the U.S. Marshalls's Service on how to execute high risk warrants.  I called the prosecutor back and left a message about this training because I did not want him to think I was sandbagging him.  The prosecutor called my residence the next morning and left a message with my wife, Susan, that I did not need to come to Muskogee to testify at the federal trial.



**DECLARATION OF PAUL D. GORDON -26**

85.     I talked to defense counsel in the federal case, who I believe to be Roger Hilfiger, only once on the telephone for a very short period of time in a call initiated by me because I had been subpoenaed and wanted to know the questions he was going to ask. I believe an investigator from the defense did make a short visit before that but I do not specifically recall the details of the conversation other than that the investigator did not ask me any substantive questions. Defense counsel told me that it was his understanding that I had a relationship with Mr. Barrett. I advised him that there was no such relationship and told him that if called to testify, I would simply tell the truth. I emphasized a couple of times during the interview that I had no affection for Mr. Barrett because he killed a state trooper but that if he asked me the questions, I would give him the answers. I told him that it depended on the questions he asked whether or not my testimony would help Mr. Barrett. Hilfiger did not ask me any questions and I was not called to testify. If called and asked the questions, I would have testified to everything to which I attest herein.

86.     I was interviewed on this matter by Mr. Barrett's present counsel, Assistant Federal Defender Joan Fisher, Attorney David Autry and the Federal Defender's investigator, Paul Mann on November 3, 2011. Since that time, I have cooperated with them, answering any questions posed and attempting to provide whatever documentation or recordings I have been able to locate to support the truth of this Declaration.

87.     After my discussion with the attorneys and investigator for Mr. Barrett, I remembered that once I became aware of the removal of my report from my computer and was worried for my professional security, I began making copies of interviews that were then

**DECLARATION OF PAUL D. GORDON -27**



available to me. I put the copies in a box and took them to my mother-in-law's residence where they remained until she died. Prior to my mother-in-law's death, I was responsible for cleaning her house and removing her property so the house could be sold. While removing the property, I came across the box of tapes which was then put in storage at my school in Moore, Oklahoma. After talking with Barrett's defense team, I searched for them and gave copies of those tapes that I have been able to find to Ms. Fisher and Mr. Autrey on December 8, 2011.

88.     I did not advise either Mr. Echols or Mr. Hilfiger that I had these recordings because I did not remember that I had them and nothing in the my conversations with them reminded me of them.

89.     I also had copies of training videos which I later copied and sent to Ms. Fisher.

90.     Among the documents upon which I have relied to refresh my recollection and to support my assertions which I have provided to counsel are the following:

      a.     Memorandum for 27th District Attorney Richard Gray regarding the Subpoena;

      b.     The Subpoena issued by the prosecutor;

      c.     Release from the subpoena dated September 19, 2002;

      d.     May 7, 2001 Request by John Matlock "for monthly time sheets for the last three years or while assigned to IASI of Captain Rodney Burris, Captain Rick Adams, 1 Lt. Eddie Davenport, 1 Lt. George Randolph, 2 Lt. Paul Gordon, 2 Lt. Leanne Spears, 2 Lt. Deryckere;"

      e.     State of Oklahoma Office of Attorney General Grand Jury Investigation

**DECLARATION OF PAUL D. GORDON -28**



Unit, June 9, 2000 report by Larry W. Andrews regarding interviews with Captain Rodney Burris and Lt. George Randolph;

f.   October 16, 2001 statement by 1 Lt. John Matlock #44 regarding an April 17, 2001 meeting with 1 Lt. Don Stockton, Capt. Jerry Simpson #18, Asst. Atty. Gen. Diana McKnight and B. J. Schmidt wherein McKnight stated that 1 Lt. Randolph and Capt. Burris of Internal Affairs compromised themselves testifying in front of the Grand Jury to events regarding Paul Gordon;

g.   Correspondence between Miles C. Zimmerman to Diana McKnight, Assistant Attorney General, dated April 21, 2001;

h.   Report on Multi-County Grand Jury Partial Report SC-99-56 (September 2001), including comparative comp days claimed, taken and calculated cost by Burris and Randolph in 1999;

i.   October 21, 2001 leave Request by 1 Lt. Matlock to Captain Jerry Simpson resulting from treatment in response to his efforts in conducting the Internal Audit "[a]long with [his] knowledge of Atty General Behavior and DPS involvement".

j.   OSCN copy of the Docket Sheet in State of Oklahoma vs. Paul D. Gordon, Oklahoma County No.  CF 2001-2226

k.   Application for Clarification of Terms and Conditions of Probation, State v. Gordon, Case No. CF 2001-2226;

**DECLARATION OF PAUL D. GORDON -29**                    PDG

l.     Order of Expungement and Vacation of Previously Entered Plea dated 13th day of October 2006, filed October 18, 2006 in State v. Gordon, Case No CF-2001-2226

m.    Current Resume of Paul Donahue Gordon (Exhibit 1)

91.     Among the recorded statements upon which I have relied to refresh my recollection and to support my assertions which I have provided to Mr. Barrett's counsel are the following:

a.     Tape by Paul Gordon - 09/24/1999

b.     TRP Eales Shooting - 09/24/1999

c.     Danny Oliver [mislabeled Scott Jenkins]- 09/24/1999

d.     Gene Hise - 11/08/1999

e.     Rick Manion - 11/09/1999

f.     John Matlock  - 07/21/2001

g.     Matlock - 08/01/2001

h.     Terry Morris- 06-24-03

i.     Steve Hash - November 19, 1999

j      Training Videos

i.     DEA- DANGERS OF DRUG LABS (EXHIBIT 2).

ii.    THE METH LAB (EXHIBIT 3)

iii.   COPS SURVEILLANCE "DRUGS"

iv.    KITCHENS OF DEATH  (EXHIBIT 4)

**DECLARATION OF PAUL D. GORDON -30**                    PDG

v..      RAID PLANNING

92.      After I spoke with Mr. Barrett's counsel and before signing this Declaration, Ms. Fisher provided me with copies of the typewritten transcripts of the interviews I conducted with Troopers Darst (Exhibit 6), Greninger (Exhibit 7), Hamilton (Exhibit 8), Hash (Exhibit 9), Hise (Exhibit 10), McBride (Exhibit 11), Manion (Exhibit 12), and Poe (Exhibit 13), as well as, Lt. Pettingill (Exhibit 14) and DEA Liaison Danny Oliver (Exhibit 15).  I reviewed those transcripts and they confirmed my recollection of the those interviews.

93.      Prior to and during the federal capital trial of Kenneth Barrett, I was able and willing to testify under oath to all of the matters discussed in this Declaration including the statements made to me in all of the interviews indicated above as well as to the conversations with the interviewees which occurred after I completed the scripted interviews and turned the recorder off.  I am willing to testify to same now.

94.      I declare under penalty of perjury that, to the best of my recollection as refreshed in part by my  review of the documents identified above, the foregoing twenty-nine  (31) page declaration is true and correct.

Executed by me this _14_ day of March, 2012 in _LiNCoLN_____ County, Oklahoma.


_____
Paul D. Gordon

**DECLARATION OF PAUL D. GORDON -31**                              _____

# Declaration of Paul D. Gordon
# EXHIBIT INDEX

**Exhibit #**                                                                                          **Tab #**

1.      Paul Gordon Resume . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.      DEA Dangers of Drug Labs - Training Video . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

3.      The Meth Lab - Training Video . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

4.      Kitchens of Death - Training Video . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

5.      Multi- County Grand Jury, Partial Report SC-99-56 . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Transcripts**

6.      Transcript of Interview with Robert Darst . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

7.      Transcript of Interview with Raymond Greninger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

8.      Transcript of Interview with John Hamilton . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

9.      Transcript of Interview with Steve Hash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

10.     Transcript of  Interview with Gene Hise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

11.     Transcript of Interview with Jim McBride . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

12.     Transcript of Interview with Rick Manion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

13.     Transcript of Interview with Billie C. Poe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

14.     Transcript of Interview with Kerry Pettingill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

15.     Transcript of Interview with Danny Oliver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# Appendix B
Declaration of Toby Barrett

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,    )
    )
       *Movant,*    )
    )
v.    )    **Case No. 6:09-cv-00105-JHP**
    )
UNITED STATES OF AMERICA,    )
    )
       *Respondent.*  )

---

## EXHIBIT 96

## TO KENNETH EUGENE BARRETT'S

## AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

---

<u>**Declaration of Toby Barrett**</u>

I, Toby Barrett, declare the following:

Kenneth Barrett is my father, and Abby Stites is my mother. I am their only child.

I was born and raised around Sallisaw. I went to Brushy Elementary School and Central High in Sallisaw. My mother had me held back in the first grade because she was not satisfied with my progress. I stayed in school throughout the 11th grade, when I withdrew. It was hard for me to focus my attention on school.

When I was 12 or 13 my parents separated for good. I lived mostly with my mom, but lived with my dad and Gelene, my grandmother, for most of a year when my parents first split up. Gelene drank beer like most of us drink water, but she drinks more moderately now. I moved back in with my dad when I was 18 for several months before the incident. He wanted me to return to school. We were working on the Camaro the night of the raid so that I could use it to go back to school. The raid changed everything, but I finally obtained a diploma from a Christian school.

Now I work on an offshore oilrig for two weeks at a time, two weeks on and two weeks off. I make pretty good money, which is important because I do not want to go in debt since I have two sons to raise. When I'm home in Sallisaw, I stay to myself mostly and with my girlfriend who just moved here, other than spending time with my sons, Toby Joe who is six and Ty Lee who is four. Their mom married a fellow who treats the boys well, so I get along with him. The boys spend more time with their stepfather than with me, which is all right because I am not a jealous person. I just want what is best for my boys.

My father was too much of a mess to raise me, and I felt resentful toward him for a while, but I do not anymore. I know he has some problems inside his head. I always thought he had a chemical imbalance. When I was a teenager, before the incident, I knew something was wrong with him because he had mood changes that were not normal. Looking back over the years, I can see he was not dealing with a full deck. My dad could be in the best of moods one minute, then the worst.

Dad was a very paranoid person. He was also a very scared person—he always thought people were out to get over on him and, of course, the police out here were crooked. My dad told me that Lloyd told him that if he didn't snitch, they were going to get him. Dad stopped leaving his property and we had to bring things to him. Even though he was scared, he was not dangerous and I was not afraid of him. Dad did the best he could. I have a lot of fond memories of being with Dad, going canoeing, and helping him work on cars. He had a tender side to him. These memories help offset the pain of having a dad with mental problems. I take medications now for my own mental health issues that I don't yet understand.

The day of the incident, soon after my friend Bubba Thompson left, I remember my dad telling me to close the gate. He said nothing at all about cops. We usually kept the gate locked, so him telling me to close it was nothing out of the ordinary.

I remember that when dad turned himself in there was a warrant for his arrest, and that's when he hired Bill Ed Rodgers. I never knew of any other warrant until after the incident. I assumed they made up the arrest warrant when they got the search warrant. I had no idea that there was an outstanding warrant. If my dad knew, he never mentioned it,

and it is nothing he would have hid from me.

Just before they raided the place, the first thing I saw were taillights that went past the driveway and then a flash of light—maybe like the interior light of a car when somebody opened a door to get out. Then an SUV and a Crown Vic went up my great grandma's driveway and then the Bronco turned toward the house and I yelled "Dad." I don't recall how many times I yelled it. It all happened so fast. I thought I saw dad come onto the porch for just a second, and then the Bronco was just coming over the ditch made a boom, like it bottomed out, if that's where the sound came from. I looked at the porch again and my dad was already gone.

The Bronco's headlights were coming toward me at first. I know for sure that nothing hit the Bronco until it came to a stop in front of the house, because that's when the windshield exploded and a cop knocked me down and wouldn't let me look toward the house. There may well have been shots before that—again it happened so fast and I was so scared, but my dad wasn't on the porch and I know for sure that nothing hit the Bronco before it came to a stop.

If my dad went to the roll top desk to get his handgun when he saw the headlights coming, which he said he did, for sure they could have seen his silhouette through the curtain. If he went into that room, they would have seen his silhouette.

The first police lights I seen was on the police car that crashed through the gate when the shooting was over. I'm sure of that. There was no vehicle near me. The cop who knocked me down must have come over Grandma's fence.

I spoke to Mr. Hilfiger once, I'm not sure where, and asked him if he was going to

want me to testify at the trial. He said he was weighing whether it would be helpful for my dad or not, but that he expected I would. He never asked me about my father's mental problems, my home life or about me or my mom. I never spoke to him again.

I have been interviewed by an investigator who told me he is working on my dad's case. Later he asked me if I would give him a declaration of what I told him. He showed me this declaration and I have read it carefully. It says what I said to the investigator.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this _23_ day of _Feb_ _2009, in _Seq._ County, Oklahoma.

_Toby Barrett_

# Appendix C

Excerpt From Doc 95 pp. 273-278

### a.      Charles "Monk" Sanders

The prosecution suppressed deals given to Charles "Monk" Sanders in Sequoyah and Tulsa Counties in exchange for his testimony, in both stages of trial, against Mr. Barrett.  In examining Sanders at trial, AUSA Littlefield merely stated, and Sanders agreed, that he would speak to the authorities in Sequoyah and Tulsa Counties regarding Sanders's cooperation, implying there were no guarantees anything would be done.  (R. 2495.)  In fact, near the end of Mr. Barrett's trial on November 17, 2005, Sanders got a sweetheart deal on his active Sequoyah County cases, and more favors shortly thereafter, all due to a "plea agreement with feds." Favorable disposition of Sanders's active Tulsa County case was delayed until after Mr. Barrett's trial.  The prosecution cynically attempted to jettison its *Brady* obligations with respect to Sanders's testimony by either failing to reveal deals it knew were in the works, and/or postponing the culmination of those deals until the end of Mr. Barrett's trial or shortly after its conclusion. The Government's ploys in these regards plainly violated the *continuing duty* to disclose *Brady* evidence.  Moreover, the prosecution violated its *Brady* obligations by failing to disclose to the defense Sanders's complete criminal history, which could have and should have been used for impeachment purposes.  It was argued in Ground Two that trial counsel were ineffective in failing to cross-examine Sanders about all his previous criminal convictions and dismissed cases; counsel unreasonably failed to make a search of Sanders's available court files.  Above and beyond that failing, the prosecution was obligated under *Brady* to reveal Sanders's complete criminal history to the defense, since it constituted impeachment evidence.  The prosecution failed to do so, papering over Sanders's appalling criminal history on direct examination, and

leaving defense counsel to simply scratch the surface based on what counsel was able to glean from the Department of Corrections website.

Of course, Sanders's alleged information was the basis upon which the no-knock warrant was secured..  Sanders's testimony was critical to the drug charges which underlay the various counts of the superseding indictment, and to the Government's arguments on malice and intent with respect to both stages of trial.

As noted in Mr. Barrett's first stage ineffective assistance of counsel argument respecting trial counsel's failure to impeach Sanders with the number and nature of his previous convictions (Ground Two, section A.4, *supra*), as well as favorable treatment he had received in these and other cases, Sanders had convictions in Sequoyah County Case No. CF-98-346 (for which he originally received a twenty year suspended sentence, of dubious legality due to his numerous prior convictions), for the felony offense of possession of methamphetamine.  Sanders was also charged in this case with a misdemeanor count for possession of drug paraphernalia, which was dismissed pursuant to plea bargain.  Two applications to revoke Sanders's suspended sentence were filed.  Initially, five years of the suspended sentence was ordered revoked, but the balance would again be suspended if Sanders completed a Department of Corrections drug program.  The revocation was ordered to run concurrently with similar dispositions Case Nos. CF-98-363, CF-99-562, CF-04-19 and CF-03-124.  (Exhibit 160.)

In CF-98-363, Sanders received another twenty year suspended sentence for uttering a forged instrument, to run concurrently with the sentences in Case Nos. CF-99-562 and CF-98-346.  Similar applications to revoke were filed in this case based on Sanders's failure to abide by the terms and conditions of probation, in part because he committed new offenses.

Initially, as with CF-98-346, the court ordered five years of the sentence to be revoked, with the balance to again be suspended in full upon completion of the drug program. The revocation in this case was ordered to run concurrently with similar actions taken in Case Nos. CF-98-346, CF-99-562, CF-03-124, and CF-04-19.  (Exhibit 161.)

In CF-99-562, in which Sanders was initially charged with three counts of concealing stolen property, uttering a forged instrument, felonious possession of a sawed-off shotgun, and a misdemeanor charge of possession of marijuana, he was allowed to plead to a single count of concealing stolen property, with the other counts dismissed.  He originally received a twenty year suspended sentence.  Again, applications to revoke were filed due to Sanders's commission of new crimes and for otherwise failing to adhere to the terms of his probation.  Five years of the sentence was revoked, the balance again to be suspended upon completion of an in-house drug program.  The sentence in this case was ordered to run concurrently with similar dispositions in Case Nos. 98-346, 98-363, 03-124 and 04-19.  (Exhibit 162.)

In Case No. CF-03-124, Sanders was allowed to plead guilty to two counts of feloniously running a roadblock, with the other charges dismissed.  Sanders received concurrent twenty-five year sentences on the two counts of conviction, with all but five years suspended, and with the entirety of the terms to be suspended on successful completion of the drug program.  The sentences in this case were ordered to run concurrently with the sentences in Case Nos. CF-98-346, CF-98-363, CF-99-562 and CF-04-19.  (Exhibit 164.)

In Case No. CF-04-19, Sanders was eventually charged in an amended information with second degree burglary, second degree arson, concealing stolen property, and

feloniously carrying a firearm.  The firearm charge was dismissed pursuant to the plea agreement.

On the three remaining counts, Sanders was sentenced to concurrent terms of twenty-five years,

with all but the first five years suspended and, yet again, the balance to be suspended upon

completion of the drug program.  The sentences in this case were ordered to run concurrently

with the sentences in Case Nos. 98-346, 98-363, 99-562 and 03-124.  (Exhibit 165.)

The Government violated Mr. Barrett's due process rights by failing to disclose

that on November 17, 2005 (the final day of Mr. Barrett's trial), and because of his testimony in

Mr. Barrett's trial, amended judgments and sentences were entered on behalf of Sanders in all of

the above-described cases, with a filing date of November 23, 2005 (well before Mr. Barrett's

formal sentencing) ordering that Sanders receive straight suspended sentences across the board.

Moreover, in each of the cases discussed above, an order was entered on April 3, 2006, making

Sanders's suspended sentences in these cases unsupervised by the Department of Corrections,

even though the sentences did not expire until 2030.  This was done, according to the notations

on the orders, "***per plea agreement with feds***."  (Emphasis added).  Finally, on December 8, 2008,

orders were entered in each of these cases relieving Sanders of the obligation to pay any

outstanding fines or costs.  (*See* the above listed Sequoyah County court files.)

Sanders received similar largesse as the result of his testimony against Mr. Barrett

in his pending Tulsa County Case, disposition of which, as noted in the ineffective assistance of

counsel argument, was delayed until Sanders could perform for the Government in Mr. Barrett's

trial.  In Tulsa County Case No. CM-04-1187, Sanders's case was passed from November 13,

2005 until November 17, 2005 (the last day of Mr. Barrett's trial), and was again passed from

November 17 until December 9, 2005.  At that time, instead of facing jail on his misdemeanor

drug possession and possession of drug paraphernalia charges, despite his numerous prior convictions, because of his testimony against Mr. Barrett, Sanders received concurrent one year suspended sentences.

During the pendency of this §2255 action, investigators for Mr. Barrett have attempted repeatedly to interview Sanders, but were stymied. Sanders initially told a defense investigator he would meet with him, and had things he wanted to discuss, but dodged all subsequent attempts at an interview. However, when a defense investigator spoke to Sanders's mother, Evelyn Sanders, regarding her son's testimony against Mr. Barrett, she revealed that Sanders had been promised a number of things in exchange for his testimony that he never received. (Exhibit 14.) This witness's statement suggests that aside from the leniency he got, Sanders was given other inducements by the Government to testify against Mr. Barrett.

Not only did the prosecution flatly violate *Brady* and its progeny by failing to disclose Sanders's deals in the particular cases discussed above, it wantonly violated its *Brady* obligations by failing to reveal the jaw-dropping favorable treatment Sanders had received in *all his* Sequoyah County and other cases, as detailed in the ineffectiveness of counsel claim. Taken together, this evidence would have destroyed Sanders's credibility, shown his motive to lie, and would have shown, contrary to this court's order, that Clint Johnson – whose nefarious, but never revealed, acts of dishonesty and criminality are discussed below – could not have reasonably relied on "information" from Sanders to establish probable cause for the no-knock search warrant, which was the poisonous tree from which the later search warrants resulting in the recovery of drug and firearms related evidence grew.

When the prosecution falsely suggested it would merely "talk to" county prosecutors, even though Sanders received deals on the last day of Mr. Barrett's trial in Sequoyah County and shortly thereafter in Tulsa County, and Sanders agreed with this assessment of the situation, it sponsored materially false testimony.

### b. Travis Crawford.[36]

During the investigation conducted for this §2255 motion, Mr. Barrett has discovered that one of the key witnesses in the first stage of trial, Travis Crawford, lied about material matters. Travis Crawford supplied testimony critical to the Government's case for malice and intent, at least as to count 3 of the superseding indictment. Crawford's testimony was also crucial to establishing the intent elements in the punishment phase of trial. Crawford's testimony was summarized in the claim regarding ineffective assistance of counsel in the first stage of trial, and will not be repeated here.

When Crawford was interviewed in the presence of his parents on December 11, 2008 by defense investigator Leonard Post, he recanted his trial testimony. To summarize, Mr. Crawford told Mr. Post the following:

Mr. Barrett's habit of not leaving his property had been established several years before the raid which led to Trooper Eales's death. At trial, of course, the prosecution contended that Mr. Barrett rarely left his property only after he supposedly learned there was a warrant for his arrest on the Sequoyah County drug charge. (Exhibit 45.)

---

[36] At the time Mr. Barrett filed his original Motion to Vacate, Mr. Crawford had declined to sign a declaration reflecting what he told defense investigator Leonard Post. Mr. Crawford has since signed his declaration to the information he gave a defense investigator prior to Mr. Barrett's initial filing. (*See* Exhibit 91; Exhibit 92; Exhibit 31; and, Exhibit 45.)

# Appendix D
Declaration of Travis Crawford

## DECLARATION OF TRAVIS CRAWFORD

I, Travis Crawford, declare the following:

I am Kenneth Barrett's first cousin on his mother's side. My mother, Phyllis Crawford, is the sister of Kenny Barrett's mother, Gelene Dotson. My parents and I live next door to Gelene.

Kenny and I used to hunt and fish together and were close. I was at Kenny's house just about every day. Kenny would do anything in the world for me. He liked to help people. Kenny rarely left the property. He ate his meals at his mother's, and sometimes friends brought him food.

I have had a long struggle with drugs and have anxiety and panic attacks. My mind does not work that well. I will be going to get something out of the truck and I will forget what I went to get. When I get my anxiety, I get so nervous I do whatever comes to mind. I was like this as a kid too. I am under a doctor's care now and am trying really hard to be healthy. I was a long term methamphetamine user and could die if I use drugs again. My doctor told me that if I ever shoot up again it will likely kill me on the spot. I know that my using drugs was the result of other psychological problems that I did not understand. Psychological problems run in my family. I have three children, one daughter and two sons. My oldest child is a grown young woman and has bipolar disorder. One of my sons seems a little slow and is having a tough time of it. My other son is a straight A student, so I am hopeful he will make it alright.

I had problems in school and joined the US Army to make a go of it. I was not able to adapt to army life and spent two months in the brig. I could not keep up with all

-1-

TOC

the rules and was late to formation. It felt terrible when people I trained with made fun of me when they marched by the stockade.

I testified falsely at Kenny's trial. At the time I testified, I was living in so many places and was so strung out, I did whatever I was told to keep out of trouble. I did methamphetamine all the time, every day. When I testified against Kenny, I was high on speed; all of the snitches who testified against Kenny were on dope and high when we testified. We were also high when Mr. Littlefield, the U.S. Attorney, interviewed us.

When Mr. Littlefield interviewed me about Kenny, I was terrified of losing my freedom and said whatever I thought Mr. Littlefield wanted me to say. Mr. Littlefield asked me if Kenny said he (Kenny) "was going down in a blaze of glory," and before I could answer, Mr. Littlefield told me all the bad things that would happen to me if I "lied." I was so scared I said, "Yes" that Kenny had said he would go down in a blaze of glory if the cops came. I was panicking because I was afraid. Mr. Littlefield said he knew things about me. I was so scared.

I never heard Kenny say he was going down in a blaze of glory. I had testified against someone once before. I was arrested for bad checks and was afraid of going to jail. The prosecution offered to let me work for them. I wore a wire and made four or fives buys. I could have been killed. I had to testify against the person I bought the drugs from even though the police lied to me and told me I would never have to.

I knew Johnny Philpot was out at Kenny's place two weeks before the raid and had inspected Kenny's guns. Kenny told me they had a case against him for a drug charge but it was not serious. Kenny never said anything about a warrant against him;

-2-

TDC

he only mentioned a case against him. At the time I testified, I thought having a warrant and having a case were the same thing. I now know they are very different.

Kenny put up a sign on his fence just a couple of days before the police raided Kenny's place. The sign was not directed at the police; it was directed at anybody. It was meant to scare people away from trespassing and stealing.

This declaration says what I told an investigator working on Kenny's case when he came to talk to me. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 3 page declaration is true and correct.

Executed by me this ___3___ day of June 2009, in Sequoyah County, Oklahoma.

Travis Crawford

# Appendix E

Excerpt From Doc 95 pp. 278-283

When the prosecution falsely suggested it would merely "talk to" county prosecutors, even though Sanders received deals on the last day of Mr. Barrett's trial in Sequoyah County and shortly thereafter in Tulsa County, and Sanders agreed with this assessment of the situation, it sponsored materially false testimony.

### b.  Travis Crawford.[36]

During the investigation conducted for this §2255 motion, Mr. Barrett has discovered that one of the key witnesses in the first stage of trial, Travis Crawford, lied about material matters.  Travis Crawford supplied testimony critical to the Government's case for malice and intent, at least as to count 3 of the superseding indictment.  Crawford's testimony was also crucial to establishing the intent elements in the punishment phase of trial.  Crawford's testimony was summarized in the claim regarding ineffective assistance of counsel in the first stage of trial, and will not be repeated here.

When Crawford was interviewed in the presence of his parents on December 11, 2008 by defense investigator Leonard Post, he recanted his trial testimony.  To summarize, Mr. Crawford told Mr. Post the following:

Mr. Barrett's habit of not leaving his property had been established several years before the raid which led to Trooper Eales's death.  At trial, of course, the prosecution contended that Mr. Barrett rarely left his property only after he supposedly learned there was a warrant for his arrest on the  Sequoyah County drug charge.  (Exhibit 45.)

---

[36] At the time Mr. Barrett filed his original Motion to Vacate, Mr. Crawford had declined to sign a declaration reflecting what he told defense investigator Leonard Post.  Mr. Crawford has since signed his declaration to the information he gave a defense investigator prior to Mr. Barrett's initial filing. (*See* Exhibit 91; Exhibit 92; Exhibit 31; and, Exhibit 45.)

Mr. Crawford stated that he has anxiety and psychological problems, something he was not cross-examined on at trial.[37]  Although he was a long-time methamphetamine addict, he told Mr. Post he had been off drugs for four months preceding Mr. Post's interview.  Before finally getting off drugs, Crawford had been a daily methamphetamine user for years preceding Mr. Barrett's arrest in this case and during Mr. Barrett's federal trial.  (Exhibit 45.)  Thus, Crawford's trial testimony to the effect that he was not a drug addict or under the influence of drugs at the time he testified against Mr. Barrett was false.

Mr. Crawford stated that at the time he was interviewed by then-AUSA Mike Littlefield regarding Mr. Barrett, he was "living in so many places and was so strung out" on drugs, that he did whatever he was told by anyone in authority in order to stay out of trouble.  Mr. Crawford states that when he was interviewed by Mr. Littlefield, he was high on drugs. Moreover, anybody who had been around drug addicts for any period of time (which surely includes Mr. Littlefield and then-Sequoyah County Sheriff John Philpot, who took Crawford to Muskogee to be interviewed by Littlefield)  would have known Crawford was high.  Not only was Mr. Crawford under the influence of illicit drugs at the time he was interviewed by Littlefield, but he was also high when he testified in the first stage of Mr. Barrett's trial. Crawford stated that the other informant witnesses who testified against Mr. Barrett were high and strung out on drugs at the time of their testimony.  (Exhibit 45.)

---

[37] These problems and his drug abuse also doubtless contributed to the difficulties he had while in the military, which Mr. Crawford alludes to in his declaration, and his spotty employment history.  Travis Crawford's military records reflect that he went AWOL four times, and suffered at least one conviction at a court-martial.  Mr. Crawford was not honorably discharged.  (Sealed military records of Travis Crawford.)   He also did not maintain steady employment in the years preceding or following the assault on Mr. Barrett's home.  (Exhibit 143.)

When Sheriff Philpot took Crawford to Muskogee to be interviewed by Mike Littlefield shortly before Mr. Barrett's trial, Crawford felt he "was already arrested" and did not know "if [he] was ever going to come back home."  When Littlefield interviewed him at the United States Attorney's Office, Mr. Crawford was terrified about losing his freedom. Consequently, he said whatever he thought it was Littlefield wanted him to say.  Mr. Littlefield asked Travis Crawford if Kenneth Barrett ever said he (Mr. Barrett) was "going to go down in a blaze of glory" if the police ever came onto his property.  Littlefield made it clear to Crawford what the appropriate answer was.  Crawford stated that before he could answer, Littlefield threatened him, stating bad things would happen to him if he "lied."  Where a witness is pressured to testify, the prosecution has every reason to believe that the product of that coercion will be false testimony.  Mr. Crawford stated he was scared and panicked, and therefore told Littlefield that Mr. Barrett had made this statement.  According to Mr. Crawford, the truth was otherwise: *Mr. Barrett never made such a statement, or anything like it, at any time*.  (Exhibit 45.)

Travis Crawford's recantation is corroborated by witnesses who were present at Mr. Barrett's house on September 23, 1999, but were not called to testify at trial.  *See* Ground Two, section A.4, *supra*.  Rick Lunsford and Brandy Hill are adamant in stating the Mr. Barrett never made such a statement.  (Exhibit 90; Exhibit 77.)

Because the Government and its agents knew or had reason to know that Crawford was a drug addict at the time he was interviewed by the prosecution, and at the time he testified at trial, the Government was obligated to disclose this information under *Brady.*  Due process and the rules of professional conduct required AUSA Littlefield to correct Travis

Crawford's false testimony about being off drugs. The same is true of at least some of the other informant witnesses, whom Mr. Crawford states were high at the time of their testimony. Moreover, the Government plainly violated its *Brady* obligations by failing to reveal Littlefield's threats to induce cooperation and shape Crawford's testimony.

Mr. Crawford admitted that before he became a witness against Mr. Barrett, he had previously worked as a snitch for local law enforcement, setting up drug buys at the direction of the authorities in exchange for escaping bogus check charges he was facing. Crawford stated that he testified regarding the controlled drug buys in state court, even though the police had promised him he would not have to do so. (Exhibit 45.) Crawford's history as an informant was not testified to at trial, though it was known to the Government or its agents. Crawford's work as a snitch was exculpatory evidence affecting his credibility. By failing to inform the defense of this fact, the Government violated is *Brady* obligations.

In marked contrast to what the Government attempted to portray at Mr. Barrett's trial regarding the "necessity" for a no-knock warrant and the armed raid on Mr. Barrett's property, Travis Crawford stated that only two weeks or so before the raid, Sheriff John Philpot had gone to Mr. Barrett's residence and inspected his firearms without incident. (Exhibit 45.)

This information is consistent with that given by Janice Sanders and Sylvia Gelene Dotson, who, though never asked by trial counsel, state that Sheriff Philpot and other law enforcement agents were at Mr. Barrett's house mere weeks before the raid. *See* Ground Two. As shown below, ex-Sheriff Philpot recently admitted to a defense investigator that he indeed was at Mr. Barrett's less than a month before the raid, and encountered no violence or threats. Mr. Barrett was not arrested on his outstanding failure to appear warrant. (Exhibit 6.) This

exculpatory evidence, of which the Government and/or its agent Mr. Philpot was well aware, was concealed from the defense in violation of *Brady.*

Again in contrast to what Mr. Crawford implied in his testimony, and to what the Government argued at trial, he recently stated that while Mr. Barrett told him he had a pending state drug charge, he was not overly concerned with it. Mr. Barrett never told Crawford he had an outstanding warrant, and was thus laying low and hiding from the law. Crawford simply assumed that having an active case meant the same thing as having an active arrest warrant. (Exhibit 45.)

At trial, with the aid of Mr. Crawford's testimony, the Government made much of the sign posted on the gate, construing it as a threat to law enforcement. Mr. Crawford states that the sign was posted as a warning to anyone coming on the property in order to prevent trespassing and theft. (Exhibit 45.)[38]

Evidence of Crawford's recantation is newly discovered, and could not have been discovered with the exercise of due diligence before or during trial, because the Government sprung the existence of Crawford and the other informant witnesses (without initially giving their names) after juror qualification had begun, and Crawford refused to be interviewed by the defense. Crawford's recantation pulls the rug out from under the prosecution's arguments respecting malice and intent in both stages of trial. Crawford was *the key Government witness* in

---

[38] At the time the original and corrected §2255 motions in Mr. Barrett's case were filed, Travis Crawford had declined to sign a declaration reflecting his statements to a defense investigator currently working for Mr. Barrett. Thus, declarations reflecting what Mr. Crawford said were filed by his parents, Roger and Phyllis Crawford, and defense investigator Leonard Post. During the continuing investigation following the filing of the §2255 action, Mr. Crawford has signed his declaration.

this respect, because he testified that only hours before the raid, Mr. Barrett talked about the police "drive-by," the "fact" that they were coming back, that he (Mr. Barrett) "[didn't] give a fuck," and that he (Mr. Barrett) was going to go out in a "blaze of glory."  Crawford's recantation also undermines the Government theory that Mr. Barrett only stayed close to home, and was thus lying in wait for a supposedly inevitable police raid, after he supposedly learned that he had a warrant out for his arrest.

### c.      Cindy Crawford.

As outlined in the first stage ineffective assistance of counsel argument (Ground Two, section A.4, *supra*), Cindy Crawford testified in the guilt/innocence stage of trial regarding drug activity she witnessed at Mr. Barrett's home, and Mr. Barrett's supposed threats to law enforcement if his property were raided.  In the penalty phase of trial, Cindy Crawford testified that on one occasion, Mr. Barrett, after she rebuffed his sexual advances and was leaving his residence with Richie Barrett, came out of the house, put the barrel of a rifle up to her leg, and threatened to kill her.

Leonard Post and another defense investigator currently working on Mr. Barrett's case, Dale Anderson, interviewed Cindy Crawford on January 13, 2009.  Like her husband, Cindy Crawford refused to *read* a declaration which faithfully recounted what she told Messrs. Post and Anderson.  (Exhibit 31.)  Mr. Post's and Mr. Anderson's declarations detail what Cindy Crawford told them, which is summarized as follows.

Cindy Crawford explained how she was contacted by the Government.  According to her, one to two weeks before she testified in the first stage of Mr. Barrett's trial, Sequoyah County Sheriff John Philpot came to see her.  Philpot told her she had to go with him.  Although

# Appendix F
Declaration of Leonard Post

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,    )
                                  )
            *Movant,*     )
                                  )
v.                           )     **Case No. 6:09-cv-00105-JHP**
                                  )
UNITED STATES OF AMERICA,    )
                                  )
         *Respondent.*  )

---

**EXHIBIT 31**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

<u>**DECLARATION OF LEONARD POST**</u>

I, Leonard Post, declare the following:

I am one of the investigators contracted by the Federal Defender's office for the Eastern District of California to work on Kenneth Eugene Barrett's case in preparation for filing a motion attacking his convictions and death sentence pursuant to 28 U.S.C. section 2255. During my investigation, I interviewed numerous witnesses including Travis and Cindy Crawford, Richard Barrett, and Mary Rogers.

Travis Crawford testified in the first stage of Mr. Barrett's trial. Cindy Crawford testified in both stages of Mr. Barrett's trial. On December 11, 2008, I interviewed Travis Crawford in the presence of his parents, Roger and Phyllis Crawford at their home in the McKey community. At that time, Travis was separated from his wife, Cindy Crawford, and lived with his parents.

I interviewed Cindy Crawford separately in the presence of another investigator, Dale Anderson, on January 13, 2009. The interview with Cindy took place at her mother's trailer.

In the presence of his parents, Travis Crawford told me the following:

Travis Crawford explained that his mother, Phyllis Crawford, is the sister of Kenneth Barrett's mother, Gelene Dotson, which makes him Mr. Barrett's first cousin. He explained that Gelene lives in the trailer on the adjacent property just west of where we sat.

Travis related that he and Mr. Barrett used to hunt and fish together, and were close. Travis stated that before Mr. Barrett was arrested, he was at Mr. Barrett's home practically every day and that Mr. Barrett "would do anything in the world" for him. He stated that Mr. Barrett liked to help people and that in the last few years before his arrest on the murder charge Mr. Barrett rarely left his property. Travis expressed concern about Mr. Barrett's ability to care for

1

himself, stating that Mr. Barrett would eat meals at his mother's house, and sometimes friends would bring him food.

Travis stated that he Travis had a long struggle with drugs and has anxiety and panic attacks. He stated that his "mind does not work that well." For example, he will go out to his truck to get something, and by the time he gets there, he will have forgotten what it was he went to get. Travis stated that when he has problems with anxiety, he gets so nervous that he just does "whatever it is that comes to mind." Travis stated that he was like this as a child, prior to using drugs, and that he is under a doctor's care and is "trying to be healthy." Travis stated that he was a long-term methamphetamine user, and that he believed he would likely die if he used drugs again because his doctor told him that if he ever shot up again, it would likely kill him on the spot. He stated that he was aware that his drug use was the result of the psychological problems from which he suffers and which he does not understand.

He stated that psychological problems run in his family. Of his three children, he stated that his oldest child, now a grown woman suffers from bipolar disorder, that one of his sons seems a little slow and is having a hard time, but that his other son is a straight-A student, and he has "hopes that he will turn out all right."

Travis stated that he had problems in school and joined the United States Army, trying to make a go of it. He stated that he was not able to adapt to Army life and spent two months in the brig because he could not keep up with all the rules and was late to formation. He stated that it made him feel terrible when people he trained with in the Army made fun of him when they marched by the stockade. He stated that he had received "a less than honorable" discharge from the Army.

2

Travis stated clearly in the presence of his mother and father that he testified falsely in Mr. Barrett's trial. He stated that at the time he testified, he was "living in so many places and was so strung out, that he did whatever he was told in order to keep out of trouble." Travis Crawford stated that for several years before Mr. Barrett was arrested, through the time of Mr. Barrett's state and federal trials, and up until four months before this interview, he had been doing methamphetamine all day, every day. He stated that when he testified against Mr. Barrett, he was high on meth. He also stated that all of the snitches who testified against Mr. Barrett were "on dope" when they testified. Travis stated that he and the other snitches were also high on drugs when the prosecutor, AUSA Mike Littlefield, interviewed them. He stated that anybody who had been around drug addicts would have known that. When John Philpot took him to see Mr. Littlefield, Travis stated that he was sure that Sheriff Philpot knew that Travis knew that Mr. Philpot knew that he was stoned. Travis stated that he felt as though he "was already arrested" and "didn't know if [he] was ever going to come back home."

During the interview, Travis stated that when Mr. Littlefield interviewed him about Mr. Barrett, he was terrified of losing his freedom and said whatever he thought Littlefield wanted him to say. Travis stated that Mr. Littlefield had asked him if Kenneth Barrett had said that he (Mr. Barrett) "was going down in a blaze of glory," and that before he could answer, Mr. Littlefield told him all the bad things that would happen to him if he "lied." Travis stated that he was so scared that he said, "Yes," that Mr. Barrett had stated that he would go down in a blaze of glory if the cops came to his residence. Travis stated that when he gave this answer, he was panicking because he was afraid. Travis stated that Mr. Littlefield told him he knew things about him (Travis). Travis repeated that he was extremely scared during his interview with Mr.

3

Littlefield and said whatever it was Mr. Littlefield indicated he wanted Travis to say. Travis stated to me affirmatively that he never heard Kenneth Barrett state that he was "going down in a blaze of glory" or express any sentiment like that.

Travis stated that he had testified against somebody prior to testifying against Mr. Barrett. On that occasion, Travis stated that he had been arrested for bad checks and was afraid of going to jail. In lieu of prosecution, he stated that he wore a wire and made four or five controlled drug buys. Travis stated that he believed he could have been killed while doing this. Travis stated that he ultimately had to testify against the person he bought the drugs from, even though the police lied to him and told him he would not have to testify.

During the interview, Travis stated that Sheriff John Philpot was at Kenneth Barrett's residence approximately two weeks before the raid that led to the fatal shooting of the trooper, and that when Sheriff Philpot went to Mr. Barrett's residence he had inspected Kenneth Barrett's guns without incident. Travis stated that Mr. Barrett told him the local authorities had a drug case against him (Kenneth Barrett), but it was not serious. Travis Crawford stated that Mr. Barrett never told him anything about an outstanding warrant for Mr. Barrett's arrest. Travis stated that at the time he testified against Mr. Barrett, he thought having a warrant and having a case were the same thing. He stated that he now knows these are two very different things.

During the interview, Travis Crawford stated that Mr. Barrett put a sign on his fence just a couple of days before Trooper Eales was killed. Travis stated that the sign was not directed at the police; "it was directed at anybody." The sign was intended, stated Travis, to scare people away from trespassing on Mr. Barrett's property and stealing his belongings.

When Travis Crawford spoke to me and told me all of the above in the presence of his

4

parents, he was separated from his wife, Cindy Crawford. Based on what Travis Crawford told me, a declaration for his signature was prepared, detailing all of the information related above. On February 15, 2009, when I asked Travis to read over the declaration detailing what he had told me, he had reunited with his wife and declined to read the declaration. He stated that he would "not sign anything," and that his psychiatrist had advised him that further involvement in Mr. Barrett's case was detrimental to his health and that his problems with anxiety were the result of his past association with Mr. Barrett, which was contrary to his earlier statement that the onset of his anxiety was in his childhood. It is my belief, based on my extensive investigation of this case that Travis Crawford declined to sign the declaration because he believed that telling the truth would get him in trouble, and that he was being pressured by Cindy Crawford not to cooperate. Family, friends and associates of Travis and Cindy Crawford informed me that Travis and Cindy have reputations in the community as liars and thieves who would say and do anything to stay out of jail and to obtain drugs. Two witnesses, Paul Rickie Lansford, and Brandy Hill were present at the time Mr. Barrett allegedly made the "blaze of glory" statement in Travis Crawford's presence, and they informed me that Mr. Barrett did not make such a statement then, and that they never heard Mr. Barrett make such a statement or express that idea at any time.

As noted above, I interviewed Cindy Crawford separately from Travis Crawford in the presence of another investigator, Dale Anderson. During this interview, Cindy Crawford told Mr. Anderson and me the following:

Cindy stated that she testified as a government witness in Kenneth Barrett's federal trial. She acknowledged that her husband, Travis Crawford, also testified against Mr. Barrett. She stated that as of 1999, she had known Mr. Barrett for approximately four years.

5

Cindy Crawford stated that one to two weeks prior to her initial testimony against Kenneth Barrett, John Philpot came to see her. Mr. Philpot told her that she had to leave with him. Cindy Crawford stated that she did not know whether she was under arrest or not, but it was clear to her that she had no choice but to go with Mr. Philpot. She stated that she got into Mr. Philpot's car and that he drove her to Muskogee. There, she met AUSA Mike Littlefield and "several men wearing guns" who appeared to be law enforcement officers. Cindy Crawford stated that the meeting occurred in Mr. Littlefield's office.

Cindy Crawford stated that the men wearing guns showed her several firearms that looked similar to ones that belonged to Mr. Barrett. Cindy stated that Mr. Littlefield told her that she needed to work with him and testify against Mr. Barrett, or she was going to prison. She stated that Mr. Littlefield reminded her that she was on a five-year deferred sentence in a drug case. Mr. Littlefield told her that Mr. Barrett's house had been under surveillance for 6 months prior to the shooting of the trooper, and that during this surveillance she was seen acting as a "lookout" on Kenneth Barrett's front porch while he cooked methamphetamine on the property. Cindy Crawford stated to us that she had never seen Mr. Barrett cook methamphetamine at any time and that she had never acted as a lookout for Mr. Barrett.

Cindy Crawford stated to us that at the time of the meeting in Mike Littlefield's office, she had no pending criminal charges, but had lost one of her children to foster care. Cindy stated that during the meeting, the threat that she would not get her child back hung in the air.

Cindy Crawford stated that during the meeting in Mr. Littlefield's office, she was told by Mr. Littlefield there were certain ways she could phrase her testimony. Cindy stated that Mr. Littlefield told her that in her testimony, she should make Kenneth Barrett appear as violent as

6

possible and as an imminent threat to those around him. Cindy stated that Mr. Littlefield had discussed with her the possibility that she risked perjury charges if she did not put this type of spin on her testimony. Mr. Littlefield also told her that they could make it extremely hard on her if she refused to testify against Mr. Barrett.

Cindy Crawford stated that when she was at the meeting in Mr. Littlefield's office in Muskogee, she was not told that she was under arrest, but that the atmosphere was intimidating. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside the restroom. She stated that she believed she was not free to leave because Mr. Philpot had driven her to Muskogee, and she had no way back home other than him. Cindy Crawford stated that she was not going to mess with Mr. Philpot because of his reputation for violence.

Cindy Crawford stated that Mr. Littlefield interviewed her about Kenneth Barrett's federal case separately from her husband, Travis Crawford. Cindy stated that Travis told her that John Philpot told him that if Travis said the right things on the witness stand, he would not get into trouble. Cindy stated that Mr. Littlefield, and later John Philpot, told her that she did not have to talk to or be interviewed by Mr. Barrett's lawyers or anyone working with them if she did not want to. Cindy stated that it was implied she should not speak to the defense.

Cindy Crawford stated that it was her recollection that when she testified at Mr. Barrett's federal trial, neither the prosecution nor the defense asked about her prior offenses. She admitted to Mr. Anderson and me that she was a heavy drug user at the time she testified against Mr. Barrett.

Cindy Crawford stated during our interview that during the time she knew Kenneth Barrett, she never bought drugs from him, but just used drugs with him. She stated that when

Mr. Littlefield interviewed her in his office, as described above, she was just coming down off a two-day meth high. She stated that the same was true when she testified at Mr. Barrett's trial. Cindy stated, "If you had ever crashed from a meth high, you would know that you would not be in your right mind."

Cindy stated that she suffered from post-traumatic stress disorder (PTSD) due to things that happened to her when she was growing up. She stated that she overreacts to stressful situations, sometimes to the point of passing out. She told us that when she was growing up, her father was often in a rage, and that her father had molested her and her sister. Because of this experience, she stated that when she is stressed she overreacts, and does not always perceive things correctly or exaggerates what is happening or has happened. Cindy Crawford stated that when she testified in the second stage of Mr. Barrett's trial about Mr. Barrett having once pressed a gun against her leg, she may well have been overreacting and embellishing the story, due to her PTSD. As Dale Anderson and I were leaving her residence, she called to us as we opened the door (she was in a leg cast and incapacitated at the time) and stated that on second thought she was sure she had misread the mood of the situation and overreacted. She stated that Kenneth Barrett had a history of being nice and helpful to her.

Cindy Crawford stated that during her interviews with the government before she testified in the first stage of trial, she had not told them about the incident with Kenneth Barrett putting the gun barrel to her leg. According to Cindy, the prosecutor or law enforcement asked her about this incident after her first stage testimony. Cindy stated that the only person who could have told law enforcement about the incident was the only other person present, Richie Barrett. I interviewed Richie Barrett and he stated that neither that specific incident nor anything

8

resembling it ever took place. I asked Richie Barrett if he would be willing to provide that information in a declaration under penalty of perjury and he said that he would.

Cindy Crawford stated that the prosecutors in the federal trial were upset with her when she denied ever seeing chemicals and equipment for making methamphetamine at Kenneth Barrett's house. Cindy stated they were also upset when she said she never saw Mr. Barrett cook methamphetamine. She said that the prosecutors were upset with her after her first stage testimony because she had not made Mr. Barrett seem threatening. She stated, "They were very angry. They scared me and threatened me." Cindy stated that while the government never told her explicitly that it was all right to lie during her testimony, it was implied that she could lie and make things up so long as it helped the government's case and hurt Mr. Barrett.

Cindy Crawford stated that she was aware John Philpot had gone out to Kenneth Barrett's property not too long before the shooting of the trooper to check Mr. Barrett's guns, and there had been no problem. Cindy said that from the information she had about this incident, Mr. Barrett and John Philpot acted like they were old buddies.

Everything that Cindy Crawford stated to Mr. Anderson and me, as reported above, was detailed in a declaration for her signature. After the declaration was prepared, I brought it to Cindy and Travis's house, asked her to review it for accuracy, and to sign the declaration if it was accurate, as she promised she would. Cindy stated that she would not read the declaration. She then asked me to leave. When I continued to talk with Travis, Cindy Crawford called the sheriff's office, or pretended to. Cindy's statements and conduct indicated she would not read the declaration because she did not want to verify the things she stated previously, or risk getting into trouble for telling the truth about her testimony.

9

As part of my assigned work on Kenneth Barrett's case, I also interviewed Mary Rogers. Ms. Rogers identified herself to me as the widow of Bill Ed Rogers, who was an attorney in Sallisaw, Oklahoma, until he passed away. Bill Ed Rogers was appointed to represent Mr. Barrett on a 1997 criminal charge (State v. Barrett, CF-97-00086, one count of Unlawful Delivery of Controlled Drug, filed 3/24/97). I was advised that Mr. Barrett had "fired" Bill Ed Rogers. I had read the docket sheet, which neither reflected that a hearing had ever been held on Mr. Rogers' motion to withdraw, or that another attorney had substituted into the case. [Oklahoma District Court Records, "Case Detail"]

On December 5, 2008, I asked Ms. Rogers if she could locate Mr. Barrett's file. Ms. Rogers told me that after her husband died, she caused his files to be moved to her (their) former residence at 303 Fryar Drive, which is now her son's home. She told me she pulled Mr. Barrett's file from a carton that had a list of the files it contained. She stated that she copied the file in its entirety in the exact order it was in and returned it to the file in the same order. I picked up the copy of the file from her on December 12, 2008. Ms. Rogers stated that she is maintaining the original file with her husband's other business documents.

Ms. Rogers and I reviewed the file and there was no letter indicating that a warrant had been issued for Mr. Barrett's failure to appear. Ms. Rogers informed me that her husband was hurt about the way Mr. Barrett fired him and the untrue and paranoid accusations Mr. Barrett made about Mr. Rogers colluding with the prosecution. She stated that had her husband been told that a warrant had been issued, he would have noted it in the file because he was a good lawyer and he kept good records. Nothing in the file indicated that her husband received such notice.

When last week I asked Ms. Rogers to sign a declaration averring to the facts above, she

10

told me she would first seek the advice of counsel. Several days later, she advised me that her lawyer advised her not to sign anything. Neither she nor her lawyer had read the two-page declaration, one page of which was the signature page.

I called her lawyer, Michael Daffin, of Sallisaw several times. He did not return my calls. Last Friday, I went by his office and he apologized for not getting back to me and explained that he had been ill. He told me he was awaiting a call and hoped to be having gall bladder surgery in 10 minutes. Still, I asked him to read the declaration. He stated that if the facts were true he would have no problem having his client sign the declaration, but that he would likely not get to it prior to his surgery and recovery period, which put it past our filing date.

I went by his office on the following Wednesday (this week) and he had not yet had his surgery, but was having further testing on Thursday. I asked if I could have Ms Rogers call him. He said, "Sure." I called Ms. Rogers who seemed amenable, but said she could not make the call until Thursday morning when I knew Mr. Daffin had a doctor's appointment. Despite repeated efforts, I was not able to reach either one of them. Mr. Barrett's counsel then directed me to recite in this declaration my efforts to reach Ms. Rogers.

The file clearly indicated that Mr. Rogers had received a no-time offer from the state. In other words, if Mr. Barrett pleaded to the charge, he would not have gone to jail unless he violated the terms of his probation. There is a letter in the file from an assistant district attorney stating that discovery was ready to be picked up by Mr. Rogers. Based on my review of the file, Mr. Rogers did not obtain that discovery. [BILL ED Rodgers case file, CF-97-00086] When I sought it those files from the Sequoyah County clerk's office in January 2009, I was informed that all the files related to that case had been sent to the U.S. Attorney's office.

11



I declare under penalty of perjury that the foregoing 12-page declaration is true and correct.

Executed by me this 13th day of March, 2009, in Sequoya County, Oklahoma.

_____
Leonard Post

12

# Appendix G
Declaration of Roger Crawford

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,    )
                )
        *Movant,*    )
                )
v.                )      **Case No. 6:09-cv-00105-JHP**
                )
UNITED STATES OF AMERICA,    )
                )
      *Respondent.*  )

---

**EXHIBIT 92**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## DECLARATION OF ROGER CRAWFORD

I, Roger Crawford, declare the following:

I am Kenny Barrett's uncle by marriage. I am married to Phyllis, who is the sister of Gelene Dotson, Kenny's mother. We live next door to Gelene, and Kenny lived next to Gelene on the other side of her house.

My son is Travis Crawford. He is married to Cindy Crawford. I have known Cindy for years. I don't like to talk bad about anyone, but Cindy is a very dishonest person, and has been dishonest and untrustworthy for as long as I have known her. Cindy basically lies about anything and everything, especially if it means she can get something for herself. It is not only my personal opinion that Cindy is very dishonest, but I know that she has that reputation in the community. Cindy has gotten victim protective orders against people that were based on false information, and has even falsely informed on her own family members through the state Department of Human Services.

I am aware that Cindy has worked as an informant for the local police around here to avoid getting into trouble herself for things she has done. When Cindy testified against Kenny Barrett at his federal trial, I believe she was in some type of trouble, as she has been afterwards, but never had to serve a day in jail. My son Travis was also in legal trouble at the time he testified against Kenny Barrett, but he never had to do any jail time, either. I believe that is also true of the other informant witnesses who testified against Kenny.

At the time of Kenny's federal trial, his lawyers did not ask me about my

*RC*

knowledge of Cindy Crawford's dishonesty and reputation for dishonesty. Had they asked, I would have told them the things I said above and would have testified to her dishonesty.

An investigator named Leonard Post interviewed my son Travis on December 11, 2008 at my residence. My wife Phyllis and I were present when Mr. Post interviewed Travis. I recall that Travis told Mr. Post the following during the interview:

Travis told Mr. Post that he is Kenneth Barrett's first cousin on his mother's side of the family.

Travis related to Mr. Post that he and Kenny Barrett used to hunt and fish together, and were close. Travis said he was at Kenny's home practically every day. Travis told Mr. Post that Kenny was very generous to him, and would do anything in the world for him. Travis told Mr. Post that Kenny Barrett liked to help people and rarely left his property. Kenny would eat meals at his mother's house, and sometimes friends would bring him food.

Travis told Mr. Post that he had had a long struggle with drugs and has anxiety and panic attacks. He told Mr. Post that his mind does not work that well. Travis gave the example of going out to his truck to get something, and by the time he gets there, he will have forgotten what it was he was going to get. Travis told Mr. Post that when he gets problems with anxiety, he gets so nervous that he just does whatever it is that comes to mind. Travis told Mr. Post that he was like this as a child as well. As Travis told Mr. Post, and as I know, he is under a doctor's care and is trying to be healthy. Travis told

*RC*

Mr. Post that he was a long term methamphetamine user, and he thinks he would die if he used drugs again. As I am also aware, and as Travis told Mr. Post, Travis was told by his doctor that if he ever shot up drugs again, it would likely kill him.

Travis told Mr. Post that he is aware that his drug use was caused by psychological problems that he has and that he does not understand. Travis told Mr. Post that psychological problems run in his mother's side of the family, something I am also aware of. Travis told Mr. Post that he has three children (our grandchildren), one daughter and two sons. Travis talked about how his oldest child is a grown woman who suffers from bipolar disorder. Travis stated to Mr. Post that in his opinion, one of his sons seems a little slow and is having a hard time. Travis said that his other son, however, is a straight-A student, and Travis hopes that he will turn out alright.

Travis told Mr. Post that he had problems in school and joined the United States Army, trying to straighten himself out. Travis said that he was not able to handle Army life and spent two months in the brig. Travis said he just couldn't keep up with all the rules and was late to formation. It made him feel terrible when people he trained with in the Army made fun of him when they marched by the stockade. Travis told Mr. Post that he got a less than honorable discharge from the Army.

Also when Travis was talking to Mr. Post in front of me and his mother, Travis said that he testified falsely in Kenny Barrett's trial. Travis told Mr. Post that at the time he testified, he was living in so many places and was so strung out, that he did whatever he was told in order to keep out of trouble. Travis told Mr. Post that for several years

*RC*

before Kenny was arrested for shooting the trooper, through Kenny's two state trials and federal trial, and up until about four months before Mr. Post came to talk to him, he had been doing methamphetamine all day, every day. Travis told Mr. Post that when he testified against Kenny Barrett, he was high on meth. He also told Mr. Post that all of the snitches who testified against Kenny Barrett were on dope and high when they testified. Travis stated that he and the other snitches were also high on drugs when they were interviewed by prosecutor Mike Littlefield. Travis told Mr. Post that anybody who had been around drug addicts would have known that. Travis told Mr. Post that when John Philpot took him to see Mike Littlefield, he was sure Mr. Philpot knew he (Travis) was stoned. Travis told Mr. Post that at the time he was interviewed by Mike Littlefield, he felt as though he was already under arrest, and "didn't know if he was ever going to come back home."

Travis told Mr. Post that when Mr. Littlefield interviewed him about Kenny Barrett, he was scared to death of losing his freedom and said whatever he thought Littlefield wanted him to say. Travis said that when Mr. Littlefield asked him if Kenny Barrett said that he (Kenny) "was going down in a blaze of glory," before Travis could answer, Mike Littlefield told him all the bad things that would happen to him if he "lied." Travis told Mr. Post that he was so scared that he said, "yes," that Kenny Barrett would go down in a blaze of glory if the cops came to his residence. Travis said that when he gave this answer, he was panicking because he was afraid. Travis told Mr. Post that Mr. Littlefield told him he knew things about him. Travis repeated that he was extremely

RC

scared during his interview with Mr. Littlefield and said whatever it was Mr. Littlefield indicated he wanted Travis to say. Travis told Mr. Post that he never heard Kenny Barrett state that he was "going down in a blaze of glory" or anything like that.

Travis admitted to Mr. Post that he had testified against somebody before he testified in Kenny's case. That time, Travis said that he had been arrested for bad checks and was afraid of going to jail. Travis said the prosecution at the time of that case let him work for them so he would not get charged in the check case. Travis told Mr. Post that he wore a wire and made four or five drug buys. Travis said to Mr. Post that he believes he could have been killed while working for the police. Travis related that he had to testify against the person he bought drugs from, even though the police lied to him and told him he would not have to testify.

Travis stated to Mr. Post that he was aware John Philpot was at Kenny's residence just two weeks before the raid that led to the trooper getting killed. Travis said that when Mr. Philpot went to Kenny's place two weeks before the raid, Mr. Philpot had inspected Kenny's guns without any problem. Travis told Mr. Post that Kenny told him the local police had a drug case against him (Kenny), but it was not serious. Travis said to Mr. Post that Kenny Barrett never told him anything about an outstanding warrant for Kenny's arrest. Travis said to Mr. Post that at the time he testified against Kenny, he thought having a warrant and having a case were the same thing, but he now knows they are two different things.

Mr. Post asked Travis about the sign Kenny put on his fence. Travis told Mr. Post

*RC*

that Kenny put a sign on his fence just a couple of days before the police raided Kenny's property and Trooper Eales was killed. Travis told Mr. Post the sign was not directed at the police, but it was meant for anybody. According to what Travis told Mr. Post, the sign was to scare people away from trespassing on Kenny's property and stealing his stuff.

As I said before, I was interviewed by investigators working on Kenny's case, and my wife and I were present when Travis was interviewed. After the interviews, I was shown this declaration and was asked if it is accurate about what I told the investigators and what I heard Travis tell Mr. Post. I have read this declaration carefully and it says what I told the investigators and what I heard Travis say.

I declare, under penalty of perjury, that the foregoing 6-page declaration is true and correct.

Executed by me this *22* day of *FEBRUARY*, 2009, in *SEQUAYAH* County, Oklahoma.

Roger Crawford

# Appendix H
Declaration of Phyllis Crawford

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

**KENNETH EUGENE BARRETT,** )
)
*Movant,* )
)
**v.** )  **Case No. 6:09-cv-00105-JHP**
)
**UNITED STATES OF AMERICA,** )
)
*Respondent.* )

---

# EXHIBIT 91

# TO KENNETH EUGENE BARRETT'S

# AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

---

## Declaration of Phyllis Crawford

I, Phyllis Crawford, declare the following:

I am Kenneth Barrett's maternal aunt; Gelene Dotson, who is Kenny's mother, is my sister. I live with my husband, Roger. My son, Travis Crawford, has lived here on and off for many years. Our home is adjacent to Gelene's home and in front of Mark Dotson's home. I can see Kenny's old shack from my home. My family grew up on this land, and many of us still live around here.

We are a close knit family and, like all families, have our quarrels and disputes, but we try hard to help each other out. We feel guilty that we did not do more for Kenny. We did not do anything to get him the kind of mental health treatment he needed, even though our family has had to deal with mental illness for a long time.

Neither Gelene nor Ernie was ready to be a parent. I lived with Gelene and Ernie in Joliet for a few months when Roger was in the service at Ford Ord. Gelene was four months pregnant with Kenny. Even at that time, Gelene drank from the moment she woke up until she went to bed. When Ernie came home from work, Gelene immediately started in on him. Often, he would turn around and leave. I had intended on staying longer, but I could not stand it.

We knew that Kenny was different because he needed so much more attention as a child than the other children. He was extremely sensitive and cried over every little thing from the time he was small until he was a grown man. He was always hyperactive, on the go, into everything, and could not sit still. He would break down and cry easily.

Kenny had a very difficult relationship with both his parents, but he loved them dearly. Gelene never gave Kenny a kind word, and she screamed at him over anything.

When Kenny was about 11, Gelene called me because Kenny was crying and would not come out of his room. My husband Roger and I went over to their house and talked to Kenny. Kenny told us that he could not get his mom's voice out of his head. The only time Gelene talked to him was to scream. That is so sad.

Gelene had a lot of problems, especially with alcohol and men, that affected Kenny badly. Gelene had different men in the house all the time right when Kenny was entering his teenage years, and it was very confusing for him.

Gelene was and is a bona fide alcoholic, although she denies it. Gelene, who is three years older than I am, started drinking in high school. She used to beat me up with her fists. Now, Gelene drinks beer from the time she gets up until she goes to bed. She screams all the time, and I can hear it in my house after it's gone through her walls and across our yards. She cannot control her emotions. Gelene takes after our father, who was also a heavy drinker who generally wanted to fight when he was inebriated. My dad's relatives were drinkers as well.

Ernie, Kenny's father, was also a drinker. He hardly had anything to do with him after the divorce, and everyone could see how much it hurt Kenny. Ernie used to come to town once a year, and I remember him coming by to show off his new Corvette when his children did not have shoes or decent clothes to wear.

Kenny was never able to be independent as a grown man. His emotions got in the way of his being able to live too far from home. As an example, a couple of years before the incident, Kenny had run to my house in tears, crying, "The laws are after me. They're coming! What should I do?" I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did. Kenny had been

afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail. I have never been afraid of Kenny.

Kenny tried to stay close to home, always worked hard and took pride in his work. He would give you the shirt off his back if you needed it. Kenny was crazy about Abby, his wife. They married young and had a little boy in no time. After Kenny married, he and his wife lived off and on with his mother, and after his divorce he moved back home, building a little shack next door to this mother's. His suicide attempt tells it all. A friend and I witnessed it right from my front window. I almost passed out. Kenny pulled his truck into his mother's driveway, went in her house and got Steve's gun, came outside and shot himself. We rushed over to him, and heard him mumbling and not making any sense. An ambulance came and took him to the hospital where he stayed almost two weeks.

We have learned a lot about depression and mental illness as our children grew up. It runs in our family. I have depression and I get treated for it. My daughter Gwen is bipolar, and her son has a rare disorder that makes him unable to talk or mature; he is like a little child. My son Travis also has to have psychiatric treatment for anxiety and panic attacks and lives with me and my husband.

This whole tragedy with the police officer did not have to happen. Instead of raiding Kenny's house in the middle of the night, all they had to do was come to me and I would have walked over to his house and told him that he had to come with me and be arrested and he would have come.

I know that my son Travis testified in the federal trial against Kenny. I was here in December 2008 when an investigator working on Kenny's case listened to what Travis

had to say about his testimony. My husband, Roger, was here and listened to the conversation, too. I have read the part of Roger's declaration where he talks about what Travis told the investigator, and I agree that is what Travis told him.

This declaration I am giving includes what I told the investigator when he asked me about Kenny, our family, Kenny's upbringing, and his interview with Travis. I did not write the declaration myself, but it says what I told the investigator.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this _22_ day of Feb 2009, in _Sequoyah_ County, Oklahoma.

Phyllis Crawford