# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

No. 12-7086

**UNITED STATES OF AMERICA,**
*Respondent/Appellee,*

**v.**

**KENNETH EUGENE BARRETT,**
*Petitioner/Appellant.*

APPEAL FROM U.S. DISTRICT COURT, EASTERN DISTRICT OF OKLAHOMA
THE HONORABLE JAMES H. PAYNE, CHIEF UNITED STATES DISTRICT JUDGE
CASE NO. CIV-09-105-JHP

**RESPONDENT/APPELLEE'S BRIEF**

**ORAL ARGUMENT IS REQUESTED**

Respectfully submitted,

DAVID A. O'NEIL
Acting Assistant Attorney General
United States Department of Justice

Jeffrey B. Kahan
Trial Attorney
U.S. Department of Justice
1331 F Street, N.W.; Rm. 337
Washington, D.C. 20530
Tel: (202) 305-8910
Jeffrey.Kahan@usdoj.gov

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

Christopher J. Wilson
Assistant United States Attorney
Eastern District of Oklahoma
520 Denison Avenue
Muskogee, OK 74401
Tel: (918) 684-5100
Chris.Wilson@usdoj.gov

**May 6, 2014**

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................... i

TABLE OF AUTHORITIES ............................................................................ iv

STATEMENT OF PRIOR OR RELATED APPEALS...............................................1

STATEMENT OF JURISDICTION......................................................................1

ISSUES PRESENTED FOR REVIEW ...................................................................2

STATEMENT OF THE CASE...............................................................................3

   A. Procedural History and Rulings Presented for Review ...................................3

   B. Statement of Facts ........................................................................................4

SUMMARY OF ARGUMENT .........................................................................10

STANDARD OF REVIEW ..............................................................................12

ARGUMENT .....................................................................................................12

I. TRIAL COUNSEL PROPERLY INVESTIGATED AND PRESENTED
EVIDENCE CONCERNING POLICE TACTICS ...............................................12

   A. Background...................................................................................................12

   B. Counsel's Decision to Call Choney as a Witness, and Not Kirkham, Was
Reasonable and not Prejudicial .........................................................................14

      1. Applicable Doctrine ................................................................................14

      2. Counsel's Reasonable Performance..........................................................16

      3. Absence of Prejudice ...............................................................................18

      4. Evidentiary Hearing .................................................................................22

II. TRIAL COUNSEL PROPERLY DECLINED TO CALL AN EXPERT IN
CRIME SCENE RECONSTRUCTION ..............................................................23

   A. Background...................................................................................................23

   B. Counsel's Decision not to Call an Expert Witness to Attempt to Rebut
Dalley's Testimony Was Reasonable and not Prejudicial ...................................24

      1. Limitations of the Certificate of Appealability...........................................24

      2. Counsel's Reasonable Performance..........................................................26

3. Absence of Prejudice ......................................................................29

4. Evidentiary Hearing .......................................................................34

III. TRIAL COUNSEL PROPERLY DECLINED TO CALL AN EXPERT ON MENTAL HEALTH DURING THE GUILT PHASE TRIAL .............................35

    A. Counsel's Decision To Forego Guilt Stage Mental Health Expert Testimony Was Reasonable and Not Prejudicial. ................................................36

    B. Absence of Prejudice. ...................................................................40

    C. Evidentiary Hearing. ....................................................................43

IV. TRIAL COUNSEL DID NOT OMIT ANY VALID REQUESTS FOR GUILT PHASE JURY INSTRUCTIONS ................................................................43

    A. Defense Counsel's Failure to Request Jury Instructions on Possible Defense Theories Was not Ineffective ........................................................44

        1. Self-Defense Instruction ...........................................................45

        2. Identity-of-Victim instruction ...................................................48

        3. Actually manufacturing or distributing drugs.............................49

    B. Defense Counsel's Failure To Request Instructions On The Credibility Of Certain Witnesses Who Were Addicted To Drugs Was Not Ineffective ............51

    C. The District Court did not Err in Declining to Hold an Evidentiary Hearing 54

V. TRIAL COUNSEL APPROPRIATELY PRESENTED MITIGATION EVIDENCE.............................................................................................55

    B. Counsel Validly Elected a Mitigation Strategy, and Any Forgone Evidence Would Have Been Counterproductive ................................................59

    C. Absence of Prejudice ....................................................................63

VI. THE TRIAL COURT PROPERLY DENIED LESSER INCLUDED OFFENSE INSTRUCTIONS ......................................................................68

    A. Barrett Procedurally Defaulted on this Claim ...............................69

    B. Voluntary Manslaughter Was Not Available as a Lesser Included Offense ..70

        1. The Offense for Which Barrett Received the Death Penalty.......................71

        2. The Offenses for Which Barrett did not Receive the Death Penalty...........74

    C.  Harmless Error ............................................................................77

CONCLUSION ................................................................................78

STATEMENT REGARDING ORAL ARGUMENT ............................................78

CERTIFICATE OF WORD COUNT COMPLIANCE.............................................79

CERTIFICATE OF DIGITAL SUBMISSION .......................................................80

CERTIFICATE OF ECF FILING AND DELIVERY.............................................80

# TABLE OF AUTHORITIES

## CASES

Alcala v. Woodford,
  334 F.3d 862 (9th Cir. 2003) ............................................................ 37, 60

Bacon v. Lee,,
  224 F.3d 470 (4th Cir. 2000) ................................................................37

Beck v. Alabama,
  447 U.S. 625 (1980) ...................................................................... 70, 73

Berghuis v. Thompkins,
  560 U.S. 370 (2010) ............................................................................44

Bobby v. Van Hook,
  558 U.S. 4 (2009) ...............................................................................15

Boyle v. McKune,
  544 F.3d 1132 (10th Cir. 2008) .............................................. 15, 16, 26

Brecht v. Abrahamson,
  507 U.S. 619 (1993) ...................................................................... 77, 78

Bryson v. Ward,
  187 F.3d 1193 (10th Cir. 1999) ..........................................................73

Burger v. Kemp,
  483 U.S. 776 (1987) ...................................................................... 36, 60

Campbell v. United States,
  364 F.3d 727 (6th Cir. 2004) ..............................................................49

Cannon v. Gibson,
  259 F.3d 1253 (10th Cir. 2001) ..........................................................67

Chandler v. United States,
  218 F.3d 1305 (11th Cir. 2000) ...................................................... 28, 36

Cole v. United States Atty. Gen.,
    712 F.3d 517 (11th Cir. 2013) ...................................................................32

Cullen v. Pinholster,
    563 U.S. ___, 131 S. Ct. 1388 (2011) ......................................... 26, 27

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579 (1993) ...................................................................23

Dodge v. Cotter Corp.,
    328 F.3d 1212 (10th Cir. 2003) ...................................................20

Druery v. Thaler,
    647 F.3d 535 (5th Cir. 2011) .......................................................74

Duty v. Workman,
    366 Fed. Appx. 863 (10th Cir. 2010) .........................................15

Duvall v. Reynolds,
    139 F.3d 768 (10th Cir. 1998) ....................................................67

Earhart v. Johnson,
    132 F.3d 1062 (5th Cir. 1998) ....................................................16

Edens v. Hannigan,
    87 F.3d 1109 (10th Cir. 1996) ........................................ 15, 17, 18

Florida v. White,
    526 U.S. 559 (1999) ...................................................................12

Fox v. Ward,
    200 F.3d 1286 (10th Cir. 2000) ........................................... 15, 18

Gonzalez v. United States,
    553 U.S. 242 (2008) ............................................................ 44, 52

Hedrick v. True,
    443 F.3d 342 (4th Cir. 2006) ......................................................36

Henderson v. Norris,
    118 F.3d 1283 (8th Cir. 1997) ....................................................42

Hooks v. Ward,
 184 F.3d 1206 (10th Cir. 1999) ................................................................ 70, 72

Hooks v. Workman,
 689 F.3d 1148 (10th Cir. 2012) ........................................... 14, 26, 28

Hooper v. Mullin,
 314 F.3d 1162 (10th Cir. 2002) ................................................................21

Hopkins v. Reeves,
 524 U.S. 88 (1998) ............................................................ 70, 73, 76

Kimmelman v. Morrison,
 477 U.S. 365 (1986) ................................................................14

Le v. Mullin,
 311 F.3d 1002 (10th Cir. 2002) ................................................................46

Leocal v. Ashcroft,
 543 U.S. 1 (2004) ................................................................32

McGee v. Higgins,
 568 F.3d 832 (10th Cir. 2009) ................................................................47

Miller–El v. Cockrell,
 537 U.S. 322 (2003) ............................................................ 24, 25

Neder v. United States,
 527 U.S. 1 (1999) ................................................................72

People v. Villegas,
 113 Cal. Rptr. 2d 1 (2001) ................................................................33

Phillips v. Workman,
 604 F.3d 1202 (10th Cir. 2010) ................................................................73

Premo v. Moore,
 131 S. Ct. 733 (2011) ................................................................14

Romano v. Gibson,
 239 F.3d 1156 (10th Cir. 2001) ................................................................61

Slack v. McDaniel,
    529 U.S. 473 (2000) ........................................................................25

Smith v. Workman,
    550 F.3d 1258 (10th Cir.2008) ......................................................69

Spaziano v. Florida,
    468 U.S. 447 (1984) ........................................................................73

Stouffer v. Trammell,
    738 F.3d 1205 (10th Cir. 2013) ...................................... 22, 34, 43, 55

Strickland v. Washington,
    466 U.S. 668 (1984) ................................................................. passim

Tarver v. Hopper,
    169 F.3d 710 (11th Cir. 1999) ......................................................60

Taylor v. Workman,
    554 F.3d 879 (10th Cir. 2009) ................................................ 70, 77

Thomas v. Gilmore,
    144 F.3d 513 (7th Cir. 1998) ................................................. 36, 60

Thornburg v. Mullin,
    422 F.3d 1113 (10th Cir. 2005) .....................................................53

Tompkins v. Moore,
    193 F.3d 1327 (11th Cir. 1999) .....................................................42

Trujillo v. Sullivan,
    815 F.2d 597 (10th Cir. 1987) ......................................................77

United States v. Barrett,
    496 F.3d 1079 (10th Cir. 2007) ............................................... passim

United States v. Beckford,
    966 F. Supp. 1415 (E.D. Va. 1997) ......................................... 71, 73

United States v. Brown,
    287 F.3d 965 (10th Cir. 2002) ......................................................70

United States v. Brown,
326 F.3d 1143 (10th Cir. 2003)......................................................................... 40, 41

United States v. Cameron,
907 F.2d 1051 (11th Cir. 1990)........................................................................40

United States v. Chanthadara,
230 F.3d 1237 (10th Cir. 2000).................................................................. passim

United States v. Cook,
949 F.2d 289 (10th Cir.1991)...................................................................... 53, 54

United States v. Crockett,
435 F.3d 1305 (10th Cir. 2006).......................................................................44

United States v. Dixon,
1 F.3d 1080  (10th Cir. 1993).........................................................................12

United States v. Fields,
516 F.3d 923 (10th Cir. 2008).........................................................................74

United States v. Flood,
713 F.3d 1281 (10th Cir. 2013).......................................................................12

United States v. Garcia,
625 F.2d 162 (7th Cir. 1980)...........................................................................47

United States v. Gresher,,
802 F.2d 373 (10th Cir.1986).........................................................................45

United States v. Harms,
371 F.3d 1208 (10th Cir.2004)..................................................................... 22, 43

United States v. Hollis,
552 F.3d 1191 (10th Cir. 2009).......................................................................69

United States v. LeCroy,,
739 F.3d 1297 (11th Cir. 2014).......................................................................45

United States v. Lewis,
594 F.3d 1270 (10th Cir.2010).................................................................. passim

United States v. McGaughy,
670 F.3d 1149 (10th Cir. 2012)......................................................................69

United States v. McVeigh,
153 F.3d 1166 (10th Cir. 1998)......................................................................72

United States v. Mejia,
545 F.3d 179 (2d Cir. 2008) ..........................................................................21

United States v. Miguel,
338 F.3d 995 (9th Cir. 2003)..................................................... 75, 76

United States v. Murray,
751 F.2d 1528 (9th Cir.1985) .................................................... 16, 17

United States v. Nguyen,
155 F.3d 1219 (10th Cir. 1998)......................................................................74

United States v. Nguyen,
413 F.3d 1170 (10th Cir. 2005) .....................................................................15

United States v. Nicholson,
983 F.2d 983 (10th Cir. 1993)........................................................................52

United States v. Oakland Cannabis Buyers' Co-op,
532 U.S. 483 (2001) ......................................................................................71

United States v. Parker,
720 F.3d 781 (10th Cir. 2013)........................................................................24

United States v. Pearson,
159 F.3d 480 (10th Cir. 1998)................................................... 74, 75

United States v. Pearson,
203 F.3d 1243 (10th Cir. 2000)......................................................................75

United States v. Regnier,
44 Fed.Appx. 524 (2d Cir. 2002) ...................................................................75

United States v. Rodriguez,
502 Fed.Appx. 637 (9th Cir. 2012) ................................................................47

United States v. Rushin,
642 F.3d 1299 (10th Cir. 2011) ..................................................................12

United States v. Serawop,
410 F.3d 656 (10th Cir. 2005) .............................................. 71, 76

United States v. Shaffer,
472 F.3d 1219 (10th Cir. 2007) .................................................................20

United States v. Smith,
692 F.2d 658 (10th Cir. 1982) .............................................. 52, 53

United States v. Snyder,
787 F.2d 1429 (10th Cir. 1986) .............................................. 15, 26

United States v. Toledo,
739 F.3d 562 (10th Cir. 2014) .............................................. 45, 70, 72

United States v. Visinaiz,
428 F.3d 1300 (10th Cir.2005) .................................................................45

United States v. Wolny,
133 F.3d 758 (10th Cir.1998) .............................................. 49, 51

United States v. Wood,
207 F.3d 1222 (10th Cir. 2000) .............................................. 72, 75

United States v. Young,
862 F.2d 815 (10th Cir. 1988) .................................................................51

Wallace v. Ward,
191 F.3d 1235 (10th Cir. 1999) .............................................. 61, 62, 65, 66

Waters v. Thomas,
46 F.3d 1506 (11th Cir. 1995) .............................................. 36, 60

Whalen v. United States,
445 U.S. 684 (1980) .................................................................74

Wiggins v. Smith,
539 U.S. 510 (2003) .................................................................36

Williams v. Bowersox,
  340 F.3d 667 (8th Cir. 2003) ................................................................ 15, 26, 27

Williams v. Illinois,
  567 U.S. ___, 132 S. Ct. 2221 (2012) ...............................................................21

Williams v. Woodford,
  384 F.3d 567 (9th Cir. 2004) ...............................................................44

## STATUTES

18 U.S.C. § 1111 .................................................................................... 71, 73, 74

18 U.S.C. § 1112 ....................................................................................71

18 U.S.C. § 924(c) ................................................................................3, 48

18 U.S.C. § 924(j) .................................................................................... 73, 74

21 U.S.C. § 841 ....................................................................................50

21 U.S.C. § 848(e) ................................................................................3, 71

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 2253(c)(2) ................................................................................25

28 U.S.C. § 2255 .................................................................................... 1, 4, 12, 24

## RULES

Fed. R. App. P. 4(a) ....................................................................................1

Fed. R. Evid. 607 ....................................................................................17

Fed. R. Evid. 702 ....................................................................................20

Fed. R. Evid. 704 ....................................................................................20

**STATEMENT OF PRIOR OR RELATED APPEALS**

In Case No. 06-7005, this Court affirmed Barrett's conviction and death sentence on direct appeal. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007). Subsequently, in *In re Barrett*, Case No. 09-7096, this Court denied Barrett's petition for a writ of mandamus seeking to disqualify the trial judge, the Honorable James H. Payne, from Barrett's 28 U.S.C. § 2255 proceedings.

**STATEMENT OF JURISDICTION**

The district court had jurisdiction over Barrett's claims pursuant to 28 U.S.C. § 2255. The district court denied the § 2255 motion on August 16, 2012 and judgment was entered that same day. 2255 Docs. 214, 216.[1]. Thereafter, Barrett sought reconsideration of that ruling, which the district court denied by written order on October 30, 2012. 2255 Doc. 221. Barrett filed his notice of appeal on December 26, 2012. 2255 Doc. 222.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and Fed. R. App. P. 4(a).

---

[1] Throughout this brief, "Trl. Doc." refers to the docket in Eastern District of Oklahoma case no. CR-04-115-P, while "2255 Doc." refers to the docket in Eastern District of Oklahoma case no. CV-09-105-P.

## ISSUES PRESENTED FOR REVIEW

This Court's Case Management Order (Doc. 01019047087) granted a certificate of appealability ("COA") for the following issues:

1.  Whether trial counsel provided ineffective assistance in the guilt phase by failing to investigate and present mental-health evidence;

2.  Whether trial counsel provided ineffective assistance in the guilt phase by failing to seek an instruction concerning the credibility of drug-addict witnesses;

3.  Whether trial counsel provided ineffective assistance in the guilt phase by failing to seek an instruction on the defense's theory of the case;

4.  Whether trial counsel provided ineffective assistance in the guilt phase by failing to present a crime-scene expert;

5.  Whether trial counsel provided ineffective assistance in the guilt phase by failing to present an expert as to whether the police tactics employed during the search warrant's execution would have identified the police as law-enforcement personnel;

6.  Whether trial counsel provided ineffective assistance in the penalty phase by failing to develop mitigation evidence; and

7.  Whether appellate counsel provided ineffective assistance by not raising the trial court's refusal to give a lesser-included-offense instruction.

The Case Management Order notes that no certificate is required for Barrett to assert cumulative prejudice arising from multiple allegations of ineffective assistance of counsel.

## STATEMENT OF THE CASE

A.  Procedural History and Rulings Presented for Review

A federal grand jury for the Eastern District of Oklahoma returned a superseding indictment that charged appellant Kenneth Barrett with using and carrying a firearm during and in relation to drug trafficking crimes (18 U.S.C. § 924(c)(1)(A) & (j)); carrying a firearm in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A) & (j)); and intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer engaged in the performance of his official duties (21 U.S.C. § 848(e)(1)(B)).  Trl. Docs. 9 & 52.  The government noticed its intent to seek the death penalty on all counts.  Trl. Doc. 60.

A jury convicted Barrett as charged.  Trl. Doc. 241.  Following a penalty phase trial, the jury recommended a death sentence on Count 3 and life sentences on Counts 1 and 2, all of which the trial court imposed.  Trl. Docs. 258 & 285. Barrett appealed, and this Court affirmed the judgment in a published opinion that the Supreme Court declined to review.  *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 552 U.S. 1260 (2008).

Barrett filed a Motion for Collateral Relief pursuant to 28 U.S.C. § 2255 in the district court, asserting 17 claims of error. 2255 Doc. 1. He subsequently filed an Amended Motion that raised 19 claims of error. 2255 Doc. 70. The district court granted Barrett leave to refile his Amended Motion – in compliance with pertinent court rules – and also to submit a brief in support of his Motion. 2255 Doc. 81. Barrett subsequently filed the reformatted Motion and the supporting brief. 2255 Docs. 95 & 149. The government filed a response in opposition (2255 Doc. 175), and Barrett filed a reply (2255 Doc. 178). The district court denied relief on all issues without an evidentiary hearing. 2255 Docs. 214 to 216.

Barrett filed a notice of appeal in the district court, which had previously denied a COA. 2255 Docs. 214 & 222. This Court subsequently granted a COA for the seven issues listed above.

B. Statement of Facts

On January 28, 1999, an Oklahoma state court issued a warrant for Barrett's arrest on charges of unlawful delivery of a controlled drug and failure to appear for a jury trial in Sequoyah County case number CF-97-86. Tr. 2:303, 323; Gov't Trl. Ex. 87. Though Barrett was not immediately arrested, the police continued to investigate him. In September of 1999, Supervising Agent Clint Johnson of Oklahoma's District Twenty-Seven Drug Task Force learned from a confidential informant, Charles Sanders, that Barrett was making and selling methamphetamine

at home.  Tr. 2:303-04, 11:2520-22.  Sanders had frequently seen Barrett selling methamphetamine at his home.  Tr. 11: 2511, 2515, 12: 2631-33.  He had also heard Barrett threaten to kill law enforcement officers if they attempted to serve the bench warrant.  Tr. 11:2515.  Relying on that information, Johnson prepared a warrant, issued September 20, 1999, that authorized police officers to conduct a search at night and to enter the home without knocking and announcing due to Barrett's violent and unstable nature.  Tr.2:305-06; Gov't Trl. Ex. 88.

Johnson considered the warrant "high risk," and therefore beyond the capabilities of local law enforcement.  Tr. 2:307-08.  He therefore contacted the Oklahoma Highway Patrol's Tactical Team (Tact Team) for assistance.  Johnson met with two team members, Troopers John Hamilton and Raymond Greninger, whom he provided with background information that the troopers relayed to Lieutenant Kerry Pettingill.  Tr. 2:307-12, 3:495-501, 4:704-08.  Ultimately, a decision was made that the highly trained Tact Team, which specialized in executing high risk search warrants would enter Barrett's home, permitting the Task Force to search it.  Tr. 2: 307, 3: 501, 7:1467-69.

On September 23, 1999, eleven Tact Team members met to craft their initial entry plan, which included the insertion of a surveillance team near the residence prior to the raid.  Tr. 3:503-11, 4:712-719.  That evening, three team members drove by Barrett's home in an unmarked Ford Bronco and discovered that the

neighboring residences were closer to the property than previously realized; that a locked gate blocked the south entrance to Barrett's home; and that the surrounding area lacked concealment and harbored roaming dogs, which would frustrate the stealth of a surveillance team. Tr. 3:514-21. After observing the Bronco, Barrett spoke with his cousin, Travis Crawford, who had also seen the vehicle pass. Barrett indicated that he had recognized the Bronco as a police vehicle. When Crawford predicted the police would return to serve the warrant, Barrett responded, "D.G.F.," which, according to Crawford, meant "Don't give a fuck." Barrett told Crawford that "he was going out in a blaze of glory." Tr. 3:465-66.

In light of observations made during the drive-by, the Tact Team decided to enter Barrett's property from the east. Tr. 3:520. Specifically, it planned that two Ford Broncos and a marked patrol unit would drive past Barrett's locked fence, turn north on a private driveway to the east of the property, then proceed west onto a trail that entered land through a ditch. Tr. 3:523-25. The six occupants of the three vehicles would enter the house on foot after the patrol car's driver breached the front door with a ram. Tr. 3:524. A marked patrol car would stop at the locked front gate. One of its occupants would remain outside the gate to cover other team members; the second and third occupants would scale the gate, enter the property on foot, and prevent Barrett from escaping to the west. Tr. 3:524, 6:1239-42.

Finally, a fifth unit, a Chevrolet Suburban, would enter the driveway of Barrett's mother's home. Tr. 7:1487.

Around 12:30 a.m. on September 24, 1999, the Tact Team met members of the Task Force at a major intersection near Barrett's residence. Tr. 3:527-28, 7:1488-90. From there, the Tact Team headed to Barrett's home, and the Task Force vehicles waited two minutes before following. Tr. 2:343.

Trooper Hamilton drove the Tact Team's lead Bronco. As he traveled eastbound past Barrett's home, he saw Barrett's son, Toby Barrett, standing in the front yard. Hamilton, attempting to maneuver the Bronco while watching Toby Barrett, missed the turn onto the driveway adjacent to Barrett's property and hit a post. After reversing the vehicle, he entered the driveway then turned westbound toward Barrett's house. The Bronco entered a deep ditch just inside Barrett's property line. Tr. 2:273, 3:532-36; Gov't Trl. Exs. 1, 69, 98. As Hamilton approached the house, Troopers Gene Hise and Robert Darst arrived scaled Barrett's fence and commanded Toby Barrett to lie on the ground. Tr. 6:1248-49. While a trooper restrained him, Toby Barrett turned his head toward the house and screamed "Dad." Tr. 6:1263.

By the time Toby Barrett shouted for his father, the lead vehicle had exited the ditch and begun receiving gunfire to the windshield, at approximately "head level" of Hamilton and his passenger, Trooper David Eales. Tr. 3:537, 4:736,

7

5:989, 1096-97, 1156, 6:1263.  The gunfire intensified as the vehicle neared the residence, and Hamilton was hit in the face with bullet or glass fragments.  Tr. 3:539, 544, 556-57.

The second Tact Team vehicle, a Ford Bronco occupied by Troopers Raymond Greninger and Ricky Manion, was immediately behind Hamilton's truck.  Unlike the first vehicle, its emergency strobe and flashing headlights were on.  Tr. 4:732-33, 785, 5:1096.  The third Tact Team vehicle, a marked highway patrol unit driven by Trooper Hash, was less than a car length behind the second Bronco.  Hash's car also had its emergency lights on.  The vehicles' emergency lights illuminated the smoke from Barrett's residence.  Tr. 5:985, 1154, 7:1101.

Hamilton stopped the Bronco in front of Barrett's residence and ducked between the bucket seats.  Tr. 5:540, 563-64.  His passenger, Trooper Eales, opened the front passenger door, exited the vehicle, and moved to the rear, but was struck by three gunshots before reaching cover.  Tr. 5:997-98, 1101-02, 7:1605-07, 1610-15.  Hamilton threw a flash bang grenade out his window.  Tr. 3:541, 543-44.  After the device detonated, Hamilton exited the Bronco and moved to the rear of the vehicle, sustaining a gunshot wound in the back of his left shoulder.  Behind the Bronco, Hamilton saw Eales lying face down, and Manion assisting him.  Tr. 3:544-45.

8

From the rear of the Bronco, Hamilton and Manion observed Barrett standing in his doorway holding a rifle.  Tr. 3:546, 5:1104.  Hamilton fired two rounds at Barrett, but missed.  Tr. 3:547.  Manion moved to the east side of Barrett's house and fired two short bursts of automatic gunfire through a window.  Tr. 5:1105-11.  Barrett sustained leg wounds and fell face down through the doorway, dropping his rifle.  Hamilton then entered the house and ordered the shooter outside.  When Barrett said he could not comply with the direction, Troopers Hamilton, Manion and Hash dragged him into the front yard.  Tr. 3: 548-51, 5:1142.  In the front of his waistband, Barrett carried a pistol, which Trooper Danny Oliver saw.  Oliver shouted a warning to the other troopers, and Manion pulled Barrett's arms from underneath him.  Manion then handcuffed Barrett and recovered the pistol.  Tr. 5:1112-13, 1163.

After unsuccessfully attempting to provide medical assistance to Eales, Tact Team members transported him to a local hospital, where he was pronounced dead.  Tr. 2:318-20.  An autopsy indicated that Eales suffered wounds to his chest, left flank, and right arm, apparently while facing away from Barrett.  The bullet to Eales's chest entered his upper back, broke four ribs, and perforated the left upper lung lobe and aorta, causing death.  Tr. 7:1598-1620, 8:1655, 1680, 1686-87.

Eighteen bullets struck Hamilton and Eales's Bronco.  Tr. 14:3168.  Subsequent investigation disclosed that Barrett fired around 19 shots at the Tact

9

Team with a Colt Sporter .223 caliber rifle. The rifle was equipped with three magazines that Barrett had taped together, providing a total of 91 available rounds. Tr. 9:1883-84, 2008-18, 2049-51. A search of Barrett's property led to the recovery of several firearms, including a loaded 12 gauge shotgun and a loaded .22 caliber pistol. Tr. 9:1888-89, 1996-97. The police also seized materials used in injecting and manufacturing methamphetamine (e.g., coffee filters, hypodermic needles, digital scales, pseudoephedrine, iodine, plastic tubing, and toluene). Tr. 11:2360, 2368-69, 2376, 2384, 2388, 2393, 2398, 2465. A search of Barrett's person produced a plastic baggie containing red phosphorous, a lighter, and approximately $2100 in cash. Tr. 8:1800, 16:3620-25, 3627, 3654-58, 10:2130.

## SUMMARY OF ARGUMENT

I. Barrett's trial attorneys validly chose to present a police tactics expert who was personally aligned with the interests of the government, but who had previously testified to facts that supported the theory of the defense.

II. Barrett's trial attorneys validly chose not to present the testimony of a defense-retained expert on crime scene reconstruction to counter a government witness. Trial counsel knew, from the government witness's prior testimony, that she would provide limited assistance to the prosecution and would concede some facts helpful to the defense.

10

III.  Barrett's trial attorneys, after appropriate investigation based upon the information then available, properly declined to present a mental health expert during the guilt phase.  Barrett was personally opposed to the presentation of such evidence, and the strategic choice to forego such evidence did not result in prejudice.

IV.  Barrett's trial attorneys made appropriate requests for jury instructions. The law and facts of this case would not have supported requests for instructions on self-defense, Barrett's ignorance of his victim's association with the police, or Barrett's lack of active involvement in drug manufacture contemporaneous with the killing.  Likewise, a request for an instruction regarding the credibility of drug-addicted witnesses was appropriately omitted, as it would have potentially strengthened the government's case at the expense of the defense.

V.  Barrett's trial attorney presented reasonable mitigation evidence during the penalty phase.  Based upon pretrial investigation and their client's own wishes, Barrett's trial attorneys did not emphasize certain mitigation evidence Barrett now claims should have been introduced.  Barrett was not prejudiced by this strategic decision.  In fact, the available information would have cast him in an unfavorable light, making a death penalty verdict even more likely.

VI.  Barrett, by failing to raise the issue on appeal, defaulted his claim that the trial court should have instructed the jury on manslaughter as a lesser-included

offense of the charged crimes.  In fact, manslaughter is not a lesser included offense of any of the charges.

**STANDARD OF REVIEW**

This Court reviews de novo a district court's denial of ineffective assistance of counsel claims raised in a § 2255 motion.  *United States v. Rushin*, 642 F.3d 1299, 1302 (10th Cir. 2011).  The Court is "authorized to affirm on any grounds that are supported on the record."  *United States v. Dixon*, 1 F.3d 1080 n.8, 1084 (10th Cir. 1993), *abrogated on other grounds by Florida v. White*, 526 U.S. 559 (1999).  It reviews the denial of an evidentiary hearing for abuse of discretion. *United States v. Flood*, 713 F.3d 1281, 1290 (10th Cir. 2013).

**ARGUMENT**

**I.  TRIAL COUNSEL PROPERLY INVESTIGATED AND PRESENTED EVIDENCE CONCERNING POLICE TACTICS**

A.  Background

During Barrett's state court prosecution, Cloyce Choney testified for the prosecution, but provided evidence favorable to the defense on cross-examination. Choney was a former SWAT team leader for the FBI, who was called by the State of Oklahoma during its prosecution of Barrett, but was critical of the arrest team on cross-examination.  Choney's association with the victim, and reluctance to testify for Barrett, underscored his credibility, as defense counsel observed.  *See* Tr. March 22, 2005 at 14-15.

Defense counsel ultimately called Choney during Barrett's federal trial.  In his testimony, Choney criticized several aspects of the Tact Team's conduct.  Tr. 17: 3905-09, 3919, 3974-75.  For example, Choney observed that no-knock warrant services were disfavored and inherently dangerous (Tr. 17: 3906-07, 3919), that the team's plan should have included a contingency for compromised stealth (Tr. 17: 3907), that the team's plan should have included a contingency for an injured officer (Tr. 17: 3908-09), that containment was preferable to forced entry (Tr. 17: 3905-06), and that the lead vehicle should have had illuminated emergency lights (Tr. 17: 3974-75).

In his § 2255 Motion, Barrett claimed that counsel erred in calling Choney and should have instead presented George Kirkham, whose declaration Barrett presented as evidence of the foregone testimony.  2255 Docs. 95 at 139-43 & 149 at 77-88.  Kirkham was an emeritus professor of criminology at Florida State University, and (according to Barrett) would have testified that the Tact Team's raid was reckless and resulted in Trooper Eales's foreseeable and preventable death.  2255 Doc. 95 Ex. 44; AB 17.  The district court denied relief.  2255 Doc. 214 at 155-57.  On appeal, Barrett claims that the district court erred and trial counsel were prejudicially ineffective in presenting Choney, rather than Kirkham, to criticize the Tact Team.  Barrett argues that, at the very least, he is entitled to remand for an evidentiary hearing.  AB 13-26, 50-51; COA #5.

B.  <u>Counsel's Decision to Call Choney as a Witness, and Not Kirkham, Was Reasonable and not Prejudicial</u>

A trial lawyer's selection of witnesses is a matter peculiarly committed to tactical discretion.  Barrett has not shown his attorneys were unreasonable in deciding to present police-practices evidence through Choney, whose credibility was above reproach.  In any event, Barrett cannot show that the decision to call a different witness would have likely led to a more favorable outcome, nor can he show that the district court abused its discretion in denying him an evidentiary hearing.

1.  <u>Applicable Doctrine</u>

A successful ineffective assistance of counsel claim requires a showing that the attorney's "performance 'fell below an objective standard of reasonableness' and 'the deficient performance prejudiced the defense.'"  *Hooks v. Workman*, 689 F.3d 1148, 1195 (10th Cir. 2012)(citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)).

The first prong requires a showing that, under "all the circumstances," specific acts or omissions fell "outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.  This standard is "highly demanding."  *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986); *see Premo v. Moore*, 131 S. Ct. 733, 739 (2011).  Challenged conduct is evaluated from counsel's perspective at the time of the alleged error, making "every effort . . . to 'eliminate the distorting

effects of hindsight.'"  *Edens v. Hannigan*, 87 F.3d 1109, 1114 (10th Cir.

1996)(quoting *Strickland*, 466 U.S. at 689).  The court must decide if

"representation amounted to incompetence under 'prevailing professional norms,'

not whether it deviated from best practices or most common custom."  *Id.* (quoting

*Strickland*, 466 U.S. at 690).  Thus, performance guidelines, like those propounded

by the ABA, "are mere guides to reasonableness."  *Duty v. Workman*, 366 Fed.

Appx. 863, 871 n.6 (10th Cir. 2010) (quoting *Bobby v. Van Hook*, 558 U.S. 4, 7-8

(2009) (rejecting treatment of ABA Guidelines as "inexorable commands")).

Choosing witnesses "is quintessentially a matter of strategy."  *Boyle v.

McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008); *see also United States v. Snyder*,

787 F.2d 1429, 1432 (10th Cir. 1986) (collecting cases for the proposition that "to

call a particular witness is a tactical decision and, thus, a matter of discretion for

trial counsel").  Strategic choices receive a strong presumption of reasonableness.

*Williams v. Bowersox*, 340 F.3d 667, 669-71 (8th Cir. 2003); *see United States v.

Nguyen*, 413 F.3d 1170, 1181 (10th Cir. 2005) (holding that adequately-informed

strategic choices are "virtually unchallengeable").  To establish that a strategic

decision constituted ineffectiveness, the defendant must show it was completely

unreasonable, and bore no relationship to any possible defense strategy.  *See Fox v.

Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000).

Assuming the defendant can meet the onerous burden of showing deficient performance, he must still establish prejudice by demonstrating a reasonable probability that a witness's testimony would have resulted in acquittal. *See Boyle*, 544 F.3d at 1138; *see also Earhart v. Johnson*, 132 F.3d 1062, 1067-68 (5th Cir. 1998); *United States v. Murray*, 751 F.2d 1528, 1535 (9th Cir.1985).

### 2. Counsel's Reasonable Performance

Barrett fails to establish that the decision to call Choney had no relationship to a possible defense strategy. When they decided to call Choney, counsel knew the witness had previously provided evidence helpful to Barrett. Tr. Jan. 7, 2005 at 11-12; Tr. Jan. 26, 2005 at 123-24. They also knew the defense would benefit from the testimony of a witness immune to impeachment on the basis of his associations with, or payment by, the defense. *See* Tr. March 22, 2005 at 14-15 ("Quite honestly, we'd like to be able to call Mr. Choney. . . . He was extremely credible."). Choney's reluctance to testify for the defense, and his association with the victim, were the hallmarks of his credibility for the defense, something the defense recognized long before trial. *See id*. at 15 (defense counsel describes Choney as "an ex-FBI agent, and he'd rather be drawn and quartered than appear . . . as a defense witness in Mr. Barrett's case.").

Defense counsel could therefore easily have concluded that it was in the defense's interest to elicit testimony criticizing the Tact Team from Choney, and

16

not from a witness paid by the defense. Choney was an exceptionally well-credentialed professional, having spent more than a quarter of a century as an FBI special agent and 19 years as a special weapons and tactics team leader. Tr. 17: 3880. He had no motive to favor the defense, as counsel recognized. *See* Tr. March 22, 2005 at 14-15. Furthermore, Choney's prior testimony was known to counsel and available for impeachment in the unlikely event that the witness refused to testify consistently with his prior statements. *Id*.; see Fed. R. Evid. 607 (permitting any party to impeach a witness). Despite all the testimony Choney could and did provide, neither he nor Kirkham could have testified about Barrett's mental state. In short, Choney permitted the defense to adduce essentially the same testimony Kirkham could have provided about the raid (*see* AB 17), from a witness whose credibility was already well-established, and without raising an issue of financially-motivated partiality.[2]

Barrett simply ignores the fact that his attorneys were well acquainted with Choney's earlier testimony. Instead, he relies on performance guidelines and inapposite cases in an attempt to demonstrate error. *See* AB 14-16. Additionally, he inappropriately evaluates counsel's performance with the benefit of hindsight, opining that Choney was a "blatantly hostile" witness. AB 21; *cf. Edens*, 87 F.3d

---

[2] Barrett contends Kirkaham would not have received a great deal of money, an assertion that does not alter the fact that the same appearance of partiality did not attach to Choney, even if he had received payment.

at 1114 (precluding a retrospective review of counsel's performance).  In so doing, Barrett ignores his burden to show that the challenged decision "amounted to incompetence under 'prevailing professional norms,' not [that] it deviated from best practices or most common custom."  *Edens*, 87 F.3d at 1114.  Indeed, Barrett does not even attempt to show that the attorneys' decision was so unreasonable as to bear no relationship to any possible defense strategy.  *See Fox*, 200 F.3d at 1296.  Given the "all the circumstances" known to counsel, Barrett cannot show that the specific decision to call Choney was so unreasonable that it fell "outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.

### 3.  Absence of Prejudice

Assuming, arguendo, that Barrett could show that his attorneys had a duty to call Kirkham, rather than Choney, he cannot show a reasonable probability that the paid witness's testimony would have led to acquittal.  Most significantly, Barrett's culpability did not hinge upon the relative professionalism of the Tact Team, the completeness of its tactical plan, or the ability of its leaders to predict the dangers of the operation.  The government had no burden to prove Barrett even recognized the victims as police – it merely had to show he had *reason* to know that they were peace officers.  *See infra*, Arg. IV, A, 1.

Further, Kirkham's analysis exists in a vacuum that would have rendered it far less effective than the measured criticism offered by Choney.  Kirkham

18

concludes the Tact Team should have initiated contact "from sufficient distance and cover to afford participating officers a reasonable degree of safety." 2255 Doc. 95 Ex. at 3. He cannot, however, explain how the Tact Team might have accomplished such an operation. His opinion ignores the circumstances that compelled a direct confrontation. Barrett's home stood behind a substantial gate. Tr. 7: 1479. The surrounding land lacked concealment or good observation points.[3] Tr. 3: 516. Feral dogs roamed the area and could give away police positions. Tr. 3: 516-017, 7: 1404, 1479. Barrett was apt to shoot at the police and was armed with, what even Kirkham refers to, as a "formidable long range weapon." Tr. 7: 1473-74; 2255 Doc. 95 Ex. 44 at 2. Barrett could have easily fled to his mother's nearby trailer. Tr. 7: 1433, 1473. In fact, his neighbors on three sides were related to him, sympathetic to his views, and potentially willing to use force against the arrest team. Tr. 4: 684-85, 839-40.

Given these facts, the Tact Team's plan represented a regrettable compromise with reality, rather than an ideal strategy consistent with the textbook views espoused by a college professor from the safety of his lectern. Indeed, many of Barrett's criticisms of the raid were undisputed – such as the facts that the team lost the element of surprise (Tr. 3: 644, 676-77); the lead vehicle advanced from a

---

[3] This fact undermines Kirkham's supposition that police should have used a bullhorn "from a position of cover to announce that officers were there . . . and to order [Barrett] to exit the cabin with his hands empty and in view." 2255 Doc. 95 Ex. 44 at 3.

tactically disadvantageous position (Tr. 3: 683); the lead Bronco was unmarked (Tr. 7: 1532, 1535-36) and lacked the coverage of a surveillance team (Tr. 7: 1404-05); and the police provided no audible warning of their presence (Tr. 4: 837-38, 7: 1535).

Barrett does not explain how a paid expert's repetition of that evidence, leavened with wishful opinions about the use of alternate tactics, would have placed him in better stead. He does not improve his position by arguing that Kirkham could have offered opinions about Barrett's mental state at the time of the shooting. Kirkham could not, as claimed, testify that the tactics employed "played into any paranoid or legitimate fears," or "resulted in a [foreseeable and preventable] tragedy," or "rendered unanswerable the important question of whether Barrett realized he was under siege from law enforcement." *Cf.* AB 17-18. No expert could have opined about Barrett's mens rea. *Cf.* Fed. R. Evid. 704; *United States v. Shaffer*, 472 F.3d 1219, 1225 (10th Cir. 2007) (affirming the exclusion of a computer expert's opinion that the defendant did not necessarily intend to download child pornography). Moreover, Kirkham's expertise in police tactics hardly qualified him to opine about anyone's mental state. *See* Doc. 95 Ex. 44. Kirkham fails to describe any reliable principle or method through which he might have determined Barrett's intent. *See id.*; *cf.* Fed. R. Evid. 702; *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) ("an inference or assertion

must be derived by the scientific method ... [and] must be supported by appropriate validation") (internal quotation marks omitted). As such, he could only attempt to do what the law prohibits – speculate or act as a conduit for the admission of inadmissible hearsay. *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008); *see Williams v. Illinois*, 567 U.S. ___, ___, 132 S. Ct. 2221, 2241 (2012) (plurality op.) (noting the courts' authority to exclude experts who merely transmit hearsay).

Barrett's legal authority does not assist him any more than the proffered opinions of his putative expert. He cites *Hooper v. Mullin* for the proposition that defense counsel acts ineffectively in calling a hostile expert at the eleventh hour. *Hooper v. Mullin*, 314 F.3d 1162, 1167-71 (10th Cir. 2002). But *Hooper* did not turn on the witness's hostility: the decision simply reflected counsel's lack of preparation. *See id.* at 1171 (finding counsel presented evidence "without any further investigation, in an unprepared and ill-informed manner. As a result . . . [it] was disastrous."). That reasoning does not apply here, as counsel knew – before calling Choney – how he had previously testified about Barrett's crime. Barrett seeks to debate the decision with the benefit of hindsight, but counsel's knowledge and forethought immunizes it from his second-guessing.

In sum, Barrett has failed to show that counsel acted unreasonably or prejudicially in presenting Cloyce Choney rather than George Kirkham.

4. <u>Evidentiary Hearing</u>

Although Barrett has not obtained a COA on the issue of whether the district court should have granted an evidentiary hearing on his claim that counsel's decision to call Choney as a defense witness was ineffective, this Court may grant an evidentiary hearing if it determines a constitutional violation has occurred. *Stouffer v. Trammell*, 738 F.3d 1205, 1220 (10th Cir. 2013). This Court reviews the denial of an evidentiary hearing for abuse of discretion. *United States v. Harms*, 371 F.3d 1208, 1210 (10th Cir.2004). An abuse of discretion occurs when the district court "renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Lewis*, 594 F.3d 1270, 1277 (10th Cir.2010) (further quotations omitted).

As explained, Barrett has not demonstrated a constitutional error that would permit the expansion of the COA to embrace the denial of an evidentiary hearing. Moreover, he has not identified any need for further factual development: Choney's testimony and Kirkham's opinions were clear from the trial record and the exhibits to the Motion for § 2255 relief, and there is no indication that an evidentiary hearing would have provided further information necessary to the district court's decision. The district court did not, therefore, abuse its substantial discretion in deciding this issue on the basis of the developed record.

## II. TRIAL COUNSEL PROPERLY DECLINED TO CALL AN EXPERT IN CRIME SCENE RECONSTRUCTION

A. Background

During the guilt phase of Barrett's trial, the government called Iris Dalley to testify as an expert, providing analysis of her own crime scene reconstruction. Dalley largely testified about Barrett's location during the shooting, and that of his targets, the Bronco and Trooper Eales. According to Barrett, Dalley also testified that he fired on the police from his porch and therefore could have seen the emergency lights on the cars that followed the victim's Bronco.

Barrett argues that his attorneys unreasonably failed to challenge Dalley's testimony under *Daubert*,[4] failed to present a rebuttal expert, and failed to consult with an expert to prepare their cross-examination. Specifically, Barrett relies on the conclusions of Edward Hueske, whose letter Barrett submitted in support of his § 2255 Motion. Hueske was a lecturer in criminalistics at the University of North Texas and the director of a private forensic training and consulting company. 2255 Doc. 95 Ex 110. Hueske asserted that Dalley employed flawed and incomplete crime scene reconstruction techniques and resulted in unreliable findings. 2255 Doc. 95 Ex 109. In view of Hueske's assertions, Barrett argues that he is entitled, if not to relief, to an evidentiary hearing on this claim. AB 27-44, 50-51; COA #4.

---

[4] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

B.  Counsel's Decision not to Call an Expert Witness to Attempt to Rebut Dalley's Testimony Was Reasonable and not Prejudicial

Barrett has only received a COA in regard to his contention that his attorneys failed to present an expert to rebut testimony about his location during the shooting.  Even that claim relies on a faulty premise, as Dalley never testified that Barrett fired from the porch.  Moreover, the claim does not account for the fact that the defense employed a reasonable strategy to turn Dalley's testimony to its advantage.

1.  Limitations of the Certificate of Appealability

This Court's COA permits Barrett to challenge whether trial counsel provided ineffective assistance in the guilt phase by failing to present a crime-scene expert at trial.  Barrett, however, has also presented two additional claims not encompassed by the COA – whether counsel should have challenged the admissibility of the government's crime-scene evidence in the first place and whether counsel should have prepared for Dalley's cross-examination with an expert's assistance.  Barrett has not sought leave to expand the COA to include these issues (*cf.* Doc. 01019053403), and this Court should disregard them.

A COA is a jurisdictional prerequisite to review of a § 2255 action.  *See United States v. Parker*, 720 F.3d 781, 785 (10th Cir. 2013) (citing *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003)).  This Court issues a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."

*Id.* (citing 28 U.S.C. § 2253(c)(2)). Such a showing requires a demonstration that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Id.* (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Nothing in Barrett's brief provides cause under these standards to expand the COA to encompass his claims that counsel should have challenged the admissibility of the government's crime-scene evidence and sought expert assistance when preparing for Dalley's cross-examination.

Even if this Court were inclined to give some measure of consideration to the uncertified issues, they would not merit reversal. As explained in further detail below, just as Barrett cannot show that counsel's decision not to call a rebuttal expert at trial was ineffective, he cannot establish ineffectiveness in counsel's decision not to attempt to exclude Dalley's testimony and not to consult a rebuttal expert in responding to that testimony. Indeed, counsel already knew what Dalley would say from her testimony in Barrett's prior trials, and counsel had good strategic reasons to want her to testify in this case because she previously admitted facts that were helpful to the defense.

## 2. Counsel's Reasonable Performance

Trial counsel reasonably concluded that no counter-expert was necessary if when the government presented Dalley as a crime-scene reconstruction expert.

"Trial counsel does not act unreasonably in failing to call every conceivable witness that might testify on a defendant's behalf." *Hooks v. Workman*, 689 F.3d at 1190. Witness selection is, as noted, "quintessentially a matter of strategy." *Boyle*, 544 F.3d at 1139; *see also Snyder*, 787 F.2d at 1432. Such choices receive a strong presumption of reasonableness (*Williams v. Bowersox*, 340 F.3d at 669-71), and are evaluated from "counsel's perspective at the time" they were made. *Cullen v. Pinholster*, 563 U.S. ___, ___, 131 S. Ct. 1388, 1428 (2011).

In this case, trial counsel prepared to confront Dalley with knowledge of her testimony in Barrett's state trials, neither of which resulted in a murder conviction, much less a death verdict. Not only did counsel know how Dalley would testify, they could judge whether cross-examination would adequately blunt the impact of the evidence. Indeed, trial counsel explained, under oath, as follows:

> The State Court transcripts caused me to be aware that during the pendency of Mr. Barrett's Sequoyah County prosecution, the presiding judge had considered striking Iris Dalley's testimony. I felt that during the federal trial, the defense could rely on the same plan for cross-examination that Mr. Barrett's lawyers had successfully employed in the county case. I did not think that employing a defense expert on crime scene reconstruction would make a difference in our ability to confront Ms. Dalley's testimony.

26

2255 Doc. 175 Ex. 12 ¶ 13.[5] Counsel also employed an investigator who helped

counsel in preparing questions to challenge the ballistics testimony. 2255 Doc.

214 at 153 n.211.

Counsel's strategic decision, which resulted from an informed understanding

of Dalley's prior testimony and the effective means of countering and exploiting

her conclusions, should receive a strong presumption of reasonableness.

*Pinholster*, 131 S. Ct. at 1428; *Williams*, 340 F.3d at 669-71. That presumption

remains unrebutted by Barrett. He argues that the complexity of the facts, the

supposed incompetence of the crime scene investigation, and uniqueness of

Dalley's conclusions required a counter expert. But his evaluation of the

circumstances confronting defense counsel, even if true, creates no legal obligation

to hire a counter expert, given that the defense had a reasonable strategy for

confronting the evidence at hand – a strategy that had already been used,

successfully, in Barrett's earlier state trial. Because counsel knew from prior trials

that Dalley could not place Barrett on the porch, the attorneys had limited incentive

to undermine her conclusions. Had they employed a counter expert in a scorched-

---

[5] Counsel's declaration is borne out by billing records: on May 13, 2005, attorney
Hilfiger spent 1.5 hours reviewing transcripts, including Dalley's; on May 16,
2005, Hilfiger spent 2.5 hours reviewing transcripts, including Dalley's; on
October 15, 2005, counsel spent 2.2 hours reviewing testimony, including
Dalley's; on October 22, 2005, counsel spent 1.4 hours reviewing testimony,
including Dalley's; on October 24, 2005, counsel spent .8 hours reviewing Dalley
testimony and preparing for witnesses; on October 26, 2005, counsel spent .8 hours
preparing for Dalley's testimony. 10th Cir. Doc. 01019206246 Appx. A.

earth strategy to wholly discredit Dalley and her conclusions, they might well have unintentionally strengthened the possibility that her concession to the defense – that Barrett could have fired from inside his home – was itself flawed.

Barrett also argues that trial counsel had reviewed Dalley's testimony in the first state trial to the exclusion of her testimony in the second. But he fails to explain why the transcript of the second trial, assuming it went unread, would have led counsel to a different conclusion about the need for a defense expert with which to counter Dalley. The reasonableness of counsel's investigation is measured against information possessed by them. *Chandler v. United States*, 218 F.3d 1305, 1318 & n.22 (11th Cir. 2000). Here, defense counsel clearly knew from Dalley's earlier testimony that they could elicit her concession that Barrett may have fired every shot from inside his house. (*See* Tr. 14: 3264, 3280-91; *see also* Tr. March 22, 2005 at 17-18 (noting that counsel had elicited damaging admissions from Dalley).)

Moreover, Barrett fails to show that counsel's cross-examination was deficient or the product of an inadequate review of earlier testimony. In total, counsel spent more than nine hours preparing for a witness he knew would make only modest evidentiary inroads for the government. *See, infra*, Arg. II, B, 3 (concerning the scope of Dalley's testimony). A diligent attorney may conclude an investigation after determining that further efforts would prove wasteful. *Hooks v.*

*Workman*, 689 F.3d at 1190.  Because counsel knew how Dalley would testify and how he could effectively confront her, Barrett cannot overcome the presumption that the attorney's actions were reasonable.  The fact that he can, with the benefit of hindsight, identify foregone strategies does not establish ineffectiveness.

### 3.  Absence of Prejudice

Assuming, *arguendo*, that counsel had acted unreasonably in failing to present a witness to counter Dalley, no reasonable likelihood exists that the omission affected the outcome of the trial.

Counsel had no need to confront what Barrett claims was the central assertion of Dalley's testimony – that Barrett fired on the police from his porch and could therefore perceive whether his targets were law enforcement officials.  As the district court found, Dalley never testified that Barrett fired from the porch. *See* 2255 Doc. 214 at 154.  Indeed, she conceded early in her direct testimony that she could not determine the exact position of the shooter or the victim's vehicle:

> Q.  Can you place exactly where the shooter was or where the Bronco was in relation to this location, for any of these trajectories, ma'am?
> A.  No. My analysis does not tell me the exact position of either or both.

Tr. 14: 3175; *see also* Tr. 14: 3226 (Dalley conceding she could not "say where the shooter was").  Thus, Appellant's principal claim about Dalley –

that she placed him on the porch – is untrue, and trial counsel was not required to counter it.

Barrett also incorrectly asserts that Dalley testified, "the only scenario consistent with all of her trajectories was that Barrett fired from the front porch." AB 37. Dalley never did more than agree that scenarios described by the prosecutor were potentially consistent with the evidence. *See* Tr. 14: 3256-58.

As the court below found, trial counsel only had to respond to two major conclusions drawn by Dalley: 1) Barrett could not have fired all the shots from a prone position inside his house, and 2) Eales's flank and elbow wounds were sustained after he exited the Bronco. 2255 Doc. 214 at 154, n.214 (citing Tr. 14: 3228-29, 3247, 3254, 3259). Contrary to Barrett's argument, Dalley did not provide the primary evidence that Barrett fired at the Bronco's windshield, nor did she discuss his intent. *Cf.* AB 37. Barrett's target – and by inference his intent – was inarguable given the damage to the Bronco, which was established by photos and eyewitness testimony. *See e.g.* Gov't Trial Exs. 5, 46 & 67; Tr. 3:537 ("The gunfire was hitting approximately head level, middle of the windshield"), 538-39 ("Little by little, the windshield started to disappear, glass fragments were going everywhere. The gunfire intensified, the closer we got to the home").

Likewise, and again contrary to Barrett's claims, it was not Dalley who establish that Barrett was a "back shooter." The position of the Eales and

30

Hamilton's entry wounds left little room for doubt that the victims were not facing their assailant. *See* Tr. 3: 544 (Hamilton testifying he was shot in the left posterior shoulder after exiting the Bronco), 7: 1605-06 (coroner describes an entry wound to Eales's left side, just forward of the posterior axillary fold).

As for the conclusions Dalley actually made, they were also inferable from the existing evidence. To the extent she concluded that Barrett did not fire every shot from a prone position inside his house, Trooper Hamilton had previously testified that he exited his vehicle and found Barrett "standing in the interior doorway of his house, holding a rifle." Tr. 3: 627. Likewise, Trooper Manion reported that he peeked at Barrett during the shooting and saw him stepping from one room to another. Tr. 5: 1103-04.

As to Dalley's second finding – that Eales had left the Bronco when he sustained his gunshot wound to the side – the jury could not have reasonably reached another conclusion, regardless of the expert's analysis. The Bronco's driver testified that the shots struck the windshield from the right. Tr. 3: 554, 605. When the Bronco stopped in front of the house, Trooper Eales exited and moved toward the rear of the vehicle. Tr. 5: 989-97, 996-98, 1033, 1096-1101, 1158-60, 1165-66. In so doing, he exposed his left side to Barrett's fire. Tr. 5: 997-98, 1101-02. According to the medical examiner, Eales was shot twice in his left side by bullets that passed through some intervening objects. Tr. 7: 1599, 1605-07,

31

1610-15. The fatal bullet entered "on the left side of the upper back," traveling "slightly back to front and slightly downward." Tr. 7: 1611, 1614-15, 1619. The wound paths preclude an inference that Eales was shot while sitting in a vehicle receiving fire from the right or front. Furthermore, evidence that Eales, while inside the Bronco, held a heavy shield between his legs further obviates any suggestion that he exposed his left side to a bullet fired into the passenger compartment. (*See, e.g.*, Tr. 3: 541-43, 612-13 (noting the 20-pound ballistic shield interfered with Eales's movement)).[6]

More fundamentally, the act of pouring high-powered rifle fire into a moving vehicle demonstrated Barrett's obvious intent to kill, quite apart from any individual bullet trajectories. Barrett simply cannot establish any likelihood that the jury, deprived entirely of Dalley's testimony, would have found that Eales's killing was unintentional, given the obvious ferocity of the attack on the victim's occupied vehicle. *Cole v. United States Atty. Gen.*, 712 F.3d 517, 527 (11th Cir. 2013) (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) for the proposition that the use of physical force against another person "'naturally suggests a higher degree of

---

[6] Barrett's suggestion that counsel could have established that friendly fire caused Eales's death (AB 40) is refuted by testimony that a bullet fragment from the victim's chest was matched to Barrett's weapon. Tr. 16 at 3704. Barrett's own expert called that testimony "very credible and forthright" without independently verifying the testing. 2255 Doc. 95, Ex. 109 at 2. The findings stemmed from microscopic comparisons of projectiles, not bullet-lead analysis, as Barrett intimates. *Cf*. AB 40 n.17.

intent than negligent or merely accidental conduct'"); *see also People v. Villegas*, 113 Cal. Rptr. 2d 1, 5-6 (2001) (firing six shots at victims from 25 feet indicated clear intent to kill).

Not only was Dalley's testimony limited in scope and reach, defense counsel effectively elicited her concession that Barrett could have fired every shot from inside his home, thus confirming the viability of the defense theory that he fired on an unknown interloper:

> Q. Okay. So, with the car at that location and the shooter inside the house, you know, moving in the house as long as the doorway's open, shooting out the doorway, would that be consistent with the -- and how you drove the car up to the porch, would that be consistent with all 18 trajectories into the car?
> A. It is possible to have a path starting at this point and coming up to the porch in which you could have relative positions that could create all of those trajectories.

Tr. 15: 3349-51. Ultimately, counsel relied on Dalley's testimony to question the reliability of several eyewitnesses. Tr. 20: 4318-20. In so doing, counsel used Dalley's testimony to underscore issues involving memory and perception, just as Barrett argues the attorneys should have done. *See* AB at 39. Counsel also relied on Dalley's testimony to argue that Barrett fired every shot from inside his living room. Tr. 20: 4333-34.

Finally, Barrett cannot demonstrate prejudice by complaining that Dalley's testimony permitted the government to establish that he shot Eales at a time when

he had reason to know the victim was a police officer.  Barrett fired multiple rounds into the Bronco while it was moving.  Tr. 3: 553-54, 608-09.  The accuracy of his fire permits only one inference – that Barrett aimed at the Bronco.  He cannot possibly explain, with or without the assistance of a crime scene expert, how he saw the Bronco clearly enough to fire on it in motion, but did not notice the two vehicles immediately behind it with the flashing emergency lights.  *Barrett*, 496 F.3d at 1084.  Certainly, nothing in Hueseke's letter indicates that Barrett was not aiming at the Bronco, nor does it substantiate a theory that Eales was killed by friendly fire.  *Cf.* 2255 Doc. 70 at Ex. 109.

Accordingly, even if counsel had successfully relied upon a counter-expert in response to Dalley's testimony no reasonable probability exists that Barrett would have received a more favorable verdict.  *See Strickland*, 466 U.S. at 691.

### 4.  Evidentiary Hearing

The district court appropriately denied an evidentiary hearing on this issue. Barrett has failed to demonstrate a constitutional error that would permit the expansion of the COA to reach the denial of a hearing.  *Stouffer*, 738 F.3d at 1220. Moreover, he has not identified any need for further factual development.  Dalley's testimony was well known to the court below, and Barrett presented the proposed testimony of his putative counter-expert through an exhibit to the Motion for § 2255 relief.  Furthermore, trial counsel explained his strategy in a declaration

presented by the government.  As such, Barrett cannot show that the denial of a

hearing was "arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Lewis*, 594 F.3d at 1277.

### III. TRIAL COUNSEL PROPERLY DECLINED TO CALL AN EXPERT ON MENTAL HEALTH DURING THE GUILT PHASE TRIAL

Barrett claims that his trial attorneys provided constitutionally ineffective

assistance of counsel when they failed to present expert evidence that the

defendant suffered from various mental illnesses, which would have allegedly

negated the government's showing of intent and shored up the viability of a

voluntary manslaughter instruction. AB 41-44.  Barrett theorizes that he would

have been convicted of nothing more serious than manslaughter and may have

been acquitted entirely had his attorneys investigated and presented a mental health

expert. AB 41, 44.  Regardless of counsel's cognizance of Barrett's supposed

mental health issues, the relevance of this information hinges on his specious

theory that he could have been convicted of manslaughter, which was not a lesser

included offense of any charged crime. *See* discussion at Part VI, *infra*.  Counsel

did not provide prejudicial ineffective assistance by omitting irrelevant mental

health evidence.

<u>A. Counsel's Decision To Forego Guilt Stage Mental Health Expert Testimony Was Reasonable and Not Prejudicial.</u>

Counsel, of course, had a duty to conduct a reasonable investigation. *Strickland*, 466 U.S. at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. A showing that counsel could have conducted a more thorough investigation that might have borne fruit does not establish ineffectiveness. *See Burger v. Kemp*, 483 U.S. 776, 794 (1987). "A reasonable investigation is not . . . the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct." *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998) (citing *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995)). The duty to investigate depends upon the facts known to the attorney. *Wiggins v. Smith*, 539 U.S. 510, 527 (2003); *see Hedrick v. True*, 443 F.3d 342, 350 (4th Cir. 2006). The reasonableness of the investigation is determined by the information conveyed to counsel by his client, as well as other information in his possession, recognizing "the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Chandler*, 218 F.3d at 1318 & n.22 (internal quotation omitted). Where counsel did not know of facts that would alert him to the need to conduct a particular investigation, a failure

to investigate does not amount to deficient performance. *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003); *see Bacon v. Lee*, 224 F.3d 470, 481 (4th Cir. 2000).

Here, Barrett fails to show that his counsel had any basis in fact or reason to conclude that the diagnoses proffered in the § 2255 Motion would have been meritorious. Barrett cites a series of declarations from lay witnesses who make unschooled observations about the defendant's mental health (2255 Doc. 95 at 56 (citing 2255 Mot. Exs. 74, 78, 81, 86, 93, 96-99, 101, 103)), and unjustifiably concludes that his attorneys should have relied on these witnesses to justify the presentation of an expert to prove his diminished capacity. Yet, the declarations overwhelmingly address Barrett's childhood and early adulthood, lacking even a vague reference to his mental condition at the time of the murder. None of the declarants attempt to provide evidence that Barrett lacked the ability to form specific intent at the time of the offense. Indeed, the only eyewitness to the murder, Toby Barrett, avers that "Even though [the defendant] was scared, he was not dangerous and I was not afraid of him. Dad did the best he could." 2255 Mot. Ex. 96 at 2. Similarly, Carolyn Joseph makes a vague assertion that Barrett hallucinated, apparently under the influence of illegal drugs, but states, "I have never known Kenny to hurt anybody. He gets emotional, but as far as hurting anybody, he is not a dangerous person." 2255 Mot. Ex. 78 at 4. The declarations may describe a man who led a troubled life, and exacerbated his own difficulties

with intoxicants, but they do not provide any relevant evidence about Barrett's capacity to form intent on the night of the murders. At most, the declarations provide a basis for a finding that defense counsel should have investigated Barrett's mental health, something they unquestionably did.

Trial counsel consulted with a psychologist, Dr. Jeanne Russell, who "reprise[d] . .. the risk assessment she had done in preparation for a second stage proceeding in state court." 2255 Doc. 95 at 48-49. Barrett provides no indication that Dr. Russell reported anything to defense counsel that might have reasonably led to the conclusion that evidence existed of neurological and psychiatric impairments so profound that these impairments could vitiate the government's evidence of intent. Russell herself makes no such claim in the declaration she provided to Barrett. *See* 2255 Mot. Ex. 56. Barrett provides no indication that Dr. Russell suggested, or that the defense in either of his prior state trials relied upon, evidence of diminished capacity based on Barrett's mental health status.

Certainly, Barrett's current reports, while identifying symptoms of supposed mental illness, include no basis for presuming that lay counsel should reasonably have recognized the likelihood of the profound defects now alleged. Nor did observations of trial counsel demonstrate that the lawyers were alerted to facts that would have induced a reasonable attorney to investigate or challenge Barrett's mental health. Despite two trials, no previous attorney had challenged Barrett's

38

competence, which necessarily involves the ability to perceive and react to events occurring around him.  2255 Doc. 175 Ex. 12.  Trial counsel also obtained copies of Barrett's educational and mental health records. 2255 Doc. 175 Ex. 12. Similarly, Barrett's friends and relatives did not report to counsel that they had concerns about the defendant's mental health.  2255 Doc. 175  Exs. 11 & 12.  Most significantly, counsel had repeated and substantive interactions with their client. Barrett took notes, displayed competent communication skills and showed sound judgment in avoiding disruptions of his attorneys' attention.  2255 Doc. 175 Exs. 11 & 12.  With the single exception of Barrett's outburst in the penalty phase, his attorneys did not find him disruptive in any way.  2255 Doc. 175 Exs. 11 & 12.

Additionally, Barrett's current psychiatric expert observed, "There was no evidence of perceptual disorders, hallucinations, or delusions," though he finds that the defendant was delusional at the time of the crime.  *Compare* 2255 Doc. 95  Ex. 117 at 6 with Ex. 117 at 26.  Significantly, the expert recognized that Barrett attempted to hide his supposed mental health issues: "Mr. Barrett is invested in appearing to be a high functioning individual, without significant past or present impairment, and who is in control of his life."  2255 Doc. 95 Ex. 117 at 7. Barrett's expert describes a defendant who would not have provided any outward appearance of mental illness that would have suggested he lacked the capacity to form intent. On the facts apparently known or reasonably knowable to trial

counsel, Barrett cannot show that a failure to further investigate evidence of such mental health claims was objectively unreasonable.

B. Absence of Prejudice.

Ultimately fatal to his claim, Barrett cannot establish that additional investigation of his mental health or the calling of a mental health expert would have influenced the jury's view of what this Court found on direct appeal was "more than sufficient evidence" proving Barrett's intent. *United States v. Barrett*, 496 F.3d at 1110. Evidence of mental illness is admissible to negate specific intent, but only if the "defendant clearly demonstrates how such evidence would negate intent rather than 'merely present a dangerously confusing theory of defense more akin to justification and excuse.'" *United States v. Brown*, 326 F.3d 1143, 1147 (10th Cir. 2003) (quoting *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990)). Courts carefully scrutinize such evidence to determine if it rests upon a legally acceptable theory for negating intent to avoid confusing the jury with improper justification theories. *Brown*, 326 F.3d at 1147. Significantly, the *Brown* court upheld the exclusion of mental health evidence intended to show that the defendant could not form requisite intent because the proffer lacked a causal nexus:

> Brown relied on Dr. Lindberg's conclusion that Brown did not have the capacity to conform his conduct to the requirements of the law. Specifically, Brown sought to rely upon testimony that he was unable to make "correct choices" because of his mental condition. . . . Dr.

> Lindberg's testimony did not address Brown's intent, or lack thereof, for conspiracy to possess with the intent to distribute and distribution of methamphetamine. Dr. Lindberg did not opine on how Brown's post-traumatic stress disorder, coupled with chemical dependency, was either related to or tended to negate the requisite specific intent element. Thus, Brown fails to connect his mental condition with any legally acceptable theory that he lacked specific intent.

*Id*. at 1148.

In view of *Brown*, Barrett cannot show a reasonable likelihood that his trial attorneys could have successfully obtained admission of the mental health evidence proffered in the § 2255 Motion. Like the defendant in *Brown*, Barrett appears to have identified evidence that at the time of the crime he suffered from supposed mental health issues, including hallucinations, prefrontal lobe dysfunction, bipolar syndrome, post-traumatic stress disorder, perceptual disorders, paranoid ideation, hyperreactivity, and affective dysregulation. *See,* e.g., 2255 Doc. 95 Exs. 78 at 4, 117 at 26, 27. But Barrett has not established the causal link between his supposed mental health issues and the *mens rea* required for conviction of the charged offenses.

To prove the § 848 offense that gave rise to the death penalty, the government had to establish, in pertinent part, that "Kenneth Eugene Barrett, intentionally killed . . . David Eales; . .. . [and] That the defendant, Kenneth Eugene Barrett, knew or had reason to know David Eales was a law enforcement officer." Trl. Doc. 240, Inst. 15. As to the § 924 homicide offenses, counts 1 and

2, Barrett conceded that those offenses were "'straight' felony murder counts." *See* Trl. Doc. 240, Inst. 7; 2255 Doc. 95 at 337; *infra* Part VI, B, 2. Thus, to establish malice aforethought for each of those crimes, the government relied on proof that Barrett committed the homicide during the commission of a felony. *See United States v. Chanthadara*, 230 F.3d 1237, 1259 (10th Cir. 2000).

As such, proof of the charged offenses did not rest, in any way, on Barrett's recognition of Trooper Eales as a police officer or his understanding that his actions were wrongful. At most, the jury had to find that Barrett had reason to know Eales was a police officer and killed him intentionally. Barrett could not have negated the *mens rea* of the charged crimes with a heat-of passion theory, as he did in state court, because voluntary manslaughter is not a lesser included offense of any count of the indictment, as fully explored, *infra*, in Part VI. Accordingly, the putative mental health evidence was irrelevant and inadmissible under *Brown*. The failure to investigate such pointless information did not constitute ineffective assistance. *See Tompkins v. Moore*, 193 F.3d 1327, 1334 (11th Cir. 1999); *Henderson v. Norris*, 118 F.3d 1283, 1288 (8th Cir. 1997). Furthermore, no reasonable probability exists that Barrett would have received a more favorable verdict had his attorneys explored, and presented, information about his mental health. *Strickland*, 466 U.S. at 691.

C. Evidentiary Hearing.

Although Barrett has not obtained a COA on the issue of whether the district court should have granted an evidentiary hearing on his claim that counsel's decision not to call a guilt stage mental health witness was ineffective, this Court may grant an evidentiary hearing if it determines a constitutional violation has occurred. *Stouffer*, 738 F.3d at 1220. This Court reviews the denial of an evidentiary hearing for abuse of discretion. *Harms*, 371 F.3d at 1210. Such abuse occurs when the court "renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." *Lewis*, 594 F.3d at 1277.

As explained, Barrett has not demonstrated a constitutional error that would permit the expansion of the COA to embrace the denial of an evidentiary hearing. Moreover, he has not identified any need for further factual development: There is no indication that an evidentiary hearing would have provided further information necessary to the district court's decision. The district court did not, therefore, abuse its substantial discretion in deciding this issue on the basis of the developed record.

## IV. TRIAL COUNSEL DID NOT OMIT ANY VALID REQUESTS FOR GUILT PHASE JURY INSTRUCTIONS

Appellant argues that his trial attorneys rendered ineffective assistance when they did not request jury instructions on three possible theories of the defense – that Barrett acted in self-defense, that he did not know the Tact Team vehicles

contained police officers, and that he was not engaged in drug manufacturing or distribution when the team entered his land. Additionally, Appellant claims that his attorneys ineffectively failed to request an instruction concerning the credibility of witnesses who were drug users. As to all of these theories, Barrett argues he is entitled to an evidentiary hearing. AB 44-51; COA #2-3. As detailed below, Appellant's theories found no support in the record and the law, and Barrett fails to show that his trial counsel could have validly obtained an instruction on any of the defense theories he now presents.

A. Defense Counsel's Failure to Request Jury Instructions on Possible Defense Theories Was not Ineffective

A defendant is entitled to an instruction on his theory of the case if the charge is "a correct statement of the law, and if he [had] offered sufficient evidence for the jury to find in his favor." *United States v. Crockett*, 435 F.3d 1305, 1314 (10th Cir. 2006). Courts apply the familiar *Strickland* standard in determining whether a forgone request for a jury instruction amounted to ineffective assistance of counsel. *Berghuis v. Thompkins*, 560 U.S. 370, 389 (2010) (citing *Strickland*, 466 U.S. at 687, 694). Requests for instructions are tactical matters left to counsel's discretion. *See Gonzalez v. United States*, 553 U.S. 242, 249-50 (2008) (determining what "arguments to advance" at trial lies solely within the province of counsel). Counsel need not present a defense that lacks support in credible evidence. *Williams v. Woodford*, 384 F.3d 567, 610-11 (9th Cir. 2004); *see also*

*United States v. LeCroy*, 739 F.3d 1297, 1323 (11th Cir. 2014) (evaluating

counsel's conduct without the benefit of hindsight).

    1.  <u>Self-Defense Instruction</u>

Barrett's attorneys understandably omitted a request for a self-defense

instruction because the record did not support one.  The scope and reach of the

self-defense doctrine is set forth in *United States v. Toledo*, 739 F.3d 562 (10th Cir.

2014).  *Toledo* observes that the law extends a right of self-defense only to people

who reasonably believe they are "in imminent danger of death or great bodily

harm, thus necessitating an in-kind response."  *Id*. at 567 (citing *United States v.*

*Visinaiz*, 428 F.3d 1300, 1311 (10th Cir.2005); *United States v. Gresher*, 802 F.2d

373, 384 (10th Cir.1986)).  In *Toledo*, the Court credited the possibility that the

defendant had experienced such a belief because the victim – his inebriated,

historically violent, and physically larger uncle – rushed toward him and could

have pulled him over the fence that separated them.  *Id*. at 567.

Here, Barrett cannot point to any historic record in which the Tact Team had

harmed him.  Quite the opposite, it was he who had indicated he would go out in a

"blaze of glory" if the police sought to arrest him.  *Barrett*, 496 F.3d at 1083.

When the arrest team's first vehicle appeared on Barrett's land, followed closely

by two vehicles displaying emergency lights (*id*. at 1084), the identity of the target

was apparent.  Nonetheless, Barrett opened fire on the passenger compartment with

a military-style rifle even though neither occupant of the Bronco had done anything to threaten his physical well-being.[7] *Id.* at 1084-85.

Ultimately, Trooper Eales fled the Bronco, seeking cover from the fusillade, and Barrett shot him as he turned away. *Id.* at 1085; *see also* Tr.3: 543 (testimony that Eales left the Bronco "seeking additional cover. The gunfire was on his side of the vehicle"); Tr. 5:1101-02 (testimony that Eales exited the Bronco and moved slowly to the rear). From the outset of this encounter, Barrett was the aggressor. *See* Tr. 3: 538-39, 543-47 (Trooper Hamilton describes the chronology of the encounter); Tr.4:1102-05 (Trooper Hash describes seeing gunfire from doorway before he moved to side of house to attempt to return fire). If Barrett felt initial apprehension about his safety when the Bronco first appeared, he could not have maintained that perspective long enough to fire 19 rounds, including several at victims who were facing away from him, as emergency lights illuminated the scene. *See, e.g.*, Tr. 7:1412, 1496, 1569 (describing emergency lights).

Barrett's attorneys had no obligation to request a self-defense instruction that they could not support. *See Le v. Mullin*, 311 F.3d 1002, 1026-27 (10th Cir. 2002) (holding counsel was not ineffective for failing to request a self defense

---

[7] Barrett fired before the police saw, much less accosted, his son, and before the teen yelled for him. 496 F.3d at 1084 n.2 (citing Tr. 6: 1357); *see also* Tr. 6:1246-47. As such, there is no basis upon which counsel might have argued that Barrett fired out of concern for his son and should thereby have received a defense-of-others instruction (AB 46).

instruction because defendant was the initial aggressor); *see also United States v. Garcia*, 625 F.2d 162, 170 (7th Cir. 1980) (finding self-defense claim unavailable to defendants who, following an altercation, chased victim, held him down and stabbed him 47 times). Because self-defense was not a viable theory under the facts, counsel did not act unreasonably in not requesting an instruction on the doctrine. *See United States v. Rodriguez*, 502 Fed.Appx. 637, 638 (9th Cir. 2012) (rejecting ineffectiveness claim for failure to request self-defense instruction unsupported by the record).

Moreover, Barrett cannot establish a reasonable likelihood that a self-defense instruction, much less a request for one, would have altered the outcome of the trial on these facts. To convict Barrett of Counts 2 and 3, the jury had to find beyond a reasonable doubt that he had reason to know that Eales was a police officer. *See* Trl. Doc. 240 at Instructions 7 & 15. That finding precludes the possibility that the jury could have found Barrett used no greater force than was reasonably believed necessary and that, by extension, he acted in self-defense . Accordingly, Barrett cannot establish that his trial attorneys' decision to forgo a self-defense instruction prejudiced the verdict. *See McGee v. Higgins*, 568 F.3d 832, 839 (10th Cir. 2009).

2.  Identity-of-Victim instruction

Barrett argues that his attorneys were ineffective for failing to request an instruction that the jury must acquit him if it found that he did not know the Tact Team vehicles were occupied by the police.  AB 46-47.  This claim finds no basis in the law or the facts.

No instruction regarding the victim's status could apply to the Count one, using and carrying a firearm during and relation to drug trafficking crimes, resulting in death.  Barrett need not have known that his victim was associated with law enforcement to commit the crime charged in Count 1.  *See* Tr. Doc. 240 at Instruction 6; *see also* 18 U.S.C. § 924(c) & (j).  This Court implicitly recognized as much when it distinguished the elements of Count 1 from those of Counts 2 and 3, in response to Barrett's multiplicity claim.  *See* 496 F.3d at 1095-96.

As to Counts 2 and 3, the jury was required to find that Barrett knew or had reason to know that Eales was a law enforcement officer.  Trl. Doc. 240 at Instruction 15.  In affirming that the convictions on Counts 2 and 3against claims of insufficiency, this Court noted "we do not mean to suggest that knowledge of the victim's status as a law enforcement officer is an essential element of the crime."  496 F.3d at 1115 n.16.   Nonetheless, the jury was instructed that convictions on these charges required it to find that "Eales was killed while engaging in *and on account of* the performance of his official duties."  Trl. Doc.

240 at Instruction 15; *Barrett*, 496 F.3d at 1095-96. Thus, the instructions appear to have required greater proof of intent than this Court deemed necessary.

Because the instructions required the jury to acquit if it did not find beyond a reasonable doubt that the defendant killed Eales "on account of" his duties," (Tr. Doc. 240 at Instruction 3, 4, 7, 15), Barrett cannot sustain his argument that his attorneys ineffectively failed to seek another instruction to repeat his theory. *See Campbell v. United States*, 364 F.3d 727, 733 (6th Cir. 2004) (holding an attorney does not act ineffectively by omitting to request an instruction that was otherwise adequately conveyed by the charge). Counsel had no legal basis upon which to request an instruction that might have simply clarified the government's burden, as stated. *United States v. Wolny*, 133 F.3d 758, 765 (10th Cir.1998). The jury necessarily found all the elements beyond a reasonable doubt, barring Barrett from demonstrating a reasonable probability that the instruction he now requests would have altered the outcome of the trial.

3. Actually manufacturing or distributing drugs

Barrett claims that his attorneys acted ineffectively in failing to seek an instruction that the jury could not convict him if he were not "engaged in drug manufacturing or distribution when the raid took place." AB 59. But that fact, even if true, would not have provided a defense to the crimes charged, and thus it was not error for counsel not to request such an instruction.

Count 3 charged Barrett with killing Eales "during the commission of, in furtherance of, and attempting to avoid apprehension and prosecution of, a felony violation of Title 21, United States Code, Sections 841 (a), 841(c), 843(a), 846, and 856." Trl. Doc. 1; 496 F.3d at 1092. The trial court instructed the jury as to the elements of each of the four alternative drug crimes underlying the homicide charge. Trl. Doc. 240 at Instructions 8 to 13. None of those crimes required proof of drug manufacture: each offense was satisfied by mere intent to manufacture. *Id*.

In rejecting Barrett's direct appeal, this Court cataloged clear evidence of Barrett's intent to manufacture:

> The search [of Barrett's home] also resulted in the seizure of a variety of materials related to the production and use of methamphetamine (e.g., coffee filters, hypodermic needles, digital scales, pseudoephedrine, ephedrine tablets, iodine, plastic tubing, toluene). A search of Barrett's person produced a plastic baggie containing red phosphorous, a lighter, and approximately $2100 in cash.

496 F.3d at 1085.

Barrett's efforts to conceal some of this material clearly implied his intention to use it for illicit purposes: his two bottles of iodine crystals were hidden in a collapsible camera, and a baggie containing 1,426 pseudoephedrine tablets were secreted behind a ceiling panel. Tr. 12: 2675, 2690- 95, 2803-2807, 2817-18; 13: 2967-70, 2958-62, 3012-13. The only items lacking for a completed, non-operating methamphetamine lab were Red Devil Lye and hydrochloric acid, both of which Barrett could have been purchased locally. Tr. 11: 2481; 12: 2734-37.

The recovery of tubing containing methamphetamine residue clearly demonstrated that Barrett had previously manufactured the drug. Tr.13: 2670, 2956; *see United States v. Young*, 862 F.2d 815, 818 (10th Cir. 1988) (partially relying on trace amounts of methamphetamine to find evidence of intent to manufacture). Furthermore, Barrett's friends and relatives testified that they had purchased methamphetamine from him in the past. *E.g.*, Tr. 8:1838; 11:2511; 13:3087.

Thus, the government adduced more than sufficient evidence from which the jury could have found intent to manufacture methamphetamine. The fact that Barrett was not making it when he was arrested would not have operated as any defense to the charged crimes. The jury was amply instructed on the concept of intent, reasonable doubt, the burden of proof and the elements of the offenses. Further instruction to clarify the government's burden was not required. *Wolny*, 133 F.3d at 765. The failure to request such a charge does not constitute error of any sort, and Barrett could not possibly demonstrate prejudice given the overwhelming evidence of his guilt.

B. Defense Counsel's Failure To Request Instructions On The Credibility Of Certain Witnesses Who Were Addicted To Drugs Was Not Ineffective

Barrett claims that his attorneys erred in failing to request an instruction on the credibility of certain witnesses who admittedly used drugs. AB 47-50; COA #2. In view of the jury charge that was actually given, he fails to show that the supposed omission was erroneous or prejudicial.

This Court held that an instruction regarding the credibility of witnesses who are addicted to drugs should be given upon request, when supported by the record. *United States v. Smith*, 692 F.2d 658, 660–61 (10th Cir. 1982). The legal availability of a jury instruction does not obligate counsel to request it, however. *See Gonzalez*, 553 U.S. at 249-50. While instructions concerning the credibility of drug addicts are favored, the omission of such an instruction is not per se prejudicial, even when the instruction is specifically requested by a defendant and refused by the court. *See Smith*, at 660-61; *see also United States v. Nicholson*, 983 F.2d 983, 991 (10th Cir. 1993).

Here, counsel had ample reasons to forgo an instruction concerning the credibility of witnesses who admitted using drugs. First, the defense presented the testimony of Ron Baldwin, an admitted drug user, whose credibility it would not have wanted to denigrate. *See* Tr. 18:4121. Second, an instruction like the one in *Smith*, which informed jurors that drug addicts have "a constant need for a supply of drugs" would have lent support to testimony that the witnesses did obtain drugs from Barrett. *See, e.g*., Tr. 2:374-75; 8:1837-38. *Cf. Smith*, 692 F.2d at 660. The *Smith* instruction also admonished jurors that addicts "may have abnormal fear of imprisonment in which his supply of drugs might be cut off." 692 F.2d at 660. That charge would have placed a judicial imprimatur on the government's theory

that Barrett preferred to die in a blaze of glory than go to jail.[8]  *See* Tr. 20:4402.

Fourth, an addict instruction could have prejudiced Barrett during the penalty phase, when the defense sought to establish his remorse, sense of responsibility, and value to his family.  *See generally* Trl. Doc. 258 § V.  That effort could have been stymied by an argument that, as a drug addict, Barrett may have had an abnormal fear of incarceration and the concomitant loss of his drug supply.  *Cf.* 692 F.2d at 660.

Even if Barrett could show that his attorneys were somehow obligated to request an instruction that would have done far more harm to the defense than good, he cannot establish a reasonable probability that such a charge would have led to acquittal.  *See Thornburg v. Mullin*, 422 F.3d 1113, 1140 (10th Cir. 2005) (applying the reasonable probability standard to a claim regarding the failure to request an instruction).  This Court has held harmless the omission of an addict instruction when the witness's drug use was explored extensively and the trial court instructed broadly on credibility.  *Smith*, 692 F.2d . at 661; *see also United States v. Cook*, 949 F.2d 289, 294 (10th Cir.1991).

---

[8] The guilt phase evidence frequently touched on Appellant's drug use.  *E.g.* Tr. 3:579 (regarding information that Appellant was a drug user), 9:1905 (describing a syringe recovered from Appellant's kitchen in a glass-covered box that was inscribed, "in case of emergency break glass"), 12:2742(drawing a conclusion that Appellant manufactured and used methamphetamine), 14:3129-30 (observing that Appellant rarely slept).

In this case, the trial court instructed the jury on credibility, impeachment, impeachment by prior conviction, and informant testimony. *See* Trl. Doc. 240. For example, the district court instructed the jury that "You are the sole judges of the believability of each witness . . . . You should take into consideration the witness' means of knowledge, strength of memory and opportunities for observation. . . . [¶] You should also consider the bias, prejudice, or interest, if any, that the witness may have . . . and all other facts and circumstances that affect the believability of the witness." *Id*. at Instruction 24. Additionally, both parties elicited testimony about the prosecution witnesses' involvement with drugs. *See, e.g,* Tr. 3: 428-31 (Randy Turman); 3: 468 & 471-72 (Travis Crawford); 8: 1836 & 1843 (Randy Weaver); 11: 2511, 2515-24, 12: 2581-82 & 2604-05 (Charles Sanders), 13: 3061 & 3070-75 (Cindy Crawford); 13: 3081, 14: 3100 & 3117 (Karen Real); 14: 3486-88 (Brandie Price). Defense counsel also attacked the credibility of these witnesses in argument. *E.g*. Tr. 20: 4328, 4339-47. Given this record, no reasonable likelihood exists that Barrett would have received a more favorable verdict had his attorneys requested an addict instruction specifically addressing the credibility of witnesses who used drugs.

### C. The District Court did not Err in Declining to Hold an Evidentiary Hearing

The district court appropriately denied Barrett's request to hold an evidentiary hearing on the instructional issues. Barrett has failed to demonstrate a

constitutional error that would permit the expansion of the COA to reach the denial

of a hearing. *Stouffer*, 738 F.3d at 1220. Moreover, he cannot show any need for

further factual development, as the charge and the evidence to support any forgone

instructions are already part of the record. As such, Barrett cannot show that the

denial of a hearing was an abuse of discretion. *United States v. Lewis*, 594 F.3d at

1277.

## V. TRIAL COUNSEL APPROPRIATELY PRESENTED MITIGATION EVIDENCE

Barrett claims that his attorneys acted ineffectively in failing to present

mitigating evidence that he had a dysfunctional childhood and suffered from

mental illness and organic brain damage. AB 51; 2255 Doc. 95 at 185-248; 2255

Doc. 149 at 102-25. Defense counsel wisely presented internally consistent

evidence meant to demonstrate that Barrett was a valuable member of his family

and community who had been treated unfairly by the government. Barrett has

failed to show that his attorneys were aware, or should have been aware, of any

evidence that he was mentally ill. *See* Part III, *infra*. Moreover, the putative

evidence of Barrett's chaotic upbringing and mental illness would have

undermined the defense strategy and violated the defendant's desire not to have the

jury decide this case on the basis of sympathy.

A. The Defense Evidence and Jury Verdict

Barrett did not want to present a case in mitigation that centered on sympathy for him or dwelled on his family. 2255 Doc. 175 Exs. 11 & 12. Given Barrett's outburst in response to the prosecution's penalty phase argument about his mother (Tr. 27: 5420-21), it appears that counsel wisely chose to heed his wishes. Additionally, counsel had not discovered a factual premise for presenting substantial mental health evidence and wished to avoid premising the mitigation case on Barrett's drug abuse, as they believed such a theory was apt to be poorly received by the jury.

In view of the circumstances confronting defense counsel, they elected to present evidence from several of Barrett's friends and relatives, who described him as a good, generally nonviolent, person who regretted Trooper Eales's homicide. Barrett's cousin, Kathy Trotter, who had many connections to the local community, was unaware of the defendant engaging in acts of violence but had heard rumors that he had engaged in mutual combat with his ex-wife. Tr. 24:4783-93. The defendant's brother, Steven Barrett, testified that Barrett was not a violent person but was a loner. Steven knew that Barrett smoked marijuana, but did not have personal knowledge that the defendant used any other drug. Tr. 25: 5030-51. Roger Crawford, an uncle and neighbor, testified that Barrett was non-violent, a good nephew, a good father, and a hardworking mechanic. Crawford suspected

Barrett might have used drugs, but had no personal knowledge. Tr. 25: 5052-70. Barrett's neighbors, Craig and Clyde Edgmon, described the defendant as non-violent and a good car mechanic. Tr. 24: 4920-25, 4929-34.

Barrett's mother and next-door neighbor, Gelene Dotson, described the defendant as an average, but hyper child, who quit high school after a disagreement with the superintendent over the need to get a haircut. Dotson noted that her son went to work, first taking care of horses then laboring at oil facilities and performing carpentry and mechanical work. Dotson recalled that Barrett married at 18 and had a stormy relationship with his wife, marked by verbal – not physical – disputes. She said that she had never observed Barrett use drugs and could not tell with certainty whether he ever had. While Dotson and Barrett had disagreements, she never feared he would act violently. She described Barrett as "more settled down" since his arrest, something she attributed to his lack of activity. She also related Barrett's statements that he wished he had reacted differently when the Tact Team entered his property. Tr. 25: 5071-5105.

Abby Stites was married to Barrett for 14 years, and conceded that the pair did engage in mutual physical combat during their relationship. However, weapons were never used. Tr. 24: 4877-81. While Stites had observed Barrett boasting of a willingness to use violence outside their relationship, she had never seen him act on those threats. Tr. 24: 4883-84. Stites touched on the fact that she

had participated in an effort to have Barrett committed to a hospital in 1986, because she felt he had undefined "mental problems." Though Barrett discontinued the medications he received at the hospital, Stites agreed to share custody of their son with the defendant following their 1995 divorce. Tr. 24: 4893.

Ernest Barrett is the defendant's father. After his divorce from Gelene Dotson, Ernest Barrett did not, by his own concession, have a close relationship with the defendant. But he characterized the defendant as non-violent and said Barrett was sorry about the killing of Trooper Eales. Tr. 25: 5105-09. Barrett's step-mother, Doris Barrett, reported that after the defendant's arrest, she had developed a close relationship with him that she intended to maintain. Tr. 25: 5119-25.

The defense presented a separate body of evidence that demonstrated Barrett had been tried and convicted of manslaughter in Sequoyah County Court for the killing of Trooper Eales. He was serving his sentence in the state's only maximum security facility, though he appeared, under Department of Corrections regulations, to merit incarceration in only a minimum security facility. Tr. 24: 4823-27. Moreover, he had not engaged in any act of misconduct in prison and was considered moderately likely to succeed if provided with substance abuse treatment. Tr. 24:4828, 4840-4843.

The defense presentation was clearly persuasive, even if it was not ultimately successful. The jury unanimously found in mitigation that Barrett was a father, a loved son and stepson, a person whose death would impact his child, family and friends, and a person with no prior felony convictions. Trl. Doc. 257. A majority of jurors also found that Barrett was a good neighbor and friend. *Id.* Additionally, five jurors found that Barrett had accepted responsibility for Eales's death from his prior conviction and that he had been punished for that death. *Id.* Finally, the jury not only rejected the prosecution's allegations that Barrett constituted a future danger, but two jurors found in mitigation that the defendant did not constitute a future danger to society. *Id.*

B. Counsel Validly Elected a Mitigation Strategy, and Any Forgone Evidence Would Have Been Counterproductive

Barrett should not succeed in faulting his attorneys for failing to investigate and present evidence of his supposed mental illnesses, which allegedly include bipolar disorder and organic damage to the prefrontal lobe of his brain. Nor should Barrett prevail by alleging that his attorneys failed to present proof that he was the progeny of a dysfunctional family. Barrett had no interest in presenting such evidence. Moreover, the records he relies upon to establish his alleged mental illness would have depicted him as a violent and inveterate drug addict, who repeatedly spurned the efforts of relatives and medical professionals to help him, in favor of a slavish abuse of marijuana and methamphetamine.

As previously noted, a showing that counsel could have conducted a more thorough investigation that might have borne fruit does not establish ineffectiveness. *See Burger v. Kemp*, 483 U.S. at 794. Investigations are not evaluated in light of ideal conditions with the benefit of hindsight. *Thomas v. Gilmore*, 144 F.3d at 515; *see Tarver v. Hopper*, 169 F.3d 710, 715 (11th Cir. 1999) (noting that counsel is not "required to investigate and present all available mitigating evidence to be reasonable"). A showing that additional evidence could have been adduced by trial counsel "usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel. . . . [B]ut perfection is not the standard of effective assistance. *Waters v. Thomas*, 46 F.3d at 1514.

In particularly, where counsel did not know of facts that would alert him to the need to conduct a particular investigation, a failure to investigate does not amount to deficient performance. *Alcala v. Woodford*, 334 F.3d at 893. "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland*, 466 U.S. at 691. Thus, notwithstanding a defense attorney's duty to investigate and present mitigating evidence, "counsel also has to be responsive to the wishes of his client."

*Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) (citing *Wallace v. Ward*, 191 F.3d 1235, 1247-48 (10th Cir. 1999) for the proposition that counsel's performance during a capital sentencing was sufficient, though counsel acquiesced in his client's wish to forgo mitigating evidence or challenge the state's evidence).

In this case, Barrett solemnly and adamantly wished to avoid presenting a mitigation case based on personal sympathy for him. 2255 Doc. 175 Exs. 11 & 12. It appears, as well, that as a point of pride, he wanted to minimize reliance on his relatives and to avoid bringing them unnecessary embarrassment. *See* 2255 Doc. 175 Exs. 11 & 12. Indeed, as mentioned, Barrett was so incensed by the prosecution's reference to his mother that he refused to attend a portion of the trial despite warnings that his decision to absent himself might be detrimental to the defense. Tr. 27: 5421, 5432, 5436. Given Barrett's conduct, he was manifestly disinterested in relying on mitigation evidence premised on any alleged dysfunction in his upbringing. *See also* 2255 Doc. 175 Exs. 11 & 12. He showed an understanding of potential penalty phase defenses by repeatedly asserting an unwillingness to dwell on his childhood or personal sympathy for him during the penalty phase. *Id.* Counsel validly elected to honor Barrett's desires, in view of the fact that they were able to present an entirely viable theory of mitigation premised on their client's loving relationships with his family and friends – a theory that clearly resonated with the jury in its factual findings.

Furthermore, Barrett is mistaken in his assertion that the facts supporting an investigation into his mental health were apparent. First and foremost, Barrett's own affect suggested to counsel that he was mentally sound. He was cooperative, helpful and communicative. He was well behaved in court and had a clear understanding of the proceedings. 2255 Doc. 175 Exs. 11 & 12. Second, Barrett's family did not inform counsel of any significant concerns about the defendant's mental health. *Id.* While Barrett now produces documents and declarations to suggest that his family was genetically predisposed to mental illness, he fails to show that this information was shared with counsel at the time of trial. Indeed, counsel have no recollection of such information. 2255 Doc. 175 Exs. 11 & 12. Third, Barrett has failed to show that there were any documents in the defense file that would have suggested the need to investigate the possibility of serious mental illness. Trial counsel have no memory of such documents, including any report from Bill Sharp, the expert Barrett now claims to have informed the defense camp of the need to investigate the defendant's mental health. *Id.*

Sharp claims to have informed prior counsel of his opinion that Barrett's mental health merited investigation and to have faxed a report of unknown content to an unidentified person on some unreported date in 2005. 2255 Doc. 95 Ex. 55 at 3-4. Nonetheless, Barrett fails to present any evidence that any specific information was ever provided to his trial counsel that suggested the need for

further investigation.  Furthermore, counsel apparently arranged for Jeanne Russell and another psychologist to meet with Barrett, as demonstrated by Barrett's jailhouse visitation log.  *See* 2255 Doc. 175 Ex. 5.  Russell omits this fact from her declaration, and Barrett has not shown that the results of her contemporaneous evaluation merited further exploration.  Russell apparently did not believe she had identified strong mitigation evidence, as she eventually dissuaded counsel from presenting her risk evaluation, in view of evidence amassed by the government.  2255 Doc. 175 Exs. 11 & 12.  Counsel cannot be faulted for omitting an investigation for which they appear to have had no basis or for forgoing the discovery of evidence that their client discouraged them from presenting at trial.

C. Absence of Prejudice

Assuming, arguendo, that Barrett could show that his attorneys unreasonably failed to investigate information that he was mentally ill and came from a dysfunctional background, he cannot establish a reasonable likelihood that the evidence would have led to a more favorable verdict.  Barrett claims his attorneys should have presented evidence of the dysfunction in his upbringing, as a precursor to evidence that he was severely mentally ill.  Doing so would have utterly negated the jury's view that he was a loved son and stepson, a person whose death would impact his child, family and friends, and a good neighbor and friend.  Trl. Doc. 257.  As such, Barrett can only establish that defense counsel could have had to

have presented a different mitigation case than they did, not one that was necessarily more successful.

Significantly, the very records that Barrett relies upon in support of his claim of mental illness demonstrate that any inquiry into the defendant's psychology was fraught with the potential for damage. *See* 2255 Doc. 175. Exs. 13-20 (excerpting 2255 Mot. Ex. 147). Barrett currently relies on diagnoses of bipolar syndrome, post-traumatic stress disorder and organic brain damage, which he received in 2009, but claims were indicative of his mental condition in 1999. *See* 2255 Doc. 95 Exs. 89 & 117. The government does not concede that any of these diagnoses is presently accurate, but that is not the issue. Rather, Barrett must establish a reasonable likelihood that he would have been spared a death sentence had he presented this evidence. He cannot do so because his own medical records demonstrate that medical professionals who diagnosed Barrett far closer in time to the murder than his current experts did not perceive a neurological illness, bipolar syndrome or post-traumatic stress disorder. Rather, they observed a dangerous and assaultive drug addict. Those records substantially undercut the accuracy of Barrett's current diagnoses and would have shattered his attorneys' attempt to characterize their client as a decent, hardworking member of his family and community.

For instance, a sworn statement executed by Abby Barrett (nee Stites) on October 8, 1986, complained that the defendant had sexually abused her, threatened to kill her, and threatened to kill himself.  Ms. Barrett further noted that the defendant had entered her home and vandalized her furniture and had previously burned her possessions in the front yard.  She described Barrett as very dangerous and noted that he was abusing drugs.  2255 Doc. 175 Ex. 13.  A document prepared by the staff at Eastern State Hospital on the day of the above complaint, describes Barrett as having no symptoms of neurological impairment.  2255 Doc. 175 Ex. 15.  Another document prepared that day indicates that Barrett refused to participate in psychiatric treatment following his suicide attempt.  2255 Doc. 175 Ex. 14.  A discharge summary prepared nine days later notes that Barrett "has been abusing different kinds of drugs since the age of 16, and admitted taking marijuana and downers."  2255 Doc. 175 Ex. 16.  The report concludes that Barrett's prognosis is guarded "because of the unpredictability of his behavior, depending on the circumstances and depending on whether or not he is taking drugs at the time." *Id.*

A Social Security denial of claim, prepared a few months after Barrett's brief stay at Eastern State hospital, summarized medical records stretching back to 1980, and concluded that the defendant had no significant mental illness:

> Medical reports show that you are moderately depressed but there are
> no signs of a severe mental illness. Most of the time you are able to

> think clearly and to carry out your normal activities. Medical evidence does not show any other impairments which would keep you from working.

2255 Doc. 175 Ex. 20.

The passage of time did not substantially alter professional assessments of Barrett's condition. His behavior remained a function of his substance abuse. In 1995 he was brought to the emergency room at Sequoyah Memorial Hospital in an agitated state. He was treated with Haldol and received a provisional diagnosis of bipolar disorder. 2255 Doc. 175 Ex. 19. That diagnosis did not – despite Barrett's repeated references to it (*see*, e.g., 2255 Doc. 95 at 56, 186, 227, 251) – survive. Barrett was discharged three days later with a diagnosis of organic effective disorder, polysubstance abuse, amphetamine dependence, urine drug screen positive for cannabis and marital conflicts. 2255 Doc. 175 Ex. 18. In short, his final diagnosis indicated that he was a drug addict whose substance abuse substantially degraded his mood. The treating doctor noted that Barrett did not appear anxious or depressed, he reported feeling calm, denied suicidal or homicidal ideation, he did not display paranoid or delusional thought processes, his memory was intact, and he had good attention and concentration. *Id.* Barrett apparently did nothing to reform his dependence on drugs, despite his recognized substance abuse issues. At the time of the murder, a blood test demonstrated that Barrett had used amphetamines and marijuana. 2255 Doc. 175 Ex. 17.

Barrett's records demonstrate that his entire mental health history was inextricably tied to his use of illegal drugs. Barrett's lawyers felt that evidence of illegal drug use would not resonate with the jury (2255 Doc. 175 Exs. 11 & 12), and the defendant fails to demonstrate that a lengthy exploration of that subject would have been more beneficial to his case than the evidence his attorneys presented. *See Duvall v. Reynolds*, 139 F.3d 768, 781-82 (10th Cir. 1998) (noting reasonableness of decision to omit ambiguous evidence during penalty phase trial). In fact, the putative evidence identified by Barrett would have depicted him as drug-dependent and violent toward his family, contradicting the evidence presented by his lawyers and markedly strengthening the government's argument that he was a future danger.  Similarly, evidence that Barrett had experienced a dysfunctional upbringing at the hands of mentally ill relatives would have undermined the jury's finding that the defendant was valued by his family.  Barrett cannot show that he was prejudiced by the omission of evidence that would have sabotaged his attorneys' efforts to characterize him as a useful and loved member of his family and society. *See Cannon v. Gibson*, 259 F.3d 1253, 1277-78 (10th Cir. 2001) (holding that omitted evidence "would have negated much of the mitigation evidence actually adduced by trial counsel and could have strengthened the prosecution's argument that Cannon represented a continuing threat to society.").

Had counsel taken the path identified in the § 2255 Motion, Barrett could argue that they were ineffective for failing to humanize him and blunt the allegation of future dangerousness. The threat of future dangerousness here was exacerbated by Defendant's refusal, against the advice of trial counsel, to take the stand during the second stage after his prior counsel, through Defendant's step-mother, convinced him not to testify. The District Court specifically found that Defendant's refusal to testify, especially in light of his outburst during closing arguments, "had a negative effect on the jury." 2255 Doc. 214 at 184. None of the foregone evidence that Barrett now urges should have been presented would have been sufficient to overcome his failure to testify.

Because the forgone evidence could have only been presented as an alternative to the case Barrett's lawyers actually developed, the attack on counsel's strategy relies entirely on the benefits of hindsight and should be rejected.

## VI. THE TRIAL COURT PROPERLY DENIED LESSER INCLUDED OFFENSE INSTRUCTIONS

Barrett claims the trial court erroneously refused to instruct the jury on voluntary manslaughter as a lesser included offense to the three charged counts. He further argues that the ineffectiveness of his appellate counsel in omitting the claim on direct appeal excuses his procedural default of this issue. AB 90-97; COA #7. Barrett defaulted the issue by failing to raise it on appeal. Because voluntary manslaughter is not a lesser offense of the charged crimes, the absence

of an instruction on such a theory could not have supported a successful appeal. Accordingly, Barrett's appellate attorneys' actions cannot establish cause and prejudice to excuse default of the claim.

A.  Barrett Procedurally Defaulted on this Claim

Barrett argues that the trial court erroneously omitted voluntary manslaughter instructions.  Such a record-based claim should be raised on direct appeal, and cannot be raise for the first time on collateral review without showing cause and prejudice or a miscarriage of justice.  *United States v. Hollis*, 552 F.3d 1191, 1193–94 (10th Cir.2009).

Barrett defaulted on his instructional claim by failing to raise it on appeal. He attempts to excuse the default by arguing that his attorneys were ineffective in omitting the issue from his direct appeal.  But, as explained below, the claim lacks merit, and counsel had no obligation to raise it on appeal.  *Smith v. Workman*, 550 F.3d 1258, 1268 (10th Cir.2008) (holding appellate counsel has no obligation to raise meritless issues).  Because counsel's performance was not deficient, Barrett cannot establish cause and prejudice to excuse his default.  Moreover, he makes no attempt to demonstrate that the alleged instructional error resulted in the conviction of an innocent person, and therefore cannot demonstrate a miscarriage of justice. *See United States v. McGaughy*, 670 F.3d 1149, 1159 (10th Cir. 2012).

B.  Voluntary Manslaughter Was Not Available as a Lesser Included
Offense

A court violates due process when it denies a capital defendant a proper

lesser-included non-capital instruction, if a lesser offense is supported by the

evidence.  *Taylor v. Workman*, 554 F.3d 879, 885 (10th Cir. 2009) (citing *Beck v.

Alabama*, 447 U.S. 625, 638 (1980)).  To obtain a lesser-included-offense

instruction, "[f]irst, the defendant must make a proper request; second, the lesser

included offense must contain some but not all of the elements of the charged

offense; third, the elements differentiating the two offenses must be in dispute; and

fourth, the evidence must allow the jury to rationally acquit the defendant on the

greater charge and convict on the lesser charge."  *United States v. Toledo*, 739 F.3d

562, 568 (10th Cir. 2014) (quoting *United States v. Brown*, 287 F.3d 965, 974

(10th Cir. 2002)).  In a capital case, a court need not instruct on lesser *non-*

*included* offenses if it could not provide such instructions in a noncapital case.

*Hopkins v. Reeves*, 524 U.S. 88, 95-96 (1998); *Hooks v. Ward*, 184 F.3d 1206,

1226 (10th Cir. 1999).  Consistent with that principle, the trial court in this case

refused to instruct the jury on voluntary manslaughter because it held that the

crime was not a lesser-included offense of any of the crimes charged in the

indictment.

### 1. <u>The Offense for Which Barrett Received the Death Penalty</u>

Barrett received the death penalty for one offense – intentional killing of a state police officer engaged in the performance of his duties. That crime, as defined by 21 U.S.C. § 848(e), contains no lesser included offenses. *See United States v. Beckford*, 966 F. Supp. 1415, 1417-18 (E.D. Va. 1997). In § 848(e), Congress omitted any gradations of the offense: the statute "neither substantively defines, nor contains penalties for, grades of homicide lesser than intentional killing." *Id.* at 1418. Under § 848, courts may not infer lesser-included offenses, like manslaughter, as they lack the authority to define common law crimes. *Id.*; *see United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 490 (2001). Further, voluntary manslaughter – a crime that includes a territorial jurisdiction element, see 18 U.S.C. § 1112 – cannot constitute a lesser-included offense of a § 848 killing, an offense premised solely on subject-matter jurisdiction. *Beckford*, 966 F. Supp. at 1418.

Even if voluntary manslaughter did not require territorial jurisdiction, it would not constitute a lesser-included offense of § 848(e). Voluntary manslaughter lies when "heat of passion" negates the malice required for second-degree murder, which includes only a general intent to kill. *United States v. Serawop*, 410 F.3d 656, 663, 665 (10th Cir. 2005); *see also* 18 U.S.C. § 1111(a) (defining murder); *id.* § 1112(a) (defining voluntary manslaughter). Section

848(e), in contrast, does not require malice; instead, it expressly requires a specific intent to kill, as the jury was instructed.[9] *See* Trl. Doc. 240 at Instruction 15; *cf. United States v. Wood*, 207 F.3d 1222, 1228 (10th Cir. 2000) (holding malice aforethought is a general intent element of murder). If § 848 made no mention of intent, this Court might infer that a mens rea requirement of malice, but the law's specific intent requirement does not permit such latitude. *Cf. United States v. McVeigh*, 153 F.3d 1166, 1193-94 (10th Cir. 1998) (inferring a general intent requirement for a statute in which Congress failed to prescribe mens rea). Because specific intent to kill does not require a finding of malice, it is not negated by heat of passion, and thus voluntary manslaughter does not constitute a lesser included offense. *Cf. Toledo*, 739 F.3d at 568. Accordingly, Barrett had no right to a voluntary manslaughter instruction. *Hooks*, 184 F.3d at 1226.

Barrett does not address the fact that heat of passion will not negate the mens rea of the offense for which he received the death penalty. Instead, he insists that jurisdiction lies for murder and its lesser included offenses whenever the government charges a homicide in relation to another federal crime. *See* AB 92-93 (citing *United States v. Chanthadara*, 230 F.3d 1237, 1257-59 (10th Cir. 2000)). Barrett's argument ignores the fact that the elements of the federal murder statute

---

[9] Had Congress defined § 848(e) homicide as a crime of "malice," heat of passion would presumably negate it. *See Neder v. United States*, 527 U.S. 1, 21 (1999) (holding that Congress generally intends to incorporate the established meaning of common law terms that it includes in statutes).

(18 U.S.C. § 1111) were expressly imported into his principal authority, *Chanthadara*, by way of the offense charged in that case – causing death with a firearm under 18 U.S.C. § 924(j). *See* 230 F.3d at 1244 & 1252. In contrast, Barrett's capital crime, a violation of § 848(e), does not refer to § 1111.

Barrett also implies that *Beck v. Alabama*, 447 U.S. 625 (1980) requires that a capital sentencing jury always consider some non-capital alternative to the charged crime. AB 92. His argument fails to acknowledge the fact that *Beck* does not require Congress to enact capital statutes that include non-capital lesser offenses. *Beckford*, 966 F. Supp. at 1430-33. In fact, the Supreme Court has made clear that a defendant has no right to lesser-included-offense instructions if the law does not provide for them. *Hopkins*, 524 U.S. at 99 & n.7. Instructions on legally unavailable lesser offenses detract from due process. *Id*. at 99 (citing *Spaziano v. Florida*, 468 U.S. 447, 455 (1984)). In keeping with that principle, this Court has long recognized that capital defendants have no right to a lesser-included-offense instruction unsupported by evidence. *Phillips v. Workman*, 604 F.3d 1202, 1211 (10th Cir. 2010); *Bryson v. Ward*, 187 F.3d 1193, 1207 (10th Cir. 1999).

Simply stated, the Constitution does not require courts in capital cases to provide juries with false choices between charged crimes and non-included offenses. As such, the trial court validly declined to instruct the jury on a legally-unavailable theory of manslaughter as a lesser included offense of § 848(e).

73

## 2. The Offenses for Which Barrett did not Receive the Death Penalty

Barrett was convicted of two offenses for which he did not receive the death penalty: using a firearm to commit murder during and in relation to drug trafficking (Count 1), and using a firearm to commit murder during and in relation to a crime of violence (Count 2). 18 U.S.C. § 924(j). Those charges relied on a felony murder theory. *See* Trl. Doc. 240, Instruction 7; *see also* § 2255 Docs. 95 at 337, Doc. 149 at 195 (Barrett's concession that the charges were premised on felony murder).[10] Accordingly, they premised malice aforethought on proof that Barrett killed Trooper Eales during the comission of a felony. *See Chanthadara*, 230 F.3d at 1259 (citing *Whalen v. United States*, 445 U.S. 684, 693 n.7 (1980)); *see also United States v. Nguyen*, 155 F.3d 1219, 1229 (10th Cir. 1998) (holding a felony murder charge does not entitle the defendant to an instruction requiring additional mens rea).

The felonies underlying Counts 1 and 2 satisfy the malice element for second degree murder. 18 U.S.C. § 1111; *United States v. Pearson*, 159 F.3d 480, 486 (10th Cir. 1998). Specifically, "[S]econd degree murder's malice aforethought

---

[10] On March 13, 2014, Barrett filed a letter withdrawing his prior concessions that counts 1 and 2 are felony murder offenses. Doc. 01019217306. He is incorrect: the offenses are felony murders as a matter of law. *United States v. Nguyen*, 155 F.3d 1219, 1225 (10th Cir.1998). Even if they were not, Barrett cannot "withdraw" his concessions at this stage of the proceedgins. *See Druery v. Thaler*, 647 F.3d 535, 545 (5th Cir. 2011) (noting application of the invited error doctrine on collateral review); *United States v. Fields*, 516 F.3d 923, 939 (10th Cir. 2008) (precluding review of invited errors).

element is satisfied by: (1) intent-to-kill without the added ingredients of premeditation and deliberation; (2) intent-to-do-serious-bodily-injury; (3) depraved-heart; or (4) commission of a felony when the felony in question is not one of those specified in the first degree murder paragraph of § 1111(a)." *Pearson*, 159 F.3d at 486; *accord United States v. Wood*, 207 F.3d 1222, 1228 (10th Cir. 2000); *United States v. Regnier*, 44 Fed.Appx. 524, 528 (2d Cir. 2002) (observing that this Court correctly determined that second degree murder "encompasses felony murder").

Voluntary manslaughter is not a lesser included offense of felony murder. *United States v. Miguel*, 338 F.3d 995, 1005 (9th Cir. 2003); *accord United States v. Pearson*, 203 F.3d 1243, 1271 (10th Cir. 2000) (holding a jury could not rationally convict on a manslaughter theory after finding the defendant guilty of first-degree felony murder). In announcing that rule, the Ninth Circuit reasoned that voluntary manslaughter requires an element that felony murder does not – the intent to inflict injury. *Miguel*, 338 F.3d at 1005. The Ninth Circuit premised its decision on this Court's holding that "the malice aforethought required for second degree murder is different in kind, as opposed to degree, than the malice required for [first-degree] felony murder." *Id*. at 1005 n.43 (citing *Chanthadara*, 230 F.3d at 1258).

Omitting any reference to felony murder, this Court has similarly held that voluntary manslaughter requires proof of heat of passion "with a mental state that would otherwise constitute second degree murder – either a general intent to kill, intent to do serious bodily injury, or with depraved heart recklessness." *United States v. Serawop*, 410 F.3d at 663. The Court's reasoning and authority preclude manslaughter as a lesser included offense of Counts 1 and 2, and the trial court properly declined to instruct on such a theory. *See Hopkins*, 524 U.S. at 99 & n.7.

Barrett argues that Counts 1 and 2 included voluntary manslaughter as lesser offenses because the felonies underlying the charges involved intent factors that were, themselves, amenable to negation by heat of passion.[11] AB 94-95. Barrett's argument fails simply because manslaughter is not a lesser-included offense of felony murder, based on its elements. *See Miguel*, 338 F.3d at 1005. Regardless, Count 1 is premised on a non-violent drug trafficking felony that does not involve any intent to inflict injury or death that might be negated by heat of passion. *See id*. The felony underlying Count 2, a violation of § 848(e), is not amenable to negation under the manslaughter doctrine, as fully discussed above. *See, supra*, Arg. VI, B, 1.

---

[11] Barrett's argument is inconsistent with his subsequent assertion that counts 1 and 2 were not felony murders. Doc. 01019217306.

C.  Harmless Error

Had Barrett made a valid showing of *Beck* error with regard to Count 3, for which he received the death penalty, the issue would require reversal regardless of prejudice.  *See Taylor*, 554 F.3d at 892-93.  Because Barrett received life sentences for Counts 1 and 2, per se reversal is not required by *Beck*.  *See Trujillo v. Sullivan*, 815 F.2d 597, 604 (10th Cir. 1987) (finding the failure to give lesser included offense instructions was not constitutionally erroneous where death penalty was not imposed).  Rather, Barrett must demonstrate that the alleged error had a substantial and injurious effect or influence on the outcome of his case.  *See Taylor*, 554 F.3d at 893 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

In this case, the jury ultimately found that Barrett committed all the charged offenses with substantial planning and premeditation.  *See* Trl. Doc. 257.  The jury necessarily based that finding on the evidence adduced during the guilt phase of his trial, as the government made no effort to augment its proof of the factor during the penalty phase.  *See* Tr. 27:5339-41 (prosecution argument regarding proof of factor).  The premeditation finding frustrates any effort to show that the jury would have convicted Barrett of manslaughter on a heat of passion theory.  *See United States v. Frady*, 456 U.S. at172 74 (1982) (discussing the inconsistency of a jury finding premeditation and heat of passion).  Simply stated, the jury's penalty phase findings do not permit Barrett to show that the absence of manslaughter

instructions had a substantial and injurious effect on the trial. *Brecht*, 507 U.S. 623.

## CONCLUSION

Based on the foregoing reasoning and authority, the government respectfully urges this Court to affirm the judgment of the court below.

## STATEMENT REGARDING ORAL ARGUMENT

The Government asserts that oral argument is necessary given the number of issues, the size and complexity of the record, and the gravity of the punishment.

Respectfully submitted,

DAVID A. O'NEIL
Acting Assistant Attorney General
United States Department of Justice

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

Jeffrey B. Kahan, PA Bar No. 93199
Trial Attorney
U.S. Department of Justice
1331 F Street, N.W.; Rm. 337
Washington, D.C. 20530
Tel: (202) 305-8910
Jeffrey.Kahan@usdoj.gov

*/s/ Christopher J. Wilson*
Christopher J. Wilson, OK Bar No. 13801
Assistant United States Attorney
Eastern District of Oklahoma
520 Denison Avenue
Muskogee, OK 74401
Tel: (918) 684-5100
Chris.Wilson@usdoj.gov

## CERTIFICATE OF WORD COUNT COMPLIANCE

This brief complies with the 23,000 word limit set forth in this Court's May 2, 2013 Case Management Order (Doc. 0109047087 at 2). According to MS Word 2010, this brief contains 17,873 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

*/s/ Christopher J. Wilson*

## CERTIFICATE OF DIGITAL SUBMISSION

I certify that:

- all required privacy redactions have been made;

- that with the exception of those redactions, every document submitted in digital form or scanned PDF format is an exact copy of the written document filed with the Clerk;

-that the ECF submission was scanned for viruses using Trend Micro OfficeScan, updated May 6, 2014, and according to the program is free of viruses.

*/s/ Christopher J. Wilson*

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on May 6, 2014, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing. A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry     dbautry44@hotmail.com

Ms. Joan M. Fisher     Joan_Fisher@fd.org

Mr. Tivon Schardl     Tim_Schardl@fd.org

I hereby certify that I caused a true and correct copy of the foregoing document to be mailed via the United States Postal Service on May 6, 2014, to the following:

Not Applicable as Defendant Has Counsel

*/s/ Christopher J. Wilson*