**CASE NO. 12-7086**

# IN THE UNITED STATES COURT OF APPEALS TENTH CIRCUIT

UNITED STATES OF AMERICA,   )
                                   )
     Respondent/Appellee,    )
                                   )      Nos. 6:04-cr-00115-JHP
v.                             )      6:09-cv-00105-JHP
                                 )      (lower dockets)
KENNETH EUGENE BARRETT,   )
                                   )
     Petitioner/Appellant.     )

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
Honorable James H. Payne

---

ORAL ARGUMENT REQUESTED

---

**APPELLANT'S REPLY  BRIEF**

---

**DAVID B. AUTRY**, OBA #11600
Attorney at Law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  (405) 521-9600
dbautry44@hotmail.com

**HEATHER E. WILLIAMS**, Bar No. 122664
Federal Defender
**JOAN M. FISHER**, Idaho Bar No. 2854
Assistant Federal Defender
**TIVON SCHARDL**, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  (916) 498-6666
Joan_Fisher@fd.org
Attorneys for Petitioner/Appellant

# TABLE OF CONTENTS

I.   THE GOVERNMENT'S STATEMENT OF FACTS IS UNRELIABLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  INEFFECTIVE ASSISTANCE OF COUNSEL. . . . . . . . . . . . . . . . . . . 3

   A.   Failure to Retain Defense Experts was Constitutionally Ineffective. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.   An independent police procedures expert was critical to the defense. . . . . . . . . . . . . . . . . . . . . . . . . . 4

             a. Reliance on a hostile government expert witness was unreasonable . . . . . . . . . . . . . . . . . . . . . . . . 4

             b. Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                  i.  Dr. Kirkham was well-qualified . . . . . . . . . . . . . . 6

                  ii. Choney's testimony harmed Mr. Barrett . . . . . . . . . 7

        2.   Failure to secure an independent crime scene reconstruction expert. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

             a. Mr. Barrett's claims are within the scope of the COA. . . . . 8

             b. The government relied on Dalley's testimony . . . . . . . . . 9

             c. Counsel's billings and declaration do not establish counsel's reasonable preparation and investigation. . . . . . . . . . . . . 11

        3.   Counsel were ineffective for failing to utilize mental health evidence in the first stage. . . . . . . . . . . . . . . . . . . 13

             a. Performance . . . . . . . . . . . . . . . . . . . . . . . . 13

             b. Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . 15

        4.   Evidentiary hearing . . . . . . . . . . . . . . . . . . . . . . 16

   B.   Failure to request instructions . . . . . . . . . . . . . . . . . . 16

   C.   Second Stage Ineffectiveness . . . . . . . . . . . . . . . . . . . . 17

        1.   Deficient performance . . . . . . . . . . . . . . . . . . . . . 17

             a. Client interference . . . . . . . . . . . . . . . . . . . . 17

             b. No cause to investigate. . . . . . . . . . . . . . . . . . 20

c. Reasonable strategic choice. . . . . . . . . . . . . . . . . . . . . . . 23

2. Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

III.  PETITIONER'S DUE PROCESS AND EIGHTH AMENDMENT RIGHTS
WERE VIOLATED WHEN THE TRIAL COURT REFUSED LESSER
INCLUDED OFFENSE INSTRUCTIONS.  APPELLATE COUNSEL
WAS INEFFECTIVE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

A. 21 U.S.C. § 848 (count 3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

B. Counts 1 and 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

C. Ineffective Assistance of Appellate Counsel. . . . . . . . . . . . . . . . . . 32

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**TABLE OF AUTHORITIES**
**FEDERAL CASES**

*Ake v. Oklahoma*,
470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Alcala v. Woodford*,
334 F.3d 862 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Anderson v. Sirmons*,
476 F.3d 1131 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 28

*Beck v. Alabama*,
471 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Bond v. Beard*,
539 F.3d 256 (3rd Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 26

*Burger v. Kemp*,
483 U.S. 776 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Cannon v. Gibson*,
259 F.3d 1253 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Cullen v. Pinholster*, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
131 S.Ct. 1388 (2011)

*DeRosa v. Workman*,
679 F.3d 1196 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Duvall v. Reynolds*,
139 F.3d 768 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Ferrell v. Hall*,
640 F.3d 1199 (11th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 24

*Gray v. Branker*,
529 F.3d 220 (4th Cir.  2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 25

*Harries v. Bell*,
417 F.3d 631 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Harrington v. Richter*,
131 S. Ct. 770 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Hinton v. Alabama*,
134 S. Ct. 1081 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 13

*Hooks v. Ward*,
184 F.3d 1206 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Hooks (Victor) v. Workman,*
689 F.3d 1148 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22, 24

*Jells v. Mitchell,*
538 F.3d 478 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Jennings v. Woodford,*
290 F.3d 1006 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Keeble v. United States,*
412 U.S. 205 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Kimmelman v. Morrison,*
477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Le v. Mullin,*
311 F.3d 1002 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Littlejohn v Trammell,*
704 F.3d 817 (10th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28

*McNeil v. Branker,*
601 F. Supp. 694 (E.D.N.C. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Melendez-Diaz v. Massachusetts,*
557 U.S. 305 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Milton v. Miller,*
744 F.3d 660 (10th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Mullaney v. Wilbur,*
421 U.S. 684 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Porter v. McCollum,*
558 U.S. 30 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 23, 25

*Reynoso v. Giurbino,*
462 F.3d 1099 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Romano v. Gibson,*
239 F.3d 1156 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rompilla v. Beard,*
545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 25

*Soffar v. Dretke,*
368 F.3d 441 (5th Cir. 2004), *amended,* 391 F.3d 704 . . . . . . . . . . . . . . . . . . . . 24

*Strickland v. Washington,*
466 U.S. 688 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 15

*United States v. Barrett,*
496 F.3d 1079 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15, 16

*United States v. Beckford,*
966 F. Supp.1415 (E.D. Va. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Brown,*
326 F.3d 1143 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Chanthadara,*
230 F.3d 1237 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Garcia,*
625 F.2d 162 (7th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Lofton,*
776 F.3d 918 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. McVeigh,*
153 F.3d 1166 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Moya,*
676 F.3d 1211 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Toledo,*
739 F.3d 562 (10th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Visinaiz,*
428 F.3d 1300 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Wood,*
207 F.3d 1222 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Wallace v. Ward,*
191 F.3d 1235 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Walters v. Thomas,*
46 F.3d 1506 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Wiggins v. Smith,*
539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17, 22, 24

*Williams v. Taylor,*
529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Wilson v. Sirmons,*
536 F.3d 1064 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 27, 28

## FEDERAL STATUTES

18 U.S.C. § 924(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. § 924(j)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. § 924(j)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. § 1111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 31

18 U.S.C. § 2254(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

21 U.S.C. § 848 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## MISCELLANEOUS

*Garrett & Neufeld, Invalid Forensics Science Testimony and*
*Wrongful Convictions,* 95 Va. L. Rev. 1, 14 (2009) . . . . . . . . . . . . . . . . . . . . . . 3

Hueske, Edward E, <u>Practical Analysis and Reconstruction</u>
<u>of Shooting Incidents</u>, Chapter 4, *Shooting Reconstruction*
*Equipment and Use* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**IN THE UNITED STATES COURT OF APPEALS TENTH CIRCUIT**

UNITED STATES OF AMERICA,  )
                                   )
      Respondent/Appellee,    )
                                     )      Nos. 6:04-cr-00115-JHP
v.                                 )      6:09-cv-00105-JHP
                                     )      (lower dockets)
KENNETH EUGENE BARRETT,    )
                                     )
      Petitioner/Appellant.     )

**APPELLANT'S REPLY  BRIEF**

Mr. Barrett submits the following Reply Brief.

**I.     THE GOVERNMENT'S STATEMENT OF FACTS IS UNRELIABLE.**

The most cursory reading of the government's version of facts illustrates the wide gulf between the parties' understanding of the events of September 24, 1999. *Compare* Petitioner's brief  ("PB"), pp. 5-9 *with* the government's brief.  ("GB") 3-9.

The government's version of facts relies largely on the testimony of Troopers Hamilton and Manion, both of whose recollections of events were seriously impaired.  Both troopers -- the only troopers to fire weapons -- were actively engaged in the firefight rendering their observations and recollections impacted by the traumatic events.  *See generally*, Samuelson, Kristin W., "Post-traumatic stress disorder and declarative memory functioning: a review" Dialogues Clin Neurosci 13(3), pp. 346-51,  (Sept. 2011); *see also*, *DeRosa v. Workman*, 679 F. 3d 1196, 1238 (10th Cir. 2012).

There are numerous examples of inconsistencies by Troopers Manion and Hamilton. For example, Trooper Hamilton steadfastly denied firing his weapon, until he was confronted with physical evidence he had done so nearly a year after the event. Only then did he "recall" and admit firing his weapon. *See*, *e.g.*, CrDoc326, p.548; *see also* Doc199, p.8¶11(d). Trooper Hamilton also originally claimed to have engaged his emergency lights on the lead Bronco, a fact he later admitted was untrue.[1] Doc199-1, p.9¶23.

Trooper Manion also claimed the two lead vehicles engaged their emergency lights, (CRDoc327, Vol.5, p.176), a fact later admitted to be untrue. *See, e.g., United States v. Barrett*, 496 F. 3d 1079, 1085 (2007). In short, "the intent was to surprise," (CrDoc325, Vol. 3, p.579), and surprise, they did. Hamilton and Manion are not the only government witnesses who arguably committed perjury.[2]

The government's recitation of the evidence of Mr. Barrett's alleged drug trafficking, (PB 10), is nothing more than a list of ordinary objects and products more easily explained as showing Mr. Barrett's automotive repair than drug trafficking or manufacturing. Moreover, the government fails to explain how the OHP searched Mr. Barrett twice and yet missed the alleged red phosphorous that

---

[1] *See, e.g.,* CrDoc326, Vol.4, p.614 (Trooper Hamilton testifies only his headlights were on); Doc199-1, ¶29 (Though he testified otherwise at trial, Trooper Hash told OHP Internal Affairs investigator Paul Gordon that the third vehicle's lights were turned on *after* the incident to "give needed light to the wounded troopers' evacuation."). The government makes no mention of Gordon's investigation which showed "that none of the vehicles which approached the residence were driving with their emergency lights activated but that they had, in fact, rolled in dark, not even using headlights initially . . ." *Id.* at 11¶ 25.

[2] Mr. Echols explained: "At the preliminary hearing, Mr. Petting[ill] under oath stated 'I never saw [Mr. Barrett] on the porch.' Second trial – first trial, he comes out and says 'I saw him on the porch' Third trial he explained that his memory had just changed." CrDoc310, p.7.

was later discovered in his jeans' pocket.[3]  *See* PB 7-8.  Though Stanley Philpot testifies that he saw the sheriff pull a pill bottle with a baggy out of Mr. Barrett's front pocket, (CrDoc336, Vol 8, p. 1770), the red phosphorous was found days later in the right front pocket and the pill bottle with the baggy in it was in the back pocket.  CrDoc338, Vol.10, p. 2130.

## II.    INEFFECTIVE ASSISTANCE OF COUNSEL.

### A.    Failure to Retain Defense Experts was Constitutionally Ineffective.

Invalid forensic testimony has been found to contribute to the wrongful convictions of innocent persons in 60% of the cases of exoneration.  *Hinton v. Alabama*, --U.S. -- 134 S.Ct. 1081, 1088 (2014), citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 319 (2009) (citing Garrett & Neufeld, Invalid Forensics Science Testimony and Wrongful Convictions, 95 Va. L. Rev. 1, 14 (2009)).  The Supreme Court recognized the "threat to fair criminal trials posed by the potential for incompetent or fraudulent prosecution of forensics experts."  *Id*.  "That threat is minimized when the defense retains a competent expert to counter the testimony of the prosecution's expert witnesses, it is maximized when the defense instead fails to understand the resources available to it by law."  *Id*.  *Hinton* makes clear decisions relating to the selection and presentation of an expert made on insufficient research and investigation are constitutionally deficient.  *Id*.

Notwithstanding the tragic death of a law enforcement officer, Kenneth Barrett stands wrongfully convicted.  Had his court-appointed attorneys provided Mr. Barrett with his constitutional right to essential forensic expert testimony at

---

[3]  Although Trooper Hash testified there was "what felt like a pill bottle," he did nothing with it.  CrDoc327, Vol 5, pp. 1009-10.

trial and sentencing, Mr. Barrett would not now stand convicted of capital murder and be sentenced to death.

### 1. An independent police procedures expert was critical to the defense.

#### a. Reliance on a hostile government expert witness was unreasonable.

The government's contention that the decision to call a prosecution witness as an expert was reasonable (GB 15) is wrong. *See* PB 16-26. Notwithstanding defense counsel's declaration and particularized billings, the evidence does not show that calling former FBI Agent Choney was strategic or a reasonable course of defense for Mr. Barrett. *See* Doc175, Exh.12; 10th Cir. Doc 0109206246. The declaration is silent on why Choney was called. Counsel's silence implicitly confirms the lack of strategy. *See* Doc175, Exh.12; Doc95, pp.139-141.

When the government argues "[d]efense counsel could easily have concluded that it was in the defense's interest to elicit testimony criticizing the Tact Team from Choney, and not paid by the defense," (GB 16-17), it is hypothetical rather than what the defense counsel did. Agent Choney was uncooperative throughout trial preparation. Trial counsel's reliance on him was unreasonable.

It is more likely that, rather than any devised strategy, counsel's "decision" to call Choney was based on concerns for finances and/or the sheer lack of preparation. The record shows extensive efforts by the district court to restrict the resources available to the defense. Mr. Echols' efforts to secure sufficient resources to defend Mr. Barrett in the manner a capital prosecution demands was so severely restricted he withdrew. *See* Doc95, pp.7-23 (and supporting documents and exhibits cited therein). Another reason Echols gave for his withdrawal was Mr. Hilfiger's failure to work on the case. *Id.* at 20, citing

Doc113, Exhs.34, 118.  Other evidence also shows his lack of diligence.  *See generally*, Doc95, pp.21-24 (and supporting documents cited therein).

Considering the difficulty in securing experts and other resources, the total lack of participation in the case and ultimate reliance on partial state trial transcripts as a "how-to" guide in his trial preparations, it is likely counsel called Choney due to their failure to understand a capital defendant's rights to independent experts, *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985), and to sufficiently prepare for trial.

The government asserts Mr. Barrett "simply ignores the fact that his attorneys were well acquainted with Mr. Choney's earlier testimony."  GB 17.  A 1.8 hours billing by Hilfiger for "review for Rule 29 motion, Choney, McBride and Callery testimony," (Doc No. 0109206246, p. 22), does not establish that counsel were "well-acquainted" with the testimony.[4]  Nor is the government's contention that Mr. Barrett 's claim that Choney was a "blatantly hostile witness" stems from hindsight meritorious.  GB 17.  The record manifested  overt hostility.  *See, e.g.*, Doc310, p.16 (Choney told John Echols that if the defense calls him "I will defy a subpoena; I will not testify for the defense, I'm just not going to[,] no matter what you do.")

The billings show minimal preparation for Choney's testimony, and no preparation beyond "reviewing" the prior testimony.  Counsel's mere acquaintance with prior testimony does not alter the unreasonableness of betting his client's life on counsel's ability to extract favorable evidence from an extremely hostile witness.  Before any decision can be considered reasonable, much more research and investigation were required.  There are: no interviews of, or substantive

---

[4]Additional billing submissions show just over 4 hours devoted to the state trial transcripts of Choney's testimony *and* five other witnesses in May and August, 2005.  10th Cir. Doc 0109206246, pp. 41, 60.

communication with, Mr. Choney; no research of reasonable police practices; no review of the OHP East Tact Team policy manual or discussion with any law enforcement regarding the policies;[5] and, no consultation with any expert familiar with police procedures. Reasonable counsel would not choose to rely on an adverse government witness to support a critical element of the defense without having assured himself that the testimony necessary for his client's case was forthcoming *and* unavailable from an independent, unbiased expert. Mr. Barrett has overcome the presumption that counsel's conduct fell within the range of reasonable professional assistance. *Strickland*, 466 U.S. 688, 689 (1984).

### b. Prejudice

#### i. Dr. Kirkham was well-qualified

The expert proffered by Mr. Barrett is a professor, criminologist and law enforcement procedures specialist, "who has evaluated over three hundred law enforcement shooting incidents throughout the nation" and who has "instructed officers and authored widely used training material on police use of force and the handling of critical incidents[.]" Doc72, Exh.44, p.1. Contrary to the government's suggestion that Dr. Kirkham's opinion is "an ideal strategy consistent with the textbook views espoused by a college professor from the safety of his lectern," (GB 19), Dr. Kirkham has "attend[ed] and graduat[ed] from a police academy," "spent six months as a patrolman on a high crime beat in a major American city" and "[a]fter rejoining the faculty at Florida State University, continued working as a fully-sworn police officer on a part time basis throughout his academic career," "on assignments as diverse as uniformed patrol, crisis intervention, vice & narcotics, criminal investigation and undercover work as part of an organized crime strike force." www.krimedr.com (last viewed on June 18, 2014).

---

[5] *See, e.g.,* Doc199-1, p.3¶10, p.8¶20, p.9¶ 22.

"Dr. Kirkham has served as a consultant to over 50 law enforcement agencies at the federal, state and local level." *Id.* He is a credible expert with no axe to grind, but without the personal acquaintance with the government witnesses and resulting bias suffered by Choney.

The government's observation that the "Tact Team's plan represented a regrettable compromise with reality," (GB 19), suggests, as Mr. Barrett contends, that the plan went awry and by its deviations from standard protocol created a circumstance which led to tragedy, not murder.

### ii. Choney's testimony harmed Mr. Barrett

The government's assertion that there was no prejudice from reliance on Choney is fantasy. GB 17. Unlike his testimony under cross-examination in the state trials, Choney's testimony in federal court did not support the defense theory. He failed to criticize the government's witnesses' actions in the raid in any relevant and material manner. The incidental criticisms cited by the government (GB 13) fell far short of the defense needs and the evidence which would have been presented through Dr. Kirkham. Choney's testimony in the federal trial was a far cry from the admissions extracted on cross-examination at the state trials. *See* PB 21-26. What the government cites as a criticism by Mr. Choney -"that no-knock warrant services were disfavored and inherently dangerous" (GB 13) – was a retreat from his position in state court, where he testified that no-knocks were discontinued, not because of their inherent dangerousness, but because the government "was offering too many perks," Doc310, p.16, arguably encouraging the Tact Team's reckless behavior in this case.

As promised, Choney simply refused to criticize the conduct of the raid. *E.g.*, CrDoc345, Vol.17, pp.3904, 3907. The government suggestion that "Choney permitted the defense to adduce essentially the same testimony Kirkham could

have provided about the raid" is untrue.  The heart of Mr. Barrett's defense was that, as a result of the dangerously flawed warrant execution, he did not know and had no reason to know the vehicular assault aimed at his son, his home and himself was law enforcement.  Nothing in the proffered testimony by Dr. Kirkham suggests Mr. Barrett sought to call him to testify to his *mens rea*, GB 20.  Instead, Dr. Kirkham would have testified to the precise issue identified by the government – that the disregard of appropriate police procedures created the situation in which Mr. Barrett would not have had "reason to know" the assaulting vehicles were law enforcement, and reasonably responded to protect his son, property and self.  Doc71, Exh.44, p.1.

### 2.    Failure to secure an independent crime scene reconstruction expert.

#### a.    Mr. Barrett's claims are within the scope of the COA.

The COA gives Mr. Barrett permission to argue his counsel failed to secure an independent crime scene reconstruction expert.  10th Cir. Document No. 1019047087.  The government wrongly contends Mr. Barrett is arguing two claims not encompassed by that COA; namely, that counsel failed to challenge the admissibility of Agent Dalley's testimony and failed to consult an expert to, at the least, assist in preparing for Dalley's cross-examination. GB 24.

The government reads the COA too narrowly.  Mr. Barrett's request included trial counsel's failure to retain an expert to, among other things, challenge the admissibility of Dalley's testimony and assist in preparing for cross-examination.  10th Cir. Document No. 01019024041, p.15.  The request raises the issue of whether "[d]ue to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence" and the arguments therein, including challenging admissibility under Fed. R. Evid. 702.  Doc95,

pp.127, 136.  The fact the argument in support of the COA is directed at the trial court's findings, with a briefer explication of the resulting prejudice (inadmissible testimony was admitted and counsel were ill-prepared to confront it), does not limit the COA requested or granted.

b. <u>The government relied on Dalley's testimony</u>

The government claims no prejudice because Dalley's testimony did not harm Mr. Barrett.  GB 28-33.  That argument is rebutted in the Opening Brief.  PB 36-41.  Like the court's finding, the government argues Dalley "never testified that Barrett fired from the porch."  GB 29.  This is not true.

Dalley opined that "all the shots could be with the shooter in one position and the Bronco moving."  Doc342, Vol.14, p.3257.[6]  The prosecutor asked whether "the shooter is shooting . . . in a location at the front door, just outside the front door **on the porch**, backing into the house," "was consistent with all of the trajectories that you saw into [sic] the Bronco?" *Id*. (emphasis added).  Dalley responded: "It appears that it is possible for all the trajectories to be accounted for in that manner."  *Id*. at 3258.  Dalley was then given two other hypothetical situations, one consistent with Mr. Barrett's theory that he fired all the shots defensively in a prone position from inside the house.  Dalley unequivocally stated: "The shooter prone inside the interior doorway is not consistent with all the shots being fired from that position prone in that doorway."  Doc342, Vol.14, p.3259.  Asked which of the three hypotheticals "has the possibility of accounting for all those trajectories," Dalley testified "there are problems with the other two."  *Id*. at 3259-60.  In response to the defense argument that all the shots were fired from the house, the prosecutor said, "[N]o way would that account for the

_____

[6]  PB mistakenly cited the relevant testimony as Doc.343, Vol.15, pp.3257-58.  PB 37.

testimony of the trajectory analyst." Doc348, Vol.20, p.4305. The jury was told by a purported expert that scientific evidence supported only the prosecution's theory.

Expert testimony showing Dalley's "trajectories" were bunk was critical to the defense. The government argued "the pattern of the shots tells you his intent." *Id*. at 4305. Mr. Hueske would have testified the government's shot pattern evidence was unreliable because Dalley violated accepted protocol in her evaluations. Doc3, p.262, Exh.109, p.6. Counsel's failure to enlist Hueske--a renowned expert already at their disposal – to demolish Dalley's testimony is inexcusable. *See* Doc3, Exh.109, p.6; see also Hueske, Edward E, Practical Analysis and Reconstruction of Shooting Incidents, Chapter 4, *Shooting Reconstruction Equipment and Use*, pp.65-96.

The government's position is disingenuous. At trial, it relied on Dalley's testimony to overcome the internal inconsistencies of its "eyewitnesses." *See, e.g.*, Doc348, Vol.20, pp.4377-80. The government now takes refuge in the testimony of those witnesses to immunize the confusing, inconsistent testimony of their own expert and claim *her* testimony was harmless. *See, e.g.*, GB pp.30-31.

The government relies on the expert testimony to deny the importance of the expert testimony. GB 32-33. It asserts that "the accuracy of [Barrett's] fire" into the moving Bronco permits only one inference --that Barrett aimed at the Bronco." GB 33. The government concludes Mr. Barrett "cannot possibly explain, with or without the assistance of a crime scene expert, how he saw the Bronco clearly enough to fire on it in motion, but did not notice the two vehicles immediately behind it with the flashing emergency lights." GB 33. This conflates the areas of expertise required by competent counsel. The government's assumption about the accuracy of fire on a moving Bronco depends on the accuracy of the shooting

scene reconstruction, which Hueske would have made clear was unreliable and unscientific. Absent the shooting reconstruction, the assumptions in the government's argument are no longer "givens," but depend on the inconsistent testimonies of law enforcement officers whose memories and bias clouded their recitation of events. The reasonableness of any inference depends on the validity of its premises. Hueske was not the expert who would have made clear the raid was conducted without an adequate showing of law enforcement presence. That would have been Dr. Kirkham's job. Taking the proffered testimony of the experts together, the government's case for Mr. Barrett's knowledge and intent collapses.

      c.  <u>Counsel's billings and declaration do not establish counsel's reasonable preparation and investigation</u>.

The government argues that "[i]n total, counsel spent more than nine hours preparing for a witness he knew would make only modest evidentiary inroads for the government." GB 28. These "inroads" made a chaotic state of facts resting on inconsistent and ever-changing testimony a matter of seriously flawed expert opinion favorable only to the government's theory. Nine hours of preparation would be woefully insufficient to make a reasonable tactical decision to forego an expert and rely on cross-examination.

There is no billing for research related to the trajectory analysis, consultation with any expert, or evidentiary development. *See* 10th Cir. Document No. 01019206246. The record suggests far less than the government's assertion of nine hours of preparation.[7] GB 28. The government relies heavily upon Hilfiger's

---

[7]*See* 10th Cir. Doc. 01019206246. Assuming the accuracy of the billing, which is a matter more appropriately addressed at an evidentiary hearing, the "nine hours" includes only two pre-trial Dalley-related entries in May, 2005, totaling 4.0

(continued...)

Appellant's Reply Brief        11        Case No. 12-7086

declaration. GB 25. In the uncross-examined declaration regarding Dalley, counsel says only that the state trial transcripts "caused [him] to be aware" of the state judge considering striking her testimony; that he *felt* he could rely on the same plan for cross-examination as Echols had in state court, and that he "*did not think*" employing a defense expert would make a difference in their ability to challenge Dalley's testimony. Doc175, Exh.12 ¶13 (emphasis added).

Despite the "strong presumption of reasonableness" (GB 27), counsel cannot know if employing an expert is necessary without actually researching the issues involved. "Counsel cannot be said to have made a tactical decision without first procuring the information necessary to make such a decision." *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006). The relevant question is whether counsel made a reasonable decision based on sufficient information to conclude any "consultation with an expert [was] unnecessary." *See Harrington v. Richter*, --U.S.--, 131 S. Ct. 770, 788 (2011); *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). That inquiry redounds to Mr. Barrett's favor.

The government contends the complaint that Hilfiger did not have Dalley's testimony from the second state trial is of no importance because "[Barrett] fails to explain why the transcript of the second trial, assuming it went unread, would have led counsel to a different conclusion about the need for a defense expert..." GB 28. The billings specifically identify the proceeding reviewed, of which Dalley's testimony is not one. The point is: unless counsel knew all of Dalley's prior testimony, it cannot be said he was familiar with it. Neither the

---

[7](...continued)
hours, during which counsel reviewed the testimony of seven witnesses, including Dalley. *Id*. at 57, 59. During trial, counsel spent five (5) hours reviewing testimony of witnesses Lyons, Marcangeli, McBride and Dalley. Two days before Dalley's testimony, counsel spent 48 minutes preparing for the trajectory analysis testimony *and* the drug informant witness, Karen Real *Id*. The morning Dalley testified, he spent another 48 minutes "prepar[ing] for Iris Dalley." *Id.* at 20, 21.

district court nor the government is correct in saying counsel was prepared to meet her testimony. *See* Doc214, p.154; GB 28.

Counsel's failure to acquire Dalley's testimony at the second trial undermines the argument that "the defense had a reasonable strategy for confronting the evidence at hand -- a strategy that had already been used, successfully in Barrett's earlier state trial[.]" GB 27. The problem is twofold: 1) it could be argued that had counsel retained and presented the experts in the state trial, Mr. Barrett may not have been convicted at all; and, 2) the prior state trial, to the extent it was successful, was the *second* trial, for which counsel had no prior testimony.

Counsel's declaration acknowledges he was aware the state judge considered precluding Dalley's testimony. Doc175, Exh.12¶13. The knowledge the testimony was suspect compelled counsel to seek independent expert assistance to have it excluded from the federal trial, or to decimate it if it were somehow admitted. Hilfiger's silence admits he did not even entertain seeking to exclude the testimony. Most damning is counsel's failure to consult any expert or to conduct any research. That is well outside prevailing professional norms. Counsel's failure to secure a readily accessible expert resulted from inadequate investigation and preparation and is constitutionally ineffective assistance. See *Hinton*, 134 S. Ct. at 1087.

> **3. Counsel were ineffective for failing to utilize mental health evidence in the first stage.**

> a. <u>Performance</u>

The government's arguments on performance mirror those made in response to the penalty phase ineffectiveness claim. GB 36-40. To avoid needless repetition, these arguments are addressed in detail in the reply on second stage ineffectiveness. The failure to investigate Mr. Barrett's mental health in

connection with the first stage defense of lack of intent and knowledge was professionally unreasonable. *E.g., Jennings v. Woodford,* 290 F.3d 1006, 1014-19 (9th Cir. 2002).

The government argues the lay observations of Petitioner's relatives failed to provide information on his mental state at the time of the offense, overlooking that their information is part of the entire picture, giving insight into Mr. Barrett's mental state. GB 37. The government selectively refers to two declarations, ignoring that Mr. Barrett's parents, ex-wife and brother speak of continuing mental problems. Doc. 3, Exhs. 81, 97, 99, 103. The fact petitioner's competency was not challenged in state court (GB 39) is irrelevant to whether counsel were on notice to investigate. Previous lead counsel Echols, who was also lead counsel in state court, requested expert assistance precisely on the issue of intent and knowledge at the time of the crime. CrDocs46, p.5; 50, pp.5-6, 8. The government's reliance on this Court's direct appeal finding there was "more than sufficient evidence" proving intent (GB 40) means little; the Court on direct appeal did not have this mental health evidence, nor the current evidence on crime scene reconstruction and police tactics, all of which bear on knowledge and intent.

The government attaches significance to Dr. Woods' statement that at the time of his 2009 examination, Petitioner exhibited no perceptual disorders or delusions (GB 39), but says nothing to specifically contest his or Dr. Young's findings regarding Petitioner's mental state at the time of the offense. These doctors took the past records the government selectively relies on into account, as well as the findings of Dr. Sharp. Doc72, Exh. 55, Doc3, Exh. 89, ¶¶ 13, 20-28, 63-65, 76-77, Exh. 117, ¶¶ 41, 44, 58-60, 63-78. Their testimony would have shown Mr. Barrett likely did not know his property was being invaded by the

police, and he perceived he was acting in defense of himself and his son.  This would have directly supported the theory of defense.

b.  <u>Prejudice</u>

It is argued Mr. Barrett can show no prejudice because the proffered mental health evidence was inadmissible; it did not tend to negate the *mens rea* elements of the charges.  GB 40-41.  *United States v. Brown,* 326 F.3d 1143, 1147 (10th Cir. 2003) (GB 40-41), does not apply.  In *Brown,* the proffered mental health evidence had no nexus to the general intent required to possess drugs with intent to distribute.  The government is wrong when it says the charge in count 3 did not require recognition that Trooper Eales was a law enforcement officer.  Count 3 required the specific intent to kill a law enforcement officer in the performance of his duties.  CrDocs240, Instr. 15, 347, vol. 19, pp. 2415-19, 348, vol. 20, pp. 4262-63.  The findings of Drs. Woods and Young went directly to Mr. Barrett's knowledge and intent, despite the government's inaccurate claim of "no nexus."

As to counts 1 and 2, the government says Petitioner concedes they are "straight" felony murder charges (GB 42), but count 2 refers to the knowledge and intent element in count 3, *Barrett,* 496 F.3d at 1112-13, and lesser included offense instructions were available under 18 U.S.C. § 1111 and for other reasons.  PB 90-96, Supplemental Authority.  One cannot wrongly concede what the law is.  Mr. Barrett has always argued that lesser included offense instructions should have been given on all three counts.  *E.g.,* PB 90-96.

At the least, the evidence, in combination with other expert testimony that should have been offered in the first stage, tended to directly negate the intent element of count 3, regardless of the availability of lesser included offenses.  This undermines confidence in the verdict.  *Strickland,* 466 U.S. at 688, 694.  The government's arguments respecting the availability of lesser included offense

instructions in connection with prejudice should be rejected for the reasons stated in the reply to Proposition II.

### 4. Evidentiary hearing

At a minimum, the government's response makes clear that many factual issues are in dispute, as reflected by the pleadings and exhibits. The need for an evidentiary hearing stems also from the inability to conduct requested discovery, including depositions of counsel, and to take the testimony of the experts to make clear the extent of prejudice. *See* Docs186, 187. It was error for the district court to resolve the issues against Petitioner by crediting speculation and unreasonable inferences drawn in part from counsel's declaration against petitioner's allegations. *See Milton v. Miller*, 744 F. 3d 660, 671-72 (10th Cir. 2014) (where notwithstanding the burdensome requirements of 18 U.S.C. § 2254(d)(1) and *Cullen v. Pinholster*, 536 U.S.--, 131 S.Ct. 1388 (2011), neither of which are present here, this Court remanded for an evidentiary hearing). There are material and genuine factual disputes which the record cannot resolve.

### B. Failure to request instructions[8]

Where the defense was that Mr. Barrett thought he was being invaded by trespassers and fired in defense of his son and himself, it was professionally unreasonable not to request instructions on self-defense and defense of another. *E.g.,* Tenth Cir. Pattern Criminal Jury Instr. 1.28 (2005). Based on the troopers' shifting accounts and the manner in which the botched raid was conducted, the evidence was sufficient to support an instruction. PB 44-46. *Barrett,* 496 F.3d at 1084-85; *United States v. Visinaiz,* 428 F.3d 1300, 1308 (10th Cir. 2005).

---

[8] This reply is limited to the failure to request a self-defense instruction. Petitioner stands on his opening brief with respect to the other failure to request instruction claims. PB 47-50.

The government's argument misses the mark.  G.B. 45-47.  The government essentially argues no instruction was warranted because the evidence was sufficient to support the convictions from its standpoint, but this is not the test for when a defense theory instruction is warranted.  *E.g., United States v. Toledo,* 739 F.3d 562, 567 (10th Cir. 2014).  The cases cited by the government apply only where the evidence never supported an instruction, *Le v. Mullin,* 311 F.3d 1002, 1026-27 (10th Cir. 2002)(GB 46), or to wildly dissimilar facts.  *United States v. Garcia,* 625 F.2d 162, 170 (7th Cir. 1980).  GB 47.

In combination with the other unreasonable first stage errors and omissions by counsel, prejudice is apparent.  The government conveniently overlooks Mr. Barrett received self-defense instructions at his state trials, which set the stage for an acquittal of murder.

**C.   Second Stage Ineffectiveness**

Instead of addressing the arguments and authority in Mr. Barrett's opening brief which show the district court's factual and legal conclusions are wrong, the government simply repeats the district court's reasoning.  The sparse authority cited by the government for its arguments is inapplicable.

**1.   Deficient performance**

The government does not disagree with Petitioner's description of counsels' lack of penalty phase preparation.  PB 59-65.  The excuses offered for their errors and omissions are refuted by the record and unsupported in law.

a.   Client interference

The government asserts, based on the *post hoc* rationalizations of counsel, *Wiggins,* 539 U.S. at 526, 536, that Mr. Barrett discouraged investigation into his background, history, the mental health history of his family, and his own mental problems because he did not want to beg for his life or present a case that dwelled

on his childhood or invoked personal sympathy for him.  GB 55-56, 59, 61; Doc214, p.178, Doc175, Exhs. 11, 12.

A client expressing these sentiments is fairly routine in capital cases.  Other than stating they told Mr. Barrett this stance could work against him (Doc214, p.178), counsel did not seek to explain the purpose and role of mitigating evidence, which does not involve begging for the defendant's life or asking that his life be spared out of "sympathy."  Doc178, Exh.219, ¶¶9-14.  *Rompilla v. Beard,* 545 U.S. 374, 393 (2005); *Hooks (Victor) v. Workman,* 689 F.3d 1148, 1204 (10th Cir. 2012).  If counsel took Petitioner's supposed statement as a reason not to investigate, it shows they had little understanding of their role and the purpose of mitigation.  Doc178, Exh.219 ¶¶ 16-19.  *Harries v. Bell,* 417 F.3d 631, 640 (6th Cir. 2005).  Even if Petitioner made these statements, counsel were not excused from investigating and developing the evidence.  *Porter v. McCollum,* 558 U.S. 30, 40 (2009); *Rompilla,* 554 U.S. at 381-82.  Strategic decisions rest with them.  ABA Criminal Justice Standard 4-5.2.

The authority cited by the government for its "client interference" argument is inapposite.  GB 61.  *Wallace v. Ward,* 191 F.3d 1235-1246-49 (10th Cir. 1999)(defendant waived jury trial and entered a blind plea; at the sentencing hearing, and on the record, Wallace objected to counsel cross-examining state's witnesses, affirmatively told the court he wanted *no* mitigating evidence introduced, and insisted on testifying himself, stating that if free, he would commit more crimes); *Romano v. Gibson,* 239 F.3d 1156, 1174-82 (10th Cir. 2001)(co-appellant Woodruff argued counsel was ineffective for failing to introduce evidence he had been abandoned and abused by his birth mother before being adopted as an infant, and that counsel omitted evidence that he had the judgment of a teenager; counsel conducted a reasonable investigation into Woodruff's

background, but was told he had a normal upbringing, and post-conviction evidence showed he suffered from *no* mental illness; interestingly, at the retrial of a separate murder charged against Woodruff, the jury rejected the death penalty based on the mitigating evidence that had been omitted from the other case). *See* Doc178, pp.97-99.

Counsel never state Mr. Barrett's alleged statements affected any strategic decisions or the course of their investigation. Nothing shows counsel would not have presented the mitigating evidence developed in post-conviction had they known about it through investigation, or that Mr. Barrett would have prevented them from doing so. Doc175, Exhs.11,12.

This excuse for failing to investigate is disproved by the record. Counsel state Mr. Barrett was among the most cooperative clients they ever had. Doc175, Exh.11¶¶ 3, 13, Exh.12 ¶17. The lawyers from the state case encountered no restrictions. Doc1, Exh.34, p.14, Doc178, Exh.219 ¶5. Counsel never alerted the court Petitioner was resisting certain lines of investigation and never told his family he was being difficult. Both counsel and Petitioner affirmed he was "on board" and cooperating. Tr. 6/2/05, p.7, Tr. 6/5/05 pp.2-3, Doc1, Exh.36, Doc175, Exhs.11, 12, Doc178, Exhs.206-17. That Petitioner frustrated counsels' investigative efforts is belied by the fact they belatedly sought, but did not use, a mitigation investigator.[9] Doc3, Exh.67, Doc72, Exhs.118 ¶¶13-18, Doc3, Exhs. 66, 67, Doc72, Exhs.54, 56, pp. 2, 4-5, Doc175, Exh.11 ¶9, Exh.12 ¶11. Although counsel say Mr. Barrett did not want to involve his family, family members were the primary witnesses for the skeletal mitigation case they offered. Doc214, pp.181-84; GB 56-58.

---

[9] The government evidently disagrees with the district court's finding that Petitioner had a mitigation investigator. Doc214, p.178. It never makes this argument.

The government references Mr. Barrett's outburst during the prosecutor's argument as "proof" he opposed presenting the types evidence omitted from trial but developed in collateral proceedings. GB 56, 61; Doc214, pp.184-85. Not so. The prosecutor only raised Mr. Barrett's ire by ridiculing the weak case the jury heard. Doc95, pp.243-46. It is counterintuitive speculation to believe a similar episode would have occurred had a competent mitigation case been introduced and had Mr. Barrett been fully advised. ABA Criminal Justice Standard 4.51(a).

b. No cause to investigate.

The government says Mr. Barrett is "mistaken in his assertion that the facts supporting an investigation into his mental health were apparent." GB 62. Counsel had no reason to know Petitioner's mental health, or the mental health history of his family should be investigated, because: 1) he was "cooperative, helpful and communicative," was well behaved in court, and understood the proceedings; 2) Mr. Barrett's family never informed counsel they believed Petitioner suffered from mental problems, and never told them about the family history of mental illness; and, 3) Petitioner has not shown there were any documents in the defense file, including Dr. Sharp's report, that would have suggested the need to investigate. GB 62.

These arguments ring hollow. That Mr. Barrett's affect and "cooperation" dissuaded counsel from investigating his mental health conflicts with the excuse that no investigation was done because Petitioner "adamantly" told counsel he did not want to "beg for his life" or present a case based on personal "sympathy." The "helpful and cooperative" line also conflicts with the argument that Mr. Barrett's outburst in the penalty phase showed counsel "wisely" chose their approach. The government fails to address authority holding a client's appearance and affect are not determinative whether an investigation into his mental condition and history is

warranted, particularly where, as here, the client has past significant contacts with the mental health system. *E.g., Gray v. Branker,* 529 F.3d 220, 231 (4th Cir. 2008).

Equally unavailing is the claim counsel had no reason to know of the family's observations and opinions regarding Petitioner's mental and emotional health, or the history of mental illness in the family because the family never told counsel. GB 60, 62. *Alcala v. Woodford,* 334 F.3d 862, 893 (9th Cir. 2003), cited by the government, has no application. PB 73.

It is not the obligation of the client's family to simply present defense counsel with all relevant information. Counsel has an obligation to actively investigate. *Wilson v. Sirmons,* 536 F. 3d 1064, 1083-85 (10th Cir. 2008); *Bond v. Beard,* 539 F.3d 256, 288 (3rd Cir. 2008). Counsel never asked about the family history of mental problems or Mr. Barrett's personal problems. Nor did they investigate his abusive and dysfunctional upbringing. Counsel do not dispute this. Nor do counsel dispute their second stage investigation with respect to family and friends consisted of last-minute "interviews." Doc3, Exhs.74, 77-78, 80-81, 83-87, 90-93, 95-99, 103; Doc71, Exh.37; Doc178, Exhs.206-17; Doc175, Exhs.11, 12. These efforts were professionally unreasonable. *E.g., Ferrell v. Hall,* 640 F.3d 1199, 1227 (11th Cir. 2011); *Bond,* 539 F.3d at 279-82.

The claim counsel were not alerted to investigate Mr. Barrett's mental state and the family history of mental illness because there were no leads in the files is baseless. Counsel possessed records detailing Mr. Barrett's serious suicide attempt, commitment to the state hospital, provisional diagnosis of bipolar disorder, prescription of anti-psychotic drugs, statement to mental health professionals that he was "losing his mind" and other contacts with the mental

health system.[10]  Docs15-27, Exh.147; Doc175, Exhs.11, 12.  Past significant contact with the mental health system is an obvious "red flag" for further investigation, regardless of how the government wants to parse the records. *Wiggins,* 539 U.S. at 527; *Hooks (Victor),* 689 F.3d at 1204-05; *Ferrell,* 640 F.3d at 1216-17.  Previous lead counsel Echols had requested the services of a psychiatrist and psychologist for reasons that were relevant to the defenses in both stages of trial.  Doc1, Exh.34; Doc3, Exhs.64-65; CrDoc97.  The prosecutor fully anticipated the defense would introduce mental health mitigation.  Tr. 9/9/05 p.38.

Counsel were aware the penalty phase investigation from the state case was incomplete.  Doc1, Exh.34; Doc3, Exhs.64-65.  Counsel told the court they had been unable to find much on mitigation in the state files and were unsure of whether they had all the materials.  Tr. 9/9/05, pp.41-43.  On the eve of trial, the court described counsels' second stage efforts as a "work in progress."  Tr. 9/9/05 p.42.  Yet, counsel never communicated with Mr. Echols, never spoke to his co-counsel, who had responsibility for any state second stage, and never spoke to Steve Leedy, the OIDS investigator who took over as the state mitigation investigator after the original investigator quit.  Doc1, Exh.34; Doc3, Exhs.82, 111, 118.

Counsel knew or should have known about Dr. Sharp's report, which indicated Petitioner likely suffered from serious mental illness, including extreme paranoia, and that additional testing was necessary.  Doc72, Exh.55.  The report was in the mitigation file possessed by Mr. Leedy and was easily obtainable.  Doc1, Exh.34; Doc3, Exh.111.  Counsels' inertia does not excuse elementary steps to acquire defense files in a case that had already been tried twice.  *Jells v. Mitchell,* 538 F.3d 478, 493-94 (6th Cir. 2008).  At a minimum, counsel should

---

[10]  The government's characterization of these records is addressed below.

have known about the report. But they actually knew of Dr. Sharp's report because it was mentioned in the risk assessments done by counsels' own potential witness, Dr. Russell. CrDocs.208, 210; Doc72, Exh.56, pp.3-4. Yet again, because available evidence was not simply presented to counsel, the government argues they were excusably ignorant. GB 62. Counsel is not limited to "what they know," absent a reasonable investigation. *Porter,* 558 U.S. at 39-40.

While the government argues counsel had no reason to question Mr. Barrett's mental health, it contends alternatively they did all that was required because they had a mental health expert in Dr. Russell. GB 63, Doc214, pp.145, 178, 189. Dr. Russell states she did not act as a mental health expert. Doc72, Exh.56, Doc175, Exhs.11, 12. Counsel told the court she was not acting in this capacity.[11] Tr. 9/9/05 p.41; Tr. 10/3/05 p.7.

The government references the murky "fact" an unidentified psychologist apparently accompanied Dr. Russell to visit Mr. Barrett. GB 63. Not only is this person unidentified, but what, if anything, he or she did is unstated. Counsel did not rely on this individual to make any investigatory decisions. Doc175, Exhs.11, 12. Counsel don't contest they failed to subject Petitioner to a comprehensive battery of examinations that would have revealed the types of mental health evidence presented here. Doc175, Exhs.11, 12.

c. Reasonable strategic choice.

As an inconsistent alternative to its "client interference" and "no cause to investigate" arguments, the government maintains counsel reasonably chose not to investigate and present the omitted mitigating evidence. GB 59-61. The existing

---

[11] The government's claim that Russell did not find strong mental health mitigation because she did not testify misses the point. GB 63. She was not examining Petitioner as a mental health expert seeking to identify mental illness or organic brain damage.

records were more harmful than helpful, and showed Mr. Barrett was a violence-prone drug addict. GB 64-66. Dredging up Petitioner's family history of mental illness and his background would have shown his family was too dysfunctional and burdened by their own problems to care about him. GB 61, 63. The evidence would have shown that he could not be viewed positively by family and friends. Counsel made a reasoned decision to present an "internally consistent" second stage showing that Petitioner was a valued family member and friend, a good inmate, and was being treated unfairly because he had already been convicted in state court. GB 56-58, 61. The "partial success" of the defense case – the jury found some mitigating circumstances and rejected the continuing threat aggravator – shows counsel pursued a reasonable strategy. GB 59, 61.

These arguments are weightless. A reasoned strategic choice presupposes an adequate investigation allowing informed decisions to be made, but counsel never inquired of Petitioner's family about his or the family's mental problems or his upbringing. *Wiggins,* 539 U.S. at 526; *Soffar v. Dretke,* 368 F.3d 441, 474 (5th Cir. 2004), *amended,* 391 F.3d 704.

The government characterizes the "existing" mental health records as being unhelpful because they showed any problems were tied to drug use, and detailed incidents of domestic violence. GB 64-67. Thus, counsel reasonably chose to omit this evidence. This not only reflects a selective view of the records (Doc178, p.122n.15), but misstates the argument.

No one is saying counsel should have simply introduced the evidence in the records to which they claim unconvincingly they were limited. The point is that the records, including Dr. Sharp's report and other red flags described above, compelled further investigation. *Hooks (Victor),* 689 F.3d at 1204-05; *Ferrell,* 640 F.3d at 1227-28. A professionally reasonable investigation would have

developed the type of mental health evidence, both expert and familial, introduced in post-conviction. This includes information from the family, which counsel never sought. A completely different light would have been put on the "negative" evidence in the records had counsel reasonably investigated and employed the appropriate experts. "Negative" information in material suggesting significant lines of investigation is no reason to stop. *E.g., Porter,* 130 S.Ct. at 455; *Rompilla,* 545 U.S. at 393; *Williams v. Taylor,* 529 U.S. 362, 396 (2000).

The government overlooks that the "negative" information in the records – heavy drug use and domestic violence – was known to the jury and exploited by the prosecution. CrDoc355, Vol. 27, pp.5340-42, 5354, 5356, 5358, 5402, 5404-09, 5411-13, 5417-22; Doc3, Exhs.97, 103. The defense "avoided" nothing but the opportunity to put a significantly mitigating, contextual light on unflattering (though readily explainable) aspects of the "records" *Anderson v. Sirmons,* 476 F.3d 1131, 1144-45 (10th Cir. 2007).

The government's attempt to discredit the findings of Drs. Woods and Young as irrelevant because they were made years after the fact fails. GB 64. Its argument ignores: 1) the post-conviction doctors related their diagnoses back to the time of the shooting, taking into account the previously existing records (Doc3, Exh.117 ¶¶68-78), and 2) the law does not support dismissal of Drs. Woods' and Young's findings because they were made in collateral proceedings. *Williams,* 529 U.S. at 398; *Gray,* 529 F.3d at 236-37. The government states it does not "concede" these doctors' findings, but presents nothing to call them into question.[12] A professionally reasonable investigation would have uncovered the

---

[12] The district court found that expert mental health evidence would have "opened the door" to Dr. Price's testimony. This was addressed in the opening brief at pages 84-85. The government abandons this argument.

types of diagnoses made by Drs. Woods and Young. *E.g., Anderson,* 476 F.3d at 1144.

Against logic and common experience (and caselaw), the government maintains evidence of Mr. Barrett's dysfunctional background and family history of mental illness would have backfired because it would show they were too dysfunctional to care about him. GB 64. That a defendant and family members can have serious problems yet still value each other for positive attributes expands, rather than diminishes, the mitigating effect of the evidence. *McNeil v. Branker,* 601 F.Supp. 694, 716-17 (E.D.N.C. 2009).

The government's bottom line – that the omitted evidence, which it mischaracterizes, was more harmful than helpful, and would have "negated" and undercut the sketchy mitigation case that was presented – finds no support in the law. GB 63, 67. That Petitioner suffers from serious mental illness and organic brain damage, came from an abusive and dysfunctional background, and comes from a family with an extensive history of mental illness does not "negate" the unremarkable fact that he also has good qualities and is loved by his family. *Bond,* 539 F.3d at 285, 290-92; *McNeil,* 601 F.Supp.2d at 716-17. It is precisely the type of mitigating evidence that was omitted that "humanizes" the defendant, not unsurprising evidence that his family loves him and considers him a good guy, the type of case that typically results in a death verdict. *Littlejohn v. Trammell,* 704 F.3d at 860-61 (10th Cir. 2013) ; *Anderson,* 476 F.3d 1131, 1141-48.

Nor did the omitted mitigating evidence "conflict with" or negate evidence that Petitioner had already been punished in state court, that the successive prosecution was unfair, or that he was a good inmate. These are historical facts. Properly investigated and developed, the powerful mitigating evidence that could

have been presented does not support a finding of continuing threat, but creates a case for life.

The government points to the "partial success" of counsels' course because the jury found some mitigating circumstances and rejected a future dangerousness finding. GB 59. This is not the test. *Kimmelman v. Morrison,* 477 U.S. 365, 368 (1986); *Wilson,* 536 F.3d at 1084. By the government's logic, counsel would be immune to an ineffectiveness challenge so long as the jury did not reject every mitigating circumstance and/or did not find every aggravating circumstance.

This is not a case where all that is shown is that counsel could have discovered "additional evidence" with the "luxury" of unlimited time, "ideal conditions," and "hindsight." GB 60. The point is that counsel failed to use the time and resources available to conduct a reasonable investigation that would have produced compelling mitigating evidence far more persuasive than what the jury heard. PB 59-65. Cases like *Burger v. Kemp,* 483 U.S. 776, 794 (1987) and *Walters v. Thomas,* 46 F.3d 1506, 1513 (11th Cir. 1995) are off-point. In *Burger,* unlike here, counsel conducted a reasonable investigation but ran into the brick wall of one potential witness after the next having harmful things to say. The government's argument is recognized as valid not in the situation here, but where additional investigation and evidence would have been cumulative, *Burger, supra,* not where a weak mitigation case is presented and far more compelling evidence is never investigated or developed.

### 2. **Prejudice**.

The government's claim that Mr. Barrett suffered no prejudice is based on its argument the omitted mitigating evidence would have negated or conflicted with the case that was presented, and its urging the findings of Drs. Woods and

Young be ignored.  GB 63-67.  This was addressed above.  The same argument was used in a failed attempt to show counsel made informed strategic choices.

The cases cited by the government are inapt.  GB 67.  In *Cannon v. Gibson,* 259 F.3d 1253, 1277-78 (10th Cir. 2001), the omitted evidence was of a different quality than that here.  Mr. Barrett suffers from mental illnesses (bipolar disorder and PTSD) with a strong genetic component (family history), in addition to organic brain damage.  The mental health mitigation omitted here would have countered the penalty phase intent elements.  Unlike *Cannon,* there was significant evidence of a dysfunctional and abusive background.  *E.g., Wilson,* 536 F.3d at 1074, 1083-85; *Anderson,* 476 F.3d at 1141-48.  In *Cannon,* the evidence of aggravating circumstances was strong,[13] and the murder was particularly brutal.  A woman in her eighties was burglarized, kidnaped, sexually assaulted, and burned alive by two men who wanted her car.  *Cannon,* 259 F.3d at 1257-58.  *Cannon* predates the Supreme Court decisions in *Wiggins* and *Rompilla,* and decisions from this Court such as *Wilson, Anderson, Littlejohn* and others which place a premium on evidence of mental illness, organic brain damage, and a dysfunctional background, as humanizing a defendant. PB 51-52.  *Duvall v. Reynolds,* 139 F.3d 768, 781-82 (10th Cir. 1998) has no application.  The omitted evidence was not "ambiguous," but of the kinds the Supreme Court and this Court recognize as the most persuasive.

The government argument that had the omitted evidence been introduced, Mr. Barrett "could argue [counsel] were ineffective for failing to humanize him and blunt the allegation of future dangerousness" is unpersuasive.  GB 68.  The types evidence not investigated or developed are precisely the kinds which do

---

[13] The government fails to address Petitioner's argument that prejudice is apparent  because the case for death was not particularly strong.  PB 86-87.

humanize a defendant and most often lead to juries rejecting death. *E.g., Wiggins, Hooks, Wilson, Anderson, supra.* The evidence blunting future dangerousness stood on its own. And, again, the government ignores that much of the "negative" evidence it catalogs was before the jury anyway.

That Mr. Barrett did not testify in the second stage and express remorse in light of his outburst (GB 68), which occurred in the context of a weak penalty phase, has nothing to do with whether counsel were ineffective for failing to investigate and present significant mitigating evidence. To say that the omitted evidence could not overcome Mr. Barrett's failure to testify, when capital defendants rarely testify in the penalty phase, and defense witnesses testified he was remorseful, is rank speculation unsupported by any caselaw.

As noted, the government fails to address Petitioner's prejudice argument that the case for death was relatively weak. It also fails to address the argument that the omitted mental health mitigation would have undercut the general intent factors and the "substantial planning and premeditation" aggravating circumstance; that the appropriate remedy is to vacate the death sentence; and that, at a minimum, an evidentiary hearing is required. PB 86-89. Those arguments will not be repeated.

III. **PETITIONER'S DUE PROCESS AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE TRIAL COURT REFUSED LESSER INCLUDED OFFENSE INSTRUCTIONS. APPELLATE COUNSEL WAS INEFFECTIVE.**

Mr. Barrett did not default[14] his *Beck v. Alabama,* 471 U.S. 625 (1980) claim with respect to count 3, or his argument that lesser included offense instructions should have been given on counts 1 and 2. *Keeble v. United States,* 412 U.S. 205, 208 (1974). Lesser included offense instructions were legally

---

[14] GB 69.

Appellant's Reply Brief       29       Case No. 12-7086

available.  Appellate counsel was therefore ineffective in failing to raise the issue, particularly because it was framed by the record and, at the least, the government agreed a manslaughter instruction was warranted on count 3.

### A.  21 U.S.C. § 848 (count 3)

In arguing there are no statutory lesser included offenses to the § 848 charge, the government relies on *United States v. Beckford,* 966 F.Supp.1415, 1417-18 (E.D. Va. 1997).  GB 71.  But this Court has not adopted the *Beckford* analysis.  *Hooks v. Ward,* 184 F.3d 1206, 1227 (10th Cir. 1999).  Unlike Mr. Barrett, the defendant in *Beckford* had a "third option."  PB 92.  The government also misconstrues *United States v. McVeigh,* 153 F. 3d 1166, 1192-98 F.3d (10th Cir. 1998).  GB 72.  Because the weapons of mass destruction charge in *McVeigh* had a general intent element, no lesser included offense was available.  However, the Court strongly implied that if the charge had contained a specific intent element,
like count 3 here, a lesser included offense would be available regardless of whether the statute itself provided for one.

The government is mistaken when it says the heat of passion required for manslaughter does not negate the specific intent in the § 848 charge, which it attempts to distinguish from "malice."[15]  But the definition of malice encompasses the specific intent to kill, which § 848 requires.  *E.g.,* Tenth Cir. Pattern Criminal Instr. 2.52 for first degree murder ("To kill with 'malice aforethought' means either to kill another person deliberately and intentionally..."); *United States v. Wood,* 207 F.3d 1222, 1228 (10th Cir. 2000) ("A killing is committed with the requisite specific intent if it is 'willful, deliberate, malicious, and premeditated.'")

---

[15]  The government also asserts Petitioner never argued that a heat of passion negates a specific intent to kill (GB 72), but this is untrue.  PB 93-94.

Both the Supreme Court and this Court have held that heat of passion negates the specific intent to kill (which is a species of malice). *Mullaney v. Wilbur,* 421 U.S. 684, 704 (1974); *United States v. Lofton,* 776 F.3d 918, 920 (10th Cir. 1985). Thus, heat of passion negates the specific intent to kill required by § 848, regardless of "territorial" or "maritime" jurisdiction. *United States v. Chanthadara,* 230 F.3d 1237, 1257-59 (10th Cir. 2000) (just as federal jurisdiction there was anchored by a Hobbs Act robbery, jurisdiction for the charged murder was based on federal drug statutes).

### B.      Counts 1 and 2

The government incorrectly states count 2 was a straight felony murder charge, ignoring that it refers to the specific intent necessary to the § 848 charge. GB 76.  *See* PB 94-95, Doc214, pp. 93-95.  *Barrett,* 496 at 1086.  As shown in the opening brief and argued above, heat of passion negates the specific intent to kill required of both counts 2 and 3.  Because a lesser included offense (manslaughter) was available on count 3, it was available on count 2.

Petitioner's supplemental authority showed that counts 1 and 2 do not charge straight felony murder counts, but require actual malice, since a person may be charged with felony murder violating 18 U.S.C. § 924(j) if the murder occurs during the commission of one of a specific list of felonies under 18 U.S.C. § 1111, none of which were charged or supported by the evidence.  By law, a lesser included offense of counts 1 and 2, charged under § 924(j)(1), is the non-capital offense listed in 18 U.S.C. § 924 (j)(2) (if the killing is manslaughter [as defined in section 1112], it should be punished as provided in that section).  *See Chanthadara, supra.*

The government concedes *Beck* error can never be harmless, but contends because the jury in the penalty phase found Mr. Barrett acted with substantial

planning and premeditation, any error for failing to give lesser included offense instructions as to counts 1 and 2 is harmless. GB 77. This ignores that had the required lesser included offense instructions been given, an entirely different light would have been placed on how the jury viewed intent. Moreover, the jury was only able to find "substantial planning and premeditation" because defense counsel failed to marshal evidence that would have dissipated the government's case for intent.

### C.     Ineffective Assistance of Appellate Counsel.

Based on the trial record and the law, Mr. Barrett was entitled to lesser included offense instructions as to all three counts. Appellate counsel was professionally unreasonable for failing to raise the issue. Had the issue been raised, there is a reasonable probability the appeal outcome would have been different. *E.g., United States v. Moya,* 676 F.3d 1211, 1213 (10th Cir. 2012).

## IV.    CONCLUSION

The government's arguments should be rejected.


Respectfully submitted,


 /s/  David B. Autry
DAVID B. AUTRY, OBA No. 11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma
73106-6405
Telephone:  405-521-9600

HEATHER E. WILLIAMS
Federal Defender Of the
Eastern District of
California

*/s/ Joan M. Fisher*
JOAN M. FISHER, ISB No.2854
Assistant Federal Defender

/s/ *Tivon Schardl*
TIVON SCHARDL Fla SB No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

**CERTIFICATE OF SERVICE**

I, hereby certify that on July 7, 2014, I electronically transmitted the attached documents to the Clerk of the Court using the ECF System for filing. Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the Following ECF registrants:

Jeffrey B. Kahan,
United States Department of Justice,
jeffrey.kahan@usdoj.gov,

Christopher J. Wilson,
Assistant United States Attorney,
chris.wilson@usdoj.gov

Linda Epperly
Assistant United States Attorney
linda.epperley@usdoj.gov
United States Department of Justice,
Eastern District of Oklahoma,

To the undersigned's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
Joan M. Fisher, ISB # 2854
Assistant Federal Defender

## CERTIFICATE OF WORD COUNT COMPLIANCE

The brief complies with the 9,500 word limit set fourth in this Court's May 2, 2013 Case Management Order (Doc. 0109047087). This brief contains 9,384 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I certify that the information on this form is true and correct to the best of my knowledge.

/s/ *Joan M. Fisher*
Joan M. Fisher, ISB # 2854
Assistant Federal Defender

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program Symantic Endpoint Protection Version 12.1.3001.165, last updated Monday, January 6, 2014, and according to the program are free of viruses.

/s/ *Joan M. Fisher*
Joan M. Fisher, ISB No. 2854
Assistant Federal Defender