**DAVID B. AUTRY**, OBA No.11600
Attorney at Law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: (405) 521-9600

**HEATHER E. WILLIAMS**, CA Bar No. 122664
Federal Defender
**JOAN M. FISHER**, Idaho Bar No. 2854
Assistant Federal Defender
**TIVON SCHARDL**, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: (916) 498-5700
Joan_Fisher@fd.org
Tim_Schardl@fd.org
Attorneys for Petitioner,
KENNETH EUGENE BARRETT

# IN THE UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **CAPITAL CASE** |
| | ) | |
| Respondent/Appellee, | ) | |
| | ) | |
| v. | ) | Case No. 12-7086 |
| | ) | (E.D. Okl. Nos. 6:04-cr-00115-JHP, |
| KENNETH EUGENE BARRETT, | ) | 6:09-cv-00105-JHP) |
| | ) | (lower docket) |
| Petitioner/Appellant. | ) | |

_____

## MOTION TO REMAND FOR FURTHER PROCEEDINGS ON NEWLY DISCOVERED EVIDENCE OF PROSECUTORIAL MISCONDUCT

_____

## I. MOTION

Mr. Barrett, through counsel and pursuant to Fed. R. App. P. Rule 27 and 27. 2(A)(1)(c) moves this Court to order a limited remand for further proceedings on newly discovered evidence of prosecutorial misconduct and related issues, and to stay this appeal pending the remand.

## II. GROUNDS SUPPORTING THE MOTION

In support of the Motion, Mr. Barrett shows the Court the following:

1. Since the filing of the original amended Section 2255 Motion to Vacate, USDC-OKED Cv Case # 6:09-00105 ("CV 105") Doc#95 and his Motion to Amend or Supplement the 2255 Motion, CV 105, Doc#201, Mr. Barrett has discovered significant additional evidence of serious misconduct showing that:

a. Government witness Clint Johnson made material false statements in his affidavit to support the search warrant executed on the Barrett residence on September 24, 1999, when he averred that an informant told Johnson the informant had been at Mr. Barrett's home within 72 hours before the application for the search warrant. See Exhibit A. [1]

---

[1] Certain declarations referenced herein are cited only by exhibit number and submitted to the Court under seal, pending this Court's Order on Mr. Barrett's Motion to File Under Seal, filed herewith.

b. The informant relied upon to secure the search warrant that ended in the deadly assault at Mr. Barrett's homestead had, in fact, not been to Mr. Barrett's for at least 2- 3 weeks and did not tell "anyone in or out of law enforcement" otherwise. Exhibit A.

c. When the informant testified that he had been at the Barrett residence shortly before the issuance of the warrant and observed drug activity by Mr. Barrett, he was lying, and the prosecutor knew the informant was lying. Exhibit A.

d. That prosecutor Michael Littlefield made undisclosed promises to and threats against the informant and his family to coerce the informant to testify falsely. Littlefield threatened to file career offender charges against the informant, and threatened he would get 150 years and never see daylight again. The informant was promised that if he testified, Littlefield would give him $30,000.00 and move his family, change his name and buy them a house. Clint Johnson also promised the informant that a forgery charge would go away. Exhibit A, pp. 2-3.

e. That during the informant's testimony at Mr. Barrett's trial, Littlefield intimidated and threatened the informant into revising his testimony and testifying falsely. Exhibit A.

f. That at the time the no-knock warrant was issued, affiant Clint Johnson was known to have a bad reputation in the law enforcement community for truth and veracity and was known to have sworn falsely under oath. *See* Exhibits B, D (under seal); Appendix 1 (Hon. Dennis Sprouse); Appendix 2 (Larry Blount); Appendix 3, pp. 2,5 (Leonard Post-Beal); Appendix 4 (Leonard Post - Beaver). Johnson was also reputed to have questionable ethics in his handling of drug informants. Appendix B, D.

g. None of the newly discovered evidence described above was disclosed to Mr. Barrett.

2. The sworn declarations referenced above lay out the factual allegations of additional and egregious prosecutorial misconduct and are filed herewith. See Appendix 1, 2, 3, 4 (attached hereto and filed herewith); Exhibits A , B, C, D (filed with Mr. Barrett's Motion to Seal, pending this Court's order on the same).[2]

3. The government did not disclose that its informant and Johnson were testifying falsely at trial. The government has at no time since, despite repeated requests, disclosed that prosecutor Littlefield knowingly suborned perjury and made promises and threats to secure the informant's testimony. This evidence

---

[2] *See infra* n.1.

would have been admissible to impeach the informant's and Clint Johnson's testimony, and served as grounds to grant Mr. Barrett §2255 relief.

4. At no time has the government disclosed that both Johnson and the informant had bad reputations in the law enforcement and judicial community for truth and veracity, or that Johnson was known to use questionable ethics in handling drug informants, including being overbroad in his probable cause and meeting with informants alone, or that Johnson had engaged in illegal acts including perjury and possible theft, all of which would have been admissible to impeach Johnson and the informant. Individually or cumulatively, this evidence would have led to §2255 relief.

## III.    RELEVANT FACTUAL BACKGROUND

On September 20, 1999, District 27 Drug Task Force Officer (TFO) Clint Johnson applied for a no-knock, nighttime search warrant to be served on Kenneth Barrett's residence and property.  The application was supported by TFO Johnson's sworn affidavit that on September 18, 1999, six days before the raid on Mr. Barrett's property, the informant contacted TFO Johnson and advised that:

> . . . .within the past seventy-two (72) hours, they were in the [Barrett] residence and observed [Mr. Barrett] present a quantity of a white powder substance and represent it as being "methamphetamine."
> The CI went on to state that while in the above described residence they observed Kenny Barrett divide and exchange a portion of the white powder substance for a quantity of money.

* * * *

The CI went on to state that while in the above described residence they overheard Kenny Barrett state "if the cops try to raid me they will regret it because I'm going to kill the first cop through the door."

The government refused to identify the informant until well into the federal proceedings, nearly five (5) years after the execution of the warrant.

On September 24, 1999, with the assistance of the Oklahoma Highway Patrol East Tactical Team, TFO Johnson and TFO Frank Lloyd, with other district law enforcement officers, set out to serve and execute the warrant. The OHP Tact Team's responsibility was to secure the premises after which the local Drug Task Force including DEA agents would conduct the search.

At approximately 12:30 a.m., a caravan of vehicles carrying Clint Johnson, Frank Lloyd and six deputies together with local public officials and other law enforcement met the OHP Tact Team at the intersection of Interstate 40 and Dwight Mission Rd. This location is approximately four (4) miles from Mr. Barrett's shack. The OHP requested that local law enforcement follow two minutes behind them to give OHP time to secure the premises. A total of five OHP vehicles, the first two unmarked, moved ahead to secure Mr. Barrett's premises.

At the time of the raid, Mr. Barrett and his son had just finished working on a car. Mr. Barrett was in his house eating a bowl of cereal. His son Toby was walking toward his grandmother's house when the first OHP vehicle entered the

east side of the property. A gun battle believed to have been initiated by automatic gunfire broke out. Shots were fired by Troopers John Hamilton and Ricky Manion, and Mr. Barrett. The gunfire lasted an estimated ten (10) seconds and ended in the death of Trooper Eales, non-life-threatening gunshot wounds to Trooper Buddy Hamilton's face and three gunshot wounds to Mr. Barrett's legs and hip. No drugs or drug lab were found on Mr. Barrett's property.

Mr. Barrett was first charged and tried for capital murder in the Oklahoma state courts. The state refused to identify the confidential informant but was required by the presiding judge to write the informant's name on a piece of paper and place it in a sealed envelope to be kept in the court file. Exhibit B. The first state trial ended in a hung jury. The second state trial resulted in a verdict of first degree manslaughter and aggravated assault, for which Mr. Barrett was sentenced by the jury to twenty and ten years, respectively.

Days before the statute of limitations ran on the drug trafficking charges, Mr. Barrett was charged by federal indictment with three counts of capital murder. CR 115, Doc# 9.

In federal court, Mr. Barrett, represented by his state court counsel, John Echols, once again moved for disclosure of the informant relied upon to secure the search warrant. The government opposed the request and the district court denied

the motion. Five years after the fact and two trials later, after voir dire in the federal trial began, the government advised the defense that the informant relied upon in the issuance of the search warrant was the declarant of Exhibit A.

The informant testified against Mr. Barrett, claiming to have been at his residence a "couple of days" before the issuance of the search warrant and to have observed a drug transaction. The informant testified he did not know that he was the informant on the search warrant at the time it was procured by Clint Johnson, but learned of this later. Cr 115 Doc#340, vol. 12, p. 2596. On cross examination, contrary to the assertions in the search warrant affidavit, the informant testified that when he went out to Mr. Barrett's house shortly before the raid, he saw guns but did not do or see any drugs other than a joint that he, his nephew and Mr. Barrett smoked, and that he reported the same to Johnson. See CR 115 Doc#340, vol. 12, p. 2623. After a break called by the AUSA Littlefield, *id.,* at 2631, the informant stated throughout his re-direct that he was uncertain of the times he had been to Mr. Barrett's and that he had observed drug activity. *See* CR 115 Doc#340, vol. 12, p. 2633. 2637. The informant admitted that Littlefield had talked with him during the break about the dates he was at Mr. Barrett's. *Id.*, at p. 2640-41. He testified, however, that they did not discuss the nature of his testimony.

Though six other drug informant witnesses testified against Mr. Barrett, none of them testified to having observed any drug activity by him in the days immediately preceding the issuance of the warrant. *See generally,* CR 115 Doc#324, Testimony of Randy Turman, vol. 2, pp. 363-392;  Doc#325, Testimony of Travis Crawford, vol. 3, pp. 450-488; Doc#336, Testimony of Randall Weaver, vol. 8, pp. 1834-1850; Doc#341, Testimony of Cindy Crawford, vol. 13, pp. 3058-3079; Doc#341, Testimony of Karen Real, vol. 13, pp. 3079 through Doc#342, vol. 14, p. 3136, and; Doc#343, Testimony of Brandie Price, vol. 15, pp. 3485-3511.

Mr. Barrett was convicted of all three counts. He was sentenced to death on Count 3, and life without possibility of release on Counts 1 and 2. This Court affirmed the convictions and sentences on direct appeal. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007).

In his 28 U.S.C. § 2255 Motion, Mr. Barrett alleged the government had in part violated his rights to Due Process under *Brady v. Maryland,* 373 U.S. 83 (1963) and *Napue v. Illinois,* 360 U.S. 265 (1959) by its late disclosure and non-disclosure of impeachment evidence related to all of the drug informant witnesses. CV 105 Doc#95, pp. 270-296.  Mr. Barrett also alleged misconduct in the government's failure to disclose material impeachment evidence regarding the

credibility of Clint Johnson and intimidation of witnesses by AUSA Michael Littlefield.  *Id.,* at pp. 297-303.

Mr. Barrett was denied an evidentiary hearing.  The district court denied relief on the *Brady/Napue* claims.  No COA was granted on the claims by the district court or this Court.

While this appeal has been pending, Mr. Barrett has discovered credible and admissible evidence that the informant lied in his trial testimony.  Exhibit A. Contrary to his testimony and the testimony of Clint Johnson, the informant had not been at the Barrett residence in the two to three weeks preceding the issuance of the search warrant – and certainly not within 72 hours before the search warrant's issuance – as sworn to by TFO Johnson.  Evidence proffered here shows the informant did not tell Clint Johnson or any law enforcement officer that he had been at Mr. Barrett's residence within 72 hours of the issuance of the warrant. Exhibit A.  The informant testified falsely against Mr. Barrett because AUSA Littlefield made promises to and threats against him and family.  *Id.* at 2. During the informant's trial testimony, Littlefield told the informant that he had to change his testimony, and he did so at the prosecutor's urging.  *Id.,* at 3.

While this appeal was pending, Mr. Barrett also acquired declarations from retired state judges that the informant was not a credible person. Had the judges

known the informant was the confidential informant on the search warrant application, it would have caused them concern. Exhibit B, Appendix 1. One of the state judges also knew that Clint Johnson had a reputation for questionable ethics and was not credible. Exhibit B. Other law enforcement officials have averred or told Mr. Barrett's investigator that at the time the search warrant was sought and secured, Clint Johnson was not a truthful person. Johnson was reputed to have engaged in illegal activities as well as failing to follow appropriate police practices in handling drug informants. *See* Exhibits C, D, Appendices 2, 4.

The newly acquired evidence of the informant's and TFO Johnson's perjury, and Johnson's known bad acts and poor reputation for truth and veracity, never disclosed by the prosecution, makes clear the government engaged in egregious prosecutorial misconduct to Mr. Barrett's prejudice. This matter should be remanded for consideration of this evidence.

## IV. LEGAL ARGUMENT

This Motion rests on *Carter v. Bigelow*, --F.3d--, 2015 WL 3462075 and *Douglas v. Workman*, 560 F. 3d 1156, 1173 (10th Cir. 2009). These cases hold the government has an ongoing, affirmative duty to disclose exculpatory evidence even during post-conviction proceedings, where a petitioner discovers new evidence supporting already-stated claims of prosecutorial misconduct as defined

by *Brady v. Maryland,* 373 U.S. 83 (1963) and *Napue v. Illinois*, 360 U.S. 264 (1959).

The only question before the Court in this Motion is whether Mr. Barrett is entitled to a remand to have the district court consider the Amended Petition in light of the new evidence of egregious prosecutorial misconduct. The United States Supreme Court's and this Court's precedents unequivocally hold that he is.

In *Mooney v. Holohan,* 294 U.S. 103, 112-13 (1935), the Supreme Court held that it is a violation of due process for the government to deliberately deceive judge and jury "by the presentation of testimony known to be perjured." In 1959, the Court held that due process is violated when the government knowingly offers false evidence that could have affected the outcome of the trial. *Napue v. Illinois*, 360 U.S. at 169. In *United States v. Agurs*, 427 U.S. 97, 103-04 (1976), the Court explained that *Brady v. Maryland, supra*, applies to "the discovery after trial of information which had been known to the prosecution but unknown to the defense." *Agurs*, 427 U.S. at 103. "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.*

In *Carter v. Bigelow*, *supra*, this Court found that a petitioner was entitled to amend or supplement his petition for writ of habeas corpus with additional facts supporting his "*Brady/Napue* Claims" discovered years after the original petition was filed. *Carter v. Bigelow*, *supra*, at *10. The issue before the Court was whether Carter had been diligent in his search for the suppressed evidence ultimately found to support misconduct claims. This Court found that Mr. Carter "was entitled to rely on the state's representation that 'all [exculpatory] evidence in any way relevant to the case and known to the State was included in police reports long ago made available' to him." *Id.,* at 9, quoting, *State v. Carter*, 888 P.2d 629, 636–37 (Utah 1995). Mr. Barrett is no less entitled.

Relying on this Court's earlier decision in *Douglas v. Workman, supra* at 1173, the *Carter* Court reaffirmed the core principle that the prosecution's obligation to turn over material exculpatory or impeachment evidence "continues throughout the judicial process." *Carter, supra,* at *10. The burden of discovery of prosecutorial misconduct does not fall on the petitioner. *Id.*

This Court's decision in *Douglas v. Workman, supra,* is even more on point. In *Douglas,* the state had successfully withheld exculpatory evidence for years. Douglas did not discover the misconduct until, like Mr. Barrett, his habeas appeal was pending. Nonetheless this Court "treat[ed] petitioner's suppression-of-

evidence claims as supplemental to his habeas petition." *Carter*, *supra* at *6, citing *Douglas,* 560 F. 3d at 1187.

The relevant inquiry here is whether (1) "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony"; (2) "the prosecution knew, or should have known, of the perjury"; and (3) "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs,* 427 U.S. at 103. *See also Giglio v. United States,* 405 U.S. 150, (1972) ("A new trial is required if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury.' " (quoting *Napue,*360 U.S. at 271)).

The evidence makes clear that Mr. Barrett's convictions and sentences rest on perjured testimony that the government knew was false. Exhibit A. The newly discovered evidence is material and relevant to Mr. Barrett's claims of prosecutorial misconduct. The record substantially supports the informant's declaration that the prosecutor told him to lie, which led directly to dramatically altered testimony. CR 115, Doc#340, vol. 12, p. 2630. *See generally*, Doc#339, vol. 11, pp. 2488-2541, Doc # 340, vol.12, pp. 2579-2652. The evidence goes to the heart of Mr. Barrett's §2255 Motion and the validity of the federal prosecution – *i.e.,* whether or not Mr. Barrett was, in fact, engaged in ongoing drug trafficking

activity justifying the issuance of the warrant. Clint Johnson swore under oath that the informant told him that he had seen drug trafficking activity at Mr. Barrett's residence, and heard threats by Mr. Barrett against the police shortly before the raid and within 72 hours of the affidavit being drafted.  CR 115, Doc 41, Ex 194.

This information was false. Without the circumstances justifying a no-knock, nighttime warrant, the tragedy of September 24, 1999, simply doesn't happen.  No middle of the night assault on Mr. Barrett's home would have occurred.  Mr. Barrett would have (and could have) been arrested peacefully on the outstanding warrant.[3]  OHP would not have been called upon, or agreed to assist, in the execution of the warrant. No shootout, death or injuries would have happened.  From beginning to end, Mr. Barrett's convictions and sentences are rooted in lies by law enforcement, propelled by the prosecutorial misconduct of undisclosed promises and threats, intimidation of witnesses, and subordination of perjury.

Mr. Barrett has been plagued by multiple prosecutions with multiple informants who are encouraged (or threatened) by law enforcement to commit perjury.[4]  That fact alone compels at the very least a remand and hearing on Mr.

---

[3] S*ee e.g.,* Appendix 5, Declaration of Gary Philpot.
[4] It is significant that the government's case for the underlying drug crimes rested on perjured testimony. In the state trials, a similar effort was made to prove Mr.

Barrett's claims in light of the newly discovered evidence. The informant's testimony is at the heart of this prosecution, serving to justify an illegal no-knock, nighttime warrant and the allegations that Mr. Barrett's conduct on September 24, 2999, was part and parcel of both drug trafficking activity and of his claimed intent to kill a police officer.

The informant's testimony was perjured. [5] There is little question that the perjured testimony, including that Mr. Barrett was dealing methamphetamine and threatened law enforcement at a time very close to the assault on his home, likely "could have affected the judgment of the jury." *Agurs,* 427 U.S. at 103. First, the facts go directly to the central issue of intent. Second, Mr. Barrett was not convicted of capital murder in state court. And finally, had the jury known the tactics used by the prosecution to threaten the informant, it is likely that it would have found other government witnesses and evidence incredible, as well. As a result, the jury would reasonably have determined the death of Trooper Eales was

---

Barrett was engaged in drug activity through witness Steven Smith, but the perjury was immediately revealed by effective cross-examination. *See State v. Barrett,* Sequoyah County Case No. CF-99-493, RT vo. 17, pp.1-39.

[5] This falsehood, coupled with the intimidation practiced on the informant, the failure to disclose his complete criminal history, and the hidden deals and/or promises to this informant and the other informants, including Travis Crawford, (DC Doc 403, Exh. 45), and Cindy Crawford (DC Doc.403, Exh.14), establish clear prejudice to Mr. Barrett by the misconduct. See also, DC Doc 95 pp. 170-220.

not the result of any criminal intent on Mr. Barrett's part, and certainly would not have sentenced Mr. Barrett to death.

## V. POSITION OF OPPOSING PARTY

Pursuant to Fed.R. App. P. Local Rule 27.3, David Autry, counsel for Mr. Barrett, contacted government counsel Jeffrey Kahn by phone on July 6, 2015. Mr. Kahn advised that the government opposes this motion.

## VI. RELIEF REQUESTED

Mr. Barrett respectfully requests that this Court stay the pending appeal and remand to the district court with instructions to consider the newly discovered evidence in support of the prosecutorial misconduct claims raised in the Amended Motion to Vacate.

DATED this 6th day of July, 2015

Respectfully submitted,

 /s/ *David B. Autry*
DAVID B. AUTRY, OBA No. 11600
Attorney at law

/s/ *Joan M. Fisher*
JOAN M. FISHER, ISB No.2854
Assistant Federal Defender

Attorneys for KENNETH EUGENE BARRETT

**CERTIFICATE OF DIGITAL SUBMISSION**

I certify that all required privacy redactions have been made and, with the exception of those redactions, every document submitted in digital form or scanned PDF format is an exact copy of the written document filed with the Clerk. I further certify that the ECF submission was scanned for viruses using Systematic Endpoint Protection, updated, March 24, 2015, and according to the program is free of viruses.

 /s/ *Joan M. Fisher*

## CERTIFICATE OF ELECTRONIC FILING AND SERVICE

This is to certify that on this 6th day of July, 2015, I caused the foregoing Motion

to Remand to be filed with the Clerk of the Court of Appeals using the ECF System for

filing and with service to be made electronically on the following ECF registrants:


Jeffrey B. Kahan,
United States Department of Justice,
jeffrey.kahan@usdoj.gov,

Christopher J. Wilson,
Assistant United States Attorney,
chris.wilson@usdoj.gov

Linda Epperley
Assistant United States Attorney
linda.epperley@usdoj.gov
United States Department of Justice,
Eastern District of Oklahoma,

To the undersigned's knowledge, there are no non-ECF
registrants who are counsel in this case.

Dated:  July 6,  2015


/s/ *Joan M. Fisher*
Joan M. Fisher, ISB No. 2854
Assistant Federal Defender
Office of the Federal Defender
801 I Street, Third Floor
Sacramento, CA 95814

# APPENDIX 1

# DECLARATION OF HON. DENNIS M. SPROUSE, RET'D.

I, Dennis M. Sprouse, a person over eighteen and competent to testify, declare as follows:

1. I am a former Associate Judge of the District Court of Sequoyah County, and currently serve as an adjunct professor at the University of Arkansas at Fort Smith.

2. I became a judge in 1986 and retired in December 2014.

3. On the 20th day of September 1999 at the request and upon the affidavit of Clint Johnson, a District 27 Drug Task Force agent, I issued an anytime, no-knock search warrant, authorizing the search of the home of Kenneth Barrett based upon an affidavit, which relied upon information given by a confidential informant. I did not know, nor did I inquire about, the identity of the confidential informant who purportedly gave the information to Clint Johnson concerning Kenneth Barrett.

4. I recently learned that the confidential informant's name was revealed in the course of Mr. Barrett's federal trial and that his name is Charles (Monk) Sanders, whom I knew to have a poor reputation for truth and veracity in and around 1999.

5. Had I known that the confidential informant whose information materially established the basis of the no-knock search warrant was Mr. Sanders, it

would have given me cause to pause before signing the warrant. Mr. Sanders was always getting into trouble. I would have had to think through whether or not I could believe the substance of the affidavit based upon Mr. Sander's' statements. My choices then would have been to not sign it or to put the affiant Clint Johnson under oath and record my questions and his answers, and then to decide one way or the other

6. I declare, under penalty of perjury, that the foregoing 2-page declaration is true and correct to the best of my knowledge.

Executed on this 26ᵗʰ day of March 2015 in Sequoyah County, Oklahoma.

DENNIS M. SPROUSE, District Judge, Ret'd

# APPENDIX 2

# DECLARATION OF LARRY BLOUNT

Larry Blount, a person over the age of eighteen and competent to testify, declare the following:

1. I am a former police officer for the Sallisaw Police Department in Sallisaw, Oklahoma. I served as a police officer in Sallisaw for 20 years, during which time I was trained and tasked with drug enforcement, among other responsibilities.

2. In my capacity as a law enforcement officer in the enforcement of drug activity and public corruption, I also worked directly with the FBI.

3. As a result of my training, experience and observations of the drug activity in Sallisaw and the surrounding area, I can and do attest to the following.

4. As part of my responsibilities as a law enforcement officer in enforcing the drug laws of the state of Oklahoma, City of Sallisaw, I became very familiar with a number of the practices and activities of the law enforcement officers from the Sallisaw Police Department, state agencies including Oklahoma Bureau of Narcotics, County Sheriff Officers and the District 27 County Multi-County Drug Task Force, as well as the agents working in drug enforcement for those agencies.

5. In my capacity as a law enforcement officer charged with drug investigations and enforcement, I also became very familiar with the persons known to be engaged in drug use, possession, manufacture and delivery and came to handle a number of those people as confidential informants ["CI"] from whom I would receive reliable and credible information in the course of my law enforcement responsibilities.

Declaration of Larry Blount -1

6. As a result of my lengthy experience and observations in my capacity as law enforcement officer, I became very familiar with both Clint Johnson and Frank Lloyd and their methods and practices of drug enforcement in the Sallisaw, Sequoyah County and surrounding areas.

7. In the course of my experience as a law enforcement officer in Sallisaw, Oklahoma, I also became very familiar with allegations of significant drug activities by a person known as Kenneth Barrett.

8. I was one of the local officers involved in the sale of 1/4 gram of methamphetamine by Kenneth Barrett to Kevin Ottwell with a confidential informant. Frank Lloyd and I were charged with providing back up for Oklahoma Bureau of Narcotics (OBN) agent Ottwell and his partner, who was usually Agent Earl *Beavers*, but on this day was Agent Robert Jerome. Jerome rode with Ottwell.

9. Lloyd and I, who were in the same vehicle, were following Ottwell's vehicle but we lost them *after I got a flat tire*, I knew well where Barrett's cabin was so we continued in that direction when able. By the time we caught up with Ottwell *was already on the way back and* the sale had already been accomplished. I think I recall Ottwell showing me the drugs.

10. Although I did not witness it, I firmly believe that this drug transaction was completed in the manner described by Agent Ottwell because I had worked with Agent Ottwell on other occasions and found him to be a truthful and credible person. Over the years, I had come to trust him.

Declaration of Larry Blount  -2

11.  Sallisaw is a very corrupt town. Though there certainly were honest cops there, there are many who were untrustworthy and unprincipled in their drug enforcement activities.  Among them are Clint Johnson and Frank Lloyd.

12.  You don't have to be a crooked cop to make drug arrests. There are plenty of good drug arrests to make in Sequoyah County and honest cops ready to make them.  When you are a drug enforcement officer working the streets, all you have is your integrity. I kept mine.  Clint Johnson and Frank Lloyd did not.

13.  As a result of my work in Sallisaw with many different agencies, officers and confidential informants, I came to know the people you could trust and the ones that you couldn't.

14.  Johnson's reputation preceded his hiring by the Drug Task Force. In his prior job with Sequoyah County, he already had reputation for not doing things by the book, for stretching the truth.

15.  Although I actively supported Frank Lloyd's hire and advancement, he, too, turned out not be a trustworthy law enforcement officer.

16.  My experience and observations made clear that I could not and therefore, did not trust either Clint Johnson or Frank Lloyd. They had reputations for dishonesty and for being over-zealous in their law enforcement activities.  Many of their arrests that utilized confidential informants were questionable.  For example, I always searched my confidential informants for drugs before allowing them to make a buy.  They did not. If one of my informants got busted for doing something on their own, I did not come to

Declaration of Larry Blount   -3

their rescue. Johnson and Lloyd protected their informants even when they went rogue or were known to be dishonest.

17. Because of the information I possessed and the reputations of both Johnson and Lloyd, I never passed on information to either one of them.

18. Drugs often went missing when Chief Gary Philpot was involved. Several women who were arrested by Chief Philpot credibly told me and other officers that Chief Philpot would take them to a Baptist Church parking lot and demand sexual favors. Although I reported this to the appropriate authorities on several occasions, no action was ever taken. I subsequently reported these activities to officials of the federal government.

19. Gilbert (Boss) Green was one of the wealthiest people in town. He was the subject of many investigations by me and by federal authorities. As part of those investigations, I often followed Boss Green. He purchased drugs from numerous dealers and manufacturers and was a known major player in the meth trade in Sallisaw.

20. I arrested Boss Green myself on three occasions, once for drugs and twice for weapons. He was never prosecuted. The drugs and a weapons arrest were *in 14 Sg* expunged. I was told to destroy the lab results, which I did not do.

21. Instead, when I retired, I sent the lab results to the Oklahoma Bureau of Narcotics. The decision not to prosecute Green was first made locally and then made at the highest level of the state, at the Oklahoma Attorney General's office. Nobody ever told me why, but I understood that he was too politically powerful to prosecute.

Declaration of Larry Blount  -4

22. On occasion, in the course of an investigation, I followed Boss Green to Ken Barrett's residence. There is no reason for someone as rich as Boss go to Barrett's but to buy drugs, presumably for the many young girlfriends he had, some of whom he kept in houses he owned, although he was married and still lived with his wife.

23. Although I made numerous reports about my suspicions of illegal drug activity by Samuel Valdivia, a trainer at the Blue Ribbons Downs racetrack, to Sheriff John Philpot, nothing was ever done until the DEA became involved. Finally, in 2006, when John Philpot was no longer sheriff, Samuel and his wife Rhonda Valdivia, who is related to John and Gary Philpot, and Paul Philpot, Travis E. Philpot and former County Commissioner Hoyt W. Philpot, among others, were charged with transporting throughout the United States and Mexico thousands of pounds of cocaine and marijuana in Valdivia vehicles and horse trailers.

24. Informants often told me previously about purchasing drugs from Kenneth Barrett. I always passed on that information to Sheriff John Philpot. No charges were ever filed. I do not know why.

25. It was well known in the community that when law enforcement previously attempted to arrest Barrett at his home, he ran to his mother's house and hid, and later turned himself in.

26. As for Rocky Eales dying. I am so sorry for him and his family, and I would not shed a tear if Barrett died for it. But still I can't believe it went down that way. It makes no sense. Whether the Oklahoma Highway Patrol Tac Team had their lights on or not, they knew they were driving onto the property in the middle of the night of a

Declaration of Larry Blount   -5

known meth addict who was known to be heavily armed and possessed night vision glasses.

27. I have been on raids with John "Buddy" Hamilton before. I know he knew better.

I declare, under penalty of perjury, that the foregoing six-page declaration is true and correct.

Executed by me this _18_ day of _Dec._, 2014, in Sequoyah County, Oklahoma.

Larry Blount

Declaration of Larry Blount  -6

# APPENDIX 3

# DECLARATION OF LEONARD POST

I, Leonard Post, a person over eighteen (18) and competent to testify, mindful of the penalties of perjury, declare as follows:

1. I am a licensed investigator retained by the Federal Defenders Office of the Eastern District of California to assist in a postconviction investigation on behalf of Kenneth Eugene Barrett, a person convicted of capital murder in the Eastern District of Oklahoma and currently under sentences of death and life without possibility of parole.

2. On May 2, 2015, I interviewed Juan Beal a person over the age of eighteen (18) and competent to testify at his home in Del City, Oklahoma.

3. The following is a true and correct accounting of the statements made to me on that date by Juan Beal.

Mr. Beal had known David "Rocky" Eales since Rocky was a police officer in Mid City, OK, while Mr. Beal was so employed in Del City, adjoining communities on the outskirts of Oklahoma City. They were friends.

Mr. Beal retired from the DEA and the Pittsburg sheriff's dept. in 2003 after a serious vehicular accident. He drove the special truck that was equipped with Biohazard equipment for searches of suspected drug labs. He then worked for the Dist. 27 Drug Task Force ["DTF"] from 2007-2012.

1

Mr. Beal says Frank Lloyd has animosity toward Mr. Beal because he got Lloyd fired when Brian Kuester beat Jerry Moore in the District 27 District Attorney's election. Under Moore, Frank Lloyd had had the power that the first assistant district attorney should have had, and he abused it. When Lloyd complained to Moore that the first assistant was demanding monthly audits, the audits were terminated. When Mr. Beal took charge after Lloyd was let go, Mr. Beal instituted audits. Mr. Beal believes Monk Sanders is a cousin of Frank Lloyd. According to Mr. Beal, Lloyd walked on a razor blade between legal and illegal conduct.

Mr. Beal advised that if Clint Johnson told him the sun was out that he would have to look out the window to see for himself because he did not trust him at all. Lloyd and Johnson are the only people in law enforcement he knew of who met with their CI's individually without a second officer present. They had their own CI's and met them separately. Lloyd and Larry Lane are very close and neither is honest.

Karen Simms was the Drug Task Force secretary and knows a lot. She still works for the D.A.'s office in Sallisaw. Simms has control of the C.I. packets, which are kept on the third floor of the courthouse in one of three unused offices that were once part of the county jail that was located there.

Lloyd has two secret rooms in his house, one upstairs in his bedroom with an escape route, and one in which he stores old DTF files and reports.

According to Mr. Beal, District Attorney Diane Barker-Harrold thrived on publicity. There was glory in kicking down doors. There was "no glory" in announcing themselves and saying "Ken Barrett come out." She was all about glory.

Mr. Beal was notified of the raid on Kenneth Barrett's place probably the day before. His DEA team was supposed to be there to conduct the search of the premises after Ken Barrett was arrested. It had been scheduled for 6 A.M. Mr. Beal got a call from Lloyd at 10 PM saying it was moved up to midnight. Mr. Beal told him he could not get the truck and team together by that time. Lloyd said they would go ahead with it anyway, that they had to do it "tonight." The next call he got was a call from Lloyd saying Rocky had been killed and Barrett shot. Mr. Beal had had a gut feeling that a nighttime raid made the risk higher. He would "not have done it at midnight, period." The call came from Lloyd because Beal was the liaison between the DTF and the DEA.

Upon arriving at the crime scene, Beal was kept outside the crime scene tape. He recalls crying and waiting to go in. OSBI had to get a new search warrant

to conduct a search for the homicide investigation. Once they were done, Diane Barker-Harrold asked "us to conduct the search."

When officers conducting a search find an address book (or a cell phone), they call it the "Golden Fleece;" because it will often give the names of suppliers and buyers. There should be a copy of the address book found in the search incident to the warrant in the case file, circa 1999. According to Mr. Beal, there is a DEA file, approximately six to eight inches thick.

Mr. Beal could not recall why he requested the address book from the evidence room. He was positive he would not have requested it had he not been asked to – that he would not risk "[messing] up the evidence." Mr. Beal had no independent recollection of finding the straw that showed a residue of methamphetamine.

When asked how we could find out if the address book had been removed prior to his removing it, Mr. Beal advised that non-drug evidence is stored in a locked repository in the basement in McAlister. He said he would have needed to sign a log to get it. He said he also gets a receipt when he signs something out and the copy goes in the Barrett non-drug evidence file. The case # would begin MG, followed by the year and the case file #. All the receipts should be together. Mr. Beal described the DEA files on cases as follows:

DEA 6 – is a case report

DEA 7 – drug evidence report

DEA 7-A non-drug evidence report

The DEA 7 reports may not include who found a specific piece of evidence, but the DEA 6 would.

Mr. Beal repeated that he would "not have done it on his own," *i.e.,* that he would not have signed out the address book unless there was a specific request. Typically he would have slit open the envelope and later put it back in the slit bag and put that bag in a new one.

According to Mr. Beal, the prosecutor Michael Littlefield and Clint Johnson were very close and neither was trustworthy. Though Mr. Beal was excluded from the courtroom when the state trials were in session, he was around most days as he always had business with the Drug Task Force. Mr. Beal got the state prosecutors whatever they needed in the Barrett case, mostly evidence.

At the conclusion of the second trial, OHP people were coming to Mr. Beal more than before to get the federal prosecutors to take the case and charge it as a capital offense, so Mr. Beal "poured gasoline on the fire." He sent the United States Attorney for the Eastern District of Oklahoma, Sheldon Sperling, an e-mail from neither Beal's official nor his home computers. Beal would not say what

computer it was from, but he did say that he did not want to leave any trail behind. He did not save a copy. He tried to "shove" Sperling into taking the case. Darren Lane was assigned to investigate whether to prosecute the case federally. They didn't assign Beal because he was a federal officer and was intimately involved in the state case.

Right after the shooting, OHP investigators asked to interview the C.I. for the Barrett search and arrest warrants. Johnson, Lloyd and Diane Barker-Harrold refused. That refusal angered everyone in OHP and in law enforcement and they not only did not support Diane' in her re-election bid, but they worked against her.

4. I have no reason to believe that Agent Beal, if called to testify, would not testify as set forth above.

I declare under penalty of perjury that this six-page declaration is true and correct.

Executed by me this 24th day of June, 2015 in New York County, New York.

Leonard Post
NYS Investigator's License #110001455413

# APPENDIX 4

# DECLARATION OF LEONARD POST

I, Leonard Post, a person over eighteen (18) and competent to testify, mindful of the penalties of perjury, declare as follows:

1. I am a licensed investigator retained by the Federal Defenders Office of the Eastern District of California to assist in a postconviction investigation on behalf of Kenneth Eugene Barrett, a person convicted of capital murder in the Eastern District of Oklahoma and currently under sentences of death and life without possibility of parole.

2. On or about May 2, 2015, I interviewed Earl Beaver, an agent with the Oklahoma Bureau of Narcotics ["OBN"] in Tulsa, OK.

3. The following is a true and correct accounting of Earl Beaver's statements to me.

    a. Earl Beaver is an agent with the OBN and has been an agent with OBN since 1983 when he began his career in law enforcement.

    b. In the late 1990s or in early 2000, Michael Reese then of the Cherokee County Sheriff's office and Clint Johnson of the District 27 Drug Task Force were temporarily tasked to OBN. As part of their

duties, they – Beaver, Reese and Johnson – went on marijuana missions, including flyovers looking for outdoor marijuana growers.

c. On one occasion during this time period, they were on a mission in a helicopter when Clint Johnson reported that he thought he knew where there were some plants growing. OBN did a flyover and there was a patch of marijuana growing behind the house described by Johnson on Coffee Hollow Road in Tahlequah, Oklahoma.

d. In the course of his regular duties as an agent for OBN, Agent Beaver was told that when the house was raided, a triple beam balance scale, commonly used by drug dealers to weigh drugs to prepare them for sale, was found, and that OBN suspected those scales came from the District 27 District Attorney's Office, the office for which Mr. Johnson worked. Agent Beaver later learned that Mr. Johnson had previously and fairly recently lived with his wife on those same premises and that relatives of Johnson's lived in that house at the time of the raid.

e. Though Agent Beaver was not privy to the conversation OBN had with Mr. Johnson, he knows that such a conversation took place when the OBN attempted to investigate the source of that scale. Agent

Beaver does not know the results of that investigation and does not know if the report of that investigation still exists

4. I have no reason to believe that Agent Beaver, if called to testify, would not testify as set forth above.

I declare under penalty of perjury that this three-page declaration is true and correct.

Executed by me this 24th day of June, 2015 in New York County, New York.

Leonard Post
NYS Investigator's License #110001455413

# APPENDIX 5

# Declaration of Gary Philpot

I, Gary Philpot, a person over eighteen (18) and competent to testify, declare as follows:

1. I am a former police chief for the City of Sallisaw and was part of the entourage of law enforcement people who trailed behind the Oklahoma Highway Patrol in the execution of a search warrant on the residence of Kenneth Eugene "Kenny" Barrett that took place soon after midnight on September 24, 1999.

2. I was there because my brother, Johnny Philpot, who was then the Sequoyah County Sheriff, asked me to be. We often helped each other out in that way.

3. I have known Kenny Barrett and his family most of my life. I think I could have gone out to Kenny Barrett's house and arrested him myself without incident had I had a lawful order to do so, depending on his mood and condition. If it looked like he was on drugs and upset or angry, I would have more than likely waited for a more appropriate time. There was never any animosity between Kenny and me.

4. Though I was never told point blank, having gathered information in the days and weeks following the raid, it is my understanding that the



reason for the raid was so that the troopers could practice executing a nighttime no-knock warrant.

I declare, under penalty of perjury, that the foregoing declaration is true and correct to the best of my knowledge.

Executed this _1st_ day of May 2015 in Sequoyah County, Oklahoma.

Gary Philpot